UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE, on behalf of
themselves and all others similarly situated,

       Plaintiffs,                 File No.

v.

                                       Hon.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

       Defendants.

_____

**<u>VERIFIED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

JURISDICTION AND VENUE ............................................................7

PARTIES ...............................................................................................7

    Plaintiffs .........................................................................................7

        John Doe A ..............................................................................7

        John Doe B .............................................................................10

        John Doe C .............................................................................13

        Mary Doe ...............................................................................15

        Mary Roe ...............................................................................18

        John Doe D .............................................................................20

        John Doe E .............................................................................23

        John Doe F .............................................................................25

        John Doe G .............................................................................27

        John Doe H .............................................................................28

    Defendants ....................................................................................30

FACTUAL ALLEGATIONS .................................................................31

I.   HISTORY AND BACKGROUND ................................................31

    History of the Michigan Sex Offenders Registration Act ...............31

    The *Does I* Litigation ...................................................................35

    The *Roe* Litigation .......................................................................37

    The *Does II* Litigation .................................................................39

    The *Betts* Litigation......................................................................42

    The Legislature Adopts SORA 2021, Which Makes Only Minor Changes to the Statute.........................................................................43

II.  SORA 2021 DOES NOT PROMOTE PUBLIC SAFETY ...........48

    SORA 2021 Is Counterproductive Because It Is Likely to Increase Rather than Decrease Sexual Offending.........................................49

SORA 2021 Misidentifies the Source of the Risk for Sexual Offending.......51

SORA 2021 Undermines Successful Reentry ...................................................52

SORA 2021's Onerous Registration Requirements  Serve No Legitimate
Public Safety Purpose ......................................................................................53

III. SORA 2021 SUBJECTS PEOPLE TO REGISTRATION WITH NO
INDIVIDUALIZED REVIEW, EVEN THOUGH MANY HAVE A
LOWER RISK OF SEXUAL OFFENDING THAN UNREGISTERED
PEOPLE ...........................................................................................................54

The Average Recidivism Rate of People with Past Sex Offenses Is Low .....54

Comparing the Likelihood that Registrants Versus Non-Registrants Will
Reoffend...........................................................................................................56

The Likelihood of Reoffending Varies Greatly Among People with Past
Sex Offenses ....................................................................................................57

The Likelihood of Reoffending Drops Dramatically Over Time ..................59

Empirically Validated Individualized Risk Assessment Tools Are Much
More Effective Than the Offense of Conviction in Assessing the
Likelihood of Reoffending...............................................................................65

SORA 2021's Conviction-Based Registration Requirements and
Conviction-Based Tier Assignments Do Not Correspond to Risk ................67

The Named Plaintiffs Are Very Unlikely to Reoffend...................................70

The Vast Majority of Class Members Will Never Reoffend, and Thousands
of People Who Are Subject to SORA 2021 Are Less Likely to Commit a
Sex Offense Than People Who Are Not Subject to Registration ..................74

IV. THE DIGITAL AGE HAS FUNDAMENTALLY CHANGED THE
CONSEQUENCES OF BEING SUBJECTED TO SEX OFFENDER
REGISTRATION .............................................................................................76

Michigan's Public Sex Offender Registry Is Unlike a Criminal Records
Archive.............................................................................................................76

The Impact of Sex Offender Registration Today Is Entirely Different
From What It Was Two Decades Ago..............................................................84

The Ubiquity of Registry Information on the Internet Causes Registrants to
Live in Fear and to Avoid the Internet, with Damaging Consequences to
Reentry .............................................................................................................86

V.  SORA 2021 IMPOSES DEVASTATING BURDENS ON THE
    NAMED PLAINTIFFS AND THE CLASS...................................................88

    Compelled Speech ..................................................................................89

    Ongoing Reporting, Surveillance, and Supervision .......................96

    Limitations on Access to Housing ..............................................101

    Limitations on Access to Employment .......................................104

    Limitations on Access to Education ............................................113

    Limitations on Travel...................................................................115

    Limitations on Speech and Use of the Internet............................120

    Public Stigmatization, False Information, and Social Engagement ............127

    Criminal Enforcement of SORA...................................................130

    Vagueness ....................................................................................130

    Additional Consequences Resulting from Registration Under SORA
    2021..............................................................................................143

VI. SORA 2021 IS VERY EXPENSIVE, HAS UNINTENDED
    CONSEQUENCES, AND DIVERTS RESOURCES FROM
    INTERVENTIONS THAT ACTUALLY WORK .....................................146

    SORA 2021 Costs Millions .........................................................146

    SORA 2021's Costs Far Exceed SORNA-Related Grant Funding .............148

VII. SORA 2021 CONTINUES TO RETROACTIVELY APPLY THE
    2011 AMENDMENTS .................................................................151

VIII. REGISTRATION IS INTERTWINED WITH THE CRIMINAL
    JUSTICE PROCESS AND IS CENTRAL TO PLEA NEGOTIATIONS...155

IX. SORA 2021 IMPOSES EXTRAORDINARY BURDENS OUT OF
    ANIMUS TOWARD PEOPLE WITH PAST SEX OFFENSES .................156

CLASS ALLEGATIONS ........................................................................159

CLAIMS FOR RELIEF............................................................................166

COUNT I: Retroactive Imposition of Punishment................................166

COUNT II: Retroactive Extension of Registration Terms....................168

COUNT III: Lack of Individualized Review ........................................169

iv

COUNT IV: Unequal Opportunity to Petition for Removal ...............................172

COUNT V: Mandatory Reporting Requirements and Compelled Speech .........177

COUNT VI: Violation of Plea Agreements ......................................................179

COUNT VII: Sex Offender Registration of People Who Did Not Commit a
    Sexual Offense ........................................................................................181

COUNT VIII: Vagueness ................................................................................184

COUNT IX: Compelled Admission of "Understanding" SORA 2021 ..............184

COUNT X: Reporting Requirements Restricting Speech and Association ........186

Lack of a Legal Remedy .................................................................................188

REQUEST FOR RELIEF..................................................................................188

## INTRODUCTION

1.   For almost a decade, courts have repeatedly held Michigan's Sex Offenders Registration Act (SORA),[1] M.C.L. § 28.721 *et seq.*, to be unconstitutional. *See Does #1-5 v. Snyder*, No. 12-cv-11194 (E.D. Mich.) (*Does I*); *Roe v. Snyder,* No. 16-cv-13353 (E.D. Mich.); *Does #1-6 v. Snyder*, No. 16-cv-13137 (E.D. Mich.) (*Does II*); *People v. Betts*, __ N.W.2d __, 2021 WL 3161828 (Mich. July 27, 2021).

2.   Despite these rulings, the State of Michigan continued to enforce a statute Defendants knew to be unconstitutional. Finally, faced with the imminent entry of a class-wide permanent injunction in *Does II* barring enforcement of major portions of SORA, the 2020 lame duck legislature made minor amendments to the law. But the legislature left intact the core constitutional defects of the law—which continues to impose extensive burdens, in most cases for life, without any individualized assessment of whether such burdens are justified—forcing Plaintiffs here to return to the courts to vindicate their rights.

3.   In 2012, six plaintiffs—four of whom are also plaintiffs here[2]—first challenged SORA in *Does I*. After years of litigation, and based on an extensive record,

---

[1] When referring specifically to the version of SORA that went into effect on March 24, 2021, Plaintiffs use the term "SORA 2021." When referring to prior versions of the statute, Plaintiffs use "old SORA." When referring to Michigan's registration statute more generally, Plaintiffs simply use "SORA."

[2] Plaintiffs John Doe A, B and C, and Mary Doe were plaintiffs John Doe #1, 3, 4, and Mary Doe in *Does I*.

Judge Robert Cleland in 2015 held portions of the statute unconstitutional on due process and First Amendment grounds. *Does #1-5 v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015); *Does #1-5 v. Snyder*, 101 F. Supp. 3d 722 (E.D. Mich. 2015). On appeal, the Sixth Circuit Court of Appeals held that SORA imposes punishment and that the retroactive application of SORA's 2006 and 2011 amendments violates the U.S. Constitution's Ex Post Facto Clause. *See Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016), *cert denied,* 138 S. Ct. 55 (2017).

4.  Defendants ignored the Sixth Circuit's and the district court's decisions, and simply continued to subject tens of thousands of other Michigan registrants to SORA.

5.  Further litigation ensued. In *Roe v. Snyder*, 240 F. Supp. 3d 697 (E.D. Mich. 2017) (Goldsmith, J.), plaintiff Mary Roe—who is also Plaintiff Mary Roe in this case—had to go to court to protect herself from prosecution under SORA in order to keep her job, even though the Sixth Circuit had already held that the provision barring her employment was unconstitutional. But even after Ms. Roe secured an injunction protecting her from prosecution, the state simply continued enforcing SORA against everyone else.

6.  Six new plaintiffs—five of whom are also Plaintiffs in this case[3]—then

---

[3] Plaintiffs John Doe D, E, F, G, and H were plaintiffs John Does #1, 3, 4, 5, and 6 in *Does II*.

challenged the state's continued application of the unconstitutional statute in a class action lawsuit which sought to enforce the *Does I* decisions on behalf of all Michigan registrants. *Does #1-6 v. Snyder*, No. 16-cv-13137 (E.D. Mich. 2016) (Cleland, J.) (*Does II*). The Court repeatedly deferred its decision to allow the legislature time to revise the law. When the legislature failed to do so, the Court granted summary judgment to plaintiffs on all counts in February 2020, but deferred entry of judgment to give the legislature one last chance to act. *Does #1-6 v. Snyder*, 449 F. Supp. 3d 719, 737–39 (E.D. Mich. 2020).

7. Faced with entry of a permanent injunction against much of the old SORA, the legislature finally responded. Although a work group of stakeholders (including representatives from law enforcement, prosecutors, corrections, survivors' groups, the governor's offices, legislative staff, and the American Civil Liberties Union of Michigan (ACLU)) had been working for more than a year to craft a law that would be both constitutional and evidence-based, the legislature ignored those efforts. Instead, it pushed through Public Act 295 of 2020, which the governor signed, and which took effect on March 24, 2021.

8. SORA 2021 makes only minor changes to Michigan's registry which fundamentally constrains the lives of some 45,000 Michiganders, as well as almost 10,000 people now living out of state. Like its predecessor, SORA 2021 imposes a vast regime of restrictions, including continuous reporting and public shaming, that

3

affect virtually every facet of registrants' lives, in most cases for life.

9.  SORA 2021 continues to impose life-altering burdens without any individualized assessment or review. SORA 2021 continues to treat all registrants—regardless of the circumstances of their offense, the passage of time, their age, their rehabilitation, their health, or their cognitive and physical abilities—as if they pose a high and irremediable risk to public safety. And SORA 2021 brands everyone on the public registry as a current threat to the community without any evidence that they are.

10. SORA 2021 continues to categorize registrants into three tiers, which determine the frequency of reporting and periods of registration (15 years, 25 years, or life). Tier classifications are based solely on the offense of conviction, without any assessment of risk. For the vast majority of registrants, there is no path off the registry: the only way to come off the registry is to die.

11. SORA 2021 keeps intact nearly all of the 2011 amendments—which the Sixth Circuit held violated the Ex Post Facto Clause—including the 2011 amendments that retroactively extended registration terms for approximately 17,000 people from 25 years to life. SORA 2021 continues to apply those provisions retroactively to all pre-2011 registrants.

12. SORA's extensive supervision requirements, which include reporting of vast amounts of information often within three business days, remain almost

unchanged. Indeed, in some respects the new law adds even more onerous reporting requirements (e.g., requiring more information about internet identifiers, phones, and vehicles). Although some changes can now be reported by mail, others still must be reported in person, leading to great confusion among registrants and law enforcement alike about how to report different types of information.

13. SORA 2021 continues to brand registrants as dangerous, without any determination of risk or consideration of individual circumstances, by placing nearly all of them on the public registry, with the predictable result that they lose housing and employment opportunities and are shunned in their communities.

14. SORA 2021, like its predecessors, also ignores the scientific consensus that registries do not work. Broad conviction-based registries like Michigan's are completely ineffective at reducing recidivism, and indeed may *increase* offending by sabotaging the ability of people to obtain housing, employment, and family support that are critically important for them to lead productive lives.

15. The research also shows that the vast majority of those convicted of a sex offense will never commit another sex offense. There is wide variation in risk levels among people with past sex offenses, and the nature of a past conviction—which determines registration requirements in Michigan—does not correlate with re-offense risk, unlike empirically validated risk instruments.

16. Actuarial research using empirically validated instruments shows that

some registrants already have a *lower* risk of reoffending—upon their return to the community—than the risk of males in the general population who are not subject to registration. After ten years offense-free in the community, most registrants will have a lower risk of reoffending than other unregistered males will have of committing a first-time sex offense. After 20 years, even registrants who were initially at highest risk no longer pose any more risk of committing a sex offense than do other unregistered males.

17. Because SORA 2021 carries over the 15, 25-year, and lifetime registration periods of the prior law, and fails to provide individualized review of registrants' *actual current risk*, the law subjects thousands, and possibly tens of thousands, of people to sex offender registration requirements even though they have lived in the community successfully for years and pose no more risk of committing a new sex offense than males who are not required to register.

18. In sum, SORA 2021 suffers from the same constitutional problems as the previous law because the basic structure of SORA 2021 remains unchanged. The legislature's tinkering with the statute does little to address the heart of the Sixth Circuit's objections to the law, namely that it treats people as dangerous "without any individual assessment" and subjects everyone to the same onerous reporting requirements—most for decades or for life—despite "scant evidence" that such restrictions make communities safer. *Does I*, 834 F.3d at 705.

19. Plaintiffs, on behalf of themselves and all others similarly situated, seek declaratory and injunctive relief for violations of their constitutional rights.

## JURISDICTION AND VENUE

20. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs seek redress under 42 U.S.C. § 1983 for the deprivation of rights secured by the U.S. Constitution.

21. Plaintiffs' requests for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–2202, by Fed. R. Civ. P. 57 and 65, and by the legal and equitable powers of this Court.

22. Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

### Plaintiffs[4]

### John Doe A

23. Plaintiff John Doe A resides in Wayne County in the Eastern District of Michigan. He was plaintiff John Doe #1 in the *Does I* case.

24. In 1990, when Mr. Doe A was 20 years old, he was fired from his job as a maintenance worker at McDonald's. He believed he was fired unjustly. Out of anger and revenge, he decided to rob his former employer.

---

[4] Declarations from Plaintiffs verifying the facts in this complaint are attached as Exhibit 1.

25. During the attempted robbery, Mr. Doe A forced the manager and her teenaged son back into the building to open the safe. The manager and her son escaped, and Mr. Doe A was apprehended.

26. Mr. Doe A pled guilty to armed robbery and weapons charges. He also pled no contest to kidnapping for forcibly moving the boy. *See* M.C.L. § 750.349.

27. Mr. Doe A never engaged in any sexual misconduct during the attempted robbery, nor has any such conduct ever been alleged against him.

28. Mr. Doe A was sentenced to 20 to 40 years in prison.

29. While incarcerated, Mr. Doe A became a model prisoner. He helped run Chance for Life, a program that trains prisoners how to handle conflict. He was a member of the Warden's Forum (representing prisoners in bringing issues to the attention of staff), held leadership positions in various prisoner organizations, and earned the support of his warden, who reinstated good time and disciplinary credits, enabling Mr. Doe A to obtain an earlier parole.

30. In 2009, Mr. Doe A was paroled. He successfully completed his two-year parole a decade ago, in 2011. He also completed sex offender group counseling in prison (which was required of him after SORA became law, making child kid-napping a registrable offense.)

31. Mr. Doe A is now 51 years old and has led a productive and law-abiding life since his release. Mr. Doe A has not been charged with or convicted of any crime

since his convictions stemming from the 1990 restaurant robbery, more than 30 years ago.

32. Mr. Doe A worked as a vocational coach for special-needs adults for five to six years, helping them to find work. He has run his own asbestos abatement, lead paint removal, and home preservation business. He has a long-time partner; she works at a hospital. He has two adult children and a son who is a fourth grader.

33. In 1990, at the time Mr. Doe A's offense, Michigan did not have a sex offender registry. He therefore did not receive, and could not have received, any notice that his conviction for a non-sex offense would subject him to registration as a sex offender.

34. Had Mr. Doe A known that a child kidnapping conviction would result in registration, he would have gone to trial or tried to bargain for an alternate disposition that would not have resulted in registration.

35. When Mr. Doe A was released from prison in 2009, he was retroactively required to register for what was then a ten-year term. 2005 Mich. Pub. Act 132, § 5(6). He would have come off the registry in 2019.

36. As a result of the 2011 SORA amendments, however, Mr. Doe A was re-classified as a Tier III registrant who now has to register and comply with SORA 2021 for life. 2011 Mich. Pub. Act 17, § 5(12).

37. Pursuant to the final judgment in the *Does I* case, Mr. Doe A's registration

9

term was reduced from life to 25 years. He was removed from the public internet registry and needed to report only basic information. *Does I*, No. 12-cv-11194, Stipulated Final Judgment on Remand, R. 153 (Jan. 26, 2018).

38. Under SORA 2021, just like under the old SORA, individuals convicted of kidnapping a minor are required to register as sex offenders for life, even if the offense lacks any sexual component. M.C.L. §§ 28.722(v)(ii), 750.349. Mr. Doe A is required to register and comply with all of SORA 2021's extensive requirements for life, even though he has never been accused of or convicted of any sexual offense.

39. SORA 2021 brands Mr. Doe A as a dangerous sex offender by placing him on Michigan's online registry, which holds him out to the public as a convicted sex offender.

40. There is no mechanism in the statute by which Mr. Doe A can ever come off the registry other than to die.

### John Doe B

41. Plaintiff John Doe B resides in the Eastern District of Michigan. He was plaintiff John Doe #3 in the *Does I* case.

42. In 1998, when Mr. Doe B was 19 years old, he had a sexual relationship with a 14-year-old girl. Mr. Doe B first met the girl at a hair salon where she had washed and cut his hair. Because she was working, and based on her appearance, and because she told him that he was not her first sexual partner, he believed that

she was an adult.

43. When the girl's parents became aware of the relationship, they demanded that Mr. Doe B marry the girl, or the parents would go to the police. Mr. Doe B's family and the girl's family met, but Mr. Doe B initially refused to marry her.

44. The girl's father then pressed charges. Thereafter, the families met again, and Mr. Doe B agreed to the marriage. After this happened, the girl's family tried to drop the charges. The girl admitted to the police, as is documented in the police reports, that at her father's request she had falsely accused Mr. Doe B of sexual assault, when in fact the sex was consensual. Mr. Doe B did not ultimately marry the girl.

45. Mr. Doe B admitted to the police that the couple had a sexual relationship. He pled guilty to attempted criminal sexual conduct in the third degree, M.C.L. § 750.520d(1)(a), for having sex with a minor. He was sentenced to four years of probation under the Holmes Youthful Trainee Act (HYTA), a record-sealing statute that allows young offenders to have their cases dismissed and their records sealed. *See* M.C.L. § 762.11 *et seq*.

46. At the time of Mr. Doe B's offense, Michigan did not yet have a public, internet-based registry. Mr. Doe B was required to register for 25 years, meaning he would come off the registry in 2023, at around age 45. The requirements for quarterly in-person reporting were introduced after his plea was accepted, but they

were nevertheless applied to him retroactively.

47. During his last year of probation, Mr. Doe B missed the 15-day registration window. He came back from vacation not realizing that it was a three-day holiday weekend. He tried to report, but the SORA office was closed. He reported one day late, and immediately notified his probation officer of the mistake. Based on his failure to report timely, however, his status under HYTA was revoked and his underlying conviction became permanent.

48. Under the 2011 SORA amendments, Mr. Doe B was retroactively reclassified as a Tier III offender, and his registration period was extended from 25 years to life. SORA 2021 incorporates the 2011 amendments that retroactively extended Mr. Doe B's registration period to life.

49. Mr. Doe B was four years and ten months older than the girl with whom he had sex. Had the age difference been less than four years, Mr. Doe B would not be subject to registration. M.C.L. § 28.722(v)(iv).

50. Mr. Doe B is 43 years old. He has lived productively in the community, and he has not been convicted of another crime since his registrable offense. Mr. Doe B worked at the family business, an auto repair shop and gas station, and later in real estate. He has three children (17, 14, and 8) from his first marriage, and is a single father with shared custody.

51. Pursuant to the judgment in the *Does I* case, Mr. Doe B was removed from

the public internet registry. He had to report only basic information, and his registration term was reduced from life to 25 years, which meant he would have come off the registry in 2023.

52. Under SORA 2021, Mr. Doe B is again required to register and comply with all of SORA 2021's extensive requirements for life.

53. There is no mechanism in the statute by which Mr. Doe B can ever come off the registry other than to die.

### John Doe C

54. Plaintiff John Doe C resides in the Western District of Michigan. He was plaintiff John Doe #4 in the *Does I* case.

55. In the summer of 2005, when Mr. Doe C was 23 years old, he had a sexual and romantic relationship with I.G., a girl he met at a nightclub. The club was restricted to those aged 18 and older.

56. Mr. Doe C did not know that I.G. had used a fake ID to get into the nightclub, and that she was actually 15. When she became pregnant, Mr. Doe C was arrested. Only after Mr. Doe C was arrested did he learn his partner's actual age.

57. In 2006, Mr. Doe C pled guilty to attempted criminal sexual conduct in the third degree, which prohibits sex with a person under 16. M.C.L. § 750.520d (1)(a).

58. Mr. Doe C was sentenced to five years of probation, which he successfully

completed. He also completed sex offender counseling.

59. At the time of his conviction, Mr. Doe C was required to register for 25 years, meaning he would come off the registry in 2031 at around age 49.

60. As a result of the 2011 SORA amendments, Mr. Doe C was retroactively reclassified as a Tier III offender, and his registration period was extended from 25 years to life. SORA 2021 incorporates the 2011 amendments that retroactively extended Mr. Doe C's registration period to life.

61. Some years after his conviction, I.G. (who was then over 18) and Mr. Doe C renewed their romantic relationship. They eventually married and now have three children together, ages 15, 7, and 3.

62. I.G. has said that while SORA may have been intended to protect people like her, "the overall effect of it was completely opposite" as "I don't feel like there was an actual crime." Rather than feeling like a victim of a crime, she feels like a "victim of the criminal justice system" because of the impact the registry has had on her ability to have a normal life with Mr. Doe C and their three children.

63. Mr. Doe C's only other criminal convictions are for driving on a suspended license.

64. Pursuant to the judgment in the *Does I* case, Mr. Doe C was removed from the public internet registry. His registration term was reduced from life to 25 years. He needed to report only basic information.

14

65. Under SORA 2021, Mr. Doe C is again required to register and comply with all SORA 2021's extensive requirements for life.

66. There is no mechanism in the statute by which Mr. Doe C can ever come off the registry other than to die.

**Mary Doe**

67. Plaintiff Mary Doe resides in the Eastern District of Michigan. She was plaintiff Mary Doe in the *Does I* case.

68. In 2003, while living in Ohio, she pled no contest to unlawful sexual conduct with a minor for having a sexual relationship with a 15-year-old male.

69. She was sentenced to three years in prison.

70. At the time, Ohio's SORA was risk-based rather than offense-based. A person's registration requirements, including the length of time on the registry and the frequency of reporting obligations, were determined through an individualized adjudication of risk.

71. Based on a psychological evaluation, the court concluded that Ms. Doe was neither a "sexual predator" nor a "habitual offender." She was assigned to the lowest risk level of the registry, which required address verification once a year for ten years.

72. Although Ohio later moved to an offense-based registration scheme similar to Michigan's, the Ohio Supreme Court has held that people like Ms. Doe

who got individualized risk-based hearings cannot be retroactively reclassified under an offense-based scheme. *See State v. Bodyke*, 933 N.E.2d 753 (Ohio 2010).

73. The Ohio Supreme Court also held that Ohio's amended SORA—which requires extensive reporting and lengthens registration periods similar to Michigan's SORA 2021—cannot be applied retroactively without violating the Ex Post Facto Clause. *See State v. Williams*, 952 N.E.2d 1108 (Ohio 2011).

74. Thus, in Ohio, Ms. Doe could not be required to register for more than ten years, nor could she be subjected to registry requirements that were stricter than those in effect under the terms of her initial registration order.

75. In 2004, after serving fewer than eight months, Ms. Doe was granted judicial release. Her sentence was modified to four years of probation and 200 hours of community service. She successfully completed her probation, public service, and sex offender therapy, and was discharged from probation in 2008.

76. When Ms. Doe received judicial release in 2004, the terms of her probation required her to move to Michigan, to live with her parents. Under Michigan law at the time, she was required to register quarterly for 25 years.

77. Ms. Doe and her ex-husband shared parenting of their teenage daughter. The daughter attended school in Michigan. Ms. Doe got remarried in 2010 to a man who lives and works in Michigan. Because their extended family also live in Michigan, Ms. Doe and her husband have remained here.

16

78. Under the 2011 SORA amendments, Ms. Doe was retroactively reclass-ified as a Tier III offender, and her registration period was extended from 25 years to life. SORA 2021 incorporates the 2011 amendments that retroactively extended Ms. Doe's registration period to life.

79. Ms. Doe has no other criminal convictions.

80. In 2013, when Ms. Doe's ex-husband moved from Ohio to Kentucky, she petitioned in Ohio to be granted sole custody of her teenage daughter. As part of the custody process, Ms. Doe was interviewed by a court counselor. The court counselor was aware of Ms. Doe's status on the registry, and was also aware that her teenage daughter knew of Ms. Doe's status, loved her, accepted her, and wanted to stay in Michigan. The counselor recommended that Ms. Doe be granted sole custody, and the court entered an order granting her sole custody in late 2013.

81. The judgment in *Does I* reduced Ms. Doe's registration term from life to 25 years. She came off the public internet registry and was required to report only basic information.

82. Under SORA 2021, Ms. Doe is again required to register and comply with all SORA 2021's extensive requirements for life.

83. There is no mechanism in the statute by which Ms. Doe can ever come off the registry other than to die.

### Mary Roe

84. Plaintiff Mary Roe resides within the Eastern District of Michigan. She was plaintiff Mary Roe in the *Roe v. Snyder* case.

85. In her late teens, Ms. Roe became addicted to drugs and ended up living on the street, hanging out with other addicted runaway or homeless teens. In 2002, at the age of 19, Ms. Roe had consensual sex with a 14-year-old boy who was associated with her group.

86. Ms. Roe pled guilty to criminal sexual conduct in the third degree, M.C.L. § 750.520d(1)(a), in 2003. She was on probation for two bad-check offenses at the time and ended up serving a little more than two-and-a-half years in prison. She also had to register under SORA. Had she been less than four years older than the boy, SORA would not have applied to her. M.C.L. § 28.722(v)(iv).

87. Ms. Roe straightened herself out in prison and was released shortly after her earliest release date. Ms. Roe completed sex offender therapy in prison and also outpatient therapy after her release. She also successfully completed her two-year parole.

88. Ms. Roe has led a productive life since her release. She has been in school or employed (or both) steadily since leaving prison. Ms. Roe earned a Bachelor's Degree in Addiction Studies *summa cum laude*, and then went on to earn a Master's Degree in Counseling. She is married, and her husband works in real estate.

89. Ms. Roe worked at a residential drug treatment facility for homeless people. She started as a therapist, was promoted repeatedly, and ultimately served as the clinical director supervising a staff of 20 therapists and counselors. The facility provided services to more than 500 clients each year. Ms. Roe was responsible for tripling the residential treatment program revenue, to $2.7 million a year. Since 2017, she has been in private practice.

90. Ms. Roe has not been charged with or convicted of any crime since her 2003 conviction.

91. At the time of her conviction, Ms. Roe was required to register for 25 years, meaning she would come off the registry in 2028 at around age 45.

92. Under the 2011 amendments to SORA, Ms. Roe was retroactively classified as a Tier III offender, putting her on the registry for life. SORA 2021 includes the 2011 amendments that retroactively extended Ms. Roe's registration period to life.

93. In 2016, Ms. Roe was threatened with prosecution if she continued to work at her job as clinical director because her job site was within 1000 feet of a school. This threat occurred despite the Sixth Circuit's 2016 decision in *Does I* holding that the 2006 and 2011 SORA amendments could not be applied retro-actively. Ms. Roe filed suit challenging SORA's constitutionality, *see Roe*, No. 16-cv-13353 (E.D. Mich.), which is discussed in more detail below.

94. Pursuant to the settlement in that case, Ms. Roe's registration term was reduced from life to 25 years. She was removed from the public internet registry and was required to report only basic information. *See id.*, Stipulated Order, R. 87 (Mar. 15, 2018).

95. After being removed from the public registry, Ms. Roe was able to start her own therapy business which focuses on treatment of trauma, including survivors of sexual assault and abusive relationships. She serves only adult clients because of her registry status.

96. Under SORA 2021, Ms. Roe is again required to register and comply with all SORA 2021's extensive requirements for life. She is terrified that being back on the public registry will destroy her business, and the life she has built.

97. There is no mechanism in the statute by which Ms. Roe can ever come off the registry other than to die.

### John Doe D

98. Plaintiff John Doe D resides in the Eastern District of Michigan. He was plaintiff John Doe #1 in the *Does II* case.

99. In early 2000, when Mr. Doe D was a 19-year-old senior in high school, he had a sexual relationship with a 14-year-old freshman girl.

100.    One day after school, the two went to Mr. Doe D's house and had sex. The police arrested Mr. Doe D about a week later, and he admitted that he had sex

with the girl.

101.   The girl gave various statements to the police, initially saying that the sex was not consensual, but later stating that while she felt pressured to have sex, Mr. Doe D did not force her or threaten her to perform any sexual acts.

102.   After Mr. Doe D's attorney explained to him that the girl could not legally give consent because she was underage, Mr. Doe D pled guilty to attempted criminal sexual conduct in the third degree, M.C.L. § 750.520d(1)(a), in 2000, under the HYTA youthful diversion statute.

103.   Mr. Doe D was sentenced to 60 days in jail, of which he served a little over a month, and three years of probation.

104.   In the summer of 2001, Mr. Doe D attended a volleyball game at his former high school with a friend, to cheer for the friend's sister. At the game, Mr. Doe D saw the victim from his case and immediately left the premises. He reported the incident to his probation officer.

105.   Mr. Doe D knew that he was not allowed any contact with the girl but was unaware that he was prohibited from going to the school. Mr. Doe D's HYTA status was revoked in 2001 as a result of having attended the volleyball game, and his probation was extended for two more years. Mr. Doe D completed probation in 2005.

106.   Mr. Doe D was approximately four years six months older than the girl.

Had the age difference been less than four years, Mr. Doe D would not be subject to sex offender registration. M.C.L. § 28.722(v)(iv).

107.   Mr. Doe D has no other criminal convictions and has led a productive life since his release. He is married, has a ten-year-old son, and works as an assembly line worker and forklift driver.

108.   At the time of his conviction, Mr. Doe D was required to register for 25 years, meaning he would come off the registry in 2025 at around age 45.

109.   The 2011 SORA amendments were applied retroactively to Mr. Doe D. He was reclassified as a Tier III offender, and his registration term was extended from 25 years to life. SORA 2021 incorporates the 2011 amendments that retroactively extended Mr. Doe D's registration period to life.

110.   Even after the *Does I* decision in 2016, Defendants required Mr. Doe D to comply with all the provisions of SORA including the 2006 and 2011 amendments, continued to classify him as a Tier III offender, and subjected him to lifetime registration. The court in *Does II* held that to be unconstitutional.

111.   Under SORA's 2021 amendments, Mr. Doe D will be required to register and comply with all of SORA 2021's extensive requirements for life.

112.   There is no mechanism in the statute by which Mr. Doe D can ever come off the registry other than to die.

**John Doe E**

113.   Plaintiff John Doe E resides in the Western District of Michigan. He was plaintiff John Doe #3 in the *Does II* case.

114.    Mr. Doe E, raised by adoptive parents, was born with Fetal Alcohol Syndrome, an incurable birth defect resulting from in-utero alcohol exposure.

115.   Mr. Doe E's in-utero alcohol exposure left him with various neurological deficits. He has a developmental age of nine or ten, and an IQ of approximately 84.

116.   Mr. Doe E's developmental delays make him vulnerable, and in the early 1990s, he was sexually assaulted by a co-worker.

117.   In 1994, Mr. Doe E was accused of engaging in inappropriate sexual touching of his six-year-old nephew. At the time, Mr. Doe E had a chronological age of 21. His nephew, who is now an adult, opposes Mr. Doe E's inclusion on the registry.

118.   Several psychologists provided detailed testimony that Mr. Doe E's actions were similar to that of a child, and that given his level of developmental and intellectual functioning, his actions should be viewed as those of a child engaged in sexual experimentation, which is common. Mr. Doe E had no history of related behavior.

119.   Mr. Doe E pled no contest in 1994 to three counts of criminal sexual

23

conduct in the second degree. M.C.L. § 750.520c(1)(a). At that time, Michigan did not have a sex offender registry. He was sentenced to 90 days in custody, as well as five years' probation, which he successfully completed without incident. He also successfully participated in counseling services with a therapist.

120.   When Michigan's first SORA came into effect in 1995, Mr. Doe E was placed on a non-public law enforcement registry, and was required to update his address with law enforcement if he moved. He was subject to registration for 25 years. Based on that registration period, Mr. Doe E should have come off the registry in 2019.

121.   He did not, however, because SORA's various amendments were retro-actively applied to him, including amendments extending his registration period to life and retroactively classifying him as a Tier III offender. SORA 2021 incorporates those amendments.

122.   Mr. Doe E has no other criminal history. Mr. Doe E has held a variety of jobs, mostly as a custodian or food service worker.

123.   He is married, and his wife also has Fetal Alcohol Syndrome. Mr. Doe E and his wife live with Mr. Doe E's 84-year-old mother.

124.   Mr. Doe E's mother helps him to comply with SORA's complex registration requirements. She is fearful that he will be unable to remain SORA-compliant if she gets sick or passes away and she cannot help him manage his affairs.

125.   Even after the *Does I* decision in 2016, Defendants required Mr. Doe E to comply with all of the provisions of SORA including the 2006 and 2011 amendments, labeled him as a Tier III offender, and subjected him to lifetime registration. The court in *Does II* held that to be unconstitutional.

126.   Under SORA 2021, Mr. Doe E will be required to register and comply with all of SORA 2021's extensive requirements for life.

127.   There is no mechanism in the statute by which Mr. Doe E can ever come off the registry other than to die.

### John Doe F

128.   Plaintiff John Doe F resides in the Western District of Michigan. He was plaintiff John Doe #4 in the *Does II* case.

129.   Starting around 2009, when Mr. Doe F was in his early twenties, he began texting with an underage girl he had met through soccer. The two eventually started dating, and they dated for about three years. Because Mr. Doe F was in college, they did not see each other often.

130.   When the girl's parents learned of the relationship, they disapproved of it, and eventually filed a police report. In 2012, when the girl was 17, Mr. Doe F was interviewed by the police about whether he had sexual contact with his girlfriend before she turned 16.

131.   Mr. Doe F admitted to the police that he and his girlfriend had had oral

25

sex, but maintained that this did not occur until after the girl was 16 years old. He said they did not have sexual intercourse. Nevertheless, the prosecution charged Mr. Doe F with a 2010 offense that assigned the offense date as the day before the girl's sixteenth birthday.

132.   In 2013, Mr. Doe F pled guilty to a two-year misdemeanor of sexual misconduct in the fourth degree. M.C.L. § 750.520e. He took this plea agreement after the prosecutor threatened to bring child pornography charges because Mr. Doe F and his girlfriend had shared nude photos via text messages. Mr. Doe F admitted that they had sent the photos.

133.   Mr. Doe F served 10 days in jail and was placed on probation for five years. He successfully completed both sex offender therapy and his five-year proba- tion.

134.   Under SORA 2021, Mr. Doe F must register for 25 years until 2038, and he is classified as a Tier II offender. Mr. Doe F has no other criminal convictions.

135.   Mr. Doe F had a six-year relationship with an adult woman. In 2018, she became ill with a leukemia-like disorder, and Mr. Doe F spent all of his time and money caring for her. She died in 2019 at age 25.

136.   After COVID took hold, Mr. Doe F's work in building trades dried up, so he agreed to help care for his deceased girlfriend's 85-year-old grandfather, who needed constant in-home assistance due to dementia and heart issues. In August

2021 the grandfather died. At present Mr. Doe F is looking for work and taking an online MBA course.

137.   Even after the *Does I* decision, Defendants continued to require Mr. Doe F to comply with all of the provisions of SORA including the 2011 amendments, even though his offense preceded those amendments. The state also continued to classify him as a Tier II offender. The court in *Does II* held that to be unconstitutional.

138.   Under SORA 2021, Mr. Doe F will remain a 25-year registrant, subject to all of the requirements and restrictions imposed by SORA 2021.

### John Doe G

139.   Plaintiff John Doe G resides in the Eastern District of Michigan. He was plaintiff John Doe #5 in the *Does II* case.

140.   In November 2006, when Mr. Doe G was living in Omaha, Nebraska, he developed a relationship with a boy who was 14 at the time. The two engaged in sexual touching. Mr. Doe G was convicted of third-degree sexual assault of a child, Nebraska Rev. Statute 28-320.01(3).

141.   Mr. Doe G spent 18 months in prison. There he voluntarily and successfully completed a sex offender treatment program. He was informed that under Nebraska law, he would be required to register as a sex offender for ten years.

142.   In 2010, Mr. Doe G moved to Michigan to be closer to his family.

Under Michigan's SORA, he was subject to registration for 25 years, meaning he would come off the registry around 2031.

143.   In 2011, Mr. Doe G was retroactively classified as a Tier III offender and his registration term was extended to life. SORA 2021 incorporates the 2011 SORA amendments that retroactively extended Mr. Doe G's registration period to life.

144.   Mr. Doe G has no other criminal convictions and has been a productive member of society since his release. He is a certified cable test technician, and currently works in product development and technical support for a cable company.

145.   Even after the *Does I* decision, the defendants continued to require Mr. Doe G to comply with all of the provisions of SORA, including the 2011 amendments which classified him as a Tier III offender and subjected him to lifetime registration. The court in *Does II* held that to be unconstitutional.

146.    Under SORA 2021, Mr. Doe G will remain on the public registry, and will continue to be classified as a Tier III offender and required to register and comply with all of SORA 2021's extensive requirements for life.

147.    There is no mechanism in the statute by which Mr. Doe G can ever come off the registry other than to die.

**John Doe H**

148.   Plaintiff John Doe H resides in the Eastern District of Michigan. He

28

was plaintiff John Doe #6 in the *Does II* case.

149.   In December 2015, Mr. Doe H pled no contest to criminal sexual conduct in the fourth degree for engaging in sexual touching with a woman who worked in a restaurant he owns. M.C.L. § 750.520e. The woman was a couple of years older than he, and Mr. Doe H believed the sexual touching was mutual and consensual.

150.   Mr. Doe H received no jail time, but was sentenced to five years of probation. He successfully completed his probation as well as sex offender classes.

151.   Mr. Doe H has had no other criminal convictions, and is a productive and respected member of the community.

152.   Under the old SORA, Mr. Doe H was classified as a Tier I offender, subject to SORA for 15 years.[5] Under SORA 2021, he will continue to be a Tier I registrant.

153.   As to all Plaintiffs listed above, the State of Michigan has required them to register as sex offenders under SORA 2021 without any individualized assessment that they pose a present danger to the public, and without any evidence that the registry makes communities safer.

_____

[5] As a Tier I registrant, Mr. Doe H is not listed on the public (online) sex offender registry. M.C.L. § 28.728(4)(c).

**Defendants**

**Governor Gretchen Whitmer**

154.   Defendant Gretchen Whitmer is the Governor of Michigan. She is sued in her official capacity.

155.   Pursuant to Article 5, § 1 of the Michigan Constitution, the executive power of the state is vested in the governor. The Michigan Constitution further provides that the governor shall take care that applicable federal and state laws are faithfully executed. Mich. Const. art. 5, § 8.

156.   Defendant Whitmer is ultimately responsible for the enforcement of the laws of this state, and for supervision of all state departments, including the Michigan State Police (MSP).

157.   The Governor is an appropriate defendant in a case challenging the constitutionality of a state statute.

**Colonel Joseph Gasper**

158.   Defendant Colonel Joseph Gasper is the director of the MSP. He is sued in his official capacity.

159.   The MSP maintains Michigan's sex offender registry. M.C.L. § 28.721 *et seq.*

160.   The MSP's responsibilities include enforcing SORA, maintaining the state's database of sex offenders, maintaining an online public sex offender registry,

registering offenders (along with other law enforcement agencies), developing registration forms, providing statutorily required notices to registrants, collecting registration fees, and coordinating with national law enforcement and the national sex offender registry. *See, e.g.*, M.C.L. §§ 28.724, 28.724a, 28.725, 28.727, 27.728.

161.   The director of the MSP is an appropriate defendant in a case challenging the constitutionality of Michigan's SORA.

## FACTUAL ALLEGATIONS

## I.   HISTORY AND BACKGROUND

### History of the Michigan Sex Offenders Registration Act

162.   SORA 2021 imposes obligations, disabilities, and restraints, which are too extensive to be set out in full here. They are listed in the Summary of SORA 2021's Obligations, Disabilities, and Restraints, Ex. 2, incorporated by reference as if fully set out herein.

163.   It was not always so. Michigan passed its first sex offender registration law in 1994. 1994 Mich. Pub. Act 295 (effective Oct. 1, 1995). Before that time, Michigan did not require anyone to register as a sex offender for any purpose.

164.   The 1994 statute established a *non-public law enforcement* database containing basic information about people convicted of certain sex offenses. Registration information was exempt from all public disclosure. A person who divulged registry information to the public was guilty of a misdemeanor, and a registrant whose information was revealed had a civil cause of action for treble damages. 1994

Mich. Pub. Act 295, § 10.

165. The statute did not require regular verification or reporting. After the initial registration was completed, the only additional obligation was to notify local law enforcement within 10 days of a change of address. The registrant did not need to notify law enforcement in person. 1994 Mich. Pub. Act 295, § 5(1).

166. Registry information was maintained for 25 years for individuals convicted of one offense and for life for individuals convicted of multiple offenses. 1994 Mich. Pub. Act 295, § 5(3)–(4).

167. The statute applied retroactively to people whose convictions occurred before October 1, 1995, but only if they were still incarcerated, on probation or parole, or under the jurisdiction of the juvenile division of the probate court or department of social services on that date. 1994 Mich. Pub. Act 295, § 3(1)(b)–(c).

168. Since that time, the legislature has repeatedly amended the statute, again and again imposing new burdens covering more people and more conduct.

169. Effective April 1, 1997, the statute's confidentiality protections were weakened. Law enforcement agencies were required to make registry information available to the public (for zip codes within the agency's jurisdiction) during regular business hours. 1996 Mich. Pub. Act 494, § 10(2). The public could view a paper copy of the registry by visiting their local law enforcement agency.

170. In 1999, registry information became available to the public on the

32

internet through the public sex offender registry. 1999 Mich. Pub. Act 85, § 8(2), 10(2)(3).

171. New in-person reporting requirements were imposed, with registrants being required to report quarterly or yearly, depending on their offense. 1999 Mich. Pub. Act 85, § 5a(4).

172. Moreover, the 1999 amendments expanded the list of offenses for which registration was required and the categories of individuals required to register for life; lengthened the penalties for registration-related offenses; required registrants to maintain a driver's license or personal identification card; made registry information on certain juveniles public; required fingerprinting and digitized photographs for registrants; and mandated registration for out-of-state students, people working in the state, and anyone convicted of a listed offense or required to register in another state or country. *See generally* 1999 Mich. Pub. Act 85.

173. In 2002, registrants were required to report in person when they (whether or not living in Michigan) enrolled, disenrolled, worked, or volunteered at Michigan institutions of higher learning. 2002 Mich. Pub. Act 542, § 4a.

174. Amendments in 2004 required the internet-based public sex offender registry to include photographs. Mich. Pub. Act 238 (2004). In addition, a fee was imposed on registrants. Failure to pay the fee was made a crime. Mich. Pub. Act 237 (2004). The 2004 amendments also modified the registration requirement for

individuals in certain diversion programs. 2004 Mich. Pub. Acts 239, 240.

175.   Further amendments effective in 2006 retroactively barred registrants (with limited exceptions) from working, residing, or loitering within 1,000 feet of school property, and imposed criminal penalties for noncompliance. 2005 Mich. Pub. Acts 121, 127. Moreover, the penalties for registration-related offenses were increased. 2005 Mich. Pub. Act 132. Another amendment, which was also applied retroactively, allowed subscribing members of the public to receive electronic notification when a person registers or moves into a particular zip code. 2006 Mich. Pub. Act. 46.

176.   In 2011, SORA underwent major revisions which fundamentally altered Michigan's sex offender registry. 2011 Mich. Pub. Acts 17, 18.

177.   First, the 2011 SORA amendments retroactively imposed extensive reporting requirements, adding in-person and in some cases immediate reporting of vast amounts of personal information.

178.   Second, the 2011 amendments retroactively categorized registrants into tiers. The tier classifications determine the length of time a person must register and the frequency of reporting. Tier classifications are based solely on the offense of conviction. Tier classifications are not based on, and do not correspond to, a registrant's actual risk of reoffending.

179.   Before 2011, almost three-quarters of those on the registry were 25-

year registrants, whereas after the retroactive tier classifications almost three-quarters were lifetime registrants.

180. There were no individualized assessments or determinations before an estimated 17,000 people had their registration extended to life.

### The *Does I* Litigation

181. In 2012, six Michigan registrants (including Mr. Does A, B, C and Mary Doe in this case) challenged the constitutionality of SORA on numerous grounds. *See Does I*, No. 12-cv-11194. The district court dismissed plaintiffs' ex post facto claim and several other claims. *See Does I*, 932 F. Supp. 2d 803 (E.D. Mich. 2013). After discovery, the parties summarized the extensive record (which included 128 exhibits comprising over 1,650 pages) in a 261-page Joint Statement of Facts. *Does I*, No. 12-cv-11194, R. 90 (June 27, 2014).

182. The district court issued two opinions under Rule 52, *Does I*, 101 F. Supp. 3d 672 (E.D. Mich. 2015), and *Does I*, 101 F. Supp. 3d 722 (E.D. Mich. 2015), holding, *inter alia*, that:

    a. SORA's prohibitions on working, residing, or "loitering" in geographic exclusion zones were unconstitutionally vague;

    b. certain of SORA's reporting requirements were unconstitutionally vague;

    c. certain of SORA's internet reporting requirements violated the First Amendment; and

    d. imposing strict liability for SORA violations violated due process, and therefore SORA therefore must be read to incorporate a knowledge requirement.

183.   Both sides appealed. The Sixth Circuit, in a unanimous opinion authored by Judge Alice Batchelder, held that SORA is punishment and that retro-active application of the 2006 and 2011 amendments violates the Ex Post Facto Clause. *See Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016).

184.   With respect to plaintiffs' other challenges to SORA, the Sixth Circuit found that "this case involves far more than an Ex Post Facto challenge. And as the district court's detailed opinions make evident, Plaintiffs' arguments on these other issues are far from frivolous and involve matters of great public importance." *Id.* at 706. The Sixth Circuit held, however, that those questions "will have to wait for another day because none of the contested provisions may now be applied to the plaintiffs [in light of the ex post facto violation]." *Id.*

185.   SORA 2021 now applies many of those very same contested provisions to the very same plaintiffs, as well as to tens of thousands of other registrants.

186.   The state defendants petitioned for certiorari. That petition was denied in 2017, after the United States Solicitor General advised that the petition did not warrant review. *See Snyder v. John Does #1-5*, 138 S. Ct. 55 (2017).

187.   In January 2018, the district court (on remand) entered a stipulated final judgment, *Does I*, No. 12-cv-11194, R. 153 (Ex. 13), that:

   a.   declared that retroactive application of SORA's 2006 and 2011 amend-
        ments violates the Ex Post Facto Clause of the U.S. Constitution;

b. enjoined defendants from retroactively applying the 2006 and 2011 SORA amendments against plaintiffs;

c. enjoined defendants from enforcing *any* SORA provision against one registrant and entirely removed him from the registry because his registration resulted from the "recapture" provisions of the 2011 amendments to SORA, which retroactively imposed SORA on registrants with pre-SORA offenses;

d. removed the other John Does and Mary Doe (who include John Doe A, B, C and Mary Doe in this litigation) from the public internet registry, reduced plaintiffs' reporting requirements to quarterly verification of basic information, and set the length of their registration periods to be that required under the pre-2011 SORA (25 years rather than life).

188. The judgment provided that "if the Michigan legislature amends or replaces SORA to implement the Sixth Circuit's holding in *Does #1-5 v. Snyder*, this injunction shall terminate on the effective date of any such amendments or new statute." *Id.*

189. The passage of new legislation does not affect the declaratory judgment in *Does I* that retroactive application of SORA's 2006 and 2011 amendments violates the Ex Post Facto Clause.

## The *Roe* Litigation

190. Not long after the Sixth Circuit's 2016 decision, a police officer told registrant Mary Roe that if she did not quit her job as the clinical director at a residential drug treatment center for the homeless (where she had worked for the preceding eight years), she would face prosecution because her workplace was within 1,000 feet of a school. The SORA provision at issue, M.C.L. § 28.734(1)(a),

was part of the 2006 amendments, which the Sixth Circuit had held could not be applied retroactively. Ms. Roe also remained subject to prosecution for any other violation of SORA that might be alleged against her, despite the Sixth Circuit's and the district court's decisions to the contrary in *Does I*.

191.   Ms. Roe filed an action seeking declaratory and injunctive relief barring enforcement of SORA against her in order to ensure that she would be protected by the Sixth Circuit's and district court's *Does I* decisions. *See Roe*, No. 16-cv-13353, Verified Complaint, R. 1 (Sept. 15, 2016).

192.   The district court granted her motion for a preliminary injunction. *See Roe v. Snyder*, 240 F. Supp. 3d 697 (E.D. Mich. 2017). Ms. Roe then settled the case with the state defendants.[6]

193.   The settlement order with the state included a permanent injunction consistent with *Does I*. Ms. Roe came off the public registry, her registration period was reduced to 25 years, and her reporting duties under SORA were limited. *See Roe*, No. 16-cv-13353, Stipulated Order, R. 87 (Mar. 15, 2018). As in *Does I,* the settlement order was to terminate if the Michigan legislature amended or replaced

---

[6] Ms. Roe also settled with the City of Royal Oak and Oakland County. The court dismissed her claims against Wayne County after the county conceded that it was bound by the Sixth Circuit's decision in *Does I* and stated that it would not enforce the unconstitutional parts of SORA against Ms. Roe. *See Roe*, No. 16-cv-13353, 2018 WL 4352687, at *4 (E.D. Mich. Sept. 12, 2018).

SORA—which has now occurred.

## The *Does II* Litigation

194.   Undeterred, Michigan continued to enforce SORA as written, requiring all registrants other than the *Does I* and *Roe* plaintiffs to comply with provisions of SORA that the district court and the Sixth Circuit had held to be unconstitutional.

195.   Six new plaintiffs—five of whom are also Plaintiffs here—then brought a class action suit seeking to enforce the *Does I* decisions on behalf of all Michigan registrants. *See Does II*, No. 16-cv-13137. The claims brought were those decided in plaintiffs' favor in *Does I* by the Sixth Circuit and the district court.

196.   At the time, dozens of cases seeking enforcement of the *Does I* decision had already been filed in both federal and state court. *Does II*, No. 16-cv-13137, Partial List of Post-*Does I* Challenges, R. 35–2, PageID.480–82.

197.   After the state stipulated to class certification, the court in 2018 certified a primary class of all people who are or will be subject to registration under SORA, and two ex post facto subclasses (one for pre-2006 registrants and one for pre-2011 registrants). *Id.*, Order Granting Class Certification, R. 46 (Sept. 11, 2018).

198.   Plaintiffs moved for partial summary judgment as to the ex post facto subclasses in July 2018. *Id.*, Mot. For Partial Summ. J., R. 40. Over the next year and a half, the court postponed briefing repeatedly to permit ongoing negotiations with state stakeholders about the contours of a new law. *Id.*, Scheduling Orders, R.

39

41, 44, 45, 47, 51, 54.

199.   In May 2019—almost a year after plaintiffs moved for partial summary judgment—the parties, hoping to spur legislative action, proposed and the court then entered a stipulated order granting a declaratory judgment. *Id.*, Stipulated Order for Declaratory J., R. 55 (May 23, 2019). The judgment declared the 2006 and 2011 amendments to be unconstitutional as to the ex post facto subclasses. *Id.*, Pg.ID.783. The court deferred ruling on injunctive relief "to avoid interfering with the Michigan legislature's efforts to address the *Does I* decisions and their findings of constitutional deficiencies with SORA." *Id.*, Pg.ID.784. But when the state shut down the legislative work group, plaintiffs moved for summary judgment.

200.   In February 2020, the court granted plaintiffs' motions for summary judgment on all counts. The order effectively incorporated the holdings of the Sixth Circuit and the district court in *Does I*, as applied to the appropriate subclasses. *See Does II*, 449 F. Supp. 3d 719 (E.D. Mich. 2020).

201.   Broadly, the court found that the provisions which violated the Due Process Clause and First Amendment, and the provisions imposing strict liability, were void and could not be enforced against *any* registrant, prospectively or retroactively. *Id.* at 737–38. As to the ex post facto claim, the court held that the unconstitutional 2011 amendments were not severable from the constitutional parts of SORA, and therefore, absent legislative action, the entirety of SORA could not be

enforced against the ex post facto subclasses (those whose registrable offense occurred before the effective date of the 2011 amendments). *Id.* at 731–33.

202.   The injunctions were to become effective 60 days after entry of judgment, to give the legislature one last chance to pass a new SORA. *Id.* at 739.

203.   Before final judgment could enter, however, the pandemic hit, making it impossible for (1) the state to provide notice of the judgment to registrants, (2) the legislature to meet to work on a new bill, and (3) registrants to obey many of SORA's registration requirements due to state and federal stay-at-home orders.

204.   Accordingly, in April 2020, the court entered an interim order delaying the entry of final judgment and notice to the class, and suspending enforcement of most SORA requirements (registration, verification, school zone, and fee violations). *Does II*, No. 16-cv-13137, Interim Order Delaying Entry of Final J., Preliminarily Enjoining Reporting Requirements, and Directing Publication, R. 91 (Apr. 6, 2020).

205.   The *Does II* court entered a final judgment on August 4, 2021, and an amended final judgment on August 26, 2021, that:

a. declared the old SORA to be punishment; the ex post facto application of the 2006 and 2011 amendments to be unconstitutional; the 2011 amendments to be not severable from the rest of the old SORA; and the old SORA to be null and void as applied to people who committed their offense or offenses requiring registration prior to July 1, 2011;

b. permanently enjoined defendants and their agents from enforcing any provision in the old SORA against people who are or will be subject to

registration under SORA and who committed their offense or offenses requiring registration prior to July 1, 2011;

c. declared unconstitutional and permanently enjoined provisions of the old SORA that prohibited registrants from working, residing or "loitering" in geographic exclusion zones;

d. declared unconstitutional and permanently enjoined certain reporting requirements; and

e. Provided that under the Due Process Clause of the U.S. Constitution, the old SORA must be interpreted as incorporating a knowledge requirement when prosecuting compliance violations.

*Id.*, Am. Final J., R. 126.

206. Because the *Does II* case only concerned the constitutionality of the old SORA, the judgment did not enjoin enforcement of SORA 2021.

### The *Betts* Litigation

207. While the *Does I* and *II* cases were working their way through the federal courts, a parallel criminal case was proceeding through the state courts. *See People v. Betts*, __ N.W.2d __, 2021 WL 3161828 (Mich. July 27, 2021). In *Betts*, a registrant with a 1993 offense challenged his post-2011 SORA-compliance conviction on ex post facto grounds,

208. On July 27, 2021, the Michigan Supreme Court held that applying the 2011 version of SORA retroactively violated the federal and state constitutional prohibition on ex post facto laws. *Id.* at *15. The Court found the statute's "demanding and intrusive requirements, imposed uniformly on all registrants regardless of an

individual's risk of recidivism, were excessive in comparison to SORA's asserted public safety purpose." *Id.* The Court also found that the 2011 amendments were not severable from the rest of the law. *Id.* at *20.

### The Legislature Adopts SORA 2021, Which Makes Only Minor Changes to the Statute

209.   In March 2020, legislators introduced a new SORA bill. The legislators ignored the work of the legislative work group that had been developing a comprehensive overhaul of SORA that aimed to be consistent with both the constitutional constraints and the social science.

210.   Instead, the newly introduced bill simply repeated many of the features of SORA that had already been held unconstitutional in *Does I* and *II*. *See* H.B. 5679, 100th Leg., Reg. Sess. (Mich. 2020).

211.   Both the Michigan Attorney General and the MSP submitted comments noting the constitutional deficiencies, with Attorney General Dana Nessel stating that "[t]he bill needs considerably more work if the State is going to avoid future litigation over the constitutionality of its registry." *Does II*, No. 16-cv-13137, Att'y Gen. Comments on HB 5679, R. 99-3.

212.   In the lame duck legislative session (November through December 2020), both houses of the Michigan legislature passed H.B. 5679, and the governor signed it on December 31, 2020. The amended Act (SORA 2021) took effect March 24, 2021. 2020 Mich. Pub. Act 295.

213.   SORA 2021 makes minimal changes to the structure, substance, and overall requirements of SORA, and is, if anything, more complex, vaguer, and harder to understand than the version that preceded it. The minimal nature of the changes can be seen in the attached exhibit. *See* SORA 2021 with Highlighted Changes Showing 2011 and 2021 Amendments, Ex. 14.

214.   SORA 2021 retains the identical tier system, the identical lengthy/lifetime registration periods, and the virtually identical onerous reporting requirements and online public registry, all without any individual assessment of risk to determine if SORA 2021's severe burdens are warranted.

215.   SORA 2021 remains a conviction-based law. Regardless of the circumstances of the offense, the passage of time, and the proven rehabilitation or incapacity of a registrant, there is, in almost all cases, no path off the registry.

216.   SORA 2021 makes no changes to the offenses which require registration. SORA 2021 continues to require people who had consensual sex with younger teens or committed other less serious offenses to register—retaining lifetime registration in most cases. *See generally* M.C.L. § 28.722(r), (t), (v). SORA 2021 continues to require sex offender registration for people who were never convicted of a sex offense. *See* M.C.L. § 28.722(r)(iii), (r)(x), (v)(ii), v(iii), (v)(viii). SORA 2021 continues to require lifetime registration of children as young as 14. M.C.L.

§ 28.722(a)(iii)–(iv). SORA 2021 continues to require registration of developmentally and physically disabled persons who may lack the ability to comply with the Act's complex requirements, or who may have limitations that make it effectively impossible for them to reoffend. Indeed, the only substantive change to who must register under SORA 2021 is that the law no longer applies to a very small number of people whose offenses were later expunged or set aside, or who successfully completed a diversion program under HYTA. M.C.L. § 28.722(a)(i)–(ii).[7]

217.    SORA 2021 continues to classify registrants into three tiers. Tier assignments are determined solely by the offense of conviction and govern both the number of years a person must register and the frequency of reporting. People are assigned to 15-year, 25-year, and lifetime registration without any individualized review ever. *See generally* M.C.L. §§ 28.722(q)–(v), 28.725(11)–(14), 28.725a.

218.    SORA 2021 retains virtually all of the 2011 SORA amendments and continues to apply them retroactively to pre-2011 registrants, despite the Sixth Circuit's clear holding that those amendments cannot be retroactively applied.

219.    SORA 2021 continues the retroactive extension of pre-2011 registrants' registration terms (e.g., lengthening the 25-year registration period to life) that was

---

[7] Because neither the expungement law, M.C.L. § 780.621c(1), nor HYTA, M.C.L. § 762.11(3)(d)–(e), applies to most sex offenses, these changes benefit only a tiny fraction of Michigan's registrants.

imposed under the 2011 SORA amendments. SORA 2021 also maintains the 2011 amendments' "recapture" provision, which imposes all of SORA's burdens on people with pre-SORA sex offenses (i.e., offenses from 1995 or earlier) if they are convicted of any non-sexual felony, even though they have not been convicted of another sex offense in a quarter century. M.C.L. § 28.723(1)(e).

220.   SORA 2021 also continues the extensive reporting requirements that were retroactively imposed under the 2011 SORA amendments. Those include the duty to report within three business days any changes to all sorts of information, such as changes to addresses, employment, schooling, vehicle information, email addresses, internet identifiers,[8] and telephone numbers. M.C.L. §§ 28.724a, 28.725, 28.727. SORA 2021 continues to require registrants to report to law enforcement in advance if they travel anywhere for more than seven days, including 21 days advance notice for foreign travel. M.C.L. § 28.725(2)(b), (8). While some changes to a registrant's information can now be reported by mail, many changes must still be reported in person. *See* M.C.L. §§ 28.724a, 28.725(1)–(2), 28.727; SORA 2021 Summary of Obligations, Disabilities, and Restraints, Ex. 2; MSP Letter, Ex. 15.

221.   Under SORA 2021, Tier II and III registrants continue to be publicly branded as sex offenders on the public registry, which publishes their pictures and

---

[8] The reporting requirement for email addresses and internet identifiers does not apply to pre-2011 registrants. M.C.L. § 28.725(2)(a).

extensive, personal information about them, including their weight, height, hair and eye color, tattoos/scars, birthdate, home address, employer address, school address, and vehicle information. The public registry can now even include a person's email and internet information, increasing the likelihood of online harassment. *See* Senate Substitute for H.B. 5679, 100th Leg., Reg. Sess. (Mich. 2020) (striking § 8(3)(e)). Tier level information is no longer posted, which makes everyone on the public registry appear to be equally dangerous. M.C.L. § 28.728(3)(e).

222.   Under SORA 2021, registrants must continue to pay an annual fee. M.C.L. § 28.725a(6).

223.   Many of SORA 2021's requirements remain incredibly unclear. The legislature amended certain provisions that were held to be unconstitutionally vague in *Does I* and *Does II*, but the new language is as vague as—if not vaguer than—the old language, appearing to require reporting of events going back decades. *See* Section V, Vagueness, *infra*.

224.   SORA 2021 continues to impose lengthy prison terms of up to ten years for non-compliance, as well as mandatory revocation of probation, parole, or youthful trainee status for even technical non-compliance or failure to pay the registration fee. M.C.L. § 28.729. The only change is that, in response to the *Does I* and *Does II* rulings, all SORA compliance violations must be shown to be willful (ending strict liability). *Id*.

47

225.   SORA 2021 bars virtually all registrants from petitioning for removal from the registry, meaning that for almost all registrants there is no path off the registry, regardless of demonstrated rehabilitation or current risk. The statute only allows certain Tier I registrants and juveniles who meet strict criteria to petition for removal after ten and twenty-five years, respectively. M.C.L. § 28.728c(1), (2), (12), (13). Other registrants who meet the same strict criteria are not allowed to petition for removal.

226.   SORA 2021 does eliminate the "geographic exclusion zones" that were adopted in 2006 and barred registrants from living, working or "loitering" within 1,000 feet of a school. But the practical impact of this change is limited because the state publicly brands people as sex offenders on the internet, posts their home and employment addresses, and even provides a mapping tool so that anyone using the internet can see where registrants live and work. The result is that registrants continue to have extreme difficulty finding and keeping housing and employment.

## II.    SORA 2021 DOES NOT PROMOTE PUBLIC SAFETY

227.   Plaintiffs incorporate by reference as if fully set out herein the expert reports of Dr. Karl Hanson (Ex. 3); Dr. Elizabeth Letourneau (Ex. 4); Dr. J.J. Prescott (Ex. 5); Dr. Kelly Socia (Ex. 6); Dr. Kristen Zgoba (Ex. 7); Dr. John Ulrich (Ex. 8); Dr. Sarah Lageson (Ex. 9); Barbara Levine, Esq. (Ex. 10); Anne Yantus, Esq. (Ex. 11); and Richard Stapleton, Esq. (Ex. 12), all of which are attached.

### SORA 2021 Is Counterproductive Because It Is Likely
### to Increase Rather than Decrease Sexual Offending

228.   The avowed purpose of Michigan's sex offender registry is set out in

the preamble as follows:

> The legislature declares that the sex offenders registration act was
> enacted pursuant to the legislature's exercise of the police power of
> the state with the intent to better assist law enforcement officers and
> the people of this state in preventing and protecting against the
> commission of future criminal sexual acts by convicted sex offenders.
> The legislature has determined that a person who has been convicted
> of committing an offense covered by this act poses a potential serious
> menace and danger to the health, safety, morals, and welfare of the
> people, and particularly the children, of this state. The registration
> requirements of this act are intended to provide law enforcement and
> the people of this state with an appropriate, comprehensive, and
> effective means to monitor those persons who pose such a potential
> danger.

M.C.L. § 28.721a.

229.   The idea that SORA 2021 will promote public safety is based on the

assumption that sex offender registration will reduce recidivism by people with past

convictions and thereby reduce the risk of sexual crime to the public.

230.   That assumption is false. To the contrary, **there is a clear scientific

and academic consensus that sex offender registration and notification laws like

Michigan's do nothing to benefit public safety.**

231.   As outlined in more detail in the declarations of Drs. Elizabeth Letour-

neau, J.J. Prescott, Kelly Socia, and Kristen Zgoba (Exs. 4, 5, 6, and 7), the research

shows that public registries do not reduce the frequency of sexual offenses, may well

*increase recidivism*, and at best have no impact on sexual recidivism—despite the immense cost to the state and to registrants of maintaining a registry law.

232. Indeed, dozens of studies by different researchers on the impact of sex offender registration laws have failed to uncover any evidence that public registries reduce recidivism. Rather, virtually all relevant empirical research strongly undermines any argument that public registries combat recidivism. Such laws simply do not reduce sexual reoffending. Instead, the research overwhelming shows that, at best, public registration laws make no difference to recidivism rates, that they may well increase recidivism, and that they are counterproductive to their avowed purpose of public protection. Prescott Decl., Ex. 5, ¶¶1–37; Letourneau Decl., Ex. 4, ¶¶6–11; Socia Decl., Ex. 6, ¶¶5–8.

233. Research on registration of juveniles similarly fails to find any public safety benefits. Letourneau Decl., Ex. 4, ¶¶6, 10.

234. Although it may seem counterintuitive that public registration *increases* rather than decreases recidivism, these results reflect the fact that sex offender registration and the attendant consequences exacerbate risk factors for recidivism such as lack of employment and housing, prevent healthy reintegration into the community, and have deleterious impacts on registrants' mental health. *See* Prescott Decl., Ex. 5, ¶¶1–37; Letourneau Decl., Ex. 4, ¶¶15–16. *See also* Section V, *infra*.

235. In a nutshell, the evidence indicates that the recidivism-increasing

effects of community notification laws at the very least offset and may overwhelm whatever public safety benefits such laws might offer (if any). Prescott Decl., Ex. 5, ¶1.

236.   Applied to Michigan, the research suggests that Michigan's registration statute contributes to sex offense rates in Michigan that are up to 5% higher than they would be without SORA 2021. Moreover, the continued growth in the size of the public registry will likely result in even more *additional* sex offenses as more and more people are added to the registry. Put simply, existing evidence suggests that, far from reducing recidivism, SORA 2021 is actively increasing the total number of sex offenses each year in Michigan. Prescott Decl., Ex. 5, ¶¶13, 15.

**SORA 2021 Misidentifies the Source of the Risk for Sexual Offending**

237.   The vast majority of new sex offenses—90 to 95%—are committed not by registered offenders, but by people without prior sex offenses who are thus not listed on a sex offender registry. Socia Decl., Ex. 6, ¶2.

238.   In addition, SORA 2021, by focusing on identifying strangers who might pose a danger, misidentifies where offending occurs. The vast majority of sex crimes are committed by acquaintances, family members, or other people who know the victim, rather than by strangers. Only 13 to 15% of sex crimes reported to the police are committed by strangers. Child-victim sex crimes are even less likely to involve strangers, who account for only 5 to 10% of such crimes. Socia Decl., Ex.

6, ¶4; Prescott Decl., Ex. 5, ¶32.

239.   The low proportion of sex crimes involving individuals on the registry—only 5 to 10%—combined with the low proportion of sex crimes involving strangers, helps explain why the research shows that sex offender registries are ineffective at reducing sexual offending or making communities safer. Socia Decl., Ex. 6, ¶5. *See also* Ira Ellman, *When Animus Matters and Sex Crime Underreporting Does Not: The Problematic Sex Offender Registry*, 7 U. Pa. J. L. & Pub. Affs. 1, 19 (2021) ("One can't have much impact on the overall incidence of sexual offenses by concentrating efforts on a group that accounts for less than 5% of them.").

### SORA 2021 Undermines Successful Reentry

240.   Not only do registration schemes fail to improve community safety, but they also undermine the ability of people with past sex offenses to successfully reintegrate into society. Letourneau Decl., Ex. 4, ¶¶6, 15–16; Prescott Decl., Ex. 5, ¶¶1, 34–51; Zgoba Decl., Ex. 7, ¶¶22–30; Socia Decl., Ex. 6, ¶¶8, 22–23.

241.   There is a scientific and academic consensus that people subjected to registration and notification requirements (like those imposed by SORA 2021) have difficulty finding and maintaining stable housing, employment, and prosocial relationships. Letourneau Decl., Ex. 4, ¶¶6, 15–16; Socia Decl., Ex. 6, ¶¶22–23; Zgoba Decl., Ex. 7, ¶¶22–30.

242.   Stable housing, employment, and prosocial relationships are the three

most important factors contributing to successful reentry and maintenance of a law-abiding lifestyle. Letourneau Decl., Ex. 4, ¶¶6, 15.

243. SORA 2021 imperils public safety by increasing the likelihood of joblessness, homelessness, and disconnection from prosocial friends and family, which in turn increases the likelihood of sexual and non-sexual recidivism. SORA 2021 thus sabotages its own avowed public safety goals. Letourneau Decl., Ex. 4, ¶¶6, 15.

244. The many burdens registrants face—the unstable housing and jobs, the public censure that creates a pariah class, and the difficulty of reintegrating into society as a result—help to explain why the research shows that public registries do not decrease recidivism, and if anything may *increase* recidivism by exacerbating the core risk factors known to contribute to reoffending. Prescott Decl., Ex. 5, ¶1.

245. The United States is one of the only countries in the world that publicizes sexual offender registry information. The great majority of other countries limit access or use of such information to law enforcement. Zgoba Decl., Ex. 7, ¶¶44–46.

### SORA 2021's Onerous Registration Requirements Serve No Legitimate Public Safety Purpose

246. SORA requires reporting of a vast array of information, often in person and within three business days, and in most cases for life. *See* SORA 2021 Summ. of Obligations, Disabilities, and Restraints, Ex. 2; Section V, Compelled Speech, *infra*.

247.   No empirical evidence supports the notion that more frequent registration check-ins lower recidivism, nor is there evidence that reporting additional information (*e.g.*, email addresses, employment information) reduces recidivism. Failure to register or comply with other registration requirements does not correlate with sexual recidivism. Letourneau Decl., Ex. 4, ¶¶19–21; Hanson Decl., Ex. 3, ¶77; Socia Decl., Ex. 6, ¶¶24–28; Zgoba Decl., Ex. 7, ¶¶12–19.

248.   Even though law enforcement officials do not use the extensive information reported, and even though failures to report this information have no impact on sexual re-offense rates, SORA 2021's one-size-fits-all regime subjects all registrants to an intensive reporting regimen that requires them to update even trivial changes to information within three days.

249.   Data produced in *Does I* showed that there were 14,884 prosecutions for SORA violations over a 15-year period from 1998 to 2012, averaging just under 1,000 per year. Data from 2010 to 2019 show an average of about 880 prosecutions per year (though this data set appears to under-report misdemeanor cases). Levine Decl., Ex. 10, ¶¶ 11, 25-28.

## III.   SORA 2021 SUBJECTS PEOPLE TO REGISTRATION WITH NO INDIVIDUALIZED REVIEW, EVEN THOUGH MANY HAVE A LOWER RISK OF SEXUAL OFFENDING THAN UNREGISTERED PEOPLE

### The Average Recidivism Rate of People with Past Sex Offenses Is Low

250.   As noted above, SORA 2021 retains most of the core provisions of the

old SORA. It is a one-size-fits-all regime designed for the highest risk offenders, without any individualized assessment of current risk. It presumes that all those convicted of a sex offense pose the same high risk to public safety—that they are all "a potential serious menace and danger," M.C.L. § 28.721a—and that they will remain so for decades or for life.

251.   Even if that assumption were true, it would not justify the harsh restrictions imposed by SORA 2021 because, as discussed above, those restrictions undermine the law's stated purpose and *reduce* public safety (or have no effect on it). *See* Section II, *supra*.

252.   The underlying assumption, however—that all people convicted of sex offenses present a serious and long-term public safety risk—is *patently false.*

253.   **Modern social science research confirms that most people convicted of a sex offense are never convicted of a second such offense.** Hanson Decl., Ex. 3, ¶¶3b, 13–14, 18; Letourneau Decl., Ex. 4, ¶¶6, 12; Socia Decl., Ex. 6, ¶¶9–12. In fact, nearly all methodologically rigorous research studies find that 80 to 90% of adult males with a past sex offense conviction are never convicted of a new sexual crime. Letourneau Decl., Ex. 4, ¶12.

254.   The recidivism rate of individuals with past sex offense convictions is also much lower than the recidivism rate (to commit a new offense of the same type

as the previous offense) of people convicted of virtually any other type of crime.[9]

### Comparing the Likelihood that Registrants Versus Non-Registrants Will Reoffend

255. For context, it is important to compare registrants' sexual recidivism rates with the likelihood of spontaneous, "out-of-the blue" sexual offending by people who have no prior history of sexual offending. There are two logical comparison groups: (1) people who have committed non-sexual offenses; and (2) the general population of adult males. Neither group is placed on sex offender registries. Hanson Decl., Ex. 3, ¶¶19, 73.

256. The rate of first time out-of-the-blue sex offenses by individuals with criminal convictions for non-sex offenses (but no history of sexual offending) is equivalent to a 5-year sexual recidivism rate of 2%, and an estimated lifetime rate of 3.8%. Hanson Decl., Ex. 3, ¶20.

257. The rate of first time out-of-the-blue sex offenses by males in the general population is equivalent to a 5-year sexual recidivism rate of 1% and a lifetime rate of 2%. Hanson Decl., Ex. 3, ¶22.

258. Any claim that SORA 2021 is intended to serve a public protection

---

[9] The recidivism rate for people with sex offenses is lower, and in most cases far lower, than for other categories of offenders (like people with assault, armed robbery, drug or property crime convictions). Only murderers have a lower recidivism rate. Socia Decl., Ex. 6, Finding #2; Hanson Decl., Ex. 3, ¶13.

function is undermined by the fact that it imposes registration on tens of thousands of people whose risk for sexual recidivism is not perceptibly higher than the baseline ambient risk presented by these two groups. Hanson Decl., Ex. 3, ¶¶3f–g, 19, 24–25, 75.

## The Likelihood of Reoffending Varies Greatly Among People with Past Sex Offenses

259.    One of the reasons that sex offender registration laws are so ineffective is that they do not accurately delineate the few people at higher risk to reoffend sexually from the large majority of people at lower risk to reoffend sexually. Letourneau Decl., Ex. 4, ¶13.

260.    Recidivism rates are not uniform across all individuals with a past sex offense conviction, but vary based on well-known factors. Hanson Decl., Ex. 3, ¶¶3a, 15–17, 29, Table 1. Thus, while the average recidivism rates are low even for an undifferentiated group of people with past sex offenses, those rates still significantly overstate the risk for lower-risk registrants by lumping them together with people who are at a higher risk of reoffending.

261.    The risk for sexual offending is highly correlated with age. The highest rates of offending are observed during the late teens and early 20s, with progressive declines thereafter. There are very few individuals over the age of 60 who present any significant risk for sexual recidivism. Hanson Decl., Ex. 3, ¶¶3c, 26.

262.    The most widely used risk assessment instrument for sexual offending,

the Static-99/Static-99R, groups individuals into five levels: Level I – Very Low Risk; Level II – Below Average Risk; Level III – Average Risk; Level IVa – Above Average Risk; and Level IVb – Well Above Average Risk. Hanson Decl., Ex. 3, ¶¶31, 35–42.

263.   Level I identifies individuals with a history of sexual crime whose risk for a subsequent sexual offense is no different than the rate of spontaneous out-of-the-blue sexual offending for individuals with a criminal history but no previous sexual offenses. Out of 100 individuals at this risk level, 98 will never be convicted of another sexual offense, even with follow-up periods extended to 20 years. The risk of recidivism for Level I individuals is so low that it would be practically impossible to lower it further. Hanson Decl., Ex. 3, ¶¶39, 45.

264.   Level II describes individuals whose risk for sexual recidivism is slightly higher than the general population, but still very low (1.6% to 2.2% after five years). Most Level II individuals will move to Level I given short term (six to 12 months) community supervision and focused counseling. Hanson Decl., Ex. 3, ¶40.

265.   Level III identifies individuals in the middle of the risk distribution for sexual recidivism. Out of 100 individuals classified as Level III, between three and seven will be expected to be reconvicted of a sexual offense within five years; conversely between 93 and 97 will remain sexual offense free. Hanson Decl., Ex. 3, ¶41.

266.   Individuals in the top two levels, Level IVa and IVb, are expected to

have sexual recidivism rates of between 9% and 60% after five years. Hanson Decl., Ex. 3, ¶42.

267.   At the time of release, most individuals with a sex offense history will be classified as Level III-average risk. Specifically, the distribution is as follows: Level I – 5.7%, Level II – 18.2%, Level III – 50.4%, Level IVa – 18.1% and Level IVb – 7.6%.  Hanson Decl., Ex. 3, ¶43.

268.   As discussed below, this distribution changes over time. After 10 to 15 years, the vast majority of individuals will transition to Level I, and their risk will be at or below the baseline risk for non-sexual offenders, and is so low that any further interventions have no public protection benefits. Hanson Decl., Ex. 3, ¶45.

**The Likelihood of Reoffending Drops Dramatically Over Time**

269.   The risk that a person will reoffend drops significantly for each year that a person spends in the community offense-free, decreasing dramatically over time. The longer individuals remain offense-free in the community, the less likely they are to reoffend. Most recidivism occurs within three years of a previous arrest and almost always within five years. The decline in recidivism risk for individuals who remain offense-free in the community is one of the most well-established findings in criminology. Hanson Decl., Ex. 3, ¶¶47, 54.

270.   The recidivism risk of people with past sex offenses drops on average by approximately 50% for each five years that they remained offense-free in the

community. In other words, if their risk was 10% at time of release, it would drop to 5% after five years, and to 2.5% after ten years. These reductions are particularly evident for the highest risk group, if they remain offense-free in the community over time. Hanson Decl., Ex. 3, ¶59.

271.   Individuals with a past sex offense conviction who are not arrested for a new sex offense will eventually become less likely to reoffend sexually than a non-registrant with a non-sex offense history is to commit an "out of the blue" sex offense. Hanson Decl., Ex. 3, ¶60.

272.   For methodological reasons and to improve accuracy, researchers have pegged the baseline rate to the rate of people who have been arrested for a non-sex offense but have no sex offenses. The rates of sexual offending in that group are in the 1 to 3% range within a five-year period. Researchers call this the "desistance" rate, which essentially measures when a person with a past sex offense conviction presents no more risk than someone who is not subject to sex offender registration requirements. Hanson Decl., Ex. 3, ¶¶61, 64.

273.   How quickly someone with a sexual offense history reaches the desistance level depends on their risk level at the time of sentencing/release. The lowest risk individuals are below the baseline from the outset. Individuals from all risk levels eventually cross the desistance threshold, meaning that their risk is below the baseline, as show in the chart below. Hanson Decl., Ex. 3, ¶¶3.f, 66–68.



274.   Most individuals, i.e., those in the middle of the risk distribution (Level III - average risk) crossed the desistance threshold after about ten years. Individuals classified at the highest risk levels (Level IVb – well above average risk) crossed the desistance threshold after about 20 years. Hanson Decl., Ex. 3, ¶66.

275.   In other words, the risk for a new sexual offense has, for practical purposes, been extinguished after people remain in the community for 20 years without reoffending sexually. This is true even for those individuals classified at the very highest risk level at the time of release. Hanson Decl., Ex. 3, ¶¶68–69.

276.   Research on recidivism also includes time-survival analysis. For example, a person's life expectancy at birth might be 82, but if the person lives to 82, the person may then have a life expectancy of 91. Similarly, the risk for future sexual

offending decreases when individuals remain offense-free during previous periods of relatively higher risk. Hanson Decl., Ex. 3, ¶70.

277.   The table below presents residual risk based on the initial risk classification and the number of years offense free in the community. The bolded values indicate when individuals with different initial risk levels present a risk for sexual recidivism that is not distinguishable from the rate of spontaneous out-of-the-blue sexual offending by males in the general community. Hanson Decl., Ex. 3, ¶72.

*Projected Residual Risk (Sexual Recidivism Rates [%]) From Time of Release Up to 20 Years Offense Free in the Community for Routine/Complete Samples* (adapted from Table S4 from Lee & Hanson, 2021)

| Follow-up | Initial risk (based on Static-99R scores) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Level I | | Level II | | Level III | | | Level IVa | | Level IVb | | | | |
| year | -3 | -2 | -1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| At release | **1.4** | 2.1 | 3.0 | 4.3 | 6.1 | 8.7 | 12.3 | 17.1 | 23.4 | 31.4 | 41.0 | 51.8 | 62.8 | 73.2 |
| 1 | **1.2** | **1.8** | 2.6 | 3.7 | 5.3 | 7.6 | 10.8 | 15.0 | 20.7 | 28.0 | 36.8 | 47.0 | 57.7 | 68.4 |
| 2 | **1.1** | **1.6** | 2.2 | 3.2 | 4.6 | 6.6 | 9.4 | 13.2 | 18.2 | 24.8 | 32.9 | 42.4 | 52.7 | 63.3 |
| 3 | **0.9** | **1.3** | **1.9** | 2.8 | 4.0 | 5.8 | 8.2 | 11.5 | 16.0 | 21.9 | 29.2 | 38.1 | 47.8 | 58.1 |
| 4 | **0.8** | **1.2** | **1.7** | 2.4 | 3.5 | 5.0 | 7.1 | 10.0 | 14.0 | 19.2 | 25.8 | 33.9 | 43.0 | 53.0 |
| 5 | **0.7** | **1.0** | **1.4** | 2.1 | 3.0 | 4.3 | 6.2 | 8.7 | 12.1 | 16.8 | 22.7 | 30.0 | 38.5 | 47.9 |
| 6 | **0.6** | **0.9** | **1.2** | **1.8** | 2.6 | 3.7 | 5.3 | 7.5 | 10.5 | 14.6 | 19.8 | 26.4 | 34.1 | 42.9 |
| 7 | **0.5** | **0.7** | **1.1** | **1.5** | 2.2 | 3.2 | 4.6 | 6.5 | 9.1 | 12.6 | 17.2 | 23.1 | 30.1 | 38.1 |
| 8 | **0.4** | **0.6** | **0.9** | **1.3** | **1.9** | 2.7 | 3.9 | 5.5 | 7.8 | 10.8 | 14.9 | 20.0 | 26.3 | 33.6 |
| 9 | **0.4** | **0.5** | **0.8** | **1.1** | **1.6** | 2.3 | 3.3 | 4.7 | 6.6 | 9.3 | 12.7 | 17.3 | 22.7 | 29.3 |
| 10 | **0.3** | **0.4** | **0.6** | **0.9** | **1.3** | **1.9** | 2.8 | 4.0 | 5.6 | 7.8 | 10.8 | 14.7 | 19.5 | 25.3 |
| 11 | **0.3** | **0.4** | **0.5** | **0.8** | **1.1** | **1.6** | 2.3 | 3.3 | 4.7 | 6.6 | 9.1 | 12.4 | 16.5 | 21.6 |
| 12 | **0.2** | **0.3** | **0.4** | **0.6** | **0.9** | **1.3** | **1.9** | 2.7 | 3.9 | 5.4 | 7.6 | 10.4 | 13.8 | 18.2 |
| 13 | **0.2** | **0.2** | **0.4** | **0.5** | **0.8** | **1.1** | **1.6** | 2.2 | 3.1 | 4.4 | 6.2 | 8.5 | 11.4 | 15.0 |
| 14 | **0.1** | **0.2** | **0.3** | **0.4** | **0.6** | **0.9** | **1.2** | **1.8** | 2.5 | 3.6 | 5.0 | 6.8 | 9.2 | 12.2 |
| 15 | **0.1** | **0.2** | **0.2** | **0.3** | **0.5** | **0.7** | **1.0** | **1.4** | 2.0 | 2.8 | 3.9 | 5.3 | 7.2 | 9.6 |
| 16 | **0.1** | **0.1** | **0.2** | **0.2** | **0.3** | **0.5** | **0.7** | **1.0** | **1.5** | 2.1 | 2.9 | 4.0 | 5.4 | 7.2 |
| 17 | **0.1** | **0.1** | **0.1** | **0.2** | **0.2** | **0.3** | **0.5** | **0.7** | **1.0** | **1.4** | 2.0 | 2.8 | 3.8 | 5.1 |
| 18 | **0.0** | **0.0** | **0.1** | **0.1** | **0.2** | **0.2** | **0.3** | **0.4** | **0.6** | **0.9** | **1.3** | **1.8** | 2.4 | 3.2 |
| 19 | **0.0** | **0.0** | **0.0** | **0.0** | **0.1** | **0.1** | **0.1** | **0.2** | **0.3** | **0.4** | **0.6** | **0.8** | **1.1** | **1.5** |
| 20 | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |

*Note.* Recidivism rate projections based on 5-year logistic regression estimates. Bolded values are below the baseline, ambient risk of out-of-the-blue sexual offending among adult males (lifetime risk < 2.0).

278.   The proportion of individuals that should be classified as low risk grows steadily over time. The table below show the proportion of individuals with a sexual offending history whose current risk is below the baseline offending rates of (a) individuals with a nonsexual conviction and no history of sexual crime (2% after five years; 3.8% lifetime), and (b) adult males in the general population (1% after five years; 2% lifetime). Hanson Decl., Ex. 3, ¶¶3.f, 74. Neither group is subject to sex offender registration.

*Proportion of Routine/Complete Samples of Individuals with a History of Sexual Offending Whose Current Risk Is Very Low Based on the Numbers of Years Sexual Offense Free in the Community.*

| Number of years sexual offence free | Threshold Used to Define Very Low Risk | |
|---|---|---|
| | Community Males (2% lifetime) | Individuals with a nonsexual criminal conviction (3.8% lifetime) |
| 0 – at time of release | 2.7 | 13.6 |
| 5 years | 13.6 | 39.6 |
| 10 years | 57.1 | 74.3 |
| 15 years | 85.0 | 96.0 |
| 20 years | 100.0 | 100.0 |

Initial risk estimates from Lee & Hanson (2021).  Distribution of risk levels based on Static-99R scores (Hanson, Lloyd et al., 2012).  Twenty-year (lifetime) sexual recidivism estimate based on methods described by Thornton et al. (2021).

279.   After ten years, most (57.1%) individuals with a sexual offense history will present no more risk than the general male population (2% lifetime). After 20 years offense-free, all will be classified as presenting no more risk than the general male population. Hanson Decl., Ex. 3, ¶¶3.f, 73–74.

280.   Using the less stringent criteria of the sexual offending rate of individuals with a nonsexual criminal conviction (3.8% lifetime), 13.6% would be very low risk at time of release. After five years almost 40% will be low risk, and this proportion increases to almost three-quarters (74.3%) after ten years. After 15 years, only a small proportion (four out of 100) of individuals released from a sexual offense would present more risk of sexual offending than any of the other individuals with past criminal justice system involvement—people who are not subject to registration. Again, after 20 years, all will be classified as presenting no more risk than non-registrants who have a non-sex conviction. Hanson Decl., Ex. 3, ¶74.

281.   Because recidivism risk declines so significantly with time spent offense-free in the community, as well as with advancing age, requiring registration for extended periods, much less for life, serves no public safety purpose.

### Empirically Validated Individualized Risk Assessment Tools Are Much More Effective Than the Offense of Conviction in Assessing the Likelihood of Reoffending

282.   States use a wide variety of methods to decide who will be on the registry, for how long, what their reporting requirements will be, and whether or not their

information will be available to the public online. Some states, unlike Michigan, use risk assessments, rather than the offense of conviction, to determine a person's registry classification. Zgoba Decl., Ex. 7, ¶¶39–43, 46.

283.   Actuarial risk assessment instruments—which are used to determine the statistical likelihood that an individual will reoffend based on known diagnostic indicators—are far better at predicting recidivism risk than the fact of a conviction. Hanson Decl., Ex. 3, ¶¶27–32; Zgoba Decl., Ex. 7, ¶¶36–37.

284.   The risk for sexual recidivism at the time of release can be reliably predicted by widely-used risk assessment tools, such as the Static-99R, which are used to assess the recidivism risk level of males who have committed sex offenses. Hanson Decl., Ex. 3, ¶¶3e, 29–32.

285.   The Static-99R, and its predecessor, the Static-99, are the most widely used and well-researched sex offense risk assessment instruments in the world. It is the risk prediction tool of choice for the Michigan Department of Corrections and is also used by other correctional entities in assessing parole suitability. Hanson Decl., Ex. 3, ¶¶31–32; Ulrich Decl., Ex. 8, ¶11.

286.   Factors considered in a Static-99R assessment include the nature of the sex-related offense or offenses that led to the most recent arrest (the "index offense"), demographics (age at release, relationship history), sexual criminal history (prior sexual offenses, any male victims, any unrelated victims, any stranger

victims, any non-contact sexual offenses), and general criminal history (prior sentencing dates, non-sexual violence committed along with the index offense, prior non-sexual violence). *See* Hanson Decl., Ex. 3, ¶30.

287.   The Static 99-R is designed to measure re-offense risk at the time of sentencing or release. Risk levels are not static, however, and drop dramatically over time, so when assessing *present* risk levels, the results of a Static-99/99R assessment must be analyzed in conjunction with the amount of time offense-free in the community. Therefore, a "Time Free in the Community Calculator" is used to adjust the initial Static 99/99R score to the present risk level. *See* Hanson Decl., Ex. 3, ¶¶3f, 55–72; Ulrich Decl., Ex. 8, ¶16.

288.   Using empirically validated risk tools like the Static-99R, decision-makers can identify registrants who pose no more risk of recidivism than do people who have never been arrested for a sex-related offense but have been arrested for some other crime, or whose risk has fallen below that of males in the general population. Hanson Decl., Ex. 3, ¶¶29–75.

### SORA 2021's Conviction-Based Registration Requirements and Conviction-Based Tier Assignments Do Not Correspond to Risk

289.   SORA 2021 mandates that people convicted of listed offenses register as sex offenders. The requirement to register is based solely on the offense of conviction, without any determination of risk. M.C.L. § 28.723.

290.   The law imposes registration regardless of whether the registrant

presents any risk to anyone and without any attempt to use risk assessment instruments that are both cost effective and much more accurate than the offense of conviction at predicting risk. Prescott Decl., Ex. 5, at 2.

291. With the exception of a small number of Tier I and juvenile registrants, SORA 2021 contains no mechanism that would allow people to be removed from the registry based on a showing that they do not present a risk to the community.

292. SORA 2021's extensive obligations, including in-person reporting, remain in force regardless of how long the person has lived successfully in the community. The level of supervision and reporting, and the restrictions the law imposes, do not decrease over time, but remain permanent—mostly for 25 years or for life.

293. A person's tier assignment is also determined by the conviction (and in some cases the age of the victim or age difference between the registrant and the victim). M.C.L. §§ 28.722, 28.723.

294. Tier classifications are not based on, and do not correspond to, a registrant's actual risk of reoffending or the danger any registrant poses to the public.

295. A registrant's tier classification determines the length of time that a person must register and the frequency of reporting. Tier I registrants must register and comply with all obligations imposed by SORA 2021 for 15 years; Tier II registrants must register and comply for 25 years; and Tier III registrants must register

and comply for life. M.C.L. §§ 28.722(q)–(u); 28.725(10)–(13) amended.

296.   Tier I registrants are, in most case, on the non-public registry, while Tier II and Tier III registrants are (with the exception of juveniles) on the public registry. M.C.L. § 28.728(2), (4).

297.   Thus, whether an individual is listed on the public registry, how long an individual must register, and how often an individual must report, are all also based solely on the offense of conviction, without any assessment or consideration of actual risk.

298.   The nature of the sexual offense conviction (the name of the offense or criminal code section), however, is unrelated to the risk of recidivism. Hanson Decl., Ex. 3, ¶¶3d, 27–28.

299.   Although there are differences in the moral seriousness of sexual crimes and the level of punishments that society deems appropriate, the seriousness of the offense is largely unrelated to the likelihood of recidivism. In fact, people who have committed more intrusive sexual offenses are, if anything, less likely to reoffend than people who have committed non-contact sexual offenses. Hanson Decl., Ex. 3, ¶27.

300.   There are also no reliable differences in recidivism rates based on whether the victim was a child (12 or under), youth (13 to 17), or adult (18+). Hanson Decl., Ex. 3, ¶27.

301. Although SORA 2021 largely uses perceived offense seriousness and the age of the victim as the basis for determining tier levels (which in turn determine how long a person will be required to report and the frequency of reporting), such offense-based levels have little relationship to the likelihood that a registrant will reoffend. Hanson Decl., Ex. 3, ¶28; Zgoba Decl., Ex. 7, ¶¶36–37.

302. Indeed, large scale empirical research has shown that the federal tier levels—which SORA 2021 adopts from the federal Sex Offender Registration and Notification Act (SORNA)—either do not correlate or *correlate inversely* with sexual reoffending. In other words, not only does research show that tier levels do not correspond to the likelihood that a person will reoffend, but research shows that **the tier levels are actually backwards**: if anything, people in a higher tier reoffend at lower rates than people in a lower tier. This is not surprising given that SORNA-derived tiering—as in Michigan—is based on the offense of conviction, which has **no bearing on recidivism risk.** Letourneau Decl., Ex. 4, ¶13; Hanson Decl., Ex. 3, ¶28; Zgoba Decl., Ex. 7, ¶¶36–38.

303. In sum, Michigan's "one-size-fits-all" conviction-based registration requirements and conviction-based tier structure bear no rational relationship to the actual risk that individual registrants might pose to the community.

### The Named Plaintiffs Are Very Unlikely to Reoffend

304. All named Plaintiffs have a track record of living successfully in the

community and all present a very low risk of committing another sexual offense.

305. Dr. John Ulrich, a licensed psychologist who provides risk assessments for the federal and Michigan state courts, the Michigan Department of Corrections, and other entities, conducted actuarial risk assessments for seven of the named male Plaintiffs using the Static-99R and the Time Free in the Community Calculator. Ulrich Decl., Ex. 8, ¶¶2–3, 5–7.

306. Dr. Ulrich found that all seven of the assessed Plaintiffs are very unlikely to reoffend. At the time of their release into the community, all were classified in the Level III/Average risk classification (Static-99R scores of 1, 2 or 3). Based on time offense-free in the community since, none of them remains in that classification. Six of the seven are in the Level I/Very Low Risk category and have attained a risk level that is deemed to be "desistance" in the research literature. Ulrich Decl., Ex. 8, ¶¶3, 17; *see also* Hanson Decl., Ex. 3. Indeed, four of the seven (Mr. Does B, C, D, and E) have a lower statistical probability for committing a new sexual offense than the average adult male in the general population has to commit a sexual offense "out of the blue." Ulrich Decl., Ex. 8, ¶3. The seventh will drop to Level I in May 2023, absent a new offense. Ulrich Decl., Ex. 8, ¶3.

307. John Doe A could not be scored as he did not commit a sex offense. As an individual with no sex offense history but a criminal history, his risk for committing a sexual offense at the time of release would be comparable to that of males

released from prison who committed a non-sexual offense but have no sex offense history, which is around 2% after five years. That number declines further with the passage of time offense free in the community. Mr. Doe A has now lived offense free in the community since 2009. Ulrich Decl., Ex. 8, ¶24.

308.   Dr. Ulrich found that John Doe B reached the Level I/Very Low Risk category—indicating desistance from sexual offending—in 2008 (13 years ago). His current risk would be even lower and is no greater than a male in the general public who has not committed a sex offense. Ulrich Decl., Ex. 8, ¶26.

309.   Dr. Ulrich found that John Doe C reached the Level I/Very Low Risk category—indicating desistance from sexual offending—in 2014. His current recidivism risk is 0.9%, and his risk of committing a new sexual offense is no greater than that of a male in the general public who has not committed a sex offense. *Id.*, ¶28.

310.   Dr. Ulrich found that John Doe D crossed the threshold for a Very Low Risk classification in 2011. His current risk is less than 1%, and is no greater than that of a male in the public who has not previously committed a sex offense. Ulrich Decl., Ex. 8, ¶30.

311.   Dr. Ulrich found that John Doe E reached the Level I/Very Low Risk category—indicating desistance from sexual offending—in 2005 (16 years ago). In 2011 (ten years ago), his estimated risk was less than 1%, which is no greater than that of a male in the public who has not previously committed a sex offense. His

current risk would be even lower. Ulrich Decl., Ex. 8*, ¶*32.

312.   Dr. Ulrich found that John Doe F currently has a residual lifetime risk of 4.0%, placing him in the Level II/Below Average Risk category. In May 2023, absent a new sexual offense, Mr. Doe F will cross the threshold into Level I/Very Low Risk classification with the residual lifetime risk of 2.8%—which the research literature signifies as desistance from sexual offending. Ulrich Decl., Ex. 8, ¶34.

313.   Dr. Ulrich found that John Doe G has a 2.4% risk of committing a new sexual offense, placing him in Level I/Very Low Risk classification, which is also considered sexual offending desistance. Ulrich Decl., Ex. 8, ¶36.

314.   Dr. Ulrich found that John Doe H has a 2.7% risk of committing a new sex offense, placing him in the Level I/Very Low Risk classification.

315.   The Static-99R could not be scored for Mary Doe and Mary Roe as it has not been validated for women. The base rate of sexual recidivism among women, however, is very low and is about 1% - 3% at the time of release. The base rate is the best available metric for assessing risk and informing legal policies. Ulrich Decl., Ex. 8, ¶¶40–41, 44.

316.   For women who have been living offense free in the community, the risk of reoffending declines even faster than for men. Women who are not chronic offenders and have been living offense-free in the community for more than a few years have a very low risk of reoffending. Ulrich Decl., Ex. 8, ¶44.

317.    Given the low baseline risk for women offenders and the fact that Mary Doe and Mary Roe were released in 2004 and late 2005 (17 and 15 years ago, respectively), their risk for sexual offending is extremely low and equals desistance. Ulrich Decl., Ex. 8, ¶45.

### The Vast Majority of Class Members Will Never Reoffend, and Thousands of People Who Are Subject to SORA 2021 Are Less Likely to Commit a Sex Offense Than People Who Are Not Subject to Registration

318.    The vast majority of Michigan's registrants will not recidivate. This is true for several reasons.

319.    First, as discussed above, most people convicted of sexual offenses do not recidivate.

320.    Second, as also discussed above, people convicted of sexual offenses are a heterogeneous group whose risk level varies.

321.    Third, there are thousands of people, and possibly tens of thousands of people, subject to SORA 2021 who have lived offense free in the community for ten years, or for decades.

322.    Data introduced in the *Does I* litigation showed that there were almost 26,000 registrants in January 2001 (20 years ago), over 38,000 registrants in January 2006 (15 years ago), and about 47,000 registrants in January 2011 (10 years ago). *See Does I*, No. 12-cv-11194, Total Number on SOR By Year, R. 92-3. Today that total number is closer to 55,000 people. Levine Decl., Ex. 10, ¶15.

323.   Recent data show that there are approximately 42,000 registrants (over 78% of the total) who have either a conviction or offense date prior to July 1, 2011, more than ten years ago. Levine Decl., Ex. 10, ¶16.d.

324.   In other words, a large proportion of registrants have been on the registry for at least ten years. If they were released and have not reoffended for ten years, most such registrants' risk drops below the risk of other *unregistered* males in the general population. For registrants who were released and have not reoffended for 20 years or more, all will have a risk lower than other unregistered males. Hanson Decl., Ex. 3, ¶75.

325.   While some of these registrants will have been incarcerated for part or even all of that time, and some may have reoffended, the data suggests that there are likely thousands, and possibly tens of thousands, of registrants who have reached desistance—where it makes no sense to keep them on a registry once they pose the same or less risk of committing a sexual offense than unregistered males in the population.

326.   There are also a significant number of registrants who are 60 years or older, a point after which the risk for reoffending is minimal. Hanson Decl., Ex. 3, ¶¶3.c, 26.

327.   The longer Michigan's registry continues in its current form, the greater the percentage will be of individuals subjected to registration even though their risk

level is at or below that of comparable unregistered groups. This is because SORA 2021, like its predecessors, imposes extremely long registration terms.

328.  About 73% of registrants (more than 39,000 people) are classified as Tier III registrants and subject to lifetime registration; 20% (more than 10,000 people) are on the registry for 25 years as Tier II; and only 6.5% (almost 3,500 people) are on the registry for 15 years as Tier I. Levine Decl., Ex. 10, ¶¶ 8, 16.b.

329.  There are surely thousands, and possibly tens of thousands, of people subjected to sex offender registration in Michigan who—given their initial risk classification and time offense free in the community—are no more likely to commit a sexual offense than the general population of adult males in Michigan. Hanson Decl., Ex. 3, ¶75.

330.  Keeping thousands of very low risk individuals on the registry serves no public safety purpose. Hanson Decl., Ex. 3, ¶75.

## IV.  THE DIGITAL AGE HAS FUNDAMENTALLY CHANGED THE CONSEQUENCES OF BEING SUBJECTED TO SEX OFFENDER REGISTRATION

### Michigan's Public Sex Offender Registry Is Unlike a Criminal Records Archive

331.  Two decades ago, the U.S. Supreme Court described an early version of an internet sex offender registry as "analogous to a visit to an official archive of criminal records," *Smith v. Doe*, 538 U.S. 84, 99 (2003). In the nearly two decades since, technology has dramatically changed the form, function, and reach of registry

information. Lageson Decl., Ex. 9, ¶11.

332.   The architecture and user functions available on the Michigan registry encourage browsing, mapping, and tracking registrants, rather than accessing targeted archival information. The design, language, and functionality of Michigan's registry website represent each person listed as a current danger to society, regardless of whether the person presents such a risk and even though the registry lacks individualized review. Lageson Decl., Ex. 9, ¶¶12–13.

333.   The search page signals that registrants are dangerous, stating: "This registry is made available through the Internet with the intent to better assist the public in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders."

334.   The registry is designed to allow users to browse a list of registrants, rather than requiring a targeted name or address search. Internet users need not search for information about specific individuals or locations to have information provided to them that a neighbor or colleague is on the registry, as shown in the image below. Lageson Decl., Ex. 9, ¶¶29–32.



335.   An internet user who searches a specific address, city, county, or zip code will pull up an interactive map of the location of all registrants within a specified radius, and need only click on the small black registrant icons to pull up the photo and all the registry details on each person in the area, as shown in the image below. Lageson Decl., Ex. 9, ¶30.



336.    The public can also search by zip code, city, or county. Such a search will pull up a list of registrants, showing their photos, compliance status, name, address, and age, with a clickable link to take the user directly to the registrant's individual page.

337.   Each registrant's "home page" contains a photo, along with extensive, stigmatizing information about them, and has clickable links to numerous other pages with further information, as shown in the image below.

79



338.   One of the first pieces of information presented about a registrant is whether the registrant is "compliant," suggesting that registrants are being continually supervised because they are currently dangerous to the public. Lageson Decl., Ex. 9, ¶40. A registrant might be shown as "non-compliant" for a variety of reasons, including not having paid the required fee, as shown in the image below.



Last Verification Date: **07/01/2021**

Compliance Status: **Non-Compliant**

> • **Fee Violation**

ate: 10/16/2017

339.   Prominent colored buttons at the top of each registrant's home page allow the user to "track offender," "map offender," and "submit a tip," all of which suggest that the individual is dangerous.

80

340.   The "track offender" button allows the user, with a simple click, to sign up for continuous updates about a particular registrant, as shown in the image below. Lageson Decl., Ex. 9, ¶39.



341.   With a click on the "map offender" button, the user can see a map pinpointing the person's address, with a balloon showing details including the person's name, compliance status, address, and age.

342.   A user who clicks on the "submit a tip" button will be asked to "[p]lease provide information regarding this offender." Tips can be provided anonymously. More information about tips is shown in the image below.

**Offender Tip Submission**

If you wish to remain Anonymous, check the box at the top of the form below. If you choose to report anonymously, please provide all the details that you can in your tip, as local law enforcement will not be able to contact you for further clarifying details.

**Your contact information**

☑ Do you wish to remain Anonymous?

| First Name | Middle Name | Last Name |
|---|---|---|
| Anonymous | Anonymous | Anonymous |

Address

Anonymous

Do not enter P.O. Box

| City | State | Zip |
|---|---|---|
| Anonymous | ▼ | Anonymous |

| Email | Confirm Email |
|---|---|
| Anonymous | Anonymous |

| Primary Phone | Work Phone |
|---|---|
| Anonymous | Anonymous |

[Submit] [Reset]

**Offender information**

Subject

███████████████████████

Please provide information regarding this offender

This is a required field.

343.    Much of the information on registrants' "home page"—such as compliance status, registration status, last verification date, registration number, and Michigan Department of Corrections (MDOC) number—likewise suggests that they are being monitored because they are a current danger. Other personal information—like the person's weight, height, and race—is also listed.

344.    The "home page" lists a person's home address, work addresses, and school addresses.

345.    Another click on "offenses" shows the user the person's registrable convictions. Contextual information that would likely be apparent in a court file—such as that the offense occurred when the registrant was a teenager or involved consensual sex with an under-age partner—is not provided.

346.    Presenting offense information alongside a current photo and address

82

creates the perception that the person is currently dangerous. It can also create harmful misperceptions about the offense itself. For example, an internet user viewing a photograph of a 55-year-old registrant who is listed for "criminal sexual conduct III (person 13-15)" will likely assume that there was a 40-year age gap, when in fact, given the age of the offense, the registrant may be listed for having had a teenage relationship. Lageson Decl., Ex. 9, ¶44.

347.   Additional clicks pull up information about a person's "aliases" (which could simply be a person's maiden name), offenses, scars/tattoos, and vehicles, including the make, year, color, and license plate number. The message sent is that the viewer should be "on the lookout" for all of these things because the registrant presents a current and outsized danger to the public.

348.   Internet users can also register to receive email alerts about any registrants who move within a selected radius of a specified address, as shown below.

## Sign up for Alerts by Location

By registering an address, you agree to receive email alerts about any registered offender(s) moving within the selected radius of the address provided.

You will receive a confirmation email within 24 hours confirming your registration. If you do not receive an email confirming your registration in your Inbox, please check your Junk or Bulk Email folders.

Search within [ .25 ] mile(s) of

| Address | City | State | Zip |
|---|---|---|---|
| 123 Rawles Avenue | Lansing | MI | 48917 |

Do not enter P.O. Box
This is a required field.

| Email | Confirm Email |
|---|---|
| johndoe@example.com | johndoe@example.com |

☐ By submitting your information you are agreeing to our Terms Of Use. Please view our Privacy Policy.

[Submit]   [Reset]

349.  The registry is unlike other forms of state public criminal records, which require a targeted search of a specific person; do not allow for browsing of lists of convicted persons; do not include mapping, tracking, or alert capabilities; and do not present up-to-date personal information. The interface, interactivity, format, and text of the registry website are unlike a criminal records archive: the registry does not simply provide historical conviction information, but displays registrants as presently dangerous. Lageson Decl., Ex. 9, ¶¶33–45.

### The Impact of Sex Offender Registration Today Is Entirely Different From What It Was Two Decades Ago

350.  When *Smith* was decided in 2003, the internet was a vastly different tool than it is today. Only 15% of Americans had broadband internet in their homes; only 3% got most of their information about the September 11th attacks from the internet; and only 6% said they would have a hard time given up their wireless devices. Lageson Decl., Ex. 9, ¶¶46–47.

351.  Today, the internet is the new public square, and the primary location for economic, social, political, and commercial exchanges. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) ("While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular." (internal quotation marks and citations omitted)).

352. People's registry status has become digitally linked to their names and is retrievable via basic internet searches—indeed it is often the first thing that will show up on a search of a person's name on Google. Search engine optimization has increased public access to registrants' personal information because internet search engine algorithms prioritize that information. Lageson Decl., Ex. 9, ¶¶22, 64–69.

353. Michigan's disclosures of data that allow for the monitoring of registrants are re-disseminated across the internet, as they are cataloged, indexed, sold, and shared by third parties. Today, registry information is routinely scraped, copied, aggregated, and re-posted to private websites. Unlike the earlier schemes that required users to conduct a targeted search for specific registrants on a government-run website, registrants' personal information is now "harvested" to drive web traffic to specific websites and to increase "clicks" through posting registrant information on, for example, real estate and other public records websites. Lageson Decl., Ex. 9, ¶¶15–16, 22.

354. Changes in internet infrastructure and database technology over the nearly two decades since *Smith v. Doe* have transformed registry information from a government-run source that a user had to intentionally access, into a large scale, private-sector data commodity that is duplicated, aggregated, and pushed to innumerable internet users who passively receive registrant information without even intending to access it. Lageson Decl., Ex. 9, ¶¶50–62.

## The Ubiquity of Registry Information on the Internet Causes Registrants to Live in Fear and to Avoid the Internet, with Damaging Consequences to Reentry

355.   When a person's registry status "pops up" on the internet, the consequences can be devastating, impacting employment, housing, education, and involvement in civic, religious, social, and family life. Easy access to registry information also results in registrants becoming the targets of on- and off-line vigilantism. Lageson Decl., Ex. 9, ¶¶74–95.

356.   The ubiquity of registry information on the internet leads registrants to purposefully avoid digital and institutional spaces that rely on the internet, which in today's world, is central to public and private life. Registrants' opting out of institutional and social life through "digital avoidance" has consequences for recidivism and public safety, because it makes it more difficult for registrants to access the basic necessities shown to prevent crime, such as safe and stable housing, employment, and community relationships. Lageson Decl., Ex. 9, ¶¶17–18.

357.   The consequences of digital labeling through the format of the Michigan registry and the attendant dissemination of registry information on private websites ultimately undermines public safety by making pariahs of registrants, effectively cutting them out of social, institutional, and technological life. Lageson Decl., Ex. 9, ¶19.

358.   Plaintiffs live in fear that anyone who Googles their names will

86

discover that they are on the registry, and that they will lose their jobs, housing, educational opportunities, or relationships as a result. This fear leads Plaintiffs to curtail their online presence, often restricting their use to a close circle of friends and family who already know about their criminal history.

359.   For example, Mr. Doe B, who was removed from the public registry as a result of the *Does I* litigation, now has his own website for his real estate business and has strong reviews. He is extremely concerned that going back on the public registry as a result of SORA 2021 will mean that anyone looking for his services as a realtor will find out he is on the registry, or that one review mentioning his status will ruin his livelihood and ability to provide for his family.

360.   Ms. Doe has had panic attacks about being outed publicly, or at work, where her co-workers do not know she is on the registry. In building relationships, she never knows whether to reveal her status, which often leads to the person cutting her off, or not to reveal her status, only to have the person find out and feel betrayed. Coming off the public registry as a result of the *Does I* litigation allowed her to begin developing relationships in a more normal way. SORA 2021 again brands her publicly as a sex offender, and she will again be living in fear that a random Google search by a colleague or neighbor could upset the life she has built.

361.   Similarly, Ms. Roe, who built a successful business as a therapist after coming off the public registry as a result of the *Roe* litigation, now lives in constant

fear that she will be outed to clients and potential clients as a sex offender and will lose everything she has worked so hard for. She uses almost no public social media and avoids any online attention. The prospect of being back on the registry pushed her into therapy for depression and post-traumatic stress disorder (PTSD).

362.   After his girlfriend's death, Mr. Doe F began going online to support other people who were dealing with leukemia. He worries that others in these support groups will find out that he is a registered as a sex offender and reject his help.

## V.   SORA 2021 IMPOSES DEVASTATING BURDENS ON THE NAMED PLAINTIFFS AND THE CLASS

363.   SORA 2021 imposes a vast array of obligations, disabilities, and restraints that govern every aspect of Plaintiffs' lives. *See* Summ. of SORA 2021's Obligations, Disabilities, and Restraints, Ex. 2. SORA 2021 compels Plaintiffs to continually provide a great deal of information about themselves to law enforcement, much of which must reported in person and/or within three days—a burden that for most registrants lasts for life. SORA 2021 subjects Plaintiffs to continuous surveillance and supervision, and stigmatizes them as dangerous without any individualized assessment. In addition, SORA 2021 severely limits their ability to find housing and employment; to get an education; to travel; to engage in free speech, including use of the internet; to be free from harassment and stigma; and to understand what is required of them under the statute.

364.   Finally, registration under SORA 2021 triggers a vast array of

additional obligations, disabilities, and restraints under federal, state, and local laws (as well as private policies barring or limiting registrants from access to goods or services available to the public), all without any individualized assessment or showing either that registrants pose a danger or that the restrictions make communities safer.

### Compelled Speech

365. Registrants are compelled under threat of criminal prosecution to provide extensive information to the state, including:

- Legal name and any aliases, nicknames, ethnic or tribal names, or other names by which the individual is or has been known. M.C.L. § 28.727(1)(a).

- Social Security number and any Social Security numbers or alleged Social Security numbers previously used. M.C.L. § 28.727(1)(b).

- Date of birth and any alleged dates of birth previously used. M.C.L. § 28.727(1)(c).

- The address where the individual resides or will reside. M.C.L. § 28.727(1)(d).

- The name and address of any place of temporary lodging used or to be used during any period in which the individual is away, or is expected to be away, from his or her residence for more than 7 days, including the dates when the temporary lodging is used or to be used. M.C.L. § 28.727(1)(e).

- The name and address of each employer, including any individual who has agreed to hire or contract for the individual's services. M.C.L. § 28.727(1)(f). It is unclear whether these requirements apply to volunteer work. *Compare* M.C.L. § 28.727(1)(f) (requiring reporting on "employers" and defining "employer" to include individuals who "hire or contract" with the registrant), *with* M.C.L. § 28.722(d) (defining "employee" to mean "an individual who is self-employed or works for any other entity as

a full-time or part-time employee, contractual provider, or volunteer, regardless of whether he or she is financially compensated").[10]

- The general areas where the individual works and the normal travel routes taken by the individual in the course of his or her employment if the individual lacks a fixed employment location. M.C.L. § 28.727(1)(f).

- The name and address of any school being attended, or any school that has accepted the individual as a student that he or she plans to attend. M.C.L. § 28.727(1)(g).

- All telephone numbers, including but not limited to residential, work and mobile phone numbers, registered to or used by the individual. M.C.L. § 28.727(1)(h).

- All electronic email addresses registered to or used by the individual, if the individual was required to be registered after July 1, 2011. M.C.L. § 28.727(1)(i).

- All internet identifiers, meaning all designations used for self-identification or routing in internet communications or posting, registered to or used by the individual, if the individual was required to be registered after July 1, 2011. M.C.L. §§ 28.722(g); 28.727(1)(i).

- The license plate number and description of any vehicle owned or operated by the individual. M.C.L. § 28.727(1)(j).

- Driver's license number or state personal identification card number. M.C.L. § 28.727(1)(k).

- A digital copy of the individual's passport and other immigration documents. M.C.L. § 28.727(1)(l).

- Occupational and professional licensing information, including any license that authorizes the individual to engage in any occupation, profession, trade, or business. M.C.L. § 28.727(1)(m).

---

[10] Defendants take the position that this requirement applies to volunteer work. *See* Explanation of Duties, Ex.16, ¶6.b.

- Written documentation of employment status, contractual relationship, volunteer status, or student status when individual enrolls or discontinues enrollment at an institution of higher education. M.C.L. §§ 28.724a(5), 28.727(1)(r).

- A complete physical description of the individual. M.C.L. § 28.727(1)(o).

366. Tier III registrants must report this information every three months; Tier II registrants must report it twice a year; and Tier I registrants must report it yearly. M.C.L. § 28.725a(3).

367. SORA 2021 also requires registrants to provide a photograph, fingerprints, and palm prints. If registrants' appearance changes, they must update the photograph within seven days. M.C.L. §§ 28.725a(5), (8), 28.727(1)(q).

368. In addition to reporting in person at regular intervals, registrants living in Michigan must report within three business days in person, or in another manner prescribed by the MSP, whenever certain information changes. M.C.L. §§ 28.724a, 28.725(1)-(3).

369. Registrants must report **in person** within three days, either because the statute requires it or because the MSP has required in person reporting,[11] whenever the registrant:

- Changes or vacates his or her residence or domicile. M.C.L. § 28.725 (1)(a).

---

[11] The MSP's determination about what information must be reported in person can be gleaned from the notification letter sent to registrants about the new statute, Ex. 15, and the Explanation of Duties, Ex. 16.

- Changes his or her place of employment. M.C.L. § 28.725(1)(b), (3).

- Discontinues employment. M.C.L. § 28.725(1)(b). Again, it is unclear whether these requirements apply to volunteer work.

- Changes his or her name. M.C.L. § 28.725(1)(d).

- Enrolls as a student. M.C.L. § 28.724a(1)(a), (3)(b).

- Discontinues enrollment as a student. M.C.L. § 28.724a(1)(a), 28.724a (3)(b).

- If, as part of his or her course of studies, the individual is present at any other location in Michigan or throughout the United States. M.C.L. § 28.724a(1)(b), (3)(b).

- If the individual discontinues his or her studies at any other location in Michigan or throughout the United States. M.C.L. § 28.724a(1)(b), (3)(b).

- Before the individual changes his or her domicile or residence to another state. The new state and, if known, the new address must be reported at the time of reporting. M.C.L. § 28.725(7).

370.    In addition, registrants living in Michigan must report within three

days:

- Any intention to travel for more than seven days. M.C.L. § 28.725(2)(b)

- Any change in vehicle information. M.C.L. § 28.725(2)(a).

- Any change in telephone numbers registered to or used by the individuals. M.C.L. § 28.725(2)(a).

371.    Registrants living in Michigan who are required to register after July

1, 2011, must also report any change in electronic mail addresses or internet identi-

fiers within three days. M.C.L. § 28.725(2)(a). The term "internet identifiers" is

broadly defined to mean all designations used for self-identification or routing in

internet communications or posting. M.C.L. § 28.722(g).

372.   In an apparent attempt to make it easier for prosecutors to establish the willfulness requirement that the *Does I* and *Does II* courts said is constitutionally required to establish a SORA violation, the MSP amended the language of the Explanation of Duties form, Ex. 16. Registrants must now agree and sign that: "I have read the above requirements and/or had them read to me and I *understand* my registration duties." (Emphasis added.)

373.   Similarly, registrants who update information using the Michigan Sex Offender Registry Mail-in Update Form, Ex. 17, must sign that "I have read the 'Explanation of Duties to Register as a Sex Offender' listed on pages two and three of this form and/or had them read to me and I *understand* my registration duties." (Emphasis added.)

374.   It is a crime for registrants not to sign the Explanation of Duties, M.C.L. §§ 28.727(4), 28.729(3). Thus, Plaintiffs must either attest that they understand SORA 2021's complex requirements—even if they do not—or face prosecution.

375.   Compelling registrants to attest that they understand SORA 2021 is unnecessary. Prior to 2021, registrants were simply required to acknowledge having read the Explanation of Duties form, but were not forced to attest to their understanding of the law. Pre-2011 Explanation of Duties, Ex. 19.

376.   Because registrants must complete their verifications in person, and

report many changes of information in person, SORA 2021 not only compels them to speak, but also requires them to do so in particular places—typically in busy police station lobbies where they can be heard by others—at particular times.

377.   Not every law enforcement agency in Michigan handles registration. Some agencies that do handle registration only allow reporting at specific times. Some registrants must travel long distances to report or must wait in long lines when they report. The process of registering even a simple change of information can sometimes take hours, and registrants may need to take considerable time off work to report.

378.   For example, at times Mr. Doe B's police station was open for registration only three to four hours a day, with a different schedule depending on the day of the week. When updating registry information, he sometimes took off work and went to register, only to find that the office was closed. At present, the situation is worse—his current station is open for registration fewer days a week for fewer hours, and the hours are more erratic.

379.   Registering can also be humiliating. For example, at times Mr. Does B has reported when the police station was crowded with other people. Instead of asking if he had any changes to report and having him sign the form, the officers taking his report raised their voices and seemed to make a point of humiliating him by keeping him at the window and letting everyone in the room know that he was

on the registry.

380.   Mr. Doe C, who knows a lot of people in his community, tries to report as early in the morning as possible in the hopes that there will be few people, and no one he knows, at the police station. He is embarrassed to have to stand in a public lobby and explain that he is there to register. If he sees people he knows, he goes and waits outside until they leave, so that they don't hear him say that he's a sex offender.

381.   When Mr. Doe D previously reported at his nearest MSP post, it would often take him hours to complete the verification process. He was embarrassed having to wait in a crowded lobby for the police to publicly announce that he was there to register as a sex offender.

382.   Mr. Doe E tries to report at the same law enforcement location to avoid being harassed by employees or members of the public at a new place. Still, every time he goes in, he is worried about how members of the public will react if they see that he is there to register as a sex offender.

383.   Mr. Doe G has been repeatedly reported as non-compliant even when he was in fact compliant with his registration obligations. For example, a few years ago, he gave his palm prints to his local law enforcement agency but never received a receipt despite demanding one. After he discovered that he was listed as non-compliant for not giving his palm prints, he was told by law enforcement to give his

palm prints again. He tried to report to his local law enforcement office about five times only to find the office closed or the right personnel not there. He ended up having to travel to an MSP post about 30 minutes away in order to do so.

384.   When Mr. Doe G has reported to his local law enforcement office, deputies have commented in public that he was a really bad offender and wondered out loud why he was not still incarcerated. Local law enforcement once asked him for his work hours only to show up at his workplace and cause him to lose his job.

385.   Ms. Doe reports to a police station that is only open on weekdays, and must take time off work to register. This is not easy, given that she may be away from work for several hours. Because her employer does not know that she is on the registry, she has to come up with an excuse each time. The actual registration process is embarrassing because she must speak loudly through bulletproof glass or a speaker, allowing other people to hear that she is a registered sex offender.

386.   Defendants compel Plaintiffs and class members to provide information and then use that information to stigmatize them and to broadcast a state-endorsed online message that they are dangerous sex offenders. Plaintiffs and class members vehemently disagree with the message that the government broadcasts about them.

### Ongoing Reporting, Surveillance and Supervision

387.   SORA 2021's reporting, surveillance, and supervision requirements not only compel Plaintiffs and class members to speak, but are similar to and, in fact, in

many ways more restrictive and onerous than, the reporting, surveillance, and supervision that many registrants experienced while on probation or parole.

388.   Like probation or parole, SORA 2021 requires registrants to report to a criminal justice agency, namely their local law enforcement agency, the sheriff's office, or the MSP. M.C.L. § 28.722(m).

389.   As a result of SORA 2021's three-day reporting requirements, coupled with the verification requirements, many registrants must report in person to law enforcement with a frequency that is similar to, and often greater than, their reporting obligations when they were on probation or parole. Indeed, SORA 2021's requirement that many changes be reported within three business days, often in person, is a level of reporting that far exceeds what most registrants experienced while they were serving their sentences on probation or parole. Moreover, Plaintiffs must report significantly more information than what they were required to report when on probation or parole.

390.   Probation and parole conditions are often relaxed during the course of supervision and can be challenged through the MDOC grievance procedures. Probation and parole requirements typically last two years. SORA requirements do not decrease over time, cannot be contested, and last 15 years to life.

391.   The public sex offender registry includes a "submit a tip" button on each registrant's page. Information provided by the public through that system is

sent to the registrant's local law enforcement agency for follow-up.

392.   Prior versions of the SORA database included investigative screens for each registrant, which are used to document citizen tips, track follow-up law enforcement actions, and track the progress of investigation into registrants. The MSP recently moved the SOR database to a new platform. Upon information and belief, the new platform likewise includes investigative screens for each registrant, which are used to document citizen tips, track follow-up law enforcement actions, and track the progress of investigation into registrants.

393.   The MSP, county sheriff's offices, the U.S. Marshalls, and local law enforcement agencies regularly engage in a variety of sweeps to determine SORA compliance. These operations include random residence checks to determine if a registrant is staying at the reported location.

394.   Law enforcement agencies also conduct sweeps targeted at registrants deemed non-compliant, a status that can simply reflect failing to pay a fee or turn in a form.

395.   When police officers have come to Mr. Doe A's home to do random residence checks, they have sometimes spoken to his neighbors to ask if Mr. Doe A lives there, increasing the odds that his neighbors will learn that he is on the registry, even though he never committed a sexual crime.

396.    The police have likewise come to Mr. Doe B's home for compliance

checks, sometimes banging on the door in the early morning when his family was sleeping, shouting his name, and scaring his children. He has had to try to explain to his children and neighbors why the police are there asking for him.

397.   In one instance, Mr. Doe B was pulled over by a police officer who claimed that he was noncompliant. Mr. Doe B was begging the officer in front of his children not to arrest him, and explaining that he had in fact registered. Eventually, the officer determined that while the state police records indicated Mr. Doe B had failed to register, a local police verification receipt, which Mr. Doe B fortunately had with him in the car, showed that he was in fact compliant.

398.   The police likewise have come to Mr. Doe C's house unannounced for compliance checks, similar to what his probation officer did when Mr. C was still on probation.  Mr. C does not want his kids to know why the police are showing up at the family's home, and it is embarrassing to have his neighbors see the police coming to his home.

399.   Mr. C finds registration worse than probation in some ways. The public could not easily look up the fact that he was on probation, and other people at the probation office were either probation officers or other probationers. By contrast, when Mr. C goes to register, anyone who happens to be at the police station can see him. And sex offender information is available worldwide on the public internet registry. In addition, while on probation he knew that he would get off if he complied

with the requirements. But there is no way for him to ever get off the registry, no matter what he does.

400.   Ms. Doe finds being on the registry much more intrusive than when she was on probation. While on probation, she only had to report information related to her employment or address changes; she never had to report her email addresses, the vehicles she was driving, or internet identifiers like she has to do with the registry. And if she needed to make her probation officer aware of any changes, she could call him or wait until their next meeting, rather than having to report the change within three days. Towards the end of her probation, Ms. Doe only had to report twice a year, but with the registry she has always had to report quarterly.

401.   Mr. Doe D believes that being on the registry is worse than probation; not only does he have to report regularly like he did as a probationer, but the police come to check up on him at his home, sit outside in their squad car, and make the neighbors wonder why the police are there.

402.   During one six-month period, the police came to Mr. Doe E's home three times.

403.   Mr. Doe G has lost jobs after the police showed up at his former work-places to verify that he worked there. He has also had police officers show up at his residence early in the morning, banging on his door until he woke up and suggesting that they wanted to search his residence.

## Limitations on Access to Housing

404.   SORA 2021 severely limits registrants' access to housing, increases the likelihood of homelessness, and can prevent registrants from living with their families.

405.   The online registry sends a clear message to the public that all registrants are dangerous. Therefore, many landlords will not rent to anyone on the registry.

406.   In addition, SORA 2021 requires posting of registrants' addresses on the public online registry. M.C.L. § 28.728(2)(c). As a result, landlords also refuse to rent to registrants because they do not want their properties to appear on the registry. This problem is exacerbated by the public registry interface, which allows users to easily map all registrants living in a particular area.

407.   Research demonstrates that being listed on a sex offender registry dramatically reduces housing options for registrants, with registrants losing or being denied housing based on their status, or being forced to move after landlords or neighbors learned they are on the registry. The ability of other tenants and neighbors to search the sex offender registry directly contributes to landlords' decisions to deny or evict registrants. Socia Decl., Ex. 6, ¶¶22–23.

408.   When Mr. Doe A (who never committed a sex offense) was released from prison, he had great difficulty finding housing. Landlords again and again

denied his applications because of his status as a registered sex offender. He only got an apartment when he had a friend lease a unit for him.

409.    Likewise, Mr. Doe C also had severe housing problems. He lost his home to foreclosure after he lost his job when his employer learned of his registry status.

410.    When Mr. Doe C tried to find rental housing, landlords told him that they would not rent to anyone on the registry. When he tried to rent a room from friends, they refused because he was on the registry, and they did not want their addresses listed.

411.    For a time, Mr. Doe C was registered at his mother's address. But after an anonymous caller reported that he was on the registry, his mother was threatened with eviction unless he moved out, so he had to leave.

412.    Mr. Doe C then lived with his sister, but he had to move out after the U.S. Marshals came to the home to do a registry sweep. His sister would have been evicted if Mr. Doe C continued to live with her.

413.    Mr. Doe C was able to live with both his mother and his sister despite having a felony conviction, but was forced to leave immediately in both cases after the landlords learned he was a registrant.

414.    Mr. Doe C then became homeless. Mr. Doe C's family members would have been happy to have him stay if he were not on the registry, but they feared that

they would lose their housing if they allowed him to live with them.

415.   When Mr. Doe C reunited with his girlfriend I.G., he was unable to live with her and their children because he was on the registry.

416.   Finally, I.G.'s father offered to rent a home he owned to Mr. Doe C and his family. This was the only way that the family was able to find housing where they could live together.

417.   Because he was on the registry, Mr. Doe D was barred from an apartment he had previously lived in. Other apartment complexes prohibited anyone on the registry from living there. He wound up living in a very small house because it was the only place he could find to live.

418.   Mr. Doe E lives with his mother. Due to his disability, he would be eligible for subsidized housing and could get his own place. His status as a lifetime registrant, however, bars him from receiving the housing subsidy.

419.   When Mr. Doe F was looking for an apartment, he checked building policies online and found that virtually every place he looked excluded registrants.

420.   Mr. Doe G has an undergraduate degree and several technical certificates, yet he was turned down for apartments after being released from prison. He discovered that no managed apartment complex would admit people on the registry.

421.   Mr. Doe G was also unable to live with his sister because her landlord did not want the apartment listed on the registry. He briefly stayed with his father,

but had to move out because his father worried that the home would be targeted by vigilantes. He was unable to find a single managed apartment complex that would rent to people on the registry.

422.   Mr. Doe G has been living in a motel for about a decade. He helps out the landlord in exchange for a lower rent. The landlord does not know that he is on the registry, and Mr. Doe G does not know what will happen if the landlord finds out.

423.   When Mary Roe was released from prison, she discovered—after filing many rental applications and paying costly application fees—that no professionally managed apartment complex in her area would rent to registrants. Even if the onsite rental agent was willing to lease the apartment after interviewing her, she was always denied after a corporate background check. She lived in several substandard, non-professionally managed buildings, which were all she could find.

### Limitations on Access to Employment

424.   SORA 2021 severely limits registrants' access to employment.

425.   Under SORA 2021, registrants' employment information and work addresses are posted on the public online registry. M.C.L. § 28.728(2)(d). The posting of employer information creates a powerful disincentive for employers to hire registrants, which is exacerbated by the mapping function on the website that allows users to easily determine if an employer has hired registrants. For example,

employees who search their work address will immediately find out whether any colleagues are on the registry.

426.    The last data available to Plaintiffs showed that in 2013 less than half of non-incarcerated registrants living in Michigan reported having any employment. Upon information and belief, registrants' unemployment rate remains very high.

427.    Research likewise demonstrates that being on a sex offender registry dramatically reduces employment options for registrants, and frequently results in job loss. Socia Decl., Ex. 6, ¶¶22–23; Zgoba Decl., Ex. 7, ¶¶25–30.

428.    Mr. Doe A has repeatedly lost job opportunities because of his status as a registrant. When he was first released from prison, he participated in a reentry program designed to help him find a job.

429.    Mr. Doe A actively sought work and flagged potential jobs off employment lists. His case manager told him time and again that those employers would not hire registered sex offenders. The occupations where he was denied employment included garbage collection and fast-food restaurant work.

430.    Mr. Doe A finally convinced the organization that ran his reentry program to hire him for its programs for special needs adults, and for several years he was successfully employed there.

431.    Mr. Doe A realized that his registry status barred him from so many jobs that his best bet might be self-employment. He started doing part-time contract

work for people who already knew him and trusted him, removing debris from homes and doing other repairs and renovations.

432. He was able to get a trade certificate for safety renovations (like asbestos and lead paint removal), mostly because the training catered to ex-offenders, and did not reject him out of hand on account of his registry status.

433. He has done that work off and on for years, sometimes employing two to four people, depending on how busy he is. He applied to become a vendor for the city, but was never approved, he suspects because of his registry status.

434. When he came off the registry (under the *Does I* judgment), an enormous burden was lifted. The risk of being exposed and of losing work was drastically reduced, because he was no longer publicly identified online (falsely) as a sex offender.

435. Nevertheless, Mr. Doe A avoids or limits the use of online advertising or social media publicity about his business because he is always aware that one unhappy customer can blow up his business by outing him online, and he knew that he might go back on the registry if SORA were amended.

436. Mr. Doe A's worst fear has now come true: under SORA 2021, he will again be viewed as a pedophile and presented to the public as a dangerous sexual offender—without any assessment of his actual risk, and even though his felony was more than 30 years ago, and *he has never committed a sexual offense*. He fears that

his business could be upended at any time.

437.   During COVID, Mr. Doe A's business lost revenue, so he partnered with a friend who did home preservation work, in part to take advantage of her online and social media advertising without risk to him of being exposed as a registrant.

438.   Mr. Doe B worked in a family gas station/auto repair business for many years because he learned from experience that he would be unable to find work elsewhere. For example, despite his experience working on and around cars, when he applied for work at Ford (twice) and Chrysler, he submitted all the required paperwork but never got a response.

439.   When his 2016 divorce pushed him into personal bankruptcy, he (like Mr. Doe A) realized that he might be better off trying to work for himself.

440.   Mr. Doe B was able to get a real estate license, studying the materials at home (to avoid the risk of being exposed in a public class). He found work on his own and then with an agency, but always worrying that he could be summarily fired if the agency learned of his SORA status.

441.   At any time, a buyer or seller could Google his name, causing a client to walk away or a purchase or sale to fall through—both of which have happened. No matter how good his reputation or how hard he works, if people see the words "sex offender" they usually cut ties with him. Being on the registry conveys to the public that he remains a *present* danger to the community, including to his clients.

442.   After coming off the public registry pursuant to the *Does I* judgment, Mr. Doe B was able to switch to an agency where the person who hired him knew of his SORA status, but also knew that his integrity, diligence, knowledge, and hard work trumped a short-term (consensual) sexual relationship that occurred more than two decades ago.

443.   When (after entry of the *Does I* judgment) Mr. Doe B came off the registry, he was able to advertise his services on Facebook, Twitter, Instagram, and Linked-In, without fear that he would be held out to the public as a dangerous Tier III sex offender. He even developed his own website.

444.   Mr. Doe B is worried that going back on the registry under SORA 2021, all of his hard work will fall apart, threatening his livelihood, and putting his children in financial jeopardy. As a real estate agent, his face is his brand, and any revelation about his registry status could destroy his business.

445.   Mr. Doe C's status as a registered sex offender has prevented him, too, from finding or holding a job. He repeatedly was not hired or lost jobs because he was on the registry.

446.   At the time of his offense and for much of the time he was on probation, Mr. Doe C worked at an auto parts factory. He did well, repeatedly earning raises over a three-year period, and hoped to become a supervisor.

447.   Then an anonymous caller informed the factory's management that Mr.

Doe C was listed on the registry. He was summarily fired and escorted off the premises by security.

448.   The fact that Mr. Doe C was listed on the public sex offender registry made information about his offense readily available to the anonymous caller and directly contributed to Mr. Doe C's firing.

449.   Mr. Doe C could not pay his bills after he was fired. As a result, he lost his home to foreclosure, and his car was repossessed.

450.   Mr. Doe C had great difficulty finding work since then because so few employers will hire registrants.

451.   Mr. Doe C found a job with a finishing company and worked there for about six months. Then the newspaper *Busted*, which republishes photos and information from the sex offender registry in a newsprint format, published the registry listing for Mr. Doe C. The newspaper appeared in the break room at his work. Mr. Doe C lost his job the next day.

452.   Mr. Doe C currently works for a cell phone company, but fears that he could lose his job if the company learns he is on the registry. He would like to find more rewarding and better-paying work, but sees no prospect for career advancement because he is on the registry. He regularly sees jobs posted for which he is qualified, but knows that applying is pointless.

453.   Mr. Doe D briefly moved to Arizona and took a nine-month course in

heating and cooling in an effort to get into that trade; he graduated third in his class of over 100 students. He applied to more than 50 such jobs but was consistently turned down because every application required him to disclose his registry status, and no one would hire anyone on the registry.

454.   Mr. Doe D has since worked on the line at an auto assembly plant, a job he was only able to get through family connections. His employer knows of his SORA status, but to the best of his knowledge his co-workers and his union do not. He would like to serve as a union representative or team leader—which provides a path for promotion—but fears that he will be outed as a registrant if he does, jeopardizing his work relationships.

455.   Mr. Doe E has, despite the limitations of his Fetal Alcohol Syndrome, tried to maintain gainful employment, but his status as a registrant has interfered with his employment. For a while he was doing custodial work in a factory, but he was transferred and then let go shortly after a new employee found his name on the registry. Recently, he applied for a job at a grocery store. The store management was prepared to hire him, but the corporate office told him that they could not hire a sex offender.

456.   Mr. Doe F was an Eagle Scout, graduated number one in his high school class, received a degree in biology from a well-known university, and intended to become a physician. After he realized he would not be hired by a hospital, he tried

to find other work, which was very difficult due to his status as a registrant. He eventually was able to find work in construction through his girlfriend's family business.

457.   Mr. Doe F is certain that it is the registry, not his conviction, that keeps him from getting interviews and jobs. "I can explain a misdemeanor for which I served ten days in jail, for touching my girlfriend the day before she turned 16; what I cannot explain away is being listed as a lifetime registrant—held out to the world as a *current* danger to society—more than a decade later."

458.   When Mr. Doe G was released from prison in Nebraska and returned to his family in Michigan, he sought restaurant work to try and get back on his feet. The registry kept him from consideration at most jobs, but even when he acquired a job, he was let go each time his employer learned he was on the registry.

459.   Police came to his workplace and questioned him in front of customers and his co-workers. Three different times, at three different restaurants, these routine "checks" on his work address resulted in him being let go.

460.   He went to a series of staffing agencies to try to be placed for factory work. Again, if they learned he was on the registry, he was immediately fired or told he could not be placed.

461.   Mr. Doe G finally found work as a machine operator after searching the registry to see where other registrants worked. Over time, he was able to use that

job to secure a better job doing technical writing for a cable company. He nearly lost that job when the company discovered his background, but luckily his work record was strong, and he was able to explain what happened in Nebraska and that he has had no criminal history since. After ten years of trying, he finally has a safe, stable job—if one that he is overqualified for—because his employer liked his work and was willing to look beyond his SORA status.

462.   Mr. Doe H owns his own restaurants, so he does not have to worry about getting or keeping a job due to the registry. But being on the registry is still a constant concern. His restaurants are community-based operations, and if his customers or employees learned of his registry status, he could lose both. In his case, the registry also creates a public harm. Before COVID, he wanted to add new restaurants—which would employ more people and increase the taxes he paid—but he did not because the regulatory process (incorporating, leasing or buying property, getting permits, licenses, etc.) would increase the risk that his status would be discovered, possibly blocking his new businesses and/or jeopardizing his current ones.

463.   Ms. Doe's status as a registrant made it hard for her to find work. She received a certificate in medical billing near the top of her class. Through her career services office she was placed in an externship. Although the host organization was pleased with her work, the employer was unwilling to hire her because the employer's information would then be posted on the registry.

112

464.   Ms. Doe submitted over 100 resumes for other jobs before she was able to find employment in medical billing. Since then, she has worked doing accounts for a freight company and for plumbing/electrical contractors, but she was always at risk of being fired if they discovered her SORA status. Her current employer is unaware of her registry status. If the employer discovers her status, she expects to be fired.

465.   When Ms. Roe wanted to start her own therapy practice, she needed to apply for her own insurance but was initially turned down because of her status as a registrant, which effectively meant she could not start her business. After well over a year of effort, she was finally approved for insurance by Blue Cross. She had similar difficulty with other insurers.

466.   Ms. Roe also had trouble finding commercial office space. When looking at a promising space, she was told that the landlord would rent to people with criminal histories, but would not rent to anyone on the sex offender registry. She left and cried on the street.

### Limitations on Access to Education

467.    Being on the registry also makes it more difficult for registrants to get an education.

468.   For example, Mr. Doe B's status as a registered sex offender has limited his ability to get an education. Mr. Doe B planned to enroll in community college in

2005. When he learned that he had to report that he was attending college, he was

concerned that his classmates would find out that he was a registered sex offender.

Mr. Doe B gave up on college classes rather than risk facing their hostility. As noted

above, Mr. Doe B would have preferred to take his real estate licensing classes with

other students, but took them online instead so that would not have to report his

status as a sex offender. He would also like to get a broker's license but was told he

cannot because he is on the registry.

469.    Because of the registry, Mr. Doe C has likewise had difficulty getting

an education. He was rejected by several GED programs because he is a registered

sex offender. With the assistance of his probation officer, Mr. Doe C was eventually

able to identify a GED program that accepted registrants and was able to get his

GED. He would like to learn a skilled trade by enrolling in community college but

knows that he would have report his status as a registrant. He fears being monitored,

excluded, and socially ostracized if he attends college.

470.    Mr. Doe D would like to pursue skilled trade courses if he were able to

get off the registry. His employer would pay for him to attend school and those

classes would make him eligible for promotions at work. He sees no point in taking

those courses while he is on the registry, because he is worried that people in his

industry would search his name and find out he is on the registry. He is also worried

that he would be turned down for any new job he might then qualify for because of

his registrant status.

471.   Mr. Doe E has wanted to take classes in cooking or crafting for several years at his local community college, but has not because he would have to register where he is going to school. He is worried that his classmates or even teachers would shun or harass him if they discovered that he was on the registry.

472.   Mr. Doe F is getting an online MBA from a university. In the past, just to take *online* courses he had to notify the school of his registry status, which triggered a series of requests for information, and conversations with the school police staff. Mr. Doe F finally realized that the best way to remove all obstacles to his admission to the program would be to promise that he would never set foot on campus, and that is what he has done.

473.   Mr. Doe G would like to take college-level computer networking courses to help him with his job. He has not because he does not want the college to know that he is on the registry. He is worried that the information may be disclosed to his classmates or that the police would show up at one of his classes.

## Limitations on Travel

474.   Being on the registry also severely restricts registrants' ability to travel.

475.   Registrants must provide advance notice when they intend to travel anywhere for more than seven days. They must tell the police where they are going, where they will stay, how long they will be there, and when they will return. M.C.L.

§§ 28.725(1)(e); 28.727(1)(e).

476.   Registrants must report in person at least 21 days before they travel outside the U.S. for more than seven days. M.C.L. § 28.725(8).

477.   In addition, registrants must plan any travel so that they are able to register in person during their required verification periods. For example, a Tier III registrant with a January birthday is required to report quarterly in January, April, July, and October. The registrant could not travel for the entirety of one of those months, because he or she would need appear in person at the police station during that time.

478.   If registrants travel, they must comply with any applicable sex offender registration laws in other jurisdictions. Because sex offender laws are exceedingly complex and vary from state to state, it is extremely difficult to obtain accurate information about either affirmative reporting obligations (such as registering one's presence in a state) or prohibitions on ordinary behavior (such as visiting a library or park) in other jurisdictions. *See* Prescott Decl., Ex. 5, ¶¶47–50, and Consequences Triggered by Sex Offender Registration: A National Sample, Attach. 1.

479.   Named Plaintiffs virtually all limit travel to no more than six days at a time, because otherwise they would be required to notify law enforcement in person about their travel plans.

480.   Mr. Doe B's status as a registrant has impaired his ability to travel. In

2011, Mr. Doe B took his then-wife on a four-day getaway to a resort in Mexico to celebrate her graduation from a program at the University of Michigan. On their return, border agents separated him from his wife and interrogated him about his sex offender status, delaying his reentry into the United States by two hours. Even just coming back from a weekend at Niagara Falls, he was separated from his family and isolated for questioning, stalling his return by one-to-two hours. Because of these experiences, Mr. Doe B is reluctant to travel outside the United States.

481.    Mr. Doe C's status has limited his travel as well. He would like to travel with his family and take his kids places. He wants to show them the world, traveling to Mexico, Puerto Rico, and other countries. He does not do so because he would have to report his travel, because the laws for registrants in different places are very complicated and he worries about getting something wrong, and because he does not know whether other countries will deny him admittance because he is on the registry.

482.    Mr. Doe D has wanted to travel but SORA makes it prohibitively risky. For example, he wanted to take his family to Disney World, but learned that Disney bars all registrants from the park, and Florida requires all out-of-state registrants to contact the local sheriff within 48 hours. Recently, he wanted to spend a week in Tennessee with his family for a wedding. Because Tennessee requires all out-of-state registrants to register within 48 hours of entering the state, however, he went

to Tennessee for the wedding and came back to Michigan the same day. He has also wanted to travel to Scotland, but is barred because he is on the registry.

483.   Mr. Doe E used to travel internationally to conferences about Fetal Alcohol Syndrome. He no longer does so because it is too stressful and risky; when he came back to the United States he was put in separate line, where he was questioned at length and his belongings were searched. He has not visited friends and family in Arizona, Colorado, and Florida for more than seven days because he does not want to register his travel and because he would have people in those states notified of his registry status or whereabouts. It is also too complicated to be in compliance with all the sex offender registration requirements for longer-term visitors to those states. Even in Michigan, he does not visit his mother-in-law for very long because he does not want to have to report her address.

484.   When Mr. Doe F was working construction, he was assigned to a building project in Pennsylvania for two weeks. He left the worksite after a week, because otherwise he would have had to register this travel and he was unsure whether there were registration requirements that applied in Pennsylvania. He was also fearful that even if some day he got off Michigan registry, he might not come off the Pennsylvania registry.

485.   Mr. Doe G's opportunities for advancement at work are limited by the fact that SORA 2021, which requires him to report international travel three weeks

in advance, makes it extremely difficult for him to travel internationally. A couple of years ago, he was supposed to accompany his boss on an overseas trip only to learn that he would most likely be denied entry due to his status as a sex offender.

486.   Mr. Doe G also could not attend his niece's graduation, because it fell during a time that he was required to report. He has not had a real vacation in more than a decade because he cannot travel for more than seven days without reporting. Moreover, traveling to other states requires him to look up the other states' laws in order to plan his trip. Most of the laws are so complicated that he cannot be sure he has read them correctly, which puts him at risk of committing a new crime if he gets the law wrong.

487.   Ms. Doe, on one occasion, took a wrong turn while driving her family in Detroit, and accidentally got into a traffic lane leading to the tunnel to Canada. Although Ms. Doe did not cross into Canada, when she turned around, she had to go back through the U.S. border checkpoint. Because of Ms. Doe's status as a registrant, border agents demanded that she and her family get out of the car. The agents searched it, interrogated Ms. Doe, her husband, and her daughter separately, and suggested that Ms. Doe was abducting her daughter. The family was eventually released.

488.   Ms. Doe did not travel outside of the United States while she was listed on the public registry, although she would have liked to do so. Since Ms. Doe was

removed from the public registry as a result of the *Does I* litigation, she has felt more free to travel. She has been able to go to Windsor with her husband for dinner, which was a completely different experience than before. She is concerned about future travel, however, because SORA 2021 requires her again to be listed on the public registry.

489.   When Mary Roe has traveled outside the United States, even on trips with professional groups, she has been subjected to extensive delays and questioning about her registrant status by border authorities when she has returned to the United States.

### Limitations on Speech and Use of the Internet

490.   SORA 2021 severely restricts registrants' ability to speak freely on the internet.

491.   Any registrant whose registrable offense occurred after July 1, 2011, must provide law enforcement with "all electronic mail addresses and internet identifiers registered to or used by the individual." M.C.L. § 28.727(1)(i). Registrants must also report "any change in . . . electronic mail addresses [or] internet identifiers . . . registered to or used by the individual" within three business days. M.C.L. § 28.725(2)(a). This language appears to require registrants to report any email address or internet identifier they have ever had or used, regardless of how long ago that occurred. Even using an identifier once—say sending an email from one's

spouse's account or creating an account to make a one-time purchase online—appears to trigger the three-day reporting requirement.

492.   The term "internet identifier" is defined expansively to mean "all designations used for self-identification or routing in internet communications or posting." M.C.L. § 28.722(g). It is unclear whether registrants must report within three days whenever they set up an online account to pay their taxes, register with Netflix, purchase or review products on Amazon, or use an online college bulletin board.

493.   SORA 2021 also permits posting on the public registry of a person's email address and electronic identifiers—which the old SORA prohibited. *Compare* M.C.L. § 28.728(3)(e) (2020), *with* Substitute for H.B. 5679, 100th Leg., Reg. Sess., at 37 (Mich. 2020), https://bit.ly/3r9l232.

494.   Although the internet is central to modern life, registrants fear using it for several reasons. First, any use of the internet could easily trigger a search of their name, with the result that they are outed as sex offenders. *See* Section IV, *supra*. Second, use of the internet triggers the reporting requirements—requirements that are very unclear. (While those requirements no longer apply to pre-2011 registrants, their experiences avoiding the internet are included here because they show just how much the reporting requirements chill use of the internet.)

495.   John Doe A rarely uses the internet because he is always afraid that

anyone who Googles him will find out that he is on the registry. The internet mirrors the way he feels about the rest of his life: as a parent, partner, family member, neighbor, and worker, he never feels like he can be "in" 100%, because in every social interaction he is waiting for the axe to fall. With the internet and in life, the constant risk is that someone will learn of his status and view him as a liar or a con man (if he does not reveal his status up front), or as a monster (if he does), even though he never committed a sex offense.

496.   In the past Mr. Doe B was very confused about whether he needed to report internet identifiers, such as Study Island, which he used to help his son with school work, or school sports sites that allowed him to keep track of his children's soccer games. He avoided the internet as much as possible so as not to have to report identifiers or risk prison for misunderstanding his reporting obligations. Under the terms of the *Does I* settlement, he was no longer required to report internet identifiers and he was removed from the public registry. He then began using the internet much more often, especially social media to advertise his real estate services. Now that he is required to be back on the registry, he is fearful that his business will suffer or that he will have to stop advertising online.

497.   Historically, Mr. Doe C limited his use of the internet because he was concerned about registering his email and internet identifiers, and needing to report constantly in order to use different websites with different user-names. It was safer

and easier not to use the internet. He does not use social media. He is concerned about being harassed online because of being on the registry.

498.   Mr. Doe D has restricted his internet use because he would have had to report in person within three days every time that he created a new internet account. Once he was automatically assigned a new account when signing up for a service; to be safe, he had to go to the registration office within three days to report it. Now, although he is no longer required to report electronic identifiers, he is still extremely guarded in using the internet because he fears it will lead to others searching his name and finding out his registry status. In fact, he wants to be more involved with his son's education but has avoided joining any online school discussions.

499.   John Doe E is reluctant to use the internet, and does not have a personal social media profile on Facebook, Twitter, or other social media sites. He has tried not to use any chat or instant messaging functions on the internet, because that requires creating a screen name, which then triggers a reporting requirement. His father died in December 2017, and he wanted to participate in online grief support, but would have had to register his screen name so he chose not to participate. Although under SORA 2021, Mr. Doe E is no longer required to report identifiers, he still avoids social media because he is afraid that people will look up his registry status and harass him for it.

500.   After being put on the registry, Mr. Doe F completely stopped using

social media. He did not return to it until he started helping leukemia support groups, but he is worried about being outed and having other participants turn against him.

501.   For Mr. Doe G, the registry has had a severe chilling effect on his internet use. He has wanted to make political statements online but chose not to because he knew he would have had to report every screen name in person.

502.   Mr. Doe G has also worried about retaliation against him by the state. For instance, he wanted to post about the police coming into the restaurant where he was working and getting him fired, but he was worried that the police could look up his screen name, see those posts, and make his life even more difficult.

503.   Mr. Doe G has avoided all internet websites that require a username and has severely restricted his internet use because he was unsure about what information he had to report and did not want to report each time he created a new identifier. For example, he is interested in advocacy on LGBT issues and wanted to comment on websites related to those issues. But he did not do so because it would have required creating an account and then registering it with the police.

504.   When SORA 2021 first passed, Mr. Doe G believed that, as for post-2011 registrants, his internet ID's and email addresses could now be posted on the public registry and he intended to shut them down rather than risk being outed on every website or bombarded with harassment. He also feared losing his job because his work email address could be publicly posted. He was tremendously relieved to

124

learn that, as a pre-2011 registrant, these provisions of SORA 2021 do not apply to him, but he worries that these provisions of the law will severely restrict the speech and economic opportunities of post-2011 registrants.

505.   Mr. Doe G is reluctant to use the internet because of his presence on the online registry. He is worried people would search his name, realize he is on the registry, and then embarrass him with that information. He therefore avoids publicly posting anything on the internet.

506.   Mr. Doe H gave up his Facebook account as soon as he was told that he would have to report it. He is never sure about what he must report and when, so it is safer to limit his internet use rather than risk making a mistake and putting himself at risk of being prosecuted for noncompliance. He avoids using personal email or online accounts, and instead uses the business email and online names (which he registers) that are less easily linked to him on the internet.

507.   Ms. Doe's status as a registrant has similarly restricted her freedom to use the internet. She has been very confused about what she needs to report, and was unable to get clarity even after seeking legal advice and asking the police about whether, for example, she had to register identifiers associated with bank accounts or utility bill payments. She wanted to comment on online news articles (on websites like the Detroit News, Click on Detroit or Fox), but did not do so because she was uncertain about whether she would then need to report the accounts within three days

and because she feared that this would enable people to identify her as a sex offender.

508.  Ms. Doe has twice established a Facebook account, only to have it deleted without notice. Although Facebook gave her no reason for shutting down her account, Facebook prohibits registrants from using its site. Ms. Doe had been using her Facebook account both to communicate with friends and family and to organize a high school reunion. She was then unable to do so.

509.  When, as a result of the *Does I* litigation, Ms. Doe no longer had to report her email addresses and internet identifiers and came off the public registry, she became more comfortable using the internet. With SORA 2021, she is again apprehensive about using social media accounts because people may find out she is on the registry and harass her or her family.

510.  When Ms. Roe was still the clinical director at the homeless shelter, she did not use social media or do public speaking because she was concerned that she would be outed, and she and her employer harmed. Those limitations held her back from advancing professionally.

511.  Before coming off the registry, Ms. Roe maintained almost no public presence on social media. She used it only with family and friends who already knew of her registrant status. A tech-savvy friend counseled her to create "dummy" positive online pages about herself, so that her registrant status might be pushed further down the line of sites that would come up when she was Googled.

512.    When Ms. Roe started in private practice as a therapist, she tried posting one online "professional page" in her own name, as opposed to using the name of her counseling LLC. Within about a week, she had to take it down because of postings calling her a "pervert" and other disparaging comments.

513.    When Ms. Roe came off the public registry after the *Roe* case, being able to use social media and to participate in online life was liberating for her. The prospect of going back on the registry after three years of being off it has put her into therapy for depression and PTSD.

### Public Stigmatization, False Information, and Social Engagement

514.    Describing someone as a "sex offender" is intensely stigmatizing and leads the public to view the person with high levels of fear and disgust. Labeling someone as a "sex offender" also leads the public to assume that the person is a pedophile or sexual predator, and poses a current high risk of committing a new sex offense. Socia Decl., Ex. 6, ¶¶17–21.

515.    Being publicly branded as a sex offender is far worse than simply having an old conviction because it conveys the message of *current* dangerousness. As a result, registrants suffer severe housing, employment, social, and other consequences that they would not experience based solely on the fact that they have a criminal record.

516.    As a result of the public online registry, registrants and their families

127

are subjected to harassment, social ostracism, and even threats of violence. Indeed, in one study almost half of registrants reported harassment. Zgoba Decl., Ex. 7, ¶25.

517.    The sex offender registry publicly and falsely labels Mr. Doe A as a "convicted sex offender," which he is not, as he was never convicted of a sex offense.

518.    In the fall of 2010, Mr. Doe C received an anonymous death threat by mail. Inside an envelope was a print-out of his page from the sex offender registry with his photo. His eyes were blacked out on the photo, and on the paper were the words "You will die." Mr. Doe C has also been called a child molester on the street, and his wife is regularly asked why she is married to a sex offender.

519.    One of the most difficult experiences of Mr. Doe C's life was when his oldest daughter found his registry information on the internet.

520.    Mr. Doe D has been harassed in his neighborhood. After posting on his homeowners' association social media page for information about a neighborhood issue, a neighbor immediately responded by linking to Mr. Doe D's registry profile. Others in the neighborhood then stopped talking to Mr. Doe D. In addition, Mr. Doe D's house and vehicles have been egged three times, and once his work car was covered in cheese.

521.    Mr. Doe E says that the registry has caused a serious strain in his marriage. His wife recently discovered that he would be on the registry for life, as opposed to 25-years, and does not know if she wants to remain married to him. She

feels stressed about all the limitations the registry has created for their lives

522.   Similarly, Mr. Doe F's neighbor stood on his lawn on Halloween telling children not to go to his house because he was a sex offender. The neighbor also threatened Mr. Doe F's girlfriend, saying that if they did not leave, they would "struggle to live here."

523.   Mr. Doe F found COVID to be a bizarre kind of relief, as everyone had to adapt to a vastly restricted life—which was his norm. They couldn't socialize; they were on edge with others; schools were closed to them; they were fearful of being evicted or losing their jobs, etc. To him, that is what life is like all the time, being on the registry.

524.   Mr. Doe G reports that a person who learned he was on the registry came up to him and told him that all sex offenders should be killed. Other people who learn he is on the registry stop talking to him. He has become a hermit, afraid to develop friendships or relationships because the registry makes him a lifelong pariah. He has developed an anxiety disorder and depression, conditions for which he takes medication.

525.   All Plaintiffs report that they avoid social engagement because at any time they can be outed as registrants. When meeting people at work or at play registrants face an impossible choice: either tell each person early on that they are on the registry and risk having the person shun them (and repeat the news to others), or wait

until they have formed a relationship, and then risk having the person turn on them because they kept their past a secret.

526.   All Plaintiffs report that they limit their social life to family, old friends, and others who know their history but accept them for who they are. When they are with people who don't know their status, all Plaintiffs are anxious and on guard, and cannot have normal relationships.

527.   The further in the past their crimes are, the more bitter Plaintiffs feel that conduct from ten, 20, or 30 years ago continues to dominate (and ruin) their lives, no matter how stable, morally upright, or successful they have been since.

### Criminal Enforcement of SORA

528.   Data from 1998 to 2012 show that there were 14,884 prosecutions for SORA violations over that 15-year period, averaging just under 1,000 per year. Levine Decl., Ex. 10, ¶11.

529.   Data from 2010 to 2019 show an average of about 880 prosecutions per year (though this data set appears to under-report misdemeanor cases). Levine Decl., Ex. 10, ¶11.

530.   SORA 2021 imposes penalties of up to ten years imprisonment for violations of the Act. M.C.L. §§ 28.729(1).

### Vagueness

531.   Like the old SORA, many of the requirements of SORA 2021, including requirements for reporting personal information, are so complex and vague that

Plaintiffs and class members are unable to know whether or not they are in violation of the law, and are therefore unable to comply with it. SORA 2021's requirements are so extensive, pervasive, and unclear, that not only Plaintiffs and class members, but even attorneys who advise registrants, are unable to understand the law.

532.   Law enforcement officers who enforce the act likewise do not understand what information must be reported, or what changes in information subject registrants to reporting requirements. Different law enforcement agencies in different places apply SORA 2021's requirements differently. SORA 2021's requirements for reporting personal information are so vague that prosecutors and police agencies cannot and do not enforce the law consistently.

533.   **Phones, Internet, and Cars:** In *Does I* and *Does II*, the district court held that SORA's provisions requiring reporting of telephone numbers, electronic mail, and instant message addresses, and vehicle information were unconstitutionally vague. *Does I*, 101 F. Supp. 3d at 686–690; *Does II*, 449 F. Supp. 3d at 736, 738. In passing SORA 2021, the legislature replaced those provisions with language that is, if anything, even vaguer.

534.   SORA 2021 now requires registrants to report all telephone numbers "registered to . . . or used by the individual," all electronic mail addresses and internet identifiers "registered to or used by the individual," and all vehicles "owned or

operated by the individual" or "used by the individual."[12] M.C.L. §§ 28.725(2)(a), 28.727(h)–(j). Any change in such information must be reported within three business days. M.C.L. § 28.725(2)(a).

535. Plaintiffs are confused about whether they must report every single phone, email address, internet identifier, or vehicle that they have ever used. For example, Plaintiffs do not know whether, if they use a friend's cell phone to make a quick call because their own phone is dead, they must report it within three days. Plaintiffs do not know whether, if they borrow a car or get a loaner while their own car is in the shop, they must tell the police. Plaintiffs also do not know how far back in time these requirements apply: because there is no time limit in the law, arguably a phone or car or old internet identifier used once in the past must now be registered because it was "used by the individual."

536. As noted above, the internet reporting requirements are expansively defined to mean "all designations used for self-identification or routing in internet communications or posting." M.C.L. § 28.722(g). Taken literally, the term "used for self-identification or routing in internet communications" would include IP addresses of Plaintiffs' computers, laptops, or tablets, and similar information for phones.

---

[12] The electronic and internet identifier reporting applies only to post-2011 registrants.

537.   The court in *Does I*—which considered a vagueness challenge to the old SORA's differently structured phrasing about reporting internet identifiers used for "posting"—distinguished between identifiers used "primarily" for posting or communicating, and identifiers that were not. *See Does I*, 101 F. Supp. 3d at 692–93. Given the different statutory language at issue in *Does II*, that distinction cannot be made here. Moreover, in today's internet, "designations used for self-identification" are requested or required (or acquired) for a host of online transactions and interactions, not just on social media. Lageson Decl., Ex. 9, ¶¶83–86.

538.   Plaintiffs cannot and do not know what they must report, or when; as a result, their default is to self-limit their internet use to avoid the risk of prosecution. *See* Section V: Limitation on Speech and Use of the Internet, *supra* (describing other examples of how Plaintiffs limit their internet use, in part out of fear that they will make reporting mistakes).

539.   In *Does I* and *Does II*, the court held that retroactive application of certain internet reporting was unconstitutional if imposed on people whose registrable crime occurred before the effective date of the 2011 SORA amendments. *Does I*, 101 F. Supp. 3d at 730; *Does II*, 449 F. Supp. 3d at 736, 738. In drafting SORA 2021, the legislature appears to have attempted to respond to these rulings, but the language chosen is confusing. Instead of saying that the provisions only apply to those whose registrable offense occurred after July 1, 2011, the new law says that

133

the email and internet provisions only apply to those "required to be registered under this act after July 1, 2011." M.C.L. § 28.725(2)(a). But anyone subject to registration is required to be registered under SORA 2021 "after July 1, 2011."

540. The vagueness of the text, combined with the harshness of the penalty (return to prison or jail) if registrants get it wrong, means that people may continue to report email and internet identifiers even though they do not have to, or more likely, will continue *not to use the internet* because SORA 2021 requires them "to be registered . . . after July 1, 2011."

541. To provide other examples, Mr. Doe C is unsure whether he needs to report his wife's car or his mother's telephone if he only uses them occasionally. Mr. Doe E tries to report everything he thinks he may need to report. He has his own vehicle, but also occasionally drives his mother's vehicle, so he is not sure whether he must report it or should do so just to be safe.

542. Mr. Doe F is fearful of using any vehicle that is not registered to him. When his car breaks down, he does not borrow a vehicle from friends or family because he is uncertain whether he would have to register it. His brothers own ATVs; when the family goes camping, Mr. Doe F does not take out the ATVs because he is unclear about whether he would then have to register them. In the past, he had an employer who had about 30 vehicles; it is unclear to Mr. Doe F if SORA 2021 would require registration of all such vehicles if an employee might drive any of them.

When working construction, he didn't know if he needed to register equipment he drove just occasionally, or even just once, nor does he know under SORA 2021.

543.   Mr. Doe F is a good driver, but if the weather is bad and his friends or family ask him to drive due to the snow, he declines because he does not know whether driving their vehicles one time would have to be reported under SORA 2021. Similarly, when he goes out with friends and they ask him to drive their car because they have been drinking and he has not, he again does not drive because that could be a violation of SORA if he failed to report their car. (And if he reported their car, it would then be listed on the registry).

544.   Mr. Doe H has registered all four vehicles that his family owns. As with everything having to do with SORA, he errs on the side of caution and restricts or limits his behavior to be certain that he is not violating the law.

545.   **Employment**: Plaintiffs are also confused about reporting employment, which requires in-person reporting within three business days. For example, M.C.L. § 28.725(1)(b) requires immediate reporting if "the individual changes his or her *place of employment*, or employment is discontinued." (Emphasis added.) This provision causes confusion because it does not use the word "employer" or "employment" but instead targets the "place."

546.   Plaintiffs cannot and do not know, for example, when they are assigned to a different work site or field office for just a day, or three days, or a week, if they

must immediately report the "change" in their "place of employment" or risk a violation if they do not.

547.   The same is true if there is a temporary closure, layoff, or strike; they cannot and do not know if they must report that their "employment is discontinued," if only temporarily. The uncertainty creates a constant fear that if they are stopped by police for any reason, or when they go for their periodic registration update, that they will be accused of a violation.

548.   Another example is M.C.L. § 28.727(1)(f), which requires registrants to report "the name and address of each of the individual's employers" and M.C.L. § 28.727(1)(b), which requires any change in place of "employment" or any discontinuation of "employment" to be reported within three days. Plaintiffs are unsure if this requirement applies to volunteer work.

549.   M.C.L. § 28.722(d) does not define "employer" or "employment," but defines "employee" to mean "an individual who is self-employed or works for any other entity as a full-time or part-time employee, contractual provider, or volunteer, regardless of whether he or she is financially compensated." But M.C.L. § 28.727(1)(f), in contrast, defines "employer" to include "any individual who has agreed to hire or contract with the individual for his or her services."

550.   Plaintiffs cannot and do not know, when they shovel a disabled neighbor's walk or mow the neighbor's lawn, if they have subjected themselves to the

immediate reporting requirements for employment. Nor do they know, when the neighbor decides to pay them to do the chore, if they must now report the neighbor's name and address within three days as an "employer."

551.  If Plaintiffs are employed or self-employed in occupations with no fixed address—like real estate, building trades, and delivery services—then they "must include" not just "the general areas where [they] work" but also "the normal travel routes taken . . . in the course of [their] employment." *See* M.C.L. § 28.727 (1)(f). Plaintiffs cannot and do not know what it takes for a series of turns over a series of days to become a mandatory reportable "normal travel route."

552.  Mr. Doe C's employer sometimes sends him to different work sites, rather than the primary location where he normally works. Mr. Doe C does not know if he has to report (in person) every time he is sent to a different work site. Similarly, Mr. Doe E does not know, for instance, if he must report the location of his job site, the corporate office, or both. Moreover, because his company has multiple locations, he does not know if he must report any other location he may work at if he is covering for a sick employee.

553.  **Nicknames, Addresses, and Physical Descriptions**: SORA 2021 requires Plaintiffs to report their "legal name and any aliases, nicknames, ethnic or tribal names, or other names by which the individual is *or has been* known." M.C.L. § 28.727(1)(a) (emphasis added). Read literally, this means that if fourth-grade

classmates called you "Slick," or if 20 years ago Navy shipmates called you "Gunner," you are obligated to report that information to the police. To require this level of detail from the beginning of time to the present all but guarantees that all registrants are non-compliant all the time—which is how Plaintiffs feel.

554.   Plaintiffs must report their primary residence, but SORA 2021 also requires them to report "The name and address of any place of temporary lodging used *or to be used* by the individual during any period in which the individual is away, *or is expected to be away*, from his or her residence for more than 7 days. Information under this subdivision must include the dates the lodging is used or *to be used*." M.C.L. § 28.727(1)(e) (emphasis added).

555.   This section creates a nightmare of uncertainty for the prospective traveler. Plaintiffs cannot and do not know at what point tentative travel plans become a mandatory SORA reporting duty, because the phrases "to be used" or "expected to be away" are so vague. The predictable result is that Plaintiffs almost never leave home for more than seven days, due to the risk of compliance violations.

556.   The problem is compounded by M.C.L. § 28.725(2)(b), which requires three-day reporting if a registrant "intends to temporarily reside at any place other than his or her residence for more than seven days." Again, Plaintiffs cannot and do not know at what point their own vague plans ripen into an immediate reportable "intent." And if their plans change the day before (or after) departure, they cannot

and do not know if they must now register their *new* plans within three business days.

557.   The text of the provision is also unclear. Plaintiffs cannot and do not know if the law means if they plan to stay in one place for more than seven days or intend not to stay in their primary residence for more than seven days—a big difference. (The issue is whether the "more than seven days" modifies "place" or modifies "residence.") Plaintiffs cannot and do not know if they must register under this provision if they plan to hike part of the Appalachian Trail, or travel by car with unknown nightly stays in different locations.

558.   For example, Mr. Doe D has had difficulty understanding the reporting requirements for travel. A few years ago, he asked whether he would have to report his temporary lodging information if he came back to Michigan on the seventh night after he left. Law enforcement told him that they did not know.

559.   The provisions affect more than travel. For example, Mr. Doe F did not know what addresses he needed to report during the year that he spent caring for his girlfriend before she died. He traveled frequently to Detroit and Ann Arbor to support her through her grueling treatments, staying where he could to be near her, but never sure what information he had to report. Not knowing if he could stay with her in a hospital when needed, or for how long he could stay with friends or family while she was being treated nearby, was an enormous stress on top of what he was going

through during her terminal illness. (For other examples of travel issues, see Section V: Limitations on Travel, *supra*.)

560.   Plaintiffs must also report a "complete physical description of the individual." M.C.L. § 28.727(1)(o). Plaintiffs cannot and do not know what this entails, or what would constitute a violation if information were omitted. Plaintiffs cannot and do not know if they can be "violated" for failing to report tattoos, moles, mastectomies, scars, toupees, or similar physical descriptors.

561.   **Institutions of Higher Education:** SORA 2021 defines "institution of higher education" to mean "1 or more of the following: (i) A public or private community college, college, or university. (ii) A public or private trade, vocational, or occupational school." M.C.L. § 28.722(h). The latter provision is unclear. Plaintiffs cannot and do not know if they can, without registering, take (for example) cooking classes offered by a restaurant or trade association, carpentry classes offered privately but using a community college's woodshop, or certificate classes, e.g., to get a real estate license. Plaintiffs cannot and do not know at what point a series of classes or a program of instruction becomes a "private trade . . . school."

562.   **Registration of People with Out-of-State Conviction:** SORA 2021 requires registration of people who were convicted in other jurisdictions of offenses that are "substantially similar" to Michigan offenses that trigger registration. M.C.L. § 28.722(r)(x), (t)(xiii), (v)(viii). A person whose out-of-state conviction is not

"substantially similar" to a registrable Michigan offense is not required to register.

563.   The length of time that a person must register and the frequency of in-person verification depend on whether an out-of-state conviction is deemed "substantially similar" to a Tier I offense, in which case the person must verify yearly for 15 years; a Tier II offense, in which case the person must verify twice a year for 25 years; or a Tier III offense, in which case the person must verify quarterly for life.

564.   For individuals with out-of-state convictions, the MSP has used a student or legal intern to assign tier classifications based on the student/intern's assessment of which Michigan offense most closely resembles the out-of-state offense. *Does I*, No. 12-cv-11194, Joint Statement of Facts, R. 90, ¶293. Upon information and belief, tier assignments for people with out-of-state convictions continue to be done by a student or legal intern.

565.   SORA 2021 provides no mechanism by which people with out-of-state convictions can challenge either the determination that their offense is "substantially similar" to a Michigan offense or the classification of their offense as "substantially similar" to a Michigan Tier I, Tier II, or Tier III offense.

566.   SORA 2021's provisions about "substantially similar" convictions from other jurisdictions are not written with sufficient specificity for persons with out-of-state convictions to know whether they must register in Michigan, and if so, how frequently and for how long they must report.

567.   **MSP and Law Enforcement Communications**: In March 2021, the MSP sent a letter to registrants regarding their obligations under SORA 2021. MSP Letter, Ex. 15. The letter does not provide a complete description of a registrant's duties under SORA 2021. The letter is incomprehensible to ordinary readers, and even lawyers cannot be sure based on the letter what registrants' obligations are under the statute.

568.   The MSP did not track whether registrants received the letters or whether a registrant's letter was returned. Many registrants did not get the letters.

569.   After passage of SORA 2021, the MSP also updated the Explanation of Duties form, Ex. 16, which is supposed to be provided to registrants when they report. The Explanation of Duties form fails to provide clear or complete information about a registrant's duties.

570.   Plaintiffs fear they will violate SORA 2021's requirements because they do not understand exactly what they must do, as well as what they cannot do.

571.   Plaintiffs' experience has been that when they ask law enforcement about their reporting obligations, law enforcement officials often do not know the answer, or provide conflicting information.

572.   When registrants are uncertain about what SORA means, they err on the side of caution. Rather than risk prosecution for a possible violation, they self-

police by assuming the worst, to avoid any chance they will be accused of wrong-doing and sent to jail or prison. As a result, the statute's vagueness and complexity have an outsized *limiting* effect on Plaintiffs' behavior across the board.

**Additional Consequences Resulting from Registration Under SORA 2021**

573.   Because Plaintiffs are required to register as sex offenders in Michigan under SORA 2021, they are also subject to a vast and labyrinthine array of laws and ordinances imposed on registered sex offenders by the federal government, other state or tribal governments, and local municipalities.

574.   The number of such restrictions, constraints and disabilities place on registrants has exploded, especially after 2000. Dozens of laws have been passed in every state, creating a complicated, constantly changing picture for individuals subject to registration and notification. The volume and scope of these laws is staggering: they cover everything from whether one can go to a church, library, or park; whether one can access a hurricane shelter; or where one can vote. Compliance is made even more difficult by the fact that these laws are unpredictable, complicated, and often vague.  Prescott Decl., Ex. 5, ¶¶40–41, 46, and Consequences Triggered by Sex Offender Registration: A National Sample, Attach. 1.

575.   The structure undergirding this vast array of laws regulating "sex offenders" is the sex offender registration statute, designating who is required to register. Other laws "piggyback" on the registration law, imposing additional obligations and

restrictions on people who are classified as "sex offenders," regardless of whether those obligations and restrictions are appropriate for the wide range of people who are subject to registration. Prescott Decl., Ex. 5, ¶¶43–46.

576.   Because registration in one state generally triggers registration in another state, people who are subject to SORA 2021 in Michigan are also subject to the sex offender laws of other jurisdictions if they travel or move. Any travel out-of-state requires extensive research to determine what the registration and reporting obligations are in the state to which a registrant would like to travel. *See* Prescott Decl., Ex. 5, ¶¶47–50, and Consequences Triggered by Sex Offender Registration: A National Sample, Attach. 1.

577.   Because of the complexity of these laws, it is essentially impossible for a Michigan registrant to travel to another state without a significant risk of being found out of compliance. The practical impact is that being required to register significantly restricts a person's ability to associate with family or friends out-of-state, or indeed to travel for any purpose, whether to attend a political conference or go on vacation. *See* Prescott Decl., Ex. 5, ¶50.

578.   In addition, as a result of the fact that they are required to register under SORA 2021, registrants are subject to policies by private entities that refuse to provide goods or services to registered sex offenders.

579.   For example, social media platforms like Facebook and Instagram—

where much of public and private life is now conducted—bar registrants. Some colleges and gyms have policies excluding them. Even hospitals sometimes refuse to allow registrants to visit friends or family who are ill. *See* Prescott Decl., Ex. 5, Consequences Triggered by Sex Offender Registration: A National Sample, at 8–9, Attach. 1.

580.   The named Plaintiffs report that they have been barred from Facebook, Twitter, and other social media platforms; are not permitted to join their local gym; and have been denied employment or housing by entities that have blanket bans on hiring or renting to registrants. In one instance, Mr. Doe E was even told that on account of his registry status he could not participate in a conference for people with Fetal Alcohol Syndrome.

581.   In sum, countless private entities use the state's "sex offender" designation as a proxy for current dangerousness, and exclude registrants from services or opportunities to which they would otherwise have access. But for the fact that the state identifies the Plaintiffs as sex offenders, the goods and services provided by those private entities would generally be available to them.

## VI.   SORA 2021 IS VERY EXPENSIVE, HAS UNINTENDED CONSE-QUENCES, AND DIVERTS RESOURCES FROM INTERVENTIONS THAT ACTUALLY WORK

### SORA 2021 Costs Millions

582.   SORA 2021 is expensive to implement and maintain, wasting government resources that could be used to actually make communities safer and reduce sexual offending. Letourneau Decl., Ex. 4, ¶¶6, 17–18.

583.   Indeed, studies from different states have shown that expansive registries with no pathway off for most registrants cost millions of dollars each year in staffing, surveillance, equipment, and maintenance. Letourneau Decl., Ex. 4, ¶¶17–18.

584.   While there is no published study on the costs of Michigan's registry, there are reasons to believe it is very high—given the size of the registry, the length of registration terms, and the frequency of the required reporting. Zgoba Decl., Ex. 7, ¶10.

585.   A full accounting of the costs of SORA 2021 must await discovery. Estimates based on publicly available data, however, suggest that the costs could significantly exceed $12 million annually.

586.   The MSP's Sex Offender Registration Unit, which is responsible for maintaining the registry and registry website, has a gross annual budget of $1 million. Levine Decl., Ex. 10, ¶¶13, 18.

146

587.   This does not include the cost to local registering authorities, who collect and enter registrant information. Given that there are roughly 35,000 active non-incarcerated registrants who must report, and that most will be reporting at least four times a year, and given the expense of law enforcement sweeps to monitor compliance, the costs to local registering authorities across the state are likely significant. Levine Decl., Ex. 10, ¶¶10, 17–20, 22–24.

588.   This also does not include the costs to the MDOC and local jails for SORA-related reporting and administration, which are unknown. Levine Decl., Ex. 10, ¶21.

589.   Michigan spends about **$11,254,000** a year incarcerating people for SORA-related convictions, which includes an average of about **$5,377,000** annually to incarcerate people in MDOC prisons, and an average of about **$5,877,000** annually to incarcerate people in county jails. Levine Decl., Ex. 10, ¶¶12, 29–39.

590.   These figures do not include the costs for parole and probation supervision, or the cost of incarcerating people on automatic parole and probation revocations that are mandatory under SORA. Levine Decl., Ex. 10, ¶¶12, 34–37.

591.   It is reasonable to believe that in addition to the more than **$11 million** in incarceration costs, there are **several million** more in costs associated with administration, registration, investigation, enforcement (like registry sweeps), and prosecution of registry violations, including litigation, court, and probation costs. Levine

Decl., Ex. 10, ¶¶13, 39.

592.   These calculations do not consider costs such as lost wages or lost taxes as a result of the difficulty registrants have in finding employment. Zgoba Decl., Ex. 7, ¶8.

593.   Registration also has other unintended consequences that put the public at greater risk. Research shows that registries increase the number of sex offenses that are pled down to non-sex offenses to avoid the onerous consequences of the registry. Registry laws also lower conviction rates for those cases that are not pled out but go forward to trial. Letourneau Decl., Ex. 4, ¶¶6, 14.

594.   Instead of devoting massive resources to a law that fails to fulfill its stated purpose, Michigan could improve community safety by investing in programs that have been shown to reduce sexual offending, such as evidence-based treatment and reentry support. Letourneau Decl., Ex. 4, ¶22; Hanson Decl., Ex. 3, ¶78.

### SORA 2021's Costs Far Exceed SORNA-Related Grant Funding

595.   The federal government has sought to incentivize states to adopt registration schemes congruent with the federal SORNA by providing that states that do not "substantially implement"[13] SORNA will lose ten percent of their Byrne Judicial

---

[13] Michigan is certified as having substantially implemented SORNA. *See* Department of Justice Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, *Jurisdictions That Have Substantially Implemented SORNA* (May 13, 2020), https://smart.ojp.gov/sorna/substantially-implemented.

Access Grant funding.[14] 34 U.S.C. §§ 20901, 20927(a).

596.   Thirty-two states—a majority—have declined to adopt SORNA-congruent registries due to the logistical and financial challenges it poses. Letourneau Decl., Ex. 4, ¶18; Zgoba Decl., Ex. 7, ¶4. Michigan is not one of those states.

597.   A primary reason that so few states have adopted SORNA-congruent registries is that the cost of doing so dwarfs the loss of any Byrne Grant funds. Every state to study the issue has found this to be true. SORNA is viewed by many states as an unfunded federal mandate because it imposes extensive obligations without providing corresponding resources. Letourneau Decl., Ex. 4, ¶18; Zgoba Decl., Ex. 7, ¶¶4, 9.

598.   When states implement SORNA-congruent registries, they incur significant costs in various areas, including but not limited to additional personnel; new software installation and maintenance; additional jail and prison space; increased court and administrative needs; law enforcement, including the need to verify information at more frequent intervals; and legislative costs associated with crafting and adopting new state laws. In addition, there are numerous costs that are even harder to measure, like costs related to loss of employment or housing by people subject to

---

[14] Byrne grant funds are made available by the U.S. Attorney General to states and local governments to support criminal justice related programs. *See* 34 U.S.C. § 10152(a)(1).

registration, and the costs of prosecution and sending people back to jails and prisons. Zgoba Decl., Ex. 7, ¶8. There are also litigation costs.

599.   SORNA requires only substantial implementation, not complete implementation. 34 U.S.C. § 20927(a). Virtually all jurisdictions that have "substantially implemented" SORNA have registries that diverge from the SORNA-congruent standards in significant ways.

600.   In determining whether a jurisdiction has "substantially implemented" SORNA, the federal government must consider any judicial rulings that prevent implementation because it would be unconstitutional. Byrne grant funding will not be withheld if the federal government determines that the jurisdiction has adopted reasonable alternative procedures consistent with the purposes of SORNA. 34 U.S.C. § 20927(b).

601.   It is accordingly very unlikely that Michigan will lose any Byrne grant funding if this Court determines that any of the SORNA-congruent provisions of SORA 2021 are unconstitutional. In any event, the cost of SORA 2021 far exceeds the loss of ten percent of its Byrne Grant funding. (Michigan's Byrne Grant was $5,165,727 in 2020; ten percent would be $516,500. *See* Department of Justice Office of Justice Programs, *Michigan's FY 2020 Byrne Justice Assistance Grant* (Sept. 18, 2020), https://bja.ojp.gov/funding/awards/2020-mu-bx-0011.)

## VII. SORA 2021 CONTINUES TO RETROACTIVELY APPLY THE 2011 AMENDMENTS

602. In *Does I*, the Sixth Circuit held that "[t]he retroactive application of SORA's 2006 and 2011 amendments to Plaintiffs is unconstitutional, and it must therefore cease." *Does I*, 834 F.3d at 706. In *Does II*, the district court applied that holding to all registrants whose registrable offenses predated July 1, 2011 (the effective date of the 2011 amendments). *Does II*, No. 16-cv-13137, Am. Final J., R. 126.

603. Although SORA 2021 eliminated the geographic exclusion zones that were added to the statute in 2006, SORA 2021 keeps in place virtually all of the 2011 amendments to SORA and continues to apply the 2011 amendments retroactively to pre-2011 registrants, despite the Sixth Circuit's holding that retroactive application of the 2011 amendments violates the Ex Post Facto Clause and must cease. *See* SORA 2021 with Highlighted Changes Showing 2011 and 2021 Amendments, Ex. 14.

604. SORA 2021 retains the 2011 amendments' retroactive classification of registrants into tiers based solely on their offense of conviction without any individualized risk assessment, with the tiers determining the number of years that they must register and the frequency of reporting. M.C.L. §§ 28.722(s)–(v), 28.725(11)–(14).

605. SORA 2021 maintains the retroactive extension of registration periods created by the 2011 amendments' tier classifications. Under the 2011 amendments,

151

people who previously had been required to register for 25 years, and who were retroactively assigned to Tier III, had their registration periods extended to life. There was no individualized determination about their risk or whether lifetime registration was warranted.

606.   Data provided in *Does I* showed that before SORA's 2011 amendments, almost **three-quarters** of Michigan's registrants were required to register **for 25 years**. After the 2011 amendments retroactively classified registrants into tiers, almost **three-quarters** of registrants were required to register **for life**. There were 11,313 lifetime registrants before the 2011 amendments and 28,680—or 17,367 more—after those amendments were implemented. *Does I*, No. 12-cv-11194, Joint Statement of Facts, R. 90, ¶¶285–291.

607.   SORA 2021 retains the requirements (from the 2011 amendments) for reporting of vast amounts of personal information, including names, nicknames, Social Security number, date of birth, addresses, employer information (including temporary jobs and routes of travel for non-stationary employment), schools attended or schools the registrant plans to attend, telephone numbers, internet information, vehicle information, driver's license and personal ID card information, passport and immigration documents, and occupational and professional licensing information. M.C.L. § 28.727. SORA 2021 continues to require that registrants appear in person for verifications (quarterly, twice-yearly or annually, depending on

tier). M.C.L. § 28.725a(3). SORA 2021 also retains the requirement in the 2011 amendments for advance notice for travel of more than seven days. M.C.L. §§ 28. 727(1)(e), 28.725(8). All of these requirements continue to be applied retroactively to pre-2011 registrants, with the exception of the reporting requirements for email and internet identifiers. M.C.L. §§ 28.725(2)(a), 28.727(1)(i).

608.   Indeed, SORA 2021 appears to require reporting of even more inform-ation. The 2011 statute required reporting of "telephone numbers . . . routinely used by the individual" and vehicles "regularly operated by the individual." M.C.L. § 28.727(1)(h), (j) (2020). In SORA 2021, the legislature chose to address the vague-ness concerns associated with the modifiers "routinely" and "regularly" not by limit-ing reporting to a person's own phone and vehicles, but by adopting a new blanket requirement to report every single use of a phone or vehicle ever. M.C.L. § 28.727 (1)(h), (j) (2021).

609.   SORA 2021 also retains the 2011 amendments' requirement for exten-sive and frequent reporting of even minor changes to information. SORA 2021 replaces the requirement to "immediately" report with a requirement to report within three business days. But that is exactly how "immediately" was defined in SORA 2011, so the change is not substantive but cosmetic. *Compare* M.C.L. § 28.722(g) (2020), *with* M.C.L. § 28.725(1) (2021).

610.   SORA 2021 mandates in-person reporting for certain changes, and in

other instances provides that updates can be made "in person, or in another manner as prescribed by the [MSP]." M.C.L. § 28.725(1). To Plaintiffs' knowledge, the MSP has not issued any formal guidelines or policies regarding which of these updates must be made in person and which in some other manner they have prescribed. However, based on a letter sent by the MSP to registrants in March 2021 and the Explanation of Duties that is supposed to be provided to registrants when they report, it appears that MSP still requires many of those updates to be made in person, but that a few can be made by submitting a form. MSP Letter to Registrants, Ex. 15; Explanation of Duties, Ex. 16; Michigan Sex Offender Registry Mail-in Update Form, Ex. 17.

611.   Changes that must be reported in person within three business days— either because the statute requires it or because the MSP has prescribed it—include residential address changes, starting or discontinuing employment, and (it is unclear) potentially volunteer work, as well as name changes, enrolling or discontinuing enrollment as a student, being present as a student in other locations in Michigan or the U.S., and moving to a new state. Updates that can be made by submitting a form include travel plans, and changes to vehicles and phones.[15] Summary of SORA 2021's Obligations, Disabilities, and Restraints, Ex. 2, at 10–13.

---

[15] Post-2011 registrants can also report changes to email and internet identifiers by submitting a form.

## VIII. REGISTRATION IS INTERTWINED WITH THE CRIMINAL JUS-TICE PROCESS AND IS CENTRAL TO PLEA NEGOTIATIONS

612.   SORA 2021 provides that a judge cannot sentence a defendant unless the defendant has been registered. *See* M.C.L. § 28.724(5).

613.   The judgment of sentence form approved by the State Court Administrative Office contains a checkbox to show that sex offender registration has been completed. Judgment of Sentence Form CC 219b, Ex. 18, Box 3.

614.   Depending on the court and the sentence, responsibility for initial registration can lie with the probation agent, parole agent, the MDOC, the sheriffs' department, the probate court, or other entities. M.C.L. § 28.724.

615.   When criminal defendants plead guilty, they waive their constitutional right to trial and other constitutionally guaranteed protections based on their understanding of the consequences of a guilty plea.

616.   Because of the severe burdens associated with sex offender registration, whether a conviction will result in registration is critical for criminal defendants in deciding whether or not to plead guilty. Yantus Decl., Ex. 11, ¶¶4–7.

617.   For people charged with sex-related crimes, the choice whether to plead guilty often turns on whether the defendant will have to register, for how long, and whether the registration is public or private. Yantus Decl., Ex. 11, ¶¶8–11.

618.   SORA 2021 fundamentally, and retroactively, alters the consequences of the pleas of many registrants by imposing registration on individuals who were

not previously required to register and by lengthening registration terms beyond what was required at the time of the plea.

619.  For example, when John Doe A pled guilty in 1991 and John Doe E pled guilty in 1994, there was no registry. Yet as a result of retroactive amendments to SORA, they now must register for life.

620.  Similarly, when John Does B, C, D, E, and Mary Roe pled guilty, their decisions to enter pleas were premised on the belief that they would be subject to registration for no more than 25 years. As a result of retroactive amendments to SORA, however, they must now register for life.

621.  These Plaintiffs, and other similarly situated, had no notice at the time they pled that a consequence of their plea would be lifetime sex offender registration.

## IX.  SORA 2021 IMPOSES EXTRAORDINARY BURDENS OUT OF ANIMUS TOWARD PEOPLE WITH PAST SEX OFFENSES

622.  Experts who study sexual offending find it very hard to understand why states, including Michigan, use ineffective or counterproductive registration and public notification schemes, rather than effective, evidence-based approaches. Prescott Decl., Ex. 5, at 3.

623.  "In a world of rational policy-making, the accumulation of empirical evidence that a costly criminal justice policy is ineffective in achieving its stated goal, might be expected to generate political pressure to abandon that program." Alissa Ackerman, Meghan Sacks & David Greenberg, *Legislation Targeting Sex*

*Offenders: Are Recent Policies Effective in Reducing Rape?*, 29 Just. Q. 858, 878 (2012).

624.   The fact that Michigan adopted SORA 2021 even though it irrationally undermines the stated goal of reducing sexual offending and protecting public safety can only be explained by animus towards people convicted of sexual offenses, coupled with the huge barriers such people face in influencing the political process.

625.   Few groups are as loathed and despised as people convicted of sex offenses. Ira Ellman, *When Animus Matters*, 7 U. Pa. J. L. & Pub. Affs., at 2–17.

626.   Because SORA 2021, like its predecessors, is grounded in animus towards people who have committed sex offenses, legislative discussions about Michigan's registry statute take place against a backdrop of loathing—a sense that no restriction is too burdensome for someone who committed a sex offense. Legislators are unwilling to consider the research about registries and sexual offending because their constituents hate registrants, and politicians cannot afford to look "soft" on crime.

627.   Michigan enacted and implemented SORA 2021 with no sustained or rigorous study of its likely consequences. *Cf.* Prescott Decl., Ex. 5, at 2 (describing this as the typical approach when states adopt registry laws).

628.   Although the purported purpose of Michigan's SORA is to prevent recidivism, the MSP does not track the recidivism rates of registrants or the impact

of registration on recidivism, nor does the state analyze SORA data to determine the effectiveness of the registry. Despite having the capacity to run reports assessing recidivism rates, the MSP has not done so. *See Does I*, No. 12-cv-11194, Joint Statement of Facts, R. 90, ¶¶210–12.

629.   During three legislative hearings on SORA 2021, virtually all of the approximately 170 people who commented—many of whom were registrants—opposed the bill.

630.   Experts on registries testified at the hearings that registries do not prevent recidivism or make communities safer. There was no testimony to the contrary.

631.   Despite the uncontroverted testimony that registry laws do not work to prevent sexual offending, despite the nearly unanimous public testimony opposing the bill, and despite the court decisions holding that the old SORA was unconstitutional, the Michigan legislature clung to its failed punitive registration and notification scheme and adopted SORA 2021 in order to appease popular animus toward a demonized group.

632.   As result of this animus, the basic structure of SORA remains unchanged. It continues to impose extensive burdens, publicly brands people as "sex offenders" and presents them to the public as *currently and equally* dangerous, without any individual review or path off the registry, in most cases for life. The scientific consensus is the opposite: that most registrants will never commit another

sex offense; that by ten years offense-free in the community most registrants pose no greater risk than do non-sexual offenders and males in general (neither of whom are required to register); and that by 20 years offense-free all registrants will reach that threshold of "desistance."

633.   In sum, SORA 2021, like its predecessor, is based on myths, fears, and misconceptions about a demonized group, was adopted out of animus, and is not rationally related to the public safety goal it purports to serve.

## CLASS ALLEGATIONS

634.   Plaintiffs bring this action on behalf of themselves and all similarly situated persons pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

635.   Plaintiffs seek certification of a "primary class," defined as people who are or will be subject to registration under SORA.

636.   Plaintiffs also seek certification of several subclasses:

a.  A "pre-2011 ex post facto subclass," defined as members of the primary class who committed the offense(s) requiring registration before July 1, 2011;

b.  A "retroactive extension of registration subclass," defined as members of the primary class who were retroactively required to register for life as a result of amendments to SORA;

c.  A "barred from petitioning subclass," defined as members of the primary class who are ineligible to petition for removal from the registry and for whom ten or more years will have elapsed since the date of their conviction for the registrable offense(s) or from their release from any period of confinement for that offense(s), whichever occurred last, and who (a) have not been convicted of any felony or any registrable

offense since; (b) have successfully completed their assigned periods of supervised release, probation, or parole without revocation at any time of that supervised release, probation, or parole; and (c) have successfully completed an appropriate sex offender treatment program, if successful completion of a sex offender treatment program was a condition of the registrant's confinement, release, probation, or parole;

    d. A "non-sex-offense subclass" defined as members of the primary class who are or will be subject to registration for an offense without a sexual component including convictions for violating M.C.L. §§ 750.349, 750.349b, 750.350, or a substantially similar offense in another jurisdiction;

    e. A "plea bargain subclass," defined as members of the primary class who gave up their right to trial and pled guilty to a registrable offense in Michigan and who, as a result of retroactive amendments to SORA, (i) were retroactively subjected to SORA even though there was no registration requirement at the time of their plea; or (ii) had their registration terms retroactively extended beyond that in effect at the time of their plea; and

    f. A "post-2011 subclass" defined as members of the primary class who committed the offense(s) requiring registration on or after July 1, 2011.

637. In *Does II*, the state defendants stipulated to class certification for both the primary class and two subclasses in that case. *Does II*, No. 16-cv-13137, Stipulated Order Granting Class Certification, R. 46.

638. Class certification in *Does II* allowed the court to stay or dismiss the many individual cases that had been brought, pending a final decision in *Does II*, thus conserving judicial resources and allowing for efficient adjudication of the constitutionality of the former statute.

639.   Here, too, the proposed primary class and the proposed subclasses satisfy the requirements of Fed. R. Civ. P. 23(a).

640.   First, the primary class and the subclasses are each so numerous that joinder of all members of the class and subclasses is impracticable.

641.   According to data filed by Defendants in *Does II*, there are approximately 55,000 registrants. *See Does II*, No. 16-cv-13137, R. 127, PageID.2589. Other data provided by the MSP in response to a public records request puts the total number of registrants at around 53,000. Levine Decl., Ex. 10, ¶¶15–16. In either event, the total number of registrants who comprise the primary class are clearly so numerous as to make joinder impracticable.

642.   There are approximately 42,000 registrants (78.5% of the total) who committed the offense(s) which subject them to registration before July 1, 2011, the effective date of the 2011 SORA amendments. Levine Decl., Ex. 10, ¶16.c.  Those individuals are all members of the 2011 ex post facto subclass.

643.   There are thousands of registrants who were retroactively required to register for life as a result of amendments to SORA. Those individuals are all members of the retroactive extension of registration subclass.

644.   Although not every one of the more than 42,000 people who have been subject to registration for more than ten years (*see* Levine Decl., Ex. 10, ¶16.c) will meet the criteria for membership in the barred from petitioning subclass, it is clear

that there are likely thousands of registrants for whom ten or more years have elapsed since the date of their conviction for the registrable offense(s) or from their release from any period of confinement for that offense, whichever occurred last; who have not been convicted of any felony or registrable offense since; who have successfully completed their assigned periods of supervised release, probation, or parole; and who have successfully completed any required sex offender treatment program. Those individuals are all members of the barred from petitioning subclass.

645.   There are thousands of registrants who gave up their right to trial and pled guilty to a registrable offense in Michigan and who, as a result of retroactive amendments to SORA, (i) were retroactively subjected to SORA 2021 even though there was no registration requirement at the time of their plea; or (ii) had their registration terms retroactively extended beyond that in effect at the time of their plea. Those individuals are all members of the plea bargain subclass.

646.   Upon information and belief, there are hundreds of registrants who are subject to registration pursuant to M.C.L. §§ 28.722(i), (v)(ii), (iii), (vii) and 28.723, based on a non-sex offense conviction for violating M.C.L. §§ 750.349, 750.349b, 750.350, or a substantially similar offense in another jurisdiction. Those individuals are all members of the non-sex-offense subclass.

647.   There are thousands of registrants whose offense occurred on or after July 1, 2011. Levine Decl., Ex. 10, ¶16.c. Those individuals are all members of the

162

post-2011 subclass.

648.   Due to the size of the primary class and subclasses, joinder is impracticable. Moreover, many registrants are indigent and would be unable to retain counsel to secure their rights absent a class action.

649.   Proceeding under Rule 23 will promote the fair and efficient adjudication of this action because it will permit a large group of similarly situated persons to prosecute their common claims simultaneously in a single forum, without duplicating evidence, and save the additional effort and expense that would otherwise be necessary if their claims were brought through a series of individual actions.

650.   There were dozens of lawsuits challenging the old SORA, which were stayed or dismissed pending resolution of *Does II*, allowing for efficient adjudication of the constitutionality of the statute in effect at the time. Absent class certification, there are again likely to be many lawsuits filed by registrants challenging the 2021 version of SORA. Judicial economy will be served by class-wide proceedings.

651.   Second, there are questions of law or fact common to the proposed primary class and the proposed subclasses. The common questions of law and fact include, but are not limited to:

a.   Whether SORA 2021 violates the Due Process and Equal Protection Clauses by failing to provide for individualized review (**primary class**);

b.   Whether compelling registrants' speech by requiring them to frequently report extensive information about themselves in support of the state's message that they are dangerous sex offenders violates the First

Amendment (**primary class, non-sex-offense subclass**);

c. Whether certain provisions of SORA 2021 are unconstitutionally vague and therefore cannot be applied (**primary class, post-2011 subclass**);

d. Whether it violates the First Amendment to compel registrants, by threat of criminal penalty, to attest that they understand their duties under SORA 2021 even if they in fact do not understand those duties (**primary class**);

e. Whether retroactively applying the 2011 SORA amendments to registrants whose offenses predate those amendments violates the Ex Post Facto Clause of the U.S. Constitution (**pre-2011 ex post facto subclass**);

f. Whether it violates the Ex Post Facto and Due Process Clauses to retro-actively require individuals to register for life who, at the time of their offenses, were either not required to register or required to register for a term less than life (**retroactive extension of registration subclass**);

g. Whether SORA 2021 violates the Equal Protection Clause by allowing only some individuals who meet specified eligibility criteria to petition for removal from the registry while barring most registrants who meet the exact same criteria from petitioning (**barred from petitioning subclass**);

h. Whether requiring sex offender registration for individuals convicted of non-sexual offenses violates the Due Process and Equal Protection Clauses (**non-sex-offense subclass**);

i. Whether the state has violated the terms of plea agreements and the Due Process Clause by retroactively imposing lengthier registration terms on individuals who pled guilty without notice that they would be subject to such registration terms (**plea bargain subclass**);

j. Whether it violates the First Amendment to require registrants whose offense occurred after July 1, 2011, to report all electronic mail and internet identifiers and allow those identifiers to be made public (**post-2011 subclass**);

k. Whether and to what extent sex offender registries increase or decrease public safety, and increase or decrease sexual offending or reoffending;

l.  To what extent does the risk of reoffending vary among people with past sex offenses and how does that risk change over time;

m.  What is the risk distribution for sexual recidivism for individuals required to register, and what percentage of people subject to SORA 2021 present no greater risk to the public than people who are not required to register;

n.  What is the relative predictive value for sexual recidivism of a conviction-based registry versus one that uses actuarial risk assessment;

o.  Do the tier assignments under SORA 2021 correspond to the recidivism risk of registrants;

p.  What impact does sex offender registration have on housing, employment, and other aspects of registrants' lives, and how does registration affect registrants' reentry into the community;

q.  How has the internet changed the consequences of sex offender registration.

652.   Third, the claims asserted by named Plaintiffs are typical of the claims of the class members and subclass members whom they seek to represent. The same common course of conduct by the defendants gave rise to Plaintiffs' and the class members' claims.

653.   Fourth, Plaintiffs will fairly and adequately protect the interests of the respective class members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the respective class members.

654.   Plaintiffs are represented by competent counsel who are experienced in prosecuting civil rights and class action litigation and include the counsel who litigated the *Does I*, *Roe*, and *Does II* cases.

655. The proposed class and subclasses also satisfy the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, warranting appropriate declaratory and injunctive relief as to the class and subclasses.

### Incorporation of the Facts Set Forth Above

656. For all of the legal claims set forth below, Plaintiffs re-allege the facts described in the paragraphs above and incorporate those facts by reference.

### CLAIMS FOR RELIEF

### COUNT I: Retroactive Imposition of Punishment
### (Ex Post Facto) (Pre-2011 Ex Post Facto Subclass)

657. SORA 2021 imposes punishment, and its retroactive application to people whose offense requiring registration was committed before July 1, 2011, violates the Ex Post Facto Clause of the U.S. Constitution, art. I, § 10, cl. 1, because it makes more burdensome the punishment imposed for offenses committed prior to that date.

658. The Sixth Circuit held in *Does I*, 834 F.3d 696, that the old SORA imposed punishment, and that its retroactive application violates the Ex Post Facto Clause. The Court specifically held that retroactive application of the 2006 and 2011 amendments "is unconstitutional, and it must therefore cease." *Id.* at 706.

659. The district court in *Does II*, 449 F. Supp. 3d at 726, 737–38, applied the Sixth Circuit's holding to a class of all Michigan registrants with pre-2011

166

offenses, holding that the retroactive application of the 2006 and 2011 amendments violates the Ex Post Facto Clause.

660.   The Michigan Supreme Court in *Betts*, 2021 WL 3161828, likewise held that the retroactive application of the 2011 amendments violates both the federal and Michigan constitutional prohibitions on ex post facto laws.

661.   SORA 2021, while largely eliminating the 2006 amendments, retains virtually all of the SORA 2011 amendments. *See* SORA 2021 with Highlighted Changes Showing 2011 and 2021 Amendments, Ex. 14.

662.   SORA 2021 continues to retroactively apply almost all of the 2011 amendments to pre-2011 registrants. *See* Section VII, *supra.*

663.   Under the Sixth Circuit's decision in *Does I* and the district court's decision in *Does II*, the 2011 SORA amendments cannot be retroactively applied to registrants whose offenses predate those amendments.

664.   The retroactive application of SORA 2021 to registrants whose offense requiring registration was committed before July 1, 2011, violates the Ex Post Facto Clause absent an individualized, periodic determination that the person presents such a high risk to public safety that SORA 2021's burdens are justified.

665.   As the Michigan Supreme Court found in *Betts* and the federal district court found in *Does II*, the 2011 SORA amendments cannot be severed because the unconstitutional portions are so entangled with the remainder of the statute that they

cannot be removed without adversely affecting the operation of the Act. *See Betts*, 2021 WL 3161828, at \*20; *Does II*, No. 16-cv-13137, Am. Final J., R. 126, Pg.ID.1793–97; SORA 2021 with Highlighted Changes Showing 2011 and 2021 Amendments, Ex. 14.

666.   John Does A, B, C, D, E, F, G, Mary Doe, and Mary Roe bring this claim for themselves and on behalf of the pre-2011 ex post facto subclass.

### COUNT II: Retroactive Extension of Registration Terms
### (Ex Post Facto and Due Process)
### (Retroactive Extension of Registration Subclass)

667.   At the time of their offenses, John Does A, B, C, D, E, G, Mary Doe, and Mary Roe, and the retroactive extension of registration subclass, were either not required to register at all or required to register for a term less than life.

668.   As a result of retroactively applied amendments to SORA, these Plaintiffs are required to register to life. SORA 2021 continues to impose these retroactive lifetime registration terms.

669.   Defendants did not make an individualized determination that retroactive to lifetime registration was warranted for these named Plaintiffs or for members of the retroactive extension of registration subclass.

670.   Lifetime registration terms serve no public protection function. Hanson Decl., Ex. 3, ¶¶3.f, 26, 55–75.

671.   Retroactively requiring a person to be subject to SORA 2021's extensive burdens for life is punitive and violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1. *See Does I*, 834 F.3d at 706; *Does II*, 449 F. Supp. 3d at 728–29; *Betts*, 2021 WL 3161828.

672.   Retroactively requiring a person to be subject to SORA 2021's extensive burdens for life also violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

673.   The Due Process Clause limits retroactive civil legislation that is harsh or oppressive; that violates principles of notice, foreseeability and fair warning; that imposes severe retroactive consequences; or that reaches far back in time.

674.   Retroactive imposition of lifetime registration under SORA 2021 is harsh and oppressive, violates principles of notice, foreseeability and fair warning, imposes severe retroactive consequences, and reaches far back in time.

675.   John Does A, B, C, D, E, G, Mary Doe, and Mary Roe bring this claim for themselves and on behalf of the retroactive extension of registration subclass.

## COUNT III:  Lack of Individualized Review
## (Due Process and Equal Protection) (Primary Class)

676.   The Supreme Court has not decided what standard of review should apply to sex offender registration. *See Conn. Dep't of Pub. Safety v. Doe,* 538 U.S. 1, 10 (2003) (Souter, J., concurring) ("Today's case is no occasion to speak

[to] . . . the standard of scrutiny that might be in order" when considering challenge to registration.).

677.   Even assuming that the standard is rational basis, a "more searching form" of rational basis review applies when a law exhibits "a desire to harm a politically unpopular group." *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring); *see also U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (if "'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). "Rational basis with bite depends on the idea that governmental 'animus' alone is never enough to sustain legislation." Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 763 (2011).

678.   The Sixth Circuit has described this more searching standard as an "exacting" rational relationship standard. *Bannum, Inc. v City of Louisville*, 958 F.2d 1354, 1360 (6th Cir. 1992). "Negative attitudes" and "unsubstantiated" fears about a group cannot provide a rational basis for legislation; rather "some data reflecting the extent of the danger must exist." *Id.* at 1360–61 (first and second quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985)).

679.   SORA 2021, like its predecessors, is grounded in animus—based on myths and unsubstantiated fears—toward people who have committed sex offenses.

680.   Michigan legislators, in adopting SORA 2021, ignored all the research and data, and instead adopted the law to appease or endorse the public demonization of people with sex offenses. *See* Section IX, *supra*.

681.   Because SORA 2021 does not increase—but rather undermines—public safety, *see* Section II, *supra*, it is not rationally related to its purported public safety goals, and cannot survive any level of review.

682.   Even if some aspects of SORA 2021 could be deemed rationally related to public safety concerns about some individuals who are a *present* danger to the community, SORA 2021's gross excessiveness in expending enormous resources to impose massive restrictions—in most cases for life—on the liberty of a large number of people who present no danger to the public is irrational and rooted in animus. *See* Sections II–IX, *supra*.

683.   The restrictions imposed by SORA 2021 are grossly disproportionate to any legitimate public safety concern. SORA 2021 criminalizes ordinary behavior (that is not criminal for non-registrants) and imposes wide-ranging burdens on a disfavored group without providing normal procedural protections.

684.   Specifically, the failure to provide any mechanism for individualized review or opportunity for removal from the registry in the vast majority of cases, coupled with extremely long or lifetime registration periods, reflects animus, rather than a rational approach to supervising people who are a present danger to the public.

685.   SORA 2021 cannot survive any level of review because imposing such extensive restrictions without any individualized review or opportunity for removal is not rationally related to the state's public safety objectives.

686.   Named Plaintiffs bring this claim for themselves and on behalf of the primary class.

### COUNT IV: Unequal Opportunity to Petition for Removal (Equal Protection) (Barred From Petitioning Subclass)

687.   The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne*, 473 U.S. at 439. SORA 2021 fails to treat similarly situated registrants alike with respect to their ability to petition for removal from the registry.

688.   Under SORA 2021, a subset of registrants is eligible to petition for removal, although they may do so only once in their lives.

689.   Tier I registrants may petition ten years after the later of the date of conviction or release from any period of confinement if they have not been convicted of any felony or any other registrable offense; have successfully completed supervised release, probation, or parole; and have successfully completed any required sex offender treatment program. *See* M.C.L. § 28.728c(1), (12).

690.   Juveniles may also petition if they have not been convicted of any felony or any other registrable offense; have successfully completed supervised release, probation or parole; and have successfully completed any required sex

172

offender treatment program. However, unlike adult registrants in Tier I who can petition after ten years, juveniles must be on the registry for twenty-five years—fifteen years longer—before they can petition.[16] M.C.L. § 28.728c(2), (13).

691. All other registrants are ineligible to petition for removal, regardless of the circumstances of their offense, the passage of time, or demonstrated rehabilitation or incapacitation.[17]

692. John Does A, C, E, F, G, Mary Doe, and Mary Roe and the barred from petitioning subclass are similarly situated in all material respects to petition-eligible registrants because more than ten years has elapsed since the later of the date of their conviction or release from any period of confinement; they have not been convicted

---

[16] Juveniles are required to register if they were 14 or older at the time of the offense, and if the adjudication is for an offense that, if committed by an adult, would classify the juvenile as a Tier III registrant. M.C.L. § 28.722(a)(iii).

[17] Technically, individuals may also "petition" for removal if they are erroneously listed on the registry even though their offense is non-registrable because it (a) falls within one of the consent-based exceptions to registration, M.C.L. §§ 28.722(t)(v), (t)(vi), (t)(x), (v)(iv), 28.728c(3), (14); (b) the registrant was adjudicated as a juvenile and was less than 14 years of age at the time of the offense, M.C.L. § 28.728c(15)(a); or (c) the individual was registered before July 1, 2011 for an offense that no longer requires registration, M.C.L. § 28.728c(15)(b). Such individuals **are not** statutorily subject to SORA, *see* M.C.L. §§ 28.722, 28.723, and accordingly SORA provides a method for correcting that error and mandates that the court order removal if the individual does not meet the definition of a person required to register, M.C.L. §§ 28.722(t)(v), (t)(vi), (t)(x), (v)(iv), 28.728c(3), (14)–(15). The issue in this litigation is whether individuals who **are** statutorily subject to SORA 2021 may seek discretionary relief from the court based on a showing that they are not a continuing threat to the public.

of any felony or other registrable offense; they have successfully completed supervised release, probation, or parole; and they have successfully completed any required sex offender treatment programs.

693.   The distinction drawn in SORA 2021—which allows some registrants who meet an extensive set of criteria to petition for removal after ten years but bars other registrants who meet those exact same criteria from petitioning for removal—violates the Equal Protection Clause of the United States Constitution because it cannot survive any level of review. This distinction is not rational.

694.   The purpose of SORA's petitioning process is to allow for removal from the registry of people who do not present a risk of reoffending, via discretionary judicial review.

695.   Because tier classifications do not correspond to the risk of reoffending, and hence to the standard for removal from the registry, and because most individuals cross the desistance threshold after ten years offense-free in the community in any event (the same threshold set for the eligibility to petition), differences in tier classifications between petition-eligible registrants and the barred from petitioning subclass are not material and cannot justify the distinction drawn. *See* Section III, *supra.*

696.   Defendants also cannot justify the distinction drawn based on the cost of providing hearings, because the cost of a hearing for a petition-eligible registrant

and a member of the barred from petitioning subclass would be comparable. More-over, the cost to state and local government of continuing the registration of persons in the barred from petitioning subclass beyond ten years far exceeds the cost of providing a hearing.

697.  Finally, the fact that SORNA encourages states to adopt provisions that limit removal-petitioning to Tier I and juvenile registrants does not justify the unequal treatment of petition-eligible registrants and the barred from petitioning subclass. States are not required to adopt SORNA-congruent registries, nor can the federal government compel Michigan to violate citizens' constitutional rights. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 587 (2012); *Printz v. United States*, 521 U.S. 898, 924 (1997); *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987). Nor is it clear that allowing petitioning by the barred from petitioning subclass would even prevent a finding that Michigan is in "substantial compliance" with SORNA. *See* U.S. Department of Justice Office of Justice Programs, SORNA Substantial Implementation Checklist, at 19, https://bit.ly/33YYjOo (allowing jurisdictions to explain why petitioning removal provisions differ from those suggested in SORNA).

698.  The Michigan state courts have a well-established procedure for considering petitions for removal from the registry. M.C.L. § 28.728c.[18] That

---

[18] The State Court Administrative Office has also developed forms for this petitioning process. *See* Petition to Discontinue Sex Offender Registration, Form

procedure could easily be used to consider petitions for removal from the registry by individuals who are currently barred from petitioning, but who meet the same strict criteria as those who are currently eligible.

699.    To grant a petition, the court must determine that the individual is not a continuing threat to the public. M.C.L. § 28.728c(11). The court must consider the individual's age and level of maturity at the time of the offense; the victim's age and level of maturity at the time of the offense; the nature of the offense; the severity of the offense; the individual's prior juvenile or criminal history; the individual's likelihood to commit further registrable offenses; any impact statement submitted by the victim; and other information considered relevant by the court. *Id.*

700.    If John Does A, C, E, F, G, Mary Doe, and Mary Roe had the opportunity to petition for removal, there is a high likelihood that they would be able to establish that ongoing registration is not warranted in their cases.

701.    If members of the barred from petitioning subclass had the opportunity to petition for removal, there is a high likelihood that a significant number of them would be able to establish that ongoing registration is not warranted in their cases.

702.    John Does A, C, E, F, G, Mary Doe, and Mary Roe bring this claim for themselves and on behalf of the barred from petitioning subclass.

---

MC 406a, Ex. 20; Order on Petition to Discontinue Sex Offender Registration, Form MC 406b, Ex. 21.

## COUNT V: Mandatory Reporting Requirements and Compelled Speech (First Amendment) (Primary Class & Non-Sex-Offense Subclass)

703.    SORA 2021 compels speech, requiring registrants to report extensive information, often in person and within three business days. *See* Section V: Compelled Speech, *supra*.

704.    These requirements are imposed without any individualized review, last for life in most cases, and have a chilling effect on registrants' constitutionally protected rights to free speech and association.

705.    The information registrants are compelled to provide feeds directly into the state's public registry, and is used by the state to craft a widely disseminated, highly-stigmatizing message that registrants are dangerous sex offenders whom the public should fear.

706.    SORA 2021 forces registrants to contribute to speech about themselves with which they vehemently disagree.

707.    Plaintiffs and the primary class vehemently disagree with the government's message that they are all dangerous sex offenders.

708.    Mr. Doe A and the non-sex-offense subclass vehemently disagree both with the government's false portrayal of them as people who were convicted of sex offenses, and with the message that they are all dangerous sex offenders.

709.    By requiring frequent, time-consuming, and humiliating reporting to law enforcement, SORA 2021's compelled disclosure requirements also severely

restrict registrants' autonomy.

710.   The public disclosure of information registrants are compelled to provide subjects them to harassment, threats, social ostracization, housing instability/ homelessness, loss of employment, and other harms. *See* Section V, *supra*.

711.   The vast majority of information that registrants are compelled to provide about themselves is already available to law enforcement through other databases and investigative tools. The state has not considered less intrusive ways to obtain the information that registrants provide—e.g., through tax, employment, motor vehicle, and postal records.

712.   Upon information and belief, the vast majority of the information that registrants are compelled to provide about themselves is simply add to the registry and is never used by law enforcement for any investigative purpose.

713.   SORA 2021's compelled disclosure requirements are subject to strict scrutiny under the First Amendment to the U.S. Constitution (incorporated against the states through the Fourteenth Amendment).

714.   Under strict scrutiny, SORA 2021's compelled speech requirements must be narrowly tailored to a compelling government interest, and be the least restrictive means of achieving that end.

715.   Although Michigan has a strong interest in preventing sexual offending, SORA 2021's ineffective or counterproductive registration scheme that compels

disclosures from people who pose no appreciable risk is not narrowly tailored, let alone the least restrictive means, of advancing that interest.

716.   SORA 2021's compelled disclosure requirements violate the First Amendment rights of named Plaintiffs and the primary class absent an individualized, periodic determination that (1) the person is presently dangerous, (2) the compelled disclosure is necessary to alleviate that danger, and (3) the information is not otherwise available to law enforcement.

717.   SORA 2021's compelled disclosure requirements violate the First Amendment rights of Mr. Doe A and the non-sex-offense subclass absent an individualized, periodic determination that (1) the person has been convicted of an offense that was sexual in nature, (2) the person is presently dangerous, (3) the compelled disclosure is necessary to alleviate that danger, and (4) the information is not otherwise available to law enforcement.

718.   Named Plaintiffs bring this claim for themselves and on behalf of the primary class. Mr. Doe A brings this claim on behalf of himself and the non-sex-offense subclass.

### COUNT VI: Violation of Plea Agreements
### (Due Process) (Plea Bargain Subclass)

719.   Defendants who plead guilty give up their constitutional right to a trial and enter into a *quid pro quo* with the government. Retroactive changes to the terms of plea agreements are analyzed under both due process and contractual principles.

720. Sex offender registration is a severe penalty that is intimately related to the criminal process and imposed as a result of a criminal conviction. *See* Section VIII, *supra*.

721. Due process requires fair notice of such consequences. "[W]hen addressing ex post facto-type due process concerns, questions of notice, foreseeability, and fair warning are paramount." *United States v. Barton*, 455 F.3d 649, 654 (6th Cir. 2006).

722. Defendants charged with sex offenses routinely consider whether they are required to register, how long the registration term is, and whether registration is public or private, in making decisions about whether to accept a plea agreement.

723. "[C]onsiderations of fair notice, reasonable reliance, and settled expectations" limit the imposition of more severe conviction-based consequences than those considered at the time of the plea. *I.N.S. v. St. Cyr*, 533 U.S. 289, 321 (2001) (internal quotation marks and citations omitted).

724. At the time John Does A and E pled guilty, Michigan did not have a sex offender registry. They had no notice that as result of their pleas, they would later retroactively become subject to lifetime registration as sex offenders, subject to all the burdens that SORA 2021 imposes.

725. At the time John Does B, C, D, and Mary Roe pled guilty, they were required to register for 25 years. They had no notice that, as a result of their pleas,

they would later retroactively become subject to lifetime registration as sex offenders, subject to all the burdens that SORA 2021 imposes. Rather, these Plaintiffs made their decisions to plead, rather than take their cases to trial, based on the then-extant version of SORA, pursuant to which they were to come off the registry after 25 years.

726.   By retroactively imposing lifetime registration on individuals who pled guilty without notice that they would be subject to lifetime registration or whose pleas were predicated on an understanding that they would not be subject to registration or be subject for a term of years, the state has violated the Due Process Clause.

727.   John Does A, B, C, D, E, and Mary Roe bring this claim for themselves and on behalf of the plea bargain subclass.

### COUNT VII: Sex Offender Registration of People Who Did Not Commit Sex Offenses (Due Process and Equal Protection) (Non-Sex-Offense Subclass)

728.   Under SORA 2021, people convicted of certain non-sex offenses are required to register as sex offenders, are publicly branded as convicted sex offenders, and are required to comply with all of SORA 2021's requirements even though they never committed a crime involving sex.

729.   There are two situations where SORA 2021 requires registration for people who were convicted of crime that did not include a sexual component as an element of the offense.

730.   First, the "catch-all" provision requires registration for an offense "that by its nature constitutes a sexual offense against an individual who is a minor." M.C.L. § 28.722(r)(vii). In such cases, the statute provides procedural protections, including most importantly a judicial determination of whether the defendant's actions were sexual in nature. *See* M.C.L. § 769.1(13).[19] Plaintiffs here do not challenge that provision.

731.   Second, SORA 2021 automatically requires sex offender registration— without any determination of whether the conduct involved sex—for people convicted of certain offenses against minors: kidnapping (M.C.L. § 750.349), unlawful imprisonment (M.C.L. § 750.349b), leading away of child under 14 (M.C.L. § 750.350), or a comparable out-of-state offense. *See* M.C.L. § 28.722(r)(iii), (r)(x), (v)(ii), v(iii), (v)(vii). Plaintiffs' challenge here is to this automatic determination that people who were not convicted of sex offense are "sex offenders."

732.   Anyone viewing the Michigan Sex Offender Registry on the internet, much less reading the site's prominent warnings about protecting the public from "convicted sex offenders," would naturally assume that those listed were convicted of a crime involving sex. *See* Merriam-Webster Dictionary (2022) (defining "sex offender" as "a person who has been convicted of a crime involving sex").

---

[19] The statutory cross-references to SORA in M.C.L. § 769.1(13) were not amended when SORA was amended, and thus refer to an older version of SORA.

733.   Mr. Doe A and the non-sex-offense subclass were not convicted of sex offenses.

734.   There has been no judicial or other procedurally protected determination for Mr. Doe A or for members of the non-sex-offense subclass, that they committed an offense that was sexual in nature.

735.   SORA 2021 irrationally imposes sex offender registration and publicly labels people as sex offenders even though their offenses had no sexual component. Imposing sex offender registration and publicly labeling people as sex offenders when their offense had no sexual component serves no public protection function.

736.   SORA 2021 draws an irrational distinction between most people convicted of non-sex crimes, who get a judicial determination that their offense was sexual in nature before they can be registered as sex offenders under the "catch-all" provision, *see* M.C.L. §§ 28.722(r)(vii), 769.1(13), and people in the non-sex-offense subclass, who get no procedural protections because their registration is automatic.

737.    Imposing SORA 2021 on Mr. Doe A and the non-sex-offense subclass absent an individualized, procedurally-protected judicial determination that they committed a crime of a sexual nature violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution.

738.   John Doe A brings this claim for himself and on behalf of the non-sex-

offense subclass.

## COUNT VIII: Vagueness
## (Due Process) (Primary Class and Post-2011 Subclass)

739.   The Due Process Clause of the Fourteenth Amendment prohibits states

from enforcing laws that are unconstitutionally vague. As a matter of due process,

statutory requirements must be written with sufficient specificity that persons of

ordinary intelligence need not guess as to their meaning and will not differ as to their

application.

740.   SORA 2021 is unconstitutionally vague. *See* Section V: Vagueness,

*supra*. SORA 2021's vague provisions cannot be enforced under the Due Process

Clause.

741.   Named Plaintiffs bring this claim for themselves and on behalf of the

primary class.

742.   With respect to the vagueness of reporting requirements for electronic

addresses and internet identifiers, John Doe H brings this claim on behalf of himself

and the post-2011 subclass.

## COUNT IX: Compelled Admission of "Understanding" SORA 2021
## (First Amendment) (Primary Class)

743.   SORA 2021 provides that registrants be provided a notification of

duties. *See* M.C.L. §§ 28.726(1), 28.727(3); Explanation of Duties, Ex. 16.

744.   It is a crime for registrants not to sign the Explanation of Duties. *See*

184

M.C.L. § 28.727(4) ("The individual shall sign a registration and notice."); M.C.L. § 28.729(3) ("An individual who willfully fails to sign a registration and notice as provided in section 7(4) is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $1,000.00, or both.").

745.   The Explanation of Duties, Ex. 16, that registrants are required to sign states: "I have read the above requirements and/or had them read to me and I understand my registration duties."

746.   Registrants who report updates by mail must use the Michigan Sex Offender Registry Mail-in Update Form, Ex. 17. The form requires registrant to sign a statement saying: "I have read the 'Explanation of Duties to Register as a Sex Offender' listed on pages two and three of this form and/or had them read to me and I understand my registration duties."

747.   Registrants are required to sign these forms regardless of whether they in fact understand SORA 2021's complex registration requirements.

748.   Many of SORA 2021's requirements are vague. Many registrants, including the named Plaintiffs, do not understand all of the requirements of the Act. *See* Section V: Vagueness, *supra*.

749.   Requiring registrants to sign the statement on the Explanation of Duties and the Registry Mail-in Update Form attesting to their understanding of SORA 2021 is compelled speech.

750.   By making it a crime for registrants not to sign these forms, the state is not only compelling registrants to speak, but is compelling them to make a statement that, in the vast majority of cases, is false.

751.   Defendants do not have a compelling state interest in forcing registrants to sign forms stating that they understand their registration requirements, and forcing registrants to sign such forms is not a narrowly tailored means of furthering any compelling interest that the state may have. Requiring registrants to attest that they understand SORA 2021 violates the First Amendment of the U.S. Constitution (incorporated against the states through the Fourteenth Amendment).

752.   Named Plaintiffs bring this claim for themselves and on behalf of the primary class.

## COUNT X: Reporting Requirements Restricting Speech and Association (First Amendment) (Post-2011 Subclass)

753.   SORA 2021 requires persons "required to be registered under this act after July 1, 2011" to report "all electronic mail addresses and internet identifiers registered to or used by the individual." M.C.L. § 28.727(1)(i).

754.   SORA 2021 further requires such persons to report "any change in . . . electronic mail addresses [and] internet identifiers . . . registered to or used by the individual" within three business days. M.C.L. § 28.725(2)(a).

755.   SORA 2021 defines the term "internet identifier" to broadly encompass "all designations used for self-identification or routing in internet communications

186

or posting." M.C.L. § 28.722(g).

756.   Under the prior version of SORA, registrants' email addresses and internet information could not be posted on the public registry. *See* M.C.L. § 28.728(3)(e) (2020). That provision was stricken in Public Act 295 of 2020. SORA 2021 thus now permits posting of registrants' email addresses and internet identifiers on the Sex Offender Registry website.

757.   SORA 2021 chills registrants' speech. Registrants are hesitant to use the internet because doing so requires them to report their email addresses and internet identifiers. *See* Sections IV, V: Limitations on Speech and Use of the Internet, *supra*.

758.   Registrants are fearful of using the internet because they do not know what information they must report.

759.   Registrants also fear that if they use the internet, their electronic mail addresses and internet identifiers will be posted on the public registry, subjecting them to harassment and intimidation.

760.   Registrants are unable to speak anonymously online.

761. SORA 2021's requirements for reporting and making public registrants' email addresses and internet identifiers violates Plaintiffs' freedom of speech and right of association which are protected under the First Amendment of the U.S. Constitution (incorporated against the state through the Fourteenth

Amendment).

762. John Doe H brings this claim for himself and on behalf of the post-2011 subclass.

## Lack of a Legal Remedy

763. Plaintiffs and the putative class members' harm is ongoing, and cannot be alleviated except by declaratory and injunctive relief.

764. No other remedy is available at law.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs, for themselves and for the putative class members whom they wish to represent, ask the Court to grant the following relief:

A. Rule that this action may be maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, and certify:

1. a "primary class," defined as people who are or will be subject to registration under Michigan's Sex Offenders Registration Act, and name John Does A, B, C, D, E, F, G, H, Mary Doe, and Mary Roe as representatives of the primary class;

2. a "pre-2011 ex post facto subclass," defined as members of the primary class who committed the offense(s) requiring registration before July 1, 2011; and name John Does A, B, C, D, E, F, G, Mary Doe, and Mary Roe as representatives of the pre-2011 ex post facto subclass;

3. a "retroactive extension of registration subclass," defined as members of the primary class who were retroactively required to register for life as a result of amendments to SORA; and name John Does A, B, C, D, E, G, Mary Doe, and Mary Roe as representatives of the retroactive extension of registration subclass;

4. a "barred from petitioning subclass," defined as members of the primary class who are ineligible to petition for removal from the registry and for

188

whom ten or more years will have elapsed since the date of their conviction for the registrable offense(s) or from their release from any period of confinement for that offense(s), whichever occurred last, and who (a) have not been convicted of any felony or any registrable offense since; (b) have successfully completed their assigned periods of supervised release, probation, or parole without revocation at any time of that supervised release, probation, or parole; and (c) have successfully completed an appropriate sex offender treatment program, if successful completion of a sex offender treatment program was a condition of the registrant's confinement, release, probation, or parole; and name John Does A, C, E, F, G, Mary Doe, and Mary Roe as representatives of the barred from petitioning subclass;

5. a "non-sex-offense subclass," defined as members of the primary class who are or will be subject to registration for an offense without a sexual component including convictions for violating M.C.L. §§ 750.349, 750.349b, 750.350, or a substantially similar offense in another jurisdiction; and name John Doe A as the representative of the non-sex-offense subclass;

6. a "plea bargain subclass," defined as members of the primary class who gave up their right to trial and pled guilty to a registrable offense in Michigan and who, as a result of retroactive amendments to SORA, (i) were retroactively subjected to SORA even though there was no registration requirement at the time of their plea; or (ii) had their registration terms retroactively extended beyond that in effect at the time of their plea; and name John Does A, B, C, D, E, and Mary Roe as representatives of the plea bargain subclass;

7. a "post-2011 subclass," defined as members of the primary class who committed the offense(s) requiring registration on or after July 1, 2011; and name John Does H as the representative of the post-2011 subclass.

B. Appoint Plaintiffs' counsel (Miriam Aukerman, Paul Reingold, and Roshna Bala Keen) as class counsel for this action.

C. **Ex Post Facto Claim (Count I)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that retroactive application of SORA 2021 to registrants whose offense requiring registration predates July 1, 2011, violates the Ex Post Facto Clause of the U.S. Constitution; and permanently enjoin Defendants from retroactively applying SORA 2021 to John Does A, B, C, D, E, F, G, Mary Doe,

and Mary Roe and the pre-2011 ex post facto subclass absent an individual-ized, periodic determination that the person presents such a high risk to public safety that SORA 2021's extensive burdens are justified.

D. **Retroactive Extension of Registration Terms (Count II)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that retroactively requiring a person to be subject to SORA 2021's extensive burdens for life violates the Ex Post Facto and Due Process Clauses of the Fourteenth Amendment to the United States Constitution; and permanently enjoin Defendants from enforcing SORA 2021 against John Does A, B, C, D, E, G, Mary Doe, and Mary Roe, and against the retroactive extension of registration subclass, for a term longer than that in effect at the time of the registrant's offense.

E. **Lack of Individualized Review (Count III)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that SORA 2021, by imposing extensive and in most cases lifetime sex offender registration without any individualized, periodic review, violates the Due Process and Equal Protection Clauses of the United States Constitution; and enjoin Defendants from enforcing SORA 2021 absent individualized, periodic review for Plaintiffs and the primary class.

F. **Unequal Opportunity to Petition for Removal (Count IV)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that SORA 2021 is irrational and violates the Equal Protection Clause in that it allows certain registrants—who for ten years following release have not been convicted of a felony or other registrable offense, who successfully completed supervised release, probation or parole, and who successfully completed any required sex offender treatment program—to petition for removal from the registry after ten years, but bars other similarly situated registrants who meet the exact same criteria from petitioning for removal; and enjoin Defendants from denying John Does A, C, E, F, G, Mary Doe, and Mary Roe and the barred from petitioning subclass the opportunity to petition for removal from the registry on the same terms as registrants eligible to petition under M.C.L. § 28.728c(1), (12).

G. **Mandatory Reporting Requirements and Compelled Speech (Count V)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that SORA 2021's com-pelled disclosure requirements violate the First Amendment rights of:

1. named Plaintiffs and the primary class absent an individualized, periodic determination that (1) the person is presently dangerous, (2) compelled disclosure is necessary to alleviate that danger, and (3) the information is

190

not otherwise available to law enforcement;

2. Mr. Doe A and the non-sex-offense subclass absent an individualized, periodic determination that (1) the person has been convicted of an offense that was sexual in nature, (2) the person is presently dangerous, (3) the compelled disclosure is necessary to alleviate that danger, and (4) the information is not otherwise available to law enforcement;

and permanently enjoin Defendants from enforcing the compelled disclosure requirements in M.C.L. §§ 28.724a(1)–(4), 28.725(1)–(3), (7)–(8), (10)–(13), 28.725a(3)–(5), (7)–(8), and 28.727(1)—absent the individualized, periodic determination described above.

H. **Violation of Plea Agreements (Count VI)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that for individuals who pled guilty, retroactively imposing SORA 2021 for life or for a longer term then in effect at the time of the plea violates the terms of the plea agreements the state made in violation of the Due Process Clause; and permanently enjoin Defendants from enforcing SORA 2021 against John Does A, B, C, D, E, and Mary Roe and the plea bargain subclass for a term longer than that in effect at the time of the registrant's plea.

I. **Sex Offender Registration of People Who Did Not Commit Sex Offenses (Count VII)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that subjecting John Doe A and the non-sex-offense subclass to registration as sex offenders under SORA 2021 violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution; and permanently enjoin Defendants from enforcing SORA 2021 against Mr. Doe A and the non-sex-offense subclass absent a judicial determination, in accordance with the standards applicable under M.C.L. § 769.1(13), that they have committed an offense that "by its nature constitutes a sexual offense against an individual who is a minor," M.C.L. § 28.722(r)(vii), and are therefore subject to registration under that provision.

J. **Vagueness (Count IX)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that SORA 2021 is unconstitutionally vague, and permanently enjoin Defendants from enforcing SORA 2021's unconstitutionally vague provisions against Plaintiffs and the primary class, and from enforcing the internet reporting requirements against John Doe H and the post-2011 subclass.

K. **Compelled Admission of "Understanding" SORA 2021 (Count IX)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that requiring registrants to sign an Explanation of Duties Form and a Michigan Sex Offender Registry Mail-in Update Form stating that they understand their registration duties under SORA 2021 violates the protection against compelled speech of the First Amendment to the U.S. Constitution; and permanently enjoin Defendants from requiring Plaintiffs and the primary class to attest that they understand their obligations under SORA 2021.

L. **Reporting Requirements Restricting Speech and Association (Count X)**: Declare, pursuant to 28 U.S.C. §§ 2201 and 2202, that SORA 2021's provisions for reporting and making public registrants' email addresses and internet identifiers, M.C.L. §§ 28.725(2)(a), 28.727(1)(i), 28.728, violates Plaintiffs' freedom of speech protected under the First Amendment to the U.S. Constitution; and permanently enjoin Defendants from requiring  Mr. Doe H and the post-2011 subclass to report their email addresses or internet identifiers, and from making public any email addresses or internet identifiers.

M. Grant Plaintiffs and all class members their costs of suit, their attorneys' fees and costs as permitted under 42 U.S.C. § 1988, and any other costs or expenses allowed by law.

N. Grant such other relief as justice requires.

Respectfully submitted,

s/ Miriam Aukerman (P63165)
Miriam J. Aukerman
Rohit Rajan (AZ 035023)
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org
rrajan@aclumich.org


s/ Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

s/ Paul D. Reingold (P27594)
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
Univ. of Michigan Law School
802 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109-1215
(734) 355-0319 - pdr@umich.edu


s/ Roshna Bala Keen (Ill. 6284469)
Loevy & Loevy
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 - roshna@loevy.com

Dated:        February 2, 2022