# Exhibit 6:

## Dr. Kelly M. Socia Expert Report

# DECLARATION OF KELLY M. SOCIA, PH.D.

## Sex Crime Arrest Data and

## Recidivism of Individuals with Sex Crime Convictions

**Prepared by:**
Kelly M. Socia, Ph.D.
Associate Professor
School of Criminology and Justice Studies
University of Massachusetts, Lowell
Kelly_Socia@uml.edu

Dated: November 9, 2021

Note: The analyses and views represented in this document are those of Kelly M. Socia, Ph.D., and do not necessarily reflect those of the University of Massachusetts, Lowell.

# Table of Contents

**Summary of Expert Witness Qualifications**…………………………………1

**Summary of Research Findings**……………………………………………2

**Summary of Existing Research**……………….…………….……….…….4

*Sex Crime Arrest Data*……………..….………………………4

*The Recidivism of Individuals Convicted of Sex Crimes*………..…...8

*Myths About Sex Crimes and "Sex Offenders"*…………………….…15

*The Stigmatization of Individuals with Sex Crime Convictions*……....16

*Employment and Housing Consequences for Registrants*……..…….17

*Failure to Register (FTR) and Risk*……………………………...19

**Conclusions**…………………………………………………...21

**Statement of Compensation**……………….………….……….22

**Oath and Signature**..…..……….…………………………..…...23

**References** …………………….………………………………24

**Appendices**

*Appendix A: Comprehensive C.V. of Kelly M. Socia, Ph.D.*

*Appendix B: Expert Witness Qualifications and Publications (last 10 years)*

*Appendix C: List of Other Relevant Expert Witness Cases*

### Summary of Expert Witness Qualifications

I am an Associate Professor in the School of Criminology and Justice Studies and a Fellow for the Center for Public Opinion at the University of Massachusetts, Lowell. I have approximately 40 peer-reviewed publications in journals such as *Criminology & Public Policy*; *Crime & Delinquency*; *Sex Abuse: A Journal of Research and Treatment*; and *Psychology, Public Policy, and Law*, in addition to other scholarly publications (e.g., book chapters). I have served as co-editor of *Sex Offender Law Report*, co-wrote an Oxford Bibliography entry on Sex Offender Policy and Legislation, and have served as an expert witness/consultant in multiple court cases involving the housing impacts of sex offender residency restrictions and other post-release policies. My research interests include registered sex offenders and public policies, reentry and recidivism, public opinion and policy-making, and spatial analyses. I hold a Ph.D. and an M.A. in Criminal Justice from the School of Criminal Justice at the University at Albany, State University of New York, and a B.S. in Business Administration: Management Information Systems, from Rochester Institute of Technology. My full curriculum vitae is attached as Exhibit A, a list of publications in the last ten years as Exhibit B, and a list of cases in which I have testified as an expert in the last four years as Exhibit C. In preparing this report, I have relied on my own research, as well as my knowledge of the work of other scholars in the field, as cited below.

### *Summary of Research Findings*

**Finding #1:** Approximately 90-95 percent of sex crime arrests involve individuals who *do not* have prior sex crime convictions, and thus who are not listed on a sex offender registry at the time of the offense. This finding is *not* an effect of registries, because it was also true before registries came into existence: more than 90 percent of sex crime arrests were committed by first-time offenders both before *and* after registry laws were passed.

**Finding #2:** The widely held public belief in a "frightening and high" sexual recidivism rate is not supported by research evidence, and that specific statistic is a myth resulting from junk science and shoddy research practices. A more reasonable estimate of the official sexual recidivism rate (e.g., rearrests) among the population of individuals listed on the sex offender registry, or with a prior sex offense before registries existed, is between 5% and 15% (rearrest for a sex crime) within the first five years of conviction/release. If *reconviction* is used as the indicator of recidivism instead of rearrest, the rate is even lower. The recidivism rate for sexual offenders, whether measured by rearrest or reconviction, is lower, and in most cases far lower, than for all other categories of offenders (like non-sexual assailants, armed robbers, drug dealers, or those who commit property crimes, etc.) but one: only murderers have a lower recidivism rate than sexual offenders.

**Finding #3:** In addition to the incorrect belief about "frightening and high" recidivism, the public believes other inaccurate myths regarding individuals listed on the registry. These include beliefs that most registrants have stranger victims (they do not), are sexual predators and/or pedophiles (they are not), and registrants are at a high risk to commit new non-sexual crimes, as well as sex crimes involving strangers, kidnapping, and victims of all ages. None of these beliefs are supported by research evidence on the criminal history of current registrants, nor research on the recidivism rates of those on the registry. Despite the lack of clear evidence that the registry actually reduces sex crimes or sexual recidivism, many members of the public believe that it *does* work, which creates a false sense of security concerning sex crimes. Additionally, much of the public admits that even if they were provided with scientific evidence that the registry does not work, they would be unwilling to change their beliefs about its efficacy.

**Finding #4:** Perhaps because of these widely held, but incorrect, beliefs about registrants and sex crimes generally, the public is intensely stigmatizing towards anyone listed on the sex offender registry. This stigmatization of anyone on the sex offender registry, in turn, negatively impacts the chances of successful reentry and rehabilitation, especially as it relates to employment and housing outcomes.

**Finding #5:** There is no consistent evidence that a failure to register (FTR) conviction is associated with an increased likelihood of sexual recidivism. The

limited research on this topic shows conflicted findings about what an FTR conviction *actually* predicts in terms of future risk, and also suggests that FTR offenses are not caused by sexually deviant intentions.

### Summary of Existing Research

1.     I start by summarizing the existing research relating to sex crime arrests and sexual recidivism estimates, which informs or underlies all five of the statements listed above. Next I turn to the research that directly supports each of the five separate findings. First, I summarize the research on sex crime arrest data to support Finding #1. Second, I present the research on sexual recidivism rates to support Finding #2. Third, I summarize the research on public beliefs about "sex offenders," sex crimes, and stigmatization, including the influence of stigmatizing labels, to support Finding #3. Fourth, I summarize the research on negative consequences for registrants from the public to support Finding #4. Fifth, I summarize the research on failure to register (FTR) convictions and recidivism risk, sexual and non-sexual, to support Finding #5.

### *Sex Crime Arrest Data*

2.     A broad summary of the existing research on sex crime arrests suggests that approximately 90-95% of all sex crime arrests involve individuals *without* prior sex crime convictions (i.e., new perpetrators), who would also not be listed on a sex offender registry at the time of the offense. (Levenson and Zgoba, 2016; Sandler,

Freeman, and Socia, 2008.) Thus, only 5% to 10% of all sex crime arrests are *repeat* sex crimes involving individuals with prior convictions, who would typically be on the registry at the time of the follow-up offense. Studies underscoring these findings are explored in more detail below.

3.     Research in Florida found that just 6.5% of sex crime arrests involved individuals with a prior sex crime conviction. (Levenson and Zgoba, 2016.) In New York, 95% of the individuals arrested for sex crimes between 1986 and 2006 did not have a prior registrable sex crime conviction on the record at the time of the offense. (Sandler et al., 2008.) Further, Sandler and colleagues (2008) also found that the implementation of the sex offender registry in New York State did not affect overall sex crime rates, new sex crime rates, or repeat sex crime rates.

4.     ***Stranger victim sex crimes.*** A related body of evidence shows that most sex crimes are committed by acquaintances, family members, or other people who know the victim, rather than by strangers. (Catalano, 2006; Snyder, 2000.) This is contrary to the widely held notion that so-called "stranger danger" sex crimes predominate. (Socia and Harris, 2016.) Indeed, research suggests that approximately 13%-15% of sex crimes reported to police are committed by strangers. (Bierie and Budd, 2015; Snyder, 2000.) There are some fluctuations to these estimates based on the data source, year examined, and the age of the victim. (C.f., Berzofsky, et al., 2013; Catalano, 2006; Greenfield, 1997; Snyder, 2000.) Child-victim sex crimes,

however, are consistently even less likely to involve strangers than adult-victim sex crimes, with strangers accounting for just 5-10% of juvenile victim sexual assaults. (See Greenfield, 1997; Snyder, 2000.)

5.     As a result of the low proportion of sex crimes involving individuals on the registry (5% to 10%; Craun et al., 2011; Levenson and Zgoba, 2016; Sandler et al., 2008), combined with the low proportion of sex crimes involving strangers, it is not surprising that research finds little support for the efficacy of post-release policies like registration and notification, either in reducing recidivism or in making communities safer. For instance, many independent studies have concluded that the sex offender registry did not reduce sex offending rates and/or sexual recidivism in a variety of states, including New York (Sandler et al., 2008), New Jersey (Veysey, Zgoba, and Dalessandro, 2008; Zgoba, Jennings, and Salerno, 2018), South Carolina (Letourneau, et al., 2010), and Florida (Levenson and Zgoba, 2016).

6.     The most comprehensive study on sex offender registration and notification's effectiveness is a recently-published meta-analysis that covered 18 individual research studies, 25 years' worth of evaluation data, and 474,640 formerly incarcerated individuals. (Zgoba and Mitchell, 2021.) This study determined such laws had no effect on recidivism. Specifically, the authors noted that their study "provide[s] comprehensive evidence that SORN policies have no effect on sexual and non-sexual crime commission over their period of existence, thereby failing to

deliver on the intention of increasing public safety." (Zgoba and Mitchell, 2021, p. 22.)

7.     The little research that suggests registration/notification *may* influence sex crimes is mixed. Both multi-state studies (Prescott and Rockoff, 2011; Vasquez, Maddan, and Walker, 2008; Walker, et al., 2008) and systematic reviews (Washington State Institute for Public Policy, 2009) find no consistent evidence of the efficacy of registration/notification in reducing sex crimes. In other words, there is little evidence that these policies make communities any safer. However, there is limited evidence that for stranger-perpetrated sex crimes, the registry may increase the speed of closure (i.e., making an arrest) by an average of just over a day, perhaps due to police more easily ruling out those on the registry. (Bierie and Budd, 2021; but see Prescott and Rockoff, 2011.) Further, one study on 216 male federal offenders with a prior or current sexual offense from a Midwestern jurisdiction found that while those individuals with registerable sex offenses (N = 38) had more parole noncompliance and revocation of their supervised release sentences than those with non-registerable sex offenses, once risk assessment scores were considered, the effects of the registry were rendered nonsignificant. (Drury, Delisi, and Elbert, 2021.)[1] This

---

[1] Of course, it is not surprising that those with registerable offenses had more noncompliance violations, given the additional compliance requirements (and likely increased supervision scrutiny) imposed by the registration requirements themselves.

suggests that the registry has not particularly influenced such outcomes (parole noncompliance and revocation), but rather this may be due to the differences in risk between those who are subject to the registry and those who are not.

8.      The above findings lead to several conclusions regarding sex crime arrest data. First, between 90% and 95% of sex crime arrests involve individuals who are *not* on the registry and *do not* have prior sex crime convictions (i.e., they are new perpetrators). Second, the first finding is not an effect of registries, as the data are the same before and after registries came into existence. Third, most sex crimes occur between acquaintances, family members, or others with an established relationship with the victim, rather than strangers, which undercuts the "stranger danger" myth that the registry and similar post-release notification and monitoring policies are founded upon. Fourth, there is scant evidence that the registry, community notification, or other post-release sex crime policies actually reduce sex crime rates. Indeed, those policies may make communities less safe, because individuals who cannot easily reintegrate into society, or cannot find jobs, or who lack places to live, or who are cut off from social support systems, may be *more* likely to reoffend, whether sexually or otherwise. (Prescott and Rockoff, 2011.)

**The Recidivism of Individuals Convicted of Sex Crimes**

9.      In *McKune v. Lile*, 536 U.S. 24, 33 (2002), a case concerning a prison sex abuse treatment program, U.S. Supreme Court Justice Anthony Kennedy cited a

8

"frightening and high" sexual recidivism rate of "as high as 80%" in his opinion. Since then, that figure has been cited repeatedly by courts as a justification for sex crime policies like the registry, and by proponents of these policies as evidence of the "problem" of sexual recidivism. (See, e.g., *Smith v. Doe*, 538 U.S. 84, 103 (2003) [citing *McKune*'s "frightening and high" comment in upholding Alaska's sex offender registration statute].) But a 2015 article demolished this argument, debunking the myth of "frightening and high" recidivism rates, and showing that the "80% recidivism rate" statistic was just plain wrong. (See Ellman and Ellman, 2015.) Indeed, the source that Justice Kennedy used for this statistic was a (non-peer reviewed) Department of Justice manual. (Schwartz and Cellini, 1988.). That manual, in turn, cited the statistic from an article in the publication *Psychology Today*, which is a non-academic mass-market magazine that is geared towards public entertainment using pop-science (i.e., "infotainment") – not peer-reviewed research.

10.   In fact, the "as high as 80%" recidivism statistic contained in the *Psychology Today* magazine article was actually an unsupported guess by therapists who wrote the article, to explain their own work with a group of very high-risk individuals with prior sex crime convictions enrolled in a single treatment program for such offenders at Oregon State Hospital. (Freeman-Longo and Wall, 1986.) Further, the "80% recidivism rate" statistic wasn't the actual estimate – their article noted a *range* that summarized the body of work that had been conducted to date

(i.e., as of the mid-1980s): "Estimates of the recidivism rate among untreated sex offenders range between 35% to 80%." (Freeman-Longo and Wall, 1986.) This unsupported claim was, in turn, then misused by the Department of Justice manual to suggest that 80% was a factual recidivism rate estimate for *all* individuals with a prior sex crime conviction, regardless of risk level, time since offense, or any other relevant characteristics. This inaccurate statistic cited in the manual was then erroneously cited as a fact by Justice Kennedy in his opinion, which in turn has spread throughout later judicial opinions and legislative actions concerning individuals with a prior sex crime conviction. (See Sullum, 2018.) In short, the 80% statistic was the result of sloppy research practices relying on an inaccurate secondhand citation to a vague estimate from an article in an "infotainment" magazine of no scientific merit.

11.    After the Ellmans' 2015 article, the therapist responsible for the original statistic, Dr. Freeman-Longo, said in a New York Times interview, "[That statistic] got taken to say all sex offenders recidivate at 80%. That's absolutely incorrect, it's wrong, it's untrue." (See Ellman and Ellman, 2015; Feige, 2017; Sullum, 2018.) He further noted the lack of scientific credibility of the underlying source: "If you're going to base laws at the federal level, you don't cite popular psychology magazines, no matter who the author is, me or anybody else, it's not a scientific journal. I'm appalled that this could happen. This is not my intent. Not my intent at all." (Feige,

2017.) Indeed, the author of the Department of Justice manual cited by Justice Kennedy, psychologist Barbara Schwartz, called Justice Kennedy's use of the 80% statistic an act of "deliberate indifference." (Feige, 2017.)

12.    In short: the 80% recidivism estimate is a perfect example of junk science. Yet, because of the sloppy research practices used in producing the Department of Justice manual, and Justice Kennedy's use of the statistic in his opinion about recidivism rates, this incorrect statistic has been relied upon as "fact" by judges deciding subsequent court cases, and by legislators enacting registry and other laws, to justify policies that have little or no scientific evidence to support them. (See Sullum, 2018.) To be clear: modern peer-reviewed social-scientific research is nearly unanimous in finding that the recidivism rate of individuals convicted of sex offenses – far from being "frightening and high" – is actually "low" compared to all other categories of offenders (except murderers). Further, while some people with sex offense convictions may, in the years following release, be more likely to commit future sex crimes than people without such convictions, the *overall* sexual recidivism rate is still surprisingly low compared to the common myths. Overall, the research on sexual recidivism suggests an official sexual recidivism rate of between 5% and 15% over 5 years, when measured as rearrests. (Hanson and Bussiere, 1998; Letourneau et al., 2010; Levenson and Shields, 2012; Zgoba et al., 2012; Zgoba et al.,

2016.)[2] This is far different than the 80% rate that has become a popular urban (as well as judicial) legend.

13.     ***Problems estimating registrants' recidivism rates.*** As noted earlier, official statistics suggest that about 90% to 95% of sex crime arrests involve individuals *without* a prior sex crime conviction. On its face, this suggests that only about 5% to 10% of officially known sex crimes are committed by someone listed on the registry at the time of the crime.

14.     One of the stated intentions of the sex offender registry is to assist law enforcement in solving sex crimes by providing a database of home addresses of individuals with prior sex crime convictions (i.e., registrants). As such, if the registry were working as intended, then it should *increase* law enforcement's ability to solve sex crimes committed by registrants, but it *would not* help law enforcement to solve crimes committed by non-registrants. That is, if the registry "worked," then

---

[2] Obviously, the official rate of sexual recidivism is not the same as the actual rate of recidivism, as there are sex crimes that are committed but do not result in an arrest. However, estimating the "actual" rate of sexual recidivism is a difficult task, and prior research has not been able to provide reliable estimates. (See, e.g., Furby, Weinrott, & Blackshaw, 1989.) Further, offender self-report studies show "the number of unreported sexual offenses is a highly skewed distribution with relatively few offenders having many victims." (Scurich and John, 2019, p. 163.) Thus, estimates about the number of sex crimes that are unreported are based around measuring *crimes*, but can say nothing about the number of *perpetrators* that are committing sex crimes that are not reported. Moreover, the issue of underreporting applies *both* to non-registrants, who as noted above, commit 90-95% of sex crimes resulting in arrest, and to people with past sex offense convictions.

registrants should have a *greater likelihood* of being caught for a sex crime, compared to non-registrants who commit a similar sex crime. It follows that if registrants are *more likely to be caught* due to their registration, then registrants would be *over-represented* in official arrest statistics of sex crimes, compared to the proportion of all sex crimes committed in the United States. To state this another way, if we know that registrants are estimated to commit 5-10% of sex crimes that result in arrest, *and* they are more likely to be caught (arrested) than non-registrants due to the supposed impact of the registry, then registrants should be responsible for *less* than 5-10% of *all* sex crimes (both reported and unreported) that occur. Thus, if the registry has any effectiveness in helping solve sex crimes, then it is only logical that registrants would be responsible for less than the 5% to 10% estimate we find using official statistics. Further, if registries are *not* effective in helping solve sex crimes, then logically a registrant would have the *same* chance of being caught as a non-registrant.

15. Indeed, logical problems plague much of the research that attempts to estimate unreported sexual recidivism. For example, some of this research relies on interviews/surveys given to a group of very high-risk individuals, who are not reflective of "registrants" as a general group. In other cases, such estimates are taken from surveys of victims regarding sex crimes that go unreported to law enforcement, but these estimates say nothing about the *proportion* that involve *registrants* committing recidivistic crimes, and thus cannot be used to estimate sexual recidivism. In

still other cases, estimates are generated from studies that were conducted decades in the past, sometimes before the existence of the registry itself, and do not reflect the current population of registrants.

16.     In any case, estimates of sexual recidivism taken from small samples of high-risk individuals, or based on decades old data, cannot be seriously used as evidence of high rates of sexual recidivism among the entire population of registrants in the United States today. Instead, such studies can only be generalized, at best, to a much smaller group of high-risk individuals (e.g., currently incarcerated, currently in treatment, currently in secure mental facilities) that simply do not reflect the typical registrant in the United States.[3]

_____

[3] Estimates of teenage cigarette smoking can provide a real-world example of this logical fallacy. That is, if we wanted to estimate the extent of teenage smoking in the United States, then we would want to sample a broad swath of teenagers in the US. Perhaps we would randomly sample 1,000 teenagers from high schools across the U.S., to provide estimates that would generalize to the current population of teenagers in U.S. high schools. Let us imagine that we find 5.8% of the high school students in our sample reported smoking a cigarette in the past 30 days. While there would obviously be some margin of error if we were to generalize this 5.8% estimate to the population of teenagers in the U.S., we could still make the case that our estimate has *external validity* (i.e., reflects the larger population of U.S. high school students), given our well-designed sampling strategy. But if we instead were to draw our sample from teenagers in a handful of nicotine addiction treatment programs around the U.S., we might find that 85% of our sample of teenagers had smoked a cigarette in the past 30 days. Would it make sense to then estimate that 85% of all teenagers in the United States smoked a cigarette in the past 30 days? Obviously not. This is because our sample is drawn from a population of teenagers who are inherently high risk for smoking, and thus does not reflect the "average" teenager in the U.S. Our smoking estimate would not have external validity for generalizing to teenagers in the U.S., but only for those teenagers from the addiction treatment

***Myths About Sex Crimes and "Sex Offenders"***

17.    As noted by Quinn, Forsyth, and Mullen-Quinn (2004), many of the policies and practices in America that focus on people convicted of sex offenses are based on popular beliefs (i.e., myths) that are not supported by evidence. Research has confirmed the vast extent of the public's misbeliefs regarding sex crimes and "sex offenders". For instance, a nationwide survey found that most of the public perceived registrants as a "uniformly high-risk group that matches common misperceptions concerning pedophilia, sexual dangerousness, and stranger-danger. Indeed, perceptions of [registrants'] risk seem to tap a single underlying construct, based largely on misconception and fear". (Socia and Harris, 2016, p. 383; see also Levenson et al., 2007.) Specifically, a majority of respondents believed that most registrants were "pedophiles", and "sexual predators", and had stranger victims, and also believed a majority of registrants were at a high risk of committing new sex crimes, abducting kids, and having future child, teen, and adult victims. (Socia and Harris, 2016.) Other research has found similar public misperceptions regarding registrants' risk profiles. (Craun and Theriot, 2009; Decluca et al., 2018.)

18.    Perhaps more concerning, the reliance on inaccurate myths about people with sex offense convictions does not appear to be easily fixed by providing

---

programs we sampled from. Further, if our estimates of teenage smoking relied on studies conducted in the 1970's and 1980's, there is no indication that such estimates would be reflective of *current* teenage smoking rates.

the public with research evidence to the contrary. For instance, as noted above, one nationwide survey found that much of the public acknowledges that research evidence wouldn't change their views concerning sex offender registry and notification policies. (Socia and Harris, 2016; see also Levenson et al., 2007.)

19.    ***The influence of language.*** Some research has found that even the term used to describe individuals with sex crime convictions can influence the public's perceptions of risk, stigmatization, and preferred policy response for this population. For instance, a nationwide survey experiment found that respondents were more likely to support registries, residency restrictions, and social network bans when asked about "sex offenders," compared to being asked about "individuals convicted of crimes of a sexual nature." (Harris and Socia, 2016.) This suggests there is an inherent knee-jerk reaction from the public in response to hearing the stigmatizing term "sex offender," or seeing an individual labeled as a "sex offender" on a public registry website.[4]

### The Stigmatization of Individuals with Sex Crime Convictions

20.    Unsurprisingly, and likely due to these inaccurate beliefs and knee-jerk reactions, the public perceives all individuals with sex crime convictions with high

---

[4] Or, importantly, reading this term in an expert witness report. This is the reason why much of my report refers to this population as "individuals with a prior sex crime conviction" or similar "person-first" language, rather than the more loaded and stigmatizing term of "sex offenders."

levels of fear, disgust, and general stigma. Stigma, described as "an attribute that is deeply discrediting" (Goffman, 1963, p.3), has important effects on reentry and rehabilitation, and can negatively impact future life chances. (Link and Phelan, 2001.) Specifically, stigma can influence whether an individual is able to secure employment (Pager, 2003) or safe housing (Israelsen-Hartley, 2008), can increase the chances of rearrest (Stolzenberg, D'Alessio, and Flexon, 2021), and influence whether individuals are welcomed into social networks (Hirschfield and Piquero, 2010), all of which are important aspects of reentry and rehabilitation.

21.    While any criminal conviction or incarceration background can lead to disdain and distrust by members of the public (Leverentz, 2011; Young, 1999), those with crimes that put them on a public registry (explicitly conveying a *current* dangerousness to the public) are perhaps the *most* stigmatized by society. (See Pickett, Mancini, and Mears, 2013; Edwards and Mottarella, 2014; Mingus and Burchfield, 2012.) This, in turn, leads to problems for registrants when it comes to finding suitable employment or housing.

### *Employment and Housing Consequences for Registrants*

22.    The existing research shows that registration and notification can have substantial negative consequences for registrants when it comes to employment and housing, likely as a result of the public stigma towards people listed on the registry, which in turn is based around mythical beliefs. (Grossi, 2017, Zevitz and Farkas,

2000a.) Surveys and interviews of samples of registrants and family members from individual states or cities all show very similar results regarding these problems. For instance, Tewksbury (2005) surveyed 121 individuals listed on the Kentucky sex offender registry, finding that because of their registration status, many individuals had experienced losing a job (42.7%), or being denied a promotion at work (23.1%). Additionally, almost half (45.3%) reported having lost or been denied a place to live. (See also, Tewksbury and Lees, 2006.) A survey of 183 registrants from outpatient treatment facilities in Florida found that 27% have lost a job after bosses or coworkers found out their sex offender registry status, 20% had to move from their residence because their landlord found out, and 15% had to move because neighbors complained. (Levenson and Cotter, 2005.) These findings were also seen in research conducted in Connecticut and Indiana (Levenson, D'Amora, and Hern, 2007), New Jersey (Mercado, Alverez, and Levenson, 2008), Wisconsin (Zevitz and Farkas, 2000b), and in a six-state study (Farkas and Miller, 2007), among many others.

23.    These findings of employment and housing consequences are also supported by research on opinions about registrants from the general public, as well as from potential landlords. For instance, social science survey research has found that the public is "more willing to subject criminal populations [e.g., sex offenders] to poor and unsafe housing conditions compared with noncriminal populations." (Dum, Socia, Rydberg, 2017, p. 835; see also Socia, Dum, Rydberg, 2019.) Research

on property owners from across the country has found that large portions would deny any applicant who had a prior sexual offense. (Clark, 2007; Evans and Porter, 2015; Helfgott, 1997.) In some cases, the decision by these landlords to deny or evict individuals with sex crime convictions is directly due to the ability of other tenants or neighbors to search the sex offender registry or otherwise be notified of nearby registrants. (See Malkin, 2008; Zevitz and Farkas, 2000a, 2000b.)

### *Failure to Register (FTR) and Risk*

24.     Despite the common assumption that sex offenders who fail to register are especially dangerous, relatively little evidence exists to support this belief. (Levenson et al., 2010.) A small number of studies have explored whether a failure to register (FTR) offense is related to recidivism risk, with very mixed findings. Overall, there no is consistent evidence that FTR convictions do not consistently predict increased sexual recidivism, and only slight evidence that FTR convictions predict general (nonsexual) recidivism.

25.     Just two studies have found any connections between FTR and sexual recidivism. An early report from Washington State found that those convicted of failure to register had higher rates of sexual recidivism (4.3% over 5 years) compared to compliant registrants (2.8%), but it was unclear whether this difference was statistically significant. (Barnowski, 2006.) Further, the overall recidivism rates were quite low for both the FTR and non-FTR groups, and challenge the "80%

recidivism rate" myth noted earlier. Interestingly, this study also found that as the number of FTR convictions increased, the likelihood of sexual recidivism decreased, a finding that muddies the connection between FTR offenses and sexual recidivism risk. (Barnowski, 2006.)

26.    A study of 7,055 adult male sex offenders registered and released in New York State prior to August 2005 similarly found that an FTR conviction predicted both sexual and nonsexual recidivism. (Levenson et al., 2012.) However, an FTR conviction only predicted sexual recidivism for offenders with adult victims, not those with minor victims. (Levenson et al., 2012.) Further, offenders with FTR convictions did not have more serious or more deviant sexual crimes. (Levenson et al., 2012.) The researchers hypothesized that "although this finding could mean that FTR is a marker of sexual deviance in some offenders, it may simply be yet another marker of poor general self-regulation." (Levenson et al., 2012, p. 562.)

27.    Conversely, slightly more research finds just the opposite – that there is no connection between FTR and sexual recidivism. Levenson and colleagues (2010) examined criminal history data from 2,970 registered adult sex offenders in South Carolina, finding that while an FTR conviction predicted increased general (nonsexual) recidivism, it did not predict an increased chance of sexual recidivism. Studies on individuals with sex crime convictions who were released from prison in Minnesota (Duwe and Donnay, 2010) and New Jersey (Zgoba and Levenson, 2012)

both found that an FTR offense did not predict either sexual or general recidivism. Indeed, in the Minnesota study, an FTR conviction only increased the risk of a future FTR offense. (Duwe and Donnay, 2010.)

28.    Overall, the existing research suggests that registration noncompliance (leading to an FTR conviction) "is more a reflection of general criminality, defiance, carelessness, or apathy than of sexually devious intentions." (Levenson et al., 2010, p. 324; see also, Levenson et al., 2012; Thomson and Huebner, 2021; Zgoba and Levenson, 2012.) This is not surprising, as FTR can be due to many different reasons unrelated to criminal intentions, and FTR is not the same as willful absconding. (Harris and Pattavina, 2009; Levenson and Harris, 2012; Levenson et al., 2012.) As such, despite the potential resource burdens that processing FTR violations can place on the criminal justice system, and the substantial disruption it can cause registrants and their families, the research evidence does not show a clear connection between FTR offenses and sexual recidivism risk.

**Conclusions**

29.    Overall, the conclusions from this report can be summarized as follows: First, the vast majority of sex crime arrests involve individuals who do not have a prior sex crime conviction (i.e., "new sex crimes"), with only about 5-10% involving those with prior sex crime convictions (i.e., "repeat sex crimes"). Second, despite the myth of a "frightening and high"' recidivism rate based on junk science,

estimates of the official sexual recidivism rates for those convicted of sex crimes are between 5 and 15% over 5 years. Third, in addition to inaccurate beliefs about sexual recidivism, the public holds many other inaccurate beliefs about registrants and sex crimes. Due to the public's reliance on these inaccurate myths about the danger posed by people on the registry, registrants experience intense stigmatization that hurts their chances of successful reentry. Fourth, because of this stigmatization, there are particularly negative and damaging effects on registrants' ability to obtain stable employment and housing in the community, both of which are key factors in success-ful reentry. Fifth, there is no consistent evidence that an FTR conviction is associated with an increased likelihood sexual recidivism, and research suggests that FTR offenses are not themselves caused by sexually deviant intentions.

**Statement of Compensation**

30.    I am being compensated at a rate of $150/hour for the initial ten hours of work in researching and writing this report, and $250/hour thereafter. For court testimony/ deposition time that may occur in the future, my rate is $350/hour, with reimbursement of reasonable travel expenses as required.

**Oath and Signature**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Kelly M. Socia, Ph.D.
Associate Professor
School of Criminology and Justice Studies
University of Massachusetts, Lowell
Kelly_Socia@uml.edu

**Report Signed and Submitted: November 9, 2021**

**References appear on the next page below.**

## References

Barnoski, R. P. (2006). *Sex Offender Sentencing in Washington State: Failure to Register as a Sex Offender - Revised*. Washington State Institute for Public Policy.

Berzofsky, M., Krebs, C., Langton, L., Planty, M., and Smiley-McDonald, H. (2013). *Female Victims Of Sexual Violence, 1994-2010* (NCJ 240655). Retrieved from Washington, DC: http://www.bjs.gov/index.cfm?ty=pbdetail&iid=4594

Bierie, D. M., and Budd, K. M. (2021). Registration and the closure of stranger-perpetrated sex crimes reported to police. *Sexual Abuse, 33*(5), 606-626.

Catalano, S. M. (2006). *Criminal Victimization, 2005* (NCJ 214644). Retrieved from Washington, DC.

Clark, L. M. (2007). Landlord attitudes toward renting to released offenders. *Federal Probation, 71*(3), 20–30.

Craun, S., Kernsmith, P., and Butler, N. (2011). Anything That Can Be a Danger to the Public: Desire to Extend Registries Beyond Sex Offenses. *Criminal Justice Policy Review 22*(3), 375-391.

Craun, S. and Theriot, M. (2009). Misperceptions of Sex Offender Perpetration: Considering the Impact of Sex Offender Registration. *Journal of Interpersonal Violence 24*(12), 2057-2072.

DeLuca, J. S., Vaccaro, J., Rudnik, A., Graham, N., Giannicchi, A., and Yanos, P. T. (2018). Sociodemographic Predictors of Sex Offender Stigma: How Politics Impact Attitudes, Social Distance, and Perceptions of Sex Offender Recidivism. *International Journal of Offender Therapy and Comparative Criminology 62*(10), 2879-2896.

Drury, A.J., DeLisi, M. and Elbert, M. (2021), Federal sex offender registration and notification act (SORNA) offenders: sexual versatility, criminal careers and supervision outcomes, *Journal of Criminal Psychology, ahead-of-print publication*. doi:10.1108/JCP-07-2021-0033

Dum, C., Socia, K., Rydberg, J. (2017). Public support for emergency shelter housing interventions concerning stigmatized populations: Results from a randomized experiment. *Criminology and Public Policy, 16*(3): 835-877.

Duwe, G., and Donnay, W. (2010). The effects of failure to register on sex offender recidivism. *Criminal Justice and Behavior, 37*(5), 520-536.

Ellman, I. M., and Ellman, T. (2015). Frightening and high: The Supreme Court's crucial mistake about sex crime statistics. *Const. Comment., 30*, 495.

Farkas, M. A., and Miller, G. (2007). Reentry and reintegration: Challenges faced by the families of convicted sex offenders. *Federal Sentencing Reporter, 20*(1), 88-92.

Feige, D. (2017). When junk science about sex offenders infects the Supreme Court. *The New York Times*.

Freeman-Longo, R. E., and Wall, R. V. (1986). Changing a lifetime of sexual crime. *Psychology Today, 20*(3), 58-64.

Furby, L., Weinrott, M. R., and Blackshaw, L. (1989). Sex offender recidivism: a review. *Psychological Bulletin, 105*(1), 3-30.

Edwards, E. R., and Mottarella, K. (2014). Perceptions of the previously convicted: The influence of conviction type and therapy participation. *International Journal of Offender Therapy and Comparative Criminology, 59*(2), 1358–1377. doi:10.1177/0306624X14536899.

Erving, G. (1963). Stigma: Notes on the management of spoiled identity. New York: Simon and Schuster Inc.

Evans, D. N., and Porter, J. R. (2015). Criminal history and landlord rental decisions: A New York quasi-experimental study. *Journal of Experimental Criminology, 11*(1), 21-42.

Grossi, L. M. (2017). Sexual offenders, violent offenders, and community reentry: Challenges and treatment considerations. *Aggression and Violent Behavior* 34, 59-67.

Greenfield, L. A. (1997). *Sex Offenses and Offenders: An Analysis of Data on Rape and Sexual Assault* (NCJ-163392). Retrieved from Washington:

Hanson, R. K., and Bussiere, M. T. (1998). Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies. *Journal of Consulting and Clinical Psychology, 66*(2), 348-362. doi:10.1037/0022-006X.66.2.348

Hanson, R. K., Morton, K. E., and Harris, A. J. R. (2003). Sexual offender recidivism risk: What we know and what we need to know. *Annals of New York Academy of Sciences, 989,* 154–166.

Harris, A. J., and Pattavina, A. (2009). *Missing sex offenders and the utility of sex offender registration systems.* America Society of Criminology Annual Conference, Philadelphia, PA.

Harris, A. J., and Socia, K. M. (2016). What's in a name? Evaluating the effects of the "sex offender" label on public opinions and beliefs. *Sexual Abuse, 28*(7), 660-678.

Helfgott, J. (1997). Ex-offender needs versus community opportunity in Seattle, Washington. *Federal Probation, 61*, 12.

Hirschfield, P. J., and Piquero, A. R. (2010). Normalization and legitimation: Modeling stigmatizing attitudes toward ex-offenders. *Criminology, 48*(1), 27-55.

Israelsen-Hartley, S. (2008). Housing is a hurdle for felons. *Deseret News*. January 7. Retrieved March 21, 2016 from: deseretnews.com/article/695241948/Housing-is-a-hurdle-forfelons. html?pg=all.

Letourneau, E. J., Levenson, J. S., Bandyopadhyay, D., Sinha, D., and Armstrong, K. S. (2010). Effects of South Carolina's Sex Offender Registration and Notification Policy on Adult Recidivism. *Criminal Justice Policy Review, 21*(4), 435-458. doi:10.1177/0887403409353148

Levenson, J. S., Brannon, Y. N., Fortney, T., and Baker, J. (2007). Public perceptions about sex offenders and community protection policies. *Analyses of Social Issues and Public Policy, 7*(1), 137-161.

Levenson, J. S., and Cotter, L. P. (2005). The effect of Megan's Law on sex offender reintegration. *Journal of Contemporary Criminal Justice, 21*(1), 49-66.

Levenson, J. S., and D'amora, D. A. (2007). Social policies designed to prevent sexual violence: The emperor's new clothes? *Criminal Justice Policy Review, 18*(2), 168-199.

Levenson, J. S. and A. J. Harris (2012). "100,000 Sex Offenders Missing... or Are They? Deconstruction of an Urban Legend." *Criminal Justice Policy Review, 23*(3): 375-386.

Levenson, J,S, Letourneau, E,J, Armstrong, K.S., and Zgoba, K. M. (2010). Failure to register as a sex offender: Is it associated with recidivism? *Justice Quarterly, 27*(3), 305-331.

Levenson, J. S., Sandler, J. C., and Freeman, N. J. (2012). Failure-to-register laws and public safety: An examination of risk factors and sex offense recidivism. *Law and Human Behavior, 36*(6), 555.

Levenson, J. S., and Shields, R. T. (2012). Sex offender risk and recidivism in Florida. (technical report).

Levenson, J. S., and Zgoba, K. M. (2016). Community protection policies and repeat sexual offenses in Florida. *International Journal of Offender Therapy and Comparative Criminology, 60*(10), 1140-1158.

Leverentz, A. (2011). Neighborhood context of attitudes toward crime and reentry. *Punishment and Society, 13*(1), 64-92.

Link, B., and Phelan, J.(2001). Conceptualizing stigma. *Annual review of Sociology, 27*(1), 363-385.

Malkin, W. (August 15th, 2008). Sex Offenders Shut Out Of Student Neighborhoods. Seattle, The Associated Press.

Mercado, C. C., Alvarez, S., and Levenson, J. (2008). The impact of specialized sex offender legislation on community reentry. *Sexual Abuse, 20*(2), 188-205.

Mingus, W. and Burchfield, K. (2012). From prison to integration: applying modified labeling theory to sex offenders, *Criminal Justice Studies: A Critical Journal of Crime, Law and Society,* 25(1), 97-109.

Pager, D. (2003). The mark of a criminal record. *American journal of sociology, 108*(5), 937-975.

Pickett, J., Mancini, C., and Mears, D. (2013). Vulnerable victims, monstrous offenders, and unmanageable risk: Explaining public opinion on the social control of sex crime. *Criminology, 51*(3), 729-759. DOI:10.1111/1745-9125.12018

Prescott, J. J., and Rockoff, J. E. (2011). Do Sex Offender Registration and Notification Laws Affect Criminal Behavior? *Journal of Law and Economics, 54*(1), 161-206.

Quinn, J., Forsyth, C., and Mullen-Quinn, C. (2004). Societal Reaction to Sex Offenders: A Review of the Origins and Results of the Myths Surrounding their Crimes and Treatment Amenability. *Deviant Behavior, 25*(3): 215-232.

Sandler, J. C., Freeman, N. J., and Socia, K. M. (2008). Does a Watched Pot Boil? A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law. *Psychology, Public Policy, and Law, 14*(4), 284-302. doi:10.1037/a0013881

Schwartz, B. K., and Cellini, H. R. (1988). A practitioner's guide to treating the incarcerated male sex offender: breaking the cycle of sexual abuse. *US Department of Justice, National Institute of Corrections, US Government Printing Office, Washington, DC*.

Scurich, N., and John, R. S. (2019). The dark figure of sexual recidivism. *Behavioral Sciences and the Law, 37*(2), 158-175.

Snyder, H. N. (2000). *Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics*. Retrieved from Washington, DC:

Socia, K., Dum, C., Rydberg, J. (2019). Turning a Blind Eye: Public Support of Emergency Housing Policies for Sex Offenders. *Sexual Abuse, 31*(1), 25-49.

Socia, K. M., and Harris, A. J. (2016). Evaluating Public Perceptions of the Risk Presented by Registered Sex Offenders: Evidence of Crime Control Theater? *Psychology, Public Policy, and Law, 22*(4), 375-385. doi:http://dx.doi.org/10.1037/law0000081

Stolzenberg L, D'Alessio SJ, Flexon JL. (2021). The Usual Suspects: Prior Criminal Record and the Probability of Arrest. *Police Quarterly, 24*(1):31-54. doi:10.1177/1098611120937304

Sullum, J. (2018, November 14). The 'Frightening and High' Factoid About Sex Offender Recidivism Still Stalks Courts Across the Land, Completely Untethered From Actual Numbers. Retrieved from https://reason.com/2018/11/14/the-frightening-and-high-factoid-about-s/

Tewksbury, R. (2005). Collateral Consequences of Sex Offender Registration. *Journal of Contemporary Criminal Justice*, *21*(1), 67-81.

Tewksbury, R. and M. Lees (2006). Perceptions of Sex Offender Registration: Collateral Consequences and Community Experiences. *Sociological Spectrum, 26*(3), 309-334.

Thompson, K. J., & Huebner, B. M. (2021). Predicting Failure on the Sex Offense Registry: An Examination of Static and Dynamic Factors. *Justice Evaluation Journal*, Advance publication ahead of print, p. 1-19. https://doi.org/10.1080/24751979.2021.1963636

Vasquez, B. E., Maddan, S., and Walker, J. T. (2008). The Influence of Sex Offender Registration and Notification Laws in the United States: A Time-Series Analysis. *Crime and Delinquency, 54*(2), 175-192. doi:10.1177/0011128707311641

Veysey, B., Zgoba, K. M., and Dalessandro, M. (2008). A Preliminary Step Towards Evaluating The Impact of Megan's Law: A Trend Analysis of Sexual Offenses in New Jersey from 1985 to 2005. *Justice Research and Policy, 10*(2), 1-18. doi:10.3818/JRP.10.2.2008.1

Walker, J. T., Maddan, S., Vasquez, B. E., VanHouten, A. C., and Ervin-McLarty, G. (2008). *The Influence of Sex Offender Registration and Notification Laws in the United States*. (Little Rock) Retrieved from:
http://www.acic.org/statistics/Research/SO_Report_Final.pdf

Washington State Institute for Public Policy. (2009). *Does Sex Offender Registration and Notification Reduce Crime?  A Systematic Review of the Research Literature*. (09-06-110). Olympia, WA Retrieved from: http://www.wsipp.wa.gov/rptfiles/09-06-1101.pdf

Young, J. (1999). The exclusive society: Social exclusion, crime and difference in late modernity. Sage.

Zevitz, R. G. and M. A. Farkas (2000a). The Impact of Sex-Offender Community Notification on Probation/Parole in Wisconsin. *International Journal of Offender Therapy and Comparative Criminology 44*(1), 8-21.

Zevitz, R. G. and M. A. Farkas (2000b). Sex Offender Community Notification: Managing High Risk Criminals or Exacting Further Vengeance? *Behavioral Sciences and the Law,* 18(2/3), 375-391.

Zgoba, K. M., Jennings, W. G., and Salerno, L. M. (2018). Megan's Law 20 Years Later: An Empirical Analysis and Policy Review. *Criminal Justice and Behavior, 45*(7), 1028-1046. doi:10.1177/0093854818771409

Zgoba, K. M., and Levenson, J. (2012). Failure to register as a predictor of sex offense recidivism: The big bad wolf or a red herring?. *Sexual Abuse, 24*(4), 328-349.

Zgoba, K. M., Miner, M., Knight, R. A., Letourneau, E. J., Levenson, J. S., and Thornton, D. (2012). *A multi-state recidivism study using Static-99R and Static-2002 risk scores and tier guidelines from the Adam Walsh Act*. Retrieved from https://www.ncjrs.gov/pdffiles1/nij/grants/240099.pdf

Zgoba, K. M., Miner, M., Levenson, J. S., Knight, R. A., Letourneau, E. J., and Thornton, D. (2016). The Adam Walsh Act: An Examination of Sex Offender Risk Classification Systems. *Sexual Abuse: A Journal of Research and Treatment, 28*(8), 722-740. doi:10.1177/1079063215569543

Zgoba, K. M., & Mitchell, M. M. (2021). The effectiveness of Sex Offender Registration and Notification: A meta-analysis of 25 years of findings. *Journal of Experimental Criminology*, Advance publication ahead of print, 1-26. https://doi.org/10.1007/s11292-021-09480-z

ATTACHMENT 1:

Comprehensive C.V. of Kelly M. Socia, PH.D.

# Kelly M. Socia, Ph.D.

School of Criminology and Justice Studies
University of Massachusetts, Lowell
HSSB 483, 113 Wilder Street, Lowell, MA 01854
Kelly_Socia@uml.edu

## Academic Employment

**Associate Professor**, Fall 2017 - Present
> School of Criminology and Justice Studies, University of Massachusetts, Lowell
> *Fellow, Center for Public Opinion, UML, 2014-Present*

**Assistant Professor**, Fall 2011 – Summer 2017
> School of Criminology and Justice Studies, University of Massachusetts, Lowell

**Assistant Professor**, Fall 2011 – Summer 2012
> Department of Sociology, University of New Mexico

**Research Support Specialist**, Summer 2011
> Sourcebook of Criminal Justice Statistics (University at Albany, SUNY)

## Education

**University at Albany, Albany, NY**
> Ph.D., Criminal Justice, 2011
>> Dissertation: *Residence Restriction Legislation, Sex Crime Rates, and the Spatial Distribution of Sex Offender Residences.*
>> Committee Members: Dr. Alan Lizotte (Chair), Dr. Jill Levenson, Dr. Steven Messner, Dr. Greg Pogarsky, Dr. Janet Stamatel
> M.A., Criminal Justice, 2008

**Rochester Institute of Technology, Rochester, NY**
> B.S. with Highest Honors, Business Administration: Management Information Systems, 2005
> Minor: Criminology

## Peer Reviewed Publications

Dum, Christopher P., **Socia, Kelly M.**, Bengt, George[s], and Neiderman, Halle[s]. (in press) "The Effect of Reading Prisoner Poetry on Stigma and Public Attitudes: Results from a multigroup survey experiment" *The Prison Journal.*

**Socia, Kelly M.**, Rydberg, Jason, and Dum, Christopher P. (epub 2019) "Punitive Attitudes Towards Individuals Convicted of Sex Offenses: A Vignette Study" *Justice Quarterly.* doi:10.1080/07418825.2019.1683218

**Socia, Kelly M.**, Morabito, Melissa M., Bond, Brenda J., and Nader, Eli S. (2021) "Public Perceptions of Police Agency Fairness and the Willingness to Call Police" *The American*

*Review of Public Administration. 51*(5), 360-373. doi:10.1177/02750740211005699

Thompson, Lisa[s], Rydberg, Jason, Cassidy, Michael, **Socia, Kelly M.,** (2020) "Contextual Influences on the Sentencing of Convicted Sex Offenders" *Sexual Abuse: A Journal of Research and Treatment. 32*(7), 778-805. doi:10.1177/1079063219852936

**Socia, Kelly M.,** Grady, Melissa D., Bolder, Tess, Cronin, Kelli, Hurt, Christi, Vidrine, Sarah (2020) "Perceptions of Individuals Who Commit Sexual Offenses and Related Policies: A Group Comparison" *Criminal Justice Policy Review. 31*(7), 1059-1094. doi:10.1177/0887403419873126

Dum, Christopher P., **Socia, Kelly M.,** Yarrison, Fritz[s], and Long-Yarrison, Brooke L.[s] (2020) "Would God Forgive? Attitudes Towards Sex Offenders in Places of Worship." *Sexual Abuse: A Journal of Research and Treatment. 32*(5), 567-590. doi:10.1177/1079063219839498

Powers, Ráchael A., Khachatryan, Norair[s], and **Socia, Kelly M.** (2020) "Reporting Victimization to the Police: The Role of Racial-Dyad and Bias Motivation" *Policing & Society. 30*(3), 310-326. doi:10.1080/10439463.2018.1523164

Stone, Rebecca, and **Socia, Kelly M.** (2019) "Boy with Toy or Black Male with Gun: An analysis of online news articles covering the shooting of Tamir Rice." *Race and Justice. 9*(3), 330-358. doi:10.1177/2153368716689594

Powers, Ráchael A. and **Socia, Kelly M.** (2019) "Racial Animosity, adversary effect, and hate crime: Parsing out injuries in intraracial, interracial, and race-based offenses" *Crime & Delinquency. 65*(4), 447-473. doi:10.1177/0011128718779566

**Socia, Kelly M.,** Dum, Christopher P., and Rydberg, Jason. (2019) "Turning a Blind Eye: Public Support of Emergency Housing Policies for Sex Offenders." *Sexual Abuse: A Journal of Research and Treatment. 31*(1), 25-49. doi:10.1177/1079063217720925

Brown, Elizabeth K., **Socia, Kelly M.,** and Silver, Jasmine R.[s] (2019) "Conflicted Conservatives, Punitive Views, and Anti-Black Racial Bias 1974-2014" *Punishment & Society. 21*(1), 3-27. doi:10.1177/1462474517736295

Rydberg, Jason, Dum, Christopher P., and **Socia, Kelly M.** (2018) "Nobody Gives A #%&!: A Factorial Survey Examining The Effect Of Criminological Evidence On Opposition To Sex Offender Residence Restrictions" *Journal of Experimental Criminology. 14*(4), 541-550. doi:10.1007/s11292-018-9335-5

Rydberg, Jason, Cassidy, Michael, and **Socia, Kelly M**. (2018). "Punishing the wicked: Examining the correlates of sentence severity for convicted sex offenders" *Journal of Quantitative Criminology. 34*(4), 943-970. doi:10.1007/s10940-017-9360-y

Brown, Elizabeth K. and **Socia, Kelly M.** (2017) "Twenty-First Century Punitivity: Social

Sources of Punitive American Views Reconsidered." *Journal of Quantitative Criminology. 33*(4), 935-959. doi:10.1007/s10940-016-9319-4

Dum, Christopher P., **Socia, Kelly M.**, and Rydberg, Jason. (2017) "Public support for emergency shelter housing interventions concerning stigmatized populations: Results from a randomized experiment." *Criminology & Public Policy. 16*(3), 835-877. doi:10.1111/1745-9133.12311

**Socia, Kelly M.** and Brown, Elizabeth K. (2017) "Up in Smoke: The Passage of Medical Marijuana Legislation and Enactment of Dispensary Moratoriums in Massachusetts." *Crime & Delinquency. 63*(5), 569-591. doi:10.1177/0011128714557024

Walfield, Scott M.[s], **Socia, Kelly M.**, and Powers, Ráchael A. (2017) "Religious Motivated Hate Crimes: A Multilevel Analysis of the Factors Related to Arrest." *American Journal of Criminal Justice. 42*(1), 148-169. doi:10.1007/s12103-016-9349-3

Morabito, Melissa M., **Socia, Kelly M.**, Wik, Amanda[s], and Fisher, William. (2017) "The Nature and Extent of Police Use of Force in Encounters with People with Behavioral Health Disorders." *International Journal of Law and Psychiatry. 50*(1), 31-37. doi:10.1016/j.ijlp.2016.10.001

Briones, Rhissa R.[s], Powers, Ráchael A., and **Socia, Kelly M.** (2016) "Sexual Orientation Bias Crimes: Examination of Victim Reporting, Perceptions of Police Bias, and Police Response." *Criminal Justice and Behavior. 43*(12), 1688-1709. doi:10.1177/0093854816660583

**Socia, Kelly M.**, and Harris, Andrew J. (2016) "Evaluating public perceptions of the risk presented by registered sex offenders: Evidence of Crime Control Theater?" *Psychology, Public Policy, and Law. 22*(4), 375-385. doi:10.1037/law0000081

Harris, Andrew J. and **Socia, Kelly M.** (2016) "What's in a Name? Evaluating the Effects of the 'Sex Offender' Label on Public Opinions and Beliefs." *Sexual Abuse: A Journal of Research and Treatment. 28*(7), 660-678. doi:10.1177/1079063214564391

**Socia, Kelly M.** (2016) "Examining the Concentration of Registered Sex Offenders in Upstate New York Census Tracts." *Crime & Delinquency. 62*(6), 748-776. doi:10.1177/0011128714526563

Levenson, Jill S. and **Socia, Kelly M.** (2016) "Adverse Childhood Experiences and Arrest Patterns in a Sample of Sexual Offenders." *Journal of Interpersonal Violence. 31*(10), 1883-1911. doi:10.1177/0886260515570751

**Socia, Kelly M.** and Brown, Elizabeth K. (2016) "'This Isn't About Casey Anthony Anymore': Political Rhetoric and Caylee's Law." *Criminal Justice Policy Review. 27*(4), 348-377. doi:10.1177/0887403414551000

Pattavina, April, **Socia, Kelly M.,** and Zuber, Malgorzata[s] (2016) "Economic Stress and Domestic Violence: Examining the Impact of Mortgage Foreclosures on Incidents Reported to the Police 2005 to 2009" *Justice Research and Policy, 16*(2), 147-164. doi:10.1177/1525107115623938

**Socia, Kelly M.,** Levenson, Jill S., Ackerman, Alissa R., and Harris, Andrew J. (2015) "'Brothers Under the Bridge': Factors Influencing the Transience of Registered Sex Offenders in Florida" *Sexual Abuse: A Journal of Research and Treatment*. 27(6), 559-586. doi:10.1177/1079063214521472

Morabito, Melissa S. and **Socia, Kelly M.** (2015) "Is Dangerousness a Myth? Injuries and Police Encounters with People with Mental Illness." *Criminology and Public Policy*. 14(2), 253-276. doi:10.1111/1745-9133.12127

Levenson, Jill S., Ackerman, Alissa R., **Socia, Kelly M.,** and Harris, Andrew J. (2015) "Where for art thou? Transient Sex Offenders and Residence Restrictions." *Criminal Justice Policy Review*. 26(4), 319-344. doi:10.1177/0887403413512326

**Socia, Kelly M.** (2015) "State Residence Restrictions and Forcible Rape Rates: A Multi-State Quasi-Experimental Analysis of UCR Data." *Sexual Abuse: A Journal of Research and Treatment. 27*(2), 205-227. doi:10.1177/1079063213509412

**Socia, Kelly M.** (2014) "Residence Restrictions are Ineffective, Inefficient, and Inadequate: So Now What?" *Criminology & Public Policy*. 13(1), 179-188. doi:10.1111/1745-9133.12071 [Policy Essay]

**Socia, Kelly M.** (2013) "Too Close for Comfort? Registered Sex Offender Spatial Clustering and Recidivistic Sex Crime Rates." *Sexual Abuse: A Journal of Research and Treatment. 25*(6), 531-556. doi:10.1177/1079063212469061

**Socia, Kelly M.** (2013) "Residence Restrictions and the Association with Registered Sex Offender Clustering." *Criminal Justice Policy Review. 24*(4), 441-475. doi:10.1177/0887403412445613

**Socia, Kelly M.** (2012) "The Efficacy of County-Level Sex Offender Residence Restrictions in New York" *Crime & Delinquency. 58*(4), 612-642. doi:10.1177/0011128712441694

**Socia, Kelly M.** and Stamatel, Janet P.* (2012) "Neighborhood Characteristics and the Social Control of Registered Sex Offenders." *Crime & Delinquency. 58*(4), 565-587. doi:10.1177/0011128711420111

**Socia, Kelly M.** (2012) "The Implementation of County Residence Restrictions in New York." *Psychology, Public Policy, and Law*. 18(2), 206-230. doi:10.1037/a0024993

**Socia, Kelly M.** (2011) "The Policy Implications of Residence Restrictions on Sex Offender Housing in Upstate, NY." *Criminology & Public Policy, 10*(2), 351-389. doi:10.1111/j.1745-9133.2011.00713.x

"Overview of 'The Policy Implications of Residence Restrictions on Sex Offender Housing in Upstate, NY.'" *Criminology & Public Policy, 10*(2), 349-350. doi:10.1111/j.1745-9133.2011.00724.x

**Socia, Kelly M.** and Stamatel, Janet P.\* (2010). "Assumptions and Evidence Behind Sex Offender Laws: Registration, Community Notification, and Residency Restrictions." *Sociology Compass. 4*(1), 1-20. doi:10.1111/j.1751-9020.2009.00251.x

Freeman, Naomi J., Sandler, Jeffrey C., and **Socia, Kelly M.** (2009). "A Time-Series Analysis on the Impact of Sex Offender Registration and Community Notification on Plea Bargaining Rates." *Criminal Justice Studies: A Critical Journal of Crime, Law, and Society. 22*(2), 153-165. doi:10.1080/14786010902975424

Sandler, Jeffrey C., Freeman, Naomi J., and **Socia, Kelly M.** (2008). "Does a Watched Pot Boil: A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law." *Psychology, Public Policy, and Law. 14*(4), 284-302. doi:10.1037/a0013881

## Book Chapters and Other Publications

**Socia, Kelly M.** (2021) *The Ancillary Consequences of SORN,* (pp. 78-101). Book chapter in Sex Offender Registration and Community Notification Laws: An Empirical Evaluation. Logan, Wayne A. and Prescott, J.J. (eds). Cambridge University Press. ISBN: 9781108328425

Rydberg, Jason**, Socia, Kelly M.,** and Cassidy, Michael. (2018). "Community-Level Influences on the Sentencing of Convicted Sex Offenders, Pennsylvania, 2004-2010." Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2018-08-07. https://doi.org/10.3886/ICPSR36593.v1 [Dataset]

**Socia, Kelly M.** (2017). "Sex Offender Civil Commitment Policies in Context." *Criminology & Public Policy. 16*(3), 909-911. doi:10.1111/1745-9133.12329

**Socia, Kelly M.** (2016). "Sex Offender Housing Options in Fort Lauderdale, FL, Under a Residence Restriction Law. A Report for the American Civil Liberties Union of Florida (ACLU FL) and the Broward Chapter of the American Civil Liberties Union"

**Socia, Kelly M.** and Rydberg, Jason. (April 2016). *Sex Offender Policy and Legislation.* (pp. 187-202). Book chapter in Advancing Criminology and Criminal Justice Policy. Blomberg, T., Mestre Brancal, J., Beaver, K., and Bales, W. (eds). Routledge. ISBN: 978-1138829237

**Socia, Kelly M.** and Maroun, Rimonda R.[§] (2016). *"Sex Offender Policies and Legislation."* In Oxford Bibliographies in Criminology. Ed. Beth M. Huebner. New York: Oxford University Press. ISBN: 9780195396607, doi:10.1093/OBO/9780195396607-0169 *-Revision and update posted February, 2019.*

In *Sex Offender Law Report:*
>  (2015)
>>  Levenson, Jill S., Ackerman, Alissa R., **Socia, Kelly M.,** and Harris, Andrew J. "Transient Sex Offenders and Residence Restrictions." *16*(1) 3-4, 12-13.
>  (2013)
>>  "From the Literature." *14*(5), 69-70, 80.
>>  "Department of Defense Releases FY 2012 Annual Report on Sexual Assault in the Military." *14*(5), 72.
>>  "From the Literature." *14*(4), 51-52, 63-64.
>>  "From the Literature." *14*(3), 40-43.
>>  "Texas Says 'No' to Federal Registry Standards." *14*(3), 39.
>>  "From the Literature." *14*(2), 25-28.
>>  "Seventh Circuit Rules Indiana DOC Sex Offender Registry Error Policy Violates Due Process." *14*(2), 23-24.
>>  "Changes to California's Three-Strikes Law Do Not Affect Many Ex-offenders." *14*(2), 19-20.
>>  "From the Literature." *14*(1), 5-8.
>  (2012)
>>  "Legal Challenge to State Residence Restriction Law in Rhode Island." *13*(6), 83, 95-96.
>>  "From the Literature." *13*(6), 85-88.
>>  "Evaluating Community-Based Management Practices." *13*(5), 65, 78-79.
>>  "From the Literature." *13*(5), 71-74.

Levenson, Jill S, Ackerman, Alissa R., **Socia, Kelly M.,** and Harris, Andrew J. (2014). "Transient Sex Offenders and Residence Restrictions in Florida" *Report to the Florida Action Committee.* Lake Monroe, FL: Florida Action Committee.

**Socia, Kelly M.** (2011). *The Obama Administration* in The Encyclopedia of Drug Policy. (Kleiman, M. and Hawdon, J., eds.) SAGE Publications.

**Socia, Kelly M.** (2008). *Spam* in The Encyclopedia of Cyber Crime. (McQuade, S. C., ed.) Greenwood Press.

**Socia, Kelly M.** and McCarthy, Kevin J. (2008). *Online Addiction* in The Encyclopedia of Cyber Crime. (McQuade, S. C., ed.) Greenwood Press.

Newman, Graeme R., with the assistance of **Kelly Socia**. (2007). *Sting Operations.* Problem-Oriented Guides for Police, Response Guide No. 6. Washington, DC: U.S. Department of Justice, Office of Community Oriented Policing Services.

## Publications Under Review

**Socia, Kelly M.,** "*Say her name: Public support for a law is higher when the law is named after a victim.*" Revise and Resubmit (Justice Quarterly)

**Socia, Kelly M.,** Stone, Rebecca; Palacios, Wilson; Cluverius, John, *"Focus on Prevention: The public is more supportive of 'Overdose Prevention Sites' than they are of 'Safe Injection*

6

*Facilities."* Revise and Resubmit (Criminology & Public Policy)

**Conference Presentations (Last 5 years)**

**Socia, Kelly M.,** Palacios, Wilson R., and Stone, Rebecca. *"The influence of message framing on support for safe injection facilities in the United States."* Annual Meetings of the Criminology Consortium, Online conference. November 2020.

**Socia, Kelly M.,** Shields, Ryan T., and Burke, Cameron[s]. "*Getting Lucky or Getting Abused: A Content Analysis of Public Comments on News Articles About Sexual Abuse*" Poster session. Association for the Treatment of Sexual Abusers Annual Conference, Online, October 2020.

**Socia, Kelly M.,** Palacios, Wilson R., and Stone, Rebecca. *"The influence of respondent characteristics on support for safe injection facilities in the United States."* American Society of Criminology Annual Conference, Washington, DC. [*2020 conference cancelled due to Covid-19*]

Shields, Ryan T., Kras, K.R., and **Socia, Kelly M.** *"Examining public support for child sexual abuse prevention efforts."* American Society of Criminology Annual Conference, Washington, DC. [*2020 conference cancelled due to Covid-19*]

**Socia, Kelly M.,** Palacios, Wilson R., and Stone, Rebecca. *"The influence of message framing and respondent characteristics on support for safe injection facilities in the United States."* Howard League Crime, Justice, and Social Harms Conference. [*2020 conference postponed to 2021 due to Covid-19*]

**Socia, Kelly M.,** Rydberg, Jason, and Dum, Christopher P. *"Punitive Attitudes Towards Individuals Convicted of Sex Offenses: A Vignette Study."* Association for the Treatment of Sexual Abusers Annual Conference, Atlanta, GA, November 2019.

Rydberg, Jason, **Socia, Kelly M., and** Dum, Christopher P. "*Shooting the Messenger: Experimental Evidence for How Knowledge Claims on Punitive Responses to Sex Offenders Impacts Perceived Expert Credibility."* American Society of Criminology Annual Conference, San Francisco, CA, November 2019.

Dum, Christopher P., and **Socia, Kelly M.** *"Would God Forgive? Public Attitudes Toward Sex Offenders in Places of Worship."* American Society of Criminology Annual Conference, Atlanta, GA, November 2018.

Rydberg, Jason, Dum, Christopher P., and **Socia, Kelly M.,** "*Nobody gives a shit ...or do they? Variation in the effects of communicating criminological evidence on opposition to sex offender residence restrictions."* American Society of Criminology Annual Conference, Atlanta, GA, November 2018.

**Socia, Kelly M.**, Dum, Christopher P., and Rydberg, Jason *"Revisiting Public Opinion: Replication of a Public Opinion Survey on Sex Offender Housing."* American Society of Criminology Annual Conference, Philadelphia, PA, November 2017.

Rydberg, Jason, **Socia, Kelly M.,** and Dum, Christopher P. *"Falling on Deaf Ears: The Effect of Criminological Research Findings on Public Support for Sex Offender Residence Restrictions."* American Society of Criminology Annual Conference, Philadelphia, PA, November 2017.

**Socia, Kelly M.** and Grady, Melissa D. *"Perceptions of Sex Offender Policies in North Carolina."* American Society of Criminology Annual Meeting, New Orleans, LA, November 2016.

Cassidy, Michael, Rydberg, Jason, and **Socia, Kelly M.** *"Community-Level Influences on the Sentencing of Convicted Sex Offenders."* American Society of Criminology Annual Meeting, New Orleans, LA, November 2016.

**Socia, Kelly M.** and Grady, Melissa D. *"Perceptions of Sex Offender Policies in North Carolina."* Association for the Treatment of Sexual Abusers Annual Conference, Orlando, FL, November 2016.

## Courses Taught

> Advanced Research Design (Ph.D.)
> Advanced Criminological Theories (Ph.D.)
> Descriptive and Inferential Statistics (Graduate, Online)
> Sex Crimes and Offenders (Graduate, Online)
> Criminology
> Honors Criminology
> Criminal Justice Research Methods (Online, Hybrid)
> Causes of Crime and Delinquency (Classroom and Online; University of New Mexico)
> American Criminal Courts (University at Albany, SUNY)

## Fellowships, Assistantships, and Internships

**Graduate Research Fellowship**, National Institute of Justice, Fall 2010 – Spring 2011

**Research Assistantship**, University at Albany, SUNY
> Research Assistant, Sourcebook of Criminal Justice Statistics, Spring 2010 – Fall 2010
> Research Assistant for Dr. Janet Stamatel, Summer 2008 – Fall 2008
> Graduate Intern, Division of Criminal Justice Services, Spring 2007 – Summer 2007
> Research Assistant for Dr. Graeme Newman, Fall 2006

**Teaching Assistantship**, University at Albany, SUNY
> Instructor, American Criminal Courts (RCRJ 353), Summer 2008 – 2010; Fall 2009
> Discussion Leader, Criminology (RCRJ 203), Fall 2007; Spring 2008, 2009

**Graduate Internship**, NY OMH, Sex Offender Risk Assessment & Record Review, Summer 2008

**Ph.D. Fellowship**, University at Albany, SUNY, Fall 2006 – Spring 2007

**Student Internship**, Rochester N.Y. Secret Service Office, Winter 2004

## Workshops Attended

Funded Participant, ICPSR Summer Program (*Conducting Research on Recidivism and Reentry*),
University of Michigan (July 2010) **
Funded Participant, ICPSR Summer Program (*Quantitative Analysis of Crime and Criminal Justice*), University of Michigan (June – July 2010) **

## Grants Received

PI, "Addressing COVID-19 public health misinformation" (with co-PIs Wilson Palacios and John Cluverius), Internal Seed Grant, *University of Massachusetts, Lowell,* $10,000 (2020)

Co-I, "Improving Identification, Prevalence Estimation, and Earlier Intervention for Victims of Labor and Sex Trafficking" (with PI Ryan Shields), 2019-VT-BX-0037, *National Institute of Justice*, $499,483 (2019)

Co-PI, "Community-level influences on the sentencing of convicted sex offenders" (with PI Jason Rydberg), 2015-R2-CX-0039, *National Institute of Justice*, $39,997 (2015)

PI, "Analyzing Indicators of Disorder, Community Structure, and Crime in Lowell, MA" (with PI Melissa Morabito*), Internal Seed Grant, *University of Massachusetts, Lowell,* $8,000 (2014 – 2015)

PI "Predictors of Injury and Reporting of Intraracial, Interracial, and Racially-Biased Nonsexual Assaults" (with PI Ráchael A. Powers*), 2013-R2-CX-0033, *National Institute of Justice*, $39,995 (2013). Data published as ICPSR36236-v1. Ann Arbor, MI: ICPSR [distributor], 2018-05-16. http://doi.org/10.3886/ICPSR36236.v1

PI, "Neighborhood Conditions and Registered Sex Offender Recidivism" Research Allocation Committee Large Grant Competition*, University of New Mexico,* $7,995 (2011 – 2012)

Travel Grant, 11th Crime Mapping Conference, *National Institute of Justice* (2011)

Graduate Research Fellowship, "Residence Restriction Legislation and Sex Offender Residential Locations in New York" 2010-IJ-CX-0004, *National Institute of Justice*, $25,000 (Sept. 2010 – May 2011)

Travel Grant, ICPSR Summer Program (*Conducting Research on Recidivism and Reentry*),
University of Michigan, $1,250 (July 2010)

Travel Grant, ICPSR Summer Program (*Quantitative Analysis of Crime and Criminal Justice*), University of Michigan, $3,500 (June – July, 2010)

Travel Grant, 10th Crime Mapping Conference, *National Institute of Justice* (2009)
Travel Grant, School of Criminal Justice, *University at Albany*, $250 (2007 – 2010)
Travel Grant, Graduate Student Organization, *University at Albany*, $350 (Fall 2007, 2010)

## Awards and Honors

Teaching Award, School of Criminology and Justice Studies, 2013-2014
President's Award for Excellence in Teaching (Teaching Assistant), University at Albany (2010)
Medal for Exceptional Civilian Service, Office of the Secretary of Defense (2006)
Certificate of Appreciation as Student Crime Analyst, RIT Campus Safety (2005)
2004 APICS D.W. Fogarty International Undergraduate Student Paper Competition, First Place, Regional Level; Second Place, Society Level
RIT Presidential Merit Scholarship, A.H. Clark Scholarship

## Invited Talks and Sessions

Invited Discussant, *Adoption of URE 404(b). Character Evidence; Crime or Other Acts.* Utah Supreme Court Advisory Committee on Rules of Evidence, October 13, 2020

"Perception, Awareness, and Actions Regarding Child Abuse, Sex Offenders, and Public Policy" Plenary Talk, *New York State Association for the Treatment of Sexual Abusers (NYS ATSA) and the Alliance Association Annual Conference*, May 2016

Invited Participant, *Roundtable to Examine Sex Offender Residency Restrictions*, New York State Assembly, Standing Committee on Correction, May 2015

"Perception, Awareness, and Actions Regarding Child Abuse, Sex Offenders, and Public Policy" Closing Keynote, *Virginia Sex Offender Treatment Association (VSOTA) Annual Conference*, March 2015

## Service to the Profession

Associate Editor & Editorial Board Member, *Victims and Offenders*, 2020 – Present
Grant Reviewer, *Swiss National Science Foundation*, 2020
Grant Reviewer, *Social Sciences and Humanities Research Council of Canada*, 2019
Editorial Board Member, *Criminal Justice Policy Review*, 2017 – Present
Executive Board, *Sex Offender Policy Research (SOPR) Working Group*, 2015 – Present
Faculty Mentor, *ASC Mentoring Program*, 2011 – Present
Grant Reviewer, *National Institute of Justice*, 2011 – 2017
Membership Committee, *American Society of Criminology*, 2012 – 2013
Co-Editor (with Andrew Harris), *Sex Offender Law Report*, 2012 – 2013
Editorial Assistant, *Journal of Criminal Justice and Popular Culture*, 2006 – 2011

## Service to the University/College

Workshop Co-Host, "Academic Publishing" *UML Center for Program Evaluation*, 2021
*Massachusetts Society of Professors* (Faculty Union)
 Social Sciences Representative [Elected Position], Executive Board, 2020-Present
 Department Representative, 2020-Present
 Contract Action Team Member, 2020-Present
Fellow, *Center for Public Opinion Research*, 2014 – Present
Faculty Mentor, *Emerging Scholars Program*, 2015-2016; 2020-2021
Official Representative, *ICPSR*, 2013 – Present
Grant Reviewer, *UML Seed Grant Program*, 2019
Faculty Attendee, *UML Open House*, Fall 2012; Fall 2014; Spring 2016, Fall 2016
Research Member, *University Crossing Impact Study*, 2014 - 2016
Ally Space Member, *UMass Lowell Ally Space*, 2014 – Present

## Service to the School/Department

Personnel Committee, 2017 – Present
 Chair, 2018-2020
Undergraduate Committee, 2012-2014; 2018-2020
Graduate Committee, 2012 – 2020
Search Committee, 2015, 2016, Chair 2017
Qualifying Exam Committee, 2014 – Present
 Co-Wrote Proposal to Revise the Qualifying Exam, 2016
Graduate Admissions Committee, 2014-2015
Organizer/Panel Participant, 'The Academic Job Market Brown Bag', 2014, 2016
Organizer/Panel Participant, 'The NIJ Graduate Dissertation Fellowship', 2014, 2016
Research Committee, 2014-2015; 2020-Present
Undergraduate Committee, *UNM Sociology Department*, 2011 – 2012
President, SCJ Graduate Student Association, *University at Albany*, 2008 – 2009

## Dissertations and Theses Committees

Dissertation Chair:
 Vera Yakovchenko, *UML Criminology & Justice Studies*
 Eli Nader, *UML Criminology & Justice Studies* (Defended 2019)
 Trevor Fronius, *UML Criminology & Justice Studies* (Defended 2019)
 Ryan Leavens, *UML Criminology & Justice Studies* (Left Program)
Dissertation Committee Member:
 Meridith Spencer, *UML Criminology & Justice Studies* (Defended 2019)
 Rimonda Maroun, *UML Criminology & Justice Studies* (Defended 2017)
 Scott Walfield, *UML Criminology & Justice Studies* (Defended 2016)
Thesis Chair:
 Sanjeev Kc, Honors Thesis, *UML Honors College*
 Isabella Perez, Honors Thesis, *UML Honors College*
 Rachel Miller, Honors Thesis, *UML Honors College* (Defended 2020)
 Casey Jo Calabrese, Honors Thesis, *UML Honors College* (Defended 2020)

Thesis Committee Member:
>Shaina Ionin, Master's Thesis, *UML Criminology & Justice Studies*
>Dylan Lambert, Honors Thesis, *UML Honors College* (Defended 2018)

## Journal Reviewer, by year of *first* review

2021: *Forensic Science International: Mind and Law; International Review of Victimology; International Journal of Offender Therapy and Comparative Criminology; Policing*
2020: *Contemporary Drug Problems; Social Justice Research; International Journal of Law, Crime and Justice; Law & Policy*
2019: *Journal of Child Sexual Abuse; Trauma, Violence, and Abuse; Archives of Sexual Behavior; Housing, Care, and Support; BMC Medical Research Methodology; Justice Policy Journal*
2018: *International Review of Law, Computers & Technology*; *Law & Social Inquiry; Preventive Medicine*
2017: *Punishment & Society*; *Social Science Research*
2016: *Journal of Sexual Aggression*
2015: *Journal of Quantitative Criminology*; *Race and Justice*; *Victims and Offenders; Justice Quarterly*
2014: *Aggression and Violent Behavior*; *Social Forces; Journal of Criminal Justice; Criminology, Criminal Justice, Law & Society*; *Journal of Policy Analysis and Management*; *Journal of Experimental Criminology*; *Criminal Justice Studies*
2013: *Applied Spatial Analysis and Policy*; *Journal of Criminal Law and Criminology*
2012: *American Journal of Criminal Justice*; *Criminal Justice Policy Review*
2011: *Criminology*; *Crime & Delinquency; Albany Law Review (Special Issue)*
2010: *Criminology & Public Policy*

## Affiliations (Past and Present)

Crime and Justice Research Alliance
Sex Offender Policy Working Group
Association for the Treatment of Sexual Abusers (ATSA)
Sex Offense Policy Research (SOPR)
American Psychology-Law Society
National White Collar Crime Center
American Society of Criminology
Academy of Criminal Justice Sciences

## Professional Experience and Consulting Activities

**Expert Witness/Subject Matter Expert,** 2019 - Present
>*1:18-CV-24145-KMW Does v. Swearingen* – (Southern District of Florida)

**Expert Witness/Subject Matter Expert,** 2019 - Present
>*National Association for Rational Sexual Offense Laws; NC RSOL; and John Does #'s 1 and 2 v. Stein, Attorney General of the State of North Carolina; Erik A. Hooks, Secretary*

*of the North Carolina Department of Public Safety; et al. Case No. 1:17-cv-53 (Middle District of North Carolina)*

**Expert Witness/Subject Matter Expert,** 2019 - 2020
    *2018-CO-352 State v. William Wright* – 4th Judicial Circuit, Nassau County, FL

**Expert Witness/Subject Matter Expert,** 2019 – Present
    *Layfield v. Southwest Ranches* –17th Judicial Circuit, Broward County, FL

**Expert Witness/Subject Matter Expert,** 2017 – 2018
    *Does vs. Miami-Dade County*, U.S. District Court, Southern District of Florida

**Expert Witness/Subject Matter Expert,** 2015 – 2019
    *In Re Honor* – Superior Court of the State of California, County of San Mateo

**Expert Witness/Subject Matter Expert,** 2015 – 2018
    *Ft. Lauderdale vs. Anderson & Ford*, 17th Judicial Circuit, Broward County, FL

**Expert Witness/Subject Matter Expert,** 2014 – 2016
    *Martin v. Houston*, U.S. District Court, Middle District of Alabama

**Consultant,** 2015
    Miami-Dade Public Defender's Office

**Technology Consultant,** 2011 – 2015
    NY State Alliance of Sex Offender Service Providers (NYSASOSP), Albany, NY

**Technology Consultant,** 2008 – 2015
    NY State Association for the Treatment of Sexual Abusers (NYSATSA), Albany, NY

**Management Analyst,** 2005 – 2006
    Department of Defense, Office of the Under Secretary of Defense (Policy), Washington, DC
    Medal for Exceptional Civilian Service

**Student Patrol Officer/Crime Analyst**, 2003 – 2005
    Rochester Institute of Technology (RIT) Campus Safety, Rochester, NY
    Certificate of Appreciation as Student Crime Analyst

\* Denotes equal contribution
\*\* Indicates the reception of a conference-funded travel grant or similar award.
\*\*\* Denotes conference presentation given by a co-author.
ˢ Denotes student co-author

ATTACHMENT 2:

Expert Witness Qualifications  and Publications
(Last 10 years)

**Appendix B: Expert Witness Qualifications and Publications (last 10 years)**

Dr. Socia is one of the leading experts in the world regarding the impact of sex crime policies, as well as on public opinion regarding sex offenders and sex offenses. He has been previously qualified as an expert witness by the Superior Court of the State of California (San Mateo County), the County Court for the 17th Judicial Circuit (Broward County, Florida), and the U.S. District Court of the Southern District of Florida. He currently has 40 peer-reviewed journal articles, the majority of which relate to sex crimes and sex crime policies, in addition to other publications on sex crime legislation and policy (e.g., book chapters, an Oxford Bibliography entry). His work has been cited approximately 1,677 times according to Google Scholar, and his research has been referenced in multiple court cases. He has previously served as co-editor to *Sex Offender Law Report*. He has given multiple keynotes at conferences for state chapters of the Association for the Treatment of Sexual Abusers. Below is a list of relevant publications.

**Journal Publications, Book Chapters, and Reports Since 2011 (Relating to Sex Crimes, Registrants, Sex Crime Policy, and Public opinion about such matters)**

*Peer-Reviewed Journal Publications*

Dum, Christopher P., **Socia, Kelly M**., Bengt, George, and Neiderman, Halle. (in press) "The Effect of Reading Prisoner Poetry on Stigma and Public Attitudes: Results from a multigroup survey experiment" The Prison Journal.

**Socia, Kelly M.,** Rydberg, Jason, and Dum, Christopher P. (2021) "Punitive Attitudes Towards Individuals Convicted of Sex Offenses: A Vignette Study" Justice Quarterly. 38(6), 1262-1289. doi:10.1080/07418825.2019.1683218

Thompson, Lisa, Rydberg, Jason, Cassidy, Michael, **Socia, Kelly M.,** (2020) "Contextual Influences on the Sentencing of Convicted Sex Offenders" Sexual Abuse: A Journal of Research and Treatment. 32(7), 778-805. doi:10.1177/1079063219852936

**Socia, Kelly M.,** Grady, Melissa D., Bolder, Tess, Cronin, Kelli, Hurt, Christi, Vidrine, Sarah (2020) "Perceptions of Individuals Who Commit Sexual Offenses and Related Policies: A Group Comparison" Criminal Justice Policy Review. 31(7), 1059-1094. doi:10.1177/0887403419873126

Dum, Christopher P., **Socia, Kelly M.,** Yarrison, Fritz, and Long-Yarrison, Brooke L. (2020) "Would God Forgive? Attitudes Towards Sex Offenders in Places of Worship." Sexual Abuse: A Journal of Research and Treatment. 32(5), 567-590. doi:10.1177/1079063219839498

**Socia, Kelly M.,** Dum, Christopher P., and Rydberg, Jason. (2019) "Turning a Blind Eye: Public Support of Emergency Housing Policies for Sex Offenders." Sexual Abuse: A Journal of Research and Treatment. 31(1), 25-49. doi:10.1177/1079063217720925

Rydberg, Jason, Dum, Christopher P., and **Socia, Kelly M.** (2018) "Nobody Gives A #%&!: A Factorial Survey Examining The Effect Of Criminological Evidence On Opposition To Sex Offender Residence Restrictions" Journal of Experimental Criminology. 14(4), 541-550. doi:10.1007/s11292-018-9335-5

Rydberg, Jason, Cassidy, Michael, and **Socia, Kelly M.** (2018). "Punishing the wicked: Examining the correlates of sentence severity for convicted sex offenders" Journal of Quantitative Criminology. 34(4), 943-970. doi:10.1007/s10940-017-9360-y

Dum, Christopher P., **Socia, Kelly M.,** and Rydberg, Jason. (2017) "Public support for emergency shelter housing interventions concerning stigmatized populations: Results from a randomized experiment." Criminology & Public Policy. 16(3), 835-877. doi:10.1111/1745-9133.12311

**Socia, Kelly M.,** and Harris, Andrew J. (2016) "Evaluating public perceptions of the risk presented by registered sex offenders: Evidence of Crime Control Theater?" Psychology, Public Policy, and Law. 22(4), 375-385. doi:10.1037/law0000081

Harris, Andrew J. and **Socia, Kelly M.** (2016) "What's in a Name? Evaluating the Effects of the 'Sex Offender' Label on Public Opinions and Beliefs." Sexual Abuse: A Journal of Research and Treatment. 28(7), 660-678. doi:10.1177/1079063214564391

**Socia, Kelly M.** (2016) "Examining the Concentration of Registered Sex Offenders in Upstate New York Census Tracts." Crime & Delinquency. 62(6), 748-776. doi:10.1177/0011128714526563

Levenson, Jill S. and **Socia, Kelly M.** (2016) "Adverse Childhood Experiences and Arrest Patterns in a Sample of Sexual Offenders." Journal of Interpersonal Violence. 31(10), 1883-1911. doi:10.1177/0886260515570751

**Socia, Kelly M.,** Levenson, Jill S., Ackerman, Alissa R., and Harris, Andrew J. (2015) "'Brothers Under the Bridge': Factors Influencing the Transience of Registered Sex Offenders in Florida" Sexual Abuse: A Journal of Research and Treatment. 27(6), 559-586. doi:10.1177/1079063214521472

Levenson, Jill S., Ackerman, Alissa R., **Socia, Kelly M.,** and Harris, Andrew J. (2015) "Where for art thou? Transient Sex Offenders and Residence Restrictions." Criminal Justice

2

Policy Review. 26(4), 319-344. doi:10.1177/0887403413512326

**Socia, Kelly M.** (2015) "State Residence Restrictions and Forcible Rape Rates: A Multi-State Quasi-Experimental Analysis of UCR Data." Sexual Abuse: A Journal of Research and Treatment. 27(2), 205-227. doi:10.1177/1079063213509412

**Socia, Kelly M.** (2014) "Residence Restrictions are Ineffective, Inefficient, and Inadequate: So Now What?" Criminology & Public Policy. 13(1), 179-188. doi:10.1111/1745-9133.12071 [Policy Essay]

**Socia, Kelly M.** (2013) "Too Close for Comfort? Registered Sex Offender Spatial Clustering and Recidivistic Sex Crime Rates." Sexual Abuse: A Journal of Research and Treatment. 25(6), 531-556. doi:10.1177/1079063212469061

**Socia, Kelly M.** (2013) "Residence Restrictions and the Association with Registered Sex Offender Clustering." Criminal Justice Policy Review. 24(4), 441-475. doi:10.1177/0887403412445613

**Socia, Kelly M.** (2012) "The Efficacy of County-Level Sex Offender Residence Restrictions in New York" Crime & Delinquency. 58(4), 612-642. doi:10.1177/0011128712441694

**Socia, Kelly M.** and Stamatel, Janet P.* (2012) "Neighborhood Characteristics and the Social Control of Registered Sex Offenders." Crime & Delinquency. 58(4), 565-587. doi:10.1177/0011128711420111

**Socia, Kelly M.** (2012) "The Implementation of County Residence Restrictions in New York." Psychology, Public Policy, and Law. 18(2), 206-230. doi:10.1037/a0024993

**Socia, Kelly M.** (2011) "The Policy Implications of Residence Restrictions on Sex Offender Housing in Upstate, NY." Criminology & Public Policy, 10(2), 351-389. doi:10.1111/j.1745-9133.2011.00713.x

"Overview of 'The Policy Implications of Residence Restrictions on Sex Offender Housing in Upstate, NY.'" Criminology & Public Policy, 10(2), 349-350. doi:10.1111/j.1745-9133.2011.00724.x

### *Book Chapters, Reports, and Other Publications*

**Socia, Kelly M.** (2021) *The Ancillary Consequences of SORN,* (pp. 78-101). Book chapter in <u>Sex Offender Registration and Community Notification Laws: An Empirical Evaluation</u>. Logan, Wayne A. and Prescott, J.J. (eds). Cambridge University Press. ISBN: 9781108328425

Rydberg, Jason, **Socia, Kelly M.**, and Cassidy, Michael. (2018). "Community-Level Influences on the Sentencing of Convicted Sex Offenders, Pennsylvania, 2004-2010." Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2018-08-07. https://doi.org/10.3886/ICPSR36593.v1 [Dataset]

**Socia, Kelly M.** (2017). "Sex Offender Civil Commitment Policies in Context." *Criminology & Public Policy. 16*(3), 909-911. doi:10.1111/1745-9133.12329

**Socia, Kelly M.** (2016). "Sex Offender Housing Options in Fort Lauderdale, FL, Under a Residence Restriction Law. A Report for the American Civil Liberties Union of Florida (ACLU FL) and the Broward Chapter of the American Civil Liberties Union" ACLU Florida.

**Socia, Kelly M.** and Rydberg, Jason. (April 2016). *Sex Offender Policy and Legislation.* (pp. 187-202). Book chapter in <u>Advancing Criminology and Criminal Justice Policy</u>. Blomberg, T., Mestre Brancal, J., Beaver, K., and Bales, W. (eds). Routledge. ISBN: 978-1138829237

**Socia, Kelly M.** and Maroun, Rimonda R. (2016). *"Sex Offender Policies and Legislation."* In <u>Oxford Bibliographies in Criminology</u>. Ed. Beth M. Huebner. New York: Oxford University Press. ISBN: 9780195396607, doi:10.1093/OBO/9780195396607-0169
*-Revision and update posted February, 2019.*

In *Sex Offender Law Report:*
   (2015)

       Levenson, Jill S., Ackerman, Alissa R., **Socia, Kelly M.,** and Harris, Andrew J. "Transient Sex Offenders and Residence Restrictions." *16*(1) 3-4, 12-13. (2013)
       "From the Literature." *14*(5), 69-70, 80.
       "Department of Defense Releases FY 2012 Annual Report on Sexual Assault in the Military." *14*(5), 72.
       "From the Literature." *14*(4), 51-52, 63-64.
       "From the Literature." *14*(3), 40-43.
       "Texas Says 'No' to Federal Registry Standards." *14*(3), 39.
       "From the Literature." *14*(2), 25-28.
       "Seventh Circuit Rules Indiana DOC Sex Offender Registry Error Policy Violates Due Process." *14*(2), 23-24.
       "Changes to California's Three-Strikes Law Do Not Affect Many Ex-offenders." *14*(2), 19-20.
       "From the Literature." *14*(1), 5-8. (2012)
       "Legal Challenge to State Residence Restriction Law in Rhode Island." *13*(6), 83, 95-96.
       "From the Literature." *13*(6), 85-88.
       "Evaluating Community-Based Management Practices." *13*(5), 65, 78-79.
       "From the Literature." *13*(5), 71-74.

Levenson, Jill S, Ackerman, Alissa R., **Socia, Kelly M.**, and Harris, Andrew J. (2014). "Transient Sex Offenders and Residence Restrictions in Florida" *Report to the Florida Action Committee.* Lake Monroe, FL: Florida Action Committee.

ATTACHMENT 3:

List of Other Relevant Expert Witness Cases

**Appendix C: List of Other Relevant Expert Witness Cases**

The cases that Dr. Socia has served as an expert witness or similar duties for in the last 4 years include:

*Does v. Miami Dade County* (14-23933-Civ-Huck/McAliley, USDC So. FL)

*Does v Swearingen,* (Case 1:18-cv-24145-KMW, USDC So. FL)

*Ft. Lauderdale v. Anderson & Ford* (17-003615MO19A and 13-010799MO10A, Broward Co. Ct., FL)

*In Re Honor* (SC073793A, Superior Court of the State of California, County of San Mateo)

*Layfield v. Southwest Ranches* (CACE19-019498; Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida)

*National Association for Rational Sexual Offense Laws; NC RSOL; and John Does #'s 1 and 2 v. Joshua Stein, Attorney General of the State of North Carolina; Erik A.Hooks, Secretary of the North Carolina Department of Public Safety; et al.* (1:17-cv-53, Middle District of North Carolina)

*State v. William Wright* (2018-CO-352, County Court of the Fourth Judicial Circuit, Nassau County, FL)

Dr. Socia is also a signatory on Brief of Amici Curiae in cases that include: *In re Gadlin* (No. S254599) before the Supreme Court of the State of California; *Commonwealth of Pennsylvania v. Torsilieri* (37 MAP 2018) before the Supreme Court of Pennsylvania; *Haymond v. United States* (No. 17-1672) and *Vasquez v. Foxx* (Illinois, No. 18-386), both before the Supreme Court of the United States.