# Exhibit 9:

## Dr. Sarah Esther Lageson Expert Report

## EXPERT DECLARATION OF DR. SARAH ESTHER LAGESON

## BACKGROUND AND QUALIFICATIONS

1.  I am an Associate Professor with tenure at Rutgers University-Newark School of Criminal Justice in New Jersey. I have worked at Rutgers since August 2015.

2.  I received an MA in Sociology (2012) and a PhD in Sociology (2015) at the University of Minnesota-Twin Cities.

3.  In my current position at Rutgers, I teach undergraduate and graduate courses, and research the impact of digital technologies on legal systems and criminal punishment.

4.  I conduct qualitative and quantitative research, including experimental studies, analyses of criminal record data, interviews with people who have criminal records, fieldwork at expungement seminars and legal aid offices, and assessments of administrative data and public policy. I also serve as a peer reviewer for scientific journals, textbooks, and funding agencies.

5.  My research has been reviewed and validated through the peer review process and has been published in academic journals in criminology, sociology, and public policy. In the past five years, my peer-reviewed publications have been cited over 900 times by other researchers.[1] In 2020, I published a peer reviewed book with Oxford University Press, *Digital Punishment: Privacy, Stigma, and the Harms of Data Driven Criminal Justice.* I am the recipient of external funding and research grants, including from the United States Department of Justice and the American Bar Foundation.

6.  My research has been covered by major media outlets, including the *New York Times,* the *Guardian*, the *LA Times,* CNN, and National Public Radio.

7.  My curriculum vitae is attached as Exhibit A and details all my publications from the last ten years.

---

[1] Google Scholar profile for Dr. Sarah Esther Lageson, showing 949 citations to research. Retrieved October 1, 2021, from https://scholar.google.com/citations?user=ElyL7y0AAAAJ&hl=en.

8.  Prior to this case, I have provided expert testimony for *Taha v. Bucks County Pennsylvania et al,* No. 12-CIV-06867 (E. D. Pa.), *A.N. v. Alamogordo Police Department*, No 2:18-CV-00173 (D.N.M.), and *Doe v. Barr,* No. 2:20-CV-03434-CJC-AGR (C.D. Cal).[2]

9.  I was approached by counsel for the plaintiffs in this matter and asked to state my professional opinion concerning the relationship between technology and sex offender registries, as well as the existence of and types of harms resulting from the public dissemination of information about a person's registry status in the state of Michigan.

10.  The purpose of this report is to provide a synopsis of the scientific literature documenting the impacts of internet-based criminal information disclosure, including my own research in this area, and externally validated, peer-reviewed research conducted by other social scientists.

## SUMMARY OF OPINION

11.  Technology has dramatically changed the form, function, and reach of registry information in the nearly two decades since the U.S. Supreme Court in *Smith v. Doe*, 538 U.S. 84 (2003), held that sex offender registration is analogous to a visit to an official archive of criminal records.

12.  The architecture and user functions available on the Michigan registry encourage browsing, mapping, and tracking registrants, rather than accessing targeted archival information.

13.  The design, language, and functionality of Michigan's registry website represent each person listed as a current danger to society, regardless of whether the person presents such a risk and even though the registry lacks individualized review.

14.  The online disclosure of registry information has both increased and expanded the economic, social, and psychological harms of being listed on a registry. I use the term "digital punishment" to describe how online information, spread to innumerable sites and sources, damages registrants far beyond the type and extent of harm the Supreme Court considered in 2003 when it decided *Smith*.

---

[2] Of these cases, only *Taha* went to trial, where I testified in court.

2

15. Registry information is routinely scraped, copied, aggregated, and re-posted to private websites. In a departure from the earlier schemes that required users to conduct a targeted search for particular registrants on a government-run website, registrants' personal information is now routinely harvested to drive web traffic to specific websites and to increase "clicks" through posting registrant information on, for example, real estate and other public records websites.

16. These changes in how the internet organizes and disseminates registry data means that websites "push" registrant data on internet users who are not even looking for such information.

17. The ubiquity of registry information on the internet leads registrants to purposefully avoid digital and institutional spaces that rely on the internet, which, in today's world, constitute the vast majority of public and private life.

18. Registrants' opting out of institutional and social life through "digital avoidance" has consequences for recidivism and public safety, because it makes it more difficult for registrants to access the basic necessities shown to prevent crime, such as safe and stable housing, employment, and community relationships.

19. The consequences of digital labeling through the format of the Michigan registry and the attendant dissemination of registry information on private websites ultimately undermines public safety by making pariahs of registrants, effectively cutting them out of social, institutional, and technological life.

## OPINION

### Changes in the internet and data sharing technologies have fundamentally changed the nature of registries and dramatically increased the intensity and effects of their attendant stigmatization

#### *Digital Punishment*

20. My research shows that the unprecedented rise of the information age has fundamentally changed the function, scope, and permanence of state-operated registry websites. I call this change "digital punishment" because that is the most accurate way to describe the effects of the digital criminal label.

21. Digital punishment occurs when state criminal justice agencies publish personally identifying information about registrants on the internet and implement

3

technological tools that encourage digital tracking, monitoring, and public shaming of people on registries.[3]

22. These state disclosures of data that allow for the ongoing monitoring of registrants – by not only the state, but by private actors – are then re-disseminated across the internet, as they are cataloged, indexed, sold, and shared by third parties. A person's registry status becomes digitally linked to their name and is continuously retrievable via basic internet searches – indeed, it is often the first thing that will show up on a search of the person's name on Google.[4]

23. The digital punishment of registrants is a special case of technologically-driven "collateral consequences,"[5] a term typically used to describe "civil" sanctions and restrictions that are imposed based on a criminal conviction[6] and that limit or prohibit opportunities across social, economic, and political domains.[7] Due to the highly stigmatizing nature of a sexual conviction, as well as the advanced internet tracking capabilities made possible by the Michigan registry, collateral harms are greater for registrants than for people with other types of criminal convictions or records.[8]

---

[3] Lageson, Sarah Esther. "Digital punishment's tangled web." *Contexts* 15, no. 1 (2016): 22-27; Corda, Alessandro, and Sarah Esther Lageson. "Disordered punishment: Workaround technologies of criminal records disclosure and the rise of a new penal entrepreneurialism." *The British Journal of Criminology* 60, no. 2 (2020): 245-264.

[4] Lageson, Sarah Esther. *Digital Punishment: Privacy, Stigma, and the Harms of Data Driven Criminal Justice.* Oxford University Press, 2020.

[5] National Inventory of Collateral Consequences of Conviction. https://niccc.csgjusticecenter.org/.

[6] Uggen, Christopher and Robert Stewart, "Piling On: Collateral Consequences and Community Supervision," *Minnesota Law Review* 99, no. 5 (January 2015): 1871, 1875.

[7] Hagan, John and Ronit Dinovitzer, "Collateral Consequences of Imprisonment for Children, Communities, and Prisoners," *Crime and justice* 26 (1999): 121; Michael Pinard, "Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity." *NYU Law Review* 85 (2010): 457; see also this online database: "National Inventory of the Collateral Consequences of Conviction." Justice Center, The Council of State Governments. Accessed February 19, 2020. https://niccc.csgjusticecenter.org/.

[8] Tewksbury, Richard. "Collateral consequences of sex offender registration." *Journal of Contemporary Criminal Justice* 21, no. 1 (2005): 67-81.

24. Unlike an archive of static criminal record information, the Michigan registry provides a constantly updated set of personal information about registrants, conveying that registrants pose a current serious public safety risk. The Michigan registry therefore disrupts rehabilitative and desistance processes that, as established by decades of research on the cognitive and social elements of crime prevention, are essential to successful reentry.[9]

25. Federal courts have recognized that the digital transformation has changed the practical realities of governmental records and individual privacy interests. In 2016, the Sixth Circuit noted that while the disclosure of booking photos twenty years ago was thought to do no harm, "the internet and social media have worked unpredictable changes in the way photographs are stored and shared."[10] Overruling a 1996 decision, this decision pointed to how changes in technology have reshaped an individual's privacy interests in materials related to their criminal proceedings, precisely because of the internet's permanent archive of such materials, with instant access by anyone from anywhere in the world.

### Advanced digital tracking, monitoring, and public labeling of risk in the Michigan registry

26. The format, presentation, and user options for the Michigan registry website allow for advanced information gathering and tracking of registrants. The website also provides personal information that is more detailed than information about people with criminal convictions posted to public court websites and criminal history websites run by the state of Michigan.

27. The Michigan registry website posts the following information: current photograph, name, registration number, MDOC number, status, age and date of birth, last verification date, compliance status, sex, race, hair color, height, weight, eye color, home address, work address, aliases, offenses, scars/marks/tattoos, and vehicle identification information. (Michigan law also requires many registrants to report to the state all of their internet identifiers, *e.g.,* social media usernames; while the registry does not currently post this information, Michigan law authorizes it to do so.)

---

[9] Lageson, Sarah Esther, and Shadd Maruna. "Digital degradation: Stigma management in the internet age." *Punishment & Society* 20, no. 1 (2018): 113-133.

[10] *Detroit Free Press Inc. v. United States Dep't of Justice*, 829 F.3d 478, 486 (6th Cir. 2016).

28.  Because registrants are required to actively report their personal information, the website contains not just historical conviction records, but continuously updated information about exactly where a person lives and works, what they currently look like, and what vehicles they drive.

29.  The public registry allows users to "browse" lists of registrants, rather than requiring a targeted name or address search like most sources of public state criminal record data. Users can enter a city, town, or neighborhood name or simply access the entire list of all registrants through the registry website.



*Screenshot of Michigan registry home page, which notes that the purpose of the registry is to protect the public from the risks posed by registrants and that labels the button to enter the registry database as an option to search for offenders in one's broad geographic area. Source: Accessed 6 October 2021,* *https://mspsor.com/.*

30.  An internet user who searches a specific address, city, county, or zip code will pull up an interactive map of the location of all registrants within a specified radius, and need only click on the small black registrant icons to pull up the photo and all the registry details on each individual in the area.



*Michigan registry mapping and browsing capabilities, here showing registrants in the City of Grand Rapids on a Google map integrated into the registry website. Source: Accessed 6 October 2021, https://mspsor.com/Home/MultiOffenderMap?RadiusStreetAddress=&RadiusCity=grand+rapids+city&RadiusZip=&RadiusMiles=5&RadiusCounty=.*

31.  The Michigan registry's browse function is thus unlike the process outlined in *Smith,* where "an individual seeking the information must take the initial step of going to the Department of Public Safety's Web site, proceed to the sex offender registry, and then look up the desired information."[11] Unlike the Alaska registry two decades ago in that case, the way Michigan's registry functions today is much more akin to forcing a person to appear in public on the internet: the new public forum. And within that public sphere, the individual is labeled by the state as a dangerous sex offender.

---

[11] *Smith v. Doe*, 538 U.S. 84, 99 (2003).

32. The active publicization of the stigmatizing label is even more pronounced through the web architecture of the Michigan registry, as internet users need not search for information about specific individuals or locations to have information provided to them showing that a neighbor or colleague is on the registry.



*Screenshot of broad search and browse options available on the Michigan registry website. Source: Accessed 7 October 2021 at 5:58 PM, https://mspsor.com/Home/Search.*

33. The Michigan registry also allows a user to actively "track" an offender through an email signup and notification system. This option is not available for other types of criminal history information made publicly available through the state.

34. In contrast to the registry, other forms of state public criminal record information require a targeted search of a specific person, do not allow for the browsing of lists of convicted persons, and do not include mapping, tracking, or alert capabilities.

35.  For example, Michigan criminal court records internet portals provide a summary of a person's legal history accessible only through a targeted search for that particular person. To conduct a search of court records, a user is typically required to submit both the first and last name of the person under inquiry and to

complete a captcha (an internet tool that requires a user to click an image to prove that the user is a person and not a machine).

36. Michigan criminal court records websites typically post the following personal information: name, attorney name, criminal charges, court events, and hearings.[12] This information is entirely historical, *i.e.*, it does not include rolling updates of personal information like the ones on the Michigan registry.

37. Criminal history reports are also available for purchase from vendors, including both private background check companies and state repositories, and the Internet Criminal History Access Tool (ICHAT) in Michigan.[13]

38. ICHAT users must submit the first name, last name, date of birth, race, gender, and reason for search to obtain a criminal history report for a fee.

39. The Michigan registry, in contrast, allows a user to actively "track" an offender through an email signup and notification system. This option is not available for other types of criminal history information made public by state or local governments in Michigan. Thus, the tracking functions of the registry select out these types of convictions as particularly dangerous (and therefore in need of such ongoing monitoring by law enforcement and the public), as compared to convictions for other crimes outside the sexual arena.

---

[12] Sample internet court records were obtained from Odyssey Public Access (OPA) for the Third Judicial District of Michigan at: https://www.3rdcc.org/odyssey-public-access-(opa).

[13] Sample criminal history records were sourced through the Michigan Internet Criminal History Access Tool (ICHAT) at https://apps.michigan.gov/.



*Options for users to track registrants and receive updates. The registrant's name has been blurred to protect their identity. Source: Accessed 1 October 2021 at 9:55 AM.*[14]

40. The Michigan registry also reports whether or not a registrant is "compliant." This suggests that the registrant is being continuously supervised because the registrant remains currently dangerous to the public.



Last Verification Date: **07/01/2021**

Compliance Status: **Non-Compliant**
- **Fee Violation**

*Registry compliance status as reported on state website. Source: Accessed 30 September 2021 at 9:13 AM.*[15]

41. Unlike other forms of public criminal records available through the State of Michigan's websites, the registry also allows internet users to "map" the registrant and "submit a tip" directly to authorities.

---

[14] The links searched have not been included because doing so would disclose the identity of the registrants pictured. Those links are on file with the author and can be provided to the Court upon request.

[15] *https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=644836.*



*User options to track, map, or report a registrant on the registry website*
*Source: Accessed 30 September 2021 at 9:15 AM.*

42. The registry thus allows for a highly interactive user experience that (a) communicates that registrants are an especially dangerous class of people with convictions and (b) encourages and enables much more serious — and more pervasive — intrusions on registrants' privacy than those inflicted on individuals with other types of criminal histories.

43. Unlike the static, archival posting of court and criminal history records made available to the public only through targeted searches, the registry website states: "This registry is made available through the Internet with the intent to better assist the public in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." This messaging signals a highly dangerous type of criminal who requires constant public monitoring and scrutiny, while also assigning elevated stigma and leading the public to believe that all registrants are dangerous.

44. Another key difference is that registries consist of regularly updated, registrant-provided data, rather than the archival nature of other forms of criminal record information. For example, the presentation of updated photographs and addresses may create the public perception that a person with a sexual offense conviction is a current public safety threat or that their offense was recent. This may pose particularly harmful perceptions for a long-ago offense that involved consensual sex between an of-age teen and an underage teen that resulted in registration but is now associated with the identification of a grown adult. For example, an internet user viewing a photograph of a 55-year-old registrant who is listed for "criminal sexual conduct III (person 13-15)" will likely assume that there was a 40-year age gap, when in fact, given the age of the offense, the registrant may be listed for having had a teenage relationship.

11

45. In sum, the interface, text, and tracking options included in the registry website do not simply provide historical conviction information, but present registrants as presently dangerous.

### The changing internet context and "pushes" of registrant data to users

46. *Smith v. Doe* was argued in 2002, when the internet was a vastly different tool. Wikipedia was one year old.[16] In 2001, only 3% of Americans said they got most of their information about the 9/11 attacks from the internet.[17] The average internet user spent 83 minutes online per day. In 2002, only 44% of people who had internet access at work said the internet helped them do their jobs.[18]

47. In November 2002, the month *Smith* was argued, only 15% of Americans had access to broadband internet in their homes. Today, that number is 77%,[19] with an additional 15% of Americans using smartphones only to access the internet at home.[20] While only 59% of American adults used the internet at all in 2002, today 93% of American adults use the internet.[21] In 2002, only 6% of Americans said they would have a hard time giving up their Blackberry or other wireless email device.[22] By 2021, 85% of Americans own a smartphone.[23]

---

[16] Wikipedia, "History of Wikipedia." Accessed 27 September 2021. https://en.wikipedia.org/wiki/History_of_Wikipedia.

[17] Pew Research. "World Wide Web Timeline." Accessed 27 September 2021. https://www.pewresearch.org/internet/2014/03/11/world-wide-web-timeline/.

[18] Ibid.

[19] Ibid.

[20] Pew Research, "Mobile Technology and Home Broadband 2021." 3 June 2021. Accessed 27 September 2021. https://www.pewresearch.org/internet/2021/06/03/mobile-technology-and-home-broadband-2021/.

[21] Pew Research, "Internet/Broadband Fact Sheet." Accessed 27 September 2021. https://www.pewresearch.org/internet/fact-sheet/internet-broadband/.

[22] Pew Research, "Mobile internet moves into the mainstream." 25 March 2008. Accessed 27 September 2021. https://www.pewresearch.org/internet/2008/03/25/mobile-internet-moves-into-the-mainstream/.

[23] Pew Research, "Mobile Technology and Home Broadband 2021." 3 June 2021. Accessed 27 September 2021. https://www.pewresearch.org/internet/2021/06/03/mobile-technology-and-home-broadband-2021/.

48. Internet use has been especially crucial during the COVID-19 pandemic lockdowns. 90% of Americans reported that the internet has been "essential or important" to them and 40% used technology in new ways because of the pandemic.[24]

49. As noted above, in *Smith,* the majority opinion described the process of accessing registrant information as follows: "An individual seeking the information must take the initial step of going to the Department of Public Safety's Web site, proceed to the sex offender registry, and then look up the desired information. The process is more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality."[25] This characterization not only does not reflect how Michigan's registry operates today, but also does not reflect how registrant information that is originally posted on a state registry like Michigan's is reproduced on the internet. Rather than requiring an internet user to seek out registrant information by accessing a governmental database or criminal record archive, this information is now routinely pushed or provided to web users even without their intent to access such records.

50. Public records, including registrant information, have become a valuable data commodity.[26] In particular, registrant information has become a valuable data source for websites that aggregate public records to create reports about people and places. In these largely unregulated web services, companies supply and display geo-specific registry information without a user ever making a specific request. Registry information is scraped from governmental sources and repackaged into a web product that is pushed to internet users.

51. For instance, Homefacts.com, a site that provides neighborhood information, supplies registrant information along with information about property prices and school ratings. The image below shows a free Homefacts report about Detroit that uses registry data as a key indicator of an area overview.

---

[24] Pew Research, "The Internet and the Pandemic." Accessed 27 September 2021. https://www.pewresearch.org/internet/2021/09/01/the-internet-and-the-pandemic/

[25] *Smith v. Doe*, 538 U.S. 84, 99 (2003).

[26] Lageson, *Digital Punishment.*



*Homefacts.com use of registry information to create city assessment reports. Source: Accessed 7 October 2021 at 2:19 PM.*

52. Scrolling down the Homefacts webpage, a user is provided with a set of registrants, including their photographs and home addresses.



*Homefacts.com dissemination of registrant photographs and personal information. Photos and home addresses have been blurred to protect the identities of registrants featured on this website. Source: Accessed 7 October 2021 at 2:21 PM.*

53. Companies like Homedisclosure.com similarly aggregate public records to create customized reports based on an address for prospective home-buyers, using registry records to flag "concerns" and "alerts" for a specific location based on the number of registrants nearby. A sample report from Homedisclosure.com shows the prevalence of registry data in crafting their address scores. Here again, an internet user is provided local registrant information without requesting such information in the first place.



*Homedisclosure.com report that highlights registrants in the targeted area. Source: Accessed 27 September 2021 at 10:33 AM at https://homedisclosure.com/samplereport.*

54. Other companies aggregate public records to sell "people search" reports to consumers. In these reports, companies now proactively include registrant information for people who live nearby the target of the search, pushing registrant data to internet users who are seeking information on a different person altogether.

55. For instance, the web service Instant Checkmate provides background reports that draw upon public records databases and report addresses, criminal histories, and social media accounts for the search target. However, Instant Checkmate also affirmatively posts registrant information for people who live in proximity to the search target. A sample Instant Checkmate report provided by the company displays the registrant data included on background check reports for non-registrants.

16



*Sample Instant Checkmate report advertising integration of registrant photographs, offense, and link to purchase a background report. Source: Accessed 27 September 2021 at 1:53PM,*
*https://www.instantcheckmate.com/crimewire/post/instant-checkmate-sample-report/.*

56. Similarly, city-data.com offers a broad set of information about cities, towns, and zip codes, including population demographics, weather patterns, real estate taxes, tourist attractions, industries and occupations, and education. The site also offers its own sex offender locator, built directly into the website. Clicking on a search result reveals the name, home address, sex, age, eye color, hair color, height, weight, scars/marks/tattoos, and race of the registrant.





*City-data.com registered sex offender tool integrated into its website. Source: Accessed 1 October 2021 at 9:45 AM.*

57. Importantly, none of these private companies push or proactively provide criminal conviction information for any other type of criminal record, including violent crime or homicide. Nor do these third-party websites report any personal information about people with other criminal convictions, such as their home address or photograph. Instead, these websites elect only to provide registry information, something which state-run websites like the Michigan registry made especially easy, by allowing for other users to access their continually-updated data on registrants. This allows third parties to easily copy and repost the registry to other sources and websites.

18

58. Private entities have also aggregated registrant information posted to state websites and created new, private databases of such information to generate income through reposting information contained in state registries. Familywatchdog.us, for instance, is owned by an Indiana-based for-profit company called FWD Holdings[27] that aggregates registry information from states and repackages it for internet users to their site.

59. The website hosts advertisements and links to other for-profit records aggregators, such as BeenVerified.com. For instance, a search result for an address reveals a map of registrants and also includes an advertisement to the registrant's BeenVerified background check, a non-Fair Credit Reporting Act compliant private background check available for sale to consumers.[28] Thus, various for-profit websites work in concert to monetize registrant data across web services.

60. Familywatchdog.us provides sales packages to media entities, law enforcement agencies, and other private companies seeking to mine registry data or host maps or mobile applications showing the locations of registrants, effectively using public registrant information as a for-profit data commodity.[29]

---

[27] FWD Holdings Incorporated is a domestic, for-profit corporation located at 2230 Stafford Road, Suite 115, Plainfield IN 46168 and operating under Indiana Business ID 2009081300027. See https://bsd.sos.in.gov/PublicBusinessSearch/.

[28] "People search" websites like Instant Checkmate and BeenVerified do not consider their businesses Consumer Reporting Agencies and thus do not comply with the requirements of the Federal Fair Credit Reporting Act. Users are warned that the background checks they purchase are not checked for accuracy and are not to be used for hiring or housing decisions.

[29] FamilyWatchdog, "Business," Accessed 27 September 2021. https://www.familywatchdog.us/servicetext/Business.asp.



*Familywatchdog.us options for registrant tracking and links to advertisers selling background reports on registrants revealed through searches. Source: Accessed 27 September 2021 at 1:38 PM at https://www.familywatchdog.us/.*

61. Mobile apps also collect and aggregate registrant data into new formats that allow "push notifications" that affirmatively alert users when they are in proximity to a registrant's address.



*Mobile apps that source registrant information and aggregate onto private platforms. Source: Accessed 27 September 2021 at 1:50 PM,*
*https://play.google.com/store/apps/collection/cluster?clp=ggEOCgxzZXggb2ZmZW5kZXXI%3D:S:ANO1lj KZJrw&gsr=ChGCAQ4KDHNleCBvZmZlbmRlcg%3D%3D:S:ANO1ljK0TBw&hl=en_US&gl=US.*

62.  In sum, changes in internet infrastructure and database technology over the nearly two decades since *Smith v. Doe* have transformed registry information from a government-run source that a user had to intentionally access into a large scale, private-sector data commodity that is duplicated, aggregated, and pushed to innumerable internet users who passively receive registrant information without even intending to access it. The fact that the internet "pushes" registrant data, even where registrant information is not actively sought by a member of the public, illustrates how internet technology has fundamentally altered the scope, reach, and function of registries.

63.  The unusually detailed and continually updated nature of the information provided in the Michigan registry in turn enables a growing ecosystem of private sector uses of registry data for surveillance, stigmatization and shaming purposes. These new functions and the broad reach of registry information make today's registries completely unlike those considered by the Supreme Court in *Smith*.

### Search Engine Optimization and Registry Records

64.  Search engine optimization has increased public access to registrants' personal information because the nature of such information is prioritized by internet search engine algorithms, frequently causing the registrant's status on the

21

registry and personal information, such as home address, to end up among the top search results for a registrant's name in a basic internet search.

65. The use of internet-based registries and the aggregation and re-posting of registrant information has allowed search engines, like Google, to "index" information posted to governmental websites and incorporate text into search results. As "search engine spiders" continuously "crawl" public webpages,[30] a basic Google search for that person's name will often return a link to a governmental sex offender registry website.[31]

66. Search results are ranked by how often an internet user clicks a link. Due to the "shock value" of sex offender information in the search results for a person's name, links to websites that post registry information often maintain dominance as top results for an individual.[32]

67. The high ranking of registry-related websites is further compounded by search engine optimization factors that purposefully increase the visibility of governmental websites when users run a basic query. Governmental sites are considered by Google algorithms to be more "trustworthy" and thus more likely to hold a dominant position in search results.[33]

68. Analytics provided by Google Trends shows that people have increasingly turned to search engines to seek out registrant information, potentially making it unnecessary to conduct targeted searches of a government-run registry, the original intent of publishing such official websites in the first place. Put different, a user used to directly seek out the state registry website to look for an individual person's registry status. That information is now readily available via a routine Google search. This means that users no longer have to seek out registry information; instead they can inadvertently learn a person is on a registry through a

---

[30] "Search Engine Optimization (SEO) Starter Guide," Google, accessed September 11, 2020: https://support.google.com/webmasters/answer/7451184?hl=en.

[31] Pierce, Doug. "The SEO Behind Mugshot Websites," *Cogney,* October 7, 2013, https://www.cogney.com.hk/blog/mugshot-seo/.

[32] Pierce, Doug, "The SEO Behind Mugshot Websites," *Cogney,* October 7, 2013, https://www.cogney.com.hk/blog/mugshot-seo/.

[33] Digital.gov. "Why government websites need SEO." May 2, 2013: https://digital.gov/2013/05/02/why-government-websites-need-seo/.

basic, generic search for an individual. Search engine algorithms boost this type of information, multiplying access to a variety of sources that post registry data. [34]



*Google Trends analysis of internet search term "sex offender near me" from 2004-2021. Source: Accessed 28 September 2021,*
*https://trends.google.com/trends/explore?date=all&geo=US&q=sex%20offender%20near%20me.*

69. Accessing registry data used to involve an active exchange of information between the registry websites and an internet user. Today, registry information is disseminated broadly across the internet due to the which, as noted above, is unlike *Smith v. Doe*'s analogy to visiting a criminal records archive.[35] The Michigan registry and the attendant private websites have duplicated and disseminated these data into the public sphere – the internet – in a manner far beyond how the internet operated nearly twenty years ago.

---

[34] Google Trends, "Sex Offender Near Me." Accessed 28 September 2021, https://trends.google.com/trends/explore?date=all&geo=US&q=sex%20offender%20near%20me.

[35] Schuler, Rus. "How Does the Internet Work?" Stanford White Paper (2002). Retrieved from: https://web.stanford.edu/class/msande91si/www-spr04/readings/week1/InternetWhitepaper.htm.

## The Michigan registry creates discriminatory harms and leads to institutional and digital avoidance

70. It is generally accepted by social scientists that being labeled a criminal sexual offender is strongly correlated with a broad set of stigmatization and harms, including discrimination in employment, housing, education, and civic and community organizations, as well as social, psychological, and personal stigmatization, alienation, and public humiliation. These correlations have been tested, peer reviewed, and validated across multiple disciplines, including economics, sociology, criminology, psychology, and empirical legal studies.

71. Social scientists have detailed the specific collateral consequences for registrants, which show social stigmatization, loss of relationships, barriers to employment and housing, and verbal and physical assaults.[36]

72. In the case of the Michigan registry, the requirement to publish (and update) the address of a registrant's employer may contribute to employment-based discrimination, because employers are likely to be reticent about being publicly associated with a registrant.

73. Numerous studies have detailed the difficulties in obtaining housing for people on the registry.[37] Quasi-experimental research has demonstrated that convictions for sex-related offenses are more stigmatized than other convictions and lead to more discrimination within the housing market.[38]

74. In the case of the Michigan registry, the requirement to publish one's current home address may contribute to housing discrimination, as landlords are likely to be reticent about having their property address associated with the Michigan registry and posted to third party websites that push registrant data to users.

---

[36] Tewksbury, Richard. "Collateral consequences of sex offender registration." *Journal of Contemporary Criminal Justice* 21, no. 1 (2005): 67-81.

[37] Tewksbury, Richard, Elizabeth Ehrhardt Mustaine, and Shawn Rolfe. "Sex offender residential mobility and relegation: The collateral consequences continue." *American Journal of Criminal Justice* 41.4 (2016): 852-866; Williams, Monica. *The Sex Offender Housing Dilemma*. New York University Press, 2018.

[38] Evans, Douglas N., and Jeremy R. Porter. "Criminal history and landlord rental decisions: A New York quasi-experimental study." *Journal of Experimental Criminology* 11.1 (2015): 21-42.

*Institutional Avoidance*

75.  When a person's sex offender status "pops up" on the internet, the social consequences can be devastating for individuals, especially in public social environments like schools, workplaces, civic organizations, and religious institutions.[39]

76.  Evidence shows that this personal and social stigmatization leads people to purposefully "opt out" of formal institutional arrangements and relationships that might trigger a Google search, also referred to as institutional and systems avoidance.[40]

77.  This avoidance has professional, economic, personal and familial consequences,[41] and has been linked to decreases in civic and political engagement,[42] such as volunteering (which in turn has been linked to a lower likelihood of future arrest).[43]

*Digital Avoidance*

78.  People who are publicly stigmatized on the internet also exhibit "digital avoidance" – a purposeful opting out of digital spaces that may trigger an internet

---

[39] Lageson, Sarah Esther. "Found out and opting out: The consequences of online criminal records for families," *The ANNALS of the American Academy of Political and Social Science* 665, no. 1 (2016): 127. While most of the research in this area has been about the consequences of being identified on the internet as a person with a criminal record, being identified as a sex offender is even more stigmatizing. In addition, as discussed, registry information is more likely to be "pushed" out on the internet unlike other criminal history information.

[40] Brayne, Sarah. "Surveillance and System Avoidance: Criminal Justice Contact and Institutional Attachment," *American Sociological Review* 79, no. 3 (June 2014): 367.

[41] Lageson, Sarah and Christopher Uggen, "How Work Affects Crime—And Crime Affects Work—Over the Life Course;" Goffman, Alice. *On The Run: Fugitive Life in an American City* (Chicago: University of Chicago Press, 2014)

[42] Lerman, Amy E., and Vesla M. Weaver. *Arresting citizenship: The democratic consequences of American crime control.* University of Chicago Press, 2014.

[43] Uggen, Christopher, and Jennifer Janikula. "Volunteerism and arrest in the transition to adulthood." *Social forces* 78, no. 1 (1999): 331-362.

search for their name.[44] This means choosing not to use routine technologies. Such digital avoidance further reduces the ability of registrants to engage in pro-social behaviors known to reduce crime, such as securing safe and stable employment and housing.[45]

79. Research shows that people stigmatized on public registries resort to self-policing their behavior and avoid using the internet to avoid further publicizing their stigmatizing label.[46]

80. Registry requirements exacerbate these effects when laws require registrants to publicly disclose all internet identities they have created, generating another powerful incentive not to use the internet.

81. The impact of digital avoidance is especially harmful in light of the ubiquity of the internet in daily life, particularly during the pandemic, where 90% of Americans say the internet has been essential or important.[47] In general, 3 in 10 American adults report that they are almost "constantly" online.[48] Only 7% of Americans report that they do not use the internet regularly.[49]

82. Not having an online identity can be harmful to employment prospects. The Society of Human Resources Management, for example, reports that a lack of social media presence can hurt job seekers, citing a CareerBuilder study that 35% of employers are less likely to interview applicants they can't find online.[50]

---

[44] Lageson, *Digital Punishment* at 118-122.

[45] Ibid.

[46] Ibid.

[47] Pew Research, "The Internet and the Pandemic," 1 September 2021. Accessed 1 October 2021, https://www.pewresearch.org/internet/2021/09/01/the-internet-and-the-pandemic/.

[48] Pew Research, "About three-in-ten U.S. adults say they are 'almost constantly' online," 26 March 2021. Accessed 1 October 2021, https://www.pewresearch.org/fact-tank/2021/03/26/about-three-in-ten-u-s-adults-say-they-are-almost-constantly-online/.

[49] Pew Research, "7% of Americans don't use the internet. Who are they?" 2 April 2021, Accessed 1 October 2021, https://www.pewresearch.org/fact-tank/2021/04/02/7-of-americans-dont-use-the-internet-who-are-they/.

[50] Society of Human Resources Management, "Lack of Social Media Presence Can Hurt Job Seekers." 18 May 2015. Accessed 1 October 2021,

83. The internet is also a primary way people connect socially. The percentage of U.S. adults who use at least one social media site has steadily grown since the early 2000's, with 72% of adults now reporting they access social media.[51] Registrants who are reticent to report social media accounts are effectively shut out of this central social platform.

84. Social media is also increasingly used as a communications tool between people and government and other institutions. For example, experts report that social media is increasingly used by local governments to post essential information to constituents.[52] Requiring registrants to publicly disclose their social media credentials may lead them off platforms that deliver important public information or are fora for public debate. Similarly, many news websites require usernames or social media logins to read or comment on articles. Relatedly, this means that a registrant's use of any site with these credentialing requirements would become known to the state and, if the registrant's identifiers are posted online as Michigan's law allows, also become known to the public.

85. The integration of social media and email accounts directly into other websites also poses obstacles for registrants. Internet sites now routinely allow users to log in using social media credentials, such as a Facebook account. At times, these logins happen automatically, allowing social media to track a person's activity on other websites through their account.[53] This means that for registrants, entire categories of routine websites may be impacted by the requirement under Michigan law to register any website account with the state. Not knowing whether or not their social media or email accounts have been linked to other websites will likely contribute to digital avoidance to avoid risking an inadvertent registration

---

https://www.shrm.org/resourcesandtools/hr-topics/technology/pages/lack-of-social-media-presence-can-hurt-job-seekers.aspx.

[51] Pew Research, "Social Media Fact Sheet." Accessed 1 October 2021, https://www.pewresearch.org/internet/fact-sheet/social-media/.

[52] Husing, Chris, "How Social Media is Elevating Engagement for Local Government," *Governing* 24 February 2020. Accessed 7 October 2021, https://www.governing.com/now/how-social-media-is-elevating-engagement-for-local-government.html.

[53] Experian, "Is it safe to use Facebook to login to other sites?" 29 April 2018. Accessed 7 October 2021, https://www.experian.com/blogs/ask-experian/is-it-safe-to-use-facebook-to-login-on-other-sites/.

violation. Registrants may also entirely avoid any website that requires registration at all, as their use of the site may be publicly linked to their registry status.

86. Despite the ubiquity of social media, some platforms, including Facebook[54] and Instagram[55], ban people convicted of sex offenses from their sites altogether, and even encourage other users to report such individuals so they can be removed from the platform.[56] Such blanket bans by social media platforms simply adopt the false assumption that all such individuals pose a lifelong public safety risk – an assumption that is reinforced by state registries.  People with past sex offenses convictions are thus excluded from many of the major digital fora that are used today for economic, social, political and commercial exchanges.

### *Public safety and recidivism consequences*

87.  Research shows that public labeling can also lead to increased crime and be detrimental to public safety. As described by one scholar: "A stigmatized individual may work to supersede the stigma through excelling at something else; he may seek to capitalize on the stigma for some sense of gain (although this does not seem probable for registered sex offenders). On the other hand, an offender may feel that his case is helpless and he will always be seen in a negative light, and thus reoffending would make little difference… In this last case, the chances for recidivism would be greatest."[57]

88.  Empirical research on labeling theory has documented the so-called self-fulfilling prophecy that can lead to future offending and harm public safety. Research involving 95,919 men and women found that those people who were formally,

---

[54] Facebook Terms of Service, Accessed 10 October 2021, https://www.facebook.com/terms.php.

[55] Instagram Terms of Use, Accessed 10 October 2021, https://help.instagram.com/581066165581870.

[56] Facebook Help Center, "How can I report a convicted sex offender on Facebook?" Accessed 7 October 2021, https://www.facebook.com/help/210081519032737.

[57] Tewksbury, Richard. "Collateral consequences of sex offender registration." *Journal of Contemporary Criminal Justice* 21, no. 1 (2005): 67-81 at 69.

publicly labeled as a criminal were significantly more likely to recidivate within two years than those who were not.[58]

89. Researchers have identified several mechanisms to explain why labeling leads to disengagement with society and a higher potential for reoffending. "Desistance" theories argue that public labels undercut an individual's ability to overcome stigmatization. In his study of British ex-convicts, Shadd Maruna argues that to maintain "abstinence from crime, ex-offenders need to *make sense* of their lives"[59] by developing a coherent identity for themselves. He terms this "willful, cognitive distortion" as "making good."[60] The highly-influential Maruna studies[61] thus demonstrated that personal agency—though difficult to measure or operation-alize—was key in successful desistance.

90. I collaborated with Dr. Maruna to examine his theory in light of the digital transformation and online disclosures of criminal records. Our study found that internet-based stigma, in particular, limits the personal agency inherent in desistance, hindering the necessary cognitive and personal transformations for desistance from crime.[62]

### Vigilantism & Digilantism

91. Researchers have documented vigilantism against registrants, including stalking, threats, harassment, and violence.[63]

---

[58] Chiricos, Ted, Kelle Barrick, William Bales, and Stephanie Bontrager, "The Labeling of Convicted Felons and its Consequences of Recidivism," *Criminology* 45, no. 3 (August 2007): 547.

[59] Maruna, Shadd. *Making Good* (Washington, DC: American Psychological Association, 2001), 7.

[60] Maruna, *Making Good,* 9.

[61] The researcher's entire body work on this topic has been cited 20,019 times as of October 7, 2021:
https://scholar.google.com/citations?user=e0qdrFUAAAAJ&hl=en&oi=sra

[62] Lageson, Sarah Esther, and Shadd Maruna. "Digital degradation: Stigma management in the internet age." *Punishment & Society* 20, no. 1 (2018): 113-133.

[63] Tewksbury, Richard. "Collateral consequences of sex offender registration." *Journal of Contemporary Criminal Justice* 21, no. 1 (2005): 67-81 at 76; Williams, Monica. *The Sex Offender Housing Dilemma*. New York University Press, 2018 at 1.

92. In my research, I use the term "digilantism" to describe how vigilante activities targeted toward people with criminal records increasingly occur online as information becomes more easily accessible or inadvertently discovered by internet users.[64]

93. In the case of the Michigan registry, the risk of vigilantism may be increased by the interface of the registry website, which allows for browsing and address searching, including for places of employment. This may also lead to other consequences, such as when landlords and human resources officials are tipped off by neighbors or fellow employees about the registration and internet publication of a rental property or workplace address.

94. People who appear in registries are also vulnerable to "pedophile hunting" groups, which are often organized on social media platforms.[65] For instance, the hashtag #shootyourlocalpedophile on Twitter and TikTok reveal substantial social media activity around using public registry information to identify, shame, and threaten real life harm to registrants.[66]

95. Digilantism concerns have caused some criminal justice agencies to change policies regarding the availability of personally identifying information in online records. For example, the Arizona Department of Corrections has removed dates of birth from inmate rosters after noting that "some ADC inmates have recently been victims of identity theft and fraud."[67] Several police departments have ended the practice of posting pre-arraignment information to social media and websites.[68]

---

[64] Lageson, *Digital Punishment* at 91.

[65] Purshouse, Joe. "'Paedophile Hunters', Criminal Procedure, and Fundamental Human Rights." *Journal of Law and Society* 47, no. 3 (2020): 384-411; Kozlowska, Hannah. "There's a global movement of Facebook vigilantes who hunt pedophiles." *Quartz* July 24, 2019. https://qz.com/1671916/the-global-movement-of-facebook-vigilantes-who-hunt-pedophiles/

[66] See, for instance, on Twitter https://twitter.com/hashtag/shootyourlocalpedophile

[67] Arizona Department of Corrections. "Using Inmate Search." https://corrections.az.gov/public-resources/inmate-datasearch/using-inmate-datasearch.

[68] Bidgood, Jess. "After Arrests, Quandary for Police on Posting Booking Photos." *New York Times* June 26, 2015. https://www.nytimes.com/2015/06/27/us/after-arrests-quandary-for-police-on-posting-booking-photos.html.

The San Francisco Police Department recently banned the release of mugshots to prevent a "potentially negative outcome for justice-involved persons" before their conviction, even though California law deems arrestee information as public record.[69] Criminal courts have installed software to block search engine indexing and have extensive strategies for redaction and privacy policies.[70]

## The Sixth Circuit Has Noted the Vastly Increased Harms of State-Sponsored Internet Disclosures.

96.  Federal courts are beginning to recognize the harms of internet-based disclosures of state records of many types. The case of mugshots is illustrative. Although Courts have long recognized the stigmatization of mugshots, they have recently begun to address their significance in a digital media context. Most notable was the Sixth Circuit's decision in *Detroit Free Press, Inc. v. Department of Justice* (*Free Press II*), 829 F.3d 478 (6th Cir. 2016) (en banc), to reverse its earlier decision in *Detroit Free Press, Inc. v. Department of Justice* (*Free Press I*), 73 F.3d 93 (6th Cir. 1996).

97.  In 1996, the *Free Press I* court ruled that the Freedom of Information Act (FOIA) requires the release of booking photos because defendants lack any privacy interest in their photos.

98.  Twenty years later, the en banc court overruled this decision, finding instead that individuals do enjoy a non-trivial privacy interest. Technology played a key role in the majority's argument, with the judges explaining that potential employers and other acquaintances may easily access booking photos on these websites, "hampering the depicted individual's professional and personal prospects."[71]

---

[69] San Francisco Police Department. Department Notice 20-112. 07/01/20. https://www.sanfranciscopolice.org/sites/default/files/2020-07/SFPDDN20.112.20200701.pdf.

[70] Robertson, Jordan. "AP Impact: When Your Criminal Record Isn't Yours," *Associated Press*, December 16, 2011; Clarke, Thomas M. "Privacy and Public Access Policies: Slides to accompany 2017 NACM Annual Conference presentation 'New Guidelines for Public Access to Court Records: What has Changed?'" *National Center for State Courts* (2017). https://ncsc.contentdm.oclc.org/digital/collection/tech/id/879.

[71] *Free Press II*, 829 F.3d at 482.

99.  In a concurring opinion, Chief Judge Cole observed that: "Twenty years ago, we thought that the disclosure of booking photographs, in ongoing criminal proceedings, would do no harm. But time has taught us otherwise. The internet and social media have worked unpredictable changes in the way photographs are stored and shared. Photographs no longer have a shelf life, and they can be instantaneously disseminated for malevolent purposes. Mugshots now present an acute problem in the digital age: these images preserve the indignity of a deprivation of liberty, often at the (literal) expense of the most vulnerable among us. Look no further than the online mugshot-extortion business."[72]

**Conclusion: Given the realities of our modern digital age and how the Michigan registry is configured, the registry promotes extreme public shaming, severely impacts registrants' ability to participate in on-line economic, social, and political life, and damages registrants' ability to obtain housing, employment and social supports.**

100.  In sum, the internet as it exists today has dramatically changed the form, function, and reach of registries. The manner in which registry information is posted and re-posted through the Michigan portal creates a disproportionate level of public shaming, particularly when imposed on people who present no public safety risk.

101.  Because inclusion on a registry lacks individualized review, registries present all registrants as equally risky and in need of continued monitoring and public oversight.

102.  From a public safety standpoint, digitally accessible records also paint an inaccurate picture of an individual by inferring a likelihood to recidivate, regardless of individual risk factors or the amount of time that has passed since the registrable offense.

103.  Because of how the internet and data-sharing capabilities have evolved, as well as the manner in which registries present registrants as posing significant public safety risk, the harms of being branded a sex offender in the digital age are extreme.

---

[72] Ibid.

**<u>Compensation</u>**

I have provided this expert declaration pro bono.

Dated: December 5, 2021

_____

Dr. Sarah Lageson, PhD
Associate Professor
School of Criminal Justice
Rutgers University-Newark
Center for Law & Justice #556
123 Washington Street
Newark, NJ 07102

# Attachment 1:

## C.V. of Dr. Sarah Esther Lageson

**Sarah Esther Lageson**
sarah.lageson@rutgers.edu
sarahlageson.com

## Academic Positions

**Rutgers University-Newark, School of Criminal Justice**
Associate Professor                                                      2021-
Assistant Professor                                                      2015-2021

**American Bar Foundation**
Affiliated Scholar                                                       2021-
JPB Foundation Access to Justice Faculty Scholar                         2020-2021

**Universitat Pompeu Fabra School of Law, Barcelona, Spain**
 Visiting Researcher                                                     2019

## Education

Rutgers Law School                                                       2022 (expected)
JD; Certificate in Criminal Law & Criminal Procedure

University of Minnesota, Twin Cities, Department of Sociology            2015
PhD in Sociology

University of Minnesota, Twin Cities, Department of Sociology            2012
MA in Sociology

Washington University in St. Louis, School of Arts & Sciences           2007
BA in Anthropology, BA in History

## Books

2020          Sarah Lageson. 2020. **Digital Punishment: Privacy, Stigma, and the Harms of Data-Driven Criminal Justice.** Oxford University Press.
              **Media**: Slate, The Markup, The Crime Report, Team Human, Digital Privacy News, Collateral Consequences Resource Center, ApexArt
              **Reviews**: Punishment & Society, Criminal Justice Review, Journal of Constitutional History, Security Dialogue, Drexel Magazine, Journal of Sociology & Social Welfare, Surveillance & Society, Law Library Journal
              **Awards**: 2021 Michael J. Hindelang Outstanding Book Award for most outstanding contribution to criminology; 2021 Law and Society Association Jacob Prize Honorable Mention; Privacy Law Scholars Conference Junior Scholar Award (for Chapter 5)

2018          Kyle Green and Sarah Lageson. 2018. **Give Methods a Chance**. New York: W.W. Norton.
              **Reviews**: Teaching Sociology. 2019. 47(2): 161–163.

## Peer Reviewed Publications

Forthcoming   Sarah Lageson. "Digital Criminal Record Surveillance and Stigma." *Annual Review of Criminology* Vol 5.

Forthcoming   Leslie Schneider, Mike Vuolo, Sarah Lageson, and Chris Uggen. "Before and After Ban the Box: Who Complies with Anti-Discrimination Law?" *Law & Social Inquiry*.

2021          Sarah Lageson, Elizabeth Webster and Juan Sandoval. "Digitizing and Disclosing Personal Data: The Proliferation of State Criminal Records on the Internet." *Law & Social Inquiry* 46(3): 635-665.
              **Media:** *Vice, The Crime Report, Digital Privacy News, This Week in Sociological Perspectives Podcast, Criminal Legal News*

2020        Alessandro Corda and Sarah Lageson. "Disordered Punishment: Workaround Technologies of Criminal Records Disclosure and the Rise of a New Penal Entrepreneurialism." *British Journal of Criminology* 60(2):245-264.
            Featured in the *Collateral Consequences Resource Center* blog

2020        Valerio Baćak, Sarah Lageson, and Kathleen Powell. "Fighting the Good Fight: Why Do Public Defenders Remain on the Job?" *Criminal Justice Policy Review* 31:939–961.

2020        Sarah Lageson. "Privacy Loss as Collateral Consequence." *The Annual Review of Interdisciplinary Justice Research* 9:16-31.

2019        Sarah Lageson, Megan Denver, and Justin Pickett. "Privatizing Criminal Stigma: Experience, Intergroup Contact, and Public Views about Publicizing Arrest Records." *Punishment & Society* 21(3): 315–341.

2019        Sarah Lageson, Suzy Maves McElrath, and Krissinda Palmer. "Gendered Public Support for Criminalizing 'Revenge Porn.'" *Feminist Criminology* 14(5):560-583.

2019        Sarah Lageson. "Digital Legal Subjects and the Use of Online Criminal Court Records for Research." *The Elgar Research Handbook on Law and Courts*.

2018        Sarah Lageson and Shadd Maruna. "Digital Degradation: Stigma Management in the Internet Age." *Punishment & Society* 20(1):113-133.

2018        Mike Vuolo, Chris Uggen, and Sarah Lageson. "To Match or Not to Match? Statistical and Substantive Considerations in Audit Design and Analysis." in S. Michael Gaddis, editor, *Audit Studies: Behind the Scenes with Theory, Method & Nuance.* New York: Springer.

2017        Sarah Lageson. "Crime Data, the Internet, and Free Speech: An Evolving Legal Consciousness." *Law & Society Review* 51(1):8-41.

2017        Mike Vuolo, Sarah Lageson, and Chris Uggen. "Criminal Record Questions in the Era of 'Ban the Box.'" *Criminology & Public Policy* 16(1):139-165.

2017        Mike Vuolo, Chris Uggen, and Sarah Lageson. "Race, Recession, and Social Closure in the Low Wage Labor Market: Experimental and Observational Evidence." *Research in the Sociology of Work* 30:141-183.

2016        Sarah Lageson. "Found Out and Opting Out: The Consequences of Online Criminal Records for Families." *The ANNALS of the American Academy of Political and Social Science* 665(1):127-141.

2016        Sarah Lageson. "Digital Punishment's Tangled Web." *Contexts* 15(1):22-27. Available online. Reprinted in *Contexts Reader* 3rd Edition, 2018. Syed Ali & Philip N. Cohen, eds. New York: W.W. Norton.

2016        Mike Vuolo, Chris Uggen, and Sarah Lageson. "Statistical Power in Experimental Audit Studies: Cautions and Calculations for Paired Tests with Dichotomous Outcomes." *Sociological Methods & Research* 45(2):260-303.

2015        Sarah Lageson, Mike Vuolo, and Chris Uggen. "Legal Ambiguity in Managerial Assessments of Criminal Records." *Law and Social Inquiry* 40(1):175-204.

2014        Chris Uggen, Mike Vuolo, Sarah Lageson, Ebony Ruhland, Hilary Whitham. "The Edge of Stigma:
            An Experimental Audit of the Effects of Low-level Criminal Records on Employment." *Criminology*
            52(4):627-654.

2014        Mike Vuolo, Chris Uggen, and Sarah Lageson. "Taste Clusters of Music and Drugs: Evidence from
            Three Analytical Levels." *British Journal of Sociology* 65(3):520-54.


**Grants**_____

2021-2023   Clean Slate Initiative & New Venture Fund, $441,093
            The Impact of Automated Record Clearance on Individuals, Families, and Communities
            Co-Principal Investigator with Elsa Chen and Ericka Adams

2020-2021   American Bar Foundation/JPB Foundation Access to Justice Scholar Award, $74,000
            Realizing a Clean Slate: Expanding Access and Improving Outcomes for Automated Criminal Record
            Expungement
            Principal Investigator

2018-2020   National Institute of Justice, New Investigator/Early Career Award, $190,909
            Multi-level Analyses of Accuracy and Error in Digital Criminal Record Data
            Principal Investigator

2017-2019   Chancellor's Office Award, Rutgers University, $94,500
            The Nebulous Nature of Criminal Records
            Co-PI with Rob Stewart

2017        Big Data Analytics Grant Program, Rutgers University, $40,000
            Understanding Systems and Outcomes of Indigent Defense using Big Data
            Co-PI with Valerio Bacak and Lee Dicker

2017        Chancellor's Seed Grant, Rutgers University, $31,500
            Social and Administrative Networks in Prison-Based Higher Education
            Co-PI with Sara Wakefield

2016        Chancellor's Seed Grant, Rutgers University, $75,000.
            Community Court Mental Health Initiative
            Co-PI with Andres Rengifo

2016        Chancellor's Seed Grant, Rutgers University, $25,000
            Criminal Justice Data Practices in Newark
            Principal Investigator

2015        Social Cohesion and Technology Grant, Univ. of MN, $2,500
            'Give Methods a Chance' Podcast Development
            Co-PI with Kyle Green

2014-2015   Doctoral Dissertation Fellowship, University of Minnesota, $22,500

2013-2014   Bilinski Educational Foundation Dissertation Fellowship, $25,500

2011-2013   Graduate Digital Media Fellowship, University of Minnesota, $45,000

**Journal Editing**

2022      *Journal of Contemporary Criminal Justice, Special Issue: Violence, Voice, and Incarceration* (special issue of submissions written by people who are incarcerated).
Co-editor with Todd R. Clear and Jennifer Yang.

**Manuscripts Under Review and In Preparation**

"Satan's Minions" and "True Believers": How Criminal Defense Attorneys' Employ Quasi-Religious Rhetoric," with Elizabeth Webster, Kathleen Powell, and Valerio Baćak. Conditionally accepted at *Justice System Journal*

"Criminal Records, Clean Slates, and the Role of Data Privacy," with Alessandro Corda. Under review at *Law and Society Review*

"Patchwork Disclosure: Divergent Public Access and Personal Privacy Across Criminal Record Disclosure policy in the United States," with Juan Sandoval. Under review at *Law & Policy*

"The Stress of Injustice: Public Defenders and the Frontline of American Inequality," with Kathleen Powell and Valerio Baćak. Under review at *American Sociological Review*

"Digital Accusation, Virtual Punishment, and Due Process." Invited submission to *Illinois Law Review*

"Accusation, Supervision, and Surveillance Before a Conviction," with Lorena Avila Jaimes. Invited book chapter in *Punishment, Probation, and Parole: Mapping Out Mass Supervision*

"Criminal Record Data Commodities, Self-Discipline, and Techno-Administrative Injustice in Criminal Record Expungement." In preparation for submission.

"The Problem with Criminal Records," with Robert Stewart. In preparation for submission.

"Surveillance Deputies," with Sarah Brayne, Karen Levy, and Lauren Kilgour. In preparation for submission.

**Public Writing & Reports**

2021      How the Criminal Justice System Deploys Mass Surveillance on Innocent People. *Vice.*

2020      Companies accused of crimes get more digital privacy rights than people under new Trump policy (with Liz Chiarello). *The Conversation.*

2020      The Perils of Zoom Justice. *The Crime Report.*

2020      How criminal background checks lead to discrimination against millions of Americans. *Washington Post.*

2020      Mugshots don't belong on search engines. *San Francisco Chronicle.*

2020      The Purgatory of Digital Punishment. *Slate.*

2020      The Chan-Zuckerberg Initiative funds Clean Slate policy. So why won't Facebook take down mugshots? *The Appeal.*

2020      Small businesses just got a $300B bailout but many who need a second chance won't get a dime (with Colleen Chien). *New Jersey Star Ledger.*

2020      The Problem with 'Clean Slate' policies: Could broader sealing of criminal records hurt more people than it helps (with Jen Doleac). *Niskanen Center.*

| | |
|---|---|
| 2020 | The Criminal Justice System's Big Data Problem. *Oxford University Press Blog.* |
| 2019 | Model Law on Non-Conviction Records (advisor). *Collateral Consequences Resource Center.* |
| 2019 | It's Time for the Digital Mug Shot Industry to Die. *Slate.* |
| 2019 | Privacy Concerns Don't Stop People from Putting Their DNA on the Internet to Help Solve Crimes. *The Conversation.* |
| 2019 | There's No Such Thing as Expunging a Criminal Record Anymore. *Slate.* |
| 2019 | It's Time to Address the Damage of a 'Criminal' Digital Reputation (with Jordan Hyatt). *Collateral Consequences Resource Center.* |
| 2019 | Can a Criminal Record Ever Be Fully Expunged? *Pacific Standard.* |
| 2019 | Policy Proposals for the 2019 Legislative Session. *Scholars Strategy Network.* <br> • Provide Individual Access to Personal Criminal Records <br> • Enforce Private Sector Compliance with Criminal Record Expungement Orders" <br> • Reclassify Mugshots as Closed, Private Records |
| 2019 | Criminal Background Checks for Employment Screening. *New Jersey State Office of Innovation, Future of Work Task Force.* |
| 2017 | Online Criminal Records & Legal Consciousness Theory. *Law & Society Review Blog.* |
| 2016 | Op-Ed: The Downside of Highlighting Crime on Social Media. *Minneapolis Star-Tribune.* |
| 2016 | Briefing: The Harmful Effects of Online Criminal Records. *Scholars Strategy Network.* |
| 2014 | The Enduring Effects of Online Mug Shots. *The Society Pages.* |
| 2014 | Health, Science, and Shared Disparities. *The Society Pages* |
| 2012 | Correcting American Corrections. *The Society Pages.* |
| 2012 | Love, Family and Incarceration: A Conversation with Megan Comfort. *The Society Pages.* |
| 2012 | Social Scientists Studying Social Movements. With Kyle Green and Sinan Erensu. *The Society Pages.* |

## Book Chapters & Reviews

| | |
|---|---|
| 2021 | "Digital Punishment." In *Fundamental Rights and Criminal Procedure in the Digital Age.* Sao Paolo, Brazil: InternetLab. |
| 2021 | "Public Accusation on the Internet." With Kateryna Kaplun. In *Media and Law: Between Free Speech and Censorship, Sociology of Crime, Law, and Deviance, Volume 26.* Deflem, Mathieu and Derek M.D. Silva, eds. Bingley, UK: Emerald Publishing. |
| 2021 | "Book Review: Captivating Technology: Race, Carceral Technoscience, and Liberatory Imagination in Everyday Life edited by Ruha Benjamin." *Contemporary Sociology* 50(1): 28-29. |
| 2021 | "Studying Surveillance and Tech Through 'Digital Punishment'" in *Society, Ethics & The Law: A Reader,* David A. Mackey and Kathryn M. Elvey, eds. Burlington, MA: Jones & Bartlett. |

| 2020 | "Book Review: *The Digital Street* by Jeff Lane." *American Journal of Sociology* 125(4):1156-1158. |
| 2018 | "The Politics of Public Punishment." *Criminology & Public Policy* 17(3): 635-642. |
| 2018 | "Book Review: Policing and Social Media: Social Control in an Era of New Media by Christopher J. Schneider." *Contemporary Sociology* 47(2):217-219. |
| 2017 | "Criminal Records," with Christiane Schwarz. *Oxford Bibliographies in Criminology*. Ed. Beth M. Huebner. New York: Oxford University Press. |
| 2015 | "Book Review: The Eternal Criminal Record by James B. Jacobs." *The Canadian Journal of Crime and Criminal Justice.* Available online. |
| 2015 | "Music and the Quest for a Tribe." *Getting Culture.* New York: W.W. Norton |
| 2014 | "Correcting American Corrections, with Francis Cullen, David Garland, David Jacobs, and Jeremy Travis." *Crime and the Punished.* New York: W.W. Norton. |
| 2014 | "Discovering Desistance," with Sarah Shannon. *Crime and the Punished.* New York: W.W. Norton. |
| 2013 | "How Work Affects Crime – and Crime Affects Work – Over the Life Course," with Chris Uggen. *Handbook of Life Course Criminology*, edited by Marvin Krohn and Chris Gibson. New York: Springer. |
| 2013 | "Laughter and the Political Landscape," with Sinan Erensu and Kyle Green. *The Social Side of Politics.* New York: W.W. Norton. |
| 2011 | "The Wire Goes to College," with Kyle Green and Sinan Erensu. *Contexts* (10)3:12-15. |

## Awards

| 2021 | Michael J. Hindelang Outstanding Book Award, American Society of Criminology |
| 2021 | Herbert Jacob Book Prize, Honorable Mention, Law & Society Association |
| 2019 | New Jersey State Office of Innovation Research Award, $2,500 |
| 2018 | Privacy Law Scholars Conference Junior Scholar Paper Award, $2,500 |
| 2017 | University of Minnesota Best Dissertation Award, $1,000 |
| 2012 | Ron Anderson Technology and Social Cohesion Award, $2,500 |
| 2011-2013 | Professional Development Award, University of Minnesota, $3,000 |
| 2010 | Public Sociology Award, University of Minnesota |
| 2010 | Graduate Research Partnership Program Award, University of Minnesota, $4,000 |
| 2010 | Academic Technology Award, Univ. of Minn., Office of Information Technology, $3,000 |
| 2008 | Segal Americorps Education Award, $5,000 |
| 2007 | Helen & Isaac Izenberg History Writing Award, Washington University in St. Louis |

**Expert Testimony** _____

| | |
|---|---|
| 2021 | ACLU Michigan and United States District Court, Eastern District of Michigan |
| 2021 | California State Assembly Committee on Privacy and Consumer Protection, AB-1475 Law Enforcement-Social Media Assembly Bill |
| 2020 | United States District Court, Central District of California, _Doe v. Barr et al._ |
| 2020 | United States District Court, District of New Mexico, _N. et al v. Alamogordo Police Department et al_ |
| 2019 | United States District Court, Eastern District of Pennsylvania, _Taha v. Bucks County Correctional Facility_ |
| 2018 | New Jersey State Assembly Judiciary Committee, A-3620 Expedited Expungement Assembly Bill |

**Invited Presentations** _____

| | |
|---|---|
| 2022 | UC-Berkeley Law, Center for the Study of Law and Society |
| 2022 | Columbia University Sociology |
| 2021 | Detroit Science Gallery |
| 2021 | County of Santa Barbara Public Defender |
| 2021 | Poynter Institute |
| 2021 | SEARCH: National Consortium for Justice Information and Statistics |
| 2021 | Massachusetts Committee for Public Counsel Services |
| 2021 | Society for the Study of Social Problems Book Panel |
| 2021 | RAND Corporation and the Arnold Foundation |
| 2021 | Privacy Law Scholars Conference |
| 2021 | Texas A&M Law School |
| 2021 | Department of Criminal Justice, Temple University |
| 2021 | The Young Women's Leadership School of Astoria, NYC |
| 2021 | Department of Sociology, University of Hong Kong |
| 2021 | New York State Youth Justice Institute |
| 2021 | Zicklin Center for Corporate Responsibility at Baruch College, CUNY |
| 2020 | Philadelphia District Attorney's Office |
| 2020 | Department of Criminology and Criminal Justice, University of Maryland |
| 2020 | Baruch College, the City University of New York |
| 2020 | InternetLab perquisa em direito e tecnologia Internation (Brazil) Conference on Fundamental Rights and Criminal Procedure in the Digital Age (Keynote) |
| 2020 | McCourt School of Public Policy, Georgetown University |
| 2020 | Cleveland Legal Aid Society |
| 2020 | Data Science for Public Service Meetup, Atlanta Regional Commission |
| 2020 | Department of Criminology, Georgia State University |
| 2020 | Crime, Law & Deviance Working Group, Dept of Sociology, UT-Austin |
| 2020 | American Bar Foundation Seminar Series |
| 2020 | School of Criminal Justice, University of Cincinnati (postponed) |
| 2019 | Student-Invited Speaker, University of California-Irvine |
| 2019 | Sociology Workshop, University of Minnesota |
| 2019 | International Seminar, Universitat Pompeo Fabra, Barcelona, Spain |
| 2019 | Digitizing Justice Conference (Keynote), University of Winnipeg |
| 2019 | Drug Policy Alliance, New York City |
| 2018 | Tech/Law Colloquium, Cornell University |
| 2018 | Amsterdam Privacy Conference |
| 2018 | Department of Public Policy, Rochester Institute of Technology |

| | |
|---|---|
| 2018 | Department of Sociology, SUNY-Brockport |
| 2018 | Measures for Justice, Rochester NY |
| 2018 | Sociology Colloquium, Washington University in Saint Louis |
| 2018 | Media Studies Colloquium, Queens College New York |
| 2018 | Technology, Law and Society Institute, University of California-Irvine |
| 2018 | Privacy Law Scholars Conference, Washington DC |
| 2018 | Automated Justice Workshop, Collegium Helveticum, Zurich |
| 2018 | LSA Punishment & Society Digital Speaker Series |
| 2018 | The University of Manchester Centre for Criminology and Criminal Justice |
| 2018 | Queens University Belfast School of Law |
| 2017 | Law, Crime & Deviance Workshop, New York University Sociology |
| 2015 | Robina Institute, University of Minnesota Law School, Minneapolis, MN. |

**Courses Designed & Taught**

Rutgers University
CJ 653 Criminal Justice Policy PhD Program Seminar
CJ 652 Law & Society PhD Program Seminar
CJ 653 Mixed Methods PhD Seminar (co-i with Sara Wakefield)
CJ 529 Research & Evaluation MA Program Seminar
CJ 202 Constitutional Issues in Criminal Justice
CJ 102 Introduction to Criminal Justice

University of Minnesota
SOC 4108 Current Issues in Crime Control
SOC 4161 Criminal Law in American Society
SOC 3101 Introduction to American Criminal Justice

**Student Advising**

Dissertation Advising
  Lorena Ávila Jaimes
  Kateryna Kaplun
  Katherine Bright

Dissertation Committees
  Brandan Turchan
  Chris Chukwedo
  Christiane Schwarz
  Vijay Chillar
  Amanda D'Souza
  Lauren Kilgour *(Cornell PhD 2021, current Postdoctoral Research Associate at Princeton)*
  Elizabeth Webster *(Rutgers PhD 2018, current Assistant Professor at Loyola University Chicago)*

Empirical Paper Committees
  Christiane Schwarz (chair)
  Kateryna Kaplun (chair)
  Katherine Bright
  Brandan Turchan
  Sofia Flores

Undergraduate Honors Theses
  Maram Tai-Elkarim

**Service**

*University and Academic Service*

| | |
|---|---|
| 2021- | Rutgers University Research & Professional Development Committee Chair |
| 2021- | Rutgers University Undergraduate Bridge Program Committee Chair |
| 2020- | Rutgers Law School Criminal Law Society, Evening Student Representative |
| 2019-2021 | Rutgers Program on Learning & Teaching Faculty Governance Committee |
| 2018-2021 | Rutgers University Research & Professional Development Committee |
| 2018- | Law & Society Association, CRN #37 Tech/Law/Society Research Network Chair |
| 2015-2020 | Rutgers University M.A. Program Committee |
| 2017-2018 | American Society of Criminology (ASC) Program Committee |
| 2017-2018 | Rutgers University Faculty Hiring Committee |
| 2016-2018 | National Science Foundation Research Experience for Undergraduates Mentor |
| 2016-2017 | New Jersey Scholarship and Transformative Education in Prisons Committee |
| 2015-2016 | Rutgers Engaged Scholarship & New Professoriate Committee (chair) |
| 2013-2014 | University of Minnesota Promotion, Tenure & Salary Committee |
| 2010-2011 | University of Minnesota Sociology Research Institute Committee |

*Legal & Non-Profit Service*

| | |
|---|---|
| 2021 | New York Legal Assistance Group SDNY Federal Pro Se Clinic, Legal Intern |
| 2021 | New Jersey Conviction Review Unit, Actual Innocence Project, Legal Volunteer |
| 2021 | New York Office of the Appellate Defender, Legal Intern |
| 2021- | Justice Catalyst, Consultant |
| 2020- | Good Call NYC Emergency Arrest Hotline, Consultant |
| 2018- | Center for Advancing Correctional Excellence Board Member, George Mason Univ. |
| 2018- | Crime & Justice Research Alliance (CJRA) Expert |
| 2018- | National Incarceration Association (NIA) Expert Advisor |
| 2015 | Minneapolis Police Officer Interview Project |
| 2014 | Crime Victim Service Access Project |
| 2012 | "Mind the Gap" Prisoner Reentry Project |
| 2012 | Seward Towers Housing Complex Community Survey |
| 2010-2012 | 'Families in Focus' Prison Program, Minnesota Department of Corrections |
| 2010 | Domestic Violence Research Initiative Report for United Way |
| 2007-2011 | Prisoner Re-Entry Family Strengthening Project, Council on Crime and Justice |
| 2008-2010 | Healthy Educational Lifestyles Project, Minnesota Department of Corrections |
| 2009 | Minnesota FATHER Project Program Analysis |
| 2008 | The State of Fatherhood Programming, Minnesota Fathers & Families Network |

*Review*

American Journal of Sociology, American Sociological Review, Criminology, Criminal Justice Policy Review, European Journal of Criminology, Feminist Criminology, Humanities and Social Sciences, The Information Society, Journal of Black Studies, Journal of Computer Mediated Communication, Journal of Research in Crime and Delinquency, Justice Quarterly, Law & Policy, Law & Social Inquiry, Law & Society Review, Punishment & Society, RAND, SAGE Open, Springer, Qualitative Sociology, Social Forces, Social Problems, Sociological Theory

National Science Foundation, Dutch Research Council (NWO), Independent Social Research Foundation

*Editorial*

| | |
|---|---|
| 2016-2019 | Editorial Board, Contexts Magazine |
| 2014-2015 | Graduate Editorial Board, Law & Society Review |
| 2010-2015 | Graduate Editorial Board, The Society Pages |
| 2009-2011 | Graduate Editorial Board, Contexts Magazine |

*Media/Production*

| | |
|---|---|
| 2015-2018 | Creator, Producer and Host, Give Methods a Chance Social Science Podcast |
| 2014-2015 | Creator, Producer and Host, Office Hours Social Science Podcast |
| 2007-2015 | Documentary Producer, On Air Host. KFAI Community Radio, Minneapolis MN |

*Community*

| | |
|---|---|
| 2017-2018 | Prison-based Tutor, Petey Greene Foundation Prison Education Program |
| 2008-2009 | McNair Scholars Program Research Mentor, University of Minnesota |
| 2008 | Instructor, C-Dreams Photography Class for Children of Incarcerated Parents |
| 2007 | Mentor, Youth News Initiative. Minneapolis, MN |
| 2007 | Mentor, International Women's Day Radio Programming. Minneapolis, MN |


**Conference Presentations**

| | |
|---|---|
| 2021 | Administrative and Technological Injustice in the Expungement Process. American Sociological Association Annual Meeting, Chicago |
| 2021 | Criminal History Information, Automated Clean Slates and the American Way of Data Privacy. With Alessandro Corda. Privacy Law Scholars Conference (virtual) |
| 2021 | Author Meets Reviewer: *Predict & Surveil* and *Digital Punishment*. With Sarah Brayne, Mona Lynch, Matthew Clair, and Keith Guzik. Law and Society Association Annual Meeting (virtual) |
| 2019 | Technology, Privacy, and Criminal Records: Innovations and Challenges in Clean Slate and Expungement Policy, American Society of Criminology Annual Meeting, San Francisco |
| 2019 | Tools for Communicating Sociology Outside the Discipline: What Works, What Doesn't Work, and What's Promising, American Sociological Association Annual Meeting, New York City |
| 2018 | Criminal Records as Big Data Commodity. American Society of Criminology Annual Meeting, Atlanta |
| 2018 | Error in Criminal Justice Data Across Public & Private Platforms. American Society of Criminology Annual Meeting, Atlanta |
| 2018 | The Weight of Public Service: Occupational Stress and Wellbeing Among Public Defenders. American Society of Criminology Annual Meeting, Atlanta. With Valerio Bacak and Kathleen Powell |
| 2018 | Surveillance and Social Control Through the Collection and Distribution of Mug Shots in the U.S. American Society of Criminology Annual Meeting, Atlanta. With Sarah Muskovitz |
| 2018 | Mugshot Distribution in the U.S.: A Sociolegal Approach. Law & Society Association Annual Meeting, Toronto. With Anna Banchik and Sarah Muskovitz |
| 2018 | Satan's Minions & True Believers. Law & Society Association Annual Meeting, Toronto. With Liz Webster and Kathleen Powell |
| 2017 | Intersecting Roles of Gender, Race and Skin Tone in Sentencing: Findings from Two Million Records. American Society of Criminology Annual Meeting, Philadelphia. With Valerio Bacak |
| 2017 | Assessments of Public Defender Attrition." American Society of Criminology Annual Meeting, Philadelphia. With Valerio Bacak and Kathleen Powell |
| 2017 | Digital Cultures of Control & The Field of Online Crime Reporting. American Sociological Association Annual Meeting, Montreal |
| 2017 | Banning the Box, Keeping the Stigma? Sustaining Attitudes Post Ban-the-Box. American Sociological Association Annual Meeting, Montreal. With Lesley Schneider, Mike Vuolo, and Chris Uggen. |
| 2017 | From Handshakes to Mouse Clicks: The Technological Transformation of Commercial Bail. Law and Society Association Annual Meeting, Mexico City. With Josh Page |
| 2017 | Attrition in Public Defenders Offices. Law and Society Association Annual Meeting, Mexico City. With Valerio Bacak |
| 2016 | Uses, Abuses, and Error in Criminal History Data Across Platforms. American Society of Criminology Annual Meeting, New Orleans |
| 2016 | Before and After Ban the Box: Employer Responses in Minnesota. American Society of Criminology Annual Meeting, New Orleans. With Lesley Schneider, Mike Vuolo, and Chris Uggen |

| | |
|---|---|
| 2016 | Digital Punishment in Online American Media. International Sociology Association Conference, Vienna, Austria |
| 2016 | Criminalizing Revenge Porn. Internet Law Works in Progress Conference, New York Law School. |
| 2015 | Tough on Crime, Tough on Families? Criminal Justice and Family Life in America. American Society of Criminology Annual Meeting, Washington, DC |
| 2015 | Legislating Revenge Porn: Protecting Victims and Preserving Civil Liberties. American Society of Criminology Annual Meeting, Washington, DC |
| 2015 | The Consequences of Online Criminal Records for Children and Families. Tough on Crime, Tough on Families? Criminal Justice & Family Life Conference, Ithaca, NY |
| 2014 | Digital Punishment: The Production and Consequences of Online Crime Reporting. Sociology Workshop Talk, University of Minnesota, Minneapolis, MN |
| 2014 | The Effects of Online Reader Comments on Crime News. American Society of Criminology Annual Meeting, San Francisco, CA |
| 2014 | How Do Employers Ask about Criminal Records on Entry-Level Job Applications? American Society of Criminology Annual Meeting, San Francisco, CA. with Mike Vuolo and Chris Uggen |
| 2014 | Mass Media and the Public Sphere, Invited Discussant. Midwest Sociological Society Annual Meeting, Omaha, NE |
| 2014 | Conceptions of the First Amendment and Online Crime Reporting. Law and Society Association Annual Meeting, Minneapolis, MN |
| 2013 | The Construction of Crime through News and Blogging. American Society of Criminology Annual Meeting, Atlanta, GA |
| 2013 | Statistical Power in Experimental Audit Studies: Cautions and Calculations for Paired Tests with Dichotomous Outcomes. American Society of Criminology Annual Meeting, Atlanta, GA |
| 2013 | Punishment, Society and Journalism: Interviews with Bloggers and Journalists. Law and Society Association Annual Meeting, Boston, MA |
| 2013 | Critical Dialogue: New Media and Sociology. Society for the Study of Social Problems Annual Meeting, New York, NY |
| 2013 | Public Sociology Online. Media Sociology Pre-Conference to ASA Annual Meeting, New York, NY |
| 2013 | The Construction of Crime through News and Blogging. American Society of Criminology Annual Meeting, Atlanta, GA |
| 2013 | The Effect of the Great Recession on Entry-Level Job Applicants by Race: A Happenstance Field Experiment. American Sociological Association Annual Meeting, New York, NY, with Mike Vuolo and Chris Uggen |
| 2013 | Statistical Power in Experimental Audit Studies: Cautions and Calculations for Paired Tests with Dichotomous Outcomes. American Criminological Society Annual Meeting, Atlanta, GA |
| 2012 | Evaluation of a Federally-Funded Prisoner Reentry Program. American Society of Criminology Annual Meeting Chicago, IL, with Ebony Ruhland |
| 2012 | Employer Perspectives on Criminal Records. Midwest Sociological Society Annual Meeting, Minneapolis, MN, with Mike Vuolo and Chris Uggen |
| 2011 | Music and Drugs: Evidence from Three Analytical Levels. American Sociological Association Annual Meeting, Las Vegas, NV |
| 2011 | Qualitative Evidence for Employer Decision-Making for Applicants with Criminal Records. Sociology Research Institute, University of Minnesota: Minneapolis, MN |
| 2010 | Employer Decisions Regarding Criminal Records: A Comparison of Self-Reported and Observed Behavior. American Society of Criminology Annual Meeting, San Francisco, CA., with Mike Vuolo and Chris Uggen |

**Media**_____

| | |
|---|---|
| 2021 | Deseret News, "Neighborhood, watched." 8/31/21 |
| | LA Times, "Police take 'wanted' posters onto social media, nabbing suspects and ruining lives." 6/29/21 |
| | Legal Talk Today, "Citizen Sleuths: What happens when amateur crime investigators go too far?" 6/11/21 |
| | USA Today, "Death threats to vitriol: New England families pay a price in public fights for justice" 6/10/21 |
| | CNN, "Helicopters, a patrol car and virtual bodyguards: Inside Citizen's scattered push to upend public safety." 6/3/21 |
| | Milford Daily News, "Public pressure is influencing Mikayla Miller's death investigation. Should it have to?" 6/3/21 |
| | The Sunday Times, "US Confidential: Live crime apps fuel fear and vigilantism in New York City." 5/28/21 |
| | The Marshall Project, "Does Banning People with Felonies on Dating Apps Really Make Anyone Safer?" 5/20/21 |
| | The Guardian, "Citizen: crime app falsely accused a homeless man of starting a wildfire." 5/19/21 |
| | The Crime Report, "False Accusation by Citizen Crime App Highlights Dangers." 5/19/21 |
| | Criminal Legal News, "Online Records Impose Digital Punishment for Millions." 5/15/21 |
| | Pew Stateline, "Online, mug shots are forever. Some states want to change that." 5/10/21 |
| | Digital Privacy News, "Disclosing criminal records on the internet creates 'digital punishment.'" 4/26/21 |
| | NJ.com "Why it's still so hard to wipe away a criminal record despite promise of a law Murphy signed." 4/26/21 |
| | The Guardian, "Tinder's plan for criminal record checks raises fears of 'lifelong punishment.'" 4/13/21 |
| | Tech Policy Press, "Recommendations to End Virtual Stop and Frisk Policing on Social Media." 4/13/21 |
| | Vice, "The Viral Story About an Amy Poehler Lookalike Is Fake and Harmful." 4/7/21 |
| | The Crime Report, "Online Criminal Records Impose 'Digital Punishment' on Millions of Americans: Study." 2/9/21 |
| | Law360, "Virtual Courts Lead to Tension Between Access and Privacy." 1/28/21 |
| | The Crime Report, "Public Defenders Suffer from the 'Stress of Injustice': Study." 1/26/21 |
| | The Appeal, "Basically Cyberbullying: How cops abuse social media to publicly humiliate." 12/21/20 |
| | |
| 2020 | The Markup, "Locked Out: When zombie data costs you a home." 10/6/20 |
| | Street Sense Media, "From parole to pride: DC agency empowers individuals vulnerable to crime." 9/20/20 |
| | Minneapolis Star-Tribune, "Troubled south Minneapolis neighborhood renews calls for help from police, City Hall." 7/13/20 |
| | WNYC The Takeaway, "Local news rethinks its use of mugshots."2/26/20 |
| | CBS News, "'Citizen' App provides real-time crime alerts in your neighborhood." 2/24/20 |
| | |
| 2019 | Ipse Dixit Legal Scholarship Podcast, 11/5/19 |
| | Quartz, "Are neighborhood watch apps making us safer?" 10/29/19 |
| | American Bar Association Legal Rebels Podcast, "Expunging Records with New Technology." 10/16/19 |
| | Center for American Progress, "NeighborhoodStat: Strengthening public safety through community empowerment." 10/2/19 |
| | Springfield News-Leader, "Facebook groups work to expose child predators in the Ozarks. Are they doing harm or good?" 10/2/19 |
| | The John Howard Society of Canada Blog, "Internet info on people and crime is damaging and often inaccurate: Lageson." 9/21/19 |
| | tbs eFM radio, Seoul, South Korea. "News Focus 2 with Sarah Lageson: Impact of mug shots criminal justice system." 9/9/19 |
| | Apex Art Gallery, "Digital Punishment and the Modern Mugshot." 9/7/19 |

The Appeal, "Pennsylvania county owes $67 million after man finds arrest records on mugshots.com." 8/27/19

Quartz, "There's a global movement of Facebook vigilantes who hunt pedophiles." 7/24/19

O Estadão de S. Paolo, "EUA usam árvore genealógica para solucionar crimes." 7/7/19

Albuquerque Journal, "Like diamonds, mugshots are forever - even for the innocent." 3/23/19

Noozhawk Santa Barbara, "Mugshots live on - even for the not guilty." 3/23/19

Massachusetts Daily Collegian, "Expunge all marijuana crimes automatically." 3/21/19

Sirius XM Radio. "Top of Mind with Julie Rose: Mugshots for Profit." 3/14/19

Politico, "Green Light for Legal Weed?" 2/19/19

New Jersey Star Ledger. "N.J.'s governor promised to clear weed convictions. Here's just how hard that will be." 2/17/19

Law360, "Clean Slate: How ditching a criminal record is no easy task." 2/10/19

2018        National Public Radio's Planet Money, "Mugshots for sale." 11/23/18

Tampa Bay Times, "Weighing access and fairness, Hillsboro Sheriff's Office limits online jail records." 11/5/18

Team Human Podcast, "Giving Each Other Some Slack." 9/29/18

The Guardian, "Haunted by a mugshot: how predatory websites exploit the shame of arrest." 6/12/18

NJ Spotlight, "Can NJ's effort to legalize pot make it through the expungement maze?" 6/5/18

NJTV News, "As legalization looms, how will NJ address marijuana convictions?" 6/4/18

San Francisco Examiner, "SFPD blasts alleged drug dealers online as critics decry 'public shaming.'" 4/29/18

American Bar Association, ABA Journal Blog "Use copyright law to battle mugshot extortion." 3/27/18

LawPod Podcast, "Digital Punishment Through Online Criminal Records." 3/1/18

2017        Austin American-Statesman, "Former RideAustin Driver's Rape Case Reignites Debate over Ride-hailing Background Checks." 11/10/17

NJ Spotlight, "Governor's Race 2017: Candidates Sharply Divided on Crime, Social Justice." 11/3/17

New York Times, "Innocent Until Your Mug Shot is on the Internet." 6/3/17

The Marshall Project, "Mugged!" 6/3/17

Salon, "Murder on Facebook raises big censorship questions." 4/21/17

2016        New York Times, "Have You Ever Been Arrested? Check here." 5/24/16

2014        Examiner.com, "Using the Internet for Social Control." 9/11/14

Law Professor Blogs Network, "How Managers Consider Job-Applicant Criminal History." 10/29/14

**Affiliations**_____

American Society of Criminology, American Sociological Association, Eastern Sociological Society, Indigent Defense Research Association, Law and Society Association, Midwest Sociological Society, Racial Democracy Crime and Justice Network, Rutgers Law Criminal Law Society