UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN DOES # A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE,
on behalf of themselves and
all others similarly situated,

                File No. 2:22-cv-10209

        Plaintiffs,

v.                        Hon.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

        Defendants.
_____

## MOTION FOR PRELIMINARY INJUNCTION

1.  Plaintiffs now move for preliminary injunctive relief on six of the claims set out in their Verified Complaint, R. 1. Specifically, Plaintiffs seek relief on their claims that (1) application of Michigan's Sex Offenders Registration Act (SORA 2021) to pre-2011 registrants violates the Ex Post Facto Clause of the United States Constitution; (2) retroactively imposing lifetime registration violates both the Ex Post Facto and Due Process Clauses; (3) denying an opportunity to petition for removal from the registry to registrants who meet the same criteria for removal as petition-eligible registrants violates the Equal Protection Clause; (4) SORA 2021's

1

extensive compelled disclosure requirements violate the First Amendment; (5) requiring people convicted of offenses with no sexual component to register as sex offenders violates the Due Process and Equal Protection Clauses; and (6) compelling registrants to attest that they understand SORA 2021 violates the First Amendment.

2. Simultaneously with this motion, Plaintiffs are filing a motion for class certification. Named Plaintiffs seek preliminary injunctive relief for themselves and for those similarly situated, as further specified below.[1]

### Retroactive Imposition of Punishment (Count I)
### (Ex Post Facto Clause) (Pre-2011 Ex Post Facto Subclass)

3. SORA 2021 imposes punishment, and its retroactive application to people whose offense requiring registration was committed before July 1, 2011, violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, because it makes more burdensome the punishment imposed for offenses committed prior to that date.

4. The Sixth Circuit held in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016) (*Does II*), *cert denied,* 138 S. Ct. 55 (2017), that the old SORA imposed punishment, and that its retroactive application violates the Ex Post Facto Clause. The court specifically held that retroactive application of the 2006 and 2011 amendments "is unconstitutional, and it must therefore cease." *Id.* at 706.

---

[1] Full definitions for the class and subclasses can be found in Plaintiffs' Motion for Class Certification, R. 5.

5.  SORA 2021, while largely eliminating the 2006 amendments, retains virtually all of the SORA 2011 amendments, and continues to retroactively apply almost all of them to pre-2011 registrants.

6.  Plaintiffs ask the Court to grant preliminary relief enjoining Defendants from retroactively applying SORA 2021 to John Does A, B, C, D, E, F, G, Mary Doe, and Mary Roe, and the pre-2011 ex post facto subclass (individuals whose offense requiring registration predates July 1, 2011) absent an individualized, periodic determination that the person presents such a high risk to public safety that SORA 2021's extensive burdens are justified.

**Retroactive Extension of Registration Terms (Count II)**
**(Ex Post Facto and Due Process)**
**(Retroactive Extension of Registration Subclass)**

7.  As a result of retroactive amendments to SORA, tens of thousands of people have had their registration terms retroactively extended to life without any individualized determination that retroactive lifetime registration was warranted. Lifetime registration serves no public protection function.

8.  Retroactively subjecting a person to SORA 2021's extensive burdens *for life* is punitive and violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1.

9.  Retroactively requiring a person to be subject to SORA 2021's extensive burdens *for life* also violates the limits that the Due Process Clause of the U.S.

3

Constitution puts on retroactive legislation that is harsh and oppressive; that violates principles of notice, foreseeability, and fair warning; that imposes severe retroactive consequences; or that reaches far back in time.

10. Plaintiffs ask the Court to preliminarily enjoin Defendants from enforcing SORA 2021 against John Does A, B, C, D, E, G, Mary Doe, and Mary Roe, and against the retroactive extension of registration subclass (individuals retroactively subjected to lifetime registration), for a term longer than that in effect at the time of the registrant's offense.

### Unequal Opportunity to Petition for Removal (Count IV) (Equal Protection) (Barred From Petitioning Subclass)

11. SORA 2021 contains a petitioning process whose purpose is to allow for removal from the registry of people who are unlikely to reoffend, via discretionary judicial review.

12. Under the statute, a subset of registrants is eligible to petition for removal from the registry after ten years if they meet strict eligibility criteria, including that they have not been convicted of any felony or any other registrable offense; have successfully completed supervised release, probation, or parole; and have successfully completed any required sex offender treatment program. *See* M.C.L. § 28.728c (1), (12).

13. Other registrants who meet the same eligibility criteria—who have not

been convicted of any felony or any other registrable offense; who have successfully completed supervised release, probation, or parole; who have successfully completed any required sex offender treatment program; and for whom more than ten years has passed since release—are not able to petition for removal, regardless of the circumstances of their offense, the passage of time, or demonstrated rehabilitation or incapacitation.[2] These registrants, are similarly situated to petition-eligible registrants in all material respects.

14.  The only difference between petition-eligible registrants and the Plaintiffs seeking relief on this claim is the tier classification of their registrable offense. Differences in tier classification are not material because tier classifications do not correspond to the risk of reoffending, and hence to the purpose of the petitioning procedure or the standard for removal.

15. SORA 2021 violates the Equal Protection Clause of the U.S. Constitution in that it allows certain registrants (those who have not been convicted of a felony or other registrable offense, who successfully completed supervised release, probation or parole, who successfully completed any required sex offender treatment program, and for whom ten years has passed since release) to petition for removal

---

[2] Juvenile registrants who meet the same eligibility criteria must wait 25 years—not ten—before being able to petition for removal. M.C.L. § 28.728c(2), (13).

from the registry, but bars other similarly-situated registrants who meet the exact same criteria from petitioning for removal.

16. Plaintiffs ask the Court to grant preliminary relief and enjoin Defendants from denying John Does A, C, E, F, G, Mary Doe, and Mary Roe, and the barred from petitioning subclass (registrants who for ten years following release have not been convicted of a felony or other registrable offense, who successfully completed supervised release, probation or parole, and who successfully completed any required sex offender treatment program, but are not allowed to petition) the opportunity to petition for removal from the registry after ten years on the same terms as registrants eligible to petition under M.C.L. § 28.728c(1), (12).

### Mandatory Reporting Requirements and Compelled Speech (Count V) (First Amendment) (Primary Class & Non-Sex-Offense Subclass)

17. SORA 2021 compels speech, requiring registrants to report extensive information, often in person and within three business days. These requirements are imposed without any individualized review, last for life in most cases, and have a chilling effect on registrants' constitutionally protected rights to free speech and association.

18. The information registrants are compelled to provide feeds directly into the state's public registry, and is used by the state to craft a widely disseminated, highly-stigmatizing message that registrants are dangerous sex offenders whom the

6

public should fear. By requiring frequent, time-consuming, and humiliating reporting to law enforcement, SORA 2021's compelled disclosure requirements also severely restrict registrants' autonomy.

19. SORA 2021 forces registrants to contribute to speech about themselves with which they vehemently disagree. Plaintiffs vehemently disagree with the government's message that they are all dangerous sex offenders. Individuals who were never convicted of a sex offense but are nevertheless required to register as sex offenders, vehemently disagree both with the government's false portrayal of them as people who were convicted of sex offenses, and with the message that they are dangerous sex offenders.

20. SORA 2021's compelled disclosure requirements are subject to strict scrutiny under the First Amendment to the U.S. Constitution. These compelled disclosure requirements violate the First Amendment because, although Michigan has a strong interest in preventing sexual offending, an ineffective or counterproductive registration scheme that compels disclosures from people who pose no appreciable risk is not narrowly tailored, let alone the least restrictive means, of advancing that interest.

21. Plaintiffs ask the Court to grant preliminary relief enjoining enforcement of SORA 2021's compelled disclosure requirements—M.C.L. §§ 28.724a(1)–(4); 28.725(1)–(3), (7)–(8), (10)–(13); 28.725a(3)–(5), (7)–(8); 28.727(1)—against the

7

named Plaintiffs and the primary class (all registrants) absent an individualized, periodic determination that (1) the person is presently dangerous, (2) the compelled disclosure is necessary to alleviate that danger, and (3) the information is not otherwise available to law enforcement.

22. Plaintiffs further ask that the Court grant preliminary relief enjoining enforcement of those same compelled disclosure requirements against Mr. Doe A and the non-sex-offense subclass (individuals required to register as sex offenders although they were neither convicted of sex offenses nor found to have committed a crime of a sexual nature) absent an individualized, periodic determination that (1) the person has been convicted of an offense that was sexual in nature, (2) the person is presently dangerous, (3) the compelled disclosure is necessary to alleviate that danger, and (4) the information is not otherwise available to law enforcement.

### Sex Offender Registration of People Who Did Not Commit Sex Offenses (Count VII) (Due Process and Equal Protection) (Non-Sex-Offense Subclass)

23. Under SORA 2021, people convicted of certain non-sex offenses are required to register as sex offenders, are publicly branded as convicted sex offenders, and are required to comply with all of SORA 2021's requirements even though they never committed a crime involving sex.

24. There are two situations where SORA 2021 requires registration for people who were convicted of a crime that did not include a sexual component as an

element of the offense. First, the "catch-all" provision requires registration for an offense "that by its nature constitutes a sexual offense against an individual who is a minor." M.C.L. § 28.722(r)(vii). In such cases, the statute provides procedural protections, including most importantly a judicial determination of whether the defendant's actions were sexual in nature. Second, SORA 2021 automatically requires sex offender registration—without any determination of whether the conduct involved sex—for people convicted of certain offenses against minors: kidnapping (M.C.L. § 750.349), unlawful imprisonment (M.C.L. § 750.349b), leading away of child under 14 (M.C.L. § 750. 350), or a comparable out-of-state offense. *See* M.C.L. § 28.722(r)(iii), (r)(x), (v)(ii), v(iii), (v)(vii). Plaintiffs' challenge here is to this automatic determination that people who were not convicted of sex offense are "sex offenders."

25. SORA 2021 irrationally imposes sex offender registration and publicly labels people as sex offenders even though their offenses had no sexual component. SORA 2021 also draws an irrational distinction between most people convicted of non-sex crimes who get a judicial determination that their offense was sexual in nature before they can be registered as sex offenders under the "catch-all" provision, *see* M.C.L. §§ 28.722(r)(vii), 769.1(13), and people in the non-sex-offense subclass who get no procedural protections because their registration is automatic. SORA

2021 therefore violates both the Due Process and Equal Protection Clauses of the U.S. Constitution.

26. Plaintiffs ask the Court to grant preliminary relief enjoining Defendants from enforcing SORA 2021 against Mr. Doe A and the non-sex offense subclass (individuals required to register as sex offenders although they were neither convicted of sex offenses nor found to have committed a crime of a sexual nature) absent a judicial determination, in accordance with the standards applicable under M.C.L. § 769.1(13), that they have committed an offense that "by its nature constitutes a sexual offense against an individual who is a minor," M.C.L. § 28.722(r)(vii), and are therefore subject to registration under that provision.

### Compelled Admission of "Understanding" SORA 2021 (Count IX) (First Amendment) (Primary Class)

27. SORA 2021 makes it a crime for registrants not to sign the Explanation of Duties form that the state provides to them. *See* M.C.L. §§ 28.726(1); 28.727(3)–(4); 28.729(1)(3).

28. The Explanation of Duties form that registrants are required to sign states: "I have read the above requirements and/or had them read to me and I understand my registration duties." *See* Explanation of Duties Form, R. 1-17.

29. Registrants who report updates by mail must use the Michigan Sex Offender Registry Mail-in Update Form, R. 1-18. The form requires registrants to

10

sign a statement saying: "I have read the 'Explanation of Duties to Register as a Sex Offender' listed on pages two and three of this form and/or had them read to me and I understand my registration duties."

30. Registrants are required to sign these forms regardless of whether they in fact understand SORA 2021's complex registration requirements.

31. Requiring registrants to sign the statement on the Explanation of Duties and on the Registry Mail-in Update Form attesting to their understanding of SORA 2021 is compelled speech, and violates the First Amendment of the U.S. Constitution because the state does not have a compelling interest in requiring registrants to sign forms stating that they understand their registration requirements.

32. Plaintiffs ask that the Court grant preliminary relief enjoining the Defendants from requiring Plaintiffs and the primary class to attest that they understand their obligations under SORA 2021.

*******

33. The bases for the preliminary relief requested on these six claims is fully set out in the accompanying brief.

Pursuant to the local rules, Plaintiffs have conferred with counsel for Defendants, who indicated that they are reviewing Plaintiffs' request for concurrence.

11

Respectfully submitted,

s/ Miriam Aukerman (P63165)
Miriam J. Aukerman
Rohit Rajan (AZ 035023)
American Civil Liberties Union
    Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org
rrajan@aclumich.org


s/ Daniel S. Korobkin (P72842)
American Civil Liberties Union
    Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org


Dated: February 2, 2022

s/ Paul D. Reingold (P27594)
Cooperating Counsel, American Civil
    Liberties Union Fund of Michigan
Univ. of Michigan Law School
802 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109-1215
(734) 355-0319 - pdr@umich.edu


s/ Roshna Bala Keen (Ill. 6284469)
Loevy & Loevy
Cooperating Counsel, American Civil
    Liberties Union Fund of Michigan
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 - roshna@loevy.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN DOES # A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE,
on behalf of themselves and
all others similarly situated,

                File No. 2:22-cv-10209

        Plaintiffs,

v.                              Hon.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

        Defendants.

_____

**PLAINTIFFS' BRIEF IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

FACTS ............................................................................................................2

ARGUMENT ....................................................................................................4

Plaintiffs Have a High Likelihood of Success ...........................................4

I.   SORA 2021 Violates the Ex Post Facto Clause. ...............................4

   A.  The Ex Post Facto Clause Was Designed to Prevent the Harms SORA
      2021 Creates. .............................................................................4

   B.  The Sixth Circuit and Michigan Supreme Court Have Held that Retroactive
      Application of the 2011 SORA Amendments Is Punishment. .......................6

   C.  SORA 2021 Is Punishment. ............................................................8

      1.   SORA Imposes Sanctions Historically Regarded as Punishment. ..............9

      2.   SORA 2021 Imposes Severe Obligations, Disabilities, and Restraints. .....14

      3.   SORA Serves the Traditional Aims of Punishment. ..................................16

      4.   SORA 2021 Is Not Rationally Related to a Non-Punitive Interest. ...........17

      5.   SORA Is Excessive in Relation to Non-Punitive Interests. .......................20

   D.  The Court Should Bar Retroactive Application of SORA 2021 to Pre-2011
      Registrants Absent an Individualized Assessment of Risk. ..........................22

II.  Retroactively Imposing Lifetime Registration Violates the Constitution's
    Ex Post Facto and Due Process Clauses. ..........................................................23

   A.  Retroactively Imposing Lifetime Registration Violates the Ex Post Facto
      Clause. .......................................................................................24

   B.  Retroactively Imposing Lifetime Registration Violates Due Process. ...........25

III. Denying Similarly Situated Registrants the Opportunity to Petition for
    Removal from the Registry Violates the Equal Protection Clause. .................32

   A.  The Barred From Petitioning Subclass Is Similarly Situated to Registrants
      Who Are Eligible to Petition for Removal. ....................................................33

   B.  Denying the Barred from Petitioning Subclass an Opportunity to Seek
      Removal from the Registry Is Irrational .......................................................37

IV. SORA 2021's Extensive Compelled Disclosure Requirements Violate the
    First Amendment. ..............................................................................41

   A. SORA 2021 Compels Speech in Support of the State's Message that
      Registrants Are Dangerous. ..........................................................41

   B. SORA 2021's Compelled Disclosures Are Subject to Strict Scrutiny. ..........43

   C. SORA 2021's Compelled Disclosure Requirements Are Not Narrowly
      Tailored to the State's Public Safety Interests ................................50

V.  Requiring People Convicted of Offenses with No Sexual Component to
    Register as Sex Offenders Is Unconstitutional .................................53

   A. Subjecting People Who Did Not Commit Sex Offenses to Sex Offender
      Registration Is Irrational. ..............................................................55

   B. People Who Were Not Convicted of Sex Offenses Are Entitled to Due
      Process Protections Before Being Subjected to SORA 2021 ..................60

   C. Compelling People Without Sex Offenses to Support the State's Message
      That They Are Sex Offenders Violates the First Amendment. ...............62

VI. SORA 2021 Violates the First Amendment By Compelling Registrants to
    Say They Understand the Law. ........................................................63

The Irreparable Harm, Balance of the Equities, and Public Interest Factors
    Favor Plaintiffs ................................................................................65

RELIEF REQUESTED ................................................................................66

iii

# TABLE OF AUTHORITIES

## Cases

*ACLU of New Mexico v. City of Albuquerque*, 137 P.3d 1215 (N.M. Ct. App. 2006) ....................................................................................57

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013)....................................................................................................47

*Am. C.L. Union of Ky. v. McCreary Cty.*, 354 F.3d 438 (6th Cir. 2003)....................................................................................................65

*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) ........................ passim

*Associated Builders & Contractors of Southeast Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) .....................48

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004)......................................43

*Bannum, Inc. v. City of Louisville*, 958 F.2d 1354 (6th Cir. 1992) .................. 19, 20

*Baxstrom v. Herold*, 383 U.S. 107 (1966) ................................................. 35, 36, 37

*Berger v. City of Mayfield Heights*, 154 F.3d 621 (6th Cir. 1998).........................56

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ................................................27

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988)......................................26

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011)............................................64

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982)..................................................................................................46

*Buckley v. Valeo*, 424 U.S. 1 (1976)......................................................................46

*Burgess v. Salmon*, 97 U.S. 381 (1878) ...................................................................6

*Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018)...........................................46, 64

*Cameron v. Mullen*, 387 F.2d 193 (D.C. Cir. 1967)...............................................37

*Carpenter v. United States*, 138 S. Ct. 2206 (2018)...............................................13

*Carter v. Miller*, 434 U.S. 356 (1978) ................................................................38

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)................ 20, 33, 56

*Coleman v. Dretke*, 395 F.3d 216 (5th Cir. 2004) ....................................................61

*Collins v. Youngblood*, 497 U.S. 37 (1990) ............................................................5

*Commonwealth v. Baker*, 295 S.W.3d 437 (Ky. 2009) ..................................... 17, 22

*Commonwealth v. Muniz*, 640 Pa. 699 (2017)................................................... passim

*Commonwealth v. Thompson*, 548 S.W.3d 881 (Ky. 2018) ....................................30

*Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) ......................... 32, 55, 61, 62

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)....................... 65, 66

*Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson
     Cty.*, 274 F.3d 377 (6th Cir. 2001) ...............................................................66

*Detroit Free Press, Inc. v. Dep't of Just.,* 73 F.3d 93 (6th Cir. 1996)....................13

*Detroit Free Press, Inc. v. Dep't of Just.,* 829 F.3d 478 (6th Cir.
     2016) ......................................................................................................... 13, 14

*Doe 1 v. Marshall*, 367 F. Supp. 3d 1310 (M.D. Ala. 2019)..................................49

*Doe v. Austin*, 848 F.2d 1386 (6th Cir. 1988)..........................................................35

*Doe v. Dept. of Pub. Safety and Corr. Servs.*, 62 A.3d 123 (Md. Ct.
     App. 2013) ................................................................................................ 12, 22, 25

*Doe v. Jindal*, 851 F. Supp. 2d 995 (E.D. La. 2012) ..............................................40

*Doe v. Miami-Dade Cty.*, 846 F.3d 1180 (11th Cir. 2017)......................................19

*Doe v. Rausch*, 382 F. Supp. 3d 783 (E.D. Tenn. 2019) .................................. 12, 25

*Doe v. Rausch*, 461 F. Supp. 3d 747 (E.D. Tenn. 2020) ........................................19

*Doe v. Saenz*, 45 Cal. Rptr. 3d 126 (Ct. App. 2006)................................................37

*Doe v. State*, 111 A.3d 1077 (N.H. 2015).................................................... 11, 21, 23

*Doe v. State*, 189 P.3d 999 (Alaska 2008) ........................................................ passim

*Doe v. Wasden*, __ F. Supp. 3d __, 2021 WL 4129144 (D. Idaho
    Sept. 8, 2021) .......................................................................................65

*Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016), *cert. denied*,
    138 S. Ct. 55 (2017) ........................................................... passim

*Does #1-6 v. Snyder*, 449 F. Supp. 3d 719 (E.D. Mich. 2020) ................... 1, 53, 66

*Does v. Rausch*, 461 F. Supp. 3d 747 (E.D. Tenn. 2020) ........................................7

*Does v. Wasden*, 982 F.3d 784 (9th Cir. 2020) ........................................................22

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) ................................... 26, 27, 28

*Fletcher v. Peck*, 10 U.S. 87 (1810) ..........................................................................6

*Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992) ..............................................26

*Grove City Coll. v. Bell*, 465 U.S. 555 (1984) ........................................................47

*Gwinn v. Awmiller*, 354 F.3d 1211 (10th Cir. 2004) ..............................................61

*Hoffman v. Village of Pleasant Prairie*, 249 F. Supp. 3d 951 (E.D.
    Wis. 2017) ...................................................................................... 20, 40

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515
    U.S. 557 (1995) .............................................................................. 43, 45

*I.N.S. v. St. Cyr*, 533 U.S. 289 (2001) .....................................................................29

*In re Z.B.*, 757 N.W.2d 595 (S.D. 2008) ..................................................................39

*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011) .......................................................64

*Jackson v. Jamrog*, 411 F.3d 615 (6th Cir. 2005) ..................................................35

*James v. Strange*, 407 U.S. 128 (1972) ...................................................................37

*Johanns v. Livestock Mktg. Ass'n,* 544 U.S. 550 (2005) .......................................63

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827 (1990) ............. 26, 32

*Kansas v. Hendricks*, 521 U.S. 346 (1997) ................................................... 9, 22, 23

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ...............................................9

*Kirby v. Siegelman*, 195 F.3d 1285 (11th Cir. 1999)...............................................61

*Koontz v. Ameritech Servs., Inc.*, 645 N.W.2d 34 (Mich. 2002) ............................54

*Kyllo v. United States*, 533 U.S. 27 (2001) .............................................................13

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ..................................... passim

*Loesel v. City of Frankenmuth*, 692 F.3d 452 (6th Cir. 2012).......................... 33, 35

*Mathews v. Lucas*, 427 U.S. 495 (1976) ..................................................................56

*McClendon v. Long*, __ F.4th __, 2022 WL 165992 (11th Cir. Jan.
    19, 2022) ...........................................................................................................52

*Meza v. Livingston*, 607 F.3d 392 (5th Cir. 2010) ........................................... 42, 61

*Miller v. Carter*, 547 F.2d 1314 (7th Cir. 1977) ....................................................38

*NAACP v. Alabama*, 357 U.S. 449 (1958)...............................................................46

*NAACP v. Patterson*, 357 U.S. 449 (1958)..............................................................46

*National Institute of Family and Life Advocates v. Becerra*, 138 S.
    Ct. 2361 (2018) .......................................................................................... 45, 48

*Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997) .............................................. 41, 61

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ..................................................................56

*Pacific Gas & Electric Co. v. Public Utilities Commission of
    California*, 475 U.S. 1 (1986)...........................................................................44

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ....................................................... 28, 30

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717
    (1984)..................................................................................................................26

*People v. Bell*, 3 Misc. 3d 773 (N.Y. Sup. Ct 2003)............................. 56, 57, 59, 62

*People v. Betts*, __ N.W.2d __, 2021 WL 3161828 (Mich. July 27,
    2021) ........................................................................................................ passim

*People v. Bosca*, 871 N.W.2d 307 (Mich. Ct. App. 2015) ............................... 58, 59

*People v. Dodds*, 7 N.E.3d 83 (Ill. Ct. App. 2014).................................................30

*People v. Fonville*, 804 N.W.2d 878 (Mich. Ct. App. 2011).................................30

*People v. Lee*, 803 N.W.2d 165 (Mich. 2011) .................................................. 55, 59

*Plyler v. Doe*, 457 U.S. 202 (1982)..........................................................................56

*Raines v. State*, 805 So.2d 999 (Fla. Dist. Ct. App. 2001) .....................................58

*Reid v. Lee*, 476 F. Supp. 3d 684 (M.D. Tenn. 2020).................................. 7, 19, 65

*Renchenski v. Williams*, 622 F.3d 315 (3d Cir. 2010) ...................................... 41, 61

*Riley v. California*, 573 U.S. 373 (2014) ................................................................13

*Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781 (1988) ..........................................43

*Rinaldi v. Yeager*, 384 U.S. 305 (1966)..................................................................37

*Roe v. Snyder*, 240 F. Supp. 3d 697 (E.D. Mich. 2017) ..........................................65

*Rogers v. Tennessee*, 532 U.S. 451, 460 (2001) ......................................................24

*Shelton v. Tucker*, 364 U.S. 479 (1960)............................................................ 46, 48

*Smith v. Doe*, 538 U.S. 84 (2003) ................................................................... passim

*Starkey v. Okla. Dep't of Corrs.*, 305 P.3d 1004 (Okla. 2013) ...................... passim

*State v. Barksdale*, 2003 WL 77115 (Ohio Ct. App. 2003)....................................56

*State v. C.M.*, 746 So.2d 410 (Ala. Crim. App. 1999)............................................39

*State v. Hill*, __ So. 3d __, 2020 WL 6145294 (La. 2020), *cert denied*, 142 S. Ct. 311 (2021).......................................................................49

*State v. Letalien*, 985 A.2d 4 (Me. 2009)........................................... 12, 15, 22, 25

*State v. Reine*, 2003 WL 77174 (Ohio Ct. App. 2003) ............................... 56, 58, 60

*State v. Robinson*, 873 So.2d 1205 (Fla. 2004).................................................. 56, 57

*State v. Small*, 833 N.E.2d 774 (Ohio Ct. App. 2005) ............................................57

*State v. Trammell*, 387 P.3d 220 (N.M. 2016) ......................................................31

*State v. Washington*, 2001 WL 1415568 (Ohio Ct. App. 2001) ..............................58

*Taylor v. State*, 698 S.E.2d 384 (Ga. Ct. App. 2010) ............................................31

*Texas Ent. Ass'n v. Hegar*, 10 F.4th 495 (5th Cir. 2021) ......................................27

*TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty.*, 430 F.3d 783
    (6th Cir. 2005) ..............................................................................................34

*Trop v. Dulles*, 356 U.S. 86 (1958) ......................................................................16

*U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989) ......................................................................................14

*United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014) ........................................49

*United States v. Barton*, 455 F.3d 649 (6th Cir. 2006) ..........................................28

*United States v. Brandon*, 158 F.3d 947 (6th Cir. 1998) ........................................56

*United States v. Carlton*, 512 U.S. 26 (1994) ......................................................28

*United States v. Carter*, 463 F.3d 526 (6th Cir. 2006) ..........................................21

*United States v. Fox*, 286 F.Supp.3d 1219 (D. Kan. 2018) ....................................50

*United States v. Hemme*, 476 U.S. 448 (1986) ......................................................27

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) .......................51

*United States v. Riley*, 72 M.J. 115 (C.A.A.F. 2013) .............................................31

*United States v. Ubaldo-Figueroa*, 364 F.3d 1042 (9th Cir. 2004) .................. 29, 31

*Vartelas v. Holder*, 566 U.S. 257 (2012) .............................................................26

*Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950
    (9th Cir. 2009) ..............................................................................................64

*Vitek v. Jones*, 445 U.S. 480 (1980) ....................................................................41

*Wallace v. State*, 905 N.E.2d 371 (Ind. 2009) .................................................. passim

*Weaver v. Graham*, 450 U.S. 24 (1981) ....................................................5

*Welch v. Henry,* 305 U.S. 134 (1938) ......................................................27

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) ...............................50

*Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020) ...................................66

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ................................4

*Wooley v. Maynard*, 430 U.S. 705 (1977) ................................. 43, 44, 48

*Yunus v. Robinson*, 2019 WL 168544 (S.D.N.Y. Jan. 11, 2019) ................... 57, 60

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)............ 47, 48, 64

**Constitutional Provisions**

U.S. Constitution, art. I, § 10, cl. 1 .............................................................5

**Statutes**

M.C.L. § 28.722 .................................................................... passim

M.C.L. § 28.723 ................................................................ 34, 62

M.C.L. § 28.724a ............................................................... 10, 53

M.C.L. § 28.725 ................................................................ 10, 53

M.C.L. § 28.727 ................................................................ 53, 63

M.C.L. § 28.728c ................................................................. passim

M.C.L. § 28.729 ................................................................. passim

M.C.L. § 750.349 ....................................................................55

M.C.L. § 750.349b ...................................................................55

M.C.L. § 750.350 ....................................................................55

M.C.L. § 769.1 ............................................................... 55, 59, 62

M.C.L. §28.725a ..................................................................................53

**Other Authorities**

2 J. Story, Commentaries on the Constitution §1398 (5th ed. 1891) ......................32

Catherine Carpenter, *The Evolution of Unconstitutionality in Sex
    Offender Registration Laws*, 63 Hastings L.J. 1071 (2012)...........................7

Henry M. Hart, *The Aims of the Criminal Law*, 23 Law & Contemp.
    Probs. 401 (1958)..........................................................................11

Ira M. Ellman, *When Animus Matters and Sex Crime
    Underreporting Does Not: The Problematic Sex Offender
    Registry*, 7 U. Pa. J. L. & Pub. Affairs 1 (2021)...........................................32

*Michigan Sex Offender Registry Welcome Page* ....................................................54

SBA SOP 50 10 5(K) Subpart C (Apr. 1, 2019)......................................................10

## INTRODUCTION

After nearly a decade of litigation and multiple court rulings holding Michigan's Sex Offenders Registration Act (SORA) unconstitutional, the legislature finally revised the statute at the very end of 2020. The latest iteration (SORA 2021) makes minimal changes to the Act's structure, substance, and overall requirements. Compl., R. 1, ¶¶213–26; SORA 2021 With Highlighted Changes, R. 1-15. SORA 2021 remains a conviction-based law. It retains the identical tier system, identical lengthy/lifetime registration periods, and virtually identical onerous reporting requirements and online public registry, all without any individualized assessment. Regardless of the circumstances of the offense, the passage of time, or proven rehabilitation or incapacity, there is, in almost all cases, no path off the registry. SORA 2021 continues to apply the 2011 SORA amendments retroactively to pre-2011 registrants—including the retroactive extension of registration terms—despite the Sixth Circuit's holding that those amendments cannot be retroactively applied, *Does #1-5 v. Snyder*, 834 F.3d 696, 706 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017) (*Does I*), and the district court's application of that decision class-wide, *Does #1-6 v. Snyder*, 449 F. Supp. 3d 719, 726 (E.D. Mich. 2020) (*Does II*).

Plaintiffs must therefore return to court. They now seek preliminary injunctive relief on behalf of themselves and all similarly situated registrants on their claims that: (1) application of SORA 2021 to pre-2011 registrants violates the Ex Post Facto

Clause; (2) retroactively imposing lifetime registration violates both the Ex Post Facto and Due Process Clauses; (3) denying an opportunity to petition for removal from the registry to registrants who meet the same criteria for removal as petition-eligible registrants violates the Equal Protection Clause; (4) SORA 2021's extensive compelled disclosure requirements violate the First Amendment; (5) requiring people convicted of offenses with no sexual component to register as sex offenders violates the Due Process and Equal Protection Clauses; and (6) compelling registrants to attest that they understand SORA 2021 violates the First Amendment.[1]

## FACTS

The litigation and legislative history are set out in detail in Plaintiffs' verified complaint. The facts and evidence supporting this motion are likewise detailed and provided in the complaint and its supporting exhibits, including ten expert reports. The facts are thus only briefly summarized here.

SORA 2021 imposes extensive restrictions on tens of thousands of people, in most cases for life.[2] Compl., R. 1, ¶¶289–97. The law does not promote public safety, and in fact is counterproductive because it is likely to *increase* rather than decrease sexual offending. *Id.*, ¶¶228–36. SORA 2021 misidentifies the source of the risk and

---

[1] Plaintiffs have asserted additional claims in their complaint on which they are not seeking preliminary injunctive relief at this time. Compl., R. 1, Claims for Relief.

[2] According to filings by the state in *Does II*, there are approximately 55,000 people subject to SORA 2021. Compl., R. 1, ¶641. *But see* Levine Decl., R. 1-11, Ex. 10, ¶¶15–16 (citing other data putting the total at around 53,000).

undermines reentry, and its extensive reporting requirements serve no purpose. *Id.*, ¶¶237–49. Michigan has adopted an expensive, counterproductive law despite the scientific consensus that such laws do not work. *Id.*, ¶¶230–36.

The average re-offense rate of people with past sex offenses is low, and varies based on established risk factors. *Id.*, ¶¶259–68. For all, risk drops off dramatically over time, such that most people with past sex offenses will drop below the baseline rate for the male population after ten years, and even those initially at highest risk do so after twenty years. *Id.*, ¶¶269–81. There are likely tens of thousands of people on Michigan's registry, including the named Plaintiffs, who—given their initial risk classifications and time spent offense free in the community—are no more likely to commit a sexual offense than the general male population. *Id.*, ¶¶318–30.

SORA 2021 imposes devastating consequences on registrants. Registrants are subject to ongoing government supervision that is akin to or more onerous than probation or parole. *Id.*, ¶¶387–403. Being branded as a "sex offender" makes it extremely difficult for registrants to obtain housing, employment, or an education. *Id.*, ¶¶404–73. It chills their ability to speak freely on the internet and limits their ability to travel. *Id.*, ¶¶474–513. It compels them to disclose extensive information about themselves, often through in-person reporting, which is then used by the state to depict them as a danger to the public. *Id.*, ¶¶514–27. Moreover, the digital age has

fundamentally changed the consequences of being subject to sex offender regis-tration, exponentially increasing the harms of this state-sponsored stigmatization. *Id.*, ¶¶331–62. It is difficult, and at times impossible, for registrants to understand SORA 2021's complex requirements. *Id.*, ¶¶531–72. Registry violations, however, can subject them to prison terms of up to ten years. *Id.*, ¶¶528–30.

SORA 2021 is imposed without any individualized consideration, based sole-ly on the offense of conviction, even though conviction-based registries are poor predictors of risk. *Id.*, ¶¶282–303. For the vast majority of registrants there is no way to be removed, regardless of the circumstances of the offense or demonstrated rehabilitation, and most will remain on the registry until they die. *Id.*, ¶10.

## ARGUMENT

Preliminary injunctions are governed by the familiar four-factor test that examines: (1) likelihood of success on the merits, (2) irreparable harm in the absence of relief, (3) the balance of equities, and (4) the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). As demonstrated below, a preliminary injunction is warranted because all four factors weigh strongly in Plaintiffs' favor.

### *Plaintiffs Have a High Likelihood of Success*

**I.   SORA 2021 Violates the Ex Post Facto Clause.**

**A. The Ex Post Facto Clause Was Designed to Prevent the Harms SORA 2021 Creates.**

The Ex Post Facto Clause, U.S. Constitution, art. I, § 10, cl. 1, prohibits the

legislature from retroactively inflicting greater punishment than that permitted at the time of the crime. *Collins v. Youngblood*, 497 U.S. 37, 42–43 (1990). SORA 2021 violates this basic rule. The Framers intended the Ex Post Facto Clause to address two problems with retroactive criminal laws: lack of fair notice and vindictive law-making. *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981).

First, retroactivity gives the legislature "unmatched powers . . . to sweep away settled expectations suddenly and without individualized consideration." *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994). The Ex Post Facto Clause "assure[s] that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver*, 450 U.S. at 28–29. "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Id.* at 30.

Second, the Ex Post Facto Clause "restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id.* at 29. The legislature's "responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals." *Landgraf*, 511 U.S. at 266. The Framers "viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment," and adopted the Ex Post Facto Clause to shield against "those sudden and strong passions to which men are

exposed." *Fletcher v. Peck*, 10 U.S. 87, 137–38 (1810) (Marshall, C.J.).

The dangers that motivated adoption of the Ex Post Facto Clause are exactly the dangers presented by SORA's retroactivity. Plaintiffs—some of whom were convicted before Michigan even created a registry—could not imagine that they would become subject to an all-encompassing lifetime registration regime. Moreover, antipathy toward sex offenders is "of the moment": there is no more despised group today, and hence no group more at risk of retributive legislation fueled by the "sudden and strong passions" which follow highly-publicized crimes. *See* Prescott Decl., R. 1-6, at 2 (describing how registry laws responded to "public outcry").

## B. The Sixth Circuit and Michigan Supreme Court Have Held that Retroactive Application of the 2011 SORA Amendments Is Punishment.

The threshold question in ex post facto challenges is whether the statute imposes punishment. "[T]he *ex post facto* effect of a law cannot be evaded by giving a civil form to that which is essentially criminal." *Burgess v. Salmon*, 97 U.S. 381, 385 (1878). In *Smith v. Doe*, 538 U.S. 84, 100 (2003), the Court rejected an ex post facto challenge to a "first-generation" registration statute that imposed only "minor and indirect" burdens, concluding that the statute did not constitute punishment. Thereafter, lower courts rejected similar challenges by finding most registration laws to be regulatory, not punitive. Legislatures, acting with precisely the sort of passion that the Ex Post Facto Clause was meant to curb, responded as if they had a judicial blank check, passing "super-registration" laws that impose extensive burdens. *See*

6

Catherine Carpenter, *The Evolution of Unconstitutionality in Sex Offender Registration Laws*, 63 Hastings L.J. 1071, 1073–74 (2012).

But in *Does I*, the Sixth Circuit made clear that *Smith* cannot "be understood as writing a blank check to states to do whatever they please in this arena." 834 F.3d at 705. The court focused on two sets of amendments: the 2006 amendments imposing geographic exclusion zones, and the 2011 amendments which restructured the registry to retroactively impose tiers, lengthened most registrants' terms to life, and required extensive reporting of minute changes to personal information. The court made clear that *neither* set of amendments could be made retroactive: "The retroactive application of SORA's 2006 and 2011 amendments to Plaintiffs is unconstitutional, and it must therefore cease." *Id.* at 706. District courts in this circuit have since repeatedly found that registry statutes violate the Ex Post Facto Clause because "the landscape of Sixth Circuit precedent has changed." *Does v. Rausch*, 461 F. Supp. 3d 747, 759 (E.D. Tenn. 2020) (collecting cases); *Reid v. Lee*, 476 F. Supp. 3d 684, 704–06 (M.D. Tenn. 2020) (same). The Michigan Supreme Court has also concluded that "the 2011 SORA increases registrants' punishment . . . in violation of the federal and state constitutional prohibitions on ex post facto laws." *People v. Betts*, __ N.W.2d __, 2021 WL 3161828, at *15 (Mich. July 27, 2021).

In adopting SORA 2021, the legislature excised the 2006 amendments, but left the 2011 amendments, and their retroactive application, almost entirely intact.

7

Under the plain language of *Does I* and *Betts*, that is unconstitutional. Defendants undoubtedly will try to get around *Does I* and *Betts*. They may argue that the Sixth Circuit was primarily concerned with the exclusion zones. But if so, then the court could simply have said that retroactive application of the 2006 amendments should cease. Defendants may also argue that the minor modifications to the requirements imposed in 2011—like eliminating a few in-person reporting requirements—mean that the rest of the 2011 amendments can now be retroactively applied. But that ignores the fact that SORA 2021 continues to "categorize[] [people] into tiers ostensibly corresponding to present dangerousness without any individualized assessment thereof"; requires "time-consuming and cumbersome" reporting, much of which remains in-person and/or within three days; "brands registrants as moral lepers solely on the basis of a prior conviction"; and "consigns them to years, if not a lifetime, of existence on the margins," all despite "scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe." *Does I*, 834 F.3d at 705. Retroactive application of the 2011 amendments is unconstitutional today for the same reasons it was in *Does I* and *Betts*, and "must therefore cease." *Id.* at 706.

## C. SORA 2021 Is Punishment.

To address any argument that *Does I* and *Betts* no longer apply because the minor modifications to SORA have transformed a punitive scheme into a regulatory one, Plaintiffs will go through the ex post facto analysis. The first question is whether

8

the legislature intended the law to be civil or criminal. *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997). The Sixth Circuit, while noting that SORA has "some features that might suggest a punitive aim," concluded that the legislature's intent was not punitive. *Does I*, 834 F.3d at 700–01. Assuming for present purposes that the same holds true for SORA 2021, the next question is whether the scheme is "so punitive either in purpose or effect as to negate the State's intention to deem it 'civil.'" *Id.* at 700 (alterations omitted). The factors in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), the most relevant of which are discussed in *Smith*, 538 U.S. at 97, provide guidance on whether a purportedly civil law is in fact punitive. *See Does I*, 834 F.3d at 701. As discussed below, those five *Mendoza-Martinez* factors clearly demonstrate that SORA 2021, like the prior version of SORA, is punishment.

### 1.  SORA Imposes Sanctions Historically Regarded as Punishment.

SORA 2021, like its predecessor, meets the widely accepted definition of punishment: "(1) it involves pain or other consequences typically considered unpleasant; (2) it follows from an offense against legal rules; (3) it applies to the actual (or supposed) offender; (4) it is intentionally administered by people other than the offender; and (5) it is imposed and administered by an authority constituted by a legal system against which the offense was committed." *Does I*, 834 F.3d at 701.

SORA 2021 "resembles the [traditional] punishment of parole/probation."[3] *Id.* at 703. Registrants are subject to "significant state supervision," and a failure to comply, "like the failure to comply with parole conditions, potentially subjects the offender to imprisonment." *Betts*, 2021 WL 3161828, at *12. Just like its predecessor, SORA 2021 requires registrants to "periodically report in person to law enforcement," *id.*, and to constantly update even minor changes to a wide range of information within three business days, in many cases in person. M.C.L. §§ 28.724a, 28.725.[4] SORA 2021's travel restrictions are also typical of correctional supervision. Obligations Summ., R. 1-3, § 6. In fact, as the former MDOC Legal Affairs Administrator explains, SORA imposes *more onerous* requirements than those imposed on probationers and parolees.[5] Stapleton Decl., R. 1-13, ¶¶26–32. The registration process is intertwined with the criminal law. Compl., R. 1, Section VIII. An unregistered

---

[3] *See also, e.g.*, *Doe v. Dep't of Pub. Safety and Corr. Servs.*, 62 A.3d 123, 140 (Md. Ct. App. 2013) (registration like lifetime probation); *Commonwealth v. Muniz*, 640 Pa. 699, 738–40 (2017) (similar to probation/parole); *Starkey v. Okla. Dep't of Corrs.*, 305 P.3d 1004, 1022–23 (Okla. 2013) (same); *Wallace v. State*, 905 N.E.2d 371 (Ind. 2009) (same); *Doe v. State*, 189 P.3d 999, 1012 (Alaska 2008) (same).

[4] Although SORA 2021 now allows a few categories of information to be reported by mail, and removed internet reporting requirements for pre-2011 registrants, registrants must still update a huge number or minor changes within three days and most reporting must still be done in person. *See* Obligations Summ., R. 1-3, § 11.

[5] The U.S. government has itself recognized the similarity: the Standard Operating Procedures for the Small Business Administration bar assistance to probationers/ paroles; a person "who is on a sex offender registry is treated as if the individual is on probation or parole." SBA SOP 50 10 5(K) Subpart C, at 293 (Apr. 1, 2019).

defendant cannot be sentenced, registration is recorded on the judgment, and the process of registration is handled by criminal justice agencies, including corrections, probation, parole, and police. M.C.L. § 28.724; Judgment Form, R. 1-19. The sentences for SORA violations, which can reach ten years, M.C.L. § 28.729, exceed those that many probationers and parolees face if they violate probation or parole.

SORA 2021 also resembles shaming punishments. *See Does I*, 834 F.3d at 702. "What distinguishes a criminal from a civil sanction . . . is the judgment of community condemnation which accompanies and justifies its imposition." Henry Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Probs. 401, 404 (1958). The registry is a world-wide wall of shame where registrants are "branded [as] a potentially violent menace by the state." *Betts*, 2021 WL 3161828, at *15. "[T]he internet is our town square. Placing offenders' pictures and information online . . . holds them out for others to shame or shun." *Doe v. State*, 111 A.3d 1077, 1097 (N.H. 2015).

In *Smith*, the majority rejected analogies to shaming, reasoning that Alaska's registry was just a way to obtain conviction information "more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality." 538 U.S. at 99. But as the Michigan Supreme Court has explained, that analogy no longer holds: "The breadth of information available to the public—far beyond a registrant's criminal history—as well as the option for subscription-based notification of the movement

11

of registrants into a particular zip code, [has] increased the likelihood of social ostra-cism based on registration." *Betts*, 2021 WL 3161828, at *11. Other courts agree.[6]

Indeed, "[t]echnology has dramatically changed the form, function, and reach of registry information in the nearly two decades" since *Smith*—a time when only 15% of Americans had broadband internet at home and only 3% were getting most of their news from the internet. Lageson Decl., R. 1-10, ¶¶11, 46–47. Not only has internet use exploded, but "[t]he architecture and user functions available on the Michigan registry encourage browsing, mapping, and tracking registrants, rather than accessing targeted archival information." *Id.*, ¶12. The website does not just list conviction data. It provides detailed personal information, offers extensive search and notification features (e.g., tracking of registrants, location-based browsing of registrant lists, one-click access to maps of registrants' homes), highlights whether registrants are "compliant," and encourages users to "submit a tip" to law enforce-ment. *Id.*, ¶¶26–45. Thus, the design, language, and functionality of the site com-municates that "each person listed [is] a current danger to society." *Id.*, ¶13.

---

[6] *See*, *e.g.*, *Muniz*, 640 Pa. at 738 ("*Smith* was decided in an earlier technological environment"; registration is comparable to shaming "when viewed in the context of our current internet-based world"); *Dep't of Pub. Safety*, 62 A.3d at 141 (internet dissemination leads to ostracism, loss of employment and harassment, and is similar to shaming); *Doe v. Rausch*, 382 F. Supp. 3d 783, 796 (E.D. Tenn. 2019) (similar to shaming); *Doe*, 189 P.3d at 1009–10, 1012 (same); *Wallace*, 905 N.E.2d at 380 (same); *State v. Letalien*, 985 A.2d 4, 23 (Me. 2009) ("[a]ll registrants, including those who have successfully rehabilitated, will naturally be viewed as potentially dangerous person by their neighbors, co-workers, and the larger community").

Moreover, unlike *Smith*, the public need not even visit Michigan's website. Rather, "changes in how the internet organizes and disseminates registry data means that websites 'push' registrant data on internet users who are not even looking for such information." *Id.*, ¶¶16, 49–63. Search engine optimization means registry information is often the top search result for a basic internet search of a registrant's name. *Id.*, ¶¶64–69. Such digital labeling "mak[es] pariahs of registrants, effectively cutting them out of social, institutional, and technological life," causing damage "far beyond the type and extent of harm the Supreme Court considered in 2003 when it decided *Smith*." *Id.*, ¶¶14, 19. Thus today, registration is "much more akin to forcing a person to appear in public" "labeled by the state as a dangerous sex offender," than it is to visiting an archive. *Id.*, ¶31.

The Supreme Court has emphasized the need to account for evolving technology in considering constitutional claims. *See*, *e.g.*, *Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018); *Riley v. California*, 573 U.S. 373, 385 (2014); *Kyllo v. United States*, 533 U.S. 27, 35–36 (2001). And the Sixth Circuit has specifically recognized that the evolution of the internet has changed the consequences of disseminating criminal history information. *See Detroit Free Press, Inc. v. Dep't of Just.* (*Free Press II*), 829 F.3d 478 (6th Cir. 2016) (en banc) (reversing *Detroit Free Press, Inc. v. Dep't of Just.* (*Free Press I*), 73 F.3d 93 (6th Cir. 1996), which had held that people have no privacy interest in mugshot photos). The Court said, "In

1996, this court could not have known or expected that a booking photo could haunt the depicted individual for decades. Experience has taught us otherwise." *Free Press II*, 829 F.3d at 485 (citation omitted). The Court found that disclosure "casts a long, damaging shadow over the depicted individual," and that "modern technology only heightens the consequences of disclosure [because] 'in today's society the computer can accumulate and store information that otherwise would have surely been forgotten.'" *Free Press II*, 829 F.3d at 483 (quoting *U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 771 (1989)). In analyzing the registry's punitive impact, this Court must likewise consider how, as a result of technological change, branding people as "sex offenders" on the internet causes harms that were unimaginable when *Smith* was decided, but that parallel the traditional shaming punishments of old.

### 2. SORA 2021 Imposes Severe Obligations, Disabilities, and Restraints.

Registrants must comply with a dizzying array of obligations and restrictions. Obligations Summ., R. 1-3. They must regularly report *in person* to law enforcement, in most cases *every three months for life*; disclose extensive private information for internet publication; report many changes *in person within three days* (including events like enrolling in a college class or volunteering); and report many other minor changes (like getting a new phone number or selling a car) *within three days* either in person or by mail. *Id.*, §§ 10–11. They must report domestic travel

seven days in advance and international travel 21 days in advance, and are entirely barred from traveling during time periods that would interfere with their in-person reporting obligations. *Id.*, § 6. They must submit to having their biometric information and photographs taken, and pay an annual fee. *Id.*, §§ 5, 12. They are subject to ongoing supervision, including police home-visits and compliance sweeps. Compl., R. 1, ¶¶387–403. "[I]t belies common sense to suggest that a newly imposed life-time obligation to report to a police station every ninety days to verify one's identification, residence, and school, and to submit to fingerprinting and provide a current photograph, is not a substantial disability or restraint on the exercise of individual liberty." *Betts*, 2021 WL 3161828, at \*13 (quoting *Letalien*, 985 A.2d at 24–25).[7]

A "failure to comply with these restrictions carries with it the threat of serious punishment, including imprisonment" for up to 10 years. *Does I*, 834 F.3d at 703; M.C.L. § 28.729. "Imprisonment is the 'paradigmatic' affirmative restraint." *Betts*, 2021 WL 3161828, at \*12 (quoting *Smith*, 538 U.S. at 86). Thousands of registrants

---

[7] *See also Does I*, 834 F.3d at 703 (requiring registrants to appear in person is a "direct restraint[] on personal conduct"); *Muniz*, 640 Pa. at 735 (frequent in-person reporting—at least 100 times in 25 years for Tier IIIs—is affirmative restraint); *Starkey*, 305 P.3d at 1022–23 (finding restraint where registrant must appear in person "every 90 days for life and every time he moves, changes employment, changes student status, or resides somewhere for 7 consecutive days"); *Wallace*, 905 N.E.2d at 379 (registry "imposes significant affirmative obligations and a severe stigma…, and compels affirmative post-discharge conduct . . . under threat of prosecution"); *Doe*, 189 P.3d at 1011–12 (significant restraint because compelled to contact law enforcement and disclose private information for public dissemination).

have already been prosecuted and incarcerated. Levine Decl., R. 1-11, ¶¶27, 30, 32. For the rest, the threat of "being lugged off in cold irons bound . . . [is] always in the background." *Does I*, 834 F.3d at 703.

Perhaps the most punitive aspect of SORA 2021 is that it destroys an individual's right to live like other free persons in society. Registration not only triggers countless legal barriers, but also is intensely stigmatizing, leading the public to believe that all registrants are dangerous, and creating enormous obstacles to employment, housing, and maintaining basic human relationships. Socia Decl., R. 1-7, ¶¶17–23. Registration is state-sanctioned ostracism. In holding that a similar all-encompassing regime—denaturalization—is punishment, the Supreme Court said:

> There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society. . . . [The individual has] lost the right to have rights.

*Trop v. Dulles*, 356 U.S. 86, 101–02 (1958). SORA 2021 is at least as destructive.

### 3. SORA Serves the Traditional Aims of Punishment.

The Sixth Circuit found that "SORA advances all the traditional aims of punishment: incapacitation, retribution and specific and general deterrence," but gave this factor less weight because some of those goals are also regulatory. *Does I*, 834 F.3d at 704. Retribution, however, is not a regulatory purpose, and the Sixth Circuit noted that SORA "is retributive in that it looks back at the offense (and nothing else) in imposing restrictions, and it marks registrants as ones who cannot be fully

admitted into the community." *Id.*[8] SORA 2021 does exactly the same thing.

### 4. SORA 2021 Is Not Rationally Related to a Non-Punitive Interest.

SORA 2021 is ostensibly supposed to "protect[] against the commission of future criminal sexual acts by convicted sex offenders." M.C.L. § 28.721a. The law is not rationally related to that purpose.

First, as J.J. Prescott, a leading scholar in the field, explains:

> community notification laws do not appear to be effective at reducing recidivism; if anything, they increase it. The many burdens registrants experience when subject to notification—the extreme notoriety that accompanies it, and the poor and unstable housing and employment and the difficulty of reintegrating into society that emanate from it—go a long way toward making sense of why my research finds notification laws are associated with *increases* in recidivism.

Prescott Decl., R. 1-6, ¶19. Elizabeth Letourneau, another leading scholar, concurs:

> [R]egistration and notification laws—and especially laws based largely on conviction offense versus validly estimated recidivism risk—simply do not reduce sexual (or nonsexual) recidivism. . . . [L]aws like Michigan's don't work and are costly. They also have unintended effects that may imperil community safety. . . . Registries also increase the likelihood of ex-offenders experiencing joblessness, homelessness, and disconnection from prosocial friends and family, which in turn

---

[8] *See also, e.g.*, *Muniz*, 640 Pa. at 744 (finding law similar to Michigan's to be retributive); *Baker*, 295 S.W.3d at 444 (when a restriction is "imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than regulation intended to prevent future ones"); *Starkey*, 305 P.3d at 1027–28 (extending registration period without individual assessment of risk is retributive); *Doe*, 189 P.3d at 1014 (when law "determines who must register based not on a particular determination of the risk the person poses to society but rather on the [conviction]," it creates a "retributive effect that goes beyond any non-punitive purpose and that essentially serves the traditional goals of punishment").

*increase* sexual and non-sexual recidivism.

Letourneau Decl., R. 1-5, ¶¶11, 23. In fact, "the more people a state subjects to community notification, the *higher* the relative frequency of sex offenses in that state." Prescott Decl., R. 1-6, ¶11. Thus, "it is likely that, far from reducing sex offense recidivism, [SORA 2021] is actively increasing the total number of sex offenses each year in the state." *Id.*, ¶13. *See also* Socia Decl., R. 1-7, ¶¶5–8. That counterproductive approach is also extremely expensive. Letourneau Decl., R. 1-5, ¶¶17–18; Zgoba Decl., R. 1-8, ¶¶4–11; Levine Decl., R. 1-11, ¶¶10–13.

Second, the average sexual recidivism risk of people with a past sex offense is low, and declines even further over time.[9] Hanson Decl., R. 1-4, ¶¶3, 10–18; Letourneau Decl., R. 1-5, ¶12. After 10 years in the community offense-free, most people with a history of sexual offending pose no more risk than do males in the general population, and after 20 years the risk is negligible for all. Hanson Decl., R. 1-4, ¶3. Registration of "these very low risk individuals serve[s] no public protection function." *Id*. Because Michigan's registry lacks risk assessments and imposes extraordinarily long registration terms, it "fail[s] to distinguish between the large percentage of people who present a lower risk of re-offending (especially over time) and the much smaller percentage of people who present a higher risk of re-offending

---

[9] The pronouncements in *Smith* about high sexual recidivism rates were based on an article that has since been thoroughly discredited. Socia Decl., R. 1-7, ¶¶ 9–12.

(although that risk also decreases over time)." Letourneau Decl., R. 1-5, ¶6.

Third, approximately 90 to 95 percent of sex crime arrests involve individuals who *do not* have prior sex crime convictions, and thus who are not listed on a sex offender registry at the time of the offense. Socia Decl., R. 1-7, ¶2. Registries therefore misidentify the source of the risk.

Courts—including the Sixth Circuit and the Michigan Supreme Court—have increasingly recognized the academic consensus that registries do not work. *See, e.g.*, *Does I*, 834 F.3d at 704 (questioning rationality of SORA based on evidence "that offense-based public registration has, at best, no impact on recidivism"); *Betts*, 2021 WL 3161828, at *15 (questioning SORA's efficacy); *Doe v. Rausch*, 461 F. Supp. 3d 747, 767 (E.D. Tenn. 2020) (no support for notion that lifetime registration accomplishes purported public safety goals); *Reid*, 476 F. Supp. 3d. at 708 ("many of the restrictions . . . serve no discernible purpose"). *Cf. Doe v. Miami-Dade Cty.*, 846 F.3d 1180, 1186 (11th Cir. 2017) (reversing dismissal of ex post facto claim where plaintiffs alleged restrictions undermined public safety goals). The fact that Michigan adopted SORA 2021 despite overwhelming testimony, including expert evidence, that registries are counterproductive, and in the absence of any evidence that the law protects the public, highlights this irrationality. Compl., R. 1, ¶¶629–31.

In *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354 (6th Cir. 1992), the Sixth Circuit, applying rational basis review, invalidated a regulation restricting housing

for released prisoners because the city's only justification was the unsupported assertion that prisoners might reoffend. If the goal is to protect against recidivism, "then some data reflecting the extent of the danger must exist." *Id.* at 1361. "Negative attitudes," "unsubstantiated" fears, or the "desire to impede a politically unpopular group" cannot provide a rational basis for restrictions, absent actual evidence of danger. *Id.* at 1360–61 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)). Likewise, a law passed based on "conjecture about the dangers posed by sex offenders [where n]o data or studies on the matter were considered" is irrational. *Hoffman v. Village of Pleasant Prairie*, 249 F. Supp. 3d 951, 960 (E.D. Wis. 2017).

### 5.  SORA Is Excessive in Relation to Non-Punitive Interests.

SORA 2021 is excessive in relation to its avowed public safety goals. Like its predecessor, SORA 2021 subjects tens of thousands of people to life-altering restrictions *without any evidence that the registry protects the public*. And as with the prior law, "while the statute's efficacy is at best unclear, its negative effects are plain on the law's face. . . . [The law's] punitive effects . . . far exceed even a generous assessment of [its] salutary effects." *Does I*, 834 F.3d at 705.

The central features that the courts found excessive in the old SORA remain in SORA 2021. The law continues to "brand[] registrants as moral lepers solely on the basis of a prior conviction," *id.*, and to impose "demanding and intrusive requirements . . . regardless of an individual's risk of recidivism." *Betts*, 2021 WL 3161828,

at *15. SORA 2021 continues to mandate frequent reporting to law enforcement for minor life changes and regular in-person reporting even when no information has changed. *Id.* The duration of these requirements is "based solely on the offender's conviction and not the danger he individually posed to the community." *Id.* Moreover, because SORA 2021 lacks individualized assessment and has extremely long/lifetime registration terms, there are likely tens of thousands of registrants whose risk of sex offending is at or below that of the average male. Hanson Decl., R. 1-4, ¶3. Imposing SORA 2021's extensive burdens on tens of thousands of people who present no appreciable risk is excessive.[10] *See United States v. Carter*, 463 F.3d 526 (6th Cir. 2006) (sex-offender-treatment condition not reasonably related to public protection given how much time had passed since the offense).

Weighing the *Mendoza-Martinez* factors, both the Sixth Circuit and the Michigan Supreme Court found the very similar prior version of SORA to be punishment. Courts around the country have likewise increasingly recognized that registration is

---

[10] For many courts, it is the excessiveness of modern "super-registration" statutes that tips the balance of the *Mendoza-Martinez* factors to a finding of punishment. *See, e.g.*, *Muniz*, 640 Pa. at 748 (over-inclusiveness of law in requiring registration of people who do not pose a risk makes it excessive); *Doe*, 111 A.3d at 1100 (lifetime registration "without regard to whether [registrants] pose a current risk to the public" is "wholly punitive"); *Wallace*, 905 N.E.2d at 384 (excessive because no mechanism to end registration even on clearest proof of rehabilitation); *Starkey*, 305 P.3d at 1030 (imposition of "severe restraint on liberty without a determination of the threat a particular registrant poses to public safety" is excessive); *Doe*, 189 P.3d at 1018.

punitive, focusing on the lack of individualized assessment, the length of the registration terms, the onerousness of ongoing reporting, and the extraordinary harms of internet stigmatization as a "sex offender" to find that these schemes violate the Ex Post Facto Clause.[11] This Court should do the same.

### D. The Court Should Bar Retroactive Application of SORA 2021 to Pre-2011 Registrants Absent an Individualized Assessment of Risk.

In *Kansas v. Hendricks*, the Court held that the civil commitment of people with past sex offenses did not violate the Ex Post Facto Clause because it was based on *individualized* determinations of *current* dangerousness. 521 U.S. at 368–71. The challenged statute was deemed regulatory, not punitive, because it "unambiguously requires a finding of dangerousness," because restrictions ended immediately "upon a showing that the individual is no longer dangerous," and because the state had "taken great care to confine only a narrow class of particularly dangerous

---

[11] *See, e.g., Letalien*, 985 A.2d at 26 (retroactive imposition of lifetime registration and in-person reporting without opportunity for removal is punitive); *Starkey*, 305 P.3d at 1029 (extending registration periods without individual assessment violates ex post facto); *State v. Williams*, 952 N.E.2d 1108, 1113 (Ohio 2011) (frequent registration for long periods of time absent individualized finding of dangerousness is punitive); *Wallace*, 905 N.E.2d at 384 (registration "without regard to . . . particular future risk" violates ex post facto); *Doe*, 189 P.3d at 1017, 1019 (punitive because imposes extensive burdens but fails to distinguish based on risk or allow for removal); *Rausch*, 382 F. Supp. 3d at 798 (ex post facto violation where "stated legislative purposes appear to be supported by popular stereotypes, rather than any individualized assessment of dangerousness"); *Dep't of Pub. Safety*, 62 A.3d at 143; *cf. Does v. Wasden*, 982 F.3d 784, 791–92 (9th Cir. 2020) (reversing dismissal of ex post facto claim because registrants sufficiently alleged punitiveness).

individuals, and then only after meeting the strictest procedural standards." *Id.* at 357, 364, 368–69. Thus, under *Hendricks*, the state can impose significant restraints on those who truly present a danger, but it can only do so based on a procedurally safeguarded and regularly reviewed *individualized* determination.

Here, too, this Court can make clear that a decision finding SORA 2021 violates the Ex Post Facto Clause does not necessarily prevent Michigan from imposing reasonable registration requirements on people who are presently dangerous. What the state cannot do is retroactively impose the current repressive regime absent individual assessments to determine if such extensive restrictions on a person's liberty are warranted. *See Doe*, 111 A.3d at 1101 (registration could be retroactively applied only after a hearing, and periodic review, to assess if the person posed a risk sufficient to justify registration requirements).

In sum, SORA 2021, like its predecessor, may not be retroactively applied to pre-2011 registrants absent individualized review. Accordingly, Plaintiffs ask that the Court enjoin retroactive application of SORA 2021 to the pre-2011 ex post facto subclass, which is defined as registrants whose offenses predate the 2011 amendments—amendments which are almost entirely replicated in the new statute, despite the fact that the Sixth Circuit held that they may not be retroactively applied.

## II. Retroactively Imposing Lifetime Registration Violates the Constitution's Ex Post Facto and Due Process Clauses.

Thousands of registrants have been retroactively required to register for life

due to successive SORA amendments. Most notably, before the 2011 amendments, almost **three-quarters** of Michigan's registrants were required to register **for 25 years**. After the 2011 amendments retroactively classified registrants into tiers, almost **three-quarters** of registrants were required to register **for life**. There were 11,313 lifetime registrants before the 2011 amendments and 28,680 after those amendments were implemented. Compl., R. 1, ¶606. In other words, more than 17,000 people suddenly had to register for the rest of their lives, all without any individualized assessment. *Id.* Retroactively imposing lifetime registration violates both the Ex Post Facto and Due Process Clauses, constitutional provisions that "safeguard common interests—in particular, the interests in fundamental fairness (through notice and fair warning) and the prevention of the arbitrary and vindictive use of the laws." *Rogers v. Tennessee*, 532 U.S. 451, 460 (2001).

## A. Retroactively Imposing Lifetime Registration Violates the Ex Post Facto Clause.

The Ex Post Facto Clause categorically prohibits retroactive criminal punishment, and Plaintiffs have explained above why SORA 2021 is punishment. Those arguments apply with even greater force to the retroactive imposition of lifetime registration—an especially punitive feature of the law. Plaintiffs here add only that lifetime registration is particularly irrational and excessive in relation to any non-punitive interest, key factors in the *Mendoza-Martinez* test. *See Does I*, 834 F.3d at 704–05. Because the risk of reoffending drops off dramatically over time, and indeed

drops below the baseline rate for the average male after 10 years in most cases and after 20 years for those initially at highest risk, "lengthy and lifetime registration terms serve no public protection function." Hanson Decl., R. 1-4, ¶¶3.f, 26, 55–75.

Unsurprisingly, courts have repeatedly recognized that retroactively extending registration to life violates the Ex Post Facto Clause. As the Oklahoma Supreme Court explained, through such retroactive increases in registration terms, "[t]he legislature has continued to move the *finish line* without a hearing and with no change in circumstances." *Starkey*, 305 P.3d at 1029. *See also Rausch*, 382 F. Supp. 3d at 799 (retroactively extending registration from 10 years to life was excessive because no evidence of any positive effects); *Letalien*, 985 A.2d at 26 (retroactive extension to lifetime registration violates ex post facto); *Doe v. Dep't of Pub. Safety and Corr. Servs.*, 62 A.3d 123, 140 (Md. Ct. App. 2013) (retroactively imposing lifetime registration "was the equivalent of placing Petitioner on probation for life").

## B. Retroactively Imposing Lifetime Registration Violates Due Process.

Even if this Court were to decide that SORA 2021 is regulatory and not punitive, retroactive imposition of lifetime registration still violates due process.[12] Retroactivity outside the criminal law, though not unconstitutional *per se*, is highly disfavored, reflecting "a legal doctrine centuries older than our Republic," that it is fundamentally unfair to impair rights or create new disabilities with respect to past

---

[12] The court only needs to reach due process if it rejects the ex post facto claim.

actions. *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (citation omitted). "Retro-active legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expec-tations and upset settled transactions." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992). "The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 844 (1990) (Scalia, J., concurring).

Accordingly, the Due Process Clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf*, 511 U.S. at 266. Retroactive legislation must thus "meet a burden not faced by legislation that has only future effects," a burden of showing that "the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984); *see also Landgraf*, 511 U.S. at 266 ("a justification sufficient to validate a statute's prospective application under the [Due Process] Clause may not suffice to warrant its retroactive application"). In other words, the constitutionality of retroactive legislation is "conditioned upon a rationality requirement beyond that applied to other legislation." *Bowen v. George-town Univ. Hosp.*, 488 U.S. 204, 223 (1988) (Scalia, J. concurring); *see also Eastern Enterprises v. Apfel*, 524 U.S. 498, 524 (1998) (explaining the "stricter limits" for

26

retroactive legislation). In particular, retroactive legislation that is "harsh and oppressive" violates due process. *Welch v. Henry,* 305 U.S. 134, 147 (1938).

Courts consider several factors in determining whether retroactive legislation is unconstitutionally harsh and oppressive. First, because due process "incorporate[s] our settled tradition against retroactive laws of great severity," courts consider how serious the retroactive consequences are. *Eastern Enterprises*, 524 U.S. at 549 (Kennedy, J., concurring in the judgment and dissenting in part). A law is suspect if "it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Id.* at 528–29 (plurality). As the Fifth Circuit recently explained in finding a due process violation where the retroactive application of a rule change resulted in fines for conduct that occurred before that change, "courts should consider 'whether, without notice, a statute gives a different and more oppressive legal effect to conduct undertaken before enactment of the statute.'" *Texas Ent. Ass'n v. Hegar*, 10 F.4th 495 (5th Cir. 2021) (quoting *United States v. Hemme*, 476 U.S. 448, 569 (1986)). Retroactively increasing the severity of an existing penalty likewise raises constitutional red flags: "The *extent* of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored." *Landgraf*, 511 U.S. at 283–84; *see also BMW of N. Am.*, *Inc. v. Gore*, 517 U.S. 559, 574 (1996) (due process requires notice of the

severity of a potential penalty in civil litigation).

Second, courts consider whether a statute's retroactive reach is "confined to short and limited periods." *United States v. Carlton*, 512 U.S. 26, 32 (1994) (citation omitted); *id.* at 38 (O'Connor, J., concurring) (noting that a retroactivity period of more than a year would raise "serious constitutional questions" and that every retroactive law upheld reached back only a short period); *Eastern Enterprises*, 524 U.S. at 534 (expressing concern about "[t]he distance into the past that the Act reaches"); *id.* at 549 (Kennedy, J., concurring and dissenting) ("[T]he degree of retroactive effect . . . is a significant determinant in the constitutionality of a statute . . . .").

Third, courts look at the extent to which notice would have impacted a person's decisions. "[W]hen addressing ex post facto-type due process concerns, questions of notice, foreseeability, and fair warning are paramount." *United States v. Barton*, 455 F.3d 649, 654–55 (6th Cir. 2006). In *Barton*, the Sixth Circuit explained that whether retroactive changes affecting criminal defendants violate due process depends in part on whether "the change in question would [or would] not have had an effect on anyone's behavior." *Id.* at 655. Defendants are not entitled to notice of all "collateral" consequences, but notice is required where consequences are both significant and "intimately related to the criminal process," even if they are "not, in a strict sense, a criminal sanction." *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010). Thus, the Supreme Court barred the retroactive application of a law altering the

immigration consequences of crimes because defendants "rely[] upon settled practice, the advice of counsel, and perhaps even the assurance in open court," and therefore the "potential for unfairness in the retroactive application . . . is significant and manifest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 323 (2001). "[I]t would surely be contrary to familiar considerations of fair notice, reasonable reliance, and settled expectations" retroactively to impose more severe conviction-based consequences. *Id.*

Finally, the Supreme Court has been especially concerned that when the "Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration," "[i]ts responsivity to political pressures pose[] a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals." *Landgraf*, 511 U.S. at 266. *See United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1054 (9th Cir. 2004) (Pregerson, J., concurring) (retroactive application of changes to immigration law violated due process because they targeted people who committed crimes, an unpopular group, and because "it is arbitrary to assume that all such persons threaten our society because they committed a crime at some time in the past").

Applying these factors here, retroactively imposing lifetime registration is

harsh and oppressive in violation of due process.[13] First, the consequences are indisputably severe: state stigmatization and supervision for the rest of one's life.

Second, the law's retroactive reach is extreme, imposing draconian consequences based on conduct that occurred decades ago. For example, when Mr. Doe B was convicted in 1998 as a 19-year-old for having sex with a 14-year-old, he was required to register for 25 years, meaning he would come off the registry in 2023 at age 45. And when Mr. Doe E (who has a developmental age of nine or ten) pled in 1994, there was no registry at all. After SORA's retroactive amendments, the only way for either of them to come off the registry is to die. Compl., R. 1, ¶¶53, 127.

Third, the lack of notice is consequential, because considerations about registration are central to how defendants litigate their criminal cases. Compl., R. 1, ¶¶612–21. Lifetime sex offender registration, like deportation, is a "severe penalty" that is "intimately related to the criminal process." *Padilla*, 559 U.S. at 357, 365. *See* Compl., R. 1, ¶¶612–18. Indeed, recognizing that defendants cannot make informed decisions if they lack notice of potential registration consequences, numerous courts, including the Michigan Court of Appeals, have held that counsel who fail to advise defendants of this sanction are constitutionally ineffective.[14] If today's criminal

---

[13] Plaintiffs do not contend that every retroactive change to SORA independently meets the "harsh and oppressive" standard. But the retroactive imposition of *lifetime* registration does, and it therefore violates due process.

[14] *See*, *e.g.*, *People v. Fonville*, 804 N.W.2d 878 (Mich. Ct. App. 2011); *Commonwealth v. Thompson*, 548 S.W.3d 881 (Ky. 2018); *State v. Trammell*, 387 P.3d 220,

defendants are entitled to notice a conviction will result in registration, then it is fundamentally unfair to impose lifetime registration retroactively when no such notice was given.

Finally, the risk of "retroactive legislation as a means of retribution against unpopular groups or individuals," *Landgraf*, 511 U.S. at 266, is particularly high here, as there is no group more despised than people with sex offenses. As Justice Souter said, concurring in *Smith*, 538 U.S. at 109:

> The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones.

Because retroactive lifetime registration "sweeps in a broad class of [people] who have committed a crime at some time in the remote past, no matter how young they were when they committed the offense, no matter how they have straightened out their lives, [and] no matter whether they have become loyal hardworking employees, good neighbors, taxpayers, and an asset to their communities," there is reason to believe it is being used as retribution against an unpopular group. *Ubaldo-Figueroa*, 364 F.3d at 1054 (Pregerson, J., concurring). Lifetime registration, even applied

---

227 (N.M. 2016); *Taylor v. State*, 698 S.E.2d 384 (Ga. Ct. App. 2010); *People v. Dodds*, 7 N.E.3d 83 (Ill. Ct. App. 2014); *see also United States v. Riley*, 72 M.J. 115 (C.A.A.F. 2013) (court should not have accepted plea without ensuring defendant understood sex offender registration requirement).

prospectively, serves no legitimate purpose. Retroactively requiring people to register for life based on decades-old offenses can only be explained as retribution against an unpopular group. *Landgraf*, 511 U.S. at 266. *See also* Ira M. Ellman, *When Animus Matters and Sex Crime Underreporting Does Not: The Problematic Sex Offender Registry*, 7 U. Pa. J. L. & Pub. Affairs 1, 12–17 (2021).

In sum, as Justice Scalia and Justice Story commented a century apart, retroactive laws offend "fundamental notions of justice" and "neither accord with sound legislation nor with the fundamental principles of the social compact." *Kaiser Aluminum*, 494 U.S. at 855 (Scalia, J., concurring); 2 J. Story, *Commentaries on the Constitution* § 1398 (5th ed. 1891). Retroactively imposing lifetime registration denies Plaintiffs fair notice, upsets their settled expectations, is harsh and oppressive, and thus violates due process.

## III.   Denying Similarly Situated Registrants the Opportunity to Petition for Removal from the Registry Violates the Equal Protection Clause.

"The line drawn by the legislature between offenders who are sensibly considered eligible to seek discretionary relief from the courts and those who are not is, like all legislative choices affecting individual rights, open to challenge under the Equal Protection Clause." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 10 (2003) (Souter, J., concurring). SORA 2021 allows certain registrants who meet strict eligibility criteria to petition the court for removal from the registry after ten years based on a judicial finding that registration is not warranted. M.C.L. § 28.728c(11). Other

similarly situated registrants—the barred from petitioning subclass[15]—are denied that opportunity even though they meet the exact same eligibility criteria. That scheme is irrational and violates the Equal Protection Clause.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne*, 473 U.S. at 439. A violation of equal protection occurs when (1) plaintiffs are "treated differently than other[s] . . . who [are] similarly situated in *all material respects*," and (2) the state has no rational basis for the different treatment. *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462, 465 (6th Cir. 2012). Both elements are met here.

### A. The Barred From Petitioning Subclass Is Similarly Situated to Registrants Who Are Eligible to Petition for Removal.

Tier I adult registrants can petition for removal from the registry after ten years if they have not been convicted of any other registrable offense or felony; have

---

[15] The subclass is defined as members of the primary class who are ineligible to petition for removal from the registry and for whom ten or more years will have elapsed since the date of their conviction for the registrable offense(s) or from their release from any period of confinement for that offense(s), whichever occurred last, and who (a) have not been convicted of any felony or any listed offense since; (b) have successfully completed their assigned periods of supervised release, probation, or parole without revocation at any time of that supervised release, probation, or parole; and (c) have successfully completed an appropriate sex offender treatment program, if successful completion of a sex offender treatment program was a condition of the registrant's confinement, release, probation, or parole. This definition mirrors the criteria for those eligible to petition. *See* M.C.L. § 28.728c(1), (12).

successfully completed supervised release, probation or parole; and have success-

fully completed any required sex offender treatment. M.C.L. § 28.728c(1), (12).

Juveniles who meet those same criteria can petition but must wait 25 years. M.C.L.

§ 28.728c(2), (13). All other registrants who meet those criteria, however, can *never*

petition,[16] regardless of the circumstances of their offense, how many decades have

passed, or what the individual has done to demonstrate rehabilitation. The only dif-

ference between those eligible to petition for removal and those in the barred from

petitioning subclass is that the former were convicted of Tier I offenses, *id.* § 28.722

(r), and the latter of Tier II or Tier III offenses, *id.* § 28.722(s), (v).

    The barred from petitioning subclass is similarly situated in all *material*

respects to petition-eligible registrants. Although the groups differ in their under-

lying offenses, the offense of conviction is not material to the purpose of the peti-

tioning provision—allowing people to seek removal from the registry if they are

rehabilitated. An equal protection challenge tolerates non-material differences. *See*

*TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty.*, 430 F.3d 783, 790 (6th Cir. 2005).

After all, a court "should not demand exact correlation [between the differently

---

[16] Technically, individuals may also "petition" for removal if they are erroneously
listed even though their offense is non-registrable, M.C.L. §§ 28.722(t)(v), (t)(vi),
(t)(x), (v)(iv), 28.723, 28.728c(3), (14) & (15). Such individuals are not statutorily
subject to SORA 2021, and thus the Act provides a method for correcting that error.
The issue here is whether individuals who are statutorily subject to SORA 2021 may
seek discretionary relief by showing that they are not a danger to the public.

treated parties], but should instead seek relevant similarity." *Loesel*, 692 F.3d at 462 (internal quotation omitted). In *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005), the Sixth Circuit rejected the notion that prisoners, prosecutors, and victims could not be similarly situated with respect to a statute about who can appeal parole decisions because "[t]he challenged statute merely seeks to define the appellate options available to parties aggrieved by decisions of the parole board, [and] prisoners, as well as prosecutors and crime victims, can be aggrieved by such determinations." Thus, "[t]he mere identification of differences is not enough; equal protection 'require[s] that a distinction made have some relevance to the purpose for which the classification is made.'" *Doe v. Austin*, 848 F.2d 1386, 1394 (6th Cir. 1988) (quoting *Baxstrom v. Herold*, 383 U.S. 107, 111 (1966)).

Here, the purpose of SORA's petitioning process is to allow for removal from the registry of people who do not present a risk of reoffending, through discretionary judicial review. To grant a petition, the court must determine that the individual is not "a continuing threat to the public," and must consider a variety of factors to make that risk determination, such as criminal history and likelihood of further offenses. M.C.L. § 28.728c(11). The petitioning provision thus functions as an escape valve, providing an opportunity for people to demonstrate that registration is not warranted.

The barred from petitioning subclass is similarly situated to petition-eligible

registrants in all respects that are material to that purpose: both groups have registered for ten years; have not been convicted of any other registrable offense or felony; have successfully completed supervised release, probation or parole; and have successfully completed any required sex offender treatment. The only difference between the groups—the tier classification of the underlying offense—is not relevant to the statutory provision's goal of providing a path off the registry for individuals who are rehabilitated. Individuals in any tier can be rehabilitated.

Although states may of course punish some offenses more severely than others, the Supreme Court has made clear that the Equal Protection Clause forbids line-drawing based on offense history where such line-drawing bears no relationship to the statutory purpose. In *Baxstrom v. Herold*, the Court held that a New York statute governing civil commitments violated the Equal Protection Clause because persons facing civil commitment who were not serving a prison term were entitled to a jury trial to determine their sanity whereas persons who faced civil commitment at the end of their prison term had no such right. 383 U.S. at 111. Although the state claimed that individuals' "past criminal records" justified the disparate treatment, the Court squarely rejected that argument because "the State ha[d] provided for a judicial proceeding to determine the dangerous propensities of all others civilly committed." *Id.* at 114. "[H]aving made this substantial review proceeding" available to others, the state "may not, consistent with the Equal Protection Clause . . . arbitrarily

withhold it from some."[17] *Id.* at 111.

### B. Denying the Barred from Petitioning Subclass an Opportunity to Seek Removal from the Registry Is Irrational.

Tier classifications do not correspond to the risk of reoffending, and hence to the standard for removal from the registry. *See* M.C.L. § 28.728c(11). Classifications based on the conviction offense "have *no bearing on recidivism risk*." Letourneau Decl., R. 1-5, ¶13. In fact, if anything, tiering systems have it exactly *backwards*: people in Tier II or Tier III are even less likely to reoffend than those in Tier I. *See* Letourneau Decl., R. 1-5, ¶13; Zgoba Decl., R. 1-8, ¶36–38; Hanson Decl., R. 1-4,

---

[17] Indeed, courts have repeatedly struck down disparate treatment based solely on criminal history. *See, e.g.*, *Rinaldi v. Yeager*, 384 U.S. 305, 307–10 (1966) (sustaining equal protection challenge to a statute that imposed transcript costs on incarcerated but not non-incarcerated criminal appellants, because the seriousness of a person's criminal record bore "no relationship whatever to the purpose of the repayment provision" and was "unrelated to the fiscal objective of the statute); *James v. Strange*, 407 U.S. 128 (1972) (equal protection violated by statute that treated indigent criminal defendants differently than other classes of debtors); *Cameron v. Mullen*, 387 F.2d 193, 201 (D.C. Cir. 1967) (while prior criminal conduct is relevant to determination of whether person is dangerous, "it cannot justify denial of procedural safeguards for that determination"); *Doe v. Saenz*, 45 Cal. Rptr. 3d 126, 143 (Ct. App. 2006) (holding in equal protection challenge to a law that barred individuals with certain convictions from working in community care facilities that "while persons convicted of different crimes may be dissimilar for punitive or rehabilitative purposes, . . . there is nothing unique in [the challenged statute's] protective purpose or in the types of different convictions at issue that renders persons convicted of the various offenses dissimilar for equal protection purposes").

¶28. In any event, most registrants, regardless of tier, cross the desistance threshold[18] after ten years in the community offense-free—the same time threshold set for eligible Tier I people to petition. Hanson Decl., R. 1-4, ¶3; *see also* Letourneau Decl., R. 1-5, ¶13. Because registrants' risk levels decline the longer they stay offense-free, a Tier II or III registrant who has lived successfully in the community for decades is likely to have an even lower risk of reoffending than a Tier I registrant after ten years. *See* Hanson Decl., R. 1-4, ¶47. Yet only the latter individual can seek to discontinue registration—a plainly illogical result. *See Miller v. Carter*, 547 F.2d 1314, 1316 (7th Cir. 1977) (finding a legislative scheme irrational that provided discretionary review to individuals whose disqualifying offense had occurred recently, while denying the same to those whose offense occurred many years in the past), *aff'd by an equally divided court*, 434 U.S. 356 (1978).

The facts here highlight the scheme's irrationality. Every single subclass representative is low risk. *See* Ulrich Decl., R. 1-9, ¶¶2, 22, 24, 44–45. Mr. Doe C, for example, is a Tier III lifetime registrant who is married to and has three children with the victim of the offense. Compl., R. 1, ¶¶60–61. He has been assessed a recidivism risk of only 0.9%, which is well below a *very low* risk classification and is no greater than that of the average male in the general population—yet he is not

---

[18] "Desistance mean[s] that the individuals' risk of future sexual offending has dropped below a level where there is no longer any public protection benefit to sexual offender specific interventions." Hanson Decl., R. 1-4, ¶64.

even given a chance to show that registration is inappropriate in his case. *See* Ulrich Decl., R. 1-9, ¶¶28–29. A legislative scheme that fails to provide people like him with discretionary review, while offering it to others, defies common sense.

Similarly, requiring juveniles to wait fifteen years longer than adults to petition makes no sense. The recidivism rate of children adjudicated delinquent of sex crimes as minors is less than 3%, nearly all of which occurs within the first two-three years post-release. Letourneau Decl., R. 1-5, ¶10. Moreover, "w*ithout exception* the entire published research literature focusing on juvenile registration and notification fails to find any public safety effect of SORNA-based laws." *Id.* ¶¶6,10. The dearth of evidence supporting juvenile registration, let alone their harsher treatment, explains why courts have repeatedly struck down provisions that subject juvenile registrants to stricter requirements than adult registrants. *See In re Z.B.*, 757 N.W.2d 595, 600 (S.D. 2008) (holding that registration statute violated equal protection because some adults convicted of sex offenses could be removed from the registry, while juveniles could not: "we cannot conceive of any state of facts to suggest a rational basis for the harsher treatment of juveniles"); *State v. C.M.*, 746 So.2d 410, 415 (Ala. Crim. App. 1999) (per curiam) ("[u]nder any level of review, the statute violates principles of equal protection" because "there is no rational basis for treating adult sex offenders differently than juvenile sex offenders").

Arbitrarily denying most registrants the opportunity to petition for removal is

also irrational because continued registration of rehabilitated people imposes a significant strain on the state's resources. Registries impose huge costs. Letourneau Decl., R. 1-5, ¶¶17–18; Zgoba Decl., R. 1-8, ¶¶4–8; Levine Decl., R. 1-11, ¶¶10–13. Michigan spends $1 million for the MSP Sex Offender Registration unit and more than $11 million for SORA-related incarceration annually. Levine Decl., R. 1-11, ¶18, 38. Those numbers do not include costs—likely several million dollars more—imposed on law enforcement agencies responsible for registration, investigation, and enforcement (like registry sweeps), or costs for prosecution of registry violations. *Id.*, ¶12. Nor does it not include costs associated with registrants' loss of employment and housing. Letourneau Decl., R. 1-5, ¶18; Zgoba Decl., R. 1-8, ¶8. If rehabilitated registrants could be removed from the registry through petitioning, these costs could be significantly reduced as well.

In sum, because there is a "lack of evidence" supporting the state's tier-based restrictions on access to the petitioning process, these restrictions violate the Equal Protection Clause. *Hoffman*, 249 F. Supp. 3d at 962; *cf. Doe v. Jindal*, 851 F. Supp. 2d 995 (E.D. La. 2012). The Court should therefore enjoin Defendants from denying the barred from petitioning subclass the opportunity to petition for removal on the same terms as registrants eligible to petition under M.C.L. § 28.728c(1), (12).

## IV.   SORA 2021's Extensive Compelled Disclosure Requirements Violate the First Amendment.

### A. SORA 2021 Compels Speech in Support of the State's Message that Registrants Are Dangerous.

SORA 2021 compels speech, requiring registrants to report a vast amount of information, often in person and within three business days. SORA 2021 commands both where registrants must speak and what they must say: they must go to a police station, say they are a sex offender, and then disclose everything from electronic identifiers, to travel plans, to education, to weight, to tattoos. The process is both humiliating—typically taking place in public police station lobbies—and time-consuming—forcing registrants to take time off work or spend hours trying to report. *See* Compl., R. 1, ¶¶376–86; Verification Form, R. 1-17. These requirements are imposed without any individualized review, last for life in most cases, and have a chilling effect on registrants' constitutionally protected speech and association. Compl., R. 1, ¶¶467–513 (describing how Plaintiffs do not use the internet, take college classes, or travel to visit family so as not to have to report those activities).

The information registrants are compelled to provide is then used by the state to craft a widely disseminated message that they are dangerous sex offenders whom the public should fear. "We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of [a person] as a sex offender." *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) (quoting *Vitek v. Jones*, 445 U.S. 480, 494 (1980)); *see also Renchenski v. Williams*, 622 F.3d 315, 326 (3d Cir. 2010) ("sex

41

offender label severely stigmatizes an individual"); *Meza v. Livingston*, 607 F.3d 392, 402 (5th Cir. 2010) (recognizing stigmatization created by sex offender registration). By warning about one category of offenses—sex offenses—and not others, the registry conveys that the people listed are so uniquely dangerous that they must be constantly monitored. *See Smith*, 538 U.S. at 109 (Souter, J., concurring) (the state's goal in creating registry "is to send a message that probably would not otherwise be heard, by selecting some conviction information out of its corpus of penal records and broadcasting it with a warning. Selection makes a statement . . . .").

Unsurprisingly, research confirms that labeling registrants as "sex offenders" engenders loathing in a way that more neutral language (e.g., "individuals convicted of crimes of a sexual nature") does not. Socia Decl., R. 1-7, ¶19. The state's indiscriminate use of the term "sex offender" communicates that all registrants are pedophiles or predators at high risk of committing new sex crimes. *Id.*, ¶¶17–21. Indeed, the registry website prominently states that its goal is to "assist the public in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." Lageson Decl., R. 1-10, ¶43. And the website's architecture— which provides clickable maps, facilitates browsing of registrants, highlights whether registrants are "compliant," and enables tracking of registrants through email notification—reinforces the message that all registrants are a threat. *Id.*, ¶¶26–45.

Plaintiffs vehemently disagree with that message.

**B. SORA 2021's Compelled Disclosures Are Subject to Strict Scrutiny.**

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The "principle of autonomy to control one's own speech" means that the government cannot "interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574, 579 (1995). "[C]ompelled statements of 'fact'" "burden[] protected speech" as much as "compelled statements of opinion." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 798 (1988). Thus, "this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573. "The constitutional harm—and what the First Amendment prohibits—is being forced to speak rather than to remain silent," and that harm does not turn on whether speech is ideological or factual. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004).

Mandating speech that a speaker would not otherwise make—particularly in the service of a government message with which the speaker disagrees—necessarily alters the content of the speech, and disclosure requirements are thus evaluated as content-based regulations of speech subject to strict scrutiny. *Riley*, 487 U.S. at 795.

The state cannot "constitutionally require an individual to participate in the dissem-ination of an ideological message," or force an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable," unless such requirements are narrowly tailored to advance a compelling state inter-est. *Wooley*, 430 U.S. at 713–14, 716. Thus, the *Wooley* Court held that a person could not be punished for refusing to use his own resources—his vehicle—to display the state's motto on his license plate. And in *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986), the Court invalidated a requirement that utility companies make their resources (mailings) available to provide messages to customers with which the companies disagreed. The Court explained that such compulsion "forces speakers to alter their speech to conform with an agenda they do not set." *Id.* at 9. The company had the right to be free from restrictions that "abridge its own rights in order to enhance the relative voice of its opponents." *Id.* at 15 (citation omitted).

Here, the information registrants are forced to provide—their photos, physical descriptors, home/work addresses, vehicle information, etc.—feeds directly into the state's public registry and the state's message that the person is a danger. Registrants are compelled to help the state disseminate a message that they are a threat, while spending the rest of their lives trying to convince employers, landlords, and anyone else they meet that they are not. In short, as in *Wooley* and *Pacific Gas*, registrants

are forced to alter their own speech in order to assist the government in disseminating a message with which they disagree.

That SORA 2021 requires registrants to report "facts" cannot obscure the reality that registrants are being compelled to support the state in conveying a message to which they object. In *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018), the Supreme Court struck down a requirement that pregnancy centers post factual information about the availability of abortion services, holding that the centers could not be compelled to help the state disseminate its message. Just as the pregnancy centers could not be compelled to provide factual information to support a governmental message about abortion that they "are devoted to opposing," *id.* at 2371, registrants cannot be compelled to provide factual information to support the government's message that they are dangerous sex offenders—a message that they too "are devoted to opposing."

By requiring frequent, time-consuming, and humiliating reporting to law enforcement, SORA 2021's compelled disclosure requirements also severely restrict registrants' autonomy, a core First Amendment concern, *Hurley*, 515 U.S. at 574. The registry's extensive reporting obligations have no exact parallel—except probation/parole, which are forms of punishment—but courts in other contexts have recognized that "forc[ing] a person to speak," even if just to provide information, can be "a severe intrusion on the liberty" of the individual. *Burns v. Martuscello*,

45

890 F.3d 77, 84 (2d Cir. 2018). In *Burns*, the Second Circuit held that under the First Amendment an inmate could not be compelled to provide information about other inmates, explaining that "compelled speech presents a unique affront to personal dignity." *Id.* at 85. By refusing to speak, the inmate "sought to exercise a right akin to the right, enjoyed by members of the public at large, to decline to participate in police questioning." *Id.* at 90. The court emphasized the degree of intrusion on the inmate's liberty, comparing it to the flag salute in *Barnette*: reporting about prison activities, potentially on an ongoing basis, "requires a good deal more of the individual than a salute. More than a gesture is at stake." *Id.* at 91. The same is true here.

Compelled disclosures pose a special threat to the First Amendment where the information is then made public, particularly if publication can result in harassment or other harm. *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2388 (2021) (describing harassment and reprisals); *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 98 (1982) (disclosure would result in "public enmity attending publicity"); *NAACP v. Patterson*, 357 U.S. 449, 462 (1958) (public disclosures led to "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility"); *Buckley v. Valeo*, 424 U.S. 1, 74 (1976); *Shelton v. Tucker*, 364 U.S. 479, 486 & n.7 (1960); *NAACP v. Alabama*, 357 U.S. 449, 462–63 (1958). Similarly, here the public disclosure of information registrants are compelled to provide subjects them to harassment, threats, social ostracization,

housing instability/homelessness, and loss of employment. Compl., R. 1, ¶¶404–66, 514–27.

To be sure, not every requirement that a person fill out a government form or provide information to the government triggers strict scrutiny. Disclosures needed to support essential operations of government like collecting taxes, or those needed to assess whether an applicant should receive some government benefit (e.g. financial assistance, a gun permit, a law license) can be required, *Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984), though the First Amendment's "unconstitutional conditions" doctrine still limits what applicants for benefits can be compelled to say, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219–21 (2013). And disclosures are a routine part of economic regulation, though the First Amendment's protections for commercial speech again limit what types of speech can be compelled and how burdensome such disclosures may be. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). Moreover, these types of disclosures are typically not *publicly* available, unlike here.

As these examples suggest, the level of scrutiny that a compelled disclosure receives depends on the context. For regulatory disclosures that chill associational or other First Amendment rights, such as disclosures of charitable contributions, the Supreme Court has sometimes applied an "exacting scrutiny" standard which requires the government to legislate with "narrow specificity" and courts to review

"the extent to which the burdens [imposed by disclosure] are unnecessary." *Bonta*, 141 S. Ct. at 2385. In the less protected commercial speech arena, disclosure requirements cannot be "unjustified or unduly burdensome." *Zauderer*, 471 U.S. at 651. Because the disclosures here involve neither economic regulation nor commercial speech, but rather compelled disclosures by individuals to support a governmental message, strict scrutiny is the proper standard. *See Becerra*, 138 S. Ct. at 2371–74; *Wooley*, 430 U.S. at 716 (even a "legitimate and substantial" governmental interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved" (quoting *Shelton*, 364 U.S. at 488)).

To be clear, the speech at issue here is fundamentally different from the above situations (although SORA 2021's disclosure requirements would not survive even the less strict tests that apply in the regulatory and commercial context). Registrants' autonomy is severely curtailed through a scheme of continuous, often in-person reporting, and by compelling them to participate in their own subjugation by providing information that the state rebroadcasts to stigmatize them as dangerous.[19]

Courts have repeatedly recognized that when the government compels speech by people convicted of sex offenses, that compulsion is invalid unless it survives

---

[19] *Cf. Associated Builders & Contractors of Southeast Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655, at *10 (E.D. Tex. Oct. 24, 2016) (holding, even in the less-protected government contracting context, that contractors could not be compelled to "publicly condemn themselves" by being forced to disclose alleged violations of labor laws).

strict scrutiny. For example, in *State v. Hill*, __ So. 3d __, 2020 WL 6145294 (La. 2020), *cert denied*, 142 S. Ct. 311 (2021), the Louisiana Supreme Court applied strict scrutiny—and invalidated—a law compelling registrants to carry an identification card with the words "SEX OFFENDER." The court in *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1318 (M.D. Ala. 2019), struck down a similar Alabama law as compelled speech that could not survive strict scrutiny, explaining that "sex offenders are not second-class citizens" and "[t]he Constitution protects their liberty and dignity just as it protects everyone else's." Although here it is the government proclaiming that registrants are dangerous "sex offenders," compelling individuals to contribute to that message is equivalent to requiring them to carry a government-issued identification card saying the same thing. Indeed, given the public nature of the registry, it is likely that a far broader swath of the public will see Plaintiffs' contributions to the message that they vehemently oppose.

By contrast, the few courts that have rejected First Amendment challenges to registration requirements have not considered the way in which registrants are forced to support the government's message, but have simply accepted inaccurate claims that registry schemes are necessary for public safety without conducting the searching review that strict scrutiny requires and without the benefit of a record—as here—establishing that such schemes are ineffective or counterproductive. For example, in *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014), the court rejected a

49

compelled speech challenge noting that the registrant (unlike here) had not argued that he was required to support a governmental message. Without any analysis of the efficacy of the scheme or whether the reporting requirements were narrowly tailored, the *Arnold* court simply assumed that registration supports "essential operations of government." *Id.*[20] In fact, it does not.  We turn, therefore, to the question of whether Michigan's scheme of imposing onerous compelled speech obligations on tens of thousands of people without any individualized review survives strict scrutiny.

## C.  SORA 2021's Compelled Disclosure Requirements Are Not Narrowly Tailored to the State's Public Safety Interests.

Under strict scrutiny the government's interest must be compelling, and the speech limitation must be the least restrictive means of achieving that end. *Bonta*, 141 S. Ct. at 2383. "[I]t is the rare case" that satisfies strict scrutiny. *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015). Here, the state has a strong interest in preventing sexual offending—but an ineffective or counterproductive registration scheme that compels disclosures from people who pose no appreciable risk is not narrowly tailored, let alone the least restrictive means, of advancing that interest. The state bears the burden of proof and may not simply speculate that registries work

---

[20] *See also United States v. Fox*, 286 F.Supp.3d 1219, 1223–24 (D. Kan. 2018) (applying strict scrutiny but assuming, incorrectly, that registrants have a high rate of recidivism and that information collected was necessary to monitor them, so that reporting requirements survived this standard of review).

or that all people with past convictions are dangerous. When the government regulates "speech as a means to . . . prevent anticipated harms, it . . . must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 472, 475, 477 (1995) (striking ban on federal employees receiving honoraria for public speeches despite the government's "undeniably powerful" interest in preventing appearance of corruption because "speculative benefits" of the ban were "not sufficient to justify this crudely crafted burden" on employees' speech rights (citation and internal quotation marks omitted)).

*Bonta* is instructive. There the Supreme Court held that while California had an important interest in preventing wrongdoing by charities, a compelled donor disclosure requirement violated the First Amendment because "[t]here is a dramatic mismatch . . . between the interest that the [state] seeks to promote and the disclosure regime that [it] has implemented in service of that end." *Bonta*, 141 S. Ct. at 2386 (majority opinion).[21] California's disclosure scheme was not narrowly tailored because (1) it created a "dragnet" to collect information from thousands of charities even though the information was only relevant in a few cases, and (2) the state had

---

[21] *Bonta*—which invalidated disclosure requirements because of their impact on associational rights—also separately supports Plaintiffs' challenge to those reporting requirements that implicate their ability to associate with others, particularly obligations to report internet activity, travel, and education. *Bonta*, 141 S. Ct. at 2382.

not considered less intrusive alternatives to get information. *Id.* at 2386–87.

The same is true here. SORA 2021's compelled disclosure regime—which requires tens of thousands of people to report even minor changes to a vast amount of information, often in person and within three business days, and in most cases for life regardless of whether they present any risk to the public—is dramatically mismatched to the state's goal of preventing sexual offending. Registries do not work to prevent sexual offending, and reporting requirements do not reduce recidivism. Prescott Decl., R. 1-6, ¶¶1–19; Socia Decl., R. 1-7, ¶¶2–8, 24–28; Letourneau Decl., R. 1-5, ¶¶6–11, 19–21; Zgoba Decl., R. 1-8, ¶¶12–19. Moreover, because there is no individualized review, SORA 2021's speech burdens are not even limited to those who may present a risk; rather, they are imposed on all registrants, even those whose risk is no greater than that of non-registrants and for whom reporting can "serve no public protection function." Hanson Decl., R. 1-4, ¶3.f–h. *See also* Ulrich Decl., R. 1-9. As other courts have observed, the failure to limit requirements to those "likely to recidivate" means that the challenged provisions cannot survive strict scrutiny. *McClendon v. Long*, __ F.4th __, 2022 WL 165992, at *5 (11th Cir. Jan. 19, 2022) (concluding that policy of placing warning signs outside of homes of registrants was not narrowly tailored). Moreover, the state has not considered less intrusive ways to obtain the same information—most of which is available through tax, employment,

motor vehicle, and postal service records.[22]

In sum, SORA 2021's compelled speech requirements are not narrowly tailored to the state's interest in preventing sexual offending, and therefore cannot survive strict scrutiny. Granting relief on Plaintiffs' compelled speech claim does not prevent the state from compiling a database of people with past sex offenses based on information the government already has or obtains (e.g. court records, postal service records). What Plaintiffs seek is simply protection from compelled disclosure—the obligation to constantly report any changes to information, as well as to regularly report even when no information has changed. M.C.L. §§ 28.724a, 28.725, 28.725a, 28.727. If the state wants to compel such disclosures, they must be narrowly tailored. Accordingly, the Court should enjoin the disclosure provisions—M.C.L. §§ 28.724a(1)–(4); 28.725(1)–(3), (7)–(8), (10)–(13); 28.725a(3)–(5), (7)–(8); 28.727(1))—absent an individualized determination that (1) the person is presently dangerous, (2) the compelled disclosure is necessary to alleviate that danger, and (3) the information is not otherwise available to law enforcement.

## V.    Requiring People Convicted of Offenses with No Sexual Component to Register as Sex Offenders Is Unconstitutional.

SORA 2021—titled the "**Sex Offenders** Registration Act"—has the osten-

---

[22] For example, Michigan used postal service records to obtain addresses for class notice in *Does II*, No. 16-cv-13137, R. 130, ¶2.a (E.D. Mich.).

sible purpose of "preventing and protecting against the commission of future criminal *sexual acts* by convicted *sex offenders.*" M.C.L. § 28.721a (emphasis added). That purpose is prominently displayed on the state website, which is called the "Michigan Sex Offender Registry" and identifies those listed as "sex offenders." *Michigan Sex Offender Registry Welcome Page*, https://mspsor.com/. SORA 2021 does not define the term "sex offender." When interpreting Michigan law, a court must "give undefined statutory terms their plain and ordinary meanings," and may consult dictionary definitions. *Koontz v. Ameritech Servs., Inc.*, 645 N.W.2d 34, 39 (Mich. 2002). The dictionary defines "sex offender" as "a person who has been convicted of a crime involving sex." *Merriam-Webster.com Dictionary* (last visited Jan. 25, 2022). Anyone viewing the registry, much less reading its prominent warnings about protecting the public from "convicted sex offenders," would assume that those listed meet that definition.

There are two situations where SORA 2021 requires sex offender registration for people who were convicted of a crime that did not include a sexual component as an element of the offense. First, the "catch-all" provision requires registration for "any . . . violation of a law . . . that by its nature constitutes a sexual offense against an individual who is a minor." M.C.L. § 28.722(r)(vii). In such cases, the Act provides procedural protections, including, importantly, a judicial determination of

whether the defendant's actions were sexual in nature. *See* M.C.L. § 769.1(13); *People v. Lee*, 803 N.W.2d 165, 168–71 (Mich. 2011) (finding error where (a) defendant was required to register despite judicial determination that offense was non-sexual in nature, and (b) statutorily required procedural protections had not been met).

Second, SORA 2021 requires registration for certain offenses against minors without any finding of a sexual component: kidnapping (M.C.L. § 750.349), unlawful imprisonment (M.C.L. § 750.349b), leading away of a child under 14 (M.C.L. § 750.350), and comparable out-of-state offenses. *See* M.C.L. § 28.722(r)(iii), (r)(x), (v)(ii), (v)(iii), (v)(viii). For example, Mr. Doe A, who robbed a McDonald's and forcibly moved the manager's teenaged son, is subjected to lifetime sex offender registration even though he never committed a sex offense. Compl., R. 1., ¶¶24–40. By mislabeling him, and the non-sex-offense subclass, as sex offenders, SORA 2021 violates equal protection, due process, and the First Amendment.

## A. Subjecting People Who Did Not Commit Sex Offenses to Sex Offender Registration Is Irrational.

Under the Equal Protection Clause, a classification that involves neither a fundamental right nor a suspect class is subject to rational basis review, meaning the classification must "rationally further a legitimate state interest."[23] *Nordlinger v.*

---

[23] Because SORA 2021's requirements for the non-sex-offense subclass do not survive even rational basis review, the Court need not decide whether a higher standard applies. *See Dep't of Public Safety,* 538 U.S. at 10 (Souter, J., concurring) ("Today's case is no occasion to speak [to] . . . the standard of scrutiny that might

*Hahn*, 505 U.S. 1, 2 (1992). Similarly, a law that does not burden a fundamental right must be rationally related to a legitimate government interest to satisfy due process. *United States v. Brandon*, 158 F.3d 947, 956 (6th Cir. 1998).

Rational basis review, while deferential, is not toothless. *Berger v. City of Mayfield Heights*, 154 F.3d 621 (6th Cir. 1998) (citing *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)). Even under the rational basis test, a state may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446. When evaluating rationality, the court may properly consider "countervailing costs" to those impacted. *Plyler v. Doe*, 457 U.S. 202, 223–24 (1982) (weighing, under rational basis review, that law denying education to undocumented children resulted in "lifetime hardship" and imposed stigma "mark[ing] them for the rest of their lives").

People convicted of crimes that have no sexual component are, by definition, not sex offenders. Their inclusion on the registry is not rationally related to the state's purpose of preventing future sexual acts by convicted sex offenders. Moreover, the

---

be in order" for reviewing an equal protection challenge to a sex offender registry statute.); *People v. Bell*, 3 Misc. 3d 773, 782 (N.Y. Sup. Ct 2003) (finding fundamental right implicated by registration of non-sex-offender and applying strict scrutiny); *State v. Robinson*, 873 So.2d 1205, 1214 (Fla. 2004) (declining to decide whether registration implicates fundamental rights because registration of non-sex-offender was irrational); *State v. Reine*, 2003 WL 77174, at *2 (Ohio Ct. App. 2003) (same); *State v. Barksdale*, 2003 WL 77115, *2 (Ohio Ct. App. 2003) (same). Because some aspects of SORA 2021 implicate fundamental rights—e.g. freedom of speech and the right to travel—Plaintiffs preserve this issue.

state has drawn an irrational classification: before being registered as sex offenders, other defendants convicted of crimes without a sexual element are entitled to a judicial determination under the "catch-all" provision of whether their offense was in fact sexual in nature, but individuals in the non-sex-offense subclass are not.

Numerous courts have held that it is irrational, and therefore violates equal protection and/or due process, to require people to register as sex offenders when their offense did not involve sex. *See*, *e.g.*, *Yunus v. Robinson*, 2019 WL 168544, at *11 (S.D.N.Y. Jan. 11, 2019) ("There is no rational reason for applying this intensely stigmatizing designation" to a person who didn't commit a sex crime); *ACLU of New Mexico v. City of Albuquerque*, 137 P.3d 1215, 1225–26 (N.M. Ct. App. 2006) (requiring registration of people convicted of kidnapping/false imprisonment not rationally related to interest in protecting public from "sex offenders"; noting great hardship imposed by being "labeled a sex offender, absent any evidence of a sexual motivation for the crime"); *State v. Small*, 833 N.E.2d 774, 783 (Ohio Ct. App. 2005) (absent evidence of sexual motivation, sex offender registration not rationally related to legitimate state interest); *State v. Robinson*, 873 So.2d 1205 (Fla. 2004) (due process violated by requiring sex offender registration where it is undisputed that there was no sexual component to crime); *People v. Bell*, 3 Misc. 3d 773, 787 (N.Y. Sup. Ct. 2003) (registration of non-sex-offender "is completely arbitrary and unreasonable" and unrelated to "sexually charged safety issues which the SORA was enacted

57

to safeguard against"); *Raines v. State*, 805 So.2d 999, 1003 (Fla. Dist. Ct. App. 2001) (registration for non-sex crime violates equal protection); *State v. Washington*, 2001 WL 1415568 (Ohio Ct. App. 2001) ("[U]nless there is evidence of sexual motivation, there is no rational basis for categorizing an abduction of a victim who is less than eighteen years old as being a sexually oriented offense."); *State v. Reine*, 2003 WL 77174, at *3 (Ohio Ct. App. 2003) (purposes of law were not served, and arguably disserved, by registration of people who did not commit sex offenses).

Concededly, courts are divided on this question, and the Michigan Court of Appeals is among those that have held—albeit in a case where the argument was "woefully developed"—that due process does not bar sex offender registration for people who did not offend sexually because SORA's purpose more broadly is to protect the public. *People v. Bosca*, 871 N.W.2d 307, 352–56 (Mich. Ct. App. 2015). *Bosca*, however, misconstrued the statute's purpose. Since then, the Michigan Supreme Court described its purpose by quoting the first sentence of M.C.L. § 28.721a: "preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." *Betts*, 2021 WL 316828, at *13. The court interpreted the remainder of M.C.L. § 28.721a to mean: "the asserted goal of the Legislature is to 'provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons' who have committed a specified *sex offense* and who are therefore considered to 'pose[]

a potential serious menace and danger to the health, safety, morals, and welfare of the people . . . of this state.'" *Id.* at *14 (quoting M.C.L. § 28.721a) (emphasis added). To the extent that *Bosca* found the statute to be rational simply because it related to broad public protection goals, *Betts* undercuts that understanding.

In any event, *Bosca*, and the similar cases it cites, are unpersuasive. First, *Bosca* did not address the equal protection claim Plaintiffs raise here. Mr. Doe A and the non-sex-offense subclass are similarly situated to others who were convicted of crimes that are not inherently sexual—people who are entitled to a judicial determination that their offense was sexual in nature before being required to register. M.C.L. § 769.1(13). And under equal protection analysis, the classification created by the state here—between non-sexual offenders who get a hearing and non-sexual offenders who do not—is irrational. Where a person convicted of child abuse cannot be subjected to sex offender registration without a determination that the offense had a sexual component, *see Lee*, 803 N.W.2d at 171, there is no reason to deny such a hearing to a person convicted of kidnapping or unlawful imprisonment. *See Bell*, 3 Misc. 3d at 787 (it is "not rational to differentiate between people convicted of non-sexual but registerable offenses, such as kidnapping, and people who commit other, non-registerable, crimes of a non-sexual nature against children").

Second, *Bosca*'s conclusion sanctions any law intended to protect people from non-sexual crimes. *Bosca*, 871 N.W.2d at 356. That argument ignores how the

registry presents information and how the law's structural design focuses on sexual offenses, rather than on all crimes or even crimes that endanger minors. The state cannot explain "why the sexual element of the designation is related to protecting against non-sexual harms." *Yunus*, 2019 WL 168544, at *11. It is as if the state passed a law "designating all persons convicted of felonies as 'murderers,' with registration and reporting requirements," such that neighbors were alerted that a "murderer" had moved nearby, when in reality the person was "convicted of an esoteric election-law felony. It is the misnaming, or mischaracterization, of the offense, that is unreasonable and arbitrary" because it "confounds the ordinary understanding of the words used." *Reine*, 2003 WL 77174 at *4. The question is whether it is rational to label people as sex offenders when they are not. The answer is no.

Finally, to the extent the state is concerned that some cases of kidnapping, unlawful imprisonment of a minor, etc., may have a sexual component, the state can still seek registration. All it need do is provide a hearing under the "catch-all" provision. The injunction Plaintiffs request only bars registration in the absence of a judicial determination that the offense in a specific case "by its nature constitutes a sexual offense against an individual who is a minor." M.C.L. § 28.722(r)(vii).

## B. People Who Were Not Convicted of Sex Offenses Are Entitled to Due Process Protections Before Being Subjected to SORA 2021.

The Third, Fifth, Ninth, Tenth and Eleventh Circuits have all held, in either a registry or a prison context, that an individual who "was not convicted of a sex

offense . . . is owed procedural due process before sex offender conditions may attach." *Meza*, 607 F.3d at 401–02. Because the "stigmatizing effect of being classified as a sex offender constitutes a deprivation of liberty," a person "who has never been convicted of a sex crime is entitled to due process before the state declares him to be a sex offender." *Kirby v. Siegelman*, 195 F.3d 1285 (11th Cir. 1999). *Accord Renchenski*, 622 F.3d 315; *Coleman v. Dretke*, 395 F.3d 216 (5th Cir. 2004); *Neal*, 131 F.3d at 830; *Gwinn v. Awmiller*, 354 F.3d 1211 (10th Cir. 2004).

These courts have distinguished *Connecticut Department of Public Safety*, 538 U.S. 1, where the Supreme Court rejected a procedural due process claim because the registration requirement turned solely on whether the person had been convicted of a sex crime, "a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest." *Id.* at 7. By contrast, for a person who was not convicted of a sex offense, there is *no prior adversarial proceeding* with due process protections to determine whether a sex crime was committed. *Meza*, 607 F.3d at 401; *see also Gwinn*, 354 F.3d at 1224; *Renchenski*, 622 F.3d at 331. Moreover, unlike in *Connecticut Department of Public Safety*, where the registry said that the state had made no determination of dangerousness, 538 U.S. at 8, here the very title of the registry—the Michigan Sex Offender Registry—indicates that the state *has* made a determination that the person is a sex offender. But the state has not.

Defendants might argue that Mr. Doe A and the non-sex-offense subclass are

61

truthfully described as "sex offenders" because the law requires registration of people convicted of "listed offenses," which include non-sex crimes. M.C.L. §§ 28.722(i), 28.723. But Michigan does not have a "Listed Offense Registry." It has a "Sex Offender Registry." The state is not disseminating "accurate information about a criminal record," *Smith*, 538 U.S. at 98, but is publicly proclaiming that Mr. Doe A and members of the subclass are sex offenders, when they are not.

In short, these cases make clear that a procedurally protected determination that a person committed a sex offense is essential before the state brands a person a "sex offender." For people convicted of sex offenses, that occurs at trial, *Conn. Dep't of Pub. Safety*, 538 U.S. at 7, and for others with non-sex offenses it occurs under the catch-all procedures, M.C.L. § 769.1(13). But the non-sex-offense subclass received no such process. *See Bell*, 3 Misc. 3d at 789 (where no element of crime involves sex, registration requires a hearing to establish sexual facet to the crime).

## C. Compelling People Without Sex Offenses to Support the State's Message That They Are Sex Offenders Violates the First Amendment.

Finally, as set out in Section IV, compelling registrants to contribute to the state's message that they are dangerous sex offenders violates the First Amendment. That argument applies with additional force to people without sex offenses since they not only disagree with the state's message that they are dangerous, but also reject the state's false labeling of them as people who committed sex offenses.

## VI.   SORA 2021 Violates the First Amendment By Compelling Registrants to Say They Understand the Law.

SORA 2021 unconstitutionally compels speech in yet another way: by forcing registrants—under threat of criminal prosecution—to attest that "I understand my registration duties." Explanation of Duties, R. 1-17.[24] It is a crime for registrants not to sign the Explanation of Duties, M.C.L. §§ 28.727(4), 28.729(1)(3). Thus, Plaintiffs must either affirm that they understand the law's complex requirements—even if they do not—or face prosecution. Plaintiffs have no practical choice but to sign.

This requirement compels Plaintiffs to support a false statement prepared by the government. For starters, SORA 2021's myriad requirements are vague and are internally contradictory, and Plaintiffs do not understand their obligations. *See* Compl., R. 1, ¶¶531–72. Indeed, even trained lawyers can have difficulty understanding the statute. Yet registrants are required to parrot a statement that they unequivocally "understand [their] registration duties." Explanation of Duties, R. 1-17.

Forcing Plaintiffs to make this false statement violates their First Amendment rights; the government cannot compel citizens to make false statements. *Johanns v. Livestock Mktg. Ass'n,* 544 U.S. 550, 557 (2005) (successful compelled-speech cases are those when "an individual is obliged personally to express a message he disagrees with, imposed by the government"); *Jackler v. Byrne*, 658 F.3d 225, 241

---

[24] Registrants who use the Mail-in Update Form, R. 1-18, must likewise attest that they understand their registration duties.

(2d Cir. 2011) ("a citizen has a First Amendment right to decide what to say and what not to say, and, accordingly, the right to reject governmental efforts to require him to make statements he believes are false"); *cf. Burns*, 890 F.3d at 81.[25] Moreover, the state cannot force an individual to adopt the state's views (here that registrants who read the Explanation of Duties will understand the law). *See* Section IV.

Compelling registrants, under threat of prosecution, to make a false statement is not narrowly tailored to serve a compelling state interest. Indeed, prior to 2021, registrants were simply required to acknowledge having read the form, but were not forced to attest to their understanding of the law. Pre-2011 Explanation of Duties, R. 1-20. New language was added in 2021 in an apparent attempt to make it easier for prosecutors to establish the willfulness requirement that the *Does I* and *Does II* courts said is constitutionally required to establish a SORA violation, and which SORA 2021 now requires. *See* M.C.L. § 28.729. There is no evidence to suggest that compliance with SORA 2021 would be diminished absent this forced statement by Plaintiffs, let alone so much so (and without alternatives) that it passes strict scrutiny.

---

[25] Even in the less protected commercial speech arena, *see Zauderer*, 471 U.S. at 651, the government cannot, consistent with the First Amendment, "force retailers to affix false information on their products," *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009), *aff'd sub nom. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011).

### *The Irreparable Harm, Balance of the Equities,*
### *and Public Interest Factors Favor Plaintiffs*

The final three injunctive factors—irreparable harm, balance of equities and public interest—overwhelmingly support Plaintiffs. "[I]f it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Am. C.L. Union of Ky. v. McCreary Cty.*, 354 F.3d 438, 445 (6th Cir. 2003). Indeed, the loss of constitutional freedoms, for even minimal periods of time, constitute irreparable harm. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Courts regularly recognize that enforcement of unconstitutional sex offender registration laws causes irreparable harm. *See*, *e.g.*, *Roe v. Snyder*, 240 F. Supp. 3d 697, 711 (E.D. Mich. 2017); *Reid*, 476 F. Supp. 3d at 708–09; *Doe v. Wasden*, __ F. Supp. 3d __, 2021 WL 4129144, at *17 (D. Idaho Sept. 8, 2021).

SORA 2021 imposes retroactive punishment in violation of the Ex Post Facto Clause, contravenes due process limits on retroactive legislation, chills the exercise of First Amendment rights, and violates equal protection and due process by irrationally requiring large classes of people, including people not even convicted of a sex offense, to register with no pathway off the registry. SORA 2021 subjects registrants to ongoing supervision, severely limits their access to housing and employment, and restricts their ability to travel and use the internet. Compl., R. 1, Section V. Any violation of the law can result in long prison terms. M.C.L. § 28.729. All of these harms are irreparable, supporting issuance of the injunction.

A preliminary injunction would not cause substantial harm to others and serves the public interest.[26] "[N]o substantial harm to others can be said to inhere in [the] enjoinment" of an unconstitutional law, *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001), and "it is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib.*, 154 F.3d at 288. Moreover, SORA 2021 has no causal connection to public safety and, in fact, jeopardizes the successful reintegration of registrants into the community. Compl., R. 1, ¶¶228–36. Indeed, Judge Cleland in *Does II* enjoined enforcement of the old SORA for more than a year, from February 2020 through March 2021. *See* No. 16-cv-13137, R.126, ¶6. The sky did not fall.

To the extent the state may assert an interest in registering those who present a significant risk, an injunction would not prevent the state from doing so, provided the state determines on an individualized basis that registration is warranted. The Act was intended to cover those who "pose[] a potential serious menace and danger" to the public. M.C.L. § 28.721a. The state can still monitor such individuals. Plaintiffs ask only that the law be limited to those who in fact pose such a risk.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court grant the preliminary injunctive

---

[26] The final two preliminary injunction factors merge when the state is the opposing party. *See Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020).

relief set forth in their motion for the reasons outlined above.

Respectfully submitted,

s/ Miriam J. Aukerman (P63165)
Miriam J. Aukerman
Rohit Rajan (AZ 035023)
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org
rrajan@aclumich.org


s/ Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

s/ Paul D. Reingold (P27594)
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
Univ. of Michigan Law School
802 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109-1215
(734) 355-0319 - pdr@umich.edu


s/ Roshna Bala Keen (Ill. 6284469)
Loevy & Loevy
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 - roshna@loevy.com

Dated:      February 2, 2022