UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE, on behalf of
themselves and all others similarly situated,

                Plaintiffs,

v.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

                Defendants.

No. 2:22-cv-10209

Hon. Mark A. Goldsmith

Mag. Curtis Ivy, Jr.

**STATEMENT OF *DOES III* PLAINTIFFS REGARDING CLASS
CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

Introduction .................................................................................................1

I.   The Court Should Certify Only One Class Action ...............................3

II.  *Does III* Counsel Are Best Able to Represent the Interests of the Class. ..........6

     A.  Does III Counsel Have the Necessary Expertise and Resources. .........6

     B.  The History Highlights the Differences in Counsel's
         Approaches. ........................................................................10

III. Consolidation Would Make this Litigation Less Efficient, Would Drive
     Up Costs, and Is Not In the Best Interests of the Class. ...................14

     A.  Consolidation Would Yoke Together Counsel Who Have
         Significant Differences in Strategy. ....................................15

     B.  Consolidation Would Complicate the Litigation. ..............................17

     C.  Consolidation Would Create Inefficiencies and Drive Up Costs. ......18

IV.  The Court Has a Variety of Options to Control Its Docket. ...........................20

     A.  Dismissal of All or Some Claims .......................................................21

     B.  Stay and Administrative Closure of Duplicative Cases. ....................22

Conclusion .................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Adam v. Jacobs*, 950 F.2d 89 (2d Cir. 1991) ...........................................................20

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997) ..............................................3

*Colorado River Water Dist. v. United States*, 424 U.S. 800 (1976).......................21

Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983)...........................................6

*Curtis v. Citibank, N.A.*, 226 F.3d 133 (2d Cir. 2000).................................. 3, 21, 22

*Doe v. Curran*, No. 18-11935 (E.D. Mich.)..............................................................24

*Does 1-5 v. Whitmer*, 21-cv-11903 (E.D. Mich.) ....................................................17

*Dunn v. City of Chicago,* Case No. 04-cv-6804 (N.D. Ill. 2010) .............................9

*Eberle v. Wilkinson*, 2008 WL 886138 (S.D. Ohio 2008)........................................22

*Ebin v. Kangadis Food, Inc.*, 2013 WL 6504555 (S.D.N.Y., Dec. 11,
    2013) .....................................................................................................................23

*Fleming v. Martin*, 24 F. App'x 258 (6th Cir. 2001)................................................15

*Gordon v. Royal Palm Real Est. Inv. Fund I, LLP*, No. 09-11770, 2013
    WL 12420136 (E.D. Mich. Oct. 24, 2013).....................................................23

*Houle v. Sampson*, 2:09-cv-10504 (E.D. Mich. 2010) ..........................................7, 8

*In re Flint Water Cases*, 960 F.3d 820 (6th Cir. 2020) .............................................5

*In re Payment Card Interchange Fee and Merchant Discount Antitrust
    Litigation*, 2006 WL 2038650 (E.D. N.Y. 2006) ............................. 14, 15, 20

*In re TransCare Corp*, 552 B.R. 69 (Bankr. S.D.N.Y. 2016) ......................... 21, 22

*Int'l Brotherhood of Elec. Workers, Loc. Union No. 2020, AFL-CIO v.
    AT&T Network Sys.*, 879 F.2d 864 (6th Cir. 1989)......................................23

*Makowski v. Governor*, 852 N.W.2d 61 (Mich. 2014).............................................9

*Mire v. Full Spectrum Lending Inc.*, 389 F.3d 163 (5th Cir. 2004)........................23

*Nowak v. Ford Motor Co.*, 240 F.R.D. 355 (E.D. Mich. 2006) ........................7, 11

*Ohio Env't Council v. U.S. Dist. Ct., S. Dist. of Ohio, E. Div.*, 565 F.2d
    393 (6th Cir. 1977) ......................................................................23

*People v. Betts*, 968 N.W. 2d 497 (Mich. 2021)..................................................7, 8

*People v. Dipiazza*, 286 Mich. App. 137 (2009) ......................................................7

*People v. Moore*, 439 N.W.2d 684 (Mich. 1989) ...................................................15

*People v. Temelkoski*, 501 Mich. 960 (2018) ......................................................7, 8

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945) ...................................................16

*Roe v. Snyder*, 16-cv-13353 (E.D. Mich. 2020) ......................................................8

*Smith v. SEC*, 129 F.3d 356 (6th Cir. 1997) .........................................................21

*Tennessee Ass'n of Health Maint. Organizations, Inc. v. Grier*, 262
    F.3d 559 (6th Cir. 2001) ..................................................................16

*Willman v. Att'y Gen. of U.S.*, 972 F.3d 819 (6th Cir. 2020) ................................15

*Young v. Cook County et al.*, Case No. 06-cv-552 (N.D. Ill. 2010) ........................9

## Rules

Fed. R. Civ. P. 23 ................................................................................ passim

Fed. R. Civ. P. 65 ......................................................................................16

## Other Authorities

Charles Silver, *Comparing Class Actions and Consolidations*, 10 Rev.
    Litig. 495 (1991).................................................................................4

Third Circuit Task Force Report on Selection of Class Counsel, 74
    Temp. L. Rev. 689 (2001) ................................................... 11, 18, 19

## Introduction

Oliver Law Group (OLG) proposes that consolidation of two putative class actions with competing proposed class counsel best serves judicial efficiency. That proposal, however, needlessly ratchets up the complexity of this litigation. The simplest path for handling these cases, which raise almost identical claims, is to certify one class action with one set of counsel. Indeed, that is exactly what Fed. R. Civ. P. 23(g)(2) requires: "If more than one adequate applicant seeks appointment, the court **must** appoint the applicant best able to represent the interests of the class." (Emphasis added.) The Court should not create competing class actions by certifying two cases and appointing two sets of counsel, creating case management problems the Court then needs to solve. Rather, the Court's task under Rule 23(g)(2) is to pick the most capable litigation team.

At present, all three cases before the Court involve claims by individuals. Two are putative class actions seeking to represent the same putative class—all people subject to Michigan's Sex Offenders Registration Act (SORA). No order certifying the class, appointing class counsel, or naming class representatives has yet issued in any of the cases. Currently, the status is:

- ***Does A-H v. Whitmer*** (***Does III***), **No. 22-cv-10209**: Ten individual plaintiffs have challenged the constitutionality of SORA in a putative class action. R.1. Plaintiffs filed a motion to certify a class action, appoint class counsel, and name

the ten individual plaintiffs as class representatives. R. 5. Defendants stipulated to certification, appointment of class counsel, and naming of class representatives. A proposed stipulated certification order was submitted on March 11, 2022.

- ***Does v. Michigan State Police*, No. 21-cv-12843**: Dozens of *pro se* plaintiffs, all but one of whom are prisoners at Parnall Correctional Facility, filed a challenge to SORA's constitutionality and alleged that they wanted to litigate not only their own claims, but those of others similarly situated. R. 1. The Court appointed OLG as counsel for those individuals. R. 25. After *Does III* was filed, OLG filed an amended complaint that dropped all claims unique to the incarcerated plaintiffs, added new non-incarcerated plaintiffs, and sought relief for a class of all registrants (the same putative class as in *Does III*) on nearly identical claims to those filed in *Does III*. R. 30. OLG also moved for class certification and appointment of class counsel.[1] R. 31. The OLG motion appears to propose that all 61 *Does v. MSP* plaintiffs be appointed as class representatives, though it fails to explain which of those plaintiffs should serve as representatives for the proposed

---

[1] OLG's statement in *Does III* (R. 30) refers to appointment of **interim** class counsel, a procedure that may be common in the products liability field where OLG has most of its class action experience, but that is much less frequently used in (b)(2) class actions challenging a law's constitutionality. In any event, Defendants have stipulated both to class certification and to appointment of the *Does III* class counsel, so there is no need for interim class counsel. *See* Fed. R. Civ. P. 23(g) (providing that, before determining whether to certify the action as a class action, the court may designate interim counsel to act on behalf of a putative class).

2

subclasses. *Id.*, Page ID.220. The motion states that Defendants do not consent to the relief sought. *Id.*, PageID.196.

- **Doe v. Whitmer, 2:22-cv-10516:** One individual has challenged the constitutionality of SORA, bringing claims that are almost identical to those brought first in *Does III*. Class certification was not requested. Counsel in *Doe* previously indicated that he is amenable to delaying resolution of the action, provided that the plaintiff is covered by the *Does III* class action. The Court could therefore stay, administratively close, or dismiss that case without prejudice subject to an order regarding preservation of potential attorneys' fees, as discussed below.

## I.    The Court Should Certify Only One Class Action

The underlying premise of OLG's argument—that two class actions should be certified for the same class on the same claims—undermines the purpose of the class action device, which is to allow for the efficient adjudication of common claims and avoid inconsistent judgments. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Moreover, it is black letter law that "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000).

OLG argues, in essence, that if the class is certified twice, the resulting case management headaches could be dealt with by consolidation and some kind of counsel leadership structure to resolve disputes about strategy. But that puts the cart

before the horse by assuming there will be two certified classes. Class certification

and consolidation are different tools in the judicial toolbox to achieve the same goal

of litigation efficiency. The most appropriate tool depends on the circumstances:

> [A] class action is a single lawsuit that binds a large number of people, while a consolidation is a set of independent lawsuits that are processed in a coordinated and relatively efficient way. Class certification joins all parties in a single massive suit in which most parties occupy passive roles; a consolidation order neither joins parties nor merges suits nor alters parties' procedural rights.
>
> \*        \*        \*        \*        \*
>
> Because a consolidation is a set of independent lawsuits, it cannot properly be characterized as a representational suit in which a lead party stands on behalf of everyone else. Lawyers and parties who lead consolidations have no authority to make decisions that limit other parties' ability to press claims, and lead parties can only stand in judgment on behalf of themselves.
>
> \*        \*        \*        \*        \*
>
> The situation in a class action is markedly different, because a class action is a representational suit properly so called. Class certification authorizes a lead party and class counsel to sue on behalf of a group by making litigation decisions that bind all class members and by standing in judgment on all class members' behalf.

Charles Silver, *Comparing Class Actions and Consolidations*, 10 Rev. Litig. 495,

497–98 (1991).

Here, the best tool is to certify one class in one case. That would allow not

just for efficient adjudication of the nearly identical claims of the 72 individual

plaintiffs in these three cases, but would also resolve those same claims for all of

Michigan's approximately 55,000 registrants. After a class is certified, the common

claims will be adjudicated in the class action case. It does not matter how many

additional registrants seek to litigate those same issues—their claims must be litigated in the class action. Indeed, because certification here will be under Fed. R. Civ. P. 23(b)(2), class members will have no right to opt out, and whatever decisions the Court makes will bind the entire class. OLG does not explain how there could be two mandatory class actions for the same class at the same time.

Consolidating the claims of the 72 individuals in these three cases—not to mention adding any similar cases filed in in the future by other registrants—would be unwieldy. *Cf.* Fed. R. Civ. P. 23(a)(1) (stating that one of the requirements for class certification is that "the class is so numerous that joinder of all members is impracticable"). It is class certification, not consolidation, that makes sense here.

What OLG is suggesting is that the Court first certify two identical classes, and then consolidate the cases. Although courts sometimes consolidate class actions, those situations involve case management issues much more complex than those present here. For example, there may, as in the Flint water cases, be multiple class actions for different classes around different claims, plaintiffs, and defendants where there are related factual and legal issues such that consolidating the class actions promotes efficiency. *See, e.g.*, *In re Flint Water Cases*, 960 F.3d 820, 823 (6th Cir. 2020). Or there may be multiple overlapping lawsuits in different jurisdictions, or in both federal and state courts, raising complex issues of inter-jurisdiction coordination, choice of law, and state/federal comity. *Cf. Crown, Cork & Seal Co. v. Parker*,

462 U.S. 345, 353 (1983).

Here, however, we are not dealing with competing lawsuits seeking large damages on different theories for different classes in different jurisdictions by for-profit plaintiffs' lawyers vying for control of the litigation. The competing cases here seek only declaratory and injunctive relief for the same class, challenging a single Michigan law in one jurisdiction with virtually identical claims. Thus, the Court need only follow Rule 23(g)'s requirement that it select among competing applicants the counsel best able to represent the class.

## II.   *Does III* Counsel Are Best Able to Represent the Interests of the Class.

### A. *Does III Counsel Have the Necessary Expertise and Resources.*

Rule 23(g)(1) sets out a non-exhaustive list of factors for courts to consider in selecting class counsel, including: the work counsel has done in identifying or investigating potential claims; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel's knowledge of the applicable law; and the resources that counsel will commit to representing the class. Courts may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class. *Id.* Courts have rejected arguments that class action experience in other contexts is sufficient, recognizing that what matters is experience with "this particular type" of case, including "relationships with key experts in the field." *Nowak v. Ford Motor Co.*, 240 F.R.D. 355,

368 (E.D. Mich. 2006) (firm with securities class action experience lacked ERISA experience of competing firms). The *Does III* team stands out under all these factors.

*Does III* counsel have unrivaled expertise on SORA. For well over a decade, they have been developing the winning legal theories that are reshaping the law on sex offender registration, not just in Michigan, but nationally. Indeed, Ms. Aukerman and Mr. Reingold are two of three lawyers chosen from across the country to present later this month at a national seminar convened by the Sex Offense Litigation Policy and Resource Center on "Building an Effective Registry Challenge."

**Miriam Aukerman** is widely regarded as one of the foremost national experts on registry litigation. In addition to serving as lead counsel in *Does I*, *Roe,* and *Does II*, she won victories in *People v. Temelkoski*, 501 Mich. 960 (2018) (registration as a convicted sex offender of a youth whose charges were dismissed under a diversion program violates due process); *Houle v. Sampson*, 2:09-cv-10504 (E.D. Mich. 2010) (settlement modifying parole board's practice of automatically imposing conditions prohibiting parent/child contact, marital relationships, and religious worship for parolees with sex offenses); *People v. Dipiazza*, 286 Mich. App. 137 (2009) (registration is unconstitutionally cruel punishment for youth in "Romeo-and-Juliet" relationships). Moreover, the Michigan Supreme Court invited her to argue as amicus, twice, in *People v. Betts*, 968 N.W. 2d 497 (Mich. 2021), where that Court held the prior version of SORA unconstitutional. As a senior staff attorney

at the ACLU, she also has extensive experience in managing some of the most complex civil rights class litigation brought by that organization. *See* Aukerman Resume, R. 5-2. She has been recognized with the State Bar of Michigan's Champion of Justice award, honored by Crain's Detroit Business with the Notable Woman in Law Award, and specifically recognized for her work on registry issues with the Criminal Defense Attorneys of Michigan's Justice for All Award. *Id.*

**Paul Reingold** of the Michigan Clinical Law Program (MCLP) first teamed up with Ms. Aukerman in 2007 to challenge the parole board's assignment of computer-generated default parole conditions in *Houle*, *supra*. In 2011, he co-counseled *Does I*, *supra* (a case which produced three published district court decisions and a published Sixth Circuit decision). Next, he co-counseled the *Roe* case in this Court after a registrant was threatened with prosecution because her workplace was within 1,000 feet of a school. *See Roe v. Snyder*, 16-cv-13353 (E.D. Mich. 2020). Next up was the *Does II* class action to extend the holding of *Does I* to all Michigan registrants, granting full relief on all claims. Along the way Mr. Reingold filed amicus briefs in *People v. Temelkoski*, *supra*, and in *People v. Betts, supra.* Mr. Reingold has also published law review articles on Section 1983, on parole issues, and on the Ex Post Facto Clause. *See* Reingold CV, R. 5-3. Mr. Reingold's work has been recognized by the State Bar with the Champion of Justice Award in 2009, and the John W. Reed Michigan Lawyer Legacy Award in 2020,

8

and his brief in *Makowski v. Governor*, 852 N.W.2d 61 (Mich. 2014), won the Distinguished Brief Award for the 2013-14 Michigan Supreme Court term.

**Roshna Bala Keen**, who has joined the *Does III* litigation as cooperating counsel, is a partner at Loevy & Loevy, a national civil rights firm based in Chicago. Ms. Keen has extensive experience successfully litigating complex federal civil rights cases across the country, including in Michigan, and has achieved significant jury awards, settlements, and appellate victories for dozens of individual civil rights clients. Ms. Keen has represented certified classes of arrested and incarcerated individuals in Section 1983 challenges to conditions of confinement, pursuing novel theories of relief and achieving outstanding results for the classes. *See e.g.*, *Young v. Cook County et al.*, No. 06-cv-552 (N.D. Ill. 2010) (class action challenging unconstitutional strip search at Cook County Jail which, following a liability trial and bell weather damages trials, resulted in an initial $55 million settlement plus additional recoveries in second-stage litigation); *Dunn v. City of Chicago,* No. 04-cv-6804 (N.D. Ill. 2010) (class action challenging unconstitutional treatment of inmates held in lockup by the Chicago Police Department, which resulted in a $16.5 million settlement). Her firm, Loevy & Loevy, has represented more than a dozen certified classes and has a wealth of experience navigating complex class issues.

The *Does III* team has also demonstrated that it has the resources, commitment, and relationships with experts to effectively represent the class. The team

carefully identified and investigated potential claims, invested substantial time and funds in developing ten reports from top experts in the field, and prepared a comprehensive initial filing—the quality of which the Court can assess for itself. Ms. Aukerman, Mr. Reingold, and Ms. Roshna Bala Keen are supported by junior and senior lawyers at the ACLU (including national experts, such as the ACLU's national Legal Director whose wealth of Supreme Court experience was invaluable during the Supreme Court phase of *Does I*), and by the resources of Loevy & Loevy, a firm of 50 lawyers that specializes in complex civil rights litigation.

### B. The History Highlights the Differences in Counsel's Approaches.

The Court need not speculate about how the competing applicants for class counsel will represent the class, but can look at their past work challenging SORA and past representation of a class of registrants subject to the old version of the law.

After SORA was rewritten in 2011 to impose extensive restrictions and extend registration to life for thousands of people, Ms. Aukerman and Mr. Reingold spent much of 2011 preparing *Does I*—doing legal research, consulting with other SORA litigators nationally, reviewing the social science, developing expert reports, and interviewing scores of registrants to learn about Michigan's SORA impact on them. *Does I* was filed in March 2012, and then exhaustively litigated for four years before plaintiffs won in the Sixth Circuit on August 25, 2016.

Five days later, on August 30, 2016, OLG filed a federal class action, that

10

copied—verbatim—substantial portions of the *Does I* complaint and added class allegations. *Compare Does I*, Am. Compl., R. 46, *with Does II*, OLG Compl., R. 1. Although OLG's rapid filing positioned the firm to be first in line[2] to profit from the ACLU-MCLP victory in *Does I* if the Sixth Circuit decision were upheld on appeal, the complaint was hastily prepared and included only one named plaintiff, who could not represent the class on the ex post facto claim (which was the issue decided by the Sixth Circuit, but which was not even included in OLG's initial complaint).

Because *Does I* was still on appeal, the district court stayed the OLG lawsuit. Meanwhile, the *Does I* plaintiffs fended off the state's motion for rehearing in the Sixth Circuit and motions to stay issuance of the mandate (both in the Sixth Circuit and in the Supreme Court), all of which were denied. In response to the state's petition for certiorari, the Supreme Court entered a rare CVSG order ("calling for the views of the U.S. Solicitor General"), which required plaintiffs not only to respond to the cert petition, but also to travel to Washington, D.C. to meet with senior U.S. Department of Justice lawyers and provide extensive submissions detailing why the

---

[2] *See* Third Circuit Task Force Report on Selection of Class Counsel, 74 Temp. L. Rev. 689, 772 (2001) (noting that "first to file" approach to selecting class counsel "can create a perverse incentive to race to the courthouse with a skeletal complaint. Speed is a poor surrogate for determining the best counsel to prosecute the particular class action"); *Nowak*, 240 F.R.D. at 365 ("Whether someone was 'first to file by itself has little to do with who is the best qualified to lead the case, and does not satisfy the requirements of Rule 23(g). To hold otherwise would further encourage a 'rush to the courthouse' in [] class action cases.").

Solicitor General's Office should recommend that cert be denied—which it did.

The Supreme Court denied cert in *Does I* in October 2017. The Michigan legislature, however, failed to amend SORA to comply with the *Does I* rulings, and the state continued to enforce the unconstitutional law. The *Does I* team had to face the fact that in order for all Michigan registrants to get the benefit of the ACLU and the MCLP's hard-fought victory, the team would need to file a class action. Meanwhile, the district court reopened the stayed OLG case. *Does II*, R. 21. The *Does I* team thought it most efficient to try to work with OLG. Under the resulting co-counsel agreement, the ACLU was lead counsel with final decision-making authority.

The ACLU and MCLP then went to work. They brought in new plaintiffs and rewrote the complaint, which was filed along with a motion for class certification in 2018. *Does II*, R.34. They negotiated a stipulated class certification order. R. 46. Over the three years of litigation before final judgment entered in 2021, the ACLU/MCLP counsel were the primary authors of every substantive pleading, court appearance, and communication with opposing counsel. After judgment, ACLU/MCLP handled drafting and extensive negotiations for class notice. OLG focused on class-member contact. (If the Court wishes to confirm counsel's respective contributions, counsel can provide *Does II* fee records or the Court can speak to Judge Cleland. ACLU/MCLP counsel also have no objection to the Court speaking ex parte to the defendants' *Does II* counsel, Eric Restuccia and Joseph Froehlich.) ACLU/MCLP

12

counsel were also deeply involved in the legislative negotiations about SORA, in an effort to reach a legislative solution. As the fee settlement in *Does II* reflects, the ACLU/MCLP team billed 83.33% of the time in *Does II* and OLG billed 16.67%.

After the legislature passed a new SORA which barely changed the old SORA, the ACLU/MCLP team—recognizing that yet another global challenge would have to be mounted—reached out to the Chicago-based Loevy & Loevy firm for help in litigating *Does III*. Both Ms. Aukerman and Mr. Reingold had co-counseled successfully with Loevy on complex cases, and knew that Loevy would make the *Does III* team stronger by bringing a wealth of civil rights experience, knowledge, and resources to the case. As in *Does I*, the undersigned counsel did not just rush into court with a new lawsuit. Instead, they again invested significant time and effort to develop legal claims, secure up-to-date expert reports, and prepare well-supported motions for class certification and preliminary injunctive relief.

Meanwhile, OLG took on representation in *Does v. MSP*. As initially filed *in pro per*, that case had some claims that overlapped with *Does III* and some that did not. OLG's amended complaint, R. 30, submitted after *Does III* was filed, added most of the same claims that the *Does III* team had developed and dropped the *in pro per* registrants' unique claims (e.g., wrongful incarceration). Some of OLG's filings copied verbatim major portions of the *Does III* pleadings. *Compare* Motions to Proceed Pseudonymously, *Does III*, R. 4, *with Does v. MSP*, R. 32. The two cases

now overlap almost entirely. *See* Chart Comparing Claims, R. 26-1.

In sum, it is the *Does III* team that has historically done the work needed to successfully litigate first *Does I* and then *Does II*. Because of the investment that counsel have already made in the case, *Does III* is the furthest advanced of the cases, and is the most appropriate case to move forward as the class vehicle. Plaintiffs have filed a motion for preliminary injunction, there is already extensive expert evidence, and the fact that all plaintiffs were previously plaintiffs in *Does I*, *Does II*, and *Roe* may simplify discovery down the road. The *Does III* parties have agreed to class certification—including class/subclass definitions, the appropriate class/subclass representatives, and appointment of class counsel. (This agreement also demonstrates the ability of proposed class counsel to work collaboratively.) The time and effort that *Does III* counsel have invested in working with the plaintiffs, developing legal claims, preparing the complaint, drafting motions, and consulting with experts, dwarfs by orders of magnitude the time and effort required to prepare pleadings that largely mirror what had already been filed in *Does III*.

## III.   Consolidation Would Make this Litigation Less Efficient, Would Drive Up Costs, and Is Not In the Best Interests of the Class.

The Court's task in managing class litigation is "to protect the interests of the plaintiffs, not their lawyers." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2006 WL 2038650, *4 (E.D. N.Y. 2006). "A result that best serves the plaintiffs must trump any alternative that may in some sense be

deemed fairer to some of the lawyers who would represent them." *Id.* Here, the class is best served by certification of one class and appointment of one set of lawyers under Rule 23(g). Certifying multiple class actions with competing class counsel, and then consolidating those cases, is not in the best interests of the class.

### A. Consolidation Would Yoke Together Counsel Who Have Significant Differences in Strategy.

OLG argues that the cases should be consolidated and a master complaint filed that encompasses the *Does v. MSP* Fourth Amendment claim and names Michigan parole board members as defendants. That suggestion just highlights the difficulty of consolidation and forced co-counseling where attorneys have different strategies. *Does III* counsel investigated the Fourth Amendment claim and elected not to bring it. *See Willman v. Att'y Gen. of U.S.*, 972 F.3d 819, 826 (6th Cir. 2020). Moreover, the Fourth Amendment claim is simply an alternative theory seeking the same relief as that sought under other (stronger) theories in *Does III*.

Nor do *Does III* counsel believe in unnecessarily complicating this litigation by suing members of the parole board. Under state law, the governor—who is a defendant here—has ultimate authority over Michigan's parole board. *See People v. Moore*, 439 N.W.2d 684, 692 (Mich. 1989) (noting that the parole board is within the Department of Corrections, which lies within the executive branch, and that the governor is the head of the executive branch); *Fleming v. Martin*, 24 F. App'x 258, 259 (6th Cir. 2001) (similar). Thus, any relief obtained against the governor would

be binding on the parole board. *See Tennessee Ass'n of Health Maint. Organizations, Inc. v. Grier*, 262 F.3d 559, 565 (6th Cir. 2001) (citing Fed. R. Civ. P. 65(d)). "[A] decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). "[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Id.* In other words, the parole board would be bound by any injunction against the governor. There is no reason to add defendants.

Thus, if this Court were to order consolidation and drafting of a master complaint, *Does III* counsel would advocate for filing exactly the same complaint they already filed. Counsel should not be forced to litigate claims or sue additional defendants when, in their strategic judgment, that is not in the best interests of the class. Nor is the problem solved by appointing *Does III* counsel as lead counsel and OLG as co-counsel. All *that* would accomplish would be to add lawyers with a different strategic vision to the team.

Counsel's experience in *Does II* is that these differences in strategy, coupled with communication problems and other tensions between counsel, made it more difficult to represent the class. For example, OLG, without notifying co-counsel, filed a new damages lawsuit premised on the *Does II* rulings before the appeal period

in *Does II* had run, which complicated matters in *Does II*. *See Does 1-5 v. Whitmer*, 21-cv-11903 (E.D. Mich.). Counsel also disagreed on how to handle fee negotiations. And OLG's own brief flags that it disagreed with lead counsel's decision to explore comprehensive legislative reform before injunctive relief.

Counsel here do not believe a detailed recounting of conflicts among counsel is appropriate in a public filing.[3] But counsel's recent experiences in *Does II*, and the fact that counsel already disagree about how best to challenge the new SORA (e.g., what claims to bring and what defendants to sue), should give the Court a sense of the difficulties that could ensue by yoking counsel together.

## B. Consolidation Would Complicate the Litigation.

In addition to the complexity created by adding more lawyers, consolidation would complicate the litigation by adding more plaintiffs who apparently want to be class representatives. The ten class representatives in *Does III* are plenty, especially when it comes to discovery. Bringing in an additional 61 plaintiffs, most of whom are incarcerated, would add nothing to the litigation, but would simply create procedural complexities, and make discovery and case administration a nightmare.

Nor is it necessary to certify a subclass of parolee-registrants. The *Does v.*

---

[3] Although counsel believe that the Court has sufficient information to determine that the class will be better served by *not* forcing the lawyers to work together in *Does III* after their experiences in *Does II*, if the Court is considering such an arrangement or wants to know more about what went wrong, it can meet separately with each group of plaintiffs' lawyers (with notice to Defendants).

17

*MSP* amended complaint no longer contains *any* claims nor seeks *any* relief unique to registrants who are incarcerated or on parole. *Does v. MSP*, R. 30. Rather, the complaint almost entirely duplicates the claims in *Does III*, and simply adds parole board members as defendants. As discussed above, relief against the governor would bind the parole board, and so there is no need to name its members as defendants.

### C. Consolidation Would Create Inefficiencies and Drive Up Costs.

Even when counsel in related class actions come together to propose a co-counsel arrangement with multiple firms, courts are cautioned to carefully scrutinize such arrangements so as to avoid unnecessary expense, complexity, or inefficiency. "In order to reach a 'deal,' lead counsel may have to 'cut in' so many lawyers that the representation of the class becomes inefficient and the ultimate fee request becomes inflated." Third Circuit Task Force Report on Selection of Class Counsel, 74 Temp. L. Rev. at 697. In appointing class counsel, "the court must guard against overstaffing by lawyer groups," and "should not hesitate to intervene by removing counsel if it appears that lawyers are simply in the case as part of a negotiating process for everyone to get a piece of the pie." *Id.* at 704–05, 770.

During fee negotiations in *Does I* and *Does II*, Defendants expressed concern, that even with the smaller litigation teams in those cases, there was duplication of effort. Obviously the more complex the litigation structure and the more attorneys that are involved, the higher the costs if the plaintiffs prevail. Defendants have

unsurprisingly argued here that a single group of attorneys should be appointed to represent the class because Defendants are worried about the costs of an unwieldy case management structure. R. 32.  (Defendants' filing also suggests that the Court micromanage how the counsel who are appointed then litigate their case. R. 32. It is not the Court's role to dictate which attorney should handle which tasks or whether it would be beneficial for a junior lawyer to observe a court hearing. Rather, if Plaintiffs prevail, the Court can determine, given the demands of the case, what constitutes a reasonable fee award. *Does III* counsel, when submitting fee petitions, routinely exercise billing judgment and reduce or eliminate fees when they are excessive or reflect an unjustified duplication of effort. And in *Does II* it is safe to say that the number of lawyers on *both* sides were quite evenly matched for major case events or conferences.)

Here, OLG does not identify what precise skills it would bring that are not already present in the *Does III* litigation team. *See* Third Circuit Task Force Report, 74 Temp. L. Rev. at 771 (those advocating for multiple firms "should be able to explain to the court why and how the use of additional law firms promotes the effective, efficient prosecution of the litigation, rather than serving the interests of the law firms"). OLG argues only that having more lawyers involved would surely benefit

the class.[4] But, as the court explained in *In re Payment Card Interchange Fee*, "more is not necessarily better." 2006 WL 2038650, *3. There the court, while noting the "surface appeal" of requiring potential leaders to work together, found that melding the different teams of proposed class counsel

> would not advance, and might instead prejudice, the plaintiffs' overall interests…. While I do not agree that placing leadership responsibility in the hands of a group is inevitably worse than appointing a sole leader, the risk is plainly greater where, as here, the group's composition is the product of compulsion rather than choice. The latter problem can only be exacerbated where, as is also the case here, the members of the group forced to work together have previously been at odds on a number of issues. *Id.*

## IV. The Court Has a Variety of Options to Control Its Docket.

If the Court certifies the class and appoints class counsel in *Does III*, the Court has lots of tools to address the two remaining cases (or other cases that maybe filed in the future). Because duplicative litigation wastes judicial resources, subjects parties to "the vexation of concurrent litigation over the same subject matter," *Adam v. Jacobs*, 950 F.2d 89, 93 (2d Cir. 1991), and can create claim or issue-preclusion difficulties that are hard to predict at the outset of litigation, courts have broad discretion in how they manage duplicative litigation. *See Colorado River Water Dist. v.*

---

[4] OLG states that its role in *Does II* was primarily class member communications. Although OLG communicated extensively with class members and did post class member education materials (drafted by the ACLU and MCLP), the *Does III* team includes a person focused solely on class member communications, who logged well over 2,000 hours in *Does II*. The ACLU also has a website (aclumich.org/SORA), runs a listserv for class members, and holds class member webinars.

*United States*, 424 U.S. 800, 817 (1976); *Curtis*, 226 F.3d at 138; *Smith v. SEC*, 129 F.3d 356, 361–62 (6th Cir. 1997) (en banc). Options include staying duplicative suits, dismissing them without prejudice, enjoining the parties from proceeding with them, or consolidating the actions. *Curtis*, 226 F.3d at 138. There is no "rigid test" for how best to manage duplicative litigation; rather the court should "consider the equities of the situation" and find a path that is appropriate under the circumstances. *Id*. Consolidation, as explained above, would create significant problems. Here the best options are either to (1) dismiss the duplicative litigation; or (2) stay and administratively close the duplicative cases. Should be the Court be considering other options, Plaintiffs would ask for a status conference to discuss the best path forward.

### A. Dismissal of All or Some Claims.

A court may "dismiss a suit that is duplicative" as "part of its general power to administer its docket." *Curtis*, 226 F.3d at 138; *id.* (noting that dismissal is a "common disposition" where suits are duplicative). Indeed, in *Does II*, Judge Cleland, while staying a few cases, dismissed numerous other cases challenging SORA, including cases that had additional claims or named additional defendants. *See Does II* Chart, Ex. A.

The Court's power to dismiss duplicative litigation includes dismissal of putative class actions. In *In re TransCare Corp*, 552 B.R. 69, 78 (Bankr. S.D.N.Y. 2016), the court was faced with two "largely duplicative" putative class actions brought for

21

the same class with similar but not identical claims against overlapping but not identical defendants. The court noted that "[i]n addition to the power to consolidate multiple cases, the court also has the discretion, pursuant to the 'general power to administer its docket,' to stay or dismiss a suit that is duplicative of another federal court suit." *Id.* at 77 (quoting *Curtis*, 226 F.3d at 138); *see id.* at 77–78 (collecting cases dismissing duplicative class suits). The court dismissed one of the two proceedings, finding that there was "no benefit" to consolidation, because that would only "increase the cost and delay the resolution of this action." *Id.* at 78. *See also Eberle v. Wilkinson*, 2008 WL 886138 (S.D. Ohio 2008) (dismissing without prejudice individual litigant's claims seeking similar relief to prisoner class and staying non-duplicative claims pending resolution of common claims in class action). Here, if the Court is concerned about the investment of resources by counsel in *Does v. MSP* and *Does v. Whitmer*, the Court could dismiss on all claims other than for attorney's fees, with that question to be resolved upon conclusion of *Does III*.

### B.  Stay and Administrative Closure of Duplicative Cases.

Courts have also found stays to be an appropriate case management device to handle multiple class actions. As explained in Plaintiffs' reply, R. 26, it is often the case that "the interests of the class heavily weigh towards a stay over consolidation," and that "having multiple lawyers from two firms duplicating efforts" would be inefficient and drive up attorneys' fees. *Ebin v. Kangadis Food, Inc.*, 2013 WL 6504555,

at *2 (S.D.N.Y., Dec. 11, 2013). *See also Ohio Env't Council v. U.S. Dist. Ct., S. Dist. of Ohio, E. Div*., 565 F.2d 393, 396 (6th Cir. 1977) (power to stay rests in trial court's discretion); *Int'l Brotherhood of Elec. Workers, Loc. Union No. 2020, AFL-CIO v. AT&T Network Sys.*, 879 F.2d 864, at *8 (6th Cir. 1989) (table) (court has discretion to stay cases to avoid duplicative litigation). In *Does II*, Judge Cleland stayed cases challenging the constitutionality of the registry, including cases that had claims and defendants that differed from those in *Does II*. *See Does II* Chart, Ex. A.

A stay could be coupled with administrative closure, pending resolution of *Does III*, so that the stayed cases would not count on the Court's list of unresolved cases. "The effect of an administrative closure is no different from a simple stay, except that it affects the count of active cases pending on the court's docket; i.e., administratively closed cases are not counted as active." *Mire v. Full Spectrum Lending Inc.*, 389 F.3d 163, 167 (5th Cir. 2004). District courts frequently rely on this device to remove from their dockets pending cases "which are temporarily active elsewhere." *Id.* This device "does not have any substantive or procedural adverse effect upon the rights of the parties*." Gordon v. Royal Palm Real Est. Inv. Fund I, LLP*, No. 09-11770, 2013 WL 12420136, at *1 (E.D. Mich. Oct. 24, 2013). For instance, "[t]he statute of limitations are not implicated if the claims have been timely filed and sometime thereafter the case is administratively closed." *Id.*

A stay with administrative closure has several advantages. After decisions in

23

*Does III*, the Court and parties can determine whether further litigation is necessary. If, for example, a class in *Does III* obtains an injunction against the reporting requirements, that could moot out the Fourth Amendment claim in *Does v. MSP*. A stay would also allow the Court to consider at the end of the litigation whether attorneys in *Does v. MSP* and *Doe v. Whitmer* are entitled to attorney's fees for the work they invested in preparing their cases. For example, during *Does II*, Judge Cleland stayed the similar case of *Doe v. Curran*, No. 18-11935 (E.D. Mich.). The parties are now litigating what fees should be awarded to plaintiffs. *See id.*, R. 116.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for class certification and appointment as class counsel, and either stay and administratively close, or dismiss the other two cases, with provisions for counsel in those cases to seek fees, if appropriate, upon conclusion of *Does III*.

Respectfully submitted,

s/ Miriam J. Aukerman (P63165)
Miriam J. Aukerman
Rohit Rajan (AZ 035023)
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org
rrajan@aclumich.org


s/ Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

s/ Paul D. Reingold (P27594)
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
Univ. of Michigan Law School
802 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109-1215
(734) 355-0319 - pdr@umich.edu


s/ Roshna Bala Keen (Ill. 6284469)
Loevy & Loevy
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 - roshna@loevy.com

Dated: April 22, 2022

## LOCAL RULE CERTIFICATION

I, Miriam J. Aukerman, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted material and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 points (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

s/ Miriam J. Aukerman (P63165)
Miriam J. Aukerman
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org