UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE, on
behalf of themselves and all others
similarly situated,

        No. 2:22-Cv-10209

     Plaintiffs,

        HON. MARK GOLDSMITH

v

        MAG. CURTIS IVY, JR.

GRETCHEN WHITMER, Governor
of the State of Michigan, And COL.
JOSEPH GASPER, Director of the
Michigan State Police, in their
individual capacities,

        **DEFENDANTS' RESPONSE
TO PLAINTIFFS' MOTION
FOR PRELIMINARY
INJUNCTION**

     Defendants.

---

Defendants Governor Gretchen Whitmer and Director of the

Michigan State Police Colonel Joseph Gasper move this Court to deny

Plaintiffs' motion for preliminary injunction for the reasons set forth in

the accompanying brief in support.

For the reasons stated more fully in the attached brief in support,

Defendants request this Court deny Plaintiffs' motion for preliminary

injunction, dismiss this complaint with prejudice and award any

additional relief it determines appropriate.

Respectfully submitted,

*/s/ Eric M. Jamison*
Assistant Attorney General
Attorney for Defendants
Whitmer and Gasper
Michigan Department of
Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
jamisone@michigan.gov
P75721

Dated:  May 26, 2022

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE, on
behalf of themselves and all others
similarly situated,

    No. 2:22-Cv-10209

    Plaintiffs,

    HON. MARK GOLDSMITH

v

    MAG. CURTIS IVY, JR.

GRETCHEN WHITMER, Governor
of the State of Michigan, and COL.
JOSEPH GASPER, Director of the
Michigan State Police, in their
individual capacities,

    **DEFENDANTS' RESPONSE
BRIEF TO PLAINTIFFS'
MOTION FOR
PRELIMINARY
INJUNCTION**

    Defendants.

Eric M. Jamison
Assistant Attorney General
Attorney for Defendants
Whitmer and Gasper
Michigan Department of
Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
jamisone@michigan.gov
P75721

Dated:  May 26, 2022

# TABLE OF CONTENTS

<u>Page</u>

Table of Contents ..................................................................i

Index of Authorities............................................................ iii

Concise Statement of Issues Presented ....................................iix

Controlling or Most Appropriate Authority................................x

Introduction......................................................................1

Statement of Facts .............................................................4

    A.    2006 Amendments....................................................4

    B.    2011 Amendments....................................................4

    *C.*    *Does I* ...................................................................6

    *D.*    *Does II*................................................................11

    *E.*    *People v Betts*........................................................12

    F.    The New SORA ....................................................13

    *G.*    *Does III* .............................................................15

Argument.......................................................................27

I.    Preliminary Injunctive Relief .........................................27

II.    Plaintiffs are not likely to succeed on the merits. .........................28

    A.    The Ex Post Facto Clause's purpose and design are not implicated by the new SORA. ...............................29

    B.    The Michigan Legislature did not intend the new SORA to impose punishment................................30

C. The new SORA is not punitive either in its purpose or effect as to negate the State's intention to deem it civil. .....33

  1. The new SORA does not resemble traditional forms of punishment. ....................................35

  2. The new SORA is not an affirmative disability or restraint.........................................................41

  3. The new SORA is not punishment. ............................45

  4. The new SORA has a rational connection to a non-punitive purpose. ...................................46

  5. The new SORA is not excessive. ................................49

  6. Consideration of all the *Mendoza-Martinez* factors confirms that the new SORA is not punishment. ..................................................51

D. An individualized risk assessment is not required for the new SORA to be applied retroactively. ..........................52

III. Plaintiffs do not have a high likelihood of success in establishing that the new SORA violates the First Amendment. ....................................................53

IV. Plaintiff does not have a high likelihood of success in establishing that the new SORA violates the Equal Protection Clause or the Due Process Clause...............................59

V. Plaintiffs have failed to show that they will suffer an irreparable harm if the injunction is not granted, and the harm to the public interest is insurmountable...........................63

A. Irreparable Harm and Balancing of the Equities ...............64

B. Public Harm and Balancing the Equities............................65

Certificate of Service ..................................................68

# INDEX OF AUTHORITIES

Page

**Cases**

*Am. Civil Liberties Union of Nev. v. Masto,*
670 F.3d 1046 (9th Cir. 2012) ............................................................... 45

*American Civil Liberties Union v. National Sec. Agency,*
493 F.3d 644 (6th Cir. 2007) ............................................................... xiii

*Bailey v. Wainwright,*
951 F.3d 343 (6th Cir. 2020) ............................................................... 54

*Benisek v. Lamone,*
138 S. Ct. 1942 (2018) ......................................................................... 63

*Board of Education v. Barnette,*
319 U.S. 624 (1943) ............................................................................. 54

*Bowman v. United States,*
564 F.3d 765 (6th Cir. 2008) ............................................................... 60

*Calif. Dept. of Corr. v. Morales,*
514 U.S. 499 (1995) ............................................................................. 30

*Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,*
470 F.3d 286 (6th Cir. 2006) ............................................................... 59

*Columbia Nat. Res., Inc. v. Tatum,*
58 F.3d 1101 (6th Cir. 1995) ............................................................... xiii

*Conn. Dep't of Pub. Safety v. Doe,*
538 U.S. 1 (2003) ................................................................................. xiii

*Cutshall v. Sundquist,*
193 F.3d 466 (6th Cir. 1999) ................................................... 48, 54, 61

*De Veau v. Braisted,*
363 U.S. 144 (1960) ............................................................................. 44

*Doe v. Bredesen,*
   507 F.3d 998 (6th Cir. 2007) ............................................................. 29

*Doe v. Cuomo,*
   755 F.3d 105 (2nd Cir. 2014) ............................................................ 42

*Doe v. Snyder,*
   (No. 16-13137), 2021 WL 2525436 (E.D. Mich. June 21, 2021) ...... 1, 13

*Doe v. Snyder,*
   101 F. Supp. 3d 672 (E.D. Mich. 2015) ........................................... 6, 7

*Does #1-4 v. Snyder,*
   No. 12-cv-11194 (E.D. Mich.) ............................................................. 6

*Does #1-5 v. Snyder,*
   834 F.3d 696 (6th Cir. 2016) ..................................................... passim

*Does v. Munoz,*
   507 F.3d 961 (6th Cir. 2007) ...................................................... 48, 61

*Dyer v. Bowlen,*
   465 F.3d 280 (6th Cir. 2006) ............................................................. 30

*Elrod v. Burns,*
   427 U.S. 347 (1976) .......................................................................... 64

*F.C.C. v. Beach Commc'ns, Inc.,*
   508 U.S. 307 (1993) ................................................................... xiii, 60

*Fisher v. Univ. of Texas at Austin,*
   570 U.S. 297 (2013) .......................................................................... 59

*Garza v. Lansing Sch. Dist.,*
   972 F.3d 853 (6th Cir. 2020) ............................................................ xiii

*Hatton v. Bonner,*
   356 F.3d 955 (9th Cir. 2003) ............................................................ 43

*Hawker v. New York,*
   170 U.S. 189 (1898) .......................................................................... 45

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944) ........................................................................ 27

*Hudson v. United States,*
  522 U.S. 93 (1997) .................................................................... 33, 44

*John Doe, et al v. Snyder,*
  No. 16-cv-13137 (E.D. Mich.) ............................................................ 12

*Johnson v. Robison,*
  415 U.S. 361 (1974) ........................................................................ 60

*Kansas v. Hendricks,*
  521 U.S. 346 (1997) ........................................................................ 34

*Kennedy v. Mendoza-Martinez,*
  372 U.S. 144 (1963) ............................................................... xiii, 8, 34

*Leslie v. Randle,*
  296 F.3d 518 (6th Cir. 2002) .............................................................. 54

*Lewis v. Continental Bank Corp.,*
  494 U.S. 472 (1990) ...................................................................... xiii

*Littlefield v. Slatery,*
  No. 3:19-CV-00490, 2020 WL 263585 (M.D. Tenn. Jan. 17, 2020) .....55

*Millard v. Camper,*
  971 F.3d 1174 (10th Cir. 2020) .......................................................... 40

*People v Betts,*
  507 Mich 527 (2021) ................................................................. passim

*Shaw v. Patton,*
  823 F.3d 556 (10th Cir. 2016) ...................................................... 41, 43

*Smith v. Doe,*
  538 U.S. 84 (2003) ..........................................passim, 36, 40, 41, 46, 50

*Speet v. Schuette,*
  762 F. 3d 867 (6th Cir. 2013) ........................................................... xiii

*Theile v. Michigan,*
    891 F.3d 240 (6th Cir. 2018) ............................................................. 59

*Trump v. Int'l Refugee Assistance Project,*
    137 S. Ct. 2080 (2017) ....................................................................... 67

*United States v. Arnold,*
    740 F.3d 1032 (5th Cir. 2014) .................................................. 55, 56, 64

*United States v. Doby,*
    No. 18-CR-40057-HLT, 2019 WL 5825064 (D. Kan. Nov. 7, 2019) ..... 55

*United States v. Fox,*
    286 F. Supp. 3d 1219 (D. Kan. 2018) .................................................. 56

*United States v. May,*
    535 F.3d 912 (8th Cir. 2008) ............................................................. 44

*United States v. Parks,*
    698 F.3d 1 (1st Cir. 2012).......................................................... 42, 44, 48

*United States v. Under Seal,*
    709 F.3d 257 (4th Cir. 2013) ...................................................... 43, 44, 47

*United States v. W.B.H.,*
    664 F.3d 848 (11th Cir. 2011) ......................................................... 43, 44

*United States v. Young,*
    585 F.3d 199 (5th Cir. 2009) ............................................................. 44

*Weaver v. Graham,*
    450 U.S. 24 (1981) ............................................................................. 29

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ........................................................................... 28

*Whole Woman's Health v. Jackson,*
    141 S. Ct. 2494 (2021) ....................................................................... 28

*Willman v Attorney General of United States,*
    972 F.3d 819 (6th Cir. 2020) ....................................................... xiii, 52

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................ 27, 28

*Wooley v. Maynard,*
   430 U.S. 705 (1977) .............................................................................. 54

*Yakus v. United States,*
   321 U.S. 414 (1944) ...................................................................... 28, 65

## Statutes

1994 Mich. Pub. Act 295 .......................................................................... 4

1999 Mich. Pub. Act 85, §§ 8(2), 10(2)-(3) ............................................. 4

2006 Mich. Pub. Act 46 ............................................................................ 2

2011 Mich. Pub. Act 17 ......................................................................... 4, 5

2011 Mich. Pub. Act 18 ......................................................................... 4, 5

2020 Mich. Pub. Act 295 .......................................................................... 1

28 U.S.C. §§ 20916(c) and 20920(b)(4) ................................................. 39

34 U.S.C. § 20901 .................................................................................. 15

34 U.S.C. § 20914(a) .............................................................................. 55

34 U.S.C. § 20914(b) .............................................................................. 55

34 U.S.C. § 20911 *et. seq.* .................................................................... xiii

34 U.S.C. § 20913(a) .............................................................................. 52

34 USC § 20911(1)-(4) ............................................................................. 5

Mich. Comp. Law § 28.721 .................................................................... xiii

Mich. Comp. Law § 28.721a ............................................................. 31, 57

Mich. Comp. Law § 28.728(1)(u) ........................................................... 32

Mich. Comp. Law § 28.728(2)(a)-(k) ...................................................... 36

Mich. Comp. Law § 28.728(2), (3)(e) .................................................... 32

Mich. Comp. Law § 28.728c ................................................................... 62

Mich. Comp. Law § 791.234 (6)(a)-(f) .................................................. 62

**Rules**

Fed. R. Civ. P. 10(c) .............................................................................. 28

**Regulations**

76 F.R. § 1630, 1637 ............................................................................. 39

86 F.R. §§ 69856, 69858 ....................................................................... 39

**Constitutional Provisions**

U.S. Const. amend. I .............................................................................. 53

U.S. Const. amend. XIV, § 1 .................................................................. 59

U.S. Const. art. I § 10, cl. 1 ................................................................... 29

## CONCISE STATEMENT OF ISSUES PRESENTED

1.    Plaintiffs do not have a high likelihood of success in establishing that the new SORA violates the Ex Post Facto Clause or the Due Process Clause when it is applied retroactively to Plaintiffs and the pre-2011 Ex Post Facto proposed subclass.

2.    Plaintiffs do not have a high likelihood of success in establishing that the new SORA violates the First Amendment.

3.    Plaintiffs do not have a high likelihood of success in establishing that the new SORA violates the Equal Protection Clause or the Due Process Clause.

4.    Plaintiffs have failed to show that they will suffer an irreparable harm if the injunction is not granted, and the harm to the public interest is insurmountable

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>*Authority*</u>: Mich. Comp. Law § 28.721 *et. seq.*

34 U.S.C. § 20911 *et. seq.*

*Willman v Attorney General of United States*, 972 F.3d 819 (6th Cir. 2020)

*Smith v. Doe*, 538 U.S. 84 (2003)

*Kennedy v. Mendoza-Martinez,* 372 U.S. 144 (1963)

*Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003)

*Speet v. Schuette,* 762 F. 3d 867 (6th Cir. 2013)

*American Civil Liberties Union v. National Sec. Agency*, 493 F.3d 644 (6th Cir. 2007)

*Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101 (6th Cir. 1995)

*F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307 (1993)

*Garza v. Lansing Sch. Dist.*, 972 F.3d 853 (6th Cir. 2020)

*Lewis v. Continental Bank Corp.*, 494 U.S. 472 (1990)

## INTRODUCTION

Once again, litigation has ensued over Michigan's Sex Offenders Registration Act (the "SORA"), which the Michigan Legislature significantly revised in 2020 (the "new SORA"). 2020 Mich. Pub. Act 295. Curiously, Plaintiffs admitted that the new SORA removed all the provisions that were found to be unconstitutional in *Does II*, but now take the position that the new SORA makes minimal changes and argues that the new SORA is still unconstitutional. *See* Ex. A, *Doe v. Snyder*, (No. 16-13137), 2021 WL 2525436, at *3 (E.D. Mich. June 21, 2021) ("all parties acknowledge that the new SORA removes or modifies all provisions that this court found to be unconstitutional in its February 14, 202[0] opinion in *Does II*."); (ECF No. 7, PageID.880.)

In the motion for preliminary injunction, Plaintiffs are inviting this Court to create mass confusion for registrants. If the preliminary injunction is granted, effected class members will have different registration requirements, they will have to be informed of their new obligations, prosecutors will have to be updated, and law enforcement will need to be apprised of the various classes of registrants that are entitled to temporary relief. Ironically, Plaintiffs already pointed out

the logistical difficulties with informing registrants of the most recent changes under the new SORA.  (ECF No. 1, PageID.147.)

By the time the effected parties are informed of the changes, the preliminary injunction may be lifted or modified by this court, an appellate court could stay the lower court proceedings pending an appeal, or an appellate court could modify the legal analysis used to determine the constitutionality of the new SORA (like the Sixth Circuit did in 2016).  If past litigation is any indication of how things will proceed, it will be years before the law is settled regarding the new SORA.  There is no need to create this chaos.

Contrary to Plaintiffs' argument, the new SORA represents a remarkable legislative overhaul of the earlier version of the SORA (the "old SORA").  See 2006 Mich. Pub. Act 46; 2011 Mich. Pub. Acts 17, 18. It implemented all the court-ordered changes spurred by the *Does I* and *Does II* litigation.  *Does #1-5 v. Snyder (Does I)*, 834 F.3d 696, 697 (6th Cir. 2016), *cert denied,* 138 S. Ct. 55 (2017); *Does #1-6 v. Snyder*, No. 16-cv-13137 (E.D. Mich. 2016) (Cleland, J.) (*Does II*).  But, Plaintiffs have brought another legal challenge claiming that the new SORA is

2

unconstitutional. (ECF No. 1, PageID.1-198.)  The arguments are tenuous, at best.

Plaintiffs are asking this Court to act as a super-legislature by (1) deciding how long someone should be on the registry and what types of crimes are eligible to be included on the registry; (2) deciding who is entitled to petition for removal from the registry; and (3) creating a process for individualized and periodic review of registrants' current risk to society.  (ECF No. 7, PageID.859, 862.)  These are all clearly legislative functions.

Plaintiffs ask this Court to ignore U.S. Supreme Court precedent. SORA registries may be applied retroactively without offending the Ex Post Facto Clause.  *Smith v. Doe*, 538 U.S. 84, 106 (2003).  Here, the new SORA does just that, yet Plaintiffs move this Court to issue a preliminary injunction notwithstanding the existing case law that explicitly endorses the constitutionality of applying sex offender registries retroactively.  For this reason, among others addressed in Defendants' brief, Defendants respectfully request that Plaintiff's motion for preliminary injunction be denied.

## STATEMENT OF FACTS

The Michigan Legislature enacted the state's first sex offender registration law in 1994. ("SORA") 1994 Mich. Pub. Act 295.  What was first established for law enforcement only, later became available to the public.  1999 Mich. Pub. Act 85, §§ 8(2), 10(2)-(3).  The Legislature amended the SORA numerous times throughout the years – in some respects SORA became more onerous for registrants and in other respects it was less restrictive.  Along with the various amendments came litigation challenging the law.

### A. 2006 Amendments

One of the major revisions to the old SORA that led to much litigation was the creation of student safety zones.  Mich. Comp. Law § 28.733-736.  Under these amendments, a registrant could not live, work, or loiter within 1,000 feet of a school.  Mich. Comp. Law § 28.734-735.

### B. 2011 Amendments

In 2011 the Michigan Legislature amended the old SORA, which imposed new requirements.  2011 Mich. Pub. Acts 17, 18.  One of the revisions was the creation of a tier system, which categorized

4

registrants into three publically available tiers that were applied

retroactively.  Mich. Comp. Law § 28.722(r), (t), and (v); 2011 Mich.

Pub. Act 17.  The tier system was adopted, in part, to comply with the

comparable SORNA legislation.  34 U.S.C. § 20911(1)-(4).

The next major revision was an in-person reporting requirement

that required a registrant to report in-person to the registrant's

registering authority.  2011 Mich. Pub. Act 17.  A registrant was

required to report certain activities or life events, such as 1) residence

or place of domicile changes; 2) place of employment; 3) status of

employment; 4) enrollment or unenrollment from an institution of

higher education; 5) legal name changes; 6) extended travel plans; 7)

establishment of email or social media presence; and 8) purchase or sale

of a vehicle. 2011 Mich. Pub. Acts 17, 18.  Again, these in-person

reporting requirements were applied retroactively.  *Id.*

Additionally, the old SORA had criminal penalties attached to it.

2011 Mich. Pub. Act 18.  Under the old SORA, a registrant who

"willfully" violated the registration requirements under it, was guilty of

a felony or misdemeanor depending upon the violation.  Mich. Comp.

Law § 28.729.  Further, a registrant's probation, parole, or youthful

5

trainee status could be revoked if a registrant willfully violated any provision under the old SORA.  *Id.*

### C. Does I

In 2012, six registrants challenged the old SORA.  *Does v. Snyder,* No. 12-cv-11194 (E.D. Mich.) ("*Does I*").  The Eastern District ruled that parts of the old SORA were constitutional and other parts of the old SORA were unconstitutional.

In its first of two 2015 opinions, the court found that the term "immediately" was not unconstitutionally vague, nor was the requirement to report any "designation used in Internet communications or postings" unconstitutionally vague.  *Doe v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015).

The court also found that the old SORA's requirement for registrants to disclose to law enforcement their Internet designations did not, by itself, infringe registrants right to free speech.  *Id.*  Finally, the Court found that Michigan had a rational basis for retroactively imposing a lifetime registration requirement. *Id.*

6

The court held that the old SORA's geographic exclusion zones and the term loitering were unconstitutionally vague, and the "in person" reporting requirement was not narrowly tailored.  *Id*.

In its second option, the court found that the requiring homeless registrants to have an identification card with an address that matched the address used to register violated Due Process.  *Doe v. Snyder*, 101 F. Supp. 3d 722 (E.D. Mich. 2015). The court also found that the old SORA's retroactive internet reporting provision violated the First Amendment.  *Id*.  The decisions were appealed to the Sixth Circuit. *Does #1-5*, 834 F.3d 696.

The Sixth Circuit began and ended its analysis with the question of whether the old SORA was an Ex Post Facto violation.  *Does I*, 834 F.3d at 699.  The Sixth Circuit heavily relied upon *Smith* in its analysis.  *Smith v. Doe*, 538 U.S. 84 (2003); *Id*. at 700.  Under *Smith*, a court must analyze retroactivity of a registry statute under the following framework: "(1) Did the legislature intend to impose punishment? And (2), if not, is the statutory scheme so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id*. (quoting *Smith*, 538 U.S. at 92) (quotations and alterations omitted).

First, the Sixth Circuit found that the Michigan Legislature did not possess a punitive intent when it enacted the old SORA. *Id*. at 700-701. In reaching its conclusion, the court stated that the legislative enactment indicated that the intent was meant to be a civil regulatory regime and not punitive. *Id*. at 700.

Next, the court addressed whether the old SORA was "so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Does I*, 834 F.3d at 701. The Sixth Circuit again cited to *Smith* and used the *Mendoza-Martinez* factors to determine whether the statute was punitive. *Id*. The factors include:

1) Does the law inflict what has been regarded in our history and traditions as punishment?

2) Does it impose an affirmative disability or restraint?

3) Does it promote the traditional aims of punishment?

4) Does it have a rational connection to a non-punitive purpose?

5) Is it excessive with respect to this purpose?

*Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168 (1963*)* (citing *Smith*, 538 U.S. at 97).

When the Sixth Circuit addressed the first *Mendoza-Martinez* factor, it found that both the student safety zone provisions and

8

publishing the tier classification on the publicly accessible SORA website were akin to "banishment" and "shaming." *Id*. at 701-02. Additionally, many of the 2011 amendments requiring in-person reporting for a multitude of life events resembled parole or probation because the reporting had to be done in-person versus by phone or mail. *Id*. at 703. The Sixth Circuit concluded, when accounting for the history and traditions of punishment, that both the 2006 and 2011 amendments inflicted punishment. *Id*.

Second, the Sixth Circuit determined whether the 2006 and 2011 amendments of the old SORA imposed an affirmative disability or restraint. The court found that the above-mentioned amendments dictated where registrants could live or work. *Does I*, 834 F.3d at 703. Further, registrants were required to report in-person for a multitude of reasons. *Id*. Thus, the court found that the amendments were onerous and imposed an affirmative disability or restraint. *Id*. at 704.

Third, the court inquired whether the old SORA promoted the traditional aims of punishment. In uncertain terms, the court stated the old SORA advanced all traditional aims of punishment, including incapacitation, retribution, and deterrence. *Id*.

Fourth, the court determined whether the old SORA had a rational connection to a non-punitive purpose.  The Sixth Circuit found this factor favored the plaintiffs.  *Id.*

Lastly, the Sixth Circuit addressed whether old SORA was excessive with respect to its purpose.  *Id.* at 705.  The court found that the old SORA determined where a sex offender could live or work, but no positive impacts could counterbalance this great burden.  *Does I*, 834 F.3d at 705.  Further, the in-person reporting requirements have no relationship to public safety and were plainly punitive in nature.  *Id.*

Ultimately, the Sixth Circuit found that the old SORA violated the Ex Post Facto Clause because it imposed punishment under the 2006 and 2011 amendments.  *Id.* at 705-706.  In finding this, the Sixth Circuit noted, "this case involves far more than an *Ex Post Facto* challenge"; however, "[t]hese questions, however, will have to wait for another day."  *Id.* at 706.

Of great importance, the Sixth Circuit stated, "we are mindful that, as *Smith*[,] [538 U.S. 84,] makes clear, states *are free to pass retroactive sex-offender registry laws*."  *Id.* at 705 (emphasis added).  The Sixth Circuit recognized that certain SORA characteristics do not offend

10

the Ex Post Facto Clause, such as annual/quarterly registration, updating a registrant's personal characteristics, or notifying a registering authority when a registrant moves or buys a new car.  *Id.* at 700.  Additionally, a state, as the Sixth Circuit noted, may maintain a publicly accessible website that publishes "the offenders' names, addresses, photos, physical descriptions, license numbers, places of employment, dates of birth, crimes of conviction, dates and places of conviction, and length of sentences, as well the offenders' compliance with the registration requirements."  *Does I*, 834 F.3d at 700.

Perhaps more importantly, the provisions of the old SORA that the court focused on in determining that there was an Ex Post Facto violation – the exclusion zones and in-person reporting requirements - were removed or substantially modified in the new SORA.[1]

### D. Does II

Following the Sixth Circuit's decision in *Does I*, a class action complaint was filed in the Eastern District in 2016.  It challenged the

---

[1] Available at: https://www.michigan.gov/-/media/Project/Websites/msp/cjic/sora_notification.pdf?rev=e00470629618476699043b0f7ba1e216.

11

old SORA on the same grounds that the Sixth Circuit did not address in

*Does I.  See John Doe, et al v. Snyder,* No. 16-cv-13137 (E.D. Mich.)

("*Does II*").  The *Does II* claims were nearly identical to the *Does I*

claims but were brought on behalf of various classes of registrants.  *Id.*

There were many delays in the briefing to allow the Legislature to

address the Court's earlier opinion in *Does I.*  (ECF No. 1, PageID.44-

46.)  The Legislature did not act.  As a result, the district court entered

an order in August 2021 finding that the old SORA was punishment

and that certain provisions were unconstitutional as applied to the

subclass members.  *Does II*, No. 16-cv-13137, Am. Final J., R. 126.

### E. People v. Betts

During the pendency of *Does II* litigation, the Michigan Supreme

Court had to address whether the old SORA violated the Ex Post Facto

Clause under the United States Constitution and Michigan

Constitution's prohibitions of Ex Post Facto lawmaking.  *People v Betts*,

507 Mich 527, 533, 541-42 (2021).  Betts brought an Ex Post Facto

challenge under both the United States and Michigan Constitutions

concerning his criminal conviction based on the old SORA.  The *Betts*

Court's reasoning significantly mirrored the reasoning of the Sixth

12

Circuit in *Does I*. *Id*. The Court concluded that the old SORA violated the Ex Post Facto Clause because the cumulative effect was punitive. *Id*. at 562.

### F. The New SORA

In response to the *Does I*, *Does II*, and *Betts* decisions, the Michigan Legislature passed the new SORA, which took effect on March 24, 2021. 2020 Mich. Pub Act 295.

The new SORA amended and repealed the provisions of the old SORA that were found to be unconstitutional. It repealed the student safety zone provisions, in their entirety; removed the retrospective in-person reporting requirements for vehicle information, email addresses, internet identifiers, and telephone numbers; removed the registration requirement for the vast majority of juvenile offenders; removed the remaining juvenile offenders from the public registry; and eliminated the publishing of tier information on the publicly accessible SORA website. *Id*.; Mich. Comp. Law § 28.733-736; § 28.725(2)(a); and § 28.728(3)(e). *See* Ex. A, *Doe v. Snyder*, (No. 16-13137), 2021 WL 2525436, at *3 (E.D. Mich. June 21, 2021) ("**all parties acknowledge that the new SORA removes or modifies all provisions that this**

13

court found to be unconstitutional in its February 14, 202[0]

opinion in *Does II*."); *see also* Ex. B, the Michigan State Police Notice

to Registrants.

In seeking a petition for certiorari in *Does I*, the U.S. Supreme

Court invited the views of the U.S. Solicitor General who identified the

same three basic ways in which the Michigan SORA departed

substantively from SORNA in explaining why the U.S. Supreme Court

should deny cert.  *See* U.S. Solicitor General's Amicus (July 2017), p.

18.[2]  ("The court of appeals explained that SORA is punitive because of

the cumulative effect of three statutory features: the school-safety zones

in which a sex offender is not permitted to live, work, or loiter; the

requirement that an offender be categorized into a tier based on his

underlying offense without an individualized assessment and that his

assigned tier be made public; and the requirement that sex offenders

appear in person 'to report even minor changes to their information.' ").

The new SORA removed the three basic ways that it departed

substantively from the SORNA and now largely mirrors its federal

---

[2] Available at: https://www.justice.gov/sites/default/files/briefs/2017/07/07/16-768_snyder_ac_pet.pdf

counterpart. Mich. Comp. Law §§ 28.733-736; 28.725(2)(a); and

28.728(3)(e); 34 U.S.C. § 20901, *et al.*; Ex. C, Comparison chart.

### G. Does III

After the new SORA was enacted, Plaintiffs filed a behemoth

complaint with ten claims – (1) Ex Post Facto claim for offenses

committed prior to July 1, 2011; (2) Ex Post Facto and Due Process

claims for retroactive registration requirements; (3) Due Process and

Equal Protection claims; (4) Equal Protection claim for some registrants

that are allegedly unable to petition for removal; (5) First Amendment

claim related to reporting requirements; (6) a Due Process claim related

to plea agreements; (7) Due Process and Equal Protection for an

individual that allegedly did not commit a sex offense; (8) a vagueness

challenge regarding certain provisions of the new SORA; (9) a First

Amendment claim related to the requirement that registrants must

attest to understanding their obligations; and (10) First Amendment

claim related to reporting email addresses and internet identifiers.

(ECF No. 1, PageID.171-193.) Contemporaneously with the complaint,

Plaintiffs filed a motion for preliminary injunction. (ECF No. 7,

PageID.857-946.) A similar class action was filed and was

administratively stayed pending the outcome of this case. (ECF No. 34, PageID.1114.)

Included with the complaint was hundreds of pages of "expert" opinions that allege to support Plaintiffs' position that registries are ineffective. (ECF No. 1, PageID.228-726.)  Plaintiffs rely on conclusions drawn from data concerning adult sex offender recidivism rates, and incorrectly indicate that there is no contrary data.  (ECF No. 1, PageID.59-61.)

For example, a 2003 U.S. Department of Justice Study showed that among 9,691 individuals released from state prisons for sex offenses in 1994, thirty percent of released child molesters and nearly forty percent of released statutory rapists had previously been arrested for sex offenses.  Patrick E. Langan et al., U.S. Dep't of Just., NCJ 198281, *Recidivism of Sex Offenders Released from Prison in 1994*, at 12 tbl. 6 (2003).[3]

A more comprehensive DOJ study published in 2019 that tracked 20,195 individuals released from state prisons for rape or sexual assault in 2005 showed that sex offenders were three times more likely than

---

[3] Available at: https://bjs.ojp.gov/content/pub/pdf/rsorp94.pdf.

individuals convicted of non-sexual crimes to be re-arrested for rape or sexual assault from 2005 to 2014. Mariel Alper & Matthew Durose, U.S. Dep't of Just., NCJ 251773, *Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005–14)*, at 5 (2019).[4]

What's more, Plaintiffs' own experts acknowledge that their statistics only represent who "would be caught" rather than what percentage of offenders actually reoffend. (ECF No. 1-4, PageID.237.) The statistics only track how many offenders "return to the courts." (*Id.* at 241.) It seems to be common knowledge that many, many, many people don't report sexual assaults because of a myriad of complex social, financial, psychological and personal reasons. This is something that Plaintiffs experts admit – "recidivism rates underestimates the actual rate . . . [and] [t]he extent of underestimation is unknown." *Id.* at 274.

Despite these limitations, Plaintiffs' experts allege that the average rate for recidivism of past offenders is between 5-15% compared to the average populations risk of 1%. (ECF No. 1-4, PageID.245.) This

---

[4] Available at: https://bjs.ojp.gov/redirect-legacy/content/pub/pdf/rsorsp9yfu0514_sum.pdf.

is obviously a monumental difference – 1% compared to 15% - especially considering that the lifetime cost of rape amongst U.S. adults is estimated to be more than $122,000 for each assault.  Peterson, C., DeGue, S., Florence, C., & Lokey, C. N. (2017), *Lifetime economic burden of rape among U.S. adults,* American Journal of Preventive Medicine, 52(6), 691–701.[5]

Every percent of increase equates with millions of dollars in economic damages to victims and society.  And more importantly, for anyone that has been the victim of sexual assault or knows someone that has been the victim of sexual assault, every percentage increase means another lifelong burden carried by survivors.

It does not take a Ph.D. statistical expert to question the value of the data if it only represents who returns to court rather than who actually reoffends.

Plaintiffs' expert also advocates for structured risk assessments but admits that debate remains about how to structure the assessments and that the science regarding predictive accuracy continues to change

---

[5] Available at: Sexual Assault Statistics | National Sexual Violence Resource Center (NSVRC)

with time. (*Id*. at 239, 249.)  Moreover, some of the studies relied on by the experts have not been "subject to peer review." (*Id*. at 243.)

Additionally, many of the statistics relied upon by the experts, only represent adult male offenders. (ECF No. 1-4, PageID.370.)  While there is no dispute that males comprise the majority of offenders, female offenders make up a surprising percentage of offenders and are thus unaccounted for in Plaintiffs' experts' statistical analysis of recidivism rates. Lara Stemple & Ilan Myer, Am. J. Public Health, *The Sexual Victimization of Men in America: New Data Challenges Old Assumptions* (2014).[6] (noting that men and women had "similar prevalence of nonconsensual sex").

Facts incorporated by reference in Plaintiffs' complaint also supports the connection between SORA and law enforcement's increased capacity to apprehend recidivist sex offenders.  *See* Donna D. Schram & Cheryl Darling Milloy, Wash. Inst. for Pub. Pol'y, *Community Notification: A Study of Offender Characteristics and Recidivism* 19

---

[6] Available at The Sexual Victimization of Men in America: New Data Challenge Old Assumptions - PMC (nih.gov).

(1995)[7] ("Offenders who were subjects of community notification were arrested for new crimes much more quickly than comparable offenders who were released without notification."); Richard G. Zevitz, *Sex Offender Community Notification: Its Role in Recidivism and Offender Reintegration*, 19 Crim. Just. Stud. 193, 202 fig. 1 (2006).[8]

Plaintiffs also claim that registration does not reduce recidivism. (ECF No. 1, PageID.59-61.) And allege that policies promoting social re-integration are more likely to reduce recidivism. (*Id.* at 277.) However, other data shows that sex offenders subject to post-conviction registration and reporting requirements recidivated at lower rates than unregistered sex offenders.

- 22% of unregistered Washington sex offenders were re-arrested for a sex crime within four years, while only 19% of registered sex offenders were re-arrested in the same time frame. Schram & Milloy, *supra*, at 17 fig. 1.

- 3.5% of 201 unregistered sex offenders discharged from prison in Iowa in 1995 were convicted of another sex crime within four years while only 3% of 233 sex offenders released in 1995 and 1996 were re-arrested for another sex crime in the same time

---

[7] Available at: http://www.wsipp.wa.gov/ReportFile/1208/Wsipp_Community-Notification-A-Study-of-Offender-Characteristics-and-Recidivism_Full-Report.pdf

[8] Available at: https://www.doi.org/10.1080/14786010600764567

frame. Geneva Adkins et al., Iowa Dep't of Human Rights, *The Iowa Sex Offender Registry and Recidivism* 10 tbl. 4 (2000).[9]

- Unregistered sex offenders released from prison in Washington from 1986 to 1999 were convicted for a felony sex crime at a rate of 7%, registered sex offenders released from prison after Washington's sex offender registry was enacted were convicted for a felony sex crime at a rate of 4%, while sex offenders convicted after Washington increased its reporting requirements in 1997 were convicted of a felony sex crime at a rate of 2%. Robert Barnoski, Wash. Inst. for Pub. Pol'y, *Sex Offender Sentencing in Washington State: Has Community Notification Reduced Recidivism?* 3 Ex. 4 (2005).[10]

- Number of rapes reported to police decreased in three States following their implementations of sex offender registries. Bob Vásquez et al., *The Influence of Sex Offender Registration and Notification Laws in the United States: A Time-Series Analysis*, 54 Crime & Delinquency 175, 187 tbl. 3 (2008).[11]

- Monthly arrests of recidivists in New York for sex offenses generally, and for rape and child molestation in particular, decreased after the State's sex offender registration act was implemented. Jeffrey C. Sandler et al., *Does A Watched Pot Boil? A Time Series Analysis of New York State's Sex Offender*

---

[9] Available at:
https://humanrights.iowa.gov/sites/default/files/media/SexOffenderReport%5B1%5D.pdf

[10] Available at: https://www.wsipp.wa.gov/ReportFile/919/Wsipp_Has-Community-Notification-Reduced-Recidivism_Report.pdf

[11] Available at:
https://www.researchgate.net/publication/254080604_The_Influence_of_Sex_Offender_Registration_and_Notification_Laws_in_The_United_States_A_Time-Series_Analysis

*Registration and Notification Law*, 14 Psych., Pub. Pol'y, & L. 284, 296 tbl. 1 (2008).[12]

- Unregistered Minnesota sex offenders recidivated at higher rates than registered sex offenders. Grant Duwe & William Donnay, *The Impact of Megan's Law on Sex Offender Recidivism: The Minnesota Experience*, 46 Criminology 411, 429 tbl. 4 (2008)[13] Bonita M. Veysey et al., *A Preliminary Step Towards evaluating the Impact of Megan's Law: A Trend Analysis*, 10 Just. Rsch. & Pol'y 1, 11 fig. 3 (2008).[14]

- Unregistered New Jersey sex offenders recidivated at higher rates than registered sex offenders.  Kristen Zgoba et al., N.J. Dep't of Corr., NCJ No. 225370 *Megan's Law: Assessing the Practical and Monetary Efficacy* 30 tbl. 7 (2008).[15]

- From a sample, 9.2% of unregistered South Carolina sex offenders were charged with a new sex crime over 8.4 years, while only 7.1% of registered sex offenders had a new sex crime charge over the same period.  Elizabeth J. Letourneau et al., *Effects of South Carolina's Sex Offender Registration and Notification Policy on Adult Recidivism*, 21 Crim. Just. Pol'y Rev. 435, 448 tbl. 2 (2010).[16]

---

[12] Available at: https://www.researchgate.net/profile/Jeffrey-Sandler/publication/232505213_Does_a_Watched_Pot_Boil_A_Time-Series_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notification_Law/links/5411a7580cf29e4a23297840/Does-a-Watched-Pot-Boil-A-Time-Series-Analysis-of-New-York-States-Sex-Offender-Registration-and-Notification-Law.pdf

[13] Available at: https://doi.org/10.1111/j.1745-9125.2008.00114.x

[14] Available at: https://doi.org/10.3818%2FJRP.10.2.2008.1

[15] Available at: https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf

[16] Available at: https://www.researchgate.net/profile/Jill-Levenson/publication/249720200_Effects_of_South_Carolina's_Sex_Offender_Registration_and_Notification_Policy_on_Adult_Recidivism/links/55af982608aeb9239915a499/Effects-of-South-Carolinas-Sex-Offender-Registration-and-Notification-Policy-on-Adult-Recidivism.pdf

- Pre-SORN sex offenders in Iowa recidivated at a rate of 16.5%, while post-SORN sex offenders recidivated at a rate of 15.8%. Richard Tewksbury & Wesley G. Jennings, *Assessing the Impact of Sex Offender Registration and Community Notification on Sex Offending Trajectories*, 37 Crim. Just. & Behav. 570, 575 tbl. 1 (2010).[17]

- 8% of New York sex offenders not subject to community notification recidivated while only 6.3% of sex offenders subject to community notification recidivated. Naomi J. Freeman, *The Public Safety Impact of Community Notification Laws: Rearrest of Convicted Sex Offenders*, 58 Crime & Delinquency 539, 551 tbl. 1 (2012).[18]

- 13% of pre-SORN sex offenders in New Jersey recidivated while only 9.7% of post-SORN sex offenders recidivated. Richard Tewskbury et al., *A Longitudinal Examination of Sex Offender Recidivism Prior to and Following the Implementation of SORN*, 30 Behav. Scis. & L. 308, 318 tbl. 1 (2012).[19]

- One of Plaintiffs' own experts, Professor J.J. Prescott, concluded that "requiring registration reduces recidivism" based on the results of a 2011 study he co-authored.  J.J. Prescott & Jonah E. Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J. L. & Econ. 161, 182 (2011).

These reductions in recidivism are not just cold numbers that a statistician compares in sterile environment in front of a computer.

---

[17] Available at: https://doi.org/10.1177/0093854810363570

[18] Available at: https://doi.org/10.1177/0011128708330852

[19] Available at: https://doi.org/10.1002/bsl.1009

Perhaps, Plaintiff's experts will opine that some of the reductions are statistically insignificant, thus are not technically considered reductions in recidivism. However, there are real people behind the numbers – moms, sisters, daughters, dads, brothers, and sons – that do not have to bear, what is often, a lifetime of recovery from being sexually assaulted. So, if recidivism is reduced by one percent, perhaps that means 4,000 or 400 less people are victims of sexual assault – those that are saved from victimization would say that the one percent reduction is significant.

Curiously, Plaintiffs' complain about the expense of maintaining the registry, yet advocate for individualized and periodic review for each registrant. (ECF No. 1, PageID.151.) No expert is needed to know that providing individualized and periodic review for 55,000 registrants would be enormously expensive. (*Id*. at 9-10.) It raises practical issues:

- Would each registrant be provided a court hearing?

- How often would the periodic reviews be required?

- Are experts required to perform some sort of evaluation? Who pays for the expert?

- Would registrants be provided a court appointed lawyer, if they couldn't afford one?

- Would victims be notified? Would victims have the right to object to removal from the registry?

24

- What costs would be borne by victims from having to relive their assault experience?

- What appeal process would there be?

- Would there be a disparate impact on economically disadvantaged people who couldn't afford the same quality of representation as those that are not economically disadvantaged?

These are the types of questions best answered by the Legislature.

Plaintiffs' experts allege that the studies failed to demonstrate causation to a sufficient degree of mathematical certainty or failed to control for certain independent variables.  (ECF No. 1-5, PageID.401-408.)  Plaintiffs' beliefs that the lower likelihood registered sex offenders will recidivate is a far cry from the sweeping claim that "dozens of studies by different researchers on the impact of sex offender registration laws have failed to uncover *any evidence* that public registries reduce recidivism."  (ECF No. 1, PageID.55).

Plaintiffs' experts also allege that data showing a meaningful correlation between sex offender registration and reduced recidivism were collected from States whose registration and reporting requirements were based on individualized assessments of risk.  (ECF No. 1-5, PageID.410.)  However, the Plaintiffs make no showing that

those States' individualized assessments of risk were meaningfully different from the new SORA's three-tiered risk assessment structure based on offenses of conviction.  At the very least, the data incorporated in the Plaintiffs' complaint show that reasonable people could disagree about the degree of correlation between sex offender registries and reduced rates of recidivism among sex offenders.

Only two studies cited by Plaintiffs' experts showed an increase in recidivism rates among adult sex offenders after a registry was implemented.  One of the studies excluded out-of-state arrests and convictions, Amanda Y. Agan, *Sex Offender Registries: Fear Without Function?*, 54 J. L. & Econ. 207, 226 (2011) ("I further restricted the data to those offenders who appear to have remained in the state that released them.  I did so by excluding offenders who were arrested out of state at any point during the 3-year follow-up period . . . ."), and the author of the other study wrote that the number of recidivists was "insufficient in number to be able to run a meaningful inferential test to rule out an idiosyncratic explanation for the different rates," Zevitz, *supra*, at 201.

26

Finally, Plaintiffs' claim that more fulsome registration requirements actually increase recidivism is based on their assumptions that SORA increases risk factors associated with recidivism generally. (ECF No. 1, PageID.55.)  Plaintiffs have produced no data showing a positive correlation between sex offender recidivism rates and the SORA 2021's reporting requirements.

## ARGUMENT

## I.    Preliminary Injunctive Relief

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that require the need for prospective relief.  *Salazar v. Buono*, 559 U.S. 700, 714 (2010) (citations omitted).  "The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944).

In exercising its sound discretion, a court of equity should be particularly cautious in regard to the public consequences in employing the extraordinary remedy of injunction.  *Salazar*, 559 U.S. at 714; *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982).  "[W]here an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff."  *Yakus v. United States*, 321 U.S. 414, 440 (1944) (emphasis added).

A plaintiff seeking a preliminary injunction must establish by making a strong showing that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021).

## II.    Plaintiffs are not likely to succeed on the merits.

Consistent with Fed. R. Civ. P. 10(c), Defendants adopt by reference the arguments set forth in their motion to dismiss being filed

shortly after this response.  The most germane arguments are also set-forth below.

### A.   The Ex Post Facto Clause's purpose and design are not implicated by the new SORA.

Under the Ex Post Facto Clause: "No State shall ... pass any ... ex post facto law." U.S. Const. art. I § 10, cl. 1.  The Ex Post Facto Clause "assure[s] that legislative [a]cts give fair warning of their effect and permit individuals to rely on their meaning" and it prevents the government from passing punitive legislation that is arbitrary or vindictive in nature.  *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981).

The Ex Post Facto Clause is only "implicated where a law punishes retrospectively", such as, when a retrospective law changes the legal consequences stemming from the underlying act that were committed before the effective date of the retrospective law.  *Doe v. Bredesen*, 507 F.3d 998, 1003 (6th Cir. 2007).  However, "[t]he Constitution's ban on Ex Post Facto laws *does not bar all retroactive lawmaking*, but only retroactive punishment."  *Does I*, 834 F.3d 696, 699 (6th Cir. 2016) (emphasis added).

Instead, the focus should not be on whether the retrospective law imposes a "disadvantage" (i.e., a civil proceeding) to a group of people, but whether the change increases the penalty by which the crime is punishable. *Smith*, 538 U.S. at 92; *Dyer v. Bowlen,* 465 F.3d 280, 289 (6th Cir. 2006) (quoting *Calif. Dept. of Corr. v. Morales,* 514 U.S. 499, 506 n. 3 (1995)).

The balance between civil proceedings and unconstitutional retroactive criminal penalties is determined by a two-part test. *Smith*, 538 U.S. at 92. First, did the legislature intend to impose punishment? *Id.* Second, if not, is the statutory scheme " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Id.*

### B.   The Michigan Legislature did not intend the new SORA to impose punishment.

First, the Michigan Legislature set forth its purpose when it passed the SORA into law.  It declared that the SORA "was enacted pursuant to the legislature's exercise of the police power of the state with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of

future criminal sexual acts by convicted sex offenders…" Mich. Comp.

Law § 28.721a. The Michigan Legislature's stated purpose in enacting

the SORA has remained unchanged for decades. 2002 Mich Pub. Act

542.

Further, several courts have found that the Michigan Legislature

did not intend to impose punishment when it passed the SORA.

"[W]e see no warrant for concluding that SORA's intent is punitive."

*Does I,* 834 F.3d 696, 700–01.  "[W]e conclude that the [Michigan]

Legislature likely intended [the] SORA as a civil regulation rather than

a criminal punishment."  *Betts*, 507 Mich. at 548-549.  Thus, it is clear

that the Michigan Legislature did not intend to impose punishment,

and the SORA is a civil penalty.

Most of Plaintiffs in this case and the pre-2011 Ex Post Facto

proposed subclass were apart of both the *Does I* and *Does II* litigation –

where the retroactive application of the old SORA was challenged.  In

*Does I*, the Sixth Circuit specifically found that the SORA, including the

old SORA provisions, should be considered a civil statute.  *Does I*, 834

F.3d at 700-01.  There is little reason to believe that any court at the

state or federal level would reach the conclusion that the Michigan

Legislature intended the new SORA to be punitive, especially when many of the challenged provisions of the old SORA were repealed in their entirety.

Plaintiffs argue that *Does I* and *Betts* require "individualized assessments" of each sex offender's present dangerousness level before a sex offender may be classified. (ECF No. 7, PageID.887.) This contention is misplaced.

First, the Sixth Circuit and the Michigan Supreme Court found that the publishing of tiered information on the *publicly accessible* sex offender registry violated the Ex Post Facto Clause. *Does I*, 834 F.3d at 702-03. The SORA 2021 eliminated the publishing of each sex offender's tier category on the *publicly accessible* sex offender registry. Mich. Comp. Law § 28.728(2), (3)(e). Instead, the tier classification is now only available to law enforcement. Mich. Comp. Law § 28.728(1)(u).

Second, the United States Supreme Court has ruled that a state may pass a retroactive sex offender registry without offending the Ex Post Facto Clause. *Smith*, 538 U.S. at 106. In *Smith*, Alaska passed a retroactive sex offender registry for any convicted sex offender

32

regardless of when the listed offense was committed, and the registration period could range from 15 years for a non-aggravated sex offense to life for an aggravated sex offense. *Id.* at 90. (i.e. the Alaska law had two tiers of offenders.)

The *Smith* court stated: "The *Ex Post Facto* Clause does not preclude a State from *making reasonable categorical judgments* that [a] conviction of specified crimes should entail particular regulatory consequences." *Id.* at 103 (emphasis added). Ultimately, the *Smith* Court rejected the challenge to the requirement that certain sex offenders register for life, and most importantly, the *Smith* Court rejected the notion that life registrants receive an individualized risk assessment. *Id.* at 104.

### C. The new SORA is not punitive either in its purpose or effect as to negate the State's intention to deem it civil.

Since the new SORA is intended to be a civil remedy, the Plaintiffs must show by the "clearest of proof" that the SORA's actual effects or purpose are punitive irrespective of the Legislature's intent. *Hudson v. United States,* 522 U.S. 93, 100 (1997). To make this

33

showing, the Plaintiffs must use five factors, known as the *Mendoza-Martinez* factors:

> (1) Does the law inflict what has been regarded in our history and traditions as punishment?
>
> (2) Does it impose an affirmative disability or restraint?
>
> (3) Does it promote the traditional aims of punishment?
>
> (4) Does it have a rational connection to a non-punitive purpose?
>
> (5) Is it excessive with respect to this purpose?

*Smith*, 538 U.S. at 97 (citing *Kennedy v. Mendoza–Martinez*, 372 U.S.144, 168–169, (1963)).

"[T]he Legislature's manifest intent will be rejected only when 'a party challenging the statute provides the clearest proof that the statutory scheme is so punitive either in purpose or effect to negate the State's intention to deem it civil.' " *Betts*, 507 Mich. at 543–44 (citing *Kansas v. Hendricks*, 521 U.S. 346, 361, (1997)).

However, Plaintiffs have failed to carry their burden to show by the clearest of proof that that the SORA's actual effects or purpose are punitive irrespective of the Michigan Legislature's intent to make the SORA a civil remedy.

34

### 1.    The new SORA does not resemble traditional forms of punishment.

Registries are a recent form of civil regulation, thus there is no direct historical comparison.  The old SORA was found to resemble traditional forms of punishment such as banishment, public shaming, and probation and parole.  *See, e.g., Does #1-5,* 834 F.3d 696, 701–03; and *Betts*, 968 N.W.2d 497, 503–508.

### i.    Banishment

The old SORA excluded registrants from working, living or loitering within 1,000 feet of school property; effectively making it difficult for registrants to find a place where they could legally live or work and resembling the traditional punishment of banishment.  *Does #1-5*, 834 F.3d at 702; *Betts*, 968 N.W.2d. at 508–09.  In enacting the new SORA, the Legislature removed any restrictions on where a registrant may work, reside, or remain.  Mich. Comp. Law §§ 28.733-736.

As such, the new SORA does not resemble the traditional punishment of banishment.  Any negative consequence of registration regarding arises not from the new SORA, but rather flows from the registrant's original conviction for a registrable offense.

### ii.   Shaming

The U.S. Supreme Court found that posting almost the exact same information online that the new SORA requires was not analogous to the traditional punishment of shaming.  *Smith*, 538 U.S. 84; Mich. Comp. Law § 28.728(2)(a)-(k).

The only difference between the new SORA and Alaska's law is that the new SORA requires registrants to provide the address of any post-secondary or trade school they currently attend.  This is not so dissimilar to the requirements of the Alaskan statute examined in *Smith* and the new SORA requiring the disclosure of the place of employment to cause it to resemble the traditional punishment of shaming.

The information being provided to the public is "accurate information about a criminal record, most of which is already public." *Smith*, 538 U.S. at 98.  "[O]ur criminal law tradition insists on public indictment, public trial, and public imposition of sentence."  *Id.* at 99 ("The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism.")  *Id.*

In contrast to the colonial shaming punishments, however, the new SORA does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme. *Id.* Any attendant "public shame" or "humiliation"—even when magnified by the "reach of the Internet"—is a "collateral consequence of a valid regulation." *Id.* As such, the new SORA does not resemble the traditional punishment of shaming. *See Betts,* 968 N.W.2d at 509 ("As with banishment, [the old SORA] does not perfectly resemble the traditional punishment of shaming").

The old SORA made a registrant's tier classification publicly available, along with conviction information that was non-public. *Does #1-5*, 834 F.3d at 702–03. The Legislature removed the public reporting of a registrant's tier classification in the new SORA. Mich. Comp. Law § 28.728(3)(e).

The new SORA also no longer requires someone to register who 1) successfully completes a sentence under the Holmes Youthful Trainee Act (HYTA), Mich. Comp. Law § 762.11-15, or 2) is adjudicated for a

37

juvenile offense after January 1, 2021.[20]  Mich. Comp. Law § 28.722(ii),

(iii); § 712A.28.  Under the new SORA, all registrants required to

register due to a juvenile adjudication have been removed from the

public registry.  As a result, the new SORA no longer reports any

information about the registrant's conviction that is not otherwise

publicly available.

As an aside, Plaintiffs try to paint the picture of the new SORA

being a means of public shaming and allowing the ordinary citizen to

contact the registrants and harass them about their status as a

registrant.  They do so by making an inference that since the prior

version of the SORA specifically stated that email addresses and

internet identifiers could not be posted on the public registry, that the

new version of SORA means that email addresses and internet

identifiers of registrants will now be posted publicly.  (ECF No. 1,

PageID.192.)

---

[20] Between June 1, 1988 and January 1, 2021 juvenile court records were open to
the general public, except as provided in the juvenile diversion act, pursuant to
Mich. Comp. Law § 712A.28.  When this statute was amended, on the same day as
SORA, it effectively removed the requirement that any person adjudicated as a
juvenile in probate court had to register as a sex offender under SORA.

That inference is a misunderstanding of what information is available on the public registry – email addresses are not publicly posted.[21]  What's more, the information that is posted on the registry is easily discoverable through various other means in an era where a plethora of information is available through simple Google searches, or by routine background checks that are run by employers, landlords, real estate agents, etc.  And perhaps most importantly, federal regulations prohibit the public posting of such information.  28 U.S.C. §§ 20916(c) and 20920(b)(4); 76 F.R. § 1630, 1637; 86 F.R. §§ 69856, 69858.

### iii.   Probation and Parole

The old SORA excluded registrants from working, living or loitering within 1,000 feet of school property and the Sixth Circuit found that these restrictions resembled the traditional punishment of probation and parole.  *Does 1-5*, 834 F.3d. 703.

The Legislature removed any restrictions on where a registrant may work, reside, or remain.  Plaintiffs contend that the new SORA's in-person reporting requirements functionally have a punitive effect

---

[21] https://mspsor.com/Home/Search.

and still resemble the traditional punishments of probation and parole. (*See e.g.* ECF No. 1, PageID.101-102, ¶¶387-390.)  Not so.

The Supreme Court has clearly distinguished the characteristics of probation or parole, on the one hand, and the requirements of sex offender registries, on the other.  *Smith*, 538 U.S. at 101.

Individuals on probation or parole are subjected to mandatory conditions of release, regular supervision, and revocation of release in the event of an infraction. *Smith*, 538 U.S. at 101.  Those conditions typically involve significant limitations on daily life, "such as mandating employment, requiring consent before moving or changing jobs, and forbidding drug and alcohol use." *Millard v. Camper*, 971 F.3d 1174, 1182–83 (10th Cir. 2020).  In the same way, law enforcement plays a "far more active role . . . in a probationer's life" by overseeing their reentry, meeting regularly, and providing the requisite consent to changes in living or working conditions. *Id.*

Although the new SORA imposes additional obligations beyond those in the law examined in *Smith*, they still fall well-short of the sort of active law enforcement supervision typical of probation and parole.

40

The new SORA does not constrain where a registrant lives, does not require employment, and does not require a registrant to obtain permission before making decisions about the registrant's life.

As with other registries deemed not to be akin to probation or parole, the new SORA only requires registrants to report changes in address, employment, and other circumstances, if they occur. *Smith*, 538 U.S. at 101; *see also Shaw v. Patton*, 823 F.3d at 556, 565 (10th Cir. 2016) (discussing ways in which probation historically involved prior consent and conditions that go beyond regular reporting obligations).

In brief, the new SORA does not reasonably resemble the traditional punishments of banishment, shaming, or probation or parole. Therefore, this factor weighs in favor of the State Defendants.

## 2. The new SORA is not an affirmative disability or restraint.

The next *Mendoza-Martinez* factor is how the effects of the new SORA are felt by registrants – is it an affirmative disability or restraint? If the restraint is minor, its effects are not likely to be considered punitive. *Smith,* 538 U.S. 84, 100. The old SORA was found to impose significantly more restraints than the registry in *Smith*, in

light of both the existence of exclusion zones and the in-person

reporting requirement.  *Doe #1-5*, 834 F.3d 703-704; *Betts*, 507 Mich.

554-556.

The new SORA did away with the exclusion zones, which were the

primary focus of the courts' earlier findings that this factor weighed in

favor of the Plaintiffs.  *Doe #1-5*, 834 F.3d 703-704; *Betts*, 507 Mich.

554-556.

The new SORA does not actually prohibit registrants from doing

anything; it does not even require that registrants seek permission

before making significant changes (e.g., moving residences, changing

employment, or enrolling in a postsecondary education institution). It

only requires that the registrants report such changes if they occur.

To be sure, the in-person reporting requirement, which partially

remains in the new SORA, also imposes a restraint on registrants, but

it has been routinely upheld as constitutional in circuits around the

country.  *See United States v. Parks,* 698 F.3d 1, 6 (1st Cir. 2012)

(concluding that in-person reporting is inconvenient but not enough to

constitute punishment); *Doe v. Cuomo,* 755 F.3d 105, 112 (2nd Cir.

2014) (holding that a requirement of quarterly in-person reporting is

not punitive); *United States v. Under Seal,* 709 F.3d 257, 265 (4th Cir. 2013) ("Although [a sex offender] is required under [the Sex Offender Registration and Notification Act] to appear periodically in person to verify his information and submit to a photograph, this is not an affirmative disability or restraint."; *Hatton v. Bonner,* 356 F.3d 955, 964 (9th Cir. 2003) (stating that a California statute's requirement of in-person reporting "is simply not enough to turn [the California statute] into an affirmative disability or restraint"); *United States v. W.B.H.,* 664 F.3d 848, 855, 857–58 (11th Cir. 2011) (concluding that a requirement of frequent, in-person reporting is "not enough" to change a statutory regime from civil and regulatory to criminal and punitive); *Shaw v. Patton*, 823 F.3d 556, 568–69 (10th Cir. 2016) (holding that in person reporting is not punitive.)

Courts have also repeatedly found that the in-person reporting requirements of the comparable federal SORNA statute are not punishment and, therefore, do not violate the Ex Post Facto Clause. *United States v. Felts*, 674 F.3d 599, 605–06 (6th Cir. 2012). "To appear in person to update a registration is doubtless more inconvenient than doing so by telephone, mail or web entry; but it serves the remedial

43

purpose of establishing that the individual is in the vicinity and not in some other jurisdiction where he may not have registered, confirms identity by fingerprints and records the individual's current appearance." *United States v. Parks*, 698 F.3d 1, 6 (1st Cir. 2012) (rejecting a claim that the quarterly in person registration requirement under SORNA imposed punitive restraints under the Ex Post Facto clause); *United States v. Under Seal*, 709 F.3d 257, 265 (4th Cir. 2013) ("Although Appellant is required under SORNA to appear periodically in person to verify his information and submit to a photograph. . .this is not an affirmative disability or restraint."); *United States v. Young*, 585 F.3d 199, 206 (5th Cir. 2009); *United States v. May*, 535 F.3d 912, 919– 20 (8th Cir. 2008), abrogated on other grounds by *Reynolds v. United States*, 565 U.S. 432 (2012); *United States v. W.B.H.*, 664 F.3d 848, 860 (11th Cir. 2011).

The in-person reporting requirement is less harsh than lifelong bans to work in certain industries, which have been upheld as non-punitive. *See, e.g., Hudson v. United States,* 522 U.S. 93, 104 (1997) (restricting participation in the banking industry); *De Veau v. Braisted,* 363 U.S. 144, 160 (1960) (prohibiting work as a union

official); *Hawker v. New York,* 170 U.S. 189, 192–94 (1898) (revocation of a medical license); *Am. Civil Liberties Union of Nev. v. Masto,* 670 F.3d 1046, 1056–57 (9th Cir. 2012) (providing that a state law requiring quarterly fingerprinting and in-person reporting does not constitute an affirmative disability or restraint because "the burden remains less onerous than occupational debarment").

There is nothing in the new SORA that makes the modified in-person reporting requirements more punitive than the in-person reporting requirements in other states or under federal SORNA. Thus, the new SORA is not an affirmative disability or restraint. This factor weighs in favor of the State Defendants.

### 3.    The new SORA is not punishment.

The next *Mendoza-Martinez* factor is whether the new SORA promotes the traditional aims of punishment. As explained by the Legislature, the new SORA is intended to help track registrants and protect the public. Mich. Comp. Law § 28.721a. "Any number of governmental programs might deter crime without imposing punishment. 'To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' ... would severely undermine the

45

Government's ability to engage in effective regulation.' " *Smith*, 538 U.S. 84, 102.

On the other hand, the ongoing obligations under the new SORA all stem from the underlying offense, which could be construed as an extension of punishment. As a result, this factor does little to guide the Court in answering the question of whether the new SORA promotes the traditional aims of punishment.

### 4. The new SORA has a rational connection to a non-punitive purpose.

The next *Mendoza-Martinez* factor is whether there is a rational connection to a non-punitive purpose. The non-punitive purpose of the SORA is to keep the public safe, attempt to prevent recidivism, and provide an "appropriate, comprehensive, and effective means to monitor those persons who pose . . . a potential danger" to the people of the state. Mich. Comp. Law § 28.721a.

Quizzically, Plaintiffs allege that registrants are much less likely to reoffend than other criminals. Plaintiffs' allegations seem to suggest that the registry isn't working because according to their statistics, some people on the registry have a lower likelihood of reoffending.

However, they miss the obvious point that perhaps the reason why registrants are less likely to reoffend is because the registry helps prevent recidivism.  See supra.  Some legislators may point to the Plaintiffs assertions as evidence that the laws are working as intended – because individuals are on the registry the public is aware of potential danger and because individuals are on the registry, they may be more likely to comport their behavior to avoid further legal issues – the end result is that the likelihood of reoffending is lowered.

Whether the registry is working as intended is ultimately a question for the Legislature to sort out, but it's clear that there could be many reasons why the likelihood of reoffending is allegedly lower for registrants.

Michigan's purpose in enacting SORA, mirrors Congresses intent for the similar, if not more restrictive federal SORNA, which was to create a non-punitive regulatory framework to keep track of sex offenders.  *U.S. Under Seal*, 709 F.3d. 257, 264-265 (4th Cir. 2013). (SORNA has a rational connection to a legitimate, non-punitive purpose of public safety, which is advanced by notifying the public to the risk of sex offenders in the community).

47

The Sixth Circuit has also found that Michigan has a rational basis for treating sex offenders differently from other offenders by requiring them to register. *Does v. Munoz*, 507 F.3d 961, 966 (6th Cir. 2007); *Cutshall v. Sundquist*, 193 F.3d 466, 482-3 (6th Cir. 1999).

SORA's periodic in-person reporting of registrants serves the purpose of establishing that the individual is in the vicinity and not in some other jurisdiction and confirms the registrant's identity and required information. *See U.S. v. Parks*, 698 F.3d 1 at 6 (1st Cir. 2012). These requirements are clearly rationally related to SORA's intended purpose to provide an appropriate, comprehensive, and effective means for the public and law enforcement to monitor individuals convicted of specific legislatively enumerated crimes. Mich. Comp. Law § 28.721a.

While there can certainly be debate over whether the Legislature's purpose is being accomplished by the policy that they enacted, there should not be debate over whether there is a rational connection between the law and the purpose. *Betts*, 968 N.W.2d 497, 512–13. A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance. *Smith*, 538 U.S. at 103. This factor weighs in favor of the State Defendants.

### 5.   The new SORA is not excessive.

The last *Mendoza-Martinez* factor is "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105.  This factor relates to reasonableness, not "whether the legislature has made the best choice possible to address the problem it seeks to remedy."  *Id.*  "The Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences."  *Id* at 103.

In looking at the old SORA, courts found that restraints imposed by the 2006 and 2011 amendments, such as the exclusionary zones, the public posting of tiering information, and the public posting of non-public conviction offenses, were excessive.  *Betts*, 507 Mich. 527, 559. *Does #1-5*, 834 F.3d 696, 705.  However, these provisions have been removed from the new SORA.

Plaintiffs posit that registrants should be given an individualized risk assessment prior to placement on Michigan's sex offender registry. (ECF No. 1, PageID.71-72.)  The U.S. Supreme Court has specifically rejected this argument, finding "[t]he State's determination to legislate

49

with respect to convicted sex offenders as a class, rather than require
individual determination of their dangerousness, does not make the
statute a punishment under the Ex Post Facto Clause." *Smith,* 538
U.S. at 104.  Failure to include an individualized risk assessment does
not weigh in favor of the Plaintiffs.

Moreover, Plaintiffs assume that an individualized risk
assessment would somehow accurately calculate whether someone is
likely to reoffend.  (ECF No. 1, PageID.71-72.)  However, Plaintiffs fail
to recognize the potential pitfalls and inaccuracies of risk assessments.
Some studies show that risk assessments "falsely identify Black men as
future criminals at twice the rate that white men are falsely identified."
*See, e.g.*, Julia Angwin, Jeff Larson, Surya Mattu & Lauren Kirchner,
*Machine Bias*, PROPUBLICA (May 23, 2016)[22]; Julia Dressel & Hany
Farid, *The Accuracy, Fairness, and Limits of Predicting Recidivism*, 4
SCI. ADVANCES art. eaao5580 (2018).[23]  A popular risk assessment
tool, was found to be "no more accurate or fair than the predictions of
people with little to no criminal justice expertise."  *Id.* at 3.

---

[22] Available at: https://www.propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing

[23] Available at: https://doi.org/10.1126/sciadv.aao5580

This illustrates the point that the decision to use individualized risk assessments, or to use the underlying crime as the basis for determining civil penalties is best left to the Legislature. The Legislature can weigh the various considerations to draft legislation that address the competing bodies of science. As the science develops more fully, the Legislature can consider the science and make amendments as appropriate.

### 6. Consideration of all the *Mendoza-Martinez* factors confirms that the new SORA is not punishment.

The legislative changes in the new SORA addressed the issues with old SORA, and in effect making it almost identical to the provisions of federal SORNA. Considering all the factors above, Plaintiffs have not clearly proven the effects of the new SORA's statutory scheme law negate the Michigan Legislature's intention to establish a civil regulatory scheme. Therefore, the new SORA is nonpunitive, and its retroactive application does not violate the Ex Post Facto Clause. *Smith,* 538 U.S. at 107-108.

What's more, even if the court somehow finds that the Michigan SORA is unconstitutional, or that Plaintiffs do not need to register

under state law, they still must register under federal law.  *See*

*Willman*, 972 F.3d 819, 824-25.  The Plaintiffs registration status would

not change. A sex offender shall register, and keep the registration

current, in each jurisdiction where the offender resides, where the

offender is an employee, and where the offender is a student.  34 U.S.C.

§ 20913(a).

### D.    An individualized risk assessment is not required for the new SORA to be applied retroactively.

Plaintiffs argue that the new SORA is unconstitutional without an

individualized risk assessment.  (ECF No. 7, PageID.901-902.)  But,

Plaintiffs ignore the inconvenient truth that the U. S. Supreme Court

and the Sixth Circuit have both ruled that States are free to pass

retroactive sex offender registry acts *without* individualized risk

assessments without offending the Ex Post Facto Clause.  *Smith*, 538

U.S. at 105-06; *Does I*, 834 F.3d at 705.

In support of Plaintiffs' argument, they cite to *Hendricks*, but that

case is inherently different in terms of the facts than the SORA in

Michigan.  521 U.S. 346.  In *Hendricks*, Kansas passed an act that

allowed for the civil commitment of sexual offenders who suffered from

a mental disease or abnormality.  *Id*. at 351-352.  However, prior to

being civilly committed, a sex offender had to have an individualized determination made of his or her present dangerousness level. *Id*. at 368-71. This heightened requirement, which differs from *Smith*, makes sense because the State is depriving a person of his or her liberty by civilly confining him or her. *Id*. at 358-60.

Unlike the Kansas law encountered in *Hendricks*, the new SORA, does not civilly confine any sex offender who is required to be registered under it. Plaintiffs cite to *Hendricks* as proof that an individualized assessment must be made prior to placing a sex offender retroactively on the SORA registry, but the comparison between the two is like an apple and an orange. Again, Plaintiffs have utterly failed to show that they are highly likely to succeed on the merits.

## III.  Plaintiffs do not have a high likelihood of success in establishing that the new SORA violates the First Amendment.

Under the First Amendment, no State "shall make no law … prohibiting the free exercise thereof; or abridging the freedom of speech…" U.S. Const. amend. I. It is well established that the First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)

(citing *Board of Education v. Barnette*, 319 U.S. 624, at 645 (1943)

(Murphy, J., concurring)).

The Primary Class and Non-Sex-Offense subclass allege that the

new SORA compels speech by requiring registrants to report extensive

information.  (ECF No. 1, PageID.182-184.)  Further, Plaintiffs' motion

alleges it is unconstitutional under the First Amendment to force the

registrants to sign the Explanation of Duties as compelled speech. (ECF

No. 7, PageID.942.)

First, it's important to note that the U.S. Constitution does not

provide registrants the rights to keep their registry information private.

*Cutshall v. Sundquist*, 193 F.3d 466, 481 (6th Cir. 1999).  SORNA's

registration requirements are defined by Sixth Circuit precedent as a

collateral consequence to a criminal conviction.  *Leslie v. Randle*, 296

F.3d 518, 521-22 (6th Cir. 2002); *Bailey v. Wainwright*, 951 F.3d 343,

346 (6th Cir. 2020).  "Although the public availability of the information

may have a lasting and painful impact on the convicted sex offender,

these consequences flow not from the [SORNA's] registration and

dissemination provisions, but from the fact of conviction, already a

matter of public record." *Littlefield v. Slatery*, No. 3:19-CV-00490, 2020 WL 263585, at *3 (M.D. Tenn. Jan. 17, 2020) (Ex. D).

Of further importance, the federal SORNA and the Michigan SORA have largely the same reporting requirements.  (Ex. C, Comparison Chart.)  The SORNA requires the reporting of name, social security number, address, employer, vehicle information and travel plans.  *See* 34 U.S.C. § 20914(a).  It also requires the jurisdiction in which the offender resides to include in the registry: a physical description, the text of the law violated, criminal history of the offender, current photograph, fingerprints and palm prints, DNA sample, and driver's license.  34 U.S.C. § 20914(b).

Numerous courts have examined the question of whether reporting information contained within the SORNA is compelled speech and have held that it is not.  *See* e.g., *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (holding that Congress enacted SORNA to protect the public by establishing a vehicle to identify those convicted of certain crimes); *United States v. Doby*, No. 18-CR-40057-HLT, 2019 WL 5825064, at *4 (D. Kan. Nov. 7, 2019) (SORNA's registration requirement satisfied strict scrutiny, meaning it was narrowly tailored

55

to serve a compelling governmental interest); *United States v. Fox*, 286 F. Supp. 3d 1219, 1224 (D. Kan. 2018) (SORNA requires convicted sex offenders to disclose information to states who, in turn, publish that information in a database. It does not require sex offenders to declare their status to every person they meet. It does not offend the First Amendment.)

Again, when accounting for the SORA appearing nearly-identical to the reporting requirements contained within the SORNA, Plaintiffs have not shown that they are highly likely to succeed on the merits of this claim because SORNA requires the same disclosures that have been upheld in numerous federal courts.

The Fifth Circuit addressed a similar allegation that the SORNA's compelled disclosures violated the First Amendment rights of registrants. *Arnold*, 740 F.3d 1032, 1033. The *Arnold* court wholly rejected this argument. In doing so, it reasoned that "[t]here is no right to refrain from speaking when essential operations of government require it for the preservation of an orderly society—as in the case of compulsion to give evidence in court." *Id.* at 1035 (citations and quotations omitted). Thus, the *Arnold* Court concluded, that the

56

government is engaged in an essential operation of government when it is required to protect the public from sex offenders by utilizing a registry system – including compelled disclosures of personal information. *Id.*

Much like the claims addressed in the Sixth Circuit and sister circuits, the Court should reject Plaintiff's request for a preliminary injunction against the compelled disclosures. The SORA has a stated purpose to protect the public and assist law enforcement to prevent "future criminal sexual acts by convicted sex offenders." Mich. Comp. Law § 28.721a. As the *Arnold* court stated, the First Amendment does not preclude the State from having a convicted sex offender offer disclosures that serve an "essential operation of government" of protecting the safety and welfare of the general public from future criminal sexual acts by the convicted sex offender. For this reason, the SORA is allowed to require sex offenders to disclose certain information that may assist the State in this essential operation of government.

Turning to Plaintiffs' request to enjoin the State from requiring sex offenders to attest to the fact that they understand their respective reporting duties under the SORA also fails for a variety of reasons.

First, the Explanation of Duties Form clearly and succinctly explains in lay terms what is required of each registrant under the SORA.  (ECF No. 1-17, PageID.762-764.)  Furthermore, Paragraph 16 of the Explanation of Duties Form clearly states that a registrant acknowledges that the registrant has "read the above requirements and/or had them read to" the registrant.  (ECF No. 1-17, PageID.763.)  So, the registrants have the option to read the requirements or have them read to them, which defeats the premise that a registrant could not understand his or her duties under the SORA.

Again, "[t]here is no right to refrain from speaking when essential operations of government require it for the *preservation of an orderly society*—as in the case of compulsion to give evidence in court." *Arnold*, 740 F.3d 1032, 1035 (citations and quotations omitted) (emphasis added).

Much like testifying under oath, signing an affidavit, filing taxes, or any other multitude government activities, the State requires a person to acknowledge that they understand what they are signing or speaking to.  The Explanation of Duties Form does just that.  The State has an essential operation interest that the SORA serves (i.e., protect

58

the general public from future criminal sexual conduct committed by convicted sex offenders), and the Explanation of Duties Form allows the State to guarantee that sex offenders provide truthful and up to date information pertinent to the SORA's registration requirements.

## IV.   Plaintiff does not have a high likelihood of success in establishing that SORA 2021 violates the Equal Protection Clause or the Due Process Clause.

The Equal Protection Clause commands that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  A plaintiff must plausibly allege that the government treated him "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.,* 470 F.3d 286, 299 (6th Cir. 2006).  The standard of review varies from strict scrutiny for suspect classes to rational-basis review for all other groups (e.g., age).  *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013); *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018).  As the United States Supreme has aptly stated:

> Whether embodied in the Fourteenth Amendment or
> inferred from the Fifth [Due Process Clause], equal
> protection is *not a license for courts to judge the wisdom,
> fairness, or logic of legislative choices*. In areas of social and
> economic policy, a statutory classification that neither
> proceeds along suspect lines nor infringes fundamental
> constitutional rights *must be upheld against equal protection
> challenge if there is any reasonably conceivable state of facts
> that could a rational basis for the classification.*

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)

(emphasis added).

Under rational-basis review, "the question is whether the

regulation at issue is rationally related to legitimate government

interests." *Bowman v. United States*, 564 F.3d 765, 776 (6th Cir. 2008)

(citation and quotations omitted).  "Courts hold statutes

unconstitutional under this standard of review only in rare or

exceptional circumstances." *Id*. at 776 (citation omitted).  A rational-

basis classification "must be reasonable, not arbitrary, and must rest

upon some ground of difference having a fair and substantial relation to

the object of the legislation, so that all persons similarly circumstanced

shall be treated alike." *Johnson v. Robison*, 415 U.S. 361, 374–75

(1974).

60

Plaintiffs allege an Equal Protection Clause violation because certain registrants convicted of more serious offenses are not permitted to petition for removal from the SORA like other offenders who were convicted of less serious offenses.  (ECF No. 1, PageID.178-179.) Additionally, Plaintiffs argue that the Equal Protection Clause and the Due Process Clause are violated when registrants who did not commit sex offenses are required to be registered under the SORA.  (ECF No. 7, PageID.864-866.)  Plaintiffs' request for a preliminary injunction asks the Court "to judge the wisdom, fairness, or logic of legislative choices" made by the Michigan Legislature.  (ECF No. 7, PageID.911-919.); *Beach Commc'ns, Inc.*, 508 U.S. at 313.

First, sex offenders are not a suspect class, and the SORA does not infringe upon any fundamental right(s), thus the Equal Protection class claim can gain no traction under strict scrutiny review.  The Sixth Circuit has held that "sex offenders" are not a suspect class.  *Does v. Munoz*, 507 F.3d 961, 966 (6th Cir. 2007).  Additionally, a state must only have "a rational basis for treating sex offenders differently from other offenders."  *Id.* (citing *Cutshall*, 193 F.3d at 482-83).  Here, again, the Michigan Legislature has exercised its discretion and has made a

judgment call that certain criminal offenders pose a danger akin to sexual offenders, and this judgement should receive deferential treatment under rational-basis review.  (ECF No. 7, PageID.865.)

Secondly, on its face, the offenders are not similarly situated and there is no Equal Protection violation.  The Michigan Legislature afforded the opportunity for certain offenders to be removed from the registry if they meet certain criteria.  *See* Mich. Comp. Law § 28.728c (provides the basis and procedures for removal).

It is not unlike other types of crimes where less serious offenses may be eligible for more lenient treatment (e.g., someone convicted of manslaughter may be eligible for parole while someone convicted of first-degree murder and imprisoned to life may not). *Compare* Mich. Comp. Law § 791.234 (6)(a)-(f) (excluding certain criminal offenses from being eligible for parole), and Mich. Comp. Law § 791.244 (establishing separate parole procedures for first-degree murderers sentenced to life imprisonment without parole).  Not treating different types of sex offenses equally does not mean that there is an Equal Protection violation.

If Plaintiffs' request is granted, that would represent a fundamental shift of Equal Protection Clause jurisprudence.  The State needs only to that it has a rational basis for the way the SORA is designed.  Simply put, Plaintiffs have failed to show that they are highly likely to succeed on the merits on their Equal Protection Clause allegations, and the Court should deny Plaintiff's invitation to enjoin the SORA's petitions procedures.

## V.     Plaintiffs have failed to show that they will suffer an irreparable harm if the injunction is not granted, and the harm to the public interest is insurmountable

As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018).  A "court must also consider whether the movant has shown that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Id*. at 1944. Even if the Plaintiffs are likely to succeed on the merits, the remaining three factors: (1) irreparable harm, (2) balancing of the equities, and (3) public interest, weighs against the granting of a preliminary injunction.

## A.      Irreparable Harm and Balancing of the Equities

As the State will concede, "[t]he loss of … freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Plaintiffs have pled a variety of constitutional claims ranging from the First Amendment, the Due Process Clause, Equal Protection Clause, and the Ex Post Facto Clause. (ECF No. 1, PageID.1-198.)

However, each claim is deficient for the reasons stated above. The new SORA does not infringe upon any of the sex offender's constitutional rights.  In addition to the SORA not violating any of Plaintiffs' constitutional rights, many of the challenges brought by Plaintiffs have been rejected by various courts.  *Smith*, 438 U.S. 84 (rejecting an Ex Post Facto challenge of a retroactive provision in Alaska's SORA); *Arnold*, 740 F.3d 1032 (rejecting a First Amendment challenge requiring compelled registration disclosures).  If an injunction is not issued, Plaintiffs will be no more harmed today than they were yesterday – they will still be subjected to the lawful registration requirements imposed under the SORA and will have no additional harm or burdens placed upon them during this litigation.  The

64

irreparable harm factor does not favor the issuance of the injunctive relief.

## B.      Public Harm and Balancing the Equities

In Plaintiffs' motion, Plaintiffs ask for extraordinary relief in that the motion asks for the new SORA to be enjoined for a multitude of reasons.  (ECF No. 7, PageID.857-858.)  The injunctive relief requested for in Plaintiffs' motion would cause great disruption to the monitoring of sex offenders in the State and would severely impact the public interest in making sure future criminal sexual conduct is not committed against the public.  Contrary to Plaintiffs' assertion, if the Court granted Plaintiff's requested relief, the sky may not fall, but the sky would certainly be darker in nature without a full, robust sexual offender statute in place.  (ECF No. 7, PageID.945.)

As the Supreme Court stated in 1944: "But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Yakus*, 321 U.S. at 440.  Here, the

65

Court is asked to enjoin significant portions of the SORA, which is meant to protect the public from the dangers of future criminal sexual conduct being committed against them by convicted sex offenders. (ECF No. 7, PageID.857-858.)  This is a public harm that is obvious.

Lastly, Plaintiffs' assertion that the State can require registration for those offenders who present a significant risk under the requested injunction if an individualized risk assessment is performed is unpersuasive.  First, Plaintiffs are admitting that their requested injunction would encompass offenders who present a significant risk to the community.  (ECF No. 7, PageID.945.)  Further, the State has not established a comprehensive risk assessment program if an injunction was to follow.  Thus, if the Court issued this injunctive relief, the SORA would go radio-silent for almost all of the required registrants, including the ones that even Plaintiffs admit pose a significant risk when being left unsupervised.  The public interest would be greatly harmed by the issuing of the requested injunctive relief and this factor weighs against the issuance of the injunctive relief.

For a court "to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at

…

large." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087, (2017).  As stated above, the harm to Defendants and the State are insurmountable while the alleged harm to Plaintiffs is not.  As such, the balancing of the equities weighs in favor of Defendants.

## CONCLUSION AND RELIEF REQUESTED

Defendants respectfully request that this Court deny Plaintiffs' request for preliminary injunctive relief in their motion for the reasons stated above.

Respectfully submitted,

*/s/ Eric M. Jamison*
Assistant Attorney General
Attorney for Defendants
Whitmer and Gasper
Michigan Department of
Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
jamisone@michigan.gov
Dated:  May 26, 2022                P75721

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2022, I electronically filed the above

document(s) with the Clerk of the Court using the ECF System, which

will provide electronic copies to counsel of record.

> _/s/ Eric M. Jamison_
> Assistant Attorney General
> Attorney for Defendants
> Whitmer and Gasper
> Michigan Department of
> Attorney General
> State Operations Division
> P.O. Box 30754
> Lansing, MI 48909
> (517) 335-7573
> jamisone@michigan.gov
> P75721

2022-0341402-A

## LOCAL RULE CERTIFICATION

I, Eric M. Jamison, certify that this document complies with Local Rule5.1(a), including: double-spaced (except for quoted material and footnotes): at least one-inch margin on top, sides, and bottoms; consecutive page numbering; and type size of all test and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 points (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

/s/ *Eric M. Jamison*
Assistant Attorney General
Attorney for Whitmer and Gasper
State Operations Division
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
jamisone@michigan.gov
P75721