UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE, on behalf of
themselves and all others similarly situated,

       Plaintiffs,

v.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

       Defendants.

No. 2:22-cv-10209

Hon. Mark A. Goldsmith

Mag. J. Curtis Ivy, Jr.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................v

INTRODUCTION ...............................................................................1

STANDARD OF REVIEW ...................................................................2

FACTS ...............................................................................................3

ARGUMENT ......................................................................................7

I.    Plaintiffs Have Plausibly Alleged that SORA 2021 Imposes
Retroactive Punishment in Violation of the Ex Post Facto Clause. ...............7

    A.    *Does I* Held that Retroactive Application of the 2011 Amend-
ments, Which Remain Part of SORA 2021, Violates the Ex
Post Facto Clause. ..........................................................8

    B.    The Ex Post Facto Clause Is Designed to Guard Against Retro-
active Legislation Targeting Unpopular Groups. ...............12

    C.    The Court Must Base Its Rulings on the Actual Effects of
SORA 2021 Based on the Facts in This Case. ...................14

    D.    Taking Plaintiffs' Allegations as True, SORA 2021 Is Punitive. .......19

    E.    SORNA Does Not Insulate SORA From Constitutional
Scrutiny. ......................................................................23

        1.    The Absence of a Federal Registry and SORNA's Dual
Character ..............................................................23

        2.    The SORNA Cases Are Inapposite. ..........................25

        3.    SORA 2021 Is More Punitive than SORNA. ............28

II.    Plaintiffs Have Plausibly Alleged that Retroactive Extension of Regis-
tration Terms Violates the Ex Post Facto and Due Process Clauses............31

III.    Plaintiffs Have Plausibly Alleged that Failing to Provide for Individ-
ualized Review Violates Equal Protection and Due Process. ......................32

    A.    The Two Types of Rational Basis Review..........................32

B.    At the Motion-to-Dismiss Stage, Plaintiffs Need Make Only Plausible Allegations of Animus and Irrationality.............................35

C.    Because Plaintiffs Plausibly Allege that SORA 2021 Was Motivated by Animus, More Exacting Scrutiny Applies...................36

D.    Imposing Extensive Burdens that Have No Public Safety Benefit on Thousands of People Who Present No Appreciable Risk Is Irrational. ...............................................................................39

IV.    Plaintiffs Have Plausibly Alleged that Denying Similarly Situated Registrants the Opportunity to Petition for Removal Violates Equal Protection. ..................................................................................40

A.    The Barred-From-Petitioning Subclass Is Similarly Situated to Petition-Eligible Registrants in All Material Respects. ......................40

B.    Plaintiffs' Challenge Is to the Classification of Who Is Eligible to Seek Discretionary Relief. .............................................................43

V.    Plaintiffs Have Plausibly Alleged that SORA 2021's Extensive Compelled Disclosure Requirements Violate the First Amendment. ...........43

VI.    Plaintiffs Have Plausibly Alleged that Retroactively Imposing Lifetime Registration Violates Plaintiffs' Plea Agreements. ........................47

VII.    Plaintiffs Have Plausibly Alleged that Requiring People Who Did Not Commit a Sex Offense to Register as Sex Offenders Violates Due Process and Equal Protection. ...................................................................48

VIII.    Plaintiffs Have Plausibly Alleged that SORA 2021 Is Unconstitionally Vague. .........................................................................49

A.    Due Process Requires a High Standard of Clarity to Provide Notice of What Conduct Is Forbidden and Guidance to Law Enforcement. ......................................................................49

B.    SORA 2021's Reporting Requirements Are Unconstitutionally Vague.................................................................................51

IX.    Plaintiffs Have Plausibly Alleged that Compelling Registrants to Say that They Understand SORA 2021 Violates the First Amendment. .............57

X.    Plaintiffs Have Plausibly Alleged that the Internet Reporting
      Requirements Unconstitutionally Restrict Speech and Association in
      Violation of the First Amendment...................................................59

XI.   The Statute of Limitations Does Not Insulate SORA 2021 from
      Constitutional Scrutiny. ..............................................................64

      A.    Statutes of Limitations Do Not Bar Claims Challenging
            Ongoing Violations of Constitutional Rights......................................64

      B.    Plaintiffs Brought This Action Within Three Years of the
            Effective Date of SORA 2021............................................68

XII.  Defendants' Mootness Argument Is Meritless and Reflects a
      Misunderstanding of the Relationship Between Federal and State
      Registry Laws. ..........................................................................70

      A.    SORNA's Federal Jurisdiction Requirement Means SORA
            Applies to More People Than SORNA. ..............................................71

      B.    State Registry Schemes Determine What a Registrant Is
            Required to Do Under SORNA............................................72

            1.    States Can Decide Whether to Have SORNA-Congruent
                  Registries...............................................................72

            2.    The Lack of a Federal Registration System Means that
                  Criminal Liability Under SORNA Turns on the Extent to
                  Which State Law Overlaps with Federal Law. .........................73

      CONCLUSION ...........................................................................75

# TABLE OF AUTHORITIES

## Cases

*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) ................................45

*Andrews v. City of Mentor*, 11 F.4th 462 (6th Cir. 2021)................................. 39, 41

*Bannum, Inc. v. City of Louisville*, 958 F.2d 1354 (6th Cir. 1992) ................. 33, 35

*Bassett v. Snyder*, 59 F. Supp. 3d 837 (E.D. Mich. 2014) ......................... 35, 37, 38

*Bassett v. Snyder*, 951 F. Supp. 2d 939 (E.D. Mich. 2013) ....................................36

*Baxstrom v. Herold*, 383 U.S. 107 (1966) ................................................................42

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................................2

*Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999) ...........................................................................................................50

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).......................................32

*Carpenter v. United States*,138 S. Ct. 2206 (2018) ......................................... 14, 15

*Carr v. United States*, 560 U.S. 438 (2010)...................................................... passim

*Caruso v. Aluminum Co. of Am.*, 473 N.E.2d 818 (Ohio 1984) .............................15

*Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564 (Fed. Cir. 1993) ...........................................................................................................69

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ....................................................52

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).............................34

*Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101 (6th Cir. 1995).........................49

*Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017)..............................................19

*Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) ..................................... 32, 33

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926)................................................49

*Connection Distrib. Co. v. Holder*, 557 F.3d 321 (6th Cir. 2009).........................61

*Cornelio v. Connecticut*, 32 F.4th 160 (2d Cir. 2022)................................... passim

*Craig v. Boren*, 429 U.S. 190 (1976)......................................................................68

*Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) .......................................... 33, 36

*Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278 (1961) .........................................49

*Cummings v. Missouri*, 71 U.S. 277 (1866)............................................................12

*Daniel v. Fulwood*, 766 F.3d 57 (D.C. Cir. 2014) .....................................................7

*Davis v. Prison Health Servs.*, 679 F.3d 433 (6th Cir. 2012) ........................... 36, 39

*Delgado v. Swearingen*, 375 F. Supp. 3d 1251 (N.D. Fla. 2018)............................55

*Detroit Free Press, Inc. v. Dep't of Just.*, 829 F.3d 478 (6th Cir. 2016)................19

*Dias v. City & Cnty. of Denver*, 567 F.3d 1169 (10th Cir. 2009)............................15

*Directv, Inc. v. Treesh*, 487 F.3d 471 (6th Cir. 2007) ...............................................2

*Doe 1 v. Marshall,* 367 F. Supp. 3d 1310 (M.D. Ala. 2019)...................................60

*Doe v. Dep't of Pub. Safety & Corr. Servs.*, 62 A.3d 123 (Md. 2013)....................19

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ................................................... passim

*Doe v. Jindal*, 853 F. Supp. 2d 596 (M.D. La. 2012) .............................................54

*Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608 (E.D. Ky. 2017) ...................54

*Doe v. Miami-Dade County*, 846 F.3d 1180 (11th Cir. 2017)...................................7

*Doe v. Rausch*, 2022 WL 481240 (M.D. Tenn. Feb. 16, 2022).............................67

*Doe v. Shurtleff*, 628 F.3d 1217 (10th Cir. 2010) ...................................................62

*Doe v. State*, 111 A.3d 1077 (N.H. 2015)...............................................................18

*Doe v. State*, 189 P.3d 999 (Alaska 2008) ..............................................................19

*Does v. Snyder*, 101 F. Supp. 3d 672 (2015) .................................................... 51, 55

*Does v. Snyder*, 834 F.3d 696 (6th Cir. 2016) ................................................. passim

*Does v. Wasden*, 982 F.3d 784 (9th Cir. 2020)......................................................7, 8

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ...............................................................34

*Fletcher v. Peck*, 10 U.S. 87 (1810).........................................................................12

*Flynt v. Shimazu*, 940 F.3d 457 (9th Cir. 2019)................................................ 65, 66

*Gardei v. Conway*, 868 S.E.2d 775 (Ga. 2022) ......................................................66

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................................50

*Hadix v. Johnson*, 230 F.3d 840 (6th Cir. 2000) ....................................................34

*Harmon v. Holder*, 758 F.3d 728 (6th Cir. 2014)...................................................70

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).........................................64

*Henderson v. Thomas*, 891 F. Supp. 2d 1296 (M.D. Ala. 2012) .............................15

*Hill v. Snyder*, 821 F.3d 763 (6th Cir. 2016) ...........................................69

*Hoffman v. Vill. of Pleasant Prairie*, 249 F. Supp. 3d 951 (E.D. Wis. 2017) ...................................................................... 18, 40

*Holmes v. Christie*, 14 F.4th 250 (3d Cir. 2021) ......................................7

*In re City of Detroit*, 841 F.3d 684 (6th Cir. 2016) .................................35

*In re T.B.*, 489 P.3d 752 (Colo. 2021) ...................................................40

*Jimenez v. Nielsen*, 334 F. Supp. 3d 370 (D. Mass. 2018) .......................7

*Johnson v. United States*, 576 U.S. 591 (2015) .....................................50

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) .............................7

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ...................................65

*Kolender v. Lawson*, 461 U.S. 352 (1983)..............................................49

*Kuhnle Bros. v. Cnty. of Geauga*, 103 F.3d 516 (6th Cir. 1997) ............... 65, 66, 68

*Kyllo v. United States*, 533 U.S. 27 (2001)............................................19

*Lambert v. California*, 355 U.S. 225 (1957)...........................................50

*Lawrence v. Texas*, 539 U.S. 558 (2003)........................................ 34, 36

*Leal v. Azar*, 2020 WL 7672177 (N.D. Tex. Dec. 23, 2020)...................66

*Loesel v. City of Frankenmuth*, 692 F.3d 452 (6th Cir. 2012)................41

*Maldonado v. Harris*, 370 F.3d 945 (9th Cir. 2004) ..............................65

*Mathews v. Lucas*, 427 U.S. 495 (1976)...............................................33

*Miller v. Caudill*, 936 F.3d 442 (6th Cir. 2019)......................................27

*Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352 (6th Cir. 2002) ...........37

*Moyer v. Alameida*, 184 F. App'x 633 (9th Cir. 2006) ...........................30

*Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015) .............15

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).................64

*Ortiz v. Breslin*, 142 S. Ct. 914 (2022) .................................................40

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) .........................59

*Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U*, 46 F.3d 682 (7th Cir. 1995) ...................................................................................65

*Pearson v. City of Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992) ...........................33

*People v. Batman*, 71 Cal. Rptr. 3d 591 (Cal. Ct. App. 2008) ...............................30

*People v. Betts*, 968 N.W.2d 497 (Mich. 2021)................................................ passim

*People v. High*, 15 Cal. Rptr. 3d 148 (Cal. Ct. App. 2004).....................................30

*People v. Lymon*, -- N.W.2d --; 2022 WL 2182165 (June 16, 2022) ............. passim

*Plyler v. Doe*, 457 U.S. 202 (1982)...........................................................................39

*Prater v. Linderman*, No. 18-cv-992, 2019 WL 6711561 (W.D. Mich. Dec. 10, 2019).........................................................................................47

*Prynne v. Settle*, 848 F. App'x 93, 100 (4th Cir. 2021)............................................8

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ........................................................44

*Reno v. ACLU*, 521 U.S. 844 (1997)..........................................................................53

*Riley v. California*, 573 U.S. 373 (2014) ..................................................................19

*Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781 (1988) ...........................................44

*Romer v. Evans*, 517 U.S. 620 (1996) ................................................................ 34, 35

*Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250 (6th Cir. 2006) .............34

*Smith v. Doe*, 538 U.S. 84 (2003) ...................................................................... passim

*Smith v. Goguen*, 415 U.S. 566 (1974) .....................................................................51

*South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) ...........................................15

*Speet v. Schuette*, 726 F.3d 867 (6th Cir. 2013) ......................................................62

*Starkey v. Oklahoma Dep't of Corr.*, 305 P.3d 1004 (Okla. 2013) .........................18

*State v. Aschbrenner*, 926 N.W.2d 240 (Iowa 2019)................................................54

*Steffel v. Thompson*, 415 U.S. 452 (1974) ................................................................68

*Stratta v. Roe*, 961 F.3d 340 (5th Cir. 2020) ...........................................................35

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........................................68

*Tiwari v. Friedlander*, 26 F.4th 355 (6th Cir. 2022) .................................. 33, 34, 35

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ....................................... 34, 36

*United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014) .................................. 46, 47

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) ..................................14

*United States v. Caseer*, 399 F.3d 828 (6th Cir. 2005)............................................56

*United States v. Doby*, No. 18-CR-40057-HLT, 2019 WL 5825064 (D. Kan. Nov. 7, 2019).............................................................................................47

*United States v. Felts*, 674 F.3d 599 (6th Cir. 2012) ...................................... passim

*United States v. Fox*, 286 F. Supp. 3d 1219 (D. Kan. 2018) ...................................47

*United States v. Guzman*, 591 F.3d 83 (2d Cir. 2010)............................................26

*United States v. Juv. Male*, 560 U.S. 558 (2010).....................................................70

*United States v. Juv. Male*, 590 F.3d 924 (9th Cir. 2010) ......................................18

*United States v. Kebodeaux*, 570 U.S. 387 (2013) .......................................... 24, 73

*United States v. Lawrance*, 548 F.3d 1329 (10th Cir. 2008) ..................................26

*United States v. May*, 535 F.3d 912 (8th Cir. 2008) ...............................................26

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995).......................44

*United States v. Parks*, 698 F.3d 1 (1st Cir. 2012) .................................................28

*United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993).....................................50

*United States v. Santos*, 553 U.S. 507 (2008)..........................................................52

*United States v. Shenandoah*, 595 F.3d 151 (3d Cir. 2010) ...................................26

*United States v. Under Seal*, 709 F.3d 257 (4th Cir. 2013)....................................28

*United States v. W.B.H.*, 664 F.3d 848 (11th Cir. 2011) ........................................28

*United States v. White*, 920 F.3d 1109 (6th Cir. 2019)...........................................27

*United States v. Windsor*, 570 U.S. 744 (2013)............................................... 34, 36

*United States v. Young*, 585 F.3d 199 (5th Cir. 2009).....................................26, 28

*Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653 (4th Cir. 1989)......................................65

*Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489 (1982) .....................................50

*Waltower v. Kaiser*, 17 F. App'x 738 (10th Cir. 2001) ..........................................68

*Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005)........................................34

*Weaver v. Graham*, 450 U.S. 24 (1981) .................................................................12

*Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279 (D. Utah 1998) ........................... 35

*Welch v. Henry*, 305 U.S. 134 (1938) ....................................................................... 32

*White v. Baker*, 696 F. Supp. 2d 1289 (N.D. Ga. 2010) .................................... 54, 60

*Willman v. Attorney General*, 972 F.3d 819 (6th Cir. 2020) ............... 26, 71, 72, 74

*Wooley v. Maynard*, 430 U.S. 705 (1977) ............................................................... 68

*Wroblewski v. City of Washburn*, 965 F.2d 452 (7th Cir. 1992) ............................ 35

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) .................................................... 60

**Statutes**

Ala. Code § 15-20A-10 ............................................................................................. 58

730 Ill. Comp. Stat. 150/4 ........................................................................................ 58

730 Ill. Comp. Stat. 150/5 ........................................................................................ 58

Kan. Stat. Ann. § 22-4904 ........................................................................................ 58

La. Rev. Stat § 15:543 .............................................................................................. 58

Me. Rev. Stat. tit. 34-A, § 11222 ............................................................................. 58

Mass. Gen. Laws ch. 6, § 178E ................................................................................ 58

M.C.L. § 28.722 .................................................................................................. passim

M.C.L. § 28.723 ........................................................................................................ 43

M.C.L. § 28.724a ...................................................................................................... 29

M.C.L. § 28.725 ...................................................................................... 9, 29, 53, 55

M.C.L. § 28.725a ................................................................................................ 29, 30

M.C.L. § 28.727 .......................................................................................... 29, 53, 55

M.C.L. § 28.728 ........................................................................................................ 29

M.C.L. § 28.728c ........................................................................................... 40, 42, 43

M.C.L. § 750.14 ........................................................................................................ 68

1994 Mich. Pub. Act 295 .......................................................................................... 69

1999 Mich. Pub. Act 85 ............................................................................................ 69

2011 Mich. Pub. Act 18 ............................................................................................ 62

2013 Mich. Pub. Act 149 ..................................................................................... 69, 70

2020 Mich. Pub. Act 295 ............................................................... 62, 68

Nev. Rev. Stat. § 179D.450 ...............................................................58

Nev. Rev. Stat. § 179D.550 ...............................................................58

N.C. Gen. Stat. § 14-208.8 .................................................................58

Ohio Rev. Code Ann. § 2950.03 .........................................................58

Okla. Stat. tit. 57, § 585 .....................................................................58

Okla. Stat. tit. 57 § 587 ......................................................................58

42 Pa. Stat. and Cons. Stat. § 9799.20 ...............................................58

42 Pa. Stat. and Cons. Stat. § 9799.23 ...............................................58

11 R.I. Gen. Laws § 11-37.1-5 ...........................................................58

18 U.S.C. § 2250 ........................................................................... 24, 71

34 U.S.C. § 20913 ..............................................................................29

34 U.S.C. § 20916 ..............................................................................30

34 U.S.C. § 20919 ..............................................................................58

34 U.S.C. § 20920 ..............................................................................30

Vt. Stat. tit. 13 § 5409 ........................................................................58

Vt. Stat. tit. 13, § 5406 .......................................................................58

W. Va. Code § 15-12-2 .......................................................................58

**Rules**

28 C.F.R. § 72.6 ......................................................................... 29, 30, 55

81 Fed. Reg. 50552 .............................................................................30

86 Fed. Reg. 69856 .............................................................................25

86 Fed. Reg. 69868 .............................................................................73

86 Fed. Reg. 69887 .............................................................................73

**Other Authorities**

Ira Ellman, *When Animus Matters*, 7 U. Pa. J. L. & Pub. Affs. 1 (2021)................37

Ira Mark Ellman & Tara Ellman, *Frightening and High: The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const. Comment. 495 (2015) ............................................................................16

*The Federalist No. 44* (James Madison) ...................................................13

Wayne A. Logan, *The Ex Post Facto Clause and the Jurisprudence of Punishment*, 35 Am. Crim. L. Rev. 1261 (1998)....................................12

Wayne Logan, *Knowledge as Power: Criminal Registration and Community Notification Laws in America* (2009) ................................................37

## INTRODUCTION

If ever there was a complaint with plausible allegations, it is this one. In a 192-page filing accompanied by ten incorporated expert reports, Plaintiffs paint a picture of the all-encompassing, life-altering regime that Michigan's Sex Offenders Registration Act (SORA 2021) imposes. The complaint describes the devastating impact of one-size-fits-all registration—the repeated loss of employment and housing, the continual harassment, the unannounced police visits, and the constant threat of incarceration for any failure to comply with "a byzantine code governing in minute detail the lives of the state's sex offenders." *Does v. Snyder* (*Does I*), 834 F.3d 696, 697 (6th Cir. 2016). The complaint details how the registry dictates virtually every choice a person makes—whether to comment on a news story, shovel a neighbor's walk, borrow a car, or visit family out of town. And the complaint explains that these burdens are imposed without any public safety benefit. Plaintiffs' allegations more than meet the plausibility threshold. Indeed, the record is so strong and the harm so irreparable that the Court should grant preliminary injunctive relief. *See* ECF No. 7.

Defendants do not argue that "even accepting the allegations as true" the complaint must be dismissed. Instead, their "statement of facts" points the Court to their response to the motion for preliminary injunction, which of course is judged under a completely different standard. ECF No. 41, PageID.1330. Defendants also lump together different claims that turn on different facts and different legal theories,

hoping perhaps that the Court, too, will not engage with the merits of each count. General propositions of law cannot substitute for an analysis of the facts and law.

Finally, Defendants argue that cases rejecting ex post facto challenges in criminal appeals under the federal Sex Offender Registration and Notification Act (SORNA) foreclose not just the ex post facto claim (which they do not, *see* Section I.E), but every other claim. Those other claims have scarcely, if ever, been brought against SORNA. Defendants make this mistake because they do not address each count individually. Plaintiffs, after summarizing the facts, take each count in turn.

## STANDARD OF REVIEW

"The defendant has the burden of showing that the plaintiff has failed to state a claim for relief." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Id*. The plaintiff must allege "facts to state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Plaintiffs need only allege enough facts to suggest that discovery may reveal evidence of illegality, regardless of the likelihood of finding that evidence. *Id*. at 556.

# FACTS

Briefly summarized, the allegations in Plaintiffs' complaint are:

**SORA 2021 Does Not Promote Public Safety:** Sex offender registration and notification laws do not make the public safer. To the contrary, SORA 2021 is likely to increase rather than decrease sexual offending. Sex offense rates in Michigan are up to 5% higher than they would be without the registry. SORA 2021 also misidentifies the source of the risk: 90 to 95% of sex offenses are committed by first-time offenders who are not on registries, and few offenses are committed by strangers. Because SORA 2021 undermines housing, employment, and pro-social relationships—which are the most important factors for reentry—the law increases the likelihood of recidivism. There is no evidence that the onerous registration requirements, such as reporting of a vast array of information, often in person and within three business days, serve any public safety purpose. *See* ECF No. 1, PageID.53–59.

**No Individualized Review Fills the Registry with Low-Risk People:** The average recidivism risk of people with past sex offenses is low; most people are never convicted of a second such offense. The recidivism rate for sex offenses is much lower than the rate for virtually any other type of crime. One reason that SORA 2021 is so ineffective is that it does not differentiate the few people at high risk of reoffending from the many who are at low risk. The likelihood of sexual reoffending varies based on well-known risk factors, and drops off dramatically over time. After

ten years, most people with a past sex offense present no more risk than the general male population, and after twenty years, all will be classified that way.

Conviction-based tier assignments do not correspond to risk. In fact, tier levels are backwards, as higher tier offenders are even less likely to reoffend than those in lower tiers. Empirical tools are much more effective than convictions in assessing the risk of reoffending. Not only are the named plaintiffs very unlikely to reoffend, but the vast majority of class members will never reoffend. Due to SORA 2021's lack of individualized review and lengthy registration terms, there are thousands or tens of thousands of people on the registry who are no more likely to commit a sex offense than people who are not subject to registration. *Id.*, PageID.59–81.

**The Digital Age Has Changed the Consequences of Registration:** In the two decades since the Supreme Court said that an early version of an internet registry was no different than a criminal records archive, technology has changed the form, function, and reach of registry information. Unlike an archive, Michigan's registry presents each individual as a *current danger*, and encourages browsing, mapping, and tracking registrants. Unlike other criminal records, which require a targeted search of a specific person and do not present up-to-date personal information, the registry is not just a portal for conviction information. Today, registry information is "harvested" and re-posted on other websites. Changes in database technology have transformed registry information from government data that a user had to access

4

intentionally, into a commodity that is pushed to internet users who passively receive it without ever asking for it. Digital labeling on registries undermines public safety by making pariahs of registrants, cutting them out of society. *Id.*, PageID.81–93.

**SORA 2021 Imposes Devastating Burdens:** SORA 2021 imposes a vast array of obligations, disabilities, and restraints that govern every aspect of Plaintiffs' lives. SORA 2021 compels Plaintiffs continually to provide detailed information to law enforcement, much of which must be reported in person and/or within three days—a burden that for most registrants lasts for life. SORA 2021 subjects Plaintiffs to continuous surveillance and supervision and stigmatizes them as dangerous without any individualized assessment. SORA 2021 also severely limits their ability to find housing and employment; to get an education; to travel; to engage in free speech, including internet use; and to be free from harassment and stigma. SORA has been aggressively enforced, with about 1,000 prosecutions a year and penalties of up to ten years' imprisonment. SORA 2021's requirements are complex and vague, leaving registrants unsure of their obligations and forcing them to overcorrect for fear of inadvertent wrongdoing. Registration also triggers a staggering and laby-rinthine array of regulations that impose further disabilities beyond SORA. Countless private and public entities use the state's "sex offender" designation as a proxy for *current dangerousness*, and exclude registrants from jobs, housing, and other opportunities to which they would otherwise have access. *Id.*, PageID.83–150.

**SORA 2021 Is Very Expensive:** In addition to $1 million annually for the Michigan State Police Sex Offender Registration unit and an estimated $11 million in incarceration costs, likely several million dollars more in costs are associated with local SORA administration/registration, as well as compliance enforcement (investigation, prosecution, court operations, probation), and litigation. These costs far exceed federal SORNA-contingent funding, to no public benefit. *Id.*, PageID.151–155.

**SORA 2021 Applies the 2011 Amendments Retroactively:** SORA 2021 retains virtually all of the 2011 amendments and continues to apply them retroactively, including tier classifications without individualized review, and the countless reporting requirements. Before 2011, only about a quarter of Michigan's registrants were required to register for life; after 2011, almost three-quarters of all registrants must register and report for life. *Id.*, PageID.156–159.

**Registration Is Central to Plea Negotiations:** Judges cannot sentence defendants who are not registered, and registration is recorded on the judgment of sentence. Because of its harsh consequences, registration is central to plea negotiations, and major changes to registration, like extension of registration terms, fundamentally alter the consequences of pleas. *Id.*, PageID.160–161.

**SORA 2021 Is Based on Animus Towards People with Sex Offenses:** The fact that Michigan adopted SORA 2021—even though it undermines the goal of reducing sexual offending and protecting public safety—can only be explained by

6

animus towards people convicted of sexual offenses, coupled with the barriers such people face in the political process. SORA 2021, like its predecessor, is based on myths, fears, and misconceptions about a demonized group. *Id.*, PageID.161–164.

**ARGUMENT**

Plaintiffs' extensive allegations far exceed the low threshold to survive a motion to dismiss (and indeed support issuance of preliminary injunctive relief).[1]

## I. PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT SORA 2021 IMPOSES RETROACTIVE PUNISHMENT IN VIOLATION OF THE EX POST FACTO CLAUSE.

Defendants do not even attempt to apply the factors of *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963), to the facts of the complaint. ECF No. 41, PageID.1337. At least five circuits have held it inappropriate to dismiss ex post facto challenges where the allegations of punitiveness are plausible. *See Daniel v. Fulwood*, 766 F.3d 57, 61–62 (D.C. Cir. 2014) ("At the motion to dismiss stage . . . a plaintiff need only show that his ex post facto claim…is plausible." (cleaned up)); *Holmes v. Christie*, 14 F.4th 250, 260 (3d Cir. 2021) (same); *Does v. Wasden*, 982 F.3d 784, 791 (9th Cir. 2020) (plaintiff "only had to plausibly allege that the amended SORA, on its face, is punitive in effect"); *Doe v. Miami-Dade County*, 846 F.3d 1180, 1185–86 (11th Cir. 2017) (allegations that residency restriction had no

---

[1] Evidence for a preliminary injunction motion can reinforce the plausibility of a plaintiff's claims. *Jimenez v. Nielsen*, 334 F. Supp. 3d 370, 390 n.2 (D. Mass. 2018).

7

impact on recidivism but imposed severe harm plausibly stated claim); *Prynne v. Settle*, 848 F. App'x 93, 100, 103 (4th Cir. 2021) (plaintiff plausibly alleged registry was excessively punitive; court "shall not attempt to forecast what further investigation may demonstrate" (cleaned up)). Moreover, at the motion-to-dismiss stage, Plaintiffs need not demonstrate by the "clearest proof" that a law is punitive. That standard "refers to a plaintiff's ultimate burden to sustain an ex post facto challenge" after discovery. *Wasden*, 982 F.3d at 791; *cf. Does I*, 834 F.3d at 705 (finding punitiveness in part based on evidence obtained in discovery).

Defendants' argument that this Court should nevertheless dismiss the claim is wrong for five reasons. First, *Does I* explicitly held that the 2011 amendments, which remain in SORA 2021, cannot be retroactively applied. Second, the Ex Post Facto Clause was designed precisely to protect unpopular groups from being targeted. Third, the ex post facto inquiry depends on the factual record of each case. Fourth, Plaintiffs plausibly allege facts establishing punitiveness. Fifth, the SORNA cases, virtually all of which are criminal appeals with no record, are inapposite because they present different legal issues and different factual circumstances, and because SORA and SORNA are different.

### A. *Does I* Held that Retroactive Application of the 2011 Amendments, Which Remain Part of SORA 2021, Violates the Ex Post Facto Clause.

The central issue—whether the 2011 amendments can be retroactively

applied—has already been decided. *Does I* held that "[t]he retroactive application of SORA's 2006 and 2011 amendments to Plaintiffs is unconstitutional, and it therefore must cease." 834 F.3d at 706. Retroactive application of the 2011 amendments has not ceased. *See* ECF No. 1, PageID.156–159, ECF No. 1-15. That violates *Does I*.

Defendants have no response. Tellingly, they do not include *Does I* on their list of controlling authority. Defendants do not dispute that SORA 2021 applies the 2011 amendments retroactively. Indeed, their statute of limitations argument is premised on the fact that SORA 2021 retains those amendments virtually unchanged. ECF No. 41, PageID.1373–76. Rather, Defendants skirt *Does I* by suggesting that excising the 2006 amendments (geographic exclusion zones) makes the new law constitutional. But the Sixth Circuit said retroactive application of the "2006 ***and 2011 amendments*** . . . must cease." *Does I*, 834 F.3d at 706 (emphasis added). Defendants point to other tweaks in the law, but those changes are minor.[2] ECF No. 39, PageID.1166.

SORA 2021, because it retains virtually all of the 2011 amendments, continues the very provisions that the *Does I* court concluded were punitive and could not

---

[2] Defendants incorrectly state that SORA 2021 removed retrospective reporting requirements for vehicles and phone numbers. ECF No. 39, PageID.1166. It did not. *See* M.C.L. § 28.725(2)(a). Defendants also assert that most juveniles need no longer register. ECF No. 39, PageID.1191 & n.20. Defense counsel who represent such youth, however, report that juveniles remain on the registry because prosecutors disagree with Defendants' interpretation of the law. The Court should therefore permit discovery to ensure that such youth are actually removed.

be retroactively applied. Like its predecessor, SORA 2021 requires "time-consuming and cumbersome" reporting similar to probation/parole, compelling registrants to interrupt their lives "with great frequency in order to appear in person before law enforcement to report even minor changes to their information," in most cases for life. *Does I*, 834 F.3d at 703, 705. SORA 2021 "makes no provision for individualized assessments of proclivities or dangerousness." *Id.* at 705. It categorizes people into tiers without any individual review. *Id.* It "discloses otherwise non-public information." *Id.* at 703. It imposes heavy criminal penalties for non-compliance. *Id.* at 703. It "marks registrants as ones who cannot be fully admitted into the community," branding them "as moral lepers solely on the basis of a prior conviction" and "consign[ing] them to years, if not a lifetime, of existence on the margins," all despite "scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe." *Id.* at 704–05. Like its predecessor, SORA 2021 resembles both traditional shaming punishments and probation/parole, *id.* at 702–03; imposes "significant restraints on how registrants may live their lives," *id.* at 703; advances all traditional aims of punishment, *id.* at 704; lacks a rational relationship to a non-punitive purpose, *id.* at 704-05; and imposes blanket restrictions whose punitive effects "far exceed even a generous assessment" of possible benefits, *id.* at 705. None of that has changed.

The Michigan Supreme Court, in holding that the old SORA was punishment,

10

similarly emphasized parts of the law that remain unchanged. *People v. Betts*, 968 N.W.2d 497 (Mich. 2021). The Court found that SORA resembled traditional shaming because of the breadth of information made public, the subscription-based notification option, the lack of active effort needed to receive registry information, and the encouragement of social ostracism. *Id.* at 509–10. SORA resembled the traditional punishment of parole because registrants had to report in person to law enforcement, pay fees, face prison for failure to comply, and be subject to investigation and supervision. *Id.* at 510. The requirement to report in person to verify and update information imposed an affirmative disability. *Id.* at 511. The fact that SORA "made no individualized determination of the dangerousness of each registrant, indicat[es] that SORA's restrictions were retribution for past offenses rather than regulations to prevent future offenses." *Id.* at 512. Such "demanding and intrusive requirements"— imposed on tens of thousands of people long after they complete their sentence, regardless of individual risk and without evidence of SORA's efficacy—were excessive. *Id.* at 514–15. Again, none of that has changed.

The Michigan Court of Appeals very recently recognized that SORA 2021, like its predecessor, imposes punishment. *People v. Lymon*, -- N.W.2d --; 2022 WL 2182165 (June 16, 2022). The Court reviewed the *Betts* analysis of the *Mendoza-Martinez* factors, found that the differences between the old and new SORA did not

significantly alter the analysis, and concluded that "2021 SORA's aggregate punitive effect negates the Legislature's intention to deem it a civil regulation." *Id.* at \*14.

Defendants assert that this Court can ignore the clear command of *Does I* and ignore *Betts* (and now *Lymon* as well), because courts have upheld a different law— SORNA. As discussed below, SORA 2021 and SORNA differ. *See* Section I.E.3. Regardless, *Does I* is directly on point because it addresses the 2011 amendments and is based on a similar record to the record here, unlike the SORNA cases.

### B. The Ex Post Facto Clause Is Designed to Guard Against Retroactive Legislation Targeting Unpopular Groups.

Defendants' mantra is: everything should be left to the legislature. But the Framers included the Ex Post Facto Clause in the Constitution to reflect their profound concern for the threat to liberty posed by retroactive criminal laws that target disfavored groups. *See* Wayne A. Logan, *The Ex Post Facto Clause and the Jurisprudence of Punishment*, 35 Am. Crim. L. Rev. 1261, 1267 (1998). As Chief Justice Marshall observed in *Fletcher v. Peck*, a core reason to prohibit ex post facto laws is to bar legislatures from enacting retroactive punishments when they are caught up in the "feelings of the moment" and subject to "sudden and strong passions" toward a particular population. 10 U.S. 87, 137–38 (1810). *See also Cummings v. Missouri*, 71 U.S. 277, 322 (1866) ("fierce passions" aroused by the Civil War could not justify retroactive abridgement of civil rights). *See also Weaver v. Graham*, 450 U.S. 24, 28-29 (1981) (Ex Post Facto Clause protects disfavored groups "by restraining

12

arbitrary and potentially vindictive legislation"); *Does I*, 834 F.3d at 705–06 ("the fact that sex offenders are so widely feared and disdained . . . implicates the core counter-majoritarian principle embodied in the Ex Post Facto clause").

Retroactive laws are different, and courts do not simply defer to legislative choices attaching new consequences to past conduct. A law's rational relationship to a non-punitive purpose is only **one** of the *Mendoza-Martinez* factors, which are themselves only "useful guideposts." *Smith v. Doe*, 538 U.S. 84, 97 (2003) (*Mendoza-Martinez* factors are "neither exhaustive nor dispositive"). Because the Ex Post Facto Clause is, in James Madison's words, a "constitutional bulwark" against impassioned legislative overreach, legislatures cannot do retroactively what they can do prospectively. *The Federalist No. 44* (James Madison) (Library of Congress), https://guides.loc.gov/federalist-papers/text-41-50.

Defendants do not dispute that registrants are an intensely hated group, nor can they dispute that the legislature ignored the expert evidence and overwhelming opposition testimony presented during legislative hearings on SORA 2021. ECF No. 1, PageID.163. But Defendants express optimism that the legislature will someday "consider the science and make amendments as appropriate." ECF No. 39, PageID.1204. We all know that is wishful thinking because when dealing with the emotionally charged issue of sexual offending, the legislature acts with precisely the sort of irrational passion that the Ex Post Facto Clause was meant to curb.

13

### C.     The Court Must Base Its Rulings on the Actual Effects of SORA 2021 Based on the Facts in This Case.

To determine whether a law is punitive under the *Mendoza-Martinez* factors, the court must analyze the factual record presented. *Smith v. Doe* itself focused on the record in 2003, asking how the effects of Alaska's statute were "felt by those subject to it." 538 U.S. at 100. The Court emphasized that "[t]he record in this case contains no evidence that the Act has led to substantial occupational or housing disadvantages," and that "the record contains no indication that an in-person appearance requirement has been imposed." *Id.* at 100–01.

Records can differ and facts can change over time. Indeed, the Supreme Court has long recognized that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938). New facts matter when real-world conditions change, as commonly occurs when new technologies emerge. In *Carpenter v. United States*, for example, the Court held that a warrant was necessary to obtain cell-site location information even though prior precedent established that information disclosed to a third party was not protected from warrantless searches. 138 S. Ct. 2206, 2211–12 (2018). The Court reasoned that when the third-party doctrine was established, "few could have imagined a society in which a phone goes wherever its owner goes, conveying to the wireless carrier not just dialed digits, but a detailed and comprehensive record of the

14

person's movements." *Id*. at 2217. *See also*, *e.g.*, *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) (holding physical-presence tax rule outdated in increasingly virtual economy); *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015) (holding Americans with Disability Act definition of public accommodations was no longer limited to physical spaces in an increasingly internet-focused world).

New scientific understandings matter too. In *Dias v. City & County of Denver*, for example, the Tenth Circuit held that a constitutional challenge to a pit bull ban should not have been dismissed, rejecting the argument that the ban was constitutional simply because there were past cases upholding similar bans. 567 F.3d 1169 (10th Cir. 2009). Plaintiffs had plausibly alleged that "although pit bull bans sustained twenty years ago may have been justified by the then-existing body of knowledge, the state of science [today] is such that the bans are no longer rational." *Id.* at 1183. *See also Henderson v. Thomas*, 891 F. Supp. 2d 1296, 1305 (M.D. Ala. 2012) (prior decision upholding policy of segregating HIV+ prisoners did not bar new suit where plaintiffs alleged that the factual premises about HIV infection informing the earlier decision was no longer true); *Caruso v. Aluminum Co. of Am.*, 473 N.E.2d 818, 821 (Ohio 1984) (invalidating eight-year statute of limitations for silicosis-related deaths based on new evidence that silicosis effects take longer to manifest).

In the 20 years since *Smith*, law, technology, and science have changed. First, registries have become more punitive as laws have evolved. Registry laws have

added restrictions, imposing obligations not contemplated in *Smith* and growing into a "byzantine code governing in minute detail the lives" of registrants. *Does I*, 834 F.3d at 697. Moreover, when the state labels someone as a "sex offender," that triggers countless other laws and policies. ECF No. 1, PageID.148–150; ECF No. 1-6, PageID.472–475, 478–486. Second, the evolution of the internet has transformed the consequences of registries. ECF No. 1, PageID.81–93. Real-world impacts matter when one looks at the "actual effects" under the *Mendoza-Martinez* factors, and the modern science is critical to analyzing rationality and excessiveness. Third, the scientific understanding of registries has dramatically changed. We now know that registries are ineffective or counterproductive, and that assumptions about high recidivism rates are wrong. ECF No. 1, PageID.53–81. The factual underpinnings of *Smith* have been debunked. *See* ECF No. 1-7, PageID.513–517 (describing how *Smith* relied on junk science); Ira Mark Ellman & Tara Ellman, *Frightening and High: The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const. Comment. 495 (2015) (same).

In short, this Court must apply the *Mendoza-Martinez* factors, but it must do so based on *this record* in the *world that exists today*. The facts alleged here—even before discovery—are unlike any considered in the cases on which Defendants rely, and are much more akin to the record in *Does I*. Whether the *effects* of SORA 2021 are punitive depends on how the law operates in the real world. That is why

16

improved scientific understanding of what the law does (or doesn't do) is relevant to the "rationality" and "excessiveness" factors, and why the evolution of the internet and the design of the state's website inform the "traditional-forms-of-punishment" and "affirmative-restraints" factors of the *Mendoza-Martinez* analysis.

Because ex post facto analysis requires an assessment of the specific statute and the record, courts—particularly when provided a solid factual record—have increasingly reached the conclusion that "super-registration" statutes are punishment after applying the *Mendoza-Martinez* factors to facts different from those in *Smith*. *See Does I*, 834 F.3d at 705 (collecting cases). The Sixth Circuit found that SORA is "altogether different from and more troubling than Alaska's first-generation registry law." *Id.* The court "consider[ed] whether SORA's actual effects are punitive," and weighed the *Mendoza-Martinez* factors in light of "[t]he record below." *Id.* at 701, 704. The court repeatedly emphasized the record, noting that it cast "significant doubt" on the factual conclusions underpinning *Smith*, that "offense-based public registration has, at best, no impact on recidivism," and that the "record in this case makes painfully evident" that SORA imposes devastating burdens. *Id.* at 702–05. This evidence of harm, coupled with the "scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe," led the court to conclude SORA was punishment. *Id.* at 704–05. The Sixth Circuit did not mechanically apply *Smith*, but looked at the *actual effects of the law* under the *Mendoza-*

*Martinez* factors *based on the record before it*. This Court must do the same here.

The Ninth Circuit likewise applied the *Mendoza-Martinez* factors to facts that differed from *Smith* to find that the retroactive application of SORNA to a juvenile violated the Ex Post Facto Clause. *United States v. Juv. Male*, 590 F.3d 924 (9th Cir. 2010), *judgment vacated as moot*, 564 U.S. 932 (2011). Recognizing that "[i]t would be tempting to conclude" based on *Smith* that registration is not punishment, the court explained that *Smith* "does not, however, mandate that result, and the case before us presents substantially different facts and issues that significantly affect our analysis." *Id.* The court highlighted the factual differences from *Smith*, e.g., that the harms imposed flowed from SORNA rather than from the underlying conviction, that juvenile recidivism rates are low, and that SORNA requires in-person reporting for decades. *Id.* at 933–42. So too here.

Other courts finding registry statutes punitive have likewise focused on the specific facts before them. *See, e.g.*, *Doe v. State*, 111 A.3d 1077, 1095 (N.H. 2015) (distinguishing *Smith* because there was evidence of substantial housing disadvantages); *Hoffman v. Vill. of Pleasant Prairie*, 249 F. Supp. 3d 951, 960 (E.D. Wis. 2017) (finding ex post facto violation because the balance of the *Mendoza-Martinez* factors depends on "objective evidence," and "conjecture about the dangers posed" by people with past sex offenses is insufficient); *Starkey v. Oklahoma Dep't of Corr.*, 305 P.3d 1004, 1030 (Okla. 2013) (distinguishing *Smith* because there was more

substantial evidence of excessiveness); *Doe v. Dep't of Pub. Safety & Corr. Servs.*, 62 A.3d 123, 142 (Md. 2013) (distinguishing *Smith* because there was more evidence of cumulative harms); *Doe v. State*, 189 P.3d 999, 1010 (Alaska 2008) (same).

Courts have also looked at whether modern registry statutes have different consequences than in "an earlier technological environment." *Commonwealth v. Muniz*, 164 A.3d 1189, 1212 (Pa. 2017), *abrogated on other grounds by Commonwealth v. Santana*, 266 A.3d 528 (Pa. 2021). *See also Detroit Free Press, Inc. v. Dep't of Just.*, 829 F.3d 478, 485 (6th Cir. 2016) (en banc) (overruling decision that there is no privacy interest in criminal history information, because 20 years later it became clear that release of a booking photo could haunt an individual for decades); *cf. Riley v. California*, 573 U.S. 373, 385 (2014) (emphasizing the need to account for evolving technology); *Kyllo v. United States*, 533 U.S. 27, 35–36 (2001) (same).

Facts matter. The Court's task is to apply the *Mendoza-Martinez* factors to determine if, on the facts alleged, Plaintiffs have stated a plausible claim that the actual effects of SORA 2021 are punitive. Plaintiffs have.

### D.    Taking Plaintiffs' Allegations as True, SORA 2021 Is Punitive.

Defendants argue that "'[t]he Ex Post Fact Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences.'" ECF No. 39, PageID.1201 (quot-

ing *Smith*, 538 U.S. at 103). But that does not mean the state may make **unreasonable** categorical judgments and impose **punitive** consequences—which is what the state has done here. Defendants' argument is premised on the idea that *Smith* immunized registry laws from scrutiny under the Ex Post Facto Clause. *Id.*, PageID.1163. But *Does I* made clear that *Smith* cannot "be understood as writing a blank check to states to do whatever they please in this arena." *Does I*, 834 F.3d at 705. The record compelled a different conclusion in *Does I*. 834 F.3d at 701–06. It should here as well, because, as shown by the chart below, the facts alleged stand in stark contrast to what the Court relied on in *Smith*:

| **Facts of *Smith*** | **Facts in *Does III*** |
|---|---|
| Registrants have high recidivism rates. 538 U.S. at 103. | Most registrants never reoffend. Thousands are less likely to commit a sex offense than unregistered people. ECF No. 1, PageID.59–62, 79–81. |
| Registrants are dangerous as a class and likely to reoffend for long after conviction. *Id.* at 103–104. | The likelihood of reoffending varies based on risk factors. Reoffending risk drops dramatically over time; after ten years, most registrants present no more risk than the average male. *Id.*, PageID.62–70. |
| Conviction-based registration requirements are reasonably related to the danger of recidivism. *Id.* at 102. | Conviction-based registration requirements do not correspond to risk. The tier levels are backwards, with higher tier registrants being even less likely to reoffend. *Id.*, PageID.70–75. |
| There is no evidence that registration causes substantial occupational or housing disadvantages; registrants are free to live/work like anyone else. *Id.* at 100–01. | SORA 2021 severely limits housing and employment. Registrants are also barred from housing and employment opportunities by laws/policies that turn on their registrant status. *Id.*, PageID.93–150. |

| Registrants are not required to report in-person and are not subject to supervision. *Id.* at 101. | SORA 2021 requires extensive in-person reporting, often within three-days, and in most cases for life. Registrants are also subject to police sweeps. Supervision is similar to or more restrictive than probation/parole. *Id.*, PageID.94–105. |
|---|---|
| Registrants "are free to move where they wish." *Id.* at 101. | Travel is restricted by reporting requirements and by the complexity of inter-jurisdictional obligations. *Id.*, PageID.120–125, 148–150. |
| The harms registrants experience flow from the fact of conviction. *Id.* at 101. | The harms registrants experience result from being on the registry, and vastly exceed the consequences of a conviction. *Id.*, PageID.81–150. |
| The registry simply disseminates accurate criminal record information. *Id.* at 98. | The registry's design, language, and functionality convey the message that every person listed is a current danger to society. *Id.*, PageID.81–90. |
| The registry is like visiting a records archive because the public must look up information. *Id.* at 99. | The digital age has fundamentally changed the consequences of registration, and information about registrants is pushed out to internet users who are not looking for it. *Id.* |

Defendants also misapply the *Mendoza-Martinez* factors, ignoring not just the record, but *Does I* and *Betts*. Those errors are briefly summarized:

**Resemblance to Traditional Forms of Punishment**: *Does I*, 834 F.3d at 703, already held that SORA's in-person reporting requirements resemble probation/ parole. The court noted that the plaintiffs averred that SORA's requirements are more intrusive than those for probation/parole. *Id.* The same is true here. ECF No. 1, PageID.101–105. *See also Betts*, 968 N.W.2d at 552–53. *Does I* and *Betts* also found that SORA resembles shaming. *Does I*, 834 F.3d at 702–03; *Betts*, 968 N.W. 2d at 551–52. Defendants argue that SORA 2021 no longer resembles shaming

21

because tier designations are no longer public. ECF No. 39, PageID.1190. But branding *all* registrants as equally dangerous, rather than some registrants as more dangerous or less dangerous (even if falsely), makes the stigma worse. Defendants also ignore the transformation of the internet in the two decades since *Smith*, and the way shaming is integral to the website's design. ECF No. 1-10, PageID.627–652. As *Lymon* held, SORA 2021 continues to bear a significant resemblance to the traditional punishments of shaming and parole because of its "publication of information and encouragement of social ostracism" and its "imposition of significant state supervision." 2022 WL 2182165 at * 10 (citing *Betts*, 507 Mich. at 553).

**Affirmative Disability or Restraint**: Defendants cite out-of-circuit cases for the remarkable proposition that requiring people to report in person for the rest of their lives, often within three days, is not an affirmative restraint. ECF No. 39, PageID.1194–98. The Sixth Circuit held the opposite: SORA's in-person reporting requirements "are direct restraints on personal conduct" which exceed those in *Smith* "by an order of magnitude." *Does I*, 834 F.3d at 703. Defendants' reliance on occupational disbarment cases is also unavailing; the Sixth Circuit held that SORA's "sweeping conditions" are far more onerous. *Id.* at 704. *See also Lymon*, 2022 WL 2182165, at *11 (SORA 2021 imposes significant affirmative obligations).

**Traditional Aims of Punishment**: Defendants concede that SORA 2021 serves traditional deterrence goals and that, because its obligations all stem from the

underlying offense, it appears punitive. ECF No. 39, PageID.1199. *See also Lymon*, 2022 WL 2182165, at *12 (SORA 2021 supports traditional aims of punishment).

**Rational Connection to Non-Punitive Purpose**: As Defendants concede, the "Sixth Circuit found this factor favored the plaintiffs." ECF No. 39, PageID.1163. The record there, like the record here, "provides scant support for the proposition that SORA in fact accomplishes its professed goals." *Does I*, 834 F.3d at 704.

**Excessiveness**: Just as in *Does I*, "while the statute's efficacy is at best unclear, its negative effects are plain" and Defendants "point to no evidence in the record that the difficulties the statute imposes on registrants are counterbalanced by any positive effects." *Id.* at 705. *See also Lymon*, 2022 WL 2182165, at *13 (surveying research on ineffectiveness of registries, and finding SORA 2021 is excessive).

### E.    SORNA Does Not Insulate SORA From Constitutional Scrutiny.

Defendants argue that, regardless of the facts alleged, because SORA 2021 is similar to SORNA, Michigan's law is necessarily constitutional. Before turning to why that is wrong, we briefly explain the relationship between SORA and SORNA.

#### 1.    The Absence of a Federal Registry and SORNA's Dual Character

"[F]ederal sex-offender registration laws have, from their inception, expressly relied on state-level enforcement." *Carr v. United States*, 560 U.S. 438, 452 (2010). The federal government does not maintain its own registry; there is no way to register directly with the federal government. Nor does the federal government provide

any notice about any federal obligations. State registration schemes are the only way for registrants to report and to be notified. *See* Sex Offense Litigation and Policy Resource Center, *SORNA 2022: A Guide for Practitioners to New Federal SORNA Regulations Effective January 7, 2022* (May 2, 2022), https://bit.ly/3GiQQbI.

"In enacting SORNA, Congress preserved this basic allocation of enforcement responsibilities" focused on state laws, *Carr*, 560 U.S. at 453, but used "Spending Clause grants to encourage States to adopt . . . uniform definitions and requirements" for state registries. *United States v. Kebodeaux*, 570 U.S. 387, 398 (2013). SORNA sets out the federal government's preferred registration provisions and seeks to incentivize states to adopt those provisions in their laws. But it is a state's "sovereign prerogative" to "choose[] not to comply with SORNA." *United States v. Felts*, 674 F.3d 599, 604 (6th Cir. 2012). Congress "did not"—and could not— "insist that the States" adopt SORNA-congruent laws. *Kebodeaux*, 570 U.S. at 398.

In addition, Congress was concerned in passing SORNA to ensure that registrants would not "fall through the cracks of a state registration system." *Kebodeaux*, 570 U.S. at 405 (Alito, J., concurring). Thus SORNA, in addition to incentivizing *states* to adopt certain provisions in their registries, also established a new federal offense making it a crime for *individuals* to fail to register or update their registration if they (a) have a federal or tribal conviction or (b) travel in interstate commerce. 18 U.S.C. § 2250(a). The goal of the federal penalty provision was not to supplant the

24

states' primary role, but to provide for federal enforcement where the federal government "has a direct supervisory interest" or where individuals "threaten the efficacy of the statutory scheme by traveling in interstate commerce." *Carr*, 560 U.S. at 453.

In sum, "SORNA has a dual character." 86 Fed. Reg. 69856 (Dec. 8, 2021). It incentivizes states to adopt certain features in their state registration schemes and it provides for individual criminal liability where there is federal jurisdiction.

### 2.     The SORNA Cases Are Inapposite.

The SORNA cases on which Defendants rely are inapposite. First, almost all are criminal appeals. This case involves a prospective civil challenge to Michigan's requirements, not a criminal defense to convictions for SORNA violations. Criminal prosecutions in SORNA cases involve convictions for failure to *register*. Because the constitutionality of such a requirement was upheld in *Smith*, it is unsurprising that courts affirm these convictions. These appeals did not necessarily give courts reason to consider whether the burdens imposed by the statutory scheme as a whole, rather than basic registration itself, are punitive. Plaintiffs here have to comply with every single part of the scheme, not just with a simple registration requirement. It is the cumulative weight of those many burdens that makes SORA 2021 punitive.

Second, some of the cases, including those in the Sixth Circuit, focused their analysis not on whether SORNA is **punishment**, but on whether it is **retroactive**. In *Felts*, 674 F.3d 599, the defendant argued that his two-year sentence (which was

25

clearly punishment) retroactively punished his *original* sex offense. The court viewed his failure to register as "entirely separate" from the earlier crime and held that the new term of incarceration punished his current failure to register, not his past offense. *Id.* at 606. *Felts* never discussed the *Mendoza-Martinez* factors. It only considered whether the custodial term punished a new or old offense.

Many of the other cases Defendants cite similarly address whether SORNA is **retroactively** punishing the original offense or prospectively punishing the new compliance violation. They do not address whether SORNA's burdens are themselves **punishment**. *See, e.g.*, *United States v. Guzman*, 591 F.3d 83, 94 (2d Cir. 2010); *United States v. Shenandoah*, 595 F.3d 151, 158 (3d Cir. 2010), *abrogated on other grounds by Reynolds v. United States*, 565 U.S. 432 (2012); *United States v. May*, 535 F.3d 912, 920 (8th Cir. 2008), *abrogated on other grounds by Reynolds*, 565 U.S. 432; *United States v. Lawrance*, 548 F.3d 1329, 1336 (10th Cir. 2008); *cf. United States v. Young*, 585 F.3d 199, 203 (5th Cir. 2009) (explaining two different types of ex post facto challenges). Those cases are not relevant here, where the question is not whether SORA 2021 is retroactive, but whether its effects are punitive.

Defendants rely heavily on *Willman v. Attorney General*, 972 F.3d 819 (6th Cir. 2020), which rejected an ex post facto challenge to SORNA. Because *Willman* merely cited *Felts* without analysis, it is unclear whether the decision was based on SORNA not being retroactive or not being punishment. No record was developed,

much less considered, and the court did not discuss the *Mendoza-Martinez* factors. Nor did *Willman*'s cursory treatment of the ex post facto question distinguish *Does I,* which, by contrast, was a thorough opinion canvassing a full record and specifically held that the 2011 amendments are punitive. The apparent tension between *Willman* and *Does I* reflects the fact that SORNA includes many aspects of the 2011 amendments that *Does I* found punitive. Indeed, those amendments were adopted in part because Michigan wanted to have a SORNA-based registry. *See* House Fiscal Agency Legislative Analysis, Senate Bills 188, 189, 206 (2011). Although there are important differences between the laws, the SORNA-congruent features that were added to SORA in 2011 were the same features identified in *Does I* as punitive (e.g., extensive in-person lifetime reporting, tiering without individual review, etc.).

As Defendants concede, in reconciling *Does I* and *Willman* this Court "should follow the case which directly controls." ECF No. 41, PageID.1333 (quoting *United States v. White*, 920 F.3d 1109, 1115 (6th Cir. 2019)). To the extent there is tension between them, *Does I* controls: based on a full review it forbade retroactive application of the 2011 amendments, which remain virtually unchanged in SORA 2021. Moreover, when published Sixth Circuit opinions conflict, "the earliest opinion normally controls because one panel can't overturn another's decision." *Miller v. Caudill*, 936 F.3d 442, 447 (6th Cir. 2019).

Third, and most importantly, the SORNA cases lacked the factual record here,

27

which also means the tension between *Does I* and *Willman* is more apparent than real. *See, e.g.*, *Young*, 585 F.3d at 206 (no ex post facto violation because defendant "ma[de] no effort to prove that the effect of SORNA" was punitive). In the absence of facts to the contrary, these decisions repeat unsupported (and untrue) assumptions, e.g., that recidivism rates are high, that registrants would suffer the same consequences simply by having convictions, or that in-person reporting is just a minor inconvenience.[3] Although courts cannot be faulted for failing to consider facts never presented, here there are detailed factual allegations. And those allegations set out the opposite of what courts have assumed to be true in the SORNA cases.

In sum, the SORNA cases are inapposite because they either are criminal appeals focused on the failure to register, address a different legal question, or are based on factual assumptions that are the opposite of the facts alleged here.

### 3. SORA 2021 Is More Punitive than SORNA.

As *Betts* noted, the old SORA "included several additional provisions" beyond those in SORNA, and when the legislature enacted the new law, "it again created a statutory scheme containing several deviations from its federal counterpart." 968 N.W.2d at 519 & n.27. Those deviations matter to the actual effect of the law.

First, SORA 2021 has more reporting requirements than SORNA. SORA

---

[3] *See, e.g.*, *United States v. Parks*, 698 F.3d 1, 5–6 (1st Cir. 2012); *United States v. W.B.H.*, 664 F.3d 848, 855–60 (11th Cir. 2011); *Young*, 585 F.3d at 206; *United States v. Under Seal*, 709 F.3d 257, 265–66 (4th Cir. 2013).

2021 requires a registrant who "*intends* to temporarily reside at any place other than his or her residence for more than 7 days" to report in advance of such travel, M.C.L. § 28.725(2)(b) (emphasis added); SORNA only requires reporting about temporary lodging where a person "is staying." 28 C.F.R. § 72.6(c)(2). Similarly, SORA 2021 requires in-person "notification of a new residence in another state *before* moving," whereas SORNA only requires notification after the move. *Betts*, 968 N.W.2d at 519 n.27; M.C.L. § 28.725(7); 34 U.S.C. § 20913(c). SORA requires registrants to report all "telephone numbers registered to or used by the individual," without apparent time limitation, M.C.L. §§ 28.725(2)(a); 28.727(1)(h); SORNA requires only current numbers. 28 C.F.R. § 72.6(b). Unlike SORNA, SORA 2021 requires registrants to "maintain a driver's license or identification card with an accurate, updated address." *Betts*, 968 N.W.2d at 519 n.27; M.C.L § 28.725a(7). SORA 2021 also has additional verification requirements. *See*, *e.g.*, M.C.L. § 28.724a(5) (registrants must "present written documentation of employment status, contractual relationship, volunteer status, or student status"). The intrusiveness of the reporting provisions contributes to the excessiveness of the statute. *See Does I*, 834 F.3d at 705; *Betts*, 968 N.W.2d at 514–15. SORA 2021 is more intrusive than SORNA.

Second, in terms of published information about registrants, SORA 2021 goes beyond, and even conflicts, with SORNA. Unlike SORNA, SORA 2021 requires the posting of nicknames (not just names and aliases). *Compare* M.C.L. § 28.728(2)(a)

*with* 28 C.F.R. § 72.6 (a). Under SORA 2021, the public registry can include a person's email and other internet IDs, increasing the likelihood of online harassment. *See* Senate Substitute for H.B. 5679, 100th Leg., Reg. Sess. (Mich. 2020) (striking § 8(3)(e)). SORNA bars disclosure of such information. *See* 34 U.S.C. § 20916(c). More importantly, Michigan's public registry fosters browsing, mapping, and tracking registrants. ECF No. 1, PageID.81–90; ECF No. 1-10, PageID.627–636. While SORNA merely encourages states to have a public registry, 34 U.S.C. § 20920, Michigan has chosen to build a website whose "design, language, and functionality . . . represent each person listed as a current danger to society," rather than simply posting accurate public record information. ECF No. 1, PageID.81–82. This matters because "[t]he breadth of information available to the public" increases "the likelihood of social ostracism based on registration." *Betts*, 968 N.W.2d at 509.

Third, SORNA allows for judicial discretion in deciding if juveniles must register. 81 Fed. Reg. 50552. SORA 2021 does not. M.C.L. § 28.722(a)(iii)(iv).

Finally, SORA 2021 imposes "a $50 registration fee not included in SORNA," which registrants pay annually. *Betts*, 968 N.W.2d at 519 n.27; M.C.L. § 28.725a(6). Failure to pay is a crime punishable by imprisonment. M.C.L. § 28.729(4). Retroactive fees can be punitive. *See Moyer v. Alameida*, 184 F. App'x 633, 638 (9th Cir. 2006); *People v. Batman*, 71 Cal. Rptr. 3d 591, 593 (Cal. Ct. App. 2008); *People v. High*, 15 Cal. Rptr. 3d 148, 152 (Cal. Ct. App. 2004).

30

In sum, Plaintiffs more than meet the plausibility standard for their ex post facto claim. The new statute continues to retroactively apply the 2011 amendments despite the Sixth Circuit's clear contrary holding. On the facts alleged here, the actual effect of the statute is punitive. Defendants' motion to dismiss should be denied.

## II.   PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT RETROACTIVE EXTENSION OF REGISTRATION TERMS VIOLATES THE EX POST FACTO AND DUE PROCESS CLAUSES.

Plaintiffs' challenge to retroactive extension of registration terms is grounded in both the Ex Post Facto and Due Process Clauses. Perhaps recognizing that retroactively extending registration to life is among the most irrational, most damaging, and most excessive aspects of SORA 2021, Defendants do not separately discuss this claim, subsuming it into a generic discussion of ex post facto and due process law. Plaintiffs address those broader arguments in Sections I and III of this brief. Only a few points will be added here.

**Ex Post Facto:** The *Mendoza-Martinez* factors tip even further towards punishment when registration is retroactively imposed for life, as many courts have found. *See* ECF No. 7, PageID.903–04. Lifetime registration serves no public safety purpose and is even more irrational and excessive than a finite registration period, because risk drops dramatically with both age and time. ECF No. 1, PageID.64–70.

Defendants do not justify retroactive lifetime registration under the *Mendoza-Martinez* factors. All Defendants say is that the statute in *Smith* required some people

to register for life. ECF No. 39, PageID.1186. But *Smith* assumed high recidivism rates and minimal burdens, including no in-person reporting. 538 U.S. at 101, 103.

**Due Process:** Defendants argue that Plaintiffs' due process challenge is foreclosed by *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003), ignoring that *Connecticut* was a procedural due process case, whereas Plaintiffs' challenge sounds in substantive due process. ECF No. 41, PageID.1337–38. As to substantive due process, because lifetime registration was imposed retroactively, it must meet not just exacting rational basis review for the reasons set out in Section III. It must also meet "a rationality requirement beyond that applied to other legislation." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 223 (1988) (Scalia, J., concurring). Defendants do not engage at all with the law establishing that "harsh and oppressive" retroactive legislation violates due process. *Welch v. Henry*, 305 U.S. 134, 147 (1938). Plaintiffs have plausibly alleged that retroactive lifetime registration is harsh or oppressive; violates principles of notice, foreseeability, and fair warning; and reaches far back in time. ECF No. 7, PageID.904–11.

## III. PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT FAILING TO PROVIDE FOR INDIVIDUALIZED REVIEW VIOLATES EQUAL PROTECTION AND DUE PROCESS.

### A. The Two Types of Rational Basis Review

Both the Equal Protection and Due Process Clauses permit challenges to statutes that impose substantive restrictions on individual liberty. *Tiwari v. Friedlander*,

26 F.4th 355, 360 (6th Cir. 2022). The Supreme Court has flagged but not decided whether registry regimes can violate equal protection and substantive due process. *Conn. Dep't of Pub. Safety*, 538 U.S. at 8; *id.* at 10 (Souter, J., concurring). Plaintiffs allege such a claim: SORA 2021's lack of individualized review results in extensive burdens on thousands of people who pose no appreciable risk with no public benefit.

Defendants argue that SORA 2021 does not implicate a suspect characteristic or fundamental right, but even assuming that is true,[4] it does not end the inquiry. "All laws, whether the challenge arises under the Due Process or Equal Protection Clause, must satisfy rational-basis review." *Tiwari*, 26 F.4th at 361; *Pearson v. City of Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992).

There are two types of rational basis review: conventional review and an "exacting rational relationship standard" when laws reflect animus. *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1360–61 (6th Cir. 1992). Conventional rational basis review requires that the legislation "bear some rational relation to a legitimate state interest." *Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002). Although legislative enactments are entitled to deference, the rational basis standard "is not a toothless one," *Mathews v. Lucas*, 427 U.S. 495, 510 (1976), and does not function

---

[4] Plaintiffs do not concede that rational basis applies. *See* ECF No. 7, PageID.934 n.23 (collecting cases where registration implicates fundamental rights and heightened review was applied). But because Plaintiffs have plausibly alleged that SORA 2021 does not survive even rational basis review, the Court need not reach the issue.

as "a rubber stamp of all legislative action," *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000). The Supreme Court has found government action constitutionally irrational in a variety of cases. *Tiwari*, 26 F.4th at 362 (collecting cases).

Courts "have applied a more searching form of rational basis review" when a statute exhibits "a desire to harm a politically unpopular group." *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring). "For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also Romer v. Evans*, 517 U.S. 620, 633–36 (1996), *United States v. Windsor*, 570 U.S. 744, 770–74 (2013); *Eisenstadt v. Baird*, 405 U.S. 438, 447–55 (1972); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446–50 (1985). The Sixth Circuit has likewise explained that plaintiffs may demonstrate that a government action lacks a rational basis "by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005); *see also Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) (invidious discrimination based on animus violates equal protection).

Disadvantaging an unpopular group cannot constitute a legitimate legislative end, *Romer*, 517 U.S. at 633, and so courts should review whether "the disadvantage

imposed is born of animosity toward the class of persons affected." *Id.* at 634. "Negative attitudes" and unsubstantiated fears cannot supply a rational basis; rather, "some data reflecting the extent of the danger must exist." *Bannum*, 958 F.2d at 1360–61 (cleaned up). Thus, "courts must look behind the stated justifications to see whether they actually relate to a legitimate governmental purpose." *Bassett v. Snyder*, 59 F. Supp. 3d 837, 849 (E.D. Mich. 2014); *see also Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1289 (D. Utah 1998) ("If the community's perception is based on nothing more than unsupported assumptions, outdated stereotypes, and animosity, it is necessarily irrational . . . under *Romer* . . . .").

### B. At the Motion-to-Dismiss Stage, Plaintiffs Need Make Only Plausible Allegations of Animus and Irrationality.

Under either conventional or exacting rational basis review, deference to the legislature "cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard." *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992). A plaintiff need only "allege facts sufficient to overcome the presumption of rationality." *In re City of Detroit*, 841 F.3d 684, 701 (6th Cir. 2016) (quoting *Wroblewski*, 965 F.2d at 460). Summary judgment is typically the "apt vehicle for resolving rational-basis claims." *Tiwari*, 26 F.4th at 369 (proper to allow discovery on law's rationality); *Stratta v. Roe*, 961 F.3d 340, 361 (5th Cir. 2020) ("test[ing] in discovery and further proceedings" is often the most appropriate way to resolve rational basis claims); *cf. Craig-*

*miles*, 312 F.3d at 224 (relying on trial evidence to find law irrational). When plaintiffs invoke exacting rational basis review, all they need at the motion-to-dismiss stage are allegations raising the inference that dislike of a particular group motivated the law. *See Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012).

## C.   Because Plaintiffs Plausibly Allege that SORA 2021 Was Motivated by Animus, More Exacting Scrutiny Applies.

In determining whether a statute was motivated by animus, courts look to several factors. *First*, the legislative history and historical background often sheds light on the government's motivation. *See Moreno*, 413 U.S. at 536 (consulting the congressional record); *Windsor*, 570 U.S. at 770 (same); *Bassett v. Snyder*, 951 F. Supp. 2d 939, 968 (E.D. Mich. 2013) (analyzing "[t]he historical background and legislative history"). *Second*, courts consider the severity of the burdens placed on the targeted group. In *Lawrence*, the Supreme Court noted that "Texas' sodomy law brands all [gay people] as criminal, thereby making it more difficult for [them] to be treated in the same manner as everyone else." 539 U.S. at 581. Similarly, in *Windsor*, the Court explained how the "principal effect" of the Defense of Marriage Act was for "same-sex married couples [to] have their lives burdened, by reason of government decree, in visible and public ways." 570 U.S. at 772–74. *Third*, courts have found evidence of animus where a law is "structurally aberrational" because it imposes "wide-ranging and novel deprivations upon a disfavored group" or departs from normal governmental processes. *Bassett v. Snyder*, 59 F. Supp. 3d 837, 847

36

(E.D. Mich. 2014) (citing *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002)). Under these factors, Plaintiffs have plausibly alleged that SORA 2021 is grounded in animus.

**Historical and Statutory Background:** In 1994 Michigan passed its first registry law, which operated as a non-public law enforcement database. ECF No. 1, PageID.36–37. Highly publicized (though very rare) stranger child-abduction cases then prompted amendments to such registry statutes nationwide. Ira Ellman, *When Animus Matters*, 7 U. Pa. J. L. & Pub. Affs. 1, 14–15 (2021). In Michigan, legislators required the reporting of more information, for more offenses, and made the registry publicly available. ECF No. 1, PageID.37–39. Around the country, legislators demonized registrants, describing them as "beast[s]," "monsters," "animals," and "the human equivalent of toxic waste." Wayne Logan, *Knowledge as Power: Criminal Registration and Community Notification Laws in America* 95 (2009).

Discussions about Michigan's registry have taken place against this backdrop of loathing. Legislators have simply ignored concerns about the reach of the registry to avoid looking "soft on crime." ECF No. 1, PageID.162. When Michigan enacted SORA 2021, it did not investigate the law's consequences. *Id.* And as shown in prior litigation, MSP does not track the recidivism rates of registrants, despite being able to do so, nor does the state analyze SORA data to determine if the law works. *Id.*, PageID.162–163 (citing *Does I*, 2:12-cv-11194 ECF No. 90, PageID.3758-3769).

37

During the legislative hearings on SORA 2021, virtually all the 170 commenters opposed the bill, and experts explained why registry laws are ineffective. Despite that testimony and the multiple rulings that SORA is unconstitutional, the legislature barely changed the law. *Id.*, PageID.37–40. *See also* ECF No. 1–7, PageID.520–522 (registrants are the most stigmatized group in society, citing research that people do not change their views on registries even when provided with scientific evidence).

**The Burdens:** Plaintiffs allege that SORA 2021 places immense burdens on registrants. It limits access to housing, employment, and education, discourages travel and internet use, and encourages harassment. *See supra*, Facts, pp. 3–7.

**Structural Aberration:** Registry laws,[5] including SORA 2021, are unlike any other laws, imposing extensive obligations and ongoing supervision for decades or life without any individual consideration. Probation and parole—which are the closest analogs—are components of a criminal sentence and are individually determined. Non-punitive systems that impose significant restrictions on liberty, such as supervision of parenting through child protective services, monitoring of medication compliance for people with serious mental health issues, or guardianships for the incapacitated, all turn on individualized assessments and periodic review to ensure

---

[5] It is immaterial that many other states have registries. Other states had anti-gay laws like the one enjoined in *Bassett, supra*, but the court found animus by comparing the Michigan statute to other states' laws aimed at politically unpopular groups. 59 F. Supp. 3d at 848, 855.

that such restrictions are warranted. SORA 2021 is aberrational.

In sum, Plaintiffs have plausibly alleged animus, which is all they need to do at the motion-to-dismiss stage. *Davis*, 679 F.3d at 438.

### D. Imposing Extensive Burdens that Have No Public Safety Benefit on Thousands of People Who Present No Appreciable Risk Is Irrational.

A plaintiff can also overcome the presumption of rationality for legislative enactments by alleging facts that negate the purported justifications for the law. *Andrews v. City of Mentor*, 11 F.4th 462, 475–77 (6th Cir. 2021) (citation omitted).

Defendants opine that SORA 2021 promotes public safety (although they do not even attempt to explain how features like lifetime registration or constant report-ing are rational). *See* ECF No. 41, PageID.1370. Taking the complaint's allegations as true, however, registry laws undermine public safety and are rooted in myths and fears that have been demolished by modern social science research. *See* Facts, pp. 3–7, *supra*; and Complaint, ECF No. 1, PageID.53–81. SORA 2021 wastes millions of dollars on a system that does nothing to reduce sexual offending. *Id.*, PageID.151–155; *see Plyler v. Doe*, 457 U.S. 202, 224 (1982) (weighing statute's costs against any purported benefits under rational basis review).

Courts have increasingly questioned the rationality of automatically imposing registry restrictions based solely on past convictions. *See*, *e.g.*, *Does I*, 834 F.3d at 704–05 (highlighting evidence that offense-based registration has, at best, no impact on recidivism and may *increase* sexual offending); *Cornelio v. Connecticut*, 32 F.4th

39

160, 173 & n.7 (2d Cir. 2022) (same and collecting cases); *Betts*, 968 N.W.2d at 514 (noting "growing body of research" questioning efficacy of these restrictions); *Hoffman*, 249 F. Supp. 3d at 960, 962 n.10 (ordinance banning people with past sex offenses from living in village, which was adopted out of animus and despite evidence it could be counterproductive, was irrational); *In re T.B.*, 489 P.3d 752, 768 (Colo. 2021) (citing research that registration does not reduce recidivism); *Ortiz v. Breslin*, 142 S. Ct. 914, 916 (2022) (Sotomayor, J., respecting denial of certiorari) (citing research that residency restrictions "may actually increase the risk of reoffending").

Plaintiffs need make only plausible allegations of animus or irrationality, and they have done both. Whether SORA 2021 was motivated by animus and whether it is rationally related to the government's public safety interests are questions of fact.

## IV. PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT DENYING SIMILARLY SITUATED REGISTRANTS THE OPPORTUNITY TO PETITION FOR REMOVAL VIOLATES EQUAL PROTECTION.

### A. The Barred-From-Petitioning Subclass Is Similarly Situated to Petition-Eligible Registrants in All Material Respects.

After ten years, Tier I registrants who meet strict criteria (successful completion of probation/parole, no subsequent felony, etc.) can petition to come off the registry. Relief is discretionary: a court **may** grant the petition if it determines that the person is rehabilitated. M.C.L. § 28.728c(1), (11), (12). Juveniles who meet the criteria must wait a staggering 25 years to petition. M.C.L. § 28.728c(2), (11), (13). Other registrants who meet the same criteria cannot petition at all. *Id.*

Plaintiffs maintain that denying the opportunity to seek discretionary relief to Tier II and III registrants who meet the same criteria (e.g., have also successfully completed probation/parole, have no subsequent felony, etc.) violates equal protection because the only way in which they are different from petition-eligible Tier I registrants—their offense of conviction—is not *material* to the purpose of the petitioning procedure. Plaintiffs also maintain that it is irrational to require juveniles who meet the criteria to wait 15 years longer than adults before they can petition.

The parties agree that an equal protection violation occurs when people (1) are "treated differently than other[s] . . . who [are] similarly situated in *all material respects*," and (2) the state has no rational basis for the different treatment. *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462, 465 (6th Cir. 2012); *Andrews*, 11 F.4th at 474 ("courts should not demand exact correlation, but should instead seek relevant similarity" (cleaned up)). *See* ECF No. 39, PageID.1213 (rational basis classification "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation").

Defendants barely address *material* similarity. The purpose of the review process under M.C.L. § 28.728c(1), (2), (11), (12) & (13) is to allow rehabilitated people to be removed from the registry. With respect to that purpose, there are no *material* differences between petition-eligible Tier I registrants and the barred-from-petitioning subclass (people who meet the same criteria but are juveniles, Tier II, or

Tier III registrants). All have successfully completed probation or parole and any required treatment, and have lived in the community for at least ten years without reoffending (which corresponds with the period after which most registrants are no more likely to offend than the average male). *Compare* M.C.L. § 28.728c(12) *with* ECF No. 35, PageID.1117–1118; ECF No. 1, PageID.65–70. All have the same interest in being able to ask a court to consider them for removal from the registry.

Defendants defend this disparate treatment by arguing that the state can punish more serious convictions more severely. *See* ECF No. 39, PageID.1215 (analogizing disparate treatment here to offense-based differences in parole eligibility). But the purpose of the discretionary-review provision is not to punish. Where "the State has provided for a judicial proceeding to determine the dangerous propensities" of individuals, it cannot solely rely on "past criminal records" to justify disparate eligibility for discretionary relief. *Baxstrom v. Herold*, 383 U.S. 107, 114 (1966). Defendants do not address *Baxstrom* or the other cases in which courts have applied this principle. *See* ECF No. 7, PageID.916 n.17 (collecting cases).

The complaint alleges that the conviction offense has no bearing on recidivism (if anything, those in higher tiers are less likely to reoffend). *Id.*, PageID.916–918. There is thus no rational relationship between tier designation and the possibility of rehabilitation. And, for juveniles, there is no evidence to support harsher treatment of children. *Id.*, PageID.918.

## B.    Plaintiffs' Challenge Is to the Classification of Who Is Eligible to Seek Discretionary Relief.

Defendants also confuse the statute's discretionary and mandatory removal provisions. As a result of various amendments, "Romeo and Juliet" offenses and offenses by children under 14 no longer require registration. M.C.L. §§ 28.722(a) (iii)–(iv), (t)(v)–(vi), (v)(iv); 28.723. An individual who commits such an offense today would not be registered, and the procedures Defendants point to are designed to remove previously registered individuals who are now no longer subject to registration. Because there is no statutory authority to subject such individuals to registration, their removal is mandatory. *See* M.C.L. § 28.728c(3), (14) ("court shall grant a petition" for individuals who are not subject to registration), (15) (same). The legislature's decision to end registration for younger children and for consensual teen sex is appropriate. Plaintiffs challenge (a) the fact that older children must wait 15 years longer than adults before being eligible for discretionary review, and (b) the complete denial of discretionary review to Tier II and III registrants who meet the same substantive criteria as petition-eligible registrants.

## V.    PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT SORA 2021'S EXTENSIVE COMPELLED DISCLOSURE REQUIREMENTS VIOLATE THE FIRST AMENDMENT.

Defendants do not dispute that SORA 2021 compels Plaintiffs to speak or that strict scrutiny applies. ECF No. 41, PageID.1347. Defendants must therefore prove that the state has a compelling interest in forcing registrants to support its message

43

that they are dangerous, that the reporting requirements are narrowly tailored to that end, and that these requirements are the least restrictive means to achieve the state's objectives. *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). Strict scrutiny requires "a justification far stronger than mere speculation about serious harms," including proof that "the recited harms are real . . . and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995); *Cornelio*, 32 F.4th at 171 (collecting cases on government's burden). Requiring people to report a vast array of information, often in person and within three days, and in most cases for life, without any risk determination, cannot survive strict scrutiny.

First, Defendants misdescribe Plaintiffs' claim as one about privacy. Plaintiffs' challenge here is not based on a claim that their information is private. Rather, they challenge the requirement that they *contribute* to the state's depiction of them as dangerous, a message with which they vehemently disagree. Defendants protest that registrants are required only to state facts, but the Supreme Court has made clear that compelled statements of fact, like compelled statements of opinion, burden protected speech. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 797–98 (1988).[6]

---

[6] Defendants compare SORA 2021 to a procedure *Riley* discussed in dicta, which would have published financial disclosure forms that charities file. 487 U.S. at 800. SORA's intrusion on individual liberty is very different from public disclosure of forms that must be filed by a regulated sector of the economy. Nor did *Riley* suggest

Moreover, while Defendants assert that the harms registrants experience flow not from registration, but the conviction, Plaintiffs plausibly allege otherwise. ECF No. 1, PageID.81–150.

Second, Defendants do not explain how SORA's compelled speech requirements pass strict scrutiny. Although preventing sex crimes is important, Defendants have not shown that Michigan's registry promotes that goal, much less that forcing registrants to report minor changes in information reduces sexual offending. Rather, the complaint alleges, and the evidence shows, that if anything, SORA 2021 increases the number of sex offenses in Michigan. ECF No. 1, PageID.56; ECF No. 1-6, PageID.461–462. Moreover, the Sixth Circuit has held that "[t]he requirement that registrants make frequent, in-person appearances before law enforcement . . . appears to have no relationship to public safety at all." *Does I*, 834 F.3d at 705; *see Cornelio*, 32 F.4th at 173 & n.7 (same and collecting cases).

Third, Defendants have also failed to prove narrow tailoring. "There is a dramatic mismatch . . . between the interest that the [state] seeks to promote and the disclosure regime that [it] has implemented in service of that end." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386 (2021). A regime that forces a person

---

that the state could, e.g., selectively pull information and repackage it on a website of "Rip-Off Charities" designed to make the public believe the charities are frauds.

who has not offended in decades to report just because he's volunteering, that compels reporting of every new on-line account, and that demands disclosure of every car ever used—including for people who present no more risk than the average male—is not narrowly tailored. *See Cornelio*, 32 F.4th at 173–74 (state failed to establish narrow tailoring of internet reporting provision).

Fourth, the state cannot show that such requirements are the least restrictive means of achieving its goals. The state concedes that "the information that is posted on the registry is easily discoverable through various other means." ECF No. 39, PageID.1192. If so, the state need not compel registrants to provide it.

Finally, Defendants do not distinguish the Supreme Court's compelled speech cases, nor the cases holding that forcing registrants to speak does not survive strict scrutiny. ECF No. 7, PageID.920–32. Defendants rely on *United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014)—which was litigated pro se—and three district court cases. These cases lack the record or legal argument made here. *See*, *e.g.*, *id.* at 1035 (noting Arnold did not claim he was required to support a message with which he disagreed). Instead of using strict scrutiny, *Arnold*—citing a tax case—employed an amorphous "essential operations of government" test that neither the Supreme Court nor the Sixth Circuit have endorsed, and which would allow the government to

46

compel or restrict speech whenever there is a compelling state interest.[7] *See id.* at 1034. But strict scrutiny requires that there be narrow tailoring and no less restrictive way to achieve the government's objectives. And even if one uses an "essential operations" test, Defendants fail to explain why registration is a core government function. The Greeks and Romans collected taxes, but states have managed without registries for centuries. Nor can Defendants establish that SORA 2021 is an "essential operation" unless they establish that it serves its purported purpose, which they have not. Accordingly, Plaintiffs have plausibly pled this compelled speech claim.

## VI.   PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT RETRO-ACTIVELY IMPOSING LIFETIME REGISTRATION VIOLATES PLAINTIFFS' PLEA AGREEMENTS.

Plaintiffs have plausibly alleged that sex offender registration is central to plea negotiations, and that it violates due process to retroactively impose lifetime registration on people who pled guilty without notice that they would be subject to lifetime registration or whose pleas were predicated on an understanding that they would not be subject to registration, or be subject for a term of years. Compl., ECF

---

[7] The district court cases applied strict scrutiny but found that standard satisfied based on assumptions that recidivism rates are high, reporting burdens minimal, and registries do not portray people as dangerous. *See United States v. Fox*, 286 F. Supp. 3d 1219, 1222–24 (D. Kan. 2018); *United States v. Doby*, No. 18-CR-40057-HLT, 2019 WL 5825064, at *3–5 (D. Kan. Nov. 7, 2019); *Prater v. Linderman*, No. 18-cv-992, 2019 WL 6711561 (W.D. Mich. Dec. 10, 2019) (adopting *Fox*). Here the record shows the opposite. ECF No. 1, PageID.53–101; ECF No. 1-3; ECF No. 1-4; ECF No. 1-5; ECF No. 1-6; ECF No. 1-7; ECF No. 1-8; ECF No. 1-9.

No.1, PageID.160–61; 184–186; ECF No. 1-12. The plea-bargain subclass entered into plea agreements that SORA 2021 changes by retroactively imposing lifetime registration, a severe penalty. Registrants received no fair notice and may not have pled had they known they would be subject to registration for life. Defendants do not argue that this count fails to state a claim. Their challenge is limited to a statute-of-limitations argument which, as explained in Section XI below, is baseless.

## VII. PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT REQUIRING PEOPLE WHO DID NOT COMMIT A SEX OFFENSE TO REGISTER AS SEX OFFENDERS VIOLATES DUE PROCESS AND EQUAL PROTECTION.

The Michigan Court of Appeals very recently decided that registration for a non-sex offense is cruel or unusual punishment, emphasizing SORA 2021's extensive burdens, the absence of anything to suggest future sexual offending, the stigma of sex crimes which "surpasses almost all other crimes," and the fact that registration for non-sex crimes undermines the law's ostensible purpose. *Lymon*, 2022 WL 2182165, at *14–17, 16 nn.10–11. Those factors make such registration irrational.

Defendants do not address the cases holding that requiring people who never committed a sex crime to register as sex offenders, and branding them as sexually dangerous when they are not, violates equal protection and due process. ECF No. 7, PageID.932–41. They only argue that the legislature could conclude that people convicted of certain non-sex crimes might pose a risk. ECF No. 39, PageID.1214–1215. But it is still irrational to stigmatize them as "sex offenders" when they did

48

not commit sexual crimes. *Cf. Does I*, 834 F.3d at 703 (expressing such a concern).

## VIII.  PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT SORA 2021 IS UNCONSTITUTIONALLY VAGUE.

### A.    Due Process Requires a High Standard of Clarity to Provide Notice of What Conduct Is Forbidden and Guidance to Law Enforcement.

A statute is unconstitutionally vague if it does not provide a person of ordinary intelligence notice of what conduct is prohibited, and does not provide clear guidance for those who enforce its prohibitions. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). These requirements "ensure fair notice to the citizenry," and "provide standards for enforcement by the police, judges, and juries." *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1104 (6th Cir. 1995).

With respect to notice, "a statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). "No one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961) (cleaned up).

With respect to guidance for law enforcement, unclear laws give "law enforcement officers, courts and jurors unfettered freedom to act on nothing but their own preferences and beliefs." *United States v. Salisbury*, 983 F.2d 1369, 1378 (6th Cir.

1993). Absent "explicit standards," those who enforce the law may decide basic policy matters on a subjective basis "with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

A law "imposing criminal sanctions or reaching a substantial amount of constitutionally protected conduct may withstand facial constitutional scrutiny only if it incorporates a high level of definiteness." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999); *see also Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982) ("because the consequences of imprecision are qualitatively less severe" for civil than criminal statutes, laws imposing criminal liability require heightened review). Vague criminal laws are facially invalid. *See Johnson v. United States*, 576 U.S. 591, 602–03 (2015).

A high level of definiteness is required here because SORA 2021 imposes criminal sanctions and reaches a substantial amount of constitutionally protected conduct. Registrants face up to ten years imprisonment for non-compliance. M.C.L. § 28.729. Criminal liability attaches simply for the failure to report common everyday *legal* activities like using a phone, taking college classes, or renting a car. *See Lambert v. California*, 355 U.S. 225, 229 (1957) (invalidating registry law that "punished conduct which would not be blameworthy in the average member of the community" (cleaned up)). SORA 2021's vagueness also implicates constitutional rights because when registrants face uncertainty about what they must do, they err

on the side of caution—for example, by limiting their internet use and travel—so as not to risk arrest and imprisonment. *See* ECF No. 1, PageID.135–147.

## B. SORA 2021's Reporting Requirements Are Unconstitutionally Vague.

Plaintiffs plausibly allege that SORA 2021 is unconstitutionally vague. *See* ECF No. 1, PageID.10, 49, 126–132, 135–147. Defendants respond that no one is confused by the requirements, but if they are, "some vagueness around the edges" is fine. ECF No. 41, PageID.1366. That is wrong both because Plaintiffs' allegations must be taken as true and because a high level of definiteness is required. Discovery could also be instructive. In *Does I*, plaintiffs surveyed police and prosecutors about how they understood SORA. *See, e.g.*, Exhibit 1 – Poxson Report. Judge Cleland relied on those surveys to find that law enforcement's "disparate views" about the meaning of particular provisions "exemplify the lack of . . . standardized guidelines for the enforcement of SORA's reporting provisions." *Does I*, 101 F. Supp. 3d 672, 689; *id.* at 688 (record showed that both "Plaintiffs and law enforcement are unsure" what SORA requires). That is enough to deny Defendants' motion.

Defendants also argue that SORA 2021 cannot be vague because SORNA uses similar language. ECF No. 41, PageID.1357. But the existence of other laws with similar features does not immunize a statute from constitutional scrutiny. *See Smith v. Goguen*, 415 U.S. 566, 582 & n.31 (1974) (flag desecration statute unconstitutionally vague despite "the universal adoption" of similar laws in all 50 states).

Next, Defendants turn the rule of lenity—which provides a shield from unjust prosecutions by requiring "ambiguous criminal laws to be interpreted in favor of the defendants," *United States v. Santos*, 553 U.S. 507, 514 (2008)—into a sword. Implicitly admitting the law is vague, Defendants suggest that the remedy is to ignore vagueness until prosecutions occur. ECF No. 41, PageID.1353. But "[t]he Constitution does not permit a legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (cleaned up). Nor can vagueness be ignored because a law only criminalizes *knowing* failures to register: "notwithstanding the State's assurances that it will not prosecute 'honest mistakes,' we cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection" of constitutional rights. *Doe v. Harris*, 772 F.3d 563, 579 (9th Cir. 2014) (cleaned up).

Most striking is how Defendants' insistence that the law is not vague undercuts their argument that the law is not punishment. If Plaintiffs have to report every car they drive, ECF No. 41, PageID.1361, Doe F could be reporting all 30 cars in his employer's fleet, would not drive for a friend who has been drinking, and should not borrow a car when his breaks down. ECF No. 1, PageID.139–40. Are registrants really supposed to report whenever someone gives them a new nickname? ECF No. 41, PageID.1364. Must a registrant, when borrowing a phone, say: "Thanks, and by

the way, your number will be added to the sex offender registry."?

Defendants fare no better when addressing specific provisions of SORA 2021:

**Internet identifiers and phone numbers**: Registrants must report all electronic mail addresses, internet identifiers, and phone numbers "registered to or used by the individual," and "any change" to such information. M.C.L. §§ 28.725(2)(a), 28.727(1)(h)–(i). These requirements impact free speech and their vagueness is concerning since the "severity of criminal sanctions may well cause speakers to remain silent rather than" risk prosecution for "arguably unlawful" activity. *Reno v. ACLU*, 521 U.S. 844, 872 (1997). That is what Plaintiffs allege is occurring, and what they anticipate proving. ECF No. 1, PageID.125–131, 136–138; *Does I*, 2:12-cv-11194, ECF No. 90, PageID.3898, 3903–3905, 3915–3919, 3933 (recounting evidence neither police nor registrants knew which internet activities must be registered).

SORA 2021's internet reporting obligations are even vaguer than the old SORA, which required reporting of designations "used in internet communications or postings." M.C.L. § 28.725(1)(f) (repealed 2021). SORA 2021 requires reporting of all internet identifiers, expansively defined as "all designations used for self-identification *or routing* in internet communications or postings." M.C.L. § 28.722(g) (emphasis added). The change is substantive, but no one knows what it means. "Routing" refers to technical aspects of internet access, but does that mean registrants must report the IP address of any device they use? Moreover, the text

requires registration of all internet IDs and phone numbers "registered or used" with no apparent time limit. The legislature could have used the present tense but did not. *See Carr*, 560 U.S. at 448 ("Consistent with normal usage, we have frequently looked to [the] choice of verb tense to ascertain a statute's temporal reach.")

Courts have found constitutional problems with similar provisions. The Ninth Circuit struck down a law requiring registrants to report "Internet identifiers established or used by the person." *Harris*, 772 F.3d at 567–68. The court held that the "district court's valiant effort at applying narrowing constructions" did not resolve vagueness because the statute was not susceptible to such constructions and because narrowing constructions "would not necessarily alleviate the chilling effect caused by the ambiguities in the Act," particularly given that a federal court's interpretation does not bind state courts where registrants face prosecution. *Id.* at 579. "[W]hether narrowly construed or not, ambiguities in the statute may lead registered sex offenders either to overreport . . . or underuse the Internet to avoid the difficult questions in understanding what, precisely, they must report." *Id. See also Doe v. Jindal*, 853 F. Supp. 2d 596 (M.D. La. 2012); *Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608, 613–15 (E.D. Ky. 2017); *White v. Baker*, 696 F. Supp. 2d 1289, 1311–12 (N.D. Ga. 2010). *State v. Aschbrenner*, 926 N.W.2d 240 (Iowa 2019), on which Defendants rely, fails to recognize that narrowing constructions do not solve the problem. Def-

endants also cite *Delgado v. Swearingen*, but Florida's law had a far clearer definition of what must be reported. 375 F. Supp. 3d 1251, 1255–56 (N.D. Fla. 2018).

In *Does I*, Judge Cleland read the old SORA to apply only to designations "*primarily* used in Internet communications and posting" so as to make commercial transactions non-reportable. *Does I*, 101 F. Supp. 2d at 692. But the legislature did not adopt this reading in SORA 2021, instead requiring reporting of "*all . . .* internet identifiers registered to *or used* by the individual." M.C.L. § 28.727(1)(i) (emphasis added). Defendants offer up yet another reading, saying reporting is required for "accounts used to send messages, post, and other *user-generated* communications or postings that implicate public safety concerns at issue with the sex offender registry." ECF No. 41, PageID.1358. Narrowing constructions are of little use if there are multiple versions, none of which the legislature adopted when it had the chance.

**Employment**: SORA 2021 requires in-person, three-day reporting of changes to one's "place of employment" or discontinuation of employment, with a bewildering array of provisions about reporting volunteer work, contract work, travel routes, and work without a fixed location. M.C.L. §§ 28.722(d), 28.725(1)(b), 28.727(1)(f). Plaintiffs' complaint sets out the confusion. ECF No. 1, PageID.140–42. Defendants, citing SORNA, argue that one should just report "with whatever definiteness is possible under the circumstances." ECF No. 41, Page.ID 1363 (citing 28 C.F.R. § 72.6(c)(3)). But SORA 2021 does not have comparable language (and that language

55

is itself unclear). Defendants cannot answer whether one must report shoveling a neighbor's sidewalk, and admit that "[t]here may be hundreds of nuanced situations" about what is reportable. *Id.* That is vagueness.

**Substantially Similar Offenses**: Whether a person with a non-Michigan conviction must register depends on whether the offense is "substantially similar" to a Michigan offense that triggers registration, with the tier of the "substantially similar" Michigan offense determining how long and how often the person must report. M.C.L. § 28.722(r)(x), (t)(xiii), (v)(viii). Mapping offenses from one jurisdiction on to those of another is difficult, because the offense elements in other jurisdictions do not necessarily track those of Michigan offenses.

**SORA 2021's Complexity Makes It Vague**: Page limits prevent Plaintiffs from addressing every vague provision raised. *See* Complaint. ECF No. 1, PageID.135–150. But a statute can be vague if it is "written in a language foreign to persons of ordinary intelligence" and is so "technical or obscure that it threatens to ensnare individuals engaged in apparently innocent conduct." *United States v. Caseer*, 399 F.3d 828, 836–37 (6th Cir. 2005). That describes SORA 2021: with its complex structure, dense provisions, and endless requirements, SORA 2021 creates a language foreign to law enforcement and obscure to registrants. Not only does the reporting regime put a colossal burden on registrants with no countervailing public safety value, but the lack of clarity about what registrants must do leaves them in

constant fear of prosecution. Vagueness is a key reason the law is so onerous.

## IX. PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT COMPELLING REGISTRANTS TO SAY THAT THEY UNDERSTAND SORA 2021 VIOLATES THE FIRST AMENDMENT.

Defendants offer a smorgasbord of arguments for why registrants can be compelled to attest they understand SORA 2021, and incarcerated if they decline to sign. First, Defendants make a comparison to forms where one acknowledges having received a document or verifies facts one has provided. Registrants are not just being asked to acknowledge receipt or verify facts; they must attest to *understanding*.

Second, Defendants say that if registrants read the form, they will understand the law. That assumes an extraordinary level of legal sophistication, as even attorneys in this case can't agree on what the law means. Moreover, the form gives only an overview of a very complex law. *Compare* ECF No. 1-17 *with* ECF No. 1-3.

Third, Defendants interpret M.C.L. §§ 28.727(4) and 28.729(3) as requiring an attestation of understanding only at initial registration and not for ongoing verifications. Whether Michigan prosecutors and judges will read it that way is anyone's guess. After all, registrants who miss a verification are prosecuted for "failure to register," and the Explanation of Duties form, which is used both for initial registration and ongoing reporting, requires a signature each time. ECF No. 1, PageID.147; ECF No. 1-17, PageID.764. But it scarcely matters. An unconstitutional compulsion to speak does not become constitutional if you only have to do it once.

Next, Defendants argue that SORNA and some state laws have similar provisions. But many of these statutes are inapposite, because they only require the registrant to verify that they were informed of their duties, not that they understand them.[8] Of the remaining laws, Defendants acknowledge that SORNA and several state statutes have no penalty provisions.[9] For those states that purportedly attach criminal sanctions, Defendants point only to the general penalties applicable to the failure to register, with no indication that they apply to the signature requirement.[10] Alabama, for example, contemplates that registrants may not sign and makes alternate arrangements. *See* Ala. Code § 15-20A-10(g) (if a registrant refuses to sign, "the designee of the registering agency shall sign the form stating that the requirements have been explained to the adult sex offender and that the adult sex offender refused to sign."). Michigan, by contrast, provides no alternative for those who refuse to do so; failure to sign is a crime. M.C.L. § 28.729(3). Regardless of the similarity of these statutes, Defendants can point to no cases upholding such compelled speech. There is no "other states do it" defense to violating the Constitution.

---

[8] *See* Kan. Stat. Ann. § 22-4904; La. Rev. Stat § 15:543(7); Mass. Gen. Laws ch. 6, § 178E; Me. Rev. Stat. tit. 34-A, § 11222; N.C. Gen. Stat. § 14-208.8(a)(1); 11 R.I. Gen. Laws § 11-37.1-5(b)(6).

[9] *See* 34 U.S.C. § 20919(a)(2); Ohio Rev. Code Ann. § 2950.03(B); 42 Pa. Stat. and Cons. Stat. §§ 9799.20(2), 9799.23(a)(5); W. Va. Code § 15-12-2(g).

[10] *See* Ala. Code § 15-20A-10(g), (j); 730 Ill. Comp. Stat. 150/4, 150/5; Nev. Rev. Stat. §§ 179D.450(3)(a)(2), 179D.550(1); Okla. Stat. tit. 57, §§ 585(A)(2), 587(A); Vt. Stat. tit. 13, §§ 5406(3), 5409(a).

Finally, Defendants argue that compelled statements of understanding survive strict scrutiny because of the state's interest in obtaining truthful information. That interest could at best justify a requirement to verify facts, not a requirement to say one *understands* the law. Moreover, Michigan began compelling registrants to attest that they understand the law only *after* the law changed to eliminate strict liability; Michigan never needed it before. Defendants also claim that forcing registrants to say they understand the law might encourage them to ask questions. That is not enough to solve problems with the statute's ambiguity. *See Harris*, 772 F.3d at 579 (rejecting Defendants' argument). Moreover, Plaintiffs allege that law enforcement often does not know the answer or provides conflicting information. *See, e.g.*, ECF No. 1, PageID.130–131, 144, 147.

## X. PLAINTIFFS HAVE PLAUSIBLY ALLEGED THAT THE INTER-NET REPORTING REQUIREMENTS UNCONSTITUTIONALLY RESTRICT SPEECH AND ASSOCIATION IN VIOLATION OF THE FIRST AMENDMENT.

The internet provides "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) (law barring registrants from social media violated First Amendment). Numerous courts have therefore struck down the very type of law at issue here, finding that requiring reporting of internet information burdens protected speech by chilling use of the internet and anonymous speech. *See, e.g.*, *Cornelio,* 32 F.4th at 166; *Harris*, 772 F.3d at 572; *Doe 1 v. Marshall,* 367 F. Supp. 3d 1310, 1329

(M.D. Ala. 2019); *White v. Baker,* 696 F. Supp. 2d 1289, 1310–11 (N.D. Ga. 2010).

For example, earlier this year, the Second Circuit found that requiring registrants to disclose internet identifiers burdened their ability to speak on the internet, singled out those engaged in expressive activity, and prevented registrants from speaking online anonymously—all forbidden by the First Amendment. *Cornelio*, 32 F.4th at 166–69. At issue was a Connecticut law which—like SORA 2021—required registrants to disclose email addresses, instant messenger addresses, and other internet identifiers. *Id.* at 166. The Second Circuit found that Connecticut's law burdens speech by requiring reporting "precisely when a registrant decides to engage in online speech using a communication identifier," and thus "plausibly deters registrants from engaging in protected online speech." *Id.* at 169 (citing *Zieper v. Metzinger*, 474 F.3d 60, 65 (2d Cir. 2007) (government action that falls short of prohibiting speech may still have chilling effect)); *accord Harris*, 772 F.3d at 573 (conditioning speech on written reporting of internet identifier imposes substantial burden on speech). The *Cornelio* court was further troubled by the law's chilling effect on anonymous speech, which is as protected online as in other fora. 32 F.4th at 169–170; *accord Harris*, 772 F.3d at 574 (same). The court found that Connecticut had failed to show that the purported government interests behind the disclosure requirement satisfied even intermediate scrutiny, and therefore declined to decide whether a higher standard applied. *Id.* at 170–71. (Because the internet-reporting requirement

60

is a speaker-based burden on speech, as well as for the reasons set out in Plaintiffs'
preliminary injunction brief, ECF No. 7, PageID.922–29, strict scrutiny applies here.
Defendants concede as much. ECF No. 41, PageID.1343, 1347–49.)

Defendants do not address this caselaw, nor do Defendants identify a com-
pelling government interest, let alone one sufficient to justify the heavy burden
imposed. And Defendants do not attempt to show that the law is narrowly tailored.
Moreover, nothing here demonstrates "that the disclosure requirement materially
provides deterrence" against sexual offending, and "[a] developed record may
undermine" any assertion by Defendants to the contrary. *Cornelio*, 32 F.4th at 174.

Instead, Defendants focus on overbreadth, apparently hoping that the Court—
instead of requiring the government to justify its restrictions—will shift the burden
to the Plaintiffs. ECF No. 41, PageID.1351. Overbreadth is the wrong doctrinal
framework. This is not a case where a speech-restricting law has a plainly legitimate
sweep, or one where someone whose own speech may validly be proscribed is chal-
lenging a law based on its unconstitutional effects on others. *See Connection Distrib.
Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (purpose of overbreadth challenge
is "to permit the claimant to strike the law in its entirety based on its application to
other individuals not before the court"). Rather, the gravamen of Plaintiffs' claim is
that SORA 2021's reporting requirements unconstitutionally burden *their* protected
speech. ECF No. 1, PageID.125–132, 182–184. It is Defendants' burden to show

those burdens are constitutional. *Cornelio*, 32 F.4th at 171.

But even if one uses an overbreadth analysis, Plaintiffs have plausibly alleged that SORA 2021's internet reporting requirements are overbroad and chill a substantial amount of protected speech. *See Cornelio*, 32 F.4th at 175 (internet reporting requirement overbroad because it applied to registrants who had never engaged in illicit online activity and required reporting of all internet identifiers); *Harris*, 772 F.3d at 578 (internet reporting requirement overbroad). In other words, Plaintiffs have plausibly alleged that "the risk exists that, if left on the books, the statute would chill a substantial amount of activity protected by the First Amendment." *Speet v. Schuette*, 726 F.3d 867, 878 (6th Cir. 2013).

Factually, Defendants dispute that registrants' e-mail addresses and internet identifiers could become publicly available (an argument that goes only to anonymity, but not to the burden of reporting). Defendants overlook not only that factual disputes must be resolved in Plaintiffs' favor, but also that SORA 2021 permits what the old SORA had prohibited—registrants' email and instant message addresses *can* now be publicly posted on the online registry. *Compare* 2020 Mich. Pub. Act 295, § 8(3), *with* 2011 Mich. Pub. Act 18, § 8(3)(e). Defendants offer no explanation for this change, and nothing prevents Michigan from posting internet information at any time. This fact alone distinguishes SORA 2021 from the Utah statute upheld in *Doe v. Shurtleff*, 628 F.3d 1217 (10th Cir. 2010). *See Cornelio*, 32 F.4th at 176 & n.11

(finding the Tenth Circuit's decision "inapposite," because the Utah statute, which was challenged as chilling anonymous speech, permitted sharing only among law-enforcement agencies and only for law-enforcement purposes). The caselaw rejects Defendants' argument that because disclosure is made to the government, not direct-ly to the public, there is no impact on speech. *Id.* at 169–70 ("disclosure requirement . . . risks chilling online speech, anonymous and otherwise").

Defendants also incorrectly claim that federal regulations bar states from posting such information. They do not. The federal regulations either govern what the federal government itself can post or are non-binding guidelines for states seek-ing federal funding. *See* Sections I.E.1, XII.B (explaining relationship between federal and state registry laws). Registrants thus reasonably fear that their identifiers will become publicly available and they will not be able to speak anonymously. That fear produces an impermissible chilling effect. *See*, *e.g.*, *Harris*, 772 F.3d at 581 ("fear of disclosure in and of itself chills [registrants'] speech").

Finally, Defendants' suggestion that Plaintiffs have not adequately pled any chilling effects is hard to square with the complaint. The complaint contains para-graph after paragraph alleging particular instances in which class members were either afraid to use the internet to speak or associate with others, or had to stop using the internet, both because the reporting requirement imposes a significant burden (three-day reporting) whenever they create a new identifier, and because of the fear

of intimidation and harassment that would result if they are unable to speak anonymously. ECF No. 1, PageID.125–132 (alleging multiple, detailed examples of registrants who avoid the internet or must use it with fear).

At most, Defendants' arguments raise factual disputes that cannot be resolved at the pleadings stage. Dismissal of a First Amendment claim "will rarely, if ever, be appropriate at the pleading stage. Instead, factual development will likely be indispensable to the assessment of whether [such a law] is constitutionally permissible." *Cornelio*, 32 F.4th at 172.

## XI.   THE STATUTE OF LIMITATIONS DOES NOT INSULATE SORA 2021 FROM CONSTITUTIONAL SCRUTINY.

Plaintiffs' claims are timely. Defendants' arguments to the contrary cannot be seriously entertained, both because the harms caused by SORA are ongoing and because Plaintiffs filed suit less than a year after SORA 2021 was enacted.

### A.   Statutes of Limitations Do Not Bar Claims Challenging Ongoing Violations of Constitutional Rights.

A statute-of-limitations period runs from "the last asserted occurrence" of a challenged practice. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 (1982). Each wrongful act "starts a new clock," even if related wrongful acts also occurred outside the limitations period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also Wallace v. Kato*, 549 U.S. 384, 391 (2007) (limitations period for wrongful imprisonment claim began when detention ended); *Klehr v. A.O. Smith*

*Corp.*, 521 U.S. 179, 189 (1997) (each sale in price-fixing conspiracy "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times" (cleaned up)).

Thus, "[a] law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within" the first few years of its enactment. *Kuhnle Bros. v. Cnty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997); *see also Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989); *Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U*, 46 F.3d 682, 686 (7th Cir. 1995); *Maldonado v. Harris*, 370 F.3d 945, 955–56 (9th Cir. 2004). "When the continued enforcement of a statute inflicts a continuing or repeated harm, a new claim arises (and a new limitations period commences) with each new injury." *Flynt v. Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019).

In *Kuhnle*, the Sixth Circuit held that a plaintiff who challenged an ordinance banning truck travel "suffered a new deprivation of constitutional rights every day that [the ordinance] remained in effect," and therefore "'a new limitations period began to run each day. . . .'" 103 F.3d at 522–23. Here, too, Plaintiffs suffer a new deprivation each day they are subjected to punishment or are compelled—under threat of prosecution—to register for life or are held out as sex offenders even if they never committed a sex offense. *See* ECF No. 1, PageID.171–193. It is the enforce-

65

ment, or threat thereof, of an allegedly unconstitutional law *in the present* that creates the injury. *See Flynt*, 940 F.3d at 462–63 & n.4.

Statutes of limitations are much more relevant to damages cases than to cases seeking prospective relief. Thus, in *Kuhnle*, the plaintiff had a claim because the government's ongoing enforcement reset the limitations period anew each day, but damages were limited to the two-year limitations period. 103 F.3d at 522–23. By contrast, where—as here—Plaintiffs seek only prospective relief based on the "realistic threat of future enforcement" of an unconstitutional statute, there is no statute-of-limitations issue. *Flynt*, 940 F.3d at 464; *see also Leal v. Azar*, 2020 WL 7672177, at *7 (N.D. Tex. Dec. 23, 2020) (statutes of limitations "are simply inapplicable" to suits for prospective relief against ongoing harm).

The Georgia Supreme Court's decision in *Gardei v. Conway*, 868 S.E.2d 775, 782 (Ga. 2022), holding that a constitutional challenge to an annual sex offender registration requirement was timely, is directly on point. The court explained that "each time [the registrant] was required to register in violation of his rights"—subjecting him to a new felony prosecution if he failed to comply—"extended the allegedly illegal consequences of registration for another year and resulted in a new wrongful act, a new injury, and the accrual of a new cause of action." *Id.* at 781. Because the plaintiff sought "a determination only as to whether he is required to comply with the [statute] in the future," there was no statute-of-limitations issue. *Id.*

*Gardei* is more persuasive than the unpublished *Doe v. Rausch* decision on which Defendants rely. 2022 WL 481240 (M.D. Tenn. Feb. 16, 2022). *Rausch* correctly acknowledged that several claims, including an ex post facto claim, were timely because they sought prospective relief against punishment and challenged aspects of the law that exposed the plaintiff to ongoing criminal liability for future conduct. *Id.* at *3. *Rausch* only found untimely a due process claim "directed at the original imposition of SORA's requirements." *Id.* Defendants here try to frame Plaintiffs' retroactive imposition of lifetime registration claim, violation of plea agreements claim, and non-sex-offense claim as directed at the original imposition of registration, and therefore time-barred. *See* ECF No. 41, PageID.1374–1375. These claims, however, are all directed "at the ongoing effects of the statutory scheme." *Rausch*, 2022 WL 481240, *3. The retroactive imposition of lifetime registration claim attacks the ongoing "extensive burdens" and harsh consequences imposed by SORA 2021 today and every day in the future until death. ECF No. 1, PageID.173–174. Similarly, the violation of plea agreements claim focuses on "the burdens that SORA 2021 imposes" on an ongoing basis for the rest of one's life. *Id.*, PageID.185–186. And the core injury for the non-sex-offense claim is the ongoing public branding as sex offenders of people who never committed a sexual offense. *Id.*, PageID.186. Because the harm for these claims accrues anew each day and inheres in the ongoing enforcement of SORA 2021, these claims are not time-barred.

On Defendants' theory, the courthouse doors are closed to people who are subject to prosecution unless they comply with a longstanding but unconstitutional criminal law. Rosa Parks would have been foreclosed from challenging the bus ordinance because she had endured it for years. And any challenge to Michigan's 1931 law criminalizing abortion would have had to been brought within the first few years of its enactment. *See* M.C.L. § 750.14. That is nonsense. Courts routinely hear challenges to criminal laws that were adopted long ago, *see, e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014); *Wooley v. Maynard*, 430 U.S. 705 (1977), and "[i]t is not necessary that [a person] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights," *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Plaintiffs' claims are therefore timely.

### B. Plaintiffs Brought This Action Within Three Years of the Effective Date of SORA 2021.

Even if a statute of limitations could bar claims for prospective relief against continued enforcement of an unconstitutional law, Plaintiffs' claims would be timely. The new SORA went into effect on March 24, 2021. *See* 2020 Mich. Pub. Act 295. Plaintiffs filed this action less than a year later, on February 2, 2022. Compl., R. 1. The *earliest date* the limitations period begins to run is from the effective date of a challenged law or policy. *See*, *e.g.*, *Kuhnle*, 103 F.3d at 521; *Waltower v. Kaiser*, 17 F. App'x 738, 740 (10th Cir. 2001); *Catawba Indian Tribe of S.C. v. United*

*States*, 982 F.2d 1564, 1569–71 (Fed. Cir. 1993); *cf. Hill v. Snyder*, 821 F.3d 763, 771 (6th Cir. 2016) (vacating order dismissing some plaintiffs' claims as untimely, because statute had since been amended and challenge would be to the new law).

Here that rule is apt because the old SORA has been permanently enjoined. If SORA 2021 had not gone into effect, pre-2011 registrants would have **no** obligation to register and post-2011 registrants would only have to comply with part of the old SORA. *Does II*, 16-cv-13137, ECF No. 126. Moreover, SORA's many amendments over the last two decades have repeatedly changed registrants' obligations. ECF No. 1, PageID.36–40. Although the 2021 statute incorporates the 2011 amendments, it also imposes additional burdens, such as an annual fee added in 2013, and more extensive reporting requirements added in 2021. *See* 2013 Mich. Pub. Act 149; ECF No. 1, PageID.52, 135–150. Plaintiffs' challenge is based on the burdens imposed by *this* statute, not those imposed by an earlier statute that was enjoined.

Take John Doe A, for example. When he pled guilty to his non-sex-offense in 1991, there was no registry. *Id.*, PageID.161. While he was in custody, Michigan passed its first registry statute. 1994 Mich. Pub. Act 295. The requirement that he register for his kidnapping offense was added in 1999—a time when the registry was very different. 1999 Mich. Pub. Act 85, § 2(d)(v). When John Doe A was released from custody in 2009, he had to comply with the statute in effect then, which had been amended several more times. *See* ECF No. 1, PageID.38–39. Under the 2011

amendments, he was classified as a tier III registrant and subjected to extensive, in-person reporting requirements, and in 2013 he was required to pay an annual fee. *Id.*, PageID.14, 39; 2013 Mich. Pub. Act 149. Under the final *Does I* judgment he was removed from the public registry and subject to only basic reporting require-ments for 25 years. ECF No. 1, PageID.14–15, 39. With SORA 2021, his obligations have changed once again. He must register for life, comply with the more extensive reporting requirements, and is branded as a sex offender at a time when the conse-quences of having that designation on the internet have increased exponentially. *Id.*, PageID.15, 82–89; ECF No. 1-10. On Defendants' theory, Doe A should have brought his claim within three years of the 1999 law. But the harms he suffers today are different from those in 1999. Because Plaintiffs' claims focus on the registry's cumulative burdens, one cannot tie the limitations period to the initial effective date of any particular provision. One must look to the effective date of SORA 2021.

## XII.  DEFENDANTS' MOOTNESS ARGUMENT IS MERITLESS AND REFLECTS A MISUNDERSTANDING OF THE RELATIONSHIP BETWEEN FEDERAL AND STATE REGISTRY LAWS.

To demonstrate that a live controversy exists, Plaintiffs need only identify an actual injury that can be redressed by the relief sought. *Harmon v. Holder*, 758 F.3d 728, 733 (6th Cir. 2014); *see United States v. Juv. Male*, 560 U.S. 558, 560 (2010) (per curiam) (to defeat mootness, all registrant needed to show was that a favorable decision would reduce his registration obligations). Defendants argue that this case

is moot because even if Plaintiffs prevail in challenging SORA, they still must comply with SORNA. This argument is wrong because (1) SORNA's federal jurisdiction requirement means that SORA applies to more people than SORNA; (2) state registry schemes determine what a registrant is required to do under SORNA; and (3) SORA and SORNA have different requirements, *see* Section I.E.3.

### A.    SORNA's Federal Jurisdiction Requirement Means SORA Applies to More People Than SORNA.

SORNA requires a federal nexus because

> Persons convicted . . . under state law who fail to register in their State of conviction would otherwise be subject to federal prosecution under § 2250 even if they had not left the State after being convicted—an illogical result given the absence of any obvious federal interest in punishing such state offenders.

*Carr*, 560 U.S. at 446. There is "federal criminal liability only when . . . [registrants] use the channels of interstate commerce in evading a State's reach," *id.* at 452, or have a federal/tribal conviction, 18 U.S.C. § 2250(a)(2)(A). Thus, registrants who simply live in Michigan and have Michigan convictions cannot be prosecuted under SORNA. *See* 18 U.S.C. § 2250.

Ignoring the federal jurisdictional requirement, Defendants argue that under *Willman*, 972 F.3d 819, SORNA applies to all registrants. The question in *Willman* was whether a person can have SORNA obligations even if he did not have to register under state law. *Id.* at 824. The court rejected Willman's argument that because he did not have to register in Michigan, SORNA could not apply to him at all.

Instead, the court read SORNA as applicable to persons who meet SORNA's definition of a "sex offender," regardless of whether they are required to register in their state. *Id.* at 823. But *Willman* in no way suggested that SORNA can apply absent federal jurisdiction. Indeed, *Willman* cited both the provision predicating liability on traveling in interstate commerce and cases holding the same. *Id.* at 823. What *Willman* means is that if Mr. Willman moves in interstate commerce, SORNA requires him to register even though he need not register in Michigan. But if he stays here, he cannot be prosecuted because there would be no federal jurisdiction.

### B.  State Registry Schemes Determine What a Registrant Is Required to Do Under SORNA.

Because there is no federal system, it is Michigan's scheme that determines what Michigan registrants must do under both SORA and SORNA. Whether a registrant can be prosecuted under SORNA turns on what Michigan requires.

### 1.  States Can Decide Whether to Have SORNA-Congruent Registries.

Most state registries diverge dramatically from SORNA, and registrants have no way to comply with any SORNA requirements that are not mirrored in state law. Congress' effort to incentivize states to adopt SORNA-based laws has largely failed. Thirty-two states have rejected SORNA, even though they lose some federal funds. ECF No. 1, PageID.153–154.[11] Although all states have registries, they vary greatly

---

[11] Only 18 states are "substantially compliant"—which is the floor for federal

in terms of who must register, for how long, how often registrants must report, what information they must report, whether registration is public, and whether risk assessments are used. Because states are free to adopt their own registration schemes, the "requirements of SORNA may or may not overlap" with state law. *Felts*, 674 F.3d at 604. While Michigan is among the minority of states that are "substantially compliant" with SORNA, SORA still differs from SORNA. *See* Section I.E.3. If the Court grants the requested relief, SORA would simply differ more, and would also be more like registries in the many non-SORNA-congruent states.

### 2. The Lack of a Federal Registration System Means that Criminal Liability Under SORNA Turns on the Extent to Which State Law Overlaps with Federal Law.

As the Supreme Court has noted, "as far as we can tell, while SORNA punishes violations of its requirements (instead of violations of state law), the Federal Government has prosecuted a sex offender for violating SORNA only when that offender also violated state-registration requirements." *Kebodeaux*, 570 U.S. at 398. Registrants are not liable under SORNA if they cannot comply with SORNA requirements that differ from state requirements and state registration is pursuant to state law. 86 Fed. Reg. 69868 (citing 18 U.S.C. § 2250(c)); *id.* at 69887 (providing example that registrant would have defense where he cannot register because state

---

funding. ECF No. 1, PageID.153–154. At least 13 of those 18 states deviate from SORNA's retroactivity guidelines. *See* Department of Justice Substantial Implementation Reviews, SMART, https://www.smart.gov/sorna-map.htm.

does not register people with his offense); *cf. Willman*, 972 F.3d at 823.

People who need not register under SORA but are theoretically required to register under SORNA have no way to register. In *Felts*, 674 F.3d 599, the Sixth Circuit specifically recognized that registrants can register only pursuant to state schemes and that there could be "circumstances where an inconsistency between federal and non-[SORNA-congruent] state regimes would render it impractical, or even impossible, for an offender to register under federal law." *Id.* at 605. For example, SORNA requires people convicted of gay sex with a person under 18 to register for life, whereas SORA requires them to register for 25 years. *See* Department of Justice, *SORNA Substantial Implementation Review State of Michigan*, at 2 (May 9, 2011), smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/michigan.pdf. After year 25, there is no way for such a person to register in Michigan.

Defendants' mootness argument makes no sense because Michigan already has a registration scheme that differs significantly from SORNA, and could, like the majority of states, have a registration scheme that differs radically from SORNA. That could happen through legislative reform or judicial decision. For example, if the Court prohibits retroactive enforcement against pre-2011 registrants absent individual review, then Michigan would diverge from SORNA in that way, just like other states that already have individual review. Far from being moot, this is a case where the Court can not only redress injuries, but can grant transformative relief.

## CONCLUSION

Defendants' motion to dismiss should be denied.


Respectfully submitted,

s/ Miriam J. Aukerman (P63165)
Rohit Rajan (AZ 035023)
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org
rrajan@aclumich.org

s/ Paul D. Reingold (P27594)
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
Univ. of Michigan Law School
802 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109-1215
(734) 355-0319
pdr@umich.edu

s/ Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

s/ Roshna Bala Keen (Ill. 6284469)
Loevy & Loevy
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
roshna@loevy.com

Counsel for Plaintiffs

Dated: July 18, 2022

## LOCAL RULE CERTIFICATION

I, Rohit Rajan, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted material and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 points (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

s/ Rohit Rajan (AZ 035023)
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
rrajan@aclumich.org
