UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE, on behalf
of themselves and all others similarly
situated,                                            No. 2:22-cv-10209

    Plaintiffs,                              HON. MARK GOLDSMITH

v                                                    MAG. CURTIS IVY, JR.

GRETCHEN WHITMER, Governor of
the State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their individual capacities,

    Defendants.

---

**DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO THE MOTION
TO DISMISS**

**EXHIBIT A**

No. 19-2405

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

M.S. WILLMAN,
Plaintiff-Appellant,

v.

U.S. ATTORNEY GENERAL,
Defendant-Appellee.

_____

On Appeal from the U.S. District Court for the Eastern District of Michigan

_____

**AMICUS CURIAE BRIEF**
**OF THE AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN**
**IN SUPPORT OF PLAINTIFF-APPELLANT AND FOR AFFIRMANCE OF**
**DISMISSAL ON ALTERNATIVE GROUNDS**

_____

Miriam J. Aukerman
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy St. SE, Ste. 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org

Daniel S. Korobkin
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

Paul D. Reingold
Cooperating Attorney, American Civil
  Liberties Union Fund of Michigan
363 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 763-4319
pdr@umich.edu

*Counsel for Amicus*

March 3, 2020

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 19-2405 _____          Case Name: M. Willman v. U.S. Attorney General ____

Name of counsel: Miriam J. Aukerman _____

Pursuant to 6th Cir. R. 26.1, American Civil Liberties Union of Michigan _____
*Name of Party*

makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the
        identity of the parent corporation or affiliate and the relationship between it and the named
        party:

> No

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
        in the outcome? If yes, list the identity of such corporation and the nature of the financial
        interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on_____ March 3, 2020 _____the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Miriam J. Aukerman _____
1514 Wealthy Street SE, Suite 260
Grand Rapids, MI 49506 _____

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTEREST OF AMICUS CURIAE ....................................1

INTRODUCTION .............................................................................2

I.    MICHIGAN MUST MAKE POLICY CHOICES ABOUT WHAT
      REGISTRATION SCHEME IT WANTS, CONSISTENT WITH
      FEDERAL AND STATE CONSTITUTIONAL LIMITS. .....................4

      A.    The *Does I* and *Does II* Litigation ...............................4

      B.    The Michigan Supreme Court Litigation....................................6

      C.    The Future of Michigan's Registry ............................................7

II.   BECAUSE WILLMAN DOES NOT HAVE A FEDERAL
      CONVICTION AND HAS NOT TRAVELED IN INTERSTATE
      COMMERCE, SORNA IS INAPPLICABLE. .......................................10

III.  UNDER SORNA, A PERSON'S REGISTRATION
      OBLIGATIONS ARE DETERMINED BY THE LAW OF THE
      JURISDICTION IN WHICH THE PERSON LIVES, WORKS,
      OR STUDIES. .........................................................................14

      A.    Most States Do Not Have SORNA-Complaint Statutes and
            Even "SORNA-Compliant" States Do Not Require
            Registration of Everyone Whose Registration Is
            Contemplated Under SORNA. .................................................15

      B.    Because There Is No Mechanism to Register Solely for
            Federal Purposes, SORNA Requires Compliance With
            State Registration Schemes.......................................................19

CONCLUSION .................................................................................27

CERTIFICATE OF COMPLIANCE .................................................29

CERTIFICATE OF SERVICE.............................................................30

ii

# TABLE OF AUTHORITIES

**Cases**

*Carr v. United States*, 560 U.S. 438 (2010) .......................................................... passim

*Dept. of Pub. Safety & Corr. Servs. v. Doe*, 94 A.3d 791 (Md. 2014) ..................... 20

*Doe v. Curran*, No. 18-11935, 2020 WL 127951 (E.D. Mich. Jan. 10, 2020) ........... 5

*Does #1-5 v. Snyder* (*Does I*), 834 F.3d 696 (6th Cir. 2016), *reh. denied* (2016), *cert. denied*, 138 S. Ct. 55 (2017) ................................................................... 1, 2, 5, 8

*Does #1-5 v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015) ................................... 5

*Does #1-5 v. Snyder*, 101 F. Supp. 3d 722 (E.D. Mich. 2015) ................................... 5

*Does #1-6 v. Snyder* (*Does II*), No. 2:16-cv-13137 (E.D. Mich.) ........................... 1, 6

*Does v. Snyder*, 932 F. Supp. 2d 803 (E.D. Mich. 2013) ........................................... 5

*Kennedy v. Allera*, 612 F.3d 261 (4th Cir. 2010) ..................................................... 14

*Nichols v. United States*, 136 S. Ct. 113 (2016) ................................................. 23, 24

*People v. Betts*, 928 N.W.2d 699 (Mich. 2019) ......................................................... 6

*Printz v. United States*, 521 U.S. 898 (1997) .......................................................... 25

*Reynolds v. United States*, 565 U.S. 432 (2012) ................................................. 13, 19

*Roe v. Snyder*, 240 F. Supp. 3d 697 (E.D. Mich. 2017) ............................................. 5

*Smith v. Doe*, 538 U.S. 84 (2003) ....................................................................... 2, 21

*Snyder v. Does #1-5*, 138 S. Ct. 55 (2017) ............................................................... 5

*State v. Williams*, 952 N.E.2d 1108 (Ohio 2011) .................................................... 16

*United States v. Billiot*, 785 F.3d 1266 (8th Cir. 2015) ........................................... 14

*United States v. Brown*, 586 F.3d 1342 (11th Cir. 2009) ......................................... 24

*United States v. Coleman*, 675 F.3d 615 (6th Cir. 2012) ......................................... 13

*United States v. Felts*, 674 F.3d 599 (6th Cir. 2012) ............................................ 9, 24

*United States v. Kebodeaux*, 570 U.S. 387 (2013) ....................................... 11, 15, 23

*United States v. Paul*, 718 F. App'x 360 (6th Cir. 2017) ............................... 4, 13, 25

*United States v. Pendleton*, 636 F.3d 78 (3d Cir. 2011) ........................................... 14

*United States v. Whaley*, 577 F.3d 254 (5th Cir. 2009) ............................................ 13

## Statutes

18 U.S.C. § 2250 ..................................................................................................... passim

34 U.S.C. § 20901 ............................................................................................................ 3

34 U.S.C. § 20911 ..................................................................................................... 21, 22

34 U.S.C. § 20912(a) ..................................................................................................... 20

34 U.S.C. § 20913 ..................................................................................................... passim

34 U.S.C. § 20914 ......................................................................................................... 20

34 U.S.C. § 20915 ......................................................................................................... 20

34 U.S.C. § 20916(a) ..................................................................................................... 22

34 U.S.C. § 20918 ..................................................................................................... 20, 22

34 U.S.C. § 20919(a) ..................................................................................................... 20

34 U.S.C. § 20922 ......................................................................................................... 20

34 U.S.C. § 20926 ......................................................................................................... 20

34 U.S.C. § 20927 ..................................................................................................... 8, 15, 20

42 U.S.C. §16901 ............................................................................................................ 3

Ariz. Rev. Stat. Ann. § 13-3825 (2016) ........................................................................ 17

Ark. Code Ann. § 12-12-917 (2016) .............................................................................. 17

Cal. Penal Code § 290.04 (West 2017) .......................................................................... 17

Ga. Code Ann. § 42-1-14 (2016) ................................................................................... 17

M.C.L. § 28.722 ............................................................................................................. 22

Mass. Gen. Laws ch. 6, §§ 178C-178Q (2015) ............................................................. 18

Minn. Stat. Ann. § 244.052 (2017) ............................................................................... 18

Mont. Code Ann. § 46-23-509 (2015) ........................................................................... 18

N.D. Cent. Code § 12.1-32-15 (2015) ........................................................................... 18

N.J. Stat. Ann. § 2C:7-8 (West 2016) ........................................................................... 18

N.Y. Correct. Law § 168-l (McKinney 2017) ............................................................... 18

Or. Rev. Stat. §§ 163A.100, 163A.105 (2015) ............................................................. 18

R.I. Gen. Laws § 11-37.1-6 (2016) ............................................................................... 18

Tex. Code Crim. Proc. Ann. art. 62.007 (West 2016) .................................................. 18

Vt. Stat. Ann. tit. 13, § 5411b (2016) ........................................................................... 18

Wash. Rev. Code §§ 72.09.345, 4.24.550 (2017) ..................................................... 18

**Other Authorities**

Andrew J. Harris, Christopher Lobanov-Rostovsky & Jill S. Levenson, *Widening the Net: The Effects of Transitioning to Adam Walsh Act's Federally Mandated Sex Offender Classification Scheme*, 37 CRIMINAL JUSTICE AND BEHAVIOR 503, 504 (2010) ............................................................................... 18

Department of Justice, National Guidelines for Sex Offender Registration and Notification, 11 (July 2008) ............................................................................. 8

Department of Justice, SORNA Substantial Implementation Review State of Tennessee (Sept. 2011) ........................................................................... 16

Freeman, N. J., & Sandler, J. C. (2009), *The Adam Walsh Act: A False Sense of Security or an Effective Public Policy Initiative?*, 21 CRIM. J. POL. REV. 31 (2009) ........................................................................................... 18

Model Penal Code: Sexual Assault and Related Offenses, § 213 (Am. Law Inst. Tentative Draft No. 10, 2019) ............................................................. 7, 17

National Guidelines for Sex Offender Registration and Notification (2008) ........ 8, 25

Prescott & Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J.L. & Econ. 161 (2011) .......................................... 7

Scott, States Find SORNA Non-Compliance Cheaper, Nov. 7, 2011 ....................... 17

Senate Criminal Justice Committee [Texas], Interim Report 14 (Dec. 15, 2010) ..... 17

Zgoba *et al.*, *A Multi-State Recidivism Study Using Static-99R and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act*, (research report submitted to the National Institute of Justice, 2012) ......................................... 18

## STATEMENT OF INTEREST OF AMICUS CURIAE

The American Civil Liberties Union of Michigan (ACLU) is the Michigan affiliate of a nationwide, nonpartisan organization with over 1.5 million members dedicated to protecting fundamental liberties guaranteed by the U.S. Constitution. The ACLU is committed to protecting the constitutional rights of all people, including people convicted of sex offenses.[1]

Attorneys from the ACLU Fund of Michigan and the University of Michigan Clinical Law Program litigated *Does #1-5 v. Snyder* (*Does I*), 834 F.3d 696 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017). *Does I* held that the 2006 and 2011 amendments to Michigan's Sex Offenders Registration Act (SORA) are unconstitutional as applied retroactively. When the Michigan legislature failed to amend SORA to bring it into compliance with *Does I*, the same lawyers (who are also counsel here) brought a class action seeking relief as to the issues on which the *Does I* plaintiffs had prevailed either before the district court or this Court. *See Does #1-6 v. Snyder* (*Does II*), No. 2:16-cv-13137 (E.D. Mich.). Amicus believes that this brief will help the Court understand the broader context of SORA reform in Michigan, as it relates to this case.

---

[1] Amicus states that no party's counsel authored this brief in whole or part, no party or party's counsel contributed money to fund preparing or submitting this brief, and no person other than amicus, its members, or its counsel made monetary contributions to its preparation or submission.

## INTRODUCTION

In August 2016, this Court held that Michigan's SORA imposes punishment:

> A regulatory regime that severely restricts where people can live, work, and "loiter," that categorizes them into tiers ostensibly corresponding to present dangerousness without an individualized assessment thereof, and that requires time-consuming and cumbersome in-person reporting, all supported by—at best—scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe, is something altogether different from and more troubling than Alaska's first-generation registry law [upheld by the Supreme Court in *Smith v. Doe*, 538 U.S. 84 (2003)]. SORA brands registrants as moral lepers solely on the basis of a prior conviction. It consigns them to years, if not a lifetime, of existence on the margins, not only of society, but often...from their own families.

*Does I*, 834 F.3d at 705. The Court held that SORA's 2006 and 2011 amendments cannot be applied retroactively. *Id.* at 706.

After *Does I*, Michigan ignored this Court's decision and continued to subject tens of thousands of people to retroactive punishment. As a result, new plaintiffs filed a class action to ensure that *Does I* would apply to all Michigan registrants, and in February 2020 won a ruling enjoining retroactive application of SORA to pre-2011 registrants. *See Doe v. Snyder*, No. 16-13137, 2020 WL 758232, *13-14 (E.D. Mich. Feb. 14, 2020) (Ex. A). Before the decision in *Does II*, numerous registrants (including Willman) filed individual lawsuits. In Willman's case, the state conceded that the 2006 and 2011 SORA amendments could not be applied retroactively to him. Stipulated Order, R.16, Pg.ID #407. Because Willman's 25-year registration

period under the prior SORA had expired, Michigan determined that Willman is "no longer…subject to any registration or verification requirements" under Michigan law. *Id.*

This appeal arose because, in addition to suing the state defendants, Willman sued the United States Government, challenging the constitutionality of the federal Sex Offender Registration and Notification Act (SORNA), 34 U.S.C. § 20901 *et seq.*[2] Nothing in the complaint suggests Willman was ever convicted of a federal crime, had ever moved between states, or had ever previously been told by federal authorities that he had any obligations under SORNA, much less been threatened with prosecution. Nevertheless, Willman, apparently seeking reassurance that he has no such obligations, preemptively sued the federal government seeking declaratory and injunctive relief, including an order that he be removed from any federal registry.

The government responded not by suggesting Willman lacked standing or that his claims were not ripe, but by arguing that even though Willman need not register under SORA, he has an *independent* obligation to register under SORNA regardless of whether there is a federal nexus. Reply, R.22, Pg.ID#554-60. Thus, Willman, having decided to raise his fears of a SORNA prosecution, suddenly found his fears confirmed. The district court, relying on *United States v. Paul*, 718 F. App'x 360

---

[2] SORNA was previously codified at 42 U.S.C. §16901.

(6th Cir. 2017), held that SORNA requires Willman to register, and on that basis granted the government's motion to dismiss Willman's lawsuit. Opinion, R.23, Pg.ID#567.

There are two main questions on appeal: (1) whether Willman, who has no federal conviction and no interstate travel, is subject to SORNA in the absence of any predicate for federal jurisdiction; and (2) whether Willman must register under SORNA when he has no state-law obligation to register and there is no SORNA-only registration mechanism. Because the answer to the first question is clearly no, the Court need not reach the second question, nor address any of Willman's assorted constitutional challenges. While amicus supports Willman's position that SORNA liability requires both a federal nexus and an underlying violation of a state registration law, amicus believes that the cleanest way for this Court to resolve the appeal is to affirm the dismissal on alternative grounds: unless or until Willman moves in interstate commerce, his claims are not ripe.

## ARGUMENT

## I. MICHIGAN MUST MAKE POLICY CHOICES ABOUT WHAT REGISTRATION SCHEME IT WANTS, CONSISTENT WITH FEDERAL AND STATE CONSTITUTIONAL LIMITS.

### A. The *Does I* and *Does II* Litigation

The context in Michigan is important. In 2011, Michigan rewrote its SORA to implement SORNA, which conditions a state's receipt of certain federal funds on

the state's willingness to adopt SORNA-based standards in its state registration scheme. Mich. Pub. Acts 17, 18 (2011). The following year, five Michigan registrants challenged SORA. The district court dismissed plaintiffs' ex post facto claim, *Does v. Snyder*, 932 F. Supp. 2d 803 (E.D. Mich. 2013), but held that parts of SORA are unconstitutionally vague or violate the First Amendment, and that registrants cannot be held strictly liable for unintentional violations. *Does #1-5 v. Snyder*, 101 F. Supp. 3d 672, 713-14; 101 F. Supp. 3d 722, 730 (E.D. Mich. 2015).

On appeal, this Court held that successive amendments have made SORA punitive and that "[t]he retroactive application of SORA's 2006 and 2011 amendments to Plaintiffs is unconstitutional, and it must therefore cease." *Does I*, 834 F.3d at 705-06. The Court declined to reach the district court's rulings that other aspects of SORA are unconstitutional, but noted that "Plaintiffs' arguments on these other issues are far from frivolous and involve matters of great public importance." *Id.* The Supreme Court denied the state's petition for certiorari. *Snyder v. Does #1-5*, 138 S. Ct. 55 (2017).

Michigan did not amend SORA to correct the constitutional deficiencies and law enforcement continued to enforce the unconstitutional provisions. *See, e.g., Roe v. Snyder*, 240 F. Supp. 3d 697 (E.D. Mich. 2017) (granting injunction to plaintiff threatened with prosecution under a provision held unconstitutional in *Does I*); *Doe v. Curran*, No. 18-11935, 2020 WL 127951, at *8 (E.D. Mich. Jan. 10, 2020) (same).

New plaintiffs then filed a class action. *Does #1-6 v. Snyder* (*Does II*), No. 2:16-cv-13137 (E.D. Mich.). The court certified a primary class comprising all registrants, and two subclasses comprising pre-2006 and pre-2011 registrants. The court repeatedly deferred decision to allow the legislature time to act, but it failed to do so. In May 2019, the court entered a declaratory judgment, holding that retroactive application of SORA's 2006 and 2011 amendments violates the Ex Post Facto Clause, but delayed injunctive relief to allow for legislative action. On February 14, 2020, after it became clear that the legislature would not act, the district court enjoined enforcement of SORA against pre-2011 registrants, and enjoined enforcement of SORA's geographic exclusion zones, strict liability provisions, and certain reporting requirements against all registrants. *Does II*, 2020 WL 758232, \*13-14. The court delayed the judgment's effective date until mid-May to give the legislature one last chance to revise SORA. *Id.* at \*13.

### B. The Michigan Supreme Court Litigation

In *People v. Betts*, 928 N.W.2d 699 (Mich. 2019), a criminal appeal, the Michigan Supreme Court has ordered briefing on whether SORA violates the Ex Post Facto Clauses of the Michigan or U.S. Constitutions, and on related questions of remedy. Because the defendant challenged retroactive application not only of the 2006 and 2011 amendments but also of earlier amendments, the Court could invalidate additional SORA provisions. Oral argument is scheduled for early April.

## C.     The Future of Michigan's Registry

Michigan is facing major registry changes, regardless of whether it amends SORA or simply allows the *Does II* injunctions (and any future Michigan Supreme Court orders) to take effect. Going forward, Michigan might prefer to invest scarce tax dollars into more effective programs focused on prevention, given that modern research shows registries are ineffective or even counterproductive.[3] Michigan might adopt a risk-based system, shorten registration terms, choose to de-register children, or make a host of other changes—all policy choices that are Michigan's to make.

Of course, any new law remains subject to constitutional constraints, and must comply with this Court's prohibition on retroactive application of punitive provisions, as well as the district court's decision that other provisions violate due process and the First Amendment, and any limits set by the Michigan Supreme Court. For pre-2011 registrants, Michigan's new law will necessarily diverge from SORNA because, in finding the 2011 amendments punitive, this Court focused on aspects of

---

[3] *See* Prescott & Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J.L. & Econ. 161 (2011). This peer-reviewed study, which analyzed data from 15 states (including Michigan) over approximately ten years, concludes that rather than reducing recidivism, notification laws may well have increased the frequency of sex crimes. *See also* Model Penal Code: Sexual Assault and Related Offenses, § 213 at 225-28 (Am. Law Inst. Tentative Draft No. 10, 2019), available at http://www.thealiadviser.org/sexual-assault/registration-and-notification/ (surveying research) (Ex. B).

SORA that mirror SORNA. Those include the law's lifetime reach; the lack of individualized assessments; the creation of tier classifications that are both unappealable and offense-based rather than risk-based; the requirement that registrants frequently and immediately report a vast array of trivial information; application to registrants without convictions for sex offenses; the serious sanctions for even inadvertent violations; and the lack of any relationship to public safety.[4] *Does I*, 834 F.3d at 698, 702-05.

To be clear, Michigan can still, if it chooses, have a SORNA-compliant registry; it just cannot impose certain SORNA features *retroactively*. Nor will Michigan lose funds. (Of the eighteen states that receive SORNA-contingent funding, at least thirteen deviate from SORNA's retroactivity guidelines.[5] SORNA also specifically provides for continued funding if noncompliance is based on judicial decisions. 34 U.S.C. § 20927(b)(1).[6]) Nor will Michigan's inability to apply certain SORNA

---

[4] *See* National Guidelines for Sex Offender Registration and Notification (2008) https://www.smart.gov/pdfs/final_sornaguidelines.pdf.

[5] DOJ has determined that the following states "substantially implemented SORNA" despite deviating from retroactivity requirements: Alabama, Colorado, Delaware, Florida, Kansas, Louisiana, Nevada, Ohio, Pennsylvania, South Carolina, South Dakota, Tennessee and Wyoming. *See* Department of Justice Substantial Implementation Reviews, SMART, https://www.smart.gov/sorna-map.htm.

[6] Under the DOJ's National Guidelines for Sex Offender Registration and Notification, 11 (July 2008), the federal government "will consider on a case-by-case basis whether jurisdictions' rules or procedures that do not exactly follow the provisions of SORNA or these Guidelines 'substantially' implement SORNA." *See* SMART, www.smart.gov/guidelines.htm.

features retroactively prevent federal authorities from enforcing SORNA against registrants over whom there is federal jurisdiction. As discussed below, such registrants can be prosecuted federally regardless of whether the jurisdiction has implemented SORNA, if they fail to register as required by their jurisdiction.

This Court's decision in *United States v. Felts*, 674 F.3d 599 (6th Cir. 2012), upholding a SORNA conviction against an ex post facto challenge, does not alter the fact that under *Does I*, SORA's 2011 amendments implementing SORNA are punitive and cannot be retroactively applied. The questions in *Felts* and *Does I* were different. Felts was convicted for not registering after moving between states. The issue was whether his two-year sentence retroactively punished his *original* sex offense. This Court rejected the argument that Felts was being sent to prison twice for the same offense, viewing his failure to register as "entirely separate" from the earlier crime: "SORNA provides for a conviction for failing to register; it does not increase the punishment for the past conviction." *Id.* at 606. Thus, *Felts* addressed the question of whether imprisonment for failure to comply with a basic registration requirement punishes a new or old offense. Imprisonment is indisputably punishment, so *Felts* did not address whether the registration standards that SORNA encourages states to adopt are punitive. In *Does I*, this Court *did* find that certain SORNA-based Michigan provisions are punitive.

The upshot is that Michigan's SORA will diverge from SORNA, as to who

must register, for how long, what information they must provide, and when and how they must provide it. The district court's opinion in *Willman*, however, suggested that it may be a federal crime if Michiganders, who have lesser obligations under state law, do not register or provide information contemplated under SORNA, even if there is no federal nexus and no mechanism by which a person can register solely for "federal" purposes, or provide information that the state does not collect. That aspect of the district court's opinion was mistaken.

## II.  BECAUSE WILLMAN DOES NOT HAVE A FEDERAL CONVICTION AND HAS NOT TRAVELED IN INTERSTATE COMMERCE, SORNA IS INAPPLICABLE.

Federal registration law is focused on encouraging states to adopt specific registry standards, and on ensuring that people with federal convictions and registrants who travel in interstate commerce register in their local jurisdictions. When Congress initially set national standards for state registries in 1994, it "did not include any federal criminal liability," but "instead conditioned certain federal funds on States' adoption of 'criminal penalties'" for non-compliance with state registration requirements. *Carr v. United States*, 560 U.S. 438, 452 (2010). "In enacting SORNA, Congress preserved this basic allocation of enforcement responsibilities," *id.* at 453, but also established a new federal offense making it a crime for a person "required to register under [SORNA]" who has a federal conviction or travels in interstate commerce to "knowingly fail[] to register or update a registration as

required by [SORNA]." 18 U.S.C. § 2250.

The goal of the federal penalty provision was not to supplant states' primary role, but to ensure registrants would not "fall through the cracks of a state registration system." *United States v. Kebodeaux*, 570 U.S. 387, 405 (2013) (Alito, J. concurring). SORNA thus provides for federal enforcement against "persons required to register under SORNA over whom the Federal Government has a direct supervisory interest or who threaten the efficacy of the statutory scheme by traveling in interstate commerce." *Carr*, 560 U.S. at 453. SORNA's penalty provision applies only where there is a federal nexus because "[p]ersons convicted…under state law who fail to register in their State of conviction would otherwise be subject to federal prosecution under § 2250 even if they had not left the State after being convicted—an illogical result given the absence of any obvious federal interest in punishing such state offenders." *Id.* at 446. Thus, Congress "chose to handle federal and state sex offenders differently," and subjected registrants "to federal criminal liability only when, after SORNA's enactment, they use the channels of interstate commerce in evading a State's reach." *Id.* at 452.

In Willman's case there is no federal jurisdictional element: he does not have a federal conviction and has not traveled in interstate commerce. 18 U.S.C. § 2250 is inapplicable.

The government argued below that a different provision of SORNA—34

U.S.C. § 20913—imposes an independent federal duty to register where there is no federal nexus. Such a reading is divorced from the plain language of Section 20913 and from SORNA's statutory structure. Congress's concern was to track the movement of registrants through different jurisdictions, which is clear from the text of Section 20913. *See* 34 U.S.C. § 20913(a) (requiring registrant to "register, and keep the registration current, in *each jurisdiction*" where he lives, works, or attends school) (emphasis added); § 20913(c) (focusing on movement of registrants by requiring updating of registration "in at least 1 jurisdiction"); *id.* (requiring *that* jurisdiction to then notify "all other jurisdictions" where the person must register).

Indeed, Section 20913 cannot be read as creating an independent mandate to register since it lacks a federal penalty. Rather, it envisions that *states* would adopt a "State penalty for failure to comply." 34 U.S.C. § 20913(e). If Section 20913(a) imposes a federal obligation to register on *all* people with past sex convictions, how would the federal government enforce this obligation absent a federal penalty provision? The government insists that Willman must register, but if he fails to do so, the federal government has no way to prosecute him since the federal penalty provision does not apply. It is illogical to read Section 20913(a) as creating a requirement that cannot be enforced.

The Supreme Court itself views Section 20913(a) as simply defining the underlying registration obligation that triggers federal criminal liability under 18

U.S.C. § 2250 when a person for whom there is a federal nexus fails to register. *See Reynolds v. United States*, 565 U.S. 432, 435–36 (2012) ("relevant registration requirements" for 18 U.S.C. § 2250 are found in 34 U.S.C. § 20913). Thus, § 20913 is not a "stand alone statute," but "must instead be analyzed in connection with § 2250."

> [W]ithout § 2250, [§ 20913] lacks federal criminal enforcement, and without [§ 20913], § 2250 has no substance….[because] neither [§ 20913] nor any other provision of SORNA creates any federal penalty for failing to register while remaining within a state: a sex offender who does not travel in interstate commerce may ignore SORNA's registration requirements without fear of federal criminal consequences.

*United States v. Whaley*, 577 F.3d 254, 259–60 (5th Cir. 2009).

The district court, in suggesting otherwise, conflated two questions: (1) whether SORNA is applicable absent a federal nexus; and (2) whether SORNA applies where there is a federal nexus, but the individual is not obligated to register under state law. This Court already answered the first question in *United States v. Coleman*, 675 F.3d 615, 620 (6th Cir. 2012), where it held that "the presence of such a jurisdictional element [is] the touchstone of valid congressional use of its Commerce Clause powers to regulate non-commercial activity." The district court thus erred in relying instead on the unpublished decision in *United States v. Paul*, 718 F. App'x 360 (6th Cir. 2017), and out-of-circuit decisions, which in any event all arose as prosecutions under 18 U.S.C. § 2250 in cases involving interstate/international

travel or federal convictions. *See Paul*, 718 Fed. App'x at 362 (registrant moved internationally); *United States v. Billiot*, 785 F.3d 1266, 1268 (8th Cir. 2015) (registrant moved interstate); *United States v. Pendleton*, 636 F.3d 78, 86 (3d Cir. 2011) (registrant moved interstate and internationally); *Kennedy v. Allera*, 612 F.3d 261, 262 (4th Cir. 2010) (federal conviction).

To decide the present case, this Court need only answer the first question: because Willman has no federal conviction and has lived continuously in Michigan, SORNA does not apply. Even if SORNA might become applicable to him at some point in the future (were Willman to relocate to another state, thereby supplying the federal nexus), it does not apply now.

## III.   UNDER SORNA, A PERSON'S REGISTRATION OBLIGATIONS ARE DETERMINED BY THE LAW OF THE JURISDICTION IN WHICH THE PERSON LIVES, WORKS, OR STUDIES.

The absence of a federal nexus is all that is necessary to resolve Willman's case. Amicus believes, however, that the Court would still benefit from a broader understanding of the intersection between state registries and federal SORNA. This is particularly important if the Court were to reach the second question above— whether SORNA applies where there is a federal nexus, but no state-law registration requirement—even though that is unnecessary here.

Two basic features define the relationship between state registration laws and federal SORNA. First, while all states have registries, they vary greatly in terms of

who must register, for how long, what registration requirements apply, and whether registration is based on individualized assessments. *See* Am. Law Inst., *Model Penal Code: Sexual Assault and Related Offense*, Article 213, at 221 (Ex. B). Most registrants live in states where state-law registration requirements differ from those Congress sought to promote via SORNA.

Second, "federal sex-offender registration laws have, from their inception, expressly relied on state-level enforcement." *Carr*, 560 U.S. at 452. Because there is no federal registration mechanism, registrants must report to state authorities pursuant to state registration schemes. Where state registration schemes diverge from SORNA, there is no way for registrants to comply with SORNA-style registration requirements that do not exist in their state.

We discuss each feature in turn.

### A. Most States Do Not Have SORNA-Complaint Statutes and Even "SORNA-Compliant" States Do Not Require Registration of Everyone Whose Registration Is Contemplated Under SORNA.

As noted, SORNA "used Spending Clause grants to encourage States to adopt…uniform definitions and requirements" for state registries. *Kebodeaux*, 570 U.S. at 398. But Congress "did not"—and indeed in our federal system could not— "insist that the States do so." *Id.* Congress' effort to incentivize states to adopt SORNA-based laws largely failed. Thirty-two states have rejected SORNA, even though they lose ten percent of their Byrne Grant funds. 34 U.S.C. § 20927(a). As

of March 2020 (fourteen years after SORNA was passed), the Department of Justice considered only eighteen states to be "substantially compliant"—the level necessary to receive Byrne Grant funding.[7] Even among the "substantially compliant" states, at least thirteen deviate from SORNA's retroactivity guidelines.[8]

In this circuit, Kentucky is not SORNA-compliant.[9] The Department of Justice considers Tennessee's registry to be SORNA-compliant although it differs from SORNA in multiple ways, including in its treatment of child registrants, a two- rather than three-tier structure, reporting frequency, and registration periods.[10] Ohio is also considered SORNA-compliant,[11] but many Ohioans are either not subject to registration or are subject to less extensive requirements than SORNA because the Ohio Supreme Court has ruled multiple aspects of the registry, including retroactive application, to be unconstitutional. *See, e.g.*, *State v. Williams*, 952 N.E.2d 1108 (Ohio 2011).

As the draft of the American Law Institute's model registration law explains,

---

[7] *See* Department of Justice Substantial Implementation Reviews, SMART, https://www.smart.gov/sorna-map.htm.

[8] *See* supra note 8.

[9] *See* SORNA Implementation Status, SMART, https://www.smart.gov/sorna-map.htm.

[10] *See* Department of Justice, SORNA Substantial Implementation Review State of Tennessee (Sept. 2011), https://www.smart.gov/pdfs/sorna/Tennessee.pdf.

[11] *See* SORNA Implementation Status, https://www.smart.gov/sorna-map.htm.

states have rejected SORNA for two reasons. Am. Law Inst., *Model Penal Code*, §

213, at 234–35. First, many states elected not to implement SORNA because the cost

of compliance dwarfs the ten-percent reduction in Byrne Grant funds.[12] For example,

California estimated that complying with SORNA would cost the state at least $38

million, against a loss of just $2.1 million in federal funds.[13] For Texas, comparable

figures were assessed at a cost of $39 million for SORNA compliance, against a loss

of just $1.4 million in federal funds.[14]

Other states expressed concerns over "the potential public safety impacts of

supplanting established risk-based classification systems with a less discriminating

system linked exclusively to conviction offense."[15] Harris et al., *Widening the Net:*

---

[12] *See* Dylan Scott, States Find SORNA Non-Compliance Cheaper, Nov. 7, 2011, http://www.governing.com/blogs/fedwatch/States-Find-SORNA-Non-Compliance-Cheaper.html. In Michigan, the 2019 state Byrne Grant allocation was around $5.6 million, making the 10% penalty about $560,000. *See* Bureau of Justice Assistance Michigan's FY 2019 Byrne Justice Assistance Grant: https://bja.ojp.gov/funding/awards/2019-mu-bx-0061.

[13] California Sex Offender Management Board, Adam Walsh Act Statement of Position 3–4, http://www.opd.ohio.gov/AWA_Information/AWA_CA_SOMB_SORNA_Position_Paper.pdf.

[14] Senate Criminal Justice Committee [Texas], Interim Report 14 (Dec. 15, 2010), http://www.senate.state.tx.us/75r/Senate/commit/c590/c590.Interim Report 81.pdf.

[15] States using risk-based assessments include Arizona, Arkansas, California, Georgia, Massachusetts, Minnesota, Montana, New Jersey, New York, North Dakota, Oregon, Rhode Island, Texas, Vermont, and Washington. *See, e.g.*, Ariz. Rev. Stat. Ann. § 13-3825 (2016); Ark. Code Ann. § 12-12-917 (2016); Cal. Penal Code § 290.04 (West 2017); Ga. Code Ann. § 42-1-14 (2016); Mass. Gen. Laws ch.

*The Effects of Transitioning to Adam Walsh Act's Federally Mandated Sex Offender*

*Classification Scheme*, 37 CRIM. JUST. & BEH. 503, 504 (2010). Research shows that

using risk assessment instruments is far better at predicting recidivism than using

only the offense of conviction (as SORNA does).[16] Moreover, while some "law

enforcement only" registries may slightly reduce recidivism, public offense-based

registries do not—and instead may actually *increase* recidivism.[17] Indeed, in devel-

oping a model registration statute, the American Law Institute has rejected the

"broad, inflexible sweep of collateral-consequence sanctions under federal SORNA"

as "unjust and counterproductive" based on an exhaustive analysis of the research.

Am. Law Inst., *Model Penal Code*, § 213, at 235 (Ex. B).

Finally, registrants, as in Michigan and Ohio, have successfully challenged

SORNA-compliant registration schemes in court, limiting states' abilities to apply

SORNA's onerous requirements retroactively, and raising questions about why they

---

6, §§ 178C-178Q (2015); Minn. Stat. Ann. § 244.052 (2017); Mont. Code Ann. § 46-23-509 (2015); N.J. Stat. Ann. § 2C:7-8 (West 2016); N.Y. Correct. Law § 168-l (McKinney 2017); N.D. Cent. Code § 12.1-32-15 (2015); Or. Rev. Stat. §§ 163A.100, 163A.105 (2015); R.I. Gen. Laws § 11-37.1-6 (2016); Tex. Code Crim. Proc. Ann. art. 62.007 (West 2016); Vt. Stat. Ann. tit. 13, § 5411b (2016); Wash. Rev. Code §§ 72.09.345, 4.24.550 (2017).

[16] *See* Zgoba *et al.*, *A Multi-State Recidivism Study Using Static-99R and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act*, (research report submitted to the National Institute of Justice, 2012); Freeman, N. J., & Sandler, J. C. (2009), *The Adam Walsh Act: A False Sense of Security or an Effective Public Policy Initiative?*, 21 CRIM. J. POL. REV. 31 (2009).

[17] *See* supra note 3.

should be used at all.

In sum, because states have declined to implement SORNA out of concerns for its cost and effectiveness, or because of legal challenges, most registrants are covered by state registration schemes that either are not modeled on SORNA, or that diverge from it. Congress may have hoped SORNA would result in interstate uniformity, but the reality is that registration remains a "patchwork" of local systems. *Reynolds*, 565 U.S. at 435.

**B.    Because There Is No Mechanism to Register Solely for Federal Purposes, SORNA Requires Compliance With State Registration Schemes.**

In passing SORNA, Congress gave "states primary responsibility for supervising and ensuring compliance among state sex offenders." *Carr*, 560 U.S. at 452. SORNA's federal enforcement provision, 18 U.S.C. § 2250, was not "a stand-alone response" to the goal of regulating people with sex offenses, but rather "is embedded in a broader statutory scheme" that seeks to support state registration systems. *Carr*, 560 U.S. at 455.

That scheme, now codified as 34 U.S.C. Subchapter I, incentivizes states to

adopt SORNA[18] and lays out the standards states must employ.[19] But Subchapter I does not include any federal penalty provision.[20] To the contrary, it envisions that SORNA-compliant states will adopt a "State penalty for failure to comply," 34 U.S.C. § 20913(e), demonstrating that Congress wanted state rather than federal enforcement for registration offenses. Thus, Subchapter I is best understood as describing registration standards states must adopt to receive SORNA-contingent funding, plus the mechanisms for coordination and information sharing.[21]

With no federal registration mechanism, registrants report under their state's registration scheme. Pre-SORNA law had required certain individuals to register with the FBI if the state was deemed not to have an adequate registration statute, but "SORNA does not include a similar FBI registration requirement, presumably

---

[18] *See* 34 U.S.C. § 20912(a) ("Each jurisdiction shall maintain a jurisdiction-wide sex offender registry conforming to this subchapter."); § 20926 (establishing time-lines for jurisdictions to comply); § 20927 (establishing financial penalties for jurisdiction's failure to implement SORNA).

[19] *See* 34 U.S.C. § 20914 (describing information to be collected); § 20915 (describing duration of registration terms to be imposed); § 20916(a) (describing Internet reporting standards); § 20918 (describing in-person verification standards); § 20919(a) (establishing that "appropriate official" shall notify registrants of their obligations).

[20] SORNA's federal penalty provision is separately codified as 18 U.S.C. § 2250.

[21] SORNA provides for state registry information to feed into a national registry, 34 U.S.C. § 20922, which "is not in fact a separate registration system, but rather is a compilation of all state registries." *Dept. of Pub. Safety & Corr. Servs. v. Doe*, 94 A.3d 791, 812 (Md. 2014). State authorities alone are "responsible for the accuracy, updating, and removal of this information." *Id*.

because, by the time of the statute's enactment, 'every State … had enacted some' type of registration system." *Carr*, 560 U.S. at 453 n.7 (quoting *Smith*, 538 U.S. at 90). The fact that Congress did not provide any mechanism by which registrants in non-SORNA-compliant states could register federally, demonstrates that Congress understood registrants' liability for SORNA violations to be predicated on a failure to register in accordance with state law.

The plain language of SORNA ties a registrant's obligations to the registrant's jurisdiction: "A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student." 34 U.S.C. § 20913(a). The term "jurisdiction" is defined to include states, territories, and Indian tribes, but **not** the federal government. *Id.* § 20911(10). Thus, SORNA envisions that registrants will register in accordance with their jurisdictions' laws. A registrant who is "register[ing], and keep[ing] the registration current, in each jurisdiction" where he lives, works or studies is not violating federal law simply because he is in a jurisdiction whose registration scheme differs from SORNA's. *Id.* § 20913(a).

An example may clarify the point. Imagine that a non-SORNA-compliant state requires twice-yearly reporting of address, work, and school information. The registrant duly complies with all state-law requirements, thereby "register[ing], and keep[ing] the registration current" in his jurisdiction. 34 U.S.C. § 20913(a). Under

the government's theory of an "independent" federal duty to register, the registrant could be federally prosecuted for failing to report quarterly if considered a "Tier III" offender under SORNA. 34 U.S.C. § 20918(3) But there is no way for a registrant in a non-SORNA-compliant state to know if he is a Tier III offender in the first place since that requires a categorization of state-law Tier III-equivalent offenses, which only occurs when a state implements SORNA. 34 U.S.C. § 20911 (2)–(4). The registrant would also have no notice of any SORNA obligations. And if the registrant did try to provide certain SORNA-required information, such as internet identifiers, 34 U.S.C. § 20916(a), the state registering authority would have no form on which to input such information because the state does not require it.

To be sure, registrants can be federally prosecuted (assuming a federal conviction or interstate travel) if they fail to "register, and keep the registration current, in each jurisdiction" where they work, live, or study—meaning if they violate their jurisdictions' registration requirements. But that *federal* offense is premised on non-compliance with the *state* registration regime.[22] As the Supreme Court has said, "as far as we can tell, while SORNA punishes violations of its requirements (instead of violations of state law), the Federal Government has prosecuted a sex offender for

---

[22] Like other states, Michigan provides that individuals with federal convictions must register. M.C.L. § 28.722(b)(i).

violating SORNA only when that offender also violated state-registration require-
ments." *Kebodeaux*, 570 U.S. at 398. Thus, if a registrant moves into the hypo-
thetical non-SORNA-compliant state described above, and fails to register at all,
federal authorities *can* prosecute. The registrant, by failing to abide by state law, has
also failed to "register, and keep the registration current" under SORNA. 34 U.S.C.
§ 20913(a). It is the registrant's failure to comply with the registration requirements
of the local jurisdiction (coupled with the federal nexus) that forms the basis for
federal criminal liability under 18 U.S.C. § 2250.

Applied here, that means that Willman, who is in compliance with Michigan's
scheme, has no current obligations under SORNA. Should he move to another state
where he *is* required to register, however, he would be subject to federal penalties
under SORNA should he fail to do so.

Understanding registrants' obligations under Section 20913 as reflecting the
registry law of their jurisdiction is consistent with *Nichols v. United States*, 136 S.
Ct. 113 (2016), which notably post-dates many of the cases on which the district
court relied. There, the Supreme Court held that a registrant who had moved from
Kansas to the Philippines did not have an obligation to register under Section 20913
because that obligation turns on what is required in the jurisdiction where the regis-
trant is located. Nichols had no obligation under Section 20913 to register in the
Philippines because it is not a "jurisdiction" within the meaning of SORNA, and had

no obligation to register in Kansas because he was no longer in that jurisdiction. *Id.* at 1117. Thus, under *Nichols*, whether the offender has an obligation under SORNA turns on what is required *in the jurisdiction where the registrant is located*.

This Court in *Felts*, 674 F.3d at 604, similarly recognized that because registrants can only register pursuant to their state's registration scheme, SORNA violations are predicated on non-compliance with that state scheme. Where a state had not implemented SORNA, "an individual may…comply with SORNA's registration requirements by registering through the state's sex offender registry." *Id.* (quoting *United States v. Brown*, 586 F.3d 1342, 1349 (11th Cir. 2009)). In holding that registrants in non-SORNA-compliant states can be prosecuted under SORNA for failing to meet state law registration requirements, this Court recognized that there could be situations "where the requirements under the non-compliant state registry are less onerous than the requirements under SORNA," noting that "precedents from other circuits largely fail to address circumstances where an inconsistency between federal and non-complying state regimes would render it impractical, or even impossible, for an offender to register under federal law." *Id.* at 605. As a result, registrants might "lack fair notice" of any federal law requirements, and states might be unable to process information, leaving the registrants with no way to fulfill any such federal requirements. *Id.* The Court also asked what would happen if a non-implementing state were to require registration for a period less than that mandated by SORNA.

24

*Id.* The Court ultimately concluded, however, that it need not resolve those questions because the defendant (who had traveled interstate) "clearly did not comply with the Tennessee law in effect at the time, which was consistent with SORNA insofar as it provided for and required registration with a registry." *Id.*

In its unpublished opinion in *Paul*, 718 Fed. App'x at 365, this Court suggested that even if Congress could not compel states to accept SORNA's standards,[23] registrants themselves should attempt to comply with those standards to create an affirmative defense against federal prosecution. This reflects a misunderstanding of SORNA as requiring only simple registration. The standards that SORNA recommends for state registries require not just regular verification, but impose frequent, often immediate, in-person reporting requirements whenever registrants experience even minor changes in their information—in many cases for life.[24] Indeed, the costs of collecting all this information on the enormous number of people that SORNA seeks to register (including children, the developmentally disabled, people with non-sex offenses, and youth who successfully complete diversion programs), was a primary reason that so few states adopted SORNA in the first place.

---

[23] Congress cannot, consistent with the Tenth Amendment, commandeer states' resources to force them to collect the vast array of information for the extensive (often lifetime) periods that SORNA contemplates. *See Printz v. United States*, 521 U.S. 898, 935 (1997).

[24] *See* National Guidelines for Sex Offender Registration and Notification, at 26–33, 49–56 (2008), https://www.smart.gov/pdfs/final_sornaguidelines.pdf.

Thus, the question is not just how people can register under SORNA if they are not required to register under state law, but also how people can report the extensive array of information SORNA asks states to collect if states choose to collect less information. In other words, there is no way for registrants to comply with SORNA standards around the frequency of reporting or the types of information to be reported where those requirements exceed state law. It makes no sense that the only way thousands of registrants in non-SORNA-compliant states can avoid federal prosecution is if they show up at local police stations every time they travel, create a new internet identifier, or take an on-line course, just so that they can be turned away because their jurisdiction lacks a mechanism for collecting that information.

In any event, in Michigan, pre-2011 registrants have been turned away by operation of law because Michigan has been enjoined in *Does II* from registering pre-2011 registrants. The Michigan State Police has instructed registering agencies not to accept verification from pre-2011 registrants. *See* MSP Feb. 21, 2020 Memo, Ex. C. There is no mechanism whereby those registrants can register federally.

In sum, SORNA should not be read as supplanting state decisions about who should register or what their obligations should be. States are entitled to make their own decisions. Registrants who do not comply with state registration law, and for whom there is a federal nexus, can be prosecuted under SORNA. But the question of whether they have to register and the details of their registration requirements—

for how many years they must register as well as what information they must report and with what frequency—are governed by state law. And under state law, Willman does not need to register.

## CONCLUSION

The Court should hold that Willman is not presently subject to SORNA because he has not traveled in interstate commerce and does not have a federal conviction. The Court need not reach the second issue. But if it does, the Court should hold that the district court erred in holding that SORNA creates a separate federal duty to comply with SORNA-style registration obligations, rather than merely a duty to fulfill state registry obligations (which can be federally prosecuted if not fulfilled and if there is also a federal nexus).

Although Willman is correct that he cannot currently be prosecuted under SORNA for a failure to register, and the district court erred in suggesting otherwise, that does not require reversal. The Court could affirm on the alternative grounds that Willman's suit is not ripe, as he has neither traveled in interstate commerce nor expressed an intent to do so. If Willman at some point in the future moves to a new jurisdiction that requires him to register, he would then be subject to SORNA. Until then, his constitutional challenges to SORNA are premature.

In sum, the Court should clarify that the district court erred in holding that Willman is subject to SORNA in the absence of a federal nexus, and should affirm

the dismissal of the action on the alternative ground that Willman's claims are therefore not ripe.

Respectfully submitted,

/s/ Miriam J. Aukerman
Miriam J. Aukerman
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy St. SE, Ste. 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org

Daniel S. Korobkin
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

Paul D. Reingold
Cooperating Attorney, American
Civil Liberties Union Fund of
Michigan
362 Legal Research Building 801
Monroe Street
Ann Arbor, MI 48109
(734) 763-4319
pdr@umich.edu

*Counsel for Amicus*

March 3, 2020

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,494 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14-point font.

/s/ Miriam J. Aukerman
Miriam J. Aukerman

March 3, 2020                              Counsel for Amicus

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on March 3, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Miriam J. Aukerman
Miriam J. Aukerman

March 3, 2020                              Counsel for Amicus Curiae

## INDEX OF EXHIBITS

A. *Doe v. Snyder*, No. 16-13137, 2020 WL 758232 (E.D. Mich. Feb. 14, 2020)

B. Model Penal Code: Sexual Assault and Related Offenses, § 213 at 225-28 (Am. Law Inst. Tentative Draft No. 10, 2019)

C. Michigan State Police Feb. 21, 2020 Memo

# Exhibit A:

*Doe v. Snyder*, No. 16-13137,
2020 WL 758232
(E.D. Mich. Feb. 14, 2020)

2020 WL 758232
Only the Westlaw citation is currently available.
United States District Court, E.D. Michigan,
Southern Division.

John DOE, et al., Plaintiffs,
v.
Richard SNYDER, et al., Defendants.

Case No. 16-13137
|
Signed 02/14/2020

**Attorneys and Law Firms**

Daniel S. Korobkin, American Civil Liberties Union Fund of Michigan, Detroit, MI, Miriam J. Aukerman, American Civil Liberties Union of Michigan West Michigan Regional Office, Grand Rapids, MI, Paul D. Reingold, University of Michigan, Ann Arbor, MI, Alyson L. Oliver, Troy, MI, for Plaintiffs.

Adam P. Sadowski, Gallagher Sharp, LLP, Detroit, MI, Joseph T. Froehlich, B. Eric Restuccia, John S. Pallas, Mark E. Donnelly, Jared D. Schultz, Michigan Attorney General, Lansing, MI, for Defendants.

**OPINION AND ORDER GRANTING PLAINTIFFS'
MOTIONS, GRANTING INJUNCTIVE RELIEF,
AND DIRECTING DEFENDANTS TO PROVIDE
NOTICE OF THIS ORDER TO SORA
REGISTRANTS**

ROBERT H. CLELAND, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiffs bring constitutional challenges to Michigan's Sex Offender Registration Act ("SORA") on behalf of a certified class comprised of multiple subclasses. Pending before the court are two motions filed by Plaintiffs. In their first motion, Plaintiffs seek declaratory and injunctive relief on behalf of the subclasses which challenge alleged violations of the ex post facto clause. In their second motion, Plaintiffs seek summary judgment and injunctive relief on behalf of all class members on

their remaining constitutional challenges. Both motions have been fully briefed, and the court held oral argument on February 5, 2020. For the reasons explained below, the court will grant both motions and will enter permanent injunctive relief enjoining Defendants and their agents from enforcing certain provisions of SORA against the primary class and enjoining Defendants and their agents from enforcing the entirety of SORA against registrants whose offenses occurred prior to the enactment of the 2011 amendments to SORA (i.e. members of the ex post facto subclasses).

# I. BACKGROUND

## A. Procedural History

### i. *Does I*

Although this case was filed in 2016, the constitutional challenges to SORA brought in the instant action were first pursued by five John Doe plaintiffs four years earlier. *Does v. Snyder*, No. 12-11194 (E.D. Mich. 2012) ("*Does I*"). In the *Does I* case, the court summarized the legislative history of SORA and issued a series of opinions resolving the parties' various dispositive motions. The court's pertinent rulings in the *Does I* case are summarized below:

(1) SORA is a regulatory statute, not criminal statute, and the retroactive application of the 2011 amendments to SORA does not violate the ex post facto clause. *Does I*, No. 12-11194 (E.D. Mich. Mar. 18, 2013) (ECF No. 27, PageID.683);

(2) SORA's retroactive application of lifetime reporting requirements does not violate the due process clause. *Does I*, No. 12-11194 (E.D. Mich. Mar. 31, 2015) (ECF No. 103, PageID. 5939);

(3) the following sections of SORA are unconstitutionally vague in violation of the due process clause, *Does I*, No. 12-11194 (ECF No. 103, PageID.

5890–5900):

    (a) the prohibition on working within a student safety zone, Mich. Comp. Laws. §§ 28.733–734;

    (b) the prohibition on loitering within a student safety zone, Mich. Comp. Laws. §§ 28.733–734;

    (c) the prohibition on residing within a student safety zone, Mich. Comp. Laws. §§ 28.733, 28.735;

    (d) the requirement to report "[a]ll telephone numbers ... routinely used by the individual," Mich. Comp. Laws.§ 28.727(1)(h);

    (e) the requirement to report "[a]ll electronic mail addresses and instant message addresses ... routinely used by the individual," Mich. Comp. Laws. § 28.727(1)(l); and

    (f) the requirement to report "[t]he license plate number, registration number, and description of any motor vehicle, aircraft, or vessel ... regularly operated by the individual," Mich. Comp. Laws. § 28.727(1)(j);

(4) SORA violates the due process clause by imposing strict liability for violations, and the statute must be read as imputing a knowledge requirement. *Does I*, No. 12-11194 (E.D. Mich. Mar. 31, 2015) (ECF No. 103, PageID.5907–09);

**\*2** (5) the following sections of SORA violate the First Amendment, *Does I*, No. 12-11194 (E.D. Mich. Mar. 31, 2015) (ECF No. 103, PageID. 5927–29; ECF No. 118, PageID. 6029):

    (a) the requirement "to report in person and notify the registering authority ... immediately after ... [t]he individual ... establishes any electronic mail or instant message address, or any other designations used in internet communications or postings," Mich. Comp. Laws. § 28.725(1)(f);

    (b) the requirement to report "[a]ll telephone numbers ... routinely used by the individual," Mich. Comp. Laws. § 28.727(1)(h);

    (c) the requirement to report "[a]ll electronic mail addresses and instant message addresses ... routinely used by the individual," Mich. Comp. Laws. § 28.727(1)(l);

    (d) the retroactive incorporation of the lifetime registration's requirement to report "[a]ll

electronic mail addresses and instant message addresses assigned to the individual ... and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," Mich. Comp. Laws. § 28.727(1)(i).

Both Plaintiffs and Defendants appealed the court's rulings. *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). The Sixth Circuit's decision focused on only Plaintiffs' ex post facto claim. The Circuit held that SORA imposes punishment and that the retroactive application of SORA's 2006 and 2011 amendments is unconstitutional. *Id.* at 706. This decision effectively vacated the above-listed first and second rulings of this court but arguably relegated to dicta the remainder of this court's rulings. Importantly, and as explained in more depth below, the Sixth Circuit did not find that only certain portions of the 2006 and 2011 amendments were unconstitutional; the court broadly invalidated the amendments and held that "[t]he retroactive application of SORA's 2006 and 2011 amendments to Plaintiffs is unconstitutional, and it must therefore cease." *Does #1-5*, 834 F.3d at 706.[1] The Sixth Circuit remanded *Does I* for the entry of judgment consistent with its decision, and the Supreme Court denied Defendants' petition for certiorari. *Snyder v. John Does #1-5*, 138 S. Ct. 55 (2017).

On remand, this court entered a stipulated final judgment that declared the "retroactive application of Michigan's Sex Offenders Registration Act's (SORA) 2006 and 2011 amendments violates the Ex Post Facto Clause of the U.S. Constitution." *Does I*, No. 12-11194 (E.D. Mich. Jan. 26, 2018) (ECF No. 153, PageID.6514.) The court also enjoined Defendants from enforcing the 2006 and 2011 amendments against the plaintiffs. (*Id.*)

## B. *Does II*

Days after the Sixth Circuit's decision in *Does I*, six John Doe Plaintiffs filed a class action complaint before this court challenging the constitutionality of SORA. *John Doe et al. v. Snyder*, No. 16-13137 (E.D. Mich.) ("*Does II*"). The claims in *Does II* are, at their core, the same constitutional challenges raised by the individual plaintiffs in *Does I*. The *Does II* second amended complaint contains four claims:

    **\*3** (1) a due process challenge based on vagueness to the following provisions SORA:

Doe v. Snyder, Slip Copy (2020)

2020 WL 758232

(a) the prohibition on working within a student safety zone, Mich. Comp. Laws. §§ 28.733–734;

(b) the prohibition on loitering within a student safety zone, Mich. Comp. Laws. §§ 28.733–734;

(c) the prohibition on residing within a student safety zone, Mich. Comp. Laws. §§ 28.733, 28.735;

(d) the requirement to report "[a]ll telephone numbers ... routinely used by the individual," Mich. Comp. Laws. § 28.727(1)(h);

(e) the requirement to report "[a]ll electronic mail addresses and instant message addresses ... routinely used by the individual," Mich. Comp. Laws. § 28.727(1)(l); and

(f) the requirement to report "[t]he license plate number, registration number, and description of any motor vehicle, aircraft, or vessel ... regularly operated by the individual," Mich. Comp. Laws. § 28.727(1)(j).

(2) a due process challenge based on SORA's imposition of a strict liability scheme for violations of the act;

(3) a First Amendment challenge based on:

(a) the requirement "to report in person and notify the registering authority ... immediately after ... [t]he individual ... establishes any electronic mail or instant message address, or any other designations used in internet communications or postings," Mich. Comp. Laws. § 28.725(1)(f); and

(b) the retroactive incorporation of the lifetime registration's requirement to report "[a]ll electronic mail addresses and instant message addresses assigned to the individual ... and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," Mich. Comp. Laws. § 28.727(1)(i); and

(4) an ex post facto challenge based on Defendants' continued enforcement of the 2006 and 2011 amendments.

(ECF No. 34, PageID.384–87.)

In September 2018, the court entered a stipulated order certifying the class under Federal Rule of Civil Procedure 23(b)(2). (ECF No. 46.) The certified class is comprised of a primary class and two subclasses. Plaintiffs define the primary class as all people who are or will be subject to registration under SORA. The primary class seeks relief on Count I (vagueness); Count II (strict liability) and Count III (First Amendment). (ECF No. 46, PageID.693.) The subclasses seek relief on Count IV (ex post facto) and are defined as follows:

(1) The "pre-2006 ex post facto subclass" is defined as members of the primary class who committed their offense or offenses requiring registration before January 1, 2006, and who have committed no registrable offense since.

(2) The "2006-2011 ex post facto subclass" is defined as members of the primary class who committed their offense or offenses requiring registration on or after January 1, 2006, but before April 12, 2011, and who have committed no registrable offense since.

(Id.)

In July 2018, Plaintiffs moved for partial summary judgment on the ex post facto claim on behalf of the subclasses. Plaintiffs requested declaratory and injunctive relief but deferred for later briefing the question of whether SORA's amendments are severable. (ECF No. 40.) While this motion was pending, the parties agreed to focus their resources on legislative reform, rather than litigating severability. At the joint request of the parties, the court repeatedly adjusted the briefing schedule to aid in the parties' attempts to engage in legislative negotiations. (ECF Nos. 41, 44, 45, 47, 51, 54.)

*4 In May 2019, the court entered a stipulated order granting declaratory relief for Plaintiffs, holding that the 2006 and 2011 amendments were unconstitutional as applied to the ex post facto subclasses. (ECF No. 55.) The court deferred ruling on the issues of injunctive relief and the severability of the 2006 and 2011 amendments for 90 days "[i]n order to avoid interfering with the Michigan legislature's efforts to address the *Does I* decisions and their findings of constitutional deficiencies with SORA." (ECF No. 55, PageID.783.) Information presented by Plaintiffs' counsel at oral argument indicates that while the briefing schedule was stayed, the parties engaged in several apparently substantial discussions with "stakeholders" and legislative staff, which resulted in draft legislation. Counsel reported that the parties were hopeful that discussions would continue and culminate in the passage of new legislation, but for reasons unknown to the court, those discussions ended with no replacement legislation in place. Consequently, Plaintiffs exercised their option of seeking relief in returning to court, and the court issued a revised briefing schedule. (ECF No. 60.)

In September 2019, Plaintiffs filed a refreshed motion for

partial summary judgment addressing the severability of the amendments to SORA and injunctive relief for their ex post fact claim. (ECF No. 62.) Several months passed, and Plaintiffs filed a motion for partial summary judgment on behalf of the primary class related to their remaining constitutional claims (vagueness, First Amendment, strict liability). Both motions have now been fully briefed, were argued before this court, and will be addressed in this opinion.

### C. Related Michigan Supreme Court Case

Defendants' briefs point to and rely upon an appeal in a criminal case now before the Michigan Supreme Court, *People v. Betts*, No. 14-8981 (Mich.).[2] *Betts* involves a criminal defendant who challenges his conviction for failing to register under SORA. Defendant/Appellant Betts was convicted in 1994 for the crime subjecting him to SORA registration.[3] The Michigan Supreme Court granted leave to appeal and issued a briefing order directing the parties to address the following issues:

(1) whether the requirements of the Sex Offenders Registration Act (SORA), MCL 28.721 et seq., taken as a whole, amount to "punishment" for purposes of the Ex Post Facto Clauses of the Michigan and United States Constitutions;

(2) if SORA, as a whole, constitutes punishment, whether it became punitive only upon the enactment of a certain provision or group of provisions added after the initial version of SORA was enacted;

(3) if SORA only became punitive after a particular enactment, whether a resulting ex post facto violation would be remedied by applying the version of SORA in effect before it transformed into a punishment or whether a different remedy applies;

(4) if one or more discrete provisions of SORA, or groups of provisions, are found to be ex post facto punishments, whether the remaining provisions can be given effect retroactively without applying the ex post facto provisions;

(5) what consequences would arise if the remaining provisions could not be given retroactive effect; and

(6) whether the answers to these questions require the reversal of the defendant's conviction pursuant to MCL 28.729 for failure to register under SORA.

(ECF No. 66-2, PageID.979–80.)

## II. STANDARD

**\*5** Plaintiffs move for declaratory and injunctive relief on behalf of the ex post facto subclasses on their ex post facto claim and move for partial summary judgment on behalf of the primary class on their remaining constitutional claims.

Summary judgment is appropriate when there exists no dispute of material fact and the moving party demonstrates entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court considers all evidence, and all reasonable inferences flowing therefrom, in the light most favorable to the nonmoving party. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). The court may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment; only the finder of fact can make such determinations. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

The movant has the initial burden of showing—pointing out—the absence of a genuine dispute as to any material fact; i.e., "an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The burden then shifts to the nonmoving party to set forth enough admissible evidence to raise a genuine issue of material fact for trial. *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim "and would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013).

## III. DISCUSSION

Doe v. Snyder, Slip Copy (2020)
2020 WL 758232

The court begins by addressing the claim pursued by the ex post facto subclasses and then turns to the remaining claims brought on behalf of the primary class. Finally, the court will address the issue of Defendants' obligation to provide notice of this decision to class members, law enforcement, and prosecutors.

## A. Ex Post Facto Claim (Count IV)

Plaintiffs argue that the Sixth Circuit broadly held in *Does I* that the 2006 and 2011 amendments to SORA violate the ex post facto clause and cannot be applied, in whole, to members of the ex post facto subclasses. Plaintiffs ask this court to find that the 2006 and 2011 amendments to SORA are not severable and to permanently enjoin Defendants from enforcing SORA against members of the ex post facto subclasses. Defendants do not dispute that members of the ex post facto subclasses are entitled to injunctive relief but argue that this court should certify the issue of the severability, passing it to the Michigan Supreme Court for final determination. Defendants contend that certification is necessary to avoid the possibility of inconsistent judgments because the Michigan Supreme Court will soon address in the *Betts* case "the very questions posed by the Plaintiffs in their motion." (ECF No. 66, PageID.951.) In the alternative, Defendants argue that the 2011 amendments are severable from SORA because in *Does I*, the Sixth Circuit declared unconstitutional only portions of the amendments.

### 1. Scope of *Does I* Decision

**\*6** The court begins by clarifying the scope of the Sixth Circuit's holding in *Does I*. Defendants argue that the Sixth Circuit declared unconstitutional only certain portions of the amendments of SORA, specifically those portions of the amendments which sweep more broadly than SORA's federal analog, the Sex Offender Registration and Notification Act ("SORNA"). Defendants' position, implying as it does that the Sixth Circuit tailored its ruling to coincide with SORNA, relies heavily on the supposed intent of the Michigan legislature to bring SORA into compliance with SORNA in passing the 2011 amendments. A large problem with Defendants' argument, however, is that the Sixth Circuit does not so much as mention SORNA in its opinion.

The Sixth Circuit's expansive ruling in *Does I* declared that "[t]he retroactive application of SORA's 2006 and 2011 amendments to Plaintiffs is unconstitutional, and it must therefore cease." *Does I*, 834 F.3d at 706.[4] Defendants contend that the Sixth Circuit's finding of unconstitutionality should be limited to SORA's exclusion zones, in-person reporting requirements, and maintenance of a public registration website because these provisions of SORA extend beyond the requirements of SORNA. (ECF No. 66, PageID.965–67.) But the court is confident that the Sixth Circuit would have at least mentioned SORNA and referenced specific provisions of the act if it had meant to limit its holding in the manner described by Defendants. Instead, it addressed the aggregate impact of the 2006 and 2011 amendments, making no distinction between particular provisions. In fact, the court specifically declined to address the plaintiffs' remaining constitutional challenges to SORA because "none of the contested provisions may now be applied to the plaintiffs in this lawsuit, and anything [the court] would say on those other matters would be dicta." *Does I*, 834 F.3d, at 706.

On remand, this court entered judgment consistent with Sixth Circuit's ruling, declaring that the "retroactive application of the Michigan's Sex Offenders Registration Act's (SORA) 2006 and 2011 amendments violates the Ex Post Facto Clause of the U.S. Constitution." *Does I*, No. 12-11194 (E.D. Mich. Jan. 26, 2018) (ECF No. 153, PageID.6514.) This court cannot now impose additional limits to the Sixth Circuit's decision and must read *Does I* as broadly—and quite clearly—invalidating all portions of the 2006 and 2011 amendments as applied to the members of the ex post facto subclasses. With this point of clarification in mind, the court turns to the issues of certification and the severability of SORA's amendments.

### 2. Certification to Michigan Supreme Court

The briefing on the issue of severability focuses on the 2011 amendments[5] to SORA, which comprise roughly half of the statute. (ECF No. 62-2, PageID.841–62.) The parties dispute whether the 2011 amendments are severable, meaning whether the amendments are so intertwined with the statute that removing them renders incomprehensible the entirety of SORA. Plaintiffs argue that the 2011 amendments are not severable and that SORA must be declared null and void as applied to members of the ex post facto subclasses. Defendants

respond that the Michigan Supreme Court, not this court, should determine the issue of the severability and urge this court to certify the question. Defendants suggest that certification is appropriate because the Michigan Supreme Court will soon rule on SORA's severability in *People v. Betts*, No. 14-8981 (Mich.). In the alternative, Defendants argue that the amendments are severable.

**\*7** Eastern District of Michigan Local Rule 83.40 provides the standard for certifying an issue to a state court:

> (a) Upon motion or after a hearing ordered by the Judge sua sponte, the Judge may certify an issue for decision to the highest Court of the State whose law governs its disposition. An order of certification shall be accompanied by written findings that:
>
>> (1) the issue certified is an unsettled issue of State law, and
>>
>> (2) the issue certified will likely control the outcome of the federal suit, and
>>
>> (3) certification of the issue will not cause undue delay or prejudice.
>
> Such order shall also include citation to precedent, statutory or court rule authority authorizing the State Court involved to resolve certified questions.
>
> (b) In all such cases, the order of certification shall stay federal proceedings for a fixed time which shall be subsequently enlarged only upon a showing that such additional time is required to obtain a State Court decision and is not the result of dilatory actions on the part of the litigants.
>
> (c) In cases certified to the Michigan Supreme Court, in addition to the findings required by this Rule, the United States District Court shall approve an agreed statement of facts which shall be subsequently transmitted to the Michigan Supreme Court by the parties as an appendix to briefs filed therein.

E.D. Mich. L.R. 83.40.

"Whether to utilize a state court's certification procedure is a matter within the discretion of the court and is 'most appropriate when the question is new and state law is unsettled.' " *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015). Additionally, "the appropriate time for a party to seek certification of a state-law issue is before, not after, the district court has resolved the issue." *Id.* Upon review of the parties' briefs and arguments, the court cannot make the necessary findings required by Rule 83.40 to certify the issue of severability to the Michigan Supreme Court.

*First*, the question of severability is not "an unsettled issue of state law." E.D. Mich. LR 83.40(a)(1). Although "[s]tate law governs the question of severability," *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 466 (6th Cir. 1999), the state of Michigan has clearly defined law on severability. *See infra* Part IV.A.3. Michigan's existing severability law presents this court with "a reasonably clear and principled course ... to follow." *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). And as Plaintiffs correctly observe, "[w]hile Michigan courts have not precisely addressed severability of the 2011 SORA amendments, '[t]he state court need not have addressed the exact question, so long as well-established principles exist to govern a decision.' *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015)." (ECF No. 62, PageID. 827–28.)

To the extent Defendants argue that the severability of SORA's 2011 amendments is a novel question of state law because the Michigan Supreme Court granted leave to appeal in *Betts*, such argument misses the mark because the issues in *Betts* are not identical to the remaining questions of law in this case. Before the *Betts* court can reach the topic of severability, it must first address threshold issues of state constitutional law which the Sixth Circuit has already answered at the federal level, namely whether SORA amounts to punishment and can be applied retroactively. *Does I*, 834 F.3d at 705–06. The Michigan Supreme Court is not bound by the Sixth Circuit's rulings in *Does I* and may come to different conclusions based on Michigan's constitution. For example, as Plaintiffs observe, the Michigan Supreme Court may reach a narrower decision than the Sixth Circuit and decide that SORA became punishment after the 1997 amendments. In that case, the court would then address whether the 1997 amendments are severable. The "novel" question of state law at issue in *Betts*—whether SORA amounts to punishment—is no longer a relevant question to *this* court at this stage in the case. Should the Michigan Supreme Court reach the issue of severability in *Betts*, the court will simply apply Michigan's clearly established severability law. This court need not wait for that possibility to occur. This court is capable of applying established Michigan severability law in this case.[6]

**\*8** *Second*, certification will not "control the outcome" of this case because the severability of the 2011 amendments is but one facet of one of Plaintiffs' four separate claims. Even though Defendants do not present any new arguments on Plaintiffs' non ex post facto claims, a

determination by the Michigan Supreme Court on severability will not resolve the lingering questions of injunctive relief in this case.

*Third*, certification will cause additional, and undue, delay and prejudice to Plaintiffs. Three and a half years have passed since the *Does I* ruling. Certification would further draw out these proceedings for an indeterminate period of time while: (1) the parties prepare the statement required by E.D. Mich. LR 83.40(c), (2) the parties brief and argue the issue of certification for the Michigan Supreme Court, (3) the Michigan Supreme Court decides whether to accept the certified question, Mich. Ct. R. 7.308(A)(2), (4) the Michigan Supreme Court issues a merits opinion, and (5) the parties return to this court and relitigate any remaining issues, particularly injunctive relief. Given the clarity of Michigan law on severability, the age of this case, and the ongoing violation of Plaintiffs' rights, the additional delay inevitably brought on by the certification process is unwarranted and inappropriate. *See Valls v. Allstate Ins. Co.,* 919 F.3d 739, 744 (2d Cir. 2019) (declining certification partly due to the "inevitable burdens on the parties relating to the cost and delay"); *Florida ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 275 (5th Cir. 1976) (explaining that in the context of certification, "delay that is not absolutely necessary should be avoided," especially when a case is already several years old); *Montgomery v. Gore Mutual Insurance Co.,* 2019 WL 5303749 (E.D. Mich. 2019) (Drain, J.) (denying certification, in part, to avoid further delay in the two-year-old case). The court will decline to certify the question of the severability of SORA's 2011 amendments and will turn to the merits of the parties' severability arguments.

### 3. Severability of the 2011 Amendments

Michigan law governs the question of severability. *Memphis Planned Parenthood, Inc.,* 175 F.3d at 466. "The general rule favors severability." *Blank v. Dep't of Corr.,* 122, 611 N.W.2d 530, 539 (Mich. 2000). For a statute to be severable, "the valid portion of the statute must be independent of the invalid sections, forming a complete act within itself." *Pletz v. Sec'y of State,* 336 N.W.2d 789, 808 (Mich. Ct. App. 1983). In determining the severability of a statute, the court should first consider whether "the Legislature expressed that the provisions at issue were not to be severed from the remainder of the act." *Blank v. Dep't of Corr.,* 122, 611 N.W.2d at 540. If not, the court must then determine whether the

"unconstitutional portions are so entangled with the others that they cannot be removed without adversely affecting the operation of the act." *Blank,* 611 N.W.2d at 540.

The statutory text of SORA contains no severability clause.[7] However, the Michigan Legislature has adopted a general severability clause applicable to all statutes:

> In the construction of the statutes of this state the following rules shall be observed unless such construction would be inconsistent with the manifest intent of the legislature, that is to say: If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application ..., and to this end acts are declared to be severable.

**\*9** Mich. Comp. Laws § 8.5. Under this framework, the court concludes that the 2011 amendments to SORA are not severable.

The highlighted version of SORA attached as an exhibit to Plaintiffs' motion shows that the 2011 amendments permeate nearly every section of the statute, most problematically the definition section of the act related to the tier classification system. (ECF No. 62-2, PageID.841–862.) It is fair to say that the 2011 amendments almost entirely rewrote the statute. Removing the deeply ingrained 2011 amendments renders the statute, as Plaintiffs' aptly describe, a "nonsensical alphabet soup" of sentence fragments.[8] (ECF No. 62, PageID.821.) The 2011 amendments "are not like a collection of bricks, some of which may be taken away without disturbing the [provisions that existed before], but rather are like the interwoven threads constituting the warp and woof of a fabric, one set of which cannot be removed without fatal consequences to the whole." *Carter v. Carter Coal Co.,* 298 U.S. 238, 315 (1936) (striking down the Bituminous Coal Conservation Act). Without the 2011 amendments, SORA registrants and law enforcement officials have no guidance for *who* must register, *what* events must be reported, *where* registrants must report, *how* often registrants must report, or *when*

registrants become eligible for removal from the registry. Michigan law makes clear that SORA cannot be enforced given such glaring omissions. *See In re Apportionment of State Legislature-1982, 321 N.W.2d 565, 582 (Mich. 1982)* (holding that in light of the illegality of Michigan's weighted land area-population apportionment formula, all apportionment rules must be struck down because the rules were "inextricably related" to the formula).

**\*10** Courts must avoid an approach to severability that "would require a significant rewrite of the statutory language." *People v. Lockridge, 870 N.W.2d 502, 520 (Mich. 2015).* Without the key definitions and provisions provided by the 2011 amendments, SORA in its current form is incomprehensible to registrants and enforcement officials alike. While the court may excavate and remove unconstitutional pieces of a statute, it must hesitate gravely before trying to backfill the holes left behind with newly-crafted statutory language. The burden of that manual labor falls, in almost every instance, to the legislature. As the Constitution empowers the court to exercise "neither force nor will but merely judgment," The Federalist No. 78 (A. Hamilton) (capitalization altered), it remains "the province and duty of the judicial department to say what the law is." *Marbury v. Madison, 5 U.S. 137, 178 (1803).* "There can be no liberty ... if the power of judging be not separated from the legislative and executive powers." The Federalist No. 47 (J. Madison).

Accordingly, because the 2011 amendments cannot be severed from the statute, the court holds that SORA *in toto* cannot be applied to any members of the ex post facto subclasses.[9]

### 4. Revival of Earlier Version of SORA

Plaintiffs argue that the court cannot revive an earlier version of SORA because any revived statute would be void for vagueness and contradict the intent of the legislature. (ECF No. 62, PageID.822–27.) Defendants respond, in a footnote, that Michigan law favors reviving previous versions of a statute when the existing statute has been declared unconstitutional. (ECF No. 66, PageID.972.)

There exists some precedent to suggest that Michigan allows for earlier versions of a statute to be revived when the current version of a statute is declared unconstitutional. *See Mcclellan v. Judge Of Recorder's Court Of Detroit, 201 N.W. 209, 212 (Mich. 1924)* ("We

are therefore constrained to hold the law invalid, which leaves all preceding laws upon that subject in force."); *Glancy v. City of Roseville, 577 N.W.2d 897, 903 (Mich. 1998)* (Kelly, J. dissenting). At the same time, in the context of legislative revival, Michigan has adopted an explicit, anti-revival approach. *See Mich. Comp. Laws. § 8.4* ("Whenever a statute, or any part thereof shall be repealed by a subsequent statute, such statute, or any part thereof, so repealed, shall not be revived by the repeal of such subsequent repealing statute."). This apparent contradiction between Michigan case law and statutory authority, along with the practical considerations described below, compels the court to conclude that revival of an earlier version of SORA is not appropriate.

The current version of SORA contains no revival clause, and the statute has been extensively modified since its passage in 1994. *See* 1996 Mich. Pub. Acts 494; 1999 Mich. Pub. Acts 85; 2002 Mich. Pub. Acts 542; 2004 Mich. Pub. Acts 238, 239, 240; 2005 Mich. Pub. Acts 121, 127, 132; 2006 Mich. Pub. Acts 46; 2011 Mich. Pub. Acts 17, 18; 2013 Mich. Pub. Acts 149. The dramatic revisions to SORA throughout the years leaves the court at a loss to determine which version of SORA most appropriately captures the legislative's "manifest intent" supporting the current version of the statute. The court's revival inquiry is further complicated by the fact that SORA, in light of this opinion, is unenforceable in whole as to members of the ex post facto subclasses but remains enforceable, under the terms of this opinion, as to all registrants whose offenses requiring them to register occurred after the enactment of the 2011 amendments.

**\*11** Thus, if SORA were to be revived, not only must the court decide which version of SORA to revive, but the court must also decide which version of SORA should apply to which group of registrants. Making these determinations invites pure speculation on the part of the court and could result in a system in which different versions of SORA apply to different classes of registrants, which would create an administrative nightmare for law enforcement and registrants alike. For example, if the court were to revive an earlier version of SORA, the court must decide which one of the five pre-2006 versions of SORA would apply to members of the pre-2006 ex post facto subclass. Additionally, the court would also need to decide which version of SORA should apply to members of the pre-2011 subclass or whether each registrant should be forced to comply with the version of SORA in effect at the time of his offense. Absent any indication of legislative manifest intent regarding which revival configuration is preferred, the court may as well spin the wheel and revive whichever version of SORA on which the marble lands. Registrants, law enforcement, and the

Doe v. Snyder, Slip Copy (2020)

2020 WL 758232

public, however, deserve a reasoned resolution.

Putting aside the guesswork inherent in reviving an earlier version of SORA, the court concludes that revival is not appropriate for another reason. Revival would force registrants to comply with an earlier version of the statute that is not easily locatable and potentially in contradiction to the current, published, version of the law. Thus, to ensure their compliance with the law, registrants must first locate earlier versions of SORA and then reconcile the applicable version with the current law—this is an arduous task, even for individuals with legal research experience and access to online legal databases. Expecting laypeople to engage in such "legal archeology"—as Plaintiffs' counsel puts it—would violate vagueness principles, specifically the fair notice requirement under which laws must be "clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 393 (1926). Law enforcement too would be saddled with the burden of locating and understanding outdated statutes and, depending on the configuration of the revived version of SORA, be required to find each offenders' offense date—which is often buried deep in court documents—to determine which version of SORA to enforce against a particular registrant. Such individualized enforcement is not a workable solution.

"Courts may not speculate regarding legislative intent beyond the words expressed in a statute. Hence, nothing may be read into a statute that is not within the manifest intent of the Legislature as derived from the act itself." *Mich. Educ. Ass'n v. Sec'y of State*, 801 N.W.2d 35, 48 (Mich. 2011) (quoting *Omne Fin, Inc. v Shacks, Inc.*, 596 NW2d 591 (Mich. 1999)). SORA has undergone numerous substantive changes since its enactment. Neither party suggests, and the court simply cannot imagine, a way for the court to make an informed and logical determination as to which iteration and configuration of SORA most accurately captures the current manifest intent of the Michigan legislature. The court will not engage in the kind of speculation required to piece together a revived version of SORA.

Unless and until decisive action is taken by the Michigan legislature, no provisions of SORA may be enforced against members of the ex post facto subclasses.

**B. Due Process and First Amendment Claims (Counts**

**I, II, and III)**

Plaintiffs move for partial summary judgment on behalf of the primary class on Count I (Vagueness), Count II (Strict Liability), and Count III (First Amendment). Plaintiffs ask the court to declare certain provisions of SORA unconstitutional, consistent with this court's rulings in *Does I*, and to enjoin Defendants from enforcing the unconstitutional portions of SORA against all registrants. Defendants do not substantially disagree with this course of action.

In their response, Defendants to do not present any new challenges to the court's rulings in *Does I* and admit that "nothing has occurred in the intervening time [since *Does I*] that would compel the [c]ourt to reach a different result from those rulings here." (ECF 77, PageID.1654.) Defendants republish their arguments initially raised in *Does I* for purposes of appeal but nevertheless agree with Plaintiffs that the portions of SORA which this court declared unconstitutional in *Does I* can be severed and that SORA remains enforceable, without the unconstitutional provisions, against all registrants whose offenses subjecting them to registration occurred after the enactment of the 2011 amendments. (ECF No. 77, PageID.1660, 1667–1678.) The remainder of Defendants' brief restates their earlier argument that the question of severability should be certified to the Supreme Court of Michigan.

*12 The *Does I* case involved constitutional challenges to SORA brought by four individual plaintiffs whereas this case involves constitutional challenges pursued by a certified class. Because *Does I* was a separate case with different plaintiffs, this court's rulings in *Does I* are not *binding* determinations in this case. *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994) ("Under the doctrine of law of the case, findings made at one point in the litigation become the law of the case for subsequent stages of that *same* litigation.") (emphasis added). Even though *Does I* is not binding precedent, the parties present no new arguments suggesting that the court's analysis in *Does I* should not be extended to this case. Nor does the court see any reason to deviate from its earlier determinations on the same questions of law presented in the instant motion. Accordingly, the court reaffirms its rulings in *Does I* (familiarity with which is presumed) and extends its analysis therein to the facts of this case. Consistent with the court's reasoning and findings in *Does I*, the following provisions for SORA will be declared unconstitutional as to all registrants:

(a) Provisions Void for Vagueness:

(1) the prohibition on working within a student

safety zone, Mich. Comp. Laws. §§ 28.733–734;

(2) the prohibition on loitering within a student safety zone, Mich. Comp. Laws. §§ 28.733–734;

(3) the prohibition on residing within a student safety zone, Mich. Comp. Laws. §§ 28.733, 28.735;

(4) the requirement to report "[a]ll telephone numbers ... routinely used by the individual," Mich. Comp. Laws. § 28.727(1)(h);

(5) the requirement to report "[t]he license plate number, registration number, and description of any motor vehicle, aircraft, or vessel ... regularly operated by the individual," Mich. Comp. Laws. § 28.727(1)(j).

(b) Provisions Void for Strict Liability:

(1) under the Due Process Clause of the U.S. Constitution, SORA must be interpreted as incorporating a knowledge requirement.

(c) Provisions Void under the First Amendment:

(1) the requirement "to report in person and notify the registering authority ... immediately after ... [t]he individual ... establishes any electronic mail or instant message address, or any other designations used in internet communications or postings," Mich. Comp. Laws. § 28.725(1)(f);

(2) the requirement to report "[a]ll telephone numbers ... routinely used by the individual," Mich. Comp. Laws. § 28.727(1)(h);

(3) the requirement to report "[a]ll electronic mail addresses and instant message addresses ... routinely used by the individual," Mich. Comp. Laws. § 28.727(1)(l);

(4) the retroactive incorporation of the lifetime registration's requirement to report "[a]ll electronic mail addresses and instant message addresses assigned to the individual ... and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," Mich. Comp. Laws. § 28.727(1)(i).

The court will enjoin Defendants from enforcing only the abovementioned portions of SORA. The remainder of SORA will still apply to all registrants whose offenses subjecting them to registration occurred after the enactment of the 2011 amendments.

## C. Notice Requirement

Plaintiffs also request that this court order Defendants to provide notice of the relief granted in this order to all SORA registrants, law enforcement officials, and prosecuting attorneys. The Federal Rules of Civil Procedure grant the court broad discretion to ensure that class members receive proper notice. Fed. R. Civ. P. 23(c)(2)(A), (d)(1)(B). This court receives several calls a week from registrants inquiring about the status of SORA and of this case, and is therefore awareof the confusion which presently exists regarding the legal status of SORA. The rulings in this order are likely to add to the existing uncertainty among law enforcement and registrants if notice is not provided. Thus, the court will order notice under the terms described below.

Plaintiffs assert that the Michigan State Police SOR Unit is best suited to issue notices because it maintains the records for all registrants and has experience with providing notice to registrants and law enforcement. (ECF No. 75, PageID.1150.) The court is amendable to the proposition of having the Michigan State Police spearhead the dissemination of notices but will direct the parties to confer and suggest to the court the most appropriate form of notice and methods for providing notice. The court will direct the parties to begin preparing notices to provide to registrants, law enforcement, and prosecuting attorneys. As part of this process, the parties will work to update the MSP Explanation of Duties form—which is provided to registrants each time they report—to accurately reflect the legal status of SORA in light of this order. The court will decide any issues that may arise as the parties craft the required notices, and approve a final form.

## IV. CONCLUSION

**\*13** For several years, registrants have been forced to comply with unconstitutional provisions of SORA. The parties, and this court, expected that the Sixth Circuit's ruling would spur legislative action, and for some time, it appeared that the legislature was poised to pass a new and comprehensive statute, obviating the need for this opinion. Unfortunately, the legislature was not able to finalize a new registration statute. Faced with the

continued violation of their rights, Plaintiffs returned to this court to remedy Defendants' ongoing violations. The court's duty is to invalidate those portions of SORA that violate the Constitution. In so doing, the court recognizes that its ruling will fracture the existing structure of SORA. However, the court anticipates that its ruling will reignite efforts to finalize a new, unified registration statute that can survive constitutional review, as has the national model, SORNA.

But until such time as the legislature acts, SORA will be unenforceable against a large portion of registrants and may be enforced only in part against the remaining registrants.

For the reasons explained above, the court will grant Plaintiffs' pending motions and will enter permanent injunctive relief on behalf of the ex post facto subclasses and the primary class. Upon the entry of final judgment in this case, Defendants will be permanently enjoined from enforcing any provision of SORA against members of the ex post facto subclasses and will be permanently enjoined from enforcing the provisions described in Part III.B of this opinion against any registrant. The parties will immediately begin efforts to formulate a joint, proposed form of judgment, which will become effective 60 days after entry. The court will include this 60-day window until the judgment becomes effective principally to allow time for the legislature to craft and enact a new statute.

Additionally, the parties will promptly begin to prepare documents sufficient to provide notice of this opinion, and its impact, to all registrants, all law enforcement officials, and prosecuting attorneys responsible for enforcement of SORA. As part of this notification process, Defendants must update their Explanation of Duties form provided to all registrants.

To be clear: SORA will not become unenforceable as of the date of this order. Rather, the holdings in this opinion will become effective and enforceable only after the entry of a final judgment, at the time specified in that final judgment. Accordingly,

IT IS ORDERED that Plaintiffs' motion for declaratory and injunctive relief (ECF No. 62) is GRANTED. Michigan's SORA is DECLARED NULL AND VOID as applied to members of the ex post facto subclasses (any registrant whose offense requiring them to register, and who has not committed a subsequent offense, occurred prior to April 12, 2011). Defendants and their agents will be ENJOINED from enforcing ANY provision of SORA against members of the ex post facto subclasses.

The holdings in this order will not become effective until the time described in the Judgment, which will be entered later.

IT IS FURTHERED ORDERED that Plaintiffs' motion for partial summary judgment (ECF No. 75) is GRANTED. Defendants and their agents will be ENJOINED from enforcing the following provisions of SORA against any registrant:

(a) Provisions Void for Vagueness:

(1) the prohibition on working within a student safety zone, Mich. Comp. Laws. §§ 28.733–734;

(2) the prohibition on loitering within a student safety zone, Mich. Comp. Laws. §§ 28.733–734;

(3) the prohibition on residing within a student safety zone, Mich. Comp. Laws. §§ 28.733, 28.735;

(4) the requirement to report "[a]ll telephone numbers ... routinely used by the individual," Mich. Comp. Laws.§ 28.727(1)(h);

(5)the requirement to report "[t]he license plate number, registration number, and description of any motor vehicle, aircraft, or vessel ... regularly operated by the individual," Mich. Comp. Laws.§ 28.727(1)(j).

**\*14** (b) Provisions Void for Strict Liability:

(1) under the Due Process Clause of the U.S. Constitution, SORA must be interpreted as incorporating a knowledge requirement.

(c) Provisions Void under the First Amendment:

(1) the requirement "to report in person and notify the registering authority ... immediately after ... [t]he individual ... establishes any electronic mail or instant message address, or any other designations used in internet communications or postings," Mich. Comp. Laws. § 28.725(1)(f);

(2) the requirement to report "[a]ll telephone numbers ... routinely used by the individual," Mich. Comp. Laws.§ 28.727(1)(h);

(3) the requirement to report "[a]ll electronic mail addresses and instant message addresses ... routinely used by the individual," Mich. Comp. Laws.§ 28.727(1)(l);

(4) the retroactive incorporation of the lifetime

registration's requirement to report "[a]ll electronic mail addresses and instant message addresses assigned to the individual ... and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," Mich. Comp. Laws. § 28.727(1)(i).

IT IS FURTHER ORDERED that Defendants PROVIDE NOTICE of this ruling to all registrants, and all law enforcement officials and prosecuting attorneys tasked with the enforcement of SORA. The parties will jointly formulate the form of such notices, including formulating an updated Explanation of Duties form to provide to all registrants each time they report. The parties are DIRECTED to submit their proposed notice by **March 13, 2020**.[10]

FINALLY, IT IS ORDERED that Plaintiffs submit a joint, proposed form of judgment encapsulating these rulings by **March 13, 2020**. This proposed judgment will include a provision making this court's rulings effective 60 days after the entry of the judgment.[11]

**All Citations**

Slip Copy, 2020 WL 758232

Footnotes

1    *See infra* Part IV.A.1.

2    Although Plaintiffs' initial brief also mentioned a possible, related case pending before the Sixth Circuit, *Lewis v. Whitmer*, No. 18-1912 (6th Cir.) (ECF No. 62, PageID.816), Plaintiffs did not discuss it during oral argument. The *Lewis* case carries no precedential weight in the instant matter because the Sixth Circuit's docket shows that the case was recently remanded to district court at the joint request of the parties. *See Lewis v. Whitmer*, No. 18-1912, Joint Mot. for Limited Remand (6th Cir. Jan. 27, 2020) (ECF No. 35); Order for Joint Mot. to Remand (6th Cir. Jan. 28, 2020) (ECF No. 36.)

3    The court obtained the date of the defendant's offense from the publicly available registration database. Michigan Public Sex Offender Registry, *Mich. State Police*, http://www.icrimewatch.net/offenderdetails.php?OfndrID=1996102&AgencyID=55  242, (last visited Jan. 24, 2020).

4    To the extent that this court's opinion in *Cain v. Michigan, et al.*, No. 19-cv-10243 (E.D. Mich. June 5, 2019) suggests the opposite result, the court now clarifies its position that the Sixth Circuit's holding relates to the entirety of the 2006 and 2011 amendments. In *Cain*, the court's primary rational for denying the plaintiff's request for preliminary injunction was that the plaintiff, as a member of the mandatory *Does II* class, could not obtain individual injunctive relief while the class litigated its constitutional claims.

5    At the hearing, the parties agreed that the 2006 amendments were severable. The court's analysis—like the parties' briefs—will focus on the severability of the 2011 amendments because if the 2011 amendments cannot be severed, SORA cannot apply to *any* members of the ex post facto subclasses, including registrants whose crimes subjecting them to registration were committed before the enactment of the 2006 amendments. *See infra* Part IV.A.3.

6    Should the *Betts* court reach the issue of the of severability of the 2011 amendments *and* that ruling runs somehow contrary to this court's determination, this court can modify its judgment to conform with *Betts. See* Fed. R. Civ. Pro. 60(b). When the court raised with Defendants at the hearing the feasibility of amending the judgment in this case to conform with a possible, adverse judgment from the *Betts'* court, Defendants asserted that amending the judgment would require the expenditure of additional judicial resources. Near the eight-year mark in this combined litigation, the court is not much daunted by the prospect of expending *additional* judicial resources ... as the court put it at argument, that horse has left the barn. In sum, Defendants offered no legal justification for why amendment under Rule 60 would not be appropriate.

7    Although Mich. Comp. Laws. § 28.728(8) provides that if the public availability of SORA information is declared unconstitutional, the website must be revised accordingly, such instructions do not amount to a severability clause for the statute as a whole.

8    Encountering the resulting fragmented product induces in the reader a reaction of "Wait ... what?" Take as one of many examples § 28.725 of SORA. That section is meant to describe "Conditions requiring individual to report in person and provide notice to registering authority; release of incarcerated individual; notice; compliance." With the 2011 amendments excised it would read as follows:

(1) An individual required to be registered under this act shall and notify the having jurisdiction where his or her residence or domicile is located after:

(a) individual changes or vacates his or her residence domicile

(5) after either of the following occurs, the department of corrections shall notify the local law enforcement agency or sheriff's department having jurisdiction over the area to which the individual is transferred or the department post of the transferred residence or domicile of an individual required to be registered under this act:

(a) The individual is transferred to a community residential program.

(b) The individual is transferred into a correctional facility of any kind, including a correctional camp or work camp.

(6) An individual required to be registered under this act shall and notify the before he or she changes his or her domicile or residence to another state. The individual shall indicate the new state and, if known, the new address. The department shall update the registration and compilation databases and promptly notify the appropriate law enforcement agency and any applicable sex or child offender registration authority in the new state

(8) If the probation or parole of an individual required to be registered under this act is transferred to another state or an individual required to be registered under this act is transferred from a state correctional facility to any correctional facility or probation or parole in another state, the department of corrections shall promptly notify the department and the appropriate law enforcement agency and any applicable sex or child offender registration authority in the new state. The department shall update the registration and compilation databases.

(9) An individual registered under this act shall comply with the verification procedures and proof of residence procedures prescribed in sections 4a and 5a.

(10) Except as provided in shall comply with this section for.

(11) Except as provided in shall comply with this section for.

9    In light of this ruling, the severability of the 2006 amendments is now moot, although the court notes that the parties agreed at the hearing that the 2006 amendments are severable. The court's determination that the 2011 amendments are not severable means that the entirety of SORA cannot apply to any persons whose crime subjecting them to registration occurred before the enactment of the 2011 amendments.

10    The court expects the parties to engage in good faith negotiations to arrive at a stipulated form(s) of notice. The parties are granted flexibility in the form of such notice, including whether different forms of notice should be provided to different classes of registrants, law enforcement, and prosecutors.

11    The court may delay entry of the judgment upon the stipulated request of the parties.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B:

Model Penal Code: Sexual Assault and Related Offenses, § 213 at 225-28 (Am. Law Inst. Tentative Draft No. 10, 2019)

1    **SECTION 213.12A. REGISTRATION FOR LAW ENFORCEMENT PURPOSES**

2    **(1) *Offenses Committed in this Jurisdiction***

3    **(a) Except as provided in subsection 213.12A(3), every person convicted of an**
4    **offense that is designated a registrable offense in this Article shall, in addition to any**
5    **sanction imposed upon conviction, be obligated to appear personally and register as**
6    **a sex offender with the law-enforcement authority designated by law in each [county]**
7    **where the offender resides, is employed, or is a student.**

8    **(b) Notwithstanding any other provision of law, no conviction for an offense**
9    **under this Article, or for any other criminal offense in this jurisdiction, shall make**
10   **the offender eligible for or subject to an obligation to register as a sex offender with**
11   **law enforcement or other governmental authority, nor shall any conviction for an**
12   **offense under this Article, or for any other criminal offense in this jurisdiction, make**
13   **the offender eligible for or subject to any other obligation or restriction applicable to**
14   **sex offenders specifically, other than obligations and restrictions incident to a**
15   **suspended sentence, probation, or parole, unless that offense is designated a**
16   **registrable offense under this Article.**

17   **(2) *Offenses Committed in Other Jurisdictions***

18   **(a) Every person obligated to register as a sex offender in another jurisdiction,**
19   **because of an offense committed in that jurisdiction, who subsequently resides, works,**
20   **or studies in this jurisdiction, shall register as a sex offender in this jurisdiction and**
21   **comply with the requirements of this Section, provided that the offense committed in**
22   **the other jurisdiction would be a registrable offense under this Article if committed**
23   **in this jurisdiction.**

24   **(b) Notwithstanding any other provision of law, no conviction for an offense in**
25   **another jurisdiction shall make the offender eligible for or subject to an obligation to**
26   **register as a sex offender with law enforcement or other governmental authority in**
27   **this jurisdiction, nor shall any conviction for an offense in another jurisdiction make**
28   **the offender eligible for or subject to any other obligation or restriction in this**
29   **jurisdiction applicable specifically to sex offenders, other than obligations and**
30   **restrictions incident to a suspended sentence, probation, or parole, unless the**
31   **commission of that offense obligates the offender to register as a sex offender in that**

© 2019 by The American Law Institute
Council Draft – not approved

1  **jurisdiction and that offense would be a registrable offense under this Article if**
2  **committed in this jurisdiction.**

3  **(3)** *Juvenile Offenders.* **No person shall be subject to the obligation to register under**
4  **subsection (1) of this Section, to other obligations or restrictions under this Section, or to**
5  **additional collateral consequences under Section 213.12I, on the basis of an offense**
6  **committed when the offender was under the age of 18, or on the basis of an adjudication of**
7  **delinquency based on conduct when the delinquent was under the age of 18; provided,**
8  **however, that this subsection (3) shall not apply to an offender convicted of Sexual Assault**
9  **by Aggravated Physical Force or Restraint if the offender was at least 16 years old at the**
10 **time of that offense.**

11 **(4)** *Scope and Implementation of the Obligation to Register, Associated Duties, and*
12 *Other Collateral Consequences Applicable Specifically to Sex Offenders*

13 **(a) Notification of the offender's duty to register and associated duties is**
14 **governed by Section 213.12B.**

15 **(b) The time of initial registration is governed by Section 213.12C.**

16 **(c) The information required upon registration is specified in Section**
17 **213.12D.**

18 **(d) The duty to keep registration current is specified in Section 213.12E.**

19 **(e) The duration of the registration requirement is specified in Section**
20 **213.12F.**

21 **(f) Penalties for failure to register are governed by Section 213.12G.**

22 **(g) Access to registry information is governed by Section 213.12H.**

23 **(h) Additional collateral consequences of conviction are governed by Section**
24 **213.12I.**

25 **(i) Standards and procedures for relief from the duty to register, associated**
26 **duties, and additional collateral consequences applicable specifically to sex offenders**
27 **are governed by Section 213.12J.**

28 **Comment:**

29 *1. Offenses committed in this jurisdiction.* Section 213.12A(1) applies to collateral
30 consequences potentially applicable on the basis of an offense committed in this jurisdiction.

© 2019 by The American Law Institute
Council Draft – not approved

## Section 213.12A. Registration for Law Enforcement Purposes

1   *a. Subsection (1)(a).* In order to serve law-enforcement purposes, subsection (1)(a) obliges
2   an offender to register as a sex offender and fulfill related duties when offense committed is
3   designated under this Article designates it as a registrable offense.

4   The following offenses are the only offenses designated as registrable offenses under this
5   Article:

6   (i) Section 213.1. Sexual Assault by Aggravated Physical Force or Restraint.

7   (ii) Section 213.2. Sexual Assault by Physical Force, but only when committed after
8   the offender had previously been convicted of a felony sex offense.

9   (iii) Section 213.3(1). Sexual Assault of an Incapacitated Person, but only when
10   committed after the offender had previously been convicted of a felony sex offense.

11   (iv) Section 213.8(1). Sexual Assault of a Minor Younger than 12, but only when
12   the offender is a [reserved] degree older.

13   (v) Section 213.8(2). Sexual Assault of a Minor 12 to 16 Years of Age, but only
14   when the offender who is a [reserved] degree older.

15   (vi) Section 213.8(3). Incestuous Sexual Assault of a Minor.

16   Subsection (1)(a) requires offenders convicted of one of these designated offenses to
17   register with law-enforcement authorities in each locality where the offender resides, works, or
18   studies. Municipal organization and local logistical capabilities will determine for each state the
19   official agency and jurisdictional level where the registration obligation is centered. For example,
20   in California, offenders required to register must do so "with the chief of police of the city in which
21   he or she is residing, or the sheriff of the county if he or she is residing in an unincorporated area
22   or city that has no police department, and, additionally, with the chief of police of a campus of the
23   University of California, the California State University, or community college if he or she is
24   residing upon the campus or in any of its facilities."[1] In Pennsylvania, offenders required to
25   register must do so with an appropriate official of the correctional facility where incarcerated prior
26   to release, with the Pennsylvania Board of Probation and Parole, or with the Pennsylvania state
27   police, depending on the circumstances.[2]

---

[1] Cal. Penal Code §290(b) (2019).

[2] 42 Pa. Cons. Stat. Ann. § 9799.19 (2019)

212

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1    *b. Subsection (1)(b).* Existing sex-offender registration requirements and related provisions
2  are codified in diverse places within the corpus of state law. In addition, many jurisdictions impose
3  sex-offender registration and related obligations on the basis of sexual offenses other than rape
4  and sexual assault—sex-related offenses that fall outside the scope of Article 213 such as
5  exhibitionism, stalking, and possession of child pornography. Section 213.12A(1)(b) provides that
6  an obligation to register as a sex offender, related duties, and other collateral consequences
7  applicable to sex offender specifically may not be imposed on an offender on the basis of any
8  offense committed in this jurisdiction that is not defined by Article 213 and designated a registrable
9  offense under this Article.

10    Subsection (1)(b) therefore makes clear that the registration provisions of Article 213.12A
11  supersede prior law governing sex-offender registration and other sex-offender collateral
12  consequences in the jurisdiction. Once enacted, the Article 213 designation of offenses that are
13  registrable, and the provisions of Sections 213.12A-J specifying the scope and limits of collateral
14  consequences applicable to sex offenders specifically constitute the exclusive source of law
15  applicable to these collateral consequences in the jurisdiction. Obligations and restrictions incident
16  to a suspended sentence, probation, or parole, and collateral consequences not applicable to sex
17  offenders specifically—that is, obligations or restrictions applicable both to persons convicted of
18  sex-offenses and to persons convicted of other offenses, such as disqualifications from voting, jury
19  service or eligibility for public benefits—are governed by *Model Penal Code: Sentencing*, and are
20  not affected by the provisions of Sections 213.12A-J.

21    *2. Offenses committed in other jurisdictions.* Section 213.12A(2) applies to sex-offender
22  collateral consequences potentially applicable when an offender enters the jurisdiction after having
23  been convicted of a sex offense in another jurisdiction. Under subsection (2)(a), this out-of-state
24  offender is subject to the registration obligations of Section 213.12A if and only if two
25  requirements are met: the offender must be obliged to register as a sex offender in the jurisdiction
26  where the offense was committed *and* the offense must be one that would be a registrable offense
27  if committed in this jurisdiction.

28    Under subsection (2)(b), the out-of-state offender is subject to those registration obligations
29  *only* if these two requirements are met. Many jurisdictions require registration for a much broader
30  array of offenses than those that trigger registration obligations under Article 213; the policy
31  judgment underlying Section 213.12A, that sex-offender registration should be carefully targeted,

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1  makes registration unnecessary in such cases. Conversely, an offender may have committed an

2  offense that would be registrable if committed in this jurisdiction but is not registrable in the

3  jurisdiction where it was committed. That situation will seldom arise in practice, because few states

4  if any restrict the registration obligation more narrowly than does Article 213. In such an event,

5  however, the policy underlying Section 213.12A *would* call for the public-safety measures that

6  Section 213.12A contemplates, and some jurisdictions accordingly require sex-offender

7  registration on the basis of offenses not registrable where committed, if the offense is registrable

8  when committed in that jurisdiction.[3] Nonetheless, since the offense was not registrable where

9  committed, the offender would not receive registration-related notice at the time of conviction. It

10  is therefore neither practical nor fair for that offender to face Section 213.12A requirements when

11  subsequently entering this state.

12      *3. Juvenile offenders.* Subsection (3) protects juveniles from the obligation to register and

13  from other collateral consequences specific to sex offenders, regardless of the offenses they

14  committed, and regardless of whether the potential trigger for those consequences is an

15  adjudication of delinquency or a criminal conviction under this Article, except that juveniles

16  convicted of Sexual Assault by Aggravated Physical Force or Restraint remain subject to the

17  requirements of Section 213.12A if they were at least 16 years old at the time of that offense.

**REPORTERS' NOTES**

18      *1. Introduction: sex-offender collateral consequences generally.*

19      Every state currently has legislation requiring sex offenders, on release from custody, to

20  register with local authorities in their place of residence, to keep authorities informed of changes

21  in their address, and to observe a variety of other restrictions, including (in many states) limits on

22  places where they can live or work. This legislation makes their personal information available to

23  law enforcement and typically permits the general public to access these registries under various

24  circumstances. Many of the new laws also establish a regime of community notification—a

25  requirement that local authorities take affirmative steps to inform the public about the names and

26  addresses of convicted sex offenders living, working, or studying in the area. Federal law not only

27  establishes a nationwide, internet-accessible registry of this information but also requires every

28  state, as a condition of receiving certain federal funds, to maintain a sex-offender registry with

29  specific minimum features. Although originally inspired by concern over violent recidivists, these

30  laws now apply even to first offenders convicted of a broad range of sexual offenses, including

---

[3] TBS.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1  possession of child pornography and statutory rape (sometimes including statutory rape in which
2  victim and perpetrator are close in age).

3     Collateral consequences of conviction are not confined to the sex offenses, and in recent
4  years they have proliferated across broad swaths of the criminal law, prompting several prominent
5  law-reform bodies to address collateral sanctions applicable to offenders in general.[4] These
6  initiatives have considered under one umbrella virtually the entire gamut of collateral sanctions
7  triggered by conviction not only of sexual offenses but also offenses ranging from homicide to
8  drug crimes, securities fraud, and drunk driving; likewise they seek to cover not only registration
9  and community notification, but also such sanctions as disenfranchisement, ineligibility for public
10  housing, loss of other public benefits, barriers to occupational licensing and the like.

11     These efforts mainly aim to identify general principles and corresponding statutory
12  language suitable for application to any collateral consequence associated with conviction for any
13  offense. Because they cover so much terrain, they cannot delve into the substantive question of
14  when a given sanction should be available for a given offense. Rather, of necessity they focus on
15  general principles of coherence, notice, and procedural fairness that can be cast in broadly
16  applicable terms—for example, requiring that the sentencing judge explain applicable collateral
17  consequences to defendants prior to entry of a guilty plea and at sentencing; that appropriate
18  authorities compile in one place a list of the jurisdiction's collateral sanctions; that jurisdictions
19  allow offenders to seek relief from inappropriate collateral sanctions; and that sentencing
20  commissions develop guidelines for courts to use in making substantive decisions about whether
21  to impose a given collateral sanction or grant relief from it.[5] These treatments inevitably stop short
22  of the sustained attention to the range of issues that arise in the context of collateral sanctions
23  applicable specifically to the sexual offenses.

24     These issues are not only important in their own right, but they also have important
25  implications for the substantive definition of the sexual offenses. In deciding the proper scope of
26  penal prohibitions, legislative bodies must consider the severe collateral consequences typically
27  triggered by state offenses denominated as "rape" or "sexual assault." Concerns of this nature
28  presumably shaped the Institute's original decision, in 1962 MPC § 213.5, to address matters of
29  procedure and evidence distinctive to rape that go beyond mere substantive crime definition.
30  Sections 213.12A-J likewise reflect the judgment that sound treatment of the sexual offenses in
31  Article 213 cannot confine itself to offense definitions alone but must also address collateral
32  sanctions authorized or required upon conviction.

33     Note 2 examines the historical development of sex-offender collateral consequences. Note
34  3 provides a brief overview of the policy concerns surrounding these laws and the Institute's

---

[4] See American Bar Association, Standards for Collateral Sanctions and Discretionary Disqualification of Convicted Persons (2004); National Conference of Commissioners on Uniform State Laws, Uniform Collateral Consequences of Conviction Act (2009); *Model Penal Code: Sentencing*, Article 7, at. 238-261.

[5] See, e.g., *Model Penal Code: Sentencing*, supra note 4.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1  perspective on the underlying issues. Note 4 describes the restrictions and disabilities in question
2  and variation in the relevant state and federal legislation, with respect to both registration regimes
3  and other sex-offender collateral consequences. Note 5 examines in detail the policy goals of this
4  kind of legislation and assesses the evidence bearing on its effects, both intended and unintended.
5  Note 6 explains the approach of Article 213 with regard to sex-offender collateral consequences
6  generally. Note 7 addresses the issues specific to registration that are resolved in Sections
7  213.12A-J.

8      **2. Historical Background.**

9      Since the 1930s and before, convicted sex offenders have faced a variety of special
10  sanctions, including mandatory sterilization and indefinite commitment for psychiatric treatment.[6]
11  But these measures had relatively little visibility or importance when the Model Penal Code was
12  originally drafted. That picture changed dramatically in the early 1990s, when public interest in
13  identifying previously convicted sex offenders emerged with new intensity following several
14  highly publicized murders of young children in the early 1990s.[7] In 1993, 12-year-old Polly Klaas
15  was kidnapped, raped, and murdered by a man with a prior record for the commission of serious
16  violent crimes. The next year, seven-year-old Megan Kanka was sexually assaulted and killed by
17  a career sex offender who lived across the street. Several similar incidents were widely publicized
18  during the 1990s and shortly thereafter.[8] The legislative reaction to the Klaas killing focused on
19  the "three-strikes-and-you're-out" solution, which mandates extended terms of imprisonment for
20  offenders previously convicted of two serious or violent felonies.[9] In New Jersey, Megan Kanka's
21  murder prompted a different response, imposing registration requirements applicable only to sex
22  offenders. Within weeks of the killing, the state Assembly declared a legislative emergency, and a
23  sex-offender registration law passed, without committee hearings, about two months later.[10]

---

[6] See WAYNE A. LOGAN, KNOWLEDGE AS POWER: CRIMINAL REGISTRATION AND COMMUNITY NOTIFICATION LAWS IN AMERICA 1-48 (2009); PHILIP JENKINS, MORAL PANIC: CHANGING CONCEPTS OF THE CHILD MOLESTER IN MODERN AMERICA (1998); Karen J. Terry & Alissa R. Ackerman, A Brief History of Major Sex Offender Laws, in Richard G. Wright, ed., *Sex Offender Laws: Failed Policies, New Directions* 65, 66-74 (2009).

[7] See generally Logan, supra note 6, at 49-108; Terry & Ackerman, supra note 6, at 74-94.

[8] In the Sex Offender Registration and Notification Act of 2006 ("SORNA"), Congress's "declaration of purpose," 34 U.S.C. § 20901 (2019), lists more than a dozen specific victims.

[9] See Michael Vitello, *Three Strikes: Can We Return to Rationality?*, 87 J. CRIM. L. & CRIMINOLOGY 395 (1997).

[10] See Michelle Ruess, Second Thoughts About Megan's Law: Concern Growing over Ripple Effects, RECORD (Hackensack, N.J.), Feb. 19, 1996, at A1 (describing rapid passage of Megan's Law); Robert E. Freeman-Longo, *Reducing Sexual Abuse in America: Legislating Tougher Laws or Public Education and Prevention*, 23 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 303, 316 (1997) (same). The statute is now codified at N.J. STAT. ANN. § 2C:7-6 (West 1995 & Supp. 2011).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1    In 1990, Patricia Wetterling responded to the murder of her 11-year old son Jacob by
2  establishing a foundation to press for the enactment of sex-offender registration laws.[11] A year
3  after New Jersey's enactment of Megan's Law, her efforts bore fruit when Congress, as part of the
4  Violent Crime Control and Law Enforcement act of 1994, enacted the Jacob Wetterling Crimes
5  Against Children and Sexually Violent Offender Registration Act, which required all states, on
6  pain of loss of federal funding, to establish a system of registration for all offenders convicted of
7  a sexually violent offense or any criminal offense against a minor.[12]

8    Congress subsequently repealed that statute and replaced it with a broader law—the Sex
9  Offender Registration and Notification Act of 2006 ("SORNA").[13] SORNA establishes a national
10  registry for sex offenders, publicly available on the Internet, directs each state to maintain its own
11  registry, and requires states to create a criminal offense, punishable under state law by more than
12  a year's imprisonment, for a sex offender who fails to register or meet a deadline for updating
13  required registry information.[14] After the passage of SORNA, many states expanded their own
14  registration requirements and enacted other special restrictions. In addition, it is a federal crime,
15  punishable by up to 10 years in prison, for a person convicted of a state-law sex offense to travel
16  interstate without maintaining an up-to-date registration with state authorities.[15]

17    Britain and other European nations have faced similar public pressure to make sex-offender
18  information more readily available, but unlike the United States, they have generally declined to
19  respond to that pressure.[16] One fundamental reason is that the continental European nations, and
20  to a lesser extent the United Kingdom (UK), generally treat criminal-history information as
21  confidential, in order to protect the privacy of offenders and to aid their rehabilitation.[17]
22  Regulations in the European Union (EU), applicable (for the moment) in the UK as well, require
23  specific safeguards to protect the confidentiality of criminal history information, and stipulate that
24  registries of criminal convictions "may be kept only under the control of official authority."[18] The

---

[11] Jacob's body was missing for almost 30 years, having been found only in 2016, and his murderer was unknown until he confessed at that time. But the crime was assumed to be the work of a sexual predator.

[12] See 42 U.S.C. § 14071(f)(1) (Supp. III 1997).

[13] PUB. L. NO. 109-248, tit. I, 120 Stat. 590 (2006) (codified as amended at 34 U.S.C. §§ 20901-20929 (2019)).

[14] 34 U.S.C. § 20913(e).

[15] 18 U.S.C. § 2250.

[16] For detailed discussion, see James B. Jacobs & Dimitra Blitsa, US, EU & UK Employment Vetting as Strategy for Preventing Convicted Sex Offenders from Gaining Access to Children, New York University School of Law, Public Law & Legal Theory Research Paper Series, Working Paper No. 12-64 (Nov. 2012), available at http://ssrn.com/abstract=2176897.

[17] See James B. Jacobs & Elena Larruri, *Are Criminal Convictions a Public Matter?: The USA and Spain*, 14 PUNISHMENT & SOC'Y 3, 12-14 (2012).

[18] European Union Directive 95/46/EC, European Parliament & Council, 24 Oct. 1995, art. 8(5).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1   EU has modified that background presumption only to the extent of seeking to bar convicted sex
2   offenders from working with children and seeking to make convictions for sexual offenses against
3   children accessible to employers whose staff serve that clientele. Although such objectives seem
4   modest relative to those pursued in American jurisdictions, "[p]rogress towards [imposing these
5   restrictions] has been slow,"[19] in part because of the commitment to the confidentiality of criminal
6   records that is embedded in the law of the continental EU nations. In the UK, a public agency is
7   responsible for determining which forms of private employment should be closed to sex offenders.
8   UK employers and volunteer organizations have a duty to check the criminal background of those
9   applying for positions that afford close contact with children and other especially vulnerable
10  groups, such as the elderly and the handicapped. But the disabilities imposed on sex offenders are
11  far more limited than in the United States, and registry information is not available to the general
12  public, largely because of concern that widespread dissemination of criminal history and
13  burdensome disabilities can undermine offender rehabilitation.[20] Similarly, in Canada, registry
14  information is available solely to law enforcement, for the purpose of investigating and preventing
15  sex offenses, and is not available to the public.[21] Almost no foreign countries have adopted the
16  prevalent U.S. practice of proactive notification of sex offender registry information to community
17  organizations and the general public.[22]

18      Laws of this kind pose several distinct policy issues: What, precisely, is their underlying
19  justification? Does their adverse impact on the offender's prospects for gainful employment and
20  reintegration into the community outweigh their potential contribution to social protection and
21  public peace of mind? Do registries in fact provide such peace of mind, and how might they be
22  structured for optimal effect?

23      ### 3. Overview of policy concerns and the judgments underlying Sections 213.12A-J.

24      Despite their prevalence, registration and other collateral-consequence laws targeting sex
25  offenders rest on highly contested premises. The best available studies discredit many of their
26  central justifications. At the same time, the research provides strong evidence of unintended
27  negative impacts, including tendencies (especially for the broadest of these laws) to *aggravate*
28  recidivism and *jeopardize* public safety, the very opposite of the results that lawmakers and the
29  general public expect registration and community notification to accomplish.

30      This realization is now widespread among criminal justice professionals, even those who
31  otherwise disagree about almost all other policies relating to sexual offenses. Critics of registration,

---

[19] Jacobs & Blitsa, supra note 16, at 34.

[20] TBS.

[21] See Janine Benedet, *A Victim-Centered Evaluation of the Federal Sex Offender Registry*, 37 QUEEN'S L.J. 437, 464 (describing effect of 2011 amendment to Canada's Sex Offender Information Registration Act).

[22] See Nora V. Demleitner, *Structuring Relief for Sex Offenders from Registration and Notification Requirements: Learning from Foreign Jurisdictions and from the Model Penal Code: Sentencing*, 30 FED. SENT. RPTR. 317, 317 & n.11 (2018).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1   community notification, residency and employment restrictions, and the like include substantial
2   numbers of victim advocates, who see harsh collateral consequences as major contributors to the
3   frequent reluctance of police and prosecutors to properly charge serious sex offenders, and to the
4   frequent reluctance of judges and juries to properly convict them.[23] The U.S. Department of Justice
5   now grants states considerable leeway to sidestep some of the ostensibly mandatory federal
6   requirements and in acknowledging their unintended consequences, the Department cautions
7   against any expansion of these regimes.[24] In candid moments, many state lawmakers, even while
8   supporting this legislation themselves, describe it as overbroad and largely counterproductive, but
9   politically impossible to oppose.[25]

10      Mindful of these assessments, Sections 213.12A-J provide for sex-offender disabilities on
11  a substantially more restricted basis than that found in currently prevalent state and federal
12  legislation. Positions supported by strong currents of public opinion and widely endorsed in the
13  political process cannot be ignored, and Article 213 does not lightly depart from them. At the end
14  of the day, however, the Model Code must be guided by the best available evidence and judgments
15  not deformed by known imperfections in the relevant political deliberations.

16      Sections 213.12A-J therefore limit sex-offender collateral consequences to the domains
17  most likely to offer public-safety benefits, without strong counterproductive side-effects. It does
18  so through four distinct mechanisms.

19      First, the relevant provisions sharply distinguish registration *for law-enforcement purposes*
20  from other restrictions and disabilities, including community notification, residency and
21  employment restrictions, and other sex-offender disabilities. Up-to-date registration with local
22  law-enforcement authorities can serve legitimate law-enforcement purposes and is far more cost-
23  effective than other sex-offender disabilities. Moreover, so long as the confidentiality of these
24  records is preserved, registration exclusively for law-enforcement purposes poses relatively few
25  dangers to public safety and to the welfare of offenders themselves. Other sex-offender disabilities,
26  in contrast, are costly to implement and entail significant, well-documented difficulties[26];
27  accordingly they must be targeted and managed with particular care. Sections 213.12A, D & E
28  therefore require all adults convicted of a registrable offense to provide up-to-date registry
29  information to local law-enforcement authorities, but Section 213.12H imposes on those
30  authorities a strong obligation to preserve the confidentiality of that information, and Section
31  213.12I strictly limits community notification and other sex-offender disabilities,

---

[23] See note xx, infra.

[24] See note xx, infra.

[25] See note xx, infra.

[26] See note xx, infra.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1    Second, Section 213.12A sharply restricts the class of offenders to whom the threshold
2    duty to register applies. It precludes registration of nearly all juvenile offenders, and for adults, it
3    imposes the threshold duty to register only upon conviction of offenses that most strongly arouse
4    public concern.
5    Third, the registration framework shortens in two ways the duration of required
6    registration. Under federal law and that of most states, the serious offenses that require registration
7    under Section 213.12A typically would trigger an obligation to register for life.[27] In contrast,
8    Section 213.12F limits to 15 years the registrant's duty to keep registry information current and
9    provides for automatic termination of that duty at an earlier date if the offender meets specified
10   rehabilitative goals during the initial registration period; in either case the offender is removed
11   from the registry at the end of the applicable period. In addition, Section 213.12J permits the
12   offender to apply for early removal from the registry or relief from some or all of the duties
13   associated with registration upon an appropriate showing of rehabilitation,
14   Fourth, Section 213.12I tightly constrains, and in most cases eliminates, other sex-offender
15   disabilities, such as community notification and restrictions on residency, employment, internet
16   access, and the like. In current law, community notification is widely required for a long list of
17   sex-related offenses, and other sex-offender disabilities, though not mandated by federal law, are
18   also commonly imposed. In contrast, Section 213.12I permits community notification and other
19   sex-offender disabilities only when an individual, case-by-case risk assessment case strongly
20   supports the need for such measures, to an extent that outweighs their well-established potential
21   for costly, counterproductive and criminogenic effects.
22   ***4. Current Law: What Burdens Are Imposed and on Whom?***
23   As discussed above, federal SORNA requires each state, on pain of losing federal funds,
24   to maintain a registry of convicted sex offenders and specifies many parameters that state
25   registration regimes must satisfy to comply with the federal mandate, including the offenses that
26   must trigger the obligation to register, the information states must include in their registries, the
27   duration of a registrant's duties and the frequency with which registrants must provide updates.
28   Separately, SORNA requires states to make it a criminal offense, punishable by at least a year in
29   prison, for a designated offender to fail to register or miss a deadline for updating registry
30   information.[28] Beyond federal mandates pertaining to the registry system itself, Federal SORNA
31   directs states to afford public access to their registry and establish a program for promptly notifying
32   concerned entities and individuals in the community about any change in information pertaining
33   to registrants in the area. Federal SORNA does not seek to dictate state approaches to other sex-
34   offender disabilities, such as restrictions on residency, employment, GPS monitoring, and internet
35   usage.

---

[27] TBS.

[28] Federal SORNA § 20913(e).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1    All states have a registration regime applicable to persons convicted of a broad list of sexual
2  offenses.[29] But states vary considerably in the extent to which they conform to federal SORNA
3  expectations with respect to many of the ostensibly mandated details, particularly with regard to
4  triggering offenses, public access, and community notification. States also vary in the extent to
5  which they impose other sex-offender disabilities.

6    *a. Which Offenders?* Federal SORNA requires states to impose the obligation to register
7  as a sex offender and meet other requirements on anyone convicted of a broad list of sexual
8  offenses, both felonies and misdemeanors. Juvenile delinquency adjudications based on
9  comparable sexual misconduct are included if the minor was at least 14 years old at the time of the
10  offense.[30] The designated offenses range from the most violent sex crimes to any offense of
11  coerced sexual contact, solicitation of a minor to engage in any sexual conduct, possession of child
12  pornography, "video voyeurism" (defined as photographing or filming the private area of an
13  individual without the individual's consent[31]), and any other "sexual act" not involving consenting
14  adults, even low-level misdemeanors such as public indecency. For example, for an offense
15  comparable to MPC § 251.1, the petty misdemeanor of committing "any lewd act which [the
16  offender] knows is likely to be observed by others who would be affronted," SORNA requires
17  mandatory registration, public access, and community notification under the "sex offender" label.

18    Federal SORNA establishes a three-tier offender-classification system based solely on the
19  seriousness of the sex offense and whether it was the defendant's first. All offenders convicted of
20  a qualifying sex offense, regardless of classification, must (to comply with SORNA) face at
21  minimum all of the restrictions and disabilities detailed in Note 4(d) below with respect to
22  registration, public access to registry information, and community notification—that is, proactive
23  law enforcement measures to alert schools, other local agencies, and the general public to the
24  identify of registered sex offenders present in the area. The three tiers differ only in the length of
25  time the offender is subject to the restriction and the accompanying duty to keep registration
26  information current (15 years for the least serious offenders, life for the most), and the frequency
27  with which the offender must appear personally to confirm the required information (once a year
28  for the least serious offenders, quarterly for the most).

29    Many states similarly impose the burdens of a sex-offender conviction automatically on
30  offenders convicted of any of a broad array of sex-related crimes. The triggering offenses typically
31  include all felonies and misdemeanors, however classified, that fall within the purview of Article
32  213, as well as many offenses that do not—for example, possession of child pornography,
33  solicitation to practice prostitution, sexual performance involving a minor, and exhibitionism. In

---

[29] See Catherine Carpenter & Amy E. Beverlin, *The Evolution of Unconstitutionality in Sex Offender Registration Law*, 63 HASTINGS L.J. 1071, 1078 (2012) (describing sex-offender registry laws enacted in the wake of federal SORNA).

[30] SORNA § 20911.

[31] See 18 U.S.C. § 1801 (2019).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1  some states, the list of covered misconduct includes as many as 40 distinct offenses.[32] In some of
2  these jurisdictions, the burdens of sex-offender conviction automatically extend not only to
3  registration, often for life, but also to stringent residency restrictions.[33] Some states grade
4  offenders according to tiers of seriousness, but as under federal SORNA, their tiers are determined
5  solely by prior record and the nature of the offense of conviction.

6        Other state regimes are more nuanced. Many exclude young offenders from registration
7  and other obligations.[34] Many states further narrow the universe of affected offenders by using a
8  ranking system to vary the scope of the collateral burdens as a function of the intensity of perceived
9  need. One common approach eschews categorization based solely on the conviction offense and
10  prior record. Instead, many states classify sex offenders on the basis of an individualized risk
11  assessment that considers a variety of factors pertinent to the nature and seriousness of the risk
12  posed, such as whether the victim of the offense was a minor, and the age difference and
13  relationship between victim and offender.[35] In New York, the level of assessed risk affects the
14  duration of the obligation to remain registered and the type of information that can be publicly
15  released.[36] Minnesota, New Jersey, Oregon, Washington, and Vermont, among other states, rely
16  on actuarial assessment to distinguish sex offenders and the basis of risk and assign more serious
17  collateral consequences to offenders who pose the greatest danger to the public.[37] In Georgia, a
18  "Sex Offender Registration Review Board"[38] uses research-based assessments to assign "points"

---

[32] See, e.g., UTAH CODE ANN. § 77-27-21.5(g), (n) (2011) (listing 29 registerable offenses); LA. REV. STAT. ANN. § 15:541(24)(a) (2011) (listing 26 registerable offenses); N.Y. CORRECT. LAW § 168-a (2011) (listing over 40 registerable offenses).

[33] See Chiraag Bains, *Next-Generation Sex Offender Residency Statutes: Constitutional Challenges to Residency, Work, and Loitering Restrictions*, 42 HARV. C.R.-C.L.L. REV. 483 (2007); Brian J. Love, *Regulating for Safety or Punishing Depravity? A Pathfinder for Sex Offender Residency Restriction Statutes*, 43 CRIM. L. BULL. 834 (2007). For discussion of states where residency restrictions are automatic or discretionary, see Mary A. Lentz, § 13:3. Missing children—Megan's Law: Missing, Abused, and Neglected Children: Residency Laws for Sex Offenders in Various States, in LENTZ SCHOOL SECURITY (2011-2012 ed.); D. Scott Bennett, Sex Offender Registry Laws and School Boards, INQUIRY AND ANALYSIS, NAT'L SCHOOL BOARDS ASS'N (February 2008).

[34] See, e.g., Lisa Ann Minutola & Riya Saha Shah, *A Lifetime Label: Juvenile Sex Offender Registration*, 33 DEL. LAW. 8, 12 (2015).

[35] E.g., N.Y. CORRECT. LAW, §§ 168-169-W (2019). See generally Hinton, supra note xx (noting that many law-enforcement officials follow classification systems that are more nuanced, and therefore more restrictive than the ostensibly mandatory federal regime).

[36] See [N.Y.] Div. of Crim. Just. Services, "Risk Level & Designation Determination," https://www.criminaljustice.ny.gov/nsor/risk_levels.htm (last visited Jul. 29, 2019) (stating that "risk level governs the amount and type of information which can be released as community notification and also impacts duration of registration").

[37] **Citations TBS. See also Colorado**.

222

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1    that are used to compute a score indicating a high, moderate, or low risk of re-offending; sexual
2    attacks against strangers and a history of multiple offenses are among the factors considered
3    indicative of high risk.[39]

4         *b. Which Burdens?*

5         All states require registrants to update their registry information periodically and authorize
6    criminal punishment for failing to register or keep registry information up to date.[40] And the great
7    majority permit public access to registry information on an essentially unlimited basis.[41] Similarly,
8    most states, at their own initiative, regularly distribute registry information to the entire community
9    or to pertinent government agencies and to private organizations where contact with children or
10    other vulnerable individuals might occur.

11         Nearly all states bar sex offenders from working as teachers, security guards, and in other
12    sensitive occupations, but many exclude sex offenders from much more extensive forms of
13    employment.[42] Sex offenders are commonly prohibited from living near schools, parks, and other
14    places where children congregate.[43] And even when not formally excluded from living or working
15    at a certain place, community notification can create almost insuperable barriers to finding a
16    landlord or employer willing to deal with them. At least 17 states require sex offenders to wear a
17    GPS monitoring device that enables law enforcement to determine their location at all times. Other

---

[38] See GA. CODE ANN. § 42-1-12 et seq. (2019). For discussion of Georgia protocols for actuarial risk assessment, see Sexual Offender Registration Rev. Board [Ga.], *Sexual Offender Registration Review Board Standing Procedure* (last visited Jul. 29, 2019) https://www.sorrb.org/board-information/standing-procedures.

[39] For example, sexual attacks against strangers and a history of multiple offenses are high-risk indicators of recidivism. See Hinton, supra note xx.

[40] See Carpenter & Beverlin, supra note 29, at 1078 (2012) (describing sex-offender registry laws enacted in the wake of federal SORNA).

[41] For details, see Reporters' Note to Section 213.12H, infra. See also "Collateral Consequences," ABA CRIMINAL JUSTICE SECTION, http://www.abacollateralconsequences.org/search/?jurisdiction=37.

[42] See "Collateral Consequences," supra note 41; Sara Geraghty, *Challenging the Banishment of Registered Sex Offenders from the State of Georgia: A Practitioner's Perspective*, 42 HARV. C.R.-C.L. L. REV. 513, 515 (2007).

[43] Geraghty, supra note 42, at 514-515 (summarizing states' residency-restriction laws). For further detail, see notes 151-152, infra.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1 restrictions, less common for the time being, range from GPS monitoring[44] and limits on using the
2 Internet[45] to chemical castration.[46]

3 **5. Results.**

4 Because most states have implemented simultaneously a package of diverse sex-offender
5 duties and restrictions, much of the data-driven research cannot tease out the separate effects of
6 registration alone or of other common elements of sex-offender policy. Other research
7 methodologies do shed some light on that question, but the overall picture is best understood by
8 beginning with what is known about the impact of sex-offender collateral consequences generally.
9 This Note then focuses on the likely benefits and costs of their individual components, and the
10 Notes to Sections 213.12H & I return to that question, with more sustained attention to the impact
11 of collateral consequences other than law-enforcement registration alone.

12 *a. Intended Effects and Inherent Limitations*. The various collateral-consequence measures
13 (registration, public access, notification, residential restrictions, employment restrictions, and the
14 like) differ substantially in the burdens they represent for offenders, but broadly speaking they
15 share the same two goals—to reduce recidivism and to facilitate self-protective measures on the
16 part of the public. A collateral aim, no doubt, is to alleviate public fear, even if the measures have
17 no concrete effect on the behavior of offenders or law-abiding citizens. Some state legislators have
18 occasionally articulated a third objective that is specific to residency restrictions—the goal of
19 making life so difficult for convicted sex offenders that they will simply choose to leave the state.[47]

20 The success of sex-offender collateral-consequence laws in reducing recidivism has been
21 extensively studied, and there is also significant research examining how members of the public

---

[44] See Kamika Dunlap, *Sex Offenders After Prison: Lifetime GPS Monitoring?*, FINDLAW BLOTTER, February 1, 2011; Michelle L. Meloy & Shareda Coleman, GPS Monitoring of Sex Offenders, in *Wright*, supra note 16, at 243 (reporting that as many as 46 states use GPS monitoring to track sex offenders under some circumstances). The Supreme Court has held that GPS monitoring of a sex offender parolee constitutes a search that must meet Fourth Amendment requirements of reasonableness, but the Court did not reach the question whether such monitoring passes muster under that standard. Grady v. North Carolina, March 30, 2015.

[45] See Charles Wilson, Court Upholds Ind. Facebook Ban for Sex Offenders, ASSOCIATED PRESS, June 25, 2012, available at http://abcnews.go.com/Technology/wireStory/judge-upholds-ind-facebook-ban-sex-offenders-16642465#.T-ikN_LNnio (discussing cases in which courts have held bans on internet use compatible with the first amendment.

[46] See Alan Blinder, "What to Know about the Alabama Chemical Castration Law," N.Y. Times, June 11, 2019. Other states imposing chemical castration on some paroled sex offenders include California, Florida, Louisiana, and Wisconsin. Id.

[47] See Nancy Badertscher, Law to Track Sex Offenders Studied, *Atlanta J.-Const.*, Aug. 16, 2005, at B1 (quoting Representative Keen, the sponsor of proposed residency restrictions, as saying: "If it becomes too onerous and too inconvenient, [sex offenders] just may want to live somewhere else… And I don't care where, as long as it's not Georgia"); Editorial, Sex Offenders Won't Vanish for Good, *Atlanta J.-Const.*, Mar. 23, 2006, at 14A (quoting Jerry Keen, House Majority Leader, as stating: "Candidly … they will in many cases have to move to another state").

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1  alter their behavior in response to these laws. The research consistently establishes four points.
2  First, in terms of the primary objective—reducing recidivism—the studies conducted to date are
3  either inconclusive or establish that pertinent gains were not achieved. Similarly, with respect to
4  the aim of enhancing citizen self-protection, research has detected no significant measurable
5  benefits and powerfully counterproductive side effects: community notification, unrestricted
6  citizen access to registry information, and restrictions on residency and employment are associated
7  with strongly negative impacts on offenders, including great difficulty reintegrating into society
8  and significantly enhanced rates of recidivism.[48] Third, there is an inherent mismatch between the
9  risks that different sorts of sex offenders pose and the restrictions to which they are subject. Finally,
10  the laws are expensive to implement.

11      (i) *Reducing Recidivism*. The Supreme Court, echoing a commonly held view, has stated
12  that "[t]he risk of recidivism posed by sex offenders is 'frightening and high.'"[49] There is little to
13  no evidence to support this assumption, which has been thoroughly debunked.[50] Recidivism in this
14  group of offenders is not unusually elevated; the available research strongly suggests the
15  opposite—that "[s]ex offenders have some of the lowest recidivism rates of any class of
16  criminal."[51] In a 2002 Department of Justice study, sex crimes were one of the offense categories
17  for which convicted offenders had the lowest rates of re-arrest for any new offense, and only 2.5
18  percent of released rapists were rearrested for a new rape, while 13.4 percent of released robbers
19  were rearrested for a new robbery and 22 percent of offenders convicted of a non-sexual assault
20  were rearrested for a new assault.[52]

---

[48] See Reporters' Notes, *infra*.

[49] Smith v. Doe, 538 U.S. 84, 103 (2003) (quoting McKune v. Lile, 536 U.S. 24, 34 (2002)).

[50] See, e.g., Ira Mark Ellman & Tara Ellman, "Frightening and High": The Supreme Court's Crucial Mistake about Crime Statistics, 30 *Constit. Comm.* 495 (2015). One writer notes that there is "vanishingly little evidence for the Supreme Court's assertion," and that the origin of its mistake was simply "a throwaway line in a glossy magazine." Adam Liptak, Did the Supreme Court Base a Ruling on a Myth?, N.Y. Times, March 6, 2017.

[51] Stuart A. Scheingold et al., *Sexual Violence, Victim Advocacy, and Republican Criminology: Washington State's Community Protection Act*, 28 LAW & SOC'Y REV. 729, 743 (1994) (noting that "as few as 5.3% [of sex offenders] re-offend within three years, according to the Bureau of Justice Statistics, as opposed to rates in the 65 to 80% range for drug offenders and thieves." See also Katherine K. Baker, *Once a Rapist? Motivational Evidence and Relevancy in Rape Law*, 110 HARV. L. REV. 563, 578 (1997) (noting evidence that convicted rapists are less likely to re-offend than convicted burglars and thieves); Wesley G. Jennings, Richard Tewksbury & Kristen Zgoba, Sex Offenders: Recidivism and Collateral Consequences, available at NCJRS https://www.ncjrs.gov/pdffiles1/nij/grants/238060.pdf (2011).

[52] U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1994, at 1, 9 (2002). See also U.S. Dept. of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders, 25-26 (1997) (among felony offenders placed on probation, "rapists had a lower rate of re-arrest for [any] new felony and a lower rate of re-arrest for a violent felony than most categories of probationers with convictions

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

Importantly, recorded recidivism rates for sex offenses are deflated by exceptionally low rates of reporting, arrest, and conviction for these crimes. A number of methodologies have been used to control for this difficulty. But recidivism is surely a greater concern than the data imply, and awareness of this distortion arguably bolsters the case for registration policies to strengthen prevention of crimes that are more frequent than might appear. But low rates of reporting, arrest, and conviction also mean that the great majority of those who commit sex offenses are not convicted in the first place, so they are not on a registry when they commit their subsequent offenses. Registry regimes cannot help prevent this large chunk of recidivist sex offenses. Indeed, many professionals believe they actually *impede* effective enforcement by focusing attention on a relatively small population of unlikely recidivists, at the expense of attention to the much larger population of potential offenders not yet caught and therefore not yet on any registry.

Misunderstandings about the data on these points are sufficiently widespread to warrant further discussion. On several occasions, the Supreme Court has stated that "convicted sex offenders are much more likely than any other type of offender to be rearrested for a new rape or sexual assault."[53] The claim is literally true but misleading. It relies on a Bureau of Justice Statistics finding that a convicted rapist is more likely than someone convicted of some other crime (e.g., bank robbery) to be arrested subsequently for rape;[54] it does not find that rapists, as compared to other offenders, have a higher rate of recidivism for their offense of conviction or for subsequent crime generally. Indeed, a Justice Department analysis of prisoners released in 1994 found that among 1717 ex-prisoners subsequently arrested for rape, *less than five percent* had previously been convicted of that offense.[55] Properly understood, in other words, the data invoked to support sex-offender registration paradoxically show how *mis*directed these laws are: By focusing attention on offenders previously convicted of rape, such legislation risks diverting attention from the vastly larger pool of individuals who will eventually commit that crime—individuals who were previously convicted of other offenses or not previously convicted of any crime at all.

Although sex offenders, therefore, are *not* more likely than other offenders to re-offend, collateral-consequence legislation arguably could be defended on the basis that sex crimes, being distinctively harmful and unsettling, warrant special effort to prevent them. The crucial question, then, is whether registration and other collateral-consequence measures have succeeded in doing so. Most studies suggest that they have not.

---

for violence"). All such studies are of course sensitive to the definition of re-offending (which offenses and whether established by arrest or conviction), and the time period over which recidivism is measured.

[53] Smith, supra, 538 U.S. at 103 (quoting *McKune*, 536 U.S. at 33).

[54] U.S. Dept. of Justice, Sex Offenses and Offenders, supra note xx, at 27.

[55] U.S. Dept. of Justice, Recidivism of Prisoners Released in 1994, supra note xx, at 9-10.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1       Before-after studies have found no significant correlation between recidivism rates and the
2  passage of registration laws, public registries, and community notification,[56] A regression analysis
3  found that *registration alone*, by keeping police informed about sex offenders in the area, tended
4  to deter the frequency of reported sex offenses against neighbors of the offender (but not against
5  family members or more distant strangers).[57] *Notification laws* had some apparent crime-reduction
6  effect by deterring *non-registered* offenders from committing offenses that would render them
7  eligible for this sanction,[58] but community notification also tended to increase recidivism among

---

[56] For New Jersey, a statewide study found a long-term downward trend in sex-offense rates, with an acceleration of the trend when Megan's Law passed in 1994. But when disaggregated to the county-level, that effect became negligible; in six counties (of 21 studied) there was no statistically significant change in the long-term downtrend, and in six others, the acceleration of that trend preceded passage of Megan's Law. Kristen Zgoba & Philip Witt, Megan's Law: Assessing the Practical and Monetary Efficacy, N.J. Dep't of Corrs. (Dec., 2008), available at https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf. The New Jersey study based sex-offending rates on arrest data, a potential source of bias, either because registered offenders were more easily targeted and arrested (an effect that would generate arrest statistics higher than the actual rate of re-offending post-1994), or because law- enforcement arrest efforts slackened in a false-sense-of-security effect (which would generate arrest statistics lower than the actual rate of re-offending post-1994). Whatever the bias, it would seem that any positive effect on recidivism was too slight to be detected in any but very subtle analysis. In a different research sample, the New Jersey researchers tracked sex offenders released from prison between 1990 and 2000; they found a significant drop in re-offending post-1994 (from 50 percent to 41 percent), but the drop cut across all offenses, with no statistically significant drop for *sexual* offenses, with respect either to likelihood of re-arrest or time from prison release to re-arrest. Id. at 21-32.

A before-after study of community notification in the state of Washington produced similar findings: no significant drop in the rate of re-arrest for sex crimes, and a slightly larger but still statistically insignificant drop in the rate of re-arrest for crimes generally. Donna D. Schram & Cheryl Darling Milloy, Community Notification: A Study of Offender Characteristics and Recidivism 17, 19, Washington State Institute for Public Policy (Oct., 1995), available at http://www.wsipp.wa.gov/rptfiles/chrrec.pdf. In the case of crimes generally, there was a substantial difference in the time to the first re-arrest (a median of only 25 months for the notification group but much better— 62 months—for the control group); nonetheless, this difference could have been due to the use of arrest statistics as a proxy for re-offending rates, and in any case the difference was observed only in re-arrests for crimes generally, not in re-arrests for sex crimes.

A study relying on three distinct data sets and three outcome measures (crime rates for sex offenses, recidivism rates for sex offenders, and location-specific incidence of offenses) found "[no] support [for] the hypothesis that sex offender registries are effective tools for increasing public safety." Amanda Y. Agan, *Sex Offender Registries: Fear without Function?*, 54 J. L. & ECON. 207, 207 (2011).

[57] J.J. Prescott & Jonah E. Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J. L. & ECON. 161 (2011). On the complexity of disentangling the effects of registration as such from accompanying measures involving community notification, see James Vess et al., *International Sex Offender Registration Laws: Research and Evaluation Issues Based on a Review of Current Scientific Literature*, 14 POLICE PRACTICE AND RESEARCH: AN INTERNATIONAL JOURNAL 322 (2014).

[58] Deterrence has not been officially advanced as a policy rationale for registration laws, and to do so would undermine the classification of these collateral consequences as non-punitive; that classification

© 2019 by The American Law Institute
Council Draft – not approved

1   offenders who *were* registered. As a result, "any beneficial effect of registration on recidivism is
2   dampened by the use of notification, and [thus] . . . the punitive aspects of notification laws may
3   have perverse consequences."[59]

4        Overall, the available research does not conclusively exclude the possibility that
5   registration, notification, restricted residency, and similar collateral consequences could
6   potentially contribute to public safety. But after two decades of experience with such laws, and
7   with the considerable body of evidence that experience has generated, their beneficial effects (if
8   any) have yet to be discerned.

9        One reason for this inability to detect public-safety benefits may be that some benefits were
10  realized but were offset by the negative consequences for public safety that these laws also entail.
11  That possibility is examined in Note 5(b) below.

12       (ii) *Transparency and Self-protection*. Public access and community notification give the
13  public and organizations responsible for the welfare of vulnerable populations an ability to take
14  precautions. Indeed, the perception of transparency and empowerment seems to follow almost
15  automatically from public access and community notification. But their effects have been
16  decidedly mixed. The evidence is discussed in the Reporters' Note to Section 213.12H, which
17  addresses the specifics of public access to registry information. Overall, the research suggests that
18  public awareness typically prompts few self-protective measures, and that the very existence of
19  these regimes tends to divert attention away from much more significant sexual dangers.[60]

20       (iii) *Mismatch*. The collateral-consequence laws under consideration here were initially
21  prompted by cases like Megan Kanka's: a young child sexually assaulted by a stranger with a prior
22  history of sexual offenses who was, unbeknownst to her parents, living nearby. Nonetheless, from
23  the start these laws extended their reach to offenses against adults and to offenders who were well
24  known to their victims. Such expansive conceptions of the offenders to be targeted are
25  understandable and potentially justified, but they sweep within the single rubric of the "sex
26  offender" individuals who may present different risks that, if so, call for different measures of
27  social protection. Offenders can be distinguished on three especially important dimensions. But
28  those differences are not necessarily stable. A fourth problem is that not all offenders "specialize"
29  in a particular type of victim or a sexual offense. Instead, research finds significant rates of "cross-
30  over" sexual offending ("polymorphism" in the language of behavioral science). These four
31  "mismatch" concerns are crucial for sound registration policy.

32       First is the "stranger danger" myth. Though contemporary sex offender registration
33  regimes grew out of highly publicized stranger crimes, most sexual assaults—by a wide margin—
34  involve family members or acquaintances. In a Wisconsin sample of 200 recidivist sex offenders,

---

is the foundation for an extensive Supreme Court jurisprudence holding that these "regulatory" measures
are not subject to the ex post facto prohibition. **CITES.**

[59] Prescott & Rockoff, supra n.55, at 181.

[60] See Reporters' Note to Section 213.12H, infra.

© 2019 by The American Law Institute
Council Draft – not approved

1  *none* had perpetrated crimes against strangers; a more comprehensive Justice Department study
2  found that among child victims of sexual abuse, 34 percent had been molested by family members
3  and an additional 25 percent by close acquaintances.[61] Moreover, despite important qualifications
4  in the "cross-over" literature discussed below, perpetrators who molest a family member seldom
5  go on to target strangers. It should be superfluous to point out that the needs for notification and
6  residency restrictions are quite different (if they apply at all) when a parent is convicted of
7  molesting the parent's own child; yet stranger assaults and acquaintance assaults are legally
8  identical offenses. That means that in the prevalent state and federal approach, classifying
9  offenders automatically based on the legal offense of conviction, stranger and acquaintance
10 offenses entail precisely the same collateral consequences.

11      Second, the "child victim" concern is not a myth, but it involves a distinctive set of
12 behavioral and rehabilitative issues. Offenders who target young, pre-adolescent children
13 (pedophiles) usually present different risks from those of the offender who has assaulted an adult.
14 Many classification regimes automatically place offenses against minors in a more serious
15 category, but some do not. And even where that distinction is drawn, it is often insufficiently
16 discriminating. Classifications often fail to take into account the age of the minor victim or to
17 differentiate between pedophiles and offenders who are themselves teenagers who had consensual
18 sex with other teens who were close or identical in age.

19      Third, is the problem of risk vs. remedy. Offenses involving adults, even those in the least
20 serious category, nonetheless remain subject to the full panoply of collateral consequences; their
21 treatment may differ from offenses against children, as in the federal regime, only in the length of
22 the registration period (merely 15 years rather than 25 years or life). Yet many of the required
23 collateral consequences—such as the federal mandate to notify day-care centers and common state
24 mandates barring residence close to school zones (not to mention prohibitions on living near a
25 school-bus stop)—apply even though the necessity for these measures is different or nonexistent
26 when the offender is an employer who groped an adult employee in the store room or a person
27 who raped an adult stranger but shows no indication of being attracted to pre-adolescent children.[62]

28      Fourth, "cross-over" offending complicates this picture. Although in conventional wisdom,
29 the pedophile and the person who forcibly rapes an adult are often assumed to harbor different
30 sexual proclivities, this is not uniformly true. One recent study of the issue found that among
31 recidivist offenders, 37 percent of those who initially raped or sexually assaulted an adult

---

[61] See Jill Levenson, Sex Offender Residence Restrictions, in SEX OFFENDER LAWS: FAILED POLICIES, NEW DIRECTIONS 267, 275 (Richard G. Wright Ed., 2009); PATRICIA TJADEN & NANCY THOENNES, DEP'T OF JUSTICE, Findings From the National Violence Against Women Survey, available at https://www.ncjrs.gov/pdffiles1/nij/210346.pdf (2006).

[62] In many states, residency restrictions apply to all offenders regardless of their classification. Catherine Elton, Behind the Picket Fence, THE BOSTON GLOBE, May 6, 2007, at 36; Geraghty, supra note xx, at 516.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1    subsequently committed a sexual offense against a pre-pubescent child.[63] Research finds similar,
2    though less pronounced, polymorphism across the stranger-acquaintance divide. In one study of
3    sexual recidivists, over 25 percent had sexually assaulted both strangers and non-strangers,[64] but
4    other studies find recidivist targeting patterns to be "highly stable" in terms of victim-offender
5    relationship (i.e., stranger vs. acquaintance vs. intra-familial) as well as the victim's gender.[65]
6    Cross-over offending cautions against narrowly matching collateral sanctions to the character of
7    the triggering offense. But because baseline rates of recidivism for sexual offenses are quite low
8    (only 2.5 percent in one Department of Justice study),[66] cross-over offenses by previously
9    convicted recidivists represent a small sliver of the total problem, arguably not enough to justify
10   the law-enforcement effort and expense devoted to the issue. And some aspects of cross-over
11   offending actually reinforce these reasons to restrict rather than extend the scope of registration
12   and notification. One study of recidivist sex offenders released on parole found that only 4.5
13   percent had been arrested only for sex offenses. The others had heterogeneous prior records—they
14   had either committed a nonsexual offense first (and hence would not have been on a registry prior
15   to committing their sexual offense) or they committed a sex offense first (and hence would have

---

[63] Jenna Rice & Raymond A. Knight, *Differentiating Adults with Mixed Age Victims from Those Who Exclusively Sexually Assault Children or Adults*, 31(4) SEXUAL ABUSE: A J. OF RES. AND TREATMENT 410, 411 (2019). Accord, Skye Stephens, et al., *Examining the Role of Opportunity in the Offense Behavior of Victim Age Polymorphic Sex Offenders*, 52 J. OF CRIM. JUST. 41, 41 (2017) (reporting "high levels of polymorphism" in regard to the targeting of adult vs. child victims); Skye Stephens, et al., *The Relationships Between Victim Age, Gender, and Relationship Polymorphism and Sexual Recidivism*, 30(2) SEXUAL ABUSE: A J. OF RES. AND TREATMENT 132, 141 (2018) (finding age-based polymorphism to be most common type). An earlier study found a much higher rate of adult-victim/child-victim cross-over offending (70%) among prison inmates, but a much lower rate (18% among parolees; researches speculated that parolees may have been less truthful for fear of triggering greater parole restrictions. See Peggy Heil, et al., *Crossover Sexual Offenses*, 15 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 221, 229 (2003). See also Mariana A. Saramago, Jorge Cardoso & Isabel Leal, *Victim Crossover Index Offending Patterns and Predictors in a Portuguese Sample*, 24 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 1, 1 (2018) (finding that among sexual recidivists in a Portuguese prison, 48% had victims in different age categories).

    Related, but indicative of the widely divergent estimates of age-based polymorphism, see Jessica N. Owens, et al., *Investigative Aspects of Crossover Offending from a Sample of FBI Online Child Sexual Exploitation Cases*, 30 AGGRESSION AND VIOLENT BEHAVIOR 3, 3 (2016) (reporting that "[r]eliable estimates vary about the percentage of child pornography offenders who also engage in other sexual crimes against children, ranging from 3 to 5% to 85%.").

[64] Rachel Lovella, et al., *Offending Patterns for Serial Sex Offenders Identified via the DNA Testing of Previously Unsubmitted Sexual Assault Kits*, 52 J. OF CRIM. JUST. 68, 72 (2017). The authors also find that among recidivists who targeted strangers, there was significant cross-over offending by age. Id.

[65] Skye Stephens, et al., supra n.xx, 52 J. OF CRIM. JUST. at 41 (2017) (finding rates of polymorphism below 10% for victim gender and below 20% in terms of victim-offender relationship).

[66] See text at note xx, infra. On the inferences to be drawn from the fact that exceptionally low conviction rates for sex offenses artificially deflate these recidivism figures, see text following note xx, infra.

© 2019 by The American Law Institute
Council Draft – not approved

1  been on a registry subject to law-enforcement attention in that regard, but then went on to commit
2  a nonsexual offense).[67]

3        (iv) *Cost.* Legislators sometimes assume that registration, residency restrictions, and other
4  collateral burdens on sex offenders are virtually cost-free so far as the state itself is concerned. But
5  these measures are expensive to implement, especially when (as is typical) the requirements target
6  a large, heterogeneous group of offenders. Recording and updating the required information and
7  installing the requisite website technology can cost each jurisdiction millions of dollars per year,[68]
8  without even counting the resulting need for law-enforcement personnel to reduce the time they
9  can devote to responding to emergencies and other duties.[69]

10       This experience raises great doubt about whether these measures are fiscally viable and
11 worth their direct costs to state and local government. Many state criminal-justice agencies, after
12 careful assessment, have concluded that they are not, especially when more selective approaches
13 can achieve most or all of the benefits at considerably lower cost.[70]

14       *b. Unintended Effects.* In contrast to the intended benefits of collateral sanctions, for which
15 empirical measures of success are disappointing or nonexistent, unintended negative side-effects
16 are well-documented. This is particularly true with respect to burdens that extend beyond the
17 disclosure of registry information to law-enforcement agencies themselve—burdens such as public
18 access, community notification, and restrictions on residency and employment. The issue is
19 discussed in more detail in the Reporters' Note to Section 213.12I, which addresses the specifics
20 of collateral consequences additional to the duty to register with law enforcement.[71]

21       The negative impacts *on offenders* include difficulty in obtaining housing and employment,
22 psychological stigma, and physical abuse by misguided members of the public.[72] These
23 consequences in turn mean negative impacts *for public safety* because the adverse personal impacts
24 for offenders impede their reintegration into society and aggravate their risks of re-offending.[73]

[67] See Jeffrey Lin & Walter Simon, *Examining Specialization Among Sex Offenders Released From Prison*, 28(3) SEXUAL ABUSE: A J. OF RES. AND TREATMENT 253, 263 (2016).

[68] See text accompanying notes xx-xx, supra. See also Hinton, supra note xx, at 2.

[69] See Geraghty, supra, note 40, at 518.

[70] See text accompanying note xx, supra.

[71] See Reporters' Note to Section 213.12G, infra.

[72] See, e.g., E.B. v. Verniero, 119 F.3d 1077, 1102 (3d Cir. 1997) ("The record documents that registrants and their families have experienced profound humiliation and isolation as a result of the reaction of those notified. Employment and employment opportunities have been jeopardized or lost. Housing and housing opportunities have suffered a similar fate. Family and other personal relationships have been destroyed or severely strained. Retribution has been visited by private, unlawful violence and threats . . . .").

[73] Prescott & Rockoff, supra note 55, at 181.

231

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1    It could be that the intuitively plausible law-enforcement benefits of these laws partially or
2  fully offset these negative consequences for public safety, a result that would explain the inability
3  of researchers to detect any *net* gain in re-offending rates. If so, the resulting symmetry is a poor
4  one, taking no account of the human consequences for registered offenders and their families, and
5  achieving a public-safety equilibrium only by driving up law-enforcement effort and expense to a
6  sufficient extent to counterbalance the *increased* dangerousness of potential offenders.

7    Perhaps unexpectedly, victim advocates and organizations actively engaged in providing
8  support services for rape survivors share these concerns and have been forceful critics of
9  registration and other collateral consequences. A recurring grievance is the way that registration
10  and notification have "done a disservice by . . . the construction of sexual assault risk—who poses
11  it, who faces it, and how to mitigate it—and [by] the reinforcement of a victim hierarchy that
12  demeans most victims."[74] Victim services organizations like state-based Coalition[s] Against
13  Sexual Assault (CASA's) repeatedly elaborate on this theme. A victim advocate affiliated with a
14  CASA in the Northeast explained that these laws "have confused the public by emphasizing the
15  least common offender."[75] At another CASA, an advocate noted that "Vulnerability [for sexual
16  abuse] is actually reinforced by these laws because it turns the attention [of the public and the
17  criminal justice system towards] one-percent of the crime."[76]

18    Advocates similarly object that sex offender laws "reinforce a narrow [view] that only
19  forced sexual contact with a stranger that results in grave bodily harm is a 'real'assault, and that
20  only child victims are 'real victims'"[77]; that view in turn 'makes it harder [for victims] to come
21  forward [because the laws] reinforce the notion that [the justice system, the public, and service
22  providers] are only interested in a specific offender type.'"[78]

23    Another prominent concern for victim advocates has been that expensive initiatives to
24  impose collateral-consequence restrictions on offenders have been coupled with "absolutely no
25  corresponding increase in material support for victim services."[79] Further, "[a]ccording to several
26  CASAs, these expensive laws have demonstrated little to no discernable impact on reducing
27  recidivism. Instead, they eat up scarce resources, scare victims into not reporting [an abusive]

---

[74] Rachel Kate Bandy, "The Impact of Sex Offender Policies on Victims," in *Wright*, supra n.xx, at 491.

[75] Id. (quoting CASA interviewee).

[76] Id (quoting CASA interviewee located on West coast).

[77] Id., at 493.

[78] Id., (quoting CASA interviewee based in Southeast).

[79] Id., at 502 (reporting views of a West Coast CASA).

232

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1   loved one, and reinforce to the public stereotypes about what violence is and who perpetrates it.[80]
2   One advocate summarizes that "[t]hese policies are about a *sense* of safety, not *real* safety."[81]

3           Patricia Wetterling, the mother of a murder victim, is widely credited with playing a pivotal
4   role in enactment of SORNA's predecessor, the first federal legislation mandating the creation of
5   state regimes for sex-offender registration.[82] Wetterling continues to support registration as a
6   useful law enforcement tool, along with notification when it is carefully done ("the way we do it
7   in Minnesota"), but she has come to regret much of the overextended legislation that her initiative
8   spawned. She describes residency restrictions as "ludicrous," noting that "most sex offenses are
9   committed by somebody that gains your trust, or is a friend or relative…. [N]one of these laws
10  address the real [problem] that nobody wants to talk about."[83]

11          Registration of juvenile offenders has had distinctively harsh consequences, and
12  assessments of its value have been especially negative. The relevant research is discussed in the
13  Reporters' Note to Section 213.12A(3), which imposes special limits on juvenile registration.

14          ***6. The Model Code: Sections 213.12A-J.*** A regime to govern sex-offender collateral
15  consequences must address dense thicket of substantive and procedural issues. Distinctive features
16  of local law necessarily affect the appropriate statutory structure and language dealing with
17  operational detail. Thus, many facets of scope and implementation do not lend themselves to
18  treatment in Model Code intended for a multi-jurisdictional audience. Crucial issues of drafting
19  and policy, however, are common to all jurisdictions and can be addressed in universal terms:
20  Which offenses and which offenders should ever be subject to restrictions specific to sex
21  offenders? How much information should be publicly accessible? Should particular collateral
22  sanctions (for example, limits on where an offender can live) ever be imposed upon conviction of
23  a sexual offense? If so, which sex offenses should trigger exposure to that sanction, and should it
24  be imposed automatically or only after an individualized assessment of benefits and costs? What
25  should be the duration of the disabilities in question? What procedural safeguards should attend
26  the determination of whether a particular offender should be subject to a particular disability or
27  whether a previously imposed disability should be lifted? Sections 213.12A-J address broadly
28  relevant issues of this kind.

---

[80] Id., at 505.

[81] 505 (quoting a West Coast CASA advocate and noting that as a result, the unintended byproduct of these laws "may well be the creation of more victims.").

[82] See text at n.xx, supra.

[83] Patricia Wetterling & Richard G. Wright, The Politics of Sex Offender Policies: An Interview with Patricia Wetterling, in Wright, supra note xx, at 101-103. For further discussion of Wetterling's further criticism of residency restrictions see Reporters" Note to Section 213.12H, infra.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1       Sections 213.12A-J do not accept the federal framework as a given and instead reconsider
2  the federal baseline on its merits, for two reasons. First, the federal "mandate" is quite weak,
3  because noncompliance causes states to lose only 10 percent of their federal law-enforcement
4  grants.[84] By comparison, the costs of compliance typically are many times greater. For example,
5  in California, the state's Sex Offender Management Board estimated that complying with federal
6  SORNA would cost the state at least $38 million, as against a loss of only $2.1 million in federal
7  funds.[85] For Texas, comparable figures were assessed at a cost of $39 million for SORNA
8  compliance, as against a loss of only $1.4 million in federal funding.[86] In Colorado, the state
9  estimated that the federal funds lost ($240,000) would suffice to implement SORNA only in a
10  single mid-size law-enforcement agency.[87] As a result, in most states, SORNA is seen as an
11  unfunded mandate of considerable proportions.[88]

12       Second, and partly as a consequence of the first point, as of August 2019, only 22 states
13  had complied with the federal mandate.[89] All states have some system for registering sex
14  offenders, but the majority have chosen to go their own way, adopting more flexible approaches,
15  even at the cost of losing some federal funds. The collateral burdens imposed on sex offenders
16  vary widely, exceeding the federal minimum in some jurisdictions but falling below it in others.

---

[84] 34 U.S.C. § 20925(a) (2019).

[85] California Sex Offender Management Board, Adam Walsh Act Statement of Position 3-4 (n.d.), available at http://www.opd.ohio.gov/AWA_Information/AWA_CA_SOMB_SORNA_Position_Paper.pdf. The implementation costs continue to dwarf even the more substantial loss of federal funds ($3.2 million) that California faced for fiscal 2011. See National Conference of State Legislatures, SORNA Noncompliance Penalties, available at http://www.ncsl.org/Portals/1/documents/cj/jagstatedollars.pdf.

[86] Senate Criminal Justice Committee [Texas], Interim Report 14 (Dec. 15, 2010), available at http://www.senate.state.tx.us/75r/Senate/commit/c590/c590.InterimReport81.pdf.

[87] Colorado Sex Offender Management Board, White Paper on the Adam Walsh Child Protection & Safety Act of 2006, at 17 (Sept. 2008), available at http://dcj.state.co.us/odvsom/Sex_Offender/SO_Pdfs/SOMB%20AWA%20White%20Paper%20Final%20-%2009-19-08.pdf. In addition to the California, Colorado, and Texas assessments just cited, see also Russell Hinton, "Georgia's Sexual Offender Registry" GEORGIA DEPARTMENT OF AUDITS AND ACCOUNTS PERFORMANCE AUDIT OPERATIONS 09-18 (2010), available at http://www.atlantaunfiltered.com/wp-content/uploads/2010/08/sex-offender-registry-audit.pdf.

[88] See Dylan Scott, States Find SORNA Non-Compliance Cheaper, Nov. 7, 2011, available at http://www.governing.com/blogs/fedwatch/States-Find-SORNA-Non-Compliance-Cheaper.html#.

[89] See "SORNA" OFFICE OF JUSTICE PROGRAMS, DEPARTMENT OF JUSTICE, http://ojp.gov/smart/sorna.htm (last accessed August 10, 2019) (listing 22 states that "[h]ave substantially implemented SORNA"). Prior to 2016, the Department of Justice considered only 17of the 50 states to be SORNA-compliant. DoJ guidance finalized in August 2016 provided states "greater flexibility" in implementing SORNA's requirements with respect to juvenile registration. See Office of the Attorney General, Supplemental Guidelines for Juvenile Registration Under the Sex Offender Registration and Notification Act, 81 Fed. Reg. 50,522, 50,552 (Aug. 1, 2016). The relaxation of these rules permitted a modest increase in the count of SORNA-compliant states.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1     This pattern suggests widespread dissatisfaction with the federal regime, whether because of fiscal
2 or policy concerns.

3         For these reasons, Sections 213.12A-J, while targeting issues that the federal mandate
4 currently leaves to the discretion of the states, also evaluate, and in part reject, approaches that
5 current federal law seeks to mandate nationwide. The potential benefits of sex-offender collateral
6 consequences become attenuated and costs together with negative side-effects dominate decisively
7 when—as under currently prevalent law—the obligation to register applies indiscriminately to
8 offenders of widely divergent culpability and future risk; when public access to registry
9 information is essentially unlimited; and when special measures go beyond registration to include
10 affirmative community notification, occupational and residency restrictions, and the like. The
11 broad, inflexible sweep of collateral-consequence sanctions under federal SORNA and under the
12 legislation of most states is unjust and counterproductive. On this point, well-considered
13 arguments for a more limited approach have won a positive reception in the legislatures and law
14 enforcement agencies of a significant minority of the states, even in the face of considerable
15 political risk. By delineating a balanced, discriminating approach, Sections 213.12A-J offer a
16 template for legislatures willing to consider much-needed reform in this area.

17         The Article 213 offense definitions limit eligibility for collateral sanctions of any sort, and
18 for eligible offenses, Sections 213.12A-J provide a structure for selectively assessing the need to
19 burden the offender with particular sorts of collateral consequences beyond the threshold
20 requirement of registration itself. These provisions require restraint in imposing registration,
21 community notification, residency restrictions and related collateral consequences, in light of the
22 public-policy costs of such sanctions that, although not readily apparent to the general public, are
23 nonetheless substantial and well-documented in all the relevant research.

24         Section 213.12A establishes the scope of the threshold duty to register. Issues relevant to
25 implementing that duty are discussed in the Reporters' Notes to Section 213.12B (for the notice
26 offenders must receive), Section 213.12C (for the time when the obligation to register ripens),
27 Section 213.12D (for the information registrants and states themselves must provide), Sections
28 213.12E & F (for the registrant's duty to periodically update registry information and the duration
29 of that duty), and Section 213.12G (for penalties applicable to failure to register or update registry
30 information as required). Consequences other than registration are discussed in more detail in the
31 Reporters' Notes to subsequent Sections, which restrict, substantively and procedurally, the
32 offender's exposure to other collateral consequences. Section 213.12H strictly limits public access
33 to registry information. Section 213.12I establishes a formal procedure for deciding on the need
34 for additional offender obligations or disabilities; identifies factors the authorized official must
35 weigh in determining whether a particular offender should incur such consequences[90]; and requires

---

[90] Statutory language is not the place to mandate specific risk assessment parameters. The sentencing judge or other authorized official will draw on detailed protocols that are evolving and continually refined for this purpose. See, e.g., Grant Duwe, *Better Practices in the Development and Validation of Recidivism Risk Assessments: The Minnesota Sex Offender Screening Tool-4*, 30 CRIM. JUSTICE POLICY REV. 538 (2019); R. Karl Hanson, et al. *The Field Validity of Static-99/R Sex Offender*

235

© 2019 by The American Law Institute
Council Draft – not approved

1     a written explanation of the reasons why any additional collateral consequence is justified in the
2     interest of public safety, after due consideration of its impact on the offenders prospects for
3     successful reintegration into law-abiding society. Finally, Section 213.12J addresses procedures
4     by which offenders can obtain early relief from sex-offender duties and disabilities, including the
5     duty to keep registry information current.

6           ***7. Section 213.12A. Registration for Law-Enforcement Purposes***

7           The findings canvassed above cast considerable doubt on the efficacy and wisdom of nearly
8     all the common collateral-consequence requirements enacted for sex offenders since the early
9     1990s. One response to that assessment would be to discard registration-related practices entirely
10     and treat sex offenders living in the community no differently from anyone else who has a criminal
11     record. That approach, however, gives insufficient weight to legitimate social interests, especially
12     the law enforcement interests that a local registry can serve.

13           To be sure, law-enforcement officials can readily retrieve criminal-history information,
14     regardless of the jurisdiction where the conviction occurred, when they need background on a
15     person of interest in a particular criminal investigation. But that option is more cumbersome than
16     the ability to quickly determine through the local registry whether that individual has a serious
17     sex-offense record. And a criminal-history search of the national data base is beside the point when
18     there is an effort to identify the unknown perpetrator of an unsettling sexual crime. At least to the
19     extent that the information does not leave law-enforcement hands, its public-safety value easily
20     outweighs the potential costs. An obligation to register with local law-enforcement authority
21     therefore seems readily defensible for the most serious offenders. Section 213.12A delineates the
22     appropriate reach of that obligation.

23           A significant difficulty is that once information exists anywhere in cyberspace, its
24     confidentiality is fragile, no matter what the law may say.[91] Whether the combined risks of data
25     breach and data misuse outweigh the law-enforcement value of location-specific sex-offender
26     information is not easy to determine; the answer inevitably depends in large part on the danger
27     posed by particular types of offenders. The difficulty of appraising that trade-off counsels in favor
28     of limiting the registration obligation, with its attendant costs, to offenders most likely to pose a
29     significant public-safety threat, and then relying on offender-specific assessments of risk, as many
30     states already do, to determine the frequency and duration of information-update obligations and
31     eligibility for early termination of registration and other collateral consequences.

32           A separate but especially salient interest is the value of heightened possibilities for citizen
33     self-protection in settings such as schools, day-care centers, and nursing homes, where staff have
34     frequent, unsupervised access to young children and other particularly vulnerable individuals. That

---

*Risk Assessment Tool in California*, 1 J. THREAT ASSESSMENT & MGMT. 102 (2014); R. Karl Hanson &
Kelly E. Morton-Bourgon, *The Accuracy of Recidivism Risk Assessments for Sexual Offenders: A Meta-Analysis of 118 Prediction Studies*, 21 PSYCHOL. ASSESSMENT 1(2009).

[91] Leakage of ostensibly confidential information has been a problem for registry information even
before the internet. See Logan, supra n.xx, at 229 n.218

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1     interest is discussed in connection with the provisions of Section 213.12H, which govern public

2     access to registry information.

3     *a. Section 213.12A(1): Adults convicted of sex offenses in this jurisdiction.* The Article

4     213 offense definitions classify as "registrable," and therefore capable of triggering sex-offender

5     collateral consequences, only those sexual offenses most likely to signal a propensity for

6     dangerous predatory sexual behavior. The following Article 213 offenses are classified as

7     registrable:

8     (i) *Section 213.1. Sexual Assault by Aggravated Physical Force or Restraint.* This, the most

9     serious sexual offense, involves exceptionally aggressive sexual abuse that clearly justifies special

10     concern about the danger of violent recidivism.

11     (ii) *Section 213.2. Sexual Assault by Physical Force.* This offense covers a wide range of

12     sexual misconduct, from that involving force just short of "aggravated physical force" to many

13     lesser degrees of force and threat, including any amount physical force that is more than negligible,

14     provided of course that the offender has the necessary culpable awareness of causing sexual

15     submission to or performance of penetration or oral sex without consent by those forcible means.

16     So defined, the offense includes within its reach misconduct that, while very serious, does not

17     necessarily mark the offender as a threat to children or a potentially violent predator. To require

18     registration for all such offenders would therefore be overbroad. Section 213.2 therefore classifies

19     the offense as registrable only when the offense conduct occurs after the offender had previously

20     been convicted of a felony sex offense.

21     (iii) *Section 213.3(1). Sexual Assault of an Incapacitated Person.* This offense similarly

22     covers a wide range of sexual misconduct, and the conduct within its reach, while very serious,

23     does not necessarily mark the offender as a threat to children or a potentially violent predator. To

24     require registration for all such offenders would therefore be overbroad. Section 213.3(1) therefore

25     classifies the offense as registrable only when the offense conduct occurs after the offender had

26     previously been convicted of a felony sex offense.

27     (iv) *Section 213.8(1) & (2).* These offenses involve sexual penetration or oral sex with a

28     victim under the age of 16 by an offender who is a *[reserved]* degree older. This is predatory sexual

29     abuse of exceptionally serious nature, justifying the special precautions that the sex-offender

30     registry permits.

31     (v) *Section 213.8(3).* This offense involves sexual penetration or oral sex with a victim

32     under the age of 21 by an offender who is a parent, guardian, or other adult in a similarly direct

33     position of trust and responsibility for the victim's welfare. This is exceptionally serious sexual

34     misconduct, involving exploitation and abuse of trust that calls for the special precautions that the

35     sex-offender registry permits.

36     The one comparably dangerous Article 213 offense not classified as registrable is the

37     offense of Sex Trafficking under Section 213.9. Like the registrable offenses, it is an especially

38     serious felony involving predatory behavior and exploitation of vulnerable victims. But as its

39     motivation is primarily economic, it calls for a different kind of law-enforcement attention. Unless

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1  its perpetrators are themselves guilty of other Article 213 offenses, they do not warrant inclusion
2  in a sex-offender registry that aims to identify a different sort of offender.
3       The other Article 213 offenses all involve serious crimes, and their perpetrators
4  undoubtedly may include a certain number of potential recidivists. But the empirical research and
5  experience detailed above makes clear that the currently prevalent approach, which seeks to cast
6  widest conceivably defensible net is unjust, costly, and counterproductive. With respect to the
7  other Article 213 offenses, the social harms of registration demonstrably outweigh its potential
8  benefits. Making this judgment explicit, Section 213.12A(1)(b) stipulates that no conviction for
9  any other criminal offense under Article 213 or any other criminal law of this jurisdiction can be
10  the basis for requiring sex-offender registration or any other obligation applicable to sex offenders
11  specifically, other than obligations incident to a suspended sentence, probation, or parole.
12       **b. Section 213.12A(2): Adults convicted of sex offenses in other jurisdictions.** Section
13  213.12A(2)(a) requires certain adults convicted sex offenses in other jurisdictions to register with
14  the appropriate local authority if they subsequently live, work, or study in this jurisdiction. This
15  out-of-state sex offender is subject to the registration obligations of Section 213.12 if and only if
16  two requirements are met: the offender must be obliged to register as a sex offender in the
17  jurisdiction where the offense was committed *and* the offense must be one that would be a
18  registrable offense if committed in this jurisdiction.
19       Many jurisdictions require sex-offender registration for a much broader array of offenses
20  than those that trigger registration obligations under Article 213. The policy judgment underlying
21  Section 213.12A, that sex-offender registration should be carefully targeted, makes registration
22  unnecessary and inappropriate in such cases. Accordingly, Section 213.12A(2)(b), like Section
23  213.12A(1)(b), stipulates that no conviction for any offense not registrable under Article 213 can
24  be the basis for requiring sex-offender registration or any other obligation in this jurisdiction
25  applicable to sex offenders specifically.
26       Conversely, an offender may have committed an offense that would be registrable if
27  committed in this jurisdiction but is not registrable in the jurisdiction where it was committed. That
28  situation will seldom arise in practice, because few states if any restrict the registration obligation
29  more narrowly than does Article 213. In such an event, however, the policy underlying Section
30  213.12A *would* call for the public-safety measures that Sections 213.12A-J contemplate, and some
31  jurisdictions accordingly require sex-offender registration on the basis of offenses not registrable
32  where committed, if the offense is registrable when committed in that jurisdiction.[92] Nonetheless,
33  since the offense was not registrable where committed, the offender would not receive registration-
34  related notice at the time of conviction. It is therefore neither practical nor fair for that offender to
35  face Section 213.12A requirements when subsequently entering this state.
36       With respect to other offenses committed outside this jurisdiction, the social harms of sex-
37  offender registration demonstrably outweigh its potential benefits. Accordingly, Section
38  213.12A(2)(b), like Section 213.12A(1)(b), stipulates that no conviction for any other criminal

---

[92] TBS.

© 2019 by The American Law Institute
Council Draft – not approved

1  offense can be the basis for imposing an obligation to register or any other obligation applicable
2  to sex offenders specifically.

3       ***c. Section 213.12A(3): Juvenile offenders***.

4       Under current law, many states impose duties to register and other sex-offender collateral
5  consequences for a long list of sex offenses even when the perpetrator was a minor at the time of
6  the misconduct. Registration is widely required, often for life, not only when the youthful offender
7  is convicted of a criminal offense as an adult but also in many circumstances where the offense
8  was the basis for an adjudication of delinquency. Federal SORNA seeks to require states to extend
9  registration to juveniles adjudicated delinquent if they were at least 14 years of age at the time of
10  the offense and the offense was comparable to or more severe than the federal crime of aggravated
11  sexual abuse or an attempt or conspiracy to commit that offense.[93]

12       The research is replete with heartbreaking stories of the unnecessarily cruel, life-destroying
13  impact of placing children on a sex-offender registry for offenses committed as minors.[94] The
14  impact has been not only harsh but particularly counterproductive. Victim advocates note that
15  "juvenile offender registration [has] inadvertently created a disincentive for victims to disclose
16  [their victimization]"[95]; that their clients "fear that there are no intermediate interventions
17  available"; and that when abused at the hands of a juvenile, "they fear that the youth will be
18  required to register as a sex offender and will, therefore, be 'branded' for life despite being
19  potentially amenable to treatment."[96]

20       Patricia Wetterling is especially outspoken in condemning juvenile registration. "I don't
21  see any, not one redeeming quality in doing that. . . . Registering juveniles is ludicrous and wrong
22  always." Noting that she objected to the language covering juveniles when the Jacob Wetterling
23  bill was being drafted, she recalls that she "kept raising questions about treating juveniles the same
24  way we treat adults. It makes no sense at all . . . . I was told not to worry about the juvenile
25  provisions because that would get thrown out. I was told there was no way that it would pass . . .
26  and yet [it did]."[97]

27       Victim advocates report that "juvenile offender registration [has] inadvertently created a
28  disincentive for victims to disclose [their victimization]."[98] They say their clients "fear that there
29  are no intermediate interventions available," and that when abused at the hands of a juvenile, "they

---

[93] SORNA § 20911(8) (2019). Under the federal criminal code, aggravated sexual abuse is defined as ...18 USCS § 2241.

[94] *Human Rights Watch, Raised on the Registry* (2013).

[95] Bandy, supra note 72, at 471, 488.

[96] Id.

[97] Wetterling & Wright, supra note 81, at 99, 101.

[98] Bandy, supra note 72x, at 471, 488.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1  fear that the youth will be required to register as a sex offender and will, therefore, be 'branded'
2  for life despite being potentially amenable to treatment."[99]

3      Apart from the vivid anecdotal evidence, systematic research tells a consistently negative
4  story. Findings suggest that registration of juveniles has no preventive effect[100] and substantial
5  criminogenic consequences, [101] with overall effects that are unambiguously negative. One
6  quantitative study estimates that juvenile registration alone saddles the public with social costs,
7  net of benefits, amounting to at least $40 million per year, and that community notification
8  pertaining to offenders placed on a registry as minors generates net social costs of at least $10
9  billion per year. [102]

10     Studies from other methodological perspectives consistently reach qualitatively similar
11  results.[103] In 2016, the Federal Advisory Committee on Juvenile Justice, in recommendations to
12  the Justice Department's Office of Juvenile Justice and Delinquency Prevention, reported that
13  juvenile sex offender registration laws "are inconsistent with research and evidence-based practice
14  and undermine positive outcomes." The Committee urged rejection of the registration approach
15  for juveniles in preference to using "evidence-based, community based and family-focused
16  responses." [104] Largely concurring in this recommendation, the Justice Department's official
17  guidance on the subject noted that "[j]uvenile cases have been pled to non-registration offenses at

---

[99] Id.

[100] Elizabeth J. Letourneau et al., *Juvenile Registration and Notification Policy Effects: A Multistate Evaluation Project*, National Criminal Justice Reference Service, http://www.ncjrs.gov/App/publications/abstract.aspx?ID=273674 (January 2018); Cynthia J. Najdowski et. al., *Adolescent Sex Offender Registration Policy: Perspectives on General Deterrence Potential from Criminology and Developmental Psychology*, 22 PSYCHOL., PUB. POL'Y, & L. 114 (2016).

[101] Catherine L. Carpenter, *Throwaway Children: The Tragic Consequences of a False Narrative*, 45 SW. L. REV. 461 (2016).

[102] See Richard B. Belzer, The Costs and Benefits of Subjecting Juveniles to Sex-Offender Registration and Notification, 41 R STREET POL'Y STUDY (2015), https://www.rstreet.org/wp-content/uploads/2015/09/RSTREET41.pdf.

[103] See, e.g., J.C. Sandler, et al., Juvenile Sexual Crime Reporting Rapes Are Not Influenced by Juvenile Sex Offender Registration Policies, *Psych., Pub. Pol'y & L.* (forthcoming 2020); E.J. Letourneau, et al., Juvenile Registration and Notification Policies Fail to Prevent First-Time Sexual Offenses: A Replication Study (manuscript under review, 2019); A.J. Harris, et al., *Collateral Consequences of Juvenile Sex Offender Registration and Notification: Results from a Survey of Treatment Providers*, 28 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 770 ((2016); Najdowski et. al., supra n.xx.

[104] GEORGE W. TIMBERLAKE & AMY M. DAVENPORT, FED. ADVISORY COMM. ON JUVENILE JUSTICE, RECOMMENDATIONS OF THE FEDERAL ADVISORY COMMITTEE ON JUVENILE JUSTICE 4 (2016), https://facjj.ojp.gov/ojpasset/Documents/FACJJ_Recommendation_OJJDP_November_2016.pdf.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12A. Registration for Law Enforcement Purposes

1     the expense of the juvenile not being eligible for treatment," even though "[c]ost-benefit analysis
2     demonstrates that sex-offender treatment programs for youth can provide a positive return on
3     taxpayer investment." The Department concluded that "[f]urther expansion of SORN [Sex
4     Offender Registration and Notification] with juveniles is not recommended."[105]

5            Responding in part to these assessments, several state courts have held that mandatory
6     registration of juvenile sex offenders is unconstitutional because it lacks an individualized
7     assessment of risk.[106] At a minimum, the research suggests, juvenile registration must be reserved
8     for "situations where either unique risk or needs are clearly associated with the commission of a
9     crime"[107] and offenders convicted (or adjudicated delinquent) for conduct as minors must have
10     viable opportunities to terminate their registration duties at an early date. But even a limited period
11     on a sex-offender registry leaves a youthful offender's sex-offense status widely available through
12     public and private databases, in effect creating long-term punishment and leading many to argue
13     that minors should be exempt from registration and notification requirements entirely.[108] Eleven
14     states specifically exclude minors from their state sex-offender registries, despite the federal
15     mandate to the contrary.[109]

16            Reflecting these persuasive assessments, Section 213.12A(3) rejects registration and all
17     associated disabilities for juveniles—that is, offenders under the age of 18 at the time of their
18     offense—regardless of the underlying offense, except in the case of offenders over 16 who are
19     criminally convicted of a sexual assault involving aggravated physical force or restraint, in
20     violation of Section 213.1.

---

[105] *U.S. Dep't of Justice, Office of Justice Programs, Sex Offender Management Assessment and Planning Initiative* (2016).

[106] In re C.P., 967 N.E.2d 729 (Ohio 2012) (finding automatic, lifelong registration of juvenile to violate constitutional prohibition against cruel and unusual punishment); In re J.B., 107 A.3d 1 (Pa. 2014) (finding automatic, lifelong registration of juvenile to violate procedural due process).

[107] Amanda M. Fanniff et al., *Juveniles Adjudicated for Sexual Offenses: Fallacies, Facts, and Faulty Policy*, 88 TEMP. L. REV. 789, 799 (2016). The authors argue that a "reasonable strategy would be to target the highest risk [juvenile sex offenders] for the … most invasive social control policies," but note the difficulty of developing the accurate risk assessment tools on which such a strategy depends. As a result other prevention strategies "may prove more fruitful than registration and notification policies, … without [their] potential harmful effects." Id., at 800-801.

See also Lydia D. Johnson, *Juvenile Sex Offenders: Should They Go to a School With Your Children or Should We Create a Pedophile Academy*, 50 U. TOL. L. REV. 39, 54-56 (2018) (arguing that registry obligations for juveniles should be limited to those who commit crimes such as forcible rape or sexual assault of minor children under the age of 14, and those juvenile offenders who fail to complete an assigned rehabilitation treatment program).

[108] Ashley R. Brost & Annick-Marie S. Jordan, *Punishment That Does Not Fit the Crime: The Unconstitutional Practice of Placing Youth on Sex Offender Registries*, 62 S.D. L. REV. 806, 817, 829 (2017).

[109] Minutola & Shah, supra n.xx, at 8.

© 2019 by The American Law Institute
Council Draft – not approved

1  **SECTION 213.12B. NOTIFICATION OF THE OBLIGATION TO REGISTER AND ASSOCIATED**
2  **DUTIES**
3      **(1) Prior to accepting a guilty plea, and at the time of sentencing after conviction on**
4  **a guilty plea or at trial, the sentencing judge shall:**
5          **(a) inform the offender who is subject to registration of the registration**
6      **requirement;**
7          **(b) explain the duties associated therewith, including:**
8              **(i) the identity and location, or procedure for determining the identity**
9          **and location, of the government office or agency where the offender must**
10         **appear to register as required by Section 213.12A;**
11             **(ii) the duty to report to that office or agency periodically in person, as**
12         **required by Section 213.12E(1); and**
13             **(iii) the duty to promptly notify at least one of the local jurisdictions**
14         **where the offender is registered of any change in the registry information**
15         **pertaining to the offender, as required by Section 213.12E(2);**
16         **(c) notify the offender of the right to petition for relief from those duties as**
17     **provided in Section 213.12J;**
18         **(d) confirm that defense counsel has explained to the offender those duties and**
19     **the right to petition for relief;**
20         **(e) confirm that the offender understands those duties and that right;**
21         **(f) require the offender to read and sign a form stating that defense counsel**
22     **and the sentencing judge have explained the applicable duties and the right to petition**
23     **for relief from those duties, and that the offender understands those duties and that**
24     **right;**
25         **(g) ensure that if the offender cannot read or understand the language in which**
26     **the form is written, the offender will be apprised of the pertinent information by other**
27     **suitable means that the jurisdiction uses to communicate with such individuals; and**
28         **(h) satisfy all other notification requirements applicable under Section 7.04.**[110]
29     **(2) At the time of sentencing, the offender shall receive a copy of the form signed**
30  **pursuant to subsection (1)(f) of this Section.**

---

[110] See *Model Penal Code: Sentencing*, § 7.04(1) (Proposed Final Draft (2017).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12B. Notification of the Obligation to Register and Associated Duties

1    **(3) If the offender is sentenced to a custodial sanction, an appropriate official shall,**
2    **shortly before release of the offender from custody, again inform the offender of the**
3    **registration requirement, explain the rights and duties associated therewith, including and**
4    **the right to petition for relief from those duties, and require the offender to read and sign a**
5    **form stating that those rights and duties have been explained and that the offender**
6    **understands those rights and duties. At the time of release from custody, the offender shall**
7    **receive a copy of that form.**

8    **Comment:**

9    *Subsection (1)* specifies the procedures for notifying the offender of applicable registration
10   rights and duties and also details the information that must be included in that notification.
11   *Subsection (2)* requires the sentencing judge to provide the offender a copy of the form signed
12   pursuant to subsection (1). For an offender who is incarcerated after conviction, *subsection (3)*
13   specifies the procedures for again notifying an incarcerated offender of applicable registration
14   rights and duties prior to that offender's release from custody.

## REPORTERS' NOTES

15   The notification provisions of Federal SORNA are stated in the briefest terms, requiring
16   only that an appropriate official "inform the sex offender of the duties of a sex offender …[,]
17   explain those duties; [and] require the sex offender to read and sign a form stating that the duty to
18   register has been explained and that the sex offender understands the registration requirement."[111]
19   Subsection (1) adds specificity by building on the notification protocols applicable to collateral
20   consequences generally under the sentencing provisions of the Model Penal Code.[112]
21   Going beyond those protocols:
22   (a) subsection (1)(b), consistent with federal SORNA, requires the sentencing judge to
23   explain the required information to the offender;[113]
24   (b) subsection (1)(d) requires the judge to insure that defense counsel has also explained
25   that information,
26   (c) subsection (1)(e) requires the judge to ensure that the offender understands that
27   information;

---

[111] SORNA § 20919(a).

[112] See *Model Penal Code: Sentencing*, supra note 108, § 7.04(1).

[113] MPCS requires the sentencing judge to provide that information to the offender in writing but does not explicitly require the judge to explain it or assure that the offender understands.

© 2019 by The American Law Institute
Council Draft – not approved

1       (d) under subsection (1)(f), the judge must, consistent with federal SORNA, require the
2  offender to read and sign a form stating that defense counsel and the judge have explained the
3  relevant information and that the offender understands it; and

4       (e) subsection (1)(g) calls attention to the need to communicate effectively with offenders
5  who cannot read or understand the language in which notification is given.

6  **SECTION 213.12C. TIME OF INITIAL REGISTRATION**

7  **A sex offender subject to registration shall initially register:**

8       **(a) if incarcerated after sentence is imposed, then within 48 hours of release;**

9  **or**

10      **(b) if not incarcerated after sentence is imposed, then not later than five**
11  **business days after being sentenced for the offense giving rise to the duty of**
12  **registration.**

13  **Comment:**

14       Section 213.12C specifies the time when the obligation to register ripens.

**REPORTERS' NOTES**

15       Federal SORNA requires that a sex offender who is required to register must do so within
16  a strict time frame. Offenders who have been incarcerated must register "*before* completing a
17  sentence of imprisonment with respect to the offense giving rise to the registration requirement."[114]
18  A sex offender not sentenced to a term of imprisonment must register "not later than 3 business
19  days after being sentenced for that offense."[115] These deadlines are unnecessarily tight and a
20  considerable challenge to meet. Not all incarcerated offenders will know prior to release exactly
21  where they will be living, and even when their new address is known in advance, incarcerated
22  offenders can hardly be expected to travel to their new residence *before release* and then appear
23  *in person* at the designated local agency, as federal SORNA and most state registry regimes
24  require.[116] Taken literally, these provisions guarantee that incarcerated sex offenders subject to
25  registration will commit a crime the moment they step outside the prison gate. To avoid this absurd
26  result, the statute authorizes the Attorney General to prescribe rules for registering sex offenders

[114] SORNA § 20913(b)(1) (emphasis added).

[115] SORNA § 20913(b)(2).

[116] SORNA § 20918 requires those subject to registration to appear periodically in person at the site
designated for registration in order to allow the jurisdiction to take a current photograph.

© 2019 by The American Law Institute
Council Draft – not approved

1    who are unable to comply with these deadlines,[117] hardly the most straightforward way to address
2    a simple problem. And the three-day time limit for sex offenders not sentenced to incarceration,
3    though not inherently ridiculous, is also unnecessarily tough to meet.

4        Section 213.12C sets more realistic deadlines that adequately meet any realistic public
5    safety concern.

6    **SECTION 213.12D. INFORMATION REQUIRED IN REGISTRATION**

7    **(1) An offender subject to registration pursuant to Section 213.12A shall provide the**
8    **following information to the appropriate official for inclusion in the sex-offender registry:**

9    **(a) the name of the offender (including any alias used by the offender);**

10    **(b) the Social Security number, if any, of the offender;**

11    **(c) the address of each residence at which the offender resides or expects to**
12    **reside;**

13    **(d) the name and address any place where the offender is an employee or**
14    **expects to be an employee;**

15    **(e) the name and address of any place where the offender is a student or**
16    **expects to be a student;**

17    **(f) the license-plate number and a description of any vehicle owned or**
18    **regularly operated by the offender.**

19    **(2) *Supplementary Information*. The local jurisdiction in which an offender registers**
20    **shall ensure that the following information is included in the registry for that offender and**
21    **kept up to date:**

22    **(a) the text of the provision of law defining the criminal offense for which the**
23    **offender is registered;**

24    **(b) the criminal history of the offender, including the date and offense**
25    **designation of all convictions; and the offender's parole, probation, or supervised-**
26    **release status;**

27    **(c) any other information required by law.**

---

[117] SORNA § 20913(d) authorizes the Attorney General to prescribe rules for the registration of sex offenders who are unable to comply with the deadlines prescribed in § 20913(b).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12D. Information Required in Registration

1       **(3) *Homeless offenders***

2       **If an offender subject to registration lacks a residential address, the offender shall, at**

3 **the time of registration, report with as much specificity as possible the principal places where**

4 **the offender sleeps and eats, in lieu of the information required under subsection (1)(c).**

5 **Thereafter, the registrant shall confirm or update those locations once every thirty days.**

6       **(4) *Correction of Errors***

7       **Each locality where an offender registers shall provide efficacious, reasonably**

8 **accessible procedures for correcting erroneous registry information and shall, at the time of**

9 **registration, provide the registrant instructions on how to use those procedures to seek**

10 **correction of registry information that the registrant believes to be erroneous.**

11 **Comment:**

12       Subsections (1) and (2) specify the information that the registrant and the registering

13 authority itself must provide. They require the disclosure of considerable detail, as do all existing

14 sex-offender registration regimes, consistent with their perceived public-safety objectives.

15       Subsection (3) explains the information to be provided, in lieu of the offender's

16 residential address, when the registrant is or becomes homeless. It allows the homeless registrant

17 to update the relevant information once every 30 days, even if the registrant has relocated one or

18 more times in the interim.

19       Subsection (4) obliges each locality where an offender registers to inform the registrant, at

20 the time of registration, how to seek correction of registry information that the registrant considers

21 erroneous. It does not specify any particular correction procedures but leaves those details to each

22 local jurisdiction, subject to the requirement that the procedures afforded be reasonably user-

23 friendly, offer expeditious means to determine the validity of a registrant's complaint and correct

24 information found to be erroneous.

### REPORTERS' NOTES

25       **1. *Subsections (1) and (2): The required information.*** Federal SORNA directs states to

26 obtain from each sex offender a long list of detailed personal information, including the registrant's

27 name, address, and social-security number; the location of the registrant's current employment or

28 school; and the license-plate number and description of any vehicle owned or operated by the

29 registrant. In addition, states must themselves provide to the directory the offender's criminal

30 history, physical description and a current photo, fingerprints, palm prints, a DNA sample, and a

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12D. Information Required in Registration

1  photocopy of the offender's driver's license or identification card.[118] States vary considerably in
2  the information that offenders must provide.[119]

3       Subsections (1) & (2) follow federal SORNA requirements with respect to the information
4  required to be reported.

5       **2. *Subsection (3): Homeless registrants.*** Nineteen states and the District of Columbia
6  provide no statutory guidance on how homeless registrants can satisfy their obligation to report
7  and continuously update their residency. Federal SORNA is silent on this issue as well. Among
8  states that do address the problem, periodic update requirements range from 90 days to a month
9  (Florida, Texas), a week, or even every three days (Arizona, Georgia, North Dakota).[120]

10      Registry requirements, along with unrestricted public access, community notification, and
11  restrictions on housing and employment, are themselves a major cause of homelessness among sex
12  offenders.[121] Adding insult to injury, the extra burdens of more frequent updating and shortened
13  periods for doing so can make compliance virtually impossible; in Arizona, the state supreme court
14  struck down that states's requirement that homeless registrants report every 72 hours.[122] In Florida,
15  a registrant who becomes homeless must notify the relevant authority within 48 hours; in
16  Minnesota, notification is required within 24 hours.[123]

17      Subsection (3), following California's relatively simple approach,[124] allows the homeless
18  registrant to update the relevant information once every 30 days, even if the registrant has moved
19  one or more times in the interim.

20       **3. *Subsection (4): Correction of errors.*** Federal SORNA contains no mandate that states
21  put in place any process to correct erroneous registry information, and many states likewise fail to
22  do so. Subsection (4) makes clear that states must provide this essential safeguard and ensures that
23  the offender will be made aware of the available procedures. It requires each locality where an
24  offender registers to inform the registrant, at the time of registration, how to seek correction of

---

[118] SORNA § 20914.

[119] See Carpenter & Beverlin, supra note 27, at 1078 (2012) (describing sex-offender registry laws enacted in the wake of SORNA).

[120] See FL. STAT. ANN. 943.0435(4) (b), (c); TEX. CODE CRIM. PROC. ANN. art. 62.051(j)(1)--(2) (West 2017); E. Esser-Stuart, Note, *"The Irons Are Always in the Background": The Unconstitutionality of Sex Offender Post-Release Laws as Applied to the Homeless*, 96 TEX. L. REV. 811 (2018).

[121] See generally Jill Levenson, Where for Art Thou: Transient Sex Offenders and Residence Restrictions, https://journals.sagepub.com/doi/pdf/10.1177/0887403413512326.

[122] State v. Burbey, 403 P.3d 145 (Ariz. 2017).

[123] MINN. STAT. 243.166 (subdiv. 3a (a)) (2019). See also Boyd v. State, 408 P.3d 362 (Wash. Ct. App. 2017), upholding a similar Washington provision.

[124] CAL. PENAL CODE § 290.011(d) (West 2017). Texas similarly allows homeless registrants to update their residency information once every 30 days. TEX. CODE CRIM. PROC. ANN. art. 62.051(j)(1)--(2) (West 2017).

© 2019 by The American Law Institute
Council Draft – not approved

1 erroneous registry information. It does not lay down the details that an appropriate system must
2 include, since those matters depend in large measure on local logistics, customs, and agency
3 procedures. But the correction processes afforded must be reasonably user-friendly and must be
4 designed to ensure that complaints will be resolved promptly and that information found to be
5 erroneous will be corrected without unnecessary delay.

6 **SECTION 213.12E. DUTY TO KEEP REGISTRATION CURRENT**

7 **(1) *Periodic Updates*. A sex offender who is required to register under Section 213.12A**
8 **shall, not less frequently than once every year, appear in person in at least one jurisdiction**
9 **where the offender is required to register, verify the current accuracy of the information**
10 **provided in compliance with Section 213.12D, allow the jurisdiction to take a current**
11 **photograph, and report any change in the identity of other jurisdictions in which the offender**
12 **is required to register.**

13 **(2) *Change of Circumstances***

14 **(a) Each jurisdiction that maintains a sex-offender registry shall permit**
15 **registrants to notify the jurisdiction, by means of U.S. mail, internet notification, or**
16 **other readily accessible means of communication of the jurisdiction's choosing, of any**
17 **change of name, residence, employment, or student status, and any change in the**
18 **identity of all other jurisdictions in which the offender is required to register.**

19 **(b) Each jurisdiction that maintains a sex-offender registry shall advise each**
20 **registrant, at the time of registration, of the registrant's option to utilize the means of**
21 **communication established under subsection (2)(a), rather than appearing personally**
22 **for that purpose, if the registrant so chooses.**

23 **(c) A sex offender subject to registration under Section 213.12A shall, not later**
24 **than five business days after each change of name, residence, employment, or student**
25 **status, notify at least one local jurisdiction specified in Section 213.12A of:**

26 **(i) all changes in the information that the offender is required to**
27 **provide under Section 213.12D, and**

28 **(ii) the identity of all other jurisdictions in which the offender is**
29 **required to register.**

30 **(3) The local jurisdiction notified of any changes pursuant to subsections (1) and (2)**
31 **shall promptly provide the offender a written receipt confirming that the updated**

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12E. Duty to Keep Registration Current

1    **information has been provided, and shall provide that information to all other jurisdictions**

2    **in which the offender is required to register.**

3    **Comment:**

4        Subsection (1) requires periodic re-registration in person once a year.

5        Changes to a registrant's name, residence, employment, or student status must be reported

6    more promptly. Subsection (2)(a) requires jurisdictions to permit registrants to do so by one or

7    more readily utilized means of communication of the jurisdiction's choosing, and subsection (2)(b)

8    requires jurisdictions to advise registrants of their ability to use that option, if they prefer, rather

9    than reporting the change of information in person,.

10       Subsection (2)(c) requires registrants to provide the necessary notification within five

11    business days and to inform the jurisdiction notified about all other jurisdictions in which the

12    offender is required to register.

13       Subsection (3) requires the jurisdiction initially notified of any changes pursuant to

14    subsections (1) and (2) to promptly provide the updated information to all other jurisdictions in

15    which the offender is required to register.

### REPORTERS' NOTES

16       **1. *Periodic Updates*.** Federal SORNA requires registrants to appear periodically in person

17    in at least one jurisdiction where they are required to register, allow that jurisdiction to take a

18    current photograph, and verify the current accuracy of the registry information pertaining to them.

19    The required frequency of these periodic updates under federal SORNA varies from quarterly to

20    yearly as a function of the seriousness of the offense that triggers the registration duty. But updates

21    only on an annual or semi-annual basis are permitted only for lower-level offenses that Section

22    213.12A does not treat as registrable at all.[125] Federal SORNA requires updates at least every three

23    months for all of the offenses that are registrable under Article 213.

24       Such frequent re-registration in person is unnecessarily burdensome and in effect punitive,

25    because registrants are in any event required to notify the pertinent local agency within a matter of

26    days whenever there is a change of the registrant's name, residence, employment, or student status.

27    Absent such a change of circumstances, reporting in person serves only to assure the current

28    accuracy of the offender's personal appearance as recorded in the photograph on file, and that need

---

[125] Federal SORNA permits annual updates for Tier I offenses, which include such crimes as ..... The statute permits semi-annual updates for Tier II offenses, which include such crimes as ..... **[TBS].**

© 2019 by The American Law Institute
Council Draft – not approved

1  is readily met on an annual basis.[126] Therefore, absent a change in circumstances, Section 213.12E
2  requires periodic re-registration in person only once a year.

3      **2. *Change of Circumstances*.** Under Federal SORNA, state registration regimes must
4  require offenders to appear in person before appropriate state authorities, not later than three
5  business days after any change of name, residence, employment, or student status, in order to
6  update the pertinent information. Requiring the registrant to provide these updates *in person* and
7  to do so within *three days* is unnecessarily burdensome and in effect punitive because, with respect
8  to information of this nature, in person appearance provides no assurance of accuracy that cannot
9  be attained by requiring submission of appropriate documentation in writing, whether by U.S. mail,
10  internet messaging, or other means of efficient communication.

11      Accordingly, subsection (2)(a) requires each jurisdiction to permit registrants to report
12  changes in this information by any readily accessible means of communication of the jurisdiction's
13  choosing, and subsection (2)(b) requires jurisdictions to advise registrants of the availability of
14  that option. Finally, subsection (2)(c) requires registrants to provide the necessary notice within
15  five business days rather than just three.

16  **SECTION 213.12F. DURATION OF REGISTRATION REQUIREMENT**

17      **(1) Subject to the provisions of subsection (3), an offender subject to registration shall**
18  **keep the registration current for a period of 15 years, beginning on the date when the**
19  **offender is released from custody after conviction for the offense giving rise to the**
20  **registration requirement; or if the offender is not sentenced to a term of incarceration,**
21  **beginning on the date when the offender is sentenced for that offense.**

22      **(2) At the expiration of that 15-year period, the duty to keep that registration current**
23  **will terminate; the offender will not be subject to any further duties associated with that**
24  **registration requirement; and no public or private agency other than a law-enforcement**
25  **agency shall thereafter be permitted access to the offender's registry information.**

26      **(3) If, during the first 10 years of the period during which the offender is required to**
27  **keep the registration current, the offender:**

---

[126] Federal SORNA does not treat an offender's deliberate alteration of personal appearance (for example, by changing hair style or hair color) as a change of circumstance requiring immediate notification, so even the most frequent periodic update required by federal SORNA (once every three months) does not effectively guard against a predator who uses that strategem to evade SORNA surveillance.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12F. Duration of Registration Requirement

1       **(a) successfully completes any period of supervised release, probation, or**

2   **parole, other than a financial obligation, such as a fine or restitution, that the**

3   **offender, despite good-faith effort, has been unable to pay; and**

4       **(b) successfully completes any required sex-offender treatment program; and**

5       **(c) is not convicted of any additional offense under this Article, or any offense**

6   **in another jurisdiction that would be an offense under this Article if committed in this**

7   **jurisdiction; then:**

8       **the duty to keep that registration current will terminate; the offender will not be**

9   **subject to any further duties associated with that registration requirement; and no public or**

10  **private agency other than a law-enforcement agency shall thereafter be permitted access to**

11  **the offender's registry information.**

12      **(4) When the offender's duty to register terminates under subsections (1) or (3), the**

13  **law-enforcement agency in the local jurisdiction where the offender resides will, upon the**

14  **offender's request, notify all other jurisdictions in which the offender has registered that the**

15  **offender's duties associated with that registration requirement have terminated and that no**

16  **public or private agency other than a law-enforcement agency shall thereafter be permitted**

17  **to have access to that registry information.**

18  **Comment:**

19      Section 213.12F(1) specifies the duration of the registration requirement, including the

20  duration of the offender's continuing obligation to keep registry information current.

21      Subsection (3) provides for automatic early termination of the registration obligation if the

22  offender successfully satisfies specified rehabilitative goals during the initial registration period.

23      Subsection (4) provides that when the offender's registration duties terminate under

24  subsection (1) or (3), the agency in the local jurisdiction where the offender resides must, upon the

25  offender's request, report that termination to all other jurisdictions where the offender is registered

26  and caution those jurisdictions that no public or private agency other than a law-enforcement

27  agency may have access to that registry information.

## REPORTERS' NOTES

28      Federal SORNA specifies the duration of registration and the accompanying duty to keep

29  information current—15 years for Tier I offenses (the least serious), 25 years for Tier II offenses,

30  and life for Tier III offenses, which include offenses comparable to the offenses registrable under

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12F. Duration of Registration Requirement

1　Article 213. The statute affords only limited opportunity for early relief from these obligations.
2　For Tier I offenders who maintain a clean record for 10 years, registry obligations terminate at the
3　end of that period, and for offenders adjudicated delinquent on the basis of a Tier III offense,
4　registry obligations terminate after 25 years if they maintain a clean record for that period. Under
5　federal SORNA, no other offenders are eligible for early relief from registry obligations. Thus,
6　even a juvenile offender must remain on the registry for at least 25 years, and Tier III adult
7　offenders must be retained for life on the registry, with all its attendant obligations, even if they
8　remain entirely crime-free for decades.[127]

9　　　　States vary considerably in the duration of their obligation to keep registration information
10　current, but lifetime registration is commonly required for the most serious offenses, such as those
11　that are registrable under Article 213. Early relief also varies considerably but many, including the
12　22 states that are SORNA compliant, impose inescapable lifetime registration on the most serious
13　sex offenders.[128]

14　　　　There is no plausible justification for maintaining the registry obligation for such an
15　extended period, without regard to the offender's subsequent behavior. Among the minority of
16　sex-offenders who recidivate at all, nearly all do so within five or at most 10 years of release from
17　custody.[129] Together with the natural decay of offending rates by age, a crime-free period of 10
18　years provides strong assurance that the likelihood of the offender's committing a new sexual
19　offense is remote, certainly no higher than the risk that a person of the same age with no previous
20　sex-offense record will commit a new sexual offense. Although the possibility of a false negative
21　cannot be excluded, that vanishingly small risk must be weighed against the cost, in terms of
22　required law-enforcement attention and resources, of maintaining and constantly updating registry
23　information on thousands of ex-offenders who will never pose any threat to public safety.

24　　　　Accordingly, Section 213.12F sets the duration of the obligation to register and its
25　associated duties at 15 years, with early termination of those obligations after 10 years for
26　offenders who maintain a clean record throughout that period. In the event that the offender does
27　commit a new sexual offense during that period, of course, the offender will face a new criminal
28　sentence, along with whatever additional registry obligations are triggered by the new offense.

---

[127] SORNA § 20915. A "clean record" is defined as "(a) not being convicted of any offense for which imprisonment for more than 1 year may be imposed; (B) not being convicted of any sex offense; (C) successfully completing any periods of supervised release, probation, and parole; and (D) successfully completing an appropriate sex offender treatment program ….".

[128] See Carpenter & Beverlin, supra note 29, at 1078 (2012).

[129] TBS.

© 2019 by The American Law Institute
Council Draft – not approved

1    **SECTION 213.12G. FAILURE TO REGISTER**

2    **(1) *Failure to Register*. A person required to register under Section 213.12A is guilty**

3    **of Failure to Register, a misdemeanor, if that person knowingly fails to register or knowingly**

4    **fails to update a registration as required.**

5    **(2) *Affirmative Defense*. In a prosecution for Failure to Register under subsection (1)**

6    **of this Section, it is an affirmative defense that:**

7    **(a) circumstances beyond the control of the accused prevented the accused**

8    **from complying;**

9    **(b) the accused did not voluntarily contribute to the creation of those**

10   **circumstances in reckless disregard of the requirement to comply; and**

11   **(c) after those circumstances ceased to exist, the accused complied as soon as**

12   **reasonably feasible.**

13   **Comment:**

14   Section 213.12G defines the misdemeanor offense of Failure to Register, applicable to the

15   offender who knowingly fails to register or knowingly fails to update required registry information.

16   It provides an affirmative defense for a person who cannot comply with required registration

17   obligations because of circumstances beyond that person's control, provided that the person did

18   not voluntarily contribute to creating those circumstances in reckless disregard of the requirement

19   to comply and subsequently complied as soon as reasonably feasible. A person convicted of a

20   misdemeanor "may be sentenced … to a term of incarceration … [that] shall not exceed [one

21   year]."[130]

## REPORTERS' NOTES

22   Federal SORNA requires states to make it a criminal offense, punishable by "a maximum

23   term of imprisonment that is greater than 1 year," for an offender who is required to register to fail to

24   do so or to miss a deadline for updating any change of the required information.[131] In addition,

---

[130] Id., § 6.06(7)(a). The maximum term is "stated in brackets [because] recommendations concerning the severity of sanctions that ought to attend particular crimes … are fundamental policy questions that must be confronted by responsible officials within each state. . . ." Id., § 6.06, Comment *k*, p. 157.

[131] Id., § 20913(e).

© 2019 by The American Law Institute
Council Draft – not approved

1  federal law makes it a crime, punishable by up to 10 years in prison, to travel interstate after
2  knowingly failing to register or update a required registration.[132]

3      State statutory offenses for failure to register and for failure to fulfill related duties vary
4  widely but generally cluster in the low end of the range the federal SORNA seeks to impose on
5  the states. Consistent with that pattern, the Article 213.12G offense requires a mens rea of
6  knowledge and is punishable as a misdemeanor.

7  **SECTION 213.12H. ACCESS TO REGISTRY INFORMATION**

8  **(1)** *Confidentiality*

9      **(a) Each local jurisdiction in which the offender is registered shall exercise due**
10  **diligence to ensure that all information in the registry remains confidential, except**
11  **that such information shall be made available upon request to any law-enforcement**
12  **agency in connection with the investigation of any offense.**

13      **(b) Any disclosure pursuant to subsection (1)(a) shall include a warning that**
14  **the law-enforcement agency receiving the information must exercise due diligence to**
15  **ensure that the information remains confidential; that such information may not be**
16  **disclosed to any person or public or private agency other than a law-enforcement**
17  **agency, including any person or agency seeking to conduct a background check in**
18  **connection with employment or service; and that the information thus disclosed may**
19  **not be used to injure, harass, or commit a crime against the offender or anyone else;**
20  **and that any such actions against the offender or anyone else could result in civil or**
21  **criminal penalties.**

22  **(2)** *Unauthorized Disclosure of Registry Information.* **An actor is guilty of**
23  **Unauthorized Disclosure of Registry Information if:**

24      **(a) the actor, having received registry information in an official capacity or**
25  **otherwise subject to an obligation to ensure that the information remains confidential,**
26  **knowingly or recklessly discloses that information, or permits that information to be**
27  **disclosed, to any person not authorized to receive it; or**

---

[132] 18 U.S.C. §2250(a) (2019).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12H. Access to Registry Information

1       **(b) the actor obtains access to registry information by computer trespassing or**

2     **otherwise in violation of law and subsequently for commercial gain knowingly or**

3     **recklessly discloses that information, or permits that information to be disclosed, to**

4     **any person.**

5     **Unauthorized Disclosure of Registry Information under subsection (2)(a) of this**

6     **Section is a misdemeanor. Unauthorized Disclosure of Registry Information under**

7     **subsection (2)(b) of this Section is a felony of the fourth degree.**

8     **Comment:**

9     Section 213.12H seeks to insure that registry information be reserved for law-enforcement

10  use and not made available for other purposes. Subsection (1) requires that registry information be

11  disseminated no more widely than necessary to serve the direct law-enforcement objectives of the

12  registration regime. Under subsection (2), Unauthorized Disclosure of Registry Information is a

13  misdemeanor, and the offense becomes a felony of the fourth degree when an actor obtains the

14  information illegally and subsequently disseminates it for commercial gain. The sentencing

15  provisions of the Model Penal Code provide that a misdemeanor is punishable by imprisonment

16  for a term that "shall not exceed [one year]," and a felony of the fourth degree is punishable by

17  imprisonment for a term that "shall not exceed [five] years."[133] These maximum terms are in

18  brackets because the Code "does not offer exact guidance on the maximum prison terms that

19  should be attached to different grades of … offenses."[134]

### REPORTERS' NOTES

20     Federal SORNA and most state registration regimes contemplate largely unrestricted

21  public access to registry information. The federal statute requires states to post on the Internet and

22  make available to the general public, in conveniently searchable form, all information included in

23  the registry, subject to specified exceptions. States are required to withhold from the public the

24  offender's social-security number, the names of victims, and all information about arrests that did

25  not result in conviction. In addition, states are permitted to withhold information concerning

26  certain low-level offenders, when the victim of the offense was an adult. For the more serious

27  offenses, and for all covered offenses involving a minor, states are permitted to withhold (in

---

[133] Id, §§ 6.06(6)(d), 7(a). These maximum terms are "stated in brackets [in part because] recommendations concerning the severity of sanctions that ought to attend particular crimes … are fundamental policy questions that must be confronted by responsible officials within each state. . . ." Id., § 6.06, Comment *k*, p. 157.

[134] Id., § 6.06, Comment *k*, p. 157.

255

© 2019 by The American Law Institute
Council Draft – not approved

1 addition to social-security number and records of arrests not resulting in conviction) only the name
2 of an offender's employer or (for a student) place of study. In other words, for more serious
3 offenders, and for *any* offender convicted of a covered offense involving a minor, states *must* make
4 available to any member of the public the offender's current address, physical description, current
5 photo, a photocopy of the offender's driver's license, and identifying information for any vehicle
6 the offender uses. In addition, the state information must be submitted to the Attorney General,
7 who maintains a national registry of the same information, also accessible in searchable form on
8 the Internet, subject to the same restrictions.[135]

9 Across the states, public access to registry information takes different forms in different
10 jurisdictions. The great majority comply with federal SORNA by maintaining registries readily
11 accessible to any member of the general public. But some restrict access to entities with a
12 demonstrated need, such as schools and youth camps, and limit at least some of the registry
13 information available to qualifying entities. A few states restrict access even more tightly, but that
14 approach is currently the exception.[136]

15 Public access, however, is only the beginning of a pervasive system for raising community
16 awareness and sensitivity with regard to the sex offenders in the area. Federal SORNA requires
17 each local jurisdiction to employ active measures to alert interested individuals and public and
18 private agencies when a sex offender registers in the area. Most states take similar steps with regard
19 to public access and community notification. And in any event, all state registry information, once
20 transmitted to the Attorney General, becomes readily accessible nationwide through a national
21 registry available on the internet.

22 Section 213.12H deals only with access to registry information by interested parties who
23 seek it, while Section 213.12I (Additional Collateral Consequences of Conviction) addresses a
24 variety of other collateral consequences, including proactive measures to alert individuals and
25 organizations in the community. Accordingly, details particular to community notification are
26 discussed in the Reporters' Note to Section 213.12I. Many issues, however, are common to public
27 access and community notification; these are discussed here.

28 Open records and government transparency are bedrock, if oversimplified, values in
29 American political culture. In addition, both public access and community notification can enable
30 citizens to feel a sense of empowerment with regard to crimes that many consider especially
31 sinister, unpredictable, and frightening. Payoffs of this kind are arguably important even if such
32 laws have no effect on actual recidivism rates.

33 But the empirical research shows that actual effects are complicated, even with respect to
34 these seemingly inherent benefits. Public access to registry information and indiscriminate
35 community notification designed to alert the population to the presence of a sex offender in its

---

[135] SORNA § 20918.

[136] See "Collateral Consequences," ABA CRIMINAL JUSTICE SECTION, http://www.abacollateralconsequences.org/search/?jurisdiction=37.

© 2019 by The American Law Institute
Council Draft – not approved

1   midst have been responsible for unwarranted public alarm at the same time that they generate
2   acutely counterproductive side effects.

3       Studies in Ohio and Minnesota found no statistically significant relationship between being
4   notified about a high-risk sex offender in the neighborhood and taking steps to protect *oneself*
5   (such as installing better locks or lighting).[137] But among residents who were parents, those
6   receiving notification in both states were more likely to take steps to protect *their children*, such
7   as warning them not to talk to strangers and not to let unknown persons into the home.[138]

8       Of course, such warnings should be routine for all children; it would be worrisome if some
9   parents not receiving notification and finding nothing of note at their own initiative neglected to
10  warn their children out of a false sense of security (false because children are equally if not more
11  vulnerable to attack by individuals with no prior sex-offense record and recidivist sex offenders
12  *not* living in their own neighborhoods).[139] It would be similarly worrisome if parents who receive
13  notification tend to emphasize the dangers of stranger abuse at the expense of warnings and
14  protective measures appropriate with respect to the even-higher risk of abuse at the hands of
15  relatives, teachers, and other acquaintances. In any case, without minimizing the importance of
16  such warnings, it is safe to say that state and local law enforcement could easily use other public-
17  education measures, where necessary, to encourage wise child-protection behavior on the part of
18  parents and teachers, without incurring the direct costs (and indirect consequences for offenders)
19  entailed in public registries and community-notification laws.

20      Negative impacts on offenders are convincingly documented in an extensive literature.
21  They include a high incidence of joblessness, social isolation, homelessness, suicide, and on
22  occasion even physically violent victimization at the hands of self-appointed vigilantes or
23  psychologically unstable citizens who object to having a sex offender nearby.[140] Because these
24  powerfully criminogenic effects hinder the offender's rehabilitation and make recidivism more
25  likely, they offset to some extent and probably outweigh the potential public-safety benefits of
26  self-protection and the enhanced possibilities for surveillance and deterrence of registrants.[141]

27      The strongest case for public access is presented when a school, day-care center or other
28  organization or person has a justified need to perform a background check on an individual being

---

[137] Rachel Bandy, *Measuring the Impact of Sex Offender Notification on Community Adoption of Protective Behaviors*, 10 CRIMINOLOGY & PUBLIC POLICY 237 (2011) (Minneapolis); Victoria S. Beck, James Clingermayer, Robert J. Ramsey & Lawrence F. Travis, *Community Response to Sex Offenders*, 32 J. PSYCHIATRY & L. 141 (2004) (Hamilton County, Ohio).

[138] Bandy, supra note 137, at 249, 255; Beck, et al., supra note 137, at 163.

[139] See text accompanying note xx, supra.

[140] See, e.g., E.B. v. Verniero, 119 F.3d 1077, 1102 (3d Cir. 1997) (noting that "[r]etribution has been visited by private, unlawful violence and threats . . . .").

[141] Prescott & Rockoff, supra note 57, at 181.

© 2019 by The American Law Institute
Council Draft – not approved

1 considered for a position involving contact with anyone a vulnerable population. But the national
2 data base affords a readily available and more efficient means to perform background checks on
3 known individuals, without need to access a local registry that can too easily be misused.

4     In light of these considerations, Section 213.12H marks a major departure from the
5 prevalent American approach of investing considerable resources in the effort to maximize the
6 public availability of sex-offender information. Both to promote just treatment of persons
7 convicted of sexual offenses and, very importantly, to further public safety goals rather than
8 impeding them, Section 213.12H seeks to ensure maximum feasible confidentiality for registry
9 information.[142]

10 **SECTION 213.12I. ADDITIONAL COLLATERAL CONSEQUENCES OF CONVICTION**

11     **(1) *Definition*. For purposes of this Section, the term "additional collateral**
12 **consequence" means any government action or government-imposed restriction or disability**
13 **applicable specifically to persons convicted as sex offenders, other than (a) the fine,**
14 **probation, supervised release, or term of incarceration authorized upon conviction of the**
15 **offense, and (b) the obligation to register and the associated duties specified under Section**
16 **213.12A. Those additional collateral consequences include any government-imposed**
17 **restriction upon an offender's occupation, employment, education, internet access, or place**
18 **of residence; any government action notifying a community organization or entity or a**
19 **private party that the offender resides, works, or studies in the locality; and any other**
20 **government action providing registry information to a public or private organization, entity,**
21 **or person except as authorized by subsection (3) of this Section.**

22     **(2) *Additional Collateral Consequences Applicable to Persons Not Required to Register*.**
23 **Notwithstanding any other provision of law, no person shall be subject to an additional**
24 **collateral consequence unless that person has been convicted of a registrable offense and is**
25 **required to register as a sex offender under Section 213.12A.**

26     **(3) *Additional Collateral Consequences Applicable to Persons Required to Register*.**
27 **Notwithstanding any other provision of law, a person required to register as a sex offender**

---

[142] *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), appears to grant First Amendment protection
for the disclosure and sale of ostensibly confidential records (in that case the prescribing practices of
doctors), but only in a situation where the person concerned acquires the information in a lawful manner;
*Sorrell* grants no right of access to the information itself. Because the offense of Unauthorized Disclosure
defined by subsection (2) applies only to individuals who obtain or disclose registry information unlawfully,
the offense presumably does not raise First Amendment problems.

© 2019 by The American Law Institute
Council Draft – not approved

1    **under Section 213.12A may not be subject to any additional collateral consequence unless**
2    **the sentencing judge or other designated official, after affording the offender notice and an**
3    **opportunity to respond concerning the proposed additional collateral consequence,**
4    **determines that the additional collateral consequence is manifestly required in the interest**
5    **of public safety, after due consideration of:**

6    **(a) the nature of the offense;**

7    **(b) all other circumstances of the case;**

8    **(c) the offender's prior record; and**

9    **(d) the potential negative impacts of the restriction, disability, or government**
10    **action on the offender, on the offender's family, and on the offender's prospects for**
11    **rehabilitation and reintegration into society.**

12    **(4)** *Limitations*. **The sentencing judge or other designated official who approves any**
13    **additional collateral consequence pursuant to subsection (3) of this Section must determine**
14    **that the additional collateral consequence:**

15    **(a) satisfies all applicable notification requirements set forth in Section**
16    **213.12B;**

17    **(b) is authorized by law;**

18    **(c) is drawn as narrowly as possible to achieve the goal of public safety;**

19    **(d) is accompanied by a written statement of the official approving the**
20    **additional collateral consequence, explaining the need for the specific restriction or**
21    **disability imposed or government action to be taken, the evidentiary basis for that**
22    **finding of need, and the reasons why a more narrowly drawn restriction, disability,**
23    **or government action would not adequately meet that need; and**

24    **(e) is imposed only for a period not to exceed that permitted by Section**
25    **213.12F.**

26    **Comment:**

27    Section 213.12I determines when conviction for a sex offense can trigger obligations in

28    addition to the basic duties to register with law enforcement and to keep the registry information

29    up to date.

30    Subsection (1) defines the operative term "additional collateral consequence," in order to

31    make clear that it includes any government action or government-imposed restriction or disability

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12I. Additional Collateral Consequences of Conviction

1    applicable specifically to persons convicted as sex offenders, other than the sentence of fine,

2    probation, supervised release, or incarceration imposed upon conviction, and the basic duties

3    associated with registration itself. The additional collateral consequences referenced include such

4    common sex-offender disabilities as restriction upon an offender's employment, education,

5    internet access, and residency. Also included is the widespread practice of notifying community

6    organizations and private citizens that a sex-offender is present in the area; notification and

7    disclosure are permitted only when authorized under the conditions specified in subsections (3)

8    and (4).

9        Because the "additional collateral consequences" governed by Section 213.12I include

10    only restrictions and disabilities applicable specifically to sex offenders as such, Section 213.12I

11    does not affect collateral consequences imposed on wider categories of offenders, such as the

12    restrictions that many jurisdictions impose on ex-offenders' rights to vote, serve on juries, or

13    receive public benefits.

14        Subsection (2) stipulates that "additional collateral consequences," as defined, are

15    categorically precluded in the case of offenders who are not subject to registration under Section

16    213.12A. Additional collateral consequences may be imposed on offenders who are subject to

17    registration, but only in compliance with the standards and procedures specified in subsections (3)

18    and (4). The offender must have notice of the additional collateral consequences contemplated and

19    an opportunity to respond. Thereafter, the sentencing judge or other official designated to make

20    the determination may authorize one or more additional collateral consequences, but only upon

21    finding that each additional consequence is manifestly required in the interest of public safety,

22    after considering all relevant circumstances, including the nature of the offense, the offender's

23    prior record, the potential negative impacts of the additional restriction, disability, or government

24    action on the offender, on the offender's family, and on the offender's prospects for rehabilitation

25    and reintegration into society.

26        Subsection (4) further limits the imposition of additional collateral consequences by

27    requiring that they be authorized by law, drawn as narrowly as possible, and accompanied by a

28    written statement explaining the need for the additional restriction, disability, or government

29    action; its evidentiary basis; and the reasons why a more narrowly drawn additional consequence

30    would be inadequate. In addition, no additional collateral consequence may be imposed for a

31    period that exceeds the duration of the offender's registry obligations under Section 213.12F.

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12I. Additional Collateral Consequences of Conviction

## REPORTERS' NOTES

1    Section 213.12I establishes standards and procedures for imposing additional collateral
2  consequences, beyond those delineated in Sections 213.12A-H. These consequences can include
3  community notification, restrictions on employment, residency, and internet access, GPS
4  monitoring, and a number of other restrictions and disabilities.

5    Regarding *community notification*, federal SORNA requires states, at their own initiative,
6  to regularly provide their registry information (other than information exempted from public
7  access, such as registrants' social security numbers) to law-enforcement and other appropriate
8  government agencies (such as schools and public-housing agencies) in the locality where the
9  registered offender resides, works, or studies. Direct notification also must be given to:[143]

10      "Any agency responsible for conducting employment-related
11      background checks …[;]

12      "Social service entities responsible for protecting minors in the child
13      welfare system[;]

14      "Volunteer organizations in which contact with minors or other
15      vulnerable individuals might occur[; and]

16      "Any organization, company, or individual who requests such
17      notification …."

18  Moreover, federal SORNA allows any concerned organization or individual to opt to receive the
19  notification as frequently as once every five business days or even sooner.[144]

20    Some states, resisting the broad mandate of federal SORNA, provide affirmative
21  notification only on a restricted basis and do not automatically notify any organization or
22  individual who requests it, independent of a demonstrated need.[145] Nearly all provide notification
23  to community entities and individuals with a need to know (such as schools and youth camps).[146]

24    The majority, however, afford affirmative notification much more widely, along the lines
25  that federal SORNA requires, often essentially notifying the entire community at large. For
26  example, in Pennsylvania, the state maintains a website listing all registered sex offenders, with
27  their home and work addresses, the license-plate number of their car, and their sex-offender
28  classification. The website advises those who visit it that the information it provides "could be a
29  significant factor in protecting yourself, your family members, or persons in your care" from the

---

[143] SORNA § 20923(b).

[144] SORNA § 20923(c).

[145] Washington State, infra.…

[146] See "Collateral Consequences," supra note 136.

© 2019 by The American Law Institute
Council Draft – not approved

1    "recidivist acts" of those listed.[147] In a recent year, three million people accessed the site.[148] To
2    further enhance public awareness, the Pennsylvania State Police send out "red alerts" by email to
3    anyone who asks to be informed whenever a registrant in their area adds or deletes their home,
4    work or school address; in a recent year the State Police sent out almost four million of these red
5    alerts.[149]

6          *Limits on employment and residency* are not addressed in federal SORNA, and state
7    approaches vary widely. Nearly all states bar sex offenders from working in particularly sensitive
8    areas of employment (such as teachers, security guards), but the list of excluded occupations is far
9    from uniform.[150] At least 27 states and many municipalities prohibit some (or all) sex offenders
10   from living within 500, 1000, or 2000 feet of schools, parks, playgrounds and day-care centers.[151]
11   In densely populated counties, such residency restrictions can make it virtually impossible for
12   convicted sex offenders to live anywhere in the jurisdiction.[152] Some states bar sex offenders from
13   living close to school-bus stops, a requirement that can preclude offenders, even in rural areas,
14   from residing almost anywhere in the county.[153] Compounding the burden of such restrictions,
15   paroles are often required as a condition of their parole (and on pain of parole revocation), to
16   obtain employment within 45 days of release (even though community notification puts employers

---

[147] See https://www.pameganslaw.state.pa.us/.

[148] Pennsylvania State Police, Megan's Law Section, 2017 Annual Report, at 5-6, available at
https://www.pameganslaw.state.pa.us/Documents/ MegansLaw Annual Report.pdf.

[149] Id.

[150] See "Collateral Consequences," supra note 136; Geraghty, supra note 42, at 515 (2007).

[151] Geraghty, supra note 42, at 514-515 (summarizing states' residency-restriction laws); accord,
Jill Levenson, Sex Offender Residency Restrictions, in *Wright*, supra note xx, at 267, 268 (stating that 30
states impose residency restrictions); "Collateral Consequences," supra note 136 (indicating 22 states that
impose residency restrictions). In some states, residency restrictions imposed by municipalities have been
held invalid on the ground that they are preempted by state legislation. See, e.g., People v. Diack, N.Y. Ct.
App., Feb. 17, 2015.

[152] See, e.g., Williams v. Dept. of Corrections & Community Supervision, N.Y. Sup. Ct., N.Y. L.J.,
Jan. 23, 2014 (upholding constitutionality of condition that paroled sex offender not live within 1000 feet
of a school or other places where children congregate; the restriction ruled out virtually all of Manhattan
and the Bronx, but court noted that large areas of Brooklyn and Queens remained available). Compare In
re Taylor, Cal. S. Ct., March 2, 2015 (holding that California voter initiative barring all convicted sex
offenders from living within 2000 feet of schools and playgrounds was unconstitutional as applied to
paroles living in San Diego County, because the restriction placed more than 97% of the county's
affordable housing off limits).

[153] Richard Tewksbury, *Exile at Home: The Unintended Collateral Consequences of Sex Offender
Residency Restrictions*, 42 HARV. C.R.-C.L. L. REV. 531, 533 (2007).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12I. Additional Collateral Consequences of Conviction

1    on alert not to hire them)[154] or to reside in a particular county (even though virtually no housing
2    may be available to them there).[155]

3        At least 17 states require sex offenders to wear a GPS monitoring device that enables law
4    enforcement to determine their location at all times.[156] Less common for the time being, but worthy
5    of note, are statutes in at least three states (Indiana, Louisiana, and Nebraska) that prohibit sex
6    offenders from using the Internet to engage in social networking.[157] Instead of imposing a
7    categorical ban on internet use, a California voter initiative required registered sex offenders to
8    provide to law enforcement all their email addresses and user names, and to notify authorities
9    within 24 hours of any changes to that information.[158] Alabama recently joined a small group of
10    states taking the lead in another area, imposing chemical castration as a condition of parole after
11    conviction for certain sex offenses.[159]

12        These restrictions and disabilities have prompted a host of constitutional challenges, with
13    frequently conflicting holdings and little prospect that litigation will abate any time soon.[160] Even
14    where courts have found such restrictions constitutionally permissible, however, the cases have
15    underscored the overbreadth and unfairness that the restrictions can present both generally and as
16    applied to particular offenders, juveniles and elderly parolees in particular.[161] Overall, the evidence

---

[154] See, e.g., State v. Dull, Kan. S. Ct., June 5, 2015 (considering burden of requirement to secure employment within 45 days as a factor rendering mandatory lifetime supervision unconstitutional as applied to juvenile sex offender).

[155] See cases cited in note xx, supra.

[156] See Kamika Dunlap, Sex Offenders After Prison: Lifetime GPS Monitoring? FINDLAW BLOTTER, February 1, 2011; Michelle L. Meloy & Shareda Coleman, GPS Monitoring of Sex Offenders, in *Wright*, supra note 16, at 243 (reporting that as many as 46 states use GPS monitoring to track sex offenders under some circumstances). The Supreme Court has held that GPS monitoring of a sex offender parolee constitutes a search that must meet Fourth Amendment requirements of reasonableness, but the Court did not reach the question whether such monitoring passes muster under that standard. Grady v. North Carolina, March 30, 2015.

[157] See Charles Wilson, Court Upholds Ind. Facebook Ban for Sex Offenders, ASSOCIATED PRESS, June 25, 2012, available at http://abcnews.go.com/Technology/wireStory/judge-upholds-ind-facebook-ban-sex-offenders-16642465#.T-ikN_LNnio (discussing cases in which courts have held bans on internet use compatible with the first amendment.

[158] Doe v. Harris, 9th Cir., Nov. 18, 2014 (upholding preliminary injunction against enforcement of this restriction on ground of its likely unconstitutionality under the First Amendment).

[159] See Alan Blinder, "What to Know about the Alabama Chemical Castration Law," N.Y. Times, June 11, 2019. Other states imposing chemical castration on some paroled sex offenders include California, Florida, Louisiana, and Wisconsin. Id.

[160] With respect to the constitutionality of mandatory lifetime GPS monitoring of sex offenders, compare Belleau v. Wall, Cir, Jan. 29, 2016) (upholding Wisconsin provision to that effect), with State v. Dykes, (S.C. May 9, 2012) (holding South Carolina provision to that effect unconstitutional as a violation of due process).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12I. Additional Collateral Consequences of Conviction

1    establishes with little doubt that indiscriminate community notification and restrictions on
2    residency and employment are responsible for wasted law enforcement effort and misdirected
3    civilian efforts at self-protection, with little to no public-safety payoff, and harsh, criminogenic
4    impact on the offenders themselves. [162]

5         In California, *GPS monitoring* of sex offenders has cost the state $60 million annually.[163]
6    The costs for states and localities involve more than simply the additional dollar outlays. In some
7    jurisdictions, sheriff's deputies and other government employees have had to reduce the time they
8    can devote to other duties, including 9-1-1 dispatch, in order to monitor sex-offender residences
9    and post eviction notices for those living in impermissible zones.[164] GPS locational monitoring
10   requires law-enforcement agents to spend more time at their computers and less time directly
11   supervising parolees or carrying out other duties in the field.[165] To make matters worse, 99 percent
12   of the GPS alerts received in some jurisdictions have come from low-battery signals or other false
13   alarms; only one percent indicated that an offender had entered a restricted area.[166] Of course, the
14   low incidence of true alarms would be consistent with the hypothesis that GPS monitoring deters
15   offenders from violating their restrictions, but even if this is the case, the frequency of false alarms
16   means that any such gains come at a high price in terms of required law-enforcement attention.

17        With respect to *residency restrictions*, the evidence of possible benefit is similarly
18   disappointing. The Minnesota Department of Corrections found that among sex offenders re-
19   arrested after release from prison (seven percent of all sex offenders released, a figure far lower
20   than the recidivism rate for other serious crimes), "[n]ot one . . . would likely have been deterred
21   by a residency restriction law," largely because "[offenders who] established direct contact with
22   victims . . . were unlikely to do so close to where they lived." [167] The Colorado Department of
23   Corrections found that child molesters who re-offended did not live closer to child-care facilities
24   and schools than first offenders arrested for similar crimes; the Department therefore concluded
25   that "[p]lacing restrictions on the location of … supervised sex offender residences may not deter
26   the sex offender from re-offending and should not be considered as a method to control sexual

---

[161] See cases cited in notes xx-xx, supra.

[162] See also Reporters' Notes to Sections 213.12A & H, supra.

[163] See Don Thompson, California to Change Sex-Offender Tracking, Associated Press, May 26, 2011, available at http://www.msnbc.msn.com/id/43186851/ns/us_news-.

[164] See Geraghty, supra, note 42, at 518.

[165] See Thompson, supra note 163.

[166] Id.

[167] Minn. Dept. of Corr., Residential Proximity & Sex Offense Recidivism in Minnesota 1, 2 (2007), available at http://www.corr.state.mn.us/publications/documents/04-07SexOffenderReport-Proximity.pdf.

© 2019 by The American Law Institute
Council Draft – not approved

1 offending recidivism."[168] Other available evidence on the efficacy of residency restrictions is
2 uniformly to the same effect.[169]

3     These consequences in turn mean negative impacts for public safety because the adverse
4 personal impacts for offenders impede their reintegration into society and aggravate their risks of
5 re-offending. Successful reintegration and law-abiding behavior typically depend on stable living
6 arrangements, supportive family relationships, and steady employment,[170] while poor social
7 support and psychological distress are important risk factors for sexual recidivism.[171] Thus, any
8 direct gains from greater law-enforcement efficacy or from improved public awareness and self-
9 protection may be outweighed by an *increased* likelihood of recidivism.[172]

10     In several widely reported incidents, sex offenders have been brutally attacked and even
11 murdered by neighbors who learned of their presence through registration and notification
12 programs.[173] More systematic research has largely depended on offender self-reports, arguably a
13 reason to discount some of the unfavorable consequences described. Subject to that caveat,
14 however, the studies find extensive evidence of worrisome impacts.

15     Among offenders subject to community notification in Connecticut and Indiana (an
16 undifferentiated group of defendants convicted of any sex offense), 21 percent lost a job because

---

[168] Sex Offender Mgmt. Bd., Colo. Dep't of Pub. Safety, Report on Safety Issues Raised by Living Arrangements for and Location of Sex Offenders in the Community 4 (2004), available at http://dcj.state.co.us/ors/pdf/docs/FullSLAFinal.pdf.

[169] See text at notes xx-xx infra (Tewskbury and ACA).

[170] CUMMING & BUELL, SUPERVISION OF THE SEX OFFENDER (1997); Levenson, supra note xx, at 282-283; Elton, supra note xx, at 38 ("community reintegration, therapy, and stability help reduce recidivism among the majority of [sex] offenders").

[171] R.K. Hanson & A. J. R. Harris, Dep't of Solicitor Gen. of Can., Dynamic Predictors of Sexual Recidivism (1998), available at http://www.static99.org/pdfdocs/hansonandharris1998.pdf; Levenson, supra note xx, at 267, 281.

[172] Prescott & Rockoff, supra note 57, at 181.

[173] See Doe v. Pataki, 120 F.3d 1263, 1279 (2d Cir. 1997) (noting "numerous instances in which sex offenders have suffered harm in the aftermath of notification—ranging from public shunning [to] physical attacks, and arson"); E.B. v. Verniero, 119 F.3d at 1102 ("[While] incidents of 'vigilante justice' are not common, they happen with sufficient frequency and publicity that registrants justifiably live in fear of them"). See also "Washington State Man Accused of Slaying Two Sex Offenders," Reuters, June 5, 2012, available at http://www.nytimes.com/reuters/2012/06/05/us/05reuters-usa-sexoffenders. One of the *amicus* briefs filed in a companion case to Smith v. Doe, 538 U.S. 84, 103 (2003), describes numerous specific instances in which registration laws resulted in sex offenders being subjected to grave physical assault, harassment, threats, loss of employment or loss of housing, including being driven into homelessness or moving out of state; the brief also describes many specific instances in which such laws drove a sex offender to suicide. Godfrey v. Doe, No. 01-729, October Term 2001, Brief Amicus Curiae of the Public Defender For The State of New Jersey, et al., at 7-21, 2002 WL 1798881 (July 31, 2002).

265

© 2019 by The American Law Institute
Council Draft – not approved

1    a boss or co-worker learned of their status,[174] 21 percent were forced to move out of their residence
2    because a landlord or neighbor found out, 10 percent had been physically assaulted after
3    community notification had been given, and 16 percent of offenders reported that a member of
4    their household had been threatened, harassed, or assaulted.[175] Roughly half reported fearing for
5    their safety, and a similar proportion said they felt alone and isolated because of community
6    notification.[176] On a more positive note, 22 percent of the offenders said registration and
7    notification had helped them avoid re-offending, but a larger proportion expressed feelings of
8    hopelessness, with 44 percent of the offenders agreeing with the statement that "no one believes I
9    can change, so why even try."[177]

10       Adverse impacts may be even more widespread among offenders in the highest risk
11   categories.[178] In a sample of high-risk sex offenders in Wisconsin, all but one said that notification
12   made it harder for them to reintegrate into the community.[179] The study found that 83 percent had
13   been excluded from a residence, and 57 percent had lost a job because of community
14   notification.[180] More than three-quarters reported being ostracized by neighbors and
15   acquaintances, or either humiliated, harassed, or threatened by community residents or others.[181]
16   In two-thirds of the cases, adverse effects extended to the parents or children of offenders; relatives
17   commonly experienced emotional distress and sometimes had been humiliated or ostracized by
18   acquaintances.[182] Similar findings recur throughout the literature. In a Florida study, 35 percent of
19   the registered offenders were forced to move, 27 percent had lost their jobs, and 19 percent had
20   been harassed.[183] In light of this research and their own on-the-ground experience, a number of

---

[174] Jill S. Levenson, David A. D'Amora, & Andrea Hern, *Megan's Law and its Impact on Community Re-Entry for Sex Offenders*, 25 BEHAV. SCI. & L. 587, 594 (2007).

[175] Id.

[176] Id.

[177] Id.

[178] Richard G. Zevitz & Mary Ann Farkas, National Institute of Justice, Sex Offender Community Notification: Assessing the Impact in Wisconsin (Dec. 2000), available at https://www.ncjrs.gov/pdffiles1/nij/179992.pdf.

[179] Id. at 9.

[180] Id. at 10.

[181] Id. at 9.

[182] Id.

[183] Richard Tewksbury, *Collateral Consequences of Sex Offender Registration*, 21 J. CONTEMP. CRIM. JUST. 67, 67-79 (2005). To similar effect, see also Anne-Marie McAlinden, THE SHAMING OF SEXUAL OFFENDERS: RISK, RETRIBUTION AND REINTEGRATION 116 (2007) ("[t]he community's abhorrence and rejection of sex offenders" prevents re-integration); Richard Tewksbury, *Experiences and*

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12I. Additional Collateral Consequences of Conviction

1  states resist public demand for indiscriminate community notification and restrict that measure to
2  a narrow category of the highest-risk offenders.[184] In Washington, the state's Sex Offender Policy
3  Board unanimously recommended that "sex offender registration information should be exempt
4  from public disclosure." The Board noted that "this information has been held from public
5  disclosure for decades, and has proven to be in the best interests of the public, of victims of sexual
6  assault, of community safety, and of registered sex offenders – both in terms of facilitating their
7  successful reintegration into the community and in terms of their physical safety."[185]

8        The negative consequences of restricted living arrangements (whether as a direct
9  consequence of residency prohibitions or an indirect effect of community notification) can be
10  dramatic, because these limitations tend to push registered sex offenders into socially disorganized,
11  economically disadvantaged communities.[186] In Iowa, residency restrictions barred sex offenders
12  from 98 percent of one county's housing units,[187] and throughout the state many offenders became
13  homeless.[188] In one Florida county, restrictions on living near a school-bus stop left only one
14  percent of the county open to residency by sex offenders.[189] At the same time, "research provides
15  little if any support for the effectiveness of residential restriction laws in deterring or preventing
16  sexual offenses."[190]

---

*Attitudes of Registered Female Sex Offenders*, 68 FED. PROBATION 30, 31 (2004) (female registered sex offenders experienced harassment, as well as loss of jobs, friendships, and residences); Richard Tewksbury & Matthew Lees, *Perceptions of Sex Offender Registration: Collateral Consequences and Community Experiences*, 26 SOC. SPECTRUM 309, 330-333 (2006) (78 percent of registered sex offenders in Illinois said that restrictions had "impeded their ability to reintegrate into community life").

[184] NJ, VT.

[185] WASHINGTON ST. SEX OFFENDER POL'Y BOARD, General Recommendations for Sex Offender Management, 6-7 (2016) https://sgc.wa.gov/sites/default/files/public/sopb/documents/general_recommendations.pdf

[186] Richard Tewksbury, supra n.xx, at 533.

[187] See Brian J. Love, *Regulating for Safety or Punishing Depravity? A Pathfinder for Sex Offender Residency Restriction Statutes*, 43 CRIM. L. BULL. 834, 835 (2007).

[188] See Elton, supra note xx, at 38.

[189] See Tewksbury, *Experiences and Attitudes*, supra note 183, at 533.

[190] Tewksbury, *Residency Restrictions*, supra note xxx, at 539. See also Am. Cor. Ass'n, Resolution on Neighborhood Exclusion of Predatory Sex Offenders (Jan. 24, 2007) (stating that "there is no evidence to support the efficacy of broadly-applied residential restrictions on sex offenders"); Jill S. Levenson et al., *Grand Challenges: Social Justice and the Need for Evidence-Based Sex Offender Registry Reform*, 43 J. SOC. & SOC. WELFARE 3, 22 (2016) (arguing that restrictions on sex offender residency should be abolished).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12I. Additional Collateral Consequences of Conviction

1    In sum, registration, community notification, and residency restrictions have frequent,
2    well-documented adverse impacts on sex offenders. And (other things being equal) these impacts
3    tend to make recidivism *more likely*.
4    Victim advocates add to these reservations. They list a wide range of harmful impacts for
5    victims, for example, that "residency restrictions … have inadvertently created a disincentive for
6    victims to disclose [their victimization]."[191] Victims informed about residency restrictions "rolled
7    their eyes, seemingly in exasperation" at the irrelevancy of these laws to their situation.[192]
8    A state Coalition Against Sexual Assault reported that notification, GPS tracking, and
9    residency restrictions "have actually impeded public safety because they have reinforced to the
10   public grossly inaccurate depictions of the type of sexual assault risk one is most likely to face. . .
11   . [b]y focusing on the 'stranger danger' myth, people are less aware of a more likely assailant: a
12   person they know. These myths, in turn, have created a public demand for sexual assault risk
13   mitigation (e.g. residency restrictions, offender registries and notification) aimed at particularly
14   scary, but unlikely, threats."[193] Many of these Coalitions have "publicly denounced residency
15   restriction laws, describing them as 'irresponsible' and 'counterproductive.'"[194]
16   Patricia Wetterling, one of the original leaders of the movement for registration and
17   community notification, is equally emphatic. Residency restrictions, she says, are "wrong and
18   ludicrous and make no sense at all. We're putting all our energy on the stranger, the bad guy, and
19   the reality is it's most sex offenses are committed by somebody that gains your trust, or is a friend
20   or relative, and so none of these laws address the real, sacred thing that nobody wants to talk
21   about."[195] Wetterling adds, "When these guys are released from prison, we want them to succeed.
22   . . . All of these laws they've been passing make sure that they're not going to succeed. They don't
23   have a place to live; they can't get work. Everybody knows of their horrible crime and they've
24   been vilified. There is too much of a knee jerk reaction to these horrible crimes. . . . [T]here is no
25   safe place for these guys. We have not built into the system any means for success . . . ."[196]
26   Unless carefully targeted, therefore, most of these measures almost inevitably aggravate
27   the very dangers that they are intended to allay.
28   In light of these findings, Section 213.12I creates a strong presumption against limits on
29   sex-offender residency and employment, GPS monitoring, and other restrictive measures that can

---

[191] Bandy, supra note 74, at 471, 488.

[192] Id., at 490.

[193] Id., at 491-492 (paraphrasing CASA interviewee based in Southwest).

[194] Id., at 492 (explaining that these provisions "provide the public with a false sense of security and serve to reinforce stereotypes about the typical offender and the typical victim").

[195] Id., at 101-103,

[196] Id., at 107-108, 112.

© 2019 by The American Law Institute
Council Draft – not approved

1  only impede the offender's prospects for re-integration into society. The same presumption applies,
2  for the same reason, against community notification as well, despite its firm pedigree in federal
3  law and widespread acceptance in the states.
4  　　　　Different issues are presented when community notification or a particular sex-offender
5  restriction is deployed on a carefully targeted basis. An obvious example might be a nursery
6  school's request for affirmative notification in the event that a registered sex offender moves into
7  the area. To accommodate potentially legitimate needs of this sort, subsections (3) and (4) establish
8  a framework for approving on a case-by-case basis specific collateral consequences, additional to
9  those authorized by Sections 213.12A-H. The official making that individual determination is
10 required to give careful consideration to the public-safety need for the particular measure; to weigh
11 that need against its impact on the offender, the offender's family, and the offender's prospects for
12 rehabilitation and reintegration into society; and to ensure that any measure approved is drawn as
13 narrowly as possible to achieve the goal of public safety.
14 　　　　This standard will not open the door to routine imposition of community notification or
15 other additional collateral consequences just because a community organization asserts a particular
16 need to know, or because a particular registrant has been found guilty of a very serious offense.
17 For example, a nursery school seeking to avoid hiring employees who have sex-offense records
18 does not require affirmative notification every time a new registrant moves into the area; ordinary
19 background check procedures suffice for that purpose.[197] In contrast, a commitment to notify the
20 nursery school about any registrant in the area who has a particularly serious record of prior
21 convictions for molesting young children might be warranted, provided that such a decision is
22 reached after carefully considering all the circumstances. And similarly, a registrant with a prior
23 record of that nature might reasonably face a narrowly targeted restriction on living or seeking
24 employment near schools and play areas where young children congregate, provided again that the
25 restriction is imposed only after carefully considering all the circumstances.
26 　　　　The important point is that the interests in public safety and successful offender
27 rehabilitation both require that the unintended harms of additional collateral consequences be fully
28 appreciated and that their use accordingly be limited to a narrow range of specially compelling
29 circumstances.[198] Subsections (3) & (4) identify the factors that the sentencing judge or other authorized
30 official must weigh in determining whether a particular offender should incur such consequences.[199]

---

[197] See Reporters' Note to Section 213.12H, addressing the related issue of whether organizations of this sort need access to registry information.

[198] Cf. Doe v. Attorney General, 686 N.E.2d 1007 (Mass. 1997) (holding Massachusetts provision subjecting sex offender to mandatory registration accompanied by public access and community notification to violate procedural due process in the absence of an individualized risk assessment); State v. Bani, 36 P.3d 1255, 1268 (Haw. 2001) (same). But see Connecticut Department of Public Safety v. Doe, 538 U.S. 1 (2003) (Connecticut's mandatory registration with public access and community notification did not violate procedural due process).

[199] Statutory language is not the place to mandate specific risk assessment parameters. The sentencing judge or other authorized official will draw on detailed protocols that are evolving and

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12J. Relief from Obligation to Register, Associated Duties,
and Additional Collateral Consequences

1  **SECTION 213.12J. RELIEF FROM OBLIGATION TO REGISTER, ASSOCIATED DUTIES, AND**
2  **ADDITIONAL COLLATERAL CONSEQUENCES**

3  　　**(1)** *Petition for relief.* **At any time prior to the expiration of the obligation to register,**
4  **the associated duties, or any additional collateral consequences, the offender may petition**
5  **the sentencing court, or other authority authorized by law, to issue an order of relief from**
6  **all or part of that obligation or those duties or consequences.**

7  　　**(2)** *Proceedings on petition for relief.* **The authority to which the petition is addressed**
8  **may either dismiss the petition summarily, in whole or in part, or institute proceedings as**
9  **needed to rule on the merits of the petition. If that authority chooses to entertain submissions,**
10 **hear argument, or take evidence prior to ruling on the merits of the petition, it shall give the**
11 **prosecuting attorney notice and an opportunity to participate in those proceedings.**
12 **Following those proceedings, the authority to which the petition is addressed may grant or**
13 **deny relief, in whole or in part, from the obligation to register, any associated duties, and**
14 **any additional collateral consequences. An order granting or denying relief following those**
15 **proceedings shall explain in writing the reasons for granting or denying relief.**

16 　　**(3)** *Standard for relief.* **The authority to which the petition is addressed may grant**
17 **relief under subsection (2) of this Section if it finds that the obligation, duty, or consequence**
18 **in question is likely to impose a substantial burden on the offender's ability to reintegrate**
19 **into law-abiding society, and that public-safety considerations do not require continued**
20 **imposition of the obligation, duty, or consequence after due consideration of:**

21 　　　　**(a) the nature of the offense;**
22 　　　　**(b) all other circumstances of the case;**
23 　　　　**(c) the offender's prior record; and**

---

continually refined for this purpose. See, e.g., Grant Duwe, *Better Practices in the Development and Validation of Recidivism Risk Assessments: The Minnesota Sex Offender Screening Tool-4*, 30 CRIM. JUSTICE POLICY REV. 538 (2019); R. Karl Hanson, et al., *The Field Validity of Static-99/R Sex Offender Risk Assessment Tool in California*, 1 J. THREAT ASSESSMENT & MGMT. 102 (2014); R. Karl Hanson & Kelly E. Morton-Bourgon, *The Accuracy of Recidivism Risk Assessments for Sexual Offenders: A Meta-Analysis of 118 Prediction Studies*, 21 PSYCHOL. ASSESSMENT 1 (2009).

© 2019 by The American Law Institute
Council Draft – not approved

Section 213.12J. Relief from Obligation to Register, Associated Duties,
and Additional Collateral Consequences

1       (d) the potential negative impacts of the restriction, disability, or government
2    action on the offender, on the offender's family, and on the offender's prospects for
3    rehabilitation and reintegration into society.

4       Relief should not be denied arbitrarily or for any punitive purpose.

5       (4) *Subsequent proceedings*. An order of relief granted under this Section does not
6    preclude the sentencing court or other authorized authority from later revoking that order
7    if, on the basis of the offender's subsequent conduct and any other substantial change in
8    circumstances, the authority finds by a preponderance of the evidence that public-safety
9    considerations, weighed against the burden on the offender's ability to reintegrate into law-
10   abiding society, no longer justify the order of relief.

11   **Comment:**

12       Section 213.12J identifies the standards and procedures for relieving an offender from the
13   obligation to register, from the associated duties, or from any additional collateral consequences.
14   It largely follows the framework applicable generally to petitions for relief from collateral
15   consequences, as specified in the sentencing provisions of the Model Penal Code,[200] with
16   additional detail pertinent to sex-offender collateral consequences.

17       In deciding whether to grant relief, the sentencing judge or other official authorized to
18   make the determination is instructed to consider all the circumstances of the case, with particular
19   attention to the nature of the offense; the offender's prior record; and the potential negative impacts
20   of the collateral consequence in question on the offender, on the offender's family, and on the
21   offender's prospects for rehabilitation and reintegration into society. Some states endorse
22   essentially similar criteria, but offer greater detail. Washington, for example, breaks down these
23   general categories into twelve factors and adds that the court may also take into account "[a]ny
24   other factors the court may consider relevant."[201]

### REPORTERS' NOTES

25       Federal SORNA makes no provision for early relief from registration and its associated
26   duties and restrictions. More than half the states provide some opportunity for early termination of
27   registration requirements, though in almost all cases the opportunity is limited to persons convicted

---

[200] See *Model Penal Code: Sentencing*, supra note 110, § 7.04(2) & (3).

[201] WASH. REV. CODE ANN. § 9A.44.142 (2019).

© 2019 by The American Law Institute
Council Draft – not approved

### Section 213.12J. Relief from Obligation to Register, Associated Duties, and Additional Collateral Consequences

1   of the least serious sexual offenses.[202] Section 213.12J draws on the early relief provisions of
2   *Model Penal Code: Sentencing*, Article 7, with additional provisions relevant to sex-offender
3   collateral consequences, and with several adjustments to align sex-offender relief with
4   implementation details and policy considerations specific to this context:[203]

5       (a) MPCS directs that petitions for relief be addressed to the sentencing court, and this is a
6   common approach among jurisdictions that authorize early relief from sex-offender registry
7   obligations.[204] However, many jurisdictions take a different approach. In some, petitions for relief
8   must be addressed to a court in the jurisdiction where the registrant resides.[205] In some states, the
9   sentencing court acts on the advice on a board of experts;[206] elsewhere the final decision is
10  entrusted to an independent risk assessment board.[207] It seems appropriate to allow for local
11  flexibility in this regard. Section 213.12J endorses that approach.

12      (b) MPCS imposes a daunting burden of proof: the offender must demonstrate by clear and
13  convincing evidence that the criteria for relief are satisfied. The effect is to create a strong
14  presumption in favor of sustaining a mandatory collateral consequence that by definition was not
15  initially attuned to the situation of the individual offender. This high hurdle has drawn criticism as
16  unduly difficult to meet with respect to collateral consequences generally.[208] It is especially
17  inappropriate in the context of sex-offender collateral consequences, because these duties and
18  restrictions carry no strong presumption that they are likely to be sufficiently justified in the
19  individual instance. To the contrary, the case for most collateral consequences is mixed at best,
20  particularly with the passage of time since the offender's initial registration. Accordingly, for sex-
21  offender collateral consequences, the appropriate burden of proof is not a matter that can be
22  suitably constrained in advance. Section 213.12J(3) does not specify a particular burden of proof
23  and instead leaves this decision to the sound discretion of the decision-making authority.

---

[202] See "Relief from Sex Offender Registration Obligations," http://ccresourcecenter.org/state-restoration-profiles/50-state-comparison-relief-from-sex-offender-registration-obligations/.

[203] The collateral-consequence provisions of MPCS were not intended to apply without exception to the unique circumstances of sex-offender collateral consequences. See **CITE.**

[204] E.g., See, e.g., FLA. STAT. ANN. § 943.0435(11)(a)(2); GA. CODE ANN. § 42-1-19; MICH. COMP. LAWS ANN. § 28.728c(4); N.Y. CORRECT. LAW § 168-o.

[205] E.g., CAL. PENAL CODE § 290.5 (*effective July 1, 2021* ) (petition to court in county in which offender resides); OHIO REV. CODE ANN. § 2950.15 (same).

[206] E.g., 42 PA. STAT. AND CONS. STAT. ANN. § 9799.15(a.2) (sentencing court acts on report of State Sexual Offenders Assessment Board); TEX. CODE CRIM. PROC. ANN. art. 62.404 (sentencing court acts on basis of individual risk assessment conducted by the state's Council on Sex Offender Treatment).

[207] E.g., MD. CODE REGS. 12.06.01.14 (decision by Sex Offender Registry Unit); 803 MASS. CODE REGS. 1.30 (petition to Sex Offender Registry Board).

[208] See Demleitner, supra note 22, at 321-323.

© 2019 by The American Law Institute
Council Draft – not approved

## Section 213.12J. Relief from Obligation to Register, Associated Duties, and Additional Collateral Consequences

1      (c) MPCS sets stiff criteria for granting relief. The offender must show that the collateral
2  consequence in question is (i) not substantially related to the elements and facts of the conviction
3  offense; (ii) likely to impose a substantial burden on the offender's ability to re-integrate into
4  society; *and* (iii) not required by public safety considerations. In the context of sex-offender
5  collateral consequences, it will too often be impossible to demonstrate that all three of these criteria
6  are met. Except in rare instances, sex-offender collateral consequences will be intrinsically related
7  to the elements and facts of the underlying sexual offense, making the first essential criterion
8  beyond reach in most cases, even when the balance of public-safety considerations and adverse
9  impacts on the offender clearly warrant relief. Accordingly, Section 213.12J(3) allows the
10  decision-making authority to grant relief simply on the basis of a finding that the collateral
11  consequence in question is likely to impose a substantial burden on the offender's ability to
12  reintegrate into law-abiding society, and that public-safety considerations do not require its
13  continued imposition.

14      (d) MPCS permits the decision-making authority to deny relief without making any
15  specific finding that the evidence and the relevant criteria warrant that result. And when the
16  decision-making authority does grant relief, MPCS does not expressly require that the necessary
17  findings be explained in writing. Section 213.12J(2) specifies that when the decision-making
18  authority institutes proceedings to rule on the merits of a petition for relief, an order granting *or*
19  *denying* relief following those proceedings must explain in writing the reasons for granting or
20  denying relief.

© 2019 by The American Law Institute
Council Draft – not approved

# Exhibit C:
## Michigan State Police Feb. 21, 2020 Memo

UD-040 (03/17)
MEMORANDUM

# STATE OF MICHIGAN
# DEPARTMENT OF STATE POLICE

**DATE:**        February 21, 2020

**TO:**          Enforcement Members

**FROM:**        Lt. Col. Richard T. Arnold, Deputy Director, Field Operations Bureau

**SUBJECT:**     UPDATE AND CLARIFICATION - Enforcement of Michigan's Sex Offender Registry Act

On Friday, February 14, 2020, the department issued a memorandum regarding an Order and Opinion issued by the United States District Court for the Eastern District of Michigan regarding the constitutionality of Michigan's Sex Offender Registration Act (SORA).  The purpose of this memorandum is to clarify the direction that was given in that memorandum.

In instances where a warrant exists for a SORA violation, whether held by the MSP or another agency, members shall not make an arrest.  The member shall confirm the validity of the warrant, advise the individual of the warrant, release the individual, and document the incident in an incident report.

In instances where there is probable cause to believe a violation of the SORA has occurred, but a warrant has not been issued, the case shall be referred to the prosecuting attorney for potential charges and no warrantless arrest shall take place.  In these instances, members shall only seek warrants if the date of offense that required registration occurred after April 11, 2011.

No administrative action (e.g. verification of registrants, collection of annual fees) shall be taken unless the member can validate the offense that required registration occurred after April 11, 2011.

Tips in OffenderWatch will continue to be accepted but shall only be acted upon in accordance with the directives above.

The Attorney General and the department are currently working to comply with the Order and further direction will be forthcoming.

Questions regarding this issue can be directed to F/Lt. Aimee Maike, Risk Management Section, at 517-284-3235.

*"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, and COURTESY"*