UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE,
on behalf of themselves and
all others similarly situated,

                                   File No. 2:22-cv-10209

         Plaintiffs,

v.                                 Hon. Mark A. Goldsmith

GRETCHEN WHITMER, Governor of the      Mag. Curtis Ivy, Jr.
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

        Defendants.

_____

## PARTIES' JOINT STATUS REPORT REGARDING DISCOVERY

## TABLE OF CONTENTS

I.   BACKGROUND ................................................................................1
II.  NON-PUBLIC CLASS MEMBER DATA ......................................3
    Plaintiffs' Position ........................................................................3
    Defendants' Position ...................................................................17
III. DATA REGARDING MICHIGAN'S REGISTRY ........................23
    Plaintiffs' Position ......................................................................23
    Defendants' Position ...................................................................25
IV. INFORMATION AND DATA REGARDING "RECAPTURE" CASES .......29
    Plaintiffs' Position ......................................................................29
    Defendants' Position ...................................................................31
V.  IMPLEMENTATION DOCUMENTS FOR THE NEW STATUTE...............32

i

Plaintiffs' Position ........................................................................32
Defendants' Position .....................................................................32

VI. SORA ENFORCEMENT DOCUMENTS AND DATA ...................................34

Plaintiffs' Position ........................................................................34
Defendants' Position .....................................................................38

VII. JOB DESCRIPTIONS AND ORGANIZATIONAL CHARTS ....................38

Plaintiffs' Position ........................................................................38
Defendants' Position .....................................................................40

VIII. DOCUMENTS RELATED TO THE NON-SEX OFFENSE SUBCLASS ...41

Plaintiffs' Position ........................................................................41
Defendants' Position .....................................................................43

IX. INFORMATION RELATED TO ANALYSES OF THE REGISTRY ............44

Plaintiffs' Position ........................................................................44
Defendants' Position .....................................................................45

## I.     BACKGROUND

The parties have been conducting informal and formal discovery, as set out

below. Discovery requests and responses that are relevant to the issues before the

Court are attached as exhibits.

9/30/22:    Plaintiffs sent a detailed list of class data requested, subject to revision after both sides had a better feel for what data could be produced by the Michigan State Police (MSP) and the Michigan Department of Corrections (MDOC), and how much work it would take to produce it.

10/5/22:    Plaintiffs filed a statement regarding the class data issues, ECF 61, and Defendants filed a response, ECF 62.

11/4/22:    Plaintiffs sent informal discovery requests, to apprise Defendants what they were seeking as to interrogatories and document requests, in addition to the class data.

11/9/22:    After status conferences on 10/13/22 and 10/28/22, the Court entered a case management order, ECF 66, setting dates of 12/2/22 for the initial wave of written discovery and 12/12/22 for responses, including objections.

11/17/22: Plaintiffs served their initial Rule 26(b) disclosures.

11/18/22: Defendants served their initial Rule 26(b) disclosures.

11/21/22: The parties met informally with the MSP SOR Unit data manager, to learn how the new MSOR program worked and what it could do. In advance of that meeting, Defendants produced a manual for the MSOR system (approximately 80 pages).

11/30/22: Defendants served their responses to the informal discovery requests and produced approximately 20 pages of documents. Defendants provided screen shots of documents gathered to date that would be produced after further review and Bates numbering.

12/2/22:    Plaintiffs filed their first formal interrogatories and document requests,

which had been narrowed in response to the meet-and-confer session with the MSP data person. *See* Exhibit A, Pls' 1st Interrogatories and RFPs. Plaintiffs revised their class data requests into separate requests for MSP data and for MDOC data. Plaintiffs also served requests to admit. *See* Ex. B, Merged Document with Pls' RTAs and Defs' Responses.[1]

Defendants served their first interrogatories, document requests, and requests to admit.

12/5/22:  Plaintiffs sent a letter to the Court regarding (1) access to non-public class data; (2) whether the MDOC is a party; and (3) production deadlines.

12/13/22:  Plaintiffs served a deficiency letter as to part of Defendants' Rule 26 disclosures. Plaintiffs served as second set of short follow-up interrogatories and RFPs, relating to Defendants' Rule 26 disclosures.

12/14/22:  Plaintiffs served their responses to Defendants' first interrogatories, RFPs, and RTAs, with objections.

Defendants served their responses to Plaintiffs' first interrogatories and requests for admission, with objections. *See* Ex. C, Defs' Resps to Pls' 1st RFPs and Rogs; Ex. B, Merged Document with Pls' RTAs and Defs' Responses.

12/16/22:  Defendants served amended responses to Plaintiffs' first requests for production, along with new documents and data in response, with objections. Ex. D, Defs' Am. Resp. to 1st RFPs.

12/16/22:  After a status conference on 12/15/22, Plaintiffs reformatted their MDOC discovery and served it by subpoena to the MDOC. (Plaintiffs have been talking to MDOC counsel to determine what data requested can be gathered easily and what cannot, and will adjust their requests accordingly, possibly after a meet-and-confer with a data person.)

12/27/22:  After a status conference on 12/22/22, the Court entered an order, ECF 74, that the balance of documents responsive to Plaintiffs' requests should

---

[1] Defendants did not include the text of Plaintiffs' requests to admit in their responses. To facilitate the Court's review, this exhibit includes both the requests and the responses, but is limited to those issues still in dispute or unresolved.

be produced the week of 1/2/22.

1/6/23:     After a meet and confer on 1/5/23, Defendants produced three pages of additional documents, and indicated that they would shortly be producing additional responsive documents later that day or the following week. Defendants also provided comments on the list of requested class data. Exhibit A to RFP 15.

In addition to the dates outlined above, the parties have held meet-and-confers and communicated by email. To date Plaintiffs have produced approximately 900 pages of documents, and Defendants have produced approximately 1,500 pages of documents, which include several hundred pages of duplicates. Defendants updated their responses on January 6, 2023, and are working to produce additional documents responsive to Plaintiffs' first requests. Also outstanding are:

1. Defendants' responses to a deficiency letter regarding Rule 26 disclosures, and the related second set of interrogatories and requests for production.

2. Responses from the Michigan Department of Corrections to the subpoenas.

The parties are continuing to negotiate over a number of issues and Defendants' counsel are continuing to work with the MSP to locate documents. The disputes between the parties that are ripe for resolution by the Court are set forth below.

## II.     NON-PUBLIC CLASS MEMBER DATA

### <u>Plaintiffs' Position</u>

Since September, when Plaintiffs first sent a list of requested class-member

data to Defendants, class counsel have been trying to obtain information about the class they represent. See Ex. A, RFP 15, Exhibit A. As became clear at the Court-ordered meeting with the MSP data manager on November 21, 2022, the MSOR database is a powerful, easily searchable system that stores a vast amount of data.[2] Plaintiffs seek only a fraction of the data available to Defendants, and have modified their original request to remove data fields that are not tracked by the MSP.[3] There are also no technical impediments to providing the data, and Defendants produced the publicly available data for some 40,000 registrants with no difficulty. It is standard in class litigation for Defendants to provide Plaintiffs with a class list, including such information about class members as is relevant to the claims at issue.[4]

The MSP has nevertheless refused to supply any data not available to the public. Two types of non-public data are at issue. First, Defendants refuse to provide any information at all about class members who are not on the public registry. Thus, class counsel cannot even get the names of the Tier I registrants and juvenile registrants whom counsel represent. Non-public registrants are class members, and thus

---

[2]  Plaintiffs use the word "data" as shorthand for any non-public information or data requested, and also as a singular noun, in line with modern editorial practice.

[3]  Some of that data is maintained by the MDOC, and is the subject of subpoenas sent to that Department.

[4]  *See*, *e.g.*, *Underwood v. Carpenters Pension Tr. Fund-Detroit & Vicinity*, No. 13- CV-14464, 2014 WL 4602974, at *11 (E.D. Mich. Sept. 15, 2014); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2010 WL 5638219, at *2 (E.D. Mich. Sept. 2, 2010); *Reed v. Am. S.S. Co.*, 682 F. Supp. 333, 339 (E.D. Mich. 1988).

4

are entitled to the same level of representation as other class members. ECF 35, Class Certification Order, PageID 1116. Counsel need to know who their clients are.

Second, the MSOR database contains a huge amount of information about each registrant. Not all of that information is made public. For example, non-public information includes: registration term, registration start date, tier level, certain offense information (e.g., offense date, victim age, recapture case), incarceration history, certain contact information (phone numbers and email addresses), employer name, enforcement information (e.g., residence checks, officer alerts), fee information, and historical information (e.g., past periods of homelessness or unemployment). As explained in more detail below, this information is essential for Plaintiffs to litigate their case.

The Court should order disclosure of the non-public data because (1) in *Does II* this precise issue was litigated and resolved in Plaintiffs' favor by Judge Cleland (*see* Opinion & Order, *Does II v. Whitmer*, 16-cv-13137 (E.D. Mich.), ECF 121, PageID 2459-2464, attached as Ex. E); (2) the data is fully insulated from public distribution by a protective order already entered by this Court (*see* ECF 69, First Amended Protective Order (11/29/22)); and (3) the data is relevant to Plaintiffs' claims, critical to class counsel's ability to represent the class, and will reduce the amount of discovery sought from Defendants.

Plaintiffs understand that releasing statutorily guarded data without a court

order makes MSP officials nervous. That is why Plaintiffs were willing to stipulate to an order requiring production, and why Plaintiffs are not insisting on mandatory costs under Fed. R. Civ. P. Rule 37(a)(5), even though Defendants' position is not justified given Judge Cleland's decision. But the MSP's angst about acting without a court order is not a reason to bar production. It is a reason to enter such an order.

### A. Judge Cleland Rejected the Identical MSP Claim in *Does II*.

In *Does II*, Plaintiffs sought similar class-member data held exclusively in Defendants' possession, which Plaintiffs could not access on their own.[5] In that case—which sought class-wide enforcement of the *Does I* Sixth Circuit and district court decisions—there was no discovery. Rather, provision of class-member data arose after judgment for purposes of class-member notice and monitoring.

In *Does II* (as here), Defendants argued that non-public data could not be

---

[5] Because the class-member list provided in *Does II* was used only for post-judgment notice and monitoring, it does not contain many of the fields Plaintiffs seek here for discovery purposes, and is no substitute for what Plaintiffs need in this case. Moreover, at the insistence of the Defendants, the *Does II* judgment contains restrictions on the use of class member data. *See Does II*, 16-cv-13137 (E.D. Mich.), ECF 126.

disclosed under M.C.L. §§ 28.214(5)[6] (barring disclosure of criminal justice infor-

mation "in a manner that is not authorized by law or rule").[7] Defendants also argued

(as here) that M.C.L. § 28.730(1) makes non-public SORA registry and reporting

data confidential but for law enforcement purposes, noting that M.C.L. §§ 28.730(4)

and (5) impose criminal and civil liability for disclosure, other than by registrants

themselves.[8] *Does II*, ECF 101, Defs' Opp'n to Pls' Motion for Entry of Judgment

(10/16/2020), PageID 1951.

In *Does II*, Plaintiffs countered relying on two cases. The first was *Dupuie-

Jarbo v. Twenty-Eighth Dist. Ct.*, No. 10-10548, 2010 WL 2813343, at *2 (E.D.

Mich. 7/14/2010), a previous decision by Judge Cleland interpreting M.C.L. §

---

[6] M.C.L. § 28.214(3) also prohibits the disclosure of "nonpublic information governed under this act for personal use or gain." Because the data would be disclosed only for purposes of the litigation, on behalf of the class, it would not be used "for personal use or gain".

[7] Defendants both here and in *Does II* also cited M.C.L. § 28.728. That statute simply delineates what information should be included on the public registry, and what in the non-public database.

[8] M.C.L. § 28.730(1) states: "Except as provided in this act, a registration or report is confidential and information from that registration or report shall not be open to inspection except for law enforcement purposes. The registration or report and all included materials and information are exempt from disclosure under section 13 of the freedom of information act, 1976 PA 442, MCL 15.243." M.C.L. § 28.730(4) states: "Except as provided in this act, an individual other than the registrant who knows of a registration or report under this act and who divulges, uses, or publishes nonpublic information concerning the registration or report in violation of this act is guilty of a misdemeanor….". M.C.L. § 28.730(5) creates a civil cause of action for information released in violation of the statute.

7

28.214 to permit disclosure of data from criminal justice information systems for use in litigation. The second was *People v. Malkowski*, 385 Mich. 244, 188 N.W.2d 559, 560 n.1 (Mich. 1971), a Michigan Supreme Court case allowing the release of confidential presentence reports to defense counsel.

In *Dupuie-Jarbo*, Judge Cleland had held that because the disclosure was relevant to ongoing discovery under the Federal Rules of Civil Procedure, "Defendants' production of the criminal history reports would be 'authorized by . . . rule' and it would not be a crime under [M.C.L. § 28.214 [(5)] for Defendants to produce them." 2010 WL 2813343, at *2. Defendants tried to distinguish *Dupuis-Jarbo* on the grounds that it involved a request for class data not at the entry-of-judgment stage (as was true in *Does II*), but at the discovery stage – under the more liberal standard of the front-end federal discovery rules. *Does II*, ECF 101, Defs' Opp'n, at PageID 1953-54. Judge Cleland rejected that distinction, noting that the rules also permit back-end discovery in aid of a judgment. *Does II*, ECF 121, Order Granting Motion for Judgment in Part (6/21/2021), PageID 2461.

Ironically, Defendants here (in two status conferences, and this report) have tried to distinguish the current dispute from *Does II* on the grounds that *Does II* involved data requests at the entry-of-judgment stage, while *Does III* is a front-end discovery dispute. But in *Does II* Judge Cleland decided the issue by finding the front-end discovery reasoning of *Dupuis-Jarbo* applicable to post-judgment

8

discovery. Of course, *Dupuis-Jarbo* has even more force here, precisely because that case (and the current request for class data in *Does III*) involve basic front-end discovery.

As to M.C.L. § 28.730, Judge Cleland held that while that statute does not explicitly contemplate disclosure of registrants' information to their attorneys, under the Michigan Supreme Court's reasoning in *Malkowski*, the statute was no bar. [9] *Malkowski* had held that the statute barring public disclosure of presentence reports "should not be construed to deny access by either a defendant or his attorney" because that was not the legislative intent of the statute. *Malkowski,* 385 Mich. at 246. Judge Cleland found that "[t]he general rule that can be drawn from *Malkowski* is that, absent explicit language to the contrary, the court should presume that reports available to an individual directly can also be provided to his counsel even when the public at large is barred from accessing such information." *Does II*, ECF 121, at 2463. As in *Malkowski*, the legislature's concern here is to protect information from third-party disclosure, not to prevent the people who are the subject of that information or their attorneys from accessing that information. Because M.C.L. §

---

[9] *Malkowski* demonstrates that a specific statutory provision authorizing disclosure to a registrant's attorney is not required. At the time of that decision, no statute granted defense counsel access to presentence reports, and trial judges therefore had complete discretion. *See Malkowski*, 188 N.W.2d at 561. The Michigan Supreme Court nevertheless construed the confidentiality provision to allow for access to a presentence report by a defendant's attorney. *Id.* at 560 n.1.

28.730 "plainly contemplate[s] registrants having access to the information for their own purposes," Judge Cleland found that the protected information can be provided to class counsel. *Does II*, ECF 121, at 2463.

Judge Cleland's decision is well-grounded. Virtually all of the data in the MSOR system was provided to Defendants by the registrants themselves. And, as evidenced by the exemption of the data from open records requests, the provision is aimed at preventing the *public* disclosure of confidential registry information. *See* M.C.L. § 28.730(1). The statute nevertheless anticipates that registrants will have access to their own nonpublic information, *id.* at § 28.730(4), and that law enforcement may provide that information in response to questions about reporting requirements. *Id.* at § 28.730(1). Indeed, the MSP's own Release of Information Sex Offender Registry Form (Form RI-46) allows registrants to authorize disclosure of "all information associated with my registration … *includ[ing] but not limited to: confidential information, public and **nonpublic** information,* regarding the details related to my registration on the Michigan SOR." Ex. H, (emphasis added). If registrants can authorize release of non-public data to their attorneys, then there is no reason that the Court cannot order release of non-public data to attorneys whom the Court has appointed as class counsel. *See* Order Appointing Class Counsel, ECF 34; Fed. R. Civ. Proc. 23(g) (setting standards for appointment of class counsel).

In sum, Judge Cleland found that "Plaintiffs' view [that the non-public data

can be provided to class counsel] more accurately reflects Michigan's law." *Id.*,

*Does II* Order at PageID 2460-61. He concluded:

> Because the statutes cited by Defendants do not the bar the court from requiring such a disclosure to class counsel, Defendants must provide the information on class members not in the [private] database and additional contact information for all class members. [*Id.* at PageID 2461.]
>
>       *          *          *          *          *
>
> To summarize, the court finds that neither of the statutes cited by Defendants actually prevent[s] them from disclosing to class counsel non-public registrant information for registrants who are already members of the certified class. …[T]he final order will require Defendants to provide the identifying information that Plaintiffs request. [*Id.* at PageID 2464.]

## B. The Protective Order Safeguards Confidentiality

Just as the language of the judgment in *Does II* (*see* ECF 126, Amended Final Judgment, at PageID 2573) ensured that any non-public data there would be secure, the protective order already entered in *Does III* serves the same function. The protective order guards the confidentiality objective of M.C.L. § 28.730. *See e.g., Howe v. Detroit Free Press, Inc.*, 487 N.W.2d 374, 388 (Mich. 1992) (Boyle, J., concurring in part and dissenting in part) (explaining how requiring the inclusion of relevant information and ordering the parties not to further disclose that information safeguard the statutory interest in confidentiality).

Here, the parties specifically amended the initial protective order (ECF 38 (5/22/22)) to allay Defendants' concerns and make clear that data provided to Plaintiffs, or further used by Plaintiffs' experts, must be kept confidential. *See* ECF 69,

First Amended Protective Order (11/29/22), at PageID 2059-61. Anyone using the data must be given a copy of the protective order and must sign a statement acknowledging that they are subject to it. *Id.* And at the conclusion of the litigation, data provided to experts or consultants must be destroyed. *Id.* Moreover, the bulk of the data will only be used in the aggregate, or to contact and discuss issues with individual class members regarding questions specific to them.

### C. The Non-Public Data Is Necessary for Class Counsel to Represent the Class and Subclasses

Non-public class member information is critical to Plaintiffs. First, class counsel need to know who is in the class, be able to communicate with class members, and be able to respond to class-member questions. Without non-public data, class counsel will not know anything at all about the non-public registrants. And class counsel need non-public contact information to communicate effectively with class members. Class counsel are contacted constantly by class members or their attorneys, and occasionally by federal and state court judges, about SORA issues in individual cases. To respond to those queries and adequately represent the class, class counsel need the relevant information. For example, for people who claim that the MSP has misclassified them, class counsel need to know the registrant's tier classification and information that the MSP relied on in making the tier classification. For registrants who claim their registration term has expired, class counsel need to know when registration started, any periods of incarceration, and when the

MSP believes the class member's registration term expires. This requires access to non-public data.

Second, non-public data is important in order for Plaintiffs to understand the registry and prove their claims. At the most basic level, Plaintiffs have received conflicting information on the most fundamental data questions—like how many people are on the registry, how many are in each tier, how many are incarcerated, etc. *See* Section III. Moreover, Defendants have objected to many of Plaintiffs' discovery requests as burdensome because they require searches of registry data. Plaintiffs are happy to do the searches themselves, but need the data to do so. For example, Plaintiffs asked for data on the number of registrants who are indigent and the number who have paid fees (RFP 12), data on registrants who have been removed from the registry (RFP 2.k., Rog 1.d), and data on how many registrants are deemed non-compliant (Rog. 1.e). Defendants have not provided this information. Plaintiffs are not currently asking the Court to order Defendants to respond to those requests because Plaintiffs expect to be able to run these queries themselves—once they have a full data set. If Plaintiffs do not receive the non-public data, it will mean more work for Defendants, and likely more discovery disputes for this Court to resolve.

Non-public data is also important for Plaintiffs' ability to check the accuracy of Defendants' assertions. For example, Defendants have asserted that most juveniles have been removed from the registry, but criminal defense attorneys report to

class counsel that they have not been removed. If Plaintiffs get the data, they can determine what is actually happening.

Perhaps most importantly, analysis of class member data may support Plaintiffs' claims. For example, if the data shows that many registrants are unemployed or have unstable work histories, that could support Plaintiffs' arguments that SORA impacts registrants' ability to find or keep jobs. If the data shows that very few registrants have email addresses or internet identifiers, that could support Plaintiffs' arguments that SORA chills their online speech. If the data shows that tens of thousands of registrants have been living offense-free in the community long past the desistance threshold (when they present no more risk than the average male), then that could support Plaintiffs' argument that SORA is irrational and excessive. Historical information may also show that the lived experience of being subject to SORA 2021 has not changed from what it was under SORA 2011, which the Sixth Circuit held rose to the level of punishment. While there is no guarantee that Plaintiffs' experts will be able use the data to support Plaintiffs' claims, Plaintiffs are simply seeking access to (a small part of) the data that Defendants possess, so that if arguments can be made from the data, it is available to both sides.

Third, non-public data is important for identifying how many and which individuals are in each subclass. For example, to determine how many people are in the ex post facto subclass, Plaintiffs need to know offense dates. Determining who

is in the retroactive extension of registration subclass requires running queries based on offense codes and offense dates.

In sum, the data requested is core front-end discovery about the class.

### D. **Defendants' Other Objections to Producing Class List Data Are Meritless**

Plaintiffs first sent Defendants the list of requested class data back in September 2022, and have worked with Defendants to narrow the list, including removing requests for information that—according to the MSP data manager—are not available. Defendants' objections to the revised formal request focus on the relevance of the data and the statutory limitations on disclosure, which are addressed above. *See* Ex. D, Defs' Am. Resps, RFP 15.

Defendants' other objections are meritless. Defendants state that some of the information is in the possession of the MDOC. After learning at the MSP data manager meeting what information the MSP possesses, Plaintiffs revised the list of requested data, dividing it into MSP and MDOC data; only MSP data is sought from the MSP. See Ex. A, Pls' First Inter., Exhibit A. Defendants also stated that not all of the information requested is in the MSOR database. Plaintiffs repeatedly asked Defendants to identify which data fields are not available, including a written request on December 22, 2022, that Defendants identify such fields by January 3, 2023. On January 6, 2022—the date this filing is due—Defendants provided a list identifying three requested fields as unavailable. Plaintiffs will review whether those fields are

in fact unavailable (based on the system manual and information provided at the data meeting). If those three fields are truly unavailable, Plaintiffs agree that they need not be produced.

Defendants also object to producing information about the subclasses, stating that Plaintiffs can run their own searches on the public data. But Plaintiffs cannot determine who is in the subclasses without the non-public data because (1) subclass members on the non-public registry are not included, and (2) information needed to identify the subclasses (such as offense dates and incarceration history) is non-public. Defendants object to having to run such queries, but also object to giving Plaintiffs that data that would allow Plaintiffs to identify the subclasses. Defendants cannot have it both ways.

If the Court orders production of the non-public data, Plaintiffs anticipate being able to run many of the searches to identify the subclasses themselves. There are a few searches that may still need to be run by the MSP, such as for the non-sex-offense subclass, since Plaintiffs do not know what out-of-state offenses the MSP considers "substantially similar" to the non-sex offense requiring registration in Michigan. After the Court decides whether non-public data should be produced and Plaintiffs have the opportunity to review that data, Plaintiffs are happy to run any searches on subclass membership that they can with that data, and to confer with Defendants about any searches that may still need to be done by the MSP.

## **Defendants' Position**

Plaintiffs have requested the names, addresses and other personal information of more than forty-four thousand registrants, many of whom may not even know that they are being represented by counsel in this case. (Request to Produce 15.)

In response to the discovery request, Defendants have provided Plaintiffs with a spreadsheet containing forty-three fields of personal information for 40,110 registrants, which was collected from the public facing SORA website. While Defendants objected to producing the information, in the spirit of cooperation, they agreed to provide it to Plaintiff's counsel since it is already on the public registry. (Response to Request to Produce 15, pg 19-20.)

As of January 4, 2023 there were 4,044 individuals on the non-public registry. Defendants did not agree to produce the information for registrants that are on the non-public registry and did not agree to produce non-public information for registrants that are on the public registry. (e.g. MSP has internet identifiers of public registrants, but that information is not disclosed on the public website so it was not produced.)

In other words, Defendants provided forty-three fields of personal information for 90 percent of registrants. Defendants objected to producing the personal information of the non-public registrants and the non-public information of the public registrants because it is protected by statute, including MCL 28.214,

17

28.278 and 28.730.

*First*, the personal information of the 4,044 non-public registrants and the other non-pubic data has nothing to do with resolving any of the claims at issue in the lawsuit. The crux of the ten claims at issue is whether the new SORA is constitutional. The addresses, aliases, tattoos, race, or vehicles driven by these non-public registrants (or even the public registrants) does not relate to any claim or defense at issue. Curiously, it seems like Plaintiffs position is that disclosing registrants' information on a public website is one of the reasons that makes the new SORA punishment. It is unclear why the non-public registrants' information is needed by Plaintiffs at all, since non-public registrants are not subject to the same "shaming" that Plaintiffs complain about as an alleged result of being publicly labeled as a sex offender and allegedly held out to the public as someone who is currently dangerous.

*Second,* Plaintiffs' counsel already has some of this information. In *Does II*, in the context of post-judgment proceedings, Defendants were ordered to produce some of this information. (Case 2:16-cv-13137-RHC-DRG, ECF No. 129, PageID.2643-2646.) Specifically, the Court ordered the production of (1) names; (2) date of birth; (3) tier level; (4) address last provided; (5) MDOC ID number if incarcerated; (6) phone number last provided; (7) email last provided; and (8) offense information. (*Id.* at 2644-2645.) Notably, the information was only

18

ordered to be produced after relief was granted and the fields of information

ordered to be produced was much, much narrower than the information that

Plaintiffs are seeking in this lawsuit. Plaintiffs were able to successfully litigate

two cases without most of the information that they are seeking here. There was a

protective order in *Does II* that may limit the use of the information in this case,

but you can't un-ring a bell - Plaintiff's counsel knows the broad parameters of the

data and can't simply forget what the data shows.  The parameters of the *Does II*

protective order have not been examined by this court.

*Third*, statutes prohibit the disclosure of non-public information. The Michigan

State Police must maintain a law enforcement (non-public) database and a public

database that must not include registrants that meet certain criteria.  Mich. Comp.

Laws 28.728(2), (4).  Information on the non-public database "shall not be open to

inspection except for law enforcement purposes."  Mich. Comp. Laws 28.730(1).

There are criminal penalties for disclosing such information.  "Except as provided

in this act an individual . . . who divulges, uses, or publishes nonpublic information

concerning the registration or report in violation of this act is guilty of a

misdemeanor punishable by imprisonment for not more than 93 days or a fine of

not more than $1,000.00, or both."  Mich. Comp. Laws 28.730(4).  And there is

potential civil liability.  "An individual whose registration or report is revealed in

violation of this act has a civil cause of action against the responsible party for

treble damages."  Mich. Comp. Laws 28.730(5).  And there are even more criminal

penalties under the Criminal Justice Information Systems Policy Act.  Mich.

Comp. Laws 28.214(5)-(6).

When interpreting a statute, courts must first look to the plain language of the

statute.  If the language is clear, the judicial inquiry ends.  *Brilliance Audio, Inc. v.*

*Haights Cross Commc'ns, Inc.,* 474 F.3d 365, 371–372 (6th Cir. 2007).  The plain

language clearly states that the non-public information cannot be disclosed except

for law enforcement purposes.  Mich. Comp. Laws 28.730(1).  Had the legislature

intended the non-public information to be produced for other reasons, they could

have included language to authorize such disclosure.  They did not, and the Court

should not order the disclosure of this non-public information.

To be sure, the Michigan Legislature knows how to craft language that allows

otherwise confidential information to be disclosed for other purposes.  Tax

information is generally treated as confidential. Mich. Comp. Laws 205.28(1)(f).

Disclosure of tax information is a felony.  Mich. Comp. Laws 205.28(2).

However, the Legislature indicated that tax information may be disclosed

"pursuant to a judicial order" under various circumstances.  Mich. Comp. Laws

205.28(1)(f).  Indeed, even before disclosing any tax information to an attorney

who is representing a taxpayer in litigation against the Department of Treasury, the

Department requires the taxpayer to execute an Authorized Representative

20

Declaration.[10]

Had the Legislature wanted the non-public information to be available to class counsel, who represent many clients that they have never met, and the clients may not even know they are being represented, the Legislature could have provided statutory language to authorize such disclosure.  They did not do so, and this Court should not allow such a disclosure.  Perhaps the analysis will be different at the conclusion of the case if some sort of relief is granted, but at this stage of the litigation, the information should not be disclosed.

Plaintiff will likely point to *Malkowski* as a basis to allow the disclosure of the non-public information. *People v. Malkowski*, 385 Mich. 244, 249 (Mich. 1971). However, *Malkowski* is inapposite.  It was a criminal case about whether a criminal defense attorney had the right to review the presentence investigation report of his/her client, which at the time, there was variability between state court judges about whether presentence investigation reports were available to the criminal defense counsel to review. (*Id.* at 248.)   In the end, the Court found that for basic fairness reasons, criminal defendants had a right to the information so that any criminal sentences were based on accurate information.  (*Id.* at 249.)

It is significant that *Malkowski* was a criminal case where someone's personal liberty was at stake.  Here, we have a civil case about the constitutionality of a

---

[10] [151, Authorized Representative Declaration (Power of Attorney) (michigan.gov)](michigan.gov)

21

statute, and much of the information being sought from individuals that are not subject to most of the alleged harms that Plaintiffs complain about because their information is non-public.  Apparently, there was wide variability between judges about whether the presentence investigation report was available to criminal defendants.  (*Id*. at 248.)  It makes sense that the Michigan Supreme Court would give judicial guidance about the issue so that criminal defendants were treated equally.  *Malkowski* does not offer mush guidance here.

Finally, the Court's decision in *Does II* to allow the production of eight fields of information was in a post judgment context.  *Doe v. Snyder*, 2021 WL 2525436, at *8 (E.D.Mich., 2021).  Indeed, the Court reasoned that it had "authority to require that Defendants produce information narrowly tailored to the enforcement of its judgment" because it was "necessary to ensure that the court's award of injunctive relief is properly enforced for all members of the certified class." (*Id*.) And the Court noted that the question of whether the SORA statute itself allowed the disclosure was a closer question.  (*Id.* at 9.)

Since Plaintiff's counsel now has the personal information of over 40,000 members of the class, if they really want detailed and personal information about their clients, they may contact them to obtain the information from them. The Court should not order the production of non-public information from the

22

Michigan Sex Offender Registry Database.[11]

## III.   DATA REGARDING MICHIGAN'S REGISTRY

### Plaintiffs' Position

Plaintiffs are seeking basic data about the registry, including current and his-torical information about the number of registrants who:

- Are on the public/private registry;

- Are subject to 15-year, 25-year, lifetime, or other registration periods (e.g. tier levels).

*See* Ex. A, Pls' RFP 18. Plaintiffs also seek current information on the number of registrants who are active (must report), incarcerated, and inactive (e.g., out-of-state).[12] *See* Ex. B, Merged RTA Doc. ¶¶ 2-3.

The information that Defendants have provided is all over the place. For example, Plaintiffs' complaint, relying on data provided in *Does II*, stated that there are approximately 55,000 registrants. Compl., ECF 1, ¶ 322. Defendants answered

---

[11] Despite efforts between the parties to identify the issues of dispute, aside from the known dispute about the public v non-public data, plaintiffs didn't disclose their list of issues until Wednesday morning.  The list of issues was quite lengthy, and the parties met and conferred to discuss some of the issues, which lead to some narrowing.  Plaintiffs only provided an index of refined issues on Thursday evening, which was amended Friday morning at 10:00 a.m.  As a result, the remainder of Defendants responses are based on limited information from Plaintiffs, and Defendants will likely need to supplement their responses after they have the opportunity to review Plaintiffs position of the actual issues left for the court to resolve.

[12] This later request is something Plaintiffs could run for themselves with non-public data.

by saying there are approximately 53,834 registrants. Answ., ECF 58, ¶ 322. When Plaintiffs tried to confirm the numbers through a request to admit, however, Defendants stated that there are approximately 44,000 registrants. Ex. B, Merged RTA Doc, ¶ 2. Similarly, the complaint alleged, based on information provided by the MSP in January 2022 to one of Plaintiffs' experts, that there were over 39,000 Tier III lifetime registrants. Compl., ECF 1, ¶ 328; Levine Rep., ECF 1-11, ¶ 16.b. Defendants responded to that allegation stating that they lacked the knowledge or information to respond. *See* Answer, ECF 58, ¶328. Then, Defendants produced a document this morning stating that there are approximately 32,000 lifetime registrants. These large numerical discrepancies highlight why it is so important for Plaintiffs to have access to complete data, including information for those on the public and private registry, as well as information on active, incarcerated, and inactive registrants.

While access to the non-public data (assuming it includes all registrants) solves some of the problem, Plaintiffs still need the historical information requested in RFP 18 about changes to the registry over time. Defendants have refused to provide this information, objecting that it is not relevant. To the contrary. Plaintiffs obtained similar information in *Does I*, and used it to demonstrate how the registry has massively increased over time, and how ever more people are subject to lifetime registration. *See* Ex. G, Samples of *Does I* Data on Registry Size. Plaintiffs seek

similar information here, and have told Defendants that data only need be reported for 2014 forward, as pre-2013 data is available from *Does I*.

Defendants also argue that the Plaintiffs should pull this information from the public registry. But the public registry, by definition, does not contain information about non-public registrants. For example, the public registry would not include Tier I or juveniles in a list of those incarcerated, resulting in inaccurate data on how many registrants are incarcerated. Nor is it possible to determine from the public registry how many people are subject to 15-years, 25-year, and life-time registration.

### **Defendants' Position**

Plaintiffs' want a host of information about the registry, some of which they already have from the previous litigation. (Case No. 2:12-cv-11194-RHC-DRG, R #90, pg 47-49.) Plaintiffs' apparently make no attempt to identify what they already have and limit their discovery to only necessary updates as was suggested by this Court. Instead, they want statistical information going back almost thirty years to when the registry was started.

To pull that information, either an MSP employee would need to stop the work that they are currently doing and manually enter the search criteria for each of the last thirty years, or MSP would need to pay a vendor to conduct the search, and then produce the results. The results would then be given to the MSP litigation coordinator for tracking purposes. The litigation coordinator would then provide

25

the information to the attorneys, who review the information and then ask support staff to bates stamp the documents and get them ready for production.

As of December 15, 2022, MSP had already spent approximately 215 hours searching for documents responsive to Plaintiffs informal and formal discovery requests, which obviously exceeds the district court's presumptive limit in its model ESI order.[13]

Historical data from the SORA database may be available free of charge through public sources.[14]  One public source shows that there were eight SORA website captures at various points throughout the time frame of 2021-2023. Plaintiffs can run their own searches at various points through 2021-2023 to see how many registrants there were.



---

[13] See Model Order 2.04(f)(4), ParkerEsiOrderChecklist.pdf (uscourts.gov) (accessed January 6, 2023.)

[14] See Wayback Machine (archive.org), which allows users to search historical data.  (accessed January 6, 2023.)  The website shows 7,759 SORA website captures between 1999 to 2016.

Earlier versions of the same website also allow Plaintiffs to conduct their own searches from 1999 through 2016 to determine how many registrants there were at various points over the years.[15]



The current SORA website allows Plaintiffs to search for published offenders, incarcerated offenders and non-compliant offenders, which will obviously be more up-to-date than the Excel spread sheet produced on December 16, 2022 that contained all public information from 40,110 registrants.[16]

---

[15] See Michigan State Police OffenderWatch® sex offender management, mapping and email alert program (archive.org) (accessed January 6, 2023.)

[16] See Search - Michigan Sex Offender Registry (mspsor.com) (accessed January 6, 2023) It should be noted that as of this filing, the public registry shows 40,150, which is an increase from the number of registrants that were on the registry in December when the data was produced.  The numbers will continue to change throughout the course of the litigation, and change from month to month as



The number of people on the public and private registry has no importance to the issues to be resolved in this litigation, especially information going back thirty years. The statute has changed over time. The number of people on the public registry in 1997, or 2002, or 2009 does nothing to answer the questions of whether there is an ex post facto violation or due process violation or whether the new SORA is unconstitutionally vague, or if there is a first amendment violation. If Plaintiff's want to obtain information about the number of registrants, or number of registrants incarcerated, they can spend their time and resources locating it through the record that was already developed by them in earlier litigation, or through other publicly available resources.

---

registrants are added or removed.

28

## IV.   INFORMATION AND DATA REGARDING "RECAPTURE" CASES

**<u>Plaintiffs' Position</u>**

Plaintiffs seek information on "recapture" cases. These are people whose were convicted of a sex offense before SORA became effective October 1, 1995, and were not subject to registration. An amendment to SORA in 2011, however, required that the MSP "recapture" such individuals and add them to the registry if they subsequently were convicted of *any* (even non-sexual) new felony. The result is that these people spent many years off the registry, and were then subjected to SORA for decades-old sex offenses.

Plaintiffs are interested in recapture cases for two reasons. First, these cases present some of the starkest examples of the ex post facto violation. Second, Defendants have argued that it is the underlying conviction, not the registry, that causes the harm class members suffer. Plaintiffs think that framework is misguided (especially given that the very existence of the registry reinforces public perceptions that people with such convictions are forever dangerous). But Plaintiffs still need to respond. One way to do so is to look at the experience of recaptured individuals, who have spent time both on and off the registry.

Accordingly, Plaintiffs have asked for basic data (including contact information) for people who have been or currently are subject to SORA under the recapture provision. *See* Ex. A, RFP 16. The inclusion of historical recapture cases

is important because Plaintiffs believe that the MSP may have removed recaptured individuals from the registry after *Does I*, and then resumed registering recaptured individuals at some later point. Plaintiffs have sought discovery on what happened with the recapture cases, but Defendants have not provided any information in response. *See id.* at RFP 2.f (seeking documents on implementation of *Does I*). Plaintiffs' understanding is that some of the data on recaptured people would not be contained in the non-public data set because those people have been removed from the registry and are not currently required to register. (SOR unit administrators have access to data on removed individuals.) In other words, Plaintiffs cannot pull this information themselves even from the non-public class data, if it is produced.

Today, Defendants provided the names (but none of the other requested information, e.g., initial registration date, offense date) for six individuals for whom the "recapture" checkbox in the new MSOR data system was checked. That system only came into effect August 26, 2021, and thus this six-person list reflects only the handful of recapture cases added to the registry since then. Anticipating that issue, Plaintiffs' RFP specifically asked Defendants to identify individuals who are or were registered based on a conviction prior to October 1, 1995, with a registration start date after July 1, 2011. Defendants did not do so. The Court should order Defendants to do such a search, and provide all of the requested data fields for recapture people.

In addition, the Court should order Defendants to provide documents about

30

whether recapture cases were removed after *Does I* (*see* RFP 2.f regarding imple-

mentation of *Does I*), and when registration of recapture cases resumed (*see* RFPs

2.b, 2.e, 2.g., 2.k, and 3 regarding the new statute).

### Defendants' Position

Defendants have provided the easily accessible information regarding

registrants that were subject to recapture.  In the new SORA database, there is a

field that can be checked for registrants that are subject to recapture.  MSP

produced the six names of the individuals where the field is checked in the

database that shows the registrant was subject to recapture.

Plaintiffs have the information for over 40,000 public registrants that they

may run their own searches to determine how many registrants may be subject to

registration pursuant to Mich. Comp. Laws 28.723.  Plaintiff can also search for

any public registrants were convicted prior to October 1, 1995.

In any event, the number of registrants subject to recapture has nothing to do

with the issues in this case.  Perhaps there is a legal question of whether the

recapture provision is constitutional, but at this stage in the litigation it is

unnecessary to know how many registrants there are that were subject to recapture.

If the Court grants relief to registrants subject to recapture, then the state can spend

resources to identify those effected but spending resources now to find that

information has no importance to resolving the claims at issue. What is more, the

numbers will change over time, and it could be years before the case is ultimately resolved, so any numbers provided today, will need to be updated.

## V.     IMPLEMENTATION DOCUMENTS FOR THE NEW STATUTE

### Plaintiffs' Position

Plaintiffs sought "documents used by or provided to MSP staff, including staff in the SOR Unit, and provided by MSP to other law enforcement agencies, regarding changes to the sex offender registry in order to implement the amendments to SORA that became effective March 24, 2021." Ex. A, RFP 3. Defendants provided letters to registrants and law enforcement about the new law, and a video about the new MSOR database. But documents used or provided to SOR unit staff about the new law were not provided. Plaintiffs believe that the SOR unit staff communicated about the new law and how it changed their daily operations. For example, it seems likely that there are documents regarding whether to register or deregister individuals based on the new law (e.g., recapture cases, set asides, HYTA cases), whether certain data should no longer be inputted or should be deleted (e.g., emails for pre-2011 registrants), whether forms or standardized notices needed to be changed, whether the registry data should be audited for conformity with the new law, etc. Plaintiffs did not receive any such documents.

### Defendants' Position

Defendants provided sufficient responses to Plaintiffs' request for documents

related to MSP's implementation of the new statute, including documents that

discuss the Michigan Supreme Court's ruling in *People v. Betts*, 968 N.W.2d 497

(Mich. 2021). For example, Defendants produced the notice issued to law

enforcement regarding the final judgment issued in *Does #1-6 v Snyder*, Case No.

1:16-cv-13137. That notice discussed the implementation of the new statute and

the *People v Betts* decision. (MSP 00001094-0001097). Defendants produced other

documents concerning MSP's implementation of the current statute. In addition to

providing the Michigan Sex Offender Registry User Guide (MSP 000001 – MSP

00000084), MSP also produced:

- correspondence regarding *People v Lymon*. MSP 0000080-00000084;
- Introduction to MSOR Video (MSP-0001085-00001093);
- SORA Registration Offenses and Violations Cheat Sheet (MSP – 0000106-0000107),
- twenty-two email bulletins about the current SORA (MSP – 0000330 – 0000354),
- a copy of the SOR Hotline Frequently Asked Questions (MSP 0000456-0000460),
- various MSP operational procedures (MSP-0000753- MSP-0000776; MSP-0000905-0000921), and
- MSP correspondence to Department members (MSP 0000518-0000521; MSP-0000898-0000899).
- Notice of Final Judgment in *Does #1-6 v. Snyder,* Case No. 1:16-cv-13137 issued to registrants, inmates, and law enforcement.  (MSP-0000954-0000969, 00001083, 00001095-0001097);
- Correspondence sent to prosecuting attorneys regarding the Amended Final Judgment entered in *Does II v. Snyder* (No. 16-13137) (MSP 0000970-MSP 0001082); and
- the summary approved by the Court in *Does II v. Snyder* (MSP0001084)

Defendants' responses provide adequate and complete information regarding

MSP's administration, operation and enforcement of the current sex offender

registry.

## VI.   SORA ENFORCEMENT DOCUMENTS AND DATA

### Plaintiffs' Position

Plaintiffs sought documents regarding SORA enforcement. Specifically,

Plaintiffs sought data about coordinated law enforcement "sweeps"—where police

go to registrants' homes or workplaces to check on their SORA compliance, as well

as to arrest registrants. This request also sought information on any changes to the

number or type of sweeps. *See* Ex. A, RFP 8. Defendants did not provide any

documents in response to this RFP, with their primary objection being that sweep

information is not relevant. Ex.  D, Resp to RFP 8. Plaintiffs also sought data on

sweeps through an interrogatory, *id.*at Rog. 5, but Defendants objected, stating only

that no sweeps have been conducted in the last two years. Ex. C, Resp. to Rog. 5.

As an initial matter, Plaintiffs are concerned about whether Defendants

conducted an adequate search for enforcement-related documents. Early in the

informal discovery process, Plaintiffs asked about which MSP staff focus on SORA

enforcement (as opposed to maintaining the registry). Such staff were previously

housed in the SOR unit. Plaintiffs were told that there are no longer SOR enforce-

ment staff at MSP. In reviewing discovery documents, however, Plaintiffs found a

training video prepared by a Sgt. Brenda Hoffman of the "MSP SOR Enforcement Unit," as well as updates to MSP staff about SORA enforcement that directed questions to Sgt. Hoffman.

Defendants' discovery responses indicate that counsel worked with the MSP SOR Unit and the governor's office in preparing responses, but say nothing about coordinating with the MSP SOR Enforcement Unit, which is housed in an entirely different division of the MSP. *See* Ex. C, Resp. to Rog. 8. Defendants indicated at a meet-and-confer on 1/5/2023 that the SOR Enforcement Unit has apparently now been consulted. But given the absence of enforcement documents and the fact that defense counsel apparently only learned about this unit when Plaintiffs pointed out documents showing its existence, Plaintiffs remain concerned that relevant documents in the possession of that unit were not provided.

Defendants' primary objection to providing enforcement documents and data is that it is irrelevant. But discovery about enforcement actions may show that SORA is similar to probation/parole, a factor used in determining if the registry is punishment. It could also demonstrate how sweeps increase the restraints imposed on registrants, as well as the burdens or humiliation they suffer. Sweeps also may show the likelihood of incarceration for SORA violations. Moreover, SORA compliance (or non-compliance) bears zero correlation to the risk of reoffending. *See* ECF 1-8, Zgoba Expert Report, PageID 560-561. If aggressive sweeps are occurring or

35

planned, despite the lack of any evidence to justify them, this would add weight to the claim that SORA is punishment under the ex post facto test.

Information about law enforcement sweeps was provided in *Does I*, and was introduced into evidence by the plaintiffs there. *See* Ex. F, Sample of *Does I* Enforcement Info. The documents Plaintiffs have received to date in this case (in response to other RFPs) also show that the MSP's new data system was intentionally designed to track sweep data and to allow for registrant mapping to facilitate sweeps. Officer alerts are created when a registrant's entry has been prepped for a sweep. Redacted correspondence with the federal SMART office appears to show the MSP was seeking grants as of July 2022 to conduct sweeps. Something is going on with sweeps—but Plaintiffs don't know what.

Defendants have also objected to providing any SORA enforcement information from before March 2021 when the new law was implemented. Defendants' statement that there were no sweeps for the last two years is unsatisfactory. Due to the injunction against SORA enforcement in *Does II*, as well as COVID, the last two years are not representative. Accordingly, Plaintiffs seek information going back seven years for documents and five years for data requested in the interrogatory. Information about enforcement under the old law is relevant because the new law functions almost exactly the same way as the old law (with the exception of the

exclusion zones). Moreover, the new statute does not exist in a vacuum. For example, understanding why SORA enforcement operations were moved out of the SOR Unit to create a new unit with the MSP's Special Operations Division is relevant, even though that may (or may not) have occurred before passage of the new law.

Defendants' objection to providing information about the old law is particularly puzzling given that Defendants are simultaneously arguing that Plaintiffs don't need discovery about the new law because there is already a record in *Does I*. While Plaintiffs agree that the *Does I* record is important, information available there ends in 2013—a decade ago. Plaintiffs need to understand how SORA has operated since then both under the former and current versions of the statute.

Finally, Plaintiffs also sought information on the SOR "tip" system which allows both law enforcement and the public to submit potential enforcement information. *Id.* at Rog. 1,g. Defendants provided the number of tips, but failed to break down the data by type of tip (law enforcement, online submission, SOR unit, etc.)—information that Plaintiffs need in order to understand how the enforcement system operates and the extent to which the public registry facilitates the public taking action against registrants.

In sum, the Court should order Defendants to respond to RFP 8 (which should include consultation with the SOR Enforcement Unit), and to fully answer Rogs 5 and 1.g.

**Defendants' Position**

Defendants objected to Plaintiffs' requests for SORA enforcement documents and data because the requests sought information regarding the old law which is not relevant. Seeking discovery about the old law only needlessly increases the costs of litigation regarding SORA 2021. This goes beyond the scope of discovery under Fed. R. Civ. P. 26 and will do nothing to assist the parties in resolving Plaintiffs' claims about the new SORA.

Defendants provided sufficient responses to Plaintiffs' request for documents and information related to enforcement of the current SORA. In addition to the documents and data identified above, Defendants also produced the contract with its current software vendor for the SOR (MSP – 0001098- MSP -0001198). Defendants' also informed Plaintiffs that the MSP SOR Enforcement Unit did not conduct any enforcement sweeps in 2020 through 2022. (Defendants' Response to Plaintiffs' Interrogatory No. 5.)

## VII.   JOB DESCRIPTIONS AND ORGANIZATIONAL CHARTS

**Plaintiffs' Position**

Plaintiffs requested job descriptions for staff at the MSP SOR Unit and the SOR Enforcement Unit. RFPs 4 & 5. Defendants object to providing job descriptions.  (Defendants previously objected to providing an organizational chart for the SOR enforcement unit, but then did provide one this morning.)

In *Does I*, depositions of SOR Unit staff, training staff, and enforcement staff provided a wealth of otherwise unknowable information about how SORA works on the ground. In each case what made the depositions invaluable was that Plaintiffs knew whom to depose. Based on the organizational chart alone (which show ten current employees in the SOR unit), Plaintiffs are not in a position to know whom to depose. Moreover, big chunks of any deposition will be used up trying to ascertain *what* the person does, rather than focusing on the substantive information that the person can provide as to how SORA is implemented, administered, and enforced— as well as what (if anything) has changed since the discovery in *Does I*, or since SORA 2021 took effect.

If Defendants want to reduce the work by providing guidance as to who is most knowledgeable about various topics, Plaintiffs are open to that possibility. But Plaintiffs need information about who does what, so they can decide who needs to be deposed. And Plaintiffs need job descriptions for those who will be deposed, so they can focus their deposition preparation accordingly. Plaintiffs should not be forced to ask MSP staff at the deposition what they do, and then discover that counsel have prepared questions based on a misunderstanding of the person's job responsibilities. Getting official job descriptions via RFPs is routine front-end discovery, and the Court should order the documents to be produced.

**<u>Defendants' Position</u>**

Defendants provided current organizational charts for MSP staff within the

SOR Unit (MSP-0000085) and for the SORA Enforcement Unit (MSP-0001516).

Defendants objected to providing job descriptions because those have no

importance to resolving the issue in this lawsuit. The burden of producing job

descriptions when taken in conjunction with Plaintiffs' other requests will place an

undue burden on Defendants. Defendants counsel also explained that the job

descriptions are likely not to be an accurate representation of staff's current duties

because duties frequently change, and job descriptions are not updated. This was

confirmed in a phone conference with MSP in the evening of January 5, 2023.

It is worth pointing out that Plaintiffs had to spend time writing a discovery

request for the job descriptions, MSP had to inquire about whether the documents

were readily available, MSP had to convey that information to their counsel, their

counsel had to draft a written response to the discovery requests, plaintiffs counsel

had to email defense counsel about the job descriptions, the parties then met and

conferred to talk about the job descriptions, plaintiffs had to draft their position on

why they need the job descriptions, defense counsel has to provide a response, the

court will need to review the joint statement of issues on the matter, the parties will

likely argue the issue at the discovery conference, the court will then have to rule

on the issue.

Plaintiffs could simply ask whomever they want to depose in the SORA unit – what are your job responsibilities? And what are the job responsibilities of the other members of the SORA unit?  It would take about two minutes to ask and answer the question.  Plaintiffs approach is far from expediting discovery.

## VIII.  DOCUMENTS RELATED TO THE NON-SEX OFFENSE SUBCLASS

### Plaintiffs' Position

Plaintiffs have sought discovery on the registration of people who were not convicted of a sex offense. *See* Ex. A, RFP 2.i, 15, Attachment A, II.C. Defendants contend that this claim is moot because the MSP intends to remove individuals convicted of non-sex offenses in Michigan (but not individuals convicted of non-sex offenses in other states) from the registry pending a potential leave grant and decision by the Michigan Supreme Court in *People v. Lymon*, __ Mich. App. __, No. 327355 (2022) (holding that registering people who did not commit sex offenses violates the Michigan Constitution's Cruel or Unusual Punishment Clause). Those individuals have apparently not yet been removed, and Plaintiffs have received no information on when that will occur.

Plaintiffs believe that the claim will not be mooted by such removals, because (1) individuals with convictions for non-sex offenses from jurisdictions other than Michigan will remain on the registry, (2) the state has not provided for a judicial determination of whether there was a sexual component to the offense for registrants

41

with Michigan convictions for non-sex offenses, but is allowing local prosecutors to decide whether people with non-sex offenses must register; and (3) there has been no permanent change in the government's policy because, if *Lymon* is reversed, the MSP will put registrants with Michigan convictions for non-sex offenses right back on the registry. Some of Plaintiffs' discovery, including requests to admit about how the state intends to treat people with non-sex offenses, is related to Defendants' mootness argument. *See* Ex. B, RTAs 84, 87. Other discovery goes to the merits.

Defendants provided some responsive documents that appear to be draft letters to affected registrants, prosecutors and law enforcement. But Defendants did not provide any implementation documents (e.g., communications about who will be removed and when, how their cases are to be flagged in the MSOR system pending a Michigan Supreme Court decision in *Lymon*, how out-of-state non-sex offense cases are to be treated, etc.). Defendants provided evasive responses to two requests to admit related to the mootness issue. *See* Ex. B, RTAs 84, 87. Defendants also failed to provide a list of non-sex-offense subclass members. As noted above, Plaintiffs cannot run this list themselves, even with non-public data, because they do not know which out-of-state non-sex offenses Defendants deem to be substantially similar to registrable Michigan non-sex offenses. It is Plaintiffs' understanding that, as a result of the *Lymon* decision, the MSP has already compiled a list of people registered as a result of non-sex offenses, including both those within Michigan and

out-of-state convictions.

The Court should order Defendants to provide the requested implementation documents, straight answers to Plaintiffs' RTAs 84 and 87, and a list of those in the non-sex offense subclass.

## **Defendants' Position**

Correspondence related to the impact of the *Lymon* decision was provided in response to request to produce two (bates range MSP-00000080 – 00000084) and requests to admit 84-87 were responded to substantively, which were also focused on *Lymon*.

Defendants objected to searching email accounts of MSP staff involved in implementing the decision due to the burden and the likely privileged material which would need to be sorted through and included on a privilege log. MSP's position regarding the impact of the *Lymon* decision is set forth in the documents produced. The internal discussions/communciations leading up to the final decision about how the *Lymon* decision would be implemented are protected by the deliberative process privilege, the attorney client privilege, or the work product doctrine.

As of the time of this filing, Defendants lack knowledge to provide more of a response.

## IX.   INFORMATION RELATED TO ANALYSES OF THE REGISTRY

### Plaintiffs' Position

Plaintiffs sought policy-level documents for the last five years, such as audits, reports, and evaluations regarding SORA with respect to its effectiveness, recidivism, cost, impact on registrants, usage by the public/law enforcement, vigilantism against registrants, and similar issues. Ex. A, RFP 6. The only document Defendants produced was a contract for the MSOR database.

If responsive documents exist, they should clearly be produced. For example, if there was an audit of the registry to determine whether it has an impact on recidivism, that would be relevant evidence. In meet-and-confers, however, Defendants have stated that there simply are no other documents responsive to RFP 6; in other words that SORA has not been evaluated, audited, or been the subject of an internal or public report. Plaintiffs recognize that if that is true, then there are no documents to produce. But in that case, Defendants should forthrightly answer Plaintiffs RTAs that request Defendants to admit as much.

Specifically, Plaintiffs asked Defendants to admit that:

"The State of Michigan has not analyzed whether Michigan's sex offender registry is effective in preventing recidivism."

Ex. B, RTA 80. Defendants objected to answering, claiming the terms used were vague. Plaintiffs, attempting to address the objection, offered to revise and send a new request that reads:

"Defendants or their employees have not conducted any studies or data analysis in the last ten years to determine if SORA reduces sexual recidivism. (For purposes of this RTA, 'sexual recidivism' means the rate at which people reoffend sexually after a first sexual conviction, as measured by rearrest or reconviction for such an offense; and 'sexual conviction' means a crime that under SORA would be a registrable offense.)"

Defendants have not responded.

Accordingly, Plaintiffs ask that the Court require the Defendants to confirm on the record that there are no responsive documents to RFP 6 in the last five years, and require Defendants to admit or deny the revised RTA 80.

Finally, Defendants state below that Plaintiffs have declined requests to identify material facts. Not so. Plaintiffs have repeatedly discussed Plaintiffs' theory of the case with Defendants, including the facts Plaintiffs believe they need to prove. Defendants, by refusing to admit or substantively respond to the majority of the allegations in the complaint and similarly declining to admit or substantively respond to many of the RTAs, have put Plaintiffs in the position of having to develop proofs for evidence that should not be in dispute. *See*, *e.g.* Ex. B, Defs' Answers to RTAs 52-63 (objecting to requests to admit basic facts about the passage of the new statute and the preceding efforts by a legislative work to draft a new law—facts which are relevant to Plaintiffs' claims that SORA is motivated by animus).

## **Defendants' Position**

As of the time of this filing, Defendants lack knowledge to provide much of a

response.  As a general response, Plaintiffs seem to be spending a lot of the parties, and the courts, resources on discovery that does anything but expedite this case. As noted above, it appears that Plaintiff's have made little, or no attempt to figure out what they already have from the factual record from *Does I*, which spanned thousands of pages, and limit their requests to updated relevant information.

Defendants have made numerous requests to Plaintiffs to identify what material facts they are trying to develop through discovery so that they could evaluate whether facts can be stipulated to, but Plaintiffs have declined the requests.

Respectfully submitted,

s/ Miriam Aukerman (P63165)
Miriam J. Aukerman
Attorneys for Plaintiffs
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org
rrajan@aclumich.org


s/ Daniel S. Korobkin (P72842)
s/ Syeda Davidson (P72801)
American Civil Liberties Union
  Fund of Michigan
Attorney for Plaintiffs
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org


s/ Paul D. Reingold (P27594)
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
Attorney for Plaintiffs
Univ. of Michigan Law School
802 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109-1215
(734) 355-0319 - pdr@umich.edu

s/ Roshna Bala Keen (Ill. 6284469)
Loevy & Loevy
Attorney for Plaintiffs
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 - roshna@loevy.com


/s/ Eric M. Jamison (P75721)
Assistant Attorney General
Attorney for Defendants
Michigan Dep't of Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
jamisone@michigan.gov