UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

Defendants.

No. 2:22-cv-10209

Hon. Mark A. Goldsmith

Mag. Curtis Ivy, Jr.

**ATTACHMENT 1**

**MARY ROE – EX B TABLE**

| | CSC 1st Degree charged or addressed on opinion | | |
|---|---|---|---|
| 1 | Defendant engaged in sexual penetrations with the victim between September 2006 and September 2009. At that time, defendant was between the ages of 17 and 20 and the victim was between the ages of 5 and 8. | People v. Keefe, 872 N.W.2d 688, 689 (Mich.,2015) | M.C.L. 750.520b |
| 2 | On April 6, 2018, the complainant was shown a video recorded two days earlier that depicted Thayer engaging in various sexual acts with her. The complainant appeared to be coming in and out of consciousness in the video. She testified that she did not give Thayer permission to engage in any sexual act with her, nor did she have any memory of such contact. She explained that she had gone to a friend's home on April 4, 2018. While there she smoked marijuana and drank liquor with Thayer and three other people. After a few hours of drinking and smoking, she went with Thayer to purchase more alcohol. She remembered drinking more liquor once they returned, but did not remember anything after that until she woke up in a van on the way home. She was 17 years old at the time. | People v. Thayer, 2020 WL 6536755, at *1 (Mich.App., 2020) | M.C.L. 750.520b |
| 3 | The evidence presented at trial established that after watching a videotape that depicted two men and one woman engaging in sexual acts, defendant indicated that he wanted to vaginally penetrate the complainant while their friend, JS, penetrated her anally. When the complainant, who was defendant's girlfriend at that time, stated that she did not want to participate in such acts, defendant sexually assaulted her by vaginally penetrating her with his penis, while at the same time forcing JS to sexually penetrate the complainant orally with his penis. Defendant accomplished the sexual assault while hitting the victim in the face more than once and by choking her twice. | People v. Sikorski, 2015 WL 3540563, at *1 (Mich.App.,2015) | M.C.L. 750.520b |
| 4 | Defendant's convictions are the result of her digital penetration of the complainant, her niece. The complainant was 24 years old at the time of trial. The crime occurred when the complainant was 7 to 10 years old, and defendant was in her early twenties. It is undisputed that, at the time of the alleged crime, the victim was under 13 years of age. The complainant recalled defendant rubbing the skin outside of her vagina and her similarly rubbing defendant. She testified that she could not recall anything entering her vagina and that her memory was fuzzy about the rubbing incidents. Thus, the testimony of the complainant did not establish beyond a reasonable doubt that defendant had penetrated her vagina. However, during an interview with Detective Keith Harvey, defendant admitted that she touched the complainant's vagina. Harvey drew a hand and asked defendant to circle the portion that went inside the complainant's vagina, and defendant responded by circling one of her fingertips. Defendant agreed that she only put her finger in "a little, tiny bit, and did not force it or hurt" the complainant. The complainant reported that she would have to throw her underwear away after visiting defendant because of blood stains; defendant sent her ex-husband a text admitting that she did "do that to [the complainant]"; and defendant's sister-in-law said that defendant responded "yes" when asked whether the complainant's allegations were true. | People v. Trimble, 2018 WL 4259369, at *1 (Mich.App., 2018) | M.C.L. 750.520b(1)(a) |

| 5 | In LC No. 11–007338–FC, the victim testified that when she was 14 years old, defendant rubbed her legs, pulled her pants down, and rubbed his penis up and down the outer lips of her vagina. In LC No. 11–007445–FC, the victim testified that when she was 12 years old, defendant put his penis into her vagina. She testified that when she turned 13, defendant put his mouth on her vagina. In LC No. 11–010105–FC, the victim testified that when she was less than 13 years old, defendant attempted to put his penis in her vagina and managed to put his penis "beyond the lips" and "in the crevice," but she told defendant to stop because it hurt. The victim further testified that defendant put his mouth and tongue on the outer lips of her vagina. | People v. Bird, 2013 WL 6480928, at *1 (Mich.App.,2013) | M.C.L. 750.520b(1)(a) |
|---|---|---|---|
| 6 | During the summer of 2003, defendant babysat for the victim and the victim's brothers. The victim was then six-years-old, and her brothers ranged in age from seven to 10 years. The victim described three specific occasions during that summer on which defendant entered her bedroom, took off her pants and underwear, and "put his private in mine." She testified that the assaults caused her to experience pain, but denied that they caused her to bleed. Defendant informed her that if she told anyone about what happened, he would hurt her family.  The victim first revealed the abuse several years later, after attending a school program concerning "safe and unsafe touches" that included a video presentation entitled, "Break the Silence." | People v. Keith, 2008 WL 2697431, at *1 (Mich.App.,2008) | M.C.L. 750.520b(1)(a) |
| 7 | This case arises from the August 2019 sexual assaults of Thomas's 13-year-old stepdaughter, AP. At the time, AP lived with her mother and Thomas. AP testified that Thomas sexually assaulted her on two straight days at home, and that the assaults involved Thomas penetrating her vagina and anus with his penis. The following day, AP met with her therapist and disclosed that Thomas had sexually assaulted her. AP and her therapist informed AP's mother, and AP's therapist filed a Child Protective Services (CPS) report and contacted the police.  At trial, Thomas denied having sexual contact of any kind with AP. Thomas argued that AP fabricated the sexual assault because she was upset that Thomas took her phone away days earlier. Unable to dispute the DNA evidence, Thomas theorized that AP took a towel he had used to clean up with after having sex with AP's mother and put it inside her vagina. | People v. Thomas, 2023 WL 327857, at *1 (Mich.App., 2023) | M.C.L. 750.520b(1)(b) |
| 8 | The victim alleged that in June 2009, when she was 14 years old, RL had plans to go out with a friend. Defendant and his children were at the home of a mutual friend, and the victim asked to stay there during her mother's absence. The victim alleged that defendant offered her the use of his bed in the home's basement. She claimed that she awoke in the middle of the night and discovered defendant in the bed with her. The victim accused defendant of digitally penetrating her vagina. The victim asserted that she immediately pulled away and went upstairs to sleep with the rest of the children. Defendant initially denied that anything had happened, but later changed his story. He testified that he awoke in the middle of the night to find the victim in his bed attempting to initiate sexual relations. Defendant admitted that he touched the victim but claimed he believed the victim was her mother. | People v. Kalmbach, 2015 WL 248732, at *1 (Mich.App.,2015) | M.C.L. 750.520b(1)(b) |

| | | | |
|---|---|---|---|
| 9 | This case arises out of defendant's sexual assault of the daughter of his former girlfriend while the victim, defendant's former girlfriend, and her three younger children were staying at defendant's home. The victim testified that the assault occurred one night after she fell asleep while watching a movie in defendant's bedroom. | People v. McMillen, 2017 WL 3642661, at *1 (Mich.App., 2017) | M.C.L. 750.520b(1)(b) |
| 10 | The victim claimed that, over time, she became dependent on the drugs such that she would get sick to her stomach, would sweat, and could not sit still if she did not take them. After becoming dependent, the victim went to defendant for more drugs, and he told her that she "had to help him out too." She testified that defendant would not sell her the pills for money and that she had to negotiate alternatives with him in order to obtain more pills. Defendant wanted sex in return for the Oxycontin and, although she did not **884 want to have sex with defendant at first, the victim decided to engage in sexual relations with him so that she could acquire more drugs and satisfy her dependency. *682 The victim testified that it was her choice to have sex with defendant and that she had sexual intercourse and oral sex with him on numerous occasions. In return, defendant provided her with drugs. The acts of sexual penetration along with the delivery of drugs formed the basis for the prosecution under MCL 750.520b(1)(c). The victim indicated that her sex-for-Oxycontin encounters with defendant became "routine" and that she would go to defendant's home for pills "pretty much" every other day. At one point, the victim told defendant that she wanted the pills before having sex with him, but, when he complied, she left immediately, so thereafter he demanded that they have sex before she would receive any drugs. At times, the victim would ask defendant to stop when they were having sex, which he would not always do right away, and she would then push him off her if he did not stop on his own. The victim testified that on another occasion when she did not want to have sex with defendant, he began to chase her and ripped the pocket off her pants, and she ran to a gas station to ask for help. She engaged in various social activities with defendant, but she only did so in order to obtain more drugs. | People v. Waltonen, 728 N.W.2d 881, 883, 272 Mich.App. 678, 681 (Mich.App.,2006) | M.C.L. 750.520b(1)(c) |
| 11 | The victim, CY, testified that she went to a gas station at Trumbull and West Warren in Detroit to look for someone to drive her to her daughter's house. A woman who CY knew only as Vicky, but who CY had frequently seen at the gas station, directed her to defendant, who was in a small white car nearby. CY approached defendant to inquire about a ride. According to CY, defendant pulled out a knife and ordered her to get into his car. He thereafter drove to a dark area near a building and parked the car close enough to the building to prevent CY from opening the passenger door. Defendant threatened CY with the knife and ordered her to perform oral sex on him and to submit to sexual intercourse. Afterward, defendant released CY and she walked back to the gas station, where she reported the incident to the police and then was taken to the hospital for a rape kit examination. Forensic testing revealed that DNA material obtained from CY matched defendant's DNA profile, which also matched DNA evidence obtained from two prior sexual assaults involving victims DJ and AP. At trial, the prosecution was allowed to call as witnesses both DJ and AP, each of whom testified that she was sexually assaulted under circumstances similar to CY's case, and who identified defendant as the assailant. | People v. Holland, 2015 WL 5442817, at *1 (Mich.App.,2015) | M.C.L. 750.520b(1)(c) |

| | | | |
|---|---|---|---|
| 12 | Durden was convicted of sexually assaulting AW at Durden's apartment on June 23, 2019. Durden met AW on a dating application, they texted for a few weeks, and Durden invited AW to his apartment. AW agreed to meet Durden at his apartment before she went to work on the morning of June 23. AW alleged that while sitting on Durden's bed, Durden began to kiss her, but she told him to stop. Durden asked her "what was the point of coming over if [she] wasn't trying to" have sex with him. AW responded that "just because [she] came over, that didn't mean that [she] wanted to ... have sex with him." Durden then began to strangle her. AW screamed, and Durden told her to shut up. AW told Durden that she had asthma and couldn't breathe, and he briefly allowed her to get up to use her inhaler. According to AW, Durden then began to again choke her, forcibly held her down, and anally penetrated her without her consent. Before AW left, Durden took a photograph of AW's identification and told her, "If you don't f**k with me, I won't f**k with you."  After leaving Durden's apartment, AW immediately called her boss and told her boss what happened. AW drove to work, and when she arrived, a coworker took her to the hospital.  The prosecution also presented the testimony of KM, who testified that she met Durden on Facebook in 2008, and eventually invited him to her house. According to KM, Durden tried to initiate sexual activity and she told him to stop, but Durden sexually assaulted her. Durden also told KM that he knew where she lived if she told anyone. Durden was later convicted of second-degree criminal sexual conduct in that matter. | People v. Durden, 2022 WL 3009754, at *1 (Mich.App., 2022) | M.C.L. 750.520b(1)(c) |
| 13 | the victim in this case testified that she was walking alone when two men followed her. One of them grabbed her arm, twisting it behind her back, and then the skinnier of the men pushed her to the ground. Her pants were ripped open and pulled down, and her legs were forced apart. The skinny man then sexually penetrated her vagina with his penis, ejaculating inside her. | People v. Spencer, 2014 WL 129321, at *8 (Mich.App.,2014) | M.C.L. 750.520b(1)(d) |
| 14 | After inhaling the marijuana, the victim became light-headed; after inhaling a second time, her legs and feet started to become weak and she started to lose her balance. The man who handed her the blunt caught her and brought her to the couch in the bedroom. The victim testified that the men kept asking her if she was okay, but her tongue was getting numb and she could not speak or move. One of the men shut the door to the bedroom. They started asking each other about a condom, which neither of them had, and then debated who would go first. One of the men tried to take the victim's dress off from the top, but was unable to do so. The men then lifted up her dress and laid her down, still arguing about who would go first. One of the men pulled her dress up and the other man pulled down her underwear. One of the men then put his penis in her vagina. The victim testified that she was crying. The other man was rubbing the victim's breast area. When the first man stopped, the other man put his penis in the victim's vagina. After the second man finished, the men started to leave, but then one of them turned around and fixed the victim's clothing. The men carried the victim out to the living room and sat her in a chair. She was still unable to communicate, stand, or walk. The men then left out the front door. | People v. Venson, 2019 WL 942310, at *1 (Mich.App., 2019) | M.C.L. 750.520b(1)(d) |

| 15 | Defendant's convictions arise from the sexual assaults of KW and SL. According to the evidence at trial, defendant committed these offenses with codefendant Joshua Matthew-Rollin Humphrey. Humphrey met KW on an online dating site, and he arranged to meet her at a bar where defendant was also present. At the bar, KW met SL. Humphrey purchased shots of alcohol for KW, SL, himself, and defendant. After consuming the shots, both KW and SL felt "funny;" they described feeling "dizzy," "woozy," "out of body," "numb," and "fuzzy." Defendant and Humphrey then drove the victims to defendant's home where the sexual assaults occurred in defendant's basement. KW and SL both denied consenting to any sexual activity with defendant or Humphrey. Indeed, they described losing consciousness and coming in and out of consciousness during the sexual assaults. They also described feeling "very heavy and sluggish," like they could not move their bodies.  In the morning, KW and SL were missing clothing and their cell phones. KW reported the incident to police. She also underwent a sexual assault examination and provided a urine sample. Her urine showed the presence of prescription medications that, according to an expert in forensic toxicology, could be used as rape date drugs, "especially if used together or used together with alcohol." Potential side effects of the medications included sedation and ataxia—i.e., muscle weakness—that would be consistent with the victims' descriptions of feeling like they could not move.  Specifically, the evidence showed that Humphrey met five women online, and he arranged to meet these women in bars where defendant was also present. While with defendant and Humphrey, the women were drugged—and like KW and SL—they described feeling sedated, unable to move, and losing consciousness. Many of the women also had items stolen. With the exception of one of the women, who escaped through the aid of friends, the women were sexually assaulted. Defendant admitted to participating in sexual activity with one of the women, and notably, defendant admitted that he had sex with her after he had reason to believe that Humphrey was drugging women. The events relating to E, which occurred in 2000 when defendant was 14 years old, are the most remote in time, which can limit the logical relevance of this other-acts evidence.  In terms of defendant's conduct, the evidence showed that defendant broke into E's home while armed with a knife and sexually assaulted her while she slept. | People v. Stiff, 2019 WL 5198929, at *1 (Mich.App., 2019) | M.C.L. 750.520b(1)(d) |

| 16 | At defendant's trial, the prosecution presented the complainant's preliminary examination testimony in which she testified that, after some marital quarreling, defendant struck her in the face, threatened and cut her with a box cutter, choked her, then wrapped an extension cord around her neck, and issued death threats. When she attempted to flee, defendant pursued her, she fell down, and defendant forced her back into the bedroom and sexually assaulted her. Hours later, after defendant fell asleep, she left home and reported to a hospital emergency room. On the first day of trial, the trial court ruled that the prosecution could present evidence that defendant committed a violent act of criminal sexual conduct in 1990 against a woman in the neighborhood in which he lived. Because the woman was deceased, the prosecution requested that her preliminary examination testimony be admitted and defendant's trial counsel stipulated to its admission.<br>In our previous opinion, we summarized the woman's preliminary examination testimony as follows:<br>In that earlier proceeding, ST testified that defendant, whom she knew only as someone who lived across the street who had once asked to borrow her lawnmower, appeared on her porch at 4:00 a.m. one morning, told her to "shut up" when she asked through a closed window what he was doing, then broke her window. ST ran to her kitchen and called the police, but defendant came to a side door near the kitchen, and "started breaking the glass out of that," then reached through that opening to begin unlocking the door, upon which she hung up her phone and ran upstairs and grabbed her rifle. ST testified that the police called back, and from her upstairs bedroom phone, while continuing to hear the sounds of breaking glass, she reported that a man was breaking in. When things seemed to have quieted down, ST entered her hallway, where she saw defendant "more or less crawlin' up the stairs." ST testified that she attempted to raise her rifle, but defendant pulled it away and threw it on the floor, then pushed her into her bedroom and started forcibly disrobing her. Over her protestations, defendant forced her onto the bed, twice struck her in the face, pulled his pants down, forced her to perform fellatio on him, then forced her to endure sexual intercourse. The police then arrived and apprehended defendant. | People v. Collins, 2022 WL 5395318, at *1 (Mich.App., 2022) | M.C.L. 750.520b(1)(e) |
| 17 | Complainant was driven away in defendant's car and taken to defendant's home without her shoes, purse or identification; items she typically took with her when she went out. Furthermore, complainant testified that defendant threatened to cut her with a knife if she did not take off her clothes and climb on top of him so he could vaginally penetrate her. Defendant penetrated complainant a total of three times without her consent. Defendant drove complainant home and complainant told her daughter she had been raped by defendant. | People v. Palmer, 1999 WL 33455078, at *1 (Mich.App.,1999) | M.C.L. 750.520b(1)(e) |

| | | | |
|---|---|---|---|
| 18 | In the instant case, complainant testified that defendant held her at knife-point, that she was able to wrestle the knife away, that defendant then pushed her out of the car, threw her on the trunk, ripped off her shirt, and then began sucking her breasts. Following this, defendant ripped off complainant's panties and forced her into sexual intercourse. Complainant further testified that defendant then moved the two of them from the trunk to the back seat of the car where he once again inserted his penis into her vagina. Complainant's testimony was corroborated by the testimony of the responding police officers. One officer testified that he went to an alley near Six Mile and Prairie to investigate a report of a woman screaming rape. When he arrived on the scene, he saw defendant's vehicle and a chase ensued. After the chase terminated, complainant jumped from defendant's car toward a scout car. She immediately told the officer that she had been raped, she was crying and appeared hysterical, and the officers noted her shirt undone and reddish marks around her neck. This evidence is consistent with complainant's claim that defendant ripped open her shirt and held her in a choke-hold. Finally, the police found two knifes in the locations where complainant testified that she had thrown them from the car. | People v. Wright, 1997 WL 33350480, at *1 (Mich.App.,1997) | M.C.L. 750.520b(1)(e) |

| | | | |
|---|---|---|---|
| 19 | Defendant was accused of sexually assaulting BM, his girlfriend's thirteen-year-old niece. On the night in question, BM, her mother, the mother's boyfriend, and the boyfriend's child were visiting the home shared by defendant and his girlfriend and their infant child. Eventually, everyone else at the home that night went to bed, leaving defendant and BM watching television. According to BM, she and defendant were sitting together on the floor of the living room when defendant asked her to "crack his back" by walking on it, and she agreed. Defendant then asked her to rub his back, and she agreed; she later reported that she did not think this was a particularly odd request because some people sometimes ask her to rub their backs. BM reported that defendant then "started to kind of rub my legs," then started "cuddling" her, put his hand under her shirt and moved his hand toward her breast, and kissed her. According to BM, she then left the room and went to the bathroom.  BM returned to the living room and sat on the couch, where defendant joined her and began "cuddling" her again. BM reported that defendant began to rub her right rib cage and stomach beneath her shirt and "grabbed her face" and kissed her. She stated that defendant touched her right thigh and buttocks, and put his hand under her pants and started to rub and touch her "vaginal area," and then "grabbed her hand [and] put it on his penis over his shorts." BM reported that at one point, defendant grabbed her hair and pulled her toward him, and that at another point he pushed her head down, but she resisted the pushing. Defendant then "put his finger in [BM's] vaginal hole" and asked her if she liked it and "if she wanted him to keep doing that." BM reported that defendant put his finger in her vagina once, but also that "he kept going in and out, but ... he kind of had it in the whole time." Defendant also put BM's hand under his shorts on his penis. According to BM, defendant kissed her again and told her not to tell anyone. She then left the room again and stayed in the bathroom until she was sure defendant was asleep, then spent the rest of the night awake on the couch to ensure that her mother's boyfriend's nine-year old daughter, who was sleeping nearby on a mattress, was not harmed by defendant.  When interviewed by police, defendant acknowledged that he watched a movie with BM on the night in question, but explained that he had been drinking heavily throughout that day and did not remember the details of the evening. Later in the interview, however, he admitted that he had kissed BM on the lips while they were sitting on the couch together, put his hand inside her pants, put his finger in her vagina, and made her touch his penis. Near the end of his interview with police, defendant wrote a letter to BM apologizing for the incident. | People v. Snover, 2020 WL 1968245, at *1 (Mich.App., 2020) | M.C.L. 750.520b(1)(f) |

| | | | |
|---|---|---|---|
| 20 | Defendant's convictions arise from sexual relations that he had with the victim while he was her therapist. In 1984, defendant was recommended to both the victim and her husband for treatment of their alcoholism. At the time, the victim was also depressed and had an eating disorder, suffering from anorexia and bulimia. The victim and her husband jointly saw defendant together for a short period and then continued to see him separately until 1994.  According to the victim's testimony at trial, she began her therapy with defendant after having "something like a nervous breakdown." At that time, her relationship with her husband was "difficult" because *197 he was verbally abusive. She also had concerns regarding her husband's fidelity.   The victim testified that she initially saw defendant once a week in the afternoons, but that she eventually began to see him three times a week because defendant believed that she "needed more help" than could be provided in a single weekly session. At defendant's suggestion, the victim also changed to evening appointments. During the last four to five years of therapy, and for a period thereafter, she met defendant in various hotels to have sex with him.  The victim explained that defendant wanted her to meet with him at these hotels because he wanted to "teach [her] how [she was] supposed to have sex with men," because he believed that the "failures" in her life stemmed from the fact **670 that she "wasn't doing the right things for men to make them happy." According to the victim, these meetings with defendant occurred "[o]nce a week for years." The victim testified that she did not begin to have sex with defendant, however, "until [she] totally trusted him," which was approximately five years into her therapy. The victim further testified that she had been plagued with "trust issues" her entire life, but that defendant "finally got [her] to trust him, which was probably the first time [she] totally trusted any male." She also testified that once defendant gained that trust, he began to control her.  The victim denied that she had any romantic feelings toward defendant while in therapy with him, but stated that she believed that defendant had romantic feelings toward her. She admitted, however, that after she discontinued therapy with defendant they continued *198 to see one another until she reported defendant's conduct to the state police and a licensing agency. | People v. Alter, 659 N.W.2d 667, 669, 255 Mich.App. 194, 196 (Mich.App.,2003) | M.C.L. 750.520b(1)(f) |

| | | | |
|---|---|---|---|
| 21 | Defendant's conviction arises from allegations that he sexually assaulted his former girlfriend. The complainant and defendant dated intermittently for several years and had two children. At some point, the complainant began dating another man named Frank. According to the complainant, defendant did not accept this new relationship. When the complainant ultimately ended her relationship with Frank in August 2000, she discussed the possibility of reconciling with defendant. On September 9, 2000, at approximately 4:30 a.m., the complainant claimed that Frank unexpectedly came to her home and stayed for half an hour. According to the complainant, defendant called during this time and "exchanged some words" with Frank over the telephone. Later that day, the complainant stated that defendant visited her house. The complainant testified ... that defendant straddled her, tore her clothes, and pulled down her pants. Throughout the assault, the complainant asserted that defendant accused her of being intimate with Frank, called her derogatory names, and punched her repeatedly in the head. The complainant indicated that defendant subsequently dragged her into her bedroom, pushed her over a chair, and punched her in the stomach. Defendant then told her to stand up, pushed her backwards, and said, "[s]uck my [penis], bit—." The complainant claimed that when she attempted to stand up, defendant punched her in the stomach again and caused her to regurgitate. Defendant ultimately pulled her head up, placed his penis on the side of her mouth, and ejaculated "all over" her. As a result of defendant's actions, the complainant stated that she suffered a blood clot in her stomach, bruising on her chest and left eye, and a swollen left cheek. On September 14th, the complainant reported the sexual assault to the police. She later obtained a personal protective order against defendant. | People v. Nickens, 685 N.W.2d 657, 659, 470 Mich. 622, 624 (Mich.,2004) | M.C.L. 750.520b(1)(f) |
| 22 | This case arises from a number of sexual assaults defendant committed against LT, a developmentally disabled member of his household. In the time surrounding the assaults, defendant regularly kept LT locked in a bedroom, which was full of trash and did not contain a bed or any method of communicating with the outside world. While locked in the room, LT was forced to use a pot to urinate and defecate in. Defendant committed CSC–I under MCL 750.520b(1)(h)(ii ) by engaging in sexual penetration with a mentally disabled person over whom he had authority. But defendant did much more than that. Before, during, and after the assaults, defendant kept LT locked in a bedroom with no way of communicating with the outside world, no way of escaping, and no way of feeding or cleaning herself unless he allowed it. Defendant slapped LT in the face a number of times while he tried to force her to perform fellatio on him. LT testified that she was "in a lot of pain" and began to bleed during the assaults. | People v. Johnson, 2015 WL 3649143, at *1 (Mich.App.,2015) | M.C.L. 750.520b(1)(h) |

| 23 | The victim in this matter was 35 years old at the time of the offense, but she functioned at the level of a child between the ages of 6 and 10 years old. Defendant had dated the victim's mother for approximately 11 years. On the day of the offense, defendant stayed alone with the victim at her home while the victim's mother and brother went to the store. When the victim's 23-year-old brother unexpectedly returned, he found defendant "thrusting" on top of the victim on her bed. The victim disclosed that she had asked defendant to have sex. Defendant had attempted to penetrate her vagina with his penis, but because it hurt her, he instead rubbed his penis on her body. The victim's brother called 911, and the victim's mother took her to the hospital for an examination.  At trial, the victim testified that on additional occasions prior to the date of the sentencing offense, defendant had licked her vagina, touched her, rubbed his penis on her, and put his penis into her vagina. The victim was not sure when the incidents began, but she reported that the first time it happened, it was defendant's idea and she did not know what sex was. The victim testified that defendant told her to keep the sexual acts secret from her mother. The victim's mother and brother testified about the victim's cognitive abilities, both stating that the victim had never lived alone and could not be safely left home alone for more than approximately an hour.  Defendant testified that he had engaged in sexual acts with the victim on four or five occasions. He stated that he engaged with the victim to pacify her and that he did not have sex with her when her family was home because it would have been "rude." | People v. White, 2021 WL 1157278, at *1 (Mich.App., 2021) | M.C.L. 750.520b(1)(h) |

| | | | |
|---|---|---|---|
| 24 | Defendant worked as a nurse at Lockwood Hospital in the mental health unit. The unit is a locked-down inpatient facility. In January of 1999, Debra Taylor, a registered nurse, was admitted to the unit for one week due to depression and withdrawal symptoms from prescription pain medication following a hysterectomy. One of Ms. Taylor's symptoms was a loss of interest in sexual activity. Defendant was one of three nurses assigned to Ms. Taylor during her stay. Defendant was also recovering from addiction and he and Ms. Taylor discussed her family problems, the possible loss of her nursing license, and recovery from addiction. Ten days after her release, Ms. Taylor voluntarily recommitted herself as her symptoms continued. Ms. Taylor's second inpatient stay at Lockwood lasted twenty-one days. Ms. Taylor testified that during this visit, defendant made several inappropriate remarks to her and that his behavior made her uncomfortable. According to Ms. Taylor, defendant first accosted her in the facility's television room. Defendant beckoned Ms. Taylor into the room where he grabbed, embraced and kissed her. Ms. Taylor pushed defendant away and asked him, "Aren't you afraid of getting caught?"3 Another male nurse was at the nurse's desk at the time, but Ms. Taylor, suspecting that the two were in collusion, did not tell him of the incident. A couple of days later, defendant was more aggressive toward Ms. Taylor in her private bathroom. Defendant fondled Ms. Taylor's breasts and digitally penetrated her. Defendant also forced Ms. Taylor to touch his penis. Ms. Taylor pulled defendant's hands off her body, pushed him away, and told him to go home. Ms. Taylor did not report the incidents for almost a year, claiming that neither she nor her husband could handle the pressure. She attended outpatient sessions, along with defendant, for healthcare professionals recovering from addiction. Ms. Taylor first told George Vandell, a counselor for the group, of defendant's behavior when Mr. Vandell used defendant as an example of someone who successfully completed the outpatient drug treatment program. In addition to Ms. Taylor's testimony, the prosecution presented the testimony of two other female former patients as similar act witnesses. | People v. Schram, 2004 WL 1752984, at *1 (Mich.App.,2004) | M.C.L. 750.520b(1)(h) |
| 25 | Defendant, a former elementary school teacher, was convicted of engaging in sexual intercourse with a 12–year–old former student from her sixth grade class. The victim had academic and behavioral problems and was suspended from school for fighting with another student at the beginning of the 2007–2008 school year. Defendant intervened on the victim's behalf and persuaded the school principal not to expel the victim from school. After the victim returned to school, defendant invited him to religious activities at her masjid (mosque) and to her home, purportedly to offer him guidance and help him with his anger and academic problems. The victim was subsequently expelled from school after a **603 second fighting incident. After his expulsion, he spent more time with defendant at her home, with his mother's permission. According to the victim, he and defendant progressed from hugging, to holding hands, to kissing, before eventually engaging in sexual intercourse. The victim testified that he and defendant had sexual intercourse on two different evenings in October 2007. After the second incident, the victim called defendant from his home and inadvertently recorded the call. During the recorded call, the victim referred to defendant as his girlfriend and stated that he was proud to be involved with a grown woman. The victim's mother heard the recording and reported it to the school | People v. Benton, 817 N.W.2d 599, 602, 294 Mich.App. 191, 194 (Mich.App., 2011) | M.C.L. 750.520b(2)(b) |

| | | | |
|---|---|---|---|
| 26 | The victim claimed that defendant sexually abused her, starting when she was four to six years old and ending when she was eight years old. At the time of trial, the victim was 15 years old and defendant was 39 years old. The victim testified that on one occasion while defendant was babysitting her, he brought her into a bedroom, groped her unclothed body, engaged in digital/vaginal and penile/vaginal penetration, and performed cunnilingus on her. The victim did not disclose the abuse to anyone until 2015. She disclosed the sexual abuse to her mother after the two of them watched a movie wherein the main character was sexually abused as a minor. | People v. Lucas–Lopez, 2018 WL 910470, at *1 (Mich.App., 2018) | M.C.L. 750.520b(2)(b) |
| 27 | The female victim, LA, was seven years old at the time of the sexual assaults. Defendant was once a close and dear family friend who at times lived with LA's family and would often care for LA. Before the assaults, defendant was loved and trusted by LA, LA's mother, and other members of LA's family. Indeed, LA referred to defendant as "Uncle Darius." With respect to the first incident, LA testified that defendant exposed his penis, pulled her pants and underwear down, painfully penetrated her vagina with his penis, forced her head down between his legs, and made her lips touch his penis. [Defendant was in his forties when the sexual assaults were committed] In regard to the second incident, LA testified that defendant pulled her pants down to her knees and then penetrated her vagina with his penis, more deeply than in the first assault and again causing excruciating pain. After the two sexual assaults, LA experienced stomach pain and often felt horrible. Her mother described a sudden and negative change in her demeanor and personality, and LA sought to avoid defendant's presence. The police interviewed defendant, and defendant told an officer that LA initiated the sexual contact. Defendant, who is 6'4" and 249 pounds, claimed to the police that seven-year-old LA essentially forced herself on him, engaging in the sexual acts until he stopped LA when he realized what she was doing. The prosecution also presented other-acts evidence, consisting of the testimony of JB, who asserted that defendant sexually assaulted her from the age of 9 until age 11. The assaults encompassed acts of fellatio and penile-vaginal penetration that took place three to four times a week in the basement of defendant's house. Defendant was a close family friend, and like LA, JB called defendant "Uncle Darius." | People v. Gordon, 2019 WL 3311357, at *1 (Mich.App., 2019) | M.C.L. 750.520b(2)(b) |
| | CSC 2nd Degree charged or addressed in opinion | | |

| | | | |
|---|---|---|---|
| 28 | Defendant and his wife adopted the victim when she was approximately 16 months old. At age 10, the victim began hiding pornography for defendant on his computer. She did so because defendant said that he loved her and he would get violent. Defendant began showing pornographic videos to the victim in his bedroom, first on television, and later on his computer. While watching these videos, defendant would masturbate in the victim's view. The victim testified that her mother would be in the next room. The victim did not discuss this with her mother because defendant threatened to kill the family if she did. The first physical contact between the victim and defendant occurred when she was 11 years old. Defendant, while watching pornography and masturbating in front of the victim in his bedroom, made contact between his genitals and the victim's. After this incident, defendant began molesting the victim while she showered, groping her breasts and buttocks. Defendant also penetrated the victim's anus with his finger, and penetrated her vagina with his mouth and fingers. Defendant eventually escalated to penetrating the victim's vagina and anus with his penis. The victim claimed that she had sex with defendant several times and enjoyed it. The victim testified that she eventually began to self-mutilate, cutting and burning herself, and had stomach problems and rectal bleeding. The victim's mother and defendant eventually separated, and the mother filed for divorce on August 17, 2010. After defendant moved out of the home, the victim disclosed what defendant had been doing to her mother and psychiatrist. | People v. Karson, 2014 WL 5066449, at *1 (Mich.App.,2014) | M.C.L. 750.520c |
| 29 | At the time of the incident, defendant was working as a hall monitor at a high school where the victim was a student. Defendant was to escort the victim to a school locker room so she could retrieve her belongings and then see her off school grounds. After the victim retrieved her possessions from the locker room, defendant told her to enter a vacant office. She complied, and when she was halfway through the doorway, defendant suddenly grabbed her buttocks, "grinded on" her, and made sexually aggressive remarks. A few seconds later, when defendant removed his hands in order to unbutton the victim's pants, she pushed him away and left the office. | People v. Bond, 2007 WL 3015441, at *1 (Mich.App.,2007) | M.C.L. 750.520c |
| 30 | Stevens's convictions arise from sexual acts perpetrated upon his stepdaughter, BH, beginning when she was 9 years old and continuing until she and her siblings were removed from their home by Children's Protective Services on January 25, 2013, when BH was 14 years old, and from his aiding and abetting2 Tingley's sexual acts perpetrated upon BH when she was between the ages of 10 and 14. Tingley's convictions arise from the sexual acts perpetrated on BH, as well as sexual acts perpetrated upon Stevens's daughter, JS, when JS was less than 13 years old | People v. Stevens, 2016 WL 7333391, at *1 (Mich.App.,2016) | M.C.L. 750.520c |
| 31 | Complainant, defendant's daughter, testified that on one occasion when she was eleven or twelve years old, defendant pinned her to the sofa, unbuttoned her shirt, removed her shorts and underwear, removed his own shorts, and rubbed his testicles on a portion of her upper leg. Complainant gestured to her body to point out the area in which defendant made contact. Complainant testified that she kicked and bit defendant and that he released her. | People v. Phillips, 2001 WL 1657594, at *1 (Mich.App.,2001) | M.C.L. 750.520c(1)(a) |

| 32 | The victim testified that, while she was at her grandmother's house, defendant, who resided with the victim's grandmother, instructed the then seven-year-old victim to remove her clothing. She did as requested. He then removed his clothing and had the victim hold his penis for a short while. | People v. Szilagyi, 1998 WL 1989920, at *1 (Mich.App.,1998) | M.C.L. 750.520c(1)(a) |
|---|---|---|---|
| 33 | The [five year old] victim testified that on three separate occasions defendant removed her clothing and touched her "vagina" and her "butt." The victim's testimony established that defendant's conduct was not accidental. Defendant pulled off her shirt and underwear before touching her. On one occasion, defendant told the victim that "this is our secret." | People v. Hickman, 1997 WL 33353310, at *1 (Mich.App.,1997) | M.C.L. 750.520c(1)(a) |
| 34 | In this case, the complainant testified to numerous sexual encounters during his early teenage years with defendant, who was an adult associate pastor of his church. Regarding whether defendant exploited the complainant's vulnerability, we observe that the abuse occurred on church property when defendant and the complainant were alone. Some of the abuse occurred after the complainant visited defendant in his office to ask for his advice as his pastor and some of it occurred when defendant found the complainant alone in other parts of the church. On many occasions, defendant wrestled with the complainant, showed photographs of himself in his bathing suit and talked about his body, or made sexually provocative comments to complainant before initiating the sexual contact. Furthermore, the complainant testified that he masturbated defendant because defendant physically pushed his hand down to defendant's penis, and the complainant was confused. He "didn't know, like, what was okay in the situation," and "didn't know whether it was right or not or whether it's what we should've been doing." | People v. Bray, 2007 WL 4125294, at *2 (Mich.App.,2007) | M.C.L. 750.520c(1)(b) |
| 35 | On the day of the incident, the complainant went to direct parking traffic with the other student volunteers when defendant informed her that she could instead accompany him on his golf cart. Defendant persistently directed the conversation towards topics of a sexual nature throughout the day. The complainant testified that defendant commented on her sister's sexual life, commented on her body, discussed his own sexual encounters, inquired into her sexual encounters, inquired into the undergarments she was wearing, and stated that she could engage in sexual activities with him whenever she was ready. Later in the day, defendant took the complainant's hand and placed it on his inner thigh over his pants, near his erect penis, and stated that "it turned him on" when she touched him there. The complainant was 15 years old at the time of the incident, while defendant was in his mid-forties with a daughter of about the same age as the complainant. | People v. Guerrero, 2020 WL 6816973, at *1 (Mich.App., 2020) | M.C.L. 750.520c(1)(b) |
| 36 | The victim testified that on several occasions when she and defendant were in the basement of her home, defendant reached underneath her shirt, pushed up her bra, and fondled her breasts. She testified that these incidents took place at night, when no one else was around and no lights were on. Breasts are undisputedly intimate parts, and the fact that this took place late at night, in a secluded portion of the house with almost no lights could lead one to reasonably construe the touching as being for a sexual purpose. The victim also testified that she was 13 years old at the time of the assault, | People v. Reid, 2009 WL 279429, at *1 (Mich.App.,2009) | M.C.L. 750.520c(1)(b) |

| 37 | As Smith, Hines, Foster, and defendant entered through the front door, Smith pulled out a gun, cocked it, said "don't move," and instructed everyone in the house to get on the floor. Defendant said, "let's do what we came here to do," and "ya all [sic] took my home boy's wallet, I want all ya all [sic] s**t." Hines, Foster, and defendant then began collecting everyone's personal belongings. During the robbery, defendant ordered LH to follow him into the bathroom. In the bathroom, defendant ordered LH to take off her clothes. LH removed her pants and defendant put his hand down the back of her underwear. He then rubbed her vagina and said that she was "going to give [him] some p***y." Defendant ordered LH to give him a gold chain she was wearing, which she did; defendant also took her purse from the bathroom. | People v. Allen, 2019 WL 6340921, at *1 (Mich.App., 2019) | M.C.L. 750.520c(1)(c) |
| --- | --- | --- | --- |
| 38 | The complainant became intoxicated and "passed out" around 10:00 p.m. that evening. As a result, she has no recollection of the evening's events independent from the stories that she heard from other people. However, early in the morning, she awoke in her bedroom "feeling violated" and walked out to the living room to observe Samantha, Jordan, Steve, and Stacy "beating up" a complete stranger, who was lying on the floor. Samantha and Jordan would later explain that the stranger was defendant, and that they had caught defendant "sexually molesting" the complainant while she was unconscious. That morning, though, the complainant did not see defendant's face as she watched him break free from his assailants and run naked from her house. Jordan and Samantha both testified that they saw defendant lying on top of or next to the complainant with his pants pulled down and his genitals between the complainant's legs while making a thrusting motion. The complainant's underwear had been removed and was lying on the floor. They pulled defendant away from the complainant and into the living room, where a physical altercation ensued. | People v. Butler, 2015 WL 8538749, at *1 (Mich.App.,2015) | M.C.L. 750.520c(1)(c) |
| 39 | This case arises out of respondent's sexual abuse of KC and MC. Respondent is friends with KC's and MC's family and would often visit their home. In November 2017, KC was six years old and MC was five years old. On an unspecified date in November 2017, respondent was visiting the children's home. During the visit, respondent "busted into" the bathroom while KC and MC were using it. Respondent pulled down KC's and MC's pants and started touching their vaginal areas with his hands. | In re McClinton, 2020 WL 2610135, at *1 (Mich.App., 2020) | M.C.L. 750.520c(1)(c) |

| 40 | The incident that led to defendant's arrest and conviction occurred in the summer of 2006. Defendant asked the victim, a longtime acquaintance, if she would be interested in performing some house cleaning duties for him to earn extra income. The victim accepted defendant's offer and defendant gave the victim a tour of his residence. After the tour was completed, defendant asked the victim if she would like "a drink." The victim agreed and sat at the kitchen counter while defendant fixed them both a drink.  After a while, defendant disappeared into another portion of his residence and returned with what the victim described as a "long" gun with a "black object on the top of it." Defendant stood in front of a long section of windows near the front of his residence, about 20 to 25 feet away from the victim, and pointed the gun out the window. Defendant commented that he could kill a deer on his property from where he stood. Defendant then turned and pointed the gun at the victim. Defendant told the victim that she was going to "start being a little more nicer [sic]" to him. Defendant said that he could not understand why she was "being such a tease." The victim requested that defendant take her home. Defendant denied the victim's request, and the victim informed him that if he would not drive her home, she would walk. Defendant told the victim that, if she walked, he "would take [her] down" before she could reach the edge of the driveway. Defendant placed the gun on the kitchen table and retrieved a plastic bag full of women's undergarments. Defendant stood in front of the victim, who was still seated at the kitchen counter, and said that he wanted her to "show him [her] vagina." Defendant also asked to see the victim's "tits." The victim again asked defendant to take her home, but defendant refused. The victim assumed, according to defendant's requests, that he wanted her to put on the undergarments in the plastic bag. The victim took off her clothes and put on the undergarments from the plastic bag. Defendant watched her as she undressed and dressed. Defendant then "put his hands all over" the victim's body. He touched both of her breasts under the brassier and put his hands down the front of her underwear. The victim testified that she was afraid of the gun, which was still on the table at this time and accessible to defendant, and that is why she complied with defendant's requests. Defendant then wanted to play a game of pool with the victim, who testified that she complied because she felt as though she had no choice. The victim played a game of pool with defendant, then she put her clothes back on and again requested that defendant take her home. This time defendant complied with her request and drove her home. The 2006 incident was eventually reported to police when defendant assaulted the victim again in 2009 | People v. Zuder, 2013 WL 3024764, at *1 (Mich.App.,2013) | M.C.L. 750.520c(1)(e) |
| 41 | Defendant is a barber. The victim is a 13-year-old boy whose mother brought him to defendant's hair salon for a haircut. The victim testified that defendant had been a family friend for about two years. After his mother dropped him off, the victim waited for his haircut in a room in the back, watching television. The room had two glass walls, but no light other than from the television and an adjoining room. The victim stated that defendant came into the room and took a gun out of a bag. Defendant put the gun on the victim's hip and told him to take out his penis. The victim refused. Defendant reached inside the victim's sweat pants and touched his penis for approximately two minutes. Defendant then put his mouth on the victim's penis. Soon after, a noise was heard from an adjoining room, and defendant stopped. | People v. Perkins, 2006 WL 2787876, at *1 (Mich.App.,2006) | M.C.L. 750.520c(1)(e) |

| 42 | The record demonstrates defendant's scheme of twice targeting his family members, the niece and his half-sister, for sexual abuse within a period of approximately three months. In both circumstances, defendant isolated his victims—in a van in an alley and in an apartment—after giving "innocent" reasons for spending time with them (in the case of the half-sister, he offered her a ride, and in the case of the niece, he was going to buy gifts for her immediate family). Also, both incidents involved defendant forcefully undressing the victims and penetrating their vaginas with his penis. Moreover, defendant mentioned providing money to both victims. He also made both the niece and the half-sister swear on their grandmother's grave that they would not disclose what had happened to them. Defendant exhibited force with both victims, who did not consent to his sexual abuse. In both cases, defendant was in his thirties and he targeted a significantly younger, teenaged victim. | People v. Smith, 2015 WL 5440334, at *1 (Mich.App.,2015) | M.C.L. 750.520c(1)(e) |
|---|---|---|---|
| 43 | On January 14, 2017, when the victim, KB, was 14 years old, she and her best friend, SB (defendant's 16-year-old niece), agreed to babysit defendant's young son while defendant went out drinking. Defendant returned at some time after 12:30 a.m. the following morning and indicated that he wanted to go to Manistee to purchase cigarettes, gasoline, and more alcohol. SB, KB, and defendant's son accompanied him there and then to other locations. During the car trip, while SB drove, defendant rubbed KB's inner thighs. He then digitally penetrated KB's vagina and asked her to sit on his lap. According to SB, KB refused, and defendant stated, "Then you want to go home." Earlier that day, KB had explicitly told defendant that she did not want to go home because she would be forced to confront her grandfather, who had previously choked her. When KB reiterated that she did not want to go home, defendant replied, "So you're going to come sit on my lap." KB acquiesced, and defendant kissed her and digitally penetrated her vagina. Defendant then asked KB to climb over the seat and remove her clothes. When KB did not respond, defendant lifted her up and threw her over the seat into the back cargo compartment of the SUV. Defendant removed his and KB's pants, and he penetrated her vagina with his penis. KB told defendant to stop, but to no avail. This continued for several minutes, until SB purposefully drove the vehicle into a snowbank. At approximately 7:00 a.m. that same morning, KB was taken to the hospital. Dr. Jennifer Reinink conducted a sexual assault examination on KB, which revealed some redness and swelling between KB's vagina and anus. During the examination, KB informed Reinink that defendant bit her left ear and left nipple. Reinink collected several swabs for DNA testing, noting as she did that while KB received the examination and treatment, she was "tearful at times, ... angry, tired, [and] hungry." A police officer arrived at the hospital at approximately 10:00 a.m. When he first made contact with KB, she was curled into the fetal position, attempting to hide her face as she cried. DNA matching defendant's was present in samples taken from KB's breasts, neck, and ears; additionally, DNA matching KB's was detected in samples taken from defendant's underwear. | People v. Bulerski, 2019 WL 1085480, at *1 (Mich.App., 2019) | M.C.L. 750.520c(1)(f) |

| | | | |
|---|---|---|---|
| 44 | The victim testified that defendant had been sexually abusing her since she was approximately five years old.  The victim testified that before defendant engaged in sex with her, he would ask her to take her clothes off, or he would take her clothes off himself. He asked her not to tell anyone about the sexual abuse and told her that if she did, he would go to prison for a long time. He purchased a car and other items for her so that she would cooperate with him and not report his actions. The victim's testimony was sufficient to prove that defendant used coercion to accomplish the sexual penetration through the abuse of his position of authority, i.e., his position as her father. Furthermore, the evidence was sufficient to prove beyond a reasonable doubt that defendant forced himself upon the victim, without regard to her wishes, where her lack of consent was clear and she was isolated from help. The victim testified that although the sexual abuse began when she was five or six years old, she was too afraid to report the abuse until she was in high school. At the time of trial, she was attending counseling sessions, and she felt angry and humiliated about what defendant did to her. She also testified that as a result of defendant's actions, she stayed in her room a lot, "didn't want to be around any guys by [her]self," and frequently cried herself to sleep. Further, trial testimony established that the victim became alienated from her entire family after she made the allegations of sexual abuse against defendant. The victim also testified that defendant referred to the sexual acts as "helping him." On one occasion, he locked the bedroom door and told her "the only way [she] could go to [her] boyfriend's house [was] if she 'helped' him." She complied, so he allowed her to stay at her boyfriend's house for one extra hour. Defendant asked her not to tell anyone about the sexual contact and told her that if she did, he would go to prison for a long time. | People v. Green, 2007 WL 1712617, at *1 (Mich.App.,2007) | M.C.L. 750.520c(1)(f) |
| 45 | Specifically, the complainant testified that defendant grabbed her arm, forced her to the ground, and penetrated her vagina at least three times. The complainant stated that she felt pain in the back of her legs as if defendant was pinning her down, and the examining doctor stated that the complainant had bruising behind her knees. Moreover, the complainant testified that she experienced severe psychological trauma at the time of the assault and for a period of time after the assault, which required hospitalization.  Along with the above testimony, the complainant stated that defendant moved his hand up her shirt and under her bra and that she felt him touch her vagina. Here, the complainant testified that after the assault, she slept on the couch so her parents could hear if she screamed, she was scared for herself, her family, and her friends, she suffered panic attacks, she was unable to return to work, and she underwent counseling and was hospitalized after becoming suicidal. | People v. Ruiz, 2007 WL 838925, at *2 (Mich.App.,2007) | M.C.L. 750.520c(1)(f) |

| 46 | Defendant's convictions were based on the sexual assault of a 21-year-old victim in the early morning hours of January 9, 2005. Defendant was convicted for having sexual intercourse, performing cunnilingus, and sexually touching the victim while she was physically helpless to communicate her unwillingness to engage in these acts. The victim testified that she went to a bar to "get drunk" and dance. While at the bar she met defendant, accepted shots of alcohol from him, and kissed him. Defendant subsequently drove the victim and her friend to the friend's apartment. Defendant was invited into the apartment. At the apartment, the victim passed out and later awoke to defendant performing cunnilingus on her. Defendant then had sexual intercourse with the victim despite her protestations. Defendant admitted to engaging in the sexual activity, but claimed it was consensual. | People v. Young, 2006 WL 3826723, at *1 (Mich.App.,2006) | M.C.L. 750.520c(1)(g) |
| 47 | Defendant was convicted of CSC I (oral-vaginal penetration) and CSC II (sexual contact with the victim's breasts) for sexually assaulting the victim while she was intoxicated after a night of drinking. The victim had no memory of the incident. At trial, the defense argued that defendant had no sexual contact with the victim. The prosecution presented testimony from an eyewitness who observed defendant performing oral sex on the "passed out" victim; testimony from a friend of defendant, who stated that while in jail awaiting the instant charges, defendant admitted to performing oral sex on the victim; and the testimony of a nurse who examined the victim and found an injury to the victim's vagina that was indicative of assault. There was also other-acts testimony from two women who testified that defendant had nonconsensual sexual intercourse with them while they were intoxicated. Finally, the prosecution presented expert forensic testimony that a DNA profile consistent with defendant's was recovered on swabs taken from the victim's breast and pubic areas. | People v. Parkin, 2016 WL 4251233, at *1 (Mich.App.,2016) | M.C.L. 750.520c(1)(g) |
| 48 | Defendant was convicted of sexually assaulting PK, a 42-year-old developmentally disabled person, in his camper trailer in Cass City on January 18, 2018. The prosecution presented evidence that defendant and PK met while both worked at an organization that provided job training for the developmentally disabled. Over time, defendant, a regular worker, and PK, one of the organization's "consumers," became Facebook friends and exchanged electronic messages. PK also sent defendant partially nude photographs upon his request. At one point, defendant told PK that she needed to "stop being a little girl." On January 18, PK's father dropped her off at a local high school to watch basketball games with her friends, who were teenagers. PK and defendant exchanged texts and then PK went outside, where defendant was waiting in his truck. PK believed they were going for a drive, but defendant drove her to his camper trailer in Cass City, which was approximately 45 minutes away. Once inside the camper, they kissed and defendant removed PK's bra, pants, and underwear. He touched and licked her breasts and vagina, and forced her to perform oral sex on him. He also digitally penetrated her vagina, which caused extreme pain, and then penetrated her vagina with his penis, causing vaginal bleeding. Throughout the events, PK was scared and wanted defendant to stop. Defendant ultimately ejaculated on PK's stomach, told her to eat it, and when she refused he cleaned it up with a paper towel. Evidence was presented that the police found a paper towel in the garbage next to defendant's bed that contained defendant's DNA and PK's blood. | People v. Damoth, 2020 WL 3399575, at *1 (Mich.App., 2020) | M.C.L. 750.520c(1)(g) |

| 49 | At the time of the offenses, defendant was a thirty-five-year-old parolee employed by an organization that provided personal care assistants to mentally and physically disabled individuals in group homes and assisted-living environments. The victim was an epileptic woman in her early twenties who lived in a group-living situation and relied on one of defendant's coworkers for practical day-to-day assistance. Defendant served a disabled male client who was a good friend of the victim. On the day of the incidents, defendant was present at the friend's home during a visit by the victim and her assistant. While the victim's assistant helped the male friend with his homework, defendant called the victim back to a bathroom under the auspices of needing help with some laundry. The victim complied. While in the bathroom, defendant groped the victim's breasts under her clothing and touched her vagina outside her clothing. The victim felt uncomfortable and told defendant to stop, but he persisted. A few minutes later, the victim left the bathroom and returned to the kitchen where her assistant and the victim's friend were still reviewing his schoolwork. The assistant testified that the victim appeared agitated and upset, but did not say anything. Shortly afterward, defendant again called for the victim, this time directing her to come to her friend's bedroom. The victim again complied, and in the bedroom, defendant again touched the victim's breasts under her clothing and touched her vagina. The victim again told defendant to stop, but he again persisted. When the victim returned to the kitchen her agitation was even more evident, and roughly forty-five minutes later, she grabbed her assistant's car keys and ran out to the car to go home. She later told her assistant what had happened, and her assistant took her to the police station to report the assault. | People v. Robinson, 2007 WL 549224, at *1 (Mich.App.,2007) | M.C.L. 750.520c(1)(h) |
| 50 | The complainant in this case was a 19-year-old woman who was described as having the mental capacity of a 22-month-old child and who was unable to speak and had limited physical coordination. She required total, around the clock care and was entrusted to Neff to provide that care. The incident that forms the basis of the charge took place when Neff picked up the complainant from her mother and then stopped in a wooded area, placed her in the backseat of his vehicle, and sexually assaulted and allegedly penetrated her. Soon after, his vehicle was spotted by Department of Natural Resources (DNR) police officers who stopped to investigate. When they arrived, Neff was in the back of his vehicle with the complainant and he, by his own later admission, told them false stories about what was going on in an attempt to get away without further inquiry. The police did not believe him, and he was arrested and charged with sexually abusing the complainant while she was under his care. There were many differences between Neff's alleged acts with his niece and his acts with the complainant. His niece was a minor, well below the age of consent. The complainant was legally an adult. His niece had the normal mental ability of a child her age and was able to understand the nature of her encounters with Neff. The complainant was mentally an infant, arguably unable to even be aware of what Neff did with her. His niece said Neff's assaults started with about a year of looking at her naked and fondling her and only later led to intercourse. | People v. Neff, 2006 WL 3017980, at *1 (Mich.App.,2006) | M.C.L. 750.520c(1)(h) |

| 51 | Respondent and complainant were home alone at the time, with respondent "babysitting" complainant because complainant suffers from "mild" cerebral palsy and "mental disabilities." Complainant testified that he went into the basement of the Harts' home to help respondent with his homework. Once downstairs, complainant asked respondent to look at a book on the United States presidents which had been given to him and respondent by their adoptive paternal grandparents. Respondent indicated that he would allow complainant to look at the book if complainant first let him "play doctor." Complainant agreed to the request. Complainant further testified that, after he agreed to let respondent play doctor, respondent went into his bathroom and retrieved a container of Vaseline. Respondent then lowered complainant's pants and underwear, as well as his own. As complainant lay on his stomach on the floor of the basement hallway, respondent climbed on top of him and inserted his penis into complainant's anal canal | In re Hart, 1999 WL 33453858, at *1 (Mich.App.,1999) | M.C.L. 750.520c(1)(h) |
|---|---|---|---|
| 52 | Defendant was the victim's stepfather. The victim lived with defendant and her mother, defendant's wife, roughly half of the time between the ages of 9 and 12. According to testimony given by the victim at trial, during this period, defendant sexually abused her numerous times. The abuse included forcing her to sit on his lap when she did not want to, intimately telling her he loved her and asking if she loved him back, intimately kissing her in her bed, pinning her down and rubbing his clothed, erect penis against her clothed vagina and grabbing her breasts, forcing her to straddle him while he intimately kissed her and rubbed his clothed, erect penis against her clothed vagina, and placing his hand inside her underwear against the skin between her vagina and stomach. Defendant's behavior eventually ceased when the victim told him that what he was doing was wrong. | People v. Ringle, 2021 WL 5405753, at *1 (Mich.App., 2021) | M.C.L. 750.520c(2)(b) |
| 53 | This case arises out of defendant's sexually assaulting his minor grandchild, LL, and his minor step-grandchild, SP. At trial, Detective Wilson testified that LL told him that defendant would touch her, kiss her, put his tongue in her mouth, put his fingers in her vagina, and try to put his penis in her vagina even though it would not fit. Detective Wilson also stated that SP told him that defendant performed oral sex on her before she kicked him away. LL testified and reiterated the same information that Detective Wilson had testified about. SP also testified, but was unable to verbally communicate the events on direct examination and so she wrote her testimony down in front of the jury, under oath. SP's written testimony stated: I was sleeping and I don't remember exactly but I remember sleeping and waking up to him on the computer. So when I woke up again, he was next to me on the couch and I thought I was dreaming but I was not and he pulled down my pants and underwear and touched me and I tried to kick him away but he wouldn't go away and he licked my private and then left me alone and then I made a bed on his bedroom floor and I went to sleep. defendant's son, the biological father to LL, and the stepfather to SP, testified that he first discovered LL watching pornography and that prompted him to ask why she was watching material that was inappropriate for her. He stated that LL then disclosed the assaults to him. | People v. Lee, 2021 WL 5405326, at *1 (Mich.App., 2021) | M.C.L. 750.520c(2)(b) |

| | | | |
|---|---|---|---|
| 54 | Defendant's convictions arose out of a sexual assault committed on his granddaughter on October 26, 2008, when she was 13 years old. The victim did not live with defendant at the time, but that night she spent the night at his apartment after he picked her up from the Kent County Juvenile Detention Facility. She had been arrested for shoplifting. Matthew Fenske, superintendent of the detention facility, testified that records established that the victim was released to defendant's custody on the day in question. She returned with defendant to his apartment and slept in his bed that night. The victim testified that twice during the night defendant attempted vaginal intercourse, partially penetrating her. The victim also testified that defendant molested her and her sisters (JR and DR) on other occasions.  The trial court permitted the prosecution to present evidence under MRE 404(b) of sexual incidents between defendant and both JR and Jennifer. JR testified that defendant sexually touched her in 2004, when she, her mother, and siblings were staying with defendant. JR *470 was 13 at the time. During the visit, JR sometimes slept in defendant's bed. One time, when the victim was also in bed with their grandfather, JR awoke to find defendant's hand in her pants. JR testified defendant put his fingers in her vagina while he masturbated himself.  Jennifer testified that growing up, she did not live with her father but when she was 6 or 7 years old she started spending summers with him. When she was about 11 years old, she stayed with defendant for a couple of weeks when he was living in Chicago. According to Jennifer, one night defendant had sexual intercourse with her. Jennifer testified that she ran away for few days, but was returned to defendant's home. She never told anyone what happened, but she refused any further childhood visits with defendant. | People v. King, 824 N.W.2d 258, 261, 297 Mich.App. 465, 469 (Mich.App., 2012) | M.C.L. 750.520c(2)(b) |
| | CSC 3rd degree charged or addressed in the opinion | | |
| 57 | The victim testified that defendant carjacked and raped her in the early morning hours of June 29, 2000, while she sat at a red light. The victim gave several statements to officers and medical personnel that morning. Although her contemporaneous accounts and her testimony nearly 20 years later were not identical, the basic story is clear. The victim was in the area because she missed her freeway exit and was trying to find her way back home after work. The victim was sitting at a red light when a man forced his way into her car at gunpoint. The man pushed the victim to the passenger seat and drove off. At some point, the man stopped the vehicle on a dark street. He ordered the victim into the vehicle's backseat where he forcibly inserted his penis into her vagina. During the sexual assault, the man either punched or hit the victim in the face with a gun. | People v. Moore, 2020 WL 5495202, at *1 (Mich.App., 2020) | M.C.L. 750.520d |

| | | | |
|---|---|---|---|
| 58 | This case concerns a January 23, 2000, incident involving two students of the same high school, about six months apart in age. On January 23, the defendant telephoned the complainant after school to ask if she wanted to "hang out." She agreed. He picked her up in an automobile and drove her to the parking lot of a YMCA. The complainant allowed the defendant to unbutton her blue jeans and to digitally penetrate her. The complainant testified, "He started making out again, the same stuff, and then wanted to have sex with me and I said no. He asked me why. I just said because I don't want to." After an interval, the defendant repeated his request that they have sexual intercourse. The complainant again said "no," explaining that she "didn't want to." "He [next] asked me if he could just stick [it] in once and I said no." He essentially repeated the question several times, and she would not answer him "[bec]ause I didn't want to answer him any more." She acknowledged that she did not physically restrain or push him away and then said, "He stuck it in anyways and kept moving and asked me if I was enjoying it and I said I didn't want to do it." When asked how *133 he got it in, she said, "He got on top of me and put it in." | People v. Carlson, 644 N.W.2d 704, 705, 466 Mich. 130, 132 (Mich.,2002) | M.C.L. 750.520d |
| 59 | With regard to the August 2002 incident, the victim and his brother were staying overnight at defendant's house. While the victim was sleeping on his stomach, he was awakened with defendant on top of him. Defendant pulled off the victim's clothes and anally penetrated him. The victim testified that he tried to move away but was "kind of pinned down." Similarly, in this case, the victim was 16 years old at the time of the incident. Defendant, an adult, was in a position of authority. Defendant himself testified, "I considered myself to be an uncle" to the victim; he was, in fact, the victim's cousin's uncle. Defendant testified that he knew the victim since he was a "little kid[ ]." The victim testified that he trusted defendant. The victim went to defendant's house "Just about every weekend" and did "a lot of work there" for which defendant paid him. The victim and his brother occasionally stayed overnight at defendant's house. Sometimes, when the boys were at his house, defendant provided them with alcohol. The victim's father testified that defendant was considered a member of the family and, after learning of the incidents, he felt that defendant had abused his family's sense of trust. The victim testified that the charged offense occurred one evening at defendant's house the day after the victim's birthday when defendant had taken a group of boys to a Kid Rock concert and furnished them with alcohol. The victim testified that, while he was at defendant's house, defendant put his mouth on the victim's penis. | People v. Welsh, 2006 WL 119158, at *2 (Mich.App.,2006) | M.C.L. 750.520d |
| 60 | Defendant was charged with CSC III and CSC IV in connection with incidents alleged to have occurred in 1994 when complainant was thirteen years old. Complainant testified that in the summer of 1994 she spent several nights in defendant's home when she worked as a babysitter for defendant's daughter. She alleged that on several occasions defendant fondled her breasts and penetrated her vagina with his finger. Complainant indicated that she pretended to be sleeping during the incidents. She acknowledged that she did not report the alleged incidents to anyone for several years | People v. Raatz, 2001 WL 1338796, at *1 (Mich.App.,2001) | M.C.L. 750.520d(1)(a) |

| | | | |
|---|---|---|---|
| 61 | Defendant, a 25–year–old male, was charged with engaging in sexual acts with the complainant, a 15–year–old girl, on two occasions.  The complainant testified that she and defendant watched a movie in the basement while the others remained upstairs. According to the complainant, she resisted defendant's advances and eventually went upstairs on the pretext of using the restroom. When she returned to lie down on the couch, defendant allegedly removed the cushions to form a bed on the floor. The complainant claimed that while lying down on the cushions, she attempted to maintain her distance from defendant, but he moved closer to her, tried to kiss her, and asked her to undress. When she refused to comply, defendant allegedly removed the complainant's clothes and forced her to engage in oral and vaginal sex, during which defendant allegedly choked her, slapped her, and made threats against her life. The complainant claimed that the intercourse lasted for more than an hour. The complainant claimed that at some point defendant followed her into her bedroom, shut the door, and ordered her to remove her clothes. As before, defendant allegedly slapped, choked, and threatened the complainant and forced her to submit to oral and vaginal sex over an extended period. | People v. Armstrong, 806 N.W.2d 676, 678, 490 Mich. 281, 284 (Mich.,2011) | M.C.L. 750.520d(1)(a) |
| 62 | There is no dispute that the victim was 13 years old and defendant was more than five years older than her at the time of the incidents at issue. The "sexual penetration" element of the third-degree CSC conviction was satisfied by the victim's detailed testimony that defendant penetrated her vagina with his penis while they were in his truck on the night she snuck out of her house. The "sexual contact" element of the fourth-degree CSC conviction was satisfied by the victim's testimony that on one occasion, defendant slapped her buttocks; on another occasion, defendant put his hand up her shirt and touched her breast and nipple; and on another occasion, defendant put his hand up her shirt, got underneath her bra with his hands, and put his mouth on her breast.  In this case, defendant was 38 years old at the time of the offense; | People v. Gerstenschlager, 2012 WL 752074, at *2 (Mich.App.,2012) | M.C.L. 750.520d(1)(a) |
| 63 | On March 7, 2017, defendant and the victim met for the first time at Michigan Works. Defendant gave the victim a shoulder and neck massage in the lobby. On March 14, 2017, defendant gave the victim another massage in the computer room at Michigan Works. The victim stated that defendant massaged her neck and shoulders. The victim stated that she did not ask defendant for the massage, and was not expecting it. However, the victim allowed defendant to massage her arms, ribs, and lower back. Defendant also massaged her outer hips, inner hips, and inner thighs. Defendant's hand then moved to the victim's lower abdominal and pelvis area. According to the victim, defendant then suddenly "had reached his hand inside [her] pants, inside [her] underwear, and was massaging [her] clitoris." The victim testified that defendant used his finger to rub her clitoris in a "windshield wiper-ish" motion. The victim told defendant "no" twice, and defendant removed his hand from the victim's pants and returned to working on his own computer. | People v. Brown-Pegues, 2019 WL 638065, at *1 (Mich.App., 2019) | M.C.L. 750.520d(1)(b) |

| | | | |
|---|---|---|---|
| 64 | During the 1997-1998 school year, the victim was a sixteen-year-old high school student at Pine Street Creative Arts Academy ("Academy.") The victim had been abandoned by her parents and lived on her own since she was thirteen years old.1 Defendant was a teacher at the Academy and the victim was a student in his physical education class. While the victim was in defendant's class he began to show her special attention, giving her his home telephone number and encouraging her to call him if she needed anything. Defendant occasionally gave the victim rides to her place of employment. During one of these rides, defendant asked the victim to join the girls' soccer team that he was coaching at a local high school. The victim joined the soccer team and defendant also occasionally gave her rides "home" from practice.  One evening, in the fall of 1997, after an argument with her boyfriend, the victim telephoned defendant, requesting that he pick her up and take her to a friend's house. Defendant agreed to pick her up. However, no one was at the location where the victim wished to be taken, so defendant brought the victim to his marital home, where he performed oral sex on her. The victim and defendant showered together the next morning before he drove her back home. On another afternoon, while the victim was walking to work, defendant gave her a ride and took her to his rented apartment.2 Defendant performed oral sex on the victim at the apartment. | People v. Canales, 2004 WL 2050545, at *1 (Mich.App.,2004) | M.C.L. 750.520d(1)(b) |
| 65 | The conviction of defendant Michael Shane Shingledecker arises out of a sexual incident with Laura Voss (Laura). On December 29, 2003, around 10:00 or 10:30 p.m., Laura, age 17, picked up her friend, Tiffany Jablonski, age 15, and returned to Laura's house where she lives with her parents, Carolyn and Robert Voss. Carolyn and Robert were in Florida at the time. Laura's sister, Nikki Voss, age 20, and her boyfriend, defendant, were at Laura's house when the two girls arrived. Defendant, age 35 at trial, was married while he was dating Nikki.  Laura, Jablonski, Nikki and defendant watched television together. At one point, Laura smacked defendant when he started rubbing her ear. Laura never flirted with defendant in the past.  Jablonski left the room around 4:00 or 4:30 a.m. and Laura was alone sleeping in her bed which is situated in a corner against the wall.  Defendant entered, Laura awoke when defendant knelt next to her bed and began rubbing her back. Defendant initially talked to Laura about drugs, but then rubbed the side of Laura's breast and licked her neck to which Laura responded, "Yuck." Laura noted this made her uncomfortable. Next, defendant put his hand under Laura's boxer shorts and put his fingers into her vagina. Laura questioned defendant, but defendant persisted and made references to intercourse. After moving toward the wall, Laura told defendant, "No Shane [defendant]. This is not right." Laura asked him to stop two to five times. Defendant penetrated Laura for around 30 seconds and continued even after Laura told him to stop. Laura said that this hurt and that she did not try to stop defendant because he was intimidating. Laura's boxer shorts remained on during this time. Finally, defendant asked Laura, "You really want me to stop, don't you?" whereupon Laura told defendant to get out. Laura claimed she did not scream and that she could have put up a fight, but had, "... never been in that predicament before so [I] didn't know what to do." Laura explained that she was never, nor had she ever, wanted to be romantically involved with defendant. | People v. Shingledecker, 2006 WL 1084348, at *1 (Mich.App.,2006) | M.C.L. 750.520d(1)(b) |

| | | | |
|---|---|---|---|
| 66 | Defendant was convicted of sexually assaulting a female acquaintance after she became intoxicated at a party at defendant's home. The victim testified that she consumed large amounts of beer and tequila throughout the evening. She rated her level of intoxication as a "ten" on a scale of one to ten, with ten being the most intoxicated, and stated that she had "never been that intoxicated." Sometime after midnight, the victim fell asleep on a fold-out couch in the living room of defendant's home. The victim recalled waking up around 3:00 a.m. to discover defendant standing over her. Defendant was talking to her, but she could not recall what he said because she was in a "fog." The victim then blacked out again. She later woke a second time and saw defendant kneeling on the bed, touching her. She felt a horrible burning sensation in her vagina and discovered that her pants and underwear had been removed. She was fully clothed when she went to sleep. A synthetic penis belonging to defendant's girlfriend was found under the pillow where the victim was sleeping. Defendant admitted engaging in sexual activity with the victim, but claimed that it was consensual. He denied that the victim was ever passed out, asleep, or physically immobile or helpless during any of his encounters with her that night. | People v. Garcia, 2014 WL 3705100, at *1 (Mich.App.,2014) | M.C.L. 750.520d(1)(c) |
| 67 | The victim testified that she was sleeping when she felt someone in the bed next to her rubbing her back and stomach and then digitally penetrate her vagina. She described herself as drunk, and "like half asleep, ... in and out of it" and not "really with it." She stated that she was unsure whether what she was experiencing was really happening and "felt like maybe it could have been like a dream almost" and thus she did not move or open her eyes. She felt the person roll her over and attempt vaginal intercourse, at which time she "started realizing, okay, this is really happening. I can really feel something is going on." She then started to sit up, which caused her assailant to roll off. She then saw that defendant was in bed with her. | People v. Tatman, 2009 WL 4163557, at *1 (Mich.App.,2009) | M.C.L. 750.520d(1)(c) |
| 68 | On that evening, the alleged victim in this case attended a party being thrown at the residence of defendant in Garden City, Michigan. The alleged victim testified that she arrived at the party with her boyfriend and over the course of the evening drank rum, beer, vodka and smoked marijuana. She then testified that at some point she fell asleep in a chair in the backyard of the residence. At some point she was helped into the residence by her boyfriend, defendant's roommate, or perhaps even defendant. Her boyfriend testified that when he placed her on the couch she was fully clothed and immediately went back to sleep. He testified that he checked in on the victim and at times she mumbled incoherently, whereas other times there was no response. Approximately two hours after the victim's boyfriend left her on the couch, he went to sleep on a couch in the front of the home. The alleged victim was awakened around 5:00 a.m., testifying that her pants were pulled down to her ankles and a man's penis was inside her vagina. She testified that she felt groggy, tired and "buzzed," and did not say anything because she was trying to figure out where she was and exactly what was happening. Following the sexual act, the perpetrator came back into the room with a towel and she recognized the v-neck shirt as the same one worn by defendant earlier in the evening. | People v. Gutierrez, 2014 WL 7338885, at *1 (Mich.App.,2014) | M.C.L. 750.520d(1)(c) |

| | | | |
|---|---|---|---|
| 69 | Defendant and complainant were legally adopted out of the foster-care system by a single woman. At the time of the offense that occurred in the family home, defendant **392 was 25 years old and complainant was 17 years old. It is unclear from the record whether defendant was living at the family home or was just visiting. In any event, defendant told the police that he climbed through the bathroom window at 5:00 a.m. because no one answered the door. It is undisputed that defendant then went to complainant's bedroom and sexually penetrated her. | People v. Moss, 963 N.W.2d 390, 391–92, 333 Mich.App. 515, 517 (Mich.App., 2020) | M.C.L. 750.520d(1)(d) |
| 70 | The 16-year-old victim lived with her sister who was married to defendant. The victim's sister was the victim's legal guardian and defendant acted as an authority figure in the victim's life. One evening, defendant came home from work and offered the victim alcohol to drink. The two were alone in the apartment. The victim's sister was out of town. After drinking a significant amount of alcohol, the victim went to the bathroom to vomit. Defendant followed the victim into the bathroom and, despite the victim's protests, removed her shirt and brassiere and proceeded to touch her breasts. The victim attempted to crawl away from defendant, but passed out in the hallway. The victim awoke in her sister's bed lying on her stomach. Defendant was positioned behind her, holding her legs and pinning her down with the weight of his body. The victim protested as defendant performed oral sex on her, digitally penetrated her, and attempted to penetrate her with his non-erect penis. Defendant released the victim after she threatened to call the police. After initially denying sexual contact with the victim, defendant eventually told investigating officers that he and the victim engaged in consensual sex. The victim testified that shortly after the assault, her sister forced her to write a letter stating that she consented to defendant's sexual contact. | People v. McPhee, 2007 WL 912116, at *1 (Mich.App.,2007) | M.C.L. 750.520d(1)(d) |

| 71 | The complainant,2 who testified at a July 21, 1999, preliminary examination in the district court, stated that she arrived in Grand Rapids by bus from the *336 state of Wyoming on June 28, 1999. She made the trip to Grand Rapids to help Goold, her stepfather for the last thirteen years, drive from Grand Rapids to Wyoming. Goold evidently picked her up from the bus station and drove her to his apartment. The complainant recalled that later that evening, while Goold was taking his bath, he called to her to come into the bathroom. She ignored him at first, but then went near the bathroom to determine why he was calling her. Goold took that opportunity to tell her that he loved her. Goold next asked her to take a bath with him, but she refused, explaining to him that she was his daughter and he should not ask his daughter to do that kind of thing. She then walked to the front room to put on her shoes. Goold got out of the bathtub, walked into the front room in his underwear, and knelt beside her near the couch where she was sitting. The complainant continued to remind Goold that she was his daughter and told Goold not to ask her "to do this." Then, according to the complainant, Goold ripped, but did not remove, her shirt and bra. When she screamed, Goold covered her mouth, but she pushed his hand away. Goold then stood up, forced her to stand up, and removed her shorts, shirt, and bra. Even though she tried to push him away, Goold put his mouth on her vagina, pulled her arms down, and told her to give him oral sex. The complainant refused, but Goold grabbed her head and forced her to give him oral sex while telling her that he did not want to have to hurt her. Goold forced her to lie on the couch and then engaged in vaginal intercourse with her before forcing her to the floor, at which time he told her to masturbate. The complainant refused, but Goold insisted and *337 forced her hand "down there" so that she masturbated. Afterward, Goold penetrated her vagina again, first with his fingers and then with his penis. When the complainant **796 told Goold to stop and that she did not like what he was doing, Goold told her that he was enjoying it. After the alleged assault, the complainant said, she and Goold left the apartment, shopped for clothes and food, and then returned to the apartment to eat. After a short time, Goold took off the complainant's shirt and pants, leaving her to sit on the couch in her bra and underwear. Goold finished eating and then told her to lie on the floor next to him. When she complied, he extended his leg over her so she could not get up. When Goold began falling asleep, he stated that they should go to bed and walked behind her into the bedroom, where they went to bed. The complainant tried to get up when she thought Goold was sleeping, but Goold awoke and grabbed her when he felt her moving. She started to cry and, when Goold asked her what was wrong, she responded, "I don't want to." Goold put his mouth on her vagina and also forced his fingers inside of her vagina, but this time the complainant was able to kick Goold and run out of the apartment. The complainant fled to a nearby house, where she told the resident that her father had raped her and asked the resident to call the police. | People v. Goold, 615 N.W.2d 794, 795, 241 Mich.App. 333, 336 (Mich.App.,2000) | M.C.L. 750.520d(1)(d) |
| | | | CSC 4th Degree |

| 72 | The charges arose out of three separate incidents involving three different women. At the time of the incidents, defendant was a teacher at Ferndale High School, and the victims were students. The victims testified at the preliminary examination that defendant pinched their buttocks while they were on the premises of Ferndale High School. | People v. Premo, 540 N.W.2d 715, 716, 213 Mich.App. 406, 407 (Mich.App.,1995) | M.C.L. 750.520e |
|---|---|---|---|
| 73 | The victim and her boyfriend went to defendant's residence in order to purchase marijuana. After entering the residence, the victim walked into the living room where defendant was sitting at a computer. Defendant was the only other person in the living room at that time, although the victim's boyfriend and two other females were in a nearby room. The victim talked with defendant for a couple of moments. Then, defendant began touching her breasts on the outside of her clothing. Defendant pulled down her shirt, placed his hands under her shirt and bra, and "play[ed]" with her nipples. Defendant also began to "rub[ ]" the victim's vagina on the outside of her clothing while making various sexual comments. The victim repeatedly asked defendant to stop touching her. Defendant initially did not respond but eventually assured her that her boyfriend was not looking. The victim testified that defendant's behavior was unexpected, she did not know what to do, she was scared, and she was unable to process what was happening. After three or four minutes, defendant stopped touching the victim. When he attempted to touch her again, the victim left the room. The victim approached her boyfriend, she finished smoking his cigarette, they exited the residence, and she called the police. | People v. Lynn, 2012 WL 6913884, at *1 (Mich.App.,2012) | M.C.L. 750.520e |
| 74 | In the present case, complainant testified that defendant entered the bedroom in which she slept and awoke her by tickling her feet. He left for a minute or two, but when he returned, defendant unbuckled and unzipped her pants and placed his hand inside her underwear. Complainant testified that she was in "shock" and that she "never felt so scared." Defendant again left the bedroom, but he came back less than a minute later. He put his hands inside her underwear again and turned her over. He grabbed her around her waist and pulled her around on her back. He then pulled her down her pants and separated her legs so that he could rub her vaginal area. Defendant then left the bedroom. Complainant testified that when defendant returned a few minutes later, he pulled her pants down further, separated her legs, and penetrated her digitally. Complainant pretended to be asleep, and defendant left the room. Defendant returned, apparently within a few minutes, crawled over her, and digitally penetrated her. Afterward, defendant got on top of her, wrapped his arms around her shoulders, and attempted intercourse, but was unable to achieve penetration. He instead performed cunnilingus on her. When defendant stopped, he again grabbed her by the shoulders and attempted to force penetration. Complainant testified that she remained silent because she was shocked, embarrassed, and scared, and that she merely tried to "block it out." Defendant left the room, but when he came back he repeated his attempt to have intercourse with her. He finally resorted to digital penetration and masturbation. | People v. Selden, 2000 WL 33418936, at *2 (Mich.App.,2000) | M.C.L. 750.520e |

| | | | |
|---|---|---|---|
| 75 | Defendant is an inmate at Macomb Correctional Facility. The complainant, Phyliss Elward, was an employee of a private company providing food services to the prison. On April 26, 2018, defendant was working in the dining area and Elward was supervising the inmates working in the kitchen. Elward testified that she was moving some pans in the food service area when defendant walked behind her and rubbed his hand across her "left butt check." She testified that she was surprised and that there was a "two-foot rule" prohibiting contact between inmates and employees. Elward moved her hand to push defendant's away as he continued walking by her. Elward then informed her supervisor of the incident. Elward testified that when she came back into the kitchen she saw defendant looking at her with a smirk or a smile on his face while holding his erect penis through his clothing. Elward further explained that defendant had opened up the white jumpsuit that he wore for work and that she could see the outline of his erection through his underneath clothing. At trial, security-camera footage of the kitchen from the time in question was played for the jury. | People v. Johnson, 2021 WL 2619710, at *1 (Mich.App., 2021) | M.C.L. 750.520e(1)(b) |
| 76 | Here, the victim testified that defendant attempted to induce her to have sex by asking for sex and then showing and offering her Vicodin in exchange for sex. After the victim rejected his advances, defendant began touching her right breast with his left hand. When the victim told defendant to stop, he complied for a moment, but then yanked her pants down to her ankles. Defendant also asked the victim to engage in oral sex. The victim became scared and went into her trailer. She told a friend about defendant's actions and asked the friend to call the police. | People v. Hutchinson, 2012 WL 2335925, at *2 (Mich.App.,2012) | M.C.L. 750.520e(1)(b) |
| 77 | The victim testified to the following events: I was there doing my prep work in the morning, and he arrived and proceeded to be touching my back up and down my spine, and I arched against it and said, "Please don't do that." We continued to be doing our stuff, and he made comments about my breasts, and I said, you know, "I don't like that" or "please don't do that". And then at one point the oven and the poofer [sic], which makes the bread rise is up in front, and he was kind of trying to grab at my breasts while I was putting cheese on the bread to put it into the, into the oven. | People v. Lechner, 2009 WL 3981021, at *1 (Mich.App.,2009) | M.C.L. 750.520e(1)(b) |
| 78 | Defendant was a teacher at Ashmun School, located at a youth home, Eagle Village. The convictions arise from her engagement in sexual intercourse and sexual contact with the complainant, who at the time was a sixteen-year-old student in her class. The complainant testified that he and defendant engaged in repeated kissing, touching, and sexual intercourse in her classroom in 2012. Defendant admitted to kissing the complainant and allowing him to touch her genital area over her clothes, but denied having sexual intercourse with him. | People v. Brown, 2015 WL 5247285, at *1 (Mich.App.,2015) | M.C.L. 750.520e(1)(f) |

| | | | |
|---|---|---|---|
| 79 | The victim was a 17 year-old high school student who received special education services through the Kalamazoo Public School System. Defendant was an employee of the Kalamazoo school district. During the victim's senior year of high school, she and defendant had numerous sexual encounters. These encounters often involved defendant penetrating the victim vaginally, anally, or orally. At defendant's instruction, the victim took numerous explicit photographs of herself, which she sent to defendant through text messages. On one occasion, defendant texted the victim a photograph of a penis. At trial, the parties stipulated to the admission of the explicit photographs, as well as Facebook communications between defendant and the victim and defendant's telephone records. | People v. Bell, 2013 WL 1748603, at *1 (Mich.App.,2013) | M.C.L. 750.520e(1)(g) |
| | **Other crimes of registrants on the public registry** | | |
| 80 | At trial, BW testified that, at approximately 4:00 a.m. on August 9, 2015, she was awakened by a tap on her shoulder. BW heard someone say her name, and she then saw defendant, whom she recognized as the man dating her brother's ex-wife, standing near her bedroom door. Because defendant was not wearing any pants, BW could see his genitals. BW got out of bed, kicked defendant in the groin, and ran screaming from her bedroom. BW's screams awakened her mother, who came running into the hall. Defendant fled to the bathroom, and exited the house through the bathroom window. BW called the police. When BW and her mother went into the bathroom, they saw that bottles of soap and shampoo that were kept on the windowsill were not there. Police found defendant less than a mile from BW's home, intoxicated and sleeping in his car. BW identified defendant as the man who entered her home, and items from the bathroom were found in defendant's vehicle. In addition to facts surrounding the events at BW's home, the prosecutor also offered evidence that in 2003 defendant committed a similar home invasion with intent to sexually assault WAB. | People v. Caldwell, 2017 WL 5503781, at *1 (Mich.App., 2017) | M.C.L. 750.520g(1) |
| 81 | Here, the victim testified that defendant, while pretending to be a customer interested in buying a home, followed her into the selection room, grabbed her, spun her around, tried to put her in a headlock and snap her neck. The victim further testified that defendant straddled her on the floor, pulled her head up and tried to "whack" it down of the cement floor. According to the victim, defendant punched her twice in the face and made a triangle shape with his thumbs and fingers and put his hands around her throat. Defendant choked the victim into unconsciousness.  Here the victim testified that after being pinned to the ground, defendant attempted to force his penis into her mouth. Defendant then proceeded to pull up the victim's shirt, lift up her bra, and fondle her chest while he masturbated. | People v. Holbrook, 2002 WL 522795, at *5 (Mich.App.,2002) | M.C.L. 750.520g(1) |

| 82 | On January 28, 2015, the minor victim, 11 years old at the time, was at home with her mother (KM), younger sister, and defendant, the minor victim's uncle. At approximately 8:00 p.m., the minor victim and defendant laid next to each other on the loveseat in the living room while watching television. The minor victim's sister sat on the floor with toys behind the minor victim and defendant while KM finished showering and preparing for a trip to the local Speedway.  The minor victim testified that as she and defendant watched television, defendant tickled her. Defendant also attempted to unbutton the minor victim's jeans and place his hand down her pants. Although defendant's attempt failed, defendant scratched the minor victim on the stomach. Subsequently, defendant reached underneath the minor victim's shirt and bra and placed one hand on her bare breasts for approximately 5 to 10 minutes.  {The victim described the incident as follows:] After my mom had left, he said he was going to bed. I, at the time, did not use my bedroom because I just didn't feel like – lonely in there and it was too far away from anyone and I got scared because I was just a little kid and I was kind of just letting him use it for the night and he was, like, okay I'm gonna go to bed, do you want to come with me, and I was, like, no. And he was, like, come on. I'm, like, no. I just kept telling him no and he was, like, okay, whatever. And then since we're family, he gave me a hug and kiss goodnight but when he went to kiss me, he tried to French kiss me and he did get his tongue in my mouth and I pushed him away and told him that's not okay. And about, I think, two, three minutes later my mom had gotten home, so ...  In addition, KM reported to police a discovery by the minor victim a few days before the January 28, 2015 incident. The minor victim testified to finding defendant's cell phone, which contained recordings of her as she undressed in the bathroom and videos of defendant setting up the cell phone camera. Upon this discovery, the minor victim deleted the videos of her undressing and defendant positioning the cell phone, and returned the cell phone to him. | People v. Lowler, 2020 WL 1332989, at *1 (Mich.App., 2020) | M.C.L. 750.520g(1) |
| 83 | Defendant's conviction stems from his sexual contact with the victim, who was nine years old when the incident occurred. The assault occurred in the victim's aunt's house, which is also defendant's home, when the victim was spending the night. The victim was asleep on the couch and awoke to find defendant "rubbing" her genital area over her pajamas. | People v. Davis, 2009 WL 3931314, at *1 (Mich.App.,2009) | M.C.L. 750.520g(2) |

| | | | |
|---|---|---|---|
| 84 | The victim, NT, a ten year old female, testified that on January 10, 2011, her mother, 28 year old CT, dropped NT off at the apartment of NT's aunt in Flint. NT was sitting on a couch watching television in the living room with defendant, the aunt's father,3 while the aunt slept in a bedroom. NT was wearing a t-shirt and blue jeans. Defendant was sitting on a separate couch in the living room, but at one point got up, walked over to the couch that NT was on, and sat down on her right side. While NT was sitting up, defendant "grabbed" her around her ankle and pulled her towards himself. NT testified that "he almost got my pants so I had pulled 'em up and I was trying to pull away still." Defendant pulled NT's pants, as well as her underwear, down to about her thighs. Defendant never removed his clothes, and NT testified that he had never done anything like this before. The aunt testified that she had been sleeping while NT and defendant were in the living room; but, when she woke up, she went into the kitchen to get some water. The aunt saw NT lying down on the couch on her stomach, while defendant was sitting on the couch with his hand "up under her." Defendant's hand was on the upper half of NT's body. Afterward, when alone with the aunt, NT "started fidgeting to her pants" and told the aunt, "he touched me." NT's mother, CT, testified concerning the other-acts evidence at issue. On one occasion, when CT was nine or ten years old, she was with her 12 year old cousin, KB, when defendant touched their bare chests under their shirts. On a later occasion, defendant took CT and KB to an abandoned house, and defendant had sexual intercourse with KB. CT testified that "he pulled his pants down and pulled [KB's] down as she was hollering and got on top of her." On a third occasion, when CT was approximately 11 or 12 years old, CT was asleep in bed when defendant "came in and tried to put his hands up under my nightgown." Defendant then performed oral sex on CT. | People v. Moody, 2013 WL 1316727, at *2 (Mich.App.,2013) | M.C.L. 750.520g(2) |
| 85 | This case arises from defendant's assaults of a female victim and his subsequent resistance of police officers while being arrested, on February 18, 2018, in Detroit, Michigan. The victim testified that she was walking along Schoolcraft Road when defendant used his motor vehicle to pin her against a fence. Defendant got out of the car, grabbed ahold of the collar of the victim's coat, and threw her to the ground. Defendant then got on top of the victim. Defendant and the victim began "tussling." Defendant grabbed the victim's coat, which was zipped down to her knees, and he tried to pull the coat apart and open it. In particular, defendant was grabbing at the chest area of the victim's coat and trying to rip the coat open. The victim thought that defendant was trying to rape her, and she began yelling, "Help." Two other vehicles pulled up, and an occupant of one of the vehicles got out of the car. Defendant stood up, and the victim noticed that defendant's pants were halfway down his thighs and that she could see his naked buttocks. Defendant got in his car and drove off. | People v. Fuller, 2020 WL 359646, at *1 (Mich.App., 2020) | M.C.L. 750.520g(2) |

| | | | |
|---|---|---|---|
| 86 | On September 5, 2014, CS arrived at a Barnes & Noble in Northville Township with her three children: her daughter AC, age 13 years old; her five-year-old daughter; and her 20–month-old son. AC was wearing a dress that day. Before going into the store, CS noticed defendant pacing in the parking lot outside of the store. She and her children proceeded toward the store, and defendant almost immediately began following them. According to CS, AC held the door open for defendant when they arrived at the store's entrance.  Once in the store, CS and her family began browsing for books. However, as CS moved through the store she noticed that each time she and her children went into an aisle defendant was nearby. CS became suspicious of defendant, and she tried to communicate these suspicions to AC by giving her "the eye," but AC did not apprehend the meaning of this communication. AC, unable to find the book she sought, asked permission from CS to check the store computer kiosk to search for her book. CS assented, but she noticed that defendant began to follow AC as she headed to the computer kiosk. CS, now very concerned, moved to collect her five-year-old daughter from the children's section of the store, and by the time she shifted her attention back to CS she saw defendant holding his phone between AC's legs. CS began screaming at defendant, and this caused AC to turn around and see defendant standing in front of her. A verbal confrontation ensued, and defendant quickly exited the store. Defendant was eventually identified after footage from the store's surveillance system was released to the media. | People v. Burrill, 2017 WL 358759, at *1 (Mich.App., 2017) | M.C.L. 750.539j |

| | | | |
|---|---|---|---|
| 87 | Defendant's convictions arise from the videotape recording of JT, the 15–year–old daughter of SW, a woman defendant had been romantically involved with. SW testified that on June 15, 2011 she had been in a romantic relationship with defendant for two years and that she and defendant lived together. SW testified that "for the longest time" defendant was in the habit of waking each morning at 6:30 a.m. However, defendant changed his morning habits about three weeks prior to June 15 and began waking 40 to 45 minutes earlier. On June 15, 2011, defendant woke SW sometime between 6:10 and 6:30 a.m. He asked her if she had seen his SD card that he was unable to find. SW testified that defendant stated that the chip was in his shorts. SW told defendant that the card may have gone into the washing machine, so the two went downstairs to the laundry room to look for it. At that point defendant informed SW that the card contained music and that he had wrapped it in a blue napkin. They did not find the card and defendant left for work. Later that morning, while SW was doing laundry, she opened the dryer and found an SD card wrapped in a blue napkin. SW put the card into her home computer and a video of her 15–year–old daughter JT appeared on the screen naked and in her bathroom shower. The video was "done" or modified on June 3 at 6:30 a.m. SW was asked where it appeared the video was shot from and she stated, "[I]f you're standing taking a shower it would be down in your left-hand corner." SW testified that there were tiles missing from the shower stall in that area. She stated, "I had noticed one-one morning that one of the tiles looked like it had been kind of pushed in, and I thought, well, that's strange because I don't remember it being like that the day before." SW described the hole as "a good size" and stated that she could see through the hole down into the downstairs bathroom. SW's other daughter, ST, testified that one morning when she was about to get into the shower, she saw "something in there and it looked like a video camera." ST described what she saw as "like blue duct tape, like something—the camera or something was like taped to a stick or something to get it up there." When asked if she had ever seen blue duct tape in the house before she said she had and that it belonged to defendant. | People v. Pomeroy, 2014 WL 2040046, at *1 (Mich.App.,2014) | M.C.L. 750.539j |
| 88 | "While on parole for a similar offense, defendant . . . exposed himself to a woman at a public bookstore. Defendant was charged with 'indecent exposure as a sexually delinquent person.'" | People v. Breidenbach, 798 N.W.2d 738, 741, 489 Mich. 1, 4 (Mich.,2011) | M.C.L. 750.10A - Sexually Deliquent Person |
| 89 | "Defendant . . .masturbated in front of an employee at the Monroe Public Library in January 2014. He was charged with aggravated indecent exposure, MCL 750.335a(2)(b), indecent exposure by a sexually delinquent person, MCL 750.335a(2)(c), and also with being a fourth-offense habitual offender, MCL 769.12." | People v. Arnold, 918 N.W.2d 164, 165, 502 Mich. 438, 444 (Mich., 2018) | M.C.L. 750.10A - Sexually Deliquent Person |

| 90 | "the defendant, a prisoner at Marquette Branch prison, placed his erect penis in the cell bars and masturbated as he attempted to engage her in conversation. She also testified that he had done so nearly every day over the period of 17 or 18 months that defendant was at the prison." | People v. Bean, 2019 WL 5197632, at *1 (Mich.App., 2019) | M.C.L. 750.10A - Sexually Deliquent Person |
| --- | --- | --- | --- |
| 91 | The victim, a fourteen-year old girl, was walking down the street with a friend. She saw a classmate, who had recently obtained his driver's permit, driving defendant's red mini van. Defendant was riding in the passenger seat, and the victim had met defendant on one prior occasion. The victim approached the vehicle to greet her classmate. Defendant told the victim to come to his side of the vehicle and to lean into the vehicle. Once there, defendant, in a lowered voice, asked the victim, "When can I get your phone number to hook up and have sex?" The victim advised defendant that she was fourteen years of age and was too young to have sex. Defendant reportedly responded that age had not stopped him before. He then asked the victim, "When are you going to let me lick in between your thighs?" The victim's friend testified that she overheard this comment made by defendant. The victim walked away from the vehicle, but felt violated and disgusted. The next day, she reported the incident to school officials, and the police were contacted. | People v. Robertson, 2009 WL 763434, at *1 (Mich.App.,2009) | M.C.L. 750.145A - Accosting a Child for Immoral Purposes |
| 92 | asked two young sisters with whom he was acquainted to "suck his nipples." | People v. Willis, 2007 WL 4248527, at *1 (Mich.App.,2007) | M.C.L. 750.145A - Accosting a Child for Immoral |

| | | | |
|---|---|---|---|
| 93 | According to the victim, defendant touched and squeezed the victim's breasts and buttocks over the top of her clothing approximately every other day, and while doing so would say, "How good it should feel." Defendant continued to fondle the victim's breasts and buttocks nearly every day. On one occasion, the victim walked in on defendant masturbating in the kitchen. Late one night during the middle of summer the victim and the rest of her sisters were sleeping in the basement. The victim woke up to defendant rubbing and touching her vagina through her underwear. Defendant also masturbated in the victim's presence. The victim testified regarding two occasions when she witnessed defendant masturbate and then ejaculate "into a kitchen pot" while he was in the living room. Defendant would often make sexually suggestive comments, telling her that he would like to perform oral sex on her and that "she would like it." Loretta testified that defendant kept pornographic material at their residence, including movies, sex toy catalogs, and photographs downloaded onto the family computer. The victim testified that ... defendant showed her a pornographic photograph on the computer. [the victim was under 13 at the time] At nights and on Saturdays defendant would either masturbate in front of the victim until he ejaculated or would force the victim to masturbate him. Defendant also forced the victim to insert her finger into her vagina while he watched and masturbated. When the victim was 16 years old, defendant placed his hand on her vagina and moved his fingers "back and forth." On other occasions, defendant would digitally penetrate the victim's anus while telling her to "bear down" and that "it should feel good." Defendant often threatened the victim, including telling her that he would "beat her ass" and that he would go to jail if she revealed the sexual abuse. Defendant would also withhold privileges if she would not engage in sexual activities with him. efendant's controlling behavior increased when the victim went to college in the summer of 2004. Defendant would call to check up on her approximately twenty times per day and often visited her at college unannounced. The sexual abuse continued when the victim came home on weekends during her first semester at college. At one point, defendant told the victim that he had fallen in love with her "as a woman and not as a daughter." | People v. Moore, 2007 WL 1160004, at *1 (Mich.App.,2007) | |
| 94 | *The Court* : Thank You. Can you tell me what happened in regards to the counts of child sexually abusive activity and criminal sexual conduct in the second degree?*[Defendant]: Yes, your Honor. I deliberately made a video of myself with a child under five, with her exposed butt and my erect penis. [Defense Counsel]: And did your erect penis also touch her buttocks during the video? [Defendant]: Yes. It did. The Court: And you said that you made a video. Did you take a—do something with your phone or some other— [Defendant]: Yes, ma'am. My phone. The Court: So you used your phone, a smart phone of some sort— [Defendant]: Yes. The Court: To make a video and then you placed it on the internet through some type of online messaging or site? [Defendant]: Yes. I uploaded it to my account on Flickr.* | People v. Gillies, 2020 WL 6684432, at *1 (Mich.App., 2020) | M.C.L. 750.145C(2) |
| 95 | a white binder containing many pages of pornographic pictures of adults with photographs and newspaper clippings of children, pictures of children's heads pasted onto adult pornographic pictures, pictures of children with pornographic adult genitalia pasted onto the child's body and newspaper articles about attempted and completed child abductions. He also found a yellow notebook containing written notes and pornographic pictures, one of which was of a female child. Next to the picture was a handwritten, sexually graphic, note | U.S. v. LaBelle, 2008 WL 1931875, at *2 (E.D.Mich.,2008) | M.C.L. 750.145C(2) |

| | | | |
|---|---|---|---|
| 96 | Petitioner sent the "girl" live webcam transmissions of himself masturbating. Petitioner explicitly told the 15–year–old what he wanted her to do to him sexually and what he would do to her sexually. They arranged to meet the following afternoon, at a theater in Novi, in Oakland County, Michigan. The following day, petitioner arrived at the theater as planned and was arrested. (Presentence Information Report, p. 2). The February 26, 2007, chat log for "thumbguy," petitioner's user name, details petitioner's sexual plan pertaining to what he will do to the alleged 15 year old and what he would like her to do to him. Petitioner periodically expresses concern that he may be conversing with a police officer, knowing that such behavior is illegal: hope u aint a cop (line 92) its kinda really illegal tho (line 421) I hope u r realy (sic) who u say u r (line 469) I don't want jailtime (line 470) you are forbidden pussy (line 472) will a bunch of hairy knuckled cops drag me to the court? (line 729–730) hi orificer (line 818) are you really 15? ... not a cop or guy or reporter? ? ? (line 1168) Petitioner also mentions an encounter with another minor at the library two days before: I was at the library 2 days ago (line 1116) a YOUNG girl was sittin across from me (line 1118) she was waiting for her dad (line 1144) I was hard (line1145) but she didnt (sic) see it (ll46)I don't think she knew about hard ons (line 1147) I kept staring at her crotch as she opened it up to me (lines 1149–1150) and her ass/tits (line1151) she enjoyed me watching (line 1152) she had nice titties (line 1154) maybe 12 (line 1155) todays (sic) youth are developing early (line1157). | Brown v. Michigan Dept. of Corrections Parole Bd., 2014 WL 502071, at *1 (E.D.Mich.,2014) | M.C.L. 750.145C(2) |
| 97 | In January 2014, when Petitioner was 25 years old, he and a few friends attended a house party where high schoolers were present, including one extremely intoxicated 17-year old girl. At some point in the evening, Petitioner met the girl in the back bedroom of the house and engaged in sexual activity with her while his friend took photographs. In the photographs, the victim is nude, or partially nude, and Petitioner is posing next to her. Early the following morning, Petitioner and his friends took the girl to Petitioner's residence. The victim could not recall very much from the evening of the party or the following morning due to her intoxicated state, but she did remember waking up on a bed at Petitioner's residence. Petitioner was on top of her, holding her legs and raping her. She told him to stop, but she had difficulty speaking. She saw Petitioner's friend Nicholas Gingras1 next to the bed, sitting on a chair. According to a presentence investigation report that Petitioner has attached to his petition, Petitioner and another friend repeatedly had sex with the victim in his bedroom; when the victim told Petitioner to stop, Petitioner and his friend told her to stop crying and resisting. (MDOC Presentence Investigation, ECF No. 1-14, PageID.159, 160.) The victim sustained multiple injuries to her inner thigh as a result of what happened.  In exchange for dismissal of the eight pending charges against him, Petitioner agreed to enter a plea to offenses with significantly lower penalties: one count of assault with intent to commit sexual penetration and two counts of distributing or promoting child sexually abusive material or activity. | Doyle v. Barrett, 2019 WL 3068787, at *2 (W.D.Mich., 2019) | M.C.L. 750.145C(2) |

| 98 | Sergeant Joseph Duke, the supervisor of the Computer Crimes Unit of the Oakland County Sheriff's Department, *450 counted over five hundred images on the computer that he believed qualified "as either child sexually abusive material or child erotica." Sergeant Duke believed that the photographs had been downloaded from the Internet. Defendant admitted to Joseph that he had obtained the photographs "from the Internet and from sharing with others." Joseph also said that it was his impression from talking with defendant that defendant had taken part in an Internet club that exchanged child pornography. | People v. Tombs, 697 N.W.2d 494, 496, 472 Mich. 446, 449 (Mich.,2005) | M.C.L. 750.145C(3) |
|---|---|---|---|
| 99 | In October of 2003, an investigator in Wyoming was conducting an Internet investigation related to the downloading of child pornography on computers. His investigation revealed that child pornography had been downloaded to an Internet address, later determined to be used by defendant. The software installed and used on defendant's computer to download the child pornography also allowed the images to be downloaded onto other computers through peer-to-peer file sharing networks (allowing one computer to share information with another without having to go through a central server) Michigan police went to the residence defendant shared with his girlfriend and defendant indicated to police that he had downloaded file-sharing software and was using it to download both adult and child pornographic images. The police confiscated the computer and, after determining that the computer contained a significant amount of child pornography, charged defendant in the instant matter. | People v. Vescoso, 2007 WL 4404568, at *1 (Mich.App.,2007) | M.C.L. 750.145C(3) |
| 100 | According to Lohman, defendant told him that the CD–Rs contained pornographic pictures of minors, preteens, and teenagers. The detective further testified that defendant admitted that he had downloaded3 the child pornography, including pictures and videos of mostly male individuals, from Russian websites and then made or compiled the CD–Rs. Detective Lohman estimated that, on the 22 CD–Rs that he had inspected so far, he found over 3,000 deviant photographs depicting nude children, children engaged, alone or with other children, in sexual acts and conduct, and children posed in sexually explicit positions. The detective additionally testified that the police had opened five videos from the CD–Rs that depicted 12– to 13–year–old boys engaged in sexual acts. | People v. Hill, 715 N.W.2d 301, 305, 269 Mich.App. 505, 509 (Mich.App.,2006) | M.C.L. 750.145C(3) |

| | | | |
|---|---|---|---|
| 101 | Federal agents identified defendant Steven Edward Flick as a purchaser of access to a website containing child pornography during April, September, and October 2002.  A forensic examination of the computer revealed child pornographic images on the hard drive. In a subsequent interview with Detective Pittman, defendant Flick acknowledged that he paid by credit card to access websites containing child pornography. Defendant Flick also admitted that he had downloaded child pornographic images on his computer.  Federal agents linked defendant Douglas Brent Lazarus's e-mail information to an online child pornography subscription purchased using his credit card. In September 2006, Detective Pittman interviewed defendant Lazarus. During the interview, defendant Lazarus stated that he knew that his former spouse had turned over to federal agents the computer that the couple had purchased together. Defendant Lazarus admitted that he looked at child pornography and acknowledged that he paid by credit card to access websites containing child pornographic images.  The forensic search revealed "a large number of websites that contained *7 titles indicative of child pornography" and approximately 26 "banners strung together" of child pornographic images. Edwards explained that "there would be more images if you counted each one from the banner." | People v. Flick, 790 N.W.2d 295, 298, 487 Mich. 1, 5 (Mich.,2010) | M.C.L. 750.145C(4) |
| 102 | In August of 2010, following forensic interviews of two young boys, the Michigan State Police conducted a search of defendant's residence pursuant to a search warrant. During the search, officers seized a digital camera, a computer, and computer hard drives. Forensic analysis of the computer uncovered approximately 1,200 thumbnail images, mainly depicting child pornography. The photographs depicted children, mostly males, engaged in various sexual acts or positions. Police also obtained a second digital camera from defendant when he arrived at the home during the search. Analysis of that camera revealed deleted images of the two boys with their eyes closed and their genitalia exposed. | People v. Skogler, 2012 WL 2362406, at *1 (Mich.App.,2012) | M.C.L. 750.145C(4) |
| 103 | On March 19, 2009, defendant's wife, Kari Norman, called police to report that she had found child pornography on the computer she shared with defendant. When detectives arrived at Norman and defendant's apartment, they discovered numerous images of nude children being sexually abused and performing sexual acts on compact discs (CDs) and computers. Norman explained that she had discovered the images, which she had not previously viewed or downloaded, while checking defendant's computer for evidence of infidelity. Defendant was arrested when he returned home from work and later confessed that the CDs and computer hard drives contained child pornography that he had downloaded and copied. A few weeks later on May 4, 2009, after defendant was released on bond, police again received a call from Norman, this time to report that defendant had a computer in his home in violation of his bond conditions. Police obtained a search warrant and discovered two hard drives containing child pornography in defendant's apartment. Defendant denied at his ensuing trial that he had downloaded or was aware that child pornography existed on his hard drives or on CDs he had burned. | People v. Norman, 2011 WL 2694624, at *1 (Mich.App.,2011) | M.C.L. 750.145C(4) |

| | | | |
|---|---|---|---|
| 104 | Special Agent Michael Ondejko of the Michigan Attorney General's "High Tech Crime Unit" was conducting an online investigation in December 2004. Ondejko, acting undercover, used a persona called "pretty-eye-kac14," a 14-year-old girl named Kelli. On the profile, Ondejko posted photographs depicting a young girl, a cat, a guitar, and a midriff with a pierced navel. On December 29, 2004, a person with the screen name "Kennedy005" contacted "Kelli" in a chat room entitled "Michigan Romance." Kennedy005 sent an instant message to "Kelli," and they exchanged messages for approximately one hour. Kennedy005 shared images of himself through a "webcam," a video camera used to send periodic frames or continuous images over the Internet. They shared sexual experiences and discussed possible future sexual encounters. From a photograph taken from the webcam video, Ondejko identified defendant as Kennedy005 at trial. Defendant asked if "Kelli" would like to see that he was "excited," and "she" agreed. Defendant undid his pants, exposed himself, and proceeded to masturbate in front of the camera. Defendant ejaculated in front of the camera and signed off the instant messenger service.  On January 5, 2005, Ondejko, still posing as "Kelli," communicated with defendant through the instant messaging service, and they exchanged messages for an hour. They discussed meeting in person and potential future sexual encounters, including defendant performing oral sex on "Kelli," and defendant asked if there was somewhere they could meet the following day. "Kelli" suggested meeting at a Blockbuster video store in Ferndale, Michigan, and defendant agreed. On January 6, 2005, "Kelli" and defendant exchanged several electronic mail ("e-mail") messages to finalize their meeting arrangements. Because defendant expressed some concern about being seen together at a hotel or getting caught by police, he and "Kelli" planned to meet at the video store and go somewhere to have a sexual encounter in his car. Ondejko arrived at the video store in Ferndale and saw defendant pull into the parking lot, where he was arrested. | People v. Kennedy, 2007 WL 2067843, at *1 (Mich.App.,2007) | M.C.L. 750.145d(2)(c) |
| 105 | First, there are numerous references in the transcripts of chat sessions between defendant and "Kelly," the online persona of Special Agent Mike Ondejko, to "Kelly's" age, to "her" being a freshman in high school and to other things of interest to teen-age girls. And defendant admitted to police after his arrest that he had traveled to Novi to meet a 14–year old girl. Moreover, Ondejko specifically told defendant during their first chat and during subsequent chats that "Kelly" was a 14–year old girl.  While chatting with "Kelly," defendant made numerous explicit lewd sexual references regarding his intention to engage in both oral and vaginal intercourse with "her." Defendant told "Kelly" that he would travel to Novi in a rental car from his home in the western part of the state to meet "her" and that they would then get a hotel room. Defendant also sent several nude pictures of himself over the internet to "Kelly," to which he also made lewd sexual references. Later, after defendant was arrested at Denny's, police found an overnight bag containing two condoms and personal lubricant in the truck defendant had rented. Defendant admitted to police that he had rented a hotel room and intended to engage in both oral and vaginal intercourse with "Kelly." Defendant also provided a written statement in which he admitted chatting with "Kelly" about participating in sexual acts. | People v. Russell, 2007 WL 419780, at *2 (Mich.App.,2007) | M.C.L. 750.145d(2)(c) |

| | | | |
|---|---|---|---|
| 106 | The above charges resulted in part from defendant's online computer activity between September 7, 2008, and October 17, 2008. Defendant used the Internet to send emails and text messages to an individual posing as a 14–year–old girl named "Raegan." Copies of some of defendant's communications with "Raegan" were submitted at trial and showed that defendant engaged in progressively more romantic and sexually explicit conversations with the "girl." Apparently, defendant could view pictures of "Raegan" on a MySpace page, and he complimented her and complied with her request to see pictures of himself. Defendant also used his webcam to show himself masturbating, and the individual using the "Raegan" persona captured screenshots of this on her computer. Eventually, defendant made plans to meet with "Raegan" at her house in Grand Rapids Township. On October 17, 2008, defendant went to the location to meet "Raegan," he was arrested and, as noted, was later convicted by a Kent County jury. | People v. Schutze, 2010 WL 4226759, at *1 (Mich.App.,2010) | M.C.L. 750.145d(2)(f) |
| 107 | Defendant admitted that he was used the internet to communicate with a person using the screen name of "cosmic-nothingness." He acknowledged believing that this person was 14 years old. Further, he admitted that he arranged to meet with her for the purpose of engaging in sexual activity, and that he appeared at a Grand Rapids address for this purpose. | People v. Morrow, 2011 WL 668318, at *1 (Mich.App.,2011) | M.C.L. 750.145d(2)(f) |
| 108 | In August 2002, the 15-year-old male victim's parents learned that he had been having sexually explicit conversations via the Internet with an adult male, later identified as 43-year-old defendant. The communications were described as adult, sexual, and graphic in nature. The communications included defendant asking the victim what time he got out of school, whether they could "hook up," and what time his parents arrived home. The communications also described what they would do when they "hooked up" in graphic detail, and included the exchange of personal information. In one online chat, defendant asked the victim if he "had ever been with anyone yet?" The victim replied, "Nope." The police eventually became involved, and an officer posed as the 15-year-old victim. After a brief online conversation, defendant asked if they were "ever going to get together?" Eventually, a meeting was arranged. Defendant described what they would do during the meeting in sexually explicit detail, suggested a sexual website, and provided a password for the site. Defendant also described the kind of car he drove, and asked that the victim bring "protection" to their meeting. Defendant was arrested at the site where he had arranged to meet the 15-year-old victim. Upon searching defendant, the police found three condoms. | People v. Roberts, 2006 WL 2683795, at *1 (Mich.App.,2006) | M.C.L. 750.145d(2)(f) |

| | | | |
|---|---|---|---|
| 109 | The prosecutor charged defendant with bestiality with a dog, MCL 750.158, and animal cruelty, MCL 750.50(2) and (4). The evidence was sufficient to prove beyond a reasonable doubt that defendant placed his penis in a dog's anus. Defendant's roommate, who had lived with defendant for three years, testified that while showering on the morning of March 15, 2014, she heard her dog howl, that she then left the shower running, and that she proceeded to walk toward the living room to investigate. In the living room, the roommate saw defendant with his pants down, on the floor on his hands and knees, kneeling over the dog, which was lying on the floor on its back, with its head away from defendant. Defendant's roommate testified to her belief that defendant "was ... trying to penetrate ... the dog." An animal control officer, to whom police officers brought the dog on the evening of March 15, 2014, testified that the dog had a swollen anus and looked very frightened. Police officers testified that they had submitted for DNA analysis defendant's underwear and an oral swab from the dog. Two forensic animal DNA experts testified that from the inside of defendant's underwear, they developed a DNA profile of a canine, which matched the DNA profile of the dog. The roommate indicated that the dog would not generally have access to defendant's clothing, which defendant routinely placed in a basement laundry hamper.<br>The evidence gave rise to a reasonable inference that defendant's penis penetrated the dog's anus. Defendant's roommate did not see defendant's penis. But moments after hearing the dog howl, she saw the dog lying on its back with its head away from defendant, who had his pants partially down, and defendant was on his hands and knees above the dog. Later that night, the dog still had a swollen anus. And two forensic animal DNA experts matched the canine profile from the interior of defendant's underwear to the profile from the dog | People v. Antonio Ratcliff, 2016 WL 4062878, at *2 (Mich.App.,2016) | M.C.L. 750.158 |
| 110 | Following a jury trial, defendant, Carlton James Rapoza, Jr., was convicted of three counts of first-degree criminal sexual conduct (CSC–I), MCL 750.520b(2)(b) (sexual penetration [penis/anus] with victim younger than 13 and defendant 17 or older), and one count of sodomy, MCL 750.158.  The child told her that Rapoza "sticks his private part in his butt." The child's mother asked him how it happened, and he told her that Rapoza put "him on his lap and puts his private part in his butt" when the other children were not around. Dr. Cynthia Smith, a pediatrician with experience in interviewing children who are alleged victims of sexual abuse, examined the child. During the examination, the child told Dr. Smith that Rapoza pulled his pants down and "put his wiener ... sticked it in."<br>Using an anatomically correct doll at trial, the child identified the penis and the anus as private parts. The child testified that Rapoza touched his private parts and "put him wiener in my butt." The child testified that this happened at night in the summertime when everyone else in the house was asleep. According to the child, he told Rapoza that this was not a good idea, but Rapoza told the child he would be grounded if he did not comply. The child testified that Rapoza told him not to tell anyone. The child testified that he was afraid of Rapoza. | People v. Rapoza, 2018 WL 2746349, at *1 (Mich.App., 2018) | M.C.L. 750.158 |

| 111 | TP was three or four years old when respondent first began touching her inappropriately in her vaginal area. According to TP, respondent threatened to kill her brother, KP, if TP told anyone about the abuse. TP disclosed that she was seven years old when the first penile penetration occurred, which she described as "hurt[ing] really bad." The abuse continued until TP was 12 years old and involved many instances of finger, mouth, penis, and object penetration. Additionally, TP reported that she would sometimes wake up with her pants around her ankles when she stayed overnight at respondent's home. The abuse continued until TP was 12 years old. The last incident occurred around December 2012, during which respondent inserted a foreign object into TP's vagina and did not remove it. Respondent appears to have left TP's life—and the relevant geographic area—for a couple of years between December 2012 and December 2014, after which respondent returned and sought to reconnect with TP, who was now 14 years old. In the interim, TP had experienced a period of cutting behavior, had withdrawn from her family, and had struggled in school. Upon hearing of respondent's intentions to reconnect, TP disclosed the abuse. TP was examined by a sexual assault nurse examiner who discovered multiple areas of injury consistent with a history of sexual abuse, including vaginal penetration and insertion of foreign objects in TP's vagina. The examiner also discovered a plastic object embedded inside TP's vagina near her cervix, which was removed by an emergency room physician. In June 2016, respondent pleaded no-contest to engaging in the services of a minor for the purposes of prostitution, MCL 750.451(4), and attempted sodomy. | In re Smith, 2018 WL 1512415, at *1 (Mich.App., 2018) | M.C.L. 750.158 |

| | | | |
|---|---|---|---|
| 112 | On October 12, defendant started a conversation about a mutual acquaintance that defendant said was "a huge bitch and lied about a bunch of stuff." After further exchanges, defendant said that, despite the person's treatment of him, he would "f**k the everliving sh*t out of her." Adams replied, "What?" and defendant explained, "She's gorgeous, even though she's a bitch." Adams told defendant, "OK you don't need to be telling me this." Defendant continued, "I'd do the same to you," and Adams responded, "I don't need to know this." Defendant asked why and, on the following day, Adams replied, "Because you don't come out and say those things to people in a relationship lol.3" Defendant told Adams that he did not care about her relationship. Adams did not reply. On October 14, defendant stated that he liked Adams and that no one had to know they talk, and he invited Adams to come over, saying, "You will not regret it." Adams replied, "No can't." Defendant asked why, and Adams stated that she has a daughter and a boyfriend. Defendant asked, "Would you if you didn't," and Adams responded, "Idk[4] don't really think that way." At this point, defendant sent Adams a video of him masturbating, followed by the messages, "I was thinking of you[,]" "And you definitely want to see me." Adams testified that she did not welcome the video from defendant, her feeling at the time was one of disgust, and she found the video disturbing and the exchange offensive. When Adams did not respond to the video, defendant sent her a string of messages seeking a reaction: "?"; "Hey"; "Any response?"; "Anything?"; "Anything???" Adams finally responded, "No why did you send me that??? That is so disrespectful!!!" Defendant replied that it was not disrespectful, and that he wanted her. Adams replied, "Aaron stop." Defendant and Adams then exchanged messages arguing about whether Adams was attracted to defendant and whether she had lied about not being attracted to him. On October 17, defendant messaged Adams that he was "sorry about the other night." Adams did not reply. On October 19, defendant sent Adams "[o]kay" and Adams responded, "Yup." Defendant stated, "I'm glad you saw it though. It'd really piss Vanessa off." Adams responded "[s]aw what" and defendant said "[t]he video." Adams testified that she eventually shared the messages with Vanessa because she knew Vanessa had an attorney, and she thought the attorney "would do something and contact [her]." | People v. Miller, 2019 WL 4230675, at *2 (Mich.App., 2019) | M.C.L. 750.335a(2)(b) |
| 113 | According to the complaining witness, after a night of drinking whiskey with defendant and others at the home of defendant's girlfriend, she fell asleep on a couch in the living room. The complainant admitted that she had earlier taken a large dosage of a prescription drug she was using recreationally. According to the complainant, she first woke up in the early morning hours and noticed that the left leg of her leggings, her left sock, and the left part of her underwear had been removed. The clothing on the right side of her body remained in place. She further recounted that her vaginal area was wet and her tampon missing. After she used the bathroom, she returned to the couch and again fell asleep. According to the complainant, she woke up a second time to find defendant standing near her face, masturbating. | People v. Rouse, 2017 WL 1683649, at *1 (Mich.App., 2017) | M.C.L. 750.335a(2)(b) |

| | | | |
|---|---|---|---|
| 114 | The victim testified that he made a police report concerning defendant in March 2004. A few weeks earlier, defendant had paid the victim to clean his motor home. While the victim was inside the motor home washing the windows, defendant walked in. Defendant grabbed the victim and held him down. He put his hand down the victim's pants and touched the victim's penis. He then put his finger into the victim's anal opening. Defendant was not charged with any crime until August 2013, when he was charged with CSC–4. Defendant argues that the circuit court made numerous errors in the admission of evidence regarding his other acts with M.P., a relative, and D.K. M.P. testified that, while he was sleeping on the couch in his grandparents' living room, he awoke to defendant's fondling him. Defendant also had his mouth on M.P.'s penis. When M.P. moved, defendant attempted to put his penis in M.P.'s mouth. D.K. testified that, about 15 minutes after he and defendant set up their fishing poles on a dock and while they were sitting in defendant's vehicle, defendant pulled down his pants and underwear and masturbated. Defendant invited D.K. to join him in masturbating.  Defendant admitted to Bernatche that he masturbated in front of D .K. In addition, when Bernatche asked if he was showing D.K. how to do it, defendant said "yeah," "more or less." | People v. Pedersen, 2015 WL 5311641, at *1 (Mich.App.,2015) | M.C.L. 750.335a(2)(b) |
| 115 | On January 6, 2017, the 15-year-old complainant was sleeping over at her best friend's home. Defendant is the stepfather of the complainant's best friend. On the evening in question, the family gathered with the complainant to watch television. Defendant's wife and children were asleep in the living room when defendant showed the complainant a message on his cellular telephone asking her whether she wished to earn $ 50, and, after she said no, $ 75, which she also rejected. The complainant believed that defendant's offer was intended as compensation for a sexual act because he had earlier shown her an image of his penis on his cellular telephone, as well as a video of what was apparently sexual activity, which she had glanced at. The complainant disclosed the incident a couple weeks later. | People v. Cournaya, 2019 WL 2063293, at *1 (Mich.App., 2019) | M.C.L. 750.462e(a) |
| 116 | Defendant's convictions arise from the fatal shooting of Donald Calhoun during a pay-for-sex "date" with 17-year-old AB at a Detroit house on the morning of June 1, 2017. AB testified, in accordance with an immunity agreement, that she began dating defendant when she was 16 years old. She did not want to have sex for money; however, defendant persuaded her to do so, took the money she made, controlled and dictated all details of the enterprise and individual transactions, and refused her requests to stop by using physical violence against her. In the instant incident, after a "date" was arranged, Calhoun met with AB at her house on Burgess Street. According to AB, after engaging in oral sex using a condom as AB required, Calhoun asked to engage in vaginal intercourse without a condom. AB refused and told Calhoun to leave. In turn, Calhoun demanded his money back. Some manner of dispute between AB and Calhoun ensued, at which point defendant entered the room with a "long gun." Defendant and Calhoun exchanged words, and Calhoun suggested that they go outside to settle the matter. Defendant shot Calhoun instead. AB's child, who was then one year old, was in a bedroom further back in the house at the time. | People v. Baskerville, 963 N.W.2d 620, 627, 333 Mich.App. 276, 281 (Mich.App., 2020) | M.C.L. 750.462e(a) |
| 117 | Testimony at trial revealed that Harris ordered A.W. to engage in oral sex with a woman named Brandy. When A.W. refused, Harris choked her until she performed the sexual act. He later asked A.W. to again perform oral sex on Brandy, and she complied. Similarly, there was evidence that Harris transported A.W. to locations for the purpose of engaging in prostitution. | People v. Harris, 2015 WL 3648862, at *2 (Mich.App.,2015) | M.C.L. 750.462e(a) |