# Exhibit 25:

## Morris Deposition Transcript, pages 140-159



(248)608-9250  Fax (844)270-7115
www.tri-countycourtreporters.com
depos@tricountyreporters.com

## Transcript of the Testimony of
## Morris, Narcisa

**Date:** January 25, 2023
**Volume:**

**Case:** JOHN DOES A, et al. v. GRETCHEN WHITMER, et al.

Printed On: February 10, 2023

Morris, Narcisa
1/25/2023

### Page 137

1  they move interstate, correct?
2  A. Yes.
3  Q. How do they fulfill that registration obligation?
4  A. In our state, we have state statute to support that
5     registration requirement.
6  Q. So they have to register under the state registration
7     system, correct?
8  A. Correct.
9  Q. There's not like a federal registry that they can
10    register in?
11 A. Not to my knowledge, no.
12 Q. Okay. I saw some references to the NSOR database,
13    what is that?
14 A. I'm sorry, I need more content.
15 Q. I've seen some references in the documents to a
16    National Sex Offender Registry database. Are you
17    familiar with what that is?
18 A. Can you expand more? Was there more with that? It's
19    not bringing anything to my recall.
20 Q. Okay. I'll maybe on a break see if I can find a
21    document.
22 A. Okay.
23 Q. So if somebody is removed from the registry in
24    Michigan, maybe there's a court order that they get
25    removed, do you communicate that in any way to the

### Page 138

1  federal government?
2  A. No, not to my knowledge.
3  Q. Would they be removed from the national registry?
4  A. Yes.
5  Q. How does that happen?
6  A. It's automatic, behind the scenes.
7  Q. So let's take after the 2020 law changes, there were
8     individuals who were under the Holmes Youthful Trainee
9     Act. Are you familiar with the Holmes Youthful
10    Trainee Act?
11 A. Yes.
12 Q. And some of those individuals came off the registry
13    after the 2021 law changes, correct?
14 A. I wasn't a participant, so.
15 Q. You weren't personally involved in removing
16    individuals?
17 A. Correct. I know something happened, I just don't know
18    the reason or the details around it.
19 Q. Okay. Sure. Are you -- did you -- but you're aware
20    that there were people that were removed as a result
21    of the 2021 law changes around HYTA?
22 A. I know that there were people removed regarding HYTA.
23 Q. Okay. Would those individuals then also come off the
24    federal registry?
25 A. They would come -- they -- if they come off our

### Page 139

1  registry, they come off the public's -- National
2  Public Sex Offender Registry.
3  Q. Okay. Let's say that that person still has -- a
4     person who's under the Holmes Youthful Trainee Act
5     still has an obligation to register under federal law,
6     how would the person do that?
7  A. I don't know.
8         MR. JAMISON: Objection, lack of
9     foundation.
10 BY MS. AUKERMAN:
11 Q. So you don't know how a person could register if
12    they're not on the federal registry -- excuse me.
13    If someone is removed from Michigan's
14    registry, you're not aware of a way for them to
15    register, correct?
16 A. Correct.
17 Q. What about -- let's talk about the pre-2011
18    registrants for a second. So one of the changes that
19    was made in March of 2021 was that the pre-2011
20    registrants don't have to report internet identifiers,
21    is that correct?
22 A. Correct.
23 Q. So if a person were required to report that under
24    federal law, how could they report that?
25 A. I don't know.

### Page 140

1  Q. Let's talk about out-of-state offenses, which is kind
2     of confusing, at least to me. I'm hoping you can help
3     me understand it. Can you explain how you determine
4     the registration requirements for people with
5     out-of-state offenses?
6  A. If it's an out-of-state offense that we've encountered
7     before, legal has already provided guidance on what
8     the tier should be, they're already in our system. If
9     it's something we haven't encountered before, we pass
10    that through legal for a case by case review.
11 Q. Okay.
12       MS. AUKERMAN: So let's take a look at an
13    exhibit here. This is Bates 723, Exhibit 9.
14       MARKED FOR IDENTIFICATION:
15       DEPOSITION EXHIBIT 9
16       1:23 p.m.
17 BY MS. AUKERMAN:
18 Q. Can you tell me what this is?
19 A. Out-of-state adult conviction flowchart.
20 Q. So can you walk me through how this works.
21 A. It's like following the prompts. You answer the
22    questions to know where you go next for an
23    out-of-state conviction -- an out-of-state offense.
24       Now these are our offenses that have
25    already been identified. However, there was a change

35 (Pages 137 to 140)

Morris, Narcisa
1/25/2023

### Page 141

1  in policy applicability of when we use our duration
2  versus the state's duration because the language in
3  statute. And so, this helped us determine that.
4  Q. Can you explain that. I'm sorry, go ahead.
5  A. So there are --
6  Q. Go ahead.
7  A. So there is -- it -- this essentially helps us
8  determine whether we're using our state duration based
9  on that conviction or if -- that similar conviction or
10 if it would have been their state duration. And
11 again, these are for convictions that have already
12 been identified in the system.
13 Q. Okay. So let me make sure, because it's a -- to me
14 it's a confusing flowchart -- make sure I'm
15 understanding you correctly.
16     So if someone has an offense that's not
17 comparable to Michigan registration statute, so we're
18 here on this first box, go no, okay. They still have
19 to register if the state requires -- if their state of
20 conviction requires registration, correct?
21 A. If their state of conviction requires registration,
22 yes.
23 Q. So you could have -- if the -- if the state of
24 registration -- it doesn't matter if comparable to a
25 Michigan offense if the state of registration -- if

### Page 142

1  the -- if -- it doesn't matter if it's comparable to a
2  Michigan offense; if the convicting jurisdiction
3  requires registration, you have to register, correct?
4  A. Say that again.
5  Q. If the convicting jurisdiction requires registration,
6  the person has to register in Michigan even if it's
7  not comparable to a Michigan conviction?
8  A. So one way or the other, yeah, if their jurisdiction
9  requires them to register, they would have to
10 register.
11 Q. So, for example, if you had indecent exposure, that's
12 not a registrable offense in Michigan. If it's a
13 registrable offense in, I don't know, Georgia, the
14 person would still have to register in Michigan?
15 A. Correct.
16 Q. Okay. Okay. So let's say the convicting -- the
17 offense -- excuse me.
18     Let's say -- well, let's say the convicting
19 state doesn't require registration -- a comparable --
20 I found this chart very confusing.
21     If it's comparable to a Michigan adult
22 conviction, but the state -- convicting state doesn't
23 require registration, would the person have to
24 register?
25 A. Say that again, I'm sorry.

### Page 143

1  Q. So let's take an offense that the convicting state
2  doesn't require registration. But if comparable to a
3  Michigan offense, as I read this looking at this top
4  line along the flowchart, it looks like they would --
5  they could still have to register in Michigan?
6  A. They could, yes.
7  Q. Okay. And so, let's take someone who is -- who has --
8  that's an offense that's comparable to a Michigan
9  conviction, but it's not a tier III offense. It's
10 tier I or tier II offense. As I read this chart, the
11 registration duration would be whichever is longer,
12 the convicting state or Michigan, is that correct?
13 A. Yes.
14 Q. Let's go on to the next page for out-of-state juvenile
15 adjudications. Can you sort of summarize how juvenile
16 adjudications are handled for out of state?
17 A. Let me think about this for a minute. So again, this
18 is trying to figure out -- because we had that change
19 where we could go on either duration. This was
20 helping us identify the duration, when to use our
21 duration requirements or the other state's.
22 Q. When you mentioned we had that change about duration,
23 when was that?
24 A. I don't know off the top of my head.
25 Q. Was it while you were in the unit?

### Page 144

1  A. Correct.
2  Q. While you were manager?
3  A. Correct.
4  Q. Was there a memo or directive or written guidance of
5  any kind about that durational change?
6  A. Received communication, I believe, I don't know if it
7  was formal or it was just a change in process of what
8  we've been doing. And so, then we were told we were
9  supposed to do it this way. But it was new to us so
10 we needed to somehow write it down to keep track of
11 it.
12 Q. Who made that decision to change the durational
13 requirements?
14 A. MSP legal.
15 Q. Okay.
16     MS. AUKERMAN: We're going to want whatever
17 communications or directive was provided to the staff.
18 BY MS. AUKERMAN:
19 Q. If I'm understanding this chart -- this flowchart
20 correctly, if it's not comparable to a Michigan
21 juvenile adjudication, the person still has to
22 register if the adjudicating state requires
23 registration, correct?
24 A. Correct.
25 Q. If the adjudicating state requires registration of, I

Morris, Narcisa
1/25/2023

### Page 145

1 don't know, some offense that we don't consider an
2 offense here, a juvenile would still -- if the
3 juvenile has to register in the other state, they'd
4 still have to register in Michigan?
5 **A.** Correct.
6 Q. Okay. If it is comparable to a Michigan juvenile
7 adjudication and in Michigan -- a Michigan juvenile
8 only registers if they're over fourteen, correct?
9 **A.** Correct.
10 Q. But if the adjudicating state requires registration
11 and the person is under thirteen, the person would
12 still be required to register in Michigan, correct?
13 **A.** Correct.
14 Q. So if you had an eight-year-old that was required to
15 register in Georgia for juvenile adjudication, they
16 would have to register in Michigan?
17 **A.** Correct. That's how I understand it.
18 Q. And in Michigan only tier III offenses require
19 registration for juveniles, correct?
20 **A.** Correct.
21 Q. Okay. But if the -- if the offense is not a tier III,
22 if it's a tier I or tier II, but the adjudicating
23 state requires registration, the person would still
24 have to register in Michigan?
25 **A.** Correct. They may still have to register in Michigan,

### Page 146

1 correct.
2 Q. So at the bottom of these charts it says consult with
3 an -- if the code is not listed, consult with an
4 analyst. Who gets consulted?
5 **A.** I'm sorry?
6 Q. It says consult with an analyst. Who's the analyst
7 that's being consulted here?
8 **A.** Our analysts, one of our four analysts.
9 Q. Okay. We received a bunch of documents that were
10 communications with MSP legal about trying to figure
11 out whether certain offenses were comparable to
12 Michigan offenses. When is legal brought in to those
13 decisions?
14 **A.** If it's an offense we've never encountered before, so
15 it's not already captured, then we would move that on
16 up the chain of -- to MSP legal. Or if for some
17 reason it just isn't making sense to us or we just
18 don't feel comfortable or we feel there's something
19 questionable about the situation, then we would pass
20 that to legal.
21 Q. For offenses you haven't encountered before, do
22 different analysts have -- sometimes have different
23 perspectives on what the comparable Michigan offense
24 is?
25         MR. JAMISON: Objection, lack of

### Page 147

1 foundation.
2 BY MS. AUKERMAN:
3 Q. You can answer.
4 **A.** Are you -- will you ask the question again.
5 Q. So -- yeah. So when you encounter an offense that you
6 haven't come across before and you're trying to figure
7 out what -- whether it's comparable to a Michigan
8 offense, do different analysts sometimes come to
9 different conclusions about whether it's comparable to
10 a Michigan offense?
11 **A.** No. Because they don't do that. They're just looking
12 to see if there isn't something that already -- if
13 it's a new one, they go through legal. We don't make
14 those decisions at this level. These are ones that we
15 already had in the system that now we had to apply the
16 new process to.
17 Q. Let me make sure I understand this. This chart is --
18 this isn't for -- this only relates to ones that are
19 already in the flowchart?
20 **A.** Correct.
21 Q. Okay. So then you would say look, it's --
22 **A.** It's already been identified.
23 Q. Uh-huh. And then you would go through the flowchart.
24 Okay. Correct? That's when you'd go through the
25 flowchart, correct?

### Page 148

1 **A.** Correct.
2 Q. Who makes the decision about whether an out-of-state
3 process is equivalent to a juvenile adjudication?
4 **A.** I'm sorry, can you ask the question again.
5 Q. So different states have different ways of treating
6 juveniles of -- different deferral programs, things
7 like that.
8         Who makes the decision that say, you know,
9 a Georgia program is comparable to the Holmes Youthful
10 Trainee Act?
11 **A.** If it -- it's not clearly communicated from that other
12 state, we don't -- we would send it to legal to
13 review. We don't determine that.
14 Q. So what kind of documents do you get in order for
15 legal to make those decisions?
16 **A.** We try to ascertain any conviction documentation,
17 police reports.
18 Q. Why do you get the police reports?
19 **A.** Just sometimes there's age -- age is captured for
20 victim; that is -- doesn't always come across in some
21 of the convicting documentation.
22 Q. Is the comparison based on -- the comparison for the
23 out-of-state offense, is that based on the -- what the
24 person was convicted of? Or what the -- what the
25 allegations in the documents are?

37 (Pages 145 to 148)

**Page 149**

1  A. I don't -- I can't answer that. I don't know.
2      MS. AUKERMAN: Let's look at another
3   document here. This is going to be the PACC code
4   table. This is Exhibit 10.
5      MARKED FOR IDENTIFICATION:
6      DEPOSITION EXHIBIT 10
7      1:38 p.m.
8  BY MS. AUKERMAN:
9  Q. Do you recognize this document?
10 A. I don't see anything yet.
11 Q. I apologize. Can you see that now. Do you recognize
12   this document?
13 A. Yes.
14 Q. Okay. And can you explain how -- what this is -- is
15   -- let me stop.
16      Can you tell us what this is?
17 A. This is what populates our tier table in MSOR.
18 Q. When you say populates our tier table, what do you
19   mean by that?
20 A. The crime codes that are in MSOR, this is how we -- we
21   communicate them. We get information. Like if there
22   was a similar -- similar offense, then if we got
23   information from legal saying that it was, we would
24   fill this out. We would send it to our vendor. And
25   then the vendor would use this to add it to the tier

**Page 150**

1   table in MSOR.
2  Q. So if someone comes in with Arkansas eleven forty-one
3   four twenty offense, if that's in MSOR, that would
4   automatically populate?
5  A. If it's in here, it's in MSOR. These are ones we've
6   already encountered. We've already determined whether
7   it's published, their tier, you know, based on
8   whatever the criteria might be.
9  Q. What does CRR mean?
10 A. That is a national -- the NCIC, that is a designation
11   within NCIC regarding the -- it being the type of sex
12   offense.
13 Q. Okay. And then the next column here is tier level,
14   correct?
15 A. Correct.
16 Q. How -- I see a bunch of these are blank. What does
17   that mean that they are blank?
18 A. Is there anything to the right of it?
19 Q. No.
20 A. I'm not sure.
21 Q. Okay.
22 A. I'm guessing because it needs to be evaluated
23   dependent -- I'm guessing it would be something -- if
24   we got one of those, we would have to give it to legal
25   to review. Because each time it could be

**Page 151**

1   circumstantial -- not circumstantial -- but it could
2   be circumstances that need to be reviewed by them.
3  Q. So like for all these we have here starting on line
4   fifty-seven a whole bunch of Alabama offenses that
5   there's no tier level for. So those would not yet
6   have been reviewed by legal?
7  A. I'm saying they probably have been reviewed by legal,
8   but because of the way the statute is written, it may
9   need to be something reviewed each time. It's not
10   something we can just say it's always going to be this
11   or that.
12 Q. So what you're saying is there's some offenses where
13   you can't tell from the language of the statute
14   whether or not a person is tier I, tier II, tier III,
15   and so they're going to have to be individually
16   reviewed?
17 A. That is my best guess.
18 Q. Okay. So then there's column O, it says publish
19   single offense. What does that mean?
20 A. That they only have to have one offense and they're
21   published.
22 Q. And if that's blank, what does that mean?
23 A. Again, it hasn't been determined.
24 Q. Okay. And then there's a column here for approved by
25   MSP legal. What does that mean?

**Page 152**

1  A. Can you click the arrow, please, the filter.
2  Q. I don't know that I can because I don't have the
3   passwords to go in. But you can kind of see that it's
4   blank.
5  A. They're not all blank.
6  Q. They're almost all blank.
7  A. So right there, they should say yes. And then if it
8   was comparable to the code, I guess, I don't know.
9  Q. Okay.
10 A. It looks like it's been over the years used for
11   different reasons.
12 Q. Okay. And then I see that -- so but -- but most of
13   these are blank whether or not they've been approved.
14   If we scroll down here, we can see on column R that
15   almost all of them are blank, correct?
16 A. I see that.
17 Q. Okay. And the comparable Michigan code, what is that
18   column supposed to be for?
19 A. I don't know that we've updated it from before to now.
20   So I don't know what it means.
21 Q. Okay. But you agree that most of these -- there's not
22   a comparable Michigan code listed for most of these
23   offenses?
24 A. Correct.
25 Q. Do you know if that's because there isn't a -- when we

38 (Pages 149 to 152)

Morris, Narcisa
1/25/2023

### Page 153

1  go back to the flowchart, right, whether or not
2  something is a comparable Michigan offense is the
3  first thing you have to figure out.
4       So the fact that these are blank, does that
5  mean that there's not a comparable Michigan offense?
6  **A.** I don't know that.
7  **Q.** How would the analyst know whether there's a
8  comparable Michigan offense if it's not marked in this
9  chart?
10 **A.** They don't use this chart to do that. They use what's
11 in MSOR.
12 **Q.** Does MSOR have a field for comparable offense?
13 **A.** No. But whatever the tier is, is how we kind of
14 figure it out. Obviously, if it's another state and
15 they're not using tiers or something, we don't look at
16 that.
17 **Q.** So how do I -- how would I figure out what -- let's
18 take -- I don't know. Here, let's just take -- D.C.,
19 second degree child abuse, tier III; how do I know
20 what the comparable Michigan offense is? Where is
21 that -- where's that kept?
22 **A.** We don't keep that. I don't know. We don't keep
23 that.
24 **Q.** Does anybody keep that?
25 **A.** Not that I'm aware of.

### Page 154

1  **Q.** Okay. So but at some point there was a determination
2  made that this D.C. twenty-two three oh oh nine
3  offense is comparable to some Michigan offense that
4  requires tier III registration, correct?
5  **A.** I know that it was designated as a tier III if the
6  victim was one through twelve.
7  **Q.** I guess what I'm trying to get at is it seems like
8  whether or not something is comparable to a Michigan
9  offense is pretty foundational to how that person is
10 classified, correct?
11      MR. JAMISON: Objection, vague.
12 BY MS. AUKERMAN:
13 **Q.** You can answer.
14 **A.** I'm not sure of your question.
15 **Q.** Okay. Let's go back to the prior document.
16      MR. JAMISON: Can we take five minutes.
17 She's saying she needs a break. Is that okay?
18      MS. AUKERMAN: Yeah, that's fine. I'm
19 trying to confirm that we're not communicating with
20 the witness.
21      MR. JAMISON: Mariam, I'm not telling my
22 witness how to answer questions.
23      MS. AUKERMAN: Okay.
24      MR. JAMISON: I said that at the beginning
25 of the deposition. If her and I want to communicate

### Page 155

1  about whether or not she needs a break, that's totally
2  permissible. We'd like to take ten minute and we'll
3  reconvene at 2:00.
4       MS. AUKERMAN: That's fine.
5       MR. JAMISON: Do you have any idea how much
6  longer you're going to need?
7       MS. AUKERMAN: I think we're going to need
8  the rest of the day.
9       MR. JAMISON: You're going to take the full
10 seven hours?
11      MS. AUKERMAN: Yes, I am, likely. We'll
12 see how it's -- let's off the record.
13      (Off the record 1:48 p.m.)
14      (Back on the record at 2:02 p.m.)
15 BY MS. AUKERMAN:
16 **Q.** Just a couple more questions on the sort of
17 out-of-state offenses, really just one more. I read
18 in the documents that you don't do predeterminations,
19 is that correct?
20 **A.** Correct.
21 **Q.** The unit does predeterminations for law enforcement,
22 correct? Like for an out-of-state registry?
23 **A.** That was a new process change. So the only ones we do
24 that for are like ICOTS and MDOC, which is the
25 transfer.

### Page 156

1  **Q.** So you would -- the MDOC, if they want to know whether
2  someone is a past registrant, you would make -- based
3  on out-of-state conviction, you would make that
4  predetermination, correct?
5  **A.** Yeah. ICOTS is part of the MDOC. So that's what I'm
6  referring to, yes.
7  **Q.** Okay.
8  **A.** Because when they're having people transferring from
9  other states.
10      MS. AUKERMAN: Let me share one more
11 document here. This is one of the policy manuals. I
12 believe we're on Exhibit 11. This is Bates 775.
13      MARKED FOR IDENTIFICATION:
14      DEPOSITION EXHIBIT 11
15      2:03 p.m.
16 BY MS. AUKERMAN:
17 **Q.** Do you recognize this document?
18 **A.** Can you go to the top, please.
19 **Q.** Sure.
20 **A.** Okay.
21 **Q.** Do you recognize this document?
22 **A.** Yes.
23 **Q.** Okay. And I just note here it says that in the --
24 this we're now on page Bates 776. It says that
25 there's no predeterminations made, correct, for

39 (Pages 153 to 156)

Morris, Narcisa
1/25/2023

```
 1     registrants?
 2  A. Uh-huh.
 3  Q. And that there are predeterminations made for the MDOC
 4     or for a court, correct?
 5  A. Correct.
 6  Q. Okay. And then the highlighted language here says the
 7     offender shall be provided with the resources needed
 8     to make the determination. What resources are
 9     provided to registrants moving in out of state to make
10     that determination?
11  A. Referencing the state statute, the registrable
12     offenses.
13  Q. So the registrant will be told you can look at your
14     out-of-state conviction and you can look at the
15     Michigan conviction and --
16  A. And consult an attorney.
17  Q. And consult an attorney. But they're not provided
18     with the chart --
19  A. No.
20  Q. -- or anything like that?
21     So they would have to try to figure out
22     themselves whether something is substantially similar
23     to a Michigan offense, correct?
24  A. I guess correct, yes.
25  Q. All right. Let's talk about -- one last question on
```
Page 157

```
 1     that, is there a role for the registrant's attorney in
 2     determining what is substantially similar?
 3     Like is there an appeals process or
 4     anything that -- the registrant or attorney can do to
 5     say, you know, I don't think it's substantially
 6     similar to this. I think it's substantially not
 7     similar. Is there -- what's the process, if any?
 8  A. So I have actually had that happen, and I've referred
 9     to legal, MSP legal.
10  Q. So the registrant or their attorney would need to
11     contact MSP legal?
12  A. No. They don't contact them, they contact us. The
13     attorney, if they have issue with it, they contact us.
14     And we can tell them that we can refer to our legal
15     for a review. But typically that's after they have
16     already been determined a certain tier.
17  Q. But if the registrant's attorney says I disagree, I
18     think this is tier II and not tier III, what happens?
19  A. For someone who's already registered?
20  Q. Yeah. The person has been registered and told you're
21     tier III and the attorney says no, I think this is
22     more comparable to a tier II offense, what happens?
23  A. They usually send something to our group email and we
24     advise them that we are forwarding to legal for
25     review.
```
Page 158

```
 1  Q. Right. And then if legal says nope, we think this
 2     person is a tier III, what happens?
 3  A. I don't know. That -- usually we respond. I haven't
 4     had anything come back. I've only had that experience
 5     once.
 6  Q. Okay. Let's talk about the non-sex offense cases.
 7     Are you familiar with registration requirements for
 8     people who are not convicted of a sex offense?
 9  A. Somewhat.
10  Q. Can you describe what you know.
11         MR. JAMISON: Objection, vague.
12  BY MS. AUKERMAN:
13  Q. Can you describe who has to register for a non-sex
14     offense?
15  A. What I've learned thus far is the Lymon, in three
16     instances of Lymon; child enticement, kidnapping, and
17     unlawful imprisonment.
18  Q. What about out-of-state offenses?
19  A. What about?
20  Q. Are there out of state -- are there people with
21     out-of-state non-sex offenses that are required to
22     register in Michigan?
23  A. I don't know. I don't -- I've not been instructed or
24     had to look at that thus far.
25  Q. So if someone had a kidnapping offense in Ohio, would
```
Page 159

```
 1     that be considered substantially similar to kidnapping
 2     in Michigan?
 3  A. If it -- I would follow the typical rule. If for some
 4     reason that's something that we are directed to start
 5     addressing, we would address it.
 6  Q. Okay. So you're familiar with the Michigan Court of
 7     Appeals called People v. Lymon, correct?
 8  A. Correct.
 9  Q. What's happening in response to Lymon within the SOR
10     unit?
11  A. As we've been directed, we are providing communication
12     to prosecutors, law enforcement, and courts advising
13     of specific individuals with those offenses -- those
14     offenses only -- and asking them to review and
15     determine if a sexual component existed -- existed.
16     And that if we don't get any response or determined
17     that there was none, they are being removed from the
18     registry. That we need to hear from them.
19  Q. So when you say you've been providing communication,
20     when -- when did that occur?
21  A. So the first one, I believe, went out in November, I
22     think. And then we just sent another here in January,
23     a reminder.
24  Q. When you say the first one, what do you mean?
25  A. The notice to PAAM, the courts, law enforcement,
```
Page 160

40 (Pages 157 to 160)