# Exhibit 27:

## Mary Chartier Declaration

# DECLARATION OF
# MARY CHARTIER

## DECLARATION OF MARY CHARTIER

## Background and Qualifications

1. I am a founding partner at the law firm of Chartier & Nyamfukudza, P.L.C. We are a criminal defense litigation firm in Michigan. Before founding Chartier & Nyamfukudza, P.L.C., I was the founding partner of another law firm where I was also a criminal defense litigator. I handle cases throughout the State of Michigan and in federal court. A significant portion of my practice is handling criminal sexual conduct cases. Conservatively, I have represented hundreds of clients accused of criminal sexual conduct and issues related to Michigan's Sex Offender Registry.

2. I have presented at conferences in the State of Michigan and nationally on topics related to criminal defense and specifically defending people accused of sexual assault. I also write the commentary for the jury instructions related to criminal sexual conduct that is published by the Institute for Continuing Legal Education. I have won numerous awards for my work as a criminal defense attorney, including the firm's work in exonerating those who have been wrongfully convicted. My curriculum vitae is attached as Exhibit A and also lists my publications.

3. The experiences that I relay in this declaration are based on my personal experience, court and police records, and other documentary evidence.

## Executive Summary

4. Registration is a major concern for people accused of committing a sex offense when considering a plea because they know that registration has significant ramifications and restrictions far beyond any jail or prison sentence, and far beyond having a conviction for a sexual offense on their criminal record.

1

5. Because the legislature has retroactively altered registration requirements, clients pleading guilty before these retroactive amendments did not and could not understand the consequences of the decision to plead guilty.

6. A central difference between having a conviction on one's record and being subject to registration is that a conviction relates to a person's prior conduct, whereas the registry is a statement about who the person is.

7. Moreover, the registry does not require a user to know a person's name before searching, meaning that users can see detailed information about any registrant who is working or living nearby. That results in job loss, housing loss, harassment, and mental health impacts for people on the registry.

8. People on the registry are subject to ongoing reporting requirements, often for the rest of their lives, and face incarceration if they fail to comply with the many requirements of Michigan's Sex Offender's Registration Act (SORA). Simply having a conviction does not result in such consequences.

9. SORA requires individuals with non-Michigan convictions that are "substantially similar" to Michigan convictions to register, but there is no definition of what constitutes a "substantially similar" offense, and no way to appeal the Michigan State Police's unilateral decision that a person must register, even if the offense does not result in registration in the convicting jurisdiction.

10. Inadequate police and prosecutorial investigation into sexual assault claims is common, resulting in individuals being charged with crimes that a more thorough investigation proves they did not commit.

11. While Tier I registrants who meet strict eligibility criteria can petition for removal from the registry, Tier II and III registrants who meet the same criteria, and who are no different from the Tier

I registrants, have no way to come off the registry because of the tier level in which they have been placed.

12. After SORA was amended in 2011, the statute now requires registry violations to be "willful." M.C.L. § 28.729. The Explanation of Duties form has also been revised to require registrants to attest that they "understand" their registration duties. But while they may understand the basic fact that they are required to register, the intricacies of the registration requirements are often confusing and vague to the registrants.

### The Registry's Impact on Client Decision-Making

13. When we represent people accused of committing sex offenses, a critical part of our representation is asking the client their priorities related to potentially resolving the case. There are two main areas—incarceration and the registry. If charges are issued, it is important to know a client's concerns if a plea offer is made. In almost all cases, the registry is a major concern for clients because of the significant ramifications and restrictions it imposes on a person's life far beyond any jail or prison sentence, and far beyond having a conviction for a sexual offense on their criminal record.

14. The reason that the registry is often the biggest concern for clients is because they know that this will have the longest impact on their lives. Many clients recognize there is an enormous difference between being convicted of an offense and being placed on the registry. They know that the registry will affect every area of their lives and will continue to subject them to ongoing supervision for years or decades after they complete any sentence imposed.

15. Accordingly, the registry is a major factor when deciding to take—or not take—a plea offer. In my experience, clients who maintain their innocence, and who have a reasonable chance of an acquittal at trial, will sometimes plead guilty because they do not want to risk sex offender registration.

16.   Prosecutors know this, so they regularly make an offer that eliminates the registry requirement. This allows them to "win" the case because they know that clients will plead guilty rather than risk the onerous consequences of the registry. Some prosecutors will also over-charge cases to include offenses requiring registration, so that they have leverage over defendants who are motivated to avoid registration at all costs.

17.   Where it is not possible to craft a plea agreement that eliminates registration, clients consider the length of time that they will be subject to registration—sometimes opting to plead guilty if they can be assured that they will not be subject to lifetime registration—so that there is some hope that eventually they can resume a normal life. Clients are also very concerned about whether they will be on the public or private registry.

18.   In other cases, clients will reject plea offers that would result in less serious convictions and relatively low sentences of incarceration and will go to trial because they cannot face being subject to sex offender registration. In other words, as a result of the registry, cases that may otherwise be disposed of through plea agreements end up going to trial, imposing additional costs on the judicial system.

19.   In one case, a client who continued to profess his innocence was willing to enter a guilty plea to a felony offense that did not require registration because he said that he was willing to serve a term of incarceration, but he would not agree to a lifetime on the registry.

20.   In another instance, an eighteen-year-old college student was charged with criminal sexual conduct in the first degree where there was a factual dispute about whether, during a sexual hook-up, the woman had communicated that she wanted to stop. He faced a relatively brief prison sentence, but he also faced a lifetime on the registry if he was convicted at trial. This was too much for him to bear. He entered a felony plea under the Holmes Youthful Trainee Act with no registration requirement. He desperately wanted to go

to trial, but the threat of a lifetime with no relief from the registry drove his decision to plead.

21.   Because the requirements of the registry change frequently, it is difficult to advise clients about what their future on the registry will hold. This is fundamentally unfair, but it is the reality for anyone who will be placed on the registry.

22.   As a criminal defense attorney, I am constantly in the position of advising clients about the advantages and disadvantages of taking a plea offer. Typically, this involves weighing the risks of going to trial against the punishment a person would face if the plea is accepted. While I usually can provide the client with reasonably accurate information about the likely incarceration and supervision that may be imposed, no one can predict what registry restrictions the legislature might impose in the future and how litigation about these future restrictions may unfold. Thus, there is no way for anyone to know if a registration requirement made in the future may be applicable to the client. Even though registration is one of the most significant factors in many client decisions whether to plead guilty, when making those decisions, clients do not have the information about the consequences they will face, including the length of registration.

### The Impact of Sex Offender Registration

23.   A central difference between having a conviction on one's record and being subject to registration is that convictions relate to a person's prior actions, whereas the registry is a statement about who the person is.

24.   Being convicted of an offense relates to a person's conduct. Being placed on the registry relates to who a person is at their core. The person is a "sex offender." There is no context, no perspective, no background. A person is a "sex offender," quite possibly for the rest of their life, no matter what happened, and no matter what they have done in their lives since then.

25.   The registry also has real world effects that go far beyond the offense of conviction. The registry is easily accessible to anyone who wants to check the registry, and people can—and do—check various neighborhoods. This allows people to target people in the community who are doing absolutely nothing wrong because of their placement on the registry. Clients know that placement on the registry means a lifetime of never being able to move on from their convictions. At any time, their lives will be turned upside down because of their placement on the registry. Despite serving their sentence and complying with terms of probation or parole, they always face the very real risk of being targeted by members of the community.

26.   The registry labels anyone on it as a "sex offender," regardless of the type of offense. There is a tremendous variation in conduct that results in registration. The public does not understand this. What that means in practice is that, while clients can often explain the context of an offense that appears on a background check, they find it almost impossible to explain that, although they are on the sex offender registry, they are not a sexual predator.

27.   The registry is different than looking up a person on the Michigan Offender Tracking Information System, which provides information about people who are or were under the jurisdiction of the Michigan Department of Corrections. That system only allows a search if a person's full name is known. Similarly, background checks require the searcher to know a person's name. This is unlike the registry where the search can be by neighborhood or location. As a result, anyone who uses the registry can see that a person working or living nearby is a "sex offender."

28.   Moreover, once a person's name is known—which can be gathered after doing a neighborhood search—the registry provides a picture and detailed information about a person, including where they live and work and even the vehicles they drive. The harassment that stems from this sort of information being easily accessible is what many on the registry deal with on a regular basis. They also fear that this could occur at any time in the future. Clients have had

their names put on posters and hung in their neighborhood and complaints made to their employers. All of this is done under the guise of "protecting" the community so the instigators are emboldened to continue their actions until the person moves or quits their job.

29.   I have had clients lose jobs—jobs they were able to secure despite having a criminal record—because their co-workers learned they were on the registry, and those co-workers complained to their supervisor. One man was so proud to finally have gotten a job working at a small store. When his co-workers found out he was on the registry, he lost his job. It is heartbreaking to have clients who are qualified for and eager to work struggle to find a job because of the registry. Then when they finally find a job, they lose that job because of their placement on the registry.

30.   Moreover, I have had clients have to move from their homes once their neighbors find out that they are on the registry. It is not because of anything the clients did. It is because neighbors fear people placed on the registry and will harass their neighbors until they move. These clients were able to secure housing despite having a criminal record; it was the registry that caused them to lose their homes.

31.   One facet of my work with clients is to try and assist them with their mental health. Being accused of sexual assault and the possible consequences of incarceration and registration result in the majority of our clients having suicidal thoughts at some point in the process. It is a high enough percentage of my clients that I ask all clients accused of sexual assault if they are thinking of hurting themselves. Roughly 75% say that they have had suicidal thoughts.

32.   One man called me from the roof of a parking garage. He had ridden his bicycle there, and he planned to jump off. The threat of prison and a lifetime on the registry was too much for him to bear at the moment. I was able to talk to him and encourage him to come down and get counseling.

33.   But I have not always been successful. For one client, the incarceration time if he was convicted was relatively low, but because of his age, he would essentially spend the rest of his life on the registry. He committed suicide leaving a devastated family to deal with the loss.

34.   These suicidal thoughts often continue when a person is on the registry, as they learn that the stressors of being on the registry are never ending.

35.   For most people who are convicted, when they complete their sentence and any period of probation or parole, they are no longer under supervision. People on the registry, however, remain subject to monitoring, often for the rest of their lives. They must report to law enforcement regularly and must update their information when they move, change jobs, drive a different car, and more. And they face incarceration if they fail to meet SORA's requirements. It is very different from what they would experience simply as a result of having a conviction on their record.

36.   Finally, the fact that the registry requirements are so confusing is a constant source of stress for clients. Clients want to comply because they know that any violation means that they can be sent to prison, yet the sheer number of requirements and lack of clear guidance makes it difficult for them to do so.

37.    Even though I am an attorney who has worked extensively with the registration statute, I often have to go back to review the statute and case law interpreting the statute when clients ask about the requirements.

### Registration for People with Non-Michigan Convictions

38.   Advising clients about the registry is particularly difficult with respect to non-Michigan convictions, including federal convictions. SORA requires registration of individuals who have offenses that are "substantially similar" to Michigan registrable convictions. *See*

8

M.C.L. §§ 28.722(q)(x), (s)(xiii), (u)(viii). The term "substantially similar" is not defined. Clients may enter a plea thinking that there is no registry, but the Michigan State Police will have a different interpretation of the offense and require registration.

39.  For example, in one instance, my client was a young woman who was a human trafficking victim. Her abusers had her "managing" other young women, and she was charged in federal court. The Assistant United States Attorney recognized that this client had herself been victimized. A central goal in crafting the plea deal was to keep this young woman off the registry. The AUSA believed that the offense to which she pled would not result in registration. However, the Michigan State Police believed the federal offense was "substantially similar" to registrable Michigan offenses. *See* Exhibit B, Plea Letter.

40.  There was no formal process to dispute the Michigan State Police's determination that a non-Michigan offense requires registration because it is "substantially similar" to a Michigan offense. Despite our best efforts, the woman remains on the registry.

### Representing People Accused of Criminal Sexual Conduct

41.  There are two key times when our firm begins representing people accused of criminal sexual conduct—pre-charge and after the prosecutor has decided to issue charges. During both phases, much of the initial work is the same in terms of investigating the claim.

42.  During the pre-charge phase, we often—but certainly not always—are able to convince the prosecutor not to issue charges because of the investigation that we do that the police did not do. Frequently, the police take a report of the complainant's allegation, try to interview the person being accused, and then turn the report over to the prosecutor. There is often no more done than that.

43.   For example, in one case we handled, a young man's former girlfriend claimed that she was raped by our client. She was very specific about the dates. We were able to review the text messages in which she told him how much she had enjoyed their sexual encounters on those dates. This convinced the prosecutor not to issue charges.

44.   In another case, a young woman claimed she was raped by her ex-boyfriend during a particular month years before. We were able to show that he was across the country doing an internship at the time—he never came home during the summer. This fact—and the woman's repeated attempts to reconcile with the young man she was accusing—convinced the prosecutor not to issue charges.

45.   In yet another case, a man was retiring from being the Chief Executive Officer of a very large company. A woman claimed that he sexually assaulted her on a particular day when he came into the company to retrieve some personal items. Before she contacted the police, she hired a civil attorney to sue the man and the company. Fortunately, we were able to obtain video of the man and woman during the entire time he was in the building and in the parking lot. At one point, the two hugged as it would likely be the last time they saw each other. His hands were visible the entire time, and the video refuted the woman's claims. We convinced the prosecutor not to issue charges through the video evidence that the police never obtained and that the prosecutor never asked them to obtain.

46.   There are numerous other instances of claims being made that are refuted by even a basic investigation by our law firm that was never done by the police.

47.   If charges are issued, it is significantly more challenging to convince a prosecutor or court to dismiss a case, but we still have done so on numerous occasions.

48.   The notion that prosecutors are not charging meritorious cases is not my experience at all. Numerous cases are charged that have serious flaws with the truthfulness of the claim.

49.   In one recent case, a young woman had her first sexual experience with a long-time friend. She told her sisters, who told their mother. Her mother refused to believe it was consensual. Her mother refused to attend her daughter's high school graduation unless the young woman said it was rape. The young woman said her mother yelled at her daily because she refused to do so. Ultimately, she was taken to the police station and reported her "rape." At the preliminary examination, we presented numerous text messages that she had sent to our client that indicated that the sexual encounter was consensual. The court dismissed the case, but not until the family expended significant financial resources and suffered untold stress and anxiety. What is also significant is that the "offer" made to the client was a felony conviction under the Holmes Youthful Trainee Act. It would have come with a period of incarceration, but no registry. The threat of the registry was overwhelming, but the accused teenager refused to plead to a crime he did not commit.

50.   In another case, a woman claimed she was sexually assaulted by a man she met at a bar. She went to his home and spent the night. She claimed that he raped her, and she was terrified and left as soon as she could. The man was charged, and the allegation received significant media attention—including national media attention—because of the man's job. But our investigation revealed that the woman's claim was false. The woman spent the day after their night together with the man, his roommate, and the roommate's girlfriend. They went to brunch and then to two different bars, where they played pool, ate, and drank. The woman took—and posted—selfies from that day with her alleged rapist. Witnesses saw the two engaged in significant public displays of affection. After providing this information to the prosecutor, the charges were dismissed at the preliminary examination stage. Only one news outlet ran the story about the dismissal.

11

51.   Another young woman claimed that she was raped years before by our client because her therapist told her that if she had ever had sex and had pain then that means that she was raped. It was her body's way of "rejecting" the sex, according to her therapist. Her first sexual experience was with our client. Years later, he faced criminal sexual conduct charges. While he was ultimately acquitted by the jury, he could not make bond and spent months in prison before trial.

52.   Another young woman claimed that she was sexually assaulted on one occasion by her ex-boyfriend. They had lived together, and then he had ended the relationship and she moved out. A few months later, they had a one-night sexual encounter, which she later claimed was rape. She claimed that he stalked her to a bar and then followed her and raped her. Text messages revealed that she texted him and invited her to meet him at the bar. She then went to his home voluntarily in her own car. She texted him the next day indicating how much she enjoyed the night and hoped they could do it again soon. She continued to text him asking him to spend the night together again. He always declined. This case was dismissed at the preliminary examination stage by the court.

53.   Another man was accused of criminal sexual conduct while at a public event. The young woman described what the man was wearing, and our client was charged after the woman identified him as the assailant. We were able to obtain video and photographic evidence that our client was not wearing anything like what the woman described. We also put together a video and photographic timeline—along with witness statements—of his whereabouts for his time at the event. The prosecutor did not want to dismiss because the "victim deserved their day in court." This is a common response. Fortunately, the court dismissed the case, but the man still suffered great expense and stress, as did the rest of his family.

54.   Similarly, a middle-aged man was charged for supposed sexual assaults that occurred 20 years prior. A troubled young man said he was assaulted by our client for years essentially every day after school while he was at our client's house playing with his son. The

young man's mother refuted his claim that he was at our client's house this much, but charges were filed anyway. We found work records and employees that proved our client's shift covered the time he was supposedly at home after school. His work was far away, so he could not even briefly come home. His wife was a stay-at-home mother and confirmed he was at work, as did numerous neighbors and neighborhood children. We presented all this evidence—and more—to the prosecutor. His response—"How would it look to dismiss the case after he's been charged?" After a two-week trial, the jury found the client not guilty. Some of the jurors also reached out to me and questioned why the case was ever charged.

55.   These are not just rare stories. This is common in the work that we do in both the pre-charge phase and the trial phase. The overall lack of investigation before charges are issued is almost universal.

## Inability to Petition for Removal

56.   Our firm is regularly contacted by people on the registry who request information about how they can be removed. Unfortunately, for the vast majority of registrants, there is no path off the registry. No matter how much they have done with their lives, they will be labeled as sex offenders for decades or for life.

57.   Michigan does allow Tier I registrants to petition for removal if they meet strict eligibility criteria, including successful completion of probation/parole and no subsequent convictions for felonies or registrable offenses for at least ten years after release from incarceration. M.C.L. § 28.728c(1), (12). Juveniles who meet the criteria can also petition but must wait 25 years. M.C.L. § 28.728c(2), (13).

58.   I have had clients who meet the eligibility criteria to petition for removal, but who are categorized as Tier II or III. Therefore, they cannot ask a court to consider whether they should remain on the registry. In my experience, these clients are no different from those Tier I clients who are eligible for removal—they successfully

completed their sentences and have been living offense free in the community for years. But I must, again and again, tell clients that there is no way for them to come off the registry because of the tier level in which they have been placed.

## Explanation of Duties Form

59.  Registrants are required to sign an Explanation of Duties Form. Failure to sign is a crime. M.C.L. § 28.729(3).

60.  The Explanation of Duties form is frequently introduced into evidence by prosecutors.

61.  After SORA was amended in 2011, the statute now requires registry violations to be "willful." M.C.L. § 28.729. The Explanation of Duties form has also been revised to require registrants to attest that they "understand" their registration duties.

62.  In my experience, clients do not always understand their registration duties. While they may understand the basic fact that they are required to register, the intricacies of the registration requirements are often confusing and vague to the registrants.

63.  I have provided this declaration pro bono.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

Dated: 2-25-23

/s/ _____
Mary Chartier

14

# Exhibit A:

Mary Chartier Curriculum Vitae

**MARY CHARTIER**
2295 Sower Boulevard
Okemos, MI 48864
517.885.3305
mary@cndefenders.com

## LEGAL EMPLOYMENT

**Attorney and Founding Partner**                    June 2017 to Current
Chartier & Nyamfukudza, P.L.C., East Lansing and Grand Rapids, MI
- Litigate and advocate for clients, specifically in the areas of criminal defense and appellate advocacy, in state and federal court.
- Provide consultation to attorneys on criminal defense and appellate matters.

**Attorney and Founding Partner**                    Sept. 2007 to June 2017
Alane & Chartier, P.L.C., Lansing, MI
- Litigated and advocated for clients, specifically in the areas of criminal defense and appellate advocacy, in state and federal court.
- Provided consultation to attorneys on criminal defense and appellate matters.

**Adjunct Professor**                    2002 to 2016
Thomas M. Cooley Law School, Lansing MI
- Taught Advanced Legal Research and Writing, a third-year course focused on appellate brief writing and legal drafting, as well as statutory and contract interpretation, and developed lesson plans and materials for class use.
- Developed and taught Marijuana Law, a third-year course that was the first marijuana law class in the country.
- Evaluated student performance, including conducting one-on-one meetings with students to assess progress and provide feedback.
- Winner of the Favorite Female Adjunct Award.

**Senior Judicial Law Clerk**                    Sept. 2003 to Aug. 2007
Michigan Supreme Court – Justice Michael F. Cavanagh, Lansing, MI
- Assisted the Justice in preparing majority opinions, concurrences, and dissents, as well as researching, editing, and analyzing draft opinions issued by other Justices.
- Drafted memoranda in advance of oral arguments, including reviewing briefs, conducting independent legal research, summarizing facts and arguments, and critically examining applicable law.
- Reviewed Supreme Court Commissioners' recommendations regarding applications for leave to appeal and advised the Justice whether the Court should hear the case or take other action.

1

**Attorney**                                                    Mar. 2002 to Sept. 2003
Prehearing Division, Michigan Court of Appeals, Lansing, MI
- Reviewed transcripts, exhibits, and briefs for assigned appeals, and researched all issues raised on appeal.
- Wrote reports for assigned judges that included a statement of facts, relevant legal research, an analysis of each issue, and a recommended outcome.
- Wrote proposed opinions.

**Law Clerk**                                                  Mar. 2001 to Mar. 2002
McGinty, Jakubiak, and Hitch, East Lansing, MI
- Conducted and participated in pretrial hearings, plea conferences, motion hearings, formal hearings, jury trials, non-jury trials, and sentencing hearings on behalf of the City Attorney of East Lansing.
- Conducted interviews, and researched and wrote legal memoranda, complaints, briefs, and motions.

## AWARDS

- International Clio Reisman Legal Impact Award
- Women Lawyer Stars, Women Lawyers Association of Michigan—Mid-Michigan Chapter, 2022
- Women Lawyer Stars, Women Lawyers Association of Michigan—Mid-Michigan Chapter, 2021
- Leo A. Farhat Outstanding Attorney Award, Ingham County Bar Association, 2020
- State Bar of Michigan Michael Franck Award for Outstanding Contribution to the Legal Profession, 2019
- Exceptional Achievement in Criminal Defense, Criminal Defense Attorneys of Michigan, 2019
- Recognition for Exceptional Achievements, Women Lawyers Association of Michigan, 2019
- Lawyer of the Year, Appellate Practice in Lansing, Best Lawyers, 2019
- Attorneys for Animals, Animal Friendly Attorneys™ Inaugural Class, 2018
- Michigan Lawyers Weekly, Leaders in the Law, 2018
- Davis-Dunnings Bar Association, Distinguished Barrister, 2018
- Michigan Lawyers Weekly, Top Women Lawyers, 2013
- Hiawatha Award for Outstanding Appellate Advocacy in *People v Koon*, Michigan Association of OWI Attorneys
- Pioneer Award for *People v Koon*, State Bar of Michigan Marijuana Law Section
- Super Lawyers
- Leading Lawyers
- Best Lawyers

## PROFESSIONAL ACTIVITIES AND COMMUNITY INVOLVEMENT

- American Board of Criminal Lawyers
- National Association of Criminal Defense Lawyers, First Amendment Strike Force
- Institute for Continuing Legal Education, Criminal Law Advisory Board
- Criminal Defense Attorneys of Michigan
- National Association of Criminal Defense Lawyers
- Hillman Advocacy Federal Training Program, Steering Committee
- Hillman Advocacy Federal Training Program, Instructor and Coach for Criminal Trial Practice and Advanced Criminal Trial Practice
- Federal Bar Association, Western District of Michigan
- Women's White Collar Defense Association
- Michigan Appellate Bench Bar Conference Planning Committee
- Michigan Association of OWI Attorneys
- American Bar Foundation Fellow
- Michigan State Bar Foundation Fellow
- Advocates Guild, Michigan Supreme Court Historical Society
- Ingham County Bar Association
- Ingham County Bar Foundation Fellow
- Institute for Continuing Legal Education Presenter and Community Champion
- Women Lawyers Association of Michigan

## PRIOR PROFESSIONAL ACTIVITIES

- Attorney Mentor, MentorJet Networking Event, National Association of Women Judges, 2022
- Attorney Mentor, MentorJet Networking Event, National Association of Women Judges, 2021
- Merit Panel Selection Committee, Western District of Michigan, Federal Public Defender, 2015
- Merit Panel Selection Committee, Western District of Michigan, Federal Magistrate Judge, 2014
- State of Michigan Attorney Grievance Commission
- Ingham County Indigent Defense Commission, Training Committee Chairperson
- Chairperson, State Bar of Michigan Professional Education and Events Committee
- Michigan Appellate Bench Bar Conference Planning Committee and Foundation Member
- Michigan Association of OWI Attorneys, Appellate Unit Chairperson
- National College of DUI Defense
- American Civil Liberties Union, Lansing Lawyers Committee
- Chairperson, State Bar of Michigan Animal Law Litigation Committee

- Chairperson, Criminal Defense Section, Ingham County Bar Association
- Ingham County Bar Association, Mentoring Committee Chairperson and Mentor
- Volunteer Attorney, Western Michigan University Thomas M. Cooley Law School Service to Soldiers Program
- Michigan Association of OWI Attorneys, Board Member
- Marijuana Law Section, Chairperson, State Bar of Michigan
- Ingham County Bar Association, President
- American Bar Association Law Practice Management Education Committee
- Executive Council, State Bar of Michigan, Animal Law Section
- Advisor and Chairperson, State Bar of Michigan Membership Services Committee
- Judge, Michigan Youth in Government Judiciary Program
- Ingham County Bar Association, Meet the Judges Committee Chairperson
- Inns of Court, Michigan State University College of Law
- Board of Directors, American Civil Liberties Union, Lansing
- 55th District Court, Court-to-School Attorney and Speaker
- Phi Delta Phi International Legal Fraternity
- American Bar Association Advisory Panel Member
- Michigan Court Forms Committee, Child Protective Proceedings and Juvenile Guardianship Work Group
- Volunteer Mediator, Resolution Services Center
- Mediation Trainer, Michigan State Court Administrative Office
- Ask A Lawyer, Ingham County Bar Association
- Lansing Area AIDS Network Board Member
- American Bar Association, Women Rainmakers Committee
- American Bar Association, Education Committee
- Ingham County Bar Association, Sponsorship Committee Chairperson
- Family Defense Attorneys of Michigan - Representing Parents Accused of Neglect and Abuse
- Character and Fitness Committee, State Bar of Michigan

## LEGAL PRESENTATIONS

- *CSC Voir Dire to Verdict,* Ingham County Bar Association Criminal Defense Law Section, January 2023
- *All Things Pretrial—Preparing to Win Your CSC Case*, Ingham County Bar Association Criminal Defense Law Section, December 2022
- Community Impact Panel, Clio Legal Conference, October 2022
- *Myths About Wrongful Convictions: What Every Judge Needs to Know*, National Association of Women Judges, October 2022
- *1 Team, 5 Years, and 8 Exonerations*, Federal Public Defenders Office for Western Michigan, September 2022
- *Voir Dire: Picking a Jury in Sexual Assault Cases*, Iowa Association for Justice, May 2022

- *Cross-Examination and Dealing with Difficult Witnesses*, Litigation Bootcamp, Ingham County Bar Association—Young Lawyers Section, April 2022
- *Marijuana in Michigan--Top Ten Issues You Need to Know*, Legal Services of Eastern Michigan Fair Housing Conference, April 2021
- *Digging Daubert,* Criminal Defense Attorneys of Michigan Fall Conference, October 2020
- *Defending OWI Cases: Tips and Tricks,* State Bar of Michigan/Institute for Continuing Legal Education Marijuana Law Conference, October 2020
- *Title IX Hearings—Advocating for Respondents Under the New Law*, May 2020
- *Evidence Extravaganza – How to Rule in the Courtroom with Your Evidence Knowledge*, Criminal Defense Attorneys of Michigan, April 2020
- *Defending the Accused—Voir Dire, Direct, and Cross-Examination in Child Abuse and Child Sexual Abuse Cases*, Wayne County Criminal Advocacy Program, February 2020
- *Michigan Law Update: You Can't Win if You Don't Know the Law*, Criminal Defense Attorneys of Michigan Fall Conference, November 2019
- Presenter, Michigan Lawyers Weekly Women in the Law, September 2019
- Michigan Indigent Defense Commission Trial Skills Trainer, September 2019
- *Big Picture: Recreational Marijuana and Its Practical and Legal Considerations,* Michigan District Judges Association, August 2019
- Michigan Indigent Defense Commission Trial Skills Trainer, August 2019
- *May the Fourth Be With You - Spotting and Litigating Fourth Amendment Issues*, Criminal Defense Attorneys of Michigan, July 2019
- *Social Media Investigation and Admissibility*, Federal Panel Presentation, July 2019
- *Recent Developments in Criminal Law*, Upper Michigan Legal Institute - State Bar of Michigan and the Institute for Continuing Legal Education, June 2019
- *Updates on Marijuana Law,* Women's Council of Realtors, June 2019
- *Know Your Rights - What Every Juvenile Must Know*, Michigan State University 4-H Exploration Program, June 2019
- *The Exoneration of an Innocent Man,* State Bar of Michigan Paralegal/Legal Assistant Section Annual Day of Education, May 2019
- *To (b) or Not To (b) - 404(b) and Other Evidentiary Issues*, Macomb County Bar Association, May 2019
- *Michigan Criminal Practice*, State Bar of Michigan Young Lawyers Summit, May 2019
- *Issue Spotting to Win Your* Case, Michigan Association of OWI Attorneys, May 2019
- *Perfecting the Art of Voir Dire - Selecting the Best Jurors to Win Your Case*, Ingham County Bar Association, April 2019
- *The Intersection of Criminal Law and Family Law - Protecting Your Client's Rights*, Ingham County Bar Association, April 2019
- *Litigating Criminal Sexual Conduct Cases,* Institute for Continuing Legal Education Webinar, February 2019
- *Federal Responses to Drug Crimes,* National Business Institute, November 2018

5

- *Michigan Law Update,* Criminal Defense Attorneys of Michigan Fall Conference, November 2018
- *Burning Issues in Marijuana Law*, Livingston County Bar Association, July 2018
- *Cross-Examining Witnesses to Win Your Case,* Ingham County Bar Association Criminal Defense Section June Meeting, June 2018
- *The Art of War: How To Win Your Case Before Trial Through Effective Motion Practice*, Criminal Defense Attorneys of Michigan Conference, March 2018
- *Evidence for the Defense – Hearsay, 404b, and Other Evidentiary Issues*, Criminal Defense Attorneys of Michigan Conference, March 2018
- Featured Speaker, Criminal Law Training at the 2018 Bench-Bar Conference, February 2018
- *Medical Marijuana Criminal Defense Workshop,* State Bar of Michigan, Marijuana Law Section Annual Conference, September 2017
- *Medical Marijuana and Criminal Defense*, State Bar of Michigan, Solo and Small Firms Section Conference, July 2017
- *Perfecting the Art of Voir Dire – Selecting the Best Jurors for Your Case*, State Bar of Michigan, Young Lawyers Section, Young Lawyer Summit, April 2017
- *20 Hot Topics Under the Michigan Medical Marihuana Act*, Continuing Legal Education International, Cannabis Law Conference, April 2017
- Featured Panelist, Environmental Crimes, Eleventh Annual Fidler Institute at Loyola Law School, Los Angeles, California, March 2017
- *Medical Marijuana: Representing Regulated Entities*, Institute for Continuing Legal Education Webinar, February 2017
- *Pending Marijuana Law Cases in Michigan's High Courts*, Michigan Cannabis Business Development Group, December 2016
- *SCRAM, BAIID, EtG tests and other bond/sentencing issues. What they are, how they work (and don't work) and how to challenge violations*, Michigan Association of OWI Attorneys, November 2016
- *Initial stages: Marketing Tips, Interview, and Discovery*, Michigan Association of OWI Attorneys, November 2016
- *How Do I Defend My Client When the Courts Keep Changing the MMA?*, State Bar of Michigan Marijuana Law Section Inaugural Conference, October 2016
- *Defending CSC Cases*, Lapeer County Bar Association, October 2016
- *Deposition Tips and Training,* National Institute for Training Advocacy, July 2016
- *Rules of Evidence You Need to Know*, National College of DUI Defense, Harvard Law School in Cambridge, Massachusetts, July 2016
- *Litigating Through the Haze of Marijuana Law*, State Bar of Michigan Upper Michigan Legal Institute, June 2016
- *Litigating Through the Haze of Marijuana Law*, NORML, Aspen, Colorado, June 2016
- *Appeal Proofing Your Case*, Michigan Association of OWI Attorneys, May 2016
- *Criminal Law Update – Collateral Consequences of Criminal Convictions*, Ingham County Bench-Bar Conference, February 2016
- *Representation Agreements, Fees, and Collections – Working with Clients and*

*Thriving in Business*, Ingham County Bar Association, January 2016

- *Medical Marijuana Use and Child Custody Cases,* Family Law Institute, Institute for Continuing Legal Education, November 2015
- *"Up in Smoke": The Legal Landscape After the Enactment of the Michigan Medical Marihuana Act*, State Bar of Michigan Annual Conference, October 2015
- *Updates on the Michigan Medical Marihuana Act*, Michigan Cannabis Business Development Conference, October 2015
- *The Evolving Issue of Damages in Animal Law Cases*, State Bar of Michigan Annual Conference, October 2015
- *Running Your Criminal Defense Practice*, Institute for Continuing Legal Education Webinar, June 2015
- *Defending OWI Cases – Hearsay, 404b, and Other Evidentiary Issues*, National College for DUI Defense, Orlando, Florida, January 2015
- *Investigating Claims of Sexual Misconduct*, Lansing Community College, April 2014
- *"Up in Smoke": The Legal Landscape and Marijuana Law*, NORML, Key West, Florida, December 2013
- *Behind the Bench: Tips on the Appellate Process*, State Bar of Michigan, September 2013
- *"Up in Smoke": The Legal Landscape After the Enactment of the Michigan Medical Marihuana Act*, Davis-Dunnings Bar Association, July 2013
- *"Up in Smoke": The Legal Landscape After the Enactment of the Michigan Medical Marihuana Act*, Shiawassee County Bar Association, June 2013
- *Evidence for the Defense – Hearsay, 404b, and Other Evidentiary Issues*, NORML, Aspen, Colorado, May 2013
- *Professionalism in Action*, State Bar of Michigan and Western Michigan University Thomas M. Cooley Law School, April 2013
- *The Practical Impact of Medical Marijuana on Child Welfare Cases: Tips for Advising Clients, Building a Legal Arsenal to Defend Clients*, Michigan State Court Administrative Office, Child Welfare Services Division, February 2013
- *"Up in Smoke": The Legal Landscape After the Enactment of the Michigan Medical Marihuana Act*, Michigan Judges Association Conference, August 2012
- *Exploring Careers in the Law*, Michigan Supreme Court, June 2012
- *Expanding Your Practice – Ten Tips on Client Development*, Ingham County Bar Association Young Lawyers Seminar Series, June 2012
- *Pre-Trial Motions to File at the Beginning of Your Case and to Develop the Issues in Your Case*, Institute for Continuing Legal Education, May 2012
- *Evidence for the Defense: Hearsay for the Truth Issues*, Criminal Defense Attorneys of Michigan Advanced Criminal Defense Practice Conference, Novi, March 2012
- *"Up in Smoke": The Interplay of Child Custody and the Medical Marijuana Statutes*, Family Law Institute, State Bar of Michigan, Institute for Continuing Legal Education, and the Michigan Judicial Institute, November 2011
- *Exploring Careers in the Law*, Michigan Supreme Court, June 2011
- *Circuit Court Pleas and Sentencing*, Ingham County Circuit Court Appointed

Counsel Training, June 2011
- *Judicial Clerkships*, Western Michigan University Thomas M. Cooley Law School, May 2011
- *Medical Marijuana: Legalities and Realities*, ACLU of Michigan, April 2011
- Host and Moderator, *Animal Law Symposium*, State Bar of Michigan, April 2011
- *Criminal Law and Appellate Practice*, University of Michigan Innocence Project, February 2011
- *Update on Legal Issues Involving Medical Marijuana*, Ingham County Bar Association, January 2011
- *Evidentiary Issues and the Right to Present a Defense*, Criminal Defense Attorneys of Michigan Advanced Criminal Defense Practice Conference, Traverse City, November 2010
- *Women's Leadership Conference*, Michigan State University, November 2010
- *Live, Learn, and Grow, Update on Legal Issues Involving Medical Marijuana*, Mid-Michigan Compassionate Choice, Lansing Community College, October 2010
- *Update on Legal Issues Involving Medical Marijuana*, Compassionate Caregivers of Michigan, August 2010
- *Preserving the Record – Appellate Advocacy and Trial Strategies*, Ingham County Bar Association Bench-Bar Conference, February 2010
- *Legal Update on Animal Law*, Animal Law Symposium, State Bar of Michigan, April 2009
- *Best Practices for Law Firm Management*, Sixth Annual Small Firm and Solo Practice Fair, Western Michigan University Thomas M. Cooley Law School, March 2007
- *Judicial Clerkships*, Western Michigan University Thomas M. Cooley Law School, September 2005
- *Working as a Law Clerk*, Western Michigan University Thomas M. Cooley Law School, January 2004
- *Lunch With a Lawyer*, Western Michigan University Thomas M. Cooley Law School, July 2003

## PUBLICATIONS AND MEDIA

- Host, *Constitutional Defenders Podcast*
- Television Host, *In the Name of the Law*, Criminal Defense Segment, WLAJ ABC-TV
- Contributing Author, *Medicolegal Aspects of Marijuana*, May 2019
- Author, Commentary for Michigan Model Criminal Jury Instructions on Evidence, Institute for Continuing Legal Education
- Author, Commentary for Michigan Model Criminal Jury Instructions on Sex Crimes and the Sex Offender Registry Act, Institute for Continuing Legal Education
- *The Police Want to Talk to My Child – What Are Our Rights?*, My Legal, WILX, 2019

8

- Guest to discuss *The Tomasik Exoneration*, State Bar of Michigan's *On Balance* Podcast, Legal Talk Network, January 2018
- *Section 8 – Michigan Medical Marihuana Act's Affirmative Defense Provision*, State Bar of Michigan Bar Journal, August 2016
- Model Criminal Jury Instructions, *Briefs*, December 2013-January 2014
- *People v Koon* case profiled in Mother Jones magazine, March/April issue, "This Car Brakes for Doritos – As legalized pot spreads, what will states do about stoned drivers?"
- Guest to discuss the *State of Michigan v McQueen*, the Michigan Court of Appeals case that held that patient-to-patient sales of marijuana are illegal, Impact 89FM Radio, Michigan State University, August 31, 2011
- Guest to discuss the *First Amendment and the City of Lansing's Profanity Ordinance*, Impact 89FM Radio, Michigan State University, May 4, 2011
- Guest to discuss *Medical Marijuana in the State of Michigan*, Impact 89FM Radio, Michigan State University, April 20, 2011
- *Medical Marijuana: Legalities and Realities*, Lansing ACLU Newsletter, Spring 2011
- *First Amendment and Profanity*, Lansing ACLU Newsletter, Spring 2011
- *Medical Marihuana Act discussed at meeting*, Ingham County Legal News, January 27, 2011, Presentation summarized and quoted in legal newspaper, October 2010
- *A Review of Constitutional Law Based on the Phil and Bill Show*, Ingham County Bar Association Briefs, February 2009

## LEGAL EDUCATION

**Thomas M. Cooley Law School,** Lansing, MI
Juris Doctor, January 2002, *summa cum laude*
Rank 1/136          G.P.A. 3.91/4.00

- Distinguished Student Award from the Thomas M. Cooley Law School Alumni Association
- Law Review Editor-in-Chief
- Winner and Best Brief, 2001 National Criminal Procedure Competition
- Rakow Award for Excellence in Business Law from the Federal District Bar Association of Eastern Michigan
- Leadership Achievement Award
- Semi-Finalist and Second Best Oralist, 2001 National Appellate Advocacy Regional Moot Court Competition
- Highest individual score in the Thomas M. Cooley Intra-School Moot Court Competition
- Certificates of Merit in Criminal Law, Torts II, Civil Procedure II, Property II, Constitutional Law I, Constitutional Law II, Juvenile Law, Trial Workshop, Advanced Trial Workshop, Moot Court, and Advanced Writing
- Teaching Assistant for Dean Nussbaumer's Criminal Law class and Professor Bretz's Criminal Procedure class

- Research Assistant for Dean Cercone in the areas of Civil Procedure and Securities Litigation; Research Assistant for Professor Swedlow in the area of Criminal Procedure
- Moot Court Executive Board; Mock Trial Board
- Grade Appeals Board Chairperson; Appeals Magistrate
- The James E. Burns Memorial Award, Raymond Burr Award, Dean's List, Honor Roll, Honor's Scholarship, and Shane Joseph Johnson Memorial Scholarship

# Exhibit B:
# Plea Letter



# U.S. Department of Justice

Patrick A. Miles, Jr.
United States Attorney
Western District of Michigan

---

5th Floor, The Law Building
330 Ionia Avenue, NW
Grand Rapids, Michigan 49503

Mailing Address:
United States Attorney's Office
Post Office Box 208
Grand Rapids, Michigan 49501-0208

Telephone (616) 456-2404
Facsimile (616) 456-2408

**VIA E-MAIL**

February 12, 2016

Mary Chartier-Mittendorf
Counsel for Defendant
mary@alanechartier.com

       Re: █████████████████████████

Dear Ms. Chartier:

Enclosed, please find the government's offer to resolve this case.  Due in part to █████████ ███████, we are offering her plea to a superseding felony information charging conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 371.  This charge caps her potential sentence at 5 years (as opposed to a maximum of life under the indictment), ████████████████████████ ████████████, and eliminates the sex offender registration requirement. It also caps her potential supervised release at 3 years (as opposed to a minimum of five years and a maximum of life under the indictment).  The government will move to dismiss the indictment against ██████████.

To assist you in evaluating this offer, I have prepared the following, **non-binding, estimated** Sentencing Guidelines calculation:

| | | |
|---|---|---|
| Base offense level | 24 | (§ 2G1.3(a)(4)) |
| Use of computer to facilitate | +2 | (§ 2G1.3(b)(3)) |
| Completion of sex act | +2 | (§ 2G1.3(b)(4)(A)) |
| Multiple instances = pattern* | +5 | (§ 4B1.5(b)(1)) |
| Minor participant in conspiracy | <u>-3</u> | (3B1.2(b)) |
| | 30 | Offense level at trial |
| | | @ criminal history I = 97-121 months |
| | | |
| Acceptance of responsibility | <u>-3</u> | (§ 3E1.1) |
| | 27 | Offense level under plea agreement |
| | | @ criminal history I = 70-87 months, |
| | | capped at 60 months by the 18 U.S.C. § 371 |

statutory maximum, minus additional levels
for cooperation, yet to be determined. If the
Court does not apply the pattern of abuse
enhancement under § 4B1.5(b), then the
guidelines will be 22, which at criminal
history I equal 41-51 months, ██████████
█████████████████████

*Pattern under § 4B1.5(b) should be applied because there were multiple instances where the minors were sex trafficked during the conspiracy, but the Judge may decide not to apply this.

The purpose of providing an estimated Guideline range is solely to present the government's understanding of where ██████████ potential sentence may fall if she were to go to trial rather than plead guilty. The above estimation does not intend to bind either party, or the Court, to any particular position regarding sentencing. The presentence report investigator will calculate the guideline range, and the Court will determine the final guideline calculation at sentencing.

The deadline for acceptance of this plea is February 17, 2016. Note that the deadline requires confirmation that ██████████ has signed the plea agreement, but it does not require that the plea hearing be completed by that date. Please note that after the deadline for acceptance passes, the government may not move for the third point for acceptance, as the effort and expense of trial preparation will not have been avoided.

Feel free to contact me to discuss this plea offer, and I look forward to hearing from you at your earliest convenience.

Sincerely,

PATRICK A. MILES, JR.
United States Attorney

*/s/ Tessa K. Hessmiller*
TESSA K. HESSMILLER
Assistant United States Attorney

Enclosure

cc:     SA Timothy Simon, FBI, w/encl.