UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

JOHN DOES, et al.,
        Plaintiffs,

v.

GRETCHEN WHITMER, et al.,
        Defendants.

No. 2:22-cv-10209

Hon. Mark A. Goldsmith

Mag. J. Curtis Ivy, Jr.

## <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs sought concurrence from Defendants. Defendants did not concur.

The named Plaintiffs, for the certified class and subclasses (Stipulated Certification Orders, R. 35, 109), ask the Court to grant them summary judgment and declaratory relief under Rule 56. Plaintiffs ask the Court to declare that:

1. **Count I - Retroactive Imposition of Punishment:** Retroactively applying Michigan's Sex Offender Registration Act (SORA 2021), M.C.L. § 28.721 *et seq*., to Does A, B, C, D, E, F, G, Ms. Doe, Ms. Roe, and the pre-2011 ex post facto subclass violates the Ex Post Facto Clause.

2. **Count II - Retroactive Extension of Registration Terms:** Retroactively requiring lifetime registration for Does A, B, C, D, E, G, Ms. Doe, Ms. Roe, and the retroactive extension subclass violates the Ex Post Facto and Due Process Clauses.

3. **Count III - Lengthy/Lifetime Registry Without Individual Review:** Imposing lifetime/lengthy registration without individual review violates the rights

of Plaintiffs and primary class under the Due Process and Equal Protection Clauses.

4. **Count IV - Unequal Opportunity to Petition:** Denying Does A, C, E, F, G, Ms. Doe, Ms. Roe, and the barred-from-petitioning subclass the opportunity to petition for removal after ten years on the same terms as registrants eligible to petition under M.C.L. §§ 28.728c(1), (12), violates the Equal Protection Clause.

5. **Count V - Compelled Speech:** Applying SORA 2021's compelled disclosure requirements (M.C.L. §§ 28.724a(1)–(4); 28.725(1)–(3), (7)–(8), (10)–(13); 28.725a(3)–(5), (7)–(8); 28.727(1)) to Plaintiffs, the primary class, and the non-sex offense subclass violates the First Amendment absent individualized review.

6. **Count VI - Violation of Plea Agreements:** Imposing SORA 2021 for life or for a longer term than that in effect at the time of the pleas of Does A, B, C, D, E, Ms. Roe, and the plea bargain subclass violates the Due Process Clause.

7. **Count VII - Non-Sex Offenses:** Requiring Doe A and the non-sex offense subclass to register violates the Due Process and Equal Protection Clauses absent a judicial determination in accordance with the standards of M.C.L. § 769.1(13) finding that they committed an offense that "by its nature constitutes a sexual offense against an individual who is a minor." M.C.L. § 28.722(r)(vii).

8. **Count VIII - Vagueness:** Imposing SORA 2021's vague provisions upon Plaintiffs and the primary class violates the Due Process Clause; and the internet requirements are void for vagueness as to Doe H and the post-2011 subclass.

2

9. **Count IX - Forced Admission of "Understanding":** Requiring Plaintiffs and the primary class to attest that they understand their obligations under SORA 2021 violates the First Amendment.

10. **Count X - Requirements Restricting Speech and Association:** Requiring Doe H and the post-2011 subclass to report email/internet identifiers, M.C.L. §§ 28.722(g), 28.725(2)(a), 28.727(1)(i), 28.728, violates the First Amendment.

11. **Count XI - Non-Michigan Convictions:** (1) determining registration requirements for Doe G, Ms. Doe, and the non-Michigan offense subclass, absent pre-deprivation notice and an opportunity to be heard, violates the Due Process Clause, and (2) imposing harsher requirements on them than are imposed on people with Michigan convictions violates the Due Process, Equal Protection, and Privileges and Immunities Clauses, and Article IV, § 2 of the U.S. Constitution.

12. Plaintiffs' motion addresses liability and declaratory relief only. Because relief on various claims may overlap, the question of what injunctive relief should issue if Plaintiffs prevail is better addressed later, after a ruling on liability and upon further briefing. Plaintiffs seek injunctive relief for all claims on which they prevail.

13. For the reasons set forth in the brief below, the Court should grant summary judgment[1] and declaratory relief, and order briefing on remedies.

---

[1] If factual disputes preclude summary judgment on any claim, Plaintiffs ask the Court to grant judgment on any part of the claim where there are no disputed material facts, and enter a Rule 56(g) order stating what facts are undisputed and established.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

JOHN DOES, et al.,
                    Plaintiffs,

v.

GRETCHEN WHITMER, et al.,
                    Defendants.

No. 2:22-cv-10209

Hon. Mark A. Goldsmith

Mag. J. Curtis Ivy, Jr.

**PLAINTIFFS' BRIEF IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STANDARD OF REVIEW .....................................................................................1

FACTS .....................................................................................................................2

ARGUMENT ...........................................................................................................4

I.      SORA 2021 Violates the Ex Post Facto Clause. ............................................4

      A.      The Ex Post Facto Clause Was Designed to Guard Against Retroactive Legislation Targeting Unpopular Groups. .........................4

      B.      The Sixth Circuit and Michigan Supreme Court Held that Retroactive Application of the 2011 SORA Amendments Is Punishment. .......................................................................................5

      C.      SORA 2021 Is Punishment Under the Ex Post Facto Clause. ..............9

            1.      SORA 2021 Imposes Sanctions Historically Regarded as Punishment. ........................................................................10

            2.      SORA 2021 Imposes Severe Obligations, Disabilities, and Restraints. .........................................................................14

            3.      SORA 2021 Serves the Traditional Aims of Punishment. .......16

            4.      SORA 2021 Is Not Rationally Related to Non-Punitive Interests. .....................................................................16

            5.      SORA 2021 Is Excessive in Relation to Non-Punitive Interests. .....................................................................20

II.     Retroactively Imposing Lifetime Registration Violates the Constitution's Ex Post Facto and Due Process Clauses. ...............................22

      A.      Retroactive Lifetime Registration Violates the Ex Post Facto Clause. ............................................................................22

      B.      Retroactive Lifetime Registration Violates Due Process. ..................23

III.    SORA 2021 Violates Equal Protection and Due Process By Imposing Lengthy and Lifetime Registration with No Consideration of Risk. ...........28

    A.    Because SORA Was Motivated by Animus, at a Minimum Exacting Rational Basis Scrutiny Applies. ...........................29

    B.    Imposing Extensive Burdens That Have No Public Safety Benefit on Thousands of People Who Present No Appreciable Risk Is Irrational. ..................................................33

IV.    Denying Similarly Situated Registrants the Opportunity to Petition for Removal from the Registry Violates the Equal Protection Clause. ..............35

    A.    The Barred-From-Petitioning Subclass Is Similarly Situated to Registrants Who Are Eligible to Petition for Removal......................35

    B.    Denying the Barred-From-Petitioning Subclass an Opportunity to Seek Removal from the Registry Is Irrational. ...............................39

V.    SORA 2021's Compelled Disclosures Violate the First Amendment. .........40

    A.    SORA 2021 Compels Speech in Support of the State's Message that Registrants Are Dangerous.............................................40

    B.    SORA 2021's Compelled Disclosures Are Subject to Strict Scrutiny. ..................................................................43

    C.    SORA 2021's Compelled Disclosure Requirements Are Not Narrowly Tailored to the State's Public Safety Interests....................46

VI.    SORA 2021 Violates Plea Agreements. ........................................48

VII.    Requiring People Convicted of Offenses with No Sexual Component to Register as Sex Offenders Is Unconstitutional............................................53

    A.    Subjecting People Who Did Not Commit Sex Offenses to Sex Offender Registration Cannot Survive Any Level of Scrutiny...........53

    B.    People Who Were Not Convicted of Sex Offenses Are Entitled to Due Process Protections Before Being Subjected to SORA 2021. ...................................................................55

C.      Providing Hearings to Other Non-Sex Offenders While
        Denying Hearings to the Non-Sex Offense Subclass Violates
        Equal Protection. ...................................................................56

VIII.  SORA 2021 Is Unconstitutionally Vague. ....................................57

IX.    SORA 2021 Violates the First Amendment By Compelling
       Registrants to Say They Understand the Law. ..............................61

X.     The Internet Reporting Requirements Violate the First Amendment. ..........62

XI.    The Classification Process for Out-of-Staters Violates the Due
       Process, Equal Protection, and Privileges and Immunities Clauses..............67

       A.      Due Process Protections Are Required Before Putting Those
               with Out-of-State Convictions on the Registry....................................67

       B.      SORA Unconstitutionally Subjects People with Out-of-State
               Convictions to Harsher Treatment. ....................................................70

CONCLUSION ........................................................................72

iv

# TABLE OF AUTHORITIES

## Cases

*ACLU of N.M. v. City of Albuquerque*, 137 P.3d 1215 (N.M. Ct. App. 2006) ................................................................................. 54, 71

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) .............................................................................................. 44

*Alaska Dep't of Pub. Safety v. Doe*, 425 P.3d 115 (Alaska 2018) ........................ 69

*American-Arab Anti-Discrimination Comm. v. Dearborn*, 418 F.3d 600 (6th Cir. 2005) .......................................................................... 63

*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) .................. 43, 46, 47

*Andrews v. City of Mentor*, 11 F.4th 462 (6th Cir. 2021) ................................ 33, 36

*Armstrong v. Manzo*, 380 U.S. 545 (1965) .............................................................. 69

*Associated Builders & Contractors of Southeast Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) .................................... 44

*Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898 (1986) ........................................... 72

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ...................................... 41

*Bannum, Inc. v. City of Louisville*, 958 F.2d 1354 (6th Cir. 1992) ........... 20, 29, 30

*Bassett v. Snyder*, 59 F. Supp. 3d 837 (E.D. Mich. 2014) ............................... 30, 31

*Bassett v. Snyder*, 951 F. Supp. 2d 939 (E.D. Mich. 2013) .................................... 30

*Baxstrom v. Herold*, 383 U.S. 107 (1966) ........................................................ 37, 38

*Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999) ................................................................................................. 58, 60

*Berger v. City of Mayfield Heights*, 154 F.3d 621 (6th Cir. 1998) ......................... 33

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ............................................... 25

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ...................................... 24

*Boykin v. Alabama*, 395 U.S. 238 (1969) ............................................................... 48

*Brady v. United States*, 397 U.S. 742 (1970) .................................................... 48, 50

*Brown v. Montoya*, 662 F.3d 1152 (10th Cir. 2011) .............................................. 68

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982) ...............43

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................43

*Burgess v. Salmon*, 97 U.S. 381 (1878) .....................................................................5

*Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018) ............................................ 44, 62

*Cameron v. Mullen*, 387 F.2d 193 (D.C. Cir. 1967) ................................................38

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ......................................... 13, 18

*Caruso v. Aluminum Co. of Am.*, 473 N.E.2d 818 (Ohio 1984) ..............................19

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)................. 29, 35, 36

*Coleman v. Dretke*, 395 F.3d 216 (5th Cir. 2004) ...................................................55

*Collins v. Youngblood*, 497 U.S. 37 (1990) ...............................................................4

*Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101 (6th Cir. 1995).........................57

*Commonwealth v. Baker*, 295 S.W.3d 437 (Ky. 2009) ..................................... 16, 21

*Commonwealth v. Hainesworth*, 82 A.3d 444 (Pa. Super. Ct. 2013) .....................51

*Commonwealth v. Martinez*, 147 A.3d 517 (Pa. 2016) ...........................................51

*Commonwealth v. Moose*, 245 A.3d 1121 (Pa. Super. Ct. 2021) ...........................53

*Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017)...................................... passim

*Commonwealth v. Thompson*, 548 S.W.3d 881 (Ky. 2018) ....................................27

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926)................................................57

*Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) .......................... passim

*Cornelio v. Connecticut*, 32 F.4th 160 (2d Cir. 2022)......................... 19, 63, 64, 67

*Cornelio v. Connecticut*, No. 19-120, 2023 WL 5979996 (D. Conn. Sep. 14, 2023) ...................................................................................................66

*Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) ..................................................33

*Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278 (1961) .........................................58

*Cummings v. Missouri*, 71 U.S. 277 (1866)...............................................................5

*Detroit Free Press, Inc. v. Dep't of Just.*, 73 F.3d 93 (6th Cir. 1996)....................14

*Detroit Free Press, Inc. v. Dep't of Just.*, 829 F.3d 478 (6th Cir. 2016)................14

*Dias v. City & Cnty. of Denver*, 567 F.3d 1169 (10th Cir. 2009)...........................19

*Doe 1 v. Marshall*, 367 F. Supp. 3d 1310 (M.D. Ala. 2019)..................... 45, 63, 64

*Doe v. Austin*, 848 F.2d 1386 (6th Cir. 1988).........................................................37

*Doe v. Dep't of Pub. Safety and Corr. Servs.*, 62 A.3d 123 (Md. App. Ct. 2013) ................................................................................................. 11, 12

*Doe v. Dep't of Pub. Safety*, 444 P.3d 116 (Alaska 2019) ......................... 13, 20, 34

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ............................................. 63, 64, 65

*Doe v. Jindal*, 851 F. Supp. 2d 995 (E.D. La. 2012) ...............................................40

*Doe v. Jindal*, 853 F. Supp. 2d 596 (M.D. La. 2012) .............................................65

*Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608 (E.D. Ky. 2017) ...................65

*Doe v. Nebraska*, 898 F. Supp. 2d 1086 (D. Neb. 2012)........................................65

*Doe v. Pennsylvania Bd of Prob. and Parole*, 513 F.3d 95 (3d Cir. 2008)......................................................................................... 69, 70, 72

*Doe v. Pryor*, 61 F. Supp. 2d 1224 (M.D. Ala. 1999) ...........................................69

*Doe v. Rausch*, 382 F. Supp. 3d 783 (E.D. Tenn. 2019) ..................... 12, 21, 23, 34

*Doe v. Saenz*, 45 Cal. Rptr. 3d 126 (Cal. Ct. App. 2006).......................................38

*Doe v. State*, 111 A.3d 1077 (N.H. 2015)................................................... 12, 20, 21

*Doe v. State*, 189 P.3d 999 (Alaska 2008) ....................................................... passim

*Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017) ...................................................................................... passim

*Does #1-5 v. Snyder*, 101 F. Supp. 3d 722 (E.D. Mich. 2015)........................ 59, 67

*Does v. Rausch*, 461 F. Supp. 3d 747 (E.D. Tenn. 2020)..................................6, 20

*Does v. Wasden*, 982 F.3d 784 (9th Cir. 2020)........................................................21

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) ......................................... 24, 25

*Edenfield v. Fane*, 507 U.S. 761 (1993) .................................................................66

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ..............................................................29

*Ex parte Weatherly*, No. WR-61,215-10, 2023 WL 2000064 (Tex. Crim. App. Feb. 15, 2023) ........................................................................27

*Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992) ...............................................23

*Gonzalez v. State*, 980 N.E.2d 312 (Ind. 2013)........................................................23

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..................................................58

*Grove City Coll. v. Bell*, 465 U.S. 555 (1984)..........................................................44

*Gwinn v. Awmiller*, 354 F.3d 1211 (10th Cir. 2004) ................................................55

*Hadix v. Johnson*, 230 F.3d 840 (6th Cir. 2000) .....................................................33

*Hawai'i v. Bani*, 36 P.3d 1255, 1265 (Haw. 2001) .......................................... 34, 43

*Henderson v. Thomas*, 891 F. Supp. 2d 1296 (M.D. Ala. 2012)............................19

*Hendricks v. Jones ex rel. State*, 349 P.3d 531 (Okla. 2013) ......................... 71, 72

*Hoffman v. Vill. of Pleasant Prairie*, 249 F. Supp. 3d 951 (E.D. Wis. 2017) .................................................................................................. passim

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995)................................................................................................ 41, 44

*I.N.S. v. St. Cyr*, 533 U.S. 289 (2001)............................................................... 26, 51

*In re T.B.*, 489 P.3d 752 (Colo. 2021) ....................................................................20

*In re Z.B.*, 757 N.W.2d 595 (S.D. 2008)................................................................40

*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011) .......................................................61

*Jackson v. Jamrog*, 411 F.3d 615 (6th Cir. 2005) ..................................................37

*James v. Strange*, 407 U.S. 128 (1972) ..................................................................38

*Johanns v. Livestock Mktg. Ass'n,* 544 U.S. 550 (2005) .........................................61

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002) ..................................70

*Johnson v. United States*, 576 U.S. 591 (2015) ......................................................58

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827 (1990)....................24

*Kansas v. Hendricks*, 521 U.S. 346 (1997).............................................................22

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) .............................................10

*Kia Motors America, Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733 (6th Cir. 2013) ........................................................................ 51, 52

*Kirby v. Siegelman*, 195 F.3d 1285 (11th Cir. 1999)........................................ 55, 68

*Kolender v. Lawson*, 461 U.S. 352 (1983) ......................................................... 57, 60

*Kvech v. New Mexico Dep't of Pub. Safety*, 987 F. Supp. 2d 1162 (D.N.M. 2013) ...................................................................................................................68

*Kyllo v. United States*, 533 U.S. 27 (2001) ...............................................................13

*LaFontaine Saline, Inc. v. Chrysler Group, LLC*, 852 N.W.2d 78 (Mich. 2014) ...................................................................................................................52

*Lambert v. California*, 355 U.S. 225 (1957) .............................................................59

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) .......................................... passim

*Lawrence v. Texas*, 539 U.S. 558 (2003) ............................................................ 29, 31

*Loesel v. City of Frankenmuth*, 692 F.3d 452 (6th Cir. 2012) .......................... 35, 36

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .............................................................69

*Mathews v. Lucas*, 427 U.S. 495 (1976) .................................................................33

*Mathis v. United States*, 579 U.S. 500 (2016) .........................................................71

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................................................................................................1, 3

*McClendon v. Long*, 22 F.4th 1330 (11th Cir. 2022) ...............................................47

*Meredith v. Stein*, 355 F. Supp. 3d 355 (E.D.N.C. 2018) .......................................68

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ................................................................29

*Meza v. Livingston*, 607 F.3d 392 (5th Cir. 2010) ............................................ 42, 55

*Miller v. Carter*, 547 F.2d 1314 (7th Cir. 1977), *aff'd*, 434 U.S. 356 (1978) ...................................................................................................................39

*Moe v. Sex Offender Registry Bd.*, 6 N.E.3d 530 (Mass. 2014) ..............................26

*NAACP v. Alabama*, 357 U.S. 449 (1958) ...............................................................43

*NAACP v. Patterson*, 357 U.S. 449 (1958) .............................................................43

*Nat'l Fed'n of the Blind v. Scribd Inc.,* 97 F. Supp. 3d 565 (D. Vt. 2015) .............19

*National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ....................................................................................... 43, 44, 45

*Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997) ................................................ 42, 55

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ...................................................57

*Ortiz v. Breslin*, 142 S. Ct. 914 (2022) ...................................................19

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*,
    475 U.S. 1 (1986)...................................................................... 41, 42

*Packingham v. North Carolina*, 582 U.S. 98 (2017) ...................................... 62, 66

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ................................................. 26, 27, 50

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1984)................24

*People v. Bell*, 3 Misc. 3d 773 (N.Y. Sup. Ct 2003).................................. 54, 56, 57

*People v. Betts*, 968 N.W.2d 497 (Mich. 2021)............................................... passim

*People v. Dodds*, 7 N.E.3d 83 (Ill. Ct. App. 2014)...................................27

*People v. Fonville*, 804 N.W.2d 878 (Mich. Ct. App. 2011)........................... 27, 49

*People v. Lee*, 803 N.W.2d 165 (Mich. 2011) ................................................. 56, 57

*People v. Lymon*, 993 N.W.2d 24 (Mich. Ct. App. 2022), *leave granted*,
    983 N.W.2d 82 (Mich. 2023)........................................... 8, 53, 55, 64

*People v. Zaidi*, 147 Cal. App. 4th 1470 (Cal. Ct. App. 2007)..............................49

*Pierre v. Vasquez*, No. 20-224, 2022 WL 3219421 (W.D. Tex. Aug. 9,
    2022) ...........................................................................................69

*Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127 (3d Cir. 2000)...........61

*Plyler v. Doe*, 457 U.S. 202 (1982)..........................................................35

*Powell v. Keel*, 860 S.E.2d 344 (S.C. 2021) ...............................................34

*Quispe Del Pino v. Md. Dep't of Pub. Safety & Corr. Servs.*, 112 A.3d
    522 (Md. Ct. Spec. App. 2015)....................................................23

*Raines v. State*, 805 So. 2d 999 (Fla. Dist. Ct. App. 2001) ...................................54

*Reid v. Lee*, 476 F. Supp. 3d 684 (M.D. Tenn. 2020)...........................................6, 20

*Renchenski v. Williams*, 622 F.3d 315 (3d Cir. 2010) ..................................... 42, 55

*Reno v. ACLU*, 521 U.S. 844 (1997) .........................................................65

*Riley v. California*, 573 U.S. 373 (2014) ....................................................13

*Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781 (1988) .............................. 29, 41, 43

*Rinaldi v. Yeager*, 384 U.S. 305 (1966) ...................................................38

*Rogers v. Tennessee*, 532 U.S. 451 (2001) ............................................22

*Romer v. Evans*, 517 U.S. 620 (1996) ........................................... 29, 30

*Saenz v. Roe*, 526 U.S. 489 (1999) .........................................................70

*Santobello v. New York,* 404 U.S. 257 (1971) .......................................49

*Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250 (6th Cir. 2006) ....... 29, 30

*Seal v. Morgan*, 229 F.3d 567 (6th Cir. 2000).........................................35

*Shapiro v. Thompson*, 394 U.S. 618 (1969)....................................... 29, 72

*Shelton v. Tucker*, 364 U.S. 479 (1960)..................................................43

*Smith v. Doe*, 538 U.S. 84 (2003) .................................................. passim

*South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) ..........................19

*Starkey v. Okla. Dep't of Corrs.*, 305 P.3d 1004 (Okla. 2013) ...................... passim

*State v. Barksdale*, 2003 WL 77115 (Ohio Ct. App. 2003)....................................54

*State v. C.M.*, 746 So. 2d 410 (Ala. Crim. App. 1999)...........................................40

*State v. Calhoun*, 694 So. 2d 909 (La. 1997)...........................................49

*State v. Dickerson*, 129 P.3d 1263 (Idaho Ct. App. 2006) .............................. 70, 72

*State v. Hill*, 341 So. 3d 539 (La. 2020), *cert denied*, 142 S. Ct. 311 (2021)...........................................................................................................45

*State v. Hinman*, 530 P.3d 1271 (Mont. 2023) .................................... 10, 12, 20, 21

*State v. Letalien*, 985 A.2d 4 (Me. 2009)..................................... 12, 21, 23

*State v. Reine*, No. 19157, 2003 WL 77174 (Ohio Ct. App. Jan. 10, 2003)............54

*State v. Robinson*, 873 So. 2d 1205 (Fla. 2004)........................................54

*State v. Small*, 833 N.E.2d 774 (Ohio Ct. App. 2005)............................54

*State v. Trammell*, 387 P.3d 220 (N.M. 2016)........................................27

*State v. Washington*, No. 99-L-015, 2001 WL 1415568 (Ohio Ct. App. Nov. 14, 2001) ...........................................................................................54

*State v. Whalen*, 588 S.E.2d 677 (W. Va. 2003)....................................51

*State v. Williams*, 952 N.E.2d 1108 (Ohio 2011)........................................................21

*Taylor v. State*, 698 S.E.2d 384 (Ga. Ct. App. 2010) ..............................................27

*Texas Dep't of Pub. Safety v. Anonymous Adult Texas Resident*, 382 S.W.3d 531 (Tex. Ct. App. 2012)........................................................69

*Texas Ent. Ass'n v. Hegar*, 10 F.4th 495 (5th Cir. 2021) ........................................25

*Tiwari v. Friedlander*, 26 F.4th 355 (6th Cir. 2022) ........................................ 29, 33

*TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty.*, 430 F.3d 783 (6th Cir. 2005)........................................................37

*Trop v. Dulles*, 356 U.S. 86 (1958)........................................................16

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973). ..........................................30

*U.S. Dep't of Just. v. Reporters Comm. For Freedom of Press*, 489 U.S. 749 (1989)........................................................ 13, 14

*United States v. Arnold*, 740 F.3d 1032 (5th Cir. 2014)........................................45

*United States v. Barcus*, 892 F.3d 228 (6th Cir. 2018)..........................................71

*United States v. Barton*, 455 F.3d 649 (6th Cir. 2006)........................................26

*United States v. Berry*, 814  F.3d 192 (4th Cir. 2016)..........................................71

*United States v. Carlton*, 512 U.S. 26 (1994)........................................................25

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) ....................................18

*United States v. Carter*, 463 F.3d 526 (6th Cir. 2006) ..........................................21

*United States v. Caseer*, 399 F.3d 828 (6th Cir. 2005)..........................................59

*United States v. Fox*, 286 F. Supp. 3d 1219 (D. Kan. 2018) ..................................45

*United States v. Hemme*, 476 U.S. 448 (1986) ......................................................25

*United States v. Massey*, No. 05-37, 2021 WL 1267798 (E.D. La. Apr. 6, 2021) ........................................................49

*United States v. Molina*, 68 M.J. 532 (C.G. Ct. Crim. App. 2009) ......................52

*United States v. Moncivais*, 492 F.3d 652 (6th Cir. 2007) ....................................49

*United States v. Montgomery*, 966 F.3d 335 (5th Cir. 2020)..................................71

*United States v. Morales*, 801 F.3d 1 (1st Cir. 2015) ............................................71

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995)......................46

*United States v. Randolph*, 230 F.3d 243 (6th Cir. 2000) ................................ 50, 52

*United States v. Reader*, 254 Fed. App'x. 479 (6th Cir. 2007) ..............................53

*United States v. Riley*, 72 M.J. 115 (C.A.A.F. 2013) ..............................................27

*United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993)....................................58

*United States v. Skidmore*, 998 F.2d 372 (6th Cir. 1993)................................. 50, 52

*United States v. Ubaldo-Figueroa*, 364 F.3d 1042 (9th Cir. 2004)................. 26, 28

*United States v. Vineyard*, 945 F.3d 1164 (11th Cir. 2019) ...................................72

*United States v. Walker*, 931 F.3d 576 (7th Cir. 2019) ...........................................71

*United States v. White*, 782 F.3d 1118 (10th Cir. 2015).........................................71

*United States v. Windsor*, 570 U.S. 744 (2013).......................................... 29, 30, 31

*Van Hoffman v. City of Quincy*, 71 U.S. 535 (1866) ...............................................52

*Vartelas v. Holder*, 566 U.S. 257 (2012) ...............................................................23

*Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950 (9th Cir. 2009), *aff'd sub nom. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)......................................................................................................................62

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ............................................................................................................. 58, 60

*Vitek v. Jones*, 445 U.S. 480 (1980).......................................................................42

*Wallace v. State*, 905 N.E.2d 371 (Ind. 2009) ..................................... 11, 12, 20, 21

*Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005)..........................................30

*Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150 (2002).....................................................................................................................63

*Weaver v. Graham*, 450 U.S. 24 (1981) ...................................................................4

*Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279 (D. Utah 1998)...........................30

*Welch v. Henry,* 305 U.S. 134 (1938)......................................................................24

*White v. Baker*, 696 F. Supp. 2d 1289 (N.D. Ga. 2010) ..........................................65

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) ..............................................46

*Wooley v. Maynard*, 430 U.S. 705 (1977) ........................................ 40, 41

*Yunus v. Robinson*, No. 17-5839, 2019 WL 168544 (S.D.N.Y. Jan. 11, 2019) ...........................................................................................54

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).................. 45, 62

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) .........................................64

**Constitutional Provisions**

U.S. Const. amend. V.........................................................................65

U.S. Const. amend. VI ......................................................................65

U.S. Const. amend. XIV ........................................................... 65, 95, 96

U.S. Const. art. IV, §2, cl.1.................................................................95

U.S. Constitution, art. I, § 10, cl. 1 .........................................................4

**Statutes**

2011 Mich. Pub. Act 18 ....................................................................64

2020 Mich. Pub. Act 295 ...................................................................64

22 U.S.C. § 212b ............................................................................15

M.C.L. § 28.721a. ...........................................................................16

M.C.L. § 28.722 ................................................................... passim

M.C.L. § 28.723 .............................................................................67

M.C.L. § 28.724 ................................................................... 11, 67

M.C.L. § 28.724a ................................................................... 11, 60

M.C.L. § 28.725 ................................................................... passim

M.C.L. § 28.727 ................................................................... 60, 64

M.C.L. § 28.728c ............................................................. 35, 36, 37, 40

M.C.L. § 28.729 ........................................................... 11, 15, 61, 62

M.C.L. § 750.349 ...........................................................................56

M.C.L. § 750.349b ..........................................................................56

M.C.L. § 750.350 ...........................................................................56

M.C.L. § 769.1 .............................................................. 56, 57

**Rules**

Fed. R. Civ. P. 56 ..............................................................1

**Regulations**

24 C.F.R. 982.553 ............................................................15

**Other Authorities**

11 *Williston on Contracts* §30.23 (4th ed. 2012)....................52

Catherine L. Carpenter & Amy E. Beverlin*, The Evolution of Unconstitutionality in Sex Offender Registration Laws*, 63 Hastings L.J. 1071 (2012)....................................................6

Henry M. Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Probs. 401 (1958)...............................................12

Ira M. Ellman, *When Animus Matters and Sex Crime Underreporting Does Not: The Problematic Sex Offender Registry*, 7 U. Pa. J. L. & Pub. Affairs 1 (2021) ...............................................28

Mark Satawa, *Developing a Strong Theory of Defense for Sex Crime Cases* (Aspatore ed., 2012)......................................49

SBA SOP 50 10 5(K) Subpart C (Apr. 1, 2019)...................11

*The Federalist No. 44* (James Madison)..............................5

Wayne A. Logan, *The Ex Post Facto Clause and the Jurisprudence of Punishment*, 35 Am. Crim. L. Rev. 1261 (1998).................5

Wayne Logan, *Knowledge as Power: Criminal Registration and Community Notification Laws in America* (1st ed. 2009) ......... 11, 31

xv

## INTRODUCTION

After a decade of litigation and multiple court rulings holding Michigan's SORA unconstitutional, the legislature finally revised the statute at the end of 2020. The latest iteration (SORA 2021) makes minimal changes to the Act's structure and requirements. Facts, §§ III, IV.A; Highlighted Changes, Ex. 2. SORA 2021 remains a conviction-based law. It retains the same tier system, the same lifetime/lengthy registration periods, and almost the same onerous reporting requirements and online registry, all without any individualized assessment. Regardless of offense circumstances, passage of time, or proven rehabilitation, there is, in almost all cases, no path off the registry, including for the thousands of registrants who are just as safe as Michigan's unregistered population. This regime continues to apply retroactively to people with decades-old convictions. Like its predecessor, SORA 2021 is unconstitutional. The Court should grant Plaintiffs summary judgment.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party establishes the absence of a genuine dispute of material fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*

1

# FACTS

The record facts are summarized in Plaintiffs Statement of Material Facts, and are largely undisputed. There is no genuine dispute that:

- SORA 2021 applies retroactively and that it continues to apply virtually all of the 2011 amendments retroactively. Facts, §§ III, IV.A.
- Conviction-based registries don't correspond to risk, and risk-assessments are much better than the offense of conviction at predicting risk. *Id.*, § IV.D-E.
- Risk varies, and recidivism rates drop dramatically over time. *Id.*, § IV.C.
- Almost three quarters of registrants are subject to SORA for life without any individualized assessment ever. *Id.*, ¶ 76.
- Registration is intertwined with the criminal justice process. *Id.*, § IV.I.
- SORA costs millions. *Id.*, § IV.J.

Defendants may try to argue about the extent and severity of the harm that SORA 2021 inflicts on registrants. But there is no dispute that:

- SORA subjects people to ongoing reporting and surveillance, and the MSP has chosen to require in-person reporting even when not required by statute. *Id.*, § IV.G.1-2.
- SORA results in the loss of employment, housing, and access to education; limits the ability to travel; causes stigma, harassment and vigilantism; impacts registrants' mental health; and harms family relationships. *Id.*, §§ IV.G.4-12.
- The state's decision to impose sex offender registration triggers thousands of other consequences under federal, state, and local laws, and also results in the denial of services by private entities. *Id.*, § IV.G.13.
- Thousands of people have been convicted for violating SORA. *Id.*, § IV.G.3.

There is also no dispute:

- About how the petitioning process works. *Id.*, § VII.
- That registration is central to plea negotiations and that SORA retroactively

2

imposes lifetime registration on people who pled guilty based on their under-standing of the law at the time, and who did not know that their plea would later subject them to lifetime registration. *Id.*, § IV.I.2.

- That SORA requires registration for people who were convicted of non-sex offenses without a judicial determination that their crime had a sexual com-ponent; that the website labels them as "convicted sex offenders"; and that registration for them has adverse and stigmatizing consequences. *Id.*, § X.

- That registrants must sign saying they *understand* SORA. Facts, § XII.

- That the Michigan State Police's (MSP's) process for registering people with non-Michigan convictions includes neither notice nor an opportunity to be heard, and results in harsher treatment for out-of-staters. Facts, § XIV.

There are other facts that Defendants may try not to concede, for example, that:

- 17,000 to 19,000 registrants are no more likely to be convicted of a sex offense than unregistered people. *Id.*, § IV.C.

- SORA is counterproductive because it likely increases rather than decreases sexual offending; it misidentifies the source of the risk; it undermines reentry; its onerous registration requirements serve no public safety purpose; it has unintended consequences that harm survivors and reduce accountability; and it is not needed by law enforcement. *Id.*, § IV.B.

- The digital age has transformed the consequences of registration. *Id.*, § IV.F.

- SORA is imposed out of animus. *Id.*, § IV.H.

- Tier levels (used to determine who can petition for removal) are inversely correlated to risk. *Id.*, § IV.D.

- Both registrants and law enforcement cannot understand SORA's complex and vague requirements. *Id.*, § XI.

- SORA chills registrants' use of the internet. *Id.*, § XIII.

The Court should treat these facts as established. Defendants provide no rele-vant admissible evidence to rebut these facts. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

3

## ARGUMENT

### I.   SORA 2021 Violates the Ex Post Facto Clause.

#### A. The Ex Post Facto Clause Was Designed to Guard Against Retroactive Legislation Targeting Unpopular Groups.

The Ex Post Facto Clause, U.S. Constitution, art. I, § 10, cl. 1, bars the legislature from retroactively inflicting greater punishment than that permitted at the time of the crime. *Collins v. Youngblood*, 497 U.S. 37, 42–43 (1990). The Ex Post Facto Clause addresses two problems with retroactive criminal laws: lack of fair notice and vindictive lawmaking. *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981).

First, retroactivity gives legislatures "unmatched powers ... to sweep away settled expectations suddenly and without individualized consideration." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). The Ex Post Facto Clause assures that "legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver*, 450 U.S. at 28–29. "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Id*. at 30.

Second, the clause "restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id.* at 29. The legislature's "responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals." *Landgraf*, 511 U.S.

at 266. *See Cummings v. Missouri*, 71 U.S. 277, 322 (1866). Because the clause is, in James Madison's words, a "constitutional bulwark" against impassioned legislative overreach, legislatures cannot do retroactively what they can do prospectively.[1]

The fact that "sex offenders are so widely feared and disdained ... implicates the core counter-majoritarian principle embodied in the Ex Post Facto clause." *Does #1-5 v. Snyder*, 834 F.3d 696, 705–06 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017) (*Does I*). The dangers that motivated adoption of the Ex Post Facto Clause are the exact dangers presented by SORA's retroactivity. Plaintiffs—some of whom were convicted before Michigan even created a registry—could not imagine that they would become subject to a life-altering registration regime. Facts, §§ II, IV. Moreover, antipathy toward "sex offenders" is "of the moment": there is no more despised group, and thus no group more at risk of retributive legislation fueled by the "sudden and strong passions" which follow highly-publicized crimes. *Id.* § IV.H.

## B. The Sixth Circuit and Michigan Supreme Court Held that Retroactive Application of the 2011 SORA Amendments Is Punishment.

The threshold question in ex post facto challenges is whether a law imposes punishment. A law's *ex post facto* effect "cannot be evaded by giving a civil form to that which is essentially criminal." *Burgess v. Salmon*, 97 U.S. 381, 385 (1878). In

---

[1] *The Federalist No. 44* (James Madison) (Library of Congress), https://guides.loc.gov/federalist-papers/text-41-50. *See* Wayne A. Logan, *The Ex Post Facto Clause and the Jurisprudence of Punishment*, 35 Am. Crim. L. Rev. 1261, 1267 (1998).

*Smith v. Doe*, 538 U.S. 84, 100 (2003), the Court rejected an ex post facto challenge to a "first-generation" registry law that imposed only "minor and indirect" burdens. Thereafter, lower courts rejected similar challenges, finding registry laws to be regulatory, not punitive. Legislatures, acting with just the sort of passion that the Ex Post Facto Clause was meant to curb, responded by passing ever harsher "super-registration" laws. *See* Catherine Carpenter & Amy Beverlin*, The Evolution of Unconstitutionality in Sex Offender Registration Laws*, 63 Hastings L.J. 1071, 1073–74 (2012).

In *Does I*, the Sixth Circuit made clear that *Smith* cannot "be understood as writing a blank check to states to do whatever they please in this arena." 834 F.3d at 705. The court focused on two sets of amendments: the 2006 amendments imposing exclusion zones, and the 2011 amendments which restructured the registry into tiers, retroactively converted most registrants' terms to life, and required extensive reporting and updating of personal information. *Neither* set of amendments could be retroactive: "The retroactive application of SORA's 2006 and 2011 amendments to Plaintiffs is unconstitutional, and it must therefore cease." *Id.* at 706. District courts have since held that other registration laws violate ex post facto: "the landscape of Sixth Circuit precedent has changed." *Does v. Rausch*, 461 F. Supp. 3d 747, 759 (E.D. Tenn. 2020); *Reid v. Lee*, 476 F. Supp. 3d 684, 704–06 (M.D. Tenn. 2020).

The Michigan Supreme Court agreed: "the 2011 SORA increases registrants' punishment ... in violation of the federal and state constitutional prohibitions on ex

6

post facto laws." *People v. Betts*, 968 N.W.2d 497, 515 (Mich. 2021). SORA resembled traditional shaming because of the breadth of information made public, the subscription-based notices to the public, the lack of active effort needed to get registry information, and the encouragement of social ostracism. *Id.* at 509–10. SORA resembled the traditional punishment of parole because registrants had to report in person to law enforcement, be subject to investigation and supervision, pay fees, and face prison for failure to comply. *Id.* at 510. The requirement to report in person to verify and update information imposed an affirmative disability. *Id.* at 511. The fact that SORA "made no individualized determination of the dangerousness of each registrant, indicat[es] that SORA's restrictions were retribution for past offenses rather than regulations to prevent future offenses." *Id.* at 512. Such "demanding and intrusive requirements"—imposed on tens of thousands of people long after they complete their sentences, regardless of risk and without evidence of SORA's efficacy—were excessive. *Id.* at 514–15. **None of this has changed in SORA 2021**.

In adopting SORA 2021, the legislature excised the 2006 amendments, but left the 2011 amendments, and their retroactive application, almost entirely intact, despite the Sixth Circuit's clear statement that retroactive application of the 2011 amendments is unconstitutional. *Does I*, 834 F.3d at 706; Facts, § IV.A; Highlighted Changes, Ex. 2. SORA 2021 requires "time-consuming and cumbersome" reporting similar to probation/parole, compelling registrants to interrupt their lives "with great

frequency in order to appear in person before law enforcement to report even minor changes to their information," in most cases for life. *Id.* at 703, 705. SORA 2021 "makes no provision for individualized assessments of proclivities or dangerousness" and categorizes people into tiers without any individual review. *Id.* at 705. It "marks registrants as ones who cannot be fully admitted into the community," "discloses otherwise non-public information" and imposes criminal penalties for non-compliance. *Id.* at 703-05. SORA 2021 continues to resemble traditional shaming punishments and probation/parole, *id.* at 702–03; imposes "significant restraints on how registrants may live their lives," *id.* at 703; advances traditional aims of punishment, *id.* at 704; lacks a rational relationship to a non-punitive purpose, *id.* at 704-705; and imposes blanket restrictions whose punitive effects "far exceed even a generous assessment" of possible benefits. *Id.* at 705. These are the very provisions that *Does I* said were punitive. **They have not changed.**

The Michigan Court of Appeals has recognized that SORA 2021, like its predecessor, imposes punishment, holding that SORA 2021's changes to the old SORA did not significantly alter the *Betts* analysis. *People v. Lymon*, 993 N.W.2d 24, 37 (Mich. Ct. App. 2022), *leave granted*, 983 N.W.2d 82 (Mich. 2023).

Defendants cannot get around *Does I*, *Betts*, and *Lymon*. They may argue that the Sixth Circuit was primarily concerned with the exclusion zones. But if so, then the court could simply have said that retroactive application of the 2006 amendments

8

must cease. It did not. The other modifications to SORA—like barring strict liability and eliminating a few in-person reporting requirements—do not transform the previous punitive scheme into a regulatory one. SORA 2021, because it retains almost all of the 2011 amendments, still "categorize[s] [people] into tiers ostensibly corresponding to present dangerousness without any individualized assessment"; requires burdensome reporting, much of which is still in-person and/or within three days; "brands registrants as moral lepers solely on the basis of a prior conviction"; and "consigns them to years, if not a lifetime, of existence on the margins," all despite "scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe." *Does I*, 834 F.3d at 705.

### C. SORA 2021 Is Punishment Under the Ex Post Facto Clause.

To address any argument that *Does I* and *Betts* no longer apply, Plaintiffs go through the ex post facto analysis. The first question is whether the legislature intended the law to be civil or criminal. *Does I*, 834 F.3d at 700–01. The Sixth Circuit, while noting that SORA 2011 had "some features that might suggest a punitive aim," concluded that the legislature's intent was not punitive. *Id.* This time around, however, the legislature kept in place the very features of the law the Sixth Circuit criticized. Moreover, legislators adopted SORA 2021 after being presented with uncontroverted evidence that registries don't work. Facts, §§ III.E., IV.H. The facts in the record on legislative animus coupled with the legislature's decision to ignore both

*Does I* and evidence-based information support a finding that the new law is intended to punish. The Court should "critically look past the civil regulatory façade to the obvious punitive intent" of imposing harsher registration requirements retroactively. *State v. Hinman*, 530 P.3d 1271, 1288 (Mont. 2023) (Sandefur, J., concurring).

If, however, the Court finds that the legislature's intent was not punitive, then the next question is whether the scheme is "so punitive either in purpose or effect as to negate the State's intention to deem it 'civil.'" *Does I*, 834 F.3d at 700 (alterations omitted). The *Mendoza-Martinez* factors, the most relevant of which are discussed in *Smith*, 538 U.S. at 97, provide guidance on whether a purportedly civil law is in fact punitive. *Does I*, 834 F.3d at 701. Those five *Mendoza-Martinez* factors clearly demonstrate that SORA 2021, like SORA 2011, is punishment.

### 1. SORA 2021 Imposes Sanctions Historically Regarded as Punishment.

SORA 2021, like its predecessor, meets the widely accepted definition of punishment: "(1) it involves pain or other consequences typically considered unpleasant; (2) it follows from an offense against legal rules; (3) it applies to the actual (or supposed) offender; (4) it is intentionally administered by people other than the offender; and (5) it is imposed and administered by an authority constituted by a legal system against which the offense was committed." *Does I*, 834 F.3d at 701.

SORA 2021 "resembles the [traditional] punishment of parole/probation." *Id.* at 703. Registrants are under "significant state supervision," and a failure to comply,

"like the failure to comply with parole conditions, potentially subjects the offender to imprisonment."[2] *Betts*, 968 N.W.2d at 510. Registrants must "periodically report in person to law enforcement," *id.*, update their information within three days (often in person), and provide advance notice of travel. M.C.L. §§ 28.724a, 28.725.[3] In fact, the "range of affirmative requirements and adverse consequences experienced as a result of registration well exceed those associated with customary probation and parole."[4] Wayne Logan, *Knowledge as Power: Criminal Registration and Community Notification Laws in America* 138 (2009). Registration is intertwined with the criminal law: an unregistered defendant cannot be sentenced; registration is recorded *in* the judgment; and the registration process is handled by criminal justice agencies. M.C.L. § 28.724; Facts, § IV.I. Sentences for violations—up to ten years—exceed those that many probationers/parolees face if they violate. M.C.L. § 28.729.

SORA 2021 also resembles shaming punishments. *Does I*, 834 F.3d at 702.

---

[2] *See Doe v. Dep't of Pub. Safety and Corr. Servs.*, 62 A.3d 123, 140 (Md. App. Ct. 2013); *Commonwealth v. Muniz*, 164 A.3d 1189, 1212–13 (Pa. 2017); *Starkey v. Okla. Dep't of Corrs.*, 305 P.3d 1004, 1022–23 (Okla. 2013); *Wallace v. State*, 905 N.E.2d 371 (Ind. 2009); *Doe v. State*, 189 P.3d 999, 1012 (Alaska 2008).

[3] Although some information can now be reported by mail, and pre-2011 registrants need not report internet/email IDs, registrants still must provide a huge amount of information, and update minor changes within three days, with many changes still being reported in person. Facts, § IV.G.1; Obligations Summary, Ex. 1, § 11.

[4] The U.S. government has itself recognized the similarity: the Standard Operating Procedures for the Small Business Administration bar assistance to probationers/parolees; a person "who is on a sex offender registry is treated as if the individual is on probation or parole." SBA SOP 50 10 5(K) Subpart C, at 293 (Apr. 1, 2019).

"What distinguishes a criminal from a civil sanction ... is the judgment of community condemnation which accompanies and justifies its imposition." Henry M. Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Probs. 401, 404 (1958). The registry is a world-wide wall of shame where registrants are "branded [as] a potentially violent menace by the state." *Betts*, 968 N.W.2d at 514. "[T]he internet is our town square. Placing offenders' pictures and information online ... holds them out for others to shame or shun." *Doe v. State*, 111 A.3d 1077, 1097 (N.H. 2015).

In *Smith*, the majority rejected shaming analogies, reasoning that Alaska's registry was "more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality." 538 U.S. at 99. But that analysis no longer holds: "The breadth of information available to the public—far beyond a registrant's criminal history—as well as the option for subscription-based notification of the movement of registrants into a particular zip code, [has] increased the likelihood of social ostracism based on registration." *Betts*, 968 N.W.2d at 509. Other courts agree.[5]

"Technology has dramatically changed the form, function, and reach of registry information in the nearly two decades" since *Smith*—a time when only 15% of

---

[5] *See*, *e.g.*, *Muniz*, 164 A.3d at 1212 ("*Smith* was decided in an earlier technological environment"); *Dep't of Pub. Safety*, 62 A.3d at 141; *Rausch*, 382 F. Supp. 3d at 796; *Doe*, 189 P.3d at 1009–10, 1012; *Wallace*, 905 N.E.2d at 380; *State v. Letalien*, 985 A.2d 4, 23 (Me. 2009); *Hinman*, 530 P.3d at 1276-79.

Americans had home internet. Lageson Rept., Ex. 11, ¶¶11, 46–47. Search engine optimization often lists registry information as the *top result*. *Id.*, ¶¶64-69. Unlike in *Smith*, the public need not even visit the website because registrant data is "pushed" on internet users who are not looking for it. *Id.*, ¶¶16, 49–63. The website does not just list convictions. Its architecture "encourage[s] browsing, mapping, and tracking registrants, rather than accessing targeted archival information," and its design conveys that "each person listed [is] a current danger to society." *Id.*, ¶¶12-13.

Digital labeling "mak[es] pariahs of registrants, effectively cutting them out of social, institutional, and technological life," causing damage "far beyond the type and extent of harm the Supreme Court considered in 2003 when it decided *Smith*." *Id.*, ¶¶14, 19. Today registration is "much more akin to forcing a person to appear in public" "labeled by the state as a dangerous sex offender," than it is to visiting an archive. *Id.*, ¶31; *U.S. Dep't of Just. v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 764 (1989) ("vast difference" between court files and clearinghouse of information); *Doe v. Dep't of Pub. Safety*, 444 P.3d 116, 129-130 (Alaska 2019).

The Supreme Court has emphasized the need to account for evolving technology in considering constitutional claims. *See Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018); *Riley v. California*, 573 U.S. 373, 385 (2014); *Kyllo v. United States*, 533 U.S. 27, 35–36 (2001). The Sixth Circuit has specifically recognized that the internet's evolution has changed the consequences of disseminating criminal

history information. *See Detroit Free Press, Inc. v. Dep't of Just.* (*Free Press II*), 829 F.3d 478 (6th Cir. 2016) (en banc) (overruling *Detroit Free Press, Inc. v. Dep't of Just.*, 73 F.3d 93 (6th Cir. 1996), which had held that people have no privacy interest in mugshot photos). "In 1996, this court could not have known or expected that a booking photo could haunt the depicted individual for decades. Experience has taught us otherwise." *Free Press II*, 829 F.3d at 485 (citation omitted). Disclosure "casts a long, damaging shadow over the depicted individual," and "modern technology only heightens the consequences of disclosure [because] 'in today's society the computer can accumulate and store information that otherwise would have surely been forgotten.'" *Free Press II*, 829 F.3d at 482 (quoting *Reporters Comm. for Freedom of the Press*, 489 U.S. at 771). In analyzing the registry's punitive impact, this Court must likewise consider how, as a result of technological change, branding people as "sex offenders" on the internet causes harms that were unimaginable when *Smith* was decided, but that parallel traditional shaming punishments.

### 2. SORA 2021 Imposes Severe Obligations, Disabilities, and Restraints.

Registrants must comply with a dizzying array of restrictions. Obligations Summary, Ex. 1. They must report *in person*, in most cases *every three months for life*; disclose an array of private information for internet publication; report many changes *in person within three days* (e.g., volunteering, taking a class); and report other minor changes (e.g., new phone number, selling a car) *within three days* either

in person or by mail. *Id.*, §§ 10–11. They must report travel in advance, have their biometrics and photos taken, and pay an annual fee. *Id.*, §§ 5, 6, 12. They are subject to ongoing supervision, including police sweeps. Facts, § IV.G.2. "[I]t belies common sense to suggest that a newly imposed lifetime obligation to report to a police station every ninety days to verify one's identification, residence, and school, and to submit to fingerprinting and provide a current photograph, is not a substantial disability or restraint on the exercise of individual liberty." *Betts*, 968 N.W.2d at 511-512.[6]

A "failure to comply with these restrictions carries with it the threat of serious punishment, including imprisonment" for up to 10 years. *Does I*, 834 F.3d at 703; M.C.L. §28.729. "Imprisonment is the 'paradigmatic' affirmative restraint." *Betts*, 968 N.W. 2d at 510 (quoting *Smith*, 538 U.S. at 86). Thousands of registrants have already been prosecuted. Facts, § IV.G.3. For the rest, the threat of "being lugged off in cold irons bound ... [is] always in the background." *Does I*, 834 F.3d at 703.

SORA destroys a person's right to live like other free persons. It is state-sanctioned ostracism, it damages registrants' ability to find jobs and housing, and it triggers countless legal barriers.[7] Facts, § IV.G. The Supreme Court, in holding that

---

[6] Other courts agree. *See*, *e.g.*, *Does I*, 834 F.3d at 703 (in-person reporting is a "direct restraint[] on personal conduct"); *Muniz*, 164 A.3d at 1211; *Starkey*, 305 P.3d at 1022–23; *Wallace*, 905 N.E.2d at 379; *Doe*, 189 P.3d at 1011–12.

[7] *See*, *e.g.*, 24 C.F.R. 982.553(a)(2) (barring access to subsidized housing); 22 U.S.C. § 212b (requiring identifiers on passports); Prescott Rept., Ex. 8, Attach. A.

a similar all-encompassing regime—denaturalization—was punishment, said:

> There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society.... [The individual has] lost the right to have rights.

*Trop v. Dulles*, 356 U.S. 86, 101–02 (1958). SORA 2021 is at least as destructive.

### 3.  *SORA 2021 Serves the Traditional Aims of Punishment.*

The Sixth Circuit found that "SORA advances all the traditional aims of punishment: incapacitation, retribution and specific and general deterrence," but gave this factor less weight because some of those goals are also regulatory. *Does I*, 834 F.3d at 704. Retribution, however, is not a regulatory purpose, and the Sixth Circuit noted that SORA "is retributive in that it looks back at the offense (and nothing else) in imposing restrictions." *Id.*[8] SORA 2021 does exactly the same thing.

### 4.  *SORA 2021 Is Not Rationally Related to Non-Punitive Interests.*

SORA is not rationally related to its purpose of "preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." M.C.L. § 28.721a. First, **SORA is counterproductive because it does not promote, but rather undermines, public safety**. Facts, § IV.B. Expert J.J. Prescott explains:

> [C]ommunity notification laws do not appear to be effective at reducing recidivism; if anything, they increase it. The many burdens registrants experience when subject to notification—the extreme notoriety that accompanies it, and the poor and unstable housing and employment and the difficulty of reintegrating into society that emanate from it—go a long

---

[8] *See*, *e.g.*, *Commonwealth v. Baker*, 295 S.W.3d 437, 444 (Ky. 2009); *Muniz*, 164 A.3d at 1215-16; *Starkey*, 305 P.3d at 1027–28; *Doe*, 189 P.3d at 1014.

16

way toward making sense of why my research finds notification laws are associated with *increases* in recidivism. [Prescott Rept., Ex. 8, ¶19.]

Elizabeth Letourneau, another leading scholar, concurs:

> [R]egistration and notification laws—and especially laws based largely on conviction offense versus validly estimated recidivism risk—simply do not reduce sexual (or nonsexual) recidivism.... [L]aws like Michigan's don't work and are costly. They also have unintended effects that may imperil community safety.... Registries also increase the likelihood of ex-offenders experiencing joblessness, homelessness, and disconnection from prosocial friends and family, which in turn *increase* sexual and non-sexual recidivism.  [Letourneau Rept., Ex. 7, ¶¶11, 23.]

SORA also misidentifies the source of the risk. The vast majority of convictions for sexual offenses—90 to 95%—involve people who are not on registries.[9] Facts, § IV.B.2. Registration discourages survivors from reporting abuse, makes it more difficult to obtain convictions for sex offenses, and diverts resources from programs that do actually reduce sexual offending. *Id.*, ¶¶ IV.B.3-5. The record also shows that law enforcement does not need or use the registry. *Id.*, ¶¶ IV.B.6.

The second main reason SORA is irrational is that it "fail[s] to distinguish between the large percentage of people who present a lower risk of re-offending (especially over time) and the much smaller percentage of people who present a higher risk of re-offending (although that risk also decreases over time)." Letourneau Rept., Ex. 7, ¶6. **Experts who analyzed the class data estimate that between 17,000-**

---

[9] Studies conducted both before and after registries existed show that registrants' low recidivism rates are not the result of registries. Socia Supp. Rept., Ex. 9B, ¶¶108-11.

**19,000 Michigan registrants are just as safe in the community as the average male; thousands more present only a slightly higher risk**. Data Rept., Ex. 4, ¶¶12-13. Registration of "these very low risk individuals serve[s] no public protection function."[10] Hanson Rept., Ex. 5, ¶3.

The science—and the fact that researchers know much more about registries now than when the early cases were decided—matters. The Supreme Court has long recognized that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938). New facts matter when real-world conditions change, as commonly occurs when new technologies emerge. In *Carpenter v. United States*, for example, the Court held that a warrant was necessary to obtain cell-site location information even though under prior precedent information disclosed to a third party was not protected from warrantless searches. 138 S. Ct. at 2211–2218. The Court reasoned that when the third-party doctrine was established, "few could have imagined a society in which a phone goes wherever its owner goes, conveying to the wireless carrier not just dialed digits, but a detailed and comprehensive record of the person's movements." *Id.* at 2217. *See also, e.g., South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080

---

[10] The pronouncements in *Smith* about high sexual recidivism rates were based on an article that has since been thoroughly discredited. Socia Rept., Ex. 9A, ¶¶ 9–12.

(2018); *Nat'l Fed'n of the Blind v. Scribd Inc.,* 97 F. Supp. 3d 565 (D. Vt. 2015).

In *Dias v. City & Cnty. of Denver*, the Tenth Circuit held that a constitutional challenge to a pit bull ban should not have been dismissed, rejecting the argument that the ban was constitutional simply because there were past cases upholding similar bans. 567 F.3d 1169 (10th Cir. 2009). Plaintiffs had plausibly alleged that "although pit bull bans sustained twenty years ago may have been justified by the then-existing body of knowledge, the state of science [today] is such that the bans are no longer rational." *Id.* at 1183. *See Henderson v. Thomas*, 891 F. Supp. 2d 1296, 1305 (M.D. Ala. 2012) (prior decision upholding policy of segregating HIV+ prisoners did not bar new suit where plaintiffs alleged that the factual premise informing the earlier decision was no longer true); *Caruso v. Aluminum Co. of Am.*, 473 N.E.2d 818, 821 (Ohio 1984) (invalidating statute of limitations for silicosis-related deaths based on new evidence that silicosis effects take longer to manifest).

Courts have increasingly recognized the academic consensus that registries do not work. *See, e.g.*, *Ortiz v. Breslin*, 142 S. Ct. 914, 916 (2022) (Sotomayor, J., re. denial of certiorari) (citing research that registry restrictions "may actually increase the risk of reoffending"); *Does I*, 834 F.3d at 704 (questioning SORA's rationality based on evidence that registration "has, at best, no impact on recidivism"); *Betts*, 968 N.W.2d at 514 ("growing body of research" questioning efficacy); *Cornelio v. Connecticut*, 32 F.4th 160, 173 & n.7 (2d Cir. 2022) (collecting cases); *Hoffman v.*

*Vill. of Pleasant Prairie*, 249 F. Supp. 3d 951, 960-62 (E.D. Wis. 2017); *Rausch*, 461 F. Supp. 3d at 767; *Hinman*, 530 P.3d at 1278; *Reid*, 476 F. Supp. 3d at 708; *In re T.B.*, 489 P.3d 752, 768 (Colo. 2021).

Whether a law is rational depends on the facts. In *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354 (6th Cir. 1992), the court (on rational basis review) struck a law limiting reentry housing because the city's rationale was an unsupported assertion that former prisoners might reoffend. Laws based on "conjecture about the dangers posed by sex offenders" are also irrational. *Hoffman*, 249 F. Supp. 3d at 960.

### 5. SORA 2021 Is Excessive in Relation to Non-Punitive Interests.

SORA 2021 is excessive in relation to its avowed public safety goals.[11] Like its predecessor, SORA 2021 subjects people to life-altering restrictions *without any evidence that the registry protects the public*. Facts, §§ IV.B-C, IV.F-G. As with the prior law, "while the statute's efficacy is at best unclear, its negative effects are plain on the law's face.... [The law's] punitive effects ... far exceed even a generous assessment of [its] salutary effects." *Does I*, 834 F.3d at 705. The central features of

---

[11] For many courts, the excessiveness of modern "super-registration" laws tips the balance of the *Mendoza-Martinez* factors to a finding of punishment. *See, e.g.*, *Muniz*, 164 A.3d at 1218 (over-inclusiveness of law in requiring registration of people who do not pose a risk makes it excessive); *Doe*, 111 A.3d at 1100 (lifetime registration "without regard to whether [registrants] pose a current risk to the public" is "wholly punitive"); *Wallace*, 905 N.E.2d at 384 (excessive because no mechanism to end registration even on clear proof of rehabilitation); *Starkey*, 305 P.3d at 1030 ("severe restraint on liberty without a determination of the threat a ... registrant poses to public safety" is excessive); *Doe*, 189 P.3d at 1018; *Doe*, 444 P.3d at 132.

the old SORA that *Does I* and *Betts* found excessive—the stigmatization of registrants, the byzantine code of endless requirements, the lack of individualized assessment—remain. Imposing extensive burdens on tens of thousands of people, many of whom have lived successfully in the community for decades, is excessive. *See United States v. Carter*, 463 F.3d 526 (6th Cir. 2006) (required sex-offender treatment not reasonably related to public protection given how old the offense was).

Weighing the *Mendoza-Martinez* factors, the Sixth Circuit, the Michigan Supreme Court, and courts around the country—e.g., in Alaska, Indiana, Maine, Maryland, Montana, New Hampshire, Ohio, Oklahoma, and Pennsylvania—have recognized that registration is punitive, citing the lack of individual review, the onerousness of ongoing reporting, the length of the registration terms, and the extraordinary harm of being stigmatized as a "sex offender."[12] This Court should do the same.

---

[12] *See, e.g., Hinman*, 530 P.3d at 1276 (registration is a "probationary surveillance system in perpetuity which is designed to facilitate social ostracism"; it "defies common sense" not to recognize it as punishment); *Letalien*, 985 A.2d at 26 (retroactive lifetime registration and in-person reporting without opportunity for removal is punitive); *Starkey*, 305 P.3d at 1029 (extending registration terms without individual review violates ex post facto); *State v. Williams*, 952 N.E.2d 1108, 1113 (Ohio 2011) (punitive to register for long periods absent finding of dangerousness); *Wallace*, 905 N.E.2d at 384 (registration without regard to risk violates ex post facto); *Doe*, 189 P.3d at 1017, 1019 (punitive because extensive burdens without distinctions based on risk or opportunity for removal); *Doe*, 111 A.3d at 1101 (registration could be retroactively applied only after a hearing, and periodic review, to assess if the person posed a risk); *Dep't of Pub. Safety*, 62 A.3d at 143; *Rausch*, 382 F. Supp. 3d at 798 ("stated legislative purposes appear to be supported by popular stereotypes, rather than any individualized assessment of dangerousness"); *Muniz*, 164 A.3d at 1218-19; *cf. Does v. Wasden*, 982 F.3d 784, 791–92 (9th Cir. 2020).

To be clear, holding that SORA violates the Ex Post Facto Clause would not necessarily bar Michigan from imposing reasonable restrictions on people who *are currently dangerous*. The Supreme Court held that a law for the civil commitment of people with sexual convictions did not violate the Ex Post Facto Clause because it "unambiguously requires a finding of dangerousness," restrictions ended immediately "upon a showing that the individual is no longer dangerous," and the state had "taken great care to confine only a narrow class of particularly dangerous individuals, and then only after meeting the strictest procedural standards." *Kansas v. Hendricks*, 521 U.S. 346, 364, 368–69 (1997). What Michigan cannot do is retroactively impose the current regime absent individual assessments to determine if the law's extensive and mostly lifetime restrictions on liberty are warranted.

## II.  Retroactively Imposing Lifetime Registration Violates the Constitution's Ex Post Facto and Due Process Clauses.

Retroactive lifetime registration violates the Ex Post Facto and Due Process Clauses. Both "safeguard common interests—in particular, the interests in fundamental fairness (through notice and fair warning) and the prevention of the arbitrary and vindictive use of the laws." *Rogers v. Tennessee*, 532 U.S. 451, 460 (2001).

### A. Retroactive Lifetime Registration Violates the Ex Post Facto Clause.

By retroactively lengthening registration terms, the legislature has "move[d] the *finish line* without a hearing and with no change in circumstances." *Starkey*, 305

P.3d at 1029. Courts have repeatedly held that such retroactive changes to registration terms violate state and federal prohibitions on ex post facto laws.[13]

Plaintiffs explained above why SORA 2021 is punishment. Those arguments apply with even greater force to retroactive lifetime registration—an especially punitive feature of the law. Plaintiffs add only that lifetime registration is grossly excessive because risk drops off dramatically over time. After ten years in the community without recidivating (for most registrants), and after 20 such years (even for high-risk registrants), *all* registrants reach the ambient risk of non-registrant males in the general population, making registration purposeless. Facts, §§ IV.C.3-5.

## B. Retroactive Lifetime Registration Violates Due Process.

Retroactive lifetime registration also violates due process. Retroactive laws are highly disfavored, reflecting "a legal doctrine centuries older than our Republic," that it is unfair to impair rights or create new disabilities with respect to past actions. *Vartelas v. Holder*, 566 U.S. 257, 266 (2012). "Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992). "The principle that

---

[13] *See, e.g., Gonzalez v. State*, 980 N.E.2d 312, 321 (Ind. 2013); *Quispe Del Pino v. Md. Dep't of Pub. Safety & Corr. Servs.*, 112 A.3d 522, 523 (Md. Ct. Spec. App. 2015); *Dep't of Pub. Safety & Corr. Servs.*, 62 A.3d at 140; *Rausch*, 382 F. Supp. 3d at 799; *Letalien*, 985 A.2d at 26.

the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 844 (1990) (Scalia, J., concurring).

Due process thus "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf*, 511 U.S. at 266. Retroactive legislation must "meet a burden not faced by legislation that has only future effects," namely to show that "the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984); *see also Landgraf*, 511 U.S. at 266 ("a justification sufficient to validate a statute's prospective application under the [Due Process] Clause may not suffice to warrant its retroactive application"). In other words, the constitutionality of retroactive legislation is "conditioned upon a rationality requirement beyond that applied to other legislation." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 223 (1988) (Scalia, J. concurring); *see also Eastern Enterprises v. Apfel*, 524 U.S. 498, 524 (1998) ("stricter limits" for retroactive legislation). Courts must determine if the "retroactive application is so harsh and oppressive as to transgress the constitutional limitation." *Welch v. Henry,* 305 U.S. 134, 147 (1938).

To decide whether retroactive laws are unconstitutionally harsh and oppressive, courts consider several factors. First, because due process "incorporate[s] our settled tradition against retroactive laws of great severity," the seriousness of a law's

retroactive effects matter. *Eastern Enterprises*, 524 U.S. at 549 (Kennedy, J., concurring in the judgment and dissenting in part). A law is suspect if "it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability." *Id.* at 528–29 (plurality). As the Fifth Circuit explained in finding a due process violation where the retroactive application of a rule change resulted in fines for prior conduct, "courts should consider 'whether, without notice, a statute gives a different and more oppressive legal effect to conduct undertaken before enactment of the statute.'" *Texas Ent. Ass'n v. Hegar*, 10 F.4th 495 (5th Cir. 2021) (quoting *United States v. Hemme*, 476 U.S. 448, 569 (1986)). Retroactively increasing the severity of a penalty is a red flag: "The *extent* of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored." *Landgraf*, 511 U.S. at 283–84; *see also BMW of N. Am.*, *Inc. v. Gore*, 517 U.S. 559, 574 (1996) (due process requires notice of severity of potential civil penalty).

Second, courts consider whether a statute's retroactive reach is "confined to short and limited periods." *United States v. Carlton*, 512 U.S. 26, 32 (1994); *id*. at 38 (O'Connor, J., concurring) (retroactivity period over a year would raise "serious constitutional questions"); *Eastern Enterprises*, 524 U.S. at 534 ( "[t]he distance into the past that the Act reaches" matters); *id.* at 549 (Kennedy, J., concurring and dissenting) (degree of retroactive effect affects the law's constitutionality).

Third, courts look at whether notice would have altered a person's decisions.

25

"[W]hen addressing ex post facto-type due process concerns, questions of notice, foreseeability, and fair warning are paramount." *United States v. Barton*, 455 F.3d 649, 654 (6th Cir. 2006). Whether retroactive changes affecting criminal defendants violate due process depends in part on whether "the change in question" would have had "an effect on anyone's behavior." *Id*. at 655. Defendants are not entitled to notice of all "collateral" consequences, but notice is required if consequences are significant and "intimately related to the criminal process," even if they are "not, in a strict sense, a criminal sanction." *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010). "[I]t would surely be contrary to familiar considerations of fair notice, reasonable reliance, and settled expectations" to retroactively impose more severe conviction-based consequences. *I.N.S. v. St. Cyr*, 533 U.S. 289, 323 (2001) (law altering crime's immigration consequences could not apply retroactively). *See Moe v. Sex Offender Registry Bd.*, 6 N.E.3d 530, 544 (Mass. 2014) (retroactively applying internet publication provision violated due process rights of those who had been found to be lower risk).

Finally, the Supreme Court has been especially concerned where retroactive legislation targets unpopular groups. *Landgraf*, 511 U.S. at 266. *See United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1054 (9th Cir. 2004) (Pregerson, J., concurring) (retroactive changes targeted people with past convictions, an unpopular group; "it is arbitrary to assume that all such persons threaten our society because they committed a crime at some time in the past").

Applying these factors, retroactive lifetime registration is so harsh and oppressive that it violates due process. First, the consequences are severe: state stigmatization and supervision until death. Second, the law's retroactive reach is extreme: it imposes draconian consequences based on decades-old conduct. When Doe B was convicted 25 years ago in 1998 (at 19) for having sex with a 14-year-old, he had to register for 25 years. When Doe E (who has a developmental age of nine or ten) pled in 1994, there was no registry. SORA's retroactive amendments require both to register for life. Facts, § II.A. Third, the lack of notice matters, because registration is key to how defendants litigate criminal cases. Facts, § IV.I. Like deportation, lifetime registration is a "severe penalty" that is "intimately related to the criminal process." *Padilla*, 559 U.S. at 357, 365. Numerous courts, including in Michigan, have held that failure to advise defendants of registration consequences is ineffective assistance of counsel.[14] If today's defendants are entitled to notice about registration, it is unfair to impose retroactive lifetime registration when no such notice was given.

Finally, there is no group more despised than people with sex offenses:

> The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the commu-

---

[14] *See, e.g.*, *People v. Fonville*, 804 N.W.2d 878 (Mich. Ct. App. 2011); *Commonwealth v. Thompson*, 548 S.W.3d 881 (Ky. 2018); *State v. Trammell*, 387 P.3d 220, 227 (N.M. 2016); *Taylor v. State*, 698 S.E.2d 384 (Ga. Ct. App. 2010); *People v. Dodds*, 7 N.E.3d 83 (Ill. Ct. App. 2014); *Ex parte Weatherly*, No. WR-61,215-10, 2023 WL 2000064, at *1 (Tex. Crim. App. Feb. 15, 2023); *see also United States v. Riley*, 72 M.J. 115 (C.A.A.F. 2013).

> nity, serves to feed suspicion that something more than regulation of safe-
> ty is going on; when a legislature uses prior convictions to impose burdens
> that outpace the law's stated civil aims, there is room for serious argument
> that the ulterior purpose is to revisit past crimes, not prevent future ones.

*Smith*, 538 U.S. at 109 (Souter, J., concurring). Because retroactive lifetime registra-

tion "sweeps in a broad class of [people] who have committed a crime at some time

in the remote past, no matter how young they were when they committed the offense,

no matter how they have straightened out their lives, [and] no matter whether they

have become loyal hardworking employees, good neighbors, taxpayers, and an asset

to their communities," there is reason to believe it is being used as retribution against

an unpopular group. *Ubaldo-Figueroa*, 364 F.3d at 1054 (Pregerson, J., concurring).

Given that lifetime registration serves no public protection purpose, *see* Facts, ¶188,

requiring it based on decades-old offenses can only be explained as retribution

against an unpopular group. *Landgraf*, 511 U.S. at 266. *See also* Ira Ellman, *When

Animus Matters and Sex Crime Underreporting Does Not*, 7 U. Pa. J. L. & Pub.

Affairs 1, 12–17 (2021). Retroactive lifetime registration denies fair notice, upsets

settled expectations, is harsh and oppressive, and thus violates due process.

## III. SORA 2021 Violates Equal Protection and Due Process By Imposing Lengthy and Lifetime Registration with No Consideration of Risk.

The Supreme Court has flagged but not decided whether registry regimes can

violate equal protection and substantive due process. *Connecticut Dep't of Pub.

Safety v. Doe*, 538 U.S. 1, 8 (2003). Plaintiffs bring such a claim here: SORA, due

to its lack of individual review, restricts the liberty of thousands of people who pose no appreciable risk with no public benefit. The Supreme Court also has had "no occasion to speak [to] ... the standard of scrutiny that might be in order" for such a claim. *Id.* at 10 (Souter, J., concurring). The aspects of SORA that impact fundamental rights—including the right to speak, work, and travel, Facts, §§ IV.G.6, IV.G.8, VIII, XI-XIV—require heightened scrutiny. *See Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988) (speech); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (work); *Shapiro v. Thompson*, 394 U.S. 618, 629, 638 (1969) (travel). With respect to the rest of SORA, "[a]ll laws, whether the challenge arises under the Due Process or Equal Protection Clause, must satisfy rational-basis review." *Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022).

## A. Because SORA Was Motivated by Animus, at a Minimum Exacting Rational Basis Scrutiny Applies.

Laws that reflect animus must be evaluated under an "exacting rational relationship standard." *Bannum*, 958 F.2d at 1360–61. This "more searching form of rational basis review" applies when a law exhibits "a desire to harm a politically unpopular group." *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring)[15]. "[I]f the constitutional conception of 'equal protection of the laws' means

---

[15] *See also Romer v. Evans*, 517 U.S. 620, 633–36 (1996); *United States v. Windsor*, 570 U.S. 744, 770–74 (2013); *Eisenstadt v. Baird*, 405 U.S. 438, 447–55 (1972); *City of Cleburne*, 473 U.S. 432 at 446–50; *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).

anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Courts must review whether "the disadvantage imposed is born of animosity toward the class of persons affected." *Romer*, 517 U.S. at 633–34 . "Negative attitudes" and unsubstantiated fears cannot supply a rational basis; there must be "data reflecting the extent of the danger." *Bannum*, 958 F.2d at 1360–61 (cleaned up). "[C]ourts must look behind the stated justifications to see whether they actually relate to a legitimate governmental purpose." *Bassett v. Snyder*, 59 F. Supp. 3d 837, 849 (E.D. Mich. 2014); *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1289 (D. Utah 1998) (law "based on nothing more than unsupported assumptions, outdated stereotypes, and animosity" is necessarily irrational).

Plaintiffs can establish that a law lacks a rational basis "by demonstrating that [it] was motivated by animus or ill-will." *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005). To determine whether a statute was motivated by animus, courts look to several factors. First, the <u>legislative history and historical background</u> shed light on governmental motivation. *See Moreno*, 413 U.S. at 536 (consulting congressional record); *Windsor*, 570 U.S. at 770 (same); *Bassett v. Snyder*, 951 F. Supp. 2d 939, 968 (E.D. Mich. 2013) (analyzing historical background and legislative history); *Hoffman*, 249 F. Supp. 3d at 960 n.10, 962 (ordinance restricting registrants reflected a bare desire to harm an unpopular group because village presented with

30

evidence that restrictions were counterproductive but adopted them anyway). Second, courts consider <u>the severity of the burdens on the targeted group</u>. *See Lawrence*, 539 U.S. at 581; *Windsor*, 570 U.S. at 772–74. Third, courts find animus where a law is "<u>structurally aberrational</u>" because it puts "wide-ranging and novel deprivations upon the disfavored group" or departs from normal government processes. *Bassett*, 59 F. Supp. 3d at 847. These factors show SORA is grounded in animus.

**Historical and Statutory Background:** Legislative discussions about SORA have taken place against a backdrop of loathing. Facts, §§ III.E, IV.H; Wayne Logan, *Knowledge as Power: Criminal Registration and Community Notification Laws in America* 95 (2009) (legislators call registrants "beasts," "monsters," "animals," and "the human equivalent of toxic waste"). Because "sex offenders" are reviled and politicians can't afford to look "soft" on crime, legislators are unwilling to consider the scientific evidence that registries are ineffective. Facts, §§ III.E, IV.H. Nor has the state ever tried to determine if the law works: "Michigan has never analyzed recidivism rates despite having the data to do so." *Does I*, 834 F.3d at 705.

Perhaps early versions of SORA could be understood as misguided legislative overreach. But by 2020–21, the scientific consensus that registries don't work was clear. Many Michigan legislators recognized that the "sex offender registry [was] a failed law," yet they were unwilling to fix it because they viewed doing so as "political suicide." Facts, ¶¶406–07. After the *Does I* decisions, Michigan did not

amend the law, but just kept enforcing it. *Id.*, ¶¶113, 413. When the legislature did amend the law because it faced an injunction in *Does II*, it ignored (a) stakeholder consensus that shorter terms and paths off the registry make sense, (b) uncontroverted evidence presented to the legislature and executive branch that SORA is ineffective,[16] (c) near-unanimous testimony criticizing the bill, and (d) the Michigan Attorney General's warning that the law would face constitutional challenges if it did not provide for individual review. *Id.*, §§ III.E, IV.A, IV.H; Attorney General Comments, Ex. 122.

**The Burdens:** SORA imposes immense burdens. *Id.*, §§ IV.F–G.

**Structural Aberration:** SORA is unlike other laws. It criminalizes ordinary behavior (that is not criminal for non-registrants) and imposes extensive supervision for decades/life on a disfavored group without any individual assessment. "There is literally nothing else like it." Weisberg Decl., Ex. 21, ¶8. Probation and parole—the closest analogs—are individually determined. Non-punitive systems that impose significant restrictions on liberty (e.g., child protective services, guardianships, medication compliance for mentally ill), all turn on individual assessments and periodic review to ensure these restrictions are warranted. *Id.*, ¶72. SORA is aberrational.

---

[16] *Hoffman*, 249 F. Supp. 3d at 960 n.10, 962 (where village was presented with evidence that residency restrictions on registrants are counterproductive but adopted them anyway, the ordinance reflected a bare desire to harm an unpopular group).

## B. Imposing Extensive Burdens That Have No Public Safety Benefit on Thousands of People Who Present No Appreciable Risk Is Irrational.

SORA 2021 cannot survive any level of review, much less the heightened scrutiny that applies to aspects of the law affecting fundamental rights or the exacting rational relationship standard that applies to the rest of SORA.[17] The unrebutted evidence shows SORA does not promote public safety. Facts, § IV.B. Defendants' own expert admitted that registries are not effective. *Id.*, ¶158. SORA undermines the key factors for reentry (housing, employment, and social connections) and harms survivors. *Id.*, § IV.B.3-5. Law enforcement does not need the registry. *Id.*, § IV.B.6. SORA wastes millions on a system that undermines its very purpose. *Id.*, § IV.J.

Even if one assumes it is rational to have **a** registry—despite the uncontroverted evidence that registries <u>do nothing to reduce recidivism</u>—**this** registry is irrational. Half the registrants living in the community are just as safe as the average male, and many more present only a slightly higher risk. Facts, § IV.C.4. Lifetime registration serves no purpose because even the highest risk people pose no greater

---

[17] Standard rational basis review requires that legislation "bear some rational relation to a legitimate state interest." *Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002). While legislative acts are due deference, the rational basis standard "is not a toothless one," *Mathews v. Lucas*, 427 U.S. 495, 510 (1976), nor "a rubber stamp of all legislative action." *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000). *See also Berger v. City of Mayfield Heights*, 154 F.3d 621, 625 (6th Cir. 1998) (a plaintiff can overcome the presumption of rationality by proving facts that negate the purported justifications for the law); *Andrews v. City of Mentor*, 11 F.4th 462, 475–77 (6th Cir. 2021) (the Supreme Court has found government action constitutionally irrational in a variety of cases); *Tiwari*, 26 F.4th at 362 (collecting cases).

risk after 20 years in the community than non-registrants. *Id.*, § IV.C.3-5. Reporting

requirements have no relationship to public safety. *Id.*, § IV.B.4. Imposing massive,

useless restrictions—in most cases for life—on the liberty of thousands of people

who pose no appreciable danger is excessive, irrational, and rooted in animus.

As noted above, courts have increasingly questioned the rationality of SOR

laws. *See* Section I.C.4, *supra*. They have held that non-reviewable lifetime registra-

tion without any opportunity for judicial review violates due process because it

> cannot be deemed rationally related to the legislature's stated purpose
> of protecting the public from those with a high risk of re-offending .…
> [T]he lifetime inclusion of individuals who have a low risk of re-
> offending renders the registry over-inclusive and dilutes its utility by
> creating an ever-growing list of registrants that is less effective at pro-
> tecting the public.… Because SORA does not provide a mechanism to
> evaluate a registrant's individual risk of recidivism, it is not tied to the
> relative public safety risk presented by the particular registrants.

*Powell v. Keel*, 860 S.E.2d 344, 348–49 (S.C. 2021). *See Doe*, 444 P.3d at 132 (ques-

tioning state's interest in registering people unlikely to commit new offense); *Doe v.*

*Rausch*, 382 F. Supp. 3d 783, 798 (E.D. Tenn. 2019) (registry based on "popular

stereotypes," with no evidence that it protects public); *Hoffman*, 249 F. Supp. 3d at

960–962 (irrational to restrict where registrants can live); *cf. Hawai'i v. Bani*, 36

P.3d 1255, 1265, 1268 (Haw. 2001) (because registry "implicitly announces that …

Bani is a risk," state constitutional due process requires opportunity to contest it).

Deference to rational legislative decisions "does not mean that we must, or

should, rationalize away [the state's] irrational decisions." *Seal v. Morgan*, 229 F.3d

34

567, 579 (6th Cir. 2000). The state may not "rely on a classification whose relation-ship to an asserted goal is so attenuated as to render the distinction arbitrary or irra-tional." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). More-over, when evaluating rationality, the courts properly consider the law's "counter-vailing costs" to those impacted. *Plyler v. Doe*, 457 U.S. 202, 223–24 (1982) (deny-ing education to undocumented children was irrational because it resulted in a "life-time hardship" and imposed stigma "mark[ing] them for the rest of their lives"). Because SORA imposes severe harm for no public safety benefit, it is irrational.

## IV. Denying Similarly Situated Registrants the Opportunity to Petition for Removal from the Registry Violates the Equal Protection Clause.

### A. The Barred-From-Petitioning Subclass Is Similarly Situated to Regis-trants Who Are Eligible to Petition for Removal.

"The line drawn by the legislature between offenders who are sensibly consid-ered eligible to seek discretionary relief from the courts and those who are not is, like all legislative choices affecting individual rights, open to challenge under the Equal Protection Clause." *Connecticut Dep't of Pub. Safety*, 538 U.S. at 10 (Souter, J., concurring). Under SORA, certain registrants who meet strict eligibility criteria can petition for removal from the registry after ten years. M.C.L. § 28.728c(11). Other registrants who meet the same eligibility criteria are denied that opportunity. This scheme violates equal protection because (1) the barred-from-petitioning sub-class is "treated differently than other[s] ... who [are] similarly situated in all mater-ial respects," and (2) the state has no rational basis for the different treatment. *Loesel*

*v. City of Frankenmuth*, 692 F.3d 452, 462, 465 (6th Cir. 2012).

Tier I adult registrants can petition for removal from the registry after 10 years if they have not been convicted of any other registrable offense or felony, and have successfully completed supervised release, probation or parole, and any required sex offender treatment. M.C.L. §28.728c(1), (12). Juveniles who meet those same criteria can petition but must wait **25** years. M.C.L. §28.728c(2), (13). All other registrants who meet those criteria can *never* use this discretion-based petition process, regardless of the circumstances of their offense, how many decades have passed, or their demonstrated rehabilitation. The only difference between eligible registrants and the barred-from-petitioning subclass is that the former were convicted of Tier I offenses, and the latter of Tier II or Tier III offenses. M.C.L. § 28.722(q)-(v).

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne*, 473 U.S. at 439. The barred-from-petitioning subclass is similarly situated in all *material* respects to petition-eligible registrants. Although the groups differ in their underlying offenses, the *offense* is not material to the purpose of the petitioning provision—allowing people to seek removal if rehabilitated. An equal protection challenge tolerates non-material differences. A court "should not demand exact correlation [between the differently treated parties], but should instead seek relevant similarity." *Loesel*, 692 F.3d at 462. *See Andrews v. City of Mentor*, 11 F.4th 462, 474  (6th Cir. 2021);  *TriHealth, Inc.*

36

*v. Bd. of Comm'rs, Hamilton Cnty.*, 430 F.3d 783, 790 (6th Cir. 2005).

*Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005), held that prisoners were not materially different from other litigants with respect to appealing parole decisions because the "challenged statute merely seeks to define the appellate options available to parties aggrieved by decisions of the parole board, [and] prisoners, as well as prosecutors and crime victims, can be aggrieved by such determinations." Thus, "[t]he mere identification of differences is not enough; equal protection 'require[s] that a distinction made have some relevance to the purpose for which the classification is made.'" *Doe v. Austin*, 848 F.2d 1386, 1394 (6th Cir. 1988) (quoting *Baxstrom v. Herold*, 383 U.S. 107, 111 (1966)).

The purpose of SORA's petitioning process is to allow for removal from the registry of rehabilitated people through discretionary judicial review. The court must find that the person is not "a continuing threat to the public." M.C.L. § 28.728c(11). Petitioning functions as an escape valve, providing an opportunity to demonstrate that registration is not warranted. The barred-from-petitioning subclass is similarly situated to petition-eligible registrants in all respects material to that purpose: both groups have registered for ten years; have not been convicted of another registrable offense or felony; and have successfully completed supervised release, probation or parole, and any required sex offender treatment. The only difference (their tier) is not relevant to the statutory goal of providing a path off the registry for people who

are rehabilitated. Individuals in any tier can be rehabilitated. Facts, §§ IV.C–E, VII.

States may punish some offenses more severely than others, but equal protection forbids line-drawing based on offense history where such line-drawing is not related to the statutory purpose. In *Baxstrom*, the Supreme Court held that a civil commitment law violated equal protection because people facing civil commitment who were not in prison were entitled to a jury trial to determine their sanity, while people at the end of a prison term had no such right. 383 U.S. at 111. The Court rejected the state's argument that people's "past criminal records" justified the disparate treatment. The state provided a "judicial proceeding to determine the dangerous propensities of all others civilly committed," *id.* at 114, and "having made this substantial review proceeding" available to others, the state "may not, consistent with the Equal Protection Clause ... arbitrarily withhold it from some."[18] *Id.* at 111.

---

[18] Courts have repeatedly struck down disparate treatment based on criminal history. *See, e.g.*, *Rinaldi v. Yeager*, 384 U.S. 305, 307–10 (1966) (imposing transcript costs only on incarcerated appellants violated equal protection; criminal record bore "no relationship whatever to the purpose of the repayment provision"); *James v. Strange*, 407 U.S. 128 (1972) (treating indigent defendants differently than other debtors violates equal protection); *Cameron v. Mullen*, 387 F.2d 193, 201 (D.C. Cir. 1967) (criminal history relevant to determining whether person is dangerous, but "it cannot justify denial of procedural safeguards for that determination"); *Doe v. Saenz*, 45 Cal. Rptr. 3d 126, 143 (Cal. Ct. App. 2006) ("persons convicted of different crimes may be dissimilar for punitive or rehabilitative purposes," but different offenses did not make them "dissimilar for equal protection purposes").

## B. Denying the Barred-From-Petitioning Subclass an Opportunity to Seek Removal from the Registry Is Irrational.

Tier classifications do not correspond to risk. Indeed, the unrebutted analysis of the class data shows that Michigan's tiers are ***backwards***: people in Tier II or Tier III are lower risk than people in Tier I. Facts, § IV.D. This data is consistent with national research showing that the tier levels of the federal Sex Offender Registration and Notification Act (SORNA) either do not correspond, or are inversely correlated, to the likelihood that people will recidivate. *Id.* Moreover, because risk declines the longer registrants stay conviction-free, a Tier II or III registrant who has lived in the community for decades is likely to be even lower risk than a Tier I registrant after ten years. *Id.* Yet only the latter person can petition—a plainly illogical result. *See Miller v. Carter*, 547 F.2d 1314, 1316 (7th Cir. 1977) (providing discretionary review to people whose offense was recent, while denying review to those with older offenses, was irrational), *aff'd by an equally divided court*, 434 U.S. 356 (1978).

The facts here highlight the irrationality. Every single subclass representative is low risk but cannot petition. Facts, § IV.C.8. Doe C, for example, is *very low* risk. He is married to and has children with the victim of his offense. *Id.*, § II.A. Denying him discretionary review, while offering it to others, defies common sense.

Requiring **juveniles to wait 15 years longer than adults** to petition is also irrational. The class data analysis shows that 99% of child-registrants did not recidi-

vate, a finding consistent with national research. Facts, § IV.C.6.c. Moreover, "*without exception* the entire published research literature focusing on juvenile registration and notification fails to find any public safety effect of SORNA-based laws." Letourneau Rept., Ex. 7, ¶¶6, 10. Courts have repeatedly struck down laws that subject juvenile registrants to stricter requirements than adults. *See In re Z.B.*, 757 N.W.2d 595, 600 (S.D. 2008) ("we cannot conceive of any state of facts to suggest a rational basis for the harsher treatment of juveniles"); *State v. C.M.*, 746 So. 2d 410, 415 (Ala. Crim. App. 1999). Denying Tier I and child registrants the chance to petition for removal is also irrational because ongoing registration of rehabilitated people strains the state's resources to no purpose. Facts, §§ IV.C.6.c, IV.C.J.

In sum, because there is a "lack of evidence" supporting the state's tier-based restrictions on access to the petitioning process, those restrictions violate equal protection. *See Hoffman*, 249 F. Supp. 3d at 962; *cf. Doe v. Jindal*, 851 F. Supp. 2d 995 (E.D. La. 2012). All registrants, regardless of *tier*, should be eligible to petition for removal on equal terms under M.C.L. §§28.728c(1), (12).

## V. SORA 2021's Compelled Disclosures Violate the First Amendment.

### A. SORA 2021 Compels Speech in Support of the State's Message that Registrants Are Dangerous.

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The "principle of autonomy to control one's own speech" means the government cannot

"interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574, 579 (1995). "[C]ompelled statements of 'fact'" "burden[] protected speech" as much as "compelled statements of opinion." *Riley*, 487 U.S. at 797–98. The First Amendment applies "not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573. "The constitutional harm—and what the First Amendment prohibits—is being forced to speak rather than to remain silent." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004). The harm does not turn on whether speech is ideological or factual. *Id.*

"Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley*, 487 U.S. at 795. The state cannot require people "to participate in the dissemination of an ideological message," or force them "to be an instrument for fostering public adherence to an ideological point of view [they] find[] unacceptable," unless such requirements are narrowly tailored to advance a compelling state interest. *Wooley*, 430 U.S. at 713–14, 716. In *Wooley*, the Court held that a person could not be punished for refusing to use his own resources (his car) to display the state's motto on his license plate. *Id.* at 717. And in *Pacific Gas & Electric Co. v. Public Utilities Comm'n of California*, 475 U.S. 1 (1986), the Court held that the government could not require companies to make their resources

41

(mailings) available to disseminate messages with which they disagreed. The company had the right to be free from restrictions that "abridge its own rights in order to enhance the relative voice of its opponents." *Id.* at 14.

SORA commands both *where* registrants must speak and *what* they must say: they must go to a police station; say they are sex offenders; and disclose their email, travel plans, classes taken, weight, tattoos, etc. The process is humiliating—typically taking place in public police station lobbies—and time-consuming. These requirements are imposed without any individual review, mostly last for life, and have a chilling effect on registrants' speech and association. Facts, §§ IV.G, VIII, XIII.

The state then uses the compelled information to widely disseminate the message that they are dangerous sex offenders. "We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of [a person] as a sex offender." *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) (quoting *Vitek v. Jones*, 445 U.S. 480, 494 (1980)); *Renchenski v. Williams*, 622 F.3d 315, 326 (3d Cir. 2010); *Meza v. Livingston*, 607 F.3d 392, 402 (5th Cir. 2010); Socia Rept., Ex. 9.A, ¶¶17–19 (state's use of the term "sex offender" communicates that registrants are predators at high risk of committing new sex crimes). By warning about one type of offenses and not others, the registry conveys that those listed are uniquely dangerous. *Smith*, 538 U.S. at 109 (Souter, J., concurring). The state's goal "is to send a message that probably would not otherwise be heard, by selecting some conviction

information out of its corpus of penal records and broadcasting it with a warning. Selection makes a statement." *Id. See Bani*, 36 P.3d at 1265 (same). Michigan's registry website is designed to reinforce the message that all registrants present a <u>current</u> threat. Facts, §§ IV.F, VIII. Plaintiffs vehemently disagree with that message.

## B. SORA 2021's Compelled Disclosures Are Subject to Strict Scrutiny.

As in *Wooley* and *Pacific Gas*, registrants are forced to alter their own speech to assist the government in disseminating a message they believe to be false and misleading, making it a content-based regulation subject to strict scrutiny. *Riley*, 487 U.S. at 795. The government must therefore establish that its interest is compelling, and that the speech limitation is the least restrictive means of achieving it. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021). Compelled disclosures pose a special threat where they are made public, especially if publication can result in harassment—as happens with SORA.[19] *Bonta*, 141 S. Ct. at 2388; Facts, § IV.G.4.

That registrants report "facts" cannot obscure the reality that they are being compelled to support the state in conveying a message to which they object. In *Nat'l Institute of Family and Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018), the Supreme Court struck down a requirement that pregnancy centers post factual information about abortion, holding that the centers cannot be compelled to help the state publish

---

[19] *See also Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 98 (1982); *NAACP v. Patterson*, 357 U.S. 449, 462 (1958); *Buckley v. Valeo*, 424 U.S. 1, 74 (1976); *Shelton v. Tucker*, 364 U.S. 479, 486 & n.7 (1960).

*its* message. *Id.* at 2371. In the same way, registrants cannot be compelled to provide facts to support the state's message that they are dangerous sex offenders—a message that they too are "devoted to opposing." *Id.*

Frequent reporting to law enforcement also restricts registrants' autonomy, a core First Amendment concern. *Hurley*, 515 U.S. at 574. SORA's reporting obligations have no exact parallel, but courts in other contexts have recognized that forcing a person to speak, even if just to provide information, can be "a severe intrusion on ... liberty." *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (First Amendment protected inmate from being forced to provide information about other inmates, given the degree of intrusion on his liberty).[20] The same is true here.

To be sure, not every requirement to fill out a government form or provide information to the state triggers strict scrutiny. Disclosures needed to support essential government operations, like collecting taxes or assessing eligibility for a government benefit (e.g., gun permit, law license), can be required, *Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984), though there are limits on what speakers can be compelled to say, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219–21 (2013). Disclosures are also a routine part of economic regulation,

---

[20] *Cf. Associated Builders & Contractors of Southeast Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655, at *10 (E.D. Tex. Oct. 24, 2016) (even in the less-protected government contracting context, contractors cannot be compelled to "publicly condemn themselves" by disclosing alleged violations of labor laws).

though protections for commercial speech again limit what speech can be compelled and how burdensome disclosures can be. *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). (Such disclosures are typically not *publicly* available.)

Disclosures under SORA 2021 involve neither economic regulation nor commercial speech, but rather individual compelled speech to support a state message. Thus, strict scrutiny is the proper standard, *Becerra*, 138 S. Ct. at 2371–74, as courts have recognized when reviewing compelled speech claims by registrants.[21] In *State v. Hill*, 341 So. 3d 539 (La. 2020), *cert denied*, 142 S. Ct. 311 (2021), the Louisiana Supreme Court, applying strict scrutiny, invalidated a law compelling registrants to carry an ID card with the words "SEX OFFENDER." The court in *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1318 (M.D. Ala. 2019), struck down a similar law under strict scrutiny, stating that "sex offenders are not second-class citizens" and "[t]he Constitution protects their liberty and dignity just as it protects everyone else's."

Here it is the government proclaiming that registrants are dangerous "sex offenders." But compelling registrants to contribute to that message is equivalent to

---

[21] A few courts, while recognizing strict scrutiny applies, have rejected such compelled speech challenges, simply crediting inaccurate state assertions that reporting is necessary, and failing to conduct the searching review that strict scrutiny requires. *See United States v. Fox*, 286 F. Supp. 3d 1219, 1223–24 (D. Kan. 2018) (applying strict scrutiny but assuming, incorrectly, that registrants have high recidivism rates and that information collected was necessary to monitor them). *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014), did not consider the standard of review and assumed registration is essential, but noted that the registrant (unlike here) had not argued that he was required to support a governmental message.

forcing them to carry a state-issued ID card saying the same thing. (Indeed, many more people will see the online registry than a driver's license.) SORA 2021 curtails registrants' autonomy through a scheme of continuous, often in-person reporting, and by forcing them to participate in their own subjugation by furnishing information that the state rebroadcasts to stigmatize them as dangerous. Strict scrutiny applies.

### C. SORA 2021's Compelled Disclosure Requirements Are Not Narrowly Tailored to the State's Public Safety Interests.

Under strict scrutiny the government's interest must be compelling, and the speech limitation must be the least restrictive means of achieving it. *Bonta*, 141 S. Ct. at 2383. "[I]t is the rare case" that satisfies strict scrutiny. *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015). The state has a strong interest in preventing sexual recidivism. But an ineffective registration scheme that compels people who pose no appreciable risk to report information—much of which is already available through other sources, and little of which is ever used, Facts, §§ IV.C, IV.G, VIII— is not narrowly tailored, let alone the least restrictive means, to advance that interest. The state bears the burden of proof. It may not simply speculate that registries work or that all registrants are dangerous. Even when the state's interests are "undeniably powerful," if the government regulates "speech as a means to ... prevent anticipated harms, it ... must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 472, 475 (1995).

46

*Bonta* is instructive. While California had an important interest in preventing

wrongdoing by charities, compelled donor disclosure requirements violated the First

Amendment because there was "a dramatic mismatch ... between the interest that the

[state] seeks to promote and the disclosure regime that [it] has implemented in ser-

vice of that end." *Bonta*, 141 S. Ct. at 2386 (majority opinion).[22] The scheme was

not narrowly tailored because (1) it created a "dragnet" to collect information from

thousands of charities though the information was only relevant in a few cases, and

(2) the state had not considered less intrusive alternatives. *Id.* at 2386–87.

The same is true here. SORA's compelled disclosures are mismatched to the

state's goals. Neither registries nor reporting requirements reduce recidivism. Facts,

§ IV.B. "The requirement that registrants make frequent, in-person appearances

before law enforcement ... appears to have no relationship to public safety at all."

*Does I,* 834 F.3d at 705. Because there is no individual review, SORA's speech

burdens are not limited to those who may present a risk. *See McClendon v. Long*, 22

F.4th 1330, 1338-39 (11th Cir. 2022) (policy of placing warning signs outside of

registrants' homes was not narrowly tailored because not limited to those "likely to

recidivate"). And the state has not considered less intrusive ways to obtain the same

---

[22] *Bonta*—which invalidated disclosure requirements because of their impact on associational rights—also separately supports Plaintiffs' challenge to those reporting requirements that implicate their ability to associate with others, particularly obligations to report internet activity, travel, and education. *Bonta*, 141 S. Ct. at 2382.

information—much of which is otherwise available. Facts, §§ IV.B.6, VIII.B.

In sum, imposing onerous compelled speech obligations on tens of thousands of people is not narrowly tailored to the state's interest, and cannot survive strict scrutiny.[23] Finally, these arguments apply with even greater force to the non-sex offense subclass, since they not only disagree with the message that they are dangerous, but also reject the state's false labeling of them as convicted sex offenders.

## VI.    SORA 2021 Violates Plea Agreements.

"[A] guilty plea is a grave and solemn act..., the defendant's consent that judgment of conviction may be entered without a trial—a waiver of his right to trial before a jury or a judge." *Brady v. United States*, 397 U.S. 742, 748 (1970). By pleading, a person relinquishes the right to proof beyond a reasonable doubt; to confrontation; to remain silent; and to call witnesses. U.S. Const. amends. V, VI, XIV; *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). Due process protects the integrity and solemnity of pleas in two ways. First, defendants' waiver of constitutional rights "not only must be voluntary" but must be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748. Second, agreements made with defendants must be fulfilled. *Santobello*

---

[23] Granting relief on this claim would not prevent the state from compiling a database of people with past sex offenses based on information the state already has or separately obtains (e.g. court records, postal service records). What Plaintiffs seek here is simply protection from compelled disclosure absent individual review.

*v. New York,* 404 U.S. 257, 262 (1971). Because defendants give up their rights, the government is held "to meticulous standards of performance ...  The *Santobello* rule proscribes not only explicit repudiation of the government's assurances, but must in the interests of fairness be read to forbid end-runs around them." *United States v. Moncivais*, 492 F.3d 652, 662 (6th Cir. 2007) (citations omitted).

For people charged with sex offenses, whether registration is required, and for how long, are key factors in plea decision-making. Facts, § IV.I.2. The severity of registration makes it a strong bargaining chip for prosecutors, who are trained to leverage it in negotiations; conversely, defense attorneys bargain to avoid it.[24] *Id.* The Michigan Court of Appeals and other courts have held that if defendants are not advised of registration consequences, that "affects whether the plea was knowingly made."[25] *People v. Fonville*, 804 N.W.2d 878, 895 (Mich. Ct. App. 2011). These cases analogize to *Padilla v. Kentucky*, which held that notice of immigration conse-quences is required for a plea to be voluntary since deportation is a "severe penalty" that is "intimately related to the criminal process" and a "nearly ... automatic result"

---

[24] Mark Satawa, *Developing a Strong Theory of Defense for Sex Crime Cases* 5-7 (Aspatore ed., 2012) (discussing sex offender registration as perhaps the most important consideration in plea bargaining).

[25] *See supra* note 14; *People v. Zaidi*, 147 Cal. App. 4th 1470, 1484 (Cal. Ct. App. 2007) (given "magnitude of the consequence," defendant's plea involuntary where not advised that registration would be for life); *United States v. Massey*, No. 05-37, 2021 WL 1267798, at *6, *8 (E.D. La. Apr. 6, 2021) (where defendant not fully aware of ramifications of his plea, supervision conditions could not be modified to require registration); *State v. Calhoun*, 694 So. 2d 909, 914 (La. 1997).

of conviction, making it difficult "to divorce the penalty from the conviction." 559 U.S. at 357, 365-66. The same is true here.

Not only does retroactive imposition of lifetime or lengthened registration fail to accord with the requirement that people who are giving up their constitutional rights do so with "sufficient awareness of the relevant circumstances and likely consequences," *Brady*, 397 U.S. at 748, but it also vitiates the deal these people struck with the state in return for giving up those rights. As the Sixth Circuit has explained:

> [p]lea agreements are contractual in nature. In interpreting and enforcing them, we are to use traditional principles of contract law. However, they are more than that.... [A] defendant's underlying right of contract is constitutional, and therefore implicates concerns in addition to those pertaining to the formation and interpretation of commercial contracts between private parties.... [W]here the consensual nature of a plea agreement is called into question—where the defendant was not fairly apprised of its consequences—it can be attacked under the due process clause.... **The requirement that a defendant be afforded due process of law necessitates that [his] reasonable expectation of benefit from the plea agreement be respected.**

*United States v. Randolph*, 230 F.3d 243, 249-50 (6th Cir. 2000) (cleaned up, emphasis added). In *Randolph*, the agreement itself did not bar a subsequent prosecution, but "whatever the technical niceties that govern the contractual meaning of the plea agreement language," the government's conduct was "simply unfair." *Id.* at 249. Thus, in determining whether a plea agreement has been breached, courts look at what the parties "**reasonably understood to be the terms of the agreement**." *United States v. Skidmore*, 998 F.2d 372, 375 (6th Cir. 1993). The Supreme Court

has held that a law imposing more severe conviction-based immigration consequences could not be applied retroactively. *St. Cyr*, 533 U.S. at 323. Because defendants "rely[] upon settled practice, the advice of counsel, and perhaps even the assurance in open court" regarding the consequences of a plea, the "potential for unfairness in the retroactive application of [the statute] … is significant and manifest." *Id*.

Retroactively imposing or lengthening sex offender registration beyond that contemplated at the time of the plea is fundamentally unfair:

> A criminal defendant enters the court with an array of constitutional rights that he or she must surrender upon pleading guilty. When a person yields rights that our federal and state Constitutions recognize as fundamental, strict performance is required of the prosecution. This is so regardless of a subsequent change in the law, and irrespective of whether such change affects only a collateral consequence of the guilty plea.

*Commonwealth v. Martinez*, 147 A.3d 517 (Pa. 2016) (Wecht, J., concurring) (citation omitted).[26] *Martinez* is consistent with *Kia Motors America, Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733, 738 (6th Cir. 2013), which held that statutory amendments that "would alter a key aspect of the parties' bargain" did not apply retroactively. The court rejected the argument that the prior statute created no vested rights, explaining that the parties "acquired *contract* rights" incorporating

---

[26] *See Commonwealth v. Hainesworth*, 82 A.3d 444, 449 (Pa. Super. Ct. 2013) (en banc) ("In negotiating a plea that will not require him to register as a sex offender, the defendant trades a non-trivial panoply of rights in exchange for his not being subject to a non-trivial restriction. Fundamental fairness dictates that this bargain be enforced."); *State v. Whalen*, 588 S.E.2d 677, 682 (W. Va. 2003) (registration "simply not part of what [defendant] "bargained" for in pleading guilty).

prior law. *Id.* at 741. "Contracting parties are free to agree that their rights and duties will track the law as it changes, but because the terms of their bargain could be significantly altered, they must make their intent to do so clear."[27] *Id.* at 738.

Principles of contract construction require applying the law in effect at the time of contract formation, so it does not matter whether a contract—or a plea agreement—specifically references existing law. *See* Williston, *supra*, §30.19 (a contract "incorporates the law existing at the time when the contract was made").[28] What matters is what the plea bargain subclass reasonably expected in return for giving up their constitutional rights. *Randolph*, 230 F.3d at 250; *Skidmore*, 998 F.2d at 375; *cf. United States v. Molina*, 68 M.J. 532 (C.G. Ct. Crim. App. 2009) (enforcing expectation of non-registration even though that term did not appear in plea agreement).

By retroactively lengthening or imposing lifetime registration on people who reasonably expected no or shorter registration in return for pleading guilty, Michigan has changed the terms of plea deals. The state may no longer like the deals it made,

---

[27] *See LaFontaine Saline, Inc. v. Chrysler Group, LLC*, 852 N.W.2d 78 (Mich. 2014) (rejecting retroactive application of statute that would impose "greater burdens than those in place" at the time contract was made); 11 *Williston on Contracts* §30.23 (4th ed. 2012) ("Changes in the law subsequent to the execution of a contract are not deemed to become part of agreement unless its language clearly indicates such to have been intention of parties.").

[28] *Van Hoffman v. City of Quincy*, 71 U.S. 535, 550 (1866) (existing laws "enter into and form a part of [a contract], as if they were expressly referred to and incorporated in its terms").

but a deal is a deal. Unilateral modification of plea agreements through "addition of new conditions which did not exist" when the agreements were made is impermissible; to allow it "would play 'gotcha' with a revered and favored method of resolving criminal cases." *Commonwealth v. Moose*, 245 A.3d 1121, 1133 (Pa. Super. Ct. 2021).[29] And for people who pled before the registry even existed, imposing punitive registry requirements "effectively increases a defendant's agreed-upon criminal sentence.... [which] would not only violate *ex post facto* principles, but would alter a fundamental term of the bargain as to the sentence." *Id.* at 1133.

## VII. Requiring People Convicted of Offenses with No Sexual Component to Register as Sex Offenders Is Unconstitutional.

### A. Subjecting People Who Did Not Commit Sex Offenses to Sex Offender Registration Cannot Survive Any Level of Scrutiny.

SORA states that its purpose is "preventing and protecting against the commission of future criminal **sexual acts** by **convicted sex offenders**." M.C.L. §28. 721a (emphasis added). The online "Michigan Sex Offender Registry" identifies those listed as "sex offenders." Registry Screenshots, Ex. 120, at 1-2. SORA does not define the term "sex offender," but the dictionary defines a "sex offender" as "a person who has been convicted of a crime involving sex." *Merriam-Webster.com*. "Simple logic compels the conclusion that an individual on the *sex* offender registry has committed an offense with a *sexual* component." *Lymon*, 993 N.W.2d at 45-46.

---

[29] *Cf. United States v. Reader*, 254 Fed. App'x. 479, 482 (6th Cir. 2007) (plea invalid where defendant wrongly informed that supervised release max was 3 years).

People not convicted of sex crimes are not sex offenders.

Numerous courts have held that requiring people to register as sex offenders when their offense did not involve sex violates due process and/or equal protection, in some cases applying strict scrutiny because fundamental rights are involved,[30] and in others declining to decide the level of scrutiny because sex offender registration for non-sex offenders does not survive even rational basis review.[31] "There is no rational reason for applying this intensely stigmatizing designation" to a person who did not commit a sex crime. *Yunus v. Robinson*, No. 17-5839, 2019 WL 168544, at *11 (S.D.N.Y. Jan. 11, 2019). It is as if the state "designat[ed] all persons convicted of felonies as 'murderers,' with registration and reporting requirements," such that neighbors were alerted that a "murderer" had moved nearby, when in reality the person was "convicted of an esoteric election-law felony. It is the misnaming, or mischaracterization, of the offense" that "confounds the ordinary understanding of the words used." *State v. Reine*, No. 19157, 2003 WL 77174, at *4 (Ohio Ct. App. Jan. 10, 2003). The Michigan Court of Appeals has held that registration for non-

---

[30] *See, e.g.*, *People v. Bell*, 3 Misc. 3d 773, 782 (N.Y. Sup. Ct 2003).

[31] *See, e.g.*, *ACLU of New Mexico v. City of Albuquerque*, 137 P.3d 1215, 1225–26 (N.M. Ct. App. 2006); *State v. Small*, 833 N.E.2d 774, 783 (Ohio Ct. App. 2005); *State v. Barksdale*, No. 19294, 2003 WL 77115, *2 (Ohio Ct. App. 2003); *State v. Robinson*, 873 So. 2d 1205 (Fla. 2004); *People v. Bell*, 3 Misc. 3d 773, 787 (N.Y. Sup. Ct. 2003); *Raines v. State*, 805 So. 2d 999, 1003 (Fla. Dist. Ct. App. 2001); *State v. Washington*, No. 99-L-015, 2001 WL 1415568 (Ohio Ct. App. Nov. 14, 2001).

sex-offenders is cruel or unusual punishment under the state constitution. *Lymon*, 993 N.W.2d at 44-45.

### B. People Who Were Not Convicted of Sex Offenses Are Entitled to Due Process Protections Before Being Subjected to SORA 2021.

The Third, Fifth, Ninth, Tenth and Eleventh Circuits have all held, either in a registry or prison case, that a person who "was not convicted of a sex offense ... is owed procedural due process before sex offender conditions may attach." *Meza*, 607 F.3d at 401–02. Because the "stigmatizing effect of being classified as a sex offender constitutes a deprivation of liberty," a person "who has never been convicted of a sex crime is entitled to due process before the state declares him to be a sex offender." *Kirby v. Siegelman*, 195 F.3d 1285, 1292 (11th Cir. 1999). *Accord Renchenski*, 622 F.3d 315; *Coleman v. Dretke*, 395 F.3d 216 (5th Cir. 2004); *Neal*, 131 F.3d at 830; *Gwinn v. Awmiller*, 354 F.3d 1211 (10th Cir. 2004).

These courts distinguished *Connecticut Department of Public Safety*, which rejected a procedural due process claim because registration turned solely on whether the person had been convicted of a sex crime, "a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest." 538 U.S. at 7. By contrast, for a person who was *not* convicted of a sex crime, there is *no prior adversarial proceeding* (with due process protections) where it was determined that a sex crime was committed, and so procedural protections are required. *Meza*, 607 F.3d at 401; *Gwinn*, 354 F.3d at 1224; *Renchenski*, 622 F.3d at 331.

55

In sum, a procedurally protected determination that a person committed a sex offense is essential before the state brands them a sex offender. *See Bell*, 3 Misc. 3d at 789. For people convicted of sex offenses, that occurs at trial. *Connecticut Dep't of Pub. Safety*, 538 U.S. at 7. The non-sex-offense subclass received no such process.

### C. Providing Hearings to Other Non-Sex Offenders While Denying Hearings to the Non-Sex Offense Subclass Violates Equal Protection.

In two situations SORA requires registration based on conviction for a crime that did not include a sexual component *as an element of the offense*. First, SORA's "catch-all" provision requires registration for a crime "that by its nature constitutes a sexual offense against an individual who is a minor." M.C.L. § 28.722(r)(vii). This "catch-all" provision requires a *judicial determination* that the conduct was sexual in nature.[32] Second, SORA requires registration for certain offenses without any finding of a sexual component.[33] This is what applies to the non-sex offense subclass.

SORA thus creates an irrational classification: people convicted of some crimes without a sexual element are entitled to a judicial determination (under the "catch-all" provision) that their offense was sexual in nature before they can be

---

[32] *See* M.C.L. § 769.1(13); *People v. Lee*, 803 N.W.2d 165, 168–71 (Mich. 2011) (error where (a) defendant required to register despite judicial determination that offense was non-sexual, and (b) statute's procedural protections had not been met).

[33] Those are kidnapping (M.C.L. § 750.349), unlawful imprisonment (M.C.L. § 750.349b), leading away of a child under 14 (M.C.L. § 750.350), and comparable out-of-state offenses. *See* M.C.L. § 28.722(r)(iii), (r)(x), (v)(ii), (v)(iii), (v)(viii).

registered, but people convicted of other crimes that also lack a sexual element are not entitled to a judicial determination. M.C.L. §769.1(13). The classification here—between non-sexual offenders who get a hearing and non-sexual offenders who do not—does not "rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 2 (1992). Where a person convicted of child abuse cannot be subjected to registration without a judicial finding that the offense had a sexual component, *see Lee*, 803 N.W.2d at 171, there is no reason to deny such a hearing to a person convicted of kidnapping or unlawful imprisonment. *See Bell*, 3 Misc. 3d at 787 (it is "not rational to differentiate between … non-sexual but registerable offenses, such as kidnapping, … and other, non-registerable, crimes of a non-sexual nature…").

## VIII. SORA 2021 Is Unconstitutionally Vague.

SORA is unconstitutionally vague because it does not (1) provide persons of ordinary intelligence notice of what conduct is prohibited, and (2) does not provide clear guidance to those who enforce its prohibitions. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The void-for-vagueness doctrine is intended to "ensure fair notice to the citizenry," and to "provide standards for enforcement by the police, judges, and juries." *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1104 (6th Cir. 1995).

With respect to public notice, "a statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential

57

of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). "No one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961) (cleaned up).

With respect to guidance for law enforcement, unclear laws give "law enforcement officers, courts, and jurors unfettered freedom to act on nothing but their own preferences and beliefs." *United States v. Salisbury*, 983 F.2d 1369, 1378 (6th Cir. 1993). Absent "explicit standards," those who enforce the law may decide basic policy matters on a subjective basis "with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

"The degree of vagueness that the Constitution tolerates ... depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). A law "imposing criminal sanctions or reaching a substantial amount of constitutionally protected conduct may withstand facial constitutional scrutiny only if it incorporates a high level of definiteness." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999); *see also Hoffman Estates*, 455 U.S. at 499 ("because the consequences of imprecision are qualitatively less severe" for civil than criminal statutes, laws imposing criminal liability require heightened review). Vague criminal laws are facially invalid. *See Johnson v. United States*, 576 U.S. 591, 602–03 (2015).

A high level of definiteness is required here because SORA imposes criminal sanctions and reaches a substantial amount of constitutionally protected conduct. A failure to report common everyday *legal* activities (like using a phone, taking college classes, or renting a car) can result in criminal liability. *See Lambert v. California*, 355 U.S. 225, 229 (1957) (invalidating registry law that "punished conduct which would not be blameworthy in the average member of the community" (cleaned up)). SORA's vagueness also implicates constitutional rights because when registrants face uncertainty, they err on the side of caution—for example, by limiting internet use and travel—so as not to risk arrest. Facts, §§ IV.G, XI, XIII.

In sum, a law is vague if it is "written in a language foreign to persons of ordinary intelligence" and is so "technical or obscure that it threatens to ensnare individuals engaged in apparently innocent conduct." *United States v. Caseer*, 399 F.3d 828, 836–37 (6th Cir. 2005). SORA's complex structure, dense provisions, and endless requirements create a language obscure to both registrants and police.

Plaintiffs here fear violating SORA 2021 because they are unsure both about what they must do and what they cannot do. Law enforcement offers little or no guidance, as the police, too, are unsure about what the law demands, as both the testimony of MSP witnesses and a survey of law enforcement agencies showed.[34]

---

[34] Judge Cleland relied on such surveys to find that law enforcement's "disparate views … exemplify the lack of ... standardized guidelines for the enforcement of SORA's reporting provisions." *Does I*, 101 F. Supp. 3d at 688-89.

Facts, §§ XI, XIII; MSP Response Chart, Ex. 3; Law Enforcement Survey, Ex. 20.

As detailed in the Facts, the most confusing provisions involve reporting:

- Employment, changes to employment, employment locations, and volunteer work. M.C.L. §§ 28.722(d); 28.727(1)(f); 28.725(1)(b); Facts, ¶¶ 469–76.

- Phone numbers. M.C.L. §§ 28.725(2)(a), 28.727(h); Facts, ¶¶ 477–83.

- Vehicles. M.C.L. §§ 28.725(2)(a), 28.727(1)(j); Facts, ¶¶ 477–83.

- Residential addresses. M.C.L. §§ 28.725(1)(a), 28.727(1)(a), (e); Facts, ¶¶ 484–88.

- Travel. M.C.L. §§ 28.725(2)(b); 28.727(1)(e); Facts, ¶¶ 360–78, 484–88.

- Email and internet usage. M.C.L. §§ 28.722(g), 28.725(2)(a), 28.727(i); Facts, ¶¶ 515–533. *See also* Section X, *infra*.

- Nicknames and physical descriptions. M.C.L. § 28.727(1)(a), (o); Facts, ¶¶ 490–492.

- Higher education and other classes. M.C.L. §§ 28.722(h), 28.724a(1)–(3); Facts, ¶¶ 493–97.

Registrants have testified how confusing these requirements are, how they police their conduct and avoid innocent activities lest a misstep land them back in custody, and how they have been unable to get clarification about their responsibilities when they ask. Facts, §§ XI, XIII. Law enforcement officials fare no better, offering widely divergent interpretations of these provisions. *Id.*; MSP Response Chart, Ex. 3; Law Enforcement Survey, Ex. 20. SORA provides neither clear guidance to registrants about what they must do/not do, nor clear guidance to those who enforce the law. *Kolender*, 461 U.S. at 357. And SORA utterly fails to meet the high standard of clarity required of criminal laws that impact constitutionally protected conduct. *Hoffman Estates*, 455 U.S. at 499; *Belle Maer Harbor*, 170 F.3d at 557.

Finally, SORA 2021's addition of a "willfulness" requirement to establish criminal violations does not mitigate the law's vagueness. M.C.L. § 28.729. Where a "scienter requirement modifies a vague term," it cannot cure vagueness. *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 138 (3d Cir. 2000) (citation omitted) (scienter requirement could not save law where definition of abortion could potentially encompass almost all forms of abortion).

## IX. SORA 2021 Violates the First Amendment By Compelling Registrants to Say They Understand the Law.

Registrants must—under threat of criminal prosecution—attest that "I understand my registration duties." Explanation of Duties, Ex. 87; Mail-in Update Form, Ex. 88 (similar). It is a crime not to sign. M.C.L. §§ 28.727(4), 28.729(1), (3). Registrants must either affirm that they understand the law's complex requirements—even if they do not—or face prosecution. They have no practical choice but to sign.

Forcing Plaintiffs to support a false statement prepared by the government violates their First Amendment rights. The state cannot compel citizens to make false statements. *Johanns v. Livestock Mktg. Ass'n,* 544 U.S. 550, 557 (2005) (successful compelled-speech cases are those where "an individual is obliged personally to express a message he disagrees with, imposed by the government"); *Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011) ("a citizen has a First Amendment right to decide what to say and what not to say, and, accordingly, the right to reject governmental efforts to require him to make statements he believes are false"); *cf. Burns*, 890 F.3d

at 81.[35] Moreover, the state cannot force people to adopt the state's views—here that registrants who read the Explanation of Duties form "understand" the law.

Compelling registrants to make a false statement is not narrowly tailored to serve a compelling state interest. Prior to 2021, registrants were simply required to acknowledge having read the form, but were not forced to attest to their understanding of the law. Pre-2011 Explanation of Duties, Ex. 89. The new language was added in 2021 in order to make it easier for prosecutors to establish willfulness, which the *Does I* and *Does II* courts said was constitutionally required, and which the revised statute now adopts. *See* M.C.L. § 28.729; Facts, § XII. Greasing the skids to a SORA conviction is not a compelling government interest. Many prosecutions would be simpler if defendants could be forced to admit elements of the offense. But the government cannot compel such admissions. It has to prove its case.

## X. The Internet Reporting Requirements Violate the First Amendment.

The internet is one of "the most important places ... for the exchange of views" and provides "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (law barring registrants from social media violates First Amendment). SORA

---

[35] Even in the less protected commercial speech arena, *see Zauderer*, 471 U.S. at 651, the government cannot, consistent with the First Amendment, "force retailers to affix false information on their products," *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009), *aff'd sub nom. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011).

2021's requirement to register internet identifies is best understood as a permitting scheme that conditions registrants' ability to use that powerful mechanism on registering their internet use with the government. The Supreme Court had held that it is offensive "not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." *Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150, 164-66 (2002). *See American-Arab Anti-Discrimination Comm. v. Dearborn*, 418 F.3d 600, 605 (6th Cir. 2005) ("The simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulations discourages citizens from speaking freely.").

Because requiring registrants to disclose electronic identifiers chills internet use and anonymous speech, numerous courts have struck down internet reporting requirements. *See*, *e.g. Doe v. Harris*, 772 F.3d 563, 573-74 (9th Cir. 2014); *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1329 (M.D. Ala. 2019); *White v. Baker*, 696 F. Supp. 2d 1289, 1310–11 (N.D. Ga. 2010). In *Cornelio v. Connecticut*, the Second Circuit held that the district court, in dismissing such a challenge, had not been sufficiently "skeptical and probing" of the government's justifications for a law that burdened speech by requiring reporting "precisely when a registrant decides to engage in online speech." 32 F.4th at 169, 177 (citing *Zieper v. Metzinger*, 474 F.3d

60, 65 (2d Cir. 2007) (law that falls short of prohibiting speech may still have chilling effect)). The Second Circuit was also troubled by the law's chilling effect on anonymous speech. 32 F.4th at 169–70. *See also Harris*, 772 F.3d at 573-74; *Marshall*, 367 F. Supp. 3d at 1329; *White*, 696 F. Supp. 2d at 1310–11.

SORA 2021—like the laws other courts have struck down—requires registrants to report email addresses and internet identifiers "registered to or used by the individual," and "any change" to such information. M.C.L. §§ 28.725(2)(a), 28.727 (1)(h)–(i). Further, SORA 2021 *permits* what the old law *prohibited*—registrants' email and internet identifiers can now be publicly posted online. *Compare* 2020 Mich. Pub. Act 295, § 8(3), *with* 2011 Mich. Pub. Act 18, § 8(3)(e); *Lymon*, 993 N.W.2d, at 10. While MSP has not yet posted such information, registrants reasonably fear their identifiers will become public, which will not only prevent them from speaking anonymously[36] but also "subject them to harassment, retaliation, and intimidation." *Harris*, 772 F.3d at 581. "[F]ear of disclosure in and of itself chills [registrants'] speech." *Id.* The record shows this chilling effect: among registrants in the community required to report identifiers, only 60% used email, and only 24% reported using some other non-email internet identifier. Facts, ¶517.

---

[36] Even without online posting of registrants' internet information, registrants' speech is chilled because law enforcement officers have access to that information. *See* Facts, ¶525 (registrant did not post about police sweep costing him his job because he feared police would look up his identifier and make life even more difficult); *id.* ¶319 n.20 (there are at least 7,000 law enforcement registry users).

SORA 2021's reporting obligations are also vaguer and broader than the old law, which required reporting of designations "used in internet communications or postings." M.C.L. §28.725(1)(f) (repealed 2021). Now registrants must report *all* internet identifiers (without time limitation), expansively defined as "all designations used for self-identification or routing in internet communications or postings." M.C.L. § 28.722(g). Such designations are required for a host of online interactions. Facts, ¶515. Devices that connect to the internet—including every smart home device, from a doorbell camera to an internet-enabled thermostat—have an IP address, which is a designation used for self-identification and routing. Neither registrants nor police know which internet identifiers are reportable. Facts, § XIII.

Such vague requirements chill speech because the "severity of criminal sanctions may well cause speakers to remain silent rather than" risk prosecution for "arguably unlawful" activity. *Reno v. ACLU*, 521 U.S. 844, 872 (1997). Courts have found constitutional problems with similarly vague provisions.[37] The Ninth Circuit struck down a law (similar to SORA 2021) that required registrants to report "Internet identifiers established or used by the person." *Harris*, 772 F.3d at 567–69. "[W]hether narrowly construed or not, ambiguities in the statute may lead registered sex offenders either to over-report ...  or underuse the Internet to avoid the difficult

---

[37] *See, e.g.*, *Doe v. Nebraska*, 898 F. Supp. 2d 1086, 1112-17 (D. Neb. 2012); *Doe v. Jindal*, 853 F. Supp. 2d 596 (M.D. La. 2012); *Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608, 613–15 (E.D. Ky. 2017); *Baker*, 696 F. Supp. 2d at 1311–1312.

questions in understanding what, precisely, they must report." *Id. See also Packing-ham*, 582 U.S. at 106 (statute's "broad wording" might apply "not only to common-place social media websites but also to websites as varied as Amazon.com, Washing-tonpost.com, and Webmd.com").

The party seeking to uphold a restriction on speech has the burden of justify-ing it. *Edenfield v. Fane*, 507 U.S. 761, 770 (1993). In *Cornelio v. Connecticut*, the district court on remand found the state's proffered reasons for requiring internet reporting could not survive even intermediate scrutiny. *Cornelio v. Connecticut*, No. 19-120, 2023 WL 5979996, at *7, 11 (D. Conn. Sep. 14, 2023) (declining to decide if strict scrutiny applies). The state had failed to prove that the disclosure of identif-iers advances advanced the state's interest in crime prevention. *Id.*, at *7.  The state also failed to show that the disclosure law did not burden substantially more speech than necessary because (1) that state could deter criminal activity on the internet without burdening speech; (2) the law required reporting of all sorts of internet IDs, including sites unlikely to be used to commit crimes; and (3) the law applied to people who had not used the internet to commit their offenses. *Id.*, at *10-11.

The same is true here, except that Defendants have conceded that strict scruti-ny applies. Mot. to Dismiss, R. 41, PageID. 1343, 1347–49. Defendants have no evidence that reporting identifiers prevents crime. In fact, the SOR Unit manager did not know if the internet information collected is ever used, and was unaware of any

detrimental impact of not having email/internet information available for pre-2011 registrants.[38] Facts, ¶176. Moreover, research shows that imposing such reporting requirements does not reduce recidivism. Facts, § IV.B.4. Alarmism about potential internet crime cannot justify the restriction: "The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it rather than by regulating speech." *Cornelio*, 32 F.4th at 174. The internet reporting requirements violate the First Amendment.

## XI. The Classification Process for Out-of-Staters Violates the Due Process, Equal Protection, and Privileges and Immunities Clauses.

### A. Due Process Protections Are Required Before Putting Those with Out-of-State Convictions on the Registry.

People with non-Michigan convictions get no notice and no opportunity to be heard before MSP decides whether they must register, and if so, what tier level/ registration requirements apply.[39] They are never informed of the legal or factual bases for the decision, nor given an opportunity to contest it. Facts, § XIV.D.

---

[38] Because *Does I*, 101 F. Supp. 3d at 730, held that retroactive imposition of lifetime internet reporting violated the First Amendment, the internet reporting does not apply to pre-2011 registrants, M.C.L. § 28.725(2)(a).

[39] People with out-of-state convictions are required to register in Michigan if either (a) the offense is "substantially similar" to a registrable Michigan offense, M.C.L. § 28.722(r)(x); (t)(xiii); (v)(viii); or (b) the "individual from another state [] is required to register or otherwise be identified as a sex or child offender or predator under a comparable statute of that state." M.C.L. § 28.723(1)(d). *See also* M.C.L. § 28.724(6) (requiring registration, subject to certain time parameters, if convicted of a listed offense in another state or country, or if "required to be registered in another state or country regardless of when the conviction was entered").

SORA indisputably deprives people of both liberty and property.[40] Facts, §
IV.G. That means registration decisions for out-of-staters require notice and an op-
portunity to be heard, as other courts have held. *Kvech v. New Mexico Dep't of Pub.
Safety*, 987 F. Supp. 2d 1162, 1213 (D.N.M. 2013), explained:

> Had Kvech been convicted of a sex offense listed in the New Mexico
> SORNA, *Connecticut Department of Public Safety* would foreclose any
> argument that he deserves an additional hearing, because he would have
> received his due process at the time he was convicted. Kvech was not,
> however, convicted under one of the listed sex offenses in New Mexico;
> he was convicted for a sex offense in Colorado, and he argues that, when
> he came to New Mexico, he was not given any opportunity to contest
> the determination that his Colorado offense was equivalent to a New
> Mexico sex offense. Unlike the situation in *Connecticut Department of
> Public Safety v. Doe*, ... the question Kvech seeks to resolve makes a
> difference under the New Mexico SORNA.

Likewise in *Meredith v. Stein*, 355 F. Supp. 3d 355, 365 (E.D.N.C. 2018), the plain-
tiff was forced to register after police in North Carolina decided that his Washington
offense was similar to an in-state offense. There was no notice, no hearing, and no
opportunity for appeal. Noting that the "substantial similarity determination is a
complicated one," the court enjoined the police from making unilateral decisions:
"Where there is no process, there can be no *due* process." *Id.* (original emphasis).

In *Doe v. Pryor*, the court held that Alabama's Public Safety Department
could not simply decide that the plaintiff's non-Alabama conviction was comparable

---

[40] *See, e.g.*, *Brown v. Montoya*, 662 F.3d 1152, 1167-68 (10th Cir. 2011); *Kirby*,
195 F.3d at 1290-92.

to a local offense: the interests were "weighty," the risk of error substantial (especially where decisions were being made by non-lawyers who did not justify their decisions in writing and acted without objective standards or registrant input), and adequate process could be provided without undue cost. 61 F. Supp. 2d 1224, 1233-34 (M.D. Ala. 1999) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). *See also Pierre v. Vasquez*, No. 20-224, 2022 WL 3219421, at *6 (W.D. Tex. Aug. 9, 2022) (due process violated by registration for an out-of-state offense without notice, a hearing to present evidence, and a written justification for the decision).

Defendants here provide *no* procedural protections, even though deciding if out-of-state crimes are similar to Michigan crimes—and deciding registrants' tier classifications—has life-altering consequences, and even though offense comparisons across jurisdictions "can vex even the most competent and experienced jurists." *Pryor*, 61 F. Supp.2d at 1233.[41] As in the cases above, here non-lawyers (and even interns) in MSP's SOR Unit make classification decisions without any objective standards, registrant input, or written justifications. Facts, § XIV.A. Due process requires, at a minimum, notice and an opportunity to be heard.[42] *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965). Michigan provides neither.

---

[41] For examples of this complexity, see, e.g., *Alaska Dep't of Pub. Safety v. Doe*, 425 P.3d 115, 121-22 (Alaska 2018); *Texas Dep't of Pub. Safety v. Anonymous Adult Texas Resident*, 382 S.W.3d 531, 534-35 (Tex. Ct. App. 2012).

[42] The Court may wish briefing on what process is due. *See Doe v. Pennsylvania Bd of Prob. and Parole*, 513 F.3d 95, 99 (3d Cir. 2008) (equivalency hearings).

## B. SORA Unconstitutionally Subjects People with Out-of-State Convictions to Harsher Treatment.

The U.S. Constitution contains multiple provisions that protect the rights of out-of-staters coming to Michigan. The Privileges and Immunities Clause of Article IV mandates that "[t]he citizens of each state shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl.1. It protects "the right to be treated like other citizens" when moving into a state. *Johnson v. City of Cincinnati*, 310 F.3d 484, 496 (6th Cir. 2002). The Fourteenth Amendment provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV. That amendment's Due Process Clause protects the fundamental right to travel which "embraces the citizen's right to be treated equally" when moving to a new state. *Saenz v. Roe*, 526 U.S. 489, 503 (1999). The Equal Protection Clause, too, bars invidious distinctions between in-staters and out-of-staters. U.S. Const. amend. XIV.

Under these provisions, courts have repeatedly struck down registry schemes that treat out-of-staters worse than in-staters. In *Pennsylvania Board of Probation and Parole*, 513 F.3d at 102, 112, the Third Circuit held that subjecting people with out-of-state convictions to automatic community notification, when it was imposed on people with in-state convictions only after a hearing, was unconstitutional. *See also State v. Dickerson*, 129 P.3d 1263, 1269 (Idaho Ct. App. 2006) (unconstitutional to distinguish between in-staters, who only had to register if their offenses occurred

after 1993, and out-of-staters, who had to register for all pre-1993 convictions); *Hendricks v. Jones ex rel. State*, 349 P.3d 531 (Okla. 2013) (unconstitutional to register people with out-of-state convictions where comparable group with in-state convictions were not registered); *ACLU of N.M. v. City of Albuquerque*, 137 P.3d 1215, 1227 (N.M. Ct. App. 2006) (same).

Here, non-Michiganders are treated more harshly in three ways:

1. They are subject to longer registration terms than people with comparable Michigan offenses if the convicting state would require longer registration.

2. Where a Michigan conviction would not result in registration, out-of-staters still must register if the convicting state would require registration.

3. MSP staff use unproven allegations about offense conduct to make registration decisions for people with out-of-state convictions.

Facts, § XIV. The first two categories parallel the cases discussed above.

The third needs some explanation. For Michigan convictions, SORA spells out whether registration is required and in what tier. Out-of-state offenses require a "substantial similarity" determination. Courts, including the Sixth Circuit, have held that jurisdictional offense comparisons for sex offender registration should be based on a "categorical approach," where only the offense elements, rather than the case facts, are considered.[43] *Mathis v. United States*, 579 U.S. 500, 504 (2016). But MSP

---

[43] *United States v. Barcus*, 892 F.3d 228, 231-32 (6th Cir. 2018); *United States v. Morales*, 801 F.3d 1, 6 (1st Cir. 2015); *United States v. Berry*, 814 F.3d 192, 196 (4th Cir. 2016); *United States v. Montgomery*, 966 F.3d 335, 338-39 (5th Cir. 2020); *United States v. Walker*, 931 F.3d 576, 579 (7th Cir. 2019); *United States v. White*, 782 F.3d 1118, 1130–35 (10th Cir. 2015); *United States v. Vineyard*, 945 F.3d 1164,

doesn't use the categorical approach. When the elements of a non-Michigan offense don't line up with the elements of a Michigan offense, MSP still requires registration if it decides that there are allegations—which the registrant has no opportunity to contest—that would make the crime comparable to a Michigan one. Facts, § XIV.C. Thus, while registration for Michigan convictions requires that the person be found guilty of the elements of a registrable offense, under MSP's procedures, people need not be found guilty of an offense with elements similar to a Michigan registrable offense. MSP staff impose registration based on unproven charges and hearsay.

Strict scrutiny applies.[44] *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986); *Shapiro v. Thompson*, 394 U.S. 618, 629, 638 (1969). Defendants have no compelling reason to treat people with out-of-state convictions more harshly. There may need to be different *procedures* for out-of-staters, but that cannot justify worse *outcomes*. Treating them more harshly is unconstitutional.

## CONCLUSION

The Court should grant Plaintiffs' motion under Rule 56 on all counts.

---

1170 (11th Cir. 2019); Model Penal Code Section 213.11A(2)(c) (Tent. Draft No. 6, approved May 2022), at 549-52.

[44] *Pennsylvania Bd. of Prob. and Parole*, 513 F.3d at 107, *Dickerson*, 129 P.3d at 1269, and *Hendricks*, 349 P.3d at 535, all declined to decide what level of scrutiny applies, holding that the worse treatment of out-of-staters could not survive even rational basis review. The same is true here.

Respectfully submitted,

s/ Miriam Aukerman (P63165)
/s Dayja Tillman (P86526)
Attorneys for Plaintiffs
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org

s/ Paul D. Reingold (P27594)
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
Attorney for Plaintiffs
Univ. of Michigan Law School
802 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109-1215
(734) 355-0319 - pdr@umich.edu

s/ Daniel S. Korobkin (P72842)
s/ Syeda Davidson (P72801)
American Civil Liberties Union
  Fund of Michigan
Attorney for Plaintiffs
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

s/ Roshna Bala Keen (Ill. 6284469)
s/ Lauren Carbajal (Cal. 336485)
Loevy & Loevy
Attorney for Plaintiffs
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 - roshna@loevy.com

Dated: October 2, 2023

## LOCAL RULE CERTIFICATION

I, Miriam Aukerman, certify that this document conforms to the page limits set forth in the Court's Order Setting Schedule for Summary Judgment Motions, R. 121, and complies with terms set under the Local Rules.

s/ Miriam Aukerman (P63165)