UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES, et al.,

            Plaintiffs,

v.

GRETCHEN WHITMER, et al.,

            Defendants.

No. 2:22-cv-10209

Hon. Mark A. Goldsmith

Mag. J. Curtis Ivy, Jr.

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................1

II.  PARTIES ................................................................................................1

    A.  The Named Plaintiffs .......................................................................1

    B.  The Class and Subclasses ..............................................................17

    C.  The Defendants ..............................................................................19

III. HISTORY AND BACKGROUND .....................................................21

    A.  History of the Michigan Sex Offenders Registration Act ........................21

    B.  The *Does I* Litigation...................................................................25

    C.  The *Roe* Litigation ......................................................................27

    D.  The *Does II* Litigation ................................................................27

    E.  The Failure of Reform Efforts and the Adoption of SORA 2021 ...........30

    F.  The *Betts* Litigation ...................................................................34

    G.  The *Lymon* Litigation .................................................................34

    H.  The Growth to Michigan's Registry Over Time ...............................35

IV.  EX POST FACTO CLAIM (COUNT I)............................................36

    A.  SORA 2021 Retains the Key Defects of the Unconstitutional 2011 Law ...............................................................................................36

    B.  SORA Undermines Rather than Promotes Public Safety........................41

        1.  SORA Is Counterproductive Because It Is Likely to Increase Rather than Decrease Sexual Offending ...........................41

        2.  SORA Misidentifies the Source of the Risk for Sexual Offending...................................................................................43

        3.  SORA Undermines Successful Reentry............................................44

        4.  Onerous Reporting Requirements Serve No Public Safety Purpose ...................................................................................45

        5.  Registration Has Unintended Consequences that Harm Survivors and Lessen Accountability for Sex Offenses ...................45

        6.  The Registry Is Not Needed by Law Enforcement .............................48

C.  Thousands of Registrants Are No More Likely to Commit a Sex Offense than Unregistered People ........................................................50

   1.  The Likelihood of Sexual Recidivism Drops Dramatically Over Time..................................................................................................51

   2.  Recidivism Risk Varies Greatly Among People with Past Sex Convictions........................................................................................52

   3.  Desistance: The Comparative Risk of Registrants and Non-Registrants ......................................................................................54

   4.  Between 17,000 and 19,000 Michigan Registrants Are Just as Safe as Men in the General Population ............................................60

   5.  Registrants' Average Recidivism Rate Is Low ...................................62

   6.  Particularly Low Risk Registrants: The Elderly, Women and Children .............................................................................................67

   7.  The Defendants' Failure to Remove Non-Registrable People..........69

   8.  The Named Plaintiffs Are Very Unlikely to Reoffend .....................69

D.  Conviction-Based Registries Do Not Correspond to Risk .......................70

E.  Risk Assessments Tools Are Effective and Widely Available .................72

F.  The Digital Age Has Fundamentally Changed the Consequences of Sex Offender Registration ......................................................................76

   1.  Michigan's Online Registry Is Unlike a Criminal Records Archive .............................................................................................76

   2.  The Impact of Online Sex Offender Registration Today Is Entirely Different from What It Was Two Decades Ago .................84

   3.  The Ubiquity of Registry Information on the Internet Causes Registrants to Live in Fear and Avoid the Internet ...........................86

   4.  Defendants Exacerbated the Stigma by How They Designed the Website ........................................................................................86

G.  SORA 2021 Imposes Devastating Burdens ............................................87

   1.  Ongoing Reporting..........................................................................87

   2.  Ongoing Surveillance and Supervision .............................................93

   3.  Criminal Enforcement of SORA ....................................................101

   4.  Stigmatization, Harassment, and Vigilantism ..................................103

   5.  Limitations on Access to Housing ..................................................109

6.   Limitations on Access to Employment ............................................112

7.   Limitations on Access to Education................................................118

8.   Limitations on Travel ....................................................................119

9.   The Impact of SORA 2021 on Family Relationships ......................126

10. Financial Consequences of Registration ........................................127

11. Mental Health Impacts ..................................................................129

12. Harms Specific to Elderly Registrants and People with
    Disabilities....................................................................................131

13. Additional Consequences from Registration Under SORA 2021....133

H.  SORA 2021 Is Based on Animus ...........................................................135

I.   Registration Is Intertwined With the Criminal Justice Process and Is
     Central to Plea Negotiations ..................................................................139

1.   Registration Occurs as Part of Sentencing ....................................139

2.   Registration Is Central to Plea Negotiations in Sex Offense
     Cases..............................................................................................139

J.   SORA Costs Millions..............................................................................141

V.    RETROACTIVE EXTENSION OF REGISTRATION (COUNT II) .......143

VI.   LACK OF INDIVIDUALIZED REVIEW (COUNT III) ..........................143

VII.  UNEQUAL OPPORTUNITY TO PETITION (COUNT IV)....................143

A.  Only a Tiny Fraction of Registrants Can Petition for Removal.............143

B.  There Are No Material Differences Between Petition-Eligible
    Registrants and the Barred-from-Petitioning Subclass Nor Any
    Reason to Treat Them Differently.........................................................144

VIII.  COMPELLED SPEECH (COUNT V)....................................................146

A.  SORA 2021 Compels Speech by Requiring Registrants to Provide
    Information to Support the State's Message that They Are
    Dangerous ..............................................................................................146

B.  The State Already Has Most Information Registrants Must Provide.....148

IX.   VIOLATION OF PLEA AGREEMENTS (COUNT VI)...........................149

X.    NON-SEX OFFENSE CLAIM (COUNT VII)........................................149

A.  People Not Convicted of Sex Offenses Are Branded as Sex Offenders 149

iv

      B.  Defendants' Temporary Removal from the Registry of Some Non-Sex Offense Subclass Members Pending a Supreme Court Decision....150

XI. VAGUENESS (COUNT VIII) ....................................................................153

      A.  Neither Registrants Nor Law Enforcement Understand SORA .............153

      B.  Confusion as to Reporting Requirements ................................................154

      C.  Registrants Are Unable to Clarify What Their SORA Obligations Are ........................................................................................................164

XII.  COMPELLED STATEMENT OF UNDERSTANDING (COUNT IX)...166

      A.  Registrants Are Compelled to State that They Understand SORA ........166

XIII. INTERNET REPORTING SPEECH RESTRICTIONS (COUNT X) ......169

      A.  SORA 2021 Chills Registrants' Speech and Association ......................169

XIV. NON-MICHIGAN CONVICTION CLAIM (COUNT XI) .....................176

      A.  Registration of People with Non-Michigan Convictions Requires Complicated Analysis, Which Is Done by MSP Staff............................176

      B.  Reasonable People Can Differ in Making Similarity Determinations....180

      C.  People with Non-Michigan Offenses Are Registered Under the Harsher of the Michigan or Non-Michigan Registration Scheme..........182

      D.  Out-of-Staters Receive Neither Notice nor an Opportunity to Be Heard........................................................................................................186

      E.  The Examples of Mary Doe and John Doe G .........................................187

XV.  EVIDENCE RESPONSIVE TO DEFENDANTS' EVIDENCE ..............190

      A.  Criminal Justice Data, Unreported Offending, and the Desistance Analysis ................................................................................................190

          1.  Criminal Justice Data Does Not Reflect All Crime That Occurs ....192

          2.  Because Desistance Analysis Is Based on Comparisons Between Registrants and Non-Registrants, It Is Unaffected by the Fact that Criminal Justice Data Does Not Include Unknown Offenses...195

          3.  Defendants' Experts Fail to Distinguish Between Repeat Offending Before and After Criminal Justice Intervention .............197

      B.  Risk Assessment Instruments Provide a Reliable Method to Identify Risk Levels and a Solid Basis for Desistance Research........................199

## I.   INTRODUCTION

1.  Over the last decade, courts have repeatedly held Michigan's Sex Offenders Registration Act (SORA),[1] M.C.L. §28.721 *et seq.*, to be unconstitutional. *See Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017) (*Does I*); *Roe v. Snyder*, 240 F. Supp. 3d 697 (E.D. Mich. 2017); *Does #1-6 v. Snyder*, 449 F. Supp. 3d 719 (E.D. Mich. 2020) (*Does II*); *People v. Betts*, 968 N.W.2d 497 (Mich. 2021). Michigan nevertheless continued to enforce SORA.

2.  Finally, faced with the imminent entry of a class-wide permanent injunction barring enforcement of much of SORA, the 2020 lame duck legislature amended the law. *See Does II*, R. 84, Op. & Order Granting Pls' Mot. for Inj. Relief; 2020 Mich. Pub. Act 295. But the legislature left intact the core of the old law. Even though the registry has no public safety benefit, SORA 2021 continues to subject some 45,000 people to its requirements, in most cases for life, without any individual review. *See* Section IV, *infra*; Data Rept., Ex. 4, ¶1.

## II.   PARTIES

### A. The Named Plaintiffs

3.  <u>**John Doe A**</u>. In 1990, at age 20, Doe A decided to rob the McDonald's he had worked at, after he was fired. During the attempted robbery, he forced the manager

---

[1] Plaintiffs use the term "SORA 2021" when referring to SORA as amended 3/24/2021, and "old SORA" or "SORA 2011" for the prior version. When referring to Michigan's registration statute more generally, Plaintiffs simply use "SORA."

and her teenaged son into the building. He pled guilty to armed robbery and weapons charges, and no contest to kidnapping (M.C.L. §750.349). Doe A never engaged in sexual misconduct during the attempted robbery, nor has any such conduct ever been alleged. He was sentenced to 20-40 years. Amended Complaint[2] [Am. Compl.], R. 108, ¶¶24–28; *Does I*, R. 90, Joint Statement of Facts [JSOF], Ex. 136, ¶¶34–41.

4.  At the time of Doe A's offense, Michigan did not have a sex offender registry. He did not receive, and could not have received, any notice that his conviction for a non-sex offense would subject him to sex offender registration. Am. Compl., R. 108, ¶¶27, 33; *Does I*, JSOF, Ex. 136, ¶¶52–53.

5.  While incarcerated, Doe A became a model prisoner and earned early parole in 2009, which he successfully completed in 2011. Now in his 50s, he has led a productive life since release, working as a job coach for special-needs adults and running his own home repair business. His long-time partner works at a hospital. He has two adult children and an elementary school-aged son. He has not been convicted of any crime since the 1990 robbery, more than 30 years ago. Am. Compl., R. 108, ¶¶29–32; *Does I*, JSOF, Ex. 136, ¶¶43–46, 48–50.

6.  When Doe A was released from prison, he was retroactively required to register. Under the 2011 SORA amendments, he was reclassified as a Tier III registrant who has to register for life. 2005 Mich. Pub. Act 132, §5(6); 2011 Mich. Pub. Act

---

[2] Plaintiffs' declarations verifying the complaint are attached as Exhibit 53.

17, §5(12); Am. Compl., R. 108, ¶¶35–36; *Does I*, JSOF, Ex. 136, ¶¶54–55.

7.  Under the judgment in *Does I*, where Doe A was a plaintiff, his registration term was reduced from life to 25 years, he was removed from the online registry, and he needed to report only basic information. *Does I*, Judgment, Ex. 137, ¶5.

8.  Under SORA 2021, Doe A is again classified as a Tier III offender, required to register and comply with SORA for life, and labeled on the online registry as a "convicted sex offender," even though he has never been convicted of a sex offense. Am. Compl., R. 108, ¶¶38–39; M.C.L. §§28.722(v)(ii), 28.725(13).750.349.

9.  **John Doe B**. In 1998, when Doe B was 19, he had a relationship with a 14-year-old girl whom he met at a salon where she had cut his hair. He thought that she was an adult based on her job, her appearance, and her saying that he was not her first sexual partner. Her parents were upset about the relationship and went to the police. The girl later admitted, as documented in police reports, that at her father's request she had falsely accused Doe B of sexual assault, when in fact she had willingly had sex. Am. Compl., R. 108, ¶42–44; *Does I*, JSOF, Ex. 136, ¶¶98–107.

10. Doe B pled guilty to attempted criminal sexual conduct in the third degree (M.C.L. §750. 520d(1)(a)) for having sex with a minor. He was sentenced to four years of probation under the Holmes Youthful Trainee Act (HYTA), a law that allows young people to have their cases dismissed and their records sealed. *See* M.C.L. §762.11 *et seq*.; Am. Compl., R. 108, ¶45; *Does I*, JSOF, Ex. 136, ¶111.

11. At the time of Doe B's offense, Michigan did not yet have an online registry. Mich. Pub. Act 494, §10(2) (1996). He was required to register for 25 years, meaning he would come off the registry in 2023, at around age 45. The requirements for quarterly in-person reporting were introduced after he pled but were nevertheless applied to him retroactively. Am. Compl., R. 108, ¶46; *Does I*, JSOF, Ex. 136, ¶113.

12. During his last year of probation, Doe B failed to register on time due to a three-day holiday weekend. He reported one day late and immediately notified his probation officer of the mistake. His HYTA status was revoked nonetheless, and his conviction became permanent. Am. Compl., R. 108, ¶47; *Does I*, JSOF, Ex. 136, ¶¶114–15; Doe B Dep., Ex. 56, at 61–62.

13. Under the 2011 SORA amendments, Doe B was retroactively classified as a Tier III offender, and his registration period was extended from 25 years to life. Am. Compl., R. 108, ¶48; *Does I*, JSOF, Ex. 136, ¶120; 2011 Mich. Pub. Act 17, §5(12).

14. Doe B was four years and ten months older than the girl. Am. Compl., R. 108, ¶49; *Does I*, JSOF, Ex. 136, ¶121. Had their age difference been less than four years, Doe B would not be subject to registration. M.C.L. §§28.722(v)(iv); 28.728c(14).

15. Doe B is now in his 40s and has lived productively in the community since his offense. He worked at the family business, an auto repair shop and gas station, and later in real estate. He has three children from his first marriage and is a single dad with joint custody. Am. Compl., R. 108, ¶50; *Does I*, JSOF, Ex. 136, ¶¶117–18.

4

16. Pursuant to the judgment in *Does I*, where Doe B was a plaintiff, he was removed from the online registry, had to report only basic information, and his registration term was reduced from life to 25 years. *Does I*, Judgment, Ex. 137, ¶5.

17. Under SORA 2021, Doe B is again classified as a Tier III offender and required to register and comply with SORA for life. M.C.L. §28.725(13).

18. **John Doe C**. In 2005, when Doe C was 23, he had a relationship with IG, a girl he met at a nightclub. The club was restricted to those aged 18 and up. Doe C did not know that IG had used a fake ID to get in or that she was 15. When she got pregnant, Doe C was arrested. He then learned her age. Am. Compl., R. 108, ¶¶55–56; *Does I*, JSOF, Ex. 136, ¶¶124–28; Doe C Dep., Ex. 57, at 24–26; IG Decl., Ex. 25, ¶¶1-4.

19. In 2006, Doe C pled guilty to attempted criminal sexual conduct in the third degree, which prohibits sex with a person under 16 (M.C.L. §750.520d(1)(a)). He was sentenced to and successfully completed five years of probation. He also did counseling. Am. Compl., R. 108, ¶¶57–58; *Does I*, JSOF, Ex. 136, ¶¶129, 131.

20. At the time of his conviction, Doe C was required to register for 25 years, meaning he would come off the registry in 2031 at around age 49. As a result of the 2011 SORA amendments, he was retroactively reclassified as a Tier III offender, and his registration term extended from 25 years to life. 2011 Mich. Pub. Act 17, §5(12); Am. Compl., R. 108, ¶¶59–60; *Does I*, JSOF, Ex. 136, ¶¶132–33.

21. Some years after his conviction, IG (who was then over 18) and Doe C renewed their relationship. They got married and now have three children together. Doe C's only other criminal conviction is for driving on a suspended license. Am. Compl., R. 108, ¶¶61, 63; *Does I*, JSOF, Ex. 136, ¶¶27, 134; IG Decl., Ex. 25, ¶6.

22. Pursuant to the judgment in *Does I*, where Doe C was a plaintiff, he was removed from the online registry, had to report only basic information, and his registration term was reduced from life to 25 years. *Does I*, Judgment, Ex. 127, ¶5.

23. Under SORA 2021, Doe C is again classified as a Tier III offender and required to register and comply with SORA for life. M.C.L. §28.725(13).

24. **<u>Mary Doe</u>**. In 2003, while living in Ohio, Mary Doe pled no contest to unlawful sexual conduct with a minor for having a sexual relationship with a 15-year-old male. She was sentenced to three years in prison. Am. Compl., R. 108, ¶¶68–69; *Does I*, JSOF, Ex. 136, ¶¶177, 184; Mary Doe Dep., Ex. 61, at 44.

25. At the time, Ohio's SORA was risk-based rather than offense-based. The registration term, reporting frequency and other requirements, were determined through an individualized adjudication of risk. Based on a psychological evaluation, the court assigned Ms. Doe the lowest risk level, which required address verification once a year for ten years. Am. Compl., R. 108, ¶¶70–71; *Does I*, JSOF, Ex. 136, ¶187–88.

26. In Ohio, Ms. Doe could not be required to register for more than ten years, nor could she be subjected to registry requirements that were stricter than those in

6

effect under the terms of her initial registration order.[3] Am. Compl., R. 108, ¶74; *Does I*, JSOF, Ex. 136, ¶¶189–90.

27. In 2004, after serving less than eight months, Ms. Doe was granted judicial release. Her sentence was modified to four years of probation and 200 hours of community service. She successfully completed probation, public service, and sex offender therapy, and was discharged from probation in 2008. She has no other criminal convictions. Am. Compl., R. 108, ¶¶75, 79; *Does I*, JSOF, Ex. 136, ¶¶186, 191.

28. The terms of Ms. Doe's probation required her to live in Michigan with her parents. Michigan law at the time required her to register for 25 years. Am. Compl., R. 108, ¶76; *Does I*, JSOF, Ex. 136, ¶193; Mary Doe Dep., Ex. 61, at 52–53.

29. Ms. Doe and her ex-husband shared parenting of their teenage daughter, who attended school in Michigan. She remarried in 2010 to a man who lives and works in Michigan. Because their extended family also live in Michigan, Ms. Doe and her husband have remained here. In 2013, when Ms. Doe's ex-husband left Ohio, she petitioned the court for sole custody of her daughter. On the recommendation of a

---

[3] Although Ohio later moved to an offense-based registration scheme similar to Michigan's, the Ohio Supreme Court held that people like Ms. Doe who got individualized risk-based hearings cannot be retroactively reclassified under an offense-based scheme. Am. Compl., R. 108, ¶72; *State v. Bodyke*, 933 N.E.2d 753 (Ohio 2010). The Ohio Supreme Court also held that retroactive application of Ohio's amended SORA—which requires extensive reporting and lengthens registration periods similar to Michigan's SORA 2021—violates the Ohio Constitution's prohibition on ex post facto laws. *State v. Williams*, 952 N.E.2d 1108 (Ohio 2011).

court counselor (who was aware of Ms. Doe's history), the court granted her sole custody. Am. Compl., R. 108, ¶¶77, 80; Mary Doe Dep., Ex. 61, at 19–20, 25–26.

30. Under the 2011 SORA amendments, Ms. Doe was retroactively reclassified as a Tier III offender, and her registration was extended from 25 years to life. Am. Compl., R. 108, ¶78; *Does I*, JSOF, Ex. 136, ¶199; 2011 Mich. Pub. Act 17, §5(12).

31. The judgment in *Does I*, where Ms. Doe was a plaintiff, reduced her registration term from life to 25 years. She came off the online registry and was required to report only basic information. *Does I*, Judgment, Ex. 137, ¶5.

32. Under SORA 2021, Ms. Doe is again classified as a Tier III offender and required to register and comply with SORA for life. M.C.L. §28.725(13).

33. **<u>Mary Roe</u>**. In her late teens, Ms. Roe became addicted to drugs and wound up living on the streets with other addicted runaway or homeless teens. In 2002, at the age of 19, she had sex with a 14-year-old boy who was part of her group. Am. Compl., R. 108, ¶85; Mary Roe Dep., Ex. 62, at 29–30.

34. Ms. Roe pled guilty to criminal sexual conduct in the third degree (M.C.L. §750.520d(1)(a)) in 2003. Because she was on probation for bad-check offenses at the time, she served about two-and-a-half years in prison. She also had to register. Had she been less than four years older than the boy, SORA would not have applied. M.C.L. §28.722(v)(iv). Am. Compl., R. 108, ¶86; Mary Roe Dep., Ex. 62, at 31.

35. Ms. Roe straightened herself out in prison, was released soon after her earliest

release date, and successfully completed parole. She did sex offender therapy in pris-on and outpatient therapy after release. She has not been convicted of a crime since her 2003 offense. Am. Compl., R. 108, ¶¶87, 90; Mary Roe Dep., Ex. 62, at 31.

36. Ms. Roe has led a productive life since her release. She has been steadily employed or in school (or both). She earned a bachelor's degree in addiction studies *summa cum laude* and a master's degree in counseling. She worked at a drug treat-ment facility for homeless people. She started as a therapist, was promoted repeat-edly, and ultimately served as the clinical director supervising a 20-person staff in a facility that provided services to more than 500 clients each year. Ms. Roe was responsible for tripling program revenue to $2.7 million a year. Since 2017, she has been in private practice. She is married. Am. Compl., R. 108, ¶¶88–89; Mary Roe Dep., Ex. 62, at 11–12, 14–16.

37. At the time of her conviction, Ms. Roe was required to register for 25 years, meaning she would come off the registry in 2028 at around age 45. Under the 2011 amendments to SORA, Ms. Roe was retroactively classified as a Tier III offender, putting her on the registry for life. Am. Compl., R. 108, ¶¶91–92; Mary Roe Dep., Ex. 62, at 31; 2011 Mich. Pub. Act 17, §5(12).

38. In 2016, despite the Sixth Circuit's decision in *Does I*, Ms. Roe was threat-ened with prosecution if she continued to work at her job as clinical director because her job site was within 1,000 feet of a school. Am. Compl., R. 108, ¶93. Ms. Roe

filed suit, and pursuant to a settlement, her registration term was reduced back to 25 years. She was removed from the online registry and was required to report only basic information. *Roe v. Snyder*, No. 16-cv-13353, R. 87 (E.D. Mich.).

39. After being removed from the online registry, Ms. Roe was able to start her own therapy practice. She focuses on treatment of trauma, including survivors of sexual assault. Am. Compl., R. 108, ¶95; Mary Roe Dep., Ex. 62, at 16, 77.

40. Under SORA 2021, Ms. Roe is again classified as a Tier III offender and required to register and comply with SORA for life. M.C.L. §28.725(13).

41. **John Doe D**. In early 2000, when Doe D was a 19-year-old high school senior, he had a relationship with a 14-year-old freshman. One day after school, the two went to Doe D's house and had sex. The police arrested him about a week later, and he admitted that he had sex with the girl. Am. Compl., R. 108, ¶¶99–100.

42.  The girl gave various statements to the police, initially saying that the sex was not consensual, but later stating that while she felt pressured, Doe D did not force her to have sex. After Doe D's attorney explained to him that the girl could not legally consent because she was underage, Doe D pled guilty in 2000 to attempted criminal sexual conduct in the third degree (M.C.L. §750.520d(1)(a)) under HYTA. He was sentenced to 60 days in jail (serving about a month) and three years of probation. Am. Compl., R. 108, ¶¶101–03.

43. In 2001, Doe D attended a volleyball game at his former high school with a

friend to cheer for the friend's sister. Doe D saw the victim from his case there and immediately left. He reported the incident to his probation officer. Nevertheless, his HYTA status was revoked, and his probation was extended for two more years. He completed probation in 2005. *Id.*, ¶¶104–05.

44.  Doe D was approximately four years and six months older than the girl. Had the age difference been less than four years, Doe D would not be subject to registration. M.C.L. §28.722(v)(iv); Am. Compl., R. 108, ¶106.

45.  Doe D has no other criminal convictions and has led a productive life since his release. He is married, has a school-aged son, and works as an assembly line worker and forklift driver. Am. Compl., R. 108, ¶107.

46.  At the time of his conviction, Doe D was required to register for 25 years, meaning he would come off the registry in 2025 at around age 45. The 2011 SORA amendments were applied retroactively to Doe D. He was reclassified as a Tier III offender, and his registration term was extended from 25 years to life. *Id.*, ¶¶108–109; 2011 Mich. Pub. Act 17, §5(12).

47.  Even after the *Does I* decision in 2016, Defendants required Doe D to comply with the 2006 and 2011 amendments to SORA, continued to classify him as a Tier III offender, and continued to subject him to lifetime registration. Am. Compl., R. 108, ¶110; Answer, R. 111, ¶110. Doe D was a plaintiff in *Does II*, where the court held that to be unconstitutional. *Does II*, 449 F. Supp. 3d 719.

11

48. Under SORA 2021, Doe D is again classified as a Tier III offender and required to register and comply with SORA for life. M.C.L. §28.725(13).

49. **John Doe E**. Doe E, raised by adoptive parents, was born with a birth defect, Fetal Alcohol Syndrome, and deficits resulting from in-utero alcohol exposure. He has a developmental age of nine or ten and an IQ of approximately 84. His developmental delays make him vulnerable, and in the early 1990s, he was sexually assaulted by a co-worker. Am. Compl., R. 108, ¶¶114–16; BW Decl., Ex. 26, ¶2.

50. In 1994, Doe E was accused of engaging in inappropriate sexual touching of his six-year-old nephew. He was 21 at the time and had no history of such behavior. Psychologists testified that given his level of intellectual functioning, his actions should be viewed as those of a child engaged in sexual experimentation, which is common. Am. Compl., R. 108, ¶¶117–18.

51. Doe E pled no contest in 1994 to three counts of criminal sexual conduct in the second degree (M.C.L. §750.520c(1)(a)). Michigan's registry did not then exist. He was sentenced to 90 days jail, as well as five years' probation. He successfully completed probation and counseling. Am. Compl., R. 108, ¶119.

52. When Michigan's SORA came into effect in 1995, Doe E was placed on a non-public law enforcement registry for 25 years and required to update his address. Although he should have come off the registry in 2019, he did not because SORA

2011's retroactive amendments extended his registration period to life and reclassified him as a Tier III offender. *Id.*, ¶¶120–21; 2011 Mich. Pub. Act 17, §5(12).

53.  Doe E has no other criminal history. He has held various jobs, mostly as a custodian or food service worker. Doe E and his wife, who also has Fetal Alcohol Syndrome, live with Doe E's 86-year-old mother. His mother, who helps him comply with SORA's complex requirements, fears he will be unable to remain compliant when she passes away. Am. Compl., R. 108, ¶¶122–24; Pls' Resp. to Defs' 2d Rogs, Ex. 84, ¶5; BW Decl., Ex. 26, ¶¶8, 12.

54.  Doe E's victim—his nephew who is now an adult—opposes his inclusion on the registry as he believes Doe E is not a risk to the public. Pls' Resp. to Defs' 2d Rogs, Ex. 84, ¶1; Doe E Nephew Decl., Ex. 51; BW Decl., Ex. 26, ¶¶9–11.

55.  Even after the *Does I* decision in 2016, Defendants continued to require Doe E to comply with the 2006 and 2011 SORA amendments, continued to classify him as a Tier III offender, and continued to subject him to lifetime registration. Am. Compl., R. 108, ¶125; Answer, R. 111, ¶125. Doe E was a plaintiff in *Does II*, where the court held that to be unconstitutional. *Does II*, 449 F. Supp. 3d 719.

56.  Under SORA 2021, Doe E is again classified as a Tier III offender and required to register and comply with SORA for life. M.C.L. §28.725(13).

57.  **John Doe F.** Starting around 2009, when he was in his early twenties, Doe F began texting with an underage girl he had met through soccer. They eventually

13

started dating and dated for about three years. When the girl's parents learned of the relationship, they disapproved. They eventually filed a police report. In 2012, when the girl was 17, police interviewed Doe F about whether he had sexual contact with his girlfriend before she turned 16. Am. Compl., R. 108, ¶¶129–30.

58.   Doe F admitted to the police that he and his girlfriend had had oral sex but maintained that this didn't occur until after she was 16. He said they did not have intercourse. Nevertheless, the prosecution charged Doe F with a 2010 offense, assigning the offense date as the day before the girl's sixteenth birthday. *Id.*, ¶131.

59.   In 2013, Doe F pled guilty to a two-year misdemeanor of sexual misconduct in the fourth degree (M.C.L. §750.520e). He took this plea after the prosecutor threatened to bring child pornography charges because Doe F had admitted that he and his girlfriend had shared nude photos via text messages. Doe F served 10 days in jail and was placed on probation for five years. He was classified as a Tier II registrant. He successfully completed both sex offender therapy and his five-year probation. He has no other criminal convictions. *Id.*, ¶¶132–34.

60.   Doe F was at the top of his high school class and attended a highly ranked college. He had hoped to be a doctor but had to re-set his goals due to the registry. He got an MBA but was unable to find a job. Doe F Dep., Ex. 59, at 12–13, 65–66.

61.   Doe F had a six-year relationship with an adult woman who became ill with a leukemia-like disorder in 2018. Doe F spent all of his time and money caring for

14

her. She died in 2019 at age 25. Doe F then helped care for his girlfriend's 85-year-old grandfather, who needed constant in-home assistance due to dementia and heart issues, until he too died in 2021. Am. Compl., R. 108, ¶¶135–36.

62.   Even after the *Does I* decision, Defendants continued to require Doe F to comply with all of SORA's requirements, including the 2011 amendments, though his offense predated those amendments. *Id.*, ¶137. Doe F was a plaintiff in *Does II*, where the court held that to be unconstitutional. *Does II*, 449 F. Supp. 3d 719.

63.  Under SORA 2021, Doe F is again classified as a Tier II offender who must register and comply with SORA for 25 years. M.C.L. §28.725(12).

64.  **John Doe G**. In 2006, when Doe G was living in Omaha, he developed a relationship with a boy who was 14. The two engaged in sexual touching. Doe G was convicted of third-degree sexual assault of a child (Nebraska Rev. Statute 28-320.01(3)). He spent 18 months in prison where he voluntarily and successfully completed sex offender treatment. He was informed that under Nebraska law he was subject to sex offender registration for ten years. Am. Compl., R. 108, ¶¶140–41; Doe G Dep., Ex. 60, at 49.

65.  Doe G has no other criminal convictions and has been a productive member of society since his release. He is a certified cable test technician and works in technical writing and technical support for a cable company. Am. Compl., R. 108, ¶144; Doe G Dep., Ex. 60, at 40.

66. In 2010, Doe G moved to Michigan to be closer to his family. In Michigan he was a 25-year registrant who would have come off the registry around 2031. However, in 2011, Doe G was retroactively classified as a Tier III offender and his registration term was extended to life. 2011 Mich. Pub. Act 17, §5(12); Am. Compl., R. 108, ¶¶142–43; Doe G Dep., Ex. 60, at 48–49.

67. Even after the *Does I* decision, the defendants continued to require Doe G to comply with all of the provisions of SORA, including the 2011 amendments which retroactively classified him as a Tier III offender and subjected him to lifetime registration. Am. Compl., R. 108, ¶145. Doe G was a plaintiff in *Does II*, where the court held that to be unconstitutional. *Does II*, 449 F. Supp. 3d 719.

68. Under SORA 2021, Doe G is again classified as a Tier III offender and required to register and comply with SORA for life. M.C.L. §28.725(13).

69. **John Doe H**. In 2015, Doe H pled no contest to criminal sexual conduct in the fourth degree for sexually touching a woman who worked in his restaurant (M.C.L. §750.520e). Doe H thought the touching was consensual. Doe H was sentenced to five years of probation, which he successfully completed, along with sex offender classes. Am. Compl., R. 108, ¶¶149–50.

70. Doe H is a productive and respected member of his community. Since his conviction, he has taken steps to better himself, completing all terms of his probation, including sex offender classes. He has no other convictions. *Id.*, ¶¶150–51.

71. Doe H was a plaintiff in *Does II*. Am. Compl., R. 108, ¶148. Under the old SORA, Doe H was classified as a Tier I offender and subject to registration for 15 years.[4] Am. Compl., R. 108, ¶152. Under SORA 2021, he will continue to be a 15-year Tier I registrant. M.C.L. §28.725(11).

**B. The Class and Subclasses**

72. As of January 24, 2023, there were **45,145 people subject to SORA**. This group is the **Primary Class**, which is defined as "people who are or will be subject to registration under Michigan's Sex Offenders Registration Act (SORA)." Data Rept., Ex. 4, ¶¶1, 24, 127–28; Stip. Class Cert. Order, R. 35, ¶2.

73. About 98% of registrants (44,154 people) <u>live, work, or go to school in Michigan, or are incarcerated in Michigan</u>. The other 991 (2%) have moved out of state but remain subject to SORA.[5] Data Rept., Ex. 4, ¶¶1, 31–32, 35.

74. Of the 44,154 Michigan registrants, **80% (35,235 people) live in the community**, and 20% (8,919 people) are incarcerated. Data Rept., Ex. 4, ¶¶2, 33–34.

75. 98% of registrants (44,076 people) are male and 2% (1,063 people) are female. 72% (32,582 people) are white, 25% (11,119 people) are Black, and 3%

---

[4] Doe H is not listed on the online sex offender registry. M.C.L. §28.728(4)(c).

[5] Non-residents who were convicted in Michigan on or after 7/1/2011 must register, although they are exempt from reporting requirements. M.C.L. §28.723(3).

(1,444 people) are other races. Blacks, who make up 14.1% of the Michigan population, are over-represented on the sex offender registry. *Id.*, ¶¶3, 37–39.

76. **73% of registrants** (32,937 people) are **Tier III**, subject to SORA <u>for life</u>. **20% of registrants** (8,887 people) are **Tier II,** subject to SORA for <u>25 years</u>. **7% of registrants** (3,191 people) are **Tier I,** subject to SORA for <u>15 years</u>. *Id.*, ¶¶5, 42.

77. **90% of registrants** (31,632 people) living in the community in Michigan are <u>on the online registry</u>. *Id.*, ¶¶6, 45.

78. 94% of registrants (42,294 people) have Michigan convictions.[6] 7% (3,100 people) have convictions from other jurisdictions, and 1% (296 people) have both a Michigan and non-Michigan conviction. *Id.*, ¶¶16, 36, 86.

79. Of registrants living in the community who have Michigan convictions, **84% have offenses <u>other than criminal sexual conduct in the first degree.</u>** This belies the common assumption that people on the registry have almost all been convicted of the most serious offenses. *Id.*, ¶¶15, 82–85.

80. There are about **31,249 people (69% of the class) in the Pre-2011 Ex Post Facto Subclass** (people whose registrable offense was committed before 7/1/2011). Stip. Class Cert. Order, R. 35, ¶3. Data Rept., Ex. 4, ¶¶24.a, 129–30.

81. There are about **16,723 people (37% of the class) in the Retroactive Extension of Registration Subclass** (people retroactively required to register for life).

---

[6] "Conviction" is used to refer both to convictions and juvenile adjudications.

18

Stip. Class Cert. Order, R. 35, ¶4; Data Rept., Ex. 4, ¶¶24.b, 131–34.

82. There are about **298 people** in the **Non-Sex Offense Subclass**. About 276 people have convictions from Michigan and 22 from other jurisdictions. Stip. Class Cert. Order, R. 35, ¶6; Data Rept., Ex. 4, ¶¶24.d, 137–43.

83. There are about **13,848 people (31% of the class) in the Post-2011 Subclass** (people whose registrable offense was committed on or after 7/1/2011). Stip. Class Cert. Order, R. 35, ¶8; Data Rept., Ex. 4, ¶¶24.f, 146–47.

84. There are about **3,100 people (7% of the class) in the Non-Michigan Offense Subclass** (people subject to SORA based on a non-Michigan conviction). Stip. Subclass Cert. Order, R. 109, ¶1; Data Rept., Ex. 4, ¶¶24.g, 148–49.

85. The size of the **Barred-From-Petitioning Subclass** (Tier II or III people who meet the same criteria as petition-eligible registrants) and the **Plea Bargain Subclass** (people who pled guilty and whose registration term was retroactively extended beyond that in effect at the time of their plea, or who were retroactively subject to SORA even though there was no registration requirement at the time of their plea) has not yet been ascertained. Stip. Class Cert. Order, R. 35, ¶¶5, 7; Data Rept., Ex. 4, ¶¶24.c, 24.e, 135–36, 144–45.

**C. The Defendants**

86. <u>**Gretchen Whitmer**</u>. Gretchen Whitmer, who is sued in her official capacity, is the Governor of Michigan. Answer, R. 111, ¶154.

87.   The executive power of the state is vested in the governor. Mich. Const. art. 5, §1. The Michigan Constitution further provides that the governor shall take care that applicable federal and state laws are faithfully executed. Mich. Const. art. 5, §8. Answer, R. 111, ¶155.

88.   Defendant Whitmer is ultimately responsible for the enforcement of the laws of this state, and for supervision of all state departments, including the Michigan State Police. Answer, R. 111, ¶156.

89.   **Colonel Joseph Gasper**. Colonel Joseph Gasper, who is sued in his official capacity, is the Michigan State Police (MSP) director. Answer, R. 111, ¶158.

90.   MSP maintains Michigan's sex offender registry. M.C.L. §28.721 *et seq.*; Answer, R. 111, ¶159. MSP manages the Michigan Sex Offender Registry database (MSOR), administers the online registry, registers (along with other police agencies) registrants, develops registration forms, collects registration fees, provides statutorily required notices, coordinates with the national sex offender registry, enforces SORA, and coordinates on registration and enforcement with other federal, state, and local law enforcement agencies and other states' registration offices. *See, e.g.*, M.C.L. §§28.724, 28.724a, 28.725, 28.727, 27.728; SOR Operating Procedures, Exs. 98–110. MSP is also responsible for determining the manner in which registrants report updates to certain information. M.C.L. §§28.725(1), (2).

91.   MSP's SOR Unit determines registrants' tier levels, whether they will be

20

placed on the online registry, and for how long they must register. The SOR Unit also prepares information for enforcement sweeps and documents to support SORA prosecutions. SOR Operating Procedures, Exs. 101–03; Morris Dep., Ex. 78, at 178, 204–08; Jegla Dep., Ex. 74, at 14–16; Beatty Dep., Ex. 71, at 103, 313–14; Selden-Manor Dep., Ex. 76, at 36-41, 93-107; MSP Org. Charts, Ex. 93; MSOR User Guide, Ex. 95, at 72.

92.   MSP's SOR Enforcement Unit oversees statewide enforcement initiatives, provides enforcement trainings, investigates registrants, and liaises with other federal and state law enforcement agencies. MSP Org. Charts, Ex. 93; Hoffman Dep., Ex. 73, at 17–18, 29–32; Registration and Enforcement Manual, Ex. 90, at 3–4.

93.   MSP posts around the state handle SORA registration and verification, and are involved in enforcement (e.g., sweeps). Registration and Enforcement Manual, Ex. 90, at 1–5; Morris Dep., Ex. 78, at 40, 123–24; Defs' Resp. to RTAs, Ex. 82, ¶68.

94.   Finally, MSP's Legal Affairs Unit provides legal advice regarding SORA to MSP and has been involved in determining registrants' obligations under SORA. Beatty Dep., Ex. 71, at 13–14, 18–21, 63.

## III.  HISTORY AND BACKGROUND

### A. History of the Michigan Sex Offenders Registration Act

95. SORA 2021 imposes obligations, disabilities, and restraints, which govern

almost every aspect of registrants' lives, and which are too extensive to be set out in full here. They are listed in the Summary of SORA 2021's Obligations, Disabilities, and Restraints [Obligations Summary], Ex. 1.

96. It was not always so. Michigan passed its first sex offender registration law in 1994. 1994 Mich. Pub. Act 295 (effective 10/1/1995). The 1994 law established a *non-public law enforcement* database containing basic information, exempt from all public disclosure. Divulging registry information was a crime, and a registrant whose information was revealed had a civil cause of action for treble damages. 1994 Mich. Pub. Act 295, §10. The statute did not require regular verification or reporting. After initial registration, the only obligation was to notify local law enforcement within 10 days of a change of address, which did not need to be done in person. Registry information was maintained for 25 years for people convicted of one offense and for life if convicted of multiple offenses. *Id.*, §§5(1), (3)–(4). The statute applied retroactively to people whose convictions occurred before 10/1/1995, if they were still incarcerated, on probation/parole, or under the jurisdiction of the probate court or department of social services on that date. *Id.*, §3(1)(b)–(c).

97. Since then, Michigan has repeatedly amended SORA, imposing new burdens covering more people and more conduct again and again. 1996 Mich. Pub. Act 494; 1999 Mich. Pub. Act 85; 2002 Mich. Pub. Act 542; 2004 Mich. Pub. Act 237, 238, 239, 240; 2005 Mich. Pub. Acts 121, 123, 127, 132; 2011 Mich. Pub. Acts 17, 18.

98.  In 1997, SORA's confidentiality protections were weakened. Law enforcement agencies were required to make registry information available for public inspection (for zip codes within the agency's jurisdiction) during business hours, and MSP was permitted but not required to make certain registry information available electronically. 1996 Mich. Pub. Act 494, §§10(2)–(3).

99.  In 1999, registry information became available to the public on the internet through the online sex offender registry. New in-person reporting requirements were imposed, with registrants being required to report quarterly or yearly, depending on their offense. 1999 Mich. Pub. Act 85, §§5a(4), 8(2), 10(2)–(3). The amendments expanded the list of registrable offenses and the categories of individuals required to register for life; lengthened the penalties for registration-related offenses; required registrants to maintain a driver's license or personal identification card; made some juveniles' registry information public; required fingerprinting and digitized photographs of registrants; and mandated registration for out-of-state students, people working in the state, and anyone convicted of a listed offense or required to register in another state or country. *See generally* 1999 Mich. Pub. Act 85.

100.  In 2002, registrants were required to report *in person* when they enrolled, disenrolled, worked, or volunteered at Michigan institutions of higher learning (whether or not they lived in Michigan). 2002 Mich. Pub. Act 542, §4a.

101.  Amendments in 2004 required the online registry to include photos. 2004

23

Mich. Pub. Act 238 §8(3)(c). An annual fee was imposed on registrants, and failure to pay was made a crime. 2004 Mich. Pub. Act 237. Requirements for people in some diversion programs were also modified. 2004 Mich. Pub. Acts 239, 240.

102.  Further amendments effective in 2006 retroactively barred registrants (with limited exceptions) from working, residing, or loitering within 1,000 feet of a school and imposed criminal penalties for noncompliance. 2005 Mich. Pub. Acts 121, 127. The penalties for registration-related offenses were increased. 2005 Mich. Pub. Act 132. Another amendment, which also applied retroactively, allowed the public to subscribe to electronic notifications about registrants. 2006 Mich. Pub. Act. 46.

103. In 2011 there were further amendments which retroactively categorized registrants into tiers. 2011 Mich. Pub. Acts 17, 18. Tier classifications, which are based solely on the offense of conviction, determine the length of time a person must register and the frequency of reporting. M.C.L. §§28.722(r)–(w); 28.725(10)–(13); *Does I*, JSOF, Ex. 136, ¶20; Crime Codes Chart, Ex. 119. Due to the retroactive reclassifications, almost 17,000 people had their registration extended to life without any individualized assessment. **Before 2011, almost three-quarters of people on the registry were 25-year registrants; after 2011, almost three-quarters were lifetime registrants**. *Does I*, JSOF, Ex. 136, ¶¶285–90; Answer, R. 111, ¶¶179–80.

104.  The amendments also required registrants to provide additional information

(e.g., internet identifiers, travel plans, telephone numbers, vehicles, etc.) during veri-fication periods and to report immediately in person when certain information changed. 2011 Mich. Pub. Acts 17, 18; *Does I*, JSOF, Ex. 136, ¶¶20–23. The 2011 amendments were led by former State Senator Alan Cropsey, who had a passionate dislike of people convicted of sex crimes. Weisberg Decl., Ex. 21, ¶¶15, 28.

### B. The *Does I* Litigation

105. In 2012, six registrants (including Does A, B, C, and Mary Doe) challenged the constitutionality of SORA. The district court dismissed plaintiffs' ex post facto claim and several other claims. *Does I*, 932 F. Supp. 2d 803 (E.D. Mich. 2013). After discovery, the court issued two opinions, *Does I*, 101 F. Supp. 3d 672 (E.D. Mich. 2015), and *Does I*, 101 F. Supp. 3d 722 (E.D. Mich. 2015), holding, *inter alia*, that:

a. SORA's prohibitions on working, residing, or "loitering" in 1,000-foot geo-graphic exclusion zones were unconstitutionally vague;

b. certain of SORA's reporting requirements were unconstitutionally vague;

c. certain of SORA's internet reporting requirements violated the First Amend-ment; and

d. imposing strict liability for SORA violations violated due process, and SORA therefore must be read to incorporate a knowledge requirement.

106. Both sides appealed. The Sixth Circuit, in a unanimous opinion authored by Judge Alice Batchelder, held that SORA is punishment and that retroactive applica-tion of the 2006 and 2011 amendments violates the Ex Post Facto Clause. *Does I*, 834 F.3d 696. With respect to the other claims, the court found that "this case in-volves far more than an Ex Post Facto challenge. And as the district court's detailed

25

opinions make evident, Plaintiffs' arguments on these other issues are far from frivo-

lous and involve matters of great public importance." *Id.* at 706. Those questions,

however, "will have to wait for another day because none of the contested provisions

may now be applied to the plaintiffs [in light of the ex post facto violation]." *Id.*

107.  SORA 2021 applies some of the very same contested provisions to the very

same plaintiffs, as well as to thousands of other registrants. M.C.L. §28.721 *et. seq.*

108.  The state defendants petitioned for certiorari, which was denied in 2017

after the United States Solicitor General advised that the case did not warrant review.

*See Snyder v. John Does #1-5*, 138 S. Ct. 55 (2017).

109.  In January 2018, the district court (on remand) entered a stipulated final

judgment, *Does I*, No. 12-cv-11194, R.153 (Ex. 137), that:

a.  declared that retroactive application of SORA's 2006 and 2011 amendments
    violates the Ex Post Facto Clause of the U.S. Constitution;

b.  enjoined defendants from retroactively applying the 2006 and 2011 SORA
    amendments against the plaintiffs;

c.  enjoined defendants from enforcing *any* SORA provision against one
    registrant and entirely removed him from the registry because his registration
    resulted from the "recapture" provisions of the 2011 amendments to SORA,
    which retroactively imposed SORA on registrants with pre-SORA offenses;

d.  removed the other plaintiffs (including those who are now Does A, B, C, and
    Mary Doe in this litigation) from the online registry, reduced their reporting
    requirements to quarterly verification of basic information, and set the length
    of their registration periods to be that required under the pre-2011 SORA (25
    years rather than life).

110.  The judgment stated: "if the Michigan legislature amends or replaces SORA

to implement the Sixth Circuit's holding in *Does #1-5 v. Snyder*, this injunction shall

terminate on the effective date of any such amendments or new statute." *Id.*, ¶7.

## C. The *Roe* Litigation

111.  Not long after the Sixth Circuit's 2016 decision, a police officer told Mary Roe that if she did not quit her job as clinical director of a residential drug treatment center (where she had worked for the preceding eight years), she would face prosecution because her workplace was within 1,000 feet of a school. The SORA provision at issue, M.C.L. §28.734(1)(a), was part of the 2006 amendments, which the Sixth Circuit had held could not be applied retroactively. Ms. Roe filed an action barring enforcement of SORA against her, and this Court granted her motion for a preliminary injunction. *Roe v. Snyder*, 240 F. Supp. 3d 697 (E.D. Mich. 2017).

112.  Ms. Roe then settled the case. Am. Compl., R. 108, ¶192. The settlement included a permanent injunction consistent with that in *Does I*. Ms. Roe came off the online registry, her registration period was returned to 25 years, and her reporting duties were limited. As in *Does I,* these provisions were to terminate if the Michigan legislature amended SORA. *See Roe*, No. 16-cv-13353, Stip. Order, R. 87.

## D. The *Does II* Litigation

113.  After the district court and Sixth Circuit decisions in *Does I*, and this Court's decision in *Roe*, Michigan continued to enforce SORA, requiring all registrants other than the *Does I* plaintiffs and Ms. Roe to comply. Answer, R. 111, ¶194.

114.  Six new plaintiffs—five of whom are also Plaintiffs Doe D, E, F, G, and H

here—then filed a class action suit seeking to enforce *Does I* for all Michigan regis-trants. The claims brought were those decided in plaintiffs' favor in *Does I* by the Sixth Circuit and the district court. *See Does II*, No. 16-cv-13137, 2d Am. Compl., R. 34. The state stipulated to certification of the class and two subclasses. *Id.*, Stip. Class Cert. Order, R. 46.

115.   Plaintiffs moved for partial summary judgment as to the ex post facto sub-classes in July 2018. *Id.*, Mot. for Partial Summ. J., R. 40. The court postponed brief-ing repeatedly to permit ongoing stakeholder negotiations as to revising SORA. *Id.*, Sched. Orders, R. 41, 44, 45, 47, 51, 54. In May 2019 (almost a year after plaintiffs moved for summary judgment), the parties, hoping to spur legislative action, pro-posed and the court entered a stipulated order granting a declaratory judgment. The judgment declared the 2006 and 2011 amendments to be unconstitutional as to the ex post facto subclasses. *Id.*, Stip. Order for Decl. J., R. 55. The court deferred ruling on injunctive relief "to avoid interfering with the Michigan legislature's efforts to address the *Does I* decisions and their findings of constitutional deficiencies with SORA." *Id.*, Pg.ID.784.

116.  After stakeholder negotiations for a new SORA failed, *see* Section III.E, *infra*, the *Does II* plaintiffs moved forward on their summary judgment motion. *Id.*, R. 75, Pls' Mot. for Partial Sum. J. In February 2020, the court granted their motion on all counts, incorporating the holdings of the Sixth Circuit and the district court in

*Does I*, as applied to the appropriate subclasses. *Does II*, 449 F. Supp. 3d 719. The court found that the provisions which violated the Due Process Clause and First Amendment, and the provisions imposing strict liability, were void and could not be enforced against *any* registrant, prospectively or retroactively. *Id.* at 737–38. As to the ex post facto claim, the court held that the unconstitutional 2011 amendments were not severable from the constitutional parts of SORA, and therefore, absent legislative action, the entirety of SORA could not be enforced against the ex post facto subclasses (those whose registrable offenses occurred before the effective date of the 2011 amendments). *Id.* at 731–33.

117.  The injunctions were to become effective 60 days after judgment, to give the legislature one last chance to pass a new SORA. *Id.* at 739. Before final judgment could enter, however, the pandemic hit, making it difficult for (1) the state to provide notice of the judgment to registrants, (2) the legislature to work on a new law, and (3) registrants to obey many of SORA's registration requirements due to state and federal stay-at-home orders. Am. Compl., R. 108, ¶203; Answer, R. 111, ¶203.

118.  Accordingly, in April 2020, the court entered an interim order delaying the entry of final judgment and notice to the class and suspending enforcement of most SORA requirements (including registration, verification, and fees). *Does II*, No. 16-cv-13137, Interim Order Delaying Entry of Final J., Preliminarily Enjoining Reporting Requirements, and Directing Publication, R. 91 (Apr. 6, 2020).

29

119.  Over a year later, the *Does II* court entered its final judgment on August 4, 2021, with an amended final judgment issued August 26, 2021. That judgment:

a. declared the old SORA to be punishment, the ex post facto application of the 2006 and 2011 amendments to be unconstitutional, the 2011 amendments to be not severable from the rest of SORA, and SORA to be null and void as applied to people who committed their registrable offense before July 1, 2011;

b. permanently enjoined defendants and their agents from enforcing any provision in the old SORA against people who committed their registrable offense prior to July 1, 2011;

c. declared unconstitutional and permanently enjoined provisions of the old SORA that prohibited registrants from working, residing, or "loitering" in geographic exclusion zones;

d. declared unconstitutional and permanently enjoined certain reporting requirements; and

e. provided that under the Due Process Clause of the U.S. Constitution, the old SORA must be interpreted as incorporating a knowledge requirement when prosecuting compliance violations.

*Id.*, Am. Final J., R. 126. Because the *Does II* case only concerned the constitutionality of the old SORA, the judgment did not enjoin enforcement of SORA 2021. *Id.*

120.  Enforcement of SORA was suspended for almost a year, from the entry of the interim order on April 6, 2020, until SORA 2021 came into effect on March 24, 2021. *Does II*, R. 91, Interim Order; 2020 Mich. Pub. Act 295.

**E.  The Failure of Reform Efforts and the Adoption of SORA 2021**

121.  The *Does II* litigation put pressure on the executive and legislative branches to revise SORA. The Senate Judiciary Committee staff convened a stakeholder work group to draft a new law. That work group, which included legislative liaisons from both parties in both houses, representatives from the governor's office, the MSP, the

30

MDOC, the Prosecuting Attorneys Association, victims' rights advocates, the Attorney General's Office, and class counsel in *Does II*, met for about a year and half while the *Does II* case was pending. Weisberg Decl., Ex. 21, ¶¶33, 37–39; Fitzgerald Dep., Ex. 72, at 14–15, 24–29. Work group information was passed on to the MSP senior leadership. Fitzgerald Dep., Ex. 72, ¶¶30–36.

122.   Although there was disagreement about the details, the work group generally recognized that the old SORA was not evidence-based, that offense-based registration does not correlate with risk, that individual assessments can be used to identify lower-risk/higher-risk groups, and that many low-risk people are required to register for 25 years or life. The workgroup considered shorter registration terms (which were supported by MSP), paths off the registry for rehabilitated people, reduction in the number of registrable offenses, simplification of reporting, ending registration of children, and provisions for people with disabilities. Weisberg Decl., Ex. 21, ¶¶42–50; Fitzgerald Dep., Ex. 72, at 32–38, 65–66. By summer 2019, the Legislative Services Bureau had prepared a draft bill. Weisberg Decl., Ex. 21, ¶41.

123.   Despite growing bipartisan agreement among the stakeholders that SORA reform was necessary, and even in the face of a possible federal court injunction, in the fall of 2019, as the 2020 election loomed, the executive branch agencies stopped participating, and the work group was disbanded. True SORA reform proved to be politically impossible. Weisberg Decl., Ex. 21, ¶¶51–54; Buhl Decl., Ex. 22, ¶¶18–

31

19; Fitzgerald Dep., Ex, 72, at 39–42.

124.  Instead, in March 2020, legislators introduced a SORA bill that was basically the 2011 law with some tweaks. The new bill did not reference or incorporate any of the work done by the legislative work group. To the contrary, the new bill *retained* most of the features of SORA 2011 that the courts had criticized or questioned in holding the old law to be unconstitutional, including the geographic exclusion zones. *See* H.B. 5679, 100th Leg., Reg. Sess. (Mich. 2020); Weisberg Decl., Ex. 21, ¶55.

125.  Unlike other amendments to criminal laws, which were assigned to MSP to shepherd them through the legislative process, this bill was assigned to the Executive Office of the Governor. Fitzgerald Dep., Ex. 72, at 42–43, 52. The former SOR Unit manager was unaware of any legislative requests for data from the SOR Unit that that might have informed the legislature as to a new bill. Morris Dep., Ex. 78, at 225.

126.  During three hearings on H.B. 5679, the House Judiciary Committee received about 170 submissions, all but two of which opposed or expressed reservations about the bill. The only favorable oral testimony came from a victims' rights advocate, who told the committee that registrants should be punished for life. Registry experts testified that registries do not prevent recidivism or make communities safer and may in fact increase recidivism. There was no contrary testimony. Weisberg Decl., Ex. 21, ¶¶56–61; Buhl Decl., Ex. 22, ¶21; Fitzgerald Dep., Ex. 72, at 54.

127.  Michigan Attorney General Dana Nessel submitted comments expressing

concerns about the bill's constitutionality. She noted that the Sixth Circuit had criticized SORA for its lack of individual risk assessment. She expressed concern that the bill's offense-based approach to registration would not address the courts' concerns and did not correspond with the social science evidence. And she criticized the continuation of in-person reporting for decades or life. "The bill needs considerably more work if the State is going to avoid future litigation over the constitutionality of its registry." Attorney General Comments on HB 5679, Ex. 122.

128.  MSP also submitted comments noting constitutional deficiencies in the bill and seeking to "improve efficiency and functionality of the … registration process for both offenders and law enforcement." MSP Comments on HB 5679, Ex. 123.

129.  In the lame duck legislative session (November-December 2020), both houses of the Michigan legislature passed a substitute version of H.B. 5679. The substitute bill removed the geographic exclusion zones but was otherwise almost identical to the original bill. The Senate Judiciary Committee did not hold any hearings on the substitute bill, but instead the Senate suspended its rules and pushed the bill through without any further public input. Weisberg Decl., Ex. 21, ¶¶62–64; SORA 2021 with Highlighted Changes Showing 2011 and 2021 Amendments, Ex. 2 (showing minimal changes from the prior statute).

130.  SORA 2021 was passed by the legislature in late December 2020 and signed by the governor. It took effect on March 24, 2021. 2020 Mich. Pub. Act 295.

Q. "…[W]ould you agree that that's perfect timing to pass a bill that you know might have political backlash, to use your words?

A. Yes, I agree with you. Bills passed in lame duck are—they are what they are.

Q. All right. It's passed in a way—it's designed to make it as invisible as possible for the public?

A. Yes.

Fitzgerald Dep., Ex. 72, at 59 (objections omitted) (testimony of former MSP commander of governmental affairs).

### F.  The *Betts* Litigation

131.  While the *Does I* and *II* cases were working their way through the federal courts, a parallel criminal case was proceeding through the state courts. On July 27, 2021, the Michigan Supreme Court held that applying the 2011 SORA retroactively violated the federal and state constitutional prohibition on ex post facto laws. *People v. Betts*, 968 N.W.2d 497 (Mich. 2021). The court found the statute's "demanding and intrusive requirements, imposed uniformly on all registrants regardless of an individual's risk of recidivism, were excessive in comparison to SORA's asserted public safety purpose." *Id.* at 562. Like Judge Cleland in *Does II*, the court also found that the 2011 amendments were not severable. *Id.* at 573.

### G.  The *Lymon* Litigation

132.  In *People v. Lymon*, 993 N.W.2d 24 (Mich. Ct. App., 2022), the Michigan Court of Appeals held that requiring a person who was not convicted of a sex offense to register under SORA 2021 violates Michigan's constitutional protection against

34

cruel or unusual punishment. Mich. Const. 1963, art. 1, §16. Lymon had been con-

victed of unlawful imprisonment (M.C.L. §750.349b), which is a registrable offense

even though it lacks any sexual element. M.C.L. §28.722(r)(iii).

133. The Court of Appeals, applying the Michigan Supreme Court's *Betts* deci-

sion and the factors set out in *Kennedy v. Mendoza Martinez*, 372 U.S. 144 (1963),

rejected the state's argument that the 2021 changes to the statute had rendered it non-

punitive: "the 2021 SORA's aggregate punitive effect negates the Legislature's

intention to deem it a civil regulation." *Lymon*, 993 N.W.2d at 44. The court further

held that requiring Lymon to register as a sex offender when he had not committed

a sex offense is cruel or unusual punishment. *Id.* at 47.

134. The Michigan Supreme Court has granted leave in *Lymon*, ordering briefing

on "whether requiring a defendant to register as a sex offender under the Sex Offend-

ers Registration Act (SORA), MCL 28.721 *et seq*., as amended by 2020 PA 295,

effective March 24, 2021 (the 2021 SORA), for a non-sexual crime, such as unlawful

imprisonment of a minor, constitutes cruel or unusual punishment under Const 1963,

art 1, §16 or cruel and unusual punishment under US Const, Am VIII." *Lymon*, No.

164685, Order Granting Application for Leave (Jan. 11, 2023).

**H. The Growth to Michigan's Registry Over Time**

135. There were approximately 17,000 registrants in 1997, as compared to over

45,000 today. *Does I*, JSOF, Ex. 136, ¶1023; Data Rept., Ex. 4, ¶1.

## IV.  EX POST FACTO CLAIM (COUNT I)

136.  The facts most relevant to the ex post facto claim are set out below.

### A.  SORA 2021 Retains the Key Defects of the Unconstitutional 2011 Law

137.  Exhibit 2 highlights which provisions of SORA 2021 were added in 2011 and which in 2021. It shows both how few changes were made in 2021 and that SORA 2021 retains almost all of the 2011 amendments and continues to apply them retroactively, even though the Sixth Circuit said that their retroactive application must cease. *Does I*, 834 F.3d at 706.

138.  SORA 2021 remains conviction-based. Regardless of the circumstances of the offense, the passage of time, or a registrant's proven rehabilitation or incapacitation, there is, in almost all cases, no path off the registry. M.C.L. §28.721 *et. seq.*

139.  SORA 2021 retains the same structure as SORA 2011: it classifies registrants into tiers based solely on their offense of conviction without any individualized risk assessment, with the tiers determining the number of years that they must register and their frequency of reporting. In other words, people are assigned to 15-year, 25-year, and lifetime registration without any individualized review ever. M.C.L. §§28.722(q)–(v), 28.725(11)–(14), 28.725a.

140. SORA 2021 maintains the retroactive extension of registration terms created by the 2011 amendments' tier classifications. Under the 2011 amendments, thousands of people had their registration terms retroactively extended from 25 years

36

to life because they were reassigned to Tier III. There was no individualized deter-mination about their risk or whether lifetime registration was warranted. SORA 2021 incorporates the 2011 amendments that retroactively extended registration terms to life. 2011 Mich. Pub. Acts 17, 18; M.C.L. §§28.722(r)–(w); 28.725(10)–(13); *Does I*, JSOF, Ex. 136, ¶¶20, 286; Am. Compl., R. 108, ¶¶48, 65, 82, 96, 111, 126, 146.

141.  SORA 2021 makes no changes to the crimes requiring registration. It con-tinues to require children as young as 14 to register for life, M.C.L. §28.722(a)(iii)–(iv), and continues to require registration of developmentally and physically disabled people who may lack the ability to comply with the Act's requirements.  People who had sexual relationships with younger teens or who committed other less serious offenses must still register, in most cases for life. M.C.L. §28.722(r), (t), (v). SORA 2021 continues to require registration for people who were never convicted of a sex offense. M.C.L. §28.722(r)(iii), (r)(x), (v)(ii), v(iii), (v)(viii). The only substantive change to who must register is that the law no longer applies to a small number of people whose offenses were later expunged or set aside, or who successfully com-pleted a diversion program under HYTA. M.C.L. §28.722(a)(i)–(ii).

142.  SORA 2021 continues the 2011 amendments' retroactive extension of pre-2011 registrants' registration terms from 25 years to life. *See* 2011 Mich. Pub. Acts 17, 18; M.C.L. §§28.722(r)–(v); 2020 Mich. Pub. Act 295.

143.  SORA 2021 also retains the 2011 amendments' "recapture" provision,

37

which imposes all of SORA's burdens on people with pre-SORA sex offenses (i.e., offenses from 1995 or earlier) if they are convicted of *any non-sexual* felony, even though they have not been convicted of another sex offense in a quarter century or more. M.C.L. §28.723(1)(e).

144.  SORA 2021 keeps the 2011 requirements for reporting of personal information, including names, nicknames, Social Security number, date of birth, addresses, employers (including temporary jobs and routes of travel for non-fixed employment), schools attended or schools the registrant plans to attend, phone numbers, emails, internet identifiers, vehicles, driver's licenses, personal ID cards, passports, immigration documents, and occupational/professional licenses. M.C.L. §28.727. As under the old law, registrants must appear in person to verify this information quarterly, twice-yearly, or annually, depending on their tier. M.C.L. §28.725a(3).

145.  Indeed, SORA 2021 requires reporting of even more information. The 2011 statute required reporting of "telephone numbers . . . routinely used by the individual" and vehicles "regularly operated by the individual." M.C.L. §28.727(1)(h), (j) (2020). In SORA 2021, the legislature chose to address the vagueness concerns associated with the modifiers "routinely" and "regularly" not by limiting reporting to a person's own phone and vehicles, but by adopting a new requirement to report every single use of a phone or vehicle ever. M.C.L. §28.727 (1)(h), (j) (2021).

146.  SORA 2021 also keeps the 2011 requirement to report within three business

38

days[7] any changes to all sorts of information, such as addresses, employment, phone numbers, vehicles, schooling, email addresses, and internet identifiers. While some changes can now be reported by mail, other changes must still be reported in person. M.C.L. §§28.724a, 28.725, 28.727; Obligations Summary, Ex. 1; MSP Letter, Ex. 86. Registrants must also still report in advance if they travel for more than seven days, with 21 days' notice for foreign travel. M.C.L. §28.725(2)(b), (8). All of these requirements continue to be applied retroactively, with the exception of reporting for email and internet identifiers. M.C.L. §§28.725(2)(a), 28.727(1)(i).

147.  Under SORA 2021, Tier II and III registrants, and some Tier I registrants, continue to be publicly branded as sex offenders on the online registry, which publishes their pictures and personal information, including their weight, height, hair and eye color, tattoos/scars, birthdate, home address, employer address, school address, and vehicle information. M.C.L. §28.728(2). The online registry can now include a person's email and internet information. *See* Senate Substitute for H.B. 5679, 100th Leg., Reg. Sess. (Mich. 2020) (striking §8(3)(e)). Tier level information is no longer posted, which makes everyone on the online registry appear equally dangerous. M.C.L. §28.728(3)(e).

148.  Under SORA 2021, registrants must continue to pay an annual fee. M.C.L.

---

[7] SORA 2021 replaces the requirement to "immediately" report with one to report within three business days. That is exactly how "immediately" was defined in SORA 2011. *Compare* M.C.L. §28.722(g) (2020), *with* M.C.L. §28.725(1) (2021).

§28.725a(6). The law continues to punish non-compliance with prison terms of up to ten years, as well as mandatory revocation of probation, parole, or youthful trainee status for even technical non-compliance or failure to pay the required fee. M.C.L. §28.729. The only compliance change is that, in response to *Does I* and *Does II*, all SORA violations must be shown to be willful (ending strict liability). *Id*.

149. SORA 2021 continues to bar virtually all registrants from petitioning for removal from the registry, meaning that for almost all registrants there is no path off the registry, regardless of demonstrated rehabilitation or current risk. Only certain Tier I registrants and juveniles who meet strict criteria may petition for removal after 10 and 25 years, respectively. Other registrants who meet the same strict criteria are not allowed to petition for removal. M.C.L. §28.728c(1), (2), (12), (13).

150. SORA 2021 does eliminate the 1,000-foot geographic exclusion zones that barred registrants from living, working, or "loitering" within 1,000 feet of a school. H.B. 5679 (2020). But the practical impact of this change is limited because the state continues to brand people as sex offenders on the internet, posting their home and employment addresses and providing a mapping tool so that anyone using the internet can see where they live and work. The result is that registrants continue to face severe housing and employment difficulties. *See* Sections IV.G.5–6, IV.F, *infra*.

151. In sum, SORA 2021 retains the identical tier system, the identical lengthy/ lifetime registration periods, and very similar reporting requirements and online

registry, all without any individual assessment of risk to determine if SORA 2021's severe burdens are warranted. SORA 2021 Highlighted Changes, Ex. 2.

## B. SORA Undermines Rather than Promotes Public Safety

### 1. SORA Is Counterproductive Because It Is Likely to Increase Rather than Decrease Sexual Offending

152.  SORA's avowed purpose is "to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." M.C.L. §28.721a.

153.  SORA 2021 is premised on the proposition that registration will reduce recidivism by people with past convictions and thereby reduce the risk of sexual crime to the public. It does not. The expert reports of Drs. Elizabeth Letourneau, J.J. Prescott, Kelly Socia, and Kristen Zgoba (Exs. 7, 8, 9A–B, 12), show **a broad scientific consensus that online registries do not reduce the frequency of sexual recidivism, may well *increase* it, and at best have no impact on it**—despite the immense cost to the state and to registrants of maintaining a registry law.

154.  Dozens of studies on sex offender registration have failed to uncover any evidence that online registries reduce recidivism. Rather, the research shows that, at best, such registration laws make no difference and may well be counterproductive to their avowed public protection purpose. Prescott Rept., Ex. 8, ¶¶1–37; Letourneau Rept., Ex. 7, ¶¶6–11; Socia Rept., Ex. 9A, ¶¶5–8. Research on juvenile registration similarly fails to find any public safety benefits. Letourneau Rept., Ex. 7, ¶¶6, 10.

41

155. Dr. Elizabeth Letourneau, a leading expert on registries, explains:

> I don't think that there is anything that suggests that these policies are effective in preventing sexual abuse or sexual violence, which is what they are intended to do…. The registry does not increase the likelihood that children grow up free from abuse and, in fact, it increases the likelihood … that children will be abused.

Letourneau Dep., Ex. 55, at 31–32. *See also* Hanson Dep., Ex. 54, at 79, 144–45.

156. These results reflect the fact that registration and its consequences exacerbate risk factors for recidivism, such as lack of housing and employment; prevent healthy reintegration into the community; and have negative impacts on registrants' mental health. The recidivism-increasing effects of online registries at the very least offset and may overwhelm whatever public safety benefits such laws might offer (if any). Prescott Rept., Ex. 8, ¶¶1–37; Letourneau Rept., Ex. 7, ¶¶15–16. *See also* Sections VI.B.3, IV.G, *infra*.

157. Applied to Michigan, the research suggests that Michigan's registration statute contributes to sex offense conviction rates in Michigan that are up to 5% *higher* than they would be without SORA. Moreover, the continued growth in the size of the online registry will likely result in even more *additional* sex offense convictions as more people are added to the registry. Put simply, existing evidence suggests that, far from reducing recidivism, SORA increases the total number of sex offenses each year in Michigan. Prescott Rept., Ex. 8, ¶¶13, 15.

158. Defendants' experts presented no evidence at all to show that registries are

effective in reducing recidivism by people convicted of sex offenses. Hanson Rebuttal, Ex. 6, ¶24. To the contrary, Defendants' expert agreed that "the research has been pretty consistent that [registries are] not effective." Turner Dep., Ex. 70, at 75.

### 2. *SORA Misidentifies the Source of the Risk for Sexual Offending*

159.  As Defendants' experts concede, the vast majority of new sex offenses for which an arrest is made—90 to 95%—are committed not by registered offenders, but by people without prior sexual convictions who are not listed on any registry. Socia Rept., Ex. 9A, ¶2; Salter Decl., Ex. 142, at 9–10. SORA, by focusing on identifying strangers who might pose a danger, misidentifies where offending occurs. As Defendants' experts also concede, the vast majority of sex crimes are committed by acquaintances, family members, or other people who know the victim, rather than by strangers. Only 13 to 15% of sex crimes reported to the police are committed by strangers. Child-victim sex crimes are even less likely to involve strangers, who account for only 5 to 10% of such crimes. Socia Rept., Ex. 9A, ¶4; Prescott Rept., Ex. 8, ¶32; Lovell Decl., Ex. 140, ¶10.

160.  The low proportion of sex crimes involving registrants, combined with the low proportion of sex crimes involving strangers, helps explain why the research shows that registries are ineffective at reducing sexual offending or making communities safer. Socia Rept., Ex. 9A, ¶5. *See* Ira Ellman, *When Animus Matters and Sex Crime Underreporting Does Not*, 7 U. Pa. J. L. & Pub. Affs. 1, 19 (2021) ("One

can't have much impact on the overall incidence of sexual offenses by concentrating efforts on a group that accounts for less than 5% of them [that is, registrants].").

161.  Nor can registries claim credit for the fact that more than nine out of ten new sex crime arrests involve people with no prior sexual conviction (who are not on registries at the time of the arrest). The research shows that this is not an effect of registries because it was also true before registries existed: more than 90 percent of sex crime arrests were committed by first-time arrested offenders both before *and* after registry laws were passed. Socia Rept., Ex. 9A, ¶8. Registries reduce neither first-time sex crime arrests nor recidivism.  Letourneau Rept., Ex. 7, ¶11.

### 3.  *SORA Undermines Successful Reentry*

162.  Not only do registration schemes fail to improve community safety, but they also undermine the ability of people with past sex offenses to successfully reintegrate into society. Letourneau Rept., Ex. 7, ¶¶6, 15–16; Prescott Rept., Ex. 8, ¶¶1, 34–51; Zgoba Rept., Ex. 12, ¶¶22–30; Socia Rept., Ex. 9A, ¶¶8, 22–23.

163.  There is a scientific consensus that registrants have difficulty finding and keeping stable housing, employment, and prosocial relationships. Letourneau Rept., Ex. 7, ¶¶6, 15–16; Socia Rept., Ex. 9A, ¶¶22–23; Zgoba Rept., Ex. 12, ¶¶22–30. Yet stable housing, employment, and prosocial relationships are the three most important factors contributing to successful reentry and a law-abiding lifestyle. Letourneau Rept., Ex. 7, ¶¶6, 15; Letourneau Dep., Ex. 55, at 35, 58–59.

44

164.  SORA imperils public safety by increasing the likelihood of joblessness, homelessness, and disconnection from prosocial friends and family, which in turn increases the likelihood of sexual *and* non-sexual recidivism. SORA thus sabotages its own avowed public safety goals. Letourneau Rept., Ex. 7, ¶¶6, 15. The many burdens registrants face help to explain why the research shows that online registries do not decrease recidivism, and if anything may *increase* it by exacerbating the core risk factors known to contribute to it. Prescott Rept., Ex. 8, ¶1.

### 4.  *Onerous Reporting Requirements Serve No Public Safety Purpose*

165.  No evidence supports the notion that more frequent registration check-ins lower recidivism, nor is there evidence that reporting additional information (*e.g.*, email addresses, employment) reduces recidivism. Failure to register or comply with registration requirements also does not correlate with sexual recidivism. Letourneau Rept., Ex. 7, ¶¶19–21; Letourneau Dep., Ex. 55, at 56–57; Hanson Rept., Ex. 5, ¶77; Socia Rept., Ex. 9A, ¶¶24–28; Zgoba Rept., Ex. 12, ¶¶12–19.

### 5.  *Registration Has Unintended Consequences that Harm Survivors and Lessen Accountability for Sex Offenses*

#### a.  *SORA Discourages Survivors from Reporting Abuse*

166.  As victim advocate Sujatha Balija explains, sex offender registries can discourage survivors from reporting abuse. Multiple studies show that the increased use of sex offender registries—and the stigmatization that comes with it—is associated with a decrease in the reporting of sex crimes. Many survivors oppose registries and

may choose to keep their abuse hidden for fear that reporting will result in the person who harmed them appearing on a registry. Balija Rept., Ex. 14, ¶¶15–17; Letourneau Dep., Ex. 55, at 79–80 (families "really grapple with whether to bring a sex crime case forward if registration is going to be one of the potential consequences").

167.   The majority of sexual offenses are committed by someone the victim knows, and many survivors hesitate to shame people they know. This means they are less willing to report a crime if the wrongdoer will appear on an online registry. Registration also deters reporting by victims because many survivors view the supervision and publicity associated with registries as a threat to their own privacy. Because so much abuse happens within families, registries can effectively "out" the victim, even though the victim is not named. Registries can discourage reporting by survivors who fear that people will learn their past by seeing information about the person convicted of abusing them on the registry. Balija Rept., Ex. 14, ¶¶18–25.

168.   Balija concludes that "registries have not supported survivors, and have conversely had the effect of silencing survivors." *Id.*, ¶17. When survivors choose not to report out of hesitation that the person who harmed them may be added to the sex offender registry, it allows the harm and abuse to persist. *Id.*, ¶26. *See* Hanson Dep., Ex. 54, at 228–29 (the more severe the possible sanction is, the more taxing the court process is for victims due to cross-examination and more court time).

*b. SORA Makes It More Difficult to Obtain Convictions for Sex Offenses*

169.  Sex offender registration increases the number of sex offenses that are pled down to non-sex offenses to avoid registration. Registry laws also lower conviction rates for cases that go forward to trial. Letourneau Rept., Ex. 7, ¶¶6, 14. Chartier Rept., Ex. 18, ¶18. The research shows

> massive increases in people pleading from sex crimes to non-sex crimes, not even to lower level sex crimes but to non-sex crimes, so pleading out of type once registration was implemented and then again even more so when online registration was implemented. [Letourneau Dep., Ex. 55, at 50.]

A policy that is associated with "vastly increasing the likelihood that somebody will successfully plead to a non-sexual offense … doesn't serve victims," but instead is "extremely damaging" to survivors. *Id.* at 53. The research also shows there was a

> significantly reduced likelihood, that people who were charged with sex crimes … would be found guilty after online registration went into practice compared to before there was registration or online notifi-cation. [*Id.* at 50.]

This was likely due to the reluctance of judges and juries to subject people to lengthy registration. *Id.*

*c. SORA Provides a False Sense of Security and Diverts Funding from Proven Alternatives*

170.  Registries can provide a false sense of security. A sex offender registry list-ing thousands of strangers is not an effective preventative measure when victims are more likely to be harmed by people close to them. Balija Rept., Ex. 14, ¶34.

171.  SORA is expensive, wasting resources that could be used to fulfill the law's

stated purpose. Michigan could improve community safety by investing in programs

shown to reduce sexual crime, such as evidence-based treatment and reentry support.

Letourneau Rept., Ex. 7, ¶¶6, 17–18, 22; Hanson Rept., Ex. 5, ¶78.

> [E]very dollar spent on a failed policy is a wasted dollar that cannot go
> to more effective strategies. And so by definition because these policies
> … don't achieve their aim of reducing recidivism, all of that money is
> wasted and really should go towards effective policies and strategies
> that can reduce sexual abuse and sexual violence.

Letourneau Dep., Ex. 55, at 55. *See* Hanson Dep., Ex. 54, at 125–26.

172.  There are effective programs to address sexual crime after it has occurred,

to prevent it from happening in the first place, and to increase reporting of sexual

crimes. But these programs are under-resourced. Balija Rept., Ex. 14, ¶¶35–43;

Letourneau Dep., Ex. 55, 26–27, 59–60, 73–76. As Sujatha Balija explains:

> As an advocate for survivors, I want to see these resources reallocated
> from counterproductive registries that discourage reporting and under-
> mine reentry to proven alternatives that prevent abuse and heal survi-
> vors. If we really want to prevent abuse and support survivors, we need
> to stop funding sex offender registries, and invest in rehabilitation and
> reintegration programs, and prevention initiatives.

Balija Rept., Ex. 14, ¶44. "[E]very single dollar we spend on [registries] should be

going to something more effective at supporting survivors and preventing harm from

occurring in the first place." Letourneau Dep., Ex. 55, at 86.

### 6.  *The Registry Is Not Needed by Law Enforcement*

173.  The MSP Legal Advisor testified that "**the legislature tagged us [MSP]**

**with maintaining a registry that we don't even need for a law enforcement purpose … because all this information is already available to us."** Beatty Dep., Ex. 71, at 242. *See also* SOR Operating Procedure 304, Ex. 100 (describing law enforcement's access to a variety of informational databases).

174.   During legislative workgroup discussions, MSP's position was that the registry itself is not typically used as an investigative tool "because it duplicates richer databases that the MSP already has in place." Weisberg Decl., Ex. 21, ¶49. MSP's Legal Advisor described MSP's position during negotiations:

> The Michigan State Police does not need the database to do our job. So please stop looking out for our interest that we need the database to do our job…. [W]e don't need the database to do police work. [Beatty Dep., Ex. 71, at 303.]

175.   MSP's former commander of governmental affairs, who had also been a trooper, testified that the registry "wasn't a value add to anything that I would have been working on… [and] nobody regularly consulted the registry for … an investigative purpose." Usually only one SORA point person in an MSP post is even trained on the complex MSOR database. Fitzgerald Dep., Ex. 72, at 61–64. He testified:

Q.   [I]n all the time you were a trooper on any cases, did you have occasion to use the registry … program provided to the [MSP]?

A.   You mean use … our MSP Sex Offender Registry?

Q.   Yes.

A.   No. [*Id.*, at 63–64.]

176.   The former SOR Unit manager testified that she did not know if the email/

49

internet information collected from registrants was ever used. For pre-2011 registrants, that information is being removed from the registry (due to the prior litigation). The manager was unaware of any impacts of not having email/internet information available for pre-2011 registrants. Morris Dep., Ex. 78, at 218–19.

177. Defendants have not done any evaluation of the registry's effectiveness, impact on recidivism, cost, or usage by the public or law enforcement, nor have they studied or issued any reports regarding vigilantism/harassment of registrants, or of registrants' demographics. Defs' Am. Resp. to 1st RFP, Ex. 81, ¶6 (producing no such documents); Morris Dep., Ex. 78, at 178–182 (knew of no evaluations of registry's effectiveness, cost, or usage; MSP has never tried to determine whether people who are removed from the registry are reconvicted). Nor have studies been done to determine whether the *Does II* court's COVID-related suspension of SORA enforcement (from 4/6/20 until 3/24/21) had any impact on sexual crime arrest or conviction rates. Fitzgerald Dep., Ex. 72, at 58; Hoffman Dep., Ex. 73, at 141; *Does II*, R. 91, Interim Order, and R. 127, Am. Final Judgment.

## C. Thousands of Registrants Are No More Likely to Commit a Sex Offense than Unregistered People

178. One reason that registration laws are so ineffective is that they do not accurately delineate the few people at high risk to recidivate sexually from the large majority of people at low risk to recidivate. Letourneau Rept., Ex. 7, ¶13.

### 1. *The Likelihood of Sexual Recidivism Drops Dramatically Over Time*

179.  Recidivism risk drops significantly the longer a person lives in the community without recidivating. The decline in recidivism risk for people who remain conviction-free in the community is one of the most well-established findings in criminology. Hanson Rept., Ex. 5, ¶¶47, 54. Defendants' experts present no evidence to counter the fact that re-arrest and reconviction rates for all types of crimes—including sexual crimes—decline the longer people are in the community without recidivating. Hanson Rebuttal, Ex. 6, ¶21. They agree that "[s]exual recidivism rates are highly dependent on how much time has passed after first being convicted and released," Lovell Decl., Ex. 140, ¶7, and that the longer a person goes without recidivating, the less likely they are to do so. Lovell Dep., Ex. 67, at 88, 95.

180.  For registrants, the decrease in recidivism risk is dramatic—roughly 50% every five years—so the longer they remain conviction-free, the less likely they are to recidivate. If their risk was 10% at the time of release, it would drop to 5% after five years, and to 2.5% after ten years. Hanson Rept., Ex. 5, ¶59. Because most sexual recidivism occurs soon after returning to the community and because the risk goes down over time, recidivism risk will be *different* during years 0-3, years 3-6, years 6-9, etc. Thus, even though a 15-year cumulative recidivism rate will be higher than a 3-year cumulative recidivism rate, the rate of recidivism in later years (e.g.,

years 13-15) for a particular population, is much, much lower than that same population's rate in the initial years (0-3). Socia Rebuttal, Ex. 10, at 8–9, 17–18.

## 2. *Recidivism Risk Varies Greatly Among People with Past Sex Convictions*

181. Both sides' experts also agree that recidivism risk is not uniform across all people with a sex offense conviction.[8] Rather, risk varies based on well-known risk factors. Hanson Rept., Ex. 5, ¶¶3a, 15–17, 29, Table 1; Hanson Rebuttal, Ex. 6, ¶14; Socia Rebuttal, Ex. 10, at 17–18; Lovell Decl., Ex. 140, ¶7; Lovell Dep., Ex. 67, at 70–74, 85–90; Salter Decl., Ex. 142, at 15; Salter Dep., Ex. 69, at 32; Turner Decl., Ex. 143, at 4; Defs' Resp. to RTAs, Ex. 82, ¶44.

182. The most widely used risk assessment instrument for sexual recidivism is the Static-99/Static-99R. It scores people using 10 primary factors,[9] and based on the score, it groups people into five risk levels. Hanson Rept., Ex. 5, ¶¶31, 35–42;

---

[8] Much of the research on recidivism rates comprises aggregated studies, some of which count not just official *conviction* records, but also official *arrest* and/or *charging* records, as evidence of a "countable" crime. From a legal perspective, the studies thus over-count recidivism, as some people arrested for a sexual crime may not be charged, or the charges may be dismissed, or they may plead to a non-sexual offense, or they may be acquitted. Because the studies include different units of measurement, however, when we use the term "conviction" in addressing recidivism rates, it should be read to include (at least in part) arrests/charges.

[9] Factors considered in a Static-99R assessment include the nature of the sex-related offense(s) that led to the "index offense," demographics (age, relationship history), criminal sexual history (prior sexual offenses, any male victim, any un-related victims, any stranger victims, any non-contact sexual offenses), and general criminal history (prior sentencing dates, non-sexual violence committed along with the index offense, prior non-sexual violence). Hanson Rept., Ex. 5, ¶30.

*id.* at p. 51, Table 1; Turner Dep., Ex. 70, at 165.

183.  The Level I very low risk classification identifies people with a history of sexual crime whose risk for a subsequent sexual offense is no different than the rate of a first-time sex offense conviction for people with a criminal history but no previous conviction for a sexual offense. Out of 100 people at the Level I risk level, 98 will never be convicted of another sexual offense, even with follow-up periods of 20 years. For Level I individuals, the risk of recidivism is so low that it would be practically impossible to lower it further. Hanson Rept., Ex. 5, ¶¶39, 45.

184.  The Level II below-average risk classification describes people whose risk for sexual recidivism is slightly higher than the general population, but still very low (1.6% to 2.2% after five years)). Most Level II individuals will move to Level I if they are provided with short-term (6-12 months) community supervision and focused counseling. *Id.*, ¶40.

185.  The Level III average risk classification identifies people in the middle of the risk distribution for sexual recidivism. Out of 100 individuals classified as Level III, between three and seven will be expected to be reconvicted of a sexual offense within five years; conversely, between 93 and 97 will not. *Id.*, ¶41.

186.  Individuals in the top two levels, Level IVa (above average risk) and IVb (well above average risk), are expected to have sexual recidivism rates of between 9% and 60% after five years. *Id.*, ¶42.

187. At the time of release, nearly three quarters of registrants will be classified as Level III-average risk or lower. Specifically, the distribution is as follows: Level I – 5.7%, Level II – 18.2%, Level III – 50.4%, Level IVa – 18.1% and Level IVb – 7.6%. *Id.*, ¶43. As discussed above, recidivism risk decreases dramatically over time. **After 10 to 15 years in the community without recidivating, the great majority of registrants will transition to Level I, and their risk will be at or below the baseline risk for non-sexual offenders and will be so low that any further interventions have no public protection benefits.** *Id.*, ¶45.

188. Because risk decreases over time in the community, **lifetime registration terms serve no public protection function**. *Id.*, ¶¶3.f, 26, 55–75.

### 3. Desistance: The Comparative Risk of Registrants and Non-Registrants

189. The justification for SORA is that registrants are much more dangerous than other people and will remain so for decades or for life. M.C.L. §28.721a (presuming that people convicted of a sex offense are "a potential serious menace and danger"). It is therefore important to compare registrants' sexual recidivism rates with the rate at which people with no criminal history for sexual crimes are convicted of such crimes. In other words, how likely are people who are not on a sex offender registry to be convicted of a sex offense? Hanson Rept., Ex. 5, ¶¶55–56, 61–62.

190. The point at which registrants (people with sex offense convictions) are no more likely to be convicted of a new sex offense than non-registrants (people without

54

sex offense convictions) is called "**desistance**." Once a registrant reaches desistance, that person is no more likely, or even less likely, than a non-registrant to be convicted for a new sex offense. *Id.*, ¶¶60–61, 64; Hanson Dep., Ex. 54, at 140–41.

191.  There are two logical comparison groups for measuring desistance: (1) people convicted of non-sexual crimes; and (2) the general population of adult males with no criminal sexual history. *Neither group is placed on sex offender registries.* Hanson Rept., Ex. 5, ¶¶19, 73. Studies show that the rate of first-time out-of-the-blue sex offense convictions by men with criminal convictions for non-sex offenses (but no convictions for sex offenses) is equivalent to a 5-year sexual recidivism rate of 2%, and an estimated lifetime rate of 3.8%. The rate of first-time out-of-the-blue sex offense convictions by males in the general population is equivalent to a 5-year sexual recidivism rate of 1% and a lifetime rate of 2%. *Id.*, ¶¶20, 22.

192.  Some registrants—those classified as Level I—will, from the outset, be no more likely to be convicted of a new sex offense than these non-registrants. *Id.*, ¶¶3.f, 62, 65–68. Other registrants (who are not convicted for a new sex offense) will over time also reach desistance and be no more likely to recidivate sexually than a non-registrant with a non-sexual offense history is to commit an out-of-the-blue sex offense. Even the highest risk registrants will eventually reach desistance if they remain sex-conviction-free in the community over time. *Id.*, ¶¶59–62, 64.

193.  How quickly registrants reach desistance depends on their risk level at the

time of release. The very lowest risk people (Level I—well-below average) *start out* below the desistance baseline—that is, they have already attained desistance on the day they are released. Those in Level II (below-average risk) cross the threshold after about five years. Those in Level III (average risk) cross it after about ten years. Those in Level IVa (above-average risk) cross it after about 15 years. Even those in Level IVb (well-above average risk) reach desistance after about 20 years. *Id.*, ¶¶14, 66. In short*, all* registrants eventually cross the desistance threshold if they remain in the community without recidivating, meaning that their risk is below the baseline risk presented by non-registrants—as shown in the chart below. *Id.*, ¶¶3.f, 66–68.



194.  In other words, **the risk of being convicted of a new sex offense has, for**

**practical purposes, been** *extinguished* **for most people who remain in the community without recidivating sexually after 10 years, and for all such registrants after 20 years.** This is true even for people classified at the highest risk level at the time of release. *Id.*, ¶¶65–69.

195.  Research on recidivism also includes time-survival analysis. For example, a person's life expectancy at birth might be 82, but if the person lives to 82, the person may then have a life expectancy of 91. Similarly, the risk of sexual recidivism decreases when people do not recidivate during earlier periods of relatively higher risk. *Id.*, ¶70. The table below presents residual risk based on the initial risk classification and the number of years in the community without a conviction for a new sexual offense. The bolded values indicate when people with different initial risk levels present a risk for sexual recidivism that is indistinguishable from the rate of out-of-the-blue sexual offending by males in the general community (desistance). *Id.*, ¶72.

*Projected Residual Risk (Sexual Recidivism Rates [%]) From Time of Release Up to 20 Years Offense Free in the Community for Routine/Complete Samples* (adapted from Table S4 from Lee & Hanson, 2021)

| Follow-up year | Level I | | Level II | | Level III | | | Level IVa | | Level IVb | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | -3 | -2 | -1 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| At release | **1.4** | 2.1 | 3.0 | 4.3 | 6.1 | 8.7 | 12.3 | 17.1 | 23.4 | 31.4 | 41.0 | 51.8 | 62.8 | 73.2 |
| 1 | **1.2** | **1.8** | 2.6 | 3.7 | 5.3 | 7.6 | 10.8 | 15.0 | 20.7 | 28.0 | 36.8 | 47.0 | 57.7 | 68.4 |
| 2 | **1.1** | **1.6** | 2.2 | 3.2 | 4.6 | 6.6 | 9.4 | 13.2 | 18.2 | 24.8 | 32.9 | 42.4 | 52.7 | 63.3 |
| 3 | **0.9** | **1.3** | **1.9** | 2.8 | 4.0 | 5.8 | 8.2 | 11.5 | 16.0 | 21.9 | 29.2 | 38.1 | 47.8 | 58.1 |
| 4 | **0.8** | **1.2** | **1.7** | 2.4 | 3.5 | 5.0 | 7.1 | 10.0 | 14.0 | 19.2 | 25.8 | 33.9 | 43.0 | 53.0 |
| 5 | **0.7** | **1.0** | **1.4** | 2.1 | 3.0 | 4.3 | 6.2 | 8.7 | 12.1 | 16.8 | 22.7 | 30.0 | 38.5 | 47.9 |
| 6 | **0.6** | **0.9** | **1.2** | **1.8** | 2.6 | 3.7 | 5.3 | 7.5 | 10.5 | 14.6 | 19.8 | 26.4 | 34.1 | 42.9 |
| 7 | **0.5** | **0.7** | **1.1** | **1.5** | 2.2 | 3.2 | 4.6 | 6.5 | 9.1 | 12.6 | 17.2 | 23.1 | 30.1 | 38.1 |
| 8 | **0.4** | **0.6** | **0.9** | **1.3** | **1.9** | 2.7 | 3.9 | 5.5 | 7.8 | 10.8 | 14.9 | 20.0 | 26.3 | 33.6 |
| 9 | **0.4** | **0.5** | **0.8** | **1.1** | **1.6** | 2.3 | 3.3 | 4.7 | 6.6 | 9.3 | 12.7 | 17.3 | 22.7 | 29.3 |
| 10 | **0.3** | **0.4** | **0.6** | **0.9** | **1.3** | **1.9** | 2.8 | 4.0 | 5.6 | 7.8 | 10.8 | 14.7 | 19.5 | 25.3 |
| 11 | **0.3** | **0.4** | **0.5** | **0.8** | **1.1** | **1.6** | 2.3 | 3.3 | 4.7 | 6.6 | 9.1 | 12.4 | 16.5 | 21.6 |
| 12 | **0.2** | **0.3** | **0.4** | **0.6** | **0.9** | **1.3** | **1.9** | 2.7 | 3.9 | 5.4 | 7.6 | 10.4 | 13.8 | 18.2 |
| 13 | **0.2** | **0.2** | **0.4** | **0.5** | **0.8** | **1.1** | **1.6** | 2.2 | 3.1 | 4.4 | 6.2 | 8.5 | 11.4 | 15.0 |
| 14 | **0.1** | **0.2** | **0.3** | **0.4** | **0.6** | **0.9** | **1.2** | **1.8** | 2.5 | 3.6 | 5.0 | 6.8 | 9.2 | 12.2 |
| 15 | **0.1** | **0.2** | **0.2** | **0.3** | **0.5** | **0.7** | **1.0** | **1.4** | 2.0 | 2.8 | 3.9 | 5.3 | 7.2 | 9.6 |
| 16 | **0.1** | **0.1** | **0.2** | **0.2** | **0.3** | **0.5** | **0.7** | **1.0** | **1.5** | 2.1 | 2.9 | 4.0 | 5.4 | 7.2 |
| 17 | **0.1** | **0.1** | **0.1** | **0.2** | **0.2** | **0.3** | **0.5** | **0.7** | **1.0** | **1.4** | 2.0 | 2.8 | 3.8 | 5.1 |
| 18 | **0.0** | **0.0** | **0.1** | **0.1** | **0.2** | **0.2** | **0.3** | **0.4** | **0.6** | **0.9** | **1.3** | **1.8** | 2.4 | 3.2 |
| 19 | **0.0** | **0.0** | **0.0** | **0.0** | **0.1** | **0.1** | **0.1** | **0.2** | **0.3** | **0.4** | **0.6** | **0.8** | **1.1** | **1.5** |
| 20 | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |

*Note.* Recidivism rate projections based on 5-year logistic regression estimates. Bolded values are below the baseline, ambient risk of out-of-the-blue sexual offending among adult males (lifetime risk < 2.0).

196. The proportion of people who should be classified as low risk grows steadily over time. The table below shows the proportion of people with a sexual conviction history whose current risk is below the baseline conviction rates of (a) people with a nonsexual conviction and no history of sexual crime (2% after five years; 3.8% lifetime), and (b) adult males in the general population (1% after five years; 2% lifetime). *Id.*, ¶¶3.f, 74. Neither of those groups is subject to registration.

*Proportion of Routine/Complete Samples of Individuals with a History of Sexual Offending Whose Current Risk Is Very Low Based on the Numbers of Years Sexual Offense Free in the Community.*

| Number of years sexual offence free | Threshold Used to Define Very Low Risk | |
| --- | --- | --- |
| | Community Males (2% lifetime) | Individuals with a nonsexual criminal conviction (3.8% lifetime) |
| 0 – at time of release | 2.7 | 13.6 |
| 5 years | 13.6 | 39.6 |
| 10 years | 57.1 | 74.3 |
| 15 years | 85.0 | 96.0 |
| 20 years | 100.0 | 100.0 |

Initial risk estimates from Lee & Hanson (2021). Distribution of risk levels based on Static-99R scores (Hanson, Lloyd et al., 2012). Twenty-year (lifetime) sexual recidivism estimate based on methods described by Thornton et al. (2021).

197.  **After ten years recidivism-free, most people (57.1%) with a sexual conviction will present no more risk than the general male population (2% lifetime). After 20 years recidivism-free, all will be classified as presenting no more risk than the general male population.** *Id*. ¶¶3.f, 73–74. Using the less stringent criteria of the sexual conviction rate of people with a nonsexual criminal conviction (3.8% lifetime), 13.6% of registrants are very low risk at the time of release. After five years almost 40% will be low risk, and **this proportion increases to almost three-quarters (74.3%) after ten years. After 15 years, 96% will have no more risk of sexual recidivism than people with a past non-sex offense conviction (*who are not subject to registration*) will have of being convicted of a first sexual offense.** Again, after 20 years, all registrants who have remained recidivism-free will have no more risk than non-registrants who have a non-sex conviction. *Id.*, ¶¶73–74.

198.  Because recidivism risk declines significantly with time spent recidivism-free in the community (as well as with advancing age), requiring registration after registrants have attained desistance *serves no public safety purpose. Id.*, ¶79.

### 4. *Between 17,000 and 19,000 Michigan Registrants Are Just as Safe as Men in the General Population*

199.  As discussed above, the amount of time that people spend in the community without a new conviction for a sex offense is strongly correlated with reduction in recidivism risk. Of Michigan registrants living in the community, 31% <u>have been living in the community without a new sex offense conviction</u> for more than 20

60

years, 15% for 15-20 years, 18% for 10-15 years, 18% for 5-10 years, 12% for 2-5

years, and 7% for 0-2 years. Data Rept., Ex. 4, ¶¶10, 62–66.



200.  Experts applied the research on desistance to this data to estimate the num-

ber of registrants who have a very low risk of sexual recidivism (i.e., have attained

desistance). Very low risk of sexual recidivism is defined here as the (more conser-

vative) expected lifetime rate of a first-time sex offense conviction for males in the

general population, approximately 2%. *Id.*, ¶¶11, 67–68.

201.  Taking the normed research on the recidivism rates of people with past sex

convictions who have lived in the community without recidivating and applying it

to Michigan's registry population, Plaintiffs' experts conclude that **between 17,000**

**and 19,000 people on Michigan's registry are no more likely to be convicted of**

**a future sexual offense than males in the general population.** *Id.*, ¶¶12, 69–71.

**Thousands more registrants have projected risk levels only somewhat above the 2% rate for males in the general population, but comparable to the other group <u>not required to register</u>**—namely, people who have nonsexual convictions but no criminal history for sex offenses, whose lifetime rate of first-time detected sexual offending is 3-4%. *Id.*, ¶¶13, 72. Moreover, 25% of registrants (11,330 people) are over 60 years old. The recidivism rates of people with past sex offenses who are over 60 is in that same 3-4% range. *Id.*, ¶¶13, 41, 72.

202.  Any claim that SORA serves a public protection function is undermined by the fact that it imposes registration on tens of thousands of people whose risk for sexual recidivism is not perceptibly higher than the baseline ambient risk presented by non-registrants. Keeping thousands of very low risk individuals on the registry serves no public safety purpose. Hanson Rept., Ex. 5, ¶¶3f–g, 19, 24–25, 75.

### *5.  Registrants' Average Recidivism Rate Is Low*

203.  Both sides' experts agree that "[a] single rate of sexual recidivism that can be applied to all convicted offenders … does not exist." Lovell Decl., Ex. 140, ¶7.d; Hanson Rept., Ex. 5, ¶¶12, 15–17, 29. Recidivism rates vary greatly depending on the population studied, the length of the follow-up period, and the time window considered. Lovell Decl., Ex. 140, ¶7.a; Section IV.C.2, *supra*.

204.  Myths about general recidivism rates are widespread, however, and have even made their way into Supreme Court opinions. *See McKune v. Lile*, 536 U.S. 24,

62

33 (2002); *Smith v. Doe*, 538 U.S. 84, 103 (2003). Scholars have since demonstrated that the Supreme Court was misled by junk science. Ellman & Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 CONST. COM. 495 (2015);[10] Socia Rept., Ex. 9A, ¶¶9–12.

205.   Though both sides' experts warn against using generalized recidivism rates without any context, it is still necessary to debunk the myth that registrants' general recidivism rates are high. **The scientific research is clear that most people convicted of a sex offense are never convicted of a second such offense.** Hanson Rept., Ex. 5, ¶¶3b, 13–14, 18; Socia Rept., Ex. 9A, ¶12. Nearly all methodologically rigorous research studies find that 80 to 90% of adult males with a past sex offense conviction are never convicted of a new sexual crime. Letourneau Rept., Ex. 7, ¶¶6, 12. **Defendants' experts concur.** Goodman-Williams Dep., Ex. 68, at 82; Lovell Decl., Ex. 140, ¶7.e.i.

206.  As Defendants' experts concede, **the recidivism rate of people with past sex offense convictions is much lower than the recidivism rate** (to commit a new offense of the same type as the previous offense) **of people convicted of virtually any other type of crime**.[11] Socia Rept., Ex. 9A, Finding #2; Hanson Rept., Ex. 5,

---

[10] If the Court is going to read one scholarly article, this is the one. It is short and clearly explains how myths and fear came to dominate an entire area of law.

[11] A recent Department of Justice study found recidivism rates for the same type of crime of: sex offenses (7.7%); robbery (16.8%); non-sexual assault (44.2%); drug

¶13; Goodman-Williams Dep., Ex. 68, at 81, 109–11.

207.  Here, class data is available to calculate recidivism rates for the very population subject to SORA. That data indicates that **the vast majority of people being put on the registry today—93% to 95%—will not be convicted of another registrable offense over a 10-year follow up period**. Data Rept., Ex., 4, ¶¶9, 60–61. The analysis underlying that finding is set out in the report and summarized below.

208.   First, researchers calculated the number of Michigan registrants who have no subsequent registrable convictions. Of those living in the community in Michigan—the group on whom the registry is focused and what the Data Report calls the In Community Group—**93% have never been convicted of a subsequent registrable offense**. Of all registrants who have ever been released to the community, 90% have never been convicted of a subsequent registrable offense. *Id.*, ¶¶7, 48–52.

209.  The 7% recidivism rate for those in the community (and the 10% rate for those ever released) overstate the true rate because they fail to account for registrants who have completed their registration term without reconviction and are no longer on the registry. The numbers also overstate the future recidivism rate for registrants

_____

offenses (60.4%); property offenses (63.5%); public order offenses (70.1%); and murder (2.7%). Put another way, non-sexual assaultive offenders were rearrested for a new non-sexual assault at *six times* the rate that registrants were rearrested for a new sex crime, and drug offenders were rearrested for a drug crime at *nine times* that rate. Mariel Alper, Matthew R. Durose & Joshua Markman, 2018 Update on Prisoner Recidivism: A 9-Year Follow-up Period (2005-2014), Bureau of Justice Statistics 4, tbl.2 (2019).

in the community who have not recidivated over time. This is so because recidivism declines with age and with the amount of time spent free in the community without recidivating. Thus, the forward-looking recidivism risk of those who have been in the community for years is much lower than the already low backward-looking recidivism rates for all registrants. *Id.*, ¶¶53–56.

210.  The average age of Michigan's registrants in the community is 50.5 years old. Registrants in the community are, as a group, older and, by definition, have been conviction-free for longer, than people newly placed on the registry. Accordingly, the recidivism risk of registrants who have been in the community over time without recidivating is necessarily lower than the recidivism rate for all past registrants. *Id.*, ¶¶40, 55. Thus, while average recidivism rates are low even for an undifferentiated group of people with past sex offense convictions, those rates still significantly over-state the risk of lower-risk registrants (like those who have been in the community longer) by lumping them together with people who are at a higher risk of recidivating (like people more recently released). *Id.*, ¶¶53–56.

211.  To address these problems, researchers divided the class into 5-year cohorts based on release dates. While the observed sexual **recidivism rates were between 4.9% and 2.9% during the first five years** in the community, the **recidivism rates dropped to around 2% for the next five years** (years 5 to 10) for those who had not recidivated during their first five years in the community. **For people who did**

65

**not recidivate for 15 years, their sexual recidivism rate was 1.4% for the next 5 years**. This rate is similar to the rate of first-time sexual offense convictions of males in the general population. *Id.*, ¶61.

### Rates of New Recidivism of People by 5-year Cohorts, Based on Release Date

| Cohort | Pop. | 5-year | 10-year | 15-year | 20-year |
|---|---|---|---|---|---|
| **1995–1999** | 8,210 | 4.9% | 2.2% | 1.8% | 1.4% |
| **2000–2004** | 7,681 | 4.5% | 2.1% | 1.9% | N/A |
| **2005–2009** | 6,458 | 3.7% | 2.0% | N/A | N/A |
| **2010–2014** | 5,227 | 2.9% | N/A | N/A | N/A |

212.  Consistent with national research, this table shows that the recidivism rates of Michigan registrants have declined in recent years.[12] Statistics from the most recent cohorts provide the best estimate of the likelihood of recidivism. The recidivism rates in the more recent cohorts (2010-2014) were lower than for older cohorts (1995-1999). **The more recent rates indicate that the vast majority of people being put on the registry today—93% to 95%—will not be convicted of another registrable offense over a 10-year follow up period**. *Id.*, ¶¶9, 60–61.

213.  The class data analysis is consistent with an independent 2014 report which found that of 4,100 people paroled from the MDOC on a sexual offense during a 39-month follow-up period, only 32—**less than 1%—returned with a sentence for a**

---

[12] The reasons for declining recidivism rates are not fully known but may reflect that more recent cohorts include a greater proportion of low-risk individuals, as a result of cultural changes in attitudes towards sex crimes, resulting in more offenses by lower-risk people being reported and prosecuted. Data Rept., Ex. 4, ¶59.

**new sexual offense**. Earlier research on MDOC data from 1986-1999 found that **only 3.1% of people with sexual offense convictions were returned to prison for a new sexual offense.** Levine Rept., Ex. 15, ¶25.

### 6. *Particularly Low Risk Registrants: The Elderly, Women and Children*

#### a. *Thousands of Older and Elderly Registrants Are Very Low Risk*

214.  Both sides' experts agree that the risk of sexual recidivism is highly correlated with age. Recidivism rates are highest for people in their late teens and early 20s, with progressive declines thereafter. Hanson Rept., Ex. 5, ¶¶3.c, 26; Salter Decl., Ex. 142, at 3; Lovell Dep., Ex. 67, at 85–86, 91–92.

215.  Few people over the age of 60 present any significant risk for sexual recidivism. Hanson Rept., Ex. 5, ¶¶3c, 26. *See also* Lovell Dep., Ex. 67, at 92 (admitting that her research showed 0% of offenders over aged 60). Of Michigan registrants living in the community, 8% (2,896 people) are over 70; 19% (6,737 people) are 60-69; 24% (8,554 people) are 50-59; and 25% (8,956 people) are 40-49. Only 23% of registrants (8,091 people) are under age 40. Data Rept., Ex. 4, ¶¶4, 40.

#### b. *Women Registrants Are Very Low Risk*

216.  Women make up only a 2% of Michigan registrants (1,063 people). Of women in the community, **98% have never been convicted of a second registrable offense**. *Id.*, ¶¶3, 17, 91–92. This Michigan data is consistent with national research. The largest meta-analysis done found a base rate of sexual recidivism for women of 1.5% at 6.5 years. Ulrich Rept., Ex. 13, ¶¶40–43; Hanson Dep., Ex. 54, at 230–32.

67

217.   Compared to men, the sexual recidivism rates of women would put them in very low risk (Level I) or low risk (Level II) categories for men. Women who are not chronic offenders and have been living offense-free in the community for more than a few years have a very low risk of reoffending. Ulrich Rept., Ex. 13, ¶¶43–44. Defendants' experts agree that women are low risk. Turner Dep., Ex. 70, at 99.

> c.   *Child Registrants Are Very Low Risk to Recidivate but at High Risk to Become Victims*

218.   5% of registrants (2,037 people) are subject to SORA for a juvenile adjudication. Of those for whom it was possible to calculate the age at the time of offense, 3% (52 people) were under 14; 19% (312 people) were 14 years old; 35% (569 people) were 15 years old; 30% (480 people) were 16 years old; and 13% (215 people) were 17 years old. **99% of child registrants have never been convicted of a second registrable offense.** Many of these children committed their offense years ago. 76% are now over 30 years old. Data Rept., Ex. 4, ¶¶18, 93–98.

219.   Research shows that child registrants, compared to children who committed similar crimes but were not required to register, were five times more likely to be approached by an adult for sex, and twice as likely to have been sexually assaulted. Child registrants are also four times as likely to have attempted suicide than non-registrants with similar crimes. Letourneau Dep., Ex. 55, at 33.

220.   The research on the ineffectiveness of registration for children, and the devastating impact it has, "is absolutely uniform, so there is no reason to believe

even remotely that these policies should ever be applied to children." *Id.*, at 60–61.

### 7. *The Defendants' Failure to Remove Non-Registrable People*

221. When Michigan law changes so that an offense is no longer registrable, MSP does not necessarily review the registry to remove people who were previously registered based on the no-longer-registrable offense. After the 2011 amendments made consensual sodomy with a 16 or 17-year-old non-registrable, for example, MSP did not identify or remove people registered for that offense. Jegla Dep., Ex. 74, at 128–130. Similarly, MSP has no process to identify or remove people with out-of-state convictions who are no longer subject to registration if either Michigan's or the other state's law changes, so that the person is no longer subject to registration. *Id.*, at 134. And although the 2011 SORA amendments ended registration for children under 14, 2011 Mich. Pub. Act 17, §2, the class data show at least 52 people registered for offenses committed when they were under 14. Data Rept., Ex. 4, ¶97.

### 8. *The Named Plaintiffs Are Very Unlikely to Reoffend*

222. Dr. John Ulrich, a licensed psychologist who provides risk assessments for the federal and Michigan state courts, MDOC, and other entities, conducted actuarial risk assessments for seven of the named male Plaintiffs.[13] Dr. Ulrich found that all

---

[13] Doe A could not be scored with the Static-99R because he was never convicted of a sexual offense. Ulrich Rept., Ex. 13, ¶24. The Static-99R could not be scored for Mary Doe and Mary Roe, as it has not been validated for women. Given the low baseline risk for women offenders and the fact that Mary Doe and Mary Roe were released in 2004 and 2005 (19 and 18 years ago, respectively), their risk for sexual

seven are very unlikely to recidivate. At the time of their release, all were classified as Level III/Average risk. Based on time offense-free in the community, all seven are now in the Level I/Very Low Risk category and have reached desistance.[14] Ulrich Rept., Ex. 13, ¶¶2–3, 5–7, 17.

### D. Conviction-Based Registries Do Not Correspond to Risk

223.  SORA's requirements are based solely on the conviction, without any risk determination. M.C.L. §28.723. The conviction determines the tier classification,[15] which in turn determines the registration term and frequency of reporting, M.C.L. §§28.722(q)–(u); 28.725(10)–(13). The conviction also determines if the person is listed on the online sex offender registry. M.C.L. §28.728(2), (4).[16] SORA's level of supervision, including in-person reporting, does not decrease regardless of how long one has lived successfully in the community. M.C.L. §28.725(11)–(13).

224.  The class data analysis demonstrates that **SORA's tier levels are *inversely***

---

offending is extremely low and equals desistance. *Id.*, ¶¶40–41, 44–45.

[14] Doe B reached the Level I/Very Low Risk category (indicating desistance) in 2008 (15 years ago). Doe C reached desistance in 2014 (nine years ago), Doe D in 2011 (12 years ago), and Doe E in 2005 (16 years ago). Dr. Ulrich found that Doe F would cross to Level I/Very Low Risk in May 2023, absent a new sexual crime. Doe F did not recidivate. Dr. Ulrich found that Doe G and Doe H had likewise reached desistance. Ulrich Rept., Ex. 13, ¶¶26, 28, 30, 32, 34, 36, 38.

[15] In some cases, the age of the victim or age difference between the registrant and the victim also affects tiering. M.C.L. §§28.722(q)–(v); Offense Chart, Ex. 115.

[16] Tier II and Tier III registrants (except juveniles) are on the online registry. A Tier I registrant's conviction determines if online registration is required.

**correlated to risk**: **people in Tier I have the highest risk scores on the Static-99R, Tier II the next highest, and Tier III the lowest**. Specifically, 63% of the people in Tier I are above average risk on Static-99R, compared to 44% of the people in Tier II, and 28% of those in Tier III. Data Rept., Ex. 4, ¶¶19, 99–104.

225.  As noted, Tier III registrants have spent more time recidivism-free in the community than Tier II registrants, who have spent more such time in the community than Tier I registrants. In fact, **68% of the people in Tier III have spent more than 10 years in the community without another sexual conviction, and 38% have spent more than 20 years**. Because such time in the community reduces recidivism risk, these data confirm that the higher tiers include many people who are just as safe as men in the general population. *Id.*, ¶¶19, 104–105.

226.  This Michigan data is consistent with national research showing that the tier levels in the federal Sex Offender Registration and Notification Act (SORNA) either do not correspond to the likelihood that people will recidivate, or are actually backwards. **Because the offense of conviction has no bearing on recidivism risk, offense-based tiering does not correspond to risk**. Letourneau Rept., Ex. 7, ¶13; Hanson Rept., Ex. 5, ¶28; Zgoba Rept., Ex. 12, ¶¶36–38. The broad scientific consensus is that the name of the offense (or criminal code section) is unrelated to recidivism risk. Using the offense of conviction to create tiers of ostensible dangerousness does not work. Data Rept., Ex. 4, ¶103; Hanson Rept., Ex. 5, ¶¶3d, 27–28.

71

227.  Although there are differences in the moral seriousness of crimes and the level of punishment that society deems appropriate, offense seriousness is largely *unrelated* to the likelihood of recidivism. People convicted of intrusive sex offenses are, if anything, less likely to recidivate than those convicted of non-contact offenses. There are also no reliable differences in recidivism rates based on whether the victim was a child, youth, or adult. Hanson Rept., Ex. 5, ¶27. Tiers based on perceived offense seriousness and victim age have little relationship to the likelihood of recidivism. *Id.*, ¶28; Zgoba Rept., Ex. 12, ¶¶36–37.

228.  The research presented by Plaintiffs' experts on the lack of a relationship between registry tier levels and recidivism was uncontested by Defendants. Hanson Rebuttal, Ex. 6, ¶18. In fact, **Defendants' experts agree that the offense of conviction does not predict recidivism risk.** Salter Dep., Ex. 69, at 33.

### E. Risk Assessments Tools Are Effective and Widely Available

229.  As Defendants' experts concede, empirically validated actuarial risk assessment instruments—which use known diagnostic indicators to determine the statistical likelihood that people will recidivate—are both widely-used and far better than the offense of conviction at predicting recidivism risk. Hanson Rept., Ex. 5, ¶¶27–32; Zgoba Rept., Ex. 12, ¶¶36–37; Salter Decl., Ex. 142, at 14–16, 33–34; Turner Decl., Ex. 143, at 10–11. These instruments not only have good predictive accuracy in classifying people into risk levels, but they are also cost effective. Hanson Rebut-

tal, Ex. 6, ¶¶19–20, 51–52; Hanson Dep., Ex. 54, at 109; Prescott Rept., Ex. 8, at 2.

230.   The risk of sexual recidivism can be reliably predicted by such tools, which include the Static-99R, the Vermont Assessment of Sex Offender Risk (VASOR), the Stable 2007, the Child Pornography Offender Risk Tool (CPORT), etc. Salter Dep., Ex. 69, at 33–34; Hanson Rept., Ex. 5, ¶¶29–32; Hanson Rebuttal, Ex. 6, ¶¶14, 58. These various tests are normed for certain populations, and they can be used separately, or in combination (for normed people). Kissinger Dep. Ex. 75, at 38–43, 46, 69; Salter Dep., Ex. 69, at 35–36, 94–95.

231.   Correctional systems use a variety of different assessments, based on what tests are normed for the individual. Hanson Dep., Ex. 54, 169–170; Kissinger Dep., Ex. 75, at 45–46.

232.   The Static-99R, and its predecessor, the Static-99, are the most widely used and well-researched sex offense risk assessment instruments in the world. The Static-99R is the risk prediction tool of choice for the MDOC and is used by many other correctional entities as well as in states with risk-assessment approaches to sex offender registration. Hanson Rept., Ex. 5, ¶¶31–32; Hanson Dep., Ex. 54, at 132–135; Ulrich Rept., Ex. 13, ¶11; Kissinger Dep., Ex. 75, at 17, 30.

233.   Based on the Static-99R scores, it is possible to distinguish between registrants who are low versus high risk of sexual offending—both initially and over time. Hanson Rebuttal, Ex. 6, ¶27. Decision-makers can also identify *when* registrants

73

pose no more risk of being arrested/convicted of a sex offense than (a) people who have never been convicted of a sex offense but have been convicted of some other crime, and (b) males in the general population. Hanson Rept., Ex. 5, ¶¶29–75.

234.  MDOC's manager for sexual abuse prevention services said all people with sex offense convictions (for whom the Static-99R is normed) are scored upon entry into custody to determine programming/treatment needs using evidence-based factors, including recidivism risk.[17] Kissinger Dep., Ex. 75, at 25. "[W]e want to go with what the science says works." *Id.*, at 35; *see also id.*, at 29 (research-driven actuarial risk assessments are part of evidence-based programming).

235. MDOC's sexual abuse prevention services unit does not recommend prison-based treatment interventions for those in lower risk levels. *Id.* at 75. If a prisoner "is assessed [on the Static-99R] as a Level 1, 2, or 3, that sex offense risk assessment is the end of their interactions with" MDOC's sexual abuse prevention services. Only people scoring in Level IV(a) or IV(b) are assigned mandatory sexual offense programming while in prison. *Id*. Similarly, for both probationers and parolees, "the intensity and duration of treatment in the community is determined by [the] Static-99R and Stable-2007 overall priority risk." Spickler Dep., Ex. 79*,* at 20.

236.  MDOC scores a *new* Static-99R at the point of release, revised to reflect the

---

[17] Since 2015, prisoners have also been scored on the Stable 2007 which includes dynamic factors and a clinical component. Kissinger Dep., Ex. 75, at 40– 41, 69.

departing prisoner's age at release, creating a baseline score and assigned risk level from which the "time free in the community" risk level can be calculated. *Id.*, at 29–30. When assessing an "in-community" registrant's *current* risk level, the results of a Static-99/99R assessment must be analyzed with the "Time Free in the Community Calculator" to adjust the baseline Static-99/99R score to the present risk level. *See* Hanson Rept., Ex. 5, ¶¶3f, 55–72; Ulrich Rept., Ex. 13, ¶16.

237.  MDOC has trained about 150 people to score the Static-99R and Stable-2007, most of whom have master's degrees. Kissinger Dep., Ex. 75, at 17, 53. MDOC also has a Static-99R "shop"—two people who do the bulk of the prison intake Static-99Rs. *Id.* at 55–56. In addition, MDOC contracts with more than 50 clinical therapists who provide assessment of and treatment for probationers and parolees. For probationers who meet the scoring criteria, a Static-99R and a Stable-2007 is scored for them in the community. Spickler Dep., Ex. 79, at 11–13, 20.

238.  When asked how long it takes to complete a Static-99R, MDOC's manager for sexual abuse prevention services answered, "for an easy one, 15 minutes; for a hard one that involves consultation, which the hard ones often do, up to an hour." Kissinger Dep., Ex. 75, at 63. Defendants' experts agree. Turner Dep., Ex. 70, at 165 (Static-99s can be completed in as little as 15 minutes); *cf.* Salter Dep., Ex. 69, at 94–95 (acknowledging probation officers can score risk assessment tools).

239.  The MDOC had done an average of 144 Static-99R risk assessments of

class members per month. Roughly 70% score average or below-average risk, and roughly 30% are above average risk. These risk distribution scores are comparable to those in national samples. Data Rept., Ex. 4, ¶¶14, 73–81.

240.  States use a variety of methods to decide who will be on the registry, for how long, what their reporting requirements will be, and whether or not their information will be available to the public online. Some states, unlike Michigan, use individual assessments, rather than the offense of conviction, to determine registry classifications. Zgoba Rept., Ex. 12, ¶¶39–43, 46; Hanson Rebuttal, Ex. 6, ¶2.

### F. The Digital Age Has Fundamentally Changed the Consequences of Sex Offender Registration

#### 1. *Michigan's Online Registry Is Unlike a Criminal Records Archive*

241.  Two decades ago, the U.S. Supreme Court described an early version of an online sex offender registry as "analogous to a visit to an official archive of criminal records." *Smith v. Doe*, 538 U.S. 84, 99 (2003). In the years since, the internet has been transformed, and technology has dramatically changed the form, function, and reach of registry information. Lageson Rept., Ex. 11, ¶11.

242.  The design, language, and functionality of the registry website present each person listed as a current danger to society, regardless of whether the person poses such a risk, and despite the fact that the registry lacks individualized review. *Id.*, ¶¶12–13. The initial search page signals dangerousness, stating: "This registry is

made available through the Internet with the intent to better assist the public in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." *Id.*, ¶¶32, 43; Registry Screenshots, Ex. 120, at 1–2.

243. The registry allows users to "browse" lists of registrants (e.g., all published, non-compliant or incarcerated registrants), rather than requiring (like most sources of public state criminal record data) a targeted name or address search. While users can look up specific people/locations, they can also discover that a neighbor or colleague is on the registry without such a search. They can simply click to get the entire list of all registrants, or enter a city, town, or neighborhood name, to see registrants in their area. The initial search page is shown below. Registry Screenshots, Ex. 120, at 2; Lageson Rept., Ex. 11, ¶¶29–32; Beatty Dep., Ex. 71, at 294.



244.  An internet user who searches a specific address—or a city, county, or zip

code—can pull up an interactive map showing all registrants within a specified radius. Registry Screenshots, Ex. 120 at 3.



245. A user need only click on the registrant icons to pull up the photo and all the registry details on each person in the area, as shown below. Lageson Rept., Ex. 11, ¶30; Registry Screenshots, Ex. 120, at 4 (personal information redacted).



246.  Users can also search by zip code, city, or county to pull up a list of area registrants, showing their photos, compliance status, name, address, and age, with a link to the person's home page. Registry Screenshots, Ex. 120, at 9–10.



247. Clicking on a person's image—whether on the map or registrant list—takes

the user to the person's registry home page. That page contains a photo, extensive

personal information, and links to numerous other pages with further information,

as shown in the image below. *Id.*, at 5.



248. Prominent colored buttons at the top of each registrant's home page allow

the user to "track offender," "map offender," and "submit a tip," all of which suggest

that the individual is dangerous. Lageson Rept., Ex. 11, ¶41; Registry Screenshots,

Ex. 120, at 5. The user need only click on the "map offender" button to see a map

pinpointing the person's home, with a balloon showing personal details, as well as

compliance status. Registry Screenshots, Ex. 120, at 6.

249. The "track offender" button allows the user, with a click, to sign up for

continuous updates about a registrant, as shown below. Lageson Rept., Ex. 11, ¶39.



250. A user who clicks the "submit a tip" button will be asked to "[p]lease provide information regarding this offender." Tips can be provided anonymously. The image below shows how the public inputs tips. Registry Screenshots, Ex. 120, at 7.



251. One of the first pieces of information shown on the registrant's home page

is whether the person is "compliant." Registry Screenshots, Ex. 120, at 5. This "suggests that the registrant is being continuously supervised because the registrant remains currently dangerous to the public." Lageson Rept., Ex. 11, ¶40. A person can be shown as "non-compliant" for various reasons, including not having paid the fee, as shown in the image below. *Id.*; Jegla Dep., Ex. 74, at 82–84.



Last Verification Date:    **07/01/2021**
Compliance Status:    **Non-Compliant**
- **Fee Violation**

ate: 10/16/2017

252. Clicking on the "offenses" tab on a registrant's home page shows the user the person's registrable convictions. Registry Screenshots, Ex. 120, at 5. Contextual information that would likely be apparent in a court file—e.g., that the offense involved youths, one of whom was under-age—is not provided. Presenting offense information alongside a current photo and address creates the perception that the person is currently dangerous. It can also create harmful misperceptions about the offense itself. For example, an internet user viewing a photo of a 55-year-old registrant who is listed for "criminal sexual conduct III (person 13-15)" may assume that there was a 40-year age gap, when in fact, given the age of the offense, the registrant may be listed for having had a teenage relationship. Lageson Rept., Ex. 11, ¶44.

253. Additional clicks on the home page pull up information about a person's

"aliases" (which could simply be a maiden name), offenses, scars/tattoos, and vehicles, including the make, year, color, and license plate number. Registry Screenshots, Ex. 120, at 5.

254. Much of the information on registrants' home page—e.g., compliance status, registration status, last verification date, registration and MDOC number—similarly suggests that they are being monitored because they are a current danger. Lageson Rept., Ex. 11, ¶40. Other personal information (like the person's weight, height, and race) is also listed, along with the person's home address, work addresses, and school addresses. Registry Screenshots, Ex. 120, at 5.

255. In addition to tracking specific registrants, users can receive alerts about any registrants who move within a selected radius of a specified address. *Id.*, at 8.



256. In sum, the architecture and functions of the Michigan registry encourage browsing, mapping, and tracking registrants, rather than accessing targeted archival

information. The registry is unlike other forms of state public criminal records, which require a targeted search of a specific person; do not allow for browsing lists of convicted persons; do not include mapping, tracking, or alert capabilities; and do not present up-to-date personal information. The interface, interactivity, format, and text of the registry website are unlike a criminal records archive: the registry does not simply provide historical conviction information, but portrays registrants as presently dangerous. Lageson Rept., Ex. 11, ¶¶29–45.

### 2. The Impact of Online Sex Offender Registration Today Is Entirely Different from What It Was Two Decades Ago

257. When *Smith* was decided in 2003, the internet was quite different than it is today. Only 15% of Americans had broadband home internet; only 3% got most of their information about the September 11th attacks from the internet; and only 6% said they would have a hard time giving up their wireless devices. *Id.*, ¶¶46–47.

258. Today, a person's registry status has become digitally linked to their names and is retrievable via basic internet searches—indeed, it is often the first thing that will show up on a search of a person's name on Google. Search engine optimization has increased public access to registrants' personal information because search engine algorithms prioritize registry information. *Id.*, ¶¶22, 64–69.

259. Registry information is now cataloged, indexed, sold, and shared by third parties. Such information is routinely scraped, copied, aggregated, and reposted to private websites. Mobile apps collect and aggregate registrant data into new formats

that allow "push notifications" that affirmatively alert users when they are in proximity to a registrant's address. A sample of such apps is below. *Id.*, ¶¶15–16, 61.



260.  Unlike earlier schemes that required users to conduct a targeted search for specific registrants on a government-run website, registrants' personal information is now "harvested" to drive web traffic to specific websites, to increase "clicks" by posting the information, and to expand services of commercial providers (like listing nearby registrants on real estate websites). *Id.*, ¶¶15–16, 22, 50–63.

261. In sum, changes in internet infrastructure and database technology have transformed the registry from a government-run source (that a user had to intentionally access) into a large scale, private-sector data commodity that is duplicated, aggregated, and pushed to innumerable internet users who passively receive registrant information without ever asking for it or seeking it. *Id.*, ¶¶50–63.

85

### 3. *The Ubiquity of Registry Information on the Internet Causes Registrants to Live in Fear and Avoid the Internet*

262.  When a person's registry status "pops up" on the internet, the consequences can be devastating, affecting employment, housing, education, and involvement in civic, religious, social, and family life. Easy access to registry information results in registrants becoming the targets of on- and off-line vigilantism. *Id.*, ¶¶74–95.

263.  The proliferation of information about registrants on the internet leads them to avoid online activity, which in today's world is central to public and private social life. Registrants' opting out through "digital avoidance" has consequences for public safety, as registrants are more likely to recidivate when they lack employment, stable housing, and community relationships. Michigan, by presenting registrants as dangerous and by allowing the attendant dissemination of online registry information on private websites, undermines public safety by making registrants pariahs, effectively cutting them out of social, institutional, and technological life. *Id.*, ¶¶17–19.

### 4. *Defendants Exacerbated the Stigma by How They Designed the Website*

264.  Effective August 26, 2021, MSP has a new data system from LexisNexis, Coplogic Solutions, which includes a new online registry interface. Morris Dep., Ex. 78, at 62; Contract, Ex. 91. As discussed above, the online registry interface has built-in information and features which emphasize the message that all registrants are dangerous (e.g., pop-up photos, compliance status, one-click searching, etc.) Registry Screenshots, Ex. 120.

265.  Many of these features are not mandated by SORA 2021. *Compare* M.C.L. §28.728(2), *with* Registry Screenshots, Ex. 120. Rather, a small group from MSP and the Attorney General's office worked with the vendor to make choices about what and how information is presented. Beatty Dep., Ex. 71, at 287, 292–301.

## G. SORA 2021 Imposes Devastating Burdens

### 1. Ongoing Reporting

#### a. The Statutory Requirements for Reporting and Defendants' Decision to Require In-Person Reporting

266.  Tier III registrants report four times per year in person for life; Tier II registrants twice per year in person for 25 years; and Tier I registrants annually in person for 15 years. M.C.L. §§28.725(11)–(13); 28.725a(3). They must provide everything from nicknames, to licensing information, to scars and tattoos. RI-004 Form, Ex. 87, §VI; *see* Obligations Summary, Ex. 1 (detailed list).

267.  In addition, registrants must report *within three days* if they:

- Change or vacate their residence or domicile. M.C.L. §28.725(1)(a).
- Change their place of employment or discontinue employment. M.C.L. §28.725(1)(b). (MSP's forms say that this requirement includes volunteer work. RI-004 Form, Ex. 87, ¶6(b); RI-004A Form, Ex. 88.)
- Change their name. M.C.L. §28.725(1)(d).
- Enroll or discontinue enrollment as a student, or if, as part of a course of studies, they are present at any other location, or they discontinue such study at another location. M.C.L. §§28.724a(1)(a), 28.724a(3)(b).
- Before they change their domicile or residence to another state. M.C.L. §28.725(7). (To move internationally, registrants must report 21 days in advance. M.C.L. §28.725(8).)

- Any vehicle information changes. M.C.L. §28.725(2)(a).
- Any electronic mail address or internet identifiers change (for those required to be registered after July 1, 2011). M.C.L. §28.725(2)(a).
- Any changes to phone numbers registered to or used by the individual. M.C.L. §28.725(2)(a).
- They intend to temporarily reside at any place other than their residence for more than seven days. M.C.L. §28.725(2)(b). (For international travel, they must report 21 days in advance. M.C.L. §28.725(8).)

268.  Registrants must provide whatever documents the police require to prove residency/domicile, employment status, contractual relationship, volunteer status, or student status. M.C.L. §§28.724a(5), 28.725a(7). Registrants must provide finger-prints and palm prints. M.C.L. §28.727(1)(q). They must maintain a driver's license or state ID card, unless homeless. M.C.L. §28.725a(7). They must have a photo taken by the Secretary of State, have a new photo taken whenever their license is renewed, and have yet another photo taken within seven days if, according to the police, their photo needs updating. M.C.L. §§28.725a(5); 28.725a(8), 28.727(1)(p).

269.  SORA 2021, with some exceptions, provides that three-day-reportable infor-mation changes are to be reported "in a manner prescribed by [MSP]." M.C.L. §§28.725(1), (2). MSP did not seek public comment on the question of what manner of reporting it should require. Rather, a small group of attorneys at MSP and the Attor-ney General's office made that decision. Beatty Dep., Ex. 71, at 58–59, 64, 114.

270. MSP did not promulgate rules about the required manner of reporting. The only public documents that say what manner of three-day reporting MSP requires

are the verification/mail-in forms and a March 2021 letter to registrants. RI-004 and

RI-004A Forms, Exs. 87, 88; MSP Letter, Ex. 86; Beatty Dep., Ex. 71, at 58–60.

271.  As reflected in the Explanation of Duties (EOD) attached to the verification

form, **MSP decided to require in-person reporting** for name, address, employ-

ment, and volunteer work changes. EOD Form, Ex. 87, ¶¶6, 9. This is not required

by SORA 2021. M.C.L. §28.725(1) (allowing for such changes to be reported in

person or in a manner prescribed by the MSP).

272.  In-person reporting *is* required by statute for international travel of more

than seven days, M.C.L. §28.725(8), for enrolling/disenrolling in higher education,

M.C.L. §28.724a(1)(a), for being present as a student in other locations in Michigan

or the U.S. or discontinuing such study, M.C.L. §28.724a(1)(b), for moving to a new

state or country, M.C.L. §28.725(7)–(8), and for non-residents working in Michigan,

M.C.L. §28.725(3). MSP decided to allow mail reporting for travel,[18] email/internet

identifiers, vehicles, and phones. Obligations Summary, Ex. 1, at 10–13; Beatty

Dep., Ex. 71, at 51–56.

273.  The state's contract with the vendor for the MSOR database requires that

registrants be able "to complete update(s) through their phones or other electronic

devices." Contract, Ex. 91, at 94. As MSP's Legal Advisor conceded, it would have

---

[18] The EOD does not inform registrants that they must report international travel
in person. *Compare* RI-004, Ex. 87, ¶9.a, *with* M.C.L. §28.725(8).

been consistent with SORA 2021 to allow online reporting for many items, but MSP did not approve that manner of reporting, and instead chose to require in-person and mail reporting. Beatty Dep., Ex. 71, at 56–57, 69, 283–84.

274.  Systems that allow information to be submitted electronically can generate receipts. Beatty Dep., Ex. 71, at 76–78. Registrants do not receive a receipt when they mail in an update. *Id.*; Jegla Dep., Ex. 74, at 139. Registrants fear using mail-in reporting because it is hard to prove they reported. Doe F testified that for him mail-in reporting isn't "worth the risk." He'd rather "do it in person and know that it's not going to get lost in the mail or lost in the shuffle and make sure that it gets into that computer system." Doe F Dep., Ex. 59, at 29. *See also* Doe D Dep., Ex. 58, at 30–31; Doe G Dep., Ex. 60, at 74 (mail-in reports could be lost); A.C. Dep., Ex. 63, at 32 (discomfort with mail updates).

275.  Outside the SORA context, the State of Michigan routinely allows people to update information online. Starkey Decl., Ex. 144, ¶6 (Secretary of State allows people to update addresses, renew licenses, and do various other business online).

### b. In-Person Reporting Is Burdensome

276.  A Tier III registrant who spends 50 years on the registry will have to report in person at least 200 times. A Tier II registrant will have to report in person at least 50 times, and a Tier I registrant will have to report in person at least 15 times. M.C.L. §§28.725(11)–(13); 28.725a(3). Depending on how often reportable information

changes, a person may need to report much more often than the quarterly/biannual/ annual in-person verifications. M.C.L. §28.725. Doe F counted 77 different items he would have to update if his information changed. Doe F Dep., Ex. 59, 74–76.

277. Reporting is time-consuming and disruptive. The lack of available registration staff can result in long registration times. TR Decl., Ex. 44, ¶11. Doe D said that when he registered at an MSP post, "It really was a roll of the dice." It took anywhere from "45 minutes to three hours" to verify/update his information. Doe D Dep., Ex. 58, at 30. Doe F's report time averages about an hour-and-a-half, including a 15-minute drive each way. Doe F Dep., Ex. 59, at 28.

278. How long it takes for Doe E to report varies based on whether the station's software is working and the registering agent is available. When the officer who handles SORA is present, it takes 20-30 minutes to register; if he isn't, Doe E has to come back another time. Pls' Resp. to Defs' 2nd Rogs & RFP, Ex. 84, ¶7. Doe G tried to provide certain information about five times at his local police office, only to find it closed or the right personnel not there. He ended up having to travel to an MSP post about 30 minutes away. Am. Compl., R. 108, ¶383. For Mary Doe, who must verify four times a year, not including updates, it can take anywhere from 20 minutes to an hour, depending on the line. Mary Doe Dep., Ex. 61, at 53–54. For Mary Roe it takes her anywhere from five minutes to an hour on top of the 15 to 20-minute drive to the station. Mary Roe Dep., Ex. 62, 31–33.

279.  Registration is even more challenging for people who must drive long distances, are elderly, or are disabled. For 76-year-old class member GO, who has knee problems, the closest registration office is 50 miles away. He must make a 100-mile trip each time; he can't find someone to drive him, and his bones scrape together painfully when he drives. GO Decl., Ex. 40, ¶¶2–3, 5. Other registrants must likewise drive long distances. *Id.* ¶7; AC Dep., Ex. 63, at 47–48 (46 miles).

280.  MSP and local police typically limit the days and hours when registrants can report. For example, Doe B's police station allowed registration only three to four hours a day, with a different schedule depending on the day. Am. Compl., R. 108, ¶378. MSP staff admit it has become harder for some registrants to report because more law enforcement agencies have stopped accepting verifications or reduced their hours. Hoffman Dep., Ex. 73, at 106–109.

281.  Registrants often need to take time off work to report. Ms. Doe reports to a police station that is only open weekdays. It is not easy to take time off work to register, given that she may be gone several hours. Her employer does not know that she is on the registry, so she has to come up with an excuse each time. Am. Compl., R. 108, ¶385; *see* Doe B Dep., Ex. 56, at 61–62; RL Decl., Ex. 34, ¶6; AS Decl., Ex. 46, ¶6; GW Decl. Ex., 49, ¶¶3–4.

282.  The number of items subject to three-day reporting heightens the burden. Class member JS, who is 76, must report every volunteer position that he takes on.

92

Because these roles are often short-term, this requires multiple trips beyond quarterly verification. JS Decl., Ex. 45, ¶7. JM struggled to find housing and spent time home-less, but had to report every time his address changed, which was a lot. JM Decl., Ex. 37, ¶4. *See also* ES Decl., Ex. 48, ¶13.

283. The contract specifications for the MSOR database included an option that would send registrants verification reminders. MSP did not implement that option. MSOR Contract, Ex. 91, at 94; Beatty Dep., Ex. 71, at 280–81.

*c. The Mail-In System Highlights That Three-Day Reporting Is Unnecessary*

284. For changes that registrants can report by mail, the information must be reported within three days. RI-004A Form, Ex. 88, ¶9; M.C.L. §§28.725(2)(a)–(b), 28.727(1)(e). There is no guidance available to registrants about how the three-day limit for mailing is counted (e.g., postmark or receipt date). SOR Unit staff did not know when the three days start to run. Jegla Dep., Ex. 74, at 140–41. MSP's Legal Advisor was also unable to explain how the three days are counted, saying this would be up to prosecutors and courts to decide. Beatty Dep., Ex. 71, at 71–74.

285. Although registrants must do mail-in reporting within three days, law enforcement may not enter mailed-in updates for weeks, or at all. Beatty Dep., Ex. 71, at 75–76; *cf.* Jegla Dep., Ex. 74, at 139 (unsure how long it takes to input).

*2. Ongoing Surveillance and Supervision*

*a. The MSOR Database's Extensive Tracking Capabilities*

286. MSP's new Coplogic data management system is used to collect and track

93

information, monitor registrants, flag people for enforcement action, log investigative actions, and publicize information about registrants. The MSOR database feeds data into the online registry, but contains much more information, including historical data. Morris Dep., Ex. 78, at 62; Contract, Ex. 91, 44, 83–98 (database specifications include monitoring systems, mapping for sweeps, tip notifications, automated violations); MSOR Fields Chart, Ex. 96 (listing tracked registrant data); MSOR User Guide, Ex. 95; MSOR Training Trans., Ex. 52, at 3 ("it's almost infinite the amount of types of searches you can run").

287.   The internal MSOR database is designed to facilitate monitoring of registrants. A "monitoring" tab is used to track residence checks. Any non-compliance is highlighted, with a red "not compliant badge" appearing over registrants' names if there are alleged violations. MSOR User Guide, Ex. 95, at 15.

288.   The contract requires the database to allow for mapping for law enforcement sweeps, automated violations, and tips about registrants. Contract, Ex. 91, at 89–91. The system can "auto-populate" violations (automatically mark people as non-compliant, e.g., if they do not have ID or are late to verify). MSOR Training Trans., Ex. 52, at 15 ("anything that … can be automated, it will be automated"). MSOR also allows "officer alerts" to be created about registrants. MSOR User Guide, Ex. 95, at 12–19, 30, 54.

289.   Tips, whether submitted by the public or law enforcement, go into a "tip

inbox" for action. MSOR User Guide, Ex. 95, 24–25, 61–66. "Citizens are encour-

aged to contact their local law enforcement agency if they think someone is in viola-

tion of the SOR Act." MSP Backgrounder, Ex. 112, at 3. As of February 2, 2023,

some 95,346 tips had been submitted. Defs' Resp. to Pls' 1st Interrog., Ex. 80, ¶1.g.

290.  MSP policy requires the SOR Unit to run weekly reports to find "abscond-

ers," who are then assigned to analysts for investigation (repeated monthly). Leads

go to state or local law enforcement or the U.S. Marshals. The SOR Unit also moni-

tors registrant travel and investigates registrants who move to Michigan but do not

register. SOR Ops.  304, 322, 328, Exs. 100, 108, 109.

291.  Among registrants in the community, 10% (3,582 people) are listed as non-

compliant. 87% of non-compliance is related to issues with identification (maintain-

ing an ID) or paying fees required under SORA. Data Rept., Ex. 4, ¶¶23, 121–123.

### b. Law Enforcement Sweeps

292.  MSP, county sheriff's offices, U.S. Marshals, and local police have regu-

larly engaged in sweeps to enforce SORA. These operations include random resi-

dence checks to see if a registrant is staying at the reported location. *Does I*, JSOF,

Ex. 136, ¶¶965–66. MSP's SOR Enforcement Unit helps coordinate sweeps, the

SOR Unit prepares materials for sweeps, and MSP officers work with local police

on residence checks. Warrants issued are entered into LEIN for enforcement. MSP

has received past federal grants for sweeps and is seeking grants and planning more

such sweeps in the future. Registration & Enforcement Manual, Ex. 90, at 3–6; Morris Dep., Ex. 78, at 123–128; Hoffman Dep., Ex. 73, at 65–79; Morris Grant Email and Application, Ex. 114; SOR Backgrounder, Ex. 112, at 3; SOR Op. 310, Ex. 103.

293. MSP reported a total of 81,268 residence checks.[19] Defs' Resp. to Pls' 1st Interrog., Ex. 80, ¶1.h. Between 2008-2012, an average of 2,180 residences were checked during each sweep. Between 2016-2019, multiple smaller sweeps were conducted, with an average of 1,516 registrants contacted a year. Sweeps were not conducted in the last several years due to the pandemic and legal issues. Levine Rept., Ex. 15, ¶¶18, 41–44; Hoffman Dep., Ex. 73, 69; Morris Grant Email, Ex. 114.

294. Although these sweeps impose considerable costs, their efficacy is questionable. In 43 sweeps conducted from 2016-2019 by 534 personnel from MSP and 25 other agencies, more than 6,000 registrants were contacted, but only 405, or 6.7%, were found to be noncompliant. Levine Rept., Ex. 15, ¶¶18, 45–54.

295. When police have come to Doe A's home to do random residence checks, they have sometimes spoken to his neighbors to ask if he lives there, increasing the odds that his neighbors will learn that he is on the registry, even though he never committed a sexual crime. Am. Compl., R. 108, ¶395. When the police have come to Doe B's home for compliance checks, they have banged on the door in the early

---

[19] It is unclear how far back that data goes, and it may significantly undercount the number of checks. Levine Decl., Ex. 15, ¶¶ 53–54.

morning when his family was sleeping, shouting his name and scaring his children. He has to try to explain to his children and neighbors why the police are there. *Id.* at ¶396. Doe C similarly does not want his children to know why the police are showing up at his home, and it is embarrassing to have his neighbors see the police at his house. *Id.* at ¶398. The police have come to Doe E's home multiple times. Once, they came twice in three months. Pls' Resp. to Def. 2d Rogs, Ex. 84, ¶10.

296.  Class members report similar events. *See*, *e.g.*, PF Decl., Ex. 29 ¶6; RH 2 Decl., Ex. 31, ¶15. Some report dealing with unannounced sweeps at least yearly. Sweeps often take place in full view of neighbors, leaving class members embarrassed. RH 2 Decl., Ex. 31, ¶15 ("I have had SWAT-style crews of sheriff's departments in full body armor … pull up to my front yard and storm around to my back door in full view of my neighbors."); TR Decl., Ex. 44, ¶3; (neighbor called to say police banging on TR's door); ES Decl., Ex. 48, ¶12.

297.  Sweeps can result in a person's registry status being exposed, causing lost jobs or housing. Doe G lost two jobs after the police showed up at his work. (Police have also shown up at his home early in the morning, banging on his door and saying that they wanted to search his home.) Am. Compl., R. 108, ¶403. Class member JM reports that after his landlord discovered his registry status due to a sweep, the landlord immediately filed eviction papers, stating that he would never have rented to JM if he had known JM was on the registry. JM Decl., Ex. 37, ¶3.

97

298. These unexpected police visits often occur without any prior notice, disrupting registrants' lives and leaving them paranoid, fearful, and depressed. ES Decl., Ex. 48, ¶12 (sweeps put him "in a state of fear and depression"); TR Decl., Ex. 44, ¶3 ("Their presence is unnerving."); PF Decl., Ex. 29, ¶6.

### c. SORA Requirements Mirror Probation and Parole

299. SORA's requirements are similar to and in many ways more onerous than the reporting, surveillance, and supervision that many registrants experienced while on probation or parole. As the former MDOC Legal Affairs Administrator explains:

> SORA is both similar to and different from regular parole/probation supervision in that both systems require regular reporting, but (a) SORA requires more information to be reported in shorter time periods; (b) SORA automatically imposes restrictions that the MDOC (or probation offices) impose on parolees/probationers only on an individualized basis; (c) SORA requirements apply for a minimum of 15 years to life, with most registrants subject to SORA for life, while parole restrictions typically last two years and probation restrictions are typically similarly short and/or are individually tailored; (d) SORA requirements do not decrease over time and cannot be contested, whereas parole/probation conditions are frequently relaxed during the course of supervision and can be challenged through MDOC grievance procedures; (e) a violation of SORA can result in a term of incarceration up to ten years, whereas the length of incarceration resulting from a violation of probation or parole is capped at the length of the underlying sentence (and is often relatively short), and (f) unlike probation and parole, SORA has no provision to work with victims or with registrants' family members (who often are victims as well), or with registrants' landlords, employers, etc., to help registrants successfully reintegrate into society.

Stapleton Rept., Ex. 17, ¶¶5, 26–32.

300. MSP's SOR Enforcement Coordinator put it this way:

98

> If [a registrant is] on probation or parole, how I describe it is you have
> two sets of parents; you have one parent with one set of rules, and the
> SOR is your other parent with a different set of rules. **You may have
> similar rule[s], but probation or parole may have more strict rules
> than say the SORA registry or vice versa.** So if I was going to violate
> someone that's on probation or parole, I could do a violation [under
> SORA] through the state. And if probation or parole wishes to violate
> them for their probation or parole violation, then they could do that as
> well.

Hoffman Dep., Ex. 73, at 84 (emphasis added).

301.  SORA, like probation or parole, requires registrants to report to a criminal
justice agency, namely their local law enforcement agency, the sheriff's office, or
MSP. M.C.L. §28.722(m). But SORA can be harsher. It mandates in-person report-
ing, while probation supervision may not. Sample Probation Order, Ex. 139, at 3
(12-month probation order allowing phone or zoom reporting after first month).

302.  Doe C finds registration in some ways worse than probation. The public
could not easily find out that he was on probation, and other people at the probation
office were either probation officers or probationers. By contrast, when Doe C regis-
ters, anyone who happens to be at the station can see/hear him. And the registry is
available worldwide on the internet. On probation, he knew that he would get off if
he complied, but there is no path off SORA. Am. Compl., R. 108, ¶399.

303.  Ms. Doe finds the registry more intrusive than probation. On probation she
only had to report her employment and address, not her cars, email, or internet iden-
tifiers. If she needed to make her probation officer aware of changes, she could call

or wait until their next meeting, rather than having to report in three days. Towards the end of her probation, she only had to report twice a year. Under SORA, she must report quarterly (plus all changes). *Id.*, ¶400; Mary Doe Dep., Ex. 61, 53–54.

304.  Doe D believes the registry is worse than probation; not only does he have to report regularly, but the police come to check up on him at his home, sit outside in their squad car, and make the neighbors wonder why the police are there. Am. Compl., R. 108, ¶401. Doe F finds the registry worse "by far" due to the "sex offender" label that "makes everyone think I am an awful person." Doe F hoped to become a doctor, but the registry prevented him from doing so; by contrast, being on probation for a misdemeanor would not have. Doe F Dep., Ex. 59, at 71–72.

305.  Class members likewise testified that being on the registry is similar to or even worse than probation/parole. SORA's reporting requirements mirrored their probation/parole conditions. TR Decl., Ex. 44, ¶8; AC Decl., Ex. 27, ¶; AC Dep., Ex. 63, 24-25, 50. It is the level of restrictions and supervision that makes SORA feel like parole. AJ Decl., Ex. 32, ¶8. Class members testified that their parole conditions were easier to navigate, easier to understand, and easier to comply with than SORA. TR Decl., Ex. 44, ¶¶9–10. They cited the online registry as a reason that registration is worse than probation or parole, because the registry puts their infor-mation "on display for the world to see and ridicule." ES Decl., Ex. 48, ¶11.

306.  Class members also pointed to the length of probation/parole supervision,

which generally lasts no more than two years, as a reason why registration, which for most registrants lasts a lifetime, is worse. ES Decl., Ex. 48, ¶11 (probation ended after six months); TR Decl., Ex. 44, ¶9 ("it only lasted two years").

307. Class members emphasized that the consequences of a parole or probation violation and a SORA violation are the same: "You lose your freedom." AC Dep., Ex. 63, 54–56; AJ Decl., Ex. 32, ¶8.

308. As one of Plaintiffs' experts stated:

> With parole, the parole board has the discretion to tailor release to individual assessments of recidivism risk. While the board cannot release a prisoner before the judicially imposed minimum sentence, it can review each individual's institutional conduct, scores on sex offender risk assessment instruments, psychological evaluations and participation in treatment programs in deciding whether to continue the person's incarceration…

> In contrast, the sex offender registry has no safety valve. There is no individualized assessment of risk. There is no consideration of the facts of the offense, the registrant's culpability, or the registrant's current circumstances. No one—not a judge or the parole board or anyone in law enforcement—has the discretion to remove a Tier II or Tier III registrant or to keep that person from spending decades, or his or her entire life, on the registry, with all the reporting requirements, subjection to enforcement efforts, loss of employment and housing opportunities, and public shaming that the registry entails. [Levine Rept., Ex. 15, ¶¶28–29.]

### 3. Criminal Enforcement of SORA

309. SORA provides that law enforcement "shall" investigate and seek a warrant (if warrant requirements are met) "immediately" after a registrant does not report as required. M.C.L. §28.728a(1). MSP's Registration and Enforcement Manual states: "Upon notification from any source that a sex offender has failed to comply with

101

SORA reporting requirements, an enlisted member **shall** initiate an investigation for possible SORA violations." Ex. 90, §2.4b (emphasis added).

310.  Data from 1998 to 2012 shows 14,884 criminal dispositions for SORA violations over that 15-year period, averaging just under 1,000 a year. Data from 2010 to 2019 show an average of about 880 criminal dispositions a year, though this appears to underreport misdemeanors. (The second set of numbers excludes violations of SORA's now-repealed geographic exclusion zones.) Levine Rept., Ex. 15, ¶¶16, 55–59, Table 2, n.1.

311.  The threat of returning to prison on a SORA violation is a constant backdrop to registrants' lives. Doe B was pulled over by an officer who claimed that he was noncompliant based on MSP records that showed he had failed to register. Doe B begged the officer not to arrest him in front of his children. He happened to have his verification receipt with him proving he was compliant, which saved him from arrest. Am. Compl., R. 108, ¶397. *See id.*, ¶383 (Doe G has repeatedly been tagged incorrectly as non-compliant; he gave palm prints but didn't get a receipt despite asking for one, only to learn he was listed as non-compliant for not supplying them); TR Decl., Ex. 44, ¶11 (twice had to show receipt for paid registry fees to avoid being flagged as non-compliant where database erroneously said he hadn't paid).

312.  Not only do registrants face criminal prosecutions for violating SORA, but SORA mandates that a person's parole, probation, or youthful trainee status "**shall**"

be revoked for a willful violation of SORA. M.C.L. §§28.729(5)–(7).

### 4. *Stigmatization, Harassment, and Vigilantism*

#### a. *The Registry Defines People as Dangerous "Sex Offenders"*

313.  As victim advocate Sujatha Balija explains, registries send a message that

> … even individuals whose offense[s] were committed decades ago, … [are] sexual deviants and … current dangers to the public… [I]n order to prevent reoffending, we must stop calling people the thing we want them to stop doing. It makes no sense to label people by the behavior we want them to stop…. When we place individuals on a sex offender registry, and then hold them out to the public—often for life—as "sex offenders," we are telling them that that is who they are and that is who they will always be. [Balija Rept., Ex. 14, ¶¶31–32.]

314.  Criminal defense attorney Mary Chartier echoes that sentiment:

> A central difference between having a conviction on one's record and being subject to registration is that a conviction relates to a person's prior conduct, whereas the registry is a statement about who the person is.

Chartier Rept., Ex. 18, ¶6; *see also id.*, ¶¶23–24. As Dr. Letourneau explains, there is a difference between stigmatizing behavior and stigmatizing people. While "we absolutely have to stigmatize inappropriate behaviors… [i]t is not effective to stigmatize people, that actually tends to drive people towards more unhelpful and sometimes harmful behaviors." Letourneau Dep., Ex. 7, at 72.

315.  Research confirms that describing someone as a "sex offender" is intensely stigmatizing, leading the public to view the person with fear and disgust, as well as to assume that the person is a pedophile or sexual predator who poses a current high risk of committing a new sex offense. Socia Rept., Ex. 9A, ¶19.

103

316. Plaintiffs live in fear that anyone who Googles their names will discover that they are on the registry, and that they will then lose their jobs, housing, educational opportunities, or relationships. When meeting people, they face a Hobson's choice: disclose early on that they are "sex offenders" and risk having the person shun (or out) them, or wait until they have formed a relationship, and then risk having the person turn on them for staying silent. They limit their social life (including online) to family, old friends, and others who know their registry status. With everyone else they are anxious and on guard. Am. Compl., R. 108, ¶358, 525–526.

317. Doe F found COVID to be a bizarre kind of relief, as everyone had to adapt to a restricted life—which was his norm. They couldn't socialize; they were on edge with others; schools were closed to them; and they were fearful of being evicted or losing their jobs. To him, that is what life is like all the time. *Id.*, ¶523. Being on the registry makes it hard for Mary Doe to maintain personal relationships and has caused some people in her Jewish community to shun her. Mary Doe Dep., Ex. 61, at 77–78. One of the worst experiences of Doe C's life was when his daughter found his registry information on the internet. Am. Compl., R. 108, ¶519. When people find out Doe G is on the registry, they stop talking to him. He has developed an anxiety disorder and depression, and become a hermit, afraid to develop friendships. *Id.*, ¶524. He would like to volunteer, but he does not because he would have to report the activity and address and fears other people will then find out he is on the

registry. Doe G Dep., Ex. 60, at 42–44.

318.  Class members are likewise stigmatized. HM states that he will always be a "second-class citizen, publicly demonized as a threat." HM Decl., Ex. 35, ¶20. AC reports that when people find out he is on the registry, he is automatically seen as a "murderer rapist." AC Dep., Ex. 63, at 37; TP Decl., Ex. 41, ¶7 ("registry made me feel like the world would rather I be dead"). The stigma of being a labeled as a "sex offender" compels many to withdraw from social activities to avoid potential harass-ment. DK Decl., Ex. 33, ¶10; TR Decl., Ex. 44, ¶17. Some don't leave their homes for anything but essentials. BP Decl., Ex. 42, ¶7. Registrants are concerned about being viewed as dangerous by people who learn of their registry status, making it difficult to connect with others and leading to shame and social isolation. DM Decl., Ex. 36, ¶9; ES Decl., Ex. 48, ¶9; WC Decl., Ex. 28, ¶11; KN Decl., Ex. 39, ¶8.

319.  Michigan expects to disseminate widely its message that registrants are "sex offenders" who are dangerous. The online registry allows for 9.9 million users, with up to 5,000 concurrent users.[20] Contract, Ex. 91, at 44.

320.  The United States is one of the only countries in the world that publicizes sex offender registry information. The great majority of other countries limit access

---

[20] In addition to MSP officers/staff, over 460 non-MSP agencies have access to the law enforcement registry, and there are over 3,250 non-MSP user accounts, where each can have multiple users. Some 7,000 potential users have editing access. Defs' Am. Rog. Resp., Ex. 80, ¶4; Morris Dep., Ex. 78, at 185–89.

and use of such information to law enforcement. Zgoba Rept., Ex. 12, ¶¶44–46.

### b. The Registry Leads to Harassment and Vigilantism

321.  Research shows that that registrants and their families are subjected to harassment, social ostracism, and threats of violence. Indeed, in one study almost half of registrants reported harassment. Zgoba Rept., Ex. 12, ¶25.

322.  Plaintiffs and class members have faced harassment, from death threats to property damage. Doe C received an anonymous death threat by mail. Inside an envelope was a print-out of his page from the registry with his photo. His eyes were blacked out on the photo, and on the paper were the words "You will die." Am. Compl., R. 108, ¶518; *Does I*, JSOF, Ex. 136, ¶997. On Halloween, Doe F's neighbor stood in front of his home swinging a baseball bat and telling children not to go to his house because he was a sex offender. Doe F Dep., Ex. 59, at 54. A neighbor also threatened Doe F's girlfriend, warning that if she and he did not move, they would "struggle to live here." Am. Compl., R. 108, ¶522. Doe G reports that a person who learned he was on the registry came up to him and told him that all sex offenders should be killed. *Id.*, ¶524. Class member JM was attacked and held at gunpoint by his landlord when his registry status came to light. JM Decl., Ex. 37, ¶5. GW got so many phone calls with death threats from strangers that he had to change his number. GW Decl., Ex. 49, ¶8. RH 2 has had people come to his home to threaten him, once demanding he come outside to "take [his] medicine." RH 2 Decl., Ex. 31, ¶13.

323.   Harassment is common. Doe C has been called a child molester on the street, and his wife is regularly asked why she is married to a sex offender. His house and vehicles have been egged three times, and once his car was covered in cheese. Am. Compl., R. 108, ¶518. After Doe D posted on his homeowners association social media page about a local issue, a neighbor responded by linking to his registry profile. Other neighbors then stopped talking to him. *Id.*, ¶520; Doe D Dep., Ex. 5858, at 57. TR reports that neighbors yell obscenities at him when he is outside, throw trash into his yard, tell others not to talk to him, and shout that he is a pedophile for everyone to hear. TR Decl., Ex. 44, ¶16. ES has had his house egged and rocked multiple times at night. ES Decl., Ex. 48, ¶7. TP had both his house and cars vandalized. TP Decl. Ex., 41, ¶6. RL reports that neighbors weaponize his registry status against him, calling the police to perform checkups on him, including a made-up report that he had assaulted his wife. RL Decl., Ex. 34, ¶5. *See also* Chartier Rept., Ex. 18, ¶30 (registrants forced to move due to harassment from neighbors).

324.   Coworkers learning about a person's registry status can result in harassment and even job loss. When WC's registry status was exposed, he was first harassed at work and then terminated. WC Decl., Ex. 28, ¶4. AC's harassment at work was so bad he quit his job despite the challenge of finding another. AC Decl., Ex. 27, ¶¶6, 8; AC Dep., Ex. 63, 16–18. KN, after having her registry status exposed, was isolated by coworkers and physically attacked by the business owner. KN Decl., Ex. 39, ¶5.

325.  Registrants also deal with online harassment. RH was direct-messaged videos and photos depicting horrific mutilations and tortures of alleged child molesters. RH 2 Decl., Ex. 31, ¶13. RH 2, who had posted photos of his cats online, was sent videos of cats being tortured and told that his cats would be killed. *Id.*, ¶14. Other class members have had their registry information shared across social media with links to their personal activities or businesses. KM Decl., Ex. 38, ¶12. DK stopped posting online after a member of an online group shared a map of registrant addresses and another member commented that someone in the group was a registrant. DK Decl., Ex. 33, ¶10.

326.  Publication of registrants' personal information makes it easy for harassers to find and target them. AC Decl., Ex. 27, ¶4 (targeted by coworkers who found him on the registry); KN Decl., Ex. 39, ¶2 (expressing fear, as a Black trans woman already at high risk for violence, that being on the registry increases her risk).

327.  The registry facilitates scams targeting registrants because scammers can find registrants' information on the online registry. In one common scheme, scammers call posing as police officers and tell registrants that they are non-compliant with SORA. The scammers then try to extort money. Registrants who reported the calls to the police were told there was nothing the police could do.  ES Decl., Ex. 48, ¶7; PF Decl., Ex. 29, ¶5; MR Decl., Ex. 43, ¶15 (contacted twice); *see also* MR Dep., Ex. 66, 61-62.

### 5.  *Limitations on Access to Housing*

328.  SORA 2021 requires posting of registrants' addresses on the online regis-

try, meaning that landlords who rent to a registrant will have their property address

*listed on the registry*. M.C.L. §28.728(2)(c).

329.  Research shows that being on a sex offender registry dramatically reduces

housing options for registrants, who are denied housing or evicted when their status

is known. The ability of other tenants and neighbors to search the registry directly

contributes to landlords' decisions to deny or evict registrants. Socia Rept., Ex. 9A,

¶¶22–23. Probation and parole officers likewise report that people on registries have

great difficulty finding stable housing. Letourneau Dep., Ex. 55, at 36–37; Letour-

neau Rept., Ex. 7, ¶15.

330. **12% of class members who have reported addresses for at least ten**

**years reported being homeless at some point.** Data Rept., Ex. 4, ¶¶21, 111–15.

331.  When Doe A was released from prison, he had trouble finding housing.

Landlords repeatedly rejected him because he was on the registry. He only got an

apartment when a friend leased a unit for him. Am. Compl., R. 108, ¶408.

332.  Doe C lost his home to foreclosure after losing his job when his employer

learned of his registry status. Landlords told him that they would not rent to anyone

on the registry, and friends refused to rent him a room because they didn't want their

addresses listed on the registry. Doe C was registered at his mother's address for a

time, but after an anonymous caller reported that he was on the registry, his mother was threatened with eviction; he was given 24 hours to leave. Doe C then lived with his sister but had to move out after the U.S. Marshals came to the home to do a registry sweep. Because he was on the registry, his sister would have been evicted if he continued to live with her. He became homeless. His family members would have been happy to have him stay if he were not on the registry, but they feared that they would lose their housing if he lived with them. When Doe C reunited with his girlfriend, IG, he was unable to live with her and their children because he was on the registry. IG's father finally offered to rent them a home he owned, so they could live together. *Id.*, ¶¶409–416; Doe C Dep., Ex. 57, at 20–21, 55.

333.   Due to his registry status, Doe D was barred from an apartment where he had previously lived. Other apartment complexes had a policy of not renting to registrants. Several places where he applied told him he was rejected due to his registry status. Doe C Dep., Ex. 58, at 12–14, 49. Doe E lives with his mother because he could not find housing. Due to his disability, he would be eligible for subsidized housing and could get his own place, but his status as a lifetime registrant bars him from receiving the federal subsidy. Am. Compl., R. 108, ¶418; BW Decl., Ex. 26, ¶7; Pls' Resp. to Defs' 2d Rogs, Ex. 84, ¶5. Doe F checked building policies online when looking for an apartment. Virtually every place he looked excluded registrants. Am. Compl., R. 108, ¶419.

334.  Doe G was unable to live with his sister because her landlord did not want the apartment listed on the registry. He briefly stayed with his father but had to move out because his father feared his home would be targeted by vigilantes. Doe G tried to rent, but he was repeatedly denied; he was told his registry status made him a "liability." He has lived in a motel for 13 years, where he helps out in exchange for lower rent. The motel owner is unaware of his registry status. Am. Compl., R. 108, ¶¶421–22; Doe G Dep., Ex. 60, at 7, 9, 10–12, 16.

335.  When Mary Roe was released from prison, she discovered—after filing many rental applications and paying costly application fees—that no professionally managed complex in her area would rent to registrants. Mary Roe Dep., Ex. 62, 8–9. Even if the onsite rental agent was willing to lease the apartment after interviewing her, she was always denied by the corporate office. She lived in substandard buildings, which were all she could find. Am. Compl., R. 108, ¶423.

336.  Class members report experiencing homelessness as a result of the housing challenge posed by being on the registry. WC Decl., Ex. 28, ¶8; JM Decl., Ex. 37, ¶4–5. Some have resorted to living in group shelters. DM Decl., Ex. 36, ¶5. Others have been evicted after being found on the registry. KM Decl., Ex. 38, ¶7; JM Decl., Ex. 37, ¶3. Some have been denied housing benefits due to their registry status. DM Decl., Ex. 36, ¶5 (denied Section 8); HM Decl., Ex. 35, ¶17 (denied public housing).

337.  Many rental properties are closed to registrants, forcing them into unstable

111

living situations. RH 2 Decl., Ex. 31, ¶11 (no lease and could be forced to leave at any time); AC Decl., Ex. 27, ¶10; HM Decl., Ex. 35, ¶17; WC Decl., Ex. 28, ¶8. Registrants have to rely on family support in order to get housing. TR Decl., Ex. 44, ¶2; KW Decl., Ex. 50, ¶7; AC Dep., Ex. 63, at 49; AS Decl., Ex. 46, ¶8.

338.  Lifetime registrants are forever barred from accessing subsidized housing. For people with non-sex convictions, such providers "look back" at convictions for a "reasonable time." (Michigan's State Housing Development Authority uses look-back periods of three months for drug offenses and 12 months for violent offenses.) But for lifetime registrants, the door to subsidized housing is permanently closed. It is their lifetime registration, not their conviction, that bars their admission. Schaafsma Decl., Ex. 19, ¶¶4–9 (citing 42 U.S.C. §13663). *See also* DM Decl., Ex. 36, ¶5 (denied Section 8 housing due to registry and forced to move into a shelter).

### 6.  *Limitations on Access to Employment*

339.  Registrants' work addresses are posted online, meaning that employers who hire registrants will have their business address show up in registry searches. M.C.L. §28.728(2)(d). Research demonstrates that being on a sex offender registry dramatically reduces employment options for registrants, and frequently results in job loss. Socia Rept., Ex. 9A, ¶¶22–23; Zgoba Rept., Ex. 12, ¶¶25–30. Probation and parole officers likewise report that people on registries have great difficulty finding work. Letourneau Dep., Ex. 55, at 36–37.

112

340.  **45% of class members living in the community (16,005 people) report no current employment**. The Michigan unemployment rate in January 2023 when MSP ran the class member data was 4.3%. Data Rept., Ex. 4, ¶¶20, 109–10.

341.  Doe A repeatedly lost job opportunities because of his registry status. When first released from prison, he participated in a reentry program designed to help him find work but was consistently told that the jobs he flagged would not hire registrants. Am. Compl., R. 108, ¶¶428–436.

342.  Doe B worked in a family gas station/auto repair business for many years because he learned from experience that he would be unable to find work elsewhere. Despite his experience working on cars, when he applied for work at Ford (twice) and Chrysler, he never got a response. He got his real estate license, but fears at any time a buyer or seller could learn he is on the registry, causing a purchase or sale to fall through—both of which have happened. He has a website for his business but fears one review exposing his status could ruin his livelihood and ability to provide for his family. Am. Compl., R. 108, ¶¶359, 438–41; Doe B Dep., Ex. 56, 8, 60–61.

343.  Doe C has repeatedly been terminated because he is on the registry. After an anonymous caller exposed his status, he was summarily fired and escorted off the premises by factory security. He worked at another company for about six months until the newspaper *Busted*, which publishes registry listings and had printed his photo, appeared in the break room at work. He lost his job the next day. Am. Compl.,

113

R. 108, ¶451; Doe C Dep., Ex. 57, at 9, 17–18, 54–55.

344.   Doe D took a heating and cooling course, graduating third in his class. He applied to more than 50 trade jobs but was consistently turned down because every application required him to disclose his registry status, and no one would hire registrants. Doe D has worked on an auto assembly line, a job he was only able to get through family connections. His employer knows his status, but to the best of his knowledge, his co-workers and union do not. He would like to become a union representative or team leader—which provides a path for promotion—but fears that he will be outed if he does, jeopardizing his work relationships. Am. Compl., R. 108, ¶¶453–454; Doe D Dep., Ex. 58, at 24, 26–27.

345.   Doe E, despite his disability, has tried to maintain gainful employment, but his status as a registrant makes that difficult. For a while he was doing custodial work in a factory, but he was let go shortly after a new employee found his name on the registry. When he applied for a position at a grocery store, the store management was prepared to hire him, but the corporate office told him that they could not hire a sex offender. Am. Compl., R. 108, ¶455; Pls' Resp. to Defs' 2d Rogs, Ex. 84, ¶6.

346.   Doe F, despite having a biology degree from a highly rated university, could not find work using his degree. He wound up working as a laborer in his best friend's family construction business. He has since finished an online MBA (earning a 3.98 GPA), but applications to over 120 jobs produced only three callbacks and no

114

offers. Doe F Dep., Ex. 59, at 11–15, 65; Am. Compl., R. 108, ¶456.

347.  Doe G has been terminated from so many jobs due to the registry that he has lost track. He was fired from his job as a server after a customer told his employer he was on the registry. The boss said that his conviction did not matter, but his publicly available registry status gave the business a "black eye." After finding another job as a server, Doe G was again terminated after law enforcement did a sweep, revealing his registry status. He spent a year unemployed. He worked with a temp agency, but because he kept getting fired after his registry status was exposed, the temp agency ran out of placements for him. Doe G Dep., Ex. 60, at 27–37.

348.  Ms. Doe received a certificate in medical billing near the top of her class. Her career services office placed her in an externship. The host organization, though pleased with her work, was unwilling to hire her because its name and address would then be posted on the registry. Ms. Doe submitted over 100 resumes for other jobs before she was able to find employment in medical billing. Since then she has done accounting for a freight company and for plumbing/electrical contractors, but she was always at risk of being fired if they discovered her SORA status. Her current employer is unaware of it; if the employer discovers her status, she expects to be fired. Am. Compl., R. 108, ¶¶463–464; Mary Doe Dep., Ex. 61, at 27–40.

349.  After being released from prison, Ms. Roe spent a few months unemployed due to her registry status. Mary Roe Dep., Ex. 62, at 10. She returned to school and

earned a masters in counseling. When Ms. Roe came off the online registry after *Roe v. Snyder*, she wanted to start her own therapy practice. *Id.*, at 79. But she was turned down for insurance because of her registry status, preventing her from starting her business. After over a year of effort, she was finally approved for insurance. She also had trouble finding office space. When looking at a promising space, she was told the landlord would rent to people with criminal histories but would not rent to anyone on the registry. She left and cried on the street. Am. Compl., R. 108, ¶¶465–466.

350. Class members face similar challenges. Even when they had advanced degrees or skills, they have had difficulty finding work suitable to their experience no matter how old the convictions or how many applications they submit. WC Decl., Ex. 28, ¶6; HM Decl., Ex. 35, ¶9; TR Decl., Ex. 44, ¶6; ES Decl., Ex. 48, ¶5.

351. When registrants do get past the application stage, they report that subsequent exposure of their status can result in termination or revocation of offered employment. AS Decl., Ex. 46, ¶4; TP Decl., Ex. 41, ¶¶3, 5; BP Decl., Ex. 42, ¶3; Chartier Rept., Ex. 18, ¶29 (people losing jobs that they were able to obtain despite having criminal records after co-workers learned they were on the registry). Registrants have lost jobs both when they were put on the registry, TP Decl., Ex. 41, ¶2, and when their registration status was exposed, and have spent long periods unemployed. WC Decl., Ex. 28, ¶5; ES Decl., Ex. 48, ¶4; JM Decl., Ex. 37, ¶2; GW Decl., Ex. 49, ¶7; TR Decl., Ex. 44, ¶6. Class members have even been harassed simply for

116

applying for work. RH 2 Decl., Ex. 31, ¶6.

352.  Class members similarly report lost opportunities for work that would have been accessible to them but for the registry. DM Decl., Ex. 36, ¶6. Some categories of jobs are closed. KM was rejected by army recruiters because of his registry status. He also applied to be a fireman but was told he did not qualify because the registry made him ineligible for an EMT license. KM Decl., Ex. 38, ¶8. AJ has lost accounts when clients discover his status. Despite being named top employee at his job, he is unable to move into management because the company is anxious about putting him in an executive position due to his registry status. AJ Decl., Ex. 32, ¶4.

353.  Even registrants who run their own businesses have lost business and money due to their registry. PF, who runs a house-painting business, was removed— along with his entire crew—from a job after the client discovered him on the registry, costing him $5,000. PF Decl., Ex. 29, ¶4. *See also* KM Decl., Ex. 38, ¶9; HM Decl., Ex. 35, ¶¶14–15; MR Decl., Ex. 43, ¶17. The registry has forced class members to seek non-traditional means for employment, such as gig-work and low-paying odd jobs. RH 2 Decl., Ex. 31, ¶9; WC Decl., Ex. 28, ¶6.

354.  Registrants report that it is appearing on the online registry, not their conviction, that turns employers away. TP reports he has been "offered numerous good jobs" since being removed from the online registry, despite the fact that his conviction remains on his record. TP Decl. Ex. 41, ¶9. JM got a job at a company that did

not do background checks. Three months later he was fired after the owner pulled up his registry page and photo. JM Decl., Ex. 37, ¶2.

### 7.  *Limitations on Access to Education*

355.  SORA requires registrants to report any higher education, post-secondary school, or trade school they attend. M.C.L. §§28.724a, 28.725(1)(c), 28.727(1)(g). That information is posted on the online registry. M.C.L. §28.728(2)(e).

356.  SORA has limited Plaintiffs' access to education. Doe B planned to enroll in community college but would have had to report it. The college would also have sent out a letter that there is a sex offender on campus. "I don't want to be looked at like that, so … I gave up." Doe B. Dep, Ex. 56, at 12–13; Am. Compl., R. 108, ¶468.

357.  Doe C, despite wanting to learn a skilled trade, refrained due to fear of being monitored and ostracized if his status were exposed. *Id.*, ¶469. Doe D sees no point in taking courses while on the registry, even though his employer would pay for him to attend school and he would become eligible for promotion. He fears that people in his industry would search his name, exposing his status and costing him future work. *Id.*, ¶470. Doe E wanted to take cooking or crafting classes at community college, but the fear of being outed and shunned by teachers and classmates stopped him. *Id.*, ¶471. Doe G wanted to take college-level computer courses for his job but has not because he is feared his registry information will be disclosed to classmates or that police might show up to his class. *Id.*, ¶473.

358.   Even when registrants are able to enroll in school, their opportunities are limited. Doe B took classes for his real estate license online so that he would not have to report his status as a sex offender. Am. Compl., R. 108, ¶¶440, 468. Doe F, when applying to get his MBA, was put through a lengthy review period that resulted in his deferral for a term. After finally being admitted on the promise that he would never set foot on campus, Doe F was limited to online classes, resulting in a multi-semester wait for courses that were rarely offered online. Am. Compl., R. 108, ¶472.; Doe F Dep., Ex. 59, at 16–18. When HM applied to a master's program, he was told he could only attend on a "limited basis," could not be on school property, and would need to take classes under specific conditions. HM Decl., Ex. 35, ¶7.

359.   Some registrants are simply rejected. Doe C was turned down by several GED programs because of his registry status. His probation officer finally found a GED program that accepted registrants. Am. Compl., R. 108, ¶469; Doe C Dep., Ex. 57, at 14–15. TR was rejected from one university after disclosing his registry status and was threatened with expulsion from another. TR Decl., Ex. 44, ¶4.

## 8.  *Limitations on Travel*

360.   When registrants intend to travel anywhere for more than seven days, they must provide advance notice to the police, including saying where they are going, where they will stay, how long they will be there, and when they will return. M.C.L. §§28.725(1)(e); 28.727(1)(e). Registrants must report in person at least 21 days

119

before they travel outside the U.S. for more than seven days. M.C.L. §28.725(8).

361.  Registrants must plan travel so that they are able to register in person during required verification periods. For example, Tier III registrants with a January birth-day must report quarterly in January, April, July, and October, and therefore cannot travel for the entirety of one of those months because they need to report in person during that time. M.C.L. §28.725a(3); Pls' Resp. to Defs' 3d Rogs, Ex. 85, ¶¶26–27.

362.  It is unclear what registrants should report if their plans change while travel-ing. Pls' Resp. to Defs' 3d Rogs, Ex. 85, ¶¶26–27.

363.  Because registration in one state generally triggers registration in other states, if registrants travel, they must comply with all applicable registration laws in other jurisdictions. Any travel out-of-state requires extensive research to determine what the registry requirements are in the states through which and to which regis-trants travel. Because registry laws are complex and vary from state to state, it is hard to obtain accurate information about either affirmative reporting obligations (such as registering one's presence when traveling in a state) or prohibitions on ordinary behavior (like visiting a library or park) in other jurisdictions. It is difficult for Michigan registrants to travel to other states without the risk of being found out of compliance. The practical impact is that being required to register significantly restricts registrants' ability to associate with family or friends out of state, or indeed to leave the state for any purpose. Prescott Rept., Ex. 8, ¶¶47–50, and Consequences

120

Triggered by Sex Offender Registration: A National Sample, Attach. 1.

364.  When registrants report proposed travel outside the U.S., the agency where they reported fills out a Notification of International Travel of Sex Offender Form, Ex. 117, which goes to the U.S. Marshals Service National Sex Offender Targeting Center. Morris Dep., Ex. 78, at 221–223. MSP policy requires the SOR Unit to generate weekly reports monitoring such registrant travel, and to coordinate with the U.S. Marshals (e.g., updating information if U.S. Marshals notify the MSP that a registrant has boarded a plane). SOR Op. 328, Ex.  109, at ¶¶1, 6.

365.  Registrants convicted of an offense against a minor cannot get regular passports, but only ones that identify them as sex offenders. 22 U.S.C §212b(c)(l); 34 U.S.C. §21503(f).

366.  Almost all Plaintiffs limit travel to no more than six days; otherwise, they must notify the police about their travel plans. Am. Compl., R. 108, ¶479.

367.   Doe B has been stopped and interrogated for hours while traveling because he is on the registry. Doe B Dep., Ex. 56, at 35–36. When he returned from a four-day getaway to Mexico with his then-wife, border agents separated them and interrogated him about his sex offender status. Just coming back from a weekend at Niagara Falls, he was separated from his family and isolated for questioning. These experiences have made him loath to travel outside the U.S. Am. Compl., R. 108, ¶480.

368.   Doe C would like to travel with his family and show his children the world.

He does not do so, however, because he would have to report his travel and because the laws for registrants in different places are very complicated, so he worries about getting something wrong. He also does not know whether other countries will deny him admittance because he is on the registry. *Id.*, ¶481.

369.  Doe D wanted to take his family to Disney World, but Disney bars all registrants, and Florida requires out-of-state registrants to report to the police within 48 hours. He wanted to spend a week with his family in Tennessee for a wedding, but Tennessee likewise requires out-of-state registrants to register within 48 hours of entering, so he went to the wedding and returned the same day. He also wanted to travel to Scotland but was barred because he's on the registry. Am. Compl., R. 108, ¶481. Doe D Dep., Ex. 58, at 56–57.

370.  Doe E used to travel to international conferences about Fetal Alcohol Syndrome but no longer does so because it was too stressful and risky. When he came back to the U.S., he was questioned at length, and his belongings were searched. BW Decl., Ex. 26, ¶7. He has not visited friends and family in Arizona, Colorado, and Florida for more than seven days because he does not want to register his travel or have people in those states notified about his status. It is also too complicated to comply with those states' registration requirements. Am. Compl., R. 108, ¶483.

371.  Doe F did not know what addresses he needed to report during the year that he spent caring for his girlfriend who had cancer. When she relapsed, they went

from the ER directly to a series of hospitals and specialty centers on the other side

the state, some of which shared the same buildings but had different addresses. Doe

F was unsure if and how he was supposed to report this unplanned travel. He stayed

in hospitals, hotels, and family homes many nights. He didn't know if he needed to

register these addresses. So as not to trigger the reporting requirements,

> instead I would leave her hospital room at one in the morning and try
> to race home every seven days if possible to step foot in my house ….
> Like, I didn't have time to worry about that. I was more worried if she
> was going to -- if I'd see her the next morning. If she'd be alive. [Doe
> F Dep., Ex. 59, at 39–41.]

372. When Doe F was working construction, he was assigned to a project in

Pennsylvania for two weeks. He left the worksite after a week because otherwise he

would have had to register his travel, and he was unsure of Pennsylvania's registra-

tion requirements. He also feared that if someday he got off Michigan's registry, he

might not come off the Pennsylvania registry. Am. Compl., R. 108, ¶485.

373. SORA's three-week notice requirement for international travel limits Doe

G's career advancement, as he has had to tell his employer he cannot travel interna-

tionally. He was forced to cancel a business trip to China because he would have

been away for 30 days during his reporting period. He doesn't visit his father in

Florida or sister in Illinois for fear of violating those states' laws or ending up on

those states' registries. He missed his niece's graduation for similar reasons. Pls'

Resp. to Defs' 3d Rogs, Ex. 85, ¶27; Doe G Dep., Ex. 60, at 20–22.

374. Ms. Doe once accidentally got into a traffic lane leading to the tunnel to Canada while driving her family in Detroit. Because of her status as a registrant, border agents searched her car, interrogated her husband and daughter separately, and suggested that she was abducting her daughter. Another time when detained at the border, her husband was asked if he knew she was a sex offender. Ms. Doe limits travel to no more than three days to be sure she is compliant. She would like to travel to the southwest but has not due to the complexity of other states' registration laws and the risk of violating them. Pls' Resp. to Defs' 3d Rogs, Ex. 85, ¶26.

375. When Mary Roe traveled outside the U.S., she was subjected to extensive delays and questioning about her registrant status. Am. Compl., R. 108, ¶489.

376. Class members report similar constraints, testifying that they don't travel for work, to visit their families in other states or countries, or simply to enjoy a vacation due both to Michigan's reporting requirements and the complex registry laws in other jurisdictions. *See*, *e.g.*, BP Decl., Ex. 42, ¶8 (limits travel to under three days because it is "really complicated … planning travel around reporting requirements"); DK Decl., Ex. 33, ¶3; TR Decl., Ex. 44, ¶15; WC Decl., Ex. 28, ¶10. HM Decl., Ex. 35, ¶18. Registrants have had to forego family events, including trips, reunions, weddings, and funerals. RH 2 Decl., Ex. 31, ¶12 (missed both his parents' funerals due to travel requirements being "confusing and easily violated"); AS Decl., Ex. 46, ¶6 (loses about $4,000/month because registry prevents him from taking out-of-state

124

assignments at his job); GW Decl., Ex. 49, ¶10; ES Decl., Ex. 48, ¶9. MR has extended family in the Philippines but is not able to go with his wife and son on trips there; he is banned from the country because he is on the registry. MR Decl., Ex. 43, ¶12. AC was detained at customs while attempting to travel. AC Decl., Ex. 27, ¶12.

377.  72-year-old class member RH's account of a trip to Florida to care for his dying 93-year-old father highlights the difficulty of complying with SORA (and is worth reading in full). He summarized it by saying:

> [B]oth at the front end and at the back end of my out-of-state trip I had a series of burdensome and time-consuming hoops to jump through— most of which had to be done in person, and which involved driving repeatedly to registry offices only to learn that I had to visit other offices or that the office I was at could not complete what needed to be done.
>
> At every phase I was anxious that something would go wrong or that I would not have what was needed or would not be able to do what was necessary. The fear is constant that if you screw up you may not get permission to travel, or you will lose your booking deposit and you will have to turn around and go home, or that you will face charges for failing to register properly or for being noncompliant in the new state or in your home state.
>
> This was for a four-week trip; I can't imagine anyone taking a short trip given the hassle and anxiety I went through on this month-long trip. In addition, I checked again [two weeks post return] and learned that I was still listed as a permanent registrant on the Florida registry. [RH Decl., Ex. 30, ¶¶16–19.]

378.  Some find it is easier simply not to travel; JS has not left Michigan in over 33 years, nor stayed anywhere other than his own home or medical facility in 15 years. JS Decl., Ex. 45, ¶8.

### 9. *The Impact of SORA 2021 on Family Relationships*

379.  Registration affects not just registrants but their families (spouses, children, parents, siblings). SORA has made it impossible or impractical for some registrants to live with their families, typically as a result of reporting requirements that would result in family homes being listed on the online registry. Doe C Dep., Ex. 57, at 21–21; KM Decl., Ex. 38, ¶6; WC Decl., Ex. 28, ¶7; TR Decl., Ex. 44, ¶2.

380.  For others, the registry results in a complete deterioration of family relationships, making it difficult to go home or be with family. ES Decl., Ex. 48, ¶14; DM Decl., Ex. 36, ¶7–8; MR Decl., Ex. 43, ¶5; TP Decl., Ex. 41, ¶7. The registry caused a serious strain on Doe E's marriage. When his wife learned he would be on the registry for life, not 25 years, she became unsure about staying married to him due to the registry's effect on their lives. Am. Compl., R. 108, ¶521.

381.  Family members are stigmatized and harassed simply for their association with the registrant. They suffer financial hardship and are sometimes forced to leave their communities. Balija Rept., Ex. 14, ¶24; AJ Decl., Ex. 32, ¶6 ("My family has consistently experienced harassment as a result of my registry status.").

382. Registrants' children are ostracized or bullied if their parent's status is exposed. Doe B Dep., Ex. 56, at 59–60; Mary Doe Dep., Ex. 61, at 77–78; AJ Decl., Ex. 32, ¶6; RL Decl., Ex. 34, ¶4. Doe D's son came home, after completing a school project about his family, and asked what a sex offender was. Through the project the

126

boy had discovered that Doe D is on the registry and had been teased by friends about it. Doe D Dep., Ex. 58, at 53. Mary Doe's daughter was confronted about having a parent on the registry; other kids rejected her due to her mom's status. Mary Doe Dep., Ex. 61, at 21–22; 77–78. HM's children, nieces, and nephews have all been mocked by kids who have found him on the internet. HM Decl., Ex. 35, ¶19. TP's high-school-aged daughter was harassed so much about his status that she began skipping classes; she eventually moved out and stopped talking to him for years. TP Decl., Ex. 41, ¶¶6-7. *See also* AJ Decl., Ex. 32, ¶6 (describing his son being taunted). Some registrants try to keep their status from their children. But because their children face ridicule from peers, registrant-parents have to help them deal with it, which can require therapy. MR Dep., Ex. 66, 55–58; KM Decl., Ex. 38, ¶6.

383.  SORA also impacts families by creating barriers to parents' full engagement in their children's lives. While the 2006 geographic exclusion zones no longer exist, schools still bar or limit registrants from participating. "I can attend, yes, but I still cannot coach, I cannot participate, nothing." Doe D Dep., Ex. 58, at 16.

### 10.  *Financial Consequences of Registration*

384.  The unemployment and housing instability caused by SORA also has financial consequences for registrants and their families. AS said, "The registry prevents me from getting a job that pays enough for me to take care of myself and my family." AS Decl., Ex. 46, ¶3; *see also* DM Decl., Ex. 36, ¶6. Lack of consistent employment

makes it hard for many registrants to keep up with household bills and other financial responsibilities. KN Decl., Ex. 39, ¶7; AS Decl., Ex. 46, ¶7. After Doe C was fired from his job when his registry status was exposed, he could not pay his bills, lost his home to foreclosure, and had his car repossessed. Am. Compl., R. 108, ¶449. Registrants have to lean on family for financial and housing support. Pls' Resp. to Defs' 2nd Rogs, Ex. 84, ¶¶5–6; BW Decl., Ex. 26, ¶7; AC Decl., Ex. 27, ¶10; KW Decl., Ex. 50, ¶7; MR Dep., Ex. 66, at 22–24. Staying in compliance with SORA is also costly: "Because I must be present and available for the entire day for my job, on the days I have to go register I lose an entire day of pay." AS Decl., Ex. 46, ¶6.

385.  Registrants who operate their own businesses have suffered economic loss after being discovered on the registry, resulting in targeting of their businesses. HM Decl., Ex. 35, ¶15 (loss in clientele at law firm due to registry); KM Decl., Ex. 38, ¶9 (thousands of dollars in lost business); MR Decl., Ex. 43, ¶22 (services canceled after status discovered, resulting in financial and reputational damage); PF Decl., Ex. 29, ¶4 (loss of contract when registry status discovered); AS Decl., Ex. 46, ¶6.

386.  Registrants must pay an annual $50 fee. M.C.L. §§28.725a(6), 28.727(1). PF Decl., Ex. 29, ¶3; DK Decl., Ex. 33, ¶9. The fee is waived for 90 days for people who are indigent, which is defined to include people who qualify for food assistance. M.C.L. §§28.722(f), 28.725b(3). While the contract for the MSOR database provides that the vendor could create an interface to identify registrants receiving state

assistance, MSP chose not to do this. Registrants must reestablish indigence every 90 days. Contract, Ex. 91, at 53; Morris Dep., Ex. 78, at 81–83; M.C.L. §28.725b(3).

387. Class member RL has been reincarcerated due to unpaid fee violations because "money is always tight." RL Decl., Ex. 34, ¶7. MSP data shows that of all "noncompliance," 25% is for fee payment problems. Data Rept., Ex. 4, ¶122.

### 11. *Mental Health Impacts*

388. Researchers have consistently found that registration has negative mental health effects. Compared to people who committed sex offenses but are not on an online registry, registrants feel increased helplessness and isolation. They fear harassment and being out in public, leading to self-isolation, which impairs their ability to form healthy relationships that are key to successful reentry. Letourneau Dep., Ex. 55, at 37–38, 67. Registered young adults are far more likely to have attempted suicide, reported feelings of hopelessness, and experienced high rates of depression, loneliness, and isolation. Letourneau Rept., Ex. 7, ¶16 a–b.

389. Ms. Roe, who built a successful business as a therapist after coming off the online registry as a result of the *Roe* litigation, now lives in constant fear that she will be outed to clients and potential clients as a sex offender and will lose everything she has worked so hard for. She uses almost no public social media and avoids any online attention. The prospect of being back on the registry pushed her into therapy for depression and post-traumatic stress disorder (PTSD). *Id.*, ¶361. She said:

129

> I think it's hard to capture the totality of the impact of the registry on me, but it has affected almost every area of my life, work, school, friends, relationships. I think the biggest effect for me has been its impact on my mental health over the years. [Mary Roe Dep., Ex. 62, at 76.]

390.  Ms. Doe has had panic attacks about being outed publicly or at work, where her co-workers do not know her status. In building relationships, she never knows whether to reveal her status, which often leads to the person cutting her off, or not to reveal it, only to have the person find out and feel betrayed. Coming off the online registry after *Does I* allowed her to begin developing more normal relationships. Under SORA 2021, she again lives with the fear that a random Google search by a colleague or neighbor could upset the life she has built. Am. Compl., R. 108, ¶360.

391.  Class members likewise report feelings of depression, paranoia, loneliness, and suicidal thoughts as a result of the isolation the registry creates and their fear of being identified and humiliated. ES Decl., Ex. 48, ¶18; GW Decl., Ex. 49, ¶¶5–6; KW Decl., Ex. 50, ¶12; RH 2 Decl., Ex. 31, ¶16; TP Decl., Ex. 41, ¶7. Setbacks caused by the registry, like job rejections/firings or housing denials/evictions, can also push registrants into depression. Doe G Dep., Ex. 60, at 32–33. Class members also report becoming paranoid or obsessive about complying with SORA. Due to the law's complexity and registrants' confusion about the rules, they fear that they will make a mistake and be returned to prison. ES Decl., Ex. 48, ¶2; GW Decl., Ex. 49, ¶6; WC Decl., Ex. 28, ¶11.

392.  Defense attorney Mary Chartier reports that of her clients who are facing

sex offense charges and the possibility of incarceration and registration, 75% report suicidal thoughts. Ms. Chartier convinced one client, who was about to jump from a roof because he could not face the threat of prison and a lifetime on the registry, to come down and seek counseling. Another client, who had a relatively short sentence, committed suicide rather than live on the registry. Chartier Rept., Ex. 18, ¶¶31–34.

393.  Even family and friends can be affected. AF's legal guardian said:

> All of us have suffered with mental health issues associated with AF being on the SOR. He has been depressed, lonely, isolated, and even suicidal at times. He is on medication and currently working with a therapist…. My husband and I have also grappled with mental health issues associated with AF being on the registry. At various times over the past 18 years, we have sought professional help to deal with these issues through medication and counseling. [KW Decl., Ex. 50, ¶¶12–13.]

### 12.  Harms Specific to Elderly Registrants and People with Disabilities

394.  MSP's enforcement coordinator agreed that SORA is a "one-size-fits-all registry" that makes no allowance for age or health. Elderly people, including those in nursing homes or who are terminally ill, must still report. "No matter what someone's age, their health issues…, they have the same duties and responsibilities," and can be prosecuted if they willfully fail to comply. Hoffman Dep., Ex. 73, at 28, 61, 111–12; MSOR Training Trans., Ex. 58, at 17–18 ("legislators…didn't realize sex offenders are getting older …We don't have an answer for that.").

395.  Many registrants are older or elderly. **Of Michigan registrants living in the community, 32% (approximately 9,630 people) are 60 or older.** Data Rept.,

Ex. 4, ¶¶4, 40. *See, e.g.*, JS Decl., Ex. 45, ¶2 (76 years old); RH Decl., Ex. 30, ¶1 (72 years old); MR Decl., Ex. 43, ¶2 (69 years old); HM Decl., Ex. 35, ¶1 (68 years old); TR Decl., Ex. 44, ¶1 (68 years old); WC Decl., Ex. 28, ¶1 (67 years old). Older registrants face challenges complying with SORA. JS Decl., Ex. 45, ¶7 ("At 76 years old, the stress of a possible arrest, prosecution, and subsequent prison sentence for failing to report on something that confuses me is too much to consider."); GO Decl., Ex. 40, ¶8 ("I am scared that, due to my age and disability, I will have no way to go to register, and that as a result I'll be prosecuted and sent to prison."); WC Decl., Ex. 28, ¶¶11–12; TR Decl., Ex. 44, ¶12.

396.   Younger registrants with disabilities face similar challenges. Doe E's parents relocated to provide a support network for him, because they knew that his Fetal Alcohol Syndrome would make it difficult for him to comply with SORA. His father passed away five years ago, and his 86-year-old mother, with whom he lives, is fearful that when she dies, Doe E won't be able to fulfill his SORA requirements without her help. BW Decl., Ex. 26, ¶¶6, 8, 12.

397.   Class member AF, who has a developmental disability, is dependent on his aunt (his legal guardian) to comply with the law. His aunt and uncle worry that he will fail to report when they can no longer assist him. They are especially concerned about housing because AF cannot live independently, and group home settings are off-limits to him because of the registry. KW Decl., Ex. 50, ¶¶3–7.

132

398.  After DK became blind, he applied for a guide dog from the only source in Michigan. His application was rejected because he was on the registry. He was told that the guide dog school did not deal with "people like him" because he was "obviously [] dangerous." He still has no guide dog. DK Decl., Ex. 33, ¶¶4–7.

### 13.  *Additional Consequences from Registration Under SORA 2021*

399.  Registrants are subject to a vast and labyrinthine array of laws imposed by the federal government, other state and tribal governments, and local municipalities. Over the last two decades, the number of such laws exploded, targeting registrants in every state, and creating a complicated and constantly changing picture. The volume and scope of these laws is enormous: they cover everything from whether one can go to a church, library, or park, to whether one can access a hurricane shelter to where one can vote. The fact that these laws are unpredictable, decentralized, complicated, and often vague makes compliance even more difficult. Prescott Rept., Ex. 8, ¶¶40–41, 46, and Consequences Triggered by Sex Offender Registration: A National Sample, Attach. 1 (providing compendium/examples of such laws).

400.  Sex offender registration laws, including SORA, are the structure undergirding this array of laws and restraints. Other laws "piggyback" on these laws, imposing restrictions and obligations based on the fact that someone is subject to registration (not the conviction), regardless of whether those obligations and restrictions are appropriate for the wide range of people required to register. *Id.*, ¶¶43–46.

133

401.  Private entities impose similar burdens and restrictions. Many social media platforms—where much of public and private life is now conducted—bar registrants. Some colleges and gyms exclude them. Even hospitals may refuse to allow registrants to visit friends or family who are ill. *See* Prescott Rept., Ex. 8, Attach. 1., at 8–9 (providing examples).

402.  Plaintiffs report that they have been barred from social media platforms, are not permitted to join their local gym, and have been denied employment or housing by entities that have blanket bans on hiring or renting to registrants. Doe E was even told that on account of his registry status he could not participate in a conference for people with Fetal Alcohol Syndrome. Am. Compl., R. 108, ¶580. *See also id.*, ¶508 (Mary Doe unable to use Facebook to stay in touch with family and friends because Facebook has repeatedly deleted her account).

403.  JM sought treatment at a local crisis center. About a week into the program, he was called into a meeting with the executive board, who terminated his treatment, telling him that because he was on the registry, he could not be on site "per their policy." JM Decl., Ex. 37, ¶6. BP, after suffering a heart attack, wanted to start a gym membership, but was unable to because he is on the registry. BP Decl., Ex. 42, ¶9. ES's long-time membership at the YMCA was terminated because he is on the registry. YMCA officials felt that if the state held him out as dangerous, then they had a duty to protect other members from him. ES Decl., Ex. 48, ¶10.

## H. SORA 2021 Is Based on Animus

404.   The passage of SORA 2021 can only be explained by animus toward regis-

trants. As retired Judge William Buhl, a former prosecutor, testified:

> There is no group that is more hated than "sex offenders." Almost all
> legislators, like the public they represent, have a hatred towards people
> who committed sex offenses…. What distinguishes legislative attitudes
> towards sexual offending from attitudes towards other offenses is the
> assumption that people who commit such offenses are irredeemable and
> forever dangerous.

Buhl Decl., Ex. 22, ¶6. Judge Buhl's insight is consistent with the research. *See* Socia

Rept., Ex. 9A, ¶¶17–26 (no amount of information changes the public's view).

405.   Legislative discussions about SORA occur in a climate of loathing—the

belief that the public wants registrants to be shut out of society forever. Because "sex

offenders" are reviled and politicians cannot afford to "look soft on crime," legis-

lators disregard the scientific research about registries and sexual offending. Weis-

berg Decl., Ex. 21, ¶¶5, 11–29; Irwin Decl., Ex. 23, ¶¶5–7, 12.

406.  For two decades, repeated efforts to make SORA evidence-based have

failed despite the pressure of the *Does I* and *II* litigation. Weisberg Decl., Ex. 21,

¶¶5, 11–29. As State Senator Jeff Irwin says, "It is impossible, or next to impossible,

to address the problems with the … registry through the legislative process [because]

[t]he issue is just so toxic and so misunderstood." Irwin Decl., Ex. 23, ¶15. Judge

William Buhl notes that while many legislators "recognize that [the] registry is a

failed law," "reform to address the problems … is unlikely or even impossible." Buhl

Decl., Ex. 22, ¶¶4–5.

407.  The registry itself puts the state's imprimatur on the false notion that all registrants remain dangerous for decades or forever. Buhl Decl., Ex. 22, ¶7. The existence of the registry thus creates a vicious circle: it reinforces the public's hatred of registrants, making it ever harder for politicians to bring the registry in line with evidence-based research. Weisberg Decl., Ex. 21, ¶6. Anything that can be seen as "lessening the restrictions [on registrants], or reducing their punishment, is considered by most legislators to be political suicide." Buhl Decl., Ex. 22, ¶11.

408.  On the flip side, championing laws to get even tougher on "sex offenders" is something politicians are happy to put in their campaign ads. Bill after bill has been passed to increase restrictions on registrants. Irwin Decl., Ex. 23, ¶¶7, 9; Buhl Decl., Ex. 22, ¶¶8–12; Weisberg Decl., Ex. 21, ¶¶7, 30. "Nothing is a safer bet [politically] than demonizing sex offenders." Buhl Decl., Ex. 22, ¶14. *See also* Fitzgerald Dep., Ex. 72, at 43 (former MSP commander of governmental affairs describing "perceived political backlash" if politicians undertake SORA reform).

409.  This animosity can also be seen by the legislative "carve-out" provisions in laws designed to reduce the impact of criminal sentencing or to adopt evidence-based practices—for everyone except registrants. Buhl Decl., Ex. 22, ¶¶11, 15; Irwin Decl., Ex. 23, ¶8; Levine Rept., Ex. 15, ¶¶19–24. "The normal rules do not apply to [registrants]." Weisberg Decl., Ex. 21, ¶10.

136

410. SORA is complex. Many legislators have little idea how it works, how much it costs, or even how many people are on the registry. They are shocked to learn its size. But even when provided with information about SORA's ineffectiveness, cost, and harms, legislators are still unwilling to take the political risks. Weisberg Decl., Ex. 21, ¶21; Buhl Decl., Ex. 22, ¶14.

411. Rather, many legislators hope *courts* will fix the problems with the registry; some privately express support for the *Does* litigation. Buhl Decl., Ex. 22, ¶13; Weisberg Decl., Ex. 21, ¶¶7, 30, 51; Irwin Decl., Ex. 23, ¶10 (legislators understand the law needs to be reformed, "but they don't want to have to vote on it").

412. SORA is different from other laws, both in how it was developed and how it has been amended. The facts don't matter. Because registrants are reviled and lack political clout, legislators see only a downside in reforming the law, and don't want to address it, even if they understand that it is ineffective or counterproductive. Weisberg Decl., Ex. 21, ¶¶8, 70; Irwin Decl., Ex. 23, ¶¶11–12; Buhl Decl., Ex. 22, ¶16.

413. Even after the *Does I* decisions held major parts of SORA to be unconstitutional, unlike what typically happens in Lansing when courts strike down a law, for years the legislature did not amend SORA, but just kept enforcing it. Buhl Decl., Ex. 22, ¶17; Weisberg Decl., Ex. 21, ¶¶31–32; Fitzgerald Dep., Ex. 72, at 18, 20–23.

414. The structure of SORA is aberrational because it imposes extensive burdens

and ongoing supervision on a highly disfavored class of people, without any individual review. As the ACLU's Political Director said after two decades working in Lansing: "There is literally nothing else like it." Weisberg Decl., Ex. 21, ¶8. SORA is aberrant because it requires lifetime supervision without any individual assessment ever. By contrast, there is individual review when criminal punishment is imposed, when parental rights are restricted or terminated, when gun purchases and driver's licenses are limited, and when restrictions are imposed based on mental health problems. Weisberg Decl., Ex. 21, ¶¶8, 71–72. *See also* Levine Rept., Ex. 15, ¶¶11, 26–29 (contrasting criminal sentencing and parole with the registry).

415.  Although SORA's purported purpose is to prevent recidivism, MSP has never tracked registrants' recidivism rates or SORA's impact on recidivism. Michigan passed SORA 2021 without studying the registry's impact even though it had the data to do so. Defs' Resp. to Pls' 2d RTAs, Ex. 83 (neither MSP nor Governor's Office has analyzed SORA to see if it reduces recidivism); Defs' Resp. to Pls' 1st RFP, Ex. 81, ¶6 (producing no evaluations of registry); Levine Rept., Ex. 15, ¶8 (Michigan appears never to have analyzed the registry's effectiveness or cost); *Does I*, JSOF, Ex. 136, at ¶210.

416.  Experts on registries and recidivism do not understand why states like Michigan retain outdated SOR laws instead of adopting effective, evidence-based approaches. Prescott Rept., Ex. 8, at 3; Letourneau Rept., Ex. 7, at ¶¶11, 22–23.

417.  Michigan's law remains rooted in the legislative animosity toward registrants that fueled SORA's creation 25 years ago, and that today imposes high costs on registrants, their families, and taxpayers without any public safety benefit. Levine Rept., Ex. 15, ¶¶10, 29.

## I. Registration Is Intertwined With the Criminal Justice Process and Is Central to Plea Negotiations

### 1. *Registration Occurs as Part of Sentencing*

418.  A judge cannot sentence a defendant unless the defendant has been registered. M.C.L. §28.724(5). The State Court Administrative Office (SCAO) judgment of sentence form contains a checkbox to show that registration has been completed. Judg. of Sentence Form CC 219b, Ex. 125, Box 3. Depending on the circumstances, responsibility for initial registration can lie with MSP, MDOC, probation/parole agents, sheriffs' departments, probate courts, or other entities. M.C.L. §28.724.

### 2. *Registration Is Central to Plea Negotiations in Sex Offense Cases*

419.  Because registration has severe consequences that last long after any probation or jail/prison sentence is over, whether a conviction will result in registration is a key factor for people charged with sex-related crimes in deciding whether to plead guilty. That decision often turns on whether the defendant will have to register, for how long, and whether the registrant's information will be posted online. Chartier Rept., Ex. 18, ¶¶4, 13–22; Yantus Rept., Ex. 16, ¶¶4–11; Defs' Resp. to RTAs, Ex. 82, ¶66. Defendants admit this. Beatty Dep., Ex. 71, at 252–53 (MSP Legal Advisor

139

testifying that sex offender registration can be central to plea negotiations).

420. The severity of registration makes it a strong bargaining chip for prosecutors, who are trained to leverage it in negotiations. Conversely, defense attorneys bargain to avoid it. *Does I*, JSOF, Ex. 136, ¶¶1034-47.

421. People charged with sex offenses sometimes opt to plead guilty if they can be assured that they will not be subject to lifetime registration. Even people who profess their innocence are sometimes willing to plead guilty and accept a sentence of incarceration if they can avoid registration. Chartier Rept., Ex. 18, ¶¶17–20.

422. Defense attorneys cannot provide accurate information about registration consequences when advising clients about plea decisions because no one can predict what registry requirements the legislature might retroactively impose in the future. Because the legislature has repeatedly changed the requirements retroactively, people who pled guilty before such amendments did not and could not understand the consequences of their decision to plead guilty. *Id.*, ¶¶5, 21–22.

423. When Doe A pled guilty in 1991 and Doe E pled guilty in 1994, there was no registry. They had no notice that as result of their pleas, they would later become subject to lifetime registration and to all the burdens that SORA 2021 imposes. Am. Compl., R. 108, ¶¶619, 794. Similarly, when Does B, C, D, and Mary Roe pled guilty, their decisions to enter pleas were premised on the belief that they would be subject to registration for no more than 25 years. They had no notice that, as a result

140

of their pleas, they would later retroactively become subject to lifetime registration and all the burdens that SORA 2021 imposes. Rather, these Plaintiffs made their decisions to plead based on the then-extant version of SORA, pursuant to which they were to come off the registry after 25 years. *Id.*, ¶¶620, 795.

424.  These Plaintiffs, and others similarly situated, had no notice at the time they pled that a consequence of their plea would be lifetime sex offender registration. They did not and could not make informed decisions. *Id.*, ¶621; *id.*, ¶34 (had Doe A known that a kidnapping conviction would result in registration, he would have gone to trial or tried to bargain for an alternate disposition that would not have led to registration); BP Decl., Ex. 42, ¶2 (pled no contest to charges only under the belief that he would be required to register for 25 years); KM Decl., Ex. 38, ¶3 (had he known that he would become subject to lifetime sex offender registration, he would have gone to trial, rather than pleading guilty); ES Decl., Ex. 48, ¶3 (same); DK Decl., Ex. 33, ¶2 (same); DM Decl., Ex. 36, ¶2 (same).

**J. SORA Costs Millions**

425.  The annual cost of Michigan's registry is at least $10 to $11 million and may be as high as $16 to $17 million. This reflects $2 million per year for the SOR Unit plus annual incarceration costs for SORA violations, which are at least $7.6 million and may exceed $14.3 million. Levine Rept., Ex. 15, ¶¶15, 17; 34–40, 60–76.

426.  The $10-17 million estimated annual cost of the registry does not include:

(a) the costs associated with the administration, registration, investigation, and enforcement of SORA at the local level in 83 counties;

(b) the unknown sums spent on MSP's SOR Enforcement Unit and MSP's involvement in enforcement efforts;

(c) the costs of parole and probation supervision, or the cost of incarcerating people on automatic parole and probation revocations that are *mandatory* for SORA compliance violations, and

(d) the costs of prosecuting registry violations, costs to the judiciary, or other SORA-related litigation costs. [*Id.*, ¶¶15, 17, 76.]

427.  SORA's unknown costs to local registering authorities are likely significant, given that some 35,000 in-community registrants must report, most at least four times per year, and given the local efforts to monitor compliance (e.g., sweeps). The costs to the MDOC and local jails for registry reporting and administration—which are in addition to incarceration costs—are also unknown. Similarly, the costs to the judicial system are unknown, but likely significant. Each of the 880-1,000 SORA violations annually involves a court case that must be investigated by police, charged by a prosecutor, defended by defense counsel, and litigated—followed by a pre-sentence report, sentencing, and possible appeal. *Id.*, ¶¶14, 38–40, 58.

428.  Estimates of registry costs also do not consider lost wages or lost taxes as a result of the difficulty registrants have in finding employment, Zgoba Rept., Ex. 12, ¶8, or the cost of property values decreasing based on information that registrants live nearby. Letourneau Dep., Ex. 55, at 85.

429.  The Michigan data is consistent with studies from other states which show

that registries cost millions each year in staffing, surveillance, equipment, and maintenance. Letourneau Rept., Ex. 7, ¶¶17–18.

## V.  RETROACTIVE EXTENSION OF REGISTRATION (COUNT II)

430.  The most relevant facts are the same as for the ex post facto claim.

## VI.  LACK OF INDIVIDUALIZED REVIEW (COUNT III)

431.  The most relevant facts are the same as for the ex post facto claim.

## VII.  UNEQUAL OPPORTUNITY TO PETITION (COUNT IV)

432.  The most relevant facts are those set out below and those in Sections IV.B–E regarding the social science, desistance, and conviction-based tiering.

### A. Only a Tiny Fraction of Registrants Can Petition for Removal

433.  SORA allows a small subset of registrants to petition for removal, which they may do only *once* in their lives. Tier I registrants may petition ten years after (the later of) conviction or release from confinement if they (1) have not been convicted of any felony or other registrable offense; (2) have successfully completed supervised release, probation, or parole; and (3) have successfully completed any required sex offender treatment program. M.C.L. §28.728c(1), (12). Tier I registrants comprise only 7% of all registrants. Data Rept., Ex. 4, at ¶¶ 5, 42.

434.  Juveniles can also petition if they meet the same three criteria, but unlike Tier I adults who can petition after ten years, juveniles must be on the registry for

25 years before they can petition.[21] M.C.L. §28.728c(2), (13). All other registrants

cannot petition for removal, regardless of the offense circumstances, passage of time,

rehabilitation or incapacitation.[22] M.C.L. §28.728c.

## B. There Are No Material Differences Between Petition-Eligible Registrants and the Barred-from-Petitioning Subclass Nor Any Reason to Treat Them Differently

435.  Registrants in Tiers II and III are barred from petitioning based on their tier

level. But tier classifications are inversely correlated to recidivism risk. Most regis-

trants cross the desistance threshold after ten years offense-free in the community

(the same threshold set for Tier I adults to petition). *See* Sections IV.C–D, *supra*.

436.  Like petition-eligible registrants, Plaintiffs John A, C, E, F, G, Mary Doe,

and Mary Roe and the barred-from-petitioning subclass have (1) had more than ten

years elapse since conviction/release; (2) have not been convicted of any felony or

other registrable offense; and (3) have successfully completed supervised release,

---

[21] Juveniles are required to register if they were 14 or older at the time of the offense, and if the adjudication is for an offense that, if committed by an adult, would classify the juvenile as a Tier III registrant. M.C.L. §28.722(a)(iii).

[22] Technically, people can "petition" for removal if they are erroneously listed on the registry even though their offense is non-registrable because it (a) falls within one of the consent-based exceptions, M.C.L. §§28.722(t)(v), (t)(vi), (t)(x), (v)(iv), 28.728c(3), (14); (b) the registrant was adjudicated as a juvenile and was less than 14 years old, M.C.L. §28.728c(15)(a); or (c) the person was registered before July 1, 2011, for an offense that no longer requires registration, M.C.L. §28.728c(15)(b). Such people **are not** subject to SORA. M.C.L. §§28.722, 28.723. They may petition to correct an erroneous registration, and SORA mandates their removal. M.C.L. §§28.722(t)(v), (t)(vi), (t)(x), (v)(iv), 28.728c(3), (14)–(15). The issue here is whether people who **are** subject to SORA may seek discretionary relief.

144

probation, or parole, as well as any required sex offender treatment. Am. Compl., R.

108, ¶762; Chartier Rept., Ex. 18, ¶58 (people who meet the petitioning criteria but

are Tier II or III are no different from eligible Tier I people because they successfully

completed their sentences and have been living in the community for years).

437.  Michigan courts have a well-established procedure for considering petitions

for removal from the registry. M.C.L. §28.728c.[23] To grant a petition, the court must

find that the person is not a continuing threat to the public. The court must consider

the *person's* age and level of maturity at the time of the offense, the *victim's* age and

level of maturity at the time of the offense, the nature of the offense, the severity of

the offense, the person's juvenile or criminal history, the person's likelihood to com-

mit further registrable offenses; any impact statement submitted by the victim, and

other information considered relevant by the court. M.C.L. §28.728c(11).

438.  If Does A, C, E, F, G, Mary Doe, and Mary Roe had the opportunity to

petition for removal, there is a high likelihood that they would be able to establish

that ongoing registration is not warranted in their cases. If members of the barred-

from-petitioning subclass had the opportunity to petition for removal, there is a high

likelihood that a significant number of them would be able to establish that ongoing

registration is not warranted in their cases. Am. Compl., R. 108, ¶¶770–71; *see*

---

[23] *See* Petition to Discontinue Sex Offender Registration, Form MC 406a, Ex.
126; Order on Petition to Discontinue Sex Offender Registration, Form MC 406b,
Ex. 127.

*generally* Data Rept., Ex. 4; Hanson Rept. Ex. 5; Ulrich Rept., Ex. 13.

439. Allowing petitioning by the barred-from-petitioning subclass would not prevent the federal government from finding that Michigan is in "substantial compliance" with SORNA. *See* DOJ Office of Justice Programs, SORNA Substantial Implementation Checklist, at 19, https://bit.ly/33YYjOo (allowing jurisdictions to explain why petitioning removal provisions differ from those suggested in SORNA).

## VIII.  COMPELLED SPEECH (COUNT V)

440.  The most relevant facts are set out below. Other relevant facts include those about law enforcement not needing the registry (Section IV.B.6), the digital age (Section IV.F), reporting (Section IV.G.1), and internet reporting (Section XIII).

### A. SORA 2021 Compels Speech by Requiring Registrants to Provide Information to Support the State's Message that They Are Dangerous

441.  Michigan's online registry conveys a highly-stigmatizing and widely disseminated message that registrants are dangerous sex offenders whom the public should fear. Michigan Sex Offender Registry, https://mspsor.com; Lageson Rept., Ex. 11, ¶¶42–43; Registry Screenshots, Ex. 120, at 1–2.

442.  The online registry is based on and displays information reported by or obtained from registrants, including a current photo. M.C.L. §28.278(2). Registrants are compelled under threat of criminal prosecution to contribute to the state's message that they are dangerous sex offenders by providing that information, by verifying that information four/two/one times a year depending on tier, and by reporting

146

specified changes within three days. *See* Section IV.E.1, *supra*.

443.  Plaintiffs and class members vehemently disagree with the message that the government broadcasts about them. Am. Compl., R. 108, ¶386. Doe A and the non-sex-offense subclass vehemently disagree not just with the government's message that they are dangerous sex offenders, but also with the government's false portrayal of them as people who were convicted of sex offenses. *Id.*, ¶778.

444. SORA 2021 forces Plaintiffs and class members to say that they are sex offenders—something they typically have to do in a busy police station lobby where they can be heard by others. Am. Compl., R. 108, ¶379 (reporting in a busy police station humiliating for Doe B); *id.*, ¶380 (Doe C doesn't want others in police lobby to her him say he's a "sex offender"); *id.*, ¶385 (Ms. Doe must speak loudly through bulletproof glass, allowing other people to hear her say she is a "sex offender"); *id.* ¶381 (Doe D embarrassed to register in crowded public lobby); *id.*, ¶382 (similar for Doe E); HM Decl., Ex. 35, ¶¶4–5 (providing information for use on the online registry forces him to support a message with which he strongly disagrees).

445.  The online registry posts registrants' current photos. M.C.L. §28.728(2)(i). TR explained that he is "forced to maintain a current photo ID on file which presents me as a current danger for a crime that is over 30 years old...." TR Decl., Ex. 44, ¶8. KM Decl., Ex. 38, ¶5 (offended as a teenager but current picture on website makes it look like he committed a recent crime); AJ Dep., Ex. 64, at 45 (same).

147

446.  By requiring frequent, time-consuming, and humiliating reporting to law enforcement, SORA's compelled disclosure requirements also restrict registrants' autonomy. *See* Section IV.G.1, *supra.*

## B. The State Already Has Most Information Registrants Must Provide

447.  The vast majority of information that registrants are compelled to provide about themselves is already available to law enforcement through other databases and investigative tools. Section IV.B.6, *supra* (registry not needed by law enforcement because the information is otherwise available); Defs' Resp. to RTAs, Ex. 82, ¶¶71, 73. *Cf. Does II*, No. 16-cv-13137, R. 130, ¶2.a (using postal service records to obtain registrants' addresses for class notice).

448.  The contract for the MSOR database provides for twelve different interfaces for data exchange between the registry database and other databases. Those include the Law Enforcement Information Network, Secretary of State, Michigan Cashiering and Receiving System (for billing registrants), Michigan's Statewide Network Agency Photos, MDOC, Michigan Department of Health and Human Services, the Michigan State Management Record Systems, the Federal Bureau of Prisons, Immigrations and Customs Enforcement, and other MSP databases (e.g., criminal history). Contract, Ex. 91, at 42, 48-54. *See also* MSOR System Interfaces, Ex. 92 (also showing interface with Michigan Department of Licensing and Regulatory Affairs); SOR Op. 319, Ex. 107 (LEIN interface).

449. MSP SOR Unit staff admit, where MSP can use an interface with another state database to obtain registry information, registrants wouldn't need to report it. Morris Dep., Ex. 78, at 84–86. For example, the MSOR database contract provided that Coplogic would create an interface so that vehicle registration data filed with the Secretary of State could be populated directly into the SOR database. Contract, Ex. 91, at 52. That capacity was not created. Morris Dep., Ex. 78, at 76, 79–80, 113.

## IX. VIOLATION OF PLEA AGREEMENTS (COUNT VI)

450. The facts most central to this claim are set out in Section IV.I, *supra*. Other relevant facts include those set are under the ex post facto claim (Section IV above).

## X. NON-SEX OFFENSE CLAIM (COUNT VII)

451. The facts most relevant to this claim are set out below. Other relevant facts include those about Doe A (¶¶3-8), the *Lymon* litigation (Section III.G), the impact of the digital age (Section IV.F), and the burdens of SORA (Section IV.G).

### A. People Not Convicted of Sex Offenses Are Branded as Sex Offenders

452. Doe A and members of the non-sex offense subclass were not convicted of sex offenses. Am. Compl., R. 108, ¶803. SORA requires people convicted of certain non-sex offenses, including Doe A and the non-sex offense subclass, to register as sex offenders. M.C.L. §28.722(r)(iii), (r)(x), (v)(ii), v(iii), (v)(vii).[24] There has never

---

[24] Offenses without a sexual element that require registration include kidnapping (M.C.L. §750.349, other than convictions for violating M.C.L. §750.349(1)(c) or M.C.L. §750.349(1)(f))); unlawful imprisonment (M.C.L. §750.349b); leading away of child under 14 (M.C.L. §750.350); or a comparable out-of-state offense.

been a judicial or other due process hearing where it was found that Doe A or the non-sex offense subclass committed offenses that were sexual in nature. Defs' Resp. to RTAs, Ex. 82, ¶85; Am. Compl., R. 108, ¶804; Beatty Dep., Ex. 71, at 244–45.

453.  The online registry publicly and inaccurately labels members of the subclass as "convicted sex offenders" even though they were never convicted of a sex offense. Registry Screenshots, Ex. 120, at 1–2; Am. Compl., R. 108, ¶¶39, 517; DM Decl., Ex. 36, ¶4; RH 2 Decl., Ex. 31, ¶5.

454.  People required to register for non-sex offenses are subject to all the same duties, disabilities, and restraints as other registrants. Obligations Summary, Ex. 1. In addition, the mislabeling of their offenses as sex crimes adds another layer of social ostracization. They are accused of dishonesty when they say they did not commit a sexual offense, painting them as sex offenders *and* liars. RH 2 Decl., Ex. 31, ¶¶5, 10 ("when I attempt to explain my situation—that my crime was not sexual—I am treated like a liar and a sex offender"); *see* DM Decl., Ex. 36, ¶4.

## B. Defendants' Temporary Removal from the Registry of Some Non-Sex Offense Subclass Members Pending a Supreme Court Decision

455.  As noted above, in *Lymon*, 993 N.W.2d 24, the Michigan Court of Appeals held that requiring a person who was not convicted of a sex offense to register is cruel or unusual punishment in violation of Mich. Const. 1963, art. 1, §16. Defendants responded to that decision in two ways. First, MSP filed an amicus brief in the Michigan Supreme Court urging the court to grant leave. *See People v. Lymon*, No.

164685 (Mich. Sup. Ct.), MSP Amicus Brf (10/21/22). After the court did so, MSP filed another brief urging the court to hold that it is not punishment to register non-sex offenders as sex offenders. *Id.*, 2d MSP Amicus Brf (6/20/23).

456.  Second, due to risk management concerns, MSP temporarily removed some registrants with non-sex offense convictions pending the Michigan Supreme Court's decision in *Lymon*. A small "internal ad hoc" group of attorneys from the MSP and Attorney General's made this decision. Beatty Dep., Ex. 71, at 235–39, 245.

457.  MSP interpreted *Lymon* as permitting registration for a non-sex offense if a *prosecutor* unilaterally decides, based on the alleged underlying facts, that there was a sexual component to the offense. The MSP developed a process that allowed prosecutors to decide whether a person with a Michigan non-sex offense must register. Procedure for *Lymon* Removals, Ex. 132; *Lymon* Cheat Sheet, Ex. 133; *Lymon* Prosecutor Letter, Ex. 128; Defs' Resp. to Pls' 1st RTAs, Ex. 82, ¶85. Under MSP's process there is no *judicial* determination of whether there was a sexual component to the offense. Beatty Dep., Ex. 71, at 244–45; Defs' Resp. to RTAs, Ex. 83, ¶85.

458.  MSP identified people registered solely based on a Michigan non-sex offense, and then wrote to prosecutors in the convicting jurisdiction, asking the prosecutor to decide whether the person should be required to register based on the prosecutor's assessment of whether the underlying offense conduct had a sexual component. The letter asked prosecutors to decide within 90 days if the person must

151

register. *Lymon* Prosecutor Letter, Ex. 128; Beatty Dep., Ex. 71, at 235–37; 244–45; Morris Dep., Ex. 78, at 160–64.

459.  MSP's process did not apply to, and MSP did not remove, people subject to Michigan's SORA based on convictions for non-sex offenses in other jurisdictions, all of whom remain on the registry. Defs' Resp. to Pls' 1st RTAs, Ex. 80, ¶86; Beatty Dep., Ex. 71, at 239–40; Morris Dep., Ex. 78, at 162.

460.  MSP removed about 152 registrants with Michigan non-sex offense convictions based either on the prosecutor's response, the prosecutor's failure to respond, or a judicial order. Elbakr Decl., Ex. 24, ¶¶7–12. Thus, of approximately 298 members of the non-Sex Offense Subclass, about 146 remain on the registry.[25] Data Rept., Ex. 4, ¶24.d.

461.  With respect to the removed registrants, MSP's position is "that doesn't mean they don't have an obligation to register…. [A prosecutor] can still go after the individual" if the prosecutor thinks they must register. Beatty Dep., Ex. 71, at 237; *see also id.* at 248–49. MSP sent registrants who were removed a letter stating that they were being removed from the registry until "a determination is made … whether you still have registration obligations in light of the *Lymon* opinion." The letter stated that the local prosecutor or police could still tell them to register:

---

[25] Defendants' numbers are a bit higher, which may reflect data being run on different dates. Selden-Manor Decl., Ex. 145, ¶9 (174 registrants with a non-sex offense remain after the removals).

***<u>This is not a determination that you no longer need to register, verify, or update your information as required by Michigan law, federal law, or another state's law.</u>*** [*Lymon* Registrant Letter, Ex. 131 (original emphasis).]

462.  MSP's Legal Advisor summarized the letter as saying that although the MSP was removing the person from the registry, "that doesn't mean you don't have an obligation to register nor does it mean that you can't be prosecuted for a violation." Beatty Dep., Ex. 71, at 260.

463.  If a local prosecutor decides that a person convicted of non-sex offense should register, MSP will place the person back on the online registry without requiring a judicial determination that the person committed an offense that by its nature constitutes a sexual offense. Defs' Resp. to Pls' 1st RTAs, Ex. 81, ¶85.

464.  If the Michigan Supreme Court reverses in *Lymon*, Defendants will again place people convicted of non-sex offenses on the registry. Beatty Dep., Ex. 71, at 265–67; Defs' Resp. to Pls' 1st RTAs, Ex. 81, ¶87; RH 2 Decl., Ex. 31, ¶4.

## XI.  VAGUENESS (COUNT VIII)

465.  The most relevant facts are below. Other relevant facts include those about SORA's burdens (Section IV.G) and internet reporting (Section XIII).

### A. Neither Registrants Nor Law Enforcement Understand SORA

466.  Registrants report that many requirements are so complex and vague that they don't know if or when they are violating SORA 2021. Registrants fear they will do something forbidden or not do something required. When uncertain, registrants

153

limit their conduct by self-policing (refraining from lawful activity like travel and internet use) and over-report to avoid mistakes. Am. Compl., R. 108, ¶¶531–72; Doe G Dep., Ex. 60, at 56; BP Decl., Ex. 42, ¶8; JS Decl., Ex. 45, ¶8; PF Decl., Ex. 29, ¶¶3, 7; WC Decl., Ex. 28, ¶¶9–10; Chartier Rept., Ex. 18, ¶¶36–37.

467. Law enforcement, too, is confused. To assess whether those who enforce SORA understand its requirements, the ACLU's in-house investigator conducted a survey of 34 law enforcement agencies asking questions about registrants' reporting obligations. Law Enforcement Survey, Ex. 20, at 1–6. The responding agencies gave widely varying answers to the same questions. Whether asked about reporting cars, travel plans, or temporary phones, some police agencies answered that such information was reportable, others said it was not, others did not or could not answer, and still others suggested that the caller contact someone else. *Id.*, 11–16. There was not a single survey question that was answered the same way by all agencies. *Id.*, 3.

468. MSP's Legal Advisor, SOR Unit manager, and SOR enforcement coordinator provided different answers when asked about what is and isn't reportable, as summarized in the MSP Response Chart, Ex. 3. In Requests to Admit, Plaintiffs also asked Defendants to clarify what reporting is required, but Defendants declined to answer. Defs' Resp. to RTAs, Ex. 82, ¶¶13–31, 92–93.

**B. Confusion as to Reporting Requirements**

469. **<u>Employment</u>**: Registrants must report employment. Any changes must be

reported *in person* within three business days. M.C.L. §§28.727(1)(f); 28.725(1)(b).

470. Registrants do not know what they must report. For example, M.C.L. §28.725(1)(b) requires in-person three-day reporting if "the individual changes his or her place of employment…." Plaintiffs cannot and do not know, when they are assigned to a different work site or field office for just a day, or a week, if they must immediately report the "change" in their "place of employment." Am. Compl., R. 108, ¶546; AS Decl., Ex. 46, ¶5; PF Decl., Ex. 29, ¶7.

471. When Doe C gets assigned to work sites other than his primary site, he does not know if he must report every different site. Doe C Dep., Ex. 57, at 42–43. Doe E does not know if he must report his job site, the corporate office address, or both, nor does he know if he must report when covering for a sick coworker in a new location. Am. Compl., R. 108, ¶552. Registrants do not know if they must report work that is briefly discontinued, such as a short-term closure, layoff or strike. *Id.*, ¶547. Doe E was briefly suspended due to a badge error; he didn't know if he needed to report stopping/resuming work. Pls' Resp. to Def. 2nd Rogs, Ex. 84, ¶8. Doe F worked in construction under different subcontractors that required different daily travel routes to job sites. He was unsure what to report, or if he had to report each subcontractor's address. Some worksites had no address. When he asked, the state police told him they did not know. Doe F Dep., Ex. 59, at 42-43.

472. If registrants are employed or self-employed with no fixed address—like in

real estate, building trades, and delivery services—then they "must include" not just "the general areas where [they] work" but also "the normal travel routes taken . . . in the course of [their] employment." M.C.L. §28.727(1)(f). They cannot and do not know what it takes for a series of turns over a series of days to become a mandatory reportable "normal travel route." Am. Compl., R. 108, ¶551. Doe B does not work in a fixed location every day and is unsure if varying his route to work would violate SORA. Doe B Dep., Ex. 56, at 29.

473.  It is unclear if volunteer work is reportable. Am. Compl., R. 108, ¶548. M.C.L. §28.722(d) doesn't define "employer" or "employment," but defines "employee" to mean "an individual who is self-employed or works for any other entity as a full-time or part-time employee, contractual provider, or volunteer, regardless of whether he or she is financially compensated." But M.C.L. §28.727(1)(f) says "employer" "includes any individual who has agreed to hire or contract with the individual for his or her services." MSP has concluded that volunteering is reportable, as reflected in the Explanation of Duties, but provides no guidance on what volunteer work is reportable. EOD Form, Ex. 87, §6.b.

474.  Plaintiffs do not know, when they shovel a neighbor's walk or mow the neighbor's lawn, if they are subject to immediate reporting, and must list the neighbor on the registry. Nor do they know, if the neighbor pays them, if *that* makes a difference. The law is unclear. Am. Compl., R. 108, ¶550.

156

475.  Class member JS volunteers as a way to give back to his community and has also run a religious fellowship group for prisoners. He is unsure if he must report either, and if so, what he must report since he supervises his own work. He has abandoned some volunteer work; the only other safe thing to do would be to over-report, which at his advanced age is more than he can manage. JS Decl., Ex. 45, ¶¶4–6.

476.  Law enforcement is also confused. Survey respondents could not agree if odd jobs, temporary layoffs, volunteer work, or day-to-day worksite changes needed to be reported. Law Enforcement Survey, Ex. 20, at 13–15. MSP's legal advisor, SOR Unit manager, and SOR enforcement coordinator also disagreed on this issue. MSP Response Chart, Ex. 3. One testified that different job sites must be reported; another testified that they did not. They also disagreed about temporary layoffs. Beatty Dep., Ex. 71, at 121–24; Morris Dep., Ex. 78, at 211–12.

477.  **Phones and Cars:** SORA 2021 requires registrants to report all phone numbers "registered to ... or used by the individual," and all vehicles "owned or operated by the individual" or "used by the individual." M.C.L. §§28.725(2)(a), 28.727 (h), (j). These changes require three-day reporting. M.C.L. §28.725(2)(a).

478.  Because there is no time limit in the law, registrants are confused about whether they must report every single phone or vehicle that they have ever used, and how far back in time these requirements apply. Doe F testified:

Q. What do you not understand about it?

157

A. Used by me when? Currently used by me, used by me ever? Do I have to include my childhood phone? You know, when [my fiancé was dying and] I was living in the hospital and the doctors would call our hospital room or I'd have to call down and order her lunch food, because I used the hospital phone do I have to register the hospital? If I was staying at a hotel for the night and I used their phone to call my loved one or her mom to make sure that she was still alive do I have to register the hotel number? If she was unconscious or sleeping and friends texted her phone and I'd respond using her phone do I have to register her number? If I'm coming home from work and my phone dies and I have to borrow my co-worker's phone to let my loved one know that I'm going to be home late do I have to then register his number? Do I have to tell him that if I use his phone I have to register his number?

Doe F. Dep., Ex. 59, at 45–46. *See also* Am. Compl., R. 108, ¶¶533–44; Mary Roe Dep., Ex. 62, at 37; Pls' Resp. to Def. 2nd Rogs, Ex. 84, ¶8.

479.  Doe D is unsure if his camper must be registered; the officer he asked could not tell him. Doe D Dep., Ex. 58, at 34–35. Mary Doe is unsure if she has to report two cars she has used but does not own. Mary Doe Dep., Ex. 61, at 59. Class member ES was unsure if his travel trailer required reporting. When he asked officers, they were unsure but told him to report it to be safe. ES Decl., Ex. 48, ¶¶16–17.

480.  Doe F never borrows a car because he doesn't know if he would have to register it. When working construction, he didn't know if he needed to register equipment he drove just occasionally, or even just once. He declines to drive friends' and family's cars on trips, or to serve as his friends' designated driver, because he does not know whether driving their vehicles one time would have to be reported. If he reports their car, *it would be listed on the online registry*. Am. Compl., R. 108,

158

¶¶542–43. In the past, he had an employer with 30 vehicles; he was unsure if he was required to report them all. Doe F Dep., Ex. 59, at 34, 48–50.

481.  Doe H has registered all four vehicles that his family owns. As with everything having to do with SORA, he errs on the side of caution and limits his behavior to be certain that he is not violating the law. Am. Compl., R. 108, ¶544. *See also* AJ Dep., Ex. 64, at 54 (police told him he does not need to report the car his wife drives).

482.  Law enforcement is just as confused. On how far back the reporting requirements go, the SOR enforcement coordinator testified that every car or phone ever used must be reported. Hoffman Dep., Ex. 73, at 124–25. But MSP's Legal Advisor and SOR Unit manager said only current and future uses need be reported. Beatty Dep., Ex. 71, at 127, 132; Morris Dep., Ex. 78, at 215; MSP Response Chart, Ex. 3.

483.  When surveyed about whether registrants must report a borrowed phone, roughly half of the responding police agencies said yes, and half said no. Law Enforcement Survey, Ex. 20, at 13. *See id*. at 13–15 (reporting similarly inconsistent answers for questions about vehicles). MSP staff, too, provided different answers. MSP Response Chart, Ex. 3. One insisted all phone usage must be reported (including using a friend's phone once), one was unsure, and the third implied temporary usage (like a hotel phone) should be reported, based on the text of the law. Beatty Dep., Ex. 71, at 125–26; Morris Dep., Ex. 78, at 216; Hoffman Dep., Ex. 73, at 126. As to vehicles, two testified that every instance of using a car needs to be reported,

including rentals. Beatty Dep., Ex. 71, at 127–28; Hoffman Dep., Ex. 73, at 125–26, 128–29. A third was unsure. Morris Dep., Ex. 78, at 217.

484. **Addresses and Travel:** Registrants must report the "address where the individual resides or will reside," M.C.L. §28.727(1)(d), with any changes being reported *in person* within three days. M.C.L. §28.725(1)(a). Registrants must also report "The name and address of any place of temporary lodging used *or to be used* by the individual during any period in which the individual is away, *or is expected to be away*, from his or her residence for more than 7 days. Information under this subdivision must include the dates the lodging is used or *to be used*." M.C.L. §28.727 (1)(e) (emphasis added).

485. Plaintiffs cannot and do not know at what point tentative travel plans become a mandatory reporting duty, because the phrases "to be used" or "expected to be away" are so vague. Am. Compl., R. 108, ¶555. The predictable result is that registrants almost never leave home for more than seven days, due to the risk of compliance violations. *See*, *e.g.*, Section IV.G.8, *supra*; JS Decl., Ex. 45, ¶8; PF Decl., Ex. 29, ¶3; BP Decl., Ex. 42, ¶8; WC Decl., Ex. 28, ¶10.

486. M.C.L. §28.725(2)(b) requires three-day reporting if a registrant "intends to temporarily reside at any place other than his or her residence for more than seven days." Again, Plaintiffs cannot and do not know at what point their own vague plans ripen into an immediate reportable "intent." And if their plans change the day before

160

(or after) departure, they cannot and do not know if they must now register their *new* (or abandoned) plans within three business days. Am. Compl., R. 108, ¶556.

487.  The text of the provision is also unclear. Plaintiffs do not know if the law means if they plan to stay in one place for more than seven days or intend not to stay in their primary residence for more than seven days—a big difference. (The issue is whether the "more than seven days" modifies "place" or modifies "residence.") Doe C Dep., Ex. 57, at 36; Doe G Dep., Ex. 60, at 52. Plaintiffs do not know if they must register if they plan to hike part of the Appalachian Trail, or car-tour with unknown nightly stays in different locations. Am. Compl., R. 108, ¶557. When Doe D asked whether he would have to report his temporary lodging if he came back to Michigan on the seventh night after he left, law enforcement told him that they didn't know. Doe D Dep., Ex. 58, at 34. *See also* RH 2 Dep., Ex. 31, ¶12; AC Decl., Ex. 27, ¶12.

488.  When police were surveyed about how many nights a registrant can spend at a partner's house before having to report, the answers were 2, 3, 4, 7, or more than 7 nights. Law Enforcement Survey, Ex. 20, at 18. Asked about whether registrants traveling without firm overnight plans must report every hotel where they stay, some thought no and others yes; they were divided on whether a hotel stay had to be 3 days or 7 days to be reportable, or whether only the first hotel had to be reported. *Id.* at 15; MSP Response Chart, Ex. 3 (different answers about travel reporting).

489.  **<u>Email and the Internet</u>**: To avoid duplication, the facts on internet/email

161

vagueness are consolidated with other related internet issues. *See* Section XIII, *infra*.

490. **Nicknames and Physical Descriptions:** SORA requires registrants to report their "legal name and any aliases, nicknames, ethnic or tribal names, or other names by which the individual is *or has been* known." M.C.L. §28.727(1)(a) (emphasis added). Read literally, this means if classmates once called a person "Slick," or Navy shipmates called the person "Gunner," the registrant must report it. Am. Compl., R. 108, ¶553.

491. Doe F tries to go by his given name to avoid these issues but notes that he cannot control what others call him. Doe F Dep., Ex. 59, at 32–33.

492. Registrants must also provide a "complete physical description." M.C.L. §28.727(1)(o). Plaintiffs do not know what this entails, or whether they can be violated for failing to report tattoos, moles, mastectomies, scars, toupees, or similar descriptors. *Id.* Am. Compl., R. 108, ¶560.

493. **Institutions of Higher Education:** A registrant must report in person within three business days if the registrant "enrolls as a student with an institution of higher education, or enrollment is discontinued," M.C.L. §§28.724a(1)–(2), 28.725 (1)(c), or if "[a]s part of his or her course of studies at an institution of higher education in this state, the individual is present at any other location in this state, another state, a territory or possession of the United States, or the individual discontinues his or her studies at that location." M.C.L. §28.724a(1)(b). *See* M.C.L. §28.724a(3)(b).

SORA 2021 defines "institution of higher education" to mean "1 or more of the following: (i) A public or private community college, college, or university. (ii) A public or private trade, vocational, or occupational school." M.C.L. §28.722(h).

494. Plaintiffs cannot and do not know if they can, without registering, take (for example) cooking classes offered by a restaurant or trade association, carpentry classes offered privately but using a community college's woodshop, or certificate classes, e.g., to get a real estate license. Am. Compl., R. 108, ¶561. Plaintiffs cannot and do not know at what point a series of classes or a program of instruction becomes a "private trade ... school." *Id.*

495. When Doe F did an online MBA, he got contradictory answers from police about reporting it. Doe F Dep., Ex. 59, at 80.

496. Other registrants forego education because the reporting requirements are too confusing for them to understand. Doe C hoped to go back to college, but he hasn't because he is unclear about what the law requires of him. Doe C Dep., Ex. 57, at 15–16. WC wanted to enroll in online computer classes but didn't because the confusing reporting requirements made him fear that he could go back to prison if got something wrong. WC Decl., Ex. 28, ¶9.

497. Law enforcement survey respondents disagreed about whether an online academic course or a local martial arts course are reportable. Law Enforcement Survey, Ex. 20, at 16. Similarly, MSP staff were unsure whether taking a taekwondo

163

class at a community center would trigger reporting requirements. Morris Dep., Ex. 78, at 219–20; Beatty Dep., Ex. 71, at 134.

**C. Registrants Are Unable to Clarify What Their SORA Obligations Are**

498.  MSP has provided only two documents to registrants about what their obligations are under SORA 2021: a notice sent about the new law in March 2021, and a new Explanation of Duties form that is signed at each verification/report. MSP Letter, Ex. 86; EOD Form, Ex. 87. MSP has not created educational materials for registrants. Beatty Dep., Ex. 71, at 115; Morris Dep., Ex. 78, at 195–96

499.  The March letter tried to summarize registrants' duties under SORA 2021, but it was widely viewed as incomprehensible. MSP's MSOR-program trainer described it as "very convoluted" and filled with "legalese." MSOR Training Trans., Ex. 52, at 7. MSP's enforcement coordinator testified that registrants who got the letter did not understand it. Hoffman Dep., Ex. 73, at 28; *see* Poxson Decl., Ex. 138.

500.  Defendants admit that the updated EOD form does not spell out every duty under the statute. Defs' Resp. to Pls' 1st RTAs, Ex. 82, ¶89; *see also* Beatty Dep., Ex. 71, at 116 (noting discrepancies between the EOD form and the statute). The *form* is vague or unclear about the issues noted above (on top of the vagueness of the underlying text of the law). RI-004 Form, Ex. 87.

501.  Registrants' experience has been that when they ask law enforcement about

their reporting obligations, officers often do not know the answer, provide conflict-ing answers, or refer them to others. Am. Compl., R. 108, ¶571; BP Decl., Ex. 42, ¶10; ES Decl., Ex. 48, ¶¶16–17; KM Decl., Ex. 38, ¶11; WC Decl., Ex. 28, ¶9. Doe B was told he no longer had to report certain information but was told the opposite at a later visit. Doe B Dep., Ex. 56, at 63–64. When Doe D asked about a reporting requirement, the officer was unsure. Doe D Dep., Ex. 58, at 31. Doe G got conflicting answers about internet identifiers when he asked. Doe G Dep., Ex. 60, at 56.

502. When Doe F asked whether he needed to report all 30 company-owned vehicles he might drive, the registering officer called the state police for clarification, and then said he would add a note to Doe F's file. But because the note was not part of Doe F's verification receipt, he feared he could still be charged if police stopped him while he was driving a company car. He was also told not to report his different work sites, which he thought conflicted with the law. Doe F Dep., Ex. 59, at 49-51.

503. The law enforcement survey found that most law enforcement agencies were unwilling or unable to answer questions about SORA. Of 34 agencies con-tacted, only eight were willing to answer all of the questions. None of the prosecutors or sheriffs' offices were willing to answer any. Local law enforcement often refers registrants to MSP's SOR Unit. Law Enforcement Survey, Ex. 20, at 3, 6–11. But MSP does not answer questions about registry obligations; it views that as legal advice. Beatty Dep., Ex. 71, at 93; Morris Dep., Ex. 78, at 271.

165

504.  MSP has not drafted regulations, issued written guidance, or offered training to law enforcement on how SORA 2021 should be interpreted. Beatty Dep., Ex. 71, at 94, 114; Hoffman Dep., Ex. 73, at 35–36. Nor is there a centralized place for law enforcement to get answers about what SORA requires, or a manual of enforcement guidelines. Morris Dep., Ex. 78, at 47–49, 197–202. MSP does not provide a "Frequently Asked Questions" document for registrants, though it has one for registry *users* (addressing questions like how to track registrants). SORA FAQ, Ex. 121.

505.  When registrants are uncertain about what SORA means, many err on the side of caution. Rather than risk prosecution for a possible violation, they self-police by assuming the worst to avoid any chance they will be accused of wrongdoing and sent to prison. *See*, *e.g.*, Pls' Resp. to Defs' 2nd Rogs, Ex. 84, ¶8; ES Decl., Ex. 48, ¶16; Doe G Dep., Ex. 60, at 56–57. As a result, the statute's vagueness has an outsized *limiting* effect on registrants' behavior. Am. Compl., R. 108, ¶572.

## XII.  COMPELLED STATEMENT OF UNDERSTANDING (COUNT IX)

506.  The most relevant facts are those set out below, and those related to the vagueness claim (Section XI, *supra*). Other relevant facts include those on reporting (Sections IV.G.1, *supra*), and those on compelled speech (Section XIII, *infra*).

### A. Registrants Are Compelled to State that They Understand SORA

507.  The *Does I* and *Does II* courts held that strict liability for SORA violations is unconstitutional. *Does I*, 834 F.3d at 698, 706; *Does II,* Am. Final J., R. 126, ¶4(a).

SORA 2021 now requires that registry violations be "willful." M.C.L. §28.729.

508.  After SORA 2021 passed, MSP revised the Explanation of Duties form to require registrants to attest: "I have read the above requirements and/or had them read to me and I **understand** my registration duties." EOD Form, Ex. 87 (emphasis added). The EOD forms used before 2021 did not require registrants to attest that they understood SORA. Pre-2021 EOD Form, Ex. 87. The MSOR trainer said, "We want all of these guys to sign new registrations and verifications. We need something to show that they are signing that, "yup I'm down with being grandfathered under the new law." MSOR Trans., Ex. 52, at14.

509.  The EOD form must be signed at initial registration, at every verification, and when updating information in person. Morris Dep., Ex. 78, at 93–97, 102; Hoffman Dep., Ex. 73, at 114–15. The Mail-in Update Form, Ex. 88, requires a similar attestation of *understanding* SORA. It is a crime for registrants not to sign the EOD. M.C.L. §§28.727(3)–(4), 28.729(3); EOD Form, Ex. 87.

510.  MSP's Legal Advisor testified that the addition of the new language may "have something to do with the requirements that they [prosecutors] would be able to demonstrate a willful violation," and agreed that because "the form would be an expression of a person's understanding" of SORA, "[i]t could be used to demonstrate willfulness." Beatty Dep., Ex. 71, 90–91. The signed form is provided to prosecutors in SORA cases and is used by them to prove compliance violations. SOR Op. 303,

Ex. 99, ¶6.b; Chartier Rept., Ex. 18, ¶60; MSOR Training Trans., Ex. 52, at 28 ("prosecutors really like to have on file an actual registration…").

511.  Many registrants do not understand SORA's requirements. *See* Section XI, *supra*. But they must sign the EOD saying they "understand" SORA or face prosecution. Doe F testified, "I sign it … because I'm going to get in trouble if I don't, and I'll do anything to not get in trouble." Doe F. Dep., Ex. 59, at 85. JS said, "I feel as though I am caught between a rock and hard place: either I don't sign the form and risk arrest, or I perjure myself and affix a false confession signature." JS Decl., Ex. 45, ¶4. KW Decl., Ex. 50, ¶5 (caregiver for a cognitively impaired registrant testifying that ward does not have the capacity to understand SORA, yet must sign the form, saying that he does); PF Decl., Ex. 29, ¶7 ("Even though I am signing the form saying I understand it, I actually do not. I sign it because if I do not, there is a penalty, and they won't record me as compliant."); AJ Decl., Ex. 32, ¶7; ES Decl., Ex. 48, ¶17; AC Decl., Ex. 27, ¶13 (all similar); Chartier Rept., Ex. 18, ¶¶59–63.

512.  Registrants who seek clarification about the form do not get answers. ES Decl., Ex. 48, ¶17 (police trainees handling registration could not explain form); DK Decl., Ex. 33, ¶8 (blind registrant cannot read form; officers reluctant to read it to him and he does not know if entire form read to him).

513.  Registrants also testified that they were required to sign the EOD form, without the form actually being provided. Mary Doe Dep., Ex. 61, at 59 (form not

provided till after she signs); TR Decl., Ex. 44, ¶13 (only given signature page or an electronic signature pad, not the form itself); PF Decl., Ex. 29, ¶7 (once MSP staff couldn't print form and he had to sign a blank sheet of paper). Where digital signature pads are used, registrants may not see what they are signing. Morris Dep., Ex. 78, at 95–96; *see* Hoffman Dep., Ex. 73, at 114–15.

## XIII.   INTERNET REPORTING SPEECH RESTRICTIONS (COUNT X)

514.   The most relevant facts are set out below. Other relevant facts include those on the digital age (Section IV.F), on law enforcement not needing the registry as the information is already available (Section IV.B.6), and on reporting (Section IV.G.1).

### A. SORA 2021 Chills Registrants' Speech and Association

515.   Anyone whose registrable offense occurred after 7/1/2011 must report "all electronic mail addresses and internet identifiers registered to or used by the individual." M.C.L. §28.727(1)(i). Any change must be reported within three business days. M.C.L. §28.725(2)(a). An "internet identifier" means "all designations used for self-identification or routing in internet communications or posting." M.C.L. §28.722(g). In today's internet, "designations used for self-identification" are required for a host of online interactions and transactions. Lageson Rept., Ex. 11, ¶¶83–86.

516.   Under SORA 2011, registrants' email and internet information could not be posted on the online registry. M.C.L. §28.728(3)(e)(2020). That provision was stricken in SORA 2021, which now permits posting of registrants' email and internet

identifiers on the online registry. *Lymon*, 993 N.W.2d at 39 (noting the change).[26]

517.  Among class members living in the community who are required to report email and internet identifiers (i.e., those with an offense date after 7/1/2011), **only 60% reported an email address, and only 24% reported a non-email internet identifier.** By contrast, 93% of adult Americans use the internet. Data Rept., Ex. 4, ¶¶22, 117–18.

518.  Although the internet is central to modern life, registrants fear using it because (1) any use of the internet can trigger a search of their name, with the result that they may be outed as registrants, *see* ¶¶519–31; (2) use of the internet triggers the requirement to report any new internet identifier within three days, M.C.L. §28.725(2)(a); and (3) registrants are confused about what they must report, or when, *see* ¶¶519–31. As a result, registrants' default is to self-limit their internet use to avoid the risk of prosecution. Am. Compl., R. 108, ¶538.

519.  John Doe A rarely uses the internet because he fears that anyone who Googles him would find out that he is on the registry.[27] He worries that people will

---

[26] MSP has not yet posted this information on the public website, Defs' Resp. to RTAs, Ex. 82, ¶3, but just the fact that it now can be published—and may be at any time—is enough to deter registrants from using email and the internet. *See*, *e.g.*, Am. Compl., R. 108, ¶¶504, 829; Lageson Rept., Ex. 11, ¶84.

[27] While the internet reporting requirements no longer apply to pre-2011 registrants, their experiences are included because they show how the reporting requirements previously chilled their use of the internet, and how being listed on the online registry continues to affect their ability to speak and associate with others online.

learn of his status and view him as a liar (if he does not reveal his status up front),

or as a monster (if he does), even though he never committed a sex offense. *Id.*, ¶495.

520.  In the past, Doe B was confused about whether to report internet identifiers,

such as Study Island, which he used to help his son with schoolwork, or sites that

allowed him to keep track of his children's soccer games. He avoided the internet as

much as possible so as not to have to report or risk prison for misunderstanding the

requirements. After the *Does I* settlement, which removed him from the online reg-

istry and eliminated his internet reporting requirement, he began using the internet

more often, including to advertise his real estate services. He is now fearful that

under SORA 2021 his business will suffer or he will have to stop advertising online.

Am. Compl., R. 108, ¶496. He is also unsure if his business website, with different

email addresses attached to it, must be reported. Doe B Dep., Ex. 56, at 31–32.

521.  Historically, Doe C limited his internet use because he was concerned about

registering his email/internet identifiers and about needing to report constantly in

order to use different websites with different usernames. It was safer and easier not

to use the internet. He does not use social media. He is concerned about being

harassed online due to the registry. Am. Compl., R. 108, ¶497. Because the reporting

requirements are confusing, he does not have an email address; he uses his wife's

email to get updates about the *Does III* litigation. Doe C Dep., Ex. 57, at 38–39.

522.  Doe D has restricted his internet use because he would have had to report

within three days every time he created a new internet account. Once he was auto-matically assigned a new account when signing up for a service; to be safe, he went to the registration office within three days to report it. Although he is now no longer required to report identifiers, he is still guarded in using the internet because he fears it will lead to others searching his name and finding out his registry status. For the same reason he does not join online school discussions related to his son's education. Am. Compl., R. 108, ¶498. Doe D Dep., Ex. 58.

523.  Doe E is reluctant to use the internet and does not have a personal social media profile. He has tried not to use any chat or instant messaging functions because that requires creating a screen name, which then triggers a reporting requirement. His father died in December 2017, and Doe E wanted to participate in online grief support, but would have had to register his screen name, so he chose not to partici-pate. Although under SORA 2021, Doe E is no longer required to report identifiers, he still avoids social media because he is afraid that people will learn he is on the registry and harass him for it. Am. Compl., R. 108, ¶499.

524.  After being put on the registry, Doe F stopped using social media. He did not return to it until he started helping leukemia support groups, but he is worried about being outed and having other participants turn against him. *Id.*, ¶500.

525.  Doe G wanted to make political statements and engage in advocacy on LGBT issues online but chose not to because he was unsure about what information

172

he had to report and did not want to register with the police each time he created a new identifier. He has avoided social media and internet websites that require a user-name, and has severely restricted his internet use. He worries about retaliation by the police if he speaks out; he wanted to post about the police coming to his workplace which resulted in his firing, but he was worried that the police could look up his screen name, see those posts, and make his life even more difficult. When he tried to clarify his internet reporting requirements, he received different answers from county police. At their instruction he continues to report his email address, though the law no longer requires it. *Id.*, ¶¶501–03; Doe G Dep., Ex. 60, at 54–57.

526.  When SORA 2021 passed, Doe G feared that his internet IDs and email would be posted on the online registry. He was relieved to learn that, as a pre-2011 registrant, these provisions do not apply to him. But he still avoids the internet because he worries people will search his name, discover he is on the registry, and use that information against him. Am. Compl., R. 108, ¶¶504–05.

527.  Doe H stopped using social media as soon as he was told that he would have to report it. He is never sure about what he must report and when, so it is safer to limit his internet use rather than to risk making a mistake and being prosecuted. He avoids using personal email or online accounts, and instead uses the business email and online names (which he registers) that are less easily linked to him on the internet. He has a computer but doesn't know if the IP address must be reported.

173

He has an iPhone for his business but is unsure if the apps he uses (e.g., mobile banking, WhatsApp) must be reported, or whether he must report each moniker he creates on a gaming app. *Id.*, ¶506; Pls' Resp. to Defs' 2d Rogs, Ex. 84, ¶18.

528.  Ms. Doe has been confused about what she must report and has been unable to get clarity even after seeking legal advice and asking the police about whether she had to register identifiers associated with bank accounts or utility bill payments. She wanted to comment on online news articles (on websites like the Detroit News, Click on Detroit, or Fox), but did not do so because she was uncertain about whether she would need to report the accounts within three days and because she feared that this would enable people to identify her as a registrant. Am. Compl., R. 108, ¶507. While on the online registry, Mary Doe did not use social media because "there were a lot of restrictions to understand and it was just easier for me not to be involved with any of it and just not to have any of it." Mary Doe Dep., Ex. 61, at 80–81. She has used social media but is apprehensive about it because people may find out her registry status and harass her or her family Am. Compl., R. 108, ¶¶508–09.

529.  When Ms. Roe was still a clinical director at a homeless shelter, she did not use social media or do public speaking because she was concerned that she would be outed, and she and her employer harmed. This held her back from advancing professionally. She maintained almost no public presence on social media, using it only with family and friends who already knew of her registrant status. A tech-savvy

174

friend counseled her to create "dummy" positive online pages about herself, so that her registrant status might be pushed further down when she was Googled. When Ms. Roe started in private practice as a therapist, she tried posting an online professional page, but quickly had to take it down because of postings calling her a "pervert" and other disparaging comments. When she came off the online registry under the settlement in the *Roe* case, being able to use social media and participate in online life was liberating for her. *Id.*, ¶¶510–13; Am. Compl., R. 108, ¶96; Mary Roe Dep., Ex. 62, 77–78.

530. KM was reincarcerated twice because he did not understand the internet reporting requirements. The first time, he was jailed for 30 days for failing to register an email address. Shortly thereafter, he was sent to prison for three years because he didn't realize that he was also supposed to report his school email address. KM Decl., Ex. 38, ¶10. WC does not use the internet or social media for lack of knowing what he must report. WC Decl., Ex. 28, ¶9. TR stays off social media to protect himself from harassment. Once, he wanted to join an online support group but decided against it because he did not want information about the account added to his registry file. TR Decl., Ex. 44, ¶18. BP was told by law enforcement that he was required to continue reporting internet identifiers, contrary to the law at the time. BP Decl., Ex. 42, ¶10. DK has received contradictory information about which internet IDs he is required to report. DK Decl., Ex. 33, ¶8.

531.  Registrants cannot speak anonymously online. Am. Compl., R. 108, ¶830.

532.  The law enforcement survey also shows confusion, with respondents unsure or divided about whether IDs for bank accounts, news services, temporary IDs for Zoom meetings, or shared social media pages must be reported. Law Enforcement Survey, Ex. 20, at 151–6. MSP staff too varied in their responses. MSP Response Chart, Ex. 3 (e.g., one was unsure if registrants must report IP addresses, while another noted that the Explanation of Duties form does not require it). Beatty Dep., Ex. 71, at 129–30; Morris Dep., Ex. 78, at 100–01. The MSOR program trainer thought reporting is limited to social media accounts ("your internet identifiers which is Facebook, Myspace, all of those things"). MSOR Training Trans., Ex. 52, at 5.

533.  In response to Requests to Admit, Defendants declined to clarify what internet information must be reported. Defs' Resp. to RTAs, Ex. 82, ¶¶21–31.

## XIV.  NON-MICHIGAN CONVICTION CLAIM (COUNT XI)

534.  The facts most relevant to this claim are set out below. Other relevant facts include those about Mary Doe and Doe G (Section II.A), the digital age (Section IV.F), and the harms of SORA (Section IV.G).

### A. Registration of People with Non-Michigan Convictions Requires Complicated Analysis, Which Is Done by MSP Staff

535.  People in Michigan with convictions from other jurisdictions are required to register in Michigan if (a) the offense is "substantially similar" to a registrable

Michigan offense, M.C.L. §28.722(r)(x); (t)(xiii); (v)(viii);[28] or (b) the "individual

from another state [] is required to register or otherwise be identified as a sex or child

offender or predator under a comparable statute of that state." M.C.L. §28.723(1)(d).

*See also* M.C.L. 28.724(6) (requiring registration, subject to certain time parameters,

if convicted of a listed offense in another state or country, or if "required to be regis-

tered in another state or country regardless of when the conviction was entered").

Determining whether a person with an out-of-state conviction must register, and if

so, in what tier, requires a multi-step legal analysis. Answer, R. 111, ¶635.

536.  MSP unilaterally decides which people with non-Michigan convictions

must register, and what tier levels apply. SORA nowhere delegates specific authority

to MSP to do so. M.C.L. §28.721, *et. seq.* MSP has promulgated no published rules

or procedures for how it makes these decisions. Answer, R. 111, ¶¶637–38.

537.  Discovery showed that SOR Unit staff use flowcharts approved by MSP's

legal department, along with the MSOR database, to determine whether and at what

tier level registrants with non-Michigan convictions must register. Jegla Dep., Ex.

74, at 92–98, 146; Beatty Dep., Ex. 71, at 138–39. The charts below show how MSP

---

[28]  This language appears in the definitions for Tier I, Tier II, and Tier III offenses. In each case, after a list of Michigan offenses that constitute a registrable offense in that tier, there is an additional subsection that includes "[a]n offense substantially similar to an offense described in subparagraphs [reference to Michigan offenses cited above] under a law of the United States that is specifically enumerated in 42 USC 16911, under a law of any state or any country, or under tribal or military law."

177

makes registration determinations for, respectively, adults and juveniles, with non-Michigan adult offenses. MSP Flowcharts, Ex. 106.





538. As the flowcharts show, determining a person's Michigan registration status first requires a determination of whether the foreign offense is "substantially similar" to a Michigan registrable offense, and if so, to which one. People with an offense deemed similar to a Tier III offense are registered for life. If the offense is deemed similar to a Michigan Tier I or II offense, then it is necessary to determine whether the person must register in the convicting jurisdiction, and if so, what that jurisdiction's registration requirements are. MSP Flowcharts, Ex. 106; Beatty Dep., Ex. 71, at 139–40; Answer, R. 111, ¶644.

539. Substantial similarity determinations can also require MSP to decide if a diversion or expungement statute in another jurisdiction is comparable to Michigan's youth diversion and set aside statutes. MSP Emails, Ex. 94; Morris Dep., Ex. 78, at 148; Beatty Dep., Ex. 71, at 209; M.C.L. §28.722(a)(i)–(ii) (providing that adjudications under Michigan's youth diversion statute and convictions that have been set aside do not result in registration.)

540. In addition to the flowcharts, the SOR Unit uses a spreadsheet which lists the tier level MSP has assigned to various non-Michigan offenses. The spreadsheet was created around 2011 when SORA was amended to require tiering. The spreadsheet lists 2,274 out-of-state offenses. For 1,471 an assigned tier is listed. PACC Code Chart, Ex. 97; Jegla Dep., Ex. 74, at 101; Elbakr Decl., Ex. 24, ¶21.

541. The spreadsheet column for "comparable MI code" (what Michigan offense

179

was deemed "substantially similar") is almost entirely blank. Only 43 offenses list a comparable Michigan offense and only 18 offense comparisons show as "approved by MSP legal." PACC Code Chart, Ex. 97; Elbakr Decl., Ex. 24, ¶21.

542.  MSP does not keep a record of which Michigan offenses it considers "substantially similar" to which out-of-state offenses, nor is this information available in the MSOR database. The former SOR Unit manager testified that she did not know how one would figure out which Michigan offense was used to assign a Michigan tier level for any given non-Michigan offense. Morris Dep., Ex. 78, at 153. The current SOR Unit manager and lead analyst did not know if the spreadsheet only lists offenses that were found to be substantially similar to Michigan offenses, or whether it also lists offenses that are not substantially similar but require registration in the convicting state. Selden-Manor Dep., Ex. 76, at 75, 77; Jegla Dep., Ex. 74, at 101.

543.  Information from the spreadsheet is programmed into the MSOR database. When SOR unit staff enter a non-Michigan offense, a tier level and registration duration is automatically assigned if a tier is listed for that offense in the spreadsheet. SOR unit staff use the spreadsheet itself to confirm the tier, or to understand—if the MSOR database is not automatically tiering an offense—whether additional information is needed. Morris Dep., Ex. 78, at 149–51; Jegla Dep., Ex. 74, at 102–05.

**B. Reasonable People Can Differ in Making Similarity Determinations**

544.  Whether a non-Michigan offense is "substantially similar" to a Michigan

180

offense can determine whether a person must register and, if so, at what tier. Answer, R. 111, ¶653. But SORA does not define what it means for an offense to be "substantially similar" to a registrable Michigan conviction. M.C.L. §28.722.

545. A non-Michigan offense may be similar to several different Michigan offenses, where the various Michigan offenses could result in different registration requirements. As MSP's legal advisor conceded, different people can reach different conclusions about whether a given non-Michigan offense is "substantially similar" to a given Michigan offense. Beatty Dep., Ex. 71, at 158, 186, 214–15.

546. Within MSP, staff do not always agree about whether a person with an out-of-state offense must register in Michigan, or what a person's registration tier level should be. Answer, R. 111, ¶651. The same can be true across law enforcement. Chartier Rept., Ex. 18, ¶¶38–40, and Ex. B (federal plea agreement designed to keep human trafficking victim off the registry where AUSA believed conviction would not result in registration, but MSP deemed federal offense "substantially similar" to Michigan offense and required registration).

547. Historically, MSP used students or legal interns to assign tier classifications based on their assessment of which Michigan offense most closely resembled the out-of-state offense. *Does I*, JSOF, Ex. 136, ¶293. SOR Unit staff do not know whether such classifications of out-of-state offenses were reviewed by a lawyer. Nor is there a way to determine which classifications (now programmed into MSOR) were

done by students/interns. Jegla Dep., Ex. 74, at 127.

548.  If the MSOR database does not automatically assign a tier when SOR Unit technicians input a non-Michigan offense, they are instructed to consult a SOR Unit "analyst." Answer, R. 111, ¶647; Jegla Dep., Ex. 74, at 90, 103–04.

549.  In some cases, if a non-Michigan offense has not already been assigned a tier level, SOR Unit staff decide whether the offense is substantially similar to a Michigan offense, and what a person's registration requirements will be. Jegla Dep., Ex. 74, at 14, 89, 116–17, 144–45; Beatty Dep., Ex. 71, at 135–36, 165; Morris Dep., Ex. 78, at 146. No SOR Unit staff have a law degree. Answer, R. 111, ¶648.

550.  In some cases, SOR Unit staff consult with MSP's Legal Department to decide whether out-of-staters must register, and if so, with what requirements. Jegla Dep., Ex. 74, at 104–05, 117, 144–45; Beatty Dep., Ex. 71, at 173; Morris Dep., Ex. 78, at 146; MSP Emails, Ex. 94. MSP's Legal Advisor estimated that he gets up to seven queries a month regarding out-of-state registration but said he would "trust that an intern at the lowest level could look at any statute" and decide whether it is "plainly similar to Michigan's offense." Beatty Dep., Ex. 71, at 188.

## C. People with Non-Michigan Offenses Are Registered Under the Harsher of the Michigan or Non-Michigan Registration Scheme

551.  As the flowcharts above show, if a foreign conviction results in a more lenient registration status in the foreign jurisdiction than in Michigan, then Michigan's harsher registration rules govern. But if Michigan has more lenient registration

requirements, then the foreign jurisdiction's harsher rule governs. MSP Flowcharts, Ex. 106; Jegla Dep., Ex. 74, at 94–97; Beatty Dep., Ex. 71, at 137–38.

552.  There are three ways in which non-Michiganders are treated more harshly. First, the SOR Unit, based on direction from MSP's Legal Department, changed the process around 2022 to require that for "substantially similar" non-Michigan offenses, **"[d]uration requirements should be based on the state of conviction or Michigan, whichever is longer."** SOR Op. Proc. 307, Ex. 101, at 1; SOR Op. Proc. 315, Ex. 105, at 13–15; Jegla Dep., Ex. 74, at 95, 135, 145; Morris Dep., Ex. 78, at 143–44; Beatty Dep., Ex. 71, at 145. For example, if the offense is "substantially similar" to a Michigan 25-year offense, but the convicting state requires a longer period, Michigan will impose the convicting state's longer period. Morris Dep., Ex. 78, at 143. But if the non-Michigan jurisdiction does *not* require registration, MSP will assign Michigan's tier/duration requirements for any foreign conviction that is deemed to be "substantially similar" to a registrable Michigan offense. Jegla Dep., Ex. 74, 95, 147; Beatty Dep., Ex. 71, at 145.

553.  Second, if **an offense would *not* require registration in Michigan, but the offense requires registration in the convicting state, the person must register in Michigan.** MSP Flowcharts, Ex. 106; Jegla Dep., Ex. 74, 94–99; Beatty Dep., Ex. 71, 140–41, 148. For example, an eight-year-old with an out-of-state disposition would have to register in Michigan if the adjudicating state registers eight-year-olds,

even though in Michigan youth must be 14 at the time of the offense to be registered. Similarly, a child adjudicated out-of-state for what in Michigan would be a Tier I or Tier II offense (and hence not registrable for children here) would still have to register if the other jurisdiction considers the offense registrable. Morris Dep., Ex. 78, at 145; *id.*, at 142 (people with indecent exposure convictions—which do not require registration in Michigan absent a minor victim—would be required to register here if they are required to register in the convicting jurisdiction); Beatty Dep., Ex. 71, at 143–44, 146–50 (out-of-staters with pre-1995 offenses must register while Michiganders with such offenses do not).

554.  Even if an act is not a crime in Michigan, the person will be registered here if the convicting state requires registration. Morris Dep., Ex. 78, at 144–45. Age of consent laws, for example, vary. A person required to register in another state for consensual sex with a 17-year-old would have to register in Michigan though the same act is legal in Michigan. Beatty Dep., Ex. 71, at 150–51.

555.  MSP does not monitor other states' registry laws, does not know when other states change their laws, and thus does not remove people with non-Michigan convictions who are no longer subject to registration in their convicting jurisdiction. Jegla Dep., Ex. 74, 132–35 (describing the lack of process for monitoring changes to registry laws or for removal of individuals with out-of-state offenses when laws in the convicting jurisdiction change).

556. Third, in making substantial similarity decisions, MSP **considers *unproven***

**allegations about offense conduct** (e.g., police reports, charges not resulting in con-

viction, and communications from other state registry authorities) instead of consid-

ering only *the elements of the offense* (the "categorical approach"). MSP's Legal

Advisor testified: "what the person did as the offense, that's where we do the analysis

on substantially similar." Beatty Dep., Ex. 71, at 158, 185–94. "[W]e sometimes use

a categorical approach [meaning elements must align], and sometimes we don't."

*Id.*, 189. Answer, R. 111, ¶659; MSP Emails, Ex. 94; Jegla Dep., Ex. 74, at 120 (lead

SOR Unit analyst responsible for such determinations testifying that she did not

know what an element of an offense is); *see also id.* at 89–91, 119–20, 125.

557. If a non-Michigan conviction does not have a sexual component as an ele-

ment of the offense, MSP will still require registration if it concludes that the offense

is substantially similar to a Michigan sexual offense based on alleged but unproven

conduct. MSP Emails, Ex. 94, at 1, 5 (MSP legal staff inferred similarity based on

probation conditions, even though out-of-state offense had no sexual element); Jegla

Dep., Ex. 74, 121–26, Dep. Exs. S, T (relying on allegations rather than elements).

558. SORA spells out which Michigan crimes—defined by specific elements—

result in registration, as well what the length of registration, frequency of reporting,

and internet posting requirements will be. M.C.L. §28.721 *et. seq.* Because MSP

doesn't limit itself to considering offense elements but also looks at unproven allegations, an out-of-stater could be convicted of an offense with elements identical to a Michigan one but be treated worse (registration rather than non-registration, a higher tier level, online rather than law enforcement registry). MSP Emails, Ex. 94. As MSP's Legal Advisor said, for Michigan convictions MSP registers people at the tier level SORA assigns, regardless of any allegation about the offense conduct. For an out-of-state offense, however, if MSP can identify facts—which may just be allegations in a police report—that would support a higher tier level, then "that's where it gets [] listed." Beatty Dep., Ex. 71, at 193.

559.  For example, a man convicted of violating Florida Code §934.215 (unlawful use of a two-way communication device, which *has no sexual element*), had to register in Michigan because MSP determined that the underlying alleged offense *conduct* was similar to M.C.L. §750.145d(1)(a) (an offense that *has a sexual element*). MSP Emails, Ex. 94, at Bates 687–93; *id.* at Bates 674-715 (more examples).

**D. Out-of-Staters Receive Neither Notice nor an Opportunity to Be Heard**

560.  People with non-Michigan convictions get neither notice nor any opportunity to be heard before MSP decides whether the person must register, and if so, what tier level and registration requirements apply. Am. Compl., R. 108, ¶¶833, 835; Beatty Dep., Ex. 71, at 224–27; *see* Morris Dep., Ex. 78, at 108.

561.  The former SOR Unit manager testified that people with non-Michigan

186

convictions do not receive a letter informing them of their tier level. Rather, when they receive the Explanation of Duties form, it states their tier level. Morris Dep., Ex. 78, at 107–08. The EOD does not provide any legal or factual basis for the decision, does not identify the allegedly "substantially similar" offense, and does not provide any information about how to dispute the decision. EOD Form, Ex. 87.

562. MSP has not published any rules about how to contest or appeal MSP's registration decisions for out-of-staters. Beatty Dep., Ex. 71, at 114, 227. SORA contains no appeal process by which they can contest MSP's registry decisions. "[T]here's nothing in the statute that provides for review." *Id.*, at 232.

563. Sometimes people who believe they are incorrectly registered write to MSP. Such complaints are not treated as contested cases under Michigan's Administrative Procedures Act, nor is there an independent decision-maker who reviews the decision. The SOR Unit itself decides whether it made the correct decision, in some cases with assistance from higher-ups in MSP. There is no judicial review of MSP's registration determinations for out-of-staters. Beatty Dep., Ex. 71, at 229–31.

### E. The Examples of Mary Doe and John Doe G

564. **Mary Doe** was convicted in 2003 in Ohio, was found to be in the lowest risk category based on individual review, and was required to register for 10 years. Am. Compl., R. 108, ¶¶680, 682. Because she is no longer subject to registration in

Ohio, she is not subject to registration under M.C.L. §28.723(1)(d) (requiring registration in Michigan if required to register elsewhere). Thus, unless her offense is "substantially similar" to a registrable Michigan offense, she is not subject to registration here. M.C.L. §28.722(r)(x); (t)(xiii); (v)(viii); Beatty Dep., Ex. 71, at 210.

565. Ms. Doe was convicted of unlawful sexual conduct with a minor in violation of Ohio R.C. 2907.04(A) and (B)(3).[29] While there is no Michigan offense with the exact same elements, the most similar offense is M.C.L. §750.520e(1)(a) (criminal sexual conduct in the fourth degree).[30] Am. Compl., R. 108, ¶¶58, 685–87.

566. A conviction under M.C.L. §750.520e(1)(a) is a *Tier II* offense resulting in 25-year registration. M.C.L. §28.722(t)(x). MSP, however, classified Ms. Doe as a *Tier III* registrant who must register for life. MSP never told Ms. Doe which Michigan offense it deemed to be "substantially similar" to her out-of-state offense such that she is required to register for life as a Tier III offender. Answer, R. 111, ¶¶681–90. The SOR Unit spreadsheet lists Ohio R.C. 2907.04 as a Tier III offense; the column for comparable Michigan offenses is blank. PACC Code Chart, Ex. 97.

---

[29] Ohio R.C. 2907.04(A) states: "No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offense is reckless in that regard." Subsection (B)(3) applies where there is an age difference of ten years or more.

[30] CSC-IV is committed when someone who is five or more years older engages in sexual contact with a person between the ages of 13-16. M.C.L. § 750.520e(a).

567.   Even after discovery, Plaintiffs still do not know which Michigan offense the MSP deems "substantially similar" to Ms. Doe's Ohio conviction. MSP's Legal Advisor, SOR Unit manager, and lead analyst were all unable to explain why Ms. Doe is in Tier III or identify the "substantially similar" Michigan offense. Beatty Dep., Ex. 71, at 210–14; Selden-Manor Dep., Ex. 76, at 51–52; Jegla Dep., Ex. 74, p.109–12; Pls' Resp. to Defs' 3d Rogs, Ex. 85, ¶32; Answer, R. 111, ¶¶684–89.

568.   **John Doe G** was convicted in Nebraska in 2008 of violating Neb. Rev. Stat. 28-320.01(3) (third-degree sexual assault of a child). He was told that he would have to register for ten years. More than ten years have passed since his conviction. Am. Compl., R. 108, ¶¶140, 692.

569.   While there is no Michigan offense with the exact same elements as Neb. Rev. Stat. 28-320.01(3),[31] the most similar offense is M.C.L. §750.520e(a) (CSC-IV), which is a *Tier II* offense where, as here, the victim is between the ages of 13 and 18. M.C.L. §28.722(t)(x). MSP, however, classified Doe G as a T*ier III lifetime* registrant. Am. Compl., R. 108, ¶¶140, 696–700. MSP never told Doe G what Michigan Tier III offense it deems "substantially similar" to his Nebraska offense, or whether instead his Tier III classification is based on the MSP's understanding of

---

[31] A person violates Neb. Rev. Stat. 28-320.01(3) by subjecting a person 14 years of age or younger to sexual contact where the actor is at least 19 years of age, and that actor does not cause serious personal injury to the victim.

his status under Nebraska law. Answer, R. 111, ¶¶695, 701. The SOR unit spreadsheet lists Neb. Rev. Stat. 28-320.01 as a Tier III offense. The column for comparable Michigan offense is blank. PACC Code Chart, Ex. 97.

570.  Even after discovery, Plaintiffs still do not know on what basis Doe G is registered, or what (if any) Michigan offense MSP deems "substantially similar" to his Nebraska conviction. Neither MSP's Legal Advisor nor the SOR Unit's lead analyst could explain why Doe G is a Tier III registrant or identify the "substantially similar" Michigan offense. Beatty Dep., Ex. 71, at 216-19; Jegla Dep., Ex. 74, at 112–14; Pls' Resp. to Defs' 3d Rogs, Ex. 85, ¶33; Answer, R. 111, ¶¶696–702.

## XV.  EVIDENCE RESPONSIVE TO DEFENDANTS' EVIDENCE

### A. Criminal Justice Data, Unreported Offending, and the Desistance Analysis

571.  As discussed above, Defendants' experts agree in large part with Plaintiffs' experts' findings. *See* Section IV.C–E, *supra*; Lovell Decl., Ex. 140, ¶¶7a–e; Lovell Dep., Ex. 67, at 70–74, 85–90; Salter Decl., Ex. 142, at 15; Salter Dep., Ex. 69, at 32; Turner Decl., Ex. 143, at 4; Goodman-Williams Dep., Ex. 68, at 81–82, 109–11; Defs' Resp. to RTAs, Ex. 82, ¶44. This includes the desistance analysis:

> Q: But you don't quibble then with [Dr. Hanson's] point that the recidivism rate at the end of 20 years will be comparable to or even lower than the detected rate of sexual offending in the male population or in the population of people who committed a previous offense but not a sex offense?
>
> A: Right. [Turner Dep., Ex. 70, at 133–34].

In addition, they agree that registries are not effective in reducing sexual offending. *Id.* at 74–75.

572.  Defendants' experts also acknowledge that Plaintiffs' experts are preeminent in their field. Salter Dep., Ex. 69, at 82 (Hanson is "one of the top authorities in the field"); Lovell Dep., Ex. 67, at 232–33 (Hanson widely cited); Turner Dep., Ex. 70, at 74-75 (Letourneau, Prescott, and Socia "top authorities" and "widely cited").

573.  Defendants' experts further concede that they do not study sex offender registration. Turner Dep., Ex. 70, at 74–75; Goodwin-Williams Dep., Ex. 68, at 24; Lovell Dep., Ex. 67, at 194; Salter Dep., Ex. 69, at 24, 100, 163.

574.  Defendants' experts' critique is focused on the fact that Plaintiffs' experts rely on official crime statistics. *See generally* Lovell, Goodman-Williams, Salter and Turner Decls., Exs. 140–43.

575.  As Defendants' experts acknowledge, official crime data is widely used by researchers because it is accurate, transparent, and has been collected in much the same way for decades. Hanson, Rept., Ex. 5, ¶¶34, 76; Hanson Rebuttal, Ex. 6, ¶¶32–37, 75; Lovell Dep., Ex. 67, at 74–75, 223 (Bureau of Justice Statistics [BJS] National Crime Victimization Survey is one of the gold standards for crime data); Salter Dep., Ex. 69, at 115–16 (researchers rely on BJS crime data); Goodman-Williams Dep., Ex. 68, at 146–48.

576.  Defendants' experts' concern, however, is that such data cannot capture all

sexual offending that occurs. Lovell, Goodman-Williams, Salter and Turner Decls., Exs. 140–143. That critique—which rests on the undisputed point that not all crime is reported or results in arrest/conviction—is briefly addressed below.

### 1. Criminal Justice Data Does Not Reflect All Crime That Occurs

577. For sexual offenses, as for all crimes, not every offense results in arrest or conviction: more offenses are committed than appear in criminal justice data. Official criminal justice data tracks what is known, not what is unknown, and thus necessarily understates the *actual* number of offenses committed, both by registrants (who have been convicted of sexual offenses in the past) and by non-registrants (who have not). Hanson Rebuttal, Ex. 6, ¶31; Socia Rebuttal, Ex. 10, at 4, 28–29.

578. One reason that official data does not cover all crime is that not all crimes are reported. Reporting rates vary by crime: some, like car theft, are usually reported, while others, like drug crimes, are not. The extent of unreported sexual crime is unknown, and there are widely varying estimates of underreporting and victimization rates. Hanson Rebuttal, Ex. 6, ¶¶28, 49, 73; Socia Rebuttal, Ex. 10, at 10–11 (estimates vary depending on the sample, the definition of sexual victimization used, and other methodological choices); Lovell Dep., Ex. 67, at 222–28 (recognizing disparity in such estimates); Salter Decl., Ex. 142, at 1, 7; Salter Dep., Ex. 69, at 117 (admitting research showing higher reporting rates was not included in her report); Goodman-Williams Decl., Ex. 141, ¶12 and Dep., Ex. 68, at 148–49; Letourneau

192

Rept., Ex. 7, ¶12(d).

579.  While reporting of sex crimes has increased in recent years, it is undisputed that many such offenses—whether committed by registrants or non-registrants—are still not reported to police. Hanson Rebuttal, Ex. 6, ¶¶28, 49; Hanson Dep., Ex. 54, at 50; Turner Dep., Ex. 70, at 154.

580.  It is also undisputed that there is case "attrition" for all crimes, including sexual crimes, meaning that not all *reported* cases result in an arrest, and that not all arrests lead to a conviction. Case attrition can result from a variety of factors, including failures to investigate, poor treatment of victims, police/prosecutorial decisions not to proceed, and acquittals. Lovell Dep., Ex. 67, at 78–79, 150–51; Chartier Rept., Ex. 18, ¶¶13–16. Even offenses that are reported may not generate official criminal justice records accessible to researchers if those offenses don't make it to the arrest/charges stage. Hanson Rept., Ex. 5, ¶¶2, 76; Hanson Rebuttal, Ex. 6, ¶39. For cases that are reported, however, clearance rates for sexual crimes are relatively high, because victims often know the offender. Hanson Rebuttal, Ex. 6, ¶73.

581.  While there is some data (e.g., victim surveys) on the *number of sex offenses* that do not result in arrest/conviction, there is no good data on the *number of people who offend sexually* without being identified by the criminal justice system. Hanson Dep., Ex. 54, at 43–45, 131. *Victimization rates* provide information about harm but cannot be used to determine *recidivism or reoffending rates*, nor do they demonstrate

193

that registries reduce victimization. Socia Rebuttal, Ex. 10, at 10–11, 26–27.

582. **Both sides' experts agree that the actual rates of sexual offending and reoffending are unknown.** None of Defendants' experts claims to know the actual rate of sexual offending in the general population, nor do they claim to know the actual rate of sexual reoffending among people with a history of sexual offending. Hanson Rebuttal, Ex. 6, ¶30; Lovell Decl., Ex. 140, ¶4.g; Lovell Dep., Ex. 67, at 81–82, 191; Salter Decl., Ex. 142, at 6 ("The truth is we know precious little about [undetected] reoffending rates").

583. Both sides' experts also agree that the rate of detected and undetected sexual offending should be roughly the same for registrants and non-registrants. Salter Decl., Ex. 142, at 10; Salter Dep., Ex. 69, at 111; Hanson Rebuttal, Ex. 6, ¶28. When observed rates (based on official crime statistics) are equivalent, and detection rates are equivalent, then the *unobserved* rates will also be equivalent. Hanson Rebuttal, Ex. 6, ¶¶32–35; Hanson Dep., Ex. 54, at 25-29, 73–74, 166–67.

584. If anything, *non-registrants*' rate of undetected offending will be higher than registrants', as registrants are more likely to be suspected/investigated and are more likely to be arrested and prosecuted (with those arrests/convictions then showing up in official criminal justice data). Hanson Rebuttal, Ex. 6, ¶¶29, 38–42; Socia Rebuttal, Ex. 10, at 14–16, 29; Letourneau Dep., Ex. 7, at 45; Goodman-Williams Decl., Ex. 141, ¶28, and Dep. Ex. 68, at 72, 69.

194

### 2. *Because Desistance Analysis Is Based on Comparisons Between Registrants and Non-Registrants, It Is Unaffected by the Fact that Criminal Justice Data Does Not Include Unknown Offenses*

585.  Defendants' experts do not dispute that official crime statistics provide a valid comparison between registrants' recidivism risk and the rate of first-time sex offense convictions for non-registrants. The fact that *actual* offense rates (for both registrants and non-registrants) are higher than *official* crime statistics rates does not affect the comparative analysis, as Dr. Hanson shows in his rebuttal report, using two graphs. Hanson Rebuttal, Ex. 6, ¶¶ 36–37.

586.  The first graph (shown at ¶193 above) charts when registrants reach desistance based on *official* recidivism statistics. The second graph (shown below) assumes that both registrants and non-registrants commit *four times*[32] more sex offenses than reflected in official crime statistics. Because the change <u>affects both groups equally</u>, the higher rate of offending does not change the length of time it takes for registrants to reach the "desistance" threshold—in other words to be just as safe as males who are not required to register. Hanson Rebuttal, Ex. 6, ¶¶35–37.

---

[32]  The multiplier of four is arbitrary, but it shows that even if actual offense rates are *much* higher than in official statistics, that does not change the analysis.



587.  The revised graph shows that increasing the base rates has no effect on the time it takes for registrants to reach desistance (even assuming much higher rates of unreported sexual offending). The lowest risk people are still below the desistance threshold at release. Most people (average risk) still cross the desistance threshold at around 10 years, and the highest risk individuals cross the desistance threshold at around 20 years sexual recidivism-free in the community. *Id.*

588.  Registrants become as safe to the public as non-registrants in the same amount of time *either way*, regardless of whether official recidivism data is used or a number is added to account for unreported crime and case attrition. Accounting for offenses not captured in official crime statistics has no affect on the analysis. *Id.*,

¶37; Hanson Dep., Ex. 56, at 237–38.  Nor does it alter the finding that half of Michigan's registrants living in the community are as safe to the public as the average male. Data Rept., Ex. 4, ¶69.

### 3. *Defendants' Experts Fail to Distinguish Between Repeat Offending Before and After Criminal Justice Intervention*

589.  When analyzing the registry, the question is not the extent to which people commit multiple sexual offenses (which is the only question Defendants' experts address). Rather, the question is: how likely are registrants to commit new sexual offenses *after* they have been arrested, convicted, and punished for such an offense? And the follow-up question is: how does that compare to the offense rates of people who don't have a sexual conviction and who therefore are not placed on the sex offender registry? Socia Rebuttal, Ex. 10, at 29.

590.  There is a meaningful difference between repeat offending before and after criminal justice intervention. For sex crimes, as for most crimes, people are rarely caught the first time they commit an offense. Being *caught, convicted, and punished* (which by definition is true for all registrants), however, has a *significant impact on reoffending*. Letourneau Dep., Ex. 55, at 79 (being caught and held accountable for a sex offense is a "very powerful intervention" with "a very strong effect"). Because only convicted people are subject to registration, and because the law only addresses *recidivism by registrants*, offending again after detection and sanction by the criminal justice system is what is relevant here. Hanson Rebuttal, Ex. 6, ¶¶43–48.

197

591.  Defendants' experts conflate repeat offending *generally* with reoffending *after a criminal sanction*. Lovell Dep., Ex. 67, at 59–60, 206; Salter Dep., Ex. 69, at 26–29, 111–12. Research on repeat offending by people who have not yet been convicted of a sex offense—necessarily using *unofficial* data—cannot reveal the rate at which people with past convictions (registrants) commit new offenses after being sanctioned. Defendants' experts seek "to generalize research about the risk posed by 'uncaught' apples to the population of 'convicted' oranges." Socia Rebuttal, Ex. 10, at 4, 13, 16. *See also* Salter Dep., Ex. 69, at 114 (admitting that victim surveys generally "can't tell us whether th[e] undetected [sexual] crime is being committed by people with past convictions who are on registries or previously undetected offenders"); Lovell Dep., Ex. 67, at 150.

592.  The research, based on actuarial data, shows that being arrested/convicted and then recidivating is a valid indicator of increased risk. Having more than one sexual offense before a first arrest/conviction, however, is not. A person may commit multiple sexual offenses *before* being detected. But what matters for determining recidivism risk is whether the person is apprehended again *after* being detected by the criminal justice system. Hanson Rebuttal, Ex. 6, ¶46–48.

593.  Research suggests the rate of undetected sexual reoffending *after conviction* is very low (2%). Hanson Dep., Ex. 54, at 112–16. Recent increases in reporting of sexual offending have not increased observed recidivism rates for people with sex

offense convictions. Rather, increased reporting is expanding the number of *new* offenders detected by the criminal justice system. Hanson Rebuttal, Ex. 6, ¶50.

## B. Risk Assessment Instruments Provide a Reliable Method to Identify Risk Levels and a Solid Basis for Desistance Research

594.  Defendants' experts criticize the use of actuarial risk assessment tools such as the Static-99R. Dr. Salter considers "being put on the registry as a big deal, as something that some care should be taken with," and therefore believes individual review should include more than the Static-99R. Salter Dep., Ex. 69, at 99–106. She agrees, however, that tools like the Static-99R are more accurate at predicting risk than the offense of conviction (the current method under SORA), or on non-actuarial methods. *Id.* at 33–34, 97–98, 105; Salter Decl., Ex. 142, at 3.

595.  Defendants' experts complain that actuarial tools have been validated using official crime statistics and do not account for unknown offenses—a critique that echoes that discussed in Section XV.A, *supra*. Salter Decl., Ex. 142, at 1; Turner Decl., Ex. 143, at 1. But they routinely use actuarial risk assessment tools, including the Static-99R, in their work. Salter Decl., Ex. 142, at 16; Salter Dep., Ex. 69, at 36–38, 84; Turner Dep., Ex. 70, at 22. They acknowledge that the Static-99 is "one of the most researched, if not the most researched, actuarial [tool] in sexual offending," and concede that it has "good predictive validity" in measuring recidivism. Turner Dep., Ex. 70, at 162; Turner Decl., Ex. 143, at 1; Salter Dep., Ex. 69, at 86 (Static-99 "predicts recidivism"); Salter Decl., Ex. 142, at 14. *See also* Hanson Dep., Ex.

54, at 34 (noting there have been hundreds of studies showing the validity of using such assessments to determine the risk of recidivism).

Respectfully submitted,

s/ Miriam J. Aukerman (P63165)
/s Dayja Tillman (P86526)
American Civil Liberties Union
  Fund of Michigan
1514 Wealthy SE, Suite 260
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org
dtillman@aclumich.org

s/ Daniel S. Korobkin (P72842)
/s Syeda Davidson (P72801)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org
sdavidson@aclumich.org

Dated:  October 2, 2023

s/ Paul D. Reingold (P27594)
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
Univ. of Michigan Law School
802 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109-1215
(734) 355-0319 - pdr@umich.edu

s/ Roshna Bala Keen (Ill. 6284469)
s/ Lauren Carbajal (CA 336485)
Loevy & Loevy
Cooperating Counsel, American Civil
  Liberties Union Fund of Michigan
311 North Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
roshna@loevy.com
carbajal@loevy.com

200

## LOCAL RULE CERTIFICATION

I, Miriam Aukerman, certify that this document conforms to the page limits set forth in the Court's Order Setting Schedule for Summary Judgment Motions, R. 121, and complies with terms set under the Local Rules.

s/ Miriam Aukerman (P63165)

201