# Exhibit 6:

## Dr. Karl Hanson Rebuttal Report

## DECLARATION OF R. KARL HANSON

In reference to challenge to Michigan's Sex Offenders Registration Act

### Rebuttal Report

I, R. Karl Hanson, declare as follows:

### Executive Summary

1.     Nothing in Defendants' experts' reports challenges the major points of my previous declaration of October 29, 2021. The experts state that the observed sexual recidivism rates will underestimate the true sexual recidivism rates because not every sexual offence is reported to police, and if reported, not every sexual offence will result in a charge or conviction. This is not contested.  What is contested is the relevance of the information presented by Defendants' experts. The major empirical finding presented in my previous declaration is that, for many individuals with a sexual offending history, their observed sexual recidivism rates are equivalent to the risk of first-time sexual offending among individuals not subject to sexual offender registration or notification. There will be undetected sexual offending in both groups. If the observed rates are the same, and the detection rates are the same, then there is a solid basis for concluding that the overall rates of sexual reoffending (including undetected offences) would also be the same for both groups.

2.     Defendants' experts concede that individuals vary in their risk for sexual recidivism, and that the risk factors for sexual recidivism are well-established. They also agree that there are validated risk assessment procedures, such as Static-99R, that can meaningfully sort individuals into relative risk levels. They conclude, however, that individualized risk assessments are time-consuming, expensive, and impractical to implement on a system-wide basis. I disagree. Many jurisdictions

1

routinely use individualized sexual recidivism risk assessments, including the Michigan Department of Corrections. None of Defendants' experts stated that offence-based classification systems, such as Michigan's sexual offender registry, accurately identify the risk presented by individuals with a history of sexual crime. Importantly, none of the experts defended Michigan's sexual offender registry as an effective method for reducing sexual victimization.

**Table of Contents**

I. Introduction ............................................................................................. 4

II. Areas Where Defendants' Experts Agree with My Report, or Do Not Rebut It ................................................................................................. 7

III. Areas Where I Agree With Defendants' Experts' Findings, But Believe Those Findings to Be Unresponsive to the Key Factual Questions at Issue. ..... 11

IV. Specific Disagreements and Clarifications ........................................... 14

    A. Officially recorded crime provides a valid comparison between the sexual recidivism risk of individuals with a sexual offending history and the risk of first-time sexual offending for individuals with no history of sexual crime. ............................................................................................. 14

    B. The Detection Rates Are Equivalent, or Higher, for People with Past Convictions. ...................................................................................... 18

    C. Recidivism Is Different from Repeat Offending. ........................... 20

    D. Reporting Rates for Sexual Offences Are Not Always Low, and May Be Increasing. ........................................................................................ 22

V. Individualized Assessments Are an Effective and Efficient Way to Assess Risk. ......................................................................................................... 23

    A. Differential Reporting Does Not Undermine the Validity of Static-99R ..... 25

    B. Dr. Turner's Criticisms of the Static-99R Instrument ................... 28

    C. Miscellaneous Criticisms ............................................................... 30

VI. Response to the Non-Expert Declarations .......................................... 34

VII. Conclusion ......................................................................................... 38

## I.  INTRODUCTION

3.      Defendants produced four expert reports and three declarations from lay witnesses in response to my expert report and the reports of Plaintiffs' other experts.[1] Defendants' expert reports present a lot of information, including detailed descriptions of serious sexual crimes committed by serial offenders. Most of this information, however, does not address what I understand to be the key factual questions before the Court. In order to help the Court weigh the expert testimony, I will provide an overview of the evidence divided into three categories:  a) findings upon which all experts agreed, or which were uncontested, b) findings upon which we agreed, but disagreed as to relevance, and c) findings upon which we disagreed. The vast majority of the evidence presented by Plaintiffs' experts, including the key factual questions at issue, can be confidently placed in the first category (i.e., explicit agreement among all experts, or uncontested).

4.      This case challenges Michigan's automatic imposition of sex offender registration requirements that last for decades or life without any individual review, for people convicted of a sex offence. Such a registration regime is premised on the assumption that all people convicted of sex offences are likely to reoffend for decades or for life, and on the assumption that sex offender registration will reduce reoffending.  **Accordingly, the key factual questions are:**

---

[1] The following reports and declarations were reviewed and form the subject of this Rebuttal Report:

    a.  Declaration of Rachel E. Lovell (March 20, 2023). 13 pages.
    b.  Expert Declaration of Dr. Rachael Goodman-Williams (March 10, 2023). 31 pages.
    c.  Psychological Consultation Report by Darrel B. Turner, Ph.D. (March 20, 2023). 13 pages.
    d.  Report of Anna Salter (undated). 16 pages.
    e.  Affidavit of Tricia Dare (March 1, 2023). 4 pages.
    f.  Declaration of Danielle Russo Bennetts (March 13, 2023). 7 pages.
    g.  Declaration of Sarah Prout Rennie (March 21, 2023).  8 pages.

    **a. Do all people who have been convicted of a sex offence present a higher risk of committing a new sex offence than people who have not been convicted of a sex offence, and how long does any heightened risk last?**

    **b. Are sex offender registries effective in reducing reoffending by people convicted of past sex offences?**

5.    Defendants' reports and declarations are largely unresponsive to these questions, even if I agree with many of the statements in their reports.

6.    My rebuttal declaration is organized as follows: I begin this report by summarizing the main points made in my initial report that Defendants' experts agree with, or that they did not rebut. I then summarize points made in Defendants' reports which I agree with, but explain why those points are irrelevant to the key factual questions at issue here.

7.    I then respond to errors of fact and logic in the reports presented by Defendants' experts, and provide the appropriate context for statements in my previous declaration that were mischaracterized by Defendants' experts. My report will address each of Defendants' expert reports. However, because some of the reports present similar arguments based on the same type of research findings, sections of my rebuttal are organized by topic. Given limits of time and space, my decision not to respond to any specific assertion should not be interpreted as acceptance of the experts' opinions.

8.    Finally, I will also briefly respond to the declarations of Defendants' lay witnesses, but do not provide a point-by-point rebuttal, as those witnesses lack the expertise to opine on recidivism, and their anecdotal personal experience is insufficient to counter the weight of the scientific evidence in this field.

9.    The information in this declaration is based upon my personal knowledge and my research and scholarship, which is listed in my CV, as well as on research and scholarship in the field, including sources of the type which researchers

in my field would rely upon in their work. I incorporate by reference all the claims and representations made in my previous declaration of October 29, 2021.

## Preliminary Comments

10.    Before providing my rebuttals, I would like the Court to know that I have deep respect for the professional work of Dr. Lovell and Dr. Goodman-Williams, both for advancing the cause of victims of sexual assault and for their empirical work on the analysis of sexual assault kits. Reporting sexual victimization to police is emotionally challenging; victim support of criminal proceedings against offenders is commonly experienced as aversive. Much could be done to improve the criminal justice experience of individuals who have been sexually victimized. Matching DNA samples across sexual assault kits is important work, both for understanding patterns of stranger rape, and for identifying perpetrators who have so far evaded justice.

11.    My concern with their reports is that the evidence presented from sexual assault kits does not address the recidivism rates of individuals with a sexual offence conviction, i.e., the individuals subject to registration and notification acts. Furthermore, neither expert explains how sexual offender registration and notification acts would mitigate the problems and harms that they have identified. Neither report justifies devoting resources to the large number of low-risk individuals currently on registries; instead, their evidence and arguments support directing more of our limited resources towards education, police training and investigation, and improved victim services.

12.    I, similarly, have professional respect for the work of Dr. Salter. My primary concern with her report, however, is that it does not address the core factual questions under consideration by the Court articulated in §4 above.

## II.  AREAS WHERE DEFENDANTS' EXPERTS AGREE WITH MY REPORT, OR DO NOT REBUT IT.

13.    Defendants' experts either agree with, or do not rebut, all the key findings of my original report (set out at ¶ 3, pp. 1-3, of that report):

**A. Recidivism rates are not uniform but vary considerably across all individuals with a history of sexual crime. Risk of reoffending varies based on well-known factors.**

14.    Both Dr. Turner and Dr. Salter declare that the risk for sexual recidivism varies across individuals. On page 4 of his report, Dr. Turner states that well-known risk factors include antisocial orientation and sexual deviancy. Both Dr. Turner and Dr. Salter conduct sexual recidivism risk assessments as part of their professional duties, using risk tools that have wide acceptance in the profession and in the courts (Static-99R, STABLE-2007, Psychopathy Checklist – R [PCL-R]). There is nothing in the reports of Dr. Goodman-Williams or Dr. Lovell that contradicts the assertion that sexual recidivism risk varies across individuals.

**B. The average sexual recidivism rate of individuals with a history of sexual crime is low. Once convicted, most are never re-convicted of another sexual offence.**

15.    Defendants' experts emphasize the distinction between new sexual crimes that results in criminal justice interventions (which I will call *recidivism*) and the overall rate of new sexual crimes that include hidden, undetected offences (which I will call *reoffending*). We agree that the observed recidivism rates underestimate the actual reoffending rate. Defendants' experts assert that the actual reoffending rates are much higher than the observed recidivism rates; however, they do not dispute that the average *sexual recidivism* rates are low.

16.    In my report, I summarize research indicating that studies typically observe sexual recidivism rates of 5% to 15% after 5 years. None of the experts

7

contests these empirical findings. Dr. Lovell (page 5 §7.e.i) states that "Approximately 8% of the released prisoners convicted of a sexual offense were arrested for a subsequent sexually based offense within those nine years." This statistic was also repeated in the declaration of lay witness Sarah Rennie. Similarly, Ms. Rennie approvingly quotes my 2004 review[2] indicating 14% recidivism rates after 5 years (page 5, §12).

**C. The risk for sexual recidivism declines with age, with a particularly strong decline for individuals of advanced age. There are very few individuals over the age of 60 who present any significant risk for sexual recidivism.**

17.     Dr. Turner explicitly acknowledges an "aging" out of risk for reoffending (page 8 §5): "When considering the 'aging' out of risk for reoffending, it simply cannot be claimed that these older individuals (or any) will eventually pose 'no' threat." Dr. Turner does not dispute the finding that the recidivism rate of older individuals is low, only that it is not zero. Similarly, Dr. Salter (page 3, first full paragraph) accepts the research indicating that "older offenders reoffended less." Sarah Rennie cites research indicating that younger individuals are higher risk to reoffend than older individuals (page 5, §13). In contrast, Tricia Dare opines, based on her personal experience, that sexual recidivism risk does not decline with age; however, this is a statement without scientific foundation (see §§64-66 below).

**D. The nature of the sexual offence conviction (the name of the offence or criminal code section) is unrelated to the risk of recidivism.**

18.     None of the expert reports mentions anything about the relationship between the name of the criminal code offence and sexual recidivism risk, nor do

---

[2] Harris, AJR & Hanson, RK. (2004). *Sex Offender Recidivism: A Simple Question 2004-03*. Public Safety and Emergency Preparedness Canada, available at http://www.publicsafety.gc.ca/res/cor/rep/2004-03-se-off-eng.aspx.

they defend the methods used to assign individuals to tiers in sexual offender registries like Michigan's. The research presented by the Plaintiffs' experts on the lack of a relationship between registry tier levels and sexual recidivism was uncontested.

**E. The risk for sexual recidivism can be reliably predicted by widely-used risk assessment tools, such as Static-99R, which are used to classify individuals into various risk levels**.

19.     Defendants' experts offer some specific critiques of Static-99R as a risk assessment instrument – primarily that it is only predictive of recidivism (not reoffending), that it has not been validated for some populations, and that higher accuracy can be achieved by combining Static-99R with other sexual risk assessment tools. Those critiques will be discussed below. Defendants' experts do not, however, dispute the basic point that there are widely-used risk assessment tools, including the Static-99R, that have good predictive accuracy in classifying individuals into various risk levels.

20.     On page 14, Dr. Salter states "Static-99R does what it was designed to do: it measures the chance someone will get caught in the future. It was designed to predict recidivism, and it does so." Dr. Salter has routinely used Static-99R along with other risk tools in the risk assessments she conducts in her professional practice (page 16). On page 10-11, Dr. Turner states that Static-99R "has been a landmark in the field of prediction of sexual recidivism for decades when no other tools existed. Simply stated, when the instrument is described in a manner commensurate with its actual function – indicating which types of sexual offenses are more likely to result in a rearrest or reconviction – it is unrivaled."

**F. Contrary to the popular notion that all individuals who have ever committed a sexual offence remain at risk of reoffending through their lifespan, the longer individuals remain offence-free in the community, the less likely they are to reoffend sexually.**

9

21.     Here Defendants' experts object to my generalizing from recidivism to reoffending, which I will address in more detail below. However, they present no evidence to counter the well-established finding in criminology that recidivism rates – and reoffence rates – go down the longer a person is in the community without any new charges or convictions. This is true for sexual offences just as it is for other offences.

### G. The recidivism risk of many registrants was already very low (at the time of the offence), or has declined to baseline levels (comparable to the general male population).

22.     Here again Defendants' experts argue that *sexual reoffence rates* are significantly higher than *sexual recidivism rates,* but they do not dispute that the *recidivism* risk of many registrants is low, or for others it has declined over time to baseline levels comparable to the risk that a male in the general population will be convicted of a sex offence.

### H. (Sex offender) policies and resources directed towards people who have very low risk initially or who attain very low risk over time serve no public protection function.

23.     Defendants' experts do not present any evidence to support the notion that sex offender registration of very low risk individuals protects the public. Although there may be a dispute about how to define who is low risk, Defendants' experts have not suggested that sex offender registration is warranted for people who are very low risk.

24.     Finally, it is important to note that Defendants' experts focus entirely on the first of the core factual questions in this case: whether all people who have ever been convicted of a sex offence present a higher risk of committing a new sex offence than people who have not been convicted of a sex offence. Defendants' experts present no evidence or argument at all on the question of whether sex

offender registries are effective in reducing reoffending by people convicted of past sex offences.

### III. AREAS WHERE I AGREE WITH DEFENDANTS' EXPERTS' FINDINGS, BUT BELIEVE THOSE FINDINGS TO BE UNRESPONSIVE TO THE KEY FACTUAL QUESTIONS AT ISSUE.

25.    Defendants' experts set out a number of factual findings with which I agree. I disagree that these findings justify decades-long or lifetime registration without individualized risk assessment. Many of Defendants' experts' factual findings, even where sound, are not relevant to the key factual questions of whether all people who have been convicted of a sex offence present a higher risk of committing a new sex offence than people who have not been convicted of a sex offence, and whether sex offender registries are effective in reducing reoffending by people convicted of past sex offences.

26.    Sexual offending can cause significant harm. Defendants' experts emphasize the harm caused by sexual offending and the costs it imposes on survivors and society. I agree. Sexual offences are serious and harmful offences. It is important to remember, however, the huge variation in the types of sex offences that place an individual on the registry, as well as variability in the impact of these offences on the victim. The criminal justice system recognizes this harm by imposing punishments, in many cases severe punishments, for sexual offences. Society clearly has a strong interest in preventing sexual offending, both by people who have been convicted of past sexual offences and by people without past sexual offence convictions. But recognizing the harm of sexual offending and society's desire to prevent it does not answer the question of the extent to which people on registries present an appreciably higher risk than the general public, or the question whether registries are effective at reducing sexual victimization.

27.   <u>Some people convicted of sexual offences have a significant risk of reoffending</u>. Defendants' experts highlight cases of horrible, repeat offenders. There is no question that some people who have been convicted of sex offences have a high risk of reoffending. It does not logically follow, however, that if some convicted individuals present a significant risk, everyone convicted of a sex offence presents a significant risk. Not everyone on the registry looks like the least dangerous named Plaintiffs in the case and not everyone looks like the most dangerous offenders highlighted by Defendants' experts. The reality is that risk levels vary, and that risk decreases over time. Furthermore, we can distinguish between individuals who are very low risk of sexual offending and individuals who are very high risk using methods that are currently available, and widely used.

28.   <u>Sexual offences are underreported</u>. Almost all crimes are underreported, including sex crimes. The extent of underreporting for sexual offences is unclear, but there is no question that many sexual offences – whether committed by registrants or non-registrants – are never reported to law enforcement. This is uncontroversial. As discussed in more detail below, however, what matters for purposes of analyzing the registry is whether underreporting is greater for registrants versus non-registrants. And Defendants' experts concede that <u>there is no evidence that the underreporting is greater for offences committed by people with past convictions than for offences committed by people without such a criminal history.</u>

29.   <u>There is attrition of sexual offence cases in the criminal justice system</u>. It is uncontroversial that not all sexual crimes reported to police result in a conviction. Again, what matters here is the comparative attrition rates for offences committed by registrants versus non-registrants. Defendants' experts present no evidence that cases brought against registrants are more or less likely to move forward than cases brought against non-registrants. Logically, cases against registrants should be

*more* likely to move forward because prosecutors are more likely to believe that they will be able to secure convictions.

30. <u>The actual rate of sexual offending and actual rate of sexual reoffending are unknown.</u> All experts agree that we do not know the actual rates of sexual offending or reoffending. Some of Defendants' experts attempt to estimate a lower bound based on a small group of exceptional cases; others make reference to unvalidated statistical models. Defendant's experts vary in the trust they place in their projections; however, none claims to know the actual rate of sexual offending in the general population, nor do they claim to know the actual rate of sexual reoffending among individuals with a history of sexual offending. This uncertainty does not invalidate the comparison between the sexual recidivism rates of individuals with a sexual offending history and the rate of first-time sexual offending in the general male population.

31. <u>Sexual reoffence rates are higher than sexual recidivism rates</u>. I agree with Defendants' experts that the rate at which people with past sex offence convictions reoffend (i.e., the number of times the person commits another sex offence) is higher than the rate at which they sexually recidivate (i.e., the number of times they are arrested or convicted for a new sex offence). Reoffence rates will always be higher than the recidivism rates precisely because not every offence is detected or results in a criminal sanction. That is true not just for sexual offences, but for virtually all crime. Defendants' experts' primary critique of my report is that it is based on known recidivism data, rather than (speculative) reoffence data.

## IV. SPECIFIC DISAGREEMENTS AND CLARIFICATIONS

### A. Officially recorded crime provides a valid comparison between the sexual recidivism risk of individuals with a sexual offending history and the risk of first-time sexual offending for individuals with no history of sexual crime.

32.     All Defendants' experts challenged the validity of criminal history records as a measure of repeat offending. I agree that many, perhaps most, individuals who commit sexual offences are never subject to criminal justice interventions. As I stated in my previous declaration (¶24, ¶76), however, **the relevant question is not whether some individuals placed on the registry after conviction are committing undetected crimes; instead, the question is whether such convicted individuals subject to registration laws are committing more sexual crimes than individuals with no conviction who are not subject to registration laws.**

33.     Criminal history records provide solid evidence for this comparison. **When the observed rates (based on official criminal justice system records) are equivalent, and the detection rates are equivalent, then the unobserved rates would also be equivalent.**

34.     In my previous declaration I provided evidence, based on large samples, that there are many individuals with a history of sexual offending whose observed sexual recidivism rates are indistinguishable from the ambient baseline risk of two groups of individuals not subject to registry restrictions: a) individuals with a nonsexual conviction but no history of sexual offending, and b) men in the general population. The length of time before people with past sexual offence convictions reach "desistance" was calculated based on risk levels and time offence free in the community. Defendants' experts' criticism is that this research is based on official recidivism data rather than (unknown) reoffence rates.

14

35.     Because what matters is the comparative sexual offence rates of people with past convictions (registrants) versus those without convictions, the fact that reoffending rates are higher than official recidivism rates does not affect the comparative analysis, as can be seen by the figures below.

36.     The first figure is from the original report. The declining hazard rate curves are calculated from three values: a) a risk level associated estimated by Static-99R scores, b) the number of years offence-free in the community, and c) the baseline risk at time of release for the complete sample of individuals with a history of sexual offending.[3] This baseline risk was observed to be 6.7% after five years, or 0.67% during the first six months in the community. The figure also plots a desistance threshold defined as the likelihood of a first-time sexual crime among individuals with a criminal conviction but no history of sexual crime. This desistance threshold was set at 1.9% after five years, or 0.19% during the first six months following release.

---

[3] Equation 5 from Hanson, RK, Harris, AJR, Letourneau, E, Helmus, LM, & Thornton, D. (2018). Reductions in risk based on time offence free in the community: Once a sexual offender, not always a sexual offender. *Psychology, Public Policy and Law, 24*(1), 48-63. doi:10.1037/law0000135.



37.     The second figure below demonstrates how changing the base rate of sexual recidivism does not change the length of time it takes for individuals to reach the desistance threshold. The second figure maintains the same effects for initial risk (Static-99R scores) and for years offence-free; however, it quadruples the sexual recidivism base rates from 6.7% to 26.8%.  Raising the overall rates by a factor of four is arbitrary, but within the range suggested by the Defendants' experts. Assuming a different value (e.g., multiplying by 2 or by 8) to account for the "dark figure" of sexual offending would not change the results. If there are 3 undetected offenders for each observed sexual offender, then the rate of sexual offending among individuals without a sexual offence history should similarly be raised by a factor of four, i.e., from 1.9% to 7.6% after five years.  As can be seen from the revised figure, increasing the base rates to include undetected offences has no effect on the time it takes for individuals to reach the desistance threshold.  The shape of the second

16

figure is identical as the first, with the only difference in the figure being the range of the y-axis. In Figure 1 above, the values ranged from 0.0019 to 0.024; in Figure 2 below, the values range from 0.0073 to 0.093. The lowest risk individuals are still below the desistance threshold at time of release. Most individuals (average risk) cross below the desistance threshold around 10 years, and the highest risk individuals cross below the desistance threshold around 20 years sexual offence-free in the community. Basing the time-free comparisons on official crime statistics or on estimates of the rate of undetected offending makes no difference, provided that the detection rates are equivalent for both groups (which Defendants' experts do not dispute).



**B. The Detection Rates Are Equivalent, or Higher, for People with Past Convictions.**

38.     In my original report I opined that the detection rate for individuals with a previous sexual conviction should not be *lower* than the detection rate for individuals with no prior history of sexual offence convictions. (Indeed, I thought that people with a criminal sexual history were more likely to be investigated after a sexual crime committed by an unknown perpetrator, which might well lead to a *higher* detection rate.)

39.     At the time of my previous declaration (October, 2021), I was unable to identify any research that compared the detection rate per sexual offence before and after being convicted of a sexual offence. Since that time, Dr. Kelley and colleagues published a study on the topic.[4] The results of their study were consistent with my expectation that detection rates increase after the first conviction. The researchers carefully examined the history of detected and undetected sexual offending in a group of 189 men who were civilly committed in Wisconsin due to high risk for sexual recidivism. All these men had been convicted of a sexual offence on more than one occasion, allowing for comparisons between the detection rate for offences committed before their first arrest with the detection rate for offences committed following subsequent releases. Detected sexual offences were defined as those that resulted in an arrest, charge, or conviction, such that they would have been available to researchers studying sexual recidivism using official police statistics.

40.     Like other researchers looking at very high-risk offenders, Dr. Kelley's group identified many victims who would not have been detected by researchers

---

[4] Kelley, SM, Kahn, RE, Mundt, JC, & Barahal, RM. (2022). Do sanctions affect undetected sexual offending? *Sexual Abuse.* Advance online publication. https://doi.org/10.1177/10790632221139178.

using official police statistics. Prior to their first arrest, this group of 189 men had committed offences against 868 victims, of which 253 were detected by police records. This corresponds to a detection rate of 22.6% (868/253 = 22.6%). After their first arrest, the detection rate increased to 36.2%. The detection rate remained in that range for subsequent release periods. To quote the authors: "Our data suggest the first formal sanction for a sexual offence makes a material difference on the detection rate, which would not be evident in the National Crime Victimization Survey and other data sources."[5]

41.    A post-arrest detection rate of 36.2% still indicates that most sexual offences would not appear in the recidivism statistics available to researchers. This does not invalidate, however, the comparisons of the official observed rates for convicted individuals (who are required to be on a sexual offender registry) with the observed rates of those who were not convicted in the past (and therefore are not subject to registration). If the *detection* rates really are 60% higher post-arrest (36.2/22.6 = 1.60), then the well-documented <u>empirical equivalence in sexual offending risk</u> for individuals with a history of sex crime convictions compared to the sexual offending risk of individuals without such history would indicate that *many individuals with the sexual offence history would now be <u>lower risk</u> than the average risk for individuals without a history of sexual crime.*

42.    Or course, there remains considerable uncertainty concerning the rate of undetected offending. Dr. Kelley's research is only one study on one specific population; however, her findings are consistent with expectations that the detection rate should increase after being arrested for a sexual offence, and I am aware of no contradictory evidence. Defendants' experts either make no comment about relative

---

[5] Kelley et al. (2022) *supra* note 4, at page 17.

differences in detection rates for registrants and non-registrants, or they assume that the rates are the same (Salter, page 10).

### C. Recidivism Is Different from Repeat Offending.

43. There is a meaningful distinction between repeat offending prior to criminal justice intervention and repeat offending after criminal justice intervention. For most crimes, it is rare for individuals to be caught the first time they commit the offence. This applies to minor crimes, such as theft, as well as to major crimes, such as sexual assault. It is less common, however, for individuals to immediately return to crime after being sanctioned.[6]

44. When I discuss recidivism in my declaration, I am referring to repeat offending *after detection and sanction by the criminal justice system*. This focus on repeat offending <u>after conviction</u> is relevant to the current deliberations because only individuals who are *convicted* of sexual crimes are subject to registration and notification measures. Repeat offending among undetected offenders is a real concern, but it is not a concern that can be fixed by a sexual offender registry.

45. I concur with Defendants' experts that it is common for individuals to have committed more than one sexual offence prior to being convicted for their first sexual offence.[7,8] Sometimes these additional offences are known to the criminal justice system, and sometimes they are known only through self-reporting, or through other means, such as the analysis of sexual assault kits.

---

[6] Rhodes, W, Gaes, G, Luallen, J, Kling, R, Rich, T, & Shively, M. (2016). Following incarceration, most released offenders never return to prison. *Crime & Delinquency, 62*, 1003-1025. doi:10.1177/0011128714549655.

[7] Groth, N, Longo, R, & McFadin, JB. (1982). Undetected recidivism among rapists and child molesters. *Crime & Delinquency, 28*(3), 450-458.

[8] Weinrott, MR, & Saylor, M. (1991). Self-report of crimes committed by sex offenders. *Journal of Interpersonal Violence, 6*(3), 286-300.

46.     Our research team has examined whether the number of different offences in the "index sexual offence" – the offence, or group of offences, which resulted in their first arrest or conviction and for which we are assessing risk using the Static-99R scoring instrument – predicted sexual recidivism.[9] Our results were surprising. We found that individuals whose index sexual offence conviction involved more than one victim and/or more than one offence *were no more likely to reoffend sexually* than individuals who were convicted of only one sexual offence against only one victim. Consequently, the Static-99R and Static-2002R data-driven (actuarial) risk tools we developed do not include the number of victims or charges in the index sexual offence as an indicator of sexual recidivism risk.

47.     What *is* related to sexual recidivism risk are previous offences that *resulted in arrest, charge, or conviction*. Specifically, if an individual is charged with a sexual offence and then later is convicted of a new sexual offence, the individual's risk for sexual recidivism is now increased by about 60%.[10] In other words, if the recidivism rate after 10 years is 10 out of 100 for individuals with no prior sexual offence conviction, the rate would now be 16 out of 100 for individuals with a prior sex offence conviction.

48.     In contrast, for individuals who have more than one sexual offence as part of their index offence (i.e., multiple offences were the basis of the index offence, but the person had no prior sexual arrest, charge, or conviction), their risk would be *the same as that presented by individuals with no prior sexual offence* (i.e., 10 out of 100 in our example). Being arrested and then reoffending is a valid indicator of increased risk.  Having more than one sexual offence in the cluster of index offences

---

[9] Hanson, RK, & Thornton, D. (2003). *Notes on the development of Static-2002*. User Report 2003-01. Ottawa: Department of the Solicitor General of Canada.

[10] Helmus, LM, & Thornton, D. (2015). Stability and predictive and incremental accuracy of the individual items of Static-99R and Static-2002R in predicting sexual recidivism: A meta-analysis. *Criminal Justice and Behavior*, *42*(9), 917-937.

is not. In other words, a person may commit multiple sexual offences *before* being detected by the criminal justice system. But what matters for determining recidivism risk is whether the person is apprehended again *after* being detected by the criminal justice system.

### D. Reporting Rates for Sexual Offences Are Not Always Low, and May Be Increasing.

49.     Defendants' experts' reports quote various statistics on the low rate at which sexual offences are reported to police, particularly sexual offences against children. Missing from their list of studies is the 2012 study by David Finkelhor and colleagues that was published by the U.S. Department of Justice/Office of Justice Programs.[11] Based on a nationally representative sample of 4,549 children (aged 1 month to 17 years) in 2008, they found that most sexual abuse of children by adults *was* reported to police: 76.1% when the abuse was committed by a nonspecific adult, and 64.9% when the abuse was committed by a known adult. Not all types of sexual victimization, however, had such high rates of reporting to police; for example, only 13.1% of sexual abuse by peers and 10.0% of rapes were reported to police. Finkelhor's 2012 survey contrasts with the findings of his earlier 1994 study on childhood victimization.[12] Based on a representative sample of 2,000 young people (ages 10 to 16), the authors found that only 3% of sexual abuse/assault victimizations (based on 1992 data) were reported to police. Although the reporting figures are not directly comparable because different questions and categories were used in the 1992 and 2008 surveys, the authors of the updated study conclude that "More victimization and abuse appear to be known to authorities currently than was the case in a

---

[11] Finkelhor, D, Ormrod, R, Turner, H, & Hamby, S. (2012). *Child and youth victimization known to police, school, and medical authorities.* Juvenile Justice Bulletin: National Survey of Children's Exposure to Violence. Office of Justice Programs. www.ojp.usdoj.gov.
[12] Finkelhor, D, and Dziuba-Leatherman, J. (1994). Children as victims of violence: A national survey. *Pediatrics, 94*(4), 413–420.

comparable 1992 survey."[13] It is unlikely that the reporting rates have declined in recent years, and, given the ongoing attention to issues of sexual victimization, they may have increased.

50.     Defendants' experts argue that the observed sexual recidivism rates are sensitive to reporting rates. In particular, they argue that the observed rates are low because the reporting rates are low. But one consequence of this argument is that an increase in the reporting rates – like the ones Finkelhor found – should result in an increase in the observed sexual recidivism. This has not happened. The increase in reporting rates documented in Finkelhor's 2012 study has not been associated with an increase in observed recidivism rates. Sexual recidivism rates are, if anything, lower in contemporary samples than in samples from the 1980s and 1990s. For example, when we were updating the recidivism rates norms for Static-99R, the inclusion of recent U.S. samples resulted in a modest decrease in the expected recidivism rates.[14] Instead of increasing official observed recidivism rates for people with sex offence convictions – as one would expect – increased reporting has not changed observed recidivism rates for that group. Instead, increased reporting appears to be expanding the number of *new* offenders detected by the criminal justice system.

## V. INDIVIDUALIZED ASSESSMENTS ARE AN EFFECTIVE AND EFFICIENT WAY TO ASSESS RISK.

51.     Both Dr. Turner and Dr. Salter accept that individuals vary in their risk for sexual recidivism, and that such variation can be determined using individualized assessments. I disagree with these experts, however, when they assert that individualized assessments would be impractical and cost-prohibitive. Dr. Turner presents

---

[13] Finkelhor et al. (2012) *supra* note 11, at page 1.
[14] Lee, SC, & Hanson, RK. (2021). Updated 5-year and new 10-year sexual recidivism rate norms for Static-99R with routine/complete samples. *Law and Human Behavior, 45*(1), 24-38. https://doi.org/10.1037/lhb0000436.

cost estimates for sexual recidivism risk assessments in the range of $8,000 to
$20,000. Dr. Salter states she typically devotes 15 hours on her comprehensive eval-
uations. Although certain experts in certain contexts receive compensation in this
range, routine sexual recidivism risk assessments are much less expensive. Most
cases are much less complicated than the cases Dr. Salter assesses for civil commit-
ment as Sexually Violent Persons. Currently, Michigan's Department of Corrections
requires sexual recidivism risk assessments for individuals who receive treatment in
the community.[15] These contracts stipulate that the evaluators will use Static-99R
and STABLE-2007,[16] and may use other measures depending on the characteristics
of the case. STABLE-2007 measures 13 factors relevant for the treatment and super-
vision needs of individuals with a sexual offending history, such as lifestyle impul-
sivity, negative attitudes toward women, and deviant sexual interests. It can be
scored by diverse professionals, including probation officers.[17,18] There are mech-
anical rules for combining STABLE-2007 with Static-99R; evaluators who consider
both measures have more accurate risk assessments than evaluators who only use
Static-99R.[19]

52.     MDOC contracts do not specify the unit cost for a sexual recidivism
risk assessment using Static-99R and STABLE-2007; however, the routine inclusion

---

[15] State of Michigan Department of Corrections. (2021). Contract Change Notice to Contract
Number 180000000186 (Wise Mind, PLLC). Lansing, Michigan. See Section 3.1.A Standardized
Assessment Tools.

[16] Hanson, RK, Helmus, L, & Harris, AJR. (2015). Assessing the risk and needs of supervised
sexual offenders: A prospective study using STABLE-2007, Static-99R and Static-2002R.
*Criminal Justice and Behavior, 42*(12), 1205-1224. doi:10.1177/0093854815602094

[17] Hanson et al. (2015) *supra* note 16.

[18] Helmus, LM, Hanson, RK, Murrie, DC, & Zabarauckas, CL. (2021). Field validity of Static-
99R and STABLE-2007 with 4,433 men serving sentences for sexual offences in British Colum-
bia: New findings and meta-analysis. *Psychological Assessment, 33*(7), 581-595.
 doi:10.1037/pas0001010.

[19]  Brankley, AE, Babchishin, KM, & Hanson, RK. (2021). STABLE-2007 Demonstrates
predictive and incremental validity in assessing risk-relevant propensities for sexual offending: A
meta-analysis. *Sexual Abuse. 33*(1), 34-62. doi:10.1177/1079063219871572

of these measures in contracts indicates that it is not cost prohibitive, for the state or for the contractors. The treatment staff who complete the evaluations are paid $80 to $185 per hour, much less than Dr. Turner's rate of $450/hour. It is unlikely that the extra cost is worth it. There is strong evidence that the predictive accuracy of the sexual recidivism evaluations *is based on the methods used to assess risk, and not on the professional expertise of evaluators*.[20] To continue Dr. Turner's example, it does not require a Ph.D. in Forensic Psychology to recognize that Ted Bundy is unusually high risk.

### A. Differential Reporting Does Not Undermine the Validity of Static-99R

53.    Both Dr. Salter (page 12-13) and Dr. Turner (page 10) raise concerns that different patterns of reporting/detection could influence the predictive validity of the Static-99R risk tool. They speculate that certain Static-99R items may not be valid predictors of sexual recidivism risk; instead, they may only be markers for the likelihood of reporting victimization when it occurs. Static-99R was constructed based on empirical relationships between offence characteristics and the likelihood of sexual recidivism as measured by police reports and criminal history records. The Defendants' experts are concerned that such empirical relationships could arise even when the items are unrelated to the likelihood of sexual offending; they suggest that, instead, the empirical associations could be based on the likelihood of reporting sexual offences, should they occur. Their arguments focus on the two of the Static-99R scoring items (out of ten total scoring items): a) only related victims (associated with lower risk) and b) any stranger victims (associated with higher risk). The experts are correct that victimization surveys have found that individuals who are victimized by

---

[20] Hanson, RK, & Morton-Bourgon, KE. (2009). The accuracy of recidivism risk assessments for sexual offenders: A meta-analysis of 118 prediction studies. *Psychological Assessment, 21,* 1-21. doi:10.1037/a0014421

family members are less likely to report to police than individuals victimized by strangers. The experts' argument is that apparent increase in risk associated with having unrelated victims or stranger victims could be an artifact of the increased likelihood that such offences would be reported to police.

54.    Defendants' experts' speculation, however, is undercut by the substantial differences between reporting of the first offence by a family member and reporting of subsequent offences. The data cited by Dr. Salter and Dr. Turner concerns first-time reporting of offending by a family member. It is rare to be charged with a new offence against a family member after having been already sanctioned for a sexual offence against a family member.  I am not aware of any data that reports the reporting/detection rate for offences committed by family members who are already known to have committed a sexual offence against a family member. I would expect that the reporting rate would be much higher for subsequent offences after arrest/ detection than for the first offence or series of offences. Charging a family member with a sexual offence against another family member typically creates a family crisis. The perpetrator is "outed" to family and friends, which happens with or without a registry. The perpetrator is subject to criminal justice interventions (arrest, jail, probation), and child protective services often become involved. Post-disclosure it is common for families to develop formal or informal risk management plans (e.g., don't let Joan be alone with Uncle Jack).  Many family members increase their vigilance of "Uncle Jack" for behaviours that could indicate grooming, boundary violations, or new offences. Given the radical reorientation of the family systems following a sexual conviction of one of its members, and given the limited pool of potential victims, it is likely that the real sexual reoffending rates are low for individuals whose only victims have been family members.  Low reporting rates *for first-time*

*offenders* against family members does not diminish the strong empirical evidence of the low observed recidivism rates for this type of sexual crime.

55.     Another problem with the argument of the Defendants' experts is that the association between high reporting rates and high observed recidivism rates only applies to certain items. For other items, the reporting rates are low, but the item is, nonetheless, empirically associated with increased observed sexual recidivism. As mentioned by Dr. Turner, males who are victims of sexual offences are less likely to report their abuse than females; however, having a male victim is associated with increased risk for observed sexual recidivism (it is one of the items in Static-99R).

56.     Furthermore, a weakness in one item on a risk tool, even if present, does not invalidate the whole risk tool. For risk tools or other assessment measures, each item is expected to measure the construct of interest (in our case, sexual recidivism risk) as well as being influenced by a certain amount of unrelated noise (e.g., variability among prosecutors in charging practices). Test developers include multiple items in their measures with the expectation that the noise will cancel out, thereby increasing the reliability of their measures. For Static-99R, in particular, it is unlikely that random noise associated with any one particular item would meaningfully influence the overall predictive validity of the total scores based on the full set of 10 items. The reason that Static-99R scores are empirically associated with the likelihood of sexual offence recidivism is its items are valid (if imperfect) markers for risk relevant propensities, such as antisocial orientation, atypical sexual interests, and hostility toward women.[21,22]

---

[21] Mann, RE, Hanson, RK, & Thornton, D. (2010). Assessing risk for sexual recidivism: Some proposals on the nature of psychologically meaningful risk factors. *Sexual Abuse: A Journal of Research and Treatment, 22*(2), 191-217. doi:10.1177/1079063210366039.

[22] Brouillette-Alarie, S, Babchishin, KM, Hanson, RK, & Helmus, L. (2016). Latent constructs of static risk scales for the prediction of sexual aggression: A 3-factor solution. *Assessment, 23*(1), 96-111. doi:10.1177/1073191114568114.

**B. Dr. Turner's Criticisms of the Static-99R Instrument**

57.     Dr. Turner's report focusses on the limitations of the Static-99R sexual recidivism risk tool to sort registrants into risk levels. His major concern is that it only examines observed recidivism, which would underestimate the actual reoffending rate that included undetected offences. As previously stated, I fully agree that observed recidivism rates underestimate actual recidivism rates. Nevertheless, the Static-99R is still a useful and practical approach to sorting individuals with a sexual offending history into risk levels.

58.     One limitation of the Static-99R identified by Dr. Turner is that it cannot be used with individuals whose only sexual offences have involved the possession of child sexual abuse materials (CSAM). This is correct. Static-99R should not be used for individuals with this offence history.  There are, however, other validated risk tools normed on individuals whose only sexual offences have involved CSAM, such as the Child Pornography Offender Risk Tool (CPORT).[23,24]  Like Static-99R, the CPORT is a relatively simple tool based on demographic and offence characteristics, and includes items concerning the nature of the sexual abuse materials. The CPORT is widely used. For example, the Michigan Department of Corrections' procurement contract for sex offender counseling services indicates that the CPORT can be used for individuals with a history of CSAM offending.[25]

59.     Another criticism that Dr. Turner levels at the Static-99R is that it ignores antisocial behaviour (page 3-4).  This is simply not true. Two of the 10 items directly address antisocial behaviour (prior nonsexual violence, prior sentencing

---

[23] Seto, M. C., & Eke, A. W. (2015). Predicting recidivism among adult male child pornography offenders: Development of the Child Pornography Offender Risk Tool (CPORT). *Law and Human Behavior, 39(4)*, 416-229. https://doi.org/10.1037/lhb0000128.

[24] Eke, A. W., Helmus, L. M., & Seto, M. C. (2019). A validation study of the child pornography offender risk tool (CPORT). *Sexual Abuse, 31*(4), 456-476.

[25] State of Michigan Department of Corrections (2021) *supra* note 15.

dates for anything), and three other items are strongly related to a general propensity for rule violation (young age, never lived with a lover for two years, victimized a stranger).[26] Consequently, five of the 10 Static-99R items are solid indicators of anti-social orientation; these items not only predict sexual recidivism, but nonsexual recidivism as well.

60.     Dr. Turner raises concerns about the Static-99R reliability across different ethnic groups. In psychology, "reliability" refers to the extent to which different assessments provide the same score. The study cited by Dr. Turner (Varela et al., 2013)[27] does not examine reliability; instead, it examines predictive validity. Dr. Turner seems to be unaware of the other studies on the validity of the Static-99R across ethnic groups. A recent summary of these studies is provided by Ahmed and colleagues.[28] Based on 17 distinct studies, Ahmed and colleagues found that the Static-99R had equivalent predictive accuracy for White men, Black men, and East Asian men. The predictive accuracy was somewhat lower for men of Latino background, a difference that could be attributed to many of these men being deported. There was, however, meaningfully lower predictive accuracy for men of Indigenous heritage (mostly studies from Canada and Australia). Given that Native Americans comprise a small proportion of the Michigan population (< 1%), the Static-99R would be expected to work as intended for most men in Michigan.

---

[26] Brouillette-Alarie, S, Proulx, J, & Hanson, RK. (2018). Three central dimensions of sexual recidivism risk: Understanding the latent constructs of Static-99R and Static-2002R. *Sexual Abuse, 30*(6), 676-704. doi:10.1177/1079063217691965.

[27] Varela, JG, Boccaccini, MT, Murrie, DC, Caperton, JD, & Gonzalez Jr, E. (2013). Do the Static-99 and Static-99R perform similarly for White, Black, and Latino sexual offenders? *International Journal of Forensic Mental Health*, *12*(4), 231-243.

[28] Ahmed, S., Lee, S. C., & Helmus, L. M. (2023). Predictive accuracy of Static-99R across different racial/ethnic groups: A meta-analysis. *Law and Human Behavior*, *47*(1), 275-291.

## C. Miscellaneous Criticisms

61.    On page 7, Dr. Turner states (correctly) that "Dr. Hanson cites a Bureau of Justice Statistics study which found that 2% of nonsexual offenders were later convicted of a sexual offense within a nine-year period."[29] Dr. Turner also correctly indicates that I said that this 2% figure is likely an underestimate. He then criticizes me for using the 2% figure as the ambient base rate for individuals with a criminal history but no history of sexual offending. This is an odd criticism. As I clearly state in my previous declaration (¶20), the 2% figure was not based on that Bureau of Justice Statistics study; instead, it was based on our prior review paper.[30]

62.    The Bureau of Justice Statistics study was included in my report to indicate that the findings of our previous review were consistent with subsequent research. Dr. Turner seems to imply that, based on this one study, I should have raised my estimate somewhere above 2%. If the estimate of the ambient base rate were raised, it would have strengthened my position that many individuals with a sexual offence history present a risk for sexual offending that is equivalent to the risk of first-time sexual offending among individuals with no previous or current sex crime convictions. Dr. Turner seems to be criticizing me for not recognizing that the evidence for my position is even stronger than the conservative way I presented it.

63.    On page 8, Dr. Turner states that using 20-year recidivism rates to estimate lifetime rates is misleading because there are material differences between an individual released at age 20 and an individual released at age 55. Although Dr. Turner does not specify the nature of the differences, I assume that he means that the

---

[29] The study in question is Alper, M, & Durose, MR. (2019). Recidivism of sex offenders released from state prison: A 9-year follow-up (2005-14). Special Report NCJ 251773, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

[30] Kahn, RE, Ambroziak, G, Hanson, RK, & Thornton, D. (2017). Release from the sex offender label. *Archives of Sexual Behavior, 46*(4), 861-864. doi:10.1007/x10508-017-0972-y.

individual released at age 20 (now 40) would be more likely to be alive and in good health than the individual released at age 55 (now 75). My position is that lifetime rates can be meaningfully estimated as 20-year rates, for all adults expected to live at least 20 years. The evidence for my position, stated in my previous declaration, is that the risk of sexual recidivism predictably declines the longer individuals remain offence-free in the community.

64.    These "time-free" effects are consistent across age groups.[31] Although younger individuals are higher risk than older individuals at time of release, *the pattern of decline is the same*. After 20 years offence-free, the likelihood of a new sexual offence is as small for individuals who were released when they were 20 as it is for individuals who were released when they were 55. It is sufficiently small for all age groups that it is within the measurement error of our current prediction model; hence, <u>there is no perceptible difference between the lifetime recidivism rates and the 20-year recidivism rates</u>.

65.    On page 8, Dr. Turner states that the Static-99R has raised ethical concerns about how it uses base rate information. To support this position, he cites a 2010 opinion article by Cauley entitled "The Death of the Static-99." Cauley argued that the Static-99/R should not be used because, among other things, it "does not have the support of cross-validation, independent studies or any peer reviewed publications." Cauley considered the problems with the Static-99/R to be serious, predicting that its use in applied practice would diminish to nothing, and that it would be increasingly rejected by courts. I am unsure why Dr. Turner decided to mention this particular article. The criticisms leveled by Cauley clearly do not apply to the

---

[31] Hanson, RK, Harris, AJR, Helmus, L, & Thornton, D. (2014). High risk sex offenders may not be high risk forever. *Journal of Interpersonal Violence, 29*(15), 2792-2813. doi:10.1177/0886260514526062.

Static-99R as it currently stands. A recent review article identified 56 Static-99R validation studies.[32] The average predictive accuracy in these studies was similar to the predictive accuracy in the development samples, and there were no statistically significant differences in the accuracy for studies involving the Static-99R's developers/authors 10 studies (AUC[33] = .66) and the independent authors' studies 46 studies (AUC = .69).

66.    Cauley's prediction that Static-99/R would stop being used was spectacularly wrong. Static-99R is the most commonly used sexual recidivism risk tool in the world, with routine use in the US[34] (including Michigan[35]), Canada,[36] Europe and East Asia.[37,38] It is also widely accepted in the US courts. Helmus and colleagues reviewed 83 cases in which Static-99 or Static-99R faced Daubert or Frye tests in the US.[39] In the vast majority of cases, Static-99/R results were admitted as presented by the evaluators. The few cases in which it was not admitted, or admitted in an altered form, tended to be from the early 2000s. At that time, it was unfamiliar, only

---

[32] Helmus, LM, Kelley, SM, Frazier, A, Fernandez, YM, Lee, SC, Rettenberger, M, & Boccaccini, MT. (2022). Static-99R: Strengths, limitations, predictive accuracy meta-analysis, and legal admissibility review. *Psychology, Public Policy, and Law*, *28*(3), 307-331.

[33] AUC stands for the Area Under Curve.  It is measure of predictive accuracy that ranges between zero and one and can be interpreted as the likelihood that a randomly selected recidivist would have a higher Static-99R score than a randomly selected individual who did not recidivate. AUC values between .64 and .71 are considered "moderate". See RK Hanson. (2022). *Prediction statistics for psychological assessment.* American Psychological Association.

[34] Kelley, S. M., Ambroziak, G., Thornton, D., & Barahal, R. M. (2020). How do professionals assess sexual recidivism risk? An updated survey of practices. *Sexual Abuse*, *32*(1), 3-29. https://doi.org/10.1177/1079063218800474.

[35] State of Michigan Department of Corrections (2021) *supra* note 15.

[36] Bourgon, G., Mugford, R., Hanson, R. K., & Coligado, M. (2018). Offender risk assessment practices vary across Canada. *Canadian Journal of Criminology and Criminal Justice, 60*(2), 167–205. https://doi.org/10.3138/cjccj.2016-0024.

[37] Helmus, Kelley et al. (2022) *supra* note 32.

[38] Lee, S. C., Hanson, R. K., & Yoon, J. S. (2022). Predictive validity of Static-99R among 8,207 men convicted of sexual crimes in South Korea: a prospective field study. *Sexual Abuse*, https://doi.org/10.1177/10790632221139173.

[39] Helmus, Kelley et al. (2022) *supra* note 32.

basic user guidance was available, and there was less research than in subsequent decades. Since 2011, there have been only a handful of admissibility challenges as Static-99R has gained widespread acceptance in applied practice. To quote Helmus and colleagues "Today, admissibility challenges centered on general acceptance are unlikely to succeed" (p. 322). Static-99R is very much alive.

67.     On page 8, Dr. Turner raised concerns about Static-99R's application to older populations. To support this claim, he cites a single Australian study from 2011.[40] The study scored 51 individuals with a history of sexual offending, using both Static-99 and Static-99R. Static-99R is identical to Static-99, with the exception of revised age weights. The researchers found that 11 of the 51 men had the same score on both instruments. This is as it should be. Updating risk tools using actuarial data should modestly change the results for most individuals scored on a previous version; nevertheless, some individuals may retain the same score, for example, individuals who are aged between 35 and 40 would receive the same score of zero for the age item on both the Static-99 and Static-99R.  There is no data in that article that raises any concerns about Static-99R application to older men. I have no idea why Dr. Turner cited this article to support his point. In contrast, there are some articles from the early 2000s that validly criticized the application of Static-99 to older (50+) men because Static-99 (the original version) failed to account for the significant decline in sexual recidivism risk with advanced age.[41,42] This criticism of

---

[40] Lennings, C., Seidler, K., Heard, R., Collins, E., & Nasr, R. (2011). Age and the Static-99R. *Sexual Abuse in Australia and New Zealand, 3*(1), 34–41. https://search.informit.org/doi/10.3316/informit.668112059639029

[41] Barbaree, HE, Langton, CM, Blanchard, R, & Cantor, JM. (2009). Aging versus stable enduring traits as explanatory constructs in sex offender recidivism: Partitioning actuarial prediction into conceptually meaningful components. *Criminal Justice and Behavior, 36*, 443-465. doi:10.1177/0093854809332283.

[42] Wollert, R., Cramer, E., Waggoner, J., Skelton, A., & Vess, J. (2010). Recent research (*N* = 9,305) underscores the importance of using age-stratified actuarial tables in sex offender risk

the original version of Static-99 motivated the revised age weights used in Static-99R.[43]

## VI. RESPONSE TO THE NON-EXPERT DECLARATIONS

68.     Tricia Dare opines at [9] that "The likelihood of committing criminal sexual conduct does not appear to change significantly with age. I have prosecuted many cases where the perpetrator was 60+ years old." The generalization concerning the likelihood of sexual offending and age is not true, and has no scientific basis. I am not aware of any researcher who has argued that individuals over the age of 60 are never charged with sexual crimes. A prosecutor with a long career would be expected to deal with a non-trivial number of older men charged with sexual offences (many for crimes committed years earlier).

69.     Scientific statements concerning the likelihood of sexual crime must be supported by group data indicating that fewer individuals in the 60+ age category commit sexual crimes than younger individuals. Tricia Dare presents no such data. There are, however, lots of data available on the topic of age and the risk of sexual crime. Well-conducted studies, by diverse research teams, using large sample sizes

---

assessments. *Sexual Abuse: A Journal of Research and Treatment, 22*, 471-490. doi:10.1177/1079063210384633.

[43] Helmus, L, Thornton, D, Hanson, RK, & Babchishin, KM. (2012). Improving the predictive accuracy of Static-99 and Static-2002 with older sex offenders: Revised age weights. *Sexual Abuse: A Journal of Research and Treatment, 24*(1), 64-101.

consistently find that the likelihood of all types of sexual crime declines significantly with advancing age.[44,45,46,47,48]

70.    The five studies I have cited are but a fraction of the available research on age and sexual offending. The decline in criminal behaviour with age is one of the most well-documented findings in criminology, and applies to both sexual and non-sexual crime. The pattern of decline is slower, however, for individuals who have sexually offended against children[49] than for other types of crimes; consequently, the small cohort of men over 60 before the courts will often contain a disproportionate number of individuals who have sexually victimized children. It may be this overrepresentation of individuals charged with sexual offences against children among the older men in courts that is the subjective experience motivating Ms. Dare's incorrect statement that the risk of sexual offending does not decline with advanced age.

71.    Danielle Russo-Bennetts opines [at 12] that "This [sexual] crime carries a higher rate of recidivism, based upon the cases I've personally handled in my years as a prosecutor." The meaning of her phrase "higher rate of recidivism" is not entirely clear, but I would assume that it means returning to the courts for either any new

---

[44] Alper & Durose (2019) *supra* note 29.

[45] Fazel, S., Sjöstedt, G., Långström, N., & Grann, M. (2006). Risk factors for criminal recidivism in older sexual offenders. *Sexual Abuse*, *18*(2), 159-167.

[46] Hanson, R. K. (2002). Recidivism and age: Follow-up data from 4,673 sexual offenders. *Journal of interpersonal violence*, *17*(10), 1046-1062.

[47] Raymond, B. C., McEwan, T. E., Davis, M. R., Reeves, S. G., & Ogloff, J. R. (2021). Investigating the predictive validity of Static-99/99R scores in a sample of older sexual offenders. *Psychiatry, Psychology and Law*, *28*(1), 120-134.

[48] Skelton, A., & Vess, J. (2008). Risk of sexual recidivism as a function of age and actuarial risk. *Journal of Sexual Aggression*, *14*(3), 199-209.

[49] Hanson (2002) *supra* note 46.

offence or, more narrowly, a new sexual crime. She appears to be discussing officially reported crime because she supports her assertion based upon the cases she has "personally handled in my years as a prosecutor." Personal experience, however, does not qualify as scientific evidence. Scientific statements concerning relative rates of officially recorded recidivism require statistics about the proportion of individuals who returned to court for the same crime, for a different crime, or did not return at all. She provides no such statistics. There are, however, many well-conducted studies, by diverse research teams, using large samples that compare the recidivism rates of individuals who have committed sexual and nonsexual crimes. As mentioned in my previous declaration, these studies find that the overall recidivism rate (any new offence) of individuals convicted of a sexual crime to be lower than the overall recidivism rate for individuals convicted of a nonsexual crime.[50,51,52]

72.    If Ms. Russo-Bennetts means "recidivism" to mean only a new sexual arrest or conviction by someone with a past sexual offence, then her comparison statement ("higher") requires a comparison group. If the comparison group is defined as individuals who have committed nonsexual crimes and the rate at which they are rearrested or convicted of a similar offence, her assertion is clearly false. The rate of nonsexual recidivism is far higher than the rate of sexual recidivism – even for individuals who have committed sexual offences. For example, a large Bureau of Justice Statistics study by Alper and Durose (2019)[53] found that 7.7% of individuals released following sexual offence conviction were rearrested for rape or

---

[50] Alper & Durose (2019) *supra* note 29.

[51] Langan, PA, Schmitt, EL, & Durose, MR. (2003). Recidivism of sex offenders released from prison in 1994. NCJ 198281.  U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

[52] Stewart, LA, Wilton, G, Baglole, S, & Miller, R. (2019). A comprehensive study of recidivism rates among Canadian federal offenders. Publication Number R-426. Correctional Service of Canada. https://www.csc-scc.gc.ca/research/005008-r426-en.shtml.

[53] Alper & Durose (2019) *supra* note 2  9.

sexual assault during the nine-year follow-up period; however, 67% were arrested for any crime. In comparison, 84% of individuals released following a nonsexual offence conviction were rearrested in the same follow-up period. Among individuals whose most serious commitment offence was drugs, 60.4% were rearrested with another drug offence. For individuals committed for public order offence, 70.1% were rearrested for another public order offence. For individuals committed for assault, 44.2% were rearrested for assault. And so on. The only commitment offence that showed lower "crime specific" recidivism than sexual offending (7.7%) was homicide (2.7%).

73.    Critics may argue that the rate of sex crime specific recidivism is still high (despite decades of data to the contrary) because of the low proportion of sexual crimes reported to police. Sexual crimes are not the only crimes, however, where the perpetrators go undetected. Motor vehicle theft is usually reported to police, but the police rarely identify the perpetrator (clearance rate of less than 15%).[54] A tiny fraction of drug offences would be reported to the police because both parties are willing participants; nevertheless, the drug-crime specific recidivism rate is high (60%). Reporting rates for sexual crimes may be low, but the police clearance rate for sexual crimes is relatively high. Most sexual crimes are committed by individuals known to the victim, meaning that it is easy to identify the perpetrator once the police have determined that a sexual offence has occurred. Low detection rates are not unique to sexual offences.

74.    Sarah Rennie opines that "Convicted sex offenders are likely to reoffend with a sex offense after release" (page 1, §1). She presents no evidence to support this statement. In her report she cites recidivism statistics indicating

---

[54] FBI: UCR. 2017 Crime in the United States. https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/topic-pages/clearances#:~:text=Overview,by%20arrest%20or%20exceptional%20means.

observed recidivism rates of 5% to 15% after five years. These recidivism statistics were drawn from many of the same studies I cited in my October, 2021, declaration. She does not present any rationale for how she extrapolated from the five-year recidivism statistics of 5% to 15% to a likelihood of reoffending. Instead, she simply states that "the reoffence and recidivism are difficult to measure" (page 1, §2). Consequently, Ms. Rennie's statement that individuals with a sexual offence conviction are likely to reoffend is a personal opinion without scientific foundation.

## VII. CONCLUSION

75.    In summary, my position is that officially recorded arrests, charges, and convictions are valuable, if imperfect, indicators of sexual recidivism risk. Observed rates will underestimate the actual rates; however, when used as the outcome variable in prediction studies, relative differences in officially recorded sexual crimes are a valid indicator of relative risk for sexual recidivism. Groups that have equivalent observed sexual recidivism rates can reasonably be assumed to have equivalent real sexual reoffence rates. And as noted above, if anything the comparative reoffence rates of those with past sexual offences may be lower (not higher) given that offences by people with past convictions are more likely to be detected and prosecuted. Nothing put forward by Defendants' experts suggests otherwise. Consequently, I stand by my previous conclusion that many individuals subject to sexual offender registration and notification laws pose no more risk for sexual offending than do individuals not subject to such laws. Furthermore, we can identify individuals with a sexual offending history who now pose a very low risk for sexual recidivism using currently available methods. Requiring these very low risk individuals to register as sexual offenders serves no public protection function.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

R. Karl Hanson, Ph.D., C.Psych.

Dated:  April _25_, 2023