# Exhibit 8:

## Dr. J.J. Prescott Expert Report

### *Does III v. Whitmer*

**EXPERT REPORT/DECLARATION OF
JAMES J. PRESCOTT, J.D., PH.D.**

I, James J. Prescott, J.D., Ph.D., state under penalty of perjury as follows:

## I.  Background, Education, and Qualifications

I am the Henry King Ransom Professor of Law at the University of Michigan Law School in Ann Arbor, Michigan, where I have been teaching since 2006. I also have an appointment in the Economics Department at the University of Michigan, and I co-direct the Law and Economics Program and the Empirical Legal Studies Center at the Law School. I received my Ph.D. in Economics from the Massachusetts Institute of Technology in 2006. I earned my J.D. *magna cum laude* from Harvard Law School in 2002 and my B.A. in Public Policy and Economics with honors and distinction from Stanford University in 1996.

Much of my work (which is primarily empirical) centers on the consequences of post-release laws for people convicted of sex offenses. I am most interested in the effects that sex offender registration and community notification laws have on sexual offending behavior. I have also written on what we know (and do not know) about sex offense recidivism. I have attached my CV, which lists my publications (including those from the past ten years) as well as cases in which I have testified as an expert. My CV also provides further details on my expertise and experience, including a list of institutions and conferences at which I have presented my research on measuring the effects of sex offender registration and notification laws.

Several notable opinions addressing sex offender registration and notification laws have cited my research, including in Michigan courts and with respect to Michigan laws. See, for example, *Does #1-5 v. Snyder*, 834 F.3d 696, 704 (6th Cir. 2016); *People v. Betts*, __ Mich. __, Mich. Sup. Ct. No. 148981, 2021 WL 3161828, at *15 (Mich. July 27, 2021); *State v. Hubbard*, No. 2020-0544, 2021 WL 4898587, at *25–26 (Ohio Oct. 21, 2021).

Also, I have just completed co-editing (as well as writing a portion of) a collected volume summarizing the state of empirical evidence on sex offender registration and notification laws. Released earlier this year by Cambridge University Press, the book includes cutting-edge views of researchers in the field.[1]

---

[1] Logan, Wayne A., & J.J. Prescott, eds., SEX OFFENDER REGISTRATION AND NOTIFICATION LAWS: AN EMPIRICAL ASSESSMENT (Cambridge Univ. Press) (2021),

In one of the central chapters, along with my regular collaborator, Amanda Agan, I collect and describe at length virtually all credible empirical scholarship (through early 2021) examining the effects on criminal behavior (specifically, recidivism) of sex offender registration and notification laws.[2] The report that follows is organized around my own original research on the consequences of sex offender registration and notification laws. But my opinion, summarized below, is informed more broadly by my expertise on the extensive body of scholarship on the questions relevant to this case.

## II.  Summary of Research Findings

All of what we know about Sex Offender Registration and Notification (SORN) laws suggests that such laws do not serve their stated purpose of lowering the risk of recidivism, reducing the total number of sex offenses, or making communities safer. To wit:

- States enacted and implemented registration and notification laws with no sustained or rigorous study of their likely consequences, often doing so in response to public outcry and anger following a particularly heinous crime covered at length by the media.

- Many states, including Michigan, impose post-release laws on the basis of the crime of conviction, regardless of whether the registrant presents any risk to anyone and without any attempt to use accurate and cost-effective risk assessment protocols.

- States defend these laws as attempts to combat sex offense recidivism and to make the public safer, but the scientific evidence is nearly unanimous that notification laws (and likely other types of affirmative restraints) do *not* reduce recidivism. This conclusion derives from a significant body of empirical work that has examined the behavior of people convicted of sex offenses and the consequences of SORN laws on recidivism.

- This body of scholarship is consistent with my own research, which shows that, at best, public registration and other affirmative restraints do not

---

https://www.cambridge.org/core/books/sex-offender-registration-and-community-notification-laws/5E3B30A35C5D3CF518C9EDEEF4589BA9.

[2] *See* Agan, Amanda Y., & J.J. Prescott, "Offenders and SORN Laws," in SEX OFFENDER REGISTRATION AND NOTIFICATION LAWS: AN EMPIRICAL ASSESSMENT (Logan, Wayne A., & J.J. Prescott, eds.) (Cambridge Univ. Press) (2021), 102–44, http://www.dropbox.com/s/ypdki9picqizsr3/Chapter_7_Agan_Prescott_2021.pdf.

improve recidivism rates, and they may well be counterproductive, that is, they may increase recidivism. The complex burdens that registrants face in Michigan and in states with similar laws limit their ability to succeed post-release and increase the risk of re-offense.

- Although perhaps counterintuitive at first blush, this conclusion is not surprising. Sex offender laws as they are currently constructed in Michigan and elsewhere place substantial burdens on every registrant, not just those with a high risk of recidivism. These burdens include the public stigma of widespread notification on top of de facto housing and employment limitations, as well as frequent registration requirements. These added hurdles likely add to the risk of recidivism, not reduce it.

- Despite this research, most of these laws and their amendments remain non-evidence-based and do not reflect our current understanding (from decades of research) of how registrants behave or what we know works and does not work in reducing recidivism risk.

- Furthermore, research demonstrates that SORN laws like Michigan's are financially costly for states and local governments to enforce, create a great deal of useless fear among members of the public, and are financially, physically, and emotionally burdensome to registrants and their families, which itself may increase recidivism risk.

- Finally, we know from well-validated research that there are alternative approaches to reducing recidivism involving treatment and targeted risk assessment. These strategies are evidence-based. When faced with effective alternatives, the use of ineffective or counterproductive registration and community notification laws like Michigan's defies reason and is very hard for experts in the field to understand.

## III.  Introduction to the Research

This report addresses a central question in the *Does III* litigation: What effects do sex offender registration and notification (SORN) laws like the one in Michigan have on sex offense recidivism?

1.  As to community notification—posting registrants and their information on a publicly accessible website—there is a clear scholarly consensus that such notification laws do *not* work to reduce sex offense recidivism. In fact, as I explain below, there are very good reasons to think that, based on the data we have and existing empirical analyses, these laws *increase* sex offense recidivism by exacerbating

recidivism risk factors. While this counterproductive result may seem counter-intuitive (as it was to me initially), it should not be surprising upon reflection. Community notification laws make registrants' lives very difficult: they make securing and keeping gainful employment and stable housing challenging. These aspects of life are well-documented to be important to explaining recidivism patterns. Essentially, returning to "normal" life for individuals on public registries is nearly impossible. In a nutshell, the evidence indicates that the recidivism-increasing effects of community notification laws at the very least offset and may even overwhelm whatever public safety benefits such laws might offer (if any).

2.  In work released earlier this year (see the Cambridge University Press volume that I edited with Wayne Logan, cited above), Amanda Agan and I describe this consensus on the effects of SORN laws on sex offense recidivism, concluding:

> Dozens of studies to date have sought to assess whether and how SORN laws affect sex offense recidivism. Multistate studies—some national in scope—using federal crime data and deploying panel data methods or time-series approaches have found no evidence that notification reduces recidivism and some evidence that it may increase recidivism. In single-state studies, using many different empirical research tools and data sources and examining different measures of recidivism in different jurisdictions (including Arkansas, D.C., Florida, Iowa, Maryland, Minnesota, New Jersey, New York, North Carolina, South Carolina, Texas, and Wisconsin), researchers from different disciplines, working independently, have essentially all failed to detect any evidence that notification reduces recidivism. The sole exception to this scholarly consensus is Duwe and Donnay (2008), who, using a small sample of potential recidivists, in a jurisdiction (Minnesota) employing an atypical, narrow, individual risk-based approach, find at least some non-trivial evidence that notification may reduce recidivism.

3.  It is possible to criticize some aspects of the studies finding public registries ineffective that I review in the chapter (indeed, I discuss many of these criticisms myself), but it is nevertheless the case that where one study is weak, another is strong—and together, they form a convincing body of scholarship that tells a coherent and scientifically satisfying account of the general inefficacy of SORN laws (including the possibility that SORN laws may increase sex offense recidivism). Below, I describe how my own research aligns with this consensus, but there are many, many other studies that come to the same critical conclusion: that registration and notification laws, despite being expensive to enforce, do not

appear to offer anything in terms of public safety. This substantial body of scholarship is referenced at length in my chapter with Agan, which is cited above.

4.  Although I do not focus on the argument in this declaration, it is worth emphasizing that baseline sex offense recidivism rates, whether high or low, are irrelevant to the central question whether SORN laws are effective at *reducing* recidivism. The evidence in general supports the view that baseline sex offense recidivism rates are quite low.[3] And yet, whatever the actual recidivism rate, the evidence indicates that SORN laws either do not change the rate (at best) or actually make recidivism worse, and concerns about under-reporting do not change this conclusion. SORN laws simply do not reduce the risk that someone will sexually reoffend, whether that risk is high or low. The idea that sex offense recidivism rates may be higher than what experts assert just confuses the most important policy question.

## IV.  The Effects of Sex Offender Laws on Recidivism

5.  Rather than reducing recidivism, my research indicates that notification laws may well have *increased* (and almost certainly have *not* reduced) the frequency of sex crimes committed by individuals previously convicted of a sex offense.[4] I present this research in three parts (A, B, and C of this section). First, I report the empirical results of my own research and explain their implications for evaluating Michigan's sex offender registration and notification laws. I focus on community notification's effects. Second, I describe the data and empirical methodology I use in my research to help the Court and others understand the inferences I draw and the robustness of the findings to alternative interpretations. Third, I explain how community notification (and, by implication, other burdensome post-release laws that share similar characteristics—like requiring the reporting of vast amounts of information, or imposing travel limitations, or residency restrictions), although

---

[3] Lave, Tamara Rice, J.J. Prescott, & Grady Bridges, "The Problem with Assumptions: Revisiting the Dark Figure of Sexual Recidivism," *Behav. Sci. & the Law*, 39(3) (2021), 279–306, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3906329 (explaining why claims that unreported recidivist sex crimes are pervasive are empirically unfounded).

[4] *See* Prescott, J.J., & Jonah E. Rockoff, "Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?," *Journal of Law and Econ.*, 54 (2011), 161–206, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1100663.

intended to make communities safer, may actually put people at greater risk of becoming victims.

### A. The Recidivism Consequences of Registration and Notification Laws

6.   Registration and notification laws have the potential to influence sex offending behavior in two primary ways. First, potential first-time sex offenders (or nonregistrants more generally) could become less likely to commit sex offenses because they fear having registration and notification laws applied to them in the future if they are caught and convicted. I refer to this behavioral response as "deterrence." Second, individuals previously convicted of sex offenses who are presently subject to registration and notification laws could become less likely to commit additional sex offenses if these laws make doing so harder—by increasing the difficulty of committing a crime or the chance of detection—or by somehow mitigating risk factors that cause individuals to recidivate. I term this response "recidivism reduction."

7.   With respect to reducing the recidivism of individuals previously convicted of sex offenses, the results of my research do *not* support the use of community notification (i.e., public registries). But my results do provide some support (with the caveats detailed below) for the use of *private* registries to help the police and other authorities monitor individuals previously convicted of sex offenses. I discuss these latter findings on the effects of *private* registration briefly for completeness and in the interest of full disclosure, but *Michigan has a public registration system*.[5] The somewhat mixed picture on the costs and benefits of private registration to reducing recidivism cannot justify Michigan's public registration scheme.

8.   <u>Private Registration</u>: To begin with, I find no discernible deterrent effect of private (law enforcement only) registries on nonregistrants (i.e., *potential* sex offenders). This is not surprising—in the 1990s, private registries allowed only the police or other state officials to learn of a conviction. As a result, there was little public shame (so long as records remained confidential), and the burdens of complying with registry requirements were very low by comparison with today's time-consuming, difficult, and expensive obligations (for example, today, SORN

---

[5] Under Michigan's registration statute, only a small number of registrants are on a non-public registry, namely persons adjudicated as juveniles, MCL §§ 28.728(4)(a)-(b), and some but not all individuals classified at "Tier I" based on the offense of convictions, MCL § 28.728(4)(c).

compliance in Michigan requires *in-person* re-registration within three business days of a change in residence, academic status, and/or employment status).

9.  With respect to the effect of private registries on recidivism, I fail to find any reliable evidence that they reduce crimes against victims who are strangers to the registrant. I do uncover evidence that private registries may decrease recidivism against victims who are "closer" to the registrant (e.g., family members, neighbors, and acquaintances), but it is possible that some of this reduction may be explained by the statistically insignificant *increase* in recidivism against victims who are strangers that I identify—i.e., private registries may partly displace crime elsewhere but not reduce it overall.

10.  There are two further caveats critical to understanding my findings regarding private registries. First, although there is very little work on the recidivism effects of private registration, at least two studies have been unable to confirm any recidivism-reduction effects. Specifically, Bouffard and Askew (2019) and Agan (2011) both fail to detect any evidence that private registration reduces recidivism.[6] Second, because research on private registration focuses on laws from the 1990s, care must be taken in extrapolating to present-day regimes re-imagined as private registries. Leaving aside the fact that registration information is now almost entirely public in Michigan (and in all states for at least some registrants) and so the effects of private registration are irrelevant, the procedures and requirements of registration in the 1990s were *significantly* less burdensome in time and money, and in terms of the difficulty of compliance, than they would be if a "private version" of the average public registry were implemented today.

11.  <u>Community Notification</u>: With respect to community notification laws like those employed in Michigan, however, I discover a different pattern. The threat of becoming subject to a community notification regime—and the shame and collateral effects that accompany being publicly identified as a "sex offender"—appear to have a measurable deterrent effect (i.e., it reduces offenses) by nonregistrants. But, once I consider the number of registrants, I find that the more people a state subjects to community notification, the *higher* the relative frequency of sex

---

[6] Bouffard, Jeff A., & LaQuana N. Askew, "Time-Series Analyses of the Impact of Sex Offender Registration and Notification Law Implementation and Subsequent Modifications on Rates of Sexual Offenses," *Crime & Delinquency*, 65(11) (2019), 1483–512, https://journals.sagepub.com/doi/10.1177/0011128717722010; Agan, Amanda Y., "Sex Offender Registries: Fear without Function?," *Journal of Law and Econ.*, 54 (2011), 207–39, https://www.journals.uchicago.edu/doi/pdfplus/10.1086/658483.

offenses in that state. These results are highly statistically significant. Thus, it is very unlikely that these laws are reducing recidivism by registrants; instead, it is probable that these laws are actually *increasing* recidivism (that is, that the laws are causing positive harm).

12. Specifically, I find a 0.86% increase in the number of sex offenses per year for every additional registrant per 10,000 people in a state with a notification regime in place. Using the average registry size across our sample of states, this practically and statistically significant increase in recidivism by registrants more than offsets the estimated gains from the deterrence of crimes by nonregistrants. On balance, for states with average-sized registries, I calculate that notification laws lead to an additional 0.144 sex offenses per 10,000 people (relative to the number of offenses that would have occurred with only a private registration law in place). If Michigan were a "typical" jurisdiction in terms of the per capita number of registrants it chose to subject to notification, these findings would translate to between 100 and 200 additional sex offenses per year in the state.

13. Michigan, however, has one of the largest public sex offender registries in the country,[7] which means the recidivism-*increasing* effects of community notification are likely to be even larger in magnitude. At registry sizes like Michigan's in 2021 (conservatively estimated at more than 34 registrants per 10,000 individuals in the state), notification-generated increases in recidivism are highly likely to dwarf any plausible deterrence gains, pointing to higher overall sex offense rates than would exist in a state without a community notification law, possibly as much as 5% higher. This increase in total sex offenses would be *net* of any reductions in sex offenses by first-time offenders that notification laws may deter. This is true even using conservative assumptions designed to put notification in a favorable light. Put simply, existing evidence suggests that it is likely that, far from reducing sex offense recidivism, Michigan's notification law is actively increasing the total number of sex offenses each year in the state.

---

[7] In a recent filing in *Does #1-6 v. Whitmer*, 16-cv-13137, Dkt. 127, PageID. 2589 (E.D. Mich.), the state indicated that there were 35,049 active registrants, 10,627 incarcerated registrants, and 9,632 nonresident registrants. In the calculations I make in the text, I use 35,049 as a conservative (small) estimate of the size of Michigan's registry, excluding registrants who are not currently living in the community either because they are incarcerated or because they have moved out of state. I use 10.05 million as an estimate of the total population in Michigan in 2021, https://www.census.gov/quickfacts/fact/table/MI (visited on Dec. 23, 2021).

14. The results of my work are rooted in comparisons of sex offense frequencies over time and across states. It is worth noting that Michigan's laws and criminal offense and other data are included in my analysis. I carefully control for inherent geographic, economic, and social differences and trends over time. Changes in national mood, for example, would not generate the patterns the data reveal; one also cannot account for the study's findings by arguing that states with large registries are just *different* from other states. For one, I control for county-level demographics and income over time and for other crime rates (e.g., the frequency of non-sex crimes generally as well as the frequency of assaults). Therefore, when public registries grow, even *relative to other kinds of crime*, the number of sex offenses rises under notification. For another, even within a state, if the number of registrants grows faster than average (relative to other states), sex offenses also increase relatively faster than average.

15. Unfortunately, my research on community notification suggests the total number of sex offenses will continue to grow as Michigan's public registry itself continues to grow in size. The application of community notification to a larger group of people will likely result in *additional* sex offenses (through more crime from greater recidivism), and this growth will increasingly outweigh any fixed gains that might occur through the deterrence of nonregistrants. Likewise, policy changes that contribute to larger public registries by making registration a consequence of more statutory offenses, by allowing it to apply to earlier convictions, etc., are also likely to generate more total sex offenses.

16. My work's conclusions that notification does not reduce recidivism and may increase it are not alone. In fact, my results align with the established consensus view of experts in the field. For example, Agan's (2011) research largely tracks my findings. She observes that individuals subject to notification laws are, if anything, more likely to be re-arrested for a sex offense than those who are not.[8] One might imagine this finding as consistent with an increase in sex offense *detection*, but on balance, the evidence is more consistent with the increase in arrests as evidence of elevated recidivism. Michigan was also among the states in Agan's sample.

17. Perhaps more important, my findings reflect the conclusions of virtually all careful and serious empirical work in this field. In my very recent review of relevant literature for my edited volume with Wayne Logan, I report that dozens of studies to date have sought to assess whether and how registration and notification laws affect sex offense recidivism. Multistate studies—some national in scope—

---

[8] Agan, Amanda Y., "Sex Offender Registries: Fear without Function?," *Journal of Law and Econ.*, 54 (2011), 207–239, https://doi.org/10.1086/658483.

use federal crime data and deploy panel data methods or time-series approaches. None of them uncovers evidence that notification reduces recidivism, and some offer at least tentative evidence that it may increase recidivism. In single-state studies, using many different empirical research tools and data sources and examining different measures of recidivism in different jurisdictions (including Arkansas, D.C., Florida, Iowa, Maryland, Minnesota, New Jersey, New York, Pennsylvania, South Carolina, Texas, and Wisconsin), researchers from different disciplines, often working independently, have essentially all failed to uncover any evidence that notification reduces recidivism.[9] Thus, my work in both empirically researching the effects of registration and notification laws and comprehensively compiling what we know about them, along with virtually all other relevant empirical research, strongly undermines the case that notification laws actually combat recidivism.

18.  Notification also does *not* appear to make it more difficult for registrants to commit new crimes. This pattern is at odds with the underlying theory that publicly identifying individuals previously convicted of sex offenses will alert potential victims to the presence of "nearby" potential recidivists and allow these potential victims to engage in precautionary behavior to protect themselves (see part 3.C below). Specifically, I find nothing to indicate that notification laws generate different increases in the frequencies of sex offenses against each type of victim— i.e., against family members, neighbors, acquaintances, or strangers. If community notification were increasing the difficulty of committing a crime against a friend, neighbor, or acquaintance in a systematic way (versus a complete stranger, for example), we would expect to see differences in frequency growth across categories of victims. Instead, there is no evidence that neighbors and acquaint-ances have benefited even in a relative sense from community notification laws in

---

[9] The sole exception to this scholarly consensus is Duwe and Donnay (2008), who, using a small sample of potential recidivists, in a jurisdiction with an atypi-cal, narrow, individual risk-based approach that looks nothing like Michigan's, find at least some non-trivial evidence that notification may reduce recidivism. *See* Duwe, Grant, & William Donnay, "The Impact of Megan's Law on Sex Offender Recidivism: The Minnesota Experience," *Criminology*, 46(2) 2008, 411–446, https://doi.org/10.1111/j.1745-9125.2008.00114.x. There has been little research comparing risk-based versus conviction-based registration schemes, but it is worth noting that the only research showing any reduction in recidivism after implemen-tation of a notification scheme involved a risk-based registry. There is not, to my knowledge, a single study showing that a conviction-based registry—such as the one in Michigan—reduces recidivism.

terms of reduced victimization risk, suggesting that the primary hypothesis in support of notification laws is at best questionable.

* * *

19.  The evidence, according to both my research and to the vast majority of experts in this field, is clear on the effects of these post-release laws on sex offense recidivism: community notification laws do not appear to be effective at reducing recidivism; if anything, they increase it. The many burdens registrants experience when subject to notification—the extreme notoriety that accompanies it, and the poor and unstable housing and employment and the difficulty of reintegrating into society that emanate from it—go a long way toward making sense of why my research finds notification laws are associated with *increases* in recidivism.

### B. Empirical Methodology for Identifying the Effects of Notification

20.  Because the effects of these laws depend a great deal on how they are structured (see part 3.C below), and because the states and the federal government passed these laws with no in-depth investigation of their likely consequences, my research employs well-known federal crime data covering many states over many years and standard empirical methods to generate reliable evidence on both how these laws influence recidivism levels and, even if crime frequency remains unaffected, how these laws alter sex offending behavior more generally.

21.  My approach builds on the fact that notification laws are designed to reduce recidivism by making individuals who are located "near" potential recidivists (like neighbors, acquaintances, etc.) safer by providing any potential victim with supposedly useful identifying information about individuals previously convicted of a sex offense who might pose a threat. Therefore, if notification works as its proponents suggest, we would expect to see relatively fewer offenses against neighbors and acquaintances under a notification regime. To test this empirical hypothesis, I made use of the federal government's National Incident-Based Reporting System (NIBRS) data, the only high-quality, multi-state crime data with details about offender-victim relationships.

22.  NIBRS is a relatively new data collection effort, with only a few states participating at the outset in the early 1990s. As registration and notification laws were enacted primarily in the 1990s, I selected the 15 states that were participating in NIBRS as of 1998: Colorado, Connecticut, Idaho, Iowa, Kentucky, Massachusetts, *Michigan*, Nebraska, North Dakota, Ohio, South Carolina, Texas, Utah, Vermont, and Virginia. This is a fairly representative group of states, both geographically and in terms of the evolution of their sex offender legislation. To enhance the

reliability of my work, I limited my analysis to states that were part of NIBRS by 1998 to be sure that I had data for a significant period of time both before and after the states enacted their notification laws. I conducted my analysis using NIBRS data through 2005, which translates to more than 10 years of data for some states and at least 7 years for all states.

23.  Next, I collected the content and timing of the registration and notification laws in each of these 15 states. I conducted painstaking legal analysis for more than a year to identify the precise times that statutes were enacted and when each became effective and operational. (Because NIBRS crime data are collected by month, I am able to make use of these precise legal details in my empirical work.) In coding these laws, I was careful to distinguish between private registration and community notification (i.e., public registration) because the two approaches are meant to function in very different ways. I was also careful in how I characterized each notification law, as the content of these laws varies across states and over time. For example, early notification laws allowed the public merely to access paper registries; eventually, all notification laws required that data for many registrants be posted to publicly accessible internet web-registries. Some states also enacted "active" notification laws under which public employees (e.g., police officers) were required to take affirmative steps to make sure individuals deemed to be at-risk (e.g., neighbors) were informed of relevant released individuals, for example, by written notice or a personal visit by a police officer.

24.  My research also took into account whether these laws had discretionary or mandatory features as they evolved over time. Finally, with respect to internet registries, I conducted a separate investigation to determine not only when each web-registry law became effective but also when each site became operational *in fact* and mostly complete in its coverage.

25.  With data on individual sex offense incidents by county for 15 states (including Michigan) over many years, I was able to conduct a fairly straightforward "program evaluation" had I wished to go that route. In effect, using multiple regression analysis, I could have proceeded by examining how the frequency of sex offenses (and the types of sex offenses—in particular, the frequency of sex offenses between neighbors or acquaintances) changed in response to the implementation of registration and notification laws. With 15 states and a long stretch of years, I had the ability to control for national trends or a trend over time in a single state (one that might affect the number of sex offenses at just around the time a state passed a sex offender law) to ensure that neither was confounding the results of the research. These data allow me, for example, to account for state-specific trends in the number of sex offenses as well as trends in other crime levels.

26.  If I had been interested purely in whether registration and notification laws reduced sex crime *on the whole*, this empirical strategy would have been the appropriate approach. But these laws have been defended as attempts to reduce *recidivism* by registrants specifically, not merely as additional deterrents to "potential" first-time offenders or nonregistrants. As described above, public registration laws could theoretically reduce new sex offenses in one of two ways: (1) by deterring nonregistrants (i.e., those who wish to avoid, for example, the burdens and shame of being subject to notification should they be caught and convicted), and (2) by reducing the recidivism of registrants by providing information to the public, thereby facilitating precaution-taking and monitoring. I designed my research to assess each of these policy-relevant possibilities individually. Separately identifying and measuring these two hypothetical consequences of notification laws is essential but also difficult to do with comprehensive federal crime data because these data do not indicate whether a crime was committed by a registrant (recidivism) or instead by a nonregistrant (new offender).

27.  My research solved this problem in an intuitive way. Although I, too, was unable to observe whether a crime in my data was committed by a registrant or by someone who was not subject to registration, I made use of the following simple fact: registration and notification laws cannot reduce (or increase) the frequency of sex offenses through changes in recidivism levels (by, for example, improving police and public monitoring or by informing potential victims of nearby threats) when nobody or only a few individuals previously convicted of a sex offense are subject to these laws—i.e., when registries are close to "empty." On the other hand, registration and notification laws *can*, in theory, reduce the frequency of sex offenses even when registries are "empty" by deterring nonregistrants who fear becoming subject to these laws in the future if they are convicted of committing an eligible sex offense.

28.  I extend this logic in my research to take advantage of the significant variation in retroactive coverage of registration and notification laws across states. This coverage variation resulted in dramatic differences in the numbers of covered individuals as these laws became effective: some states applied their laws only prospectively; others made them retroactive, applying them to individuals convicted and/or released over a range of different time frames. Accordingly, as states began to enforce their registration and notification laws, some states had large registries while others had empty or nearly empty registries.

29.  To operationalize this idea, I collected registry size data for each state at different points in time and used county-level registry sizes in August 2007 to estimate the size of the registry in each county for each month. In effect, I studied

how county patterns in the number and type of sex offenses vary with my measure of registry size over time. If these laws work to reduce recidivism as proponents assert, one would expect to see that counties with larger registry sizes had greater relative reductions in the number of sex offenses, all else equal (i.e., after controlling statistically for other differences across counties, states, and time—crime rates and how they change, demographics and how they change, national trends and shocks, etc.). This pattern is not what I found, however.

### C. How Notification Laws Can Increase Recidivism

30. The conclusion of my research that notification appears to _increase_ recidivism (see part 3.A) may seem counterintuitive at first blush. After all, community notification (i.e., the active identification of individuals previously convicted of sex offenses through public registries) is designed to alert potential victims to the threat a nearby registrant may pose so that they may engage in precautionary behavior and/or monitor the registrant. But, for this approach to reduce the recidivism levels of registrants, two separate conditions must be met.

31. First, for notification laws to reduce recidivism, public identification (along with other affirmative restraints placed on registrants) must make it more difficult, on average, for a potential recidivist to commit a sex crime. This condition, in turn, requires (1) that individuals who are likely to be victimized must be _newly_ informed of a registrant's status _as a result_ of the operation of the community notification law, (2) that potential victims are _newly_ capable of acting in ways that reduce their exposure to victimization by the registrant or that the registrant at risk for committing a new sex offense is _newly_ unable to access the potential victim, and (3) that the registrant at risk of committing a new sex offense will not discover an alternative victim nearby who is either unaware of the registrant's criminal history or is unable to act on the basis of that information to eliminate (or reduce by a lot) the risk of becoming a victim.

32. These conditions seem unlikely to hold in the vast number of cases. As ample research demonstrates, offenders are rarely strangers to their victims. In fact, the vast majority of sex offenses occur within the context of an existing familial or other social relationship. Importantly, friends and family members of people previously _formally convicted_ of sex offenses will often already be aware of a potential recidivist's criminal history, meaning that registry information will be irrelevant to this group of potential victims. Even if the information is news to a potential victim, and even if the victim can reduce her exposure, which research

14

shows may happen rarely,[10] or if the registrant is prevented from accessing some victims, a registrant who becomes a risk for reoffending will likely be able to find other potential victims.

33. Second, for notification to reduce recidivism, these laws must avoid aggravating the risk factors that significantly increase a registrant's chance of reoffending. Even if notification and other affirmative restraints were to succeed at making it more difficult for registrants to reoffend, recidivism might still increase: after all, the difficulty of committing a crime is only one factor, among many, affecting a registrant's likelihood of recidivating. Publicly identifying an individual as a "sex offender" (as well as imposing other significant burdens, as Michigan does, for example, through frequent reporting requirements, etc.), by contrast, influences *many* of these factors by dramatically changing a registrant's daily life, future prospects, and psychological and financial burdens. Although proponents argue, without evidence, that laws that impose restraints and/or burdens on a registrant might reduce recidivism if such laws make the commission of crime more difficult or if they mitigate risk factors, SORN laws in fact seem highly likely to *increase* recidivism because they exacerbate risk factors (e.g., unemployment, unstable housing) that are known to contribute to reoffending.

34. In sum, notification regimes, with their attendant registration burdens, are much more likely to *increase* the likelihood that affected individuals return to crime, all else being equal. These laws and their application exacerbate recidivism risk factors in significant and visible ways. On the basis of many compelling empirical studies (and no contrary evidence to speak of), scholars agree that publicly identifying individuals who were previously convicted of sex offenses makes it more difficult for these individuals to find employment and housing. Life as a registrant, by all accounts, is simply much more difficult than it otherwise would be—in no small part because of the operation of comprehensive sex offender post-release laws.

35. Notification schemes (as well as other post-release sex offender restrictions) are intended to reproduce an upside of incarceration, essentially by "incapacitating" potential recidivists *as if* they were still in prison. Community notification and other affirmative restraints attempt to create a barrier between registrants and potential victims. Unfortunately, the analogy of post-release laws to prison is too

---

[10] *See, e.g.*, Anderson, Amy L., & Lisa L. Sample, "Public Awareness and Action Resulting from Sex Offender Community Notification Laws," *Criminal Justice Policy Review*, 19(4) (2008), 371–396, https://journals.sagepub.com/doi/10.1177/0887403408316705.

apt: the public identification of individuals as "registered sex offenders" in society reproduces many of the deprivations and burdens of prison in addition to the fact of social and economic incapacitation. Plus, by making the world outside of prison more like being inside prison, sex offender post-release laws reduce the value of any threat to return potential recidivists to prison should they commit additional sex crimes.[11] Put another way, the more difficult, lonely, and unstable registrants' lives are, the more likely they are to return to crime—and the less they have to lose by committing new crimes.

36. Michigan's SORN law almost certainly contributes to this risk. Registrants face a variety of collateral burdens that, according to research,[12] negatively interfere with their ability to find gainful employment, obtain housing, and form positive relationships—all of which are key components in reducing criminal

---

[11] *See* Prescott, J.J., "Portmanteau Ascendant: Post-Release Regulations and Sex Offender Recidivism," *Connecticut Law Review*, 48(4) (2016), 1035–78, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2822045.

[12] *See, e.g.*, Evans, Douglas N., & Michelle A. Cubellis, "Coping with Stigma: How Registered Sex Offenders Manage Their Public Identities," *American Journal of Criminal Justice*, 40 (2015), 593–619, https://doi.org/10.1007/s12103-014-9277-z; Lasher, Michael P., & Robert J. McGrath, "The Impact of Community Notification on Sex Offender Reintegration: A Quantitative Review of the Research Literature," *International Journal of Offender Therapy and Comparative Criminology*, 56(1) (2012), 6–28, https://doi.org/10.1177/0306624X10387524 ("Overall, however, almost a third (30%) reported job loss…. 12% reported that they had to move out of a home or apartment because a landlord found out and when the question was worded more broadly to include loss of housing for any reason, 19% responded affirmatively. With respect to safety issues, 16% reported that a family member or cohabitant was harassed, assaulted, or had property damaged and 44% reported being threatened or harassed by neighbors."); Levenson, Jill S., & Leo P. Cotter, "The Effect of Megan's Law on Sex Offender Reintegration," *Journal of Contemporary Criminal Justice*, 21(1) (2005), 49–66, https://doi.org/10.1177/1043986204271676 ("Overall, about one third of partici- pants had experienced dire events, such as the loss of a job or home, threats or harassment, or property damage."); Tewksbury, Richard, "Collateral Consequences of Sex Offender Registration," *Journal of Contemporary Criminal Justice*, 21(1) (2005), 67–81, https://doi.org/10.1177/1043986204271704 ("[I]t is clear that the collateral consequences of sex offender registration . . . may be quite serious and harmful, for individual offenders, for their families and loved ones, and for communities in general.").

recidivism. With respect to employment, public registration facilitates discrimination by customers, clients, or co-workers (and employers willing to accommodate such discrimination), regardless of the details of the registrant's conviction or risk of recidivating. Discrimination by landlords and anticipated difficulties with neighbors who become aware of a registrant's status also makes securing stable, quality, reasonably priced housing challenging. Furthermore, as I have written elsewhere, "pervasive public awareness that one has committed a sex crime makes it difficult to form and maintain relationships, both with family members (who might suffer from the association) and those with whom one might wish to build a family."[13] In addition to the isolating effect of SORN laws, making registrants' identities and addresses available to the community leads some members of the community to harass individuals who have committed a sex offense and even accost registrants in public, online, or at their homes. These ancillary criminogenic consequences have been well documented by researchers.[14]

37. Adding to these burdens are the direct affirmative obligations imposed on registrants, which make everyday life more difficult and financially costly. For example, registrants must report any time they change their residence, academic status or location, vehicle information, employment status, any phone number they have or use, or any online identifier or email address[15]—and they must do so within a few business days, and in many cases in person (MCL § 28.725; MCL § 28.727). Photographs are also required within seven days whenever an officer or authorized employee of the registering authority determines existing photographs do not sufficiently match the registrant's appearance (MCL § 28.725a(5)). Much of this information is then made available online (MCL § 28.728). Even when their situations do not change at all, registrants must find the time (possibly asking for time off of work) and the resources to go, in person, a minimum of once a year to verify their information, with tier II and III registrants requiring more regular

---

[13] *See* Prescott, J.J., "Portmanteau Ascendant: Post-Release Regulations and Sex Offender Recidivism," *Connecticut Law Review*, 48(4) (2016), 1035–78, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2822045.

[14] *See* Socia, Kelly, "The Ancillary Consequences of SORN," in SEX OFFENDER REGISTRATION AND NOTIFICATION LAWS: AN EMPIRICAL ASSESSMENT (Logan, Wayne A., & J.J. Prescott, eds.) (Cambridge Univ. Press) (2021), 78–101 (summarizing research on the negative employment, housing, social, and health effects of SORN laws).

[15] Email and internet identifier reporting requirements do not apply to registrants required to be registered after July 1, 2011. MCL § 28.725(2)(a); MCL § 28.727(1) (i).

appearances, up to four times a year (MCL §§ 28.725a; 28.725). During these in-person visits, registrants must verify all employment, housing, academic, and other information in writing (MCL § 28.725a), and they must pay $50 a year as a registration fee (MCL § 28.725a), a significant sum for those with few economic opportunities. Registrants must report within three business days whenever they travel for more than seven days, and they are unable to travel whenever it will interfere with their ability to comply with in-person reporting requirements (MCL §§ 28.725(1)(e); 28.725a(3); 28.727(1)(e)). Requirements like these place barriers between registrants and the support they need to reduce their risk of recidivating.

## V. SORN Laws, Burdens, and Recidivism Risk Factors

38. To carry out my empirical research into the consequences of sex offender post-release laws, I have had to carefully research and document relevant registration and notification laws in each of the 50 states over time. This was not a trivial exercise. In order to understand the consequences of these laws on health, crime, life prospects, etc., it is necessary to carefully distill the substantive provisions of these laws into categories that can be useful for analysis. Because my work is empirical and requires comparisons across states, I recorded all substantive post-release laws that apply specifically to individuals previously convicted of a sex offense, and I have spent considerable time ensuring that I am able to accurately assess—i.e., compare and contrast the substance of—similar-sounding approaches that appear in multiple states.

39. This research exercise thus records and describes the establishment and subsequent evolution of all forms of laws targeted exclusively at controlling and supervising registrants—including registration, community notification, residency restrictions, employment restrictions, and civil commitment, among others.

40. The record begins for most states in the late 1980s or early 1990s—Michigan's SORN law story begins in 1994, when the legislature first enacted a registration law—but in the intervening years, dozens of laws have been passed in every state, creating a complicated, constantly changing picture for individuals subject to registration and notification. More recent post-release restrictions have been built "on top" of the basic registration framework laid down in the early 1990s. I have focused on "substantive" behavioral restrictions and obligations, not the many burdensome "procedural" requirements that must be satisfied for a released registrant to remain free (such as registering any change to any identifying registry information within a specified number of days, etc.). Although my extensive documentation does contain some of this information, and it is often easy to see how many new procedural obligations have been added to Michigan's and

other states' sex offender post-release laws, my collection of data on laws is under-inclusive in that it omits many of the complicated day-to-day requirements and fees that covered individuals are under pain of criminal penalties to satisfy.

41. Analysis of the evolution of the sex offender laws of the 50 states shows that the number of post-release obligations, restrictions, constraints, and disabilities placed on registrants has exploded since the 1990s and especially after 2000.

42. With very few exceptions, sex offender post-release laws across the states have been caught for years in a one-way ratchet of imposing increasingly severe and burdensome restraints and disabilities on registrants. In many states, these laws have become progressively more wide-reaching on an almost yearly basis, requiring more and more of an individual's time (and money) to remain in compliance. The regular changes and growing complexity of these laws make compliance more difficult, and innocent errors, which lead to great trouble if not prison, more common. Furthermore, legislatures regularly broaden the scope of laws that had been previously on the books, adding new individuals to the class of "registered sex offenders," even though the crimes newly covered may have been committed many years in the past.

43. The structures undergirding the vast array of state sex offender laws are the basic sex offender registration statutes. Historically, a state identified those individuals it wished to register for the sake of monitoring (often by their crimes of conviction) and defined that category as "sex offenders" or used some similar term, such as "sexually violent predators." Registration statutes sometimes create, as in Michigan, two or more groups of registrants, differentiating one from the others and from nonregistrants on the basis of the perceived seriousness of the crime of conviction and the perceived need to register the groups in question.

44. Although these groups were demarcated for a particular purpose (i.e., for registration and police monitoring) at a particular point in time, subsequent sex offender post-release laws have in effect piggybacked on the existing structure and its definitions. Yet it has never been made clear whether the individuals who the legislature originally determined ought to be publicly registered as "sex offenders" *also* ought to be subject to other requirements. In other words, the panoply of obligations and restrictions now knotted up with "sex offender" registration are premised on an individual's underlying status as a registrant regardless of whether those particular obligations and restrictions are appropriate for the wide range of individuals who are now classified as "sex offenders" under state law, or whether

they are appropriate for the extremely lengthy or lifetime registration periods that are imposed on most registrants.

45. Sex offender registration laws and the post-release requirements that derive from them share, as a general matter, a number of other characteristics, as well. To begin with, the failure to comply with the increasingly complex and confusing restraints and disabilities can return a registered individual to incarceration (see, e.g., MCL § 28.729, MCL § 28.725, MCL § 28.725a), at least if the failure is considered "willful." Considerable vagueness in language plagues many definitions of these constraints and obligations. There is often little discretion on the part of judges or others to loosen these restrictions, and the penalties for violations can be severe, including up to 4 years of imprisonment for a first violation of the registration act (e.g., MCL § 28.729(1)(a)) (with penalties increasing to 7 or 10 years of imprisonment for subsequent violations, MCL §§ 28.729(1)(b)-(c)) or up to 2 years for failing to maintain a valid driver's license or state-issued identification card with the individual's address (e.g., MCL §§ 28.729(2), 28.725a(7)). Moreover, compliance violations of Michigan's SORN law result in *mandatory* return to jail or prison for those who are on probation or parole, regardless of a sentencing judge's views on the appropriate sanction or how best to keep the community safe (e.g., MCL §§ 28.729(5), 28.729(7)).

46. While the basic categories of sex offender restrictions built on top of early registration statutes seem straightforward enough in the abstract, the vast web of sex offender post-release laws across the states are numerous, unpredictable, unexpected, burdensome, complicated, and often vague. In the attached exhibit, I list and describe several examples. Note the sheer volume of constraints and obligations the laws impose, and the constant vigilance required of registrants to stay in compliance.

47. One serious set of difficulties for registrants generally arises from the fact that they face additional nonobvious and often confusing obligations in *other* states should they travel out of state for work or to visit family or friends, especially in a state like Michigan where distances to other states are relatively short from the most populated parts of the state. Post-release sex offender laws as a general matter allow only very small windows within which to comply with applicable state regulations, and because there is incredible variety in the procedures and substantive obligations across the states (including types that do not exist in Michigan), confusion on the part of the registrants is certain and accidental failure to comply is

likely to be common, leaving aside the time and effort that satisfaction of these obligations requires of them.[16]

48.  For example, consider an individual with a previous sex offense conviction who must register in Michigan because he maintains residency in the state (see MCL § 28.723, which requires offenders "who are domiciled or temporarily reside in this state or who work with or without compensation or are students in this state" to register under certain conditions). If this registrant visits an Ohio county for three or more days, he must register with the local Ohio sheriff (Ohio Code § 2950.04(A)(2)(a)). If the registrant will attend school in an Ohio county, he must register *immediately* (Ohio Code § 2950.04(A)(2)(b)), and he must also register upon being employed in the county for 3 consecutive days or 14 nonconsecutive days total in a calendar year (Ohio Code § 2950.04(A)(2)(d)). In Indiana, a person must register if he spends or intends to spend at least *seven* days, inclusive, in Indiana, or if he owns any real property in Indiana and returns to the state at any time (see IC 11-8-8-7(a)(1)). Registration laws are written such that individuals may have to be simultaneously registered in many states at a time and yet the rules and procedures for registration vary by enough to make ensuring complete compliance difficult and time-consuming. Individuals who are required to register in another state for a temporary visit may also continue to be on that state's registry even after returning home to Michigan, and even after being removed from Michigan's registry (see, e.g., Fla. Stat. § 943.0435 et seq, *McGroaty v. Swearingen*, 977 F.3d 1302 (11th Cir. 2020)). It does not help that many states require regular in-person registration with local law enforcement.

49.  Consider other types of post-release restraints that apply to a registrant in Michigan who travels regularly and thus must register elsewhere (continuing to use Ohio as an example). Ohio prohibits registrants from living within 1,000 feet of "any school premises or preschool or child day-care center premises" (see Ohio Code § 2950.034). So does Indiana, although the details differ (see IC 35-42-4-11).

---

[16] *See* Rolfe, Shawn M. "When a Sex Offender Comes to Visit: A National Assessment of Travel Restrictions," *Criminal Justice Policy Review*, 30(6) (2017), 885–905, https://journals.sagepub.com/doi/pdf/10.1177/0887403417742948 ("Most notably, there is significant variation in the number of days a registered sex offender has to register in any given state when they come to visit for any occasion. Depending on the state or jurisdiction that the registrant is visiting, residence restrictions may also be applicable. As a result of these laws, registrants may feel stymied from visiting another state, which may further delineate prosocial opportunities, including gatherings with family and friends or fulfilling employment obligations.")

Thus, while Michigan no longer imposes residency restrictions, Michigan registrants remain subject to them in other states, where the procedures registrants must follow and the precise areas that are off-limits vary by state. Sometimes, these restrictions can vary city by city, even if the state itself does not impose such restrictions. Registrants in Michigan who visit Wisconsin, for example, will have to contend with residency restrictions that vary by municipality (e.g., Town of Paris Code of Ordinances 10-19 et seq., City of Muskego Code of Ordinances 294-2 et seq.). Some states impose residence and even presence restrictions whether or not an individual is actually required to register in that state (e.g., Mo. Rev. Stat. § 566.147, 566.148), making compliance even more difficult. Consequently, registrants from Michigan traveling to other states where they also must register will be subject to a range of very different regimes of post-release laws.

50.  The examples above are merely illustrative of the complexity of the system in which registrants must live. These examples are presented to help make sense of the fact that registration and notification laws have real potential to increase sex offense recidivism by the heavy burdens they impose. It is essentially impossible for a Michigan registrant to travel to other states without significant risk of being found out of compliance. Even determining how to remain in compliance when traveling requires fortitude, time, and discipline. Registration laws ensnare registrants in a tangled web of administrative requirements. Normal activities, like traveling or even moving residences, force them to remain continuously apprised of intricate laws spanning multiple jurisdictions, regardless of where (or often when) they were convicted. Failing to do so risks conviction for failure to register and potentially prison. The practical impact of registration, then, is that it significantly impacts registrants' ability to associate with family or friends out-of-state, or indeed to travel for any purpose, whether that would be to attend a political conference or go on vacation.

51.  Engaging in careful compliance, on the other hand, can also be detrimental to registrants' post-release prospects. Adhering to all these requirements can take a great deal of a registrant's time when all is said and done, from in-person registration meetings to understanding what exactly must be done (and not done). This is time registrants need to find work, housing, or the social supports that would reduce their risk of recidivism. Even when a registrant is in compliance, Michigan's notification policies broadly advertise a registrant's status. This publicity directly aggravates recidivism risk factors by making it more difficult for registrants to rebuild their lives. Indeed, experts uniformly agree that these burdens, disabilities, and constraints have real potential to *increase* rather than decrease recidivism risk.

## VI. Conclusion

The research findings and my conclusions are set out in Parts II and III above, with the discussion that supports those conclusions in Parts IV and V. The bottom line is that any "public safety" justification for modern SORN laws is contradicted by the wealth of social science and economic research that has emerged over the past 25 years. Laws like Michigan's appear, according to a large body of research, to do nothing to reduce sex offense recidivism and likely increase sex offense (and other types of) recidivism, making communities less safe overall.

## Statement of Compensation

I have provided this report pro bono.

I state under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

_____
James J. Prescott, J.D., Ph.D.

Dated: December 29, 2021

## TABLE OF EXHIBITS

### Exhibit A

Consequences Triggered by Michigan
Sex Offender Registration: A National Sample

### Exhibit B

C.V. of James J. Prescott

23

# Attachment 1:

Consequences Triggered by Michigan Sex Offender
Registration: A National Sample

**Exhibit A:**
**Consequences Triggered by Michigan Sex Offender Registration:**
**A National Sample**

In addition to complying with their home state's registration requirements, Michigan registrants must also comply with the idiosyncratic laws of any jurisdiction in which they are "temporarily domiciled." In many states, including nearby Ohio, Illinois, and Pennsylvania, a visit lasting longer than two days triggers registration, even if the registrant's crime of conviction would not have otherwise warranted registration in those states.

Examples of such reciprocal registration laws include: Colo. Rev. Stat. § 16-22-103 ("[A]ny person convicted of an offense in any other state or jurisdiction . . . for which the person, as a result of the conviction, is, was, has been, or would be required to register if he or she resided in the state or jurisdiction of conviction . . . shall be required to register in the manner specified in section 16-22-108, so long as such person is a temporary or permanent resident of Colorado."); Mich. Comp. Laws § 28.724(6)(d); Ohio Rev. Code Ann. § 2950.04(4); 42 Pa. Cons. Stat. Ann. § 9799.13(7) (all substantively similar). Every state appears to have some sort of reciprocal registration law. There are also some states that impose restrictions on those with past sex convictions even if they are not otherwise required to register in the state of conviction.

Thus, registrants who travel out-of-state, even temporarily to visit family or to engage in business, may find themselves subject to unfamiliar, unpredictable, confusing, and burdensome obligations and restrictions—not to mention registration fees. As these laws reach into many areas of life, they render it very difficult to travel lawfully. This exhibit highlights some of these travel-related burdens and provides examples of some of the more unexpected and onerous sex offender laws from around the country, to which Michigan registrants are subject if they move or travel to other states.

## 1.  Reporting, Surveillance, and Supervision

- Nearly every state requires registration of those with past sex offense convictions—or otherwise subject to a registration obligation in another jurisdiction—even if they are visiting. *Cf.* Shawn Rolfe, *When a Sex Offender Comes to Visit: A National Assessment of Travel Restrictions*, 1 CRIM. JUST. POL. REV. 21 (2017).

25

- Registrants must register, in person, for example, if they <u>visit for longer than two days</u> in Illinois or Ohio, five days in Florida, or if they spend 7 days in Indiana over any six-month period. They must register <u>within 48 hours</u> of arriving in Pennsylvania and <u>by the first working day</u> of arriving in Alaska. These obligations apply even if the registrant intends to stay only temporarily. Other states mandate similar time periods for registration. Alaska Stat. § 12.63.010; 730 Ill. Comp. Stat. 150/3(a)(1); Ind. Code § 11-8-8-7(a); Ohio Rev. Code Ann. § 2950.04(4) (West 2008); 42 Pa. Cons. Stat. § 9799.19(i); Fla. Stat. Ann. §§ 943.0435, 775.21.

- In Illinois, <u>registrants must pay a $100 initial registration fee</u> and a $100 annual renewal fee; in Iowa, registrants must pay a $200 or $260 one-time fee post-conviction, plus a $25 annual registration fee; and in Idaho, registrants must pay an $80 annual registration fee. Idaho Code Ann. § 18-8307(2); 730 Ill. Comp. Stat. 150/3(c)(6); Iowa Code § 692A.110.

- In Alabama, <u>registrants must obtain travel permits</u> if they intend to leave their county of residence temporarily for more than two days. Ala. Code § 15-20A-15.

- In Illinois, registrants must provide law enforcement with a <u>detailed travel itinerary</u> if they will be away, or intend to be away, from their registered residence for more than two days; in Alabama, for visits longer than three days; and in Iowa, for visits longer than five days. Ala. Code § 15-20A-15; 730 Ill. Comp. Stat. 150/3; Iowa Code § 692A.105.

- If traveling internationally, registrants are required under both federal and many state laws to notify government officials 21 days in advance of their travel plans, including travel itinerary, dates and places of departure and return, means of travel, purpose of travel, and where they will be staying. Many states have their own independent international travel obligations that may be more burdensome than federal law. *See* 42 U.S.C. § 16901 et seq., https://smart.ojp.gov/sorna/notice-international-travel; Mich. Comp. Laws § 28.725(8) (requiring 21-day advance notice of international travel lasting more than seven days); Ky. Rev. Stat. Ann. § 17.510(10)(e) (West 2018) (requiring 21-day advance notice as well as re-registration upon return).

## 2.  Denial of Access to Public Accommodations

- In Warren, Michigan, registrants are <u>banned from public parks</u>, playgrounds, or city recreation facilities. Warren Mun. Code 22-140 (Warren, MI). *See*

*also* Irvine Mun. Code 4-14-803 (Irvine, CA) (similarly banning registrants convicted of crimes involving minors).

- In Missouri, anyone with a designated sex offense conviction is <u>banned from being present within 500 feet of any public park with playground equipment, a swimming pool, an athletic complex, a museum, or Missouri department of conservation nature or education center properties</u>. Violating the provision is a felony offense, whether or not the individual is registered in Missouri. Rev. Stat. Mo. §566.150.

- In Huachuca City, Arizona, registrants are banned from <u>many</u> public places, including public schools, parks, pools, gymnasiums, sports fields, and sports facilities. Town of Huachuca City, Az., Rev. Ordinances § 9.35.

- In Iowa, certain registrants are <u>barred from public libraries and may not loiter within 300 feet of the property boundary of a library</u>. In Tennessee, library directors may exclude registrants at any time. Iowa Code § 692A.113(f); Tenn. Code Ann. § 40-39-216. *But see Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) (striking down municipality's library ban on First Amendment grounds).

- In Florida, registrants may be <u>banned from public hurricane or emergency shelters</u>. *See* Elizabeth Weill-Greenberg, *Florida County: People on the Sex Offender Registry Should Shelter from Dorian in Jail*, THE APPEAL (Sept. 4, 2019); Elizabeth Flock, *Where Florida Counties Sheltered Sex Offenders during Irma*, PBS (Sept. 13, 2017). In Collier County and Indian River County, registrants can be kept in a separate room of the shelter. In Lee County, registrants may use only "pre-designated" shelters specifically intended for registrants, if they are available. Collier County, Fla. Code of Ordinances 111-33; Indian River County, Fla. Code of Ordinances 306.06; Lee County, Fla. Code of Ordinances 24½-5.

### 3. Restrictions on Religious Participation and Social Activities

- In Georgia, registrants <u>are prohibited from working or volunteering at a church</u>. Ga. Code. Ann. § 42-1-15(c)(1).

- In Oklahoma, registrants must <u>receive written permission</u> from the "religious leader" of a church or other institution <u>before entering to worship</u>. Okla. Stat. tit. 21, § 1125(E).

- In North Carolina, certain registrants <u>may not be present in any place where minors gather</u> for regular educational, recreational, or social programs. N.C.

Gen. Stat. § 14-208.18(a)(3). That includes churches and other institutions of religious worship. *See* Bonnie Rochman, *Should Sex Offenders Be Barred from Church?*, TIME (Oct. 14, 2009).

- In North Hudson, Wisconsin, registrants cannot "participate in a holiday event involving children," except if the registrant is the parent or guardian and no other children are present. North Hudson, Wis. Code of Ord. 70-95.

- In Tennessee, certain registrants may not "[p]retend to be, dress as, impersonate or otherwise assume the identity of a real or fictional person or character or a member of a profession, vocation or occupation while in the presence of a minor." Tenn. Code Ann. § 40-39-215(a)(1).

- In Missouri; Nassau County, Florida; and Orange County, California, registrants on Halloween must post a sign stating, "No candy or treats at this residence," and must turn off all outside residential lighting. Missouri registrants must also stay inside their homes "unless required to be elsewhere for just cause." Mo. Rev. Stat. § 589.426; Nassau County, Fla. Code of Ordinances 19¼-44; Orange, Cal. Code of Ordinances 9.10.045. *See also F.R. v. St. Charles County Sheriff's Dept.*, 301 S.W.3d 56 (Mo. 2010) (finding the Missouri provision punitive and prohibiting its retroactive application).

## 4. Restrictions on Civic Engagement

- In Minnesota and Missouri, registrants cannot be candidates for school board positions. Minn. Stat. § 609B.123; Mo. Rev. Stat. § 162.014.

- In Illinois, registrants cannot be selected as election judges. 10 Ill. Comp. Stat. 5/14-1.

- In Vigo County, Indiana, registrants cannot vote at schools. *Officials: Sex Offenders Can't Vote at Schools*, WTHI (Terre Haute, IN) (May 9, 2011).

## 5. Free Speech, Internet, and Web Site Restrictions

- In North Carolina, certain registrants are barred from using Facebook, Instagram, and other similar websites. Additionally, they are barred from communicating with or gathering information about anyone they believe to be under the age of 16—regardless of whether or not they are a family member. N.C. Gen. Stat. §14-202.5(a). *But see Packingham v. North Carolina*, 137 S.Ct. 1730 (2017) (holding prior version of North Carolina's

28

statute unconstitutional). For similar statutes, see Ind. Code § 35-42-4-12; La. Rev. Stat. Ann. § 14:91.5; Tex. Gov't Code Ann. § 508.1861.

- Registrants are often <u>barred from websites defined broadly to have the primary purpose of facilitating social interaction</u> with other users, to allow users to create profiles about themselves that are available to the public or other users, or to offer a mechanism for communication among users. La. Rev. Stat. Ann. §14:91.5(B)(2). *But see Doe v. Jindal*, No. 11-554-BAJ-SCR, 2012 WL 540100 (M.D. La. Feb. 16, 2012) (striking down statute barring certain registrants from accessing social media as substantially overbroad and therefore a violation of the First Amendment).

- In Louisiana, even if certain registrants are not barred from using social media entirely, a registrant must still "<u>include in his profile for the networking website an indication that he is a sex offender</u> or child predator and shall include notice of the crime for which he was convicted, the jurisdiction of conviction, a description of his physical characteristics . . . and his residential address" should they choose to use such a website. La. Rev. Stat. Ann. §15:542.1(D)(1).

- In Kentucky, registrants who committed their offense against a minor are barred from communicating with or gathering information about anyone who is a minor. In Kentucky, Georgia, and other states, registrants are <u>barred from taking any photograph or video of a minor without parental consent</u>. Ky. Rev. Stat. Ann. § 17.546; Ga. Code Ann. § 42-1-18 (similar restrictions). *But see State v. Oatman*, 871 N.W.2d 513 (Wis. Ct. App. 2015) (striking down similar restriction on First Amendment grounds).

- In Indiana, registrants on probation or parole must sign a "consent form" authorizing law enforcement authorities to <u>search "at any time" their personal computers</u> or other devices with Internet capability, as well as to install hardware or software to monitor their Internet usage. This installation shall occur at the registrant's expense. Ind. Code § 11-8-8-8(b).

- In New Jersey, registrants whose crime involved a computer or any other device with Internet capability <u>must receive court approval to use any device with Internet access</u> and must submit to unannounced searches of those devices. N.J. Stat. Ann. § 2C:43-6.6.

- In Illinois, <u>registrants are required to provide the government with</u> "all e-mail addresses, instant messaging identities, chat room identities, and other Internet communications identities that the sex offender uses or plans to use,

all Uniform Resource Locators (URLs) registered or used by the sex offender, <u>all blogs and other Internet sites</u> maintained by the sex offender or <u>to which the sex offender has uploaded any content or posted any messages or information</u>." 730 Ill. Comp. Stat. § 150/3(a). Failure to provide any of this information is a felony offense. 730 Ill. Comp. Stat. § 150/10. *See People v. Minnis*, 67 N.E.3d 272 (Ill. 2016) (Illinois Supreme Court affirming juvenile adjudication for failure of defendant to inform authorities that he had updated his Facebook cover photo since his last registration).

## 6. Identification Cards

- Federal law requires that any individual required to register because of an offense against a minor have a <u>specialized identifier on their passport</u>, identifying them as such. 22 U.S.C. § 212b.

- In Alabama, Indiana, and Tennessee, <u>registrants must carry identification at all times</u>. Ala. Code § 15-20A-18(a); Ind. Code § 11-8-8-15; Tenn. Code Ann. § 40-39-213.

- In Florida, Tennessee, and Texas, <u>registrants must carry special driver's licenses or identification cards that clearly indicate that they are registrants</u>. Fla. Stat. § 322.141; Tenn. Code Ann. § 55-50-353; Tex. Transp. Code Ann. § 521.057. *But see Doe 1 v. Marshall*, 367 F.Supp.3d 1310 (M.D. Ala. 2019) (striking down branding identification requirement on First Amendment grounds); *State v. Hill*, __ So. 3d __; 2020 WL 6145294 (La., Oct. 20, 2020) (same).

- In Texas, registrants must renew their driver's license or personal identification cards annually. Tex. Code Crim. Proc. Ann. art. 62.060 (West 2016).

## 7. Housing Restrictions

- Approximately half of all states and an unknown number of localities impose residential exclusion zones on people with past sex offense convictions. These zones prohibit covered individuals from living within proscribed distances—typically between 500 and 3,000 feet—from any number of locations typically frequented by children. *See* Joanne Savage and Casey Windsor, *Sex Offender Residence Restrictions and Sex Crimes against Children: A Comprehensive Review,* 43 AGG. & VIOL. BEH. 13 (2018). These laws can result in homelessness, such as in Miami-Dade County, Florida, where one of the few lawful places for registrants to reside

is underneath the Julia-Tuttle Causeway. Greg Allen, *Sex Offenders Forced to Live Under Miami Bridge*, NPR (May, 20, 2009).

- Landlords in Ludington, Michigan, are <u>prohibited from renting to registrants</u> when their property is located within 1,000 feet of school property. Ludington, Mich. Code of Ordinances § 34-232. In Jackson, Michigan, a "Fair Chance" housing ordinance <u>permits landlords to evict or refuse to rent to anyone subject to a lifetime registration requirement</u>. Jackson, Mich., Code of Ordinances § 14-606.

- Across the country, any person whose household includes a person subject to life-time registration is <u>barred from accessing federally subsidized housing</u>. 42 U.S.C. § 13663 (2006).

- In Illinois, Indiana, Maryland, and Washington, among many other states, homeless registrants must <u>report to the local sheriff, in person, once a week</u>. 730 Ill. Comp. Stat. 150/3(a); Ind. Code § 11-8-8-12(c); Md. Code Ann., Crim. Proc. § 11-705(d)(2); Wash. Rev. Code § 9A.44.130(6)(b).

- In Pennsylvania, any person who is transient must report in person monthly. 42 Pa. Cons. Stat. § 9799.15(h)(1). Such individuals must also <u>report "a list of places the individual eats, frequents and engages in leisure activities."</u> 42 Pa. Cons. Stat. § 9799.16(b)(6).

- In California, a registrant on parole <u>may not live with any other registrant</u> in a "single family dwelling." In Oregon, registrants on probation, parole, or supervision may not "reside in any dwelling" together. In Idaho and Oklahoma, a registrant may not live with more than one other registrant. Of these states, only California and Oklahoma provide statutory exceptions to allow married or related registrants to live together. Cal. Penal Code § 3003.5(a); Idaho Code Ann. § 18-8331; Okla. Stat. tit. 57, § 590.1; Or. Rev. Stat. § 144.642. *But see In re Taylor*, 343 P.3d 867 (Cal. 2015) (striking down blanket enforcement of statutory residency restrictions on parolees).

## 8. Employment Restrictions

- In Daytona Beach, Florida, registrants <u>cannot work as garbage collectors</u> for recycling or waste disposal franchisees. Daytona Beach Shores, Fla. Code of Ordinances 12-7(7).

- In Georgia, registrants convicted after July 1, 2008, are barred from working or volunteering at any childcare facility, school, or church—or "at <u>any business or entity</u> that is located within 1,000 feet of a childcare facility, a

school, or a church." Ga. Code. Ann. § 42-1-15(c)(1). *See also* Tenn. Code. Ann. § 40-39-211(a)(1) (similar restrictions).

- In Louisiana, registrants cannot operate <u>any bus, taxicab, or limousine</u>, or work in any service position that would involve entering a residence. La. Rev. Stat. Ann. § 15:553.

- In Massachusetts, New York, and Tennessee, registrants <u>cannot operate an ice cream truck</u>. Mass. Gen. Laws ch. 265, § 48; N.Y. Correct. Law § 168-v; Tenn. Code Ann. § 40-39-215(a)(3).

- In Illinois, certain registrants cannot work at a state or county fair, or lease a residential unit to a family with children, or <u>operate vending, rescue, or emergency vehicles</u>. 720 Ill. Comp. Stat. 5/11-9.3. Registrants are also not eligible to be health care workers. 20 Ill Comp. Stat. 2105/2105-165(b).

- In Alabama, registrants are <u>not eligible for a commercial driver license for passenger vehicles</u>. Ala. Code § 32-6-49.24. In numerous states, registrants are prohibited from driving for ride-sharing companies like Lyft or Uber. *See* Alaska Stat. Ann. § 28.23.100(b)(3); Ariz. Rev. Stat. § 28-9555(B)(3), Cal. Pub. Util. Code § 5445.2(a)(2)(B); Md. Code. Public Util. § 10-404.

- In Arkansas, registrants are <u>ineligible to be barbers</u>. Ark. Stat. § 17-20-308(1)(B).

- In numerous Michigan localities, <u>registrants can be denied permits as canvassers, peddlers, or solicitors</u>. *See* Lathrup Village, Mich. Code of Ordinances § 50-34; Huntington Woods, Mich. Code of Ordinances § 28-3; Green Oak Charter Township, Mich., Code of Ordinances § 28-4. In Plymouth, and Ann Arbor, Michigan, registrants can be denied permits to operate a pedicab. Plymouth, Mich., Code of Ordinances, § 22-296; Ann Arbor, Mich. Code § 10:219 (similar).

## 9. Restrictions by Private Businesses and Universities

Many private actors also use sex offender registries to deny registered individuals goods and services. Examples include:

- <u>Facebook and Instagram prohibit anyone with a past sex conviction from using their platforms</u>. *See* Facebook Help; Instagram Help. Nextdoor prohibits anyone who lives with a registrant from using their platform. *See* Nextdoor Membership Agreement. *See also* Aline Reynolds, *Facebook and Myspace Kick Out Thousands of NY Sex Offenders*, DISCOVER MAGAZINE

(Dec. 4, 2009); *MySpace Kicks Out 90,000 Sex Offenders, Connecticut AG Says*, CNN TECH (Feb. 3, 2009).

- Online dating sites are unavailable to registrants. Carol J. Williams, *Match.com Agrees to Screen for Sex Offenders to Settle Lawsuit*, LOS ANGELES TIMES (Aug. 24, 2011) (reporting that "the company's promise to screen all members is expected to spark a new industry norm").

- Regardless of state law, many providers in the "gig economy" sector—such as Doordash, Postmates, and Uber Eats—prohibit individuals convicted of sex offenses from working for them. *See, e.g.,* Uber Help.

- Airbnb bans guests and hosts who were convicted of crimes involving "sexual violence and exploitation," regardless of when those convictions occurred. *See* Airbnb Help.

- Some colleges also ban registrants. *See* Mary Helen Miller, *Lake Michigan College Bans Sex Offenders of Children from Its Campuses,* THE CHRONICLE OF HIGHER EDUCATION (Mar. 3, 2010),

- Athletic clubs use the registry to deny membership to people on the registry. *See Muskegon YMCA Revokes Memberships of Registered Sex Offenders*, Associated Press (Nov. 29, 2007) (crediting the Michigan online sex offender registry for "making the policy even possible"); Emily Friedman, *YMCAs Revoke Memberships of Registered Sex Offenders*, ABC News (Feb. 4, 2010) (explaining how 12 Connecticut YMCAs revoked memberships after cross-referencing their membership lists against the state's sex offender registry).

- Church associations sometimes bar churches who hire registrants. *Assoc. Asks Church with Sex-offender to Resign*, TOWN HALL MAGAZINE (Mar. 08, 2012) (reporting that the Jacksonville Baptist Association in Jacksonville, Florida, is seeking a member church's resignation after the church hired a registrant as a minister).

- Registrants are sometimes barred from visiting friends and relatives at hospitals. *See, e.g.,* Heather May & Julia Lyon, *Utah Children's Hospital Screens Visitors to See if They Are Sex Offenders*, THE SALT LAKE TRIBUNE (Dec. 18, 2011) (reporting on computerized check-in program used to identify registrants at "more than 100 other hospitals across the country"). This Utah children's hospital reportedly allows registrants to visit their own children (while devoting "extra scrutiny") but asks other registrants to leave.

# Attachment 2:

## C.V. of James J. Prescott

# JAMES J. PRESCOTT

University of Michigan Law School
Ann Arbor, MI 48109
(Office: 734-763-2326)
jprescott@umich.edu
https://orcid.org/0000-0001-5483-3516

---

## EMPLOYMENT

**UNIVERSITY OF MICHIGAN LAW SCHOOL**, Henry King Ransom Professor of Law (2019–)
Professor of Economics (2015–) (courtesy)
Co-Director, Program in Law and Economics (2012–)
Co-Director, Empirical Legal Studies Center (2014–)
Professor of Law (2011–19)
Assistant Professor of Law (2006–11)

Research:     Criminal Law
Civil Litigation and Settlement
Empirical Law and Economics
Sentencing and Corrections
Employment Law

Teaching:     Criminal Law
Employment Law
Law and Economics Workshop
Negotiation
Economic Analysis of Law

## EDUCATION

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**, Ph.D., Economics, 2006

Honors:        MIT Department of Economics Fellowship (1997–99)
Jacob K. Javits Fellowship (1998–2002)

Dissertation:   *Essays in Empirical Law and Economics*
(Advisers: David Autor, Michael Greenstone, Christine Jolls)

**HARVARD LAW SCHOOL**, J.D., 2002

Honors:        Graduated *magna cum laude*
John M. Olin Fellowship in Law and Economics (1999–2002)
Treasurer (Vol. 115) and Editor, *Harvard Law Review*

Clerkship:     Hon. Merrick B. Garland, U.S. Court of Appeals for the D.C. Circuit (2002–03)

**STANFORD UNIVERSITY**, B.A., Public Policy and Economics, 1996

Honors:        Graduated with Honors and Distinction; Phi Beta Kappa (elected in junior year);
Ethics-in-Society Honors Program; Presidential Award for Excellence in the
Freshman Year; Truman Scholar Finalist (CA)

Thesis:        *Why Vote? Using Principles to Solve the Paradox of the Irrational Voter*

## PUBLICATIONS & MANUSCRIPTS

Jolly, Richard, and J.J. Prescott, "Beyond Plea Bargaining: A Theory of Criminal Settlement," *Boston College Law Review*, 62(4) (2021), 1047–116.

Starr, Evan, J.J. Prescott, and Norman D. Bishara, "Noncompete Agreements in the U.S. Labor Force," *Journal of Law and Economics*, 64(1) (2021), 53–84.

Lave, Tamara Rice, J.J. Prescott, and Grady Bridges, "The Problem with Assumptions: Revisiting the Dark Figure of Sexual Recidivism," *Behavioral Sciences & the Law*, 39(3) (2021), 279–306.

Bulinski, Maximilian A., and J.J. Prescott, "Designing Legal Experiences: Online Communication and Resolution in Courts," in LEGAL INFORMATICS (Daniel Martin Katz, Michael J. Bommarito II and Ron Dolin, eds.) (Cambridge Univ. Press) (2021), 430–48.

Agan, Amanda Y., and J.J. Prescott, "Offenders and SORN Laws," in SEX OFFENDER REGISTRATION AND NOTIFICATION LAWS: AN EMPIRICAL ASSESSMENT (Logan, Wayne A., and J.J. Prescott, eds.) (Cambridge Univ. Press) (2021), 102–44.

Logan, Wayne A., and J.J. Prescott, eds., SEX OFFENDER REGISTRATION AND NOTIFICATION LAWS: AN EMPIRICAL ASSESSMENT (Cambridge Univ. Press) (2021).

Starr, Evan, J.J. Prescott, and Norman D. Bishara, "The Behavioral Effects of (Unenforceable) Contracts," *Journal of Law, Economics, and Organization*, 36(3) (2020), 633–87.

Prescott, J.J., and Sonja B. Starr, "Expungement of Criminal Convictions: An Empirical Study," *Harvard Law Review*, 133(8) (2020), 2460–555.

Prescott, J.J., Benjamin Pyle, and Sonja B. Starr, "Understanding Violent-Crime Recidivism," *Notre Dame Law Review*, 95(4) (2020), 1643–98.

Mentovich, Avital, J.J. Prescott, and Orna Rabinovich-Einy, "Are Litigation Outcome Disparities Inevitable? Courts, Technology, and the Future of Impartiality," *Alabama Law Review*, 71(4) (2020), 893–979 (winner of 2021 Dispute Resolution Advancement Award presented by the Hugh L. Carey Center for Dispute Resolution at St. John's School of Law)

Prescott, J.J., and Sonja B. Starr, "The Power of a Clean Slate," *Regulation*, 43(2) (2020), 28–34.

Prescott, J.J., and Alexander Sanchez, "Platform Procedure: Using Technology to Facilitate (Efficient) Civil Settlement," in SELECTION AND DECISION IN JUDICIAL PROCESS AROUND THE WORLD: EMPIRICAL INQUIRIES (Yun-chien Chang, ed.) (Cambridge Univ. Press, 2020), 30–72.

Spier, Kathryn E., and J.J. Prescott, "Contracting on Litigation," *RAND Journal of Economics*, 50(2) (2019), 391–417.

Prescott, J.J., and Benjamin Pyle, "Identifying the Impact of Labor Market Opportunities on Criminal Behavior," *International Review of Law and Economics*, 59 (2019), 65–81.

McJunkin, Ben A., and J.J. Prescott, "Sex Offenders: Technological Monitoring and the Fourth Amendment," *Search & Seizure Law Report*, 46(7) (2019), 75–88.

Prescott, J.J., "Community Notification Policies," in THE SAGE ENCYCLOPEDIA OF CRIMINAL PSYCHOLOGY (Robert D. Morgan, ed.) (Thousand Oaks, Calif.: Sage Publications), Vol. 1 (2019): 138–43.

Prescott, J.J., "Comment on 'Judicial Compensation and Performance,'" *Supreme Court Economic Review*, 25 (2019), 149–54.

O'Neil, Meghan M., and J.J. Prescott, "Targeting Poverty in the Courts: Improving the Measurement of Ability-to-Pay Fines," *Law and Contemporary Problems*, 82 (2019), 199–226.

McJunkin, Ben A., and J.J. Prescott, "Fourth Amendment Constraints on the Technological Monitoring of Convicted Sex Offenders," *New Criminal Law Review*, 21 (2018), 379–425.

Prescott, J.J., "Assessing Access to Justice Outreach Strategies," *Journal of Institutional and Theoretical Economics* (JITE), 174(1) (2018), 34–63.

Prescott, J.J., "Improving Access to Justice in State Courts with Platform Technology," *Vanderbilt Law Review*, 70 (2017), 1993–2050.

Hou, Youyang, Cliff Lampe, Maximilian Bulinski, and J.J. Prescott, "Factors in Fairness and Emotion in Online Case Resolution Systems," *Proceedings of the 2017 ACM Conference on Human Factors in Computing Systems* (May 2017).

Prescott, J.J., and Kathryn E. Spier, "A Comprehensive Theory of Civil Settlement," *New York University Law Review*, 91 (2016), 59–143.

Prescott, J.J., "Portmanteau Ascendant: Post-Release Regulations and Sex Offender Recidivism," *Connecticut Law Review*, 47 (2016), 1035–78

Bulinski, Maximilian A. and J.J. Prescott, "Online Case Resolution Systems: Enhancing Access, Fairness, Accuracy, and Efficiency," *Michigan Journal of Race and Law*, 21 (2016), 205–49.

Prescott, J.J., "Criminal Sanctions and Deterrence," in Encyclopedia of Law and Economics (2019), vol. 1 (A-E) (Alain Marciano and Giovanni Battista Ramello, eds.) (New York: Springer) (first published online in 2016), 498–510.

Prescott, J.J., Norman D. Bishara, and Evan Starr, "Understanding Noncompetition Agreements: The 2014 Noncompete Survey Project," *MSU Law Review*, 2016, 369–464

Gerstein, Charlie, and J.J. Prescott, "Process Costs and Police Discretion," *Harvard Law Review Forum*, 128 (2015), 268–88.

Agan, Amanda Y., and J.J. Prescott, "Sexual Offenses," in Encyclopedia of Law and Economics (2019), vol. 3 (O-Z) (Alain Marciano and Giovanni Battista Ramello, eds.) (New York: Springer) (first published online in 2015), 1871–84.

Prescott, J.J., Kathryn E. Spier, and Albert H. Yoon, "Trial and Settlement: A Study of High-Low Agreements," *Journal of Law and Economics*, 57 (2014), 699–746.

Agan, Amanda Y., and J.J. Prescott, "Sex Offender Law and the Geography of Victimization," *Journal of Empirical Legal Studies*, 11 (2014), 786–828.

Prescott, J.J., "Do Sex Offender Registries Make Us Less Safe?" *Regulation*, 35(2) (2012), 48–55.

Prescott, J.J., "Child Pornography and Community Notification: How an Attempt to Reduce Crime Can Achieve the Opposite," *Federal Sentencing Reporter*, 24 (2011), 93–101.

Prescott, J.J., and Jonah E. Rockoff, "Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?" *Journal of Law and Economics*, 53 (2011), 161–206.

Prescott, J.J., "The Challenges of Calculating the Benefits of Providing Access to Legal Services," *Fordham Urban Law Journal*, 37 (2010), 303–46.

Prescott, J.J., and Sonja B. Starr, "Improving Criminal Jury Decision Making After the *Blakely* Revolution," *University of Illinois Law Review*, 2006, 301–56.

Jolls, Christine M., and J.J. Prescott, "Disaggregating Employment Protection: The Case of Disability Discrimination," *NBER Working Paper 10740* (2004).

Prescott, J.J., "Tort as a Debt Market: Agency Costs, Strategic Debt, and Borrowing against the Future," *Harvard Law Review*, 115 (2002), 2294–316 (Student Note).

Prescott, J.J., "Prevailing Party—*Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 121 S. Ct. 1835 (2001)," *Harvard Law Review*, 115 (2001), 457–67 (Student Supreme Court Case Comment).

Prescott, J.J., "Second Circuit holds that Punitive Damages are Unavailable against Municipalities—*Ciraolo v. City of New York*, 216 F.3d 236 (2d Cir. 2000)," *Harvard Law Review*, 114 (2000), 666–72 (Student Recent Case Comment).

## WORKS IN PROGRESS

Prescott, J.J., and Evan Starr, "Subjective Beliefs about Contract Enforceability," draft available.

Garrett, Brandon L., and J.J. Prescott, "Determinants of Success in Post-Conviction Litigation by the Innocent," draft available.

Prescott, J.J., "The Possibilities of Offender Choice in Sentencing: Eliciting Forward-Looking Information," draft available.

Prescott, J.J., "Measuring the Consequences of Criminal Jury Trial Protections," draft available (revise and resubmit, *Journal of Legal Studies*).

Prescott, J.J., "Empirical Evidence of Prosecutorial Charging Manipulation: And What It Tells Us about What Prosecutors Are Trying to Do," draft available.

Klick, Jonathan, and J.J. Prescott, "The Effect of Sex Offender Laws on the Sexual Abuse and Health of Minors," 25-page funding narrative available.

Prescott, J.J., and Eric B. Laber, "The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes," 15-page funding narrative available.

Bailey, Martha J., and J.J. Prescott, "The Regulation of Vice in the 1960s: The Case of Contraception as 'Obscene,'" précis available.

Prescott, J.J., "Data Set: New Orleans District Attorney's Office Data, 1988-1999," including arrest, charging, conviction, and sentencing data with judge, prosecutor, and defendant identifiers and over 30,000 defendant observations.

Prescott, J.J., "A Fifty-State Compendium of Sex Offender Regulation."

## OTHER WRITING

Buhl, William, J.J. Prescott, and Miriam Aukerman, "Michigan Poised to Double Down on Failed Sex Offender Registry," DETROIT FREE PRESS, Dec. 10, 2020, https://www.freep.com/story/opinion/contributors/2020/12/10/michigan-sex-offender-registry-legislation/6507848002/.

Prescott, J.J., Benjamin Pyle, and Sonja Starr, "It's Time to Start Releasing Some Prisoners With Violent Records,'" SLATE, April 13, 2020, https://slate.com/news-and-politics/2020/04/combat-covid-release-prisoners-violent-cook.html.

Prescott, J.J., and Sonja B. Starr, "The Case for Expunging Criminal Records," N.Y. TIMES, March 20, 2019, at A27, https://www.nytimes.com/2019/03/20/opinion/expunge-criminal-records.html.

Prescott, J.J., "Unclogging Courts by Resolving Simple Cases Online," THE BRIDGE, May 19, 2016, http://bridgemi.com/2016/05/unclogging-courts-by-resolving-simple-cases-online/.

Prescott, J.J., Kathryn E. Spier, and Albert H. Yoon, "审审审审审审审审审审审" [Trial and Settlement: A Study of High-Low Agreements] (translated by Yajie Xin. 比审): *Comparative Studies*, no. 80 (2015), 154–189.

Prescott, J.J., "In Michigan, Access to Justice a Click Away," DETROIT NEWS, March 12, 2015, at 3B, http://www.detroitnews.com/story/opinion/2015/03/11/prescott-court-innovations/70166738.

Prescott, J.J. (principal drafter), Miriam J. Aukerman, Michael J. Steinberg, Kary L. Moss, and John R. Minock, "Distinguished Brief: People of the State of Michigan v. David Mark Cole," *Thomas M. Cooley Law Review*, 30(3) (2013), 313–68.

## GRANTS AND AWARDS

American Civil Liberties Union ($250,000) ("Prosecutor Transparency Project") (2021)

Distinguished University Innovator Award, University of Michigan (2020)

Vital Projects at Proteus ($20,000) (2019) ("Understanding Recidivism Rates for Homicide Offenders") (Co-PI: Benjamin D. Pyle)

National Science Foundation, Cyber-Human Systems ($909,213) (2018) ("Drawing from Theories of Justice to Respond to Online Harassment") (Co-PIs: Sarita Yardi Schoenebeck and Clifford Lampe)

University of Michigan, Poverty Solutions at Ford School of Public Policy ($25,000) (2017) ("Targeting Poverty in the Courts: Improving the Measurement of Ability to Pay") (Co-PI: Meghan M. O'Neil)

University of Michigan, Global Challenges for Third Century Initiative (Phase Two: $2,767,500) (2014) ("Technology-Aided Access to Courts through Enhanced Online Functionality")

University of Michigan, Office of the Vice President for Research ($15,000) (2013) ("A Survey of Employment Non-Competition Agreements: Incidence, Knowledge, Perceptions, and Mobility")

Distinguished Brief Award, Thomas M. Cooley Law Review ("recognizes the most scholarly brief filed before the Michigan Supreme Court, as determined by a panel of judges") (2013) (*People v. Cole*, No. 143046, opinion filed May 25, 2012)

University of Michigan, Global Challenges for Third Century Initiative (Phase One: $275,000) (2013) ("Technology-Aided Access to Courts through Enhanced Online Functionality")

University of Michigan, Office of the Vice President for Research ($15,000) (2011) ("The Role of the Prosecutor in Criminal Justice Outcome Disparities")

Population Studies Center, University of Michigan ($4,000) (2011) ("The Effects of Sex Offender Laws on Teenage Sexual Health and on the Geography of Crime Commission")

National Fellow, Hoover Institution, Stanford University, Stanford, CA (2010–11)

National Science Foundation, Law and Social Sciences Program ($145,000) (2010) ("Evaluating the Impact of Set-Aside Laws on Ex-Offender Recidivism and Socioeconomic Outcomes") (Co-PI: Sonja Starr)

University of Michigan, Office of the Vice President for Research ($15,000) (2009) ("Evaluating the Impact of Set-Aside Laws on Ex-Offender Recidivism and Socioeconomic Outcomes")

National Poverty Center, University of Michigan ($7,500) (2009) ("Evaluating the Impact of Set-Aside Laws on Ex-Offender Recidivism and Socioeconomic Outcomes")

ABA Section on Litigation, Litigation Research Fund ($12,000) (2008) (with Albert Yoon) ("Settlement <u>and</u> Trial? A Study of High-Low Agreements")

## PROFESSIONAL ACTIVITIES

Affiliations:      Co-Editor-in-Chief, *American Law and Economics Review* (2017–)
Fellow of the Society for Empirical Legal Studies (2019–)
Research Faculty Affiliate, Pop. Studies Center, Univ. of Michigan  (2009–)
Affiliate, University of Chicago Crime Lab (2016–)
Faculty Affiliate, National Archive of Criminal Justice Data (2017–)
Senior Academic Affiliate, Edgeworth Economics, LLC (2012–)
Faculty Expert, Poverty Solutions, University of Michigan (2017–)
Research Associate, Ctr. for Research in Econometric Theory and
    Applications (CRETA), National Taiwan University (2018–)
ICLE (Inst. of Continuing Legal Educ.) Tech. Advisory Board (2016–)
Associate Editor, *International Review of Law and Economics* (2012–18)
Board of Directors, American Law and Economics Association (2015–18)
Co-President, Society of Empirical Legal Studies (2018–19)
Board of Directors, Society of Empirical Legal Studies (2016–19)
Board of Directors, Innovations for Poverty Action (2010–18)
Working Group, Nat'l Task Force on Fines, Fees, and Bail (2016–18)
Member, MI Advisory Comm., US Commission on Civil Rights (2013–17)
Editorial Board, American Law and Economics Review (2014–17)
Member, State Bar of California (admitted in 2002)
Member, American Bar Association
Member, American Economic Association
Member, American Law and Economics Association

Referee Service:   *Journal of Legal Studies*
*Journal of Law and Economics*
*Journal of Law, Economics, and Organization*
*Journal of Empirical Legal Studies*
*American Law and Economics Review*
*International Review of Law and Economics*

*Review of Law and Economics*
*Quarterly Journal of Economics*
*Review of Economics and Statistics*
*Journal of Labor Economics*
*American Economic Journal: Applied Economics*
*Journal of Public Economics*
*Economic Journal*
*Economic Inquiry*
*Law and Society Review*
*Law and Social Inquiry*
*Crime and Delinquency*
*Justice Quarterly*

## TESTIMONY AND EXPERT ACTIVITIES

*Commonwealth of Pennsylvania v. Torsilieri*, Court of Common Pleas, Chester County, PA: expert report, Apr. 1, 2021.

*Constan v. City of Dearborn Heights et al.*, Wayne County Circuit Court, Michigan: expert report, Dec. 6, 2020.

Legislative Testimony before *Michigan Senate's Judiciary and Public Safety Committee* (Lansing, MI, via Zoom), on proposed Clean Slate (expungement) legislation, June 4, 2020.

Legislative Testimony before *Michigan House of Representatives' Judiciary Committee* (Lansing, MI, via Zoom), on proposed reforms to Michigan's Sex Offender Registration and Notification Laws, May 27, 2020.

*NARSOL v. Joshua Stein*, U.S. District Court for the Middle District of North Carolina: expert report, Feb. 27, 2020; deposition, July 10, 2020.

*John Does #1–5 v. Richard Swearingen*, U.S. District Court for the Southern District of Florida: expert report, Feb. 24, 2020.

*John Does #1–7 v. Greg Abbott and Col. Steven McCraw*, U.S. District Court for the Northern District of Texas, Dallas Division: expert report, May 25, 2018.

*United States v. David Keith Wills*, U.S. District Court for the Southern District of Texas, Corpus Christi Division: expert declaration, Jan. 14, 2018; hearing testimony, Jan. 29, 2018.

*Lucinda J. Shuell v. Mobile Medical Response, Inc.*, American Arbitration Association, Case No. 01-16-0001-9155: expert report, Dec. 21, 2017.

*Southern Motors Chevrolet, Inc. v. General Motors*, U.S. District Court for the Southern District of Georgia, Savannah Division: expert report, June 30, 2015.

*State of Georgia v. Beverly Hall*, Superior Court of Fulton County for the State of Georgia: expert report, July 11, 2014.

*McGuire v. City of Montgomery, Alabama et al.*, U.S. District Court for the Middle District of Alabama: expert report, Sept. 13, 2013; deposition, Oct. 30, 2013; rebuttal expert report, Dec. 17, 2013; trial testimony, Mar. 31, 2014, and Apr. 1, 2014.

*John Does #1–5 and Mary Doe v. Richard Snyder and Col. Kriste Etue*, U.S. District Court for the Eastern District of Michigan: expert report, Mar. 16, 2012; deposition, Dec. 12, 2013

## UNIVERSITY SERVICE

*University of Michigan*:  Digital Innovation Advisory Group (2014–16); Online Course Selection Committee (2013–14); UM Civil Liberties Board (2010–13).

*University of Michigan Law School*: Founder and Organizer, Student Research Roundtable (2007–18); Tenure Review Committee (2021–); Personnel Committee (2019–21); Alumni Survey Director (2014–); Technology Committee (2010–20); Alumni Academic Placement Committee (2010–14; 2016–18); Institutional Advancement Committee (2009–11; 2012–13); Graduate Programs and Foreign Affiliations (2011–12); Academic Standards and Practices Committee (2009–10); Clinical Committee (2008–09); Student Careers and Professional Affairs Committee (2007–08); Curriculum Committee (2006–07).

## OTHER EMPLOYMENT

Academic:          Visiting Lecturer, University of Tokyo Faculty of Law (Summer 2009)
                   Visiting Researcher, Georgetown University Law Center (2004–2006)
                   Special Guest, Brookings Institution, Economic Studies Program (2004–2005)
                   Fellow in Law and Economics, Univ. of Michigan Law School (Winter 2005)
                   Post-Graduate Olin Research Fellow, Harvard Law School (2003–2004)
                   Research Assistant, Brookings Institution, Economic Studies (1996–1997)

Law Practice:      Summer Associate, Gibson, Dunn & Crutcher, LLP, New York, NY (2002)
                   Summer Associate, Munger, Tolles & Olson, LLP, Los Angeles, CA (2001)
                   Summer Associate, Morrison & Foerster, LLP, San Francisco, CA (2001)
                   Summer Associate, Gibson, Dunn & Crutcher, LLP, Los Angeles, CA (2000)

## SELECTED PRESENTATIONS

**2021:**   Northwestern University IDEAL Workshop: Evaluation and Accountability: Technologies for Law (online) (April) ("Evaluating the Effects of Court-Technology Innovations")

Record Clearing Research Webinar (National Record Clearing Project) (Community Legal Services – Philadelphia) (online) (March) ("Expungement of Criminal Convictions: An Empirical Study")

Dispute Resolution Works-in-Progress Consortium (online) (March) (Discussant on Gilat Bachar, "The Psychology of Secret Settlements")

Stanford Law Legal Tech and the Future of Civil Justice Series (Panel: "Legal Tech, A2J, and the Unrepresented") (online) (February) ("Using ODR Platforms to Level the Playing Field: Improving Pro Se Litigation Through Technology)

Michigan Journal of Law Reform Symposium ("The Poverty Penalty: America's Overuse of Fines and Fees) (online) (January) (Panelist: Civil and Criminal Fines and Fees)

**2020:**   Duke Empirical Criminal Law Roundtable (online) (December) (Discussant on Ben Grunwald, "How to Reduce the Prison Population by X%")

Columbia Law School (Law and Economics Workshop) (online) (November) ("Subjective Beliefs about Contract Enforceability")

Conference: National Legal Aid & Defender Association (online) (November) (Panelist: "Record Clearing in 2020: Challenges and Opportunities")

Conference: APPAM Annual Meetings (online) (November) (Discussant on Aria Golestani, Emily Owens, and Kerri Raissian, "Specialization in Criminal Courts: An Evaluation of the Impact of Domestic Violence Courts in Nashville and Davidson County, Tennessee")

Michigan Law Insights from the Quad (online) (November) (Panelist: "Criminal Justice Reform" with Eve Primus and Margo Schlanger)

Harvard Law School (Empirical Law and Economics Workshop) (online) (October) ("Noncompetes and Employee Mobility")

Clean Slate Initiative Panel, National Expungement Week (online) (September) (Panelist)

The 2020 University of Michigan Distinguished Innovator Award Address (Ann Arbor, MI) (September) ("Matterhorn: Technology, Access to Justice, and Democratizing American Courts")

2019:    Conference: The Choice Redux: Market, Organization, Democracy, Algorithm or Community? (Univ. of Michigan Ross School of Business) (Ann Arbor, MI) (December) ("Gigs & Regs: Platform Choices for Competitive & Fair Labor Markets")

Conference on Empirical Legal Studies (Claremont McKenna College) (Claremont, CA) (November) ("Expungement of Criminal Convictions: An Empirical Study")

Notre Dame Law Review Symposium (Notre Dame Law School) (South Bend, IN) (November) ("Understanding Violent-Crime Recidivism")

Detroit Police's Committee on Race and Equality Meeting (Detroit Police Department) (Detroit MI) (October) ("Expungement in Michigan")

Columbia Law School (Courts Workshop) (New York, NY) (May) ("Is Judicial Bias Inevitable? Courts, Technology, and the Future of Impartiality")

Univ. of Michigan Law School's 2019 Junior Scholars Conference (Ann Arbor, MI) (April) (Discussant on three papers in "Panel I: Observation and Documentation")

Univ. of Southern California Gould School of Law (Law and Economics Workshop) (Los Angeles, CA) (April) ("Expungement of Criminal Convictions: An Empirical Study")

Univ. of Michigan Institute for Research on Women & Gender (Ann Arbor, MI) (March) (Book Discussant on David Halperin and Trevor Hoppe, "The War on Sex")

Univ. of British Columbia Allard School of Law (Law and Economics Workshop) (Vancouver, BC) (March) ("Noncompetes and Employee Mobility")

Conference: The Choice: Market, Organization, Democracy, Algorithm or Community? (Univ. of Michigan Ross School of Business) (Ann Arbor, MI) (February) ("Law and 'The Choice'") (focus on analytics, prediction, and algorithms in the law)

2018:    2018 eCourts Conference (National Center for State Courts) (Plenary Panel with Judge Alexis Krot and Elizabeth Lucas) (Las Vegas, NV) (December) ("'Right-sizing' Penalties Through Technology")

Notre Dame Law School (Law and Economics Workshop) (South Bend, IN) (November) ("Noncompetes and Employee Mobility")

Symposium: Shining a Light on Dispute Resolution: Transparency, Metrics, and Empirical Research (Texas A&M Univ. School of Law) (Fort Worth, TX) (November) ("Court-Connected Mediation and Online Dispute Resolution")

NBER Law and Economics Meetings (Cambridge, MA) (July) (Discussant on Jian Jia and Liad Wagman, "Platform, Anonymity, and Illegal Actors: Evidence of Whac-a-Mole Enforcement from Airbnb")

Univ. of Bonn (Law and Economics Workshop) (Bonn, Germany) (May) ("Noncompetes and Employee Mobility")

Symposium: Alternatives to Incarceration (Univ. of Haifa, Faculty of Law) (Haifa, Israel) (May) ("Targeting Poverty in the Courts: Improving the Measurement of Ability to Pay Fines")

Univ. of Michigan Law School (Law and Economics Workshop) (Ann Arbor, MI) (March) ("Noncompetes in the U.S. Labor Force")

Stanford Law School (Law and Economics Workshop) (Palo Alto, CA) (February) ("Noncompetes in the U.S. Labor Force")

Supreme Court Economic Review Research Roundtable on the Economics of Legal Error (George Mason Univ. Antonin Scalia Law School) (Arlington, VA) (February) (Discussant on Gregory DeAngelo and Bryan C. McCannon, "Judicial Compensation and Performance")

Univ. of Virginia Batten School of Policy (Faculty Research Workshop) (Charlottesville, VA) (January) ("Noncompetes in the U.S. Labor Force")

2017:   Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (November) ("Noncompetes and Employee Mobility")

Univ. of Toronto, Faculty of Law (Law and Economics Workshop) (Toronto, ON) (November) ("Noncompetes and Employee Mobility")

George Mason Univ. Antonin Scalia Law School (Manne Forum) (Arlington, VA) (September) (Senior Commentator on Megan Stevenson, "Assessing Risk Assessment")

Empirical Studies of Judicial Systems International Conference (Symposium: Do Courts Rule Efficiently? Empirical Inquiries) (Institutum Iurisprudentiae Academia Sinica) (Taipei, Taiwan) (June) ("Platform Procedure: Using Technology to Facilitate (Efficient) Civil Settlement")

Seminar on Empirical Methods for the Law (Journal of Institutional and Theoretical Economics, Max Planck Institute for Research on Collective Goods, Bonn, and the Univ. of Bonn, Germany) (Syracuse, Italy) (June) ("Assessing Access to Justice Outreach Strategies")

Duke Univ. School of Law (Culp Colloquium) (Durham, NC) (May) (Commentator on Andrea Chandrasekher, "Police Contract Status and Labor Unrest," and Sherod Thaxton, "Disentangling Disparity: Exploring Racially Disparate Effect and Treatment in Capital Charging")

UC Irvine School of Law Civil Justice Research Institute (Symposium: Practitioners and Scholars in Dialogue: What Do We Know About the Civil Justice System?) (UC Irvine School of Law) (Irvine, CA) (April) (Panel: Innovative Practices)

Vanderbilt Law Review Symposium on State Courts (Vanderbilt Law School) (Nashville, MI) (March) ("Improving Access to Justice in State Courts with Platform Technology")

Michigan State Law Review Symposium ("Empirical Legal Studies and Legal Analytics: Shall the Twain Meet?") (Michigan State Univ. College of Law) (East Lansing, MI) (March) (Panel: "ELS and Legal Analytics: Partners in the Same Pursuit or Never the Twain Shall Meet?")

Univ. of Michigan Complexity and the Law Conference (Ann Arbor, MI) (February) ("UM's Online Court Project: Big Data, Analytics, and Research Opportunities")

Univ. of Arizona James E. Rogers College of Law QuantLaw Conference (Tucson, AZ) (February) ("Noncompetes and Employee Mobility")

2016:   Conference on Empirical Legal Studies (Duke Univ. School of Law) (Durham, NC) (November) ("Noncompetes and Employee Mobility")

National Task Force on Fines, Fees, and Bail Practices Business Meeting (National Center for State Courts) (Lunch Presentation) (Arlington, VA) (November) ("Online Case Resolution")

National Association for Justice Information Systems 2016 Conference (Tucson, AZ) (November) ("Online Case Resolution Systems: Enhancing Access, Fairness, Accuracy, and Efficiency")

Georgetown Univ. Law Center (Law and Economics Workshop) (Washington, DC) (October) ("Noncompetes and Employee Mobility")

George Mason Univ. Antonin Scalia Law School (Law and Economics Workshop) (Arlington, VA) (October) ("Noncompetes and Employee Mobility")

Justice Codes Symposium (John Jay College of Criminal Justice) (New York, NY) (October) ("Citizens and Online Court Access")

Columbia Law School (Law and Economics Workshop) (New York, NY) (September) ("Noncompetes and Employee Mobility")

Concordia Univ. School of Law (Criminal Justice Reform Conference) (Boise, ID) (June) ("Online Case Resolution Systems: Enhancing Access, Accuracy, and Fairness")

UC Irvine Department of Informatics (Friday Seminar Series) (Irvine, CA) (May) ("Online Case Resolution Systems: Enhancing Access, Fairness, Accuracy, and Efficiency")

Northwestern Univ. School of Law (Colloquium on Law and Economics) (Chicago, IL) (April) ("Noncompetes and Employee Mobility")

Univ. of Connecticut School of Law (Faculty Workshop) (Hartford, CT) (March) ("A Comprehensive Theory of Civil Settlement")

NYU Law School (Law and Economics Colloquium) (New York, NY) (March) ("A Comprehensive Theory of Civil Settlement")

UCLA Law School (Law and Economics Workshop) (Los Angeles, CA) (February) ("A Comprehensive Theory of Civil Settlement")

Michigan Journal of Race & Law Symposium ("Innocent Until Proven Poor") (Univ. of Michigan Law School) (Ann Arbor, MI) (February) ("Online Case Resolution Systems: Enhancing Access, Accuracy, and Fairness")

2015:   Univ. of Texas School of Law (Law and Economics Workshop) (Austin, TX) (November) ("Noncompetes in the U.S. Labor Force")

Connecticut Law Review Symposium ("The Other One Percent: Prison Reform from Sentencing to Parole") (Univ. of Connecticut School of Law) (Hartford, CT) (November) ("Post-Release Regulations and Sex Offender Recidivism")

Conference on Empirical Legal Studies (Washington Univ. Law School) (St. Louis, MO) (October) ("Noncompetes in the U.S. Labor Force")

Conference on Empirical Legal Studies (Washington Univ. Law School) (St. Louis, MO) (October) (Discussant on Thomas H. Cohen, "Does Change in Risk Matter? Examining Whether Changes in Offender Risk Characteristics Influence Recidivism Outcomes")

Michigan State Law Review Symposium ("Legal Quanta") (Michigan State Univ. College of Law) (East Lansing, MI) (October) ("Noncompetes in the U.S. Labor Force")

Univ. of Michigan School of Information (Information Alliance for Community Development (IACD) speaker series) (Ann Arbor, MI) (September) ("Michigan's Online Court Project: Improving Access, Accuracy, and Fairness")

American Law and Economics Association Annual Meetings (Columbia Law School) (New York, NY) (May) (Discussant on Andrea Cann Chandrasekher, "The Effect of Police Slowdowns on Crime")

NBER Mid-Year Law and Economics Meetings (Cambridge, MA) (February) ("Tailored Suits: Contracting on Litigation")

Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (February) ("A Comprehensive Theory of Civil Settlement")

**2014:** Third Annual Robina Conference: The Future of Criminal Law? (Univ. of Minnesota Law School) (Minneapolis, MN) ("Policing Public Order without the Criminal Law")

Univ. of Virginia School of Law (Law and Economics Workshop) (Charlottesville, VA) (March) ("Neighborhood Offending: Is Sex Offense Victimization Risk Higher Where Sex Offenders Reside?")

**2013:** Conference on Empirical Legal Studies (Univ. of Pennsylvania Law School) (Philadelphia, PA) (October) ("Neighborhood Offending: Do Sex Offenders Reside and Offend in the Same Places?")

Conference on Empirical Legal Studies (Univ. of Pennsylvania Law School) (Philadelphia, PA) (October) (Discussant on Kuo-Chang Huang, "The Effect of Stakes on Settlement: An Empirical Lesson from Taiwan")

Tel Aviv Faculty of Law (Law and Economics Workshop) (Tel Aviv, Israel) (May) ("Criminal Choice in Sentencing")

Cornell-Tel Aviv Conference: Empirical Legal Studies (Tel Aviv Faculty of Law ) (Tel Aviv, Israel) (May) (Discussant on Michael Frakes, "The Impact of Criminal Law on the Incidence of Crime: Evidence from Expansions in the Scope and Severity and Statutory Rape Laws")

Notre Dame Law School (Law and Economics Workshop) (South Bend, IN) (March) ("Criminal Choice in Sentencing")

**2012:** NBER Law and Economics Meetings (Cambridge, MA) (July) (Discussant on Dara Lee, "The Digital Scarlet Letter: The Effect of Online Criminal Records on Crime and Recidivism")

American Law and Economics Association Annual Meetings (Stanford Law School) (Palo Alto, CA) (May) ("Criminal Choice in Sentencing")

Univ. of Toledo College of Law (Faculty Workshop) (Toledo, OH) (March) ("Criminal Choice in Sentencing")

**2011:** Conference on Empirical Legal Studies (Northwestern Univ. Law School) (Chicago, IL) (November) (Discussant on Jonah Gelbach, "The Effects of Heightened Pleading on Motion to Dismiss Adjudication")

Univ. of Chicago Law School (Law and Economics Workshop) (Chicago, IL) (November) ("Criminal Choice in Sentencing")

Columbia Law School (Law and Economics Workshop) (New York, NY) (October) ("Settlement and Trial? A Study of High-Low Agreements")

Stanford Law School (Faculty Workshop) (Palo Alto, CA) (March) ("Settlement and Trial? A Study of High-Low Agreements")

Cornell Law School (Empirical Colloquium) (Ithaca, NY) (March) ("Settlement and Trial? A Study of High-Low Agreements")

NBER Mid-Year Law and Economics Meetings (Cambridge, MA) (February) (Discussant on Howard Chang & Hilary Sigman, "An Empirical Analysis of Cost Recovery in Superfund Cases: Implications for Brownfields and Joint and Several Liability")

**2010:** Conference on Empirical Legal Studies (Yale Law School) (New Haven, CT) (November) ("Settlement and Trial? A Study of High-Low Agreements")

Conference on Empirical Legal Studies (Yale Law School) (New Haven, CT) (November) (Discussant on Sasha Romanosky, Rahul Telang, and Alessandro Acquisti, "Do Data Breach Disclosure Laws Reduce Identity Theft?")

American Law and Economics Association Annual Meetings (Woodrow Wilson School of Public Policy) (Princeton, NJ) (May) ("Settlement and Trial? A Study of High-Low Agreements")

Univ. of Haifa Law School (Law and Economics Workshop) (Haifa, Isreal via Internet) (May) ("Settlement and Trial? A Study of High-Low Agreements")

Univ. of Virginia Law and Economics of Crime Conference (Charlottesville, VA) (March) ("Determinants of Success in Post-Conviction Litigation by the Innocent")

Rice Univ. and Univ. of Houston (Applied Economics Workshop) (Houston, TX) (March) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

American Economic Association Annual Meetings (Atlanta, GA) (January) ("Empirical Evidence of Prosecutorial Charging Manipulation" and Discussant on Richard Boylan and Naci Mocan, "Intended and Unintended Consequences of Prison Reform")

**2009:** Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (October) ("Settlement and Trial? A Study of High-Low Agreements")

Univ. of Michigan Population Studies Center (Brown Bag) (Ann Arbor, MI) (October) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Univ. of Toronto Faculty of Law (Law and Economics Workshop) (Toronto, ON) (September) ("Settlement and Trial? A Study of High-Low Agreements")

NBER Law and Economics Summer Institute (Cambridge, MA) (July) ("Settlement <u>and</u> Trial?  A Study of High-Low Agreements")

UC Hastings College of Law (Faculty Workshop) (San Francisco, CA) (February) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Stanford Law School (Law and Economics Workshop) (Palo Alto, CA) (January) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

American Economic Association Annual Meetings (San Francisco, CA) (January) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?" and "The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes")

2008:     American Bar Association Litigation Section Access to Justice Symposium (Atlanta, GA) (December) ("The Challenges of Calculating the Benefits of Providing Access to Legal Services")

Searle Center Research Symposium on Empirical Studies of Civil Liability (Northwestern Univ. Law School) (Chicago, IL) (October) ("Settlement <u>and</u> Trial? A Study of High-Low Agreements")

Conference on Empirical Legal Studies (Cornell Law School) (Ithaca, NY) (October) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Conference on Empirical Legal Studies (Cornell Law School) (Ithaca, NY) (October) (Discussant on John F. Pfaff, "The Myths and Realities of Correctional Severity: Evidence from the National Corrections Reporting Program on Sentencing Practices")

Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (September) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Law and Society Annual Meetings (Montreal, Canada) (May) ("The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes")

American Law and Economics Association Annual Meetings (Columbia Law School) (New York, NY) (May) ("The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes")

Univ. of Chicago Law School (Criminal Law Colloquium) (Chicago, IL) (April) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Brooklyn Law School (Faculty Workshop) (Brooklyn, NY) (April) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Univ. of Haifa Law School (Law and Economics Workshop) (Haifa, Isreal via Internet) (March) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Univ. of Virginia School of Law (Law and Economics Workshop) (Charlottesville, VA) (February) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

NBER Mid-Year Law and Economics Meetings (Cambridge, MA) (February) (Discussant on Betsey Stevenson, "Beyond the Classroom: Using Title IX to Measure the Return to High School Sports")

**2007:**   Northwestern Univ. Law School (Law and Economics Colloquium) (Chicago, IL) (December) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Conference on Empirical Legal Studies (NYU Law School) (November) (Discussant on Stéphane Mechoulan, "The External Effects of Black-Male Incarceration on Black Females")

NBER Working Group on Crime (Cambridge, MA) (September) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

National Federal Sentencing Guidelines Seminar (Salt Lake City, UT) (May) ("Using U.S. Sentencing Commission Data in Empirical Research")

American Law and Economics Association Annual Meetings (Harvard Law School) (Cambridge, MA) (May) ("The Effects of Sex Offender Notification laws")

**2006:**   Conference on Empirical Legal Studies (Univ. of Texas Law School) (Austin, TX) (October) ("Empirical Evidence of Prosecutorial Charging Manipulation")

Conference on Empirical Legal Studies (Univ. of Texas Law School) (Austin, TX) (Discussant on Brandon Garrett, "Judging Innocence")

Junior Empirical Legal Scholars Conference (Cornell Law School) (Ithaca, NY) (September) ("Empirical Evidence of Prosecutorial Charging Manipulation")

Law and Society Annual Meetings (Baltimore, MD) (July) ("Measuring the Consequences of Criminal Jury Trial Protections")

Various Job Talks (January and February) ("Measuring the Consequences of Criminal Jury Trial Protections") (Michigan; Harvard; Stanford; NYU; Columbia; Univ. of Pennsylvania; UCLA; Georgetown; USC; Washington Univ.; Univ. of Texas)

**2005:**   Various Job Talks (September through December) ("Measuring the Consequences of Criminal Jury Trial Protections") (Yale; Univ. of Virginia; Duke; Cornell; Boston Univ.; Minnesota; Univ. of Colorado; William and Mary; Univ. of Miami)

MIT Department of Economics Labor Seminar (Cambridge, MA) (November) ("Measuring the Consequences of Criminal Jury Trial Protections")

Florida State College of Law (Faculty Enrichment Series) (Tallahassee, FL) (June) ("Measuring the Consequences of Criminal Jury Trial Protections")

Brookings Institution, Economic Studies Program (Brown Bag Lunch Talk) (Washington, DC) (June) ("Measuring the Consequences of Criminal Jury Trial Protections")

American Law and Economics Association Meetings (NYU Law School) (May) ("Measuring the Consequences of Criminal Jury Trial Protections")