# Exhibit 12:

## Dr. Kristen Zgoba Expert Report

*Does III v. Whitmer*

**Expert Report of**
**Kristen M. Zgoba, Ph.D.**
**Assistant Professor**
**Florida International University (FIU)**
**Miami, FL 33199**
**kzgoba@fiu.edu**

**Dated: December 13, 2021**

I, Kristen M. Zgoba, Ph.D., certify that:

### Education and Experience

1. I received my Ph.D. in criminology from Rutgers University, the State University of New Jersey, and I am an Assistant Professor at Florida International University (FIU) in Miami, Florida. I teach courses on sexual offending, corrections, research methods, and statistics. Prior to coming to FIU, I was the Supervisor of Research at the New Jersey Department of Corrections from 2004 until 2018. Throughout the course of my career, I have studied correctional populations, policy evaluation, violence, and recidivism; however, my main focus has been on sexual offending behavior and legislation. I am the author of over 55 peer-reviewed publications, with the vast majority relating to sexual offending. I have qualified to testify as an expert in approximately ten proceedings involving sexual offenders. Additionally, I have been awarded two federal grants from the Department of Justice to study the efficacy of Megan's Law and the Adam Walsh Act (AWA). Over the last 15 years, I have been invited to present on the topic of sexual offending on approximately twenty occasions and have testified to the United States Sentencing Commission on failure to register (FTR) as a sex offender. My full curriculum vitae, which includes a list of all of my publications authored in the last ten years and a list of all cases where I have testified as an expert in the last four years, is attached.

### Executive Summary

- **Costs of Registries:** The costs to a state of implementing the federal Sex Offender Registration and Notification Act (SORNA) far outweigh the federal fiscal penalties for states that choose not to implement SORNA. From 2006 to 2021, only 18 states have implemented SORNA. A Justice Policy Institute (JPI) analysis found that in all 50 states, the first-year costs of implementing SORNA would far outweigh the cost of losing 10 percent of the state's Byrne Grant funds (which provides federal money for prosecutors and law enforcement).

- **Failing to Register or to Comply:** Failing to register, or other non-compliance with SORN laws by registrants, does not correlate with subsequent sexual reoffending. The rate of failures to register addresses and similar location-related non-compliance is very low (about 3%), and research demonstrates that most such failures do not involve intentional failures or absconding to avoid detection by law enforcement.

- **Consequences of Registries:** Many registered sex offenders (RSOs) experience unemployment, housing disruption, harassment, social alienation, and depression as a consequence of public Sex Offender Registry and Notification (SORN) laws like Michigan's. Research has demonstrated a correlation between these negative consequences and recidivism (both sexual and non-sexual), suggesting that public sex offender registration may be counterproductive and could potentially increase rather than decrease sexual offending.

- **Tiering Based on Conviction:** Risk assessment-based registries are more effective in identifying individuals who present a risk to the public than conviction-based registries (like Michigan's). Michigan's SORNA-based use of "tiers" does not accurately describe or predict risk. (Without periodic reassessment, neither method is effective at showing *current* risk – that is, risk after having lived offense-free in the community.)

- **Variations in Registries:** The United States is one of the only countries that publicizes sexual offender registry information. The great majority of other countries limit access or use of such information to law enforcement. Within the United States, states use a wide variety of methods to decide who will be on the registry, for how long, what their reporting requirements will be, and whether or not their information will be available to the public online.

## Introduction

2. All information in this report is based upon publications and online research that are used by academicians and clinicians, my personal knowledge of the foundational work in the fields covered, or knowledge derived from my professional relationships, my own research, and the organizations with which I have worked or been affiliated. The conclusions and opinions are solely mine. Throughout this report, I provide key findings and conclusions from researchers and empirical scientists, myself included, regarding (1) the cost of SORN laws, (2) the lack of relationship between failure to register (FTR) (and other non-compliance with SORN laws) and recidivism, (3) the impact of SORN laws on registrants, (4) the lack of relationship between tier designations and recidivism, and (5) the variations of sexual offense legislation in the United States and abroad.

3. Michigan's registry is the fourth largest in the nation, with about 46,000 registered offenders. Because Michigan's registry law is modeled on the federal SORNA,

Michigan places registrants into three "tiers" based solely on their offense of conviction, makes the registry accessible online to the public for most registrants, requires reporting of vast amounts of information, and keeps most people on the registry for 25 years or for life, regardless of their current risk of reoffending.

## I.  Costs Associated with Registration and Notification Laws

4.  Over the last 25 years, sex offender policies have increased in size and scope. One of the most popular sex offender policies is registration and notification. All states currently have some form of registry, but only 18 states have adopted the 2006 federal SORNA-based system because of the logistical and financial challenges it poses. SORNA is viewed by many states as an unfunded federal mandate because it imposes extensive obligations without providing corresponding resources. (States that do not implement SORNA lose ten percent of their federal Byrne Grant funding, a separate grant program that provides support for prosecutors and law enforcement.) The research that exists indicates that states and localities can expect to incur significant costs if they attempt to implement SORNA, which is one of the reasons for rejecting SORNA supplied by the many states that have *not* implemented it since 2006.

### *The Cost of Megan's Law*

5.  Most financial analysis has addressed the costs of implementing SORNA. But a brief analysis examined the costs associated with the earlier (1996) federal Megan's Law (which many states still rely upon in some form). A 2008 report in New Jersey (shortly after that state passed a Megan's Law-based SORA) was the first and only study to examine the costs. (Zgoba, Witt, Dalessandro & Veysey, 2008.) This effort proved challenging, as delineating costs associated with community registration and notification was difficult to disentangle from other state and county spending. Tabulations were conducted on startup costs and ongoing yearly implementation costs. Startup costs included those initial costs to establish *each county's* Megan's Law Unit, because the law was largely administered by the counties.

6.  Three variables were included under startup costs: establishment of the internet sex offender registry, equipment costs, and other/miscellaneous costs (e.g., computer software). Ongoing costs consisted of expenses such as staff salaries, internet registry and equipment maintenance and supplies, and other miscellaneous expenses (e.g., mailings, printings, software updates, etc.). Examples of functions performed by Megan's Law Unit personnel include risk or tier classification, door-

to-door and community notifications, trainings (e.g., law enforcement, day care center employees), internet registry maintenance, and enforcement (e.g., prosecution/litigation). The study did not attempt to measure other costs associated with SORN laws, such as lost employment by registrants due to registration, or the cost of returns to prison for non-compliance (e.g., for SORA violators on parole).

7.   The start-up implementation cost of Megan's Law totaled close to $600,000. The cost for the full calendar year 2006 was estimated to be $1,557,978. The county costs for the full calendar year 2007 totaled $3,973,932. This change represents a 155% increase in ongoing expenses from calendar year 2006 to calendar year 2007. These increases were obtained from raw figures provided by the Megan's Law Units and were not broken out for specific costs. (Zgoba, et al., 2008.) While there have been no cost analyses of the New Jersey law since the 2008 study, it is expected that costs have grown exponentially as the size and scope of the law has grown.

### The Costs of SORNA

8.   The Justice Policy Institute released a report (2008)[1] documenting each state's projected costs for implementing and maintaining SORNA. At least seven states explicitly expressed apprehension over the fiscal difficulties of implementation. The hesitation to implement SORNA was striking as states do not want the reputation of being either "soft on crime" or out of step with other states. In attempting to implement SORNA, states incur significant costs in various areas, including but not limited to additional personnel; new software installation and maintenance; additional jail and prison space; increased court and administrative needs; law enforcement, including the need to verify information at more frequent intervals; and legislative costs associated with crafting and adopting new state laws. In addition, there are numerous costs that are even harder to measure, like costs related to loss of employment or housing by people subject to registration, and the costs of prosecution and sending people back to jails and prisons.

9.   As noted in JPI's report (2008), in every state, the first-year costs of SORNA implementation outweighed the cost of losing ten percent of the state's Byrne Grant funding. (See Appendix A.) In California, the Sex Offender Management Board recommended that the state legislature, governor, and citizens elect not to adopt a SORNA-based registry, emphasizing the "substantial" and "un-reimbursed" costs associated with the law. (Wang, 2015.) A study by the Texas Senate Criminal Justice

---

[1] https://justicepolicy.org/research/registering-harm-how-sex-offense-registries-fail-youth-communities/

Committee also found that losing ten percent of federal justice funding was an inadequate incentive to comply with SORNA, estimating that "it would cost $38.7 million to comply, but the state would lose only about $1.4 million in Byrne funds if it refused." Additionally, the SORNA program itself is underfunded, and Congress has failed to allocate consistent funding to underwrite the significant implementation costs incurred by state and local governments. Some state leaders called SORNA an "unfunded federal mandate" because of the "disturbing disconnect" between the federal government's withholding funds to states that failed to comply while not providing any funds to help meet the expensive new federal requirements for states that wished to adopt a SORNA-based registry.

10. While there is no published study that assesses the true cost of Michigan's registry, it has several features that suggest that its costs are very high. First, the registry is very large, with approximately 46,000 registrants who live in the state, most of whom are required to report in person at least four times a year and are subject to registration for life. Moreover, registrants have to report to law enforcement all sorts of information, such as changes to addresses, employment, schooling, vehicle information, email addresses, internet identifiers, and telephone numbers. The size of the registry, length of registration terms, and frequency of reporting imposes significant costs on law enforcement agencies responsible for SORA.

11. In summary, over time, in light of the now well-established ineffectiveness of SORN laws to reduce sexual offending, most states have decided against modifying their existing systems (often a version of Megan's Law) to SORNA and are instead taking the ten percent deduction in federal Byrne Grant funding. The costs for Megan's Law, but especially the significantly larger costs for SORNA-based state laws, are hard for state legislatures to justify given the negligible impact of SORN laws on public safety. In addition, while there is no published research on the costs of Michigan's registry, the available data suggest that it imposes very high costs for little or no public benefit.

## II. Failure to Register and Other Non-Compliance Offenses

12. Shortly after SORNA was passed in 2007, the U.S. Marshals Service was designated as the lead federal agency to investigate violations of federal sex offender registration laws and to assist state, local, tribal, and territorial jurisdictions in locating and apprehending registrants who failed to comply with their sex offender registration requirements. The Marshals Service collaborates with those partner agencies to investigate and aggressively pursue non-compliant offenders.

13.  The focus on non-compliant offenders reflects an assumption that people who fail to register are especially dangerous because they are attempting to avoid scrutiny. Even those tasked with managing sex offender policies share this assumption. As the former director of the SMART Office warned in a USA Today story: "The people you need to be worried about most are the ones who aren't registering at all." (Koch, 2007, p. 1.) **As detailed below, research on this topic shows that** *this assumption is false.* (Agan & Prescott, 2021; Duwe & Donnay, 2010; Levenson, Letourneau, Armstrong, & Zgoba, 2010; Levenson et al. 2013; Logan, 2021; Zgoba & Levenson, 2012.) **People who fail to register (or are otherwise non-compliant with SORN laws) are** *no more likely to recidivate sexually* **than people who do register (and are otherwise compliant).**

### Relationship Between Failure to Register/Non-compliance and Recidivism

14.  Empirical data published to date does not support the assumption that FTR leads to decreased public safety. (Agan & Prescott, 2021; Duwe & Donnay, 2010; Levenson, Letourneau, Armstrong, & Zgoba, 2010; Levenson et al. 2013; Logan, 2021; Zgoba & Levenson, 2012.) To the contrary, the existing research studies demonstrate that there are *no significant differences* between the sexual recidivism rates of non-compliant registrants versus compliant registrants, and there is no significant difference in the proportion of sexual recidivists versus non-recidivists with registration violations. The bottom line is that non-compliance does not correlate with higher sexual recidivism rates, or (looking backward) sexual recidivism does not correlate with higher non-compliance rates, as the studies below show.

15.  In Minnesota, an arrest for FTR did not predict sexual or general recidivism. Duwe and Donnay (2010). The study also found that FTR offenders were less educated, less violent, less likely to have assaulted victims of different age groups, more likely to be a racial minority, less likely to have participated in treatment, and more likely to have prior felonies and supervision violations. The researchers reported that FTR has become the most common new offense for sex offenders released from Minnesota prisons. They examined conviction data for 1,561 released sex offenders who were required to register as predatory offenders in Minnesota. About 11% had been convicted of failing to register. FTR was not predictive of either sexual or general recidivism, but an FTR conviction significantly increased the risk of another FTR offense. The authors concluded that registration non-compliance did not appear to elevate the risk of sexual reoffending. (Duwe & Donnay, 2010.)

16.  In South Carolina, FTR offenders were not more likely to sexually recidivate. (Levenson et al., 2010.) FTR offenders were also less likely to have a minor victim,

were younger, had more prior nonsexual arrests, were more likely to be non-white. This study involved 2,970 registered sex offenders and did not support the hypothesis that sexual offenders who fail to register are more sexually dangerous than those who abide by registration requirements. (Levenson et al., 2010.) Specifically, 10% of the sample of sex offenders had registry violation convictions across an average follow-up period of about 6 years. There were no statistically significant differences in sexual recidivism rates between those who failed to register (11%) and compliant registrants (9%).The authors concluded that FTR and sexual offending tap separate constructs, with FTR related to rule-breaking behavior, and sexual offending driven by sexual deviance.

17. A similar study in New Jersey analyzed the recidivism outcomes of 1,125 RSOs in two groups. The first group comprised 644 RSOs who were convicted of a sex crime and at some point failed to register after release from prison. The comparison group contained 481 RSOs released from prison during a similar timeframe who did not fail to register after their release. The groups were then tracked for both sexual and non-sexual offenses to determine whether failure to register (under Megan's Law) was predictive of reoffending. Failure to register was not a significant predictor of sexual recidivism, casting doubt on the belief that registrants who are non-compliant with registration are especially sexually dangerous. (Zgoba & Levenson, 2012.)

18. A study in Florida was the first to empirically investigate the characteristics of "absconded" registrants and explore how this group compares to other groups of registrants. (Levenson et al., 2013.) Using data from the Florida sex offender registry (N = 23,557), this exploratory study compared the characteristics and risk factors of absconders with those of compliant and non-compliant (but non-absconding) registrants as well as with those with convictions for failure to register. Absconders, as a group, were less likely than compliant registrants to be listed as predators, and less likely than both "compliants" and "noncompliants" to have a minor victim or to be a repeat sex offender. Absconders were also least likely to have a prior FTR conviction. The findings fail to support the hypothesis that fugitive registrants are more sexually dangerous, and suggest a multitude of other explanations for absconding.

19. Complying with SORN requirements can be burdensome and difficult, and inevitably, some registrants will fail to keep their information current, fail to satisfy technical rules, or otherwise be non-compliant. (Agan & Prescott, 2021; Logan, 2021.) Current research shows that most people who fail to register are not "absconders" running from the law or committing new sexual crimes. (Bierie & Detar,

2016.) Indeed, because non-compliance is often unintentional, and because non-compliance does not correlate with sexual reoffending, aggressive policing of compliance offenses makes little sense. Many failure-to-register and non-compliance violations can be explained by the burdens of satisfying complex registration requirements, the scope of what must be reported, and the life circumstances of many registrants. Registrants move a lot and are more likely to live in poor, socially disorganized neighborhoods. (Mustaine, Tewksbury & Stengel, 2006; Yeh, 2015.) These considerations suggest that failing to register may signal many things about those subject to SORNA laws, <u>but not that they are more likely to sexually recidivate</u>.

### Prevalence of Failure to Register

20. It is challenging to confirm the number of registrants who fail to register, given that states have widely disparate methods for classifying or distinguishing absconders, registration violators, and others whose locations are uncertain. When analyzing data downloaded from public registries, however, researchers found no empirical evidence to support claims of large numbers of "missing" registrants. To the contrary, <u>only about 3%</u> of RSOs were labeled as non-compliant as to their address (or with whereabouts unknown), and only an additional 2% of RSOs were found to be transient or homeless without a specific address. (Levenson & Harris, 2012.) (Registries may also list individuals as non-compliant for other reasons, such as failure to pay a fee, but that does not implicate the concern about "missing" registrants.)

21. Rates of residency non-compliance varied across the states, with a median rate of 2.7%. The most inclusive estimates revealed that the addresses of approximately 22,000 to 36,000 RSOs may be unverified, indicating numbers nowhere near those sometimes sensationalized in the media. (Levenson & Harris, 2012.) Additionally, it is unlikely that all registrants arrested for FTR are willful violators, as most are easily located and do not appear to have absconded. (Duwe & Donnay, 2010; Harris et al., 2012; Levenson et al., 2010; Levenson et al., 2012; Zgoba & Levenson, 2012.) Some registrants appear to be "missing" due to administrative errors, inadequate or incomplete address information, data entry anomalies, lag times in updating registry information, unauthorized travel, or homelessness. (Harris & Pattavina, 2009.) Some registrants may unintentionally or carelessly disregard their duty to update.

### III.  Impact of SORN Laws on Registrants

22.  Collateral consequences are effects, both intended and unintended, arising from convictions. Examples of legal collateral consequences include being barred from certain employment, the loss of the right to possess a firearm, the inability to participate in political elections, and (as here) being placed on a registry of offenders. In addition, people with convictions face social collateral consequences, which typically vary in intensity, frequency, and certainty. These might include relationship and parenting problems, employment difficulties, harassment, ostracism, and feelings of shame and diminished self-worth.

23.  According to Tewksbury (2007), collateral consequences are not unique to sex offenders. Because of SORN laws, however, registered sex offenders (RSOs) are more significantly affected by collateral consequences than other people with criminal records. The problems of re-entry commonly faced by other criminal offenders are greatly exacerbated for people who have committed sexual offenses when, as in Michigan, they are placed on a public online registry, and can remain on the registry for their entire lives.

24.  The stigma of sex offender registration and community notification is well documented, as are the ways in which SORN laws can impede community re-entry and adjustment. The research on collateral consequences has been established over the past twenty years and has demonstrated consistency in its findings. Research establishes RSOs experience a range of negative consequences, and that these consequences are typically more negative than those experienced by other people with convictions. Although these collateral consequences are not universal and may vary in intensity and the degree to which they affect the short- and long-term experiences of offenders, they nonetheless have serious implications for individual offenders, their families, communities, and society. This is important because many of the consequences are also "triggers" or catalysts for recidivism, for example, the lack of employment and housing, or the instability of either. (Maletzky, 1993; McGrath, 1991.)

25.  Several studies used surveys to document the experiences of RSOs in general. More than one-half (54.7%) of a general sample of RSOs in Kentucky reported losing a friend who found out they were on the registry, 47% were harassed in person, 45.3% lost or were denied a place to live, and 42% lost a job as a result of registration. Rural RSOs generally experienced more negative consequences than those living in metropolitan areas. Focusing on the experiences of forty female RSOs

in Kentucky and Indiana, another study found that "a number of negative experiences stem from sex offender registration." The most significant collateral consequences identified by women in the sample were the loss of a job (42.1%), the loss of a friend who learned of their registration (39.5%), in-person harassment (34.2%), the loss or denial of a place to live (31.6%), and rude treatment in public (31.6%). (Tewksbury, 2005.)

26. Levenson and Cotter (2005) examined the collateral consequences of 183 RSOs in Florida. They reported that the majority of the respondents in their study experienced negative psychological feelings that were directly related to sex offender registration. Using a methodology similar to that of earlier studies, the authors reported that 35% of their sample was "forced" to move because of their placement on the Florida sex offender registry. Additionally, 27% said that they had lost their jobs because of their status as RSOs, and 19% reported some form of harassment.

27. A similar study conducted in Kentucky provides an in-depth analysis of the experiences and perceptions of RSOs through the use of qualitative in-person interviews. (Tewksbury & Lees, 2006.) They interviewed 22 RSOs listed on the Kentucky sex offender registry and reported several primary types of collateral consequences, including employment difficulties, relationship problems, harassment, stigmatization, and persistent feelings of vulnerability. As one respondent in the study explained, "I know [the registry] is there to remind and punish, but it will always be like a roadblock in the way for those of us who wish to truly rehabilitate and change their lives." This research found that these issues were experienced more intensely by RSOs than has been found among other people with felony convictions. The study concluded that re-integration into society can be more difficult for RSOs as a result of registration.

28. Similarly, Burchfield and Mingus (2008) reported on interviews with 23 RSOs in Illinois. They found that RSOs have less access to local social capital because of their status as RSOs. More than one-third of their sample reported voluntary withdrawal from the community and a decrease in social interaction. RSOs were also found to be generally fearful of community members learning of their registration and experienced feelings of stigmatization due to their registry listing. Most respondents (78%) reported that policy requirements for sex offender parolees "impeded their ability to reintegrate into community life."

29. Another study in New Jersey examined how registered sex offenders experience, respond to, and attribute stress regarding sex offender registration and notification policies, particularly a new ban on internet access. Drawing on survey data

from a random sample of 107 RSOs, responses show significant levels of stress, significant losses due to restrictions on internet access, and coping methods associated with higher and lower stress levels. The most significant loss reported by the sample related to employment search difficulties. Factors associated with increased levels of stress include using self-distraction for coping and not accepting the situation. (Tewksbury & Zgoba, 2010.)

30.  In summary, it is well established that many RSOs experience unemployment, housing disruption, harassment, and social alienation as a result of SORN laws. (Levenson & Cotter, 2005; Levenson et al., 2007; Mercado et al., 2008; Mustaine et al. 2006; Socia, 2021; Tewksbury, 2005; Tewksbury & Lees, 2006; Tewksbury & Zgoba, 2010; Zevitz & Farkas, 2000.) Some RSOs also report that these negative consequences have affected other members of their households. Likewise, many RSOs report depression and hopelessness. (Jeglic, Mercado, & Levenson, 2011.) As a result, SORN laws may actually undermine public safety by exacerbating factors that are correlated with criminal recidivism, as shown below.

## IV.  Tier Levels Are Not SORNA-Based in Most States

31.  The United States Marshals Service recently provided information showing that about 925,000 people are required to register in the United States. (Personal communication with David Bierie, senior statistician and researcher responsible for registry counts, in September 2021.) In the 18 states that (like Michigan) use SORNA's mandatory three-tier offense-based system, about three-quarters of registrants fall into Tier 2 or 3, which carry registration periods of 25 years and life, respectively. (Harris, Lobanov-Rostovsky, & Levenson, 2010; Zgoba, Miner, Levenson, Knight, Letourneau & Thornton, 2016.)

32.  The large majority of states that have not implemented SORNA use various methods to categorize people convicted of sexual offenses for purposes of registration and notification requirements. (Zgoba et al., 2016.) Some of those states still classify sex offenders into categories based (at least in part) on their conviction, while other states use actuarial-based risk assessments (or a combination of methods). States also vary in determining whether a person with a particular conviction is in a lower or higher tier.  For example, a person classified as a level/tier I registrant with no public notification requirement in one state might be classified as tier II or tier III registrant subject to public notification in another state. (Harris & Lobanov-Rostovsky, 2010.)

33. Harris, et al., 2010, identified the sources of variation among the state classification schemes: how classes of registrants are distinguished from one another, as well as the criteria used in the classification process and in making the classification decisions.

34. One point of divergence is how states distinguish their registrants. At one end are the states operating single-tier systems that treat registrants equally with respect to reporting, registration duration, notification, and related factors. Alternatively, some states use multi-tier systems, usually with two or three categories that are supposed to reflect presumed public safety risk and, in turn, required levels of scrutiny from law enforcement and the public. (Harris, et al., 2010.) Approximately 14% of states operate single tier systems that subject all registered sex offenders to similar requirements, 18% operate modified single tier systems with a special category for offenders identified as "sexual predators," and 68% set forth separate requirements for two or more categories of sex offenders. (Harris, Levenson & Ackerman, 2014.)

35. A second dimension is the criteria employed in the classification decision. States running offense-based systems use the conviction offense or the number of prior offenses as the criteria for tier assignment. Other jurisdictions use various risk assessments that consider factors that scientific research has linked to sexual risk, such as age, number of prior sex offenses, victim gender, and relationship to the victim. Finally, some states use a hybrid of offense-based and risk-assessment-based systems for classification. Approximately 70% of states consider the conviction offense; 45% of states consider the number of convictions; and 32% use a form of empirically-based risk assessment to determine a person's classification. (The numbers add up to more than 100% because of the overlap among the methods.)

36. Research has shown that offense-based classification systems fail to accurately identify individuals who are high risk, and that risk-assessment-based systems, which employ actuarial-based risk assessment instruments to classify registrants, are much more accurate.

37. For example, a recent study compared the federal SORNA classification tiers with actuarial risk assessment instruments and existing state classification schemes in their respective abilities to identify registrants as high risk to reoffend. (Zgoba, et al., 2016.) Data from 1,789 adult registrants released from prison in four states were collected (Minnesota, New Jersey, Florida, and South Carolina). SORNA Tier 2 registrants had higher Static-99R scores and higher recidivism rates than Tier 3 offenders. Actuarial measures and non-SORNA-based state tier systems, in contrast,

did a better job of identifying high-risk offenders and recidivists. As well, the study examined the distribution of risk assessment scores within and across tier categories, finding that a majority of registrants are classified as SORNA Tier 3, but more than half score low or moderately low on the Static-99R. The results indicate that the SORNA sex offender classification scheme is a poor indicator of relative risk and is likely to result in a system that is less effective in protecting the public than those currently implemented in states with risk-assessment based approaches. (SORNA-based systems also mislead the public into believing that people assigned to Tier III are more dangerous when we know they are not.)

38. In sum, tiering of registered offenders varies by state, and many states do a better job than Michigan by using evidence-based methods for predicting risk. According to recent research, actuarial measures and existing non-SORNA-based state tier systems did a better job of identifying high-risk offenders and recidivists than SORNA's exclusively offense-based classifications – which do not correlate with risk of sexual reoffending.

## V.  Variations in SORN Laws in the United States and Abroad

### *SORN Laws Not Based on SORNA in the United States*

39. As noted above, sex offender registry requirements vary by state in the U.S. While there are some common characteristics, there is also great variation in who has to register, whether there are individual assessments in determining registration requirements, how long registration periods last, what information is collected from registrants, and whether (or which) registrants' information is shared with the public. Because only 18 states have adopted SORNA since it was passed in 2006, the federal goal of creating "standardized" registration laws has not been realized. Though many states retain a version of the original Megan's Law (1996), the contours of those laws are widely variable, as shown below.

40. Common among registration schemes is that people convicted of sex offenses are required to register with their local law enforcement or corrections agency. This information is forwarded to a central location, such as the state police or state bureau of investigation. Information required for the registry typically includes name, address, date of birth, social security information, physical description, fingerprints, and photographs.

41. Additionally, every state has a public sex offender registry, but states vary greatly in how they notify the public, who goes on the public registry, and what

information is released. Some states require interested citizens to access registry information at their local law enforcement agencies. For example, New Jersey withholds the majority of incest offenders from online placement, and in South Dakota, only a few communities have placed specific offender information online; in most communities, interested citizens must request the information from authorities. In Iowa, in contrast, anyone can access information online about any person on its sex offender registry. Searches can be conducted by name, geographic location, or gender of the offender or victim. Iowa provides photos, physical descriptions, addresses, and details of convictions. This is also true in Florida, which maintains broad community notification and designated registrants as either 'sex offenders' or 'predators' online.

42. As can be seen from the above, Megan's Law did not mandate standardization of implementation, and states took the liberty to adopt individualized provisions for notifying the public about registrants who were deemed to carry the most risk. As this occurred, the notification stipulations evolved in a variety of ways, for instance, producing different procedures for the tiering of sex offenders or implementing broad notification procedures without a distinction between high and low risk. (Levenson, D'Amora & Hern, 2007; Lobanov-Rostovsy, 2015; Vasquez, Maddan & Walker, 2008; Zgoba, et al., 2016; Zgoba et al., 2018.)

43. In sum, some states tailor registration and notification requirements through evidence-based risk classification. Other states, like Michigan and the other 17 states that have adopted SORNA-type laws, apply the same registration requirements to all or most registrants regardless of their classification, and allow public access to all or most online information, with no evidence-based determination of risk, let alone current risk.

### Sexual Offense Legislation Abroad

44. Outside the United States, public sex offender registries are very uncommon. Many countries, including the United Kingdom Canada, Spain and the European Union, do require persons who have been convicted of a sexual offense to register with law enforcement or other official authority. Like the United States, these jurisdictions have faced pressure to make sex offense registry information readily available to the general public, but unlike the United States, they have generally declined to do so. Typically, their registry information is available only to law enforcement, or they permit somewhat wider disclosure, but only in limited circumstances. One fundamental reason is that other nations generally treat criminal-history information as confidential, in order to protect the privacy of those who have been

convicted of crime and to aid their rehabilitation. (Jacobs & Blitsa, 2012; Jacobs & Larruri, 2012.)

45. A global survey conducted by the U.S. Department of Justice (2016)[2] found that while many other nations maintain sex-offense registries, in most cases they are either not available to the public at all or are available only upon inquiry by certain people or organizations under particular conditions. Virtually no foreign countries listed in the survey permit the prevalent U.S. practice of proactive notification of sex-offense registry information to unlimited community organizations and the general public. More recently, at least two Latin American nations have enacted sex-offense registry laws, but they too reject the U.S. practice of proactive community notification; access to sex-offense registry information is largely restricted to law enforcement, with limited exceptions.

  *a. **United Kingdom**.* The restrictions imposed on persons who have been convicted of a sexual offense are far more limited in the UK than in the United States, largely because of concern that widespread dissemination of criminal history and burdensome limitations can undermine the rehabilitation of ex-offenders. (Zgoba & Cowan, 2020.) Upon release from custody, persons convicted of a sexual offense must report to local police, provide certain personal details (for example, birthday, national insurance number, names used, and where they are living or planning to travel), and keep these details current for as long as they remain on the registry. Registrants must also provide notice when they travel abroad or stay in a house with children, and must provide a DNA sample, fingerprints, and a current photograph. The Violent and Sex Offenders Register (ViSOR) allows law enforcement to access information in the registry and to track registrants within their jurisdiction. Unlike the United States, the UK does not permit unlimited public access to registrant information. Instead, the UK allows for "controlled disclosure" of information about certain registrants, but only if they have been convicted of a sex offense against a child. Under that regime, known as Sarah's Law, members of the public may inquire whether a specific individual poses an ongoing risk to their child. Before disclosure is made, the application by the parent or guardian is subject to a rigorous series of reviews. (Cowan, Zgoba, Guerette & Levenson, 2020.)

  *b. **Canada**.* The sex-offense registration system in Canada is similar to that in the UK. Registry information is available to law enforcement for the purpose of investigating and preventing sexual offenses but generally is not available to the public. Following a high-profile abduction and murder, the province of Ontario

---

[2] USDOJ- https://smart.gov/pdfs/global-survey-2016-final.pdf

created a sex-offense registry (OSOR) in 2001. When other provinces prepared to follow suit, in 2004 Canada adopted a National Sex Offender Registry (NSOR), administered by the Royal Canadian Mounted Police. Whereas registration in Ontario (under the OSOR) is required automatically upon conviction, the original 2004 legislation placed offenders on the national registry (NSOR) only by court order at the prosecutor's request, which the judge could reject if it was found not to be in the public interest. National sex-offense registry information in Canada is available only to the police, but individual provinces have established separate community-notification schemes to notify the public about high-risk registrants. In 2015, the Tougher Penalties for Child Predators Act and the High-Risk Child Sex Offender Database Act created a national database centralizing information about high-risk registrants (as determined by risk-assessment instruments and clinical judgment), but it includes only information that the police or other authorities have previously disclosed publicly. (Murphy, Fedoroff & Martineau, 2012; Murphy & Federoff, 2013.)

    *c. **Australia and New Zealand**.* Beginning with New South Wales in 2001, each Australian state and territory has created a sex-offense registry linked to an Australian National Child Offender Register (ANCOR). In 2012, Western Australia became the only Australian state to allow public access. Its three-tier system (1) publicizes missing registrants who have not complied with reporting obligations, (2) allows members of the public to search for high-risk individuals in their local area, and (3) allows members of the public to inquire whether a particular person in contact with their child is a registrant, a system similar to the system in the UK. In 2016, New Zealand created a sex-offense registry that is not publicly available. (Taylor, 2017; see New Zealand Police, *CSO Register: Information for People on the Register* (Oct. 2016.)

    46. In sum, sex offender registry and notification requirements vary by state in the U.S. Moreover, the U.S. is an outlier when it comes to notifying the public about the criminal histories and addresses of sexual offenders, as the majority of other countries that have implemented sex offense legislation maintain the information for law enforcement exclusively.

## Statement on Compensation

I have charged a rate of $275/hour for writing this report.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the above

statements are true and correct to the best of my knowledge, information, and belief.

Date: <u>December    , 2021</u>

Kristen Zgoba, Ph.D.
Florida International University
Miami, FL 33199

**Appendix A: Source: Justice Policy Institute, "Registering Harm"**
In each of the states, just the 1st year implementation costs far outweighs the Byrne money

| | AWA Implementation Estimate for 2009 | Byrne Money Received in 2006** | 10 Percent of Byrne Money |
|---|---|---|---|
| ALABAMA | $7,506,185 | $3,178,628 | $317,863 |
| ALASKA | $1,108,573 | $565,971 | $56,597 |
| ARIZONA | $10,281,201 | $3,653,881 | $365,388 |
| ARKANSAS | $4,597,925 | $2,180,442 | $218,044 |
| CALIFORNIA | $59,287,816 | $21,876,819 | $2,187,682 |
| COLORADO | $7,885,178 | $2,725,489 | $272,549 |
| CONNECTICUT | $5,680,602 | $2,189,001 | $218,900 |
| DELAWARE | $1,402,612 | $1,248,534 | $124,853 |
| DISTRICT OF COLUMBIA | $954,186 | $1,804,991 | $180,499 |
| FLORIDA | $29,602,768 | $12,402,693 | $1,240,269 |
| GEORGIA | $15,481,193 | $5,594,288 | $559,429 |
| HAWAII | $2,081,603 | $933,732 | $93,373 |
| IDAHO | $2,431,969 | $1,170,003 | $117,000 |
| ILLINOIS | $20,846,306 | $8,501,000 | $850,100 |
| INDIANA | $10,291,799 | $3,696,033 | $369,603 |
| IOWA | $4,846,488 | $1,881,623 | $188,162 |
| KANSAS | $4,502,553 | $2,035,999 | $203,600 |
| KENTUCKY | $6,879,497 | $2,702,451 | $270,245 |
| LOUISIANA | $6,963,401 | $3,514,704 | $351,470 |
| MAINE | $2,136,456 | $1,172,583 | $117,258 |
| MARYLAND | $9,112,724 | $4,320,568 | $432,057 |
| MASSACHUSETTS | $10,461,238 | $4,353,201 | $435,320 |
| MICHIGAN | $16,336,082 | $6,793,169 | $679,317 |
| MINNESOTA | $8,430,328 | $3,061,831 | $306,183 |
| MISSISSIPPI | $4,734,150 | $2,065,269 | $206,527 |
| MISSOURI | $9,534,548 | $4,182,382 | $418,238 |
| MONTANA | $1,553,611 | $1,076,424 | $107,642 |
| NEBRASKA | $2,878,281 | $1,288,957 | $128,896 |
| NEVADA | $4,160,944 | $1,808,095 | $180,810 |
| NEW HAMPSHIRE | $2,134,219 | $1,192,435 | $119,244 |
| NEW JERSEY | $14,088,206 | $5,160,709 | $516,071 |
| NEW MEXICO | $3,195,121 | $1,879,901 | $187,990 |
| NEW YORK | $31,300,125 | $11,279,841 | $1,127,984 |
| NORTH | $14,696,622 | $5,460,983 | $546,098 |
| NORTH DAKOTA | $1,037,592 | $554,556 | $55,456 |
| OHIO | $18,598,869 | $6,223,825 | $622,383 |
| OKLAHOMA | $5,867,138 | $2,790,472 | $279,047 |
| OREGON | $6,078,218 | $2,251,312 | $225,131 |
| PENNSYLVANIA | $20,165,479 | $7,640,322 | $764,032 |
| RHODE ISLAND | $1,715,760 | $967,292 | $96,729 |
| SOUTH CAROLINA | $7,149,123 | $3,610,292 | $361,029 |
| SOUTH DAKOTA | $1,291,426 | $513,858 | $51,386 |
| TENNESSEE | $9,985,946 | $4,817,782 | $481,778 |
| TEXAS | $38,771,924 | $14,045,713 | $1,404,571 |
| UTAH | $4,290,617 | $1,557,034 | $155,703 |
| VERMONT | $1,007,649 | $630,419 | $63,042 |
| VIRGINIA | $12,508,695 | $3,943,036 | $394,304 |
| WASHINGTON | $10,491,519 | $3,538,816 | $353,882 |
| WEST VIRGINIA | $2,939,046 | $1,679,108 | $167,911 |
| WISCONSIN | $9,085,630 | $2,982,833 | $298,283 |
| WYOMING | $848,009 | $584,036 | $58,404 |

# Attachment 1:

## C.V. of Kristen M. Zgoba, Ph.D.

**CURRICULUM VITAE**
**OF**
**KRISTEN M. ZGOBA**
**DEPARTMENT OF CRIMINOLOGY & CRIMINAL JUSTICE**
**Updated January 17, 2022**

---

**EDUCATION**

| Degree | Institution | Field | Dates |
|---|---|---|---|
| Ph.D. | Rutgers University, NJ | Criminal Justice | 00-04 |

*Dissertation Title- Variations in the Recidivism of Treated and Non-Treated Sexual Offenders in New Jersey: An Examination of Three Time Frames*

| | | | |
|---|---|---|---|
| M.A. | Rutgers University, NJ | Criminal Justice | 99-00 |
| B.A. | Rutgers University, NJ | Psychology | 95-99 |

**FULL-TIME ACADEMIC EXPERIENCE**

| Institution | Rank | Field | Dates |
|---|---|---|---|
| Florida International University | Assistant Professor | Criminal Justice | 19-present |
| University of Central Florida | Assistant Professor | Criminal Justice | 18-2019 |

**PART-TIME ACADEMIC EXPERIENCE**

| Institution | Rank | Field | Dates |
|---|---|---|---|
| Rutgers University-Newark | Adjunct | Criminal Justice | 16-2018 |
| Michigan State University | Adjunct | Criminal Justice | 13-2019 |
| Rutgers University- New Brunswick | Adjunct | Criminal Justice | 01-2018 |

**NON-ACADEMIC EXPERIENCE**

| Place of Employment | Title | Dates |
|---|---|---|
| New Jersey Department of Corrections | Supervisor of Research | 04-2018 |

**EMPLOYMENT RECORD AT FIU**

| Rank | Dates |
|---|---|
| Assistant Professor | 19-present |

**PUBLICATIONS IN DISCIPLINE**

**Books**
NA

1

**Papers in Professional Journals**

***Articles Since Hired at Florida International University***

\*Denotes Graduate Student Co-Author

D'Alessio, S., Stolzenberg, L., Guerette, R. & **Zgoba**, K. (2022). "The Effect of Self Defense Laws on Firearm use Among Offenders. *Crime & Delinquency.*

**Zgoba**, K. & Mitchell, M. (2021). "A Meta-Analysis of the Effectiveness of Sexual Offense Registration and Notification Policies on Recidivism". *Journal of Experimental Criminology.* DOI:/10.1007/s11292-021-09480-z.

Guerette, R. T., Przeszlowski, K\*., Lee-Silcox, J\*. & **Zgoba**, K. (2021). "Improving Policing through Better Analysis: An Assessment of a Crime Analysis Training & Enhancement Project within an Urban Police Department." *Police, Practice and Research: An International Journal.*  DOI: /10.1080/15614263.2020.1861448.

Pizarro, J., **Zgoba**, K. & Pelletier, K. (2021). Firearm Use in Violent Crime: Examining the Role of Premeditation and Motivation in Weapon Choice. *Journal of Primary Prevention* (42), 77–91. DOI:/10.1007/s10935-020-00595-z.

Baker, T., **Zgoba**, K. & Gordon, J. (2021). "Incarcerated for a Sex Offense: In-Prison Experiences and Concerns about Reentry". *Sexual Abuse: A Journal of Research and Treatment, 33(2), 135-156.*DOI: 1079063219884588.

**Zgoba,** K. & Clear, T. (2020). "A Review of the Reality of Violent Offending and the Administration of Justice". *Criminal Justice Policy Review.* DOI: 0887403420919471.

**Zgoba,** K., Pizarro, J. & Salerno, L**.** (2020). "Assessing the Impact of Restrictive Housing on Inmate Post-Release Criminal Behavior. *American Journal of Criminal Justice* (45), 102–125. doi.org/10.1007/s12103-019-09496-2.

- 2020 *American Journal of Criminal Justice* Outstanding Article Award

Cowan\*, D., **Zgoba**, K., Guerette, R. & Levenson, J. (2020). "Do Views on Sex Offending Vary by Nationality? A Comparative Analysis of Community Sentiment Toward Sex Offense Legislation in the United States and United Kingdom".  *International Journal of Offender Therapy and Comparative Criminology.* DOI: /0306624X20964168.

**Zgoba,** K., Reeves, D., Tamburello, A. & Debilio, L. (2020). **"**Criminal Recidivism in Inmates with Mental Illness and Substance Use Disorders". *The Journal of the American Academy of Psychiatry and the Law.*  DOI: https://doi.org/10.29158/JAAPL.003913-20.

Baker, T., Ray, J. & **Zgoba**, K. (2020). "Race Differences in the Effects of Early School Behavior Problems and Substance use Type on Lifetime Arrest". *Deviant Behavior, 1-12.* DOI:10.1080/01639625.2020.1815252.

Meldrum, R. C., Jackson, D. B., **Zgoba,** K., & Testa, A. (2020). "Sleep duration, handgun carrying, and taking a handgun to school: An analysis of a statewide sample of Florida youth". *Sleep Health: Journal of the National Sleep Foundation,6,* 153- 158. DOI: 10.1016/j.sleh.2019.11.008.

Guerette, R., **Zgoba,** K., Comerford*, C. & Salerno, L. (2020). "The Journey to Crime Among Sexual Offense Acquaintance and Non-Acquaintance Cases" *Victims & Offenders: An International Journal of Evidence-Based Research, Policy, and Practice, 15*(1), 119-139. DOI.org/10.1080/15564886.2019.1661318

**Zgoba,** K., Tewksbury, R., & Mustaine, E. (2019). Who gets the biggest bang for the buck? A review of minimum wage and purchasing power in prison commissaries versus superstores. *Journal of Crime and Justice, 43(1*), 36-48. DOI.org/10.1080/0735648X.2019.1619614

Salerno, L. & **Zgoba**, K. (2019). "Disciplinary Segregation and its Effects on In-Prison Outcomes." *The Prison Journal, 100*(1), 74-97. DOI:10.1007/s12103-019-09496-2

**Zgoba,** K. & Cowan*, D. (2019). "Sexual Offense Legislation Across the Pond: A Review of Community Sentiment Towards the United Kingdom's Implementation of Sarah's Law". *Sexual Abuse: A Journal of Research and Treatment, 32*(4), 476-496. DOI:1079063219847671.

### *Articles Prior to Hiring at Florida International University*

Pizarro, J., **Zgoba,** K., Salerno, L. & Circo*, G. (2020). "The Processing of Homicides in the Courts: An Examination of Multiple Case Outcomes in the Context of Little Ethnic Variability".  *Race and Justice: An International Journal, 10*(4),400-423. DOI:10.1177/2153368718759401.

**Zgoba**, K. M., Jennings, W. G., & Salerno, L. M. (2018). "Megan's Law 20 years later: An empirical analysis and policy review". *Criminal Justice and Behavior*, *45*(7), 1028-1046. DOI.org/10.1177/0093854818771409.

Hsieh*, M. L., Hamilton, Z., & **Zgoba**, K. (2018). "Prison experience and reoffending: Exploring the relationship between prison terms, institutional treatment, infractions, and recidivism for sex offenders. *Sexual Abuse: A Journal of Research and Treatment*, *30*(5), 556-575. DOI.org/10.1177/1079063216681562.

**Zgoba**, K. M., & Salerno, L. M. (2017). A three-year recidivism analysis of state correctional releases". *Criminal Justice Studies*, *30*(4), 331-345. DOI.org/10.1080/1478601X.2017.136464.

Beaudry-Cyr*, M., Jennings, W.G., **Zgoba**, K., & Tewksbury, R. (2017).  "Examining the Continuity of Juvenile Sex Offending into Adulthood and Subsequent Patterns of Sex and General Recidivism". *International Journal of Offender Therapy & Comparative Criminology*, *61*(3) 251- 268. DOI.org/10.1177/0306624X15594442.

**Zgoba,** K. (2017). "Memorialization Laws in the United Kingdom: A Response to a Moral Panic or an Increased Occurrence?" *American Journal of Criminal Justice, 42*(3), 628-643.

**Zgoba**, K., Miner, M., Letourneau, E., Levenson, J., Knight, R., Thornton, D. (2016). "A Multi-state Recidivism Study Using Static-99 and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act." *Sexual Abuse: A Journal of Research and Treatment, 28*(8), 722- 740.

Levenson, J. S. & **Zgoba**, K. (2016). "The Impact of Community Protection Policies on Sexual Reoffense Rates in Florida". *International Journal of Offender Therapy & Comparative Criminology*, 60 (10), 1140-1158.

Jennings, W.G., & **Zgoba**, K. (2015). "An Application of an Innovative Cost-Benefit Analysis Tool for Determining the Implementation Costs and Public Safety Benefits of SORNA with Educational Implications for Criminology and Criminal Justice". *Journal of Criminal Justice Education*, 26, 147-162.

Jennings, W.G., **Zgoba**, K., Donner, C., Henderson, B., & Tewksbury, R. (2014). "Considering Specialization/Versatility as an Unintended Collateral Consequence of SORN". *Journal of Criminal Justice*, 42, 184-192.

Jennings, W.G., **Zgoba**, K., Maschi, T., & Reingle, J. (2014). "An Empirical Assessment of the Overlap Between Sexual Victimization and Sex Offending". *International Journal of Offender Therapy & Comparative Criminology*, 58, 1466-1480.

Pizarro, J.M., **Zgoba**, K. M. & Haugebrook, S. (2014). "Supermax and Recidivism:  An Examination of the Recidivism Covariates among a Sample of Supermax Ex-Inmates." *The Prison Journal*, *94*(2), 180-197.

Jennings, W.G., **Zgoba**, K., Piquero, A.R., & Reingle, J*. (2013).  "Offending Trajectories among Native-Born and Foreign-Born Hispanics to Late Middle Age". *Sociological Inquiry*, 83, 622-647.

**Zgoba,** K., Jennings, W.G., Maschi, T., & Reingle*, J. (2012). "An Exploration into the Intersections of Early and Late Sexual Victimization and Mental and Physical Health among an Incarcerated Sample of Older Male Offenders".  *Best Practices in Mental Health: An International Journal*, 8, 82-98.

**Zgoba,** K. & Levenson, J. (2012).  "Failure to Register as a Predictor of Sex Offense Recidivism: The Big Bad Wolf or a Red Herring?" *Sexual Abuse: A Journal of Research and Treatment,* 24, 328-349.

Jennings, W., **Zgoba,** K. & Tewksbury, R. (2012) "A Comparative Longitudinal Analysis of Recidivism Trajectories and Collateral Consequences for Sex and Non-Sex Offenders Released Since the Implementation of Sex Offender Registration and Community Notification". *The Journal of Crime and Justice,* 35(3), 327-334.

Ragusa-Salerno, L.M.**,** & **Zgoba,** K. (2012). "Taking Stock of 20 Years of Sex Offender Laws and Research: An Examination of Whether Sex Offender Legislation Has Helped or Hindered Our Efforts". *Journal of Crime and Justice,* 35(3), 335-355.

Tewksbury, R., Jennings, W. & **Zgoba,** K. (2012) "A Longitudinal Examination of Sex Offender Recidivism Prior to and Following the Implementation of SORN". *Behavioral Science & the Law,* (30) 308–328.

Ackerman, A., Harris, A., Levenson, J. & **Zgoba**, K. (2011) "Who are the People in Your Neighborhood? A Descriptive Analysis of Individuals on Public Sex Offender Registries". *International Journal of Law and Psychiatry*, 34(3), 149-159.

Maschi, T., Morgen, **Zgoba,** K., Courtney, D. & Ristow, J. (2011). "Age, Cumulative Trauma, and Post Traumatic Stress Symptoms among Older Adults in Prison: The Role of Subjective Experience". *The Gerontologist* 51(5), 675-686.

Pizarro, J., **Zgoba**, K. & Jennings, W. (2011). "Assessing the Interaction of Offender and Victim Lifestyle Characteristics for Differentiating Homicide Incidents: Results from a Hierarchical Agglomerative Cluster Analysis Approach". *The Journal of Criminal Justice*, 39(5), 367–377.

Neuilly, M., **Zgoba**, K., Tita, G. & Lee, S. (2011). "Predicting Recidivism in Homicide Offenders Using Classification Tree Analysis". *Homicide Studies,* 15(2), 154-176.

**Zgoba,** K. (2011). "Residence Restriction Buffer Zones and the Banishment of Sex Offenders: Have We Gone One Step Too Far?". *Criminology & Public Policy,* 10(2), 391-400.

**Zgoba,** K.,Veysey, B, Dalessandro, M. (2010). "Do the Best Intentions Predict Best Practices:  An Analysis of the Effectiveness of Megan's Law". *Justice Quarterly,* 27(5), 667-691.

Veysey, B. & **Zgoba**, K. (2010). "Reducing Risk of Sex Offenses Reconsidered: Changes in Predictors of Recidivism Over Time".  *Criminal Justice and Behavior: An International Journal,* 37(5), 583-595.

Haugebrook, S., **Zgoba**, K., Maschi, T. (2010). "Trauma, Stress, Health and Mental Health Issues among Ethnically Diverse Older Adult Prisoners: A Correctional Healthcare Concern". *Journal of Correctional Healthcare,* 16(3), 220-229.

Tewksbury, R. & **Zgoba**, K. (2010). "Perceptions and Coping with Punishment: How Registered Sex Offenders Respond to Stress, Internet Restrictions and the Collateral Consequences of Registration". *International Journal of Offender Therapy and Comparative Criminology,* 54(4), **537-551.**

Levenson, J., LeTourneau, E., Armstrong, K. & **Zgoba**, K. (2010). "Failure to Register as a Sex Offender and Recidivism". *Justice Quarterly,* 27(3), 305-331.

**Zgoba**, K., Levenson, J. & McKee, T. (2009). "Examining the Impact of Sex Offender Residence Restrictions on Housing Availability". *Criminal Justice Policy Review,* 20(1), 91-110.

**Zgoba**, K. & Levenson, J. (2008). "Variations in the Recidivism of Treated and Non-Treated Sexual Offenders in New Jersey: A Statistical Examination of Three Time Frames". *Victims & Offenders,* 3(1), pp. 10-30.

**Zgoba,** K., Haugebrook, S. & Jenkins, K. (2008) "New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism". *Criminal Justice and Behavior: An International Journal,* 35(3), pp. 375-387.

Veysey, B. M., **Zgoba**, K., & Dalessandro, M. (2008). "A Preliminary Step Towards Evaluating the Impact of Megan's Law: A Trend Analysis of Sexual Offenses in New Jersey from 1985 to 2005". *Justice, Research & Policy,* 10 (2), pp. 1-18.

Levenson, J., **Zgoba**, K. & Tewksbury, R. (December 2007). "Sex Offender Residence Restrictions: Sensible crime policy or flawed logic?" *Federal Probation.* 71(3), 2-9.

Roberts, A. & **Zgoba**, K. (September/October 2007). "The Offending Histories and Patterns of 350 Male and Female Inmates". *Aggression and Violent Behavior: A Review Journal,* 12, pp. 493-507.

Neuilly, M. & **Zgoba**, K. (2006). "Assessing the Possibility of a Pedophilia Panic and Contagion Effect between France and the United States". *Victims & Offenders,* 1(3), pp. 1-29.

Simon, L.M.J. & **Zgoba**, K. (December/January 2005). "Therapeutic Jurisprudence and Sex Offender Policies: Part II". *Sex Offender Law Report,* 7(1), pp. 1-16.

Simon, L.M.J. & **Zgoba**, K. (October/November 2005). "Therapeutic Jurisprudence and Sex Offender Policies: Part I". *Sex Offender Law Report,* 6(6).
Witt, P. & **Zgoba**, K. (April/ May 2005). "Psychological Treatment of Sex Offenders: Current Status". *Sex Offender Law Report*, 6(3).

**Zgoba**, K. & Simon, L. (2005). "Recidivism Rates of Sex Offenders Up to Seven Years Later: Does Treatment Matter?" *Criminal Justice Review,* 30(2), pp. 155-173.

**Zgoba,** K.M. (2004). "The Amber Alert: An Effective Solution to Missing Children?" *Journal of Psychiatry & Law*, 32(1), pp. 71-88.

**Zgoba,** K.M. (2004). "Spin Doctors and Moral Crusaders: The Moral Panic behind Child Safety Legislation." *Criminal Justice Studies: A Critical Journal of Crime, Law & Society*, 17(4), pp. 385-404.

**Zgoba,** K., Sager, W. & Witt, P. (2003) "Evaluation of New Jersey's Sex Offender Treatment Program at the Adult Diagnostic and Treatment Center: Preliminary Results." *Journal of Psychiatry & Law* (31), pp. 133- 164.

Potchak M.C., McGloin J.M., **Zgoba** K. (2002) "A Spatial Analysis of Criminal Effort: Auto Theft in Newark, New Jersey." *Criminal Justice Policy Review*, 13(3), pp. 257-285.

## Proceedings

**Zgoba,** K. Failure to Register as a Sex Offender. Testimony to the United States Sentencing Commission on March 13, 2014: Washington DC.

## Chapters in Books

**Zgoba, K.** & Tewksbury, R. & (2021, June). "SORN and Law Enforcement". In *Sex Offender Registration and Community Notification Laws: An Empirical Evaluation*. Edited by Wayne Logan and J.J. Prescott. Cambridge University Press: Cambridge, UK.

**Zgoba**, K. (2016). "The National Institute of Justice". In *The Encyclopedia of Crime and Punishment*.  Edited by Wesley Jennings. Wiley-Blackwell Publishing: Hoboken, New Jersey.

**Zgoba**, K. & Dayal, N. (2016). "Recidivism". In *The Encyclopedia of Crime and Punishment*.  Edited by Wesley Jennings. Wiley-Blackwell Publishing: Hoboken, New Jersey.

**Zgoba**, K. and Ragbir, D. (2016). "Sex Offender Registration and Notification Act (SORNA): Sexual Violence". In *Evidence Based Policy and Prevention*. Edited by Cynthia Calkins and Elizabeth Jeglic. Springer Publishing Company: New York, New York.

**Zgoba,** K. (2016). "The Aftermath of Sex Offender Registration and Other Controls". In *The Oxford Handbook of Sex Offences and Sex Offenders*. Edited by Teela Sanders & Brian Francis. Oxford University Press: New York, New York.

Levenson, J. S. & **Zgoba,** K. (2014). **"**Sex Offender Residence Restrictions: The Law of Unintended Consequences". In *Sex Offender Laws: Failed Policies, New Directions, 2nd Edition.* Edited by Richard Wright. Springer Publishing Company: New York, New York.

Haugebrook, S. & **Zgoba**, K. (2007). "Prison Group Counseling". In *Correctional Group Counseling and Treatment*.  Edited by Albert Roberts.  Prentice Hall: Upper Saddle River, NJ.

Simon, L. & **Zgoba**, K. (2006). "Prevention of Sex Crimes against Children: Legislation, Prevention and Investigation." In *Situational Prevention and Child Sex Offending* (Volume 19). Edited by Richard Wortley & Stephen Smallbone. Criminal Justice Press: Monsey, NY.

**Zgoba**, K. (2004). "Megan's Law and its Effect on Incarcerated and Released Sex Offenders." In *Encyclopedia of US Prisons and Correctional Facilities,* Sage Publications: Thousand Oaks, CA.

### Government Reports or Monographs

Levenson, J. S. & **Zgoba,** K. (2015). "Sex Offender Policies in Florida: Impact on Recidivism Trends over 20 Years". Final Report for Florida Department of Law Enforcement; Tallahassee, Florida.

**Zgoba**, K., Miner, M., Letourneau, E., Levenson, J., Knight, R., Thornton, D. (December 2012). "A Multi-state Recidivism Study Using Static-99 and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act". National Institute of Justice, U.S. Department of Justice; Washington, DC.

Tewksbury, R., Jennings, W. & **Zgoba**, K. (2012). "Sex Offenders: Recidivism and Collateral Consequences". Document Number 238060. National Institute of Justice, U.S. Department of Justice; Washington, DC.

**Zgoba**, K. & Bachar, K. (April 2009). "Sex Offender Registration and Notification: Limited Effects in New Jersey." In Short: Toward Criminal Justice Solutions, NCJ 225402.  National Institute of Justice, U.S. Department of Justice; Washington, DC.

**Zgoba**, K., Witt, P. & Dalessandro, M. (2008).   "Megan's Law: Assessing the Practical and Monetary Efficacy".  Document Number 225370. National Institute of Justice, U. S. Department of Justice; Washington, DC.

**Zgoba**, K. & Wolff, N. (2003). "Comparative Analysis of Sexual Offender Treatment and Legislation." Final Report for the New Jersey Department of Corrections; Trenton, NJ.

**Zgoba**, K. (2002). "Bullying and DARE Projects in Linwood Middle School, North Brunswick, New Jersey." Final Report for *C.O.P.S. Department*; Washington, D.C.

**Book Reviews**

**Zgoba**, K. (2006). Ending Intimate Abuse: Practical Guidance and Survival Strategies. Oxford University Press: New York, New York.

**Zgoba**, K. (2004). Crime Control and Women, Feminist Implications of Criminal Justice Policy, edited by Susan L. Miller (Thousand Oaks, CA: Sage Publications, 1998), In the *Journal of Psychiatry and Law,* Federal Legal Publications.

## OTHER PUBLICATIONS

**Zgoba**, K., Miner, M., Knight, R., Letourneau, E., Levenson, J. & Thornton, D. (May/June 2013). "Findings from a Recent Multi-State Evaluation of Sex Offender Risk & Recidivism Using the Adam Walsh Act Tiers". *Corrections Today,* American Correctional Association, pp. 92-95.

**Zgoba**, K. (2008). "Evaluating the Impact of Megan's Law". *Justice, Research & Policy Digest,* 1-2.

## PRESENTED PAPERS, LECTURES, EXHIBITIONS, AND PERFORMANCES

November 13-16, 2019 San Francisco, CA- American Society of Criminology
- Who's in Administrative Segregation: The Effect of Inmate Type on Post-Release Behavioral Outcomes
- An Exploratory Analysis of Female Placement in Restrictive Housing

November 13-17, 2018 Atlanta, GA- American Society of Criminology
- Administrative Segregation and Offender Recidivism: Does Placement in Administration Segregation Affect Inmate Post-Release Offending Behavior?
- An Exploration of the Reality of Violent Offending in a Sample of Inmates

November 15- 18, 2017 Philadelphia, PA- American Society of Criminology
- A Longitudinal Analysis of the Criminal Career Patterns of Juvenile and Adult Sex Offenders
- A Comparative Analysis of Journey to Crime Patterns among Acquaintance and Non-Acquaintance Sex Offenders

November 15-19, 2016 New Orleans, LA- American Society of Criminology
- A Life Course Analysis of the Criminal Behavior of 500 Sexual Offenders: Phase III
- American and British Policy: A Comparison of Community Sentiment Toward Sex Offense Legislation Across the Pond
- Exploring the Conviction and Sentencing of Homicide Offenders in the Context of the Liberation Hypothesis

April 4, 2016 Newark, NJ- National Science Foundation Meeting at Rutgers University
- The Chicken or the Egg: What Came First, Research or Policy?

<u>May 5, 2015 Belfast, Ireland- Public Protection Arrangements Northern Ireland and Probation Board Northern Ireland</u>
- Building Bridges: Lessons Learned from Multiple National Institute of Justice Grants on Sexual Offense Legislation in the United States

<u>April 22, 2015 Pucklechurch, England- Her Majesty's Prison Ashfield</u>
- Building Bridges: Lessons Learned from Multiple National Institute of Justice Grants on Sexual Offense Legislation in the United States

<u>March 24, 2015 Bristol, England- University of the West of England</u>
- Building Bridges: Lessons Learned from Multiple National Institute of Justice Grants on Sexual Offense Legislation in the United States

<u>November 17-21, 2015 Washington, DC- American Society of Criminology</u>
- A Forty-Year Life Course Analysis of a Sample of One Thousand Released Sex Offenders: Phase II
- Memorialization Laws in the United Kingdom: A Response to a Moral Panic or an Increased Occurrence

<u>November 18-22, 2014 San Francisco, CA- American Society of Criminology</u>
- Sex Offender Buffer Zones: Are They Really Protecting Children?
- A Forty-Year Life Course Analysis of a Sample of One Thousand Released Sex Offenders: Phase 1

<u>May 28- 30, 2014 Cleveland, OH- National Seminar for Federal Defenders</u>
- Representing a Client in a Sexual Offense Case

<u>March 19, 2014- Philadelphia, Pennsylvania- University of Pennsylvania</u>
- Distinguished Lecture Series- "Results from Two National Institute of Justice Grants: Federal Sex Offender Laws and their Effect on Recidivism"

<u>March 13, 2014- Washington DC- United States Sentencing Commission</u>
- Provided testimony of federal sentences for sexual offenders charged with failure to register crimes.

<u>November 13-16, 2013 Atlanta, GA- American Society of Criminology</u>
- Supermax & Recidivism: An Examination of the Recidivism Covariates Among a Sample of Supermax Ex-Inmates

<u>January 28-30, 2013 Houston, TX- American Correctional Association</u>
- Final Results: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers

<u>April 18, 2013 Newark, NJ- Rutgers University School of Criminal Justice</u>

- Distinguished Lecture Series- "Results from Two National Institute of Justice Grants: Federal Sex Offender Laws and their Effect on Recidivism"

November 14-17, 2012 Chicago, IL- American Society of Criminology
- Final Results: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers

October 17-19, 2012 Denver, CO- Association for the Treatment of Sexual Abusers
- Final Results: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers
- A Longitudinal Examination of Sex Offender Recidivism Prior to and Following the Implementation of SORN

September 2012 Atlantic Beach, FL- Southern Criminal Justice Association
- Considering specialization/versatility as an unintended collateral consequence of SORN

November 15-19, 2011 Washington, DC- American Society of Criminology
- Preliminary Findings and Discussion of the Adam Walsh Act: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers
- What Older Prisoners Report About How They Cope with the Prison Experience: Implications for Prison Treatment
- A Longitudinal Examination of Sex Offender Recidivism Prior to and Following the Implementation of SORN
- Trauma Among Younger and Older Prisoners: Does Age Make a Difference?

November 3-4, 2011 Toronto, Canada- Association for the Treatment of Sexual Abusers
- Preliminary Findings and Discussion of the Adam Walsh Act: A Multi-State Recidivism Study Comparing Static-99 Risk Scores with Adam Walsh Act Tiers
- A Longitudinal Examination of Sex Offender Recidivism Prior to and Following the Implementation of SORN

July 24-27, 2011 Chicago, IL- American Probation and Parole Association
- Preliminary Findings and Discussion of the Adam Walsh Act: Title 1 of the Sex Offender Registration Notification Act

June 13- 15, 2011 Washington DC- National Institute of Justice Annual Conference
- Reducing Risk of Sex Offenses Reconsidered: Changes in Predictors of Recidivism Over Time

November 17-20, 2010 San Francisco, CA, American Society of Criminology
- Assessing the Interaction of Offender and Victim Lifestyle Characteristics for Differentiating Homicide Incidents
- Adventures in SORN-Land: Using Sex Offender Registry Data to Promote Informed Practice

- Who are the People in Your Neighborhood: A Descriptive Analysis of Individuals on Sex Offender Registries
- Does History Always Repeat Itself? Failure to Register as a Predictor of Sexual Recidivism

October 31-November 1, 2010 Louisville, KY- International Community Corrections Association
- Sex Offender Policies and Legislation

August 1-3, 2010 Chicago, IL- American Corrections Association Summer Conference
- Sex Offender Management, Treatment and Civil Commitment: An Evidence-Based Analysis Aimed at Reducing Sexual Violence

June 14- 15, 2010 Washington DC- National Institute of Justice Annual Conference
- Sex Offenders in the Community: Post-Release, Registration, Notification and Residency Restrictions

March 11-14, 2009 Boston, MA- American Criminal Justice Society
- Author Meets Critic: Sex Offender Laws: Failed Policies, New Directions by Richard Wright

June 15-17, 2009 Washington DC- National Institute of Justice Annual Conference
- Establishing the Practical Efficacy and Monetary Value of Megan's Law: Phase Two

August 19- 22, 2009 Tenth Crime Mapping Research Conference, sponsored by the Mapping and Analysis for Public Safety (MAPS) program of the National Institute of Justice- New Orleans, LA
- Speaker on Mapping Sex Offender Residences in the 21st Century

November 4- 7, 2009 Philadelphia, PA- American Society of Criminology
- Reducing Risk of Sex Offenses Reconsidered: Changes in Predictors of Recidivism over Time

November 14- 18, 2008 St. Louis, MI- American Society of Criminology
- Establishing the Practical Efficacy and Monetary Value of Megan's Law: Phase Two

October 22- 24, 2008 Atlanta, GA- Association for the Treatment of Sexual Abusers
- Establishing the Practical Efficacy and Monetary Value of Megan's Law: An Empirical Analysis

July 21- 22, 2008 Washington DC- National Institute of Justice Annual Conference
- Sex Offender Residency Restrictions in New Jersey

June 19, 2008 Harvard Kennedy School- Ash Center for Democratic Governance and Innovation
- Webinar on "Sex Offender Residency Restrictions: Implementation and Impact"

November 12- 17, 2007 Atlanta, GA- American Society of Criminology
- A Preliminary Step towards Evaluating the Impact of Megan's Law: A Trend Analysis of Sexual Offenses in New Jersey from 1985 to 2005

October 31-November 3, 2007 San Diego, CA- Association for the Treatment of Sexual Abusers
- A Preliminary Step towards Evaluating the Impact of Megan's Law: A Trend Analysis of Sexual Offenses in New Jersey from 1985 to 2005

October 2006 Atlantic City, NJ- The New Jersey American Correctional Association
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism

October 30- November 4, 2006 Los Angeles, CA- American Society of Criminology
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism
- Part II- Domestic Violence Mandatory Arrest Policies and Actual Arrest Rates: A Comparative Analysis

February 2005 Honolulu, HI- Western Society of Criminology
- Therapeutic Jurisprudence in the Criminal Justice System

March 2005 Correctional Education Association Leadership Forum, Council of Directors, Annapolis, MD
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism"

April 2005 Trenton, NJ- Residential Community Release Program- Community Providers Conference
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism"

April 2005 New Brunswick, NJ- Rutgers University
- The Structure of New Jersey State Prisons: From Geography to Social Dynamics"

May 2005 Trenton, NJ- National Advisory Council Meeting
- The Expansion of New Jersey's Analysis of the Effect of a GED on Inmate Re-offending

August 8- 15, 2005 Philadelphia, PA- International Society of Criminology
- A Retrospective Examination of the Offending Histories and Re-offending Patterns of 300 Homicide Offenders

October 2005 New Brunswick, NJ- Rutgers University
- The Structure of New Jersey State Prisons: From Geography to Social Dynamics
- The Development of Ethical Research Protocol in State Government

October 2005 Atlantic City, NJ- The International Community Corrections Association
- Prison Treatment Programs and the Subsequent Impact on Inmates

<u>November 14- 18, 2005 Toronto, Canada- American Society of Criminology</u>
- A Retrospective Examination of the Offending Histories and Re-offending Patterns of 300 Homicide Offenders
- New Jersey's Analysis of the Effect of GED Obtainment on Inmate Recidivism
- Domestic Violence Mandatory Arrest Policies and Actual Arrest Rates: A Comparative Analysis

<u>October 2004 New Brunswick, NJ- Rutgers University</u>
- Variations in the Recidivism of Treated and Non-Treated Sexual Offenders in New Jersey: An Examination of Three Time Frames

<u>November 17-20, 2004 Nashville, TN- American Society of Criminology</u>
- Variations in the Recidivism of Treated and Non-Treated Sexual Offenders in New Jersey: An Examination of Three Time Frames
- The Pedophilia Panic in France and the United States

<u>September 8- 11, 2004 Agen, Dordogne, France- French Society of Criminology</u>
- A Cross- National Analysis of Moral Panics in the United States and France

<u>November 18-24, 2003 Denver, CO- American Society of Criminology</u>
- Recidivism Rates of Sex Offenders up to Seven Years Later: Does Treatment Matter?

<u>October 8, 2003 St. Louis, MI- Association for the Treatment of Sexual Abusers</u>
- Collaboration between Academia and the Department of Corrections: Why Bother?

<u>November 13-16, 2002 Chicago, IL- American Society of Criminology</u>
- A Ten-Year Longitudinal Analysis of Sex Offender Recidivism.

<u>September 2002 Woodbridge, NJ- Association for the Treatment of Sexual Abusers</u>
- A Ten-Year Longitudinal Analysis of Sex Offender Recidivism

<u>November 4-9, 2001 Atlanta, GA- American Society of Criminology</u>
- An Examination of New Jersey Civil Commitment Statutes: How Does It Compare to Other States?
- Tracking Offender Residence for Auto Thefts in Newark, New Jersey

## WORKS IN PROGRESS

### Papers submitted for review

Yan, S., **Zgoba,** K. & Pizarro, J. "Who's in Restrictive Housing: The Effect of Inmate Type on Post-Release Behavioral Outcomes" *Journal of Quantitative Criminology*.

### Other completed papers

N/A

**Research in Progress**

**Zgoba**, K. "Painting Restrictive Housing Pink: An Exploratory Review of Female Disciplinary Incarceration".

**Zgoba**, K. "A Life Course Analysis of the Criminal Career Patterns of 1,000 Sexual Offenders Released Over 40-Years".

**Zgoba,** K. & Salerno, L. "Exploring the Predictors of First Time Offending and Reoffending through Inmate Intake Surveys".

**FUNDED WORK**

*Grant Award- Fall, 2021-Spring, 2023*
Arnold Ventures, LLC.
Role: **Consulting Research Partner** (Principal Investigators Todd Clear and Robert Apel, Rutgers University, awarded 1,000,000.00).
This grant supports the work being done with the New Jersey Criminal Sentencing and Disposition Commission. Particularly, the research team is examining criminal data over two decades for sources of racial disparity in New Jersey's criminal justice system and the impact of recent legislative and sentencing changes on subsequent dispositions.  As a consultant paid hourly, this will not result in a course buyout or student tuition. It will result in collaboration, publications and funding to attend conferences.

*Grant Award- 2016*
Bureau of Justice Assistance, Edward Byrne Memorial Justice Assistance Grant (JAG)
**$190,000.00** awarded September 2016
Role: **Co- Investigator** (Principal Investigator Jennifer Malinowski, New Jersey Department of Corrections)
This grant supplied funding to create a new data mart that would allow for active offender monitoring within numerous state law enforcement agencies.  In an effort to ensure compliance with recent legislative changes in New Jersey a new repository to track real time offender information was created and maintained.

*Grant Award- 2015*
**$5,000.00**
National Institute of Justice
Bridging Research and Practice
Role: **Principal Investigator**
This grant supplied funding to lecture on two previous National Institute of Justice grant studies.  Three lectures took place between March and April 2015 in England and Northern Ireland on how the findings of the studies pertain to those functioning in practitioner roles.

*Grant Award 2015 Cohort*
Fulbright Police Research and Criminal Justice Scholar Award

Fulbright Commission, US, UK
Role: **Principal Investigator**
*A Multi-Phase Outcome Evaluation of Sarah's Law in the United Kingdom*
This project determined if 1) the implementation of Sarah's Law (Child Sex Offender Disclosure Scheme) and the Violent and Sex Offender Register in designated areas of the UK decreased the rate of sexual crimes; 2) matched samples of sex offenders released post law implementation had lower rates of sexual recidivism and; 3) if the community, law enforcement and stakeholder express increased "self-protective" measures for their families, increased community safety, and validate the need for sex offender disclosure laws.

*Grant Award- 2010 FRS #638479*
**$100,000.00** awarded September 2010
The John A. Hartford Foundation
Role: **Consultant** (Principal Investigator Tina Maschi, Fordham University)
*Exploring the Relationship between Trauma, Coping Resources and Physical and Mental Well-being among Older Adults in Prison-* The specific aims of this study were to describe the types and frequencies of reported lifetime traumatic experiences of an older sample of prison inmates. This study also sought to examine the relationships of coping resources to trauma, stressors and well-being and to explore a possible moderating or mediating effect.

*Grant Award- 2009- IJ- CX-0203*
**$76, 502**.**00** awarded September 24, 2009-March 31, 2012
National Institute of Justice
Role: **Consultant** (Principal Investigator Wesley Jennings, University of South Florida)
*Sex Offenders: Recidivism and Collateral Consequences-* This study identified the recidivism trajectories of a sample of sex offenders and non-sex offenders post-release from the New Jersey Department of Corrections. Both samples of offenders had been released from the custody of the NJDOC and will be/ were under the supervision of the New Jersey State Parole Board. Special attention was devoted to identifying if and how the likelihood and frequency of recidivating is affected by the collateral consequences that many offenders face upon their release back into the community.

*Grant Award- 2008- MU-MU-0001*
**$507,073.00** awarded July 31, 2008-December 31, 2012
National Institute of Justice
Role: **Principal Investigator**
*A Multi-State Recidivism Study Using Static 99 Risk Scores and Tier Guidelines for the Adam Walsh Act-* This study tested the predictive validity of both the Adam Walsh tier designations and the Static 99 and 2002. This was the first study of its kind to determine the effectiveness of the mandatory federal law. In addition to the research responsibilities, under this grant the PI was responsible for overseeing the sub-grants of 5 state universities and one state agency.

*Grant Award- 2007-IJ-CX-0037*
**$296,656.00**
National Institute of Justice
Role: **Consultant** (Co- Principal Investigators Cynthia Mercado and Elizabeth Jeglic, John

Jay College of Criminal Justice)
*Sex Offender Management, Treatment and Civil Commitment: An Evidence Based Analysis Aimed at Reducing Sexual Violence-* This study used a sample of NJ sex offenders who were treated and a sample of civilly committed sex offenders to ascertain recidivism risk and re-offending patterns.

*Grant Award- 2006-IJ-CX-0018.*
**$38,252.00** awarded September 1, 2006- December 31, 2008
National Institute of Justice
Role: **Principal Investigator**
*Megan's Law: An Empirical Analysis-* This study was the first of its kind awarded by the Department of Justice to test the effectiveness of the federal version of Megan's Law.  It 1) established prevalence rates of sexual offenses prior and post Megan's Law, 2) statistically compared recidivism of sex offenders subjected to Megan's Law and those who are not and 3) completed a cost effectiveness analysis of the federal law.

**Grant Proposals Pending**

Grant Year Award 2022- Bureau of Prisons, Solicitation Number 15BNAS21Q00000040. Role: Principal Investigator (with Co-PI Stephen Gies, Development Services Group). Requested Subcontract Amount- $405,000.00 (Full Amount $1,405,000.00).

Grant Year Award 2022- Philip Morris International, PMI 3rd Round of Funding. Role: Principal Investigator (with Co-PI Maureen Kenny, Florida International University). Requested Amount- $650,000.00.

**Grant Proposals Submitted but not Funded**

**FEDERAL APPLICATIONS**

Grant Year Award 2021- Community Oriented Policing Services- COPS. Role: Co- Principal Investigator (with PI Laura Salerno, New Jersey Department of Corrections). *Law Enforcement Mental Health and Wellness Act.* Requested Amount- $140,000.00.

Grant Year Award 2020- Bureau of Justice Assistance's Comprehensive Opioid, Stimulant, and Substance Abuse Program. Role: Principal Investigator. *Addressing Substance Use Disorders in America's Jails: Clinical Guidelines for Withdrawal Management.* Requested Amount: $298,000.00

Grant Award Year 2020- National Institute of Justice, NIJ-2020-17327. Role: Principal Investigator (with PIs: Ojmarrh Mitchell and Jesenia Pizarro-Terrill, Arizona State University). *An Assessment of the Community- and Individual-Level Effects of Plea Bargaining in Firearms Offenses on Crime.* Requested Subcontract Amount- $123,000.00

Grant Award Year 2020- National Institute of Justice, NIJ-2020-17296. Role: Co-Principal Investigator (PI: Laura Salerno, NJDOC). *Correctional Officer Wellness: Implementation*

*and Evaluation of Stress Reduction and Suicide Prevention Interventions Utilizing a Randomized Sample*. Requested Subcontract Amount- $103,000.00

Grant Award Number 2019-15365- National Institute of Justice. Role: Co-Principal Investigator (PI: Stephen Gies, Development Services Group). *A Space to Feel Safe: A Multisite Evaluation of GPS to Monitor Intimate Partner Violence Defendants.* Requested Subcontract Amount- $145,000.00

Grant Award Number 2018- 14001- National Institute of Justice. Role: Principal Investigator (with PIs: Rob Guerette, FIU & Wesley Jennings, Texas State University). *The Impact of Police Officer Body Worn Cameras on the Prosecution of Violence Against Women: A National Survey of Prosecutor Sentiment and a Multi-State Review of Case Outcomes.* Requested Amount- $688,000.00

Grant Award Number 2018- 14023- National Institute of Justice. Role: Principal Investigator. *An Examination of Federal Recommendations on Inmate Disciplinary Segregation: A Review of Quality of Life and In-Prison Behavioral Outcomes.* Requested Amount- $186,097.00

Grant Award Number 2018-13702- National Institute of Justice. Role: Co- Investigator (PI: Stephen Gies, Development Services Group). *Space to Feel Safe: A Multi-Site Evaluation of GPS to Monitor IPV Defendants*. Requested Subcontract Amount- $168,701.00

Grant Award Number 2018-13702- National Institute of Justice. Role: Principal Investigator (with PIs: Rob Guerette, FIU & Wesley Jennings, Texas State University). *The Impact of Police Officer Body Worn Cameras on Incidents of Violence Against Women: A Multi-State, Multi-Site Panel of Field Experiments.* Requested Subcontract Amount- $200,380.00

**PRIVATE APPLICATIONS**

Grant Year Award 2021- John D. and Catherine T. MacArthur Foundation's Safety and Justice Challenge. Role: Principal Investigator (with PI: Besiki Kutateladze). *Exploring Prosecutorial Discretion in the Plea-Bargaining Process.* Requested Amount- $250,000.00

Grant Award Year 2020- National Collaborative on Gun Violence Research. Role: Co-Principal Investigator (PI: Jesenia Pizarro-Terrill). *In Their Own Words: An Examination of the Pathways, Drives, and Motives of Firearm Use Among Violent Offenders.* Proposal Invited. Requested Subcontract Amount- $123,000.00

Grant Award Year 2019- Arnold Ventures. Role: Co-Principal Investigator (PI: Stephen Gies, Development Services Group). *A Multisite Evaluation of Pretrial Electronic Monitoring for Intimate Partner Violence Defendants.* Requested Subcontract Amount- $145,000.00

**FIU APPLICATIONS**

Grant Award Year 2020- Florida International University Grantsmanship Program. Role: Principal Investigator. *Using Real-Time Data to Detect Suicide Risk in Local Jails: The Creation of an Active Suicide Risk Monitoring System (SRMS).* Requested Amount- $25,000.00

Grant Award Year 2021- Florida International University- The Research Center in Minority Institutions. Role: Principal Investigator. *Using Real-Time Data to Detect Suicide Risk in At Risk Populations in Prison.* Requested Amount- $50,000.00

**PROFESSIONAL HONORS, PRIZES, FELLOWSHIPS**

| | | |
|---|---|---|
| 2020 | Outstanding Article of Year | American Journal of Criminal Justice |
| 2018 | Part Time Lecturer Award | Rutgers University- New Brunswick |
| 2015 | Bridging Research & Policy Award | National Institute of Justice |
| 2014 | Research Scholar Award | Fulbright Commission |
| 2013 | Peter P. Lejins Award for Excellence in Correctional Research | American Correctional Association |
| 00-04 | Graduate Assistantship | Rutgers University-Newark |
| 2000 | Graduate Scholar Excellence Award | Rutgers University-Newark |
| 1997 | Dean's Scholar Award | Rutgers University-New Brunswick |
| 1997 | Psi Chi National Honor Society | Rutgers University-New Brunswick |
| 96-98 | Dean's List | Rutgers University-New Brunswick |

**INSTITUTIONAL SERVICE**

**Department**

| | | |
|---|---|---|
| 2021 | PhD. Student Evaluation Committee. Department of Criminology and Criminal Justice, Florida International University. | Member |
| 2020 | Instructor Hiring Committee. Department of Criminology & Criminal Justice, | Member |

| | | |
|---|---|---|
| | Florida International University. | |
| 2020 | PhD. Student Evaluation Committee. Department of Criminology and Criminal Justice, Florida International University. | Member |
| 2018 | Faculty Search Committee. Department of Criminal Justice, University of Central Florida. | Member |
| 2018 | Masters Curriculum Committee. Department of Criminal Justice, University of Central Florida. | Member |

**University**

| | | |
|---|---|---|
| 2020-present | Institutional Research Board. Florida International University. | Chair |
| 2019-2020 | Institutional Research Board. Florida International University. | Member |

**OFFICES HELD IN PROFESSIONAL SOCIETIES**

N/A

**OTHER PROFESSIONAL ACTIVITIES AND PUBLIC SERVICE AT FIU**

| | |
|---|---|
| 2021 | Tenure and Promotion Workshop |
| 2021 | CITI Institutional Research Board Chair Training |
| 2020 | Safety and Justice Challenge Consortium Membership with Dr. Kutateladze |
| 2020 | National Institute of Health Grant Writing Workshop |
| 2020 | Cybersecurity Training |
| 2020 | Tenure and Promotion Workshop |
| 2020 | Provost Hybrid Program Certification Training |
| 2020 | The FIU Remote Teach Ready Badge |
| 2020 | Research Center in Minority Institutions (RCMI) Pilot Proposal Workshop |
| 2020 | FERPA Basics Training |

| 2020 | Panthers Protecting Panthers: COVID-19 Safety Certificate |
| 2020 | At-Risk for University & College Faculty Certification |
| 2019 | National Science Foundation Grant Writing Workshop |
| 2019 | Inclusion, Diversity, Equity, & Access (IDEA) Training |
| 2019 | Strategies and Tactics for Recruitment to Increase Diversity and Excellence (STRIDE) Training |
| 2019 | CITI Institutional Research Board Member Training |

**OTHER PROFESSIONAL ACTIVITIES AND PUBLIC SERVICE OUTSIDE FIU**

| 2020-present | Editorial Board Member, *Journal of Experimental Criminology* |
| 2016-present | Editorial Board Member, *Policing: An International Journal* |
| 2020-present | Editorial Board Member, *American Journal of Criminal Justice* |
| 2018-present | Edna Mahan Correctional Facility for Women- NJ Department of Corrections Board of Trustees |
| 2016-2018 | Aresty Research Faculty Review Board, Rutgers University, New Brunswick |
| 2016-2018 | Aresty Research Mentor, Rutgers University, New Brunswick |
| 2016 | Criminal Justice Alumni and Career Mentoring Participant, Rutgers University, New Brunswick |
| 2016 | Outside Reader for Dissertation Committee of Laura Ragusa, Rutgers University, Newark |
| 2016-present | Council Member, Sexual Offense Policy Research Working Group |
| 2015 | Appointed Member of the Strategic Planning Committee "Envisioning Tomorrow's University", Rutgers University and University of Medicine & Dentistry, New Jersey |
| 2015 | Council Member, Prison Rape Elimination Act (PREA) Sexual Assault Advisory Council |
| 2013 | Council Member, New Jersey Governor Christie's Information Technology Strategic Planning Committee |
| 2013-present | Research Council Board Member, American Correctional Association |

2011          Federal Grant Reviewer, Office of Juvenile Justice and Delinquency
              Prevention (OJJDP)

2010          Council Member, New Jersey Governor Jon Corzine's Advisory Council
              Against Sexual Violence

2009          Council Member, New Jersey Governor Jon Corzine's Crime Plan- *Another
              Chance Initiative*

2009          Board of Directors for the Megan's Law Analysis, Violence Institute at the
              University of Medicine and Dentistry, New Jersey

2008          Invited Participant to the Prison Administrator's Workshop on the National
              Inmate Survey, Bureau of Justice Statistics (BJS)

2008          Committee Member, New Jersey State Bar Association's Subcommittee on
              Megan's Law

Reviewed journal articles for the following peer reviewed journals:

*American Journal of Criminal Justice*
*Journal of Research on Crime and Delinquency*
*Journal of Psychiatry and Law*
*Security Journal*
*Criminal Justice Policy Review*
*Crime & Delinquency*
*Criminology & Public Policy*
*Criminal Justice and Behavior: An International Journal*
*Homicide Studies*
*Victims & Offenders*
*Justice Quarterly*
*Sexual Abuse: A Journal of Research & Treatment*
*Journal of Experimental Criminology*
*Journal of Crime & Justice*
*Criminal Justice Studies*

## **Membership in Academic and Professional Organizations:**

2001-present          American Society of Criminology

2016-present          Sexual Offense Policy Research Board (A Founding Member)

2013-present          American Corrections Association Research Council (Lifetime
                      Member due to 2013 Peter P. Lejin's Award)

2013-2015                Academy of Criminal Justice Sciences

2006-2012                Association for the Treatment of Sexual Abusers

**Graduate Students Advised (As Dissertation/Thesis Committee Member)**

Doctoral Students

2021- present. Raymond Douglas Partin (Department of Criminology & Criminal Justice, Florida International University). Serving as a dissertation committee member.

2021- present. Sashane McDonald (Department of Criminology & Criminal Justice, Florida International University). Serving as chair of dissertation committee.

2021- present. Wendy Dressler (Department of Criminology & Criminal Justice, Florida International University). Serving as dissertation committee member.

2021. Raymond Douglas Partin (Department of Criminology & Criminal Justice, Florida International University). Served as comprehensive exam committee member.

2021-present. Chase Montagnet (School of Criminal Justice, Rutgers University). Serving as external dissertation committee member (outside reader).

2020- present. Christopher Keller (Department of Criminology & Criminal Justice, Florida International University). Serving as comprehensive exam committee member.

2018-2019. Devin Cowan (Department of Criminal Justice, University of Central Florida). Served as research mentor and co-author on publications.

Authored several letters of recommendation for students who applied for admission to law schools and various graduate programs.

**MEDIA INTERVIEWS**

The Star Ledger- Newark, New Jersey- 2006, 2007, 2008, 2009, 2010, 2011
The Philadelphia Inquirer- Philadelphia, Pennsylvania- 2007, 2008, 2010, 2011, 2012, 2013, 2015
The Associated Press, 2008, 2009, 2010
New Jersey Network, Trenton, New Jersey 2009
The Washington Post, 2009
The Economist, 2009
The Boston Globe- Boston, Massachusetts, 2008, 2009, 2010, 2011
The Cape May Herald- Cape May, New Jersey, 2008
The Human Rights Watch, 2008
CNN, Atlanta, 2011
USA Today, 2011

Correctionsone.com, 2014, 2015
Crime Report, 2015
Al Jazeera America, 2015

## EXPERT REPORTS/TESTIMONY IN LEGAL CASES

1. 2013 - Jeffrey Sylvia vs Nordic Fisheries—hired by attorney Seth Greenblott, from Holbrook Murphy, Massachusetts. Submitted expert opinion, no testimony required. Case number can be supplied if needed.

2. 2014 - Hired by attorney Jeanne Baker, Miami, Florida, to analyze sex offender recidivism in Florida for a sexual registry case. I did not have to testify for this case; the article that came from my official opinion to her is cited above. See Levenson, J. S. & **Zgoba, K.** (2015). "The Impact of Community Protection Policies on Sexual Reoffense Rates in Florida". *International Journal of Offender Therapy & Comparative Criminology*, 60 (10), 1140-1158. Case number can be supplied if needed.

3. 2014 - Ramon Matos v The State of Maryland, In the Circuit Court for the County of Montgomery, Case No. 380688V. Expert opinion and testimony provided.

4. 2016 - Hired by the New Jersey Office of the Public Defender, Fletcher Duddy. Expert opinion and testimony provided. Case number can be supplied if needed.

5. 2017 - Her Majesty the Queen v Eugen Ndhlovu**.** Hired by attorney Elvis Iginla, Edmonton Canada. Docket# 110548831Q101. Expert opinion and testimony provided.

6. 2018 - Hired by Elizabeth Malloy at Buchanan Ingersoll & Rooney, Philadelphia, PA, for the Southeastern Philadelphia Transit Authority (SEPTA). Employment litigation regarding criminal background checks and sexual offenses. Expert witness report provided; no testimony required. Case number can be supplied if needed.

7. 2019 - Hired by the New Jersey Office of the Public Defender, Fletcher Duddy. Expert opinion and testimony provided. Case number to be supplied if needed.

8. 2021 - State of New Jersey v Moriba Herron. Hired by attorney James Maynard, Morristown, New Jersey. Expert opinion and testimony provided. Case number can be supplied if needed.

9. 2021 - State of New Jersey v J. Russell. Hired by attorney James Maynard, Morristown, New Jersey. Expert opinion and testimony provided. Case number can be supplied if needed.

10. 2021 - State of New Jersey v Bruce Davis. Expert opinion and testimony provided (3 separate dates). Hired by Jesse DeBrosse, New Jersey Office of the Public Defender.

11. 2021 - Does III v Whitmer, Michigan. Paul Reingold, American Civil Liberties Union. Expert opinion provided.

**Upcoming Cases:**

2022 - Hired by Cornell, Farrow, Haelea, LLC for a registration challenge in Missouri
2022 - Steve Tehovnik, Pittsburgh, Pennsylvania
2022 - Eric Closs, Strousburg, Pennsylvania

- 24 -