# Exhibit 14:

## Sujatha Balija Expert Report

## DECLARATION OF SUJATHA BALIGA

### Executive Summary

The key findings of my report, which draw on scholarship in the field of child sexual abuse and prevention, as well as my experience as a survivor and survivor advocate, are that:

> ➢ sex offender registries tend to discourage victims from reporting their abuse;
>
> ➢ sex offender registries are counterproductive and can lead to recidivism and increased offending;
>
> ➢ maintaining a sex offender registry diverts necessary resources from alternatives with proven results;
>
> ➢ each instance of sexual offending is uniquely different and, as such, the needs and response of each survivor is different.

### Background and Qualifications

1.  I am an attorney and restorative justice practitioner. I most recently served as the Director of the Restorative Justice Project at Impact Justice in Oakland, California where I worked since 2015.

2.  I received my A.B. in Special Concentrations from Harvard College in 1993 and my J.D. from the University of Pennsylvania in 1999. I then clerked for the Honorable William Session III and the Honorable Martha Vazquez of, respectively, the U.S. District Court for the District of Vermont and the U.S. District Court

1

for the District of New Mexico. I served as a victim advocate for three years in California and New York, and as a public defender in New York and New Mexico for seven years, and I have continued to volunteer with and serve on boards of victim-serving organizations until today.

3.  I was awarded a Soros Justice Fellowship in 2008 which I used to launch a pre-charge restorative youth diversion program. I have also worked at the National Council on Crime and Delinquency as the director of the Restorative Justice Project, and at Community Justice Works, and support organizations such as family justice centers and child rights organizations the world over, including the Contra Costa County Family Justice Center, the Firecracker Foundation in Lansing, MI, and various nonprofits working in India to end child sexual abuse.

4.  My current practice focuses on survivor-centered restorative justice alternatives to traditional legal interventions as a means of helping crime survivors heal, holding those who cause harm accountable, and breaking cycles of recidivism and violence. In my position with Impact Justice, I am focused on implementing restorative alternatives to end child sexual abuse and intimate partner violence.  I was named a Just Beginning Collaborative Fellow, which supports the innovative work of child sexual abuse survivor-leaders.

5.  In 2019, I was named a MacArthur Fellow in recognition of my work to facilitate constructive, rather than punitive and retributive, responses to wrong-

2

doing. The MacArthur Fellowship has allowed me to focus on expanding access to survivor-centered restorative justice strategies that interrupt the criminalization of people of color, enable survivors to find healing, and prevent recidivism by coupling accountability with the recognition that wrongdoers can change.

6.  I bring to my work my experiences as both a victim advocate and a public defender. I also bring my lived experience as a survivor of child sexual abuse by my father. I have leaned heavily on my own experience as a survivor in my work. The combination of my experiences have provided me with a unique perspective on topics related to the effectiveness of child sexual abuse prevention methods.

7.  As a public survivor, I receive near-daily emails and other correspondence from child sexual abuse survivors who share my views and are seeking more effective, healthier ways to address and end child sexual abuse.

8.  I have spoken and written at length about my experiences and am currently using my MacArthur Fellowship to author a book about it. I am also the co-founder of Crime Survivors for Safety and Justice, a national network of survivors focused on creating healing communities and shaping public safety policies that reflect the voices of survivors.

9.  Through my research and professional projects, I am familiar with the data and literature on sexual abuse prevention. Much of my research and work focuses specifically on the survivors of sexual abuse, the manners in which survivor

3

trauma has been addressed, and the effectiveness of these methods. In this work, I have worked at length with survivors of sexual abuse and childhood sexual abuse, as well as with individuals who have committed sexual crimes and acts against others, many of whom have been subject to sex offender registries. I have worked and met with thousands of survivors and with hundreds of people who have committed sexual crimes and are subject to sex offender registration.

10. I have also worked closely with a sexual and domestic violence organizations, including Safe Place, Narika, and the Contra Costa County Family Justice Center in the Bay Area, CA, the National Clearinghouse for the Defense of Battered Women in Philadelphia, and the Santa Fe Rape Crisis Center in New Mexico.

11. I am a frequent public commentator regarding child sexual abuse and effective prevention practices. I have been featured in many media pieces on the topic of child sexual abuse, including in the New York Times Magazine, NPR, Vox, and the Atlantic, among others. I have presented my research and experience on various platforms, including academic conferences at Harvard, Yale, Columbia, Stanford, and countless state educational institutions across the nation.

12. In preparing this report/statement, I have relied on my own research, personal and professional experiences, as well as my knowledge of the work of other scholars in these areas as cited throughout. The testimony expressed in this

report are mine alone and do not reflect the views or opinions of any organization I have founded, been associated with, or am currently affiliated with.

13. A copy of my c.v., which includes publications I have authored in the last ten years, is attached. I have testified before State Legislative bodies on matters of child sexual abuse and other forms of sexual violence in both New Mexico and California.

**Sex Offender Registries Discourage Survivors from Reporting**

14. Survivors of sexual abuse are often left out of conversations about what "justice" looks like. Rather, prosecutors and law enforcement claim that they are speaking for survivors, but what they most often propose reflects law enforcement preferences for punishment and surveillance rather than survivors' priorities of prevention and healing.

15. In my experience as a survivor of child sexual abuse and an advocate for victims of sexual abuse, the systems ostensibly intended to protect survivors, instead have the effect of ensuring our silence. That includes sex offender registries.

16. It is commonly known that sex crimes are underreported. There are various reasons why survivors do not report their sexual abuse, including: a desire to protect the person who offended, fear of disrupting friends/family, a desire for

privacy, and distrust of the criminal justice system.[1] These considerations are amplified when there is a risk that a person who perpetrated will be placed on the sex offender registry because of the public nature of the reporting. Multiple studies on the effectiveness of sex offender registries suggest that the increased use of sex offender registries—and the stigmatization that comes with it—is associated with a decrease in reporting of sexual crimes.[2]

17.    My own experience working with survivors of sexual abuse is consistent with the research findings. I have learned that many survivors oppose punitive sentences, including the use of sex offender registries, for people convicted of sexual crimes or misconduct and many choose to keep their abuse

---

[1] *See, e.g.*, Department of Justice, Office of Justice Programs, Youth Victimization: Prevalence and Implications, National Institute for Justice: Research in Brief (April 2003); Ronet Bachman, *The Factors Related to Rape Reporting Behavior and Arrest: New Evidence from the National Crime Victimization Survey*, 25 CRIMINAL JUSTICE & BEHAVIOR 8, 25-26 (1998); J. BELKNAP, THE INVISIBLE WOMAN: GENDER, CRIME, AND JUSTICE (Wadsworth, 6th ed. 2001).

[2] Heather R. Hlavka & Christopher Uggen, *Does Stigmatizing Sex Offenders Drive Down Reporting Rates? Perverse Effects and Unintended Consequences*, 35 N. Kentucky L. Rev. 347, 368 (2008); *see also* William Edwards & Christopher Hensley, *Contextualizing Sex Offender Management Legislation and Policy: Evaluating the Problem of Latent Consequences in Community Notification Laws*, 45 Int'l J. Offender Therapy & Comp. Criminology 83, 93 (2001); Jill. S. Levenson & Leo P. Cotter, *The Effect of Megan's Law on Sex Offender Registration*, 21 J. CONTEMP. CRIM. JUSTICE 49, 51, (2005); Robert E. Freeman-Longo, *Prevention or Problem*, 8 SEXUAL ABUSE: J. RESEARCH & TREATMENT 91, 94 (1996).

hidden for fear that reporting will result in the person who harmed them appearing on a sex offender registry and suffering other consequences that the survivor does not want. In other words, registries have not supported survivors, and have conversely had the effect of silencing survivors.

18.     Survivors are less likely to report people they know when they fear continuing repercussions for that person.[3] In my experience, many survivors hesitate to shame people they know, meaning they are less willing to report an assault if it means that the wrongdoer will appear on a public registry for year, decades, or even a lifetime. As a result of this fear that reporting might result in a family member or close acquaintance being added to the sex offender registry, some victims forgo reporting entirely.

19.     A majority of sexual assaults are committed by someone the victim knows.[4] This is particularly true for child-victims where the person who

---

[3] Richard B. Felson & Paul-Philippe Pare, *The Reporting of Domestic Violence and Sexual Assault by Nonstrangers to the Police*, 67 J. MARRIAGE & FAMILY 597, 607 (2005).

[4] Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *National Crime Victimization Survey*, 2010-2016 (2017); Rose Corrigan, *When is a Rapist a Sex Offender?: Sex Offender Registration and Notification Statutes*, Up Against a Wall, 218-221 (NYU Press, 2013); *No Easy Answers: Sex Offender Laws in the U.S.*" HUMAN RIGHTS WATCH REPORT, https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us (last accessed Apr. 18, 2023).

perpetrated is more often a family member or close acquaintance.[5] Many of the survivors I worked with were victims of child sexual abuse committed by a relative or family friend.

20.    When a survivor has been victimized by an acquaintance or family members, in many cases the type of relief they seek is not retribution or punishment. Many survivors report they do not want to see the person who harmed them thrown in jail. Many child victims fear the consequences of state intervention as a result of reporting their abuse.[6] This is particularly true for non-white victims where fear of the state and distrust of law enforcement are common considerations when deciding to report.[7]

21.    The person who perpetrated against me – my father – passed away when I was sixteen. It is only his death that allows me to speak so freely about what happened to me. I have spoken with hundreds upon hundreds of survivors

---

[5] Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Sexual Assault of Young Children as Reported to Law Enforcement* (2000); KELLY M. SOCIA & JASON RYDBERG, SEX OFFENDER LEGISLATION AND POLICY IN ADVANCING CRIMINOLOGY & CRIMINAL JUSTICE POLICY 189 (2016).

[6] *See* Heather Hlavka, Ph.D. Dissertation: *When Discourse Becomes Disclosure: Children's Constructions of Self and Sexual Abuse*, University of Minnesota Department of Sociology (2008).

[7] *Id.*; *see also* Hlavka & Uggen, *supra* note 4, at 363 (finding a decrease in reporting from 56% to 17% over a five year period for Black victims of sexual assault, compared to an increase in reporting between 2002-2005 for White victims).

who say they wish they, too, could speak openly about the abuse, but are unable because the person who abused them is still alive, and they do not want conse-quences such as lifetime registration.

22.     In my experience, the knowledge that the person causing abuse could be subject to the sex offender registry is a deterrent for many survivors to report their harm or the person who harmed them for another reason: Many survivors view the supervision and publicity associated with public sex offender registries as a threat to their own privacy.[8] It is not uncommon for notification and registration of a sex offender to inadvertently release the identity of victims via the identity and location of the person who harmed them.[9]

23.     Because so much abuse happens within families and amongst those closest to us, public sex offender registries do not just stigmatize the wrongdoer, but, as a practical matter, can effectively "out" the victim, even though the victim is not named. Our culture still attaches shame and stigma to being a survivor, and as a result many survivors do not want their stories known. Sex offender registries can discourage reporting by survivors who fear that people will learn the

---

[8] *See* Corrigan, *supra* note 6, at 218; Edwards & Hensley, *supra* note 4.

[9] Edwards & Hensley, *supra* note 4, at 92; Robert E. Freeman-Longo, *Revisiting Megan's Law and Sex Offender Registration*: *Prevention or Problem* in Hodgson & Kelly (2002).

survivor's past by seeing information about the person convicted of abusing them on a sex offender registry.

24. Public notification that an individual is a sex offender may discourage victims or even their relatives from reporting because reporting could impact the entire family, not just the person who offended.[10] Reports show that the families of individuals placed on sex offender registries are increasingly experiencing shame and harassment as a result of the publication and notification.[11] There are many reports of family members experiencing what is known as "courtesy stigma" – public disapproval evoked as a consequence of associating with a stigmatized person or group.[12] Both survivors and their families report dealing with financial hardship and stigmatization from neighbors, co-workers, school officials, and classmates.[13] Family members report having to leave their homes and communities after dealing with harassment as a result of a family

---

[10] Edwards & Hensley, *supra* note 4, at 92 ("It is not unreasonable to consider how the reality of public notification may further discourage a victim or nonoffending relative from seeking assistance, as notification would affect the entire family unit, not just the offender [...].").

[11] *See* Freeman-Longo, *supra* note 11, at 9; Jill.S. Levenson & Leo P. Cotter, *The Effect of Megan's Law on Sex Offender Registration*, 21 J. CONTEMP. CRIM. JUSTICE 49, 52, 58 (2005).

[12] Hlavka & Uggen, *supra* note 4, at 368; Levenson & Cotter, *supra* note 13, at 52.

[13] *Id.*

member being added to the registry.[14] These are the specific concerns that caused me to remain silent about the abuse when my father was alive; survivors often repeat these concerns to me.

25.     Adult victims of sexual assault have cited the public nature of the registry and lack of confidentiality as reasons for not reporting their abuse to law enforcement.[15] Similarly, both experience and research reveal that the abuse experienced by child victims of sex abuse often goes unreported due to the child's desire to protect the family.[16]

26.     When survivors choose not to report out of hesitation that the person who harmed them may be added to the sex offender registry, it allows the harm and abuse to persist. The decision to not report in order to shield the individual from the registry ultimately decreases the likelihood both that the person who offended will stop offending and the victim will find relief from the harm.

**Sex Offender Registries Are Counterproductive**

27.     In addition to working extensively with survivors, I have also worked as a public defender with people who committed sex crimes and who were on sex offender registries. What I learned from those experiences, and what is clear from

---

[14] *See id.*

[15] *See* Heather R. Hlavka, *supra* note 4, at 348.

[16] *See supra* note 6-7 and accompanying text.

the research is that sex offender registries are counterproductive. Programs that employ punitive and supervision-based approaches where the goals are sanction or deterrence have been strongly linked to recidivism.[17] Sex offender registries and SORA-type laws employ these same types of programming whereby registrants are under state-supervision and subject to extensive restrictions, fees, stigma, and potential incarceration.

28.    While the presumed purpose of sex offender registries is to decrease sexual offending and/or reoffending, there is little evidence that registries have accomplished these goals.[18] On the contrary, sex offender registries have been linked to increases in offending.[19]

29.    It is unsurprising that sex offender registries do the opposite of what they are supposed to do. After all, being on a public sex offender registry makes

---

[17] SOCIA & RYDBERG, *supra* note 7, at 193.

[18] Elizabeth L. Jeglic, Ph.D., *Sex Offender Registries: Are They Keeping Our Children Safe?*, PSYCHOLOGY TODAY (Aug. 9, 2009), https://www.psychologytoday.com/us/blog/protecting-children-sexual-abuse/201908/sex-offender-registries#:~:text=As%20with%20most%20things%2C%20the,to%20nothing%20to%20reduce%20reoffending.

[19] *Id.* at 188; *see also*, Richard Tewksbury, *The Unintended Collateral Consequences of Sex Offender Residency Restrictions*, 42 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES L. REV., 531, 540 (2007).

it extremely difficult for registrants to find stable housing or employment, which are well-established as critically important in preventing reoffending.[20]

30.    Sex offender registries also result in isolation of registrants, which is a key factor associated with reoffending. Registrants are often isolated from the communities they were in when the offended. Because of the sex offender registry, they are often also ostracized if they move into new communities.[21]

31.    Perhaps most important, public sex offender registries stigmatize those who are placed on them. Registries label individuals, even individuals whose offense were committed decades ago, as sexual deviants and as current dangers to the public.

32.    One of the central tenets of restorative justice is language; in order to prevent reoffending, we must stop calling people the thing we want them to stop doing. It makes no sense to label people by the behavior we want them to stop. We should not lock people into the language of what we all want them to move beyond. When we place individuals on a sex offender registry, and then hold them out to the public—often for life—as "sex offenders," we are telling them that that is who they are and that is who they will always be.

---

[20] *See Id.* at 504; Levenson & Cotter, *supra* note 13, at 52, 58.

[21] *See Ending Child Sexual Abuse: A Transformative Justice Handbook*, GENERATION FIVE (2019), https://generativesomatics.org/wp-content/uploads/2019/10/Transformative-Justice-Handbook.pdf.

**Sex Offender Registries Divert Necessary Funding from Proven Alternatives**

33.     The overwhelming majority of sexual assaults (95%) are committed by people who do not have prior sex offense convictions, and therefore are not on sex offender registries.[22] Registries thus ignore the source of most sexual offending.

34.      Sex offender registries also tend to provide communities and survivors with a false sense of security.[23] For some, registries in fact communicate to them that it is okay to reduce their vigilance.[24] Registries also falsely suggest that it is strangers who present a danger. Individuals may be less likely to suspect a close friend or family member of committing sexual harm. Therefore, having a sex offender registry listing thousands of strangers is not an effective preventative measure when people are more likely to be harmed by individuals close to them.

35.     Instead of leaning on sex offender registries, states should turn to alternatives that have demonstrated positive outcomes. In my work, I have observed many different programs and methods used to both address sexual

---

[22] Kelly M. Socia, Naomi Freeman, & Jeffrey Sandler, *Does a Watched Pot Boil? A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law*, 14 PSYCHOLOGY PUBLIC POLICY & LAW 284 (2008).

[23] Sarah W. Craun & Catherine A. Simmons, *Taking a Seat at the Table: Sexual Assault Survivors' View of Sex Offender Registries*, VICTIMS & OFFENDERS 312-326, 321 (2012).

[24] *See* SOCIA & RYDBERG, *supra* note 7, at 188; Craun & Simmons, *supra* note 25, at 313.

violence after it has occurred and prevent it from happening in the future, including my 15 years of work with accountability-based, victim-centered restorative justice programs. Many are effective. But they are under-resourced.

36. There are a wide range of programs to prevent and address sexual abuse. These programs have been endorsed by agencies such as the Center for Disease Control, the National Sexual Violence Resource Center and the National Coalition to Prevent Child Sexual Abuse and Exploitation.[25]

37. Victim support groups are often the most important way to address sexual violence. Victim support can be achieved through various avenues, including through support groups, crises intervention, or medical and legal advocacy. Instead of focusing on punishing the person who harmed them or publicizing their abuse, many survivors are instead more focused on healing and rebuilding their own sense of self and safety. More often than not, however, many survivors are met with little to no resources to adequately address their harm and needs, particularly when they forego reporting their abuse to law enforcement.

38. Targeting and increasing sexual violence prevention education in schools has been an effective method in addressing some elements of sexual

---

[25]*Prevention Strategies*, CDC, https://www.cdc.gov/violenceprevention/sexualviolence/prevention.html (last accessed Apr. 20, 2023); Sarah DeGue et al., *A Systematic Review of Primary Prevention Strategies for Sexual Violence Perpetration* (2014).

violence. Teaching children about sexual abuse at an early age has been shown to increase reporting – which in turn increases detection and is more likely to prevent future reoffending.[26]

39.     Bystander intervention programs, especially those that utilize social emotional learning—the process through which young people and adults acquire and apply the knowledge, skills, and attitudes to develop healthy identities, manage emotions and achieve personal and collective goals—have also been shown to address sexual abuse more effectively than sex offender registries.[27] Programs adopted using SEL to address sexual assault, including programs such as Second Step, Safe Date Green Dot, and Bringing in the Bystander have seen noted success, specifically in their ability to decrease sexual violation perpetration and interpersonal violence in schools.[28]

40.     Community-based education efforts include efforts to attack sexual offending in schools and homes specifically. This is done most effectively though communication education and community-led efforts. One particular campaign utilizing these methods is Shifting Boundaries, an intervention designed to reduce

---

[26] Kerryann Walsh et al., *School-based Education Programmes for the Prevention of Child Sexual Abuse*, COCHRANE DATABASE OF SYSTEMATIC REVIEWS (last accessed Apr. 18, 2023).

[27] *Prevention Strategies*, *supra* note 27.

[28] *See   id.*; *Progress:   Pivotal   Momentum*, ALTERISTIC, https://alteristic.org/progress/ (last accessed Apr. 18, 2023).

16

the incidence and prevalence of dating violence and sexual harassment among young people. The intervention includes a classroom-based curricula as well as a more general school-wide component. Programs like Shifting Boundaries have seen much success in reducing sexual violence in schools.[29]

41.     Victimization preventing programs are designed to help potential victims stop or prevent an attack on themselves or someone else. There are several programs under this umbrella that individuals can and do take advantage of, offered both privately and publicly. The National Institute of Justice lists several programs that are specifically geared toward victimization prevention, many of which are supported by various reports noting their effectiveness at reducing sexual violence.[30] The Enhanced Assess, Acknowledge, Act Sexual Assault Resistance Program, one such program listed on the site, provides an educational, skills-based workshop to first-year college female students designed to teach them how to assess risk, overcome barriers in acknowledging danger, and engage in

---

[29] *See* Bruce Taylor, Elizabeth Mumford, & Nan Stein, *Effectiveness of "Shifting Boundaries" Teen Dating Violence Prevention Program for Subgroups of Middle School Students*, 56 J. ADOLESCENT HEALTH 520 (Feb. 2015).

[30] *Victims & Victimization*, NATIONAL INSTITUTE OF JUSTICE, https://crimesolutions.ojp.gov/topics/victims-victimization (last accessed Apr. "18, 2023).

self-defense.[31] Similar to the alternative methods used above, the victimization prevention programs have seen success in reducing sexual violence.

42.    Circles of Support and Accountability (CoSAs), "a unique and restorative justice-informed approach to the safe community integration of persons who have sexually offended and who typically present as both high-risk and high-need," have been shown to be far more effective than registries in protecting communities and supporting those who have offended to not repeat their behavior.[32]

43.    Although there are many effective models to prevent sexual abuse and to address harm that happens, these programs do not have sufficient support or funding.

44.    Sex offender registries are not just ineffective. They are also expensive, with costs including creating, maintaining, and interfacing multiple databases, funding for local monitoring and compliance enforcement, and costs associated with non-compliance.[33] As an advocate for survivors, I want to see these resources reallocated from counterproductive registries that discourage

---

[31] *See id.*

[32] https://www.ojp.gov/pdffiles1/smart/grants/305149.pdf

[33] Jill S. Levenson, et al., *Grand Challenges: Social Justice and the Need for Evidence-Based Sex Offender Registry Reform*, J. SOCIOLOGY & SOCIAL WELFARE 1, 7 (June 2016).

reporting and undermine reentry to proven alternatives that prevent abuse and heal survivors. If we really want to prevent abuse and support survivors, we need to stop funding sex offender registries, and invest in rehabilitation and reintegration programs, victim's services, and prevention initiatives.[34]

**There is Great Variation in Sexual Offending and in the Experiences of Survivors**

45.     I take exception to the reports and declarations presented by the Defendants because they present a picture of "sex offenders" and "victims" as homogenous, monolithic groups.

46.     In reality, every case is different. People who commit sex offenses do so for a wide variety of reasons and in many different contexts. There is no one "sex offender," and the stereotypes of who "sex offenders" are do not conform to the reality.

47.     Similarly, it has been my experience that the needs of survivors vary tremendously because each person's experience is different. This ultimately results in variation in the needs and responses survivors have to their abuse and trauma as well as what might be the best way to address the offender and the need to prevent future reoffending.

---

[34]*See id.* at 17.

48.     Survivors often share conflicting ideas of how they would like to address their abuse. While some more openly seek support, from family, friends, resources and sometimes law enforcement, others turn internally to address their harm more privately. There is no right or specific way for any survivor of sexual abuse to address their abuse or harm as each survivor has different needs that must be addressed and met in order for them to begin healing.

49.     Survivors similarly share conflicting ideas on how they would like to address the *person* who abused them. Like each survivor, each person who offends is also uniquely different and commit their offenses under totally different circumstances. Because of this, the relationship between survivor and the person who harmed them is different in each case. Not every survivor will seek the same relief from the person who harmed them and not every person who offended will need or respond to the same type of accountability to address the harm they've perpetrated.

50.     While some survivors want to see the person who harmed them punished, many make extreme accommodations to prevent the exposure of the individual's conduct. There are various—and sometimes many—reasons why a survivor may make extreme accommodations for their abuse, including a survivor's financial dependence on the person who offended, the fear of having their privacy invaded, or the fear of subjecting the individual to lasting conse-

20

quences. It is critical that we not dismiss this as a psychological outcome of the abuse. As is reflected in the notable underreporting of sexual assault cases, it is not often that survivors look to the law, the state, or a public registry for how to best to move forward and address the abuse they have experienced – this is often a practical, well-reasoned response to the negative outcomes of engaging with state systems for the entire familial/community ecosystem impacted by the abuse.

51.     Survivors often have these conflicting ideas on how best to address the specific situation because each instance of sexual abuse is uniquely different. Survivors experience different levels of harm and are often in completely different situations.

52.     Sex offender registries do not account for the very different types of harm and the very different experiences of survivors. The reality is that one-size-fits-all approaches are always inadequate and never survivor-centered.

53.     Indeed, sex offender registries are used even when the "victim" does not see herself has harmed. For example, sex offender registration may be required when a person engages in sexual activity with a teenage who is not old enough to legally consent, regardless of the teenager's wishes or experience. Indeed, regardless of whether the victim reports no fear of harm or safety, or indeed even later marries the partner, the "sex offender" is required to register.  This is particularly damaging to teenagers in consensual relationships with other

21

teenagers/young adults who happen to fall across the legally-imposed age-gap line.

54.    As a survivor, survivor advocate, and survivor leader who has worked my whole adult life to create programs and policies that will better meet the needs of those who've lived through what I did, and who holds the possibility of a world in which we see the end of the sexual violation of children, I thank you for your consideration of my knowledge and research.

55.    I am providing this report pro bono. My rate for deposition testimony is $500/hour, and travel/lodging costs if required to be in person. I use whatever fees I receive to offer my time pro bono to local non-profits working to end child sexual abuse.

I certify under penalty of perjury the above statement is true and correct pursuant to 28 U.S.C § 1742.

_____

sujatha baliga

April 27, 2023

# sujatha baliga

www.sujathabaliga.com ♦ Berkeley, CA ♦ sujatha@sujathabaliga.com

### FELLOWSHIPS & HONORS

- ◆ MacArthur Fellowship, 2019
- ◆ Penn Law School's Louis H. Pollak Public Service Alumni Award, 2019
- ◆ Just Beginnings Collaborative Fellowship, 2016
- ◆ Harvard Law School, Women Inspiring Change awardee, 2015
- ◆ South Asian Bar Association–Northern California, Public Interest Award, 2013
- ◆ Soros Justice Advocacy Fellowship, 2008
- ◆ Penn Law Public Interest Scholar, 1996
- ◆ Pforzheimer Foundation Public Service Fellowship, 1993

### EXPERIENCE

**WRITER, CONSULTANT, AND PUBLIC SPEAKER,** Berkeley, CA                      August 2020-Present

**THE GYUTO FOUNDATION,** Richmond, CA                      January 2017-Present
Leads weekly secular meditation at Tibetan Buddhist Monastery, under tutelage of Geshe Kunchok Tenzin.

**CHAT PROJECT (COLLECTIVE HEALING AND TRANSFORMATION)**, Richmond, CA      January 2017-Present
Founding member, trainer, consultant, and facilitator. Provides technical assistance, training, and co-facilitation in cases of intimate partner and sexual violence, employing community-based restorative justice approaches without reliance on the state.

**IMPACT JUSTICE,** Oakland, CA                      April 2015–July 2020
Vice-President and Director, Restorative Justice Project. Provided technical assistance to communities implementing restorative justice programs. Assisted restorative justice programs to better meet needs of crime survivors while reducing racial and ethnic disparities in restorative diversion processes. Offered restorative justice trainings.

**BERKELEY LAW SCHOOL,** BERKELEY, CA                      Spring 2017
Adjunct Faculty; taught seminar on restorative justice.

**NATIONAL COUNCIL ON CRIME AND DELINQUENCY,** Oakland, CA                      Sept. 2011–April 2015
Director, Restorative Justice Project. Assisted counties in implementing restorative justice programs while better meeting needs of survivors of crime.  Provided technical assistance to the US Attorney General's Task Force on Childhood Exposure to Violence.

**COMMUNITY WORKS**, Berkeley, CA                      July 2008–Oct. 2008, Oct. 2009–Aug. 2011
Director, Community Justice Works. Continued implementation of restorative justice diversion program initiated under Soros Fellowship with RJOY, below. Led forgiveness workshops using restorative justice principles for groups of incarcerated men accused of violent offenses. Advised and trained Community Works in restorative justice programs.

**RESTORATIVE JUSTICE FOR OAKLAND YOUTH (RJOY)**, Oakland, CA                      Apr. 2008–Sept 2009
Soros Justice Advocacy Fellow.  Recipient of fellowship from the Open Society Institute to assist Alameda County's juvenile justice system adopt restorative justice practices to

decrease its reliance on incarceration and other forms of punishment. Implemented county-wide system to help youth accused of crime and those they harmed collectively resolve conflicts and root out the causes of young people coming into conflict with the law.

**STANFORD CRIMINAL JUSTICE CENTER,** Palo Alto, CA                July 2007–Jan. 2008
Organized academic symposium titled *Rights, Needs, Power: The Victim in Criminal Justice* held in January 2008.

**NEW COLLEGE SCHOOL OF LAW,** San Francisco, CA                Aug. 2007 – Jan. 2008
Adjunct Faculty. Taught *Restorative Justice* seminar.

**CALIFORNIA INSTITUTE FOR INTEGRAL STUDIES,** San Francisco, CA        Jan. 2007 – May 2007
Adjunct Faculty. Taught undergraduate *Approaches to Justice* seminar.

**LIBERATION PRISON PROJECT,** San Francisco, CA                Aug. 2006 –2008
Volunteer Counsel. Advised Buddhist non-profit in assisting inmates with legal questions.

**NOLAN, ARMSTRONG & BARTON,** Palo Alto, CA                June 2007– Sept. 2007
Independent Contract Attorney. Performed legal research and writing for criminal defense firm.

**LAW OFFICES OF RICHARD B. MAZER,** San Francisco                Oct. 2006 – July 2007
Independent Contract Attorney. Completed Appellant's Opening Brief in capital state direct appeal, and prepared case for state habeas corpus proceedings.

**OFFICE OF THE APPELLATE DEFENDER,** New York, NY                Sept. 2004–Aug. 2006
Staff Attorney. One of three attorneys chosen nationally to participate in two-year appellate defense training program.

**NEW MEXICO PUBLIC DEFENDER DEPARTMENT,** Santa Fe, NM                Oct. 2002–May 2004
Assistant Appellate Defender. One of thirteen attorneys responsible for representation of New Mexico indigent criminal defendants before the New Mexico Court of Appeals and Supreme Court.

**U.S. FEDERAL DISTRICT COURT,** Burlington, VT, & Santa Fe, NM        9/99-8/00 & 8/01-6/02
Law Clerk to the Honorable William K. Sessions, III, U.S. District Court Judge and Chair of the U.S. Sentencing Commission and to the Honorable Martha Vázquez, U.S. District Court Judge. Drafted civil and criminal opinions and jury instructions. Researched application of the Federal Sentencing Guidelines on variety of issues, including illegal reentry cases.

**NATIONAL CLEARINGHOUSE FOR THE DEFENSE OF BATTERED WOMEN,** Phila., PA        June – Aug. 1999
As summer intern, performed legal research and developed trial strategies on pre-trial and habeas issues facing battered women accused of violent and non-violent crimes. Researched issues on self-defense and other jury charges in cases of women accused of harming their abusers.

**SOUTHERN CENTER FOR HUMAN RIGHTS,** Atlanta, GA                May – June 1998
As summer intern, drafted briefs and motions on prisoners' rights and capital defense cases. Assisted staff attorneys in preparation for depositions of prison officials. Interviewed clients in detention facilities.

DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION, Criminal Sect., Washington, DC          July-Aug. 1998
One of twelve law students selected nationally for Summer Law Intern Program.  Worked on police and prison guard brutality cases, and with the National Church Arson Task Force in the Civil Rights Criminal Section.  Drafted memoranda and indictment in case involving Ku Klux Klan members allegedly burning African American church.  Researched prosecution of grand jury witness for perjury in cross burning case.

KRASNER & RESTREPO, Philadelphia, PA                          Fall 1997 – Spring 1999
Worked during law school as student intern for small civil rights criminal defense firm.

KAIRYS, RUDOVSKY, EPSTEIN, MESSING AND RAU, Philadelphia, PA                     Summer 1997
Served as summer intern for small civil rights firm.  Assisted in preparation of class action in which female applicants for Philadelphia Police Department were denied employment.  Researched class certification, drafted and answered interrogatories, and assisted in preparation for depositions of class representatives.

PREP FOR PREP, New York, NY                                    Summer 1996
Taught English Literature and Research Skills to seventy 5th and 6th graders in a program tracking academically gifted children of color in New York City public schools for placement in private schools.  Advised double-dutch.

NEW YORK CITY URBAN FELLOWS PROGRAM, New York, NY                     1994-1995
One of 25 recent college graduates selected nationally for public service fellowship combining placements in Mayoral Offices or city agencies with weekly seminars on issues facing the City of New York.  Served as Intake Coordinator for city-operated domestic violence shelters.

PFORZHEIMER FOUNDATION FOR PUBLIC SERVICE, San Francisco, CA            1993-1994
One of four recipients of a stipend awarded by Harvard University to promote post-graduate public interest work.  Worked with two South Asian battered women's organizations and a domestic violence shelter in the Bay Area.

## SELECTED TALKS AND PUBLICATIONS
Numerous, available at www.sujathabaliga.com

## SELECTED LEGISLATIVE TESTIMONY
*California Legislative Judiciary Committee*, testified on ending statute of limitations for sex offenses, Sacramento, CA 2009
*New Mexico Legislature*, testified on proposed legislation impacting those on registries for having committed sexual offenses, Santa Fe, NM 2003

## SELECTED PROFESSIONAL ACTIVITIES
Co-Founder, Crime Survivors for Safety and Justice
Member and Convener, Alameda County Restorative Juvenile Justice Task Force (2008-09)
Board Member, Santa Fe Rape Crisis Center (2003-2004)

## TEACHERS FROM WHOM I'VE LEARNED ABOUT RESTORATIVE JUSTICE, PEACEMAKING, AND CIRCLE
Introduction to Circle Process, Harold and Phil Gatsenby, 2020

Family Group Conferencing in Domestic Violence Cases, Gale Buford and Joan Pennell, April 2018

Seminars for Trauma Awareness and Resiliency, David Anderson Hooker and Elaine Zook Barge, April 2010

Family Group Conferencing New Zealand Style Workshop, Allan MacRae, Dec. 2009

Defense Initiated Victim Outreach in Capital Cases, Kelly Branham and Lisa Eager, Aug. 2009

Victim Offender Dialogue in Crimes of Severe Violence, Lorraine Stutzman Amstutz and Barb Toews, June 2009

Restorative Discipline in Schools Workshop, Lorraine Stutzman Amstutz, March 2009

Peacemaking Circles, Kay Pranis, December 2008

Restorative Group Conferencing, Jessalyn Nash and Jon Kidde, December 2007

Two additional teachers I continue to learn from in various contexts: Howard Zehr since 2007 and Justice Robert Yazzie since 2013

## Bar Memberships

State Bar of New York (2006, retired)

State Bar of New Mexico (2001, inactive)

## Education

University of Pennsylvania Law School, J.D., 1999

Harvard and Radcliffe Colleges, A.B. *cum laude*, 1993