# Exhibit 15:

## AMENDED DECLARATION OF

# BARBARA R. LEVINE

## AMENDED DECLARATION OF BARBARA R. LEVINE

I, Barbara R. Levine, declare as follows:

### Background and Experience

1. I am an attorney who was admitted to the Michigan Bar in 1974. During my professional career, I have served as assigned counsel for indigent defendants appealing their felony convictions; taught as an adjunct at the University of Michigan and Wayne State University Law Schools, and as an assistant professor at the University of Toledo Law School; served as a commissioner for the Michigan Supreme Court; and served as co-counsel in several prisoners' rights lawsuits.

2. From 1985 to 1998, I was the administrator of the Michigan Appellate Assigned Counsel System, an agency within the Judicial Branch, and am therefore familiar with building and administering state agency budgets.

3. From 2003 to 2013, I was the Executive Director of the Citizens Alliance on Prisons and Public Spending (CAPPS). I was the associate director of CAPPS from 2013 to 2017. CAPPS was a research and advocacy organization focused on increasing the use of alternatives to incarceration. In that capacity, I frequently testified before the Michigan Legislature and interacted with legislators. Since 2017, I have served as a consultant to Safe and Just Michigan (SJM), the successor organization to CAPPS.

4. Throughout my work with CAPPS and SJM, I engaged in empirical research using publicly available data from various sources, particularly the Michigan Department of Corrections (MDOC). I then authored or co-authored data-based reports on various aspects of Michigan's criminal justice system that were published by CAPPS/SJM, a list of which is attached as Appendix A. I also published a law review article, while teaching, based on an empirical analysis of ineffective assistance of counsel claims raised by Michigan defendants on appeal.[1]

---

[1] Barbara Levine, *Preventing Defense Counsel Error – An Analysis of Some Ineffective Assistance of Counsel Claims and Their Implications for Professional Regulation*, 15 U. Tol. L. Rev. 1275 (1984).

1

5. In January 2016, I co-authored an amicus curiae brief filed in *Does #1-5 v Snyder,* No. 15-2346/2486 (6th Cir.) (*Does I*).

6. Because of my familiarity with Michigan data sources and experience with utilizing those sources in empirical research, I was asked to analyze, to the extent possible, the costs of maintaining and enforcing Michigan's Sex Offender Registry (SOR).

7. I initially prepared a report, dated January 30, 2022, that was filed with the complaint in this case. The information in that initial report was based primarily on MDOC annual statistical reports, publicly available legislative documents, other published reports, and court filings in *Does I*, No. 2:12-cv-11194 (E.D. Mich.) and *Does #1-6 v. Snyder*, No. 16-cv-13137 (E.D. Mich.) (*Does II*). I also obtained additional data by submitting a public records request (under the Freedom of Information Act) to the Michigan State Police (MSP). In February 2023 I received from class counsel a substantial number of documents that were provided to Plaintiffs in the process of discovery. The additional information in these documents required amendments to this declaration. The sources for all figures are indicated either in the body of this declaration or accompanying footnotes.

## **EXECUTIVE SUMMARY**

8. There is very little publicly available data regarding Michigan's sex offender registry. Although the registry is used to supervise tens of thousands of people at considerable expense, Michigan appears never to have analyzed the cost or effectiveness of its registry.

9. Michigan's sex offender registry is a relic of the "get tough" era of the 1990s when criminal justice policies and practices assumed that all sex offenders were irredeemable recidivists. Research has proven the premise to be utterly false, but Michigan continues to base its policies for people with past sex offenses on that discredited assumption.

10. The animosity displayed by legislators and other public officials towards people with past sex offenses had no basis in evidence and imposes high costs on those individuals, their families, and taxpayers without any apparent benefit.

11. While judges, prosecutors, and the parole board have the ability to consider individual circumstances around a sex offense when determining the appropriate punishment, the sex offender registry imposes harsh consequences, often for life, without any individual review.

12. The data available to me shows that Michigan's registry is very large, with about 55,000 total registrants, of whom about 45,000 are Michigan residents. Of that number, about 35,000 are active registrants and about 10,000 are incarcerated registrants. Over 70 percent of Michigan registrants are classified as Tier III, and therefore subject to lifetime registration.

13. Almost three-quarters of Michigan registrants have offenses that pre-date the 2011 amendments to Michigan's Sex Offenders Registration Act (SORA) (most of which were retained in SORA 2021). That same group has been on the registry for at least ten years.

14. The total costs related to SORA administration, registration, reporting, and enforcement for the MSP and local law enforcement agencies are unknown, but are likely significant, given that approximately 35,000 active registrants must report regularly, and given that law enforcement has, at least in the past, regularly engaged in sweeps to monitor registrants.

15. Although additional information would be needed in order to determine the full cost of Michigan's registry, it is reasonable to believe that the total annual cost is at least **$10 to $11 million** and may range as high as **$16 to $17 million** a year.

   a. As explained below, estimated annual incarceration costs for SORA compliance violations vary based on the data used. But these costs are at least **$7.6 million** and may exceed **$14.3 million**. This does not include incarceration costs for people whose probation or parole was revoked for both SORA compliance violations and technical violations that may not have resulted in revocation but for the *mandatory* nature of the SORA revocations.

   b. The state spends **$2 million** a year for the SOR unit, and an unknown sum on the SOR enforcement unit and state police involvement in enforcement.

   c. There is **substantially more** in costs associated with the administration, registration, investigation, and enforcement of SORA at the local level, as well as with the prosecution of registry violations, including litigation,

court, and probation costs. Most of those costs are not included here, for lack of data.

16. Data from 1998 to 2012 show that there were **14,884** prosecutions for SORA violations over that 15-year period, averaging just under **1,000** per year. Data from 2010 to 2019 show an average of about **880** prosecutions per year (though this data set appears to under-report misdemeanor cases). These prosecutions impose significant but unknown costs on prosecutors' offices, appointed defense counsel, and courts.

17. The **$7.6 million** a year estimate for incarcerating people for SORA-related convictions includes an average of about **$5,454,500** annually to incarcerate people in MDOC prisons, based on the number of people committed to the MDOC each year. Using the number of people serving sentences for SORA violations in any given year, *as Defendants do*, MDOC figures yield an average annual cost of **$12,100,000**. Either way, an additional average of about **$2,151,000** is spent annually to incarcerate people in county jails. And these figures do not include the costs for parole and probation supervision, or the *total* cost of incarcerating people on automatic parole and probation revocations that, as noted, are *mandatory* for SORA compliance violations.

18. The Michigan State Police has, at considerable expense, coordinated sweeps to identify non-compliant registrants. The efficacy of these sweeps is questionable. In 43 sweeps conducted from 2016-2019 by 534 personnel from MSP and 25 other agencies, more than 6,000 registrants were contacted but only 405, or 6.7%, were found to be noncompliant.

## SORA and the Systemic Animus Towards People Convicted of Sex Offenses

19. The Sex Offender Registration Act was passed in 1994 and became effective on Oct. 1, 1995. This places it in the midst of the "tough on crime" movement of the 1990s. Believing that harsh responses were necessary to address a spike in assaultive offenses, the Michigan Legislature passed a spate of criminal justice initiatives. These included:

- replacing the civil service parole board members with political appointees who had a mandate to reduce the number of paroles granted;
- enacting mandatory sentencing guidelines;
- enacting "truth-in-sentencing" provisions that eliminated disciplinary credits for good conduct while in prison;
- enacting mandatory parole guidelines;

- establishing the automatic waiver to adult court of juveniles charged with the most serious felonies, with no individualized review of the individual child's conduct and background.

20. Many of these changes had an intentionally disproportionate impact on people convicted of sex offenses. For instance, the new (1990s) parole board not only increased parole denials to assaultive offenders generally, it was especially harsh on sex offenders. In a report issued in 1997, the MDOC bragged that it had reduced decisions to grant parole from 66.1% to 55.7% and that the number of prisoners serving beyond their minimum sentences had effectively doubled from 5,992 in Dec. 1991 to 11,855 in July 1997. The report continued: "The new board is also making more sex offenders serve longer past the minimum sentence imposed by the court. Since the overhaul, the sex offender population has grown rapidly – reaching record levels, both in terms of raw numbers and as a percentage of the population, almost every year."[2]

21. The new Michigan Sentencing Guidelines produced harsher minimum sentences for assaultive offenders in general than for non-assaultive offenders, but the offense variable scoring was designed especially to maximize the number of points awarded for sex offenses. The effect was to push people with sex offenses into higher cells on the sentencing grid, resulting in longer recommended sentences.[3]

---

[2] Michigan Department of Corrections, *Five Years After: An Analysis of the Michigan Parole Board since 1992* (Lansing, September 1997), pg. 4. An MDOC graph comparing parole approval rates by offense type from 1990-2013 shows that sex offenders consistently had far lower approval rates than any other group, including other assaultive offenders. At the lowest point (in 2002) the rate was 10.2% for sex offenders, 35.1% for other assaultive offenders, 61.0% for other non-violent offenders, and 73.1% for drug offenders. *See* Barbara Levine, *10,000 fewer Michigan prisoners: Strategies to reach the goal* (Citizens Alliance on Prisons and Public Spending, June 2015), pg 43. This reflected the pervasive but now discredited belief that all people who committed sex offenses were incorrigible, had very high recidivism rates, and remained dangerous to society forever.

[3] See discussion of Offense Variables 10, 11 and 13 in Barbara Levine, Mahar, A., and Smith, J. in *Do Michigan's Sentencing Guidelines Meet the Legislature's Goals? A Historical and Empirical Analysis of Prison Terms for Life-Maximum Offenses* (Safe and Just Michigan, Nov. 2021), pp. 69-71.

22. The Michigan Parole Guidelines, too, targeted sex offenders, reducing parole grant rates for them. Depending on the number of points awarded, all prisoners are categorized as having a high, average, or low probability of release. Those with high probability scores are supposed to be paroled unless there are substantial and compelling reasons to deny release. For all prisoners, the "Active Sentence" section of the Parole Guidelines awards from one to three negative points for various aspects of the offense, such as the number of victims, use of a weapon, value of property stolen, or injuries caused. But an *extra* negative point is awarded for sex offenses.

23. In addition, in the "Mental Health" section of the Gidelines, either four or five negative points are added if the prisoner was convicted of a CSC offense. Moreover, prisoners who score average probability of parole can have their scores adjusted to reach the high probability range – but for some specific exclusions, one of which is *prisoners convicted of a sex offense*.[4]

24. All of these harsh steps aimed specifically at sex offenders were based on the false assumption that they posed an especially high risk of repeating their offenses. This is the same false assumption that was embodied in the declaration of legislative intent added to the Sex Offender Registration Act in 2002[5] (and retained today).

25. During my years at the Citizens Alliance on Prisons and Public Spending, I prepared research reports based on data obtained from the MDOC that refuted this assumption. The research demonstrated that the animosity displayed by legislators and other public officials towards people with past sex offenses had no basis in evidence and imposed high costs on those individuals, their families, and taxpayers without any apparent benefit.

---

[4] Michigan Department of Corrections Policy Directive (PD) 06.05.100A.

[5] Specifically, the SORA declaration states: "The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger." MCL 28.721a.

a. A 2003 CAPPS report examined nearly 77,000 cases of Michigan prisoners released from 1986-1999 to determine whether denying parole to people who had served their minimum sentences improved recidivism rates.[6]

- We found that 61.4% of all released prisoners were paroled when first eligible; 91% were released within two years of first eligibility. Among sex offenders, only 32.6% were released when first eligible; fewer than 74% were released within two years.
- At less than eight percent, homicide and sex offenders had the lowest rates of return to prison for any new offense. **Of 6,673 sex offenders, only 3.1% were returned to prison for a new sex offense**.
- Compared to the old civil service board, the new appointed parole board increased the average length of stay in prison for sex offenders by 16 months.
- There was no relationship between success upon release and length of time served.
- The effect of keeping people incarcerated for additional years was minimal, especially when compared to the cost. **In the sex offense group, 3,807 of 3,998 people who were kept up to four years past their earliest release date, or 95.2%, were not returned to prison within four years for any new crime against a person.**

b. In 2009 then-Governor Jennifer Granholm, in order to contain prison costs, expanded the parole board and directed it to review thousands of prisoners who had served their minimum sentences but had their incarceration "continued." Many of these were homicide offenders and people with sex offenses who scored high probability of release on the parole guidelines. Granholm's decision was strongly denounced, with some in law enforcement predicting dire consequences. We examined recidivism rates three years after their release.[7]

- **Of more than 4,100 people paroled on a sex offense during the 39 months under review, only 32 – less than 1% – returned with a sentence for a new CSC offense.**

---

[6] Barbara Levine, *Denying parole at first eligibility: How much public safety does it actually buy?* (Citizens Alliance on Prisons and Public Spending, August 2009).

[7] Barbara Levine and Kettunen, E., *Paroling people who committed serious crimes: What is the actual risk?* (Citizens Alliance on Prisons and Public Spending, December 1, 2014).

- Nearly 34% of the sex offenders had been continued four or more times. There was no relationship between the number of continuances and re-offense rates.
- For other crimes against people, there was a correlation between parole guideline scores and the number of continuances. That is, people with high probability scores (meaning lower risk) were *less likely to be repeatedly continued* than people with average scores (meaning higher risk). But for the sex offense group that was not true – those with both high and average scores were continued at similar rates. For instance, 14.9% of those scoring high *and* those scoring average were continued three times. And 35.5% of those with high scores and 32.2% of those with average scores were continued at least four times. That is, whether their scores on the MDOC's own release guidelines were high or average, half of the sex offenders were continued at least three times, and often many more.

26. Both sentencing and parole have safety valves that allow justice to be served in individual cases. With sentencing, judges have broad discretion to tailor penalties to fit individual culpability. They can consider the facts of the offense and the defendant's background and, where leniency is warranted, they can select a sentence at the low end of the guidelines range or depart below the range. Although downward departures are less common in sex offenses, analysis of 1,225 sentences for first-degree CSC imposed between 2003 and 2012 on people not prosecuted as habitual offenders showed that 23.3% were below the low end of the applicable guidelines range.[8] Leniency can also be afforded by prosecutors through the process of plea negotiations.

27. In fact, judges and prosecutors can effectively avoid the harshness of legislative mandates so long as no one appeals. Our research on sentences in life-maximum offenses found that of 110 first-degree CSC cases in which the statute mandated a 25-year minimum sentence regardless of the guidelines recommendation, 80 (72%) were below the mandatory minimum. The median length of those 80 sentences was 10.8 years.[9]

---

[8] The downward departure rates for murder II, assault with intent to murder, and armed robbery were 32.3%, 38.6%, and 40.3%, respectively. *See* Levine, Mahar and Smith, note 3, *supra*, at pg. 79.

[9] *Id.* at pg. 91.

8

28. With parole, the parole board has the discretion to tailor release to individual assessments of recidivism risk. While the board cannot release a prisoner before the judicially imposed minimum sentence, it can review each individual's institutional conduct, scores on sex offender risk assessment instruments, psychological evaluations and participation in treatment programs in deciding whether to continue the person's incarceration. In recent years the board has relied much more heavily on these evidence-based techniques to make individualized decisions about paroling people with sex offenses.

29. In contrast, the sex offender registry has no safety valve. There is no individualized assessment of risk. There is no consideration of the facts of the offense, the registrant's culpability, or the registrant's current circumstances. No one – not a judge or the parole board or anyone in law enforcement – has the discretion to remove a Tier II or Tier III registrant or to keep that person from spending decades, or his or her entire life, on the registry, with all the reporting requirements, subjection to enforcement efforts, loss of employment and housing opportunities, and public shaming that the registry entails. While the research has grown exponentially, treatment programs have become increasingly effective, and public attitudes toward second chances have softened, the sex offender registry stays rooted in the blanket animosity toward sex offenders that fueled its creation more than 25 years ago. SORA remains in effect because there has been no objective evaluation of its costs, its benefits, or the moldy foundation on which it stands.

## Michigan's Sex Offender Registry: Basic Data

30. It is my understanding that Plaintiffs have obtained non-public data from the Michigan State Police that will be analyzed by another expert. The figures derived from that data are likely to be more up-to-date and accurate than the numbers I was able to calculate. The data below is based on information reported by the state in *Does I* and *Does II*, and in response to a Freedom of Information Act request in 2022.

31. Michigan's registry includes:

   a. Non-incarcerated active registrants who are state residents,
   b. Incarcerated registrants, and
   c. Inactive nonresidents—people who previously resided or worked in Michigan and were subject to registration, but who are not presently living or working in the state.

32. According to filings in *Does II*, on September 2, 2021, there were a total of **55,308** registrants, comprised as follows:

   - **35,049** active non-incarcerated registrants (63.4%);
   - **10,627** incarcerated registrants (19.2%);
   - **9,632** inactive nonresident registrants (17.4%).

   The combined total number of active non-incarcerated registrants and incarcerated registrants was **45,676**. *See Does II*, Parties' Joint and Separate Statements Regarding Outstanding Issues, R. 127, PageID.2589 (Sept. 2, 2021).

33. According to information provided by the MSP SOR Unit on January 14, 2022, in response to a public records (FOIA) request:

   a. There were 53,451 people on Michigan's registry. (It is unclear why this number would be almost 2,000 less than the total reported a few months earlier to the court in *Does II*.) [These figures do not differentiate registrants who are active, incarcerated, or inactive.]

   b. The number of registrants in each tier was:

      1) Tier 1 –   3,464 (6.5%)
      2) Tier 2 – 10,798 (20.2%)
      3) Tier 3 – 39,030 (73%)
      4) Other Special Conditions – 27
      5) No Risk Classification Yet – 132

   c. Although offense dates were not available for all registrants, 39,131 were convicted before July 1, 2011, meaning that their offenses were necessarily before that date. There were an additional 2,839 registrants with an offense date before July 1, 2011, and a conviction date after July 1, 2011. Thus, a total of **41,970** (78.5% of the total) have an offense date before July 1, 2011. The July 1, 2011, date has legal significance because it is the effective date of the extensive 2011 SORA amendments, which the Sixth Circuit in *Does I* said could not be retroactively applied to registrants whose offense pre-dates that date. This data also shows that for more than three-quarters of registrants, their offenses occurred at least a decade ago.

**Costs of Basic Registry Operations**

34. The basic operation of the registry—collecting, entering, and publishing information from all registration and reporting; training staff; procuring and maintaining hardware and software; employing outside contractors; and monitoring registrants for compliance—imposes costs at both the state and local levels.

35. The MSP SOR Unit is responsible for maintaining the registry and the registry website. The SOR Unit has a gross annual budget of approximately $2 million.[10] It has income from three sources: the Sex Offender Registration Fund (which derives from annual charges to registrants), federal grants awarded by the Department of Justice under the Adam Walsh Act (AWA), and state general fund appropriations.

   a. Figures provided in *Does III* discovery show that the SOR Fund averages $879,646.69 annually, making the SOR Unit's share $527,788.[11]

   b. According to the federal Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering and Tracking (SMART), Michigan received an AWA grant in every year except two from 2010-2022. The amounts for recent grants were:

        i. 2019 -- $398,976
       ii. 2020 -- $398,712
      iii. 2021 -- $399,865
       iv. 2022 -- $366,465.[12]

36. Part One of the organizational chart provided by Defendants in discovery indicates that the SOR Unit has 11 positions. These include one manager, six

---

[10] Information provided by Defendants is that the SOR Unit's budget was $2.2 million for FY 21, $1.99 million for FY 22 and $1.99 million for FY 23.

[11] Registrants who are not indigent are charged a $50 annual fee. M.C.L. § 28.725a(6), of which $30 goes to the MSP and $20 goes to local law enforcement M.C.L. § 28.725b(1).

[12] https://www.smart.ojp.gov/funding/awards/list?field_award_status_value=All &state=MI&field_funding_type_value=All&fiscal_year=&combine_awards=&aw ardee=State+Police&city=#awards-awards-list-block-gkgdpm1ooymuyukj.

analysts and four technicians. This unit is part of the MSP Criminal Justice Information Center. *See* Appendix B, MSP SOR Organizational Charts.

37. Part Two of the organizational chart indicates that a separate SOR Enforcement Unit exists within the Special Operations Division. *Id.*

   a. The SOR Enforcement Unit has four positions for sworn officers, a sergeant and three Level 11 troopers. But all the trooper positions are currently vacant. *See id.* From Procedure Manual 07-14, entitled "Sex Offender Registry: Registration and Enforcement," provided in discovery, it appears that a primary purpose of this unit is to plan, coordinate, and oversee the sweeps discussed below.

   b. The $2 million budget for the SOR Unit does not include the costs of the SOR Enforcement Unit. Plaintiffs' counsel informed me that they have requested, but have not yet received, the budget for the SOR Enforcement Unit.

38. Non-incarcerated registrants report to a local registering authority (local police department, sheriff's department, or MSP post). M.C.L. § 28.722 (m). Depending on their tier level, such registrants must report in person one, two, or four times a year. M.C.L. § 28.725a(3). All registrants must also report changes in required information within specified deadlines, usually within three business days, and often in person. *See, e.g.*, M.C.L. § 28.725.

39. In Michigan, the state has—to my knowledge—conducted no studies to determine the cost to local authorities of handling SORA registration and reporting. Notably the User Guide, Vol 1, which was provided in discovery, contains 79 pages of material with which the personnel of registering authorities must be familiar to perform their duties. Defendants also provided a training video for the system, with the training session lasting almost two hours, since users must learn how to input the large amount of information registrants must report under SORA. Given that there are roughly 35,000 active non-incarcerated registrants who must report, that most will be reporting at least four times a year, and that this will involve personnel at hundreds of county sheriff, municipal police, and township police departments, the costs to local registering authorities across the state are likely significant. It is unknown to what extent these costs are covered by the $351,800 (40 percent) share of the SOR fund allocated for distribution to local law enforcement.

40. For incarcerated registrants, the MDOC and county jails are responsible for SOR-related reporting and administration. *See, e.g.,* M.C.L. §§ 28.724(4), 28.725(4)-(6), 28.725a(2). The staffing and other costs to the MDOC, as well as to sheriffs' departments operating county jails, for such reporting have likewise, to my knowledge, never been calculated by the state, and are unknown.

## Statewide Law Enforcement Sweeps

41. As part of SORA monitoring, in the past the MSP coordinated with local law enforcement on periodic statewide sweeps of addresses at which active registrants were supposed to be residing. *See* Table 1.[13] The information available to me shows that seven such sweeps were conducted between 2008 and 2012. Information about two of them is lacking, but the remaining five sweeps show an average <u>for each sweep</u> as follows:

    a. 2,180 residences checked,
    b. 144 people arrested,
    c. 329 warrants issued,
    d. 99 federal, state and local law enforcement agencies were involved.

42. From the available data, we do not know how many personnel from each law enforcement agency participated; for what violations the arrests were made; how many of the arrests resulted in a conviction; what proportion of all annual SORA convictions resulted from such sweeps; or what the total costs were. But given the number of residences targeted in each sweep, the resources involved were likely to have been significant.

43. Documents provided in *Does III* discovery contain more information about the conduct of sweeps. These include a spreadsheet displaying sweeps coordinated by the Michigan State Police from Jan. 1, 2016 – Dec. 31, 2022, and a form entitled "Sex Offender Sweep Findings" which is completed by officers upon contacting each individual offender during a sweep.

44. During the 2008 – 2012 period summarized in Table 1, annual sweeps were conducted statewide over a single period of 12-15 days. In the four years from 2016-2019, summarized in Table 1a, it appears that the strategy changed so

---

[13] This information appears in *Does I*, No. 2:12-cv-11194 (E.D. Mich.), Defs.' Resps. to Pls.' First Set of Interrogs. and Reqs. for Production of Documents (on file with author).

that multiple smaller sweeps were conducted at various times and locations throughout the course of a year. Thus, there were 19 discrete sweeps in 2016, 6 in 2017, 13 in 2018 and 5 in 2019.[14] (No sweeps were conducted in 2020, 2021 or 2022, presumably due to Covid-19.) While the total number of affected registrants declined, the four-year average was still 1,516 registrants contacted per year.

45. The more recent spreadsheet contains previously unavailable information on the location of sweeps, participating law enforcement agencies, the number of law enforcement personnel involved, and the number of registrants found to be noncompliant. For the four-year period (2016-2019), the rounded averages per year are:

    a.  11 sweeps conducted,
    b.  15 days spent,
    c.   7 agencies involved other than MSP,
    d.  134 law enforcement personnel participating,
    e.  1,516 registrants contacted,
    f.  101 (6.7%) registrants found to be noncompliant,
    g.  7 (0.5%) registrants arrested,
    h.  94 (6.2%) warrants submitted.

46. The purpose of sweeps is to identify registrants who have not complied with some rule of the registration scheme, such as failures to appear in person for a routine verification, to report a change in address or telephone number or e-mail address, or to pay a fee.[15] For those found to be noncompliant, the data

---

[14] Five sweeps conducted in Sept. 2016 were not counted. They were all labeled "Operating Enduring Justice Arrest Sweep (Various locations in Metro Detroit Area)" and were conducted with the U.S. Marshal Service, the Detroit Fugitive Apprehension Team, and the Michigan Department of Corrections Absconder Recovery Unit.  These sweeps netted 35 arrests, but all show zero for the number of registrants to be contacted and, consequently, zero instances of noncompliance. These appear to be instances where the MSP SOR enforcement unit participated with other agencies in making arrests unrelated to registry enforcement.

[15] The purpose of sweeps is not to identify people who have failed to register in the first place. That is, law enforcement is not sweeping the general public at random looking for people who were supposed to register but did not.  Most people convict-ed of sex offenses are initially registered by probation officers, parole officers, or

available to me does not indicate which specific rules were broken or the extent to which warrants submitted were for misdemeanors as opposed to felonies.

47. It is not possible to conduct a cost-benefit analysis of these sweeps for two reasons.

   a. Complete data is not available about the costs, which would include not only the hourly rates for and the number of hours spent by all participating officers, but also the time spent by all agencies involved in planning and coordinating the sweeps, and incidental expenses such as vehicle usage and overnight hotel stays.

   b. There is no data to indicate what benefit to the public exists from enforcing compliance with the registry.

48. The very low overall rate of noncompliance found during sweeps indicates that the financial cost per incidence of noncompliance is high. Some examples are particularly dramatic. For instance:

   • On June 6, 2016, 12 officers from the Michigan State Police, the U.S. Marshal Service and the Detroit Fugitive Apprehension Team contacted 102 registrants in Taylor. They found two who were noncompliant.

   • On August 12, 2016, ten officers from the Michigan State Police, the Detroit Fugitive Apprehension Team, the Macomb County Probation Office, and the St. Clair Shores Police Department contacted 113 registrants in St. Clair Shores. They found one to be noncompliant.

   • On May 5 and June 4, 2018, 36 officers from the Michigan State Police, St. Clair County Sheriff's Office and the Port Huron Police Department contacted 659 registrants in St. Clair County and found 19 were noncompliant.

   • On Oct. 22 and 23, 2018, 24 members of the Michigan State Police contacted 394 registrants in Kalamazoo and found 11 were noncompliant.

   • Over a period of four days in July 2019, 12 members of the Michigan State Police conducted "Operation High Five" in Detroit. They contacted 220

the Michigan Department of Corrections. People coming into Michigan with out-of-state convictions bear the burden of registering themselves initially.

registrants, apparently because of missing palmprints, but did not indicate that anyone was noncompliant.

- Six other smaller sweeps at various locations each produced either 0 or 1 registrant who was noncompliant.

- The largest numbers of noncompliant registrants found in a single sweep were 40 out of 378 registrants contacted by 29 officers in Berrien County in April 2018 and 39 out of 290 registrants contacted by 12 officers in Detroit in August 2018.

49. Overall, in four years, 534 law enforcement personnel contacted 6,063 registrants during 43 sweeps and found 405 (6.7%) had failed to comply with some regulation of the Sex Offender Registry. Without knowing all the costs involved in each sweep, it is impossible to calculate the cost of identifying each instance of noncompliance. The information that is available, however, suggests the "per instance" cost is high.

50. The starting salary for a Michigan State Police Trooper (Level 10) is $55,230 a year or $26.45 per hour. Fringe benefits add $67,250 for a total cost of $122,480 per year or $58.88 per hour. For a second-year trooper (Level 11), the annual salary is $65,040 or $31.15 per hour. With fringe benefits of $76,589, the total cost increases to $141,629 or $68.09 per hour. After four years, the base salary at Level 11 increases to $78,860 or $37.77 per hour. The cost of retirement benefits increases accordingly. These figures do not account for shift premiums, overtime, more experienced personnel or ancillary expenses.[16]

51. Assuming the average trooper participating in a sweep is in his or her first year at Level 11, the cost to have a single trooper spend eight hours on a SOR sweep would be $544.72. The cost for 12 troopers would be $6,536.64. Thus, for example, in the Ypsilanti sweep that was conducted on July 30, 2018, using only 12 MSP personnel, where 9 of 181 registrants contacted were found to be noncompliant, the base cost of discovering each instance of noncompliance would begin at $726.29 and grow from there.

---

[16] The fringe benefits look high, but this salary and fringe benefit information was provided to me by the Michigan House Fiscal Agency on Feb. 16, 2023.. E-mail message is on file with the author.

52. Salaries and fringe benefits for troopers are rolled into a single salary line in the MSP Budget. There is no separate line item in the SOR Unit budget for troopers who participate in sweeps, nor have I received any separate budget for the SOR Enforcement Unit. It appears that the base costs for these troopers are absorbed by the overall MSP budget without being identified as a SOR expense. Thus, the cost of the SOR Enforcement Unit and of the sweeps are substantial expenditures beyond the $2 million reflected in the SOR Unit budget.[17]

53. It is important to note that the calculations above do not account for local enforcement activity where the Michigan State Police was not involved. For instance, the calculations do not account for residence checks. According to data produced in *Does III*, over 81,000 residence checks have been reported in the MSOR database.[18] Of these, 79,803 were entered in the original database, which did not record residence checks by county. Additional checks were recorded in the current database, which I have been informed became operational on August 26, 2021. While it is unclear how far back the residence check data in the old system goes, the annual average for residence checks in the new system is 1,034. It is unclear whether or how the number of residence checks has been impacted by the pandemic. It is also unclear—particularly given the large number of law enforcement agencies that are involved in conducting checks—what percentage of residence checks that are conducted are actually entered into the database.

54. It appears that the volume of residence checks varies greatly by county. The current database shows that 38 of Michigan's 83 counties reported making checks. It is unknown whether the remaining 45 counties did not make checks or made but did not report them. Among those reporting, the number of checks varies greatly without a clear relationship to county size. For instance, 18 counties, including Kalamazoo, Jackson, Muskegon, and Saginaw had only one or two checks. Wayne (137), Oakland (133) and the much smaller Ingham County (134) had virtually identical numbers, while Ottawa County had 188. Kent reported by far the greatest number of residence checks at 373. The

---

[17] Reporting for the 2021 Adam Walsh Act grant provided in discovery indicates that funding was requested in Year 1 to cover overtime expenses for the Enforcement Unit Sergeant and 16 troopers in the amounts of $32,547 for salaries and $27,172 for fringe benefits. An additional $4,032 was requested for lodging and meals.

[18] Defs. Am. Resp. to Pls' 1st Interrogatories (Feb. 2, 2023), #1.h (on file with author).

accuracy of the data is questionable since the list includes counties called Michigan, Sebastian, None and Unknown while Berrien appears twice. It is quite possible that the number of residence checks reported may be a significant undercount of the actual number that occurred.

**Prosecutions for Registry Violations**

55. Michigan's SORA creates penalties for noncompliance with registry requirements. These range from a maximum of 90 days in jail for failing to pay the registration fee to a maximum of 10 years in prison for failing to register, third offense. M.C.L. § 28.729.

56. Table 2 shows the number of dispositions for SORA violations statewide for each year from 2010-2019.[19] The 10-year total was **8,812** dispositions, for an annual average of **881** dispositions. The data in Table 2 comes from MDOC annual reports.

57. I also reviewed data from *Does I* provided in 2013 in response to Plaintiffs' First Request for Production of Documents, Request 2c. That document (on file with me) contained a table for every county showing the number of people convicted of a SORA violation from 1998 to 2013 (partial year).[20] A somewhat condensed form of the data from *Does I* is attached as Table 3. The convictions were sorted among multiple statutory provisions. Dropping the partial year data, the total number of convictions over the 15 years (1998 to 2012) was **14,884**, for an average annual number of "dispositions" of just under **1,000** per year.[21]

---

[19] This information is drawn from the annual MDOC Statistical Report, Table A2, Criminal Court Dispositions by Offense and Type of Disposition – Non-Assaultive Offenses, for each of the enumerated years. Figures in my Table 2 are rounded, and "attempts" are combined with completed offenses. Some defendants may have had multiple dispositions. I used 2019 as the last year to avoid artificial skews in the data caused by the Covid-19 pandemic.

[20] The table goes back to 1994, but for the first four years, as SORA was being implemented and the registry gradually populated, very few registrants were prosecuted.

[21] The somewhat lower numbers in the MDOC data set are attributable to the fact that many misdemeanors may not get reported to the MDOC, as shown in Table 3a, attached. Accordingly, cost estimates and other observations based on the MDOC data should be viewed as conservative (that is, understated).

58. Although no cost studies have been done, each of the 880 to 1,000 such "dispositions" (depending on the data set used) is the product of a court case that must be investigated by police, reviewed and charged by a prosecutor, defended by defense counsel (often at public expense), litigated until pled out or tried—followed by a presentence report, sentencing, and possible appeal. The cost of processing such SORA enforcement cases per year is unknown, but presumably is significant.

59. In *Does III* discovery, Defendants provided a series of Excel spreadsheets that show the number of offenders serving sentences for various SORA violations for the years 2017-2021.[22] This data differed from the disposition data in my Table 2 in several important ways.

- Defendants' figures count people, some of whom had multiple dispositions. One would expect the number of people to be less than the number of dispositions.

- Defendants' figures describe the person's status in the year being analyzed, e.g., in prison, in jail, on probation, as opposed to the sentence imposed in the year of disposition. Depending on the length of the sentence and when during the year the sentence was imposed, an individual with a single disposition could serve his or her sentence across two or even three years.  For instance, a 2-year term of probation imposed in July 2017 would extend through July 2019, meaning the person would be counted as someone serving probation in 2017, 2018 and 2019. On the other hand, since jail sentences tend to average between two and four months, the number of people in jail in a given year could be much smaller than the number of dispositions if the count is taken only at a specific point in time, such as on December 31st.

- Some people who were sentenced to probation could have subsequently been incarcerated as probation violators.

Despite these differences, the totals for dispositions and for numbers of offenders in the years 2017, 2018 and 2019 are remarkably similar.[23]

---

[22] Defs' Resp. to Plf's 1st Req. for Production, #4.

[23] These totals do not include incarcerated probation or parole violators.

| Year | Total Dispositions | Total Offenders |
|------|--------------------|-----------------|
| 2017 | 959 | 906 |
| 2018 | 661 | 638 |
| 2019 | 646 | 601 |

That is, whether one counts dispositions or offenders, the number of cases that must be processed by the courts is much the same.

## Incarceration Costs

60. The costs of SORA described above do not include the cost of punishment. Although fewer than 3% of active non-incarcerated registrants are convicted of SORA violations each year, the price of incarcerating them can be calculated for prisons based on state-supplied data and can be estimated for jails based on known cost evaluations from other sources.

61. **Prisons:** Table 4 shows that a total of **409** people were committed to the MDOC for SORA-related convictions for the period from 2015-2019, for an average annual rate of **82** commitments per year. Table 4 also shows the average minimum sentence imposed for each type of violation.[24] I have also included the actual average cost of incarceration per prisoner (reported by the MDOC annually) for each of those five years (which ranges from an equivalent daily cost of about $96 per day in 2015 to $108 per day in 2019).

62. When the number of commitments is multiplied by the average minimum sentence and the annual cost per prisoner, the total cost to keep SORA violators in prison for the five-year period was about **$26,885,000.** Dividing by five, the *average annual cost* was about **$5,377,000** a year.[25] The added cost for parole supervision of people with SORA-related convictions is unknown.

---

[24] This information is drawn from Table B2a, Commitments by Minimum Term Distribution—Non-Assaultive Offenses, in the annual MDOC Statistical Report for each of the enumerated years. Links to the MDOC annual reports can be found at https://www.michigan.gov/corrections/0,4551,7-119-1441---,00.html.

[25] This, too, is a conservative base cost because an unknown number of people may have served an unknown amount of time beyond their minimum sentences.

63. The Excel spreadsheets described above in Paragraph 59 include one that shows for 2017, 2018, and 2019, respectively, the number of people in prison for each of five statutory SORA violations and their minimum sentences. These figures would necessarily differ from the commitment figures in Table 4 as those include everyone serving a sentence regardless of when their incarceration began.

- One would expect that the number of people serving for an offense in any given year would be greater than the number committed for that offense in the same year. That was generally but not always the case.

- Notably, in almost every instance, the average minimum sentence reported for those serving was shorter than the MDOC had reported for commitments.

- Applying the annual cost per person that appears in Table 4 to Defendants' figures yields an average annual incarceration cost for those three years of $**3,365,353**.

The basis for Defendants' figures is unclear. When compared to published MDOC statistics for the prisoner population, the published data shows substantially more and longer sentences.[26] For example:

- For those convicted of violating MCL 28.729, for 2017 Defendants' spreadsheet shows 44 offenders serving an average minimum sentence of 1 year and 3 months while the MDOC Annual Report shows 82 prisoners with an average minimum sentence of 1.8 years.

- For convictions of the same statute, for 2018 Defendants' spreadsheet shows 38 offenders serving an average minimum sentence of 1 year and 4 months while the MDOC reported 59 prisoners with an average minimum sentence of 5.7 years.

- Similarly, for 2019 Defendants show 37 offenders serving an average minimum of 1 year and 4 months while the MDOC reported 52 prisoners with an average minimum sentence of 3.8 years.

---

[26] These statistics appear in Table C1a, Prisoner Population by Minimum Term Distribution – Non-Assaultive Offenses, of the 2017, 2018 and 2019 Michigan Department of Corrections Statistical Reports.

- When I recalculate the costs based on the number of people serving in each year as opposed to the number of people committed in that year (using the MDOC tables cited above in footnote 26), the costs more than double. Multiplying the total number of people serving for each SORA violation by the average minimum sentence for that type of violation, yields the following rough calculations of the least amount of time all the people in prison for SORA convictions were serving in a given year. [27] When the number of people serving is multiplied by the average minimum sentence and the result is multiplied by the MDOC's average annual cost prisoner (which appears in Table 4) we get a rough estimate of the cost of incarcerating all the people serving sentences solely for SORA violations.

| Year | Total Number of People Serving for Any SORA Violation | Average Minimum Sentence for All SORA Offenses | Total Cost for Incarcerating SORA Violators |
|------|------|------|------|
| 2015 | 197 | 1.8 | $12,404,617 |
| 2016 | 152 | 1.8 | 9,618,955 |
| 2017 | 138 | 1.9 | 9,466,993 |
| 2018 | 112 | 4.0 | 17,046,848 |
| 2019 | 98 | 3.1 | 11,966,985 |
|      | 139 |     | **$12,100,879** |

64. It is apparent that the commitment data, which addresses the cost of each individual's minimum sentence over time, produces a much more conservative estimate than the prisoner population data, which counts all the individuals serving in a given year regardless of when they were committed to the MDOC. That is depending on which basis for calculation one chooses, the cost of imprisonment for SORA violations may be as low as **$5,377,000** annually or as high as **$12,100,800**. While either method is justifiable, both rest on published MDOC statistics from the same annual reports.

---

[27] This method of calculation, which involves multiplying averages, is not mathematically precise, but the results are reasonably accurate. The much longer average minimums in 2018 and 2019 are skewed by a handful of people serving very long minimums, presumably as the result of habitual offender sentencing.

65. **Jails:** Table 5 shows dispositions to county jails, with and without probation, for SORA-related convictions for each year from 2015-2019. Table 5 shows that, according to MDOC figures, a total of **3,084** people were committed to county jails for SORA-related convictions for the period from 2015-2019, for an average annual rate of **617** commitments per year. Because there is no data publicly available regarding the actual sentences imposed (or the actual time served) for each offense, I used the following averages:

- Jail for felony – six months
- Jail + probation for felony – four months
- Jail for misdemeanor – one month
- Jail + probation for misdemeanor – two months.[28]

66. The cost of jail sentences is borne by and varies by county. Calculating an exact overall annual expenditure for SORA-related jail sentences is not possible. To achieve a credible estimate, I used a conservative figure of $62 per day.[29] When the number of dispositions is multiplied by the average sentence and the estimated daily cost, it results in a five-year (2015 to 2019) estimated total cost of **$29,360,000** which works out to an average *annual cost* of about **$5,877,000**.

67. The Excel spreadsheets described above in Paragraph 59 included one that shows for 2017, 2018, and 2019, respectively, the number of people in jail for each of five statutory SORA violations and the amount of time they served.

---

[28] These averages were drawn from Michigan Joint Task Force on Jail and Pretrial Incarceration, Report and Recommendation (Jan. 10, 2020), p. 14.

[29] The $62 figure was drawn from Hornby Zeller Associates, Inc., *The Cost of Raising the Age of Juvenile Justice in Michigan*, Final Report (March 14, 2018), at 25, https://council.legislature.mi.gov/Content/Files/cjpc/MIRaisetheAgeFinalRepo rt03.14.2018.pdf. This figure is corroborated by a 2017 presentation to the Michigan Criminal Justice Policy Commission, which said: "The average cost of a jail bed nationally is about $60.00, it varies across the state of Michigan." *See* Barbara Hankey and Tim Bouwhuis, *Reforming Pretrial Justice in Michigan*, CJPC minutes (Mar. 1, 2017) p.12 slide 11, https://council.legislature.mi.gov/Content/Files/cjpc/ Minutes.Final_CJPC_Mar%201%202017.pdf. In addition, M.C.L. § 801.83, which was enacted in 1984 and last amended in 1999, sets a maximum of $60 on the amount per day that counties can charge jail inmates. It is likely that per day costs have risen and that the current average is above $62, which is why I say the figure is conservative.

Defendants' figures, which combine people serving sentences of jail only and jail plus probation, show roughly half the number of people as the disposition figures I used. In addition, sentences for the most serious offenses were shorter. As a result, when the same average daily rate is applied to Defendants' jail data, the average annual cost is **$1,673,938**.

68. Note that the disposition data I used is based on court records of sentences imposed. They may include multiple sentences for some people. On the other hand, data about the number of people serving jail sentences is notoriously incomplete since all counties do not consistently and timely report to the state all categories of information. It is likely that the disposition data yielded an overestimate and that Defendants' data yielded an underestimate. Because my initial calculation of the jail costs for those convicted of SORA violations was based on my best estimates of the number of people serving and the amount of time they served, I have recalculated the jail costs to account for Defendants' specific figures of people and time served.

69. The additional supervision costs for the average annual 346 dispositions to probation shown in Table 2 are unknown. This figure combines people sentenced to "probation only" with people sentenced to "jail plus probation." For people sentenced solely to probation in 2017, 2018, and 2019, the disposition numbers are 111, 88, and 64 respectively, an average of 78 per year. The figures on Defendants' spreadsheet for people serving probation sentences in these three years are substantially higher. They are: 2017 – 490, 2018 – 347, 2019 – 306.

70. In addition to the cost of incarcerating people who are sentenced either to prison or to jail for SORA violations in the first instance, the statute also mandates incarceration for willful violations committed while a registrant is on parole or probation.[30]

71. Thus, parole is revoked and the individual is returned to prison regardless of whether any other parole violations have occurred, or whether the parole board, given discretion, would have revoked parole solely for the SORA

---

[30] M.C.L. § 28.729(7) ("The parole board shall rescind the parole of an individual released on parole who willfully violates this act."); M.C.L. § 28.729(5) ("The court shall revoke the probation of an individual placed on probation who willfully violates this act.").

infraction. The statute does not set any minimum prison time the parolee must serve before being re-paroled, and it is unclear how much the MDOC is spending on incarceration resulting from such automatic violations.

72. The spreadsheets provided by Defendants include one for parole violators that shows only two people whose paroles were revoked for SORA violations in 2018 and two more in 2019. They all appear to have served at least an additional year in prison. At $38,051 each, that would amount to $76,102 in 2018. At $39,391 each, that would amount to $78,782 in 2019. The two-year average would be **$77,442**. But Plaintiffs' figures include only people whose parole was revoked solely for a SORA violation.[31] SORA violations that were, for example, combined with a technical violation are not counted. It is unknown how many people had both SORA and other violations of parole conditions but whose paroles would not have been revoked but for the mandatory SORA revocation rule. Likewise, if probation is revoked, the defendant is sentenced to jail or prison for the offense for which probation was the original sentence.

73. Defendants' spreadsheets included a page for people whose probation was revoked solely for SORA violations. There were 96 individuals in 2017, 55 in 2018 and 82 in 2019. Their average jail terms for the various offenses ranged from 16 days to one year, with three months being most common.[32] They were not included among the people initially sentenced to jail as discussed above. Applying the jail per diem of $62, the incarceration cost for probation violators whose probation revocation was mandated by SORA was $510,632 in 2017, $357,678 in 2018 and $562,278 for a three-year average of **$476,863.**

74. Adding both the prison and jail costs *as I initially calculated them based on MDOC commitment data,* yields an annual sum of **$11,254,000** for incarcerating people convicted of SORA violations, not including people who were paroled beyond their minimum sentences, whose probation or paroles were

---

[31] MDOC's 2nd Supp. Resp. to Pls' 1st Req. for Production (on file with author).

[32] Three individuals are indicated as serving 14 months and four days in 2018 for violating MCL 28. 2791A. Since one year is the maximum amount of time that can be served in jail, it may be that one or more of these sentences were served in prison. But these appeared on the spreadsheet as "flat" sentences, without a minimum and a maximum. Given this uncertainty, I counted them as jail sentences.

revoked solely for SORA violations, or whose jail sentences may not have been reported to the MDOC.

75. The figures are different if one uses the data provided by Defendants in discovery. That data shows annual incarceration costs in prisons and jails for people with convictions, parole revocations, and probation revocations for SORA violations are at least **$5,593,596.** For the reasons discussed above, I continue to rely on published MDOC data for prison costs but reduced my calculations for jail costs based on the Defendants' figures. I also added newly provided figures for people incarcerated for SORA-based probation and parole revocations. This led to a revised total cost for incarceration of **$7,605,326** if one utilizes commitment statistics and **$14,329,122** if one utilizes prisoner population statistics.

76. The incarceration costs are in addition to:

- the $2 million MSP SOR Unit budget,

- unknown additional costs for the SOR Enforcement Unit and the sweeps embedded in the MSP overall budget,

- local law enforcement expenditures for maintaining the registry, administering registration and reporting, and monitoring/enforcement (such as sweeps and individual residence checks), and

- criminal justice system costs for prosecuting SORA violation charges, including, prosecution and defense, court costs, probation, and appeals).

- It is reasonable to believe that all the expenses associated with implementing and enforcing Michigan's SORA are at least **$10 to $11 million** and may range as high as **$16 to $17 million** annually.

## Statement of Compensation

I have provided this report pro bono.

26

**<u>Oath and Signature</u>**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

<u>s/ Barbara R. Levine P24207</u>

Dated: February 26, 2023          Barbara R. Levine, Esq.

An index of appendix and tables appears below.

## Index of Exhibits

**Appendix A**:  Articles Authored by Barbara R. Levine

**Appendix B:**  MSP SOR Organizational Charts

**Table 1**:   Statewide Sweeps for SORA Violators 2008-2012

**Table 1a:**  Sweeps for SORA Violations 2016-2019

**Table 2**:   Criminal Court Dispositions of SORA Violations by Offense
Type and Disposition – 2010-2019 (from the MDOC)

**Table 3**:   Number of Individuals Convicted of a SORA Violation by County.
1998-2012 (from discovery in *Does I*)

**Table 3a**:  Comparison of Data (from the MDOC versus *Does* I) on Convictions
for SORA Violations

**Table 4**:   Prisoners Committed to Prison for SORA-Related Convictions:
Number, Average Minimum Sentence, Cost – 2015-2019

**Table 5**:   Dispositions to County Jails for SORA-Related Convictions: Number,
Average Sentence Length, Cost (at $62/day) – 2015-2019

# Appendix A:

## Articles Authored by Barbara R. Levine

**Appendix A:**
**Publications by Barbara L. Levine from Citizens Alliance on Prisons**
**and Public Spending, and Safe and Just Michigan**

- *Do Michigan's Sentencing Guidelines Meet the Legislature's Goals? A Historical and Empirical Analysis of Prison Terms for Life-Maximum Offenses* (Nov. 2021) [Co-author]

- *10,000 fewer Michigan prisoners: Strategies to reach the goal* (June 2015)

- *Paroling people who committed serious crimes: What is the actual risk? (*Dec. [Co-author]

- *Corrections spending proposals reflect major policy choices:  Examining the consequences* (May 2014)

- *Parolable Lifers in Michigan: Paying the price of unchecked discretion* (Feb. 2014)

- *Michigan's Parolable Lifers: The Cost of a Broken Process (*June 2013)

- *Denying parole at first eligibility: How much public safety does it actually buy? A study of prisoner release and recidivism in Michigan* (Aug. 2009)

- *When "life" did not mean life: a historical analysis of life sentences imposed in Michigan since 1990* (Sept. 2006)

- *Foreign Nationals in Michigan Prisons: An examination of the costs* (Apr. 2006) [Editor]

- *Penny-wise & pound-foolish: Assaultive offender programming and Michigan's prison costs* (Apr. 2005) [Co-author]

- *No way out: Michigan's parole board redefines the meaning of "life"* (Sept. 2004)

- *The high cost of denying parole: an analysis of prisoners eligible for release* (Nov. 2003)

1

# Appendix B:

MSP SOR Organizational Charts

November 4, 2022



# CRIMINAL JUSTICE INFORMATION CENTER

MICHELLE KLECKLER
SENIOR POLICY EXECUTIVE 18
SHAWN SIBLE
STATE ADMINISTRATIVE MANAGER 16
ASHLEY ALVARDO
SENIOR EXEC. MGT. ASSIST. 11
KRISTIN FORESTER
DEPT. ANALYST TRAINEE 9

PART ONE

**INCIDENT SECTION**

**CRIME AND CRASH REPORTING SECTION**

**SEX OFFENDER REGISTRY UNIT**
NARCISA MORRIS
DEPT. MANAGER 14
KARIS MAYER
DEPT. ANALYST 12
SHARON JEGLA
DEPT. ANALYST 11
KARIS OLNEY
DEPT. ANALYST 11
VACANT
DEPT. ANALYST 11
JENELLE SCHKADE
DEPT. ANALYST 9
COURTNEY SEGAL
DEPT. ANALYST 9
LANA HADZAJLIC-KING
DEPT. TECH. 9
MATTHEW SCHNEIDER
DEPT. TECH. 9
KATRINA STEHLIK
DEPT. TECH. 8
MEAGHAN BILSKY
DEPT. TECH. 7

**e-APPLICATIONS UNIT**

**STATEWIDE RECORDS MANAGEMENT UNIT**

**QUALITY ASSURANCE UNIT**

**TRAFFIC CRASH REPORTING UNIT**

**MICR UNIT**

**FARS SUB-UNIT**



**PART 2**

**SPECIAL OPERATIONS DIVISION**
CAPTAIN
SENIOR POLICY EXEC. 18
ELYCE BABCOCK
SENIOR EXEC. MGMT. ASST. 11

TACTICAL SUPPORT & SERVICES SECTION
F/LT. 15

BOMB SQUAD UNIT
LT. 14

BRIDGEPORT
SPL/TPR. 11
SPL/TPR. 11

GRAND RAPIDS
SPL/SGT. 12
SPL/TPR. 11

GRAYLING
SPL/SGT. 12
SPL/SGT. 12

LANSING
SPL/SGT. 12
SPL/TPR. 11

NORTHVILLE
SPL/SGT. 12
SPL/SGT. 12

STERLING HEIGHTS
SPL/TPR. 11

EMERGENCY SUPPORT
SGT. 12
TPR. 11
**FIRST DISTRICT**
SGT. 12
TPR. 11
TPR. 11
TPR. 11
TPR. 11
TPR. 11
**SECOND DISTRICT**
SGT. 12
TPR. 11
TPR. 11
TPR. 11
TPR. 11
**THIRD DISTRICT**
SGT. 12
TPR. 11
TPR. 11
TPR. 11
TPR. 11
VACANT
TPR. 11
VACANT
TPR. 11

EMERGENCY SUPPORT
**FIFTH DISTRICT**
SGT. 12
TPR. 11
TPR. 11
TPR. 11
TPR. 11
**SIXTH DISTRICT**
SGT. 12
TPR. 11
TPR. 11
TPR. 11
TPR. 11
TPR. 11
TPR. 11

EMERGENCY SUPPORT
**SEVENTH DISTRICT**
SGT. 12
TPR. 11
TPR. 11
TPR. 11
TPR. 11
TPR. 11
**EIGHTH DISTRICT**
SGT. 12
TPR. 11
TPR. 11
TPR. 11
TPR. 11
VACANT
TPR. 11

MARINE SERVICES
SGT. 12
SGT. 12
SGT. 12
VACANT
SGT. 12
TPR. 11
TPR. 11
TPR. 11
VACANT
TPR. 11
TPR. 11
TPR. 11
VACANT
TPR. 11

SOR ENFORCEMENT UNIT
BRENDA HOFFMAN
SGT. 12
(LANSING POST)
VACANT
TPR. 11
(METRO POST)
VACANT
TPR. 11
(LAKEV EW POST)
VACANT
TPR.11
(GAYLORD POST)

MSP-0001516
Jan 5, 2023

# Table 1:

## Statewide Sweeps for SORA Violators

## 2008-2012

| Table 1.  Statewide Sweeps for SORA Violators 2008-2012 | | | | |
|---|---|---|---|---|
| Dates | Residence Checks | Arrests | Warrants Issued | Law Enforcement Agencies Involved (federal, state, local) |
| 10/20 - 10/31/08 | 3,194 | 196 | 682 | 90 |
| 2/2 - 2/13/09 | 2,220 | 150 | 405 | 70 |
| 2/1 - 2/12/10 | 1,512 | 179 | 248 | 120 |
| 6/14 - 6/25/10 | unknown | unknown | unknown | unknown |
| 10/18 - 10/29/10 | 2,232 | 144 | 193 | 125 |
| 10/17 - 10/28/11 | unknown | unknown | unknown | unknown |
| 10/16 - 10/30/12* | 1,742 | 51 | 116 | 90 |
| TOTAL (of available data) | 10,900 | 720 | 1,644 | |
| Average/sweep (of five sweeps with data) | 2,180 | 144 | 329 | 99 |

*This was characterized in an MSP press release dated Nov. 16, 2012, as the "ninth annual coordinated sweep" but the response to the Plaintiff's request and supporting documents showed only the seven listed here.

1

# Table 1a:

Sweeps for SORA Violations 2016-2019

## Table 1a.  Sweeps for SORA Violations 2016-2019

| Year | No. Sweeps | No. Days | No. Non-MSP Agencies | No. Personnel | No. RSOs (Registered Sex Offenders) | No./Percent RSOs Found Noncompliant | No./Percent RSOs Arrested | No./Percent Warrants Submitted |
|---|---|---|---|---|---|---|---|---|
| 2016* | 19 | 20 | 9 | 201 | 1,508 | 176/11.7% | 0/0% | 147/9.7% |
| 2017 | 6 | 10 | 4 | 82 | 1,474 | 68/4.6% | 0/0% | 68/4.6% |
| 2018 | 13 | 20 | 12 | 180 | 2,753 | 159/5.8% | 0/0% | 159/5.8% |
| 2019 | 5 | 9 | 3 | 71 | 328 | 2/0.6% | 28/8.5% | 2/0.6% |
| Total | 43 | 59 | 28 | 534 | 6,063 | 405/6.7% | 28/0.5% | 376/6.2% |
| Average/yr. | 10.75 | 14.75 | 7 | 133.5 | 1,515.75 | 101.25/6.7 | 7/0.5% | 94/6.2% |
| | | | | | | | | |

* Five sweeps conducted in Sept. 2016 were not counted.  They were all labeled "Operating Enduring Justice Arrest Sweep (Various locations in Metro Detroit Area) and were conducted with the U.S. Marshal Service, the Detroit Fugitive Apprehension Team and the Michigan Department of Corrections Absconder Recovery Unit.  These sweeps netted 35 arrests, but all show zero for the number of registrants to be contacted and, consequently, zero instances of noncompliance.  These appear to be instances where the MSP SOR enforcement unit participated with other agencies in making arrests unrelated to registry enforcement.

# Table 2:

Criminal Court Dispositions of SORA Violations by
Offense Type and Disposition – 2010-2019
(from the MDOC)

| Table 2.  Criminal Court Dispositions of SORA Violations by Offense and Type of Disposition  –  2010 - 2019 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 5 Year Average | 2015 | 2016 | 2017 | 2018 | 2019 | 5 Year Average | 10 Year Average |
| Failure to Register/1st MCL 28.729 & 729(1)(a) (4 yr maximum) | | | | | | | | | | | | | |
| Total | 595 | 554 | 530 | 580 | 591 | 570 | 618 | 556 | 510 | 345 | 328 | 471 | 521 |
| Prison | 96 | 79 | 95 | 114 | 117 | 100 | 111 | 63 | 63 | 56 | 38 | 66 | 83 |
| Jail | 207 | 253 | 244 | 233 | 239 | 235 | 229 | 236 | 243 | 149 | 159 | 203 | 219 |
| Jail/Probation | 168 | 142 | 127 | 155 | 159 | 150 | 200 | 162 | 142 | 88 | 81 | 135 | 143 |
| Probation | 105 | 63 | 53 | 62 | 55 | 68 | 68 | 78 | 49 | 45 | 44 | 57 | 63 |
| Other | 19 | 17 | 11 | 16 | 21 | 17 | 10 | 17 | 13 | 7 | 6 | 11 | 14 |
| Failure to Register/2nd MCL 28.729(1)(b) (7 yr maximum) | | | | | | | | | | | | | |
| Total | 49 | 49 | 57 | 63 | 61 | 56 | 71 | 69 | 64 | 42 | 43 | 58 | 57 |
| Prison | 15 | 19 | 23 | 15 | 17 | 18 | 19 | 10 | 17 | 10 | 6 | 12 | 15 |
| Jail | 18 | 18 | 21 | 27 | 27 | 22 | 33 | 31 | 21 | 18 | 26 | 26 | 24 |
| Jail/Probation | 11 | 8 | 9 | 14 | 13 | 11 | 15 | 23 | 24 | 8 | 11 | 16 | 15 |
| Probation | 5 | 3 | 3 | 6 | 3 | 4 | 4 | 4 | 2 | 6 | --- | 3 | 4 |
| Other | -- | 1 | 1 | 1 | 1 | 1 | --- | 1 | --- | --- | --- | --- | 1 |
| Failure to Register/3rd MCL 28.729(1)(c) (10 yr maximum) | | | | | | | | | | | | | |
| Total | 16 | 15 | 25 | 21 | 20 | 19 | 36 | 30 | 45 | 24 | 34 | 34 | 27 |
| Prison | 4 | 6 | 5 | 4 | 7 | 5 | 15 | 8 | 15 | 10 | 12 | 12 | 9 |
| Jail | 7 | 6 | 13 | 10 | 7 | 7 | 16 | 13 | 19 | 11 | 16 | 15 | 11 |
| Jail/Probation | 5 | 3 | 5 | 5 | 3 | 4 | 2 | 6 | 9 | 3 | 5 | 5 | 5 |
| Probation | -- | -- | 1 | 2 | 2 | 1 | 2 | 2 | 2 | --- | 1 | 1 | 1 |
| Other | -- | -- | 1 | -- | 1 | -- | 1 | 1 | --- | --- | --- | --- | -- |

| | 2010 | 2011 | 2012 | 2013 | 2014 | 5 Year Average | 2015 | 2016 | 2017 | 2018 | 2019 | 5 Year Average | 10 Year Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Failure to Comply w/ Duties MCL 28.729(2) (2 yr maximum) | | | | | | | | | | | | | |
| Total | 43 | 50 | 315 | 363 | 339 | 222 | 312 | 314 | 309 | 211 | 208 | 271 | 247 |
| Prison | -- | 2 | 36 | 38 | 47 | 25 | 38 | 25 | 18 | 13 | 20 | 23 | 24 |
| Jail | 21 | 31 | 124 | 162 | 146 | 97 | 130 | 114 | 145 | 97 | 100 | 117 | 107 |
| Jail/Probation | 7 | 6 | 92 | 98 | 98 | 60 | 76 | 98 | 80 | 61 | 62 | 75 | 68 |
| Probation | 11 | 8 | 53 | 54 | 33 | 32 | 58 | 66 | 55 | 32 | 17 | 46 | 39 |
| Other | 4 | 3 | 10 | 11 | 15 | 9 | 10 | 11 | 11 | 8 | 9 | 10 | 10 |
| Failure to Report/2nd MCL 28.729(2)(b) | | | | | | | | | | | | | |
| Total | 18 | 13 | 1 | 2 | -- | 7 | 1 | 2 | -- | 1 | -- | 1 | 4 |
| Prison | -- | 1 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Jail | 13 | 9 | -- | 1 | -- | 5 | 1 | -- | -- | -- | -- | -- | 2.5 |
| Jail/Probation | 2 | 2 | -- | -- | -- | 1 | -- | -- | -- | 1 | -- | -- | -- |
| Probation | 3 | 1 | 1 | 1 | -- | 1 | -- | 2 | -- | -- | -- | -- | 1 |
| Other | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Failure to Report/3rd MCL 28.729(2)(c) (4 yr maximum) | | | | | | | | | | | | | |
| Total | 40 | 24 | 6 | 1 | -- | 14 | -- | 1 | 2 | -- | -- | 1 | 8 |
| Prison | 5 | 5 | 4 | -- | -- | 3 | -- | -- | -- | -- | -- | -- | 2 |
| Jail | 20 | 10 | 2 | 1 | -- | 7 | -- | -- | 2 | -- | -- | -- | 4 |
| Jail/Probation | 11 | 8 | -- | -- | -- | 4 | -- | -- | -- | -- | -- | -- | 2 |
| Probation | 3 | 1 | -- | -- | -- | 1 | -- | -- | -- | -- | -- | -- | -- |
| Other | 1 | -- | -- | -- | -- | -- | -- | 1 | -- | -- | -- | -- | -- |

| | 2010 | 2011 | 2012 | 2013 | 2014 | 5 Year Average | 2015 | 2016 | 2017 | 2018 | 2019 | 5 Year Average | 10 Year Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other SORA Violations[1] MCL 28.7293 & 7294 (90-93 days) | | | | | | | | | | | | | |
| Total | 3 | 7 | 5 | 4 | 6 | 5 | 23 | 47 | 29 | 38 | 33 | 34 | 20 |
| Prison | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1 | 1 | -- | -- |
| Jail | 3 | 3 | 4 | 1 | 5 | 3 | 14 | 16 | 17 | 18 | 19 | 17 | 10 |
| Jail/Probation | -- | 2 | -- | 1 | -- | 1 | -- | 12 | 4 | 8 | 10 | 7 | 4 |
| Probation | -- | 2 | 1 | 2 | -- | 1 | 6 | 17 | 3 | 5 | 2 | 7 | 4 |
| Other | -- | -- | -- | -- | 1 | -- | 3 | 2 | 5 | 6 | 1 | 3 | 2 |
| **Total SORA Violations** | | | | | | | | | | | | | |
| Total | 764 | 712 | 939 | 1,034 | 1,017 | 893 | 1,061 | 1,019 | 959 | 661 | 646 | 869 | **881** |
| Prison | 120 | 112 | 163 | 171 | 188 | 151 | 183 | 106 | 113 | 90 | 77 | 114 | 133 |
| Jail | 289 | 330 | 408 | 435 | 424 | 377 | 423 | 410 | 447 | 293 | 320 | 379 | 378 |
| Jail/Probation | 204 | 171 | 233 | 273 | 273 | 231 | 293 | 301 | 259 | 169 | 169 | 238 | **235** |
| Probation | 127 | 78 | 112 | 127 | 93 | 107 | 138 | 169 | 111 | 88 | 64 | 114 | **111** |
| Other | 24 | 21 | 23 | 28 | 39 | 27 | 24 | 33 | 29 | 21 | 16 | 25 | 26 |

[1] These include failure to sign the registration form and failure to pay the registration fee.  Student safety zone violations were excluded because the requirements have been repealed and such violations cannot occur in the future.

3

# Table 3:

## Number of Individuals Convicted of a SORA Violation by County. 1998-2012
### (from discovery in Does I)

Table 3.  Number of Individuals Convicted of a SORA Violation
By County, 1998-2012*

| County | 15-Year Total | Average Per Year |
|---|---|---|
| Kent | 1,769 | 117.9 |
| Ottawa | 753 | 50.2 |
| Muskegon | 729 | 48.6 |
| Macomb | 625 | 41.7 |
| Berrien | 608 | 40.5 |
| Washtenaw | 601 | 40.1 |
| Wayne | 571 | 38.1 |
| Oakland | 567 | 37.8 |
| Calhoun | 495 | 33.0 |
| **Totals** | | |
| 9 Highest Volume Counties | 6,718 | 447.9** |
| **Grand Total, All Counties** | **14,884** | **992.3** |

*The years 1994-1997 were omitted because of minimal data; 2013 was omitted because data was available for only part of the year.

**All other counties averaged fewer than 30 individuals per year

1

# Table 3a:

## Comparison of Data (from the MDOC versus Does I) on Convictions for SORA Violations

| Table 3a.  Comparison of Data on Convictions for SORA Violations | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Total | 28.729 | 28.7291B | 28.7291C | 28.7292 | 28.7292B | 28.7292C | 28.7293 & 7297 |
| Figures from Response to *Does I* Plaintiff's Request for Documents | | | | | | | | |
| 2010 | 1,607 | 555 | 27 | 11 | 895 | 74 | 20 | 25 |
| 2011 | 1,419 | 538 | 37 | 15 | 737 | 46 | 17 | 29 |
| 2012 | 1,572 | 662 | 40 | 20 | 744 | 16 | 2 | 88 |
| Figures from MDOC Statistical Reports | | | | | | | | |
| 2010 | 764 | 595 | 49 | 16 | 43 | 18 | 40 | 3 |
| 2011 | 712 | 554 | 49 | 15 | 50 | 13 | 24 | 7 |
| 2012 | 939 | 530 | 57 | 25 | 315 | 1 | 6 | 5 |

The chart shows that the major discrepancy between the two data sets is in the column of reported versus unreported misdemeanors.

1

# Table 4:

## Prisoners Committed to Prison for SORA-Related Convictions: Number, Average Minimum Sentence, Cost – 2015-2019

| Table 4.  Prisoners Committed to Prison for SORA-Related Convictions Number, Average Minimum Sentence, Cost 2015-2019 | | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 5-Yr. Av. |
| Failure to Register, 1st 4 yr. maximum | | | | | | |
|    Number | 81 | 49 | 44 | 41 | 29 | 49 |
|    Average minimum | 1.4 | 1.6 | 1.7 | 2.9 | 3.1 | |
|    Annual cost/person | $34,982 | $35,157 | $36,106 | $38,051 | $39,391 | |
|    Total cost | $3,966,959 | $2,756,309 | $2,700,729 | $4,524,264 | $3,541,251 | |
| Failure to Register, 2nd 7 yr. maximum | | | | | | |
|    Number | 15 | 7 | 11 | 8 | 4 | 9 |
|    Average minimum | 1.7 | 1.8 | 1.4 | 1.7 | 2.1 | |
|    Annual cost/person | $34,982 | $35,157 | $36,106 | $38,051 | $39,391 | |
|    Total cost | $892,041 | $442,978 | $556,032 | $517,494 | $330,884 | |
| Failure to Register, 3rd 10 yr. maximum | | | | | | |
|    Number | 12 | 7 | 13 | 11 | 10 | 11 |
|    Average minimum | 1.6 | 2.2 | 1.6 | 2.1 | 1.7 | |
|    Annual cost/person | $34,982 | $35,157 | $36,106 | $38,051 | $39,391 | |
|    Total cost | $671,654 | $541,418 | $751,005 | $878,978 | $669,647 | |
| Failure to Comply w/Duties 2 yr. maximum | | | | | | |
|    Number | 20 | 21 | 12 | 8 | 6 | 13 |
|    Average minimum | 1.6 | 1.2 | 1.2 | 1.1 | 1.2 | |
|    Annual cost/person | $34,982 | $35,157 | $36,106 | $38,051 | $39,391 | |
|    Total cost | $1,119,424 | $885,956 | $519,926 | $334,849 | $283,615 | |
| **TOTAL NUMBER** | 128 | 84 | 80 | 68 | 49 | **82** |
| **TOTAL COST** | $6,650,078 | $4,626,661 | $4,527,692 | $6,255,585 | $4,825,397 | **$5,377,083** |

1

# Table 5:

## Dispositions to County Jails for SORA-Related Convictions: Number, Average Sentence Length, Cost (at $62/day) – 2015-2019

| Table 5. Dispositions to County Jails for SORA-Related Convictions Number, Average Sentence Length, Cost (at $62/day) 2015-2019 | | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 5-Yr. Av. |
| **Failure to Register/1st** **MCL 28.729(1) & 7291(a) (4 yr max)** | | | | | | |
| Jail: 6 mos. = $11,315 | 229=$2,591,135 | 236=$2,670,340 | 243=$2,749,545 | 149=$1,685,935 | 159=$1,799,085 | 203=$2,296,945 |
| Jail + proba: 4 mos = $7,440 | 200=$1,488,000 | 162=$1,205,280 | 142=$1,056,480 | 88=$ 654,720 | 81=$ 602,640 | 135=$1,004,400 |
| **Failure to Register/2nd** **MCL 28.729(1)(b) (7 yr max)** | | | | | | |
| Jail: 6 mos. = $11,315 | 33=$373,395 | 31=$350,765 | 21=$237,615 | 18=$203,670 | 26=$294,190 | 26=$294,190 |
| Jail + proba: 4 mos.=$7,440 | 15=$111,600 | 23=$171,120 | 24=$178,560 | 8=$ 59,520 | 11=$ 81,840 | 16=$119,040 |
| **Failure to Register/3rd** **MCL 28.729(1)(C) (10 yr max)** | | | | | | |
| Jail: 6 mos =$11,315 | 16=$181,040 | 13=$147,095 | 19=$214,985 | 11=$124,465 | 16=$181,040 | 15=$169,725 |
| Jail + proba: 4 mos.=$7,440 | 2=$ 14,880 | 6=$ 44,640 | 9=$ 66,960 | 3=$ 22,320 | 5=$ 37,200 | 5=$ 37,200 |
| **Failure to Comply w/ Duties** **MCL 28.729(2) (2 yr max)** | | | | | | |
| Jail: 6 mos =$11,315 | 131=$1,482,265 | 114=$1,289,910 | 147=$1,663,305 | 97=$1,097,555 | 100=$1,131,500 | 118=$1,332,907 |
| Jail + proba: 4 mos.=$7,440 | 76=$ 565,440 | 98=$ 729,120 | 80=$ 595,200 | 62=$ 461,280 | 62=$ 461,280 | 76=$ 565,440 |
| **Other SORA Violations** **MCL 28.7293 (93 days) & 7294 (90 days)** | | | | | | |
| Jail: 1 mo =$1,860 | 14=$26,040 | 16=$29,760 | 17=$31,620 | 18=$33,480 | 19=$35,340 | 17=$31,620 |
| Jail + proba: 2 mos.=$3,720 | -- | 12=$44,640 | 4=$14,880 | 8=$29,760 | 10=$37,200 | 7=$26,040 |
| **Total SORA Violations** | | | | | | |
| Jail: 6 mos =$11,315 | 409=$4,627,835 | 394=$4,458,110 | 430=$4,865,450 | 275=$3,111,625 | 301=$3,405,815 | 362=$4,100,556 |
| Jail + proba: 4 mos.=$7,440 | 293=$2,179,920 | 289=$2,150,160 | 255=$1,897,200 | 161=$1,197,840 | 159=$1,182,960 | 231=$1,718,640 |
| Jail: 1 mo = $1,860 | 14=$ 26,040 | 16=$ 29,760 | 17=$ 31,620 | 18=$ 33,480 | 19=$ 35,340 | 17=$ 31,620 |
| Jail + proba 2 mos.= $3,720 | | 12=$ 44,640 | 4=$ 14,880 | 8=$ 29,760 | 10=$ 37,200 | 7=$ 26,040 |
| **Grand Total** | 716=$6,833,795 | 711=$6,682,670 | 706=$6,809,150 | 462=$4,372,705 | 489=$4,661,315 | 617=$5,876,856 |