# Exhibit 17:
# Richard Stapleton Expert Report

# EXPERT REPORT OF RICHARD B. STAPLETON

I have been asked to compare Michigan's parole and probation supervision processes to the requirements of the Michigan Sex Offenders Registration Act, M.C.L. § 28.721 *et seq*.

## I. Background, Education, and Qualifications

1.  I was Administrator of the Michigan Department of Corrections Office (MDOC) of Legal Affairs (formerly the Office of Policy and Hearings) beginning in 1999 until my retirement in June 2011.  As chief legal counsel for the MDOC, I was responsible for development of all policy directives and for coordination of all policy decisions with the MDOC's Executive Policy Team and the Department of Attorney General.  I was the chairperson of the MDOC's Policy Review Committee and responsible for the promulgation of all administrative rules, policy directives and Director's Office Memoranda in accordance with MDOC policy.  I was also responsible for management of the overall prisoner disciplinary process within the MDOC; for the direction and supervision of formal administrative disciplinary hearings in correctional facilities pursuant to the Corrections Hearings Act (M.C.L. § 791.251, *et seq*.); and for the administrative management of the litigation, prisoner grievance, internal audit, and FOIA sections within the Office of Legal Affairs.

2.  During my tenure as the MDOC Legal Affairs Administrator, I was the chairperson of the Department's Resource Team between 2003 and 2010.  The Resource Team was a committee of high-level administrative staff that strategically planned and managed the development of the Michigan Prisoner Reentry Initiative (MPRI).  The Resource Team coordinated the implementation of a comprehensive evidence-based reentry model that was recognized nationally for increasing parole rates and reducing recidivism by 33% for parolees who were released through MPRI.  In 2010, under the direction of the Resource Team the MDOC contracted with the Center for Effective Public Policy to conduct a review of policies and practices for treatment of sex offenders under the department's supervision.  Their recommendations were resulted in the development of the Michigan Sex Offender Program, a collaborative treatment approach to the management of sex offenders.

3.  Since retirement in 2011, I have been engaged as an expert witness in consulting and testifying on corrections issues in federal and state courts.  I

1

have participated on the Board of Directors with organizations concerned with sentencing and incarceration issues, including Safe and Just Michigan (formerly Citizens Alliance on Prisons and Public Spending), a non-profit public policy organization concerned with evidence-based correctional practices, and with NorthWest Initiative in Lansing, which through its ARRO program (Advocacy, Re-entry, Resources, and Outreach), assists ex-offenders transition back to their communities. Although I am no longer working at the MDOC on a day-to-day basis, I keep up to date on its policies and practices through my work at Safe and Just Michigan and the NorthWest Initiative, as well as through my personal connections with former colleagues.

4. I have a Juris Doctor degree from Michigan State University College of Law (1986) and a Bachelor of Science in Criminal Justice from Wayne State University (1977). I am an *emeritus* member of the State Bar of Michigan, retiring in 2016 after 30 years as a member in good standing. A copy of my resume is attached as Exhibit A. I have primarily served as a lawyer, administrator, and policy person, so I have no academic publications within the last 10 years.

## II. Executive Summary

5. The key conclusions of this report are:

➢ The MDOC uses actuarial assessment instruments to measure offender risk, and then uses evidence-based practices to narrowly tailor parole and probation conditions based on offender risk level and individual needs. The MDOC not only targets interventions to high-risk offenders, but also minimizes interventions to low-risk offenders, because research shows that intensive supervision of low-risk offenders is counter-productive. By contrast, the requirements of the Sex Offenders Registration Act (SORA) are applied indiscriminately to all registrants, regardless of risk level or individual circumstances.

➢ SORA undermines the MDOC's use of evidence-based correctional practices because it imposes virtually identical requirements on all registrants regardless of risk level; it requires extensive and potentially counterproductive interventions for low-risk offenders; and it significantly limits employment opportunities, access to housing, and family

    reunification, which are critical to offender success upon release, for all offenders.

- SORA is both similar to and different from regular parole/probation supervision in that both systems require regular reporting, but (a) SORA requires more information to be reported in shorter time periods; (b) SORA automatically imposes restrictions that the MDOC (or probation offices) impose on parolees/probationers only on an individualized basis; (c) SORA requirements apply for a minimum of 15 years to life, with most registrants subject to SORA for life, while parole restrictions typically last two years and probation restrictions are typically similarly short and/or are individually tailored; (d) SORA requirements do not decrease over time and cannot be contested, whereas parole/ probation conditions are frequently relaxed during the course of supervision and can be challenged through MDOC grievance procedures; (e) a violation of SORA can result in a term of incarceration up to ten years, whereas the length of incarceration resulting from a violation of probation or parole is capped at the length of the underlying sentence (and is often relatively short), and (f) unlike probation and parole, SORA has no provision to work with victims or with registrants' family members (who often are victims as well), or with registrants' landlords, employers, etc., to help registrants successfully reintegrate into society.

- Parole and probation agents charged with supervising parolees/probationers who are also subject to sex offender registration have great difficulty interpreting and applying SORA because the statute is so vague.  The interpretation of enforcing agencies has varied greatly from jurisdiction to jurisdiction.

Each of these conclusions is addressed and supported in the sections below.

### III. The MDOC Uses Evidence-Based Practices and Risk Assessments to Improve Outcomes for Parolees and Probationers

6.  A vast body of research has been published over the past 20 years establishing that evidence-based practices work in reducing criminal behavior. In the correctional context, "evidence-based practices" mean organizing criminal justice interventions to promote rather than hinder the implementation of programs and services that are known to work in reducing criminal behavior.

Effective correctional interventions lead to reductions in risk and recidivism, and to improved outcomes for individuals under supervision, particularly when those interventions are targeted to those who are at higher risk and are focused on the individual's specific criminogenic needs.

7.  In 2003, the National Institute of Corrections (NIC), in collaboration with the Crime and Justice Institute, assembled leading scholars and practitioners from the fields of criminal justice and corrections to define the core elements of evidence-based practices based on published research. The evidence-based principles identified by the NIC now form the basis for the MDOC's interventions with offenders, and have been incorporated into the MDOC's policies and practices for supervision of parolees and probationers.

8.  Since research has demonstrated that aligning the level of intervention with the level of risk produces the best outcomes, the starting point for evidence-based corrections is **to assess an offender's risk level**. For supervision and case management strategies to be effective, they must be based upon an offender's risk level. Higher intensity programs, services, supervision, and surveillance techniques are reserved for those assessed as higher risk. **Research has consistently shown that lower risk offenders tend to recidivate at higher rates when interventions are over-delivered.** Lower risk offenders may still require services such as housing, family reunification, or medical support to reduce their risk of re-offending. But offenders who are at low risk to re-offend are unlikely to benefit from interventions that are designed to change their behavior, and such interventions are often counterproductive.

9.  The MDOC uses empirically-based actuarial instruments to enable the Department and the parole board to assess each individual's actual level of risk. At the recommendation of the Resource Team, the MDOC began using the Northpointe COMPAS risk assessment instrument in 2005 to measure prisoners' risks and needs, and to inform the parole board in the parole release decision-making process. The parole board also began using the Static-99 risk assessment instrument for assessing the likelihood of sex offenders to commit new sex offenses after release. These actuarial risk assessment tools are used because they have proven to have greater accuracy in predicting risk than either basing risk on the offense of conviction or basing risk on a parole or probation agent's subjective assessments of the offender.

10. Actuarial instruments used to assess risk look at both static risk factors, *i.e.*, factors that cannot be changed, such as age and criminal history at the time of conviction, and dynamic risk factors, *i.e.*, factors that change over time, such as current age, marital status, behavior, attitudinal changes, *etc.*  Accordingly, not only may individuals with the same offense have very different risk levels, but **individuals with more serious offenses may have lower risk levels than individuals with lesser offenses**, especially as time passes**.**

11. COMPAS is a dynamic instrument that employs evidence-based principles as a tool for creating treatment and supervision plans.  COMPAS has demonstrated that by addressing the specific and defined criminogenic needs of individual offenders their risk for violence and recidivism can be reduced. "COMPAS Core" identifies risk and needs when an offender first begins serving his or her sentence.  Programming is assigned by the MDOC to target those needs and to effect change in behavior given the prisoner's specific characteristics.

12. A "COMPAS Reentry" assessment is used by the MDOC prior to release consideration and during parole supervision to measure the effectiveness of programming and the impact of changes in circumstances specific to the offender in order to create a more accurate prediction for risk of violence and recidivism.  COMPAS Reentry provides a statistically accurate prediction of an individual's risk for engaging in further criminal behavior.

### III. The MDOC Uses Risk Assessments and Individualized Case Management Tools to Tailor Supervision Levels to the Needs of Individual Offenders

13. Supervision for parolees and probationers is individually tailored to an offender's actual risk and needs, and is based on actuarial risk assessments, including the COMPAS, and, for people with sex crimes, the Static-99 and the Vermont Assessment of Sex Offender Risk (VASOR).  The COMPAS is an instrument that is designed to measure recidivism risk among people with past criminality generally, while the Static-99 and VASOR are specifically designed to measure risk among people with past sex offenses.  Assessments specific to sex offenders are used to supplement re-offense predictions made in COMPAS which does not assess an offender's current conviction.

14. The MDOC uses multidisciplinary groups in the local community, called a case management team (CMT), to facilitate information-sharing and to inform

supervision decisions. The CMTs consist of parole/probation agents, treatment providers, law enforcement, polygraph examiners, and victim advocates. The MDOC's collaborative case management approach recognizes that research "has proven that to have the greatest impact on recidivism, markedly different case management strategies must be employed based on the offender's risk as judged by correctional risk assessments and aided by professional judgment." Examples of the issues and decisions that may be the subject of CMT meetings include addition or deletion of specific parole/probation conditions and sanctions for rule violations.

15. The number and type of required contacts between offenders on community supervision and their agents has changed with the implementation of collaborative case management. Historically, parolees and probationers were required to report in person at least monthly to the agent's office. Agents were also required to conduct at least monthly home calls to the offender's residence. **Current case management standards no longer require in-person monthly reporting for all offenders, regardless of their risk. Rather, the frequency and nature of reporting (*e.g.*, in person, by phone, by mail) are determined by the offender's assigned level of supervision.** The standards recognize that effective case management may require "sporadic differences in the numbers and types of contacts required over a period of time." In-person contacts with offenders may therefore occur outside of the office, including at the offender's home, place of employment, and during CMT meetings. Depending on the level of supervision, some parolees and probationers can use the phone, mail, or email to contact their agents and/or to report changes.

16. The offender's score on risk assessment instruments also determines the frequency of CMT meetings. In-person meetings are staffed for moderate and high-risk offenders every 6 to 8 months during the period of parole or probation. CMT meetings for offenders who score low risk may be conducted by email or in-person, as needed. The MDOC Uses Risk Assessments and Individualized Case Management.

### IV. Tools to Tailor Parole/Probation Conditions to the Needs of Individual Offenders

17. Michigan Administrative Rule 791.7730 requires that parole orders contain conditions that are reasonably necessary to assist a parolee to lead a law-abiding life. Further, the rule requires there to be a reasonable relationship between

parole conditions and both the prisoner's previous conduct and present capabilities. Since the adoption of evidence-based principles within the Department, the parole board uses risk assessment instruments to identify appropriate special conditions based on a prisoner's specific risks and needs. Probation agents are also guided by risk assessments in recommending probation conditions to be imposed by the sentencing court.

18. **The Parole Board and probation agents thus strive to narrowly tailor the special conditions of supervision to the individual circumstances of each prisoner with the goal of ensuring the success of the offender and the protection of the public while the offender is under community supervision.** For example, unless an offender was sentenced for an offense involving use of an automobile, the parole board or sentencing courts generally do not impose special conditions prohibiting or restricting driving.

19. Conditions can be chosen off a "menu" of standardized special conditions. For example, the parole board routinely imposes a restriction on computer use for parolees whose crimes involved computers. Conditions can also be individually drafted for the specific offender. For example, in domestic violence cases, a special condition may prohibit the parolee from going within 1000 feet of the victim's home. Agents have the authority and discretion to recommend the addition or removal of special conditions during the period of supervision, and several of the conditions are drafted to enable the agent to grant permission for otherwise prohibited behavior – again tailored to the individual parolee.

## V. SORA Undermines Evidence-Based Correctional Practices

20. Michigan's parole and probation supervision process, with its use of empirically validated risk assessments, stands in stark contrast to the offense-based classification system required by SORA. The current system under SORA fails to distinguish between registered offenders who present significant threats to public safety and those who present little or no risk. Registration under SORA is determined solely by reference to the original offense committed (no matter how old the offense may be).

21. **The fact that parolees and probationers with sex offenses are subject to SORA creates challenges for the MDOC's efforts to use evidence-based correctional practices with this population. First, SORA imposes virtually identical reporting and other requirements on almost all registrants; that is, it treats everyone on the registry as if they were at equal risk of**

**reoffending.** This approach breeds universal hysteria about sex offenders by inaccurately branding them all as intolerably dangerous, and furthers the isolation of offenders. Under the previous version of SORA, to the extent that the public considered tier classifications as indicating risk levels, the public registry served to mislead the community as to the true risks, since tier classifications are based not on risk assessments but solely on offense classifications, which are poor measures of the risk of re-offending. The new SORA may be worse, because by not listing registrants' tier levels, it conveys the message that all registrants are equally dangerous.

22. **Second, evidence-based research shows that correctional interventions are counterproductive when applied to low-risk individuals**. Yet the MDOC is forced to ensure compliance with SORA, and the extensive requirements it imposes, even for low-risk offenders, and even though doing so undermines the MDOC's efforts to implement evidence-based policies and procedures.

23. **Third, the expanded registration and community notification policies can significantly hamper reintegration efforts.** A primary goal for CMTs is to ensure that parolees/probationers have stable housing and employment, since these are strongly correlated with offender success. By putting people on a public registry when they pose little or no risk of reoffending, SORA makes the CMTs' task much more difficult.

24. **Fourth, SORA also conflicts with the MDOC's use of evidence-based principles with respect to reunifying families and developing a strong community support network with non-offending partners, family members, and other persons – all factors that are also strongly correlated with offender success.** The MDOC's supervision strategies are based on research documenting that "family, peer, and community support have a greater direct effect on offender behavior than formal social controls imposed by law enforcement and correctional supervision." MDOC parole and probation agents are therefore required to "work to build productive relationships with the offender's social support network," and the Department recognizes that "identifying appropriate family and non-family social supports with whom the offender may associate during supervision is important not only to the offender's success, but in enhancing public safety." A "goal in supervising moderate and high risk offenders is to assist them in strengthening relationships with their families and pro-social community supports." Unfortunately, SORA requirements place undue public scrutiny and stigma on the families of offenders. The public

registry makes it especially difficult on families, particularly when a family is forced either to live apart due to SORA's publication of residency information (which can lead landlords to refuse to allow registrants on a lease), or to relocate, which can involve uprooting children from their established environments.

25. Due in large part to the need to ensure compliance with SORA and other statutory obligations for people with sex offense convictions, parolees and probationers who must register are initially placed at the maximum level of supervision, regardless of their actual risk level, which creates a burden for MDOC agents. By contrast, other parolees/probationers generally have their risk and reporting levels determined by a COMPAS assessment, although agents and CMTs can reassess risk and reassign risk levels with supervisor approval to accommodate the needs and circumstances of the specific parolee.

## VI. Comparing SORA Requirements with Parole/Probation Supervision Requirements

26. If one compares the requirements imposed on registrants under SORA with those imposed on offenders as part of parole/probation, there are both significant similarities and significant differences.

27. **First, both systems require regular reporting of information to supervising authorities. SORA registrants, however, are required to report a great deal more information** (*e.g.*, vehicles, internet identifiers) **that the MDOC does not require parolees and probationers to report. Even where the same information is required, the time frames for reporting are much more onerous under SORA.** For example, under SORA a registrant must report a new job *in person* to SORA authorities within 3 days, but could wait to report that same job to his/her parole agent until the next scheduled meeting with the agent, or could report it by phone.

28. **Second, as discussed above, the MDOC seeks to tailor parole and probation requirements to the individual's needs and risk level, whereas SORA imposes requirements without any consideration of the registrant's needs or risk level.** All registrants must report the same information (with a minor exception for pre-2011 registrants who no longer need to report internet identifiers due to court decisions holding that provision to be unconstitutional).

9

29. **Third, the requirements under SORA apply to registrants for periods ranging from 15 years to life. By contrast, most periods of parole supervision will end after 2 years with satisfactory adjustment**. Indeed, in recent years the MDOC has shortened parole terms and accelerated discharge dates for low-risk parolees, absent statutory provisions to the contrary.

*30.* **Fourth, SORA requirements do not decrease over time, and there is no procedure under SORA for an offender to challenge his/her tier classification, reporting requirements, public notification requirements, etc. By contrast, parole/probation agents constantly review conditions of supervision, and typically relax conditions over time for offenders who are successfully reintegrating into the community.** Moreover, offenders on parole supervision or probation can contest the conditions of their supervision under the established grievance procedures within the MDOC.

*31.* **Fifth, a violation of SORA can result in prison terms of up to ten years, while the incarceration resulting from a probation or parole violation is capped at the length of the underlying offense.** For example, if a person who was sentenced to probation on a one-year misdemeanor violates probation, that person cannot be incarcerated for more than a year. By contrast, a person who violates SORA faces sentences of four years for a first offense, seven years for a second offense, and ten years for a third offense. M.C.L. § 28.729(1)

32. **Finally, other than the publication of offense information through the public registry, there is no mechanism in SORA for involving victims or employers.** By contrast, the parole and probation process considers the interests of victims (who in sex offense cases may be partners or family members of the offender) and collaborates with relevant partners in the community, including employers, during the period of an offender's supervision. To the extent that is possible to do so, agents must share information with the offender's family or social supports throughout the period of supervision. It is the agent's responsibility to educate the support network and to ensure they are aware of the nature of the offense, supervision, and SORA requirements, and the importance of protecting victim's interests. In addition, members of the sex offender CMTs are encouraged to "seek out public education opportunities in their communities to assist with educating employers, landlords, and faith-based groups on sex offender topics."

### VII. SORA's Vagueness Makes It Difficult for MDOC Agents to Ensure Compliance with SORA

10

33. All parolees and probationers who are subject to SORA have a parole/probation condition requiring them to comply with SORA, and parole/probation agents work with offenders and their families to try to achieve compliance. **But many of the SORA requirements are vague enough that MDOC agents themselves cannot know which behaviors violate the Act.** These are issues that are often the subject of discussion at local CMT meetings. Although law enforcement representatives are included as team members on CMTs, the interpretations reached often vary from one case management team to the next.

34. As the MDOC's Legal Affairs Administrator, my role was to assist department managers in the interpretation of legal requirements for guidance to field staff. Sometimes these legal questions were raised proactively, and at other times they came up in determining whether a parole/probation violation had occurred (since it is a violation of probation/parole to be non-compliant with SORA). any of the questions raised by field staff could not be appropriately answered because of the lack of adequate definition or guidance within SORA itself. While the new SORA 2021 requires violations to be willful, it does not address the underlying problems of complexity and vagueness when it comes to advising parolees or probationers (or agents) as to what the law requires.

35. **In my experience, the interpretation of SORA varies significantly from jurisdiction to jurisdiction, meaning that – to avoid criminal prosecution for non-compliance – registrants must rely on the varying interpretations of prosecutors and courts across the state.** There are no mechanisms in place, however, to ensure that offenders are made aware of the interpretations of their local prosecutors and courts as to what constitutes violations of SORA. When I was the Legal Affairs Administrator, law enforcement officials explained to me on more than one occasion that a violation is something you know when you see it. While that may be true depending on the case, such a subjective interpretation by law enforcement does not provide adequate notice of prohibited behavior to the offender who is subject to SORA's requirements.

36. **Confusion about the meaning of SORA also leads to situations where MDOC agents inform parolees/probationers that some conduct is permissible, only to find that prosecutors or law enforcement agencies disagree**. For example, I was involved in several cases as the Legal Affairs Administrator where parole agents had authorized parolees to attend their children's school sporting events, only to have the registrants charged by local prosecutors for violating SORA.

11

37. The MDOC has established "sex offender specific" caseloads for probation and parole agents who specialize in the supervision of sex offenders and the technical requirements of SORA.  But even with intensive supervision, SORA's complexity and vagueness all but guarantee that parolees and probationers will still be unsure about what they can and cannot do.  And to my knowledge, no similar orientation was provided to registrants who completed their sentences before the major amendments to SORA that passed in 2011 and that are carried over into SORA 2021, nor does the MDOC or any other agency provide guidance about the meaning of SORA to registrants who are no longer on parole or probation but who remain subject to the amended act.

**Conclusion**

As set forth in the Executive Summary above, based on my experience, I believe that Michigan's SORA creates a monitoring and supervision regime that is in some ways more onerous, and far longer-lasting, than criminal probation and parole, especially for the great majority of registrants who are at lower risk of re-offending sexually.  SORA also undermines core tenets of the MDOC's mission because it is not evidence-based, and it hinders rather than promotes registrants' successful re-entry and reintegration into society, for decades or for life.  SORA also creates burdens for parole and probation staff with no corresponding benefit for the MDOC, for local law enforcement, for registrants, or for community safety.

**Statement Regarding Prior Expert Testimony**

Over the years, I have testified at trial or in deposition or submitted a report to the court as an expert in the following cases:

*John Does 8–10 v. Rick Snyder, et al*, (USDC-ED 2:17-cv-11181)
*Does et al v. MDOC et al,* 22nd Circuit Court 13-1196-CZ and 15-1006-CZ
*Hill v. Snyder, et al* (USDC ED 5:10-cv-14568)
*Iswed v. Caruso, et al.*, USDC-WD 1:08-cv-1118
*Hoffman v. Rutter, et al.*, USDC-WD 2:10-cv-26
*People v. Yengling*, 18th Circuit Court 10-11079-FC
*John Does #1-5 and Mary Doe v Richard Snyder, et al*, Case No. 2:12-cv-1119
*People v. Nelson*, 17th Circuit Court, 10-09966-FH, 11-05158 FH
*People v. Zuniga,* 17th Circuit Court, 10-00280-FC
*People v. Antonio Espree* 22nd Circuit Court 88-22318-FC

*Garvins v. Hofbauer, et al,* USDC-WD 2:09-cv-4
*Hill, et al v. Snyder, et al*, USDC-ED 10-cv-14568
*Suciu v. Washington, et al,* USDC-ED 2:12-cv-12315
*Muthana v. Heyns*, et al, USDC-WD 2:11-cv-132
*McNeal v. Kott*, et al, 2:11-cv-78
*Selby v. Caruso*, et al, 2:09-cv-152
*John Doe #1, et al v. MDOC*, et al, 2:13-cv-14356
*People v. Alexis Ayala*, Macomb Circuit Court 91-0663-FC
*People v. John Atkins*, Oakland Circuit Court 89-95782-FC
*People v. Christopher Machacek*, Washtenaw Circuit Court 87-21575-FC
*People v. Jeremy Longerbeam*, Lapeer Circuit Court 92-4666-FC
*People v. Richard Simmons*, Lake Circuit Court 86-2451-FC
*People v. Willie Servant*, 91-02558-FC
*People v. Mark Storey*, Wayne Circuit Court 85-7676-01-FC
*People v. Gary Peters*, 16th Circuit Court 78-0353-FC
*People v. Jerry Lashuay*, 42nd Circuit Court 83-4623-FC
*People v. Sheldry Topp*, 3rd Circuit Court 62-20237-FC
*People v. John Bennett*, 6th Circuit 72-55257-FC
*People v. Kenneth Williams*, Oakland Circuit Court 74-21183-FC
*People v. Ronnie Waters*, Oakland Circuit Court 80-45437-FC
*People v. Scott Davis*, Oakland Circuit Court 80-46614-FC
*People v. Donald Williams*, Oakland Circuit Court 93-1791-FC
*People v. Timothy Clark*, Oakland Circuit Court 74-20672-FC
*People v. Ronald Tolbert*, Wayne Circuit Court 81-03043-FC
*People v. Ervin Jennings*, Wayne Circuit 92-01949-FC
*People v. Nathaniel Gilbert*, Macomb CC 06-0173-FC
*People v. Victor Waterford*, Wayne Circuit Court 90-13736-01-FC
*People v. Kenneth Anderson*, Wayne Circuit Court 90-6515-FC
*People v. Leeclifton Moore*, Kent Circuit Court 05-09552-FC
*People v. James Taylor*, 6th Circuit Court 88-87133-FC
*People v. William Neilly*, Kalamazoo Circuit Court 93-0756-FC
*People v. Darnell Johnson*, Macomb Circuit Court 97-9134-FC
*People v. Nathan Bell*, Genesee Circuit Court 97-0553-FC
*People v. Devon Wyrick*, Kalamazoo Circuit Court 96-0169-FC
*People v. Clinton Cheeks,* Wayne Circuit Court 93-11580-FC
*People v. Antonio Payne*, Macomb Circuit Court 93-2682-FC
*People v. Jenard Sharp*, Wayne Circuit Court 93-7172-FC
*People v. Damon Jackson*, Kent Circuit Court 00-05206-FC
*People v. Deonte Howard*, Wayne Circuit Court 10-05562-FC
*People v. Charles Porter*, Jackson Circuit Court 84-35221-FC

*People v. Christopher Tobar*, Berrien County Circuit Court 93-0490-FC
*People v. William Garrison,* Wayne Circuit Court 76-02815-FC
*People v. John Espie*, Shiawasee Circuit Court 99-02999-FC

*People v. Daniel Wheeler*, Shiawasee 70-3957-MJS-FC
*People v. Agustin Pena*, Macomb Circuit Court 90-1535-FC
*People v. William Hodge*, Wayne Circuit Court 80-04667-FC
*People v. Tommie Richards,* Berrien Circuit Court 87-01623-FC
*People v. Ronald Hammond*, Shiawasee Circuit Court 86-5672-FY
*People v. Charles Lewis*, Wayne Circuit Court 76-05890-FC
*People v. Mark Abbatoy*, Berrien Circuit Court 97-403846-FC
*People v. Dennis Watson*, Wayne Circuit Court 85-04346-FC
*People v. Robert Leamon*, Cass Circuit Court 98-8555-FC
*People v. Stanley Fowle*, Jackson Circuit Court 93-66611-FC
*People v. Jeffrey Seay*, Eaton Circuit Court 97-020162-FC
*People v. Jamar Johnson*, Oakland Circuit Court 84-20672-FC

**Statement Regarding Compensation**

My hourly rate of compensation for consultation, report writing, and testimony is $150 per hour. In this instance, I have agreed to provide this report pro bono.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

*/s/ Richard B. Stapleton*

_____
Richard B. Stapleton

Dated: December 3, 2021

14

# Attachment 1:

## C.V. of Richard B. Stapleton

**C.V. OF RICHARD B. STAPLETON**
16346 Wacousta Rd.
Grand Ledge, MI 48837
517-627-4704 - rbstapleton@hotmail.com

**EMPLOYMENT :**

      **Associate Director**
      **Citizens Alliance on Prisons and Public Spending**
      403 Seymour Ave., Suite 200
      Lansing, MI 48993
      517-482-7753
      September, 2011 – June 2012

      **Director, Board of Directors (volunteer position)**
      2013 - 2018

The Citizens Alliance on Prisons and Public Spending (CAPPS), a non-profit public policy organization, is concerned about Michigan's excessive use of punitive strategies rather than preventive ones to deal with crime and its impact on the quality of life for all Michigan citizens. Associate Director responsibilities included informing policymakers, advocacy groups, affected communities and the general public about these issues through public speaking appearances, newsletters, and development of research reports.

      **Administrator, Office of Legal Affairs**
      **Michigan Department of Corrections**
      (517) 373-0450
      2005 – June, 2011 (Retired)

Overall management of the department's litigation, prisoner grievance, prisoner discipline, freedom of information, and policy development operations. Position functioned as chief legal counsel within the department for developing litigation strategies and coordinating the activities of the Department of Attorney General in defending the department in the state and federal courts. Reviewed all case law and legislation that impacted the department's operations and facilitated the development of statewide implementation strategies for programs, policies, and staff training. Advised executive management staff and consulted with facility wardens on policy objectives and strategies for avoiding litigation. Served as chairperson for the department's Policy Review and Post- Incident Review committees.

    Achievements:
- Chairperson (2003-10), Michigan Prisoner ReEntry Initiative (MPRI) "Resource Team". The Resource Team was a committee of MDOC administrators representing custody, field, and operations support staff who, with technical support and assistance from the National Governor's Association (NGA) and the National Institute of Corrections (NIC), were charged with developing and

1

   implementing a comprehensive model of prisoner transition planning. The MPRI's mission is to reduce crime by implementing a seamless plan of services and supervision developed with each offender—delivered through state and local collaboration— from the time of their entry to prison through their transition, reintegration, and aftercare in the community. The MPRI is credited with reducing Michigan's prison population by 7,500 prisoners while at the same time reducing the return to prison rate by 33%.

- Designed revisions to the MDOC prisoner disciplinary process and facilitated successful implementation in November, 2010. The process in place for over 30 years required attorney hearing officers to conduct approximately 85,000 major misconduct hearings year. The revised process created three levels of misconduct (Class I, II, and III). Class II misconducts, comprising 70% of previously defined major misconducts and appealable to the state circuit courts, are now heard by custody shift commanders and may be appealed only to the facility level. Conducted statewide due process training for all shift commanders.

- Primary liaison with court appointed monitors in the class action lawsuit entitled, *Michigan Protection and Advocacy Services (MPAS) v. Caruso*. Facilitated settlement agreement in the U.S. District Court and implemented revisions to MDOC policies involving the screening, identification and appropriate classification of mentally ill prisoners.

- Facilitated development of a Segregation Incentive Program within the Department's maximum security prisons designed to transition long term segregation prisoners back to general population. The program is structured to provide prisoners the opportunity to experience progressive success and rewards for small improvements in behavior, as well as providing staff with meaningful consequences when inmates behave inappropriately. Lengths of stay in segregation and rates of misconduct have been significantly reduced.

- Facilitated the MDOC's response and policy development consistent with standards proposed for the Prison Rape Elimination Act (PREA).

- Department policy liaison for class action lawsuits, including *Bazetta v. Overton*, *Hadix v. Caruso, MPAS v. Caruso* and *Cain v. Department of Corrections.*

- Oversaw development of an electronic document system for Department-wide distribution and retention of policies and procedures.

Memberships:
- Chief Information and Privacy Officer, State of Michigan Information and Privacy Council.

2

- MDOC Regulatory Affairs Officer, State Office of Administrative Hearings and Rules.
- MDOC Post-Incident Review Committee, chairperson.
- MDOC Shoot Review Committee, member.
- MDOC Policy Review Committee, chairperson.
- MDOC ReEntry Implementation Resource Team, chairperson.
- State Bar of Michigan Prison and Corrections Section, MDOC representative and elected council member.
- Criminal Justice Information Systems Policy Council, MDOC Representative.
- Michigan Judicial Institute, Faculty - New Judges Seminars.
- State Court Administrator's Office,  Evidence-Based Sentencing Committee

### Administrator, Office of Policy and Hearings
### Michigan Department of Corrections, 1993 – 2005

Managed department-wide policy development and policy operations, issued policy directives and facilitated the promulgation of administrative rules.  Overall responsibility for the department's prisoner disciplinary process. Conducted routine training of wardens and facility staff on prisoner discipline.  Directed and supervised attorney level administrative law examiners who conduct formal administrative hearings in correctional facilities pursuant to the Corrections Hearings Act (MCL 791.251, et seq.).   Issued final agency decisions and rehearing orders in response to appeals submitted by prisoners and wardens.

### Assistant for Rehearings and Rules, Hearings Division
### Michigan Department of Corrections, 1988 – 1993

Reviewed and decided prisoner and warden appeals of formal administrative hearing decisions in behalf of the Hearings Administrator.  Drafted and promulgated Department of Corrections' administrative rules pursuant to MCL 24.231 *et seq.* at the direction of the Administrator.

**Prior MDOC positions:**
**Administrative Law Examiner, 1987 – 1988**
**Parole / Probation Officer, 1978 - 1987**
**Corrections Officer, 1977 - 1978**


**EDUCATION:**     Juris Doctor, Michigan State University College of Law, 1986 BS Criminal Justice, Wayne State University, 1977


*Emeritus* **Status, State Bar of Michigan  P# 38793**

3