# Exhibit 21:

## Shelli Weisberg Declaration

## DECLARATION OF SHELLI WEISBERG

1.  I was the Political Director of the American Civil Liberties Union of Michigan, a position from which I have recently retired.

### Qualifications and Experience

2.  I worked at the ACLU for two decades, starting in 2003 as a lobbyist, then from around 2006 as the Legislative Director, and finally from around 2017 till my retirement at the end of 2022 as the Political Director.

3.  In all of these roles, I worked very closely with both the legislature and the executive branch. I have worked on a wide range of civil rights and civil liberties issues, lobbying legislators, building reform coalitions, and coordinating with executive branch officials. I have participated in efforts to pass, amend or defeat legislation on many different topics (e.g., criminal legal reform, sentencing guidelines, court funding, reproductive rights, LGBTQ rights, free speech, privacy and technology, public education, higher education, etc.). I am intimately familiar with the political process in Lansing.

4.  The ACLU's work is done in a bipartisan manner because our issues include those that draw support from conservatives (e.g., privacy and technology, free speech) and from progressives (e.g., social issues). Many ACLU issues are championed by both Democrats and Republicans (e.g., indigent defense reform, court funding). Approximately 80% of my work was done through coalitions where we

1

DOES III - 00001231

had to negotiate compromises, so I know how to navigate diverse stakeholders. And much of our work had parallel legislative, legal, and public education components, so I am familiar with how to assess those factors in planning an overall strategy, as well as with how to develop advocacy networks and build public support for legislative reform.

### Overview of Obstacles to SORA Legislative Reform

5. For my entire career at the ACLU, I have advocated for reforms to Michigan's Sex Offenders Registration (SORA). Based on my two decades of SORA advocacy, it is clear that the political process in Lansing is completely broken when it comes to addressing the many problems with Michigan's sex offender registry. There are several reasons why.

6. Most importantly, the existence of the sex offender registry creates a vicious circle. It conveys the message that people on the registry are *dangerous* for as long as they remain on the registry (and most are on for life). The result is that the registry itself reinforces the public's hatred of registrants, thus making it harder for politicians to bring the registry in line with evidence-based social science research—without losing votes needed for reelection.

7. Legislators—many of whom privately acknowledge that Michigan's registry is bloated and ineffective—do not want to do anything that appears to be soft on sex offenders. Politicians with ambitions are extremely reluctant to engage with SORA

**DOES III - 00001232**

reform because of the adverse political consequences. On the flip side, championing laws to get even tougher on sex offenders is something politicians are happy to put in their campaign ads.

8. SORA is also structurally different from other legislation, both in the legislative process through which it has been developed and amended, and in the structure of the law itself, which imposes extensive burdens and ongoing supervision on a highly disfavored class of people, without any individual review. SORA singles out a group of people for stigmatization and public warnings of dangerousness by the state. And SORA makes the failure to report common everyday events (like renting a car, borrowing a phone, or going to work) a crime, with no evidence that such reporting does *anything* to protect the public or to reduce sexual offending. There is literally nothing else like it.

9. Efforts to reform the registry have been almost entirely unsuccessful, despite the fact that Michigan's registry causes tremendous harm to registrants and their families, with scant evidence of any benefit to public safety. In my experience, it is virtually impossible to use the legislative process to reform SORA because registrants are so despised and so politically powerless.

10. The normal rules just don't apply to people with sex offenses. In my time as a lobbyist in Lansing, I participated in advocacy on a broad array of criminal justice issues, and in virtually every piece of legislation designed to reduce the impact of

**DOES III - 00001233**

criminal sentencing laws, sex offenses were carved out of the law—thus excluding any form of relief.

### Early Efforts at SORA Reform

11. I began working to reform SORA in 2003, shortly after starting at the ACLU, when I was contacted by a group of parents who had children on the registry. These youth had all successfully completed a youth diversion program called the Holmes Youthful Trainee Act (HYTA), and as a result did not have a criminal record. Yet they were still subject to SORA and publicly labeled as sex offenders.

12. My initial efforts for SORA reform were focused on HYTA youth. These youth are among the most sympathetic registrants, as they are typically teenagers who engaged in some kind of sexual misconduct (which could be sex with an under-age partner) and whom a judge determined should not have a criminal record if they successfully completed their probation.

13. But efforts by the ACLU and the children's parents to change the law were obstructed by pushback from prosecutors who felt HYTA recipients should be tracked. Prosecutors, along with legislators, adopted the popular (but false) narrative about registrants and the need for SOR laws: that people convicted of sex offenses could not control their impulses, were prone to continue down a path of ever more deviant behavior, and would be dangerous forever. The underlying conduct of the young people whose parents were advocating in Lansing was embellished to justify

DOES III - 00001234

SORA's harsh treatment of them, despite their lack of a criminal record. Eventually, the parent advocates were isolated, and were labeled as disillusioned parents who were only trying to cover up for their children.

14. There were influential legislative leaders, including Senators Alan Sanborn and Wayne Kuipers, as well as legislators on the Senate Judiciary Committee, who recognized that youth who did not even have a criminal record should not be on the sex offender registry. But due to the prosecutorial pushback and the growing anti-registrant sentiment, they were unwilling to move legislation forward. The false idea that registrants are forever dangerous was simply too politically potent for them to challenge.

15. There was one legislator in particular, Senator Alan Cropsey—a member of the Judiciary Committee—who was particularly hostile towards people with past sex offenses, often vilifying registrants, and claiming they were incorrigible sexual deviants, and their parents were ignorant of their true danger to society. Senator Cropsey blocked all attempts at reform by spreading this false narrative that people convicted of sexual crimes were incurable and had to be behind bars, ostracized, or surveilled.

### Passage of the 2006 Geographic Exclusion Zones

16. In the 2005/2006 Michigan legislative session, a package of bills was introduced and ultimately passed that prohibited registrants from living, working, or "loitering" within 1,000 feet of a school. The bills passed despite there being no

5

DOES III - 00001235

evidence presented, quantitative or anecdotal, of registrants committing sex offenses in proximity to a school. Instead, this legislation preyed on parents' unfounded but visceral fears that sex offenders lurk near schools looking for victims.

17. The ACLU of Michigan pointed the total lack of evidence to support such legislation, as well as specific critical flaws in the language of the proposed legislation itself. These included the lack of a standardized way to measure the 1,000-foot distance (e.g., property line to property line, door-to-door, as the crow flies), and the lack of an actionable definition for what it means to "loiter". More-over, given the number of schools in high-density communities, the 1,000 feet prohibition would cover so much territory in many cities and towns that the geographic exclusion zones would result in registrants being unable to live or work in much of the state. The bills passed anyway.

### The Professional Advisory Board

18. In the years that followed, legislative support for reform became even less. Around 2007, other advocates and I convened a volunteer task force on SORA issues. The Professional Advisory Board (PAB) consisted of well-respected judges, criminal defense lawyers, probation officers, psychologists, researchers, juvenile court administrators, and child welfare experts. Putting together a group of experts and stakeholders to educate legislators and develop policy reform proposals is a

DOES III - 00001236

common approach in Lansing, particularly when an issue is complex, and legislators have little knowledge of the topic.

19. The PAB developed policies based on the emerging scientific studies related to registrants and to the ineffectiveness of new SOR laws. At that point, Michigan's SORA had been in place for over a decade, and other states had laws that went back even further. Social scientists had been studying these laws, and finding that they do not work to reduce sexual offending, but that they cause great harm to registrants and their families.

20. The PAB gathered this research and developed an advocacy strategy to inform lawmakers and the public about the data and need for reform of Michigan's SORA. PAB also worked with communication specialists to help registrants learn how to tell their stories. PAB put on several legislative "learning and information" events designed to inform lawmakers about the low recidivism rates of people who committed sexual offenses, as well as the science showing the ineffectiveness of registries in improving public safety.

21. During this time, we had opportunities to speak with lawmakers about the problems with SORA, which over time had become ever more draconian and expensive, affecting ever more people. What was clear from these conversations was that sitting legislators had no idea how the SORA law worked. They did not understand that federal law does not mandate the contents of Michigan's law, or that the

7

registry is very expensive and imposes huge costs on local law enforcement without any impact on public safety. Legislators did not even know how many people were on the registry, and were shocked to learn its size. But even when provided with information about the ineffectiveness, harms, and cost of registration, legislators were still unwilling to act due to the political risks.

22. The PAB eventually dissolved because, despite its expertise, it was unable to gain any traction in Lansing. I have worked on other issues with similar groups of experts or stakeholders, and we have been able to achieve significant legislative reforms, such as indigent defense reform. But SORA was (and is) unique in my experience: legislators were (and are) so afraid of appearing soft on SORA that almost any evidence-based, legislature-initiated change is foreclosed.

**SORNA and Passage of the 2011 Amendments Restructuring SORA**

23. In 2006, on the heels of a few horrific abduction-by-strangers child rape-murders (which garnered national media attention), Congress had passed the federal Sex Offender Registration and Notification Act (SORNA). SORNA did not set up a federal registry. Rather, the Act sought to incentivize states to adopt state registry laws that have particular features. Essentially, Congress created a model registration law that it hoped states would adopt. SORNA also provided for federal prosecution of registrants where there was federal jurisdiction, such as interstate travel.

DOES III - 00001238

24. The model registration statute promoted by SORNA was draconian, requiring automatic registration for a wide array of criminal conduct regardless of individual risk, vastly increasing the level of reporting required, and imposing extremely long or lifetime registration on almost all registrants. At bottom, the federal SORNA proposed that states adopt laws that subject *all* registrants to the level of supervision and monitoring deemed appropriate for the most dangerous perpetrators (whose rare but notorious crimes had provoked Congress to act).

25. But the states balked. Today, almost two decades after SORNA was passed, only 18 states have passed SORNA-compliant laws. Most states recognized that SORNA would be costly to run, and that the costs of implementing SORNA far exceeded the small amount of grant funding lost to states that did not adopt SORNA-congruent registries. Some states were concerned about the lack of individual risk assessment in SORNA. Others objected to how SORNA requires the registration of children.

26. SORNA also contradicted the social science evidence, which over time has shown ever more plainly that registration and notification do not reduce (what were always very low) sexual recidivism rates. And the lengthy or lifetime registration terms under the SORNA model means that registries will get bigger and bigger even as the people on them get older and older—imposing more costs on both states and registrants, for no public gain.

9

DOES III - 00001239

27. Because the large majority of states have rejected SORNA, there is a wide diversity of registration laws across the country. Some states use individual risk assessments, while others do not. States vary tremendously in who is subject to public registration, what the reporting requirements are, and the length of time that people spend on the registry.

28. Despite the fact that there was no federal mandate, in 2011 Michigan passed a new SORNA-based SORA. Former State Senator Alan Cropsey, who was then in charge of victim services for the Attorney General's office and who as noted had a passionate dislike of people with past sex offenses, led the charge.

29. The 2011 amendments fundamentally changed the registry, retroactively categorizing registrants into tiers without any individual review and retroactively extending the registration terms of thousands of registrants to life. The amendments also imposed new, extensive reporting requirements, including requirements for immediate in-person reporting for even minor changes to information.

### *Does I* and Legislators' Responses to the Litigation

30. When the ACLU filed *Does #1-5 v. Snyder*, No. 12-cv-11194 (E.D. Mich.) (*Does I*) challenging SORA in 2012, some legislators privately expressed support for the litigation in the hopes the courts would do what the legislature was unwilling to do. During this time, we regularly updated legislators on the progress of the case, encouraging them to take the issue into legislative hands so they could control the

10

reform process as opposed to being under the dictates of a court order. They refused again, citing the political risk.

31.  In *Does I*, the federal district court found portions of SORA unconstitutional in 2015. In 2016, the Sixth Circuit held that SORA violated the ex post facto clause, and the Supreme Court denied certiorari in 2017.

32. At the time, it was my expectation that the legislature would respond to the federal court rulings by amending SORA. This is what typically happens in Lansing when courts hold laws unconstitutional. But SORA is not like other laws. Even in the face of federal court rulings that the 2011 SORA was unconstitutional, the state just kept enforcing it and the legislature failed to amend the statute.

33. In 2017, the Chairs of both the House and Senate Judiciary Committees did task the ACLU with convening a process to develop comprehensive bipartisan legislation amending the SORA law in response to the Sixth Circuit decision. The stakeholders included the Michigan State Police, the Michigan Department of Corrections, the Prosecuting Attorney's Association of Michigan, and legislative staff.

34. To the best of my recollection, the workgroup lasted six months. With the election of Governor Whitmer in 2018, there was a change of administration (from Snyder to Whitmer) during the short working lifetime of the workgroup.

35.  Before the change in administration, there was a lot of negativity from some of the participants in the workgroup. Specifically, legal counsel for the Michigan

11

State Police expressed that the law needed no changes because the registrants "didn't deserve relief."

36.   After the change in administration, the legislative workgroup re-formed with a similar makeup. A representative for domestic violence survivors joined the group at this point for a short time. But the meetings turned more heated, and eventually ceased without making progress toward a new constitutional law.

### *Does II* **and the Legislative Workgroup**

37.   After it became apparent that the legislature was not going to amend SORA despite the federal court decisions and would just keep enforcing the unconstitutional law, registrants turned to litigating *Does #1-6 v. Snyder*, No. 16-cv-13137 (E.D. Mich.) (*Does II*), a class action to enforce the *Does I* decision for all registrants. The *Does II* legal team also argued that the unconstitutional sections of SORA were not severable, meaning that the litigation would make the statute entirely unenforceable against pre-2011 registrants. (The plaintiffs eventually won that an argument before Judge Cleland, and the Michigan Supreme Court agreed in *People v. Betts*, 507 Mich. 527 (2021).)

38.   In response to *Does II*, both the executive and legislative branches realized that they had to do something. Policy staff for the Senate Judiciary Committee (Jonathan Shiflett) was tasked with convening a group of stakeholders to work on drafting a new SORA. That legislative workgroup included legislative liaisons from both

12

parties in both houses of the legislature, representatives from the Governor's office, the Michigan State Police, the Department of Corrections, the Prosecuting Attorneys Association, victims' rights advocates, the Michigan Attorney General's Office (who represented the defendants in *Does II*), and class counsel in *Does II*. I participated in the work group for the ACLU of Michigan's political department.

39. The work group met regularly for over a year and half, starting in either later 2017 or early 2018. At the height of activity, the work group was meeting roughly every 2-4 weeks in person.

40. Class counsel in *Does II* repeatedly agreed to extensions in the litigation in order to give legislators time to draft a new, constitutional law. The Court likewise repeatedly postponed briefing deadlines to permit the legislative workgroup to nego-tiate a new statute.

41. When the new work group convened, the meetings gradually met with some success. Indeed, by the summer of 2019, the Legislative Services Bureau (which drafts most Michigan legislation) had prepared a working bill draft. In my experience, when the Legislative Service Bureau drafts a bill, that represents signifi-cant progress because it means that legislators (in this case the Republican chair of the Judiciary Committee) are seeking to move the legislation forward and suggests that influential legislators support the reforms offered in the draft.

13

DOES III - 00001243

42. While the draft bill revising SORA was very much a work in progress, and all stakeholders had concerns about various aspects of the draft, it was a working document for discussion, and reflected the progress that was being made.

43. There was widespread recognition within the work group that SORA was not evidence-based. The social science evidence had only gotten stronger over the last decade that "third-generation" SOR laws like Michigan's cause immense harm to registrants, do not make communities safer, and may actually make them less safe. The work group focused both on curing the statute's constitutional deficiencies and on developing an evidence-based law. There was a general consensus that the registry was far too large, and that its size should be reduced.

44. Work group stakeholders understood that a risk-based registry is far preferable to an offense-based registry, and that individual assessments could be used to identify the lower-risk and higher-risk groups. Much consideration was given to how risk assessments could be performed going forward, as well as how to handle those people already on the registry. For example, the 2019 draft provided for sentencing courts to designate risk levels based on individualized risk assessments, with registration obligations tied to those assessments.

45. Work group stakeholders were also considering much shorter registration terms. While there was no final agreement on the appropriate length of registration terms, work group participants generally recognized that keeping most registrants

14

DOES III - 00001244

on the registry for 25-years or for life was unnecessary when the science showed that most registrants were never going to commit a second offense and that the likelihood of reoffending drops off dramatically over time. There was also widespread agreement that there should be some path off the registry for people who could demonstrate rehabilitation.

46. Even the prosecutors, who still wanted lifetime registration for repeat offenders and for the most serious crimes, agreed that registration terms for many registrants should be reduced and that there should be ways to seek removal. Similarly, while the MSP representatives disagreed about the length of the terms, they agreed that the current terms were too long, and that the chance to petition for removal should be included. The work group also spent a lot of time discussing whether registry information should be public or non-public.

47. In addition, stakeholders, including the prosecutors, began working through a list of all the registrable offenses to determine which should be removed entirely from the registry, and developed a tentative list of currently registrable offenses that should not result in registration.

48. The work group was also open to simplifying the law, by permitting mail or online (as opposed to in-person) reporting, as well as by reducing some of the endless reporting requirements. The 2019 bill draft also barred the registration of children,

15

and allowed for removal of juveniles already on the registry. In addition, it provided special protections for people with developmental disabilities.

49. The position of the Michigan State Police was that the registry itself was not used as an investigative tool because it duplicated richer databases that the MSP already had in place. The MSP advocated for various technical fixes to the statute that addressed administrative problems.

50. In sum, over the lifespan of the work group, there was growing agreement among many of the participants (including the prosecutors) to recommend changes to SORA that were both based evidence-based and would address the constitutional problems identified by the courts. The legislative workgroup made significant progress narrowing the areas of disagreement about what a new (and constitutional) SORA might look like.

51. Despite the progress, however, as the 2020 election loomed (and as Governor Whitmer's name was mentioned as a possible vice-presidential candidate), the executive branch agencies stopped participating. The Governor's office did not provide feedback or give a reason for the turnabout, but I learned that the Senate policy analyst (who was originally charged with bringing the workgroup together) had been told to stop convening the meetings. The clear signal was that the Governor's office and the legislature wanted to leave SORA reform to the courts, because the political risks of legislative reform were too high.

DOES III - 00001246

52.   The ACLU continued to meet alone with the prosecutor's office every couple of months, but it was clear that the government itself had disengaged—fixing SORA was going to be too toxic for too many people as the elections neared.

53. The workgroup disbanded without providing any formal recommendations for an amended bill. In other words, despite growing bipartisan agreement among the stakeholders that SORA reform was necessary, and even in the face of a looming federal injunction against the statute, SORA reform was considered too politically risky.

54. My experience with the SORA legislative workgroup was different from what I've had with other groups in one fundamental way—it was the first time in that the Governor's office refused to verbally participate in the meetings, or comment on the conversations, despite being part of the workgroup. They attended pretty much only to watch. And it was the first time I'd heard of the Governor's office pulling the plug and explicitly forbidding a state agency (the MSP) from participating in the meetings and conversations.

## Passage of SORA 2021

55.   In March 2020, legislators introduced a new SORA bill. See H.B. 5679, 100th Leg., Reg. Sess. (Mich. 2020). That bill did not reflect or incorporate any of the almost two years of work done by the legislative work group. Indeed, the bill retained most of the provisions of SORA 2011—such as the geographic exclusion

DOES III - 00001247

zones—that were a part of what the Sixth Circuit had said made the law unconstitutional.

56. In the summer of 2020, the House Judiciary Committee held hearings on House Bill 5679. It received about 170 submissions, in the form of written comments, letters, in-person testimony, or online (Zoom) testimony. All but two of the submissions on House Bill 5679 opposed—or expressed reservations about—the bill.

57. Michigan Attorney General Dana Nessel submitted comments expressing concerns about the law's constitutionality. *See* Exhibit A, Nessel Letter to Graham Filler re House Bill 5679 (May 11, 2020). The letter noted that the Sixth Circuit had criticized SORA for its lack of individualized risk assessment, expressing concern that the bill's offense-based approach to registration would neither address the courts' concerns nor correspond with the social science evidence on the need for risk-assessments.

58. The Attorney General further expressed concern that there was no mechanism for registrants to petition for removal from the registry. The letter also flagged as problematic the geographic exclusion zones, tiering absent risk assessments, and the continuation of many in-person reporting requirements for decades or life. Even the Michigan State Police submitted comments noting the unconstitutionality of the geographic exclusion zones, among other problems.

DOES III - 00001248

59. Social scientists submitted testimony on House Bill 5679 stating that the bill contradicted modern social science research, and reporting findings that laws like that proposed in House Bill 5679 can increase sexual recidivism.

60. Organizations whose representatives testified or submitted written testimony in opposition to House Bill 5679 included the Association for the Treatment of Sexual Abusers, the State Appellate Defender Office, the Criminal Defense Attorneys of Michigan, Michigan Citizens for Justice, Safe and Just Michigan, professors at the University of Michigan Law School, the American Friends Service Committee's Michigan Criminal Justice Program, Legal Reform for Intellectually and Developmentally Disabled, Freedman & Herskovic, PLC, Coalition for a Useful Registry, Michigan Collaborative to End Mass Incarceration, Washtenaw Citizens for Restorative Justice, MI-CURE, and the American Civil Liberties Union of Michigan.

61. The only favorable oral testimony on House Bill 5679 came from a victim's rights advocate, who told the legislative committee that registrants should be punished for life because victims are punished for life. (Of course, the federal courts had already decided that SORA 2011 was unconstitutional precisely *because* it punished registrants retroactively.)

62. In the lame duck legislative session, a substitute version of the bill was reported out on December 1, 2020, and passed by the full House a day later, on December 2, 2020, without any further hearings.

DOES III - 00001249

63.  The substitute bill did remove the geographic exclusion zones, but was otherwise largely identical to the earlier version of the bill and to the existing SORA statute. It retained the tier structure and required offense-based registration, in most cases for life, without any individual review.

64. The Senate Judiciary hearing did not hold any hearings on the bill. Rather, the Senate suspended the rules, and passed the bill through the full Senate on December 16, 2020. In other words, legislators wanted to rush the bill through the lame duck session without any further public input.

65. The Governor signed H.B. 5679 on December 31, 2020. The amended Act (SORA 2021) took effect March 24, 2021. 2020 Mich. Pub. Act 295

66. Watching this process play out reinforced for me again how broken the political process is with respect to SORA. Despite the agreements in principle among the stakeholders in the workgroup, despite the legislature having been provided uncontroverted evidence that SORA is ineffective or counterproductive, and despite the Attorney General herself advising that the law faced serious constitutional challenges if it did not provide for individual review, the bill was rammed through in lame duck.

67. The new law barely changed the statute that the federal courts had held to be unconstitutional, and it ignored all of the modern evidence-based research data that had been provided to the executive and legislative branches. All the new law did was

20

bring the *Does II* litigation to a close (with a permanent injunction against the old law being entered in that case), and precipitate new litigation.

68. The years invested by stakeholders—including class counsel in *Does II* who had held that litigation in abeyance for almost two years, while their clients were suffering under a unconstitutional law, in the hopes of a legislative solution—were all for naught.

### How SORA Legislation Differs From Other Legislation

69. In my two decades in Lansing, I have worked on all sorts of legislation affecting many different populations. SORA is different from other legislation in at least two ways.

70. First, because uninformed and false beliefs about the registry and recidivism are widely shared by legislators and the public, SORA reform is such a politically toxic issue that legislators are unwilling to consider the actual facts or evidence in developing legislation. And registrants have absolutely no power in the political process. Legislators see only a downside in taking on this issue, and have no incentive or desire to address the issue, even if they understand that the current law is ineffective or counterproductive.

71. Second, SORA itself differs from other laws because it imposes such extensive restrictions and obligations without any individual review. While there is a lot

DOES III - 00001251

of legislation that imposes punishments and consequences for particular bad conduct, such punishments are meted out on an individual basis, typically through the judicial process. By contrast, SORA adds people to a list that bars them from full inclusion in society, labels them as the worst of the worst, and subjects them to decades or a lifetime of supervision, all without any consideration of their individual circumstances or any ability to appeal or seek judicial review.

72. I am not aware of any other legislative scheme that imposes restrictions comparable to those of SORA that does not involve individual review. For example, there is individual review when criminal punishments are imposed, when parental rights are limited or suspended, when people are restricted from purchasing guns, when people are subject to restrictions based on their mental health, or when driver's licenses are restricted or taken away. SORA is aberrational because it effectively requires lifetime supervision without any consideration of individual circumstances.

I, Shelli Weisberg, declare under penalty of perjury that the above statement is true and correct pursuant to 28 U.S.C. § 1746.

*Shelli Weisberg*
_____
Shelli Weisberg

March 20, 2023

DOES III - 00001252

# Exhibit A:

Nessel Letter to Graham Filler re

House Bill 5679

DOES III - 00001253

STATE OF MICHIGAN
DEPARTMENT OF ATTORNEY GENERAL



P.O. Box 30212
LANSING, MICHIGAN 48909

**DANA NESSEL**
ATTORNEY GENERAL

May 11, 2020

The Honorable Graham Filler, Chair
House Judiciary Committee
124 North Capitol Avenue
Lansing, MI 48933

      Re:    House Bill 5679

Dear Chairman Filler and members of the Judiciary Committee:

      I appreciate the opportunity to weigh in on House Bill 5679 and the important issue of amending Michigan's current Sex Offender Registry Act (SORA). The scope and contours of SORA are issues I care about deeply, for reasons I set forth in <u>my amicus brief</u> to the Michigan Supreme Court in the SORA cases pending in that court.

      For reasons that include community stability and public safety, I have particular concerns with SORA's overall lack of individualized assessment of risk, its geographic exclusion zones, the tiers, and its onerous in-person reporting requirements. And given that the Sixth Circuit addressed these same points when it held that imposition of SORA on individuals who had committed offenses prior to July 1, 2011, was an Ex Post Facto Clause violation, *Does #1-5 v Snyder*, 834 F3d 696 (CA 6, 2016), it is vital that amendments to SORA fully address these concerns.

      I believe that HB 5679 has made some headway in doing so, and I appreciate the work that has gone into its drafting. But it is my opinion that the bill does not sufficiently address either my concerns or those of the federal court in these key areas and others. The bill needs considerably more work if the State is going to avoid future litigation over the constitutionality of its registry. And because courts tend to analyze the registry as a whole, any major area that remains insufficiently addressed could cause the entire Act to fall.

      For ease, I have organized my comments based on the specific provision, as follows:

The Honorable Graham Filler, Chair
Page 2
May 11, 2020

## Overall view

The bill has further complicated, rather than simplified, SORA. One key way it has done so is by bifurcating the registry—essentially creating separate registries for pre-2011 and post-2011 registrants. And within those separate registries there are actually five different sets of rules, depending on the length of registration. This makes an already "byzantine code," *Does #1-5 v Snyder*, 834 F3d 696, 697 (CA 6, 2016), even more difficult for registrants to understand and for law enforcement officials to enforce. This is likely to lead to increase rather than avoid litigation.

## Lack of individualized risk assessment

The length of registration should be based on risk and should be supported by evidence and research on recidivism. (Nessel amicus at pp 29–40.) The current SORA uses the offense of conviction as the only factor in determining whether an individual has to register and, if so, the length of the registration. HB 5679 continues this shortsighted offense-based assessment, and for post-2011 registrants who are still subject to tier designations, their assigned tier is tied to the offense(s) rather than to degree of risk. The Sixth Circuit criticized our SORA on this very point, noting that it "ascribes and publishes tier classifications corresponding to the state's *estimation* of present dangerousness *without providing for any individualized assessment*." *Does #1-5*, 834 F3d at 703 (emphasis added).

And problematically, HB 5679 suffers from the same weakness as the current SORA in that it affords a registrant no path to get off the registry. There is no ability to petition for removal based on an individualized assessment of risk or the passage of a specified number of years with no new sex offense.

HB 5679's offense-only approach does not adequately address public safety or federal court concerns. Unless this approach is re-evaluated, I believe the State will continue to be vulnerable to litigation. Other states have utilized various models, and some existing tools—such as Static-99 and Parole Board evaluation—could potentially be utilized in this endeavor.

## Geographic exclusion zones

The bill retains school geographic exclusion zones (Sec 33(e); Sec 34(1)(a),(b)). This will be problematic given that the existence of geographic exclusion zones was a key focus of the Sixth Circuit in holding that SORA was unconstitutional Ex Post Facto punishment. The Sixth Circuit said that these zones pose "a great difficulty in finding a place where [registrants] may live or work" and "put significant restraints on how registrants may live their lives." *Does #1-5*, 834 F3d at 702, 703. And the Court noted that there was "scant" evidence that these zones actually keep

DOES III - 00001255

The Honorable Graham Filler, Chair
Page 3
May 11, 2020

the public safe. *Id*. at 704–705. I argued those same points to the Michigan Supreme Court. (Nessel amicus at pp 7.)

Therefore, the mere inclusion of these zones—even if clarity is added—could cause the entire Act to fall. Student safety zones are not required under the Sex Offender Registration and Notification Act (SORNA). It is one of the many ways Michigan's SORA goes beyond the requirements of SORNA.

The bill does attempt to clarify what constitutes an exclusion zone, which is a help. But it falls short in its definition of a school safety zone. It defines the zone as 1,000 feet or less from school property line (Sec 33(3)). It is unlikely that individuals will know where those property lines are, particularly since school property often extends a considerable distance from the school building itself and can include play yards and fields whose boundaries are not clearly delineated. Thus, the vagueness problems that Judge Cleland identified in 2015, see *Doe v Snyder*, 101 F Supp 3d 672 (ED Mich, 2015); *Doe v Snyder*, 101 F Supp 3d 722 (ED Mich, 2015), remain.

The bill also takes a positive step in fixing a vagueness problem by removing references to, and the definition of, "loitering" in school safety zones, Sec 33(b), and by adding some exceptions such as transport to and from school, attendance at school events, meetings with school employees, and intermittent passing through for work (Sec 34(4)(a)–(d)). These exceptions help registrants to stay connected to children and family members—which promotes stability. The bill should also indicate whether the restrictions are imposed 24/7 or just during school hours and whether there are exceptions for non-school activities that are held on school property (for example, a private dance studio recital where the studio has rented space in a high school theatre or auditorium).

## Tiers

HB 5679 took a significant step forward in removing the tiers for pre-2011 registrants (Sec 2a(2)). The tiers were part of what drove the Sixth Circuit to conclude that SORA is an unconstitutional Ex Post Facto violation. The Sixth Circuit said that "SORA ascribes and publishes tier classifications corresponding to the state's estimation of present dangerousness without providing for any individualized assessment." *Does #1-5*, 875 F3d at 703. And the Court noted that the tiers "are unappealable." *Id*.

But for post-2011 registrants, the tiers remain. Again, the tiers are tied to offenses rather than to degree of risk, which burdens the registrant without adequately addressing public safety concerns. Thus, the problems with the tiers as outlined by the Sixth Circuit may remain unconstitutional for registrants moving forward.

DOES III - 00001256

The Honorable Graham Filler, Chair
Page 4
May 11, 2020

## In-person reporting requirements

The bill reduces the burden of reporting requirements by slightly extending
the reporting periods. But it still requires in-person reporting on a wide variety of
information unless the Michigan State Police comes up with a different system.
The in-person reporting is burdensome especially for registrants who must do so for
life. *Id.* For those whose offenses were after 2011, the lengths of registration,
including lifetime registration, remain. For all others, the period is 25 years or 10
years after release from incarceration, whichever is longer, or lifetime registration if
the registrant has committed certain offenses.

These requirements, especially the voluntary nature of an MSP alternative to
in-person reporting, are still problematic based on the fact that the Sixth Circuit
focused on SORA's "cumbersome in-person" reporting. *Does #1-5*, 875 F3d at 703.
The Court specifically noted that the requirement that registrants make frequent
in-person visits to law enforcement "appears to have no relationship to public safety
at all." *Id.* at 705.

In sum, I appreciate your careful consideration of these comments and
concerns. And once again, I thank you for the opportunity to be a part of this
important, ongoing discussion.

Sincerely,

Dana Nessel

Dana Nessel
Attorney General

DN/AMS