# Exhibit 43:
## M.R. Declaration

# DECLARATION OF M.R.

1. I am a current registrant on Michigan's Sex Offender Registry. In 2005, I was convicted of enticement to induce a minor to participate in illegal activity, and interstate travel with intent to engage in illicit sexual conduct. My conviction was in the federal district court for the Northern District of Ohio. I was assigned to federal prison in Michigan by the Federal Bureau of Prisons (BOP) where I spent four years incarcerated before being released in 2009.

2. I am now 69 years old. I have been on the registry since 2008. As a tier II registrant, I have to be on the registry for 25 years. So, I will be on the registry until 2034, when I'll be 81 years old.

3. When I pled guilty to my charges, I did so based on the assertions made by both my attorney and the U.S. Attorney that I would only be required to register for 10 years after serving my sentence. This was a major inducement to sign the plea agreement. However, after leaving prison and going to register for the first time, I found out that I would now be required to register for 25-years—15 years more than I understood when I pled guilty. I feel like I was tricked into pleading guilty to a deal that they could not guarantee but that I relied on. If it had been true that I would only have to register for 10 years, I would be off the registry now.

4. The MSP "mapped" my federal offense to what they thought was a similar offense in Michigan. I was simply informed that I had been assigned to tier II. At

1

no point was I given a chance to challenge the designation or provide any arguments or evidence about whether my offense is similar to a Michigan offense, or which offense is most similar.

5. At the time of my conviction, I was living in the state of New York with my then-wife (with whom I shared a consulting business) and our two daughters. However, my arrest and subsequent conviction contributed to the breakdown of our marriage and eventual divorce. Because my then-wife made it clear during my pre-sentence investigation that I was no longer welcome in our home in New York, I was assigned to a federal correctional institution in Michigan which served the Northern District of Ohio. The BOP was also aware my mother and sister lived in Michigan.

6. While in federal corrections, it was made clear to me that upon release, I had to have a home address or else I would be sent to a shelter in Ohio. Because my 94-year-old mother agreed that I could live with her once I was discharged, I was able to be released to Michigan instead of Ohio.

7. I was initially assigned to a BOP supervised half-way house prior to release into the community. I lived in the halfway house for 6 months. While I lived there, BOP required I attend cognitive restructuring programs, including substance abuse evaluation. When I was discharged from BOP supervision and assigned to the US Probation Office for supervised release, my cognitive restructuring release report

included an evaluation and statement from the therapist that I was "at low risk to reoffend." After being released from the half-way house, I was finally able to move in with my mother.

8. I was sentenced to supervised release for 36 months during which I regularly attended AA meetings (despite no requirement to do so); continued to participate in cognitive restructuring with a therapist through Catholic Charities; co-founded a 501(c)(3) charitable organization dedicated to Re-Entry After Prison; volunteered with the US Probation Department (E.D. Michigan) to assist in their re-entry programs for returning citizens, and started up my current company. My supervision was eventually reduced to 20 months due in part to my success during supervised release and the evaluation of my risk status.

9. While I was incarcerated, the Adam Walsh Act was passed, amending, among other things, the Immigration and Nationality Act to prohibit citizens convicted of any "specified offense against a minor" from filing a family-based immigrant petition on behalf of any beneficiary.

10. In 2012, my current wife and I were married in the Philippines (where she is from). Our son was born in the Philippines 10 months later. After marrying, we learned that the Adam Walsh amendment would be a bar to filing any immigration petition for my wife in the U.S. due to my conviction, preventing my family from immigrating to the United States to be with me. We learned shortly after that a

DOES III - 00001174

provision in the Act permits a waiver to be issued upon showing rehabilitation efforts and lack of risk factors. Despite being told it was rare to be granted a waiver, I was encouraged to do so by my attorney based on my record.

11. I filed for the waiver in 2013. The waiver required I demonstrate rehabilitation as well as prove beyond any reasonable doubt that I posed no risk to the safety or well-being of the intended beneficiary. Based on case notes, psychological assessments, and letters of support from the community—including the district court judge who adjudicated my case—I was able to make this showing that I posed no risk to my family. My waiver was granted in 2015 after 24 months of investigation and review. My wife and son were finally able to immigrate to the United States in August of 2015.

12. Despite proving beyond a reasonable doubt that I pose no risk and receiving the Adam Walsh waiver, my continued inclusion on the sex offender registry burdens my ability to be with and care for my family. Previously, I had few issues with traveling between the U.S. and Philippines aside from complying with the complex reporting requirements. On my last trip to the Philippines, however, I was denied admission because I was designated a sex offender, as I had showed up on the registry. I have since been blacklisted from travel to the Philippines until such time that I am removed from the sex offender registry.

DOES III - 00001175

13. Counsel in the Philippines advised that because the state has put me on the registry, I must be dangerous. I was told that once I was removed, I could reapply for re-admittance to the country. This has had a profound effect on my family as I am unable to accompany my family home or be with them in the Philippines.

14. My registry status has caused not only separation from my family, but also fear and anxiety. The public nature of the registry causes my family to live in constant fear that we will be attacked in our home. My wife is afraid to drive because our license plate is listed on the registry, and she is scared someone will recognize it and try to hurt her.

15. Twice I have been contacted by people posing as police officers who have found my information on the registry in an attempt to harass me, terrifying me and my family. The last time I received a call like this was in August of 2022. The caller claimed I had missed a mandatory DNA verification, identifying himself as from the local sheriff's department. In both instances, I have reported the calls to the real police and have been told that there is no recourse available for this situation.

16. After my conviction, my ex-wife and I agreed that she would continue to operate the business we shared while I was incarcerated as it was her only source of income. I signed a power of attorney and turned over all legal and financial responsibility to her. After my release, we officially divorced, and the business was dissolved.

17. In 2009, I started another consulting business here in Michigan as an alternative to seeking direct employment. Due to my registry status, I feared I would be rejected from most jobs once my status was inevitably exposed. Both friends and professional colleagues explicitly discouraged me from seeking direct employment because of my registry status, many telling me not to bother. As a former corporate Human Resources Officer, I both understood their reasoning and knew they were right. For that reason, I decided to restart my consulting business. However, even though I am my own employer, my registry status continues to be an issue, costing me business, contracts, opportunities, and income.

18. For example, around 2010 while I was still establishing my business, I was offered an opportunity by the Michigan Small Business Technology Center to work on a project that would offer me compensation and exposure for my consulting business. However, a competitor found and weaponized my registry profile against me. This competitor shared this information with the Center's Director and eventually filed a complaint, arguing I should not be allowed to participate at all because of my background. The complaint was dismissed, but the business was lost, and my business' reputation harmed.

19. Another instance involved a family-owned company to whom I provided consultation to for several months. The company offered me the position of general manager, which was a full-time role with great pay and full benefits. Before taking

the position, I spoke with the owner about my conviction. He was gracious and offered me the position, nonetheless. After working there for two months, I returned from a trip to see my daughter graduate and found that I could no longer access my office. The owners brought me into a conference room and immediately fired me for "failure to disclose" my background, despite my earlier disclosure.

20. I found out later from their attorney (as I had intended to sue) that they fired me despite already knowing of my conviction because I had to report my employment address—their office—as required by the registry. This change triggered "alerts" to the surrounding residents who wrote letters to the company with threats of going to the press about how they hired sex offenders.

21. Not only was I fired from this position as a result of the registry, but the word spread amongst the industry causing me to lose a contract with a client who was friendly with the owners.

22. In another example, I was asked by a friend of my wife's to provide a consultation for a company transaction. I agreed to provide the consultation, but after two months my registry status was exposed. I was confronted by the company's CFO with a printout of my registry flyer that he received from a staff member of the other company involved in the transaction. I was fired on the spot and my services canceled, causing financial and reputational damage to my consulting business and to me.

I, M.R., certify that the above statement is true and correct pursuant to 28 U.S.C. § 1746.

M.R._____<br>
(name on file with Plaintiff's counsel)

March 15, 2023

**DOES III - 00001179**