# Exhibit 54:

## Dr. Karl Hanson Deposition Transcript

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                   SOUTHERN DIVISION

 4    - - - - - - - - - - - - - - - - - -
                                         )
 5    JOHN DOES A, B, C, D, E, F, G, H,  )
      MARY DOE and MARY ROE, on behalf   )
 6    of themselves and all others       )
      similarly situated,                )
 7                                        )
                            Plaintiffs,  )
 8                                        )
          -vs-                           )No. 2:22-cv-10209
 9                                       )Judge Goldsmith
      GRETCHEN WHITMER, Governor of the  )Mag. Ivy, Jr.
10    State of Michigan, and COL. JOSEPH )
      GASPER, Director of the Michigan   )
11    State Police, in their official    )
      capacities,                        )
12                                        )
                            Defendants.  )
13    - - - - - - - - - - - - - - - - - -

14

15            R E M O T E   D E P O S I T I O N

16    of R. KARL HANSON, Ph.D., a witness called by

17    Defendants, taken via Zoom before Tamara Staley

18    Heckaman, Certified Shorthand Reporter and Notary

19    Public, on Friday, May 12, 2023, noticed for the

20    hour of 10:00 a.m.

21

22                    HECKAMAN & NARDONE, INC.
23                   Certified Shorthand Reporters
                          P.O. Box 27603
24                    Lansing, Michigan 48909
                         (517) 349-0847
25                    theckaman@live.com
```

2

```
1   APPEARANCES:
2       AMERICAN CIVIL LIBERTIES UNION
3       FUND OF MICHIGAN
        802 Legal Research Building
        801 Monroe Street
4       Ann Arbor, Michigan 48109
        By
5       PAUL D. REINGOLD, J.D.
            -and-
6       AMERICAN CIVIL LIBERTIES UNION
        FUND OF MICHIGAN
7       1514 Wealthy SE, Suite 260
        Grand Rapids, Michigan 49506
8       By
        MIRIAM AUKERMAN, J.D.
9           -and-
        DAYJA TILLMAN, J.D.
10
            On behalf of Plaintiffs.
11
12      MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
        MDOC Division
13      P.O. Box 30217
        Lansing, Michigan 48909
14      By
        ERIC M. JAMISON, J.D.
15          -and-
        SCOTT DAMICH, J.D.
16
            On behalf of Defendants.
17
18
19
20
21
22
23
24
25
```

3

```
1           EXAMINATION INDEX
2   ATTORNEY'S NAME  EXAMINATION RE-EXAMINATION
3   BY MR. JAMISON:     4
4   BY MR. REINGOLD:  208
5           *    *    *
6           INDEX OF EXHIBITS
7   EXHIBIT                     MARKED
8   Ex. A  Declaration of R. Karl Hanson     21
9       dated 10-29-21
10  Ex. B  Sex Offender Recidivism: A Simple   46
11      Question 2004-03, document prepared
12      by Andrew J.R. Harris and
13      R. Karl Hanson
14  Ex. C  Declaration of R. Karl Hanson,   130
15      Rebuttal Report dated 4-25-23
16  Ex. D  Affidavit of Sharon Jegla      161
17  Ex. E  Affidavit of Tricia Dare       163
18  Ex. F  Excerpts from CSC court opinions  205
19
20
21
22
23
24
25
```

4

```
1           Remote Deposition
2           Friday, May 12, 2023
3           10:00 a.m.
4           R E C O R D
5           COURT REPORTER:  The attorneys
6   participating in this deposition acknowledge that
7   I am not physically present in the deposition room
8   and that I will be reporting this deposition
9   remotely.  They further acknowledge that in lieu
10  of an oath administered in person the witness will
11  be sworn remotely and his testimony in this matter
12  is under penalty of perjury.  The parties and
13  their counsel consent to this arrangement and
14  waive any objections to this manner of reporting.
15          Please indicate your agreement by
16  stating your name and your agreement on the
17  record.
18          MR. JAMISON:  Eric Jamison, I agree.
19          MR. REINGOLD:  Paul Reingold,
20  agreed.
21          R. KARL HANSON, Ph.D.,
22  having been duly sworn, testified as follows:
23          EXAMINATION
24  BY MR. JAMISON:
25      Q.   Good morning, Doctor Hanson.  My name is
```

5

```
1   Eric Jamison.  I'm an assistant attorney general
2   and I represent Governor Whitmer and Colonel
3   Gasper in this lawsuit.  I noticed your deposition
4   in the case, which is Does v Whitmer, case number
5   2:22-cv-10209, in the district court of the
6   Eastern District of Michigan in front of the
7   Honorable Judge Goldsmith.
8           There's a protective order in place
9   in this case.  Have you been provided with a copy
10  of the protective order?
11      A.   No.
12      Q.   I don't believe anything will come up in
13  the course of the deposition that will be -- will
14  fall under the protective order, but, in any
15  event, there is a protective order in place which
16  protects the identity of the named plaintiffs.  Do
17  you know who any of the named plaintiffs are in
18  this lawsuit?
19      A.   I do not.
20      Q.   All right.
21          MR. JAMISON:  Like I said, I don't
22  think we'll get there, but, Tami, could you
23  confirm that you've been provided a copy of the
24  protective order and signed the acknowledgment?
25          COURT REPORTER:  Yes, I have.
```

6

BY MR. JAMISON:

1    **Q.** All right. Doctor Hanson, so I'll
2 describe the rules briefly about depositions, and
3 I guess, first, have you had your deposition taken
4 before?
5
6    **A.** I have.
7    **Q.** So I'll -- it will be a bit of a
8 reminder. We can't talk over each other. You
9 can't respond with a head shake or a head nod.
10 You need to have verbal responses.
11       If you don't understand a question I
12 can rephrase it. I'm not trying to trick you with
13 the way I'm asking the questions or anything like
14 that. And lawyers tend to be notoriously wordy
15 and convoluted, so if I get there, which I
16 probably will throughout the day, feel free to ask
17 me to rephrase the question. And if you answer a
18 question I'll assume that you understood the
19 question; is that fair?
20    **A.** Yes, that is fair.
21    **Q.** Are you taking any medication or any
22 substances that might affect your memory or your
23 ability to answer questions truthfully today?
24    **A.** No.
25    **Q.** Anything else that might interfere with

7

1 your ability to answer questions truthfully and
2 fully today?
3    **A.** No.
4    **Q.** How many times have you had your
5 deposition taken?
6    **A.** Depositions probably about -- more than
7 six but less than twelve.
8    **Q.** And how many times have you testified in
9 court?
10    **A.** Four or five, I'd say.
11    **Q.** How many times have you been qualified as
12 an expert?
13    **A.** 20 to 30 times probably.
14    **Q.** And what is the area of expertise in
15 which you are qualified as an expert?
16    **A.** So I've been and consider myself
17 **qualified in the area of sexual offending**
18 **behavior, the psychology of sex offending in crime**
19 **generally, the sexual recidivism rates of**
20 **individuals, the interventions that are used both**
21 **by psychologists and by public policy to control**
22 **and manage the risk of sexual offending,**
23 **statistics of a certain type, research**
24 **methodology.**
25       **I've also done testimony and**

8

1 **qualified as an expert witness on ethnic**
2 **differences in risk assessments and threats to**
3 **risk assessments in applied practice. And on --**
4 **in correctional rehabilitation more generally.**
5    **Q.** Have you ever been disqualified as an
6 expert in any of the cases you've consulted on?
7    **A.** I have not.
8    **Q.** Have you ever been retained by the
9 defense as an expert in a -- in a civil case?
10    **A.** I have been retained by the government as
11 **the defense in some civil cases. I spent many**
12 **years working for the government of Canada, and in**
13 **my capacity as a civil servant I was -- and an**
14 **expert I was called upon to describe information**
15 **and opt for in this case the government's side.**
16 **This included issues to do with sex offender**
17 **registration as well as risk assessment as applied**
18 **to individuals in the corrections and criminal**
19 **justice system.**
20    **Q.** And sort of a broad question but is
21 the -- I assume that Canada has a sex offender
22 registry; is that right?
23    **A.** It does, though it's different in form to
24 **the registries that are used in the United States.**
25    **Q.** And in what ways is -- you know, just

9

1 sort of at a high level in what ways is it
2 different in Canada versus the United States?
3    **A.** In Canada it is not public. It is
4 **controlled by the police forces who selectively**
5 **disclose information when they consider it**
6 **appropriate.**
7    **Q.** And what are those -- what are some
8 circumstances under which they would disclose that
9 information?
10    **A.** When somebody is traveling to a foreign
11 **country and is returning to Canada and has the**
12 **history of sexual offending and is deemed to be**
13 **high risk for sex tourism, that information would**
14 **be shared with the border services.**
15       **Individuals who are completing their**
16 **sentences and are deemed to be unusually high risk**
17 **for immediate offending could be, and often are,**
18 **subject to public notification, though the numbers**
19 **are very much smaller in Canada than in the United**
20 **States. The number of public notifications would**
21 **be probably less than 30 a year, and the**
22 **notifications are only for a determinant period of**
23 **time, for months or a year, after which they are**
24 **no longer findable on any public documentation.**
25    **Q.** And when you say public notification what

10

1   does that mean?
2       A.   Public notification, that means that the
3   police issue a statement that is a public
4   statement, and they make efforts to inform the
5   public that this individual is in the community
6   and is a high risk and to take special precautions
7   should this individual engage in questionable
8   behavior.
9       Q.   And what does that look like in practice?
10  Is it a press release, is it a press conference;
11  how does that get published by the police?
12      A.   It varies depending on the police service
13  and the resources in the case.   If there -- most
14  typically the ones I've seen have been a press
15  release that gets picked up by the major and
16  local -- usually the local news services since
17  it's not of particular interest or relevant for
18  the national services if somebody is going into a
19  particular region, but the local region would
20  typically pick it up.
21      Q.   And how is it determined which offenders
22  are subject to this public notification?
23      A.   Yeah.   It's -- it's based on a risk
24  assessment that is conducted from information and
25  recommendations from the correctional systems,

11

1   most typically the federal system but it could be
2   other systems as well, and the responsibility for
3   the final decision is actually made with the
4   police who have the decision making authority upon
5   the recommendations from the correctional
6   services, though in legislation it -- the
7   correctional services are not the only people who
8   could nominate people for notification.   It could
9   also be another community agency, but in practice
10  it's almost always the correctional services
11  identifying people who are leaving the system who
12  remain at an unusually high risk that are subject
13  to this form of notification.
14      Q.   Does Canada have any sort of civil
15  commitment program or mechanism for people who
16  remain to be at risk to the community?
17      A.   Yeah.   Canada has a different mechanism,
18  which is done at the time of sentencing, so if
19  somebody is -- commits a sex offense and the sex
20  offense does not justify a life sentence, so
21  somebody might have touched somebody, but the
22  individual has a long history of serious personal
23  injury offense and there's a risk assessment
24  saying that this individual is likely to re-offend
25  and is unresponsive to community supervision, then

12

1   they could be subject to what's called the
2   dangerous offender designation, which is a
3   designation -- a sentence at the time of
4   sentencing, which is a life sentence, and they
5   only get released then after somebody in the
6   correctional service determines that they're a
7   sufficiently low risk that they can be released.
8   So this is a form of very long term sentences
9   based on risk assessment, but it's not done after.
10          There's another feature of Canadian
11  policy which is relevant, which is after the end
12  of sentences it is possible to place a strict
13  community supervision order on people even after
14  their sentence has expired based on the perceived
15  risk.   Again, this is a power of the police
16  services and they're referred to as 810 orders,
17  and so individuals who are unusually high risk
18  coming out could be subject to an 810 order, which
19  could require them to reside in a certain place,
20  not to go certain places, to attend treatment, to
21  remain substance free, and these can be enforced
22  with penalties, incarceration penalties, if they
23  are violated.
24      Q.   And these 810 orders, how long can they
25  be in effect for?

13

1       A.   Two years and you can renew them.
2       Q.   And do you have any knowledge about how
3   often they're renewed?
4       A.   They're not renewed that often.   People
5   usually either violate the order and go back into
6   the system or they don't and their risk level is
7   downgraded to a more manageable level, so the rate
8   of renewal of the orders is quite small.   I don't
9   have the exact statistic, but it's well less than
10  half and maybe less than a quarter.
11      Q.   And after someone has an 810 order are
12  they given another risk assessment at the end of
13  the two year period?
14      A.   Yes.
15      Q.   And to back up a minute, it sounds like
16  when folks are leaving incarceration they're given
17  some sort of risk assessment.   What do those risk
18  assessments look like?
19      A.   We have 14 different correctional systems
20  in Canada, so they all look different.   I will
21  talk about the ones that I know best, which are
22  the risk assessments conducted by the Correctional
23  Service of Canada.
24          In Canada we have a federal prison
25  service called the Correctional Service of Canada.

14

1  It is different from the US federal service
2  because the Canadian federal service is --
3  distinction is based on the length of sentences.
4         So in Canada if you have a sentence
5  of two years less a day you go to one of the
6  provincial or territorial systems.  If you have a
7  sentence of two years or more you go to the
8  federal system.  So the serious offenders end up
9  in the federal system, which is called the
10 Correctional Service of Canada.
11        At the end of -- individuals in the
12 Correctional Service of Canada have a correctional
13 plan, which is steps that they are expected to do,
14 programs they are expected to take, activities
15 they're supposed to engage in, and at the end of
16 their sentence or near the end of their sentence
17 there are stages of conditional release.  They can
18 be released early, middle, or late, and those are
19 based on a decision made by the Parole Board of
20 Canada, which is a legislative body which is
21 administrative and distinct from the Correctional
22 Service of Canada though both do report to the
23 same minister.
24        The Parole Board of Canada makes
25 their decision based on information provided by

15

1  the Correctional Service of Canada as well as from
2  assessments which are contracted by the Parole
3  Board of Canada that are typically done by
4  psychologists using the standard procedures that
5  psychologists would use to do risk assessments.
6  If you want me to describe more what those would
7  look like I can describe that, but I -- could --
8      Q.  Yeah, one of the things I'm curious about
9  is is it -- and I assume for -- and maybe my
10 assumption is wrong but I would think that for --
11 most sex offenders are going to end up in the
12 federal -- federal custody in Canada?
13     A.   No.  In Canada sex offenders -- people
14 who are -- if you get a sex offense conviction in
15 Canada half of those would get a community
16 sentence, which would be a provincial sentence,
17 about 35 to 40 would get a provincial sentence,
18 and only 10 to 15 percent would get a federal
19 sentence.  So our sentencing is not as severe as
20 would be typical in the States so --
21     Q.  What about the other 50 percent?
22     A.   What -- excuse me?
23     Q.  I thought you said 35 percent would get a
24 provincial and then 10 to 15 percent would get the
25 federal --

16

1      A.   The federal, and the other 50 percent, as
2  I said before, would get a community sentence,
3  probation, which is administered at the provincial
4  level.
5      Q.  Got it.  So when the -- whether it's the
6  parole board or the correctional service -- or let
7  me move down a layer.  So the psychologists that
8  do the assessments, do they use Static-99, do they
9  use STABLE, do they do sort of an individualized
10 review for each offender; how does that work?
11     A.   In Canada, I'll, you know, talk about the
12 Correctional Service of Canada since I know it
13 well, they do a detailed risk assessment early in
14 the sentence, and by current policy Static-99 is
15 part of that risk assessment.  They also use
16 STABLE as part of their initial risk assessment
17 and that's used for establishing their
18 correctional plan, what programs they attend, what
19 institutions they attend.  So they have a Static/
20 STABLE assessment, which is done within the first
21 hopefully few months of their sentence.
22        They are then reassessed at the end
23 of their programming with a new STABLE, Static
24 doesn't change, and then if their release
25 opportunities are substantially different from

17

1  their end of programming they would be reassessed
2  again by an independent evaluator.  Most of --
3      Q.  What does an independent evaluation look
4  like?
5      A.   Well, it's not specified specifically
6  because they're -- they're contracted out to
7  psychologists in their particular region.  They do
8  specify in the most general way that they should
9  use a validated actuarial risk tool, so in
10 practice almost everyone I've seen uses Static-99
11 or Static-2002, but they could use other things as
12 well.  They very often use multiple risk tools,
13 and STABLE is very often -- is probably the most
14 commonly used measure of that type.  They also may
15 use a structured professional judgment tool such
16 as the SCR 20.
17     Q.  Does it also include an interview with
18 the individual?
19     A.   The Static tools can be done without
20 interviews.  Most of the other risk tools strongly
21 recommend that you have an interview.  However,
22 you can still score some of them without the
23 interview if your records are good.
24        So if you are scoring on
25 psychological risk relevant propensities, things

18

1 like impulsivity or sexual preoccupations, it's
2 very helpful to be able to talk to the individual.
3 However, it may be possible to do those types of
4 assessments even with a resistant individual.
5 **Q.** Do you have any idea in practice how many
6 of those independent evaluations include an
7 interview?
8 **A.** Oh, 85 percent, 90 percent, most include
9 an interview.
10 **Q.** And for the independent evaluation does
11 that include the independent evaluator producing
12 some sort of reports outlining their findings or
13 their recommendations?
14 **A.** Yes.
15 **Q.** Do you have an idea of how long that
16 re-evaluation process takes? It sounds like there
17 may be another STABLE done. There's a risk
18 assessment tool. There -- it sounds like in 85
19 percent of the instances there's an individual
20 review. Do you have an idea of the length of time
21 required to conduct those steps?
22 **A.** Yeah, it varies a lot. If the individual
23 is moderate or low risk they can be done
24 reasonably quickly, in the matter of -- oh, you
25 can basically start and finish in a day or

19

1 day-and-a-half. So if the person has a very
2 lengthy criminal history and is very high risk it
3 could take several days to collect the necessary
4 information, interview the person, and to do some
5 report.
6 **Q.** And after that independent evaluation is
7 conducted what is the next step?
8 **A.** The -- for what? I guess could you
9 clarify?
10 **Q.** Sure. So if somebody gets re-evaluated,
11 we'll just say it's a medium risk person, does the
12 evaluator make a recommendation to the parole
13 board about what their conditions of release
14 should be? Could the independent evaluator say,
15 well, you know, I think they're still at a high
16 risk so they should stay incarcerated or -- I'm
17 just trying to understand what the next steps are
18 after that independent evaluation.
19 **A.** Yeah. There's several different -- the
20 evaluations are done for several different
21 purposes, so there could be early -- I'll call
22 them early release, normal release, very late
23 release, and then public notification, so those
24 are all sort of levels of risk, so to speak, each
25 with a different threshold.

20

1 So if a person has done well they
2 could apply for early release, which would be
3 parole, and they could -- they have to proactively
4 request this. So the individual would say I think
5 I'm ready, and then it set the wheels in motion so
6 that they get an assessment and then they make an
7 application to the parole board.
8 So the parole board would receive a
9 report. The report will speak to what the
10 individual is like. The report will be done on
11 the awareness that the individual is being
12 considered for parole and will talk -- provide
13 information. The task of the evaluator is to
14 provide information that would assess the decision
15 makers, in which case -- in our case would be the
16 parole board, about whether they meet the criteria
17 for early release.
18 And similarly if in the very high
19 risk situations there'd be an assessment and the
20 evaluator would be aware that they are considered,
21 for example, for detention right to the end of
22 their sentence, that there was criteria for that,
23 the report should speak to that criteria, but the
24 decision is made by this independent quasi
25 judicial body who hears evidence and makes a

21

1 decision.
2 **Q.** Do you happen to have a copy of your --
3 you provided two reports in this case. Do you
4 happen to have a copy of them in front of you?
5 **A.** I do.
6 **Q.** Okay. So I'm going to mark as Exhibit A
7 the Declaration of R. Karl Hanson, which was --
8 it's in the record at ECF Number 1-4, and it
9 starts at page ID 229.
10 (Whereupon Deposition Exhibit A
11 marked for identification.)
12 MR. JAMISON: Paul, do you have a
13 copy in front of you?
14 MR. REINGOLD: Well, I'm opening one
15 right now.
16 MR. JAMISON: Okay. If I need to I
17 can share my screen, but I think if everybody has
18 it it might be easier to just work sort of on the
19 copies we have in front of us.
20 MR. REINGOLD: It's definitely
21 easier to do that because the screen usually is
22 hard to see.
23 MR. JAMISON: Yeah, okay.
24 BY MR. JAMISON:
25 **Q.** All right. So, Doctor Hanson, I'm

22

1 looking at the first page of your report, and the
2 version I have -- well, I guess, Doctor Hanson, do
3 you have a copy -- I'll share my screen just for a
4 minute to see if we're on the -- we're looking at
5 the same thing. Okay, so the copy I have it has
6 these little blue numbers at the top. Do you have
7 that on the version you have?
8     A. I don't have the blue numbers.
9     Q. Okay.
10     A. I have the numbers at the bottom. If you
11 want to refer to things the -- it's like page 1 of
12 54 on my version.
13     Q. All right, I'll do that. Okay, so
14 looking at page one. Under paragraph three it
15 says my research on recidivism shows the
16 following. How do you define recidivism?
17     A. I define recidivism as committing a new
18 offense after being caught for -- after being
19 caught most generally. Sometimes it's a more
20 specific definition, which has to do with being
21 caught for a particular type of offense.
22 Sometimes it's restricted to certain types of
23 being caught. Essentially, though I do generally
24 make a distinction between sort of recidivism,
25 which is committing an offense and being caught,

23

1 and re-offending, which is being caught and then
2 committing a new offense, whether you're detected
3 or not. So sometimes I will use recidivism as
4 distinct from re-offending but generally I use
5 recidivism as repeating.
6     So when I talk about observed
7 recidivism rates I'm obviously talking about being
8 caught. If I talk about undetected offending I'm
9 not necessarily including events that result in
10 criminal justice processing.
11     Q. Okay, so when I read your report how
12 would I know which definition of recidivism you're
13 using throughout your report?
14     A. It should be clear from context. If not
15 I -- that would be the -- it should be clear from
16 context, and I -- I hope that's the case.
17     Q. Okay, so let's look at 3a. It says,
18 recidivism rates are not uniform but vary
19 considerably. When you use recidivism there are
20 you referring to someone getting arrested or
21 convicted again or are you referring to someone
22 committing another sex offense whether they're --
23 whether it's detected or not?
24     A. So the first statement is based on --
25 it's a research based statement based on observed.

24

1 The second statement --
2     Q. Can I just pause you there? When you say
3 observed you mean that someone has been arrested
4 or -- and/or convicted for --
5     A. That's correct.
6     Q. -- criminal sexual conduct?
7     A. So I'll use observed re-offending as
8 appearing in some database that people like
9 myself, researchers, would have access to,
10 observed by the neighbors we would not have access
11 to, so when I talk about observed it's always in
12 the case of observed going to some form of
13 database.
14     And just to continue, the second
15 part of that, risk of re-offending, I'm talking
16 about not just observed but re-offending, varies
17 based on well-known factors. So what I'm saying
18 here is that the observed rates are a valid
19 indicator of proven re-offending. It doesn't
20 measure all re-offending, but the relative rates
21 of observed re-offending are legitimate indicators
22 of the true rates of re-offending, and that's the
23 statement I'm asserting in 3a.
24     Q. And when you say true rates of
25 re-offending what does that mean?

25

1     A. True rates of re-offending would include
2 both detected and undetected. Whether the
3 individual who has been caught, and, again, I'm
4 restricting my comments and my research -- or I
5 guess when I talk about recidivism or re-offending
6 I'm not talking about offending on more than one
7 occasion. That is a different question. I'm
8 talking about after being caught does the person
9 re-offend, so I'm, I think, almost always using it
10 in that context.
11     And so re-offending here would mean
12 somebody who has committed a sex offense, been
13 caught, and then goes to commit another sex
14 offense, so that would be re-offending. It does
15 not mean that the person has re-offended on
16 Tuesday, then re-offended on Thursday, then
17 re-offended on Friday, is caught on Saturday. In
18 that case a person would have re-offended on three
19 different occasions but only being caught once.
20 That's a different meaning.
21     Q. And are you saying that risk assessment
22 tools such as Static-99 can assess risk of
23 re-offending or risk of recidivism?
24     A. The data that we built it upon is based
25 on recidivism, but I am asserting that it also is

26

1 a valid indicator of the risk for re-offending.
2    Q.   And have you done any studies to -- that
3 support that assertion?
4    A.   I've done a large of number of studies
5 looking at what we know about the people who come
6 back as recidivists.  A lot of my research is
7 based on that.  We do not know the true rate of
8 re-offending, but I -- the evidence that I've
9 found suggests that it is legitimately
10 proportional to the rates of recidivism so that
11 the risk factors for recidivism are strong
12 indicators based by diverse evidence, that these
13 are people that differentiate people based on
14 their risk levels.
15        So it's not just whether they're
16 caught or not.  The people who show up as high
17 risk for we'll use the term here recidivism,
18 meaning detected recidivism, share a collection of
19 risk relevant propensities.  They tend to be
20 impulsive.  They tend to have negative attitudes
21 towards authority.  They have sex crime specific
22 problems.  They have the psychological portrait of
23 somebody who is high risk to re-offend and that we
24 know as indicators of both the onset and
25 persistence of offending.  And these can be

27

1 detected purely on the basis of detected
2 offending.  You don't need to go for undetected
3 offending in order to identify people who are high
4 risk.
5        So I have strong confidence that the
6 observed offending is a valid and credible
7 indicator of relative risk both in terms --
8 defined in terms of the psychological
9 characteristics of the individuals involved, of
10 which we have considerable evidence, as well as
11 their likelihood for sexual re-offending, which we
12 have much less evidence for, but I believe the
13 evidence we do have suggests that its proportional
14 in that way as well.
15    Q.   So you're a researcher, you're an
16 academic, I'm going to dumb this down for myself.
17 What I think I heard you explain is you have --
18 you have a theory that the rates of recidivism can
19 be used to sort of extrapolate the risk for
20 re-offending; is that accurate?
21        MR. REINGOLD:  Eric, I'm going to
22 object.  I'll only object on this once but it's --
23 you should take it as a standing objection, and
24 that is that anything that has to do with
25 undetected or unreported offending is our

28

1 position is irrelevant to any issue that's
2 presented in the case and, therefore, should not
3 even be inquired about.  That will be a standing
4 objection.  That way I won't interrupt every time.
5        MR. JAMISON:  Understood.  The
6 objection is noted.
7 BY MR. JAMISON:
8    Q.   Would you like me to reask that question?
9    A.   Sure.
10    Q.   Yeah.  So just sort of in laymen's terms,
11 the way I understood what you said was that you
12 have a theory that the rates of -- or the risk of
13 offenders based on data from detected offenses is
14 viable to make -- to draw conclusions about the
15 risk for undetected offenses; is that right?
16    A.   My position is that recidivism as
17 detected offenses is a valid indicator of re- --
18 of having committed at least one offense, so it
19 identifies people who have re-offended.
20        Not having a conviction or a charge
21 will catch -- will miss some people who don't have
22 a -- or aren't convicted, but it will correctly
23 identify, I believe, a large number of people who
24 are -- haven't re-offended.  You can't get
25 reconvicted if you haven't re-offended, and the

29

1 evidence of having not re-offended is a --
2 provides information that it's more likely this
3 person hasn't re-offended.
4        If they have re-offended and got
5 caught you're pretty confident, beyond a
6 reasonable doubt, that they have but -- and if
7 they haven't got caught it is more likely that
8 they haven't done it.  It's not an absolute
9 difference.  We don't have complete, perfect
10 precision on that, but we do know that getting
11 caught, the people who do get caught look higher
12 risk on many psychologically meaningful variables
13 than the individuals who don't get caught.
14        So I believe, and most researchers
15 in the field would similarly believe, that the
16 risk for re-offending, defined as a propensity to
17 re-offend, an individual propensity, is validly
18 ordered or informed by the history of offending.
19    Q.   So this -- you know, this idea or this
20 theory that you have, how long have you had that
21 theory?
22    A.   I don't understand the question.
23    Q.   So the -- this idea that recidivism rates
24 can be used in terms of evaluating or -- that
25 there's a strong correlation between detected

30

1  offenses and undetected offenses, how long have
2  you had that theory?
3     A.  The reason I'm having difficulty
4  answering your question is because the basic
5  theory that I'm using is fundamental to
6  psychological assessment, and I was taught this as
7  soon as I learned psychological assessment in
8  graduate school and maybe undergraduate school,
9  and that is the distinction between the indicator
10  and the propensity.
11        So if I'm, you know, assessing
12  anxiety I ask people, you know, are you anxious,
13  you know, how often are you anxious, and they will
14  say something.  You know, I look at them, are they
15  sweating, so these are indicators, and the
16  indicators are -- are not what we're really
17  interested in.  What we're really interested in
18  is, you know, anxiety, the propensity to be
19  anxious or the construct of anxiety, and this
20  distinction between the indicators and the
21  construct is fundamental to psychological
22  assessment.  And the idea that a criminal
23  conviction is fundamental to the propensity to
24  commit crime is so obvious that I don't think I
25  even pause to think that it could not be an

31

1  indicator of the propensity to commit a crime.
2        The distinction between indicators
3  and propensities is -- is fundamental to
4  psychological assessment.  It's fundamental to
5  risk assessment.  It's fundamental to how we do
6  assessments, how we use risk tools, how we
7  construct risk tools, and the link between -- that
8  there is a link between criminal convictions and
9  the propensity to commit crime seems so obvious
10  that I can't even remember doubting it.
11     Q.  Understood.  And I don't know if we've
12  got to this question or not, so are you saying
13  that Static-99 can assess risk of re-offending or
14  it can assess the risk of recidivism?
15     A.  Risk assessments need to be evaluated on
16  two criteria, two big criteria.  When you ask a
17  question does it predict, or something like that,
18  you're asking two different questions, and you
19  probably don't even recognize that you're asking
20  two different questions?
21        One of the questions is does it rank
22  order people in terms of relative risk for
23  offending.  This is referred to by statisticians
24  as discrimination or, another way of saying it,
25  are people who have the outcome, do they look

32

1  different, how different do they look from people
2  who don't have the outcome, so that is called
3  discrimination.
4        This other property is called
5  calibration.  So calibration is a match between
6  the expected rates and the observed rates, so when
7  I say there's a 60 percent chance of rain this
8  afternoon, if I'm a weather forecaster, what I'm
9  saying is that on six out of ten days, like this
10  afternoon, it will rain.  On some of those days,
11  four of them, it won't.  And this is based -- and
12  I can be evaluated on that statement based on
13  group data.
14        In other words, I look at 10 or
15  100 days like today and if I -- my prediction is
16  well calibrated, then you would have 60 percent of
17  those days it would rain and that refers to as
18  calibration.  So I'm making a strong statement
19  based on a substantial body of evidence, which is
20  largely uncontested, that the relative risk is
21  well indicated by the static historical factors
22  that are on Static-99 and many other risk tools.
23        What is contested is the link
24  between the observed rates and the real rates and
25  which I say is a -- it's essentially a calibration

33

1  question between the statements about the
2  likelihood of re-offending, which people can
3  object to or have objected to.
4     Q.  Okay.  So can risk assessment tools be
5  used to identify or categorize the risk for
6  committing another sex offense?
7     A.  If you would use my language I -- that
8  would be great.  Otherwise I will repeat the
9  distinction I just made to you.
10     Q.  Okay.  I think it's a pretty
11  straightforward question and, you know, like I
12  understand your response related to calibration or
13  whatnot, but I need to understood can Static or
14  STABLE or any other risk assessment tools, can
15  they be used to identify the level of risk for
16  re-offending detectable -- a detectable offense?
17     A.  You used two different words there.  You
18  used re-offending and detectable offense.  Do you
19  want me to answer both of those questions or were
20  you meaning to --
21     Q.  What's the distinction between
22  re-offending and the detectable offense?  Perhaps
23  my understanding was incorrect, but I thought
24  recidivism generally, although there's caveats,
25  recidivism in your language means getting detected

34

1  by the criminal justice system, and re-offending
2  means actually committing another sex offense.
3      A.   Okay.  To say it simply we have good
4  evidence supported by many studies, I'd say
5  hundreds at this point, that we can rank order the
6  likelihood of re-offending using Static historical
7  factors as well as psychologically meaningful
8  factors.
9      Q.   And just so we're clear, the record's
10 clear, re-offending means committing another sex
11 offense --
12     A.   Yes.
13     Q.   -- and it doesn't mean getting detected
14 by the criminal justice system?
15     A.   I would agree with that statement.
16     Q.   Okay.  And then let's turn to page two,
17 paragraph b.  You say that the average sexual
18 recidivism rate of individuals with a history of
19 sexual crime is low.  In that paragraph when
20 you're talking about sexual recidivism are you
21 referring to being detected by the criminal
22 justice system or are you referring to something
23 else?
24     A.   I'm referring to detected.  It says once
25 convicted most are never reconvicted of another

35

1  sexual offense.
2      Q.   Okay.  And when you say the rate is low
3  what does low mean?
4      A.   That's -- that's an excellent question
5  because the meaning of low changes by context.  I
6  mean low here in terms of absolute numbers that
7  are less than 50 percent, in this case they're
8  less than 20 percent, and that the vast majority,
9  I'll use phrases like that, are not reconvicted.
10     Q.   Do you know do all researchers agree or
11 is there a consensus around what the definition of
12 low is?
13     A.   Low, moderate, and high are relative risk
14 terms, so if you're talking about low, moderate,
15 and high people will generally agree that low is
16 less than moderate and moderate is less than high.
17 If you try to match those onto absolute numbers
18 then researchers may do different things.
19          If you look at the middle of my
20 report I have an extensive discussion about the
21 classification of individuals into risk levels,
22 and I have a detailed procedure, which is widely
23 adopted by practitioners in correctional systems,
24 for rank ordering people and for labeling them.
25 There are five levels that we use which have

36

1  definitions.
2          So we have recognized that the use
3  of terms such as low, moderate, and high have
4  both -- have some imprecision in natural language
5  so we have developed labels which have evidence
6  based markers for nonarbitrary placement of
7  individuals into risk categories.  And I'm happy
8  to discuss those ones which I mention in the
9  middle of my report.
10     Q.   So did you know if -- if members of the
11 public would agree with sort of this general
12 definition of low?
13          MR. REINGOLD:  Objection, I think
14 that calls for speculation.  You may answer.
15          THE WITNESS:  Yeah.  Very often I
16 give risk assessment training, and I give it not
17 quite to the general public but I give it to
18 people who have limited experience in working with
19 people with a sex offense history.  I've done
20 probably hundreds of these types of trainings.
21          One of the questions I often ask
22 early in the training is what proportion of the
23 individuals who have a sex offense history will
24 get caught and reconvicted of another offense
25 within one year, five years, ten years, something

37

1  like that.  Now, these aren't the general public
2  but I think they -- many of these people would
3  have attitudes similar to the general public.
4          And when I ask that question I
5  universally get numbers that are things like, you
6  know, 50 percent, 80 percent, oh, close to
7  100 percent after ten years.  People will give me
8  numbers that are substantially -- are typically
9  over 50 percent.  And then I say, well, actually
10 here's what the statistics look like, and people
11 go, oh, hmm, that's lower.  That surprised me.
12 Hmm, this is new.
13 BY MR. JAMISON:
14     Q.   Yeah, I think you're answering a little
15 bit different question than I asked.  I think the
16 question you're answering is the public perception
17 around a sex offender's likelihood to re-offend
18 and whether it's high or low, but what I'm trying
19 to get at is do you think or do you know if the,
20 you know, residents would agree with researchers
21 about what low means?  You know, so I guess I'm --
22     A.   I don't have an opinion on that.
23     Q.   All right.  Do you know if the Michigan
24 legislature would agree with your or other
25 researchers' definition of what low is?

38

1        MR. REINGOLD:  Same objection.
2        THE WITNESS:  Can I answer this in a
3   slightly different way?  I provided definition of
4   very low in this report.  I don't provide a clear
5   definition of low.  I only provide a definition of
6   low as lower than expected.  And so I use it in
7   the summary here in a natural language way as low
8   meaning lower than what I expect the readers of
9   this report will have in their mind already.  So
10  when I say that the -- the rate is low in 3b, what
11  I'm saying is that it's lower than what I expect
12  the readers will have in their mind for a number.
13  BY MR. JAMISON:
14      Q.   And that paradigm is based on training
15  that you've done where you've polled people and
16  people think that --
17      A.   Yeah, I --
18      Q.   -- the recidivism rate is going to be
19  quite high and they're surprised to find out that
20  if they think it's 80 percent the reality is
21  20 percent?
22      A.   Yeah.  There's also research on this.
23  There's a number of published studies which find
24  essentially the same -- same pattern as I observed
25  in my, you know, multiple trainings.  There's a

39

1   couple of published articles which just ask, you
2   know, the public, you know, of the people who are
3   convicted of a sex offense what proportion are
4   reconvicted within five years?  And those come up
5   with numbers and typically those numbers are
6   between 50 and 80 percent.  So when I say here
7   that the rates are low I'm saying it's less than
8   the expectation of the general public.
9       Q.   Would that be similar to saying, you
10  know, I'm from a family who's quite tall.  I have
11  a brother who's six eight, an uncle who's six six,
12  and I'm six two.  Would that be saying that I'm
13  short in my family because sort of the pool from
14  which I'm, you know, compared against is tall?  So
15  if the public perception is that the rate is very,
16  very high and the statistics show that it's --
17  there's a big discrepancy between the public
18  perception and the statistics, that that's where
19  the distinction comes from?
20      A.   Yeah, I think I'm going to stop this line
21  of questioning because the basic question you're
22  asking is what do I think the public would think
23  about particular levels of risk, right?  And that
24  requires an empirical evaluation of, you know,
25  asking people in the public whether, you know,

40

1   50 percent is low, whether ten percent is low,
2   whether one percent is low, so that would require
3   an empirical questioning.  You know, one percent
4   some people -- and there are clearly people who
5   believe that a one in a thousand chance is too
6   high, right, and so that you can find people like
7   that.  And you can find people who would think
8   that -- who would use the term low to describe
9   other numbers.
10          If you look at the logic of my
11  report it doesn't hinge on the definition of low.
12  It hinges on a comparison between individuals who
13  are on the registry and individuals who are not on
14  the registry.  In this case it's a relative risk
15  comparison, of which I think we have strong
16  grounds to make, and we can make definitions of
17  very low risk, which I do, that are comparable to
18  the rate of spontaneous first time offending by
19  people without a criminal conviction for a sex
20  offense, and I think we can do that.  And they --
21  people can still say that a one percent chance is
22  too high, but they would be describing essentially
23  a large proportion of the -- of the general male
24  population.
25      Q.   All right.  And in paragraph b you go on

41

1   to say, once convicted most are never reconvicted
2   of another sexual offense.  What do you mean by
3   most?  Is that simply more than 51 percent?
4       A.   It's a number closer to 80 percent,
5   somewhere between 75 and 80 percent.
6       Q.   And what's -- what is the pool of data,
7   where is that pool of data drawn from?  Is that
8   specific to Michigan; is that worldwide?
9       A.   I've conducted dozens of studies looking
10  at long-term recidivism rates, and I have examined
11  the difference between short-term recidivism rates
12  and long-term recidivism rates, which provides a
13  solid basis for inferring long-term recidivism
14  rates.
15          The samples I've looked at have
16  included a large number of American samples, a
17  large number of Canadian samples, European,
18  Korean, lots of different countries.  I do not
19  have specific data on Michigan although I
20  understand that that is something which may be
21  part of -- be provided at some point as part of
22  this examination.
23      Q.   So I think you said 80 percent are not
24  reconvicted and obviously that means 20 percent
25  are reconvicted then, correct?

42

1    **A.**   That's correct.

2    **Q.**   And of the 80 percent that are not

3    reconvicted is there any data indicating how many

4    are rearrested or recharged with criminal sexual

5    conduct?

6    **A.**   It would be slightly higher number but

7    it's not that much different.

8    **Q.**   Do you have any data or have there been

9    studies that you're aware of on that?

10   **A.**   I've done a large number of studies that

11   have compared conviction and arrest rates. It's

12   hard to make a generalization because the data

13   sources that you use vary. In some studies the

14   data sources for arrests are very well kept and

15   police charging practices is to charge -- a low

16   threshold for charging, and in that case you'll

17   get reasonably big differences between arrests and

18   charges.

19          In other studies you'll find that

20   the police are very restrained in when they're

21   going to charge and relatively few of their

22   charges do not result in convictions, and so

23   there's a small gap between them.

24          So I haven't found a huge

25   difference. It's a few percentage points overall,

43

1    but it largely depends on the types of data that

2    you're using and the fidelity or -- and local

3    police practices.

4    **Q.**   Okay, and we're talking about you say

5    most are not reconvicted so...

6    **A.**   I would say most are not rearrested as

7    well.

8    **Q.**   And that just means more than 51 percent,

9    but we don't know where it lands between 51

10   percent and 80 percent were not rearrested,

11   correct?

12   **A.**   Yeah, I would put it if I was -- my best

13   estimate would be somewhere in the 70s for not

14   rearrested.

15   **Q.**   So then somewhere between 29 percent and

16   21 percent are rearrested or reconvicted?

17   **A.**   Yeah, 20 to 30. If you use it as arrest

18   it might be up to 30 percent at some point, yup.

19   **Q.**   And then of those do you know how many

20   commit sex offenses that aren't reported, that

21   don't lead to an arrest or don't lead to a

22   conviction?

23   **A.**   Which group?

24   **Q.**   Of the offenders that we're talking about

25   where we --

44

1    **A.**   There's two groups we're talking about,

2    those who get caught and those who don't get

3    caught. Are you asking about one group or the

4    other?

5    **Q.**   The ones who are not caught.

6    **A.**   We don't know the proportion who would

7    have committed a sex offense and not get caught.

8    **Q.**   Do you have any idea or is there any

9    studies to indicate how many offenses there are

10   that are uncaught?

11   **A.**   I have looked at this reasonably

12   carefully at several points throughout my career,

13   and I do not believe we have data to make strong

14   statements on the rate of undetected offenders.

15   We have reasonable data on the rate of undetected

16   offenses, and you can make reasonable estimates

17   based on victimization surveys, police reports,

18   and other statistics about the number of offenses

19   that are detected -- offenses that are detected.

20   We don't have good information about offenders who

21   have been undetected.

22          The issue is that if you commit

23   multiple offenses you are likely to get caught

24   even if the detection rate for offense is low. If

25   you don't commit any offenses you'll not get

45

1    caught because you haven't committed any offenses.

2    **Q.**   Um-hum.

3    **A.**   If you commit one offense you might get

4    caught. And it's the rate of undetected low

5    frequency offenders which change the statistics,

6    and we have no idea of what proportion are

7    offending at low rates or offending at high

8    rights.

9          If you believe that the individuals

10   are offending at high rates and that these

11   specific individuals are doing lots of undetected

12   crime then the chances are they will get caught

13   and our recidivism statistics will be close to our

14   re-offending statistics. If you believe that

15   there's an offense here and there, some people

16   will do one, rarely will they do two, then there

17   would be a big gap between the recidivism

18   statistics and the re-offending statistics.

19          And that number, the rate of

20   re-offending by people who we haven't -- been

21   caught, we just don't have a number for, and it

22   can so strongly influence the estimates from being

23   very close to the observed rates to very far away

24   that I decline to speculate as to a number.

25   **Q.**   Understood. So there's -- let's see,

46

1   there's a publication, and I believe it's
2   referenced in your report.  I'll share my screen
3   for a minute just to make sure you're familiar
4   with it.
5       A.   Hum.
6       Q.   Do you recall this -- here and I'll blow
7   it up too to make it --
8       A.   Yeah, yeah, I've got it.  No, I've got
9   it.
10      Q.   Do you recall this publication that
11  you --
12      A.   I do.
13      Q.   -- wrote?
14      A.   Yup.
15      Q.   And --
16      A.   And I've got a copy -- do you want me to
17  get a -- I've got a copy just right here if you
18  want me to pull it out.
19      Q.   No, that's okay.  Like I have one or two
20  questions on it so I think we can probably work
21  through it this way but --
22              MR. JAMISON:  And I'll mark this as
23  Exhibit B.
24              (Whereupon Deposition Exhibit B
25              marked for identification.)

47

1   BY MR. JAMISON:
2       Q.   And what was your role in drafting this
3   paper?
4       A.   I was a researcher with Public Safety and
5   Emergency Canada, and we were tasked, myself and
6   Andrew Harris, who was my colleague at the time,
7   with describing recidivism rates for the
8   development of policy, Canadian policy, around sex
9   offending and -- sex offending.
10      Q.   And do you still stand by the -- sort of
11  the conclusions you made in this report?
12      A.   I'd have to do a quick look, but
13  basically, yes, I think the basic findings are --
14  have been replicated many times, and the basic
15  finding is that there is differences in the
16  recidivism rates and that the recidivism rates --
17  the highest risk period is in the first few years
18  and that the subsequent periods of time the
19  rates -- the risk goes down.
20      Q.   All right.  Let's see, I should have
21  highlighted this.  So one area I wanted to bring
22  your attention to, and this is on page two, it
23  looks like it's in the third paragraph, and
24  generally here you're talking about some of the
25  difficulty around defining recidivism and sexual

48

1   assault and -- you know, so that at least the way
2   I interpreted this is researchers sometimes define
3   it differently so sometimes having a conversation
4   about what recidivism is is difficult because
5   you're not -- researchers are not always comparing
6   apples to apples.
7               And in this last sentence you say,
8   in the analyses that follows recidivism is defined
9   as sexual offenses reported to police that are
10  credible and sufficiently serious to justify
11  charges or convictions.  What did you mean by that
12  sentence?
13      A.   So in this particular study we looked
14  at -- using the language we've established in
15  the -- our discussions today, we're talking about
16  recidivism as observed or detected recidivism, and
17  so this was -- arrest was largely the criteria.
18  In practice most of these were charged or
19  convictions, but we would have counted an arrest
20  as well.
21      Q.   So when you use the term credible and
22  sufficiently serious, are you explaining that --
23  or I guess can you explain that a little bit more
24  by what you meant by that?
25      A.   Police in our jurisdictions, and most

49

1   jurisdictions, do not charge people randomly.
2   They shouldn't.  They should charge people when
3   they have a reasonable and probable ground that an
4   offense occurred and that the offense is something
5   that would fit a criminal code definition, I guess
6   criminal code in Canada, but whatever definitions
7   of crime, so that's credible, that's reasonable
8   and probable and sufficiently serious that it is
9   something that would meet a criminal code
10  definition.  So this is -- I'm just basically
11  describing the directions that police are given
12  for establishing charging.
13      Q.   Okay, gotcha.  So you're not making any
14  sort of determination of what's credible or not.
15  You're just sort of summarizing what the police
16  force would look at to make a determination of
17  whether someone -- whether there's probable cause
18  to make an arrest --
19      A.   Yes.
20      Q.   -- or issue charges?
21      A.   Yes, that's another way of saying
22  probable cause.
23      Q.   Yup, okay.  And then up above here you
24  talk about the Besserer and Trainor study that
25  showed that sexual assault had the highest

50

1 percentage of incidents that were not reported to
2 the police of 78 percent. Do you believe that
3 percentage to be accurate?
4    A. I believe the Besserer and Trainor study
5 to be accurate at that time. There is a number --
6 those were numbers between 1993 and 1999. As you
7 read it in my rebuttal report there is other
8 research that suggests that the reporting rates
9 have changed substantially, or could have changed
10 substantially, over that time, but I do agree that
11 a substantial portion of sexual offenses are never
12 reported to police.
13    Q. So if the majority of sex offenses aren't
14 reported to the police and the recidivism rates
15 that you rely on, they exclude most of the
16 instances of sexual assault, right?
17    A. Again I'm coming back to the -- there's
18 instances of offenses and then there's offenders.
19 I would agree that people get charged for fewer
20 offenses than they committed, and this would apply
21 to sex offenses, drug offenses, theft, any crime.
22 The question that we're interested in and that is
23 substantive relevance is undetected offenders.
24 And that one I know that there will be undetected
25 offenders, but I won't give a number for what that

51

1 would be.
2    Q. All right, and then going back to your
3 report. We're still on page two under paragraph
4 c, you talk about the --
5    A. I'm not seeing the report anymore. Would
6 you like me to get a physical copy so I can look
7 at it?
8    Q. No, I'm going back to your original
9 report not --
10    A. Oh, okay.
11    Q. -- the research paper. Yup.
12    A. Sorry, okay.
13    Q. So we're on page two, paragraph c, and
14 you talked about the decline of recidivism with
15 age.
16    A. Yeah.
17    Q. And you use the term advanced age. What
18 is advanced age?
19    A. I usually use the term advanced age to be
20 60, but it's a general term for essentially
21 retirement age. That's sort of...
22    Q. I think some people may have issue with
23 advanced age being considered 60, but that's a
24 conversation for a separate day.
25    A. Yeah. If you actually look at one of our

52

1 reports we played with this. If you have a chance
2 to look at our 214 we considered, you know, less
3 than something like 30 to be immature and over 50
4 to be prime of life, but we have to make some --
5 but advanced age, I think most people in common
6 language would consider advanced age for crime
7 particularly to be maybe over 50, maybe over 60,
8 but I would -- both those numbers make sense if
9 that's even...
10    Q. And, again, this is -- sexual recidivism
11 rate refers to them being caught again, correct?
12    A. I'm making both statements. I would say
13 the risk for sexual recidivism being caught
14 declines with age and a particularly strong
15 decline for advanced age. I make that statement.
16 And I'd also make the statement that there are
17 very few individuals over the age of 60 who
18 present any significant risk for any type of
19 sexual offending.
20    Q. And how do you define significant risk?
21    A. Meaning being higher than the base rate
22 amongst individuals who are not subject to
23 registrations and notifications.
24    Q. So if someone was 30 when they committed
25 a sex offense and they spent 30 years in prison

53

1 for raping several children is it your expert
2 opinion that they do not present a significant
3 risk for sexual recidivism after they've been
4 released from prison?
5    A. My statement is there are very few
6 individuals over the age of 70. This individual
7 may or may not. We have to do an assessment about
8 the other factors. This is obviously a horrible
9 offense. This person is clearly blameworthy and
10 was given a very long sentence, but a one sentence
11 description is insufficient for me to determine
12 his overall risk level.
13    Q. What other information would you need to
14 make a determination about their overall risk
15 level?
16    A. The types of information required is
17 criminal history, the quality of his psychological
18 development and adjustment. If somebody is
19 serving a very long sentence such as 30 years
20 you'd want to pay attention to his -- how he's
21 done in prison or types of adaptations?
22    The -- it's not that there
23 are people -- aren't people over the age of 60 who
24 would be at high risk, especially at time of
25 release, and I have described cases of people in

54

1 their 90s who were, you know, minimally high risk.
2 It's not that risk gets extinguished, it's just
3 that it's rare, and there's very few individuals
4 who would meet that profile of -- of significant
5 risk if they're over 60 at the time of release.
6     Q.   And when you say very few, I'm trying to
7 understand what that means in relative terms. So
8 if we have 100 registrants who are over the age of
9 60 is very few 20, is very few three, is very few
10 eight?
11     A.   There are two major considerations for
12 making that, one is at time of release and the
13 other is registrants as they currently sit on the
14 registry, so they could have been released five
15 years ago. They could have been released 20 years
16 ago. Do you want to make a more precise question?
17     Q.   Well, I'm trying to understand the
18 statement that they -- that there's very few
19 individuals over the age of 60.
20     A.   There are very few individuals. It would
21 be -- the statement, the context I am making,
22 applies to the full class, not just at time of
23 release but also applies to the people who have
24 been in the community for a period of time.
25     Q.   Okay. And so in this hypothetical I gave

55

1 you about someone who assaulted children, they
2 spent time in prison, whether it's ten or 20 or 30
3 years, it rests on the assumption that they are
4 sexually attracted to children and they acted out
5 in the past, so are you saying that by turning 60
6 or becoming advanced age, however you define that,
7 that their sexual attraction to children just goes
8 away?
9     A.   No, I am not saying that. It's like your
10 sexual attraction whatever it happens to be won't
11 go away. You know, it -- you know, adult males
12 become less sexually active, they become less
13 sexually driven regardless of whatever sexuality
14 they -- they start as they get older. There's a
15 predictable relationship between testosterone
16 levels and sex drive preoccupation that we can
17 mark and measure, as well older people develop
18 self control.
19            They develop better insight. They
20 realize that they can control their behavior. And
21 there are many people with -- who want to do
22 things that are wrong but don't do them, and they
23 don't do them because they have developed the self
24 control and the self regulation that they realize
25 these things are wrong.

56

1         So just having a deviant sexual
2 interest or a pedophilia and -- doesn't mean that
3 the person will re-offend. And if you look at the
4 statistics on indicators of re-offending,
5 pedophilia is an indicator but it's not the only
6 indicator. There's lots of other things that you
7 need to consider. So the mere fact that one
8 feature may not change does not determine the
9 overall risk assessment and no competent evaluator
10 would say otherwise.
11     Q.   So are you suggesting that in general
12 terms, because it sounds like there's always some
13 exceptions where people even into their 90s can be
14 dangerous, but are -- so are you suggesting that
15 age should be a factor in determining -- or is a
16 significant factor in determining whether someone
17 presents a risk of committing another sex offense?
18     A.   Yes.
19     Q.   And is the inverse also true, that if
20 someone is younger that they're at a higher risk
21 for committing another sex offense?
22     A.   That is true.
23     Q.   And going back for a minute about, you
24 know, the use of the term significant risk, that
25 is your determination of what's significant,

57

1 correct?
2     A.   Going back to my answer, which I've
3 already given you, I define significant risk as
4 meaningfully different from the risk presented by
5 individuals who are not on the registry.
6     Q.   And do you know if others, the Michigan
7 legislature or members of the public in Michigan,
8 would agree with your definition of what
9 significant risk means?
10         MR. REINGOLD: Same objection as
11 before.
12         THE WITNESS: I'm not going to speak
13 to the -- what the Michigan legislature may or may
14 not believe.
15 BY MR. JAMISON:
16     Q.   So this person that I described
17 previously, you know, the 60 year old that spent
18 30 years in prison for raping children and then
19 they're released, so if that person is on the
20 registry does it inform the public about the
21 potential risk whether it's -- whether their risk
22 of re-offending is high, medium, or low?
23     A.   Could you be a little more precise?
24     Q.   Sure. So let's assume that this person,
25 they get released from prison and they're on the

58

1 public registry, does a public registry identify
2 or does it tell the public that that individual is
3 a high risk of re-offending, a medium risk, or a
4 low risk?
5     A.   The -- I actually haven't looked at
6 Michigan's registry, and I probably should have,
7 but I actually have a list and they -- sometimes
8 some of them have little names on them saying this
9 person's high risk, but I think they're done by
10 tiers, level one, two, three, and thereon for
11 certain descriptions.  The -- it's not
12 particularly -- there's a lot of peo- -- the risk
13 level of people on the registry varies a lot, and
14 it -- I think it would be very hard for the public
15 to differentiate between people who are
16 legitimately high risk of this individual, maybe
17 one, and people who would be not high risk and be
18 very low risk.
19          And so what I'm saying in my report
20 is not that people with a sex offense history as a
21 group at some times aren't higher risk than people
22 who never committed a sex offense.  I say this
23 repeatedly throughout my report, that a sex
24 offense conviction is a legitimate indicator of
25 risk but it's time dependent.  It's not forever.

59

1 And so that individuals who are able to remain
2 offense free, their risk goes down to levels that
3 are indistinguishable from the general population.
4          And on the registry, as I understand
5 it, are people who have been on the registry for
6 long periods of time.  There's some people who are
7 very low risk to begin with, and there's many
8 people who haven't re-offended on the registry,
9 and so these would be very low risk people.  And
10 there'd be people, perhaps, like the case that
11 you're talking about, who is actually
12 significantly at risk and is -- be on the registry
13 as well.
14          So what I'm saying is that there's
15 variation and that this variation can't be
16 measured using commonly available indicators that
17 have reasonable credibility in the professional
18 and scientific communities.
19     Q.   So if this person, if they score a zero
20 on Static-99R, in your opinion is that low enough
21 that it -- that that person doesn't need to be on
22 a public registry?
23     A.   The question of who goes on the registry
24 is a -- I -- in order to -- let me re-answer it in
25 a different way.  What I'm arguing in my report is

60

1 that there's some threshold of very low risk,
2 which is the same as the community.
3          If you can accept that we can talk
4 about a definition or a threshold of very low
5 risk.  I provide two which are similar but not
6 identical.  I provide one for people who have a
7 criminal conviction but no sex offense conviction,
8 and I provide another for males as well.  If
9 people are what I would say in the range of less
10 than two percent after five years, which is
11 roughly what it would be for individuals in the
12 criminal justice system who have a criminal
13 conviction but no sex offense conviction, let's
14 say that is very low risk and let's say that's the
15 threshold where applying the registration and
16 notification to these individuals won't identify
17 people who are higher risk than a large group of
18 people who have a criminal conviction, so let's
19 just start there.
20          So if you want to get a threshold of
21 minus -- or of two percent, there's ways of doing
22 that.  There's -- you can use a Static-99.  At
23 time of release it would be a score of basically
24 minus three at that time, maybe minus two
25 depending on what other features of the case, and

61

1 you'd want to check some of the psychological
2 adjustment factors as well.  So it's possible that
3 this individual would rate at that level, very
4 unlikely he would.
5          If you look at the Static-99
6 criteria, if he has multiple sexual offenses
7 against children involving force you'd come up
8 with a score, you know, probably in the moderate
9 range even though he's 60, so that individual
10 would be perceptibly higher risk than the general
11 population.  And then you'd have to sort
12 of -- yeah, he would be.
13          And if he -- this was his first time
14 offending, he had only related victims, didn't
15 have much of an other criminal history, he might
16 be in that very low risk group, but you have to
17 look at the case specific characteristics.
18     Q.   So in terms of the labels for risk
19 category, are you suggesting that the legislature
20 could use the scoring to determine someone's
21 registration obligations?
22     A.   Just say that again, so I'm not exactly
23 sure what you're asking me.
24     Q.   Yeah.  So what I'm -- the way I sort of
25 understood part of your report is you're

62

1 suggesting that by using Static factors you can
2 categorize offenders into risk categories?
3     A.   Right.
4     Q.   And that the conviction based statute
5 that Michigan uses, it's not really correlated to
6 risk and Static-99 is a better indicator of
7 whether someone presents a risk to the public; is
8 that fairly accurate?
9     A.   Yes, that -- yes.
10    Q.   So are you suggesting that one of the
11 options the legislature could consider is using
12 the Static-99 score to determine how long someone
13 should have to register or how long someone's on
14 the public registry?
15    A.   I'm not making any -- like a direct
16 suggestion to the legislature in the sense that my
17 role is providing information that could inform
18 decisions, so the legislature's decisions and the
19 court's decisions are informed by a bunch of
20 principles one of which is evidence.  The evidence
21 that I'm presenting is that risk varies and that
22 you can in a fairly efficient way identify people
23 by risk levels based on Static scores.
24          And there are some states which have
25 actually written in Static-99 into their

63

1 legislature, in their law, like Virginia would be
2 one.  My recommendation would be not to write in a
3 specific measure but to write in a risk level,
4 which is -- are associated with the appropriate
5 levels of intervention.  So if people are very low
6 risk levels they would have less onerous
7 restrictions than people who are a higher risk.
8 And those I would recommend be given as clear a
9 definition as possible and that the legislature
10 should define what these are.
11          And one of the things I'm arguing is
12 that you can make a definition of very low risk by
13 comparing it to the ambient base rate in the
14 general population, and that's part of my argument
15 of why you can make these distinctions.  But
16 exactly what levels of distinctions you make I
17 think should be stated conceptually, and I think
18 in practice you could use Static-99 for making
19 some of these distinctions, but you could use
20 other measures.
21          You know, Michigan could develop its
22 own measure.  You know, there's all sorts of ways
23 of doing it.  If you -- if Michigan was concerned
24 about risk levels and evidence supporting risk
25 levels they could adopt policies and practice that

64

1 are aligned with that.
2     Q.   You mentioned Virginia law uses
3 Static-99.  Do you know what it's used for?
4     A.   It's used in the high end in terms of
5 civil commitment so that if you -- all people must
6 be assessed -- by coming out of prison if you have
7 one of the types of offenses that qualify you for
8 civil commitment.  And if your score is -- I think
9 it's four or higher you will be evaluated for
10 civil commitment.  If your score is three or lower
11 you will not be.
12    Q.   Are you aware of any states or provinces
13 that use Static-99 as the basis for determining
14 how long someone needs to register as a sex
15 offender?
16    A.   I am not.  I know that many states use it
17 within their correctional systems, including
18 Michigan, but I do not know of anybody using it at
19 this point.  Most, as far I understand all, of the
20 registration laws are sort of mirrored after the
21 federal law, which isn't explicitly risk based, so
22 they conform to the federal law rather than the --
23 looking at a risk based, though I think you could
24 do a risk based one.
25    Q.   Is there any data out there that compares

65

1 the rates of committing another sex offense when
2 there is a registry in place versus when there's
3 not a registry in place?
4     A.   Yes, there is a number of studies which
5 have been organized into a meta analysis by
6 Kristin Zgoba and they make those comparisons.
7 And the existence of a registry as far as we can
8 tell has no perceptible effect on either the
9 recidivism rates or the population rates of new
10 crimes, sex crimes.
11    Q.   And the recidivism rate again refers to a
12 re-arrest or reconviction; is that --
13    A.   In this case --
14    Q.   -- right?
15    A.   In this case, yes.
16    Q.   All right.  And so you're -- I think
17 generally you're saying if there's 100 sex
18 offenders who -- or 100 individuals who have been
19 convicted of a sex offense and there's 100
20 individuals who have not been convicted of a sex
21 offense they have the same likelihood of
22 committing another sex offense?
23    A.   No, I am not saying that.  What I am
24 saying is there's -- within -- you take 100 people
25 from Michigan's correctional system, take -- just

66

1  take them, anybody that's been convicted of
2  anything but sex ever, that's a group. Pretty big
3  group. It's probably at least ten percent of the
4  population, maybe higher, okay? That's a group.
5  Take 100 of those guys, that's one group.
6          Now, if we take 100 people who have
7  been convicted of a sex offense, at the time of
8  release on average most of those, and I'd say 95
9  percent, would have a greater risk of I'd say
10 sexually re-offending than the individuals who
11 have never been convicted of any sex offense ever.
12 However, if you wait five years some of the people
13 with a sex offense history will re-offend and
14 they'll go back into the system and most will not
15 be -- will not be reconvicted and will not go back
16 into the system. So you'll have -- after five
17 years you'll have -- 90 percent of them will still
18 be in the community.
19         Now, that 90 percent is lower risk
20 than the comparison group, it's higher risk --
21 it's still higher risk than this comparison group
22 but some of those won't be. So the lower risk
23 guys on those will now be looking very much
24 equivalent to the individuals in the comparison
25 group.

67

1          And at ten years, if you keep doing
2  this, some -- a few more will re-offend, and at
3  ten years you'll probably be down to about
4  80 percent of the original group of people with a
5  sex offense history will still be there, and now
6  most of those individuals will look no different
7  than the comparison group. Not all, there's a few
8  that will look more, but most of them by ten
9  years.
10         And if you wait 20 years all of them
11 will. We haven't found any group identified who
12 remain offense free for -- for 20 years who still
13 look at a perceptibly substantial risk for sexual
14 offending.
15     Q.   But your comparison group is -- is other
16 folks who have been through the criminal justice
17 system but haven't had a sexual offense?
18     A.   That's correct.
19     Q.   Okay.
20     A.   And that's what I was just talking about
21 here. It's very similar to the rate of, you know,
22 first time offending among young males, but I
23 was -- what I was just talking about here, and
24 because you asked for a comparison group so I made
25 one up, but you could also use general young males

68

1  to link the same things, and the numbers would be
2  similar but not exactly the same. The proportions
3  would change slightly.
4      Q.   So if -- I want to make sure I understand
5  this, so if we drew a comparison group, let's say
6  we had -- we have 100 sex offenders age 20 to 60,
7  various socioeconomic, educational backgrounds,
8  and we have a similar group drawn from the general
9  public with similar socioeconomic, educational --
10     A.   No.
11     Q.   -- backgrounds --
12     A.   No.
13     Q.   -- and we compare the two groups --
14     A.   No, I'm not saying that. I'm saying that
15 my comparison group are people who are not on the
16 registry. It's not necessarily matched on
17 anything. It's not matched on age. It wouldn't
18 be matched on age because in general people who
19 commit sex offenses are older than people who
20 don't commit -- that commit other types of
21 offenses.
22         The argument I'm making is not that
23 matching them on all these different things, a sex
24 offense history doesn't increase the risk. What
25 I'm -- I'm saying is it doesn't increase the risk

69

1  enough to make them perceptibly different from
2  somebody else who is not -- not only somebody else
3  but a large group of somebody elses who aren't on
4  the registry.
5      Q.   Okay. So if there was some way to have
6  100 individuals that are offenders and 100
7  individuals who are -- who haven't been through
8  the criminal justice system that come from similar
9  backgrounds, similar educations, similar, you
10 know, races, things like that, and we match them
11 up you are not saying that the sex offenders are
12 going to have a lower or similar rate of
13 committing another sex offense than this
14 hypothetical group that are similarly situated to
15 the sex offenders?
16     A.   Again, you're -- you keep asking a
17 different question than the one I'm answering.
18 Either I'm not answering your question or you're
19 asking it in an odd way, so could you restate your
20 question a little more specifically so I can try
21 to be as --
22     Q.   Sure.
23     A.   -- helpful as possible?
24     Q.   Sure, yeah. I'm just trying to get a
25 sense of the -- this comparison or these groups.

70

1 So the way I understood your report, which perhaps
2 is wrong, is you're saying, or I understood it to
3 be, sex offenders in comparison with the general
4 population, after a certain period of time they
5 have similar rates of committing another sex
6 offense, so I'm trying to understand what the --
7    A.   Yeah, that's closer.
8    Q.   Okay.  So I'm trying to understand what
9 the comparison group is.  Is it prisoners, is it
10 if somehow we're able to match up --
11    A.   It's not matching.
12    Q.   Okay.
13    A.   So if you're concerned about, you know,
14 60-year-old people, you know, from upper -- upper
15 social classes matched on race and postal code or
16 something, I'm not talking about that, and there's
17 nowhere in my report where I talk about matching,
18 and I don't think that is the valid comparison.  I
19 don't think we should match on that.
20        I think what we should match on is
21 whether the absolute risk is comparable to the
22 risk of people who we don't think to put on a
23 registry.  And that number -- there are definable
24 groups who we don't put on the registry and they
25 have -- they will look different than the people

71

1 who have a sex offense conviction.  They'll be
2 younger, for example, and more likely to have more
3 criminal convictions than people with a sex
4 offense history, but, nonetheless, we don't treat
5 them as sex offenders, and they're as likely to
6 sexually re-offend as many people we put on the
7 registry who are currently on the registry I'd
8 suspect.
9    Q.   So now I'm on page three of your report
10 in paragraph g.
11    A.   G.
12    Q.   Yeah.  You talk about there appear to be
13 tens of thousands of people on Michigan's registry
14 who have lived offense free in the community.
15 What's your basis for concluding that there's tens
16 of thousands of people that --
17    A.   Yeah, I got some --
18    Q.   -- are offense free?
19    A.   I have to go back and read my report for
20 that.  I got some numbers for Michigan about
21 the -- when the registry was started and when --
22 how -- approximate period of time -- how many
23 people are on it, when the registry was started,
24 and some guess about how long they've been on it.
25 So the -- I'm just trying to see if I can find

72

1 this in the report.  75.  Right.
2        Yeah, I had two sources of
3 information.  One was the National Center for
4 Missing and Exploited Children provided numbers on
5 the -- of individuals on their sex offender
6 registry for particular years.  I got that from
7 the website.
8        I also got an Excel sheet from the
9 Michigan State Police which gave the numbers of
10 individuals by year between '97 and 2010, and so
11 those were numbers that I was able to use.
12        So there's about 40,000 individuals
13 on the registry.  Many of them would be on for
14 more than ten years, so I would say that probably
15 half, at least, of those 40,000 would be in this
16 very low risk category presumptively if we knew
17 nothing else about them.
18    Q.   Okay, yeah, so I guess that's what I'm
19 getting.  You don't really know whether they
20 actually committed another sex offense.  It's just
21 sort of a presumption based on your theory that as
22 people get older they're less likely to recommit
23 another sex offense?
24    A.   No, no, that is not correct.  That is not
25 stating what I believe to be true.  What I'm

73

1 stating is that the observable risk level and the
2 measurable risk level of many of these individuals
3 will be no different than that of people who are
4 not on the registry, and that is a definition of
5 very low risk that I've stated in my report, I've
6 stated several times today, and I'm happy to state
7 it again now.
8        So the definition of very low risk,
9 it's the comparison.  It's the comparison between
10 people who are on the registry and are off the
11 registry.
12        And the point that I'm making is
13 that the observed rates are the same.  There's no
14 reason to believe the detection rates are any
15 different, so the undetected rates would be the
16 same too.  And I think --
17    Q.   Wait, wait, we don't know the undetected
18 rates, correct?
19    A.   We don't know the undetected rates, but
20 nobody has argued that the undetected rates are
21 meaningfully different for people who are on the
22 registry or off.  And the only evidence that we
23 have suggests that the detection rates are
24 actually higher for people who have a previous
25 conviction, which would suggested that the

74

1 comparison is biased in the direction of a lower
2 risk threshold for people on the registry than the
3 people off. And I'm happy to restate this in as
4 many ways as you want me to state it if you ask
5 the question again and again and again.
6 Q. Looking at paragraph h, you indicate that
7 individuals who have committed a sexual offense
8 are not continuous lifelong threats. Would you
9 agree that there are some individuals who are
10 continuous lifelong threats?
11 A. I would.
12 Q. Have you ever worked with victims of
13 sexual assault?
14 A. Yes. I actually began my career working
15 with victims of sexual assault. It was -- I was
16 trained as a clinical psychologist, and the reason
17 that I'm actually doing the work that I'm doing
18 today was based on my early experience working
19 with women, it tended to be, who presented
20 themselves for psychological services. And what I
21 found, this was in the 1980s when I was doing this
22 work, that a disproportionate number of these
23 women reported histories of sexual assault
24 victimization, and it was like one after the
25 other.

75

1 And so it got me to thinking that --
2 that -- got me to wondering if you're going to
3 help I guess not these women but future women that
4 we had to do something that effectively addressed
5 the problems of sexual victimization.
6 And so I continued working with
7 people who were victimized for a while, and then I
8 switched to working with people who were offending
9 or at risk of offending. So I perceive the work
10 that I do as preventing sexual victimization and
11 that we want policies and practices that are
12 actually effective to these needs.
13 Q. When you worked with victims did you ever
14 hear victims say that one of the reasons why they
15 come forward to report the crime is because they
16 don't want what happened to them to happen to
17 others?
18 A. I have heard that.
19 Q. How common was that?
20 A. That was not the most common and, again,
21 this is a long time ago and may not be
22 representative of victims now. The most reason --
23 most of the victims I worked with had never
24 reported it, and they described the barriers and
25 the stigma attached to reporting. And so most of

76

1 what I heard was horrible stories of abuse that
2 never involved criminal justice intervention, and
3 in most cases the victims were known to the
4 offender and vice versa.
5 They were family members or
6 associates and very often they were still in some
7 form of relationship. They still showed up at
8 family parties, showed up at Christmas, and it was
9 the task of the individuals that I was working
10 with to deal with these situations. So they're
11 talking more about the shame and stigmatization
12 attached to it rather than talking about their
13 willingness to go forward with the criminal
14 justice.
15 Some did and some with that always
16 had mixed feelings about doing that, but it was --
17 and mostly when they did is they wanted it to
18 stop. They didn't want -- not so much that they
19 wanted the individual to be identified, and most
20 cases because the offender is known the very act
21 of charging was sufficient for letting people know
22 because it became part of the discussions amongst
23 the family members. You know, this person has
24 been charged with a sexual offense, and the people
25 who are potential victims within that family and

77

1 extended system would know.
2 So if you charge or convict your
3 swim coach everybody in the swimming community
4 knows that. It doesn't get hidden. And so there
5 was no need for any other registration or
6 notification. The swim community would know that.
7 So the big barrier is not like
8 getting people who are identified as offenders.
9 There's something we can do there, and we should,
10 and much of my work is related to dealing with
11 people who have been caught, but the big action is
12 giving people the courage and the strength to come
13 forward so that people will report quickly and
14 that we can deal effectively with the people once
15 there. And it doesn't necessarily require more
16 than, I guess, routine criminal justice
17 intervention. You don't need exceptional criminal
18 justice interventions in order for it to do that.
19 Q. So in the scenario with the swim coach,
20 you said if the swim coach were convicted then the
21 swim community would be aware of it so they could,
22 you know, take action to protect themselves or
23 whatever. What if the swim coach moved to a
24 different community, how would the new swim
25 community be aware of --

78

1   A.   In most --
2   Q.   -- what could have been a very recent --
3   A.   Right.  Yeah --
4   Q.   -- incident?
5   A.   -- in most jurisdictions if you're going
6   to be hired as a swim coach there's some screening
7   involved.  This involves not only the screening
8   about whether the guy's a swim coach but they'd
9   look at his CV, and in Canada, for example, we
10  have something called a vulnerable records check.
11  And so when I wanted to help out with my son's
12  soccer I had to go sign a form describing --
13  releasing my criminal history record to the people
14  who are organizing the kids soccer, which I
15  happily signed, and they'll know.  They'll know if
16  there's a sex offense on that conviction.
17          So I think there's lots of
18  mechanisms for doing it and they're widely
19  implemented in many countries and jurisdictions.
20  Q.   So in this scenario, though, if -- let's
21  say the swim coach sexually assaulted a minor that
22  was on his or her swim team.  The swim coach moves
23  somewhere else and was in a dating relationship
24  with a woman who had small children.
25  A.   The argument you're -- you're making

79

1   is -- I'm not sure whether you're arguing a right
2   to know or a public protection argument.  If
3   you're arguing the public protection argument the
4   empirical evidence just doesn't support that it
5   serves a public protection function.  As you asked
6   me before there are -- I don't want to say dozens
7   but at least a dozen studies looking at whether
8   the existence of registries actually affects the
9   likelihood of sexually re-offending, and it
10  doesn't as far as I can tell.  There's no evidence
11  that it does.  So there could be some times the
12  people may want to know about something, but
13  whether it actually protects the public is --
14  there's no evidence to that effect.
15          So if you're dating there's lots of
16  things that you want to pay attention to about
17  someone who's dating, and the swim coach,
18  particularly if you're dating you'd want to figure
19  out what their background is like.  And, yes,
20  there are a few people who are slippery and liars
21  and can slide through all sorts of nets, but
22  practically they don't get caught by a sex
23  offender registry.  It doesn't inhibit them.  It
24  doesn't -- well, it doesn't.  We just don't see
25  that.

80

1   People either don't check or they
2   use a different name.  You know, I'm dating this
3   Bob as opposed to Rob, you know.  There's all
4   sorts of ways that people can slide through, and
5   so as an effective public policy is gets very low
6   marks.
7   Q.   Are you an expert in effective public
8   policy?
9   A.   I have looked at policy around sex
10  offending.  I was a -- my standard job for more
11  than 25 years was developing research evidence to
12  support criminal justice policy in Canada, and so
13  I spent a lot of time looking at the effectiveness
14  of various types of interventions and rules and
15  laws.  We -- my -- I very often write briefing
16  notes that would be used to inform the decisions
17  that the government of Canada made and changed
18  laws.
19          So, yes, I think that I have enough
20  background and experience to make statements about
21  what works and what doesn't work in certain areas of
22  crime policy particularly.
23  Q.   I guess what I'm asking is have you ever
24  been qualified as an expert in public policy?
25  A.   Well, in this topic, yes, I've been --

81

1   you know, in terms of in my comments on the
2   effectiveness of various public policy
3   interventions for sex offense, yes, I've talked
4   about that and it's remained unchallenged.
5   Q.   And then on page -- page four of your
6   report you talk about sex offender risk assessment
7   training that you've provided in Michigan.  Can
8   you share the details of that, of what you
9   provided and when it was?
10  A.   Page -- which page?
11  Q.   Page four.  It's near the bottom.  Since
12  1997 I've provided training and consulting
13  services concerning risk assessments to U.S.
14  states including, you know, blah-blah-blah,
15  Michigan.
16  A.   Yeah.
17  Q.   So what did -- what training and
18  consulting services have you provided to the State
19  of Michigan?
20  A.   Yeah, so this is probably ten to 15 years
21  ago I made a trip to Lansing, your hometown, and
22  met with a group of evaluators who were working
23  for the Department of Corrections, Michigan
24  Department of Corrections, and I was providing
25  training in the Static, STABLE, and acute risk

82

1  tools, which they were using in their applied risk
2  assessments.  So I provided -- it was like a two
3  or three day training for them.
4           And I provided some consultation
5  following that in terms of questions about if you
6  had this type of offense in Michigan would you
7  class it as a violent offense or not.  And then
8  after that I've had no contact.
9      Q.   And you said that was about 15 years ago?
10     A.   Yeah, ten to 15 years ago, somewhere in
11  there.
12     Q.   And do you know what the Department of
13  Corrections was using the training for?
14     A.   The -- the -- my understanding -- and my
15  job wasn't to develop their policy, my job was to
16  provide the risk assessment training so I didn't
17  look very closely at their policy, but from my
18  conversations with them my understanding was that
19  their correctional programming required a risk
20  level, whether they needed the intensive,
21  moderate, or low intensity programming, and they
22  were using Static/STABLE combinations to inform
23  those risk level placements.
24           And these were being conducted --
25  the way Michigan corrections is organized they

83

1  have the main civil servant but the treatment
2  providers are contracted to the state, so most
3  were private companies who were contracted to the
4  state, so most of the people who were in
5  attendance were individuals who were actually
6  doing these risk assessments on contract to the
7  Department of Corrections.
8      Q.   All right.  And then I'm looking at page
9  seven of your report, numbered paragraph 11, and
10  you say eventually, if they remain sexual offense
11  free, all individuals convicted of a sexual
12  offense will be no more likely to commit another
13  sex offense than the rate of spontaneous out of
14  the blue sexual offenses in the general
15  population.
16           I have a hard time understanding
17  this in relation to the things we were talking
18  about earlier how some individuals will remain a
19  risk throughout their life, so how is it that all
20  individuals convicted of a sexual offense can be
21  no more likely than the average member of the
22  public to commit another sex offense?
23     A.   I'd be delighted to tell you yet again.
24  So, okay, what I'm talking about is there is
25  periods of risk and that if you look at the --

84

1  what you were talking about before when I said
2  these people are going to be higher is matching
3  based on a bunch of features and that if you have
4  somebody who has been -- you know, let's say both
5  of them are 60 years old, both are at the same
6  education level, they're identical in every way,
7  every possible risk relevant way that we measure
8  except one and that one one is that one of them
9  20 years ago, 35 years ago, has a sex offense
10  conviction, okay?  I think that was the question
11  you were asking; is that correct?
12     Q.   Generally, yeah.
13     A.   Right.  In that case if I was a betting
14  man I would probably say, hum, the guy with the
15  sex offense conviction was probably a little bit
16  higher risk.
17           However, that's not what I'm talking
18  about.  What I'm talking about is take that
19  60-year-old man with a sex offense conviction
20  20 years ago and compare him to a 35 year old
21  who's getting out from a robbery offense or a
22  theft, or a drunk driving for that matter, and
23  there's no history of sex offending, what's the
24  chance that the second guy we're talking about
25  will commit a sex offense?

85

1           And the answer to that is the same
2  as the 60 year old, okay, it's exactly the same.
3  We can't tell the difference.  It's -- it's a
4  single digit somewhere but it's the same level.
5  So there's many, many people who are on the
6  registry who have similar risk levels to people
7  who aren't on the registry.
8           So that's what I'm saying, it's
9  the -- the rate of spontaneous out-of-the-blue or,
10  you know, first time offending in the general
11  population.  It's not matched.  It's just I'm
12  talking about it as the rate that we already --
13  the risk that we already assume.  The risk of
14  individuals who are getting out of our prisons.
15  The young man in university right now.  It's a
16  nonzero rate and we're already dealing with that,
17  and I think we should deal with that, you know,
18  probably better, but it's not going to help with
19  the registry because they aren't on it.
20     Q.   All right.  We've been going for about
21  two hours.  Can we take about a 15 minute break?
22     A.   Sure.
23     Q.   Okay.
24           (A break was taken.)
25           MR. JAMISON:  Okay, so let's go back

86

1  on the record.
2  BY MR. JAMISON:
3      Q.   So, Doctor Hanson, we'll look back for a
4  minute again at page seven, paragraph eleven. The
5  first sentence there it says, it turns out we were
6  wrong, and I think that's referring to some of the
7  assumptions made about likelihood of re-offending;
8  do you see that?
9      A.   Yes, I see that section. It turns out we
10 were wrong. So this stated some assumptions in
11 the previous paragraph, and let me enumerate
12 specifically what I was referring to.
13     Q.   Yeah, no, I mean, it's there. I mean,
14 what I'm getting at is I guess in ten years from
15 now could we find out that the assumptions that
16 we're making now are wrong based on more
17 information or better science?
18     A.   Science is, delightfully, learned and
19 that we adjust and -- our practice based on the
20 best available evidence. What I'm doing today is
21 presenting what I considered to be the best
22 available evidence. It is much better than the
23 evidence that we had before.
24          I think there will be some changes.
25 I fully expect and I, in fact, hope there will be

87

1  some changes in what we know ten years from now.
2  That being said, given the evidence we have now I
3  think we have strong basis for making the points
4  that I make in my -- this deposition.
5      Q.   And then let's scroll down to page 14.
6  I'm sorry, hold on, I'm giving you the wrong
7  numbers. Let's see, we're on -- it's paragraph
8  14, which is on page nine, and the sexual
9  recidivism rates you cite are -- they range five
10 to 15 percent after five years and between ten and
11 20 percent after ten years. Do you recall -- and
12 I guess to preface this, recidivism here, that's
13 defined as getting caught or identified in the
14 criminal justice system again, correct?
15     A.   Right. The statement I make is on
16 average the observed --
17     Q.   Um-hum.
18     A.   -- sexual recidivism rates.
19     Q.   Okay.
20     A.   And so that is -- observed what I mean is
21 available in a database to researchers for access.
22     Q.   Understood, and that when I look back at
23 the studies that I believe you relied on, that was
24 data from the 1950s to the 1990s; does that sounds
25 accurate?

88

1      A.   That does not sound accurate because I do
2  reference a study by Lee and Hanson which uses
3  more contemporary American samples, so it goes up
4  to probably 2015, 2018 types of data.
5      Q.   Okay. And would you agree that the range
6  between five percent and 15 percent is
7  significant?
8      A.   Can I ask you what you mean by
9  significant?
10     Q.   Well, it's a big -- it's a large range.
11     A.   I actually would not agree with that. I
12 think that the issue of sizes of ranges has to do
13 with this -- in my thought, mind, the threshold
14 for decision making in that if you're going to
15 make a decision if your decision threshold was
16 50 percent for new convictions, then a range
17 between five and 15 percent is safely on the other
18 side of that boundary.
19          If your decision threshold is ten
20 percent then you have a bit more trouble because
21 your range straddles the decision threshold. If
22 your decision threshold is one or two percent,
23 what I'm using for very low risk, then five to
24 15 percent is safely on the other side of that.
25          So what the -- you're asking me

89

1  questions about the meaning of low, big,
2  significant. It has to do with the type of
3  decisions that we're making, and depending on the
4  decision that you're making and the decision
5  threshold five to 15 could be safely narrow or it
6  could be right on top of a threshold where you
7  actually would want to make a decision providing
8  precision. Imprecision, that would be troubling
9  to the decision makers.
10     Q.   So next I'm looking at the table that
11 you've got on page ten. Can you explain what
12 those -- you've got mixed groups of sex offenders
13 five to ten, what does -- or, sorry, five to 15,
14 what does the five to 15 represent?
15     A.   That is detected sexual recidivism during
16 those period of times.
17     Q.   And then after ten years the detected
18 recidivism rate is 10 to 20 percent; is that
19 right?
20     A.   That's correct.
21     Q.   And how does the victim age relate to the
22 recidivism rate above --
23     A.   So --
24     Q.   -- or victim type?
25     A.   Yeah, so the mixed groups of sex

90

1  offenders is -- language we're using here, is
2  people who have committed different types of
3  offenses, and you can make meaningful distinctions
4  in their likelihoods based on risk factors, the
5  type of risk factors that we use to develop
6  Static-99, for example.
7       So if you had violence as -- in your
8  offense and you were sexually assaulting adult
9  women you're slightly higher risk than other
10 groups. If your only victimizing -- your only
11 history of victimization involves related children
12 you're lower. If you're victimizing or have a
13 history of victimizing girls, young girls, you're
14 less likely to re-offend or to be caught or
15 recidivate than if you have unrelated boys.
16      So these are the types of risk
17 factors that are, you know, commonly used, easily
18 measured, and we package them into risk tools,
19 meaning myself and others, package them into risk
20 tools, which are used to attribute relative risk
21 levels for individuals with a sex offending
22 history.
23      And that's essentially, looking at
24 the bottom of the table, risk levels, you know,
25 below average, average, and above average. In

91

1  this case average means the middle of the
2  distribution, above average means higher than the
3  middle of distribution, and below average means
4  lower, so these are relative risk statements here.
5  And these are the --
6       Q.  What are the -- I don't understand what
7  those numbers represent. When you've got the risk
8  level and below average, what is one to two,
9  what is --
10      A.  That's one to two percent sexual
11 recidivism rates after five years.
12      Q.  Okay, so the -- from the mixed group of
13 sex offenders who have gone through some sort of
14 risk assessment and have been identified as being
15 below average, according to this table you're
16 saying one to two percent of them sexually
17 recidivate?
18      A.  Yes.
19      Q.  And if I'm reading this right for -- from
20 the mixed group of sex offenders who offend
21 against unrelated boys, they are at the highest
22 likelihood of re-offending after ten years in
23 comparison with the other victim types?
24      A.  Right. So I've presented four common
25 victim types, and of these four the unrelated

92

1  boys, people who have a history of victimizing
2  unrelated boys, would be more likely to be caught
3  for a new sex offense than individuals who -- in
4  the other categories mentioned in this table.
5       Q.  And then on page 11 you talk about there
6  being a debate remaining about -- concerning how
7  to best structure risk assessments. What is the
8  ongoing debate there?
9       A.  Yeah. The ongoing debate is -- I guess
10 what we have consensus on is that the major risk
11 factors that we identify, the -- what are the
12 characteristics of the individuals and what are
13 the indicators of those which largely fall into a
14 general criminality factor for a bunch of things
15 and then sex crime specific things, and everybody
16 agrees that these are risk --
17      Q.  Can I pause for one second --
18      A.  Sure.
19      Q.  -- because I want to make sure I
20 understand. When you say major risk factors are
21 you referring to the items that are on the
22 Static-99 or is it something different?
23      A.  I'm referring to the risk relevant
24 propensities, what would make an individual more
25 likely to re-offend or not re-offend, so that's

93

1  the characteristics of an individual, a propensity
2  to do something, and it's related to psychological
3  characteristics as well as features of their
4  community and our response to them, frankly.
5       Q.  Is there a specific list or is it just
6  sort of a general principle that you have to look
7  at risk factors for each individual to -- you
8  know, a wide range of items?
9       A.  So on table one I provide a list, page
10 51, of established risk factors for sexual
11 recidivism, so a comprehensive risk assessment
12 would consider many of these. You don't have to
13 consider them all because sometimes once you know
14 enough you know enough. You don't have to always
15 go check everything, but if you have the time you
16 can check for a lot of things.
17      But these -- most of the risk scales
18 that we work with and are used by evaluators
19 contain factors from this list. If you just go
20 look at them there'll be some on sex crime history
21 and sex -- they'll have something on age, most of
22 them do, and they'll have stuff on general
23 criminology, and so these are the types of things
24 that evaluators look for. So all the evaluators
25 will look for essentially the same thing.

94

1    The debate is how do you combine
2    those into overall risk assessment, and there are
3    two major ways of doing it. One way is you have a
4    mechanical rule, an actuarial table, where you
5    give, you know, one point for a male victim,
6    check; two points for prior sex offense, check;
7    and then you add up the points and then people are
8    rated by the number of points that they have, and
9    that's referred to as the actuarial sort of
10   approach.
11       Q.   And that's how Static-99 --
12       A.   Yeah, Static-99 is an empirically derived
13   actuarial risk tool.
14       Q.   Got it.
15       A.   The other way of doing it is you start
16   with a list of factors, much like this list, much
17   like table one, you rate the individual on these
18   factors, and then at the end of it you make a
19   judgment based on your own professional judgment
20   of whether the individual is low, moderate, or
21   high risk. They only make a relative risk
22   adjustment. They do not make statements about the
23   likelihoods but only whether this person is higher
24   risk, average risk, or lower risk.
25       And some people strongly prefer the

95

1    structured professional judgment approach, some
2    people strongly prefer the actuarial approach, but
3    most evaluators do a bit of both. If you look at
4    what people actually do they typically use one or
5    more actuarial tools. They'll often use a
6    structured professional judgment tool in a
7    comprehensive assessment.
8        That being said, correctional
9    systems who are -- want more efficient methods
10   typically specify in advance the risk tools to be
11   used, which are mostly actuarial, not entirely,
12   and so that the actuarial risk tools are easier to
13   implement and to maintain quality control.
14       If you have a place for -- a big
15   place for professional judgment then it's harder
16   to know what people are doing, and it's harder to
17   assure that they're doing it well.
18       Q.   Okay. And to your -- I think we touched
19   on this already but I want to make sure, to your
20   knowledge is there any state government or
21   provincial government that uses the actuarial
22   tools or these other tools to determine
23   someone's -- an offender's registration
24   obligations?
25       A.   I'm not aware of anyone currently using

96

1    that on a systematic basis for -- at the time of
2    initial placement on registry. I do know that
3    there are some jurisdictions, a number of
4    jurisdictions, who have a capacity for
5    individualized risk assessments to get off
6    registries, and in that case Static-99 is used in
7    practice but I don't think by statute.
8        Within the Canadian federal
9    government it is -- Static-99 is used on everybody
10   who has a sex offense against a child and who has
11   a passport. We use that for screening people who
12   are potentially traveling for sex tourism in
13   countries such as Thailand, so it's used in terms
14   of the application of the registry but not on
15   whether they're on it or not. So what happens
16   will depend on -- in Canada on a Static-99 score,
17   but the fact that they're on it is not determined
18   by a Static-99 score.
19       Q.   And for an offender is it accurate to say
20   that their level of risk will change throughout
21   their life?
22       A.   I believe that it changes and it
23   typically goes down. It can go up but it
24   typically goes down, and so even though I've
25   created a tool called Static-99 based on Static

97

1    historical risk factors risk is not static.
2    People change, and one of the most well
3    established findings in criminology is that young
4    people commit crimes, and it's less common amongst
5    people of a certain age.
6        Q.   So if Static-99 or other risk assessment
7    tools were used to evaluate an offender's risk
8    would those evaluations have to be redone
9    periodically as the offender's life circumstances
10   or age changes so that there could be a
11   determination of what potential risk they
12   represent?
13       A.   If you want to get a precise estimate
14   reassessments help. The frequency of reassessment
15   will determine based on the thresholds that you're
16   looking at. If you're not close to a threshold
17   wait, right, because a lot of change is necessary.
18   If you're close to a threshold then maybe frequent
19   reassessment would actually be an efficient way of
20   determining when people would be above or below a
21   particular threshold.
22       Q.   When you say a threshold what are you
23   referring to?
24       A.   So, for example, as we've been talking
25   about, if you or some state adopted a threshold of

98

1   you can be released from obligations to register
2   if your risk is no different from that of the
3   general male population and if that's defined as a
4   risk of, you know, less than two percent after
5   five years, if that's the risk level that's the
6   threshold. And so if an individual's assessed
7   risk now is 40 percent after five years, well, you
8   probably want to wait a bit before reassessing.
9   There's no likelihood that a person would
10  miraculously get that much better that quickly.
11          If the person's likelihood now is
12  four or five percent, then medium, small changes
13  in both time free and community adjustment could
14  push the person down below the threshold, so
15  that's what I'm talking about by threshold here.
16      Q.   And would an actuarial tool be effective
17  in making those -- what I would characterize sort
18  of a reevaluation or --
19      A.   If the person has time in the community
20  you can use the time in a community in a fully
21  actuarial way, so we have specific equations which
22  we have computed, validated, calculated confidence
23  intervals for and have reported in -- in a number
24  of published documents that are being used
25  routinely now by evaluators.

99

1           So if you're looking at time free by
2   itself, along with initial risk, that's all
3   developed and it's all done in an actuarial way.
4   If you're looking at the quality of community
5   adjustment, which I actually -- I think is
6   probably a good idea as well, then that
7   requires -- that is less worked out. There is
8   some actuarial methods for doing it in the first
9   few years after release, but we don't have
10  information on -- for, you know, ten, 15 years in
11  the community. We don't really know how -- we
12  haven't had follow-up studies that are longer than
13  about five years for these psychological changes
14  that occur during that period of time.
15      Q.   Okay. So I want to understand how this
16  would potentially work in practice. So if this
17  individual we talked about earlier that -- you
18  know, let's say he was 20, he sexually abused, you
19  know, children, he raped children, and let's say
20  he went to prison for 15 years so he's going to
21  come out at 35, age of 35, so it's still a long
22  time before he hits, you know, what you've
23  characterized as advanced age. So how often would
24  an evaluation need to be performed on him to
25  determine what his relative risk level would be?

100

1       A.   What -- the chances are if somebody is
2   35, let's give him a moderate risk level assuming
3   it's not really low already, it would be hard for
4   him to be really low with that type of history, he
5   would presumptively be below the threshold after
6   about ten years. If he -- depending on individual
7   assessment it could be as short as five years.
8   It's unlikely to be less than five years.
9           So the -- if I was setting it up
10  and -- or a system that you could use and that is
11  used by many evaluators is you -- you can -- you
12  have to -- somebody else besides the evaluator has
13  to set the threshold, what risk is tolerable,
14  right? And I'd be arguing it should be this
15  baseline and be at risk in the general population.
16          Once you've set that, which is set
17  at a policy level, then you can assess when they
18  are going to be below that and importantly you can
19  predict when they're going to be below that.
20          So you don't have to even do the
21  assessment. You know, this guy you can predict if
22  he doesn't do any new offenses he might -- might
23  be eight years out. If he commits a new sex
24  offense then he's back up again and you start the
25  clock all over again, so he'd sort of -- he

101

1   forfeits his chances there.
2           If he commits a nonsexual offense
3   his risk increases a little bit and it may go from
4   eight years to say 12 years, and you can
5   mechanically do that. And then you can sort of
6   just build it right into the system so that if the
7   guy's been offense free for, you know, eight
8   years, 10 years, 12 years, whatever the prediction
9   is, he could automatically be relieved or -- you
10  automatically assume to be below the threshold.
11  If you want to invest more money into it you could
12  actually talk to the guy and see what he's up to
13  and take a look at him, but that would make a much
14  more expensive system.
15      Q.   And for this narrative you just outlined
16  where, you know, they get out at 35, they commit
17  another non-sex offense five or six years after
18  they're out, would then they -- would they need to
19  be given another evaluation after that non-sex
20  offense was committed?
21      A.   They would not need to have a new
22  evaluation. You want to make sure that the sex --
23  the new -- what -- the thing labeled as a non-sex
24  offense wasn't actually a sex offense because some
25  people are committed -- convicted of an assault

102

1  but it's a sexually motivated assault, and if it's
2  a sex as- -- you know, you'd want to do some
3  precision in terms of that it really wasn't a
4  sexual offense, but you don't need to do a
5  reassessment.
6           You need to keep track of the time
7  in prison so if he goes back for a robbery and
8  does five years, you know, the clock stops during
9  that period of time.  He doesn't get credit for
10 the five years in prison, so you'd have to
11 recalculate the time like -- because like it
12 wouldn't be -- if it was originally going to be
13 20 -- you know, 20-30, you know, and he does five
14 years, then it would be 20-35 that you'd have to
15 do it.  But there's mechanical ways of doing all
16 of this, which are used routinely now by
17 evaluators who have been trained in this.
18    Q.   Okay.  And with this hypothetical
19 individual we're talking about if they commit a
20 non-sex offense and somebody who -- or we -- I
21 guess we don't know whether it's a non-sex
22 offense.  If they commit an assault someone would
23 have to look at the records and make a factual
24 determination of whether or not there is a sexual
25 component to the offense?

103

1    A.   I would recommend that there is some way
2  that somebody looks at the record to see what the
3  original accusation was or that there's some
4  warranty by somebody that it was not a sexually
5  motivated offense.
6    Q.   Yeah.  And, I mean, I think given your
7  background you're familiar with how -- or I think
8  generally you're familiar with how the prosecution
9  process works, that somebody might be charged with
10 a whole list of things and then end up pleading to
11 one, so they might be charged with criminal sexual
12 conduct in the fourth degree and then may end up
13 pleading to a sexual assault.  Are you familiar
14 generally with how that process works?
15   A.   Yeah, I am.
16   Q.   So in that scenario if someone was
17 charged with criminal sexual conduct in the fourth
18 degree, which is -- in Michigan it's the least
19 severe, and they end up pleading to assault,
20 simple assault, how would one determine whether or
21 not there is a sexual component because all we
22 have is allegations.  We don't have any facts
23 that were developed.
24   A.   Yeah.  It's a good question.  The -- I
25 would recommend that there is somebody who takes a

104

1  look at the record and makes a determination of
2  the -- of the facts, whether it was sexual.  You
3  could also create a separate legal process to
4  distinguish sexual motivation for offenses.
5           I know that there's -- in some
6  jurisdictions they have a -- a conviction like an
7  assault, but they also have another determination
8  about whether this person is needing a sex
9  offender specific intervention, which is a
10 separate determination.
11          So you would -- it would help the
12 process if you do -- are aware of sexually
13 motivated, nonsexual convictions.  Those account
14 for, I don't know, ten, 15 percent of the -- of
15 the recidivism events or the conviction events
16 would be of that nature, so you'd have to make
17 some decision about how to deal with those.
18   Q.   Okay.  And then would there have to be a
19 process for the offender to challenge the
20 determination?
21   A.   Well, it's all -- you know, that's a --
22 very much a legal question in terms of, you know,
23 how your state wants to run it.  In some
24 jurisdictions you don't have the opportunity to
25 challenge your -- their sex offender label, so to

105

1  speak, others you do, others it's informal, so I
2  don't really have an opinion about that.  I would
3  recommend that it -- that it's considered.  How
4  it's considered would be sort of left to the
5  lawyers.
6    Q.   That's dangerous but --
7    A.   Well, you all seem very competent.
8    Q.   Yeah.  So I want to turn now to talk a
9  little bit about Static-99 and Static-99R and the
10 differences of the two, and I think your general
11 discussion of that starts around page 20 of your
12 report.
13          So can you explain, you know, in
14 broad terms what's the difference between the
15 Static-99 and the Static-99R?
16   A.   Yeah, there's -- there's one difference
17 in scoring and there's some difference in
18 interpretation.  So the Static-99 was developed
19 back in 1999 with the data we had available and
20 mainly from cases from the 1970s and '80s were
21 most of the cases at that time.  The population
22 was a lot younger at that time, and so that
23 individuals in the '70s and the '80s in prison
24 tended to be in their 30s or early 30s, and there
25 were very few people who were over the age of 50.

106

1  It was less than two percent were over the age of
2  50 at that time.
3         As the population aged we ended up
4  with a lot more people over the age of 50 who were
5  in prison for sex offenses, and we had to figure
6  out what to do with them. So going from what was
7  two percent it was now like 10, 15 percent. It
8  was a nontrivial amount of individuals who were
9  significantly older, and so we recalibrated
10 Static-99 to account for these older offenders.
11        So originally we only made a
12 distinction between young, which was defined as
13 less than 25, and not young, which was 25 and
14 older. Whereas the Static-99 what we did was we
15 got a bunch of datasets, we got a couple of -- two
16 different people, myself and David Thorton, and we
17 checked different empirical age weights that would
18 work best for these older offenders or for the
19 whole range, and then we came up with the revised
20 age weights, which became the Static-99R.
21        The other thing that Static-99R has
22 is we have updated recidivism rate tables, so we
23 collect data routinely on the predictive accuracy
24 and the distributions of scores, and when we see a
25 shift in the statistics we present new statistics

107

1  or norms, so the norms shift as -- as more
2  information becomes available.
3         The most recent ones were 2021.
4  We'll probably do -- in a couple years we may do
5  another one, so we shift the norm. So that's --
6  whereas we've stopped supporting Static-99, it's
7  sort of gone to the graveyard of risk tools that
8  were use -- were useful at one time. It's...
9     Q.  So will it need to change again as
10 there's changes in demographics or changes in --
11    A.  It might. Yeah, so evidence based
12 practice is based on evidence and evidence
13 changes. That being said we did the analyses for
14 the Static-99R in I guess about 2009, and we don't
15 feel a need to change it yet. So we've had a
16 decade of research and it seems to be doing
17 essentially what it -- we have updated the coding
18 manual I guess twice, but it's basically every ten
19 to 15 years we'll update the coding manual. And I
20 hope that things would be updated as evidence.
21        And I think one of the arguments
22 that I'd like to make and one of the values is if
23 you're running a public protection based
24 intervention that it's evaluated, that you keep
25 track of the numbers, you keep track of the

108

1  evidence, so that if things aren't going the way
2  you want to them to do you can adjust.
3         And so I think that if you want to
4  have effective public policy then you need to
5  build in evaluations as you go. And so I -- right
6  now you have a package that you could use. In the
7  future, the -- hopefully we'll do it better, and
8  I -- you know, myself and my junior colleagues are
9  working on trying to make things better all the
10 time. And so hopefully in, you know, five or
11 ten years there's something that will make -- make
12 it work even better in terms of differentiating
13 risk and in terms of, you know, protecting the
14 public.
15    Q.  Are you aware of anyone who has used
16 Static-99 to categorize risk and then they
17 followed up on it five or ten years later to find
18 out if their original categorizations of risk were
19 accurate?
20    A.  Yes, I'm aware of dozens of studies like
21 that.
22    Q.  And what are the -- what have the general
23 findings been of those?
24    A.  There's a -- in my rebuttal report I
25 mention a meta analysis that was done by one of my

109

1  colleagues of which she looked at close to 60
2  different studies of that nature and found that
3  the relative risk rankings were very similar to
4  those proposed by -- in the original development
5  samples, so it was within, you know, decimal
6  points, you know, second decimal points of what we
7  had predicted. So that was very encouraging.
8         In terms of calibration, which is
9  the other measure of predictive accuracy, there is
10 a tendency for Static-99 predictions to
11 overestimate risk. Sometimes it matches up but
12 sometimes there is a direction that the current
13 samples have lower recidivism rates than we expect
14 based on that, which suggests the need to update
15 norms and that there may be some covert changes in
16 recidivism rates over time.
17    Q.  All right. And I think you mention this
18 in your rebuttal report but how does -- how does
19 Static-99R account for different races and
20 different ethnic groups?
21    A.  Right. So we don't have an item that's
22 race related on that and we have the same
23 interpretations of that. We have examined its
24 predictive accuracy, again coming back to
25 discrimination and calibration, for different

110

1  racial groups.  Different countries have different
2  racial groups, and I assume that you're most
3  interested in the racial groups that are
4  represented in the criminal justice systems in the
5  United States, which are mainly white, black,
6  Hispanic, or indigenous, which you call the Native
7  Americans or I think that's the term.
8      Q.   Yeah.
9      A.   So what we've found is that for -- that
10  Static-99 specifically works equivalently for
11  white men and black men and that we have similar
12  predictive accuracy, similar discrimination,
13  similar calibration.
14          For -- there are a number of studies
15  looking at men of Hispanic background and the
16  predictive accuracy is a little lower for that
17  group, and particularly amongst the higher risk
18  groups Static-99 tends to slightly overestimate
19  the risk for the higher -- people labeled as
20  higher risk, Hispanic who don't re-offend as much
21  as we expect.
22          I have argued based on some evidence
23  that some of this effect, and perhaps all of this
24  effect, is due to deportation.  That the
25  individuals who were studied live on border states

111

1  with Mexico, many of them were ethnically Latin
2  American, and would have been deported.  And once
3  we account for deportation that effect gets a lot
4  smaller.  It doesn't entirely disappear.  So there
5  is a slightly less accurate for the higher risk
6  designation for people of Latino background.
7          It doesn't work as well for people
8  of indigenous background in Canada, Australia, New
9  Zealand.  We have very little data about the
10  Native Americans.  We have a couple of little
11  studies.  It's okay.  It works less well and it
12  suggests that there are other things that we're
13  missing, so it's not as effective.
14          In the -- it does work for Asian
15  background.  We have now a number of studies based
16  on large samples looking at Asians, both Asian
17  in -- as immigrant Asians in western countries, as
18  well as Asians in Asia, Korea, Hong Kong, Japan,
19  and it works just fine for the Asian population.
20  Its predictive accuracies are as high or higher
21  and the calibration is within the expected ranges.
22  So we're quite confident with white men, black
23  men, Asian men, somewhat less confident with
24  Latino men, and even less confident again for
25  individuals of indigenous heritage.

112

1      Q.   Okay.  And then turning to -- let's see,
2  we're on page 23, paragraph 34.  You talk about
3  evaluating risks at a later time, evaluators of
4  the current risk should consider initial risk but
5  should also consider information unavailable at
6  the time of release such as subsequent nonsexual
7  convictions and the number of years offense free
8  in the community.
9          And offense free in the community
10  just means that they haven't been caught again,
11  right?  It doesn't imply that somehow you'd be
12  able to determine whether someone actually
13  committed another sex offense, right?
14      A.   Yeah, so one of the things that I do want
15  to mention and have on the record is that there's
16  been a number of studies -- and I've tried to do
17  this.  Like I've been aware of the distinction
18  between detected and undetected for as long as
19  I've been doing these going back into the '80s,
20  and I've looked for ways of detecting like
21  undetected offenses, right, to try to get some
22  estimate of that.
23          One of the things I looked at was
24  lie detection.  So in many states they -- they
25  have use of lie detection as a supervision

113

1  monitoring device, so every six months or so the
2  guys who are being supervised will be required to
3  do a lie detection test, and one of the questions
4  is have you committed a new sex offense.  And they
5  ask other questions such as, you know, have you
6  broken curfew, have you violated any conditions,
7  have you masturbated to deviant fantasies.
8  There's a bunch of questions that they ask.
9          What they've found -- they didn't
10  find a lot of new offending, so if like 100 guys
11  were required to do lie detecting and if they had
12  the observed recidivism rate of, you know, say our
13  ten percent that we typically see, if you use lie
14  detection that may go up to 12 percent.  There may
15  be a couple of guys that you detect through this.
16          What you do detect are a lot of
17  violations of conditions.  So you'll detect that
18  people are breaking curfew.  They're drinking when
19  they shouldn't.  They're visiting people they
20  shouldn't be talking to, so you find --
21      Q.   Sorry, Doctor Hanson, I've got to --
22  somebody's at my door.  I've got to go answer the
23  door, so if you wouldn't mind let's take like a
24  three minute break.  I don't want to interrupt
25  your answer but if you wouldn't mind --

114

1    A.   Sure, I can come back to that so --
2         MR. REINGOLD:  Hold that thought.
3         THE WITNESS:  Yeah, okay.
4         (A break was taken.)
5    BY MR. JAMISON:
6    Q.   Thank you for that, I apologize.  Let's
7    go back on the record.
8    A.   So just to continue, so one of my
9    questions was whether polygraph are effective in
10   detecting bad behavior that wouldn't otherwise be
11   detected, and in some ways the answer was a
12   resounding yes because we detected a lot of -- the
13   people doing this type of research detected a lot
14   of misbehaviors that would result in violation if
15   they were known about, and so that was
16   encouraging.  However, we just didn't find new
17   offending.  We found, you know, a case here, a
18   case there.  We found troubling behavior.  You
19   know, people would start befriending or doing what
20   we'd consider high risk behavior, but we didn't
21   actually see a lot of new offending.
22        So this sort of reinforces my sense
23   that the observed rates are -- they underestimate,
24   but I don't think they wildly underestimate.  It's
25   fairly hard to find these -- to find actual direct

115

1    evidence that they are substantially lower than
2    they -- than their real rates.
3    Q.   Now, haven't there been some studies,
4    though, that have found that when someone is
5    interviewed -- or an offender is interviewed what
6    they report versus the results after a polygraph
7    have been dramatically different?
8    A.   Yes, those reports, as I detailed in my
9    rebuttal report, all concern individuals at the
10   time of -- of -- like when they're caught and
11   they're talking about their past.  So if you have
12   an individual and you ask them, you know,
13   here's -- we know you're convicted of these two or
14   three things.  Okay, now tell me everything you've
15   done and we're going to check really carefully,
16   right?
17        And you'll get accounts that are
18   multiples, you know, for -- multiple you know,
19   multiply by four, multiple by, you know, seven,
20   eight, or whatever.  They'll be much higher
21   overall that the people have done more sex crimes
22   and they're caught.  And this is no different than
23   any other crime in the sense that, you know, if
24   you asked the similar questions about a drug
25   offender, you know, you're caught twice for drug

116

1    offending, you know, how many drug offenses have
2    you committed, you know, it would be a much bigger
3    number, and so that would be the same for just
4    about any offenses.
5         But it's a different question about
6    whether people -- the rate at which they offend
7    afterwards.  So the polygraph studies of people,
8    post conviction polygraph on community
9    supervision, just have not revealed a lot of new
10   offending.  People have done this.  There's
11   thousands of individuals who have been subject to
12   these types of regimes, and the number of new
13   offenses detected through that process is -- is
14   very, very small.
15   Q.   Next I want to turn to page 27 -- it's
16   paragraph 45.  It starts on page 27 and it spills
17   over onto page 28, and you talk about how many
18   U.S. registration notification laws were justified
19   by a belief that individuals with criminal -- you
20   know, with sexual crime were likely to re-offend.
21   How do you know what the laws were justified by?
22   A.   Many of the laws, like Florida, Alabama,
23   Michigan -- not Michigan, I haven't actually
24   looked at Michigan's law, but many of the laws
25   usually come with a preamble, and those preambles

117

1    often say the purpose of this law is to, you know,
2    protect society from the risk presented by -- the
3    high risk presented by people with a sex offender
4    history, something like that.  There's often a
5    statement.  Sometimes it comes with the very
6    explicit statement that the individuals are very
7    high risk, but all of them come with some
8    statement that these individuals are -- a lot of
9    them come with these preambles that clearly state
10   it.  And I've seen, I don't know, probably a half
11   a dozen of these and they're all pretty similar.
12        I was also privy to the -- or I
13   listened to the debates around the original
14   federal SORA laws and talked -- and listened to
15   some of the transcripts of those, and much of the
16   conversation -- or repeatedly, not much of the
17   conversation, but in the conversation it was
18   mentioned not infrequently the high rates, using
19   that term, of recidivism among people with a sex
20   offend history, so that's the basis of my
21   statement.
22   Q.   And did anyone say what a high rate was
23   or are you aware of any preambles to the statutes
24   that say what a high -- a high risk of recidivism
25   is or a high risk of sexual offense is?

118

1     **A.**   Yeah.  None of the documentation, like
2  **the legislation, I've never seen a number in**
3  **the -- any of the documentation around the**
4  **legislation itself.  There is some mention of**
5  **numbers in some of the peripheral discussion, but**
6  **in the legislation itself I haven't seen a number.**
7     **Q.**   So it's fair to say that you don't know
8  what the various legislatures believe to be a high
9  risk?
10    **A.**   I think we can fairly assume that the
11 **legislators' beliefs about what high risk is, if**
12 **we're talking about it in terms of numbers, would**
13 **be roughly congruent with the rates of high risk**
14 **as defined by the general population as in the**
15 **types of surveys I mentioned earlier where you ask**
16 **community members what their -- you know, what is**
17 **the recidivism rate of people with a sex offend**
18 **history and is that high.**
19          **So those studies provide numbers.**
20 **As I said before and I will say again, the**
21 **number's usually between 50 and 80 percent on**
22 **average.  And my assumption, and I think it's a**
23 **reasonable assumption, that the legislators when**
24 **they're making this legislation would hold similar**
25 **beliefs as members of the public, and that -- and**

119

1  **as representatives of members of the public they**
2  **would be sensitive to public perceptions in this**
3  **area and would probably want to make legislation**
4  **congruent with those expectations.**
5     **Q.**   So were you aware that Michigan changed
6  their sex offender law in 2021?
7     **A.**   Yes.
8     **Q.**   And did you participate at all in the
9  legislative committee hearings prior to the
10 changes --
11    **A.**   I did --
12    **Q.**   -- in the law?
13    **A.**   -- not.  I did not.
14    **Q.**   Were you aware that there were several
15 people that testified in front of committee
16 hearings regarding the rates of recidivism?
17    **A.**   I was not.
18    **Q.**   So if the legislators heard testimony
19 about the rates of recidivism from experts who I
20 would say align with sort of your conclusions in
21 the report, isn't it fair to say that the
22 legislature would be more well informed than a
23 member of the public?
24    **A.**   **What is the question specifically?**
25    **Q.**   Well, so the legi- -- legislators, they

120

1  have hearings on various bills.  One of the bills
2  that they had hearings on was the new changes to
3  the Sex Offender Registry Act, and I believe the
4  attorneys, you know, representing the plaintiffs
5  here, and they had other experts testify at -- at
6  committee hearings explaining their view of the
7  world that sex offenders have a low risk of
8  reoffense, so isn't it fair to assume, then, that
9  a legislator who heard this testimony would be
10 more informed about the science around the risk of
11 recidivism than an average member of the public?
12          MR. REINGOLD:  I'm going to object
13 to the question as calling for speculation.  The
14 witness has no personal knowledge.  I think this
15 one is a reach.
16          THE WITNESS:  Yeah.  You know, I
17 would hope so.  If people are given -- you know,
18 we hope, we aspire, that our decision makers are
19 as well informed as possible, and one of my goals
20 by participating today is to inform people about
21 the information and hopefully it gets through.  No
22 guarantee that it does.
23          And, again, the stuff that I've
24 presented -- I'm presenting today about the
25 relative comparison, I don't know, and I am not

121

1  sure, that it was presented in the previous one in
2  terms of the comparators against the base rate in
3  the general population.  And I think that's quite
4  relevant for our -- this discussion because I --
5  we have good evidence of relative risk and when
6  they're equivalent, the detection rates are
7  equivalent, we have an equivalent system.
8          So we have a situation where people
9  who are on the registry are not perceptibly
10 different risk than not, and I -- you know, I have
11 no idea what was presented by the experts or what
12 other experts said at that -- or other things that
13 may be influencing the legislators, so I don't
14 really --
15 BY MR. JAMISON:
16    **Q.**   I want to turn your attention to
17 paragraph 45.
18    **A.**   **Sure.**
19    **Q.**   The last sentence there in paragraph 45
20 you talk about that after ten or 15 years the vast
21 majority of individuals with a history of sexual
22 crime will transition to Level I indicating that
23 the risk for future sexual crime is so low that
24 any further interventions have no public
25 protection benefits.  What do you mean by further

122

1    interventions?
2        A.    Well, there's a list of things that we
3    do, we meaning society, that we either force on,
4    compel people, or motivate them to do, so
5    interventions would be things like providing a
6    notice of registration information, restricting
7    access to certain locations would be an
8    intervention, so these are activities done, and
9    sort of planful activities, that are intended to
10   provide a public protection function, not just
11   punishment.
12        There's a bunch of things we do for
13   punishment and we do these for shaming. There's
14   all sorts of criminal justice interventions we do
15   for all sorts of purposes. But one of the
16   purposes of our criminal justice and our more
17   broadly public protection policies is to reduce
18   crime rates in -- in specific individuals, these
19   individuals who are comitting further crimes, and
20   that's what I'm talking about.
21        It's the whole gamut of community
22   supervision, notification, registration, all the
23   things that -- there's some jurisdictions, for
24   example, which, you know, require very long-term
25   community treatment, and so people may be in

123

1    community treatment for ten, 15 years.
2        And it's -- you know, I don't think
3    this would make a big difference because -- on
4    sexual recidivism rates because we're not going to
5    change the rates from one percent to half a
6    percent or we're not going to notice if we did.
7        Q.    So next I want to look at -- I think it's
8    paragraph 55, 56, let's see. Yeah, so paragraph
9    56 you say that -- you know, and you're referring
10   to a study by I think Blumstein.
11        A.    Blumstein.
12        Q.    Where the city found after 15 years of
13   living in the community 73 percent of sexual
14   offenders have not been charged with, or convicted
15   of, another sex offense. Is that study, is that
16   consistent with your professional experience and
17   opinion about the rates of reoffense?
18        A.    So this isn't the Blumstein, so if you
19   read paragraph 55 it says I have conducted studies
20   similar to those conducted by Blumstein and
21   Nakamura. So what I'm describing here are studies
22   that we conducted, and I reference it at the note
23   58 at the bottom of the page, which turns out to
24   be none other than the same Harrison-Hanson study
25   that you mentioned to me earlier.

124

1        So what we're talking about here are
2    a summary of findings that were in the
3    Harrison-Hanson 2004 report that we have
4    previously discussed, so is that the context.
5        Q.    Yeah.
6        A.    Okay.
7        Q.    So those studies -- so 15 years living in
8    the community then 27 percent of sex offenders
9    have been charged with or convicted of another
10   sexual offense, right?
11        A.    Yes.
12        Q.    And 27 percent is higher than the
13   population in general, right?
14        A.    It's higher like -- yes, there's the
15   general population. As you start people in the
16   general population it's something like two percent
17   after five years.
18        Now, in this study we don't look at
19   it as carefully but the cumulative rate of sexual
20   offending is obviously higher, and it's
21   uncontested that it's higher among people with a
22   sex offense history. What I am saying is that
23   risk changes so that after a period of time their
24   risk becomes equivalent to. It's not of the
25   cumulative risk as a group in the history, it's

125

1    they become equivalent risk, and that's -- that's
2    a change based on demonstrated good behavior for
3    periods of time in the community.
4        Q.    And then in paragraph 57 you talk about
5    intensive interventions. What does that mean,
6    intensive interventions?
7        A.    Yeah, so I've used intervention as I used
8    it before, so these are, you know, policies that
9    we set for public protection purposes to manage
10   sex offenses. And this would include registration
11   and notification. It would include restrictions
12   of movement. It would include restrictions of,
13   you know, location. It would include things such
14   as community supervision. It would include things
15   such as community treatment. It would include
16   things such as polygraph assessments.
17        So there's a number of things that
18   we do, and I think they're -- I think I could
19   probably rephrase that as any interventions at
20   this point make no difference. I'm not
21   emphasizing intensive. I'm using the word
22   intensive here because the interventions we do are
23   intensive because they actually impose a
24   significant burden both on the state, we have to
25   hire a whole bunch of people to enforce these

126

1 regulations, as well as on the individuals so
2 targeted by these, so there -- it's not cost
3 neutral. These things do -- are -- consume
4 resources which I would argue we could better
5 place elsewhere if we were concerned about the --
6 and I think as we should be, concerned about the
7 risk of sexual victimization.
8     Q.    Yeah. Aren't there always going to be
9 disagreements over how resources could be spent,
10 though, how government resources should be sent?
11    A.    As a government researcher for many, many
12 years I hold the value that we should use evidence
13 to direct our resources and that we should fund
14 things that work and we should not fund things
15 that are either shown not to work or are actually
16 detrimental.
17    Q.    And there is -- there's going to be
18 differences of opinion over whether a certain
19 policy works or doesn't work, isn't there?
20    A.    There will be differences of opinion,
21 and I'm -- what I'm arguing is that evidence
22 should be part of that conversation.
23    Q.    And ultimately it's the legislature, at
24 least in the United States, who gets to decide
25 where government money is spent, correct?

127

1     A.    You know, I'm not a lawyer on these sorts
2 of things, but I am clearly aware of cases where
3 the courts have imposed sanctions and enforced
4 policies, so it's -- and the structure of
5 government is not a dictatorship. You know, there
6 isn't a dictatorship of the legislature, there's
7 checks and balances built into the system, and my
8 hope is that the -- all of these discussions are
9 guided as best as possible by the evidence that's
10 available at the time.
11    Q.    All right. Next I want to look at
12 paragraph 78, which is on page 49, and you talk
13 about promoting social reintegration of offenders
14 there. If someone has a criminal record they're
15 going to have more difficulty obtaining
16 employment; would you agree with that?
17    A.    Than people who don't have a criminal
18 record or people who have a sex offender record?
19    Q.    I'm just speaking about it generally, if
20 someone has a criminal -- if they have a felony on
21 their record they will have a more difficult time
22 than someone who doesn't have a felony on their
23 record?
24    A.    I think there's good evidence to support
25 that conclusion.

128

1     Q.    Yeah, and that they'll have a harder time
2 finding a place to live; is that fair?
3     A.    Yeah, I think it -- just to be -- preempt
4 some of this discussion here, having a criminal
5 record does interfere with the reintegration, and
6 there's considerable discussion amongst people in
7 criminal justice and -- about how to balance the
8 public protection and reintegration goals of
9 corrections.
10          I think the barriers are higher for
11 people with a sex offense conviction. We have
12 greater concern about sex offenders and a greater
13 stigma, and as many of -- as many of your experts
14 will argue that there's something particularly
15 difficult and problematic about sex offending and
16 about -- and are -- that it creates, I think, more
17 barriers than individuals that just have a
18 criminal conviction. I think it's easier with a
19 criminal conviction. I'm not saying that it's
20 easy.
21    Q.    And whether a registry exists or not, do
22 you know if it's typical whether employers or
23 landlords would look at someone's criminal
24 history?
25    A.    There's -- I guess you're obviously aware

129

1 of the ban the box discussion in that there's a
2 lot of employers who do use criminal history
3 records, and there's also a lot of discussion
4 about the value of doing that. So some do, some
5 don't, some use it inappropriately, and I would
6 probably say some use it appropriately. You know,
7 if I was hiring a financial manager I'd want to
8 know if the person, you know, was recently out of
9 jail for a financial crime. You know, that is
10 information I think would be relevant to the
11 hiring decision. However, if I'm hiring a
12 financial manager and I realize that he smoked
13 marijuana, you know, 15 years ago, I could safely
14 ignore it. And so I think there is some
15 information provided by that.
16          I am less aware about landlord
17 practices, and I assume that it's permitted in
18 some jurisdictions to ask these types of
19 questions. In some jurisdictions it's not. I
20 know that there's certain federal housing and
21 state housing things which are also linked to
22 felony convictions, and I know -- definitely know
23 that there's some that are linked to sex offense
24 convictions, but I think the range of restrictions
25 would be higher for people -- the explicit

130

1  restrictions would be higher for people with a sex
2  offense history.
3          I've -- I've almost -- I don't think
4  I've ever seen like a -- like a residency
5  restriction, you can't live within X number of
6  feet of a, you know, church, for example, for
7  people who don't have sex offense convictions,
8  whereas those types of things were commonly
9  applied to people with sex offense histories.
10     Q.  Okay.  Next I want to return to your --
11  turn to your rebuttal report.  Do you have a copy
12  of that in front of you?
13     A.  I have a copy of that in front of me.
14     Q.  Okay, and we'll refer to that as -- let's
15  see, I think we're Exhibit C.
16         (Whereupon Deposition Exhibit C
17          marked for identification.)
18  BY MR. JAMISON:
19     Q.  In about the middle of paragraph one you
20  say, the major empirical findings presented in my
21  previous declaration is that for many individuals
22  with a sexual offending history their observed
23  rates are equivalent to the risk of first time
24  sexual offending.  What does that mean, many?
25     A.  In that context, if you refer back to my

131

1  previous report, I would say numbers in the
2  thousands and also a substantial proportion of the
3  people currently on the registry.  I don't have
4  exact data, but I suspect it's in the tens of
5  thousands.
6      Q.  I think we've already covered this, but
7  there's really no real way to tell what the rate
8  of undetected offenses actually is, right?
9      A.  I -- there's a -- as I said before, we
10  have some information which was presented by the
11  various people in this -- I guess some of your
12  experts on the rates of undetected offenses, and
13  some of that can be you make reasonable estimates
14  about the likelihood that a particular offense as
15  experienced by a victim would result in a criminal
16  justice intervention.
17         We don't have information about the
18  likelihood of undetected offenders.  The
19  proportion more specifically, the one that we care
20  about, is the proportion of people who are caught
21  for a sex offense who then go on to commit a new
22  offense and what proportion of individuals go on
23  to commit a new offense without being detected.
24  That's a number we do not have.
25     Q.  And then paragraph two there you talk --

132

1  the very end of page one, paragraph two, you say
2  many jurisdictions routinely use individualized
3  risk assessments.  Do you know how many
4  jurisdictions use the Static-99R?
5      A.  No, I do not know the exact number.
6  Anecdotally I'd say probably half of U.S.
7  jurisdictions.  Maybe some would also use
8  Static-2002.  There'd be a few that would use none
9  but most of them -- and what I'm talking about are
10  used in the correctional systems.  That's where
11  they're used routinely.  I haven't done --
12     Q.  What specifically -- sorry, did I cut you
13  off?
14     A.  No, that's fine.
15     Q.  Okay.  What specifically do they -- are
16  they -- and I'll just say generally these risk
17  assessment tools rather than Static-99, but what
18  are these individualized risk assessments, what
19  are they used for in the correctional context?
20     A.  So there's -- they're used for decision
21  making about how to -- early in the sentence
22  they're used for developing correctional plans and
23  interventions, so if people are identified as high
24  risk and they have lots of life problems they
25  will, you know, be offered correctional

133

1  programming that will hopefully mitigate that
2  risk.  If they are very low risk they would be
3  diverted into less intensive streams.
4          Most states, Canada, have some risk
5  based sentencing, so, for example, we have this
6  dangerous offender legislation we talked about
7  before, which is risk based, so even the lengths
8  of the sentence can be determined based on Static
9  scores, which would be done at the sentencing,
10  occa- -- I think prior to sentence.  That in --
11  within the correctional it would be the streaming
12  of the programs.
13         Measures like STABLE are used to
14  identify treatment needs for people who do end up
15  into treatment programs and to determine the
16  overall risk levels.  There's -- risk assessments
17  are used to make decisions about prison placement,
18  what types of institutions would -- are, you know,
19  balancing so the liberty interests with public
20  protection, can they be stepped down from a
21  maximum security to, you know, medium or lower
22  security types of institutions.  They're used to
23  keep --
24     Q.  If I can interrupt you for one second.
25  Is it fair to say that in the corrections context

134

1  they're used to make decisions about risk in a
2  controlled environment when somebody is under the
3  custody and control of the Department of
4  Corrections?
5      A.   Let me finish.  So I started with the
6  beginning of the sentence and running through the
7  sentence.  They're also used to make decisions
8  about who gets out and what happens to them out.
9           So, for example, California the
10 Static-99 is not used in prison.  It is used --
11 oh, it's used very late in the sentence so that
12 California has very little treatment in prison, so
13 they do the risk assessments at the very end and
14 it determines the nature of the parole conditions
15 as well as whether the person should be on
16 electronic monitoring and also other types of
17 statutory requirements, which are based fully on
18 the Static-99 -- not fully on the Static-99 score
19 but mostly.  Or, say it this way, Static-99 scores
20 are one of the criteria for assigning people to
21 these categories, and these are release condition
22 categories.
23           And then in the community the Static
24 scores are used to determine the nature of
25 community supervision.  They're also used to

135

1  determine the types of interventions, so if
2  somebody is low risk they may need to report less
3  often.  They may not need to go for treatment.  If
4  they're high risk they may need to go for frequent
5  sessions.  Supervision sessions, they may have
6  more strict supervision conditions and they may
7  have longer periods on supervision.  So it's used
8  both -- it's both used in sentencing rarely but
9  it's used routinely in corrections in the
10 institution, and it's used routinely in community
11 corrections.
12           There are more people, substantially
13 more people, in the community than in the -- in
14 institutions.  People tend to spend -- and a lot
15 of the activity around risk assessment and risk
16 management concerns individuals in the community.
17     Q.   And the -- your answer related community
18 corrections, that sounds to me like where someone
19 who is on probation and parole where they're still
20 under the direct supervision of a correctional
21 institution; is that accurate?
22     A.   Yeah.  You asked me the question about
23 when are these things routinely used, so -- and
24 I re- -- and when are they routinely used by
25 corrections, if I understand your question

136

1  correctly, so I was responding how they are
2  routinely used by corrections.
3           If you -- they're also used in --
4  some states have an option so if people are
5  registered at one level they can petition to have
6  their level lowered or actually to be removed from
7  the register.  And these people have
8  individualized risk assessments that inform that
9  decision with a, you know, quasi judicial body who
10 makes the decision whether the person is low
11 enough to change, so -- and those are -- you know,
12 risk assessments are used routinely there
13 typically by psychologists paid for by the
14 individual.
15     Q.   I'm sorry, I didn't catch the end of
16 that, it was paid for by who?
17     A.   By the individual in question so --
18     Q.   And do you know which -- which states --
19     A.   Massachusetts.  I'm trying to think of
20 other ones.  I'd have to go back and check, but
21 I've come across a number of these so it's not
22 that unusual.
23     Q.   And I believe you said that they would --
24 the person petitioning for removal, they'd have to
25 hire and pay for a professional to evaluate them?

137

1      A.   That's how it's done in Massachusetts.
2      Q.   Okay.  And so it's fair to say they don't
3  just use an actuarial risk assessment tool?
4      A.   They do use actuarial risk assessment
5  tools, but they -- it's applied by a person who
6  would then testify to the validity of it as
7  applied to this individual.
8      Q.   And do you know if the professional that
9  does the evaluation, do they interview the
10 individual that's petitioning for removal?
11     A.   I think that would be routine practice.
12     Q.   Okay.
13     A.   Since the individual is the one who's
14 applying I think that would be...
15     Q.   Are you aware of whether the U.S. federal
16 government uses the Static-99 in any way?
17     A.   I don't know.  I think they do use it but
18 I -- my memory was that they were developing their
19 own Static-like tool, so I don't think my
20 information is up-to-date on that.  So I do -- I
21 do know that they have used it, but I don't know
22 whether they're currently using it.
23     Q.   And next I want to look at page four of
24 your rebuttal report, and you talk about the key
25 factual questions.  Are you an attorney?

138

1     A.   No, I am not an attorney.
2     Q.   Okay, and you're not a judge, correct?
3     A.   No, I am not a judge.
4     Q.   So how did you determine what the key
5  factual issues are in this case that Judge
6  Goldsmith is presiding over?
7     A.   This was in conversation with the
8  attorneys that I was -- I was asked to speak to
9  the key factual things.  I'm a fact expert and so
10  in order to understand the key factual things I
11  have to ask what those are, and they provided me
12  with an answer and this is what I understood to be
13  their answer.
14     Q.   So just -- in summary the key factual
15  issues are what the plaintiffs' attorneys told you
16  were the key factual issues that they then
17  retained you to opine on --
18     A.   Exactly.
19     Q.   -- is that right?
20     A.   That's correct.
21     Q.   And in Michigan you're aware that the --
22  our registration is based on convictions, right?
23  Our registration obligations are based on the
24  conviction, they're not based on other criteria?
25     A.   I'm aware.

139

1     Q.   Are you aware of how many other states
2  use the conviction as the basis for determining
3  registration obligations?
4     A.   I do not have that information.  I think
5  it's common for people to use conviction based
6  registration though -- but it's not universal.
7  There are some states that have a more risk based
8  determination.
9     Q.   Do you know which states have a more risk
10  based?
11     A.   That's a good question.  I have heard
12  about it but I cannot actually place it right now,
13  so I do not have a name to provide.
14     Q.   Okay.
15     A.   If you do -- I think California has
16  recently moved in that direction, but I'd have to
17  double-check what their current statute is.
18     Q.   And the key factual question that you
19  identified in your report is do all people who
20  have been convicted of a sex offense present a
21  higher risk of committing a new sex offense.  Is
22  there ever something that's going to be true for
23  all people?
24     A.   Are you suggesting that I'm over
25  generalizing that type of thing?  I guess if

140

1  you --
2     Q.   I mean, I guess what I'm --
3     A.   If you want to rephrase it -- it -- is
4  the -- it's is there an identifiable class, I
5  guess it'd probably be a better way of saying it,
6  is there an identifiable class of people with a
7  sex offend history who -- who present -- you know,
8  do everybody in that class present?  No, you know.
9  Is there identifiable class that is equivalent to,
10  that's largely what I'm speaking to, the risk of
11  in a general population, or, you know, can you
12  like gen- -- or how valid is this generalization.
13        So I think that you can state at a
14  reasonable level that a sex offense history is a
15  valid indicator of increased risk.  I don't think
16  that was contested.  It's an item on the
17  Static-99, and we do lots of studies, you know
18  I've done lots of studies, comparing people with
19  sex offense history than without it, and all of
20  these studies consistently find that the risk of
21  sexual offending is higher overall among people
22  with a sex offense history.  That's not contested.
23        What I'm talking about in the report
24  is that that risk level isn't -- isn't static,
25  that over time individuals change their risk level

141

1  and they -- that that can be recognized at the --
2  recognized by their behavior in the community and
3  specifically if they, you know, don't re-offend.
4  And that identifies, I think, a large class of
5  individuals who are subject to the registry who,
6  you know, are not higher risk than the general
7  population.  So, yes, I guess in terms of phrasing
8  the question it is an indicator, and not even all
9  people because there's some people that would not
10  be that, and can we tell?
11        It's not a question of -- if we're
12  doing risk assessments one of the things that
13  you're doing is you're predicting about -- you're
14  talking about the future, so you can never have
15  complete confidence because the future is so
16  uncertain.  What you want to do is have a set of
17  rules or guidelines that gives you a reasonable
18  guess about what the future is going to be like,
19  and we do this all the time.
20        And one of the things that I think
21  people have done is, you know, a sex offense
22  conviction increases your risk as a class of, you
23  know, re-offending sexually, and I would say, yes,
24  that's true.  But that risk doesn't continue in
25  perpetuity and that, knowing that, there are rules

142

1 **around identifying people who are, you know,**
2 **sufficiently low risk that they don't look much**
3 **different than, you know, young males roaming**
4 **around the streets with no criminal convictions.**
5    Q.   And I think we already touched on this,
6 but Static-99R, it doesn't work for all offenders,
7 right?
8    A.   **That's correct.**
9    Q.   And is it fair to say that all laws are
10 over and under inclusive?
11    A.   **You know, you're the lawyer.**
12    Q.   Or maybe most laws.  I mean, I guess what
13 I'm thinking about is like the drinking age in the
14 United States is 21.  Are there some people who
15 are 20 years old who can drink responsibly and are
16 there some 30 years old who can't drink
17 responsibly, so isn't the legislature -- when
18 they're drawing lines aren't they always going to
19 be over and under exclusive?
20    A.   **So you're asking -- just to be clear**
21 **here, you're asking for me to opine as a public**
22 **policy expert?**
23    Q.   Well, I'm just asking in your experience
24 as we're talking about where the legislature draws
25 lines about who has registration obligations,

143

1 isn't it accurate to say that when the legislature
2 draws those lines they're going to be over and
3 under exclusive?
4    A.   **Yeah.  So when -- all legislation and all**
5 **things on a blanket level will, you know,**
6 **hopefully target mostly what you're looking for,**
7 **and there will be some that will be overreach and**
8 **there will be underreach, so you'll miss some**
9 **things and you'll catch some things you don't want**
10 **to catch, so that's pretty common.**
11       **If you're aspiring to effective**
12 **public policy you will always pay attention to**
13 **what you're actually catching whether -- if you're**
14 **catching primarily what it is that you want versus**
15 **things that you don't want, and this is something**
16 **that you have to monitor because it isn't**
17 **necessarily the case that everything you think up**
18 **actually works.  So sometimes when you develop a**
19 **policy you think it should look like this and then**
20 **you find it looks actually quite different.**
21       **So what I'm arguing is for feedback.**
22 **And one of things that I hope I'm providing by**
23 **this testimony is some feedback of what the**
24 **research studies have shown about certain**
25 **characteristics and assumptions of the individuals**

144

1 **who are subject to these types of laws.**
2    Q.   Okay.  Your next key factual question
3 that was identified for you by plaintiffs' counsel
4 is whether sex offender registries are effective
5 in reducing re-offending by people convicted of
6 past sex offenses.  How is -- how is effectiveness
7 determined or measured?
8    A.   **Yeah.  There's a number of studies and**
9 **these ones I relied on studies conducted by others**
10 **and reviewed them in order to provide my opinion**
11 **on -- on this topic.  So the effectiveness is I**
12 **took a public protection eye on this and that so**
13 **does -- are these effective in reducing the**
14 **overall burden of sexual victimization, and there**
15 **is a couple of ways of evaluating that.**
16       **One is a recidivism evaluation, do**
17 **people who are subject to these laws have lower**
18 **sexual recidivism rates than people who are not**
19 **subject to these laws within the same**
20 **jurisdiction.  And those are typically done as**
21 **cohort studies, so what was the recidivism rate**
22 **prior to the implementation, what was the**
23 **recidivism rate after implementation, so there is**
24 **both a cohort effect and an implementation effect.**
25       **And you can look at different**

145

1 **jurisdictions and different types of**
2 **implementation to look at some variation on that.**
3 **And my reading of that is that sometimes the rates**
4 **go a little up and sometimes they go a little**
5 **down, but overall they look pretty flat, that it**
6 **doesn't change them.**
7       **The other way that these can be**
8 **evaluated has to do with the -- I guess a general**
9 **deterrence effect of -- for individuals who aren't**
10 **subject to these laws but they would inhibit their**
11 **sexual offending because if they were caught they**
12 **would be subject to these laws so that would**
13 **de- -- could deter the individuals.  And so what**
14 **you're looking at is the rate of new sex crimes**
15 **reported prior and after these offenses, and,**
16 **similarly, you don't see any substantive**
17 **difference in the actual rates reported.**
18       **So on those two major criteria we**
19 **don't see a public protection benefit to these**
20 **laws, and that's the basis of my skepticism about**
21 **these as an effective intervention to reduce the**
22 **burden of sexual victimization.**
23    Q.   Who gets to determine whether or not a
24 law is effective?
25    A.   **Effectiveness is determined in terms of**

146

1    criteria, so you have to set criteria. A law
2    might be effective in, you know, raising public
3    awareness. That could be a goal overall. I
4    consider effectiveness in this area a thing that I
5    am concerned about because I don't want people to
6    suffer sexual victimization, and that's what I'm
7    trying to, you know, evaluate interventions based
8    on.
9        Q.   Sure, but I guess what I'm getting at is
10   so that we're talking about the Michigan SORA,
11   Doctor Hanson, you don't set the -- you don't
12   draft the law, you don't pass the law. Isn't it
13   the Michigan legislature who decides whether or
14   not the law is effective or what they're trying to
15   measure has effectiveness?
16       A.   What I am presenting or what I've
17   received my role is I'm -- I am defining what I
18   think is a reasonable goal, and I would hope that
19   the legislature shares the goal, of reducing
20   sexual victimization. I would be very surprised
21   if they would abandon that as their goal. They
22   might but I would be surprised if they do. It's a
23   goal I share and it's a goal I have been willing
24   to work towards for my professional career and I'm
25   still engaged in.

147

1            I think it's an important goal, and
2    I think it is not -- not easily separated from the
3    activities of registration and notification. I
4    think you can try to give other objectives to it,
5    and I think people you could, but I think that
6    most people and I think -- and my interest in them
7    as effectiveness or not effectiveness is clearly
8    based on reduction of harm. And if I --
9        Q.   So if --
10       A.   When I say --
11       Q.   -- there was --
12       A.   Go ahead.
13       Q.   Well, if there was a metric that said
14   that the SORA, the new SORA, reduced sexual crime
15   by .1 of a percent, could the Michigan legislature
16   say, yes, the law is effective?
17       A.   The balancing the relative cost and
18   benefits of things is a public decision and it's
19   not mine to make, so if -- you know, the -- they
20   could -- you know, .1 percent change could be
21   considered worth the investment and the harms that
22   are associated with it. I -- as a researcher I
23   would probably question a .1 because that's not
24   within our precision of measurement, but the
25   conceptual point you're making is that people can

148

1    value things more or less than others and that is
2    separate from the actual statistics.
3            What I'm saying is that the
4    statistics show it's not having an effect and that
5    it's very unlikely to have an effect on people who
6    are already very low risk. There's no reason for
7    it to be. So when I talk about ineffective that's
8    what I mean, that it doesn't protect the public
9    from sexual victimization, and it's unlikely to do
10   so for a very large group of individuals.
11       Q.   Can the registry be considered effective
12   if it encourages victims of sexual abuse to report
13   their abuse?
14       A.   I think you could place reporting as a
15   goal. I am not aware of any statistics on that,
16   but I think that would be a legitimate goal of a
17   registry. It could have that effect or it could
18   have that intention.
19       Q.   Do you know the societal cost for victims
20   of sexual assault?
21       A.   I'm sure it's very, very high.
22       Q.   Did the plaintiffs' counsel provide you
23   with a copy of Doctor Lovell's report?
24       A.   Yes.
25       Q.   Do you recall reading where at least

149

1    according to her calculations the cost per rape is
2    between 100 and $300,000?
3        A.   I remember reading some cost estimates,
4    but I remind you that these are irrelevant if the
5    intervention has no effect on changing them. I
6    too am concerned about the horrible effects
7    psychologically and the actual cost of
8    out-of-pocket expenses for criminal offenses and
9    sex offenses specifically we're talking about now.
10   This is a problem, and I would be more than happy
11   to support policies and practices that
12   legitimately reduce that burden. So I looked at
13   it and said, fine, that sounds pretty reasonable,
14   but it's not what we're talking about. We're
15   talking about whether -- everybody agrees that sex
16   offending is harmful, it's also expensive, and
17   it's wrong. Let's try to stop them.
18       Q.   So if the cost per rape is between 100
19   and $300,000 and the registry prevents 20 rapes a
20   year that's a cost savings of two to six million
21   dollars, so if the --
22       A.   I am not going to do the math for you
23   because just making up numbers, and we don't know
24   whether it prevents or creates 20 rapes per year.
25   We just honestly don't know. The chances are it

150

1　makes no difference at all. That looks like what
2　the data is showing us.
3　　Q.　But if the registry were shown to prevent
4　20 rapes a year, which is a cost savings of two to
5　six million dollars, could the registry be
6　considered effective?
7　　A.　Things don't really work that way just --
8　it's -- if you're dealing with like a single case
9　here, a single case there, that's -- you know,
10　we're -- that's not how we actually -- that's not
11　really how things work. We want to show something
12　that is likely to work in a way that's
13　perceptible. Like if we're looking at single like
14　.001 percent changes we're not going to really
15　change things.
16　　　　I would be pleased, you know, just
17　personally pleased, if there was, you know, one
18　less sexual offense. Like I guess my
19　consideration is could that efforts, could our
20　thoughts, could our -- you know, I'm spending
21　four hours -- you know, four or five hours today
22　talking to you. Could I have -- be spending this
23　in better ways, could you be spending it in better
24　ways, on policies and practices that promote
25　sexual victimization. And if we're dealing with

151

1　tiny, tiny little things the question is could we
2　spend it on other things that would have a bigger
3　effect, and I think the answer to that is just
4　yes.
5　　Q.　Well, those are all policy considerations
6　that are made by the legislature, right?
7　　A.　I think there's a role of the experts in
8　determining the relative effectiveness of various
9　different types of interventions. That is not to
10　be assumed. You would not expect a legislator or
11　a lawyer to be cognizant of the social science
12　research and that the -- you engage people like me
13　in order to summarize the evidence to better
14　inform your decisions. Ultimately you'd make a
15　decision to choose something that is -- choose
16　whatever, but I hope that those decisions are made
17　on an informed basis.
18　　Q.　Right. And decisions are ultimately made
19　by the legislature through the normal political
20　process, right?
21　　A.　You keep coming back to that, though I
22　did respond to earlier that there are court
23　processes, and this is one of them and there's
24　been other ones, where courts actually have
25　criticized and changed forced laws, such as the

152

1　previous version of SORA, so the idea that it
2　should be the legislature seems a bit odd. And,
3　again, I'm not a lawyer, but why do you keep
4　asking me --
5　　Q.　Sure, but the --
6　　A.　-- this question? Why do you keep
7　asking --
8　　Q.　If we're talking about effectiveness --
9　　A.　Hey, wait a second, I haven't finished.
10　　Q.　Well, no, hold on, because you're
11　answering a little bit of a different question,
12　and if we're talking about the effectiveness of a
13　law --
14　　A.　Right.
15　　Q.　-- the court -- I have never read an
16　opinion that says, well, Michigan legislature, we
17　think that XYZ process is a more effective use of
18　public funds so you need to use the money
19　differently. Are you aware of any situations like
20　that where a court has dictated that the
21　legislative body has to spend their funds
22　differently because the court thinks that the
23　expenditure of funds could be more effective?
24　　A.　Yeah.
25　　　　MR. REINGOLD: I'll object to the

153

1　form and foundation and unfair characterization, I
2　think, but you may answer.
3　　　　THE WITNESS: Yeah, so the -- I --
4　you know, I know Canadian courts and very commonly
5　the courts say you stop doing this and you do
6　that. You know, this happens and this is -- has
7　funds implications. And the -- you may be asking
8　about do they engage in cost benefit analysis and
9　relative harms. I don't know, I don't know if
10　I've seen that, but I've clearly seen examples
11　where courts have stopped certain activities which
12　are -- have been funded and told the people to do
13　other things which would be funded in different
14　ways. So there's clearly a direction of resources
15　that happen at the court level, and I've seen
16　this, you know, like commonly.
17　　　　It's -- I don't think they engage in
18　exactly the type of logic that a social scientist
19　would engage in, but clearly the resource
20　allocation decisions are -- are highly influenced
21　by the legality of what they're doing.
22　BY MR. JAMISON:
23　　Q.　Are you aware of how many rapes occur in
24　Michigan each year?
25　　A.　I am not.

154

1  Q. Would you be surprised to find out
2 there's more than 6300?
3  A. I'd have to just do a little calculation
4 based on the population in Michigan and things,
5 but I'm sure there's lots.
6  Q. All right.
7  A. And I wish there were fewer and that's
8 why I'm here.
9  Q. Did you review the report of James
10 Prescott?
11  A. No, I did not.
12  Q. He's a researcher.
13      MR. JAMISON: I believe, Paul, maybe
14 you can correct me if I'm wrong, but I think he's
15 from University of Michigan?
16      MR. REINGOLD: That's correct.
17 BY MR. JAMISON:
18  Q. Yeah. Doctor Hanson, did you -- that
19 doesn't ring a bell? You didn't review --
20  A. I know who he is and I've talked to him.
21 I have -- I'm in friendly professional
22 relationship with him, but I did not read his
23 report in this particular case.
24  Q. Okay, so his -- well, and maybe it's not
25 a fair question, maybe you can't answer it, but

155

1 his report, his conclusion, was that registries
2 may increase recidivism?
3  A. I didn't read his report and I have no
4 opinion.
5  Q. All right. I don't see it in front of me
6 but I have it written down. You said something to
7 the effect that there could be much -- much could
8 be done to improve the criminal justice experience
9 for individuals who have been sexually victimized?
10  A. (Nodding head.)
11  Q. What did you mean by that?
12  A. Yeah. Coming back to my statements made
13 very early of have I ever worked with victims, I
14 have talked repeatedly to people who are -- have
15 been sexually victimized. I've also read the
16 literature on the experience of people going to
17 the courts, and I've also been aware of efforts by
18 the Canadian government in particular to improve
19 that experience.
20      So if you look at the experience of
21 individuals who report sexual crimes, it's a very
22 difficult and challenging experience to them.
23 It's -- I consider it heroic because they're doing
24 it --
25  Q. Sorry, I didn't hear what you said.

156

1  A. Heroic.
2  Q. Heroic, okay.
3  A. In the sense that they're doing it at
4 personal cost for collective gain because it --
5 probably the personal benefit for them is less
6 than the cost that will -- but the societal
7 benefit is high, so I consider this a heroic task.
8      And it's considered to be very
9 adverse. People are asked very personal
10 questions. They have to repeat the stories again
11 and again. They get accused of all sorts of bad
12 behavior, sexual. They have to reveal intimate
13 elements of their sexual life, which none of us
14 want to do, and the outcome of it is often
15 considered to be -- leave them pretty much where
16 they started except now the person's been sort of
17 outed as an offender.
18      So there's been a number of attempts
19 to improve this experience, not all successful. I
20 know that in my career I have witnessed some good
21 hearted attempts to improve it, but it has not
22 always resulted in actually improved experiences
23 of the victims. I would like a system where
24 people could be -- come forward that have sexual
25 victimization and make it a validating and a --

157

1 and a supportive experience, and that's not what
2 we have now.
3  Q. So if the plaintiffs win this lawsuit and
4 there's tens of thousands of registrants that no
5 longer have to register do you think that will be
6 an improvement on the criminal justice experience
7 for the victims?
8  A. It'll be neutral.
9  Q. You think that -- do you think that will
10 be validating and supportive of the victims?
11  A. I don't think -- if you take a look at --
12 the issue that I'm concerned about is not whether
13 you get your right amount of retribution. You
14 know, the pool of retribution is endless and if
15 you've been seriously harmed you -- there's no
16 amount of punishment that would compensate for the
17 damage that's done.
18      And in some ways you can't satisfy
19 the -- our thirst for vengeance. You know, that
20 is a very deep vein. And the whole criminal
21 justice system is set up to have a -- sort of a
22 neutral that it -- we take it out of the hands of
23 vigilantes. We have a justice system that is
24 intended to be just, not vindictive.
25      I'm not concerned so much about

158

1  whether the victims feel like they've got their
2  slice of punishment from the offenders. What I'm
3  concerned about is how easy it is for the victims
4  to come forward. How easy is it to get into the
5  system to make the initial disclosures. That's
6  what I care about. And having very severe
7  penalties doesn't necessarily help because if
8  there's severe penalties you need rigorous
9  defense.
10         If the person's looking at 10 to
11  15 years you need a rigorous defense or else the
12  person will be, you know, locked up for a long
13  time without careful scrutiny. We don't want to
14  make too many of those mistakes, and so very high
15  penalties may serve a sort of retribution function
16  but it doesn't make it easier for people to come
17  forward.
18         And so what I want to -- and I'm not
19  sure exactly how to do this because I say, you
20  know, we've tried things and I've watched people
21  try to make it a more positive experience and
22  fail, but I think this is something that we should
23  consider. Like what do we need to do to make it
24  so that if something happens that we can use, you
25  know, public systems, and it may not be the

159

1  courts, to, you know, identify these people and
2  prevent them from, you know, further
3  victimization.
4     Q.   So do you think that if tens of thousands
5  of registrants are removed from the Michigan
6  registry that the victims will believe that the
7  criminal justice system worked for them?
8     A.   I can't answer that one.
9     Q.   Do you think it may change the victims'
10  opinions about whether it was worth reporting
11  their assaults?
12     A.   Some would -- I guess my question that
13  I'm concerned about, and I'm -- I'm not that
14  concerned about these types of questions as
15  whether this will make the victims happy, I'm
16  concerned about whether -- about public
17  protection, and I don't want people to be
18  revictimized. So those are my concerns. It's not
19  whether they feel like they have a sense of
20  vengeance or if -- what I want is for people to
21  feel confident that if they go forward with a
22  claim, an accusation, that it will be taken
23  seriously, and that is a major concern.
24         And I don't think anybody -- well, I
25  doubt that the people who are coming forward make

160

1  that decision based on whether or not there's a
2  registry at the end of the day. They make that
3  based on whether they think they're going to be
4  believed, whether they -- whether they have
5  support in their family, whether there's enough
6  public education so that there's a route for them
7  to do it which they're not going to be abused
8  again in that. They're less concerned about
9  whether the person will be on a registry or even
10  the length of sentence that they will receive.
11  That's not determinant in how they decide whether
12  to go forward or not.
13     Q.   Do you know what the actual recidivism
14  rate in Michigan is for those that are currently
15  on the registry?
16     A.   I do not.
17     Q.   Have you seen the affidavit of Sharon
18  Jegla?
19     A.   Affidavit of Sharon Jegla. I'll just
20  double-check. Which one is this?
21     Q.   Here, I'll share my screen for a minute,
22  that might help you find it if you have it there.
23     A.   No, no, I haven't seen it.
24     Q.   Okay.
25     A.   Sharon Jegla, no.

161

1     Q.   Yeah, so this -- I think we're on Exhibit
2  E (sic), so this is the affidavit of Sharon Jegla.
3         (Whereupon Deposition Exhibit D
4         marked for identification.)
5  BY MR. JAMISON:
6     Q.   And she works in the sex offender
7  registration unit of the Michigan State Police,
8  and according to her affidavit as of January 25th
9  of 2023 there were approximately 44,000
10  registrants and approximately 52, 5300 that have a
11  subsequent registrable offense. And lawyers are
12  really -- shouldn't be doing math, but I did math,
13  that comes out to about 12 percent, so that's a
14  12 percent recidivism rate. Does that rate seem
15  high to you?
16         MR. REINGOLD:  Before you answer I'm
17  going to object. After the deposition of Ms.
18  Jegla our position is going to be that almost
19  nothing in her affidavit is tied to numbers that
20  are reliable. This number may be helpful to us or
21  unhelpful to us but it doesn't matter. Our
22  position is that whatever it was that she thought
23  she was doing doesn't meet the requirements to get
24  to the numbers -- to any of the numbers that she
25  got to.

162

1 You may answer.
2 THE WITNESS: Yeah, so what is
3 missing from there is the -- first of all, the
4 distinction between prior offenses and recidivism,
5 so that some of those people will have more than
6 one offense because they have a prior offense and
7 some -- but doesn't speak to recidivism.
8 Also unspoken of is the length of
9 time. If you're looking at people who've been on
10 the registry for 20 years we're sort of maxing out
11 at 12 percent. If most people were followed for
12 20 years that rate would be somewhat lower. If
13 most people were followed for five years it would
14 be sort of on the high end but not outrageously on
15 the high end.
16 But, again, I haven't seen the
17 numbers. I have no idea where they come from or
18 how they calculated repeat offending, what the
19 risk -- how they determined the index of the prior
20 offense or I just -- I don't have any further
21 comments on that.
22 BY MR. JAMISON:
23 Q. All right. Next I want to draw your
24 attention to paragraph 17 in your report, and
25 you're talking about Tricia Dare and her

163

1 affidavit. It's right near the end of paragraph
2 17.
3 A. Yeah, yeah, yeah, got it.
4 Q. So I think we're on -- I think we're on
5 Exhibit F (sic).
6 (Whereupon Deposition Exhibit E
7 marked for identification.)
8 BY MR. JAMISON:
9 Q. Do you have her affidavit in front of
10 you?
11 A. I have -- I only have electronic version
12 of it. I could get it up on my screen if you do
13 want. It would take me a min- -- a minute to do
14 it but I could do it.
15 Q. Well, let's see if we can do it without
16 it, and if you want it we can pull it up. Let's
17 see, let me find the right paragraph.
18 A. I have a more extensive discussion of it
19 later on in the report on pages 64 -- or paragraph
20 64 and 66.
21 Q. Yeah, let's see.
22 A. Where is that? Oh, I actually got the
23 numbers slightly wrong. Yeah, it's 68 to -- 68,
24 69, and 70 I have a discussion of that statement.
25 I quote her statement, which I think is the

164

1 relevant one for discussion, as the likelihood of
2 committing criminal sexual conduct does not appear
3 to change significantly with age. I have
4 prosecuted many cases where the perpetrator was 60
5 plus years old, end quote.
6 Q. Yeah, so that's -- her statement is a
7 little bit different than recidivism, right,
8 because she's not talking necessarily about
9 recidivism?
10 A. That's true.
11 Q. Right, so there's a distinction between
12 your statement about -- or that you take issue
13 that -- you know, according to your summary the
14 sexual recidivism risk does not decline with age,
15 and I don't think that's what she's saying. I
16 think what she's saying is the likelihood of there
17 being a subsequent -- or a sexual offense may not
18 decline with age?
19 A. A first time sex offense?
20 Q. Correct.
21 A. Yeah. Yes, I -- I apologize if I
22 mischaracterized it. I think what she's saying is
23 the likelihood of committing criminal sexual
24 conduct, and that would include both recidivism
25 and onset, and I was responding to the recidivism

165

1 element of it because we're dealing with the
2 registry. There is -- so with the registry people
3 we're talking about recidivism, we're not talking
4 about first time.
5 That being said there is good
6 statistics on the ages at which people are first
7 time convicted of a sex offense or charged with a
8 sex offense, and it's strongly age related and
9 there is repeated data, tens of thousands over
10 decades, showing the same pattern. There's even
11 better information about the onset not being about
12 the recidivism, and so if you include the large
13 category of committing criminal sexual conduct
14 it -- it would more strongly apply.
15 I think, as I say in my report, that
16 the rate of decline is slower for people who
17 commit sexual offenses against children, and so
18 what happens is that a disproportionate number of
19 the older offenders, this is a logic problem, you
20 know, older offenders are more likely to be child
21 molesters, but it doesn't mean that child
22 molesting is more common in older ages. There's
23 just more types of other offenders in younger ages
24 groups.
25 Q. Okay. I was hoping you could give me

166

1  some clarity around paragraph 33 in your report.
2  It's on page 14. And you're talking about
3  observed rates and detection rates. What's the
4  difference between an observed rate and a
5  detection rate?
6      A.  Oh, I'm happy to say this one more time.
7          MR. REINGOLD:  What page are we on
8  now?
9          MR. JAMISON:  We're on page 14.
10         MR. REINGOLD:  Okay.
11         MR. JAMISON:  The Bates number is
12 1287.
13         THE WITNESS:  The detection rate
14 here is the rate in which offenses are detected,
15 so what we're talking about here is there is some
16 statistic, we don't know what it is, about the
17 rate in which people commit offenses and are not
18 detected for them. We don't know what that number
19 is. I'm assuming that that number is similar for
20 people with or without a sex offense conviction.
21 It looks, from one study that I mentioned here,
22 that the rate could be higher, the detection rate
23 could be higher for people with a sex offense
24 history than without, but, again, that's one
25 study. Nobody else has presented any evidence

167

1  that suggests otherwise.
2          On logical grounds it should be that
3  people with a sex offense history are more likely
4  to be detected than people without because people
5  may be more likely to report and more confidence
6  that they're -- you know, are going to be heard,
7  and as well all the factors that went to getting
8  this detected in the first place, whatever it is,
9  are probably still present.
10         So I'm asserting that it's probably
11 equal. There's no reason that it's going to be
12 expected to be lower, so when the detection rates
13 are the same, the observed rates are the same, the
14 total rates should be the same as well.
15     Q.  All right, so I want to break this down a
16 little bit. So if you were explaining this to a
17 judge and he asked you to define what an observed
18 rate is in one or two sentences what would you --
19 how would you respond?
20     A.  The observed rate is what we see, like
21 something in a criminal justice record, people
22 convicted or charged of a sex offense over some
23 period of time.
24     Q.  Okay. And then what is a detection rate?
25     A.  Detection rate is the proportion of

168

1  individuals who committed -- who have committed a
2  sex offense during that period of time who are
3  caught for that who figure in the observed rates,
4  contributed to the observed rates.
5      Q.  All right. Can you explain that again?
6      A.  Okay.
7      Q.  So -- sorry, to back up, observed rate,
8  somebody gets arrested or they go through the
9  criminal justice system so there's an official
10 record that says that person A committed criminal
11 sexual conduct in the first degree or whatever it
12 might be. So how is that different than a
13 detection rate?
14     A.  This is the detection rate that is the --
15 so the observed rates, the denominator -- say you
16 take 100 people, okay, so there's 100 people we're
17 dealing with, and you follow them for five years.
18 After five years ten of them are convicted for a
19 sex offense, we'll use conviction, so you have an
20 observed conviction rate of ten percent.
21         Let's say there are another five
22 individuals who in that period of time have
23 committed at least one sexual offense, and when
24 the five year bell rings they're still in the
25 community, and if we looked at them we would say

169

1  that they have not re-offended. So there are in
2  truth 15 people who re-offended of which ten are
3  observed. The detection rate in this case would
4  be the 15 -- or I mean would be the ten divided by
5  15, so ten people were caught out of 15 people who
6  actually committed an offense, so two-thirds,
7  67 percent.
8          The observed rate would be ten
9  percent and the unobserved rate in this case is
10 five percent. Again, I'm making up the numbers
11 for --
12     Q.  Because the unobserved is the difference
13 between the ten and the 15 number?
14     A.  Yeah.
15     Q.  Okay, got it. All right. And then on
16 page 24 of your report you're talking -- a couple
17 lines down you talk about Michigan's Department of
18 Corrections requires sexual recidivism risk
19 assessments and stipulate -- contracts stipulate
20 that the evaluators will use Static-99R and
21 STABLE-2007 and may use other measures depending
22 on the characteristics of the case. What do you
23 mean by other measures depending on the
24 characteristics of the case?
25     A.  So, for example, if the person is

170

1  convicted only of child sexual abuse images, or
2  child sexual exploitation materials, Static-99
3  doesn't apply, so the -- the contract stipulates
4  that they would use a risk tool that's developed
5  and validated for that population.  In this case
6  it's called the CPORT, the child pornography risk
7  tool or something, so they specify a tool
8  specifically for that population.
9      Q.   And if various tools were used together
10 would you say that the assessments would be more
11 accurate?
12     A.   Depending.  Usually I recommend
13 evaluators to use multiple risk tools.  However,
14 the method of combining them needs to be carefully
15 considered, so it's good to have the extra
16 information.  Sometimes that extra information
17 helps, sometimes it doesn't help much.
18     Q.   And if there is a comprehensive
19 evaluation conducted, like the ones that Doctor
20 Turner and Doctor Salter referred to in their
21 reports, would their risk assessments be more
22 accurate?
23     A.   I would hope so.  The risk assessment --
24 as I said in my report, the method of doing the
25 risk assessment is more important than the hourly

171

1  rate that is charged the expert, and there is --
2  if they are using validated risk tools, they're
3  doing a careful job, they have high quality
4  professional integrity, then they would probably
5  do well.
6          But, similarly, they're not going to
7  be that different than somebody who's trained by
8  the administra- -- you know, trained in the
9  Static/STABLE risk assessment.  It's going to be
10 very, very similar to people who are paid an awful
11 lot less who are doing a more routine type of
12 assessment.  And we've done actually quite a
13 number of studies looking at, you know,
14 qualifications, background, professional
15 expertise, and that has no relationship to --
16 they're no better than otherwise intelligent lay
17 people unless they use a validated risk tool, and
18 then you evaluate the risk tools on that -- on
19 that basis.
20     Q.   Page 25 of your report you talk about the
21 treatment staff at MDOC who complete the
22 evaluations are paid between 80 and 185 an hour.
23 Where did you get those numbers from?
24     A.   It was on the contract under footnote
25 number 15, so it's -- they just stipulate the

172

1  rates in there.
2      Q.   And --
3      A.   That document was avail- -- I found it on
4  the internet.  I did -- searched for Static-99
5  Michigan and that's where I came up with -- one of
6  the things I came up with.
7      Q.   And then you make a comment about -- or
8  you respond to Doctor Turner's comment about Ted
9  Bundy.  How would Ted Bundy score on the
10 Static-99R?
11     A.   He'd have a moderate score.
12     Q.   And do you think he's -- in reality do
13 you think he's a moderate risk?
14     A.   No, I think he's high risk.  Risk tools
15 don't work 100 percent, and there's some cases --
16 in this case Ted Bundy is an obvious one where the
17 facts of the case are sufficiently horrific that
18 everybody would agree that there's an unusual
19 pattern, so -- but most of the time, you know,
20 risk tools do a reasonable job.  They're not
21 perfect but they do a reasonable job.
22     Q.   Are you familiar with the -- with Doctor
23 Larry Nassar?
24     A.   No.
25     Q.   He's a -- or he was a sports medicine

173

1  doctor at Michigan State University that was
2  alleged to have sexually assaulted hundreds of
3  young women, gymnastics.
4      A.   I'm not --
5      Q.   You're not familiar with him?
6      A.   No, I am not.
7      Q.   Okay.  And then in paragraph 54 of your
8  report you talk about family member assaults and
9  how they're -- there's some difficulties around
10 family members who get assaulted in reporting the
11 crimes, but once a family member is charged then
12 it allows the family to create a formal or
13 informal risk management plan?
14     A.   That is correct.
15     Q.   Wouldn't that be true for members of the
16 public as well?  If a neighbor -- if there's a guy
17 next door to me that was convicted of criminal
18 sexual conduct that then I could make a formal or
19 informal risk management plan with my children to
20 try to protect my children from a potential risk,
21 and I don't know whether he's a risk or not, but
22 wouldn't that allow me to make that determination
23 myself?
24     A.   The -- with -- in families you're already
25 in relationship, so the relationships don't

174

1  disappear, they just change.  So when you're
2  making plans you have to do something.
3          With the registry, I guess, and
4  strangers, and I guess particularly strangers, you
5  don't have a relationship and you probably won't
6  understand what's going on in order to develop
7  sensible plans.  You could get to know the person
8  and then you -- but that is a different activity
9  than just knowing that the person's name figures
10 on a list.
11         So in family situations everybody
12 knows who everybody else is like an -- a simple
13 example.  You know, you have a guy who's sexually
14 abused against a -- his stepdaughter.  He's
15 married to your sister.  Unfortunately your sister
16 has real sorts of life problems.  She has maybe
17 mental illness and substance abuse, and she
18 doesn't provide very good care of, you know, your
19 niece, okay?
20         If you're making a protection plan
21 in that particular case you wouldn't involve your
22 sister to provide protection because she's not the
23 one who's likely to do it.  Especially, and it's
24 very common, the sister, who I'm making up here,
25 sides with the guy and says -- blames the

175

1  stepdaughter for being too promiscuous, which
2  happens more often than you think it should
3  happen.
4          And then -- so if you want to make a
5  protection plan you have to involve people who you
6  know could be competent to do this.  And -- and
7  groups of people who know each other and are
8  working together do it, and sometimes they do it
9  with professional help.
10         And I spent, you know, a number of
11 years in my professional life developing these
12 plans and working with families and trying to
13 figure out how they all work together.  I was
14 working as a paid external expert.  But it was
15 very obvious that these systems were responding to
16 themselves.
17         What you're suggesting is creating a
18 system where none existed before.  You're reaching
19 out to an individual and engaging them somehow or
20 providing some form of -- I don't know, maybe
21 you're suggesting some form of social ostracism,
22 but I don't know exactly what you were suggesting.
23 But I'm suggesting it's much, much harder to do it
24 with a stranger who you don't have an existing
25 relationship with.

176

1          And knowing that a person is on the
2  sex offender registry and avoiding them isn't the
3  same as developing like a plan, a protection plan,
4  and a way of mitigating the risks.
5      Q.   Yeah, maybe I'll put a finer point on it.
6  So one of the plaintiffs, according to the
7  allegations in the complaint, he is cognitively --
8  I don't remember the age but the equivalent of a
9  child, a ten year old or 12 year old, and he
10 was -- he's on the registry because according to
11 the complaint he was engaging in sexual
12 experimentation with I believe a nephew who was
13 eight or ten years old?
14     A.   Okay.
15     Q.   So hypothetically if this individual
16 lived next door to me, was my neighbor, I knew
17 him, I interacted with his parents who he lived
18 with, and he was on the public registry as being a
19 sexual offender, wouldn't that allow me to make
20 informal protection plans to protect my
21 eight-year-old child from playing with the
22 neighbor guy who seems to be -- you know, he acts
23 like an eight or ten year old so my kid would want
24 to hang out with him.  They might want to play
25 video games together, but he's on the public

177

1  registry as -- identified as someone who's created
2  a past sex offense, wouldn't that allow me to take
3  measures that I'd want to take to protect from the
4  guy who's immediately next door to me?
5      A.   Yeah, you're making the assumption that
6  people on the registry are perceptibly higher risk
7  than the person who lives on the other side of
8  your street, and what I'm arguing is that there's
9  lots of people who aren't, all right?  So just
10 being on the registry is not a reliable indicator
11 of whether the person is or isn't.
12     Q.   So you don't see any value at all in the
13 registry in this scenario that I'm presenting to
14 you, a guy who thinks he's -- you know, he has a
15 mental equivalency of a eight or ten year old who
16 may not understand the social boundaries that you
17 don't sexually experiment -- when you're in the
18 body of a 40 year old you don't sexually
19 experiment with a six year old?
20     A.   How it actually works in real life as
21 opposed to -- people don't check registries.  You
22 know, if you ask people do they actually check the
23 neighbors in the registries, they say no.  It
24 is -- they might do it voyeuristically.  They're
25 sort of forced on you sometimes when you check

178

1 property values, but it's not something that is --
2 like people actually do, right?
3          What we actually do is we talk
4 to the -- the developmentally delayed person next
5 door, he probably has a support network probably.
6 You know, if you're going to engage with the
7 developmentally delayed individual next door you'd
8 probably want to talk to the support network.  It
9 might be a parent, it might be a brother who lives
10 with him, it might be a professional worker, and
11 that would be a way of developing a reasonable
12 plan and also some sort of assessment about, you
13 know -- the guy may be very interested in certain
14 things but it maybe have been a long time ago.  It
15 may be something that's very specific and if you
16 avoid that very specific situation, so to develop
17 a real plan is a lot more than a name on a
18 registry.
19          And, frankly, if the risk -- you
20 know, if it was a developmentally delayed person
21 next door, you know, it was male of a certain age,
22 I would want to take public protection measures
23 whether or not they're on the registry.  I'd want
24 to make sure, you know, either -- you know, what
25 types of situations, what does he talk about, does

179

1 he want to be alone with the kids?
2          You know, there's a whole series of
3 things that you do as a -- as a guardian of the
4 child that we should be doing, and I think we're
5 actually doing more of this now than we did in the
6 past.  But these things are motivated not by the
7 name appearing -- flashing up on some list but it
8 appears by the characteristic of the person in
9 that environment.
10     Q.   All right.  A little while ago we already
11 touched on this, in your report you talk about how
12 Static-99R isn't -- isn't as accurate on some
13 populations of offenders as others, like Latino
14 men and indigenous people.  So in your opinion
15 should those risk assessment tools be used on
16 those populations?
17     A.   My opinion is yes but you have to use
18 them with more caution, and what more caution
19 means is you must ensure that the information that
20 you have is valid and also just be more
21 circumspect in the types of assertions and
22 generalizations you could make from those scores.
23     Q.   And how do you define Latino man?
24     A.   Good question.  I'm not really an expert
25 on the -- the datasets that I've used have used it

180

1 as a field that -- that is defined by the state's
2 correctional systems so I -- and I don't know
3 exactly.  Often it is self -- self identified as
4 Latino, and I've included -- it's an ethnic
5 identification as opposed to a racial one, so
6 people can be Latino white, for example, in the
7 analyses that we have done.  But it's defined --
8 and in a practical -- if I was doing it if the
9 person had citizenship of a Latino country and had
10 been in the country for less than, say, five years
11 I would probably use that as a default definition.
12 But you could make up one but it's -- I don't have
13 a strong expertise in this.  I don't have a
14 particular connection with Latino communities.
15     Q.   Is there a manual on Static-99R that
16 flags that issue for practitioners who are trying
17 to apply the Static-99 to individuals?
18     A.   Static-99 is supported by a training
19 education group called SAARNA of which I'm a
20 member of.  The information about Latino is quite
21 new, it's within the last six months that we've
22 organized that, and based on that we have posted
23 information about that on our website so people
24 could access it if they are interested.  So you
25 can register as a Static-99 user or you can go

181

1 there for free and get the information, and so the
2 types of things that I'm saying today are written
3 down in documents available on that website.
4          To -- in terms of the official
5 manual, we update it once in a while.  We don't
6 currently have a plan to update it, the Static-99
7 manual, though we are currently updating the
8 STABLE manual, and it will be discussed in the
9 STABLE manual.
10     Q.   So I just want to make sure I'm clear, in
11 the Static-99 manual there is no note about the
12 less accuracy for Latino men?
13     A.   There is a discussion of race ethnicity
14 in the Static-99 manual, but it's five years out
15 of date.  It's not a bad statement, but as
16 evidence one of the strengths of Static-99, I
17 think, is that we update it as evidence becomes
18 available.
19          As I say, the stuff -- this finding
20 about lower predictive accuracy for Latino is a
21 recent finding, and I've only in the last couple
22 of months really been convinced that it's true.
23 And so we make a statement about it, and these
24 will eventually be collected into the next version
25 of the manual when it comes out.

182

1    Q.   And you don't know when the next manual
2   is going to come out?
3    A.   Yeah, the way that we've organized it is
4   if you use a certified trainer, so there's a
5   system of certified trainers who are expected to
6   be cognizant of the updates, so if you're -- a
7   person who's trained in the use of it will train
8   from the manual, but they should also be aware of
9   any updates that have happened since the manual
10  was printed.
11   Q.   And the updates are on the website?
12   A.   Yes.
13   Q.   Is there any sort of broadcast that goes
14  out to certified trainers so they're aware?
15   A.   If you're on our list, we have a list of
16  about 750 people who have signed up to it, if
17  you're on the list you get a broadcast with
18  updates.  If you're not on the list somebody
19  hopefully will tell you.  We do conference
20  presentations.  We do webinars every now and then.
21  We do what we can, and we hope to update practice
22  as -- as necessary.
23   Q.   And for the indigenous men I believe you
24  said something to the effect of it has a
25  meaningfully lower accuracy.  Has that been shared

183

1   with the practitioners that use Static-99?
2    A.   Yeah, and there's a statement about that
3   and what you should do about it on the website if
4   you go look for it.  It's another step.
5    Q.   Is that in the -- is that new information
6   like it is with the Latino men or has that been
7   known longer?
8    A.   It's been -- I wasn't surprised, let's
9   say it that way, so the -- the previous evidence,
10  and I've published on this in the past, has been
11  equivocal but tending towards lower predictive
12  accuracy for the indigenous.  When it was
13  aggregated or when this research group aggregated
14  it the conclusion was that it's significantly
15  lower and now I'm convinced of that.  So it was
16  sort of expected but now it's fairly well
17  established.
18   Q.   But I guess what I'm asking, is that
19  information that's been learned in the last few
20  months as well or has that been known for a longer
21  period of time?
22   A.   There's been questions -- I guess science
23  is never 100 percent this or 100 percent that,
24  it's always in shades of gray, so we -- you know,
25  practitioners shift, you know.  I've been involved

184

1   in court cases around the application of Static-99
2   to people of indigenous heritage in Canada, and
3   these court cases go back 15 years.  And so
4   15 years ago if I was summarizing the evidence it
5   would be that Static-99 predicts, and then I'd
6   probably be silent.
7        What I could say now is Static-99
8   predicts, it does, it is related to the likelihood
9   of the outcome, but now we can add but not as well
10  as for people of non-indigenous heritage.  So that
11  nuance was up for debate, and now I think it is
12  resolved on the side of it doesn't predict as
13  well, which requires extra caution when dealing
14  with individuals of indigenous heritage.
15       In Michigan it doesn't seem like a
16  big -- as big an issue as it would be in Canada
17  where we -- in some of our regions we have a
18  significant proportion of indigenous people
19  with -- in our prisons and correctional systems,
20  but it is something that is of some concern.
21   Q.   So when -- I still don't know the answer
22  to the question, when was that discovery made or
23  when was that shift from the first --
24   A.   When --
25   Q.   -- to we think it's less accurate?

185

1    A.   My shift or other people's shift?  I
2   guess it's --
3    Q.   Both if you know them.  If it's your
4   personal shift versus consensus is -- I'm trying
5   to understand how long has this been known?
6    A.   Yeah, in 2017 I would say we don't know.
7   I was -- and I wrote things about that.  2021 I
8   would probably say, hum, probably -- probably it
9   isn't working as well.  I think there's reasons to
10  doubt it.
11       2023, January 2023, I would say I am
12  convinced that this is meaningfully lower.  That
13  being said in 2017 I could point to colleagues who
14  thought it was lower at that time.  I could also
15  point to colleagues in 2021 who said there was no
16  difference at all so...
17   Q.   So is there something in the manual or
18  something on the website that there is sort of an
19  official position on --
20   A.   Yes, there --
21   Q.   -- Static --
22   A.   Yes, there is an official position on the
23  application of Static-99 and STABLE with people of
24  indigenous heritage posted on the website during
25  the last month or so.

186

1      Q.    So those who -- I forget how you said,
2  licensed or trained people --
3      A.    Certified.
4      Q.    Certified, they would get an email blast
5  if they subscribe to the notification or perhaps
6  someone would tell them, or if they looked at the
7  website they might -- they might know of this
8  change?
9      A.    Yeah.  All our certified trainers are on
10  our email distribution list and would receive a
11  blast.  We provided a -- we post it on the
12  website.  We posted the academic article that goes
13  along with it.  We organized a webinar, it was
14  free to the trainers who could just attend, on
15  this topic and, you know, sent out an email blast
16  about it as well.
17      Q.    Do you know if the Michigan Department of
18  Corrections has a certified trainer on their
19  staff?
20      A.    I do not know.  I'd have to check my list
21  but I -- I think so, but I don't actually -- I
22  didn't do that checking before.
23      Q.    So for correctional institutions that may
24  not have a certified trainer on their staff, how
25  would they -- how would they learn about this

187

1  change?
2      A.    Right.  So for people who are -- don't
3  have certified trainers, who are not linked into
4  the certified training things, we have to depend
5  on the dissemination of -- through I guess the
6  usual professional development things.  Hopefully
7  they attend workshops and things.
8           Implementation is an issue.  If you
9  look at medicine it often takes ten years between
10  the time that a new discovery is made in terms of
11  practice and when 50 percent of the practitioners
12  are doing it the way they should be doing it as
13  opposed to the old way, so it's a slow process of
14  implementation.
15           You know, we developed SAARNA very
16  much in awareness that it's hard to keep up but
17  that we encourage people to keep up, and we try to
18  make it as easy as possible.  So an effective
19  system would also -- I have argued earlier your
20  system should learn, should keep track of numbers
21  and keep track of what's happening, but also
22  building professional development opportunities,
23  and, you know, tune into, you know, organizations
24  such as SAARNA or other organizations that promote
25  this type of work in order to keep up with the

188

1  latest developments.
2      Q.    Okay.  So if there's someone in the
3  Department of Corrections today who is evaluating
4  an offender who is Native American and he's
5  relying on Static-99 and there's not a trainer at
6  Department of Corrections he would be unaware of
7  this, so his or her assessment of that offender
8  could -- could be inaccurate, correct?
9      A.    It could be suboptimal, yes, that's
10  possible.
11      Q.    I want to turn next to the Static-99
12  quoting form.  I'll share my screen to make sure
13  I'm looking at what I think is the form, and if
14  you can just tell me if this is the right form.  I
15  assume you're really, really familiar with the
16  form.
17      A.    I've seen it before, yes.
18      Q.    Yeah, so does this look like the most
19  recent form?
20      A.    Could you scroll down so I can see the
21  bottom?
22      Q.    Sure.
23      A.    And the next page.  This is not my form.
24  The bottom -- the second page is -- I don't know
25  quite where you got it from.

189

1      Q.    Okay.
2      A.    Do you know where you got it from?
3      Q.    I don't.  I looked for it online.  I
4  don't recall which --
5      A.    Yeah.
6      Q.    -- which resource.  So what's the
7  difference between your form and this form?
8      A.    Well, our form doesn't have all this
9  other stuff on the second page.  So what we do is
10  we have a scoring -- we have the form, which is
11  the first page, which is correct.  Go down, down,
12  down, down, up, up.  No, this form is absolutely
13  wrong.
14      Q.    Okay.
15      A.    This is the incorrect form.  If you look
16  at the translating scores they've got the wrong
17  numbers in it, so you got a bogus form.  Sorry.
18      Q.    All right.
19      A.    I did present a form in my original
20  report --
21      Q.    Yeah.
22      A.    -- the correct one.
23      Q.    Right, it's probably somewhere.  That's
24  why I was Googling it yesterday trying to find it
25  because it would be easier than -- is it the

190

1  general -- I guess I just want to ask, can you
2  walk me through the process to score someone?
3      A.   Sure.  Just let me see, I -- no, I didn't
4  include the form in this version.  Yeah, so --
5      Q.   Maybe I found it on your website, but I
6  think when I read your original report I found
7  one, and then yesterday I was -- you know, I
8  probably should have went back to the original
9  source but...
10     A.   Yeah.  A valid Static-99 coding form can
11 be found on the SAARNA website.  That form that
12 you showed me had the wrong risk categories, had
13 the correct item names but the wrong risk
14 categories, and the -- and the whole second page I
15 would have to look at very carefully because it's
16 not standard.  It's something they made up for
17 that particular -- for whatever reason.
18     Q.   Okay.
19     A.   Okay.  How do you do a Static-99 risk
20 assessment.  So a Static-99 risk assessment is
21 based on commonly available criminal justice and
22 demographic information, so if you're doing it you
23 can do it from records, you don't need the person,
24 and it depends on what records you have exactly
25 how you do it.

191

1          So typically what you do is you have
2  a file or an electronic database which has fields
3  in it, so most -- nowadays most people use --
4  score it from electronic files that have fields in
5  it.  And the fields would have things such as age,
6  date of birth, what date it is today so that you
7  score that one from age.
8          You have things like ever lived with
9  a lover for two years, consecutive years.  This
10 typically requires talking to the person because
11 there may or may not be a record of that.  If you
12 have a record that the person has been married for
13 ten years, fine, but if you don't have a good
14 record you need to talk to them.  And so that is a
15 bit based on talking, but often that information
16 is available and uncontroversial.
17          The next item --
18     Q.   Can I pause there for a minute
19 because that --
20     A.   Sure.
21     Q.   -- I have a question about that.  So does
22 that have to be like two years consecutively or
23 like if they lived for nine months and then they
24 split up for a month and then were back together
25 for three months and then they split up --

192

1      A.   Yeah, we --
2      Q.   -- or if somebody's in the military --
3      A.   Yeah, yeah.
4      Q.   -- so they're overseas for three months.
5  Like how is the two years measured?
6      A.   Yeah, it's -- it's living together as --
7  for two years.  We do have some exemptions for
8  military and work, so if there's a legitimate
9  reason for them to be separated and they, you
10 know, like -- and keep in touch and they --
11 they're actually making a relationship of it, you
12 know, it can be less than two years actually being
13 in the same house, but it is -- it has to be at
14 least two calendar years.  It's typically longer.
15 You'd probably want it longer if the person's like
16 doing military service or works in a remote fish
17 camp or something like that.
18     Q.   Yeah.  What about if they go --
19     A.   If they have two --
20     Q.   -- like I've got a friend that's a
21 consultant.  He flies out Monday mornings, he
22 comes back Thursday nights, so he's not in the
23 same like --
24     A.   Yeah.
25     Q.   Yeah, you know.

193

1      A.   Are they making a reasonable effort to
2  live together and share a life together.
3      Q.   Okay.
4      A.   That's the question.  I think lots of
5  people go away for work.  Like, we all go away
6  during the day and come back, so we --
7      Q.   Yeah.
8      A.   -- don't have to spend 24 hours together,
9  but if it's a reasonable --
10     Q.   Is there guidance in the SAARNA manual
11 that sort of explains --
12     A.   Yeah, yeah, there's a big section in
13 there, and we have high rate of reliability.  We
14 don't have large numbers of disagreements.  There
15 will be a few cases where people go I'd go this
16 way, I'd go that, but most of the time, 90 percent
17 of the time, people agree on exactly the same
18 score, and about 10 percent of the time they'd go
19 one up or one down.  So we don't have trouble with
20 rate of reliability.  That one works pretty well.
21          And the manual is big.  It's like
22 140 pages or something, and so every possible
23 scenario that you've probably thought of there's
24 probably a page or two describing, you know, what
25 do you do when it -- you know, it's the -- well, I

194

1 was going to say if you're in jail. In jail you
2 actually -- that's considered a break, you have to
3 start again, so we have different scenarios
4 depending on different types of things. So we
5 have coding rules and, again, we update them
6 periodically and in response to the types of
7 questions.
8     We also have a frequently asked
9 questions section of the website where if we --
10 something's coming up, it's something new. For
11 example, revenge porn. You know, what do you do
12 with people who are sending unsolicited images or
13 sending personal images to other people, would
14 that count as a sex offense. And you have rules
15 around that that wasn't part of the manual but now
16 it's one of the sex offenses that show up, so we
17 have rules that fit in there and they keep -- we
18 keep adjusting them depending on what goes on.
19     We have a committee that makes these
20 decisions and that was just largely the SAARNA
21 policy and practice committee of which Doctor
22 Yolanda Fernandez is the chair, and she's
23 responsible for the final word, which is done in
24 consultation with users and with other people who
25 are involved and the researchers.

195

1     Now, did I answer your question or
2 am I rambling here just --
3   Q. Yeah, no, yeah. So I think we can move
4 on to question three.
5   A. Okay. Question three -- oh, the question
6 three, yes.
7   Q. Yes.
8   A. So question three, so the rest of the
9 items have to do with criminal justice
10 interventions, so these are officially recorded --
11 I'm just going to remember which items are which.
12 I'll just get out my coding form here for a
13 second.
14     MR. JAMISON: Hey, Paul, are you
15 going to have any questions for your expert?
16     MR. REINGOLD: I'm expecting to.
17 Probably not a ton but there should be some time
18 at the end for us, yes.
19     MR. JAMISON: Okay.
20     THE WITNESS: So our last revision
21 of the coding manual was 2016 and it is 104 pages
22 and it is published by SAARNA and by Public Safety
23 Canada, so you can get it at both sources. It's
24 available in multiple languages and you can --
25 yeah, it's been translated.

196

1     So item number three is any
2 convictions for nonsexual violence, so what you do
3 there is you look on their -- you have to decide
4 what the index sex offense is, which is typically
5 your most recent sex offense, and then you ask in
6 that cluster of events was the person convicted of
7 a nonsexual violent offense, something like
8 kidnapping or assault, so the scenario that you
9 talked about before about somebody who was charged
10 with sexual assault but convicted of assault would
11 get an extra point here.
12     Just, you know, the training for
13 scoring Static-99 takes about a day. It's a full
14 day of training. We have reasonable accuracy
15 afterwards. The accuracy continues to improve for
16 about the first 20 cases, so it takes some
17 training to get up to speed but it can be done
18 accurately and effectively by people in various
19 levels of professional training, so probation
20 officers can do it, psychologists can do it,
21 psychiatrists can do it. I suspect even lawyers
22 could do it. And, anyway --
23 BY MR. JAMISON:
24   Q. Big assumption.
25   A. Yeah, so, this -- this -- see, there is

197

1 some training involved, what's in this event was
2 not, so I'm not going to be able to do the full --
3 full day training in the next hour or so that we
4 have available, but you basically look at the
5 criminal history record and is there a conviction
6 for -- indexed on sexual violence. Yes, you get a
7 point; no, you get no points.
8     Then you look to the whole record,
9 is there any other convictions for nonsexual
10 violence, assault, robbery, arson, if there's not
11 they get another point for that, so you're looking
12 at the criminal -- so you need a criminal history
13 record to work with. And it should -- it ideally
14 would contain charges but you can score it if it only
15 has convictions in it. The next one --
16   Q. Let me interject for one second?
17   A. Sure.
18   Q. So it looks like the rest of this -- it's
19 all binary, like they have a conviction or they
20 don't; is that fair to say?
21   A. Well, the next one, item number five, is
22 prior sex offenses and there's a weighting here so
23 it's -- and the weighting is different based on
24 charges and convictions. So, you know, the number
25 of prior sex offense charges, we have a particular

198

1  way of counting it, which is probably about six
2  pages in the manual, but if there are, you know,
3  one conviction and one charge you get a score of
4  one.  If there's six charges and no convictions
5  you'd get a score of three.
6          You take whatever is highest there,
7  and these were empirically established rules where
8  we have datasets of both.  If you look at the
9  inflation or the difference between charges and
10 convictions, you know, we talked about is it
11 higher for charges or convictions, this is about
12 what the inflation looks like, so, you know, a
13 four would equal a six, a two would equal a three,
14 something like that, in terms of priors, and these
15 were, again, empirically established as we were
16 developing.
17         Then we count up prior sentencing
18 dates for anything.  Contact for non-contact sex
19 offenses increases the risk.  This is an indicator
20 of a typical sexual interest.  A lot of it's
21 voyeurism or possession of child sexual
22 exploitation materials.
23         And then we have three items related
24 to victims, and so these are often in the police
25 reports, so if you're doing it you have a criminal

199

1  history, you have demographics, and then you need
2  some descriptions of the victims.
3          And you need -- it's pretty basic
4  but you do need the gender of the victim as
5  perceived by the offender and their preexisting
6  relationships, where they're a stranger we have
7  rules around that; were they related, we have
8  rules around that.  And then you count up the
9  scores and you put them into risk categories based
10 on the number scores.
11    Q.   And is there a process for the offender
12 being scored to challenge the score?
13    A.   Not usually.  Could, depends how it's
14 used.  The -- I get no shortage of communications
15 from offenders who believe they've been unfairly
16 treated because of a Static-99 score, but they're
17 appealing to a very distant and ineffectual
18 authority since I'm not part of their system.
19 People can obviously complain about it, but the
20 extent to which it actually makes a difference in
21 those cases is probably limited.
22         There is -- it's not really based --
23 you can -- usually it's not built into the
24 process.  It's -- what we do want built into the
25 process is some sort of peer review checking, so

200

1  we could check with the -- like when I do a
2  Static-99 I like talking to the offender about it
3  because it helps clarify things in the criminal
4  history record.
5          So, for example, if there was a
6  trespass by night 15 years ago and that's all I
7  know, trespass by night, if I'm able to talk to
8  them I could say -- he says, oh, yeah, yeah, I was
9  hanging around this girl's window and she
10 misunderstood, I would probably code it as a sex
11 offense.  Whereas if he said, oh, trespass by
12 night, yeah, I was trying to break into Jack's
13 place and take his boat but I got caught, right,
14 you know, I'd code that as a nonsexual offense, so
15 sometimes the offenders --
16    Q.   How --
17    A.   What's that?
18    Q.   Can I ask a question?  How would you know
19 if they're telling the truth if you just ask the
20 offenders?
21    A.   I don't but they can incriminate
22 themselves and I usually count that.  So if
23 they're -- if they identify it as a sex offense I
24 would count it, and if they don't count it as a
25 sex offense their score doesn't change so...

201

1          If you have police information
2  that's great but if you -- sometimes you don't.
3  And sometime you can get the order, like the order
4  is like you're trying to figure out which came
5  first, and talking to the guy will give you an
6  order, and if it's plausibly related -- because
7  the charges may or may not coincide with the order
8  that the events happened so sometimes talking to
9  them helps.
10         That being said most of these guys,
11 like 85 or 90 percent, will have no prior sex
12 offenses.  About, you know, 30 or 40 percent of
13 them will have a prior -- you know, one or two
14 prior offenses, so it's actually pretty easy in
15 most cases.  And very often you're looking at one
16 offense, and so it becomes pretty quick to score.
17         If you're doing the types of
18 assessments that, you know, Doctor Salter and
19 Doctor Turner are doing, which are for civil
20 commitment or high risk cases, you often have a
21 file that looks like this, right, it's a -- it's a
22 big book.  You know, one admission versus another
23 admission.  You have police reports that are, you
24 know, pages long.  That's a lot of work.
25         But that's not typical.  You know,

202

1  it would be less than ten percent, less than five
2  percent probably, are the types of cases where you
3  have to really dig into the record to sort things
4  out. A lot of these things you're also scored on
5  is there any, so once you find one victim of --
6  who's a stranger you can skip all the others. You
7  don't have to figure out all the others, so there
8  is a bunch of time saving features built in.
9      Q.  And the form doesn't -- there's no field
10 for gender, right?
11     A.  No, it is -- Static-99 is only to be used
12 on men, males.
13     Q.  Is there a tool that can be used on
14 female offenders?
15     A.  There -- very recently, meaning within
16 the last month since I wrote my last report, I am
17 aware that one of my colleagues has developed a
18 tool that looks promising for predicting sexual
19 recidivism. It's -- again, it came to my
20 attention within the last two or three weeks.
21 I'll have to communicate with the researcher and
22 look more closely at it, but it looks like it's --
23 it does look promising.
24         It's based on -- it's a static type
25 tool using criminal history. He validated in

203

1  several different states, so it does have some
2  state transportability. I am familiar with the
3  researcher. His name is Grant Euwe, E-u-w-e, and
4  he is very credible, so I am optimistic that this
5  would -- is a promising tool, but, again, as
6  things get introduced they need to receive
7  scrutiny and that hasn't yet been done. But
8  I'm -- I'm optimistic that within the next couple
9  years there will be either this one or similar
10 tools that could be used for women.
11     Q.  All right. So then when a person is
12 assessing an offender and they go through these
13 ten questions, they come up with a score, then
14 they get a label for the risk category, and at
15 least on the sheet I'm looking at it says low,
16 moderate low, moderate high, and high, are those
17 the correct or the --
18     A.  No, those are not.
19     Q.  -- current --
20     A.  No, those are not.
21     Q.  So what are the risk categories?
22     A.  The current risk categories are the ones
23 that I described in my report, which I describe in
24 some depth in my report if you want to refer to
25 those sections, which are level I, level II, level

204

1  III, level IVa, and IVb, and these are
2  standardized risk levels which have objective
3  criteria for assigning people to them.
4          You can be assigned to a risk level
5  based on the Static-99 score, but that risk level
6  can change based on other information that you
7  collect in the case. So the presumptive level,
8  you can do it based on the Static-99 score only,
9  or you can supplement with other information that
10 can result in adjusting the risk level. Most
11 cases do not change but probably 15 to 25 percent
12 would change your risk level once you do a more
13 thorough analysis of risk relevant factors.
14     Q.  Okay.
15         MR. JAMISON: I think -- Tami, do
16 you know what exhibit we're on? Are we on F?
17         COURT REPORTER: I have no idea. I
18 haven't had a chance to write anything down.
19         MR. JAMISON: This is my last
20 exhibit. I'll call it Exhibit F. It may be
21 Exhibit E, I'm not sure.
22         COURT REPORTER: I think we have an
23 E.
24         MR. JAMISON: Yeah, so we'll say F.
25

205

1          (Whereupon Deposition Exhibit F
2          marked for identification.)
3  BY MR. JAMISON:
4      Q.  So I'll share my screen with you, Doctor
5  Hanson. I'm not going to spend very long on this
6  one, but I do want to ask you a few questions.
7          So this is an exhibit that's been
8  produced in other depositions, and these are a
9  list of cases and these are facts that I've pulled
10 out of cases from court opinions, you know, and
11 there's court citations over there. So can you
12 just read to yourself what's in row one there?
13     A.  Okay, yup, I can read it.
14     Q.  So how would that person -- or I guess
15 can -- your opinion is that you can predict
16 whether or not this criminal defendant will commit
17 another sexual offense based on his Static-99
18 score?
19     A.  We don't have enough information right
20 now to make that determination based on a one
21 sentence or two sentence description. But these
22 are the types of people who would fit into the
23 sampling frame on which Static-99 is built.
24     Q.  Okay. But, presuming that you'd have
25 access to the police reports and the other

206

1  information you'd need, it's your opinion that you
2  could use the Static-99 to make an informed
3  decision about the relative risk of this criminal
4  defendant of committing another sex offense?
5      **A.  Yes.**
6      Q.  And what is -- what would you say is your
7  level of confidence in the assessment?
8      **A.  Yeah, so in terms of relative risk I**
9  **would say moderate to large.  The basis of that**
10 **statement has to do with the statistic use to**
11 **report relative risk accuracy, which is referred**
12 **to as the area under the curve.  It is developed**
13 **from established statistical methods that have**
14 **been used for many, many years.**
15          **The area under the curve is a**
16 **statistic that runs from zero to one.  The value**
17 **of that statistic for sexual recidivism for**
18 **Static-99 is around .7, and what that means is**
19 **that the -- if you had a group of recidivists over**
20 **here and a group of non-recidivists over here and**
21 **you took one from each group what is the**
22 **likelihood that the recidivists would have a**
23 **higher score and what would it mean, so there'd be**
24 **a 70 percent chance that the recidivists would**
25 **have a higher score than the non-recidivists.**

207

1          **So in the prediction of people**
2  **behavior, that is a moderate predictive accuracy.**
3  **You know, predicting the future is never certain,**
4  **people do all sorts of things for unexpected**
5  **reasons, but it is as good as other things that we**
6  **do.  And it is -- and you can use it to**
7  **differentiate people whose likelihoods are, you**
8  **know, in single digits, very low, you know, one or**
9  **two percent, and people whose lifetime risk is**
10 **well over 50 percent, and I think this is useful**
11 **for making informed decisions about likelihoods.**
12          **It's -- we don't say with**
13 **100 percent certainty that this person will or**
14 **will not re-offend.  It has to do with their**
15 **relative likelihood compared to other people,**
16 **other people both on and off the registry, and**
17 **their likelihood based on the detected rates that**
18 **we are able to record from the publicly available**
19 **statistics.**
20     Q.  I don't think I have any other questions.
21         MR. JAMISON:  Paul, I know you said
22 you have some questions.  Do you want to take like
23 a ten minutes break and then we'll come back?
24         MR. REINGOLD:  Yes, let's take a ten
25 minute break, and then I'll ask my questions and

208

1  we'll have a wrap.
2          (A break was taken.)
3              EXAMINATION
4  BY MR. REINGOLD:
5      Q.  All right.  Now, this may be a little bit
6  disjointed because I have taken notes over the
7  course of a long time, and there's some overlap
8  and some are inscrutable to me but I will do my
9  best.
10         I wanted to start with some
11 questions about the Static-99's -- the utility of
12 the Static-99 as a tool for people leaving prison
13 and going onto the registry.  We deposed people
14 from the MDOC, the Michigan Department of
15 Corrections, who service in the testing of people
16 who are -- who have been convicted of sexual
17 crimes, and what we learned is that on the way in
18 everybody who's eligible for the Static-99, that
19 is the folks who are old enough and otherwise meet
20 the criteria, are now getting it.  And when they
21 get it it's done almost automatically.  Doctor
22 Hanson, you said (loss of transmission.)
23     **A.  You seem to have frozen.**
24     Q.  ...you know, the decision might be made
25 that they don't need much programming.

209

1      **A.  So, Paul, you froze there for a second.**
2  **Could you just tell back the last 15 seconds of**
3  **what you said.**
4      Q.  Yeah, so I have frozen a couple times
5  here, and I thought it was at your guys' end that
6  was freezing but apparently it was my end that was
7  freezing.
8          So what I'm saying is the people
9  from the Department of Corrections said they use
10 this religiously for people convicted of sex
11 offenses on the way in, and I was saying that you
12 had said that often at the front end it's used to
13 determine programming.  And I think the example
14 that you said was if, for example, they're very
15 low scoring, then services can be provided
16 accordingly; is that -- does that sound right?
17     **A.  Yeah, so in many correctional**
18 **jurisdictions and I'm not exactly aligned with**
19 **Michigan's -- I can't speak with authority on**
20 **Michigan's, but many jurisdictions that I know,**
21 **such as California, Canada, Ontario, Quebec, they**
22 **use Static-99 as part of the initial decision**
23 **about how they're going to be managed within the**
24 **institution and particularly what type of**
25 **programming, if any, they require to mitigate**

210

1  their risk.

2  **Q.**  Right.  So the -- what struck me, and

3  frankly surprised me, when we were talking to the

4  MDOC people in deposition was that they said

5  that -- if I got this right, that people who

6  scored level I, II, or III got no mandatory

7  programming during their incarceration unless

8  there were other factors that came up.  Either,

9  you know, they did the STABLE and something

10  surfaced or it's possible there'd be an interview

11  or an incident in prison; does that surprise you?

12  **A.  A little bit.  I'm not surprised about**

13  **level I and II.  Level I, presumptively it's very**

14  **similar to the baseline in the population, but**

15  **level II is a little bit higher but they're not**

16  **problematic.**

17  **Level III you expect to find some**

18  **problems, and I would presumptively assume that**

19  **level III could benefit from some intervention.**

20  **That is sort of how it's decided within the**

21  **standardized risk levels, definitely levels, you**

22  **know, IVa and IVb, but level III would -- would --**

23  **by how the risk levels are defined would assume**

24  **some intervention.**

25  **Q.**  They also led us to believe that at the

211

1  front end the scoring, they used both the

2  Static-99 and the STABLE, is routinized to a

3  degree that I also found surprising, that is, in

4  addition to having quite a lot of trained people

5  in-house, just, you know, people who worked in the

6  Department of Corrections, they had a separate

7  unit of a handful of people, it was like five

8  people or seven people, I'd have to go back and

9  look, who did nothing but this, and they were

10  doing the bulk of it simply from records with the

11  occasional question when needed, and so they were

12  doing this with huge efficiency.  Is that -- what

13  do you think about that?

14  **A.  That is not that uncommon.  If you have a**

15  **policy of statewide implementation or some very**

16  **vast implementation, it is efficient to develop an**

17  **expertise in the -- in the unit.  And I'm -- I'm**

18  **aware of other similar units where there is a**

19  **group of four or five people who do nothing much**

20  **else but score Static-99s.**

21  **I think you can do that.  It**

22  **develops some expertise.  They can do it quite**

23  **efficiently, and if you have like the information,**

24  **if you know what screens to look at, you can go**

25  **bang-bang-bang-bang-chit, bang-bang-bang-chit, you**

212

1  **can do it pretty, pretty quickly if you have it**

2  **for the Static.**

3  **For the STABLE it's -- you can't do**

4  **that.  For the STABLE you need to talk to the**

5  **person and you need to develop some level of**

6  **rapport with the individual.  So with the STABLE**

7  **you -- it typically takes about an hour-and-a-half**

8  **plus you need some file review and some thought.**

9  **So it's more like a half day, morning, to score or**

10  **afternoon to score that if you're -- it's not**

11  **something you can do in minutes.  So that being**

12  **said STABLE improves the accuracy but not by a**

13  **huge amount.  As I said in my earlier --**

14  **Q.**  This is the first time -- you just froze

15  for me so you'll have to repeat what --

16  **A.  Okay, so I'm not sure where you froze,**

17  **but Static can be done very routinely mechanized**

18  **using fields in minutes if you have the system set**

19  **up and people know what they're looking for.  Not**

20  **so for STABLE.  STABLE requires an interview with**

21  **the person and rapport, so you need to understand**

22  **the person's life, understand where their**

23  **offending fits into their life and who their**

24  **friends are.  You know, there's a whole series of**

25  **questions that you need to -- to answer, and**

213

1  **that even if it's done efficiently it'd at least**

2  **take like a half a day and it may take longer to**

3  **do that.  So STABLE you can't do that.**

4  **That being said, most people are --**

5  **remain in the same risk category even after doing**

6  **the STABLE, so 80 percent roughly will stay in the**

7  **same risk category.  If they're STABLE, you know,**

8  **in the middle and they're Statics in the middle**

9  **they stay in the middle.  It's when they have an**

10  **unusually high or unusually low STABLE assessments**

11  **they get pushed up or pushed down risk levels.**

12  **And this happens sometimes and I**

13  **think you should pay attention to it but it's not**

14  **the norm.  The norm is that people will stay --**

15  **most people will stay in the same risk levels that**

16  **they were assigned originally based on the Static.**

17  **Q.**  And then I want to ask about the back end

18  when people are at the point of either being

19  considered for release or being released.  And,

20  again, my impression from the MDOC folks was that,

21  again, everybody gets the Static-99 and nearly

22  everybody gets a STABLE at least -- if their level

23  is high enough that they're going to require --

24  the parole board is going to require some kind of

25  monitoring and treatment for their sexual

214

1    proclivities while under supervision.
2                And, again, the sense was that this
3    is highly routinized and done very efficiently.
4    Given the purpose vis-a-vis the registry where
5    what we're thinking about is figuring out the risk
6    somebody poses, or at least the risk that the
7    group they're in poses, and the time before they
8    reached assistance, is that workable?
9        A.   I think you can set up a system of
10   individualized risk assessment based at the time
11   of release that -- that would be the -- aligned
12   with sort of registration requirements.
13               So as I said before, there's a
14   static risk which can be done fairly routinely,
15   there's a time free which also can be done fairly
16   mechanically.  The STABLE requires more
17   investment.  If you know the person and they've
18   been participating in treatment you can score it
19   in a matter of minutes because you already have
20   the necessary information.  If you don't know the
21   person it does take time to know them.
22               The other thing that -- if you're
23   using STABLE in the community people change, so
24   when they get out from prison into the community
25   usually there's a period of a bit of chaos of

215

1    adjusting and then they settle down.  And so what
2    they're like after they've settled down is the
3    better predictor of what they're going to be like.
4                So you could have a system, for
5    example, of they're given a presumptive risk level
6    at release based on Static then you could
7    reassess them a year out based on how well they're
8    adjusting, do they have jobs, friends, problems,
9    substance abuse, whatever, the types of things
10   that are in the STABLE a year later, and then you
11   could fine tune what the recommendations were for,
12   you know, the length of time that would require
13   for reaching these very low risk thresholds or if
14   they've already reached those.
15       Q.   If somebody gets out and fulfills their
16   parole requirements and gets off parole is the
17   Static score -- does that give the Static score
18   sort of more reliability, you know, assuming they
19   haven't been violated, they haven't gone back to
20   prison, you know, that sort of thing?
21       A.   The mere fact of compliance with parole
22   conditions is a good sign.  It doesn't explicitly
23   figure in the calculations unless they have a new
24   violation, so -- and -- but it's really the amount
25   of time that -- that figures in the calculations.

216

1        So if they're on a short period of
2    parole, a few months or less than a year, it won't
3    make a big difference as long as they don't have a
4    new offense while on parole.  But if it's, you
5    know, long parole, and I don't know if Michigan
6    has long community supervision but if it's like
7    five years or four years, even, that period of
8    time should inform current risk estimates.
9        Q.   Relatedly you were talking about the use
10   of the Static-99 and -- let me remember where I
11   was going.  No, I think I lost that one.  All
12   right.
13               I wanted to ask another question
14   about the use of the Static-99 either just sort of
15   actuarially or combined with a structured, you
16   know, clinical professional judgment.  And I -- I
17   know that with the latter it depends -- I assume
18   it depends hugely on the expertise and skill and
19   judgment of the clinician, but what I want to know
20   is is this a little bit like -- you know, these
21   are actuarially instruments.
22               We know that with the stock market
23   there are people who do nothing but specialize in
24   the stock market, and yet we're told over and over
25   again over time they can't beat the market.  That

217

1    no matter how much information they have in the
2    end investors are better off with an index fund,
3    and all the predictions that the market stock
4    pickers want you to believe are not borne out
5    through research.
6                With using the Static-99 is there
7    actually literature out there where you test the
8    predictive increase when you add the structured
9    professional judgment or is it just, you know, it
10   feels like a good thing to do because these are
11   knowledgeable people and, you know, why not?
12       A.   So the types of studies that have been
13   done, you take a Static-99 score and then what you
14   do is you ask them, you know, look at the whole
15   case, consider the case, and then do you think the
16   risk score is too high, too low, or just about
17   right, some version of that?  Do you want to bump
18   them up a risk level, do you want to keep them the
19   same risk level, or do you want to lower them?
20   And there's a been a large number of studies of
21   that sort of structure.
22               And consistently the people who
23   are -- these -- as you change the risk level it
24   degrades predictive accuracy.  Not only does it
25   not improve it it makes it worse, so -- and I've

218

1  done some of this research as well so that people
2  who will -- they'll justify a person is low risk
3  for the same things that are already included in
4  the actuarial risk tool, so they don't weight them
5  appropriately.
6          That being said if you used a
7  structured method of calculating a risk score
8  that's separate and then you have a mechanical way
9  of combining them, which we do with Static-99 and
10 STABLE, so there's a -- you add up the STABLE
11 points.  There's -- you get so many points you're
12 put in this category here or over here.  If you do
13 it mechanically you consistently improve
14 predictive accuracy, so if you leave people to
15 their own devices it's very, very hard for them
16 not to double count or forget things.  If you give
17 people a structured method of doing it they will
18 improve.
19          So if you take an expert with a
20 Static-99 score they will make it worse.  If you
21 take a Static-99 and a scored STABLE, you'll make
22 it better.
23     Q.   All right.  I mean, that -- correct me if
24 I'm wrong but that makes it sound like, again, if
25 you build in the correct methodology and take out

219

1  the human element it's going to be more accurate
2  and a heck of a lot more efficient if you're
3  dealing with large numbers of people?
4      A.   Yes, it's efficient.  You -- I wouldn't
5  use you take out the human element because there
6  are a series of human judgments required to score
7  them on these things that are human judgments.
8  It's organizing those and not letting people stray
9  too much which counts.
10     Q.   Okay.
11     A.   So it's like having a -- it's like going
12 grocery shopping and you do it without a list you
13 forget things, you know.  And it's like, uh, you
14 know, I'm making this spaghetti sauce but I don't
15 have any spaghetti.  You know, I've got all the
16 sauce, right?  That's what happens.  You know,
17 humans are fallible and our thinking processes are
18 fallible, so you want as much written down as
19 possible.
20     Q.   All right.  We also spent a fair amount
21 of time in your deposition today talking about the
22 Static-99 and in some respects its limitations,
23 but I want to ask you some questions about
24 comparing the virtues of the Static-99 to what we
25 have at present.

220

1          Right now the tiering system is
2  based entirely on the offense or conviction that
3  put the person on to the registry.  To your
4  knowledge is there any correlation between the
5  offense of which the person is convicted and the
6  risk of recidivism?
7      A.   There's many different ways of defining
8  or classifying the offense convictions in various
9  ways.  The ways that are typically used for
10 classifying people into tiers, things like the
11 seriousness of the offense or the age of the
12 victim, are unrelated to the likelihood that they
13 will re-offend.
14     Q.   And across categories of crime given the
15 system that we have does it account in any way for
16 variations for specific kinds of crime?
17     A.   You're going to have to be a bit more
18 precise.
19     Q.   Let me see how to reframe this.  Let me
20 ask it a different way.  Are there some crimes --
21 I think you said there are some crimes that are
22 likely to result in higher risk?
23     A.   Yes, so certain crimes have high
24 likelihoods attached to them.  So, for example, in
25 Static-99 we have an item which is, you know,

221

1  conviction for a noncontact sex offense, so if you
2  have an exhibitionism, voyeurism, things like
3  that, those are -- actually bump your likelihoods
4  up that if you have a violent offense paired with
5  a sexual motivation, like overtly violent, that
6  increases the risk.  Penetration --
7      Q.   Oh, go ahead, sorry.
8      A.   Penetration, which is like -- or the
9  duration of the offense doesn't, so a person could
10 offend and be very sexually involved for many,
11 many years, which is very serious and very
12 blameworthy, you know, it's abhorrent, but it's
13 not a risk factor.  It's -- so you can't just
14 guess what factors are or are not.
15          And the other thing is that all the
16 offense characteristics only have weak
17 relationships, and so if you're doing a risk
18 assessment you need some structured way of putting
19 all these little pieces together, and if you don't
20 have that list you're going to end up
21 overemphasizing one piece of information and that
22 would distort the overall assessment.
23     Q.   And given the current system I take it
24 that those kinds of considerations are left out
25 entirely?

222

1    A.   They consider -- again, you have to say
2    it --
3    Q.   The considerations of the differences in
4    the kinds of offenses and --
5    A.   Yeah.  My understanding is that it wasn't
6    developed empirically, that the criteria was done
7    on a rational basis, and that my comment to you as
8    a researcher is that not everything that we
9    develop on a rational basis acts like we expect it
10   to.  So that some things that we think should be
11   related to recidivism risk are, some of them
12   aren't, and this requires evidence.  You have to
13   justify it with evidence.
14        And my intent in participating in
15   this -- with you is to provide the evidence of
16   both factors which are and are not in my -- my
17   declarations, and to help you better understand
18   what choices you could be making or the courts
19   could be making.
20   Q.   So if when the registries were formed the
21   understanding was that people who offended
22   sexually remained dangerous for a very long time
23   or for life and were highly likely to re-offend,
24   to use the U.S. Supreme Court's term, that their
25   recidivism rates were frightening and high and the

223

1    system was set up with those assumptions, in light
2    of what we know today would you say that the
3    registry is irrational as applied to the actual
4    population that is on it?
5    A.   I would say that the assumption that the
6    registry identifies as a class individuals whose
7    risk is frightening and high is empirically false.
8    I think that it can be stated that the disconnect
9    between the expected rates or expected rates of
10   convictions and the observed rates is information
11   that should be considered and that many of the
12   individuals on the registry present no more risk
13   than people -- large identifiable classes of
14   people who aren't on the registry.  In that way it
15   is I'd say ineffective, and I can't see a
16   justification or a public protection justification
17   for having a registry applied to these -- this
18   large class of people.
19   Q.   The registry in Michigan has now been
20   around for almost 30 years and continues to grow.
21   Over time because so many registrants, I think 92
22   or 93 percent, are on the registry for 25 years or
23   for life after release, how does that affect its
24   utility as we get 30 years out, 40 years out,
25   50 years out?

224

1    A.   Yeah, the registry, I haven't seen the
2    numbers, but I've -- if you've had the registry
3    and have very long registration periods the
4    registry will include an increasingly number of
5    senior citizens who are old and substantially old.
6    They'll be in their 60s, they'll be in their 70s,
7    and they'll be in their 80s, and so the risk
8    managed by the registry will be increasingly
9    diluted.
10        The new cases coming on will be the
11   highest risk cases, but as long as the registry is
12   on it will be increasingly -- has increasing low
13   information value to identify people who actually
14   are more than a minimal risk for sexual offending.
15   Q.   Is it fair to say that over time the
16   percentage of people who have reached desistance
17   will get higher and higher and the percentage of
18   people whom we actually want to be looking at --
19   A.   There'll be a steady state, and I'm not
20   sure, it may have attained that already, but there
21   will be some steady state when the very old people
22   start to die, and so they'll -- it will accumulate
23   to some point and then people will die at the
24   equal rate of being added.  And I don't know
25   whether it's attained that level or not.

225

1    Q.   Yeah, and at that point you get a steady
2    state?
3    A.   Yeah.
4    Q.   Yeah, okay.  Another area I wanted to ask
5    about has to do with the defense experts and the
6    undetected offending.  And, I mean, the defense
7    experts also spend a fair amount of time talking
8    about things that don't work in the current
9    system, and let me just ask you about some of
10   those.  Can the registry itself fix in any way
11   underreporting of sexual crime?
12   A.   I don't see a connection.
13   Q.   Can the registry itself fix the aversive
14   experience that so many victims feel occurs when
15   they're in the criminal justice system?
16   A.   I think it would have no effect on that.
17   Q.   Can the registry itself fix the attrition
18   of cases, and by that I mean the drop off as the
19   case progresses from investigation to arrest to
20   potential charges to referring it to the
21   prosecutor for approval of charges and so forth?
22   A.   On this one for first time offenders, no,
23   and most times it will be first time offenders.  I
24   do think that there is some possibility that the
25   existence of somebody on a registry would increase

226

1 the police charging likelihood. I don't think it
2 would be a large effect, and I do report some data
3 there that there probably is some effect for that,
4 so that would increase the -- somewhat could
5 increase the likelihood that the police will
6 charge people who are already on the registry.
7 But that being said I don't think it's the
8 registry that's doing it. It's the previous
9 criminal conviction, so that's --
10    Q.  That's what I was going to ask.
11    A.  Yeah, yeah, it's not -- the existence of
12 a previous conviction will do it, but not the fact
13 that they're publicly notified or that it's
14 available to the public I don't think is -- have
15 any effect at all.
16    Q.  And then defense experts also bemoan, and
17 probably with good reason, the relatively low
18 conviction rate even with that attrition of the
19 cases, what the prosecutorial side would probably
20 say the weeding out of the weak cases. Even with
21 all that weeding out most victims can probably
22 expect a, you know, one in two chance of a
23 conviction, maybe a two in three chance of
24 conviction. Can the registry fix that in any way,
25 shape, or form?

227

1    A.  I don't -- I don't see a connection
2 there.
3    Q.  All right. We were talking yesterday
4 with someone who had spent many years as a hotline
5 respondent for people who called in with --
6 wanting to talk about past sexual offenses,
7 sometimes old ones -- these are victims, sometimes
8 old ones that they had doubts about their not
9 having reported and wanted to talk to someone or
10 sometimes a recent one where they wanted advice
11 about what to do.
12        And her take was that at least some
13 victims are uncertain about how serious the
14 offense was, you know, whether they should move on
15 it or not, but also a lot of the hesitation was
16 especially with known offenders often, whether
17 it's family members or boyfriends or
18 ex-boyfriends, whatever, it was two things that
19 often deterred them from going to the police, and
20 one was the length of the sentences and the other
21 was knowing that the person might be on the
22 registry for 25 years or for life. Do you know if
23 there's any studies that go either way on those
24 issues?
25    A.  Yeah, I have heard that before and it

228

1 sounds plausible to me. The -- most victims want
2 the offending to stop. They want the person to be
3 publicly identified as offending, so they want it
4 in their system, like a family system or whatever.
5 They want the person to sort of take the blame, so
6 to speak. Very little about the amount of
7 punishment.
8        There's -- people vary tremendously
9 on the amount of punishment, and some people will
10 relish the, you know, very long sentences and are
11 motivated to do that, others feel that this is not
12 what they want, and once they get involved in the
13 system they don't have control over it. So I
14 don't actually have systematic data on that though
15 I have heard stories in different ways.
16        I do know, and this is the Canadian
17 experience, when we try to make the system more --
18 less punishing for victims that the length of
19 sentence was a clear factor in the
20 cross-examination of the witness, so when there
21 was relatively minor sanctions and the offender
22 would agree to them the victim was largely spared
23 the whole court process and the rigorous
24 cross-examination.
25        When the offense severity was high,

229

1 and, you know, in Canada that would be something
2 like five years would be high, there was very high
3 cross-examination and more likely to be a court
4 process that would be more punishing.
5        So the prospects of the seriousness
6 of the eventual sentence did -- was correlated, I
7 guess, with the amount of court time clearly, and
8 it was also correlated with the -- negatively
9 correlated with how the victims felt about the
10 whole experience, about the court experience
11 itself as opposed to the sentencing, which is a
12 separate thing.
13    Q.  Just having heard that, I mean, again, a
14 five year sentence is, you know, shocking to
15 American ears, but have studies shown that the
16 recidivism rates in Canada are any different from
17 what they are in the U.S., and I understand it
18 might just be that Canadians are nicer, you know,
19 than Americans?
20    A.  Yeah. Countries vary substantially in
21 terms of their default sentences for sex crimes.
22 The -- Canada's recidivism rates is quite hard to
23 do direct comparisons. We have done some
24 comparisons on sentence length within Canada and
25 found no correlation, so the correlations that

230

1  we're looking at are between, you know, community
2  sentence versus up to about five or six years,
3  which are long sentences in our system, and we
4  don't find a positive or negative correlation
5  between sentence length or time served.
6       And for very long sentences like,
7  you know, 15, 20 years, if you do serve 20 years
8  there's a slight protective effect in that the
9  individuals are older when they get out.  But that
10 has to be like in our system exceptionally long.
11 You know, a 20 year sentence is almost unheard of
12 in the Canadian system.
13    Q.   We also talked briefly today about women
14 and the registry, and can you say a word about
15 women's rates of sexual recidivism generally?
16    A.   Yeah.  The average recidivism rate for
17 women is very low.  It is in the -- I can't give
18 you a precise number.  It's something that I'm
19 actively working on right now, but it's less than
20 five percent after five years.  It may be as low
21 as two-and-a-half percent, it may be more like
22 three or four percent, but it's in the -- the low
23 single digits.  It is close to, but not quite the
24 same as, the rate of first time offending in males
25 in general population, but it's close, and I think

231

1  that it is very hard to identify women who would
2  present a substantial risk for sexual recidivism.
3       There's also a difference in the
4  patterns of offending with women, that women do
5  different types of sex crimes than men and we tend
6  to treat these ones differently, so they will do
7  things that men won't do.  So I think there's some
8  specialization but very low recidivism rates, and
9  it would be -- the default probably would be to
10 assume that they're in the very low risk category
11 unless there are aggravating features like prior
12 offenses or some unusually, you know, vicious
13 crime.
14    Q.   Given what you've said how -- do you have
15 a sense of how quickly let's say most women would
16 pass the desistance threshold using as that
17 threshold the male base rate in the population?
18    A.   Yeah.  Based on the data that I'm
19 currently working on it looks like after five
20 years that women's will go from a rate that's
21 slightly higher than the desistance threshold to
22 lower than the desistance threshold, so we don't
23 have a lot of data on that but the data we do have
24 shows that the desistance patterns are identical
25 to the patterns reserved for men.

232

1       We also have a large body of
2  research on the desistance patterns of women for
3  nonsexual crimes and for violent crimes, and they
4  follow exactly the desistance patterns for men, so
5  there's no reason to believe that the desistance
6  patterns are going to be different.  So after five
7  years with the available data we have the
8  presumption would be that they are in that very
9  low risk category, if they survive five years
10 though.
11    Q.   So for women the five year point would be
12 the equivalent of the 20 year point for men in
13 your research?
14    A.   I'd probably say more like the ten year
15 rate.
16    Q.   Okay.  All right, give me a minute to
17 look through.
18       I wanted to ask you a few questions
19 about your expertise in certain areas.  We've
20 talked a lot about recidivism risk, but I wanted
21 to at least get a little bit of testimony from you
22 about your expertise in statistics and research
23 methodologies.  Can you describe the training that
24 you had to learn how to do the statistics that are
25 necessary and the research methodologies that

233

1  you use for --
2     A.   Yeah, so I was trained as a research
3  psychologist.  I took academic courses in research
4  methodology and statistics.  I taught statistics
5  and research methodology at York University and at
6  Carleton University.
7       I am a frequent contributor to the
8  academic peer reviewed literature on statistics.
9  I have published on the use of various statistics
10 specifically, and quite recently I published a
11 whole book called Prediction Statistics for
12 Psychological Assessment, which is basically a
13 textbook on prediction statistics, that was
14 published by one of the leading publishers in my
15 area, which is the American Psychological
16 Association.
17    Q.   Do you also serve as a peer reviewer when
18 you're doing blind reviews of --
19    A.   Yeah.
20    Q.   -- research that's submitted to journals?
21    A.   Yes, I do peer review.  I've been an
22 editorial associate editor of a journal.  I am on
23 the editorial board of two journals right now.  I
24 probably do one or two peer reviews a month and
25 have been doing this for the last 15, 20 years.

234

```
 1   Q.   And how does one go from being the
 2   submitter of, you know, scholarly work to a
 3   journal to being on the receiving end and serving
 4   as a peer reviewer, how does that work?
 5   A.   Yeah, that is a decision made by the
 6   editors, so the editor of the journal has the
 7   authority, editor and associate editor, and they
 8   will look for people who are -- have trusted
 9   expertise in the areas.  And so as an editor what
10   I did was I would -- you have an editorial review
11   board, there are names of people, these are people
12   I know.  I know what they have published on, I
13   know what they can do, I know how they write, and
14   I would ask them very nicely to participate if I
15   thought they would be -- have something to say and
16   the competence to say it about the article that is
17   being submitted to the journal.
18   Q.   When it comes to the areas that you have
19   expertise in, and I'm thinking about risk factors
20   for sexual offending or re-offending, policy
21   regarding registries and other forms of
22   interventions for sexual offenders, statistical
23   and research methodologies, is there anybody else
24   in the field that you think -- and I don't mean
25   this facetiously, I mean it seriously, who knows
```

235

```
 1   more about these things than you?
 2   A.   Recidivism risk factors I don't think so.
 3   I think that I've done a lot of that research and
 4   it has been -- it's basically standing.
 5        Policy I'm a contributor.  There
 6   probably would be other people who have thought
 7   long and hard about this, and they're somewhat
 8   hard to identify because they're not academics.
 9   Their contributions to policy are done through
10   government and political processes, and I've
11   participated in that and I've been part of that
12   for, you know, most of my professional career, but
13   there are other people in there who have -- would
14   have -- you know, I can -- people I've met over
15   the years I could say, yeah, that person is really
16   good at it so I could see them.
17        What was the third one, the
18   statistics?
19   Q.   Yeah, statistics, yeah, in the field.
20   A.   Prediction statistics I'm probably as
21   good as -- I'm one of the leaders in this practice
22   area.  I have a particular form of statistics
23   which I think are quite popular and they're quite
24   useful.  There are other people who do other types
25   of statistics and other prediction statistics who
```

236

```
 1   are really good at it, and I have lots of respect
 2   for their work as well.
 3        So I wouldn't class myself as the
 4   world's expert in prediction statistics per se.
 5   I'm a contributor, I've got a solid mastery, many
 6   people follow my examples.  I try to be helpful,
 7   and there's others who are -- do really good work
 8   in that area as well.
 9   Q.   I think the last question I have for you
10   goes to the defense experts.  We've spent a lot of
11   time on this over the last few hours, but I want
12   to give you one last shot to tell us why it is
13   that the undetected offending is irrelevant to the
14   questions that you think matter regarding the
15   registry today.
16   A.   Right.  The basic question that I see is
17   whether the people on the registry are higher risk
18   than the people off the registry, so the registry
19   is supposed to signal an increased risk for sexual
20   crime.  I think that's one of the intents of this
21   registry.  That is an empirical question.  It's
22   not something you just make up.  There actually is
23   data that should inform a question like that, and
24   if you frame the question as what is the
25   likelihood that they're going to get reconvicted
```

237

```
 1   you can answer it.
 2        And so we have numbers about that,
 3   and they're -- some of them it's medium high, some
 4   of it's medium low, but there's a predictable
 5   group who are very low.  And we know those numbers
 6   and we can identify those people using the methods
 7   that we have.
 8        That number, you know, the one
 9   percent, two percent, we can compare it to people
10   who aren't on the registry who have rates of sex
11   offense convictions of one percent, two percent,
12   three percent, that sort of range, and both groups
13   have equivalent risk levels based on observed
14   rates.  Some of each group will be committing
15   offenses that -- and they'll get caught but we
16   don't need to know.
17        If we change the baseline, so to
18   speak, multiply everything by four as I did in my
19   presentation, my rebuttal one, the same patterns
20   apply, the same relative risk applies.  We don't
21   know what the proportion of undetected offenders
22   are, but we don't need to know to make that
23   relative comparison.  And based on the relative
24   comparison we can identify many people who are on
25   the registry now who are no riskier than the
```

238

1  **people who aren't on the registry.**
2       **Q.**  With that I have no further questions.
3  Thank you.
4       **A.  Thank you.**
5            MR. JAMISON:  And I don't have
6  anything.  Thank you for your time.  It was a very
7  long day.  I appreciate it.
8            (Whereupon Deposition concluded
9             at 4:08 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

239

1  STATE OF MICHIGAN )
                     ) SS
2  COUNTY OF KENT    )

3
4       I, Tamara Staley Heckaman, Certified
5  Shorthand Reporter and Notary Public in and for
6  the County of Kent, State of Michigan, do hereby
7  certify that the foregoing Deposition was taken
8  before me remotely at the time and place
9  hereinbefore set forth.
10      I further certify that said witness was
11  duly sworn in said cause to tell the truth; that
12  the testimony then given was reported by me to the
13  best of my ability; subsequently produced under my
14  direction and supervision; and that the foregoing
15  is a complete, true, and correct transcript of my
16  original shorthand notes.
17      IN WITNESS WHEREOF, I have hereunto set
18  my hand and seal this 30th day of May, 2023.
19
20
        _____
21      Tamara Staley Heckaman, CSR-3443,
        Certified Shorthand Reporter,
22      and Notary Public, County of
        Kent, State of Michigan.
23
        My Commission Expires:  5-20-24
24
25