# Exhibit 55:

## Dr. Elizabeth Letourneau
## Deposition Transcript

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3       - - - - - - - - - - - - - - - -
                                        )
 4       JOHN DOES A, B, C, D, E, F, G,)
         H, MARY DOE and MARY ROE, on  )
 5       behalf of themselves and all  )
         others similarly situated,    )
 6                                      )
                         Plaintiffs, )File No.
 7                                      )2:22-cv-10209
            -vs-                        )
 8                                      )HON. GOLDSMITH
         GRETCHEN WHITMER, Governor of )MAG. IVY, JR.
 9       the State of Michigan, and    )
         COL. JOSEPH GASPER, Director   )
10       of the Michigan State Police, )
         in their official capacities, )
11                                      )
                          Defendants. )
12       - - - - - - - - - - - - - - - -

13                       REMOTE DEPOSITION

14       of ELIZABETH LETOURNEAU, a witness called by Defendants,

15       taken before Melinda S. Nardone, Certified Shorthand

16       Reporter and Notary Public, via Zoom, on Thursday, May

17       25, 2023, noticed for the hour of 10:00 a.m.

18

19

20

21                       HECKAMAN & NARDONE, INC.
22                   Certified Shorthand Reporters
                           P.O. Box 27603
23                   Lansing, Michigan  48909
                           (517) 349-0847
24                     msnardone5@gmail.com

25
```

2

```
1  APPEARANCES:
2
       AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
3      1514 Wealthy SE, Suite 260
       Grand Rapids, MI 49506
       By
4      MIRIAM AUKERMAN, J.D. and
       DAYJA TILLMAN, J.D.
5
           On behalf of Plaintiff.
6
       MICHIGAN DEPARTMENT of ATTORNEY GENERAL
7      State Operations Division
       P.O. Box 30754
8      Lansing, Michigan 48909
       By
9      SCOTT DAMICH, J.D.

10          On behalf of Defendants.

11 Also present:  Claudia Castre

12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1            Thursday, May 25, 2023

2            10:00 a.m.

3            R E C O R D

4         ELIZABETH LETOURNEAU,

5  having been first duly sworn, testified as follows:

6            EXAMINATION

7  BY MR. DAMICH:

8    Q.   Good morning, Doctor Letourneau, my name is Scott

9  Damich, I'm an assistant attorney general with the State

10 of Michigan, I represent Governor Whitmer and Colonel

11 Gasper.  And more specifically I represent them in a

12 case titled Does V Whitmer, it's Case Number

13 2:22-cv-10209, and it's pending in the District Court in

14 the Eastern District of Michigan in front of the

15 Honorable Judge Goldsmith.  I noticed your deposition in

16 this case because you have been listed as a potential

17 expert on behalf of the plaintiffs in this matter.

18       Now, there's a protective order in place in

19 this matter, it's meant to protect the named plaintiffs'

20 identity and also other declarants' identity.  From

21 defendants' side we're not in the business to try to

22 divulge anyone's personal information, so when we take

23 depositions of those individual named plaintiffs we want

24 to make sure that we don't ask questions that divulge

25 their personal information.  I don't think that's going
```

3

```
1        _____ EXAMINATION INDEX _____

2  ATTORNEY'S NAME  EXAMINATION   RE-EXAMINATION

3  BY MR. DAMICH:      4

4  BY MS. AUKERMAN:   77

5          *       *       *

6

7          _____ INDEX OF EXHIBITS _____

8   EXHIBIT                  MARKED

9  Ex A  Curriculum vitae        12

10 Ex B  Slate article           19

11 Ex C  Report                  30

12 Ex D  TEDMED video            72

13         *       *       *

14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
1  to be an issue today but who knows what worm hole we go

2  down, and to the extent we do divulge any personal

3  information I will work with Miriam to get that

4  redacted.  But I do want to let you know that there is a

5  protective order in place and I'd also like to confirm

6  that you have read and signed the protective order.

7    A.   I don't actually know if I've read and signed a

8  protective order.

9        MS. AUKERMAN:  I don't believe so because

10 there hasn't been any individual information divulged to

11 Doctor Letourneau.

12       MR. DAMICH:  Okay.  I can't imagine it would

13 get to that point either but just to be safe it is in

14 existence.

15       Also, joining the deposition today we have

16 Ms. Claudia Castre, she's joined us recently as a

17 student intern for the summer here at the AG's office.

18 She's a 1L student at Michigan State University and I

19 thought it would be a good idea for her to sit in on an

20 expert deposition.  And given, Doctor Letourneau, your

21 CV I think she's going to learn a thing or two.  So

22 we're happy to have her here.  She's also read and

23 signed the protective order in this case as well.

24       And, Mindy, will you confirm that you've

25 read the protective order and signed the acknowledgment?
```

6

1    COURT REPORTER:  Yes, I have.
2    MR. DAMICH:  Okay, good.
3  BY MR. DAMICH:
4    Q.  Doctor Letourneau, have you ever been deposed
5  before?
6    A.  I have.
7    Q.  Approximately how many times?
8    A.  I think four times.
9    Q.  Four times.  And was it for a civil lawsuit?
10    A.  I think different, different types of lawsuits,
11  some civil, some criminal.
12    Q.  Okay, so we'll go -- there's four of them and I
13  think they are perhaps listed on your CV, correct?
14    A.  Uh-huh.
15    Q.  So we'll get to that, we'll get to those here in
16  a little bit, but understanding you've been deposed four
17  times I think you understand the nature of what a
18  deposition is and what's happening right now.  What I'm
19  saying is being recorded by Mindy, the court reporter,
20  verbatim and because of that, you know, if I ask like a
21  yes or no question to you if you could say yes or no
22  that would be great.  Mindy won't be able to record a
23  head nod for yes or no for that matter.
24    Also, I'm going to -- I'll be asking -- the
25  purpose of today's deposition for me is to try to -- I'm

7

1  not even close to having an understanding of what you do
2  for a living, and to try to gain an understanding of
3  that.  So I have some basic general questions for you
4  and I hope it's more conversational than it is
5  adversarial.  And let's be honest, I'm the one asking
6  the questions so it's not like it's really a true
7  conversation but I would hope that it doesn't become
8  combative.
9    And the reason I say that because usually
10  when it does become combative is when cross talk
11  happens.  And cross talk is horrible for Mindy to be
12  able to record what we're saying.  So if I'm asking you
13  a question, if you can wait until I'm done asking the
14  question.
15    And also there's going to be some questions
16  that I ask today that I'm sure that there's going to be
17  objections made by opposing counsel.  If you would let
18  her get opposing counsel's full objections out before
19  you answer that will probably help Mindy out too.  And I
20  will do my best to not interrupt your answer.
21    Also, my goal today is not to trick you into
22  saying things that are going to help me help my clients
23  win their case, I'm not in to playing that game, it's
24  not my job.  I am going to try to ask questions in a way
25  that both efficiently and effectively resolve some of

8

1  the factual issues that we might have in this case, and
2  I'm going to try to do that with questions that make
3  some semblance of sense to you.
4    Now, I have a history and political science
5  undergrad degree and we're going to be talking about a
6  lot of different things outside of those two areas, so I
7  apologize ahead of time if I butcher some of the words
8  that you use in your profession.  But if I'm misusing
9  words that's causing confusion that's going to make your
10  answer not accurate please say, hey, Scott, I don't
11  understand your question because or, Scott, could you
12  please rephrase.
13    In other words, I don't want you to assume
14  that I've asked the question that you think I wanted to
15  ask you.  So with that in mind is it a fair rule for
16  today if I ask you a question and you answered the
17  question asked that you fully understood what question I
18  asked you?
19    A.  Yes.
20    Q.  Excellent, thank you.  Also, I don't -- I'm going
21  to stand by my statement that I'm going to try to be
22  efficient and, of course, effective, but with that I
23  don't anticipate this taking all day.  I will ask
24  probably to take my own breaks, but I'm not the ruler of
25  breaks.  Actually I'd like to consider you as the one

9

1  who would be able to call whenever to take breaks if you
2  want one.  Don't hold back to ask, say, Scott, I need a
3  break for any reason, to get up, walk around, go to the
4  bathroom, get a drink.  The only caveat to that is if
5  I've asked you a question that if you can answer the
6  question before we go off the record.  Is that fair?
7    A.  That is, yes.
8    Q.  Excellent.  Okay, are you taking any medication
9  or any substances that affect your ability to answer
10  questions truthfully today?
11    A.  No.
12    Q.  And is there anything else that might interfere
13  with your ability to answer the questions truthfully
14  today?
15    A.  No.
16    Q.  Okay.  Why were you retained as an expert in this
17  case?
18    A.  I believe I was retained as an expert in this
19  case because I have conducted 20 years of research on
20  registration and notification policies.
21    Q.  Okay.  Now the 20 years of research, is that
22  research dedicated to a specific age group?
23    A.  No.
24    Q.  And then who contacted you to be an expert in
25  this case?

10

1    A.  Miriam Aukerman.

2    Q.  Do you remember approximately when?

3    A.  It's been a couple years so I don't remember

4    exactly when.  Covid interrupted things, I think.

5    Q.  Sure.  So it was pre-covid so pre 2020?

6    A.  I don't remember.

7    Q.  Approximately how many times have you met with

8    Miriam about this case?

9    A.  Maybe four or five.

10   Q.  Did you do anything today to prepare for today's

11   deposition?

12   A.  I did.

13   Q.  What did you do?

14   A.  I reviewed my affidavit.  I made sure that I had

15   the articles that might be brought up in questioning at

16   hand.

17   Q.  What articles did you print out that you thought

18   might be questioned today?

19   A.  I did not print out any articles, I just pulled

20   my PDF versions of the articles that I am the lead

21   author on.

22   Q.  And how many articles are there?

23   A.  That I quoted from myself maybe ten.  Do you want

24   me to count them?

25   Q.  Sure.  So you reviewed any articles that you were

11

1    lead author of, and were those articles cited in your

2    report?

3    A.  These are articles I cited in my report.  I

4    didn't necessarily review them, I just pulled them into

5    a folder so I'd have easy access to them.

6         MS. AUKERMAN:  Just for the record,

7    objection, misstates her prior testimony.

8    BY MR. DAMICH:

9    Q.  And what do you understand to be at issue in this

10   lawsuit?

11   A.  My understanding is the Michigan Sex Offender

12   Registration and Notification Act is in contention, that

13   this act subjects people to registration who do not

14   present a clear present risk to other individuals and

15   that it assumes that it is an effective policy when, in

16   fact, it's not or it's unlikely to be.

17   Q.  Did you review the complaint that was filed in

18   this case?

19   A.  I did.

20   Q.  I'm going to share my screen real quick if you'll

21   give me a second.  Will you let me know whenever it

22   shows up?  Are you there?

23   A.  Sorry, I muted.  So I live in Baltimore and I

24   work in Baltimore.

25   Q.  Okay.

12

1    A.  And there are sirens in Baltimore so I was

2    muting, and then when you pulled that up I couldn't find

3    the mute button.

4    Q.  No, that's fine, that's fine.  Okay.  Do you see

5    the document though now?

6    A.  Yes.

7    Q.  Do you recognize this document?

8    A.  Yes.

9    Q.  And what is this document?

10   A.  This is my curriculum vitae.

11        MR. DAMICH:  I'd like to mark this as

12   Deposition Exhibit A.

13        (Whereupon Deposition Exhibit A

14        marked for identification.)

15   BY MR. DAMICH:

16   Q.  I'm going to scroll down to page 12 of the CV

17   itself, that is also marked -- it's also ECF number 1-5

18   page ID 435.  And at the bottom it says key live

19   testimony articles; do you see that?

20   A.  I do.

21   Q.  And then it continues on to the next page,

22   correct?

23   A.  It's a different heading on part of the next

24   page, but, yes, it does.

25   Q.  There is approximately seven cases that you

13

1    provided key live testimony in?

2    A.  Yes.

3    Q.  Starting with the first one, 2021 listed there,

4    the PA Court of Common Pleas regarding Commonwealth of

5    Pennsylvania versus George J. Torsilieri, what was at

6    issue in that case?

7    A.  Sex offender and registration, Pennsylvania's

8    policy.

9    Q.  And the defendant, was he in non-compliance with

10   the state's policy?

11   A.  I don't know if he was not in compliance with the

12   state policy.  My testimony focused on the research

13   around registration and notification.

14   Q.  And were you qualified as an expert in that case?

15   A.  I was.

16   Q.  Was there a challenge to your qualification as an

17   expert?

18   A.  There was not a challenge to my qualification as

19   an expert out of registration notification.  There was a

20   challenge to my qualification as a policy expert and as

21   an expert on child sexual abuse victimization, and I was

22   subsequently qualified as an expert in those areas as

23   well.

24   Q.  In the same case?

25   A.  In the same case.

14

1   Q.   And then the second one is in 2016 there's a
2   Circuit Court, Huntsville, Alabama, in the interest of
3   AS.  Is that a case pertaining to juvenile registration
4   and notification?
5   A.   Yes.
6   Q.   What was at issue in this case?
7   A.   That case there was also about Alabama's juvenile
8   sex offender registration notification policy.
9   Q.   Okay.  And was the -- was AS challenging the
10  requirements?
11  A.   As I recall.
12  Q.   And what did you testify to in that case?
13  A.   The fact that these are ineffective policies that
14  don't reduce sexual violence.
15  Q.   And were you qualified as an expert in that case?
16  A.   Yes.
17  Q.   An expert as?
18  A.   On sex offender registration and notification
19  policies.
20  Q.   Was there a challenge to your qualifications as
21  an expert in that case?
22  A.   I don't recall if there was a challenge.
23  Q.   Then there's a 2014 matter listed there, the
24  United States District Court for the Middle District of
25  Alabama, the Northern Division?

15

1   A.   Yes.
2   Q.   The case challenged AL's sex offender
3   registration?
4   A.   Yes.
5   Q.   What was at issue in that case?
6   A.   That was about adult sex offender -- Alabama's
7   adult sex offender registration and notification policy.
8   Q.   And what did you testify to?
9   A.   That these policies are ineffective at preventing
10  sexual violence.
11  Q.   And were you qualified as an expert?
12  A.   I was.
13  Q.   Were there any challenges?
14  A.   I don't recall actually.
15  Q.   And you were specifically qualified as an expert
16  on?
17  A.   Sex offender registration and notification
18  policy.
19  Q.   And the next case there, the 2011 Horry County
20  South Carolina Circuit Court in People of the State of
21  South Carolina V TS.  What was at issue in that case?
22  A.   The issue in that case was the civil commitment
23  of a person who had been adjudicated delinquent as a
24  minor of sex crimes.  Sex offender civil commitment.
25  Q.   And what did you testify to in that matter?

16

1   A.   That the individual in question was an
2   inappropriate candidate for civil commitment.
3   Q.   And were you qualified as an expert?
4   A.   I was.
5   Q.   And an expert on?
6   A.   I think generally on sex crime policy.
7   Q.   Okay.
8   A.   It is possible I was also qualified based on my
9   expertise around child sexual abuse victimization.
10  Q.   And then the next one, the 2010 case, the
11  Charleston County Family Court matter, what was at issue
12  in that case?
13  A.   In that case there was a person arguing to be
14  released from sex offender registration notification
15  requirements.
16  Q.   And are you in favor of the individual being
17  released or did you testify in favor of the individual
18  being released?
19  A.   I testified to the facts that these are
20  ineffective policies that do not reduce the likelihood
21  of sexual violence.
22  Q.   And were you qualified as an expert?
23  A.   Yes, I was.
24  Q.   And were there any challenges to your
25  qualifications as an expert?

17

1   A.   Not that I recall.
2   Q.   And you were qualified as an expert on?
3   A.   Juvenile sex offender registration and
4   notification policy.
5   Q.   There's a 2009 matter out of Washtenaw County,
6   Michigan, Trial Court, Family Division.  What was at
7   issue in that case?
8   A.   I believe what was at issue is registration and
9   notification, but I will let you know that that is so
10  long ago I don't remember the particulars.
11  Q.   And do you remember if you were qualified as an
12  expert?
13  A.   I assume I must have been.
14  Q.   But you're not sure?
15  A.   I think it's safe to say that I was.  I don't
16  have any other reason that I would have been involved in
17  a case like that unless it had to do with registration
18  and notification.
19  Q.   And then the 2008 matter in this Ohio Court, In
20  re CP?
21  A.   Yes.
22  Q.   What was that case about?
23  A.   That case was about Ohio's juvenile sex offender
24  registration and notification policy.
25  Q.   And I'm assuming you testified against the

18

1  effectiveness of the policy registration?
2      **A. Correct, I testified that this is an ineffective**
3  **policy.**
4      Q. And were you qualified as an expert, do you
5  remember?
6      **A. I was.**
7      Q. And an expert on?
8      **A. Sex offender registration and notification**
9  **policy.**
10     Q. Do you consider yourself an expert in pedophilia?
11     **A. I know a lot about pedophilia.**
12     Q. Okay.
13     **A. Yeah, I know a lot about pedophilia. I'm not**
14 **sure that I would hold myself out as an expert on**
15 **pedophilia.**
16     Q. Are you an expert on government budgets?
17     **A. No, definitely not.**
18     Q. Are you an expert on governmental accounting?
19     **A. No.**
20     Q. Okay. Are you an expert at reviewing the
21 efficiency of government functions?
22     **A. No.**
23     Q. And back to pedophilia, I'm going to go ahead and
24 stop this share. I'm going to share my screen again
25 here. Okay, do you see this document?

19

1      **A. I do.**
2      Q. Do you recognize this?
3      **A. I do.**
4      Q. And what is this document?
5      **A. This is an interview that involved the reporter,**
6  **Jennifer Bleyer.**
7      Q. And who was she a reporter for?
8      **A. At that time she was reporting for Slate.**
9              MR. DAMICH: I'm going to mark this as
10 Deposition Exhibit B.
11         (Whereupon Deposition Exhibit B
12         marked for identification.)
13 BY MR. DAMICH:
14     Q. I'm going to scroll down. Do you see a
15 highlighted version here and do you see that?
16     **A. I do.**
17     Q. Do you want me to scroll in a little bit because
18 I'm going to have you read it. Does that help out a
19 little bit?
20     **A. Yeah, that looks fine.**
21     Q. Okay. Could you read this first highlighted
22 portion where it starts with your name -- I'll just read
23 it, it says, Elizabeth Letourneau of the Johns Hopkins
24 Bloomberg School of Public Health, who studies child
25 sexual abuse, agrees that even with red flags people are

20

1  notoriously unable to recognize child molesters because
2  people they respect simply don't fulfill the image they
3  have of monsters or predators. Given our blind spots,
4  she says, we need to try and reach potential abusers
5  before they abuse or even after they've abused but don't
6  want to again, which means first understanding the
7  source of their harmful urges. Do you still agree with
8  that statement?
9      **A. Yes.**
10     Q. Okay. And so within this statement you talk
11 about red flags. What do you mean by red flags?
12     **A. What I was referring to there is the fact that it**
13 **is often the case that when somebody that we like or**
14 **respect or love or know well is engaging in behavior**
15 **that would otherwise raise concerns we often give them a**
16 **pass, that we look for other explanations for why they**
17 **might be engaging in behavior that would be concerning**
18 **to us if it was someone that we didn't know or like or**
19 **love or respect.**
20     Q. And you still believe that people are notoriously
21 unable to recognize child molesters?
22     **A. In some situations, yes.**
23     Q. Okay. What do you mean in some situations?
24     **A. When people who are sexually abusing children and**
25 **who are well-known to the individual, that can make it**

21

1  difficult to identify that harm is occurring.
2      Q. And why is that?
3      **A. Because when we care about someone or know them**
4  **or respect them, love them, we understand that there is**
5  **a lot of good and it can be difficult to also believe**
6  **that someone who is engaged in good behavior could also**
7  **be engaged in the very harmful behavior of child sexual**
8  **abuse.**
9      Q. So does that -- is it fair to say then that
10 results in a substantial amount of underreporting?
11     **A. I don't -- I think there's many reasons why**
12 **people do not report sexual abuse. One of those reasons**
13 **might be that they don't recognize it's happening,**
14 **obviously, so you can't report something that you don't**
15 **recognize.**
16     Q. But would you agree that there's a substantial
17 underreporting of sexual abuse amongst minors?
18     **A. It depends on what you mean by substantial. So**
19 **the Department of Justice, the U.S. Department of**
20 **Justice, reports that about 48 percent of rapes and**
21 **sexual assaults do get reported to the police, so indeed**
22 **that does mean that 52 percent don't. That is**
23 **substantial I would say.**
24     Q. Now, you talk about understanding the source of
25 their harmful urges; could you unpackage that a little

22

1   bit?

2       A.   People sexually abuse children for a variety of

3   reasons.  Most people assume that everyone who sexually

4   abuses a child does so because they have strong sexual

5   attraction to children, preferential sexual attraction

6   to children we might say, which is part of the

7   definition of pedophilia.  The reality is is that half

8   or more than half of adults who sexually offend against

9   children do not have strong or preferential sexual

10  attraction to children and we need to do a much better

11  job of understanding what these other risk factors are

12  that would lead an adult to engage in sexual abuse of a

13  child, particularly adults who are not sexually

14  attracted to children.

15      Q.   The article goes on to say, as Cord Jefferson

16  reported recently in Gawker, new research suggests that

17  pedophilia-the attraction to children, not the act of

18  molesting them-is essentially impossible to change.  Do

19  you see that?

20      A.   I do see that in the article, yes.

21      Q.   Do you agree with that statement?

22      A.   I do.  Sexual attraction, whatever your sexual

23  attractions are, are very difficult to change,

24  potentially impossible.

25      Q.   Okay.  I believe this article was talking about a

23

1   boy who found out -- determined at a very young age that

2   he was attracted to younger children.  Can you hear me?

3       A.   I can, yes.

4       Q.   Sorry, I dropped off for a little bit there.

5       A.   Okay.

6       Q.   The last thing I did was ask you -- I asked you a

7   question and I didn't get -- I kind of dropped off of

8   Zoom, so it's not set in stone for every person.

9       A.   I did not.

10      Q.   Okay.  Now, I was referring to this article that

11  you were interviewed for and the story, the backup

12  story, I think the article discusses about a young boy

13  who finds out at a young age that he's sexually

14  attracted to other young boys and that that attraction

15  stays with young boys as he ages.  Do you believe that

16  the attraction to young children stays with a human

17  being throughout their life?

18      A.   I believe that it can and probably does most of

19  the time.  There are absolutely cases of people

20  reporting that the age of attraction does change over

21  time so it's not set in stone for every person.

22      Q.   Okay.  So if you're an individual who has a

23  sexual preference for children you're more -- you have a

24  better chance of acting on that sexual preference than

25  someone who doesn't, correct?

24

1       A.   Well, as I said there's other risk factors for

2   acting sexually against children and so we know that

3   sexual attraction to children is a risk factor, but it

4   is not the only risk factor.  And there's not very good

5   data yet comparing the strength of different risk

6   factors.

7       Q.   And what are some of those other risk factors?

8       A.   It appears that being surrounded by children

9   perhaps as part of your job or your volunteer activities

10  to whom you're not related biologically or through

11  adoption related presents a risk to some people who

12  offend against children, primarily out of access.

13  There's also kind of antisocial sociopathy and

14  psychopathy where an individual is prone to prioritizing

15  their own needs and wants over those of others including

16  others who they may harm, that is another factor for

17  engaging in these kinds of behaviors.

18           And then people who are in positions of

19  impunity appear to be at higher risk.  So if you know

20  that the organization that you work for or that employs

21  use, that you're connected to, tolerates the sexual

22  abuse of children, that also seems to be a risk factor

23  for engaging in the sexual abuse of children.

24      Q.   Okay.  And those factors, is there a lot of

25  research on how those play into the overall risk

25

1   assessment of an individual?

2       A.   I think our understanding that people offend for

3   reasons other than sexual attraction to children is

4   still relatively new.  I mean folks have known this for

5   decades, have known that most offenders who are

6   convicted of sexual offenses against children don't have

7   preferential sexual attraction to them, that was

8   established a couple decades ago.  But seeking out then

9   why else do people offend against children has taken

10  some time to get prioritized by funders, research

11  funders.

12      Q.   So are there ways to treat, to suppress, the urge

13  to want to act on this sexual desire?

14      A.   Yeah.  I mean you may not be able to change

15  attraction but you can certainly change behavior.

16      Q.   And what type of actions would that be?

17      A.   Well, there are many people with sexual

18  attraction to children who choose themselves not to act

19  on it and so they figure out how to keep themselves

20  safe.  In terms of effective prevention programs, you

21  know, this is an area of science, evaluating prevention

22  programs that specifically are for specific risk factors

23  is a pretty new area of research.  We, for example, are

24  just about to launch a randomized control trial

25  evaluating whether an online self-help intervention

26

1  **actually improves people's ability to avoid harming**
2  **children and is specifically targeted towards people**
3  **with sexual attraction to children.  There's a couple of**
4  **other randomized control trials along similar lines that**
5  **are really looking at do interventions for people with**
6  **sexual attraction to children work to reduce the**
7  **likelihood of future abuse.**
8          Those trials, several of them, really just
9  got started.  This is a pretty new area of research.
10  One was completed and showed some promise in behavior,
11  although that one by Christopher Rahm and his colleagues
12  didn't necessarily target people with sexual attraction
13  to children but targeted people engaged in searching for
14  child sexual abuse images online.
15          I should also say there's another area of
16  research looking at the treatment of people who have
17  sexually offended and what it takes to reduce recidivism
18  rates of high risk individuals, and that research is
19  also -- is actually a little more robust.  So there's
20  several randomized control trials that support one
21  particular intervention called Circles of Support and
22  Accountability, and that intervention is for people who
23  are returning to the communities after serving time in
24  prison for child sexual abuse.  That intervention has
25  been shown to significantly reduce the likelihood of

27

1  recidivism among offenders.
2      Q.  Do you think that it's possible that an
3  individual who is predisposed to act on a sexual
4  attraction to a child would be deterred from doing so,
5  not solely, but would it play a factor in the
6  determination if -- because the result would be they'd
7  find themselves on the sex offender registry?
8      **A.  Can you restate the question, please?**
9      Q.  Absolutely, yes.  Do you believe that it's
10  possible that there are individuals who are predisposed
11  to have sexual attractions to minors to not act on those
12  predispositions because they are deterred by the fact
13  that they might find themselves on the sex offender
14  registry if caught?
15          MS. AUKERMAN:  Objection, vague.  You can
16  answer if you understand the question.
17          THE WITNESS:  Thank you.  I think that
18  people who are sexually attracted to children and who
19  choose not to act on that attraction choose not to act
20  on that attraction for many different reasons.  The
21  individuals with whom I've interacted as part of our
22  research did not want to hurt children and that is why
23  they -- that was one of the main reasons they gave.
24  They also do want to keep themselves safe, by safe they
25  generally meant from, you know, both criminal justice

28

1  interventions but also from, you know, the scorn and
2  stigma that attaches appropriately to people who
3  sexually offend against children.
4  BY MR. DAMICH:
5      Q.  Okay, so then do you believe that the sex
6  offender -- potential of being on a sex offender
7  registry could act as a deterrent to those predisposed
8  to have sex with minors?
9      **A.  I don't know.  There has never been a research**
10  **study that has looked at whether registration works as a**
11  **primary prevention tool with people specifically who**
12  **have some -- who are predisposed, in your words, to**
13  **offend against children.**
14      Q.  I don't want to say a primary prevention tool but
15  one of many factors that could be considered as a
16  deterrent?
17      **A.  So when I use the word primary prevention I mean**
18  **it in the sense of -- the public health sense, so we**
19  **have primary prevention before any harm has occurred.**
20      Q.  Okay.
21      **A.  I think that's what you're asking about.**
22      Q.  Sure.  Yeah, I mean just what I'm getting at is
23  the idea behind deterring an individual from acting on
24  their predisposition to sexually encounter a minor and
25  the fear that being on the registry might cause could

29

1  act as a deterrent effect, it could be one of the many
2  factors that causes them not to act; is that correct?
3          MS. AUKERMAN:  Objection, compound, form and
4  foundation.
5          THE WITNESS:  Again, I think that there are
6  many reasons that people who might offend against
7  children choose not to do so.
8  BY MR. DAMICH:
9      Q.  Okay.  If the fear of being listed on the
10  registry caused a potential sex abuser or sex offender
11  to not act, wouldn't you agree that it was effective?
12      **A.  The registry is not meant to serve as a primary**
13  **deterrent to first time sex crimes, is my understanding.**
14  **My understanding is the impact of the registry is to**
15  **deter recidivism from known offenders.**
16      Q.  Okay.  And do you think that -- okay, for those
17  known offenders and deterring recidivism, do you think
18  the fear of now they are already -- they will already be
19  on the list, those first time offenders, the fear of
20  being on the list could prevent first time offenders
21  from acting, correct?
22          MS. AUKERMAN:  Objection, calls for
23  speculation, asked and answered.
24          THE WITNESS:  Do you want me to repeat my
25  answer?

30

1  BY MR. DAMICH:
2  Q. Yes.
3  A. **Okay. I believe that the registry is not**
4  **intended to serve as a primary deterrent of first time**
5  **sex crimes, that it is predicated on the understanding**
6  **that it would deter recidivism events. And that people**
7  **who might be predisposed or may be at risk of offending**
8  **against children have many reasons to avoid engaging in**
9  **harm against children.**
10 Q. I'll go ahead and share my screen again.
11 Hopefully I don't drop the call because I do this, but
12 if I do I apologize. Okay, could you let me know when
13 the document pops up?
14 A. **I can see it.**
15 Q. And what's appearing on your screen right now?
16 A. **My affidavit.**
17        MR. DAMICH: And I'm going to -- if it's
18 okay I'd like to mark this as Exhibit C.
19        (Whereupon Deposition Exhibit C
20        marked for identification.)
21 BY MR. DAMICH:
22 Q. And what is this affidavit for?
23 A. **I believe it's to document my expertise in the**
24 **area of sex offender registration and notification and**
25 **my understanding of the inability of these policies to**

31

1  **prevent sexual violence.**
2  Q. Okay. I'd like to scroll down here to page two
3  where it says research findings, do you see that? I'll
4  zoom in a little bit, is that better?
5  A. **I do see it.**
6  Q. Okay, it says research findings. It says under
7  number six, it says, as I detail in the sections below,
8  my research and that of others in my field finds that
9  sex offender registration and notification laws like
10 Michigan's fail to improve community safety in any way.
11 Now, we just talked about the potential -- I mean I know
12 there was some back and forth about the potential of it
13 being a deterrent effect, I know you disagree with that,
14 but do SORN laws benefit the victims in any way?
15 A. **I don't think there is any kind of generalization**
16 **for what benefits all victims of child sexual abuse or**
17 **sexual violence.**
18 Q. Okay. So you don't think there would be any kind
19 of benefit?
20 A. **I don't think that there is anything that**
21 **suggests that these policies are effective in preventing**
22 **sexual abuse or sexual violence, which is what they are**
23 **intended to do.**
24 Q. Okay.
25 A. **I also don't think all victims share the same**

32

1  opinion about this or anything else.
2  Q. Okay. Now, going back to the registration -- or
3  sex offender registration's failure to protect the
4  public, imagine a hypothetical where you have an
5  individual who moves in next door, say who is 25 years
6  old -- or say 30 years old and they were -- they are
7  predisposed to -- they are sexually attracted to minors.
8  And if you lived next door to this individual and you
9  have children would you want to know if this person
10 perhaps was previously arrested for this individual
11 acting on this predisposition to abuse minors?
12        MS. AUKERMAN: Objection, compound, form and
13 foundation.
14        THE WITNESS: So first of all, the registry
15 does not tell anybody if somebody is sexually attracted
16 to children. Again, most sex crimes are committed by
17 people who do not have strong sexual attraction to
18 children, so that's not a piece of information that you
19 can obtain from the registry. I believe very strongly
20 that all children should grow up free from abuse. The
21 registry does not increase the likelihood that children
22 grow up free from abuse and, in fact, it increases the
23 likelihood I believe that children will be abused.
24 BY MR. DAMICH:
25 Q. How? Can you explain to me how you believe it

33

1  would increase the likelihood of child abuse?
2  A. **Yes. We have two papers, one that's been**
3  **published, one that's under review for publication**
4  **linking sex offender registration of children who**
5  **committed sex crimes as minors to increased risk for**
6  **being approached by adults for sex. So in our research**
7  **children who were registered compared to children who**
8  **committed similar crimes but were not required to**
9  **register were five times more likely to be approached by**
10 **an adult for sex in the past year, and they were twice**
11 **as likely to have been sexually assaulted in the past**
12 **year.**
13        They were also four times more likely to
14 have attempted suicide in the past 30 days prior to the
15 survey, again, than children who had committed similar
16 crimes but were not required to register. So this
17 policy is particularly devastating when it's applied to
18 children.
19 Q. And you said there were two studies?
20 A. **Correct.**
21 Q. And which studies are those?
22 A. **One of them is my publication on the collateral**
23 **consequences of child sexual abuse -- or, sorry, of**
24 **juvenile sex offender registration notification, I can**
25 **give you the proper citation for that. It is cited in**

34

1  my --

2      Q.  And what year was that published?

3      A.  It was -- wait, so I misspoke, there's three

4  papers.  One was published in 2015, one paper was

5  published in 2018, and our third paper, which actually

6  pertains to young adults ages 18 to 21 where we found,

7  again, the increase in suicidality and suicide attempts

8  is under review for publication, so it has not yet been

9  published.

10      Q.  Are all of these papers limited to research of

11  juveniles?

12      A.  The one --

13          MS. AUKERMAN:  Objection, misstates her

14  testimony.

15          THE WITNESS:  The paper that's currently

16  under review examines young adults ages 18 to 21.

17  BY MR. DAMICH:

18      Q.  And the previous two?

19      A.  Pertain to children under the age of 18.

20      Q.  Okay, they both do?

21      A.  Yes.

22      Q.  Moving on, the same page here in your report, how

23  did you come to the opinion that Michigan SORA makes it

24  more difficult for sex offenders to find and maintain

25  housing?

35

1      A.  The research --

2          MS. AUKERMAN:  Objection, it

3  misstates -- mischaracterizes her report.

4          THE WITNESS:  So the research is not

5  specific to Michigan, it's specific to many states.  Sex

6  offender registration notification policies and much of

7  this research pertains to surveys of people on

8  registries and identifies the negative impact that

9  registration has on finding and maintaining housing,

10  finding and maintaining employment, and finding and

11  maintaining relationships with prosocial peers and

12  family members, which is relevant because, as the

13  Department of Justice has identified, stable housing,

14  stable employment, stable prosocial relationships with

15  non-offending peers and family members are key to

16  successful reentry for people returning into their

17  communities from prisons.

18  BY MR. DAMICH:

19      Q.  Do you know how large the sample size was of the

20  study or the surveys that you reviewed and everything?

21      A.  There's several, I would have to go back and

22  look.  I believe that they were relatively large and

23  perhaps in the hundreds, but I would have to look at the

24  research.

25      Q.  And do you know approximately when that research

36

1  was done?

2      A.  Across a period of time, you know, I don't know

3  specifically.

4      Q.  And did you look at any research specific to

5  Michigan?

6      A.  I would have to go back and look and see if

7  Michigan -- if people were recruited from Michigan or

8  not.

9      Q.  Okay.  And so how did you -- another question I

10  have is how did you come to the opinion that Michigan

11  SORA makes it difficult for sex offenders to find

12  employment?

13      A.  So, again, these statements pertain to sex

14  offender registration and notification policies in

15  general and not specifically to Michigan.  And, again,

16  the results -- those findings are based primarily on

17  surveys in which people on registries were interviewed

18  or responded to questions about the impacts.  They also

19  include research from probation officers and parole

20  officers who -- community supervisors of people who have

21  been released from prison and are on our registries, and

22  one of the single largest concern of community

23  supervisors is that the registered offenders aren't able

24  to find stable housing or stable employment, which is

25  often a condition of probation or parole.  And they

37

1  spend a lot of their time trying to help their parolees

2  and their probationers find housing and find employment.

3      Q.  And what do you believe are the major

4  contributing factors that cause these individuals to not

5  find employment?

6      A.  I believe that a major contributing factor is the

7  fact that they are on sex offender registries.

8      Q.  The same question for housing?

9      A.  Correct, I believe that it's the same reason,

10  that they are on sex offender registries.

11      Q.  So in your studies, what are some ways that the

12  registry -- that being on the registry has impacted an

13  individual's ability to maintain housing?

14      A.  My research has not focused on looking at the

15  impact on housing, I'm citing other published research

16  in the literature.

17      Q.  And you also talk about how sex offender

18  registration policies make it difficult for sex

19  offenders to find and maintain prosocial positive

20  relationships.  Could you kind of -- could you explain

21  that to me?

22      A.  Yes.  For example, in our research with people

23  who were registered in comparison to people who had

24  committed sex crimes but were not registered we found

25  increased helplessness and increased isolation.  And so

38

1  one thing that happens is -- that appears to happen is
2  that people become afraid of being out in the public,
3  afraid of being harassed, which they also report
4  experiencing. And so they kind of self-isolate and that
5  is going to impact relationships as well as employment.
6      Q.  And then you talk about how policies are costly
7  and they waste taxpayer funds. On what basis did you
8  form that opinion or those opinions?
9      A.  There are a couple of bases for that. First and
10  foremost interventions can be clinically effective,
11  registration and notification are not. They are not
12  effective at achieving reduced sexual violence. If
13  you're not effective in your main goal you cannot be
14  cost effective, so you fund an intervention or a policy
15  in this case that is an ineffective policy, by
16  definition you cannot have a cost effective policy, you
17  have a cost wasting policy, so that's one thing.
18      And then in terms of the actual expenses, I
19  cite in my affidavit a number of states that -- or
20  local -- state or local offices that looked at the cost
21  of implementing sex offender registration notification
22  and found that those costs were quite high. There are
23  also a couple of publications. There's one sort of cost
24  effectiveness analysis that was conducted by an
25  organization called R Street, the letter R Street, which

39

1  I understand to be kind of a libertarian organization.
2  So they looked at the cost of juvenile registration in
3  particular and estimated that nationally it runs in the
4  billions of dollars.
5      Q.  So you had mentioned some of the studies you
6  reference in your report regarding the cost
7  effectiveness of these type of policies. I'm going to
8  go ahead and -- I believe it's on page 18, I'm going to
9  scroll down just to be sure here so we can go through
10  those. Yes, right here on page 18, is this what you
11  are -- or not page 18, paragraph 18 on page 18 of your
12  report, are these the reports you're referring to
13  regarding the cost estimates?
14      A.  Yes.
15      Q.  So the first one talks about a cost estimate for
16  Austin, Texas, correct?
17      A.  Correct.
18      Q.  And it is in 2009?
19      A.  Correct.
20      Q.  And it says, the Austin Police Department
21  estimated that complying with the Adam Walsh Act would
22  result in 137 percent increase to its budget. Did you
23  ever confirm if it did, in fact, increase its budget by
24  137 percent?
25      A.  I did not.

40

1      Q.  Do you know the total amount of Austin, Texas'
2  overall budget?
3      A.  I do not.
4      Q.  And you also reference a study in California,
5  correct, a 2008 report?
6      A.  Yes.
7      Q.  In that report California estimated the local
8  costs to implement SORNA approached the 102 million. Do
9  you see that?
10      A.  I do.
11      Q.  Did you confirm that those estimates were, in
12  fact, accurate, and that they came to fruition?
13      A.  I did not.
14      Q.  Have you reviewed California's budget since, a
15  more recent budget of California in its implementation
16  of SORNA or SORA, its version of SORA?
17      A.  No.
18      Q.  Do you know what the total amount of California's
19  budget was in 2008?
20      A.  I do not.
21      Q.  All right. Then you reference a Florida
22  report -- a Florida report, a 2008 report, correct?
23      A.  Correct.
24      Q.  Okay. That report was also an estimate, correct?
25      A.  They used the language that the Florida Senate

41

1  estimated the likely cost of complying with SORNA.
2      Q.  And did you confirm that that was the actual cost
3  for 2008?
4      A.  I did not confirm with the Florida Senate that
5  that was the actual cost.
6      Q.  And have you since looked at Florida's budget to
7  comply with SORNA?
8      A.  I have not.
9          MS. AUKERMAN:  Objection, it assumes facts
10  not in evidence. You're assuming that all of these
11  states actually implemented SORNA and those are facts
12  not in evidence.
13          MR. DAMICH:  Okay, noted.
14  BY MR. DAMICH:
15      Q.  Do you know what percentage 3.2 million
16  represents of Florida's 2008 budget?
17      A.  I do not.
18      Q.  You also reference a study from New Jersey and
19  the study was in 2007, correct?
20      A.  Correct. Scott, did you hear me?
21      Q.  Yeah, I did.
22      A.  Okay.
23      Q.  It appears that this one was not based off of an
24  estimation, this was actually raw data, correct? I mean
25  it looks like this is what....

42

1    A.  It looks like that, yes.
2    Q.  Do you know how much -- what percentage 555,000
3  represents in New Jersey's budget in a year?
4    A.  I do not.  No, I do not.
5    Q.  The same question with four million dollars?
6    A.  I do not.
7    Q.  You then reference an Oregon study, a 2008 Oregon
8  study.
9    A.  Yes.
10    Q.  And that was also an estimated total cost?
11    A.  Yes.
12    Q.  Okay.  Did you confirm that that was the actual
13  amount of their budget?
14    A.  I did not.
15    Q.  And do you know --
16        MS. AUKERMAN:  Objection, same objection,
17  assumes facts not in evidence.
18  BY MR. DAMICH:
19    Q.  Okay.  Do you know what percentage $850,000 was
20  of Oregon's overall 2008 budget?
21    A.  No.
22    Q.  Okay, you also reference a study in Vermont, a
23  2008 report?
24    A.  Correct.
25    Q.  Okay.  And it says that the state indicated that

43

1  the likely costs of complying with SORNA would approach
2  3.9 million in year one of implementation.  Did you
3  confirm that that information was accurate?
4        MS. AUKERMAN:  Again, assumes implementation
5  of SORNA, facts not in evidence.
6        THE WITNESS:  I did not.
7  BY MR. DAMICH:
8    Q.  Do you know what percentage 3.9 million
9  represents of Vermont's overall 2008 budget?
10    A.  No.
11    Q.  Bear with me a second, I have to go back to the
12  beginning.  Are you of the opinion that Michigan's SORA
13  increases the likelihood that registrants will
14  recidivate?
15    A.  When you say recidivate do you mean with a new
16  sex crime or with new crimes in general?
17    Q.  With a new sex crime.
18    A.  I am not of that opinion.
19    Q.  Okay.  So you do not believe the Michigan SORA
20  increases the likelihood that registrants would
21  recidivate?
22    A.  With a new sex crime, correct.
23    Q.  Do you think other felons have difficulty finding
24  housing and obtaining employment?
25    A.  Yes.

44

1    Q.  In your report here you say, modern SORN laws
2  fail to make the public safer because sexual recidivism
3  rates are low to begin with.  What is your definition of
4  recidivism?
5    A.  My definition of recidivism is a new charge for
6  adjudication or conviction following the original or
7  index adjudication or conviction.
8    Q.  Okay.  So recidivism has to -- for you it means a
9  new charge, adjudication, and/or conviction?
10    A.  Yes.  I use adjudication to refer to cases
11  involving children under the age of 18 who are being
12  tried in juvenile or family court, conviction of adults
13  or juveniles being tried as adults.
14    Q.  Okay, you say, such laws fail to distinguish
15  between the large percentage of people who present a
16  lower risk of reoffending (especially over time) and the
17  much smaller percentage of people who present a higher
18  risk of reoffending (although that risk also decreases
19  over time).  Can you explain that portion to me?
20    A.  Yes.  People who commit sex crimes vary in terms
21  of their likelihood of committing another crime once
22  they've been detected and held accountable.  Most people
23  will not go on to garner new charges or new
24  adjudications or convictions for sex crimes once they've
25  been detected and held accountable.  So that number for

45

1  adults with a prior sex crime conviction is around 80
2  percent will not go on to garner a new sex crime
3  conviction.  Approximately 20 percent will over time.
4  For children the numbers are actually much, much lower
5  even than that, about 97 percent of children with an
6  adjudication for a sex crime will not garner a new
7  adjudication or conviction for sex crime over time, less
8  than three percent will.
9    Q.  But not being convicted doesn't mean that they
10  won't commit another sex crime, right?
11    A.  True.  Conviction is not the only measure of sex
12  crimes and it does not capture all sex crimes.
13    Q.  Sure.  And would you agree that most sex crimes
14  are not reported to police?
15    A.  As I mentioned earlier, research by the
16  department, the U.S. Department of Justice, suggests
17  that about 48 percent of sex crimes are reported to the
18  police.  And new research is emerging that suggests that
19  people with prior convictions are even more likely to be
20  reported if they commit a new sex crime.
21    Q.  And those that are reported to the police not
22  always are convicted, correct?
23    A.  That's correct, that's why it's important to look
24  at charges and convictions.  I am going to need a bio
25  break.

46

1    Q.   Yes.
2    A.   Is this a good time to take five?
3    Q.   Yeah, absolutely.  That was one of the best
4    requests I've heard in my lifetime of depositions so
5    thank you for that.  If we can come back in how about
6    quarter after?
7    A.   Sure, that's plenty of time.
8         MR. DAMICH:  All right, sounds good.  See
9    you in a bit.
10        THE WITNESS:  Thanks.
11    (A recess was taken.)
12        MR. DAMICH:  Back on the record.
13   BY MR. DAMICH:
14   Q.   Before we took a break we were working through
15   the report you submitted in this case and if it's okay
16   with you we're going to go back and discuss a little bit
17   more some of your opinions in that report.  If we could
18   go back to page three of that report, which is ECF
19   number 1-5, page ID 401.  You indicate here that without
20   exception the entire published literature focusing on
21   juvenile registration and notification fails to find any
22   public safety effect of SORNA-based laws.  Now, just to
23   be clear, that's limited to juvenile registration and
24   notification, correct?
25   A.   Before I answer do you mean to be sharing your

47

1    screen or do you want me to use my copy to look up the
2    section?
3    Q.   I mean to be sharing my screen and I didn't
4    realize it's not sharing anymore so I appreciate that.
5    There you go, you're following my instructions perfectly
6    because you weren't assuming.  Thank you.
7    A.   I can see it now.
8    Q.   Okay, what I was reading from is right here, it's
9    the third bullet point down, it starts, without
10   exception.  And then the question that I asked was that
11   statement is limited to juvenile registration and
12   notification, correct?
13   A.   Correct.
14   Q.   Does the same hold true for adult registration
15   and notification?
16   A.   It does not.
17   Q.   And why is that not true for the adult
18   population?
19   A.   I mean I don't know why it's not true, I will
20   tell you.  The great majority, over 80 percent of the
21   published literature fails to find any positive impact
22   of registration.  Another two studies find specific
23   negative impacts, and another two studies do find
24   positive.  So of the studies that I'm aware of, the bulk
25   either show -- the bulk simply show that registration

48

1    and notification are ineffective, they don't reduce the
2    likelihood of recidivism.
3         And then two studies on either side indicate
4    that registration was associated with increased sexual
5    recidivism or other types of recidivism, and two studies
6    suggest that it was associated with reduced recidivism.
7    As a scientist when I look at the entire field of
8    published research that strongly suggests to me that
9    this is just a failed -- these are failed policies.
10   Q.   Fair.  So that's just based off of -- so your
11   opinion is that it's -- it's failed policies to adults
12   as well, and that's based off of just your review of
13   other -- of your peers' research, correct?
14   A.   My research and my peers' research, yes.
15   Q.   Okay.
16   A.   I will say, if I can continue my answer a little
17   bit.
18   Q.   Yes, absolutely.
19   A.   It's extremely uncommon in any field of science,
20   policy science, social science, criminology, to find
21   that the entire published literature agrees.  So the
22   fact that we have that with juvenile registration being
23   universally identified as a failed policy is an
24   unusually strong finding.  It is much more common, as we
25   have with the adult field, to have kind of a majority of

49

1    the research finding that it doesn't work and then
2    having a couple of other studies that may come up with
3    different results.
4         But as you build the science and you get ten
5    and twelve and 14 publications, different studies
6    showing the same thing, that it doesn't work, then the
7    one or two that suggest it's harmful or the one or two
8    that suggest it's helpful become less relevant.
9    Q.   Okay.  In the next bullet point there you talk
10   about how such laws have unintended consequences that
11   put the public at greater risk.  And you talk about how
12   like more sex offenders being pled down to non-sex
13   offenses to avoid the onerous consequences of the
14   registry and lower conviction rates for those cases that
15   were not pled out but went forward to trial.  Do you
16   still agree with that statement?
17   A.   Yes.
18   Q.   So then is it fair to say that you agree with the
19   statement that this causes an under- -- a lower
20   conviction rate, it causes a lower rate of conviction of
21   sex offenses?
22   A.   No, that would not be the correct interpretation.
23   Q.   Okay, and why is it wrong?
24   A.   The research that we did looked at the likelihood
25   of plea bargains over time before and after registration

50

1 was implemented and also before and after online
2 notification was implemented. So we looked at the rate
3 of plea bargains, we found massive increases in people
4 pleading from sex crimes to non-sex crimes, not even to
5 lower level sex crimes but to non-sex crimes, so
6 pleading out of type once registration was implemented
7 and then again even more so when online registration was
8 implemented.
9     And then we also looked at cases that didn't
10 plead where the sex offense or a sex offense went
11 through from arrest to charge to the conviction process,
12 and we found significantly reduced likelihood,
13 statistically significantly reduced likelihood, that
14 people who were charged with sex crimes, that they would
15 be found guilty after online registration went into
16 practice compared to before there was registration or
17 online notification.
18     We cannot say on the basis of a single study
19 and of a kind of a time series analysis like that that
20 registration caused or notification caused that change.
21 In that particular study we did reach out to prosecutors
22 and judges to ask them to help us interpret this
23 finding, that guilty findings went down. And what we
24 heard anecdotally was that indeed judges and juries were
25 concerned about finding somebody guilty if one of the

51

1 consequences was going to be placed on a lifetime sex
2 offender registry, public sex offender registry.
3     But we didn't do a study to specifically
4 identify what was the thinking of the people making
5 those decisions. That would require a different study.
6   Q.  Couldn't your research conclude, though, that
7 then you can say that that's a way that, in fact, the
8 registration is working, in other words, it's filtering
9 out the individuals that shouldn't be on the registry,
10 for instance, and allowing the prosecutor, judge,
11 defense attorney to figure that out closer in time to
12 the actual conviction itself?
13   A.  I think my interpretation is that it was
14 extremely damaging, actually. That if a survivor comes
15 forward to say that they were sexually abused, watches
16 this case go through and we see reduced likelihood of
17 guilty findings after online registration goes into
18 place compared to before, to me that actually -- I don't
19 think that there are fewer -- I don't think that there
20 were more irrelevant cases going forward or more not
21 guilty cases going forward over time.
22     I think that a more parsimonious explanation
23 is that in light of this consequence, lifetime public
24 registration, judges and juries became less willing to
25 subject some offenders to that. Some people who had, in

52

1 fact, offended, they became less willing to subject
2 people to that consequence. There is research in
3 criminology that shows that when judges and juries
4 believe that a consequence is too severe relative to the
5 offense that they will find ways around it, and one of
6 those ways is to find people not guilty even if they
7 believe they are guilty. So I think that's what was
8 happening.
9   Q.  Previously we were having a discussion about the
10 benefits of the registry to victims and you brought up
11 the idea of what happened in your recent response, the
12 idea of reducing charges, sex charges, and pleading down
13 to avoid the registry and the impact that would have on
14 the victim, right?
15   A.  I didn't talk about benefits of the registration
16 to victims because I don't think we -- as a class we can
17 assume what somebody who survives sexual abuse thinks
18 about the registry.
19   Q.  Sure. In the instance where the parties plead
20 down to a situation where they don't have to register,
21 which means then it goes from being a sex offense to a
22 non-sex offense, the victim, you talk about how that
23 would hurt the victim, correct?
24   A.  I believe that it can be harmful to people who
25 bring forward their own victimization and who encounter

53

1 a legal system that -- and a policy that is associated
2 with vastly increasing the likelihood that somebody will
3 successfully plead to a non-sexual offense. I think
4 that doesn't serve victims. I also don't think it
5 serves offenders because again anecdotally what we heard
6 is that then they won't give sex offender specific
7 treatment because people in the system, the criminal
8 justice system, don't have the time to go back and
9 figure out what was the original charge.
10     And so people who get convicted or
11 adjudicated in the case of children of assault, so the
12 most typical plea was from a sexual offense, charged
13 down to a physical assault charge, that they will get
14 anger management or that they'll get some kind of
15 treatment that aligns with physical assault, but they
16 won't get treatment that aligns with sex offending. And
17 so I think that it doesn't serve -- I don't think it
18 serves anybody well to have cases plead, huge, huge
19 numbers of cases plead to an offense that wasn't what
20 was alleged to have taken place.
21   Q.  Do you think that some victims might feel like
22 their voices are being heard if their perpetrators are
23 on a registry?
24     MS. AUKERMAN:  Objection, calls for
25 speculation.

54

1  THE WITNESS: I would prefer not to
2  speculate about what people who have survived child
3  sexual abuse feel or think.
4  BY MR. DAMICH:
5  Q. Do you think it's out of all the realms of
6  possibility, though?
7  MS. AUKERMAN: Objection, calls for
8  speculation.
9  THE WITNESS: I don't think it's out of the
10  realm of possibility.
11  BY MR. DAMICH:
12  Q. Okay. You then mention again about how such laws
13  are expensive to implement and maintain, wasting
14  government resources that could be used to make
15  communities safer and reduce sexual offending. Do you
16  still believe that statement to be true?
17  A. Yes.
18  Q. And is that statement based off of the studies we
19  previously discussed as far as the estimation of budgets
20  for certain jurisdictions to implement SORNA?
21  A. There were a couple of resources that I cited
22  that you and I did not review specifically that are also
23  informing that belief.
24  Q. And what resources are those?
25  A. They are also in my affidavit. So there was some

55

1  work by the government accountability office, the USGAO
2  office, where they were reaching out to states that were
3  not yet in compliance with the Adam Walsh Act, which
4  most states are not in compliance with the Adam Walsh
5  Act, to figure out why and cost was a significant
6  barrier, and I think they identified a particularly high
7  cost. There's another survey that I mentioned that
8  looks at and tried to estimate the cost for each state
9  that also came up with costs. And then a colleague of
10  mine, Kristin Zgoba, had looked at the expenses related
11  to New Jersey's Megan's law and also identified some
12  pretty significant costs.
13  And then too every dollar spent on a failed
14  policy is a wasted dollar that cannot go to more
15  effective strategies. And so by definition because
16  these policies are failed policies that don't achieve
17  their aim of reducing recidivism, all of that money is
18  wasted and really should go towards effective policies
19  and strategies that can reduce sexual abuse and sexual
20  violence.
21  Q. Okay. But aren't many laws expensive to
22  maintain?
23  A. I don't know. I don't know.
24  Q. Okay. And, of course, the expenditure of
25  government resources, that's a policy decision, correct?

56

1  MS. AUKERMAN: Objection, calls for
2  speculation. Calls for a legal conclusion.
3  THE WITNESS: I'm not an expert on
4  government spending.
5  BY MR. DAMICH:
6  Q. Okay. But do you understand it's the legislature
7  that is the body that makes policy decisions, correct?
8  MS. AUKERMAN: Calls for a legal conclusion.
9  THE WITNESS: I understand the legislatures
10  are policymakers.
11  BY MR. DAMICH:
12  Q. You go on further to say that such laws put
13  misplaced emphasis on monitoring and enforcing
14  compliance violations-and clogging the courts and
15  filling up jails and prisons. What data do you rely on
16  to support your opinion that enforcement of SORA is
17  clogging up courts and filling up jails and prisons?
18  A. There I'm relying on research and findings that
19  the most common charge for which people on registries --
20  their most common offense for which people on registries
21  are charged are registry violations, but that accounts
22  for a large percentage of people being returned to
23  prison and also research finding that often those
24  violations had nothing to do with the likelihood that
25  they were ever going to reoffend sexually but had to do

57

1  with other factors, for example, being confused about
2  when they had to register new information or reregister.
3  And our research also showed that it was
4  younger people who were on registries who were more
5  likely to garner failure to register convictions. And
6  we believe that that was because these people are either
7  easily confused and/or kind of young and dumb is the way
8  I put it, that younger people are less likely to conform
9  with expectations and tend to grow out of that over
10  time.
11  And I should clarify that failure to
12  register doesn't actually necessarily mean that the
13  person never registered or even that they failed to
14  register, but it's a broad term to indicate that
15  something might have been incorrect or left out or was
16  provided after what are often very relatively and
17  legitimately short due dates. And that that just hasn't
18  been found to be associated with risk for sexual
19  offending.
20  So, for example, the idea that the failure
21  to register would automatically require time in prison
22  or return to prison doesn't make sense if, for example,
23  somebody was legitimately trying to register and
24  couldn't because, you know, it was Memorial Day or
25  something and they were a day late, that's what I mean.

58

1    Q.  In formulating your opinion did you review how
2  many people in Michigan were charged with violating SORA
3  in the past, say, five years?
4    **A.  My study was not based on Michigan data.**
5    Q.  Did you review Michigan court systems to see how
6  many cases were pending where a violation of Michigan
7  SORA is at issue?
8    **A.  No.**
9    Q.  So is it fair to say that you're not -- you don't
10  know whether or not violations are clogging up
11  Michigan's court systems?
12         MS. AUKERMAN:  Objection, misstates her
13  testimony.
14         THE WITNESS:  I think it's fair to say that
15  these are clogging up the courts actually.  I think
16  there's sufficient information from across the country
17  that that is a reasonable belief.  It is also knowable,
18  somebody could look up those numbers.
19  BY MR. DAMICH:
20    Q.  You said, the risk of sexual offense recidivism
21  can be lowered by laws that address the factors
22  empirically shown to increase risk.  What are those
23  factors that are empirically shown to increase risk?
24    **A.  Inability to find and maintain employment,**
25  **inability to find and maintain housing, inability to**

59

1  **find and maintain social relationships are three of the**
2  **largest risks for people who are returning to**
3  **communities from prison to fail, to not be able to**
4  **maintain a law abiding lifestyle.**
5    Q.  So then that would cause them to then recommit a
6  sexual offense?
7    **A.  It increases the likelihood of recidivism in**
8  **general. In terms of sexual offense recidivism, what**
9  **can work there are evidence based treatments. For**
10  **example, Circles of Support and Accountability for**
11  **adults and for children, there are at least two very**
12  **well evidence-based effective treatments that**
13  **significantly reduce the likelihood of recidivism. With**
14  **kids, I have to say we don't know that the interventions**
15  **reduced the likelihood of sexual events recidivism**
16  **because those rates are below three percent and they**
17  **almost never happen.**
18         And so we do know that these two
19  evidence-based interventions reduce reoffending in
20  general and improve other outcomes for kids, like
21  improve parent/child relationships and school outcomes
22  and the like.  But because sexual reoffenses are so, so
23  rare among kids who have been adjudicated delinquent of
24  sex crimes nobody's been able to show that these impact
25  and make it even lower.

60

1         Also, prevention programs work so there are
2  some evidence-based well-validated by which I mean
3  multiple randomized control trial studies that show that
4  you can prevent the onset of problem sexual behavior
5  among teens.  So there's two evidence-based school-based
6  prevention programs that work to prevent the onset of
7  sexual offending against peers.  And then we have a
8  program that shows promise for preventing the onset of
9  sexual abuse of younger children by teenagers.
10    Q.  I'm going to scroll down to page 12 here.  Sorry
11  for the delay there, I was just gathering my thoughts.
12    **A.  Sure.**
13    Q.  Okay.  Under number 11 here you say, there is no
14  reason to believe-even remotely-that registration and
15  notification laws will have any beneficial impact when
16  applied to children.  Do you see that?
17    **A.  I do.**
18    Q.  And do you believe the same to be true for
19  adults?
20    **A.  I believe that it is vanishingly unlikely that**
21  **registration and notification will have any beneficial**
22  **impact on adults.  However, the literature on -- the**
23  **published literature on the impact of these policies on**
24  **children is absolutely uniform, so there is no reason to**
25  **believe even remotely that these policies should ever be**

61

1  **applied to children.  I think that these policies are**
2  **failed policies with adults as well, but, again, there**
3  **are, you know, two studies that show that -- suggest**
4  **that these policies increase recidivism risk, two**
5  **studies that show that they decrease recidivism risk, so**
6  **I think they are failed policies.  I think that is a**
7  **very -- I think that's the most logical conclusion from**
8  **the bulk of the science, but I use stronger language**
9  **when I talk about these policies and the impact that**
10  **they have on children because the research is**
11  **unambiguous.**
12    Q.  Okay.  I'm going to go down to number twelve here
13  and I think you're discussing why SORNA -- your opinion
14  why SORNA based laws fail to reduce recidivism.  In
15  number twelve here you say, sex offender registration
16  and notification policies fail, in part, because they
17  are based on the common misunderstanding that most
18  people who commit one sexual offense are at high risk to
19  commit a second sexual offense.  In fact, nearly all
20  methodologically rigorous research studies find that 80
21  percent to 90 percent of adult male sex offenders are
22  never reconvicted of a new sexual crime. I'm going to
23  focus on your use of the word reconvicted.  Not being
24  reconvicted does not mean another sex crime didn't
25  occur, right?

62

1    A.  Correct.

2    Q.  And if we go down to here on page -- it's going

3  to be page ID 411, it will be page 13 of your report, in

4  C you indicate that over 25 years 18 percent did

5  reoffend, right?

6    A.  Yes, over 25 years 18 percent of men convicted of

7  sex crimes had a new sex crime conviction.

8    Q.  Okay.  And 18 percent reoffense rate, is that an

9  acceptable rate for you?

10     MS. AUKERMAN:  Objection, calls for

11  speculation, unclear.

12     THE WITNESS:  I don't think any sex crime is

13  acceptable.

14  BY MR. DAMICH:

15     Q.  If 18 percent of the general population commit

16  two sex offenses when they are convicted over a 25 year

17  period?

18     A.  Can you restate the question?

19     Q.  Sure.  Does 18 percent of the general population

20  commit two sex offenses when they are convicted over a

21  25 year period?

22     MS. AUKERMAN:  Objection, vague.  Vague and

23  confusing, you're mixing various different aspects of

24  the question here.

25     MR. DAMICH:  Sure.

63

1    THE WITNESS:  When we talk about the general

2  population we typically mean the general population, not

3  forensic population, as defined by people who have a

4  conviction.

5  BY MR. DAMICH:

6    Q.  Okay, I'm going to scroll back up to I believe

7  there's some studies that were done that you referred to

8  here on page 12 and 13, into 13.  In B you say, in the

9  same South Carolina study we found that registration had

10  no effect on reoffense rates; that is, registration

11  failed to reduce the recidivism rate and protect the

12  public.  Do you know if South Carolina, if their SORNA

13  law is similar to Michigan's?

14     MS. AUKERMAN:  Objection, vague.

15     THE WITNESS:  I believe that there are

16  similarities between the two policies.

17  BY MR. DAMICH:

18     Q.  Okay.  Okay, I'm going to move on to you talked

19  about before how SORN laws have unintended consequences

20  that undermine public safety, and we're now focusing on

21  page ID 413.  And you talk about one of the unintended

22  consequences is pleading down, correct, or pleading out

23  of sexual offenses, right?

24     A.  Yes.

25     Q.  Okay.  And then in B you talk about New York

64

1  State's registration and notification policy and that

2  they did not find an increase in plea bargains because

3  of notification, but then you mentioned that New York's

4  policy is more narrowly crafted than South Carolina's.

5  Can you explain that to me?

6    A.  Yes.  So we have two studies and to my knowledge

7  still only two studies that look at or try to assess the

8  impact of registration notification policies on the

9  likelihood of pleading down to lesser offenses and

10  pleading to other types of offenses that are not sex

11  crimes.  In my study, which relied on data from South

12  Carolina, we found a market increase in plea bargains

13  down to non-sex offenses.  And importantly we did not

14  find that kind of change for other types of offenses so

15  we also looked at robbery and physical assault offenses

16  and didn't find anything like that over the time period

17  that we were looking at.  Those comparison analyses are

18  important because they lend more credence to the idea

19  that the pleas were in direct response to trying to stay

20  off the registry and not for other reasons.

21     Colleagues in New York did not find a change

22  in plea bargains after New York implemented its

23  registration notification policy, but there were some

24  distinct differences.  So, you know, we try to

25  understand why would two studies that were quite similar

65

1  in many respects, why would they come out with different

2  findings.  And because there are only two, you know, we

3  don't know, and we didn't do a direct comparison of New

4  York and South Carolina data.  But in New York at that

5  time their registration notification law was more

6  narrowly crafted, which meant it applied to fewer sex

7  offenses and included differences in the period of

8  registration, whereas South Carolina applied to really a

9  vast array of sex offenses and is for life regardless of

10  anything.

11     Q.  Regardless of the offense committed?

12     A.  Yeah, regardless of anything it's for life.  I'm

13  sorry, so those were the differences.  And then what we

14  wondered about and speculated was that there may be less

15  tolerance for plea bargaining in a state where there is

16  some differentiation between who has to register and who

17  doesn't versus a state where almost anyone who commits

18  or is adjudicated or convicted of any type of sex crime

19  will be required to register.

20     Q.  Do you know, does New York have a tiering

21  structure?

22     A.  I believe so.

23     Q.  Okay.

24     A.  But I would have to check.  But, yes, I believe

25  so.

66

1    Q.   And, again, just to clarify, it includes less
2    offenders because the definition of an offender or
3    whatever they will qualify as a registrant is not as
4    expansive as South Carolina's, correct?
5    **A.   The number of offenses and the severity of**
6    **offenses is less expansive in New York than it was in**
7    **South Carolina at that time, yes.**
8    Q.   And South Carolina does not have a tiering
9    system, correct?
10   **A.   I would not say they don't have a tiering system**
11   **because I think they distinguish between sexually**
12   **violent perpetrators and others, but they do not make**
13   **distinctions in terms of duration of registration.**
14   Q.   Are you familiar with New York State's reporting
15   requirements or the frequency of them?
16   **A.   I'm sorry, I didn't understand, New York State's**
17   **what?**
18   Q.   How frequent do registrants have to report in New
19   York, do you know?
20   **A.   I don't know.**
21   Q.   So if it's a less onerous law implementing SORNA
22   it's less likely to find an increase in plea bargains,
23   correct?
24   **A.   I would not say that's correct.**
25          MS. AUKERMAN:  Objection.  Go ahead, Doctor

67

1    Letourneau.
2          THE WITNESS:  No, I would not say that
3    that's a correct conclusion.
4    BY MR. DAMICH:
5    Q.   And what's wrong with that conclusion?
6    **A.   We have two studies that have different results,**
7    **we don't know why those two studies have different**
8    **results, so we guessed as to why they might, but there**
9    **has not been additional research that would shed light**
10   **on this.**
11   Q.   I think I'm on page 16 you talk about -- under
12   number 16 you talk about additional research has
13   identified deleterious mental health impacts of
14   registration and notification.  Is it your opinion that
15   requiring an individual to register has a negative
16   impact on the registrant mentally?
17   **A.   It's my opinion based on the science that that is**
18   **true for more people than not, that relative to people**
19   **who don't have to register that registration is**
20   **associated with negative mental health impacts.**
21   Q.   Okay.  And I see that you give the percentages
22   for the registered young adults who felt hopelessness
23   and less perceived social support from friends and
24   family.  Do you know the rate of attempted suicide for
25   victims of sexual assault?

68

1    **A.   I do not know the rate of attempted suicide for**
2    **victims of sexual assault offhand.  I'm familiar with**
3    **the literature that shows an increase in suicidality and**
4    **attempted suicide among survivors of child sexual abuse.**
5    Q.   Okay.  And do you know how many victims of sexual
6    assault reported feeling hopelessness?
7    **A.   Again, I'm familiar with the research that shows**
8    **that child sexual abuse is associated with numerous**
9    **mental health, physical health, and behavioral health**
10   **outcomes that can extend across their lifespan.  I have**
11   **contributed to that literature as well, in fact.**
12   Q.   And those consequences, would that result in
13   intensive treatment oftentimes after being sexually
14   assaulted?
15   **A.   I don't believe that we provide intensive**
16   **treatment automatically to people who have been sexually**
17   **assaulted and we should, and that is where money should**
18   **go.**
19   Q.   Okay.  Do you know the rate of depression or
20   loneliness for victims?
21   **A.   I know, and, again, I've contributed to the**
22   **literature that sexual assault is associated with**
23   **increased risk for particularly experiencing depression**
24   **or experiencing anxiety like post-traumatic stress**
25   **disorder, but also a host of other negative mental**

69

1    **health consequences.**
2    Q.   Okay.  Do you know what cost on society -- let me
3    rephrase this.  What cost on society does a sexual
4    assault have, like what's the overall cost on society?
5          MS. AUKERMAN:  Objection, vague.
6          THE WITNESS:  So I have published a study
7    that looks at the fiscal burden of child sexual abuse on
8    our nation and also on individual survivors.  So in our
9    publication, which was conducted with the CDC, people
10   from the CDC and other health economists, we found that
11   people who survive child sexual abuse compared to people
12   who had not been sexually abused in childhood earned
13   about $283,000 less across their lifetimes and that the
14   national burden of child sexual abuse is about 9.2
15   billion dollars annually of costs that can be attributed
16   to child sexual abuse.  It is a very costly, very
17   harmful public health problem.
18          MR. DAMICH:  It's getting pretty close to
19   twelve, do you mind if we take about a ten minute break
20   and come back at 12:10; is that okay with you, Miriam?
21          MS. AUKERMAN:  I'm going to refer to Doctor
22   Letourneau, who I know wants lunch at some point.
23          THE WITNESS:  I was going to say can we take
24   longer and break for lunch, that would be --
25          MR. DAMICH:  No, you only get ten minutes to

70

1 eat.
2 THE WITNESS: It feels like prison.
3 MR. DAMICH: How long, would you like a half
4 hour?
5 THE WITNESS: Yeah, 30 minutes would be
6 great. Come back at --
7 MR. DAMICH: 12:30?
8 THE WITNESS: Yes.
9 MR. DAMICH: And to be up front I don't
10 anticipate too much longer after that.
11 THE WITNESS: I still definitely want lunch.
12 MR. DAMICH: Exactly. All right, we'll see
13 you in a bit.
14 THE WITNESS: Okay, thanks.
15 (Lunch recess.)
16 MR. DAMICH: We're back on the record.
17 BY MR. DAMICH:
18 Q. Let me go ahead and share my screen. I know
19 before we took a lunch break we were looking through
20 your report, but I'm going to share my screen and try to
21 see if I can play a video for you. Okay, do you
22 remember giving a TEDMED presentation?
23 A. Yes.
24 Q. And when did you give that presentation?
25 A. I think it was 2016, 2016 or 2017.

71

1 Q. And then what was the topic of the presentation?
2 A. That child sexual abuse is preventable, not
3 inevitable.
4 Q. Okay. I'm going to attempt to play a clip from
5 the presentation and I'm hoping that the sound works.
6 Let me know if you don't hear anything, okay?
7 A. Okay.
8 (Transcription of video.)
9 Dr. Letourneau: ....abuse of images of
10 children, child pornography, without having any
11 idea that doing so was both harmful and illegal.
12 We rightly stigmatize and punish adult sexual
13 violence, but children are not adults, and it is
14 appropriate and it is just to treat them
15 differently.
16 (Video stopped.)
17 BY MR. DAMICH:
18 Q. Okay, I'm going to go ahead and stop. Were you
19 able to hear that?
20 A. Yes.
21 Q. All right, success. You had stated that we
22 rightly stigmatize and punish adult sexual violence.
23 What do you mean by rightly stigmatize?
24 A. That it is appropriate to have laws that hold
25 people accountable for causing harm against children.

72

1 Q. So laws that stigmatize, is that what you're
2 saying?
3 A. What I mean is identifying behavior as immoral
4 and as unjust and harmful.
5 Q. Okay.
6 A. And I am careful to talk about behavior and not
7 individuals. It is not effective to stigmatize people,
8 that actually tends to drive people towards more
9 unhelpful and sometimes harmful behaviors, but we
10 absolutely have to stigmatize inappropriate behaviors.
11 It's a similar distinction that's made with suicide, we
12 don't want people to view suicide as a reasonable
13 option, but we don't ever want to stigmatize people who
14 feel or are suicidal.
15 Q. I got you. So focus on the act itself, not the
16 person?
17 A. Correct.
18 Q. Okay. I'm going to go back to your report here,
19 I'm going to go ahead and reshare my screen. And also
20 if we could -- the video I played, if we could have it
21 as Exhibit D I think we're on.
22 (Whereupon Deposition Exhibit D
23 marked for identification.)
24 BY MR. DAMICH:
25 Q. Okay, can you see my screen now?

73

1 A. Yes.
2 Q. On page 22 here this looks like it's section III
3 of your report where you talk about recidivism risk can
4 be lowered by laws that address the factors that
5 increase risk. Are you with me on that one?
6 A. Yes.
7 Q. Okay. Could you explain to me what in your
8 opinion those laws should be, what can be done?
9 A. Yes. I believe that we should support efforts to
10 effectively prevent sexual violence. So, for example, I
11 have advocated for many years to increase funding for
12 child sexual abuse prevention research, and that
13 advocacy has, in fact, resulted in a line item in the
14 federal budget that now gives the CDC three million
15 dollars a year in support of child sexual abuse
16 prevention science.
17 So I think what we need are policies that
18 direct resources, including funding but as well as other
19 resources, to really identify and then disseminate
20 effective prevention programming and effective
21 intervention programming as well. I think that we
22 should ensure that people who have engaged in harmful
23 sexual behaviors are provided with interventions that
24 effectively reduce the likelihood of recidivism. That
25 means, for example, Circles of Support and

74

1 Accountability, an intervention that has been validated
2 in multiple randomized controlled trials in multiple
3 countries.
4          And likewise with children who have engaged
5 in harmful sexual behavior there are at least two
6 evidence based effective programs that reduce the
7 likelihood of future offending in general. And then
8 prove outcomes, including school outcomes, family
9 outcomes, and so on.
10     Q.   Okay. You mentioned the Circles of Support and
11 Accountability. The Circles of Support and
12 Accountability, that was founded in Canada, correct?
13     A.   Yes.
14     Q.   And what exactly is it? Is it like a nonprofit;
15 is it a government agency or entity?
16     A.   Circles of Support and Accountability, CoSA, is
17 an intervention, so it's an intervention strategy. My
18 understanding is that there was a religious group, I
19 don't recall if it was Quakers or Mennonites, but some
20 religious group that had a congregation member who was
21 returning from prison and they were grappling with what
22 to do with him. He had been convicted of child sexual
23 abuse, he was returning to the community. And they
24 decided to try to figure out what would actually help
25 him be successful.

75

1          So they worked with probation officers and
2 others and came up with a strategy of identifying
3 volunteers who would be there to help support him when
4 he returned to the community in terms of helping him
5 find and maintain employment, find and maintain housing,
6 and also provide social support with him.
7          At the same time they worked closely with
8 probation officers or parole officers as the case may be
9 to understand what was this individual's crime, what was
10 his modus operandi, that is how did he engage in his
11 criminal behavior, what strategies did he use. So that
12 they could also, in addition to providing support around
13 those three key factors of employment, housing, and
14 social support, could also serve as people who might
15 identify early warning signs that someone could be
16 slipping back into criminal behavior and alert the
17 community supervisor or take other steps to ensure that
18 it didn't go any further.
19     Q.   Okay. And do you know how much it would cost to
20 provide that type of program for each of the more than
21 50,000 registrants on Michigan's registry?
22     A.   There would be no reason to provide this
23 intervention to each registrant or to other people who
24 may have committed sex crimes who aren't on Michigan's
25 registry. You would, as with any intensive

76

1 intervention, limit it to people at highest risk and so
2 that is how you would apply this. It would not be
3 something that you would apply to everyone because most
4 individuals who come out will not be reconvicted of a
5 new sex crime and most of them will be found to be low
6 risk to reoffend and could be successfully supported
7 under other more standard community supervision schemas.
8     Q.   And in your opinion, what is an individual at
9 high risk, how do you determine high risk?
10     A.   With evidence based empirically rigorous risk
11 assessment tools.
12     Q.   And what type of tools are you familiar with?
13     A.   I am familiar with but not an expert on
14 Static-99, or there's another violence -- BSOR
15 (phonetic), I think. It's been a while since I've
16 reviewed that literature so it's not an area that I am
17 an expert on.
18     Q.   Okay. So you think they would have to have an
19 individualized assessment in addition to the
20 individualized assessment this Circle of Support and
21 Accountability for high risk individuals would be your
22 suggestion to lawmakers?
23     A.   That is one way that they could improve their
24 efforts to actually prevent sexual violence, yes.
25     Q.   And do you know how much it cost to provide

77

1 individualized review for Michigan registrants?
2     A.   I do not.
3          MR. DAMICH: I don't have any further
4 questions.
5          EXAMINATION
6 BY MS. AUCKERMAN:
7     Q.   I just have just a few, Doctor Letourneau. We
8 talked at the beginning about your areas of expertise
9 and I just wanted to make sure that you had a chance to
10 tell us what areas you consider yourself to be an expert
11 in?
12     A.   I am an expert in child sexual abuse in general.
13 I am an expert in child sexual abuse victimization, I am
14 an expert in child sexual abuse perpetration, I am an
15 expert in sex crime policy, particularly sex offender
16 registration and notification, and I think I would
17 probably clear the hurdle to be judged to be an expert
18 in policy research more generally based on the funded
19 research that I do that looks at the impacts of a
20 variety of policies, including policies that have
21 nothing to do with sexual offending but their impact on
22 violence.
23     Q.   And so with respect to policy, public policy
24 expertise, that would include issues around
25 registration, child sexual abuse and prevention, and

78

1  victimization?
2     A.  Yes.
3     Q.  And you mentioned that you're an expert on child
4  sexual abuse broadly and also child sexual abuse
5  perpetration.  Are you an expert in child sexual abuse
6  prevention?
7     A.  Yes, I am possibly the world's leading expert,
8  not to brag, but, yes, I think, yes.
9     Q.  I wanted to make sure we got that clarified.  And
10  then what about victim -- an expertise in victim and
11  victimology?
12     A.  Yes.
13     Q.  Have you testified on behalf of victims or
14  survivors?
15     A.  I have.
16     Q.  Can you tell us about that?
17     A.  There were a couple of cases where I was the
18  therapist for survivors and went to court, not as an
19  expert but as their therapist.  In one case it was to
20  protect a young boy from unsupervised visitation by his
21  offending father, and then another case it was for a
22  criminal case against a gynecologist who my client
23  alleged, I believe quite truthfully, that had sexually
24  assaulted her when she was a teenager.
25     Q.  And then we talked a little bit about the

79

1  difference between -- you were asked a number of
2  questions with respect to whether or not people could
3  reoffend after being caught and detected by the criminal
4  justice system.  The people on Michigan's registry have
5  by definition been caught by the criminal justice
6  system, convicted, and punished.  Does being caught by
7  the criminal justice system have an effect?
8     A.  I believe it has a very strong effect.  Again, we
9  see that 80 percent or more of adults who are held
10  criminally accountable for sex crimes do not go on to
11  have another sexual reconviction.  And more than 92
12  percent of children do not go on in childhood or
13  adulthood to have another sex crime conviction.  So I
14  think being held -- being caught and held accountable is
15  a very powerful intervention in and of itself.
16     Q.  And then we talked a little bit about the impact
17  on victims.  Are you aware of any literature, any
18  scientific literature, that registries make it more
19  likely that victims would report?
20     A.  No.  I have not seen any research to suggest that
21  registration increases reporting.  Anecdotally I can
22  share that people have reached out to me trying to
23  figure out how to report a sex crime but avoid
24  registration as a possible outcome, and that is usually
25  not possible.  So I know that there are families that

80

1  really grapple with whether to bring a sex crime case
2  forward if registration is going to be one of the
3  potential consequences.  That's anecdotal, but it is
4  something that I've heard repeatedly over the course of
5  the last 20 years of my career.
6     Q.  So just to be clear, your personal experience
7  being contacted by victims is -- victims coming to you
8  saying I want to report but I'm concerned that if I do
9  that the offender will be put on the registry and that's
10  a reason not to report it, has that been your
11  experience?
12     A.  Yes.  And often it's parents of victims who are
13  contacting me.
14     Q.  Okay.  You talked some about the impact of
15  registration on children.  Does the research distinguish
16  between -- let me put it this way, what is the impact on
17  children of registration that is offline so they are not
18  put on a public registry?
19     A.  So our research study -- we've conducted a couple
20  of research studies looking at the impact of
21  registration notification when it's applied to children
22  under the age of 18, and one of those studies involves
23  surveying 256 therapists who work with children and
24  children and adults who had committed sex offenses, I
25  think we recruited them from 44 states, so a pretty

81

1  broad sample.  And they independently identified and
2  very almost unanimously identified a number of harms
3  that they attributed to registration separate
4  from -- about registration separate from public
5  notification.
6        And we asked about consequences on
7  schooling, on housing, on mental health, and what we
8  found is that for a majority of the items in all of
9  those different categories the providers believe that
10  registration increase the likelihood of harm in those
11  categories to kids, they believed that notification
12  increased the harm more.  So that was one study.
13        And then in the second study we looked at
14  kids who were in treatment for having sexually offended,
15  and we compared those who were required to register
16  and/or placed on a -- and/or subjected to notification
17  policies compared to kids that had -- that we matched
18  for type of crime and for age, for gender, they were all
19  boys, and for race, and we found that most of the kids
20  were not on public registries.  So many states, I
21  believe Michigan is one, have a non-online registry for
22  children.
23        That didn't diminish the results that we
24  found.  Even though most of the children in our sample,
25  these were kids aged 12 to 17, were on non-online

82

1 registries, we nevertheless found just these horrific
2 increases in being approached by adults for sex, being
3 sexually victimized and attempting suicide, not just
4 thinking about it.
5 So from my perspective there is not a way to
6 make registration safe or effective, it is ineffective
7 whether it involves online notification or other types
8 of notification. For example, even when children are
9 not online states often will inform a child's school
10 about his or her registration status and so it is
11 certainly not private.
12 Q. Thank you. And then you were asked a number of
13 questions about cost estimates. And I wanted to ask, I
14 mean the term estimate can mean that you're projecting
15 into the future, but it also can mean that the cost is
16 estimated because it's hard to get it precise, right?
17 An estimate can mean two separate types of things; is
18 that fair to say?
19 A. Yes, that's fair to say.
20 Q. So if you're estimating, trying to give an
21 estimate, of what sex offense registration and
22 notification, what the costs are, what are the factors
23 that you would need to look at, what are the costs that
24 would be encompassed in that?
25 A. There's a number, I mean in those local and state

83

1 cost estimates that I found that were conducted by local
2 and state government offices, they all used -- they all
3 looked at different criteria. It would be helpful to
4 the field to have a really solid cost estimate that
5 looked across states and looked at the same -- the same
6 cost elements.
7 So, you know, cost elements can
8 include -- I'm not going to give a whole list right here
9 if that's okay, but just in general like when I've
10 thought about what would an ideal study look like it
11 would include all of the costs related to personnel who
12 manage registries, all of the costs related to
13 confirming the information on the registry, all of the
14 costs related to reregistration and the frequency with
15 which that has to happen and the different conditions
16 under which that has to happen.
17 It should include any costs related to
18 officers going out to check is a person where they say
19 they are and so forth. It should include the costs --
20 ideally a proper cost estimate would also include the
21 cost borne by the registrant, so taking time off of work
22 to reregister, mileage, whatever their identifiable
23 costs are available in that respect.
24 Q. And then there would be costs for
25 re-incarceration or failure to register?

84

1 A. Yeah, absolutely. Yeah, I mean there's also
2 costs just to maintain the website, so that's not free,
3 there's a cost related to maintaining registry websites
4 to responding to requests for more information. And
5 then the costs related to additional litigation that I
6 think, and others have estimated, increases both before,
7 during, and after registration.
8 So, again, we saw all this plea bargaining
9 that we believe was occasioned by registration and even
10 more so by online registration, that would be
11 another -- you know, those kinds of costs, costs of
12 appeals to get off a registry, and then costs of
13 subsequent registry related violations I think should
14 also be included.
15 Q. So like the cost of prosecuting the subsequent
16 registry violations and the incarceration, so the court
17 costs, public defense, prosecutorial costs,
18 incarceration costs?
19 A. Costs of arrest, costs of any pretrial detention,
20 all of that stuff, yes.
21 Q. Okay. And then you described how registries can
22 affect employment and housing. If people on registries
23 are earning less money, paying less taxes, are there
24 costs associated there as well?
25 A. Yes.

85

1 Q. Okay. And then what about -- oh, I believe your
2 report mentioned disamenity costs, the impact of
3 registries on property values?
4 A. Yes. I think there's been three studies now that
5 show that if somebody who is a registered -- on a sex
6 offender registry lives near you, when you put your
7 house up on the market you stand to get about five
8 percent less in your sale price than if you did not have
9 a near neighbor who was on a sex offender registry, and
10 that is what's meant by a disamenity impact. And that
11 actually drove some of the large figures in that R
12 Street report that I mentioned where they tried to
13 estimate the cost of juvenile registration to the
14 country.
15 Q. And you mentioned that there hasn't been a
16 comprehensive study of the cost of registration; is that
17 right?
18 A. That's correct, not to my knowledge.
19 Q. Is it fair to say that they are quite
20 substantial?
21 MR. DAMICH: Object, lack of foundation.
22 THE WITNESS: I think based on multiple
23 government agencies estimating costs in the hundreds of
24 thousands and millions of dollars annually, you know, it
25 depends on what you mean by substantial, but what I

86

1 would say without equivocating is that every single
2 dollar we spend on these should be going to something
3 more effective at supporting survivors and preventing
4 harm from occurring in the first place.
5        MS. AUKERMAN:  I don't have any further
6 questions.
7        MR. DAMICH:  I don't have any follow up
8 either.
9   (Whereupon Deposition concluded at 12:55 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

87

1 STATE OF MICHIGAN )
              ) SS
2 COUNTY OF INGHAM  )

3        I, Melinda Nardone, Certified Shorthand
4 Reporter and Notary Public in and for the County of
5 Ingham, State of Michigan, do hereby certify that the
6 foregoing deposition was taken before me at the time
7 hereinbefore set forth.
8        I further certify that said witness was
9 duly sworn in said cause to tell the truth; that the
10 testimony then given was reported by me remotely to the
11 best of my ability; subsequently produced under my
12 direction and supervision; and that the foregoing is a
13 complete, true, and correct transcript of my original
14 shorthand notes.
15        IN WITNESS WHEREOF, I have hereunto set
16 my hand and seal this 12th day of June, 2023.
17
18

   _____
19
      Melinda S. Nardone, CSR-1311,
20    Certified Shorthand Reporter,
      and Notary Public, County
21    of Ingham, State of Michigan.
      My Commission Expires:  10-24-24
22
23
24
25