# Exhibit 56:

## John Doe B Deposition Transcript (redacted)

```
              UNITED STATES DISTRICT COURT

              EASTERN DISTRICT OF MICHIGAN

                    SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - -
                                    )
JOHN DOES A, B, C, D, E, F, G, H,   )
MARY DOE and MARY ROE, on behalf    )
of themselves and all others        )
similarly situated,                 )
                                    )
                    Plaintiffs,     )
                                    )
       -vs-                         )No. 2:22-cv-10209
                                    )Judge Goldsmith
GRETCHEN WHITMER, Governor of the   )Mag. Ivy, Jr.
State of Michigan, and COL. JOSEPH  )
GASPER, Director of the Michigan    )
State Police, in their official     )
capacities,                         )
                                    )
                    Defendants.     )
- - - - - - - - - - - - - - - - - -


         R E M O T E   D E P O S I T I O N

of JOHN DOE B, a Plaintiff called by Defendants,

taken via Zoom before Tamara Staley Heckaman,

Certified Shorthand Reporter and Notary Public, on

Monday, April 10, 2023, noticed for the hour of

10:30 a.m.



                 HECKAMAN & NARDONE, INC.
                Certified Shorthand Reporters
                      P.O. Box 27603
                   Lansing, Michigan 48909
                      (517) 349-0847
                    theckaman@live.com
```

**Page 2**

APPEARANCES:
    AMERICAN CIVIL LIBERTIES UNION
    FUND OF MICHIGAN
    2966 Woodward Avenue
    Detroit, Michigan 48201
    By
    SYEDA DAVIDSON, J.D.
        -and-
    AMERICAN CIVIL LIBERTIES UNION
    FUND OF MICHIGAN
    1514 Wealthy SE, Suite 260
    Grand Rapids, Michigan 49506
    By
    DAYJA TILLMAN, J.D.

        On behalf of Plaintiffs.

    MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
    MDOC Division
    P.O. Box 30217
    Lansing, Michigan 48909
    By
    ERIC M. JAMISON, J.D.

        On behalf of Defendants.

        EXAMINATION INDEX
ATTORNEY'S NAME  EXAMINATION  RE-EXAMINATION
BY MR. JAMISON:      4              65
BY MS. DAVIDSON:    56
        *       *       *
        INDEX OF EXHIBITS
EXHIBIT                                    MARKED
No. 1 Michigan Sex Offender Registry         46
      Mail-In Update
No. 2 Excerpts from CSC court opinions       46
No. 3 MCLA 750.27-adulterated cigarettes     53

**Page 3**

                Remote Deposition
                Monday, April 10, 2023
                10:34 a.m.
            R E C O R D
            COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that in lieu of an oath administered in person the witness will be sworn remotely and his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.
            Please indicate your agreement by stating your name and your agreement on the record.
            MR. DOE B: John Doe B.
            MR. JAMISON: And Eric Jamison, agreed.
            MS. DAVIDSON: Syeda Davidson, agreed.
                JOHN DOE B,
    having been duly sworn, testified as follows:

**Page 4**

            EXAMINATION
BY MR. JAMISON:
    Q. Good morning. My name is Eric Jamison. I'm an assistant attorney general and I represent Governor Whitmer and Colonel Gasper in this lawsuit. I've noticed your deposition in this case, which is Does v Whitmer, case number 2:22-cv-10209, in the District Court of the Eastern District of Michigan in front of Honorable Judge Goldsmith.
        There's a protective order in place in this case, which I'm sure you're aware of, and that's found at ECF number 88, page ID 2389 through 2395, which protects your identity.
        Will the court reporter confirm that she's read the protective order and signed the acknowledgment?
        COURT REPORTER: Yes, I did.
        MR. JAMISON: Will counsel confirm that the person tendered is, in fact, John Doe B?
        MS. DAVIDSON: Yes.
BY MR. JAMISON:
    Q. I'll do my best not to ask you any identifying information throughout the course of the deposition. I'll refer to you as John Doe B,

**Page 5**

and I'll try to not ask you specifics about the name of the company you might work for or the city you live in or anything like that, so we can try to stay away from any identifying information.
        I know that you've had your deposition taken before at least once in the previous lawsuit, but I'll sort of review the rules with you. You'll need to give verbal responses. If you shake your head the court reporter can't record that, and one of the purposes of the deposition is to create a record.
        If you don't understand a question I can rephrase the question. I'm not trying to trick you with the way that I'm asking you questions.
        We'll need to avoid talking over each other, so if I'm asking a question you have to let me finish it and if you're answering a question I have to let you finish it before I ask you a follow-up question. And if you answer a question I'll assume that you understood that question; is that fair?
    A. Yes.
    Q. All right. Are you taking any medications or substances that affect your memory

**Page 6**

1  or ability to answer questions truthfully today?
2      A.  No.
3      Q.  Is there anything that -- anything else
4  that might interfere with your ability to answer
5  questions truthfully today?
6      A.  No.
7          MR. JAMISON:  Syeda, did you want to
8  put anything on the record?
9          MS. DAVIDSON:  Not at this time.
10 I'm fine with how you did the protective order.
11         MR. JAMISON:  Got it.
12 BY MR. JAMISON:
13     Q.  Your deposition was taken in November of
14 2013 in a previous version of a lawsuit related to
15 SORA; does that sound correct?
16     A.  Yes.
17     Q.  Have you been deposed since then?
18     A.  No.
19     Q.  Have you been involved in any other
20 lawsuits since then?
21     A.  No.
22     Q.  Did you meet with your attorneys to
23 prepare for this deposition?
24     A.  Yes, we spoke.
25     Q.  Did you review any documents in

**Page 7**

1  preparation for your deposition?
2      A.  I looked over some, yes.
3      Q.  Did your attorneys tell you how to answer
4  any questions?
5      A.  No.
6      Q.  Do you still live in Michigan?
7      A.  Yes.
8      Q.  And that's in the Metro Detroit area?
9      A.  Yes.
10     Q.  And do you have any kids?
11     A.  I do.
12     Q.  And what ages are your kids now?
13     A.  19, 15, and 9.
14     Q.  And what's the gender of your kids?
15     A.  They're all males.
16     Q.  If a 19-year-old adult had sex with your
17 15-year-old child would you be okay with that?
18     A.  No.
19     Q.  Should the 19-year-old face criminal
20 charges in your view?
21         MS. DAVIDSON:  Objection, relevance.
22 You can still answer.
23         THE WITNESS:  Can you repeat the
24 question again, if somebody what?
25 BY MR. JAMISON:

**Page 8**

1      Q.  Yeah, so if a 19-year-old had sex with
2  your 15-year-old kid do you think they should face
3  criminal charges?
4      A.  I don't know what the -- I wouldn't know.
5  I don't know what the circumstances are so I don't
6  know.
7      Q.  Since 2013 what types of jobs have you
8  held?
9      A.  Since 2013 pretty much two.
10     Q.  And what types -- what industries were
11 they in?
12     A.  Family business and real estate.
13     Q.  And how -- I received your dep transcript
14 from your last deposition so I have a general
15 idea, but can you explain a little bit more what
16 the family business was or is?
17     A.  It was a gas station, auto repair, and
18 towing.
19     Q.  And when did you transition to real
20 estate?
21     A.  2016.
22     Q.  Okay.  And what was your approximate
23 income level when you worked in the family
24 business?
25     A.  My income level?

**Page 9**

1      Q.  Yeah.  About how much money did you make?
2      A.  Probably about 70,000 a year.
3      Q.  And when you transitioned to being a real
4  estate agent do you know whether -- or did you
5  have to disclose that you have a CSC conviction?
6      A.  Yes.
7      Q.  And what was the response of your -- the
8  employer?
9      A.  I personally know the broker and he knows
10 my situation, so he made things happen for me.
11     Q.  So having your CSC conviction didn't bar
12 you from obtaining that employment obviously,
13 correct?
14     A.  It made things very difficult, and had I
15 not known the broker of the real estate company I
16 don't think another brokerage would accept me.
17     Q.  Have you ever tried applying for other
18 jobs since --
19     A.  No.
20     Q.  So is it fair to say that the one job
21 that you did apply for since 2013 you were able to
22 get the position?
23     A.  Yes, it was the one that I was most
24 comfortable with.
25     Q.  Do you know anyone, family members or

**Page 10**

1  friends, that have a felony conviction?
2     A.  No.
3     Q.  Do you know approximately -- so are you
4  in residential real estate?
5     A.  And commercial.
6     Q.  Do you know approximately how many sales
7  you've closed since 2016?
8     A.  Since 2016?  I don't know the exact
9  volume, no.
10    Q.  Do you have any approximation?  I mean,
11 it seems like that's something that real estate
12 agents generally have a general idea of, perhaps
13 you don't, but I'm just curious, do you have an
14 idea of the number of units you've closed on or
15 the value of sales or anything like that?
16    A.  I probably do about maybe 20 units --
17 now, since I've been in the business for seven
18 years, I do about 20 units a year now.  In the
19 beginning I was doing about maybe ten units a
20 year.
21    Q.  And what's your approximate income level?
22    A.  Right now about 100,000.
23    Q.  And what about when you were starting?
24    A.  My first three years I was probably
25 making the same amount, about like 60-70,000.

**Page 11**

1     Q.  And what year did you -- or let me back
2  up a minute.  Do you need a license to sell real
3  estate in Michigan?
4     A.  Yes.
5     Q.  And what year did you obtain your
6  license?
7     A.  2017.
8     Q.  Was that before or after you were removed
9  from the public sex offender registry?
10    A.  Well, I don't remember what year I was
11 removed from the public sex offender registry.  I
12 don't know what year I was removed.
13    Q.  Okay.  Do you know or do you remember,
14 when you applied for your real estate license did
15 you have to disclose your criminal history?
16    A.  Yes.
17    Q.  And is it fair to say that even with your
18 criminal history you were able to obtain your real
19 estate license?
20    A.  Yes.
21    Q.  Were you required to attend any sort of
22 training to obtain your real estate license?
23    A.  Yes, we had to do a 40 hour class.
24    Q.  And was that in person?
25    A.  No, at that time we did it online.

**Page 12**

1     Q.  Did you have to report that training to
2  law enforcement?
3     A.  I don't know.
4     Q.  Aside from real estate sales do you have
5  any other sources of income?
6     A.  No.
7     Q.  Do you have any rental properties?
8     A.  No.
9     Q.  Since November of 2013 have you tried to
10 enroll in college?
11    A.  Yes, I tried to do continuing education.
12    Q.  And do you remember what year that was?
13    A.  I've been trying to do it since 2008.
14    Q.  And when is the last time you tried?
15    A.  2015.
16    Q.  And what college did you apply for?
17    A.  ▮▮▮▮▮▮▮▮
18    Q.  And were you able to enroll?
19    A.  No, I had to disclose that I was a sex
20 offender.
21    Q.  And since 2015 have you tried to apply
22 any other times?
23    A.  No, I gave up.
24    Q.  Have you -- aside from ▮▮▮▮▮▮▮ have
25 you tried to apply to any other colleges?

**Page 13**

1     A.  No.
2     Q.  And did ▮▮▮▮▮▮▮ disclose to you -- or
3  I guess can you explain why you couldn't enroll at
4  ▮▮▮▮▮?
5           MS. DAVIDSON:  Objection, asked and
6  answered.
7  BY MR. JAMISON:
8     Q.  You still need to answer the question.
9     A.  Can you repeat it?
10    Q.  Yeah.  Why couldn't you enroll in ▮▮▮
11 ▮▮▮?
12          MS. DAVIDSON:  Same objection.  You
13 can still answer.
14          THE WITNESS:  Oh, okay.  Yeah,
15 because I just gave up.  They want -- you have to
16 disclose that you're a sex offender, and actually
17 they will send a letter to the whole college that
18 there is a sex offender on our campus, and I don't
19 need that in my life.
20 BY MR. JAMISON:
21    Q.  So were you able to enroll but you just
22 didn't want to because that letter would be sent
23 to the whole campus?
24    A.  Of course, yeah.  I wanted to enroll but
25 I'm not -- I don't want to be looked at like that

## 14

1  so I walked away. I gave up.
2  Q. Do you know if this same requirement is
3  in place if you took online classes?
4  A. Of course.
5  Q. Of course it is?
6  A. Yeah.
7  Q. Okay. I'm going to switch over to talk
8  about your registration history. Do you remember
9  when you were first placed on the public registry?
10  A. I believe it was in 199- -- well, public
11  registry, I don't remember what year that came up,
12  but in 1998 I started. That's when I was
13  convicted.
14  Q. And do you remember when you were removed
15  from the public registry? I think you already
16  answered that you didn't quite recall, but do you
17  have a recollection of approximately when it was?
18  A. No, I don't remember the exact year or
19  date.
20  Q. Do you have an idea, like are we talking
21  2010 or 2020, do you have any idea?
22  A. I honestly don't remember. I don't know
23  when I was on it or off or if we won or if we
24  lost. I -- I don't recall.
25  Q. And currently you're not on the public

## 15

1  registry; is that right?
2  A. I don't know.
3  Q. Okay. Aside from your CSC conviction,
4  which led to your registration requirements, have
5  you been arrested or charged with any other
6  crimes?
7  A. I was arrested for public nuisance.
8  Q. Do you remember when that was?
9  A. I believe it was in '21.
10  Q. And can you explain what happened?
11  A. We were at a pub in ▮▮▮▮▮▮ for a
12  birthday party with a bunch of wives and friends
13  and family, and I had an incident with a person
14  that was there that got in my personal space and
15  got very aggressive, and it was basically
16  self-defense and I had to do what I had to, you
17  know, do and they arrested me. They let me go
18  20 minutes later. I bailed myself out for 500
19  bucks, and then they just gave me public nuisance,
20  I paid $150 fee, and I went home and that was it.
21  Q. Well, when you say you had to do what you
22  had to do, what does that mean?
23  A. I had to protect myself.
24  Q. But what did you do specifically?
25     MS. DAVIDSON: Objection, relevance.

## 16

1  You can still answer.
2  BY MR. JAMISON:
3  Q. Yeah, so, Mr. Doe, your attorney is going
4  to object -- sorry, let me just explain this for a
5  quick minute. So your attorney will object
6  sometimes. You'll still need to answer the
7  question unless she tells you specifically to not
8  answer it, and that's generally only going to be
9  if it's -- like if I'm asking you to disclose
10  conversations between you and her. So most of the
11  time she'll make an objection to form or
12  foundation or something like that, and then you'll
13  still need to answer the question. And, you know,
14  if she objects and you want me to reask the
15  question I'm happy to do that.
16  A. No. I mean, is it -- that's -- I mean,
17  that's what I did, I protected myself. It was
18  basically self-defense. Somebody was in my
19  personal space and being very aggressive and I
20  protected myself.
21  Q. So was it a fight; is that what it was?
22  A. No, it wasn't really a fight.
23  Q. And so the -- you were charged with
24  public nuisance?
25  A. Yeah.

## 17

1  Q. And were you convicted of public
2  nuisance?
3  A. I don't even known what public nuisance
4  is. It's not even like a crime, I think.
5  Q. But I guess did you have to go to court?
6  A. Yeah.
7  Q. And did you --
8  A. I paid a -- I got my -- I got my $500
9  bond back and then they told me to pay 150 at the
10  window and that was it. I never went -- I never
11  went in front of a judge if that's what you're
12  asking me.
13  Q. Yeah, okay. And then you said wives were
14  there. Are you currently married?
15  A. No.
16  Q. Have you been married before?
17  A. Yes.
18  Q. And when -- how long were you married?
19  Do you remember the years?
20  A. From 2002 to 2016.
21  Q. And the three children you have, are
22  those the kids from the marriage you just
23  mentioned?
24  A. Yes.
25  Q. And do you stay in contact with your

**Page 18**

1 kids?
2 A. Yes.
3 Q. Do you have joint custody?
4 A. Yes.
5 Q. How often do you see your kids?
6 A. Every day.
7 Q. Do they live with you?
8 A. Yes.
9 Q. All three of them?
10 A. Yes.
11 Q. All right, so I want to talk a little bit
12 about your -- the situation that led to your
13 criminal sexual conduct. Do you -- that was CSC
14 in the third degree; is that correct?
15 A. Yes.
16 Q. And the victim was a 14-year-old child;
17 is that right?
18 A. Yes.
19 Q. And I believe it says somewhere in the
20 current complaint or the -- perhaps in your last
21 deposition, but initially when you had sex with
22 the victim you didn't know her age; is that right?
23 A. Correct.
24 Q. And then after her family heard about the
25 relationship you learned her age; is that right?

**Page 19**

1 A. Correct.
2 Q. And then after you learned her age you
3 still had sex with her again?
4 A. Correct.
5 Q. And you were nearly five years older than
6 her; is that right?
7 A. Correct.
8 Q. And prior to having sex with the victim
9 approximately how many other sexual partners did
10 you have?
11 A. None.
12 Q. In your opinion can a 14-year-old child
13 consent to having sex with an adult?
14 A. No.
15 Q. In your experience does a 14-year-old
16 have the maturity level to consent to having sex
17 with an adult?
18    MS. DAVIDSON: Objection,
19 foundation. You can still answer.
20    THE WITNESS: I -- I don't know the
21 scenarios of a 14-year-old, so I wouldn't -- I
22 don't know.
23 BY MR. JAMISON:
24 Q. You didn't serve any prison time as a
25 result of your conviction, right?

**Page 20**

1 A. Yup, no.
2 Q. You were on probation for four years,
3 though, right?
4 A. Yes.
5 Q. And you were part of the Holmes Youthful
6 Trainee Act?
7 A. Yes.
8 Q. And if you had complied with the terms of
9 probation your conviction would have been sealed
10 and your case dismissed, right?
11 A. Yes.
12 Q. And how important was it for you to have
13 your case sealed?
14 A. It was very important. It would have
15 been life changing.
16 Q. Do you know if your case was sealed would
17 you have to register as a sex offender?
18 A. No, I don't.
19 Q. All right. You didn't comply with the
20 terms of the probation, correct?
21 A. Yes.
22 Q. And at the time you were convicted you
23 had to register for 25 years; is that right?
24 A. No.
25 Q. What -- what's incorrect about that?

**Page 21**

1 A. At the time I was convicted I was told by
2 my probation officer and by the courts that it
3 would be 15 years.
4 Q. And at what point were you told that
5 you'd have to register for 25 years?
6 A. I think it was almost ten years later.
7 Q. Okay. And then at some point the law
8 changed and you became a lifetime registrant; is
9 that correct?
10 A. Yes.
11 Q. And as a registrant you still have to go
12 in and verify your information with law
13 enforcement; is that accurate?
14 A. Yes.
15 Q. And since March of 2021 how often have
16 you had to go in and verify?
17 A. Four times a year.
18 Q. How long does that take you each time?
19 A. Roughly an hour-and-a-half, two hours.
20 Q. Each time you go?
21 A. Yes.
22 Q. And how far away is the place where you
23 register from your home or your business?
24 A. Twenty minutes.
25 Q. Have you had to update any information

## Page 22

1 aside from your in person verification?
2     A. **Every time I go.**
3     Q. I guess aside from those in person
4 verifications, though, have you had to appear in
5 person to change any of your other information --
6     A. **Yes.**
7     Q. -- since -- and how many times has that
8 been since March of 2021?
9     A. **Probably a handful of times.**
10    Q. How many is a handful?
11    A. **Five.**
12    Q. Okay. And what information did you have
13 to update?
14    A. **Email addresses, my work, work**
15 **information, and then my car, I switched a car**
16 **out. '21 -- oh, my address because I did get a**
17 **new house, so things like that.**
18    Q. So since March of 2021 you've updated
19 your email address with law enforcement?
20    A. **Email address, car, address.**
21    Q. You also indicated work.
22    A. **Yeah.**
23    Q. What did you have to update with work?
24    A. **I guess you had to give them your work**
25 **address.**

## Page 23

1     Q. Yeah. Did you change employers or did
2 they move offices?
3     A. **No, because in 2017 -- yes, I did. 2017**
4 **I was with [REDACTED], and then in**
5 **2019 --**
6     Q. Hey, hey, let's not use the names of the
7 companies that you work for.
8     A. **Oh, I'm sorry.**
9     Q. Okay?
10    A. **I was with a different broker in 2017,**
11 **and then in '19 I went to another broker.**
12    Q. But since March of 2021 have you had to
13 update your work information with law enforcement?
14    A. **Yes. Oh, no, since '21, no, because I**
15 **did it in '19.**
16    Q. Have you had to update your car
17 information since March of 2021?
18    A. **March of 2021, no. Well, honestly it's**
19 **confusing. One person at the desk will tell you**
20 **you have to, the other person will tell you you're**
21 **all set. I don't know so...**
22    Q. I guess what I'm asking you is have you
23 made a trip to a law enforcement agency since
24 March of 2021 to update any information related to
25 your vehicle or vehicles that you've owned or

## Page 24

1 operated?
2     A. **Yes, and my home.**
3     Q. Okay. And how many times did you go to
4 update vehicle information?
5     A. **Once for the vehicle, once for the home.**
6     Q. And I believe you said you also updated
7 email information with law enforcement?
8     A. **Yup.**
9     Q. And how many times have you updated your
10 email information since March of 2021?
11    A. **That was one time. Once.**
12    Q. Have you ever asked your attorney whether
13 or not you need to provide your email information
14 to law enforcement?
15         MS. DAVIDSON: Objection,
16 privileged, which means --
17         THE WITNESS: I mean --
18         MR. JAMISON: Don't answer.
19         MS. DAVIDSON: -- don't divulge what
20 you have talked about with any attorney.
21 BY MR. JAMISON:
22    Q. Have you made any updates to your
23 information via mail?
24    A. **No.**
25    Q. Are you aware that you can update some

## Page 25

1 information via mail now?
2     A. **No, I was always told it was in person.**
3     Q. Did you receive any letters from the
4 state police or from the state regarding SORA over
5 the last several years?
6     A. **Yeah. I don't recall what they were for,**
7 **though.**
8     Q. Let me share my screen here in a minute.
9 Okay, Mr. Doe, can you see my screen now?
10    A. **Yes.**
11    Q. Are you on your phone? Is this pretty
12 small?
13    A. **I can see it.**
14    Q. Okay. So have you seen this form before?
15    A. **No, I have not.**
16    Q. I'm going to scroll down, so this is a
17 three page form. The second and third page is
18 what's called Explanation of Duties to Register as
19 a Sex Offender; have you seen that form before?
20    A. **When I go in person I see it.**
21    Q. Okay, so I'm looking -- this is page two
22 of the document. Under paragraph 4A it says you
23 need to provide the following information, your
24 name, any aliases, nicknames, tribal names, ethnic
25 names. Do you know what your legal name means?

26

1 A. Yeah.
2 Q. Do you know what an alias is?
3 A. Yes.
4 Q. Do you know what a nickname is?
5 A. Yes.
6 Q. How would you describe what a nickname
7 is?
8 A. Something your friends call you.
9 Q. What about an alias?
10 A. Also known as.
11 Q. A tribal name?
12 A. No, I'm not familiar with that.
13 Q. Okay, or an ethnic name?
14 A. Yeah.
15 Q. What do you think that means?
16 A. That would be like, you know, a cultural
17 name.
18 Q. And then it says any other name by which
19 I have been known. What do you think that means?
20 A. I think basically like another nickname.
21 Q. Okay. So are you confused at all about
22 what's required there, to report your name and any
23 of the other things that are identified there?
24 A. No.
25 Q. Okay, so 4B says social security number

27

1 and any social security numbers or alleged social
2 security numbers that I've previously used, do you
3 see that?
4 A. Yes.
5 Q. Do you know what a social security number
6 is?
7 A. Yes.
8 Q. Do you have any confusion about what you
9 need to report to law enforcement related to your
10 social security number?
11 A. No.
12 Q. And then C says my date of birth and any
13 alleged dates of birth that I've previously used;
14 do you see that?
15 A. Yes.
16 Q. And do you know what a date of birth is?
17 A. Yes.
18 Q. Do you have any confusion about what you
19 have to report to law enforcement related to your
20 date of birth?
21 A. No.
22 Q. Part d says the address where I reside or
23 will reside; do you see that?
24 A. Yes.
25 Q. Do you know what an address is?

28

1 A. Yes.
2 Q. Do you have any confusion about what you
3 need to report to law enforcement?
4 A. No.
5 Q. Let's see, under E it says name and
6 address of any temporary lodging used or to be
7 used when I'm away from my residence for more than
8 seven days; do you see that?
9 A. Yes.
10 Q. Do you know what temporary lodging means?
11 A. Yes.
12 Q. Do you have any confusion about what
13 you'd have to report to law enforcement?
14 A. On a temporary lodging?
15 Q. Correct.
16 A. No.
17 Q. Okay. For F it says the names and
18 addresses of each of my employers, employers
19 includes contractors. If my employment location
20 is not in a fixed location then I must provide the
21 general areas where I work and the normal travel
22 routes that I take while working; do you see that?
23 A. Yes.
24 Q. Do you know what an employer is?
25 A. Yes.

29

1 Q. Do you know what information you need to
2 provide to law enforcement?
3 A. No.
4 Q. What is unclear about that?
5 A. My travel routes, my locations.
6 Q. And what specifically is unclear related
7 to travel routes?
8 A. So if I take a different way to work one
9 day is that a violation? If I take a different
10 route to work or if I travel a different route is
11 that a violation; am I in violation?
12 Q. Is your employment location a fixed
13 location?
14 A. The building is but that's not where I am
15 every day.
16 Q. All right. Under G it says the name and
17 address of any school that I attend; do you see
18 that?
19 A. Yes.
20 Q. Do you know what school means?
21 A. Yes.
22 Q. Do you have any confusion about what
23 information you have to provide to law enforcement
24 related to the schools that you might attend?
25 A. No.

30

1 Q. Under H it says all telephone numbers
2 registered to me or used by me including, but not
3 limited to, residential, work, and mobile
4 telephone numbers; do you see that?
5 A. Yes.
6 Q. Do you know what a telephone number is?
7 A. Yes.
8 Q. Do you know what a residential telephone
9 number is?
10 A. Yes.
11 Q. And a work telephone number?
12 A. Yes.
13 Q. And a mobile telephone number?
14 A. Yes.
15 Q. So do you have any confusion about what
16 you need to report to law enforcement related to
17 telephone numbers?
18 A. No.
19 Q. Okay. So next paragraph is all
20 electronic mail addresses and internet identifiers
21 registered to me or used by me. It goes on to say
22 this section only applies to individuals with
23 offenses committed on or after July 1st, 2011. So
24 your offense was committed prior to July 1st,
25 2011; is that correct?

31

1 A. Yes.
2 Q. So according to this form does that
3 suggest that you don't need to provide your
4 electronic email addresses and internet
5 identifiers to law enforcement?
6 A. Yes.
7 Q. Do you know what an email address is?
8 A. Yes.
9 Q. Do you know what an internet identifier
10 is?
11 A. No.
12 Q. Have you looked at the statute which
13 defines what an internet identifier is?
14 A. I have not.
15 Q. Have you ever asked an attorney what an
16 internet identifier is?
17 A. No.
18             MS. DAVIDSON: Objection,
19 privileged.
20             THE WITNESS: Sorry.
21 BY MR. JAMISON:
22 Q. Do you have any confusion about what you
23 need to report to law enforcement related to
24 electronic mail or internet identifiers?
25 A. Yes.

32

1 Q. And what's the confusion?
2 A. An email address is something that I
3 reported, and I update with them when I change it
4 or I get a new one. I don't know if my website
5 for my business, I have to report our website,
6 because my website might have a different email
7 that is connected to our domain in our brokerage
8 office. So, I mean, I don't know if I've got to
9 report these things, my marketing emails, my -- my
10 other emails that I use for websites to market
11 homes, so I don't know if I have to report these
12 things so I -- I don't know. I just report my
13 email.
14 Q. But your conviction was before July 1st,
15 2011, right?
16 A. Yes, absolutely.
17 Q. Next is J, the license plate number and
18 description of any vehicle that I own or operate;
19 do you see that?
20 A. Yes.
21 Q. Do you know what a license plate number
22 is?
23 A. Yes.
24 Q. Do you know what a vehicle is?
25 A. Yes.

33

1 Q. Do you know what to own something means?
2 A. Yes.
3 Q. Do you know what to operate something
4 means?
5 A. Yes.
6 Q. So do you have any confusion about what
7 information you have to provide to law enforcement
8 related to vehicles that you own or operate?
9 A. No.
10 Q. Do you have a passport?
11 A. Yes.
12 Q. The next line is my passport and all
13 other immigration documents I may have; do you see
14 that?
15 A. Yes.
16 Q. Do you know what a passport is?
17 A. Yes.
18 Q. Do you have any confusion about what
19 information you need to report to law enforcement
20 related to your passport or immigration documents?
21 A. Yes.
22 Q. What's your confusion?
23 A. I don't -- they've never -- I don't know
24 if I have to report it that I do have one or if I
25 don't have one. I've never been asked. I don't

**Page 34**

know. Am I even allowed to have a passport? I guess I have one so I am.

Q. Have you ever done any research to look up the law to figure out what you need to report?

A. I don't understand it.

Q. You don't understand my question or you don't understand what needs to be reported?

A. Yeah, I don't understand your question.

Q. So here it says that you need to report passport and immigration documents. Have you ever done anything to try to determine what that means?

A. The only thing I've done is at the place that I go register and report quarterly is ask them because when I did apply for it one person said that I couldn't have one and then -- because I'm a convicted felon. And then I still went ahead and did the paperwork and then I got it.

Then I went back and told them, hey, I got a passport. And the lady said, oh, okay, that's cool, and the other lady was still there and she said, oh, you got a passport? I said, yup, I got a passport. I thought I couldn't have a passport but I got one, so that was kind of confusing.

Q. And did they take your passport

**Page 35**

information at the law enforcement agency?

A. They asked if I had one and they checked the box, I guess, and they said I told them I had my passport.

Q. Have you used your passport to travel?

A. No.

Q. When did you obtain your passport?

A. 2013, 2012, I believe.

Q. What was the purpose of obtaining the passport if you've never used it?

A. I actually got a passport card and a passport because we would -- my family and I and my kids would travel to Mexico or to Canada.

Q. So you have traveled with your passport before then?

A. Yeah.

Q. And how many times have you traveled with your passport?

A. I don't know how many times. I've been to Mexico a few times, maybe a couple times to Mexico, a couple times to Canada. That's about it.

Q. Did you ever have any trouble traveling with your passport?

A. Absolutely. I've been stopped --

**Page 36**

stopped, interrogated for hours.

Q. Were you able to travel, though?

A. Yes.

Q. And do you know why they stopped you?

A. Because of my sex offender conviction.

Q. All right. And then the next part there says all -- and that's under L, it says all occupational and professional licensing information I have. Aside from your real estate license do you have any other professional licenses?

A. No.

Q. And have you -- do you understand what professional licensing means?

A. Yes.

Q. And in your own words what does that mean?

A. It's a certain -- it's a certain job that requires you to be licensed in order to get the job.

Q. And have you reported to law enforcement that you have a real estate license?

A. Yes.

Q. Do you have any confusion about what occupational and professional licensing is

**Page 37**

required to be reported to law enforcement?

A. No.

Q. And when you verify four times a year do you review your information that is on file with the law enforcement agency?

A. I do.

Q. So if we move on to paragraph six it says that you're required to report in person not more than three business days after you get a new address; do you read that?

A. Yes, I do.

Q. Do you know what that means, if you get a new address?

A. Yes, I've had some trouble in the past with this, but yes.

Q. And what does it mean in your own words?

A. Basically if I'm moving to a new home I have three business days -- I have to report it within three business days or face consequences.

Q. So there's no confusion over what that provision means?

A. No.

Q. And then under 6B it says the name and address of my employer upon obtaining, changing, or discontinuing employment including volunteer

38

```
 1  work; do you see that?
 2      A.  Yes.
 3      Q.  Do you know what that means?
 4      A.  Yes.
 5      Q.  And in your own words what does that
 6  mean?
 7      A.  If I'm changing jobs I have to report it.
 8  If I quit I have to report it.  And the only thing
 9  that's confusing is volunteer work.  We do a lot
10  of charity work.  I don't know if I have to go in
11  there and tell them, hey, I'm doing charity work.
12      Q.  And so do you know if you just -- or have
13  you disclosed any volunteer work to law
14  enforcement in the past?
15      A.  No.  I'm not going to go and waste two
16  hours of my time to tell them I'm doing volunteer
17  work.  It's volunteer work.
18      Q.  And what's the nature of the volunteer
19  work that you do?
20      A.  I help out a lot of charities, a lot of
21  homeless shelters.  We feed them; we clothe them.
22      Q.  In what way do you help them, though?  Do
23  you -- I'm trying to understand.  Do you volunteer
24  on site, do you donate money?  What's the nature
25  of your --
```

39

```
 1      A.  Yeah, we volunteer on site.
 2      Q.  -- volunteer work?
 3      A.  We volunteer on site.  We go there, we
 4  take food, we feed them, give them clothes, make
 5  sure they're good.  We work at shelters.
 6      Q.  Have you ever asked any law enforcement
 7  agencies whether you need to disclose that
 8  information?
 9      A.  No, because that it's just I wasn't sure.
10      Q.  Have you ever done any research on your
11  own to try to figure out if you need to report
12  that information?
13      A.  No.
14      Q.  Okay, under 6C it says the name and
15  location of the school upon enrolling or
16  discontinuing enrollment at an institution of
17  higher learning; do you see that?
18      A.  Yes.
19      Q.  Do you know what that means?
20      A.  Yes.
21      Q.  And in your own words what does that
22  mean?
23      A.  It means if I'm enrolling into college or
24  into a school I need to report that.
25      Q.  Is there any confusion about what the
```

40

```
 1  reporting obligation is there?
 2      A.  No.
 3      Q.  Okay, I'll go to the top of this
 4  document.  It's entitled Michigan Sex Offender
 5  Registry Mail-In Update; do you see that?
 6      A.  Yes.
 7      Q.  And you see we've got -- it looks like
 8  there's five different sections, offender
 9  information, temporary residence information,
10  contact information, vehicles, and mobile homes;
11  do you see that?
12      A.  Yes.
13      Q.  And were you aware that you can
14  provide -- you can update this information via
15  mail under the new SORA?
16      A.  No.
17      Q.  Do you see that section IV includes a
18  section for vehicles, so if you obtain a new
19  vehicle you can mail in that update; do you see
20  that part?
21      A.  Yes.
22      Q.  And do you see under section II (sic) in
23  the contact information, telephone numbers, and
24  email -- email internet identifiers can now be
25  updated by mail?
```

41

```
 1      A.  Yes.
 2      Q.  And do you see this signature block at
 3  the bottom?
 4      A.  Yes.
 5      Q.  And I'll read the second sentence there,
 6  it says, I understand that willfully failing to
 7  comply with the requirements of the Sex Offender
 8  Registration Act or knowingly providing false
 9  information is a crime and may result in criminal
10  prosecution; do you see that?
11      A.  Yes.
12      Q.  Do you know what willfully means?
13      A.  Willfully means that you are doing it --
14  your -- basically your consent, you're doing it.
15  Is that a good answer?
16      Q.  And what is -- in your own words what
17  does knowingly providing false information mean?
18      A.  Lying.
19      Q.  Mr. Doe, do you pay your taxes?
20      A.  Yes.
21      Q.  Do you know if your child is 19 do they
22  still qualify as a dependent for income tax
23  purposes?
24          MS. DAVIDSON:  I'm going to object
25  to relevance.  You can still answer.
```

42

1 THE WITNESS: Yes.
2 BY MR. JAMISON:
3 Q. You do know if they qualify?
4 A. Yeah, yes.
5 Q. And do they qualify as a dependent?
6 A. Do they qualify as what, I'm sorry?
7 Q. Do they qualify as a dependent?
8 A. He still does, yeah.
9 Q. Do you know if you help a neighbor shovel
10 their snow, shovel the sidewalk or the driveway
11 several times over the winter and they pay you 300
12 bucks, do you know if you need to report that as
13 income tax or income for tax purposes?
14 A. I don't know.
15 Q. Do you know if you donate a car to
16 charity, do you know how to value that for a tax
17 deduction?
18 A. No.
19 Q. So how would you find answers to these
20 questions?
21 A. I would go to people that are in that
22 industry.
23 Q. Perhaps talk to an accountant?
24 A. Yeah.
25 Q. Or maybe a tax lawyer?

43

1 A. Um-hum.
2 Q. Could you perhaps do an internet search
3 and try to find information online?
4 A. Yes.
5 Q. So going back to the car example, if tax
6 law allows you to deduct the fair market value of
7 a car donated to charity, how do you determine the
8 fair market value?
9 A. I think that would be up to an
10 accountant. I'm not -- I've never done that
11 before in my life so I'm not sure.
12 Q. Okay. If you asked three separate people
13 do you think you might get three answers?
14 A. Yeah, probably.
15 Q. So is it fair to say people may have
16 different ideas about what the fair market value
17 of a car might be?
18 A. Possibly, yeah.
19 Q. Or I guess since you're in real estate if
20 someone were donating a house to charity could
21 three appraisers come to three different values on
22 a property?
23 A. I'm a real estate agent, not an
24 appraiser, sir.
25 Q. Sure, but in your work you deal with

44

1 appraisers; is that right?
2 A. No, I don't. I'm not a lender. I'm a
3 real estate agent.
4 Q. Okay. So if you get three different
5 opinions on what the fair market value of a car is
6 how would you decide which one to use?
7 A. Probably the best one, the best price,
8 whoever gives you the most money.
9 Q. So what do you think would happen if you
10 represent to the IRS that the fair market value of
11 a 1998 Honda Accord is $30,000?
12       MS. DAVIDSON: Object to relevance,
13 also this is a hypothetical. You can still
14 answer.
15       THE WITNESS: I don't know. I'm not
16 the IRS.
17 BY MR. JAMISON:
18 Q. So you have no idea what --
19 A. No.
20 Q. Okay. Do you think the sex offender
21 registry protects the public in any way?
22 A. No.
23 Q. And why not?
24 A. I don't believe it protects the public
25 because of the fact that crime is happening every

45

1 single day. You're not going to stop it or -- and
2 this registry is not going to prevent it.
3 Q. Do you think the sex offender registry
4 might encourage victims to come forward?
5       MS. DAVIDSON: Objection,
6 speculation.
7       THE WITNESS: No.
8 BY MR. JAMISON:
9 Q. Why not?
10       MS. DAVIDSON: Objection,
11 speculation, foundation.
12       THE WITNESS: I -- I don't know why
13 not but I just don't believe it. I don't believe
14 it.
15 BY MR. JAMISON:
16 Q. Do you know anybody that's been a victim
17 of sexual assault?
18 A. No.
19 Q. Okay. I'm going to share my screen
20 again.
21       MS. DAVIDSON: Eric, is this the
22 chart?
23       MR. JAMISON: Yeah.
24       MS. DAVIDSON: Okay, so before you
25 get to this, we acknowledge that due to the

## 46

1  court's order you're permitted to ask certain
2  questions related to this exhibit so long as the
3  questioning doesn't become impermissibly
4  oppressive due to excessive length or an
5  exorbitant number of sample cases. However, I
6  would still like to place a standing objection on
7  the record to any line of questioning related to
8  this exhibit for the reasons already articulated
9  to the court.
10             MR. JAMISON: Noted.
11  BY MR. JAMISON:
12     Q.  So, Mr. Doe, what's on the screen now,
13  and we'll identify this -- and I guess to back up
14  a minute. So the first document we shared, the
15  SORA mail-in update, that will be Exhibit 1. This
16  will be identified as Exhibit 2.
17             (Whereupon Deposition Exhibits
18             No. 1&2 marked for identification.)
19  BY MR. JAMISON:
20     Q.  And what this is, Mr. Doe, is this is --
21  these are verbatim word-for-word sections of court
22  opinions from various criminal sexual conduct
23  cases, so these are publicly available information
24  that is taken word-for-word from court opinions,
25  and I'm going to go through a number of these and

## 47

1  ask you about them.
2             This is a 47 page document, and
3  you'll see on the left there's a column that has a
4  number in it so this is the 23rd entry on it. So
5  if you could just read that to yourself and then
6  let me know when you're done, and I'll ask you a
7  couple questions about it.
8     A.  Okay.
9     Q.  Okay. Would you want to know if the
10  criminal defendant lived next door to you?
11     A.  Would I want to know if this criminal
12  lived next door to me?
13     Q.  Correct.
14     A.  Yes.
15     Q.  Would you want to know if that criminal
16  defendant were giving -- were a coach to one of
17  your kids?
18     A.  Yes.
19     Q.  Would you want to know if they were
20  babysitting your children or family members?
21     A.  Yes.
22     Q.  All right, I'm going to scroll down. If
23  you can read what's in row 24 there to yourself.
24     A.  Okay.
25     Q.  Would you want to know if that criminal

## 48

1  defendant lived next door to you?
2     A.  No.
3     Q.  Would you want to know if they were
4  providing health care services to your children?
5     A.  No.
6     Q.  Would you want to know if they were a
7  soccer coach to your children?
8     A.  No.
9     Q.  So what's the difference between this
10  criminal defendant that you indicate you don't
11  want to -- you wouldn't want to know the history
12  of and the previous criminal defendant that you
13  said you would want to know the history of?
14     A.  Well, in the first story there was a
15  brother that walked in and seen it. In this story
16  it's sounds like this lady is lying.
17     Q.  So based on the information in front of
18  you you think the victim is not being truthful?
19     A.  Yeah.
20     Q.  And because you think the victim's not
21  being truthful you wouldn't want to know whether
22  the criminal defendant lived next door or coached
23  your kids or anything like that?
24     A.  Every scenario is different, you know.
25  Every scenario is different and this one doesn't

## 49

1  sound so, you know, convincing to me that he's a
2  predator.
3     Q.  Okay. Could you read row 25?
4     A.  Okay.
5     Q.  Would you want to know if this criminal
6  defendant was teaching your children?
7     A.  Yes.
8     Q.  And why is that?
9     A.  This -- this predator had intent to do
10  this.
11     Q.  Can you read line 26 or the information
12  in row 26?
13     A.  Okay.
14     Q.  Would you want to know if that criminal
15  defendant were babysitting your children?
16     A.  Yes.
17     Q.  Would you want to know if they lived next
18  door?
19     A.  It wouldn't matter.
20     Q.  Would you want to know if they were
21  coaching your children?
22     A.  Yes.
23     Q.  Can you read the entry in row 27 there?
24     A.  Okay.
25     Q.  Would you want to know if that person

50

1  were babysitting one of your children?
2  A. Yes.
3  Q. Would you want to know if they were --
4  the criminal defendant in this case were coaching
5  your children?
6  A. Yes.
7  Q. Would you want to know if that criminal
8  defendant lived next door to you?
9  A. It wouldn't matter.
10 Q. What do you mean by that, it wouldn't
11 matter?
12 A. It doesn't matter where they live. I
13 don't really care --
14 Q. Would you want to know if --
15 A. I don't really care where they live.
16 Q. But would you want to know if they lived
17 next door? Would you want this information --
18           MS. DAVIDSON: Objection, asked and
19 answered.
20           MR. JAMISON: He didn't answer the
21 question.
22 BY MR. JAMISON:
23 Q. Would you want to know if this criminal
24 defendant lived next door to you?
25 A. Yes. Yeah, I answered it, I said I

51

1  wouldn't care. Whatever.
2  Q. Sorry, maybe I didn't hear. Did you say
3  you wouldn't care or you would care?
4  A. I wouldn't care.
5  Q. Okay. So your -- I want to make sure I
6  get this, so you wouldn't care whether they lived
7  next door but you would want to know if they lived
8  next door; is that what your testimony is?
9  A. Yes.
10           MS. DAVIDSON: I don't believe that
11 was the testimony on the record.
12 BY MR. JAMISON:
13 Q. Okay, perhaps you can clarify it. I'm
14 just misunderstanding here. So if this criminal
15 defendant moved in next door and they had that
16 history would you want to be aware of that
17 history?
18 A. No.
19 Q. Okay. If you can read row 28 there.
20 A. Okay.
21 Q. Would you want to know if that criminal
22 defendant were babysitting your children?
23 A. Yes.
24 Q. Would you want to know if they were a
25 piano teacher or a coach for your children?

52

1  A. Yeah, yes.
2  Q. All right. Have you ever contacted a
3  member of the Michigan legislature to inquire
4  about changing the sex offender registration law?
5  A. I've written letters. Never got any
6  response.
7  Q. And when did you write those letters, if
8  you remember?
9  A. It was after my deposition and during the
10 time that we were going through that lawsuit.
11 Q. And do you know if the law has changed at
12 all since you wrote that letter?
13 A. Nothing has changed.
14 Q. And are you aware that it's the
15 legislature who has the power to change the law?
16 A. Yes.
17 Q. Do you know whether Governor Whitmer has
18 the power to change the sex offender registration
19 law?
20 A. I believe she does.
21 Q. Do you know whether Colonel Gasper has
22 the power to change the sex offender registration
23 law?
24 A. I don't know who he is.
25 Q. Colonel Gasper is the head of the

53

1  Michigan State Police and he's one of the
2  defendants that you're suing in this case, so do
3  you know whether Colonel Gasper has the authority
4  to change the sex offender registration law?
5  A. No, I don't.
6  Q. All right, let me share my screen again
7  for a minute. Mr. Doe, do you smoke at all?
8  A. Yes.
9           (Whereupon Deposition Exhibit
10          No. 3 marked for identification.)
11 BY MR. JAMISON:
12 Q. So if it's not up there yet it will be up
13 there in a minute, and this is a law found at MCL
14 750.27, adulterated cigarettes; do you see that on
15 your screen?
16 A. Yes.
17 Q. Do you know what an adulterated cigarette
18 is?
19 A. No.
20 Q. Have you ever heard of this law before?
21 A. No.
22 Q. Do you see there at the end it says --
23 you know, it goes on and says any person, fill in
24 the blank there, shall be guilty of a misdemeanor;
25 do you see that?

54

1   A. Yeah.
2   Q. So do you -- do you have any knowledge
3 about whether cigarettes are good for you, good
4 for your health?
5   A. Yeah.
6   Q. And what's your knowledge?
7   A. It's a very bad habit.
8   Q. Okay. So in the statute it says any
9 person within the state who manufactures, sells,
10 or gives to anyone any cigarette containing any
11 ingredient deleterious to health or foreign to
12 tobacco shall be guilty of a misdemeanor; do you
13 see that?
14  A. Yes.
15  Q. And that word deleterious, it means
16 damaging or harmful to health. Do you think that
17 cigarettes are harmful to someone's health?
18  A. Yes.
19  Q. So do you think under this statute that
20 someone who sells cigarettes could be guilty of a
21 misdemeanor?
22  A. No.
23  Q. Why not?
24  A. Because people make choices and make
25 decisions.

55

1   Q. Okay. Does this statute say that any
2 person who gives -- sells or gives cigarettes
3 shall be guilty of a misdemeanor?
4   A. Yes.
5   Q. Do you know whether you could be charged
6 with a crime even if you don't understand what
7 this section means?
8   A. No.
9   Q. Do you know how many criminal laws are on
10 the books in Michigan?
11  A. No.
12  Q. Do you know whether you can -- whether
13 the state police has some sort of hotline that you
14 could call them and ask them what this law means?
15  A. No.
16  Q. Do you know whether Governor Whitmer has
17 some sort of hotline where you can call and ask
18 her or her staff what this law means?
19  A. No.
20  Q. Are you aware of whether or not there's a
21 website that explains what this law means?
22  A. No.
23  Q. Do you think if you asked an attorney
24 what this law means they may be able to explain it
25 to you?

56

1   A. Yes.
2   Q. All right. I don't have any other
3 questions.
4           EXAMINATION
5 BY MS. DAVIDSON:
6   Q. I have a few. Mr. Doe, do you need a
7 break or can you go straight through?
8   A. I can go straight through.
9   Q. Okay, I don't have that many. So you
10 testified that you were able to obtain employment
11 despite your conviction; do you remember that?
12  A. Yes.
13  Q. Has your presence on the registry made
14 employment difficult for you?
15  A. Are you talking about from the beginning
16 or...
17  Q. Ever since you've been on the registry
18 has finding employment been difficult for you?
19  A. Well, I -- well, since my conviction in
20 1998 I've been working for family, so I couldn't
21 get into certain jobs, yes, I couldn't. I applied
22 for certain things and I never got accepted
23 because I never passed the background check.
24  Q. Was that because of your presence on the
25 registry?

57

1   A. It was because I'm a sex offender, not
2 because I was a felon.
3   Q. Okay. So when you say it was not because
4 I was a felon, it was because of the sex offender,
5 are you saying it's because of the registry and
6 not the conviction?
7   A. Yes.
8   Q. And did you have employers tell you that?
9   A. I've been denied for that, yes.
10  Q. Okay. And you're currently -- you
11 testified that you are in real estate, correct?
12  A. Yes.
13  Q. Has your presence on the registry made it
14 difficult for you to work in real estate?
15  A. It's -- it's put a cloud over my career,
16 yes.
17  Q. How so?
18  A. Oh, you know, clients are going to Google
19 you. They want to know who you are. It's not
20 somebody is just going to go, you know, see a
21 house with you one-on-one and not, you know, look
22 you up and -- so I've been told before that I am
23 on the sex offender registry and that we will not
24 be working with you by some clients throughout the
25 years.

## 58

It's very tough when you have a website and people are Googling you or looking, you know, in your website and trying to figure out who you are, what your background is, and that always pops up. And it hasn't been really good for business, it hasn't been really good for my life, for my children, so yeah. It has a big effect on life and on work and on my children.

Q. Okay. You said just now twice that it's been hard on your children. Can you explain how your presence on the registry has been hard on your children?

A. You know, there has been times where in school my older -- my older one has heard it a couple times from different kids, you know, some gibberish going around in the school, somebody said something, and it's tough having that conversation with your son. And I have a ▇-year-old son that, you know, is very aware. Even my ▇-year-old, my ▇-year-old understands, you know, so it was a tough conversation to have, and it took a toll, took a toll.

Took me a long time to tell them because I -- I didn't know how to, but when it

## 59

came out in schools and he's in high school and your dad is on the sex offender list, that doesn't sit well with kids, you know, so I couldn't protect them from that.

But then I told him and then I had to tell the other two so they understand because there's bullies in this world, and they're going to use that against them.

Q. Is there any other way that your presence on the registry has been -- has made it difficult to be involved in your kids' lives?

A. Yeah, I've never been on a field trip with any one of them ever. I've never been on a school field trip with any one of them. For the longest time I could never pick up from school, could never be on school property. I'd have to wait on the corner, and I'd have to tell them every day in the morning that this is the corner that you've got to walk to and I'll meet you there.

Because I just wasn't sure if I can be on school properties. It was in the beginning you can, then you couldn't live within a thousand feet, and then you're allowed to, you're not allowed to.

## 60

Like there was times they would get sick in school and thankfully their mom is a schoolteacher, and I had to keep them in the school that she was in in order to have access to them so she could bring them out to me. Up till this day my ▇-year-old goes to the school that she works in.

Q. Let's go back to your career for just a minute. Did you always want to be a real estate agent?

A. No.

Q. What other careers did you consider?

A. When I was -- at the time that they put me on the registry my first year in 1999 I got an opportunity to get into ▇▇▇▇ and I did everything all the way up until they found out that I was a sex offender and on the registry and that I had been convicted of this crime, and I never got accepted for that.

And then in 2000 I was working at a gas station for a friend for one year because if ▇▇▇▇ is not going to accept me, I mean, what corporate America is going to accept me?

Then in 2001 my family bought a gas station, you know, and I started working for my

## 61

family. And I worked with them and got married in 2002 all the way up until I made the transition to real estate because I never trusted putting myself out there anymore. I'm not -- you know, I'm not going to put myself out there anymore, and I didn't trust it anymore and I had to find -- I had to find a way to make a living without anybody knowing who I am. It's like I'm hiding or embarrassing myself or embarrassing my family or my kids.

Q. Okay. You testified earlier that you lost your HYTA status because you didn't comply with the terms of your probation; do you remember that?

A. Yes.

Q. Would you like the opportunity to explain what happened?

A. Yeah, I missed -- so back in the day the registry was you only had between the 1st and the 15th day of the month to register. That weekend had fell -- well, where I -- where I register they have weird hours, so they work like half days on this day, this day, and this day, then half days in the afternoon on this day, so it was -- it was so frustrating. You had to catch it at the right

62

1 time. You had to take off work to get there.
2     And there was this weekend where it
3 was like a holiday or something so the 15th had
4 landed on a Sunday, and I usually try to get there
5 before the 15th. So I had missed registration
6 literally by one day and my probation officer
7 violated me, I lost my HYTA, and it was all
8 downhill from there.
9   Q.  And your probation officer, how did she
10 learn that you had missed registering by one day?
11   A.  I told her. I'm the one who told her.
12 She didn't even -- like she didn't even know
13 because I was -- I was always doing everything I
14 was supposed to do because I wanted to just -- I
15 knew that I was going to get out of this. I was
16 going to be done. I served my time.
17     And I went in there and I told her,
18 I told her on Tuesday. I went in there and I told
19 her, I said, hey, I missed -- I missed it. I -- I
20 registered on the 16th instead of the 15th because
21 it was a holiday weekend and a Sunday and I
22 couldn't get out of work during the week. And she
23 said, oh, no problem, I'm going to have to violate
24 you, just like that.
25     And I was -- never give her -- I'd

63

1 never given her a problem, never had a problem
2 with her ever, and she violated me and I took it.
3 I went back to court and the judge agreed and he
4 revoked my HYTA and that was it.
5   Q.  I'm going to switch to -- switch gears
6 just a little bit here. Do you recall walking
7 through the mail-in registration form with
8 Mr. Jamison?
9   A.  Yes.
10   Q.  And he asked you whether certain
11 provisions were confusing on the form?
12   A.  Yes.
13   Q.  And you testified about what confused you
14 and what didn't, right?
15   A.  Yes.
16   Q.  Is there anything additional about
17 registering that you found confusing?
18   A.  So there is a lot of things that are
19 confusing, you know. As far as me going in to
20 register, number one, it's very frustrating.
21 You've got this person at the desk that will tell
22 you, hey, I need your car. I need your home. I
23 need your this, I need all these different -- all
24 this different information, and I'm like, okay, no
25 problem, I said, but I think that ever since

64

1 our -- you know, our first case and they had said,
2 oh, now you don't have to give them information
3 about your car, your home, your address, your
4 work, nothing. Now you've just got to go in there
5 and be compliant and walk out.
6     But when you get to the desk they're
7 saying, no, you've still got to do this, and
8 you're like, no, I don't. Here's my letter that I
9 got from my attorney's office that I don't anymore
10 have to report this stuff to you, and they're
11 like, no, you do have to report it. I'm like,
12 okay, let's report it.
13     As far as the three day thing when
14 he said about going in to change your address.
15 When I moved to this home in '21 it was June. I
16 had already did my registration in May, so in June
17 I had to go back. When I went back to change my
18 address it was on the back of my license.
19     She -- the lady at the counter told
20 me that I'm in violation. I said, how am I in
21 violation? She's like when did you get this
22 address? I said, I just got this house on
23 June 8th but I -- I registered -- I went to -- you
24 know, I went and did my compliance in May. She's
25 like I'm in violation.

65

1     So every time I go there they're
2 telling me what I'm violating and what I'm not
3 violating, what I have to do and what I can't do.
4 But we won a lawsuit and then we didn't win a
5 lawsuit. Then I'm on the registry, I'm not on the
6 registry, so I'm just all over the place about it.
7 So I just stick to my guns and do what I've been
8 doing for the last 25 years and hopefully I don't
9 get in trouble.
10   Q.  Thank you, Mr. Doe.
11     MS. DAVIDSON: I don't have anything
12 additional, but, Eric, when you are done I will
13 want to put one brief statement on the record.
14     MR. JAMISON: Yeah, I just had a
15 couple of follow-up questions.
16     RE-EXAMINATION
17 BY MR. JAMISON:
18   Q.  So you indicated you had some difficulty
19 with like the prohibitions around you being at
20 schools. You're aware that there's no longer
21 exclusion zones in the law; is that -- are you
22 aware of that?
23   A.  Well, in the -- I was aware that when I
24 did talk to my attorney who actually was a part of
25 the team -- you know, the whole team she did tell

66

1 me that, hey --
2 　　　　　MS. DAVIDSON: Let me just stop you,
3 don't talk about anything that you talked about
4 with any attorneys.
5 　　　　　THE WITNESS: Okay.
6 　　　　　MS. DAVIDSON: It's privileged.
7 BY MR. JAMISON:
8 　　Q.　Yeah, let me just rephrase the question.
9 So are you aware that the law has changed in the
10 last several years that now there's no longer --
11 or that there is no longer a prohibition that
12 would prevent you from being within the thousand
13 foot of a school?
14 　　A.　No, because --
15 　　Q.　You're --
16 　　A.　No, because we couldn't be and then we
17 could be, and now they're saying that they're
18 going back and we can't be, so I don't know if I
19 can be or if I can't be.
20 　　Q.　Who is saying that you can't be?
21 　　A.　The law, the legislature, the -- whoever
22 is making these rules. Every time I look and I
23 get a letter or I get an update on something or I
24 speak to one of my peers they're telling me that,
25 yeah, you're off and you can do this now and you

67

1 can do that now. Then, wait, hold on a second, I
2 think that they're going to come back and they're
3 going to fight it and you're not allowed to do
4 this and you're not allowed to do that. So what
5 am allowed to do? Can I go get my -- can I be a
6 parent? I don't know.
7 　　Q.　Have you looked at the law as it's
8 written since March of 2021?
9 　　A.　I got a letter in the mail from the State
10 of Michigan, I think it was the State of Michigan
11 or the Michigan State Police, something,
12 requesting information about schools or my -- my
13 children's schools or something. I have the
14 letter somewhere but I have to dig it up.
15 　　　　　This was years ago when the law
16 started changing and they took some of the
17 restrictions off of us, but it wasn't 100 percent
18 that I was convinced that these restrictions were
19 off of us because it was the time that there was a
20 lawsuit that we were going and fighting to remove
21 these restrictions, so I wasn't 100 percent clear
22 on it.
23 　　Q.　And where do you register? Do you
24 register at a State Police Post or do you register
25 at a sheriff's office?

68

1 　　A.　Local, local police station.
2 　　Q.　Understood. That's all the questions I
3 have.
4 　　　　　MS. DAVIDSON: Okay, and I don't
5 have anything else. I just want to again
6 acknowledge the protective order. Thank you for
7 doing that on the record at the beginning. I just
8 want to note here that there have been some
9 accidental disclosures, and under the protective
10 order plaintiffs must be given the opportunity to
11 review and redact the transcript as necessary
12 before it's filed to make sure there's no
13 identifying information.
14 　　　　　MR. JAMISON: Yeah. Is there
15 anything speci- -- I know he mentioned -- I think
16 he mentioned the name of an employer. Is there
17 anything else that you caught? I'm not going to
18 hold you to it obviously but just trying to
19 understand the categories of information that
20 you're concerned about.
21 　　　　　MS. DAVIDSON: Sure. That's the
22 only thing I recall offhand, but obviously I'll
23 review it when it comes.
24 　　　　　MR. JAMISON: Okay. All right,
25 thank you for your time, Mr. Doe.

69

1 　　　　　MS. DAVIDSON: Thank you.
2 　　　(Whereupon Deposition concluded
3 　　　　　at 11:56 a.m.)

```
 1   STATE OF MICHIGAN )
                       ) SS
 2   COUNTY OF KENT    )

 3

 4         I, Tamara Staley Heckaman, Certified
 5   Shorthand Reporter and Notary Public in and for
 6   the County of Kent, State of Michigan, do hereby
 7   certify that the foregoing Deposition was taken
 8   before me remotely at the time and place
 9   hereinbefore set forth.
10         I further certify that said witness was
11   duly sworn in said cause to tell the truth; that
12   the testimony then given was reported by me to the
13   best of my ability; subsequently produced under my
14   direction and supervision; and that the foregoing
15   is a complete, true, and correct transcript of my
16   original shorthand notes.
17         IN WITNESS WHEREOF, I have hereunto set
18   my hand and seal this April 24, 2023.
19
20
                    _____
21                  Tamara Staley Heckaman, CSR-3443,
                    Certified Shorthand Reporter,
22                  and Notary Public, County of
                    Kent, State of Michigan.
23
                    My Commission Expires:  5-20-24
24
25
```