# Exhibit 57:

## John Doe C Deposition Transcript (redacted)

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                   SOUTHERN DIVISION

 4   - - - - - - - - - - - - - - - - -
                                       )
 5   JOHN DOES A, B, C, D, E, F, G, H, )
     MARY DOE and MARY ROE, on behalf  )
 6   of themselves and all others      )
     similarly situated,               )
 7                                     )
                          Plaintiffs,  )
 8                                     )
       -vs-                            )No. 2:22-cv-10209
 9                                     )Judge Goldsmith
     GRETCHEN WHITMER, Governor of the )Mag. Ivy, Jr.
10   State of Michigan, and COL. JOSEPH)
     GASPER, Director of the Michigan  )
11   State Police, in their official   )
     capacities,                       )
12                                     )
                          Defendants.  )
13   - - - - - - - - - - - - - - - - -

14

15          R E M O T E   D E P O S I T I O N

16   of JOHN DOE C, a witness called by Defendants,

17   taken via Zoom before Tamara Staley Heckaman,

18   Certified Shorthand Reporter and Notary Public, on

19   Monday, April 10, 2023, noticed for the hour of

20   1:30 p.m.

21

22
                     HECKAMAN & NARDONE, INC.
23                  Certified Shorthand Reporters
                           P.O. Box 27603
24                    Lansing, Michigan 48909
                          (517) 349-0847
25                     theckaman@live.com
```

**Page 2**

```
 1  APPEARANCES:
        AMERICAN CIVIL LIBERTIES UNION
 2      FUND OF MICHIGAN
        2966 Woodward Avenue
 3      Detroit, Michigan 48201
     By
 4      SYEDA DAVIDSON, J.D.
             -and-
 5      AMERICAN CIVIL LIBERTIES UNION
        FUND OF MICHIGAN
 6      1514 Wealthy SE, Suite 260
        Grand Rapids, Michigan 49506
 7   By
        DAYJA TILLMAN, J.D.
 8
             On behalf of Plaintiffs.
 9
10      MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
        MDOC Division
11      P.O. Box 30217
        Lansing, Michigan 48909
12   By
        ERIC M. JAMISON, J.D.
13
             On behalf of Defendants.
14
15           EXAMINATION INDEX
16   ATTORNEY'S NAME  EXAMINATION RE-EXAMINATION
17   BY MR. JAMISON:       4
18   BY MS. DAVIDSON:     54
19           *    *    *
20           INDEX OF EXHIBITS
21   EXHIBIT                          MARKED
22   No. 1  Michigan Sex Offender Registry    32
23      Mail-In Update
24   No. 2  Excerpts from CSC court opinions  46
25
```

**Page 3**

```
 1              Remote Deposition
 2              March 31, 2023
 3              1:32 p.m.
 4              R E C O R D
 5           COURT REPORTER: The attorneys
 6   participating in this deposition acknowledge that
 7   I am not physically present in the deposition room
 8   and that I will be reporting this deposition
 9   remotely. They further acknowledge that in lieu
10   of an oath administered in person the witness will
11   be sworn remotely and his testimony in this matter
12   is under penalty of perjury. The parties and
13   their counsel consent to this arrangement and
14   waive any objections to this manner of reporting.
15           Please indicate your agreement by
16   stating your name and your agreement on the
17   record.
18           MR. JAMISON: Eric Jamison, I agree
19   to the waiver.
20           MS. DAVIDSON: Syeda Davidson, I
21   agree.
22           MR. DOE C: Do I say my full name or
23   John Doe C?
24           MS. DAVIDSON: John Doe C.
25           MR. DOE: John Doe C, I accept.
```

**Page 4**

```
 1              JOHN DOE C,
 2   having been duly sworn, testified as follows:
 3              EXAMINATION
 4   BY MR. JAMISON:
 5       Q.  Good afternoon, my name is Eric Jamison
 6   and I'm an assistant attorney general, and I
 7   represent the two defendants that you're suing in
 8   this lawsuit, which are Governor Whitmer and
 9   Colonel Gasper, who is the director of the State
10   Police. I noticed your deposition in this case,
11   which is captioned Does v Whitmer, and it's case
12   number 2:22-cv-10209, in the District Court of the
13   Eastern District of Michigan in front of the
14   Honorable Judge Goldsmith.
15           There's a protective order in place
16   in this case, and that's found in the record at
17   ECF number 88, page ID 2389 through 2395, which
18   protects your identity.
19           Tami, could you confirm that you've
20   read the protective order and signed the
21   acknowledgement?
22           COURT REPORTER: I have, yes.
23           MR. JAMISON: And, Counsel, will you
24   confirm that the person tendered is, in fact, John
25   Doe C?
```

**Page 5**

```
 1           MS. DAVIDSON: Yes.
 2   BY MR. JAMISON:
 3       Q.  So, Mr. Doe, I'll do my best just to
 4   refer to you as John Doe throughout the
 5   deposition, and I'm going to try my best not to
 6   ask you any questions that will identify you, like
 7   the street that you live on or the name of your
 8   employer or any family members or anything like
 9   that, so hopefully that will make things easier on
10   the end for your attorney and for us.
11           Have you had your deposition taken
12   before?
13       A.  Yes.
14       Q.  And when was the last time you had your
15   deposition taken?
16       A.  I don't remember the exact year, but
17   it -- it was three, like two or three years ago, I
18   believe. I'm not sure.
19       Q.  And what was -- what lawsuit was your
20   deposition taken in?
21       A.  What do you mean, what lawsuit?
22       Q.  Like what was the lawsuit about?
23       A.  About what we're talking about now, the
24   registry.
25       Q.  Okay, got it. And were you represented
```

**Page 6**

1 by the ACLU in that lawsuit?
2    **A. Yes.**
3    Q. And I'll just review the rules fairly
4 quickly about depositions. So you can't give a
5 verbal response because Tami won't be able to
6 record -- or, I'm sorry, you have to give verbal
7 responses. You can't just shake your head --
8    **A. Okay.**
9    Q. -- because Tami won't be able to record
10 that. We have to try to avoid talking over each
11 other because if I'm asking a question, then you
12 start to jump in with an answer, Tami won't be
13 able to record that either. So I'll do my best to
14 wait to ask you any follow-up questions until
15 you've fully responded, and if you can wait to
16 answer until I've fully gotten the question out.
17         And if you don't understand the
18 question you can ask me to rephrase it. I'm not
19 trying to trick you with the way that I'm asking
20 any questions. And if you answer a question I'll
21 assume that you understood the question that I
22 asked; is that fair?
23    **A. Yes.**
24    Q. Okay. Are you taking any medication or
25 under the influence of any substances that might

**Page 7**

1 affect your memory?
2    **A. No.**
3    Q. Or anything that might affect your
4 ability to answer questions truthfully today?
5    **A. No.**
6    Q. Aside from the previous lawsuit involving
7 the same -- the SORA, have you been involved in
8 any other lawsuits?
9    **A. No.**
10    Q. Did you review any documents to prepare
11 for this deposition?
12    **A. Just a document when I first did the**
13 **deposition the first time.**
14    Q. And that was several years ago?
15    **A. Yes.**
16    Q. And do you still live in Michigan?
17    **A. Yes.**
18    Q. Is that the west part of Michigan?
19    **A. Yes.**
20    Q. And are you currently married?
21    **A. Yes.**
22    Q. And do you have any children?
23    **A. I have five, two with a previous**
24 **relationship and three with my wife now.**
25    Q. And what ages are your kids?

**Page 8**

1    **A.** ▉
2    Q. And the -- are any of the children
3 children that you had with the victim that led to
4 your criminal sexual conduct charge?
5    **A. Yeah, my wife, I have three with her,**
6 **yes, the** ▉**, the** ▉
7    Q. So the way I understood your complaint,
8 though, the -- you had sex with the -- the victim,
9 she was ▉ she became impregnated. Was that
10 child born?
11    **A. Yes, um-hum.**
12    Q. And how old is that child?
13    **A. She is** ▉**. She'll be** ▉**.**
14    Q. So you have a ▉-year-old, a ▉-year-old,
15 a ▉-year-old, a ▉-year-old, and a ▉-year-old?
16    **A. Yes.**
17    Q. And the ▉-year-old, ▉-year-old, and
18 ▉-year-old are all with the same woman?
19    **A. Not the same -- the three that I got with**
20 **my wife now? Yes.**
21    Q. Okay.
22    **A. They're** ▉**.**
23    Q. And then the ▉-year-old children,
24 are those with the same women or are those
25 different women for the mothers?

**Page 9**

1    **A. They're -- they're the same mom with the**
2 **21 and 15.**
3    Q. So my understanding is that your first
4 CS -- or the CSC conviction that led to you being
5 on the registry, that occurred around the time you
6 were 23; is that right?
7    **A. Yes.**
8    Q. And can you tell me what types of jobs
9 you had between the ages of 18 and 23?
10    **A. I worked for automotive companies.**
11    Q. And what does that mean, like in
12 factories, in sales?
13    **A. Factories, factories, sorry.**
14    Q. And did you work for multiple companies
15 or was it the same company the whole time?
16    **A. I worked for multiple because some**
17 **were -- were hourly, let go of some.**
18    Q. And why were you let go?
19    **A. Because of the registry.**
20    Q. Okay. So how many companies would you
21 say that you worked for between the ages of 18 and
22 23?
23    **A. I would say three or four.**
24    Q. And what was your approximate level of
25 income when you worked at those companies?

### Page 10

1  A. How much I was making per hour?
2  Q. Yeah.
3  A. I would say like 12 to 13 dollars an
4  hour.
5  Q. And then since your conviction when you
6  were 23 what types of jobs have you held?
7  A. Did I hold?
8  Q. Yeah.
9  A. I was working for the -- for an
10 automotive factory when I was around that age, 23.
11 Q. And approximately how much money were you
12 making then?
13 A. I would say like the same, 12, 13.
14 Q. And what have you done since you worked
15 there?
16 A. What have I done since I worked --
17 Q. Yeah, what types of jobs. I'm trying to
18 understand your job history, so from what I heard
19 today you worked at some automotive companies from
20 the time you were 18 to 23, and then from 23 on
21 I'm trying to understand what jobs --
22 A. So mainly --
23 Q. -- you've had.
24 A. -- I've worked for factories, and then I
25 got the job that I've got now that I've been there

### Page 11

1  for ten years.
2  Q. What industry is the job in, the job that
3  you have now?
4  A. Sales.
5  Q. And what's your approximate level of
6  income in the sales job that you have?
7  A. I make like $10 an hour to 11.
8  Q. In the current job that you have that
9  you've had for ten years, are they aware of
10 your --
11 A. No.
12 Q. -- criminal -- they have no idea of your
13 criminal history?
14      MS. DAVIDSON: Can I just jump in
15 here for a minute? Mr. Doe, you do have to let
16 Mr. Jamison finish his question even if you think
17 you know where he's going with it.
18      THE WITNESS: Oh, okay, sorry.
19      MS. DAVIDSON: That's okay, it's
20 easier for the court reporter.
21      THE WITNESS: Okay, sorry.
22 BY MR. JAMISON:
23 Q. She has the hardest job right now just
24 trying to --
25 A. No, I apologize.

### Page 12

1  Q. All right. So your current employer,
2  they have no idea of your criminal history to --
3  A. No.
4  Q. -- your knowledge?
5  A. No.
6  Q. Did you have to fill out an application
7  when you applied for that job; do you remember?
8  A. I did not, no.
9  Q. And how did you get that job, then,
10 without filling out an application?
11 A. A friend of mine was working there and
12 got me the job.
13 Q. And what kind of sales is it?
14 A. Cell phone.
15 Q. And then the times -- we'll say from the
16 time you were 23 until the time you got this job
17 at a cell phone company, those factories you
18 worked at, did you have to disclose to them your
19 criminal history?
20 A. Not at the time because I was already
21 employed by the -- by them, so I didn't think of
22 telling them when I got that offense, if it makes
23 sense.
24 Q. And then after you got your offense is
25 the next job you had was at a cell phone company?

### Page 13

1  A. Correct, yeah, yes.
2  Q. And in -- during the time that you've
3  been at the cell phone company have you been on
4  the public registry at all?
5  A. I have, yes.
6  Q. And do you know if you're currently on
7  the public registry?
8  A. I am not at the moment.
9  Q. So is it fair to say that even being on
10 the public registry you're able to maintain
11 employment at the same employer that you're still
12 at?
13 A. If I would have -- okay, say what? Can
14 you repeat that, please?
15 Q. Yeah, so is it accurate or is it fair to
16 say that you are on the public registry and you're
17 still at the same job that you were at when you
18 were on the public registry?
19 A. He doesn't know of -- of that so I can't
20 really answer that. I don't know how to answer
21 that.
22 Q. Okay. Have you been on the public
23 registry in the last ten years?
24 A. Yes, I have.
25 Q. Do you know when you came off the public

14

1 registry?
2  A. Not -- not exactly, no.
3  Q. Do you know approximately?
4  A. I would say six months to a year, I
5 believe. I don't -- I don't remember. I don't
6 recall the time, how long it's been.
7  Q. Did you -- did you attend college from
8 the time that you were 18 to 23?
9  A. No.
10  Q. Did you try to attend -- did you ever
11 apply to a college from the time you were 18 to
12 23?
13  A. I have asked but with me being on the
14 registry it made it difficult to do all that
15 because they look into the registry.
16  Q. Yeah, I understand. I'm focusing on the
17 period of time, though, before you were on the
18 registry --
19  A. Oh, before --
20  Q. -- from the age of 18 to 23?
21  A. -- I was on the registry? I was -- I
22 wasn't -- I didn't finish high school so now and
23 then I would try to go back to get my GED at
24 least.
25  Q. Have you obtained your GED?

15

1  A. Yes.
2  Q. And do you recall what year that was?
3  A. I do not. It's been a while. I don't
4 remember the date in there.
5  Q. Was that before or after your conviction?
6  A. After, after.
7  Q. And after your conviction did you ever
8 apply to college?
9  A. I -- I haven't applied but I tried to ask
10 the school that I attended the GED, and they told
11 me they looked into the registry and they
12 basically told me that I would have to go through
13 a process to get approved by the state and all
14 that, so I've never bothered to do it.
15  Q. Did you ever want to attend college?
16  A. For sure, of course, so I can better --
17 get better pay, better living, for sure.
18  Q. Did you ever look into it further beyond
19 what the GED school told you?
20  A. I have and it's been -- the law, how it
21 is is kind of -- I don't understand it, so I
22 didn't really pursue it because of that. I don't
23 understand what the requirements are, they change
24 it all the time, so I don't -- I didn't do it
25 because of that. I don't understand it, so I

16

1 didn't go further to that.
2  Q. Did you ever seek out the assistance of
3 an attorney to find out what the limitations might
4 be?
5  A. The only help I got was with ACL -- I
6 didn't have money to pay for an attorney like
7 that.
8  Q. And did you ever do any research yourself
9 to find out what the limitations might be on
10 attending college?
11  A. Not after the -- the series of what I had
12 to do to go to school, you know. It's just the
13 law under that was so difficult for me, so I never
14 even bothered to do it after that because the law
15 is just -- I don't understand it. Like it's hard
16 to follow and I don't get it, so I didn't pursue
17 it, no.
18  Q. Did you ever attend a trade school?
19  A. Trade school, like what's that?
20  Q. Like mechanic school, HVAC, anything like
21 that?
22  A. No.
23  Q. Did you ever try to attend a trade
24 school?
25  A. Where I did my GED I tried to, but,

17

1 again, they looked into the registry and obviously
2 I wasn't able to be there, but I -- I was there
3 because of the my probation so they basically had
4 to have me there. So I didn't pursue it because
5 of the law that it requires everything to do I
6 don't understand it, so I didn't bother to do --
7 continue to do it.
8  Q. Do you have any sort of professional
9 licenses?
10  A. Just a driver's license.
11  Q. Would you say it's difficult for you to
12 find employment because of your CSC conviction?
13  A. My registry, yes. I believe so, yes, my
14 registry.
15  Q. And what makes you think it's the
16 registry rather than your conviction?
17  A. Because now that I'm not on the registry
18 publicly I can do things with my kids. Like I
19 feel more comfortable. I don't feel like I'm
20 being watched and, how do you say, like there --
21 you can feel the difference. Before when I was on
22 it you can feel people like talking about it. I
23 can overhear those things. People don't think I
24 might be hearing but I do.
25  Q. I'm asking about employment, though, so

18

1 do you think it's more difficult to find
2 employment because of your CSC conviction?
3     **A.  On the registry, yes.**
4     Q.  Okay, so what makes you think that being
5 on the registry makes it more difficult to find
6 employment?
7     **A.  Because once when I was employed in a**
8 **factory because of the registry, someone knew I**
9 **was on the registry, and that's when I lost my job**
10 **because they looked in the registry and they saw**
11 **that I was on it.**
12     Q.  And now that you're off the registry you
13 haven't -- have you sought to obtain other
14 employment?
15     **A.  I have not because, you know, of the law.**
16 **I don't understand the registry as it is now, and**
17 **I've been with this employer for ten years. I**
18 **don't want to risk the chance of me looking for**
19 **another job. Even though at the moment I'm off**
20 **the registry, public registry, but I just don't --**
21 **I can't afford to take that chance.**
22     Q.  Do you know if employers ask about
23 criminal history on applications?
24         MS. DAVIDSON:  Objection, calls for
25 speculation.  Sorry, we talked at the same time.

19

1 How would you like to clarify that?
2 BY MR. JAMISON:
3     Q.  Yeah, could you just answer the question
4 again, do you know if employers ask about criminal
5 history on applications?
6     **A.  They do, yes.**
7     Q.  And do you have any friends or family
8 members that have felony records?
9     **A.  Not that I know of, no.**
10     Q.  Do you think it might be harder to obtain
11 employment if you have a felony on your record?
12     **A.  With the --**
13         MS. DAVIDSON:  Objection, calls for
14 speculation.  You can answer still.
15         THE WITNESS:  With the registry I
16 believe, yes, it's harder for me to get
17 employment, yes, elsewhere or if I looked
18 elsewhere, yes.
19 BY MR. JAMISON:
20     Q.  Yeah.  My question's a little bit
21 different, though, because from what I understand
22 you're not currently on the registry, so my
23 question is do you think that your felony
24 conviction will make it more difficult for you to
25 obtain employment?

20

1         MS. DAVIDSON:  And same objection,
2 and you can still answer.
3         THE WITNESS:  I say the registry
4 because that was the issue before.  Like me being
5 on the public registry everyone and anyone can
6 see.  If it's just the employer that's different
7 but it's not like that.  Once the public sees it
8 they can -- they can go to the -- like I lost my
9 job because of me being on the registry.
10 BY MR. JAMISON:
11     Q.  Yeah, and you're no longer on the
12 registry, so I'm asking do you think, if you
13 wanted to look for a different job tomorrow do you
14 think it would be difficult for you to find
15 another job tomorrow because of your felony that's
16 on -- currently on your record?
17     **A.  I don't know how to answer that because I**
18 **didn't -- I'm not seeking for another job because**
19 **I'm with my employer now that I've been with for**
20 **ten years, so I -- I don't know how to answer**
21 **that.  I'm not seeking for another job at the**
22 **moment.**
23     Q.  Understood.  What type of housing did you
24 live in from the age of 18 to 23?  Did you have a
25 home; did you live in an apartment; did you live

21

1 with family members?
2     **A.  So I was living with family members.**
3     Q.  And what type of housing did you live in
4 after your conviction?
5     **A.  I was living with my family members.**
6     Q.  So your housing arrangement didn't change
7 after your conviction?
8     **A.  It did, yes.**
9     Q.  And how did it change?
10     **A.  Me being on the registry forced my mother**
11 **to -- I couldn't live with my mother.  Then**
12 **because I was on the registry again they -- they**
13 **told her I had to -- I can't live there.**
14         **And then I moved in with my sister,**
15 **and the same thing, since I was on the registry I**
16 **couldn't be in those apartments, yeah.**
17     Q.  And what type of housing do you live in
18 now?
19     **A.  I live with my wife at a house.  It's my**
20 **father-in-law's house, so that's why I don't have**
21 **an issue.**
22     Q.  And how long have you lived in that
23 current house?
24     **A.  I would say like -- I don't really**
25 **remember exactly when -- how long it's been.  I**

22

1 would say six to eight years.
2   Q.  So you -- is it accurate to say that
3 you've lived in that house when you're on the
4 registry and now you're off the registry?
5   **A.  Yes.**
6   Q.  Do you remember when you were first
7 placed on the public registry?
8   **A.  The exact date, no.**
9   Q.  No, just approximately.
10   **A.  I believe it was 2006, 2007, around**
11 **there.  I'm not really sure of exact date and**
12 **year.  It's one of those two years.**
13   Q.  And you were around 23 years old at the
14 time?
15   **A.  Yes.  I've got to change my ear piece**
16 **right quick, hold on.**
17   Q.  Okay.
18   **A.  Sorry.  You can still talk.  I'm just**
19 **changing my ear piece.**
20   Q.  All right, got it.  I think I already
21 asked you this, but you don't recall when you were
22 removed from the public registry, because you're
23 no longer on the public registry, right?
24   **A.  Correct, at the moment I'm not, but I**
25 **don't remember the exact date that I was off the**

23

1 registry, no.
2   Q.  And I think you said you thought it was
3 in the last year or so or 18 months or something;
4 does that sound right?
5   **A.  (Loss of transmission.)**
6   Q.  We can't hear you very well.  You're
7 going to have to switch your audio.
8       MS. DAVIDSON:  We can't hear you.
9       THE WITNESS:  Now?
10 BY MR. JAMISON:
11   Q.  Yeah, that's better.
12   **A.  Sorry.**
13       MR. JAMISON:  All right.  Tami, did
14 you catch all of that?
15       COURT REPORTER:  I didn't because I
16 couldn't really hear him, so I didn't want to
17 guess what he was saying.
18 BY MR. JAMISON:
19   Q.  Okay, let me back up a minute then.  So I
20 think you already said that the last six -- six
21 months to a year ago you think you were removed
22 from the public registry?
23   **A.  Around six months to a year.  I'm not**
24 **sure of the exact date.**
25   Q.  Okay.  I want to talk a little bit about

24

1 the situation that led to you being convicted, you
2 know, the CSC conviction, and I'll ask you a few
3 questions.  Can you hear me?
4   **A.  Say what now?**
5   Q.  Yeah, can you hear me now?
6   **A.  I can hear you now, yeah.  Sorry, I don't**
7 **know what's going on.**
8   Q.  So I'm going to ask you a series of
9 questions about what led to you being on the
10 registry.  I'll refer to that as the CSC
11 conviction, but just to be clear, do you have any
12 other criminal convictions on your record?
13   **A.  No.**
14   Q.  Okay.  So I'll ask you questions about
15 your CSC conviction, and I'm talking about what's
16 in the lawsuit.  It says it was in 2005 that you
17 had some sort of relationship with a girl and
18 that's what led to you being on the registry.  So
19 at the time you were 23 and the victim was
20 15-years-old; is that right?
21   **A.  Yes.**
22   Q.  And if I'm doing my math right at that
23 time you already had one child who was about
24 ▮-years-old?
25   **A.  ▮▮▮▮, ▮▮▮▮-years-old.**

25

1   Q.  Okay.  So you were about 20 years old
2 when you had the first child?
3   **A.  Yes.**
4   Q.  Had you ever been to a nightclub before?
5   **A.  Yes.**
6   Q.  And how often did you go to the
7 nightclub?
8   **A.  Weekends.  It depends if I felt to go out**
9 **that weekend.**
10   Q.  Was it a fairly common occurrence for you
11 to go?
12   **A.  At the time, yes.**
13   Q.  Had you ever snuck into a nightclub
14 before you were 18?
15   **A.  No.**
16   Q.  Had you ever heard of anyone sneaking --
17 underage sneaking into a nightclub?
18   **A.  I mean, not that I -- I never snuck in so**
19 **I wouldn't -- I can't speak on other people.  I**
20 **don't know.**
21   Q.  You never heard of that, though, that
22 underage people want to get into nightclubs?
23   **A.  Have I heard it, yes, but do I know**
24 **somebody that did it, no.**
25   Q.  And the victim, you met her at the

26

1 nightclub in the summer of 2005; is that right?
2   A.  I believe so. I don't remember the exact
3 date and year.
4   Q.  And can you tell me what happened when
5 you met her at the nightclub?
6   A.  It was an 18 and over nightclub. You
7 have to show ID. And, you know, I seen her, I
8 said -- we talked, and one thing led to another.
9   Q.  And did you have sex with her that night?
10   A.  I don't -- I don't recall. I don't
11 remember. It's been so long I don't remember.
12   Q.  Do you recall how many times you had sex
13 with her?
14   A.  I don't remember, no.
15   Q.  Was it more than once?
16   A.  It's been more than once, yes.
17   Q.  Was it on more than one occasion?
18   A.  I would say yes.
19   Q.  Was it more than ten times?
20   A.  Yes.
21   Q.  Was it more than 50 times?
22   A.  I don't know, like, I don't know. I
23 can't keep track of how many times we had sex.
24   Q.  Okay. Did you -- were you in a dating
25 relationship with her?

27

1   A.  No.
2   Q.  How long were you in a relationship with
3 her after you met at the nightclub?
4   A.  What do you mean by relationship? As a
5 friend?
6   Q.  Well, yeah, maybe I should define it.
7 You had sex with this -- with the victim at
8 least -- I think we said it was ten times, so I'm
9 trying to understand, were you guys in a dating
10 relationship, did you just hang out? You had sex
11 once every three months when you saw each other?
12   A.  We were -- I mean, I don't know -- like
13 we were friends. We were friends.
14   Q.  And how long were you friends for from
15 the time that you met at the nightclub until you
16 were -- until you were charged with a crime?
17   A.  We -- I mean, we became friends that
18 night, and I'm married to her until this day.
19   Q.  Yeah, I'm trying to understand, though,
20 between the time you met at the nightclub and the
21 time that you were charged how much time are we
22 talking about? Is that three days or is that six
23 months or two years?
24   A.  That I have known her?
25   Q.  The time between when you met her at the

28

1 nightclub and when you were charged with a crime.
2   A.  I'm not understanding the question.
3 Like, I'm not understanding what you're trying to
4 tell me.
5   Q.  All right, I can reask it. So from what
6 I understand you met the victim in the summer of
7 2005 at a nightclub; is that right?
8   A.  Yes.
9   Q.  And then in -- let's see, either in 2005
10 or 2006 you were charged with criminal sexual
11 conduct; is that right?
12   A.  Yes.
13   Q.  So is it fair to say that between the
14 time you met her in the summer of 2005 to the time
15 that you were charged in 2006 that you maintained
16 a friendship with her?
17   A.  I couldn't really because of the -- I was
18 convicted of the crime we didn't keep in touch for
19 like a year or two.
20   Q.  Yeah, I'm just asking up until the point
21 when you were charged with a crime did you
22 maintain a friendship with her?
23   A.  I would say yes.
24   Q.  Did you ever go to her house?
25   A.  Did I go to her house? No.

29

1   Q.  Did she ever come to your house?
2   A.  No.
3   Q.  Did she drive a car?
4   A.  Not when I -- when I met her, no, she
5 didn't drive a car.
6   Q.  Do you know if she went to high school?
7   A.  Did I know -- I didn't know her when we
8 first met, so I didn't ask her anything.
9   Q.  Sure, but after you met did you learn
10 that she went to high school?
11   A.  No, I didn't. We'd like -- when we
12 talked it wasn't about anything. It was just we
13 were there and things led to one thing and that's
14 it. We didn't really converse about if you're in
15 high school or stuff like that.
16   Q.  So what did you guys do together as
17 friends?
18   A.  We talked and just one thing led to
19 another, just talking about that night that we
20 went out or how -- what is she doing for the day,
21 things like that.
22   Q.  Did she ever tell you that she's going to
23 high school for the day?
24   A.  No.
25   Q.  And when did you come to learn that she

30

1  was 15-years-old?
2     A.  **When I got convicted, um, when the**
3  **detective came to my mother's house looking for**
4  **me.**
5     Q.  And aside from the fact that she was in a
6  nightclub was there anything else that indicated
7  that she was over 18 years old?
8     A.  **I mean, she was at the nightclub. She --**
9  **she was there so I would believe she was 18 years**
10 **old, yes.**
11    Q.  Did you know at the time that it was
12 illegal to have sex with kids under the age of 18?
13    A.  **Under the age of 18?**
14    Q.  Yeah.
15    A.  **Of course, yes.**
16    Q.  And you didn't try to find out how old
17 she was before you had sex with her?
18    A.  **I did not. The club was 18 and over, so**
19 **I would assume they were doing their job, you**
20 **know, 18 and over. They're closed now but 18 and**
21 **over, I would assume that the person that's**
22 **getting into the nightclub is over 18.**
23    Q.  Okay. And how often do you have to show
24 up in person to verify your information with law
25 enforcement?

31

1     A.  **Four, four times a -- so every -- four**
2  **times a year, I believe, so every three is it**
3  **quarters that you guys call it, I believe? I**
4  **don't know. Like, so my next verification is in**
5  **May, and then I believe -- it's like two or**
6  **three months so like four times a year.**
7     Q.  And when you verify do you verify at a
8  Michigan State Police Post or do you verify at a
9  sheriff's department or something?
10    A.  **At the police department.**
11    Q.  And is it the local police department?
12    A.  **Yes.**
13    Q.  And how long does it take you to verify
14 each time you go?
15    A.  **I would say 15 to 20 minutes.**
16    Q.  And aside from those four times a year
17 that you have to verify, have you had to show up
18 in person to update any other information of yours
19 since March of 2021?
20    A.  **Like update what information?**
21    Q.  Well, I think in the law if you get a new
22 address or you get a new car you have to update
23 information within a certain number of days. Have
24 you had to do that since March of 2021?
25    A.  **No.**

32

1     Q.  Are you aware that now you can mail in
2  updates to certain information?
3     A.  **I was not aware, no.**
4     Q.  So is it accurate to say that you haven't
5  mailed in any updates?
6     A.  **I don't have no updates to do so I**
7  **haven't mailed anything, and I go to the place and**
8  **register.**
9             (Whereupon Deposition Exhibit
10            No. 1 marked for identification.)
11 BY MR. JAMISON:
12    Q.  All right, I'm going to share my screen.
13 I'm not sure how well it's going to work on your
14 phone, but, let's see, in just a minute you should
15 see a document up on your screen. Do you see that
16 yet?
17    A.  **Yes. Um-hum, yes.**
18    Q.  That's a Michigan Sex Offender Registry
19 Mail-In Update. Have you seen that form before?
20    A.  **I have not, no.**
21    Q.  Okay. I'll scroll down. This is page
22 two of the document. This is explanation of
23 duties to register as a sex offender, and have you
24 seen this form before?
25    A.  **When I go register it comes with the**

33

1  **packet that I get.**
2     Q.  Okay, so that's a yes, you've seen this
3  one before?
4     A.  **Yes.**
5     Q.  I want to draw your attention to a couple
6  parts of this. So there's a line here that's line
7  four, it says, upon registering as a sex offender
8  I'm required by law to provide the following
9  information, and the first one is A there, it says
10 my legal name and alias; do you know what a legal
11 name is?
12    A.  **My name?**
13    Q.  Yeah, do you know what that means?
14    A.  **Yeah, my -- my full name, yeah.**
15    Q.  Yup. Do you know what a nickname is?
16    A.  **Yes.**
17    Q.  Do you know what any other name by which
18 I have been known, do you know what that means?
19    A.  **By the name that I go by only?**
20    Q.  So are you confused at all about what you
21 have to report to law enforcement regarding --
22    A.  **At certain times, yes.**
23    Q.  -- names?
24    A.  **My name, no.**
25    Q.  So we'll go through this sort of

## 34

1  line-by-line, and, you know, I'll be asking you
2  basically the same questions to see if you have
3  any -- if you understand what you're supposed to
4  report and if you're confused about it, so if you
5  are confused about some provisions then I'm sure
6  we'll get to it.
7      **A.   Okay.**
8      Q.   So the next one asks for your social
9  security number.  Do you know what a social
10 security number is?
11     **A.   Yes.**
12     Q.   And how would you describe that to
13 someone?
14     **A.   What do you mean, to someone?**
15     Q.   Like if somebody asked you -- if somebody
16 was like, hey, I don't know what a social security
17 number is, what would you explain?  How would you
18 explain that to somebody?
19     **A.   I mean, that's a personal identification**
20 **that you get when you're born.**
21     Q.   Okay.  And it says or alleged security
22 number that I have previously used.  Do you have
23 any idea what that might mean?
24     **A.   No.**
25     Q.   Do you know what previously using

## 35

1  something means?
2      **A.   I do.**
3      Q.   What does it mean?
4      **A.   Like something that I've used before.**
5      Q.   Okay.  So if you have to report to law
6  enforcement social security numbers that you used
7  before, do you know what that means?
8      **A.   Yeah, that's my social security number.**
9      Q.   Okay.  And then the next line is 4C.  It
10 says my date of birth and any alleged dates of
11 birth that I've previously used; do you see -- do
12 you know what that means?
13     **A.   My date of birth, yes.**
14     Q.   And dates of birth that I've previously
15 used, do you know what that means?
16     **A.   Yes.**
17     Q.   And what does that mean?
18     **A.   My birthday.**
19     Q.   Yup.  And the next part is the address
20 where I reside or will reside; do you know what to
21 reside means?
22     **A.   Where you're living.**
23     Q.   Is there anything confusing about that
24 requirement to report to law enforcement that you
25 provide them the address where you reside?

## 36

1      **A.   That's where I live at.**
2      Q.   Is there anything --
3      **A.   So no.**
4      Q.   -- confusing about that?
5      **A.   No.**
6      Q.   Let's see, the next one is E, the name
7  and address of any temporary lodging used or to be
8  used when I'm away from my residence for more than
9  seven days; do you know what that means?
10     **A.   That -- like what does -- I really don't**
11 **understand that, no.**
12     Q.   Okay.  Do you know what temporary lodging
13 means?
14     **A.   No.  No, I don't understand what it's**
15 **asking.**
16     Q.   Do you know what being away from your
17 residence for more than seven days means?
18     **A.   Like if I'm -- like if I'm not at my**
19 **house?**
20     Q.   Are you asking a question or is that your
21 answer?
22     **A.   No, I'm asking you a question, is that**
23 **like not being at my own home?**
24     Q.   Yeah, I'm asking you if you understand
25 it.  If you don't that's okay.

## 37

1      **A.   I mean...**
2      Q.   You don't know what it means to be away
3  from your house for more than seven days?
4      **A.   Yes, I do, yes.**
5      Q.   Okay.  The next provision asks for the
6  name and address of your employer; do you know
7  what an employer is?
8      **A.   Yes.**
9      Q.   Do you have any confusion about what it
10 means to report the name and address of your
11 employer?
12     **A.   No.**
13     Q.   The next one asks for the name and
14 address of any school that I attend.  Do you know
15 what a school is?
16     **A.   I do.**
17     Q.   Do you have any confusion about what
18 you'd have to report to law enforcement if you
19 attended a school?
20     **A.   Am I confused, yes, about that, yes.**
21     Q.   And what are you confused about?
22     **A.   If I go to school bas- -- I can't be**
23 **within a thousand feet.  I'm on the registry, I**
24 **can't be around school property, so I just don't**
25 **understand the registry and the laws of it.  Some**

38

1 things I understand, some things I don't.
2    Q. So this provision in particular is asking
3 for the name and address of any school that you
4 attend.
5    A. Okay.
6    Q. So if you had to report the name and
7 address of any schools that you attend, do you
8 know what that means? Do you know what you'd have
9 to report?
10    A. Yes.
11    Q. Is there anything confusing about
12 providing the name and address of schools that you
13 attend?
14    A. No.
15    Q. The next provision talks about email
16 addresses. Do you report your email addresses to
17 law enforcement?
18    A. I don't have an email address. I use my
19 wife's.
20    Q. Okay, do you report that to --
21    A. No, I just use it for this. I don't want
22 her to be involved in anything.
23    Q. Is it fair to say, though, you have not
24 reported your wife's email address to law
25 enforcement?

39

1    A. It's not my email so, yes, I haven't.
2    Q. Okay, but you use that email?
3    A. No, just -- just for this occasion --
4 occasion, sorry.
5    Q. Your conviction was before July 1st,
6 2011, though, right?
7    A. Yes, it was in 2005, 2006, I believe.
8    Q. Okay. The next provision asks for
9 license plate number and description of any
10 vehicle that I own or operate; do you know what
11 that means?
12    A. Yes.
13    Q. And do you report vehicles that you own
14 or operate to the -- to law enforcement?
15    A. If I owned, yes.
16    Q. Is there anything confusing about that
17 provision that requires you to provide the license
18 plate number and description of any vehicle that
19 you own or operate?
20    A. Can't hear you.
21    Q. Can you hear me now?
22    A. Yes.
23    Q. Okay. So is there anything confusing
24 about the provision that requires you to report
25 your license plate number and description of

40

1 vehicles that you own or operate?
2    A. I can't hear it. Excuse me one second
3 here. Hello?
4    Q. Yeah, I can hear you. Can you hear us?
5    A. Yeah, I've got to put you on my ear. I
6 can't find the speaker button. So what was the
7 question again, I'm sorry?
8    Q. Yeah, so the law requires you to report
9 the license plate number and description of any
10 vehicle that you own or operate. Is that
11 confusing at all to you?
12    A. No.
13    Q. And also report -- let me ask you this,
14 do you have a passport?
15    A. No.
16    Q. Do you have any professional licensing?
17    A. No, just my driver's license.
18       MS. DAVIDSON: Can I just ask for
19 the record, I'm sorry to interrupt, Mr. Doe, if
20 you are talking on the phone with it to your ear
21 does that mean you can no longer see this exhibit?
22       THE WITNESS: Yeah, I can't see it,
23 yeah. Oh, this -- hold on, let me see if I can --
24 go ahead. There we go. I'm trying to find the
25 speaker but I can't find it.

41

1       MR. JAMISON: Yeah. Syeda, you guys
2 have an office in Grand Rapids, don't you?
3       MS. DAVIDSON: Yes.
4       MR. JAMISON: Should we try to do
5 this so he's in your office?
6       MS. DAVIDSON: I can ask. Can we go
7 off the record for a minute?
8       MR. JAMISON: Sure, yeah.
9       (Discussion off the record.)
10       MR. JAMISON: Tami, let's go back on
11 the record.
12 BY MR. JAMISON:
13    Q. Okay, Mr. Doe, can you see the screen
14 now?
15    A. Yes, sir.
16    Q. And you can hear us okay?
17    A. Yes.
18    Q. All right. And then I want to draw your
19 attention there to paragraph six. It's right at
20 the top of page three. It says that you have to
21 report to law enforcement within three days if you
22 have a new address; do you see that?
23    A. Yes.
24    Q. Do you know what that means?
25    A. Yes.

### 42

1  Q. What does that mean in your own words?
2  A. **That if I get a new address to report it.**
3  **Like if I move from where I'm from to report.**
4  Q. And then the second part of that, 6B, it
5  says the name and address of my employer upon
6  obtaining, changing, or discontinuing employment
7  including volunteer work; do you see that?
8  A. Yes.
9  Q. What does that mean in your own words?
10 A. **I don't understand that. Because I work**
11 **for a cell phone company that requires sometimes**
12 **to move to store to store, so do I -- I don't know**
13 **if I have to report that.**
14 Q. Okay. Is the name of your employer the
15 same?
16 A. Yes.
17 Q. And is the -- is there a home office or
18 are these retail stores that you might work at
19 different retail stores?
20 A. **They're different retails.**
21 Q. And what have you done to try to
22 understand what the law requires regarding
23 reporting that information?
24 A. **What do you mean, what -- what have I**
25 **done?**

### 43

1  Q. Well, so the way I understood your
2  testimony is you're confused by this and what you
3  have to report, so I'm trying to understand what
4  you've done to try to understand what the law
5  requires you to do.
6  A. **I mean, I limit myself to a lot of things**
7  **so I won't have to do that, so I won't have that**
8  **issue or problem to do those things. I just don't**
9  **do it or get anything because of that.**
10 Q. Okay, so have you read the law? Like
11 have you tried to look it up online or anything?
12 A. **Yeah, but I don't understand the law.**
13 **Like I'm -- I'm not a lawyer, I never went to law**
14 **school, and it's very difficult for me to**
15 **understand the law. Like it's very hard for me.**
16 Q. Have you ever sought the advice of an
17 attorney about what you have to report?
18     MS. DAVIDSON: Objection,
19 privileged.
20     MR. JAMISON: I don't think seeking
21 the advice of an attorney is privileged. I think,
22 you know, if I were to ask what advice was given
23 would be different but just whether he sought the
24 advice of an attorney I don't think is privileged.
25     MS. DAVIDSON: I think that the

### 44

1  contents of the discussion and the substance of
2  what advice was sought is privileged.
3      MR. JAMISON: Okay. Are you going
4  to direct your client not to answer that?
5      MS. DAVIDSON: He can answer this
6  question, but he cannot talk about any advice he
7  was given.
8  BY MR. JAMISON:
9  Q. Okay, so, Mr. Doe, I'll ask the question
10 again. Have you sought the advice of an attorney
11 about what you have to report regarding your
12 employer?
13 A. Yes.
14 Q. And have you reached out to -- or have
15 you done anything else to try to understand what
16 your reporting obligations are about your
17 employer?
18 A. **Like what? I don't understand what**
19 **you're saying right now. What do I have -- like**
20 **what are you asking?**
21 Q. I'm just trying to understand like what
22 efforts did you make to understand what you're
23 required to do by law?
24 A. **I mean, I -- I try to follow it as much**
25 **as I can. Like whatever they tell me I do.**

### 45

1  Q. Whatever who tells you?
2  A. **The -- like anything that has to do with**
3  **the registry, like if I move I've got to give the**
4  **address. If I get a new employer I've got to give**
5  **that address, but I haven't had to do that because**
6  **I've been with my employer for ten years so I**
7  **haven't done it.**
8  Q. Do you think the sex offender registry
9  protects the public in any way?
10 A. **It -- it does. It depends, I guess.**
11 Q. And how does it protect them?
12 A. **In that the public know who -- who's at**
13 **risk and who's committing these crimes.**
14 Q. Do you think the sex offender registry
15 might encourage victims to come forward?
16     MS. DAVIDSON: Objection, calls for
17 speculation. You can still answer.
18     THE WITNESS: So what was the
19 question again?
20 BY MR. JAMISON:
21 Q. Do you think the sex offender registry
22 might encourage victims to come forward?
23 A. **I don't know.**
24 Q. Do you know -- do you know anyone that's
25 been a victim of sexual assault?

46

1  A.  I do not, no.
2  Q.  All right. So I'm going to share my
3  screen again. There's a -- this -- we'll call
4  this Exhibit 2, and what this is is this is a
5  table that we've used in other depositions, and it
6  has word-for-word descriptions from court cases of
7  criminal sexual conduct.
8           (Whereupon Deposition Exhibit
9           No. 2 marked for identification.)
10 BY MR. JAMISON:
11 Q.  So I'll share the screen. What you'll
12 see is you'll see like a row number. It should be
13 up there in just a minute, but you'll see like,
14 you know, this is row 30, then 31, 32. We're
15 going to go through, I'm going to ask you to read
16 some of these, and then I'll ask you a few
17 follow-up questions.
18           I think Syeda probably has an
19 objection here, so we'll let her address that now.
20           MS. DAVIDSON: I do, thanks very
21 much. We acknowledge that due to the court's
22 order you are permitted to ask certain questions
23 related to this exhibit so long as the questioning
24 does not become impermissibly oppressive due to
25 excessive length or an exorbitant number of sample

47

1  cases. However, I would like to place a standing
2  objection on the record to any line of questioning
3  related to this exhibit for the reasons already
4  articulated to the court at the status conference
5  and in our memo.
6           MR. JAMISON: Okay, the objection is
7  noted.
8  BY MR. JAMISON:
9  Q.  So, Mr. Doe, if you could read what's in
10 row 30 there. You can just read it to yourself
11 and let me know when you're done, and then I'll
12 ask you a few questions.
13 A.  Okay.
14 Q.  So if this -- this criminal defendant, it
15 looks like the last name is Stevens, if Stevens
16 lived next door to you would you want to know?
17 A.  **If he was at risk and he's a person**
18 **that's always doing it, yes.**
19 Q.  And how would you determine whether he's
20 still at risk?
21 A.  **If he keeps committing the same crime**
22 **over and over.**
23 Q.  And when you say he keeps committing the
24 same crime over and over, what do you mean by
25 that?

48

1  A.  **By what he was -- from what I read he was**
2  **raping his daughters and stepdaughter.**
3  Q.  The way that I read this it sounds like
4  he did this continually for a number of years
5  until the children were removed from the home, so
6  is that what you mean by him continually doing it
7  or did you mean something else?
8  A.  **Yeah, if he continues to do that I would**
9  **like to know that, yes.**
10 Q.  Continues from when, though, from when he
11 gets charged?
12 A.  **From when he was charged, yes.**
13 Q.  Okay. So it's your testimony that if
14 this criminal defendant committed these crimes you
15 would only want to know if he was caught and
16 charged again?
17 A.  **If he was at risk, yes.**
18 Q.  And if I understood your testimony
19 correctly being at risk means that he was caught
20 again for criminal sexual conduct?
21 A.  **Correct, if he's a high risk I would love**
22 **to know, yes.**
23 Q.  And if he were one of your kids' soccer
24 coaches would you want to know?
25 A.  **If he was a high risk, yes.**

49

1  Q.  And how would you determine if he's a
2  high risk?
3  A.  **If he --**
4           MS. DAVIDSON: Objection,
5  foundation -- hang on, Mr. Doe. Objection,
6  foundation, he's not an expert. You can answer.
7           THE WITNESS: If he was doing the
8  same crime over and over I would like to know,
9  yes.
10 BY MR. JAMISON:
11 Q.  And if he were a scout leader would you
12 want to know or a scout leader for one of your
13 kids?
14 A.  **Again, if he's high risk, yes. If he**
15 **continues to do the same thing, yes.**
16 Q.  And if he sexually assaulted his daughter
17 repeatedly between the ages of 10 and 14, would
18 you consider that to be a high risk?
19           MS. DAVIDSON: Objection,
20 foundation, he's not an expert. You can answer.
21           THE WITNESS: I don't -- I don't
22 know how to answer that.
23 BY MR. JAMISON:
24 Q.  Okay. Can you read what's in row 31 to
25 yourself?

50

 1    A.  Yes.  Okay.
 2    Q.  Would you want to know if that criminal
 3  defendant was your child's soccer coach?
 4    A.  Yes.
 5    Q.  Would you want to know if they were
 6  babysitting your children?
 7    A.  Yes.
 8    Q.  All right.  Could you read row 32?
 9    A.  Okay.
10    Q.  Would you want to know if that criminal
11  defendant lived next door to you?
12    A.  Yes.
13    Q.  Would you want to know if they were
14  giving kids piano lessons?
15    A.  If they gave my kids their pianos, yes.
16  If they didn't, no.
17    Q.  Could you read row 33?
18    A.  Okay.
19    Q.  Would you want to know if that criminal
20  defendant were babysitting your kids?
21    A.  Yes.
22    Q.  Would you want to know if they were a
23  volunteer soccer coach for your children?
24    A.  If they played the sport, yes.
25    Q.  Could you read row 34?

51

 1    A.  Okay.
 2    Q.  Would you want to know if that criminal
 3  defendant were a pastor at the church where your
 4  kids attend?
 5    A.  Yes.
 6    Q.  Would you want to know if they were
 7  volunteering to supervise children?
 8    A.  Yes.
 9    Q.  Could you read row 35?
10    A.  Okay.
11    Q.  Would you want to know if that criminal
12  defendant were coaching your kids?
13    A.  Yes.
14    Q.  Have you ever contacted a member of the
15  Michigan legislature to try to change the Sex
16  Offender Registry Act?
17    A.  What do you mean?
18    Q.  Do you know who writes the laws?
19    A.  I do not, no.
20    Q.  Do you know if the governor writes the
21  laws?
22    A.  I do not know.
23    Q.  Do you know or did you know that under
24  the old law you couldn't come within a thousand
25  feet of a school?

52

 1    A.  Yes, yup, yes.
 2    Q.  And do you know if that provision --
 3  sorry, do you know that provision has been removed
 4  from the law?
 5    A.  From the law in general?
 6    Q.  From the Sex Offender Registry Act, are
 7  you aware that that was removed from the law?
 8    A.  For the moment, yes.
 9    Q.  And are you aware -- I think we've
10  already covered this, but are you aware now that
11  you can update some information via mail?
12    A.  Yeah, you told me that, yes.
13    Q.  Okay, but before I told you you weren't
14  aware of that?
15    A.  I was not aware of that, no.
16    Q.  Under the old law, and the old law is
17  what existed prior to March of 2021, do you know
18  whether you had to update everything in person or
19  could some of it be done by mail?
20    A.  Everything was in person from what I
21  understood.
22    Q.  Do you know how many criminal laws there
23  are in Michigan?
24    A.  I do not, no.
25    Q.  Do you know if you can be charged with a

53

 1  crime even if you don't know it exists?
 2    A.  I don't know.
 3    Q.  All right, so like this is total
 4  hypothetical, right, but if there was a law that
 5  says you can't wear two left shoes and you wore
 6  two left shoes, do you know if you could be
 7  convicted of that?
 8    A.  I don't -- I don't know how to an- -- I
 9  don't know.  I mean, if that's the -- I mean, I
10  don't have two left feet so I don't know.
11    Q.  All right.  I guess what I'm getting at
12  do you have to know what every single law is in
13  the State of Michigan to be convicted of it or can
14  you be convicted if you violate the law regardless
15  of whether you know that it exists?
16        MS. DAVIDSON:  Objection, calls for
17  speculation.  You can still answer.
18        THE WITNESS:  I guess.  I can't give
19  you a direct answer.  I don't know.
20        MR. JAMISON:  I think that's all I
21  have.
22        MS. DAVIDSON:  Okay, I just have a
23  little bit of follow-up.  Do you need a break or
24  are you okay.
25        THE WITNESS:  I'm good.

54

1  EXAMINATION
2  BY MS. DAVIDSON:
3    Q.  Okay.  So just a little bit of follow-up
4  here.  So, first, has your status on the registry
5  made it difficult to be involved in your kids'
6  lives?
7    A.  Yes.  When I was on the public registry?
8    Q.  Yes.
9    A.  Yes, it has.
10   Q.  Can you -- can you talk about the ways
11 that being on the public registry made that
12 difficult?
13   A.  I couldn't be within a thousand feet of
14 my kids' school.  I couldn't attend to any of
15 their plays, games, any activities, daddy-daughter
16 dances.
17   Q.  Is that your whole answer?
18   A.  Yes.
19   Q.  Okay, thank you.  I just wasn't sure if
20 there was more.  You testified earlier about your
21 employment.  You said somebody knew that I was on
22 the registry and that's how I lost my job.  Can
23 you explain what happened there?
24   A.  Yes.  I knew the lady that worked with me
25 at the factory, and she had -- I overheard her

55

1  going to the HR, and that same night I overheard
2  her say that she was going to HR she showed him
3  that I was on the registry, that same night before
4  my shift was over I got escorted out.
5    Q.  Thank you for explaining that.  You also
6  testified that you couldn't live with your mother
7  or your sister after your conviction.  Can you
8  explain why you weren't able to live with your
9  mother or your sister?
10   A.  Because I was on the registry and that's
11 what they looked up was the registry, and they
12 gave my mother 24 hours for me to be removed from
13 her house -- apartment.
14   Q.  When you say they is that your mother's
15 landlord?
16   A.  Yes.
17   Q.  And did the same thing happen with your
18 sister or something different?
19   A.  Same thing happened with my sister.
20   Q.  Did you try to live in other homes with
21 your family before you moved into the house that
22 you're in now?
23   A.  Yes, and the same thing happened, so once
24 I got into this house, like he's my father-in-law
25 and obviously he knows, and -- and I'm here.

56

1    Q.  Did you have problems finding a place to
2  live before you found this house?
3    A.  Yes.
4    Q.  Can you describe the extent of those
5  problems?
6    A.  Yes.  Where I looked at because I was on
7  the registry I can't be near schools and most of
8  the houses that were for rent is where -- near
9  schools and that's what best fits for my family,
10 for the kids and all that, and I couldn't get into
11 the housing in general because of the public
12 registry.
13   Q.  Okay, so just to clarify, you said that
14 you were having problems because you wanted
15 your -- you wanted to be near schools for your
16 kids but then also generally you couldn't get in
17 because of the registry, so is that two separate
18 reasons or is that one reason?
19   A.  Two -- both, I guess both.  Two reasons,
20 because I couldn't be near school and I couldn't
21 be within -- within -- I didn't really understand
22 the law and I still don't.  Like what is it that I
23 can't be near.  I don't know if the malls, you
24 know, because kids go there so I don't know.
25 That's confusing to me.

57

1    Q.  Okay, so let me just back up a little
2  bit.  So my question is more when you were looking
3  for housing before you -- before you lived in the
4  house that you're in now.
5    A.  Um-hum.
6    Q.  Did you encounter problems looking for
7  housing aside from being near a school?
8    A.  Yes.
9    Q.  What were those problems?
10   A.  When I -- when I'd go to them to get the
11 apartment everything would be good, and then when
12 they do the registry to check if I have anything,
13 you know, like registry-wise, the SORA and the
14 felony, the criminal conduct, I was not approved
15 of anything because I was on both registry and the
16 conviction.
17   Q.  Okay.  And do you remember being asked
18 whether you think that the registry helps people?
19   A.  Yes, I believe he asked me, yes.
20   Q.  And do you remember that your answer was
21 that it depends?
22   A.  Correct, yes.
23   Q.  Can you explain what you mean when you
24 say that it depends?
25   A.  It depends if the person is still a high

58

```
 1  risk.  You know, what was the offense?  Like, I
 2  believe people deserve a second chance, and I
 3  don't think everybody that's on the registry is
 4  the same.
 5      Q.  Is that your whole answer?
 6      A.  Hum?
 7      Q.  That's your whole answer?  I'm not
 8  trying to --
 9      A.  Yes.
10      Q.  -- get you to saying anything else.
11      A.  Yes.
12      Q.  I'm just making --
13      A.  I'm sorry, yes, yes.  I'm sorry.
14      Q.  Okay, thank you.  I don't have anything
15  else.
16          MR. JAMISON:  Okay.  Yeah, I think
17  we're all set.  I appreciate your time, Mr. Doe.
18          (Whereupon Deposition concluded
19            at 2:45 p.m.)
20
21
22
23
24
25
```

59

```
 1  STATE OF MICHIGAN )
                     ) SS
 2  COUNTY OF KENT    )

 3
 4      I, Tamara Staley Heckaman, Certified
 5  Shorthand Reporter and Notary Public in and for
 6  the County of Kent, State of Michigan, do hereby
 7  certify that the foregoing Deposition was taken
 8  before me remotely at the time and place
 9  hereinbefore set forth.
10      I further certify that said witness was
11  duly sworn in said cause to tell the truth; that
12  the testimony then given was reported by me to the
13  best of my ability; subsequently produced under my
14  direction and supervision; and that the foregoing
15  is a complete, true, and correct transcript of my
16  original shorthand notes.
17      IN WITNESS WHEREOF, I have hereunto set
18  my hand and seal this 24th day of April, 2023.
19
20
                _____
21              Tamara Staley Heckaman, CSR-3443,
                Certified Shorthand Reporter,
22              and Notary Public, County of
                Kent, State of Michigan.
23
                My Commission Expires:  5-20-24
24
25
```