# Exhibit 58:

## John Doe D
## Deposition Transcript (redacted)

10:01:41

```
                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
                           SOUTHERN DIVISION

     - - - - - - - - - - - - - - - - -
                                       )
     JOHN DOES A, B, C, D, E, F, G,)
     H, MARY DOE and MARY ROE, on   )
     behalf of themselves and all   )
     others similarly situated,     )
                                    )
                       Plaintiffs, )File No.
                                    )2:22-cv-10209
        -vs-                        )
                                    )HON. GOLDSMITH
     GRETCHEN WHITMER, Governor of )MAG. IVY, JR.
     the State of Michigan, and     )
     COL. JOSEPH GASPER, Director   )
     of the Michigan State Police, )
     in their official capacities, )
                                    )
                       Defendants. )
     - - - - - - - - - - - - - - - - -

                       REMOTE DEPOSITION

     of JOHN DOE D, a Plaintiff called by Defendants,

     taken before Melinda S. Nardone, Certified Shorthand

     Reporter and Notary Public, via Zoom, on Friday, April

     7, 2023, noticed for the hour of 10:00 a.m.




                          HECKAMAN & NARDONE, INC.
                         Certified Shorthand Reporters
                              P.O. Box 27603
                          Lansing, Michigan  48909
                              (517) 349-0847
                          msnardone5@gmail.com
```

Page 2

```
 1   APPEARANCES:
 2   LOEVY & LOEVY
     Cooperting Counsel, American
 3   Civil Liberties Union Fund of Michigan
     311 North Aberdeen, 3rd Floor
 4   Chicago, Michigan  60607
     By
 5   LAUREN CARBAJAL, J.D.
     and
 6   AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
     2966 Woodward Avenue
 7   Detroit, Michigan  48201
     By
 8   SYEDA DAVIDSON, J.D.
 9        On behalf of Plaintiff.
10   MICHIGAN DEPARTMENT of ATTORNEY GENERAL
     State Operations Division
11   P.O. Box 30754
     Lansing, Michigan  48909
12   By
     SCOTT DAMICH, J.D.
13
14        On behalf of Defendants.
```

Page 3

```
 1              EXAMINATION INDEX
 2   ATTORNEY'S NAME    EXAMINATION    RE-EXAMINATION
 3   BY MR. DAMICH:         4               59
 4   BY MS. CARBAJAL:      49
 5
 6           *       *       *
 7
 8              INDEX OF EXHIBITS
 9    EXHIBIT                      MARKED
10   Ex A  Registry mail-in update    32
11   Ex B  List of cases              39
12           *       *       *
```

Page 4

 1   Friday, April 7, 2023
 2   10:00 a.m.
 3   R E C O R D
 4   JOHN DOE D,
 5   having been first duly affirmed, testified as follows:
 6           MR. DAMICH: Good morning, sir, my name is
 7   Scott Damich and I'm an assistant attorney general with
 8   the State of Michigan and I represent Governor Whitmer
 9   and Colonel Gasper. We noticed your deposition in this
10   case, Does V Whitmer, Case Number 2:22-cv-10209 in the
11   District Court in the Eastern District of Michigan in
12   front of the Honorable Judge Goldsmith.
13           So there's a protective order in place in
14   this case and it's found at ECF number 88, page ID
15   2389-2395, and the purpose of that protective order is
16   to protect your identity. Will the court reporter
17   confirm that she has read the protective order and
18   signed the acknowledgement?
19           COURT REPORTER: Yes, I have.
20           MR. DAMICH: Okay. And then will counsel
21   affirm that the person tendered is, in fact, John Doe D?
22           MS. CARBAJAL: Yes, we do.
23           EXAMINATION
24   BY MR. DAMICH:
25      Q.   All right. Sir, with the protective order I'm

Page 5

 1   going to do my best today to make sure that I don't ask
 2   questions that will identify your name, your exact
 3   address, or anything of that nature. If I do, if I make
 4   a mistake and we do divulge that information through a
 5   question and answer series I'll work with your counsel
 6   to make sure that that gets redacted and it doesn't find
 7   itself in the public sphere, that's the purpose of the
 8   protective order. And, again, we're going to work to
 9   make sure that we don't get you to say anything that
10   identifies you. Have you ever been deposed before?
11      A.   I have not.
12      Q.   You've not, okay. So just real quick, the
13   purpose of this deposition at least from my viewpoint is
14   to have a conversation with you. It's going to be a
15   question and answer event here where I'll ask questions
16   and you just give answers. Because it's being recorded
17   by a court reporter and she's writing down what we say,
18   if I ask you a yes or no question you have to say yes or
19   no. The court reporter can't record head nods yes or a
20   no.
21           Sometimes I tend to talk fast or I will tend
22   to cut in when you're answering. One thing we've got to
23   try to do to work through this is to make sure we don't
24   talk over each other, it makes Mindy's job a lot easier
25   if there's not double talk going on. So if I'm asking a

6

1 question I ask that you don't answer it until I finish
2 it and I'll try to do the same for you whenever you give
3 an answer.
4          I'm not here to try to trick you into
5 anything or any kind of answer so if you don't know the
6 answer to a question I ask you don't guess. Do your
7 best not to speculate. We're just looking for the truth
8 and if you don't know the answer to the question just
9 say so. You know, so if you don't understand a question
10 that I ask please ask that I clarify, you're not going
11 to offend me at all. Say, Scott, I don't understand
12 what you're asking me, and I'll do my best to rephrase
13 the question.
14     A. Okay.
15     Q. But with that said, if you answered a question
16 I'll assume you answered the question -- that you
17 understood the question. Let me rephrase that. If you
18 answer the question I'll assume you understood the
19 question; is that fair?
20     A. Yes.
21     Q. All right, perfect. Are you taking any
22 medications or any substances that would affect your
23 ability to testify truthfully today?
24     A. No.
25     Q. Okay. And is there anything else that might

7

1 interfere with your ability to answer the questions
2 truthfully and fully today?
3     A. No.
4     Q. Okay. Are you currently in your home?
5     A. Yes.
6     Q. And is your home in the metro Detroit area?
7     A. Yes.
8     Q. And throughout this deposition I'm going to be
9 referring to a CSC, criminal sexual conduct, conviction
10 that happened back in 2000. If I refer to your CSC
11 conviction is it fair -- will you understand that that's
12 what I'm referring to throughout this?
13     A. Yes.
14     Q. Okay, thank you. So since your release from
15 prison in 2000 for your CSC conviction what type of
16 housing have you obtained?
17     A. **Let's see, I lived with my mother until the age**
18 **of 25. And then we rented an apartment, my girlfriend**
19 **at the time and I rented an apartment for I believe one**
20 **year.**
21     Q. Okay, so let's go about it this way. So you were
22 released from prison in 2000, correct?
23     A. Yes.
24     Q. Okay. And then after you were released you went
25 and lived with your mother, correct?

8

1     A. **Yes, I was living with her before and I went back**
2 **after.**
3     Q. Okay. So then until you were 25, so as far as
4 what year was that that you left your mother's house?
5     A. **2005 I believe, yeah.**
6     Q. And then from 2000- -- and then after that you
7 moved into an apartment with a girlfriend, correct?
8     A. Yes.
9     Q. And that started in approximately 2005; is that
10 fair?
11     A. **I'm trying to think here, sorry, it's all kind**
12 **of --**
13     Q. It's a long time ago, that's fine, take your
14 time.
15     A. **No, I believe we actually -- let me respeak on**
16 **that, I lived with my mother until 2006, then we moved**
17 **into the apartment in 2006 for one year.**
18     Q. And when you rented that apartment did you have
19 to fill out an application?
20     A. **I believe so.**
21     Q. And did that application ask if you were
22 convicted of a felony?
23     A. **I'm not 100 percent sure.**
24     Q. Okay, that's fine. Do you remember whether or
25 not the apartment that you rented from knew of your

9

1 prior conviction?
2     A. **Not at the time of leasing, and we'll get into**
3 **this later too, but they did find out like midway when I**
4 **was living there, which wasn't an issue until I moved**
5 **back two years later from out of state and trying to**
6 **move back into that apartment complex and I was denied**
7 **due to my status on the registry.**
8     Q. Okay. So you were in that apartment from 2006
9 until when?
10     A. **For one year.**
11     Q. Okay. And then so in 2006 then where did you go
12 after that apartment?
13     A. **My wife and I moved -- or still girlfriend at the**
14 **time, we moved out to the** ▮▮▮▮▮▮▮▮ **, area for two**
15 **years.**
16     Q. So from 2006 to 2008, is that correct?
17     A. **No, we were in the apartment from '06 to '07,**
18 **October to October.**
19     Q. Okay.
20     A. **And then we moved to** ▮▮▮▮▮ **from '07, and we**
21 **came back I believe November of '09.**
22     Q. And what type of housing did you have in Phoenix?
23     A. **Rentals.**
24     Q. You said rentals; did you live in a couple
25 different places in Phoenix?

10

1 A. In two different places, one year, then a
2 different house for another year.
3 Q. Okay. The first place that you rented from, did
4 you have to fill out an application?
5 A. Yes.
6 Q. Do you remember whether or not they asked if you
7 were convicted of a felony?
8 A. That I don't recall.
9 Q. Do you remember telling them during the
10 application process of your prior conviction?
11     MS. CARBAJAL: Objection, asked and
12 answered.
13 BY MR. DAMICH:
14 Q. You still have to answer the question. I should
15 have explained that at the beginning, there's going to
16 be a lot of questions that I ask that counsel is going
17 to object to.
18 A. Right.
19 Q. Unless they claim privilege of some sort you
20 still have to answer the question.
21 A. I've got that. For the second house -- for the
22 first house out in ▇▇▇▇, my uncle is a real estate
23 agent so it was a friend of his that we rented from so
24 he may have discussed that with those people before I
25 moved in. I personally do not remember discussing that

11

1 the first house we moved into.
2 Q. Okay. So do you have family in the Phoenix area
3 then?
4 A. I did, yes, they've all since passed, yes.
5 Q. I'm sorry. And then you said there was a second
6 rental, correct?
7 A. Yes.
8 Q. Also a house?
9 A. Yes.
10 Q. Okay. And how did you obtain rental status of
11 that house?
12 A. By -- with my wife and I, or girlfriend and I, we
13 did that one our own but by that time I'd already
14 established myself in ▇▇▇▇ and with their laws out
15 there they actually look case-by-case basis and I was
16 deemed by whoever does that out there to be a non-threat
17 and all that so I actually went on the non-public list
18 while I was in ▇▇▇▇ so I did not have the obligation
19 to let the rental home know.
20 Q. And did the rental home ask to the best of your
21 knowledge?
22 A. Honestly I don't recall if they asked that or
23 not. If they did, though, I had the right to put no or
24 however you put that, say pretty much it's none of your
25 business, because I was on the private registry out

12

1 there.
2 Q. Sure. But if they were asking about a prior
3 conviction, that was what the question was more geared
4 towards, not whether or not you were on the registry.
5 A. Okay, then I don't remember if they asked about
6 felony status.
7 Q. Okay. And then you said you moved -- if I
8 remember correctly you said you moved back to Michigan;
9 is that correct?
10 A. Yes.
11 Q. And that was in -- was that in 2009?
12 A. Yes, October of 2009.
13 Q. Okay. And then where did you live then?
14 A. We rented another home. We were unable to get
15 back into the original apartment we were in. They
16 denied me due to my registry status.
17 Q. Now, the house that you ended up renting from,
18 did they ask about your prior conviction at all?
19 A. I don't believe so.
20 Q. Did they ask whether or not you were on the sex
21 offender registry?
22 A. I don't believe so.
23 Q. And how long did you stay in that home?
24 A. I want to say three years.
25     COURT REPORTER: I'm sorry, I didn't hear

13

1 you.
2     THE WITNESS: I'm sorry, I was speaking to
3 myself, I was trying to get the timeline straight in my
4 head, sorry. I believe it was three years, yes.
5 BY MR. DAMICH:
6 Q. So it's fair to say October 2012 is when your
7 relationship with that place ended?
8 A. Yeah, that sounds about right.
9 Q. And then where did you go after that?
10 A. We bought our first home.
11 Q. In 2012?
12 A. Yeah, sounds about right.
13 Q. And is that the reason why you left the prior
14 home you rented from is because you purchased the home?
15 A. Yes.
16 Q. Okay. And is that the home that you're currently
17 in right now?
18 A. No, we bought this current home I'm in in 2016.
19 Q. Did you have any difficulty purchasing your first
20 home because of your prior conviction?
21 A. No, huh-uh.
22 Q. Was there any problem created by you being on the
23 sex offender registry when purchasing your first home?
24 A. No, we just had to make sure I was outside of
25 that thousand foot from a school.

### Page 14

1 Q. Certainly understood. And so then you said you
2 bought your second home in 2016; is that correct?
3 A. That sounds about right.
4 Q. Okay. And did you have any issues with buying
5 your second home because of your prior conviction?
6 A. No.
7 Q. Did you have any issue purchasing your second
8 home because of your status as a sex offender and being
9 on the sex offender registry?
10 A. No, I did not, as long as we stayed outside the
11 thousand foot rule, yup.
12 Q. Did you have any issues selling your first home
13 because of your prior conviction?
14 A. No.
15 Q. And so is it a fair statement to say that since
16 your release from prison you were able to obtain
17 adequate housing?
18 A. Yes, with a caveat of finding all these houses
19 and, you know, we did go through a lot of houses that
20 were within the thousand feet. We got rejected from
21 several apartment complexes, which is when we ended up
22 buying our home because we couldn't get into an
23 apartment.
24 Q. And you said you're married, correct?
25 A. Yes.

### Page 15

1 Q. And how long have you been married?
2 A. 15 years.
3 Q. And do you have any children?
4 A. I have one son.
5 Q. And is he still under the age of 18?
6 A. Yes.
7 Q. Is your son involved in any extracurricular
8 activities?
9 A. Yes.
10 Q. In what type of activities?
11 A. He's in a golfing class, he plays baseball and
12 for a while played flag football. He's in the Boy
13 Scouts of America, and starting this summer he'll be
14 playing football.
15 Q. Did you help coach or participate in any of those
16 activities?
17 A. I was not allowed to.
18 Q. Were you able to observe your son play in any of
19 the events?
20 A. Only since the last law changed just a year or
21 two ago I believe it was where they took the loitering
22 off the school event, but before that I was not allowed
23 to attend any events at a school, any event for sporting
24 or anything.
25 Q. But now currently you can?

### Page 16

1 A. I can attend, yes, but I still cannot coach, I
2 cannot participate, nothing. As a matter of fact, you
3 know, I don't know if this is the right spot to say it,
4 but when he was in ▬▬▬▬▬▬▬▬▬▬ they had a
5 father-son breakfast at his school where they awarded
6 the dads these little baseball trophies for being a good
7 dad, and I was specifically called by the principal of
8 the school to let me know that I was not allowed to
9 attend due to my status on the registry.
10 Q. Is it fair to say that your status on the
11 registry was caused by your prior conviction?
12     MS. CARBAJAL: Objection, form.
13     THE WITNESS: Yes.
14 BY MR. DAMICH:
15 Q. Okay. Did you graduate high school?
16 A. I did not.
17 Q. So you don't have a high school -- how far along
18 did you get in your high school education?
19 A. I was removed from school when all this happened
20 three months before my graduation.
21 Q. And since then have you tried to obtain your GED?
22 A. Yes, I did that immediately upon being released
23 from jail.
24 Q. And so you did -- did you obtain your GED?
25 A. I did.

### Page 17

1 Q. Prior to your conviction were you a good student?
2 A. Average, I would say, Cs.
3 Q. Did you take any advanced placement classes?
4 A. No.
5 Q. So I believe there's a grade point scale like up
6 to 4.0 being the highest and zero being the lowest. So
7 is it fair to say you were like a 2.0 student?
8     MS. CARBAJAL: Objection, relevance.
9     THE WITNESS: I still have to answer that,
10 right?
11 BY MR. DAMICH:
12 Q. You do, yes.
13 A. Sorry, I'm just trying to --
14 Q. I know, that's fine.
15 A. I would say between a two and a three. I think
16 you have to hold at least a 2.4 to even play any sports.
17 Q. What sports did you play?
18 A. Football, baseball, and ice hockey.
19 Q. After you obtained your GED did you try to go to
20 college?
21 A. I went to a trade school.
22 Q. So was that by choice?
23 A. Yeah.
24 Q. That was a yes?
25 A. Yes, I'm sorry, that was when I was living out in

18

1  ▓▓▓▓ so back in like 2008.
2  Q. Okay. And did you attend a trade school in
3  person?
4  A. Yes.
5  Q. And then what did you specialize in in the trade
6  school?
7  A. HVAC, heating and cooling and electrical.
8  Q. Did you excel in the trade school program?
9  A. Yes, I graduated the top three of my class.
10 Q. Great, congratulations. And how long did you
11 attend the trade school?
12 A. About a year and a half roughly.
13 Q. And did you have to report to the trade school
14 your prior conviction?
15 A. I'm sorry, I don't understand.
16 Q. Sure. When you applied to the trade school in
17 ▓▓▓▓ did you have to let the institution know that
18 you were convicted of a felony?
19 A. I don't recall. I don't recall.
20 Q. Did your prior conviction get in the way at all
21 of your trade school education?
22         MS. CARBAJAL: Objection, form.
23         THE WITNESS: The education process, no.
24 BY MR. DAMICH:
25 Q. And after finishing up your education at the

19

1  trade school did you receive any further education?
2  A. No.
3  Q. Did you seek to enroll in any colleges after
4  trade school?
5  A. No.
6  Q. And was that by choice?
7  A. Yes.
8  Q. Okay. So I'm going to go now through your
9  employment. Since you were released from prison where
10 have you been employed starting with back in 2000?
11 A. Let's see, I think I worked with a -- it was like
12 a sorting company that ▓▓▓▓▓▓▓▓ would bring in when
13 they had issues with quality, and so they would bring in
14 the company I worked for to sort through all the
15 products to find any defects.
16 Q. And so that was back when you moved back to
17 Michigan, then?
18 A. No, that was pretty much freshly out of jail.
19 Q. Okay. So do you recall the gap -- how many days
20 or months between your release from prison and you
21 obtaining that employment, what was that length?
22 A. Maybe two months.
23 Q. Did you try to find any other work before that?
24 A. Yes.
25 Q. And were you denied employment at those places

20

1  that you applied to?
2  A. I don't recall ever getting too many calls back.
3  I did have one place that called me back for it was like
4  a retail position, and then around the same time my
5  sister, through a friend of hers, got me the job that I
6  ended up taking with the sorting company, so I went with
7  that job, it paid more.
8  Q. Do you remember if the sorting company asked
9  about your prior conviction?
10 A. The lady that does the hiring and all the telling
11 us where to go every day was actually a friend of my
12 sister that I'd known also for about 15 years so she
13 already knew ahead of time.
14 Q. So even with knowing your prior felony status
15 they still hired you, correct?
16 A. Yes. Yeah.
17 Q. And so how long did you stay with the sorting
18 company?
19 A. Not too long. I would say maybe eight months.
20 Q. And then that's when you moved out to Phoenix and
21 you attended trade school, correct?
22 A. No, huh-uh. No, I've had a lot of jobs. Like so
23 from there I worked for 7-Up, I got that job through my
24 brother-in-law whose buddy was the hiring manager there.
25 Q. And was that an increase in pay?

21

1  A. A little bit, yeah, it was a little better with
2  working hours compared to what I was doing before.
3  Q. Okay. And that company hired you even though you
4  had your prior conviction?
5  A. Yes. Again, it was the hiring manager was a
6  friend of the family who did.
7  Q. How long did you stay at that job?
8  A. Till about 2004, mid 2004.
9  Q. And then where did you go after that?
10 A. My uncle was a hiring manager at a ▓▓▓▓ company
11 and worked it out somehow to offer me the job to go work
12 for him.
13 Q. And is that in Michigan?
14 A. Yes.
15 Q. And was there an increase in pay at the ▓▓▓▓
16 company?
17 A. Yes.
18 Q. And is that why you left your prior position?
19 A. Yes, for better stability.
20 Q. So you weren't fired from your prior position?
21 A. No.
22 Q. And so how long did you stay at the ▓▓▓▓
23 company?
24 A. Until I moved to ▓▓▓▓▓▓, so 2007.
25 Q. Did you work while you were in trade school?

22

1   A. Yes.
2   Q. When did you start that position?
3   A. That was kind of an off and on position with my
4   uncle who owns a ▓▓▓ company out there.
5   Q. A ▓▓▓ company, is that what you said?
6   A. Yes, uh-huh. So my uncle was the owner and just
7   said, you know, hey, I've got some hours here if you're
8   interested while you're in school.
9   Q. And when did you start there?
10  A. Maybe towards the end of the year once I moved
11  out there, maybe.
12  Q. So 2007?
13  A. Yeah, 2007, probably Decemberish. I was helping
14  with some Christmas parties.
15  Q. And how long did you do that job for?
16  A. Just off and on until I moved back to Michigan.
17  Q. So for roughly two years?
18  A. Yeah.
19  Q. And so then when you moved back to Michigan did
20  you get employment right away?
21  A. It took about two months.
22  Q. And where did you get hired?
23  A. It was a company that does the equipment for
24  ▓▓▓ needs, and that was through my mother, who had
25  been with that company for over 30 years.

23

1   Q. And then is it fair to say that employment
2   started in 2009?
3   A. Yes.
4   Q. And was that an increase in pay from your prior
5   catering job?
6   A. It was about the same.
7   Q. Was there fringe benefits associated with it?
8   A. As in like health benefits and stuff?
9   Q. Correct, yes.
10  A. There was not, no.
11  Q. And this company hired you even though you were
12  priorly convicted of criminal sexual conduct?
13        MS. CARBAJAL: Objection, form.
14        THE WITNESS: Yes, the hiring manager is
15  very good friends with my mother so she knew all about
16  that.
17  BY MR. DAMICH:
18  Q. Okay. You said there's like a gap of two months
19  between the time you moved back to Michigan and the time
20  you started with the ▓▓▓ company, we'll call it.
21  Did you apply for any other positions during that time
22  period?
23  A. Yes.
24  Q. Approximately how many?
25  A. I have no idea. I don't remember.

24

1   Q. Would you say more than five?
2   A. I would say between five and ten most likely.
3   Q. Okay. Were you interviewed by any of those
4   potential employers?
5   A. Not in person. I did do one phone interview with
6   a heating and cooling company and once it came out with
7   my conviction and my status on the registry I was denied
8   employment, they just didn't want the, I'll call it, the
9   hassle of having someone on the registry going into
10  people's homes.
11  Q. Okay, then how long did you stay with the ▓▓▓
12  company?
13  A. Until 2011.
14  Q. Then why did you leave the ▓▓▓ company?
15  A. Well, I was fired and then they soon after went
16  under so....
17  Q. And why were you fired?
18  A. I did have, what do you call it, a slight
19  argument with a lady at a McDonald's drive-through and I
20  was in a company vehicle so she called the number on the
21  side of the company vehicle and told them that she had a
22  parking argument with one of their employees and didn't
23  like the way it went. So they called me back into the
24  office and I went in and I was let go at that time.
25  Q. So it had nothing to do with your status on the

25

1   sex offender registry?
2   A. No.
3   Q. Did you find employment after you were fired?
4   A. About two to three weeks later is when my son was
5   born so, no, I -- I was fired before that and then I
6   went about nine months before I found another job, which
7   is the current job I'm still at today.
8   Q. Did you primarily take care of your son during
9   that time?
10  A. I did.
11  Q. So would it be fair to say your current position
12  started in 2013?
13  A. April of 2012.
14  Q. And what is your current position?
15  A. Auto manufacturing.
16  Q. And what's your job function; what do you do?
17  A. Forklift driver and assembly line operator.
18  Q. And was that position a pay increase from the
19  ▓▓▓ company?
20  A. Yes.
21  Q. Did you receive fringe benefits in the new
22  position?
23  A. Yes.
24  Q. Do you remember when you applied to the auto
25  company if they asked about your prior conviction?

26

1  A. They did.
2  Q. And they hired you even though you were priorly
3 convicted of criminal sexual conduct?
4  A. Yes. But, again, like every previous job I've
5 ever had it was my wife's co-worker's mother who was in
6 the hiring position that got, you know, quote, unquote,
7 got me in there.
8  Q. Since you started there in 2012 have you had
9 steady pay increases over the years?
10  A. Yes.
11  Q. And would you say they are substantial pay
12 increases?
13  A. Over the span that I've been there, yeah.
14  Q. Have your responsibilities increased over the
15 years in your current position?
16  A. No, huh-uh.
17  Q. All right. So is it a fair statement that you've
18 been steadily employed for the past 23 years?
19      MS. CARBAJAL: Objection to form.
20      THE WITNESS: Yes, thanks to family and
21 friends that were able to assist me.
22 BY MR. DAMICH:
23  Q. Would you say that having a CSC conviction has
24 made finding employment more difficult?
25  A. Absolutely.

27

1  Q. How so?
2  A. Going back to when I, you know, went to school
3 for HVAC, you know, I applied at several like 20 plus
4 companies out in ▮▮▮▮, never received a call back
5 except for two companies and both of them said pretty
6 much the same thing, as a company they didn't want the
7 hassle or the potential blowout of having somebody on
8 the registry, you know, going into homes, working on
9 HVAC systems. So with the whole HVAC part of it, yes, I
10 was unable to even do one day of service for the class
11 that I went to. And like I said before, if it wasn't
12 for my family and friends I honestly couldn't tell you
13 if I would have been able to, you know, get a decent
14 paying job like I have now.
15  Q. So even with your CSC conviction you've been able
16 to maintain employment, though, correct?
17      MS. CARBAJAL: Objection to form.
18      THE WITNESS: Yes.
19 BY MR. DAMICH:
20  Q. Okay. Do you belong to any social clubs or
21 anything currently?
22  A. I do not.
23  Q. What do you do in your spare time outside of
24 work?
25  A. I like to go fishing and hunting.

28

1  Q. Okay. Has your prior conviction gotten in the
2 way of your ability to enjoy fishing or hunting at all?
3  A. For fishing, yes, only because of the area I live
4 in, I have the ability -- or where I fish at is right on
5 the border of Canada and Michigan, so I'm unable to -- I
6 have to stay in a certain area in the middle of the
7 river, I can't go over because of my status and
8 conviction.
9      Hunting-wise, yes, because I'm not allowed
10 any firearms, so I have to stick to traditional bow and
11 arrow, which makes it very difficult.
12  Q. I want to go and start talking a little bit about
13 your CSC conviction, just a couple questions about that.
14 So you were convicted in 2000 of criminal sexual conduct
15 in the third degree because you had sex with a minor,
16 correct?
17  A. Yes, attempted CSC three, yes.
18  Q. And the victim was a 14 year old, was 14 years
19 old, right?
20  A. Yes.
21  Q. So you had sex with a 14 year old?
22  A. Yes.
23  Q. And did you have a special relationship with the
24 14 year old at the time the sexual conduct occurred?
25  A. No, it was more of a kind of we met at kind of

29

1 like an after football game party kind of deal.
2  Q. And how many times did you have sex with the 14
3 year old?
4  A. Just the one time.
5  Q. How many different charges of CSC were bought
6 against you?
7  A. Just one.
8  Q. Just one. And you pled guilty, correct?
9  A. Yeah, I did plea bargain, yeah. I'm not sure how
10 that all comes out.
11  Q. Were there allegations of force or coercion in
12 the sexual activity?
13  A. Out of her five interviews she did with the
14 police two of them she said that it was forced and then
15 she recanted on her statements and finally told the real
16 story.
17  Q. Okay. In your opinion do you think a 14 year old
18 child can consent to sex with an adult?
19  A. No.
20  Q. In your opinion does a 14 year old have the
21 maturity level to consent to having sex with an adult?
22  A. No.
23  Q. Aside from your 2000 conviction have you been
24 arrested or charged with any other crimes?
25  A. No.

### 30

Q. When you were originally released from prison you had to register for 25 years, right?
A. Correct, uh-huh.
Q. Okay. And due to changes in the law the registration period was changed to life; is that correct?
A. Yes.
Q. And as a lifetime registrant how often do you need to verify in person with law enforcement?
A. Four times a year, quarterly.
Q. And where do you do that; where do you physically go to do that?
A. The majority of my registration up until about eight years ago was through the Michigan State Police Post.
Q. Okay. And then how far away is the Michigan State Police Post from where you were living?
A. 15 miles.
Q. And approximately how long did it take to register each time you went?
A. It really was a roll of the dice. It went anywhere from 45 minutes to three hours.
Q. And then when you verify four times per year you review and update your information, correct?
A. Yes.

### 31

Q. Are you aware that there is the ability to send your updates in the mail?
A. Recently I found out about that, yes.
Q. Have you taken advantage of that at all?
A. I have not.
Q. So you have -- each time you register you actually go to register in person?
A. Yes, 'cause I was a little confused if -- excuse me, if that was for say I buy a new vehicle or something, if that's what that was for just to send in a quick change or if you were allowed to do that quarterly instead of in person, I was not aware of how that exactly worked.
Q. And did you do anything to clarify your confusion at all?
A. The last time I went in to the local PD I asked the lady in front, you know, is this for just any changes that happened between my registration or is this for registration and she said she wasn't 100 percent sure and she would get back to me next time I come in.
Q. So you still don't have a clear answer on that?
A. Correct.
Q. Have you tried to contact the Michigan State Police directly to get clarification on that question?
A. I have not.

### 32

Q. I'm going to go ahead and show my screen real quick here.
A. Okay.
Q. Can you see that?
A. Yes.
Q. Have you seen this document before?
A. Only with the previous meeting I had with one of the lawyers.
Q. Okay. And can you tell me what this document is?
A. It appears to be the mail-in update form.
   MR. DAMICH: Just real quick I'm going to ask that this be marked as Exhibit A.
   (Whereupon Deposition Exhibit A marked for identification.)
BY MR. DAMICH:
Q. Now, looking at this form here, is this the type of information that you have had to report to law enforcement in the past?
A. Yes.
Q. Is there anything -- looking at this form, is there anything confusing with the first section where it says offender information, is there anything confusing there to you?
   MS. CARBAJAL: Objection, form.
   THE WITNESS: No, other than like I wouldn't

### 33

know what my Department of Corrections number is or my registration number.
BY MR. DAMICH:
Q. Okay. You just don't know them by heart, you just have to look that up, right?
A. Yes, 'cause when I go into the police department to update my information they don't hand us this sheet or any sheet to write in ourselves, they do all that for us and then kind of slip it across. So I've actually never really looked up my registration number or my Department of Corrections number.
Q. Are you confused by what Michigan Department Correction number means?
   MS. CARBAJAL: Objection to form.
   THE WITNESS: No, I mean I'm sure I have an MDOC number, I'm sure I have -- I would assume I have one, yes.
BY MR. DAMICH:
Q. And does the term registration number confuse you as well?
   MS. CARBAJAL: Objection, asked and answered.
   THE WITNESS: No, it doesn't confuse me, I just don't know what it is.
BY MR. DAMICH:

34

1  Q.  Okay.  Do you find anything confusing about the
2  second section there, temporary residence information?
3  A.  I mean not -- I guess, yes, because it's asking
4  for a temporary residence information.  I don't know if
5  that's asking for my home or because I would consider my
6  home a permanent residence.
7  Q.  Okay.  If you had questions about what temporary
8  means who would you ask for clarification?
9  A.  If I was in the police department I would ask
10 whoever the person is doing it, but I have in the past
11 with any questions I had, I know we're not there yet,
12 but involving travel I would call a Michigan Department
13 of -- I'm sorry, the Michigan State Police sex offender
14 unit.
15 Q.  Now moving down to the third column there, which
16 is contact information, is there anything confusing in
17 that area to you?
18 A.  No.
19 Q.  And then down to the section four there where it
20 says vehicles, is there anything confusing about that
21 section to you?
22 A.  The only thing I found confusing with this
23 section is, like I said before, I do fish and camp and
24 hunt and everything and I do own a boat and not anymore
25 but we used to own an RV or a camper, when I did go into

35

1  the police department to ask them if I'm supposed to put
2  the boat and the RV and everything on there they could
3  not give me an answer, they were unaware.
4  Q.  Okay.  And did you -- so did you report to the
5  police the identification numbers for the boat and the
6  RV?
7  A.  I did, excuse me, I did with the boat, yes, just
8  in case.  I didn't want some police visiting my house
9  because I didn't register my boat.
10 Q.  Sure.  And the same question for the RV as well?
11 A.  I don't think I did that.  I think by that time
12 is when I found out the answer that the boat was yes and
13 the RV I believe was no, which now that's -- even since
14 then that's changed so....
15 Q.  In the next section, section five, mobile homes,
16 is there anything confusing about that?
17 A.  No.
18 Q.  Do you think that the sex offender registry
19 protects the public in any way?
20       MS. CARBAJAL:  Objection, calls for an
21 expert conclusion and form and foundation.  Go for it.
22       THE WITNESS:  Can you repeat it one more
23 time?
24 BY MR. DAMICH:
25 Q.  Sure.  Do you think the sex offender registry

36

1  protects the public in any way?
2        MS. CARBAJAL:  Same objections.
3        THE WITNESS:  Yes, but there are just
4  numerous caveats I would put on that, but, yes.
5  BY MR. DAMICH:
6  Q.  Why do you think it protects the public or how do
7  you think it protects the public?
8        MS. CARBAJAL:  Same objections.
9        THE WITNESS:  To be honest with you I really
10 can't come up with a good answer.  I don't know.
11 BY MR. DAMICH:
12 Q.  But you believe it does protect the public?
13 A.  To an extent, sure.
14       MS. CARBAJAL:  Objection.
15       THE WITNESS:  I mean.
16 BY MR. DAMICH:
17 Q.  Now, you said there were caveats to that, though,
18 correct?
19 A.  Yes.
20 Q.  Can you go through those?
21 A.  Just some of them are -- I don't have the exact
22 statistics but I will ballpark them, you know, it's
23 somewhere in the high 90 percentile are -- of people
24 that commit CSC crimes are either first time offenders
25 or relation to the victim.  So if that high of a

37

1  percentage is first time offenders and/or people in your
2  households, I don't see how a registry would protect
3  those people.
4  Q.  So, in other words, you believe the registry
5  underreports victims?
6        MS. CARBAJAL:  Objection, form.
7        THE WITNESS:  No, I just don't think the
8  registry does its due diligence.  I guess the best way I
9  can put it is, you know, for the actual, you know,
10 convicted pedophiles that mess with children, you know,
11 stuff like that, sure.  But for -- it's so oversaturated
12 with people like mine that were in the, quote, unquote,
13 high school sweetheart status, you know, and your
14 typically peeing in public, stuff like that, no, I think
15 it fails miserably with that.
16 BY MR. DAMICH:
17 Q.  Do you think that the sex offender registry may
18 encourage victims to come forward?
19       MS. CARBAJAL:  Objection, form and
20 foundation.
21       THE WITNESS:  I have no idea.
22 BY MR. DAMICH:
23 Q.  If victims come forward to report sex crimes,
24 does that protect the public?
25       MS. CARBAJAL:  Objection, form, foundation.

### Page 38

1  THE WITNESS: Yes.
2  BY MR. DAMICH:
3  Q. And why do you believe that that would protect
4  the public?
5  A. Assuming the person that did that to that person,
6  you know, wasn't a first time offender, then, yes, they
7  would be placed on the registry, which would -- I don't
8  know, I don't know how to word it, how I want to say it.
9  I don't know, I guess. I don't know how to word it the
10 way I want to, I guess.
11 Q. Okay, I'm going to go ahead and share my screen
12 again.
13     MS. CARBAJAL: Is this your next exhibit,
14 Scott?
15     MR. DAMICH: It is, yes.
16     MS. CARBAJAL: Okay, can we take a short
17 break before you bring this up?
18     MR. DAMICH: Absolutely, yes. How long do
19 you want, like ten minutes?
20     MS. CARBAJAL: Yeah, ten minutes would be
21 great.
22     MR. DAMICH: Perfect, excellent, back in ten
23 minutes.
24     MS. CARBAJAL: Sounds good.
25    (A recess was taken.)

### Page 39

1     MR. DAMICH: We're back on the record.
2    (Whereupon Deposition Exhibit B
3     marked for identification.)
4  BY MR. DAMICH:
5  Q. I'm going to go ahead and share my screen real
6  quick with you.
7     MS. CARBAJAL: Before we get too far into
8  this questioning I just want to put on the record that
9  we are still objecting globally to this line of
10 questioning for the reasons that we articulated to the
11 court. And just as a general reminder that the court
12 said this line of questioning couldn't become abusive so
13 please keep it short and not abusive to the extent you
14 can, thank you.
15     MR. DAMICH: Noted, thank you.
16 BY MR. DAMICH:
17 Q. Sir, do you see the document that I'm showing you
18 on the screen?
19 A. Yes.
20 Q. This document summarizes various court cases and
21 factual scenarios from those court cases. I'm going to
22 ask that you read through some and then I'm going to
23 have some questions after you're done reading them. So
24 I'd like to scroll down here to number 11, and I'll zoom
25 in a little bit to help you out here. Could you go

### Page 40

1  ahead and read the words in this box here and let me
2  know when you're done?
3  A. Okay. Okay.
4  Q. Would you want to know if this perpetrator lived
5  next door?
6  A. Yes.
7  Q. If you could read number 16 here. Let me know
8  when you're done, it's a long one.
9  A. Okay. Okay.
10 Q. Would you want to know if this perpetrator lived
11 next door?
12 A. Yes, but I would also like to know, you know, was
13 this his first offense, did he take any classes.
14 There's a lot of things I would also like to know than
15 just simply a yes or no about did he live next door to
16 me. Excuse me for my voice.
17 Q. Number 18, if you could go ahead and read that
18 and let me know when you're done. Okay?
19 A. Okay.
20 Q. Would you want to know if this perpetrator lived
21 next door?
22 A. Yes, with the same understanding of, you know, I
23 would like more information about if they'd been through
24 sex offender classes or if they are a first time, second
25 time, repeat, stuff like that, I would like to know also

### Page 41

1  along with that.
2  Q. In your opinion, do you believe that information
3  makes them more or less of a threat?
4     MS. CARBAJAL: Objection, foundation and
5  form.
6     THE WITNESS: Probably -- well, I mean it
7  all depends. Like using my own example, you know, if I
8  were to move in next door to me and I found out that it
9  was a one time thing in high school and I've never been
10 in trouble since I would like to know that, I would
11 not -- I would not be bothered if someone lived next to
12 me that was in my kind of situation.
13 BY MR. DAMICH:
14 Q. Okay, but for this situation here, number 18, you
15 would like to know that information, correct?
16 A. Yes.
17    MS. CARBAJAL: Objection to form.
18 BY MR. DAMICH:
19 Q. Go ahead, if you could read number 41 and let me
20 know when you're done.
21 A. Okay.
22 Q. Would you want to know this information if this
23 perpetrator was your son's barber?
24 A. Yes.
25 Q. If you could read 42.

**42**

1     A. Okay.
2     Q. Okay. Would you like to know this information if
3 this perpetrator was your son's golf instructor?
4     A. Yes, again, with -- I would like to know
5 everything about the situation, yes, like I said before.
6     Q. Okay, if you can read number 59, please.
7     A. Okay.
8     Q. Would you like to know this information if this
9 defendant were your son's baseball coach?
10    A. Yes.
11    Q. If you could read number 81 and let me know when
12 you're done.
13    A. Okay.
14    Q. Would you like to know this information if this
15 defendant lived next door?
16    A. Yes, with the same caveats that I spoke of
17 before.
18    Q. In your opinion, when does someone no longer
19 become a threat?
20         MS. CARBAJAL: Objection to form and
21 foundation.
22         THE WITNESS: There's a lot of factors, you
23 know, did they attend sex offender training classes that
24 they make us do, how long it's been since their offense
25 and if anything has happened again since then, I mean

**43**

1 that's just the stuff I would like to know.
2 BY MR. DAMICH:
3     Q. Okay.
4     A. Are they a habitual offender or was that a one
5 time thing kind of deal.
6     Q. And after all of those things occurred you
7 believe the person would no longer be a threat?
8         MS. CARBAJAL: Objection, mischaracterizes
9 the testimony and foundation.
10        THE WITNESS: Well, yes, if they -- again, I
11 can use myself as an example, it's been 23 years since
12 they made their one mistake, then, yes, I wouldn't have
13 any issue living next door to that person.
14 BY MR. DAMICH:
15    Q. Okay. Back to the scenario in 81, if it was 23
16 years after the fact would you still feel uncomfortable
17 living next door to this person?
18        MS. CARBAJAL: Objection, form.
19        THE WITNESS: No, I would not feel
20 uncomfortable living next to that person.
21 BY MR. DAMICH:
22    Q. So in your opinion the passage of time removes
23 threat?
24        MS. CARBAJAL: Objection to form,
25 foundation.

**44**

1         THE WITNESS: Like I said before, it's a
2 number of things, the passage of time, if -- you know,
3 what has happened since then, you know, have they become
4 a part of society, did they not break any more laws, a
5 lot of that. It's not just as cut and dried as just the
6 passage of time.
7 BY MR. DAMICH:
8     Q. Have you ever contacted a member of the Michigan
9 legislature to inquire about changing the sex offender
10 registration laws?
11    A. I have.
12    Q. On how many occasions?
13    A. I think I've written probably four emails over
14 time.
15    Q. And that was sent to the legislature?
16    A. I believe so. Yeah, I received a list of, you
17 know, people in my area who I would contact that can
18 help with -- or that deal with that so that's the list I
19 used to contact them.
20    Q. Okay. Are you aware that the legislature has the
21 power to change the law?
22        MS. CARBAJAL: Objection, form.
23        THE WITNESS: I believe so, yeah.
24 BY MR. DAMICH:
25    Q. And do you know whether Governor Whitmer has the

**45**

1 power to change the sex offender registration law?
2        MS. CARBAJAL: Objection, form, foundation.
3        THE WITNESS: If I'm not mistaken I believe
4 she holds the power to veto anything that comes before
5 her or to allow it to pass.
6 BY MR. DAMICH:
7     Q. Assuming that the governor does not veto
8 something, does she have the power to change that law?
9        MS. CARBAJAL: Objection to form,
10 foundation.
11        THE WITNESS: I'm not 100 percent sure.
12 BY MR. DAMICH:
13    Q. Do you know whether Governor Whitmer can reduce
14 the registration period?
15        MS. CARBAJAL: Same objections.
16        THE WITNESS: Did you say do I know why?
17 BY MR. DAMICH:
18    Q. No, do you know whether she can reduce the
19 registration period?
20    A. Again, I assume she held the overall power to
21 accept it or to veto it?
22    Q. Do you think that today Governor Whitmer could do
23 something to reduce the registration period?
24        MS. CARBAJAL: Same objections.
25        THE WITNESS: Yes, I believe she could.

### 46

BY MR. DAMICH:
Q. And what would that be?
    MS. CARBAJAL: Same objections.
    THE WITNESS: I mean just what I believe she could -- I guess I'm repeating myself, but I guess it would be the legislature bringing something in front of her, she has the power to allow it or veto it, you know, call that power to change laws.
BY MR. DAMICH:
Q. So the legislature would have to do something first, then the governor would have to act; is that your understanding?
    MS. CARBAJAL: Same objections.
    THE WITNESS: I believe so. I trust in the lawyers to go after the proper people.
BY MR. DAMICH:
Q. Do you know whether Colonel Gasper has the power to change the sex offender registration laws?
A. I do not.
    MS. CARBAJAL: Objection, form, foundation.
BY MR. DAMICH:
Q. And do you know whether he can reduce the registration period?
    MS. CARBAJAL: Same objections.
    THE WITNESS: I'm not sure with him.

### 47

BY MR. DAMICH:
Q. Did you know under the old law that you had to make all changes to information in person within a specified number of days?
A. Yes.
Q. And did you know that under the new law some of those changes could be made by mail?
A. Yes, I did, yeah.
Q. And would you agree that making the changes by mail is easier than making those changes then in person?
    MS. CARBAJAL: Objection to form, foundation, he already said that he was confused about that.
    THE WITNESS: Yes, I've never used it before so I don't know, you know, ease of use or -- you're trusting in the mail getting there and the people doing the proper thing with your paperwork. And the way I look at it with -- I've never been in trouble since then, I've done everything I'm supposed to do with the registry, that's just too much trust for me to put into the mail carriers and the people that receive it to do the proper thing with it that it gets done in time so that I don't get arrested for not doing the proper thing.
BY MR. DAMICH:

### 48

Q. Do you use the U.S. mail for any other purposes?
    MS. CARBAJAL: Objection, form.
    THE WITNESS: To be quite honest with you I pretty much use the U.S. mail to send holiday cards and what else, to return Amazon stuff. Besides that, no.
BY MR. DAMICH:
Q. Do you think placing the holiday cards in the mail is easier than personally delivering the holiday cards?
    MS. CARBAJAL: Objection to form.
    THE WITNESS: Well, sure, I have a lot of family that live across the country so that would be easier.
BY MR. DAMICH:
Q. So would you agree that mailing your registration would be physically easier than hand delivering it?
    MS. CARBAJAL: Objection to form.
    THE WITNESS: Yes, it would probably be easier than delivering it.
    MR. DAMICH: I don't have any further questions.
    MS. CARBAJAL: Okay, I will have a few but I need a few minutes, I guess like five minutes.
    MR. DAMICH: Works for me.
    MS. CARBAJAL: All right, see you all back

### 49

soon.
    (A recess was taken.)
        EXAMINATION
BY MS. CARBAJAL:
Q. So first thing I just want to make a clarification, do you remember when there were questions, Mr. Doe, about being released from jail?
A. Yes.
Q. I think the record got a little bit muddy there. Did you serve time in jail or prison?
A. It was jail.
Q. Thank you. And then do you also remember being asked about obtaining adequate housing?
A. Yes.
Q. And then you mentioned being rejected from a lot of apartments; is that correct?
A. Yes.
Q. Do you know why you were rejected from those apartments?
A. **Yes. Two or three of them told me verbally it was due to my registration status and one other one it was right in their terms on the contract that if you've ever been convicted of a sex crime and served time on the registry they do not allow people on the registry to live in the apartment complex.**

50

Q. And then do you remember -- oh, sorry, strike that. Did you have any other housing difficulties due to your status on the registry?

A. I mean pretty much -- no, I mean everything -- the places he asked me is pretty much everywhere I've lived so....

Q. And then do you remember talking about how you were not allowed to coach or participate in events with your son?

A. Yes.

Q. Are there any specific activities that you would have liked to be involved in with him?

A. Well, I played baseball pretty much my entire life and into softball as an adult and everything. I would have loved to coach his baseball team, T ball team. Especially right now they are begging for people to be coaches, they just can't find enough and here I am able to but cannot.

And also he's -- in the past year he joined the Boy Scouts of America, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and he told me, he goes, we would love to have you in here as a troop leader and everything but unfortunately due to your registration we cannot. So that's something I would have liked to have done too. Like I can't go to any of

51

their camping outings with them, when he gets all of his badge work they do that all at the camps and I'm unable to attend to be able to watch that.

Q. And why can't you attend those Boy Scout events?

A. He told me it's due to the registration status.

Q. And in terms of coaching baseball, why aren't you allowed to coach baseball teams?

A. It was the same thing, it's through the school so they run the background checks, and the same as I'm not allowed to go -- or wasn't allowed to go participate in the father/son breakfast. Before the law changed two years ago I wasn't allowed to go to any Christmas concerts, art projects, nothing like that. And the principal called me on the phone and told me that I'm not allowed to attend those due to my registration, and if the laws ever change to call him back and we can discuss it further with him.

Q. Are there any other specific events and activities that you would have liked to attend with your son besides ones we've talked about now?

A. Yeah, I mean basically that's all the things, you know, his -- I would have loved to go to all of his T ball games, baseball games and football games and hockey try outs and all that, but I wasn't allowed to.

Q. And besides you not being able to coach your son

52

or participate with him in the Boy Scouts and attend some of his events, is there any other way that your son has been affected by your registration status?

A. Yeah, he -- I want to say last year in fifth grade they had him -- I believe the school was trying to just kind of teach them about how things you do, you know, on social media or YouTube and stuff pretty much stays on the internet forever so they had them Google their names as part of a project. And when my son Googled his name my picture appeared for my offender registration and a couple of his friends made little comments, oh, dude, your dad's on the internet thing.

So fast forward to the end of that day he came home and asked my wife, you know, what does sex offender mean and why is dad on the internet as a sex offender. So we had to at ten years old pretty much explain to him what happened and where we're at today with that. So he had a little bit of embarrassment from his friends.

Q. What do you mean by a little bit of embarrassment from his friends?

A. They teased him a little bit about, oh, your dad's on the internet for some sex thing or whatever. So we did reach out to the school and to the teacher and kind of explained the situation and I think -- we

53

haven't really heard much about that specific incident since I think the teacher kind of nipped that in the bud for us kind of deal, but he was pretty upset when he came home asking, you know, why people were laughing at him.

Q. Thank you. And then earlier you testified that you've been able to obtain employment through friend and family connections, correct?

A. Yes.

Q. And you've had a pretty successful track record of having employment through your friends and family's connections, correct?

A. Yes.

Q. When you're searching -- when you have searched for employment in places that you don't have connections have you had the same kind of success?

A. I have not. So far in my adult life I've never obtained a job on my own with nobody else's help.

Q. Have you ever gotten to use your heating and schooling certification?

A. Never spent even one day in the field.

Q. Would you have liked to have a career in that field?

A. Yes, especially back then when I was living in ▮▮▮▮▮▮▮▮▮, I thought that was a good route to go.

### Page 54

Q. Any other reason that you would have liked to have a career in that field?

A. I just kind of like the -- you know, you're kind of working outside, you're kind of your own boss doing your own thing kind of deal.

Q. And then in terms of not being able to obtain employment without friend and family connections, have you been told why you've been rejected from the other jobs you've applied to?

A. Several of them I just never heard anything back. The other ones that I did hear something back I was told that, you know, due to either your conviction or your registry status that they were unable to extend employment opportunities. A lot of it, you know, I've noticed any kind of service industry or anything that you need to go in people's homes that's the first thing out of their mouths is due to my registration as a company they pretty much don't want that hassle of dealing with it, any blow-back from, you know, jobs that you would do.

Q. And then do you remember also talking about how you in your current position your responsibility hasn't really increased?

A. Right, uh-huh.

Q. Would you have liked to have your

### Page 55

responsibilities increase?

A. Oh, yeah, that was -- I really wanted to go forward to become like a unit rep or some type of supervisor, team leader. And after the election process I see how people are, it's no different inside there than it is in our own political election process where, you know, people start dredging through the mud, find anything out about you.

For instance, one of the guys that was trying to go for team leader, he had a DUI from several years ago and someone found like his mug shot with his information on it and plastered it all over our workplace as a way to deter people from voting for him so I just -- I don't want to do that to myself so I'm kind of restricted, unable to run for any of those offices.

Q. So you haven't looked for more responsibility because of your registration status, correct?

A. Yes.

Q. Because you don't want people bringing that up like you've seen it brought up for other people, correct?

A. It would be plastered all over my workplace.

Q. Have you faced any other hardship due to your registry status that we haven't spoken about today?

### Page 56

A. Yeah, as far as, you know, traveling for family vacations, things like that. Every state has their own rules, you know. It was a big deal for us wanting to take my son to Disney and then we found out how Florida has a 48 hours -- or, for instance, say I fly there I have 48 hours to register with the State of Florida in which I get put on the Florida registry. So even if I ever get off the Michigan registry I would still remain on the Florida registry. So anyone with half a brain would not want to do that to themselves.

And Disney does have rules in their terms that if you're on the sex offender registry you're not allowed in the parks and there's several documented where people were found out about that and removed from the park by police in front of their families and everything. So unfortunately I was not able to take my son to Disney.

Then we had a big family trip a couple years ago to Scotland, I was unable to go to that due to the registry, they don't allow people on the registry into Scotland. And also on your passport now they do a nice big red stamp on your passport so anywhere I would go would instantly open my passport and see that I'm a registered individual. So within the United States, you know, there's states like, for instance, where I used to

### Page 57

live, ▮▮▮▮, you have to let them know within three business days that you're there on vacation so really you only have that small gap to visit there and it's become such a pain to go anywhere longer than three days or trying to find anywhere to go longer than three days.

Q. Have you had any issues with social media due to your status on the registry?

A. Yes. I had a Facebook account for several years and I was in my -- the neighborhood I live in has an HOA page just for things going on in the community, I was on there. And there was -- someone left their dog outside and was barking and I just commented, hey, just in case you forgot your dog's outside barking all day long. And ▮▮▮▮▮▮▮▮▮▮▮▮ responded to my post with the link to my offender registry profile on the State of Michigan's website. And when I commented back, you know, what does this have to do with anything, there was no response.

And then fast forward about four or five hours later I went to go sign on to Facebook and my account had been deleted because she reported me as being a person on the registry on Facebook and, yeah, and come to find out she is ▮▮▮▮ so I was getting harassment by law enforcement where I live.

### Page 58

1  Q. Can you say a little bit more about the
2  harassment by law enforcement?
3  A. Well, yeah, I mean just that and so come to find
4  out we were friendly with our neighbors, it's a little
5  bit of an older community here but grew friendly with
6  our neighbors, but we have noticed like ever since then
7  we stopped getting invited over. Like the guy next to
8  us, we used to go over there for barbecues and dinners
9  and that has ceased since that post on the HOA page.
10     We don't get many hello's and hi's when
11 we're walking around anymore. My car has been egged I
12 think twice here and once in ■■■■. And I know it
13 sounds funny but actually my one work car was covered in
14 American cheese when I came out to go to work one day,
15 it was covered in American cheese, which upon
16 researching that more I found out that it begins to
17 degrade the paint on the vehicle so, yup.
18  Q. Thank you. And then some final questions. Do
19 you remember speaking earlier about holiday cards?
20  A. Yes.
21  Q. Are there any consequences if your holiday cards
22 do not arrive to their intended destination?
23  A. No.
24  Q. Are there consequences if your registration
25 updates do not arrive to the Michigan State Police?

### Page 59

1  A. Yes, I would be arrested and given a felony for
2  not following through on my registration duties.
3     MS. CARBAJAL: Those are all my questions.
4  Thank you so much.
5     RE-EXAMINATION
6  BY MR. DAMICH:
7  Q. I have a couple follow up questions. You have to
8  be convicted of a sex crime to be on the registry,
9  correct?
10  A. Yes, I believe so, uh-huh.
11  Q. When's the last time that you tried to apply for
12 an HVAC position?
13  A. Probably after I was fired from my last job in
14 2000 -- what did I say it was, 11.
15  Q. So it's been over a decade?
16  A. Yeah.
17     MS. CARBAJAL: Objection to form.
18 BY MR. DAMICH:
19  Q. Does your job have a policy in place that
20 prevents you from running for leadership positions?
21     MS. CARBAJAL: Objection to form.
22     THE WITNESS: In the union I would say no,
23 but it's kind of a specific -- it's kind of a different
24 kind of place where I work so for a union position
25 there's nothing against it, but if I wanted to go into

### Page 60

1  like salary, supervision position, I mean there are --
2  you know, I would have to go through another background
3  check and all that. I'm not 100 percent if there's
4  something that would hold me back from that but I do
5  know I would have to run through another background
6  check because it's two separate things, yup.
7  BY MR. DAMICH:
8  Q. You had mentioned some out-of-state registries,
9  for example, the Florida registry.
10  A. Yes.
11  Q. Are you required -- would you have been required
12 to register in Florida because you registered in
13 Michigan or is it because you were convicted of a sexual
14 crime?
15     MS. CARBAJAL: Objection to form,
16 foundation.
17     THE WITNESS: I don't know, I just -- when I
18 called the Florida sheriff and the county we were
19 thinking of going to wherever Orlando is at and that's
20 just what he told me, he said, you know, are you on the
21 registry in Michigan, and I said yes. And he said,
22 okay, so any visitors that are on the registry in any
23 other state are required within 48 hours to register
24 where they are staying, who they are with, what they are
25 doing, and that if I stay there longer than 48 hours I

### Page 61

1  would be forced to be on the public Florida registry as
2  well. And he explained to me that even if I ever get
3  removed from the Michigan registry I would still remain
4  on the Florida registry.
5  BY MR. DAMICH:
6  Q. But just to be safe, you have to be convicted of
7  a sex crime to be on the Michigan registry, correct?
8     MS. CARBAJAL: Objection, form.
9     THE WITNESS: Yes.
10 BY MR. DAMICH:
11  Q. You talked about a post on social media from a
12 ■■■■■■■■■■■■■■■■■?
13  A. Yes.
14  Q. Do you know whether or not that ■■■■■■■■
15 ■■■■■ was actually in his or her individual capacity
16 or official capacity?
17     MS. CARBAJAL: Objection to form,
18 foundation.
19     THE WITNESS: There's no way I would know.
20 BY MR. DAMICH:
21  Q. Do you remember if the Facebook post had the
22 official title associated with it?
23  A. It did not.
24  Q. You talked about vandalism to some of your
25 personal property including your house.

62

1  A. Uh-huh.
2  Q. Do you know for sure it's because you were on the
3  sex offender registry?
4      MS. CARBAJAL: Objection to form.
5      THE WITNESS: For sure, I mean, no, because
6  no one left a note, but I mean, you know, two plus two
7  is always four, so I can put two things together and I'm
8  the only house that got egged, the only house that had a
9  cheese covered car, egged cars, literally the only one
10 'cause no one else ever complained on the HOA page about
11 their houses getting egged or their cars, I was
12 literally the only house.
13 Q. In your opinion, do only sex offenders have their
14 things vandalized?
15 A. **Of course not.**
16     MS. CARBAJAL: Objection to form and
17 foundation.
18 BY MR. DAMICH:
19 Q. I'm sorry, I didn't hear your answer, sir?
20 A. **I said of course not.**
21     MR. DAMICH: That's all I have. No further
22 questions.
23     MS. CARBAJAL: Okay, I don't have anything
24 else either.
25 (Whereupon Deposition concluded at 11:45 a.m.)

63

1  STATE OF MICHIGAN )
             ) SS
2  COUNTY OF INGHAM )

3      I, Melinda Nardone, Certified Shorthand
4  Reporter and Notary Public in and for the County of
5  Ingham, State of Michigan, do hereby certify that the
6  foregoing deposition was taken before me at the time
7  hereinbefore set forth.
8      I further certify that said witness was
9  duly sworn in said cause to tell the truth; that the
10 testimony then given was reported by me remotely to the
11 best of my ability; subsequently produced under my
12 direction and supervision; and that the foregoing is a
13 complete, true, and correct transcript of my original
14 shorthand notes.
15     IN WITNESS WHEREOF, I have hereunto set
16 my hand and seal this 23rd day of April, 2023.
17
18
         _____
19
         Melinda S. Nardone, CSR-1311,
20       Certified Shorthand Reporter,
         and Notary Public, County
21       of Ingham, State of Michigan.
         My Commission Expires: 10-24-24
22
23
24
25