# Exhibit 59:

## John Doe F
## Deposition Transcript (redacted)

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                  SOUTHERN DIVISION

 4    - - - - - - - - - - - - - - - - - -
                                        )
 5    JOHN DOES A, B, C, D, E, F, G, H, )
      MARY DOE and MARY ROE, on behalf  )
 6    of themselves and all others      )
      similarly situated,               )
 7                                       )
                           Plaintiffs,  )
 8                                       )
          -vs-                          )No. 2:22-cv-10209
 9                                       )Judge Goldsmith
      GRETCHEN WHITMER, Governor of the )Mag. Ivy, Jr.
10    State of Michigan, and COL. JOSEPH)
      GASPER, Director of the Michigan  )
11    State Police, in their official   )
      capacities,                       )
12                                       )
                           Defendants.  )
13    - - - - - - - - - - - - - - - - - -

14

15             R E M O T E   D E P O S I T I O N

16    of JOHN DOE F, a Plaintiff called by Defendants,

17    taken via Zoom before Tamara Staley Heckaman,

18    Certified Shorthand Reporter and Notary Public, on

19    Thursday, April 20, 2023, noticed for the hour of

20    9:30 a.m.

21

22                      HECKAMAN & NARDONE, INC.
23                    Certified Shorthand Reporters
                             P.O. Box 27603
24                      Lansing, Michigan 48909
                             (517) 349-0847
25                       theckaman@live.com
```

**Page 2**

1  APPEARANCES:
2      AMERICAN CIVIL LIBERTIES UNION
    FUND OF MICHIGAN
3      University of Michigan Law School
    802 Legal Research Building
    801 Monroe Street
4      Ann Arbor, Michigan 48109
    By
5      PAUL D. REINGOLD, J.D.
    -and-
6      AMERICAN CIVIL LIBERTIES UNION
    FUND OF MICHIGAN
7      1514 Wealthy SE, Suite 260
    Grand Rapids, Michigan 49506
8      By
    DAYJA TILLMAN, J.D.
9
10          On behalf of Plaintiffs.
11      MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
12      MDOC Division
    P.O. Box 30217
    Lansing, Michigan 48909
13      By
    ERIC M. JAMISON, J.D.
14
15          On behalf of Defendants.
16        EXAMINATION INDEX
17  ATTORNEY'S NAME   EXAMINATION RE-EXAMINATION
18  BY MR. JAMISON:   5      81
19  BY MR. REINGOLD:   65
20      *      *      *
21       INDEX OF EXHIBITS
22  EXHIBIT           MARKED
23  Exhibit A         30
24  Exhibit B         55
25

**Page 3**

1        Remote Deposition
2        Thursday, April 20, 2023
3        9:30 a.m.
4      COURT REPORTER:  The attorneys
5  participating in this deposition acknowledge that
6  I am not physically present in the deposition room
7  and that I will be reporting this deposition
8  remotely.  They further acknowledge that in lieu
9  of an oath administered in person the witness will
10  be sworn remotely and his testimony in this matter
11  is under penalty of perjury.  The parties and
12  their counsel consent to this arrangement and
13  waive any objections to this manner of reporting.
14      Please indicate your agreement by
15  stating your name and your agreement on the
16  record.
17      MR. JAMISON:  Eric Jamison, agreed.
18      MR. REINGOLD:  Paul Reingold, also
19  agreed.
20      MR. DOE F:  My name is John Doe F
21  and I agree.
22        JOHN DOE F,
23    having been duly sworn, testified as follows:
24      MR. REINGOLD:  Eric, before we
25  actually start the deposition itself but on the

**Page 4**

1  record I just want to make a couple of statements
2  for the record and a couple of corrections to the
3  record if that's okay.
4      MR. JAMISON:  Sure.
5      MR. REINGOLD:  All right.  For the
6  record, the plaintiffs have a standing objection
7  to the use of any documents not supplied to date
8  by the defendants.  These were requested in
9  discovery and none have been produced.  I won't
10  make objections during the deposition, but I want
11  it to be clear there's a standing objection to
12  that from the start.
13      The other thing is the kind of thing
14  that just happened, I want to make sure that
15  everybody understands that there's a protective
16  order here and that no one is to divulge the name
17  of Mr. Doe F or -- and the transcript of this
18  deposition will be redacted to the extent that
19  things that could identify him are included.
20      The last thing I want to say is we
21  have two corrections to the record that we
22  discovered in prepping for this deposition.  One
23  is in paragraph 457 of the complaint we said that
24  Doe F was held out on the registry as a lifetime
25  registrant, and that's just not correct.  Neither

**Page 5**

1  he nor I had caught the error when getting the
2  complaint out.  He's actually a 25 year
3  registrant.
4      Also in prepping for today's dep we
5  discovered at paragraph 456 that in the complaint
6  he said that he was able to get work through his
7  girlfriend's family business and that's a mistake.
8  It should have been through his best friend's
9  family business.  When we file our amended
10  complaint we'll make those corrections.
11      MR. JAMISON:  Okay.
12        EXAMINATION
13  BY MR. JAMISON:
14    Q.  Mr. Doe, my name is Eric Jamison.  I'm an
15  assistant attorney general.  I represent Governor
16  Whitmer and Colonel Gasper in this lawsuit.  I've
17  noticed your deposition in this case, which is
18  Does, et al, v Whitmer, et al, case number
19  2:22-cv-10209, in district court in the Eastern
20  District of Michigan in front of the Honorable
21  Judge Goldsmith.
22      As your attorney mentioned there's a
23  protective order in place, which is found at ECF
24  number 88, page ID 2389 through 2395, which
25  protects your identity.

6

1  Will the court reporter confirm that
2  she's read the protective order and signed the
3  acknowledgement?
4  COURT REPORTER: I have, yes.
5  MR. JAMISON: And will counsel
6  confirm that the person tendered is, in fact, John
7  Doe F?
8  MR. REINGOLD: Yes.
9  BY MR. JAMISON:
10  Q. I'll do my best not to ask you questions
11  that have identifying information throughout the
12  course of the deposition. Have you had your
13  deposition taken before?
14  **A. No, I have not.**
15  Q. So your attorney's probably explained
16  this to you, but I'll ask you questions throughout
17  the course of the deposition. You'll need to
18  respond verbally. You can't just shake your head
19  or say uh-huh or huh-uh because the court reporter
20  won't be able to tell whether that's affirmative
21  or negative, and it makes the transcript very
22  difficult to tell, it you know, what your intended
23  response was.
24  We need to avoid talking over each
25  other, so if I'm asking a question you've got to

7

1  let me get it all the way out before you answer.
2  And, likewise, if you're answering a question I
3  won't interrupt you so you can get your full
4  answer out because if we try to talk over each
5  other the court reporter can't do her job and
6  won't be able to transcribe what we're saying.
7  If you don't understand a question I
8  can rephrase it. I'm not trying to trick you with
9  the way that I'm asking questions. Lawyers are
10  notoriously wordy so I can have a very, very long
11  question, and, like, if it gets too long you're
12  just like, yeah, I have no idea what you're
13  asking, I'm happy to rephrase it and put it -- you
14  know, chunk it up a little bit. And if you answer
15  a question I'll assume that you understood the
16  question; is that fair?
17  **A. I don't know what's fair and what's not**
18  **fair but I believe I understand.**
19  Q. Are you taking any medications or any
20  substances that affect your memory or your ability
21  to answer questions truthfully today?
22  **A. No, no medications.**
23  Q. Is there anything else that might
24  interfere with your ability to answer questions
25  truthfully and fully today?

8

1  **A. No.**
2  Q. Have you been involved in any previous
3  lawsuits?
4  **A. No.**
5  Q. Did you meet with your attorneys to
6  prepare for this deposition?
7  **A. Yes.**
8  Q. Did you review any documents?
9  **A. I reviewed -- yes, I reviewed documents.**
10  Q. Which documents did you review?
11  **A. I reviewed my court documents from my**
12  **criminal case. I reviewed -- I'm trying to think.**
13  **I reviewed the complaint, and then I reviewed the**
14  **explanation of duties, stuff like that.**
15  Q. What other things did you review?
16  **A. It was awhile ago now because I reviewed**
17  **most of it for our original date. Let me think.**
18  **I reviewed like sample questions that could**
19  **possibly be asked. I don't know if that's a**
20  **document but...**
21  Q. Were you given sample answers to
22  questions?
23  **A. No.**
24  Q. Was there anything else you reviewed to
25  prepare for the deposition?

9

1  **A. Possibly but not -- not that's coming to**
2  **mind right now.**
3  Q. Do you still live in Michigan?
4  **A. Yes.**
5  Q. On the west side of the state?
6  **A. The west side.**
7  Q. And are you married?
8  **A. No, I'm not.**
9  Q. Do you have any kids?
10  **A. No.**
11  Q. Your CSC conviction was in 2013; is that
12  correct?
13  **A. Yes, the conviction was in 2013.**
14  Q. And throughout the course of the
15  deposition I'll say CSC conviction, and what I'm
16  referring to is the conviction which led to your
17  requirement to register as a sex offender; do you
18  understand that?
19  **A. Yes.**
20  Q. So prior to 2013 what types of jobs did
21  you hold?
22  **A. Prior to 2013?**
23  Q. Yeah.
24  **A. I grew up as a child working on my**
25  **father's farm. That was at a real young age.**

10

1 High school I worked at -- I won't name the place
2 because it would give away my location but -- and
3 it may still because there's not many in the
4 state, but I worked at an amusement park doing
5 landscaping.
6 　　　　　During college I -- through my years
7 of my undergrad I worked in the hospital in
8 surgery and in endoscopy, and that led up to my
9 conviction after college.
10 　Q. So were you still in college when you
11 were convicted?
12 　A. No.
13 　Q. So between the time that you graduated
14 college and your conviction can you explain what
15 type of job you had?
16 　A. I worked in the hospital for a year
17 following my graduation.
18 　Q. And what was your approximate income in
19 that year?
20 　A. I have no idea. It was -- it wasn't a
21 job that used my degree. I was a procedure
22 support technician in surgery and endoscopy, which
23 is similar to an orderly, so it wasn't a high
24 paying job.
25 　Q. So after your conviction in 2013 what

11

1 types of jobs have you had?
2 　A. Well, I guess I'd have to correct my
3 previous statement. I got a job with my best
4 friend's construction company prior to my
5 conviction, but I was already -- I knew that I was
6 going to be in trouble, so I got that job in
7 preparation of going onto the registry.
8 　　　　　And him and his father own the
9 company and they helped me out with a job, so that
10 when I went to jail I was on work release. So
11 I've done construction work since my conviction.
12 　Q. When you started that job when the
13 charges were pending or the criminal proceedings
14 were in process, what was your approximate level
15 of income, if you remember?
16 　A. I don't know. $16 an hour, maybe.
17 　Q. And you said you were on a work release?
18 　A. Yes.
19 　Q. So were you able to work from the time of
20 your conviction?
21 　A. At the beginning of my conviction or
22 since my conviction?
23 　Q. Yeah, I guess I'm just trying to
24 understand the timeline of things. So you were
25 convicted. After you were convicted were you able

12

1 to maintain employment in the construction
2 industry?
3 　A. Yes, until 2018 when my fiancee' got
4 blood cancer and I had to quit my job to take care
5 of her.
6 　Q. So in that five year span what is -- from
7 2013, your conviction, to 2018 when you had to
8 resign from your position to care for your
9 girlfriend, or your fiancee', what was -- what was
10 your income level? Did it go up from the $16 an
11 hour?
12 　A. Over the five years it maybe went up to
13 18.
14 　Q. And then what jobs have you had since
15 2018?
16 　A. I haven't. I finished my MBA and I've
17 applied for 120 jobs -- over 120 jobs in the last
18 year, and I've gotten three callbacks.
19 　Q. What -- and what years did you work on
20 your MBA?
21 　A. From 2018 to 2022. My fiancee' got sick
22 in 2018 and I took a course at a time while she
23 was sick. And then when she passed I took two
24 semesters off, or when I knew she was going to
25 pass I dropped out of that semester and took two

13

1 semesters off.
2 　Q. And what -- you said that since you
3 graduated in 2022 you've applied for 120 jobs; is
4 that right?
5 　A. Yes.
6 　Q. And can you tell me what types of jobs
7 they are?
8 　A. They're everything that ranges from using
9 my master's degree to using my bachelor's degree
10 to needing an associate's degree to only needing a
11 high school diploma, and everything from financial
12 analyst positions to HR positions to quality
13 control positions to health and safety positions
14 in a factory. I mean, it's been a lot of
15 different types of jobs.
16 　Q. In the application process for these jobs
17 do they ask for your criminal history?
18 　A. Some do and some do not. Some only ask
19 if I've had a felony, which I do not.
20 　Q. And what do you currently do for income?
21 　A. I don't. I live off the savings that I
22 saved up before my fiancee' got sick, and
23 I -- I just live very frugally. I don't spend
24 money on myself other than paying my mortgage.
25 　Q. So can you help me understand, so my

14

1  understanding of your testimony is you earned 16
2  to $18 an hour up until 2018. You haven't worked
3  since 2018, but you've been able to support
4  yourself from your savings over a five year
5  period?
6     **A.   From my savings, some of my fiancee's**
7  **savings from when she passed, money that was**
8  **donated to us to help us live when she got sick,**
9  **and I went on unemployment for the first time**
10 **during COVID.**
11    Q.   Do you have other sources of income?
12    **A.   Nope. And family has helped me as well.**
13    Q.   And you said you have a mortgage. How
14 much is your mortgage payment?
15    **A.   It's automatically paid so I don't know**
16 **the exact amount. I -- around 700.**
17    Q.   When's the last time you applied for a
18 job?
19    **A.   Two or three days ago.**
20    Q.   And how -- how many jobs did you apply
21 for in the last month?
22    **A.   In the last month? I don't know,**
23 **probably 20 or 30.**
24    Q.   And what about in the entire year of 2023
25 so far how many jobs have you applied for?

15

1     **A.   In 2023? 50 to 60. It's been 120 in the**
2  **last year.**
3     Q.   And for the three callbacks did you have
4  an interview?
5     **A.   Just the phone screening.**
6     Q.   And what happened during the phone
7  screening?
8     **A.   Just typical. You know, I asked**
9  **questions about what the job entailed. They asked**
10 **questions about me, about my experience.**
11    Q.   Did they ask any questions about your
12 criminal history?
13    **A.   No.**
14    Q.   Did you disclose to them that you were on
15 the registry?
16    **A.   No.**
17    Q.   Have any potential employers told you
18 that they can't hire you because of your criminal
19 history?
20    **A.   No, it doesn't really ever get to that**
21 **point.**
22    Q.   Have any employers told you they can't
23 hire you because you're on the public registry?
24    **A.   No, I just get a cookie cutter response**
25 **every time that they've gone with someone else.**

16

1  **It's almost the same exact response from every**
2  **company.**
3     Q.   Do you know any family members or friends
4  that have felony convictions?
5     **A.   Family members or friends? I don't think**
6  **so, no.**
7     Q.   When you obtained your MBA did you attend
8  in person?
9     **A.   No, I wasn't allowed to.**
10    Q.   Were you able to -- I think you've
11 already answered this, but you indicated you
12 obtained your MBA; is that correct?
13    **A.   Yes.**
14    Q.   And what does MBA stand for?
15    **A.   Master's in Business Administration. My**
16 **concentration was in finance.**
17    Q.   And how did you pay for school?
18    **A.   My parents helped me. I owe them a lot**
19 **of money.**
20    Q.   Did you have to report to law enforcement
21 that you were attending MBA school?
22    **A.   I tried to. I reported it immediately**
23 **when I was accepted, and they put it on my**
24 **registration information. And then either the**
25 **next time or the time after that when I went to go**

17

1  register it was no longer on there.
2        **And I asked why and they said it's**
3  **because I only -- her reasoning, and she wasn't**
4  **for sure and she asked the other person, the other**
5  **gal there, and they weren't sure of the answer**
6  **either, but they assumed that it was automatically**
7  **removed because I don't have to report internet**
8  **identifiers and I was only going online, but they**
9  **weren't sure if that was the right answer or not**
10 **but they didn't have control over changing it.**
11    Q.   Do you -- when you report do you report
12 to a Michigan State Police post?
13    **A.   I believe it's the sheriff's office.**
14 **It's in our county courthouse where the jail is.**
15    Q.   Okay. When did you obtain your
16 bachelor's degree?
17    **A.   In 2010.**
18    Q.   So despite your CSC conviction you were
19 still able to obtain a master's degree; is that
20 right?
21    **A.   Yes, but it made it more difficult.**
22    Q.   In what way did it make it more
23 difficult?
24    **A.   I mean, it made it more difficult just**
25 **getting accepted. You know, I had to defer my**

18

1 admissions for a semester while a committee there
2 reviewed my case and had to talk to my probation
3 officer, and I wasn't allowed to start a second
4 term until I had paperwork stating that my
5 probation was successfully completed. And because
6 I was on the registry I had to agree that I would
7 never step foot on campus.
8         So there were courses -- you know,
9 courses are offered all the time in person, but
10 the course that I may need is only offered one of
11 the three semesters in a year, so I would have to
12 wait to get certain courses because I could only
13 take online classes.
14     Q.   What types of housing have you had since
15 2013?
16     A.   Just my house.
17     Q.   So you've stayed in the same --
18     A.   Well, I lived -- in 2013 until 2015 I
19 lived with my parents.
20     Q.   And then in 2015 did you buy like a
21 single family home?
22     A.   Yes, and that was purely because my -- my
23 girlfriend at the time, her dad owned a
24 construction company that a local bank often uses
25 for doing repairs and had him show up to a

19

1 foreclosed house to fix the roof and soffits and
2 some other work. And he called me home from work
3 immediate- -- said, you know, you've got to come
4 home from work, you're buying this house, and that
5 they just wanted it off the market. You know,
6 that it wasn't posted yet.
7         And I was able to buy it for
8 probably half of what it was worth. I could have
9 turned around and sold it the next day for double.
10 That is the only way I could afford a house is
11 because of that.
12     Q.   And you still live in the same house?
13     A.   Yes.
14     Q.   Since being on the registry have you ever
15 traveled for more than seven days away from your
16 home?
17     A.   In a row?
18     Q.   Yeah.
19     A.   I real- -- I don't know. I -- I possibly
20 could have. The year 2018 was a long -- long year
21 that all blended together into one long day, and I
22 don't know if there were times. I'd try my
23 hardest to come home and make sure I stepped foot
24 in my house so I wouldn't get in trouble, but it
25 was a long time and I -- I don't know.

20

1     Q.   Do you register your email addresses and
2 internet identifier for law enforcement?
3     A.   No.
4     Q.   So aside from the CSC conviction have you
5 been arrested or charged with any other crimes?
6     A.   No. I had a couple speeding tickets, I
7 believe, when I first got my license and that's
8 it.
9     Q.   And you pled guilty of fourth degree
10 criminal sexual conduct in 2013, right?
11     A.   I believe I pled no contest. I don't
12 know if that's the same thing or not but...
13     Q.   And who is the -- who was the victim for
14 the CSC conviction?
15     A.   You want her name?
16     Q.   Yeah, maybe we'll skip over that one. So
17 how did you meet the victim?
18     A.   She was friends with my cousin, and I
19 coached my cousin's soccer team with my uncle. I
20 was an assistant volunteer.
21     Q.   And how old were you when you met the
22 victim?
23     A.   I'm not real sure. I was probably a
24 sophomore in college so maybe 19 or 20.
25     Q.   And how old was the victim?

21

1     A.   When I first met her?
2     Q.   Yeah.
3     A.   Probably 13 or 14.
4     Q.   Was she in middle school at the time?
5     A.   When I first met her, probably, yes.
6     Q.   And when did you begin texting her?
7     A.   Probably when she was 15.
8     Q.   And why did you begin texting her?
9     A.   Just we developed a liking for each other
10 over getting to know each other for a couple
11 years.
12     Q.   So if she was 15 when you began texting
13 her that would have put you at what, 22 or 23?
14     A.   I believe 22.
15     Q.   And you knew she was 15 at the time?
16     A.   Yes.
17     Q.   And that's about a seven year age
18 difference, right?
19     A.   Yup, yes.
20     Q.   And she was in high school at the time?
21     A.   Yes.
22     Q.   And what was the purpose of the texting?
23     A.   We started dating. You know, at the time
24 I -- I fell in love with her, and I -- I
25 understand now that what I did was wrong, but I

22

1 didn't understand it at the time.
2     **Q.** Was she -- sorry, you can finish your
3 answer.
4     **A. No, I'm done. Go ahead.**
5     **Q.** Was she old enough to drive when you
6 started dating?
7     **A. No. Not if she was 15, no.**
8     **Q.** So what did dating look like?
9     **A. I lived across the state at school, so it**
10 **was mainly through texting.**
11     **Q.** How often did you see her?
12     **A. During the summers. You know, just here**
13 **and there, hardly ever.**
14     **Q.** Were her parents aware that you were
15 dating their daughter?
16     **A. No.**
17     **Q.** Did you ever meet her parents?
18     **A. Yes.**
19     **Q.** When was that?
20     **A. Her dad was another assistant on the**
21 **soccer team. I knew them well.**
22     **Q.** But he didn't know that you were texting
23 his daughter in the context of a relationship?
24     **A. Not that I'm aware of.**
25     **Q.** Did you ever pick her up from her house

23

1 for a date over the three years you dated?
2     **A. No.**
3     **Q.** Did she ever come to your house for a
4 date?
5     **A. No.**
6     **Q.** Did you ever have dinner with her family
7 over the three years that you were dating?
8     **A. Not like a couple's dinner. There was**
9 **probably like team dinners where we were -- you**
10 **know, the whole team was out at a restaurant and**
11 **her parents were there.**
12     **Q.** Did you go on any outings with her
13 family?
14     **A. That was prior to us dating, though. We**
15 **never dated while I was her coach. That was prior**
16 **to us dating.**
17     **Q.** Did you go on any outings with her family
18 over the three years that you were dating?
19     **A. No.**
20     **Q.** Was it kept a secret from her family that
21 you were dating?
22     **A. Yes.**
23     **Q.** And why was it a secret?
24     **A. Because I think she knew that they**
25 **wouldn't be okay with it, and I probably**

24

1 **subconsciously did as well.**
2     **Q.** You didn't consciously know that it
3 wasn't okay for a 23-year-old man to date a
4 15-year-old child?
5     **A. I mean, it's hard for me to put myself**
6 **back in that -- that age mindset, but I'm sure**
7 **part of me did. Not like I do now.**
8     **Q.** During that -- the three year dating
9 relationship did you graduate college?
10     **A. Yes.**
11     **Q.** As you sit here today do you think it's
12 acceptable for a 20-year-old, 21-year-old man to
13 have a dating relationship with a 14-year-old
14 child?
15     **A. Sorry, I didn't catch the first part of**
16 **that. You cut out.**
17     **Q.** Yeah. As you sit here today do you think
18 it's acceptable for a 20-year-old, 21-year-old
19 adult to have a dating relationship with a
20 14-year-old child?
21     **A. No, but I didn't have a relationship with**
22 **a 14-year-old child.**
23     **Q.** As you sit here today do you think it's
24 acceptable for a 22-year-old adult to have a
25 dating relationship with a 15-year-old child?

25

1     **A. No.**
2     **Q.** Do you think it's acceptable for a
3 23-year-old to have a dating relationship with a
4 16-year-old child?
5     **A. No.**
6     **Q.** Do you think it's acceptable for a
7 24-year-old to have a dating relationship with a
8 17-year-old child?
9     **A. I don't know. I wouldn't do it.**
10     **Q.** Can a 15 year old -- in your opinion can
11 a 15 year old consent to having sex with a
12 22-year-old adult?
13     **A. No.**
14     **Q.** Can a 16-year-old child consent to have
15 sex with a 23-year-old adult?
16     **A. I don't know about legally, but mentally,**
17 **no.**
18     **Q.** How many times did you have sex with the
19 victim?
20     **A. I don't know what you define as sex. We**
21 **never had intercourse. After she turned 16 there**
22 **was oral sex three or four times.**
23     **Q.** So your testimony is that you had oral
24 sex with her three or four times during the three
25 year dating relationship?

26

1    **A.   Yes.**
2    Q.   And you never had intercourse with her?
3    **A.   No.**
4    Q.   Did you exchange nude photographs with
5    her?
6    **A.   Yes.**
7    Q.   How many times?
8    **A.   I don't know, probably a dozen.  I don't**
9    **know.**
10   Q.   You weren't charged with child
11   pornography, though, correct?
12   **A.   No, but that's what led to my plea is**
13   **they threatened me with the photos because I had**
14   **admitted to the police that photos were sent, so**
15   **the prosecutor is threatening me with the photos**
16   **and that's what caused me to plea.**
17   Q.   And you admit that you did exchange
18   sexually explicit photographs with a child?
19   **A.   Yes.**
20   Q.   Was a charge ever brought against you for
21   child pornography?
22   **A.   No, part of the plea deal was that they**
23   **couldn't.**
24   Q.   So is it fair to say that the instance
25   that led to you being charged with criminal sexual

27

1    conduct wasn't a one time momentary lapse in
2    judgment?
3    **A.   Can you repeat that?**
4    Q.   Yes.  So this three year dating
5    relationship that you had that you had oral sex
6    with this child three or four times, that wasn't a
7    momentary lapse in judgment, that was a long-term
8    relationship that you had with the victim; is that
9    correct?
10   **A.   It was a long-term relationship.  There**
11   **was only the one instance of me touching her**
12   **breast when she was under the age of 16.**
13   Q.   Did you meet any other children through
14   soccer that you developed a romantic relationship
15   with?
16   **A.   No.**
17   Q.   Did you meet any other children through
18   soccer that you had a sexual relationship with?
19   **A.   No.**
20   Q.   To your knowledge have you had sex with
21   any other partners under the age of 18?
22   **A.   No.**
23   Q.   And you didn't serve prison time as a
24   result of your conviction, right?
25   **A.   No, I spent ten days in jail.**

28

1    Q.   And you have a 25 year registration
2    period; is that right?
3    **A.   Yes.**
4    Q.   And you have to verify two times per
5    year, correct?
6    **A.   Yes.**
7    Q.   Since March of 2021 how many times have
8    you appeared in person to verify?
9    **A.   Since March of 2021.  Four?**
10   Q.   Approximately how long does it take you
11   to do that, the four times that you've gone?
12   **A.   From leaving home to getting back home**
13   **probably averages about an hour-and-a-half.**
14   Q.   How close is the law enforcement agency
15   where you register, how close is that to your
16   home?
17   **A.   I'd say about 15 minutes away.**
18   Q.   Have you made any updates -- aside from
19   those four times you've had to verify, which is
20   two times per year, since March of 2021 have you
21   had to appear to update any other of your personal
22   information with law enforcement?
23   **A.   I'm -- I'm not certain.  At some point my**
24   **vehicle died and I had to switch my fiancee's**
25   **vehicle to my primary vehicle, but I don't know if**

29

1    **that occurred prior to 2021.**
2    Q.   Have you made any updates via mail?
3    **A.   Oh, and also when -- when I graduated my**
4    **MBA, although I was certain that my information**
5    **wasn't on my registration, I still -- I went there**
6    **to attempt to take it off just to be sure.**
7    Q.   And are you aware that you can make
8    certain updates to your information by mail?
9    **A.   I'm aware that there's certain ones, but**
10   **I've never paid that much attention because it's**
11   **not worth the risk to me.**
12   Q.   And what do you mean by that?
13   **A.   I mean that I would much rather drive the**
14   **15 minutes and do it in person and know that it's**
15   **not going to get lost in the mail or lost in the**
16   **shuffle and make sure that it gets into that**
17   **computer system where I can -- they print off the**
18   **verification and show me that it's on there.**
19   Q.   So aside -- sorry, had you finished your
20   answer?
21   **A.   Yes, sorry.**
22   Q.   So aside from the -- possibly the vehicle
23   information that you may have updated since March
24   of 2021, is there any other information that you
25   think you had to update since March of 2021?

30

1      A.   I don't believe so as I live a very
2 minimal life as I don't like going there.
3      Q.   Okay. I'm going to try to share my
4 screen with you. This will be marked as
5 Defendants' -- let's see, call this Defendants'
6 Exhibit A.
7             (Whereupon Defendants' Exhibit
8             A marked for identification.)
9 BY MR. JAMISON:
10      Q.   Have you seen this document before?
11      A.   Yes.
12      Q.   And when have you seen this?
13      A.   I reviewed it for this deposition, and I
14 believe maybe they sent it out when the law was
15 first changed to allow mail-in updates.
16      Q.   And --
17      A.   And I looked at it between those times.
18      Q.   So is it fair to say you've never used
19 this form itself?
20      A.   I've never used the mail-in form, no.
21      Q.   And I'll scroll down. This is a three
22 page document, so page two and three are the
23 explanation of duties; do you see that?
24      A.   Yes.
25      Q.   And have you reviewed this document

31

1 before?
2      A.   I reviewed this, you know, for the
3 deposition, and I -- I don't know if this is the
4 same explanation of duties that's printed off for
5 me when I go in person but if it is then yes.
6      Q.   So I'm going to run through a few of
7 these and ask you some questions about it. So you
8 see how it's got numbered paragraphs here along
9 the left?
10      A.   Yup.
11      Q.   So -- and I'll try to make this a little
12 bit bigger. Are you on a computer or iPad or
13 something?
14      A.   I'm on a laptop. I can read it.
15      Q.   Okay. So under paragraph four it says
16 upon registering as a sex offender I'm required by
17 law to provide the following information, and then
18 under A it says my legal name. Do you know what
19 your legal name is?
20      A.   Yes.
21      Q.   Do you know what an alias is?
22      A.   Yes.
23      Q.   How would you describe what an alias is
24 to someone if they asked you?
25      A.   Another name that either someone refers

32

1 to by or that you refer to yourself by. Similar
2 to a nickname I would consider.
3      Q.   Okay. And do you understand what a
4 nickname is?
5      A.   Yes.
6      Q.   And how would you describe that to
7 someone?
8      A.   A name that you refer to yourself by or
9 that others refer to you by.
10      Q.   Do you know what tribal names mean?
11      A.   No.
12      Q.   Or ethnic names?
13      A.   No.
14      Q.   Or any other name by which I've been
15 known, do you know what that means?
16      A.   Not really.
17      Q.   What's confusing about that?
18      A.   How am I supposed to -- I don't remember
19 all the names that I've ever been known by. You
20 know, like my niece growing up, like when she was
21 young she referred to me by Ky-Ky and other names
22 that I can't remember.
23          Like when I was growing up playing
24 soccer people would refer to me by my last name.
25 In high school some referred to me by my initials,

33

1 others would refer to me by other nicknames that
2 they would make up as the season went on. I don't
3 remember all those names.
4          You know, since graduating from my
5 MBA my neighbor now shouts over the fence, hey,
6 nerd. Am I supposed to go register all of these
7 nicknames.
8      Q.   Have you looked at the law to try to
9 determine what's required with respect to any
10 other name by which I've been known?
11      A.   No.
12      Q.   Have you done any sort of research to try
13 to figure out what that means?
14      A.   I don't know where I would begin to
15 research what's considered nicknames, and -- I
16 wouldn't know where to look.
17      Q.   And have you sought the advice of an
18 attorney?
19      A.   No.
20      Q.   And if you --
21      A.   I've tried my hardest to go by my name so
22 that I don't have to deal with that stuff, but
23 what I go by, you know, and what others go by is
24 out of my control.
25      Q.   And if you were unsure about which names

34

1 to report to law enforcement and you reported all
2 of them --
3    A.   I don't know all of them.  I can't
4 remember all of them.
5    Q.   So if you reported all the names that you
6 remember, would that present any sort of problems
7 in your mind?
8    A.   I would imagine that the ladies at the
9 sheriff's office wouldn't be happy with me.
10    Q.   And why is that?
11    A.   Because it would be a lot of work for
12 them in the same way when I try -- when I tried
13 previously when I worked construction registering
14 all my vehicles that they weren't happy with me
15 wanting them to list 30 vehicles, and they settled
16 with just putting a note on there that vehicles
17 registered to that company work for me.  They
18 didn't want to go through the work of putting 30
19 vehicles on there.
20    Q.   Then under 4B it says my social security
21 number; do you see that?
22    A.   Yup.
23    Q.   Do you know what a social security number
24 is?
25    A.   Yes.

35

1    Q.   Do you have any confusion about that
2 provision related to social security numbers?
3    A.   Only as far as if I possibly mistakenly
4 used the wrong social security number.  For
5 instance, I have a colonoscopy coming up on
6 Monday, and I had to call the doctor's office two
7 days ago.  And in calling them I was trying to
8 come up with my social security number in my head,
9 and I haven't used it in a long time and it gets
10 confusing to me because the first three digits are
11 the first three digits of my late fiancee's phone
12 number but in another order and I get the two
13 confused, and if -- if she had asked for -- she
14 didn't ask for my social security number but if
15 she did and I accidentally gave it in the wrong
16 order do I then have to go register that because I
17 used it as my social security number?
18    Q.   Have you done any research to figure out
19 what you have to report in that sort of a
20 situation?
21    A.   No, I wouldn't know where to look.
22    Q.   Have you consulted with an attorney --
23    A.   No.
24    Q.   -- to try to find an answer to that
25 question?

36

1    A.   No, and if I ever used the wrong
2 security number it would have been by mistake, and
3 it wouldn't be something that I would remember
4 because I wouldn't have knowingly done it.
5    Q.   And what does knowingly mean?
6    A.   That I -- that I would have purposely
7 used the wrong number and that I knew it was the
8 wrong number.  If I gave the wrong social security
9 number it was by accident, and I wouldn't have
10 known that I did it.
11    Q.   Are you aware that the SORA has a
12 knowingly component, that any of this information
13 you have to knowingly not provide it before you
14 could be charged with a crime; are you aware of
15 that?
16    A.   I -- I've maybe heard something about it,
17 but I don't really understand what can be
18 knowingly and what can't and what can be mailed
19 and what can't.  It's -- it changes.
20    Q.   And then under 4C it says my date of
21 birth.  Do you know what a date of birth is?
22    A.   Yes.
23    Q.   Do you know what alleged dates of birth
24 that are previously used means?
25    A.   Not fully.  Again, it could be the same

37

1 thing.  You know, growing if my mom took me to the
2 doctor's office, you know, I have four brothers,
3 if she accidently used one of their birth dates
4 for me do I have to register it?
5        Or after my fiancee' passed, you
6 know, after a tough time I finally found the
7 strength to go to therapy.  And I met with the gal
8 one-on-one and during that first visit she asked
9 me for my birth date.  And during the time my
10 loved one was in the hospital it became so second
11 natured that the nurses would come in 200 times a
12 day to give her medicine, and if she was awake
13 and -- if she was awake she'd have to give her
14 birth date, if she wasn't awake I'd have to give
15 it to them, and it got to the point where we would
16 spit out her birth date, we could do it while we
17 were sleeping, you know, wake up and spit out her
18 birth date.  So when that therapist asked for my
19 birth date I gave my fiancee's birth date, just
20 automatically gave it to her.  Do I have to go
21 register that as my birth date now because I used
22 it?
23    Q.   Have you done any research to try to find
24 the answer to that question?
25    A.   No.

38

1    Q.   Have you sought legal advice about
2   whether or not you need to register that
3   information?
4    A.   No.
5    Q.   The next provision says the address where
6   I reside or will reside; do you see that?
7    A.   Yes.
8    Q.   Do you know what an address, like a
9   residential address is?
10   A.   Yes.
11   Q.   And how would you describe that to
12  someone else?
13   A.   I don't -- it's the number and the street
14  of where you live.  The part I don't understand is
15  the or will reside as I don't know where I will
16  reside.  I don't know where I'll reside tomorrow,
17  next month, next year.
18   Q.   Do you have plans on moving tomorrow?
19   A.   I don't have plans, but I've also learned
20  in life that, you know, your plans for what
21  tomorrow brings is far different than what
22  actually happens.
23   Q.   Now, if you look at 4E it says the name
24  and address of any temporary lodging you used or
25  to be used when I'm away from my residence for

39

1   more than seven days; do you see that?
2    A.   Yes.
3    Q.   Do you know what that means?
4    A.   Not fully, no.
5    Q.   And what -- what do you mean by not
6   fully?
7    A.   For instance after -- after my loved
8   one's stem cell transplant and she went into
9   remission and then she relapsed in xxxxx and I
10  took her -- sorry, I shouldn't have said that,
11  where I live.
12       MR. JAMISON:  We can just -- Tami,
13  we can just strike that.
14       Paul, I think you're in agreement we
15  can just strike that reference to --
16       MR. REINGOLD:  No objection.
17       MR. JAMISON:  -- anywhere he lives.
18       THE WITNESS:  I took her to the
19  local cancer center, and they told me that I had
20  to take her immediately to the ER.  And I called
21  her -- directly called her transplant doctor on
22  the other side -- in Detroit, and he said that I
23  had to take her immediately, do not go home, do
24  not go pack your bags with clothes, take her
25  immediately to the emergency room in Detroit.  She

40

1   had her transplant at Karmanos Cancer Center,
2   which rents space in the DMC, the Detroit Medical
3   Center, and in that same building there's also
4   Harper Hospital.
5        And I took her immediately to the
6   ER.  I didn't know how long we were going to be
7   gone.  I didn't have time to go register.  I
8   didn't know if it was going to be more than seven
9   days.  I didn't know if she'd ever come home and
10  she didn't.
11       But I took her to the ER and I
12  didn't have time to think about lodging or where I
13  was going to be the next night or having to
14  register.  I had to worry about the bleeds in her
15  brain and her eyes and the bleed coming out of her
16  rectum and her coughing up blood.  I didn't have
17  time to think about any of that.
18       But we had a residence in the ER for
19  one night and then she was on a floor in Harper
20  Hospital the next night, and then she went to
21  Karmanos for the next however many nights.
22       And once they told her that there
23  was nothing they could do for her we discharged
24  her, and I took her to the ER at U of M, and she
25  was admitted onto the floor at the main hospital

41

1   at U of M.  And after a time there she was
2   switched over to Mott Children's Hospital, which
3   is in the same building but has a different
4   address.  Do I have to register each of those
5   addresses?
6        And then once her family came I
7   spent every other night either in a hotel or at a
8   family's house or her family's house.  Do I have
9   to go re-register every night?  Like, I wouldn't
10  know where to register there.  So instead I would
11  leave her hospital room at one in the morning and
12  try to race home every seven days if possible to
13  step foot in my house.
14       Like, do you have to register when
15  you knowingly are going to be gone for more than
16  seven days or once seven days hits?  Like, I
17  didn't have time to worry about that.  I was more
18  worried if she was going to -- if I'd see her the
19  next morning.  If she'd be alive.
20   Q.   Would you like to take a minute off the
21  record?
22   A.   No, I'm fine.
23       (Discussion off the record.)
24  BY MR. JAMISON:
25   Q.   So we'll go back on the record.  Under 4F

42

1  it says the name and address of each of my
2  employers; do you see that?
3      A.  Yes.
4      Q.  Do you have any confusion about what that
5  means?
6      A.  Yes, more so further on where employers
7  includes contractors as I worked for a general
8  contractor and I was their only laborer for the
9  general contractor, so every day I would work with
10  our subcontractors and quite often they were in
11  charge of me for the day.  Are those
12  contractors -- do I you have to list those
13  contractors that I worked with or for for the day
14  as employers?  I don't know the answer to that
15  and...
16      Q.  What did you report at the time when you
17  had that job?
18      A.  I reported -- as far as the name and
19  address of the company?
20      Q.  Correct.
21      A.  I reported the name of the company, and
22  then I worked on different address -- you know, I
23  worked at different addresses, locations all
24  around the state, every single day.  And a lot of
25  these -- a lot of these locations didn't have

43

1  addresses yet.  You know, you were clearing trees.
2  There were no addresses until the building was up
3  and the postal service gave it an address.
4          But I asked what I was supposed to
5  do, and they didn't know.  The state police when
6  they called them didn't know.  The sheriff's
7  office called the state police.  They didn't know.
8  And they decided that it was best to just use the
9  office address of my employer.
10      Q.  Did you ever ask an attorney what was
11  required to be reported?
12      A.  No.
13      Q.  Did you ever look at the law itself?
14      A.  I've looked at this explanation of duties
15  given to me and I didn't understand it, so that's
16  why I asked the sheriff's office what I was
17  supposed to do.
18      Q.  Did you -- were you ever violated for not
19  reporting the name and address of each of your
20  employers?
21      A.  No, but I don't know what would have
22  happened.  You know, further on it talks about the
23  normal travel routes.  Like, I didn't have normal
24  travel routes.  I was at different job sites every
25  single day, and halfway through the day my boss

44

1  could call and tell me I had to be somewhere else.
2  I didn't have normal travel routes.
3          And they told me to just use the
4  address of where I worked, but I don't know what
5  would have happened if I got pulled over.  I never
6  got pulled over but if I did, you know, I'm
7  trusting the word of the sheriff's office or the
8  single person at the state police office.  If the
9  person that pulled me over had a different
10  opinion, you know, this may seem like nitpicking
11  but it's -- it's my prison time that's on the
12  line.  You know, I live with fear.  I have
13  nightmares over this.
14      Q.  The next portion says the name and
15  address of any school that I attend or that
16  accepted me if I plan to attend; do you see that?
17      A.  Yes.
18      Q.  Do you know what that means?
19      A.  Not fully, no.
20      Q.  What part do you not understand?
21      A.  I thought I understood it until I went
22  and tried to register my MBA program, and it was
23  on there for one or two times before it was
24  removed.  And I don't know why it was removed
25  other than them telling me it's because I don't

45

1  have to register internet identifiers, but I
2  didn't understand why I didn't still have to
3  register the address of my school, and they told
4  me I didn't have to.
5      Q.  The next portion talks about telephone
6  numbers registered to me or used by me; do you see
7  that?
8      A.  Yes.
9      Q.  Do you understand what that means?
10      A.  Not fully, no.
11      Q.  What do you not understand about it?
12      A.  Used by me when?  Currently used by me,
13  used by me ever?  Do I have to include my
14  childhood phone?  You know, when I was living in
15  the hospital and the doctors would call our
16  hospital room or I'd have to call down and order
17  her lunch food, because I used the hospital phone
18  do I have to register the hospital?
19          If I was staying at a hotel for the
20  night and I used their phone to call my loved one
21  or her mom to make sure that she was still alive
22  do I have to register the hotel number?  If she
23  was unconscious or sleeping and friends texted her
24  phone and I'd respond using her phone do I have to
25  register her number?

46

1        If I'm coming home from work and my
2  phone dies and I have to borrow my co-worker's
3  phone to let my loved one know that I'm going to
4  be home late do I have to then register his
5  number?  Do I have to tell him that if I use his
6  phone I have to register his number?
7        Q.   When were you originally registered?
8        A.   Originally registered when?  Following my
9  conviction in 2013.
10       Q.   And what was that process like?
11       A.   I don't understand.
12       Q.   So how did it happen that -- so my
13  understanding of the law is when you are convicted
14  and you have to register you have to provide
15  certain information to law enforcement; is that
16  correct?  Is that what happens?
17       A.   I don't -- I don't remember exactly the
18  process ten years ago, but I would imagine, yes,
19  or maybe they already have the information, I
20  don't know.
21       Q.   Do you remember if you provided that
22  information while you were incarcerated or while
23  you were in jail?
24       A.   I don't know if it was while I was in
25  jail or before going into jail or when I got out.

47

1        Q.   Do you remember if you had your attorney
2  help you register?
3        A.   I don't believe so.  I think I would have
4  gone to the sheriff's office and reg- --- the first
5  time I registered was at the sheriff's office.
6        Q.   And the first time you registered did you
7  ask them whether or not you needed to provide your
8  childhood phone number?
9        A.   No, I did not, and I don't know if that
10  was -- I don't know if the law was even the same
11  back then.
12       Q.   Do you remember how many phone numbers
13  you provided at the time that you originally
14  registered?
15       A.   When I originally registered I provided
16  my cell phone number and so that's the -- at the
17  time that's the only phone that I routinely used.
18       Q.   And you indicated that you don't provide
19  email addresses to law enforcement; is that right?
20       A.   No, I don't believe that that's required
21  of me anymore.
22       Q.   When was your -- when was your offense?
23       A.   My offense was -- I don't know the exact
24  date, maybe 2009.
25       Q.   The next portion asks for a license plate

48

1  number and description of any vehicle that I own
2  or operate; do you see that?
3        A.   Yes.
4        Q.   Do you know what it means to own a
5  vehicle?
6        A.   Yes.
7        Q.   Do you know what it means to operate a
8  vehicle?
9        A.   No, no, not fully, no.
10       Q.   What do you mean by that?
11       A.   I mean working construction -- I also
12  don't exactly know what it means by vehicle.  In
13  working construction I drive different equipment,
14  you know, forklifts, scissor lifts, boom lifts,
15  bulldozers, you know, all sorts of equipment,
16  ditch diggers.  Do I have to register each of
17  those?
18       Q.   Did you ever ask --
19       A.   I don't know what does operate means.
20  You know, does operate just mean driving it down
21  the road?  Does operate mean, you know, turning it
22  on so that the engine starts to -- you know,
23  bulldozer you can't just get in it on a cold day
24  and start driving it.  You've got to turn it on.
25  Usually I wasn't driving the bulldozer, but I

49

1  would be tasked with going and turning it on so
2  the diesel engine begins to warm up.  Is turning
3  it on and sitting there and revving it, is that
4  operating it?  I don't know.
5        Q.   Does a bulldozer have a license plate on
6  it?
7        A.   I don't know.
8        Q.   Does a ditch digger have a license plate
9  on it?
10       A.   No.
11       Q.   Does a lawn mower have a license plate on
12  it?
13       A.   No, but are they -- does that mean it's
14  not a vehicle?  Like that just confuses me more
15  because how am I supposed to report the license
16  plate number of a vehicle that doesn't have a
17  license plate?
18       Q.   Have you ever asked law enforcement if
19  you need to report to them that you drove a
20  bulldozer?
21       A.   I asked when -- not specifically about a
22  bulldozer but I asked about all the company
23  equipment and vehicles.  This was, you know, the
24  company that owned over 30 vehicles, and I asked
25  them if I'm supposed to register each one, and I

50

1  could tell that there was no way they were doing
2  that.  They called the state police, talked to
3  them, and they said to just put a note in my
4  registration that I could drive any vehicle that
5  was owned by this company.
6      Q.  Were those --
7      A.  And they said that this note was in there
8  but it never -- the note never appeared on my
9  printed off registration, so I had to just trust
10 that it was in there and that police would see it
11 and that if I ever got pulled over police would
12 see this note.  And I had to go by their trust and
13 never see this note personally.  I never got
14 pulled over, thankfully, to find out, but if I did
15 I had to trust that they did what they said and
16 that it was the correct thing to do.
17     Q.  Those 30 vehicles, were those trucks that
18 were driven on the road?
19     A.  The 30 were the trucks, but then there
20 was, you know, countless other equipment and there
21 were, you know, different -- different equipment
22 rentals at every job site.
23     Q.  Did you ever ask them if you need to
24 report backhoes?
25     A.  No.

51

1      Q.  Did you ever ask an attorney if you
2  needed to report backhoes or bulldozers or ditch
3  witches or anything like that?
4      A.  No, I just assumed that if -- if the note
5  covered all the company vehicles that were driven
6  on roads that they would also cover that stuff,
7  but I don't know if it's true and it's -- me going
8  to prison is the consequence of it being wrong.
9      Q.  Do you know what a passport is?
10     A.  Yes.
11     Q.  Do you have a passport?
12     A.  No.  I would be far too scared to ever
13 leave this country.
14     Q.  Do you have any occupational or
15 professional licenses?
16     A.  No.
17     Q.  So I'll draw your attention to paragraph
18 15 down there; do you see that?
19     A.  Yes.
20     Q.  In your own words what does that mean to
21 you?
22     A.  I guess to purposely provide wrong
23 information would lead to prosecution.
24     Q.  So earlier you mentioned the thing about
25 the bulldozer, so if you didn't understand that

52

1  you had to report the bulldozer would it be your
2  understanding that you could be prosecuted for
3  that?
4      A.  I -- I have no idea.  You know, I --
5  because I tried to report the vehicles and they
6  told me that I didn't have to report any further
7  vehicles, so I -- you know, in my head they
8  should -- they should have wrote down each -- each
9  vehicle.  They didn't want to do that.
10     Q.  Now, I'm not talking about the trucks.
11 I'm talking about the bulldozer.
12     A.  But that's what led me to believe that I
13 didn't have to do that stuff because of the
14 vehicles, if that makes sense.
15     Q.  So if the requirement in law is that it
16 has to be a knowing false or misleading
17 information, if you didn't know that you had to
18 report it is it your understanding that you could
19 still be prosecuted?
20     A.  Not -- I guess not based on this
21 statement, but I -- I don't know what, you know,
22 other lawyers and prosecutors are going to make
23 happen.
24     Q.  Have you ever read that -- you know, you
25 see at the end of the sentence in 15, it says

53

1  MCL 28.272(6); do you see that?
2      A.  Yes.
3      Q.  Do you know what that means?
4      A.  No.
5      Q.  Have you ever looked at that law before?
6      A.  No.
7      Q.  Have you ever asked an attorney what that
8  provision means?
9      A.  No, I can't afford an attorney to ask
10 them all of these questions.
11     Q.  Are you represented by an attorney today?
12     A.  Yes, for this case.  I've never asked him
13 what the -- what MCL and the number means.
14     Q.  And the attorney that represents you
15 today is representing you with respect to the sex
16 offender registry, correct?
17     A.  Yes.
18     Q.  Have you ever tried to ask your attorneys
19 what -- your current attorneys what these
20 provisions mean?
21         MR. REINGOLD:  I'm going to object
22 because it seems to me that's privileged.
23         THE WITNESS:  Do I still answer?  I
24 don't know what I'm supposed to do.
25         MR. REINGOLD:  No, you don't need to

54

1    answer.
2    BY MR. JAMISON:
3        Q.   Do you think the sex offender -- have you
4    seen the public sex offender registry website?
5        A.   I went on it the first time maybe two
6    weeks ago for the sole purpose of trying to figure
7    out where other offenders worked because I can't
8    find employment.
9        Q.   Do you think the sex offender registry
10   website protects the public in any way?
11       A.   I don't believe so, no.
12       Q.   Why is that?
13       A.   Because I think it takes a huge part of
14   our society and kicks them to the bottom and holds
15   their foot on their throat and doesn't allow them
16   to have any hope to improve ourselves.  You know,
17   and at the same -- the same way as in a battle
18   with cancer hope is everything.  If we have no
19   hope to better ourselves, to get better jobs,
20   to -- you know, to improve and be valuable to
21   society again, when you don't have that hope, you
22   know, it kills us.
23       Q.   Have you talked to any of the other
24   plaintiffs in this lawsuit?
25       A.   No.

55

1        Q.   Have you talked to any other people that
2    are on the registry?
3        A.   When?
4        Q.   At any point since you've been on the
5    registry.
6        A.   Yes.
7        Q.   And what was the nature of the
8    conversations that you had?
9        A.   I mean, it was a family friend of my
10   girlfriend's.  It had nothing to do with the
11   registry.  I just knew he was on the registry, he
12   knows I'm on the registry, but it was about -- you
13   know, we were up at her cabin about, you know,
14   stuff up at the cabin.  He likes hunting and
15   fishing and...
16       Q.   Does he have a job?
17       A.   I believe so.
18       Q.   Do you know what type of work he's in?
19       A.   I think he -- if I remember correctly I
20   believe he works at a sheet metal fabricator.
21       Q.   Did you ever ask him about getting
22   employment there?
23       A.   No.
24       Q.   I'm going to share my screen again.  This
25   is Exhibit B.

56

1            (Whereupon Deposition Exhibit
2            B marked for identification.)
3            MR. JAMISON:  Paul, now that you've
4    done a few of these I imagine you have an
5    objection to this exhibit.
6            MR. REINGOLD:  Yes, I have a
7    standing objection to use of the exhibit.  I think
8    that's all I need to say.
9            MR. JAMISON:  All right.
10   BY MR. JAMISON:
11       Q.   So this exhibit, we've used this in other
12   depositions, and what this is is these are
13   word-for-word excerpts from cases of individuals
14   that have been charged with various CSC
15   convictions, and these are taken, as I said,
16   word-for-word from court opinions.
17           And on the left you'll see the
18   column of numbers and then there's a -- another
19   column that has some text in it, so what I'm going
20   to -- I'll ask you about a few of these cases.  So
21   if you could, read there that case 32.  Just read
22   it to yourself and then let me know when you're
23   done and I'll ask you a couple questions?
24           MR. REINGOLD:  Yeah, can you enlarge
25   this a little bit because I'm reading this on a

57

1    laptop and it's hard for me to see.
2            MR. JAMISON:  Sure, no problem.
3            MR. REINGOLD:  And which number is
4    it?
5            MR. JAMISON:  32.
6            MR. REINGOLD:  Okay.
7            THE WITNESS:  I'm done reading it.
8    BY MR. JAMISON:
9        Q.   So do you have any nieces or nephews?
10       A.   Yes, both.
11       Q.   So if this criminal defendant lived next
12   door to your niece or nephew would you want to
13   know?
14       A.   No.
15       Q.   And what makes you say that?
16       A.   I've never used the registry to see if
17   one lives next to them.
18       Q.   I'm not asking about whether you use the
19   registry.  I'm asking if you knew that this
20   person, this criminal defendant, lived next door
21   to your niece or nephew would you want to know
22   that?
23       A.   No, I wouldn't.
24       Q.   And why would you not want to know that?
25       A.   Because if this person is out of jail or

58

1  out of prison they've done their -- they've done
2  their time and are deemed by society -- I would --
3  if they're still a risk to society after doing
4  their prison time then I think that's a problem
5  with our judicial system and with -- with our
6  incarceration system.  If they're still a risk
7  then they shouldn't be out there.
8      Q.   How would you -- how would you know
9  whether they're still a risk?
10     A.   I wouldn't but I would imagine there's
11  professionals who do risk assessments and that
12  should be done on them before being released from
13  prison.
14     Q.   Okay, that's not where we are today,
15  though.  So today for purposes of this question we
16  don't have a risk assessment done on this person.
17  What we know is the facts on the screen, and if
18  they are registered would you want to know that
19  they're living next door to your niece or nephew?
20     A.   No, I wouldn't.
21     Q.   Would you want to know if they were
22  babysitting your niece or nephew?
23     A.   No.
24     Q.   Would you want to know if they were a
25  scout leader or a piano teacher for your niece or

59

1  nephew?
2      A.   No.  I don't go around -- you know, my
3  nephews were in scouts.  I didn't look up to see
4  if their scout leader was on the registry.  I -- I
5  don't want to know.
6      Q.   Would you want to protect your niece or
7  nephew from potentially being a victim of sexual
8  abuse?
9      A.   Yes.
10     Q.   Do you think knowing this information
11  could help inform you and actions you could take
12  to protect your niece or nephew?
13     A.   No, I think they -- you know, they go to
14  a babysitter.  They go to a day care that's
15  registered.  You know, someone with a criminal
16  conviction is not going to be registered with the
17  State as a certified day care person.  You know,
18  they take the steps to protect their children.
19  It's not -- it's not my role to police the world.
20  That's what the police and the judicial system are
21  for.
22     Q.   Can you read the information row 33?
23     A.   Okay.
24     Q.   Would you want to know if that person
25  lived next door to your niece or nephew?

60

1      A.   No.
2      Q.   Would you want to know if that person
3  were babysitting your niece or nephew?
4      A.   No.
5      Q.   Would you want to know if that person
6  were giving piano lessons to your niece or nephew?
7      A.   No.
8      Q.   Okay.  Can you read row 34?
9      A.   Okay.
10     Q.   Would you want to know if that criminal
11  defendant were a pastor at the church where your
12  niece or nephew attended?
13     A.   No.
14         MR. REINGOLD:  I'm going to object
15  before you answer, and I probably should have
16  objected on the previous two.  I'm objecting on
17  the grounds that the question assumes facts that
18  aren't in evidence or makes assumptions that I
19  want to make sure are clear.  It seems to me that
20  for all three of these if the person were not on
21  the registry there'd be no way to know that the
22  person was a danger, and, therefore, the question
23  shouldn't be would you want to protect someone
24  from this person.
25         The question has to be if this

61

1  person were on the registry would that make a
2  difference or would you want to know that the
3  person was on the registry, because otherwise
4  there's no way to know.  They have to have been --
5  the only way you'd know that somebody might be
6  dangerous is if they've been previously convicted
7  and are on the registry.  Otherwise the question
8  is assuming facts that are impossible.
9  BY MR. JAMISON:
10     Q.   Okay, the objection is noted.  You still
11  need to answer the question.
12     A.   All right, I don't remember the question.
13  Do I -- would I want to know --
14     Q.   Yeah.  So if your niece and nephew
15  attended church with this pastor would you want to
16  know?
17     A.   No, not as far as if -- I would hope that
18  the church would run background checks on their
19  employees and that their crime would be caught by
20  the -- by the background check, but I wouldn't
21  want to know as far as them being on the registry.
22     Q.   All right, can you read row 35?
23     A.   Okay.
24     Q.   Would you want to know if that criminal
25  defendant were -- was a volunteer coach for your

62

1  niece or nephew?
2      A.   No, I would trust that the school runs
3  background checks.  I was a volunteer coach at my
4  high school for their soccer team, and I had a
5  background check ran on me.  I would trust that
6  that would catch any crimes but not as far as from
7  them being on the registry, no.
8      Q.   What if they were a piano teacher for
9  your niece or nephew?
10     A.   I think the same -- the same would go.
11  My niece or nephew if they were to get piano
12  lessons they would go to the -- the music company
13  downtown -- not downtown but out by our mall, and
14  I would trust that that company would catch a
15  crime in their background check and not have to
16  rely on the registry.  I wouldn't want to know if
17  they're on the registry.
18     Q.   Have you ever contacted a member of the
19  legislature to inquire about change in the sex
20  offender registration law?
21     A.   I believe so.  I think it's more
22  usually -- the few times that I've done it I
23  believe it's more trying to convince them not to
24  pass a certain law more so than trying to get them
25  to change the law, but I've probably done both.

63

1      Q.   And how did you contact them?
2      A.   I wrote them an email.
3      Q.   Did they respond to your email?
4      A.   I don't know if they had directly but
5  maybe -- maybe a secretary.  I don't remember if
6  it was a personalized message or if it was just a
7  cookie cutter response.  I don't recall.
8      Q.   Do you remember how long ago it was?
9      A.   It's had to have been a few years now.
10     Q.   Have you tried to contact them since
11  December of 2020?
12     A.   I don't believe so.
13     Q.   Are you aware it's the legislature that
14  has power to change the law?
15     A.   I think so, yes.
16     Q.   Were -- are you aware that other states
17  have changed their sex offender registration
18  laws --
19     A.   I don't know --
20     Q.   -- that reduces the registration period
21  for certain offenders?
22     A.   No, I don't know how other states work or
23  anything about their registrations.
24     Q.   Were you aware that Michigan recently
25  passed a clean slate law that automatically sets

64

1  aside certain misdemeanor and felony convictions?
2      A.   I've heard of the clean slate law, but I
3  don't know exactly what it entails.
4      Q.   Do you know whether Governor Whitmer has
5  the power to change the sex offender registration
6  law?
7      A.   I don't think she has the power directly,
8  but she has influence over -- you know, as the
9  head of our state she has a lot of influence.
10     Q.   Do you know who Colonel Gasper is?
11     A.   Is he the head -- the head of the state
12  police?
13     Q.   Yeah, so do you know whether Colonel
14  Gasper has the power to change the sex offender
15  registration law?
16     A.   Again I don't think that he has the power
17  directly, but he also has a lot of influence.
18     Q.   And what do you mean by that, he has a
19  lot of influence?
20     A.   As the head of the state police, you
21  know, I think they're the ones that overlook the
22  registration, if he feels that something is right
23  or wrong he has a lot of influence on, you know,
24  getting something that's wrong changed.  You know,
25  if he makes a public statement to the legislature

65

1  that something's good or bad I -- I believe that
2  they would take his word quite strongly.
3      Q.   Okay.  I don't have any other questions.
4          MR. JAMISON:  Paul, did you --
5          MR. REINGOLD:  All right.  I have a
6  few questions, maybe more than a few questions.
7               EXAMINATION
8  BY MR. REINGOLD:
9      Q.   You talked about your difficulty getting
10  jobs, applying for jobs but not getting
11  interviews.  What were your grades like in high
12  school?
13     A.   In high school I had a 4.0 out of 4.0.
14     Q.   And where did you rank in your class?
15     A.   Number one.
16     Q.   And in college what were your grades?
17     A.   Well, I graduated with a degree in
18  biology with all pre-med requirements.  I believe
19  my GPA was a 3.2 in my undergrad.
20          For my master's I got one A- during
21  the time that my fiancee' was first diagnosed and
22  I was taking my final exams in her hospital room.
23  I got one A- and graduated with a 3.98.
24     Q.   Do you know what your rank was in your
25  MBA class?

66

1    A.   I don't but I don't know of anyone else
2  that did better, but I don't know the number.
3    Q.   You were asked about your sexual contact
4  with your girlfriend before she was 16, and I
5  thought that there might have been confusion about
6  your answers.  Did you and she ever have oral sex
7  before she was 16?
8    A.   No.
9    Q.   And the only sexual contact you were
10 accused of was touching her breast the day before
11 her 16th birthday; is that right?
12    A.   Correct.
13    Q.   When you had to report phones and cars
14 before the SORA 2021 amendments isn't it true that
15 you only had to report phones or vehicles that you
16 routinely or regularly used?
17    A.   That sounds correct, yes.
18    Q.   But based on what we saw today is it your
19 understanding that that's still true or not?
20    A.   No, I don't -- I didn't see routinely
21 used in the explanation of duties today.
22    Q.   All right.  In talking about the crimes
23 that other people commit, do you understand that
24 if they're not on the registry there's no way that
25 anyone can know what conduct they've done in the

67

1  past?
2    A.   Anyone as in the public?
3    Q.   Yes.
4    A.   Then yes.
5    Q.   And what is it about the registry itself
6  that makes you say that you don't think that the
7  public should have the ability to see people who
8  committed those kinds of crimes in the past or at
9  least you don't want to?  What is it about the
10 registry that you find misleading or offensive is
11 all I'm asking.
12    A.   I think, you know, for me personally and
13 I'm sure for a lot of people on the registry it --
14 it gives us a label that people can't look past.
15 You know, when applying for jobs I can explain my
16 misdemeanor for touching my girlfriend's breast
17 the day before her 15th birthday, but I cannot
18 explain --
19    Q.   16th birthday.
20    A.   16th birthday, but I cannot explain the
21 word sex offender.  It's -- people hear that word
22 and they think I'm the worst of the worst person
23 and I'm irredeemable and I have no hope in life.
24 I can't explain away that word.
25         You know, it's that word that

68

1  causes -- that caused my neighbor when I first
2  move in to drive through my yard instead of using
3  his driveway, to have his wife out in the street
4  waving a baseball bat on Halloween telling people
5  not to go to my house because a sex offender lives
6  there.  It had nothing to do with my crime.  She
7  didn't know what my crime was.  It was because of
8  that label of a sex offender.
9    Q.   I want to ask a few questions about
10 your -- what happened after you were convicted.
11 When you pled guilty to the CSC 4 what was your
12 sentence?
13    A.   My sentence was 60 days in jail.
14    Q.   And did you serve the full 60 days?
15    A.   No, the judge let me out after ten.
16    Q.   And did you know when you were sentenced
17 that the judge was going to let you out and you'd
18 only have to serve ten days?
19    A.   No, I didn't know that I would only have
20 to serve ten days, but I had -- I had an idea
21 that -- you know, at least I was hoping that he'd
22 let me out sooner as he seemed understanding of my
23 case.  And my lawyer told me that it was a
24 possibility that he would give me a stronger
25 sentence and let me out sooner because he wanted

69

1  to appease the girl's father, who was in the
2  prosecutor's office every day.
3    Q.   How long after you were released was your
4  period of probation?
5    A.   My probation was five years long.
6    Q.   And when you were released and put on
7  probation how often did you have to see your
8  probation officer?
9    A.   I don't recall exactly.  I believe that
10 the first either year or six months it was a
11 higher rate, but after -- after that initial
12 period it was once a month.
13    Q.   And for whatever that first period was,
14 what was it that you had to do with probation?
15    A.   I believe it was twice a month, and I
16 also had to go through the -- the sex rehab class.
17    Q.   And did you complete all of that --
18    A.   Yes.
19    Q.   -- successfully?
20    A.   Yes.
21    Q.   And where did you go when you had to
22 report to probation?
23    A.   The probation office downtown in my city.
24    Q.   And how long did that take?
25    A.   Usually I would get there, I'd stop there

70

1 before work, and I'd be in and out of his
2 office -- or it was -- I went through three
3 different probation officers in the five years,
4 two men and one woman, and I'd be in their office
5 for maybe 30 seconds.
6     Q.  Did you ever -- were you ever able to not
7 show up for an appointment in person?
8     A.  Yes.  There was one time when my -- it
9 was girlfriend at the time were at the grocery
10 store, and it was the night before I was supposed
11 to report for probation, and I saw my probation
12 officer and he waved at me, and I jokingly asked
13 if this could count as our meeting and he said of
14 course, and I didn't have to report that month.
15     Q.  When you were seeing your probation
16 officer, if you changed your address or job did
17 your parole officer want to know?
18     A.  Yeah, I'm sure that they probably did.
19     Q.  Did you have to either call it in or mail
20 it in or something or could you do it at your
21 monthly visit?
22     A.  I don't know if -- I don't know if
23 they're automatically update -- like I would have
24 had to have reported that for my registration and
25 I think they get automatic updates from that, but

71

1 I -- I would have called it in to make sure.
2     Q.  Did you have to report to probation if
3 you started or stopped going to school?
4     A.  Yes.  Yes, when I --
5     Q.  Did you change --
6     A.  When I began my MBA that was part of the
7 having to defer it for a semester is that they had
8 to contact my probation officer and have a meeting
9 with him.
10     Q.  During the five years that you were on
11 probation were you also on the registry?
12     A.  Yes.
13     Q.  Which was worse?
14     A.  The registry by far.
15     Q.  And why was that?
16     A.  Because probation didn't come with the
17 label sex offender that makes everyone think that
18 I'm an awful person.
19     Q.  Can you give us some examples of how the
20 registry has harmed you or changed your life for
21 the worse?
22     A.  Well, you know, before my -- before being
23 placed on the registry I was applying to medical
24 schools and taking my GMAT to become a physician.
25 After that the only job I could get was a

72

1 construction job purely because my best friend
2 gave me a job.  So, yeah, every dream that I had
3 prior went up in flames and my life will never be
4 the same because of it.  And now I -- I can't find
5 a job.  I have two degrees from what I would
6 consider ▮ top university ▮▮▮▮▮▮, and I --
7 can't get a job that uses ▮▮▮▮ one of them.
8     Q.  Knowing what you know today if you could
9 have pled to a crime that had a longer jail
10 sentence and a longer probation but no registry
11 would you have done it?
12     A.  Yes.
13     Q.  I'd like you to take a look again at the
14 explanation of duties form.
15     MR. REINGOLD:  Eric, can you bring
16 up the exhibit just so that it's on and it's --
17 that way we'll have the official exhibit instead
18 of my not as good copy?  And can we go to the
19 first two pages, which was the blocks, yeah.
20 BY MR. REINGOLD:
21     Q.  Looking at the first two pages of the
22 explanation of duties form, when you first go in
23 to register about how many boxes have to be
24 checked or filled in when you first register, can
25 you tell?  You can take a minute and count them if

73

1 you want.
2     Can we go back to the first page and
3 the second page?
4     A.  Yeah, I don't know because usually when I
5 go to register there's not blocks like this, and
6 it doesn't look like this when I go in to
7 register.
8     MR. JAMISON:  Yeah, I'm going to
9 object too, to the extent that you're
10 referring to the mail-in update as the original
11 verification form.  It seems like it misstates
12 what the record is.
13     MR. REINGOLD:  Oh, yeah, you're
14 right.  Let me pull up mine.
15     MR. JAMISON:  Do you want me to stop
16 sharing my screen?
17     MR. REINGOLD:  Yeah, you can stop
18 sharing and I'll share mine.  Let's see if I can
19 make it work.  I want to share -- let's see, that
20 looks like one.  Nope.  Can you --
21     MR. JAMISON:  Yeah, it's -- we see
22 the sex offender registration verification update.
23     MR. REINGOLD:  All right, is it full
24 screen or not?
25     MR. JAMISON:  Yeah.

74

1     MR. REINGOLD: Okay.
2  BY MR. REINGOLD:
3     Q.  All right, can you read that?
4     **A.  Yes.**
5     Q.  This is the form that's used for
6  registration verification and update, right?
7     MR. JAMISON: Paul, is there a Bates
8  number on this or can you scroll up so I can see
9  it, because sometimes the MSP...
10    MR. REINGOLD: Yeah.
11    MR. JAMISON: All right, got it.
12    MR. REINGOLD: Okay.
13 BY MR. REINGOLD:
14    Q.  All right, and is it large enough for you
15 to see easily?
16    **A.  Yes.**
17    Q.  All right. Why don't you count while I
18 go through these, all right? Can you see my -- is
19 my pointer on this?
20    **A.  Yes.**
21    Q.  Let's just count. You start counting.
22    **A.  Out loud or just in my head?**
23    Q.  Out loud, out loud.
24    **A.  Okay. One, two, three, four, five, six,**
25 **seven, eight.**

75

1     Q.  All right, and you just keep going. You
2  just keep going.
3     **A.  Nine, ten, 11, 12, 13, 14, 15, 16, 17,**
4  **18, 19, 20, 21, 22. I don't know if I count the**
5  **boxes, the fingerprints.**
6     Q.  Yeah, do count one for each.
7     **A.  24, 25, 26, 27, 28, 29.**
8     Q.  All right. How about continuing on for
9  the address?
10    **A.  30, 31, 32, 33, 34, 35, 36, 37, 38, 39,**
11 **40, 41, 42 up to contact info.**
12    Q.  Yup, let's do that. Just do one, let's
13 assume it's just one for this line.
14    **A.  Okay. I think I was at 42 so that's 43.**
15    Q.  Yup.
16    **A.  44.**
17    Q.  All right. Assume there's one of these.
18    **A.  45. One for --**
19    Q.  One for each of these, yup.
20    **A.  45, 46, 47, 48.**
21    Q.  Employment.
22    **A.  Do I count each box? I don't know what**
23 **I'm supposed to be counting.**
24    Q.  Each box right across there.
25    **A.  48, 49, 50, 51, 52, 53.**

76

1     Q.  All right, school?
2     **A.  54, 55, 56, 57.**
3     Q.  Vehicles?
4     **A.  58, 59, 60, 61, 62, 63, 64.**
5     Q.  Offense information?
6     **A.  65, 66, 67, 68, 69, 70, 71, 72.**
7     Q.  Down at the bottom, number 12.
8     **A.  73, 74, 75, 76, 77.**
9     Q.  All right, so we're -- and every time you
10 go in to register those are the things that have
11 to be reviewed, and any change to any one of those
12 has to be reported; is that right?
13    **A.  Yes.**
14    Q.  Let's take a look at page three,
15 paragraph two. Can you read that out loud for us?
16    **A.  I am required to sign the -- or I am**
17 **required to sign the required registration forms.**
18 **Failure to sign the required registration forms is**
19 **a misdemeanor and may result in criminal**
20 **prosecution.**
21    Q.  And in your own words what does that mean
22 to you?
23    **A.  If I don't sign it I'm probably going to**
24 **jail.**
25    Q.  All right. And let's take a look at the

77

1  last page, and the second -- the sentence -- the
2  second sentence, the one just above your
3  signature, can you read that out loud?
4     **A.  Just the second sentence of that**
5  **paragraph or the second paragraph?**
6     Q.  Yeah, just the second sentence.
7     **A.  I have read the above requirements and/or**
8  **have had them read to me, and I understand my**
9  **registration duties.**
10    Q.  All right. As to the second sentence
11 there where it says I understand my registration
12 duties, when you sign the form is that true?
13    **A.  Do I sign it or --**
14    Q.  Yeah, do you sign it?
15    **A.  I sign it, you know, because I'm going to**
16 **get in trouble if I don't, and I'll do anything to**
17 **not get in trouble.**
18    Q.  When you sign it do you, in fact,
19 understand your registration duties?
20    **A.  No, there's -- there's plenty on this**
21 **form that I don't understand.**
22    Q.  Do you have any idea how many separate
23 sections, or subsections, or subsections the
24 registry has?
25    **A.  No.**

78

1    **Q.** If I told you that there were around 290
2    separate sections and subsections of the law do
3    you think you could ever truthfully say that you
4    understand what the law requires?
5    **A. No, I never -- I would never be able to I**
6    **don't think. I'm not a lawyer. I don't**
7    **understand most of this jargon.**
8    **Q.** All right. You testified that you were
9    told by a registry officer that you only had to
10   register your employer's address and not the
11   address of your several work sites; have I got
12   that right?
13   **A. Yes.**
14   **Q.** Section 8(2)(d), which relates to what
15   must go on the public website, reads as follows.
16   I'll read this to you because I don't have it.
17   The address of each of the individual's employers.
18   For purposes of this subsection the employer
19   includes a contractor and any individual who's
20   agreed to hire or contract with the individual for
21   his or her services. Information under this
22   section must include the address or location of
23   employment if different from the address of the
24   employer. Let me read the last line again.
25   Information under this subsection must include the

79

1    address or location of employment if different
2    from the address of the employer.
3           When you were working for the
4    contractor you were told, if I understood your
5    testimony, that you didn't have to report the
6    address or location of employment even if it was
7    different from the address of the employer; is
8    that right?
9    **A. That's correct. I was told to -- to**
10   **register the address of -- I don't remember if it**
11   **was the address of their office or their**
12   **warehouse --**
13   **Q.** All right.
14   **A.** -- but it was one of them.
15   **Q.** Is what you were told consistent with
16   what I just read to you from the act about what
17   must go on the public website and therefore what
18   you must report?
19   **A. No.**
20   **Q.** What conclusion would you draw from this
21   about the registry officers' understanding of an
22   individual's employment registry duties?
23   **A. That it's also confusing for them and**
24   **they don't fully understand it either.**
25   **Q.** You also testified that you were told

80

1    that you didn't need to report your school when
2    you were getting your MBA because it was online
3    only. Do you know if that information turned out
4    to be right or wrong?
5    **A. I do not. I never got in trouble for it,**
6    **but I don't know if it was the correct thing or**
7    **not.**
8    **Q.** And as I understood your testimony two
9    different registry officers told you two different
10   things; is that right?
11   **A. Yes, yes.**
12   **Q.** And what conclusion would you draw about
13   the two different officers' understanding of the
14   law?
15   **A. That if two different people come to --**
16   **you know, in a capacity like that come to**
17   **different conclusions that there's confusion in**
18   **the law.**
19   **Q.** At the end of your visit do you always
20   sign the form saying that you understand your
21   registry duties?
22   **A. I do.**
23   **Q.** Do you recall telling me that when the
24   COVID pandemic hit and everybody's life changed
25   that it actually made you feel better instead of

81

1    worse?
2    **A. Yes.**
3    **Q.** Can you describe what it was that made
4    you feel that way?
5    **A. When the pandemic really hit, you know,**
6    **during -- during the time at least on this part of**
7    **the state, and I believe, you know, most of the**
8    **country, things shut down, forced people to stay**
9    **in their homes. You know, here, you know, there**
10   **was an ordinance that you couldn't leave unless**
11   **you were going to work. It shut everyone into**
12   **their -- their homes. You know, people were**
13   **losing their employment, couldn't find work. It**
14   **put them in the place that I've been since I've**
15   **been on this registry. It made them feel in a way**
16   **that I feel every day.**
17   **Q.** I don't have any further questions.
18          MR. JAMISON: So I have a couple
19   follow-up questions. Paul, and maybe you can stop
20   sharing your screen?
21          MR. REINGOLD: Oh, I'm sorry, yup.
22          RE-EXAMINATION
23   BY MR. JAMISON:
24   **Q.** So when you -- Mr. Doe, when you took the
25   plea deal were you represented by an attorney?

82

1    **A.   Yes.**

2    Q.   And was that the public defender that was
3    appointed to you or was that someone that you
4    hired?

5    **A.   Someone that I hired.**

6    Q.   And at the time that you took the plea
7    deal did you understand that you would have to
8    register as a sex offender?

9    **A.   Yes, but I was also told by the judge**
10   **that I would -- that he would see me in five years**
11   **to have my crime expunged, and that law was**
12   **changed after the fact.**

13   Q.   Which judge was that?

14   **A.   Judge Hicks.**

15   Q.   And how did the crime that led to your
16   conviction, how did that get reported to law
17   enforcement?

18   **A.   Can you -- I don't know what you mean.**

19   Q.   So how -- do you know how the police
20   found out that you had a -- some sort of
21   relationship with a 15-year-old child that led to
22   the criminal sexual conduct charges?

23   **A.   I don't for sure as I haven't had contact**
24   **with her since then, but I believe her father went**
25   **to the police.**

83

1    Q.   And you testified that after your
2    conviction you were able to get a job because your
3    best friend was willing to give you a job.  Have
4    you tried to get a job with your best friend
5    since?

6    **A.   I have not as I was hoping to use my**
7    **degrees and not be working construction.**

8    Q.   And we looked at that form a minute ago
9    that had 77 boxes on it; do you remember that?

10   **A.   Yes.**

11   Q.   One of those boxes was -- was your sex or
12   your gender; do you remember that?

13   **A.   I -- I didn't read every box as we were**
14   **going through it.  I was just counting, but I**
15   **believe, yes, it's on there.**

16   Q.   So does your sex change or has your sex
17   changed since you've had to register?

18   **A.   Mine has not.**

19   Q.   Okay.  Has your first or last name
20   changed since you've had to verify?

21   **A.   No.**

22   Q.   Has -- how many times has your vehicle
23   changed since you've had to verify?

24   **A.   My vehicle or work vehicles or...**

25   Q.   Any of the vehicles.  How many times have

84

1    you had to update or provide your vehicle
2    information?  Or I guess let me back up.  So how
3    many times has your date of birth changed since
4    you've had to verify?

5    **A.   My date of birth has never changed.**

6    Q.   Has your social security number changed?

7    **A.   Not my official one but if I've false --**
8    **you know, if I incorrectly stated it somewhere**
9    **possibly.**

10   Q.   Okay.  Has your hair color changed?

11   **A.   Yes.**

12   Q.   Has your height changed?

13   **A.   Probably.  It's a little different every**
14   **time I go to the doctor, but I haven't changed it**
15   **on the document.**

16   **Q.**   Yeah, I guess that's what I'm getting at.
17   Have you had to change your height when you've
18   gone -- you know, from the time that you had to
19   originally register in 2013 to the time that
20   you've had to update twice a year, has your height
21   changed at all?

22   **A.   I haven't changed it.  I don't know if**
23   **I'm supposed to go change a half inch or not.  You**
24   **know, the last time I was at the doctor a few**
25   **weeks back and I was a half inch shorter, I don't**

85

1    **know if I have to go change that or if it -- it's**
2    **just that they measured me without shoes instead**
3    **of with shoes.**

4    Q.   So have you changed that information at
5    all, though?

6    **A.   No.**

7    Q.   And I believe one of the boxes was about
8    your passport.  You don't have a passport, right?

9    **A.   No.**

10   Q.   Do you have any occupational or
11   professional licenses?

12   **A.   No.**

13   Q.   And your attorney asked you a little bit
14   about the form where you have to sign where it
15   says you understand your registration duties; do
16   you remember that?

17   **A.   Yes.**

18   Q.   What have you done to try to understand
19   what your registration duties are?

20   **A.   I've read through the registration**
21   **duties, and I've asked the sheriff's office where**
22   **I register on certain points of misunderstanding.**

23   Q.   Have you read the registration duties
24   since March of 2021?

25   **A.   Yes.**

86

1  **Q.** Have you read the law since March of
2  2021?
3  **A. Is that different than the registration**
4  **duties? I don't know what law I would even look**
5  **at so probably not.**
6  **Q.** Have you asked an attorney since March of
7  2021 what your registration duties are?
8  **A. I mean, I've had discussions with Paul on**
9  **what my registration duties are, and I -- I get**
10  **the list of registration duties that we just went**
11  **over.**
12  **Q.** Have you gotten a speeding ticket before?
13  **A. In the years after getting my license so**
14  **probably between the ages of 16 and 18, maybe 19.**
15  **Q.** Have you ever read the law to know what
16  the actual law on the book says about speeding?
17  **A. No.**
18  **Q.** But you were still given a ticket for
19  violating the law?
20  **A. I was given a ticket, but I think we're**
21  **comparing apples and oranges. For that I get a**
22  **$60 fine. If I mess up on this I'm going to**
23  **prison.**
24  **Q.** Right, so do only lawyers understand the
25  law?

87

1  **A. Fully understand it I would -- I mean, I**
2  **guess there's some people that aren't lawyers that**
3  **are capable of understanding the law.**
4  **Q.** Are all people subject to the law or are
5  only lawyers subject to the law?
6  **A. All people.**
7  **Q.** I don't have anything else. Thank you
8  for your time, Mr. Doe.
9  **A. Thank you.**
10  MR. REINGOLD: All right, thank you
11  all.
12  (Whereupon Deposition concluded
13  at 11:20 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

88

1  STATE OF MICHIGAN )
) SS
2  COUNTY OF KENT   )

3

4  I, Tamara Staley Heckaman, Certified
5  Shorthand Reporter and Notary Public in and for
6  the County of Kent, State of Michigan, do hereby
7  certify that the foregoing Deposition was taken
8  before me remotely at the time and place
9  hereinbefore set forth.
10  I further certify that said witness was
11  duly sworn in said cause to tell the truth; that
12  the testimony then given was reported by me to the
13  best of my ability; subsequently produced under my
14  direction and supervision; and that the foregoing
15  is a complete, true, and correct transcript of my
16  original shorthand notes.
17  IN WITNESS WHEREOF, I have hereunto set
18  my hand and seal this 3rd day of May, 2023.
19
20
_____
21  Tamara Staley Heckaman, CSR-3443,
Certified Shorthand Reporter,
22  and Notary Public, County of
Kent, State of Michigan.
23
My Commission Expires: 5-20-24
24
25