# Exhibit 60:

## John Doe G
## Deposition Transcript (redacted)

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MICHIGAN
 2                      SOUTHERN DIVISION

 3      - - - - - - - - - - - - - - - -
                                       )
 4      JOHN DOES A, B, C, D, E, F, G,)
        H, MARY DOE and MARY ROE, on  )
 5      behalf of themselves and all   )
        others similarly situated,     )
 6                                     )
                          Plaintiffs, )File No.
 7                                     )2:22-cv-10209
           -vs-                        )
 8                                     )HON. GOLDSMITH
        GRETCHEN WHITMER, Governor of )MAG. IVY, JR.
 9      the State of Michigan, and     )
        COL. JOSEPH GASPER, Director   )
10      of the Michigan State Police, )
        in their official capacities, )
11                                     )
                          Defendants. )
12      - - - - - - - - - - - - - - - -

13                    REMOTE DEPOSITION

14      of JOHN DOE G, a Plaintiff called by Defendants,

15      taken before Melinda S. Nardone, Certified Shorthand

16      Reporter and Notary Public, via Zoom, on Thursday, April

17      6, 2023, noticed for the hour of 10:00 a.m.

18

19

20

21                      HECKAMAN & NARDONE, INC.
22                   Certified Shorthand Reporters
                          P.O. Box 27603
23                   Lansing, Michigan  48909
                          (517) 349-0847
24                    msnardone5@gmail.com

25
```

**2**

```
 1   APPEARANCES:
 2       AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
         2966 Woodward Avenue
 3       Detroit, Michigan  48201
         By
 4       SYEDA DAVIDSON, J.D.
         and
 5       AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
         1514 Wealthy SE, Suite 260
 6       Grand Rapids, Michigan  49506
         By
 7       DAYJA TILLMAN, J.D.
 8
 9           On behalf of Plaintiff.
10       MICHIGAN DEPARTMENT of ATTORNEY GENERAL
         State Operations Division
11       P.O. Box 30754
         Lansing, Michigan  48909
12       By
         SCOTT DAMICH, J.D.
13
14           On behalf of Defendants.
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1   _____ EXAMINATION INDEX
 2   ATTORNEY'S NAME  EXAMINATION  RE-EXAMINATION
 3   BY MR. DAMICH:       4
 4   BY MS. TILLMAN:     76
 5
 6           *       *       *
 7
 8   _____ INDEX OF EXHIBITS
 9    EXHIBIT                    MARKED
10   Ex A  Registry mail-in update      51
11   Ex B  List of cases               62
12           *       *       *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1       Thursday, April 6, 2023
 2       10:00 a.m.
 3       R E C O R D
 4       JOHN DOE G,
 5   having been first duly affirmed, testified as follows:
 6       MR. DAMICH:  Good morning, sir, my name is
 7   Scott Damich, I'm an assistant attorney general with the
 8   State of Michigan and I represent Governor Whitmer and
 9   Colonel Gasper.  I noticed your deposition today in this
10   case, Does V Whitmer, Case Number 2:22-cv-10209, in the
11   District Court in the Eastern District of Michigan in
12   front of the Honorable Judge Goldsmith.
13       There is a protective order in place in this
14   case and that's found at ECF number 88, page ID
15   2389-2395, which protects your identity.  Would the
16   court reporter please confirm that you have read the
17   protective order and signed the acknowledgment?
18       COURT REPORTER:  Yes, I have.
19       MR. DAMICH:  And would counsel confirm that
20   the person tendered is, in fact, John Doe G?
21       MS. TILLMAN:  I can confirm that the person
22   tendered is, in fact, John Doe G.
23       EXAMINATION
24   BY MR. DAMICH:
25       Q.  Sir, I'm going to do my best today to make sure
```

**5**

```
 1   that I ask questions that don't divulge any of your
 2   personal information.  To the extent that it does we
 3   will work with your counsel to make sure that that's
 4   redacted, it doesn't find itself in the public sphere at
 5   all.  I'm going to make my best effort to make sure I
 6   don't draw any personal information out from you, but if
 7   I make a mistake and that happens we will fix it.  Have
 8   you ever been deposed before?
 9       A.  No.
10       Q.  Okay.  So I'm going to go over a couple ground
11   rules I guess we'll call them.  First of all, I'm just
12   looking to have a conversation with you, just question/
13   answer type format.  Of course there's a court reporter
14   here that is writing down everything that we're saying,
15   so when I ask a question, if you'll wait to let me
16   finish the question before you start talking so we don't
17   have cross talk, it's really hard for Mindy to write
18   down what we're saying when there's cross talk, and I'll
19   do the same for you whenever you're answering a question
20   I'll do my best to not talk over you.
21       And since this is done verbally and it's
22   being recorded and actually written down by the court
23   reporter, if I ask you a yes, no, question we ask that
24   you say yes or no.  Like head nods like you're doing
25   right now, a yes, that wouldn't make it into the record
```

6

1  so make sure you verbalize the yes or no. And I usually
2  do a pretty good job of asking you to do that anyway in
3  case it ever happens but I always like to go over that
4  rule as well.
5       I'm going to ask -- like I said, it's a
6  conversation but it's a conversation in a sense that
7  I'll be asking you some questions. I'm not here to
8  confuse you or to trick you in any way, so if you don't
9  understand a question that I'm asking just say so and
10 I'll do my best to rephrase in a manner that you
11 understand. I won't take offense to it if you say I
12 don't understand your question, I will do my best to
13 make sure to get you to understand what I'm looking to
14 get at. So I prefer that you not guess at your answers
15 or assume or anything like that, I'm just looking for
16 what you know and what you don't know. So if you answer
17 a question -- with all that said, if you answer a
18 question I'll assume you understood the question, is
19 that fair.
20 **A. Yeah. Actually what I intend to do is read back**
21 **the question from my understanding to you and request**
22 **confirmation that, in fact, I understand the question**
23 **and then I'll answer.**
24 Q. Okay, we'll see how that goes. Another thing is
25 this, I don't anticipate this deposition taking an awful

7

1  long time, I don't, but I also -- it's also not to be
2  treated like a marathon where if you need a break ask
3  for it, if you need to go to the bathroom, if you need
4  to get up, stretch your legs, whatever, just ask me,
5  say, sir, I need to take a break. The only caveat to
6  that is that if I've asked you a question I would ask
7  you answer the question before we take a break.
8       Are you taking any medication or any
9  substances that would effect your ability to answer
10 questions truthfully today?
11 **A. No.**
12 Q. Okay. And is there anything else that might
13 interfere with your ability to answer questions
14 truthfully or fully?
15 **A. No.**
16 Q. Okay. Where are you currently at right now?
17 **A. My home.**
18 Q. And now do you own your home?
19 **A. I do not.**
20 Q. So do you rent, then?
21 **A. I live in a motel.**
22 Q. You live in a motel?
23 **A. For 13 years, yes, sir.**
24 Q. Okay. And the motel, is it fair to say, it is
25 located in the central east area of the state?

8

1  **A. Yes.**
2  Q. Okay. Throughout this deposition I'm going to be
3  referring to a CSC conviction. Would it be fair -- if
4  I, in fact, refer to that CSC conviction, would it be
5  fair that it represents the 2006 conviction of CSC in
6  Nebraska?
7  **A. I don't know. I'd have to look at the Michigan**
8  **statutes to tell you.**
9  Q. Sure. Were you charged with any crimes of a
10 sexual nature in the State of Nebraska?
11 **A. Yes.**
12 Q. And when was that?
13 **A. That would have -- the conviction would have been**
14 **Octoberish, I don't remember the exact date, of 2008.**
15 Q. October 2008, okay. So then if I refer to your
16 conviction, is it fair that throughout this deposition
17 that we're speaking about that 2008 conviction in
18 Nebraska?
19 **A. Yes, that would be correct.**
20 Q. Okay, excellent. So you lived in a hotel for the
21 past 13 years?
22 **A. This is correct.**
23 Q. So then to do the math here, so when did you
24 first move into the hotel?
25 **A. 2010.**

9

1  Q. And then prior to 2010 where did you live?
2  **A. I lived very briefly with my father for about 90**
3  **days.**
4  Q. And that would -- was that still in 2010?
5  **A. Yes.**
6  Q. And then before living briefly with your
7  father -- actually did your father live in Michigan?
8  **A. Not at the moment but he did at that time.**
9  Q. Okay. Where does your father live now?
10 **A. Florida.**
11 Q. And prior to living with your father for 90 days
12 did you live anywhere else?
13 **A. I was incarcerated in the state of Nebraska,**
14 **Nebraska Department of Corrections.**
15 Q. Okay. So then after your release from prison in
16 Nebraska you then went and lived with your father for 90
17 days?
18 **A. I did.**
19 Q. And that was in Michigan?
20 **A. Yes.**
21 Q. And then from there you moved into the hotel that
22 you currently live in now, right?
23 **A. Yes.**
24 Q. Okay. During your 13 years at your current
25 location have you sought different housing?

10

1    A.  On multiple occasions, yes.
2    Q.  Okay.  Could we go through those different
3  instances?
4    A.  I don't recall all of them, but I can certainly
5  answer any questions you might have.
6    Q.  Sure.  So you said this happened on -- you sought
7  out different housing on multiple occasions,
8  approximately how many times?
9    A.  More than five, less than ten.
10   Q.  Okay, that's fair.  And did you seek
11 homeownership?
12   A.  Without the financial resources to do so I was
13 not able to, so, no.
14   Q.  Okay.  So did you seek to rent?
15   A.  Yes.
16   Q.  Before we go on to renting, so the reason you
17 didn't seek to buy a home was because you didn't have
18 the financial resources to do so?
19   A.  Correct.
20   Q.  Now on to the renting situation.  What type
21 of -- did you try to rent a home?
22   A.  I tried to rent apartments and homes.
23   Q.  Okay.  Now for the apartments, what type
24 of -- were they apartment complexes?
25   A.  Yes.

11

1    Q.  Okay.  And why did you not rent with those large
2  apartment complexes?
3    A.  Every time they ran a background check, which is
4  a standard mechanism for any management company to vet
5  renters, they would notice the fact that I was on the
6  registry.
7    Q.  Now, did you apply to rent there in these areas,
8  fill out an application?
9    A.  Yeah.  I did initially, yes, I did.
10   Q.  And now do you remember if the application
11 specifically asked if you were on the sex offender
12 registry?
13   A.  It did not.
14   Q.  When those apartment complexes denied to rent to
15 you did they say it's because of you being on the sex
16 offender registry?
17   A.  Yes, they indicated to me that it was a liability
18 issue.
19   Q.  And are you saying it wasn't because of your
20 underlying conviction?
21   A.  That doesn't even show up on a background check.
22 So it was the fact that I was on the registry that was
23 their main concern.  They would -- when I got into a
24 position of where I could rent and was making enough
25 money, after I had tried my initial round of getting

12

1  into an apartment I tried again figuring an amount of
2  time had passed and in the meantime the conviction
3  itself falls off the record.  After seven years if you
4  just do a standard criminal background check it no
5  longer shows up.  So the only thing that shows up is the
6  fact that you're still on the registry, that shows up.
7  So basically the concern was that they didn't want the
8  liability problem, they just didn't like the idea of
9  having someone on the registry listed at their address
10 is what it amounted to.
11   Q.  Okay.  Do you remember if the application asked
12 if you were priorly convicted of any felonies?
13   A.  I don't recall.
14   Q.  And approximately how many times did you apply to
15 rent apartment complexes?
16   A.  At least five.
17   Q.  Okay.  And each time they said it's
18 because -- it's exclusively because you're on the
19 registry?
20   A.  That is correct.
21   Q.  And there was no concern about your underlying
22 conviction?
23   A.  I mean part and parcel correct.  I mean obviously
24 there has to be an underlying conviction for you to be
25 on the registry, but what showed up was the fact that I

13

1  was on the registry so that was their main concern.
2    Q.  And so absent you being on the registry there
3  would be no way for them to find out your prior
4  conviction?
5    A.  That is correct.  After seven years, yes, that's
6  right.
7    Q.  Okay.  Aside from the apartment complexes what
8  other type of places did you try to rent from?
9    A.  A couple of private homeowner rentals.
10   Q.  And was there an application process for that?
11   A.  There was a -- well, catch as catch can, I
12 suppose a very modest one.  I paid a fee for a
13 background check in both cases because even the
14 home -- the private homeowners wanted to run a
15 background check and they were able to do so online, it
16 doesn't require much, and they came up with the same
17 result, they didn't -- they wanted to rent to me, but at
18 the same time they knew I could financially afford it at
19 the time when I did apply, but they were concerned that
20 their property would be targeted for -- if I was to show
21 up on the registry and their property would be listed
22 online they were concerned that they would suffer
23 vigilantism, property damage, things like that.
24   Q.  And how many different -- how many different
25 private homes did you try to rent from?

**14**

1    A.  As I recall two to three.  It's been a while
2  since I've tried the home thing.
3    Q.  So then you were released in 2008, correct?
4    A.  2010 I was released.
5    Q.  Or 2010.  So then your conviction -- so under
6  your statement that your prior conviction would be
7  erased from your record seven years after, did you not
8  apply for any apartments or homeowner -- or many homes
9  during that seven year time period after you were
10  released?
11    A.  Yeah, so I did initially, I looked at a few
12  places and was told resoundingly that there was nobody
13  that would rent to me.  And then I tried -- and once I
14  realized -- I was not aware that that conviction would
15  actually drop off the record but it would still show the
16  fact that you're on the registry.  So once I realized
17  that, because an employer did a background check, then I
18  tried re-applying again but still borno, I was still
19  turned down.
20    Q.  So for those seven years post release from prison
21  is it fair to say that being on the registry wasn't the
22  exclusive way that potential renters found out about
23  your conviction?
24    A.  It's a very quick Google search.  One of the very
25  first things that they -- after the first couple of

**15**

1  times of losing money, because you have to pay money to
2  apply, I started just simply telling them, hey, if you
3  guys run a background check I'm on the registry, it
4  became easier just for me to let them know.  And they
5  would tell me, no, if you're on the registry we can't
6  rent to you at all.
7    Q.  So is it a true statement that when you went to
8  apply to rent from these places you told them you were
9  on the registry?
10    A.  A couple of them, yeah, after I got sick of
11  paying money for every application, yes.
12    Q.  Okay.
13    A.  It sucks to have to pay money for an application
14  then only -- you practically know you're going to be
15  turned down so....
16    Q.  If you weren't on the registry would you tell
17  them prior to applying that you were previously
18  convicted of a sexual crime?
19    A.  No.
20    Q.  You would not have?
21    A.  No, absolutely not.
22    Q.  So you're currently living in a motel and it's
23  been that way for 13 years?
24    A.  It has, yes.
25    Q.  And so do you have a P.O. Box or how do you

**16**

1  receive your mail?
2    A.  The mail is received at the hotel's business
3  address.
4    Q.  And do you pay monthly?
5    A.  I pay monthly.
6    Q.  And did the hotel have any problems with your
7  prior conviction?
8    A.  They don't know.
9    Q.  They don't know, okay.
10    A.  I'm waiting for that hammer to drop.  Eventually
11  they might find out and I might lose even a place to
12  live like a hotel, then what do I do?
13    Q.  Are you currently married?
14    A.  I am not.
15    Q.  Do you have a partner?
16    A.  No.
17    Q.  Were you previously married at all?
18    A.  No.
19    Q.  And did you previously have a partner?
20    A.  Define partner.
21    Q.  Sure.  Have you dated?
22    A.  Yes.
23    Q.  And have you cohabitated with anyone that you've
24  dated?
25    A.  No.

**17**

1    Q.  Are you dating right now?
2    A.  No.
3    Q.  How long have you been single?
4    A.  Six years.
5    Q.  Do you have any children?
6    A.  No.
7    Q.  Do you have any siblings?
8    A.  Yes.
9    Q.  Do you have any nieces and nephews?
10    A.  Yes.
11    Q.  How many nieces do you have?
12    A.  One.
13    Q.  And is the niece a minor?
14    A.  No.
15    Q.  How old is your niece?
16    A.  25.
17    Q.  Okay.
18    A.  That's a guess.
19    Q.  That's all right, understood.  And you indicated
20  you have a nephew, correct?
21    A.  Yes.
22    Q.  Do you have more than one nephew?
23    A.  No.
24    Q.  How old is your nephew?
25    A.  28.

18

1   Q.   And so backing up, is your niece and nephew from
2   the same sibling?
3   A.   Yes.
4   Q.   And is that your brother or sister?
5   A.   My sister.
6   Q.   And do you have any other siblings?
7   A.   No.
8   Q.   And does your sister live in Michigan?
9   A.   No.
10  Q.   Where does she live?
11  A.   Illinois.
12  Q.   How about your niece, does she live in Michigan?
13  A.   No.
14  Q.   Does she live in Illinois?
15  A.   Yes.
16  Q.   The same with your nephew?
17  A.   No, nephew lives in Missouri.
18  Q.   Missouri, okay.  Does your niece or nephew have
19  children?
20  A.   Yes, my nephew does.
21  Q.   How many children does he have?
22  A.   One.
23  Q.   One child.  And how old is that child?
24  A.   Less than a year old.
25  Q.   Do you get to see your niece and nephew often?

19

1   A.   Only around holidays when I decide to travel to
2   Illinois to say hi.
3   Q.   Okay.  Is it the same situation with your sister
4   as well?
5   A.   More or less.
6   Q.   Would you say that having a CSC conviction has
7   made it more difficult to be involved in the lives of
8   your nieces and nephews?
9   A.   Yes.
10  Q.   And why is that?
11  A.   There's a different set of rules in Illinois that
12  are in some ways more lenient and some ways more strict
13  than Michigan.  So any -- there's no zoning requirements
14  in Illinois.  There's a bunch of different laws that
15  make it more -- they make it difficult for me to
16  interact with them.
17  Q.   Okay.  So the fact that you're on Michigan's sex
18  offender registry, has that made it more difficult for
19  you to interact with your nieces and nephews?
20  A.   Absolutely.
21  Q.   And can you elaborate why?
22  A.   Because Michigan requires me to report to
23  Illinois whenever -- well, I should say Illinois
24  requires me to report that I'm a registered offender in
25  Michigan.  And there's also a notice requirement if I

20

1   should travel more than, what, seven days, so if I was
2   to leave Michigan for more than seven days I have to
3   report that to Michigan and then Michigan would report
4   it to Illinois.  So any visiting time that I have in
5   Illinois is always defined as seven days or less.
6   Q.   But your visits have been limited, correct?
7   A.   Yes.
8   Q.   And was that a choice of your own?
9   A.   Yes, to avoid being in conflict with the law out
10  of state.
11  Q.   So you would avoid traveling to Illinois out of
12  fear of violating Illinois law?
13  A.   Yes.  And also to avoid a ton of additional steps
14  that I would have to take in Michigan just to travel.
15  Q.   But you could still travel to go see them,
16  correct?
17  A.   Assuming that their residences weren't part of
18  the zoning restriction issues that go on in Illinois,
19  that would be theoretically correct, yes.
20  Q.   And what about Missouri, the same thing?
21  A.   Missouri is even -- is another yet degree of
22  worse.  I cannot even -- I cannot visit my nephew in
23  Missouri because they draw 15 -- I think it's 1500 foot
24  circles around literally anything you can think of like
25  a playground, bus stop, church.  So his house is -- I

21

1   mean if you draw circles in Missouri there's literally
2   almost nowhere you can live except maybe out in a
3   prairie.  So I would be loitering according to Missouri
4   law if I was to visit my -- loitering in an unauthorized
5   zone, according to Missouri law, so I can't even visit
6   my nephew, I'm sorry, I've never been there.
7   Q.   Okay.  Now is it fair to say that those
8   restrictions are placed on you because of your
9   conviction in Nebraska?
10  A.   Well, I would say that those convictions -- those
11  restrictions are placed upon me because I'm still
12  required to register in Michigan.  Especially now
13  because Nebraska indicated to me that I only had to
14  register for ten years.
15  Q.   So are you saying that Illinois' restrictions
16  wouldn't apply to you if you weren't on Michigan's sex
17  offender registry?
18  A.   That is correct.  If I wasn't required to
19  register in Michigan I would not have to notify or worry
20  about issues that may occur in Illinois, that's my
21  understanding of it, so I could be wrong.
22  Q.   So --
23  A.   I would be guessing.  I don't know all the codes
24  so....
25  Q.   Okay.  So you don't know whether or not your

22

1  requirement to -- or your restrictions in Illinois or
2  Missouri are borne out of your conviction in Nebraska?
3     A.  I think if you -- yeah, I think that actually
4  the -- yes, the conviction out of Nebraska would
5  definitely trigger, I guess, all of the sex offender
6  statutes no matter what state I go to.
7     Q.  Okay.  So then just to clarify, then, it's not
8  exclusively because you're on Michigan's sex offender
9  registry, right?
10    A.  No.
11    Q.  It's because of the crime you were convicted for
12  in Nebraska, correct?
13    A.  Yes.
14    Q.  And you can still travel the states, correct?
15    A.  Well, theoretically I can travel to Missouri but
16  where would I go?
17    Q.  Now, you said your father lives in Florida,
18  correct?
19    A.  That is correct.
20    Q.  Do you get to see him often?
21    A.  I do not.
22    Q.  Okay.  Do you have a good relationship with your
23  father?
24    A.  I do.
25    Q.  Do you not travel to see him for financial

23

1  reasons?
2     A.  No, it's again because of the -- Florida's laws
3  are similar to Missouri's in the restrictiveness.  So
4  again where my father lives falls into a zone that is
5  prohibited for me to even visit.  And also there's a big
6  problem with Florida where if you are there more than
7  three days you have to show up, pay a fee, and register
8  in Florida and they don't take you off the registry when
9  you leave even if you're only there for four days.
10    Q.  And that's because of your underlying conviction
11  in Nebraska, correct?
12    A.  I would assume that's the case.  You're asking me
13  to guess.  I don't know all the statutes and codes
14  around it.  I mean because right now, as far as I was
15  advised, in Nebraska I was only required to register for
16  ten years and now it's been more than ten years.
17    Q.  Sure.  But to the best of your knowledge the fact
18  those restrictions apply don't have anything to do with
19  your registration requirements in Nebraska, correct?
20    A.  I'm sorry, could you clarify?
21    Q.  Sure.  Your ability to visit Florida has nothing
22  to do with your registration requirements in Nebraska,
23  right?
24         MS. TILLMAN:  I'm going to object to that as
25  asked and answered but you can answer.

24

1         THE WITNESS:  I would say that -- I'm sorry,
2  I still don't understand that question.  Could you
3  clarify one more time?
4  BY MR. DAMICH:
5     Q.  Sure.  Your registration requirements in Nebraska
6  are not -- they do not hinder your ability to go to
7  Florida, correct?
8     A.  I would say that based on the --
9         MS. TILLMAN:  I'm also going to object to
10 this question because it calls for speculation and the
11 witness has already explained that he doesn't know.
12        THE WITNESS:  I really don't know.  I don't
13 know all the statutes.
14 BY MR. DAMICH:
15    Q.  Okay.  All right, I'd like to go through your
16 education a little bit.  Did you graduate high school?
17    A.  Yes, I did.
18    Q.  And then did you go on to further schooling after
19 high school?
20    A.  I did.
21    Q.  And what type of degree -- did you obtain a
22 degree?
23    A.  I did.
24    Q.  And what year did you obtain your degree?
25    A.  1992.

25

1     Q.  Okay.  And what was your degree in?
2     A.  Bachelor of science, business administration, and
3  a management information systems major.
4     Q.  And did you go on to any further education after
5  undergraduate?
6     A.  Yes, I obtained a certificate in project
7  management in 1995, that was a one year university level
8  course.
9     Q.  Got you.  Anything after that?
10    A.  Besides industry certifications, no.
11    Q.  Since your release from prison in 2008 have you
12 received any further education?
13    A.  I was released from prison in 2010.  I have not
14 received -- could you define education for me?
15    Q.  Sure.  Have you attended any classes at all?
16    A.  Like a college?
17    Q.  Correct.
18    A.  No.
19    Q.  Okay.  Have you attended any classes to gain a
20 certificate of any sort?
21    A.  Yes.
22    Q.  And --
23    A.  Online courses.
24    Q.  Online courses.  And can you tell me what those
25 courses -- what type of courses you took?

26

1    A.   Technical courses that relate to my current job.
2    Q.   And since 2010 have you received any
3  certifications?
4    A.   Do you mean like industry certifications, like --
5    Q.   Yes.
6    A.   Yes, uh-huh.
7    Q.   Could you tell me what those are?
8    A.   Let's see, BICSI certification for installers,
9  for communications cable installation.
10   Q.   Okay.  Any other ones?
11   A.   There was also one to certify me to run a test
12 machine, that's called a certified cable test
13 technician.
14   Q.   Any others?
15   A.   No.
16   Q.   Now back to the first certificate, was it a BICSI
17 or BICSI, what was the name of it?
18   A.   B-I-C-S-I, BICSI.
19   Q.   Okay, and were you required to go to in-person
20 instruction for that certificate?
21   A.   No.
22   Q.   It was done online?
23   A.   Online.
24   Q.   Okay.  And for the second certification you spoke
25 of, the certified cable test tech, did you have to

27

1  attend in person?
2    A.   No, it was online.
3    Q.   So would you say that having a sexual conviction
4  has made obtaining those certificates more difficult?
5    A.   I would say that it's not relevant because they
6  were online courses.
7    Q.   Since your release from prison have you applied
8  for further education but were denied entry because of
9  your prior conviction?
10   A.   I have not applied for additional education in
11 person, no.
12   Q.   And could you -- approximately when did you
13 receive these certifications?
14   A.   2019, 2020.
15   Q.   And since your release from prison have you been
16 steadily employed?
17   A.   No.
18   Q.   No.  If you don't mind if we can walk through
19 your employment history from your release date to
20 present day, is that okay?
21   A.   If I recall it all.  It's been a pretty big
22 disaster so....
23   Q.   Okay, so let's start from the year you were
24 released from prison.  When did you first obtain
25 employment after that?

28

1    A.   I managed to get a job at ████ as a server
2  serving tables within 30 days of being released from
3  prison while living with my father.
4    Q.   Why did you leave that job?
5    A.   I was terminated.
6    Q.   Why were you terminated?
7    A.   Because my employer found out about my registry
8  entry.
9    Q.   Do you know how your employer found out?
10   A.   A customer.
11   Q.   A customer, okay.  And is it fair to say that
12 your employer fired you because of your underlying
13 conviction?
14   A.   No, they loved my work.  Their application didn't
15 even ask nor did they care if you even had a felony
16 conviction, they had convicted everything there,
17 especially the cooks.  In my case they were more
18 concerned about the fact that it gave them a bad look,
19 it was, again, a perception problem and it was
20 not -- that was very clearly explained to me that they
21 actually didn't care about the underlying conviction,
22 that what they cared about was the fact that it was
23 publicly available and it was giving them a bad -- a
24 black eye, so to speak.
25   Q.   Okay.

29

1    A.   The perception was bad.
2    Q.   The --
3    A.   Especially since a customer pointed it out to
4  them.
5    Q.   So then after your job with ████ did you gain
6  employment after that?
7    A.   Yes.
8    Q.   Where?
9    A.   The next job would have been a server position at
10 ████.  So I tried switching over to another
11 restaurant because that's what I was comfortable with.
12   Q.   And then do you remember approximately when you
13 started your employment with ████
14   A.   No, I don't recall.  It's been a while.
15   Q.   Sure.  Do you know if there was a large gap in
16 time between your position with ████ and your position
17 with ████?
18   A.   I don't recall.
19   Q.   Would you say it was less than a year?
20   A.   Probably less than a year.
21   Q.   And how long did you stay employed at ████?
22   A.   I would say less than 90 days.
23   Q.   And then why did you stop working with ████?
24   A.   I was terminated.
25   Q.   And why were you terminated?

**30**

1    A.   My employer found out that I was on the sex
2  offender registry.
3    Q.   So the sex offender registry tipped your employer
4  off to your conviction?
5    A.   No, the uniformed sheriff's deputy showing up
6  with my picture asking if I worked there did.
7    Q.   Okay.  So was ███████ concerned with your
8  underlying conviction?
9    A.   I don't know what they were concerned with, they
10  just simply terminated me immediately.
11    Q.   And they --
12    A.   Upon the deputy showing up and the picture being
13  shown around, I was terminated without a reason at that
14  point.
15    Q.   Do you know why the deputies showed up?
16    A.   For verification of employment.  I mean I assume
17  that's what it was, that's calling for speculation, but
18  I mean they had a picture of me and were asking
19  questions to my managers, specifically requested the
20  manager, and then they pointed out a picture on a piece
21  of paper and as soon as they did that my manager looks
22  over at me so I can only assume that that, in fact, was
23  the cause of my termination, an employment verification.
24    Q.   So aside from your conviction in Nebraska that
25  we've been speaking of, do you have any prior

**31**

1  convictions?
2    A.   No.
3    Q.   So is it fair to assume that the officer was
4  there because of your conviction back in Nebraska?
5    A.   No.
6         MS. TILLMAN:  Objection, calls for
7  speculation.  You can answer.
8         THE WITNESS:  No, the deputies were there
9  for employment verification purposes, nothing to do with
10  Nebraska.
11  BY MR. DAMICH:
12    Q.   Okay.  So you were told -- is this an accurate
13  statement that you were told that you were fired because
14  you're on the sex offender registry?
15    A.   The manager didn't say those exact words.  The
16  manager told me that the sheriff had showed up with a
17  picture, asked if I worked there, he saw what it was, he
18  said he wasn't interested in discussing it any further,
19  and then he said you're terminated, get your stuff and
20  leave.
21    Q.   Then after your position with ██████ did you
22  seek employment after that?
23    A.   Yes.
24    Q.   Where did you go after your job with ██████?
25    A.   Well, I stopped trying to be a server so I went

**32**

1  and started trying to work for temp agencies.
2    Q.   And now when you started working for temp
3  agencies did they ask if you have any prior convictions?
4    A.   They did.
5    Q.   And did you tell them that you did?
6    A.   I did.
7    Q.   And did you get placed anywhere after?
8    A.   Right, uh-huh, innumerable.
9    Q.   You did?
10    A.   Yeah, innumerable places, yes.  I was terminated
11  from most of them due to the fact that they would
12  not -- see the employment agency knew that I had a
13  conviction and I was on the registry at that time.  The
14  employer, the base employer, that being the staffing
15  agency, was aware of my conviction, which still showed
16  up on the record at that time, and the fact that I was
17  on the registry.  And they did place me multiple places.
18    Q.   So let's go through those multiple places that
19  you were placed.  Actually first do you remember when
20  you started your relationship with the temp agency?
21    A.   Not precisely.  It would have to have been around
22  2013, '14 maybe.
23    Q.   So did you --
24    A.   There was a long period of unemployment in there
25  as well, like a year of unemployment, but, again, it's

**33**

1  all pretty fuzzy.  I've held and been terminated from so
2  many jobs due to being on the registry that I have lost
3  track.
4    Q.   So during that period of unemployment did you
5  apply to any emp- -- apply to work anywhere?
6    A.   Say that again one more time, I'm sorry.
7    Q.   The gap in time between ██████ and the temp
8  agency you said you were unemployed, correct?
9    A.   That's right.
10    Q.   Did you fill out any applications to be employed
11  anywhere else?
12    A.   No, I fell into a period of depression.
13    Q.   Okay.  So then back to the temp agency, where is
14  the first place that they placed you?
15    A.   A factory, various factories, it's all manual
16  labor factories, dirty, hot, sweaty type work.
17    Q.   Okay.
18    A.   I couldn't remember what all the various
19  factories they were.
20    Q.   Could you give me an approximation?
21    A.   Of?
22    Q.   How many different factories you worked at?
23    A.   Minimum ten, probably less than 20.
24    Q.   And what type of -- what was your job at these
25  factories?

34

1    A.   Whatever they wanted me to do.  Mostly just
2  pressing a button.
3    Q.   So they were positions that were not pertinent to
4  your undergraduate degree?
5    A.   Not even remotely.
6    Q.   And were you ever reprimand -- do you remember
7  being reprimanded by any of those factories for
8  performance reasons?
9    A.   Never.
10    Q.   But you claim that you were fired from each of
11  those factories?
12    A.   No.
13    Q.   Then why did you jump from factory to factory?
14    A.   Because sometimes the contract would end, and so
15  in the case of the ones where it was a short-term thing
16  the contract would end and I would then go to another
17  factory until I got to a factory that I was at there
18  long enough that they found out I was on the registry
19  and they wanted a new temp anyway from the temp agency.
20        I found out that the temp agency was not
21  telling them that -- the factory that is, that someone
22  from the registry was coming in, they just simply put
23  bodies at the factory.  So when the factory, and some of
24  them did find out, I can't remember the number of them,
25  but a number of them did find out that I was on the

35

1  registry, usually from other employees who were being
2  nosey or whatever, and terminated -- basically what
3  happened is I would not get called back the next day,
4  and then the temp agency would advise me that it was
5  because someone had told them -- or someone had found
6  out I was on the registry and then I would then be put
7  into a holding pattern to go to another factory.
8    Q.   Okay.  So would you say -- is it fair to say that
9  you having a sexual conviction did not prevent you from
10  obtaining work at these factories?
11    A.   What the --
12        MS. TILLMAN:  Objection, calls for
13  speculation.
14        THE WITNESS:  I don't understand.  I don't
15  understand that question.
16  BY MR. DAMICH:
17    Q.   Sure.  Would you say that having the sexual
18  conviction has made obtaining a job in these different
19  factories more difficult?
20        MS. TILLMAN:  I'm going to object to that
21  question as speculative, but you can answer.
22        THE WITNESS:  I would say that being on the
23  registry and having it being so easily publicly
24  discoverable is what has caused me the vast majority if
25  not all of the problems around obtaining and retaining

36

1  competitive employment.
2  BY MR. DAMICH:
3    Q.   Okay.  But each time you were asked to be removed
4  from a factory you were replaced at another factory,
5  correct?
6    A.   Yes.
7    Q.   Okay.  And did there ever reach a point that you
8  weren't placed somewhere after you were removed from one
9  factory?
10    A.   Yes, when the temp agency ran out of factories to
11  place me in they would typically just put me in a
12  holding pattern but they would not place me anywhere so
13  I was going through long periods of unemployment between
14  these factories.  So it wasn't an instant placing me
15  from one factory to another factory, it was it could be
16  two weeks, it could be two days, it could be two months.
17    Q.   Okay.  And during your relationship with this
18  temp agency did you apply for positions outside of the
19  temp agency?
20    A.   No.
21    Q.   And how long were you with this temp agency?
22    A.   Two years.
23    Q.   Okay.  So that would be -- would you say your
24  relationship with them ended in say 2016; is that fair?
25    A.   That would be fair.

37

1    Q.   And then after the temp agency what happened with
2  your employment, where did you go?
3    A.   I went to another temp agency.
4    Q.   And did you tell the temp agency about your prior
5  conviction?
6    A.   I did.
7    Q.   Okay.  And did you also tell them that you're
8  required to register as a sex offender?
9    A.   Yes.
10    Q.   And they still took you on as a potential
11  employ --
12    A.   They said they would place me in a place that
13  does not care about background.  So they did and I
14  stayed at another employer for approximately -- another
15  contractor, client of theirs, for approximately a year
16  and then their business took a downturn and then I was
17  let go from the agency -- from that factory.  And then
18  when I found out -- when I went back to the agency
19  asking for more work they said that they didn't have any
20  other clients that were willing to take anybody that was
21  on the registry, so that's what I was told verbatim.  So
22  I was -- I had to look for something else.
23    Q.   So in 2017 is it a fair statement to say that you
24  were on Michigan sex offender registry because of your
25  underlying conviction in Nebraska?

38

1    A.   At that time I -- yeah, I was required to
2  register in the State of Michigan at that time because
3  of the underlying registry -- or because of the
4  underlying conviction, yes.
5    Q.   So then you were a contractor in this factory
6  until 2017?
7    A.   Yes, approximately.
8    Q.   And then after that where did you end up?
9    A.   I went to another factory, but this time I was
10 getting sick of losing jobs and I decided to actually
11 make the registry work for me.  I parsed out the
12 registry in my area and I started doing some very
13 in-depth research, set up a macro, and literally sifted
14 through every single work address that people had listed
15 on the registry, and then I came up with an employer who
16 had several people who were on the registry at their
17 address.  And I knew that that employer would not care
18 about an underlying sex offense so I then sought
19 employment with that employer.
20   Q.   And was this outside of the temp agency
21 relationship?
22   A.   Yes.
23   Q.   This was on your own?
24   A.   This was on my own, yes.
25   Q.   Okay.  So you were able to obtain employment even

39

1  with your underlying conviction and being on the
2  registry?
3    A.   Yes.
4    Q.   Now, this factory position that you just
5  mentioned, was your compensation more or less than your
6  prior positions?
7    A.   Less.
8    Q.   Less.  How long did you stay at this factory
9  position?
10   A.   Up until -- I was there for a while, up until
11 2019.
12   Q.   So 20- --
13   A.   Yeah, early 2019 would have to be my -- late
14 2018, early 2019, somewhere in there.
15   Q.   So is it fair to say you were employed by this
16 factory from 2017 to 2019?
17   A.   Yes.
18   Q.   And what did you do, what were your job
19 responsibilities at that factory?
20   A.   Machine operator.
21   Q.   And were you ever reprimanded for your work
22 performance at that factory?
23   A.   No.
24   Q.   And you said your employment ended in 2019 with
25 that factory, correct?

40

1    A.   Correct.
2    Q.   Where did you go after that?
3    A.   Well, lightning struck, something happened that I
4  thought would never happen again in my life, I was able
5  to find employment working -- or creating technical
6  articles for my current employer so I -- basically it's
7  a technical writing type position and technical
8  assistance to customers, it's all work from home.  And
9  so I found an employer, I wrote a very detailed review
10 on a communications cable that I had purchased and my
11 future employer noticed that because I posted the review
12 on Amazon.
13   Q.   So this relationship started in 2019?
14   A.   Yes.
15   Q.   And was there an increase in pay in this new
16 position?
17   A.   Yes.
18   Q.   Significant?
19   A.   Significant.
20   Q.   Did you receive fringe benefits as well?
21   A.   Yes.
22   Q.   Did you previously receive fringe benefits in the
23 other positions?
24   A.   Very minor, what was required by law.  Obamacare
25 had already came into effect at that time so....

41

1    Q.   Sure, but with this new position your fringe
2  benefits were better?
3    A.   Better.
4    Q.   Okay.  And that started in 2019, correct?
5    A.   Yes.
6    Q.   And you're still currently employed by this
7  outfit?
8    A.   I am.
9    Q.   And is this -- your current employer is the
10 employer that -- did they pay for you to get your
11 certification for the BICSI and the cable tech?
12   A.   Yes.
13   Q.   So would you agree that having the prior
14 conviction and being on the sex offender registry did
15 not prevent you from obtaining your current employment?
16   A.   No, it almost did.  My current employer put me
17 through a background check, I was moving from -- the
18 current employer I have desperately wanted me to work
19 for them and my boss in particular.  When they did the
20 background check in corporate they did not find the
21 underlying conviction, they found the fact that I was on
22 the registry, which brought up a lot of questions.  And
23 I narrowly did not get extended the job offer, but if it
24 wasn't for my manager running interference for me and
25 telling the corporate office that he wouldn't hear of

**42**

1  me, you know, not getting the offer, then I don't think
2  I would have got this job.  The major saving grace was
3  we were able to make the argument that I was not going
4  into any office, that I was, in fact, working from home
5  and, therefore, that this should not be a concern.
6      Q.  But you still got the -- ultimately got the job
7  though, correct?
8      A.  Yes.
9      Q.  And have you received an increase in pay since
10 you've started there?
11     A.  Yes.
12     Q.  On multiple occasions or just one occasion?
13     A.  Multiple occasions.
14     Q.  So is it fair to say that despite being on the
15 registry you've been able to maintain your current
16 employment and progress in your career?
17     A.  The current career, yes, I would say that is
18 correct.
19     Q.  What do you do for fun outside of work?
20     A.  I build computers.
21     Q.  Okay.  Do you belong to any groups, any kind
22 of -- any kind of community organizations or anything?
23     A.  No.
24     Q.  Do you have any interest in doing that?
25     A.  No.  I've thought about doing volunteer work but

**43**

1  that requires reporting it to the county or the state so
2  that has nullified my desire to volunteer for anything.
3  And I'm afraid that other people will find out about my
4  registry status so I've been extremely hermit for many
5  years now, no relationships, no friends, no anything.
6      Q.  So just to clarify, is it your understanding that
7  you can't volunteer because you're on the registry?
8      A.  No, I can, but I would have to report it and that
9  would put the volunteer -- from my perspective that
10 would put the volunteer organization at undue risk.
11     Q.  Who would you have to report your volunteer
12 activities to?
13     A.  The state and the county.  The law requires me to
14 report volunteer work to the state.
15     Q.  Have you ever tried to actually go out and
16 volunteer at all?
17     A.  No.  You mean in the last ten -- let's clarify
18 that, you mean in the last 13 years?
19     Q.  Yeah.
20     A.  No.  Before that, yes.
21     Q.  According to the complaint you've been a
22 productive member of society since your release.  In
23 your opinion, what's a productive member of society?
24     A.  My opinion, my definition of a productive member
25 of society is someone that is capable of pulling their

**44**

1  own weight, not getting into trouble, paying taxes.
2  That's pretty much my definition of productive member of
3  society.
4      Q.  What volunteer group -- assuming it were true
5  that you can't -- well, you have to report volunteer
6  activity for registry purposes, who would you go
7  volunteer with?
8      A.  There's a number of clubs that I would love to
9  volunteer with like radio clubs.  I would like to do
10 volunteer work at like animal shelters.  I would like to
11 do volunteer work at like homeless shelters, things like
12 that.
13     Q.  Okay.  I'm going to move over to your conviction.
14 Again, you were convicted in 2006 of unlawful sexual
15 conduct with a minor, correct?
16     A.  Yes, unlawful sexual contact with a minor, yes.
17     Q.  And the victim was a 14 year old child, correct?
18     A.  That's what I was convicted of.  In reality he
19 was 15 but, yeah, we'll say he's 14 for purposes of this
20 deposition.
21     Q.  Okay.  And you engaged in sexual touching with a
22 14 year old child, right?
23     A.  Correct.
24     Q.  Okay.  And did you have a special relationship
25 with this child?

**45**

1      A.  Define special relationship.
2      Q.  Sure.  Did you live in the same house as this
3  child?
4      A.  Yes.
5      Q.  Okay.  Were you related to the child?
6      A.  No.
7      Q.  So what circumstances brought you to be living in
8  the same house with him?
9      A.  That was my best friend's son.
10     Q.  And how many times did you sexually touch that 14
11 year old child?
12     A.  Once.
13     Q.  And do you remember if there was just a single
14 charge for sexual touching?
15     A.  There was initially some confusion.  There was a
16 charge and then there was confusion about the date,
17 about when it occurred, so then they put a second
18 charge, which they eventually -- which they dropped.
19     Q.  Do you remember if the victim testified that
20 there were multiple touchings, multiple instances?
21     A.  We only addressed the one so I don't recall.  I
22 don't recall him saying that.
23     Q.  Do you remember if you appealed your conviction?
24     A.  I did.
25     Q.  And do you remember why you appealed your

46

1  conviction?
2     **A.   Ineffective assistance of counsel.**
3     Q.   And why do you believe counsel -- your counsel
4  was ineffective?
5     **A.   I didn't believe that, the attorney did, so that**
6  **would be speculation on my part.**
7     Q.   Do you remember whether or not the judge that was
8  presiding over your conviction had made mention of
9  multiple incidents of touching?
10    **A.   No, just multiple instances of the two charges,**
11 **but there was confusion as to when it actually happened.**
12    Q.   Okay.  So sitting here today you still believe
13 there was only one instance of sexual touching of a
14 child?
15    **A.   Correct.**
16    Q.   In your opinion can a 14 year old child consent
17 to sexual touching with an adult?
18    **A.   No.**
19    Q.   And in your opinion does a 14 year old have the
20 maturity level to consent to having sexual touching with
21 an adult?
22          MS. TILLMAN:  Objection, lack of foundation.
23 You can answer.
24          THE WITNESS:  Continue answering?  I believe
25 that that is a no.

47

1  BY MR. DAMICH:
2     Q.   And as you sit here today do you think it's okay
3  for a 36 year old adult to have sexual relations with a
4  14 year old child?
5     **A.   No.**
6     Q.   Since 2006 have you had any other sexual
7  relationships with children 17 or under?
8     **A.   No.**
9     Q.   Were you attracted to the 14 year old?
10    **A.   No, not specifically.**
11    Q.   When you say not specifically can you elaborate
12 on that?
13    **A.   I would say that without going into -- without**
14 **relitigating the case there was a momentary lapse of**
15 **reason where I engaged in sexual touching with the 14**
16 **year old but it wasn't due to an underlying attraction.**
17    Q.   Do you have -- did you do it to seek pleasure?
18    **A.   At that time I would say yes.**
19    Q.   So the sexual touching with a 14 year old was an
20 event that you did for pleasure for yourself?
21          MS. TILLMAN:  Objection, asked and answered.
22          THE WITNESS:  I would say yes.
23 BY MR. DAMICH:
24    Q.   Do you still find pleasure in being with 14 year
25 old children?

48

1     **A.   No.**
2     Q.   Are you attracted to children?
3     **A.   I am not.**
4     Q.   The complaint indicates that you completed a sex
5  offender treatment program while in prison.
6     **A.   Yes.**
7     Q.   Could you elaborate on what type of treatment you
8  received?
9     **A.   I was given -- the treatment that was prescribed**
10 **by the prison or by the Nebraska Department of**
11 **Corrections was a cognitive behavioral therapy.**
12    Q.   Okay.  And do you remember if there was any
13 testing done?
14    **A.   I don't understand.**
15    Q.   Sure.  So the cognitive behavior therapy, was
16 there any type of institutional test that was done by
17 the person that was giving you cognitive behavior
18 therapy?
19    **A.   I don't know.**
20    Q.   You don't know?
21    **A.   Not that they ever disclosed to me.**
22    Q.   Okay.  And could you elaborate on what this
23 cognitive behavioral therapy entailed?
24    **A.   Handbooks, counseling sessions, homework.**
25    Q.   So when you moved to Michigan you had -- is it

49

1  fair to say you had to register for 25 years or life?
2     **A.   Say that one more time now.**
3     Q.   When you first moved to Michigan you had to
4  register for 25 years, correct?
5     **A.   Yes, that was my understanding at the time, yes.**
6     Q.   And then due to changes in law the registration
7  period was changed to life, correct?
8     **A.   Correct.**
9     Q.   Okay.  The complaint indicates that the only way
10 you can ever come off the registry would be for you to
11 die, correct?
12    **A.   Correct.**
13    Q.   You can move to Nebraska, though, right?
14    **A.   Theoretically I suppose I could move to Nebraska.**
15    Q.   And if you moved to Nebraska you wouldn't have to
16 register, right?
17    **A.   Honestly, I don't know anymore.  The laws**
18 **constantly change, I really don't know.**
19    Q.   I think you previously testified that you no
20 longer have to register in Nebraska; do you remember
21 that?
22    **A.   I was given a ten year -- yeah, a ten year**
23 **registration there.  But I know that their laws have**
24 **probably changed since.**
25    Q.   Assuming that they haven't, you could move to

50

1 Nebraska and be off Michigan's sex offender registry,
2 right?
3   A.  No, they --
4       MS. TILLMAN:  I'm going to object to the
5 question because it calls for a legal conclusion and it
6 requires speculation on the witness' part, but you can
7 answer.
8       THE WITNESS:  Yeah, I believe that Nebraska
9 had to largely comply with the Adam Walsh Act so their
10 laws regarding the registry and all that had to largely
11 substantially comply with the Adam Walsh Act, so I would
12 say that I would have to register going back to
13 Nebraska, yes.
14 BY MR. DAMICH:
15  Q.  As a lifetime registrant how often do you need to
16 verify in person with law enforcement?
17  A.  Once every quarter, four times a year.
18  Q.  Four times a year.  And how far away is the
19 police department from your current residence?
20  A.  Which one?
21  Q.  What do you mean which one?  Wherever you go to
22 verify.
23  A.  The place I regularly verify at would be ████
24 County Sheriff's Department, and that is approximately
25 10, 15 minutes away.

51

1  Q.  And how long does it take you to register each
2 time you go?
3  A.  It varies.  Up to a half an hour.
4  Q.  I'm going to go ahead and share my screen real
5 quick here.  Do you see that, sir?
6  A.  I do, uh-huh.
7  Q.  Do you recognize this document?
8  A.  I've seen it once before.
9  Q.  And can you identify what it is?
10  A.  It's a Michigan sex -- I'm just reading off the
11 document here on the screen, Michigan sex offender
12 registry mail-in update.
13  Q.  Have you ever completed one of these forms?
14  A.  Yes.
15  Q.  On approximately how many occasions?
16  A.  Once.
17       MR. DAMICH:  I'm going to ask this be marked
18 as Deposition Exhibit A.
19       (Whereupon Deposition Exhibit A
20       marked for identification.)
21 BY MR. DAMICH:
22  Q.  Starting at the first part here where it says
23 offender information, is there anything under this
24 category that confuses you?
25  A.  Not under that particular section.  Section one

52

1 does not confuse me.
2  Q.  Okay, how about the second section?
3  A.  That confuses me, it indicates temporary
4 residence information.  I don't understand the context
5 of the entire block.
6  Q.  Now, have you had to report a temporary residence
7 for any reason since you have been required to register?
8  A.  No.
9  Q.  Because you've been at the same place for 13
10 years, correct?
11  A.  Yes.
12  Q.  So what confuses you about the temporary
13 residence information?
14  A.  It seems very out of context.  Section two says
15 temporary residence information, and it's not clear to
16 me what the context of that is.  In other words, if this
17 is a mail-in update form why would there be something
18 indicating temporary residence information on it.  I
19 don't understand the context of that.
20  Q.  Okay.
21  A.  Because I'm not in a temporary residence, I'm in
22 a permanent residence, or at least for the moment I am.
23  Q.  So if you had a question about what this means
24 would you contact anyone and ask?
25  A.  Yes, I would attempt to contact somebody.

53

1  Q.  Who would you try to contact?
2  A.  Well, I could try calling the state and get a
3 different answer than the county would give me because
4 they always conflict, the answers conflict often.  I
5 could contact the ACLU for a legal opinion, but
6 sometimes they can't even tell me precisely what that
7 stuff may mean because it's vague.  Or I could also
8 contact a private attorney outside of the ACLU who may
9 not be familiar with this at all and have to go through
10 research and they still may not give me a correct
11 answer.
12  Q.  Now, you made mention that you had received
13 perhaps conflicting information from the state and the
14 county level.  Have you previously contacted the state
15 for direction on the Sex Offender Registration Act?
16  A.  Yes.
17  Q.  And do you remember why you contacted them?
18  A.  It had to do with zoning restrictions, that it
19 had to do with measurement distances and where property
20 lines were and things like that.
21  Q.  Okay.  And did you contact the county with the
22 same type of question?
23  A.  I did.
24  Q.  Do you know that those restrictions no longer
25 apply?

54

1    A.  I'm aware that they no longer apply to me, yes.
2    Q.  And have you contacted the state for any other
3  reason?
4    A.  Yes.
5    Q.  What was that other reason?
6    A.  The other reason was palm prints.
7    Q.  And what was your question with the palm prints?
8    A.  It was basically how to comply because I had
9  attempted to get palm prints registered, I was marked
10  non-compliant for lack of palm prints just summarily by
11  somebody at the state or county, I don't know who, but I
12  was just summarily marked non-compliant for lack of palm
13  prints even though I never knew I had to give them, and
14  it was like six or seven years into the registration in
15  Michigan.  So I called them asking why all of a sudden I
16  had to give a palm print.  And then I asked, you know,
17  where I could get it done and would I be getting a
18  receipt and things like that, so that was the main gist
19  of that conversation.
20    Q.  And so after doing what was advised to do from
21  the state, you were then considered to be in compliance?
22    A.  Not -- well, I had to go through quite a bit of
23  trouble to get into compliance.
24    Q.  You followed the direction that the state gave
25  you to get into compliance, correct?

55

1    A.  I did, and that did not get me into compliance.
2    Q.  Okay.  What kept you out of being in compliance
3  then?
4    A.  County -- I would say malfeasance of county
5  duty -- malfeasance of the county.  I was attempting to
6  get palm prints registered at the county level for state
7  use on multiple occasions and was unable to bring myself
8  into compliance no matter what level of effort I
9  exerted.  I finally had to go to a state police post,
10  which is a long way away, in order to get my palm prints
11  taken.
12    Q.  And then after that you were considered to be
13  compliant?
14    A.  Yes.
15    Q.  Did you con- -- other than the zoning questions
16  and the palm print questions, were there any other
17  reasons you contacted the state for questions regarding
18  registration?
19    A.  Not that I can recall.
20    Q.  Going back to the exhibit we were speaking of,
21  item number three, contact information, is there
22  anything in this area that you find confusing?
23    A.  Yes, the email/internet identifier.  An email
24  makes sense, I understand that.  But internet identifier
25  is extremely vague, that could be -- I mean what exactly

56

1  does that mean?
2    Q.  Okay.  When you submitted your updates or your
3  verification forms have you applied -- have you provided
4  internet identifiers?
5    A.  Generally -- well, email addresses, yes.  But
6  because the internet identifiers were extremely vague
7  and I got conflicting answers from the county level as
8  to what exactly that meant they couldn't tell me exactly
9  what an internet identifier exactly was with a great
10  deal of accuracy, so rather than have to report it I
11  simply didn't bother registering for any so-called -- I
12  just basically didn't use the internet.  I was starting
13  to just -- I just used email and I would look at like
14  websites but I wouldn't go out of my way to -- and try
15  to interact, certainly nothing like social media.
16    Q.  Sure.  Now I'm going to highlight a portion here,
17  I don't know if it's a little hard to read, I'll zoom in
18  a little bit for you.  Based off what I just highlighted
19  do you still have to report any of that information?
20    A.  I still report the email address.
21    Q.  Okay.  So you still provide an email address even
22  though it says, the following email internet information
23  is only collected for those offenses committed on or
24  after July 1, 2011, correct?
25    A.  Yes, because the county has told me that I have

57

1  to report my email address.  They said I didn't have to
2  report other internet identifiers, but the county told
3  me that they still required my email address along with
4  my phone number.
5    Q.  Now on to the next section, vehicles, is there
6  anything that you find confusing about that?
7    A.  That I do not find confusing.
8    Q.  The same question for number five, mobile homes,
9  is there anything confusing on that?
10    A.  No, that's not confusing to me.
11    Q.  Okay.  Do you think the sex offender registry
12  protects the public in any way?
13    A.  No.
14    Q.  And why do you believe that?
15    A.  Based on my perceptions and experience the vast
16  majority, from my understanding, of sex crimes are, in
17  fact, not with somebody you don't know but somebody you
18  know.  It's almost always somebody close to you that is
19  likely to commit a sex offense upon you.  I think the
20  registry generates fear, uncertainty, and doubt and is
21  not a useful public safety tool.
22    Q.  Can you elaborate on how the registry creates
23  fear?
24    A.  Yes.  Because when you go onto the registry and
25  do a search it looks very much like you're looking at a

58

1   prison record, like at the Michigan Department of
2   Corrections.  It's giving like tattoos and aliases, and
3   the assumption is is that somebody must use an alias,
4   even though it's just -- it could be just because they
5   have a middle initial in their name that they don't
6   always use.  It gives the perception that someone who is
7   on the registry or listed on the website is a clear and
8   present legal danger to you and to people you know.  So
9   I think it instills fear.
10          Also because it's not accurate in regards to
11  -- it lists an offense that you might be convicted of,
12  but that offense may not in any way resemble what
13  actually occurred because sometimes people are convicted
14  under statutes that they plead to or they are convicted
15  under statutes that don't resemble actually what
16  occurred.  And my take on it is that it misleads people
17  into a false sense of security or causes undue alarm.
18      Q.   So back to the fear part, do you think it creates
19  fear to the general public?
20      A.   Yes, I think it causes -- I think people that go
21  on the registry and look for friends, neighbors,
22  relatives, I think it causes people to be more paranoid
23  and to be more fearful of their neighbors who are not
24  necessarily a threat.
25      Q.   You also mentioned that the sex offender registry

59

1   creates doubt; could you elaborate on that?
2       A.   Yes.  Let's say you know someone who's been on
3   the registry for a long time but you didn't know they
4   were on the registry.  And then subsequently you
5   discover that they are actually on the registry.  Now
6   that's going to cause you to doubt your entire
7   relationship with someone that you've known for no good
8   reason other than the fact that they are listed on the
9   website.
10      Q.   Do you think that the fact that the underlying
11  conviction would maybe cause harm on that relationship?
12      A.   I think that that's possible but I think that
13  being publicly branded is the greater amount of damage,
14  I think that would cause the greater amount of damage to
15  the relationship because now you've put the person that
16  has discovered your status, for example, in the position
17  of having to defend you if other people should find out.
18      Q.   You also made mention that the sex offender
19  registry creates uncertainty; could you elaborate on
20  that?
21      A.   Part and parcel of what I've been talking about
22  generally speaking is that I think that it causes
23  uncertainty for people when they -- I believe that
24  uncertainty comes from not knowing whether you -- you
25  know someone is an actual threat to you or if they are a

60

1   threat to anybody else.  And also uncertainty because
2   the person that you're looking at on the public registry
3   may not, in fact, be the person that you suspect of
4   actually being on the registry.
5       Q.   In your opinion how do you determine if someone
6   is an actual threat?
7       A.   Individualized assessment.
8       Q.   What do you mean by individualized assessment?
9       A.   I think that an individualized assessment needs
10  to take place by a therapist or someone who is qualified
11  to do so to determine if someone is an ongoing risk or
12  not.
13      Q.   And what kind of things do you think that they
14  should consider?
15          MS. TILLMAN:  I want to just quickly object
16  to this line of questioning because the witness is not
17  an expert and there's a lack of foundation, but you can
18  continue.
19          THE WITNESS:  I can speculate all day but I
20  have no idea what kind of questions are appropriate to
21  ask.
22  BY MR. DAMICH:
23      Q.   I mean like what type of characteristics would
24  make someone a threat?
25      A.   I don't know, I'm not an expert.

61

1       Q.   Do you think the sex offender registry may
2   encourage victims to come forward?
3           MS. TILLMAN:  Objection, calls for
4   speculation.
5           THE WITNESS:  I don't know.
6   BY MR. DAMICH:
7       Q.   Have you ever been a victim of a sex offense?
8       A.   No.
9       Q.   Do you think if victims come forward to report
10  sex crimes that would protect the public?
11      A.   At large?  Let me just -- so you're asking me if
12  an individual person who's had a sex offense committed
13  upon them comes forward would that protect the public at
14  large; is that the question?
15      Q.   Yeah.
16      A.   Sure, yes.
17      Q.   I'm going to go ahead and share my screen again.
18  Do you see -- is a document appearing on your screen,
19  sir?
20      A.   Yes, I can see it, yeah.
21          MS. TILLMAN:  And before you jump in we just
22  want to make a quick objection, notwithstanding the
23  court's order allowing the use of this exhibit, we just
24  want to place a global objection on the use of the
25  exhibit and the line of questioning associated with this

62

1    exhibit as irrelevant and improper.
2          MR. DAMICH:  Thank you, Dayja.
3    BY MR. DAMICH:
4       Q.  Sir, what we have here, as you can see, it's a 47
5    page document that has some snippets of facts from
6    different judicial decisions regarding cases of a sexual
7    nature.  And I'm going to ask you to read through some
8    of these factual scenarios and I'm going to have some
9    questions for you following your reading of them.  But
10   before I do that I'm going to ask that this exhibit be
11   marked as Exhibit B.
12         (Whereupon Deposition Exhibit B
13         marked for identification.)
14   BY MR. DAMICH:
15      Q.  I'm going to scroll down to number seven here,
16   and I'll zoom in a little bit.  Could you read that for
17   me and let me know when you're done?
18      A.  Which one is it again?
19      Q.  Number seven.
20      A.  Seven.  Okay.
21      Q.  Would you want to know if this perpetrator was
22   going to babysit one of your grandnieces and nephews?
23      A.  I don't know.  The first problem with this is
24   that I don't know who ordered this narrative.  There's
25   two sides to every story, I don't know if this is even

63

1    truthful.  You state that they are facts, but I'm
2    disputing that these are, in fact, the facts.  So this
3    narrative was typed up by someone, but I was not sitting
4    there at the trial, there's two sides to every story,
5    and, more importantly, I don't know if that individual
6    who allegedly did this actually, in fact, is currently a
7    threat or not.  So the answer is I don't know.
8       Q.  Okay.
9       A.  There's not enough information here to go off of.
10      Q.  So assume for purposes of today that these facts
11   are true and not in dispute.
12      A.  If this person is a continuing threat, then, yes,
13   I would prefer to know, yes.
14      Q.  And what do you believe is the threshold for
15   continuing threat?
16      A.  That's not within my purview to decide.  I'm not
17   qualified to make that assertion.
18      Q.  Would you consider this person a threat?
19          MS. TILLMAN:  Objection, asked and answered.
20          THE WITNESS:  I don't know.  The answer to
21   your question on this guy is I don't know.
22   BY MR. DAMICH:
23      Q.  Okay.  Number 13, go ahead and read it and let me
24   know when you're done.
25      A.  Okay.

64

1       Q.  Okay, would you like to know this information if,
2    in fact, this perpetrator lived next to your sister?
3       A.  I would say that, again, it's I don't know.
4    Again, we've got a narrative here that I don't know is
5    truthful or factual, but assuming for sake of argument,
6    'cause I know you're going to ask that next, assuming
7    for sake of argument that this is the absolute truth I
8    would say that I can't answer your question because I
9    don't know.  This person may or may not be a continuing
10   threat.
11      Q.  Okay, let's assume that they are a continuing
12   threat, would this be information that you'd want to
13   know?
14      A.  If they are an actual continuing threat, yeah,
15   I'd prefer to know that.
16      Q.  Okay.  Number 19, it's a little longer, can you
17   see it?
18      A.  Yeah, yeah.
19      Q.  Okay.
20      A.  Okay.
21      Q.  Would you want to know this information if this
22   defendant were to enter the home of your nephew?
23      A.  I would say that, again, I don't know if
24   he's -- this narrative is accurate, factual, or correct.
25   But, again, for the sake of argument, assuming that it

65

1    is, I would say that there's not enough information here
2    for me to make a determination one way or the other as
3    to whether or not this -- I would prefer to know.
4       Q.  What more information would you need?
5       A.  I would need to know if the person was a
6    continuing threat.
7       Q.  Okay.  And assuming they were a continuing
8    threat, would you want to know this information?
9       A.  If they were a continuing threat absolutely,
10   sure.
11      Q.  Okay.  If you'd read number 20 and then let me
12   know when you're done.
13      A.  Sure.  Okay.
14      Q.  Would you want to know this information if this
15   defendant here was your sister's therapist?
16      A.  Again, assuming that this information is factual
17   and accurate, which it may not be, there's two sides to
18   every story, and what I'm reading here, I mean, appears
19   to be an inappropriate relationship.  It also appears to
20   be somewhat consensual.  So I would say that without a
21   continuing risk assessment of some kind I don't think
22   this person may -- I don't honestly, from what I'm
23   reading here assuming this is correct, I don't know if
24   this person is a threat or not even with a risk
25   assessment.

66

1    Q.   Okay, but if they were still considered a threat
2    would you want to know this information if your sister
3    were -- if this was your sister's therapist?
4        A.   If this person had a history of it and was likely
5    to do it again, in other words, a continuing history,
6    and was someone that was likely to reoffend in some way,
7    I would say it's something she should know about, yeah.
8    But, again, this appears to be, again, somewhat
9    consensual, there's a very big gray area on this one,
10   Scott, assuming this narrative is correct.
11       Q.   So number 22, if you could read that and let me
12   know when you're done.
13       A.   Okay.
14       Q.   Okay, and let's assume this defendant here is
15   also a pianist and offers lessons.  Would you want to
16   know the information here about defendant before one of
17   your nieces or nephews or grandnieces or nephews were to
18   take piano lessons from this individual?
19       A.   I would say assuming that this narrative is
20   correct, which I don't know that it is, if this person
21   is a continuing threat to society I would say that I
22   would prefer to know, I would prefer that my niece or
23   nephew prefer to know, but without some sort of you,
24   know, individualized risk assessment I'm not entirely
25   sure that they should know.

67

1        Q.   Okay.  If you would read number 28.
2        A.   Okay.
3        Q.   Okay, would you want to know this information if
4    your niece was going to go on a date with this
5    defendant?
6        A.   I would say, again, assuming that this narrative
7    is accurate and correct, which I'm not certain that it
8    is factual, I would say that I would prefer to know if
9    there was an individualized risk assessment that
10   confirms that this person was a continuing threat, that
11   they have a high level or high risk of reoffending.
12   Beyond that I would say I would not prefer to know.
13       Q.   What type of things should go into that
14   individualized assessment for this individual, in your
15   opinion?
16       A.   I have no idea.  That's not my job and that's not
17   my area of expertise.
18       Q.   Okay, number 33, could you read that and let me
19   know when you're done?
20       A.   Sure.  Okay.
21       Q.   And would you want to know if this perpetrator
22   was going to babysit one of your grandnieces or nephews?
23       A.   Again, assuming that the narrative that is
24   written here is accurate and factual, which I cannot say
25   whether it is or is not, I would say if the person that

68

1    allegedly did this is a continuing threat to society and
2    has been tested or, you know, classified as such through
3    an individualized risk assessment then I would say yes.
4    Otherwise, no, I would not prefer to know.
5        Q.   Okay.  Number 41, if you could go ahead and read
6    that and let me know when you're done.
7        A.   Sure.  Okay.
8        Q.   Would you take your nephew to this barber if you
9    knew this information?
10       A.   I would say the information is not relevant if
11   the person that is described here -- in fact, if this
12   narrative is accurate, which I cannot say for sure
13   whether this information is accurate or not, but if a
14   risk -- individualized risk assessment is conducted that
15   proves that this individual who allegedly did this is,
16   in fact, a continuing risk to society then, yeah, I
17   would prefer to know, in fact, I would prefer that they
18   don't even be a barber, but if their individualized risk
19   assessment indicates that they are not a threat any
20   longer then I would say, no, I would not want to know.
21       Q.   Can you read number 76?
22       A.   Okay.
23       Q.   Would you want to know this information if your
24   niece was dating the defendant?
25       A.   Assuming that this narrative is factual and

69

1    correct, which I don't know that it is, I would say that
2    an individualized risk assessment needs to be done upon
3    this individual, assuming that they did what they
4    allegedly -- this allegedly says they did, and if they
5    prove or they show to be a continuing threat, likely to
6    reoffend, then I would say I would prefer to know.
7    Otherwise I would not prefer to know.
8        Q.   Okay, number 79.  Just let me know when you're
9    done reading it.
10       A.   Okay.
11       Q.   Okay.  Assuming this defendant now offers
12   tutoring services, is this some information you'd want
13   to know if your niece or nephew were to seek out
14   tutoring services from this individual?
15       A.   Assuming this narrative is accurate and correct,
16   which I cannot say that it is, I don't know who came up
17   or spun that narrative and wrote it down, but assuming
18   for the sake of argument that it is, in fact, a correct
19   and accurate narrative I would say that the individual
20   that's accused or allegedly did this should be put
21   through an individualized risk assessment and if they
22   prove that they are a continuing threat or likely to
23   reoffend then, yes, I would prefer to know.  Otherwise,
24   no, I would not prefer to know.  With that I'd like to
25   say can we take a break?

70

1    Q.  Absolutely, yes.  How long do you need?
2    A.  **Ten minutes are good.**
3        MR. DAMICH:  Okay, that sounds good.
4        THE WITNESS:  All right.
5        MR. DAMICH:  See you back in ten minutes.
6        THE WITNESS:  You bet you.
7    (A recess was taken.)
8        MR. DAMICH:  Back on the record now.
9    BY MR. DAMICH:
10   Q.  I'm going to go ahead and reshare my screen, I
11   took it down during the break.  If you could read number
12   85 for me right here and let me know when you're done.
13   **A.  Sure.  Okay.**
14   Q.  Okay, would you want to know this information if
15   this defendant lived next to any of your family members?
16   **A.  Not necessarily.  Again, the information that's**
17   **provided here may not be factual.  It's a narrative**
18   **that's been written down and I don't know from what**
19   **perspective and whose so I honestly don't know how to**
20   **answer that question other than to say that -- I mean**
21   **for sake of argument if this is a factual narrative, and**
22   **I'm not saying that it is, if this individual is still,**
23   **you know, indicated by an individualized risk assessment**
24   **to be a continuing threat to society, and is, therefore,**
25   **likely to reoffend, then I would say I would prefer to**

71

1    **know otherwise I would not prefer to know.**
2    Q.  All right.  Have you ever contacted a member of
3    the Michigan legislature to inquire about changing the
4    sex offender registration law?
5    **A.  I have written a letter to the legislature in**
6    **regards to when Doe 2 was going on and there was an**
7    **inappropriate committee meeting of the house judiciary,**
8    **I did write some letters in regards to that.**
9    Q.  Okay.  And so are you aware that it's the
10   legislature that has the power to change the law?
11   **A.  The legislatures have the ability to nullify,**
12   **create, and change laws, yes.**
13   Q.  Do you know whether Governor Whitmer has the
14   power to change the sex offender registration law?
15   **A.  She has the ability to veto an unconstitutional**
16   **one and she did not do so.**
17   Q.  Okay.  So the question was do you know whether
18   Governor Whitmer has the power to change the sex
19   offender registration law?
20       MS. TILLMAN:  Objection, asked and answered.
21   You can keep going.
22       THE WITNESS:  Oh, yeah, okay, so, Scott,
23   Governor Whitmer is part of the three branches of
24   government that we have, right, and she's the executive
25   branch.  And she has the power to veto the legislation

72

1    that was put forward as a result of Does 2, and she
2    either should have -- she either did know or should have
3    known through her own legal counsel that the law in its
4    entirety was unconstitutional and did not pass
5    constitutional muster.  So she signed it into law so,
6    therefore, she is directly responsible and indicated in
7    this lawsuit.
8    BY MR. DAMICH:
9    Q.  Okay.  Can she currently change the law?
10   **A.  On her own?**
11   Q.  Correct, yes.
12   **A.  I don't know.**
13   Q.  Is it your understanding that the executive
14   branch of government doesn't have the ability to change
15   the law?
16   **A.  My pedestrian understanding is that she does not**
17   **create law.**
18   Q.  Do you know whether or not she can reduce the
19   registration period?
20   **A.  I do not believe she has a mechanism to directly**
21   **do so.**
22   Q.  Do you know whether Colonel Gasper has the power
23   to change the sex offender registration law?
24   **A.  He can refuse to follow it, it's his**
25   **constitutional duty to actually do that.  If he either**

73

1    **knows or has reason to believe to know that the law is**
2    **unconstitutional he has a duty to uphold the**
3    **constitution in this state and the United States.  He**
4    **swore an oath and if he knows that a law is either, A,**
5    **unconstitutional or, B, he has good reason to believe**
6    **the law is unconstitutional he has a duty to actually**
7    **not enforce it.**
8    Q.  Again, the question was does he have -- how about
9    I rephrase it.  Does Colonel Gasper currently have the
10   power to change the sex offender registration law?
11   **A.  He has the option to not enforce it.**
12   Q.  Okay.
13   **A.  Which would --**
14   Q.  Does he have the authority to change the language
15   of the law?
16   **A.  To change the actual language of the law?  I'm**
17   **not aware of any mechanism that he would have to change**
18   **the mech- -- or to change the wording of the statute as**
19   **it's currently written, but then, again, I have a**
20   **pedestrian understanding so....**
21   Q.  And do you know whether he can reduce the
22   registration period?
23   **A.  He can refuse to enforce the registration**
24   **altogether, but as far as I'm aware he has no ability to**
25   **actually rewrite the law.**

74

1  Q.  Do you now know that under the new law some of
2  the changes can be made by mail?
3  A.  I'm aware that that is a possibility for certain
4  adds and additions and changes, yes.
5  Q.  And would you agree that making the changes by
6  mail is easier than making those changes in person?
7  A.  No, I would argue that it actually had no impact
8  whatsoever.
9  Q.  Okay.  So it wouldn't be easier to
10  actually -- instead of having to physically go somewhere
11  and update your changes, you think that it would be just
12  as hard as just sending it in the mail?
13  A.  I would think that it's a mechanism which leaves
14  open the possibility for either mistakes or intentional
15  malfeasance.  Based on an experience I had at the county
16  once my take on the mail-in form is that it is, in fact,
17  something that could easily be misplaced, lost in the
18  mail, intentionally misplaced or lost at the state level
19  or county level through malfeasance of duty or criminal
20  activity at the state or county level.
21  And so, therefore, considering that any
22  change you make on that mail-in form has criminal
23  penalties associated with the state not knowing about it
24  and if they -- anybody can claim they never got the form
25  or never entered it or it could get laid to the side, it

75

1  could be accidental or it could be intentional, but it's
2  too much of a risk to send in that mail-in form.  Once
3  it leaves my hands I have no idea where it goes.
4  Q.  Sure.  Just from a pure physical, pure physics
5  standpoint, wouldn't you agree that it's easier to mail
6  something than it is to hand deliver something?
7  MS. TILLMAN:  Objection, asked and answered.
8  You can go ahead.
9  THE WITNESS:  I would say that, no, I would
10  argue that the mail-in form is completely useless as it
11  currently is set forth.
12  BY MR. DAMICH:
13  Q.  Just to be clear the question was asked from a
14  physical standpoint would you agree --
15  A.  I would argue the level of effort is not -- in
16  some cases the level of effort would not be dissimilar,
17  you have to go get a stamp, you may not have stamps, you
18  have to get an envelope, you may not have envelopes, you
19  have to fill out the form instead of somebody doing it
20  for you at the county level, so I would argue that the
21  level of effort would vary from person to person.
22  Q.  Okay.
23  MR. DAMICH:  That's all the questions I
24  have.
25  MS. TILLMAN:  I have a couple of questions

76

1  if you don't mind, Scott.
2  MR. DAMICH:  I may have to follow up, of
3  course, if you don't mind.
4  MS. TILLMAN:  Yes, of course.
5  THE WITNESS:  Is this like cross and
6  redirect and all that stuff I see on TV?
7  MS. TILLMAN:  More or less, right.
8  MR. DAMICH:  Yeah, we look better than
9  people on TV, though so....
10  EXAMINATION
11  BY MS. TILLMAN:
12  Q.  All right.  So just really quickly you earlier
13  testified that there were periods of unemployment while
14  you were at the temp agency, correct?
15  A.  Yes.
16  Q.  And if you remember how long were those periods
17  of unemployment?
18  A.  It varied.  Those periods of unemployment could
19  vary from two days to a couple of months.
20  Q.  And this was because the temp agency you were at
21  was not able to place you at those times?
22  A.  Correct.
23  MS. TILLMAN:  Got you.  And that's all of my
24  follow up questions, thank you.
25  THE WITNESS:  Scott?

77

1  MR. DAMICH:  I don't have any follow up
2  questions.
3  THE WITNESS:  Okay.
4  MR. DAMICH:  It's a pleasure talking with
5  you today, sir, I appreciate it.  Thanks for taking the
6  time out of your day.
7  THE WITNESS:  Sure, of course, absolutely.
8  (Whereupon Deposition concluded at 12:15 p.m.)

1  STATE OF MICHIGAN )
          ) SS
2  COUNTY OF INGHAM  )

3          I, Melinda Nardone, Certified Shorthand
4  Reporter and Notary Public in and for the County of
5  Ingham, State of Michigan, do hereby certify that the
6  foregoing deposition was taken before me at the time
7  hereinbefore set forth.
8          I further certify that said witness was
9  duly sworn in said cause to tell the truth; that the
10 testimony then given was reported by me remotely to the
11 best of my ability; subsequently produced under my
12 direction and supervision; and that the foregoing is a
13 complete, true, and correct transcript of my original
14 shorthand notes.
15         IN WITNESS WHEREOF, I have hereunto set
16 my hand and seal this 23rd day of April, 2023.
17
18

19     _____

       Melinda S. Nardone, CSR-1311,
20     Certified Shorthand Reporter,
       and Notary Public, County
21     of Ingham, State of Michigan.
       My Commission Expires:  10-24-24
22
23
24
25