# Exhibit 61:

## Mary Doe
## Deposition Transcript (redacted)

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3        - - - - - - - - - - - - - - - -
                                         )
 4        JOHN DOES A, B, C, D, E, F, G,)
          H, MARY DOE and MARY ROE, on  )
 5        behalf of themselves and all  )
          others similarly situated,    )
 6                                       )
                          Plaintiffs, )File No.
 7                                      )2:22-cv-10209
            -vs-                        )
 8                                      )HON. GOLDSMITH
          GRETCHEN WHITMER, Governor of )MAG. IVY, JR.
 9        the State of Michigan, and    )
          COL. JOSEPH GASPER, Director  )
10        of the Michigan State Police, )
          in their official capacities, )
11                                       )
                          Defendants. )
12        - - - - - - - - - - - - - - - -

13                     REMOTE DEPOSITION

14        of MARY DOE, a Plaintiff called by Defendants,

15        taken before Melinda S. Nardone, Certified Shorthand

16        Reporter and Notary Public, via Zoom, on Monday, March

17        27, 2023, noticed for the hour of 10:00 a.m.

18

19

20

21                      HECKAMAN & NARDONE, INC.
22                   Certified Shorthand Reporters
                          P.O. Box 27603
23                   Lansing, Michigan  48909
                          (517) 349-0847
24                      msnardone5@gmail.com

25
```

APPEARANCES:

AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, Michigan 48201
By
SYEDA DAVIDSON, J.D.
and
AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
1514 Wealthy SE, Suite 260
Grand Rapids, Michigan 49506
By
DAYJA TILLMAN, J.D.

      On behalf of Plaintiff.

MICHIGAN DEPARTMENT of ATTORNEY GENERAL
State Operations Division
P.O. Box 30754
Lansing, Michigan 48909
By
SCOTT DAMICH, J.D. and
ERIC M. JAMISON, J.D.

      On behalf of Defendants.

---

4

1                Monday, March 27, 2023

2                10:00 a.m.

3                R E C O R D

4                MARY DOE,

5  having been first duly sworn, testified as follows:

6          MR. DAMICH:  Good morning, my name is

7  Assistant Attorney General Scott Damich and also with me

8  today is Assistant Attorney General Eric Jamison and we

9  represent Governor Whitmer and Colonel Gasper.  And we

10  noticed your deposition in this case, Does versus

11  Whitmer, Case Number 2:22-cv-10209 in the District Court

12  in the Eastern District of Michigan, and it's pending in

13  front of the Honorable Goldsmith.

14          There is a protective order in place in this

15  case and it's found at ECF number 88, page ID 2389-2395,

16  which will protect your identity.  And, Mindy, will you

17  confirm that you have read the protective order and

18  signed the acknowledgment associated with it?

19          COURT REPORTER:  Yes, I have.

20          MR. DAMICH:  And, Counsel, will you affirm

21  that the person tendered today is, in fact, Mary Doe?

22          MS. DAVIDSON:  I can confirm that the person

23  tendered is Mary Doe.  And I would just like to add in

24  addition to the statement you've already made about the

25  protective order the plaintiffs must be given the

---

3

1          EXAMINATION INDEX

2  ATTORNEY'S NAME  EXAMINATION   RE-EXAMINATION

3  BY MR. DAMICH:    5         82

4  BY MS. DAVIDSON:    76

5

6        *     *     *

7

8          INDEX OF EXHIBITS

9  EXHIBIT            MARKED

10  Ex A  Registry mail-in update     64

11  Ex B  List of cases         64

12        *     *     *

---

5

1  opportunity to review and redact the transcript as

2  necessary before it's filed to ensure that there's no

3  identifying information.

4          MR. DAMICH:  Understood, and we certainly

5  understand the parameters of the court rules.

6          EXAMINATION

7  BY MR. DAMICH:

8    Q.  So, Ms. Doe, I'm going to do my best to make sure

9  that there's no personal identifying information that's

10  going to come from any of my questioning.  And to the

11  extent that it does happen, as counsel indicated, we

12  will make sure it's redacted.  So I apologize ahead of

13  time, if a question leads to something personal

14  identifying we'll make sure it's not in the public

15  sphere.

16          I'm going to go ahead and describe the rules

17  of a deposition.  You've been deposed before, correct?

18    **A.**  **Correct.**

19    Q.  Just real quick, of course you know verbal

20  responses.  We have a court reporter here today that is

21  recording and going to record what you're saying.  So if

22  I ask you a question, if you could respond with actual

23  verbal responses.  If it's a yes or no question please

24  respond yes or no.  Head nods tend to not get recorded

25  so please provide verbal responses when the questions

---

6

1  are asked.  If you could wait until I finish asking the
2  question before you start answering it, when talking
3  over each other it makes it very hard for Mindy to write
4  down what's being said.  And I'll do the same on my end
5  to the best of my ability not to talk over you.
6          Of course you're represented by counsel here
7  today who will probably have objections to some of my
8  questioning.  When that happens I ask that you let
9  counsel state their objections and then more often than
10 not you'll still have to provide an answer.  If you
11 don't understand a question please say so and I'll do my
12 best to rephrase it.  I prefer that you not guess at the
13 answer.  I don't want you just to, like I said, guess at
14 what I'm asking you.  If you don't understand what I'm
15 asking you please ask that I rephrase.  I will take no
16 offense to that and I will be happy to do so and
17 rephrase the question.  And so if you answer the
18 question I'm going to assume that you understood the
19 question; is that fair?
20     A.  That is fair.
21     Q.  Excellent, okay.  Are you taking any medication
22 or any substances that affects your ability to answer
23 the questions truthfully today?
24     A.  No.
25     Q.  Okay.  Is there anything else that might

7

1  interfere with your ability to testify truthfully today?
2     A.  No.
3     Q.  Okay.  Where are you currently located?
4     A.  In Michigan.
5     Q.  Are you in metro Detroit area?
6     A.  In the metro Detroit area.
7     Q.  Are you in a home right now or your personal
8  residence?
9     A.  I do live in a home, personal residence.
10    Q.  And is that where you're located today?
11    A.  Yes.
12    Q.  Do you own your home?
13    A.  I do not.
14    Q.  You do not.  So do you rent your home, correct?
15    A.  Well, yes and no.  So we moved in with my parents
16 to help finances and they are elderly, so we do pay half
17 of the mortgage.
18    Q.  Okay.
19    A.  So I guess, 'cause it's not really rent, we
20 contribute half to everything.
21    Q.  So you live in Michigan, correct?
22    A.  Correct.
23    Q.  And you still live in the metro Detroit area?
24    A.  Correct.
25    Q.  I'm going to be talking today about a CSC

8

1  conviction of yours back in I believe 2003.  Do you
2  expect questions around that; do you understand what I'm
3  talking about with that?
4     A.  Yes.
5     Q.  Okay.  And since your release from prison in 2004
6  from your CSC conviction where have you lived?
7     A.  I've lived all around Detroit metro area.
8     Q.  So starting from when you were first released did
9  you -- where did you go, did you go to a specific house?
10    A.  I did, I went back to my parents.
11    Q.  Okay.  And was that your choice or was it part of
12 a court order?
13    A.  Both.
14    Q.  Could you please elaborate on that?
15    A.  So when my conviction happened in Ohio there was
16 nothing for me in Ohio.  And when I was released my
17 options were my parents.  And my parents decided, you
18 know, this is our daughter, we support her for
19 everything, she'll come and live with us.  And then it
20 was also, I want to say, I'm not positive, but in my
21 release it did say I was to live in Michigan with my
22 parents.  I'm not positive on that.
23    Q.  Were you confused at all by that order when it
24 was issued?
25    A.  A little because I knew I was going home to

9

1  Michigan and going home to my parents, but I couldn't
2  understand why if it was in there it was specific that I
3  had to live with them.
4     Q.  Did you seek any advice from counsel to fully
5  understand the order?
6     A.  I don't remember.
7     Q.  Do you remember if you sought advice from anyone?
8     A.  You know what, I really don't remember, you know,
9  it's 20 years ago.
10    Q.  Sure, understandable.  So that was in 2004 you
11 went to your parents' house.  Did you move anywhere else
12 from your parents' house after that?
13    A.  I did.
14    Q.  Okay.
15    A.  I have gotten married and me and my husband, we
16 lived in two other locations.
17    Q.  So you left from your parents' house to another
18 location, correct?
19    A.  Correct.
20    Q.  And was that location in the Detroit metro area?
21    A.  Yes.
22    Q.  And was it -- and so to leave from your parents'
23 house to go to this new location did you have to seek
24 approval from the court in Ohio?
25    A.  No, I was already off probation, everything that

10

1   was done, from my understanding, once probation ended I
2   was able to seek out wherever I wanted to reside.
3     Q. And did you confer with anybody before you made
4   that move to make sure that it was okay?
5     A. No.
6     Q. So then you went from your parents' house to
7   another location with your husband. How long of a gap
8   between your parents' house and the next location?
9     A. Seven years.
10     Q. Now, when you went to that second location since
11   you've been back to Michigan did you rent?
12     A. We rented.
13     Q. Did you eventually own?
14     A. No.
15     Q. And then you mentioned a second location,
16   correct?
17     A. Correct.
18     Q. So how long of a gap between the first location
19   with your husband and the second location, how long of a
20   gap of time was that?
21     A. Three years.
22     Q. And was that third location also in the Detroit
23   metro area?
24     A. Yes.
25     Q. Did you rent that location or did you purchase?

11

1     A. We rented.
2     Q. And from that third location did you move
3   anywhere else?
4     A. Yes, to where we are at now.
5     Q. And just to confirm, you're currently located,
6   your current residence, is in the Detroit metro area,
7   correct?
8     A. Correct.
9     Q. And how long of a gap between your third location
10   and your current location was there?
11     A. Six years.
12     Q. And then how long have you been at your current
13   location?
14     A. Three and a half years.
15     Q. So roughly 2021 you moved to your current
16   location?
17     A. 2019, right before the pandemic.
18     Q. They didn't hire me for my math skills. Going
19   back to your first move from your parents to the second
20   location, did you struggle finding a place to live when
21   you met your new husband?
22     A. We did.
23     Q. Could you explain to me what struggles you
24   incurred?
25     A. Being on the public registry at that time I

12

1   couldn't live within, I want to say, 2000 feet of a
2   school. So finding a location in a neighborhood not
3   near a school, not near a park, not near, you know, a
4   place of worship, was very, very difficult.
5     Q. Did you have to fill out an application? You
6   mentioned that you rented; did you have to fill out a
7   rental application at all?
8     A. Yes, we did.
9     Q. And do you recall if the rental application asked
10   about your CSC conviction?
11     A. It did not.
12     Q. It did not, okay. And then when you went to the
13   I'll say the overall third location in Michigan, first
14   there was the parents, then the first location with your
15   new husband, and then now the third location, did you
16   have any struggle making that move as well?
17     A. At that time, yes, because it was still those
18   restrictions. We wanted to stay in the city that we
19   were at but due to where some of the rental properties
20   were we couldn't live there because they were within
21   those school districts.
22     Q. Were those the only restrictions that made it
23   hard for you to move?
24     A. At that time it was just a lot with all the
25   restrictions of, you know, not being near a park, not

13

1   being near, you know, a place of worship, schools. It
2   was a huge difficulty and also being on the public
3   registry, you know, was extremely hard because if there
4   was on the rental application, you know, have you ever
5   been convicted of a felony or anything, then, yes, I
6   would answer that truthfully.
7     Q. Now, did you apply for any places to live that
8   had that information on its application?
9     A. There was one that we looked at, I want to
10   recall, that did have that and we decided not to apply
11   to it.
12     Q. But you still found a place to live despite that,
13   correct?
14     A. Eventually, yes.
15     Q. Okay. So aside from it being around the schools
16   and places of worship, there were no other instances
17   that made it difficult for you to gain housing?
18     A. Well, besides funds, that might have been -- I
19   want to say that might have been it, you know, it's hard
20   to recall every instance that happened.
21     Q. Okay.
22     A. You know, I knew I had to report, you know,
23   within three days, you know, wherever I moved to.
24     Q. Okay. When you moved from your third location to
25   your current location do you remember what year it was

14

1  that you moved?
2     A.  2019.
3     Q.  Okay.  And did you suffer any hardship in finding
4  a place to move, that would have been the third
5  time -- fourth time?
6     A.  No.
7     Q.  No.  Is that because the school restrictions and
8  the worship restrictions were no longer part of the law?
9     A.  That helped and also not being on the public
10  registry helped 'cause I didn't have to worry about
11  someone come knocking on my door, which had happened to
12  us in the past.
13     Q.  Okay, but just focusing on your attempts to
14  achieve a place to live and rent, did being on the
15  registry prevent you at all from being able to rent at
16  your current location?
17     A.  No.
18     Q.  So it's fair to say you didn't have trouble
19  finding suitable housing because of your CSC history to
20  get to your current location; is that correct?
21     A.  From -- I'm sorry, the abbreviation is for?
22     Q.  Criminal sexual conduct.
23     A.  Well, that and the registry, I did not have an
24  issue finding where we live now.
25     Q.  Okay.  You mentioned you're currently married,

15

1  correct?
2     A.  Correct.
3     Q.  And how long have you been married?
4     A.  We just celebrated 13 years.
5     Q.  Congratulations.  Were you previously married?
6     A.  I was.
7     Q.  So there was a divorce?
8     A.  Yes.
9     Q.  And when did that divorce occur?
10     A.  2004 was our civil divorce.  We had a judi- -- a
11  Jewish divorce September of 2003.
12     Q.  Okay.  Focusing on the civil divorce, were you
13  incarcerated at the time that happened?
14     A.  When we got divorced I was already out.
15     Q.  Now, from my understanding a divorce proceeding
16  doesn't happen just overnight.  Did the divorce
17  proceeding start while you were incarcerated?
18     A.  Yes.
19     Q.  And did you receive the advice of counsel during
20  that process while you were incarcerated?
21     A.  From which attorney?
22     Q.  How many attorneys did you have at that point?
23     A.  I had my divorce attorney and my criminal
24  attorney.
25     Q.  Okay.  So from your divorce attorney did you

16

1  receive any advice regarding your civil divorce while
2  you were incarcerated?
3     A.  Yes.
4     Q.  Okay.  And why did you seek out advice from an
5  attorney during that divorce?
6          MS. DAVIDSON:  I'm going to object to the
7  extent that any answer she gives could be privileged.
8          MR. DAMICH:  Okay.
9  BY MR. DAMICH:
10     Q.  Did you seek advice because you weren't
11  knowledgeable about current divorce laws?
12     A.  It was supposed to be a very easy divorce and my
13  ex-husband had made it extremely difficult.  And it was
14  my parents that had found my divorce attorney for me.
15     Q.  I'm sorry it was difficult.  During that
16  difficult time were there actions that he was taking
17  that you didn't understand why legally they were
18  happening?
19     A.  He would send me information and my mom would
20  also send me information to clarify any questions that I
21  had.
22     Q.  Okay.
23     A.  I knew he was working on things in the background
24  so there wasn't much for me to do while I was
25  incarcerated.  My biggest thing was to make sure that I

17

1  did everything that I needed to do to get out, come
2  home, and get divorced.
3     Q.  Okay.  So is it fair to say that you sought his
4  legal advice because you did not fully understand the
5  divorce laws at that time?
6     A.  That's correct.
7     Q.  Now, you also mentioned your criminal attorney;
8  was he or she part of the civil divorce process as well?
9     A.  No.
10     Q.  And did either your civil divorce attorney or
11  criminal attorney visit you while you were incarcerated?
12     A.  No.
13     Q.  No.  Did you have conversations with either of
14  them while you were incarcerated?
15     A.  Yes.
16     Q.  And to the best of your knowledge were those
17  conversations private?
18     A.  Well, they were either on the phone or through
19  mail.
20     Q.  And when you were on the phone were you by
21  yourself or were there other people around you?
22     A.  To the best of my rec- -- to the best that I can
23  recall there were other inmates around me when I was
24  talking to my attorneys.  It wasn't like I was taken to
25  a private room and like, oh, here's a phone call from

18

1 your attorney.
2    Q. Sure. And so during those conversations did any
3 of the activities related to the criminal sexual conduct
4 come up at all?
5      MS. DAVIDSON: Objection, privileged. I'm
6 going to direct her to not answer that.
7      MR. DAMICH: Okay.
8 BY MR. DAMICH:
9    Q. Do you have any children?
10    **A. I do.**
11    Q. How many children do you have?
12    **A. Three.**
13    Q. And at the time you were incarcerated did you
14 have three children?
15    **A. No, I had one.**
16    Q. And that was with -- was that with your
17 ex-husband?
18    **A. Yes.**
19    Q. And so you had two children with your new
20 husband?
21    **A. They are my stepchildren.**
22    Q. Stepchildren.
23    **A. But they are my children.**
24    Q. Understood. Now, focusing on your child with
25 your ex-husband, was it your daughter?

19

1    **A. Yes.**
2    Q. Okay. And upon your release what was the custody
3 situation?
4    **A. I had supervised visits.**
5    Q. And where did she live?
6    **A. In Ohio.**
7    Q. And how many years did you go through supervised
8 visits?
9    **A. I want to say it was just the first maybe year I**
10 **was released.**
11    Q. And then what changed?
12    **A. We went back to court and I wound up getting**
13 **every other weekend. I was not considered harmful in**
14 **any way to our child.**
15    Q. And so when you say every other weekend, would
16 your daughter travel to Michigan?
17    **A. Yes.**
18    Q. So the distance between yourself and your
19 daughter, despite there being different states, was not
20 that far; is that an accurate statement?
21    **A. That's accurate.**
22    Q. Okay. And did custody change at all after that?
23    **A. Eventually it changed when she started to come to**
24 **school up in Michigan that I had her Wednesdays and**
25 **every other weekend, I had her four weeks in the summer.**

20

1    **And then the very last change was I wound up getting**
2 **custody of her and she saw her father once a month and**
3 **four weeks in the summer.**
4    Q. So you had mentioned that you see her every
5 Wednesday and then every other weekend; was she enrolled
6 in school at that point in Michigan?
7    **A. Yes.**
8    Q. Okay. And so was she living in Michigan at that
9 time?
10    **A. No, she was still living in Ohio and traveling**
11 **back and forth to school every day.**
12    Q. And how old was she around that time?
13    **A. Twelve.**
14    Q. And then how old was she when you got custody of
15 her and your ex-husband would see her on the weekends,
16 was it, is that correct?
17    **A. Once a month.**
18    Q. Once a month.
19    **A. And then four weeks in the summer. She was 15.**
20    Q. Okay. And is that high school age?
21    **A. Yes.**
22    Q. So she attended high school in Michigan?
23    **A. Yes.**
24    Q. Did she graduate high school?
25    **A. Yes.**

21

1    Q. Congratulations.
2    **A. Thank you.**
3    Q. Did she go on to further education --
4    **A. Yes.**
5    Q. -- from high school?
6    **A. Yes.**
7    Q. And did she go to -- where did she go?
8    **A. She went to one of the universities in metro**
9 **Detroit area.**
10    Q. Okay. And did she obtain a bachelor's degree?
11    **A. She did.**
12    Q. And did she go on for a master's degree at all?
13    **A. She's actually enrolled right now for her**
14 **master's.**
15    Q. Congratulations.
16    **A. Thank you.**
17    Q. So is it safe to say that your daughter didn't
18 suffer academically because of your CSC history?
19    **A. It's hard to say because it's not just my CSC,**
20 **it's also when I was on the public registry. So I mean**
21 **she did have backlash with me being on the public**
22 **registry.**
23    Q. Did she apply to any schools of higher education
24 and was denied because you were on the public registry?
25    **A. In middle school she applied to a school and was**

22

1 denied because of my CSC and public registry.

2    Q. In middle school?

3    A. Yes.

4    Q. Okay. Did she suffer any of the same denial when

5 she went on to high school?

6    A. When she was enrolled in high school she was

7 enrolled originally under my ex-husband, and when I took

8 over there were then issues with me being the custodial

9 parent.

10    Q. And what type of issues were those?

11    A. Parent/teacher conferences, school work, getting

12 answers from teachers. She was singled out a lot, I

13 feel, because of not only my CSC and public registry,

14 because her stepfather is not Jewish so I want to say

15 there were a lot of factors that played in, but a lot of

16 it had to do also with my criminal background and public

17 registry.

18    Q. Did she graduate high school within four years?

19    A. Yes.

20    Q. And did she go immediately to college after

21 graduation?

22    A. Yes.

23    Q. And then after graduation from undergrad did she

24 go directly to her graduate studies?

25    A. No.

23

1    Q. Did she gain employment after high school?

2    A. She gained employment in high school too so....

3    Q. Okay. Do you have any grandchildren?

4    A. I do.

5    Q. How many do you have?

6    A. Five.

7    Q. Five, congratulations.

8    A. Thank you.

9    Q. And are they all to one of your three children or

10 are they spread out?

11    A. Spread out.

12    Q. Okay, what --

13    A. So our oldest son has four ranging from age 17 to

14 two months, and then our oldest daughter has one who

15 just turned 13.

16    Q. And now your daughter that you had with your

17 ex-husband, does she have any children?

18    A. No.

19    Q. And then you said the oldest son is 17?

20    A. The oldest grandchild is 17.

21    Q. All right, oldest grandchild is 17. Are you

22 involved in your grandchildren's lives?

23    A. I am.

24    Q. And to what extent are you involved in their

25 lives?

24

1    A. The 13 year old, I pick him up once a week from

2 school, we spend the afternoons together. I help him

3 with his homework, I go to his events at school. Our

4 oldest grandson, we go to all of his football games. We

5 used to go to our oldest granddaughter's cheerleading

6 events. So the other two, because they are younger

7 there isn't much that they are really involved in just

8 yet.

9    Q. Do you do any babysitting or anything like that?

10    A. With my 13 year old I have him, like I said,

11 every -- I have him once a week and we spend time.

12    Q. And you said ranging from two months old; is that

13 correct?

14    A. The two month old, yes, they are out of state.

15    Q. Do you visit them often?

16    A. We have yet to see her yet so....

17    Q. So now your oldest son lives out of state; is

18 that accurate?

19    A. Yes.

20    Q. And so he has four children?

21    A. Yes.

22    Q. How often do you go see your out-of-state son?

23    A. We have yet to go out of state to see him.

24    Q. So you haven't visited your oldest stepson since

25 you've been married?

25

1    A. No, no, he moved -- within the past year he moved

2 out of state.

3    Q. Okay.

4    A. But when he was in state, you know, we'd see him,

5 you know -- my husband saw him every day because they

6 sometimes worked together.

7    Q. Now do they still work together at times?

8    A. No.

9    Q. No. Is that just because of the distance?

10    A. Yes.

11    Q. Have they ever talked about perhaps maybe joining

12 back up and working together in the future?

13    A. No.

14    Q. Have you ever had any interest in moving back to

15 Ohio?

16    A. No.

17    Q. And why is that?

18    A. There's nothing there for me. Everything is

19 either here in Michigan or down south in Alabama or

20 ██████████

21    Q. So you wouldn't move to Ohio to be closer to your

22 grandchildren and to help out the oldest son?

23    A. Well, my grandchildren live in the Detroit metro

24 area, my older ones. And my son lives out of state with

25 his new wife and the baby, so the other three that he

26

1   has we do see.
2   Q.  Are there any restrictions on you moving to the
3   state of Ohio?
4   **A.  No.**
5   Q.  Would you say that having your CSC conviction has
6   made it difficult to be involved in your grandchildren's
7   lives recently?
8   **A.  With me not being on the public registry and with**
9   **the CSC it has been actually -- I want to say better**
10  **because I'm able to be involved in their sporting**
11  **events, their after school activities, you know, when it**
12  **comes to their education, you know.  Not being on that**
13  **public registry, you know, it's helped, I'm able to go**
14  **and enjoy and we're able to be a family.**
15  Q.  Okay.
16  **A.  There are --**
17  Q.  Okay, I'm sorry.
18  **A.  Sorry.  Where I didn't get that as much with my**
19  **biological daughter.**
20  Q.  Okay.  So because of the fact that you're able to
21  attend schooling events and all of that stuff under the
22  new law as opposed to the prior law, that aside, would
23  you say having the CSC conviction has made it difficult
24  to be in your grandchildren's lives?
25  **A.  It hasn't come up.**

27

1   Q.  Okay.
2   **A.  My grandchildren do not know.  Their parents do**
3   **but the kids do not.**
4   Q.  In spite of the fact that you have your CSC
5   convictions you're still able to go and attend these
6   events that you speak of, correct?
7   **A.  Correct.**
8   Q.  And enjoy time with your grandchildren whenever
9   you would like?
10  **A.  Correct.**
11  Q.  Since your release from prison have you attended
12  any schools or received any certifications?
13  **A.  I did attend [REDACTED] and got certified**
14  **as a medical insurance biller and coder.**
15  Q.  And what year was that?
16  **A.  2010 through 2011, or it was 2011 to 2012.**
17  Q.  Do you recall whether you had to report to law
18  enforcement that you were attending that institute?
19  **A.  I did.**
20  Q.  And how often?
21  **A.  When I did my verifications until I completed my**
22  **study, once that was done I went back up and let them**
23  **know I was no longer attending.**
24  Q.  And did having a CSC conviction prevent you from
25  attending any classes and obtaining your certification?

28

1   **A.  No.**
2   Q.  Did you attend in person?
3   **A.  Yes.**
4   Q.  Did you graduate at the top of your class?
5   **A.  Yes.**
6   Q.  Would you say that having a CSC conviction has
7   made it more difficult for you to obtain a certificate
8   in insurance billing?
9   **A.  Yes and no.**
10  Q.  Okay, could you elaborate, please?
11  **A.  Sure.  It didn't obtain (sic) me so much to get**
12  **the certification, but part of this program was to be**
13  **able to help me also get employment, and that part of**
14  **that course, because of my conviction and being on the**
15  **registry, wound up not being able to help secure me**
16  **employment even though I graduated top of my class, 4.0,**
17  **and was even an ambassador for the school.**
18  Q.  And you said you graduated in 2011, correct?
19  **A.  Correct.**
20  Q.  Have you received any other certifications since
21  you were released from prison?
22  **A.  No.**
23  Q.  Okay.  Nothing through your work like a HIPAA
24  certification or anything like that?
25  **A.  No.**

29

1   Q.  Okay.  Since your release from prison have you
2   been steadily employed?
3   **A.  Yes and no.  There have been times that I've**
4   **got -- I was unemployed, I actually had a job and they**
5   **found out that CSC and on the registry, I was let go**
6   **from that job so I wound up being unemployed for a**
7   **period of time.**
8   Q.  Starting from the date you were released in 2004
9   did you gain employment?
10  **A.  Yes.**
11  Q.  And was that in the greater metro Detroit area?
12  **A.  Yes.**
13  Q.  Do you remember the date you were hired?
14  **A.  Shortly after May 20th, 2004.  My husband, who**
15  **was not my husband at the time, told me to go talk to**
16  **the owners and try to get my job back.**
17  Q.  Was that successful?
18  **A.  It was, I worked there for about six months.**
19  Q.  And what did you do there?
20  **A.  Cashier.**
21  Q.  And was the employer a service provider, were
22  they a retailer?
23  **A.  Retail of food.**
24  Q.  And what did you do for them again, I'm sorry?
25  **A.  I was a cashier.**

30

1    Q.   Cashier.  And that started May 20th, 2004, you
2    said it lasted six months.  After that what was your
3    next employment date?
4    A.   It was January of 2005.
5    Q.   And what did you do in January of 2005?
6    A.   I was an afternoon dispatcher.  I started out, I
7    should say, as an afternoon dispatcher for a heating and
8    cooling company.
9    Q.   How long did you stay at that job?
10   A.   Five years, six years.
11   Q.   And did you apply for that position?
12   A.   No, actually it was someone that I wound up
13   meeting, his brother owned -- his brother-in-law owned
14   this heating and cooling place and I went in to
15   interview and was offered the position.
16   Q.   Awesome.  So between the first and second job
17   that we just talked about did you apply anywhere else?
18   A.   Yeah, there were lots of places I applied.
19   Q.   Okay.  Can you give me a rough estimation of how
20   many different places?
21   A.   At least, you know, two, three dozen places.
22   Q.   So you were unemployed, it seems like, from
23   November to January and you said you applied to two or
24   three dozen places?
25   A.   Uh-huh.  Oh, sorry, correct.

31

1    Q.   And do you remember if those applications asked
2    if you were on the Michigan's public registry?
3    A.   I don't remember if all of them did.  I know a
4    couple of the places I applied to it asked if I had ever
5    been convicted of a felony.  I don't know at that time
6    if they asked about the public registry, but I do know
7    that because of my conviction to some of the places I
8    applied to I was told they wouldn't hire me because of
9    my felony.
10   Q.   So as of today you don't remember any of those
11   two or three dozen applications having a specific
12   question of whether or not you were on Michigan's public
13   registry?
14   A.   No, I don't.
15   Q.   And so your second job starting in January 2005,
16   you said you were there for how many years?
17   A.   About five years.
18   Q.   And then where did you go after that?
19   A.   I went to another heating and cooling company.
20   Q.   Do you remember around about when that was?
21   A.   2000- -- mid 2010.
22   Q.   Did you apply for that position?
23   A.   I did.
24   Q.   And do you remember if that application had a
25   question regarding your status as a registrant on

32

1    Michigan's sex offender registry?
2    A.   That one did not.
3    Q.   It did not.  Did it have a question regarding if
4    you were previously convicted of any felonies?
5    A.   It did not.
6    Q.   And so between those two jobs, the one you
7    started in January 2005 and then the one you started in
8    mid 2010, did you apply for any other positions?
9    A.   No.
10   Q.   Did you receive a pay raise?
11   A.   I did.
12   Q.   Was it significant?
13   A.   It was.
14   Q.   How about benefits?
15   A.   Yes, those too.
16   Q.   Did you have benefits in your previous position?
17   A.   Towards the end of my employment I did.
18   Q.   Okay, but then for your new position the benefits
19   got much better?
20   A.   Yes.
21   Q.   Okay.  And so how long did you stay at that
22   position?
23   A.   A year.
24   Q.   Okay.  So we'll say mid 2011?
25   A.   Yes.

33

1    Q.   And then where did you go?
2    A.   That's when I started school, I was let go and I
3    started school.
4    Q.   Why were you let go?
5    A.   I was told there was an issue with me and the
6    office manager.  Come to find out it had to do with
7    people knowing about my conviction and me being on the
8    registry.
9    Q.   Okay.  And how did you come to know that that was
10   the reason for your firing or being let go?
11   A.   I still kept very much in contact with a lot of
12   the sales reps and service technicians.  You know, of
13   course, it's secondhand knowledge, I never got the
14   direct, you know, if this was really true from the
15   owner.
16   Q.   Sure.  So did the sales reps and service techs,
17   were they the ones that let you go?
18   A.   No.
19   Q.   Okay.  Now, you said there was an issue with the
20   office manager; would you mind explaining what that was
21   about?
22   A.   You know, I work hard, I work fast, I type very
23   fast, and I was just very efficient and I'm not sure
24   exactly what the office manager and me were even
25   disagreeing about.  I didn't think there were any

34

1  disagreements. I thought I did my job to the best of my
2  abilities, so I didn't know for sure exactly why, you
3  know, she decided to say, you know, we're going to let
4  you go.
5      Q.  Did you seek legal redress against that company
6  for letting you go?
7      A.  No.
8      Q.  Did you look into any options of doing so?
9      A.  No.
10     Q.  Do you have any document or anything in writing
11 saying that the reason you were let go is because they
12 noticed you were on the Michigan sex offender
13 registration?
14     A.  No.
15     Q.  Okay.  So after your third job after you were let
16 go you went to school, correct?
17     A.  Correct.
18     Q.  Okay.  So then after school -- I think you said
19 you graduated in 2011, right?
20     A.  Yeah, it was 2011, 2012 area.
21     Q.  Okay.  So then did you gain employment after
22 that?
23     A.  I did.
24     Q.  Okay.  Do you remember when?
25     A.  It had to be about 2012.

35

1      Q.  Did you apply for the position?
2      A.  I did.
3      Q.  Do you remember if that application had a
4  specific question regarding if you're a registrant on
5  the Michigan sex offender registration?
6      A.  It did not.
7      Q.  Do you remember if the application asked about
8  prior felony convictions?
9      A.  It did not.
10     Q.  Did not, okay.  This new position, was it similar
11 to your previous positions in was it a service provider,
12 retailer?
13     A.  It was a doctor's office so I was actually doing
14 medical insurance billing and coding.
15     Q.  Your compensation, was it higher or lower than
16 your previous position?
17     A.  It was about the same.
18     Q.  About the same.  Benefits?
19     A.  No, because I worked -- I was not full time.
20     Q.  Was that your choice to not be full time or was
21 that part of the employment?
22     A.  Part of the employment.
23     Q.  How long did you stay at that position for?
24     A.  Seven and a half months.
25     Q.  And during those seven and a half months did you

36

1  try to find a second job because you were not a
2  full-time employee?
3      A.  No.
4      Q.  So then after that position where did you go?
5      A.  I went back to one of the heating and cooling
6  places.
7      Q.  Which one was it?
8      A.  The second one.
9      Q.  And did you experience a pay increase?
10     A.  Yes.
11     Q.  Significant?
12     A.  Significant.
13     Q.  And the same with benefits?
14     A.  Yes.
15     Q.  Okay.  And what were your responsibilities in
16 that job?
17     A.  I was the installer, dispatcher, commercial
18 installations, rebates, warranty, new construction.
19     Q.  So did you deal a lot with warranties, written
20 warranties, and that kind of stuff?
21     A.  It was more of submitting their equipment for
22 their warranties and then verifying if the equipment was
23 still under warranty if they used our company.
24     Q.  I see.  Were there ever any instances where you
25 weren't so sure if something was under warranty or not?

37

1      A.  Always.
2      Q.  Always.  And what would you do then if you didn't
3  understand if something was under warranty or not?
4      A.  There were times that I knew also a lot of the
5  wholesalers and I could reach out to some of them to
6  find out for sure what under the equipment was under
7  warranty.
8      Q.  And so that started -- and that position, I'm
9  sorry, that started in 2013?
10     A.  Correct.
11     Q.  And how long did you stay there?
12     A.  A year.
13     Q.  And why did you leave?
14     A.  I was let go again.
15     Q.  Do you remember why you were let go?
16     A.  There was a customer that had an installation
17 scheduled that one of the other ladies had scheduled and
18 didn't inform the customer so I became the fall guy,
19 yeah.
20     Q.  Sorry about that.  So it didn't have anything to
21 do with your status as being a registrant on the
22 Michigan sex offender registration?
23     A.  No, the owner knew.
24     Q.  The owner knew?
25     A.  Yeah.

38

1    Q.   Okay.  And he was fine with you still being an
2  employee?
3    A.   Yes.
4    Q.   And you said that from -- where did you go after
5  that?
6    A.   At that point I was unemployed for a while and
7  then I wound up at a temp agency.
8    Q.   Okay.  And so do you remember around about how
9  long you were unemployed?
10   A.   I know I started around the temp agency around
11  2015 to 2016.
12   Q.   Okay.  So you were unemployed for maybe roughly a
13  few months?
14   A.   About.
15   Q.   And when you sought the services of a temp agency
16  did they ask whether or not you were a registrant on
17  Michigan sex offender registry?
18   A.   They did not.
19   Q.   Did they ask about prior convictions, criminal
20  convictions?
21   A.   There was a box on there for it and I know that
22  they did a background check, but because it was already
23  more than seven years out my background check didn't
24  come up with my felony.  And at that time I was also off
25  of the public registry.

39

1    Q.   And so the temp agency, do you remember the
2  different places where you were placed while you were at
3  the temp agency?
4    A.   I was only placed at one place that wound up
5  hiring me in.
6    Q.   And so when were you placed at that employer?
7    A.   I started with them January of 2017.
8    Q.   And are you still employed with that employer?
9    A.   No, I left.
10   Q.   And when did you leave?
11   A.   I left June of 2022.
12   Q.   And why did you leave?
13   A.   I found a position that offered a huge increase
14  in salary and much better benefits.
15   Q.   And so that start would it be -- how much of a
16  gap in time between the place you found through the temp
17  agency and the new employer where there was a
18  significant raise?
19   A.   I was with so the temp agency and then they hired
20  me in that position and I was there for five and a half
21  years.
22   Q.   So then does July 20th, 2022, sound right?
23   A.   Yes.
24   Q.   So five years, say does November sound right,
25  November of -- are you still with this employer?

40

1    A.   The new one that I just left, the one that I was
2  there for five and a half years, I'm with that employer.
3    Q.   Okay.  So then you worked for -- what did you do
4  for this employer that you started with in July 2022?
5    A.   I worked for their accounting division.
6    Q.   Then just to confirm, you received a significant
7  pay raise from your previous job, correct?
8    A.   Correct.
9    Q.   And then did you leave that position?
10   A.   No, I'm still with this position.
11   Q.   Okay.  So it seems like you had what seven
12  different positions since you've been released from
13  prison?
14   A.   It seems about right.
15   Q.   So is it fair to say that even with your CSC
16  conviction you've been able to maintain employment?
17   A.   Yes and no 'cause I do know for sure one of the
18  jobs I had I was let go because of not only my CSC but
19  also being on the public registry.  I even had one owner
20  tell me if he knew that I had a felony and was on the
21  registry he would never have hired me.
22   Q.   Is that the same employer?
23   A.   Two different employers.
24   Q.   But the one that said if he had known, did he
25  fire you?

41

1    A.   No, I wound up eventually leaving that one.
2    Q.   Okay.
3    A.   And a lot of times I will also say that when I
4  would get through most of the application and there was
5  the check box for the felony, I never really saw
6  anything about the public registry that I can recall,
7  but when it came to the felony and it said -- you know,
8  and if it didn't say, you know, seven years, that they
9  only go back seven years, I just -- I would stop my
10  application because I knew right then and there they
11  wouldn't have hired me.
12   Q.   Okay.  So it was the result of the actual felony
13  conviction itself not being listed on the public
14  registry then?
15   A.   Because the public registry wasn't one of the
16  questions.
17   Q.   Okay, makes sense.  Do you currently have an
18  Instagram account?
19   A.   I do but I don't use it.
20   Q.   How long have you had an Instagram account?
21   A.   A year.
22   Q.   How about a LinkedIn account?
23   A.   I do.
24   Q.   And how long have you had the LinkedIn account
25  for?

42

1    A.  I've had it for about five years.
2    Q.  Do you have any other forms of social media?
3    A.  I do.
4    Q.  Okay, what other forms do you have?
5    A.  I do have Facebook to keep in constant
6  communication with my family that is all over the world.
7    Q.  Sure.  And how long have you had Facebook?
8    A.  About five years.
9    Q.  So is it fair to say that even with your CSC
10 conviction you've been able to maintain social media
11 accounts?
12   A.  With that and not being on the public registry
13 I've been able to.
14   Q.  Do you know where on the public registry it
15 prevents you from having social media accounts?
16   A.  I do not.
17   Q.  But from your understanding the registry prevents
18 you from having those accounts?
19   A.  From when I was first on the public registry,
20 yes.
21   Q.  Where did you gain that understanding from?
22   A.  Reading the very first line items when I first
23 went on the registry it talked about, you know, social
24 media, it talked about email accounts.  You know, having
25 to list everything like that I stayed away.

43

1    Q.  So, again, you said that you weren't allowed to
2  have social media accounts; is it more you just didn't
3  want to list them all out?
4    A.  I guess I don't understand the question.
5    Q.  Sure.  I asked from where you gained the
6  understanding that you weren't allowed to have social
7  media accounts, and from my understanding of your
8  response you referred to the information you have to
9  fill out about how you'd be identified on the internet,
10 correct?
11   A.  Correct.
12   Q.  Now, is it your understanding that being asked to
13 identify your specific names and where you're registered
14 on the internet is a denial or restriction of your
15 ability to be on social media?
16   A.  That's a good question.  I guess when I first
17 signed up and everything like social media was not as
18 big as it is now, and when I first signed everything it
19 had mentioned about, you know -- I don't think Facebook
20 was out at that time, I think it was Myspace was out at
21 time.  I want to say it mentioned something about
22 not having social media accounts.  I cannot remember
23 exactly, but I want to say I saw somewhere in there.
24   Q.  Okay.  Do you remember asking any questions of
25 any authorities of whether or not you could have a

44

1  social media account?
2    A.  I did not.
3    Q.  Okay.  So is it fair to say that you just assumed
4  that you weren't allowed to have those accounts?
5    A.  That's fair to say.
6          MR. DAMICH:  Do you mind if we take a five
7  minute break?
8          THE WITNESS:  That's fine.
9          MR. DAMICH:  Okay, we'll be back in five
10 minutes?
11         THE WITNESS:  Five minutes.
12         MR. DAMICH:  Thank you.
13   (A recess was taken.)
14 BY MR. DAMICH:
15   Q.  Okay, I want to discuss a little bit about your
16 conviction.  You were convicted in 2003 of unlawful
17 sexual conduct with a minor, right?
18   A.  Yes.
19   Q.  Okay.  And the victim was a 15 year old child,
20 correct?
21   A.  Yes.
22   Q.  And you had sex with this 15 year old child,
23 correct?
24   A.  Yes.
25   Q.  Okay.  Did you also exchange sexually lewd

45

1  communications with this 15 year old child?
2    A.  I don't recall all of it so I don't know.
3    Q.  Did you exchange emails with the 15 year old
4  child?
5    A.  Yes.
6    Q.  And were the emails of a sexual nature at all?
7    A.  I don't recall.
8    Q.  Did the 15 year old child have a special
9  relationship with your husband at the time the unlawful
10 sexual conduct occurred?
11   A.  Yes.
12   Q.  And what was that special relationship?
13   A.  He was in the process of becoming orthodoxed like
14 a lot of the Jewish teenagers and kids in the area,
15 orthodox Judaism was very present in the area where we
16 were living.  So we had a lot of teenagers in and out of
17 our home multiple occasions, staying over weekends for
18 the Sabbath, being able to be close to the synagogue in
19 walking distance.
20   Q.  And were you attracted to the 15 year old child?
21   A.  I don't recall.
22   Q.  How many times did you have sex with the 15 year
23 old child?
24   A.  I don't know.  I don't even recall that, how many
25 times.

46

1    Q.   Was it more than once?
2    A.   Yes.
3    Q.   Was it more than five times?
4    A.   Possibly, yes.
5    Q.   Was it more than 20?
6    A.   No.
7    Q.   15?
8    A.   Maybe less than that, maybe.
9    Q.   So somewhere between as many times as 15 and at
10   least five times?
11   A.   Yeah, somewhere in there I would say.
12   Q.   How many charges of unlawful sexual conduct were
13   brought against you, do you remember?
14   A.   I don't.
15   Q.   Were there multiple charges -- excuse me, were
16   there multiple charges?
17   A.   I don't recall.  I know I took a plea.
18   Q.   And what did you plea to?
19   A.   One count of unlawful sexual conduct with a
20   minor.
21   Q.   How did you get caught?
22   A.   His mom put some type of spyware on his computer
23   and we were instant messaging at the time, I think it
24   was like AOL had a messaging system.  And she found out,
25   went to the rabbi.  And then from there I went and told

47

1    my ex-husband, and from there he called his therapist,
2    and from there the therapist called child protective
3    services.
4    Q.   Do you remember the nature of those instant
5    messages?
6    A.   I don't.
7    Q.   Do you know whether or not the 15 year old
8    completed his religious studies?
9    A.   From what I heard he never did.
10   Q.   Okay.  In your opinion do you think that your
11   actions had a direct impact on that?
12         MS. DAVIDSON:  Objection, calls for
13   speculation.  You can answer.
14         THE WITNESS:  It's possible.  There's a lot
15   of factors.  With him not being in an orthodox Jewish
16   household you never know which way a child might go.
17   BY MR. DAMICH:
18   Q.   In your opinion do you think having sex with a 29
19   year old would impact a child's want to proceed with a
20   religious education?
21         MS. DAVIDSON:  Objection, calls for
22   speculation, foundation.
23         THE WITNESS:  Am I supposed to answer?
24         MR. DAMICH:  Yes.
25         MS. DAVIDSON:  Yes.

48

1          THE WITNESS:  Oh, sorry, you know, like I
2    said, I wouldn't know.
3    BY MR. DAMICH:
4    Q.   Okay.  In your opinion can a 15 year old child
5    consent to having sex with an adult?
6    A.   No.
7    Q.   In your opinion does a 15 year old have a
8    maturity level to consent to having sex with an adult?
9          MS. DAVIDSON:  Objection, foundation.  You
10   can answer.
11         THE WITNESS:  That's -- you know, I'm going
12   to say no.
13   BY MR. DAMICH:
14   Q.   In your opinion should an adult exchange sexually
15   lewd electronic messages with a 15 year old?
16   A.   No.
17   Q.   As you sit here today do you think it's okay for
18   a 29 year old adult to have sex with a 15 year old
19   child?
20   A.   No.
21   Q.   Okay.  Since 2003 have you had any other sexual
22   relationships with children 17 years or under?
23   A.   No.
24   Q.   Are you sexually attracted to children?
25   A.   No.

49

1    Q.   Were you sexually attracted to children at the
2    time that the events happened?
3    A.   No.
4    Q.   Did you believe he wasn't a child?
5    A.   No.
6    Q.   Because you knew he was a child?
7    A.   Teenager, yes.
8    Q.   Okay.  So was it just more for want and need of
9    sex?
10   A.   No.
11   Q.   Okay, then why did you do it?
12         MS. DAVIDSON:  Objection, relevance.  You
13   can still answer.
14         THE WITNESS:  I don't have an answer, I
15   really don't.  I ask myself that question every day.
16   BY MR. DAMICH:
17   Q.   Okay.  Do you think a 15 year old that has sex
18   with a 29 year old, that would impact the male's ability
19   to develop mentally?
20         MS. DAVIDSON:  Objection, foundation.  She's
21   not qualified to talk about that, she's not an expert.
22   BY MR. DAMICH:
23   Q.   In your opinion do you think having sex with -- a
24   29 year old having sex with a 15 year old would stymie
25   their development as a human being?

50

1      MS. DAVIDSON:  Same objection.
2  BY MR. DAMICH:
3      Q.  You still have to answer.
4      A.  Oh, sorry.  It's a yes and a no, you know.  It's
5  on an individual basis I want to say.
6      Q.  Do you know if the 15 year old child went on to
7  higher education at all?
8      A.  I do not know.
9      Q.  Do you know whether or not he's married?
10     A.  I do not know.
11     Q.  Are you attracted to children now?
12     A.  No.
13         MS. DAVIDSON:  Objection, asked and
14  answered.
15  BY MR. DAMICH:
16     Q.  The complaint indicates that, and I'm quoting
17  from the complaint, paragraph 71, that based upon a
18  psychological evaluation Ohio court concluded that you
19  were not a sexual predator.  Are you familiar with that
20  allegation?
21     A.  Yes.
22     Q.  Okay.  Can you explain to me the extent of the
23  psychological evaluation referenced?
24     A.  Can you elaborate or rephrase what you're asking?
25     Q.  Sure.  There was a psychological evaluation done,

51

1  correct, in Ohio?
2      A.  Correct.
3      Q.  Could you explain to me the nature and extent of
4  that psychological evaluation?
5      A.  It was an evaluation I want to say, from my
6  recollection, of where I was at the time, what I was
7  thinking at the time, what was going on in my life at
8  the time.  You know, do I understand my mistake, do I
9  understand what I did.  So all those took part in that
10  evaluation.
11     Q.  Do you know who did the evaluation?
12     A.  I don't recall.
13     Q.  Was it a doctor?
14     A.  I want to say it might have been a court
15  counselor at the time, I don't recall.
16     Q.  And do you recall if there was any specific
17  testing names that were associated with the evaluation?
18     A.  I don't recall.
19     Q.  In the same paragraph of the complaint it
20  indicates that the court determined that you are not a
21  habitual offender based on a psychological evaluation.
22  Are you familiar with that allegation?
23     A.  Yes.
24     Q.  Do you remember what portion of the psychological
25  evaluation discussed you being a habitual offender?

52

1      A.  I don't, I really don't.
2      Q.  You don't remember any specific testing to
3  determine if you were a habitual offender?
4      A.  I don't.
5      Q.  Okay.
6      A.  It was 20 years ago.
7      Q.  Sure.  Do you at least know how long this
8  evaluation lasted?
9      A.  I don't.
10     Q.  You don't recall?
11     A.  I don't recall.
12     Q.  Aside from the 2003 conviction have you been
13  arrested or charged with any other crimes?
14     A.  A speeding ticket, that's it.
15     Q.  And then when you moved to Michigan, I believe it
16  was in 2004, correct?
17     A.  Correct.
18     Q.  You had to register for 25 years, correct?
19     A.  I was told Michigan I had to register for 25
20  years, Ohio it was ten years.  And I was told that if I
21  only want to register for ten years then I should go
22  back to Ohio, where I proceeded to say there's nothing
23  for me in Ohio except my child.
24     Q.  So then there's an allegation in the complaint
25  that the only way that you could come off Michigan's

53

1  registry was death, but you just said you could have
2  moved to Ohio, correct?
3      A.  I could have, but there was nothing for me in
4  Ohio and also per me being released it was said that I'm
5  moving to Michigan to my parents.
6      Q.  Is there anything preventing you now from moving
7  to Ohio?
8      A.  There's nothing there for me.
9      Q.  But is there anything preventing you from going
10  there?
11         MS. DAVIDSON:  Objection, asked and
12  answered.
13         THE WITNESS:  Like I said, there's nothing
14  there for me.  My life is here with my husband.
15  BY MR. DAMICH:
16     Q.  Is there a court order preventing you from going
17  to Ohio?
18         MS. DAVIDSON:  Objection, asked and
19  answered.
20         THE WITNESS:  Not that I'm aware of.
21  BY MR. DAMICH:
22     Q.  You no longer have to -- do you still have to
23  register?
24     A.  Yes.
25     Q.  Okay.  And what's the extent of registration you

54

1  have to do?
2     A.  **Verification of my address four times a year.**
3     Q.  Okay.  And where do you -- do you physically take
4  that somewhere?
5     A.  **Yes.**
6     Q.  Okay, where do you take it?
7     A.  **To the state police department.**
8     Q.  And how far away is that from where you currently
9  reside?
10     A.  **About five miles.**
11     Q.  Okay.  And how long does it take to register each
12  time you go?
13     A.  **It depends.  If there's people in front of me it**
14  **can take 30 minutes to an hour.  If there's nobody in**
15  **front of me it could take 20 to 35 minutes.**
16     Q.  Do you visit the Secretary of State's office at
17  all?
18     A.  **Yes.**
19     Q.  How often?
20     A.  **Only when I have to literally get a new picture**
21  **for my license.**
22     Q.  So in the past four years how many times have you
23  been to the Secretary of State?
24     A.  **Twice.**
25     Q.  And how long were your visits then?

55

1     A.  **Well, the first time I made an appointment but it**
2  **was still another hour and a half.  And the second time**
3  **I made an appointment and I was taken right away.**
4     Q.  Can we go back to when you were incarcerated?
5  Did you have a lot of people visit you in prison?
6     A.  **No.**
7     Q.  No.  Did anyone call you?
8     A.  **No, just my mother.**
9     Q.  Okay.  And when you spoke with your mother were
10  you in a private room?
11     A.  **No.**
12     Q.  No.  So other people could hear your
13  conversation?
14     A.  **Yes.**
15     Q.  And did you discuss with your mother the nature
16  and extent of the actions that got you in prison?
17     A.  **I told her I knew I made a mistake.  And, you**
18  **know, she would keep me up-to-date because she saw my**
19  **daughter, and she would keep me up-to-date on how she**
20  **was doing and keep me up-to-date on how my dad was.  And**
21  **at the time I still had some of a relationship with my**
22  **sisters so, you know, she let me know what was going on**
23  **with my sisters.**
24     Q.  Okay.  But did you ever get into the details of
25  what happened to get you into prison?

56

1     A.  **My mom never asked.**
2     Q.  If she would have asked would you discuss it with
3  her?
4     A.  **Yes.**
5     Q.  Okay.  So just to be clear, you still have to
6  register but you're not on the public facing registry;
7  does that make sense?
8     A.  **Yes.**
9     Q.  I'm going to share my screen here real quick if
10  you'll give me a second.
11     A.  **Uh-huh.**
12     Q.  Okay, do you see it?
13     A.  **Yes.**
14     Q.  Do you recognize this document?
15     A.  **Yes.**
16     Q.  Can you generally describe what this document is?
17     A.  **It's my -- it says mail in update.  Actually,**
18  **sorry, I have not seen this one 'cause it's a mail in**
19  **update.**
20     Q.  Okay.
21     A.  **Mine usually just says Michigan sex offender**
22  **registry.**
23     Q.  Are you aware that you're able to mail in your
24  updates now?
25     A.  **I am unaware of that.**

57

1     Q.  Looking through this information here, is this
2  the type of information that you have to report four
3  times a year?
4     A.  **Right now it's just my name and my address.**
5     Q.  Okay.  Nothing about vehicles or anything of that
6  sort?
7     A.  **No.**
8     Q.  Do you find anything confusing about what you
9  have to report four times a year now?
10     A.  **Right now, no, because, like I said, it is just**
11  **all they are verifying is my address and my name.**
12     Q.  Now, you said right now; why did you say right
13  now?
14     A.  **Because before it was all of this.**
15     Q.  When you say all of this, all of the information
16  that's showing up on the document that I'm sharing with
17  you?
18     A.  **Yes, it was the address, it was my telephone**
19  **numbers, my emails, make and model of my vehicles, it**
20  **was all of it.**
21     Q.  Okay.  And was any of this confusing to you?
22     A.  **It was because of the email identifier.  My**
23  **vehicles, at the time I think I had two major vehicles**
24  **but neither one was in my name.  You know, telephone**
25  **number, you know, I never asked about what number two**

58

1 telephone number was, but email, internet identifiers,
2 that part, and user screen names confused me because
3 where I would work some of those emails were not my
4 emails but I had to use that email.
5 Q. Did you ever seek out guidance from anyone to
6 kind of clarify your confusion on any of this
7 information?
8 A. When it came to -- not on this, sorry, not on
9 this I did not.
10 Q. When you say this, what do you mean, what are you
11 speaking of?
12 A. There was an incident where it came to my
13 daughter's school and being at events where I would try
14 to get information of am I allowed to be there, am I not
15 allowed to be there, so that. But on this form I did
16 not.
17 Q. Okay. So you'd mentioned some confusion about
18 vehicles?
19 A. Correct.
20 Q. And you'd mentioned you had two vehicles that you
21 would use or operate; is that correct?
22 A. Yes.
23 Q. What's your understanding of using something, to
24 use something?
25 A. I mean I'm using it, I'm using it either to go to

59

1 work or I'm using it to run to the store. It's not
2 something that I physically own.
3 Q. And just to clarify, you've never seen this form
4 before?
5 A. The application, all that information form I have
6 not. The next page I have seen it once I've signed.
7 I'm not allowed -- they don't let me see it before I
8 sign it.
9 Q. Could you elaborate on that? You're not allowed
10 to see it before you sign it?
11 A. So when I go to verify they just ask if there's
12 any changes, which to me is my address and my name, and
13 then they just say sign here and I sign it and then
14 I -- they ask me do I want a copy. So I don't see any
15 of this until after I'm done signing.
16 Q. So this isn't presented to you at all whenever
17 you go to sign to give your information updates?
18 A. Correct.
19 Q. If you look here, I'm going across, the license
20 plate number and description of any vehicle that I own
21 or operate, do you see that?
22 A. Yes.
23 Q. What's your understanding of the word operate?
24 A. Drive.
25 Q. So based off of your understanding of the word

60

1 operate, any vehicle that you would drive would be
2 required to be recorded on this form?
3 A. According to the way it's worded operate would be
4 drive.
5 Q. So you're really not confused about what vehicle
6 needs to be reported on this form, then, correct?
7 A. Like I said, by the definition of operate then,
8 no, I'm not confused.
9 Q. Okay. I'm going to highlight the second
10 sentence -- or another one here, it's under I, do you
11 see that or do you need me to zoom in at all?
12 A. No, I can see it.
13 Q. Okay. So based off of your reading of that do
14 you need to register your email address or other
15 identifiers, internet identifiers, on this form now?
16 A. Considering my offense was in 2003 I do not,
17 according to what that says.
18 Q. And that's not confusing to you at all, right?
19 A. Correct, because it's after my conviction so I'm
20 before that so that would not apply to me.
21 Q. If you had any questions about any of the
22 information requested here would you seek advice from
23 anyone?
24 A. I would at least try to see the officer if -- I
25 would ask maybe them a question if I saw the form before

61

1 I did verification.
2 Q. Okay. And so you understand that not filling
3 this form out correctly, I'm scrolling down to here and
4 highlighting this portion on page two of this, failure
5 to register as required by law is a felony and may
6 result in prosecution. So to be able to avoid that you
7 would make sure to go and clarify any of this
8 information is required?
9 A. After I've already signed it, you know, I can't
10 go back and change it till my next verification.
11 Q. Okay, so then assuming -- between the time you
12 signed it and then your next verification you think
13 like, oh, man, there's something on here I really didn't
14 understand, would you reach out and try to get an answer
15 from anyone to try to guide you on it?
16 A. Honestly I can just say, you know, I might reach
17 out to the ACLU.
18 Q. So you'd seek legal advice?
19 A. Try to find out maybe some understanding of it.
20 Q. I'll stop sharing my screen. Do you think the
21 sex offender registry protects the public in any way?
22 A. Yes and no. Yes for the ones that are out there,
23 you know, non-stop, you know, sexual behaviors with
24 minors. You know, the ones that make a mistake, you
25 know, to be, you know -- not to be on there for a

62

1  lifetime. I mean it does and it doesn't.
2      Q.   Okay. So for those individuals that are out
3  there, like you said, that are out there offending all
4  the time, how do you think that the registry protects
5  the public?
6      A.   If that person is out there like all the time
7  like non-stop -- well, first of all they shouldn't be
8  out there, you know. And it can be harmful also, I mean
9  it can hurt even those ones that are out there. It's a
10 very misplaced and fumbled water completely.
11     Q.   Okay. But focusing on those individuals that you
12 would deem dangerous, is that a fair way to describe
13 somebody that you think should be on the registry?
14     A.   But my way of seeing someone dangerous is
15 somebody else's way of saying, oh, they are not
16 dangerous. So if we're talking about my way of someone
17 being dangerous, then it might be good.
18     Q.   And why do you -- and how do you think it would
19 be good, like what benefits would it have?
20     A.   You know, I feel like if there's a public
21 registry for this then I would want to know if, you
22 know, the person next to me committed like five murders
23 I'd want to know that. I would want to know if the
24 person next to me might have committed like 30 -- was
25 incarcerated like multiple times for the same thing.

63

1      Q.   Okay. Who do you think should make that
2  determination of whether or not they are dangerous or
3  not to be on the list?
4      A.   I don't have an answer for that. I would say,
5  you know, it should be a committee of doctors and
6  officials, you know, that each case should be
7  determined, you know. For someone like me it was a one
8  event 20 years ago and I'm now for my lifetime till the
9  day I die I have to register for something that I made a
10 mistake and I acknowledge what I did was wrong.
11     Q.   Do you think the sex offender registry may
12 encourage victims to come forward?
13          MS. DAVIDSON: Objection, calls for
14 speculation.
15          THE WITNESS: I don't know.
16 BY MR. DAMICH:
17     Q.   So if victims come forward and report sex crimes
18 does that protect the public?
19     A.   It could.
20     Q.   How?
21     A.   Well, it depends. I mean if it's the same person
22 over and over and over again then the public would know
23 like this is that one person, they are doing it again
24 and again and again and again.
25     Q.   So it takes multiple violations of criminal code

64

1  to be -- consider someone to be on a registry, in your
2  opinion?
3          MS. DAVIDSON: Objection, foundation, calls
4  for speculation, also she's not an expert.
5          THE WITNESS: I don't know. I can only
6  speak about my experience.
7          MR. DAMICH: Before we move on, the first
8  exhibit I showed, I'd like to offer it as Exhibit A to
9  this deposition.
10         (Whereupon Deposition Exhibits A & B
11         marked for identification.)
12 BY MR. DAMICH:
13     Q.   I'm going to share my screen again, ma'am.
14         MS. DAVIDSON: Before you start questioning
15 on this, Scott, I understand that due to the court's
16 order you are permitted to ask certain questions so long
17 as they don't become impermissibly oppressive. However,
18 I'd still like to place a standing objection on the
19 record to any line of questioning related to this
20 exhibit for the reasons articulated to the court at the
21 status conference in our memo.
22         MR. DAMICH: Your objection's noted.
23 BY MR. DAMICH:
24     Q.   First of all, can you see the new document shared
25 on the screen?

65

1      A.   Yes.
2      Q.   I'm going to scroll all the way up to the top.
3  And what this is here, it's a random selection of cases
4  of criminal sexual conduct in Michigan. And I want to
5  point you to this number 21. Could you read the text of
6  that? You don't have to read it out loud, just let me
7  know when you're done reading it.
8      A.   Okay.
9      Q.   Just let me know when you're done.
10     A.   Okay.
11     Q.   Would you want to know if this perpetrator lived
12 next door to you?
13     A.   I will tell you, first of all, while I read it it
14 just disturbed me in every way, shape, and form.
15 Honestly, I would hope the person didn't live next to
16 me.
17     Q.   So the question was would you want to know if
18 this perpetrator lived next door?
19     A.   In reality, yes.
20     Q.   Go ahead and read number 25.
21     A.   Okay.
22     Q.   Okay. Would you want to know if this perpetrator
23 would be the teacher of any of your grandchildren?
24     A.   I'm going to say, first of all, that the
25 teacher's probably no longer teaching so I wouldn't have

66

1  to worry about that.
2      Q.  So I'll change the question.  In a scenario where
3  the perpetrator is offering tutoring services would you
4  want to know whether this perpetrator -- whether or not
5  these events occurred for this perpetrator?
6      **A.  No, because I would hope that this person learned**
7  **from it and is in tutoring.**
8      Q.  Sure.  The question is specifically assuming that
9  the individual is tutoring and one of your grandchildren
10  were close to being tutored by this individual would you
11  want to know this information?
12      **A.  No.**
13      Q.  You wouldn't want to know this information?
14      **A.  No.**
15          MS. DAVIDSON:  Objection, asked and
16  answered.
17  BY MR. DAMICH:
18      Q.  Why wouldn't you want to know this?
19          MS. DAVIDSON:  Objection, argumentative.
20          THE WITNESS:  I still have to answer,
21  correct?
22          MS. DAVIDSON:  Yes.
23          THE WITNESS:  Okay.  Because you asked me to
24  assume that they were my grandchild's tutor.  When it
25  comes to any of their studies either they are getting

67

1  tutoring during school, I can already tell you, so I
2  can't assume it.  It's not realistic to me because if
3  they are having problems with their homework either they
4  are asking me, they are asking my daughter, or they are
5  getting tutoring during school.
6  BY MR. DAMICH:
7      Q.  Okay, so your answer is based off of you're
8  disagreeing with the hypothetical that I posed?
9      **A.  Yes.**
10      Q.  What if this person were to coach one of your
11  grandchildren, would you want to know?
12      **A.  I would hope that their sports programs are doing**
13  **background checks and they are not teaching sports.**
14      Q.  Okay.  Assuming they are not, would you want to
15  know this information?
16      **A.  If they are not, no.**
17      Q.  You would not want to know?
18      **A.  No, if they are not coaching there's no reason**
19  **for me to know about someone it looks like once and**
20  **probably has rebuilt their life.**
21      Q.  How about a parent volunteer on a sports team?
22      **A.  No.**
23      Q.  You wouldn't want to know?
24      **A.  No.**
25          MS. DAVIDSON:  Objection, asked and

68

1  answered.
2  BY MR. DAMICH:
3      Q.  Okay, moving on to number 26, could you read that
4  one?
5      **A.  Okay.**
6      Q.  Would you want to know whether or not this
7  individual is giving piano lessons?
8      **A.  I don't want to answer this just due to the fact**
9  **that this hits too close to home to one of my**
10  **grandchildren.**
11      Q.  Okay.  So would you want to know whether or not
12  one of your grandchildren would be taught piano by this
13  individual?
14      **A.  Like I said, this one hits too close to home**
15  **because of something that happened to one of my**
16  **grandchildren.  I don't know how to answer this.**
17      Q.  Sure.  So I don't want to dig too deep into what
18  happened to your grandchild and I'm sorry for whatever
19  happened, but had you known whatever was going to happen
20  by a certain individual with a history like this, would
21  you want to know that?
22      **A.  I would.**
23      Q.  Okay.  And having known that information what
24  would you have done?
25      **A.  First of all, I wouldn't have hired the tutor, I**

69

1  **wouldn't have hired the babysitter.  And, second of all,**
2  **there's no reason why a 39 year old should be**
3  **watching -- you know, or take off, what, seven years, so**
4  **a 31 year old babysitting an eight year old?**
5      Q.  Okay, moving on, number 31, could you read that?
6      **A.  Okay.**
7      Q.  Do you think that's information that your
8  daughter might want to know before going out on a date
9  with an individual like this?
10          MS. DAVIDSON:  Objection, calls for
11  speculation.
12          THE WITNESS:  No, it's very vague.
13  BY MR. DAMICH:
14      Q.  What's vague?
15      **A.  11 and 12 years old, defendant pinned her down, I**
16  **mean it was probably a kid the same age, you know, who**
17  **knows, but, no, I wouldn't want to know.**
18      Q.  Would you want to know this information before
19  trusting one of your grandchildren with an individual
20  like this?
21      **A.  No.**
22      Q.  You don't think this person is a threat?
23      **A.  I don't even know how to answer that, I really**
24  **don't.  I mean so the whole scenario is just extremely,**
25  **extremely vague.**

70

1    Q.  Do you think the individual is a threat?
2    A.  No.
3        MS. DAVIDSON:  Objection, asked and
4    answered.  I think she answered it the way she's going
5    to answer it.
6    BY MR. DAMICH:
7    Q.  Okay.  Can you read number 32?
8    A.  Okay.
9    Q.  Would you want to know if this perpetrator lived
10   next door?
11   A.  No.
12   Q.  Why not?
13   A.  There's no reason for me to assume that, you
14   know, what really happened I mean just from reading
15   that.
16   Q.  So just for clarification, these are from actual
17   lawsuits and reported from a judicial opinion, so this
18   did happen.  So with knowing that would you want to know
19   whether this perpetrator lived next door?
20   A.  Honestly, no.
21   Q.  You don't believe he's a threat?
22   A.  No.  I don't know the person, I don't know if
23   that person's a threat, I don't know what occurred after
24   the event.  All I'm getting is just a little blurb of
25   what happened.  There's nothing that tells me what any

71

1    of the aftereffects have ever been.
2    Q.  Do you think it's appropriate to ask a seven year
3    old to hold your penis?
4    A.  No.
5    Q.  Okay, number 34, would you read that one.
6    A.  Okay.
7    Q.  Okay, would you want to know this information
8    before sending any of your grandchildren or children to
9    religious education with this individual?
10   A.  Considering that I'm not involved in a church,
11   synagogue and have nothing to do with my grandchildren's
12   upbringing it's hard for me to answer this question.
13   Q.  Okay.  Now, assuming you were sending your
14   children or grandchildren to this person for any kind of
15   tutoring, would you want to know this information?
16   A.  Honestly I don't know.
17   Q.  Okay.
18   A.  I mean these are scenarios that you're asking me
19   to make a decision on and I can't.
20   Q.  Okay, number 57, can you read that one?
21   A.  Okay.
22   Q.  Do you think any of your grandchildren or
23   children would want to know this information about this
24   perpetrator before going on a blind date with him?
25       MS. DAVIDSON:  Objection, it calls for

72

1    speculation.
2        THE WITNESS:  I couldn't say yes or no.
3    BY MR. DAMICH:
4    Q.  If you knew the information about this individual
5    and you knew that they were going on a date together
6    would you let your grandchildren or children know?
7    A.  Am I assuming all of this or --
8    Q.  Yeah.
9        MS. DAVIDSON:  Objection, calls for
10   speculation.
11       THE WITNESS:  Yeah, I mean I couldn't tell
12   you yes or no.  I mean we're talking 20 years and, you
13   know, my kids are all grown and it's their parents that
14   are left to raise them and screen their boyfriends or
15   girlfriends.
16   BY MR. DAMICH:
17   Q.  So even if you had access to this information and
18   you knew they were going out on a date with this
19   individual you wouldn't tell them?
20       MS. DAVIDSON:  Objection, asked and
21   answered.  She answered that question the way she's
22   going to answer.
23       THE WITNESS:  Like I said, I mean, my kids
24   are all grown.  My grandkids, that's up to their parents
25   to deal with whoever they are dating.

73

1    BY MR. DAMICH:
2    Q.  Okay, if you would read number 61.
3    A.  Okay.
4    Q.  Would you want to live next door to this
5    individual?
6    A.  You know, honestly, I would say the 15 year old
7    girl when she came down and saw the bed she should have
8    just left the house, that's my honest answer.  Do I want
9    to know?  This isn't going to have an impact on me
10   whether or not my neighbor next door is this person,
11   it's just not.  It's not my reality of how I'm living
12   and wanting to know who my next door neighbor is.
13   Q.  Do you have any opinions about whether any of
14   these individuals that we went through may be more or
15   less likely than someone who has not been convicted of
16   criminal sexual conduct to commit another sex offense?
17       MS. DAVIDSON:  Objection, I believe the
18   court order is that you specifically cannot ask about
19   recidivism.  Don't answer that.
20       MR. DAMICH:  I believe you're right, thank
21   you, I appreciate that.  She's correct, I apologize.
22   BY MR. DAMICH:
23   Q.  Have you ever contacted a member of the Michigan
24   legislature to inquire about changing the sex offender
25   registration law?

74

1    A.  I have not.

2    Q.  Okay.  And are you aware that it's the

3  legislature that has the power to change the law?

4    A.  I really don't.  I'm not political, laws, nowhere

5  in my wheelhouse.

6    Q.  Do you know whether Governor Whitmer has the

7  power to change the sex offender registration law?

8         MS. DAVIDSON:  Objection, foundation.

9         THE WITNESS:  Honestly, I don't know.

10 BY MR. DAMICH:

11   Q.  Do you know whether she can reduce the

12 registration period?

13   A.  I don't know.

14        MS. DAVIDSON:  Objection, asked and

15 answered.

16 BY MR. DAMICH:

17   Q.  You still have to answer the question.

18   A.  I don't.

19   Q.  Do you know whether Colonel Gasper has the power

20 to change the sex offender registration law?

21   A.  I don't even know who that is.

22   Q.  Do you know you're suing him?

23   A.  I don't.

24   Q.  Do you know under the new law that some of the

25 changes can be made via mail instead of in person?

75

1    A.  From the form you showed me I saw that.

2    Q.  Okay.  Would you agree that making the changes by

3  mail is easier than making those changes in person?

4    A.  No, I think it would be just as difficult.

5    Q.  Why would it be just as difficult?

6    A.  Depending on what information you need to verify.

7  Honestly when I had to verify my new addresses it wasn't

8  easier or harder whether or not I had to do it, you

9  know, in person or in mail.  Like in 2019 when I moved I

10 didn't know I could have done it by mail, I still went,

11 did it how I normally did it, I went in.

12   Q.  Did you have to adjust your schedule to go in

13 and --

14   A.  I -- go ahead.

15   Q.  I'm sorry.  We did a good job till this point of

16 not interrupting each other so it's two hours in the

17 first time so kudos.  Did you have to adjust your

18 schedule in the past when you would have to actually go

19 and report physically to the police station?

20   A.  Yes.

21   Q.  Would you have to adjust your schedule any more

22 if you simply have to mail in the information?

23   A.  I don't know because I don't use the mail one at

24 all.

25   Q.  You would agree, though, that mailing something

76

1  is easier than actually physically delivering it to the

2  intended location, correct?

3    A.  Probably.  I mean it's just -- it's still just as

4  hard because, you know, do you have to send a copy of

5  your driver's license with it or is it just, you know,

6  you can just fill out the form.

7    Q.  Sure, I'm talking about just the actual physical

8  delivery of the thing, contents aside.

9    A.  Contents aside?

10   Q.  Content aside.

11   A.  Probably if I had an envelope laying around the

12 house and a stamp, then probably it might be easier.

13        MR. DAMICH:  Okay, I don't have any further

14 questions.

15        MS. DAVIDSON:  I'll have a little bit of

16 follow up but can I have like five minutes?

17        MR. DAMICH:  Of course.

18        MS. DAVIDSON:  Thanks.

19    (A recess was taken.)

20        EXAMINATION

21 BY MS. DAVIDSON:

22   Q.  All right, Ms. Doe, you are not on public

23 registry any more, correct?

24   A.  Correct.

25   Q.  Do you remember when you came off?

77

1    A.  Right about when Does 1 was filed, I want to say.

2    Q.  Do you recall approximately what year that was?

3    A.  I want to say it was about 2014.

4    Q.  I want to draw your attention to your testimony

5  that your daughter received backlash from you being on

6  the public registry.  Do you remember giving that

7  testimony?

8    A.  Yes.

9    Q.  What was the backlash that your daughter

10 received?

11   A.  Not only from my own family, my siblings, who

12 would constantly bring it up to my daughter, who knew,

13 she knew at a young age, not by my choice, about what

14 happened to me, but, you know, friends she met, friends

15 from school, their parents knew.  It was -- it was very,

16 very difficult for her to have that strong exterior all

17 the time knowing how people felt about her mother.

18   Q.  You're saying -- I'm sorry, go ahead, I didn't

19 know you weren't done.

20   A.  There were a couple friends that she couldn't be

21 friends with because of me and she wanted to be friends

22 with them but because of my status being on the public

23 registry, also having my CSC, they weren't allowing it.

24   Q.  Okay.  You also mentioned that your daughter had

25 issues related to parent/teacher conferences and school

78

1   work?
2       A.  Yes.
3       Q.  Can you elaborate on how that was related to you
4   being on the public registry?
5       A.  Because of the school that she went to having to
6   be in the Jewish community they all knew about my past.
7   It's a community, everybody knows everybody.  We know
8   everybody's secrets here and there, everybody's past, if
9   you don't know them, you know their parents, you know
10  their parents' parents.  I had teachers that wouldn't
11  communicate with me, it would take days for them to get
12  back to me regarding anything that was happening in
13  school, but my ex-husband at the time, they would answer
14  him almost immediately.  So it was like almost I
15  couldn't coparent.
16      Q.  You also testified that at the conclusion of your
17  own education it was hard for you to find employment.
18  Do you recall giving that testimony?
19      A.  Yes.
20      Q.  Can you elaborate on how it was hard for you to
21  find employment?
22      A.  Due to me having my conviction and being on the
23  public registry the school happened to note that even
24  though I graduated top of the class and I should have
25  had an easy time finding a position it was very

79

1   difficult because of the registry along with the
2   conviction.
3       Q.  How did you know it was because of the registry?
4       A.  Because that I was still on, you know, publicly
5   on that registry where you could search me, find me on
6   that registry, know everything about me.  It didn't
7   matter how well of a student I was, you know, I -- even
8   when I sought employment and I was working for a doctor
9   someone came in, told them I was on the registry, he
10  went and looked and I lost my job because of that.
11      Q.  Okay.  And to switch gears here, you also
12  testified that it's easier for you to be involved with
13  your grandchildren than it was for you to be involved
14  with your daughter because you're no longer on the
15  public registry.
16      A.  Correct.
17      Q.  Can you elaborate on that?
18      A.  Yes.  My daughter, I missed her eighth grade
19  graduation.  If her -- anything that she was involved
20  with at school happened on school grounds, I missed out
21  on all of it.  When I came off that public registry I
22  was able to go to her high school graduation,
23  that -- sorry, that meant the most to me, to be able to
24  see my daughter walk across stage after everything she
25  had gone through.  And the fact that me and her father

80

1   had come to such a good place that we were able to come
2   together as one big family, all of us, to be there to
3   support her as she took the next step in her life.
4           And now my grandkids, it's been great, I go
5   to their sporting events, get to see them, you know,
6   either win or lose, you know, do well in their music
7   concerts.  It's nice not having that looming over me,
8   that I'm able to be there and enjoy everything as a
9   family, that, you know, Nana gets to be there, you know.
10  There's no question of, well, where's Nana, like Nana's
11  there.
12      Q.  Thank you.  Do you need a moment?
13      A.  Yeah, just a second.  Okay, sorry.
14      Q.  That's okay.  Are you ready to continue?
15      A.  Yes.
16      Q.  All right.  Did you have social media when you
17  were on the public registry?
18      A.  I did not.
19      Q.  Why?
20      A.  The restrictions, the -- all the information
21  required, it was just a lot, you know.  There were so
22  many things outlined that it was very confusing with the
23  registry, you know, saying, you know, you can't have
24  social media, I believe.  I mean it was very -- there
25  were a lot of restrictions to understand and it was just

81

1   easier for me not to be involved with any of it and just
2   not to have any of it.
3       Q.  Lastly you tes- -- well, not lastly, but you
4   testified that the registry is and it isn't helpful to
5   the public; do you remember that testimony?
6       A.  Yes.
7       Q.  Can you elaborate on how you feel that the
8   registry isn't helpful to the public?
9       A.  It's not helpful for people like me.
10      Q.  What do you mean by people like you?
11      A.  I made a mistake when I was 29 years old, I've
12  paid for it, I got sentenced, I served my time, I was
13  judged, I did my probation following all the rules, to
14  this day still following rules in society.  And for me
15  to have to sit there and go from ten, then to 25, and
16  now it's for life for someone that I made a mistake when
17  I was 29.  It's 20 years later I'm still paying for that
18  mistake being on that registry for life instead of me
19  being -- someone saying, you know, oh, well, look at
20  this person, she's rebuilt her life, you know, she's
21  done everything, she's not, you know, a habitual or a
22  sexual deviant, you know, she has done everything she
23  needs to do and she's lowest risk possible, there's no
24  way she will ever offend again.  It's not helpful for
25  someone like me or other people like me.

82

1    Q.   Are you aware that there is a new law that could
2    cause you to be put back on the public registry?
3    A.   Yes.
4    Q.   And how has that knowledge impacted you
5    emotionally?
6    **A.   It scares me.  It scares me because, like I said,**
7    **the job I have now -- I'm finally at a place in my life**
8    **where I'm happy.  I'm able to do everything with my**
9    **children, my grandchildren, you know.  My husband who's**
10   **involved with his hall, you know, I'm able to go to**
11   **services with him and be the support he needs for when**
12   **he has to give a speech, and just not having that fear**
13   **like, oh, they are going to know, someone's going to**
14   **know, you know, it -- it's a huge, huge fear of me going**
15   **back into -- you know, being very reclusive and not**
16   **being able to enjoy family events.**
17          MS. DAVIDSON:  Thank you.  I don't have
18   anything else.
19          MR. DAMICH:  I do have just a couple quick
20   follow ups if that's okay.
21          RE-EXAMINATION
22   BY MR. DAMICH:
23   Q.   You had mentioned that the Jewish community is
24   very tight knit and that that had caused some of the
25   problems with, you know, kind of shunning yourself and

83

1    your daughter; do you remember that testimony?
2    **A.   Yes.**
3    Q.   Did the Jewish community find out about your
4    actions before or after you were on the sex offender
5    registry?
6    **A.   Both.**
7    Q.   So they found out before?
8    **A.   There were some that found out before, there were**
9    **some that found out during everything, and there were**
10   **others that found out after.**
11   Q.   Do you believe the majority of the community knew
12   before you moved to Michigan while you were
13   incarcerated?
14          MS. DAVIDSON:  Objection, calls for
15   speculation.
16          THE WITNESS:  I wouldn't know who knew when
17   I was getting incarcerated and who knew when I got out
18   and who knew when I became on the public registry.
19   BY MR. DAMICH:
20   Q.   Are you aware that the law changes removed the
21   exclusion zones of the schools?
22   **A.   Yes, that I did know.**
23   Q.   You discussed the social media restrictions, but
24   just to clarify, you didn't identify anything specific
25   that said you can't have social media accounts, correct?

84

1    **A.   I would literally have to go back to see when I**
2    **first did the registry what my restrictions were, and I**
3    **want to say the restrictions were that you couldn't have**
4    **social media.**
5    Q.   Okay.  But you're not sure if that's true or not,
6    correct?
7    **A.   I can't say, you know -- I know that there were**
8    **restrictions, I don't know the exact form of the**
9    **restrictions, but I knew like internet usage, social**
10   **media, I want to say there was something in there about**
11   **that but I would literally need to see that document**
12   **like to see it.**
13   Q.   Okay.  I could pull back up the restrictions and
14   see if you want to look through it again and see if
15   there's any current restrictions on it.
16   **A.   Currently because my crime is before 2011,**
17   **currently those restrictions don't apply to me now.**
18   Q.   Sure.
19   **A.   Back when I first started they were there.**
20   Q.   Would you have any reason to dispute the
21   statement that there was no law that restricted you from
22   having a social media account?
23   **A.   What do you mean dispute?**
24   Q.   Disagree with.
25   **A.   Now or prior?**

85

1    Q.   Prior.
2    **A.   I want to say that, yes, I would have to dispute**
3    **it because I want to say there was something in there**
4    **that mentioned there were restrictions about social**
5    **media accounts.**
6          MR. DAMICH:  All right, that's all I have.
7          MS. DAVIDSON:  I don't have anything else.
8    (Whereupon Deposition concluded at 12:20 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

88

1  STATE OF MICHIGAN )
            ) SS
2  COUNTY OF INGHAM )

3        I, Melinda Nardone, Certified Shorthand
4  Reporter and Notary Public in and for the County of
5  Ingham, State of Michigan, do hereby certify that the
6  foregoing deposition was taken before me at the time
7  hereinbefore set forth.
8        I further certify that said witness was
9  duly sworn in said cause to tell the truth; that the
10 testimony then given was reported by me remotely to the
11 best of my ability; subsequently produced under my
12 direction and supervision; and that the foregoing is a
13 complete, true, and correct transcript of my original
14 shorthand notes.
15       IN WITNESS WHEREOF, I have hereunto set
16 my hand and seal this 5th day of April, 2023.
17
18

19      _____

        Melinda S. Nardone, CSR-1311,
20      Certified Shorthand Reporter,
        and Notary Public, County
21      of Ingham, State of Michigan.
        My Commission Expires:  10-24-24
22
23
24
25