# Exhibit 62:

## Mary Roe
## Deposition Transcript (redacted)

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                  SOUTHERN DIVISION

 3    - - - - - - - - - - - - - - - -
                                     )
 4    JOHN DOES A, B, C, D, E, F, G,)
      H, MARY DOE and MARY ROE, on  )
 5    behalf of themselves and all   )
      others similarly situated,     )
 6                                   )
                       Plaintiffs, )File No.
 7                                   )2:22-cv-10209
        -vs-                         )
 8                                   )HON. GOLDSMITH
      GRETCHEN WHITMER, Governor of )MAG. IVY, JR.
 9    the State of Michigan, and     )
      COL. JOSEPH GASPER, Director   )
10    of the Michigan State Police, )
      in their official capacities, )
11                                   )
                       Defendants. )
12    - - - - - - - - - - - - - - - -

13              REMOTE DEPOSITION

14    of MARY ROE, a Plaintiff called by Defendants,

15    taken before Melinda S. Nardone, Certified Shorthand

16    Reporter and Notary Public, via Zoom, on Monday, March

17    13, 2023, noticed for the hour of 2:00 p.m.

18

19

20

21                 HECKAMAN & NARDONE, INC.
22             Certified Shorthand Reporters
                     P.O. Box 27603
23             Lansing, Michigan  48909
                     (517) 349-0847
24              msnardone5@gmail.com

25
```

1  APPEARANCES:

2  AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
   1514 Wealthy SE, Suite 260
3  Grand Rapids, MI  49506
   By
4  MIRIAM AUKERMAN, J.D. and
   DAYJA TILLMAN, J.D.
5  and
   AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
6  2966 Woodward Avenue
   Detroit, Michigan  48201
7  By
   SYEDA DAVIDSON, J.D.
8
9          On behalf of Plaintiff.

10  MICHIGAN DEPARTMENT of ATTORNEY GENERAL
    State Operations Division
11  P.O. Box 30754
    Lansing, Michigan  48909
12  By
    ERIC M. JAMISON, J.D. and
13  SCOTT DAMICH, J.D.

14          On behalf of Defendants.

15

16

17

18

19

20

21

22

23

24

25

---

3

1          EXAMINATION INDEX

2  ATTORNEY'S NAME   EXAMINATION   RE-EXAMINATION

3  BY MR. JAMISON:      5            80

4  BY MS. AUKERMAN:    75

5

6          *      *      *

7

8          INDEX OF EXHIBITS

9  EXHIBIT                    MARKED

10  Ex #1  Registry mail-in update        33

11  Ex #2  List of cases                  45

12  Ex #3  MCL 750.145a                   67

13  Ex #4  MCL 257.625                    70

14  Ex #5  MCL 750.85                     72

15          *      *      *

16

17

18

19

20

21

22

23

24

25

---

4

1          Monday, March 13, 2023

2          2:00 p.m.

3          R E C O R D

4          MARY ROE,

5  having been first duly sworn, testified as follows:

6          MR. JAMISON:  Good afternoon, my name is

7  Eric --

8          MS. AUKERMAN:  Eric, we need to put a couple

9  things on the record to begin with I think just because

10  there is a protective order in this case.

11          MR. JAMISON:  As I said in my email, Miriam,

12  I have those things and I'll get to them in a moment.

13  And if I miss anything feel free to jump in before I

14  start asking Mary any questions.

15          MS. AUKERMAN:  Okay.

16          MR. JAMISON:  So I'm Assistant Attorney

17  General Eric Jamison, I represent Governor Whitmer and

18  Colonel Gasper, and here along with me is Assistant

19  Attorney General Scott Damich.  I noticed your

20  deposition in this case, Doe V Whitmer, it's Case Number

21  2:22-cv-10209 in the District Court of the Eastern

22  District of Michigan in front of the Honorable Judge

23  Goldsmith.

24          There's a protective order in place in this

25  case and it's found at ECF number 88, page ID 2389

---

5

1  through 2395, which protects your identity from public

2  disclosure.  Mindy, could you confirm on the record that

3  you've read the protective order and signed the

4  acknowledgment?

5          COURT REPORTER:  Yes, I have.

6          MR. JAMISON:  Thank you.  Counsel, will you

7  confirm that the person tendered is, in fact, Mary Roe?

8          MS. AUKERMAN:  Yes, the person tendered is,

9  in fact, Mary Roe.  I just want to make clear, for the

10  record, that both the deposition and the transcript and

11  all things related to this deposition are covered by the

12  protective order.  Before any transcripts are filed the

13  plaintiffs have to be given an opportunity to review the

14  transcript for the appropriateness of any redactions

15  that will be needed to protect Ms. Roe's identity, so

16  there's no identifying information that can be used in

17  any public transcripts.

18          MR. JAMISON:  I understand the parameters of

19  the protective order.

20          EXAMINATION

21  BY MR. JAMISON:

22  Q.  So, Ms. Roe, I'll do my best not to ask you any

23  identifying information throughout the course of the

24  deposition.  Have you had your deposition taken before?

25  A.  No.

6

1     Q.   So I'll go over the rules sort of briefly and I'm
2  sure your counsel prepared you for this.  The purpose --
3  one of the purposes of the deposition is to get recorded
4  answers to your questions -- to the questions I ask you.
5  So when I ask you a question you can't just nod your
6  head or say uh-huh or huh-uh because it makes it very
7  difficult to later try to figure out what you meant by
8  that.  So you need to have verbal responses.
9           We need to be careful not to talk over one
10 another so let me fully ask the question, I'll let you
11 fully answer, so that Mindy can write everything down
12 that we're saying.  If you don't understand a question I
13 can rephrase the question, I'm not trying to trick you
14 in the way to answering something.  Lawyers are
15 notoriously wordy and convoluted in the way that we say
16 things so don't feel bad about asking me to rephrase it.
17 And if you answer a question I'll assume that you
18 understood the question; is that fair.
19    A.   Yes.
20    Q.   Are you taking any medications or are you under
21 the influence of any substances that might affect your
22 memory or ability to answer questions truthfully today?
23    A.   No, I'm not.
24    Q.   Is there anything else that might interfere with
25 your ability to answer questions truthfully and fully

7

1  today?
2     A.   No.
3     Q.   Do you still live in Michigan?
4     A.   Yes.
5     Q.   You live in the metro Detroit area?
6     A.   Yes.
7     Q.   Throughout the deposition I'm going to refer to
8  your CSC conviction, and what I'm referring to is the
9  2003 CSC conviction, is that -- you understand what that
10 means when I say that?
11    A.   Yes.
12    Q.   Okay.  Since your release from prison for your
13 CSC conviction what type of housing have you obtained?
14    A.   Can you -- I'm not quite sure what you mean by
15 the question.
16    Q.   Yeah, can you just explain generally where you
17 lived since you were released from prison?
18    A.   Sure.  I lived in a few places, a few apartments,
19 I've rented a few houses, and I currently live in a
20 house that I'm buying.
21    Q.   Did you have any trouble finding suitable housing
22 because of your criminal sexual conduct conviction?
23    A.   Yes.
24    Q.   And can you explain what that was?
25           MS. AUKERMAN:  Objection.  Objection,

8

1  unclear what the question was.  Can you please restate
2  the question?
3           MR. JAMISON:  The objection is noted.
4  BY MR. JAMISON:
5     Q.   You can go ahead and answer the question.
6     A.   Yes, I've had trouble obtaining housing both
7  because of my conviction and because of my presence on
8  the registry.
9     Q.   And can you explain what trouble you've had?
10    A.   I've been denied for multiple housing,
11 particularly professionally managed housing complexes
12 will not rent to me, so I've had to live often in
13 privately owned or sometimes even substandard housing in
14 order to obtain housing.
15    Q.   And is that because of your -- the conviction, if
16 you know?
17    A.   I'm not sure.
18    Q.   At any time since you were released from prison
19 have you been homeless?
20    A.   No.
21    Q.   And have you been able to find housing since you
22 left prison?
23    A.   I have even though it has been, you know, hard at
24 times.
25    Q.   And when you say hard, what do you mean by that?

9

1     A.   Stressful, trying to -- you know, having a date
2  that I need to be out of one house or apartment and then
3  trying to find one that will rent to me, a landlord that
4  will rent to me, and sometimes that has caused a lot of
5  stress and distress for me.
6     Q.   Are you currently married?
7     A.   Yes.
8     Q.   And how long have you been married for?
9     A.   Since June 2021.
10    Q.   And prior to that were you married?
11    A.   No, I've never been married before.
12    Q.   Okay.  Do you have any children?
13    A.   No.
14    Q.   Do you have any nieces or nephews?
15    A.   No.
16    Q.   The complaint indicates that since your release
17 from prison you've been steadily in school or employed;
18 is that accurate?
19    A.   Yes.
20    Q.   Can you walk me through the types of jobs you had
21 since your release from prison?
22    A.   Sure.  In the beginning I did work study for the
23 ███████████████  where I went to school.  I
24 waitressed.  And then in the early 2000s, some time 2007
25 maybe, I'm not exactly sure on the dates, I began to

10

1   work in the field of counseling, which is where I work
2   now.  And I've held multiple positions in that field as
3   a case manager, as a therapist, as a director of a
4   treatment program, and now I own my own private
5   practice.
6       Q.   Okay.  Were there any periods of time that you
7   were unemployed?
8       A.   Brief periods of time, yes, particularly when I
9   first came home it took me about four or five months to
10  gain employment, but I have not had any real absences of
11  employment since then.
12      Q.   And what impact, if any, did your CSC conviction
13  have on your ability to gain employment?
14      A.   I have been denied a few jobs based on where they
15  wanted to offer me the job but then upon consulting with
16  their attorney decided that they could not offer me the
17  position due to my presence on the registry.
18      Q.   And when was that?
19      A.   This was early in my career, I want to say 2006,
20  2007, but I'm not exactly sure of those dates.
21      Q.   And what information did they relay to you about
22  why they couldn't offer the position to you?
23      A.   That my presence on the registry was a liability
24  for them and they didn't feel comfortable offering me
25  employment.

11

1       Q.   Okay.  Do you know whether any of those employers
2   ran background checks on you prior to considering you as
3   a candidate for employment?
4       A.   I don't know for sure.  I disclosed in my
5   interviews, because I found it pointless not to disclose
6   it if they were going to do a background check anyway,
7   so I don't know what they did beyond that.
8       Q.   So is it fair to say that even with your CSC
9   conviction you've been able to maintain employment?
10      A.   Yes.
11      Q.   And you earned a bachelor's degree; is that
12  right?
13      A.   I have a master's degree, but, yes, that can
14  include the bachelor's degree.
15      Q.   And what year was that?
16      A.   I got my master's degree in 2011.
17      Q.   Let's start with your bachelor's degree; what
18  year did you obtain your bachelor's degree?
19      A.   I think 2008, but again I would have to check
20  like the diploma to be sure, but I think it was in 2008.
21      Q.   And 2008, that was after your CSC conviction,
22  right?
23      A.   Correct.
24      Q.   Do you recall whether you had to report to law
25  enforcement that you were attending college?

12

1       A.   I did.
2       Q.   And how often did you have to report that to law
3   enforcement?
4       A.   I'm not exactly sure, it's a long time ago.  I
5   believe I had to report when I started going to school
6   there, I mean, and then when I ended going to school
7   there, but I might be incorrect about that, it was a
8   long time ago.
9       Q.   Did having your CSC conviction prevent you from
10  attending college?
11      A.   It did not prevent me from attending college, no.
12      Q.   And did you attend in person?
13      A.   I did.
14      Q.   And you said you graduated -- or in the complaint
15  I believe it says you graduated near the top of your
16  class; is that correct?
17      A.   Yup, I did.
18      Q.   Sorry, I didn't hear an answer, maybe there's a
19  lag there.
20      A.   Oh, yes, I did graduate at the top of my class,
21  sorry.
22      Q.   No, I think it was on my end.  And then after you
23  obtained your bachelor's degree you obtained a master's
24  degree; is that right?
25      A.   Correct.

13

1       Q.   And what year was that?
2       A.   2011 I believe.
3       Q.   And what was your master's in?
4       A.   Counseling.
5       Q.   And did you have to disclose to law enforcement
6   that you were attending the master's program?
7       A.   I did.
8       Q.   Did --
9       A.   Can I clarify that?  I'm sorry.  I don't know
10  that I actually had to report because it was the same
11  school I went for undergrad and grad school and I went
12  straight through, so I think I didn't have to report
13  that because it had already been reported in 2008 when I
14  started, or 2007.
15      Q.   Thank you.
16      A.   Uh-huh.
17      Q.   Did having a CSC conviction prevent you from
18  attending your master's program?
19      A.   No, it did not.
20      Q.   And did you attend in person?
21      A.   I did.
22      Q.   And did you graduate near the top of your class
23  for your master's program?
24      A.   I believe so.  I believe I was also in like a
25  similar place in my master's program.

14

1    Q.  And now you're a licensed therapist in Michigan,
2  correct?
3    A.  Correct.
4    Q.  And how long have you been practicing?
5    A.  I've been practicing since 2008 in the field in
6  one position or another, but I didn't start practicing
7  as a therapist until after I -- 2011.
8    Q.  So did you have like a limited license or
9  something?
10    A.  I had a limited license initially, although I
11  didn't apply for my license until years later.  I
12  believe I didn't apply for my license until 2017 due to
13  fear of being rejected based on me being on the
14  registry.
15    Q.  Okay.  What license did you obtain in 2011?
16    A.  I didn't get a license, I graduated in 2011.  And
17  the job I held at the time did not require me to get my
18  license.
19    Q.  Do you have a website for your therapy practice?
20    A.  I do.
21    Q.  Do you know whether it says on your website that
22  you've been licensed since 2011?
23    A.  I'm not sure, it might.  There might be a mistake
24  on there.
25    Q.  And you said that you did obtain your license in

15

1  2017?
2    A.  I believe so.  Again, I would have to check the
3  dates to be sure.
4    Q.  But ballpark 2017?
5    A.  Yes, ballpark, uh-huh.
6    Q.  Sorry, I didn't catch that.
7    A.  Sorry, it was a provisional license at first.
8        MS. AUKERMAN:  I'm going to object to any
9  questions that rely on information obtained by the
10  defendants, a continuing objection, obtained by the
11  defendants regarding Ms. Roe that was not disclosed,
12  provided to the plaintiffs.  We requested in our
13  discovery that all documents that defendants obtained be
14  provided.  Those were not provided to us in advance of
15  this deposition so we couldn't review them so I'm going
16  to have a continuing objection to any documents or
17  references that defendants make to any documents that
18  were not provided.
19        MR. JAMISON:  Your objection is noted.
20  BY MR. JAMISON:
21    Q.  And in 2017 you were and you still are on the sex
22  offender registry; is that correct?
23    A.  Correct.
24    Q.  So is it fair to say that you've been able to
25  become a licensed therapist even though you have your

16

1  CSC conviction?
2    A.  Yes, I have, but it has been harder, I believe.
3    Q.  And I believe you said now you have your own
4  practice; is that right?
5    A.  Correct.
6    Q.  And what's the nature of your practice?
7    A.  It's a therapy practice that specializes in
8  treating trauma.
9    Q.  And what's your approximate annual income from
10  your therapy practice?
11    A.  Do you want gross or net?
12    Q.  Gross.
13    A.  Around $90,000.
14    Q.  And do you have other sources of income?
15    A.  No, I do not.
16    Q.  Do you have clients that are on the sex offender
17  registry?
18    A.  Not that I know of.
19    Q.  Have you disclosed to any of your clients that
20  you're on the sex offender registry?
21    A.  None of my current clients know.  I have had a
22  client previously who found me on the registry.
23    Q.  And what impact did your client finding that out
24  have on --
25    A.  I think it made it hard to develop a therapeutic

17

1  rapport, which is the foundation of good therapy.
2  Beyond that, you know, I can't really speak to what
3  impact it had, I guess you would have to ask him.
4    Q.  And after he found out that you were on the
5  registry did he leave your care?
6    A.  Shortly after.
7    Q.  How soon after?
8    A.  Probably about two or three sessions after he
9  left my care.
10    Q.  And how long was he in your care prior to finding
11  out?
12    A.  Only about two or three sessions.  He found me on
13  the registry before he even met me.
14    Q.  And do you treat clients struggling with
15  addiction?
16    A.  I have and I do.  I'm trying to think if I have
17  anybody on my case currently.  Yeah, I have a couple
18  clients currently that I help treat with addiction.
19    Q.  And what types of addiction?
20    A.  Currently or historically?
21    Q.  Historically.
22    A.  I've treated all types of addictions.  My
23  previous specialty before trauma was addiction.  I've
24  treated almost every drug addiction that there is.  I've
25  never treated any process addictions, though, such as

18

1 gambling or sex or any of those.

2 Q. So aside from drugs or substances are there other

3 sorts of addictions that you treat?

4 A. No.

5 Q. Do you have any sorts of metrics for tracking

6 success rates for people obtaining therapy for

7 addiction?

8 A. Yeah, ending therapy I guess would be the only

9 one that I currently have. Because of the size of my

10 practice we can't really follow clients post therapy,

11 unlike some other larger programs could, but I do

12 assess, as we go through the therapeutic process, their

13 substance use, their mood, and some other measures.

14 Q. And in general would you say that people that

15 struggle with substance abuse, that they are able to

16 overcome their addictions?

17 A. That's -- I don't know that I can answer that.

18 Statistically speaking there is a percentage, and I

19 don't know it off the top of my head, of people that

20 can, but there is also a percentage of people who

21 continue to struggle with it their entire life no matter

22 what intervention they have so it's kind of a difficult

23 question to answer.

24 Q. Do people dealing with addiction sometimes have

25 slip ups and revert back to unhealthy coping mechanisms?

19

1 A. Yes, sometimes they do.

2 Q. And does the age of the patient matter?

3 A. The longer an addiction has been present the more

4 entrenched it often is. So I don't know that age has

5 something to do with it as much as it has to do with

6 length of the addiction and the supports that are in

7 their life.

8 Q. What about circumstances, do life circumstances

9 impact success with addiction treatment?

10 A. Yeah, I would say so.

11 Q. And in what way?

12 A. The harder your life is often -- you know,

13 stressors exacerbate, excuse me, drug use or alcohol use

14 and so the more stressful your life is the harder it can

15 be to maintain that sobriety.

16 Q. And what about health issues, do health issues

17 have an impact on an addict's ability to deal with their

18 addiction?

19 A. Yeah, I think it would be included as a stressor,

20 as well as the fact that some of the medication you can

21 be prescribed for health issues can both start an

22 addiction and exacerbate one that's already existing.

23 Q. And do you treat clients with PTSD?

24 A. I do.

25 Q. And how do people cope with trauma or PTSD?

20

1 A. A big way is substance use. Avoidance is one of

2 the diagnostic criteria for PTSD, and substance use is

3 one of the most classic ways that you can avoid.

4 Q. And once someone has worked with a therapist to

5 address the trauma or their PTSD are they cured?

6 A. I wouldn't say cured, no.

7 Q. And why wouldn't you say that?

8 A. We do have more modern treatments within the

9 last, I don't know, 10 to 20 years, again, I would have

10 to check the dates on that, that can significantly

11 reduce symptoms. But having PTSD makes you more

12 susceptible to having PTSD reactions to future traumas,

13 and so I don't know that you can really ever say one is

14 cured per se because you can't predict what's going to

15 happen to them in the future and if those future

16 situations are going to exacerbate this tendency to have

17 this post traumatic reaction.

18 Q. Can circumstances change that can retrigger

19 someone's trauma?

20 A. Yes.

21 Q. And what would that look like?

22 A. I'm not sure I understand the question.

23 Q. So if you've treated a patient for some sort of

24 trauma and there's sort of a retriggering event in their

25 life what impact would that potentially have on a

21

1 patient?

2 A. Oh, it would cause an increase in symptoms

3 generally is normally what we would see. So the

4 symptoms that had been, you know, resolved or feeling

5 better, usually they all start to come again when

6 triggered.

7 Q. And is it typical for patients to turn back to

8 old coping mechanisms if trauma is triggered?

9 A. I don't know if I can use the word that you use,

10 I don't know the numbers for that. I would say that,

11 right, if they don't have appropriate supports in place

12 or appropriate coping mechanisms in place then, yes, it

13 would make a lot of sense to me that they might return

14 to some old coping behaviors like substance use.

15 Q. And do you treat abuse survivors?

16 A. I do.

17 Q. Have you treated survivors of sexual abuse?

18 A. I have.

19 Q. In your experience are victims of sexual abuse

20 typically abused by someone they know?

21 A. Again, I don't know the numbers on that off the

22 top of my head, but speaking from my own caseload they

23 are.

24 MS. AUKERMAN: Objection, lack of personal

25 knowledge, lack of foundation.

22

1    MR. JAMISON:  Yeah, I'm just asking in her
2  experience, I'm not asking generally.
3  BY MR. JAMISON:
4    Q.  In your experience in treating survivors of
5  sexual abuse have they typically been abused by someone
6  they know?
7    A.  It is common, I would say, that they have been
8  abused by someone that they know.
9    Q.  In your experience do victims of sexual abuse
10  report their crimes to law enforcement or report the
11  crimes to law enforcement?
12    A.  Not often, no, actually is my experience.
13    Q.  And in your experience do you know why they don't
14  report to law enforcement?
15    A.  I think there's a myriad of reasons that depend
16  on the individual.  I think shame is a big one, I think
17  lack of faith in the justice system and the
18  retraumatization that sexual abuse survivors often
19  experience when reporting.  Those would be the things
20  that come to mind when you ask that question.
21    Q.  In your experience are victims of sexual abuse
22  only abused one time?
23    MS. AUKERMAN:  Objection, lack of
24  foundation, lack of personal knowledge.
25    MR. JAMISON:  These are questions, Miriam,

23

1  directed at her experience.  I'm not asking generally,
2  you know, across the state of Michigan, I'm asking her
3  experience as a therapist who has testified that she
4  treats victims of sexual abuse, in her experience are
5  victims of sexual abuse only abused one time.
6    THE WITNESS:  No, they are not.
7  BY MR. JAMISON:
8    Q.  In your experience what typically happens that
9  triggers a sexual abuse victim to report the abuse to
10  law enforcement?
11    A.  I don't have a lot of experience with victims
12  reporting to law enforcement so I don't think I can
13  really answer that question or speak to that.
14    Q.  Okay.  In your experience how often have the
15  abusers been convicted?
16    MS. AUKERMAN:  Objection, lack of -- again,
17  lack of foundation, lack of personal knowledge.
18    THE WITNESS:  I think I only have a handful
19  of clients in my career that the offender has been
20  jailed or convicted.
21  BY MR. JAMISON:
22    Q.  Okay.  And so you said you had a handful where
23  the abuser was jailed or convicted.  Can you tell me
24  approximately how many patients you've had that have
25  been victims of sexual abuse?

24

1    A.  I don't think I could guess at that.  I've seen,
2  you know, hundreds of patients in my career.  I can only
3  think of one or two off the top of my head that the
4  offender has been jailed or convicted, but I don't know
5  how many of those would have been survivors of sexual
6  abuse, I'd have to look at my records.
7    Q.  In your experience have you treated patients that
8  were victims of sexual abuse and they decided not to
9  testify against their abuser?
10    A.  Not that I recall have I ever had a patient in
11  that situation.
12    Q.  In your experience have you seen a correlation
13  between people being sexually abused and needing mental
14  health services?
15    A.  Yes, I have.
16    Q.  And what is that correlation?
17    A.  Well, sexual abuse is a trauma so, you know, for
18  some clients -- for many clients it causes a PTSD type
19  response and they would need additional treatment to
20  help them with that.
21    Q.  And how long or how much treatment is typically
22  needed?
23    A.  I don't think I can really --
24    MS. AUKERMAN:  Again, objection, lack of
25  foundation, lack of personal knowledge.

25

1  BY MR. JAMISON:
2    Q.  You can go ahead and answer the question.
3    A.  I don't know --
4    MS. AUKERMAN:  You can answer, restrict it
5  to your own experience.
6    THE WITNESS:  Okay.  A lot of my clients
7  have multiple traumas so I don't know that I can really
8  piece out the sexual abuse piece specifically because
9  many of them are dealing with complex trauma.
10  BY MR. JAMISON:
11    Q.  Would it be fair to say that it takes more than
12  one or two sessions for a sexual abuse victim to work
13  through the trauma they experienced?
14    A.  Yes, it would.
15    Q.  Would it be fair to say that it takes more than
16  six or eight sessions?
17    A.  Depending on the modality.  There are more recent
18  types of trauma treatment that you can -- if it's a
19  single episode PTSD event, like one incident of sexual
20  abuse could be resolved in six to eight sessions, but it
21  just depends on the person, it depends on the
22  complexity, and it depends on the type of therapy being
23  provided.
24    Q.  In your experience as a therapist as someone who
25  treats sexual abuse victims, aside from needing therapy

26

1 are there other impacts on the victims?
2   A.  Yes.  There is, yes.
3   Q.  And what are those impacts?
4   A.  **It impacts often not -- you know, their family**
5 **relationships, their relationships with other people.**
6 **And the mental health symptoms that result from the**
7 **trauma can often impact work, school, you know, kind of**
8 **your major life areas.**
9   Q.  And are there any other ways that impacts
10 victims?
11   A.  **There probably is that I'm not thinking of right**
12 **now, but none that I can think of.**
13   Q.  Do you provide counseling services to abusers?
14   A.  **No, I do not.**
15   Q.  Do you treat clients on how to handle stress?
16   A.  **Yes.**
17   Q.  And what are, if there is such a thing, typical
18 unhealthy coping mechanisms for people handling stress?
19   A.  **The typical unhealthy coping mechanisms, is that**
20 **what you're asking?**
21   Q.  Yes.
22   A.  **Substance abuse, overworking, poor relationships,**
23 **compulsive sexuality, and defense mechanisms in general.**
24 **I'm sure there are others but that's what comes to mind.**
25   Q.  Is it fair to say if someone used alcohol as a

27

1 coping mechanism they are likely to return to alcohol as
2 a coping mechanism during times of stress?
3   A.  **I think it depends on the individual.**
4   Q.  And what do you mean by that?
5   A.  **Because, again, I think it depends on the coping**
6 **skills that they've been able to grow over time, it**
7 **depends on the complexity of their trauma, it depends on**
8 **the stressors and their life environment.  It's hard to**
9 **speak generally because I think each individual person**
10 **is so complex and different.**
11   Q.  Uh-huh.  So if you had two patients and one
12 patient used alcohol as a coping mechanism and another
13 patient used exercise as a coping mechanism and the
14 patient who used exercise as a coping mechanism had
15 never drank alcohol before, of those two patients who do
16 you think would be more likely to return to alcohol as a
17 coping mechanism during a time of stress?
18       MS. AUKERMAN:  Objection, calls for
19 speculation.
20       THE WITNESS:  I mean I would think the
21 person who has already used alcohol previously.
22 BY MR. JAMISON:
23   Q.  Based on your professional experience and
24 training would you say that someone with a CSC
25 conviction is more or less likely than someone without a

28

1 CSC conviction of committing a second sex offense?
2       MS. AUKERMAN:  Objection, lack of personal
3 knowledge, lack of foundation, no expertise.
4       THE WITNESS:  Yeah, I don't have any
5 expertise in this area.  I don't treat people with CSC
6 convictions so I can't really speak to that.
7 BY MR. JAMISON:
8   Q.  Do you remember when you were first placed on the
9 registry?
10   A.  **I do.**
11   Q.  And when was that?
12   A.  **When I was 19 -- 20 maybe, 19 or 20 and went to**
13 **prison was the first time I had to register.**
14   Q.  And was that a public registry at that point?
15   A.  **I think so but I'm not completely sure, but I**
16 **believe so.**
17   Q.  And while you were on the registry or while you
18 had been on the registry you worked as a therapist,
19 correct?
20   A.  **Correct, yes.**
21   Q.  And at some point you became the clinical
22 director?
23   A.  **Correct.**
24   Q.  And have you ever been removed from the public
25 registry?

29

1   A.  **Yes, I was removed from the public registry I**
2 **believe in 2017, but again I don't know the exact dates.**
3   Q.  If I told you March of 2018, does that sound
4 right?
5   A.  **Yeah, that sounds about the time.**
6   Q.  And that's in the complaint at paragraph 94.  And
7 do you know if you're on -- if you're currently on the
8 public registry?
9   A.  **The last time I checked I was not.**
10   Q.  Has your business been destroyed since being back
11 on the registry?
12   A.  **I'm not on a public registry currently so I can't**
13 **speak to that or that I know of at least.**
14   Q.  Has your business grown since March of 2021?
15   A.  **March of 2021?  Yes, it has.**
16   Q.  Do you have a waiting list for new clients?
17   A.  **No, I don't keep a waiting list.**
18   Q.  Do you have excess capacity where you can take on
19 new patients?
20   A.  **No, I cannot take on new patients at this time.**
21   Q.  And you were convicted in 2003 of criminal sexual
22 conduct in the third degree, right?
23   A.  **Correct.**
24   Q.  And the victim was a 14 year old child, right?
25   A.  **Correct.**

30

1    Q.  How many times did you have sex with a 14 year
2    old child?
3        A.  Twice.
4        Q.  Was that on different dates?
5        A.  My memory of this time is really hazy so I can't
6    really speak to that.  I know I was charged twice but
7    I'm not aware exactly of when or where or how.
8        Q.  So you were charged with two separate instances
9    of criminal sexual conduct; is that correct?
10       A.  I know I was charged with two counts, correct,
11   yes.
12       Q.  And it was the same victim?
13       A.  Yes.
14       Q.  And were one of the counts dismissed?
15       A.  I believe so, yes.
16       Q.  In your opinion can a 14 year old child consent
17   to having sex with an adult?
18       A.  No.
19       Q.  In your professional experience does a 14 year
20   old child have the maturity level to consent to having
21   sex with an adult?
22       A.  No.
23       Q.  As you sit here today do you think it's okay for
24   a 19 year old adult to have sex with a 14 year old
25   child?

31

1        A.  No.
2        Q.  Since 2003 have you had any other sexual
3    relationships with children 17 or under?
4        A.  No.
5        Q.  And did you take a plea deal?
6        A.  I did.
7        Q.  Aside from the 2003 conviction have you been
8    arrested or charged with any other crimes?
9        A.  Previous to that I had two check cases.  Uttering
10   and publishing I believe is the actual charge.
11       Q.  Yeah, anything since 2003?
12       A.  No, nothing but like a speeding ticket.
13       Q.  And how long were you incarcerated for?
14       A.  A little over two and a half years.
15       Q.  And at the time you were convicted you had to
16   register for 25 years?
17       A.  Correct.
18       Q.  Does that sound right?
19       A.  Uh-huh.
20       Q.  And then due to changes in the law that
21   registration period was changed to life, is that
22   correct?
23       A.  That's correct.
24       Q.  As a lifetime registrant how often do you need to
25   verify in person with law enforcement?

32

1        A.  Four times a year.
2        Q.  How far away is the police department that you
3    register at from your home or your office?
4        A.  The one that I go to is maybe 15 or 20 minutes
5    away from my home.
6        Q.  And approximately how long does it take you to
7    register each time you go?
8        A.  I can't really speak to a typical.  Sometimes
9    it's five minutes, sometimes it's an hour.  It just
10   really depends on what's going on inside the police
11   station when I go.
12       Q.  So since March of 2021, I think you've had to
13   register approximately eight times over that time
14   period, how long has it taken?
15       A.  Anywhere between, I don't know, ten minutes and
16   an hour, it just depends on how many people are there,
17   who's in the lobby, all of that kind of stuff.
18       Q.  Since March of 2021 how many times have you had
19   to make changes to your information?
20       A.  I don't remember if I've had to make any changes
21   since March 2021.  I don't think so, but I'm not exactly
22   sure of that.
23       Q.  Have you mailed in any updates --
24       A.  No.
25       Q.  -- for any changes?  And you don't recall whether

33

1    you had to appear in person aside from those four times
2    a year that you have to register to make any changes?
3        A.  Yeah, no, I don't think I have but I'm not 100
4    percent sure on that.
5        (Whereupon Deposition Exhibit No. 1
6        marked for identification.)
7    BY MR. JAMISON:
8        Q.  Okay.  I'm going to try to share my screen.
9    Okay, so if it's not up there now you should see it in a
10   minute.
11       A.  I see it.
12       Q.  So this is a Michigan sex- -- do you see it?
13       A.  Uh-huh.
14       Q.  So this is a Michigan sex offender registry mail
15   in update, have you seen this before?
16       A.  I've never seen the mail in one but it looks
17   similar to the one I receive when I go in person.
18       Q.  And then if I scroll down this is a three page
19   document, this is form RI-004A, it has an explanation of
20   duties to register as a sex offender.  Have you seen
21   this before?
22       A.  Yes, I've seen it.
23       Q.  And is this something that you review when you
24   appear in person to verify?
25           MS. AUKERMAN:  Objection, assumes facts not

34

1   in evidence.
2          THE WITNESS:  This is given to me after I
3   register normally on the proof that I've been there to
4   register.  I'm not sure exactly what it's called.
5   BY MR. JAMISON:
6      Q.   Okay.  I want to focus a little bit on section
7   four here.
8      A.   **Uh-huh.**
9      Q.   It says you need to provide information, and
10  under A it says legal name and aliases.  Do you know
11  what -- well, I'll read it, my legal name and any
12  aliases, nicknames, tribal names, ethnic names, and any
13  other name by which I have been known; do you see that?
14     A.   **I do.**
15     Q.   And do you understand what that means?
16     A.   **I think so, yeah.  It's possible I don't**
17  **completely know the full legal ramifications of it,**
18  **though, I'm not an attorney.**
19     Q.   Sure.  But do you know what an alias is or a
20  nickname?
21     A.   **Yeah, it's another name that you go by, right?**
22     Q.   And do you see where it says and any other name
23  by which I have been known?
24     A.   **I do, yeah.**
25     Q.   And then part B says my social security number.

35

1   Do you know what a social security number is?
2      A.   **I do.**
3      Q.   And do you see that part where it says or alleged
4   social security number that I've previously used?
5      A.   **Yes.**
6      Q.   Do you know what previously used means?
7      A.   **Yes, I think so.**
8      Q.   Do you know what a date of birth is?
9      A.   **Yes.**
10     Q.   Do you know what a date of birth that you
11  previously used means?
12     A.   **I think so.**
13     Q.   Do you know what an address where I reside means?
14     A.   **Yes.**
15     Q.   What about the name and address of any temporary
16  lodging used or to be used when I'm away from my
17  residence for more than seven days?
18     A.   **Yes, I think I know what that means.**
19     Q.   And in your own words what does that mean?
20     A.   **If I stay anywhere outside of my home, either my**
21  **home or anywhere outside of my home, longer than seven**
22  **days.**
23     Q.   And under F it says, the name and address of each
24  of my employers.  Do you know what that means?
25     A.   **I believe so.**

36

1      Q.   And how would you explain that to someone else if
2   they were asking you that you have to identify the name
3   and address of your employer?
4      A.   **The name and address of anywhere I work.**
5      Q.   And then under G it says, the name and address of
6   any school that I attend or that has accepted me if I
7   plan to attend; do you understand what that means?
8      A.   **Yes.**
9      Q.   And what do you understand that to mean?
10     A.   **Any school that I go to I have to give a name and**
11  **address to, or if I go there and I've already been**
12  **accepted.  Although it doesn't give me a lot of**
13  **information about when I need to do that if I've been**
14  **accepted so that's a little unclear to me.**
15     Q.   Then under H it says, all telephone numbers
16  registered to me or used by me; what does that mean to
17  you?
18     A.   **Any phone numbers that I use.**
19     Q.   And does that section have the same qualifier
20  that it does up top when we're talking about names and
21  social security numbers and dates of birth where it
22  says -- like in A it says, and any other name by which
23  I've been known or any number that I've previously used,
24  anything like that?
25     A.   **No, it does not say that, I don't see it.**

37

1      Q.   So would you read this to mean that you need to
2   provide your phone number from 2003?
3      A.   **No, I wouldn't.**
4      Q.   And then section I, do you have to report your
5   email address to law enforcement when you register?
6      A.   **No, it does -- according to that, although I**
7   **thought I did until recently.**
8      Q.   Okay.  And then looking at J, the license plate
9   number and description of any vehicle that I own or
10  operate, do you know what that means?
11     A.   **Yeah, that's one is a little unclear to me**
12  **actually similar to the telephone number one I guess in**
13  **a sense that how often do I have to operate these or use**
14  **these in order to report them, that's the part that I**
15  **find a little unclear, but the rest of it I understand**
16  **what it means.**
17     Q.   And do you know what to use something means?
18     A.   **Yes, although I guess if I use it once does that**
19  **qualify enough that I have to go in to report, I'm not**
20  **exactly clear on that.**
21     Q.   Sure.  In your own words what does to use
22  something mean?
23     A.   **To use it, I don't know, at all, I guess would be**
24  **my interpretation, although that seems pretty broad for**
25  **the purposes of this.**

38

1    Q.   So if your neighbor came over and said, hey, can
2    I use your lawn mower you'd know what they mean?
3    **A.   Yeah, they want to take it and mow their lawn.**
4    Q.   And do you know what to operate means?
5    **A.   Yeah, I think so, uh-huh.**
6    Q.   And in your own words what does to operate mean?
7    **A.   To control something.  I don't know the word**
8    **exactly, I'd have to look up in Webster to know the**
9    **exact words, but to operate a car is to use a car or to**
10   **control a car, I guess.**
11   Q.   Okay.  Do you know what the word knowingly means?
12   **A.   Yes, I believe so.**
13   Q.   And what's your understanding of that word?
14   **A.   Again, I guess it depends on context, but I'm**
15   **aware of what's going on, I guess, would be knowingly**
16   **would be my first response.**
17   Q.   Yeah, so you can't mistakenly --
18   **A.   You have to have intent, I guess.**
19   Q.   You can't mistakenly do something, does that
20   sound accurate?
21   **A.   Yeah, that sounds right, although, again, I'd**
22   **have to consult, you know, Webster's to be sure.**
23   Q.   Sure.  So do you -- I assume you pay taxes, is
24   that a fair assumption?
25   **A.   Yes.  Yes, it is.**

39

1    Q.   Okay, one of the certainties in life.  So do you
2    know if you help a neighbor shovel their snow several
3    times over the winter and they pay you $300 in cash, do
4    you need to report that on your taxes?
5    **A.   I have no idea.  I would think so but I don't**
6    **know for sure.  I am not a tax professional.**
7    Q.   And if you donate a car, have you heard about you
8    can get a tax exemption for donating a car to charity?
9    **A.   I've never heard that, although I've seen the car**
10   **charities like a commercial for them on the television.**
11   Q.   Sure.  So do you know how to value -- how that
12   would be valued if you donate a car to charity?
13   **A.   I have no idea.**
14       MS. AUKERMAN:  Objection, lack of
15   foundation, lack of personal knowledge.
16   BY MR. JAMISON:
17   Q.   I didn't catch your answer.
18   **A.   I have no idea.**
19   Q.   Okay.  How would you find an answer to that
20   question?
21   **A.   I would either ask my CPA or I would go online**
22   **and do some research probably.**
23   Q.   And could you review the law, the tax law that
24   explains what's deductible?
25   **A.   I could, although I don't know that I would**

40

1    **understand it or I would trust my interpretation of it**
2    **since I'm not an attorney.  I would probably still**
3    **consult with my CPA.**
4    Q.   So talking about this car example, if tax law
5    allowed you to deduct the fair market value of a car
6    donated to charity how do you determine the fair market
7    value?
8        MS. AUKERMAN:  Objection, lack of
9    foundation, lack of personal knowledge.
10       THE WITNESS:  Yeah, I don't know.  I have no
11   idea.
12   BY MR. JAMISON:
13   Q.   Would you perhaps consult a CPA?
14   **A.   I would definitely consult a CPA.**
15   Q.   Do you know if the U.S. Department of Treasury
16   provides written guidance on how to arrive at the fair
17   market value of a car donated to charity?
18   **A.   No, I did not know that.**
19   Q.   Do you know if they have FAQs on their website?
20   **A.   I have no idea, I've never looked at it.**
21   Q.   Do you know if they have a hotline for taxpayers
22   to call in and ask what that provision in tax law means?
23       MS. AUKERMAN:  Objection, this hypothetical
24   is calling for speculation going really far afield of
25   anything related to the registry, Eric.

41

1    BY MR. JAMISON:
2    Q.   Would you say that -- or are you aware of a
3    website the Department of Treasury has that explains how
4    to calculate the fair market value of a car donated to
5    charity?
6    **A.   No, I was not aware of that or I did not know**
7    **that.**
8    Q.   Is a fair market value of a car, is that
9    subjective?
10       MS. AUKERMAN:  Objection, lack of
11   foundation, lack of personal knowledge.  I don't know
12   where you're going with this, Eric, but this is really
13   far afield of anything related to the registry so
14   continuing objection to this entire line of questioning.
15       MR. JAMISON:  Your objection is noted.
16       THE WITNESS:  Can you repeat the question?
17   BY MR. JAMISON:
18   Q.   Yeah, so is the fair market value, is that
19   subjective?
20   **A.   I have no idea.**
21       MS. AUKERMAN:  Objection, not relevant and
22   not likely to lead to discoverable evidence.
23   BY MR. JAMISON:
24   Q.   So if you ask three people what the fair market
25   value of a car is might you get three different answers?

42

1      MS. AUKERMAN:  Same objection.
2      THE WITNESS:  Yeah, I guess you might
3  depending on what they know about how to fair market
4  value a car.
5  BY MR. JAMISON:
6    Q.   And how would you -- if you're claiming or if you
7  donate a car to charity and you're claiming this on your
8  taxes how do you decide which value to use if you talk
9  to three people and they tell you three different
10  things?
11      MS. AUKERMAN:  Same objection, lack of
12  personal knowledge, not relevant, not likely to lead to
13  discoverable evidence.
14      THE WITNESS:  I have no idea.  Again, I
15  would ask my CPA to give me some direction on that.
16  BY MR. JAMISON:
17    Q.   So is it fair to say there's different ways to
18  arrive at fair market value?
19      MS. AUKERMAN:  Objection, misstates --
20  mischaracterizes what she stated.
21      THE WITNESS:  Yeah, I have no idea about how
22  to get to a fair market value of a vehicle.
23  BY MR. JAMISON:
24    Q.   So what do you think would happen if you valued a
25  1998 Honda Accord at $30,000 for a tax exemption?

43

1      MS. AUKERMAN:  Objection, calls for
2  speculation, not relevant, not likely to lead to
3  discoverable evidence.
4      THE WITNESS:  I have no idea.
5  BY MR. JAMISON:
6    Q.   Okay.  Do you think the IRS might have a problem
7  with that?
8      MS. AUKERMAN:  Objection, calls for
9  speculation, not relevant, not likely to lead to
10  discoverable evidence.
11      THE WITNESS:  Again, I have no idea.  I
12  don't know anything about this.
13  BY MR. JAMISON:
14    Q.   So are you familiar at all with the child tax
15  credit?
16      MS. AUKERMAN:  Objection, same objection.
17      THE WITNESS:  I've heard of it but I'm not
18  familiar with any of the specifics since I don't have
19  children.
20  BY MR. JAMISON:
21    Q.   So when you go to verify if you're unsure whether
22  or not you should report a phone number and you report
23  it to the law enforcement have you ever had them refuse
24  to take a phone number?
25    A.   Not that I can recall, no.

44

1    Q.   And to your knowledge are phone numbers or email
2  addresses posted on the public website?
3    A.   I'm not sure.
4    Q.   Do you think the sex offender registry protects
5  the public in any way?
6    A.   Do I think it does?
7    Q.   Yeah.
8    A.   No, because it doesn't actually show people who
9  are a risk and who are not, so I think it dilutes the
10  ability of it to protect the public.
11    Q.   How so?
12    A.   Because there are not any -- how do I put this?
13  I think you've lumped everybody in together without any
14  sort of actual assessment of their ongoing risk to the
15  community and so I think it makes it difficult for
16  people in the community to know who they need to watch
17  out for and who they don't or who is a danger and who is
18  not a danger.
19    Q.   Do you think that some people on the registry are
20  a threat to the public?
21    A.   I don't have specific knowledge of it so I'm not
22  sure but I imagine, yes.
23    Q.   Do you think the sex offender registry may
24  encourage victims to come forward?
25

45

1      (Whereupon Deposition Exhibit No. 2
2      marked for identification.)
3  BY MR. JAMISON:
4    A.   I'm not sure.  I think it depends on the victim.
5    Q.   So I want to spend some time looking at this
6  exhibit, which we'll call Exhibit 2, and can you read
7  your -- can you see this pretty well or do you need me
8  to zoom in any more?
9    A.   No, I think I can see it.
10    Q.   Okay.  So that row that's identified as one,
11  could you read that to yourself?
12    A.   Yes, I read it.
13    Q.   So if that perpetrator, that defendant, criminal
14  defendant, lived next door to you would you want to know
15  that they lived next door?
16    A.   I guess it would depend on the situation.  I
17  can't really speak to that just based off the
18  information that you've provided me.
19    Q.   What would it depend on?
20    A.   I think a lot of things, the circumstances of the
21  case, what the person has done since, if they've been
22  given a risk assessment that had some science based
23  information in it or measures in it, those would all be
24  things that I would want to know.
25    Q.   And if this criminal defendant, if he were the

46

1  soccer coach of a child that you cared about would you
2  want to know that this person was on the registry?
3  **A. I think it's the same answer, it would depend on**
4  **the circumstances, I think.**
5  Q. And can you explain a little bit more about that?
6  **A. I think just what I already said, the**
7  **circumstances of the case. And for me especially has**
8  **the state given him a risk assessment so that I as a,**
9  **you know, a community member can trust the information**
10 **that's being presented to me would be one of my**
11 **concerns. And if they continue to be a risk based on**
12 **these measures, then, yes, I would want to know but I**
13 **would want to see some kind of risk assessment to help**
14 **me make sense of the information.**
15 Q. So if this defendant in row one, if he were given
16 a risk assessment with a low value you wouldn't want to
17 know that they are living next door?
18 **A. No, that's not really any of my business.**
19 Q. And it wouldn't be important to you to know that
20 this person were a soccer coach for a child that you
21 cared about?
22 **A. Again, if they were low risk, is that what you're**
23 **saying?**
24 Q. Correct, yup.
25 **A. Yeah, no, I don't think I would.**

47

1  Q. And if this person were a babysitter for a child
2  that you cared about you wouldn't want to know their
3  history?
4  **A. Again, depending on the results of the risk**
5  **assessment, I don't think it's really -- I should know**
6  **every single person's history that comes in contact with**
7  **me, no.**
8  Q. On the sex -- have you looked at the public sex
9  offender registry?
10 **A. I have previously. I haven't -- I check for**
11 **myself regularly but I haven't looked at anyone else's**
12 **in quite a while.**
13 Q. So are you suggesting that you would want to have
14 the results of -- like individualized review on the
15 registry for people that were deemed to be high risk?
16 **A. No, what I'm saying is I think placing someone on**
17 **the registry should be based on the ongoing risk.**
18 Q. And then if you can look at row two, if you want
19 to read that to yourself.
20 **A. I read it.**
21 Q. Would you want to know this person's history
22 before you went on a date with them?
23 **A. Yes, I would.**
24 Q. Would you want to know if they lived next door to
25 you?

48

1  **A. If they continue to be a risk, yes, I**
2  Q. Would you want to know if they were a
3  schoolteacher?
4  **A. If they continue to be a risk, yes, I would.**
5  Q. Then if you could read row three.
6  **A. I've read it.**
7  Q. Would you want to know that person's history
8  before you went on a date with them?
9  **A. Yes, I would.**
10 MS. AUKERMAN: Okay, objection, relevance.
11 BY MR. JAMISON:
12 Q. Would you want to know if this person were
13 working at a care facility to treat patients
14 with -- that weren't at full mental capacity?
15 **A. Yes, I would, if they continue to be a risk.**
16 MS. AUKERMAN: Objection, relevance.
17 BY MR. JAMISON:
18 Q. Would you want to know if they lived next door?
19 MS. AUKERMAN: Objection, relevance.
20 THE WITNESS: If they continue to be a risk,
21 yes, I would.
22 BY MR. JAMISON:
23 Q. All right. Could you read information in row
24 four?
25 **A. I've read it.**

49

1  Q. Would you want to know this person's history
2  before you went on a date with them?
3  **A. If they continue to be a risk, yes, I would.**
4  Q. Would you want to know that information if they
5  were to be a teacher at a school where a child you cared
6  about attended?
7  **A. If they continue to be a risk, yes, I would.**
8  Q. Can you read the information in row five?
9  **A. I've read it.**
10 Q. If this person lived next door to you would you
11 want to know their history?
12 MS. AUKERMAN: Objection, relevance. Her
13 personal views about these issues are not relevant to
14 the case.
15 THE WITNESS: If they continue to be a risk,
16 yes, I would.
17 BY MR. JAMISON:
18 Q. And if you were in a dating relationship with
19 this person would you want to know?
20 MS. AUKERMAN: Objection, relevance.
21 THE WITNESS: If they continue to be a risk,
22 yes, I would.
23 BY MR. JAMISON:
24 Q. And if they were teaching at a school where a
25 child attended that you cared about would you want to

50

1  know?
2       MS. AUKERMAN:  Objection, relevance.
3       THE WITNESS:  If they continue to be a risk,
4  yes, I would.
5  BY MR. JAMISON:
6    Q.  And then can you read the information in row six?
7    A.  **Uh-huh, yes, I can.  I read it.**
8    Q.  Would you want to know if this person lived next
9  door?
10      MS. AUKERMAN:  Objection, relevance.
11      THE WITNESS:  If they continue to be a risk,
12  yes, I would.
13  BY MR. JAMISON:
14   Q.  Ms. Roe, you have to give Miriam time to object,
15  again, you're talking over each other.  She's probably
16  going to object to every question I ask you here so you
17  have to give her a minute to object before you answer so
18  we can get a clean record.
19   A.  **Okay, sorry.**
20   Q.  Would you want to know if this person were a
21  potential babysitter for a child you cared about?
22      MS. AUKERMAN:  Objection, relevance.
23      THE WITNESS:  If they continue to be a risk,
24  yes, I would.
25  BY MR. JAMISON:

51

1    Q.  Would you want to know if they were applying for
2  a job at a summer camp caring for children?
3       MS. AUKERMAN:  Objection, relevance.
4       THE WITNESS:  If they continue to be a risk,
5  yes, I would.
6  BY MR. JAMISON:
7    Q.  Can you read the information in row seven?
8    A.  **I've read it.**
9    Q.  Would you want to know if this person lived next
10  door to you?
11      MS. AUKERMAN:  Objection, relevance.
12      THE WITNESS:  If they continue to be a risk,
13  yes, I would.
14  BY MR. JAMISON:
15   Q.  Would you want to know if they were in some sort
16  of role with responsibility over children?
17   A.  **If they continue to be --**
18      MS. AUKERMAN:  Objection, relevance.
19      THE WITNESS:  If they continue to be a risk,
20  yes, I would.
21  BY MR. JAMISON:
22   Q.  Read the information in row eight.
23   A.  **I read it.**
24   Q.  And would you want to know if this person lived
25  next door to you?

52

1    A.  **If they continue to be a risk, yes, I would.**
2       MS. AUKERMAN:  Objection, relevance.
3  BY MR. JAMISON:
4    Q.  Would you want to know if this person were in a
5  job or in a position with responsibility over children?
6       MS. AUKERMAN:  Objection, relevance.  Again,
7  her personal views about who should or shouldn't be on
8  the registry are irrelevant to the case.
9       THE WITNESS:  If they continue to be a risk,
10  yes, I would.
11  BY MR. JAMISON:
12   Q.  Will you read row number nine?
13   A.  **I read it.**
14   Q.  Would you want to know that information before
15  you went on a date with someone, with this criminal
16  defendant?
17      MS. AUKERMAN:  Objection, relevance.
18      THE WITNESS:  If they continue to be a risk,
19  yes, I would.
20  BY MR. JAMISON:
21   Q.  And if they had a job or responsibility with --
22  or a position with responsibility over children would
23  you want to know?
24      MS. AUKERMAN:  Objection, relevance.
25      THE WITNESS:  If they continue to be a risk,

53

1  yes.
2  BY MR. JAMISON:
3    Q.  And can you read row ten?
4    A.  **I read it.**
5    Q.  Would you want to know if that person lived next
6  door to you?
7       MS. AUKERMAN:  Objection, relevance.
8       THE WITNESS:  If they continue to be a risk,
9  yes, I would.
10  BY MR. JAMISON:
11   Q.  Would you want to know if they worked in some
12  sort of job treating individuals with drug addiction?
13      MS. AUKERMAN:  Objection, relevance.
14      THE WITNESS:  If they continue to be a risk,
15  yes, I would.
16  BY MR. JAMISON:
17   Q.  Can you read row 11?
18      MS. AUKERMAN:  I'm going to object to this
19  line of questioning.  This is harassing and
20  retraumatizing to the witness and I'd ask that you cease
21  this line of questioning.
22      MR. JAMISON:  Yeah, your objection is noted.
23  I mean your case hinges on recidivism, reading quotes
24  from cases -- we're going to continue the questioning.
25      MS. AUKERMAN:  It's harassment of the

54

1  witness and it's traumatization, so I'm going to object
2  to this line of questioning.
3      MR. JAMISON:  Your objection is noted.
4      THE WITNESS:  I've read it.
5  BY MR. JAMISON:
6      Q.  Would you want to know if that person lived next
7  door to you?
8      A.  If they continue --
9      MS. AUKERMAN:  Objection.
10     THE WITNESS:  If they continue to be a risk,
11 I'm sorry.
12     MS. AUKERMAN:  I'm restating my prior
13 objections.
14 BY MR. JAMISON:
15     Q.  Would you want to know if they had some sort of
16 position with responsibility over children?
17     MS. AUKERMAN:  Same objections.
18     THE WITNESS:  If they continue to be a risk,
19 yes.
20 BY MR. JAMISON:
21     Q.  Could you read row 12?
22     A.  I read it.
23     Q.  Would you want to know if that person lived next
24 door to you?
25     MS. AUKERMAN:  Objection.  Same objection.

55

1      THE WITNESS:  If they continue to be a risk,
2  yes, I would.
3  BY MR. JAMISON:
4      Q.  Would you want to know if they had responsibility
5  or a position with responsibility over children?
6      MS. AUKERMAN:  Same objections.
7      THE WITNESS:  If they continue to be a risk,
8  yes, I would.
9  BY MR. JAMISON:
10     Q.  Can you read row 13?
11     A.  I read it.
12     Q.  Would you want to know if that person lived next
13 door to you?
14     A.  If they continue to be a risk, yes, I would.
15     MS. AUKERMAN:  Same objections.
16 BY MR. JAMISON:
17     Q.  Would you want to know if they had responsibility
18 over children?
19     MS. AUKERMAN:  Same objections.
20     THE WITNESS:  If they continue to be a risk,
21 yes.
22 BY MR. JAMISON:
23     Q.  Would you want to know if they were a co-worker
24 of yours?
25     MS. AUKERMAN:  Same objections.

56

1      THE WITNESS:  If they continue to be a risk,
2  yes.
3  BY MR. JAMISON:
4      Q.  Would you want to know if it's someone that you
5  were dating?
6      MS. AUKERMAN:  Same objections.
7      THE WITNESS:  If they continue to be a risk,
8  yes.
9  BY MR. JAMISON:
10     Q.  Read row 14.
11     A.  I've read it.
12     Q.  Would you want to know this person's history
13 before you went on a date with them?
14     MS. AUKERMAN:  Same objections.
15     THE WITNESS:  If they continue to be a risk,
16 yes.
17 BY MR. JAMISON:
18     Q.  Would you want to know if they have
19 responsibility over children?
20     MS. AUKERMAN:  Same objection.
21     THE WITNESS:  If they continue to be a risk,
22 yes.
23 BY MR. JAMISON:
24     Q.  Would you want to know if they were a co-worker?
25     MS. AUKERMAN:  Same objections.

57

1      THE WITNESS:  If they continue to be a risk,
2  yes.
3      MS. AUKERMAN:  I'll ask -- these all have
4  been asked -- I mean these are effectively the same
5  questions over and over again, asked and answered.
6  BY MR. JAMISON:
7      Q.  So maybe we can shorten this up a little bit.  So
8  these 14 cases we've read, do you have an opinion on
9  whether these people would be more likely than someone
10 who's never been convicted of criminal sexual conduct of
11 committing another sex offense?
12     MS. AUKERMAN:  Objection, lack of personal
13 knowledge, lack of foundation.
14     THE WITNESS:  Yeah, I don't have any
15 expertise in that.
16 BY MR. JAMISON:
17     Q.  I'm sorry, I didn't hear you.
18     A.  I don't have any expertise in that, I'm sorry.
19 Yeah, I have no idea what the criteria would be so I
20 can't answer that.
21     Q.  I'm not asking for your expertise, I'm just
22 asking you've read, you know, snippets from these 14
23 cases, in your human experience would you think that
24 these 14 criminal defendants would be more likely than
25 someone who's only ever gotten a speeding ticket to

58

1  commit another sex offense?
2      MS. AUKERMAN:  Objection, calls for
3  speculation, lack of personal knowledge, lack of
4  expertise, lack of foundation.  She can't answer that.
5      THE WITNESS:  I don't know.
6  BY MR. JAMISON:
7      Q.  So do you think that the criminal defendants in
8  these cases committed one sex offense and never
9  committed another sex offense?
10      MS. AUKERMAN:  Objection, calls for
11  speculation, lack of personal knowledge, lack of
12  foundation.  She can't speculate about something she
13  doesn't know.
14      THE WITNESS:  Yeah, I don't know.  I have no
15  idea.
16  BY MR. JAMISON:
17      Q.  You have no opinions?
18      A.  About this?  No, I don't have enough information
19  to have an opinion, I don't think.
20      Q.  What additional information would you need?
21      A.  Some understanding of what the criteria is, some
22  understanding outside of just the details of the case, I
23  would imagine, to make any kind of speculation like
24  that.
25      Q.  What sort of additional details?

59

1      A.  I'm not even sure what else I would need because
2  I know so little about it, quite honestly.  But what I
3  do know is that the information provided isn't enough
4  for me to make that kind of guess.
5      Q.  And your answer to a lot of these were, you know,
6  you'd want to know if they continue to be a risk.  How
7  would someone know whether a criminal defendant who
8  sexually assaulted someone is going to continue to be a
9  risk?
10      A.  I don't have any expertise in that but I imagine
11  there are people out there who do know better than I do.
12      Q.  And could those conclusions be wrong?
13      MS. AUKERMAN:  Objection, calls for
14  speculation, lack of personal knowledge, lack of
15  foundation, lack of expertise.
16      THE WITNESS:  I don't know enough about it
17  to know.
18  BY MR. JAMISON:
19      Q.  Sure.  So you treat patients, though, that are
20  trying to overcome substance abuse; is that right?
21      A.  Uh-huh, that's correct.
22      Q.  Do you have any tools that will predict whether
23  or not they'll be successful in overcoming their
24  addiction?
25      A.  Uh-huh, yeah, we have some -- I don't know the

60

1  word I'm looking for, but some idea and some things that
2  we can use to determine if someone is going to relapse
3  or not.
4      Q.  And how accurate are those?
5      MS. AUKERMAN:  Eric, if you're going to not
6  use the exhibit could you minimize the screen so that we
7  can see the witness?  Thank you.
8  BY MR. JAMISON:
9      Q.  How accurate are those tools?
10      A.  I don't -- you know, I didn't create the tools or
11  study the tools, I can't really speak to their accuracy.
12      MS. AUKERMAN:  Objection, relevance.
13  BY MR. JAMISON:
14      Q.  Have you had patients who you thought would be
15  successful in overcoming their addiction and ultimately
16  they weren't?
17      A.  I have.
18      Q.  All right, if you can read row 16.
19      A.  I've read it.
20      Q.  Would you like to know if that person lived next
21  door to you?
22      MS. AUKERMAN:  Same objections.
23      THE WITNESS:  If they continue to be a risk,
24  yes, I would.
25  BY MR. JAMISON:

61

1      Q.  And how would you know if this person would
2  continue to be a risk?
3      A.  Again, I don't have any expertise in that to
4  know.
5      Q.  So can you explain a little more by what you mean
6  that if they continue to be a risk?
7      A.  If they continue to be a -- if the state has
8  determined that they continue to be a risk to us or the
9  people around them because that is the whole point of
10  the registry, right?
11      Q.  And how often would, in your view, would the
12  state have to reevaluate someone to figure out if they
13  continue to be a risk?
14      A.  I don't have enough information to even answer
15  that or --
16      Q.  Do you think someone's risk level may change with
17  their age?
18      A.  I think it's a possibility.
19      MS. AUKERMAN:  Objection.
20      THE WITNESS:  Sorry.
21      MS. AUKERMAN:  Yeah, lack of foundation,
22  lack of personal knowledge, lack of expertise, calls for
23  speculation.
24      THE WITNESS:  I think it's a possibility,
25  although, again, I don't have enough expertise to speak

62

1  to it.
2  BY MR. JAMISON:
3  **Q.**  Do you think someone's risk could go up over
4  time?
5          MS. AUKERMAN:  Calls for speculation, lack
6  of expertise, lack of personal knowledge, lack of
7  foundation.
8          THE WITNESS:  Yeah, I don't know, I don't
9  have enough expertise.
10 BY MR. JAMISON:
11 **Q.**  All right.  Could you read row 17?
12 **A.  I've read it.**
13 **Q.**  Would you want to know if they lived next door to
14 you?
15         MS. AUKERMAN:  Objection, same objections.
16 (Interruption in transmission.)
17         MR. JAMISON:  Did she freeze?
18         MS. AUKERMAN:  Maybe.  Eric, how long is
19 this going to go on?  I mean this line of questioning is
20 completely irrelevant and it's not likely to lead to
21 relevant or discoverable evidence, it's badgering the
22 witness, it's argumentative.
23         MR. JAMISON:  Your objection's noted.
24         MS. AUKERMAN:  How long is it going to go
25 on?

63

1          MR. JAMISON:  I'm not sure.
2          MS. AUKERMAN:  Do you intend to do this in
3  other depositions as well?
4          MR. JAMISON:  We haven't decided.
5          THE WITNESS:  Can you repeat the -- am I
6  supposed to be answering a question?  I don't remember
7  what the question was, I'm sorry.
8          MS. AUKERMAN:  I think you froze for a
9  moment.
10 BY MR. JAMISON:
11 **Q.**  Yeah, I think we're on row 17 there.  I believe
12 Miriam objected on the record and then the question was
13 left open about whether you'd want to know if the
14 criminal defendant in row 17 lived next door to you?
15         MS. AUKERMAN:  Objection.
16         THE WITNESS:  If they continue to be a risk,
17 yes, sure.
18 BY MR. JAMISON:
19 **Q.**  If you want to read row 18.
20 **A.  I've read it.**
21 **Q.**  Would you want to know if that person lived next
22 door to you?
23 **A.  If they continue to be a risk.**
24         MS. AUKERMAN:  Same objection.
25         THE WITNESS:  Sorry, if they continue to be

64

1  a risk, yes, I would.
2  BY MR. JAMISON:
3  **Q.**  And would you want to know that information
4  before you went on a date with them?
5          MS. AUKERMAN:  Same objections.
6          THE WITNESS:  If they continue to be a risk,
7  yes, I would.
8  BY MR. JAMISON:
9  **Q.**  And read 19.
10 **A.  I've read it.**
11 **Q.**  Would you want to know if that person lived next
12 door to you?
13         MS. AUKERMAN:  Same objection.
14         THE WITNESS:  If they continue to be a risk,
15 yes, I would.
16 BY MR. JAMISON:
17 **Q.**  Would you want to know if they were in a position
18 with responsibility over children?
19         MS. AUKERMAN:  Same objection.
20         THE WITNESS:  If they continue to be a risk,
21 yes.
22         MS. AUKERMAN:  Eric, can you provide us with
23 a version of this document, please?
24         MR. JAMISON:  Yup.
25         MS. AUKERMAN:  Can you have someone send

65

1  that to us at this point?
2          MR. JAMISON:  No.
3  BY MR. JAMISON:
4  **Q.**  Can you read row 20?
5          MS. AUKERMAN:  I think we need to take a
6  break at this point.
7          MR. JAMISON:  Okay, how much of a break do
8  you need?
9          MS. AUKERMAN:  Probably like 15 minutes.
10         MR. JAMISON:  Okay, see you back about a
11 little after 3:30.
12 (A recess was taken.)
13         MR. JAMISON:  Let's go back on the record.
14 BY MR. JAMISON:
15 **Q.**  So, Ms. Roe, is it fair to say that your answer
16 to these questions about whether or not you'd want to
17 know if someone that was convicted of criminal sexual
18 conduct if they lived next door or if they worked with
19 children or if they were a co-worker, that your answer
20 would basically be the same, that if they continue to be
21 a risk you'd want to know?
22 **A.  Correct.**
23 **Q.**  Okay.  Have you ever contacted a member of the
24 Michigan legislature to inquire about changing the sex
25 offender registration law?

66

1    A.   I don't think I've ever contacted them.  I have
2  testified at like a congressional hearing or something
3  in Lansing regarding this issue, but I don't think that
4  I've ever individually wrote to anyone, not that I can
5  recall.
6    Q.   Okay.  And are you aware that the legislature has
7  the power to change the law?
8    A.   No, I was not aware of that.
9    Q.   Do you know who writes laws?
10   A.   No, I have no expertise in this.  I'm not quite
11 sure.
12   Q.   Were you aware that Michigan recently passed a
13 clean slate law; have you ever heard of that?
14   A.   No, I have not.
15   Q.   Do you know whether Governor Whitmer has the
16 power to change the sex offender registration law?
17   A.   I do not know.
18   Q.   Do you know whether Colonel Gasper, the head of
19 the MSP, has the power to change the sex offender
20 registration law?
21   A.   I don't know.  I don't believe so.
22   Q.   Do you know that under the old law you had to
23 make certain changes to your information in person?
24   A.   Yes, I did know that.
25   Q.   And are you aware that under the new law you can

67

1  make some of those changes via mail?
2    A.   I wasn't until recently but I am now.
3        (Whereupon Deposition Exhibit No. 3
4        marked for identification.)
5  BY MR. JAMISON:
6    Q.   All right.  I'm going to share my screen again, I
7  think we're on Exhibit 3, can you see my screen now?
8    A.   I can.
9    Q.   So this is MCL 750.145a entitled accosting,
10 enticing, or soliciting a child for immoral purposes; do
11 you see that?
12   A.   I do.
13   Q.   Have you read that law before?
14   A.   No, I haven't.
15   Q.   Do you see there's some sections there that are
16 highlighted, one of them is -- it says, with the intent
17 to induce or force that child or individual to commit an
18 immoral act; do you see that?
19   A.   I do.
20       MS. AUKERMAN:  I'm just going to object to
21 questions about this statute.  She's not a lawyer; she
22 lacks expertise, lacks foundation, lacks personal
23 knowledge.
24 BY MR. JAMISON:
25   Q.   Do you know what an immoral act is?

68

1    A.   Not according to the law I don't.
2    Q.   Do you know what gross indecency is?
3    A.   No, I don't.
4    Q.   Do you know what depravity or delinquency means?
5    A.   No, I do not.
6        MS. AUKERMAN:  Same objections.
7  BY MR. JAMISON:
8    Q.   Do you know whether you could be convicted of
9  this crime even if you didn't understand what those
10 specific terms meant?
11       MS. AUKERMAN:  Objection, lack of personal
12 knowledge, lack of expertise, lack of foundation, calls
13 for speculation.
14       THE WITNESS:  I do not.
15 BY MR. JAMISON:
16   Q.   So you don't know if you have to know what a
17 specific phrase means in a statute to be convicted?
18       MS. AUKERMAN:  Same objections, lack of
19 personal knowledge, not a lawyer, lack of foundation,
20 calls for legal conclusions.
21       THE WITNESS:  No, I don't.
22 BY MR. JAMISON:
23   Q.   Would you say that this law -- that the language
24 in the law is confusing?
25       MS. AUKERMAN:  Calls for a legal conclusion,

69

1  lack of knowledge, lack of foundation, lack of
2  expertise.
3        THE WITNESS:  I would say confusing to me as
4  someone with no legal expertise, yes.
5  BY MR. JAMISON:
6    Q.   Do you know how many criminal laws there are?
7    A.   I have no idea.
8    Q.   Do you know if the --
9        MS. AUKERMAN:  Eric, could you -- again,
10 when you're not using the exhibit could you go back to
11 full screen?  Thank you.
12 BY MR. JAMISON:
13   Q.   Do you know if the state police has a hotline
14 that citizens can call and ask what certain laws mean?
15   A.   I do not.
16   Q.   Do you know whether Governor Whitmer has some
17 sort of hotline that people can call and ask what
18 immoral act or gross indecency means?
19   A.   I do not.
20   Q.   Are you familiar with the OWI, what an OWI is,
21 operating under the influence?
22   A.   That's a drunk driving?
23   Q.   Yeah.  Do you know what the legal limit is in
24 Michigan?
25

**70**

1　　(Whereupon Deposition Exhibit No. 4
2　　marked for identification.)
3　BY MR. JAMISON:
4　　**A. I think it's .08, but I'm not sure about that.**
5　　Q. So I'm going to share my screen again. So do you
6　drink alcohol?
7　　　MS. AUKERMAN: Same objection to using an
8　exhibit with a statute that she's not familiar with,
9　calls for questions around legal conclusions, lack of
10　expertise, lack of foundation, lack of personal
11　knowledge.
12　　　MR. JAMISON: She lacks personal knowledge
13　about whether she drinks alcohol?
14　　　MS. AUKERMAN: I'm referring to the exhibit.
15　I suppose my objection should have been clearer, I'm
16　referring to the exhibit that you just posted.
17　　　MR. JAMISON: Okay.
18　BY MR. JAMISON:
19　　Q. So, Ms. Roe, do you drink alcohol?
20　　**A. Occasionally, yes.**
21　　Q. And do you have an understanding of what the
22　limitations are around drinking alcohol and driving?
23　　**A. A limited understanding, yes. Obviously not as**
24　**much as an attorney or an expert would have.**
25　　Q. Of course. What's your general understanding of

**71**

1　what the limitations are?
2　　**A. That you shouldn't drink and drive.**
3　　Q. Is it that you can't drink anything at all or you
4　can't drink over a certain amount?
5　　**A. You can't drink over a certain amount, although**
6　**how to tell that in the moment is pretty difficult so I**
7　**just tend to not drink and drive at all.**
8　　Q. Understood. So up on the screen, this is statute
9　MCL 257.625, do you see that?
10　　**A. Uh-huh, I do.**
11　　Q. And this is the motor vehicle code that basically
12　prohibits us, you know, people from driving while
13　intoxicated. So if you look at like paragraph B down
14　here, do you understand what that means?
15　　　MS. AUKERMAN: Same objections.
16　　　THE WITNESS: Yeah, I somewhat understand,
17　although, again, some of the language is pretty specific
18　and I don't really understand all of it. I understand
19　that you shouldn't be over .08. I don't really know
20　what that means exactly, though.
21　BY MR. JAMISON:
22　　Q. Sure. So if you were caught driving and you were
23　at .09 could you still be charged with a crime?
24　　**A. I believe so.**
25　　Q. And even if you didn't understand the specific

**72**

1　language here it's your understanding that you could
2　still be charged with a crime?
3　　**A. I imagine so, although, again, I'm not a lawyer**
4　**or an expert in this.**
5　　(Whereupon Deposition Exhibit No. 5
6　　marked for identification.)
7　BY MR. JAMISON:
8　　Q. Okay. So the next exhibit, I think we're on
9　Exhibit 4 or 5, in any event this is MCL 750.85, do you
10　see that?
11　　**A. I do.**
12　　　MS. AUKERMAN: Same objections to using a
13　statute to ask questions of the witness that call for a
14　legal conclusion, speculation, lack of personal
15　knowledge, lack of foundation.
16　BY MR. JAMISON:
17　　Q. So this is the torture statute, it uses a
18　language and it's highlighted here, cruel or extreme
19　physical or mental pain and suffering; do you see that?
20　　**A. I do.**
21　　Q. What does -- I guess if you asked ten therapists
22　what cruel or extreme mental pain and suffering meant do
23　you think that everyone would come up with the same
24　answer?
25　　**A. Probably not.**

**73**

1　　Q. Why not?
2　　**A. Because it's somewhat of a subjective term.**
3　　Q. And what do you think if you asked ten police
4　officers, would they come up with the same explanation
5　of what that means?
6　　**A. I'm not sure, I don't have any expertise, but I**
7　**would imagine they might come up with closer answers**
8　**since they do have the expertise and training that**
9　**therapists do not.**
10　　Q. Do you know what brutal, inhuman, sadistic, what
11　that means?
12　　**A. Yeah, I have a general view, although I don't**
13　**know the legal terminology. Sometimes I think the legal**
14　**words have a more specific meaning than what we**
15　**understand generally.**
16　　Q. And do you know if someone could be charged with
17　the crime of torturing if they met these elements here?
18　　　MS. AUKERMAN: Objection, calls for a legal
19　conclusion, it calls for speculation, lack of
20　foundation, lack of personal knowledge. She's not a
21　lawyer.
22　　　THE WITNESS: Yeah, I don't know, I don't
23　have legal expertise.
24　BY MR. JAMISON:
25　　Q. Okay. So I guess I think you said you got some

74

1  parking tickets or speeding tickets?
2      A.  Uh-huh.
3      Q.  Do you know what the Michigan vehicle code says,
4  the actual language that it says related to speeding?
5      A.  I have no idea.
6      Q.  But you've still been charged with a misdemeanor
7  or crime and gotten a ticket, correct?
8      A.  Yes, I was.
9      Q.  So you don't really have to have a full
10  understanding of what the law says to be subject to the
11  law; is that correct?
12          MS. AUKERMAN:  Objection, it misstates her
13  testimony, leading, calls for speculation, and lack of
14  foundation.
15          THE WITNESS:  I guess not, although, again,
16  I'm not sure because I'm not a lawyer or an expert in
17  this area.
18          MR. JAMISON:  Let's see, I think we're about
19  done.  Give me about two minutes to go off the record
20  and then we might be able to wrap this up, okay?
21          THE WITNESS:  Okay.
22      (Off the record.)
23          MR. JAMISON:  I think we're all set.
24          MS. AUKERMAN:  I just have a couple follow
25  up questions, give me just a minute.

75

1          First I want to just put a statement on the
2  record regarding the fact that we believe that the
3  conduct during this deposition was abusive and asked for
4  irrelevant information, that we are asking you by the
5  end of today to provide the document that you used to go
6  through with the witness where we had all the objections
7  about the abusive conduct towards the witness.  We're
8  asking you to provide us by the end of today, and if you
9  can't by then as soon as possible, whether you intend to
10  use the same abusive conduct with other witnesses, the
11  same abusive exhibit.
12          If you are not willing to agree not to do
13  that we're going to have to consider whether we will
14  produce the witnesses.  Since we have upcoming
15  depositions we need to know that as soon as possible,
16  we'd ask you to let us know as soon as possible so that
17  we can either move forward with the depositions as
18  scheduled or determine how we're going to proceed in
19  light of a line of questioning that we think is abusive
20  towards the witness.  So I just want to put that on the
21  record.
22          EXAMINATION
23  BY MS. AUKERMAN:
24      Q.  So, Ms. Roe, could you describe for us the impact
25  on you of being on the registry?

76

1      A.  Yeah, I think it's -- one, I just want to say I
2  think it's hard to capture the totality of the impact of
3  the registry on me, but it has affected almost every
4  area of my life, work, school, friends, relationships.
5  I think the biggest effect for me has been its impact on
6  my mental health over the years.
7      Q.  Can you say more about that?
8      A.  Yeah, I have been in therapy myself for post
9  traumatic stress disorder, which is tied to my presence
10  on the registry and tied to the changes in the law that
11  have occurred over the years that increasingly made the
12  registry worse for me.  And it has been a big
13  complicator, I guess is a good word, of my mental
14  health.  It seems like, you know, all the work that I've
15  done to rehabilitate myself to become an asset to the
16  people around me and then, you know, something will
17  change and I go from 25 years to life, for example, and
18  it just really negatively impacts me and my mental
19  health.
20      Q.  As a result of litigation that you were involved
21  in you for a period of time came off the public
22  registry; is that correct?
23      A.  Correct, yeah.
24      Q.  Can you tell us how you were affected by coming
25  off the public registry?

77

1      A.  Yeah, sure.  So it just opened up I think a lot
2  of opportunity in the future for me in a way that I
3  hadn't been able to see it before.  It was shortly after
4  I came off of the registry that I decided to open my own
5  practice, to move forward in private practice.  And my
6  mental health during the time that I was off the public
7  registry before this law was passed was the best that
8  it's been in the 20 years since I've been on the
9  registry.
10      Q.  And so you were able to open a practice as a
11  result of coming off the public registry; is that
12  accurate?
13      A.  Yes, correct.
14      Q.  And to be clear, although you're not on the
15  public registry you do have a criminal conviction,
16  correct?
17      A.  Correct.
18      Q.  But you had these opportunities -- even though
19  you still have a criminal record your life has changed
20  dramatically as a result of coming off the public
21  registry; is that fair to say?
22      A.  Yes, it's fair to say.
23      Q.  Are you aware that as a result of the new law you
24  may be put back on the public registry?
25      A.  Yeah, I'm aware.

78

1    Q.   And how has that knowledge impacted you?

2    A.   As soon as I found out, which was late 2020, I

3    believe, December 2020, if I'm remembering correctly, my

4    mental health deteriorated quickly after that.  My post

5    traumatic stress disorder got worse, I then looked for a

6    few therapists and finally found a good one in August of

7    2021 and I've been in therapy for chronic PTSD since

8    that time.  And I can just see a direct correlation

9    between, you know, realizing that this might happen

10   again to my mental health symptoms increasing.

11   Q.   Do you have concerns about not understanding your

12   obligations on the registry?

13   A.   Yeah, I have concerns.  I mean I think I'm an

14   intelligent person and I read, you know, I think that I

15   understand, but, again, the law has changed so often and

16   has been so broad that, you know, one of my anxieties or

17   one of my fears is that I'm going to inadvertently miss

18   something or do something and be charged again.

19   Q.   And if you don't report something you're supposed

20   to report, what are the consequences of that?

21   A.   I think I could be charged again, although I'm

22   not, again, completely sure.

23   Q.   And you could go to prison again?

24   A.   That's my fear, yeah.

25   Q.   You've worked with people who have criminal

79

1    records, correct?

2    A.   Correct.

3    Q.   How would you compare your experience on the

4    registry to that of people who have criminal records but

5    are not on the registry?

6    A.   It feels like night and day to me.  One of the

7    things that I noticed is that people with like a normal

8    criminal history, I guess so to speak, without the

9    registry are really able to just move on and

10   rehabilitate themselves in ways that I just have felt

11   like I can't.  Because I continue to have to, you know,

12   report because I'm publicly deemed a risk to my

13   community I think it's a stigma and a scarlet letter, so

14   to speak, that follows me in a way that a criminal

15   history would not.

16        And I think a big part of that is the fact

17   that, you know, all somebody has to do is Google you to

18   see if you're on a registry.  To find out if you have a

19   history it's a little bit more involved than that.  So I

20   think that, again, I just see -- you know, I've worked

21   with a lot of people, former drug addicts, you know,

22   people who have been in prison, all these kind of things

23   and the way that they are able to just kind of move on

24   and put whatever happened in the past in the past is

25   something that I wish I could do.

80

1        MS. AUKERMAN:  I don't have any further

2    questions.

3        MR. JAMISON:  Just one follow up question.

4        RE-EXAMINATION

5    BY MR. JAMISON:

6    Q.   So the victims of sexual abuse, are they able to

7    move on?

8    A.   I guess that would depend on the victim and the

9    circumstances.

10   Q.   Is it something that stays with some victims

11   throughout their life?

12   A.   Yes, it is something that stays with some people

13   throughout their life.

14        MR. JAMISON:  All right.  No further

15   questions.  And we'll send out the exhibits later today.

16   We'll try to have an answer for you later today or

17   tomorrow about the exhibit in future depositions.  I

18   suspect that we're going to have to have a call with the

19   court because I don't think we're going to agree to not

20   use this in any future depositions.  So perhaps we can

21   just try to reach out to Scott tomorrow, the court's

22   clerk, to figure out, you know, if the court can resolve

23   this for us quickly.

24        MS. AUKERMAN:  Okay.

25   (Whereupon Deposition concluded at 3:55 p.m.)

81

1    STATE OF MICHIGAN )
                       )  SS
2    COUNTY OF INGHAM  )

3        I, Melinda Nardone, Certified Shorthand

4    Reporter and Notary Public in and for the County of

5    Ingham, State of Michigan, do hereby certify that the

6    foregoing deposition was taken before me at the time

7    hereinbefore set forth.

8        I further certify that said witness was

9    duly sworn in said cause to tell the truth; that the

10   testimony then given was reported by me remotely to the

11   best of my ability; subsequently produced under my

12   direction and supervision; and that the foregoing is a

13   complete, true, and correct transcript of my original

14   shorthand notes.

15       IN WITNESS WHEREOF, I have hereunto set

16   my hand and seal this 23rd day of March, 2023.

17

18

19       _____

20       Melinda S. Nardone, CSR-1311,
         Certified Shorthand Reporter,
         and Notary Public, County
21       of Ingham, State of Michigan.
         My Commission Expires:  10-24-24

22

23

24

25