# Exhibit 64:

A.J. Deposition Transcript (redacted)

A.J.
May 11, 2023

1 (Pages 1 to 4)

**2**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE, on behalf of
themselves and all others similarly
situated,

        Plaintiffs,

vs.               Case No. 2:22-10209
                 Hon. Mark A. Goldsmith

GRETCHEN WHITMER, Governor of the
State of Michigan and COL. JOSEPH
GASPER, Director of the Michigan
State Police, in their official
capacities,

        Defendants.

_____/

DEPOSITION OF:  A.J.
LOCATION:       Remote Location
DATE:           Thursday, May 11, 2023
TIME:           9:00 a.m.

Taken remotely in the above-entitled cause, before
Stefanie S. Pohl, Certified Shorthand Reporter, CSR 5616,
and Notary Public for the County of Clinton.

**2**

APPEARANCES:

DAYJA S. TILLMAN, ESQUIRE
ACLU of Michigan
1514 Wealthy Street SE, Suite 260
Grand Rapids, Michigan 49506-2700
Appearing on Behalf of the Plaintiffs.

SYEDA F. DAVIDSON, ESQUIRE
American Civil Liberties Union of Michigan
2966 Woodward Avenue
Detroit, Michigan 48201-3035
Appearing on Behalf of the Plaintiffs.

SCOTT L. DAMICH, ESQUIRE
Assistant Attorney General
Michigan Department of Attorney General
State Operations Division
525 West Ottawa Street
P.O. Box 30754
Lansing, Michigan 48909-8254
Appearing on Behalf of the Defendants.

**3**

I N D E X

WITNESS:                        PAGE:
A.J.
Examination by Mr. Damich          4
Examination by Ms. Tillman        79
Further Examination by Mr. Damich  83

EXHIBITS:                MARKED:
Deposition Exhibit A           10
(Declaration)

Deposition Exhibit B           53
(Offender reporting document)
Deposition Exhibit C           58
(tax return)

Deposition Exhibit D           91
(table)

**4**

1                        Thursday, May 11, 2023
2                        8:58 a.m.
3                 Remote Videoconference
4                        **A. J.**
5  **a Witness herein, after having first been duly sworn**
6  **remotely, testified as follows:**
7                  **EXAMINATION**
8  BY MR. DAMICH:
9  Q  Good morning, sir.  My name is Scott Damich.  First of
10    all, thanks for taking the time this morning to speak
11    with me.  I'm an Assistant Attorney General with the
12    State of Michigan, and I represent Governor Whitmer and
13    Colonel Gasper.
14        And I Noticed your deposition in the case called
15    Does versus Whitmer, and it's case number 2:22-CV-10209
16    in the District Court in the Eastern District of
17    Michigan in front of the Honorable Judge Goldsmith.
18        There's also what's called a Protective Order in
19    place.  It's meant to protect your identity, and that
20    is found at ECF number 88.  It's page IV 2389-2395.
21    And, again, that protects your identity.
22        MR. DAMICH:  Madam Court Reporter, could you
23    please confirm that you have read the Protective Order
24    and signed the Acknowledgement?
25        COURT REPORTER:  Yes, I have.

A.J.
May 11, 2023

2 (Pages 5 to 8)

---

**5**

1     MR. DAMICH:  Okay.  Excellent.  Thank you.
2     And will counsel affirm that the person in
3 attendance is in fact Declaration A.J.
4     MS. TILLMAN:  I can confirm that this is A.J.
5     MR. DAMICH:  Thank you so very much.
6 Q  (By Mr. Damich)  Okay.  Sir, have you ever been deposed
7 before?
8 **A  I have not.**
9 Q  So a couple of things real quick.  First of all, you
10 heard me talk about a Protective Order and that's to
11 protect your identity.  I want to go over two things.
12 First, just the ground rules of a deposition, and which
13 will tie into the reason I bring up the Protective
14 Order.
15     What's going to happen today is I'm just going to
16 ask you a series of questions, just basically having a
17 conversation.  But during that conversation, I don't
18 want to elicit any responses from you that will in any
19 way be able to -- that someone could be able to read
20 this transcript and personally identify you.
21     I will do my best to craft my questions in a way
22 that won't elicit those type of answers from you.  But
23 to the extent that it does happen, I don't want you to
24 lose any sleep over it because myself and Dayja and
25 Syeda, we will actually go through the transcript to

---

**6**

1 confirm whether -- if there are no -- there's nothing
2 within the transcript that will divulge your identity.
3 So I don't want you to think that we're going to put
4 your name out there in the public sphere by any means.
5     Like I said, today is meant to be a conversation.
6 And what is different about this conversation than
7 normal conversations, of course, is that we have a
8 court reporter here copying down everything that we
9 say.  And that's important because it's what we say,
10 not what we do, in reaction to the question.
11     For example, if I ask you a yes, no question, and
12 the answer is yes, and you shake your head yes, the
13 court reporter can't pick up in her writing the shaking
14 up and down of yes.  So we need verbal responses.
15     Another thing is this:  I -- I'm guilty of this at
16 times and that's when I'll ask a question, and you'll
17 start to give an answer, and I'll talk over you.  I'm
18 going to do my best to not do that.  And I ask that you
19 do the same for me when I ask a question.
20     The reason being is that, again, back for courtesy
21 of the court reporter here, cross-talk is probably -- I
22 don't know first-hand, but I'm imagining it is a pain
23 to try to record down.  So we're going to do our best
24 to help out Stefanie here this morning and not do any
25 cross talk.

---

**7**

1     There's going to be some questions that I'll ask
2 that I'm sure there's going to be some objections made
3 by counsel here that's representing you.  Counsel will
4 make -- will make her objections, and then unless if
5 it's a claimed privilege, you still have to answer the
6 question.
7     Another thing, too, is that because I'm trying to
8 learn facts here, I'm not the expert of those facts,
9 you are.  So sometimes I might ask questions that make
10 zero sense to you.  Please don't guess what my question
11 is meant to get after.  Just say, Scott, I have no idea
12 what you meant by that question, could you please
13 rephrase.  You won't offend me, I promise you.  And,
14 I'll do my best to make sure to get the question in a
15 way that you understand.
16     With that said, if you answer a question that I ask
17 you, is it fair to say that you understood the
18 question?
19 **A  I guess I'll have to find out based on your questions.**
20 Q  There we go.  All right.  Makes sense.  But if you do
21 answer the question, I will assume that you understood
22 it.  Is that fair?
23 **A  That's fair.**
24 Q  Okay.  Makes sense.  I don't anticipate this deposition
25 taking too long, but it's also not meant to be a

---

**8**

1 marathon or a test of endurance by any means.  If you
2 need to take a break, if you -- just for a breather, if
3 you need to go to the bathroom, let me know, even if
4 it's five minutes from now.  That's fine.
5     The only caveat to that is that if I have a
6 question asked, that you answer the question before you
7 go ahead and part ways and we take our break.  Other
8 than that, I'm fine with however many breaks you want
9 to take.  Like I said, I don't anticipate this taking
10 too long this morning.
11     Are you taking any medication or on any substances
12 that will affect your memory or ability to testify
13 truthfully today?
14 **A  No.**
15 Q  Okay.  Is there anything else that might interfere with
16 your ability to answer questions truthfully and fully
17 today?
18 **A  No.**
19 Q  Where are you currently located, sir?
20 **A  On the Zoom call, you mean?**
21 Q  Sure.  How about this:  Are you in the State of
22 Michigan right now?
23 **A  Yes.**
24 Q  Okay.  Are you in the Eastern -- are you in the Lower
25 Peninsula?

---

PRS - Pohl Reporting Services
(517)243-2695

9

1  A  Southeast Michigan.
2  Q  Okay.  Southeast Michigan, the Detroit Metro area?
3  A  Yes.
4  Q  And it looks like you're in a car; is that correct?
5  A  That's correct.
6  Q  Are you parked at your residence or your workplace?
7  A  I'm parked -- I'm parked near my workplace.
8  Q  Okay.  Is your workplace close to where you live?
9  A  About 30, 45 minutes.
10  Q  Okay.  So same general geographical area?
11  A  Yes.
12  Q  Do you remember signing a document that appeared to be
13      a declaration for this case that we had mentioned?
14  A  A declaration -- I'm sorry, I don't understand your
15      question.
16  Q  Sure.  What I'll do is I'm going to go ahead and share
17      my screen real quick.  Okay.  If you let me know when
18      that shows up on your screen?
19  A  I see it, yes.
20  Q  Okay.  I'm scrolling down.  Do you recognize this
21      document?
22  A  Yes.
23  Q  Okay.  And could you describe what this document is?
24  A  It's just as you indicated, a declaration, you know,
25      based on, you know, my -- things that have occurred in

10

1      my life.
2          MR. DAMICH:  Okay.  Unless there's any
3      objection, I'd like to offer this as exhibit --
4      Deposition Exhibit A.
5          MS. TILLMAN:  No objection.
6          MR. DAMICH:  Thanks, Dayja.
7          (Whereupon Deposition Exhibit A was marked for
8          identification.)
9  Q  (By Mr. Damich)  Okay.  Back to the declaration here,
10      it talks about, under number one -- number one there,
11      it says -- the second sentence, it says:  I am 46 years
12      old and was convicted of using the Internet to commit a
13      crime in 2004.
14          Do you see that?
15  A  Yes.
16  Q  What crime did you use the Internet to commit?
17  A  I was engaged in a chat.
18  Q  Why was engaging in -- were you charged for simply
19      engaging in a chat?
20  A  I was charged with engaging in a chat with a minor.
21  Q  Okay.
22  A  Law enforcement.
23  Q  So you thought that it was a minor, but it was really
24      law enforcement?
25  A  I was communicating with law enforcement.

11

1  Q  When -- during the time you were communicating, did you
2      think that it was a minor you were communicating with?
3  A  I did not initially.
4  Q  Okay.  Did you at any point determine that it was a
5      minor?
6  A  Yes.
7  Q  At what point?
8  A  During the chat, it was disclosed.
9  Q  Did the chat happen just one day or was it over
10      multiple days?
11  A  Just one day.
12  Q  Okay.  And then after you learned that the individual
13      was a minor, did you stop the chat?
14  A  I did not.
15  Q  Okay.  What was the objective of the chat?
16  A  I do not recall all the details of the chat.  I recall
17      that I was in -- in an adult chat room, and a
18      conversation took place.  I don't remember all the
19      details.
20  Q  Do you remember asking if you would -- to meet up with
21      a minor?
22  A  That was part of the chat.  I don't recall who
23      initiated that.
24  Q  Okay.  Were there any images shared or anything?
25  A  I did not share any images.

12

1  Q  Did the minor?
2  A  They did not.
3  Q  And so there were charges that came out of this chat.
4      What were those charges, do you remember?
5  A  My conviction, using the Internet to commit a crime.
6  Q  Was the crime to solicit sex with a minor?
7  A  I'm not sure.  Based on my crime, I'm not sure if
8      that's exactly what the charge was for.  As I
9      indicated, it was a chat, and there was a meeting
10      place.  So I'm not sure if that's what the perspective
11      was or not, to solicit sex or not.
12  Q  Okay.  Is that the only time you used the chat room?
13  A  I don't understand your question.
14  Q  Sure.  Did you use -- did you use -- did you engage in
15      any chats before that chat that you -- the charges stem
16      from?
17  A  I had previous to that, yes.
18  Q  Okay.  And since -- since your conviction, have you
19      engaged in chats?
20  A  I have not.
21  Q  Have you used the Internet for sexual gratification at
22      all?
23  A  No.
24  Q  So throughout -- throughout today's conversation, I'm
25      going to be -- if it's fair to -- I believe you were

A.J.
May 11, 2023

13

1      convicted in, what, 2004, that's correct?
2   A  Yes.
3   Q  So we're going to talk -- if I refer to the Internet
4      sex crime conviction in 2004, is it fair that you'd
5      understand I'm speaking of your conviction in 2004?
6   A  Yes.
7   Q  Okay.  Before 2004, were you living in Michigan?
8   A  Yes.
9   Q  Were you -- where were you living, without a specific
10     address, were you in the same -- were you living in the
11     same location as you are now?
12  A  No.
13  Q  Where were you living?
14  A  I was living in ███████, Michigan.
15  Q  Okay.  So you were living in southeast Michigan?
16  A  Yes.
17  Q  And did you live in an apartment or a house?
18  A  House.
19  Q  And did you buy that house?
20  A  Yes.
21  Q  Okay.  And then, did you serve any jail time?
22  A  No.
23  Q  You were placed on probation, correct?
24  A  Yes.
25  Q  How long did you stay on probation?

14

1   A  Three years.
2   Q  Three years?  Okay.  And then, how long did you live in
3      that -- in that house?
4   A  I don't recall.  It was several years.
5   Q  Did you move after your conviction?
6   A  No.
7   Q  You moved before your conviction?
8   A  I'm sorry, I didn't understand the question.
9   Q  Sure.  Previously you had testified that you had --
10     before your conviction in 2004, you lived in a home
11     that you owned in southeast Michigan.  And I want --
12     and the question that I was asking, what I was seeking
13     to get from you is, after your conviction, did you stay
14     in that same house or did you move?
15  A  I stayed in the same house.
16  Q  Okay.  And are you still in that same house now?
17  A  No.
18  Q  And when did you move from -- when did you move from
19     the house that you were living in when you were
20     convicted, where did you move to?
21  A  I moved to ███████ Township.
22  Q  So you moved to southeast Michigan?
23  A  Yes.
24  Q  Did you -- did you purchase a home?
25  A  No.

15

1   Q  What -- did you rent?
2   A  Rent free.
3   Q  Rent free?  Could you explain that dynamic to me?
4   A  I was living with my parents.
5   Q  Why did you move from your house -- your previous house
6      into your parents' house?
7   A  Because I was terminated from my employer.
8   Q  And then -- so you lived with your parents.  How long
9      did you live with your parents?
10  A  I don't recall exactly how long it was.
11  Q  And then from your parents' house, where did you move
12     -- did you move somewhere after that?
13  A  Yes.
14  Q  And where did you move -- if you could do without
15     saying a township or county name, if you could just
16     say, general geographic location, using the cardinal
17     directions of the State of Michigan.
18  A  I was still in southeast Michigan.
19  Q  Was that a house or did you rent?
20  A  House.
21  Q  Did you purchase it?
22  A  Purchase.
23  Q  Okay.  Is that the current home you live in now?
24  A  Yes.
25  Q  Do you have an approximation of when you moved into

16

1      your current home, or how long you've lived at your
2      current home?
3   A  2014.
4   Q  So then just to make sure I have this -- this clear,
5      after you moved out from your parents' home, you then
6      purchased a home in southeast Michigan; is that right?
7   A  Yes.
8   Q  And that -- and then after that, you purchased yet
9      another home in southeast Michigan?
10  A  After I moved out, I purchased only one home in
11     southeast Michigan.
12  Q  Okay.  And that's your current home right now?
13  A  Yes.
14  Q  Okay.  Sounds good.  Sounds good.  Thank you.  Did you
15     finance that purchase?
16  A  Yes.
17  Q  Do you know an approximation of when you sold your
18     first home, the one you sold after your conviction?
19  A  I do not recall.
20  Q  After you sold your home, was it your plan to move in
21     with your parents?
22  A  It was a discussion, yes.
23  Q  Okay.  And then when you decided to move out of your
24     parents' home, did you -- did you look at a lot of
25     houses to purchase or did you find a house right away?

A.J.
May 11, 2023

17

1  **A   I did a search to find a home.  I didn't find one right**
2  **away.**
3  Q   Do you remember how long it took you to find a home?
4  **A   I do not recall.**
5  Q   Was it a few months?
6  **A   I mean, it -- the house took several months to -- to**
7  **build.**
8  Q   So you built a home?
9  **A   Yes.**
10 Q   Okay.  So when you were living with your parents, did
11    you ever seek to -- to move out before you decided to
12    purchase your home?
13 **A   I'm not sure I understand your question.**
14 Q   When did -- when did you decide to leave your parents'
15    house, and why?
16 **A   I mean, I knew I couldn't live there forever, so I, you**
17    **know, made a decision to purchase a home.**
18 Q   Okay.  And then you ultimately made a decision to
19    build, right?
20 **A   I made a decision to purchase a home.**
21 Q   Okay.  Then you said you built a home though, right?
22 **A   The home was new construction, yes.**
23 Q   So since your conviction date of 2004, is it fair to
24    say that you have found suitable housing?
25 **A   I mean, I financed housing by purchasing a home.**

18

1  Q   Is it fair to say that you did not struggle to find a
2     place to live because of your conviction?
3  **A   No.**
4  Q   Why not?
5  **A   Because prior to living at my parents' home, I was told**
6     **I could not rent on my own because of my sex offender**
7     **registry.**
8  Q   Did you attempt to rent from anywhere?
9  **A   I talked to several landlords that indicated I could**
10    **not because I'm on the registry.**
11 Q   Is it your understanding to get on the registry you
12    have to be convicted of a listed offense?
13          MS. TILLMAN:  Objection, requires a legal
14    conclusion.  You can still answer.
15          THE WITNESS:  Could you repeat the question?
16 Q   (By Mr. Damich)  Sure.  Is it your understanding that
17    you have to be convicted of an underlying offense to be
18    on sex offender registry?
19 **A   Yes.**
20 Q   So is it fair to say perhaps the individuals didn't
21    rent to you because of your conviction?
22 **A   I was told specifically if I'm on the registry, I would**
23    **not be able to rent.**
24 Q   Okay.  And those -- you were told by individual
25    landlords?

19

1  **A   Yes.  I disclosed that I was on the registry, and they**
2     **said I would not be able to rent.**
3  Q   You were looking for places to rent from while you were
4     still in your -- in the home that you had previously
5     owned, right?
6  **A   Yes.**
7  Q   Okay.  And then eventually you decided to go live with
8     your parents, correct?
9  **A   Yes.**
10 Q   Was there any -- was there a gap in time in there where
11    you didn't have a place to live?
12 **A   No.**
13 Q   Okay.  So I guess I go back to my -- my initial
14    question on why it would not be fair to say that you
15    found suitable living, despite your conviction in 2004?
16          MS. TILLMAN:  Objection, asked and answered.
17    But you can still answer.
18          THE WITNESS:  I'm sorry.  Can you repeat that
19    again?
20          MR. DAMICH:  Stefanie, can you read the
21    question back, please?
22          (Whereupon the question was read back by the
23          court reporter as requested.)
24          THE WITNESS:  I don't understand the
25    question.

20

1  Q   (By Mr. Damich)  Sure.  I guess I'm struggling to
2     understand at what point in time after 2004 conviction
3     that you did not have suitable living.
4  **A   It was a challenge to find living, and I ended up**
5     **moving in with my parents.**
6  Q   Okay.  And then while living with your parents, did you
7     apply for places to live before you decided to build
8     your own house
9  **A   No.**
10 Q   Approximately how many landlords did you talk to?
11 **A   I don't -- I do not recall.**
12 Q   Okay.  And these were all verbal communications?  There
13    were no written documentation saying that you can't
14    rent if you were on the sex offender list -- or
15    registration?
16 **A   Yes.**
17 Q   So they were all verbal communications, correct?
18 **A   Yes.**
19 Q   Okay.  Did you -- switching gears here.  Are you
20    married?
21 **A   Yes.**
22 Q   How long have you been married?
23 **A   Since 2019.**
24 Q   Do you have any children?
25 **A   Yes.**

A.J.
May 11, 2023

21

1  Q  How many?
2  A  Two.
3  Q  Are either of them minors?
4  A  Yes.
5  Q  How -- how -- what are their ages?
6  A  Three and 15.
7  Q  So both children are minors.  Okay.  So, is this your
8     first marriage or were you previously married?
9  A  Previously married.
10 Q  Okay.  And then when -- when did your previous marriage
11    end?
12 A  I believe 2010.
13 Q  Were you married at the time of your 2004 conviction?
14 A  I was not.
15 Q  And your 15-year old child, is that -- I'm assuming
16    that's from your prior marriage; is that correct?
17 A  Yes.
18 Q  The three-year old, is that from your current marriage?
19 A  Yes.
20 Q  Do you have custody over the -- over your older child?
21 A  Yes.
22 Q  Is it shared?
23 A  Yes.
24 Q  Okay.  And 50/50, or --
25 A  Yes.

22

1  Q  Do you have any siblings?
2  A  Yes.
3  Q  How many?
4  A  Three.
5  Q  And how about any nieces and nephews?
6  A  Yes.
7  Q  How many?
8  A  Four.
9  Q  All right.  Did you -- did you graduate from high
10    school?
11 A  No.
12 Q  You did not?  Okay.  What's the furthest level of
13    education that you have received?
14 A  Master's degree.
15 Q  If you don't mind, can we kind of walk through your
16    education history then?  I guess, let's go backwards.
17    When did you get your -- when did you get your master's
18    degree?
19 A  2007.
20 Q  Okay.  And what's your master's in?
21 A  Master of Science and Administration.
22 Q  Did you have a specific focus area?
23 A  Business administration.
24 Q  Did you obtain an undergrad degree?
25 A  Yes.

23

1  Q  What year was that?
2  A  I'm not sure exactly the year.  It was two or three
3     years prior to the graduate degree.
4  Q  So, you went right in order from your undergraduate
5     degree to your master's degree?
6  A  Yes.
7  Q  Where did you get your undergrad degree from?
8  A  Baker College.
9  Q  So you said you didn't graduate high school.  How did
10    you -- did you have any kind of education before you
11    went to Baker College?
12 A  I attended ITT Technical Institution.
13 Q  Do you remember what years those -- what year that was?
14 A  I do not recall.
15 Q  Do you remember if it was before or after 2004?
16 A  Before.
17 Q  Did you get a degree or certificate from ITT Tech?
18 A  Associate's degree.
19 Q  Okay.  And what was your associate's degree in?
20 A  Electronic engineering technology, I believe.
21 Q  Now, going back to your undergrad education, did you
22    intend -- attend in-person classes?
23 A  Yes.
24 Q  Same question for your master's degree:  Did you attend
25    in-person classes?

24

1  A  Yes.
2  Q  So even though you were convicted in 2004 of your
3     Internet sex crime, you were still able to obtain an
4     undergraduate degree and a master's degree after your
5     conviction, correct?
6  A  Yes.
7  Q  So with that in mind, has -- has being on the sex
8     offender registration -- sex offender registry impacted
9     your ability to achieve your education?
10 A  Thus far, no.
11 Q  What was -- I'm sorry.  What was your undergrad degree
12    in?
13 A  Business administration.
14 Q  Were you working at the time you were convicted -- when
15    you were convicted in 2004?
16 A  Yes.
17 Q  Where -- what type of work did you do in 2004?
18 A  Just counselor, like a student -- student aid
19    counselor.
20 Q  So, did you work for like a university?
21 A  A college.
22 Q  So you would oftentimes communicate -- in that role,
23    did you communicate directly with potential attendees
24    at the college you were working for?
25 A  Yes.

---

**25**

1  Q  And were a lot of those individuals under the age of
2  18?
3  A  No.
4  Q  Were they around between the ages of 18 and 20, I would
5  say?
6  A  I don't recall their ages.
7  Q  Then how long did -- how long did you have your job as
8  a student aid counselor?
9  A  I do not recall.
10  Q  Did you maintain your job after you were convicted?
11  A  No.
12  Q  When did you leave your job as -- as the counselor --
13  student aid counselor?
14  A  After the offense.
15  Q  Was it like the same month, year, years, do you have
16  any -- do you remember?
17  A  Same month.
18  Q  Same month?
19  A  Yes.
20  Q  Were you terminated?
21  A  Yes.
22  Q  And why were you terminated?
23  A  They were aware of everything that took place.
24  Q  Okay.  So you were -- you were -- is it fair to say you
25  were terminated because of your Internet sex crime?

---

**26**

1  A  Yes.
2  Q  When you did your undergrad work, were you a full-time
3  student?
4  A  Yes.
5  Q  So then, after you were terminated, did you -- did you
6  then decide to go to undergrad?
7  A  I do not recall.
8  Q  Do you remember how long it took you to complete your
9  undergrad degree?
10  A  Two years.
11  Q  Two years?  And did you go year-round?
12  A  Yes.
13  Q  Did you have a full-time job while you were a full-time
14  student -- full-time undergrad student?
15  A  I do not recall.
16  Q  You don't recall if you were employed during the time
17  of your education?
18  A  Throughout the undergrad and the graduate, or just --
19  Q  I'm happy you did -- I'm happy you asked that.  Yeah,
20  during your undergrad, just your undergrad.
21  A  I do not recall.  I'm not sure with the undergrad.
22  Q  Okay.  So then, I guess, how did -- how did you support
23  yourself financially then during your time of undergrad
24  during those two years?
25  A  My father supported me and helped me.

---

**27**

1  Q  So then, we're not sure whether or not you worked
2  during -- during your undergrad time period, which I
3  think -- would it be fair to say you were an undergrad
4  from, I think you said you went straight through from
5  undergrad to graduate school.  So is it safe to say
6  that you were an undergrad in, say -- from 2005 to
7  2007?
8  A  I don't -- I don't recall the undergrad, exactly what
9  the years are.  I do recall more of the graduate.
10  Q  Okay.  But during that two-year time period, we're not
11  sure whether or not you were employed, correct?
12  A  I do not recall.
13  Q  Do you remember trying to find employment during that
14  time period?
15  A  I do not recall.
16  Q  So then, now fast forwarding -- fast forward to your --
17  how about this:  What was the first job you had
18  post-conviction?
19  A  I -- yes, I did have a job post-conviction.  Are you
20  asking what year, or --
21  Q  If you can.  I mean, yeah, that would be great.  But,
22  just trying to kind of get a run down of the jobs you
23  had between -- between the date of conviction and
24  present day, so.  To the extent you -- I don't want you
25  to guess on dates, but if you can get me an

---

**28**

1  approximation, that would be greatly appreciated.
2  A  Yes.  It was either 2005 or 2006, I'm not sure exactly
3  what it is.  I don't want to --
4  Q  Sure.
5  A  -- commit to a year.  I'm not entirely sure, it was so
6  long ago.
7  Q  But you got a job, right?
8  A  Yes.
9  Q  Do you remember what the -- what the job was, what you
10  were hired to do?
11  A  Yes, it -- mortgage industry.
12  Q  What did you do for the mortgage industry?
13  A  I was a loan officer.
14  Q  Okay.  You're thinking that's some time like in the
15  2005, 2006 range?
16  A  If I had to take a guess, yes.
17  Q  Okay.  Do you remember if it was during your graduate
18  school education?
19  A  I believe during graduate school, yes.
20  Q  How long did you stay as a loan officer with this -- in
21  the mortgage industry?
22  A  I mean, I worked for several companies throughout my
23  career.  I'm currently in the mortgage industry.
24  Q  Uh-huh.
25  A  I want to say since 2005 to current.

A.J.
May 11, 2023

29

1  Q  So in 2005 to current, how many different employers
2     have you worked for?
3  A  **All together to current, four.**
4  Q  And all of those positions were within the mortgage
5     industry?
6  A  **Yes.**
7  Q  Safe to say -- is it fair to say since your conviction
8     in 2004, you've held five separate jobs within the
9     mortgage industry?
10 A  **I did not say five jobs.**
11 Q  Okay.  How many jobs have you had since your conviction
12    in 2004?
13 A  **Four.**
14 Q  Do you remember how long you stayed at your first job
15    post-conviction?
16 A  **I do not recall.**
17 Q  And why did you leave that job?
18 A  **I wanted to secure a better position with another**
19    **company.**
20 Q  And did you achieve that goal?
21 A  **I did.**
22 Q  And how long did it take you to achieve that goal?
23 A  **Well, the company that I moved up to, at the time --**
24    **now as I'm thinking, the company that I ended up moving**
25    **up to I believe was before I was convicted fully.  I**

30

1     **was going through the trial still, but, yes, I was able**
2     **to land that position with a larger company.**
3  Q  And how long did you stay with that company?
4  A  **I want to stay at least a year.**
5  Q  And so then they -- was -- the difference between that
6     job and the previous job, there was a pay increase?
7  A  **I wouldn't say a pay increase.  Just, you know, there**
8     **was more support to learn, you know, the industry.**
9  Q  Sure.
10 A  **As opposed to a smaller independent company.**
11 Q  Okay.  So you stayed there for a year.  Why did you
12    leave?
13 A  **They were bought out by another company.  I did not**
14    **leave, it was just -- it was bought out under another**
15    **name.**
16 Q  And then did you stay on board?
17 A  **Yes.**
18 Q  So then would -- did you -- would it be fair that then
19    you considered the person -- the entity that bought out
20    your second employer in this dialogue here would be
21    your third employer, three out of four employers we
22    talked about post-conviction?
23 A  **One, two -- yes, that would be the third.**
24 Q  Okay.  And there -- they were a mortgage company?
25 A  **Yes.**

31

1  Q  And how long were you with them?
2  A  **I do not recall.**
3  Q  Do you know if it was more than a year?
4  A  **Yes.**
5  Q  Was it less than five years?
6  A  **Yes.**
7  Q  And then why did you leave employment with that outfit?
8  A  **I was terminated.**
9  Q  When were you terminated?
10 A  **I do not recall the exact dates.**
11 Q  Do you know why you were terminated?
12 A  **Yes.**
13 Q  Why were you terminated?
14 A  **Because they found out I was on the sex offender**
15    **registry.**
16 Q  And then you had mentioned a fourth position.  How --
17    who is the fourth -- was the fourth employer also
18    within the mortgage industry?
19 A  **Yes.**
20 Q  How long of a gap between the job that terminated you
21    and the new position with a different mortgage --
22    different mortgage provider, was there, what was the
23    gap in time?
24 A  **I do not recall.**
25 Q  Was it -- do you know if it was more or less than a

32

1     month?
2  A  **I -- I'm not sure.**
3  Q  Do you know if it was more or less than a year?
4  A  **I do -- I do not recall.**
5  Q  Less than five years?
6  A  **I would say yes, less than five years.**
7  Q  Now, did you apply to this new position?
8  A  **I did not apply, no.**
9  Q  Then how did you obtain employment with this new
10    mortgage servicer?
11 A  **Are you referring to the company that bought out the**
12    **company that I was with?**
13 Q  No, the one after that.
14 A  **Oh, I -- okay.  I misunderstood.  So, the one after**
15    **that, you're not talking about where I'm at currently;**
16    **is that correct?**
17 Q  I don't think we got to that point yet.
18 A  **Okay.  Okay.  I just want to make sure.**
19 Q  That's fine, no.
20 A  **The one after that, I did apply.**
21 Q  Okay.  So you -- so after you -- so from the job that
22    you were terminated from, after you were terminated,
23    you -- you applied for your new position -- the --
24    another position, correct?
25 A  **So the one -- I'm getting a little confused.  I'm**

**33**

1    sorry.  So the one that was bought out, I was
2    grand-fathered in.
3  Q  Sure.
4  A  And then after I was terminated, I then applied for
5    another position with another company.
6  Q  There we go.  And that's the one I want to talk about
7    right now, the one you applied for after you were
8    terminated.
9  A  Yes.
10  Q  So you did apply for this -- you did apply for that
11    one, right?
12  A  Yes.
13  Q  And you obviously got hired, correct?
14  A  Yes.
15  Q  Did you let that mortgage servicer know about your
16    conviction?
17  A  They did not do a background check.
18  Q  How long did you work for that employer?
19  A  I would say two years or less.
20  Q  Why did you leave that employer?
21  A  I was also terminated.
22  Q  And why were you terminated?
23  A  The sex offender registry.
24  Q  After you were terminated from that position, did you
25    find employment?

**34**

1  A  No.
2  Q  So you're currently unemployed?
3  A  I am currently employed, yes.
4  A  Yes.
5  Q  Okay.  So then after -- I'll ask again:  After you were
6    terminated from your -- the previous job we just spoke
7    of, were you -- did you find employment anywhere else?
8  A  Yes.
9  Q  Where?
10  A  So there was -- there was -- there was a big gap.  So I
11    applied at other places and I was not offered the
12    position, but I am currently employed.
13  Q  How long have you been with your current employer?
14  A  12 years.
15  Q  So that -- so you started in 2011 with your current
16    employer; is that right?
17  A  Yes.
18  Q  Now, you talked about a large gap between your current
19    employment and your previous employment.  How large of
20    a gap was there?
21  A  I would say at least two years -- two to three years.
22  Q  What did you do during those two to three years?
23  A  I was on unemployment.
24  Q  And where were you living?
25  A  I was with my parents.

**35**

1  Q  Where did you find the money to build a home?
2  A  My current employer.
3  Q  So you built your current home while working for your
4    current employer?
5  A  Yes.
6  Q  Okay.  And so you -- is it fair to say -- if I remember
7    correctly you said you built your house in 2014; is
8    that right?
9  A  Yes.
10  Q  So then you lived with your parents for the -- maybe
11    three years while you worked for your current employer?
12  A  Yes.
13  Q  And you said during those -- you said during that gap
14    period you applied for positions.  Approximately how
15    many positions did you apply for?
16  A  Two.
17  Q  So over a two- to three-year period you only applied
18    for two positions?
19  A  Approximately, yes.
20  Q  And then your -- then your sole source of income was
21    unemployment?
22  A  Yes.
23  Q  The two positions that you applied for, did you get
24    interviewed?
25  A  Yes.

**36**

1  Q  Before you got interviewed, did the application ask
2    about any previous criminal history?
3  A  Yes.
4  Q  And did you answer truthfully on the application?
5  A  Yes.
6  Q  And they still gave you an interview?
7  A  Yes.
8  Q  And that's true for both potential employers that you
9    applied to?
10  A  I'm not sure about the other one, if -- I don't recall
11    the -- I recall one distinctively because I got a
12    notice that they decided not to hire me.  I don't
13    recall the other one, whether they interviewed me first
14    before answering the application, I do not recall.
15  Q  I got you.  And you said you received notice, was it --
16    was it a phone call, was it a written letter?
17  A  A written letter.
18  Q  Okay.  Do you still have a copy of the written letter?
19  A  I do not.
20  Q  Okay.  I mean, to the best of your recollection, do you
21    remember why they didn't hire you?
22  A  Because of the registry.
23  Q  Just to clarify, is it your understanding to be on the
24    registry, you have to actually be convicted of a sex
25    offense?

A.J.
May 11, 2023

---

37

1         MS. TILLMAN: Objection. Calls for legal
2    conclusions You can answer.
3         THE WITNESS: Yes.
4    Q  (By Mr. Damich) Over your last 12 years -- over your
5    last 12 years of employment with your current employer,
6    have you received pay increases?
7    A  No.
8    Q  You've stayed at the same current rate?
9    A  I'm in sales, so I don't --
10   Q  You're not salaried?
11   A  I'm not salaried.
12   Q  Got you. Did your -- did your prospects increase over
13   the years with your current employer? In other words,
14   were there better opportunities thrown your way to be
15   able to -- to be able to drum up more business over the
16   years?
17   A  I mean, I've created opportunities for myself.
18   Q  Sure. Have you -- have your responsibilities at your
19   current employer increased over the years?
20   A  I mean, I guess -- you know, with any company, you
21   know, there becomes increased responsibilities. I'm
22   not sure exactly what you're asking with that. Can you
23   be more specific?
24   Q  Sure. Of course, I don't know the -- you know, the
25   power structure, the dynamic of your current employer,

---

38

1    and I don't really want to jump into that. But, as far
2    as increased responsibility from a management
3    perspective, did you -- do you manage individuals, are
4    you considered a more senior member of the team, things
5    like that?
6    A  Yes. I am a senior member, you know, with my tenure
7    there.
8    Q  Uh-huh.
9    A  So if that's what you're asking, I -- I would say I am
10   a senior member due to my tenure.
11   Q  Sure. Are there any perks of being a senior member?
12   A  No.
13   Q  Is there increased responsibility of being a senior
14   member?
15   A  In some instances, yes.
16   Q  All right. Is it fair to say that you have stayed
17   gainfully employed since your 2004 conviction?
18   A  No.
19   Q  And can you tell me why you say no?
20   A  I was unemployed for two to three years.
21   Q  Okay. So for -- correct me if I'm wrong. It seems
22   like 21 of the 23 years post-conviction you've been
23   employed, right?
24   A  Yes.
25   Q  Okay. During the two to three years you weren't

---

39

1    employed, you only applied at two places, correct?
2    A  Yes.
3    Q  Okay. So was it the sex offender registry that
4    prevented you from only applying to two places during
5    those two to three years?
6    A  Yes.
7    Q  Okay. And that was the sole reason you didn't apply to
8    any other positions other than those two?
9    A  That was the reason why I was not able to gain
10   employment.
11   Q  Okay. But just for that two- to three-year period,
12   correct?
13   A  Yes.
14   Q  Has your status as a -- and your previous conviction of
15   an Internet sex crimes, and your status as a sex
16   offender registrant, has it impacted your current
17   employment at all over the last 12 years?
18   A  As a sex offender?
19   Q  Correct.
20   A  Yes.
21   Q  How?
22   A  I lost several opportunities with accounts that I work
23   with, Googling me, you know, knowing that I'm on the
24   registry. So I've lost opportunities there. I'm not
25   able to get to an executive position with the company.

---

40

1    I'm more of a -- on the sales floor, as opposed to an
2    executive position.
3         So it hindered me from promotion within the
4    company, as well as missed opportunities to grow, due
5    to, again, several accounts knowing that I'm on the
6    registry and not wanting to work with me.
7    Q  Despite not gaining those accounts, you're still
8    employed by your employer though, right?
9    A  Yes.
10   Q  On how many occasions do you think that has happened
11   over the 12 years that you know definitively that it
12   was because -- no one wants to do business with you
13   because of your prior convictions?
14   A  That I'm not aware of, I would say at least three.
15   Q  Okay. And how many sales have you made over your last
16   12 years?
17   A  I'm not sure I understand your question.
18   Q  Sure. So you said that your status as a sex offender
19   has impacted your relationship with at least three
20   opportunities, right?
21   A  Yes.
22   Q  So how many deals have you -- I guess, maybe the right
23   word would be -- to use here, or phrase, how many deals
24   have you closed over the past 12 years with your
25   current employer?

---

A.J.
May 11, 2023

41

1    A   Well, I don't close deals.  You know, I'm not consumer
2        facing, so I work with other independent companies
3        that, you know, send business over to us.  So these are
4        accounts that I work with that are not consumer facing.
5    Q   Okay.  So how many accounts have you successfully
6        handled over the past 12 years that you're currently --
7        at your current employer?
8    A   I don't -- I don't recall.  There's -- you know,
9        there's a mix up of accounts.  I mean, some I still
10       work with.  Some I still don't.  You know, some have
11       the ability to say, I don't want to work with this --
12       this guy, you know.  So it just -- there's a shake up.
13   Q   Sure.  How many accounts do you currently have right
14       now?
15   A   I would say about 20.
16   Q   Over the past 12 years, how many accounts have you had,
17       an approximation?
18   A   I don't recall.
19   Q   In the life span of an account, how long does that
20       usually last?
21   A   I mean, it can last for years.  There's really no
22       timeline.
23   Q   Sure.  So there's no way you could put an approximation
24       on how many accounts you say -- that you've touched
25       over the past five years?  We know you said 20 --

42

1        currently 20 accounts right now.  But over the past
2        five years, overall, can you give me an approximation
3        of how many accounts you've handled?
4    A   I -- I mean, I -- I don't know exactly.  I can't answer
5        that.
6    Q   Sure.  But like an approximation.  Is it more than 100?
7    A   I would say more than 100, yes.
8    Q   More than 200?
9    A   No.
10   Q   So it's fair to say that you've -- that you've handled
11       more than 100 accounts over the past five years,
12       correct?
13   A   That's -- that's a guess, but I'm not sure exactly what
14       it is.
15   Q   Okay.  And so you can only think of maybe three
16       situations where an account was lost because of your --
17       your status as a sex offender?
18   A   That's what I'm aware of that were brought to my
19       attention.  I've lost other opportunities that could
20       have been related, but was not presented to me.
21   Q   But you have not lost enough accounts for your current
22       employer to fire you, correct?
23   A   I'm not sure -- I'm not sure of -- if that is a merit
24       -- I'm not sure.  I mean, I'm still employed, so I'm
25       not sure if that -- the amount of accounts I lose would

43

1        be related to being terminated.
2    Q   Right.  You are in a senior position right now though,
3        right?
4    A   My title is a senior because of -- you know, how long
5        I've been there.
6    Q   So that's a yes, right?
7            MS. TILLMAN:  Objection.  Asked and answered.
8        You can answer.
9            THE WITNESS:  Can you give me more
10       clarification on -- on your question?
11   Q   (By Mr. Damich)  No, I think I got what I needed.
12       I want to go back -- you said you -- I said you're
13       still considered more of a -- you're still considered a
14       -- you still have a senior position, right?
15   A   It's a title due to my experience in the industry.
16   Q   Okay.  Is there a policy within your current employer
17       that you know of that you can't hold an executive
18       position if you have a prior felony?
19   A   I am not aware of a policy.
20   Q   Okay.  Have you ever asked anyone higher up on how you
21       could become more of an executive level position?
22   A   I did not specifically ask, but I was told by
23       executives that I know more on a personal level the
24       reason why I'm not.
25   Q   And these are executives within your current employer?

44

1    A   Yes.
2    Q   Have you ever put forth any effort to achieve an
3        executive position?
4    A   Yes.
5    Q   Okay.  What type of efforts have you put forth?
6    A   I mean, I've -- I have applied for positions within the
7        company.
8    Q   Executive level positions?
9    A   Yes.
10   Q   And did you get interviewed for those positions?
11   A   Yes.
12   Q   Was there a paper application before the interview?
13   A   No.
14   Q   Do you know why you didn't -- were you ever explained
15       why you didn't achieve the executive level position?
16   A   Just that there were other candidates that they
17       considered.
18   Q   So it had nothing to do with your status as a sex
19       offender?
20   A   The interviewer did not say that --
21           MS. TILLMAN:  Objection.
22           THE WITNESS:  -- specifically.
23           MS. TILLMAN:  I'm sorry, A.J.  I'm going to
24       just object to this question really quick because it
25       calls for speculation.  But you can keep answering.

A.J.
May 11, 2023

---

**45**

1      THE WITNESS:  The interviewer did not mention
2    that specifically.
3  Q  (By Mr. Damich)  Okay.  But you believe that's the
4    reason why?
5  A  I was told that, you know, that is the reason why I'm
6    not in an executive position.
7  Q  And you were told that by a current executive?
8  A  By a colleague.
9  Q  By a colleague?
10 A  Yes.
11 Q  And was that colleague a hire -- the hiring employee --
12   or hiring employer?
13 A  No.
14 Q  Were they the ones making the decision on whether or
15   not to give you the position?
16 A  No.
17 Q  Okay.  Again, you're still employed by this employer,
18   correct?
19 A  Yes.
20 Q  Okay.  Even though you -- even though you were
21   previously convicted of an Internet sex crime?
22 A  Yes.
23 Q  So then with all of that said, would you say that
24   having a -- an Internet sex crimes conviction has made
25   finding employment more difficult for you?

---

**46**

1  A  I wouldn't say the conviction.  I would say the actual
2    sex offender registry has a bad stigma to it.  And
3    that's precluded me from living a normal life.  You
4    know, it's made everything in my life very difficult.
5    A 20-year old conviction is very forgivable.
6      You know, people make mistakes, and the stigma is a
7    sex offender registry.  Right?  So that's current, my
8    picture is current.  Nobody wants to take liability for
9    that.  It's just -- it's a hindrance in everyone's
10   life, regardless of how long you've been on the
11   registry, and regardless of how long you've been
12   conviction-free, to redeem yourself.
13     So the sex offender registry has made my life
14   miserable.  It's not my conviction, it's my sex
15   offender registry is the issues that I'm having since
16   2004.
17 Q  Sure.  Okay.  So the question that I asked, I said --
18   the question was:  Would you say that having your --
19   your sex offense conviction has made finding employment
20   more difficult?
21 A  No.
22 Q  It has not?
23 A  No.
24 Q  Okay.  Thank you.  Do you do any extra curricular
25   activities outside of work?

---

**47**

1  A  I do not.
2  Q  Is that by choice?
3  A  That's by being restricted from the sex offender
4    registry.
5  Q  Okay.  What does the sex offender registry restrict you
6    from doing as far as an extra curricular aspect?
7  A  Well, I mean, you know, I have young kids.  It's hard
8    for me to participate in any sports, in any form of
9    coaching, you know, with my -- with my kids.  You know,
10   a lot of -- a lot of public places, whether it's, you
11   know, schools or -- a perfect example of, if I wanted
12   to participate in sports and coaching, I'm not able to
13   do that.
14 Q  Have you ever sought out the opportunity to do so?
15 A  I have, but I was told that since I'm on the registry,
16   I'm not able to.
17 Q  Do you belong to any social clubs?
18 A  No.
19 Q  Do you volunteer at all?
20 A  Not currently.
21 Q  Have you volunteered post-conviction?
22 A  I -- yeah, I volunteered at my church.
23 Q  Okay.  So what do you do with your spare time outside
24   of work?
25 A  I spend time with my family.

---

**48**

1  Q  So aside from the 2004 conviction, have you been
2    arrested or charged with any other crimes?
3  A  No.
4  Q  I want to go back to your conviction and dig in a
5    little deeper.  Do you remember what age you thought
6    the minor was that you were speaking to?
7  A  14.
8  Q  Did you ask the 14-year-old if -- the 14-year-old minor
9    if the minor would want to engage in sex with you?
10 A  I do not recall.
11 Q  Do you remember if you asked the 14-year-old minor to
12   engage in any kind of sexual activities with you?
13 A  I -- I don't recall the -- the chat details.
14 Q  Do you think a 14-year-old minor has the capacity to be
15   able to consent to sexual activity?
16     MS. TILLMAN:  Objection.  Foundation.
17   You can answer.
18     THE WITNESS:  I'm not sure.
19 Q  (By Mr. Damich)  You said you had a 15-year-old child,
20   right?
21 A  I have a 15-year-old child, yes.
22 Q  Do you think your 15-year-old is old enough to consent
23   to sex?
24 A  Based on what merit?  Is it their decision, my
25   decision?  I'm not sure.

---

**49**

1  Q  I'm just asking for your opinion.  Do you think a
2    15-year-old has the mental capacity to consent to sex
3    with an adult?
4        MS. TILLMAN:  Same objection.  Foundation.
5        THE WITNESS:  I mean, it's -- it's possible.
6  Q  (By Mr. Damich)  How is it possible?
7  **A**  **I mean, it's a decision that they make on their own.**
8  Q  The victim?
9  **A**  **You were asking about my 15-year-old son.**
10  Q  Okay.  Yeah, so we'll take it out of the more specific
11    context of your son, and we'll just talk about if a
12    14-year-old victim, overall; do you think a 14-year-old
13    has an ability to consent to sex with an adult?
14  **A**  **I'm not sure.  I'm not -- I'm not -- I don't know what**
15    **-- what they could consent to or what they will, or how**
16    **they make their decisions.  I'm not sure.**
17  Q  Do you think it's wrong for a 14-year-old to have sex
18    with an adult?
19  **A**  **I'm not sure how to answer that question.**
20  Q  I think it's a yes or no.  I mean, do you think it's
21    wrong for a 14-year-old to have sex with an adult?
22  **A**  **I mean, it depends.  It happens, it would be --**
23    **everyone has a different opinion on that.**
24  Q  What's your opinion on it?
25        MS. TILLMAN:  Objection.  Argumentative, and

**50**

1    asked and answered.  Go on.
2        THE WITNESS:  I don't have an opinion.
3  Q  (By Mr. Damich)  Would you be upset if your 15-year-old
4    child was having lewd conversations over the Internet
5    with a 27-year-old?
6  **A**  **It depends on, you know, what the conversation was.**
7  Q  A lewd conversation.
8        MS. TILLMAN:  Objection, calls for a
9    hypothetical.  You can answer.
10        THE WITNESS:  It depends.  I can't say yes or
11    no.  Just depends on the nature of the conversation
12    exactly.
13  Q  (By Mr. Damich)  Sir, if the general nature of the
14    conversation was a 27-year-old reaching out to your
15    15-year-old child to solicit sex, would that make you
16    upset?
17        MS. TILLMAN:  Same objection.  Asked and
18    answered.  Argumentative, but you can answer.
19        THE WITNESS:  I mean, I would be concerned.
20    Again, it depends on the nature of the conversation.
21  Q  (By Mr. Damich)  Okay.  And because of your conviction,
22    you were required to register for 25 years, correct?
23        MS. TILLMAN:  Calls for a legal conclusion --
24    excuse me -- objection.  Calls for a legal conclusion.
25        You can answer.

**51**

1        THE WITNESS:  I'm a Tier Two currently, sex
2    offender, and that requires 25 years.
3  Q  (By Mr. Damich)  And how often do you have to update
4    your information, do you know?
5  **A**  **Yes.  I have to report twice a year.**
6  Q  And then do you update in person?
7  **A**  **Yes.**
8  Q  Okay.  And where do you go to do that?
9  **A**  **The police station.**
10  Q  And how far away is the police station from your home?
11  **A**  **About five minutes.**
12  Q  Since March 2021, how many times have you had to make
13    changes to your information?
14  **A**  **Several times.**
15  Q  Could you give me an approximation?
16  **A**  **I do not recall.**
17  Q  Okay.  When you made those changes, did you do them in
18    person?
19  **A**  **Yes.**
20  Q  Okay.  How long did you -- do you typically spend at
21    the police station whenever you are making those
22    changes?
23  **A**  **45 minutes to an hour.**
24  Q  So is it fair to say that each year, you go twice a
25    year, and you spend 45 minutes to an hour each time.

**52**

1    So about two hours out of the year you spend
2    registering?
3  **A**  **So, yeah, about four to five hours a year.**
4  Q  Does that include travel time and everything, like
5    preparation, filling out the form work, all that stuff?
6  **A**  **Yes.**
7  Q  Okay.  I'm going to go ahead and share -- I've been
8    sharing it for a while, sorry about that.  I didn't
9    take that down.  I'm going to go ahead and share my
10    screen again, and bring up something different this
11    time.
12      Do you see the document?
13  **A**  **Yes.**
14  Q  Do you recognize this document?
15  **A**  **I may have seen the document.  It throws me off that it**
16    **says mail-in update.**
17  Q  Right.  Just by looking at this document, is this some
18    of the typical information that you have to report
19    twice a year?
20  **A**  **Yes.**
21        MR. DAMICH:  Unless there's an objection, I'd
22    like to offer this as Deposition Exhibit B.
23        MS. TILLMAN:  No objection.
24        MR. DAMICH:  Thank you, Dayja.
25    ///

A.J.
May 11, 2023

---

53

1          (Whereupon Deposition Exhibit B was marked for
2          identification.)
3  Q   (By Mr. Damich)  Okay.  Back to the document we're
4      looking at, is it -- looking at the -- at Roman
5      Numeral I, where it says, offender information, is
6      there anything under that section that is confusing to
7      you?
8  A   Temporary resident information.
9  Q   Just Roman Numeral I, don't worry about going -- we're
10     going to go through each of these.
11 A   Oh, okay.  I understand that -- that section.
12 Q   Okay.  So you understand what information is called for
13     under Roman Numeral I, correct?
14 A   Yes.
15 Q   Okay.  Moving on to Roman Numeral II, where it says
16     temporary residence information, is there anything in
17     that area that you find confusing?
18 A   No.
19 Q   Moving on to Roman Numeral III, where it says, contact
20     information, do you see anything in that area that --
21     that appears confusing to you?
22 A   No.
23 Q   Okay.  Down to Roman Numeral IV, where it says,
24     vehicles, is there anything there that's confusing to
25     you?

---

54

1  A   No.
2  Q   How about Roman Numeral V, where it says, mobile homes?
3  A   No.
4  Q   Okay.  If you understand all of that information -- if
5      none of that information is confusing to you, why did
6      you state in your declaration that all of the changes
7      over the years have sort of made it hard to keep up
8      with, and you don't know what you need to report?
9  A   I think there's other pages on that document, if you
10     could scroll down for me.  Okay.
11         You know, a lot of the explanations are confusing.
12     But one confusion is the reporting of vehicles, you
13     know.  I have two vehicles, my wife drives one.  I, you
14     know, ended up getting a new vehicle, and I don't drive
15     that vehicle.  So when I went to report it, they said
16     that since I'm not driving it, I'm not required to
17     report it.
18         So I'm confused on what I'm supposed to report and
19     when I'm not supposed to report, if it's me driving the
20     vehicle, if it's not me driving the vehicle.  I'm also
21     confused on the travel part out of the country.  You
22     know, I know there's a flag on my passport, so I'm not
23     sure if I have to report when I travel outside the
24     company -- the country.
25         You know, there's confusion on -- on those parts of

---

55

1      duties that I have to do.  So, you know, I'm always
2      concerned that I don't report correctly, and I could
3      get -- I could get in trouble for that.
4  Q   Have you ever got in trouble for reporting incorrectly
5      yet?
6  A   I think I over report just to cover myself from not --
7      you know, going to prison or misreporting.  So I feel I
8      go above and beyond, even though they've told me that I
9      don't have to make certain updates, I insist that they
10     do just so it doesn't ever come back.
11 Q   When you say you over report, what area do you -- have
12     you over reported in?
13 A   I've over reported the -- the vehicles, the updates of
14     the vehicles.
15 Q   Why do you believe you over reported there?
16 A   Just because they told me I'm not -- I don't need to if
17     I'm not operating or driving the vehicle.  And, you
18     know, it's confusing to me because I'm not sure if I'm
19     supposed to report the vehicles that I have in the
20     household, or is it just the vehicles that I'm driving.
21     I wasn't very -- clear on that, and they give me
22     conflicting information.
23 Q   And, you said they, who's they?
24 A   The law enforcement when I go to report information.
25 Q   What law enforcement did you go see?

---

56

1  A   The local police station that I report twice a year.
2  Q   Okay.  Is that the Michigan State Police?
3  A   It's not.
4  Q   Have you ever called the Michigan State Police to seek
5      any kind of guidance on whether or not you need to
6      report that vehicle that you purchased?
7  A   I was not told to -- you know, no one ever informed me
8      that I need to -- that I'm supposed to call them,
9      that's not where I report.  So I would -- I presume
10     that wherever I report would know the information.
11 Q   But you had ended up reporting the vehicle, correct?
12 A   I did because I didn't want to, you know, be in
13     violation of the registry.
14 Q   And has anyone from SORA -- the SORA unit, within MSP
15     have called you and said that you should not be
16     reporting that, you haven't reported and you're in
17     trouble?
18 A   No.
19 Q   Okay.
20 A   And there's frequent updates, you know.  Since I've
21     been on the registry, there's been a lot of updates
22     that I wasn't aware of.  I went into the police station
23     one time and they pulled me in the back, scared me half
24     to death, and they took my fingerprints.  I thought I
25     was going to jail, and they didn't tell me the reason

---

57

```
 1    why.
 2         But I guess there was an update to update, you
 3    know, fingerprints on record.  You know, there's been
 4    so many different updates with SORA since I've been on
 5    there since 2004.  And I -- I'm not sure exactly, aside
 6    from reporting my address or any mobile homes, and my
 7    phone numbers, exactly what I'm supposed to report
 8    every time, and I try to keep up with all the changes.
 9  Q  And, so, but you have questions about what to report,
10    just to clarify, you have -- you -- the only people
11    you've talked to is your local police station?
12  A  Yes.
13  Q  Okay.
14  A  I mean, I trust that they're well versed in that.
15    That's where I'm required to report, because, like I
16    said, it -- I'm not sure exactly on these duties and I
17    don't feel comfortable signing the forms every time.
18    But I feel if I don't, I will be in violation.
19  Q  Okay.  I'm going to go ahead and share my screen again
20    here, bring up another document for you.
21         Can you see this -- can you see the document?
22  A  Yes.
23  Q  Do you recognize this document?
24  A  Yes.
25  Q  What is this document?
```

58

```
 1  A  A tax return.
 2  Q  Do you recognize it as a -- as a United States
 3    individual income tax return?
 4  A  That's what it says.
 5  Q  Okay.  Have you ever seen a form like this before?
 6  A  Yes.
 7  Q  Okay.  Have you filed your 2022 taxes yet?
 8  A  Yes.
 9         MR. DAMICH:  Unless there's an objection, I'd
10    like to offer this exhibit as Deposition Exhibit C.
11         MS. TILLMAN:  No objection at the moment, but
12    I'm little concerned about the relevance.
13         MR. DAMICH:  Got it.
14         (Whereupon Deposition Exhibit C was marked for
15    identification.)
16  Q  (By Mr. Damich)  Okay.  If we go down to where it says
17    income here, I'm actually going to zoom in a little
18    bit.
19       Number 11 here, what does adjusted gross income
20    mean?
21  A  What income that you're earning for the year.
22  Q  That's your understanding of adjusted gross income?
23  A  Yes.
24  Q  And if you had a question regarding your understanding
25    and if what number you're reporting is correct, who
```

59

```
 1    would you ask?
 2  A  Well, I -- when it comes to these, I use a software
 3    that plugs in all the numbers for me.
 4  Q  Okay.  Does that software have any kind of question and
 5    answer format?
 6  A  Yes.
 7  Q  Did you use it at all when filling out your taxes?
 8  A  I mean, I've clicked on it.
 9  Q  When you say clicked on it, is it like clicked on a
10    term that you're -- or a term that they're asking you
11    for a figure from to fully understand what that term
12    means?
13  A  No, I just -- I've clicked on it just to see what pops
14    up.
15  Q  Okay.  Not because you didn't understand it?
16  A  Correct.
17  Q  Okay.  You said you have joint custody, correct, with
18    one of your children?
19  A  Yes.
20  Q  If you were -- if you had questions about what to do
21    with a child care tax credit and who gets it, who would
22    you ask?
23  A  I don't ask, I use a software that, you know, asks me
24    if I have a dependant, and it does everything for me.
25  Q  Okay.  If you look at where Line H under income, where
```

60

```
 1    it says other earned income, to see instructions, do
 2    you know what other income is?
 3         MS. TILLMAN:  Objection.  Calls for a legal
 4    conclusion, but you can go ahead.
 5         THE WITNESS:  I would presume that it -- it's
 6    income outside of my W-2 income.
 7  Q  (By Mr. Damich)  Okay.  If you had a question about
 8    whether this -- something is other earned income, would
 9    you ask about that or would you just guess at a number?
10  A  I don't have any other earned income, so it's not
11    applicable.
12  Q  Okay.  Do you -- do you understand that you have a
13    different understanding of what's earned income than
14    other individuals can?
15  A  I can't answer that.  I'm not sure what other
16    individuals think about, you know, other income.
17  Q  Sure.  If there's -- but if you ever had any questions
18    about this stuff, you understand that there's
19    professionals out there for you to call and ask about,
20    correct?
21  A  I guess if -- if I'm doing business with a professional
22    that's handling it for me, then, yes.
23  Q  Okay.  Wouldn't you agree that there's some terms on a
24    tax return that might seem vague to the normal layman,
25    they'd have to look it up?
```

A.J.
May 11, 2023

---

61

1    MS. TILLMAN: Calls for speculation.
2    Objection. Calls for speculation. Apologies.
3    THE WITNESS: There could be vagueness in the
4    document.
5    MR. DAMICH: Okay. Do you mind if we take a
6    five-minute break?
7    THE WITNESS: Sure.
8    MR. DAMICH: Thank you. Should we come back
9    at like -- how about let's do 10:50.
10   THE WITNESS: Okay.
11   (Brief recess.)
12   Q  (By Mr. Damich) Sir, how much do you make a year?
13   A  **Well, I'm in a sales position, so, you know, I'm paid**
14   **on commission. I don't have a salary.**
15   Q  Okay. For 2022, how much did you make?
16   A  **I don't know. It's a multi-six figure.**
17   Q  Multi-six figure?
18   A  **Uh-huh.**
19   COURT REPORTER: Is that a yes? You said
20   uh-huh.
21   THE WITNESS: Yes.
22   Q  (By Mr. Damich) Would you say more than 200,000?
23   A  **Yes.**
24   Q  More than 500,000?
25   A  **No.**

---

62

1    Q  What kind of car are you in right now?
2    A  **SUV.**
3    Q  What's the make and model?
4    A  **A Cadillac.**
5    Q  And the model?
6    A  **XT6.**
7    Q  What year?
8    A  **2021.**
9    Q  Do you own it?
10   A  **No.**
11   Q  You lease?
12   Q  Yes.
13   A  **How many square feet is your home right now?**
14   A  **About 3,000.**
15   Q  How many cars do you have?
16   A  **Two.**
17   Q  What's the other car that you own?
18   A  **I lease -- I lease the other car.**
19   Q  I'm sorry, and what's the other car that you lease?
20   A  **A Cadillac.**
21   Q  What's the model?
22   A  **It's an Escalade.**
23   Q  What year?
24   A  **'23.**
25   Q  Do you own any recreational vehicles?

---

63

1    A  **No.**
2    Q  Okay. Do you have a boat?
3    A  **No.**
4    Q  Do you belong to any country clubs?
5    A  **No.**
6    Q  Is this the first year that you had -- is 2022 the
7    first year that you had a multi-six figure salary?
8    A  **No.**
9    Q  When did you start making multiple six figures?
10   A  **Several years ago. I'm not -- I'm not sure exactly the**
11   **date.**
12   Q  Would you say more than ten years ago?
13   A  **No.**
14   Q  More than five?
15   A  **Yes.**
16   Q  Do you remember how much you made -- what was the most
17   amount you made in your previous position?
18   A  **I do not recall.**
19   Q  Do you know if it was over, say, 50 grand?
20   A  **I -- I don't recall.**
21   Q  Okay. How about over the past five years, you have
22   made more than six figures for those years, right?
23   A  **Yes.**
24   Q  Have you ever made more than a million dollars in a
25   year?

---

64

1    A  **No.**
2    Q  Have you ever made more than $750,000 in a year?
3    A  **No.**
4    Q  How about half a million?
5    A  **Yes.**
6    Q  How many years have you done that?
7    A  **I don't know, maybe a couple of years.**
8    Q  Okay. You said made over $500,000 over a couple years,
9    correct?
10   A  **Yes.**
11   Q  All right. Sorry if I asked this already: Have you
12   made over 750?
13   A  **I have not.**
14   Q  Okay. How about over 600?
15   A  **No.**
16   Q  I'm going to go ahead and share my screen here. Give
17   me a second.
18   Can you see the screen?
19   A  **I do see the screen.**
20   Q  Okay. Now, what this document is here, it's a summary
21   of -- you'll see that in the second column, it's a
22   listing of facts from some judicial rulings regarding
23   some various criminal sexual conduct cases. And I was
24   going to have -- I'm going to have you read through
25   some of the facts and scenarios, and I'll have some

---

A.J.
May 11, 2023

---

65

1      questions for you, if that's okay.
2  A  Uh-huh.
3  Q  Okay.
4         MS. TILLMAN:  Scott, before you jump in, can I
5     just put our same general objections?
6         MR. DAMICH:  I was waiting for it.
7         MS. TILLMAN:  Appreciate it.  So,
8     notwithstanding the Court's order allowing the use of
9     this exhibit, we would just like to place a global
10     objection on the use of this exhibit and the line of
11     questioning associated with this exhibit as irrelevant
12     and improper.  Thank you.
13         MR. DAMICH:  Noted.  Thank you, Dayja.
14  Q  (By Mr. Damich)  If you look at number six here, could
15     you read that fact scenario for me?  Just read it to
16     yourself, and let me know when you're done.  And let me
17     know if you need me to zoom in at all or anything.
18  A  Okay.
19  Q  Okay.  Would you want to know if this perpetrator lived
20     next door to you?
21  A  I guess it depends on if they're still a risk.
22  Q  If they're still a risk, would you want to know that
23     this perpetrator lived next door?
24  A  I mean, it -- it depends.  I mean, that's -- I don't
25     know anything aside from -- from reading that.  I mean,

---

66

1     it depends if they're a risk.  I don't know, if they're
2     still a risk.  It just depends.
3  Q  Assuming this individual was lined up to babysit your
4     child, would you want to know this information?
5  A  It depends.
6  Q  Depends on risk?
7  A  Yes.  I mean, nowadays anyone can land on the registry,
8     so it -- it depends.
9  Q  So what's your -- how do you -- how do you assess risk?
10  A  I assess risk with --
11         MS. TILLMAN:  Objection.  Lack of foundation.
12     But you can keep answering.
13         THE WITNESS:  With being on the registry for
14     over 20 years and not have offended as -- and getting
15     an evaluation by a licensed professional that says
16     you're no risk.
17  Q  (By Mr. Damich)  So you think you -- you'd have to know
18     from a licensed professional whether or not this person
19     was a risk before you would decide if you would want to
20     know this information?
21  A  Yes.  I would want a licensed professional, and, you
22     know, their history of reoffending.  That's how I would
23     make a determination.
24  Q  Is it your belief that time lessens risk?
25         MS. TILLMAN:  Objection, calls for a legal --

---

67

1     he's not an expert, so lack of knowledge to answer this
2     question.
3         But you can answer.
4         THE WITNESS:  Yeah, time -- time tells.
5  Q  (By Mr. Damich)  At what point do you believe that this
6     perpetrator here in the fact scenario that you just
7     read would no longer be a risk?
8  A  You know, it depends on if he's gotten an evaluation
9     that says he's not a risk.  It depends on how long
10     they've been on the registry for.  So it -- it just
11     depends.
12  Q  Okay.  If you'd read number eight.
13  A  Okay.
14  Q  Okay.  Would you want to know if this perpetrator lived
15     next door?
16  A  Again, you know, it's based on if they're still a risk.
17     How long they've been on the registry, if they've re --
18     reoffended.  It depends.
19  Q  Assuming they're still a risk, would you want to know
20     this information?
21  A  I believe there's different levels of risk, so I'm not
22     -- again, it depends on if there's other factors that I
23     would consider.  Like I said, nowadays if you urinate
24     in public, you could be on the registry, so I'm not
25     sure.  I mean, I feel that if you look at someone the

---

68

1     wrong way, you're on the registry.  So it just depends.
2  Q  This perpetrator though, I don't think there was
3     anything about urinating in public.  So I just -- you
4     talked about different levels of risk.  What are those
5     levels?
6  A  I -- I don't know.  There's -- there's, you know,
7     different levels of -- of risk based on, you know, what
8     -- what crimes have been committed and different
9     evaluation.  And, like I said, based on how long
10     they've been on the registry.  I mean, do they have a
11     track record of these type of offenses, was it a
12     one-time scenario, was it a -- a miscommunication?
13     I don't know.  There's -- there's different factors
14     that I would look at as far as risk.
15  Q  Okay.  And assuming all those factors in your risk
16     evaluation were met, would you want to know that this
17     information lived next door -- want to know that this
18     perpetrator lived next door?
19  A  Again, it depends on the risk factor to me.  I -- you
20     know, like I said, I'm sure there's people next door to
21     other people that, you know, have a good relationship
22     with their neighbors, and there's no issues, so.
23  Q  So absent a risk evaluation, this individual is not a
24     risk in your opinion?
25  A  Yup, because it -- they could have been on the registry

---

A.J.
May 11, 2023

69

1  for 30 years and not reoffended and gotten evaluated
2  and they say that there's no risk.
3  Q  If you could read number 13.
4  A  Okay.
5  Q  Would you want to know if either of these perpetrators
6  lived next to you?
7  A  This -- in this scenario, they -- I don't think they
8  would be living next to anyone, so it -- I don't think
9  that's a realistic scenario.
10 Q  Okay.  Let's assume there is a realistic scenario and
11 this individual is potentially moving in next door.  Is
12 this information you would want to know?
13 A  I mean, if they're next door at that -- in that
14 instance, then they would be no risk.
15 Q  Why would -- okay.  So how did you come to the
16 conclusion they'd be no risk if they lived next door?
17 A  Because based on what I'm reading, you know, if they
18 were in a house next door to me, you had asked me, you
19 know, where I lived, what square footage my home was,
20 they would be no risk if they were living next door to
21 me.
22 Q  Are you saying these type of people don't live next to
23 you?  Are you saying they're in a different financial
24 status?
25 A  I'm not sure if they do live next to me or not.  But,

70

1  you know, again, when I read these scenarios, you know,
2  there's no definitive answer.  Everyone has
3  circumstances, there's different factors.
4      So everything for me depends on where they're at
5  today, how long ago it was, were they evaluated.  You
6  know, to me, if someone was at a high level risk, they
7  probably would be incarcerated for the rest of their
8  lives.  I think he would be living in a jail cell and
9  not next door to me.
10 Q  Okay.  But, then, this scenario I asked you, the
11 question is assuming this individual lives next to you,
12 would you want to know this information?
13 A  And I'm going to repeat myself.  And I'm going to say
14 it depends.
15 Q  Okay.  If they're still a risk, right?
16 A  It depends if they're still considered a risk.
17 Q  So if -- imagine it's the first year this individual is
18 out of prison.
19 A  Well, I don't know their history before that.  I don't
20 know who -- you know, what individual, like who the
21 person is, so it depends.
22 Q  But you knew that one -- you knew at least one of the
23 individuals participated in a situation where a
24 female's pants were ripped open, pulled down and her
25 legs were forced apart.  And a skinny man then sexually

71

1  penetrated her vagina with his penis, ejaculating
2  inside of her.
3      Do you think a year within the correction facility
4  -- one year removed from corrections, this person would
5  no longer be a risk?
6      MS. TILLMAN:  Objection.  Argumentative.
7      You can go on.
8      THE WITNESS:  I believe that -- that crime as
9  you describe, they would be in prison for life.
10 Q  (By Mr. Damich)  Okay.  Assuming they're not in prison
11 for life, and that they move in next door to you.
12     MS. TILLMAN:  Objection.  Hypothetical --
13 calls for a hypothetical.
14     But you can answer.
15     THE WITNESS:  I mean, it's hypothetical.
16 That's not a real life scenario.  That's not realistic.
17 Q  (By Mr. Damich)  Is it something that you'd want to
18 know?
19     MS. TILLMAN:  Objection.  Asked and answered.
20     You can go on.
21     THE WITNESS:  I mean, I don't -- like I said,
22 it just depends, you know, if they're still a risk.
23 Q  (By Mr. Damich)  If you could read number 22.
24 A  Okay.
25 Q  Would you want to know if this individual was living

72

1  next to you?
2  A  If they're a high risk, I don't feel that they would be
3  living next to me.  I just -- I don't -- I guess I
4  don't agree with what you're asking me because I don't
5  know their entire history.  I don't know if they've
6  been evaluated.  I don't have all the information to
7  want to know if, you know, that person is living next
8  to me.
9  Q  So you're saying you don't have enough information to
10 be able to make a decision on whether or not you'd want
11 to know if this person was living next to you?
12 A  Yeah, I don't -- I don't know their entire history.  I
13 don't know who they are.
14 Q  Right.  So these facts alone -- these facts alone that
15 you read, it really doesn't bother you that much to
16 know?
17     MS. TILLMAN:  Objection.  Argumentative.
18     THE WITNESS:  I'm just not faced with these
19 situations.  That's not real life for me.  I've never
20 been put in that situation, so that -- that's why I
21 said, to me it's -- I've never had to deal with
22 anything like that, so I can't make judgment or know
23 their entire history, or, again, if they're, you know,
24 deemed a -- a risk.  I mean, that -- that's how I could
25 answer this for you.

73

1  Q  (By Mr. Damich)  If you could read number 29.
2  A  Okay.
3  Q  Would you want to know this information if this
4     individual was to be one of your children's teachers?
5  A  If it -- if there was a conviction and it was a
6     teacher, then they wouldn't be a teacher.  So, again,
7     this is irrelevant to me as far as answering that
8     question.  It's not realistic.
9  Q  Would you want to know if this -- how about if this
10    individual got a job as a -- a tutor, and they offered
11    their own service as tutors.  Would that be something
12    you'd  want to know before you sent your child there
13    for tutoring?
14        MS. TILLMAN:  Objection.  Calls for a
15    hypothetical.
16        You can answer.
17        THE WITNESS:  Well, there would be no reason
18    for me to try to dig further and figuring out if a
19    person that I chose would do something like that to --
20    to my -- to one of my kids.  Like I said, there's a lot
21    of different factors there for me, and...
22  Q  (By Mr. Damich)  Would this -- would this scenario play
23    any -- would it have any relevance at all on your
24    decision on whether to use that individual as a tutor
25    or not?

74

1  A  No, it wouldn't.  It wouldn't, because I -- it's
2     basically playing out a scenario that, you know,
3     something happened, but I don't see -- I mean, unless
4     I'm missing something, was this -- was it one person's
5     words -- word over the other word?  Again, there's
6     other factors to me as well.  So it just -- it depends.
7  Q  Do you think the sex offender registry protects the
8     public in any way?
9  A  No.
10  Q  Why not?
11  A  Well, the sex offender registry today is not the same
12    as it was intended when they first brought it out.
13    Now, like I said, anyone -- if you look at someone the
14    wrong way, you could end up on the registry.  So I
15    don't agree with -- you know, that everyone on the
16    registry is -- is a bad person, or it would protect
17    anyone.  I don't think it would stop anyone from doing
18    anything, just because they're on the registry.
19        You know, looking at, you know, facts, you know,
20    most people that, you know, offend are people that the
21    victim knows, like a family member.  I wouldn't say
22    that people on the registry, you know, I don't see that
23    -- it would affect anyone in any kind of way just by
24    being on the registry.  I don't see the dynamic behind
25    being on a registry as protecting any citizens at all.

75

1        Example, myself.  I mean, I'm no harm to anyone.  I
2     come to work every day, I'm with my family.  I haven't
3     had a -- any -- I haven't reoffended for 20 years.
4     And, I look at myself as an instance, and I am not a
5     harm to anyone.  So no one has to fear me.
6        So, I don't think -- I think it's ineffective and I
7     think it's punishment and it's unconstitutional of
8     people's rights.  So I think it's very ineffective.
9  Q  Okay.  So you don't believe it protects the public?
10  A  No.
11  Q  Okay.  Do you think the sex offender registry may
12    encourage victims to come forward?
13  A  No.
14        MS. TILLMAN:  Objection.  Calls for
15    speculation.
16  Q  (By Mr. Damich)  If victims come forward to report sex
17    crimes, does that protect the public?
18        MS. TILLMAN:  Same objections.
19        THE WITNESS:  It may or may not.
20  Q  (By Mr. Damich)  Okay.  You said it may.  How could it?
21  A  I'm not entirely clear if it would or, you know, I
22    haven't -- I'm not a professional to dig into data as
23    far as how it could or could not prevent any sex
24    crimes.
25        I just feel that people on the registry are not

76

1     necessarily at risk, because, like I -- from everything
2     that I've read or looked into, it's more of -- of
3     family members that are perpetrating these, people that
4     they know and not necessarily people on a registry.
5  Q  Is it your opinion there's a substantial amount of
6     under reporting of sex crimes?
7  A  I'm not sure.
8  Q  Okay.  So then what -- what relevance does it have --
9     does it have in your analysis here of the closeness of
10    relationships between the victim and the perpetrator?
11  A  That people on a registry, just because they're on a
12    registry doesn't mean that, you know, it's going to
13    protect citizens out there, because someone -- because
14    they could look someone up on a registry.
15  Q  I think the question was if victims come forward to
16    report sex crimes, does that protect the public?
17  A  I don't know if it will affect the public or not if
18    they report something that has happened to them.  I
19    don't know if it will.
20  Q  Okay.  Have you contacted a member of the Michigan
21    legislature to inquire about changing the sex offender
22    registration law?
23  A  Recently or at any point?  I'm not -- I'm not sure.
24  Q  At any point.
25  A  About changing the -- the sex offender registry law?

A.J.
May 11, 2023

77

1  Q  Uh-huh.
2  A  I don't recall if I have or not.
3  Q  Do you know whether Governor Whitmer has the power to
4     change the sex offender registration law?
5        MS. TILLMAN: Objection. Lack of personal
6     knowledge.
7        But you can answer
8        THE WITNESS: I'm not sure if she has the
9     power or not.
10 Q  (By Mr. Damich) Okay. Do you understand that there's
11    three separate branches of government within Michigan?
12    The executive, the judicial, and the legislature --
13    legislative branch?
14 A  Yeah, but I don't know exactly what their roles are or
15    what they have the ability to do.
16 Q  Do you know who writes the laws out of those three
17    entities?
18 A  I'm not sure.
19 Q  Okay. Do you know whether Colonel Gasper has the power
20    to change the sex offender registration law?
21       MS. TILLMAN: Same objections.
22       THE WITNESS: I do not --
23       MS. TILLMAN: Go for it.
24       THE WITNESS: No.
25 Q  (By Mr. Damich) Did you know under the new law, some

78

1     of the changes -- some of the changes could be made by
2     mail?
3  A  I -- I'm not sure. I've always had to report, take
4     time out of work, and drive in the report face-to-face.
5  Q  Now, if you didn't have to take time off of work to
6     report face-to-face, do you think that would be less of
7     a burden? You would just have to mail in the
8     information?
9  A  No, it wouldn't be less of a burden. It's still -- I
10    feel like I'm on parole because I have -- the simple
11    fact that I have to report, whether I have to do it via
12    mail or in person. So it -- in both instances, it is a
13    burden.
14 Q  Okay. So, let's just focus on just like the actual
15    physics of it all.
16 A  Uh-huh.
17 Q  Would it be less burdensome for you to mail in the
18    information as opposed to taking time off work and
19    driving to the police station?
20 A  No.
21 Q  It wouldn't take less time, you wouldn't save time?
22 A  It would be a burden.
23 Q  Getting stamps or envelope? What would be the burden?
24 A  Well, just, you know, publishing the information and
25    sending it in. Regardless, both of them are burdens

79

1     for me.
2  Q  Do you think one is less than the other from a physical
3     standpoint?
4  A  Physical, you know, currently what I'm doing now is,
5     you know, I've got to take time off of work and go and
6     sit for an hour. So as far as like, you know, taking
7     time off of work and mailing it, it's still a burden,
8     but it's less time.
9  Q  Okay.
10       MR. DAMICH: All right. That's all I have for
11    now.
12       MS. TILLMAN: Perfect. Do you mind if I do a
13    couple of follow up questions?
14       MR. DAMICH: I'd be happy -- yeah.
15       MS. TILLMAN: For sure. All right. And I
16    think I don't need any time.
17       I think I can just go right into them if
18    you're ready, A.J.
19       MR. DAMICH: Sure.
20       THE WITNESS: I'm ready.
21          EXAMINATION
22 BY MS. TILLMAN:
23 Q  Perfect. So you earlier testified that it takes you
24    about four to five hours to go register every year?
25 A  Yes.

80

1  Q  And you also just testified that you have to take time
2     off of work in order to go make some of those updates
3     and to go register and things like that?
4  A  Yes.
5  Q  Have you had to take time off of work on more than one
6     occasion to do that?
7  A  Yes.
8  Q  Gotcha. And then, also, I want to talk a little bit --
9     just go back a little bit to some of the conversations
10    you were having with Scott earlier about your
11    employment.
12       So you mentioned that you had been fired from two
13    jobs because of the registry, correct?
14 A  Yes.
15 Q  So starting out with the first instance, how did they
16    find out you were on the registry?
17 A  So a coworker had Googled me and found out that I was
18    on the registry. And they sent an anonymous letter,
19    you know, with my photo to my employer. And as a
20    result, I was terminated.
21 Q  Gotcha. And in the second instance, how did they find
22    out you were on the registry?
23 A  Same -- same scenario. You know, it's very easy to
24    Google someone and look them up, specifically if you
25    work with people that, you know, want to get to know

81

```
 1    you.  And same instance where, you know, they made a
 2    decision that I wasn't a good fit for their company and
 3    they terminated me as well.
 4  Q  Gotcha.  And then just to pivot a little bit more, you
 5    also earlier testified that you spent three years on
 6    probation following your conviction?
 7  A  Yes.
 8  Q  And how often did you have to see your probation
 9    officer at that time?
10  A  Well, at first it was -- it was very frequent.  I want
11    to say at first it was weekly.  Same thing, I had to
12    take time out, I had to drive.  I just -- again, I felt
13    out of place, but I believe it was initially every
14    week.
15  Q  And at that time, did you have to report to your
16    probation officer if you changed your address or your
17    job or anything like that?
18  A  Yes.
19  Q  And while you were on probation, were you also on the
20    sex offender registry?
21  A  Yes.
22  Q  And in your opinion, which experience was worse for
23    you?
24  A  Well, I don't think there's anything worse than being
25    on the registry.
```

82

```
 1  Q  And can you --
 2  A  I --
 3  Q  Go for it.  I interrupted you.
 4  A  Yeah.  You know, when I initially took the plea, you
 5    know, there -- there were no online photos.  So, you
 6    know, that has really hurt me over the years.  It was
 7    something that was not -- I didn't agree to, and then
 8    after I was on the registry, they took a photo of me
 9    and then posted it after.  At that point I was still on
10    probation.
11  Q  And can you explain if you -- in any ways that you
12    haven't already, explain how the registry has been
13    worse for you than being on parole?
14  A  Well, you know, I feel like I am on parole.  My life is
15    very restrictive.  It's -- you know, I've lost a lot of
16    friends.  My wife has lost a lot of friends when she
17    married me.
18      There's always judgment.  You know, people Google
19    me all the time.  I lose, you know, opportunities,
20    friends, family.  You know, it's been a struggle to get
21    where I'm at right now, and I'm always in fear because,
22    you know, if I lose this opportunity where I'm at, I'm
23    going to be back to square one in trying to rebuild my
24    life, you know, to find employment, to find housing.
25      I'm the only source of income, and if for some
```

83

```
 1    reason I get terminated again, a third time, then I'm
 2    not going to be able to support my family and I will
 3    lose everything like I did before.
 4      My 15-year-old, all his friends found out, and, you
 5    know, he's lost friends.  None of them come over.  You
 6    know, they taunt him all the time.  You know, I'm in
 7    fear of, you know, traveling anywhere.  It's just -- I
 8    can't be part of their sports and coaching and things
 9    of that nature.  Just it's -- it's hindered me since
10    2004.
11  Q  And one of my final questions for you, as a condition
12    of your probation, did you ever have to get any type of
13    risk assessment and individualized review or anything
14    like that?
15  A  I did, it was part of my probation to get a risk
16    assessment.  Of course, I passed with flying colors.
17    And then two to three years ago I took it upon myself
18    to get a risk assessment, and I have the report that
19    says I'm not a risk.
20      MS. TILLMAN:  Gotcha.  No more questions from
21    me.
22      FURTHER EXAMINATION
23  BY MR. DAMICH:
24  Q  How many -- how many days did you take off so far this
25    year from work to report?
```

84

```
 1  A  I've -- so at least, you know, twice -- twice a month
 2    to take off.  And then like I said, if, you know, I try
 3    to over disclose so it -- in the instance where I said
 4    I bought a new car, that was outside of my reporting.
 5      So I've had, any time I lease a vehicle that comes
 6    to lease, I have to go back and report that outside of
 7    my typical reporting days.  I -- my work, my employer
 8    is probably about 45 minutes away from the police
 9    station.  So I have to take off early to get to go back
10    and forth for reporting.
11  Q  The question was:  In the past year, how many times
12    have you gone to report?
13  A  Well, I -- I report twice a year.
14  Q  Okay.  So how many times this year have you gone to
15    report?
16  A  24 times, 25 times.
17  Q  This year?
18  A  Well --
19  Q  Just this year.
20  A  Oh, this year?  So, where are we at?  I reported twice.
21  Q  Okay.  So you've taken two days off work so far to
22    report?
23  A  Yes.
24  Q  How many times did you take off last year to report?
25  A  About five or six.
```

85

1   Q   Okay.  Do you take time off to go to the Secretary of
2       State's office?
3   A   Yes.
4   Q   Okay.  So you say on average maybe four -- you say --
5       give me on average how many times you go to report, you
6       have to take time -- on average throughout a year, how
7       many days do you have to take off of work to go report?
8   A   Probably like four to five times.
9   Q   So you've purchased and leased new cars that often?
10  A   No, I don't.
11  Q   So why are you going more than the two times annually?
12  A   I guess if -- if I -- on a year I go twice -- I go
13      twice a year, so, unless I have to update something
14      outside of that.  So maybe two to three times.
15  Q   Okay.
16  A   That I have to take off.
17  Q   You were on probation for three years, right?
18  A   Yes.
19  Q   Did you have to take drug tests during then?
20  A   Yes.
21  Q   How often?
22  A   I don't -- I want to say once a month.
23  Q   Does the sex offender registry require you to take drug
24      tests?
25  A   No.

86

1   Q   Part of the terms of your probation, were you required
2       to speak with your probation officer even before
3       applying for a new job?
4   A   I do not recall.
5   Q   Okay.  Do you remember having to talk with your
6       probation officer at all about new employment?
7   A   I don't -- I don't recall.  They -- I think some of the
8       terms, if I remember correctly, is I had to be employed
9       or find some kind of work, I believe.  I'm not entirely
10      sure.
11  Q   So does SORA require you to work?
12  A   No.  It does not require me to work.
13  Q   Okay.  Were you tracked at all while you were on
14      probation?
15  A   Trapped?
16  Q   Tracked.  T-r-a-c-k-e-d, sorry.
17  A   Oh, okay.  Sorry.
18  Q   No, that's okay.
19  A   Can you be more specific?
20  Q   Yeah, did you have to wear an ankle bracelet?
21  A   I did not.
22  Q   You didn't?  Did you have any kind of tracking device
23      on you at all?
24  A   No.
25  Q   Did you have to talk to your probation officer before

87

1       you left the state?
2   A   Yes.
3   Q   Okay.  Does SORA require you to contact MSP or the SORA
4       unit if you're going to decide to go to Ohio today?
5   A   I -- that's -- I'm not clear on that because it
6       mentions traveling.  I'm not sure exactly who do I --
7       who I report that to, if it's MSP -- I believe it's
8       MSP.
9   Q   Did your probation officer have the right to come into
10      your home any time he or she wanted to?
11  A   Yes.
12  Q   Okay.  Does SORA give MSP the right to come into your
13      home at any type?
14  A   They -- they -- they have come to my home.
15  Q   Okay.  The question was:  Does SORA give MSP the right
16      to enter your home at any time, like your probation
17      officer had right to?
18          MS. TILLMAN:  Objection.  Calls for legal
19      conclusion and personal knowledge that the witness does
20      not have.
21          THE WITNESS:  I'm not sure, but I feel that
22      they can enter my home.
23  Q   (By Mr. Damich)  I guess I'm just confused on how
24      probation -- your comment that being on the registry is
25      worse than being on probation,

88

1       I mean, SORA doesn't require you to go get drug
2       testing.  SORA doesn't allow any kind of officer to
3       just enter your house whenever.  I guess, if you could
4       just elaborate on how the two -- how one outweighs the
5       other.
6           MS. TILLMAN:  Objection, argumentative --
7       excuse me.  I interrupted you.
8           MR. DAMICH:  That's fine.
9           THE WITNESS:  So probation is three years.  So
10      I was convicted in 2004, so that would have let me off
11      of probation in 2007, which I wish that was the case
12      with SORA, because then we wouldn't have this
13      conversation right now.
14          But SORA is very restrictive.  I'm on it for
15      life, so I'm on parole for life.  So there's struggles
16      every day with SORA.  I -- if I don't abide by the
17      rules with SORA and I violate, I go back to prison.
18      After the third year of my probation, unless I
19      reoffended, you know, there's -- really, it's a
20      non-issue.
21          With SORA, I'm on parole for the rest of my
22      life, or until the 25 years.  So there's constant
23      reporting, there's consistent lookups.  You know, it --
24      it's a completely different ball game, and I -- and I
25      think you would agree.

A.J.
May 11, 2023

89

1  Q  So you believe you're on parole right now?
2  A  I am on parole.
3  Q  Who's your parole agent?
4  A  **SORA -- SORA is my parole agent. The law enforcement**
5     **that I report to every year, you know, jeopardy of**
6     **losing my job, all that -- all those are my parole**
7     **agents. Any harm done to my family, those are all**
8     **parole agents to me. You know, the damage that it's**
9     **caused -- caused for almost 20 years are parole**
10    **agents.**
11           MR. DAMICH: I don't have any further
12    questions. Dayja?
13           MS. TILLMAN: All good on my end.
14           MR. DAMICH: Sir, thank you so much. I
15    really appreciate you taking the time today. And, you
16    know, I wish you all the best.
17           We'll do our best to look at the transcript.
18    I think there's going to be some things you identified,
19    I think ████ and areas like that. And I just did it
20    again. So, we'll have to redact it.
21           But, otherwise, seriously, though, thank you
22    for taking the time out of your day. I really
23    appreciate it. I wish you all the best. Have a great
24    day.
25           THE WITNESS: I appreciate you, Scott. If you

90

1     don't mind, I appreciate your time and giving me this
2     opportunity. You know, you see how I'm dressed. You
3     know, I got a three-piece suit. I dress like this
4     every day, I'm a professional, just like you. I'm over
5     here just trying to make a living for my family.
6            I made a huge mistake 20 years ago, and I
7     haven't reoffended, you know. You asked me income
8     questions. You asked me, you know, things I do with my
9     family. I am no risk, you know. And, you know, I know
10    Michigan recently celebrated a clean slate. It's all
11    over the media that they're giving people second
12    chances. You know, they understand people have made a
13    mistake and they know that, you know, there's
14    opportunity for people to work.
15           There's -- they know that there's opportunity
16    for people to find housing. And it's just better for
17    our community to give people a second chance. So I
18    just feel there's no pathway off, and people that are
19    deserving of it should -- should be off the registry,
20    you know.
21           And I just -- like I said, I hope, you know,
22    you would reconsider that and try to help people that
23    deserve to be helped and not, you know, hurt them for
24    the rest of their lives, including -- including their
25    families.

91

1            So I just wanted to put that out there and
2     thank you for being a part of this and giving me the
3     opportunity to -- to speak with you.
4            MR. DAMICH: I appreciate that. If I'm ever
5     in a position where I get to make the laws, I'll take
6     that into consideration. But, for the time being, just
7     enforcing what's there. I appreciate it, and we -- you
8     know, good luck with everything. So thank you.
9            (Whereupon both counsel agreed to mark and
10           attach Deposition Exhibit D and the deposition
11           was concluded at about 11:46 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

92

CERTIFICATE OF NOTARY - COURT REPORTER

STATE OF MICHIGAN)
                 )
COUNTY OF CLINTON)

       I, Stefanie S. Pohl, a Notary Public in and
for the above county and state, do hereby certify that this
transcript consisting of 92 pages stenographically reported
is a complete, true and correct record of the testimony of
A.J. held in the case on Thursday, May 11, 2023.
       I also certify that prior to taking this
deposition and by agreement of counsel, A.J. was duly sworn
remotely to tell the truth.
       I also certify that I am not a relative or
employee of an attorney for a party or financially
interested in the action.

                          _____
                          Stefanie S. Pohl
                          CSR #5616
                          Notary Public, Clinton County,
                          Michigan
                          My Commission Expires: 6/21/25