# Exhibit 66:

M.R. Deposition Transcript (redacted)

M. R.
May 24, 2023

1 (Pages 1 to 4)

2

APPEARANCES:

DAYJA S. TILLMAN, ESQUIRE
ACLU of Michigan
1514 Wealthy Street SE, Suite 260
Grand Rapids, Michigan 49506-2700
Appearing on Behalf of the Plaintiffs.

SYEDA F. DAVIDSON, ESQUIRE
American Civil Liberties Union of Michigan
2966 Woodward Avenue
Detroit, Michigan 48201-3035
Appearing on Behalf of the Plaintiffs.

SCOTT L. DAMICH, ESQUIRE
Assistant Attorney General
Michigan Department of Attorney General
State Operations Division
525 West Ottawa Street
P.O. Box 30754
Lansing, Michigan 48909-8254
Appearing on Behalf of the Defendants.

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE, on behalf of
themselves and all others similarly
situated,

            Plaintiffs,

vs.                          Case No. 2:22-10209
                             Hon. Mark A. Goldsmith

GRETCHEN WHITMER, Governor of the
State of Michigan and COL. JOSEPH
GASPER, Director of the Michigan
State Police, in their official
capacities,

            Defendants.
_____/

DEPOSITION OF:  M.R.

LOCATION:       Remote Location

DATE:           Wednesday, May 24, 2023

TIME:           9:00 a.m.

Taken remotely in the above-entitled cause, before
Stefanie S. Pohl, Certified Shorthand Reporter, CSR 5616,
and Notary Public for the County of Clinton.

---

3

                 I N D E X

WITNESS:                              PAGE:
M.R.
Examination by Mr. Damich               4

EXHIBITS:                            MARKED:
Defendants' Deposition Exhibit Number 1    50
(Mail-In Update)

Defendants' Deposition Exhibit Number 2    64
(scenario questions)

---

4

```
 1                    Wednesday, May 24, 2023
 2                    8:58 a.m.
 3                    Remote Videoconference
 4                    M. R.,
 5      a Plaintiff herein, after having first been duly sworn
 6      remotely, testified as follows:
 7                    EXAMINATION
 8      BY MR. DAMICH:
 9      Q  Good morning, sir.  My name is Scott Damich.  I'm an
10         Assistant Attorney General with the State of Michigan,
11         and I represent Governor Whitmer and Colonel Gasper.
12         And I Noticed your deposition in -- in this case which
13         is Does versus Whitmer, Case Number 2 22-CV-10209, and
14         it's pending in the District Court in the Eastern
15         District of Michigan in front of the Honorable Judge
16         Goldsmith.
17            Now, There is what's called a protective order in
18         place is this case, sir.  And it can found at ECF No.
19         88, page ID 23892395.  It sounds like a lot of
20         technicalities, but I'm going to tell you what this
21         protective order does.
22            My goal today is to not get your personal
23         information out in the public sphere by any means.  So,
24         I'm going to try to tailor my questions in a way that
25         elicits answers that aren't going to divulge any of
```

**5**

1  your personal identifying information.  And if it does
2  and if you do give an answer, if I do ask a question
3  that elicits that information, and it does give an
4  answer that gives us that information, I know that
5  myself and opposing counsel will work together to make
6  sure that it's redacted and it doesn't find itself into
7  the public sphere.
8      So that protective order, that's ^ this not promise
9  that I'll do it.  It requires that we do it.  So, just
10  feel safe knowing that your public information, even if
11  you talk about it today, is not going to leave this
12  conversation, so.
13      Will the court reporter confirm that she has read
14  the protective order and signed the acknowledgement?
15          COURT REPORTER:  I have, yes.
16          MR. DAMICH:  Excellent.  And, will counsel
17      affirm that the person tendered is in fact declarant
18      M.R.?
19          MS. TILLMAN:  Yup, I can confirm this is M.R.
20  Q  (By Mr. Damich)  Okay.  Thank you, Dayja.
21      And, like I say, I'll do my best to not ask you
22  personal identifying information throughout.  But, I
23  make mistakes and, if I do, we'll fix it.
24      Have you ever been deposed before, sir?
25  **A  No.**

**6**

1  Q  Okay.  So I'm going to just go over real quickly what a
2      deposition is and some ground rules about the same.
3      The way I like to explain depositions is a
4  conversation between myself and you.  It's not a normal
5  conversation because I'm the one driving the
6  conversation, I'm asking questions.  But I'd like it to
7  be more conversational, if possible.
8      Another thing that makes this conversation a little
9  bit more different than our typical conversations is
10  that we have Stefanie here, our court reporter.  She's
11  writing down everything that I'm saying right now and
12  she'll right down everything that you say as well.
13      Now, That's important because I'll ask questions
14  that require a yes or no response, and oftentimes, as
15  human beings, we all have a tendency just to nod our
16  head,  yes or no.  Unfortunately, Stefanie won't be
17  able to pick that up in her court reporting duties with
18  a nod or a shake of the head, yes, right to left, or,
19  even for a no.  So we have to verbalize our responses,
20  if that makes any sense.
21      Another thing, too, is that it's very hard -- I've
22  never had to transcribe, but I can imagine having to
23  transcribe cross talk.  If I'm talking now and then you
24  chime in and so we start talking over each other, it
25  could create probably quite the headache for Stefanie.

**7**

1      So, I'm going to do my best to avoid that, doing
2  that to you, and if you'd do the same for me, and I
3  think the best way we can make that happen is if I'm
4  asking a question, just let me finish the question
5  asked.  And then go ahead and answer the question
6  asked.
7      Now, there's going to be some questions that I ask
8  that I -- you're represented by counsel today.  There's
9  going to be some objections that are going to be made.
10  I'm confident in saying the majority of those
11  objections are still going to require you to give an
12  answer.  But, not the whole cross talk thing.  It will
13  work out better for everyone if you let your counsel
14  get her objection out first, and then give the answer.
15      Now, because there's going to be some kind of gaps
16  between the questions asked and objections, even if
17  there's no objections and I ask you a question, you
18  might not understand what I'm asking.  I don't want you
19  to guess at an answer.  I want you to fully understand
20  what I'm asking you, and so you fully understand what
21  answer you're giving me.
22      Today is not a day for me to trick you or play any
23  kind of gotcha.  Just trying to -- to give some -- some
24  facts here, and truthful facts.  So, if you answer a
25  question that I ask you, is it a fair rule that you --

**8**

1  that we can assume that you understood what I asked
2  you?
3  **A  Yes.**
4  Q  Okay.  Thank you.  Another thing, too, I don't
5  anticipate this deposition taking all morning.  I
6  don't.  But you are entitled to take a break whenever
7  you want.  The only caveat being is if I've asked you a
8  question, you have to answer the question before you go
9  ahead and take a break.
10      I'll probably even ask to take a break here and
11  there, too, but I'm not trying to sit here and see how
12  long you can sit in one place and let me ask you
13  questions.  If you need to get up and walk around, let
14  me know if you need a break, whatever you need, so.
15      Are you taking any medications or on any substances
16  that affects your memory or ability to answer a
17  question -- answer questions truthfully today?
18  **A  I don't believe I am.**
19  Q  Okay.  And is there anything else that might interfere
20  with your ability to answer questions truthfully today?
21  **A  No.**
22  Q  Okay.  Throughout today's deposition I'm going to be
23  referring to a -- to a felon -- a Federal felony you
24  were convicted of back in 2005.  And I believe it was
25  for an enticement to induce a minor to participate in

9

1    illegal activity.
2        Do you remember that?
3  **A  Yes.**
4  Q  Okay.  So, throughout this deposition if I refer to
5    your Federal offense or your felony, or your prior
6    criminal sexual conduct conviction, we're referring to
7    that 2005 conviction.  Is that fair?
8  **A  Yes -- excuse me.**
9  Q  That's okay.  Without giving me a specific address, how
10   about if you give me a -- are you in the State of
11   Michigan right now?
12 **A  Yes.**
13 Q  Without giving me a specific address, can you tell me
14   if you're in northern Michigan, southern Michigan, the
15   eastern part of the state, or the western part of the
16   state?
17 **A  I would be in the eastern district of Michigan.**
18 Q  Okay.  Are you closer to Detroit or Lansing?
19 **A  I would say I'm closer to Lansing.**
20 Q  So is it fair to say it's like central east part of the
21   state?
22 **A  That would be okay.**
23 Q  Okay.  And are you at your workplace, are you in your
24   home?
25 **A  I'm in my home, in my home office.**

10

1  Q  How long -- do you own your home?
2  **A  Yes.  My wife and I own our home.**
3  Q  And how long have you owned your current home?
4  **A  This home was acquired as part of an estate settlement**
5    **from my mother.  It was my mother's home and in her**
6    **provisions of her trust and her will, she granted the**
7    **ownership of the home to my wife and myself as security**
8    **for a place to live for me, my family, including my**
9    **wife and my son.**
10 Q  Okay.  Can you give me an approximation of fair market
11   value of your current home?
12 **A  I believe the assessed value was approximately**
13   **$150,000.**
14 Q  Okay.
15 **A  And we've owned the home since 2020.**
16 Q  You've owned the home since 2020?
17 **A  Yes.  That's when -- my mother passed in 2019, and the**
18   **trust and the estate was settled in 2020, at which time**
19   **the ownership transferred to my wife and I.**
20 Q  Okay.  So then before you -- before 2020, where did you
21   live?
22 **A  We lived across the street from my mother.  We --**
23 Q  Okay.  Did you live in a house?
24 **A  I'm sorry.  My -- my screen went blank here.  I'm**
25   **trying to get my screen back.  Please, bear with me for**

11

1    one second.
2  Q  Okay.
3  **A  Okay, thank you.  I thought I had been disconnected.**
4    **So when I was released from the halfway house from**
5    **prison, I was released in 2009 into this community into**
6    **my mother's custody.  In the Federal system, you're**
7    **required to have a release plan, and since I was**
8    **incarcerated in Michigan, I was convicted in Ohio, I**
9    **had to have a release plan that included a provision**
10   **for a satisfactory residence.**
11   **The only residence that was available to me at the**
12   **time was in the home of my elderly mother here.  And my**
13   **mother agreed to take me and that prevented me from**
14   **being homeless in 2009.  I lived in this house with my**
15   **mother until my wife and my son came to join us in --**
16   **let's see, 2015.  And so I was here from 2009 until**
17   **2015.**
18   **I was paying rent to her and I was also doing --**
19   **paying for part of the household expenses as a**
20   **provision of my being here.  And then when my wife and**
21   **my son joined us in 2015, my mom was close to -- well,**
22   **she was over 100 years old at that time.  And our son**
23   **was three when he joined us, and so a three-year old**
24   **and a 100-year old, and my wife and I all in the same**
25   **house, it was a little tough on mom, and she asked us**

12

1    to leave.
2        So we had to go find a place on our own and we were
3    very fortunate to find a house that came open just as
4    we were prepared to go make an offer on a house farther
5    -- much farther away.  The house across the street came
6    open.  And, so, I had withdrawn savings and monies that
7    we had -- that I had saved up from prior to my
8    incarceration to purchase a house.
9  Q  And how much --
10 **A  We lived there from approximately 2015 until -- or 2016**
11   **until after my mother passed in 2019, and then we moved**
12   **back into this house.**
13 Q  Okay.  Back into your mom's house?
14 **A  Yes.**
15 Q  So the house that you lived in from 2016 to 2019, do
16   you remember how much you purchased that house for?
17 **A  Approximately $80,000.**
18 Q  Okay.  And then once you inherited your mom's home, did
19   you sell that house?
20 **A  Yes.**
21 Q  Did you realize a profit?
22 **A  Yes.**
23 Q  What did you sell it for?
24 **A  I believe it was approximately 130,000.**
25 Q  Is there a lot of acreage, do you own a lot of acreage?

M. R.
May 24, 2023

---

**13**

1  A  No.
2  Q  No?  Okay.
3  A  We're in an urban setting.
4  Q  So in 2009 you were released, correct?
5  A  That's correct.
6  Q  Were you entered into parole?
7  A  In the Federal system, there's three components to the
8      sentence that the Federal judge assigns:  One is the
9      monetary penalties; the other is the penalty of
10     incarceration, if there's any to be imposed; and then
11     the third element of that is what is known in the
12     Federal system as supervised release.
13 Q  Sure.
14 A  There is no parole.  The judge maintains custody over
15     your case after you are released from prison, after
16     you're released from the custody of the Bureau of
17     Prisons.  So the judge exercises his or her authority
18     through the US Probation Office.
19         And so I was supervised on probation.  I was
20     assigned to a three-year term of supervised release.
21     I was put into the community in 2008 in Detroit in a
22     halfway house in the inner city of Detroit, near the
23     ▇▇▇▇▇▇▇▇▇ Chrysler plant, and was told to go find
24     employment at that time.
25         I was unable to find employment, and, so I was --

---

**14**

1      stayed in the halfway house for six months, and then I
2      was released to the custody of my mother for the period
3      of my supervised release.
4  Q  So, were there any -- what were the terms of your
5      supervised release?
6  A  Well, I had a -- I was very fortunate in that my judge,
7      in the plea bargain that we entered into, I had agreed
8      to several terms of restrictive elements of the
9      supervised release.  During the actual sentencing
10     hearing and the review of the plea bargain, the judge
11     omitted most of those conditions of supervised release.
12         But the standard conditions still applied.  And the
13     standard conditions of my supervised release included:
14     I needed to find employment; I needed to have stable
15     housing; I needed to not use drugs or alcohol; I needed
16     to report to the probation officer on a regular basis;
17     I needed to have my computer monitored by the US
18     Probation Office; I needed to report any travel outside
19     the district to my probation officer, and have it
20     approved by him before I could travel outside the
21     district.
22 Q  Okay.  And you had -- do you still have to do that
23     stuff?
24 A  No.  I was -- I was sentenced to 36 months of
25     supervised release.  Upon a motion to the court after

---

**15**

1      approximately 18 months, the judge released me in the
2      interest on justice and, on the basis of my record, at
3      the 20-month-period.  So I was released, what is that,
4      16 months early from supervised release, or supervised
5      probation, I mean.
6  Q  So what year would that have been, if you remember?
7  A  Well, that began in February of 2009, so, 12 months
8      later would have 2010, 2011.  It would have been the
9      middle of 2011, approximately.  I want to say June or
10     July of 2011, although I don't know for sure.
11 Q  Okay.  Did you ever violate the terms of your
12     supervised release?
13 A  No.
14 Q  Prior your conviction, where did you live?
15 A  I lived in New York State, ▇▇▇▇▇▇▇▇▇.
16 Q  Okay.  Did you live in a home?
17 A  Yes.
18 Q  Did you own the home?
19 A  Yes.  I co-owned it with my former wife.
20 Q  Okay.  Does your -- does your ex-wife still live in
21     that home?
22 A  No.
23 Q  Okay.  At the time of your conviction, if you remember,
24     can you give me an approximation of the valuation of
25     your home?

---

**16**

1  A  I -- I really don't recall.  I mean, I was -- you know,
2      I know she disposed of the home, but I really don't
3      know what she got for it.  So, I mean, I could give you
4      a guesstimate, but it would just be a guess.
5  Q  Okay.  Maybe if you could give me just a rough
6      estimate?
7  A  150,000, perhaps.
8  Q  Okay.  Now, you said with your -- you owned the home
9      with your former ex-wife.  Did you -- am I correct
10     saying you got divorced because of your conviction?
11 A  Yes, that would be correct, although I would point out
12     that our relationship was on rocky grounds prior to
13     that.  I had a -- a -- we had been trying to attempt
14     some marital counseling and it wasn't working too well
15     for us.  And, so, when my arrest came about, I was told
16     by my wife that she wanted a divorce at that time.
17 Q  Sure.  Okay.  Do you have a high school education, sir?
18 A  I have a high school education.  I also have two
19     degrees, college degrees.  I have an undergraduate
20     degree in organizational behavior sociology, and I have
21     a graduate degree in labor and industrial relations.
22 Q  When did you get your graduate degree?
23 A  I completed my course work in 1977, and I completed my
24     requirements for the degree in 20 -- in 1980.
25 Q  Okay.  So, you completed your -- all of your education

---

17

1  before your conviction, correct?
2  A  Yes, correct.
3  Q  Post-conviction, have you sought out further education?
4  A  Only occasionally some online seminars, but nothing
5  formal.
6  Q  Okay.  What's the age difference between you and your
7  first wife?
8  A  My first wife was -- is three years older than me.
9  Q  Okay.  Before you were -- before the 2005 conviction,
10  were you employed?
11  A  Yes.  My former wife and I co-owned a company together,
12  a management consulting company.
13  Q  And how long did that -- and how long did that endeavor
14  go on for?
15  A  We purchased the company in 1989, and she dissolved the
16  company upon my release from prison in 2009.
17  Q  Okay.  So from 1989 to the time you were incarcerated,
18  you worked -- you co-owned a management consulting
19  company, right?
20  A  That's correct.
21  Q  Okay.  And if you can give me an approximation of how
22  much you made the year prior to your conviction.
23  A  It was approximately $150,000.  It fluctuated quite a
24  bit year-to-year, depending on the number of contracts
25  and clients that we had.  So, you know, an average over

18

1  a ten-year period would probably be anywhere from a low
2  of 85 to 90,000, to a high of 250,000.
3  Q  Sure.
4  A  So, I mean, in any one particular year, I mean, it
5  would average about 130 to 150,000 over, let's say a
6  ten-year span prior to my conviction.
7  Q  Okay.  So then post-conviction, let's go through your
8  employment history.  Where would you -- where were you
9  -- part of the terms of your supervised release was
10  that you had to find employment.  Did you find
11  employment?
12  A  In the Federal -- Bureau of Prisons, what you're
13  required to do is complete a -- a pre-release plan with
14  your unit team, unit management team in the prison.
15  That's then reviewed with your US Probation Officer as
16  you get closer to release.  But you remain in the
17  custody of the Bureau of Prisons until the point of
18  release.
19  What I was told and advised by my case management
20  team in the prison was that I should think about
21  restarting my -- my consulting business, because I was
22  told I would have difficulty finding employment on the
23  basis of my conviction.  And, so, I -- I listened to
24  them and I had worked in the prison system as a -- an
25  employee of the education department.  And I had taught

19

1  résumè writing, interviewing skills, how to construct
2  -- how to find a job, to other inmates.  And that was
3  -- that was part of my expertise.
4  And so when I left the prison, I was also told by
5  my US Probation Officer that it would be difficult for
6  me to find employment, and that if I could find the
7  means to restart or -- or regain employment as a human
8  resources consultant, I should do that.
9  So, with my probation officer's consent, and I set
10  up a -- a company which I own now, individually, and I
11  tried to duplicate some of the same work that I was
12  doing prior to my conviction.
13  Q  Nice, okay.  So you didn't apply -- you didn't apply to
14  any -- to an outside employer at all, correct?
15  A  I made a couple of attempts to apply for positions, but
16  because -- when I got to the convictions part of the
17  online applicant tracking system, I was always
18  precluded from applying because of my conviction.
19  Q  Okay.
20  A  I knew that would be a problem because I -- my
21  background is human resource, my labor and industrial
22  relations background.  And, so, I have worked in human
23  resources for 40 years, so I knew what the employment
24  systems were in place at the time.  And I knew it would
25  be difficult for me because there was -- there are few

20

1  restrictions in Michigan on background checking on
2  individuals.
3  And so as a normal course of matter, employers do a
4  criminal convictions check, and I was told it would be
5  seven years before that conviction might not be
6  searchable any more.  So, I had in my mind about 2012,
7  2013 because my conviction was on '05.  By 2012, 2013
8  time frame, that it would be not searchable any more.
9  And I needed to show the judge and I needed to show
10  my US Probation Officer that I was making concrete
11  steps and efforts towards establishing a business.  So
12  I -- I set up a corporation, I went to the Michigan
13  Small Business Development Center located in my city,
14  and I talked to the regional consultant.
15  And together we laid out a plan for me to get some
16  -- I guess the best word would be marketing.  So what I
17  agreed to do is I agreed to conduct training sessions
18  on a pro bono basis for the Michigan Small Business
19  Development Center.  They would then invite members or
20  people that were needing consulting work to come to
21  these training sessions.
22  And then through those training sessions, I was
23  able to start to generate a few leads.  My first year
24  out, I had zero income, and my second year out, I had
25  maybe $15,000 of income.

21

1  Q  Okay.  How about for 2022?
2  A  I had zero in income for 2022.
3  Q  Okay.
4  A  What happened was in 2014, 20 -- well, because I was
5     running these programs for the Small Business
6     Development Center, they were open to the public, so I
7     had some competitors that came to my programs to see
8     what I was doing.
9        And one of the competitors searched me up on the
10    registry and made a complaint to the state that I
11    shouldn't be permitted to do training because of my
12    conviction.  And that I was on the registry and they
13    were finding that information from the registry, and
14    the state regional office that was working with me had
15    to defend me with the state director.
16       It came out in my favor that they were going to
17    continue to do business with me, because I was a
18    returning citizen.  I wasn't doing anything that was in
19    violation of any laws or regulations.  And, so, but
20    that competitor has broadcast that information and uses
21    my registry conviction against me.
22       So I've been successful in finding a few contracts
23    out of state, but in terms of working in this region
24    and working in the State of Michigan, it's been very
25    difficult because the registry prevents me from staying

22

1     employed for any period of time.
2  Q  Okay.  So since your release, you've been self-employed
3     through your own company, correct?
4  A  That's correct.
5  Q  Okay.  If you had zero dollars -- if you had zero
6     dollars in income in 2022, how did you survive -- how
7     did you live last year, what did you survive off of?
8  A  Well, at my age, when I was -- again, when I was
9     released I was -- I have to remember my age now.  But,
10    I can -- I can say that at age 62, I applied for Social
11    Security, and because I was successful in my business,
12    I had a high earnings amount.  So I was qualified for a
13    good Social Security benefit.  So I've been able to
14    supplement with my Social Security.
15       Also, my former wife and I had a successful
16    business.  As I told you, my income was 130,000, and
17    she had a similar level of income from the business
18    because she was co-owner and worked in it with me.  We
19    put aside quite a bit of money for retirement, and for
20    our daughter's education.  And during my period of
21    incarceration, you know, she continued to contribute.
22       I paid for our -- I paid out of my share of our
23    estate for my daughter's -- our two daughter's
24    education, but at the end of my incarceration, in our
25    settlement there was a -- a division of the assets that

23

1     we had and I -- I received enough assets that I could,
2     you know, have a little nest egg, if you will, and not
3     be destitute.
4        And then I was fortunate enough, again, lucky
5     enough to be able to live with my mother, and my mother
6     had two sources of income.  She had a pension, a
7     retiree pension, survivor pension, and she had her
8     Social Security income as well.
9        And, as of now, my current wife is working.  She's
10    working full-time, and so that's providing us with
11    income for the house as well.
12 Q  How much do you receive in Social Security benefits?
13 A  My -- I don't know the complete -- correct answer to
14    that number, because I get a benefit, my wife gets a
15    benefit, and my son gets a small benefit.  My wife gets
16    a benefit for a child in care until our son is, I
17    think, 16 years old.
18       So, I would say roughly -- I could look up the
19    number, but I would say roughly 35,000 a year is our
20    benefit amount.
21 Q  So you survive off of your current wife's income,
22    Social Security benefits, whatever amount you make from
23    your own company -- these are the words you used -- the
24    nest egg, from the dissolution of the prior business
25    you had with your ex-wife, right?

24

1  A  Correct.  There were retirement savings monies that
2     were put aside for both of us in our prior company.
3     And then my share of that retirement account came over
4     to me and was invested in a rollover IRA.
5  Q  Sure.
6  A  So I've been taking withdrawals from that.  That's part
7     of how I was able to buy the other house.
8  Q  How much -- what was the value of the amount that went
9     to you from -- upon dissolution?
10 A  It was roughly $220,000.
11 Q  Okay.
12 A  I was very fortunate.  I mean, I really don't know how
13    I would have survived if I didn't have that prior nest
14    egg.  I would have been really just living with my mom
15    and scraping by as best as I could, seeing if I could
16    find a job somewhere or trying to generate my own
17    income, which is what I did.
18       What's hurt me the most has been the registry being
19    accessible by the public and people finding out about
20    my background.  And, so, I've had two instances where I
21    had one client up in the Midland area that I had worked
22    for on a contract, they were impressed with me, they
23    wanted to hire me directly.
24       And I told them I would be happy to go on payroll
25    because they were offering me a benefits package of

**25**

1   retirement, as well as some medical coverage. And at
2   the time, I was paying top dollar for ObamaCare-type
3   benefits.
4       I was hired; I went up and met with the owner of
5   the company who was a 78, 79-year old man. His
6   daughter had talked to me about being hired, and I
7   said, yes, I will be hired only if I speak to your dad.
8   I told her dad everything about my conviction from
9   2005, and he said, ███ that's okay, that's in the
10  past. You have been rehabilitated; we think you'll be
11  a good fit for our company. And so he put me on the --
12  on the payroll.
13      I worked for three months. I left to go see my
14  daughter get her Doctorate in psychology out in Oregon.
15  I took my mom out there, and when I returned, I was
16  brought in -- I wasn't even permitted in the building.
17  I was deterred at the front desk, brought into a
18  conference room. The father was there and the daughter
19  was there, and I was fired for failure to disclose my
20  background to them.
21      I was working in an industrial setting with no
22  children. We were several miles away from any kind of
23  daycare center, church, school, anything like that.
24  And what I found out from later talking with the
25  attorney for the company was that a neighbor had been

**26**

1   alerted because of my registration change of
2   employment, now being changed to Midland, Michigan that
3   this company had employed a sex offender on the
4   registry.
5       The neighbors had written letters to the owner and
6   the owner's daughter, threatening to write letters to
7   the Midland newspaper about this company now employing
8   sex offenders. So I was summarily dismissed, with no
9   severance.
10      That happened again in 20 -- I want to say 2019,
11  2017 -- excuse me. 2017, my wife had introduced me to
12  a business owner in a community near Flint, and the
13  business owner was a -- his wife was my wife, were
14  personal friends. And so he talked to me a little bit
15  about my background, and he needed a human resources
16  person.
17      And he hired me on a contract. I knew this time
18  that I wouldn't change my employment address, that I
19  would be a contractor and go in and work as a
20  contractor. But, in this case, what I did was I worked
21  there for approximately six weeks. They were going
22  through a buy-out situation. The new owners were out
23  of Green Bay, Wisconsin. The chief financial officer
24  for the new company came in on a review meeting.
25      During that review meeting, one of the employees

**27**

1   gave the CFO a copy of my registration paperwork, which
2   she had obtained off the registry. About ten minutes
3   later he was in my office asking me to pack up and
4   leave immediately.
5   Q  Okay.
6   A  So, and then I've run into other situations where I've
7   gone and made proposals to companies, and my competitor
8   who is in this area, the one who filed a complaint
9   against me with the Small Business Technology
10  Development Center, goes in. And then I get a phone
11  call back that says, we don't think you're the right
12  person for this job.
13      And I clearly have been excluded, or I don't get
14  any phone calls back at all. So, I've had to really
15  work to try to find employment in the Michigan area.
16  I have to work and see if I can find employment outside
17  the area. And because my mom was elderly at the time
18  and I had a small family, it was difficult for me to
19  travel extensively. Also, I run into restrictions
20  because of the travel requirements of the registry as
21  well.
22          (Zoom technical difficulties.)
23  Q  (By Mr. Damich) All right. Sorry about that.
24      Okay. So, the last thing I heard, you were talking
25  about that you had to search for employment outside of

**28**

1   Michigan?
2   A  Yes, because when I'm in Michigan, I have the issue of
3   who my competitors are. And the other part of that is
4   just the searchability of my background on the
5   registry, if any company or any individual wishes to
6   search me up and Googles my name, the first thing that
7   pops up on the Google returns is my sex offender
8   registration.
9       So I have to be -- every -- every contract that I
10  have to go after or every encounter that I run into
11  with a potential client, I have to weigh what is the
12  risk factor to my family, what's the risk factor to me,
13  about whether I can obtain employment or whether I will
14  be disclosed.
15      I can give you another good example. I'm currently
16  being worked as part of my work with the Small Business
17  Technology Development Center, they've had me
18  introduced to several county or regional economic
19  development people. People that are associated with
20  MEDC. These are people that have access to business
21  owners.
22      And during the pandemic, I did some consulting work
23  for the Small Business Technology Development Center to
24  -- to assist them with the shut down and the pandemic
25  issues. One of the regional economic development

M. R.
May 24, 2023

---

29

1    directors has referred to me several businesses that
2    need help in hiring and recruiting and staffing.  I've
3    talked with my consultant at M -- MI -- at the Michigan
4    Small Business Development Center.  And he says that
5    this development director probably is not aware of my
6    background, and I need to be very careful about
7    pursuing any leads he gives me, because it would
8    probably reflect poorly upon him.
9            And, so, I have to be careful with the reputation
10   of the people that I'm talking to, not to do anything
11   that would hurt their reputation.
12   Q  So is it -- if -- I'm trying to fully understand your
13      business operations and, correct me if I'm wrong.
14      Essentially, you collaborate with other businesses
15      where you will provide consulting services about hiring
16      and other HR related things, correct?
17   A  That's correct.
18   Q  And, you've been doing that since 2011?
19   A  I've been doing that for my whole career.  I've bee3n
20      doing it as an internal with a large -- well, I can say
21      the company.  I worked for General Electric Company out
22      of college, was trained there for 12 years.
23      And then Bought my own business with my wife.
24          And that's what we did, my ex-wife, that's what we
25      did from 1989 until now.  So I've been in the

---

30

1    consulting business since 1989 as an independent
2    private consultant.
3    Q  Okay.  So if you could give me an approximation of how
4       many different clients you've had since 2011 to present
5       day?
6    A  I would say approximately 12 to 15.
7    Q  Okay.  So even with your conviction -- even with your
8       felony conviction, you're still able to obtain 12 to 15
9       clients, correct?
10   A  Those 12 to 15 clients were all obtained in the period
11      of 2009 through approximately 2014, '15.  Since 2015
12      and going forward, it's been much more difficult for me
13      to acquire new clients.
14   Q  How many new clients have you acquired since 2015?
15   A  I would say two, maybe three.
16   Q  Okay.  How many hours -- how many hours a week do you
17      work?
18   A  For my business, I work when I have clients.  So I
19      don't have clients right now, so I'm not working for my
20      business right now.  I mean, I'm working to try to
21      market myself, but it's -- it's very successful at this
22      stage.
23   Q  Okay.
24   A  Yeah, the issues right now in the marketplace are
25      really working against what I do, because the clients

---

31

1    are wanting consultants who can generate people out of
2    nowhere, and I don't -- I can't generate people.  And
3    I'm not an employment service, I'm not a staffing
4    service.
5    Q  Sure.  So this past week have you performed any
6       consulting services?
7    A  No.
8    Q  How about this past month?
9    A  Approximately one hour, two hours.  I had one consult
10      with a client of mine that's a janitorial services
11      business.  So she called me on a question that she had
12      about a situation involving a return to work from
13      disability question.
14   Q  So in the past month -- so actually for the month of
15      May, you've worked approximately two hours?
16   A  That's correct.  And, to be clear, two hours for
17      billable time.  So that doesn't mean that I do nothing.
18      It means that I can bill for those two hours.
19   Q  Sure.  Right.
20   A  You know, I've prepared some marketing materials.  I'm
21      reviewing those with my Small Business Development
22      Center consultant who helps me.  And we're trying to
23      position and figure out where I can position myself in
24      the marketplace right now.  Because my services were
25      services that were really more geared towards companies

---

32

1    that are ongoing enterprises, not a start-up business.
2    a company that may be having -- well, before the
3    pandemic I had an extensive contract in Ohio.
4        This was shortly after my release and I was able to
5    go to Ohio and work for a client company down there.
6    And what I installed down there was a brand new
7    recruiting system.  I taught the team how to hire
8    people.  I worked on assessing leadership talent and
9    doing some leadership training for them privately.
10       A small privately held company down there that had
11   resources and was -- and I was able to get that job
12   through a long-term networking contact I had that went
13   back to my days at General Electric
14   Company in 1985, or '84, actually.
15   Q  Sure.  When's the last time you submitted an
16      application for employment?
17   A  When I was hired by the company in Midland.
18      (Zoom technical difficulties.)
19   Q  (By Mr. Damich)  Do you have anything further to say in
20      response to the question?
21   A  Yes, I do.  I don't apply for jobs.  What I do is I
22      send out -- I meet with business owners.  So my -- my
23      process of acquiring work is, I get referrals, or I am
24      told about a potential client that might be in the area
25      that might have some needs.

---

33

1    And then what I attempt to do is I attempt to make
2 contact with the principals, generally the owner, or if
3 there's a CFO or a chief human resources person, I will
4 attempt to get to that person. And go and sit down
5 with them and present a little bit about my credentials
6 and what I think the scenario is and what I think I can
7 do for them.
8    And then that will result in me writing a proposal,
9 a formal proposal, which outlines the terms and
10 conditions of how I would do the work, and what the
11 deliverables would be. And, so that was -- that was
12 the strategy that was discussed with my US Probation
13 Officer way back, because he said if you can avoid
14 applying for jobs, that's going to be better for you
15 because you'll have a better chance of convincing
16 somebody that you're realistic.
17    And that was the situation with the Midland
18 employer where I did that, I was consulting with them,
19 I showed them that I was a good honorable person, that
20 I had good background, and I was able to be a good
21 contributor to their business. And, then it blew up
22 because of the registry.
23    And so -- so, I mean, if there weren't the
24 registry, you know, there wouldn't have been the
25 notification to the neighbors that lived several miles

34

1 away. There wasn't even a subdivision near there, but
2 they knew the owner and the owner's daughter. And, so
3 that was like, you know, community shaming kind of a
4 situation.
5    MR. DAMICH: Well, I'm going to have to take a
6 ten-minute break. I'm going to go ahead and reset my
7 systems here, and pick back up, say, about -- 10:00
8 good for everyone?
9    MS. TILLMAN: Perfect.
10    (Brief recess.)
11 Q (By Mr. Damich) Before we took a quick break there, I
12 had asked you a question about if you had -- you know,
13 how many different places have you applied for
14 employment since your -- your release.
15    And you went and discussed about your -- your
16 attempts to obtain, it sounds like to obtain new
17 clients in your current business.
18    But the question I was asking was to see if you
19 reported -- you testified earlier that you had zero
20 income for certain years. You know, you have been
21 making so through your current company, did you ever
22 seek to go and get employed by someone else?
23 A No.
24 Q Okay. So, then, would you say that having your
25 conviction has made finding employment more difficult?

35

1 A I would say being on the registry has made it
2 difficult. I knew having a conviction would make life
3 difficult. But, I'm an human resources professional,
4 and I write policies and I work with companies on doing
5 background screening.
6    And, so, the typical background screening is done
7 seven years after a conviction. What's happened in the
8 marketplace since the registries have been in place has
9 been the background screening companies offer at no
10 cost to any employer that does a -- a criminal
11 background check, they offer also a search of the
12 registries.
13    And, so, any employee that tries to find a job with
14 a company that's doing a -- using an online or a
15 reference checking system is going to automatically get
16 a report that that person is still on the registry. So
17 I know that because I'm -- I'm the guy that has helped
18 set those up in some of my client companies since my
19 release.
20 Q Okay. But just to be clear, you have not submitted a
21 paper application to a company outside of yours since
22 you've been incarcerated?
23 A Only the position in Midland, which required as part of
24 the employment process there.
25 Q Okay. And so then I asked you if having a CSC

36

1 conviction, or having a conviction has made finding
2 employment more difficult; and, I guess, if you haven't
3 really applied anywhere, how could you say that it has
4 made it more difficult to find employment?
5 A Well, I have applied in the sense of that my work -- is
6 that my company, I own my company, I invest in my
7 company, I put my own money into my company. And then
8 I try to put myself out there and interview with
9 people.
10    It's similar as a -- as, if you think about a
11 private attorney that is trying to obtain clients, they
12 obtain their clients sometimes by word of mouth or
13 referrals. And in the process of checking out that
14 particular attorney, what you might hear might lead you
15 to look at something else in their background and say,
16 well, gee, I didn't really know that about them.
17    And, so, that's the situation that I run into is, I
18 get the word of mouth, and then the check-out is on the
19 registry. And then the --
20 Q And you know for sure every time it's because they go
21 and look at the registry?
22 A I can't say hundred percent every time, no.
23 Q Okay.
24 A I don't know because they don't disclose it to me.
25 Q You're just assuming?

37

1    A  I know it from when I have worked in a company as a
2       human resources director.  I will give you an example
3       of a company that I worked for down in the Brighton
4       area.
5          It was an industrial manufacturing company, again,
6       isolated away in a business park.  And we wrote a
7       policy about screening applicants and required
8       applicants to fully list convictions on their
9       background and on their record.  And we had an
10      applicant that did not list a conviction because it was
11      outside the seven year statute.
12         But it did pop up as a CSC on the registry.  That
13      candidate was denied employment, and this was for an
14      operator job in the factory, you know, a $12 an hour
15      job, so.
16   Q  Do you think that maybe he was denied employment
17      because he wasn't fully truthful on his application?
18         MS. TILLMAN:  Objection, calls for
19      speculation.
20         You can answer.  Sorry.
21         THE WITNESS:  Okay.  He was denied because the
22      reg -- the CSC conviction was disclosed via the
23      registry, and that gave the company the pretext to deny
24      him application because he was not honest and truthful
25      in his background.

38

1    Q  (By Mr. Damich)  In that application, did the
2       application ask for this individual to list felonies
3       and prior convictions?
4    A  Yes.
5    Q  And he didn't list this one, correct?
6    A  Because it was more than seven years ago.
7    Q  The question was:  He didn't list it though, right?
8    A  That's correct.
9    Q  Do you remember if that application asked specifically:
10      Are you a registered sex offender?
11   A  It did not.
12   Q  So it asked you about the conviction, correct?
13   A  That's correct.
14   Q  Okay.  So it would be the conviction that would prevent
15      the individual from being hired, not the actual
16      placement on the registry?
17         MS. TILLMAN:  Objection.  You can answer.
18         THE WITNESS:  I don't know the answer to that
19      question.
20   Q  (By Mr. Damich)  Why not?
21   A  I can tell you that when it came back that he was on
22      the registry, I was there in the room, and the plant
23      manager and the director of operations said we don't
24      want somebody with that kind of a background working in
25      this factory.

39

1    Q  Okay.
2    A  And I said, you have to be careful because you may have
3       a situation where you have a legal case if you're
4       denying his employment for something that you're
5       finding on a different background check.  They said we
6       will take the legal risk to do that, and that's the
7       choice that they made.
8    Q  Okay.  When did you marry your second wife?
9    A          and I were married in January 26th, 2012.
10   Q  Where did you two meet?
11   A  We met on an online dating site.
12   Q  What site?
13   A  Cupid.com.
14   Q  And where was your wife located when you met on the
15      Internet?
16   A          , my wife, was located in the Philippines.
17   Q  And where were you at, were you in Michigan?
18   A  Yes.
19   Q  And cupid.com, was that geared towards a certain type
20      of relationship?
21   A  Not that I'm aware of.  It -- just a standard dating
22      site at the time.
23   Q  Do you remember why you chose cupid.com over any of the
24      other ones?
25   A  It just seemed to have less people on it that were

40

1       sketchy, to use a slang term, I guess.  Just seemed to
2       be better curated, I guess, would be my reason.
3    Q  Have you traveled to the Philippines before 2012, or
4       before you --
5    A  Yes.
6    Q  Did you travel to the Philippines before you met your
7       current wife on the online dating site?
8    A  No.  I met her on the online dating site.
9    Q  Okay.
10   A  She saw my profile and sent me a message.  I wasn't
11      interested in her initially, and then she was very
12      persistent.  And we talked and talked, and I ended up
13      wanting to assist her with her education was my initial
14      motivation.
15   Q  Okay.  How old is your wife?
16   A  She's 35.
17   Q  And how long have you been married?
18   A  We've been married for ten years.
19   Q  So she was 25 years old when you got married?
20   A  That's correct.
21   Q  And how old were you answer you got married?
22   A  59.
23   Q  How long did you converse on the Internet before you
24      actually met in person?
25   A  Approximately nine months.

M. R.
May 24, 2023

41

1  Q   And then did you -- what happened -- why did you meet
2       in person for the first time?
3  A   I'd have to go back and look at my records, and you
4       know, I -- I want to make it clear that I was removed
5       from supervised release.  I had no computer monitoring
6       requirements at the time that I was using the computer.
7            So I may have earlier misspoke about the date of
8       release from supervised release.  I'd have to go back
9       and look at the records.  I don't have those in front
10      of me, but, my memory is that I was -- met her in late
11      -- late -- September 26th, 2012.  Let's see.  It was
12      late 2010, 2011, somewhere in the -- early 2011, maybe,
13      when I met her.
14  Q   Okay.  And you were off supervised --
15  A   I was off supervised release and I had no restrictions
16      on computer usage at that time.
17  Q   Okay.  And why did you find that relevant to tell me
18      that?
19  A   Because I would be prohibited from using the computer
20      for going to an online dating site at that time.
21  Q   Okay.  And why is that?
22  A   Because that was one of the restrictions that's imposed
23      by my supervised released.
24  Q   Okay.
25  A   Was that my computer was monitored, and that I was not

42

1       permitted to use it for any other purposes other than
2       my business.
3  Q   Then, you got married in 2021, and then, did you have a
4       child; is that right?
5  A   Yes.  We were married in September -- in January of
6       2012, and then our son was born in September of 2012.
7  Q   I want to talk about your conviction a little bit.
8       Again, this happened -- the conviction happened back in
9       -- you were convicted back in 2005, correct?
10  A   Correct.
11  Q   And, if I'm correct, if I'm - if my records are
12      correct, you were convicted under 18 USC 2422B for
13      coercion and enticement of a minor?
14  A   Correct.
15  Q   Okay.  What did you do?
16  A   What I was doing was I was on the computer chatting
17      with a woman who purported to be in her 30s,
18      35-year-old woman.  And we had been discussing having a
19      relationship on the computer, not a relationship on the
20      computer, but an in-person relationship.
21           And so I had talked to her several times on the
22      computer about getting together to meet.  She
23      introduced a daughter into the equation, and started to
24      tell her daughter towards me as a potential partner for
25      the relationship.

43

1            And I foolishly played along with it.  And after
2       several months of being encouraged to come and visit
3       with her in Ohio, I made a bad choice and went out and
4       tried to visit with this person who was an undercover
5       agent.  And I drove to the community, did not go to the
6       meeting site, had second thoughts, and -- and was in
7       the process of leaving the community and was arrested
8       for crossing state lines.  And also for the coercion
9       and enticement charge.
10  Q   Okay.  Do you remember what -- what chat room you were
11      using?
12  A   I don't remember.
13  Q   Okay.  But you said there were several months of
14      requests to meet up; is that correct?
15  A   That's correct.
16  Q   And were -- all the communications were over the
17      Internet, right?
18  A   That's correct.
19  Q   Now, were there lewd conversations over the Internet?
20  A   There were conversations about sexual preferences.
21  Q   Sure.
22  A   And conversations regarding intercourse and different
23      sexual activities.
24  Q   And how old did you believe the daughter to be?
25  A   I believed the daughter to be 14.

44

1  Q   Do you think a 14-year-old has the ability to consent
2       to sex?
3  A   No.  But I should make it clear, I never spoke with the
4       daughter.  I was always speaking with the mother, and I
5       never asked the mother for sex with the daughter.
6  Q   Was that the first time you ever used a site like that?
7  A   No.  I had met other women online.  I mentioned earlier
8       that my wife and I were going through marital
9       counseling at the time of my arrest.  And the reason we
10      were going through marital counseling was because I had
11      had several affairs with women, adult women, and was
12      really not in a good place emotionally with respect to
13      my relationship with my then wife.
14  Q   How old were you by that time?
15  A   I would have been approximately 50 when I started
16      these --
17  Q   Okay.
18  A   -- these trysts.
19  Q   Sure.  And, what were the age ranges of the potential
20      women that you were going to have an affair with?
21  A   The women that I talked to and that I met were
22      typically in the range of 25 to 50 years old.
23  Q   Approximately how many times did you meet up with
24      someone from the site?
25  A   Eight or nine.

M. R.
May 24, 2023

45

1  Q  Do you find 14-year-old's attractive?
2  A  I'm not sure I understand that question.
3  Q  Are you attracted by 14-year-old females?
4  A  No.  I mean, if you're asking in a sexual sense, no, of
5     course not.
6  Q  Were you at the time that you were going to go meet up
7     and perform sexual relations with a 14-year-old,
8     leading up to your conviction?
9  A  I was never intending to perform any sex with a
10    14-year-old.  I was intending to perform sex with the
11    mother.
12 Q  Okay.  But that 14-year-old was going to be involved,
13    right?
14 A  The 14-year-old was involved in some undefined way by
15    the mother.
16 Q  Did you find that attractive?
17 A  Not really.
18 Q  Okay.
19 A  I wasn't interested in her, I was interested in the
20    mother.
21 Q  Okay.  Were there any other scenarios that you had
22    chats with individuals that were -- seeking to
23    introduce their daughters into a sexual relation with
24    you?
25 A  No.

46

1  Q  Okay.  So, then, you said you drove to the town, and
2     then you started having second thoughts; is that right?
3  A  That's correct.
4  Q  Why did you start having second thoughts?
5  A  I just had a feeling that what I was doing was wrong.
6     I had a -- my wife and her -- our youngest daughter,
7     were on a college visit that weekend.  They were out of
8     town, and I just got -- and during the drive, I just
9     thought, this is not a good thing for me to be doing.
10    I need to stop doing this.
11        And, so, I -- I didn't complete the meeting at the
12    assigned location.  I stopped and -- and was attempting
13    to leave the -- the -- the area when I was arrested by
14    law enforcement.
15 Q  Was there any concern at all about the impact you had
16    on the 14-year-old that you were going to perform
17    sexual relations with?
18 A  I had no intent to perform any relationship with the
19    14-year-old, so, I would not have involved myself with
20    any 14-year-old.
21 Q  Okay.  How was she supposed to play into the equation
22    then?
23 A  It was unclear to me.
24 Q  Okay.
25 A  The mother was supposed to, quote, bring her along.

47

1     And I was, okay, that's fine, you know, we'll figure it
2     out.  It was a bad choice that I made at a bad point in
3     my life.  And I regret it sincerely, and I have great
4     remorse for the damage that I've caused to my family
5     and others around me.
6  Q  Okay.  Do you still frequent Internet chat sites?
7  A  No.
8  Q  Okay.  So, do you -- are you attracted to women that
9     are substantially younger than you?
10 A  I guess I would say that I have no preference.  I'm
11    attracted to a woman who's intelligent and is -- has a
12    good self image about themselves.
13 Q  Okay.
14 A  I'm not attracted to any woman who would be a minor.  I
15    need to make that very clear.  That's off limits, out
16    of bounds, that doesn't count.  I have daughters of my
17    own and I would never have any interest in any underage
18    woman.
19 Q  Okay.
20 A  Prior to meeting my current wife, I had dated women in
21    their 50s, and -- and in all instances, the three
22    instances that I had meetings and dates with these
23    women, who I also met on dating sites, these American
24    women, as soon as we got to the point of some serious
25    relationship, my conviction became an issue.

48

1     And so it was -- it was clear to me that I was
2     going to have some difficulty in that area as well.
3  Q  So then you decided to go international?
4  A  I put a -- my wife is the one that made me decide to go
5     international.  She had put a -- she had saw my posting
6     and contacted me, so, I had no intent to go
7     international at all.  I had never -- I didn't even
8     know where the Philippines was.  I thought it was a US
9     related territory, but I didn't know anything about it.
10    I'm happy that I made the choice that I made.
11 Q  Okay.  So you -- you're currently required to register,
12    right?
13 A  That's correct.
14 Q  In Michigan?
15 A  That's correct.
16 Q  And when I say register, that means register as a sex
17    offender at a Michigan sex offender registration area,
18    correct?
19 A  That's correct.
20 Q  And.  How often do you have to do that a year?
21 A  I have to do it two times a year.
22 Q  And where do you do that at?
23 A  I do it at the local Michigan State police post.
24 Q  Okay.  How far away is that from your residence?
25 A  Approximately three miles.

49

1  Q  Now, can you give me an approximation of how much time
2     it takes you to register, or update your information if
3     the MSP is three miles away?
4  **A  Well, I have to plan the trip, because sometimes it's**
5  **unpredictable what's going on at the post.  But,**
6  **generally it takes me about an hour.**
7  Q  Okay.  And that includes travel time?
8  **A  Yes.**
9  Q  So registering takes two hours out of your year?
10 **A  That's correct.**
11 Q  Okay.
12 **A  Complying with the registration requirements takes up**
13 **the balance of my year.**
14 Q  What type of information do you need to report to law
15    enforcement?
16 **A  Well, the -- the requirements change in Michigan, and**
17 **so they have changed.  So my most recent reporting**
18 **requirements were that I have to report my vehicles.**
19 **I have to report my driver's licenses.  I have to**
20 **report my phone numbers.  I have to report my email**
21 **addresses.  I have to report any planned travel that I**
22 **have to make -- that I'm making.**
23 **When I was traveling to the Philippines, I reported**
24 **all my travel in advance, and that actually resulted in**
25 **me being excluded from attending -- visiting the**

50

1  **Philippines after our marriage and after our son was**
2  **born, so.**
3  Q  I'm going to go ahead and share my screen with you real
4     quick.  Give me a second here.
5     Let me know when you see the document that comes
6     up.  Do you see it?
7  **A  I see that.**
8  Q  Do you recognize this document at all?
9  **A  Yes.  I think it was sent to us -- or to me after the**
10 **last change to the registry was made.**
11 Q  Okay.  And then I'm going to offer this as Deposition
12    Exhibit A.
13    (Whereupon Defendants' Deposition Exhibit A
14    was marked for identification.)
15 Q  (By Mr. Damich)  You previously had testified about
16    information that you have to report twice a year to law
17    enforcement.  Is the type of information on this form
18    the type of information you have to report?
19 **A  Yes.**
20 Q  And, if we look at that form under Roman Numeral I,
21    where it says, offender information, is there anything
22    under that section that is confusing to you?
23 **A  I do not have a Michigan Department of Corrections**
24 **number.**
25 Q  Okay.  So did that make that confusing to you?

51

1  **A  Yes.  I'm not sure what I'm supposed to do with that**
2  **category.**
3  Q  Would you just -- if you don't have one, would you just
4     put maybe N/A, not available?
5  **A  I would leave it blank.**
6  Q  Okay.  How about number two, temporary residence
7     information, is that -- do you find that confusing?
8  **A  Yes, because I don't know what that implies, what**
9  **that's related to.  For instance, if I'm traveling for**
10 **business or to visit one of my children out of state,**
11 **and I go to stay with them for longer than a -- the**
12 **period of time that's -- that I have to register that,**
13 **do I report that temporary residence information there,**
14 **or is that related to where I'm living right now in**
15 **Michigan?**
16 Q  Sure.  If you -- if you wanted to get an answer to that
17    question, would you call anyone and ask?
18 **A  I would go to the state police post and ask the**
19 **Sergeant at the desk.**
20 Q  Okay.  And, have you done that in the past?
21 **A  I have.**
22 Q  Have you received -- have you received good responses?
23 **A  I've received a variety of responses.  I've -- the**
24 **responses sometimes are, I will need to check on it,**
25 **and they go and check on it.  Sometimes the response**

52

1     that I've gotten is, you don't need to report that.
2  **Other times I've been told that I needed to report**
3  **it in a different place.  So, they do attempt to answer**
4  **the question, but the answers are -- are varied**
5  **sometimes depending on who you talk to.**
6  Q  Sure.  Have you ever been found in violation of your
7     self reporting requirements yet?
8  **A  No.  I try to make sure that I'm always in compliance**
9  **with my reporting requirements, because I do not want**
10 **to be arrested or otherwise charged with a crime.**
11 Q  Sure.  Okay.  So, then, if we go back to the form, so
12    you said temporary residence information, and that
13    might be -- that's something that might confuse you a
14    little bit.  You'd have to check with MSP,
15    How about contact information, is there anything
16    that's confusing there?
17 **A  No.**
18 Q  Okay.  How about vehicles?
19 **A  No.  I've had to go in a couple of times and update**
20 **vehicle information.  Most recently, when my mother's**
21 **vehicle was transferred to me upon her death.  We had**
22 **to reregister that vehicle to make sure that it was**
23 **property assigned in my name and not her name any more.**
24 Q  Makes sense.  So since March of 2021, how many times
25    have you had to update your information?

M. R.
May 24, 2023

53

1    A  Well, that would have been December of 2021 and January
2       of 2022, December -- no, March of 2021, June 2022,
3       December 2022, three times.
4    Q  And you said those times you have done it in person?
5    A  Yes.
6    Q  Okay.  Are you aware that you could -- you can mail in
7       updates, as I think this form indicates?
8    A  I am aware of that.  I don't trust the mail system and
9       it is confidential and private information.  And so I
10      would rather report directly to the State Police post
11      because I know there at least it's maintained in
12      confidence.
13   Q  Okay.  Sure.  Understandable.  Why don't you trust the
14      mailing system?
15   A  Well, because my mother had a check that was stolen out
16      of the mail system.  I have had friends that have had
17      their personal identifier information lost in the mail
18      system.  And then eventually their identity's been
19      compromised.  So when I'm dealing with something like
20      this, if I was to mail it in, I would send it certified
21      mail to ensure that I had evidence that it had been
22      received.
23   Q  Do you use the US Mail a lot?
24   A  For my business I've used it several times.  And in all
25      matters that relate to any legal or financial matters

54

1       with the IRS, I always use the US mail service.
2    Q  Okay.  So the US mail service is reliable when it comes
3       to the IRS in that regard, but it's not when it comes
4       to your SORA reporting requirements?
5    A  It's not if I drop it in the mail with a stamp on it.
6       It's more reliable if I have a tracking system
7       associated with it.  And there's an extra cost to doing
8       that, so it's actually cheaper for me to go and drive
9       in to the State Police post and wait the time, and then
10      I know it's done.
11   Q  There's penalties for filing tax returns late, right?
12   A  Correct.
13   Q  Okay.  Do you have a concern if you don't send in your
14      tax returns by certified mail that maybe the IRS won't
15      get it and you'll get hit with late charges?
16   A  Yes, of course.
17   Q  Then why don't you do the same process for your taxes
18      that you would propose to do for your SORA mail-in
19      requirements?
20   A  I could.
21   Q  Okay.  And wouldn't you agree that it would be
22      physically easier, I mean, from a physical standpoint,
23      you don't have to actually get out, go in your car and
24      drive to the police station, and take an hour out of
25      your day.  You just have to drop it in the mail,

55

1       correct?
2    A  I still have to drive to the post office and fill out a
3       certified envelope and complete it.  So there's still a
4       -- there's some still some burden on me for doing that.
5    Q  Okay.  But it would be less than actually going to the
6       actual post itself to deliver it, right?
7    A  The post office and the State Police post are almost
8       equidistant away from my home.  So both of them would
9       be about the same time.
10   Q  Okay.  Fair enough.
11   A  One is free and the other isn't, so I would probably
12      pick the free one.
13   Q  Okay.  Are you involved in any extra curricular
14      activities?
15   A  I'm involved in the Bible study group at my church.
16   Q  Okay.  Have you been accused of any crimes since your
17      2000 -- since your previous conviction?
18   A  No.
19   Q  So you say you participate in the Bible study groups.
20      Is there -- are there any other groups that you seek to
21      be a part of, but you weren't able to because of your
22      status as a sex offender?
23   A  I was -- I want to talk about my son, to answer that
24      question, and also our son.  Our son is a fourth grader
25      in elementary school.  Prior to the pandemic, he was

56

1       enrolled in a private religious school.  And -- as he
2       was enrolled there when he came to America in 2015 with
3       my wife.  And when he was enrolled in the private
4       school, the religious school, I had been advised to
5       make sure that the supervising religious official at
6       that school was aware that I had a conviction, and that
7       I was on the sex offender registry, which I did.
8          And the supervising religious official and the
9       supervising principal said, that's okay, we're welcome
10      -- you're welcome to be here.  Just, if you come to the
11      school, please come to the office and one of us will
12      escort you to your son's classroom, if you want to go
13      to your classroom, or, if you're here for a family
14      event, just please bring your wife.
15         And, so, I was able to comply with those
16      requirements from 2015, 2016, 2017.  And then in 2018
17      that changed, and I was -- my wife and son and I were
18      in the car coming back from a short trip to the -- a
19      friend's house in the Midwest, and I was given a call
20      by the principal of the school, five days before the
21      school year began.
22         The principal asked me and my wife to come into the
23      office and meet with him and the supervising religious
24      official.  And what we were told was that I was now
25      going to be required to not come on the school

57

1  property, not attend religious services with my son
2  during the school day, and not participate in any
3  school activities any more.
4       As a private institution, they certainly have the
5  right to do that, but this was the result of, again, an
6  overly zealous parent or teacher, I do not know which,
7  but someone had alerted the principal that they felt
8  uncomfortable with me being in the school.
9       And so because of that, I was prohibited from
10  participating in our son's religious education and also
11  in his school education.  Our son has an IEP, an
12  Individual Education Plan, because he has a speech
13  therapy problem.  And so I was required to not come
14  into the school and not meet with the teacher and the
15  speech therapist, and the -- the special ed person that
16  was helping our son with his speech therapy problem.
17       Instead, it was done similar to this, where I had
18  to call in on a Zoom call.  And so it was difficult
19  because our son is now -- we had to take our son to
20  some counseling this year as a result of this, because
21  my son had questions, why can't daddy come to school
22  and can't go to church with me any more.
23       And, so, now we've had to discuss with our son, at
24  age 11, the fact that people are nosey and that people
25  will find out information about dad, and the

58

1  information they find out may not be fully complete and
2  may not fully accurate.  And they may be used against
3  him to make him feel bad, or to diminish him in some
4  way, so.
5  Q  So it's your belief that your son needs counseling
6     because you're on the sex offender registry?
7  A  It's not my belief.  It was suggested to us by the
8     religious official who said to us in the meeting, well,
9     doesn't your son know about this?  And the answer was,
10    no, he's only in first grade.
11 Q  Sure.
12 A  And the answer was, well, you're going to need to tell
13    him at some time, and when you do, you need to make
14    sure you have counseling for him.  And it was discussed
15    with another friend of mine who's a counselor, and he
16    suggested that that would be an appropriate thing to do
17    to make sure that we were preparing our son
18    appropriately so that he wouldn't get an a-ha, gotcha
19    kind of a moment by one his classmates who would be
20    able to find out by Googling my name what a bad person
21    daddy was.  So, yes.
22 Q  Sure.
23 A  There are significant impacts in my life to being on
24    the registry that prevent me from participating in
25    regular activities that most parents would participate

59

1  in with their children.
2  Q  Wouldn't you say though that it's your conviction
3     that's preventing you from participating in those
4     activities though, sir?
5       I mean, and I understand that, you know, that your
6     son's friends are able to find out, you know, perhaps
7     on the registry and Google your prior offenses.  But is
8     it potentially a problematic that your son has to think
9     about the crime that you've committed, and that's
10    what's causing the problem, not you being listed on the
11    registry?
12 A  My son knows that I'm a good father.
13 Q  Sure.
14 A  And, what I would point out, sir, is that on January of
15    2005 when I pled to the plea bargain, I was told by the
16    US attorney and I was also told by my -- my attorney
17    that my registration period would probably -- would --
18    not probably -- would be approximately ten years upon
19    release.  And at that time, that's what I plead to.
20      And so when I was released from prison in 2008 and
21    went to the State Police post and registered, I was not
22    given a time frame for my -- my registration period,
23    because there was not one at that time.  And then a
24    year and a half later I was told that my registration
25    period was 25 years.

60

1       So my issue is simply that expanding -- I had
2  planned on being on the registry for ten years after
3  release, so that would be 2019 -- what would that be,
4  2019, 2020.  And I would -- had been advised by private
5  counsel prior to that time that I was suffering no
6  injury until I was beyond that point of that ten-year
7  period that I had been told I would be registered for
8  at the time of my conviction.
9       So I -- my -- my concern, or my personal issue with
10 my family, is simply that my registration period was
11 anticipated to be one set of time frame, and as when I
12 pled, and yet upon my release, my -- my time frame has
13 been more than doubled from ten years to 15 -- 25
14 years.
15      So, for me, you know, that's the issue, is that I
16 had made a calculation in my mind that I would be off
17 the registry by now, and I would still be a viable
18 person for employment and consulting work and other
19 things of that nature.  I would maybe have a chance to
20 restart a family, and yet I'm still on the registry.
21      So every time -- every time -- so my conviction is
22 -- is in the past.  It's almost 20 years old now.  And
23 yet the registration requirement is what points people
24 towards the conviction.  And no other factor in my life
25 points people towards a conviction -- I mean, the

61

1    registration.
2  Q  Is it your belief that if the Michigan Sex Offender
3     Registry did not exist, no one would be able to find
4     out by a simple Google search of your name, find out
5     what you did?
6  A  No.  My record is public record.  People could find
7     out.  An employer could find out through normal
8     employment verification processes that I have a
9     criminal record.
10 Q  Sure.
11 A  What my concern is, is the public nature of the
12    registry, and I will point out one other event if it's
13    okay, please, that two summers ago -- let's see -- no
14    -- we're in 2023 -- in 2021, in the summer of 2021,
15    after we had moved back into this house, I had my son
16    and two of his friends in this house.
17       One of the friends is a 12-year old girl.  The
18    other friend is a 13-year old boy, and my son was nine
19    at the time.  The phone in this housed rang and I
20    answered the phone, and it was a person who said that
21    they were a deputy sheriff with the County, and that I
22    was in violation of the registry because of -- or, I
23    was -- I had an arrest warrant, because I had failed to
24    appear for a mandatory DNA screening that they had
25    notified me about six months earlier.

62

1       I had no idea if this was a legitimate call or not.
2  My son overheard me on the phone and texted his mother,
3  who was at work at the time, about daddy's on the phone
4  with the police and somebody says they're going to come
5  and arrest him.
6     So this was a scam call, but not until I was able
7  to get these kids safely to another house and drive to
8  the Michigan State Police post, all the while with this
9  individual on the phone with me -- I'm now on my cell
10 phone -- threatening to send a sheriff patrol car to my
11 house to arrest me, that was a significant traumatic
12 experience for my son, a significant traumatic
13 experience for my wife.
14    In fact, so traumatic that my wife won't drive
15 because she knows that the car, make, model and license
16 plate number is registered and available for any public
17 person to -- to review.
18    It also affects our ability to live outside our
19 house, as people that go by the house, strangers, we
20 don't know if they have bad intent or if there's a bad
21 actor that's using this information in a -- in an
22 appropriate manner.
23 Q  Sure.  Again, the question before all that was:  Isn't
24    it possible that it's, you know, that the fact that
25    your son needs counseling is because of what you did?

63

1  A  No, it's not.
2  Q  No?
3        MS. TILLMAN:  Objection.  Asked and answered.
4     You can answer.
5        THE WITNESS:  No, it's not.
6  Q  (By Mr. Damich)  I'm going to go ahead and bring up
7     another document for you to review and for us to talk
8     about here.  Give me a second.  Let me know when you
9     see the screen come up.
10       Do you see it?
11 A  Oh, that's really small print.  I can see it.
12 Q  Is that a little better?
13 A  That's better.  Thank you.
14 Q  How about one more?
15 A  That's too big, make it a little bit shorter.  I can't
16    see the whole screen.  There you go.  That's good.
17 Q  Okay.  So --
18 A  I've got to take my glasses off.
19 Q  So, real quickly before you start reading, what this is
20    here, sir, is a -- it's a document that has a series of
21    factual statements from various cases, judicial
22    decisions, over the years.
23       I'm going to have you read some of these factual
24    scenarios and I'm going to have some questions for you
25    after you're done reading them.  So, if -- I'm going to

64

1  go ahead and mark this as Exhibit B, if that's okay.
2     And, then, Dayja, if you have your objection?
3        MS. TILLMAN:  Yup.  I'll just put the global
4  objection on the record.  So, notwithstanding the
5  Court's order allowing the use of this exhibit, we
6  still want to put the objection to the use of this
7  exhibit and any of the questions, you know, associated
8  with this exhibit as irrelevant and improper.
9        MR. DAMICH:  Sure.
10       (Whereupon Defendants' Deposition Exhibit B
11       was marked for identification,)
12 Q  (By Mr. Damich)  Could you read number four for me,
13    sir, and let me know when you're done?
14 A  Okay.  I'm done reading.
15 Q  Would you want to know if this perpetrator lived next
16    door to you?
17 A  I wouldn't really care who lived next door to me.  It's
18    not my business what they do in the privacy of their
19    home.  And if they're living next door to me, then they
20    must have been released from prison under some sort of
21    supervision plan that states that they're able to
22    return to the community safely.
23 Q  Yeah.  Would you let this perpetrator tutor your child?
24 A  Again, if the person is in the community, then they
25    have completed some sort of behavioral counseling at

M. R.
May 24, 2023

65

1    some point in the system, similar to me.  And at some
2    point some psychologist or authority figure have
3    determined that they're rehabilitated enough to make a
4    living again and be in the community.
5  Q  Do you believe that they're no longer a risk upon
6    release?
7  A  If they've been determined to be low risk by whoever is
8    evaluating them, and whatever rehabilitation they've
9    gone through, I would -- I trust the system to make
10   sure that people are getting proper rehabilitation.
11 Q  So what if this individual was released, but they're
12   still considered high risk?
13 A  Well, if they're operating as a tutor, they have to be
14   licensed at some point in the State of Michigan.  And
15   Michigan's licensing requirements would prohibit this
16   person from operating as a tutor in that regard.
17 Q  Okay.  Let's assume that those licensing restrictions
18   don't exist then.
19 A  Well, that's an assumption.
20 Q  Correct, it is.  It's an assumption.  You're absolutely
21   correct.  We're assuming it just for the purpose of
22   this question.
23 A  It's none of my business what people do in their homes
24   and what people are doing next door.  I mean, the
25   person in this case has a family relationship with a

66

1    victim.  And, so, it's an opportunistic situation, and
2    that's a completely different scenario than anything
3    that I'm familiar with.
4        And I -- you know, again, this person, you know,
5    there's lots of people that have lots of different
6    issues with drugs, alcohol, weapons, violence and other
7    things, too, that are in the community, and they live
8    next door to me already, so.
9  Q  So you wouldn't care?
10 A  I don't view this person as a risk to my family or me.
11 Q  Okay.  But if they had -- if this individual had direct
12   contact with your family on a more regular basis, would
13   you consider them a risk to you or your family?
14 A  Probably not because, again, this is a family
15   relationship scenario, and I just don't see where it's
16   relevant.  I mean --
17 Q  A 24-year old touching a seven- to ten-year old in her
18   private areas?
19 A  That's a personal issue between that person and the
20   victim, that's no concern of mine.  So, I'm not going
21   to say that I would condone the behavior.  Certainly I
22   don't condone that behavior, but I would not see that
23   as a risk factor to my family.
24 Q  How about number 12, could you read that one for me?
25 A  Okay.

67

1  Q  Okay.  Would you want to know -- would you want to know
2    if this perpetrator was living next door to you?  Or
3    let me -- how about this way, do it this way:
4        Would you want to know if one of your family
5    members was going on a date with this individual that
6    they met online?
7  A  It wouldn't matter -- I mean, I don't know why I would
8    be interested in that.  You know, again, a conviction
9    is one thing, rehabilitation is another thing.  So, you
10   know, if you're looking at this conviction, you know, I
11   don't know the date -- oh, 2019, so, you know, my
12   assumption is that this person is incarcerated at this
13   point.  And, so, I would be highly -- I mean, I'd be
14   surprised if they were able to go on a date.
15 Q  Well, let's assume -- for purpose of this question,
16   let's assume that they're not incarcerated, that they
17   are active on dating sites, and that someone in your
18   family is about to go on a date with them; would you
19   want to know this information?
20 A  Again, it's not my -- it's not my place to substitute
21   my judgment for that of another family member.
22 Q  So you would withhold this information from another
23   family member?
24 A  If the information came to me, and I knew that the
25   person was going on a date with one of my family

68

1    members, no, I would not withhold that information with
2    me.  But, I would not go search it out either.
3  Q  If you could read number 13.
4  A  Done.
5  Q  Let's assume that neither of these perpetrators are in
6    jail, okay, or in prison -- or in prison.  And one of
7    your family members are set up to go out on a date with
8    one of these two perpetrators.  Would you want your
9    family members to know this information about these
10   perpetrators?
11 A  Why would they not be in jail?
12 Q  Just, again, for purposes of the question, we're just
13   assuming they're not.
14 A  These are all really severe examples of sexual
15   behavior.  And, so, my -- my concern would be simply
16   that these are much different than my conviction.  And,
17   so, I'm not really sure how these relate to my
18   conviction and my situation.
19       But the answer to your question would be simply
20   that as -- as a parent, we would always want to be
21   concerned about our children, no matter what age they
22   are.  And I think every father and every mother would
23   want to make sure that their daughter or son was
24   protected as much as a father or mother might be able
25   to help them.

M. R.
May 24, 2023

69

1        On the other hand, you know, people have different
2    underlying issues and motivations.  And there's not
3    enough information here to know about these people and
4    what their scenarios are.  I mean, I see the act and
5    the act is repulsive, and the act is -- is illegal, and
6    certainly the person should be punished for doing what
7    they did.
8        The person should also have the chance to be
9    rehabilitated and be given a second chance if they can
10   rehabilitate themself.  So, I don't know where they
11   would be at in their rehabilitation process either.
12   Q  Okay.  Even -- absent that knowledge, you would -- you
13   wouldn't let your family know about this situation
14   before they'd go on a date?
15   A  This is not a date scenario, a date rape scenario, so.
16   Q  No, my hypothetical -- my hypothetical was a scenario
17   that we --
18   A  Yeah.  No, I get it.  I understand.  You know, again, I
19   -- I find it repulsive, repugnant, and if the
20   information came to me second-hand or third-hand, I
21   would probably check it out and then decide if this was
22   appropriate to share with my family member.
23   Q  Okay.
24   A  What's missing is the context of these behaviors, and
25   the context of the person involved, and so I think we

70

1    can pick and choose situations from everybody's case
2    and find the worst parts of the case, for sure.
3    Q  Okay.  If you can read number 17 and let me know when
4    you're done.
5    A  Okay.
6    Q  Would you, assuming that this perpetrator is not in
7    prison or jail, and assuming that this perpetrator has
8    asked one of your family members on a date, would you
9    want to know this information before they went on a
10   date?
11   A  Well, I'll give you the same answer that I've given you
12   before.  It all depends on the situation and the
13   circumstances.  You know, these are violent behaviors.
14   These are behaviors that, if we're going to report
15   behaviors of violence, we should report all behaviors
16   of violence.
17       And, so, you know, to me, I would be more concerned
18   about the violent aspects of the behavior, the other
19   part of that, the sexual part of that is -- is
20   certainly a concern, too.
21   Q  How about number 22, can you read that and let me know
22   when you're done?
23   A  I'm finished reading that.
24   Q  Okay.  Would you want to know this information before
25   you'd hire this perpetrator as a babysitter for your

71

1    child?
2    A  We don't hire babysitters for our child.  We have them
3    stay with known people.
4    Q  Sure.  Okay, but, assuming that you -- let's just
5    assume that you were looking for babysitters and you
6    came across this name, this perpetrator's name, would
7    you want to know this information?
8    A  I'll give you the same answer as before.  It all
9    depends.  I mean, I don't know anything about this
10   situation.  I don't know anything about these people.
11   I don't know anything about this relationship.
12       This is a horrible, egregious situation, and
13   clearly the person who is the perpetrator in this
14   situation has issues way beyond, you know, issues of --
15   of being a normal member of society.  And, so, you
16   know, I would be -- I would do background checking on
17   any babysitter, and if I was to find this as a part of
18   their background, I certainly would not hire the
19   person.
20   Q  Okay.  Do you think the Sex Offender Registry protects
21   the public in any way?
22   A  No.
23   Q  And why do you have that belief?
24   A  I've read research and data that indicates that the sex
25   offender registries are administratively -- well, let

72

1    me -- let me restate that.
2        I've read research and data which indicates that
3    people that are on the sex offender registries are less
4    -- what's the word I'm looking for here?  The research
5    shows that what I've read, it said there has been no
6    correlation between being on the Sex Offender Registry
7    and any reduction or any change in -- in the recidivism
8    rate, regarding sex offenses.
9    Q  And, you mentioned research and data.  Could you tell
10   me what research you reviewed?
11   A  There's some research studies that have been done I
12   believe by the Federal Bureau of Justice Information.
13   I don't know the name of the research that I read.
14   It's not Internet-related.  And I can try to search
15   that up and get it to my attorney to get to you, if
16   you'd like, later.
17   Q  So you said there was a Federal Bureau of Justice
18   research paper.  Are there any others --
19   A  Office of Justice Information.  There's also -- and, I
20   haven't looked at the study.  There's a study that was
21   one by Families Against Mandatory Minimums a while
22   back.  I don't know how old that data is now, that
23   might be useful to look at as well.
24   Q  Okay.  And you said you -- have you actually reviewed
25   data?

73

```
 1  A  Not recently.  I haven't reviewed it in anticipation of
 2     this deposition.
 3  Q  But have you reviewed data?
 4  A  Yes.
 5  Q  What -- what do you consider data?
 6  A  Scientifically conducted studies that are properly
 7     researched and properly validated.
 8  Q  That's what you -- you consider that data?
 9  A  Yes.
10  Q  Okay.  You don't consider data a specific number of a
11     -- a specific group or identified characteristics,
12     anything like that -- or, anything like that?
13         MS. TILLMAN:  Objection.  Argumentative.
14     Asked and answered.
15         But you can go ahead.
16         THE WITNESS:  Would you restate the question,
17     please?
18  Q  (By Mr. Damich)  Sure.  So, for you, data equals
19     research?
20  A  Data equals validated research.
21  Q  Okay.  So do you believe that data validates research?
22  A  I don't understand that question.  That -- that's --
23     data doesn't validate research.  The research is used,
24     and you collect data, and then the data is validated in
25     terms of its reliability and its reproducibility.
```

74

```
 1         So if you do longitudinal studies of cohorts of
 2     individuals, for instance, you know, you can -- you can
 3     look at the cohorts of individuals that have individual
 4     convictions of a certain character.  And then you can
 5     examine their track record five, ten, 15 years after
 6     release and see what is the percentage of individuals
 7     that might re -- reoffend with that similar conviction.
 8         I don't think the data shows that there is any
 9     correlation between sex offender registries and
10     recidivism rates for sex offenders.
11  Q  Okay.  So stop right there.  You said the data doesn't
12     show.
13  A  Correct.
14  Q  Are you -- I'm just -- where you're confusing the word
15     data with research.  Like, the research doesn't show.
16     Like, what data set did you look at to come to the
17     conclusions that you're drawing today?  That's what I'm
18     getting at, have you looked at data sets?
19  A  I understand what you're saying.  I don't have it at my
20     fingertips.  I would be happy to research it and get it
21     to you after this -- I'll give it to my attorney
22         MS. TILLMAN:  I also just want to put an
23     objection on the record here, a foundational objection,
24     that the witness here is not an expert on SORA research
25     or data collection.  So he cannot testify to that.
```

75

```
 1         MR. DAMICH:  Thank you.
 2         THE WITNESS:  Thank you.
 3  Q  (By Mr. Damich)  Okay.  Do you think that the Sex
 4     Offender Registry may encourage victims to come
 5     forward?
 6         MS. TILLMAN:  Objection.  Calls for
 7     speculation.
 8         But you can answer.
 9         THE WITNESS:  I don't know.
10  Q  (By Mr. Damich)  You don't know?  Okay.  If victims
11     come forward to report sex crimes, does that protect
12     the public?
13  A  Any crime that's not reported should be reported.
14     I don't know why people won't -- don't come forward to
15     report crimes.
16  Q  Okay.  So the question was:  If victims come forward to
17     report sex crimes, does that protect the public?
18         MS. TILLMAN:  Same objection.  Calls for
19     speculation.
20         But you can go ahead.
21         THE WITNESS:  I'm not an expert, and so I
22     don't know.
23  Q  (By Mr. Damich)  Okay.  Have you ever contacted a
24     member of the Michigan Legislature to inquire about
25     changing the Sex Offender Registry law?
```

76

```
 1  A  No.
 2  Q  Okay.  And are you aware that the Legislature has the
 3     power to change the law?
 4  A  Yes, the Legislature can change laws.
 5  Q  Okay.  And do you know whether Governor Whitmer has the
 6     power to change the Sex Offender Registration law?
 7  A  No, the Governor does not have that power.  The
 8     Legislature has to pass a law and it has to be signed
 9     into law by the Governor.
10  Q  Sure.  Okay.  And do you know whether or not Governor
11     Whitmer can reduce the registration period?
12  A  I don't believe the Governor has the power to do that.
13     I believe the Legislature has the power to change the
14     Sex Offender Registry.
15  Q  Do you know whether Colonel Gasper has the power to
16     change the Sex Offender Registry law?
17  A  Colonel Gasper is the head of the Michigan State
18     Police, and the Colonel operates under whatever
19     guidance they're given by the Legislature to function
20     as a member of the Executive Branch.
21  Q  Okay.  And do you know whether Colonel Gasper can
22     reduce the registration period?
23  A  My belief is that the Colonel cannot.
24  Q  Okay.
25         MR. DAMICH:  I don't have any further
```

77

1  questions.
2        MS. TILLMAN:  Could you give me maybe about 30
3  seconds to a minute, just to see if I have any?
4        MR. DAMICH:  Could you give me five so I could
5  maybe walk around for a second?
6        MS. TILLMAN:  For sure.  That's not a problem.
7        MR. DAMICH:  Thank you.  I appreciate it.  How
8  about 11:15?
9        MS. TILLMAN:  Perfect.
10       MR. DAMICH:  Excellent.
11       (Brief recess.)
12       MS. TILLMAN:  So, I don't have any follow-up
13  questions on my end.
14       MR. DAMICH:  Okay.  That's great.  Sir, I
15  really appreciate your taking time out of your day to
16  talk to me.  I really do.  I know we all lead busy
17  lives, and this is not a comfortable scenario.  And it
18  was a pleasure speaking to you today.  I hope you truly
19  understand that and I truly mean that, so.
20       THE WITNESS:  Thank you, Scott.  I appreciate
21  the opportunity to present my information to you.
22       MR. DAMICH:  Sure.
23       THE WITNESS:  And thank you for your time
24  today.
25       MR. DAMICH:  Excellent.  All right.  That's

78

1  all I've got.  I think I'll be seeing you all tomorrow,
2  so, and then Friday.
3        MS. TILLMAN:  Thank you.
4        (Whereupon the deposition was concluded at
5  about 11:17 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

79

CERTIFICATE OF NOTARY - COURT REPORTER

STATE OF MICHIGAN)
                 )
COUNTY OF CLINTON)

        I, Stefanie S. Pohl, a Notary Public in and
for the above county and state, do hereby certify that this
transcript consisting of 77 pages stenographically reported
is a complete, true and correct record of the testimony of
M.R. held in the case on Wednesday, May 24, 2023.
        I also certify that prior to taking this
deposition and by agreement of counsel, M.R. was duly sworn
remotely to tell the truth.
        I also certify that I am not a relative or
employee of an attorney for a party or financially
interested in the action.



Stefanie S. Pohl
CSR #5616
Notary Public, Clinton County,
Michigan
My Commission Expires:  6/21/25