# Exhibit 67:

## Dr. Rachel Lovell Deposition Transcript



TRI-COUNTY
COURT REPORTERS
INC.

(248)608-9250 Fax (844)270-7115
www.tri-countycourtreporters.com
depos@tricountyreporters.com

Transcript of the Testimony of
**Lovell, Rachel**

**Date:** May 19, 2023
**Volume:**

**Case:** Does, et al v. Whitmer, et al

Printed On: June 12, 2023

Lovell, Rachel
5/19/2023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G,
H, MARY DOE and MARY ROE,
on behalf of themselves and
all others similarly situated,
        File No. 2:22-cv-10209
 Plaintiffs,     Hon. Mark A. Goldsmith
         Mag: Curtis Ivy, Jr.
 -vs-
GRETCHEN WHITMER, Governor of
the State of Michigan, and COL.
JOSEPH GASPER, Director of the
Michigan State Police, in their
official capacities,
 Defendants.
_____/

REMOTE DEPOSITION OF RACHEL LOVELL

Taken on Friday, May 19, 2023, in
Bay Village, Ohio.

REPORTED BY:  Kelly Bonheim, CSR-8167
Certified Stenographic Reporter

Page 1

---

1
2
3 APPEARANCES:
4
5 For the Plaintiff:  AMERICAN CIVIL LIBERTIES UNION
         OF MICHIGAN
4        By: MIRIAM J. AUKERMAN
        (P63165)
5        BY: DAYJA S. TILLMAN (P86526)
        1514 Wealthy Street
6        Suite 260
        Grand Rapids, Michigan
7        49506-2700
        (616) 301-0930
8        Maukerman@aclumich.org
        Dtillman@aclumich.org
9        Appearing remotely
10
11 For the Plaintiff:  UNIVERSITY OF MICHIGAN LAW
         SCHOOL
        By: PAUL D. REINGOLD (27594)
12        801 Monroe Street
        802 Legal Research Bldg
13        Ann Arbor, Michigan
        48109-1210
14        (734) 355-0319
        Pdr@umich.edu
15        Appearing remotely
16
17 For the Defendant:  MICHIGAN DEPT OF ATTORNEY
         GENERAL
18        By: SCOTT L. DAMICH (P74126)
        PO Box 30754
19        Lansing, Michigan  48909-8254
        (517) 335-7573
20        Damichs@michigan.gov
        Appearing remotely
21
22
23
24
25

Page 2

---

1   T A B L E   O F   C O N T E N T S
2 Witness          Page
3 RACHEL LOVELL
4   Examination by Ms. Aukerman   5
5
6
7    E X H I B I T   I N D E X
8 Exhibit  Description      Page
9 1  Dr. Rachel Lovell's report   10
10 2  (Not marked)
11 3  Article entitled Dissemination and  64
    Impact
12    Amplified
13 4  Lussier study      71
14 5  Article Entitled Offending Histories  81
    and Typologies of Suspected Sexual
15    Offenders Identified Via Untested
    Sexual Assault Kits
16
 6  Document entitled Examining   91
17    Walking-Waiting Sexual Assaults from
    Previously Untested Sexual Assault
18    Kits: The
    Intersection of Stranger and Outdoor
19    Sexual
    Assaults
20
 7  Connecting the Dots: Identifying  118
21    Suspected Serial Sexual Offenders
    Through Forensic DNA Evidence
22
 8  Document - Lawfully Owed DNA  144
23
24
25

Page 3

---

1 9  Article entitled The case for   132
    "investigate all": Assessing the
2    cost-effectiveness of investigating no
    CODIS hit cases in a Sexual Assault Kit
3    Initiative
4 10  DNA Identification Profiling System Act  153
5 11  Document - MCL 28727   155
6 12  MLive article     158
7 13  (Not marked)
8
 14  The Bureaucratic Burden of Identifying  196
9    your Rapist
    and Remaining "Cooperative"
10
 15  Understanding the Geography of Rape  216
11    through the Integration
    of Data
12
 16  Victimization survey    224
13
 17  The National Intimate Partner and  226
14    Sexual Violence Survey
15 18  Lovell Curriculum Vitae   235
16
17
18
19
20
21
22
23
24
25

Page 4

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1     Bay Village, Ohio | 1     time being deposed as an expert witness. |
| 2     Friday, May 19, 2023 | 2     Q.  Oh.  Okay.  Have you ever testified in court? |
| 3     9:09 a.m. | 3     A.  No. |
| 4     * * * | 4     Q.  Okay.  So I just want to go over -- if you've been |
| 5     RACHEL LOVELL, | 5         deposed before, be familiar with this, |
| 6     was thereupon called as a witness herein and, | 6         but I just want to go over some of the basic rules |
| 7     after having been first duly sworn to tell the | 7         for depositions.  You have to verbally answer the |
| 8     truth, the whole truth and nothing but the truth, | 8         questions that I ask.  The court reporter can't |
| 9     was examined and testified as follows: | 9         take things down if you nod or smile or shake your |
| 10    E X A M I N A T I O N | 10        head or something like that. |
| 11    BY MS. AUKERMAN: | 11              We have to try to avoid talking over each |
| 12    Q.  Good morning, Dr. Lovell.  Nice to meet you.  My | 12        other.  I know that I sometimes do that, and so I |
| 13        name is Miriam Aukerman.  I am currently an | 13        will do my best not to do that to you, and then we |
| 14        attorney at the ACLU of Michigan.  Before that, I | 14        can try to both avoid that.  The court reporter |
| 15        was an attorney at Legal Aid where, among other | 15        will let us know if we're talking too fast, which |
| 16        things, I represented survivors of domestic | 16        is also something that I tend to do. |
| 17        violence.  So reading your work was really | 17              So, you know, we're trying to make it as |
| 18        interesting. | 18        easy as possible for the court reporter to get an |
| 19              I represent the plaintiffs in this case. | 19        accurate transcript of our conversation today.  If |
| 20        Have you ever been deposed before? | 20        you need clarification on a question, can you ask |
| 21    A.  I have. | 21        me for that clarification? |
| 22    Q.  Can you tell me in what circumstances that was? | 22    A.  Yes. |
| 23    A.  I -- for a civil suit, I was in a car accident. | 23    Q.  And if you answer a question, I'll assume that you |
| 24    Q.  Okay.  Any other time? | 24        understood the question, okay? |
| 25    A.  No, not as an expert witness.  This is the first | 25    A.  Got it. |
| Page 5 | Page 6 |

| | |
|---|---|
| 1     Q.  Okay.  From time to time, your attorney may object | 1         and -- well, just water.  Not other kinds and -- |
| 2         to a question.  Unless your attorney instructs you | 2         it's a little early.  And then I have some of the |
| 3         not to answer the question, the objection gets | 3         articles and other sorts of things that were cited |
| 4         noted for the record but you continue then to | 4         in the -- the paper and other sorts of references. |
| 5         answer the question.  We can take a break if you | 5     Q.  And do you have a copy of your report there with |
| 6         need to. | 6         you? |
| 7              It might be a long day, we'll see how | 7     A.  I -- I have it.  I'm pulling it up on my computer |
| 8         quickly we get through everything.  But if you do | 8         screen. |
| 9         want to take a break, we just ask that you answer | 9     Q.  Okay. |
| 10        any pending question that's out there before we go | 10    A.  I forgot to print that off when I was at the |
| 11        into a break.  And finally today, I'm going to ask | 11        office. |
| 12        you to talk about the opinions that are listed in | 12    Q.  Okay.  Are you under the influence of any |
| 13        your report.  I'm not going to ask you to offer | 13        medications or other condition that might affect |
| 14        opinions that are not already disclosed in your | 14        your ability to testify today? |
| 15        report.  Is that fair? | 15    A.  No. |
| 16    A.  Yes. | 16    Q.  Okay.  Anything else that would prevent you from |
| 17    Q.  Okay.  So if you start to offer an opinion that's | 17        answering questions truthfully today? |
| 18        not discussed in your report, I'll probably cut | 18    A.  No. |
| 19        you off because that's not something that's been | 19    Q.  Okay.  So let's talk a little bit about how you |
| 20        disclosed already; fair enough? | 20        prepared for your deposition today.  What did you |
| 21    A.  Fair enough. | 21        do to prepare? |
| 22    Q.  Okay.  So I think we already clarified where you | 22    A.  I read -- I read over the -- the rebuttals to |
| 23        are.  Is there anything in front of you other than | 23        the -- that -- that were provided to me and read |
| 24        the computer screen? | 24        through some of the articles cited in those |
| 25    A.  Yeah, so I have a piece of -- you know, drinks | 25        rebuttals.  And then yesterday, I also prepared |
| Page 7 | Page 8 |

2  (Pages 5 to 8)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1  by -- yeah, just reading, taking notes on those | 1  report and some of the articles.  Did you read |
| 2  rebuttals and then sort of re-reading the | 2  articles that you had cited in your report as |
| 3  declaration that I wrote. | 3  well? |
| 4  Q.  Okay.  Did you have any meetings or conversations | 4  A.  No, I did not read those.  I'm -- I'm very |
| 5    with your attorneys?  Not to tell me what you | 5    familiar with those.  Most of those are mine.  So |
| 6    discussed, but did you meet or talk with your | 6    I didn't -- I didn't need to review those.  But I |
| 7    attorneys? | 7    did review sort of -- yeah, like some of the |
| 8  A.  We talked about just, like, deposition prep.  Is | 8    literature cited in the -- in the rebuttals and |
| 9    that... | 9    other sorts of things. |
| 10  Q.  Yeah.  I mean, I don't want to hear what you | 10  Q.  Okay.  And did you speak with anyone else about |
| 11    talked about. | 11    your deposition? |
| 12  A.  Okay.  Yeah, right.  Yeah, so -- yeah. | 12  A.  No, I told my husband this morning that I had one, |
| 13  Q.  Yeah. | 13    but that's it. |
| 14  A.  Just sort of prepare me for -- for the structure | 14  Q.  Okay.  Fair enough. |
| 15    and the format and things like that. | 15  A.  I told him that I -- he's going to have to take |
| 16  Q.  Okay.  And how many times did you meet? | 16    care of if my daughter needs something dropped off |
| 17  A.  Once. | 17    at school.  And so I'm, like, well, I'm off the |
| 18  Q.  And for how long? | 18    grid for a little bit, you're going to have to |
| 19  A.  An hour. | 19    take care of the dropping something off. |
| 20  Q.  Okay.  And you talked about reviewing the | 20  Q.  Fair enough.  Okay. |
| 21    documents.  Anything else that you reviewed? | 21    (At 9:15 a.m., Exhibit 1 marked.) |
| 22  A.  Can you be maybe -- | 22  BY MS. AUKERMAN: |
| 23  Q.  I mean, you mentioned that you read the rebuttal | 23  Q.  So let's turn to your report.  I'm going to just |
| 24    reports.  You mentioned that you read some of the | 24    share my screen here.  Okay.  Are you seeing a |
| 25    articles that were cited.  You read your own | 25    copy of your report there? |
| Page 9 | Page 10 |

| | |
|---|---|
| 1  A.  Yes, I am. | 1    assumptions as you were writing the report, things |
| 2  Q.  Is there a way that I can make -- I just want | 2    that you should assume? |
| 3    to -- I'd like to see you on a larger screen.  I'm | 3  A.  No. |
| 4    not -- | 4  Q.  Okay.  Or provide you with any facts that are not |
| 5      MS. AUKERMAN:  I don't know if the court | 5    included in the materials that are cited in your |
| 6    reporter knows how to -- | 6    report? |
| 7      THE WITNESS:  So if you hit the plus | 7  A.  No. |
| 8    button above in the middle toolbar, maybe it looks | 8  Q.  Okay.  And you mentioned before that you've not |
| 9    like.  In the middle of your toolbar, in the | 9    been qualified by a court as an expert previously, |
| 10    middle of your screen at the top. | 10    right? |
| 11  BY MS. AUKERMAN: | 11  A.  Correct. |
| 12  Q.  Okay.  So this is your declaration.  I believe | 12  Q.  Okay.  So are you familiar with the Federal Court |
| 13    it's dated -- this is your declaration, correct? | 13    Rules about expert reports? |
| 14    It's dated March 20th, 2023? | 14  A.  I am. |
| 15  A.  Is there a date on -- do you have a date on there? | 15  Q.  Okay.  So let's review those.  Let me -- okay. |
| 16    Okay.  Yep.  Perfect. | 16    Can you see this -- these are the Federal |
| 17  Q.  Okay.  And you wrote this report? | 17    Court Rules.  Can you see those? |
| 18  A.  I did. | 18  A.  I can. |
| 19  Q.  And did anyone help you write it? | 19  Q.  Okay.  So this requires you to have a complete |
| 20  A.  No. | 20    statement of all opinions that the witness will |
| 21  Q.  Okay.  Was anyone else doing research related to | 21    express and the basis and reasons for them, |
| 22    writing the report?  I don't mean articles you | 22    correct? |
| 23    cited but just research for the report itself. | 23  A.  Correct. |
| 24  A.  No. | 24  Q.  Okay.  So are all the opinions that you intend to |
| 25  Q.  Okay.  And did anyone tell you to make any | 25    offer in this case, those are contained within |
| Page 11 | Page 12 |

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1      your report, correct? | 1   **A.**   Correct. |
| 2   **A.**   Correct. | 2   **Q.**   Okay. |
| 3   **Q.**   And you haven't left anything out? | 3      MR. DAMICH: I'm going to go ahead and |
| 4   **A.**   No. | 4      put an ongoing objection to a lack of foundation |
| 5   **Q.**   Okay. And your report is also complete -- your | 5      for Dr. Lovell's ability to testify about the |
| 6      report also contains a complete statement of the | 6      Federal Court Rules. |
| 7      basis and reasons for your opinion, correct? | 7      MS. AUKERMAN: Noted. |
| 8   **A.**   Correct. | 8      MR. DAMICH: The Rules of Evidence. |
| 9   **Q.**   Okay. You haven't left anything out in terms of | 9   BY MS. AUKERMAN: |
| 10      the basis or reasons for your opinion? | 10   **Q.**   Okay. And so you've identified all the underlying |
| 11   **A.**   No. | 11      documents that support your opinions, correct? |
| 12   **Q.**   Okay. And then if we look at the second one here, | 12   **A.**   Correct. |
| 13      requires you to provide -- the report to provide | 13   **Q.**   Okay. |
| 14      the facts or data considered by the witness in | 14      MS. AUKERMAN: So I'm going to just state |
| 15      forming your opinions, correct? | 15      for the record that Dr. Lovell's report cites a |
| 16   **A.**   Does that -- when we interpret for research, does | 16      paper called, "Rethinking estimates of sexual |
| 17      that mean that I've cited and provided sufficient | 17      recidivism: How the national assault kit |
| 18      evidence to be able to support the statements? Is | 18      initiative is changing our understanding of repeat |
| 19      that the interpretation of that? | 19      sexual offending." |
| 20   **Q.**   Yeah. I think what we're talking about is that | 20      That paper is not publicly available. We |
| 21      your report indicates that you provide the basis, | 21      repeatedly asked for that paper and it was not |
| 22      the facts, and the data that you consider. So if | 22      provided to us in advance of this deposition. |
| 23      your report cites something, we can then look at | 23      Meaning that we cannot -- we're not -- it was not |
| 24      the citation. But your report has -- describes | 24      provided to us, so we're going to object to the |
| 25      the facts and data that you relied on, correct? | 25      defendants use of anything in Dr. Lovell's report |
| Page 13 | Page 14 |
| 1      that cites to or is derived from that paper. | 1   **A.**   Does retain mean first talk to or, like, made |
| 2      THE WITNESS: I'm sorry, can you tell me | 2      decisions upon? Like, you know, more final or |
| 3      which one again? | 3      early conversations? |
| 4   BY MS. AUKERMAN: | 4   **Q.**   So why don't you just tell me that -- that's a |
| 5   **Q.**   Okay. So I can show you. Can you -- | 5      great question. So why don't you just tell me |
| 6   **A.**   Okay. | 6      when you first were approached about it and then |
| 7   **Q.**   If I switch, can you see your report here when I | 7      when you decided to move forward with being an |
| 8      switch over to that? | 8      expert. |
| 9   **A.**   Um-hum. | 9   **A.**   I don't remember the exact month. Would you like |
| 10   **Q.**   Okay. So you cite -- okay. It's this one right | 10      me to search my emails or just give you a |
| 11      here. | 11      general -- |
| 12      Rachel Lovell, [as read], "Rethinking | 12   **Q.**   No, just approximately. |
| 13      estimates of sexual recidivism: How the National | 13   **A.**   Approximately, in the winter, early winter. If it |
| 14      Sexual Assault Code Initiative is changing our | 14      was March when I wrote this, yeah, maybe early |
| 15      understanding of repeat sexual offending." So | 15      winter. |
| 16      it's the one set in Footnote 24. | 16   **Q.**   Okay. |
| 17   **A.**   Okay. Yes, that's a present -- that's a | 17   **A.**   And for me, that means I go sort of academic |
| 18      conference presentation. | 18      calendars. That's the way my sort of brain |
| 19   **Q.**   Okay. So that was not provided to us despite our | 19      thinks. So I'm thinking probably somewhere around |
| 20      request. So I'm just stating for the record that | 20      January or February maybe. |
| 21      we're going to object to any use -- anything in | 21   **Q.**   Okay. And what was your assignment in this case? |
| 22      the declaration that relies on that information | 22      What were you asked to provide an opinion on? |
| 23      since it wasn't provided to us. Okay. So let's | 23   **A.**   To provide information about the research that I'm |
| 24      move forward. | 24      primarily doing, as well as in general the |
| 25      When were you retained in this case? | 25      research around the sexual assault kits and how it |
| Page 15 | Page 16 |

4 (Pages 13 to 16)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1   speaks to undetected sexual offending and the -- | 1   A.  It's about the Michigan Sex Offender Registry. |
| 2   the -- the serial offending nature of sex | 2   And specifically -- and this is also based upon |
| 3   offenders.  As well as some of the work cited | 3   what I see in the rebuttals and what was cited in |
| 4   around cost benefit analysis.  And, you know, | 4   the other declarations around the extent of |
| 5   general sexual offending behavior. | 5   which -- or the recidivism sex offender |
| 6   Q.  Okay.  Before you agreed to serve as the | 6   registration in terms of an inspect -- the |
| 7   defendants expert in this case, did you learn | 7   registrations effect on recidivism.  And it |
| 8   anything about what this case is about? | 8   appears from one of the rebuttals, there's |
| 9   A.  No. | 9   something around risk assessments. |
| 10  Q.  Did you read any documents about the case? | 10  Q.  Do you know anything about the -- do you know -- |
| 11  A.  No. | 11  A.  And some aspect -- I'm sorry, we're talking -- |
| 12  Q.  And are you familiar with the case outside of your | 12  Q.  Oh, no, go ahead. |
| 13  work for the defendants? | 13  A.  Some aspect of the -- the -- yeah, the -- the risk |
| 14  A.  No. | 14  assessments for sex offenders. |
| 15  Q.  Okay.  If I ask you what this case is about, could | 15  Q.  Do you know anything about the plaintiffs in this |
| 16  you tell me? | 16  case? |
| 17  A.  I can give a general synopsis I think.  I haven't | 17  A.  No.  No. |
| 18  actually read any of, you know, the sort of the -- | 18  Q.  And did you do any research on, you know, who's on |
| 19  the statements or anything that's filed with the | 19  the Michigan Sex Offender Registry or anything |
| 20  court that lays out the general arguments.  But | 20  like that? |
| 21  I've been provided some information about the | 21  A.  No. |
| 22  general idea of what the -- what the lawsuit | 22  Q.  Okay.  Were you told anything about the facts of |
| 23  pertains to.  Would you -- | 23  this case? |
| 24  Q.  Yeah.  What, in your understanding, is this case | 24  A.  Can you maybe provide a little bit more |
| 25  about? | 25  information as to, like, what the -- what facts |
| Page 17 | Page 18 |
| 1   specifically? | 1   know, to what I was asking.  But other than that, |
| 2   Q.  So for example, were you provided the complaint in | 2   I didn't -- I didn't look up any specific things |
| 3   this -- or did you read the complaint in this | 3   around the Michigan registry. |
| 4   case, which is the initial court document? | 4   Q.  Why did you want to know about violent specs? |
| 5   A.  No. | 5   A.  The aspect of violent specs because there's some |
| 6   Q.  Were you provided any other facts by the | 6   conditions under which, right, the violent specs |
| 7   defendants about the case?  I'm not talking about | 7   has the idea of repeat offending, as well as |
| 8   the rebuttal or expert reports but any other -- | 8   propensity or probability of competing another |
| 9   A.  Like -- | 9   violent spec.  So I wanted to see the extent to |
| 10  Q.  Facts about Michigan's registry, anything like | 10  which that was the case.  I read a couple articles |
| 11  that. | 11  that mentioned different specifications, you know, |
| 12  A.  I did ask at one point if -- how -- because | 12  and how that might fit in with the registry -- in |
| 13  different states obviously have different terms of | 13  the literature. |
| 14  the registry.  So I had something -- I had a | 14  Q.  So is it fair to say that you were interested in |
| 15  question about whether Michigan's registry -- | 15  understanding whether the registry distinguishes |
| 16  because I couldn't really find that information. | 16  between different types of offenders? |
| 17  Whether it had sort of, like -- in Ohio, they call | 17  A.  I -- no, because I assumed that it did. |
| 18  them, like, violent specs. | 18  Q.  Okay.  So you assumed that the registry makes |
| 19      Or, like, a specification where, you | 19  categorizations somehow based on risk? |
| 20  know, like, there's -- I know California -- I was | 20  A.  It has tiers, I assume. |
| 21  reading some stuff around California's violent | 21  Q.  Okay.  But you're not familiar with how Michigan |
| 22  specs, and I know Ohio has some.  They can add | 22  categorizes registrants? |
| 23  specs to the specs -- some aspect of that.  And so | 23  A.  No. |
| 24  I asked a question about whether Michigan had | 24  Q.  Okay. |
| 25  that, and apparently, the answer was no -- or, you | 25      Okay.  Which of the expert reports of the |
| Page 19 | Page 20 |

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1    plaintiffs experts did you review? | 1    **A.** No. |
| 2   **A.** The ones that pertained primarily to the research | 2    **Q.** Did you look at any DNA data related to the |
| 3    that I do. So I looked at Hanson's report. And | 3    Michigan Sex Offender Registry? |
| 4    then I also reviewed -- there's another -- I can't | 4    **A.** No. |
| 5    remember her name, but she also does research in | 5    **Q.** Anything else that you looked at? |
| 6    this area. It's a -- I forgot her name. | 6    **A.** No. |
| 7    **Q.** Dr. Letourneau? | 7    **Q.** Were there any materials that you asked the |
| 8   **A.** That sounds right, I think. I'd have to | 8    defendants to provide that they didn't provide to |
| 9    double-check with -- like, to -- to be sure. | 9    you? |
| 10    Like, because I'd have to look it up, to look at | 10    **A.** No. |
| 11    the report to make sure it was that one. Yeah, | 11    **Q.** Did you conduct any independent studies for the |
| 12    those are -- the best I recall, those are the only | 12    purposes of writing this report separate from the |
| 13    two that I looked at. | 13    work that you have conducted generally as a |
| 14    **Q.** And those were the initial expert reports, | 14    scholar? |
| 15    correct? | 15   **A.** Meaning did I try to research or come up with |
| 16   **A.** Correct. | 16    different topics as it relates -- I'm just trying |
| 17    **Q.** And then you said you looked at rebuttal reports? | 17    to make sure I understand what you mean by study. |
| 18   **A.** Correct. | 18    **Q.** Sure. Absolutely. I want to make sure that |
| 19    **Q.** And those would be the rebuttal reports from Dr. | 19    we're -- that's exactly what I mean when I say |
| 20    Hanson and Dr. Socia? | 20    clarify the question. |
| 21   **A.** Correct. | 21     So what I'm asking I guess is, your |
| 22    **Q.** Okay. Did you look at any deposition testimony? | 22    report cites research that you've done otherwise, |
| 23   **A.** No. | 23    but did you conduct any separate new research for |
| 24    **Q.** Did you look at any data regarding the Michigan | 24    purposes of writing this report? |
| 25    Sex Offender Registry? | 25   **A.** Oh. No, I did not. |
| Page 21 | Page 22 |

| | |
|---|---|
| 1    **Q.** Okay. And your report does not mention any of the | 1    State of Michigan or any of the individual |
| 2    reports that you -- that plaintiffs' expert | 2    defendants in this case? |
| 3    reports that you received, correct? | 3    **A.** No. |
| 4   **A.** Like did I cite -- like that I don't specifically, | 4    **Q.** Okay. Or with the defendants attorneys? |
| 5    like -- there wasn't like a rebuttal. So I'm not | 5    **A.** No. |
| 6    saying, like, "Hanson said this," or, "So and so | 6    **Q.** Are you currently working with the defendants or |
| 7    said that?" | 7    their attorneys on any other cases? |
| 8    **Q.** Correct. | 8    **A.** No. |
| 9   **A.** No. | 9    **Q.** And are you currently working on other cases, any |
| 10    **Q.** So you weren't addressing those reports in your | 10    other litigation? |
| 11    report? You weren't -- let me clarify that. You | 11   **A.** As an expert witness? |
| 12    weren't addressing the plaintiffs reports in your | 12    **Q.** Yes, as an expert. |
| 13    report? | 13   **A.** Yeah. No. |
| 14   **A.** I would say I wasn't specifically like -- | 14    **Q.** Okay. And you mentioned that you've not testified |
| 15    specifically addressing certain aspects, but | 15    as an expert before, correct? |
| 16    certain -- so the beginning ones informed how I | 16   **A.** Correct. |
| 17    thought about and was writing what I wrote. | 17    **Q.** And you've not been retained as an expert before, |
| 18    Because I was trying to see what they were | 18    correct? |
| 19    writing, right? So it was a general informing, | 19   **A.** Correct. |
| 20    but it wouldn't -- I wasn't necessarily, like, | 20    **Q.** Okay. So the defendants are, as you know, seeking |
| 21    making a complete, like, direct reference to their | 21    to qualify you as an expert in this case, right? |
| 22    stuff. | 22    And is it fair to say that no one is an expert in |
| 23    **Q.** Okay. So let me ask you about sort of your past | 23    everything, right? |
| 24    work and expertise. | 24   **A.** Correct. |
| 25     So have you done any prior work with the | 25    **Q.** So a person could be an expert on some things but |
| Page 23 | Page 24 |

6 (Pages 21 to 24)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 not on other things, right? | 1 Q. Okay. Do you consider yourself an expert on |
| 2 **A.** Correct. | 2 everything having to do with gender-based |
| 3 Q. And that same is true for you, correct? | 3 violence? |
| 4 **A.** Correct. | 4 **A.** I think that's kind of a hard question to ask |
| 5 Q. So let's talk about the areas where you think a | 5 without knowing a little bit more about, like, the |
| 6 court should find that you're an expert. Now your | 6 specifics about that. So for context, I -- I do |
| 7 report says that your research focuses on | 7 applied research and program evaluations, and so |
| 8 gender-based violence and the victimization, | 8 that tends to bring about a level of knowledge |
| 9 particularly sexual assault, human trafficking and | 9 about, you know, certain programs or certain |
| 10 intimate partner violence; is that accurate? | 10 aspects of those programs. So I wouldn't say that |
| 11 **A.** That is accurate. | 11 those are the only things that I research. But, |
| 12 Q. Okay. And would you hold yourself out as an | 12 you know, there's certain areas or pockets, but |
| 13 expert in gender-based violence and victimization? | 13 I've published and done research and evaluations |
| 14 **A.** Yes. | 14 for all, you know, human trafficking, intimate |
| 15 Q. Okay. What do you mean by gender-based violence? | 15 partner violence, domestic violence, and sexual |
| 16 **A.** Violence that primarily happens to women and | 16 assault. |
| 17 girls. | 17 Q. So you mentioned that you do applied researching. |
| 18 Q. Anything else when you say gender-based violence? | 18 Can you explain sort of the focus of your |
| 19 **A.** No. Yeah, just the victimization is | 19 expertise within this sort of broad field of |
| 20 disproportionately experienced by women and girls. | 20 gender-based violence and victimization? |
| 21 Q. Okay. And that sounds like a really large topic, | 21 **A.** Well, it -- primarily it has a lot to do with the |
| 22 gender -- you know, victimization of women and | 22 grants that I have, or have had, as it relates to |
| 23 girls. That covers a lot of different research | 23 this. And so since, I don't know, the last eight |
| 24 areas; is that fair to say? | 24 or nine years, I've been -- my primary research |
| 25 **A.** That is fair to say. | 25 scholarship has been -- or at least the biggest |
| Page 25 | Page 26 |

| | |
|---|---|
| 1 chunk of it has been around sexual assault, and | 1 just kits. |
| 2 specifically sexual assault kits. But I would | 2 Q. Are there areas of sexual assault in which you |
| 3 also say in general, like, I also have grants as | 3 don't do research? |
| 4 it relates to violent crime and other -- and I | 4 **A.** So I would say of the major areas and fields of |
| 5 teach a victimology course and I'm a criminology | 5 sexual assault, I've never had -- I've never been |
| 6 professor. | 6 funded to study campus sexual assaults. Although, |
| 7 So, like, you know, there's different | 7 I am very familiar with the literature on campus |
| 8 levels to all of that. So I guess it really just | 8 sexual assaults, as well as, you know, the Title |
| 9 makes a difference in terms of, like, what | 9 IX process and all that sort of stuff. So I |
| 10 specifically about the topic. Because, again, | 10 think -- I think it depends on if you're talking |
| 11 sexual assault is very broad. So, you know, in | 11 about what areas am I primarily publishing in |
| 12 what context; I primarily studied in that space. | 12 or -- or have -- like, received grants to -- to |
| 13 Q. So is it fair to say that within the field of | 13 study in versus my general understanding and |
| 14 sexual -- research on sexual assault, you have a | 14 knowledge as a scholar in the field. I think, you |
| 15 lot of expertise around sexual assault kits, | 15 know -- I think all of that means I know the |
| 16 correct? | 16 general knowledge of the field as it relates to |
| 17 **A.** Correct. | 17 sexual assault in a variety of areas. |
| 18 Q. But you wouldn't say that you have the same level | 18 Q. When you say sexual assault, what do you mean by |
| 19 of knowledge about every other aspect of sexual | 19 that? |
| 20 assault? | 20 **A.** Sexual assault is usually used in the literature |
| 21 **A.** No, I wouldn't -- I don't think that's correct. I | 21 as a more expansive word than just rape. Which |
| 22 -- I would have a level of knowledge around sexual | 22 rape primarily has a -- has a more legal term to |
| 23 assault and in other ways. Because kits are one | 23 it. And sexual assault usually encompasses rape |
| 24 component but certainly I have expertise around | 24 but can also include other aspects of -- of |
| 25 many different aspects of sexual assault. Not | 25 victimization within the -- the incident. As |
| Page 27 | Page 28 |

7 (Pages 25 to 28)

Lovell, Rachel
5/19/2023

1    compared to say -- you know, which is not -- you
2    know, like, so it's a broader term for that as
3    compared to, like, sexual misconduct, which is a
4    different term.
5    Q.  So how would you define sexual misconduct?
6    A.  Sexual misconduct usually encompasses -- it can
7        encompass rape, sexual abuse, but also could be
8        aspects of sexual harassment, and -- and/or, you
9        know -- you know, inappropriate touching, those
10       kinds of things.
11   Q.  And so your area of expertise is on sexual assault
12       specifically rather than sex crimes -- all sex
13       crimes or all sexual misconduct?
14   A.  I would say -- I would say my expertise would also
15       lie in the better understanding of sexual abuse as
16       well.
17   Q.  Have you published on noncontact sex offenses?
18   A.  I'm trying to think of would fit -- so I'm trying
19       to -- so, like, peeping or internet-based crimes,
20       ICAC sort of stuff.  No, I have not published in
21       that area.
22   Q.  Is it fair to say that your publications focus on
23       sexual assault?
24   A.  They don't just focus on sexual assault.
25   Q.  What else do they cover?

Page 29

1    A.  Human trafficking, carjacking.  I'm working on a
2        paper on carjacking.  I've published stuff
3        around -- like, I've -- I'm on publications for,
4        you know, how -- like, methodological papers
5        around statistical assumptions of using spatial
6        data.  I've published -- and also, I'm sorry, can
7        you have a general timeframe?  Because it's --
8        I've -- I've been a PhD for quite some time.  So
9        do you mean, like, maybe in the past five years,
10       ten years, ever?
11   Q.  Ten years.  Let's say past ten years.
12   A.  Let's see, I'm going to pull up my CV just to --
13       just to clarify that and look at the past ten
14       years.  Yes, human trafficking.  I've also
15       published some stuff as it relates to sex -- to
16       sex work.  I've published some stuff as a
17       methodologist around a program evaluation for
18       rural pastors.  I've published some stuff with a
19       medical doctor on biomarkers and blood levels for
20       adolescent trauma.  Yeah, those -- those are the
21       other areas.
22   Q.  Okay.  And you're trained as a victimologist; is
23       that correct?
24   A.  I specialize as a victimologist.
25   Q.  And that's the aspect of sexual assault that

Page 30

1    you're -- when you're looking at sexual assault,
2    you focus on a victimology basis; is that fair?
3    A.  It's really the -- the way to really think about
4        it is that, like, there's -- there's sociology,
5        which is the very general, that's what my PhD is
6        in, right?  The general discipline.  Criminology
7        is a subsection of sociology, which specializes in
8        criminology and/or criminal justice.
9            And then within criminology and criminal
10       justice, there is a specialization for looking at
11       the victims as well.  I wouldn't say I only look
12       at and study victim -- the victimology component.
13       But yes, that's a -- that is a specialization
14       within criminology.
15   Q.  And then within victim -- it's really helpful to
16       have that sort of low, sort of down -- within
17       victimology, are there particular sort of
18       sub-areas of -- well, what are the kind of areas
19       of study within victimology?
20   A.  It -- it certainly -- I mean, there's a variety of
21       areas.  Some could be international comparisons of
22       victimology, which I don't do.  But it's primarily
23       based around the types of victim -- the types of
24       crimes that people are victims of.
25            So it could be, you know, like -- it

Page 31

1    could be, you know, financial crimes.  It could be
2    internet crimes.  It could be -- it could be
3    intimate partner violence.  It could be sexual
4    assault.  It could be homicide.
5            So you're sort of looking at the
6    different types of crime.  But from -- you know,
7    from the, you know, trends and patterns as it
8    relates to being a victim of that type of crime.
9    Q.  And so within victimology, as I understand it, you
10       focus on sexual assault, intimate partner
11       violence, and human trafficking?
12   A.  And domestic violence.
13   Q.  Okay.
14   A.  The -- I'm sorry, the distinction there is that
15       domestic violence is usually used as a broader
16       term for, you know, just violence within the
17       household or with household -- or individuals
18       within a household.  Whereas, intimate partner
19       violence is violence between a couple or someone
20       who has a romantic relationship.  So a child can
21       also be a perpetrator of domestic violence if
22       they're within that sort of household.  So a more
23       general term is domestic violence.
24   Q.  Okay.  So, I mean, it's interesting that you're
25       talking about terms and then one of the things

Page 32

8 (Pages 29 to 32)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1   that you talk about in your declaration is just<br>2   the importance of terminology.  And so when we're<br>3   talking today, I want to make sure that when we<br>4   use -- when I use certain terms or you use certain<br>5   terms, we both know what we're talking about.  So<br>6   let's talk about kind of what the meanings of<br>7   these are.<br>8        We just started talking about sexual<br>9   assault as a topic of your research and what you<br>10   mean by that.  And I believe you said that it's --<br>11   let me see.  It's a more expansive term than rape,<br>12   perhaps more of a legal term than sexual assault,<br>13   encompasses rape but also some other aspects of --<br>14   that sort of go beyond the technical legal<br>15   definition of rape; is that accurate?<br>16  A.   That's accurate.<br>17  Q.   Okay.  So a sexual assault, would that include<br>18   offenses where both parties are willing to engage<br>19   in sexual activity?<br>20  A.   So one of the things I actually teach in my class<br>21   are -- is the difference -- I teach a victimology<br>22   course -- is to have the students really think<br>23   through the difference between what a statute<br>24   says, what a criminal statute says as in terms of<br>25   the definition.  And those often and frequently | 1   don't match up with what the -- the field of<br>2   victimology might describe as a -- as a term for<br>3   describing the nature of that crime.<br>4  Q.   Okay.<br>5  A.   So there's a different -- right.  So, like,<br>6   there's a criminal statute for what you're<br>7   describing would be, you know, sort of<br>8   statutory -- a traditional statutory rape; where<br>9   consent is not the issue in so much as the age<br>10   difference and whether someone could -- or age or<br>11   some other variable that made it to where one<br>12   person couldn't give consent in that case because<br>13   of age or because of disability, or mental<br>14   impairment, or something like that.<br>15        Which is different than something around,<br>16   like, a drug or alcohol facilitated sexual<br>17   assault.  Those are kind of terms, but those don't<br>18   necessarily match up with the statute -- a<br>19   criminal statute.<br>20  Q.   Right.  But when you're talking about sexual<br>21   assault, just to make sure that we're talking<br>22   about the same thing.  When you're talking about<br>23   sexual assault, are you including something, like,<br>24   gross indecency where people are, you know, having<br>25   sex in the park together?  They both -- |
| Page 33 | Page 34 |
| 1  A.   Oh.<br>2  Q.   They both want to do it but they're -- it's still<br>3   a crime.<br>4  A.   By and large, no, those would not be considered<br>5   sexual assault.  That's not the -- that wouldn't<br>6   be considered sexual assault.  So sexual assault,<br>7   whether there's penetration or not, is usually<br>8   what most people think of rape, they're thinking<br>9   of penetration.  Sexual assault could involve<br>10   penetration -- forced penetration or coerced<br>11   penetration but also could involve other aspects<br>12   or attempted sexual assaults or other things.<br>13   But, no --<br>14  Q.   But --<br>15  A.   The only issue would be when there wasn't<br>16   consent -- like consent, you know, let's say<br>17   between a 14-year-old -- or let's say 13-year-old<br>18   and an 18-year-old, both of them, you know,<br>19   consented to the act but one of them couldn't<br>20   consent because of their age.  That would be<br>21   considered sexual assault as compared to, like,<br>22   public indecency, someone having sex under the<br>23   bridge and that would be -- you know, that<br>24   wouldn't be considered as part of the sexual<br>25   assault -- you know, the general umbrella of | 1   sexual assault.<br>2  Q.   So when you talk about sexual assault, would you<br>3   include the 15-year-old who's sleeping with the<br>4   17-year-old?  Is that a sexual assault in your --<br>5   as you define sexual assault in your report?<br>6  A.   No.  And in our data -- well, it depends on the<br>7   criminal statute.  For us, we define -- we do have<br>8   those cases we see in the rape -- in our data and<br>9   we did not code or consider -- you know, like,<br>10   again, this is -- this is based on the data that I<br>11   have and the data I published, that if -- it<br>12   depends upon -- in Ohio statute, based upon what<br>13   would qualify as a statutory rape versus, you<br>14   know, between a 15 and 17-year-old is not -- is<br>15   not -- because of the Romeo and Juliet laws,<br>16   that's not illegal.  It's not a crime in Ohio.<br>17  Q.   Okay.<br>18  A.   Romeo and --<br>19  Q.   It is a crime in Michigan.<br>20  A.   Okay.<br>21  Q.   But let's -- I want to make sure I'm<br>22   understanding.  When you use the term "sexual<br>23   assault" in your report, when you say sexual<br>24   assault, do you include the Romeo and Juliet cases<br>25   where there is consensual sexual activity but one |
| Page 35 | Page 36 |

9 (Pages 33 to 36)

Lovell, Rachel
5/19/2023

Page 37

1  of the partners is -- or not -- where there is
2  willing sexual activity but one of the partners is
3  under age.  Would you include that in your
4  definition of sexual assault?
5  A.  Only -- yes, but only in the cases where consent
6  cannot be provided due to the age or it's outside
7  of that Romeo and Juliet law.  So in Ohio, if
8  someone was under the age of 13, it's -- you know,
9  and there's sexual contact, there's that --
10  there's that under 13, which -- or 13 and under
11  that makes it, like -- like, you know, it doesn't
12  matter if they were consenting.  If the child was
13  13, they can't get consent to have sex with
14  someone who's 20.
15        The age of consent is 15 in Ohio but --
16  but the Romeo and Juliet laws would say 15 to 17,
17  in your example, is not considered -- you know,
18  it's not considered rape because of the Romeo and
19  Juliet laws in Ohio.  So when I teach -- actually
20  my college students, you would be surprised that
21  they're very interested to know all about what
22  makes which age and things like that based upon
23  the age of the perpetrator and the age of the
24  victim.  And then there's a whole bunch of
25  different statutes around that.

Page 38

1        Now the only difference to that would
2  be -- and also in Ohio, it -- and it's maybe
3  similar in Michigan, it -- that Romeo and Juliet
4  stuff doesn't matter as much if someone is in a
5  position of authority or power over that person.
6  Then, like, a teacher or other sorts of things.
7  So let's say someone is, you know, 16 or 15 with
8  an adult, and then someone's in a position of
9  power, then...
10  Q.  Okay.  Just so I'm understanding you, you're
11  saying that if it is a crime under the law, you
12  would include it as sexual assault?
13  A.  Yes, as long as the victim said that they were --
14  so in some cases, we did not code for cases where
15  let's say the victim always said it was consensual
16  and the victim -- I'll give a she pronoun because
17  almost all the victims in our data are female.
18  And that's true for sexual assault in general.  If
19  she always said it was consensual and she's of age
20  to be able to do that and it didn't fit within the
21  crime statutes, then we didn't code that as doing
22  that.
23        So for example, if someone, you know,
24  found out their daughter was having sex, took them
25  to the hospital to get an exam.  The victim said,

Page 39

1  "No, no, no, he's my boyfriend.  I had consensual
2  sex with him."
3        I'm -- you know, it's -- he's whatever
4  age but it's not a crime, then we didn't code
5  that.  Because she never said that she was raped
6  and it didn't fit within the statute for statutory
7  rape.
8  Q.  But you would consider it a sexual assault if
9  someone was underage, willing to have sex but it's
10  a crime for that because of the age difference, it
11  would be a crime?
12  A.  Yes.
13  Q.  Okay.  So to give you an example, one of the
14  plaintiffs in our case met a young woman at an
15  over 18 club.  They hit it off, they had sex.
16  Turns out she wasn't 18 even though, you know,
17  she's got a fake ID and turned out she was 15.
18  That is a crime in Michigan.  And would you
19  consider that a sexual assault?
20  A.  I'm going to write down the facts of it -- that --
21        MR. DAMICH:  I'm also going to object to
22  asking for a legal conclusion.
23        MS. AUKERMAN:  I'm asking whether -- as
24  she uses the term "sexual assault," whether
25  that's -- she would consider that a sexual

Page 40

1  assault.
2        MR. DAMICH:  Noted.
3        THE WITNESS:  Okay.  So in this case --
4  I'm just going through because these are the sort
5  of criteria under which we make determinations
6  about whether to include them in our database.
7        So the victim says it was consensual the
8  whole time?
9  BY MS. AUKERMAN:
10  Q.  Yes.
11  A.  It doesn't say.  Is this -- I'll call them the
12  suspect.  Is the suspect in a position of
13  authority or power over that individual?
14  Q.  No.
15  A.  Okay.  And the victim is 15?
16  Q.  The victim is 15.
17  A.  And the suspect is how old?
18  Q.  I believe he was 19.
19  A.  The victim's not able to give -- you know, at
20  least in Ohio, wouldn't be able to give consent
21  because she's under the age of 16.  And if over
22  19, we would include in our database because of
23  the age difference, that would be considered a
24  potential for a crime.  I -- I'm not a prosecutor,
25  but I believe prosecutors have to make other

10 (Pages 37 to 40)

Lovell, Rachel
5/19/2023

1  decisions around there are other, like, legal
2  things that they have to prove as -- as part of
3  that.
4       But that's not necessarily what we
5  concern ourselves with of, like, the different
6  proving statutes because, you know, we're not
7  looking at it like a prosecutor would.  We're not
8  charging anyone with that, we're just coding a
9  case.  But if the -- but that would be considered
10 a crime in Ohio, a 15 and 19 because the victim's
11 under the age of 16.
12 Q.  So when you use the term "sexual assault" in your
13     report, you're including examples like the one I
14     just gave, that would, in your mind, qualify as a
15     sexual assault?
16 A.  Yes.
17 Q.  Okay.  What about sodomy?  Gay sex.
18         MR. DAMICH:  Objection --
19 BY MS. AUKERMAN:
20 Q.  You may answer.
21         (9:58 a.m., Court Stenographer
22     clarification.)
23         MR. DAMICH:  Calls for a legal
24     conclusion.  Form and foundation.
25         THE WITNESS:  So let me make sure that I

Page 41

1  understand.  I mean, so sodomy -- sodomy laws were
2  primarily used, as I'm sure you know, a reason to
3  criminalize sexual behavior between men.  Most of
4  the time, consensual.  So are you -- but -- but
5  that's not -- most of that, at least in Ohio, has
6  -- that doesn't qualify as a crime.
7       Sodomy is not a -- sodomy, you know,
8  would be included in rape in terms of forced
9  penetration.  So penetration of any orifice.  So
10 the fact that -- so are you saying two consenting
11 adults?
12 BY MS. AUKERMAN:
13 Q.  I'm talking about consensual sodomy, whether or
14     not that -- I mean, that has in the past been
15     illegal.  Would you consider that to be, at the
16     time that it was illegal, would that have been a
17     sexual assault?
18         MR. DAMICH:  Form.  Foundation.
19         THE WITNESS:  Yeah, I -- I can't answer
20     that because that -- that isn't really something
21     that we would have -- that's nothing that I would
22     have had to work through or have that sort of
23     definition as part of our data, is -- is that
24     hasn't come up.
25 BY MS. AUKERMAN:

Page 42

1  Q.  What about prostitution, is that a sexual assault?
2          MR. DAMICH:  Objection.  Form.
3      Foundation.
4          THE WITNESS:  So, and by prostitution,
5      you mean someone, although it is illegal to do it,
6      someone who is willing to have sex with somebody
7      for an exchange of money or goods or services or
8      some aspect of that but willingly?  Like --
9  BY MS. AUKERMAN:
10 Q.  Yes, willingly having sex in exchange for some
11     type of compensation.
12 A.  And that the willing exchange didn't turn into,
13     you know, something that the person was unwilling
14     to do.
15 Q.  Correct.
16 A.  Because we see that in our data as well, sex
17     workers --
18 Q.  But we're talking only about cases where someone
19     is willing to have sex in return for compensation.
20     Is that --
21 A.  And the terms didn't change within the act, right?
22     So, "I'm willing to do this for that," and then
23     they get into the --
24 Q.  Right.
25 A.  And then he does --

Page 43

1  Q.  What I'm trying to do here, Dr. Lovell, is I'm
2      trying to understand what you mean by sexual
3      assault, and so I'm trying to understand what the
4      boundaries are.  So it sounds like it's not --
5      you're saying that it's when someone is
6      unwilling -- you know, there's some kind of
7      unwillingness in the sexual act or it is a crime
8      because the person isn't old enough to consent.
9          Now, I'm talking about other types of
10     cases where there's a consent to engage in the act
11     but the person is of age and the person's of age
12     to consent, like prostitution.
13 A.  So --
14         MR. DAMICH:  Just object to form and
15     foundation.
16         THE WITNESS:  Sorry, go ahead.
17 BY MS. AUKERMAN:
18 Q.  So let me clarify that question.
19         So would you consider prostitution the
20     willing exchange of sexual activity for
21     compensation to be a sexual assault?
22         MR. DAMICH:  Objection.  Form.  Form.
23     Calls for a legal conclusion.
24         THE WITNESS:  In the sense of, like,
25     the -- the person paying for the sex committed a

Page 44

11 (Pages 41 to 44)

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

| | | | |
|---|---|---|---|
| | **Page 45** | | **Page 46** |

1    sex act -- or a sexual assault?
2    BY MS. AUKERMAN:
3    Q.  The person who is offering the sex act, as you use
4       the term sexual assault in your declaration, is
5       the person committing a sex act, in exchange for
6       money, is that a sexual assault?
7            MR. DAMICH:  Same objection.
8            THE WITNESS:  So the person selling, I
9       would not -- the person selling, I would not
10      consider if that was -- if it was consensual and
11      there's all those other conditions we talked
12      about, not age, not incapacity, mental impairment,
13      you know, drug or alcohol facilitated types of
14      things that would -- but we're just all in the up
15      and up consent.  The person buying and the person
16      selling would not be considered sexual assault
17      under the -- under the definitions here or under
18      the -- the -- the approved or, in general, the --
19      how sexual assault is used in the literature.
20   BY MS. AUKERMAN:
21   Q.  Okay.  So let's talk about -- so for sexual
22      assault, would you include unwanted sexual contact
23      that does not involve touching of a person's
24      genitals or breasts?
25            MR. DAMICH:  Objection.  Form and

                    Page 45

1       foundation.
2    BY MS. AUKERMAN:
3    Q.  So for example, unwanted kissing, is that a sexual
4       assault?
5            MR. DAMICH:  Same objection.
6            THE WITNESS:  Most of the time in the
7       literature -- well, I'll start by saying, in our
8       data, those are not decisions we often have to
9       make in that, A, those cases are very rarely
10      reported.  And two, you know, it's not in the
11      aspects of, like, you know, sexual assaults,
12      especially with sexual assault kits.  But in that
13      case, I -- I think I -- you know, in the
14      literature as well as -- as well as in, you know,
15      the general approach, that would be considered
16      more sexual misconduct.
17            Most of the time sexual assault, again,
18      has to do with a lack of consent or ability to
19      provide consent along with penetration, attempted
20      penetration, or, you know, touching of the genital
21      areas.
22   BY MS. AUKERMAN:
23   Q.  So sexual assault would be unwanted penetration,
24      attempted penetration, or touching of genital
25      areas?

                    Page 46

1    A.  Primarily, yes.  But there is an -- I mean, it is
2       very important to talk about definitions.  And
3       there are -- there is a -- I think I did cite it
4       in here -- I can confirm -- but there is -- yeah,
5       I did cite it.  There is a -- the most commonly
6       used survey, it's a prevalence survey done by the
7       CDC and they lay out very specific terms of
8       including, "This is what we mean by sexual
9       coercion, this is what we mean by sexual assault
10      and rape," and so and so.
11            So, like, in general, the literature also
12      follows that -- those sorts of approaches.  Again,
13      state statutes often don't match up necessarily
14      with the -- the terms that we use, or there could
15      be multiple, you know, like, criminal statutes
16      that could go with one act.  But there's a --
17      there is a literature that is very well cited and
18      very well used in this space specifically as it
19      relates to -- to sexual contact, sexual
20      misconduct, sexual assault, and rape.
21   Q.  So is it fair to say there's a distinction between
22      sexual assault and sexual misconduct, those are
23      two different things, correct?
24   A.  Yes.  Yeah.
25   Q.  Okay.  And your research is on -- the SAK research

                    Page 47

1       that you did is on sexual assault?
2    A.  Yes.
3    Q.  Okay.  What about, would you consider noncontact
4       offenses -- so if -- let me rephrase that.
5            If sexual assault involves penetration --
6       attempted penetration or unwanted touching to
7       sexual areas, genital areas, a noncontact offense
8       is not a sexual assault, correct?
9            MR. DAMICH:  Objection.  Form.
10      Foundation.
11   BY MS. AUKERMAN:
12   Q.  You can answer.
13   A.  I'm trying to make sure -- can you repeat the
14      question?  Just so...
15   Q.  Sure.  So a noncontact offense where there is no
16      physical contact with -- between people, would not
17      be a sexual assault, correct?
18            MR. DAMICH:  Same objection.
19            THE WITNESS:  Okay.  Sorry.  A noncontact
20      sexual offense?
21   BY MS. AUKERMAN:
22   Q.  Yeah, a noncontact sexual offense.
23   A.  Right.  So let's -- I just want to make sure, for
24      example, something like child porn, distributing
25      of sexually -- you know, material, peeping Toms,

                    Page 48

                                    12 (Pages 45 to 48)

Lovell, Rachel
5/19/2023

## Page 49

1 those kinds of nonsexual contact types of things
2 would in most -- it would not be -- I would not
3 consider those sexual assaults, and the literature
4 would not as well.
5 Q. And those types of offenses are not covered in
6 your research, correct?
7 A. Correct.
8 Q. Okay. Sexual assault would not include offenses
9 that don't have a sexual component, correct?
10 MR. DAMICH: Objection. Form.
11 Foundation.
12 BY MS. AUKERMAN:
13 Q. So let me give you an example. So kidnapping,
14 sometimes it has a sexual component, sometimes it
15 doesn't, correct?
16 A. Correct.
17 Q. Is a kidnapping without any sexual component a
18 sexual assault?
19 MR. DAMICH: Objection. Form.
20 Foundation.
21 THE WITNESS: In Ohio, kidnapping is
22 frequently charged -- and I think it's called an
23 allied or -- ali -- something offense. Where it's
24 frequently charged with -- when there is a sexual
25 assault, kidnapping is usually added as a charge

## Page 50

1 for that. And so you'll see frequently, like,
2 rape, kidnapping because as part of the act of
3 rape, you're also meeting the definition of
4 kidnapping.
5 But if there was just kidnapping and no
6 -- and there was -- there's no hint or act or
7 attempt to -- you know, to sexually assault,
8 touch, grope genital areas, penetration, attempted
9 penetration, then no, that would not be considered
10 sexual assault.
11 BY MS. AUKERMAN:
12 Q. Okay. So your report also used the term "repeat
13 sexual offending," which you define as engaging in
14 a sexually based crime and then engaging in a
15 subsequent sexually based crime and a separate
16 incident regardless of being caught for either, or
17 both, or all offenses, correct?
18 A. Correct.
19 Q. Okay. When you say a subsequent sexually based
20 crime, subsequent to what?
21 A. The first.
22 Q. So if a person commits -- if a person commits a
23 sexual offense more than once, you would consider
24 that person a repeat offender, correct?
25 A. Correct.

## Page 51

1 Q. You're not measuring repeat offending from the
2 point when the person is first convicted, correct?
3 A. Correct.
4 Q. Okay. So you're measuring whether the person has
5 committed more than one offense, correct?
6 A. Yes.
7 Q. Okay. So let's take an example. We have a person
8 who's convicted of one sex offense. They've never
9 been re-convicted. And let's say, just
10 hypothetically, we know to 100 percent certainty
11 that they never re-offend. That person would --
12 is not a repeat offender, correct?
13 MR. DAMICH: Objection. Form.
14 Foundation.
15 THE WITNESS: Okay. Let's go through the
16 scenario again. So let's say someone is --
17 commits, or is convicted of, or arrested for?
18 BY MS. AUKERMAN:
19 Q. They're convicted of a sex offense and then they
20 never get convicted and they never commit another
21 sex offense.
22 A. Never convicted nor -- and we know 100 percent
23 certain that they never even attempted or did
24 anything --
25 Q. Yep.

## Page 52

1 A. -- else to commit that -- no, then they would not
2 be a repeat sexual offender.
3 Q. Okay. Because they've only offended once, so
4 they're not a repeat offender, correct?
5 A. Correct.
6 Q. So let's take a second example. We have a person
7 who's convicted of one sex offense and it turns
8 out that they've also committed two additional sex
9 offenses, that person would be a repeat offender,
10 right?
11 A. Correct.
12 MR. DAMICH: Objection. Form.
13 Foundation.
14 BY MS. AUKERMAN:
15 Q. And that person is a repeat offender whether or
16 not they get caught for crimes two or three,
17 correct?
18 A. Correct.
19 MR. DAMICH: Same objection.
20 BY MS. AUKERMAN:
21 Q. And -- okay.
22 Let's take a third example. We have a
23 person who engages in three acts of sexual abuse
24 against the same victim over the course of a year.
25 They're then caught and convicted but they never

Lovell, Rachel
5/19/2023

**Page 53**

1  re-offend after conviction.  Is that person a
2  repeat offender as you use the term?
3          MR. DAMICH: Objection.  Form and
4  foundation.
5          THE WITNESS:  So serial or repeat
6  offending in the literature as well as in my
7  declaration is defined, it can be the same victim.
8  But if they're in multiple incidents, then those
9  are separate crimes.  So separate incidents,
10  meaning you would be picking at more than one.  So
11  if you raped the same victim in the same act
12  twice, criminally, you can be charged with a
13  different amount of counts.  But in the
14  literature, they would -- and I, you know, would
15  consider that person a repeat offender because
16  they had done -- they've raped even -- even if
17  it's the same victim, they have repeatedly
18  sexually assaulted or sexually abused, however we
19  want to say it, that person in separate incidents.
20  BY MS. AUKERMAN:
21  Q.  Okay.  So if someone engages in multiple, let's
22      say two sex crimes, we know that they've committed
23      two sex crimes, and then they're convicted.  We
24      can make this two separate victims.  That person,
25      in your view, is a repeat offender, correct?

**Page 54**

1          MR. DAMICH: Objection.  Form and
2  foundation.
3          THE WITNESS:  They've been convicted once
4  but they have two separate victims and two
5  separate incidents?
6  BY MS. AUKERMAN:
7  Q.  Correct.
8  A.  Yes, that person would be a repeat sexual
9      offender.
10  Q.  And that's true even if both of those offenses
11      predate the conviction?
12  A.  Correct.
13          MR. DAMICH: Objection.  Form.
14  Foundation.
15  BY MS. AUKERMAN:
16  Q.  You can answer.
17  A.  Correct.
18  Q.  Okay.  So when you say repeat sexual offending,
19      what you're measuring is whether someone committed
20      more than one offense, correct?
21  A.  Yes.
22  Q.  And you're not measuring whether someone has
23      re-offended after conviction, correct?
24  A.  Can you repeat that -- the second part?
25  Q.  The measurement is not limited to whether a person

**Page 55**

1  has committed another offense after conviction,
2  correct?
3  A.  They could have but it's not contingent upon the
4     second conviction.
5  Q.  Okay.  But a person could be a repeat offender if
6     in -- as you use the term "repeat offender," all
7     of the offenses could predate the conviction and
8     the person is still a repeat offender, correct?
9  A.  Correct.  And -- and by the same token, someone
10     could get a conviction and then continue to offend
11     after that and they would be a repeat offender as
12     well.
13  Q.  Okay.  So one of the things that -- are you aware
14     that this litigation is about people who have been
15     convicted, and as a result, are on the Sex
16     Offender Registry?
17  A.  I assume because it -- because I read this -- the
18     declarations that it was about the Sex Offender
19     Registry, so I assumed it had something to do with
20     people who are on the registry.
21  Q.  So one of the things we're interested in
22     understanding is how likely people are to commit a
23     new sex offense after being convicted of a prior
24     sex offense.
25          What term would you use for re-offending

**Page 56**

1  after conviction?
2  A.  Re-offending after conviction?  Re-offend --
3          MR. DAMICH: Objection.  Calls for a
4  legal conclusion.
5          But go ahead.  Sorry.
6          THE WITNESS: Sorry.
7          I would call it re-offending.
8  BY MS. AUKERMAN:
9  Q.  But didn't you just testify that when someone is
10     re-offending, you're not limiting that to after
11     conviction?
12  A.  If I understood your question, it was, like,
13     here's the conviction, someone -- someone -- after
14     conviction, someone commits another crime, I would
15     call that re-offending.  If you're saying here's a
16     conviction-based into which someone was convicted
17     again for the same type of crime, that would be
18     recidivism.
19  Q.  So what I'm trying to understand is, would you
20     agree that there's a difference -- so someone
21     commits three offenses let's say.  Okay.  They
22     commit three offenses.  That person, in your view,
23     is a repeat offender regardless of whether they're
24     convicted, correct?
25  A.  Correct.

14  (Pages 53 to 56)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1       MR. DAMICH:  Form and foundation. | 1       I think when you're looking at offending |
| 2  BY MS. AUKERMAN: | 2  behavior, which is what the research -- the -- |
| 3  Q.  And the person who commits three offenses is a | 3  that I cite and the research that I do looks at, |
| 4      repeat offender regardless of whether those | 4  is that we're interested in -- we're looking not |
| 5      offenses occur prior to conviction, correct? | 5  at, like, what -- what time period did they do |
| 6  A.  Correct. | 6  this and they do that.  You're looking at their |
| 7  Q.  And they're a repeat offender if those offenses | 7  full behavior across the lifespan.  So you're |
| 8      occur -- if the second and third offenses occur | 8  looking at what types of crimes did they commit |
| 9      after conviction for the first offense, correct? | 9  across their lifespan regardless of when the |
| 10 A.  Correct. | 10 convictions happened in those cases. |
| 11 Q.  What I'm trying to understand is, what is the | 11 BY MS. AUKERMAN: |
| 12     terminology we can use to distinguish between the | 12 Q.  So your research doesn't look at when people |
| 13     people who re-offend after conviction and the | 13     offend in relation to when they've been convicted, |
| 14     people who commit multiple offenses prior to | 14     correct? |
| 15     conviction? | 15 A.  I do have a study that's under review that does |
| 16      MR. DAMICH:  Form and foundation. | 16     look at -- it does look at repeat sexual |
| 17      THE WITNESS:  I think the issue is -- has | 17     offending.  And we are able to see, you know, |
| 18 to -- well, in all cases, it's -- it's just a | 18     what's their first -- what's their first sexual |
| 19 matter of what term you want to use for that.  So | 19     offense that they have.  Over 50 percent of those |
| 20 recidivism is how a lot of the studies -- and, you | 20     were convicted, and then what ends up happening |
| 21 know -- you know, especially sexual recidivism is | 21     after that.  And we do see, you know, how many |
| 22 being caught, right, and convicted or arrested. | 22     percentage of those, like, went on to commit other |
| 23 But mostly, it's being convicted once and then | 23     ones.  But -- but -- but that's not the |
| 24 being either arrested or convicted for a | 24     traditional, like, recidivism research that's |
| 25 subsequent one. | 25     cited in those declarations. |
| Page 57 | Page 58 |
| 1  Q.  Do some scholars use the term recidivism to mean | 1  Q.  Correct. |
| 2      re-offending after conviction? | 2       And when you're talking about |
| 3  A.  If they do, they would be incorrect because it's | 3  re-offending, you're talking about how many times |
| 4      not re-offending.  It's getting caught again. | 4  people commit an offense, correct? |
| 5  Q.  So just so that we can be talking about the same | 5  A.  Correct. |
| 6      thing here.  Your report does not include -- you | 6  Q.  Okay.  But you don't have a term that relates to |
| 7      provide a series of definitions, but your report | 7      how many times people commit an offense after |
| 8      does not include a separate term for re-offending | 8      being convicted? |
| 9      after conviction, correct? | 9  A.  That would be repeat sexual offending.  So that -- |
| 10 A.  That would just be re-offending.  It'd be repeat | 10 Q.  But repeat sexual offending, you have also |
| 11     offending.  That would fit the definition of | 11     included offending prior to conviction, correct? |
| 12     whether the person was caught or not.  If they -- | 12 A.  Right.  So it would just -- so there -- so it |
| 13     so part -- because recidivism is a measure of | 13     would be all of that.  So -- |
| 14     behavior, but it's also a measure of the extent of | 14 Q.  So for repeat sexual offending, you include |
| 15     reporting adjudication in the criminal justice | 15     behavior before conviction and behavior after |
| 16     system and other things.  So it's not -- | 16     conviction.  You don't make a distinction, |
| 17     recidivism is not a measure of just behavior.  So | 17     correct? |
| 18     repeat sexual offending is a measure of -- of | 18 A.  Correct. |
| 19     behavior, not incorporating this into which | 19 Q.  Okay. |
| 20     victims report and the extent to which the case | 20 A.  Although, I do have data on that but that's not |
| 21     becomes adjudicated.  So -- | 21     what that term is meant to use. |
| 22 Q.  So when you say "recidivism," what you're talking | 22 Q.  Okay.  So just so that we're clear as we're |
| 23     about is people being caught a second time or | 23     talking today, if at any point you want to talk |
| 24     additional times in the criminal justice system? | 24     about sexual offending after conviction |
| 25 A.  Correct. | 25     separately, just use that terminology sexual |
| Page 59 | Page 60 |

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 re-offending after conviction so that we know that | 1 context of the publications, the data and methods |
| 2 you're not talking about re-offending broadly. | 2 lay out that -- what we're talking about are, you |
| 3 **A.** Okay. Sure. | 3 know, those connected to sexual assault kits. |
| 4 **Q.** Okay. You also use the term "sexual offender." | 4 So... |

1  re-offending after conviction so that we know that
2  you're not talking about re-offending broadly.
3  **A.**  Okay.  Sure.
4  **Q.**  Okay.  You also use the term "sexual offender."
5       Who do you consider -- when you use the term
6       "sexual offender," who do you mean by that?
7  **A.**  It's a general term for someone who has committed
8       a sexually based crime.
9  **Q.**  So are you restricting that to people who
10      committed rapes or sexual assaults?
11 **A.**  No, I -- I primarily use that -- and I do
12      distinguish in my publications if we're talking
13      about sexual assault offending, and that's a
14      specific type of sexual offending versus sexual
15      offending in more general, which might include a
16      variety of different types of sexually based
17      crimes.
18 **Q.**  So when you use the term sexual offender, are you
19      referring to anyone who commits a sexual crime?
20 **A.**  Yes.
21 **Q.**  Okay.  Do you ever use the term sexual offender as
22      a shorthand or the sample -- the people in the
23      sample in your research?
24 **A.**  I have, yeah.  So sometimes it can be a short-hand
25      for -- for a sexual offender.  But the -- in the

Page 61

1  context of the publications, the data and methods
2  lay out that -- what we're talking about are, you
3  know, those connected to sexual assault kits.
4  So...
5  **Q.**  So when you're using it as a shorthand when you
6       say sex offender, you mean the people who are
7       associated with the sexual assault kits?
8  **A.**  In my publications, yes.
9  **Q.**  And in your report when you use the term sexual
10      offend, are you referring to anyone committed --
11      who's convicted of a sexual crime or the people
12      associated with --
13 **A.**  Yeah, so -- yeah, so, just to be more general.
14      Yeah, so I cite -- when I'm talking about my data,
15      I use the term sexual assault offender.  When I'm
16      talking about sexual offenders in general using
17      the term sexual offender or repeat sexual offender
18      and not adding in the assault component of that.
19 **Q.**  So sometimes in the report you're using sexual
20      offender to mean the people in your data and
21      sometimes you're using it to mean anybody
22      convicted of a sex crime, correct?
23 **A.**  Incorrect.  The -- in the -- in the report when it
24      says sexual offender, that's the broad category
25      under which -- you know, encompasses a variety of

Page 62

1  sex crimes.  And then sexual assault offenders,
2  more specifically to those connected to sexual
3  assaults specifically.
4  **Q.**  So let's look at just -- I want to make sure I'm
5       clear.  Let me share my screen here.  Looking at
6       your report in 9(b).
7  **A.**  Um-hum.
8  **Q.**  You discuss your research and you talk about a
9       number of -- in (b)(i) you talk about 1,270
10      samples to suspected sexual offenders.
11          When you say sexual offenders there, you
12      mean people associated with the SAKs.  You don't
13      mean people convicted of every sex crime, correct?
14 **A.**  Correct.  Right.
15 **Q.**  Okay.  Okay.
16          All right.  I'm showing you an article
17      that you wrote on dissemination impact amplified.
18      Do you recognize this article?  Let me scroll up
19      here if I can.  Oh, I guess I haven't shared it
20      yet, so that would help.  Have you read this
21      article?
22 **A.**  Yes.
23 **Q.**  Okay.
24          MS. AUKERMAN:  And we'll make this
25      Exhibit 3 here.

Page 63

1          (At 10:27 a.m., Exhibit 3 marked.)
2  BY MS. AUKERMAN:
3  **Q.**  And you write here that the, [as read], "Public's
4       media consumption strongly impacts their
5       understanding of crime and justice, often noting
6       that the public's perception rarely matches the
7       reality.  This is especially true with sex crimes
8       where the more sensational crimes are prominent
9       and disproportionately focused on violent sex
10      crimes committed by strangers and on the actions
11      of the victim and the crime."
12          Would you agree with that statement?
13 **A.**  Correct.
14 **Q.**  Okay.  And would you agree that in the decision
15      making about preventing sexual offending, we
16      should be focused on the facts and not on public
17      perceptions about sensational sex crimes?
18 **A.**  No, I would not agree with that statement.
19 **Q.**  Okay.  Would you agree that in the decision making
20      about preventing sexual offending we should focus
21      on the facts?
22          I guess what I'm asking is, --
23 **A.**  Yeah.
24 **Q.**  -- do you believe in evidence based --
25      evidenced-based approaches to sexual offending?

Page 64

16 (Pages 61 to 64)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1  **A.** Yeah, as a -- as a general approach. I think the | 1  **A.** Yes. |

Page 65

1  **A.** Yeah, as a -- as a general approach. I think the
2     question is whose evidence and who -- you know,
3     like, for example, you know, victims, while it may
4     be evidence based, victims are often written and
5     reported about around all the actions -- like I
6     said here, that, like, led up to that, that lead
7     victims to be blamed. So while it is --
8  **Q.** Sure, but -- right. Right. But what I'm asking
9     about is whether -- I mean, it seems like you've
10    dedicated your career to research that will inform
11    evidence-based responses to sexual violence,
12    correct?
13  **A.** Correct.
14  **Q.** And trying to understand what the data and what
15    the research shows us?
16  **A.** Correct.
17  **Q.** Right. Okay.
18       I mean, preparing for this deposition, I
19    found your research incredibly interesting because
20    it seems to really improve our understanding of
21    and ways to respond to sexual assault, and your
22    work seems to be really creative.
23       In a number of pieces, you wrote that
24    your work is unique or novel. Is your work unique
25    or novel?

Page 65

1  **A.** Yes.
2  **Q.** What's novel about your work?
3  **A.** The sexual assault kits certainly make the -- the
4    information that we have from this novel because
5    of -- because of the opportunities that sexual
6    assault kits provide for us to be able to examine
7    sexual offending.
8  **Q.** Is it fair to say that not many people have done
9    the kind of research that you've done?
10  **A.** That's correct.
11  **Q.** Okay. Your report mentions I believe just one
12    other study in Wayne County; is that correct?
13  **A.** Correct.
14  **Q.** Are you aware of any other studies that look at
15    repeat sexual offending based on sexual assault
16    kits?
17  **A.** There -- well, we wrote -- I recently wrote a
18    book. It's an edited book. As far as I'm aware,
19    our study, along with Detroit's from Wayne County,
20    are the only ones that have -- other people have
21    looked at sexual offending and, you know, sort of
22    aspects of repeat sexual offending.
23       But the reason why I cited ours too is
24    because they're -- they're pretty comparable in a
25    number of meaningful ways. So I really can

Page 66

1  compare the two in a sense because we've measured
2  things very similarly. We have similar
3  jurisdictions.
4       There's similar things of how they
5  approached it. Like, there's a lot of
6  similarities between Wayne County and Cuyahoga
7  County in how they did their sexual assault kits.
8  So that's one way to compare.
9       But certainly, like, for example, the
10  Sexual Assault Kit Initiative itself keeps federal
11  data on whether the suspects are -- are serial
12  offenders or have -- you know, are known to be a
13  sexual offender. So certainly, we're not the only
14  two people who have those metrics, but that's --
15  the reason I cited it is because I'm comparing
16  their, like, two similar metrics that can be
17  compared.
18  **Q.** When you say that -- well, are there other
19    published studies that look at SAK based research
20    on repeat offending?
21  **A.** Kansas did some work on that. I don't think it
22    was ever published in a journal but has been
23    disseminated broadly. The Kansas Bureau of
24    Investigation did some really interesting stuff
25    with sexual offenders. They're no longer a SAKI

Page 67

1  site, I believe, because they finished, but they
2  did some for -- for some time. I'm trying to
3  think because now there's some 80 different sites
4  for SAKI.
5  **Q.** So to your knowledge though that the two -- your
6    study and the Wayne study are the two published
7    studies -- two published peer-reviewed studies
8    related to SAKs and repeat offending, correct?
9  **A.** Yes, I believe so.
10  **Q.** So, I mean, is it fair to say that you're sort of,
11    you know, on the cutting edge of this area of
12    research?
13  **A.** Correct. Yeah.
14  **Q.** Okay. It's kind of uncharted --
15  **A.** Me along with Wayne County. I don't want to --
16  **Q.** Yeah.
17  **A.** They've been doing great work too. Yeah.
18  **Q.** Yeah. Reading your work, it seems like SAKs are
19    an important way to uncover -- well, let me say
20    this differently.
21       It seems like your work identifies ways
22    in which we can more successfully use DNA evidence
23    to identify, investigate, and then prosecute
24    people who commit sexual offenses; is that fair to
25    say?

Page 68

17 (Pages 65 to 68)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 | **A.** Yeah, certainly, that DNA leads that but not all |
| 2 | the cases in Cuyahoga County that they worked |
| 3 | through have DNA. So it's also broader than |
| 4 | just -- so it's not -- DNA isn't the only |
| 5 | component. But how it can be used in conjunction |
| 6 | with a more improved response from the criminal |
| 7 | justice system and from individuals in the |
| 8 | criminal justice system to, you know, have a |
| 9 | better response to sexual assault. |
| 10 | **Q.** Right. And your work suggests a variety of ways |
| 11 | in which we can improve responses -- we can better |
| 12 | ensure accountability for people who are |
| 13 | committing sexual offenses, correct? |
| 14 | **A.** Correct. |
| 15 | **Q.** Okay. And would you agree that to prevent |
| 16 | victimization, we should be investing in the kinds |
| 17 | of evidence-based approaches that, you know, you |
| 18 | and others talk about as being effective in |
| 19 | reducing victimization and ensuring |
| 20 | accountability? |
| 21 | **A.** Correct. |
| 22 | **Q.** All right. Let's talk a little bit -- I want to |
| 23 | get to re-offending, but I want to talk about |
| 24 | recidivism as you define it, first in terms of |
| 25 | getting caught again. So let's start with talking |

Page 69

| | |
|---|---|
| 1 | about that. |
| 2 | You define sexual recidivism in your |
| 3 | report, it's paragraph 4(a), as being caught by |
| 4 | the criminal justice system once and then being |
| 5 | caught by the criminal justice system at least one |
| 6 | more time, correct? |
| 7 | **A.** Correct. |
| 8 | **Q.** Okay. And then in paragraph 7(d), you write that, |
| 9 | [as read], "A recently released meta-analysis on |
| 10 | sexual recidivism argues that a single rate of |
| 11 | sexual recidivism that can be applied to all |
| 12 | convicted sexual offenders, e.g., a true base rate |
| 13 | for sexual recidivism does not exist. Of the 808 |
| 14 | empirical studies in their meta-analysis, the |
| 15 | reported sexual recidivism rate varied from zero |
| 16 | to 68 percent," correct? |
| 17 | **A.** Correct. |
| 18 | **Q.** Okay. And that meta-analysis was done by -- I'm |
| 19 | not sure if I'm pronouncing this correctly -- |
| 20 | Lussier and colleagues, correct? |
| 21 | **A.** Correct. |
| 22 | **Q.** All right. Do you agree with the statement that |
| 23 | there's no one rate for sexual recidivism? |
| 24 | **A.** Correct. In the sense of, like, a true -- the |
| 25 | true -- a true number or something that -- you |

Page 70

| | |
|---|---|
| 1 | know, like, a true rate for heart attacks or a |
| 2 | true rate for other sorts of things. Because you |
| 3 | are working with the criminal justice system, and |
| 4 | since sexual recidivism is a measure of behavior |
| 5 | as well as reporting rates, and adjudication and |
| 6 | the criminal justice response to it. And it |
| 7 | varies a lot by the size, how long we study them, |
| 8 | what crimes you're looking at; that there isn't |
| 9 | really, like, one true number. Although, there |
| 10 | are good studies that have, you know, good |
| 11 | estimates of that number. |
| 12 | **Q.** So the recidivism rate, the detection rate, the |
| 13 | getting caught rate, that varies, you said, by |
| 14 | what population you're looking at, the amount of |
| 15 | time you're looking at the person at the sample, |
| 16 | that kind of thing, correct? |
| 17 | **A.** As well as what caught means. Like arrest, |
| 18 | conviction. |
| 19 | **Q.** Right. Okay. |
| 20 | (At 10:38 a.m., Exhibit 4 marked.) |
| 21 | BY MS. AUKERMAN: |
| 22 | **Q.** So let me just pull up the study that you cited, |
| 23 | the Lussier study. |
| 24 | So Lussier writes that -- writes that, |
| 25 | [as read], "the base rate of recidivism can vary |

Page 71

| | |
|---|---|
| 1 | drastically with changes in parameters, such as |
| 2 | the measurement criteria selected, the length of |
| 3 | the follow-up period, and the nature of the |
| 4 | sample, etc." |
| 5 | Do you agree with that statement? |
| 6 | **A.** Agree. |
| 7 | **Q.** And then later on, Lussier writes, [as read], |
| 8 | "Sexual offending encompasses a wide range of |
| 9 | behaviors that range from gross indecency to |
| 10 | sexually motivated homicide and include diverse |
| 11 | behaviors such as child pornography (production, |
| 12 | usage), rape and sexual assault, and child sexual |
| 13 | abuse and sexual exploitation that vary in terms |
| 14 | of the nature, frequency, context, intrusiveness, |
| 15 | and level of violence and harm. Even a legally |
| 16 | defined crime such as sexual assault can vary |
| 17 | along various dimensions (e.g., level of |
| 18 | violence, level of physical injuries, use of a |
| 19 | weapon, presence of accomplices, length of time |
| 20 | over which the offense occurred.) This wide range |
| 21 | is lost in the aggregate measure, sexual |
| 22 | recidivism." |
| 23 | Would you agree with that statement? |
| 24 | **A.** I -- I don't know that I completely agree with |
| 25 | the -- the idea there that sexual assault -- that |

Page 72

18 (Pages 69 to 72)

Lovell, Rachel
5/19/2023

| | |
|---|---|

1    legal definitions vary dramatically by, like, use
2    of a weapon or presence of accomplices.  But
3    the -- but the idea -- I think what he's -- or
4    they are trying to say is that, like, even the
5    idea of sexual assault, that there's variation
6    within that idea of sexual assault or how, you
7    know, like, quote -- like, these are air quotes.
8    So, air quote, bad the sexual assault can be.
9    Yeah, that there's -- there's variation within,
10   for example, rapes, right?  I think that's --
11   Q.  I think, as I understand this quote, the point is
12       that there are a variety of different behaviors
13       that make up sexual offending.  And that an
14       aggregate measure of sexual recidivism is -- loses
15       the wide diversity of offenses that result in --
16       that are sex crimes; is that correct?
17   A.  Yeah, I would say that there's variation within
18       the population of sexual offenders.
19   Q.  Right.  And so an aggregate number of sexual
20       recidivism is inaccurate because it doesn't
21       account for that variation of the population?
22   A.  I would say it is accurate if you've made it clear
23       as to exactly what -- what's included in that
24       term.  So for example, the Feds, Bureau of Justice
25       Statistics is the -- one of the major cited

Page 73

1    articles.  Everywhere in here that I talk about,
2    like, what -- you know, the eight percent
3    recidivism.  It's on, let's see, 7 -- 7(e) where
4    that large US -- "a large representative sample of
5    prisoners released from 30 states in 2005 and
6    followed for nine years post-release."
7         So in that study, they give very
8    specific, like, definitions of all those things.
9    So I think in that case -- like, if -- if it's all
10   laid out as to exactly what you're including in
11   that and how many years and who's that, then I
12   think you can kind of start to come up with
13   comparable measures over time.  But I think -- I
14   think you can when you -- when it's laid out as to
15   exactly what you're measuring and how you're
16   measuring it and who you're measuring.
17   Q.  But you have to lay out what the time period is,
18       what population we're talking about when we're
19       talking about recidivism.  That matters in the
20       rate; is that accurate?
21   A.  Correct.  Correct.
22   Q.  And you mentioned I believe the Bureau of Justice
23       Statistics?
24   A.  Correct.
25   Q.  And that's a -- is that a widely regarded source

Page 74

1    for crime and victimization data?
2    A.  Correct.  Yeah.
3    Q.  Are they sort of the gold standard for that?
4    A.  Correct.  Yeah.
5    Q.  Okay.  Let's stop sharing this.
6         So let's talk about the difference
7    between sexual recidivism and sexual re-offending.
8    Sexual recidivism, as you used that term in your
9    report, counts only offenses where a person is
10   caught in the criminal justice system, right?
11   A.  Correct.
12   Q.  Okay.  Would you agree that because people who are
13       convicted have gone through the criminal legal
14       system, we can have a fair degree of confidence
15       that they committed the offense that they were
16       convicted of?
17   A.  Yes, with -- with a degree of error in there of
18       course.  But yes.
19   Q.  Right.  There's some wrongful conviction cases but
20       a conviction represents a decision by the legal
21       system that the person did what they were accused
22       of doing, right?
23   A.  Correct.
24   Q.  Okay.  But you point out in your declaration that
25       conviction-based recidivism rates understate the

Page 75

1    true amount of offending because we know that as a
2    result of underreporting and case attrition, there
3    are offenses that happen that don't result in
4    conviction, right?
5    A.  Correct.
6    Q.  Okay.  So let me make sure I understand.  As I
7        understand, there's three main reasons why
8        conviction-based recidivism data undercounts the
9        true rate of sexual offending.  So I want to make
10       sure I'm understanding this correctly.
11            So first, many sexual crimes are not
12       reported, correct?
13   A.  Correct.
14   Q.  So that offense is never detected by the criminal
15       justice system?
16   A.  Correct.  And there's variation in the different
17       types of sex crimes and their reporting rates.
18   Q.  So different types of sex crimes will have
19       different reporting?
20   A.  Correct.
21   Q.  Okay.  And then a crime might be reported, but it
22       doesn't lead to an arrest, correct?
23   A.  More often than not it doesn't lead to an arrest.
24   Q.  Okay.  And then third, a person might be arrested
25       but they're not convicted for the sex offense,

Page 76

19 (Pages 73 to 76)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 correct? | 1 person got caught, correct? |
| 2 **A.** Correct. Or they're convicted but it doesn't show | 2 **A.** Correct. |
| 3 up as a sex offense because it's pled down to | 3 **Q.** Okay. Now when a victim reports a crime, there's |
| 4 something else. | 4 a variety of reasons why a person might not be |
| 5 **Q.** Okay. Right. | 5 convicted, right? |
| 6 So for that third reason only, studies -- | 6 **A.** Correct. |
| 7 do some studies measure recidivism based on | 7 **Q.** So it might be because the police blame the victim |
| 8 arrests? | 8 or don't believe the victim or there's amiss that |
| 9 **A.** Yes. | 9 the police have about -- and assumptions about |
| 10 **Q.** Okay. So that would account for that third | 10 victims, right? That could be a reason they're |
| 11 reason. Not the first two, but the third reason? | 11 not -- the person is not -- the case is not |
| 12 **A.** Correct. Yeah, so the -- the Bureau of Justice | 12 pursued, correct? |
| 13 statistics, the one that I cited, they define it | 13 **A.** Correct. |
| 14 as the -- the subsequent one is an arrest or a | 14 **Q.** Okay. The police might do an inadequate |
| 15 conviction for a sexually based crime. | 15 investigation, correct? |
| 16 **Q.** Would you agree that if we measure re-offending in | 16 **A.** Correct. |
| 17 ways other than relying on convictions, that may | 17 **Q.** Or the prosecutor might think, "I'm not going to |
| 18 address some of the issues with underreporting and | 18 pursue this because I don't think I can get a |
| 19 case attrition? | 19 conviction," correct? |
| 20 **A.** Arrest could be a more encompassing way to measure | 20 **A.** Correct. |
| 21 sexual offending, yes. | 21 **Q.** Or it could be because the investigation -- there |
| 22 **Q.** And then other types, you talk about | 22 was an investigation but it showed that there |
| 23 self-reporting, you talk about the SAK data. | 23 wasn't a crime, correct? |
| 24 There's other ways of trying to figure out what | 24 **A.** Correct. Well, those would be unfounded, but yes. |
| 25 re-offense rates are without looking at whether a | 25 **Q.** So that would be unfounded. Or it could be |
| Page 77 | Page 78 |

| | |
|---|---|
| 1 because a jury acquitted the defendant. The case | 1 **Q.** Okay. |
| 2 went to trial but the jury believed the defendant, | 2 **A.** There's other cases where that wouldn't be the |
| 3 correct? | 3 case. |
| 4 **A.** Correct. | 4 **Q.** So let's look at paragraph 6 of your report. You |
| 5 **Q.** So is it fair to say that when we use non | 5 say that, [as read], "Sexual recidivism research |
| 6 conviction-based measures of re-offending, there's | 6 based on official, court/administrative research |
| 7 been no legal determination that the person did | 7 from criminal justice agencies provides biased and |
| 8 what they were accused of doing, correct? | 8 unrepresentative estimates of repeat sexual |
| 9 **A.** Correct. You're -- you're balancing there the -- | 9 offending." |
| 10 the difference between false reporting versus, you | 10 Are you suggesting that the scholars who |
| 11 know -- or sort of standards of evidence. So if | 11 do recidivism research are biased? |
| 12 you're at conviction, it's beyond a reasonable | 12 **A.** No. |
| 13 doubt versus, you know, at a time of report under | 13 **Q.** And the recidivism research measures reconviction |
| 14 which there's a presumption, right, of certain | 14 rates. So it would be representative of |
| 15 things. So I think there's different assumptions | 15 reconviction rates, correct? |
| 16 at different parts of that -- | 16 **A.** Correct. |
| 17 **Q.** Right. | 17 **Q.** So when you say unrepresentative, what you mean is |
| 18 **A.** -- and how careful you are with saying -- | 18 that it's incomplete because it doesn't account |
| 19 **Q.** Sure. So conviction-based measures don't address | 19 for undetected offending or criminal justice |
| 20 unreported cases or case attrition, correct? | 20 system attrition, correct? |
| 21 **A.** Correct. | 21 **A.** Correct, that often in sexual recidivism research, |
| 22 **Q.** But non conviction-based measures aren't premised | 22 they shorthand or use the term to reflect |
| 23 on a legal certainty that the person committed the | 23 behavior. Not -- not -- they -- they don't |
| 24 offense, correct? | 24 reflect, you know -- they -- they mean -- what |
| 25 **A.** Yeah, typically beyond a reasonable doubt. | 25 they say is they haven't committed another offense |
| Page 79 | Page 80 |

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1    but what they really mean is they haven't got | 1   **A.**   Correct. |

---

1    but what they really mean is they haven't got
2    caught for the other offense.  Right.
3    Q.  But you're not questioning the integrity of that
4        research with respect to having been caught?
5    A.  No.  No.
6    Q.  Okay.  So let's talk about determining -- you
7        know, your report distinguishes between sexual
8        recidivism and repeat sexual offending.  So let's
9        talk about repeat sexual offending.
10   A.  Okay.
11   Q.  Let me show you an article.  So this is an
12       article, this is I think Exhibit 5.
13       (At 10:51 a.m., Exhibit 5 marked.)
14   BY MS. AUKERMAN:
15   Q.  "Offending histories and typologies of suspected
16       sexual offenders identified via untested sexual
17       assault kits."  And you were one of the authors of
18       this article, correct?
19   A.  Correct.
20   Q.  Okay.
21       Okay.  So this is -- you write, [as
22       read], "Estimates vary greatly as to how prevalent
23       repeated sexual offending is."  Correct?
24   A.  Correct.
25   Q.  And do you still agree with that statement?

Page 81

1    A.  Correct.
2    Q.  So there's no academic consensus about how
3        prevalent repeat sexual offending is, correct?
4    A.  Correct.  It depends on how you know and what you
5        know and who you know about.
6    Q.  Okay.  And then you write, [as read], "This
7        variation primarily stems from the difficulty in
8        measuring repeat offending, especially among
9        sexual offenders."
10       So you would agree that measuring repeat
11       offending for people with past sex offenses is
12       difficult?
13   A.  Extremely.
14   Q.  Okay.  And then you write that, [as read], "Data
15       that rely only on official criminal justice system
16       records are an undercount of re-offending, but
17       especially in the case of sexually based
18       re-offending.  It is not known how great this
19       undercount is."  Correct?
20   A.  Correct.
21   Q.  And you would still agree with that statement?
22   A.  Correct.
23   Q.  Okay.  And then up here, going back up to page
24       471, you talk about the difficulty of measuring
25       repeat offending and you describe sort of three

Page 82

---

1    ways -- you -- repeat offending estimates depend
2    upon three separate things.  A, which population
3    is under observation.  B, how offending and
4    re-offending is known and measured.  And C, the
5    length of the follow-up period, correct?
6    A.  Correct.
7    Q.  Okay.  So let's go through each of those factors.
8        So let's start with the population under
9        observation.
10       Is it accurate to say that the population
11       sample in which you do your research affects the
12       results?
13   A.  Correct.
14   Q.  Okay.  So if you have two groups with different
15       characteristics, groups A and B and you do a study
16       on group A.  You can't assume that the results for
17       group A are also true for group B, correct?
18   A.  I --
19       MR. DAMICH:  Form.  Foundation.
20       THE WITNESS:  I think that's too vague
21   to -- to say that.
22   BY MS. AUKERMAN:
23   Q.  Okay.  So let's say that you have group A and they
24       have a certain set of characteristics, and group B
25       has different characteristics.  Can you assume

Page 83

1    that research on group A is also true for group B?
2    A.  I think the -- I wouldn't characterize it that way
3        because that's -- like, you're talking about,
4        like, generalizable knowledge.  So we rarely have
5        everything that's exactly the same in this group,
6        it's going to be exactly the same.  Michigan is
7        different from Ohio, but guess what, Michigan and
8        Ohio are actually quite similar in a number of
9        ways, right?  Like, they're dissimilar in some
10       ways, they're similar in other ways.  Can you say
11       that they're exactly the same?  No.  Can you say
12       they have maybe similar characteristics that you
13       could generalize something?  Yes.  Is there a
14       preponderance of evidence over time that would
15       make them comparable?  Yes.  Like so -- I -- I
16       think -- I think that's just too general of a
17       statement to -- to affirm either way if we're
18       talking about science.
19   Q.  But you would --
20   A.  I have specifics.
21   Q.  Right.  But you would agree that you have to look
22       at the similarities and differences between the
23       groups to know whether or not you can generalize
24       out?
25   A.  You would -- you would have to be clear or have an

Page 84

21 (Pages 81 to 84)

Lovell, Rachel
5/19/2023

1    understanding of how the groups might be different
2    and how they might be similar, so that the reader
3    can make inferences about, you know, how -- how
4    and where to generalize.
5    Q.  And you've talked about how with sexual re-offense
6    rates, the estimates for re-offense will depend on
7    the group at issue, correct?
8    A.  Correct.
9    Q.  Okay.  So when you're looking at research on
10   re-offending or recidivism, you have to take into
11   account things like younger people may have higher
12   offense rates than older people, correct?  Yes?  I
13   think she froze.
14   A.  [Audio distorted.]
15   Q.  Sorry, you cut out for a second.
16   A.  Oh, I'm sorry.
17   Q.  Can you --
18   A.  Yeah, sorry.  The answer's -- yeah, that's a major
19   criminological principle, the age crime curve.
20   Q.  Can you tell us what the age crime curve is?
21   A.  It's the idea that -- that, you know, like, when
22   people are younger, they're more likely to commit
23   crimes, a variety of crimes, most crimes.  And
24   that at some point, you know, the -- the
25   propensity to commit crime decreases as

Page 85

1    individuals age.
2    Q.  And has that been true in your research on sexual
3    offending as well?
4    A.  Yes, but as we -- I think even in that paper that
5    you just pulled up, we talk about the sexual
6    offenders.  In our study and in other studies
7    don't follow that same age crime curve and
8    continue to sexually offend later in their life
9    cycle than other types of crime.
10   Q.  Does sexual offending drop off over time?
11   A.  It does drop off over time.
12   Q.  And as people age?
13   A.  Correct.
14   Q.  Okay.  And when we talk about, so taking into
15   account differences.  If you're doing research on
16   a group of people who were federally committed for
17   dangerous past sexual conduct and you were
18   comparing them to people who were convicted of
19   having sex with an underage girlfriend or
20   boyfriend, might you expect to see different
21   re-offense rates?
22   A.  I think --
23        MR. DAMICH:  Object to form and
24   foundation.
25        THE WITNESS:  I haven't -- I don't know

Page 86

1    of any studies or didn't cite any studies of -- of
2    that but do I -- do I -- I guess -- like do I --
3    do you want me to sort of just make a
4    generalization from the literature or what
5    might -- would be considered?  Because that's not
6    really something I've published of looking at
7    civil committed and what their recidivism rates
8    are and so forth.
9    BY MS. AUKERMAN:
10   Q.  I guess what I'm asking is, I mean, it doesn't
11   sound like you have experience on recidivism or
12   re-offense rates for different populations,
13   correct?
14   A.  Correct.
15   Q.  But you would agree that different populations
16   might have different re-offense rates?
17   A.  Correct.  I would agree with that, yes.
18   Q.  Okay.  And so, like, research on people who were
19   sent to prison might have different results than
20   research on people who got probation?
21   A.  Yeah, in so much as it's based on the severity of
22   the crime.
23   Q.  Okay.
24   A.  But, again, like, against what they're caught for
25   may not necessarily represent their full offending

Page 87

1    behavior.  But yeah.
2    Q.  Okay.  I mean, the broad point is that the
3    population you study could affect the re-offense
4    rates?
5    A.  Correct.
6    Q.  All right.  So returning to the article we were
7    just looking at.  This is Exhibit 5.  This is your
8    offending histories article.
9         You write that, [as read], "The longer
10   sexual offenders go without getting rearrested for
11   a sexually based offense, the less likely they are
12   to get rearrested for another such offense."
13   Correct?
14   A.  Well, I'm citing actually Hanson, the one that
15   is -- that I read the -- the declaration for.  So
16   I'm citing his work.  I'm -- I'm citing -- I
17   didn't do that study, but I'm citing his as
18   finding that, yes.
19   Q.  Okay.  You cited it as something that you agree
20   with?
21   A.  Correct.
22   Q.  Okay.  And then at the bottom of page 472, you
23   write, [as read], "heterogeneity is common among
24   sexual offenders."  Do you still agree with that
25   statement?

Page 88

22  (Pages 85 to 88)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 | A. Yes, in -- in the context of -- but this paper is |
| 2 | in the context of typologies. Like -- |
| 3 | Q. So there's different types of sex offenders, |
| 4 | correct? |
| 5 | A. Well, most of my research, and this one and |
| 6 | others, are looking at that there's a lot more |
| 7 | diversity in their offending behaviors. So my |
| 8 | studies aren't looking necessarily at, like, you |
| 9 | know, people -- to which, like, peeping Toms are |
| 10 | also, you know, doing sex offenses. But looking |
| 11 | at of those connected to a sexual assault through |
| 12 | a sexual assault kit, how diverse is their |
| 13 | offending behavior? Are they just really more |
| 14 | rapists who will rape or sexually assault in a |
| 15 | variety of ways with a variety of different |
| 16 | victims, aspects of victims and other sorts of |
| 17 | things. Or are they sort of sticking to a type? |
| 18 | And so this is the article about trying to see |
| 19 | that they're, like -- |
| 20 | Q. Right. Okay. |
| 21 | A. There's just one type of person. We -- you know, |
| 22 | we do find a lot of that actually do cross over |
| 23 | between adults and -- |
| 24 | Q. Right. So what I'm -- okay. That's sort of not |
| 25 | -- this is kind of outside of the scope of what |

Page 89

| | |
|---|---|
| 1 | we're talking about here. |
| 2 | A. Okay. |
| 3 | Q. So I'm just conscious of the time because I want |
| 4 | to make sure that we get through everything that |
| 5 | we want to get through today. Okay. |
| 6 | So you write at the bottom of page 43, |
| 7 | [as read], "Our findings support prior research |
| 8 | that indicates criminal offending is not evenly |
| 9 | distributed so that some criminals offend with a |
| 10 | high frequency." |
| 11 | So, like, there's not an even |
| 12 | distribution. Some people offend more, some |
| 13 | people offend less, correct? |
| 14 | A. Correct. |
| 15 | Q. And then you say, [as read], "Even in a sample of |
| 16 | disproportionately criminogenic offenders, our |
| 17 | analysis finds almost a third of the offenders |
| 18 | have ten plus arrests in their criminal history, |
| 19 | and more than ten percent are in the top |
| 20 | decile..." |
| 21 | So you have even within a sample of |
| 22 | disproportionately criminal offenders, you still |
| 23 | have a concentration even within that, correct? |
| 24 | A. Correct. |
| 25 | Q. Okay. And then on page 473, you write, [as read], |

Page 90

| | |
|---|---|
| 1 | "Studies show that as sexual offenders age, their |
| 2 | rates of desisting from sexual offending |
| 3 | increase." |
| 4 | Do you agree with that statement still? |
| 5 | A. Correct. That's -- the research on that is... |
| 6 | Q. Okay. |
| 7 | All right. Let's look at -- |
| 8 | A. But again, our study -- that study also shows as |
| 9 | well as others that, like, they go much further |
| 10 | into their later years than -- so we -- |
| 11 | Q. But it drops off as they age even though -- it may |
| 12 | not be the same age curve, but it is an age curve, |
| 13 | correct? |
| 14 | A. Correct. |
| 15 | Q. Okay. |
| 16 | (At 11:04 a.m., Exhibit 6 marked.) |
| 17 | BY MS. AUKERMAN: |
| 18 | Q. All right. So let's look at -- I've shared, this |
| 19 | is Exhibit 6. This is an article that you wrote |
| 20 | on walking and waiting sexual assaults? |
| 21 | A. Correct. |
| 22 | Q. And in this article, you found -- let me see if I |
| 23 | can find it. So this is an article where you |
| 24 | looked at the suspects, the characteristics of |
| 25 | suspects linked to walking-waiting sexual |

Page 91

| | |
|---|---|
| 1 | assaults, correct? |
| 2 | A. Correct. |
| 3 | Q. And you were the coauthor of this article? |
| 4 | A. I was the lead author. |
| 5 | Q. Lead author. Okay. |
| 6 | And you found that 57 percent were |
| 7 | committed by people aged 18 to 30, right? |
| 8 | A. Linked -- well, of those that committed were |
| 9 | linked to walking-waiting? |
| 10 | Q. Yes. |
| 11 | A. Yes, the 57.1 were between 18 and 30. |
| 12 | Q. And then for between 51 and 60, you found it was |
| 13 | 1.8 percent who are linked to walking and waiting, |
| 14 | correct? |
| 15 | A. Yes. |
| 16 | Q. And for over 60, it was zero percent, correct? |
| 17 | A. Correct. |
| 18 | Q. Okay. So it's fair to say that offenses -- this |
| 19 | type of offense anyway, is -- it's fair to say |
| 20 | that the walking and waiting offenses are more |
| 21 | likely to be committed by people aged 18 to 30 |
| 22 | than people over 50, correct? |
| 23 | A. Correct. |
| 24 | Q. Okay. So we talked about -- sort of going back to |
| 25 | kind of the three factors that one needs to |

Page 92

23 (Pages 89 to 92)

Lovell, Rachel
5/19/2023

Page 93

1    consider in trying to understand the difficulty of
2    measuring the offending. The first one was the
3    population that we're looking at. And the second
4    one you mention in your article is how
5    re-offending is known and measured, correct?
6    A. Correct.
7    Q. Okay. When you say re-offending is known, do I
8       correctly understand that you mean the way in
9       which it's determined that more than one offense
10      has been committed?
11   A. Right. The information that would connect what
12      kind of information connects someone to more than
13      one.
14   Q. So it could be known through, like, a contact with
15      the criminal justice system, like an arrest or
16      conviction, right?
17   A. Correct.
18   Q. And it could be known through self-reporting, like
19      a polygraph or a self-reporting study?
20   A. Right.
21   Q. And it could be known through a DNA linkage, like
22      the research that you're doing, correct?
23   A. Correct.
24   Q. Okay. And as I understand you, the different ways
25      that we find out or know about a second offense

Page 94

1    might affect the results?
2    A. Correct.
3    Q. Okay. And when you say how re-offending is
4       measured, do I correctly understand that to mean
5       that there's different ways to measure what counts
6       as re-offending?
7    A. Correct.
8    Q. So one way to measure might be how many times a
9       person has committed more than one sexual offense,
10      correct?
11   A. Yes, the question would be how would we know that
12      they committed -- were they a suspect in the
13      crime? Were they arrested for the crime? Were
14      they convicted of the crime? Were they linked by
15      DNA and no one ever tested it?
16   Q. Right. What I'm trying to get at, you talk about
17      both known and measured here. You say how
18      offending and re-offending is known and measured.
19      So known is how you find out about it. And then
20      the measured part is what you define as
21      re-offending, correct?
22   A. Correct.
23   Q. Okay. So re-offending could be defined as
24      committing more than one offense, correct?
25   A. Correct.

Page 95

1    Q. Or it could be defined as committing more than one
2       offense after conviction, correct?
3    A. Correct.
4    Q. And what you're measuring is the first, committing
5       more than one offense, correct?
6    A. Correct.
7    Q. Okay. And then the third factor that you talk
8       about in terms of the difficulty of measuring
9       repeat offending is the length of the follow-up
10      period, right?
11   A. Correct.
12   Q. Okay. So when you're discussing re-offense rates,
13      it's important to include a time period?
14   A. Correct.
15   Q. Okay. So it's fair to say you might get different
16      rates if you measure re-offending from five years
17      from release from prison compared to 20 years from
18      release?
19   A. Correct.
20   Q. Okay. Is it also fair to say that you might get
21      different rates if you measure re-offending in
22      years one to five after release versus years 15 to
23      20 after release?
24   A. Correct.
25   Q. Okay.

Page 96

1         All right. How are we doing? I wanted
2    to start talking about the sexual assault kits.
3    But I don't know if folks need a break. So do we
4    want to take a break or do we want to keep going?
5    A. Maybe -- I'd like maybe a five minute break.
6    Q. Okay. Let's take a five minute break and come
7       back at 11:15. Does that work?
8         MR. DAMICH: Sure does.
9         MS. AUKERMAN: Okay. Great. We'll be
10      back at 11:15.
11        (From 11:09 a.m. to 11:16 a.m. a break
12        was held.)
13        MS. AUKERMAN: So we're back on the
14      record.
15   BY MS. AUKERMAN:
16   Q. So I want to talk about the sexual assault kit
17      issue and -- or really just understand more about
18      how those -- starting off, sort of how those are
19      collected?
20   BY MS. AUKERMAN:
21   Q. So where are they collected? Is that done in
22      hospitals?
23   A. Primarily in hospitals, at least in the United
24      States. They're primarily done in hospitals
25      and/or some medical setting by medical

24 (Pages 93 to 96)

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

```
 1      professionals.
 2   Q.  And so those are done by medical professionals,
 3      like nurses or people who are trained -- like who
 4      does them?
 5   A.  So it could be -- primarily it's either ER doctors
 6      or doctors -- you know, ER or some type of, you
 7      know, emergency type of doctor.  And increasingly
 8      more they're being collected from individuals,
 9      sexual assault nurse examiners who are nurses who
10      get specialized training in forensic -- medical
11      forensic exams, which the -- there's the exam and
12      then the evidence that's collected is the kit.
13   Q.  Okay.  And at the time that your research was
14      being done, those exams were mostly being done by
15      physicians; is that fair to say?
16   A.  I wouldn't say mostly but with a mix of -- of
17      physicians as well as nurses and others.  But
18      usually those with -- or, like, nurse
19      practitioners or, you know, like not -- not
20      typically, like, you know, a cardiac nurse
21      wouldn't necessarily -- who wasn't in the ER
22      wouldn't necessarily collect those but...
23   Q.  And those were collected in hospitals, the ones in
24      your research?
25   A.  Correct.
```

Page 97

```
 1   Q.  Okay.  What does the process itself involve?  Like
 2      how long does it take?  Is it painful?
 3   A.  It can vary dramatically based upon the age of the
 4      victim, as well as what the victim consents to
 5      having done as part of the exam.  So, as well as
 6      injury -- other injuries that might be more --
 7      that require more immediate attention.  So if --
 8      if someone comes in who's been sexually assaulted
 9      but is also injured, right, broken ribs and they
10      have to go to X-ray for -- you know, so they have
11      to attend to their medical needs first before
12      doing the exam.  But it can range from, you know,
13      an hour to, you know, four, five, six hours.
14   Q.  And what is physically done during the exam?
15   A.  Again, it can vary dramatically based upon the age
16      of the victim, as well as what the victim consents
17      to.  But typically, it involves collecting
18      evidence -- forensic evidence from the bodies.  So
19      almost -- what's almost always collected for adult
20      -- I'll just say adults, are fingernail clippings,
21      swabs of bodily orifices and other parts of the
22      body, which the victim said might be involved in
23      the sexual assault.  Like the neck or the breasts
24      or other, you know -- combing of hair, collecting
25      of clothing.  And then that's the most typical
```

Page 98

```
 1      part of that, and then there's also variations in
 2      that.  So it could also include photographic
 3      evidence.  It could include, you know, other types
 4      of evidence collected as well.
 5   Q.  Okay.  And the combing of hair, the collection of
 6      -- that's all about -- collection of bodily
 7      fluids, that's all about trying to identify a
 8      source of DNA, correct?
 9   A.  Or evidence, yeah.  Right.
10   Q.  Okay.  And --
11   A.  I'm sorry.  I'll just clarify that it's also used
12      as corroborating evidence, not just for the DNA.
13      But it can be used as corroborating evidence.  So,
14      like, if the victim said, you know, "He licked my
15      breast," and his DNA is found on her breast, so
16      that could corroborate.  So it's not just about
17      the DNA, but also is the DNA kind of -- you know,
18      where it should or could be based upon the account
19      from the victim.
20   Q.  All right.  So it might be identification, but
21      even if the person's identified, the DNA -- even
22      if the suspect is known, the DNA could be helpful
23      in terms of establishing that a sexual assault
24      occurred?
25   A.  Correct.
```

Page 99

```
 1   Q.  Okay.  Let me go back to this article, the
 2      offending histories article.
 3          Okay.  So you write here that for a SAK
 4      to hit -- for the SAKs to hit each other, several
 5      things have to happen.  And then you set out six
 6      basically preconditions for the possibility of a
 7      SAK hit.
 8          So first, each sexual assault has to be
 9      recorded.  It had to have a -- second, it had to
10      have a SAK collected.  Third, the SAK had to have
11      enough evidence, had to have enough DNA from the
12      offender for testing or the SAK had to be retained
13      by law enforcement.  Fifth, the SAK had to be
14      submitted for testing.  And the sixth, the SAK had
15      to have enough DNA information to be eligible for
16      entry into the DNA database, correct?
17   A.  Correct.
18   Q.  Are there any other preconditions to getting a
19      hit?
20   A.  So there is a little bit more -- this is a broader
21      component.  You could have more specificity as
22      part of that.  So you can actually get a sexual
23      assault kit collected and not have it be reported
24      to police.  But in this case, it means, like, the
25      victim had to, you know, go or get the kit
```

Page 100

25 (Pages 97 to 100)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 collected. | 1 Q. Okay. |
| 2    Like report to at least medical | 2 A. -- you can get a kit but you don't have to put |
| 3 professionals. You don't necessarily have to | 3    your name on it. |
| 4 report to police to get a sexual assault kit | 4 Q. So the kits you tested -- or not tested yourself. |
| 5 collected. And then -- so it had to have enough | 5    The kits that you -- your research is based on |
| 6 DNA and it had to be -- had to be eligible for -- | 6    included a small number where the person had the |
| 7 for entry into CODIS. Yeah, it had to be | 7    kit done but didn't report an assault? |
| 8 submitted -- oh, yeah, I did say that. | 8 A. Correct. A small number, yeah. |
| 9    Have enough, you know, DNA information to | 9 Q. Okay. |
| 10 be eligible for entry. Yeah, so all of those | 10    All right. So let's talk about each of |
| 11 things have to be there for a kit to -- to hit to | 11 these preconditions. So the first one is that the |
| 12 each other. | 12 case had to be reported. And obviously, not all |
| 13 Q. Okay. And you mentioned that you could have a SAK | 13 sex crimes are reported, right? Correct? |
| 14 collected and not report to the police. Was that | 14 A. Correct. |
| 15 true in Cleveland and Cuyahoga County when you | 15 Q. Yeah. |
| 16 were doing -- for the time period where you -- | 16    I believe you testified earlier that |
| 17 that your research covers? | 17 there's certain types of sex offenses that are |
| 18 A. Yes, it -- I mean, it is true -- it was true then. | 18 more likely to be reported than others, correct? |
| 19 There are -- most of the victims did make a police | 19 A. Correct. |
| 20 report, at least an incident report. A small | 20 Q. What are the sex offenses that are more likely to |
| 21 handful did not make an incident report or left | 21 be reported? |
| 22 before the police got there. But not -- part of | 22 A. Rape, attempted rape, as well as more violent |
| 23 our kits also have this, but even more so now, | 23 sexual offenses. And those where there's a |
| 24 there's federal laws around anonymous kit | 24 possibility of knowing who the person is. So for |
| 25 collection. But, like -- | 25 example, you know, a peeping Tom, you know, if you |
| Page 101 | Page 102 |

| | |
|---|---|
| 1 don't know who the -- who is peeping, then you | 1 Q. So the modal -- the most are acquaintances or |
| 2 can't really report that, right? But most of the | 2 recent acquaintances in terms of reporting? |
| 3 time it's the more violent offenses. | 3 A. Of rapes. |
| 4 Q. Are offenses committed by strangers more likely to | 4 Q. Okay. |
| 5 be reported? | 5    Okay. And so offenses with strangers, |
| 6 A. More likely to be reported than -- than what | 6 offenses with violence, offenses rape, attempted |
| 7 happens in the population, like in terms of | 7 rape, those are the -- those offenses are more |
| 8 incident rates? | 8 likely to be reported, correct? |
| 9    MR. DAMICH: Object to form and | 9 A. Correct. |
| 10 foundation. | 10 Q. Are there certain types of offenses that are less |
| 11 BY MS. AUKERMAN: | 11 likely to be reported? |
| 12 Q. So is it more likely that a person who is sexually | 12 A. Sexual offenses? |
| 13 assaulted by a stranger will report that than | 13 Q. Yes, sexual offenses. |
| 14 someone who is sexually assaulted by someone known | 14 A. Yes. Yes. |
| 15 to them. | 15 Q. Which ones? |
| 16 A. Report to police? | 16 A. Sexual offenses where there's sexual misconduct, |
| 17 Q. Yes, report to police. | 17 sexual harassment, which, in most cases, is not |
| 18 A. Yeah. So -- so I'll say, stranger rapes are | 18 considered a crime. Offenses where there's -- |
| 19 disproportionately reported to police, but don't | 19 like where someone maybe doesn't know or quite |
| 20 make up the majority or the modal category. The | 20 know that they're a victim. So if you could think |
| 21 modal category are acquaintances or recent | 21 of, like, ICAC, internet crimes against children, |
| 22 acquaintances. | 22 or other sorts of things. |
| 23 Q. When you say modal category, what do you mean? | 23    You know, those sort of cases. Children |
| 24 A. I mean, the -- sorry, the category that has the | 24 sometimes -- increasingly it's getting better but |
| 25 most number. | 25 children sometimes are -- are unaware of certain |
| Page 103 | Page 104 |

26 (Pages 101 to 104)

Lovell, Rachel
5/19/2023

**Page 105**

1  offenses being, you know, crimes. So, yeah, or,
2  like, noncontact sexual offenses are less likely
3  to be reported.
4  Q. Okay. If a victim is concerned that she might not
5  be believed, is that -- could that affect the
6  likelihood of reporting?
7  **A.** Yes.
8  Q. And if the victim is concerned that law
9  enforcement might think there was consent, could
10  that affect the likelihood of reporting?
11  **A.** Yes.
12  Q. I spoke with a sexual assault hotline advocate the
13  other day because I was trying to understand more
14  about how all this works. And that person told
15  me -- that person worked on a sexual assault
16  hotline in 2007 to 2013, and told me that the
17  majority of calls they got were from people who
18  experienced an assault long ago but had never
19  reported it. Does that sound right to you?
20         MR. DAMICH: Object to form and
21  foundation.
22         THE WITNESS: That -- that is -- that is
23  true. Most -- I work a lot with the Cleveland
24  Rape Crisis Center as well, and I've done
25  evaluations for them. And a lot of the victims

**Page 106**

1  who, at least at the time are seeking supportive
2  services, there can be a time period between the
3  time that they were sexually assaulted and the
4  time that they seek services. Especially if it
5  wasn't reported.
6  BY MS. AUKERMAN:
7  Q. And the advocate I spoke to also said that about
8  50 percent of the calls that they receive were
9  from people asking whether what they had
10  experienced qualified as a sexual assault. So
11  maybe both parties got drunk and the person felt
12  pressured into having sex but didn't want to have
13  sex until the person did -- is this a sexual
14  assault or not. Does that sound right to you?
15         MR. DAMICH: Object to form and
16  foundation.
17         You can answer.
18         THE WITNESS: Okay. Yeah, I -- I can't
19  really -- I don't have information a lot -- I
20  don't necessarily do research on that. I think
21  the -- one of the reasons why some of the other
22  sexual offenses aren't reported as much is
23  because -- because people, you know, are trying to
24  reconcile the legal and criminal codes with their
25  experiences.

**Page 107**

1  BY MS. AUKERMAN:
2  Q. Right. And if someone is unsure whether the
3  victimization that they experienced qualifies as a
4  crime, might they be less likely to report that?
5         MR. DAMICH: Objection. Form.
6  Foundation.
7  BY MS. AUKERMAN:
8  Q. You can answer.
9  **A.** Correct.
10  Q. And if there's an offense, a sex crime where both
11  parties are willing participants, might that be
12  less likely to be reported? So we talked before
13  about prostitution, gross indecency, sexual
14  activity with a willing partner who's underage.
15  Would offenses like that where both parties are
16  willing be less likely to be reported?
17         MR. DAMICH: Objection to form.
18         THE WITNESS: I would say correct unless
19  there's some variation there about the age of the
20  person. So, and in some cases, those might be
21  because there's some guardian who -- or
22  guardianship that would recognize that. But
23  overall, yes, as a general.
24  BY MS. AUKERMAN:
25  Q. Okay. So it's fair to say that there's some types

**Page 108**

1  of sex crimes that are more likely to be reported
2  than others, correct?
3         MR. DAMICH: Objection. Form.
4  Foundation.
5         THE WITNESS: Correct.
6  BY MS. AUKERMAN:
7  Q. And it's fair to say that reports about certain
8  types of sex crimes are also more likely to be
9  believed than others?
10         MR. DAMICH: Objection. Form and
11  foundation.
12  BY MS. AUKERMAN:
13  Q. That wasn't clear. Let me -- I can see from your
14  face that I'm asking an unclear question.
15  **A.** I'm trying. Yeah. Okay.
16  Q. And opposing counsel was rightly objecting to the
17  confusing question I'm asking. So let me try that
18  again.
19         So in your experience, are police more
20  likely to believe some victims than others?
21  **A.** Correct. Yes.
22  Q. Okay. And does the -- and the type of sex crime
23  might affect the likelihood that a person is
24  believed?
25         MR. DAMICH: Objection to form and

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1   foundation. | 1   So let's say you have an online |
| 2   THE WITNESS: Correct. I would say | 2   solicitation offense. There's not going to be the |
| 3   especially as it relates to potential evidence of | 3   ability to collect a SAK because there's no -- |
| 4   that. | 4   A. I see. |
| 5   BY MS. AUKERMAN: | 5   Q. -- DNA evidence associated with online |
| 6   Q. So that was the first precondition, which is | 6   solicitation, correct? |
| 7   making sure that -- you can't collect a SAK if a | 7   A. Correct. Yes. |
| 8   person doesn't report. Correct. So, all right. | 8   Q. Right. And -- |
| 9   Okay. So let's move on to the second | 9   A. Because I was thinking, like, no, you can still |
| 10   precondition. | 10   collect even though perhaps ejaculation wasn't |
| 11   The SAK actually has to be collected, | 11   part of the rape. But, yes. Okay. Yes. |
| 12   correct? | 12   Q. All right. So, like, indecent exposure, peeping |
| 13   A. Um-hum. | 13   Tom, something like that, correct? |
| 14   Q. Okay. So even when a person reports a sex crime, | 14   A. Right. |
| 15   facts aren't always collected, correct? | 15   Q. And then there's going to be some -- so there you |
| 16   A. Correct. | 16   just can't collect a SAK because there's nothing |
| 17   Q. Okay. There's going to be some types of crimes | 17   to collect, correct? |
| 18   where it's not possible to collect a SAK because | 18   A. Correct. |
| 19   there won't be any -- it's a crime that doesn't | 19   Q. And then there's going to be some types of crime |
| 20   involve DNA or physical evidence, correct? | 20   where it's not that likely even though there was |
| 21   A. Incorrect. I would rephrase that to say SAKs are | 21   physical contact for there to be DNA, correct? So |
| 22   most probative within a 96-hour window after the | 22   if we talked about sexual misconduct, say |
| 23   sexual assault. | 23   touching -- over the clothes touching, somebody |
| 24   Q. So let me -- I think my question would have been | 24   touches a breast. Could you collect a SAK there? |
| 25   unclear. | 25   A. You could on the -- on the clothing. |
| Page 109 | Page 110 |

| | |
|---|---|
| 1   Q. You could -- | 1   kid -- kids exams are different than adult exams |
| 2   A. You could collect -- you could collect the | 2   in terms of how much they swab and what they -- |
| 3   clothing and test the clothing as part of that | 3   where they collect evidence from. |
| 4   with touch DNA. | 4   Basically, there's no internal |
| 5   Q. Right. Is that less likely to be collected? | 5   collection, or a limited internal collection, for |
| 6   MR. DAMICH: Objection to form and | 6   children under the age of 12 -- or 12 and under. |
| 7   foundation. | 7   And then there's a very specific one on for, like, |
| 8   BY MS. AUKERMAN: | 8   tiny ones. And then -- but, you know, if it's -- |
| 9   Q. In your experience. | 9   they still will do one over 96 hours, but it's |
| 10   A. Let me just make sure I'm understanding. Is it | 10   primarily around medical attention and help |
| 11   less likely that facts would be collected in cases | 11   knowing that they'll still collect it, just the |
| 12   where there's over the clothes touching and things | 12   DNA evidence might not be as strong. |
| 13   like that? | 13   I'm trying to think if the other |
| 14   Q. Yes. | 14   offenses -- like, really to have a kit, your body |
| 15   A. Correct. Yeah, it's not -- it's not that common. | 15   has -- the victim's body needs to be basically the |
| 16   Q. Okay. Are there other types of offenses where you | 16   crime scene in some way. Whereas, if you were |
| 17   can't collect a SAK or can't do a SAK? | 17   having solicitation over the internet or something |
| 18   A. Like I mentioned, typically, if there's a delay -- | 18   like that, that person's body is not the crime |
| 19   a delayed reporting, they won't -- you know, they | 19   scene. |
| 20   can do a SAK but -- well, two things. For kids, | 20   Q. So, and then you mentioned that delay matters. |
| 21   they almost always -- even if there is a delayed | 21   What's the -- I read in some of your work |
| 22   report, they will almost always -- you know, if | 22   something about 72 hours and now you mentioned 96 |
| 23   there's a disclosure, they will -- they will, you | 23   hours. How long -- what's sort of the timeframe |
| 24   know, often collect still information there | 24   in which SAKs are collected? |
| 25   knowing that there's a delayed report. But PS | 25   A. So 72 has traditionally been the -- the window and |
| Page 111 | Page 112 |

28 (Pages 109 to 112)

Lovell, Rachel
5/19/2023

1    so most -- up until fairly recently, 72 has been
2    the recommendation, and it's typically what's on
3    the form.  Like for when they do an exam, they'll
4    ask the victim, like, "Have you had sex within the
5    last 72 hours?"  More recently because of DNA
6    advances, now the federal guidelines have changed,
7    and it's now up to 96.
8    Q.  Okay.  So, but at the time that the SAKs that
9    you're looking at were collected, it would have
10   been 72?
11   A.  Primarily, 72.  Although, again, you can get them
12   over the 72 but most of them would have been
13   within that 72-hour window.
14   Q.  So for a person who reported a crime after that 72
15   window, it's unlikely that a SAK would have been
16   collected, fair?
17   A.  Correct.  Correct.  Yeah.
18   Q.  Are there certain types of offenses that are more
19   likely to be reported within a three-day window,
20   like a violent assault?
21        MR. DAMICH: I'll object to form and
22   foundation.
23   BY MS. AUKERMAN:
24   Q.  So are there certain types of offenses -- are some
25   offenses more likely to be reported within that

Page 113

1    three-day window?
2    A.  Certain types of sexual offenses?
3    Q.  Yes.
4    A.  Yes.  I -- you know, sex offenses that involve
5    penetration or attempted penetration and/or
6    violence.  I mean, rape itself is a violent act
7    but I mean, gratuitously, you know, like other
8    types of violent injuries.
9    Q.  So sort of gratuitous violence, forceable rape,
10   something where the police were called to the
11   scene, those are more likely to be reported within
12   that 72-hour window, correct?
13   A.  Correct.
14   Q.  Is whether or not a victim seeks medical care a
15   factor in whether a SAK is collected?
16        MR. DAMICH:  Object to form and
17   foundation.
18        THE WITNESS:  So almost all of -- I mean,
19   it's usually, like, sort of part and parcel.  Like
20   they -- they go together, the -- the SAK
21   collection and the medical attention.
22   BY MS. AUKERMAN:
23   Q.  Okay.  So you mentioned that SAKs are collected in
24   hospitals; a person's might have to go to a
25   hospital presumably if they have injuries

Page 114

1    requiring medical care?
2    A.  Um-hum.
3    Q.  Or if there's been penetration where they're
4    worried about STDs or pregnancy or something like
5    that, right?
6    A.  Yes, or -- but there's also variations of that of
7    if they're -- if they were drugged and/or
8    intoxicated and they weren't for sure whether
9    they -- whether there was sexual contact because
10   they don't know or don't remember.  Again, kids
11   ones are different.  Often because kids can't
12   quite explain the nature of the -- the sexual
13   contact or, you know, don't have the words for it.
14        We also have publications on other things
15   on, like, still intimate partner ones and/or date
16   rape ones.  There's -- one merging theme is when
17   there was sort of, like, either didn't -- the
18   victim didn't know violent or there was a firm, "I
19   don't give consent."  Like a -- you know, like in
20   their mind -- the victim's mind, it was, like,
21   this is rape because -- or this -- you know, "I
22   need to report this because, you know, I said no,"
23   and -- or, you know, "I did not want that or I was
24   drugged or something."
25   Q.  But someone who's seeking medical care is more

Page 115

1    likely to have a SAK collected than someone who
2    doesn't go to the hospital to seek medical care,
3    right?
4    A.  Correct.
5    Q.  Okay.  Do some people seek medical care at
6    hospitals that don't do SAK collection?
7    A.  Correct.
8    Q.  So not all hospitals do SAK collection?
9    A.  Correct.
10   Q.  And do you know at the time you were working on
11   your research what the number of hospitals in the
12   Cleveland area that weren't collecting SAKs?
13   A.  They will all collect and do the evid -- they
14   will -- at the time, any hospital you went to
15   would do a sexual assault -- a medical forensic
16   exam.  Now most jurisdictions in Cleveland, this
17   is definitely the case.  They have hospitals that
18   specialize in it, so if you go to one hospital,
19   let's say the closest hospital and they don't have
20   a SANE, a sexual assault nurse examiner on call or
21   they don't do those necessarily, they will
22   transfer you over to the closest hospital that
23   does do those.  So now they tend to specialize so
24   that they can have someone on-call at those.  But
25   at this time, you know, to a large extent, most of

Page 116

                              29 (Pages 113 to 116)

Lovell, Rachel
5/19/2023

| | |
|---|---|

1  these, you could go to any hospital and they would
2  do the exam.
3  Q. Does the likelihood of getting a SAK depend on
4  what hospital you go to?
5  A. No.
6  Q. Okay. Are people more likely to seek medical care
7  if they have more serious injuries?
8  A. Correct.
9  Q. Okay. And you cite an article Connecting the
10  Dots, it's about the Wayne County research. And
11  that article says that about 21 to 43 percent of
12  sexual assault victims seek post-medical care and
13  therefore have access to SAK collection. Does
14  that sound right to you?
15  A. Yeah, those numbers are a little low. Our numbers
16  are a little higher than that in Cleveland. But
17  -- but, you know, there's -- there aren't a lot of
18  good estimates as to the proportion of reported
19  rapes that have a sexual assault kit associated
20  with them. We have a study that shows what it is
21  in Cleveland over time but...
22  Q. So the Wayne County one was 21 or 43 percent,
23  correct?
24  A. I think that study actually cites other people's
25  studies on that. It's not theirs.

Page 117

1  Q. I believe you're right. Okay.
2  A. I mean, I can -- I have it with me -- or I can
3  look it up if you want. But I'm pretty sure they
4  cite other people's studies that show that.
5  Q. Yeah. Okay. Do some people seek medical care
6  after the three-day window?
7  A. Yes.
8  Q. Okay.
9  (At 11:45 a.m., Exhibit 7 marked.)
10  BY MS. AUKERMAN:
11  Q. All right. Let me actually show you the article
12  about the Campbell one. So Campbell writes, [as
13  read], "SAKs may not be collected in all types of
14  sexual assaults, typically just those involving
15  penetration."
16  Would you agree with that?
17  A. I would -- I would add a little bit more to that
18  to say, like, attempted penetration as well.
19  Which is rape -- you know, like, more with rape
20  and/or -- you know, attempted rape or sexual
21  assault in a more general sense. But, like, yeah,
22  so SAKs are more likely to be collected in the
23  more violent types of ones.
24  Q. Right. And then there's a note here. Note 1
25  says, [as read], "historically, kits have been,

Page 118

1  and may continue to be in many jurisdictions,
2  collected only for penetrative assaults in which
3  there's a possibility of foreign bodily fluid
4  recovery."
5  Would you agree with that?
6  A. Historically, I would say not -- not as much
7  anymore.
8  Q. But historically, that was the case?
9  A. True.
10  Q. And that would have been the case when you did the
11  sample for your research?
12  A. I would say they are penetrative or attempted --
13  if the rape was, you know, disrupted or
14  interrupted.
15  Q. Okay. So penetration or attempted penetration?
16  A. Right. Yeah.
17  Q. Okay.
18  Okay. So let's take a situation where,
19  you know, we've got the type of crime that might
20  produce DNA evidence. It's reported within -- you
21  know, the case has been reported, the person goes
22  to the hospital for medical care. It's like --
23  you know, it's a type of crime that might have DNA
24  evidence. It's reported within the time window.
25  What factors at that point affect the likelihood

Page 119

1  that a SAK will be collected?
2  MR. DAMICH: Object to form. Foundation.
3  BY MS. AUKERMAN:
4  Q. So let me be a little clearer. Is cost a factor
5  in whether a SAK is collected?
6  A. The cost to the victim?
7  Q. The cost of conducting a SAK, is that a factor?
8  A. No.
9  Q. Was it historically a factor?
10  A. No.
11  Q. What is collecting a SAK -- well, what does the
12  exam cost, do you know?
13  A. No, the State pays -- the State pays hospitals for
14  the exams.
15  Q. And was that true historically?
16  A. Um-hum.
17  Q. Okay. And what does it cost to test a SAK?
18  A. That has varied dramatically. It -- it would run
19  up to 5- to $10,000 in the early days of DNA. Now
20  we have a cost benefit study that, at least in
21  Ohio, I can tell you exactly what it costs based
22  upon information from BCI, the Bureau of Criminal
23  Investigations. It costs less than 500 to test
24  and about 1,500 -- I can look at the exact number,
25  but about 1,500 to -- or 1,000 to 1,500 for a lab

Page 120

30 (Pages 117 to 120)

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 person to, like, read the results, right? | 1 disclose that aspect and then they're offered, is |
| 2 Somebody has to read the DNA results and write a | 2 that the sort of -- yes. |
| 3 lab report. So typically, between 1,000 and | 3 Q. Yes. |
| 4 $2,000 for the whole thing. | 4 A. Typically, they are offered the option to have a |
| 5 Q. And that's today? | 5 medical -- a sexual assault medical forensic exam. |
| 6 A. Today. | 6 Q. Was that true historically? |
| 7 Q. Okay. And so if I'm understanding you -- well, | 7 A. It has been since really the late '80s, early |
| 8 did the cost of testing, was that part of the | 8 '90s. |
| 9 reason that so many SAKs were never tested? | 9 Q. So the rape advocate that we spoke to told us that |
| 10 A. It's one of -- | 10 hospitals and law enforcement were much more |
| 11 MR. DAMICH: Objection. Form and | 11 likely to offer SAKs to certain types of victims |
| 12 foundation. | 12 rather than others. Does that sound accurate to |
| 13 BY MS. AUKERMAN: | 13 you? |
| 14 Q. You can answer. | 14 MR. DAMICH: Objection. Form. |
| 15 A. It's one of many factors. One of many factors, | 15 Foundation. |
| 16 yes. | 16 THE WITNESS: I -- I don't have |
| 17 Q. Okay. In your experience, are all victims offered | 17 anything -- I don't know of anything that would |
| 18 a SAK? | 18 suggest which ones were offered the option. |
| 19 A. If they report to the hospital? | 19 BY MS. AUKERMAN: |
| 20 Q. Yeah, once they -- once they -- | 20 Q. What the rape advocate also told us is that law |
| 21 A. They get to the hospital? | 21 enforcement -- hospitals or law enforcement were |
| 22 Q. Yeah. | 22 likely to encourage or push a victim to do a SAK |
| 23 A. And they say, you know, "I've been sexually | 23 in some cases than in others where law enforcement |
| 24 assaulted," or, you know, some aspect of that? | 24 thought, "Hey, this really is a terrible crime. |
| 25 Like they're disclosing -- they go there, they | 25 We need to get -- have a SAK on this one." |
| Page 121 | Page 122 |

| | |
|---|---|
| 1 Versus, "I don't know, but I really believe this | 1 Whereas if the -- you know, if it was a report |
| 2 person." | 2 where somebody, you know, might -- where police |
| 3 So my question is, is it possible that | 3 didn't really believe what happened happened or |
| 4 SAKs are more likely to be collected where law | 4 thought the victim was somehow blameworthy. It |
| 5 enforcement is more interested in pursuing the | 5 was much less likely that a SAK would be |
| 6 suspect? | 6 collected? |
| 7 MR. DAMICH: Objection to form and | 7 A. I don't think -- my opinion would be that that's |
| 8 foundation. | 8 not necessarily the case or at least that's not |
| 9 THE WITNESS: To the best of my | 9 the scenario under which that occurs; that police, |
| 10 knowledge, that's not the case and -- because most | 10 you know, tend to just wait till what comes with |
| 11 of the time the -- the -- that that the presenting | 11 them and don't necessarily, like, make decisions |
| 12 happens first to the hospital or other sorts of | 12 early on of saying, "Oh, you've been, you know, |
| 13 things, and then they call law enforcement to come | 13 badly beaten or -- or raped." They see victims |
| 14 in and take a report. Sometimes they do call law | 14 who are badly beaten and raped all the time and |
| 15 enforcement and then, you know -- you know, ask | 15 don't necessarily take up, you know, the cause for |
| 16 the victim if they want to go to the hospital as | 16 this victim versus this other one necessarily. |
| 17 well. But I don't know of things -- and maybe you | 17 They let the bureaucracy do more of the attrition. |
| 18 could have more specificity there about, like, in | 18 Q. Do you know what role police played in SAK |
| 19 what context the victim was -- or the victim | 19 collection at the time for these kits that are the |
| 20 advocate was saying. But that's not been my | 20 subject of your study? |
| 21 experience. | 21 MR. DAMICH: Objection to form and |
| 22 BY MS. AUKERMAN: | 22 foundation. |
| 23 Q. Yeah. The victim advocate was saying to us that, | 23 THE WITNESS: Can you maybe give a little |
| 24 for example, if there was a violent rape, that | 24 bit more... |
| 25 person would be strongly encouraged to do a SAK. | 25 BY MS. AUKERMAN: |
| Page 123 | Page 124 |

31 (Pages 121 to 124)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 Q. So did police play a role in SAK collection at the | 1 MR. DAMICH: Objection to form and |
| 2 time that, you know, in the 1990s when the SAKs in | 2 foundation. |
| 3 your study were collected? | 3 THE WITNESS: The -- the research on the |
| 4 MR. DAMICH: Same objection. | 4 efficacy of victim advocates in a hospital-based |
| 5 THE WITNESS: About whether they would be | 5 show that victims are -- are, you know, better |
| 6 collected or not? | 6 supported in the hospital when there is an |
| 7 BY MS. AUKERMAN: | 7 advocate there. And do, you know, a good job of |
| 8 Q. Well, what role did police play? | 8 sort of explaining some of the rights and |
| 9 A. I mean, a lot -- a lot of the reports say, you | 9 responsibilities and help supporting the victim in |
| 10 know, like, either we transport -- the victim was | 10 that. But victim advocates are not supposed to |
| 11 transported to the -- they reported and they were | 11 encourage one way or the other. |
| 12 transported. Or they were already at the hospital | 12 They're supposed to listen to what the |
| 13 and the nurse and the hospital called the police | 13 survivor wants as part of that. I've also |
| 14 to make a report and the patrol shows up to take | 14 interviewed many survivors who cannot tell you |
| 15 the incident report. So in that early stages, | 15 what exactly was said and what somebody told them. |
| 16 there's often, like, kind of a disjointed role of | 16 And, you know, like, they're so traumatized that |
| 17 police in that -- like I don't think that they're | 17 they don't remember any of those things. |
| 18 a huge role in that early part, or at least not in | 18 BY MS. AUKERMAN: |
| 19 Cleveland, were not sort of a big part of the | 19 Q. All right. Do you know if there's any research on |
| 20 early role in, like, whether a victim got a kit or | 20 whether the presence of victim advocates affects |
| 21 not. | 21 the likelihood of a SAK being collected? |
| 22 Q. The advocate also told us that whether or not a | 22 A. I don't know -- I don't know that -- that |
| 23 victim advocate was present had a major impact on | 23 research. I do know that research is sort of |
| 24 whether a SAK was collected. Is that consistent | 24 overall supportive of having victim -- |
| 25 with your experience? | 25 hospital-based victim advocates. But I don't know |
| Page 125 | Page 126 |

| | |
|---|---|
| 1 whether the variable, like, did it increase SAK | 1 right to you? |
| 2 collection is -- I'm -- I'm not familiar. | 2 MR. DAMICH: Objection to form and |
| 3 Q. Do you know whether there's research on the | 3 foundation. |
| 4 demographics of victims and the likelihood of SAKs | 4 THE WITNESS: I would say that and in |
| 5 being collected? So, like, are African Americans | 5 general, victims are much more likely to engage in |
| 6 more likely to have SAKs collected or less likely | 6 the entire process if they feel -- you know, if |
| 7 or... | 7 they -- if the response from the system is more |
| 8 A. No, as far as I know, there isn't any research on | 8 victim centered and victim trauma informed, which |
| 9 that because -- it's difficult because you have to | 9 includes, you know, believing them. |
| 10 look at sort of propensities. Like who's -- | 10 BY MS. AUKERMAN: |
| 11 who's -- who are the ones all reporting and then | 11 Q. So what this advocate told us is if the police |
| 12 who would be the ones that would be most likely to | 12 were taking the assault seriously, and they wanted |
| 13 be victimized. I think you can make some | 13 to go out, you know, and catch the offender and |
| 14 inferences about, like, who's most likely to based | 14 then the victim was more likely to go ahead and |
| 15 upon, you know, reporting rates and victimization | 15 get a SAK. Does that seem right? |
| 16 rates and the types of sexual assaults and the | 16 MR. DAMICH: Objection to form. |
| 17 nature of the sexual assaults. But there really | 17 THE WITNESS: I -- I can't -- that -- |
| 18 isn't any literature on that. | 18 that doesn't ring true for any of the research |
| 19 Q. So once a rape kit -- or a SAK is offered, the | 19 that I've seen or, in general, the process because |
| 20 victim has the choice whether to do it or not, | 20 I didn't -- |
| 21 correct? | 21 BY MS. AUKERMAN: |
| 22 A. Correct. | 22 Q. But if a victim -- I mean, you said that if a |
| 23 Q. And again, the rape advocate we spoke with said | 23 victim feels believed, they're more likely to |
| 24 that in her experience victims were more likely to | 24 engage in the process overall, right? |
| 25 get the kit if they felt believed. Does that seem | 25 A. Well, I think actually it's a -- it's -- it's a |
| Page 127 | Page 128 |

32 (Pages 125 to 128)

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

---

**Page 129**

1    broad -- it's not necessarily believing because
2    police often won't just say, like, "I believe
3    you." That's what the advocates say. The --
4    the -- if they're treated in a trauma informed
5    victim center sort of way by the police, then
6    they're going to be more likely to engage.
7           They're going to have less secondary
8    victimization, which is the term you use. So I
9    think it's -- for police, it's a broader term,
10   it's not just, "I believe you." For victim
11   advocates, you know, they need -- that's what they
12   tell the victims.
13   Q.  Is there any data on the likelihood of a SAK being
14       collected in cases where the suspect has been
15       convicted of a past sexual offense?
16   A.  I don't think that there would be a way to know
17       that. Like...
18   Q.  I mean, if the person -- if it's a known assailant
19       and the person's been convicted of a past sex
20       offense, is there any data on that?
21   A.  Yeah, the known assailant comes later in the --
22       when it's forwarded for investigative follow-up,
23       not at the time of the incident.
24   Q.  Okay. But the person coming in might say, "Hey, I
25       was raped by John James." And, you know, he was

---

**Page 130**

1    convicted of a rape in the past. Does that affect
2    SAK collection at all? Is there any data on that?
3    A.  No, it doesn't because -- or it couldn't really
4        because an incident -- a reporting officer would
5        be taking that. They're not looking up that
6        person. They don't -- they just put down the
7        names and then forward it for investigative
8        follow-up. And that's really a detective's job,
9        to look up who the suspect is and where they are.
10          Now, if it's somebody on the scene, like
11       if they caught the person on -- in the act or on
12       the -- on scene or arrested them on scene, like --
13       like I still don't think that would change
14       anything. Because the victim would still be going
15       to get a SAK and then they would separate and
16       arrest and book the suspect and then do that. So
17       it's -- it's at a different stage in the process.
18   Q.  Okay. Is there any data on what percentage of
19       victims decline SAKs -- a report that decline
20       SAKs?
21   A.  I don't have any of that data. I don't know the
22       number off the top of my head, but I know
23       there's -- there's some colleagues that have --
24       that might be doing some of that. But I don't
25       know those numbers off the top of my head.

---

**Page 131**

1    Q.  But some victims decline, correct?
2    A.  Yes.
3    Q.  And some victims may go to the hospital because
4        they want medical care but they don't necessarily
5        want to have a SAK done?
6    A.  Correct.
7    Q.  Or they may not want to bring charges?
8    A.  Correct.
9    Q.  Okay.
10   A.  They need to get screenings for STDs, for
11       pregnancies, for other sorts of things that they
12       don't want the SAK. Yeah.
13   Q.  So there's a variety of factors that affect
14       whether SAKs are going to be collected once a
15       person appears at the hospital; fair to say?
16          MR. DAMICH: Object to form and
17       foundation.
18          THE WITNESS: No, I think that most of
19       the time by the time someone appears at the
20       hospital, they're almost -- they can decline and
21       they can do those sorts of things but -- but
22       they're very, very frequently going to be getting
23       a SAK because that's why they went there.
24   Q.  But you don't have data on the percentage of
25       people who are getting SAKs?

---

**Page 132**

1    A.  No. But, like, the -- all the -- all the data
2        would suggest, and even I've interviewed
3        several -- many victims about how they made that
4        decision, and they went there to get that.
5    Q.  So has SAK collection changed between 1993 and
6        2015, which I believe is the period that your data
7        covers?
8    A.  Has the -- the -- the standards -- you mean, like,
9        the process?
10   Q.  The practice. The practice of collection.
11   A.  Yes, I think the protocols and other things
12       have -- have changed over time, have improved over
13       time.
14   Q.  I'm going to show you, this is an article that you
15       wrote. The case for "investigate all." You were
16       an author on this article, correct?
17   A.  Correct.
18          (At 12:04 p.m., Exhibit 9 marked.)
19   BY MS. AUKERMAN:
20   Q.  Okay. So I guess I didn't have this highlighted
21       here. So you write that from 1993 through 2015,
22       approximately half of the kits -- half of the
23       assaults have a kit and that varied from as low as
24       36 percent in 1993 to 67 percent in 2009, correct?
25   A.  Correct.

---

33 (Pages 129 to 132)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1  Q. So it sounds like roughly half of the reported | 1  foundation. |
| 2     assaults couldn't be included in your data because | 2       THE WITNESS: I have data on that. I -- |
| 3     no kit was collected? | 3     I don't -- I would have to make -- like, I -- I |
| 4  A. Correct. | 4     don't have the exact number right in front of me. |
| 5  Q. Okay. Were any of these SAKs collected out of | 5     But would you like for me to provide a general |
| 6     domestic violence cases? | 6     estimate of -- like, for example, of the five |
| 7  A. Like intimate partner sexual assaults? | 7     felony sex crimes, like how many were rape versus |
| 8  Q. Yes. | 8     the other sex crimes? |
| 9  A. Yes. | 9  BY MS. AUKERMAN: |
| 10 Q. Okay. Do you know what percentage were intimate | 10 Q. Well, if you don't have the data, I don't want you |
| 11    partner sexual assaults? | 11    to -- |
| 12 A. Yeah, I have those numbers. They varied as we've | 12 A. Okay. |
| 13    added more data to the database, but I thought I | 13 Q. -- speculate about it. And I'm talking about not |
| 14    wrote it in here. I'm looking at -- okay. A 14.4 | 14    just felony sex crimes, I'm talking about -- |
| 15    percent -- I did -- were intimate partner. | 15 A. Oh. |
| 16 Q. Intimate partner cases, okay. | 16 Q. So it sounds like you don't know what percentage |
| 17       We talked before about sort of what -- | 17    of all sexual crimes, which would include peeping |
| 18    about the variety of different crimes that there | 18    Toms and consensual -- you know, the prostitution |
| 19    are and that sexual assault is one type of sexual | 19    or gross indecency, you know, a whole gamut of |
| 20    crime, right? | 20    cases. You don't know what percentage of reported |
| 21       Do you know what percentage of all | 21    sex crimes are sexual assault cases, correct? |
| 22    reported sex crimes were sexual assaults in, you | 22 A. Correct. |
| 23    know, Cleveland, Cuyahoga County, during your | 23 Q. But the SAKs were collected for sexual assault |
| 24    research? | 24    cases? |
| 25       MR. DAMICH: Object to form and | 25 A. Yes, or -- well, it -- I mean, it could -- SAKs |
| Page 133 | Page 134 |

| | |
|---|---|
| 1     can also be collected for, like -- like sexual | 1     age of the kit. |
| 2     battery or -- like, the criminal codes of sexual | 2  Q. So for the offenses that are unlikely to lead to |
| 3     battery and for gross sexual imposition. | 3     ejaculation, is it fair to say that it's less |
| 4  Q. Let's talk about -- | 4     likely that those offenses, there would be |
| 5  A. Most of them are rape. | 5     sufficient DNA to do a SAK? |
| 6  Q. Okay. So most of the SAKs are rape? | 6  A. Yes, but we -- there's certainly a lot of cases as |
| 7  A. Um-hum. | 7     well where there wasn't, like, ejaculation in the |
| 8  Q. Okay. Let's talk about the third precondition you | 8     vaginal cavity, for example. Or in the -- you |
| 9     mentioned earlier in terms of getting to a point | 9     know, like, in the anus or on the mouth, that they |
| 10    where there's a SAK hit. And that was having | 10    were still able to -- there was ejaculation or |
| 11    enough DNA for testing, right? | 11    there was some penetration and no ejaculation that |
| 12       Under what circumstances would there be | 12    they're able to get DNA from. |
| 13    enough DNA for testing? | 13 Q. But it's more likely that if you have a rape with |
| 14 A. It depends upon -- well, ejaculation. It depends | 14    penetration, that you're going to be able to |
| 15    upon the body -- the bodies of the victims, if | 15    collect DNA than if you have someone who is |
| 16    someone is male-bodied or female-bodied. And | 16    touching someone's breast over the clothing? |
| 17    because female bodies hold DNA better than male | 17 A. Over the clothing, yes. Saliva, no. So -- or |
| 18    bodies, in particular, vaginal cavities hold DNA. | 18    blood. So body fluids, not just semen, but also |
| 19    It's sort of kind of designed to do that for | 19    blood and saliva. |
| 20    pregnancy. So DNA is more present in rapes where | 20 Q. If a person takes a shower, does that make it less |
| 21    there -- where there was ejaculation because | 21    likely that there will be sufficient DNA? |
| 22    there's more DNA left. But that has changed over | 22 A. It depends on where the swab is. So if you have a |
| 23    time in -- in the DNA being able to get collected | 23    lick of the breast and you take a shower, then, |
| 24    from smaller amounts, and the technology was able | 24    yes. If there's vaginal penetration with -- you |
| 25    to pull a profile from smaller amounts. And the | 25    know, inside the vaginal cavity and someone takes |
| Page 135 | Page 136 |

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1  a shower, they can still get samples. | 1  that were collected. Some jurisdictions kind of |
| 2  Q.  In the fourth precondition, you mention that it | 2  chipped away at their kits over time. |
| 3     had to be retained by law enforcement. When would | 3  BY MS. AUKERMAN: |
| 4     a SAK not be retained? | 4  Q.  Okay. And then I think the last precondition I |
| 5  A.  Some law enforcement agencies destroyed their kits | 5     have is there had to be enough DNA information to |
| 6     and/or have a -- had a retention policy that -- | 6     be eligible for entry into the DNA database, |
| 7     like, they were -- they didn't illegally destroy | 7     right? So you're not going to have a hit if |
| 8     kits, they just didn't keep them after -- you | 8     there's not enough DNA. |
| 9     know, after a certain amount of time that they | 9        So am I understanding correctly that you |
| 10    were required to keep biological evidence. | 10    could have enough material to, like, do collection |
| 11 Q.  And in the fifth precondition, you mention | 11    but the sample doesn't -- the DNA can't -- isn't |
| 12    that it had to be submitted for testing. So | 12    strong enough or good enough to be entered into |
| 13    obviously, many SAKs were not tested in a timely | 13    CODIS. |
| 14    fashion, right? What factors account for whether | 14       MR. DAMICH: Objection to form. |
| 15    a SAK is tested? | 15       THE WITNESS: It depends on what kind of |
| 16       MR. DAMICH: Object to the form. | 16    evidence was left and when it was tested. So if |
| 17       THE WITNESS: That -- that varied a lot | 17    it's been tested in the last ten years, they're |
| 18    depending upon the jurisdiction. Jurisdictions | 18    going to be able to get a lot more from it. And |
| 19    and even detectives got to make their decisions if | 19    the -- the testing can extract better profiles |
| 20    they were going to submit a kit for a test | 20    that make it more likely to go into CODIS. Some |
| 21    contemporaneously to the sexual assault. In | 21    of the earlier techniques were not as good at |
| 22    Cleveland and I know in Wayne County as well, most | 22    extracting profiles. |
| 23    of -- by and large, most of the kits didn't get | 23 BY MS. AUKERMAN: |
| 24    tested contemporaneously. So what was left over | 24 Q.  So looking at your offending history article, you |
| 25    as part of the initiative was almost all the kits | 25    write that 41 percent of SAKs did not -- the |
| Page 137 | Page 138 |
| 1  testing did not have enough DNA for a CODIS entry; | 1  SAK-based research. |
| 2     is that correct? | 2        So since SAKs can only be collected when |
| 3  A.  Can you maybe pull it up? | 3     a crime is reported, is it fair to say that |
| 4  Q.  Yeah, let me share my screen. | 4     research on SAK does not include unreported sex |
| 5  A.  Okay. So, yes, I mean, that is true. I think | 5     offenses? |
| 6     it's -- you have to look at, like, of all the kits | 6        MR. DAMICH: Objection. Form. |
| 7     that were submitted, you know, how many were | 7        THE WITNESS: In most cases. But again, |
| 8     eligible to hit to each other? | 8     victims can get a SAK and not report. |
| 9  Q.  I just want to make sure I'm understanding it | 9  BY MS. AUKERMAN: |
| 10    correctly. So basically all of the SAKs that were | 10 Q.  Okay. But they would have had to have gone to the |
| 11    tested, 41 percent, the DNA -- they don't meet | 11    hospital? |
| 12    precondition six, there was not enough DNA to be | 12 A.  They'd have to go to the hospital but not report |
| 13    eligible for -- | 13    to police, yes. |
| 14 A.  Yeah, so there was -- there was DNA or it wasn't | 14 Q.  So it would have been reported to a hospital but |
| 15    sufficient for a CODIS entry or the -- you know, | 15    not to the police. But I think you said in the |
| 16    didn't have DNA as part of -- in the kit. | 16    majority of cases -- or in almost all cases I |
| 17 Q.  So do the same factors that affect whether you can | 17    think you said, they -- |
| 18    collect DNA, like, whether there's ejaculation | 18 A.  Yes. |
| 19    also affect whether or not there's going to be | 19 Q.  -- also report to the police, correct? |
| 20    enough DNA for a CODIS entry? | 20 A.  Correct. |
| 21 A.  Correct. | 21 Q.  Okay. So since SAKs require collectible and |
| 22 Q.  Okay. So I want to understand, we've talked about | 22    usable DNA evidence, is it fair to say that crimes |
| 23    these six preconditions for a SAK hit, and I just | 23    which are more likely to result in DNA evidence |
| 24    want to make sure I'm understanding what they | 24    are also more likely to be represented in the SAK |
| 25    mean -- what the implications of those are for | 25    data? |
| Page 139 | Page 140 |

35 (Pages 137 to 140)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1      MR. DAMICH: Objection to form and | 1    where the body -- the physical body is not the |

---

Page 141

1          MR. DAMICH: Objection to form and
2      foundation.
3  BY MS. AUKERMAN:
4  Q.  You can answer.
5  A.  Can you say that again? I'm trying to make -- put
6      the two together.
7  Q.  Sure.
8          So a SAK hit requires collectible and
9      usable DNA evidence, right?
10 A.  Um-hum.
11 Q.  So is it fair to say that crimes that are more
12     likely to result in DNA evidence are also more
13     likely to be represented in the SAK data?
14          MR. DAMICH: Same objection.
15          THE WITNESS: Yes.
16 BY MS. AUKERMAN:
17 Q.  Okay. And SAKs can't be collected for crimes that
18     don't result in DNA evidence?
19 A.  Incorrect.
20 Q.  Okay. We talked before about how certain types of
21     crimes, like online, solicitation, viewing of CSEM
22     materials, things like that, there's not going to
23     be SAK collection, correct?
24 A.  Correct.
25 Q.  So for those types of crimes where there's not --

Page 141

---

Page 142

1      where the body -- the physical body is not the
2      crime scene, there's not going to be SAK
3      collection, correct?
4  A.  Correct.
5  Q.  And those are not going to be represented in the
6      SAK evidence -- excuse me -- the SAK research?
7  A.  Correct.
8  Q.  Okay. And we talked about how SAKs can't be
9      collected outside of, you know, a 72, 96-hour
10     window, something like that, correct?
11 A.  They can be. They're just often not.
12 Q.  They're often not.
13 A.  Except with kids. They do -- they do do it with
14     kids.
15 Q.  So the SAK research is going to be -- the SAK
16     research is going to have primarily data from
17     crimes that are reported within that window,
18     correct?
19 A.  Yeah, especially for adults.
20 Q.  And the SAK data is more likely to have rapes,
21     attempted rapes, as compared to other types of
22     sexual crimes, correct?
23 A.  Correct.
24 Q.  And violent crimes are more likely to be
25     represented in the SAK data, correct?

Page 142

---

Page 143

1  A.  Correct.
2  Q.  And stranger crimes are more likely to result in
3      SAK data, correct?
4  A.  Disproportionately, yes.
5  Q.  Disproportionately.
6          The victim advocate that we spoke with
7      told us that in her experience, victims who got
8      SAKs were not representative of the overall victim
9      population that she served. Do you have any
10     reason to question that observation?
11          MR. DAMICH: Objection to form.
12          THE WITNESS: I think it depends on what
13     -- it depends on -- I mean, I don't know what she
14     serves.
15 BY MS. AUKERMAN:
16 Q.  Okay.
17 A.  Some -- for example, some victim advocates work in
18     DV, sexual assault, human trafficking, right? So
19     they're working with a variety of different types
20     of victimizations. So I -- I can't really...
21 Q.  So we talked about how the SAK data doesn't
22     represent -- it more likely includes certain types
23     of, you know, rape, stranger offenses, cases
24     involving penetration, correct?
25 A.  Correct.

Page 143

---

Page 144

1  Q.  So is it fair to say that the SAK data is not
2      representative of all sexual offending?
3  A.  Correct.
4  Q.  Okay. So let's talk about what a CODIS match
5      means. I can pull this up if we need it. But I
6      reviewed an article of yours, Lawfully Owed DNA.
7  A.  Oh, yeah.
8  Q.  Are you familiar with that article since you wrote
9      it?
10 A.  Yes.
11 Q.  Okay. I'll just share my screen, so we add this
12     as -- I'm going to make this Exhibit 8.
13          (At 12:24 p.m., Exhibit 8 marked.)
14 BY MS. AUKERMAN:
15 Q.  So in this article, you describe the difference
16     between offender hits and forensic hits, and I
17     want to see if I'm understanding the difference
18     between those correctly. So an offender hit is
19     where the DNA matches the DNA for a named
20     individual who's already in CODIS, right?
21 A.  Correct.
22 Q.  Okay. So an offender hit could tell you that new
23     DNA collected from a SAK is the same as DNA for a
24     person who's already in CODIS, right?
25 A.  Correct.

Page 144

---

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1   Q.  So for example, if a person is assaulted and<br>2       there's a SAK performed, you put the DNA in CODIS<br>3       and it shows a match to identify a person with DNA<br>4       in CODIS, right?  That would be an offender hit?<br>5   A.  It would be a -- it would be a forensic hit to<br>6       a -- to an offender hit -- to an offender profile.<br>7       So CODIS has two -- two indices.  One is from<br>8       people.  So here's -- "I'm going to swab you."<br>9       "I'm going to put you -- I know who you are.  It's<br>10      attached to you, this is your DNA.  I'm going to<br>11      put that into CODIS."  That's the offender side.<br>12          The forensic side is a crime scene side.<br>13      So it's evidence collected from a crime scene; it<br>14      could be a robbery, a burglary, a rape.  And<br>15      testing those kits match -- then puts a forensic<br>16      profile to potentially an offender profile.<br>17          You can have -- you can have multiple<br>18      forensic hits and one offender hit, or you can<br>19      have multiple forensic hits and no offender<br>20      profile.  So you can have a --<br>21  Q.  Okay.<br>22  A.  -- hit but their hits are hitting each other,<br>23      not to someone who we know who they are.<br>24  Q.  Right.  So the forensic hit is where the DNA from<br>25      a sample in CODIS matches -- I'm not saying this<br><br>Page 145 | 1       correctly.<br>2           So with a forensic hit, that could tell<br>3       you that DNA from a SAK being tested now matches<br>4       DNA collected in relation to a past crime,<br>5       correct?<br>6   A.  Correct.<br>7   Q.  You might not know who committed that past crime<br>8       but you know that the same person committed the<br>9       past crime and the current one, correct?<br>10  A.  Right.<br>11  Q.  Okay.  And CODIS isn't restricted to DNA for<br>12      sexual crimes, correct?<br>13  A.  Correct.<br>14  Q.  So there could be a CODIS match to some other type<br>15      of crime besides the sexual?<br>16  A.  Yes, definitely.<br>17  Q.  Okay.  But the people that you were -- the<br>18      research that you've done has been based on SAKs,<br>19      and so the individuals, by definition, are linked<br>20      to one reported sexual assault?<br>21  A.  Mostly reported and -- yeah, so they're all --<br>22      they may not have had a hit to that person, a<br>23      forensic hit, but they would have been a suspect<br>24      or somehow connected or linked to that kit, not<br>25      necessarily by DNA.<br><br>Page 146 |
| 1   Q.  Okay.  So where there's a CODIS hit, that doesn't<br>2       necessarily mean that the person connected with<br>3       that DNA has committed a crime, right?<br>4   A.  It's just -- it's just a lead.<br>5   Q.  Okay.  So the CODIS hit could be for DNA of a<br>6       person who was a consensual partner, right?<br>7   A.  Correct.<br>8   Q.  Or the police could investigate based on the DNA<br>9       match and determine that there was no crime that<br>10      was committed?<br>11  A.  Correct.<br>12  Q.  Okay.  Or the case could go forward and the jury<br>13      could acquit the person?<br>14  A.  Correct.<br>15  Q.  Okay.  So what CODIS does is it shows you whether<br>16      there's a DNA match.  It doesn't tell you whether<br>17      the person committed a crime, correct?<br>18  A.  Yeah, it -- it doesn't make -- it's not a go<br>19      directly to jail type of card that you get in<br>20      Monopoly.<br>21  Q.  So it's the legal system that determines whether<br>22      or not a crime's been committed?<br>23  A.  Yeah.<br>24  Q.  Okay.  Let's look at -- this is Exhibit 9, which I<br>25      think we had already.  This is the "investigate<br><br>Page 147 | 1       all" article.<br>2   A.  The cost paper?<br>3   Q.  Yeah.  Oh, I'm sorry, I'm not sharing.  That's my<br>4       fault.<br>5           In this article, you say that 13 -- let's<br>6       see if I can find it.<br>7           Okay.  You say that 13 percent of the<br>8       cases led to indictment, correct?<br>9   A.  Okay.  Hang on.  Oh.  Right.  Correct.  So, yeah,<br>10      36 percent were not able to be prosecuted.<br>11  Q.  Right.  And then of those that were able to be<br>12      prosecuted, 13 percent led to indictment, correct?<br>13  A.  No, that's all of them.  So I think I say, like, I<br>14      think 51, 13, and 36 add up to 100.  So --<br>15  Q.  So 13 percent of the total --<br>16  A.  Of the total, right.  Wait.<br>17          "Or the investigation was closed due to<br>18      insufficient evidence."<br>19          Can you scroll back up on, I'm sorry, to<br>20      figure 1 just so that I'm...<br>21  Q.  I think there might be another figure down below.<br>22      Hold on a second.<br>23  A.  Okay.  Yeah.<br>24  Q.  You know what, I'm wrong.  I think it is --<br>25  A.  I think -- yeah.<br><br>Page 148 |

37 (Pages 145 to 148)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1    Q.  You know better than I do. | 1    A.  Correct. |
| 2    A.  There is another paper that has this figure too, | 2    Q.  And of those, they were then put into CODIS and |
| 3        but it has different stats.  So -- so yeah, so | 3        there were 116 forensic hits, correct? |
| 4        it's looking at how many led to an indictment, | 4    A.  Correct. |
| 5        right? | 5    Q.  So that means that out of the 3,069 DNA samples, |
| 6    Q.  Right.  So you say that 13 percent led to | 6        there are 116 cases where the DNA matched an |
| 7        indictment and then -- | 7        unsolved crime that was in CODIS? |
| 8    A.  Yeah, 54 -- | 8    A.  Correct. |
| 9    Q.  -- 51 percent were closed to insufficient | 9    Q.  Okay.  So that's a hit rate of about 3.8 percent? |
| 10       evidence.  And then the remainder were not | 10   A.  Correct.  Because it's only hitting to the -- the |
| 11       prosecutable for various reasons? | 11       forensic side, right?  Because they weren't on the |
| 12   A.  Correct. | 12       offender side.  So -- |
| 13   Q.  Okay. | 13   Q.  They get added to the offender side now? |
| 14       Okay.  Let's go back to the Lawfully Owed | 14   A.  They got added.  But, yeah, so it's only a hit to |
| 15       DNA article.  And you describe an initiative there | 15       the forensic side and the forensic side is a much |
| 16       to collect DNA from people who have been | 16       smaller side of CODIS. |
| 17       previously arrested or convicted of a felony in | 17   Q.  Right.  So, but only 96 percent of the people with |
| 18       Ohio but had not provided DNA, correct? | 18       a past felony or conviction -- I'm sorry.  About |
| 19   A.  Correct.  This is not -- this is an offshoot, but | 19       96 percent of the people who had a past felony |
| 20       this is not SAK data. | 20       conviction or arrest didn't have a hit on |
| 21   Q.  Okay. | 21       the forensic side. |
| 22       Okay.  So it looks like -- I'm on page | 22   A.  Correct. |
| 23       2328 here.  It looks like DNA was collected from | 23   Q.  Correct?  Okay. |
| 24       3,609 people who owed it because of a past felony | 24       And then let's look at table 3.  So it |
| 25       arrest or conviction, correct? | 25       looks like where there was -- of the cases where |
| Page 149 | Page 150 |

| | |
|---|---|
| 1        there was a hit, in 11 percent of those cases, the | 1    Q.  So if my math is correct, out of 3,069 people who |
| 2        person was ruled out as a suspect, correct? | 2        were previously caught for some offense in the |
| 3    A.  Yes. | 3        criminal justice system and had to give DNA, 27 |
| 4    Q.  So there was a DNA match, but the person was | 4        were indicted for a new crime based on the DNA |
| 5        determined -- who gave the DNA, was determined not | 5        match? |
| 6        to be responsible for the crime on which they hit? | 6    A.  Correct. |
| 7    A.  Correct. | 7    Q.  So that's less than one percent, right? |
| 8    Q.  Okay.  And then there's another 38 percent of | 8    A.  I didn't -- I can write down the numbers to |
| 9        cases where the investigation was closed without | 9        confirm but I would trust your one percent there, |
| 10       indictment, correct? | 10       yes. |
| 11   A.  Correct. | 11   Q.  Okay. |
| 12   Q.  So even though you have a DNA match and at least | 12       All right.  Let's talk about DNA |
| 13       some kind of investigation, prosecutors conclude | 13       collection.  Do you know if DNA is collected from |
| 14       that there's not enough evidence to proceed, | 14       people with -- convicted of felonies in Michigan? |
| 15       correct? | 15   A.  I don't know.  Michigan's -- well, let me take |
| 16   A.  Correct. | 16       that back.  You said convicted? |
| 17   Q.  So basically in 49 percent of cases, basically | 17   Q.  People convicted of felonies in Michigan -- |
| 18       half, even when you have a DNA match, the person | 18   A.  Right.  Every -- every state has -- every state |
| 19       for whom there was a match, either didn't commit | 19       has, at least at conviction, DNA is collected. |
| 20       the crime or the prosecutor concluded there was | 20   Q.  Okay.  Do you know if DNA is collected from people |
| 21       insufficient evidence to proceed, correct? | 21       arrested for felonies in Michigan regardless of |
| 22   A.  Correct. | 22       whether they're convicted? |
| 23   Q.  Okay.  And then there were indictments in 23 | 23   A.  I think I've written about it in some earlier |
| 24       percent of these cases of 27 cases, right? | 24       stuff, but I can't remember. |
| 25   A.  Um-hum. | 25   Q.  All right.  Let me show you -- let's see here. |
| Page 151 | Page 152 |

38 (Pages 149 to 152)

Lovell, Rachel
5/19/2023

1    I'm going to show you, this is Michigan's DNA --
2  **A.**  Okay.
3  **Q.**  -- Identification Profiling System Act.  This is
4    Exhibit 10.
5      (At 12:36 p.m., Exhibit 10 marked.)
6  BY MS. AUKERMAN:
7  **Q.**  And do you see that under 1(a), it requires DNA
8    collection of people arrested for committing or
9    attempting to commit a felony offense?
10      MR. DAMICH: I'm going to object.  You're
11    interpreting a statute, so it's asking for a legal
12    conclusion.
13  BY MS. AUKERMAN:
14  **Q.**  You can answer.
15  **A.**  Yeah, it says someone arrested for a felony.
16  **Q.**  Okay.  And then do you see under 1(b) that it
17    requires DNA collection for individuals convicted
18    for a felony and for a series of different
19    misdemeanors, correct?
20      MR. DAMICH:  Same objection.
21      THE WITNESS:  Correct.
22  BY MS. AUKERMAN:
23  **Q.**  Okay.  And do you see that some of those
24    misdemeanors are sexual offenses?
25  **A.**  I don't know the -- the criminal -- the -- I don't

Page 153

1    know if those are, like, you know, according to
2    the Michigan code in that, like, whatever
3    section --
4  **Q.**  Sure.
5  **A.**  -- that sex offenses are, but it looks like --
6    like, for example, you know, loitering in a house
7    of ill fame or prostitution.  It may --
8  **Q.**  Indecent exposure --
9  **A.**  Indecent exposure or peeping, yeah.  Those seem
10    like sex -- sex -- but I'm not for sure about the
11    ill fame or prostitution.  It may be under
12    Michigan's sex offending, you know, revised code.
13  **Q.**  Okay.  So based on the statute that we just looked
14    at, under Michigan law, a person convicted of a
15    felony would -- is supposed to have their DNA in
16    CODIS, correct?
17      MR. DAMICH:  Objection.  Form.  Calls for
18    a legal conclusion.
19  BY MS. AUKERMAN:
20  **Q.**  You may answer.
21  **A.**  Yeah, it looks like Michigan is similar to Ohio
22    in -- in that.
23  **Q.**  Do you know if Michigan tracks the collection of
24    DNA from people who are convicted of sex offenses?
25      MR. DAMICH:  Object to the form and

Page 154

1    foundation.
2      THE WITNESS:  I don't know.
3  BY MS. AUKERMAN:
4  **Q.**  Okay.  I'm going to show you -- we'll make this
5    Exhibit 11.
6      (At 12:38 p.m., Exhibit 11 marked.)
7  BY MS. AUKERMAN:
8  **Q.**  This is MCL 28727.  This is a subsection of the
9    Michigan Sex Offender Registration Act.
10  **A.**  Okay.
11  **Q.**  Do you see under E here -- it doesn't let me
12    highlight for some reason.  But under E --
13    actually, hold on a second, am I looking at the
14    wrong -- no, I'm sorry, I'm looking at the wrong
15    thing.  We want 2(e).  Sorry.
16      Under Section 2(e) it requires that the
17    State identify whether a DNA sample has been
18    collected and any resulting DNA profile has been
19    entered into the federal combined DNA index system
20    (CODIS).
21      MR. DAMICH:  I'm going to object to the
22    form of the question.  Also foundation.  You're
23    asking her to testify about a statute.
24      THE WITNESS:  This is the -- this is --
25    you said this is the Michigan Sex Offender

Page 155

1    Registry Rules and Regulations -- a legal code for
2    that?  And then it says --
3  BY MS. AUKERMAN:
4  **Q.**  The Sex Offender Registration Act.
5  **A.**  As a contingency?  Like -- you know, like,
6    contingent upon being on the registration, then
7    it --
8  **Q.**  It says the registration must contain all of
9    the --
10  **A.**  Okay.
11  **Q.**  -- following, correct?  And then number 2.  And
12    then under E, it says, [as read], "An identifier
13    that indicates whether a DNA sample has been
14    collected and any resulting DNA profile that has
15    been entered into the federal combined DNA index
16    system (CODIS)."
17
18  **A.**  Yeah.  I -- I think -- I do know Michigan has had
19    issues with ensuring that DNA is collected, just
20    like Ohio has but -- and Michigan had some big
21    profile misses like Ohio had.  But I can see that
22    it says that the DNA is supposed to go in there.
23  **Q.**  Okay.  So when you say Michigan has had issues
24    with collection of DNA, what's your basis for
25    saying that?

Page 156

39 (Pages 153 to 156)

Lovell, Rachel
5/19/2023

```
 1    A.  There's a big -- there was a big -- one of the big
 2        reports came out in Michigan from -- from -- it
 3        was from -- I think it was from Michigan
 4        Department -- Department of Rehabilitation and
 5        Corrections.  I'm not sure if that's what you guys
 6        call it there.  Oh, here, it's the Ohio Department
 7        of Rehabilitation and Corrections.  Basically, the
 8        prison systems in Michigan found a whole bunch of
 9        people who were in prison who were supposed to
10        have their DNA in CODIS but did not.
11    Q.  Okay.  So let's talk about that a little bit more.
12        This is Exhibit 8, the Lawfully Owed DNA article.
13        And here you report that there is large scale
14        issues with collecting lawfully owed DNA have been
15        identified within states, including Michigan,
16        correct?
17    A.  Correct.
18    Q.  And you wrote this article in 2022, correct?
19    A.  Correct.
20    Q.  Okay.  So let's look at the cite for that.  That
21        footnote is to this article -- news article from
22        MLive, correct?
23    A.  Yeah.
24    Q.  And that article was from 2011, correct?
25    A.  Yes.
```

                    Page 157

```
 1    Q.  Okay.  So let's go look at that article.  Let me
 2        share my screen.  This is Exhibit 12.
 3             (At 12:43 p.m., Exhibit 12 marked.)
 4    BY MS. AUKERMAN:
 5    Q.  This is the article that you cite.
 6    A.  Um-hum.
 7    Q.  Okay.  And it's dated October 4th, 2011, correct?
 8    A.  Yes.
 9    Q.  Okay.  So you were citing this article on 2022 for
10        the proposition that there are large scale issues
11        with DNA collection.  The article you cite is 11
12        years earlier, correct?
13    A.  Right.
14    Q.  Okay.  And then in this article, it says that --
15        it describes some issues and then it says that
16        there were -- it says there's a new law requiring
17        DNA collection from prisoners to be completed by
18        January 1, 2012, correct?
19    A.  Yes, but this is specific to prisoners, right?
20    Q.  Right.  And it reports that the MDOC is collecting
21        DNA from prisoners early in their sentences now,
22        correct?
23    A.  That's what the article says, yes.
24    Q.  Do you have any current information about what
25        Michigan is doing to collect DNA from people?
```

                    Page 158

```
 1    A.  No, just -- just what was cited, that -- that, you
 2        know, there had been some high profile cases about
 3        missing large numbers of people.  And then in the
 4        article, I cite that Michigan's was done in
 5        prison, right?  Ohio had also a big issue --
 6    Q.  So the article you're citing though is from 11
 7        years before --
 8    A.  Right, but there -- we had -- right.  Because at
 9        the beginning, the first sentence in there says,
10        like, this has been a known issue for a while.
11        Like for --
12    Q.  Okay.  But you don't know -- but you don't know
13        since 2011 when this article was written
14        whether -- what the status is of DNA collection?
15    A.  Right, I -- I don't -- I don't have any
16        publications or any data from Lawfully Owed DNA in
17        Michigan.
18    Q.  Okay.
19    A.  Do you know whether SAKI has a lawfully owed DNA
20        in Michigan, a project?
21    Q.  I -- I am the one asking questions --
22    A.  Okay.
23    Q.  -- unfortunately.  We can talk about that -- so
24        I'm sorry.
25    A.  It's all right.  The teacher came out of me.
```

                    Page 159

```
 1    Q.  It's an unfair thing to say but that's how it goes
 2        with a deposition.  So I just want to --
 3    A.  I was only saying because if they did, you could
 4        look up because they would have similar things to
 5        what we were doing if Michigan had the lawfully
 6        owed DNA site.
 7    Q.  So the statute that I showed you from the sex
 8        offender registry showed that it's required for
 9        people who are on their registry to give DNA.  Or
10        excuse me, let me correct that.
11             The statute I showed you shows that
12        Michigan State Police is required to track whether
13        or not registrants have provided DNA, okay?
14        Correct?
15    A.  Um-hum.
16             MR. DAMICH:  Object to the form.
17    BY MS. AUKERMAN:
18    Q.  Did you request any data from the Michigan State
19        Police about what percentage of registrants had
20        provided DNA to be entered into CODIS?
21    A.  No.
22    Q.  So you don't know if it is 100 percent of
23        registrants who provided DNA?
24    A.  I have no -- no information.
25    Q.  So let's imagine a situation where a person
```

                    Page 160

40 (Pages 157 to 160)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1  committed a sex offense, they're now on the sex | 1  that person is in there? |
| 2  offender registry and they had their DNA collected | 2  Q.  Yes. |
| 3  as required by Michigan law.  And if there's now | 3  A.  Yes, that's what -- that's what should happen |
| 4  DNA collected from a new sex offense, wouldn't | 4  contingent on the fact that, you know, there was |
| 5  that result in an offender hit once that SAK is | 5  enough DNA -- |
| 6  tested if the registrant was the one who committed | 6  Q.  So assuming that Michigan is following its law and |
| 7  the crime? | 7  collecting DNA from people with felony convictions |
| 8  MR. DAMICH:  Objection.  Form. | 8  and many misdemeanor sex offense convictions, |
| 9  THE WITNESS:  So let me rephrase to make | 9  assuming Michigan is following its law, if there's |
| 10  sure that I understand your question.  So you're | 10  a new sex offense and DNA is collected, there |
| 11  saying here's someone who's on the registry, and | 11  would be an offender hit in CODIS? |
| 12  as a condition of that, let's, for argument sake, | 12  A.  When they tested the SAK, yes.  And it came -- if |
| 13  say that the law is actually being implemented as | 13  it -- if there was DNA and it came back, yeah. |
| 14  designed.  Which most -- a lot of the lawfully | 14  Q.  And again, you don't know -- you don't request |
| 15  owed research would suggest that a lot more people | 15  information on the percentage of registrants who |
| 16  are being missed because the law is not | 16  have DNA in CODIS? |
| 17  actually -- that people aren't actually getting | 17  A.  Uh-uh. |
| 18  their DNA collected when they should be. | 18  Q.  So you don't know what that percentage percent is? |
| 19  But let's say that they are following the | 19  A.  No, actually, I'm not for sure CODIS would |
| 20  law and they are putting the DNA in there.  Then | 20  actually have that information. |
| 21  if they're in there, then they are -- then, you | 21  Q.  No, but the Michigan Sex Offender Registry |
| 22  know, somewhere down the line, they test a kit. | 22  requires tracking.  We talked about this.  Of how |
| 23  And that DNA in that kit hits to that person and | 23  many people have submitted -- how many registrants |
| 24  would have a forensic hit -- a forensic hit match | 24  have submitted DNA, correct? |
| 25  to an offender hit and have in -- in CODIS since | 25  A.  Correct.  But CODIS -- |
| Page 161 | Page 162 |
| 1  Q.  And you don't know what that percentage is? | 1  say that your research in Cuyahoga County and |
| 2  A.  Right, but CODIS wouldn't know -- CODIS wouldn't | 2  similar research in Wayne County on SAKs you say |
| 3  know because it's the federal -- why they were in | 3  have documented a large number of identified |
| 4  there.  Michigan might know -- Michigan might -- | 4  serial sexual offenders, correct? |
| 5  or -- or the Bureau of Criminal Investigations | 5  A.  Um-hum. |
| 6  from Michigan might know why that person got in | 6  Q.  And then what do you mean by a serial sexual |
| 7  there.  But CODIS doesn't have that information. | 7  offender? |
| 8  Q.  But the DNA would be in -- yeah, if DNA is | 8  A.  In this case, it would mean those that are |
| 9  collected, then it would be in CODIS and there | 9  connected to -- connected to two or more sexual |
| 10  would presumably be a hit if a person on the | 10  assaults and/or rapes. |
| 11  registry committed a crime? | 11  Q.  Can you just give me one second.  All right. |
| 12  A.  Yes, as long as there was DNA in the kit.  Yeah. | 12  So you said serial sexual offender is |
| 13  Q.  Okay.  How are we doing?  Do you want to take | 13  someone who's committed more than one rape; is |
| 14  another short break or do want to keep going? | 14  that right? |
| 15  (From 12:50 p.m. to 1:01 p.m., a break | 15  A.  Or connected to, yeah, more than one rape, or |
| 16  was held.) | 16  sexual assault.  So I think I defined -- I think I |
| 17  MS. AUKERMAN:  So let's go back on the | 17  defined it in here.  I thought I did.  Yeah, so -- |
| 18  record. | 18  yeah, so someone connected to more than one.  So |
| 19  BY MS. AUKERMAN: | 19  serial, meaning serial sexual assault offender. |
| 20  Q.  I wanted to talk now a little bit about your | 20  Q.  Okay.  So when you say serial sexual offender, you |
| 21  methodology in the research that you conducted. | 21  mean serial sexual assault offender? |
| 22  And also, again, a little bit about starting I | 22  A.  Correct.  Because this is only in reference to the |
| 23  guess with terminology to make sure that we're | 23  -- the kits. |
| 24  talking about the same thing. | 24  Q.  Okay.  So we're not talking about other types of |
| 25  So in paragraph 9(b) of your report, you | 25  sex offenses? |
| Page 163 | Page 164 |

41 (Pages 161 to 164)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1   **A.** No. | 1   have their criminal history. |
| 2   **Q.** Okay. And then just so we're clear, a serial | 2   **Q.** So these are people who are known -- you know, |
| 3   sexual assault offender would not have had to have | 3   like you've got a name associated with them -- |
| 4   been convicted of more than one sex offense, | 4   **A.** Um-hum. |
| 5   correct? | 5   **Q.** Okay. They're not people who have been proven to |
| 6   **A.** Correct. | 6   have committed more than one sexual offense, |
| 7   **Q.** Or even convicted of a single sex offense, | 7   correct? |
| 8   correct? | 8   **A.** Correct. |
| 9   **A.** Correct. | 9   **Q.** But they've been linked in some way to two sexual |
| 10   **Q.** And they wouldn't necessarily be on a sex offender | 10   offenses? |
| 11   registry, correct? | 11   **A.** Correct. |
| 12   **A.** Not necessarily, no. | 12   **Q.** Or two -- |
| 13   **Q.** Okay. So we aren't talking about people who are | 13   **A.** Right. Right. So this -- the way I describe it, |
| 14   convicted of sex offenses and then commit another | 14   it's, like, suspected sexual offenders identified |
| 15   sex offense whether caught or uncaught, correct? | 15   in that. |
| 16   **A.** There -- there are those folks in that -- in this | 16   **Q.** In paragraph 9(b)(ii), you talk about 801 |
| 17   data, but that's not the parameters -- that's -- | 17   suspected sexual offenders or -- by which I assume |
| 18   that's not the parameters of that study. | 18   you mean sexual assault offenders, correct? |
| 19   **Q.** So the sample is not limited to people convicted | 19   **A.** Yeah, sexual -- yeah. |
| 20   of sex offenses? | 20   **Q.** Okay. And the citation you give to that, again, |
| 21   **A.** No. Correct. | 21   is the rethinking estimates of sexual recidivism |
| 22   **Q.** And then you use the term "identified serial | 22   paper that was not provided to us, correct? |
| 23   sexual offender." What do you mean by | 23   **A.** Correct. Well, I didn't know that till today. |
| 24   "identified?" | 24   Yes, that's correct. |
| 25   **A.** It means that you have to know who they are to | 25   **Q.** Okay. You say that in the first paragraph -- or |
| Page 165 | Page 166 |

| | |
|---|---|
| 1   in sub ii you say that a third (39 percent) had | 1   provided it. And so I'm not able to ask you |
| 2   two or more sexual assaults from SAKs or a link by | 2   questions about this because it -- I wasn't able |
| 3   DNA to a SAK, plus a rape arrest, or other | 3   to review your methodology. |
| 4   registrable offense. | 4   **A.** Okay. |
| 5   And then the next paragraph you have a 30 | 5   **Q.** So what I'm going to do instead -- and, so, you |
| 6   percent amount. Which is the correct percentage, | 6   know, we're going to object to that portion of the |
| 7   30 or 39 percent? | 7   report because it relies on facts that we could |
| 8   **A.** So, they're different measures. They're both | 8   not review. |
| 9   correct. So it says of the 108, 30 percent were | 9   So what I'm going to do instead is talk |
| 10   identified as being connected to a subsequent to | 10   about your offending history article because that |
| 11   the first coded SAK rape offense. Either by being | 11   has some -- you know, some of the methodologies |
| 12   arrested or convicted or linked to another | 12   spelled out in it. Is that fair? |
| 13   untested kit. | 13   **A.** Well, I -- well, I -- we certainly can. But I |
| 14   So -- so we had -- so if you look, the | 14   want to say that they're using different samples. |
| 15   other definition includes those that have a -- or | 15   **Q.** The 30 and 39 percent are using different samples, |
| 16   other registrable sexual offense. In this case, I | 16   is what you're saying? |
| 17   was -- we only had time data, like dates of | 17   **A.** No, no, 30, 39 percent is using the same sample. |
| 18   offenses for those that were connected to rapes | 18   The -- the typology sample were all undetected. |
| 19   that we coded and/or those that were in their | 19   These 800, about half of these had a prior -- were |
| 20   criminal history for rape. Specifically for the | 20   convicted for the rape associated with the kit. |
| 21   crime of rape. So they're both correct, they're | 21   **Q.** Okay. |
| 22   just -- | 22   **A.** So, like -- so we expanded our sample over time |
| 23   **Q.** As we noted previously, we -- you know, and I | 23   because this is a long-term project. So the |
| 24   realize this is not on you, Dr. Lovell, but we | 24   earlier study only looked at undetected -- the |
| 25   requested a copy of your paper, we weren't | 25   undetected rates associated with those kits. This |
| Page 167 | Page 168 |

42 (Pages 165 to 168)

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

**Page 169**

1    more expanded sample includes those that were
2    previously adjudicated for the -- for the rape
3    associated with the kit.
4    Q.  Okay.  So since we didn't have that report,
5    despite requesting it -- or that data, I can't ask
6    you about that.  I mean, we can -- I guess I'll
7    preserve for the record the opportunity to
8    re-depose you on that if -- in the future.  But we
9    can't -- we can't -- I can't depose you on that
10   data today because it wasn't provided to me.
11          So let's look at the offending history
12   one that I believe is Exhibit 5.  Okay.  Let me
13   share my screen.
14          And again, you describe that as a sample
15   of disproportionately criminogenic offenders; is
16   that accurate?
17   A.  Correct.
18   Q.  And this sample, is this primarily from Cleveland,
19   Cuyahoga County?
20   A.  Yes.
21   Q.  Okay.
22   A.  It's -- it's -- it's almost all Cleveland.
23   Q.  Almost all Cleveland.
24          Cleveland has three times the national
25   crime rate, correct?

**Page 170**

1    A.  Correct.
2    Q.  And three times the rate of reported sexual
3    assault, correct?
4    A.  Correct.  National.  It -- it would differ if you
5    looked at sort of city to city or similar cities
6    to similar cities.  But nationally, yes.
7    Q.  Okay.  So the sample is drawn from a geographic
8    area that has three times the national crime
9    rates?
10   A.  Yes.
11   Q.  Okay.  And in this sample, we talked about the six
12   preconditions for a SAK match.  And your research,
13   by definition, relates to SAK kits, correct?
14   A.  Correct.
15   Q.  So by definition, those six preconditions have to
16   be met, right?
17   A.  Not all of them.
18   Q.  Okay.  Which ones would not need to be met?
19   A.  The -- the -- the Cuyahoga County did not just
20   investigate cases that had a DNA hit.  They
21   investigated all cases with -- that was part of
22   that 7,000.  So they didn't necessarily have to
23   have a DNA hit for -- or DNA in the kit to be --
24   to be, like, investigated or associated with the
25   rape.

**Page 171**

1    Q.  But they were all cases where a SAK had been
2    collected, correct?
3    A.  Yes.  Right, but it's not all those conditions.
4    It didn't have to have DNA, didn't have to be
5    sufficient for profile, didn't have to be in
6    CODIS.
7    Q.  Right.  So it would have been the first -- it had
8    to be reported and there had to be a SAK
9    collected.  So it was those first couple of
10   conditions?
11   A.  Yes.
12   Q.  Okay.  That's a helpful clarification.  Okay.
13          So, and then in addition to meeting the
14   criteria of reporting the case and having a SAK
15   collected, you would -- there's also criteria to
16   be included in the sample, correct?
17   A.  Right.
18   Q.  Okay.  So in the sample that you're talking about
19   here, there was 7,000 untested rape kits.  Let's
20   go to page 475.  There was 7,000 untested rape
21   kits.  And of those, you selected out 721 cases
22   where there had been an investigation, correct?
23   A.  Yeah, and the investigation was complete.
24   Q.  Okay.  Do you know what factors determined whether
25   a case was selected for investigation?

**Page 172**

1    A.  All the cases were selected for -- all the cases
2    were investigated.  They just weren't all
3    investigated at the same time.  So they were --
4    Q.  They investigated --
5    A.  Yeah, they investigated all 7,000.
6    Q.  I see.  So you picked the 721 where the
7    investigation was complete.
8    A.  Right.  So, yeah, because they didn't have
9    documentation -- like if they hadn't done the
10   investigation, that documentation wasn't there for
11   everything.  So we're coming behind their
12   initiative to, like, study and sample their stuff.
13   So --
14   Q.  Okay.
15   A.  So they had finished investigating the case.
16   Q.  And did you include in your sample of cases where
17   that investigation was complete but the prosecutor
18   chose not to indict?
19   A.  Yes.
20   Q.  Okay.
21   A.  It's right -- it's the next sentence.
22   Q.  Okay.  Yeah, you're right.
23          And you eliminated non-prosecutable
24   cases, correct?
25   A.  If you -- just -- can you scroll down just a

43 (Pages 169 to 172)

Lovell, Rachel
5/19/2023

---

**Page 173**

1  little bit more?  Just to make sure because we've
2  done different things.
3      Yeah, so we -- we excluded -- we didn't
4  sample those cases -- of the 7,000, we didn't
5  exclude those that were previously -- in this
6  study that were previously disposed.  Meaning --
7  which is not the same thing as convicted, but
8  those that were outside of the statute, the
9  suspect was deceased, or they were closed because
10  of a consensual partner -- the hit was to a
11  consensual partner.
12  Q.  So, let me just make sure I'm finding the right
13  place here, when you said previously disposed.
14      So, I'm sorry, you excluded the cases
15  that had previously been disposed of, correct?
16  A.  Correct.  For these --
17  Q.  And one reason -- one reason a case might
18  previously be disposed of is if the SAK was
19  associated with a prior -- the case had already
20  been prosecuted, correct?
21  A.  Correct.
22  Q.  Okay.  So --
23  A.  They just didn't -- yeah, they just didn't test
24  the kit, but --
25  Q.  Right.

---

**Page 174**

1  A.  -- they prosecuted the person.  Yeah.
2  Q.  They found the person anyway and the person was
3  charged and convicted.  Okay.  Right.
4      And so, to make sure I understand, so the
5  victim reports an assault.  They have a SAK done,
6  the SAK isn't tested, but independently, the
7  suspect is prosecuted and convicted, right?
8  A.  Correct.
9  Q.  And those people were excluded from your study?
10  A.  Correct.
11  Q.  So if the case was disposed of earlier through a
12  conviction for a sexual crime, the defendant could
13  have ended up on the sex offender registry,
14  correct?
15  A.  Could, yes.
16  Q.  Okay.  So I just want to be clear; you excluded
17  from your sample people who had been convicted for
18  the SAK related -- let me say that again.
19      You excluded from your sample SAKs and
20  cases where people had already been convicted of a
21  sexual crime and hence, might already be on the
22  registries?
23  A.  Well, they could have had a subsequent conviction
24  and been on that, but our selection criteria was
25  only for that -- that one kit that we sampled was

---

**Page 175**

1  that one kit, you know, previously disposed or
2  not.  They could have had other convictions or,
3  you know, been on the registry for other things.
4  But at least for that SAK, they weren't.
5  Q.  So if that SAK resulted in a conviction, it was
6  excluded?
7  A.  Correct.
8  Q.  Okay.
9  A.  So these are all undetected -- undetected for that
10  rape.
11  Q.  And another reason you gave for non-prosecutable
12  cases is that the DNA hit was connected to a
13  consensual partner.  So you would have excluded
14  cases where say the SAK was -- the DNA was found
15  to be the victim's husband, not the suspect,
16  correct?
17  A.  Correct.
18  Q.  Okay.  What about -- and we talked about this a
19  little bit earlier, but what about cases where,
20  you know, there's a -- parents bring in their
21  15-year-old, find out she's having sex with her
22  boyfriend.  And there's a SAK collected.  The girl
23  says, "Hey, this is my boyfriend.  You know, I was
24  totally into this."  Would you have excluded that
25  case?

---

**Page 176**

1      MR. DAMICH: Objection.  Form.
2      THE WITNESS:  It would have -- it
3  wouldn't have mattered -- you know, again, we made
4  decisions about which ones to include or not
5  include once they were sampled.  But if -- if both
6  partners provided consent and the victim never
7  said she was raped and it wasn't -- it didn't fit
8  within the criminal statute for statutory rape
9  then we didn't include it.
10      So for example, you know, a 15-year-old
11  and -- you know, a 15-year-old or something like
12  that, both of those -- they both said it was
13  consensual.  Mom or dad or somebody is mad that
14  their daughter had sex, takes them to the hospital
15  to get a kit.  That would not be included in this.
16  BY MS. AUKERMAN:
17  Q.  Because some of those age consent cases would have
18  been excluded?
19  A.  Correct.  Unless it was -- unless it -- you know,
20  it would be -- have been charged as statutory.
21  Q.  Okay.  And I believe you write that 72 percent of
22  your sample involved cases from 1993 to 1999,
23  correct?
24  A.  Correct.  Well, I don't -- can you -- just to
25  confirm --

---

44 (Pages 173 to 176)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1  Q. Let me see if I can find that. | 1  any better?  Not really. |
| 2  **A.** We've expanded our sample over time.  Yeah, that | 2  BY MS. AUKERMAN: |
| 3  right there.  Yes.  So it's because those are the | 3  Q. Okay.  Is it fair to say that hospital staff |
| 4  cases that the prosecutor's office were | 4  attitudes towards sexual assault today differ from |
| 5  prioritizing because of the statute -- the | 5  attitudes in the 1990s, 20 to 30 years ago? |
| 6  statute.  So over time, our sample has gotten, you | 6  MR. DAMICH: Objection.  Form. |
| 7  know, including older cases, but most of these | 7  Foundation. |
| 8  72.5 percent were in the mid to late '90s. | 8  THE WITNESS: I don't -- I don't think I |
| 9  Q. Okay.  Is it fair to say that law enforcement | 9  can speak to that because I haven't really, like, |
| 10  attitudes towards sexual assault differ from | 10  studied attitudes of hospital personnel. |
| 11  attitudes in the 19 -- today?  Let me restate | 11  BY MS. AUKERMAN: |
| 12  that. | 12  Q. Do victim attitudes towards sexual assault today |
| 13  Is it fair to say that law enforcement | 13  differ from the attitudes in the 1990s, -- |
| 14  attitudes towards sexual assault today differ from | 14  MR. DAMICH: Objection.  Form -- |
| 15  the attitudes in the 1990s, 20 to 30 years ago? | 15  BY MS. AUKERMAN: |
| 16  MR. DAMICH: Objection.  Form and | 16  Q.  -- 20 to 30 years ago? |
| 17  foundation. | 17  MR. DAMICH: -- and foundation.  I'm |
| 18  THE WITNESS: I -- I think that's a very | 18  sorry. |
| 19  hard answer to provide because that's what I | 19  THE WITNESS: Can you describe maybe in |
| 20  study.  And I would say that the -- there's some | 20  what ways victims attitudes -- |
| 21  very big exceptions to that, that we aren't | 21  BY MS. AUKERMAN: |
| 22  actually doing much better with sexual assault | 22  Q. I guess what I'm asking is, do victims think about |
| 23  than we were in the '90s in terms of attrition and | 23  sexual assault in the same way today as they did |
| 24  other sorts of things.  Attitudes, maybe. | 24  in the 1990s? |
| 25  Attrition, not really.  Are we treating victims | 25  MR. DAMICH: Objection.  Form and |
| Page 177 | Page 178 |
| 1  foundation. | 1  differences in, you know, reported rapes and |
| 2  THE WITNESS: I think in some ways, yes, | 2  things like that from the mid '90s and late '90s. |
| 3  and in some ways, no.  I think that's a really | 3  So there's a lot more of those rapes in |
| 4  hard -- that's a very general hard question to | 4  the mid to late '90s.  And, you know, it doesn't |
| 5  answer.  Is there greater awareness around sexual | 5  necessarily affect completely in generalizable |
| 6  assault and Me Too, you know, in the last five or | 6  now, but is -- with our more expanded sample, most |
| 7  six years?  Yes.  But -- but I don't see a massive | 7  of these patterns have remained the same.  The |
| 8  wholesale change from the, you know, mid to late | 8  numbers have changed slightly but the patterns are |
| 9  '90s to now in a lot of -- of this. | 9  all the same. |
| 10  BY MS. AUKERMAN: | 10  Q. Is it possible that there was a greater emphasis |
| 11  Q. Do you think that the fact that your data is from | 11  in SAK collection in the 1990s on violent offenses |
| 12  the 1990s could affect your results? | 12  than there is today? |
| 13  **A.** I think -- well, this study was based upon some of | 13  MR. DAMICH: Objection.  Form and |
| 14  the first couple of waves.  We have data now from | 14  foundation. |
| 15  2,400 coded rape cases.  So we've advanced in | 15  THE WITNESS: I don't think there's any |
| 16  several -- in the past several years, and I've | 16  data to know that. |
| 17  also included -- we also have expanded to include | 17  BY MS. AUKERMAN: |
| 18  Akron's cases as well. | 18  Q. Okay.  Is there any data to know whether major |
| 19  And so I would say we do see some trends | 19  offenses are more -- even more disproportionately |
| 20  that are different in the '90s than more current | 20  reflected in the 1990s data as compared to more |
| 21  rapes.  But one difference is that in the mid to | 21  recent data? |
| 22  late '90s was also the very high crime rate that | 22  **A.** There's really -- yeah, I don't -- we don't have |
| 23  globally was experienced.  So, like, if you | 23  the denominator to be able to do that. |
| 24  remember late -- the mid to late '90s experienced | 24  Q. Okay.  Let's look a little more at the sample.  So |
| 25  extremely high crime rates.  And so you can see | 25  it says here that you coded a criminal history for |
| Page 179 | Page 180 |

45 (Pages 177 to 180)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1     58 percent of the SAK case files, correct?<br>2  A.  Yes.<br>3  Q.  Of the match --<br>4  A.  Yeah.<br>5  Q.  So for a little under half of the sample you<br>6     didn't have a conviction history?<br>7  A.  Well, the difference here is that we coded SAKs,<br>8     which are not the same thing as offenders.  So<br>9     because so many offenders had more than one SAK,<br>10    you're changing the unit of analysis there.  So of<br>11    all -- of -- you know, like, we coded 418 --<br>12    right.  Like, you see, like, of those SAK case<br>13    files, that's how many we had proportionate to.<br>14    But that's because there's a lot more offenders<br>15    connected to more than one.<br>16  Q.  So you have more offenses than you have offenders.<br>17    Right.  Okay.<br>18  A.  Yeah.<br>19  Q.  Okay.  And you coded for eight felonies, right?<br>20  A.  Well, no, 11 felonies.  And the eight you see are<br>21    crimes.<br>22  Q.  I see.  And the only sex crime though was rape,<br>23    correct?<br>24  A.  Correct.  Rape, the -- the 290702 in Ohio.<br>25  Q.  And you didn't code for any other kind of sex<br><br>Page 181 | 1    crime?<br>2  A.  No, and it was for a rape of a -- it was for an<br>3    arrest for a rape.  It didn't have to be convicted<br>4    for a rape but...<br>5  Q.  Okay.  And again, it's based on the arrest, not<br>6    the conviction?<br>7  A.  Correct.<br>8  Q.  Did you calculate what percentage of people would<br>9    have been connected to SAKs if you only looked at<br>10    convictions rather than arrests?<br>11  A.  Well, the numbers there you could do, you could<br>12    work backwards.  So, like, there you have rape,<br>13    the -- those that had a conviction and 46 percent<br>14    of the 119, right, were convicted --<br>15  Q.  That's the total number of arrests.  So I'm trying<br>16    to -- you say 37 percent ever arrested.  Is that<br>17    of the individuals or is that of the SAKs?<br>18  A.  So this would be the -- these would be the<br>19    offenders.  So the 418, like -- so of the 418,<br>20    were they ever arrested for arson?  Were they ever<br>21    arrested for burglary?  Were they ever arrested<br>22    for domestic violence?<br>23  Q.  I think it's 408, I believe.<br>24  A.  Oh.  What did I say?<br>25  Q.  418.<br><br>Page 182 |
| 1  A.  Oh, sorry.  Yeah, 408.  And then --<br>2  Q.  Just so I'm understanding.  So if there's 408<br>3    individuals, 37 percent, so that'd be 151 people<br>4    roughly, right?<br>5  A.  Let's see, I mean, if you've done the math there,<br>6    yes, then I trust what you're saying with the<br>7    math.  But...<br>8  Q.  And then the conviction rate, the 46.12 percent on<br>9    a conviction rate, is that based on individuals or<br>10    is that based on the number of arrests?  So if we<br>11    have 151 people who were arrested -- I'm just --<br>12    the math isn't adding up here for me.<br>13  A.  So it's saying of those incidents of rape, those<br>14    are the total number of arrests, not necessarily<br>15    the total number of people who have arrests.<br>16  Q.  Right.  So if we take -- if we assume that 46<br>17    percent of the 151 people are convicted, then<br>18    we're down to 69 or 70 people with convictions,<br>19    correct?<br>20  A.  With --<br>21  Q.  Rape convictions.<br>22  A.  Yes, somewhere -- I would say somewhere around<br>23    there, yeah.  If you're saying a little less than<br>24    half were convicted of -- of the arrests that they<br>25    were for rape -- or for the rape that they were<br><br>Page 183 | 1    arrested for.<br>2  Q.  So in your sample, there were -- in your total<br>3    sample, you had roughly 70 people who might have<br>4    been on a sex offender registry?<br>5  A.  I'd have to look to see what -- what year they<br>6    were and what Ohio's, like, registry was in that<br>7    point.  But I guess, let's say if it's for<br>8    current -- let's say the laws of current registry,<br>9    then yes, they would have been.  But not all of<br>10    these would have been registered depending upon<br>11    when the crime was.<br>12  Q.  Would you agree that sample size is important in<br>13    statistics?<br>14  A.  Of course.<br>15  Q.  And sample composition we've talked about being<br>16    important statistics, correct?<br>17  A.  Yes.  Oh, but let me rephrase that.  Had they<br>18    actually been convicted -- like, those were what<br>19    was already in their criminal history.  Had --<br>20    these are all, though, people who walked,<br>21    basically the front door is a sexual offense that<br>22    they weren't adjudicated for.  So had they been<br>23    adjudicated for the crime associated that got them<br>24    in this data set, then many more of them -- you<br>25    know, all of them potentially would have had the<br><br>Page 184 |

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1  opportunity to be prosecuted and convicted and be | 1  **A.**  Well, by definition, they would be because they're |
| 2  on the sex offender registry. | 2  all in here because of a rape.  So what we're |
| 3  **Q.**  Right.  But you don't know -- but they weren't as | 3  saying here is that even though they were |
| 4  a result of those offenses? | 4  associated with a rape, because that rape wasn't |
| 5  **A.**  Correct. | 5  as part of the criminal record because the case |
| 6  **Q.**  Okay. | 6  wasn't handled and the kit wasn't tested, then |
| 7  **A.**  And that's what we're arguing.  Like so many of | 7  two-thirds of them -- only two-thirds -- or a |
| 8  these because rape -- because these kits weren't | 8  third of them had a rape in their criminal |
| 9  tested and cases weren't adjudicated, there were | 9  history.  Which means two-thirds of them never had |
| 10  all these undetected rapes out there that no one | 10  an indicator that they were a sexual predator or a |
| 11  was -- it wasn't appearing in their criminal | 11  sexual offender, a sexual assault offender, but |
| 12  history. | 12  they -- had the kit been tested and -- |
| 13  **Q.**  Right.  So you're studying undetected offending, | 13  **Q.**  So in the large majority of cases you're |
| 14  not detected offending? | 14  saying.  In the large majority of cases, the |
| 15  **A.**  Correct.  In this sample. | 15  criminal history didn't show that the person had |
| 16  **Q.**  Right.  And you're not studying undetected | 16  any kind of sexual offending history? |
| 17  offending after conviction, you're just studying | 17  **A.**  Correct. |
| 18  undetected offending in general? | 18  **Q.**  So these sex offenses are being committed by |
| 19  **A.**  Correct.  Not in this study.  We -- we have other | 19  people who are -- don't have a criminal history |
| 20  studies, but yes. | 20  for sex offending? |
| 21  **Q.**  So you write here that there's 30 percent of your | 21  **A.**  Yeah, two-thirds of them, -- |
| 22  sample who are suspected sexual offenders.  Do you | 22  **Q.**  Two-thirds of them. |
| 23  mean suspected serial sexual offenders?  Let's | 23  **A.**  -- right, had never been arrested for -- well, |
| 24  see -- are these individuals associated with more | 24  specifically for rape.  They could have -- |
| 25  than one offense? | 25  **Q.**  Right. |
| Page 185 | Page 186 |
| 1  **A.**  -- been arrested for the -- for other sex crimes, | 1  the initiative, it includes those who, you know, |
| 2  but yes. | 2  cases were closed due to insufficient evidence, as |
| 3  **Q.**  And I guess it sounds like at least even more of | 3  well as those that, you know, weren't indicted. |
| 4  them would not have a conviction since the | 4  **Q.**  Right.  So I think we talked earlier that it was, |
| 5  conviction rate was only -- | 5  like, 13 percent that got indicted? |
| 6  **A.**  Correct. | 6  **A.**  Yeah, but that's not necessarily -- that's of the |
| 7  **Q.**  -- something percent, right? | 7  total percent.  I -- I -- I put -- I'm sure I put |
| 8  **A.**  Correct. | 8  in here somewhere what percentage of just this |
| 9  **Q.**  So the large majority of individuals here did not | 9  sample had been indicted or were potentially |
| 10  have a sex offense conviction? | 10  indicted. |
| 11  **A.**  Correct. | 11  **Q.**  Right.  But you included as a second offense or |
| 12  **Q.**  Okay.  When you counted whether a person had more | 12  in -- in counting offenses, you included offenses |
| 13  than one offense and was a serial sexual assault | 13  that were not indicted, correct? |
| 14  offender, did you -- you included arrests that did | 14  Let me say that a little bit more |
| 15  not lead to conviction, correct? | 15  clearly.  I think that question was not a great |
| 16  **A.**  Correct. | 16  question. |
| 17  **Q.**  And you included SAK matches -- SAK forensic hits | 17  So in order to determine if somebody's |
| 18  regardless of whether there was an arrest, | 18  offended more than once, there are a couple of |
| 19  prosecution, or conviction, correct? | 19  ways to do that, correct? |
| 20  **A.**  Currently.  All -- because all of these were | 20  **A.**  Right. |
| 21  undetected at the time, there wasn't a | 21  **Q.**  One of them is to see if your person for whom |
| 22  prosecution.  We know there wasn't a prosecution | 22  there's a SAK -- a new SAK hit had a past |
| 23  at the time.  Right.  Because these got two | 23  conviction or arrest for rape, right? |
| 24  investigations at the time.  And then as part of | 24  **A.**  Yes. |
| 25  the Sexual Assault Kit Initiative -- as part of | 25  **Q.**  And you included people with arrests for rape, |
| Page 187 | Page 188 |

47 (Pages 185 to 188)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 | correct? |
| 2 | A. Correct. |
| 3 | Q. And people with convictions for rape? |
| 4 | A. Yes. |
| 5 | Q. Right? Okay. |
| 6 | And if the person -- you also |
| 7 | included a person who would have more than one SAK |
| 8 | hit, right? I mean, so they'd be associated with |
| 9 | more than one sexual offense in CODIS? |
| 10 | A. Yes. |
| 11 | Q. Okay. And in counting those CODIS hits, did you |
| 12 | include cases where there had been an |
| 13 | investigation but a decision not to proceed? |
| 14 | A. By the task force? |
| 15 | Q. By the task force. |
| 16 | A. Yes, those would be the -- those closed due to |
| 17 | insufficient evidence. |
| 18 | Q. So even though the prosecutor closed a case for |
| 19 | insufficient evidence, you counted it as a second |
| 20 | offense? |
| 21 | A. Correct. |
| 22 | Q. Okay. In counting the number of sexual assaults |
| 23 | linked by DNA or a past arrest, if the victim was |
| 24 | the same in two assaults, did you count that as |
| 25 | one arrest -- or excuse me -- as one assault or |

Page 189

| | |
|---|---|
| 1 | two assaults? |
| 2 | Let me give you an example, it might be |
| 3 | clearer. |
| 4 | So let's imagine a DV victim reports one |
| 5 | sexual assault by an intimate partner, that case |
| 6 | is not prosecuted. And then later, the victim |
| 7 | reports another assault by the same partner. A |
| 8 | SAK is collected in both and there's a CODIS hit, |
| 9 | would that person be counted as a serial sexual |
| 10 | assault offender? |
| 11 | A. There's very few victims that have more than one |
| 12 | kit. There are a couple and they are primarily |
| 13 | very high risk individuals and/or those that are |
| 14 | mentally ill. So to the best of my knowledge, we |
| 15 | don't have any in our sample that would fit that |
| 16 | criteria. |
| 17 | We did remove those that -- where the |
| 18 | victims are severely mentally ill. So, for |
| 19 | example, some mentally ill individuals will -- you |
| 20 | know, like one woman has reported, like, 50 |
| 21 | different rapes, right? She's -- she is very |
| 22 | mentally ill, and so, you know, like, she doesn't |
| 23 | know, like -- right? Like she -- she probably was |
| 24 | sexually assaulted at some time, but she is very |
| 25 | mentally ill. |

Page 190

| | |
|---|---|
| 1 | So we excluded a couple of those extreme |
| 2 | outliers. But there -- to the best of my |
| 3 | knowledge, there's no victims that reported -- had |
| 4 | two different kits at two different times from the |
| 5 | same perpetrator. |
| 6 | Q. So as I understand it, one of the goals of your |
| 7 | research is to assess the rate of undetected |
| 8 | sexual offending, right? |
| 9 | A. Is to get an idea of that. I don't think -- my |
| 10 | goal is not to, like, give a complete, like, |
| 11 | accurate assessment of undetected. It's to say |
| 12 | there's -- recidivism tells us so little about |
| 13 | re-offending, and here's a better glimpse than |
| 14 | what we've had before and what -- |
| 15 | Q. So -- right. So I mean, we talked before about |
| 16 | how -- I mean, you said you can't necessarily give |
| 17 | a complete accurate assessment because it's very |
| 18 | difficult to measure re-offending, correct? |
| 19 | A. Correct. |
| 20 | Q. Right. And so what you're trying to do is look at |
| 21 | specifically -- and we talked about the importance |
| 22 | of the sample, correct? |
| 23 | A. Um-hum. |
| 24 | Q. And what you're trying to do is get an idea of |
| 25 | serial sexual assault offending by rape -- in |

Page 191

| | |
|---|---|
| 1 | cases of rape and sexual assault, correct? |
| 2 | A. Correct. So one of the main things that we |
| 3 | publish quite a bit about is how the sexual |
| 4 | assault kits are giving us a better understanding |
| 5 | of the extent to which how often rape -- sexual |
| 6 | offenders and, in particular, those connected to |
| 7 | sexual assault kits continued to sexually offend, |
| 8 | both in their past and in their future. These |
| 9 | rates are much higher than recidivism rates |
| 10 | suggest. |
| 11 | So we're -- we're certainly not trying |
| 12 | to -- and, you know, we put in all the limitations |
| 13 | and I think I even put in the declarations, you |
| 14 | know, like, these aren't generalizable to all |
| 15 | sexual offenders or all rapes. However, it does |
| 16 | give us something that we have never been able to |
| 17 | really do before, which is looking at someone's |
| 18 | near complete history over decades. And see, |
| 19 | okay, let's look at what they've done over decades |
| 20 | through a more objectable -- objective connection |
| 21 | than self-report or recidivism. |
| 22 | Q. So if I'm understanding you correctly, the DNA -- |
| 23 | the SAK research gives us a window into kind of |
| 24 | the lifetime course of sexual offending for people |
| 25 | who fit a particular profile, right? Who are on a |

Page 192

48 (Pages 189 to 192)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1   particular sample. Is that fair to say? It's not | 1   not spelled out in the -- the declaration. |
| 2   generalizable, you said, to all sexual offenders, | 2   Q.  So just to make sure I'm very clear; your report |
| 3   right? | 3       isn't about people on registries who have been |
| 4   A.  No. | 4       convicted of sexual crimes, correct? |
| 5   Q.  And it provides the information about the group | 5   A.  Correct. |
| 6       that you're studying, which makes sense, correct? | 6   Q.  Okay.  And your report doesn't compare detection |
| 7   A.  Correct. | 7       rates for people with past convictions versus |
| 8   Q.  Okay.  And the group -- what you're studying is | 8       detection rates for people without past |
| 9       repeat sexual offending, not sexual offending | 9       connections, correct? |
| 10      after conviction, correct? | 10  A.  Correct. |
| 11  A.  That's not our research question.  Although, | 11  Q.  In this offending history article, you say that |
| 12      again, we have -- we can do that since we have | 12      more often than not, people -- the SAK-associate |
| 13      dates.  But that's -- that's not the -- this isn't | 13      -- sorry.  Those involved in the SAK-associated |
| 14      a recidivism study. | 14      sexual assaults, more often than not, do not have |
| 15  Q.  But you haven't -- that's not what's in your | 15      an arrest for rape in their criminal histories, |
| 16      declaration, correct? | 16      correct? |
| 17  A.  I'm sorry? | 17  A.  Correct. |
| 18  Q.  Your report doesn't discuss separately sexual | 18  Q.  And since the conviction rates are 46 percent in |
| 19      offending after conviction, correct? | 19      this particular study, less than half of those who |
| 20  A.  Correct.  Right.  Yes.  Well, actually, yes.  It | 20      did have arrests, would have convictions, correct? |
| 21      doesn't -- it -- it doesn't do that because it | 21  A.  Correct. |
| 22      includes all of them, right?  Like of the 800 and | 22  Q.  You mentioned that your data set has the dates in |
| 23      all these sorts of -- it includes those that some | 23      it, correct?  The dates of conviction? |
| 24      were, you know, convicted and some were not prior | 24  A.  Correct. |
| 25      to that.  So we -- we do have that -- yeah, it's | 25  Q.  And you have the dates of the SAKs? |
| Page 193 | Page 194 |

| | |
|---|---|
| 1   A.  Correct.  And the dates of arrest. | 1              (At 1:47 p.m., Exhibit 14 marked.) |
| 2   Q.  And the dates of arrest.  Okay. | 2   BY MS. AUKERMAN: |
| 3              So you could have looked at how many -- | 3   Q.  This is another article of yours on -- maybe this |
| 4       you could have looked at how many people were | 4       is the wrong one.  This is not it. |
| 5       offending after conviction, correct? | 5              Okay.  This is an article you wrote on |
| 6   A.  We do -- I mean, I have a paper under review that | 6       the bureaucratic burden of identifying and |
| 7       does -- that is that. | 7       remaining your rapist.  And this was also based on |
| 8   Q.  But that's not -- | 8       SAK kits, correct? |
| 9   A.  Correct.  That's not -- | 9   A.  Correct. |
| 10  Q.  -- included in your report, correct? | 10  Q.  And here you write on page 547, [as read], "Our |
| 11  A.  Right. | 11      findings cannot be generalized to all sexual |
| 12  Q.  Okay. | 12      assaults with kits or all jurisdictions. |
| 13              Okay.  I want to go down to the | 13      Additionally, our samples comprised of sexual |
| 14      limitation section of your -- let's see, this is | 14      assaults disproportionately committed by strangers |
| 15      the offending history article again.  We're on | 15      and/or very casual acquaintances, and almost |
| 16      Exhibit 5.  You write that, [as read], "our | 16      two-thirds of the sexual assaults in the sample |
| 17      findings cannot be generalized to all suspected | 17      occurred between 1993 and 1999, (72.8 percent), |
| 18      sexual offenders connected to SAKs or all sexual | 18      which reflects the prioritization of cases based |
| 19      offenders (whether suspected or convicted sexual | 19      on the state's then 20 year olds" -- "20-year |
| 20      offenders)." | 20      statute of limitations.  Therefore, these data |
| 21              Is that still correct? | 21      cannot be generalized to current practice." |
| 22  A.  Correct. | 22              And then you note that they're also |
| 23  Q.  Okay.  And then let me show you, this is -- | 23      derived from official police and prosecutor |
| 24              MS. AUKERMAN:  We'll mark this as Exhibit | 24      documentation, which may contain errors or fail to |
| 25      15. | 25      include essential details. |
| Page 195 | Page 196 |

49  (Pages 193 to 196)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1       Is that still accurate? | 1   BY MS. AUKERMAN: |

1              Is that still accurate?
2     **A.**  Correct.
3     **Q.**  So you'd agree that you cannot generalize from the
4         SAK data about -- the SAK data that you describe
5         in your report to all people who commit sexual
6         offenses in any jurisdiction?
7     **A.**  Correct.
8     **Q.**  All right. Let's look at the walking and waiting
9         article again. This is Exhibit 6, I believe.
10            MS. TILLMAN: I think you're sharing the
11        wrong --
12            MS. AUKERMAN: Oh, sorry, I think I am.
13    BY MS. AUKERMAN:
14    **Q.**  Are you seeing that now?
15    **A.**  No, I think you're sharing your chat.
16    **Q.**  Oh, sorry. I don't mean to be doing that.
17            All right. Let's -- I don't even know
18        what chat I just shared. That's --
19    **A.**  It didn't seem anything...
20    **Q.**  Okay. Good.
21            MR. DAMICH: There was nothing good in
22        there, Miriam. Yeah, nothing good.
23            THE WITNESS: There was -- yeah.
24            MS. AUKERMAN: I'm, like, what did I just
25        share?

Page 197

1     BY MS. AUKERMAN:
2     **Q.**  Okay. Let's try this again. I think I'm sharing
3         the correct thing. So this I believe is the
4         walking and waiting article. Let's just check
5         here. Yeah. Okay.
6             And so we're going to again look at the
7         limitation section of that study. In there, you
8         write that the -- [as read], "Our data are also
9         disproportionately comprised of sexual assaults
10        committed by strangers (42 percent) compared to
11        national estimates that strangers commit
12        approximately 15 percent of sexual assaults,"
13        correct?
14    **A.**  Yeah. Although, I would say, like, the national
15        estimates are based on -- just based on
16        victimization, not reported. So reported rapes
17        are higher than -- than just prevalence rates. So
18        that 15 percent means those that are reported and
19        not reported. The numbers are a little bit closer
20        when you look at actual reported rapes.
21    **Q.**  Right. But this --
22    **A.**  Just to clarify, yeah --
23    **Q.**  People are more likely to report a stranger rape,
24        correct?
25    **A.**  Correct. Correct.

Page 198

1     **Q.**  And so in terms of the total actual sexual
2         offending that happens, strangers are
3         disproportionately included in -- stranger rapes
4         are disproportionately included in the SAK data?
5     **A.**  Correct.
6     **Q.**  Okay. Are you aware that a -- whether or not
7         someone has a stranger as a victim, is -- makes
8         that person higher risk?
9     **A.**  So I do know it's on many risk assessments. But
10        in our data, we talk a lot about crossover
11        offending. Meaning --
12    **Q.**  But -- but risk assessment --
13    **A.**  -- like --
14    **Q.**  Yeah.
15    **A.**  Right. But, like, part -- I'm explaining that
16        part of the issues with what we are -- part of
17        it -- not specifically around risk assessments.
18        But that part of the issue is that we know more
19        about stranger -- we don't know who they are but
20        we know more about stranger rapes. Because these
21        kits weren't tested with those that were
22        associated with people they did know, you
23        couldn't -- and because DNA wasn't connecting
24        them. Once you have DNA connecting them, you can
25        see that stranger rapes -- that people who rape

Page 199

1         people they know often rape people they don't know
2         as well. So that it's not --
3     **Q.**  But --
4     **A.**  So the research would suggest it's not as good of
5         a predictor as this -- it has traditionally been
6         used because there were all these undetected rapes
7         that we didn't know about.
8     **Q.**  Right. So there's undetected offending that
9         occurs both by people who have been convicted and
10        people who haven't been convicted, right?
11    **A.**  Correct.
12    **Q.**  And so what you're saying is that we can get --
13        this data is giving us some better information,
14        but you're aware that whether or not someone has a
15        victim who's a stranger is used in risk assessment
16        tools currently to identify people as higher risk?
17    **A.**  Correct.
18    **Q.**  Okay. And then you mention that the data's
19        derived from official police and prosecutorial
20        sources, and is based on information provided
21        indirectly by victims, correct?
22    **A.**  Correct.
23    **Q.**  Okay. And did you look at all at the defendants
24        accounts of what happened?
25    **A.**  So few of these cases were actually -- so we did

Page 200

50 (Pages 197 to 200)

Lovell, Rachel
5/19/2023

|  |  |
|---|---|
| 1  and we do have that whenever there is some mention | 1  in paragraph 9(e) -- let's see. You summarize and |
| 2  of an interview with a suspect. We have | 2  say that these estimates 35.7 percent for Wayne |
| 3  information coded in our database on that. We | 3  County to 39 percent for Cuyahoga County should be |
| 4  haven't published anything specifically related to | 4  considered the lowest reasonable estimates of |
| 5  that. I've read a bunch of those case files and, | 5  repeat sexual assault. Okay. Do you still agree |
| 6  you know, suspects, you know, "It wasn't me. I've | 6  with that statement? |
| 7  had sex with thousands of women." Like the -- | 7  A. Yeah. Yeah. |
| 8  there's only a handful usually of responses back | 8  Q. Okay. Now we talked earlier about the importance |
| 9  to -- to those. | 9  when talking about re-offending and recidivism of |
| 10  Q. Right. So it's fair to say that victims and | 10  identifying the population under observation, |
| 11  defendants often have different accounts of what | 11  correct? |
| 12  happened, right? | 12  A. Correct. |
| 13  A. Right. Right. Yes. | 13  Q. Did you limit your statement here to the |
| 14  Q. Right. | 14  population under observation? |
| 15  A. So, yeah. | 15  A. Observation of those that sexually assault. |
| 16  Q. So it's up to the judge or jury to determine, you | 16  Q. So when you give this estimate, you're referring |
| 17  know, whether or not the defendant's account is | 17  only to sexual assault offenders? |
| 18  correct or whether or not the victim's account is | 18  A. Yeah, because... |
| 19  correct? | 19  Q. Is that correct? |
| 20  A. Correct. | 20  A. Yes. Correct. |
| 21  Q. Okay. | 21  Q. Okay. Sorry, I didn't hear you respond. |
| 22  A. But I'm saying we do have that data. | 22  A. Oh. |
| 23  Q. But it's not part of the -- | 23  Q. So this statement is, these estimates are |
| 24  A. Right, it's not part of the -- | 24  limited to sexual assault offenders? |
| 25  Q. Okay. Let's go back and look at your report. So | 25  A. Yeah, to sexual assault -- |
| Page 201 | Page 202 |

|  |  |
|---|---|
| 1  Q. Okay. And so you're not attempting to extrapolate | 1  hospital, likely to have DNA, and likely to have |
| 2  to repeat offending for all types of sexual | 2  evidence collected through a SAK? |
| 3  offenses? | 3  A. Correct. That's why the -- that's why we say the |
| 4  A. No. | 4  actual number is much higher. Because if you're |
| 5  Q. Okay. And we talked earlier about the importance | 5  limiting it to just those cases, the number that |
| 6  when talking about re-offending and recidivism, | 6  exists, that sort of dark figure is much higher. |
| 7  about talking about how it's known and measured. | 7  Q. Right. But the research sample you were looking |
| 8  When you talk about repeat sexual assault here, | 8  at is the sample I just described to you, correct? |
| 9  you're not talking about committing a new offense | 9  A. Right, but I think you're going backwards in terms |
| 10  whether detected or undetected after conviction, | 10  of how it can be generalized. If you're putting |
| 11  correct? | 11  all these limitations on the extent to which, |
| 12      MR. DAMICH: Object to the form. | 12  right, like, I say in the sentence above, only 40 |
| 13      THE WITNESS: I would include all of | 13  percent had -- you know, 60 percent had the |
| 14  that. So I would include those that had prior, | 14  opportunity to hit. So once you add those in, it |
| 15  later, whatever. Just, you know, how often are | 15  actually -- the numbers then are higher than they |
| 16  they committing sexual assault more than once. | 16  are lower. |
| 17  BY MS. AUKERMAN: | 17  Q. You're talking about the fact that there is |
| 18  Q. Right. So it's sexual assault more than once | 18  offending that happens that is not going to be |
| 19  regardless of when or whether they were convicted? | 19  detected by the SAK kits, correct? |
| 20  A. Correct. | 20  A. Correct. |
| 21  Q. So is it fair to say that these estimates are | 21  Q. Okay. But that's a different question than |
| 22  based on research involving people who commit | 22  whether the SAK -- the research on the SAK kits |
| 23  rapes or sexual assaults that are likely to be | 23  measures all of that offending or whether it's |
| 24  reported -- likely to be reported within a 72 to | 24  based on the sample that you have, correct? |
| 25  96-hour window, likely to lead people to go to the | 25  A. Can you rephrase that? |
| Page 203 | Page 204 |

51 (Pages 201 to 204)

Lovell, Rachel
5/19/2023

```
 1    Q.   So the sample -- the research that you have done
 2         on SAKs is obviously based on the sample that you
 3         pull, correct?
 4    A.   Correct.
 5    Q.   Okay.  And so in terms of your projections,
 6         they're based on that sample, correct?
 7              MR. DAMICH:  Object to form.
 8              THE WITNESS:  So what -- no, I -- so if
 9         you're saying that if we can find 40 percent of
10         someone who we know has been connected to a rape
11         or a kit, even under all these conditions.
12         Then -- then what we're saying is if we -- if we
13         can connect 40 percent to what we know here, then
14         the -- and what we know about all these other
15         things means the -- the number is much higher.
16         This is a concern --
17    BY MS. AUKERMAN:
18    Q.   You're saying potentially for the type of people
19         who are involved in your research, the numbers
20         could be higher?
21    A.   For sexual assault offenders, yes.
22    Q.   Okay.  Have other scholars outside of your team
23         analyzed the data set that you're working with?
24    A.   It's not public.
25    Q.   Okay.  So no other scholars have replicated your
```

Page 205

```
 1         results?
 2    A.   No.
 3    Q.   We talked before about the Wayne County research
 4         as being the only others that have peer-reviewed
 5         research around these issues.  That's all -- and
 6         that's also based on the SAKs, correct?
 7    A.   Correct.
 8    Q.   And that also doesn't distinguish between people
 9         who committed offenses after conviction and those
10         who committed more than one offense regardless of
11         conviction?
12    A.   It's not a recidivism study.
13    Q.   Let me share my screen again.  So this is the
14         Campbell study, and it talks about the comparison
15         to your research.  And then it says --
16    A.   Is this the Connecting the Dots one?
17    Q.   This is Connecting the Dots.
18    A.   Okay.
19    Q.   Yeah.  Sorry.  So this is Exhibit --
20    A.   She's published a lot of -- they publish a lot of
21         things too, so just making sure.
22    Q.   Okay.  Yeah.  It's the one that's cited in your
23         article.  And it talks about how her rates are
24         different from the rates that you found.  And then
25         she writes, [as read], "There are key
```

Page 206

```
 1         setting-level (e.g., city) and methodological
 2         (e.g., sampling) variations between these studies,
 3         and future research is needed to clarify how these
 4         differences affect documented rates of suspected
 5         serial sexual perpetration."
 6              Would you agree with that?
 7    A.   Yes.  That -- yeah.
 8    Q.   Okay.  I want to go back to paragraph 5(a) of your
 9         report.  I'm going to share my screen again.
10              You talk about the high rates of sexual
11         victimization in the United States.  And you sort
12         of say there's kind of two possible bases for
13         that.
14    A.   Simplistically, yes.
15    Q.   Simplistically, right.  One's a sizable portion of
16         the population, mostly male are sexual offenders
17         or that repeat sexual offending is common, right?
18         What do you consider a sizable portion of the
19         population?
20    A.   Well, I think if you're taking it at its base
21         level, what you would say is if -- if offenders
22         are only committing once and one -- who are almost
23         all male or just, you know, 90 to 98 percent male
24         depending on how you're measuring it -- then if
25         you're saying if -- if the male population who
```

Page 207

```
 1         rape -- only rape one person ever in their life,
 2         then a fifth of the male population are rapists.
 3         Right.
 4    Q.   So 25 percent?  Or 20 percent --
 5    A.   No, 20 percent.  Yeah.  What did I say?  25 are
 6         rapists.  If that's its most basic form, which the
 7         data -- most data don't really seem to suggest
 8         that one in five men are rapists.  Instead, the
 9         preponderance of evidence really suggests that
10         repeat sexual offending is more common.
11              That there's a small proportion that
12         commit a lot of crime.  That's also a basic
13         chronological principle, that a small portion of
14         individuals commit the most number of crimes,
15         disproportionate number of crimes.  You could
16         also -- it's also by space and other sorts of
17         things.
18              So that's the sort of argument that you
19         can't have this be really common in society and
20         also say, you know, like, we don't think -- we
21         think, you know -- you know, they're only doing it
22         one every -- you know -- you know, one out of
23         every five men are rapists.
24    Q.   So I wanted to ask about that because you
25         mentioned that you published a monograph, edited
```

Page 208

52 (Pages 205 to 208)

Lovell, Rachel
5/19/2023

1   volume, and I was looking at the chapter in that.
2   I don't have that to pull up because I have the
3   actual book here.  You get another royalty for
4   that.
5  A.  Yeah, I'm glad you bought the book.  That's good.
6   I'll get that point one cent maybe later in life
7   or whatever the portion is.  It's not much.
8  Q.  Yeah.  So on page 110, you report about a study
9   that found that 35 percent of males reported some
10   likelihood of committing a sexual assault if given
11   the opportunity without being caught, correct?
12  A.  Right.
13  Q.  So that's a sizable portion of the population;
14   wouldn't you agree?
15  A.  I disagree.  Well, I agree but not what you're
16   saying.  So I agree that it's a sizable portion of
17   the population but what that article is what's
18   called -- what that article is motivation to
19   offend.  So not offending.  So that study says
20   that --
21  Q.  All right.  Hold on just a second.
22       (From 2:08 p.m. to 2:09 p.m., off the
23       record.)
24  BY MS. AUKERMAN:
25  Q.  I'm sorry, can you say that again?  Something

Page 209

1   was -- my computer was acting strange.
2  A.  So that article -- and it's sort of a seminal
3   study, is that there's a motivated group of
4   offenders, not offenders who actually act.  But
5   the one in five would be people who -- one in five
6   women means somebody acted on them.  Like it was
7   an actual commitment.  And we know that people
8   would commit a lot more crimes if they didn't get
9   caught.  So the -- the idea of, like, motivated
10   offenders versus actually those that -- that
11   complete the motive -- you know, who actually act
12   on their motivation are different.
13  Q.  All right.  But that article says that -- I mean,
14   you know, you report that there's 35 percent of
15   males would commit an offense --
16  A.  Right.  They said it would be -- if they wouldn't
17   get caught, they would be motivated to do it but
18   not necessarily, "I have raped."
19  Q.  Okay.  So do you recall giving a presentation to
20   the Ohio Alliance to end sexual violence in
21   October of 2022?
22  A.  2022?  Is that the one on victim blaming?
23  Q.  Yeah, it's on victim blaming.
24  A.  Yes.
25  Q.  Okay.  So let me see if I can do this without --

Page 210

1   let me see if I can share my screen here.  I want
2   to play you a clip from that.  And this is you
3   speaking at that event.
4       (From 2:11 p.m. to 2:11 p.m., off the
5       record.)
6  Q.  It's minute 42:56 is where I'm trying to start.
7   Okay.  Let's try that again.  Do you still agree
8   with that statement that you made to the Ohio
9   Alliance to end sexual violence?
10  A.  I -- I couldn't hear any audio that went with it.
11       MR. DAMICH:  Yeah, there was no audio.
12       MS. AUKERMAN:  You couldn't hear the
13   audio?
14       THE WITNESS:  Uh-uh.
15       MS. AUKERMAN:  Oh.  I wish someone had
16   told me that.
17       THE WITNESS:  I -- I thought you were
18   trying to find the -- the --
19       MS. AUKERMAN:  No.  Sorry.  All right.  I
20   wonder why you can't hear the audio.
21       (From 2:14 p.m. to 2:15 p.m. off the
22       record.)
23       MS. AUKERMAN:  Here we go.
24       (Video playing.)
25       VOICE OF MS. LOVELL:  There's also a way

Page 211

1   that people talk about rapists as being sort of
2   monsters, the mentally ill, sickos, not normal
3   people.  Whenever we know that -- in fact, about
4   30 percent of college-age men have perpetrated
5   some form of sexual violence by the time they --
6   you know, in college or prior to college.  So by
7   the time they reach college, about a third of men
8   have perpetrated -- college men have perpetrated
9   some form of sexual violence.
10       So in fact, it's not just the sickos,
11   it's not just the monsters.  While they may be
12   that, what actually ends up happening when you
13   describe it as sort of a Netflix documentary sort
14   of thing, is that then when confronted with
15   knowing a perpetrator, you couldn't -- then they
16   think, "Oh, that couldn't possibly be my son, my
17   friend, my colleague, my friend," those sorts of
18   things.
19       And we saw that a lot within Me Too as
20   terms of, "Oh, he's a good guy, he couldn't have
21   possibly done that."  But when you describe that
22   sort of mythology of a rapist, you're doing a
23   disservice to victims as well.
24       (End of video.)
25  BY MS. AUKERMAN:

Page 212

53 (Pages 209 to 212)

Lovell, Rachel
5/19/2023

---

1  Q.  Okay.  So do you still agree with your statement
2      in that presentation that about one-third of
3      college men have perpetrated some form of sexual
4      violence?
5  A.  Yes, but that also coincides and doesn't
6      contradict the -- the one -- the -- study that
7      I had about the one in five women and the
8      propensity to do those things because I
9      specifically used the term sexual violence and not
10     rape.  The one in five is rape, the -- when you
11     have the broadest category of sexual violence,
12     which includes a whole variety of acts, you get
13     about a third.  But this study I cited used the
14     term specifically "rape."
15 Q.  So one in three college -- about one in three
16     college men have perpetrated some form of sexual
17     violence?
18 A.  Right, in the broadest category that the -- in
19     that study if you look at the national prevalence
20     estimates of that.  Of the broadest category of
21     the term, sexual violence, yes.  If you use rape,
22     no.
23 Q.  Okay.  And then would you still agree with your
24     statement that focusing on the mythology of
25     rapists does a disservice to victims?

Page 213

---

1  A.  Yes.  I think when you try to make them seem like
2      a Netflix documentary of then -- when confronted
3      with a sexual perpetrator, they have a hard time,
4      you know, believing that -- you know, and
5      processing.  Or if it's by somebody that they know
6      or love, "he's not a monster, how could he do
7      this?  He's not Ted Bundy."  So and so.  So that
8      presentation -- but that presentation was for
9      reporters.  So --
10 Q.  Right.  I understand.
11 A.  -- it was in the context of writing how reporters
12     write and talk about.
13 Q.  Right.
14 A.  That's why I brought in the sort of Netflix and
15     documentary component.
16 Q.  Right.  But we want to have an accurate picture of
17     sexual offending and focusing on the sort of -- I
18     think you talk about in that, the dark and stormy
19     night, the scary person jumping out of the bushes,
20     that that's not representative of sexual
21     offending, correct?  And that we need to be
22     looking at the fact that a lot of violence happens
23     with people that we know and those kinds of
24     things, correct?
25 A.  Yeah.

Page 214

---

1  Q.  And so we don't want to mythologize or create
2      these monsters when a lot of sexual offending is
3      happening outside of that context, correct?
4  A.  Correct.
5  Q.  Okay.  So I want to look at your report again.
6      And in 9(b)(ii) on the second bullet, you give a
7      couple of examples of people in your sample,
8      right?
9  A.  Yeah.
10 Q.  And you say that one of these offenders is a
11     former probation officer.  And then you describe a
12     pretty horrific series of rapes by that person.
13 A.  Correct.
14 Q.  Would you say that probation officer is a monster?
15 A.  I wouldn't want to live next to that person.
16 Q.  Okay.  But he's the kind of person that you're
17     talking about when you say focusing on monsters?
18 A.  I -- I would say -- but he was a probation officer
19     and went -- and many of his victims actually
20     described him at first as being, you know, very
21     charismatic and nice.  So actually I think that
22     actually further serves the point of, like, if we
23     only think that they're, like, terrible monsters
24     and we don't often think that they are hiding in
25     plain sight and that they have normal jobs and all

Page 215

---

1      these sorts of things.  Like he wasn't suspected
2      for a long time connected to these rapes because
3      he didn't come across as a monster.
4  Q.  You did an article specifically about him,
5      correct?
6  A.  Correct.
7          (At 2:20 p.m., Exhibit 15 marked.)
8  BY MS. AUKERMAN:
9  Q.  And let me know if you need me to share my screen
10     on this.  And that's the Understanding the
11     Geography of Rape article, correct?
12 A.  Correct.
13 Q.  And in that article, you write this case is
14     certainly an outlier, correct?
15 A.  Certainly.  It's the most number of kids in
16     Cuyahoga County that that person is connected to.
17 Q.  So it's not representative of the sample?
18 A.  No.
19 Q.  Even though the sample itself is very
20     criminogenic?
21 A.  Correct.  That article says -- it's a case study.
22 Q.  Okay.
23         Okay.  Then going back to paragraph 11 of
24     your report.  You say that, [as read], "Sexual
25     assault offenders frequently commit other types of

Page 216

---

54 (Pages 213 to 216)

Lovell, Rachel
5/19/2023

1    crimes (general offending) in addition to sexual
2    assault offenses (sexual assault offending)."
3    Okay.
4         So we're talking again here about
5    specifically sexual assault offenders, correct?
6    A.  Correct.
7    Q.  And not anyone convicted of a sex crime, correct?
8    A.  Right.
9    Q.  Okay.  And then in 11(c), you say that general
10   recidivism rates for those convicted of sexually
11   related crimes are lower than those convicted of
12   non-sexually related crimes."
13        Is that statement still correct?
14   A.  That's correct, if you're looking at recidivism.
15   Q.  Right.  We're looking just at recidivism.  So when
16   we're looking just at recidivism, people who
17   commit sexual offenses are less likely to commit
18   non-sexual offenses than other people with a
19   criminal history?
20   A.  I would say those that have been caught and
21   convicted and --
22   Q.  Yeah.
23   A.  -- they get out, yes.
24   Q.  Okay.  And then in paragraph 12, you talk about
25   the research that you did on undetected sexual

Page 217

1    assault offenders, correct?
2    A.  Correct.
3    Q.  This is the Exhibit 5 offending histories article.
4    And you describe the study as, "Examining the
5    offending behaviors of a large number of
6    undetected sexual assault offenders (those not
7    previously arrested and/or convicted of the sexual
8    offenses associated with the kits)."  Correct?
9    A.  Correct.
10   Q.  So this is research about undetected offenders,
11   not people who have been convicted of sex offenses
12   and who are on registries, correct?
13   A.  Correct.
14   Q.  Okay.  And as we talked about before, you excluded
15   the SAKs for the -- that were associated with a
16   sexual offense where there was a prior conviction,
17   correct?
18   A.  Correct.
19   Q.  And so, again, this is not people -- this is not
20   research about people on registries?
21   A.  Correct.
22   Q.  Okay.  So paragraph 12(d), you say, [as read],
23   "The findings from this study suggest that sexual
24   offenders might have general recidivism that more
25   closely matches the rates for those convicted of

Page 218

1    non-sexually related crimes.  They have yet to be
2    identified as sexual offenders due to
3    underreporting and attrition in the criminal
4    sexual" -- "criminal justice system."  Correct?
5    A.  Correct.
6    Q.  And so here you're also looking at people who are,
7    quote, "yet to be identified as sexual offenders."
8    In other words, not people with convictions for
9    sex offenses, correct?
10   A.  Correct.
11   Q.  Okay.  Again, we're not talking about registrants,
12   correct?
13   A.  Correct.
14   Q.  And when we are talking about sexual offenders
15   here, do you mean sexual assault offenders from
16   SAK kits?
17   A.  No, I'm -- I'm talking about in reference to the
18   11(c).  So if we're talking about those that have
19   been convicted of a sexually related offense and
20   here's all these sexual assaults that aren't in
21   their criminal history because the system doesn't
22   address them, then it's that -- it's -- it's so
23   rare to get a conviction for rape.  That if you're
24   just looking at those that have been convicted of
25   rape and then following them along, you're not

Page 219

1    capturing a whole bunch of their other offenses.
2    Because they haven't been identified as being a
3    sexual offender yet.  So you can't really say that
4    sexual offenders have -- you can't say sexual
5    offenders have lower -- general recid -- lower
6    rates than others if you're just using the term
7    "recidivism" to do it.  If you're just looking at
8    those that have --
9    Q.  Right.  I'm asking you a different question --
10   A.  Okay.
11   Q.  What I'm trying to understand is when you talk
12   about sexual offenders here, right?  When you say
13   that sexual offenders might have general
14   recidivism, and you're talking about sexual
15   offenders.
16   A.  Right.
17   Q.  Do you mean sexual assault offenders as identified
18   by the SAK kits?
19   A.  Not -- not necessarily as identified by the SAK
20   kits but those of sexual assault offenders.
21   Q.  This research was based on SAK kits, correct?
22   A.  Correct.
23   Q.  Okay.  And the SAK kits were about sexual
24   assault --
25   A.  Correct.

Page 220

55 (Pages 217 to 220)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1   Q.  All right.  And so the people in your sample are | 1   Q.  So what you're saying is that undetected -- |
| 2        people who had a sexual assault that resulted in a | 2        undetected sexual -- undetected sexual assault |
| 3        SAK kit, correct? | 3        offenders may have general recidivism rates that |
| 4   A.  Correct. | 4        are higher than is generally believed? |
| 5   Q.  So when you say sexual offenders, that's the | 5   A.  Right. |
| 6        people you mean? | 6   Q.  Okay.  That's what I wanted to clarify. |
| 7   A.  I am not -- I don't -- I think that you're | 7   A.  General recidivism, right. |
| 8        misinterpreting how you might interpret science | 8   Q.  Okay.  So let's talk a little bit about |
| 9        that way.  So there's no science that says we are | 9        victimization rates.  And is it fair to say that |
| 10       going to do studies and only in this one thing, | 10       in measuring victimization -- I mean, we talked |
| 11       we're never going to try to do a larger assessment | 11       about how many people don't report.  So is it fair |
| 12       of what the -- the whole cadre of science would | 12       to say that in measuring victimization, |
| 13       tell us.  This research, coupled with all the | 13       researchers often use surveys as a way to get |
| 14       other research, suggests because we're not | 14       information on victimizations that are not |
| 15       detecting sexual assault offenders; that the fact | 15       reported to the police, and not -- therefore, not |
| 16       that they have lower general recidivism rates just | 16       captured in criminal justice data? |
| 17       means they haven't been detected for the sexual | 17   A.  Correct. |
| 18       offense that they are -- probably are doing that. | 18          MR. DAMICH:  Objection to form and |
| 19           And once we did look at those that were | 19       foundation. |
| 20       not detected, guess what, they have a whole bunch | 20   BY MS. AUKERMAN: |
| 21       of other violent -- violent acts that they | 21   Q.  Okay.  And is it fair to say that when you use a |
| 22       weren't -- that they were connected to the violent | 22       survey, the results can be impacted by the |
| 23       acts.  But they weren't identified as rapists or | 23       questions you ask? |
| 24       sexual assault offenders because the system -- | 24   A.  Correct. |
| 25       because of -- of that.  The issue -- | 25   Q.  And how you ask the questions?  Like whether it's |
| Page 221 | Page 222 |
| 1       in person versus online? | 1   A.  They -- yes, so they do multiple ones.  It's by |
| 2   A.  Correct. | 2        household.  The unit of analysis is a household, |
| 3   Q.  To whom you ask the question? | 3        not an individual.  And then they study them for a |
| 4   A.  Correct. | 4        couple of -- a period of time.  And yeah, it's a |
| 5   Q.  The size of the sample? | 5        nationally representative stratified sample. |
| 6   A.  Correct. | 6   Q.  Okay.  And they have a very high response rate, |
| 7   Q.  How frequently you ask the question? | 7        correct? |
| 8   A.  It depends on the question, but yes. | 8   A.  Correct. |
| 9   Q.  And then the response rate? | 9   Q.  It's, like, 78 percent, something like that? |
| 10   A.  Yes. | 10   A.  I couldn't exactly speak but it's a -- it's a good |
| 11   Q.  Okay.  And we talked before about the Bureau of | 11       response rate. |
| 12       Justice Statistics National Crime Victimization | 12          (At 2:30 p.m., Exhibit 16 marked.) |
| 13       survey, which I think you described as the gold | 13   BY MS. AUKERMAN: |
| 14       standard for the -- | 14   Q.  Okay.  So let's look at their victimization |
| 15   A.  It's one of the gold standards. | 15       survey.  Okay.  So I'm showing you here, this is |
| 16   Q.  Okay.  And they do an annual victimization survey, | 16       from -- this is the BJS Criminal Victimization, |
| 17       correct? | 17       2021.  And when we scroll down to Table 14, let me |
| 18   A.  I don't think it's annual.  I think it's every | 18       see if I'm understanding this correctly.  It looks |
| 19       couple years, but I could be wrong. | 19       like their annual victimization rate in 2021 for |
| 20   Q.  Okay.  And do you -- they have a large | 20       rape and sexual assault is point 07 percent.  Am I |
| 21       geographically stratified national random sample? | 21       reading that correctly? |
| 22   A.  Correct. | 22   A.  Can you -- point 07, there -- "number of |
| 23   Q.  Okay.  And do you know, they do in person | 23       victims" -- "number and percent of persons who are |
| 24       interviews with multiple six-month follow-ups?  If | 24       victims." |
| 25       you know. | 25          In that -- but is it by a time period? |
| Page 223 | Page 224 |

56 (Pages 221 to 224)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1     Like are we looking at -- we're not looking at<br>2     lifetime, right? We're, like, within the last six<br>3     months or --<br>4  Q.  It looks like it's by year. It looks like 2017,<br>5     2018, 2019, 2020. So we're not doing lifetime.<br>6     We're talking about annual --<br>7  A.  Okay.<br>8  Q.  If I understand it.<br>9  A.  Okay. So, yeah, by -- by rates, it looks like.<br>10    And then they have a very specific definition of<br>11    rape and sexual assault.<br>12  Q.  Okay. So based on their definition of rape and<br>13    sexual assault, they show an annual victimization<br>14    rate in 2021 of point 07 percent, correct?<br>15  A.  Yes, each year that proportion of people<br>16    experience a rape or a sexual assault.<br>17  Q.  And that wasn't data that was included in your<br>18    report, correct?<br>19  A.  No.<br>20  Q.  Okay. And your report relied on the National<br>21    Intimate Partner and Sexual Violence survey.<br>22  A.  Correct.<br>23  Q.  Which is I believe done by the Center for Disease<br>24    Control and Prevention, correct?<br>25  A.  Correct.<br><br>Page 225 | 1     MS. AUKERMAN: And let me flip to that.<br>2    Let's make this Exhibit 17.<br>3     (At 2:32 p.m., Exhibit 17 marked.)<br>4  BY MS. AUKERMAN:<br>5  Q.  Okay. Now the questions asked by the CDC are<br>6    different from those asked by the Bureau of<br>7    Justice Statistics, correct?<br>8  A.  Correct.<br>9  Q.  And you talked about the importance of defining<br>10    rape and sexual assault. Do you know if the BJS<br>11    and the National Intimate Partner and Sexual<br>12    Violence survey define those terms differently?<br>13     MR. DAMICH: Objection. Form and<br>14    foundation.<br>15     THE WITNESS: This survey is just for<br>16    intimate partner and sexual violence survey. The<br>17    NCVS is, you know, as you saw, like a bunch of<br>18    different types of crime. They're very different<br>19    types of surveys. So they have different<br>20    definitions. The other one is just rape and<br>21    sexual assault, and this one as -- as I was<br>22    mentioning, has a bunch of different types of<br>23    sexual victimizations.<br>24  Q.  Okay. And are the -- so the survey instruments<br>25    are different, correct?<br><br>Page 226 |
| 1  A.  Correct.<br>2  Q.  And then the samples are different, correct?<br>3  A.  Correct.<br>4  Q.  And is the National Intimate Partner and Sexual<br>5    Violence survey about a tenth of the size of the<br>6    BJS sample?<br>7  A.  I don't -- I couldn't answer that.<br>8  Q.  Do you know if the response rates for the National<br>9    Intimate Partner and Sexual Violence survey is<br>10    lower than for the BJS survey?<br>11     MR. DAMICH: Objection. Form and<br>12    foundation.<br>13     THE WITNESS: I don't know what the<br>14    response rate is.<br>15  BY MS. AUKERMAN:<br>16  Q.  Okay.<br>17  A.  I mean, I -- yeah, I'm sure it's in the report in<br>18    the methodology, but I don't know.<br>19  Q.  But in your report, you talk about lifetime<br>20    prevalence, right? And that's obviously a<br>21    different measure than annual victimization?<br>22  A.  Correct.<br>23  Q.  Okay. So on page 18 here of the National Intimate<br>24    Partner and Sexual Violence survey, it looks<br>25    like -- oops. It looks like that's where you were<br><br>Page 227 | 1    drawing your data from.<br>2  A.  Correct.<br>3  Q.  And --<br>4  A.  This is the most commonly cited one in the sexual<br>5    assault, sexual violence field.<br>6  Q.  Okay. And that's the one that says there's one in<br>7    five lifetime experience --<br>8  A.  Correct.<br>9  Q.  -- of rape?<br>10     Okay. And then it gives a rate of 1.2<br>11    percent for rape in the preceding 12 months,<br>12    correct?<br>13  A.  Correct.<br>14  Q.  Okay. So is it accurate to say that there's one<br>15    survey conducted by the Bureau of Justice<br>16    Statistics that shows a one year rate of point 07<br>17    percent. And then you have a different survey<br>18    that shows a one year rate of 1.2 percent,<br>19    correct?<br>20  A.  Can you see if the one point -- the 1.2 might have<br>21    different definitions. But...<br>22  Q.  I don't know if --<br>23  A.  So this is one is rape or attempted rape, and the<br>24    other one -- I bet they're similar. But yeah,<br>25    they -- they have, like, different samples. So --<br><br>Page 228 |

57 (Pages 225 to 228)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1   so -- | 1   talking about a very small base rate because |
| 2   Q.  So I guess what I'm getting at -- | 2   that's what you will get.  If something is really |
| 3   A.  Yeah. | 3   rare, very small, a percent change isn't the |
| 4   Q.  Yeah, you have two different surveys.  They're | 4   statistic you would use. |
| 5       both reporting on sexual victimization but they're | 5   Q.  Okay.  But is it fair to say that those rates are |
| 6       reporting on somewhat different aspects of it, | 6       different? |
| 7       correct? | 7   A.  Yes. |
| 8   A.  Yeah. | 8   Q.  Okay. |
| 9   Q.  Okay.  And so the Bureau of Justice Statistics has | 9   A.  But I would say within -- but they're both pretty |
| 10      a one year rate of point 07 percent, correct? | 10      close actually in terms of measuring something as |
| 11  A.  Yeah. | 11      difficult as -- as sexual violence is. |
| 12  Q.  And -- | 12  Q.  So you think 1.2 percent and -- |
| 13  A.  For how you define it, yeah.  For how you -- | 13  A.  Point 07 -- |
| 14  Q.  Right. | 14  Q.  -- point 07 -- |
| 15  A.  -- define it. | 15  A.  Yeah. |
| 16  Q.  And the CDC has a one year rate of 1.2 percent, | 16  Q.  -- percent are close -- |
| 17      correct? | 17  A.  Yes. |
| 18  A.  Correct. | 18  Q.  -- to one another? |
| 19  Q.  And it's always dangerous when you have lawyers do | 19  A.  Yes. |
| 20      math, but by my math, that came out to 1,614 | 20  Q.  Okay.  Is it fair to say that different |
| 21      percent higher for the BJS study than the CDC | 21      researchers using different methodologies and |
| 22      rate.  Does that sound right to you? | 22      different definitions will make different |
| 23  A.  I don't think that sounds right because you're | 23      estimates about the prevalence of sexual |
| 24      talking about very small base rates.  So you | 24      offending? |
| 25      shouldn't use a percent like that when you're | 25  A.  Yes. |
| Page 229 | Page 230 |
| 1   Q.  Okay.  Let's talk really briefly about paragraph | 1       study in criminology when you talk about cost of |
| 2       13 in your report where you talk about the cost of | 2       crime. |
| 3       rape.  And what you're describing here is the | 3   Q.  Okay.  And so that was based on 2010.  That was |
| 4       societal cost of the offense of rape, correct? | 4       published in 2010, correct? |
| 5   A.  Correct. | 5   A.  Correct, but my data is -- has been adjusted. |
| 6   Q.  You're not talking about the societal cost of | 6   Q.  Right.  Okay.  So -- |
| 7       other types of sexual offenses? | 7   A.  The costs have been adjusted for... |
| 8   A.  Correct.  Just rape. | 8   Q.  Yeah.  I don't believe that I saw anything in that |
| 9   Q.  Okay.  So the societal costs of a rape might be | 9       study that related to other types of sexual |
| 10      different than a societal cost of having an older | 10      offenses other than rape. |
| 11      teen engage in sexual touching with a younger teen | 11  A.  Okay. |
| 12      who's not old enough to consent, correct? | 12  Q.  And you're not aware of any calculations around |
| 13  A.  I don't know what those costs are.  The study has | 13      the societal cost of sexual offenses other than |
| 14      a whole list of those crimes.  So that study may | 14      rape? |
| 15      have those different types of sexual offense | 15  A.  No, just -- I've just... |
| 16      crimes in there.  I didn't -- I didn't -- since | 16  Q.  And your calculations are specific to rape? |
| 17      our SAK data is based on rapes, I pulled the rape | 17  A.  Correct. |
| 18      cost.  So I can't speak to what the other ones | 18  Q.  Okay.  You mentioned that you looked at some of |
| 19      are, only what I've published on, which is rape. | 19      the work of some of our experts.  Are you familiar |
| 20  Q.  You're talking about the McAllister study; -- | 20      more broadly with the work of Dr. Carl Hanson? |
| 21  A.  Correct. | 21  A.  Yes. |
| 22  Q.  -- is that correct? | 22  Q.  Okay.  And you cite his work in your report, |
| 23  A.  Yeah. | 23      correct? |
| 24  Q.  That's -- | 24  A.  Correct. |
| 25  A.  It's a -- it's a -- it's a very commonly cited | 25  Q.  Is it fair to say that his work is widely cited? |
| Page 231 | Page 232 |

58 (Pages 229 to 232)

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 | **A.** Yes. |
| 2 | **Q.** Okay. Is it fair to say that he's considered one |
| 3 | of the top authorities in the field? |
| 4 | **A.** That I don't know. |
| 5 | **Q.** Are you familiar with the work of Dr. Kelly Socia? |
| 6 | **A.** I was not before reading that. |
| 7 | **Q.** Are you familiar with the work of Dr. Elizabeth |
| 8 | Letourneau? |
| 9 | **A.** I was not. |
| 10 | **Q.** Okay. Are you familiar with the work of Dr. James |
| 11 | J. Prescott? |
| 12 | **A.** No. |
| 13 | **Q.** Are you familiar with the work of Dr. Kristen |
| 14 | Zgoba? |
| 15 | **A.** No. |
| 16 | **Q.** Okay. So for these last four experts that I |
| 17 | mentioned, Dr. Socia, and Dr. Letourneau, Dr. |
| 18 | Prescott, and Dr. Zgoba, is the reason that you're |
| 19 | not familiar with their work, that you're not |
| 20 | working in the same fields as they're working in? |
| 21 | **A.** Well, I don't know who the others are. The Socia |
| 22 | one I wasn't familiar with, so I looked up his CV. |
| 23 | He seems to have a wide variety of topics that he |
| 24 | does work on, not just sexual violence. |
| 25 | And the -- he has a couple older studies |

| | |
|---|---|
| 1 | it looked like on the sexual offender registry. |
| 2 | And they were specifically on the registry and |
| 3 | measuring aspects of the registry. So we would be |
| 4 | publishing in different -- different -- different |
| 5 | topics. |
| 6 | **Q.** So you're publishing in different areas than these |
| 7 | experts are publishing in; is that -- |
| 8 | **A.** Correct. |
| 9 | **Q.** -- fair to say? |
| 10 | **A.** I mean, Hanson less so in a general sense because |
| 11 | he has some of the stuff about recidivism and |
| 12 | Lussier and others who do work in recidivism. But |
| 13 | -- but I don't -- the research I do isn't on -- |
| 14 | the question isn't about recidivism or the |
| 15 | effectiveness of the -- the registry. Those are |
| 16 | different questions. |
| 17 | **Q.** I'm sorry, say that again. The research you do is |
| 18 | not on recidivism or the effectiveness of the |
| 19 | registry, correct? |
| 20 | **A.** Correct. |
| 21 | **Q.** Okay. So let's look -- I promise we're getting |
| 22 | close to done here. |
| 23 | Let's take a look at your CV. Let me |
| 24 | share my screen. |
| 25 | MS. AUKERMAN: So let's make this Exhibit |

| | |
|---|---|
| 1 | 18. |
| 2 | (At 2:42 p.m., Exhibit 18 marked.) |
| 3 | BY MS. AUKERMAN: |
| 4 | **Q.** Okay. This is your CV? |
| 5 | **A.** Yeah, it looks like as of September. |
| 6 | **Q.** Okay. Have there been any changes since then? |
| 7 | **A.** Yeah, there's always changes. |
| 8 | **Q.** Does it reflect your current experience that's |
| 9 | relevant to this litigation? |
| 10 | **A.** I mean, I -- I have -- you know, I continue to |
| 11 | publish and do research and get awards and grants |
| 12 | and things. So it's updated. But none of this is |
| 13 | wrong, I just have added more to it over time. |
| 14 | **Q.** Is there anything that you'd like to tell us about |
| 15 | that you've added that's not on here? |
| 16 | **A.** Since September, I've submitted a couple articles |
| 17 | for publication. But what you put on your CV... |
| 18 | **Q.** But they haven't been published, correct? |
| 19 | **A.** Correct. And I did submit an NIJ report that -- |
| 20 | for a final report since this. And I have maybe a |
| 21 | grant or two more but... |
| 22 | **Q.** Okay. So if you had to describe your professional |
| 23 | background in one word, would you describe |
| 24 | yourself as a victimologist? |
| 25 | **A.** I think that's one way but I -- that's certainly |

| | |
|---|---|
| 1 | not just one word. I -- I don't think I could |
| 2 | describe myself in just -- with -- that wouldn't |
| 3 | be all encompassing. |
| 4 | **Q.** Okay. So what else would you include? |
| 5 | **A.** I do work in applied research and program |
| 6 | evaluation. I do research on, you know, sexual |
| 7 | violence more generally, as well as other types of |
| 8 | more gender-based violence. But as you can see |
| 9 | over my career, I've studied and looked at -- you |
| 10 | know, like most -- like most academics, you know, |
| 11 | like, have changed a bit over time. I haven't |
| 12 | just had one area of study. |
| 13 | **Q.** I didn't read the articles in Polish. |
| 14 | **A.** I didn't actually either. My advisor translated |
| 15 | them for me. |
| 16 | **Q.** Okay. You're not trained as a psychologist, |
| 17 | correct? |
| 18 | **A.** I'm sorry? |
| 19 | **Q.** You're not trained as a psychologist, correct? |
| 20 | **A.** Correct. |
| 21 | **Q.** Okay. |
| 22 | **A.** No. Correct. |
| 23 | **Q.** What training do you have in empirical research? |
| 24 | **A.** So do you mean like -- like what do you mean by, |
| 25 | like, what classes have I taken, what have I |

59 (Pages 233 to 236)

Tri-County Court Reporters
248-608-9250

Lovell, Rachel
5/19/2023

| | |
|---|---|
| 1 published in, what -- like what specifically -- | 1 Q. Okay. So again, not in the context of sexual |
| 2 Q. Yeah, exactly. | 2 assault? |
| 3 A. I mean, I would define and have defined myself as | 3 A. Yeah. |
| 4 a -- one aspect of what I do is quantitative | 4 Q. Okay. In terms of statistics, there are a variety |
| 5 methodology, but I'm mixed method as well. I've | 5 of different fields within statistics, correct? |
| 6 done qualitative studies, quantitative studies, | 6 A. Correct. |
| 7 spatial studies. I -- I do a lot of work around | 7 Q. What would you describe those as? |
| 8 methodology. | 8 A. I would -- like can you give me a little bit more |
| 9    So that could be research methods, it | 9 of what you're looking for? |
| 10 could be program evaluations, statistics. I've | 10 Q. I guess, I'm trying to understand, I mean, my -- |
| 11 taken and have done a variety of quantitative | 11 I'm not a statistician at all, but my |
| 12 types of papers, and can do that and understand | 12 understanding is that there are different types of |
| 13 that as well as, like, more qualitative stuff. | 13 statistics and people are trained in particular |
| 14 Q. Have you done longitudinal research? | 14 types of statistics. And I'm trying to |
| 15 A. I have. | 15 understand, like, what are the areas of statistics |
| 16 Q. What kind of longitudinal research? | 16 that your work is focused on. |
| 17 A. My dissertation was longitudinal. | 17 A. So there is a general divide between statistics |
| 18 Q. Okay. Was that on sexual assault issues? | 18 from the statistics department as compared to |
| 19 A. It was not. It was actually a panel study, not | 19 quantitative methodology and/or those -- sometimes |
| 20 just longitudinal. But it was not, it was on | 20 it's called applied statistics. So I'm not |
| 21 women and work. | 21 trained in the statistics department. It was |
| 22 Q. Okay. Have you done survival analysis? | 22 always -- the work that I've done is always much |
| 23 A. I have. | 23 more around methodology. |
| 24 Q. And in what context? | 24    So being able to have -- so the |
| 25 A. In -- for my dissertation. | 25 difference is that a statistician, you give them |
| Page 237 | Page 238 |
| 1 data and you tell them the research question and | 1 Q. Sure. But it's not something that you published |
| 2 then they often will then just do the stats part. | 2 on or... |
| 3 A quantitative methodologist comparatively has the | 3 A. No, that's not really a term I would use or that |
| 4 one that has the data, comes up with the | 4 is used in my -- so -- |
| 5 questions, and also then does the -- the methods | 5 Q. It's not a term that's used in the work that you |
| 6 or the statistics associated with that. | 6 do? |
| 7 Q. Are you trained in predictive statistics? | 7 A. Right. |
| 8 A. Depends on what -- what you mean by predictive. | 8 Q. Okay. Okay. |
| 9 Like regression predictive or do you mean, like -- | 9 A. Because regression is predictive, but it's not of |
| 10 like -- | 10 the future. |
| 11 Q. Predictive of the future. | 11 Q. Okay. |
| 12 A. Of the future? | 12 A. So if I know X, can I predict Y? Yes. That's -- |
| 13 Q. Yeah. | 13 that's regression. If you want to say if I know |
| 14 A. Like -- | 14 now, can I predict where crime will be? That's |
| 15 Q. Statistics about what is likely to happen in the | 15 regression -- or that's Risk Terrain Modeling. |
| 16 future. | 16 Q. Okay. Now your CV lists the courses, and I'm |
| 17 A. Like -- oh, well, Risk Terrain Modeling has some | 17 going to scroll down to page 11 here. It lists |
| 18 of that, and we're doing some work around Risk | 18 the courses that you've taught. Are there any |
| 19 Terrain Modeling. | 19 other areas that you've taught in that are not |
| 20 Q. Have you taken any courses in predictive | 20 listed here? |
| 21 statistics? | 21 A. This semester I taught a graduate program |
| 22 A. Predictive statistics. No. I mean, again, Risk | 22 evaluation course. It's on there, but this one |
| 23 Terrain Modeling uses some aspects of that, but | 23 only says a doctoral course. I taught a master's |
| 24 not a class in it. Of course I graduated a long | 24 level one at Cleveland State this semester. But |
| 25 time ago. | 25 other than that, they should all be on there. |
| Page 239 | Page 240 |

60 (Pages 237 to 240)

Q. And where it says the teaching and research interest, that summarizes the areas of your -- of your research interest as well then, right?
**A.** Correct.
Q. Okay. You've not -- I think you said earlier, you've not done any work on sex offender registration, correct?
**A.** Correct.
Q. You've not written books about or articles about sex offender registration?
**A.** Correct.
Q. You've not done empirical work on sex offender registries and whether they increase or decrease sexual offending, correct?
**A.** Correct.
Q. You're not holding yourself out as an expert on sex offender registration?
**A.** Correct. No.
Q. And you're not holding yourself out as an expert on whether sex offender registries increase or decrease sexual offending?
**A.** Correct.
Q. Okay.
All right. Compensation, you list $250 an hour as your rate. Is that the current rate?

Page 241

**A.** Correct.
Q. Okay. How many hours have you worked on this case?
**A.** I'd have to look it up, but do you want me to provide an estimate?
Q. Just approximate, yeah.
**A.** Maybe 15.
Q. Okay. And that includes reviewing the materials, writing your report, your discussions with the attorneys --
**A.** Correct.
Q. -- for this deposition, that includes everything?
**A.** Correct.
Q. Okay. So about 15 hours. Is there any time that you invested that you didn't bill for?
**A.** No.
Q. Okay.
MS. AUKERMAN: All right. Let's take a ten minute break, and I think I'm pretty close to done but I want to take a minute and figure out -- Scott, are you going to have questions?
MR. DAMICH: You know what, I probably won't have very much at all, if anything, so...
MS. AUKERMAN: Okay. So let's just take a minute. Okay.

Page 242

MR. DAMICH: Take ten minutes.
(From 2:53 p.m. to 3:05 p.m., a break was held.)
MS. AUKERMAN: Okay. So I don't think I have any other questions. I might have a few more questions after Scott asks you any questions he has. But I think I'm done with my initial set of questions, so...
THE WITNESS: Okay.
MR. DAMICH: I don't have any follow-up.
MS. AUKERMAN: All right. Well, then we are done. Dr. Lovell, thank you very much for your time. I appreciate that. And it was really interesting to learn about your work, and I wish you all the best.
THE WITNESS: Thank you very much.
(Proceedings concluded at 3:05 p.m.)
* * *

Page 243

STATE OF MICHIGAN )
) ss
COUNTY OF OAKLAND )

I certify that this transcript, consisting of 244 pages, is a complete, true, and correct record of the testimony of Rachel Lovell taken remotely by me, a certified stenographic reporter, on May 19, 2023.

I also certify that prior to taking this remote deposition, Rachel Lovell was duly sworn to tell the truth.

Kelly Bornheim, CSR #8167
Notary Public: Oakland County, Michigan
Acting in the County of: Oakland
My commission expires: 11/1/2027
Date of completion of transcript: 6-12-23

Page 244