# Exhibit 68:

## Dr. Rachael Goodman-Williams
## Deposition Transcript



TRI-COUNTY
COURT REPORTERS
INC.

(248)608-9250 Fax (844)270-7115
www.tri-countycourtreporters.com
depos@tricountyreporters.com

Transcript of the Testimony of
**Goodman-Williams, Ph.D., Rachael**

**Date:** June 1, 2023
**Volume:**

**Case:** JOHN DOES A, et al. v. GRETCHEN WHITMER, et al.

Printed On: June 13, 2023

Goodman-Williams, Ph.D., Rachael
6/1/2023

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G,
H, MARY DOE and MARY ROE, on
behalf of themselves and all
others similarly situated,
             Plaintiffs,
       vs.          Case No. 2:22-cv-10209
                    Hon. Mark A. Goldsmith
                    Mag. Curtis Ivy, Jr.
GRETCHEN WHITMER, Governor of
the State of Michigan, and COL.
JOSEPH GASPER, Director of the
Michigan State Police, in their
official capacities,
             Defendants.
_____

The Deposition of RACHAEL GOODMAN-WILLIAMS, Ph.D.,
Taken via videoconference,
Florence, Kansas,
Commencing at 9:00 a.m.,

**Page 2**

1   The Deposition of RACHAEL GOODMAN-WILLIAMS, Ph.D.,
2   Taken via videoconference,
3   Florence, Kansas,
4   Commencing at 9:00 a.m.,
5   Thursday, June 1, 2023,
6   Before Heather DeMar, RPR, CSR-8951.

**Page 3**

APPEARANCES

PAUL REINGOLD - P27594
and DAYJA TILLMAN - P86526
University of Michigan Law School
801 Monroe Street
Ann Arbor, Michigan 48109
734.355.0319
    Appearing on behalf of the Plaintiffs.


ERIC JAMISON - P75721
Michigan Department of Attorney General
525 West Ottawa Street
Lansing, Michigan 48933
517.335.7573
    Appearing on behalf of the Defendants.


ALSO PRESENT:
MIRIAM ELBAKR - INTERN WITH ACLU
JESSE LIN - INTERN WITH ACLU

**Page 4**

TABLE OF CONTENTS

Witness                          Page
RACHAEL GOODMAN-WILLIAMS, Ph.D.

EXAMINATION
BY MR. REINGOLD:                   7
EXAMINATION
BY MR. JAMISON:                  155

INDEX TO EXHIBITS

Exhibit                          Page
(Exhibits retained.)

DEPOSITION EXHIBIT 1              11
DEPOSITION EXHIBIT 2              23
DEPOSITION EXHIBIT 3              46
DEPOSITION EXHIBIT 5             79
DEPOSITION EXHIBIT 7            109
DEPOSITION EXHIBIT 4            147

1 (Pages 1 to 4)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1 Florence, Kansas | 1 out.  So if that happens and anyone is having trouble |
| 2 Thursday, June 1, 2023 | 2 hearing me, let me know.  I think it happens when I |
| 3 9:00 a.m. | 3 move to the side.  But keep me posted. |
| 4 | 4 All right.  So the court reporter, it's |
| 5 RACHAEL GOODMAN-WILLIAMS, Ph.D., | 5 important that you answer every question verbally.  It |
| 6 was thereupon called as a witness herein via | 6 -- if you don't, it'll just be a blank in the record. |
| 7 videoconference, where all parties stipulate to the | 7 You can't nod your head or say uh-huh.  It's just |
| 8 witness having first been duly sworn in remotely to | 8 something to get used to. |
| 9 testify to the truth, the whole truth and nothing but | 9 If you don't understand the question I'm |
| 10 the truth, was examined and testified as follows: | 10 asking you, you can feel free to ask for |
| 11 MR. REINGOLD:  Good morning, | 11 clarification.  The downside of that is if you answer |
| 12 Dr. Goodman-Williams.  My name is Paul Reingold.  I'm | 12 a question, we're going to assume that you understood |
| 13 an ACLU cooperating attorney representing the | 13 it.  Is that okay? |
| 14 plaintiffs in this case.  Welcome to Michigan | 14 THE WITNESS:  Yes. |
| 15 virtually. | 15 MR. REINGOLD:  All right.  The court |
| 16 THE WITNESS:  Thank you. | 16 reporter also can't record two people at once.  And |
| 17 MR. REINGOLD:  Sure.  We're on the record | 17 so, we should try not to talk over each other. |
| 18 today for deposition pursuant to Notice in the Federal | 18 There may be objections to some of my |
| 19 Rules of Civil Procedure in the case of Does versus | 19 questions by your counsel.  If that happens, you can |
| 20 Whitmer, for all purposes permitted by the rules. | 20 let him object and then most of the time you'll then |
| 21 I want to go over some basic rules of the | 21 answer the question anyway, unless he instructs you |
| 22 road to ensure that the court reporter gets a good | 22 not to.  Okay? |
| 23 record.  The other thing is I've got a brand new | 23 When I'm asking questions to the extent you |
| 24 laptop and yesterday when I was on Zoom meetings, | 24 can, you should try to just answer the question that |
| 25 people said my microphone occasionally was dropping | 25 I'm asking.  This is true in court, true of |
| Page 5 | Page 6 |
| 1 depositions, but sometimes lawyers ask a short | 1 right now? |
| 2 question and get a very long answer.  And if it goes | 2 A.  No. |
| 3 beyond the extent of the question, not to be rude, I | 3 Q.  Okay.  Good.  Are you -- I have to ask you this |
| 4 may interrupt you.  If you want to say more about | 4 question, are you under the influence of any |
| 5 something that I didn't cover, you'll have a chance | 5 medications or any other condition that would impair |
| 6 with your lawyer to do that at the end.  Okay? | 6 your ability to be deposed today? |
| 7 If you need a break at any time, you should | 7 A.  No. |
| 8 feel free to let me know.  I said I think it's -- | 8 Q.  All right.  And anything that would prevent you from |
| 9 where I am, it's going to get hot today.  I'm not in | 9 answering truthfully? |
| 10 an air conditioned room, that's why I'm lightly | 10 A.  No. |
| 11 attired.  And if we need breaks, we'll take them. | 11 Q.  Okay.  Let me ask you a few questions about how you |
| 12 EXAMINATION | 12 prepared for the deposition, this won't take long. |
| 13 BY MR. REINGOLD: | 13 What did you do to prepare for today? |
| 14 Q.  Is there anything in front of you right now other than | 14 A.  I reread my expert witness report. |
| 15 a computer? | 15 Q.  And that was it? |
| 16 A.  A messy desk, but nothing. | 16 A.  Yes. |
| 17 Q.  Okay.  Do you have a copy of your report open in front | 17 Q.  Okay.  And did you have any meetings or conversations |
| 18 of you or not? | 18 with your attorneys in the last few days? |
| 19 A.  I can have one if you would like. | 19 A.  Yes. |
| 20 Q.  Yeah.  I mean, I will use it occasionally.  And it'll | 20 Q.  How many did you have? |
| 21 be introduced as an exhibit for the deposition.  But | 21 A.  One. |
| 22 it's often easier for people if they have it open on | 22 Q.  And about how long did that take? |
| 23 their own screens. | 23 A.  I would say about thirty to forty minutes. |
| 24 A.  Sure. | 24 Q.  Okay.  Did you review any documents other than your |
| 25 Q.  And we'll see how that goes.  Is there anyone with you | 25 opinion? |
| Page 7 | Page 8 |

2  (Pages 5 to 8)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1  **A.**  No. | 1  your CV.  So let me pull that up and let me figure out |
| 2  **Q.**  All right.  Did you speak with anyone else about your | 2  how to share here.  Just a minute, I've lost my |
| 3  deposition? | 3  picture of you.  Hold on a second. |
| 4  **A.**  Can you clarify what you mean -- | 4  **A.**  Can I go back to one thing you asked before. |
| 5  **Q.**  In the way of getting a consultation.  I don't mean, | 5  **Q.**  Sure. |
| 6  you know, speaking to a partner to say I'm having a | 6  **A.**  You asked if there was anyone else here.  Currently |
| 7  deposition. | 7  there is not, my wife is out walking the dog. |
| 8  **A.**  Okay.  I asked my graduate mentor if she had been | 8  **Q.**  Okay. |
| 9  depositioned before and if she had any advice. | 9  **A.**  She'll be back at some point to get ready for her day. |
| 10  **Q.**  All right.  Did you get some advice from her? | 10  I want to let you know you may hear movement around, |
| 11  **A.**  Yes. | 11  but that's what that would be. |
| 12  **Q.**  What did she tell you? | 12  **Q.**  That's fine.  I have a few questions, let me share |
| 13  **A.**  She said much of the same of what you told me, don't | 13  screen and just make sure that I'm sharing a correct |
| 14  talk over people, only ask the question being | 14  screen.  I want number one -- that's here.  Did it |
| 15  answered, it's okay to say if you don't know or don't | 15  work or not? |
| 16  remember something, and think before you answer. | 16  **A.**  I believe so.  I can see Adobe. |
| 17  **Q.**  Yeah.  All right.  Good advice.  I -- I believe this | 17  **Q.**  Can you see the document or not? |
| 18  is your first deposition, is that right? | 18  **A.**  No, not yet. |
| 19  **A.**  That's correct. | 19  **Q.**  Let me -- |
| 20  **Q.**  Okay.  And you've never served as an expert witness | 20  **A.**  I think you might need to click on the tab. |
| 21  for a court before? | 21      MR. JAMISON:  You got like your tools up |
| 22  **A.**  Correct. | 22  there, Paul. |
| 23  **Q.**  All right.  That makes life easier for me because I | 23      MR. REINGOLD:  Yeah. |
| 24  don't have to ask about all those things. | 24      MR. JAMISON:  That looks like your outline. |
| 25      I want to ask you a few questions about | 25      MR. REINGOLD:  That is my outline.  Let me |
| **Page 9** | **Page 10** |
| 1  get out of that and try again. | 1  **A.**  Yeah.  Yeah, it was related between 2009 and I started |
| 2  BY MR. REINGOLD: | 2  my Master's in 2014.  So that five years in between, I |
| 3  **Q.**  The CV -- there it is.  And can you now see it, or? | 3  spent two years as an AmeriCorps member doing sexual |
| 4  **A.**  I can. | 4  assault prevention and education work. |
| 5  **Q.**  You can? | 5  **Q.**  Where was that? |
| 6  **A.**  Yes. | 6  **A.**  The first year was in southern Oregon, Grants Pass, |
| 7      MR. REINGOLD:  Okay.  This should be marked | 7  Oregon, working with middle and high schoolers doing |
| 8  as Exhibit 1. | 8  prevention education.  The second year was in |
| 9      MARKED FOR IDENTIFICATION: | 9  Portland, Oregon, also working with adolescence doing |
| 10      DEPOSITION EXHIBIT 1 | 10  some teen sort of support groups and prevention |
| 11      9:09 a.m. | 11  education as well. |
| 12  BY MR. REINGOLD: | 12      And then from 2011 to 2014, I coordinated |
| 13  **Q.**  And I take it this is a copy of your CV, is that | 13  the crisis response services at a rape crisis center |
| 14  right? | 14  in Beaverton, Oregon. |
| 15  **A.**  Correct. | 15  **Q.**  All right.  So you've got a lot of hands-on |
| 16  **Q.**  Okay.  I had a few things I wanted to run through | 16  victim-oriented experience? |
| 17  about it.  It shows that you graduated from college in | 17  **A.**  Yes. |
| 18  May of 2009, but didn't start your Master's degree or | 18  **Q.**  And was that what led you to graduate school? |
| 19  Ph.D. until probably 2015 or so.  And I just wondered | 19  **A.**  Somewhat the opposite, I knew that I wanted to go to |
| 20  if anything that you did in those five or six years | 20  graduate school to do this research and felt that |
| 21  relates to the -- to the work that you're doing now? | 21  before doing so, I wanted to spend a number of years |
| 22      That is, for example, did you do any work | 22  working directly with victims first. |
| 23  that involved sexual assault or sexual assault, | 23  **Q.**  All right.  You chose the program in ecological |
| 24  working with survivors, that sort of thing?  Or were | 24  community psych at Michigan State, the evil university |
| 25  you doing something totally unrelated? | 25  in Michigan.  I -- I'm wondering why it is you chose |
| **Page 11** | **Page 12** |

3  (Pages 9 to 12)

Goodman-Williams, Ph.D., Rachael
6/1/2023

---

**Page 13**

1  that program?
2  A.  Yeah.  Largely in part of the work of Dr. Rebecca
3  Campbell, who was my mentor while I was in graduate
4  school.  And also because there are not many community
5  psychology Ph.D. programs around the country and that
6  was one of them.
7  Q.  What is ecological community psychology?
8  A.  Yeah.  So community psychology is a branch of
9  psychology that split off from clinical in the 1960s
10  or so.  Said clinical, we think you're doing great
11  work, but you approach problems on a very individual
12  level.
13       So if there is, you know, for addressing
14  homelessness, it's clinical psychologists are going to
15  work with individuals who are homeless and things like
16  that.  We think there needs to be a branch of
17  psychology that approaches social problems on a
18  community level, takes an outer level approach and
19  looks at what community level interventions could be
20  created to address social issues.
21  Q.  And when you're doing that kind of work, is it the
22  community that's largely making the decisions?  Or,
23  you know, is your sort of -- are you in kind of a
24  leadership position?  Or are you the facilitator in
25  the background?

---

**Page 14**

1  A.  It can vary a lot within community psychology.
2  Personally, the way that I do my research is largely
3  in collaboration.  But I'm generally the PI, the
4  primary investigator, of the research and bringing
5  that research expertise.
6  Q.  All right.  And did you enter the program to get a
7  Master's or was it a -- were you a Ph.D. candidate
8  from the start?
9  A.  I was a Ph.D. student from the start.
10  Q.  Okay.  You describe your specialization as
11  quantitative methods in evaluation science.  I didn't
12  know if those are two different things or if it's one
13  long word.
14  A.  It's one long word.
15  Q.  And what does it mean?
16  A.  It means that I got a specialization in quantitative
17  methods and evaluation sciences.  It was a
18  specialization offered through the psychology doctoral
19  program at Michigan State for achieving certain
20  milestones in quantitative methods and evaluation.
21  Q.  Does that include like courses in statistics, that
22  sort of thing?
23  A.  Yes.
24  Q.  Did you do a dissertation as part of your graduate
25  work?

---

**Page 15**

1  A.  I did.
2  Q.  And what was the topic of the dissertation?
3  A.  It was on posttraumatic stress disorder on sexual
4  assault victims and how that relates to social support
5  over time.
6  Q.  And again, the -- I think what you're saying is what
7  typifies the work that you do is sort of numbers
8  analysis of a problem, is that right?
9  A.  Yes.
10  Q.  All right.  And then you moved to the job -- you took
11  the job at Wichita State when you got out.  And there
12  were two things on the résumé, one is that you were
13  appointed as core faculty in clinical community
14  research.  And can you just tell us briefly what does
15  it mean to be a core faculty.
16  A.  Yeah.  So community psychology faculty at Wichita
17  State are -- have sort of dual appointments in the
18  community psychology doctoral program and the clinical
19  community doctoral program.  They are two separate
20  Ph.D. programs within the psychology department at
21  Wichita State.  And we have faculty responsibilities
22  in both of them.
23  Q.  All right.  It sounds like this was sort of an ideal
24  fit for you.  So I assume you're able to continue the
25  kind of work that you were doing in the past, is that

---

**Page 16**

1  right?
2  A.  That's correct.
3  Q.  All right.  And -- and the -- the part that you're
4  doing as a -- an assistant professor in community
5  psychology, is that strikingly different from the core
6  faculty work?  Or is it similar?
7  A.  I'm sorry, can you clarify.
8  Q.  Yeah.  I'm just trying to get a feel for the
9  difference between your -- your tasks or the topics
10  when you're doing one or the other.
11  A.  There is no real difference.  Are you trying to get a
12  sense of the difference between the community and
13  clinical role, is that it?
14  Q.  Yes.  That's what I mean.  But it may be that the
15  clinical role is also very statistically oriented, is
16  that the case?
17  A.  I see.  My research, I just have one program of
18  research between the two -- between the two programs.
19  Being faculty in the clinical program means that I can
20  advise clinical students.  It means that I teach
21  courses that the clinical students need to take.
22  They're the same courses that I teach for community,
23  it's just students in both programs take them.  I
24  attend the clinical faculty meetings, things like
25  that.

---

4 (Pages 13 to 16)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1    Q.  All right.  So when you're teaching, you're not | 1      The 2017 through 2018 role was working at |
| 2      necessarily teaching the work that you do, you might | 2    the rape crisis center that I had actually worked in |
| 3      be teaching broader courses, right? | 3    prior to starting graduate school, to do an evaluation |
| 4    A.  Correct. | 4    of their prevention programming. |
| 5    Q.  Okay.  Can you say a word about the evaluation and | 5    Q.  All right.  And is that more hands-on and less number |
| 6      consulting that you've done.  Some of that was on page | 6      oriented? |
| 7      four, let's go down to that.  It must be page five. | 7    A.  No.  It's very number oriented. |
| 8    A.  Keep going. | 8    Q.  Okay.  All right.  You're looking at statistical |
| 9    Q.  A little bit further down? | 9      results basically? |
| 10   A.  Yeah. | 10   A.  Yes. |
| 11   Q.  There it is, yeah.  It's at the end, sorry.  Can you | 11   Q.  All right.  Okay.  And then I wanted to ask just a few |
| 12      tell us just a little bit about what you are doing in | 12      questions about the -- some of your articles, some of |
| 13      these -- in these consulting or evaluating roles. | 13      which I have read.  Your early articles, one and two, |
| 14   A.  Sure.  In the 2021 to 2022 research consultant | 14      were on sexual victimization in prison and reporting |
| 15      position, I was brought on to a research project to | 15      abuse and the perception of justice in litigation.  I |
| 16      run a certain statistical model that I had experience | 16      didn't see -- oh no, these two, yeah. |
| 17      with from my dissertation and to do that research and | 17   A.  There you go. |
| 18      write up the manuscript for it.  It was a latent class | 18   Q.  Did you wind up doing prison work?  How did that come |
| 19      transition analysis. | 19      about? |
| 20      For the 2015 through 2020, I was staff at | 20   A.  I was an early graduate student.  And so, I was not |
| 21      the Michigan Coalition to End Domestic and Sexual | 21      involved in the formation of the research projects, so |
| 22      Violence.  And I was working on the two CDC grants | 22      much as coming in and my advisor saying hey, if you |
| 23      listed there as an evaluator, so helping to design the | 23      want to be involved, you can join these problems, you |
| 24      measures that we would use, do the data collection | 24      know, join these projects and help with the data. |
| 25      that would inform the project, things of that nature. | 25   Q.  All right.  And then the number four one is |
| Page 17 | Page 18 |
| 1      co-authored with Campbell, and that's the person who | 1    A.  Thank you. |
| 2      you went to MSU to work with, is that right? | 2    Q.  And then number seven, is this one of the articles |
| 3    A.  Correct. | 3      that bears the most on what we're talking about today? |
| 4    Q.  Was this, too, a project she already had off the | 4    A.  Yes. |
| 5      ground? | 5    Q.  And this is based on the Detroit problem, where there |
| 6    A.  She was the PI on the project.  She started it while I | 6      were almost three decades of untested rape kits that |
| 7      was there, I believe.  But it was very much her | 7      you were able to get back into, right? |
| 8      primary project, and I was a graduate student on it. | 8    A.  Yes.  Closer to four decades. |
| 9    Q.  Okay.  And then number six, was that an outgrowth of | 9    Q.  Okay.  All right.  You also wrote -- let's see.  You |
| 10      the work you had already been doing? | 10      also wrote a paper on trying to get the legislature |
| 11   A.  Can you clarify what work I had already been doing. | 11      involved in mandatory SAK laws, right? |
| 12   Q.  Yes.  I mean the work you had been doing with | 12   A.  Can you clarify which paper you're referring to. |
| 13      Campbell. | 13   Q.  Yeah.  I thought -- I think I wrote down the wrong |
| 14   A.  Yes.  It was based on an earlier branch of the data | 14      number.  Let me look.  Did you write -- let me ask you |
| 15      from a similar project that I wrote up for | 15      this way.  It might have been a presentation, I'm not |
| 16      publication. | 16      sure. |
| 17   Q.  And what was the wrong that needed to be righted | 17      Did you write a paper that was in effect |
| 18      regarding approaches for resolving untested rape kits? | 18      trying to get the legislature involved in passing |
| 19   A.  Testing them. | 19      mandatory SAK laws? |
| 20   Q.  Oh, actually testing them? | 20   A.  Without seeing the citation, I can't say for sure. |
| 21   A.  Yes. | 21      But that's -- yeah, I will say I would need to see the |
| 22   Q.  Oh, okay.  All right.  We know that was a problem. | 22      citation to jog my memory. |
| 23   A.  Yes. | 23   Q.  But, I mean, is that something you remember doing? |
| 24   Q.  And also congratulations on the prize on your first | 24   A.  Not specifically that paper, but working on the issue, |
| 25      article as lead author. | 25      yes. |
| Page 19 | Page 20 |

5 (Pages 17 to 20)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | | | |
|---|---|---|---|
| 1 | Q. All right. And tell me what it is -- I mean, it -- it | 1 | case today? |
| 2 | -- how -- what -- how -- what problem is that solving | 2 | A. I would say doing the work on how SAK testing informs |
| 3 | and what is it that you would want the legislature to | 3 | what we know about serial perpetration. |
| 4 | do? | 4 | Q. All right. Do you have any other expertise that you |
| 5 | A. So generally, the issue is providing legislative | 5 | think is relevant to the case? |
| 6 | guidance for SAK testing, saying that SAKs should be | 6 | A. I have expertise on the low rates of reporting sexual |
| 7 | tested. They need to be tested. They can't just be | 7 | assault, the reasons why victims don't report sexual |
| 8 | put in a warehouse and left to rot. And a lot of that | 8 | assault, and case attrition through the criminal legal |
| 9 | has to do with providing funding for SAK testing. | 9 | system, and how that can inform conclusions about |
| 10 | Q. All right. So the issue isn't forcing sexual assault | 10 | serial perpetration. |
| 11 | survivors to have SAKs be mandatory -- | 11 | Q. And is some of that based on the work that you did |
| 12 | A. Oh God, no. | 12 | before your graduate work? |
| 13 | Q. -- you wouldn't go there? | 13 | A. No. I think that that's a different vein of expertise |
| 14 | A. No. | 14 | that I bring that is also available, but they are |
| 15 | Q. All right. The impression I had was it was in that | 15 | somewhat separate. |
| 16 | direction and -- | 16 | Q. Okay. In your report you said that you were charging |
| 17 | A. Oh no. No. Very much just if a victim gives a -- has | 17 | the defendants two hundred fifty dollars an hour for |
| 18 | a SAK collected, wants that SAK to be tested, that | 18 | the work -- for your work. Is that true for today as |
| 19 | that SAK in fact should be tested. | 19 | well? |
| 20 | Q. Yeah. You don't want the problem that we had over the | 20 | A. Yes. |
| 21 | past -- | 21 | Q. Okay. Have you done any prior work for the State of |
| 22 | A. Exactly. | 22 | Michigan or any of the defendants or their attorneys? |
| 23 | Q. -- several decades. Okay. All right. | 23 | A. No. |
| 24 | And just let me ask what would you say that | 24 | Q. And are you working as an expert currently on any |
| 25 | is your most relevant experience that you bring to the | 25 | other cases? |

Page 21 Page 22

| | | | |
|---|---|---|---|
| 1 | A. No. | 1 | system, how both of those affect serial offending |
| 2 | Q. When did you agree to be an expert for this case? | 2 | compared to criminal history data, and what SAKs |
| 3 | A. In the last year, but I don't recall the specific | 3 | contribute to serial offending, right? |
| 4 | date. | 4 | A. Yes. |
| 5 | Q. All right. I'll get out of all of these and stop | 5 | Q. Did you review any of the plaintiffs' experts' reports |
| 6 | screen sharing. All right. | 6 | before you wrote your report? |
| 7 | I'm just going to introduce your report so | 7 | A. I did. |
| 8 | we have it in the record. Can you see that? | 8 | Q. And which ones did you look at? |
| 9 | A. Yes. | 9 | A. All of them. |
| 10 | MR. REINGOLD: All right. And that's -- | 10 | Q. Okay. Prior to agreeing to serve as the defendants' |
| 11 | that'll be introduced as Exhibit 2. | 11 | expert, did you learn what this case is about? |
| 12 | MARKED FOR IDENTIFICATION: | 12 | A. Yes. |
| 13 | DEPOSITION EXHIBIT 2 | 13 | Q. And what did you learn about the pending case? |
| 14 | 9:28 a.m. | 14 | A. I learned that it was a case about whether or not the |
| 15 | BY MR. REINGOLD: | 15 | sex offender registry is needed and in what capacity. |
| 16 | Q. Is that in fact the first page of your report? | 16 | Specifically the piece that was brought to my |
| 17 | A. It looks that way. | 17 | attention to speak to was whether rates of sexual |
| 18 | Q. Okay. In the paragraph ten of your report, you set | 18 | recidivism are in fact relatively low and how that |
| 19 | forth what it was the defendants asked you to do. And | 19 | should inform what happens with the sex offender |
| 20 | would you read through that, and is it still an | 20 | registry. |
| 21 | accurate description? | 21 | Q. Had you done any work with sex offender registries |
| 22 | A. Yes. | 22 | before this? |
| 23 | Q. All right. And just for the record, what it is that | 23 | A. No. |
| 24 | you were asked to do is address issues of | 24 | Q. Do you know any of the -- anything about the |
| 25 | underreporting, attrition in the criminal justice | 25 | individual plaintiffs in the case? |

Page 23 Page 24

6  (Pages 21 to 24)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1  **A.** I do not. | 1  **A.** No. |
| 2  **Q.** And do you know what relief the plaintiffs are seeking | 2  **Q.** Did anyone else do any of the research relating to the |
| 3  in the case? | 3  report? |
| 4  **A.** No. | 4  **A.** No.  As far as help writing it, I did run one piece of |
| 5  **Q.** Have you ever been told at any time anything about the | 5  it by a colleague to just make sure that I wasn't |
| 6  facts of the case? | 6  going off on a tangent that didn't make sense.  And |
| 7  **A.** I believe that the Attorney General's Office gave me | 7  she said yeah, that makes sense to me.  And that was |
| 8  an overview of it.  But -- | 8  it. |
| 9  **Q.** Okay.  Yeah.  You don't have to say what that was. | 9  **Q.** Okay.  What was the issue, do you recall? |
| 10  **A.** Yeah. | 10  **A.** It -- I don't recall the specific issue. |
| 11  **Q.** Okay.  All right.  Let me ask you a little bit about | 11  **Q.** Okay.  Are all of the opinions that you intend to |
| 12  documents you reviewed for your report.  Were you | 12  offer in the case now contained in that report? |
| 13  provided any materials to consider in writing your | 13  **A.** Yes. |
| 14  report? | 14  **Q.** And you haven't left anything out? |
| 15  **A.** Only the expert witness reports. | 15  **A.** Can you clarify. |
| 16  **Q.** Okay.  And were there any materials that you wanted or | 16  **Q.** Is there anything that -- you're not going to opine on |
| 17  asked for? | 17  anything that's not in the report? |
| 18  **A.** No. | 18  **A.** No. |
| 19  **Q.** Okay.  And have you reviewed any deposition testimony | 19  **Q.** Okay.  And have you identified to the best of your |
| 20  that's been produced in the case? | 20  knowledge all of the documents that you're relying |
| 21  **A.** No. | 21  upon in the report, documents and studies? |
| 22  **Q.** All right.  Looking at what was marked as Exhibit 2, | 22  **A.** Yes. |
| 23  your report, was anyone else involved in writing it? | 23  **Q.** All right.  I want to ask you a few questions about |
| 24  **A.** No. | 24  the plaintiffs' experts in this case.  Are you |
| 25  **Q.** And did you get any help writing it? | 25  familiar with the work of scholars in the field of -- |
| Page 25 | Page 26 |

| | |
|---|---|
| 1  or at least partly in the field of -- sexual | 1  **Q.** Okay.  What about Elizabeth Letourneau? |
| 2  recidivism? | 2  **A.** No. |
| 3  **A.** Some of them. | 3  **Q.** You're not familiar with any of her work?  No, okay. |
| 4  **Q.** Okay.  And did you know or had you read anything by | 4  And you had never heard of her before this case? |
| 5  Karl Hanson? | 5  **A.** No. |
| 6  **A.** Yes. | 6  **Q.** Had you ever heard of Kelly Socia? |
| 7  **Q.** And are you familiar then with his scholarly work? | 7  **A.** No. |
| 8  **A.** Slightly.  I know I've read his work.  I wouldn't be | 8  **Q.** Ever heard of James Prescott? |
| 9  able to tell you about it off the top of my head. | 9  **A.** No. |
| 10  **Q.** Okay.  Is it fair to say that his work is widely | 10  **Q.** Ever heard of Kristen Zgoba? |
| 11  cited? | 11  **A.** Yes. |
| 12  **A.** Yes. | 12  **Q.** And were you familiar with her work? |
| 13  **Q.** And is it fair to say he's considered one of the top | 13  **A.** I had read it, but again, would not be able to tell |
| 14  authorities in his field? | 14  you about it in depth.  I just recognized the name. |
| 15  **A.** I don't know that I can speak to that. | 15  **Q.** Is it fair to say that she's considered an authority |
| 16  **Q.** Okay.  Would you say that his area does or does not | 16  in her field? |
| 17  overlap with yours? | 17  **A.** Again, I don't know that I could confidently speak to |
| 18        MR. JAMISON:  I'm going to object to the | 18  that. |
| 19  question as vague. | 19  **Q.** Okay.  Let me ask you a question about sort of where |
| 20  BY MR. REINGOLD: | 20  experts come from.  The plaintiffs' lead experts in |
| 21  **Q.** You said you -- you've read some of his work, but not | 21  this case, I would say, are Hanson and Letourneau and |
| 22  much.  What I'm asking is do you think of yourselves | 22  both testified in their depositions that they got |
| 23  as being in the same field or not? | 23  interested in their research fields from their |
| 24  **A.** Not primarily.  I would say some of our work has | 24  clinical work with victims of sexual assault. |
| 25  overlapped. | 25        I think it's fair to say both of them |
| Page 27 | Page 28 |

7 (Pages 25 to 28)

Goodman-Williams, Ph.D., Rachael
6/1/2023

---

**Page 29**

```
 1   wanted to reduce sexual offending and that was and
 2   remains their primary motivation for the work that
 3   they do.  Do you have any reason to doubt them in that
 4   regard?
 5   A.  I don't know enough about them to be able to speak to
 6       their motivations one way or the other.
 7   Q.  But is it similar to your own in the sense that having
 8       worked with victims of sexual offending and then
 9       wanting to work to improve the situation for them?
10       Does that resonate?
11           MR. JAMISON:  I'm going to object for lack
12       of foundation.
13   BY MR. REINGOLD:
14   Q.  You can still answer.
15   A.  Can you repeat the question.
16   Q.  I'm asking if in light of your own experience and what
17       I told you about them, does that resonate?  Does it
18       match your experience?
19   A.  Yes.
20   Q.  Okay.  Both, as -- as I said, had victim or
21       survivor-oriented practices early in their careers and
22       both over time became critical of public policies like
23       the registry, that based on their research and the
24       research of others, they thought did little or nothing
25       to reduce sexual offending or to increase public
```

---

**Page 30**

```
 1   safety.
 2           And I -- I think they both said or would
 3       say that policies like the registry prevented -- also
 4       prevented low risk offenders from reintegrating into
 5       society, and all of this was done at great
 6       governmental expense.  Do you have any views on that?
 7   A.  That is not an area that I'm an expert in.
 8   Q.  If they're right, isn't it true that if we took
 9       everyone off the registry who was not shown to be
10       currently dangerous, then there could be millions of
11       dollars in resources freed up to address the very
12       issues that they and you want addressed?
13           MR. JAMISON:  Objection, lack of
14       foundation.
15   BY MR. REINGOLD:
16   Q.  Again, you can answer.
17   A.  I'm sorry, that's not something I feel I have the
18       expertise to speak to.
19   Q.  Okay.  I want to ask you a few questions and make some
20       clarifications about definitions.  Throughout this
21       case, on both sides, have somewhat criticized each
22       other for using imprecise terms.  And I think some
23       clarity at the front end can be helpful.
24           So I'm going to -- first, let me tell you
25       about a few terms that I'll be using and then I'll ask
```

---

**Page 31**

```
 1   you about the terms that you use.  Is that okay?
 2   A.  Yes.
 3   Q.  All right.  So I think that for most lawyers and
 4       judges, the term recidivate or recidivism is viewed as
 5       kind of a technical legal term that refers to a person
 6       who's been convicted once and is then convicted again.
 7           But when I use that term in our deposition
 8       today, I'm giving it broader meaning.  When I say
 9       recidivism, I mean a person who's convicted of an
10       offense and then at a later point in time, is
11       arrested, charged, or convicted of a subsequent
12       offense.  Okay?
13   A.  Okay.
14   Q.  Again, so when I use recidivist or one of its
15       derivations, it means a convict who is arrested,
16       charged, or convicted for a new crime.  Okay?
17   A.  Are you specifically referring to that new crime being
18       a sexual crime or any crime?
19   Q.  It would be both.
20   A.  Okay.
21   Q.  It would be both.  Yeah.  I said it's hard for me to
22       do that because I feel like if someone hasn't been
23       convicted, they haven't earned the right to wear the
24       badge of recidivist.
25           But I know that that's how in your field
```

---

**Page 32**

```
 1   re-offending is usually categorized.  It's being
 2   caught by the system, not being -- not becoming a
 3   known state certified offender through a conviction.
 4   It's just being caught.
 5   A.  I would say that varies quite a bit in the research.
 6       There is some research that uses a convicted and
 7       convicted standard.  There's other research that uses
 8       convicted and offense, sort of like you're referring
 9       to now.  And there's some research that looks at just
10       multiple arrests or multiple charges or multiple
11       convictions.  So there's some variation there for
12       sure.
13   Q.  Okay.  Good.  All right.  So in contrast, when I use
14       the term re-offend or re-offender, I'm -- I mean a
15       person who's convicted of a first offense and
16       thereafter may have re-offended, but has not yet been
17       detected by law enforcement, let alone arrested or
18       charged.
19           So for me a re-offender means convicted of
20       a first offense and then being out there in the wind
21       as a -- I mean, it's -- it -- I was going to say as a
22       potential offender.  To me it's really just a
23       placeholder name.  It's as if I was saying Joe Blow,
24       because it's a label.
25           You have to be able to say something if you
```

---

8 (Pages 29 to 32)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1    know that there was an offense committed and you want
 2    to talk about the person who did it. And so, I'm
 3    using re-offender for that if a person had a
 4    conviction.
 5        All right. So let me ask you --
 6  A.  I'm sorry, can I clarify something about that.
 7  Q.  Yes. Sure.
 8  A.  So you're using re-offender even if there hasn't been
 9    a re-offense?
10  Q.  Well, I mean, I think that's the blunt of the problem.
11    Tell me what you mean by re-offense.
12  A.  An indication of a new offense.
13  Q.  Okay. No, that's exactly what I mean. That's exactly
14    what I mean. The problem, of course, is we don't know
15    what the indication is. It might be that a victim
16    reports it --
17  A.  You're not --
18  Q.  -- something happened. And we need a name for the
19    person who did the act that happened, right?
20  A.  Okay. I see.
21  Q.  And I'm saying I use re-offender if that person has a
22    criminal record.
23  A.  And if there's an indication of a new offense, knowing
24    that what that indication is, is fluid.
25  Q.  Exactly.
```
Page 33

```
 1  A.  Okay. I see.
 2  Q.  Okay. All right. So in your report you use a bunch
 3    of different terms. And I want to make sure -- excuse
 4    me, I'm -- you may be losing me when I turn my head.
 5        You use the term sexual offender. You use
 6    the term perpetrator. Can you give me a quick
 7    taxonomy so I know what you're talking about during
 8    this dep.
 9  A.  I use the term sex offender and perpetrator
10    interchangeably.
11  Q.  And what is the meaning of those?
12  A.  Someone who there's an indication that they have
13    perpetrated a sexual offense.
14  Q.  All right. And when we use the term generically, if
15    you say this person reported a crime, the offender
16    blank?
17  A.  Uh-huh.
18  Q.  Again, you're using it in the sense that I was talking
19    about as a placeholder because you have to call the
20    person something?
21  A.  Yes.
22  Q.  An offender is the way to do it. It's tough, right,
23    because the word offender sounds like it means we know
24    that he offended rather than he is a potential
25    offender, right?
```
Page 34

```
 1  A.  I'm sorry, what's the question?
 2  Q.  The -- the -- question is that the word offender
 3    has two meanings, right, just conventionally? If
 4    people are talking about an offender, they're likely
 5    talking about somebody who has a conviction in
 6    everyday parlance.
 7        Here we're using it in a more technical
 8    sense of Joe Blow who might have been the one who did
 9    this crime.
10  A.  My experience in general parlance is that offender is
11    often used in these types of crimes, because there's
12    so much case attrition and such a low likelihood of
13    recidivism, that I think offender is often used as a
14    placeholder, but to denote someone where there was an
15    indication of a sexual offense.
16  Q.  So you're saying that might be -- it's not a unique
17    use in this particular field. It's at least more
18    likely to be used in this field?
19  A.  Yes, I think so.
20  Q.  Okay. So, for example, if you saw someone driving
21    down the road and swerving, you wouldn't think to
22    yourself there goes a drunk driving offender?
23  A.  I think I would -- there goes someone who's driving
24    dangerously.
25  Q.  Exactly. Yeah.
```
Page 35

```
 1  A.  Yeah.
 2  Q.  All right. So let me ask a couple of questions about
 3    the -- how far the term extends. Does it cover all
 4    sexual offenders? Does the term sex offender or
 5    perpetrator cover all offenders?
 6        Let me ask it a different way. What does
 7    it encompass?
 8  A.  I think it depends who is using the term. I certainly
 9    can't speak for everyone who's using the term.
10  Q.  Right. And I know that it's used differently. But
11    I'm asking how do you use it? How --
12  A.  Oh, I use it -- yeah. I use it to cover anyone who
13    has committed or, you know, who there's an indication
14    that they have committed a sexual offense.
15  Q.  Okay. So it would go from the most violent rapist,
16    predatory rapist, to somebody where the charge is
17    gross indecency?
18  A.  Yes.
19  Q.  Okay. Does it go to prostitution?
20  A.  Not in my mind.
21  Q.  Okay. Would it go to consensual sex where both
22    parties are under age?
23  A.  Where both parties are -- I think there's some details
24    there, depending on the age difference between them.
25  Q.  Let's assume a small age difference.
```
Page 36

9 (Pages 33 to 36)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1   **A.**   Can you define small age difference. | 1   something different than that. |
| 2   **Q.**   Yeah, two years. | 2   **Q.**   Okay. And let me ask about the term repeat offender |
| 3   **A.**   Then I would not think that that would apply. | 3   versus serial offender; is there a difference in those |
| 4   **Q.**   Okay. How about teenage sexual activity where one | 4   two for you? |
| 5   person is not old enough to consent? | 5   **A.**   Serial offender is generally used more when talking |
| 6   **A.**   Can you, again, define the age difference. | 6   about criminal history data. But it's -- I don't |
| 7   **Q.**   Yeah. Again, we'll make it two -- let's make it a | 7   think they have a different meaning, just a slightly |
| 8   narrow age difference, two years. | 8   different usage in the research literature. |
| 9   **A.**   That is not personally how I use the term. | 9   **Q.**   And does serial mean two or more? |
| 10   **Q.**   Just to be clear, do you also use that same term to | 10   **A.**   Yes. |
| 11   refer to people who have been convicted of a sex | 11   **Q.**   Okay. So a person who is associated with two offenses |
| 12   offense? | 12   or more but is never caught would be a repeat or |
| 13   **A.**   I might use a different term. But I -- to me it's an | 13   serial -- or serial offender? |
| 14   umbrella term that would cover all of the above. | 14   **A.**   Yes. I think if they're never caught, generally the |
| 15   **Q.**   Okay. When you use it, do you intend for it to | 15   research literature talks in terms of suspected serial |
| 16   include people on the registry? | 16   offender, suspected repeat offender, things like that. |
| 17   **A.**   I imagine that it does, but I'm not specifically | 17   But yes, that's -- yes. |
| 18   trying to make that distinction. | 18   **Q.**   Okay. You understand that all of our clients, |
| 19   **Q.**   Okay. And for purposes of today, based on the studies | 19   everybody on the registry, has been convicted of a |
| 20   you have done, when we're talking about recidivism, | 20   sexual offense, right? |
| 21   are you going to be using the getting caught and | 21   **A.**   Yes. |
| 22   charged or arrested and charged as the standard for | 22   **Q.**   And for people who re-offend after conviction, there |
| 23   recidivism as opposed to a conviction? | 23   can be observed recidivism. That is, arrest or -- |
| 24   **A.**   I am fine generally using it the way that you are | 24   arrest and charged or arrest or charged, but who |
| 25   using it. I will work to clarify my meaning if I mean | 25   aren't detected by the criminal justice system? |
| Page 37 | Page 38 |

| | |
|---|---|
| 1   **A.**   I'm sorry, I don't understand the question. Can you | 1   escape than one innocent suffer, right? |
| 2   clarify. | 2   **A.**   Yes. |
| 3   **Q.**   Yes. For somebody who's had a sexual conviction, | 3   **Q.**   And it's true that we have guarantees built both into |
| 4   there can be both observed offending and unobserved | 4   the constitution and enshrined in Supreme Court |
| 5   offending? | 5   decisions specifically intended to carry out that |
| 6   **A.**   Yes. | 6   design? Yes? |
| 7   **Q.**   Okay. All right. We're going to move on. Does that | 7   **A.**   Yes. |
| 8   help with your definitions? Are we in a better place | 8   **Q.**   It's true that accused have a right to counsel? |
| 9   than when we started? | 9   **A.**   Yes. |
| 10   **A.**   I'm going to be honest and say I feel a little more | 10   **Q.**   And they can't be made to testify against themselves? |
| 11   confused than when we started. But I'll do my best to | 11   **A.**   Yes. |
| 12   circle back as needed. | 12   **Q.**   They have to be told their rights before being |
| 13   **Q.**   All right. That works for me. In the early part of | 13   interrogated? |
| 14   your report, you spend some time talking about the | 14   **A.**   Yes. |
| 15   criminal justice system. And I want to ask you some | 15   **Q.**   And they can demand a trial by jury? |
| 16   questions about what I would call systemic problems | 16   **A.**   Yes. |
| 17   with the U.S. criminal justice system. | 17   **Q.**   And typically the jury verdict has to be unanimous? |
| 18   First, I think you agree that our justice | 18   **A.**   You're outpacing my knowledge of the inner workings |
| 19   system intentionally makes it very hard to convict the | 19   there, but I trust you. |
| 20   wrongdoers? | 20   **Q.**   All right. And people can only be convicted by proof |
| 21   **A.**   Yes. | 21   beyond a reasonable doubt? |
| 22   **Q.**   Okay. And paragraph thirty-two of your report, let me | 22   **A.**   Yes. |
| 23   get down there, you note that the British law we | 23   **Q.**   And as far -- as a result because of that, for every |
| 24   inherited and the U.S. criminal justice system that we | 24   category of crime, some people, maybe even most |
| 25   adopted are designed to ensure that better ten guilty | 25   people, when in fact -- who in fact committed a |
| Page 39 | Page 40 |

10 (Pages 37 to 40)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1    criminal offense may never be convicted and punished?
 2  A.  Can you restate the question.
 3  Q.  As a result of all of those protections, for every
 4      category and crime, some people, maybe even most
 5      people, who in fact committed a criminal offense will
 6      never be convicted or punished?
 7  A.  I would agree that that's certainly true for some
 8      people. The degree to which it's true, I think,
 9      varies by type of crime.
10  Q.  Right. For murderers where there's a body and the
11      body has to be buried and we have to be --
12      documentation on burying the body, I agree. And --
13      and especially in something like that if the body is
14      filled with bullet holes, it's going to get referred
15      to the criminal justice system anyway, yeah. Right.
16          And we all sort of experience this, right.
17      If somebody breaks into our house and steals our
18      stereo we all know we may not report it because our
19      house insurance may go up more than the value of the
20      stereo, right?
21  A.  I would say by crime, there's very different reasons
22      why people don't report. But I'm sure there are
23      reasons why people don't report various types of
24      crime.
25  Q.  Same with cars, if someone breaks the window of your
```

Page 41

```
 1      car and takes your belongings, you may not report it
 2      because your insurance is going to go up?
 3  A.  That sounds like a reason why someone may not report
 4      that, yes.
 5  Q.  Okay. And would you agree that vast numbers of
 6      crimes, therefore, will remain invisible to the system
 7      for lack of reporting?
 8  A.  At different levels for different crimes, yes.
 9  Q.  Okay. And researchers often call these undetected
10      offenses?
11  A.  Okay.
12  Q.  Is that right?
13  A.  I don't know that that's a term that I've heard, but
14      it sounds like a very reasonable term.
15  Q.  I thought I had seen that often in the literature, but
16      maybe I'm wrong.
17  A.  You are very possibly correct.
18  Q.  All right. If it's unreported and undetected, then no
19      criminal justice system record of the offense is going
20      to exist, right?
21  A.  Correct.
22  Q.  Unless someone -- unless something changes in the case
23      to bring it to the system's attention, no one will
24      ever be investigated, no one will be arrested,
25      charged, prosecuted, or convicted of the offense?
```

Page 42

```
 1  A.  Correct.
 2  Q.  Okay. And -- and -- and sexual crime, as you
 3      describe, has a whole other set of issues that
 4      contribute to attrition, right?
 5  A.  Uh-huh. Yes.
 6  Q.  And you -- you -- you make the case that many victims
 7      or all sexual assault victims, I suppose, have good
 8      reasons for not reporting because when they report,
 9      there's a -- a bunch of bad things that can happen to
10      them, right?
11  A.  Yes.
12  Q.  And -- and especially historically these included not
13      being believed by the police? You have to say yes.
14  A.  Yes.
15  Q.  Okay. Their account might have been belittled?
16  A.  Yes.
17  Q.  They can be made to feel blamed?
18  A.  Yes.
19  Q.  If they didn't have bruises or skin under their
20      fingernails, they can be told that they consented or
21      didn't resist?
22  A.  Yes.
23  Q.  There may have been a bias by the police not to
24      investigate sex crimes aggressively?
25  A.  Yes.
```

Page 43

```
 1  Q.  Prosecutors might have been reluctant to authorize
 2      charges?
 3  A.  Yes.
 4  Q.  Prosecutors would take a plea to a lower offense?
 5  A.  Yes.
 6  Q.  And juries might not convict?
 7  A.  Yes.
 8  Q.  So it's a struggle to get there, right?
 9  A.  Yes.
10  Q.  And a lot of what's happening that would affect
11      reporting is happening often shortly after the -- the
12      crime?
13  A.  Yes.
14  Q.  When -- when I say historically, I mean that all of
15      these factors were true before even there was a
16      registry, right? In fact, it was probably worse in
17      the past?
18  A.  Yes.
19  Q.  And there have been efforts to make changes along
20      these dimensions, but you say the changes haven't gone
21      far enough?
22  A.  Yes.
23  Q.  And even though nowadays, unlike when I was first
24      practicing law, there are now female prosecutors and
25      there are female police detectives and there are
```

Page 44

11 (Pages 41 to 44)

Goodman-Williams, Ph.D., Rachael
6/1/2023

1       female doctors in the hospital and there are female
2       judges, it's still a steep uphill climb?
3   A.  Yes.
4   Q.  These are all built-in societal biases that might be
5       especially pronounced in a law enforcement
6       environment, is that fair to say?
7   A.  Can you clarify what you mean.
8   Q.  Yes.  I mean -- I mean being disbelieved by the
9       police, the idea that women are doubted when they're
10      reporting crimes, all of that, these are not unique to
11      the police.  They are built-in societal -- societal
12      biases that might be especially pronounced in a
13      military kind of organization like the police?
14  A.  Yes.
15  Q.  All right.  And none of the features that we've been
16      talking about that discourage reporting or that make
17      it hard to get cases processed or convictions won has
18      anything to do with the registry?
19  A.  Correct.
20  Q.  All right.  It isn't the registry that makes people,
21      you know, disbelieve their stories?
22  A.  Not that I'm aware of.
23  Q.  All right.  And the same for all the rest, it's not
24      the registry that makes police belittle people,
25      anything like that?

Page 45

1   A.  No.
2   Q.  Okay.  But there is one area where the registry
3       actually makes -- or can make this situation worse.
4           MR. REINGOLD:  Let me de-share this and put
5       up another exhibit, which is Exhibit 3.
6           MARKED FOR IDENTIFICATION:
7           DEPOSITION EXHIBIT 3
8           10:01 a.m.
9   BY MR. REINGOLD:
10  Q.  And can you see that?
11  A.  No.
12  Q.  How about now?
13  A.  No.
14  Q.  Okay.  Now?
15  A.  Yes.
16  Q.  This is introduced as plaintiff's Exhibit 3.  This is
17      an article by Elizabeth Letourneau and others.  And it
18      was a study done in South Carolina where they took
19      advantage of the change from not having a registry to
20      having a registry, a breakpoint that makes for good
21      data, right?
22  A.  Uh-huh.
23  Q.  It's what social scientists are looking for?  Yes?
24  A.  Yes.
25  Q.  All right.  And they studied three five-year groups

Page 46

1       looking at adult sex crime cases and outcomes that
2       related to reduced charges or changes in the
3       conviction rate.
4   A.  Okay.
5   Q.  Does that sound accurate to you from what you can see?
6   A.  Can you say that one more time.
7   Q.  Does that sound like an accurate summary of the
8       abstract?
9   A.  Can I take a moment to read the abstract.
10  Q.  Sure.
11  A.  Okay.
12  Q.  So is it fair to say looking at the abstract, which
13      includes the results, that one of the significant
14      differences between not having a registry and having a
15      registry was that the registry appears to have made
16      prosecutors more likely to let perpetrators plead down
17      to non-sex offenses and made juries more likely to
18      acquit sex offenders?
19          MR. JAMISON:  I'm going to object for lack
20      of foundation to the extent the question implies that
21      she has an opinion on that other than what she just
22      read in the abstract.
23  BY MR. REINGOLD:
24  Q.  You --
25  A.  I'm sorry, I would have to spend a lot more time with

Page 47

1       the article to feel confident in my ability to speak
2       to their findings.
3   Q.  Let's look at the highlighted part.
4           MR. JAMISON:  We'll stipulate that the
5       abstract says what the abstract says.
6           THE WITNESS:  Yeah.
7   BY MR. REINGOLD:
8   Q.  All right.  Why don't I have you read just so we can
9       get it in the record of the deposition, the
10      highlighted part.
11  A.  Sure.  The abstract reads results indicated that
12      defendants were more likely to have charges reduced
13      from sex to non-sex crimes over time, with a nine
14      percent predicted probability of reduced charges in
15      year group one, a fifteen percent predicted
16      probability in year group two, corresponding with
17      initial implementation of SORN, and a nineteen percent
18      predicted probability in year group three,
19      corresponding with internet notifications.
20          Results also indicated that the probability
21      of a guilty disposition changed at each year group
22      with a predicted probability in year group one at
23      fifty-five percent, increasing to sixty-five percent
24      in year group two, and then declining to sixty percent
25      in year group three.

Page 48

12  (Pages 45 to 48)

Goodman-Williams, Ph.D., Rachael
6/1/2023

1  Q.  Thank you.
2  A.  Sure.
3  Q.  I will -- let me see if I have any other questions on
4      that.
5          Assuming that the results that you just
6      read are correct, is it true that these are the kinds
7      of issues that might make sexual assault survivors
8      especially angry and bitter because they tend to come
9      further back in the process?
10         That is, survivors will already have gone
11     through full investigation.  They've been, you know,
12     it's a case that's moving, and -- and a plea may come
13     early, middle, or late in the litigation stage, but
14     we're already at the litigation stage.  And
15     convictions come and acquittals come at the very end.
16         So that means if this happens and more
17     people take a plea, especially to a non-sex offense,
18     and more offenders are acquitted, the consequences for
19     the victims are even tougher than if it's an attrition
20     at the very front end of the case, right?
21  A.  I think that's a very good question.  I don't know of
22     any research that has looked into sort of the
23     differential impact on victims at different points in
24     the process.
25  Q.  Does it make sense to you that it's --

Page 49

1  A.  You know, I'm not sure, to be honest.  I would really
2      need to conduct research on that.  I could see it
3      going both ways.  It's not something I feel
4      comfortable speculating on victims' frame of mind
5      about.
6  Q.  Okay.  I lived with a scientist for quite a while and
7      I'm used to those kinds of answers.  All right.
8          The kinds of attrition issues that we're
9      talking about occur -- maybe -- they occur with all
10     crimes in the sense that some of the crimes, even if
11     reported, won't be investigated or won't be
12     investigated thoroughly, right?
13  A.  I'm not familiar with the literature on rates of
14     investigation in other crimes.  But I would imagine
15     that that's the case at different rates, but that some
16     crimes are not investigated thoroughly at all times.
17  Q.  And other cases as well as sexual crimes, if the
18     offender is unknown, some of them will never be
19     identified?
20  A.  Correct.
21  Q.  And some may be identified but never caught?
22  A.  Correct.
23  Q.  And some will be caught but never arrested?
24  A.  Caught but never arrested?
25  Q.  Yeah, they'll be detected.

Page 50

1  A.  Detected, so identified but never arrested?
2  Q.  Yes.  The people might say we think you're the guy, go
3      talk to him and then say we're not going to arrest
4      you.
5  A.  Yes.
6  Q.  Some will be arrested but never charged?
7  A.  Yes.
8  Q.  And some will be charged but the charges will be
9      dropped?
10  A.  Yes.
11  Q.  And some will plead to a lesser offense?
12  A.  Yes.
13  Q.  Some -- for some, the lesser offense might not reflect
14     the type or the seriousness of the original offense?
15  A.  I would imagine that's the case, yeah.
16  Q.  And some will go to trial and be acquitted?
17  A.  Yes.
18  Q.  And a lot of these are resource issues, isn't that
19     right?
20  A.  I don't know to what degree I would say a lot.  I
21     mean, I would imagine some of them are.  But I don't
22     know specifically to what extent.
23  Q.  So but it's something like the SAKs, right?  We -- law
24     enforcement and prosecutors have available to them
25     almost a miracle method to track down serious sexual

Page 51

1      offenders and they didn't use them, right?
2  A.  And you're asking is it a resource issue?
3  Q.  Yeah.  In part of --
4  A.  Yes.  In part I would agree, absolutely, yes, a
5      resource issue.
6  Q.  And in all of these categories of crime, these things
7      happen even if there's a person out there who actually
8      did the illegal act, right?
9  A.  Can you restate that again.
10  Q.  Yeah.  Yes.  I'm saying everyone -- in any category of
11     crime when something like this happens, it means
12     somebody's getting away with it?
13  A.  Yes.
14  Q.  There's a -- a crime that's occurred or at least --
15  A.  Yes.
16  Q.  -- an -- but the person is undetected?
17  A.  Yes.
18  Q.  Okay.  So illustrate just really quickly, let's talk
19     through one simple example from when I served as a
20     local prosecutor early in my career.  Are you familiar
21     with the offense of drunk driving?
22  A.  Yes.
23  Q.  And you understand that it prohibits operating a
24     vehicle if the driver is impaired?
25  A.  Yes.

Page 52

13 (Pages 49 to 52)

Goodman-Williams, Ph.D., Rachael
6/1/2023

Page 53

```
 1   Q.  And we'll assume -- it can be drugs.  We'll assume for
 2       this hypothetical it's alcohol, right.
 3   A.  Hold on one second, I'm hearing you and I'm getting
 4       warm.  Let me just turn on a fan real quick.
 5   Q.  Okay.
 6   A.  It's only 9:00 where I am and I do have air.
 7   Q.  I'll be taking my shirt off soon.
 8           I did a quick check on the web yesterday
 9       and the National Highway Traffic Safety Administration
10       told me that for 2021, drunk driving killed, you know,
11       some thirteen thousand people in the United States and
12       seriously injured tens of thousands more.  That
13       thirty-one percent of traffic fatalities were alcohol
14       related.
15           And that the costs stemming from damage to
16       cars and damage to people exceeded forty-four billion
17       dollars, at least according to the Center for Disease
18       Control and Prevention, I don't know how they got that
19       number.  I'm not going to swear by it, but that's what
20       they said.
21           And the CDC also estimated for 2021, cars
22       were driven by drunk drivers about a hundred and
23       forty-seven million times.  Would you agree that drunk
24       driving causes the most -- among the most serious
25       kinds of harm that criminal offenses can cause, and I
```

Page 54

```
 1       mean death and destruction?
 2   A.  Would I believe that drunk driving causes death and
 3       destruction?
 4   Q.  Yes.
 5   A.  Yes.
 6   Q.  But it's always an invisible crime, right?
 7   A.  What do you mean by that?
 8   Q.  Well, you almost never see someone going down the road
 9       weaving, right, it's rare?
10   A.  I don't know about that.
11   Q.  Really?
12   A.  Yeah.  I mean, maybe people in Kansas are worse
13       drivers than Michigan.  But I feel like if a drunk
14       driver is about to hit someone, I'm likely to notice.
15   Q.  Well, nowadays you might notice if they're texting,
16       right?  It has the same effect?
17   A.  Sure.
18   Q.  All right.  But it's not -- but it's -- what I'm
19       saying it's not an everyday occurrence.  We're told
20       that a hundred forty-seven million cars were driven by
21       drunk drivers in the last year, but in your own
22       experience you probably couldn't remember the last
23       time you saw one, right?  It --
24   A.  Sure.
25   Q.  -- I mean, it's just -- it's not part of your everyday
```

Page 55

```
 1       experience, right?
 2   A.  Yes.
 3   Q.  And what that means is if a person is over the limit
 4       but together enough to be able to stay within the
 5       lanes, they're not going to be seen by the police.
 6       That's what I mean by it's an invisible crime.
 7   A.  I see.
 8   Q.  And that's right, isn't it?
 9   A.  Yes.
10   Q.  Okay.  What that means is that people have to be
11       stopped in order to be detected?
12   A.  People have to be stopped?
13   Q.  Yeah.  Pulled over by the police in order to be
14       detected.
15   A.  In order to be detected by the -- the criminal legal
16       system, I would say yes.  In order to be detected by
17       other civilians, I would say there are ways to detect
18       that without that person being pulled over.
19   Q.  Right.  There might be people in the car.
20   A.  Or you see someone weaving or drinking a beer bottle
21       while they're driving.
22   Q.  No.  I was saying if they're driving well.
23   A.  Oh yes.  If they're driving well, then yes,
24       absolutely.
25   Q.  So the police need probable cause to stop a car.  That
```

Page 56

```
 1       means they have to pull them over for something else.
 2       You've got to pull them over for speeding or because
 3       there's a taillight out, something like that.
 4   A.  If they're driving well you mean, yes.
 5   Q.  Yes.  Yes.  Okay.  So this invisible crime is only
 6       going to get detected if the police do that and then
 7       when they get to the driver, they notice that he's got
 8       slurred speech and bloodshot eyes and smells of
 9       alcohol and he can't walk the line.  And then they
10       give him a breathalyzer, right?
11   A.  Uh-huh.
12   Q.  So we've got this crime that the CDC is telling us is
13       happening one hundred forty-seven million times a
14       year.  And yet the only way we're going to get any of
15       those people counted is if the police decided to stop
16       -- decide to -- either see somebody drunk driving,
17       which we know it doesn't happen often, or pulls them
18       over for something else and gets lucky, right?
19   A.  Or they cause harm.
20   Q.  Yes, or they cause harm, yeah.  I'm not counting cause
21       harm.  Yes, the thirteen thousand, that's a lock.
22       They've had the accident and killed somebody, yeah.
23       And there may be others.  All right.
24           So what I'm saying is this is a
25       self-evident proposition about the American legal
```

14 (Pages 53 to 56)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1    system.  The vast numbers of crime -- and the same is<br>2    true for drug offenses.  You've got people on the<br>3    streets selling drugs a mile a minute, right, in any<br>4    city, is that right?<br>5    **A.**  Yes.<br>6    **Q.**  And the police don't go after them because the people<br>7    actually selling the drug will be replaced in fifteen<br>8    minutes, right, so that's low priority for police?<br>9    **A.**  Right.<br>10    **Q.**  The people they want to go after are the distributors<br>11    because that way you take the product out of the hands<br>12    of the people who are going to give it to the people<br>13    who are addicted?<br>14    **A.**  Yes.<br>15    **Q.**  That's another good example.  So every single drug<br>16    sale is a crime, right?<br>17    **A.**  Yes.<br>18    **Q.**  In fact, it's a double crime because the person<br>19    selling has -- is committing the crime of sale and the<br>20    person buying is committing the crime of possession?<br>21    **A.**  Yes.<br>22    **Q.**  So the undercounting of drug crimes is actually going<br>23    to be double the total -- at least street drug crimes,<br>24    street sales -- it's going to be double the total of<br>25    undetected offenses?<br><br>Page 57 | 1    **A.**  Yes.<br>2    **Q.**  All right.  And so, what I'm trying to say is that if<br>3    as a prosecutor back in the day I went into the office<br>4    on a Monday and was told that there were twenty-five<br>5    drunk driving cases that had come in over the weekend<br>6    and for me to review, do you agree that I would have<br>7    to be out of my mind if I thought that there were only<br>8    twenty-five drunk drivers on the road over the<br>9    weekend?<br>10    **A.**  Yes.  What I --<br>11    **Q.**  That's all I need.  By definition, criminal history<br>12    records, arrest, charges, dispositions, do not and<br>13    cannot count unreported offending?<br>14    **A.**  Correct.<br>15    **Q.**  Okay.  So that means you can't go to criminal records<br>16    statistics and think that you're going to learn<br>17    anything about the actual number of offenses in any<br>18    category of crime, maybe with the exception of murder?<br>19    **A.**  Yeah.  I think some will be more accurate than others<br>20    based on the percentage of reporting.  But you --<br>21    **Q.**  Right.  It --<br>22    **A.**  You won't ever know all of them, yes.<br>23    **Q.**  With the examples I've given, they're going to make --<br>24    if you talk about drunk driving and drugs, it's going<br>25    to make -- those are going to be the highest of all,<br><br>Page 58 |
| 1    right?<br>2    **A.**  Well, I think that you will know about the ones that<br>3    cause harm in those categories.<br>4    **Q.**  Yes.  You may know about the ones that cause harm,<br>5    that's a -- that's probably right.  But most of them<br>6    don't?<br>7    **A.**  Most drunk driving incidents, right, I would say are<br>8    un-wise, but did not cause harm to anyone.<br>9    **Q.**  Okay.  And just in the same way that you don't go to<br>10    the department of motor vehicles to find out how many<br>11    babies were born that year, you can't go to criminal<br>12    justice statistics and find out the actual number of<br>13    -- of -- of offenses that were committed for any<br>14    category of crime?<br>15    **A.**  They will be more or less accurate for certain crimes,<br>16    but you will always be undercounting.<br>17    **Q.**  Do you agree that what we've just been talking about<br>18    is a totally uncontroversial proposition that is basic<br>19    common sense that any intelligent person understands?<br>20    **A.**  You know, to be honest, I'm not sure that I do.  I<br>21    think a lot of people do have faith in those<br>22    statistics that they read.  And if -- I think if you<br>23    walked a lot of people through it, they would see the<br>24    logic in it.<br>25          But at a base level, I think a lot of<br><br>Page 59 | 1    people would hear X number of drunk driving incidents<br>2    per year, X number of robberies or whatnot, and they<br>3    would take that more at face value than is accurate.<br>4    **Q.**  I think you're right.  Let me rephrase the question<br>5    and say is that fair to say about people who work<br>6    within the system and people who research about the<br>7    system, the criminal justice system?<br>8    **A.**  Yes.<br>9    **Q.**  Okay.  Let's move on.  When it comes to re-offending<br>10    rates that are not in the criminal justice system, the<br>11    sources that are available are very different from<br>12    what's in the criminal justice system, is that true?<br>13    **A.**  Can you say that one more time, please.<br>14    **Q.**  Yes.  The sources that are available to try to figure<br>15    out crime not recorded by the criminal justice system<br>16    are very different from the kinds of information<br>17    recorded by the criminal justice system?<br>18    **A.**  Sources meaning like self-report?<br>19    **Q.**  Yes.<br>20    **A.**  Yes.<br>21    **Q.**  One is hard data that's accumulated over time in the<br>22    same ways, right?<br>23    **A.**  One is, I would say both are hard data with a fairly<br>24    systematic approach.  They're different types of data<br>25    for sure.<br><br>Page 60 |

15 (Pages 57 to 60)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1   Q.  Yeah.  Let's talk about the hard data first.  I mean,
 2       isn't the beauty of the criminal justice statistics or
 3       any governmental statistics that you're requiring
 4       people over an -- an entire area of -- of civil work,
 5       criminal work, whatever it is, to record what they're
 6       doing.
 7             And so, at the end of a month, of a year,
 8       or a -- however it's recorded, every single
 9       jurisdiction in a state like Michigan is going to be
10       reporting the same categories of data in the same way
11       to central authorities, is that right?
12   A.  I would hope so.
13   Q.  Yeah.  Right.
14   A.  Yeah.
15   Q.  They may not do it exactly the same way.
16   A.  Yeah.
17   Q.  But it doesn't really matter because as long as
18       they're doing it same way -- each jurisdiction is
19       doing it the same way every year, cumulatively the
20       data is going to be massively valuable because you
21       have this huge array of recorded data from official
22       reports and it's sent to the state and sent to the
23       federal government and circulated and it's transparent
24       and --
25   A.  Yes.
```

Page 61

```
 1   Q.  -- it means once you've got it done, you can compare
 2       next year's data to last year's data, right?
 3   A.  Uh-huh.
 4   Q.  If it's done the same way for decades and often being
 5       improved over time for decades, that's what allows
 6       social scientists to spot trends in whatever it is
 7       that they're studying, right?
 8   A.  Yeah.  There's a phrase in research garbage in,
 9       garbage out.
10   Q.  Yes.
11   A.  So I think the value of that data really depends on
12       what is being collected and how it's being collected.
13       But if that is -- if how it's being collected is -- is
14       good and all of that, you know, it has the potential
15       to be very valuable, yes.
16   Q.  And even if it's -- it's not -- even if it's imperfect
17       data, what I'm saying is if, you know, if in Grand
18       Rapids, you know, the -- the person who does the data
19       gets sick for two weeks and doesn't record it, it --
20       it, you know, these are tiny, tiny changes in the
21       margin.
22             But if everybody is doing it the same way
23       year in and year out, even if some jurisdictions are
24       doing it better than others year in and year out,
25       you've got a set of data that's comprehensive as to
```

Page 62

```
 1       what it's doing.  For what we're talking about now, it
 2       records or should record every arrest, every charge,
 3       and every conviction, right?
 4   A.  Yes.
 5   Q.  And not only is the data there, but if someone wants
 6       to back up the data in some way or verify the data in
 7       some way, a lot of the information is public.  You can
 8       go to the criminal file and check it out, right?
 9   A.  Yes.
10   Q.  You've got backup to the data itself?
11   A.  Uh-huh.  Yes.
12   Q.  All right.  And that's why I call it hard data.  It's
13       there.  It's available.  And, I mean, in some respects
14       for researchers, it's viewed as the gold standard
15       because it's unchanging year to year other than due to
16       variables, right?
17   A.  My concern with that data is, for example, like
18       official COVID tests, you know, I see as being
19       somewhat the same thing.  It was done by sort of often
20       county agencies recording data, recording it the same
21       way, keeping track of it.  So it could tell us a lot.
22             But when you know what all it's not
23       counting, your confidence in what it's able to tell
24       you is pretty minimal.  If those official COVID tests
25       were saying, you know, look, rates of COVID are very
```

Page 63

```
 1       low and I'm going, yeah, but I don't know a person
 2       who's gone and gotten one of those.  Most people are
 3       just testing at home and are not reflected in those
 4       numbers.  That data might be reliable, but I would
 5       have questions as to whether it's valid.
 6   Q.  But -- but COVID is a great example because COVID is
 7       something that was new and everything had to be done
 8       for the first time and everybody was doing it
 9       differently.  That -- that -- I mean that's
10       significantly different from criminal justice data
11       that's been done the same way for generations, right?
12   A.  Yeah.  It's --
13   Q.  Generation is too strong.  It's been done for decades,
14       right?  Is that right?
15   A.  Can you repeat the question.
16   Q.  That's very different from criminal justice data that
17       has been done the same way or much the same way for
18       decades?
19   A.  I think there were some COVID data that were being
20       collected quite systematically early on, but it was
21       certainly newer than criminal justice data,
22       absolutely.
23   Q.  Yes, and spottier.  But you raise a great point, with
24       COVID data one of the things that people wanted to
25       know, that scientists wanted to know, was how many
```

Page 64

16 (Pages 61 to 64)

Goodman-Williams, Ph.D., Rachael
6/1/2023

1    people have gotten COVID and how many people have died
2    of COVID, right?
3  A.  Uh-huh.
4  Q.  Yes?
5  A.  Yes.
6  Q.  And part of that was to track the disease because they
7    kind of knew if they had a feel for the mortality
8    rates, testing would tell us more, testing would tell
9    us where it was starting, as -- as with deaths.
10    But there's one interesting thing about the
11    deaths side of it.  And that is because we had really,
12    really good health data, it didn't matter if we -- in
13    the end, if we wanted to know how many people died of
14    COVID, we didn't have to record COVID deaths at all.
15    Do you remember that?  You may not.
16  A.  Are you referring to just changes in the death rate
17    over time?
18  Q.  Absolutely, yes.  And in the end -- I remember reading
19    it in the New York Times -- there was a big debate.
20    We need this data and we need this data.  And somebody
21    wrote in the New York Times we don't need any data
22    because we have death rates going back thirty years,
23    forty years, fifty years.
24    And we know when -- when we look at this
25    data, the hard data, we're going to be able to see

Page 65

1    that for whatever the year, you know, whatever period
2    of time you want to pick, 2020 or 2021, compared to
3    all that past data, there were, you know, one million
4    three hundred and fifty thousand deaths that there
5    weren't before?
6    And that's way more accurate than anything
7    else that anybody could have done while it was
8    happening, isn't that right?
9  A.  Yeah.  I think that was a very good data source.
10  Q.  Yeah.  And you might have to tinker with it if it
11    turns out that during the year you're looking at
12    usually ten thousand people would die of heart
13    attacks, but in that year only five thousand people
14    died of heart attacks, you don't want to count those
15    as COVID deaths because then you're kind of double
16    counting, right.
17    You've got to take out five thousand of
18    your COVID deaths because they really should have --
19    they would have died -- or should have died of heart
20    disease.  You can massage it to get it really, really
21    accurate when you have complete, accurate, you know,
22    decently accurate, data -- complete consistent data,
23    right?
24  A.  Uh-huh.
25  Q.  Yes?

Page 66

1  A.  Yes.
2  Q.  All right.  Let me ask you about detection rates
3    postconviction as -- as -- as -- excuse me -- as --
4    pardon me -- to pre-arrest.  Hold on just a second.
5    Let me find my place here.
6    Are you aware of the literature that shows
7    that ninety-five percent of arrests, charges, and
8    convictions for sex offenses every year are committed
9    by people who have never been previously convicted of
10    a sex offense?
11  A.  I'm not.
12  Q.  All right.  I don't have that study in front of me.
13    But -- but -- but that's a number -- some people might
14    say ninety to ninety-five -- but that's a number
15    that's been reported for decades.  It was true before
16    there were registries and it was true after the
17    registries.
18    When we get numbers like that, we can't
19    know how many people convicted additional offenses
20    beyond those that they were convicted, right?  Those
21    are the undetectable?
22  A.  How many do you mean have perpetrated --
23  Q.  Yes.
24  A.  -- additional offenses?
25  Q.  Yes.

Page 67

1  A.  Yes, we do not know that.
2  Q.  Okay.  Isn't it true that there's no reason to think
3    that the percent of offenses reported to police
4    differs between people who have been previously
5    convicted and people who have been convicted?
6  A.  I'm going to need that one more time.
7  Q.  Isn't it true that there's no reason to think that the
8    percent of offenses reported to police differs between
9    people who have not been previously convicted and
10    people who have been?
11  A.  I'm not sure that there's no reason to think that.  I
12    think that some perpetrators are very good at picking
13    vulnerable victims or victims who lack credibility.
14    There might be systematic reasons that those victims
15    don't report to police.
16  Q.  Is there any reason to believe that people with past
17    convictions are going to be better or worse at that
18    than people with no convictions?  The people with past
19    convictions we know are the people who weren't very
20    good at it, they were the losers?
21  A.  Yeah, I'm not familiar with any research on that one
22    way or the other.  You are giving me lots of ideas for
23    good questions.
24  Q.  Yeah.  In fact, one of the other defense exerts,
25    Rachel Lovell -- do you know her work?

Page 68

17 (Pages 65 to 68)

Goodman-Williams, Ph.D., Rachael
6/1/2023

**Page 69**

1    **A.** I do.
2    **Q.** She wrote in her report, quote, there's no compelling
3         evidence to suggest the percentage of unreported
4         offenses is different between those with no previous
5         convictions and those who do.
6             Are you disagreeing with her?
7    **A.** I'm not agreeing or disagreeing.  I would have to give
8         a lot more thought to that kind of question and
9         consider before.
10   **Q.** Do you think, if anything, the reporting or detection
11        rate is going to be higher for those with a past
12        conviction -- when I say reporting or detection, I
13        mean by -- reporting to or detection by police will be
14        higher because the police will be more likely to act
15        on the case if the report involves someone who has
16        offended before?
17   **A.** I do think police would be more likely to act on a
18        case if it involves someone who's offended before.
19   **Q.** All right.  Let's go back to your report,
20        paragraph twenty-eight.  Can you see that?
21   **A.** I can.
22   **Q.** Okay.  In this part of the report, you say for the
23        sake of argument, let's suppose that it's -- that
24        the -- the detection rate is a hundred percent.  That
25        is, if someone has a previous -- was arrested for a

**Page 70**

1         previous sexual assault and is arrested for a second,
2         you'll assume that they get caught on the second,
3         right?
4    **A.** Yes.
5    **Q.** And that's because even just a prior arrest for a
6         sexual assault will make it at least somewhat more
7         likely -- and maybe a lot more likely -- that the case
8         will be taken seriously and will move forward?
9    **A.** I would imagine and hope so.  And that next sentence,
10        this is a standard unlikely to be met.  But for the
11        sake of the sort of thought experiment I was
12        proposing, I wanted to get sort of the upper bound of
13        what could be identified.
14   **Q.** Yeah.  And -- and -- and it's safe to assume, isn't
15        it, that if that's true for people with prior arrests,
16        it will be even more true for people with prior
17        convictions?
18   **A.** I would imagine so.
19   **Q.** Because the police will say this is not just someone
20        who's been suspected, but this is someone who's been
21        convicted --
22   **A.** Yeah.  Like I said, I'm not aware of any data on that.
23        But for the thought experiment, that was upper the
24        upper bound.
25   **Q.** Okay.  All right.  And if it's true -- if it's true

**Page 71**

1         that people are -- with a conviction who are
2         implicated in some way or connected in some way to a
3         crime or suspected of a crime, if they're more likely
4         to get into the criminal justice system if they have
5         an arrest or conviction, doesn't that mean that when
6         they are reconvicted or if they are reconvicted, the
7         recidivism numbers that we see for them are going to
8         be somewhat higher than the recidivism numbers that we
9         see for people who don't have a prior arrest or a
10        prior conviction?  That's the consequence, isn't it?
11   **A.** How would we see recidivism numbers for someone who
12        doesn't have a prior arrest or conviction?
13   **Q.** We wouldn't.  But what I'm saying is the numbers that
14        we see for the -- for those with the conviction are
15        going to be higher than the -- you're right.  You're
16        right to correct me.
17            They are higher than what they would have
18        been on that second offense?
19   **A.** I'm sorry, I'm not trying to be obtuse, but I'm
20        struggling to understand the question.
21   **Q.** What I'm saying is if people are more likely to get
22        caught on a second offense because of a first offense,
23        then when we run numbers on their recidivism rate,
24        it's slightly out of whack with what you'd expect for
25        detection rates with someone who -- who didn't I

**Page 72**

1         understand why you're confused.  I'm using recidivism
2         and I should use detection.
3             Let's do it that way.  If we say you've got
4         two different detection rates; one is for people who
5         had an undetected offense and then get arrested on
6         something, right?
7    **A.** Uh-huh.
8    **Q.** And -- and -- arrested or convicted.  And you've got
9         people who have known and in the records offenses,
10        arrests, charges, or convictions who then get
11        convicted.
12            What I'm saying is the first group is going
13        to have detection rates higher than the second group?
14   **A.** I would imagine so, yeah.
15   **Q.** What --
16   **A.** There's no data on that, to my knowledge, but I would
17        hope so.
18   **Q.** Yeah.  You'd hope so.  And it makes sense?
19   **A.** Yeah.
20   **Q.** So what I'm saying is when you're looking at detection
21        rates or -- of which recidivism rate is one, the
22        number that we're getting is disproportionately high,
23        even though -- even though the numbers are quite low,
24        seven percent to twelve percent or whatever in the
25        first five years.

18  (Pages 69 to 72)

Goodman-Williams, Ph.D., Rachael
6/1/2023

**Page 73**

1       It's actually higher -- it's -- it's got an
2  added factor built into it.  It's actually a little
3  higher than it would be if they didn't have the arrest
4  or the offense?
5  A.  Well, I think the factors are affected by forces in
6  both directions.  I think the factors that are
7  affecting it in a direction that we are missing a lot
8  of recidivism are about twenty to one on the factors
9  that are affecting it towards where we might catch a
10  little bit more of that recidivism.
11  Q.  But we're not measuring against undetected offending.
12  We're only measuring it against detected offending.
13       And what I'm saying is as the detected
14  offending, it's higher than it otherwise would have
15  been.  And so, when we report a recidivism rate, it's
16  actually an inflated recidivism rate.  We're --
17  A.  I don't see --
18  Q.  -- not -- we're not --
19  A.  -- I don't --
20  Q.  What?
21  A.  I don't see it as being an inflated recidivism rate,
22  no.  I see it as being a sightly more accurate
23  recidivism rate than it would be otherwise.
24  Q.  Why is it more accurate if it's higher because of
25  their conviction?

**Page 74**

1  A.  Because within the hypothetical, these are people who
2  have convicted -- or I'm sorry -- who have perpetrated
3  multiple offenses.  And so, that is somebody who has,
4  you know, within the thought experiment, perpetrated
5  two sexual offenses.
6       And so, the question that I was engaging
7  with is do we recognize them correctly as having
8  perpetrated two sexual offenses.  And the vast
9  majority of the time we do not.  But when they were
10  arrested for the first offense, we have a slightly
11  more accurate view of that second offense.
12  Q.  Isn't it true that the fact that they've -- that they
13  have two offenses is built into this?  I mean, that's
14  what -- right?
15  A.  Yes.  Absolutely.  The thought experiment that I was
16  proposing in this report is somebody who has
17  perpetrated two sexual assaults.  What are the chances
18  based on case attrition numbers that they will be
19  recognized as a recidivist through criminal history
20  data alone.
21  Q.  I'm not talking about your thought experiment.  I'm
22  just talking about criminal justice records.  For
23  criminal justice records, it's built in that if they
24  have two offenses, they have two offenses.
25       But what's not built in is that they're

**Page 75**

1  more likely to be apprehended because of the first
2  offense.  And so, what I'm saying is not -- not in the
3  thought experiment, but within the actual records,
4  people who have a previous offense are more likely to
5  be caught.  And therefore, their rate is higher in --
6  in -- in the somewhat artificial way compared to
7  people who don't?
8  A.  I think it's higher in an accurate way.  But, I mean,
9  I -- again, I don't know of any data on that.  But I
10  would certainly hope that people who have been
11  apprehended once for a sex offense are more likely to
12  -- to be looked into thoroughly for a second reported
13  offense.
14  Q.  Okay.
15  A.  I apologize if I'm not understanding that fully.
16  Q.  That's okay.  Give me a minute to see where I want to
17  go next.
18  A.  Could we actually take a quick break.
19  Q.  Sure.
20       (Off the record 10:44 a.m.)
21       (Back on the record at 10:54 a.m.)
22       MR. REINGOLD:  Back on the record.
23  BY MR. REINGOLD:
24  Q.  So just to sum up what we were talking about before
25  the break.  It's fair to say, isn't it, that the --

**Page 76**

1  the criminal justice system and the way it records
2  data is a -- good system for figuring out catch
3  rates.  That is, who with a criminal history has been
4  caught for committing a new crime?
5  A.  Yes.
6  Q.  Okay.  With unreported crime, we've got a very
7  different kettle of fish, right?  Unreported offenses
8  are undetected offenses by definition?
9  A.  Yes.  You're talking specifically about unreported,
10  not reported and not investigated or all of that?
11  Q.  Yeah.
12  A.  Okay.  Yeah.
13  Q.  So these are offenses that, again, by definition never
14  make it into an official database that police or the
15  public or researchers can look at?
16  A.  Correct.
17  Q.  No law enforcement investigation to determine if the
18  alleged offense is true or fabricated --
19  A.  Can I clarify.
20  Q.  Sure.
21  A.  Sometimes they do make it into a public database that
22  researchers and things can look at through things like
23  the National Crime Victimization Survey and things
24  like that.
25  Q.  Yeah.  Okay.  All right.  So there are methods that

19 (Pages 73 to 76)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1    researchers use to try to estimate the level of
 2    unreported crime, and one of those is self-reporting,
 3    right?
 4  A.  Yes.
 5  Q.  At paragraph thirty-three -- I think it was
 6    thirty-three, yes -- you say there's no perfect
 7    alternative to using criminal history records as an
 8    indicator of sexual offending and -- correct?
 9  A.  Correct.
10  Q.  But one widely used method is self-reporting by
11    perpetrators, right?
12  A.  Yes.
13  Q.  All right.  And basically that means getting people to
14    admit that they committed a past undetected offense?
15  A.  It means asking people if they've perpetrated
16    undetected offenses.
17  Q.  Yeah.  But you can't actually interview them because
18    if you're asking them to confess to a past offense
19    that has never been detected and if they tell you yes,
20    then they can be charged with a crime?
21  A.  No.  There are researchers that have gotten
22    confidentiality waivers and the like to carry out that
23    research.
24  Q.  And does that mean they have to get it like from
25    prosecutors?
```

Page 77

```
 1  A.  I don't know the details of that.
 2  Q.  All right.  But in any event, it's true that if you
 3    ask that question, if -- if -- if the police ask the
 4    question, have you committed a past offense, the
 5    person has a right to say I'm not going to talk to
 6    you?
 7  A.  Yes.
 8  Q.  All right.  And in order to do this, you would need,
 9    you know, a waiver from prosecutorial authorities?
10  A.  I'm not sure if it's prosecutorial authorities.
11  Q.  Is that relatively rare?
12  A.  I don't know.
13  Q.  Okay.  Because I don't think I've ever seen one where
14    it was actually asking about past offenses, but you
15    might be right.
16       But in any event, the most common way to do
17    that is not through interviews, but anonymous surveys
18    to known offenders asking them about prior sexual
19    offenses, rights?
20  A.  By anonymous surveys, you know who the participants
21    are but not the individual answers.
22  Q.  Yes.
23  A.  I think that is a common way, yes.
24  Q.  All right.  So one of the -- in fact, the lead article
25    that you raise -- I think I have to bring it up.  This
```

Page 78

```
 1    is an article -- this is Exhibit 5.  It's not in
 2    order, but we'll call it Exhibit 5, which is an
 3    article about undetected recidivism among rapists and
 4    child molesters, right?
 5  A.  Yes.
 6       MARKED FOR IDENTIFICATION:
 7       DEPOSITION EXHIBIT 5
 8       10:59 a.m.
 9  BY MR. REINGOLD:
10  Q.  All right.  And this is -- you said at page
11    thirty-five that this is an example of the kind of
12    studies that are, quote, worthwhile, close quote, to
13    look at to help us -- to help inform us about
14    undetected serial sexual offending, right?
15  A.  Yes.
16  Q.  The very first line of the article says that the
17    article is looking at recidivism among, quote,
18    dangerous sexual offenders, right?
19  A.  Yes.
20  Q.  So it's not going to be able to inform us about
21    undetected serial offending generally, but only about
22    highest risk people recognized as dangerous sexual
23    offenders?
24  A.  I would have to remind myself how they chose their
25    sample, but I believe that that's correct.
```

Page 79

```
 1  Q.  Okay.  And the study actually doesn't address
 2    recidivism at all in the sense that I've been talking
 3    about it.  Because it's not about people being caught
 4    again after --
 5  A.  Yes.
 6  Q.  -- convicted of a prior offense, right?
 7  A.  Yes.
 8  Q.  Okay.  What it's really talking about is undetected
 9    past sexual offenses?
10  A.  Yeah.  Repeat perpetration.
11  Q.  Okay.  That's a good way to phrase it.
12       In this case, I looked them up, the lead
13    author was a prison clinical psychologist who is the
14    director of a sex offender program at a Connecticut
15    prison.  And the co-author was a consultant to the
16    Florida Department of Corrections, if memory serves.
17       And we'll go through this.  But the impetus
18    for this study was a 1950 report by a New Jersey
19    commission on a habitual sexual offender, which was
20    cited in a 1966 publication called Federal Probation.
21    I think that's in the footnote.  Do you see that,
22    footnote number one?
23  A.  I do.
24  Q.  All right.  And the date of the study is 1982, which
25    means it's looking back thirty years at a random
```

Page 80

20  (Pages 77 to 80)

Goodman-Williams, Ph.D., Rachael
6/1/2023

1  commission study from New Jersey that was spotted by
2  them apparently in a sixteen-year-old federal
3  publication that apparently focussed on probation. Do
4  I have that right?
5  A. I trust that you do. Again, I'd have to spend some
6  more time with that article to remind myself, but that
7  sounds right.
8  Q. And the authors quote the New Jersey commission at the
9  beginning. And they say, the first line, sex
10  offenders have one of the lowest rates as repeaters,
11  close quote, of all types of crime among serious
12  crimes. Homicide alone has a lower rate of
13  recidivism.
14       Assuming that they're using recidivism and
15  repeaters in the way that I do, meaning, official
16  recorded arrest, that remains true today, right?
17  A. Say that again, please.
18  Q. Assuming that they're talking about actual reported --
19  A. Oh yes. Official recidivism rates, that remains
20  true today, yes.
21  Q. Because the -- the -- right. Right. So that
22  means it's been true for 1950 to 2023, is
23  seventy-three years?
24  A. Yes.
25  Q. Okay. It goes on to say careful studies of large

Page 81

1  numbers of sex criminals show that most of them get
2  into trouble only once. Of those who do repeat, a
3  majority commit some crime other than sex.
4       Again, using the same recidivism data and
5  getting into trouble means being convicted of a sexual
6  crime, this statement too remains true today?
7  A. I believe they're using arrest, it looks like, as a
8  threshold there, but yes.
9  Q. Yeah, that's right. All right. Today, again, using
10  arrest, charges, or conviction, most people who are
11  convicted of a sexual crime are never arrested,
12  charged, or convicted of a subsequent crime, correct?
13  A. Yes.
14  Q. And the majority of those who are arrested or
15  convicted of a subsequent crime -- of those who are
16  arrested for a subsequent crime, the majority is for a
17  crime other than sex?
18  A. Yes.
19  Q. Okay. And then it concludes by saying only seven
20  percent of those convicted of a serious sexual --
21  serious -- I assume they mean sexual crime -- are
22  arrested again for a sex crime. Those who are
23  recidivists are characteristically minor offenders
24  such as peepers, exhibitioners, homosexuals. We'll
25  say in 1950 homosexuality was a crime.

Page 82

1  A. Yeah.
2  Q. Rather than criminals of serious measure -- menace,
3  right?
4  A. Yes. And again, this is like what they're referring
5  to at the beginning of the article, not their actual
6  findings.
7  Q. Right. Okay. All right. In the Groth study -- I
8  don't know if it's Groth or Groth, but I'll -- I'll
9  use Groth.
10  A. That's how I say it in my head.
11  Q. Okay. Those authors took umbrage with the report
12  because their prison clinical experience suggested not
13  that the actual recidivism figures were wrong, but
14  that undetected offending was not being counted,
15  right?
16  A. Yes.
17  Q. Okay. And the lead author, it turns out, had access
18  to sexual offenders in the Connecticut maximum
19  security prison. And the second author had access to
20  sexual offenders at a Florida mental health facility
21  designated exclusively for sexual offenders?
22  A. Yes.
23  Q. Okay. We don't know if the Florida facility was for
24  civil commitment. I tried to find out, but it's -- it
25  doesn't appear to be there anymore. Or was part of a

Page 83

1  Florida DOC.
2       But if it was a civil commitment, that
3  would mean that the residents were confined because
4  they were viewed as so dangerous that they could be
5  kept in a custodial setting regardless of their
6  criminal history?
7  A. And you said we don't know which it was for?
8  Q. No.
9  A. Okay.
10  Q. That's a yes?
11  A. It's an -- I believe that -- I haven't looked into
12  what it was for. And I'm confirming that we don't
13  know which it was for.
14  Q. Okay. But I'm -- but I'm saying if it was civil
15  commitment, it would mean people who could be civilly
16  committed regardless of their criminal background,
17  right?
18  A. Oh, I don't know.
19  Q. Okay. All right. And -- and in both the Florida and
20  the Connecticut population, the majority of the
21  prisoners had been convicted more than once for a
22  sexual assault?
23  A. Okay.
24  Q. In fact, I believe -- I don't know if we need to find
25  it, but you can review it if you wish, sixty-five

Page 84

21 (Pages 81 to 84)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1    percent of the subjects who had offended against
 2    adults and thirty-seven percent of -- and had had
 3    multiple convictions, with a mean of two point eight,
 4    and thirty-seven percent of the subjects who had
 5    offended against children had multiple convictions,
 6    with a mean of one point seven.
 7          Combined seventy-four of the hundred
 8    thirty-seven people surveyed, fifty-four percent had
 9    multiple convictions for sexual offenses.
10  A.  Okay.
11  Q.  If the New Jersey commission report was accurate that
12    only about seven percent of people convicted of sexual
13    crimes are arrested for a new sexual crime, wouldn't
14    that mean that the sample that Groth, et al., chose to
15    use for their study was about eight times higher risk,
16    that is, fifty-four percent versus seven percent
17    recidivists?
18  A.  I don't know that I would talk in terms of risk.  But
19    I would definitely agree that they were a sub-sample
20    that had been caught a uniquely high number of times.
21  Q.  Okay.  And the group wasn't just within the seven
22    percent of people arrested for crimes -- subsequent
23    crimes.  Because what the Groth study counted was the
24    number of convictions, so this would be an even
25    smaller percentage than the seven percent, right?
```

Page 85

```
 1  A.  Yes.
 2  Q.  And we know that the attrition rates after arrest on
 3    sexual offenses from the L.A. studies that you cited
 4    can be sixty-six to eighty-two percent.  So if we use
 5    an attrition average in between that, let's say
 6    seventy-two percent, and add that to the added
 7    attrition you get -- that it takes to -- to get a
 8    conviction, which in those studies was fifty-three to
 9    seventy-eight percent, so let's use sixty-five
10    percent, that's going to put us not just in the top
11    seven percent of repeat offenders, but something like
12    in the top three percent of all offenders, right?
13  A.  Yes.
14  Q.  Okay.  Fair to say that this is a population that's
15    about as far to the edge of the spectrum as one can
16    get when it comes to their actual recidivism rate?
17  A.  I imagine you could get farther, but yes, this is --
18    this is at one end of the spectrum for sure.
19  Q.  Okay.  And -- and it's more or less what you'd expect
20    given the description of who these people are and the
21    facilities that they're in, right?
22  A.  Yes.
23  Q.  Okay.  The authors also tell us that the range of
24    officially recorded repeat convictions for those who
25    offended against adults were from one to twenty
```

Page 86

```
 1    convictions.  And the range for those who offended
 2    against children were from one to eight convictions.
 3    These again are actual offenses, not what they reveal
 4    about past offenses.
 5  A.  These are actual -- actual -- like criminal history
 6    data offenses is what you're saying.
 7  Q.  Yes.
 8  A.  Yes.
 9  Q.  Okay.  So the authors, though, they don't tell us what
10    the distribution was for either of those.  So we can't
11    see how much of the criminal conduct of just a few
12    people raise the average of everyone else, right?
13  A.  I would have to look at the article more in depth to
14    see if they give medians or anything like that.
15  Q.  I don't -- I don't know if they did or not.  I don't
16    think they told us that.  Known recidivism rates, they
17    have a mean, two point seven, three point one, and two
18    point eight.
19  A.  Yeah.
20  Q.  Okay.  But again, it's hard for us to know given --
21  A.  Yeah.  I could look more in depth in the text itself
22    to see if they give a standard deviation or a mean,
23    but in table one they do not.
24  Q.  Yeah, they don't.  They don't.  It makes it hard for
25    the reader --
```

Page 87

```
 1  A.  Yes.
 2  Q.  -- it could be a few people with very high scores and
 3    that would get us to two point seven and three point
 4    one or it could be almost no one in the high scores,
 5    right --
 6  A.  I know that there's an article that I refer to in my
 7    report, and I can't remember whether it was this one
 8    or a different one, that gave those means after
 9    dropping about seven percent of the sample that had an
10    extremely high number --
11  Q.  That was this one and we'll get to that.
12  A.  Okay.  In this case, they did drop the outliers before
13    calculating those means.
14  Q.  We'll get to that.  Okay.  All right.  Now, let's take
15    a look at how the study was conducted.  The authors
16    wanted to investigate undetected sexual offending.  So
17    they designed a survey to give to one hundred
18    thirty-seven survey subjects, right?
19  A.  Yes.
20  Q.  Okay.  I -- I -- I would say at that point an odd
21    thing happened.  At the Florida mental health
22    facility, all ninety of the inmates or residents who
23    committed a sexual assault offense, that is a hundred
24    percent of them, agreed to take the survey, right?
25  A.  If that's what it says in the article, then --
```

Page 88

22 (Pages 85 to 88)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1   Q. That's what it says. | 1   Q. And I represented prisoners for decades, that's a |

Page 89

```
 1   Q.  That's what it says.
 2   A.  Okay.
 3   Q.  And at the Connecticut prison, forty-seven of the
 4       sexual assault inmates asked to take the survey,
 5       ninety-seven percent said yes.  Do you agree with that
 6       as well?
 7   A.  I don't have it in front of me, but if that's what it
 8       says in the article --
 9   Q.  Let me see if I can find it.
10   A.  It looks like -- yeah.  Okay.  Could you scroll up
11       just a little bit more.
12   Q.  Yeah.  I should have said ninety-four percent, not
13       ninety-seven percent.
14   A.  Okay.
15   Q.  All right.  Have you ever conducted a study of people
16       in prison or combined -- confined to a mental health
17       facility?
18   A.  I was a part of studies early in graduate school that
19       interviewed and surveyed people who were in prison,
20       but I was not doing the interviewing or surveying
21       myself.
22   Q.  For a random survey where there's no interviewing,
23       ever seen results or -- or take results at a hundred
24       percent or ninety-four percent?
25   A.  Not that I recall.
```

Page 89

```
 1   Q.  And I represented prisoners for decades, that's a
 2       primary thing that I did.  And I was on their side and
 3       I had a reputation for helping them.  If I ever needed
 4       information from them about an issue, I sent out
 5       questionnaires or asked for them to respond to
 6       something -- in those days I could send self-addressed
 7       stamped envelopes -- I don't think I ever had a higher
 8       response than twenty or thirty percent.  But Groth, et
 9       al., got response rates of ninety-seven and a hundred.
10           Doesn't that suggest to us that there was
11       an inducement that was provided to get the people to
12       take the survey?
13           MR. JAMISON:  Objection, lack of
14   foundation.
15           THE WITNESS:  Yeah, I would not make that
16       assumption.  I would agree that it's an unusually high
17       participation rate, but I don't know why.
18   BY MR. REINGOLD:
19   Q.  And in this case, the authors didn't tell us.  Usually
20       in a study, the authors will say here's what we did,
21       here's the number we, you know, here's how we went out
22       --
23   A.  Yeah.
24   Q.  -- and got them.  This doesn't have any of that.  It's
25       just there was a population nearby and we gave them
```

Page 90

```
     the study.  Okay.
 1           If professionals are going to provide an
 2   inducement to get subjects to take a survey, isn't it
 3   customary to make that known in the study itself?
 4   A.  Yes.
 5   Q.  You commonly see it, right?  We're paying people --
 6   A.  Yes.
 7   Q.  -- online study five dollars or whatever.  Yeah.
 8   Okay.
 9           In fact, do the rates of a hundred percent
10   and ninety-seven percent, are they so high that they
11   might suggest that the survey wasn't optional, but was
12   effectively mandatory?  That is, instead of offering
13   inducement, the inmates were simply told no survey, no
14   dinner or no survey, no yard or no survey, no visits?
15   A.  I --
16       MR. JAMISON:  Objection, misstates the
17   record and assumes -- or lack of foundation.
18       THE WITNESS:  Yeah.  I do not think that
19       would have gotten IRB approval.  I don't think that
20       was likely at all.
21   BY MR. REINGOLD:
22   Q.  It --
23   A.  I shouldn't say that.  I should say that is not what I
24       would assume from that participation rate.
```

Page 91

```
 1   Q.  I would be surprised if there was approval required --
 2       what was our survey date again.  It might have been by
 3       then -- oh no, we never got a date.
 4   A.  But no, I would not assume that it was mandatory.
 5   Q.  But you've never seen survey results close to
 6       ninety-seven or a hundred percent, have you?
 7   A.  No.
 8   Q.  What's the highest you've ever seen, do you think?
 9   A.  I don't recall.
10   Q.  Okay.  Is it fair to say that rates of ninety-four
11       percent and a hundred percent -- I should correct what
12       I said before, ninety-four, not ninety-seven.
13           But fair to say that rates of ninety-four
14       percent and a hundred percent are effectively off the
15       charts for random samples?
16   A.  Well, this was not a random sample, correct?
17   Q.  Well, they tout it as one.  They say we were going to
18       give it to this pool of people.
19   A.  I don't think --
20   Q.  It --
21   A.  I haven't looked in this article in depth in a little
22       bit.  But I don't recall this being a systematic
23       random sample.  With that --
24   Q.  It -- it -- I would agree with that, it's not a
25       systematic random sample --
```

Page 92

Tri-County Court Reporters
248-608-9250

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1    A.  Okay.  Yes, ninety-four and a hundred percent is
 2        extremely high.
 3    Q.  Okay.  All right.  Now, let's look at the five
 4        questions to the survey.  The first question was how
 5        old were you at the time of your first sexual assault
 6        or attempted assault, regardless if you were caught
 7        for this or not.
 8            Anywhere in the study is there a definition
 9        for the study takers of what sexual assault or
10        attempted sexual assault means?
11    A.  I don't know.
12    Q.  There's not.  I'm telling you.
13    A.  Okay.  Do they -- do they affirmatively state that
14        there's not a definition of that?  Or they don't say
15        whether there's a definition of that in their
16        publication?
17    Q.  There's no definition contained in the study.
18    A.  In the publication?
19    Q.  In the publication, yes.
20    A.  Okay.
21    Q.  The only thing we're given that appears to have been
22        given to the inmates is these five questions.
23    A.  Yes.
24    Q.  Right.  Okay.  So it's fair to say that prisoners or
25        detainees or residents in a mental facility don't
```

                        Page 93

```
 1        really have a clue when -- what they're being asked
 2        about as to what sexual assault or attempted assault
 3        means?
 4            MR. JAMISON:  Objection, lack of
 5        foundation.
 6            THE WITNESS:  Yeah, I -- it cannot be
 7        assumed.  I will say this is less than stellar
 8        publication reporting practices.  But it cannot be
 9        assumed that just because something is not in this
10        publication it was not in the survey that was given to
11        participants, unless it is affirmatively stated no
12        definition was given to participants.
13  BY MR. REINGOLD:
14    Q.  But the reader doesn't get a definition?
15    A.  The reader does not get a definition, correct.
16    Q.  There's no way to know if the prisoners got a
17        definition?
18    A.  Correct.
19    Q.  The second question is how many sexual assaults have
20        you been convicted of to date.  Same problem, there's
21        no definition, right?
22    A.  Uh-huh.  Yes.
23    Q.  The answers could be all over the map.  But since they
24        didn't tell us, we can't know whether the answers were
25        all over the map, right?
```

                        Page 94

```
 1    A.  Yes.
 2    Q.  Okay.  So some people might have included, you know,
 3        when they touched somebody through their clothes, you
 4        know, thirty years ago.  And some people may only have
 5        included a penetrative rape?
 6    A.  Yes.  If they were convicted for touching someone
 7        through their clothes, because that question is
 8        specific to convictions, then yes, they can count
 9        that.
10    Q.  Okay.  The second question doesn't really have any
11        meaning, right?  How many sexual assaults have you
12        been convicted of to date, because we already know the
13        answer to that question?  They --
14    A.  Say that again, please.
15    Q.  Yeah.  Question number two, how many sexual
16        assaults -- how many sexual assaults have you been
17        convicted of to date, include attempted sexual
18        assaults, homicide, et cetera.
19            But we already know the answer to
20        that question -- or at least the authors can get it --
21        because they both work within the Department of
22        Corrections in their respective states, right?
23    A.  Well, they can't get it if this survey was anonymous.
24        And I'm not sure whether it was.  I'd have to go back
25        and look more closely at the method.
```

                        Page 95

```
 1    Q.  Well, I can tell you what they did is they took this
 2        data and -- and measured it against the actual
 3        criminal records.
 4    A.  Against the criminal records, okay, then yes, I would
 5        agree that question is more of a confirmatory
 6        statement.
 7    Q.  It actually could be -- in some ways it could be a
 8        useful confirmatory statement because -- or question.
 9        Because if the answers don't jive with the criminal
10        history, then you know that there's a certain amount
11        of lying or memory failure or possibly mental illness,
12        right?
13    A.  Or misunderstanding like you were saying of the
14        definitions, yeah.
15    Q.  And so, if you're going to ask the question, get the
16        result, and then not tell the reader what the result
17        was and instead rely only on the criminal history
18        data, again you're concealing from the reader what
19        might be something that undermines our confidence in
20        the result?
21            MR. JAMISON:  Objection, lack of
22        foundation.
23            THE WITNESS:  Would you like me to answer.
24            MR. JAMISON:  Yeah, you can answer if you
25        can.
```

                        Page 96

                                    24  (Pages 93 to 96)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1  BY MR. REINGOLD: | 1   Q.  All right.  Third question was were you ever |
| 2   Q.  Yeah. | 2       apprehended.  This is the key question because that's |
| 3   A.  Okay.  There are a variety of reasons why researchers | 3       the one where they're asking for the undetected |
| 4       fail to include information that we as a reader might | 4       crime -- |
| 5       wish they did in their publications.  Some are space | 5   A.  Yeah. |
| 6       constraints of the journals.  Some are just not being | 6   Q.  -- and again, we don't know if there were definitions |
| 7       able to anticipate the different questions that | 7       or not. |
| 8       readers might have.  It's -- it's a problem -- | 8          Four, how many offenses have you been |
| 9   Q.  And -- | 9       acquitted for which you in fact did.  And then five is |
| 10  A.  -- not specific to this article. | 10      how many offenses, assaults, or attempted assaults |
| 11  Q.  Yeah.  And -- and some it's just really sloppy work, | 11      have you been found guilty of which you in fact did |
| 12      right? | 12      not do.  This would be false positives as it were, |
| 13  A.  It could be.  I -- I think more often it's space | 13      right? |
| 14      constraints and not anticipating the questions that a | 14  A.  Yes. |
| 15      reader will have. | 15  Q.  Okay.  So five is also confusing, and let me tell you |
| 16  Q.  But there is really sloppy work out there? | 16      why it's confusing to me.  The entire survey has been |
| 17  A.  Absolutely. | 17      about sexual assault.  At every point it talks about |
| 18  Q.  And this is one looking at it, you can't tell whether | 18      sexual assaults or attempts, with one exception and |
| 19      it's sloppy work or they did it or they didn't do it? | 19      that's homicides. |
| 20  A.  Yeah.  I will say I think it's more common than we | 20         When you read question number two, did you |
| 21      might hope that it is.  I did a meta analysis looking | 21      think that it meant include attempted sexual offense, |
| 22      at something akin to this with sexual victimization | 22      assaults, and sexual homicides?  Or did you think it |
| 23      studies.  And the number of studies where it was like | 23      meant include sexual assaults, homicides, non -- |
| 24      nope, I can't include this, they don't give this | 24      non -- non-sexual homicides, et cetera? |
| 25      information in the publication is very high. | 25  A.  Personally, I would have interpreted that as sexual |
| Page 97 | Page 98 |
| 1       homicide. | 1       survey that we don't know about, then yes, absolutely. |
| 2   Q.  Yes, I would too.  It doesn't really make sense | 2   Q.  Okay.  In summarizing the results, the authors use the |
| 3       otherwise, does it? | 3       term throughout the publication and in the title |
| 4   A.  Yes. | 4       undetected rapes.  Even though I believe the term rape |
| 5   Q.  Okay.  And somewhat the same in paragraph five, right, | 5       is never mentioned in the survey.  Does that seem odd |
| 6       they have somehow dropped the sexual offense and -- | 6       to you? |
| 7       and -- they've dropped the adjective sexual -- | 7   A.  Do they use the term undetected rape?  Or are they |
| 8   A.  Yeah. | 8       talking about undetected rapists? |
| 9   Q.  -- have no idea if it's intentional or if it was a | 9   Q.  No.  They use the term undetected rapes. |
| 10      mistake, right? | 10  A.  Can you show me an example just so I can better |
| 11  A.  Yeah. | 11      understand what you're referring to. |
| 12  Q.  And they don't tell us.  So again, we don't know what | 12  Q.  Yeah.  No, it was rapists there.  We have to get down |
| 13      it is that the respondents are responding to.  Some of | 13      to the -- the discussion part, rapists, rapists, |
| 14      them might be responding to non-sexual assaults if | 14      rapists. |
| 15      they're -- if they read it the way we do and they're | 15  A.  I will say that is pretty common in this type of |
| 16      smart enough to figure it out.  I think most of them | 16      literature, to distinguish between rapists and child |
| 17      would respond only to sexual assaults.  Is that | 17      molesters. |
| 18      fair -- | 18  Q.  Oh, okay.  You may be right.  I might have read that |
| 19  A.  I agree that that question is confusing, number five. | 19      into it and it's not there.  All right.  So that's a |
| 20  Q.  And depending on how people interpreted this array of | 20      distinction that the people use in the literature? |
| 21      questions, the number can vary enormously, right? | 21  A.  Yeah.  To distinguish between people who sexually |
| 22  A.  You mean depending on if someone was interpreting this | 22      offend against adults and children. |
| 23      as all sexual offenses or just penetrative -- | 23  Q.  Okay.  The sample size is also only a hundred |
| 24  Q.  Yes. | 24      thirty-seven people, of whom eighty-six admitted to |
| 25  A.  Yes.  If there were not definitions given in the | 25      having committed at least one prior undetected sexual |
| Page 99 | Page 100 |

25 (Pages 97 to 100)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1 offense, right? | 1 fifty to two hundred fifty, we still had a range with |
| 2 **A.** Okay. | 2 highs of twenty-seven to thirty admitted undetected |
| 3 **Q.** As you mentioned earlier, the authors knocked out nine | 3 offenses? |
| 4 more people who claimed they have committed fifty to | 4 **A.** Yes. |
| 5 two hundred and fifty undetected sexual crimes, | 5 **Q.** All right. Again, the authors didn't report the |
| 6 because keeping them in would, in their words, bias | 6 distribution. They did report a mean, but they didn't |
| 7 the overall estimation? | 7 report the distribution. So as readers, we can't tell |
| 8 **A.** Yes. | 8 how many of the people had just one offense and how |
| 9 **Q.** So that brings the total down to seventy-seven? Yes? | 9 many had a different distribution, right? |
| 10 Yeah, eighty-six minus nine. | 10 **A.** Correct. |
| 11 **A.** Okay. | 11 **Q.** And fair to say that high numbers, even at just |
| 12     MR. JAMISON: Paul, could you reference a | 12 twenty-seven to thirty, can pull the average up even |
| 13 portion of the report where it shows that so she's | 13 if many respondents are reporting just one? |
| 14 just not relying on your -- | 14 **A.** Can you tell me where you're seeing twenty-seven to |
| 15     MR. REINGOLD: Yeah. | 15 thirty? I'm seeing the range topping out at twenty. |
| 16     THE WITNESS: Yeah. Sorry. If you could | 16 **Q.** I think this is for the known recidivism rates. And |
| 17 go back to the sample section or -- | 17 it's the undetected recidivism -- |
| 18     MR. REINGOLD: Yeah. | 18 **A.** I see. |
| 19     THE WITNESS: If you like, I can pull this | 19 **Q.** -- that's here. That's why they went down to |
| 20 article up separately. I'm wanting to see. | 20 seventy-six. |
| 21 BY MR. REINGOLD: | 21 **A.** Okay. |
| 22 **Q.** Yeah. I think it was below actually. It -- | 22 **Q.** And the -- |
| 23 **A.** Scroll back down just a little bit. Okay. I'm on the | 23 **A.** I gotcha. |
| 24 same page. | 24 **Q.** -- see the range here? |
| 25 **Q.** Even after knocking out those crazy high numbers, | 25 **A.** Yes. |
| Page 101 | Page 102 |
| 1 **Q.** In fact, if there were just ten of the seventy-seven | 1 **Q.** We do know that even with this most dangerous group -- |
| 2 respondents -- seventy-six, I guess -- seventy-six | 2 I'm quoting most dangerous group -- almost half, |
| 3 respondents who report twenty-five undetected offenses | 3 forty-six percent, didn't have a sexual offense |
| 4 and everyone else reports one, the mean is going to | 4 conviction. And even counting the nine people not |
| 5 four, right? Ten times four fifty would be two hundred | 5 tallied, about forty percent, eighty-three of a |
| 6 fifty, plus sixty-seven who have one. And that's | 6 hundred thirty-seven, reported no undetected sexual |
| 7 three seventeen divided by seventy-six, which is four. | 7 offending at all? |
| 8 **A.** Yeah. That is one way to get to that information. | 8 **A.** Eighty-three of the hundred twenty-seven, are you -- |
| 9 **Q.** Right. And we don't have a clue. So it could be -- | 9 that's larger than the sample, right. |
| 10 **A.** No, we don't. | 10 **Q.** Yes. I was putting back in the nine people tallied -- |
| 11 **Q.** Okay. The survey also has no limitation as to time, | 11 the nine people taken out because I thought that -- |
| 12 right? It's not recorded whether the offenses | 12 **A.** Where are you getting a hundred twenty-seven people? |
| 13 occurred before or after the first conviction? | 13 **Q.** The total. |
| 14 **A.** Correct. | 14 **A.** A hundred twenty-seven people total? |
| 15 **Q.** So it's at least highly likely that some of the | 15 **Q.** A hundred thirty-seven, wasn't it? That was what we |
| 16 admitted undetected offenses occurred before the | 16 started with? |
| 17 subject's first conviction? | 17 **A.** No. I think we started with eighty-something. |
| 18 **A.** Yes. | 18 **Q.** I think it's not worth going back to find out. Let's |
| 19 **Q.** But the authors didn't ask and they can't -- or didn't | 19 move on. |
| 20 tell us whether those -- whether that happened, right? | 20 **A.** Okay. |
| 21 **A.** Correct. | 21 **Q.** Let's go to question number five. That was the |
| 22 **Q.** So the studies shed zero light on whether or not | 22 question on how many offenses, assaults, or attempted |
| 23 undetected offending declines after sexual offense | 23 assaults -- no, number four -- no, number five. |
| 24 conviction? | 24     How many offenses, assaults, or attempted |
| 25 **A.** Correct. | 25 assaults have you been found guilty of which in fact |
| Page 103 | Page 104 |

26 (Pages 101 to 104)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1    you did not do. That's the one that's going to false | 1   Q.   The match that these are mostly serial offenders? |
| 2    convictions, right? | 2   A.   In the Groth article? |
| 3   A.   Correct. | 3   Q.   Yeah. |
| 4   Q.   Okay. And for that one, I'll read it aloud. The | 4   A.   Yes. They are mostly serial offenders. |
| 5    conclusion was in our combined survey, eighteen, so | 5   Q.   All right. Hold on a second. |
| 6    twenty-one percent, of the rapists and six, eleven | 6   A.   No problem. |
| 7    percent of child molesters, claim that they had at | 7   Q.   Starting here, to assure that alleged perpetrators are |
| 8    some point been convicted of a charge of which they | 8    only brought to court and potentially held accountable |
| 9    were innocent, right? | 9    for sexual assaults in which there is exceedingly |
| 10   A.   Yes. | 10    strong evidence against them. You're saying that's |
| 11   Q.   Let me get my bearings here. | 11    how the system is designed, right? |
| 12   A.   You're fine. Blame it on the heat. | 12   A.   Yes. |
| 13   Q.   Paragraph thirty-one of your report, you address the | 13   Q.   And you go on to say that while it's certainly |
| 14    issue of people being counted as having committed | 14    possible the individuals who have not in fact |
| 15    crimes that they in fact didn't commit, right? | 15    perpetrated the sexual offense they are accused of are |
| 16   A.   I was specifically talking about a false positive for | 16    wrongly investigated, arrested, charged, and brought |
| 17    serial sexual offending. | 17    to trial, but the criminal system is designed to |
| 18   Q.   Right. But almost for sure all of the people in this | 18    immunize that -- |
| 19    study -- would be huge numbers, right, of having more | 19   A.   No, minimize. |
| 20    than one sexual offense? | 20   Q.   To minimize that possibility and there is no evidence |
| 21   A.   Yes. | 21    that it is systematically failing in that regard, |
| 22   Q.   So the match is pretty good here? | 22    right? |
| 23   A.   I'm sorry? | 23   A.   Yes. |
| 24   Q.   The match is pretty good? | 24   Q.   Okay. But there is evidence in the Groth study of |
| 25   A.   What match? | 25    false convictions of twenty-one point seven percent |
| Page 105 | Page 106 |
| 1    for those with adult victims and eleven point one | 1    people who are being surveyed about sex offenses and |
| 2    percent for those with child victims, right? | 2    who we both agree that the study suggests that they |
| 3   A.   Well, I think you -- | 3    would only be reporting on sex offenses and should |
| 4   Q.   I'm asking is that right? | 4    only be reporting on sex offenses came out with this |
| 5   A.   No. I would say you pointed out that it's unclear | 5    data, right? |
| 6    what that's referring to, sexual assaults specifically | 6   A.   Yeah. I don't see it as being quite as relevant as |
| 7    or all offenses. And it's asking people whether | 7    you seem to. Which is a fair disagreement, I'm just |
| 8    they've been convicted of a crime, you know, whether | 8    -- yeah, I did not include it in that. |
| 9    they've been convicted for something that they did not | 9   Q.   All right. You did accept the self-reporting accounts |
| 10    commit. | 10    of the convicted offenders as to undetected offending |
| 11        So you're right that we don't know whether | 11    and used the percentage figures, even though the same |
| 12    they're referring to a sexual assault or a non-sexual | 12    problem presents there. You don't know for sure |
| 13    assault. Whether they're saying I was convicted for | 13    whether they were talking about sexual assaults, |
| 14    this when really it was more like that. Yeah, that | 14    non-sexual assaults, or what they were including -- |
| 15    Groth article is not as clear as we might wish it was. | 15   A.   Yeah. |
| 16   Q.   But in the article, the percentages can't be argued. | 16   Q.   -- the -- |
| 17    Twenty-one percent said that they had been falsely | 17   A.   I think question two is quite a bit clearer in the |
| 18    convicted and eleven percent of the -- of the child | 18    Groth survey than question five. But -- |
| 19    molesters, people with child victims, said they -- | 19   Q.   The question -- |
| 20    they had been convicted, right, of false -- | 20   A.   -- in both questions. |
| 21   A.   Of something, right. Like you pointed out, we don't | 21   Q.   But question two also included homicide, et cetera, |
| 22    know whether they were referring specifically to | 22    right? |
| 23    sexual assaults or a drug charge or a robbery, | 23   A.   Within a parenthetical where the base question |
| 24    whatnot. | 24    referred to sexual assault, and that's not the case in |
| 25   Q.   But you didn't mention in your report that a group of | 25    question five. |
| Page 107 | Page 108 |

27 (Pages 105 to 108)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1  Q.  You're reading it like a Ph.D.  The subjects of this | 1  Duros report. |
| 2     study were -- | 2  A.  I don't believe so. |
| 3  A.  Yes. | 3  Q.  This is the most cited recidivism study that's ever |
| 4  Q.  -- were people in a maximum security facility and | 4     been produced.  It's a nine-year followup after a 2014 |
| 5     people in a mental health environment, right? | 5     study.  So the data was from the original data study |
| 6  A.  Yeah.  I wish we could ask them how they were | 6     from 2005 to 2014.  And this went from 2014 to close |
| 7     interpreting it. | 7     to 2019. |
| 8  Q.  The 1950 New Jersey commission report which leads off | 8  A.  Okay. |
| 9     this article -- we're out of the article, sorry -- | 9  Q.  And what it looked at was recidivism rates across |
| 10    concluded that the official reported sexual recidivism | 10     categories of offenders.  And I'll have you look at |
| 11    rate remains low, right?  That's what it said when we | 11     table number two.  And you can say -- see the axis |
| 12    read it before? | 12     across the top is the recidivistic offense, and the |
| 13 A.  Yes. | 13     axis going down on the left is all prisoners with a |
| 14 Q.  Okay.  And again, that remains true today, especially | 14     history of one of the crimes cited. |
| 15    compared to the recidivism rate of all other | 15        So if we look at rape, sexual assault, we |
| 16    categories of crime except for murder? | 16     see any offense, they recidivated at almost |
| 17 A.  Yes. | 17     sixty-seven percent; totally violent, twenty-eight; |
| 18 Q.  Okay.  Let's take a look at the recidivism rates from | 18     homicide, point two; rape, sexual assault, seven point |
| 19    other categories of crime.  This is -- let me go back | 19     seven.  And this is now out from 2005, I believe, and |
| 20    out and get the exhibit number.  This is Exhibit 7. | 20     then robbery, sixty; assault and so on. |
| 21        MARKED FOR IDENTIFICATION: | 21        There seven point seven is, let's see -- |
| 22        DEPOSITION EXHIBIT 7 | 22     let me get out another sheet.  So what they found was |
| 23        11:41 a.m. | 23     that except for people previously convicted of murder, |
| 24 BY MR. REINGOLD: | 24     people who committed sex offenses are less likely than |
| 25 Q.  Have you seen this report before?  This is the Alper | 25     any other category of felonies to be rearrested for a |
| Page 109 | Page 110 |

| | |
|---|---|
| 1     new crime of the same type for which they previously | 1  Q.  Right.  Okay.  And it means compared to drug |
| 2     been committed. | 2     offenders, who had sixty point four, it's almost nine |
| 3  A.  Okay. | 3     times difference, right? |
| 4  Q.  They had lower recidivism rate for any post-release | 4  A.  Yes. |
| 5     violent crime of all the discreet groups, including | 5  Q.  Okay.  You agree that these results could not be |
| 6     murderers.  And they had lower recidivism rates for | 6     further from the popular conception of sex offenders |
| 7     any subsequent crime than every other group of | 7     based on the -- the official reported data? |
| 8     offenders except murderers. | 8        MR. JAMISON:  Objection, lack of |
| 9  A.  Okay. | 9     foundation. |
| 10 Q.  When you look at their figures and compare the figures | 10        THE WITNESS:  Yeah, I'm sorry, I'm not sure |
| 11    for the other offenders, their recidivism rate was | 11     what you're asking. |
| 12    seven point seven, robbers were sixteen point eight; | 12 BY MR. REINGOLD: |
| 13    non-sexual assaults, forty-four point two; drug | 13 Q.  Okay.  I'm asking if you think the public would be |
| 14    offenders, sixty point four; property offenders, | 14     surprised to learn this data? |
| 15    sixty-three point five; and public order recidivism | 15        MR. JAMISON:  Same objection. |
| 16    rates, seventy point one.  Murder is the only lower | 16 BY MR. REINGOLD: |
| 17    rate there at two point seven. | 17 Q.  I'm asking -- |
| 18        So it's not just that they are different a | 18 A.  I'm sorry? |
| 19    little bit, they're different a lot.  Isn't it true | 19 Q.  I'm asking if you think the public would be surprised |
| 20    that if they're at seven percent and non-sexual | 20     to learn that sex offenders, using official data, |
| 21    assault crime is at forty-four percent, that means | 21     reciprocate at six times less than drug offenders and |
| 22    their recidivism rate is six times less than people | 22     six times less than non-violent offenders -- not |
| 23    who are committing non-sexual assaults? | 23     non-violent -- non-sexual assault offenders and nine |
| 24 A.  When we define recidivism as being caught, yes, | 24     times less than drug offenders? |
| 25    absolutely. | 25 A.  Yeah, I don't know.  I can't speak to that. |
| Page 111 | Page 112 |

28 (Pages 109 to 112)

Goodman-Williams, Ph.D., Rachael
6/1/2023

1    Q.  Okay.  I use this one -- this study as an example,
2        because one of the hard parts about the way studies
3        get implemented, as you said from the meta study that
4        you did, is that everybody uses a different -- a
5        different definition and everybody has got a different
6        group of respondents and everybody is looking at a
7        different period of time or often looking at no period
8        of time, which is a big deal.
9             And so, when you're looking at and citing
10       studies as opposed to hard data like what comes from
11       the government, you run into exactly the problem that
12       you -- that we -- or that's revealed, as it were, in
13       your report, is that the best you can do is give a
14       range based on the study, right?
15   A.  I don't necessarily see that as a problem.
16   Q.  Well, it's -- it -- if you're saying the best we can
17       do is say somewhere between, you know, fifteen out of
18       a hundred and forty out of a hundred people do X,
19       maybe to you as a statistician that's not a problem.
20   A.  I think that those studies often are able to account
21       for some of the weaknesses in the official data in a
22       way that I find helpful rather than problematic.
23   Q.  Well, here we're talking about two different things
24       where there's official data on one topic and -- and
25       unofficial data on a topic for which there is no

                        Page 113

1        official data, so they can't be compared.  We're
2        looking at undetected offending.
3    A.  Uh-huh.
4    Q.  Right.  So I say again, the best you can do is survey
5        a bunch of people, as these jokers did, and -- and
6        then pretend that it's a valid study and hope that
7        it'll get cited and it did, right?
8    A.  I see it quite a bit differently.
9    Q.  All right.  You can -- you may.  All right.
10            The second study that you looked at on this
11       issue was again a thirty-two-year-old, a 1991 study.
12       And that too was a population of institutionalized sex
13       psychopaths, right?
14   A.  Which study are you referring to?
15   Q.  The Weinrott study.
16   A.  Yes.
17   Q.  Fair to say that the population of institutionalized
18       sex psychopaths is going to look an awful lot like the
19       Groth study?
20   A.  I would imagine so.
21   Q.  And fair to say that it can't be in any way
22       generalized to the population of everyone who's
23       committed a sex offense from the very lowest offense
24       to the very highest offense?
25   A.  I don't know that I would say it can't be generalized

                        Page 114

1        in any way.  Insights can still be valid.  But they're
2        different populations.
3    Q.  So the -- the rates of re-offending can't be
4        generalized?
5    A.  Yes.  Correct.  I would agree.
6    Q.  All right.  What about the -- the other false positive
7        problem?  When we're looking at undetected or
8        unreported offending, we count, my understanding is,
9        that researchers count every offense that is reported,
10       right?
11   A.  What do you mean?
12   Q.  If you're doing it through perpetrator studies, you
13       take as gospel what they tell you.  I mean, you count
14       it as a re-offense if they tell you they re-offended?
15   A.  Yes.
16   Q.  Even though you have no idea if they're telling the
17       truth?
18   A.  Yes.
19   Q.  And no idea if they're doing it to please you as the
20       inmates might do?
21   A.  Yeah.  I mean, I think that there's generally
22       mechanisms put in place.  And I want to say it was the
23       Weinrott study they were filling it out in a
24       computer-assisted way.  I could be wrong, I would have
25       to look at the study.  But yes, I mean, we are

                        Page 115

1        interpreting the data that they provide.
2    Q.  Okay.  And it's the same if the report is coming from
3        surveys of victims, right?  A lot of these reports are
4        looking at this time true random samples of women and
5        -- and not -- not sexual assault populations and then
6        finding the sexual assault population in the random
7        survey and then asking the questions about reporting,
8        right?
9    A.  Yes.
10   Q.  And -- and -- and -- again, it's the same set of
11       problems.  You've got to make sure your definitions
12       are really good.  You've got to make sure people
13       understand what you're asking.  You've got to make
14       sure your time matters, right?
15   A.  Yeah.
16   Q.  And the rates you get if you don't do that can be
17       enormously different.  For example, if you ask -- if
18       you do lifetime reporting and you ask only women over
19       seventy, let's say, have you ever been convicted of a
20       -- not convicted -- the victim of a sexual assault,
21       well defined, they've had, you know, depending how
22       young the youngest sexual assault is, they have, you
23       know, like sixty years in which there could have been
24       an assault.
25            So you would expect the numbers to be way,

                        Page 116

Tri-County Court Reporters
248-608-9250

Goodman-Williams, Ph.D., Rachael
6/1/2023

1    way higher than if you're surveying a mixed sample
2    where people might range from eighteen to seventy or a
3    young sample where everybody is going to be under
4    twenty-five, right?
5    A.  There would be some factors pulling it in both
6        directions.
7    Q.  All right.  What I'm saying is unless your audience
8        knows what it is that you're surveying, what the
9        question is, and what the time is, it's really hard to
10       talk about two surveys in the same breath.  Because
11       when -- when you're giving a range, you're probably
12       giving a range of two different populations over two
13       different times, possibly with two different
14       definitions of assault?
15   A.  That's certainly possible.
16   Q.  Okay.  Actually just occurred to me, but one of the
17       interesting things is if you're only surveying women
18       over seventy, let's say, the -- the assaults that
19       you're recording, the great majority of them, are
20       likely to be thirty to fifty years old, right.
21            Even if they tell you something, what
22       they're really telling you what the rates of crime
23       were not today, but fifty years ago.  But if you
24       report it as our population said, you know, here's
25       what -- here's how many people are convicted of --

Page 117

1    have been victim of a -- a sexual assault, the reader
2    might very well think it's current, right, and it's
3    not current?
4    A.  Yeah.  I would hope that that would be clarified in
5        the publication addressing sexual assaults in a
6        population over seventy.
7    Q.  Yeah.  Okay.  Let's spend the last bit of time that we
8        have looking at SAKs.  It's fair to say that the, I
9        mean, in some respects, for all the horror of -- of
10       three-plus decades of missing SAK kits, this was a
11       bonanza for researchers, right?
12   A.  It was a -- yeah.  There was definitely an opportunity
13       for research.
14   Q.  And I take it -- I don't know the full history.  But
15       were there any SAKs that were being done during these
16       years?  Or was it, you know, somebody dropped the ball
17       completely?
18   A.  I would not say that they were no SAKs being tested
19       within those years, but the vast majority were not
20       tested.
21   Q.  Okay.  And -- and as I understand it, to get off the
22       ground with a SAK, there has to be -- the crime has to
23       be known about, is that right?  It is -- it has to
24       become detected?
25   A.  It has to be reported.

Page 118

1    Q.  Does it have to be reported?
2    A.  For a SAK to be tested, yes, it has to be reported.
3    Q.  Okay.  Okay.  So what that -- that means is the people
4        who are getting SAKs are people who have been the
5        victim of a sexual assault and seek medical help?
6    A.  Uh-huh.
7    Q.  Right?  That's the primary group.  Again, there might
8        be an outlier here or there, but that's the primary
9        group, right?
10   A.  Yes.
11   Q.  Okay.  And there are a lot of barriers just to getting
12       the SAK done itself, true?
13   A.  Yes.
14   Q.  Okay.  And that's because for the kinds of biological
15       evidence that you'd be collecting, there's a window in
16       which it can be collected.  And after the window
17       passes, the odds of getting useful DNA decline, right?
18   A.  Yes.
19   Q.  And they decline enough that it's not worth getting it
20       because CODIS is so likely to reject it?
21   A.  Yes.
22   Q.  So anybody that comes in for medical help, whatever
23       the cutoff is, seventy-two hours, ninety-six hours,
24       different people have different standards, they're --
25       they're not going to be able to -- to have a SAK done,

Page 119

1    for the most part?
2    A.  Yes.
3    Q.  And -- and there's other barriers as well.  If the --
4        well, there's other barriers that come just in the
5        form of the same kind of barriers that cause
6        attrition, right?  You might have people who come in
7        who might want a SAK or at least be interested in a
8        SAK to whom it's never offered because the crime may
9        not be viewed as the sort of crime that's serious
10       enough.
11            If it's a non -- it might be a contact
12       offense, but not a penetrative offense.  And the
13       person might be adamant that they want a SAK, but
14       there's a decent chance that they still won't get it
15       because whoever is administering it or the police, if
16       they're present, might kind of blow it off?
17   A.  That should not be accurate as of 2005 to 2007.  The
18       VAWA Reauthorization Act of 2005 mandated that victims
19       have access to a SAK regardless, excuse me, regardless
20       of what law enforcement wants.
21   Q.  So I -- I was aware of that.  But what I'm suggesting
22       is that just because the law says it, doesn't mean
23       it's so.  Let me say this to you, we -- we spent some
24       time with a woman who had done, much as you had, four
25       years of sexual assault hotline and advocacy and who

Page 120

30 (Pages 117 to 120)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1   knew a lot.  She had done this in the Cleveland area.
 2          And the thing that she did the most was go
 3   to the hospital with victims.  And -- and she said the
 4   level of discouragement from either doctors, staff,
 5   especially police, in all but violent crimes or
 6   stranger perpetrator crimes was noticeable.  And that
 7   virtually all of the kits were on the most violent and
 8   the most intrusive crimes.
 9   A.  I will say that that was not my experience at all as
10   an advocate from 2011 to 2014.  And there's also a
11   2014 study that was published that looked at victims'
12   access to SAKs and found that -- overwhelming -- that
13   VAWA Reauthorization Act law had been implemented
14   fully and was being carried out and that in general
15   victims did not report major barriers for accessing
16   SAKs.
17   Q.  So -- all right.  So it must vary from place to place
18   and this makes my point about when you only have soft
19   information and who knows what the audience was or the
20   sample was for the -- the study.
21          All right.  But then there are ongoing
22   things.  The person -- the -- has to be willing to do
23   it?
24   A.  Yes.
25   Q.  And most people don't.  And it's understandable
```

Page 121

```
 1   because if you're recently traumatized, show up at the
 2   ER or a clinic or wherever, you might be waiting hours
 3   and hours to get in.  And once you get in, what you
 4   really want is medical attention, and by the time
 5   you've had medical attention, you've been, you know,
 6   who knows how long you've been there.
 7          And then somebody says to you do you want
 8   to do a -- a forensic exam and -- and you say how long
 9   is that going to take and they say a very long time.
10   And people are discouraged, right?
11   A.  In my experience -- I'll say first the research part
12   is that the majority of sexual assault victims do not
13   seek medical care or medical forensic care.  That's
14   pretty well established through research.  My
15   experience is that of those who do, the vast majority
16   do have the sexual assault kit collected.
17   Q.  All right.  So you're saying if one in three people
18   make it to medical care, what percentage will get --
19   what percentage of the one in three will get -- will
20   get a SAK?
21   A.  There's a study I recall from either 1999 or 2001 that
22   found about eighty percent.  I can't recall off the
23   top of my head more recent studies.  But I feel
24   confident that it's most people if they're going to a
25   hospital for medical forensic care, most of them will
```

Page 122

```
 1   choose to have that SAK collected.
 2   Q.  Okay.  And it -- of course a lot of people who go
 3   won't be eligible for it, right?  It won't be a
 4   question of whether they ask for it or not.  It'll be
 5   can they do it, right?  Have they taken a shower or if
 6   it's more than five days.  If they've taken a shower
 7   --
 8   A.  They will still be -- I'm sorry.
 9   Q.  I understand they will still be eligible for it with
10   the shower, but the data may not be there, right?
11   A.  Yeah.  The -- the likelihood of getting useable DNA
12   might be lower.  But they will still be eligible if
13   they've taken a shower.  It's really only if they've
14   passed a five-day window.  And most victims who seek
15   medical forensic care do so before that five-day
16   window has closed.
17   Q.  And what is -- what's the success rate on completed
18   SAKs in terms of getting DNA?
19   A.  That is, I think, a more complicated question than I
20   can answer.  There's a lot of steps that go through,
21   you know, what SAKs lead to a CODIS-eligible DNA
22   profile and things like that.
23   Q.  So you don't have a sense of out of the SAKs taken,
24   the number of -- get -- that are useable in CODIS?
25   A.  The article that you referred to that you said this is
```

Page 123

```
 1   probably your most relevant article to this, that
 2   actually does have relevant data in it.  If you would
 3   like to pull that up, we can look at it together.
 4   Q.  I won't now because I don't think it's a big enough
 5   point.
 6   A.  Okay.
 7   Q.  But I was just curious to know.  Because I -- I don't
 8   have a very good feel, even from the studies, of how
 9   many people are getting medical care and so forth.
10   A.  Yeah.  The data is in that article.  I just don't want
11   to guess about it off the top of my head.
12   Q.  Yeah, I understand.  That's fine.
13   A.  Do you mind if we take a three-minute break.
14   Q.  Sure, not a problem.
15          (Off the record 12:05 p.m.)
16          (Back on the record at 12:08 p.m.)
17   BY MR. REINGOLD:
18   Q.  So it's fair to say that the great majority of SAKs
19   are collected at hospitals.  And from the Campbell
20   article you cite in your report -- or I -- I think
21   it's in the report -- that about twenty-one to
22   forty-three percent of sexual assault victims seek
23   post-assault medical care and, therefore, have access
24   to a SAK collection, right?
25   A.  Yes.
```

Page 124

31 (Pages 121 to 124)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1   Q.  And then there's going to be falloff from there, | 1   difference -- |
| 2       depending on the quality of the biological sample. | 2   A.  Older offenses, no.  I'm specifically thinking about, |
| 3       And then there's going to be the hits, right? | 3       you know, acquaintance sexual assault, sexual assault |
| 4   A.  Yes.  If -- | 4       without a high level of violence or things like that. |
| 5   Q.  If it's tested.  Okay.  Let's stay in the emergency | 5       I -- I felt like those were well represented in the |
| 6       room or the medical facility for a minute.  My | 6       survivors that I was with at a hospital while they |
| 7       understanding is is that the -- the -- by and large, | 7       were having a SAK collected or that my advocates were |
| 8       the people who make it to the emergency room are folks | 8       with. |
| 9       who are most likely to be the people who are victims | 9   Q.  All right. |
| 10      of the most violent or most penetrative assaults, is | 10  A.  And I will say I'm doing work now coding hospital |
| 11      that true? | 11      records from a hospital in Maryland.  And there are, |
| 12  A.  It may have been true at one time.  That is not my | 12      yeah, I would say similarly, you know, non-stranger |
| 13      sense since I've been doing this work for about the | 13      sexual assaults are the majority of the SAKs that I'm |
| 14      last twelve years. | 14      coding over the last twelve years. |
| 15  Q.  I ask because, again, the person that we talked to who | 15  Q.  In the SAKs that you looked at from 1980 to -- was it |
| 16      had done the work in Cleveland about the period of | 16      1990 or what was the -- |
| 17      time that you were doing it in Oregon said when she | 17  A.  Are you talking about the backlog? |
| 18      went to the emergency room in no emphatic terms, she | 18  Q.  Yeah, the Michigan. |
| 19      said the population that went to the emergency room | 19  A.  Yeah, it was back to 1980. |
| 20      was not at all representative of the population that | 20  Q.  1980, at that time is it fair to believe that the |
| 21      she was dealing with daily on the hotline. | 21      great majority of the victims were victims of the most |
| 22  A.  I would say that's not -- that was not my experience | 22      serious crimes? |
| 23      in Oregon. | 23  A.  I don't know. |
| 24  Q.  But was the difference that people with much lesser or | 24  Q.  Are you able to tell from the criminal record if that |
| 25      much older offenses were going to the ER?  Or was the | 25      was the case? |
| Page 125 | Page 126 |

| | |
|---|---|
| 1   A.  No.  We did not have access to a lot of that data | 1       pregnancy? |
| 2       about the assault itself. | 2   A.  If there was no penetration, yeah, you would not have |
| 3   Q.  Okay.  But is it fair to say if somebody has been | 3       to worry about pregnancy. |
| 4       seriously injured or had a penetrative crime, they're | 4   Q.  Okay.  And it's also true that at least over time |
| 5       more likely to need medical attention? | 5       there were lots of hospitals -- at least some |
| 6   A.  Yeah, I would say so. | 6       hospitals -- that didn't do SAKs?  You could go to one |
| 7   Q.  Okay. | 7       hospital and say I want a SAK and they would say we |
| 8   A.  I don't know that that corresponds to having a SAK | 8       have to send you somewhere else because we don't do |
| 9       collected.  But if they've been injured, I would | 9       it. |
| 10      certainly hope they would get medical attention. | 10  A.  Correct. |
| 11  Q.  But the point is, is if they don't make it to the | 11  Q.  Okay.  All right.  With the data that you had from |
| 12      hospital, they're never going to have a SAK collected, | 12      Detroit, first, let's talk about the hits.  So from |
| 13      right? | 13      your report and what I've learned about SAKs, there's |
| 14  A.  Yeah.  If they don't go -- I mean, they could go to a | 14      a bunch of stuff that's going to happen once the data |
| 15      community collection type of center like they have in | 15      is -- can you hear me -- |
| 16      Detroit.  But yeah, the people with injuries tend to | 16  A.  I can. |
| 17      go to the hospital. | 17  Q.  There's a couple of options.  What CODIS has online in |
| 18  Q.  Okay.  And the people who have had penetrative sexual | 18      its database are lists of unknown offenders and lists |
| 19      assaults are also more likely to go to the hospital | 19      of known offenders whose DNA has been associated with |
| 20      for STDs or pregnancy prevention, that sort of thing? | 20      a past crime, right? |
| 21  A.  I don't know of any data on that.  It seems logical, | 21  A.  Correct. |
| 22      but I can't speak to it like from an expert research | 22  Q.  We -- the -- the unknown offenders we know nothing |
| 23      perspective. | 23      about, by definition.  The known offenders we -- we |
| 24  Q.  Okay.  But it makes sense that if there was no sexual | 24      have access to their criminal records? |
| 25      penetration, there's -- you don't have to worry about | 25  A.  It's not exactly true that we know nothing about them. |
| Page 127 | Page 128 |

32 (Pages 125 to 128)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1      CODIS doesn't know their identity, but the police
 2   report itself, I mean, might have a good investigative
 3   lead in it.
 4   Q.  Okay.
 5   A.  That information is not in CODIS.
 6   Q.  All right.  But I meant for purposes of a hit --
 7   A.  Yes.
 8   Q.  -- CODIS doesn't know about it.  All right.
 9          So what you're doing is you're getting a
10   DNA sample taken via a SAK kit and you're sending it
11   to CODIS, hoping for a hit.  And ideally hoping for a
12   hit with a known offender?
13   A.  Yes.
14   Q.  In the sense that if that happens, you now have, you
15   know, not an airtight, but a powerful lead to someone
16   known and known to -- and known because he's
17   affiliated or associated with a previous crime?
18   A.  Yes.
19   Q.  And the -- the -- unknown hits aren't bad because at
20   least now you know that the person -- the unknown
21   person whose DNA you have the hit with is now
22   affiliated with two crimes, right?
23   A.  Yeah.  And if it was a known offender from a SAK, then
24   you're not necessarily trying to resolve the identity
25   of an offender and --
```
Page 129

```
 1   Q.  Exactly.
 2   A.  -- say a forensic hit to another sexual assault kit
 3   can still document a pattern of suspected serial
 4   offending.
 5   Q.  Yeah.  So what you had when you got the kits was the
 6   opportunity to run a whole bunch of SAKs at almost the
 7   same time or some -- whatever.  Which also lead to the
 8   occasional SAK to SAK hit, right?
 9   A.  Yes.
10   Q.  They may not have been quite in the database yet, but
11   somehow it got -- it was -- it -- the machinery of
12   CODIS told you we've seen this before and you realized
13   it was a SAK to SAK hit?
14   A.  Yes.
15   Q.  And those too might be known or unknown, right?
16   A.  Yes.
17   Q.  Okay.  All right.  And then so -- so what you wound up
18   with was seven thousand, two hundred and eighty-seven
19   SAKs.  Of those, only about five -- not about -- of
20   those, five thousand, forty-eight had biological
21   material good enough for DNA testing.  Of those, only
22   fifty-eight percent tested eligible for CODIS.
23          Leaving you a -- a -- a -- sort of a -- a
24   base group that you would now get hits against, right?
25   A.  Yeah.  Would you mind pulling up either the figure in
```
Page 130

```
 1   the expert witness report or the connecting the dots
 2   article.
 3   Q.  Yeah.  Let's go to the report here.  One of the
 4   problems with virtual depositions, it takes a little
 5   longer.
 6   A.  I have plenty of empathy from virtual teaching.  So I
 7   understand.
 8   Q.  All right.  So here it was seventy-two eighty-seven to
 9   fifty forty-eight, fifty-eight percent of that brought
10   us down to twenty-nine thirty-eight.
11   A.  Could you share that on the screen.
12   Q.  I'm sorry.
13   A.  That's okay.  Again, virtual teaching, I understand.
14          MR. JAMISON:  That's your mailbox up there,
15   Paul.
16   BY MR. REINGOLD:
17   Q.  All right.  My mailbox?
18   A.  Yeah, your email.  The fact that you only have eighty
19   unread messages makes you some kind of superstar.
20   Q.  I'm not sure why it's doing that because my email is
21   not open on screen two, and I didn't think it was open
22   on screen one.  But give me a minute.
23   A.  No problem.  I can pull it up if that's easier.
24   Q.  Okay.  Let's try to share first.  Okay.  Now I got it.
25   A.  Okay.
```
Page 131

```
 1   Q.  All right.  So it was seventy-two eighty-seven to
 2   fifty forty-eight to twenty-nine thirty-eight.  And
 3   that goes into the CODIS database and you get sixteen
 4   seventy-five CODIS hits?
 5   A.  Yeah.
 6   Q.  And analysis of those hits produced a record of
 7   fourteen twenty-four unique offenders.  Tell me what
 8   that means, when you go from sixteen seventy-five to
 9   fourteen twenty-four.  Does that just mean there's
10   repeats?
11   A.  Yes.
12   Q.  Okay.
13   A.  It means we're going from the SAK level to the
14   perpetrator level.
15   Q.  Okay.  All right.  I want to go to the chart and have
16   you walk us through the -- second part of it, your
17   unique and identifiable.  Tell us how these get
18   determined.
19   A.  Sure.  So we already got to the fourteen twenty-four,
20   right, the unique perpetrators?  We're good starting
21   there?
22   Q.  Yeah.  Yeah.  We're good starting there because the
23   others are repeats and so they're not --
24   A.  Yeah.
25   Q.  -- counted twice otherwise.
```
Page 132

33 (Pages 129 to 132)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1   A.  Sometimes people have questions about how many hits
 2       are going to come out of X number of SAKs.  So that's
 3       not really what we're worried about.  We're worried
 4       more about the people than the SAKs.  So starting at
 5       the fourteen twenty-four.
 6   Q.  Yes.
 7   A.  So that's the unique perpetrators.  Unique and
 8       identifiable means that we were able to access their
 9       criminal history records.  They were identifiable.
10       And through Michigan State Police, we were able to see
11       their full -- well, not their full -- it was just
12       Michigan and adult criminal history records.  To which
13       --
14   Q.  Okay.  So unique and identifiable doesn't mean
15       offender hits?
16   A.  It -- I think --
17   Q.  Or is it both?  Was it offender hits and then some
18       with extra work you were able to --
19   A.  No.  I think they were all offender hits.  I think
20       those were all identifiable within CODIS.
21   Q.  Okay.  All right.  So the twelve seventy is CODIS?
22   A.  Yeah.  Yeah.
23   Q.  And then take us over to unique serial.
24   A.  So you'll see the unique serial, it's a direct
25       offshoot of the unique perpetrators.  So before we go
```

Page 133

```
 1       into identifiable and start incorporating criminal
 2       history records, we're just looking at unique
 3       perpetrators.
 4           And then through CODIS, how many unique
 5       serial, what indication of suspected serial offending
 6       did we get just from CODIS.  And that's that five oh
 7       eight.  So of the unique perpetrators, of the fourteen
 8       twenty-four unique perpetrators, five hundred and
 9       eight of them were suspected serial offenders, were
10       associated with multiple assaults just from CODIS.
11   Q.  Okay.  So that means two or more in CODIS?
12   A.  Yes.
13   Q.  All right.  And unique and identifiable serial on the
14       other side?
15   A.  Yeah.  So then what we go to is from the unique and
16       identifiable, we look at -- so how many sexual
17       assaults just within CODIS from that unique and
18       identifiable sample, but then what we were able to do
19       with the unique and identifiable sample was to add in
20       the Michigan adult criminal history records.  And see
21       okay, when you look at both criminal history records
22       and CODIS, what percentage of suspected serial
23       offending do we see within that.  And that's that five
24       oh four, that five oh four out of the twelve seventy.
25   Q.  So five oh four is the -- sort of the reconstructed
```

Page 134

```
 1       identifications?
 2   A.  Yes.  It's the -- when we incorporate both criminal
 3       history records and CODIS hits, what percentage of the
 4       unique and identifiable perpetrators were suspected
 5       serial offenders.
 6   Q.  And out of this population, do we know what the --
 7       if -- I don't believe it appears in the study.  But do
 8       we know what the sexual assault crime rate was during
 9       the period being studied?
10   A.  What do you mean the sexual assault crime rate?
11   Q.  Michigan keeps really good data on every single crime.
12       Annually they report, you know, from a year ago or two
13       years ago the number of crimes reported to the
14       government for every single crime.  And so, that tells
15       us how many people were caught and, therefore, how
16       many crimes were committed.
17           What I'm trying to figure out is of these
18       unidentified people who are only there because there
19       was an identified crime, what's the pool that we're
20       looking at as total perpetrators?  I feel like I've
21       got a numerator but not a denominator?
22   A.  I'm sorry, I'm still not understanding the question.
23   Q.  Everybody in the system because they
24       were affiliated with a crime, right?
25   A.  Everybody in this data?
```

Page 135

```
 1   Q.  Yeah.
 2   A.  Possibly through SAKs or multiple SAKs, not
 3       necessarily through criminal history records.
 4   Q.  Okay.  I'm understanding what you're saying.  There'll
 5       be some people who have a hit but no criminal record,
 6       right?
 7   A.  Yes.  And possibly because they were not detected by
 8       the criminal system and possibly because they weren't
 9       an identifiable perpetrator in CODIS.  And so, we --
10       we don't know.
11   Q.  Yes.  Okay.  I'm asking a slightly different question,
12       which is do we know how many sexual offenses were
13       committed each year during this period of time?
14   A.  I do not know.
15   Q.  Okay.  Because in a sense that would be a denominator,
16       right?  Each of these people is affiliated with a
17       crime.  And if we looked at all SAKs collected, let's
18       say, in 1991 and we know the total number of reported
19       crimes for 1991, we have a sense of are we looking at,
20       you know, fifty percent of the potential criminal
21       population, some of them who will be convicted
22       already.  Or are we looking at an eighty of the
23       potential criminal population.
24   A.  Yeah.  That's not information that I know.
25   Q.  Okay.  And no one thought to look at that during the
```

Page 136

34 (Pages 133 to 136)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1    period of the study.  You just weren't looking at
 2    that?
 3  A.  Other people might have been that I don't recall.  At
 4    this point it's been about eight years since we were
 5    in this data.  So not that I recall.
 6  Q.  Okay.  And by the same token, no one looked at whether
 7    the criminal records were for -- no one took from the
 8    data whether old crimes were before or after a first
 9    conviction?
10  A.  I don't believe so.
11  Q.  Okay.  So this study, too, can't tell us anything
12    about whether or not recidivism rates or re-offending
13    rates drop after someone is convicted?
14  A.  No.
15  Q.  But this was data that could have shown that, right?
16    It still could?
17  A.  I believe so.
18  Q.  Is the data still available?  Do you know?
19  A.  Yeah, I believe it is.
20  Q.  All right.  Just -- I might toss it over to our
21    experts one of these days.
22  A.  Yeah.  You're giving me ideas for research studies
23    here.  I feel like I should have you as a co-author.
24  Q.  All right.  And then you determine that thirty-five
25    percent of the unique perpetrators were associated
```
                      Page 137

```
 1    with sexual offending, right?
 2  A.  Serial --
 3  Q.  Serial?
 4  A.  Serial sexual, yeah.
 5  Q.  Yeah.  Okay.  Did you look at -- at any time did you
 6    look at the severity of the offense that generated the
 7    SAK?
 8  A.  I don't believe so.
 9  Q.  All right.  So it's fair to say then that you don't
10    have -- you don't know whether eighty percent, sixty
11    percent, forty percent, or twenty percent of the SAKs
12    done were -- you don't know what kind of crime was
13    committed that you could line up with the SAKs
14    themselves?
15  A.  No.  I mean, like you referred to earlier, you know,
16    we know that it's more likely to get DNA from
17    penetrative offenses, particularly, you know, DNA of
18    sufficient quality to be entered into CODIS.  But per
19    SAK, I do not know what the offense was.
20  Q.  And given the time period, this was all, you know, ten
21    to thirty years ago or more, is it fair to say that
22    the built-in biases that would deter people from
23    getting SAKs were stronger or were probably stronger
24    then than they are today?
25  A.  Yeah, I would imagine so.
```
                      Page 138

```
 1  Q.  All I'm trying to say is when we got in the end a
 2    thousand -- whatever the number was -- a little over a
 3    thousand hits, is that -- let me go back to the chart.
 4  A.  Yeah.  So sixteen seventy-five SAKs yielded a CODIS
 5    hit --
 6  Q.  A CODIS hit.
 7  A.  -- perpetrators.
 8  Q.  Yeah.  And we've got five hundred and four
 9    identifiable serial perpetrators.
10        It -- it's fair to say that of the five
11    hundred and four, it's probably a disproportionately
12    dangerous higher criminalogic factors population among
13    the identified offenders?
14  A.  Why?
15  Q.  Because the crimes that were committed were the more
16    serious crimes --
17  A.  I guess it depends on what you mean by more serious
18    and more dangerous.  I think that a lot of them will
19    have been penetrative offenses because that's what's
20    likely to yield DNA profiles.  But I wouldn't make any
21    assumptions beyond that about dangerousness or
22    criminogenic behavior.
23  Q.  But in the study itself, you actually feature the
24    criminogenic behavior, right?  All of your individual
25    examples are people who committed six or eight or
```
                      Page 139

```
 1    whatever it was crimes, right?
 2        And they were all the worst kind of crimes.
 3    They were stranger danger, you know, stranger jumping
 4    out of an -- a concealment, forcing someone into a --
 5    into a private area and having forced sex with them,
 6    right?
 7  A.  Which -- which case studies are you referring to?  I
 8    think there were a few case studies that we included
 9    at different levels, one that had two or three
10    assaults.  We often did not have victim/offender
11    relationship.  So I think a lot of our case studies
12    didn't specify that.
13  Q.  And -- and, I mean, the other way to check on this
14    would be looking at the criminal records that you
15    found, right?  If it turns out that you've got ninety
16    percent people who have been affiliated with a first
17    crime of first degree rape or stranger rape, that's
18    very different than if you've got a criminal
19    population that's, you know, mostly -- in Michigan we
20    call it CSC 3 or CSC 2?
21  A.  Uh-huh.
22  Q.  And we don't know that.
23  A.  Yeah.  I think a lot of CSC 2's and particularly 3's,
24    right, those are non-penetrative offenses?
25  Q.  Yes.
```
                      Page 140

                          35  (Pages 137 to 140)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1    **A.** Yeah. So they're less likely to have DNA and less | 1    that -- that you can find and identify serial sexual |
| 2    likely to be reflected in SAKs because of that. But | 2    offenders. |
| 3    beyond that, we don't have the specifics. | 3    But if -- when we get this number -- how do |
| 4    **Q.** You understand why I'm asking about the -- the | 4    you know what percentage of all offenders -- this is |
| 5    reported offenses generally, because if we don't have | 5    what I'm trying to get at. How do you know what |
| 6    that information we don't really know what the pool is | 6    percentage of all offenders you're looking at? |
| 7    and what the range of offenses is. | 7    **A.** What do you mean what percentage of all offenders? |
| 8    All we know is that we've got five hundred | 8    **Q.** Well, you're looking at a -- what I mean by -- by -- |
| 9    four serial offenses and -- and we don't have a clue | 9    what percentage of all offenders is you found serial |
| 10    about what else was going on at the same time that | 10    offenders. |
| 11    you're measuring the broad population of everybody who | 11    **A.** Uh-huh. |
| 12    committed a sex offense over the same period of time, | 12    **Q.** How do you -- is there a way to figure out out of how |
| 13    right? | 13    many actual offenders there were? |
| 14    **A.** I'm sorry, I'm not sure that I'm following. | 14    **A.** Well, there's a way to look at out of the unique |
| 15    **Q.** Maybe I'm not being clear or maybe I'm not | 15    perpetrators that were identified. There's about |
| 16    understanding it. It seems to me in the end, you've | 16    thirty-five percent that were suspected serial |
| 17    got five hundred people and there are a bunch of | 17    offenders just based on CODIS data. |
| 18    different ways to find out whether these are among the | 18    And when we incorporated criminal history |
| 19    most dangerous people or not. And assuming that they | 19    data and looked specifically at that unique and |
| 20    all are, what the rest of the population out there | 20    identifiable subset, it was about forty percent were |
| 21    looks like. But it may be we can't get there, so | 21    associated with two or more sexual assaults via CODIS |
| 22    that's okay. All right. | 22    or criminal history records. |
| 23    The bottom line is what separates you from | 23    **Q.** There have been studies done of CODIS hits from |
| 24    the plaintiffs' experts in many ways is that your view | 24    similar data like you had, where people wait until the |
| 25    is that this makes a difference somehow, and that -- | 25    -- the scientists wait until after the cases are |
| Page 141 | Page 142 |

| | |
|---|---|
| 1    prosecuted, right, investigated and prosecuted? | 1    saying -- all I can do as a researcher is say this is |
| 2    **A.** I'm not familiar with those studies, but I would be | 2    what the data is for this circumstance and situation. |
| 3    interested in reading them. | 3    **Q.** All right. So you're not generalizing it to the |
| 4    **Q.** Okay. You don't know this. Okay. All right. I read | 4    general population? |
| 5    one study where that's what they did. And it was | 5    **A.** I -- I'm just presenting data from this population and |
| 6    surprising because the data -- I mean the -- the -- | 6    this study. |
| 7    many of the crimes were so old that the -- the people | 7    **Q.** Okay. Give me a minute again. |
| 8    don't want to go forward with prosecution. They don't | 8    **A.** Sure. |
| 9    want to go back into it. | 9    **Q.** Let me just -- well, I don't understand your |
| 10    Do you have any idea of the hits that you | 10    conclusion then. So let's go to that. I thought what |
| 11    got, how many of the cases have resulted in | 11    you said at the bottom of the page at the conclusion |
| 12    convictions? | 12    was measures of serial sexual offenders that include |
| 13    **A.** I don't know. | 13    data less vulnerable to case attrition suggest that |
| 14    **Q.** No one has ever checked that, to your knowledge? | 14    approximately forty percent of sexual offenders are |
| 15    **A.** My knowledge, no. | 15    serial sexual offenders. The measures of -- so tell |
| 16    **Q.** All right. And so, what you want to do is say because | 16    me what you mean by that. |
| 17    you found thirty-nine percent in this population based | 17    **A.** Sure. I mean that data that is less vulnerable to |
| 18    on SAKs taken from people who -- taken from a percent | 18    case attrition, such as this CODIS hit data, finds a |
| 19    of people who went to the hospital, probably because | 19    rate of serial sexual offending of forty percent. |
| 20    they were more severe victims or victims of | 20    **Q.** All right. The measures of serial sexual offending |
| 21    penetrative crimes, you nevertheless want to | 21    that include data less vulnerable to case attrition, |
| 22    generalize directly to the entire population of people | 22    that would include survey data, wouldn't it? There's |
| 23    who are convicted -- who have committed sex offenses | 23    no attrition with survey data. |
| 24    in the past? | 24    **A.** Yeah. What I'm referring to here is data that is not |
| 25    **A.** No. I don't think that's what I'm doing at all. I'm | 25    reliant on sort of that case attrition through |
| Page 143 | Page 144 |

36 (Pages 141 to 144)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | |
|---|---|
| 1   investigation, arrest, charge, conviction.  So that -- | 1   Eric, are you going to have some questions? |
| 2   I mean, I think what you might be speaking to is that, | 2            MR. JAMISON:  Yeah.  I think I just have |
| 3   you know, even this I would say is quite an undercount | 3   one -- one line of questioning.  It'll take about five |
| 4   of serial sexual perpetration.  Because it's not | 4   minutes. |
| 5   including all of those people you talked about who | 5            MR. REINGOLD:  Let me sign off for a |
| 6   didn't go get a SAK collected, whose SAK we, you know, | 6   minute.  There was one other thing that I wanted to |
| 7   there wasn't a DNA-eligible profile in -- or a | 7   cover.  If anyone wants to use the bathroom, do it |
| 8   CODIS-eligible DNA profile.  But it's still, I think, | 8   now. |
| 9   a more -- I think it's still a -- an estimate of | 9            (Off the record 12:44 p.m.) |
| 10  serial sexual offending that provides information. | 10            (Back on the record at 12:45 p.m.) |
| 11  Q.  And -- and does it apply equally to, in your view, to | 11  BY MR. REINGOLD: |
| 12  people convicted of sexual offenses? | 12  Q.  I want to ask you a couple questions about reporting |
| 13  A.  What do you mean does it apply equally? | 13  of crime -- of sexual crime.  A lot of the studies |
| 14  Q.  Does it apply to people who have been convicted of | 14  that are done informally, the random studies, tended |
| 15  sexual offenses in the past? | 15  to be, as I read them, all over the map on how much |
| 16  A.  You mean do I think the estimate would be the same? | 16  crime is reported. |
| 17  Q.  Yes. | 17            The Bureau of Justice Statistics did a |
| 18  A.  I don't know. | 18  report on reporting of crime from 1992 to 2000, and I |
| 19  Q.  Okay.  So you have no idea whether conviction of a | 19  want you to take a look at this.  Do you know what the |
| 20  crime is going to reduce sexual offending or not? | 20  Bureau of Justice Statistics is? |
| 21  A.  Whether -- | 21  A.  Yes. |
| 22  Q.  Sexual re-offending? | 22  Q.  And is it fair to say that that's among the best, if |
| 23  A.  No, I don't know. | 23  not the best, in the sense of being comprehensive, |
| 24  Q.  Okay. | 24  straightforward, non-aligned, that sort of thing, |
| 25            MR. REINGOLD:  Give me a minute or two. | 25  outfits in the country for doing survey data type |
| Page 145 | Page 146 |
| 1   questioning? | 1            Is that a figure that is, do you think, is |
| 2   A.  I think there's some very important limitations in the | 2   within the range of what other outfits are reporting? |
| 3   National Crime Victimization Survey data that they | 3   A.  That forty-eight percent of rapes or sexual assaults |
| 4   use.  I think they're still valuable but with some | 4   are reported? |
| 5   important caveats. | 5   Q.  Yes. |
| 6   Q.  But compared to other people doing the same thing or | 6   A.  No.  I think it's much higher than most other studies |
| 7   doing it in informal studies or less organized | 7   have found. |
| 8   studies, would you give this high marks? | 8   Q.  The Bureau of Justice Statistics, isn't that one of |
| 9   A.  I think -- again, there's some great benefits to the | 9   the only organizations that actually follows up year |
| 10  studies.  But the NCVS data has some important | 10  to year with the people who they're studying? |
| 11  limitations that other studies have tried to account | 11  A.  I don't know. |
| 12  for. | 12  Q.  You don't know the answer to that? |
| 13  Q.  Okay.  All right.  This one says robbery was -- I | 13  A.  No, I don't. |
| 14  should have said this is Exhibit 4 for purposes of the | 14  Q.  Okay.  My understanding was that this is the operation |
| 15  deposition. | 15  that has -- actually goes into people's homes, spends |
| 16            MARKED FOR IDENTIFICATION: | 16  time with them, you know, asks questions, earns their |
| 17            DEPOSITION EXHIBIT 4 | 17  trust, asks questions about every possible crime. |
| 18            12:47 p.m. | 18  A.  Yeah.  I think where NCVS data is usually problematic |
| 19  BY MR. REINGOLD: | 19  when it comes to rape and sexual assault is that they |
| 20  Q.  Robbery was reported to the police at percentages | 20  are asking about it through a lens of crime.  They're |
| 21  somewhat higher than rape, sexual assault, which was | 21  saying has this crime happened. |
| 22  reported at forty-eight percent.  Other apparent | 22            And there's a lot of data to show that when |
| 23  differences between the percentage of rape, sexual | 23  you ask people about sexual assaults that they've |
| 24  assault and other violent crimes reported to the | 24  experienced in the context of health surveys, they |
| 25  police were not statistically significant. | 25  recognize many -- they report many more of them.  And |
| Page 147 | Page 148 |

37 (Pages 145 to 148)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1    the reporting rate goes a lot further down.
 2            If you're just asking people who
 3    conceptualize what happened to them as a crime, you're
 4    going to see these higher rates of reporting and
 5    you're going to often see sort of more stranger rates,
 6    things like that.  Where studies that ask people, you
 7    know, still very well rationalized, has anyone ever
 8    made you had sex through force or tried to force when
 9    you were incapacitated.  But they're not basing it in
10    this is a National Crime Victimization Survey.  They
11    tend to find higher rates of sexual assault and lower
12    rates of reporting.
13 Q.  You said the lower rates are when it's medically
14    oriented?
15 A.  The lower rates of reporting.  So you find higher
16    rates of sexual assault and fewer of those victims say
17    that they reported it to police.
18 Q.  So would that -- that should lead us to believe that
19    maybe the two -- the balance is somewhere in the
20    middle?
21 A.  No.  I would say that it's probably just much more
22    accurate when you're not asking -- the NCVS uses
23    phrases like have you ever been attacked, things like
24    that, that are -- that researchers have criticized for
25    sort of triggering a lot of the rape myths in people
```

Page 149

```
 1    and leading to a lot of underreporting within the
 2    NCVS.
 3            MR. REINGOLD:  I think I'll leave it at
 4    that.  Eric, if you want to ask some questions, I
 5    think -- oh, there was one other -- one other thing I
 6    wanted to ask about.  Sorry, almost done here.
 7            THE WITNESS:  No problem.
 8            MR. REINGOLD:  Sorry for the delay.
 9            THE WITNESS:  No problem.  You're giving me
10    the chance to hydrate.
11 BY MR. REINGOLD:
12 Q.  Okay.  I'm looking for a citation and I'm not finding
13    it, just a second.  Let's look at paragraph
14    thirty-eight, this was talking about the entry and
15    getting SAKs.
16            Paragraph thirty-eight, you say after a
17    sexual assault -- after a sexual assault, victims are
18    routinely encouraged to seek out a medical forensic
19    exam, MFE.  The MFE as a whole includes examination of
20    physical trauma, documentation of signs of penetration
21    or force, interviewing the patient, and collecting
22    evidence.
23            Having an MFE conducted post-assault is
24    routinely described an emotionally difficult, even
25    traumatizing experience, for sexual assault victims,
```

Page 150

```
 1    which helps explain why only twenty-one percent to
 2    thirty-eight percent of victims seek such care in the
 3    aftermath of an assault.  Did I read that correctly?
 4 A.  Yes.
 5 Q.  I mean, you cited for this Zinzow, Ullman, and
 6    Amstadter.  And I think what you're saying is only
 7    twenty-one to thirty-eight percent of victims seek an
 8    MFE, is that right?
 9 A.  Correct.
10 Q.  All right.  And those are the ones who are going to
11    get the SAK if they want, right?
12 A.  Correct.  Yes.
13 Q.  And you cite three different studies for that.  You
14    cite Zinzow -- going from bottom up -- Ullman and
15    Amstadter.  And that's for the proposition that only
16    twenty-one to thirty-eight percent of victims seek
17    MFEs in the aftermath of an assault.
18            I -- I don't have the studies in front of
19    me.  But Zinzow wasn't studying MFEs.  He was studying
20    only receipt of post-rape medical care in a sample.
21    And we know that the -- the twenty-one to thirty-eight
22    percent was not people who seek MFEs, but people who
23    seek medical care itself.
24 A.  I'd have to take a closer look at that study.
25 Q.  And his definition of sexual assault was only the most
```

Page 151

```
 1    serious sexual assaults, it was penetrative rape,
 2    forceable rape, and incapacitation by alcohol.
 3 A.  What's the question?
 4 Q.  Did you -- I'm asking if you looked at Zinzow when you
 5    made your -- when you cited it?
 6 A.  I'm sure I did.  I would need to see it in front of me
 7    to refresh my memory.
 8 Q.  Okay.  Amstadter also did the same thing.  It was a
 9    study not of the number of people who get MFEs, but it
10    was a study of who gets medical care.  It's a
11    different population.  I mean, it's a different group,
12    right?  One is a subset of the other?
13 A.  Can you pull it up.
14 Q.  I might be able to.  Let me see if I still have it.  I
15    thought I did and I couldn't find it.  I don't -- I
16    think these are ones that I couldn't download.  I --
17    yes, hold on a second.
18 A.  Sure.
19 Q.  Let me get the names for you.  All right.  I'll share
20    Zinzow first.  Can you see it?
21 A.  Yes, thank you.
22 Q.  Okay.  So he -- he describes a sample and he describes
23    the -- the definitions.  Let me just take it from the
24    top.  It's all about medical care, seeking medical
25    care, and only seeking medical care.
```

Page 152

38 (Pages 149 to 152)

Goodman-Williams, Ph.D., Rachael
6/1/2023

```
 1   A.  Uh-huh.
 2   Q.  It never mentions the word medical forensic exam.  And
 3       it defines the population as -- let's see the
 4       definition.  Focussed only on recent -- only rape
 5       incidents that occurred of -- at age of fourteen
 6       years.  Rape was defined as digital, oral, penial, or
 7       object penetration of the victim's vagina, mouth, or
 8       rectum by a male or female without consent.
 9             Cases of forceable rape needed -- needed
10       forced threat, injury, so forth, drug or alcohol
11       facilitated incapacitated rape.  So when he's doing
12       this study, he's not looking at sexual offenders
13       generally.  He's looking at a very refined,
14       edge-of-the-margin population of people who got the
15       most -- who were victims of the most serious offenses,
16       right?
17   A.  Well, of penetrative rape, yeah, I don't think that
18       that's a small subset, but.
19   Q.  No.  No.  I'm -- I'm -- well, we can look at the total
20       number of charges per year and it's not -- it might
21       not be a small -- you're right.  It might not be a
22       small subset, but it's certainly nothing close to all
23       sexual offenses, right?
24   A.  Yeah.  There are absolutely non-penetrative sexual
25       assaults.
```

Page 153

```
 1   Q.  But I'm saying if that's what he's studying, you're
 2       not then allowed to say this is the percentage for all
 3       sexual offenders, which is what you said.
 4   A.  Well, I don't think I was talking about sexual
 5       offenders.  I was talking about sexual assault
 6       victims, right?
 7   Q.  Sorry, yes.  And if you want me to show you the other
 8       studies, I can show you these as well.  Almost the
 9       same thing, the Amstadter study is -- the definitions
10       are nearly identical.
11   A.  Okay.
12   Q.  So what I'm saying is you're -- you're generalizing by
13       saying I'm citing these three studies for the
14       proposition that twenty-one to thirty-eight percent of
15       sexual assault victims get MFEs.  And I'm saying
16       you've got three studies that never mention the word
17       MFE.
18   A.  Yes.
19   Q.  All three relate to -- okay.  That's a fair criticism?
20   A.  Yeah.
21   Q.  Okay.  And the third study is a study of
22       African-American women in Chicago.  And it has to do
23       with all kinds of care that included, I think, clergy
24       care and other stuff, although they did have a number
25       for medical care.
```

Page 154

```
 1   A.  I'm imagining that number was specifically for medical
 2       care.  Most medical care at the hospital -- so when
 3       someone goes to seek a sexual assault exam at the
 4       hospital, that is generally referred to as a medical
 5       forensic exam, regardless of whether they have a SAK
 6       collected.
 7             Most people who have a medical forensic
 8       exam do have a SAK collected.  But that overarching
 9       post-assault exam by a sexual assault nurse, exam
10       nurse, that's generally referred to as an MFE.
11             Now, in this study right here, you're
12       right, they're talking specifically about post-assault
13       medical care.  So it's very possible that the
14       percentage who received specifically a forensic exam
15       could be lower, possibly by about twenty percent.
16   Q.  And -- okay.  All right.  Fine.
17       MR. REINGOLD:  Let's end there.
18       THE WITNESS:  Sure.
19       MR. REINGOLD:  Thank you.
20       THE WITNESS:  Sure.  Absolutely.
21       MR. JAMISON:  All right.  So I just have
22       what I think will be some quick questions.
23          EXAMINATION
24   BY MR. JAMISON:
25   Q.  At the beginning of your deposition we talked about
```

Page 155

```
 1       the number of individuals that are killed by drunk
 2       driving every year.  Do you remember that?
 3   A.  Yes.
 4   Q.  And I think it was around thirteen thousand.  And then
 5       there was a line of questioning related to how many
 6       sort of undetected drunk driving instances there were
 7       annually.  Do you remember that?
 8   A.  I do.
 9   Q.  And is it fair to say there was a high number of
10       undetected drunk driving offenses every year?
11   A.  Yes.
12   Q.  Okay.  And if it's an undetected drunk driving
13       offense, is there any victim or any harm involved?
14   A.  No.  And that's -- that was the point that I was
15       hoping to make in that line of questioning, is that I
16       would say we have a very high detected rate of drunk
17       drivers that cause harm.
18             Whereas, in sexual assault there's always
19       harm caused, regardless of whether it is detected or
20       not.  And I think that's quite different.
21   Q.  Is there ever a sexual assault where there's not a
22       victim?
23   A.  Not that I can think of.
24   Q.  What are the harms to victims of sexual assault?
25   A.  I mean, they are immense in terms of psychological
```

Page 156

39 (Pages 153 to 156)

Goodman-Williams, Ph.D., Rachael
6/1/2023

| | | | |
|---|---|---|---|
| 1 | harm, emotional harm, physical harm, even economic | 1 | health impacts there would be on victims of sexual |
| 2 | harm.  I mean, sexual assault has one of the -- the | 2 | assault. |
| 3 | crimes at the highest rate of PTSD in its victims. | 3 | A.  Yeah.  I mean, PTSD, shame, self-blame, depression, |
| 4 | Yeah, I mean, the harms are extensive and immense. | 4 | anxiety, pretty much every negative mental health |
| 5 | Q.  And do you know how many sexual assaults there are per | 5 | effect you can think of is associated with sexual |
| 6 | year in the United States? | 6 | assault. |
| 7 | A.  Gosh, I -- I could find that relatively quickly in | 7 | Q.  And what sort of relational impacts are there on |
| 8 | research literature.  Again, that would be an | 8 | victims? |
| 9 | imperfect figure based on reported sexual assaults or | 9 | A.  What do you mean relational impacts? |
| 10 | other sort of social science survey estimates.  So no, | 10 | Q.  Well, from what I understand, a lot of victims of |
| 11 | I don't know that offhand. | 11 | sexual assault are victimized by someone they know. |
| 12 | Q.  Are you familiar with the National Sexual Violence | 12 | So what sort of impacts are there on their |
| 13 | Resource Center? | 13 | relationships they have? |
| 14 | A.  Possibly. | 14 | A.  Yeah.  I mean, there can be a real difficulty in, you |
| 15 | Q.  According to information on the website, they say | 15 | know, trusting people, in, you know, maintaining |
| 16 | there are seven hundred and thirty-four thousand | 16 | relationships.  Sexual assault, particularly if it was |
| 17 | estimated people who are raped, including threatened, | 17 | sort of within one circle, can be really challenging |
| 18 | attempted, or completed rape, in the U.S. in 2018. | 18 | in terms of losing supportive relationships and things |
| 19 | Does that number sound high, low, or about right? | 19 | like that. |
| 20 | A.  Oh gosh, it doesn't sound surprising to me.  But | 20 | Q.  And what about the economic impacts to victims? |
| 21 | depending on how -- I would need to read so much into | 21 | A.  Yeah.  So, you know, there's lost productivity in |
| 22 | the methods into how they're collecting that number | 22 | terms of lost work, lost educational attainment.  You |
| 23 | before I felt confident speaking to that estimate. | 23 | know, victims who leave jobs because their perpetrator |
| 24 | Q.  All right.  Circling back for a minute to the impacts | 24 | is associated with a job.  Victims who, due to the |
| 25 | on the victims, can you explain more what mental | 25 | mental health impacts, you know, get fired from their |

Page 157                                     Page 158

| | | | |
|---|---|---|---|
| 1 | job, you know, all sorts of things like that. | 1 | CERTIFICATE |
| 2 | MR. JAMISON:  I think that's all I have. | 2 | |
| 3 | THE WITNESS:  Okay. | 3 | STATE OF MICHIGAN |
| 4 | MR. REINGOLD:  I think we're done. | 4 | COUNTY OF MACOMB |
| 5 | (The deposition was concluded at 1:09 p.m. | 5 | I, Heather DeMar, RPR, CSR, and Notary |
| 6 | Signature of the witness was not requested by counsel | 6 | Public in and for the above county and state, do |
| 7 | for the respective parties hereto.) | 7 | hereby certify that this deposition was taken before |
| 8 | | 8 | me at the time and place hereinbefore set forth via |
| 9 | | 9 | videoconference; that the witness was by me first duly |
| 10 | | 10 | sworn to testify to the truth; that this is a true, |
| 11 | | 11 | full and correct transcript of my stenographic notes |
| 12 | | 12 | so taken; and that I am not related, nor of counsel to |
| 13 | | 13 | either party, nor interested in the event of this |
| 14 | | 14 | cause.  I agree that I nor any person, attorney, |
| 15 | | 15 | paralegal, or expert witness may make, copy, and/or |
| 16 | | 16 | distribute to others for future sales, monetary gain, |
| 17 | | 17 | or any other purpose, a transcript and/or video |
| 18 | | 18 | without paying Tri-County Court Reporters the ordinary |
| 19 | | 19 | and customary charges for any and all additional |
| 20 | | 20 | transcripts.  Transcript completed 6/5/2023. |
| 21 | | 21 | |
| 22 | | 22 | Heather DeMar, RPR, CSR - 8951 |
| 23 | | 23 | Notary Public. |
| 24 | | 24 | Macomb County, Michigan |
| 25 | | 25 | My Commission Expires:  8/31/2023 |

Page 159                                     Page 160

40 (Pages 157 to 160)