# Exhibit 8; :

# F t0'Cppc"Ucnvgt"F gr qukkqp"Vtcpuetkr v



**TRI-COUNTY**

**COURT REPORTERS**

**INC.**

(248)608-9250 Fax (844)270-7115

www.tri-countycourtreporters.com

depos@tricountyreporters.com

Transcript of the Testimony of
**Salter, Anna C.**

**Date:** May 30, 2023
**Volume:**

**Case:** JOHN DOES A, B, C, D, E, F, G, H, et al. v. GRETCHEN WHITMER,
Governor of the State of Michigan, et al.

Printed On: June 13, 2023

Salter, Anna C.
5/30/2023

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E,
F, G, H, MARY DOE and
MARY ROE, on behalf of
themselves and all others
similarly situated,
        Plaintiffs,

                                File No. 2:22-cv-10209
        vs.              Hon. Mark A. Goldsmith
                              Mag. Curtis Ivy, Jr.
GRETCHEN WHITMER, Governor
of the State of Michigan, and
COL. JOSEPH GASPER, Director
of the Michigan State Police,
in their official capacities,
        Defendants.
_____/

The remote videoconference deposition of
ANNA C. SALTER, Ph.D., taken before me, SANDRA
APLEY, CSR-8838, a Certified Shorthand Reporter and
Notary Public acting within the County of Oakland,
State of Michigan, on Tuesday, May 30, 2023, at
10:02 a.m.

Page 1

---

1  APPEARANCES:
2
3  AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
   By:  Ms. Miriam J. Aukerman (P63165)
       Ms. Dayja S. Tillman (P86526)
4  1514 Wealthy Street SE, Suite 260
   Grand Rapids, Michigan 49506
5  (616) 301-0930
   maukerman@aclumich.org
6  dtillman@aclumich.org
   Appearing via videoconference on behalf of Plaintiffs
7
   MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
8  By:  Mr. Eric M. Jamison (P75721)
   525 West Ottawa Street
9  Lansing, Michigan  48933
   (517) 335-7573
10 jamisone@michigan.gov
   Appearing via videoconference on behalf of Defendants
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

---

1        T A B L E   O F   C O N T E N T S
2  WITNESS                        PAGE
3  Anna C. Salter, Ph.D.
4      Examination by Ms. Aukerman        4
       Examination by Mr. Jamison        174
5
6
        E X H I B I T   I N D E X
7
   PLAINTIFFS'
8  EXHIBITS      DESCRIPTION      PAGE
9  Exhibit No. 1 - Psychological Report        9
10 Exhibit No. 2 - Federal Rule citation        9
11 Exhibit No. 4 - Curriculum Vitae        38
12 Exhibit No. 5 - List of Legal Cases        52
13 Exhibit No. 6 - Court transcript        86
14 Exhibit No. 9 - BJS article        116
15 Exhibit No. 10 - APA article        126
16 Exhibit No. 11 - AIC article        130
17 Exhibit No. 13 - Westlaw case: U.S. v. Graham   169
18 Exhibit No. 14 - Westlaw case: K.M. v. S.M.M.   169
19 Exhibit No. 15 - Westlaw case: State v. Tjernagel 170
20 Exhibit No. 16 - Court transcript        171
21 Exhibit No. 17 - APA article        97
22
23      (Exhibit Nos. 3, 7, 8, and 12 were
24        intentionally omitted.)
25

Page 3

---

1              Tuesday, May 30, 2023
2                10:02 a.m.
3                  --oOo--
4        THE REPORTER:  My name is Sandra Apley, a
5  Michigan State certified shorthand reporter and notary
6  public.  This deposition is being held via
7  videoconferencing equipment.  The witness and the
8  reporter are not in the same room.  The witness will
9  be sworn in remotely pursuant to agreement of all
10 parties.
11        ANNA C. SALTER, Ph.D.
12 was thereupon called as a witness herein, and after
13 having been first duly sworn or affirmed to tell the
14 truth, the whole truth, and nothing but the truth,
15 was examined and testified as follows:
16              EXAMINATION
17 BY MS. AUKERMAN:
18 Q.  Good morning, Dr. Salter.  My name is Miriam Aukerman.
19    I'm an attorney at the ACLU of Michigan, and I
20    represent the plaintiffs in this case.  I just want to
21    start by going over some of the basic rules for
22    depositions.
23        I think -- I know that you've testified a
24    fair amount in the past, so I'm sure they're quite
25    familiar to you.  But you have to answer verbally.

Page 4

---

1  (Pages 1 to 4)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 The court reporter can't take down nods or heads<br>2 shaking or things like that.<br>3       If you need clarification on a question that<br>4 I'm asking you, can you ask me for that?<br>5 **A.** Yes.<br>6 **Q.** Okay.  And if you answer a question, I'll assume you<br>7 understood that.  Okay?<br>8 **A.** Yes.  Well, I'll assume I understood it, too.<br>9 **Q.** Okay, great.  Now, the court reporter can't take down<br>10 two people talking at once, so we should both try not<br>11 to talk over each other.  From time to time, your<br>12 attorney may object, but unless he instructs you not<br>13 to answer, you need to answer the question.<br>14       You should answer just the questions that<br>15 I've asked.  In my experience, sometimes witnesses<br>16 want to add information they think is important, but<br>17 that isn't what I've asked about.  If your attorney<br>18 wants you to elaborate about something, your attorney<br>19 can ask you questions after I'm finished asking my<br>20 questions.<br>21       So can we agree that you'll provide answers<br>22 that are responsive to the questions that I'm asking?<br>23 **A.** Yes.<br>24 **Q.** Okay, great.  And then, if I cut you off because your<br>25 answers are nonresponsive, we'll stop, and your | 1 attorney can ask some questions later if he wants more<br>2 information.  Is that okay?<br>3 **A.** Well, I'd rather finish my answer, but we'll just see<br>4 how it goes.<br>5 **Q.** Okay.  Well, you know, if I cut you off, your attorney<br>6 can ask questions later to clarify anything than you<br>7 wanted to add in.<br>8       If you want to take a break today, we can<br>9 certainly do that whenever you need to.  I just ask<br>10 that you answer the pending question that is on the<br>11 table.  And finally, today, I'm going to be asking you<br>12 about things that are listed in your report.  I'm not<br>13 going to ask you to offer opinions that are not<br>14 already disclosed in this report.  Is that fair?<br>15 **A.** Yes.<br>16 **Q.** Okay.  And, again, if you start to offer an opinion<br>17 that's not discussed in your report, I may cut you off<br>18 because it wasn't discussed in your report.  Okay?<br>19 **A.** I understand.<br>20 **Q.** Okay.  So since we're doing this by Zoom, can you<br>21 clarify where you're at?<br>22 **A.** I am at 300 Palomino Drive, Jefferson, Colorado.<br>23 **Q.** Okay.  And do you have anything in front of you other<br>24 than your computer screen?<br>25 **A.** Yes.  I have my report and -- |
| Page 5 | Page 6 |
| 1 **Q.** Your report.  I'm sorry.  I cut you off.  Your report?<br>2 **A.** I have my report and some of the research that I<br>3 referenced.<br>4 **Q.** Okay.  And other than the animals you mentioned before<br>5 we went on the record, do you have anyone with you?<br>6 **A.** No.<br>7 **Q.** Are you under the influence of any medications, or is<br>8 there anything else that could affect your ability to<br>9 answer questions truthfully today?<br>10 **A.** Well, aging, but other than that, no.<br>11 **Q.** Okay.  All right.  Let's talk about how you prepared<br>12 for your deposition today.<br>13       What did you do to prepare, if anything?<br>14 **A.** I went back and read my report, and I read some of the<br>15 literature.  I reviewed some of the literature that I<br>16 referenced in the report.<br>17 **Q.** Okay.  And did you have -- without telling me what you<br>18 might have discussed, did you have any conversations<br>19 with your attorney?<br>20 **A.** I don't think so.  Maybe he contacted me about just<br>21 with the information about Zoom, but that was mainly<br>22 practical information about when it started and so<br>23 forth.  We didn't discuss the research or my report.<br>24 **Q.** Okay.  And you mentioned that you reviewed your report<br>25 and some literature that you referenced in your | 1 report.<br>2       Did you review any other documents?<br>3 **A.** No.<br>4 **Q.** And did you speak with anyone else in preparation for<br>5 the deposition?<br>6 **A.** No.<br>7 **Q.** Anything else you did to prepare?<br>8 **A.** No.<br>9 **Q.** Okay.  So let me share my screen here.<br>10       Okay.  Can you see that?  You should be<br>11 seeing Exhibit 1.  Do you see that?<br>12 **A.** If you're asking me, yes.<br>13 **Q.** Yes.  So this is -- let's see if I can get this larger<br>14 here.<br>15       Can you see the copy of your report,<br>16 Dr. Salter?<br>17 **A.** Yes.<br>18 **Q.** So did you write this report?<br>19 **A.** Yes.<br>20 **Q.** And was anyone else involved in writing it?<br>21 **A.** No.<br>22 **Q.** Okay.  Did anyone help you write it?<br>23 **A.** I think it's the same question.  No.<br>24 **Q.** Okay.  Did anyone tell you what to write?<br>25 **A.** No. |
| Page 7 | Page 8 |

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1    Q. Did anyone tell you to make any assumptions in writing | 1    Q. Do you see that, Dr. Salter? |
| 2      this report? | 2    A. No, ma'am. I see your desktop. |
| 3    A. No. | 3    Q. Okay. Let's try that again. Do you see that now? |
| 4    Q. And did anyone provide you with any facts not included | 4    A. Yes. |
| 5      in the materials you reviewed? | 5    Q. So these are the Federal Rules of Civil Procedure. |
| 6    A. I'm sorry. I'm not sure I understand the question. | 6      This has to do with expert reports. And I just want |
| 7    Q. Did you -- were you provided with any sort of factual | 7      to point you to what is required for expert reports in |
| 8      background documents, facts that you considered in | 8      federal court. |
| 9      making your opinions? | 9        So looking here at page 3 of Exhibit 2, the |
| 10    A. Yes. I was given some of the other experts' reports. | 10      Federal Rules of Civil Procedures 26, it requires you |
| 11    Q. Okay. | 11      cite "a complete statement of all opinions that the |
| 12    A. And I referenced them in the report. | 12      witness will express and the basis and reasons for |
| 13    Q. Okay. We'll get to that in just a second. | 13      them." |
| 14      Are you familiar with the Federal Court | 14        Do you see that, Dr. Salter? |
| 15      Rules for expert reports? | 15    A. Yes. |
| 16    A. No. | 16    Q. And all the opinions you intend to offer in this case |
| 17    Q. So let me then stop sharing and share this. Can you | 17      are contained in your report, correct? |
| 18      see -- this is Exhibit 2. | 18    A. Yes. |
| 19      MS. AUKERMAN: We should mark it. I'm | 19    Q. You haven't left anything out? |
| 20      sorry. We should mark the report as Exhibit 1. This | 20    A. Not to my knowledge. |
| 21      is Exhibit 2, the Rule 26 of the Federal Rules of | 21    Q. Okay. And the report is also a complete statement of |
| 22      Civil Procedure. | 22      the basis and reasons for your opinion, correct? |
| 23      (Plaintiffs' Exhibit Nos. 1 and 2 were | 23    A. Yes. |
| 24      marked.) | 24    Q. And in No. 2 here it says, the report must contain |
| 25    BY MS. AUKERMAN: | 25      "the facts or data considered by the witness in |
| Page 9 | Page 10 |

| | |
|---|---|
| 1    forming" your opinion. | 1    A. Yes. That's a better way of putting it. |
| 2      Does your report contain all the facts and | 2    Q. Okay. So let's talk about how you became assigned to |
| 3      data you considered in forming your opinions? | 3      work on this case. |
| 4    A. Well, yes and no. There is a large literature. I am | 4      When were you retained in this case? When |
| 5      aware -- I didn't include every study on undetected | 5      were you first approached about it? |
| 6      offenses that I'm aware of. | 6    A. I don't remember. I can find that, but I don't |
| 7    Q. Okay. So in other words, even though the report -- | 7      remember that offhand. |
| 8      the rules require that the report contain the facts | 8    Q. Okay. |
| 9      and data considered by the witness, you haven't | 9    A. Or I can send it to you later, if you'd prefer. |
| 10      included all of the things that you relied on. Is | 10    Q. Sure. That would be fine to hear that later. |
| 11      that accurate? | 11      Do you know why you were retained in this |
| 12      MR. JAMISON: Objection. It calls for a | 12      case? |
| 13      legal conclusion. | 13    A. Yes. I was retained to talk about Static-99. |
| 14    BY MS. AUKERMAN: | 14    Q. Okay. And what was your assignment in this case? |
| 15    Q. You can answer. | 15    A. Excuse me one second. It looks like that the earliest |
| 16    A. I included enough research to support my opinions. I | 16      emails I have were in November 2022. |
| 17      can't tell you that I included every -- I don't know | 17    Q. Okay. And so in terms of your assignment in this |
| 18      how to say it -- the background of knowledge that I | 18      case, what were you asked to provide an opinion on? |
| 19      have on undetected offenses. I did not include every | 19    A. Whether Static-99 is an adequate measure of |
| 20      study in the field on undetected offenses, but I | 20      reoffending and whether recidivism as measured by |
| 21      included ones that supported the ones enough that | 21      Static-99 is the same thing as reoffending, in other |
| 22      supported my opinion. | 22      words, the justice gap. |
| 23    Q. So you've included -- it's fair to say you included | 23    Q. Okay. Anything else you were asked to provide an |
| 24      the facts that you think are sufficient to support | 24      opinion on? |
| 25      your opinion, correct? | 25    A. Yes. How long it takes to do a comprehensive |
| Page 11 | Page 12 |

3 (Pages 9 to 12)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 assessment. I believe those are the only two things. | 1 **A.** I don't see it here, so I don't remember. |
| 2 Q. Okay. Were you asked to provide an opinion on -- to | 2 Q. What about Dr. Zgoba? That's Z-g-o-b-a. |
| 3 respond to the opinion of the plaintiffs' experts? | 3 **A.** I can't remember every report that was sent to me. |
| 4 **A.** To be honest, I don't remember whether I was | 4 The question is were they sent to me. Wait a minute. |
| 5 specifically. I was given all of that material to | 5 Wait a minute. Wait a minute. I have a list. |
| 6 read, but I don't remember if I was specifically asked | 6 Hanson's and -- well, Hanson's goes on for a while. |
| 7 to review their reports. | 7 Q. So it sounds like you reviewed Dr. Hanson's, |
| 8 I did review their reports in light of what | 8 Dr. Letourneau's? |
| 9 I needed to do which was talk about reoffending versus | 9 **A.** Yes. I'm looking through the ones that were sent now, |
| 10 recidivism. I don't remember if anyone specifically | 10 but I haven't got past Hanson's yet. They are all in |
| 11 asked me to include anything on their reports. | 11 a line. They weren't sent separately. |
| 12 Q. You mentioned that you reviewed the experts' reports. | 12 Q. I see. They were one? |
| 13 Which reports from plaintiffs' experts did | 13 **A.** They were one document which is why I can't do it |
| 14 you review? | 14 faster. Okay. There's Hanson's. Elizabeth |
| 15 **A.** Well, for certain, Karl Hanson's and -- I'm blanking | 15 Letourneau's, there's Letourneau's. Well, okay. I |
| 16 on her name. Hang on a second. | 16 see a Letourneau's, James Prescott, a Kelly Socia, |
| 17 Q. Dr. Letourneau? | 17 Z-g-o-b-a. |
| 18 **A.** Thank you. And Dr. Letourneau. And I reviewed -- so | 18 Q. Okay. |
| 19 I think I did this afterwards. I reviewed Dr. -- wait | 19 **A.** John Aldrich; Lageson or "Lageson," L-a-g-e-s-o-n; |
| 20 a minute -- Rachael Goodman-Williams' report. | 20 Barbara Levine; Anne Yanthis (phonetic); Richard |
| 21 Q. Okay. That's one of the defendants' experts. | 21 Stapleton, and that's the last one. Those were the |
| 22 **A.** Yes. That was actually after I handed in my report. | 22 reports that were sent to me, and I read all of them. |
| 23 The only two that I see here are Hanson's and | 23 Q. Okay. You read all of them. It doesn't sound like |
| 24 Letourneau's. | 24 you have a particular recollection of any of them |
| 25 Q. Did you review Dr. Socia's report? | 25 other than Dr. Hanson and Dr. Letourneau. Is that |
| Page 13 | Page 14 |

| | |
|---|---|
| 1 accurate? | 1 Q. Okay. So your understanding is that the question in |
| 2 **A.** Most of them were addressing a different issue from | 2 this case are whether the -- the efficacy of the |
| 3 what I was asked to opine on. | 3 registry and whether the Static-99 be used to |
| 4 Q. Okay. | 4 determine whether people be on the registry. |
| 5 **A.** So the answer is "yes." I remember the ones that I | 5 That's your understanding of what the case |
| 6 referenced in my report. I don't remember the ones | 6 is about? |
| 7 that were essentially on a different issue. | 7 **A.** I don't know if it's just the efficacy, but whether or |
| 8 Q. Sure, yeah. That makes sense. | 8 not the registry should be allowed to continue. |
| 9 And so the two that you referenced in your | 9 Q. Okay. |
| 10 report were Dr. Hanson and Dr. Letourneau, correct? | 10 **A.** And, yes, my particular part had to do with the second |
| 11 **A.** Yes. | 11 part of that which is if there is a registry, that |
| 12 Q. Okay. And then your report includes all the | 12 Static-99 and not the offenses they were committed for |
| 13 criticisms of Dr. Hanson and Dr. Letourneau's reports | 13 be used to determine -- |
| 14 that you intend to offer in this case, correct? | 14 (At 10:24 a.m., Mr. Jamison was |
| 15 **A.** As far as I know. I'll answer, of course, what I'm | 15 disconnected from the videoconference.) |
| 16 asked subject to objections, but as far as I know, I'm | 16 MS. AUKERMAN: Let's stop for a second, |
| 17 only going to be asked questions about my report. | 17 doctor. Mr. Jamison just dropped off, so we need to |
| 18 Q. Okay. So as part of agreeing to serve as defendant's | 18 stop until he comes back. |
| 19 expert in this case, did you learn what this case is | 19 (At 10:27 a.m., Mr. Jamison rejoins the |
| 20 about? | 20 videoconference.) |
| 21 **A.** Yes. | 21 BY MS. AUKERMAN: |
| 22 Q. And what do you believe this case to be about? | 22 Q. So Dr. Salter, we were talking about -- before |
| 23 **A.** The efficacy of the registry, and if the registry does | 23 Mr. Jamison lost his internet connection, we were |
| 24 stand, the suggestion of Static-99 be used to | 24 talking about what you thought this case was about. |
| 25 determine who should be on it. | 25 How did you learn what this case was about? |
| Page 15 | Page 16 |

4  (Pages 13 to 16)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1   **A.** Well, I was contacted by the attorneys. I've had | 1   this case are seeking, what they're asking for the |
| 2   conversations with them, and they have sent me | 2   court to do? |
| 3   materials relevant to the case. | 3   **A.** I don't remember from the Complaint. I believe it was |
| 4   **Q.** What materials relevant to the case have they sent | 4   to abolish the registry or -- well, to abolish the |
| 5   you? | 5   registry. |
| 6   **A.** Well, the expert reports and -- let's see. I can | 6   **Q.** So your understanding of this case is based on your |
| 7   provide you a list afterwards if you'd prefer. | 7   conversations with the attorneys, what you read in the |
| 8   **Q.** Yeah, if we can get a list afterwards of the documents | 8   expert reports, and the Complaint? |
| 9   that you were sent. | 9   **A.** Yes. |
| 10     MS. AUKERMAN: Is that okay, Mr. Jamison, so | 10   **Q.** Okay. Were you familiar with this case outside of |
| 11   that we don't spend a lot of time trying to track down | 11   those, the things I just listed? |
| 12   all of that? | 12   **A.** No. |
| 13     MR. JAMISON: Yeah. I think my recollection | 13   **Q.** Okay. We talked about the documents that you were |
| 14   is she was given the expert reports and perhaps a copy | 14   provided. Were you also provided the rebuttal reports |
| 15   of the Complaint, and to my knowledge, there was | 15   in this case? |
| 16   nothing else she was provided. | 16   **A.** No. Excuse me. Do you mean by the experts for the |
| 17     THE WITNESS: Yes. I was given a copy of | 17   defense? |
| 18   the Complaint. | 18   **Q.** No. What I mean is there were reports written by |
| 19   BY MS. AUKERMAN: | 19   Dr. Canton and Dr. Socia that responded to the |
| 20   **Q.** Okay. And did you read the Complaint? | 20   defendants' expert reports including yours. |
| 21   **A.** Yes. | 21   **A.** No. |
| 22   **Q.** What, if anything, do you know about the individual | 22   **Q.** You were not provided those? |
| 23   plaintiffs in this case? | 23   **A.** No. |
| 24   **A.** Nothing. | 24   **Q.** Were you provided any deposition testimony? |
| 25   **Q.** Okay. And do you know what relief the plaintiffs in | 25   **A.** I don't believe so. |
|       Page 17 |       Page 18 |
| 1   **Q.** Or a psychological record of any of the plaintiffs? | 1   **Q.** Okay. What about prostitution? |
| 2   **A.** No. I know nothing about the plaintiffs. | 2   **A.** Well, typically go by the Static-99 definitions, and |
| 3   **Q.** Are there any materials you asked for that you were | 3   that depends. Prostitution, I believe, is a Category |
| 4   not provided? | 4   B offense. It would count if there was at least one |
| 5   **A.** No. | 5   Category A offense. |
| 6   **Q.** Okay. Let's talk a little bit about the definitions | 6   **Q.** So I just want to be clear. You're saying that you go |
| 7   you use in your report. Throughout your report you | 7   by the Static-99 definitions of who a sex offender is? |
| 8   use the term "sex offender." | 8   **A.** In prac- -- yes, in practicality. |
| 9     How do you define the term "sex offender"? | 9   **Q.** So there could be -- someone could have committed an |
| 10   **A.** Someone who has committed an unlawful sexual act | 10   unlawful sexual act that doesn't count for the |
| 11   whether or not it was detected. | 11   Static-99, correct? |
| 12   **Q.** So you use the term in your report to mean anyone who | 12   **A.** They could. And, actually, I have to take that back |
| 13   committed any kind of unlawful sexual act regardless | 13   'cause I can't say that I only go by that because say, |
| 14   of the type of act? | 14   for example, child pornography doesn't count on |
| 15   **A.** Unlawful sexual. | 15   Static-99 unless they have a Category A offense. But |
| 16   **Q.** Okay. So you would include, for example, someone who | 16   I would include someone who had child pornography |
| 17   commits gross indecency? | 17   offenses as someone who is a sex offender. |
| 18   **A.** Yes. They would be considered a sex offender. | 18   **Q.** So it sounds like you're not going to simply whether |
| 19   **Q.** Or sodomy when it was legal? | 19   or not a person -- whether the offense was unlawful, |
| 20   **A.** I don't think today you would consider the person a | 20   correct? |
| 21   sex offender. | 21   **A.** There are some exceptions, yes. |
| 22   **Q.** But if they had a conviction on their record from an | 22   **Q.** Okay. And you're not going simply by what the |
| 23   unlawful sexual act, the unlawful sexual act is | 23   Static-99 requires or defines it as? |
| 24   sodomy, would they be a sex offender? | 24   **A.** That's correct. |
| 25   **A.** Well, yes. That would count in Static-99. | 25   **Q.** Okay. Would you include teenage sexual activity where |
|       Page 19 |       Page 20 |

5 (Pages 17 to 20)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1  one person is not old enough to legally consent? | 1  the field. |
| 2       The person that does that, is that person a | 2  Q. Is there anything in the Static-99 definitions that |
| 3  sex offender? | 3     specify certain age difference for someone to be a sex |
| 4  A. It depends on the difference in age, the general, and | 4     offender? |
| 5     whether there was coercion. | 5  A. I believe so. |
| 6  Q. Say there's no coercion and the difference in age is | 6  Q. And what is that age difference? |
| 7     four years, four years and a month. | 7  A. I don't remember. I think it might be three years. |
| 8  A. Four years would count. Two years, generally, is not | 8  Q. So if someone has an age gap of two years, they |
| 9     accepted in the field as coercion. A 17-year-old with | 9     wouldn't be a sex offender in your view, even if that |
| 10    a 15-year-old would not generally be considered a sex | 10    was illegal, correct? |
| 11    offender. | 11 A. No. I mean, in general, sex offenders are people who |
| 12 Q. So you're saying that sexual activity with a willing | 12    commit unlawful sexual acts. There are exceptions as |
| 13    but underage partner, whether or not that person | 13    you are pointing out. |
| 14    counts as a sex offender, would depend -- in your | 14 Q. Okay. But when you use the term "sex offender" in |
| 15    view, would depend on the age difference? | 15    your report, you're using it to mean people who commit |
| 16 A. Yes. And, of course, whether the one party was | 16    an unlawful sexual act but with some exceptions, |
| 17    disabled in any way. | 17    correct? |
| 18 Q. Right. But we're talking about consensual. I mean | 18 A. That's true. |
| 19    not legally able to consent, but we're talking about a | 19 Q. Okay. So let's take an example of one of our |
| 20    willing, nondisabled fully, you know, competent but | 20    plaintiffs. He met a girl in an over-18 club. They |
| 21    underage young person having sexual activity with | 21    hit it off. They had sex. It turns out she was |
| 22    someone who is older than they are. | 22    underage. |
| 23 A. Yes. That's correct. It depends on the age. | 23       Do you consider that man to be a sex |
| 24 Q. And what do you base that on? | 24    offender? |
| 25 A. Oh, that's just generally accepted in the research in | 25 A. How old was she? |
| **Page 21** | **Page 22** |
| 1  Q. I believe she was 15. | 1  who's been convicted of a sex crime? |
| 2  A. And how old was he? | 2  A. No. |
| 3  Q. I think he was more than four years older. | 3  Q. Michigan law sets out specific requirements for who is |
| 4  A. More than four years older? | 4     a registered sex offender. Do you know if everyone |
| 5  Q. More than four years older, yes. | 5     who's required to register as a sex offender in |
| 6  A. Yes. | 6     Michigan falls within your definition of sex offender? |
| 7  Q. Even though he didn't know that she was underage? | 7  A. I was not asked to comment on the registry itself. I |
| 8  A. It's his responsibility to know. I don't think that's | 8     was only asked to comment on recidivism versus |
| 9     a defense in court. | 9     reoffending and the use of Static-99, so I did not |
| 10 Q. Okay. So you would consider him a sex offender? | 10    study the Michigan Registry's laws. |
| 11 A. Yes. | 11 Q. Okay. So you're not -- you don't know anything about |
| 12 Q. What about -- okay. Does the term sex offender mean | 12    Michigan's Registry laws? |
| 13    the same thing each time you use it in your report? | 13 A. Correct. |
| 14 A. I would assume so. I can't think of examples -- at | 14 Q. You didn't look at that? |
| 15    least at the present moment, I can't think of times | 15 A. Very little. I didn't include anything about it in my |
| 16    that I used it differently. | 16    report, and I'm testifying on my report. |
| 17 Q. And you said before that you're not restricting the | 17 Q. And you're not testifying about the registry? |
| 18    term sexual offender to people who have been convicted | 18 A. I am not. |
| 19    of sex crimes, correct? | 19 Q. Your report distinguishes between recidivism and |
| 20 A. That's correct. | 20    reoffending, and you define -- let me put your report |
| 21 Q. You include people who commit sex crimes but are not | 21    back up again. This is Exhibit 1. |
| 22    detected, correct? | 22       Can you see your report again? |
| 23 A. Yes. | 23 A. Yes. |
| 24 Q. Okay. And so just to be clear, when you say "sex | 24 Q. Okay. And so on the first bullet here, you said that |
| 25    offender," you don't mean a registered sex offender | 25    there's a difference in recidivism which you define as |
| **Page 23** | **Page 24** |

6 (Pages 21 to 24)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1  getting caught and charged. | 1      MR. JAMISON:  I'm sorry.  If I drop again, |
| 2      If a person -- that's how you define | 2  I'll just try to do it on my mobile phone. |
| 3  recidivism, correct? | 3      MS. AUKERMAN:  Okay. |
| 4  **A.** Yes. | 4  BY MS. AUKERMAN: |
| 5  **Q.** Okay.  If a person is caught and charged only once, is | 5  **Q.** So on reoffending, you mean that someone is committing |
| 6  that person a recidivist? | 6  multiple sexual offenses, whether they're detected in |
| 7  **A.** Well, no.  What I am saying is it's someone that -- | 7  the criminal legal system, correct? |
| 8  the only thing that recidivism measures is future | 8  **A.** Yes. |
| 9  charges and convictions. | 9  **Q.** Okay.  You're not measuring repeat offending to the |
| 10  **Q.** Okay.  So recidivism isn't simply getting caught and | 10  point when a -- |
| 11  charged.  It means getting caught and charged, and | 11      (At 10:40 a.m., Mr. Jamison's connection is |
| 12  then getting caught and charged again, correct? | 12      buffering.) |
| 13  **A.** Yes. | 13      MR. JAMISON:  I'm gonna try it on my phone |
| 14  **Q.** Okay.  So the definition of recidivism that you're | 14  and see if I can log in that way. |
| 15  using is when a person who has been detected by the | 15      (From 10:40 a.m. to 10:44 a.m., off the |
| 16  criminal legal system is detected again by the | 16      record.) |
| 17  criminal legal system, correct? | 17  BY MS. AUKERMAN: |
| 18  **A.** Yes. | 18  **Q.** So before Mr. Jamison dropped off, we were talking |
| 19  **Q.** And then you defined reoffending here as committing | 19  about how you define reoffending, and my understanding |
| 20  more than one sexual -- I'm sorry -- committing a | 20  is that you're measuring -- when you say |
| 21  sexual offense whether detected or undetected, | 21  "reoffending," you mean the person has committed more |
| 22  correct? | 22  than once sexual offense detected or undetected, |
| 23  **A.** Yes.  Assuming it was not the first sexual offense. | 23  correct? |
| 24      (From 10:39 a.m. to 10:40 a.m., Mr. Jamison | 24  **A.** Yes. |
| 25      was disconnected from the videoconference.) | 25  **Q.** And you're not measuring reoffending from the point |
| Page 25 | Page 26 |

| | |
|---|---|
| 1  when a person was first convicted, correct? | 1  include a term for reoffending after conviction, |
| 2  **A.** No. | 2  correct? |
| 3  **Q.** Okay.  So a person who commitments three sex offenses | 3  **A.** I didn't -- I don't remember if I -- some of the |
| 4  but is never caught would be a repeat offender as you | 4  research that I cited was definitely on reoffending |
| 5  define it, correct? | 5  after conviction.  I don't know that I used a separate |
| 6  **A.** Yes. | 6  term for that.  I just described what the research |
| 7  **Q.** Okay.  And measuring whether someone has committed | 7  found. |
| 8  more than one offense is not the same as measuring | 8  **Q.** Okay.  So you didn't use a separate term for |
| 9  whether someone has reoffended after a conviction, | 9  reoffending after conviction -- |
| 10  correct? | 10  **A.** No. |
| 11  **A.** Correct. | 11  **Q.** -- correct? |
| 12  **Q.** For people who reoffend after conviction, there could | 12  **A.** It's a separate term. |
| 13  be observed recidivism, meaning they're detected by | 13  **Q.** And you said there was some research you cited that |
| 14  the legal system, correct? | 14  was specific to reoffending after conviction. |
| 15  **A.** Well, yes.  Anyone can be -- they can be -- anyone who | 15      Which research was that? |
| 16  commits sexual offenses can be detected at any point. | 16  **A.** Well, for example, the Kelly research certainly was. |
| 17  **Q.** Right.  So if they're reoffending after conviction, | 17  **Q.** Okay.  Anything besides the Kelly research? |
| 18  they're recidivating.  If that's observed by the legal | 18  **A.** I don't remember. |
| 19  system, that would be observed recidivism, correct? | 19  **Q.** Okay.  So just so that we're talking about the same |
| 20  **A.** Yes. | 20  thing, since your report doesn't separate out |
| 21  **Q.** But there could also be unobserved recidivism, meaning | 21  reoffending, meaning committing -- |
| 22  they can offend after conviction, but they aren't | 22      (At 10:47 a.m., Mr. Jamison was |
| 23  detected by the criminal legal system? | 23      disconnected from the videoconference.) |
| 24  **A.** Yes. | 24      MS. AUKERMAN:  Oh, hold on.  Let's go off |
| 25  **Q.** Okay.  The definitions you use in your report didn't | 25  the record again. |
| Page 27 | Page 28 |

7 (Pages 25 to 28)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1       (From 10:27 a.m. to 11:23 a.m., off the<br>2     record.)<br>3     MS. AUKERMAN: So just for the record, we<br>4   had a number of technical difficulties. We've been<br>5   off the record for some time trying to sort out how to<br>6   address those. But we seem to have everybody back, so<br>7   we'll resume the questioning.<br>8   BY MS. AUKERMAN:<br>9   Q. So I believe where we left off, Dr. Salter, is that<br>10   you were talking about how the definitions in your<br>11   report don't separately include a term for reoffending<br>12   after conviction, correct?<br>13   A. Yes.<br>14   Q. And so you're using the term -- you aren't using the<br>15   term reoffending to mean unobserved recidivism,<br>16   correct?<br>17   A. Unobserved recidivism, recidivism is by definition<br>18   charges and convictions, so it has to be observed to<br>19   be recidivism.<br>20   Q. Okay. I mean, different people use different<br>21   terminology. But the way you're using it, your report<br>22   doesn't separate out reoffending, meaning committing<br>23   more than one sex offense, from reoffending after<br>24   conviction, correct?<br>25   A. It doesn't use a separate term for it, but it<br><br>Page 29 | 1   describes the conditions of the research. Some of it<br>2   which applies to just reoffending, whether or not they<br>3   were convicted. And the other research applies to --<br>4   for example, Kelly, reoffending after an initial<br>5   charge or conviction.<br>6   Q. So --<br>7   A. It's clear by the context.<br>8   Q. So the only -- I believe you said the only research<br>9   that you decided that relates specifically to<br>10   reoffending after conviction was the Kelly research,<br>11   correct?<br>12   A. No. There's other research. I said that's all I can<br>13   think of at the moment. But there's very little<br>14   research actually that can identify sex offenders<br>15   unless they have been detected. Most of the research,<br>16   like the Langevin or DeLisi, et cetera, is concerned<br>17   with individuals who are in the system. It should be<br>18   clear from the context which research is affirmed.<br>19   Q. But other than Kelly, can you point to any study that<br>20   specifically separates out reoffending after<br>21   conviction?<br>22   A. Well, for example, let's take a look at some of the<br>23   undetected research. Well, assuming I could find it.<br>24     All right. I believe that the Schenk study<br>25   had to be concerned for the adolescents who had<br><br>Page 30 |
| 1   already been caught.<br>2   Q. I'm sorry. What page are you on?<br>3   A. Seven, next to last paragraph.<br>4   Q. So the -- I'm sorry. You're talking about the Schenk<br>5   study, okay.<br>6   DeLisi's studied 119 federal sexual offenders.<br>7   Q. I think you're misunderstanding my question,<br>8   Dr. Salter. I'm not asking whether the studies<br>9   involve people who had been convicted. I'm asking<br>10   whether they distinguish between reoffending before<br>11   and after conviction. That's a separate issue.<br>12   A. I would have to go back and read the research to<br>13   really answer that.<br>14   Q. Okay. But as you sit here today, you can't point to<br>15   any separate -- any study other than Kelly that looks<br>16   specifically at reoffending after conviction, correct?<br>17   A. That's the one that comes to mind.<br>18   Q. Okay. So just so we're clear that we're talking about<br>19   the same thing, when you use the term reoffending<br>20   today, I'm going to assume that you're talking about<br>21   committing multiple offenses regardless of whether<br>22   they're before or after conviction. Is that fair?<br>23   A. No. It depends on the context of the question that<br>24   you ask me.<br>25   Q. Okay. Just so we're clear, can you -- if you're<br><br>Page 31 | 1   specifically talking about reoffending after<br>2   conviction, can you be specific and use the term<br>3   reoffending after conviction?<br>4   A. Yes.<br>5   Q. Okay, great. I just wanted to make sure we're talking<br>6   about the same thing and not miscommunicating.<br>7     Okay. Let's talk about in reviewing your<br>8   background, it appears that over the last 20 years<br>9   you've done quite a large number of assessments of<br>10   individuals who have been convicted of sex offenses in<br>11   order to evaluate their risk of committing new<br>12   offenses, correct?<br>13   A. Yes.<br>14   Q. Okay. And do you agree that among people convicted of<br>15   sex offenses, the risk of reoffending varies?<br>16   A. Yes.<br>17   Q. So some people are a higher risk to reoffend, and some<br>18   people are a lower risk to reoffend, correct?<br>19   A. Yes.<br>20   Q. And would you agree that looking simply at the offense<br>21   of conviction does not accurately predict a person's<br>22   risk of reoffending?<br>23   A. We don't -- the problem is we don't know what the risk<br>24   of reoffending is.<br>25   Q. That's not the question I'm asking you. I'm asking<br><br>Page 32 |

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1  you whether looking at the offense of conviction | 1  assessments by clinicians? |
| 2  accurately predicts a person's risk of reoffending? | 2  **A.** In predicting what? |
| 3  **A.** And my answer is we can only measure the risk of | 3  **Q.** Predicting recidivism. |
| 4  recidivism not of reoffending doesn't appear to | 4  **A.** Recidivism, yes. |
| 5  accurately predict the risk of recidivism. Whether or | 5  **Q.** Okay. There were a variety actuarial instruments that |
| 6  not it predicts the reoffending, risk of reoffending, | 6  are used in the process of risk assessments, correct? |
| 7  we don't know. | 7  **A.** Yes. |
| 8  **Q.** Okay. So you're saying that the offense of conviction | 8  **Q.** What are the most commonly used risk assessment tools? |
| 9  doesn't predict recidivism? | 9  **A.** Static-99 and Static-2002R. |
| 10 **A.** Recidivism. | 10 **Q.** What are some of the other risk assessment tools that |
| 11 **Q.** Okay. And would you agree that actuarial risk | 11 are used? |
| 12 assessment instruments are more accurate at predicting | 12 **A.** Well, there are a variety. Well, there's the Thornton |
| 13 recidivism than looking simply at a person's | 13 has in SACJ. There are -- I don't actually deal with |
| 14 conviction? | 14 the other ones. There are a variety of dynamic |
| 15      MR. JAMISON: Objection. The question is | 15 instruments which predict sexual recidivism such as |
| 16 vague. | 16 the VRS-SO, and the stable 2007. |
| 17 BY MS. AUKERMAN: | 17 **Q.** I also have here the CPORT. Are you familiar with the |
| 18 **Q.** You may answer. Or let me restate that. | 18 CPORT? |
| 19 **A.** Go ahead. | 19 **A.** Yes. But I haven't -- yes. I haven't used it, |
| 20 **Q.** Do you agree that actuarial risk assessment | 20 though, because it is for child pornography offenders. |
| 21 instruments are more accurate at predicting recidivism | 21 **Q.** And then the Violence Risk Scale, the VRS-SO, is that |
| 22 than looking at a person's conviction? | 22 one that you used? |
| 23 **A.** Recidivism, yes. | 23 **A.** I said that one. |
| 24 **Q.** Okay. And would you agree that actuarial risk | 24 **Q.** I'm sorry. Yes, you did. I apologize. |
| 25 assessments are more accurate than unstructured | 25      Did we mention the Baiser (phonetic) |
| **Page 33** | **Page 34** |
| 1  already? | 1  **A.** If that is the only offense, if they also have a |
| 2  **A.** I don't think so. | 2  hands-on offense, you can use it. |
| 3  **Q.** Is that one that you use? | 3      I'm sorry. You can't use it if that type of |
| 4  **A.** No. | 4  offense is their only type of offense. |
| 5  **Q.** Okay. The Psychopathy Checklist? | 5  **Q.** Okay. But in that case, you would use the CPORT |
| 6  **A.** Yes. Well, Psychopathy Checklist predicts violence, | 6  instead, correct? |
| 7  so it's not used solely for the protection of sexual | 7  **A.** Possibly. I have not used that because we don't get |
| 8  offense recidivism. | 8  pure -- in the setting that I'm in, we don't get pure |
| 9  **Q.** Okay. | 9  child porn offenders. |
| 10 **A.** In the kind of cases that I'm in, it is used as | 10 **Q.** Okay. Which of the risk assessment tools are you |
| 11 an instrument, but it's not the sole instrument used | 11 trained to use? |
| 12 to predict sexual recidivism. | 12 **A.** Well, the Static-99, the Static-2002. I have taken |
| 13 **Q.** Are there any other assessment tools that are used to | 13 courses in the Stable. It was sometime ago. The |
| 14 predict sexual recidivism? | 14 Psychopathy Checklist, I'm certified in that, and I |
| 15 **A.** There probably are, but there aren't any that I used. | 15 am -- I didn't mention it, but I'm certified to train |
| 16 **Q.** Okay. So you said that the Static-99R is the most | 16 in the Static-99R. |
| 17 likely used risk assessment instrument for measuring | 17 **Q.** I read a number of evaluations that you've written, |
| 18 sexual recidivism, correct? | 18 and a number of them contain the following language |
| 19 **A.** Recidivism, yes. | 19 when you describe your credentials. Quote: |
| 20 **Q.** Okay. But it's not normed for all populations; is | 20      "In order to do these evaluations, I |
| 21 that correct? | 21 have taken training from the authors of the |
| 22 **A.** No. I mean, yes. That is correct. | 22 most prominent static and dynamic tests. I've |
| 23 **Q.** Yeah. And so, for example, it's not normed for people | 23 taken trainings on Static-99R and Static-2002R |
| 24 convicted of possessing child sexually abusive | 24 from David Thornton, Karl Hanson, Leslie |
| 25 material, correct? | 25 Helmus." End quote. |
| **Page 35** | **Page 36** |

9 (Pages 33 to 36)

Salter, Anna C.
5/30/2023

---

**Page 37**

1        Is that an accurate description of what
2    you've written in some of your evaluations?
3  A. Yes.
4  Q. Okay. So Karl Hanson was one of the people that
5    you've taken training from?
6  A. Well, a number of trainings over the years.
7  Q. How many trainings did you do on the Static-99R?
8  A. Did I take?
9  Q. Did you take, yes.
10  A. Oh, I don't remember when I was. I don't even
11    remember. I've taken ongoing trainings on that
12    instrument and then certified to train on it. I don't
13    remember the number of trainings.
14  Q. And when were you certified to train on the
15    Static-99R?
16  A. I don't remember. It was in Wisconsin. I left there
17    years ago, but it was some years before that.
18  Q. And in the evaluations I've read, you wrote that,
19    quote, "I am certified by the Static-99R team to train
20    on scoring Static-99R." End quote.
21        Is that accurate?
22  A. Yes.
23  Q. Okay. And who is the "Static-99R team"?
24  A. Say again.
25  Q. Who is the Static-99R team? Who is that?

---

**Page 38**

1  A. Well, there's certainly Karl Hanson, David Thornton,
2    Leslie Helmus. Let me see who else is on the team
3    now. Phenix, Amy Phenix. Let's see. I don't
4    remember if they are the people on the team now.
5  Q. I think that's fine.
6        You said that you were certified to train
7    others about the Static-99R. How many trainings have
8    you presented on the Static-99R?
9  A. I don't know.
10  Q. Roughly?
11  A. Well, I trained the department of corrections
12    regularly when I was in Wisconsin, so I haven't
13    trained on it since I left Wisconsin three years ago.
14    I was in the department of corrections from 1997 to
15    about 2000 and -- it must have been 2018, 2019. And I
16    can't say that I trained on it every year, but I
17    frequently trained on it during that period of time.
18  Q. Okay. Let's take a look at your CV. I'm showing what
19    should be Exhibit 4.
20        (Plaintiffs' Exhibit No. 4 was marked.)
21  BY MS. AUKERMAN:
22  Q. Let's see if I can make this screen bigger. I'm
23    having the same problem I had before.
24  A. I can see it if that's any help.
25  Q. All right. I guess I'll just try to work with the

---

**Page 39**

1    smaller screen.
2        Is this -- we'll make this Exhibit 4. Is
3    this your CV?
4  A. Yes.
5  Q. And are there any changes in the CV since you
6    submitted it?
7  A. They've changed the USPS address again. It is no
8    longer Como. It's 300 Palomino Drive, Jefferson.
9  Q. And does this reflect your -- does this CV reflect
10    your current experience?
11  A. Yes.
12  Q. Okay. Now, let's go back to your report. Going back
13    to Exhibit 1, on page 2, you describe your background,
14    and you say that here on the second from the bottom
15    paragraph, "In recent years, I have concentrated on
16    the evaluation of sex offenders."
17        What do you mean by "in recent years"?
18  A. Well, I closed by private practice in -- let me think.
19    It was probably around 1998, 1999. And after that
20    point, I worked with corrections of Wisconsin on a
21    variety of tasks related to offenders with the civil
22    commitment system in Iowa. So I would say I've done
23    some work with victims since then, but I haven't
24    assessed or treated victims, I don't believe, since
25    around 2000.

---

**Page 40**

1  Q. I'm sorry. You hadn't treated victims or offenders
2    since 2000?
3  A. That's correct.
4  Q. Let's go back to -- let's go back to your CV. This is
5    Exhibit 4. It looks like you closed your private
6    practice in 1996; is that correct?
7  A. If it says -- well, no. That's not entirely accurate.
8    I moved in 1996, but I had a private practice for a
9    couple of years after I moved in Wisconsin.
10  Q. Okay. That's not reflected on your CV, correct?
11  A. Not apparently. I didn't put it down.
12  Q. So you had a private practice in Wisconsin until about
13    2000?
14  A. No, later than 2000 for sure.
15  Q. Till when?
16  A. I'm not sure. In 1999, 2000, somewhere around there.
17  Q. Okay. And you were treating both victims and
18    offenders in that practice?
19  A. Treated mostly victims at that time. I wasn't running
20    offender groups. I did evaluate some offenders
21    outside my commitment to Wisconsin and Iowa in my
22    private practice.
23  Q. Okay. Let's talk first maybe about your Iowa work.
24    Your CV shows that you've been a Civil
25    Commitment Evaluator for the State of Iowa since 2003,

---

10 (Pages 37 to 40)

Salter, Anna C.
5/30/2023

**Page 41**

1   correct?
2   A. Yes, but in two different roles.
3   Q. Right. So for 20 years you've been doing evaluations
4       of people to determine if they are sexually violent
5       predators under Iowa's civil commitment law, correct?
6   A. Well, yes and no. In 2015, I gave up doing initial
7       evaluations and concentrated on -- and I got the
8       contracts in 2014 to do the annual re-evals.
9   Q. So you were initially doing the initial evaluations,
10      and then in 2015, you switched to doing exclusively
11      the annual evaluations, correct?
12  A. Yes.
13  Q. Okay. But for the past 20 years, you've been doing
14      evaluations, initial and annual -- or let me say that
15      again.
16          For about 20 years you've been doing
17      evaluations of people under Iowa's Civil Commitment
18      Program, correct?
19  A. Yes.
20  Q. Okay. Are you still doing that work?
21  A. Yes. But the contract ends in July, and I did not
22      rebid it. So it will end -- well, I'll have to go to
23      court some for the six months after that, but the
24      official contract ends in July.
25  Q. Are you retiring in July?

**Page 42**

1   A. Semi. I'm retired from the rigors of a 12-month
2       contract.
3   Q. Will you continue to do other types of work?
4   A. Yes.
5   Q. And what would that be?
6   A. I'm sure I'll continue training. I may or may not
7       take legal cases, and I'm working on, you know, an
8       academic paper with two other people. And I have
9       another book that I want to write.
10  Q. Okay.
11  A. I hope to mainly write.
12  Q. Just briefly, what is the academic paper on?
13  A. It's on this question, the misuse of Static-99 and the
14      claims that recidivism that Static-99 accurately
15      measures reoffending.
16  Q. And who are your coauthors with that?
17  A. Darrell Turner is one. I believe he's involved in
18      this case and -- I'm having a senior moment -- Michael
19      Bourke.
20  Q. Michael Bourke?
21  A. Yes.
22  Q. B-o-r-k?
23  A. Wait a minute. I think it's B-o-u-r-k-e, but let's
24      check to be sure. B-o-u-r-k-e.
25  Q. And then you mentioned you're writing a book. What is

**Page 43**

1   that about?
2   A. Well, it's about sex offenders. It's a follow-up to
3       my book, Predators, and it's, again, about motivation
4       and thinking. It's going to have chapters on
5       undetected offending and the issue with pretending
6       that the justice gap doesn't exist. It will have
7       chapters on counterintuitive behaviors in victims and
8       the way that legal cases are lost because people
9       misread victims' reactions that are perfectly normal
10      in victims. It'll have a chapter on psychopathy.
11      It'll have a chapter on sadism, et cetera.
12  Q. And who is the audience for that book?
13  A. Well, it's particularly for people who deal with sex
14      offenders. Although, it may have a similar audience
15      to my last look. It turned out it was very popular
16      with victims who are not in the field.
17  Q. Okay. We talked about the experience you have during
18      evaluations under Iowa's Civil Commitment Program.
19          Would you hold yourself out as an expert on
20      evaluating individuals under Iowa's Civil Commitment
21      Program?
22  A. I certainly hope so, yes.
23  Q. And my understanding is you were talking about this
24      before that there's an initial procedure to determine
25      whether the person should be civilly committed,

**Page 44**

1   correct?
2   A. Yes.
3   Q. And am I correct that for a person to be civilly
4       committed in Iowa, the court first has to determine
5       that they're a sexually violent predator, right?
6   A. Yes.
7   Q. And to be found to be a sexually violent predator,
8       they first have to be found to have a mental
9       abnormality?
10  A. Yes.
11  Q. And they also have to be found more likely than not to
12      engage in future acts of a sexually violent nature,
13      correct?
14  A. Yes.
15  Q. So in these cases when you were doing your initial
16      evaluations, you were doing a psychological evaluation
17      of the individual to determine if the individual
18      satisfies Iowa's criteria for civil commitment,
19      correct?
20  A. Yes.
21  Q. I read online that Iowa's civil commitment facility
22      has about 144 beds, and there were 138 individuals
23      committed as of June 2021.
24          Does that sound about right to you?
25  A. Yes.

11 (Pages 41 to 44)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1    Q. And so among all the people convicted of sex offenses | 1    being released from prison qualifies as a sexually |
| 2      in Iowa, these would be the ones the state has | 2      violent predator who should be civilly committed, yes? |
| 3      determined to be the most dangerous, correct? | 3    A. Yes. |

**Q.** And so among all the people convicted of sex offenses in Iowa, these would be the ones the state has determined to be the most dangerous, correct?

**A.** Well, the term "dangerous," it depends on how you mean that. These are the ones that confirm to Iowa law. But, for example, Iowa would civilly commit -- does civilly commit exhibitionist, and under most definitions of dangerous, it would not -- exhibitionists would not necessarily be included.

**Q.** These are people that Iowa has determined are more likely than not to commit another sexually violent offense?

**A.** And that have a mental abnormality that predispose them to do that and an impairment and volition.

**Q.** And then you were describing how once a person has been civilly committed, the person gets an annual evaluation, correct?

**A.** Yes.

**Q.** And annual evaluations are to determine if the person can be moved to a less secure setting or be released, right?

**A.** Yes, transitional release program and/or -- well, released.

**Q.** Okay. And so your CV indicates that from 2003 to 2015 you did initial evaluations to determine if someone

Page 45

---

being released from prison qualifies as a sexually violent predator who should be civilly committed, yes?

**A.** Yes.

**Q.** And I believe your CV said you did somewhat more than 100 of those civil commitment evaluations?

**A.** Somewhere around 103.

**Q.** Okay. In initial civil commitment cases there are typically at least two evaluations done, correct?

One by the evaluator for the state of Iowa, and one by the person retained by the person's defense attorney; is that right?

**A.** Generally, yes.

**Q.** Okay. And for whom did you do the evaluations?

**A.** I had a contract with the state to do the evaluations.

**Q.** Okay. Were you ever hired by a defense attorney to be their evaluator?

**A.** In Iowa, no.

**Q.** Okay. Were you paid -- I think you said you had a contract, correct?

**A.** I had a contract for both, different contracts. But one for the initial and then later a different type of contract for the evals, for the re-evals.

**Q.** Were you paid by the evaluation, like per evaluation?

**A.** For the -- only for the initial SVPs.

**Q.** So the initial SVPs, it was like a payment per eval?

Page 46

---

**A.** Yes.

**Q.** And then for the annual evaluations, what kind of payment structure was that?

**A.** It was a lump sum divided into 12 months.

**Q.** Okay. What is the amount on the -- what were paid for -- I'm sorry.

What were you paid for evaluation for the initial SVP evals?

**A.** You were paid separately for the preliminary, for the final. If you found that the person was, you know, possibly an SVP, you went on to a final evaluation. At that point, you've got to interview the person, and you were paid. If you still thought they had criteria, you were paid separately for going to court. And I don't remember the exact fee structure. But I think you were paid something like 2- or $3,000 if you ended up in court. And again, I don't remember this clearly, but I think you were paid a similar amount for the final eval and less for the initial.

**Q.** When you say "a similar amount," so it was 2 to 3K for the initial preliminary and 2 to 3K for going to court?

**A.** Well, there are three payments: initial, the final, and going to court. But I don't remember the details. I don't think any of them were over 3,000.

Page 47

---

**Q.** Okay. So there were three payments somewhere around -- somewhere under 3,000 but around 3,000?

**A.** That's what I think.

**Q.** And then how much were you paid?

What is the contract for the annual evaluations? What is the amount of that?

**A.** Well, the contract for the annuals, I don't do all of them. At this point, I only do three out of the ten a month we are assigned, and I have subcontractors for the other seven. We roughly do ten a month. Sometimes it's 11 a month, something like that, and the amount total is around 41,000 a month. And that ends up being around 3,000 per eval.

**Q.** So you yourself would be getting about 9K per month on --

**A.** Yes.

**Q.** The annual evaluations by definition involve people who were civilly committed at the end of their criminal sentence because the court found them to have a mental abnormality and to be more likely than not to commit sexually violent acts, correct?

**A.** Yes.

**Q.** Your report says that you've done about 425 annual evaluations. Is that right?

**A.** There's a few more by now, but in that ballpark, yes.

Page 48

Salter, Anna C.
5/30/2023

| | |
|---|---|

1  Q. Does that include the ones done by subcontractors?
2  A. No.
3  Q. Okay.  My understanding is that the annual evaluations
4     don't always result in court proceedings; is that
5     right?
6  A. Excuse me for one second.  Let me be sure I'm
7     answering -- I can answer that question more
8     precisely.  I guess it's pretty close, 430.  I believe
9     I've done 430 annual evals by myself at this point.
10       No.  They are two different types of court
11    proceedings.  The patient signed something that says
12    whether or not he even wants to go to court this year.
13    Some patients think they're not ready.  Or for
14    various reasons, they don't want to go to court, so
15    those don't go to court.  We do an eval, but it
16    doesn't go to court that year.
17       Secondly, there is a judge who makes the
18    decision about whether there's sufficient evidence to
19    send it to a trial.  They call it a hearing, but it
20    has all the characteristics of a trial.  So even if
21    the patient asked to go to court, the only thing that
22    they can control is that it will go to a judge.  That
23    initial hearing has -- they're not there.  I am not
24    there.  It's the two attorneys and the judge, and I
25    believe it's generally on the phone.  And the judge

Page 49

1     makes a decision about whether it goes to another
2     trial.
3  Q. And how many of those trials do you do a year?
4  A. Well, that's really hard to say.  The whole thing
5     closed down in 2020 with COVID, and we didn't do any.
6     And then I don't know if they're caught up yet.  They
7     are -- they're trying to catch up.  So I'm saying it
8     isn't normal right now.  There's probably a few more
9     than usual because of the backlog.
10       I think I've done three or four this far in
11    2023.  I know I have one next Thursday, and I believe
12    I've done three this year thus far before the one next
13    Thursday.
14  Q. So of the 430 evaluations that you've done, how many
15    of those would you say resulted in court proceedings?
16  A. I'm sorry.  How many would I say?
17  Q. Resulted in court proceedings, went to this trial
18    stage that you were describing.
19  A. I really don't know.  There's another variable as well
20    which is when we stipulate that the person is ready
21    for transitional release or release with supervision,
22    we don't go to -- I don't go to court.
23  Q. So --
24  A. Excuse me.  Let me be sure I'm clear with that.  I
25    don't go to court, but the issue goes to court.  The

Page 50

1     judge has to sign off on the TRP or release.  But
2     since it is not adversarial, I don't testify.
3  Q. Okay.  And so just to be clear of the roughly 430
4     evaluations, annual evaluations that you've done,
5     you've always been hired by the state, correct?
6  A. Well, I have a contract with the state.
7  Q. Okay.  I spoke with an attorney who represents people
8     in civil commitment proceedings in Iowa, and he told
9     me that in 20 years, he's never once seen you
10    recommend release in an annual evaluation.  Is that
11    accurate?
12  A. No, that's silly.  Of course I've recommended release
13    in annual evaluations.
14  Q. How many times have you recommended release?
15  A. I don't know, but I certainly -- I certainly have.
16  Q. When is the last time you've recommended release?
17  A. I don't remember.
18  Q. How long ago was it?
19  A. Well, if I remembered, I could tell you.  I don't
20    remember how long ago since I recommended release of
21    evaluation.  Typically, I don't recommend release of
22    evaluation until they have gone through the
23    transitional release program because I believe in a
24    gradual transition to the community.
25       MS. AUKERMAN:  Okay.  Let's look at -- I'm

Page 51

1     going to share my screen.  This is the list of cases.
2     Let's mark this as Exhibit 5.  It's a list of legal
3     cases in which you testified between 2020 and 2023.
4        (Plaintiffs' Exhibit No. 5 was marked.)
5  BY MS. AUKERMAN:
6  Q. You put this list together, correct?
7  A. Yes.
8  Q. And this shows eight cases in the last four years
9     where you testified in SVP hearings, correct?
10  A. Yes.
11  Q. So let's just go through those quickly.
12       "In Re The Detention of Alvin Barnes," did
13    you recommend release in that case?
14  A. I wouldn't be testifying if I recommended release.  By
15    listing the cases that I testified in, I am listing
16    the cases where I did not recommend release.  As I
17    just said, I don't go to court if it is
18    non-adversarial.
19  Q. So is it fair to say that in all of the cases on this
20    list -- the Jeffrey Goodwin, Vernon Pearson, Schuman
21    Barker, Teepee, DeMoss, Shaffer -- you did not
22    recommend release in any of those cases; is that
23    correct?
24  A. That's correct.
25  Q. And you don't recall in what cases you most recently

Page 52

13  (Pages 49 to 52)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1    recommended release? | 1    accurate? |

**Page 53**

1    recommended release?
2    **A.** No, I don't.
3    **Q.** Okay. Your report also talks about how you evaluated
4    high-risk violent offenders for release from
5    administrative confinement for the Wisconsin
6    Department of Corrections, right?
7    **A.** Yes.
8    **Q.** Were those evaluations -- those were evaluations that
9    were used by prison administrators for making
10   classification decisions. Is that accurate?
11   **A.** Well, yes and no, not from making initial
12   classification decisions. These were particularly
13   people who had either attacked guards or attacked
14   other inmates and had been put in administrative
15   confinement which is a type of segregation.
16        The difficult question for corrections is
17   always when can they let them out, and I did some of
18   evaluations to determine when you could let them out.
19   I should say these were not all sex offenders. Most
20   of them were purely violent offenders.
21   **Q.** Okay. How many of those evaluations did you do?
22   **A.** I have no idea.
23   **Q.** Ten? A hundred? Five hundred? Any estimate?
24   **A.** No, it certainly wasn't. It was under 50; I'm sure.
25   **Q.** So you didn't go to court in these cases; is that

**Page 53**

1    accurate?
2    **A.** No. Those were not court cases. The control of
3    administrative confinement was under -- administrative
4    confinement was under the control of the department of
5    corrections.
6    **Q.** So you were evaluating people who had engaged in
7    typically violent activity that put them into
8    administrative confinement for -- whether they could
9    go back into a lower security setting?
10   **A.** Yes.
11   **Q.** Okay. When's the last one of those that you did?
12   **A.** I don't know. I quit working for corrections. I
13   think it was either 2000- -- probably 2018, 2019.
14   **Q.** Yeah. Your CV says 2019. Does that sound right?
15   **A.** That does sound right.
16   **Q.** Okay. Other than those evaluations that you've done for
17   Iowa and Wisconsin, have you done other evaluations of
18   people with past sex offenses?
19   **A.** Yes.
20   **Q.** Can you tell me about those?
21   **A.** Well, in Wisconsin I had a private practice when I was
22   sent offenders at times to evaluate. For example, the
23   hospitals and a doctor who had been sexually
24   offending. I have done a little work for other
25   states, but I stopped doing that. The majority --

**Page 54**

1    **Q.** So I just want to -- let's just go through these one
2    at a time.
3        So you said in Wisconsin you had -- I
4    believe you said you had your private practice until
5    around 2000, is that right, what you testified to
6    before?
7    **A.** I think it was 1999. But at the same time, yes, I had
8    a private practice and I was also working for the
9    department of corrections all that time.
10   **Q.** And when you say you were referred people to evaluate,
11   how many such referrals did you get?
12   **A.** I don't know. You mean in that time when I had my
13   private practice in Wisconsin?
14   **Q.** Um-hmm.
15   **A.** I don't know. I was also -- I should clarify that I
16   did not just evaluate violent offenders for
17   administrative refinement for corrections. I was
18   often -- I also did some initial classification
19   evaluations for sex offenders to determine what kind
20   of treatment, what level of treatment they should go
21   into.
22        I also was asked to do evaluations at
23   different prisons for treatment purposes or generally
24   for management purposes when they had someone who was
25   self-harming or doing some other kind of unacceptable

**Page 55**

1    behavior, being violent to other inmates. So I did a
2    variety of evaluations for the department of
3    corrections when I was there.
4    **Q.** Before we're talking about corrections in Wisconsin, I
5    believe your report says that you took on a variety of
6    special projects related to sex offenders and violent
7    offenders.
8        Is there anything other than what you
9    described just now?
10   **A.** Well, sure. I helped get the polygraph program
11   started. I designed a curriculum with some other
12   people for treating sex offenders in their -- they
13   have layers of sex offender treatment, but their
14   intensive program.
15        Of course, I did training in Wisconsin
16   Corrections. I worked with juvenile corrections for a
17   period of time. I did do some individual -- actually,
18   I'll take that back. I think I didn't do individual
19   evals of juveniles until I was working with the
20   Tri-Counties Project. I don't think I did them with
21   corrections. So basically, I did whatever projects I
22   was assigned.
23   **Q.** And how many hours a week were you working with the
24   department of corrections in Wisconsin?
25   **A.** I could work up to 50 percent, but I often didn't.

**Page 56**

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 They often didn't have anything they needed me to do. | 1 I worked with community corrections in New |
| 2 I mean, they didn't have enough that took up to | 2 England. I did not work with community corrections in |
| 3 50 percent, and we had an arrangement that I only | 3 Wisconsin. I was sent cases by judges. Although, I |
| 4 billed for the hours I actually worked. | 4 don't -- by the court. I don't remember. I don't |
| 5 Q. How many hours did you work on average a week? | 5 think that happen very often, and I don't specifically |
| 6 A. I don't know. In the beginning, I think I worked half | 6 remember it. I was also referred cases by attorneys |
| 7 time, and eventually -- I don't know. It just | 7 at times. |
| 8 differed week to week, but it was never over half | 8 But, generally, in Wisconsin, I had a -- |
| 9 time. | 9 well, I'm sorry. I don't think I answered that |
| 10 Q. Let's go back to talking about evaluations that you've | 10 correctly. What I just said was applicable to my time |
| 11 done other than Iowa and Wisconsin. We were talking | 11 in New England. In Wisconsin, if you're only talking |
| 12 about how you were in private practice in Wisconsin | 12 about the private practice and not corrections, I only |
| 13 before 1999, and you were sometimes sent people to | 13 ran it for a couple of years, and the only cases I |
| 14 evaluate. | 14 remember came from attorneys. |
| 15 Who referred those cases to you? | 15 Q. And how many were those? |
| 16 A. Well, I mentioned the hospital referred one. There | 16 A. Oh, I don't know, not very many. I only ran it for |
| 17 were actually some, not many, that self-referred. I | 17 three years. |
| 18 was also referred cases from other clinicians who | 18 Q. So like three, five maybe? |
| 19 didn't work with sex offenders. I was referred | 19 A. Maybe. |
| 20 cases -- well, actually, I ran a sex offender group | 20 Q. And when you say you were referred by attorneys, what |
| 21 for the community mental health center even after I | 21 kind of legal proceedings were involved? |
| 22 went to private practice and left the community health | 22 A. Typically -- well, could be criminal, could be civil. |
| 23 system. I initially -- I'm sorry. I'm confusing | 23 Q. What was the purpose of the evaluation? |
| 24 Wisconsin with New Hampshire. Let me scratch the last | 24 A. Well, I don't remember these evaluations very well. |
| 25 part of that answer. | 25 We're talking about 1999, so I can't give you a |
| Page 57 | Page 58 |

| | |
|---|---|
| 1 specific answer. Typically, when I was referred cases | 1 A. What do you mean by "profile"? |
| 2 by attorneys, it's for things like whether they can be | 2 Q. I mean why were they coming to you. Were they coming |
| 3 safely put in the community. These were not SVP | 3 for treatment? Were they coming for an evaluation? |
| 4 cases. Well, that -- well, I did some SVP cases for | 4 A. Self-referred was usually treatment. They are people |
| 5 corrections, but I didn't do them in my private | 5 who are attracted, for example, to children who don't |
| 6 practice. | 6 want to be, and are deeply troubled by it and want |
| 7 Q. Were the evaluations that you did in the private | 7 help. |
| 8 practice -- did those involve typically high-risk | 8 Q. So how many -- how many individual evaluations have |
| 9 individuals? | 9 you done besides those for Iowa and Wisconsin? |
| 10 A. Are you talking about Wisconsin? | 10 A. I don't really know. For Iowa -- you mean, while I |
| 11 Q. Wisconsin. | 11 was there including private practice or you mean -- |
| 12 A. Or New England? | 12 Q. I'm excluding anything that you've done for the state |
| 13 Q. Yeah, Wisconsin. | 13 of Wisconsin or the state of Iowa. How many other |
| 14 A. Not necessarily in the private practice. They tended | 14 individual evaluations have you done? |
| 15 to be high-risk in corrections. | 15 A. Very few. I quit traveling for individual evaluations |
| 16 Q. And in New England, what was -- what kind of | 16 years ago. |
| 17 evaluations did you do there? | 17 Q. Okay. So in the last 20 decades, almost all of your |
| 18 A. Well, that's where I was sent cases. First of all, I | 18 evaluations have been -- not 20 decades. |
| 19 worked for community mental health, and then I worked | 19 A. I'm not that old. |
| 20 for the department of psychiatry in New England. I | 20 Q. No, no. None of us are. Although, it would be nice |
| 21 believe I ran groups in both of those cases. I also | 21 to get that old. Wouldn't it? |
| 22 took some outside cases of sex offenders. They were | 22 In the last two decades, is it fair to say |
| 23 not necessarily high-risk offenders. Although, some | 23 that most of your evaluations have been in the -- or |
| 24 were, and, as I said, some were self-referred. | 24 let me put that differently. In the last two decades, |
| 25 Q. What was the profile people who were self referred? | 25 your evaluations have been in the context of civil |
| Page 59 | Page 60 |

Tri-County Court Reporters
248-608-9250

Salter, Anna C.
5/30/2023

1 commitment or for the state of Wisconsin correctional
2 management issues?
3 A. Yes.
4 Q. Let's go back to -- I'm sorry. Go ahead.
5 A. Before you ask a question, can we just take a
6 two-minute break?
7 Q. Absolutely, let's come back at -- is 12:20 too soon?
8 A. That's fine.
9 Q. Okay.
10 (From 12:17 p.m. to 12:20 p.m., recess was
11 taken.)
12 BY MS. AUKERMAN:
13 Q. So let's take a look at and go back to the chart of
14 cases that you sent over. Let me share my screen
15 again.
16 We talked before about the -- well, just for
17 the record, your expert report does not contain a list
18 of your prior expert testimony in the last four years,
19 correct?
20 A. Correct.
21 Q. But after we requested, you put this list together,
22 correct?
23 A. Yes.
24 Q. And you list three cases besides the civil commitment
25 cases where you testified as an expert in the last

Page 61

1 four years, right?
2 A. Well, I didn't necessarily testify. The Hawaiian case
3 settled, for example, and so did the last case.
4 Q. Okay. That's a fair point. But there's three cases
5 listed besides the civil commitment cases, correct?
6 A. Yes.
7 Q. Okay. So the first of those is this N.D. by Makaha
8 Hawaii Congregation case.
9 A. Yes.
10 Q. And is that a state court case?
11 A. It's a Circuit Court of the First Circuit. I actually
12 don't know whether -- I assume it had to be a state
13 case.
14 Q. Okay. And I believe you sent over the case number
15 this morning.
16 A. Not this morning. I sent over the case number
17 sometime ago. And then I was told you couldn't find
18 them, and I copied the first pages of the depositions
19 which should have had all the information. And I sent
20 that. And, again, that was maybe last week.
21 MS. AUKERMAN: Okay. Just for the record,
22 we didn't receive it until this morning.
23 BY MS. AUKERMAN:
24 Q. What was that case about?
25 A. It was about standards for institutions, child-serving

Page 62

1 institutions. So it was about a woman who was abused
2 as a girl by a -- I think they called him elder of the
3 Congregation of Jehovah's Witnesses. It's in a
4 particular, you know, area in Hawaii. And whether or
5 not the Jehovah's Witnesses were liable for the fact
6 that they didn't do anything about it, and he offended
7 again.
8 Q. And what was the topic of your report?
9 A. Whether they were liable or not. Whether,
10 according -- whether they had -- they followed the
11 standards of good practices in terms of preventing
12 sexual assault in youth-serving institutions.
13 Q. Okay. And I believe you said that you never testified
14 in that case, correct?
15 A. No. The Jehovah's Witnesses settled it.
16 Q. Do you know if your report was ever submitted to the
17 court?
18 A. I don't know what went to the court. I know I was
19 deposed in that case.
20 Q. Do you know if anyone objected to your being qualified
21 as an expert in that case?
22 A. Not to my knowledge.
23 Q. But you never testified in court, so there was never
24 any determination whether you were an expert, correct?
25 A. I never testified in court.

Page 63

1 Q. The next one in this list is People of the State of
2 California v. Martin Field, correct?
3 A. Yes.
4 Q. And you said that that was in San Bernardino County
5 Superior Court, correct?
6 A. Yes.
7 Q. You listed that as a civil case. That was a civil
8 case?
9 A. Well, I assume it was civil. It certainly wasn't a
10 criminal case with a defendant. It was -- the topic
11 was whether or not SVP evaluators could compel people
12 referred for an evaluation for SVP purposes to have an
13 interview.
14 Q. Okay. Was it a civil commitment case?
15 A. No. It wasn't a case about a particular person. It
16 was a case about an issue. I mean, a particular
17 person brought it, but it was about whether they could
18 be compelled to testify -- to interview.
19 Q. In SVP proceedings?
20 A. Yes.
21 Q. And who retained you for that?
22 A. The prosecution retained me.
23 Q. And, I'm sorry. I should have asked you. For the
24 N.D., you were retained there by the plaintiff who had
25 been abused?

Page 64

16 (Pages 61 to 64)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 | **A.** Yes. |
| 2 | **Q.** Okay. Do you know who represented the defendant in |
| 3 | the Martin Field case? |
| 4 | **A.** No, but it should be on the page of the deposition |
| 5 | that I sent you. |
| 6 | **Q.** Okay. And in the Field case, you testified in |
| 7 | September 2022, correct? |
| 8 | **A.** Let me see. Where is it? |
| 9 | Yes, I did testify in that case. |
| 10 | **Q.** Do you know if anyone objected to your being qualified |
| 11 | as an expert in that case? |
| 12 | **A.** Not to my knowledge. |
| 13 | **Q.** And what were you qualified as an expert -- were you |
| 14 | qualified as an expert? |
| 15 | **A.** I'm sure I was because I testified. I don't remember |
| 16 | any concerns about my being an expert. |
| 17 | **Q.** Do you recall what you were qualified as an expert on? |
| 18 | **A.** No. It would have been -- I'm generally qualified as |
| 19 | an expert on sexual abuse, child sexual abuse, adult |
| 20 | sexual abuse. I've done evaluation SPV, predator |
| 21 | evaluations. I don't remember specifically the |
| 22 | language used in this case. |
| 23 | **Q.** So I just want to make sure I've got that. You're |
| 24 | generally qualified as an expert on child abuse, |
| 25 | sexual abuse? |

Page 65

| | |
|---|---|
| 1 | **A.** Yes. |
| 2 | **Q.** And what else? |
| 3 | **A.** Violent offenders, generally. |
| 4 | **Q.** Okay. And when you say "generally qualified," you're |
| 5 | referring to civil commitment proceedings? |
| 6 | **A.** Well, I am qualified. I've always been qualified in |
| 7 | civil commitment proceedings, but in other cases like |
| 8 | this which are not civil commitment proceedings, I |
| 9 | have been qualified as an expert as well. |
| 10 | **Q.** Okay. So I wanted to draw down a little bit more into |
| 11 | each of those cases where you've been qualified as a |
| 12 | civil commitment contact. |
| 13 | But you don't recall what you were qualified |
| 14 | as an expert on in People v. Field? |
| 15 | **A.** I don't remember the specific language, no. |
| 16 | **Q.** Okay. And then the next one is A.L. at the bottom |
| 17 | here, the plaintiff against the Family Foundation |
| 18 | School? |
| 19 | **A.** Yes. |
| 20 | **Q.** That was a civil case in the U.S. District Court in |
| 21 | the Northern District of New York; is that right? |
| 22 | **A.** Yes. |
| 23 | **Q.** What was that case about? |
| 24 | **A.** The Family Foundation School was supposedly a school. |
| 25 | It was a residential setting for supposedly acting out |

Page 66

| | |
|---|---|
| 1 | adolescences. It was actually highly abusive |
| 2 | punishment. Techniques included, for example, |
| 3 | wrapping a kid in a carpet and leaving them there for |
| 4 | five days with only dog or cat food in front of them |
| 5 | that they could eat. The case was by individuals who |
| 6 | had been at that school were now older and were |
| 7 | suing the school for abuse. |
| 8 | **Q.** And who retained you in that case? |
| 9 | **A.** The plaintiffs. |
| 10 | **Q.** And what did you write an expert report on? |
| 11 | **A.** Whether they -- whether the school was abusive or not. |
| 12 | **Q.** Okay. Were there allegations of sexual abuse? |
| 13 | **A.** Yes. |
| 14 | **Q.** Do you recall who represented the other side in that |
| 15 | case? |
| 16 | **A.** No. But, again, I sent you the front page of a |
| 17 | deposition, I believe, so you should have that |
| 18 | information. |
| 19 | **Q.** Okay. |
| 20 | **A.** But it didn't go to court. It was settled. |
| 21 | **Q.** Do you know if your report was ever submitted to the |
| 22 | court? |
| 23 | **A.** No. |
| 24 | **Q.** So the court never qualified you as an expert since it |
| 25 | didn't go to court, correct? |

Page 67

| | |
|---|---|
| 1 | **A.** I don't know, but I know I didn't go to court. |
| 2 | **Q.** Okay. Your CV says that from 1980 to present you |
| 3 | testified as an expert in both civil and criminal |
| 4 | trials. |
| 5 | Excluding the civil commitment cases, how |
| 6 | many times have you been retained as an expert? |
| 7 | **A.** I don't know. I have speculated just counting on how |
| 8 | long I've been in the field and how many cases I've |
| 9 | done that it was probably around 200. |
| 10 | **Q.** Okay. In the last three years -- in the last four |
| 11 | years, there have been three, correct? |
| 12 | **A.** Yes. I'm winding down, but for a long time I did |
| 13 | seven or eight a year. |
| 14 | **Q.** When is the last time that you did seven or eight a |
| 15 | year? |
| 16 | **A.** I don't know. It's been a gradual pulling back. |
| 17 | **Q.** Okay. How many of your cases have been in federal |
| 18 | court versus state court? |
| 19 | **A.** No idea. |
| 20 | **Q.** How many times have you testified as an expert in |
| 21 | civil cases in the last ten years? |
| 22 | **A.** I can't tell you. I've never kept a master list. |
| 23 | **Q.** You've testified in federal court, correct? |
| 24 | **A.** Yes. |
| 25 | **Q.** Are you aware that the federal rules require you to |

Page 68

17 (Pages 65 to 68)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1   keep a list or add a list of your past testimony? | 1   I don't testify that there is a profile of offenders |
| 2   **A.** Yes.  But I have whenever that's come up, and I've | 2   because I don't believe there is one.  I have |
| 3   done one.  I did in this case.  I have tried to | 3   testified that, you know, whether they're rich or poor |
| 4   reconstruct the last several years. | 4   or well educated or not is irrelevant to the issue at |
| 5   Q. Do you have any of those prior lists that you've | 5   hand. |
| 6   reconstructed? | 6         As I said, I've testified many times on |
| 7   **A.** No.  I had a computer disaster in 2020, and I lost a | 7   delayed disclosure.  I increasingly began to testify |
| 8   lot of data. | 8   on counterintuitive victim behaviors.  I've testified |
| 9   Q. So you don't know how many times you've testified as | 9   in some torture cases, but I can't remember the exact |
| 10   an expert in civil cases in the last ten years? | 10   questions I was asked or the exact topics. |
| 11   **A.** That's correct. | 11         I have testified about child development.  I |
| 12   Q. Do you know how many times you've testified in | 12   have a master's in child development, and I have -- |
| 13   criminal cases in the last ten years? | 13   for example, I remember testifying against a church |
| 14   **A.** No. | 14   that was beating six-week-olds for not paying |
| 15   Q. Could you estimate how many times you've testified in | 15   attention to the sermon.  That's an accurate |
| 16   criminal cases in the last ten years? | 16   statement.  A variety of issues.  I've testified about |
| 17   **A.** Until I left Wisconsin, I worked frequently with the | 17   interviewing in suggestibility, testified about the |
| 18   AG's office, so I testified fairly regularly in | 18   research on suggestibility. |
| 19   criminal cases, although, generally, about things like | 19   Q. And these were criminal cases that we're talking about |
| 20   counterintuitive behavior in victims and the nature of | 20   now, correct? |
| 21   discloser.  I can't tell you how many times it was, | 21   **A.** Yeah, these are criminal cases. |
| 22   but it was a pretty regular occurrence. | 22   Q. And I think your report says that your criminal cases |
| 23   Q. What other types of issues, if any, have you testified | 23   you testified particularly in the areas of the impact |
| 24   about in criminal cases? | 24   of child sexual abuse on victims, delayed disclosure |
| 25   **A.** Well, I have testified against the idea of a profile. | 25   of sexual abuse, and counterintuitive victim |
| Page 69 | Page 70 |
| 1   behaviors. | 1   I couldn't talk about cults because I hadn't had |
| 2         Is that an accurate description of the | 2   enough experience with them, and I think that's the |
| 3   general area of your testimony in criminal cases? | 3   only thing I've been told I wasn't qualified to talk |
| 4   **A.** Well, you're right.  I have also testified on the | 4   about in court. |
| 5   impact of sexual abuse on victims, and I think I've | 5   Q. What were you qualified to testify on in criminal |
| 6   named several other issues in addition to those three. | 6   cases? |
| 7   But those three are the most common things I've | 7   **A.** And I would tell you generally on child sexual abuse, |
| 8   testified about. | 8   offender assessment and treatment.  Specifically under |
| 9   Q. And in criminal cases, how many times have you been | 9   child sexual abuse the things that we listed: impact |
| 10   retained by prosecutors? | 10   on victims, disclosure, delayed disclosure, |
| 11   **A.** I've always been retained by prosecutors. | 11   counterintuitive victim behaviors, the ways in which |
| 12   Q. You've never been retained by defense attorneys? | 12   offenders create counterintuitive victim behaviors, |
| 13   **A.** Well, I think once or twice many years ago. | 13   those kinds of issues. |
| 14   Q. When's the last time that you've testified in a | 14   Q. And in terms of civil cases, when's the last time the |
| 15   criminal case? | 15   three that you listed that we talked about before -- |
| 16   **A.** It would have been in Wisconsin; I believe.  But I | 16   before those, when is the last one that you did? |
| 17   don't remember the year.  I left there in 2019. | 17   **A.** I don't remember. |
| 18   Q. So you haven't testified in a criminal case since | 18   Q. Okay.  Roughly, how many civil cases have you |
| 19   sometime before 2019? | 19   testified in -- setting aside civil commitment |
| 20   **A.** Yes, that's correct. | 20   cases -- in the last ten years? |
| 21   Q. Okay.  And in criminal cases, have there ever been | 21   **A.** I couldn't tell you.  I've never -- I couldn't tell |
| 22   objections to you being qualified as an expert? | 22   you even if you combined it with criminal cases.  As I |
| 23   **A.** There was a -- I don't remember how many times there | 23   said, I never kept a master list. |
| 24   have been objections.  I've always been qualified, to | 24   Q. Ten? Five? Fifty? Can you estimate? |
| 25   my knowledge.  I was told by a judge at one point that | 25   **A.** Well, it certainly wouldn't be over 50. |
| Page 71 | Page 72 |

18  (Pages 69 to 72)

Salter, Anna C.
5/30/2023

---

1  Q. So closer to ten?
2  A. I can't tell you any closer than that.
3  Q. Okay. In civil cases, have there ever been objections
4     to you being qualified as an expert?
5  A. I don't remember any objections, at least none that
6     went through. By that I mean none that the judge
7     agreed with.
8  Q. So there may have been objections, but you were still
9     asked to testify?
10 A. As far as I know. I mean, I don't remember specific
11    objections.
12 Q. Do you recall if a court ever limited -- aside from
13    the cult example, do you recall the court ever limited
14    what you could testify to?
15 A. Well, the court has limited what the prosecution could
16    present, for example, data on false reports, but
17    that's different from saying that I'm not an expert in
18    those areas. They ruled that it was more prejudicial
19    than probative.
20 Q. Sure. I mean, typically courts qualify experts on a
21    particular topic, and what I'm trying to understand is
22    what courts have qualified you to be an expert on.
23 A. I can only answer as I did before, generally, on child
24    sexual abuse, adult sexual abuse, assessment and
25    treatment of offenders, assessment and treatment of

Page 73

---

1  victim's impact of sexual abuse. Those are some of
2  the specific topics. Delayed disclosure,
3  counterintuitive victim behaviors and so forth. But I
4  don't remember every court narrowing it to one issue.
5  It seems to me that I have been qualified generally as
6  an expert on, for example, child sexual abuse or adult
7  sexual abuse.
8  Q. Okay. In the civil cases, how many times have you
9     been represented -- have you been retained by counsel
10    representing civil plaintiffs?
11 A. Well, I can't tell you that I have a rule for whether
12    I'll take a civil case or not. Most of the civil
13    cases I've been approached about have been
14    institutional malfeasance cases. Was the institution
15    responsible for the abuse of this child? Could they
16    have prevented it in someway? Where their protocols
17    accurate and state of the art?
18        And my general rule is that if the
19    institution -- if the institution asks me to testify,
20    my decision point is whether or not they had any
21    warning that person was a sex offender. In other
22    words, had anyone reported him, you know, if he was
23    found communicating with children online when he
24    wasn't supposed to, et cetera. If the institution had
25    no warning -- I don't believe you can pick a sex

Page 74

---

1  offender out of the general population -- then I will
2  testify. If the institution had warning, I won't
3  testify for them.
4      And the same thing is true if I'm approached
5  on the other side. The issue is twofold. It's what
6  year was it because that determines what we knew about
7  sexual abuse at that time, and what the standards
8  were. And, secondly, the issue of notification, had
9  the institution been notified in someway that this guy
10 might be molesting children.
11 Q. So let me see if I understand this background
12    correctly. In the last 20 years or so, you've
13    testified in civil commitment proceedings about
14    psychological evaluations that you've done, correct?
15 A. Yes.
16 Q. And you've testified in three civil cases in the last
17    four years, correct?
18 A. To the best of my knowledge, yes.
19 Q. And you've testified in -- you don't remember how
20    many, but in other civil cases, served broadly about
21    sexual abuse, child abuse, victim impacts, and similar
22    issues?
23 A. Yes.
24 Q. And you've testified in criminal cases about the
25    impact of child sexual abuse on victims, the late

Page 75

---

1  disclosure of sexual abuse, and counterintuitive
2  victim behaviors, correct?
3  A. Those are the most common ones, yes.
4  Q. And you've been retained by the state in civil
5     commitment proceedings, correct?
6  A. Yes.
7  Q. And you've been retained by prosecutors in criminal
8     proceedings, correct?
9  A. Yes.
10 Q. And you don't recall being retained except, perhaps,
11    once or twice long ago by defense counsel?
12 A. Correct.
13 Q. Okay. Other than the things that we've talked about,
14    are there any other areas where you would hold
15    yourself out to be an expert?
16 A. I can't think of any.
17 Q. Let's talk a little bit sort of what you're paid for
18    your expert work. And we talked about already the
19    contract with the state of Iowa.
20        You also have an annual income from expert
21    services, correct?
22 A. What do you mean by "expert services"?
23 Q. Things like --
24 A. Testifying in court, that kind of thing?
25 Q. Testifying in court, writing reports like the one that

Page 76

---

19 (Pages 73 to 76)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1    you wrote. | 1    keeps track of all of that and does my tax filings at |
| 2    **A.** Yes. | 2    the end of the year. |
| 3    **Q.** And how much is your annual income for those types of | 3    **Q.** And does your tax return show what your income is from |
| 4    work? | 4    expert services? |
| 5    **A.** I have no idea. | 5    **A.** I don't really know how it's broken down. |
| 6    **Q.** You don't know how much you make? | 6    **Q.** So do you -- |
| 7    **A.** No, I don't.  At this time, I have income from a | 7    **A.** I can -- |
| 8    variety of sources including Social Security, | 8    **Q.** Go ahead. |
| 9    retirement funds, investments, et cetera.  And as I | 9    **A.** I can certainly ask him if he separated out expert |
| 10    said, since I moved in the last three years, I started | 10    services from the Iowa income.  But they're all 1099s, |
| 11    withdrawing.  I only take cases that I care about, | 11    so I don't know that he did.  He certainly -- I'm an |
| 12    really care about.  And I'm closing out the contract | 12    S-Corporation, so he certainly has my business taxes |
| 13    with Iowa, so it's been changing. | 13    separate from the other income that I have.  But I |
| 14        Also, COVID interrupted a lot of court | 14    don't know if he subdivides according to the ways in |
| 15    testimony.  It's been changing every year over the | 15    which you are looking for. |
| 16    last three years, so I haven't separated out the | 16    **Q.** What is your annual income? |
| 17    income from testifying in expert cases, for example, | 17    **A.** It's around -- this last year I think it was around |
| 18    from the income from the Iowa contract. | 18    180,000. |
| 19    **Q.** Do you do your taxes? | 19    **Q.** Do you know what percentage of that comes from the |
| 20    **A.** No.  I certainly do not personally. | 20    Iowa contract? |
| 21    **Q.** You don't personally do your taxes? | 21    **A.** No.  I mean, that information is certainly available, |
| 22    **A.** No, I do not. | 22    but I don't have it on the tip of my tongue. |
| 23    **Q.** But you have someone do your taxes, and then you sign | 23    **Q.** The 180-, is that -- what sources of income does that |
| 24    your tax forms, correct? | 24    include? |
| 25    **A.** I do.  I pay my taxes, and I have an accountant who | 25        There's the Iowa contract.  There's your |
| Page 77 | Page 78 |
| 1    expert services.  What else does that include? | 1    after this.  But the report writing was 22 and a half |
| 2    **A.** That includes Social Security that you have to pay | 2    hours, and the total was $7,875. |
| 3    taxes on.  That includes retirement funds from the | 3    **Q.** And that includes the report writing, your discussions |
| 4    department of corrections.  That includes funds from | 4    with the attorneys, reviewing materials, correct? |
| 5    my private retirement accounts. | 5    **A.** Yes.  Although, I don't usually charge for the initial |
| 6    **Q.** So your testimony is that you don't know how much you | 6    consultation. |
| 7    get from expert services? | 7    **Q.** But that doesn't include work that you've done since |
| 8    **A.** That's correct.  I don't know.  As I told you, I can | 8    the report was written? |
| 9    tell you roughly how much -- how big the checks are | 9    **A.** Well, in preparation for this, certainly not.  It |
| 10    from Iowa which are going to end this month -- next | 10    doesn't include that. |
| 11    month, but from the occasional court cases that I | 11    **Q.** Do you have any prior work with the state of Michigan |
| 12    take, I don't know.  And, also, I still do trainings | 12    or any of the individual defendants? |
| 13    as well. | 13    **A.** Not for any of the individual defendants.  I might |
| 14    **Q.** What do you bill for trainings? | 14    have had criminal cases in Michigan, one or two over |
| 15    **A.** It's 3500 a day, and I typically do all-day trainings. | 15    the years.  I'm not sure. |
| 16    **Q.** And your annual rate is three -- excuse me -- your | 16    **Q.** Any other prior work with the defendants' attorneys? |
| 17    hourly rate is 350? | 17    **A.** No, not that I know of. |
| 18    **A.** Yes. | 18    **Q.** Are you working with the defendants or their attorneys |
| 19    **Q.** That's what you billed the defendants in this case? | 19    on any other cases? |
| 20    **A.** Yes. | 20    **A.** No. |
| 21    **Q.** How many hours have you worked on this case? | 21    **Q.** Are you familiar with the work of scholars in your |
| 22    **A.** Well, I can pull up the bill for the defendants.  I | 22    field? |
| 23    mean the -- yeah, defendants in this case.  I should | 23    **A.** I hope so. |
| 24    be able to. | 24    **Q.** What do you do to keep up with the literature? |
| 25        Looks like -- I don't know if I did anything | 25    **A.** Well, I read research.  These days, you can get almost |
| Page 79 | Page 80 |

20  (Pages 77 to 80)

Salter, Anna C.
5/30/2023

1  all of the research off the Web.  It's quite different
2  than it used to be.  I tend to look up research on
3  specific topics, for example, undetected offending,
4  Static-99, et cetera.  There's a wonderful variety of
5  journals out there, and they typically have more
6  up-to-date research than the books.  Although, I do
7  have a higher library of books on sexual abuse.
8  Q.  What journals do you read?
9  A.  Well, the ATSA Journal.  I'm a member of ATSA.  I
10  found the Journal of Interpersonal Violence is very
11  helpful.  Sometimes -- I belong to ResearchGate, so
12  generally I can get articles directly from the
13  authors.  So I will -- you know, the research is
14  spread through a variety of journals, the criminal
15  justice and behavior, behavior in the law.
16      American Psychologist never has anything
17  that's useful, so I don't read that.  The Journal of
18  Child Sexual Abuse often does.  But I typically don't
19  just read these cover to cover.  I look at the topic
20  that I'm interested in, and then I go to whatever
21  journals have articles on that topic.
22  Q.  So you're not subscribing to journals, right?
23  A.  Well, I get the Journal of -- the ATSA Journal, and I
24  should get the Criminal -- I get the Criminal Justice
25  Journal.  But, frankly, even with ATSA, I look up the

Page 81

1  journal on the Net because I can get it for free.  And
2  also, if you're a member of ATSA, of course, you get
3  access to the SAGE criminology series.  So I subscribe
4  to a lot fewer journals that I used to because I can
5  get them on -- I can get the articles on the Net.
6  Q.  So your typical way to keep up with the field is to do
7  literature searches for topics you're interested in?
8  A.  Yes.
9  Q.  Rather than reading through journals in the field?
10  A.  Rather than reading a journal cover to cover, I may
11  look at that journal and see which of those articles
12  are relevant to what I'm doing or interested in.  But,
13  yes, that's how I do it.
14  Q.  Okay.  We talked about receiving training from
15  Dr. Karl Hanson.  Are you familiar with his scholarly
16  work?
17  A.  Yes.
18  Q.  Is it fair to say that his work is widely cited?
19  A.  Yes.
20  Q.  And is it fair to say he's considered one of the top
21  authorities in the field?
22  A.  Yes.
23  Q.  Are you familiar with the work of Dr. Elizabeth
24  Letourneau?
25  A.  Yes.

Page 82

1  Q.  Were you familiar with it before this case?
2  A.  Yes.
3  Q.  Okay.  Is it fair to say that her work is widely
4  cited?
5  A.  Yes.
6  Q.  And it's also fair to say that she is considered one
7  of the top authorities in her field?
8  A.  Yes.
9  Q.  Are you familiar with the work of Dr. Kelly Socia?
10  A.  Less so.  I can't tell you how widely she's cited.
11  Q.  It's a he, actually.  Were you familiar with the work
12  of Dr. Socia before this case?
13  A.  I don't know whether I've read articles by him or not.
14  Q.  What about James J. Prescott, are you familiar with
15  his work?
16  A.  No.  I'm not really.
17  Q.  So he doesn't publish in a field that is the same as
18  yours.  Is that accurate?
19  A.  Well, I haven't run across his work.  That's all I can
20  say.
21  Q.  What about Kristen Zgoba, Dr. Kristen Zgoba, are you
22  familiar with her work?
23  A.  I may have come across articles by any of these
24  experts, but I haven't followed their work like I have
25  Karl's and Letourneau's, but especially Karl's.  He's

Page 83

1  contributed a great deal to the field.
2  Q.  For the ones that you're not following, is it fair to
3  say that their work is in the fields that you're not
4  focused on?
5  A.  Some of them for sure.  I guess probably all of them,
6  but I can't remember all of them at this point.
7  Q.  Okay.  Let's talk about the Static-99, Static-99R.  I
8  mean, there's obviously various versions of it.
9      How many static assessments have you scored
10  in your career?
11  A.  Oh, my God.  I don't know.  Probably over 500.
12  Q.  And you also score other risk assessments, both for
13  Static and 99 factors, correct?
14  A.  At times, yes.
15  Q.  Are you currently using risk assessment instruments
16  when you do evaluations?
17  A.  I use -- currently, I use Static instruments and
18  sometimes dynamic.
19  Q.  And which static instruments do you use?
20  A.  Static-99R.  I don't use Static-2002R.
21  Q.  And which dynamic ones do you use?
22  A.  I tried to VRS-SO.  I don't find it helpful in my
23  situation.  Lately, I've been using Stable-2007.
24  Q.  You've also used the Static-99 in -- strike that.
25      Have you included Static-99 scores in your

Page 84

21 (Pages 81 to 84)

Salter, Anna C.
5/30/2023

1    recent evaluations and re-evaluations?
2    A. In the most recent ones. There was a period of time
3        that I wasn't using it for re-evals.
4    Q. And why is that?
5    A. Because it can't change their treatment, and my -- it
6        won't change their treatment. And my job is to
7        determine, I believe, whether or not the person had
8        lowered their risk to reoffend primarily through
9        treatment. Static-99, if they came in with a 6, and
10       they didn't -- or a high score, no matter how much
11       treatment they did, unless they got into a new age
12       category, the patients were unlikely to have a
13       different Static-99R score. So I didn't really think
14       it was fair to include the Static-99R in an evaluation
15       of treatment progress.
16   Q. Okay. You use Static-99R in initial SVP commitment
17       evaluations, correct?
18   A. Yes, I did.
19   Q. I'm going to show you -- this is a transcript in a
20       case In Re The Detention of Stewart Schuman.
21           Did you testify in this case?
22   A. Yes.
23   Q. And this was a civil commitment proceeding?
24   A. Yes.
25   Q. And you testified on page 123 of this transcript your

Page 85

1    discussions of Static-99. Can you see that?
2    A. Yes.
3    Q. And it says -- and you testified that the Static-99,
4        quote:
5            "...predicts recidivism, I believe -- at
6            least ranking of recidivism -- well. And it's
7            very useful in initial SVP evaluations. I use
8            it in initial SVP evaluations."
9        Do you see that?
10   A. Yes.
11   Q. And that was your testimony in that case?
12   A. Yes.
13   Q. Do you still agree with that statement?
14   A. Yes. It's useful for recidivism.
15   Q. Okay. Let's go back to your report. This is
16       Exhibit 1.
17           MS. AUKERMAN: I'm sorry. I should have
18       given you the -- marked that last one. That last
19       exhibit was Exhibit 6, the Schuman transcript.
20           (Plaintiffs' Exhibit No. 6 was marked.)
21   BY MS. AUKERMAN:
22   Q. Going back to Exhibit 1 which is your report, on page
23       3 you write that the Static-99 -- you talk about the
24       Static-99. You said that it "measures recidivism of
25       adult male sex offenders, or the likelihood that

Page 86

1    someone who has previously committed a sexual offense
2    will be charged or convicted of another" offense.
3    A. Yes.
4    Q. When you say "previously committed a sexual offense,"
5        the Static-99 cannot be used on people who have
6        committed an offense but not been charged and
7        convicted, correct?
8    A. That's correct. That's probably badly phrased. I
9        should have put that in there.
10   Q. So basically, it'd be more accurate to say that the
11       Static-99 measures recidivism of adult male offenders
12       more than the likelihood that someone who has
13       previously been charged or convicted of a sexual
14       offense will be charged or convicted of another one,
15       correct?
16   A. Yes. That is more correct.
17   Q. Okay. Let's go back to the top of your report. You
18       say in the fourth bullet on page 1 here, "proponents
19       of Static-99R have switched to claiming Static-99R
20       measures reoffending," by which we're using your
21       definition of reoffending meaning committing a sexual
22       offense whether it's detected or undetected.
23           What proponents are you referring to here?
24   A. Well, there's -- it's a variety of them, but the ones
25       in this case were Karl and Elizabeth Letourneau, and I

Page 87

1    believe that Dr. Hanson repeatedly talked about
2    reoffending. I read many statements in the past by
3    Letourneau saying that the reoffending rates, et
4    cetera, are low, and there's no justification for
5    saying that they're high. So both of those experts,
6    to the best of my knowledge, have based their
7    statements on Static-99 findings.
8    Q. So your specific statement here is that these
9        proponents, by whom you mean Dr. Hanson and
10       Dr. Letourneau, are claiming that the Static-99R
11       measures for reoffending. That's what you're saying?
12   A. Yes.
13   Q. Can you point me to a passage in Dr. Hanson's report
14       where he says that the Static-99 measures the
15       likelihood of committing an offense regardless of
16       whether one is detected?
17           I'm not talking about whether he's using the
18       term reoffending. I'm asking you to find me a passage
19       where he discusses the Static-99 as measuring
20       reoffending.
21   A. He does that by referring to the outcome of Static-99
22       as reoffending. He does that repeatedly in his
23       report.
24   Q. Okay.
25           MR. JAMISON: Sorry, Dr. Salter. I'll place

Page 88

22 (Pages 85 to 88)

Salter, Anna C.
5/30/2023

1    an objection on the record to the extent you're asking
2    her a question implying that you want her to review or
3    rereview a 70 page -- a 60 or 70 page report and try
4    to find one line in his expert report.
5         MS. AUKERMAN:  She's making a statement.
6    Objection is noted.
7    BY MS. AUKERMAN:
8    Q.  Dr. Salter, you make a statement that you're basically
9    saying that Dr. Hanson is saying Static-99 measures --
10   A.  Yes.
11   Q.  Measures undetected offending.  I'm asking you to
12   point me to something in his report that says that
13   Static-99 measures undetected offending.
14   A.  Wait a minute.  I'm going through three of them.
15        It's really everywhere.  There is -- page
16   10, "There's scientific and professional consensus
17   that are an average individuals with more risk factors
18   are higher risked to reoffend."  We don't know that.
19   Q.  Static-99 does not -- he doesn't discuss the Static-99
20   there, correct?
21   A.  He's using reoffending in place of recidivism.
22   Q.  But what I'm asking you is to point me to something
23   where he says that the Static-99 measures on
24   undetected offenders.
25        I understand that you quarrel with his use

Page 89

1    with the word reoffending.  I'm asking you to point me
2    to something that supports your statement that he
3    suggests Static-99 measures reoffending.
4    A.  Well, page 20, "Risk assessment tools exist to predict
5    the risk of sexual reoffending."
6         They don't predict reoffending.
7    Q.  Okay.  Let's look back at your report again.
8    A.  I can give you more if you want them.
9    Q.  I think we're talking at cross purposes here.  Let's
10   look at -- hold on a second.  Let's go back to your
11   report.
12   A.  Well, do you want more examples of this 'cause I can
13   give them to you?
14   Q.  Let me go back to Hanson's report.  Why don't you give
15   me one more example, then.
16   A.  Okay.  Page 29, first paragraph, bottom of first
17   paragraph:  "Research has long shown that the longer
18   an individual remains free of arrest or convictions,
19   the lower the chance of reoffending."
20   Q.  That doesn't say anything about the Static-99, though.
21   Does it?
22   A.  That research is based on instruments from the
23   Static-99 and other instruments.  It's simply not true
24   that we know that.  What we know is --
25   Q.  What I'm asking you -- Dr. Salter, what I'm asking you

Page 90

1    is where that says -- where he says that Static-99 is
2    measuring undetected offending.  Is there anything
3    that says that?
4    A.  I'm saying --
5    Q.  You're saying that -- okay.
6         MR. JAMISON:  You're interrupting her, and
7    you don't let her finish her answer.  You have to let
8    her finish her answer, before you try to interrupt
9    her.
10        THE WITNESS:  My answer is --
11        MS. AUKERMAN:  She's not answering my
12   question, but okay.
13   BY MS. AUKERMAN:
14   Q.  Go ahead.  I'm sorry.  What paragraph were you on?
15   A.  First paragraph.
16   Q.  On page 29?
17   A.  Yes.  My answer is that he repeatedly refers to
18   research based on the Static-99 that predicts
19   recidivism, and he, instead, says that it predicts
20   reoffending.  The research that has shown the longer
21   an individual remains free of arrest or convictions --
22   the research shows the lower the chance of getting
23   caught for a new offense or recidivism.  It doesn't
24   say anything about reoffending.
25        And I quoted you earlier where he says that

Page 91

1    Static-99 -- wait a minute -- "risk assessment tools
2    exist to predict the risk of sexual reoffending."
3    Static-99R is a risk assessment tool.  He says it
4    bluntly that it predicts the risk of sexual
5    reoffending on page 20.  And then he refers throughout
6    the thing to research that predicts recidivism and
7    says instead that it's predicting reoffending.
8    Q.  That's not what I'm asking you.  I'm asking on page
9    40- -- on paragraph 47 that you cited, he never uses
10   the term Static-99, correct?
11   A.  He says "risk assessment instruments."
12   Q.  But in paragraph 47, he doesn't say risk assessment
13   instruments?
14   A.  Page 47?  Wait a minute.  What are you saying?
15   Q.  You said the first paragraph on page 29, which is
16   paragraph 47 of his report.
17   A.  He says "research."  The research is based on
18   Static-99 and other static instruments, and it is not
19   accurate.
20   Q.  Let's move on.  In your report on page 4 -- let me
21   show you.  You say that, "...in this case, Static-99R
22   is being recommended as a stand-alone risk assessment
23   instrument."
24        On what basis do you conclude that the
25   Static-99R is being recommended as a stand-alone risk

Page 92

23  (Pages 89 to 92)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1   assessment? | 1   A.  Yes.  I don't remember if anyone else recommended it. |
| 2   A.  Well, that's my understanding from his report.  But as | 2   Q.  Okay.  Is it also based on your conversations with the |
| 3      you say, it is a long report, so I don't know that I | 3      attorneys? |
| 4      can find that instantly.  And if it isn't being | 4   A.  Yes. |
| 5      recommended, that's great. | 5   Q.  On page 2 of your report -- let's see.  You express |
| 6   Q.  So your statement is based -- it's not based on | 6      concern that the Static-99 is not a comprehensive risk |
| 7      anything the plaintiffs have filed in this case or | 7      assessment tool because it measures only static risk |
| 8      any -- I should say any of the pleadings written by | 8      factors and not dynamic factors, correct? |
| 9      the lawyers in this case, correct? | 9   A.  Yes. |
| 10  A.  Well, I'm not -- actually, I do think it's based.  For | 10  Q.  And you've talked about the fact that there are |
| 11     example, on page 2, Dr. Hanson says under A, "the risk | 11     assessment tools that measures dynamic risk factors, |
| 12     for sexual recidivism can be reliably predicted by | 12     correct? |
| 13     widely-used risk assessment tool such as Static-99R | 13  A.  Yes. |
| 14     which are used to classify individuals into various | 14  Q.  And those include the Stable, correct? |
| 15     risk levels." | 15  A.  Yes. |
| 16         Now, with that said, immediately after D | 16  Q.  And are you aware that there are mechanical rules for |
| 17     where he says don't use the nature of the sex offense | 17     combining the Static-99R with the Stable, correct? |
| 18     conviction, and in E, he doesn't say anything about | 18  A.  Yes. |
| 19     adding anything else to Static-99. | 19  Q.  And are you aware that the Stable can be scored by the |
| 20  Q.  Okay.  You did not -- you testified you didn't read | 20     first professionals including probation officers, |
| 21     his rebuttal report, correct? | 21     correct? |
| 22  A.  No.  I haven't been sent it, but I will. | 22  A.  Yes. |
| 23  Q.  Okay.  So your conclusion that the Static-99R is being | 23  Q.  Are you aware that the Michigan Department of |
| 24     recommended as a stand-alone risk assessment is based | 24     Corrections does both Static-99R and Stable |
| 25     on Dr. Hanson's report? | 25     assessments? |
| Page 93 | Page 94 |

| | |
|---|---|
| 1   A.  Yes. | 1      did not include Static-99 scores.  I don't know if |
| 2   Q.  When you were consultant for the Wisconsin Department | 2      they do now. |
| 3      of Corrections, do you know if the Wisconsin | 3   Q.  Did they use it for treatment decisions? |
| 4      Department of Corrections used the Static-99R? | 4   A.  Not for the initial treatment decisions.  I don't know |
| 5          I mean, I believe you testified that you | 5      about after they got in a treatment program if they |
| 6      trained on the Static-99R there? | 6      were ever moved up or down according to their |
| 7   A.  Yes.  But they went back and forth over the years over | 7      Static-99R score.  But for the initial classification |
| 8      who could score it.  Psychologists could always score | 8      of which, whether they went into something that |
| 9      it, but for some years, they allowed probation and | 9      resembled outpatient treatment one or two groups a |
| 10     parole officers to score it as well. | 10     week, or the intensive treatment program, they did not |
| 11  Q.  And how is the Static-99R used by the Wisconsin | 11     use Static-99 when I was there. |
| 12     Department of Corrections? | 12  Q.  Was it used in combination with other assessment |
| 13  A.  Well, I've been gone for four years.  I don't know how | 13     tools? |
| 14     they're using it now.  But at the time, the | 14  A.  Not -- well, they used Compass for a while.  I don't |
| 15     psychologists certainly used it in making assessments, | 15     know how they combined it with Compass.  And I wasn't |
| 16     oddly.  Well, I don't -- I don't know exactly.  I | 16     involved in Compass, so I can't tell you.  I think |
| 17     don't remember the diverse ways in which they use | 17     they may have used Stable for a while.  I have no |
| 18     Static-99.  But I did train on it, and they did use | 18     memory of them using the VRS-SO. |
| 19     it. | 19  Q.  Is it fair to say that while you were there, the |
| 20  Q.  Did they still -- | 20     department of corrections in Wisconsin used risk |
| 21  A.  Excuse me.  They certainly used it for determining who | 21     assessment tools for a variety of purposes, |
| 22     should be referred for civil commitment. | 22     correctional purposes? |
| 23  Q.  Did they use it for classification decisions? | 23  A.  Yes. |
| 24  A.  No.  When I worked in classification, they had a list | 24  Q.  And they did that routinely, correct? |
| 25     of questions you were supposed to ask the person.  It | 25  A.  Yes. |
| Page 95 | Page 96 |

24  (Pages 93 to 96)

Salter, Anna C.
5/30/2023

Q. I'm going to show you another article. This is an
article by Helmus that you cite in your report.
  MS. AUKERMAN: This is Exhibit 17. We're a
little bit out of order.
  (Plaintiffs' Exhibit No. 17 was marked.)
BY MS. AUKERMAN:
Q. Do you recognize this article? This article is on
Static-99.
A. Yes.
Q. And you cite this in your report, correct?
A. Yes.
Q. Okay. It discusses -- in this article Helmus and
coauthors discuss the use of the Static-99, and here
they write:
    "...although actuarial risk scales like
    the Static-99R cannot account for all
    risk-relevant information, every study
    examining the use of professional discretion
    to adjust actuarial results have found that
    overrides degrade predictive accuracy."
And it further writes that unstructured overrides in
the Static-99R "tends to lead to overestimation of
risk."
  Do you agree with this?
A. Well, certainly not the second one. That's another

Page 97

example of people confusing recidivism with
reoffending. It does degrade professional discretion,
generally will degrade the prediction of recidivism.
But here it gives this implicit assumption in all of
this, that recidivism is the same thing as reoffending
or risk. And we know that the variety -- the
undetected offenses, even after they are caught, are
according to Kelly three --
Q. Well, we'll get to talking about undetected offending.
I want you to answer the questions that I'm asking
you.
A. I did.
Q. So you agree that overrides of actuarial assessments
tend to lead to an overestimation of recidivism?
A. Of recidivism in -- yes.
Q. Okay. On page 15 of your report, you cite this
article by Helmus and -- let me get there, page 15 of
your report -- and Helmus notes that Static-99 is not
a comprehensive risk assessment, but writes, "What
additional information needs to be considered may
depend on the purpose of the assessment."
  Do you agree with that statement?
A. I don't see that on my page 15.
Q. Sorry. It is on page 14. It's in the quote from
Helmus.

Page 98

A. Yes. I agree it's not a comprehensive risk
assessment.
Q. Do you agree that's when additional information needs
to be considered and may depend on the purpose of the
assessment?
A. Yes and no. I think -- the part I'm not sure I agree
with is "...may be fine for routine triage of large
numbers of cases." Well, it depends on what you're
gonna do with that information.
    I would consider being put on the registry
as a big deal, as something that some care should be
taken with. So I don't -- I don't know what "routine
triage of large numbers of cases" she's talking about
in which she thinks Static-99 is sufficient. There
are issues with Static-99.
Q. When you say that being put on the registry is a big
deal, what do you mean by that?
A. Well, is that what she's talking about? "...may be
fine for routine triage of large numbers of cases,"
"triage" for what?
    If she's talking about the registry, I would
say no. I'm not sure what she's talking about there.
I do think the registry -- of being put on the
registry affects people's lives so...
Q. How does it affect people's lives?

Page 99

A. Look. I'm not testifying on the registry. I'm
testifying on my report and recidivism versus --
recidivism versus reoffending.
Q. But you testified that the registry affects people's
lives and is a big deal, correct?
A. Yes. I think it is, but I'm not an expert on the
registry.
Q. Okay. So you think the consequences of registration
are so severe that care should be taken, individual
assessments should be done with care --
    MR. JAMISON: Objection. Misstates --
    MS. AUKERMAN: -- on the registry?
    THE WITNESS: I'm sorry. Was there an
objection?
BY MS. AUKERMAN:
Q. You may answer.
    THE WITNESS: I lost him for a second.
    MR. JAMISON: Yeah. I objected just 'cause
it misstates your testimony. You can answer if you
feel like you can.
    THE WITNESS: I never said "so severe," but
I do believe it's obvious that the results are not
trivial.
BY MS. AUKERMAN:
Q. And so because the results are not trivial, you think

Page 100

25 (Pages 97 to 100)

Salter, Anna C.
5/30/2023

1   that individual assessments to determine whether
2   someone should be on the registry needs to be done
3   with care?
4   A. If you're going to do an assessment of the individual,
5   I do not believe in just using Static-99R. If you're
6   going to do an individual assessment, I think you're
7   going to have to go beyond Static-99R. I would never
8   use just Static-99R in any assessment.
9   Q. So looking at your report -- let me show this to you
10  again.
11       Do you have it in front of you, your report?
12  A. Yes, I do.
13  Q. So your first full paragraph on page 15 it says,
14  "whether or not triage in large number of cases," you
15  say that's made -- whether that's fine.  You say,
16  "That may depend on the purpose of the triage and how
17  much triage it will impact the individual."
18  A. Yes.
19  Q. In which circumstances do you think using a risk
20  assessment to triage a large number of cases would be
21  okay?
22  A. Well, that's what I'm questioning.  I'm not sure.
23  Somebody is gonna have to explain to me what she means
24  by "triage in a large number of cases," and that's
25  what I'm saying.  Triaging for what?  I don't know

Page 101

1   that I can think of an outcome where it would be fine
2   just to use Static-99R.
3   Q. When you say "how much the triaging will impact the
4   individual," what do you mean by that?
5   A. Well, I do think that there's a difference in civil
6   commitments and -- you know, whether they are
7   considered intensive-probation supervisees or low-risk
8   probation supervisees.  There's a difference in the
9   levels of confinement, and how long people are
10  confined, and whether people are confined, and whether
11  the purpose is just whether they're going to an
12  intensive treatment program or a low treatment
13  program.  I think different interventions affect
14  individuals differently.
15  Q. And so is it fair to say, then, that the greater the
16  impact on a person's rights, the more comprehensive
17  the risk assessment needs to be?
18  A. Yes.  I would say that.
19  Q. Okay.  And your report says that you spent at least
20  15 hours at each evaluation that you do, correct?
21  A. Generally, yes.
22  Q. And that's in the context of determining whether a
23  person were made indefinitely detained, correct?
24  A. Detained for another year.  I don't decide whether
25  they are indefinitely retained.  I only decide my

Page 102

1   recommendation as to whether they're ready for
2   transition or release.
3   Q. But your evaluations, the comprehensive evaluations
4   that you do, are in the context of determining whether
5   a person will remain detained for another year?
6   A. Yes.  Well, no.  I do address -- my job is solely to
7   address transitional release.  They would be retained.
8   They would still be civilly committed under
9   transitional release.  It just works to integrate them
10  within the community.  So I just don't decide on
11  release.  I decide on my opinion of whether they're
12  ready for the next phase in treatment.
13  Q. Right.  But I guess my question is, or the point here
14  is that the comprehensive risk assessment you do has
15  the potential to determine whether someone will spend
16  another year detained, correct?
17  A. Yes.  It has a potential.
18  Q. Okay.  And you also have to determine if the person
19  has a mental abnormality and is more likely than not
20  to commit another sexually violent offense, correct?
21  A. Well, for the re-evals, they all were diagnosed with a
22  mental abnormality.  The question is do they have
23  control of it, have they learned interventions that
24  will manage it.  These mental abnormalities don't
25  usually just go poof.  They require interventions.

Page 103

1   Q. But that's a part of your assessment in those cases,
2   is what's the status of the person's mental
3   abnormality?
4   A. Yes.
5   Q. And then are they more likely than not to commit
6   another sexual violent offense, correct?
7   A. Yes.  Are they still more likely than not.
8   Q. Okay.  That's a fair correction.
9        So in the conclusion to your report on page
10  16 at the very end you say, quote:
11       "If there are issues with the method
12  that is being used to determine who belongs on
13  the Michigan Registry, they will not be solved
14  by substituting Static-99R as a stand-alone
15  instrument."  End quote.
16  Do you know what method is currently being used who is
17  subject to registration in Michigan?
18  A. I believe it's the nature of the current offense.
19  Q. When you say "the nature of the current offense," what
20  do you mean?
21  A. I don't know specifically which offenses they are put
22  on the registry and which they don't since I wasn't
23  asked to testify about that.
24  Q. Do you know if it's a conviction-based registry?
25  A. I would assume it is, but no.  I'm not testifying on

Page 104

26 (Pages 101 to 104)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 the registry. | 1 kind of accuracy. |

1    the registry.
2    Q. And you say "if there are issues with the method that
3        is being used..."
4              What issues are there with that method?
5    A. Well, that's what I'm saying. I'm not addressing what
6        method is currently being used. I wasn't asked to.
7        But, presumably, if Karl is recommending Static-99, he
8        feels that there are issues with the current methods.
9        In fact, I think -- oh, it was in his report, not
10       mine, where he said there were issues with the current
11       method. And if there are, I just -- I don't think
12       you're gonna get anywhere. I think using Static-99
13       alone is misleading.
14   Q. So you're not saying that a conviction-based method is
15       an appropriate method, correct?
16   A. No. I'm not addressing that issue one way or the
17       other.
18   Q. Okay. You're simply saying that if there are problems
19       with a conviction-based registry, the answer is to do
20       individual assessments that are more comprehensive
21       than just the Static-99?
22   A. I'm saying I wouldn't use Static-99 as a replacement,
23       yes. If you're going to do an individual assessment,
24       which apparently they are not now, then you are going
25       to have to go beyond Static-99 if you want to get any

Page 105

1    kind of accuracy.
2    Q. So to improve the accuracy, you need to do things in
3        addition to the Static-99?
4    A. You would need -- one way to improve accuracy -- I
5        don't know if anybody suggested any others -- would be
6        to do a comprehensive assessment. That's very time
7        consuming.
8    Q. Okay. What method would you suggest?
9    A. I didn't look into that. I was only asked to address
10       the issue of reoffending versus recidivism and some of
11       the -- some of the fairly dramatic ways in which
12       recidivism and reoffending differ.
13   Q. Okay. So let's talk about that. I know you've been
14       wanting to talk about that all morning, so let's get
15       to that.
16             We've talked about before how you define
17       recidivism versus reoffending and that you use the
18       term reoffending to mean committing another sexual
19       offense. Let's go back to page 1 of your report, and
20       on the last bullet on page 1 you say, quote:
21             "In reality, because of the large number
22             of undetected offenses, there is no reliable
23             information on reoffending rates." End quote.
24       Do you still agree with that statement?
25   A. Yes. We know very little actually about reoffending.

Page 106

1    Q. Okay. So we know that not all sexual crimes are
2        reported or detected, correct?
3    A. Only a small minority.
4    Q. But we don't have reliable information on the rates
5        that people who have been convicted by the criminal
6        legal system commit more than one offense?
7    A. Well, we have some information from sex offender
8        reports.
9    Q. Okay. We don't have reliable information to know how
10       many people who have been convicted commit further
11       offenses after conviction, correct?
12   A. Well, we have some information. I should have said
13       that. But because we do have some studies like the
14       Kelly study which looked at specifically undetected
15       offenses. But mostly you're right. We don't have the
16       same amount of information on reoffending that we have
17       on recidivism.
18   Q. So we don't have reliable information on how many
19       people with convictions have committed more than one
20       offense before conviction, right?
21   A. Well, as I said, we have more information on that
22       issue than we have on how many commit offenses after
23       their first conviction. For example, I don't believe
24       the Weinrott and Saylor study distinguished between
25       the two, but they did have data on the undetected

Page 107

1    offending as the offenders based on offender
2    admissions. And we have some based on polygraphs.
3    But it's more common not to separate them out
4    according to when did you commit this offense.
5    Q. So the research on undetected offending doesn't
6        typically separate out whether the undetected
7        offending occurred prior to the conviction or after
8        the conviction, correct?
9    A. No, a lot of it doesn't.
10   Q. Okay.
11   A. It doesn't.
12   Q. Okay. We also don't have reliable information on the
13       rates that people who've never been detected by the
14       criminal legal system commit more than one offense,
15       correct, have never been convicted?
16   A. No. You don't have reliable rates. We can make
17       estimates about the size of the population by looking
18       more closely at the victim literature which I wish
19       they would, the researchers would, so we can get some
20       idea. I mean, we know that 15 percent of offenses are
21       reported to police, and 1 to 2 percent of all sexual
22       offenses actually result of convictions.
23   Q. So the people who have not been convicted of sexual
24       offenses are not on registries, correct?
25   A. No, they're not.

Page 108

27 (Pages 105 to 108)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 | Q. Okay. And you said in your report research showing |
| 2 | that 95 percent of sex offenses are committed by |
| 3 | people who have not been previously convicted of a sex |
| 4 | offense, correct? |
| 5 | A. That's the Sandler study. |
| 6 | Q. Yes. And of that 95 percent, we don't know how many |
| 7 | have committed additional offenses beyond those they |
| 8 | were convicted of. Meaning, they might have committed |
| 9 | one or five before they got convicted, correct? |
| 10 | A. I don't remember the Sandler study having any data on |
| 11 | that. It might, but I don't remember if it did. |
| 12 | Q. Is it fair to say that for the 95 percent of sex |
| 13 | offenses that are committed by people who are not on |
| 14 | registries, we don't know how many times those people |
| 15 | might have offended, correct? |
| 16 | A. Well, according to Sandler, I believe that was a |
| 17 | registry study, and 95 percent of the new offenses |
| 18 | were done by people who had not been caught before. |
| 19 | Q. Right. But my question is a little bit different. My |
| 20 | question is for those people who were never caught -- |
| 21 | or, excuse me. |
| 22 | For those people who only now got caught, |
| 23 | right? This is their first offense. They weren't on |
| 24 | a registry, but they committed a sexual offense. We |
| 25 | don't know how many offenses they committed before |

Page 109

| | |
|---|---|
| 1 | getting caught, correct? |
| 2 | A. I don't think Sandler has data on that to the best of |
| 3 | my memory. |
| 4 | Q. Okay. So you talk about the Sandler. You talk about |
| 5 | the 95 percent in the Sandler study on page 10 of your |
| 6 | report. Let's go there. |
| 7 | You say the question isn't whether people |
| 8 | with convictions or people without convictions are |
| 9 | committing the most sex offenses. You say the |
| 10 | question is whether there is any reason to think that |
| 11 | the percent of offenses reported to the police differs |
| 12 | between offenders not previously convicted and |
| 13 | offenders who have been. And then you conclude, |
| 14 | quote: |
| 15 | "...there is no compelling evidence to |
| 16 | suggest the percentage [sic] of reported |
| 17 | offenses is different between those with no |
| 18 | previous convictions and those who do." End |
| 19 | quote. |
| 20 | Do you still agree with that statement? |
| 21 | A. Yes. |
| 22 | Q. This case concerns people on sex offender registries |
| 23 | whose offense has been detected and who have been |
| 24 | furnished. |
| 25 | A. Excuse me. I didn't hear that. |

Page 110

| | |
|---|---|
| 1 | Q. I'm sorry. |
| 2 | A. The sound got jumbled for a second. |
| 3 | Q. Sorry about that. So this case concerns people on sex |
| 4 | offender registries whose offenses have been detected |
| 5 | or at least an offense has been detected and who have |
| 6 | been punished. |
| 7 | We talked about this before but with the |
| 8 | exception of the Kelly study, none of the research |
| 9 | that you cited differentiates between repeat offenses |
| 10 | that occur before conviction and repeat offenses that |
| 11 | occur after conviction, correct? |
| 12 | A. Well, I don't think so, but I will after the |
| 13 | deposition go back and double check this. But I think |
| 14 | in certainly the majority of the studies, just look at |
| 15 | how many undetected offenses the person has had. |
| 16 | Q. And the Kelly study shows a higher detection rate |
| 17 | after conviction, correct? |
| 18 | A. Well, relatively speaking, it was still only a third |
| 19 | of the total offenses. They had three times as many |
| 20 | undetected offenses as detected after. |
| 21 | Q. But the detection rate was higher after conviction |
| 22 | even though it was still not a size we would like? |
| 23 | A. Only up to the first sanction, but it was -- |
| 24 | Q. After the first sanction, correct. |
| 25 | A. There's still a minority of the offenses that were far |

Page 111

| | |
|---|---|
| 1 | more undetected offenses at every point than there |
| 2 | were detected. |
| 3 | Q. So just to be clear, when in your report you're |
| 4 | discussing undetected offending, that relates to how |
| 5 | much sexual crime is not detected, regardless of |
| 6 | whether it occurred before or after conviction, |
| 7 | correct? |
| 8 | A. That depends on the context in which I am using it in. |
| 9 | For example, in this last question, we were talking |
| 10 | about Kelly's findings which have to do with the |
| 11 | impact of sanctions, so I was talking about after a |
| 12 | sanction. |
| 13 | Q. Is there anywhere in your report other than the |
| 14 | discussion of Kelly where you talk about undetected |
| 15 | offending as referring to undetected offending after |
| 16 | conviction? |
| 17 | A. Not specifically, I don't think. |
| 18 | Q. Okay. So in undetected offending as I understand it, |
| 19 | right, it's by definition not reported to the criminal |
| 20 | legal system. Otherwise, it would have been detected. |
| 21 | And your report discusses two basic types of |
| 22 | studies that try to estimate undetected offending. |
| 23 | The first of those is victim surveys, right? |
| 24 | A. Yes. |
| 25 | Q. One way. And then the second of those are studies |

Page 112

28 (Pages 109 to 112)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 based on reporting by offenders about the offenses | 1 type of crime. Is that fair to say? |

---

**Page 113**

1   based on reporting by offenders about the offenses
2   they've committed, right?
3   A. Well, first of all, by detected, I mean that are
4   charged or as charged and/or convicted. I don't mean
5   that someone found out about it but then wasn't
6   prosecuted.
7   Q. Right. So we're talking about detected by the
8   criminal legal system in some way?
9   A. Yes.
10  Q. But there's basically these two types of research,
11  victim surveys and offender surveys, right, to try to
12  get at what that undetected offending might me?
13  A. Oddly. But there are also -- well, I guess you could
14  say they're victim surveys. There are a large scale
15  of victim surveys, and then there's surveys of things
16  like disclosure rates between kids who were molested
17  by a relative versus kids who were molested by someone
18  outside the family.
19        So they are not necessarily broad
20  sociological victim surveys. It's also the disclosure
21  research as relevant. But, yes, in general, if you're
22  talking about sexual abuse, you're either surveying
23  victims, or you're surveying offenders.
24  Q. So victim surveys are a way to measure how many people
25  are reporting having been the victim of a particular

---

**Page 114**

1   type of crime. Is that fair to say?
2   A. Yes.
3   Q. And --
4   A. As I said, there are other kinds of victim surveys
5   like research on what factors lead to disclosures and
6   what don't.
7   Q. Okay.
8   A. With that exception, yes. Go ahead.
9   Q. Okay. And doesn't that type of research provide us
10  information about the amount of crime that's out there
11  that's undetected by looking at the difference between
12  how much crime victims report and how much crime is
13  reported to the police, so you can get a sense of how
14  much undetected crime is out there? Is that fair?
15  A. That's one type of victim survey, yes.
16  Q. But those victim surveys can't tell us whether that
17  undetected crime is being committed by people with
18  past convictions who are on registries or previously
19  undetected offenders, correct?
20  A. Generally, it cannot.
21  Q. Okay. Would you agree that survey results can be
22  impacted by factors of the size and composition of the
23  survey sample?
24  A. Of course.
25  Q. Or the questions asked?

---

**Page 115**

1   A. Definitely the questions asked.
2   Q. And the response rate?
3   A. Yes.
4   Q. Okay. And in surveying people about whether they have
5   been a victim of a sexual crime and how you define
6   would constitutes a sex crime could affect the
7   results, correct?
8   A. Yes.
9   Q. Now, the studies you've set in your report have ranges
10  of dates going back to 1984 and up to 2015.
11        Does that sound about right?
12  A. Well, I also reference things like Helmus's 2021
13  study; I believe. So, no, it does have higher than
14  that.
15  Q. Okay. So they refute -- you report you find reporting
16  rates of between 6 percent and 32 percent, I believe,
17  in the studies that you've described?
18  A. Yes. I don't know if I -- yes. In general, that's
19  the range of reporting, right. So I think those 6 and
20  32 are outliers.
21  Q. Okay. Are you familiar with the Bureau of Justice
22  Statistics' National Crime Victimization Survey?
23  A. Yes. But I don't know -- if you asked me what the
24  rates are for that, I can't tell you automatically.
25  But it's part of the research that I've read.

---

**Page 116**

1   Q. Okay. And they do an annual victimization survey with
2   a large national random sample; is that right?
3   A. Yes.
4   Q. And did you say that many scholars rely on BJS data,
5   including the National Crime Victimization Survey?
6   A. Rely on what data?
7   Q. The Bureau of Justice Statistics BJS data?
8   A. It's usually included. They are a number of them
9   based on the surveys, on offender surveys, and that
10  one is usually included.
11  Q. And that scholars rely on that pretty routinely,
12  correct?
13  A. Along with other data. I wouldn't say they rely on
14  that alone. It's one of the surveys that people use.
15  Q. Let me show you -- this is a report from the Bureau of
16  Justice Statistics reporting crime to the police.
17  It's about reporting rates published in 2003.
18        (Plaintiffs' Exhibit No. 9 was marked.)
19  BY MS. AUKERMAN:
20  Q. Do you see that on your screen?
21  A. I do.
22  Q. Okay. Are you familiar with this report at all?
23  A. Yes.
24  Q. What's that?
25  A. "Yes."

---

29 (Pages 113 to 116)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1  Q. You are familiar with this report? | 1  A. Yes.  That's fair to say.  But they tend to group |
| 2  A. Can I cite the statistics from memory, no, but yes. | 2     between 6 and 32 percent. |
| 3  Q. And going down to Table 1, do you see that they are | 3  Q. Okay.  And so even though the Bureau of Justice |
| 4     reporting that they show a reporting rate for rape and | 4     Statistics and the Department of Justice has a |
| 5     sexual assault of 48 percent?  Do you see that? | 5     national sample, the National Crime Victimization |
| 6  A. Yes. | 6     Survey, you would disregard that survey? |
| 7  Q. Do you see that the accompany text says, with the | 7  A. I think it's definitely an outlier.  And after the |
| 8     exception of robbery, there appear differences in the | 8     deposition, I will go back and see if I can find out |
| 9     percentage of "...sexual assault and other violent | 9     why, what the characteristics of that study are that |
| 10    crimes reported to the police were not statistically | 10    make it different from so many other studies. |
| 11    significant. | 11  Q. On page 2 of your report you say -- let me see if I |
| 12    Do you see that? | 12    can find it here.  It's the second bullet on page 2 of |
| 13  A. Yes. | 13    you report.  It says: |
| 14  Q. You didn't include the NCVS data in your report.  Did | 14       "Victims report some types of offenders, |
| 15    you? | 15    e.g., extra-familial and stranger offenders, |
| 16  A. I did not.  I think that is a real outlier and | 16    more than they do other types, e.g., familial |
| 17    possibly related to the fact that it only surveys | 17    and familiar." |
| 18    people 12 and up, so they miss the entire group of | 18    Correct? |
| 19    people who are molested as children. | 19  A. Yes. |
| 20  Q. Okay.  Is it fair to say that -- | 20  Q. And then on page 13 you talk about how the research |
| 21  A. Whether that's the reason or not, that is a real | 21    specifically shows that reporting rates are lower for |
| 22    outlier. | 22    incest offenses, correct? |
| 23  Q. Is it fair to say that different studies reach | 23  A. Yes. |
| 24    different conclusions about the percentage of sexual | 24  Q. And so some of the factors that make familial victims |
| 25    crimes that are reported? | 25    of abuse having to report is a fear that they might |
| Page 117 | Page 118 |
| 1     not be believed, correct? | 1     don't have that information. |
| 2  A. Yes. | 2  Q. So we don't know what the reporting rates are where a |
| 3  Q. Or that they're worried about, you know, living with | 3     person is reporting reoffending by someone who has |
| 4     the perpetrator, outing somebody's member of their | 4     already been convicted, correct? |
| 5     family as an offender? | 5  A. I have -- I don't know how to answer that.  Static-99 |
| 6  A. Yes. | 6     underestimates the risk of incest offenders. |
| 7  Q. So the research about incest reporting rates, that | 7  Q. That's not my question, Dr. Salter.  My question is |
| 8     relates to the initial reporting of abuse, correct? | 8     whether we know what the reporting rates are for |
| 9  A. Well, incest typically goes on for a long period of | 9     reoffending.  What the reporting rates are for |
| 10    time, and what they found -- so it's almost never | 10    familial offenses where a person is reporting |
| 11    reported immediately.  I'm not sure what you're asking | 11    reoffending by someone who has already been convicted. |
| 12    by the "initial." | 12  A. And I answered that.  Victims don't have that |
| 13  Q. I guess when it's first reported to authorities, when | 13    information. |
| 14    abuse that's happening is first reported to | 14  Q. So we don't know what those rates are, correct? |
| 15    authorities.  It might be years later, but when it's | 15  A. This is based on victim samples.  I can tell you |
| 16    first reported to authorities. | 16    clinically that most of the incest offenders that I've |
| 17  A. Okay.  Yes, the -- ask the question again. | 17    seen are the victims, who were victims of incest |
| 18  Q. So the studies about reporting rates in familial | 18    offenders, it went on for years.  And they were |
| 19    offenses deal with when abuse is first reported to | 19    never -- if they were -- they were typically not even |
| 20    police authorities? | 20    included in the criminal justice figures because by |
| 21  A. Or if it's reported, yes. | 21    the time the kids reported it, they were adults and |
| 22  Q. Okay.  Do any of the studies you cite examine how | 22    the statute of limitations have expired. |
| 23    frequently familial offenses are reported against | 23  Q. So the reporting you're talking about, underreporting |
| 24    someone who has already been convicted of a sex crime? | 24    or lower rates of reporting is abuse that might go on |
| 25  A. No.  These are victim surveys.  The victims typically | 25    for a longer period of time, correct? |
| Page 119 | Page 120 |

30 (Pages 117 to 120)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 | **A.** I'm talking about the fact that Static-99 has a |
| 2 | variable called incest offending, and in that variable |
| 3 | it says if you've only committed offenses in the |
| 4 | family, you get a lower score. |
| 5 | **Q.** But you're not answering my question, Dr. Salter.  My |
| 6 | question -- let me restate my question to make sure |
| 7 | that we're talking about the same thing. |
| 8 | My question is can you cite research that |
| 9 | looks at the reporting rates for familial offenses |
| 10 | where a person already has been -- where the offender |
| 11 | has already been convicted of a sex offense? |
| 12 | **A.** And I'm telling you that the research in victims |
| 13 | doesn't usually have that data. |
| 14 | **Q.** Okay.  Thank you.  So we talked about some of the |
| 15 | reasons why familial crimes might be less frequently |
| 16 | reported, right? |
| 17 | Like victims might be hesitant to out a |
| 18 | family member who is an offender, correct? |
| 19 | **A.** Yes. |
| 20 | **Q.** Or the child might not be -- be afraid that they might |
| 21 | not be believed, correct? |
| 22 | **A.** Yes. |
| 23 | **Q.** Okay.  Could those factors change once the family has |
| 24 | already been -- where the family member has already |
| 25 | been outed as an offender? |

Page 121

| | |
|---|---|
| 1 | **A.** It's usually worse. |
| 2 | **Q.** You think that reporting is less likely to happen |
| 3 | after someone has already been convicted? |
| 4 | **A.** Yes, in my clinical experience, the disruption to the |
| 5 | family, the loss of financial support.  I believe it's |
| 6 | Marshall who has said that he followed up with a group |
| 7 | of kids who have reported abuse and asked them if it |
| 8 | happened again, would they report it.  And 100 percent |
| 9 | said no, so no -- |
| 10 | **Q.** But that's not -- that study is not dealing with |
| 11 | whether people actually report it but whether they |
| 12 | would have reported it, correct? |
| 13 | **A.** Whether they would report, and they said no 'cause |
| 14 | they're traumatized by the court process.  I certainly |
| 15 | clinically have no evidence that they would be more |
| 16 | likely to report a second time.  My belief is they'd |
| 17 | be less likely. |
| 18 | **Q.** Okay.  But that's based on your personal experience as |
| 19 | a clinician, correct? |
| 20 | **A.** It's partly based on that.  It's also true.  We have |
| 21 | some research that says that court harms children. |
| 22 | **Q.** But we don't have research on reporting after a person |
| 23 | has been convicted of a familial offense, correct? |
| 24 | **A.** Of a familial offense, I don't know of any. |
| 25 | **Q.** Okay.  Thank you.  We talked about victim surveys. |

Page 122

| | |
|---|---|
| 1 | Let's talk about self-report surveys of people who |
| 2 | offended. |
| 3 | Would you agree that survey results for |
| 4 | self-reports would be affected by the size and |
| 5 | composition of the sample? |
| 6 | **A.** All research is affected by the size and composition |
| 7 | of the sample. |
| 8 | **Q.** A number of the studies you cite suggest that people |
| 9 | in the sample groups in those studies have a large |
| 10 | number of undetected victims. |
| 11 | Do you believe that studies showing large |
| 12 | numbers of victims for that particular sample groups |
| 13 | can be generalized to apply to people with sex |
| 14 | offenses generally? |
| 15 | **A.** I'm not sure how you're asking that, but yes.  I |
| 16 | believe that there's data and information in those |
| 17 | studies which is relevant to sex offenders generally. |
| 18 | **Q.** So you think -- are you testifying that the rates of |
| 19 | undetected offending for people who are committed as |
| 20 | sexually violent predators and studies done on those |
| 21 | would be the same as the rates of reoffending for |
| 22 | somebody who, you know, is convicted of a sex offense |
| 23 | for sleeping with an underage girlfriend? |
| 24 | **A.** No.  I'm not saying that.  I'm saying the literature |
| 25 | in undetected offenses generally is consistent and is |

Page 123

| | |
|---|---|
| 1 | relevant to a discussion of whether you can rely on |
| 2 | recidivism.  The major study in that group that looked |
| 3 | at SVP people who have been committed was the Kelly |
| 4 | study.  Most of the studies had people who had then |
| 5 | committed crimes like the Weinroff and Saylor, et |
| 6 | cetera, but were not SVPs. |
| 7 | **Q.** So one of the studies you cite is the Bourke and |
| 8 | Hernandez study -- |
| 9 | **A.** Yes. |
| 10 | **Q.** -- about child abusive materials.  Are you aware that |
| 11 | the authors of that study, Hernandez has disavowed |
| 12 | your interpretation of that study writing that, quote: |
| 13 | "The argument that the majority of child |
| 14 | pornography offenders are in the context of |
| 15 | sexual offenders and they're a dangerous |
| 16 | predator simply is not supported by the |
| 17 | scientific evidence." |
| 18 | Were you aware that Hernandez has disavowed the |
| 19 | interpretation you have of his study, of that study? |
| 20 | **A.** Well, first of all, there were two studies.  Hernandez |
| 21 | and Bourke was involved would both of them.  Hernandez |
| 22 | was involved with one of them. |
| 23 | The one that Hernandez was involved with had |
| 24 | a flaw in it, and that had to do with -- I think they |
| 25 | included some people.  And I don't remember it |

Page 124

31 (Pages 121 to 124)

Salter, Anna C.
5/30/2023

Page 125

1 exactly, but I think they included some people who
2 did -- who distributed pornography or had some kind of
3 other offense rather than simply downloading
4 pornography.  So Bourke redid the study excluding
5 those and got the same results.
6           But where is that?  Where are you referring
7 to in my report?
8 Q. It's the discussion of Bourke and Hernandez.  Let me
9 see if I can find it.
10 **A.** If you find the page number, let me know.
11 Q. It's on Page 12.  My question is specifically were you
12 aware that Hernandez has disavowed the interpretation
13 of the study that you gave?
14 **A.** Yes.
15 Q. Okay.  But you didn't note that Hernandez has
16 disavowed your interpretation in your report, correct?
17 **A.** 'Cause my understanding is he was under quite a bit of
18 pressure from the Federal Bureau of Prisons, and
19 Bourke resigned.  He took a different job and did a
20 study free of their interference, and it got the same
21 results or similar.  So the results stood up in
22 replication.
23 Q. Are you aware that many scholars have criticized both
24 the study and it's misinterpretation?
25 **A.** Well the first study, I'm not aware of valid

Page 126

1 criticisms of either the second study or Bourke has.
2 I don't know if I reported it.  Bourke has a series of
3 three other studies that were done that also found
4 high rates of hands-on offending at usually based on
5 polygraph results.
6 Q. You didn't include any of those criticisms in your
7 report.  Did you?
8 **A.** No.
9 Q. Okay.  Are you aware that at least one federal court
10 has rejected reliance on that study?
11 **A.** On the Hernandez study or the other Bourke and
12 Hernandez?
13 Q. The Bourke and Hernandez study.  Are you aware of
14 that?
15 **A.** No.  I don't remember.
16 Q. Are you familiar with the American Psychological
17 Association of Guidelines For Forensic Psychology?
18 **A.** I haven't read them recently, but yes.  I'm aware of
19 them.
20 Q. Let me show you those.
21           (Plaintiffs' Exhibit No. 10 was marked.)
22 BY MS. AUKERMAN:
23 Q. Do you see those?
24 **A.** It's pretty small, but yes.
25 Q. Let me make that bigger.  Do you see that better now?

Page 127

1 **A.** Yes.
2 Q. And would you agree that those guidelines apply to
3 your work in this case?
4 **A.** Yes.
5 Q. Okay.  In looking at Guideline 1.02, that guideline
6 requires forensic practitioners to seek "to represent
7 alternative perspectives, including data, studies, or
8 evidence on both sides of the question, in an
9 accurate, fair and professional manner, and strive to
10 weigh and present" -- wait.  I might be looking at the
11 wrong one.
12 **A.** I can't see what you're talking about.  I think I can
13 see the --
14 Q. I think it's further down.  Okay.  I'm sorry.  Can you
15 see that now?
16 **A.** Yes.
17 Q. So it says:
18           "When providing educational services,
19 forensic practitioners seek to represent
20 alternative perspectives, including data,
21 studies, or evidence on both sides of the
22 question, in an accurate, fair and
23 professional manner, and strive to weigh and
24 present all views, facts, or opinions
25 impartially."

Page 128

1 Correct?
2 **A.** Yes.
3 Q. And do you see the Guidelines 11.01?  Let's scroll
4 down to that.  It requires that "...forensic
5 practitioners do not distort or withhold relevant
6 evidence or opinion in" written -- "in reports or
7 testimony," correct?
8 **A.** Yes.
9 Q. So basically, these requirements are to fairly
10 describe the research and also point out -- and also
11 make clear if there's criticism of research.
12           Is that fair to say?
13 **A.** Well, yes.  Although, you would never finish a report
14 if you included all the commentary on it, on the
15 research.
16 Q. But is it fair to say that where a piece of research
17 has been debunked or heavily criticized, that's
18 something that you should note in your report?
19 **A.** No.  If you take out the Hernandez study, the other
20 studies get the same results.  The Hernandez study,
21 essentially, was replicated with other research.  I
22 don't think I have -- and the research that Karl
23 cites, that other people cite, there is always
24 somebody out there criticizing that research.  When I
25 thought it was relevant, for example, in the Scurich

32 (Pages 125 to 128)

Tri-County Court Reporters
248-608-9250

Salter, Anna C.
5/30/2023

Page 129

```
1    study where there wasn't other studies that replicated
2    the findings, I did say Abbott has criticized this on
3    statistical grounds.
4         So I do believe that I have been impartial
5    and fair in this report, and I don't believe, not
6    including the research in the Bourke and Hernandez --
7    which frankly, after reading the study, I don't even
8    think was fair or accurate -- makes my report any less
9    impartial.
10   Q. So in Scurich, you would agree that that has been
11   widely criticized, correct?
12   A. Scurich was criticized by Abbott for the statistical
13   analysis. But, again, you've got the problem that
14   Scurich's findings are similar to findings from a wide
15   variety of research.
16   Q. Has Scurich been criticized by other scholars as well?
17   A. All of these studies have, and all of the ones that
18   Karl Hanson cited have. And Static-99 has been
19   criticized -- I didn't even include that -- by
20   researchers. You have to figure out what you think is
21   fair and accurate and include it.
22   Q. So, for example, the Langevin study -- I don't know if
23   I'm pronouncing that correctly -- on page 8.
24   A. "Langevin."
25   Q. Langevin that you cite, are you aware that that study
```

Page 130

```
1    has been very widely criticized?
2    A. Let's see. Where is it?
3    Q. Let me see. It's page 8; I believe.
4    A. I don't see it. Oh, yeah. Wait a minute.
5    Q. The top of the page, the first not full paragraph.
6    A. Yes. But I'm not sure if that's been criticized
7    because it isn't accurate or because people just don't
8    like the findings.
9    Q. But you're aware that it's been widely criticized?
10   A. All of these studies including Static-99 have been
11   criticized.
12   Q. But you didn't include those criticisms in your
13   report, correct?
14   A. I didn't include criticisms in the report when I
15   didn't think they were relevant because the literature
16   was consistent with a wide variety of other studies
17   that had the same reports. That kind of speaks to how
18   valid the criticism was.
19   Q. So let me look at -- I'm just gonna go to another
20   article. This is Exhibit 11, and let's just talk a
21   little bit more, then maybe we can take a short break.
22        (Plaintiffs' Exhibit No. 11 was marked.)
23   BY MS. AUKERMAN:
24   Q. Showing you Exhibit 11, this is an article on
25   misperceptions about child sex offenders by Kelly
```

Page 131

```
1    Richards put out by the Australian Institute of
2    Criminology.
3         Are you familiar with this?
4    A. I've seen it, but in all honesty, I don't remember it.
5    Q. Okay. So let's scroll down to page 5 here. I'm
6    sorry. It's page 4. This is an article that
7    discusses common misperceptions about child sexual
8    offending and child sex offenses. And it says one of
9    the common misperceptions is at the time an offender
10   is detected, he has victimized hundreds of children.
11        And then it goes on to say that the
12   misperception has even -- quote, the "misperception
13   has even permeated the academic literature on child
14   sex offenders." And then it cites to you and your
15   book, Predators, as an example of the way that this
16   misperception has permeated the academic literature.
17        It goes on to quote you as saying that men
18   who molest out-of-home female children average 20
19   victims and men who molest out-of-home male victims
20   average 150 victims.
21        And then it's accurate to say -- then the
22   report goes on to criticize your discussion of the
23   literature as, quote (as read), "strictly speaking,
24   correct," unquote, but is failing to report key
25   findings that the median number of victims is 1.3 for
```

Page 132

```
1    females and 4.4 for male victims.
2         Do you see that?
3    A. Yes.
4    Q. So you were suggesting in your work the victim range
5    of 20 to 150, correct?
6    A. No. I was accurately quoting a research study. That
7    wasn't my finding. That was Abel's finding, and it
8    was an important finding.
9    Q. Right. But you neglected to mention that while the
10   average was 20, the average of victims is 20, you
11   failed to disclose that the medium number is 1.3.
12        You failed to disclose that, correct?
13   A. Apparently. I don't remember in the book. But I'm
14   assuming she's correct that I used the average rather
15   than the median.
16   Q. Do you think that talking about 20 victims when the
17   median is actually 1.3 is consistent with the APA
18   guidelines that you should not distort or withhold
19   relevant evidence?
20   A. I did not distort relevant evidence, and I do stand by
21   reporting Abel's findings in that matter.
22        MS. AUKERMAN: Okay. Why don't we take --
23   can we take a five-minute break, or do you need more
24   time than that?
25        MR. JAMISON: Do you know how much more you
```

33 (Pages 129 to 132)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 | have, Miriam? |
| 2 | MS. AUKERMAN:  I'm actually getting close to |
| 3 | done.  I mean, we can probably push through, but I |
| 4 | think it might be nice to have a five-minute break. |
| 5 | THE WITNESS:  I need a five-minute break. |
| 6 | MS. AUKERMAN:  Yes.  Okay.  Let's do that. |
| 7 | (From 2:12 p.m. to 2:18 p.m., recess was |
| 8 | taken.) |
| 9 | BY MS. AUKERMAN: |
| 10 | Q.  Let's go back to your CV which is Exhibit 4. |
| 11 | You are trained as a clinical psychologist, |
| 12 | correct, Dr. Salter? |
| 13 | A.  Yes. |
| 14 | Q.  You got your Ph.D. in 1977, correct? |
| 15 | A.  Yes. |
| 16 | Q.  And then it looks like you spent about a decade doing |
| 17 | some teaching and working in programs focused on |
| 18 | parents in distress and children at risk, correct? |
| 19 | A.  Parents in Distress was a child abuse program. |
| 20 | Children at Risk was a sexual abuse program. |
| 21 | Q.  And then it looks like you taught at Dartmouth as an |
| 22 | assistant professor from 1981 to 1988 and as an |
| 23 | adjunct from 1988 to 1996; is that right? |
| 24 | A.  Yes. |
| 25 | Q.  What courses did you teach? |

Page 133

| | |
|---|---|
| 1 | A.  We didn't teach courses.  I was in the department of |
| 2 | psychiatry, and this was -- and in the department |
| 3 | of -- it was pediatrics, but at that time, it was |
| 4 | called maternal and child health.  And while there, I |
| 5 | had a clinical caseload.  I supervised psychiatric |
| 6 | residents.  I supervised pediatric residents. |
| 7 | I was director of psychosocial education for |
| 8 | the pediatrics residency program.  I started a |
| 9 | parenting clinic.  We rotated -- well, with the |
| 10 | pediatricians, we rotated kids -- we rotated residents |
| 11 | through that. |
| 12 | I was director of child psychiatry |
| 13 | consultations in the inpatient unit.  Again, I |
| 14 | supervised psychiatric residents who were called for |
| 15 | consultation, psychiatric consultation to the |
| 16 | residency program, codirector of the Children At Risk |
| 17 | Program.  We didn't have residents in that. |
| 18 | I wrote a child abuse program called the |
| 19 | Parents in Distress Program.  So I had |
| 20 | responsibilities for supervising residents in various |
| 21 | programs that I was involved in.  I occasionally -- I |
| 22 | didn't teach any courses at the medical school.  I |
| 23 | lectured there a couple of times, but that's all. |
| 24 | Q.  Okay.  So your work was primarily clinical and |
| 25 | supervising other -- and supervising residents in a |

Page 134

| | |
|---|---|
| 1 | clinical setting.  Is that fair to say? |
| 2 | A.  Yes.  Well, Steve Caris (phonetic), the pediatrician, |
| 3 | and I started programs, wrote grants, and did some |
| 4 | research.  But, really, I think most of my time was |
| 5 | clinical in one way or another. |
| 6 | Q.  Okay.  And then starting in 1988 until 1996 -- |
| 7 | although, I guess we talked about how you had a |
| 8 | private practice, but we talked about earlier how the |
| 9 | CV is incorrect in that.  The private practice |
| 10 | actually extended longer than that, correct? |
| 11 | A.  Well, I don't know that the CV is incorrect, but it |
| 12 | looks like I didn't include the brief private practice |
| 13 | after I moved. |
| 14 | Q.  Okay.  But you stopped treating patients, and we |
| 15 | talked earlier about the type of patients that you |
| 16 | saw, correct? |
| 17 | A.  Well, we talked about the type of patients that I saw |
| 18 | primarily in my Wisconsin private practice. |
| 19 | Q.  Okay. |
| 20 | A.  In Lebanon, New Hampshire, I saw a wide variety of |
| 21 | patients.  I did see some sex offenders, but I -- and |
| 22 | I did run some sex offender groups, but I also saw |
| 23 | kids and adults for depression, anxiety, the general |
| 24 | practice. |
| 25 | Q.  And you stopped treating patients -- did you stop in |

Page 135

| | |
|---|---|
| 1 | 1996 treating patients? |
| 2 | A.  As I said, I moved in 1996, and then I ran a private |
| 3 | practice for a couple of years. |
| 4 | Q.  So you stopped treating patients more like 1999? |
| 5 | A.  Yes. |
| 6 | Q.  Okay.  I just want to make sure I get the dates right |
| 7 | here. |
| 8 | And then starting in 1996, you started |
| 9 | working as a consultant for the Wisconsin Department |
| 10 | of Corrections, correct? |
| 11 | A.  Yes. |
| 12 | Q.  It looks like you consulted with them for about |
| 13 | 13 years, correct? |
| 14 | A.  Well, till 2019, so yeah 12, 13 years. |
| 15 | Q.  We talked earlier about your work there.  You also |
| 16 | spent about five years starting in 2009 as a |
| 17 | consultant with the Tri-Counties Juvenile Sex Offender |
| 18 | Project.  What did you do there? |
| 19 | A.  Three counties came together to start a sex offender |
| 20 | group in northern Wisconsin.  None of them had -- a |
| 21 | juvenile sex offender group.  None of them had |
| 22 | juvenile sex offenders to start a group in each |
| 23 | county, so they combined their referrals and started a |
| 24 | group. |
| 25 | I did training.  I initially did, I think, |

Page 136

34  (Pages 133 to 136)

Salter, Anna C.
5/30/2023

1    five days of training.  I helped write the curriculum,
2    and I, you know, met with them once a month and
3    consulted clinically.  At one point, I assessed a
4    particular juvenile, but mostly I was training and
5    supervising clinicians who ran -- who were involved
6    with juvenile sex offenders.
7    Q.  So this, again, was clinical work or supervising
8        training for clinical work?
9    A.  Yes.  I'm a clinician.
10   Q.  Yup, okay.  You also talk about the trainings that
11       you've conducted, and your CV says you conducted
12       trainings on sexual abuse, correct?
13   A.  Yes.
14   Q.  So let me just -- so on page 3 of your CV, it says you
15       conducted training on sexual abuse, and then it goes
16       on to list locations for those trainings.  And I
17       believe you testified earlier that you charge $3500 a
18       day roughly for the trainings.  Is that right?
19   A.  Well, I do now.  When I started out, we charged less.
20       I think I charged 2,000 or something.
21   Q.  Okay.  Now, there's a lot of these trainings.  You
22       list a lot of locations but not the organizations that
23       you provided the training for.
24           What types of organizations do you provide
25       trainings for?

Page 137

1    A.  Mostly any organization, type of organization, that's
2        involved with sex offenders or violent offenders, a
3        lot of training for corrections, a lot of mental
4        health trainings, trainings for attorneys, trainings
5        for judges, trainings for probation and parole.  I
6        think the last training I did was for the FBI's
7        Behavioral Analysis Unit for the new recruits.  I
8        train them every year for --
9    Q.  What's -- I'm sorry.  I cut you off.  Go ahead.
10   A.  So I trained for some religious organizations.  I've
11       never trained for a victim's conference, meaning of
12       victims.  I tend to train professionals who are
13       involved with sex offenders.
14   Q.  What's the topic of the trainings that you provide?
15   A.  Pretty much everything on children, disclosure, child
16       sexual abuse, impact of child sexual abuse.  Let me
17       just pull up some of the names of my slides, and I can
18       tell you.
19           Pathology in thinking of sex offenders,
20       counterintuitive behaviors, current controversy.  I've
21       done trainings on psychopaths, sadists.  I do
22       trainings on detecting deception on antisocial
23       thinking, on child pornography, on staff predators,
24       people -- inmates or other offenders who seduce and
25       manipulate staff, on actuarial in Static-99 and

Page 138

1    dynamic factors, on adolescents and the research on
2    immature brain, development on child pornography, on
3    cognitive distortions, on incest.  Those are some of
4    the training that I've done.
5    Q.  Let's just look quickly just because it's a little
6        hard to tell from your CV, quite frankly, because you
7        don't list the organizations or the topics of each
8        training.
9           Let's just look at the first entry here,
10      March 20, 2022, you say you did a training in
11      Anchorage, Alaska.  What was that for?
12   A.  There are a variety of mental health people there.  I
13       think it was organized by corrections, but they were
14       outpatient clinicians invited as well.  I'm not sure
15       if that's the one where the -- wait a minute.  Hang on
16       a second.  I got interrupted.
17           Anyway.  I've done two trainings probably in
18       the last five years in Alaska.  One got interrupted
19       because I was there for the earthquake.  And the
20       ceiling fell in, and I had to go home.  And I came
21       back at a different time to try to finish.  Let me see
22       if I can pull up that particular training if you want
23       to know.
24   Q.  I'm just trying to get a sense.  We don't have to go
25       into huge detail.  I'm just trying to get a sense in

Page 139

1    what you've actually trained on in the last couple of
2    years.
3    A.  Well, FBI this year.  I trained on counterintuitive
4        victim behaviors, current controversy, psychopath,
5        sadists, typologies of sex offenders.  I don't think I
6        got to detecting deception, but I had it ready.
7           I also trained in the last few years on the
8        national psychologists who work for the National
9        Security Counsel.  That was on the topics that I just
10       mentioned plus antisocial thinking and child
11       pornography.  I trained on nurses recently in
12       Wisconsin remotely, and that was on staff predators.
13       Those are some of the more recent trainings.
14   Q.  Okay.  The one in Des Moines, Iowa, who was that for?
15   A.  When was that?  Oh, it doesn't say.
16           Does it say when that was?
17   Q.  It says sometime between March 2020-2022.
18   A.  Des Moines, Iowa was on final -- on "final" -- on
19       counterintuitive behaviors, disclosures, coaching of
20       children, suggestive questioning, something I call
21       protective parent panic.  I believe that was for a
22       hospital.
23   Q.  And the one in Austin, Texas, who was that for?
24   A.  Well, in '21, I see Des Moines, Alaska, FBI, a high
25       school, CSOT.  I don't see Austin.

Page 140

35  (Pages 137 to 140)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 | Q. The version of your CV that I have -- I can share my |
| 2 | screen. |
| 3 | A. Well, just tell me what's on there. |
| 4 | Q. It just says 2020 to 2022, Austin, Texas. |
| 5 | A. I don't remember. |
| 6 | Q. It's right here on top of page 4. |
| 7 | A. No, I understand. But I'm looking for the slides. |
| 8 | Q. I'm just wondering. I don't necessarily need to know |
| 9 | what you covered, just who it was for. If you don't |
| 10 | recall, that's fine. |
| 11 | A. I don't recall. |
| 12 | Q. Okay. Do you recall for Montreal, Canada who that was |
| 13 | for? |
| 14 | A. Wait a minute. I think that Austin was for a group |
| 15 | that had a very odd name, like the angels of |
| 16 | something. That's all I remember about Austin. The |
| 17 | computer accident was in 2020, and I did lose some |
| 18 | data that could not be recovered. |
| 19 | Q. Okay. You also have a website, correct, |
| 20 | AnnaSalter.com; is that right? |
| 21 | A. Yes. |
| 22 | Q. And you sell video presentations on that? |
| 23 | A. No. I don't do video presentations on that website. |
| 24 | Q. I thought when I went on that website it was possible |
| 25 | to purchase video presentations? |

Page 141

| | |
|---|---|
| 1 | A. Not presentations, no. I have two videos, training |
| 2 | videos out. One is called Truth, Lies and Sex |
| 3 | Offenders. It's interviews with offenders, and you |
| 4 | only see their faces about how they fooled their |
| 5 | communities, families, victims, parents. |
| 6 | And the second one -- actually, I think we |
| 7 | combined them on one DVD -- is interviews with sadists |
| 8 | and psychopaths. They don't usually talk to you, so I |
| 9 | thought it was valuable to put out a video on how they |
| 10 | think. |
| 11 | Q. How many copies of these videos have you sold? |
| 12 | A. I have no idea. I took it back from Sage because they |
| 13 | were charging so much that it was ridiculous and put |
| 14 | it on my website. I have no idea how many were sold. |
| 15 | Q. It looked like on your website each one costs $149. |
| 16 | Is that right? |
| 17 | A. I don't think so. I think that's when it was in Sage, |
| 18 | but maybe I'm wrong, maybe when they combined the two |
| 19 | of them. I have somebody running my website. Maybe |
| 20 | they charge 149. If that's what it says, it must be |
| 21 | right 'cause the woman who ships them does the |
| 22 | website. |
| 23 | Q. Okay. And when were those made? |
| 24 | A. Oh, gosh, many years ago. Probably, I'd say in the |
| 25 | '90s. |

Page 142

| | |
|---|---|
| 1 | Q. Let's look at your CV and look at your publications. |
| 2 | So you have a section here that says Publications, |
| 3 | Awards & Examples of Workshops. |
| 4 | So your CV groups together your |
| 5 | publications, your awards, and your workshops, |
| 6 | correct? |
| 7 | A. Yes. |
| 8 | Q. So I want to focus on what you've published. Now, I |
| 9 | understand that you also write mystery novels, |
| 10 | correct? |
| 11 | A. Yes. |
| 12 | Q. But let's set those aside because they're probably not |
| 13 | that relevant to this, and let's look at the three |
| 14 | books that you've written related to sexual offending. |
| 15 | A. Yes. |
| 16 | Q. So I've highlighted those in blue. Working backwards |
| 17 | starting at the end, the first one of those books |
| 18 | was -- hold on. |
| 19 | A. Treating Child Sex Offenders and Victims: A Practical |
| 20 | Guide. |
| 21 | Q. Right. Did I not highlight that in blue? I intended |
| 22 | to. Yeah, it should have been in blue. Okay. |
| 23 | Anyway. Training Child Sex Offenders and |
| 24 | Victims: A Practical Guide. And Amazon described |
| 25 | that book "as a practical manual designed to assist |

Page 143

| | |
|---|---|
| 1 | mental health professionals in the effective treatment |
| 2 | of both victims and offenders through the development |
| 3 | of specialized skills. The book discusses methods of |
| 4 | treatment of offenders and victims." |
| 5 | Is that an accurate description of the book? |
| 6 | A. Yes. |
| 7 | Q. Okay. And that was published in 1988, correct? |
| 8 | A. Yes. |
| 9 | Q. So 35 years ago. The second book that you have is |
| 10 | Transforming Trauma: A Guide to Understanding and |
| 11 | Treating Adult Survivors of Child Sexual Abuse, |
| 12 | correct? |
| 13 | A. Yes. |
| 14 | Q. And Amazon says this book is, quote, "primarily |
| 15 | oriented toward treating adult survivors," end quote, |
| 16 | but, quote, "will also be useful for treating sex |
| 17 | offenders." End quote. |
| 18 | And Amazon talks about how it discusses |
| 19 | topics such as what clinicians who treat survivors |
| 20 | need to know about sex offenders, the different ways |
| 21 | sadistic and non-sadistic offenders think, and |
| 22 | resolving different footprints they leave in the heads |
| 23 | of survivors? |
| 24 | Is that an accurate description of the book? |
| 25 | A. Yes. |

Page 144

36 (Pages 141 to 144)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 | Q. So it was a guide for treatment professionals? |
| 2 | A. Yes. Although, most of the feedback I get has been |
| 3 | from victims. |
| 4 | Q. Okay. Was it aimed at clinicians? |
| 5 | A. It was aimed at clinicians, but it turns out it was |
| 6 | more useful for victims than I anticipated. |
| 7 | Q. Okay. And so then that was published in 1995, |
| 8 | correct? |
| 9 | A. Yes. |
| 10 | Q. And then the third book that you've written |
| 11 | is Predators: Pedophiles, Rapists, and other Sex |
| 12 | Offenders: Who They Are, How They Operate, and How We |
| 13 | Can Protect Our Children, correct? |
| 14 | A. Yes. |
| 15 | Q. And Amazon says this, quote, "Dispels the myth about |
| 16 | sexual predators and gives us the tools to protect our |
| 17 | families and ourselves." |
| 18 | Is that an accurate description? |
| 19 | A. Yes. |
| 20 | Q. So this book has a general audience, right? |
| 21 | Meaning, it provides information to parents |
| 22 | about how to protect their kids and to the public |
| 23 | about how to protect themselves; is that right? |
| 24 | A. Yes. |
| 25 | Q. And that was first published in 2003, about 20 years |

Page 145

| | |
|---|---|
| 1 | ago? |
| 2 | A. Yes. |
| 3 | Q. Okay. Now, your CV says that there was a new edition, |
| 4 | a second edition to be released in the fall of 2019. |
| 5 | Was the second edition released? |
| 6 | A. No. |
| 7 | Q. There was not a second edition? |
| 8 | A. No. The publisher claims there was. I mean, they |
| 9 | have labeled it, but it's the same book. |
| 10 | Q. Okay. So there were changes made to what you |
| 11 | published in 2003? |
| 12 | A. There were not changes made. |
| 13 | Q. Okay. So if I'm understanding it correctly, you've |
| 14 | written two books that are aimed at or intended for |
| 15 | treatment providers and clinicians, and one that was |
| 16 | for a sort of general audience. Is that accurate? |
| 17 | A. For treatment providers and clinicians. |
| 18 | Q. Were any of your books peer reviewed? |
| 19 | A. Oh, yeah. Before Sage took my first book, they sent |
| 20 | it out for peer review, and I'm blanking his name. I |
| 21 | met him afterwards. Maybe it was Frank Baldwin. |
| 22 | Anyway. It was peer reviewed by several |
| 23 | people who publish with Sage Publishing. |
| 24 | Q. This Treating Child Sex Offenders and Victims, is that |
| 25 | the one you're talking about? |

Page 146

| | |
|---|---|
| 1 | A. I don't know if that's -- that got one. Well, I mean, |
| 2 | they're all reviewed after you put them out. But if |
| 3 | you mean before you put them out, then I the second or |
| 4 | the third one were, but they all get reviewed. |
| 5 | Q. Right. I'm talking about the academic peer-reviewed |
| 6 | process. So it sounds like the second and third book |
| 7 | didn't go through any kind of academic peer review? |
| 8 | A. I thought the peer-review process is typically for |
| 9 | articles. Typically, books are not reviewed. I think |
| 10 | it was probably an exception because they didn't know |
| 11 | me that they put out -- they put the initial one out |
| 12 | for peer review, but I don't think that's typical of |
| 13 | books. |
| 14 | Q. Okay. So that initial one was sent out for someone to |
| 15 | look at it and vouch for it, basically? |
| 16 | A. Or not, but it was sent out to more than one person; I |
| 17 | believe. |
| 18 | Q. Okay. Your CV also lists one book chapter here, and |
| 19 | that is -- at least it looked like a book chapter. |
| 20 | Epidemiology of child sexual abuse, in a volume by |
| 21 | Dominique O'Donohue, The Sexual Abuse of Children. |
| 22 | Is that a book chapter? |
| 23 | A. Yes. |
| 24 | Q. And that came out in 1992, correct? |
| 25 | A. Yes. |

Page 147

| | |
|---|---|
| 1 | Q. Correct, 1992? |
| 2 | A. Yes. I said "yes." |
| 3 | Q. Sorry. I didn't hear you. And just very briefly, |
| 4 | what was that about? |
| 5 | A. Well, it was for -- it was about the incidents in |
| 6 | prevalence of child sexual abuse, how common it is, |
| 7 | what we know from the literature and epidemiology. |
| 8 | Q. Okay. And you were saying before that books are |
| 9 | typically peer reviewed, so would that chapter have |
| 10 | been peer reviewed? |
| 11 | A. I don't know if O'Donohue had it peer reviewed or not. |
| 12 | I submitted it, and it was accepted. But I don't know |
| 13 | if there was any process. |
| 14 | Q. Okay. So then I went through and I highlighted in |
| 15 | yellow on your CV what looked to be the articles that |
| 16 | you've written. I found five that were published in |
| 17 | journals. |
| 18 | Am I missing any published articles listed |
| 19 | on your CV? |
| 20 | A. Well, I don't think so. |
| 21 | Q. Okay. So have you published any articles in journals |
| 22 | other than those listed on the CV? |
| 23 | A. Not that I know of. |
| 24 | Q. Okay. So let's talk briefly about those articles |
| 25 | starting at the top here. There's an article, |

Page 148

37 (Pages 145 to 148)

Salter, Anna C.
5/30/2023

1  Confessions of a whistleblower: Lessons learned, in
2  the journal Ethics and Behavior.
3         My understanding is that article is about
4  your experience being subject to ethical charges and
5  lawsuits; is that right?
6  A.  Well, by one person, not subject to anybody else.  But
7  this one person did sue me for writing -- or for a
8  variety of things, being in a film in Australia that
9  debunked his work, writing a monograph that debunked
10  his work.
11         He set me up with a phony phone call.  A
12  woman calls my home, asked for my help in a legal
13  case, asked me who he was, and I said he's a hired
14  gun.  And he sued me with that and tried to take on
15  ethics charges based on a phony phone call.  So it was
16  about my experience with Ralph Underwager.
17  Eventually, all of it was thrown out.  The legal suit
18  was thrown out.  The ethics charges were thrown out.
19  Q.  Was that article peer reviewed?
20  A.  Yeah, I think so because it was in a journal, Ethics
21  and Behaviors.
22  Q.  But do you recall whether it was.  Do you know for
23  sure that it was peer reviewed, or you just assume it
24  was?
25  A.  I assume it was.  I don't remember 'cause it's been a

Page 149

1  long time ago.
2  Q.  Okay.  So then let's look at the next article.  This
3  actually should not be highlighted 'cause that's --
4  A.  No, that's the training on that.
5  Q.  Yeah.  That should not be highlighted.
6         Okay.  So the next one I had -- actually,
7  maybe there's only four articles.
8  A.  There may be.
9  Q.  All right.  So I believe there's only four.  The next
10  one is Response to the "Abuse of the child sexual
11  abuse accommodation syndrome" in the Journal of Child
12  Sexual Abuse.
13         Do you know whether that article was peer
14  reviewed?
15  A.  Again, that's a journal that would have done peer
16  review.  I don't remember any specific feedback on my
17  article, but I assume all the journals do peer review.
18  Q.  Okay.  But you're not certain?
19  A.  No, I don't remember.
20  Q.  Okay.  And that was published in '92, correct?
21  A.  Yes.
22  Q.  And then you have an article on Treating Abusive
23  Parents in Child Welfare from 1985, correct?
24  A.  Yes.
25  Q.  And, again, you don't know whether or not that was

Page 150

1  peer reviewed?
2  A.  Again, I assume any article in a reputable journal --
3  and these are all reputable -- as peer reviewed.
4  Q.  Okay.  And then you have an article from 1985, Working
5  with Abused Preschoolers:  A Guide for Caretakers, in
6  Child Welfare, correct?
7  A.  Yes.
8  Q.  Okay.  And, again, you assume it was peer reviewed,
9  but you don't really know?
10  A.  Yes.
11  Q.  Okay.  So we have a total of four articles published
12  between 1985 and 1998, correct?
13  A.  Yes.
14  Q.  Okay.  So the most recent published journal article
15  you have is from 1998, right?
16  A.  Probably, yes.
17  Q.  I was reading your book, Predators.  It's written in
18  the first person; is that right?
19  A.  Well, some of it is.
20  Q.  And it describes your personal experiences?
21  A.  Well, some of it does.  It also talks about sadists
22  and psychopaths based on interviews I have done with
23  them and transcripts.
24  Q.  Okay.  And it talks about your views on people who
25  commit sex offenses, correct?

Page 151

1  A.  Well, you have to be more specific.
2  Q.  Well, you share your opinions in that book, right?
3  A.  The book is based on data.  It's based on transcripts.
4  I try to illustrate how offenders think by using their
5  own words.  And sometimes for some topics like
6  epidemiology, I go to the research literature as well.
7  But a lot of it is based -- I'm a clinician.  A lot of
8  it is based on clinical interviews with offenders that
9  I typed while I was doing them.
10  Q.  So when you say the book is based on data, what you
11  mean is that the book is based on clinical
12  experiences, interviews that you've done, correct?
13  A.  It certainly includes those.  There are chapters that
14  include a summary of the research.  I think the
15  epidemiology chapter probably only has research in it.
16  Q.  Okay.
17  A.  But, yes, it certainly includes transcripts of
18  interviews with offenders.
19  Q.  Okay.  You didn't do any research studies from writing
20  Predators, correct?
21  A.  I'm not a researcher.  Now, I think Predators does
22  include one informal study I did in Wisconsin, staff
23  predators where I interviewed a series of offenders
24  who had seduced multiple staff members.  But mostly, I
25  review the research.  It's not based on a study that I

Page 152

38 (Pages 149 to 152)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 | did. |
| 2 | Q. So you review other people's research. You don't do |
| 3 | your own research, correct? |
| 4 | A. That's correct. I'm not a researcher. |
| 5 | Q. You don't do quantitative analysis, correct? |
| 6 | A. Well, not for a very long time, no. |
| 7 | Q. There's a couple of things that struck me reading your |
| 8 | book, and I just wanted to read back some pieces from |
| 9 | that. |
| 10 | On page 7, you said, quote, "I want to learn |
| 11 | more about sadists, so that I can become better at |
| 12 | evaluating them and testifying against them." End |
| 13 | quote. |
| 14 | Do you still agree with that statement? |
| 15 | A. Well, I can't remember testifying for a sadist. If I |
| 16 | stipulate to a sadist being released, I don't testify, |
| 17 | so if I'm testifying, it is against -- if I'm |
| 18 | testifying about a sadist, it's against them. |
| 19 | Q. So is that broadly true of people with sex offenses? |
| 20 | When you're testifying, you're testifying |
| 21 | against them? |
| 22 | A. Yes, because of the job I have. If I stipulate to the |
| 23 | TRPR release, then I am not called to testify. |
| 24 | Q. You haven't testified on behalf of persons who |
| 25 | committed a sex offense, correct? |

Page 153

| | |
|---|---|
| 1 | A. Well, I can't because in the present job I have or in |
| 2 | the job I had before this doing initial evaluations. |
| 3 | For example, the 50 percent of offenders that I said |
| 4 | did not meet criteria are released. It doesn't go |
| 5 | forward to a trial. |
| 6 | Q. You said 50 percent of offenders who don't meet |
| 7 | criteria. In what context was that? |
| 8 | A. That was when I was working for Iowa doing initial |
| 9 | sexual SVP evaluations, not the reoffending |
| 10 | evaluations, the initial ones. And I believe -- I |
| 11 | think I have it somewhere, that I had about a |
| 12 | 51 percent rate of finding that the people did not |
| 13 | meet criteria, so the case ended. So I found more |
| 14 | often for the defense than for the prosecution, but |
| 15 | that gets twisted in court when people say, "Oh, so |
| 16 | you didn't testify for offenders. Did you?" I didn't |
| 17 | testify because they were released, and there wasn't a |
| 18 | trial. |
| 19 | Q. So let me ask about that. How did you track the |
| 20 | number of cases you were testifying for -- excuse me. |
| 21 | How did you track the number of cases in |
| 22 | which you didn't find that the person didn't meet |
| 23 | criteria for commitment? |
| 24 | A. I don't know if I still have it after the crash, but |
| 25 | that's the one thing I kept a list of, was when I was |

Page 154

| | |
|---|---|
| 1 | doing the initial SVP evaluations. And the reason I |
| 2 | kept a list is because I would be asked what my |
| 3 | percentage was in terms of finding that they met |
| 4 | criteria or finding that they didn't. So I had an |
| 5 | active need for it in court. |
| 6 | Q. Who was referred for screening for evaluation for an |
| 7 | SVP? |
| 8 | A. Who? |
| 9 | Q. Yes. How does that work? |
| 10 | Who got sent for evaluation in the first |
| 11 | place? |
| 12 | A. Well, DOC made -- the Iowa DOC made the first cut in |
| 13 | that they took a group of people that they thought |
| 14 | were high risk to reoffend. Typically, they were |
| 15 | people who failed treatment or wouldn't go to |
| 16 | treatment or something like that. And I think they |
| 17 | almost always had multiple offenses. |
| 18 | There might have been one or two cases where |
| 19 | the initial offense was so egregious, that they were |
| 20 | reported. That they were sent for an evaluation, and |
| 21 | then a clinician was assigned -- I was not the only |
| 22 | person doing these -- to evaluate whether that case |
| 23 | should go forward or not. That's the point where I |
| 24 | rejected over 50 percent of them. |
| 25 | Q. Okay. So we don't really have a good sense, then, of |

Page 155

| | |
|---|---|
| 1 | who was being retained in the first place, right? |
| 2 | These are people that DOC staff was sending |
| 3 | your way, right? |
| 4 | A. Well, we have a sense that they were trying their best |
| 5 | to follow the law which said did the person have a |
| 6 | diagnosis that predisposed them to sexual abuse, and |
| 7 | were they more likely than not to reoffend. They |
| 8 | often had in-house people who did an evaluation, and |
| 9 | based on that -- I don't remember what percent of the |
| 10 | sex offenders they sent forward, but it was certainly |
| 11 | no more than 8 percent of those. And I cut that down |
| 12 | to the top 4 percent based on my evaluation. |
| 13 | Q. And then for the annual evaluations, I believe you |
| 14 | testified earlier that you can't recall how many of |
| 15 | those individuals you found qualified for release, |
| 16 | correct? |
| 17 | A. That's correct. And you have to remember -- are you |
| 18 | just saying discharge or transitional release? |
| 19 | Q. I'm talking about discharge. |
| 20 | A. Discharge, well, they have to be in the transitional |
| 21 | release program before I will consider them for |
| 22 | discharge because I don't believe in throwing |
| 23 | offenders, many of whom have been institutionalized, |
| 24 | out with no support. So in the transitional release |
| 25 | program, I don't know how many we have in today, but |

Page 156

39 (Pages 153 to 156)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 it's often like only 14 people in that program. | 1 program. |
| 2 Q. So how many people have you recommended for | 2 Q. When is the last time you recommended someone for |
| 3 transitional release? | 3 transitioning to a lower level of security? |
| 4 A. Well, it's the same question. I don't know exactly | 4 A. Oh, I don't know. Certainly, in the last couple of |
| 5 how many I recommended, but the law in Iowa requires | 5 years, I have, but I don't know specifically. |
| 6 that they have completed an RPP, Relax Prevention | 6 Q. When's the last time you recommended someone for |
| 7 Plan, that has been approved by the treatment team. | 7 relief? |
| 8 That means the only ones who are eligible are in Phase | 8 A. I think you asked me that earlier, and I told you I |
| 9 4 because -- | 9 didn't know. I don't keep a list. |
| 10 Q. Dr. Salter, you're not answering the question that I'm | 10 Q. Going back to your book, Predators, on page 16 you |
| 11 asking. I'm asking -- well, did you keep a list of | 11 write, quote, "In our system of justice, lawyers are |
| 12 the number of cases where you're doing annual | 12 for sale." End quote. |
| 13 evaluations where you recommended that the person step | 13 Do you believe that? Do you still agree |
| 14 down and enter transition? | 14 with that statement? |
| 15 A. No. | 15 A. Absolutely. The more money you have, the more lawyers |
| 16 Q. Did you keep a list of the number of cases where you | 16 you can hire. |
| 17 recommended the person be released? | 17 Q. Page 25 and 26 of your book you write that "even when |
| 18 A. No. | 18 people are warned that someone has a past sex offense, |
| 19 Q. So you don't know how many people you've recommended | 19 while they still routinely understate the pathology |
| 20 for transition, correct? | 20 which they're dealing, niceness and likability |
| 21 A. That's correct. I was explaining to you that the pool | 21 override a track record of child molestation any day |
| 22 of candidates is not the entire 138. It's only the | 22 of the week." End quote. |
| 23 people who have an approved relapse plan in Phase 4. | 23 Do you still agree with that statement? |
| 24 The number is gonna be relatively small because I'm | 24 A. Absolutely. Likability will override other things. |
| 25 not allowed to consider all of the offenders in the | 25 Q. Okay. In Chapter 11, that's the chapter in which you |
| Page 157 | Page 158 |

| | |
|---|---|
| 1 describe what people can do to protect themselves and | 1 parent present? |
| 2 their children from sexual abuse, correct? | 2 A. I think you should be -- when they're young. |
| 3 A. Well, I don't remember the chapter number, but I'll | 3 Obviously, this is not gonna work for teenagers, but I |
| 4 take your word for it. | 4 encourage parents to be involved in their children's |
| 5 Q. And you provide guidance to people what practical | 5 activities. They tend to think that strangers are the |
| 6 steps they can take to be safe, correct? | 6 issue, and they aren't the issue. They tend to |
| 7 A. Yes. | 7 blankly trust people in certain roles, and they |
| 8 Q. And steps that they can take to protect their kids, | 8 shouldn't. Yes, that's my recommendation. Parents |
| 9 right? | 9 should get involved in their kid's activities. |
| 10 A. Yes. | 10 Q. You recommend against allowing children to go to |
| 11 Q. So you make a number of recommendations there, and let | 11 overnight camp, correct? |
| 12 me just list some of them. You describe on page | 12 A. Well, I tell them that it's a high-risk situation, and |
| 13 224 -- you describe dropping off your kids at little | 13 it is. |
| 14 league and watching another mom drop off her kids, and | 14 Q. And you recommend monitoring your children's internet |
| 15 you are appalled. You wrote, quote: | 15 use, correct? |
| 16 "Is she really going to do it, I | 16 A. Oh, especially in their 11 to 14-year-old range. |
| 17 thought, dropping a nine-year-old off for his | 17 Q. You recommend not putting pictures of your children on |
| 18 first day in the first year of little league? | 18 your desk at work, correct? |
| 19 Yes. She was going to do it, and she did." | 19 A. Yes, I do. If you deal with the public, that is. |
| 20 End quote. | 20 Q. You recommend keeping a cell phone in your room at |
| 21 So one of your recommendations is to always be present | 21 night, correct? |
| 22 for your child's sport's practices or other events, | 22 A. Yes. |
| 23 correct? | 23 Q. You recommend getting a dog, and you say that, quote, |
| 24 A. Yes. Get involved. | 24 "a poodle works just fine," correct? |
| 25 Q. You shouldn't let your child go to sports without a | 25 A. Yes. A poodle probably would. |
| Page 159 | Page 160 |

40 (Pages 157 to 160)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1 Q. So in describing -- we talked about some of the | 1 attend ongoing classes by -- as I said, I have |
| 2 different recommendations you make in Chapter 11 about | 2 attended Karl Hanson and Helmus, Thornton, and -- I |
| 3 the steps we can take to protect ourselves and our | 3 blanked on his name, the psychopathy guy. Harris. |
| 4 kids. | 4 Q. So it's fair to say that -- I mean, you're a |
| 5 You didn't include anything about the sex | 5 clinician. |
| 6 offender registry, correct? | 6 You're not a researcher, correct? |
| 7 A. No, I didn't. | 7 A. Yes. |
| 8 Q. Okay, thank you. | 8 Q. And you don't have training in -- I mean, you don't do |
| 9 Do you have training in statistics? | 9 your own statistical analysis. You don't do your own |
| 10 A. I did it at Harvard, but I am not a statistician and | 10 research. You don't do your own quantitative data |
| 11 do not pretend to be one. | 11 analysis, anything like that, right? |
| 12 Q. Okay. Do you have training in empirical research? | 12 A. Correct. |
| 13 A. Again, I did at Harvard, but as I've explained, I am a | 13 Q. And you haven't done empirical work in one of these |
| 14 clinician. | 14 datasets involving people with sex offenses, correct? |
| 15 Q. Right. So that would have been back in the 1970's is | 15 A. That's correct. |
| 16 the last time that you had training in statistical or | 16 Q. You haven't received any training to do empirical |
| 17 empirical work? | 17 research? |
| 18 A. Well, you know, I attended the trainings by Hanson and | 18 A. Well, yeah, I did when I was at Dartmouth, but I |
| 19 Thornton and others, and they certainly discuss the | 19 haven't done -- with Steve Caris, but I haven't done |
| 20 statistical basis of the Static-99R. But in terms of | 20 it since then. |
| 21 formal classes outside of at ongoing continual | 21 Q. And you haven't published any data based research |
| 22 education, I got the formal stuff back when I was in | 22 studies? |
| 23 school. | 23 A. Well, again, Predators, I did have a chapter on |
| 24 Q. And do you have training in research methodology? | 24 research that I had done on staff predators, but that |
| 25 A. Again, I took training when I was in school, and I | 25 was it. |
| Page 161 | Page 162 |
| 1 Q. But that was -- you said that was an informal study, | 1 testimony by a court? |
| 2 right? | 2 A. Well, it's the same thing; I suppose. I said I was |
| 3 A. Well, yes. And it was just basically frequency data | 3 excluded from giving testimony on cults by a Wisconsin |
| 4 rather than, you know, anything more complicated | 4 court. There was a court in Minnesota that didn't |
| 5 statistically. | 5 allow me to testify, but I don't think it was based on |
| 6 Q. Okay. The report you've written cites the work of | 6 expert qualifications. It was a topic, so |
| 7 various scholars, but it doesn't cite any work that | 7 far as I know, that they wanted me to testify on. |
| 8 you yourself have published, correct? | 8 Q. What was that about? |
| 9 A. As I said, I'm a clinician not a researcher. | 9 A. It was so many years ago, I don't remember. But the |
| 10 Q. Let's talk a little bit about the sex offender | 10 judge wouldn't allow the topic, and I -- that's |
| 11 registry. You said before you're not an expert on the | 11 happened before. There's a judge in Wisconsin that |
| 12 sex offender registry, correct? | 12 wouldn't allow anyone to testify on interviewing. The |
| 13 A. That's correct. | 13 training, the child advocacy center advocates go |
| 14 Q. You've not done any empirical work on sex offender | 14 through to avoid suggestibility, so I remember -- I |
| 15 registration? | 15 mean, there have been topics that the court wouldn't |
| 16 A. No. | 16 allow because they were prejudicial, but they have |
| 17 Q. You've not written articles or books about sex | 17 allowed me to testify on other topics, generally. |
| 18 offender registration? | 18 Q. Have you ever -- has a court ever found you not to be |
| 19 A. And I'm not testifying on sex offender registration. | 19 credible? |
| 20 Q. I believe you testified earlier that you've always | 20 A. Oh, there have been. Out of 200 cases, I am aware of |
| 21 been qualified as an expert. That there's not been a | 21 two to three judges that have written negative |
| 22 situation where you've not been qualified as an expert | 22 comments about my testimony, but that's not really |
| 23 when you've been offered as one. Is that accurate? | 23 including -- and there had certainly been a couple of |
| 24 A. As far as I know. | 24 SVP judges who didn't agree with me. But it's, you |
| 25 Q. Okay. Have you ever been excluded from giving | 25 know, as far as I can figure out, the ones who have |
| Page 163 | Page 164 |

41 (Pages 161 to 164)

Salter, Anna C.
5/30/2023

1  actually criticized me and said I wasn't credible is 1
2  to 2 percent of the cases I've been involved in.
3  Q. You mentioned two to three judges who have written
4     negative comments on your testimony.
5        Can you tell me who those are, what cases
6     those were?
7  A. Well, no, probably not. I remember the criticism more
8     than where they were. But there was a case on the
9     east coast where all the records were sealed. It was
10    a child sexual abuse case, and I was testifying that
11    the -- the type of interview that was done, that one
12    was suggestive and the other was not. And the
13    particular judge was very angry at the mother, and
14    criticized and found not credible every expert for the
15    child. And I was among them. I remember that. I
16    don't remember. I don't remember what state. I don't
17    remember what state that was. Maybe Rhode Island, but
18    it was definitely on the east coast.
19 Q. Are there other courts that have criticized your
20    testimony?
21 A. Yes, there was. I don't remember where this was, but
22    there was a judge in an SVP case who said that -- I
23    talked about an offender. He did a number of rapes.
24    But one of them he attacked a seven-month pregnant
25    woman on a bicycle path, and it was interrupted by an

Page 165

1  observer.
2        And I called it -- I was talking about his
3     motivations, and I called it an assault. And the
4     judge criticized me because the assault -- because the
5     bystander had interrupted it. So he hadn't gotten to
6     assault the woman, but he was trying to. And that
7     same judge criticized me because I didn't believe the
8     offender.
9        He had met a woman in a bar. According to
10    her, she didn't know him, and then he had tried -- he
11    had raped her. He talked her into going outside, and
12    then he raped her. And she said she didn't know him.
13    The guy claimed that she was his girlfriend, and it
14    was just a misunderstanding. And I called it a
15    stranger rape. And this was in the --
16 Q. What case is this in? It's not helpful to me unless I
17    know the names of the cases.
18 A. I can look for that. I don't know.
19 Q. Well, let's -- are there any other cases where you
20    remember the name of a court where you were
21    criticized?
22 A. I don't remember the name of the court. I think at
23    least -- I am sure that one judge in Wisconsin must
24    have criticized me at some point.
25 Q. So it's fair to say that some judges have criticized

Page 166

1  your testimony?
2  A. Oh, sure. To the best of my knowledge about 2
3     percent, and I'm not gonna do any better than that if
4     I live to be 100.
5  Q. So let's look at one of those cases. This is -- let
6     me share my screen here.
7        Do you recall testifying in the case of
8     United States v. Graham in the United States District
9     Court the District of Massachusetts?
10 A. That's the one I was talking about where he accused me
11    of calling it an assault when it was interrupted, and
12    he accused me of not -- eventually, not believing the
13    offender.
14 Q. So let's look here of what the court says about you.
15    The court says --
16 A. That's what I just said.
17 Q. Right. I understand. I'm just wanting to review what
18    the court's findings were about you. So on page 10
19    here says, after weighing both your testimony and the
20    content of the report, "this court finds that
21    Dr. Salter was not a credible witness." Correct?
22 A. Yes.
23 Q. And then the court goes on to say, "First, it is worth
24    noting that Dr. Salter's report and testimony contain
25    a number of factual inaccuracies, many insignificant

Page 167

1  and some significant," correct?
2  A. Yes.
3  Q. And then the court goes on to say that:
4        "It is difficult to make a determining
5     ultimate significance, if any, of each mistake
6     or ignored facts on Dr. Salter's final
7     diagnosis. Viewed in totality, however, the
8     court discerned a definite bias in her overall
9     analysis. This troubling bias detracted from
10    her credibility as a witness for the
11    Government."
12    Correct?
13 A. Yes.
14 Q. And the court further finds that you had a previous
15    position to a particular diagnosis. That your
16    findings were against the weight of the evidence in
17    the record, and that you appeared unwilling to credit
18    evidence weighing against the diagnosis you made.
19    Correct?
20 A. Yes.
21 Q. So those were the criticisms the court had of you in
22    that particular case?
23 A. Yes. That's correct.
24 Q. Let's look at another one. Can you see this? This is
25    Supreme (sic) Court of New Jersey?

Page 168

42 (Pages 165 to 168)

Salter, Anna C.
5/30/2023

| | |
|---|---|
| 1      MS. AUKERMAN: I'm sorry that last one was | 1   Q. And court quote -- the court found you were, quote, |
| 2   Exhibit 13, and this is now Exhibit 14. | 2      "clearly not credible," end quote, in attempting to |
| 3        (Plaintiffs' Exhibit Nos. 13 and 14 were | 3      defend the interviewing technique used, correct? |
| 4      marked.) | 4   A. Yes.  And they were -- and I still stand by that |
| 5   BY MS. AUKERMAN: | 5      testimony. |
| 6   Q. This is an unpublished case out of the Superior Court | 6   Q. Okay.  Then here's another one.  This is -- I'll make |
| 7      of New Jersey, K.M. v. S.M.M. | 7      this Exhibit 15. |
| 8        Do you recall testifying in this case? | 8        (Plaintiffs' Exhibit No. 15 was marked.) |
| 9   A. Actually, I don't.  But, I mean, assuming I do, if I | 9   BY MS. AUKERMAN: |
| 10     was -- obviously, I must have, but I don't remember | 10  Q. This is State v. Tjernagel from the Iowa Court of |
| 11     this case. | 11     Appeals, 2017. |
| 12  Q. Okay. | 12  A. Sure. |
| 13  A. I don't know if this was the one I talked about or | 13  Q. And this appears to be an appeal reversing a |
| 14     not. | 14     conviction for a sexual offense, and you testified in |
| 15  Q. This may be the one.  It sounds similar to like the | 15     that case in that trial court, correct? |
| 16     one you were describing before. | 16  A. Yes, I did. |
| 17  A. Yes. | 17  Q. And on page 4 here -- I think I already said this, but |
| 18  Q. This has to do with testimony regarding the mother had | 18     this is Exhibit 15. |
| 19     made sexual abuse allegations against the father, and | 19       On page 4 here the court says that you |
| 20     that's the one with the ruling of the trial court? | 20     impermissibly vouched for the credibility of the child |
| 21  A. Yes.  That's the one I was talking about. | 21     victim, correct? |
| 22  Q. And here, you were testifying about interviewing | 22  A. Yes.  That was the court's complaint. |
| 23     techniques of the person who interviewed the children, | 23  Q. And the court found that your statements went too far |
| 24     correct? | 24     when you implied that the child was telling the truth |
| 25  A. Yes. | 25     about the alleged abuse, correct? |
| **Page 169** | **Page 170** |
| 1   A. Yes.  Although, I can't remember.  You know, I can't | 1   A. Yeah.  And I actually think that they were right about |
| 2      remember how it was they thought that I implied that | 2      that. |
| 3      the child was credible, but they did find that. | 3   Q. I mean, you've done a lot of these hearings, but you |
| 4   Q. Okay.  Let's look at another one here. | 4      made a mistake about who has the burden of proof, |
| 5        MS. AUKERMAN: Make this Exhibit 16. | 5      correct? |
| 6        (Plaintiffs' Exhibit No. 16 was marked.) | 6   A. In this case. |
| 7   BY MS. AUKERMAN: | 7   Q. Okay.  Moving on to page 15 of this report, you relied |
| 8   Q. This is a recent decision, In Re The Detention of | 8      a lot on polygraph examinations including one here, |
| 9      Stewart Schuman in the Iowa District Court For Story | 9      and the court discussed the problems with reliance on |
| 10     County, correct? | 10     polygraphs and finds, quote: |
| 11  A. Yes. | 11       "...this court gives no weight to the |
| 12  Q. August 2022, Exhibit 16.  And you prepared a report | 12       polygraph results.  To the extent that |
| 13     and testified in this case, correct? | 13       Dr. Salter's conclusions and CCUSO's actions |
| 14  A. Yes.  This was one of the re-evals. | 14       rely on those results, those conclusions and |
| 15  Q. And the court found that you had misinterpreted | 15       actions are not supported in this record." |
| 16     statements by the petitioner.  On page 7 it says, "The | 16     Correct? |
| 17     court finds that Dr. Salter's analysis of the two | 17  A. Yes.  That's correct.  The polygraph is part of the |
| 18     points makes too much of too little.  Her conclusion | 18     treatment program.  The program does give some weight |
| 19     that he was deceptive on these occasions is not | 19     to it.  And I reported the polygraph results, and I |
| 20     entitled to any weight." | 20     did give some weight to them. |
| 21       Correct, that's what the court found? | 21  Q. Okay.  And the court rejected your reliance on |
| 22  A. That's true. | 22     polygraphs, correct? |
| 23  Q. Okay.  And then on page 8, the court finds that you | 23  A. And on the plethysmograph, the court did.  The court |
| 24     applied the wrong legal standard by putting the burden | 24     threw out most of the records. |
| 25     on Mr. Schuman, correct? | 25  Q. Going on to page 18, there the court discusses that |
| **Page 171** | **Page 172** |

43  (Pages 169 to 172)

Salter, Anna C.
5/30/2023

---

**Page 173**

1   you declined to consider the Static-99 score in
2   assessing Mr. Schuman, and one of the reasons that you
3   gave is that the Static-99 measures recidivism and not
4   reoffending, correct?
5   A. Well, I think the main reason I gave -- yes. I did
6   give that reason, but also that it was insensitive to
7   treatment.
8   Q. Okay. And then on page 19, the court noted that
9   recidivism as a proxy for reoffending was part of the
10  initial decision to commit Mr. Schuman and to at least
11  as valid to consider it now.
12      So the court rejected in Schuman the
13  argument that you're making here about not using the
14  Static-99 or not considering the Static-99, correct?
15  A. That's true.
16  Q. Okay. And on page 20 on whether Mr. Schuman had a
17  mental abnormality, the court stated that it was not
18  convinced that your judgment on that topic are sound,
19  correct?
20  A. Wait a minute. I'm looking for that.
21  Q. It's the very bottom line here that I've got the
22  cursor on.
23  A. Yeah, he didn't agree with me. He thought that
24  Schuman had reduced his mental abnormality.
25  Q. Okay. And finally on page 22, the court found that

---

**Page 174**

1   your evaluation was based on information that the
2   court does not find it is reliable, correct?
3   A. Right. The court didn't -- wouldn't admit any of the
4   polygraph or the plethysmograph or the Abel screen
5   information.
6   Q. Okay. Give me just a minute. So just to go back
7   quickly to the evaluations that you've done. You
8   don't recall what -- you don't recall what your income
9   is for expert testimony, correct?
10  A. Well, not testimony outside the civil commitment
11  arena. I have records on the Iowa contract.
12      MS. AUKERMAN: Okay. I think that I don't
13  have any further questions.
14      Eric, do you have questions?
15      MR. JAMISON: Yeah. I just had a couple
16  that I think will be really quick.
17      EXAMINATION
18  BY MR. JAMISON:
19  Q. First, at some point we were talking about Dr. Hanson
20  and Dr. -- "Letourneau," I believe is how it's
21  pronounced?
22  A. Yes.
23  Q. And you had talked about whether or not they're top
24  authorities in their field?
25  A. Yes.

---

**Page 175**

1   Q. I believe your answer was yes to both of those
2   questions.
3       In what field are they top authorities in?
4   A. Well, recidivism, recidivism of sex offenders,
5   particularly Static-99R.
6   Q. Okay. And is recidivism the same thing as
7   reoffending?
8   A. No. That's my complaint, is that the recidivism
9   figures don't take into account the fact that only a
10  small minority of offenses are actually reported. The
11  chances of getting convicted for a sexual event
12  compared to the amount of offending out there is about
13  1 to 2 percent.
14      My complaint, ironically given the questions
15  today, is bias. That there is a large movement today
16  to underestimate the risk that sex offenders pose, and
17  that data are getting distorted in service of what is
18  ultimately a political agenda. And that the
19  problem -- the reason this is an important issue to me
20  is because it orients policy away from reducing the
21  justice gap.
22      We need to find ways to make the court
23  experience easier for victims, so that more victims
24  will disclose. It is not acceptable to have a
25  15 percent disclosure rate of sexual offenses for

---

**Page 176**

1   children and adults. And by claiming that the figures
2   on Static-99 measure reoffending, they collapse as
3   justice gaps as though it doesn't exist. And it is in
4   the service of claiming that people are overreacting
5   to sex offenders, and that sex offenders are really
6   that dangerous, and they rarely reoffend, yada, yada,
7   yada. That's my concern.
8       My concern is that good researchers are
9   putting out things that they either know aren't true
10  or should know aren't true in the service of trying to
11  get rid of things like the registry or sexually
12  violent predator commitments itself.
13  Q. And you also -- throughout your course of your
14  deposition, we talked about, I think, in Iowa one of
15  the requirements for civil commitment is there's a
16  mental abnormality?
17  A. Yes.
18  Q. What is a mental abnormality?
19  A. Well, it's more than that. It's a mental abnormality
20  that predisposes them to commit sexual offending, and
21  generally, people go by DSM-V to determine what is and
22  isn't a mental abnormality.
23      Now, in Iowa -- and probably in every state
24  that has these laws -- has a theory it would apply
25  because it predisposes people to commit sexual

---

44 (Pages 173 to 176)

Salter, Anna C.
5/30/2023

| | | | |
|---|---|---|---|
| 1 | offenses. Sexual sadism would apply. Antisocial | 1 | STATE OF MICHIGAN ) |
| 2 | personality disorder is accepted in Iowa, but I've | | ) ss: |
| 3 | never seen a case where depression, for example, was | 2 | COUNTY OF OAKLAND ) |
| 4 | accepted. | 3 | |
| 5 | Psychosis is rarely accepted unless the | 4 | I, Sandra Apley, Certified Shorthand |
| 6 | person has, for example, hallucinations that tell them | 5 | Reporter, a Notary Public acting for the County of |
| 7 | to offend unless they can be specifically tied to | 6 | Oakland, State of Michigan, do hereby certify that the |
| 8 | offending. But most psychotic -- you know, a | 7 | testimony of ANNA C. SALTER, Ph.D., whose attached |
| 9 | diagnosis of schizophrenia wouldn't predispose them to | 8 | deposition consisting of 177 pages, was taken before |
| 10 | commit sexual offenses. So it has to be a diagnosis, | 9 | me in the above-entitled matter and was by me duly |
| 11 | but it has to be one that's tied to sexual offending. | 10 | sworn at the aforementioned time and place; that the |
| 12 | MR. JAMISON: All right. I think that's all | 11 | testimony was stenographically recorded in the |
| 13 | I have. Thank you. | 12 | presence of said witness and afterwards transcribed by |
| 14 | MS. AUKERMAN: We can go off the record. | 13 | computer under my personal supervision; and that the |
| 15 | (At 3:21 p.m., the deposition concluded.) | 14 | said deposition is a full, true, and correct |
| 16 | // | 15 | transcript of the testimony given by the witness. |
| 17 | // | 16 | I further certify that I am not connected by |
| 18 | | 17 | blood or marriage with any of the parties or their |
| 19 | | 18 | attorneys, and that I am not an employee of either of |
| 20 | | 19 | them, nor financially interested in the action. |
| 21 | | 20 | |
| 22 | | 21 | |
| 23 | | 22 | |
| 24 | | | Sandra Apley, CSR-8838 |
| 25 | | 23 | Notary Public |
| | | | Oakland County, Michigan |
| | | 24 | Signed: 06/12/2023 |
| | | | My commission expires: 06/08/2029 |
| | | 25 | |
| | Page 177 | | Page 178 |

Salter, Anna C.
5/30/2023

**A**

**A.L** 66:16
**a.m** 1:21 4:2
16:14,19 25:24
25:24 26:11,15
26:15 28:22
29:1,1
**Abbott** 129:2,12
**Abel** 174:4
**Abel's** 132:7,21
**ability** 7:8
**able** 21:19 79:24
**abnormalities**
103:24
**abnormality**
44:9 45:13
48:20 103:19
103:22 104:3
173:17,24
176:16,18,19
176:22
**abolish** 18:4,4
**above-entitled**
178:9
**Absolutely** 61:7
158:15,24
**abuse** 65:19,19
65:20,24,25
67:7,12 70:24
70:25 71:5
72:7,9 73:24
73:24 74:1,6,7
74:15 75:7,21
75:21,25 76:1
81:7,18 113:22
118:25 119:8
119:14,19
120:24 122:7
133:19,20
134:18 137:12
137:15 138:16
138:16 144:11
147:20,21
148:6 150:10

150:11,12
156:6 159:2
165:10 169:19
170:25
**abused** 63:1
64:25 151:5
**abusive** 35:24
67:1,11 124:10
150:22
**academic** 42:8
42:12 131:13
131:16 147:5,7
**acceptable**
175:24
**accepted** 21:9
21:25 148:12
177:2,4,5
**access** 82:3
**accident** 141:17
**accommodation**
150:11
**accompany**
117:7
**account** 97:16
175:9
**accountant**
77:25
**accounts** 79:5
**accuracy** 97:20
106:1,2,4
**accurate** 11:11
15:1 33:12,21
33:25 37:1,21
40:7 51:11
53:10 54:1
70:15 71:2
74:17 83:18
87:10 92:19
127:9,22 129:8
129:21 130:7
131:21 144:5
144:24 145:18
146:16 163:23
**accurately** 32:21

33:2,5 42:14
132:6
**accused** 167:10
167:12
**ACLU** 4:19
**act** 19:10,13,14
19:23,23 20:10
22:16
**acting** 1:19
66:25 178:5
**action** 178:19
**actions** 172:13
172:15
**active** 155:5
**activities** 160:5
160:9
**activity** 20:25
21:12,21 54:7
**acts** 22:12 44:12
48:21
**actuarial** 33:11
33:20,24 34:5
97:15,19 98:13
138:25
**add** 5:16 6:7
69:1
**adding** 93:19
**addition** 71:6
106:3
**additional** 98:20
99:3 109:7
**address** 29:6
39:7 103:6,7
106:9
**addressing** 15:2
105:5,16
**adequate** 12:19
**adjunct** 133:23
**adjust** 97:19
**administrative**
53:5,14 54:3,3
54:8 55:17
**administrators**
53:9

**admissions**
108:2
**admit** 174:3
**adolescences**
67:1
**adolescents**
30:25 139:1
**adult** 65:19
73:24 74:6
86:25 87:11
144:11,15
**adults** 120:21
135:23 176:1
**adversarial** 51:2
**advocacy** 164:13
**advocates**
164:13
**affect** 7:8 99:25
102:13 115:6
**affirmed** 4:13
30:18
**aforementioned**
178:10
**afraid** 121:20
**AG's** 69:18
**age** 21:4,6,15,23
22:3,6,8 85:11
**agenda** 175:18
**aging** 7:10
**ago** 36:13 37:17
38:13 51:18,20
60:16 62:17
71:13 76:11
142:24 144:9
146:1 150:1
164:9
**agree** 5:21 32:14
32:20 33:11,20
33:24 86:13
97:24 98:13,22
99:1,3,6
106:24 110:20
114:21 123:3
127:2 129:10

153:14 158:13
158:23 164:24
173:23
**agreed** 73:7
**agreeing** 15:18
**agreement** 4:9
**ahead** 33:19
61:4 78:8
91:14 114:8
138:9
**AIC** 3:16
**aimed** 145:4,5
146:14
**Alaska** 139:11
139:18 140:24
**Aldrich** 14:19
**all-day** 79:15
**allegations**
67:12 169:19
**alleged** 170:25
**allow** 164:5,10
164:12,16
**allowed** 16:8
95:9 157:25
164:17
**allowing** 160:10
**alternative**
127:7,20
**Alvin** 52:12
**Amazon** 143:24
144:14,18
145:15
**American** 2:2
81:16 126:16
**amount** 4:24
47:5,18,20
48:6,12 107:16
114:10 175:12
**Amy** 38:3
**analysis** 129:13
138:7 153:5
162:9,11 168:9
171:17
**Anchorage**

Salter, Anna C.
5/30/2023

139:11
and/or 45:22
  113:4
angels 141:15
angry 165:13
animals 7:4
Anna 1:17 3:3
  4:11 178:7
AnnaSalter.com
  141:20
Anne 14:20
annual 41:8,11
  41:14 45:16,19
  47:2 48:5,17
  48:23 49:3,9
  51:4,10,13
  76:20 77:3
  78:16 79:16
  116:1 156:13
  157:12
annuals 48:7
answer 4:25 5:6
  5:13,13,14 6:3
  6:10 7:9 11:15
  15:5,15 31:13
  33:3,18 49:7
  57:25 59:1
  73:23 91:7,8
  91:10,17 98:10
  100:16,19
  105:19 120:5
  175:1
answered 58:9
  120:12
answering 49:7
  91:11 121:5
  157:10
answers 5:21,25
anticipated
  145:6
antisocial
  138:22 140:10
  177:1
anxiety 135:23

anybody 106:5
  149:6
Anyway 139:17
  143:23 146:22
APA 3:15,21
  132:17
Apley 1:18 4:4
  178:4,22
apologize 34:24
appalled 159:15
apparently
  40:11 105:24
  132:13
appeal 170:13
Appeals 170:11
appear 33:4
  117:8
APPEARAN...
  2:1
appeared
  168:17
Appearing 2:6
  2:10
appears 32:8
  170:13
applicable 58:10
applied 171:24
applies 30:2,3
apply 123:13
  127:2 176:24
  177:1
approached
  12:5 74:13
  75:4
appropriate
  105:15
approved 157:7
  157:23
area 63:4 71:3
areas 70:23
  73:18 76:14
arena 174:11
argument
  124:13 173:13

arrangement
  57:3
arrest 90:18
  91:21
art 74:17
article 3:14,15
  3:16,21 97:1,2
  97:7,7,12
  98:17 130:20
  130:24 131:6
  148:25 149:3
  149:19 150:2
  150:13,17,22
  151:2,4,14
articles 81:12,21
  82:5,11 83:13
  83:23 147:9
  148:15,18,21
  148:24 150:7
  151:11 163:17
aside 72:19
  73:12 143:12
asked 5:15,17
  12:18,23 13:2
  13:6,11 15:3
  15:16,17 19:3
  24:7,8 49:21
  55:22 64:23
  70:10 73:9
  104:23 105:6
  106:9 114:25
  115:1,23 122:7
  149:12,13
  155:2 158:8
asking 5:4,19,22
  6:11 8:12 18:1
  31:8,9 32:25
  32:25 88:18
  89:1,11,22
  90:1,25,25
  92:8,8 98:10
  119:11 123:15
  157:11,11
asks 74:19

assault 63:12
  117:5,9 166:3
  166:4,6 167:11
assessed 39:24
  137:3
assessing 173:2
assessment 13:1
  33:12,20 34:8
  34:10 35:13,17
  36:10 72:8
  73:24,25 84:15
  90:4 92:1,3,11
  92:12,22 93:1
  93:13,24 94:7
  94:11 96:12,21
  98:19,21 99:2
  99:5 101:4,6,8
  101:20 102:17
  103:14 104:1
  105:23 106:6
assessments
  32:9 33:25
  34:1,6 84:9,12
  94:25 95:15
  98:13 100:10
  101:1 105:20
assigned 12:2
  48:9 56:22
  155:21
assignment
  12:14,17
assist 143:25
assistant 133:22
Association
  126:17
assume 5:6,8
  23:14 31:20
  62:12 64:9
  104:25 149:23
  149:25 150:17
  151:2,8
assuming 25:23
  30:23 132:14
  169:9

assumption 98:4
assumptions 9:1
ATSA 81:9,9,23
  81:25 82:2
attached 178:7
attacked 53:13
  53:13 165:24
attempting
  170:2
attend 162:1
attended 161:18
  162:2
attention 70:15
attorney 2:7
  4:19 5:12,17
  5:18 6:1,5 7:19
  46:11,15 51:7
attorneys 17:1
  18:7 49:24
  58:6,14,20
  59:2 71:12
  80:4,16,18
  94:3 138:4
  178:18
attracted 60:5
audience 43:12
  43:14 145:20
  146:16
August 171:12
Aukerman 2:3
  3:4 4:17,18
  9:19,25 11:14
  16:16,21 17:10
  17:19 26:3,4
  26:17 28:24
  29:3,8 33:17
  38:21 51:25
  52:5 61:12
  62:21,23 86:17
  86:21 89:5,7
  91:11,13 97:3
  97:6 100:12,15
  100:24 116:19
  126:22 130:23

133:9 169:1,5
170:9 171:5,7
174:12 177:14
**Austin** 140:23
140:25 141:4
141:14,16
**Australia** 149:8
**Australian**
131:1
**authorities**
82:21 83:7
119:13,15,16
119:20 174:24
175:3
**authors** 36:21
81:13 124:11
**automatically**
115:24
**available** 78:21
**average** 57:5
89:17 131:18
131:20 132:10
132:10,14
**avoid** 164:14
**awards** 143:3,5
**aware** 11:5,6
68:25 94:16,19
94:23 124:10
124:18 125:12
125:23,25
126:9,13,18
129:25 130:9
164:20

**B**

**B** 1:4 3:1,6 20:4
**B-o-r-k** 42:22
**B-o-u-r-k-e**
42:23,24
**back** 7:14 16:18
20:12 24:21
29:6 31:12
39:12,12 40:4
40:4 54:9

56:18 57:10
61:4,7,13
68:16 86:15,22
87:17 90:7,10
90:14 95:7
106:19 111:13
115:10 118:8
133:10 139:21
142:12 153:8
158:10 161:15
161:22 174:6
**background** 9:8
11:18 32:8
39:13 75:11
**backlog** 50:9
**backwards**
143:16
**badly** 87:8
**Baiser** 34:25
**Baldwin** 146:21
**ballpark** 48:25
**bar** 166:9
**Barbara** 14:20
**Barker** 52:21
**Barnes** 52:12
**base** 21:24
**based** 18:6 88:6
90:22 91:18
92:17 93:6,6
93:10,24 94:2
108:1,2 113:1
116:9 120:15
122:18,20
126:4 149:15
151:22 152:3,3
152:7,8,10,11
152:25 156:9
156:12 162:21
164:5,6 174:1
**basic** 4:21
112:21
**basically** 56:21
87:10 89:8
113:10 128:9

147:15 163:3
**basis** 10:12,22
92:24 161:20
**beating** 70:14
**beds** 44:22
**began** 70:7
**beginning** 57:6
**behalf** 1:5 2:6
2:10 153:24
**behavior** 56:1
69:20 81:15,15
149:2
**Behavioral**
138:7
**behaviors** 43:7
70:8 71:1
72:11,12 74:3
76:2 138:20
140:4,19
149:21
**belief** 122:16
**believe** 13:1
15:22 18:3,25
20:3 22:5 23:1
29:9 30:8,24
39:24 42:17
46:4 49:8,25
50:11 51:23
55:4 56:5
59:21 62:14
63:13 67:17
70:2 71:16
74:25 85:7
86:5 88:1 95:5
100:22 101:5
104:18 107:23
109:16 115:13
115:16 122:5
123:11,16
129:4,5 130:3
137:17 140:21
147:17 150:9
154:10 156:13
156:22 158:13

163:20 166:7
174:20 175:1
**believed** 119:1
121:21
**believing** 167:12
**belong** 81:11
**belongs** 104:12
**Bernardino** 64:4
**best** 75:18 88:6
110:2 156:4
167:2
**better** 12:1
126:25 153:11
167:3
**beyond** 101:7
105:25 109:7
**bias** 168:8,9
175:15
**bicycle** 165:25
**big** 79:9 99:11
99:16 100:5
**bigger** 38:22
126:25
**bill** 79:14,22
**billed** 57:4 79:19
130:21 163:10
**BJS** 3:14 116:4
116:7
**blanked** 162:3
**blanking** 13:15
146:20
**blankly** 160:7
**blood** 178:17
**blue** 143:16,21
143:22
**bluntly** 92:4
**book** 42:9,25
43:3,12 131:15
132:13 143:25
144:3,5,9,14
144:24 145:10

145:20 146:9
146:19 147:6
147:18,19,22
151:17 152:2,3
152:10,11
153:8 158:10
158:17
**books** 81:6,7
143:14,17
146:14,18
147:9,13 148:8
163:17
**bottom** 39:14
66:16 90:16
173:21
**Bourke** 42:19,20
124:7,21 125:4
125:8,19 126:1
126:2,11,13
129:6
**brain** 139:2
**break** 6:8 61:6
130:21 132:23
133:4,5
**brief** 135:12
**briefly** 42:12
148:3,24
**broad** 113:19
**broadly** 75:20
153:19
**broken** 78:5
**brought** 64:17
**buffering** 26:12
**bullet** 24:24
87:18 106:20
118:12
**burden** 171:24
172:4
**Bureau** 115:21
116:7,15 118:3
125:18
**business** 78:12
**bystander** 166:5

| C | | | | |
|---|---|---|---|---|
| **C** 1:4,17 3:1,3 4:11 178:7 | 65:3,6,9,11,22 66:20,23 67:5 67:8,15 69:3 71:15,18 74:12 79:19,21,23 83:1,12 85:20 85:21 86:11 87:25 92:21 93:7,9 110:22 111:3 127:3 149:13 154:13 155:22 165:8 165:10,22 166:16 167:7 168:22 169:6,8 169:11 170:15 171:13 172:6 177:3 | 157:12,16 164:20 165:2,5 166:17,19 167:5 | **certify** 178:6,16 **cetera** 30:16 43:11 74:24 77:9 81:4 88:4 124:6 | 34:20 35:24 36:9 65:19,24 70:11,12,24 72:7,9 73:23 74:6,15 75:21 75:25 81:18 121:20 124:10 124:13 130:25 131:7,8,13 133:19 134:4 134:12,18 138:15,16,23 139:2 140:10 143:19,23 144:11 146:24 147:20 148:6 150:10,11,23 151:6 158:21 159:25 164:13 165:10,15 170:20,24 171:3 |
| **California** 64:2 **call** 49:19 140:20 149:11 149:15 | | **cat** 67:4 **catch** 50:7 **category** 20:3,5 20:15 85:12 **caught** 25:1,5,10 25:11,12 27:4 31:1 50:6 91:23 98:7 109:18,20,22 110:1 | **chance** 90:19 91:22 **chances** 175:11 **change** 85:5,6 121:23 **changed** 39:7 **changes** 39:5 146:10,12 **changing** 77:13 77:15 | |
| **called** 4:12 63:2 121:2 134:4,14 134:18 142:2 153:23 166:2,3 166:14 | | | | |
| **calling** 167:11 **calls** 11:12 149:12 | | | | |
| **camp** 160:11 **Canada** 141:12 **candidates** 157:22 | **caseload** 134:5 **cases** 3:12 35:10 42:7 43:8 44:15 46:7 52:1,3,8,15,16 52:19,22,25 53:25 54:2 57:15,18,20 58:3,6,13 59:1 59:4,4,18,21 59:22 61:14,24 61:25 62:4,5 66:7,11 68:5,8 68:17,21 69:10 69:13,16,19,24 70:9,19,21,22 71:3,9,21 72:6 72:14,18,20,22 73:3 74:8,13 74:14 75:16,20 75:24 77:11,17 79:11 80:14,19 99:8,13,19 101:14,20,24 104:1 154:20 154:21 155:18 | **cause** 20:13 90:12 100:18 122:13 125:17 142:21 149:25 150:3 **CCUSO's** 172:13 **ceiling** 139:20 **cell** 160:20 **center** 57:21 164:13 **certain** 13:15 22:3 150:18 160:7 **certainly** 6:9 28:16 38:1 43:22 51:15,15 53:24 64:9 72:25 77:20 78:9,11,12,21 80:9 95:15,21 97:25 111:14 122:14 152:13 152:17 156:10 158:4 161:19 164:23 **certified** 1:18 4:5 36:14,15 37:12,14,19 38:6 178:4 | **chapter** 43:10 43:11 147:18 147:19,22 148:9 152:15 158:25,25 159:3 161:2 162:23 **chapters** 43:4,7 152:13 **characteristics** 49:20 118:9 **charge** 30:5 80:5 137:17 142:20 **charged** 25:1,5 25:11,11,12 87:2,6,13,14 113:4,4 137:19 137:20 **charges** 25:9 29:18 149:4,15 149:18 **charging** 142:13 **chart** 61:13 **check** 42:24 111:13 **Checklist** 35:5,6 36:14 **checks** 79:9 **child** 20:14,16 | |
| **Canton** 18:19 **capacities** 1:11 **care** 77:11,12 99:11 100:9,10 101:3 | | | | **child's** 159:22 **child-serving** 62:25 **children** 60:5 74:23 75:10 117:19 122:21 131:10,18 133:18,20 134:16 138:15 140:20 145:13 147:21 159:2 160:10,17 169:23 176:1 |
| **career** 84:10 **Caretakers** 151:5 **Caris** 135:2 162:19 | | | | |
| **carpet** 67:3 **case** 3:17,18,19 4:20 10:16 12:3,4,12,14 12:18 15:14,19 15:19,22 16:2 16:5,24,25 17:3,4,23 18:1 18:6,10,15 36:5 42:18 52:13 62:2,3,8 62:10,13,14,16 62:24 63:14,19 63:21 64:7,8 64:10,14,15,16 | | | | **children's** 160:4 160:14 **church** 70:13 **Circuit** 62:11,11 **circumstances** 101:19 **citation** 3:10 **cite** 10:11 97:2 97:10 98:16 |

Salter, Anna C.
5/30/2023

117:2 119:22
121:8 123:8
124:7 128:23
129:25 163:7
**cited** 28:4,13
82:18 83:4,10
92:9 111:9
129:18
**cites** 128:23
131:14 163:6
**civil** 2:2 9:22
10:5,10 39:21
40:24 41:5,17
43:18,20 44:18
44:21 46:5,7
51:8 58:22
60:25 61:24
62:5 64:7,7,9
64:14 66:5,7,8
66:12,20 68:3
68:5,21 69:10
72:14,18,19
73:3 74:8,10
74:12,12 75:13
75:16,20 76:4
85:23 95:22
102:5 174:10
176:15
**civilly** 43:25
44:3 45:6,7,16
46:2 48:18
103:8
**claimed** 166:13
**claiming** 87:19
88:10 176:1,4
**claims** 42:14
146:8
**clarification** 5:3
**clarify** 6:6,21
55:15
**classes** 161:21
162:1
**classification**
53:10,12 55:18

95:23,24 96:7
**classify** 93:14
**clear** 20:6 23:24
30:7,18 31:18
31:25 50:24
51:3 112:3
128:11
**clearly** 47:18
170:2
**clinic** 134:9
**clinical** 122:4
133:11 134:5
134:24 135:1,5
137:7,8 152:8
152:11
**clinically** 120:16
122:15 137:3
**clinician** 122:19
137:9 152:7
155:21 161:14
162:5 163:9
**clinicians** 34:1
57:18 137:5
139:14 144:19
145:4,5 146:15
146:17
**close** 49:8 133:2
**closed** 39:18
40:5 50:5
**closely** 108:18
**closer** 73:1,2
**closing** 77:12
**club** 22:20
**coaching** 140:19
**coast** 165:9,18
**coauthors** 42:16
97:13
**codirector**
134:16
**coercion** 21:5,6
21:9
**cognitive** 139:3
**COL** 1:10
**collapse** 176:2

**Colorado** 6:22
**combination**
96:12
**combined** 72:22
96:15 136:23
142:7,18
**combining**
94:17
**come** 61:7 69:2
83:23
**comes** 16:18
31:17 78:19
**coming** 60:2,2,3
**comment** 24:7,8
**commentary**
128:14
**comments**
164:22 165:4
**commission**
178:24
**commit** 22:12,15
23:21 45:6,7
45:11 48:21
103:20 104:5
107:6,10,22
108:4,14
151:25 173:10
176:20,25
177:10
**commitment**
39:22 40:21,25
41:5,17 43:18
43:20 44:18,21
46:5,7 51:8
61:1,24 62:5
64:14 66:5,7,8
66:12 68:5
72:19 75:13
76:5 85:16,23
95:22 154:23
174:10 176:15
**commitments**
27:3 102:6
176:12

**commits** 19:17
27:16
**committed**
16:12 19:10,13
20:9 26:21
27:7 43:25
44:4,23 45:16
46:2 48:18
87:1,4,6 103:8
107:19 109:2,7
109:8,13,24,25
113:2 114:17
121:3 123:19
124:3,5 153:25
**committing**
25:19,20 26:5
28:21 29:22
31:21 32:11
87:21 88:15
106:18 110:9
**common** 71:7
76:3 108:3
131:7,9 148:6
**commonly** 34:8
**communicating**
74:23
**communities**
142:5
**community**
51:24 57:21,22
58:1,2 59:3,19
103:10
**Como** 39:8
**compared**
175:12
**Compass** 96:14
96:15,16
**compel** 64:11
**compelled** 64:18
**compelling**
110:15
**competent** 21:20
**complaint** 17:15
17:18,20 18:3

18:8 170:22
175:8,14
**complete** 10:11
10:21
**completed** 157:6
**complicated**
163:4
**composition**
114:22 123:5,6
**comprehensive**
12:25 94:6
98:19 99:1
102:16 103:3
103:14 105:20
106:6
**computer** 6:24
69:7 141:17
178:13
**concentrated**
39:15 41:7
**concern** 94:6
176:7,8
**concerned** 30:16
30:25
**concerns** 65:16
110:22 111:3
**conclude** 92:24
110:13
**concluded**
177:15
**conclusion**
11:13 93:23
104:9 171:18
**conclusions**
117:24 172:13
172:14
**conditions** 30:1
**conducted**
137:11,11,15
**conference**
138:11
**Confessions**
149:1
**confined** 102:10

102:10
**confinement**
53:5,15 54:3,4
54:8 102:9
**confirm** 45:5
**confusing** 57:23
98:1
**Congregation**
62:8 63:3
**connected**
178:16
**connection**
16:23 26:11
**consensual**
21:18
**consensus** 89:16
**consent** 21:1,19
**consequences**
100:8
**consider** 19:20
22:23 23:10
99:10 156:21
157:25 173:1
173:11
**considered** 9:8
10:25 11:3,9
19:18 21:10
82:20 83:6
98:20 99:4
102:7
**considering**
173:14
**consistent**
123:25 130:16
132:17
**consisting** 178:8
**constitutes**
115:6
**consultant** 95:2
136:9,17
**consultation**
80:6 134:15,15
**consultations**
134:13

**consulted**
136:12 137:3
**consuming**
106:7
**contact** 66:12
**contacted** 7:20
17:1
**contain** 10:24
11:2,8 36:18
61:17 167:24
**contained** 10:17
**content** 167:20
**context** 30:7,18
31:23 60:25
102:22 103:4
112:8 124:14
154:7
**continual**
161:21
**continue** 16:8
42:3,6
**contract** 41:21
41:24 42:2
46:14,19,20,22
48:5,7 51:6
76:19 77:12,18
78:20,25
174:11
**contracts** 41:8
46:20
**contributed**
84:1
**control** 49:22
54:2,4 103:23
**controversy**
138:20 140:4
**conversations**
7:18 17:2 18:7
94:2
**convicted** 23:18
24:1 27:1 30:3
31:9 32:10,14
35:24 45:1
87:2,7,13,14

107:5,10
108:15,23
109:3,8,9
110:12 113:4
119:24 120:4
120:11 121:11
122:3,23
123:22 175:11
**conviction** 19:22
27:9,12,17,22
28:1,5,9,14
29:12,24 30:5
30:10,21 31:11
31:16,22 32:2
32:3,21 33:1,8
33:14,22 93:18
107:11,20,23
108:7,8 111:10
111:11,17,21
112:6,16
170:14
**conviction-ba...**
104:24 105:14
105:19
**convictions** 25:9
29:18 90:18
91:21 107:19
108:22 110:8,8
110:18 114:18
**convinced**
173:18
**copied** 62:18
**copies** 142:11
**copy** 8:15 17:14
17:17
**correct** 10:17,22
11:25 15:10,14
20:11,20,24
21:23 22:10,17
23:19,20,22
24:13 25:3,12
25:17,22 26:7
26:23 27:1,5
27:10,11,14,19

28:2,11 29:12
29:16,24 30:11
31:16 32:12,18
34:6 35:18,21
35:22,25 36:6
40:3,6,10 41:1
41:5,11,18
44:1,3,13,19
45:3,17 46:8
46:19 48:21
51:5 52:6,9,23
52:24 61:19,20
61:22 62:5
63:14,24 64:2
64:5 65:7
67:25 68:11,23
69:11 70:20
71:20 75:14,17
76:2,5,8,12,21
77:24 79:8
80:4 84:13
85:17 87:7,8
87:15,16 89:20
92:10 93:9,21
94:8,12,14,17
94:21 96:24
97:10 100:5
102:20,23
103:16,20
104:6 105:15
107:2,11 108:8
108:15,24
109:4,9,15
110:1 111:11
111:17,24
112:7 114:19
115:7 116:12
118:18,22
119:1,8 120:4
120:14,25
121:18,21
122:12,19,23
125:16 128:1,7
129:11 130:13

131:24 132:5
132:12,14
133:12,14,18
135:10,16
136:10,13
137:12 141:19
143:6,10 144:7
144:12 145:8
145:13 147:24
148:1 150:20
150:23 151:6
151:12,25
152:12,20
153:3,4,5,25
156:16,17
157:20,21
159:2,6,23
160:11,15,18
160:21,24
161:6 162:6,12
162:14,15
163:8,12,13
167:21 168:1
168:12,19,23
169:24 170:3
170:15,21,25
171:10,13,21
171:25 172:5
172:16,17,22
173:4,14,19
174:2,9 178:14
**correction** 104:8
**correctional**
61:1 96:22
**corrections**
38:11,14 39:20
53:6,16 54:5
54:12 55:9,17
56:3,4,16,16
56:21,24 58:1
58:2,12 59:5
59:15 79:4
94:24 95:3,4
95:12 96:20

136:10 138:3
139:13
**correctly** 58:10
75:12 129:23
146:13
**costs** 142:15
**counsel** 74:9
76:11 140:9
**count** 19:25 20:4
20:10,14 21:8
**counterintuitive**
43:7 69:20
70:8,25 72:11
72:12 74:3
76:1 138:20
140:3,19
**counties** 136:19
**counting** 68:7
**counts** 21:14
**county** 1:19 64:4
136:23 171:10
178:2,5,23
**couple** 40:9
58:13 134:23
136:3 140:1
153:7 158:4
164:23 174:15
**course** 15:15
21:16 51:12
56:15 82:2
114:24 176:13
**courses** 36:13
133:25 134:1
134:22
**court** 1:1 3:13
3:20 5:1,9 9:14
10:8 18:2 23:9
41:23 44:4
47:14,17,22,24
48:19 49:4,10
49:12,14,15,16
49:21 50:15,17
50:22,25,25
52:17 53:25

54:2 58:4
62:10,11 63:17
63:18,23,25
64:5 66:20
67:20,22,24,25
68:1,18,18,23
72:4 73:12,13
73:15 74:4
76:24,25 77:14
79:11 122:14
122:21 126:9
154:15 155:5
164:1,4,4,15
164:18 166:20
166:22 167:9
167:14,15,20
167:23 168:3,8
168:14,21,25
169:6,20 170:1
170:1,10,15,19
170:23 171:9
171:15,17,21
171:23 172:9
172:11,21,23
172:23,25
173:8,12,17,25
174:2,3 175:22
**court's** 167:18
170:22
**courts** 73:20,22
165:19
**cover** 81:19,19
82:10,10
**covered** 141:9
**COVID** 50:5
77:14
**CPORT** 34:17
34:18 36:5
**crash** 154:24
**create** 72:12
**credentials**
36:19
**credibility**
168:10 170:20

**credible** 164:19
165:1,14
167:21 170:2
171:3
**credit** 168:17
**crime** 24:1 112:5
114:1,10,12,12
114:14,17
115:5,6,22
116:5,16 118:5
119:24
**crimes** 23:19,21
107:1 117:10
117:25 121:15
124:5
**criminal** 25:16
25:17 26:7
27:23 48:19
58:22 64:10
68:3 69:13,16
69:19,24 70:19
70:21,22 71:3
71:9,15,18,21
72:5,22 75:24
76:7 80:14
81:14,24,24
107:5 108:14
112:19 113:8
120:20
**criminology**
82:3 131:2
**criteria** 44:18
47:14 154:4,7
154:13,23
155:4
**criticism** 128:11
130:18 165:7
**criticisms** 15:13
126:1,6 130:12
130:14 168:21
**criticize** 131:22
**criticized** 125:23
128:17 129:2
129:11,12,16

129:19 130:1,6
130:9,11 165:1
165:14,19
166:4,7,21,24
166:25
**criticizing**
128:24
**cross** 90:9
**CSOT** 140:25
**CSR-8838** 1:18
178:22
**cult** 73:13
**cults** 72:1 164:3
**current** 39:10
104:18,19
105:8,10
138:20 140:4
**currently** 84:15
84:17 104:16
105:6
**curriculum** 3:11
56:11 137:1
**cursor** 173:22
**Curtis** 1:8
**cut** 5:24 6:5,17
7:1 138:9
155:12 156:11
**CV** 38:18 39:3,5
39:9 40:4,10
40:24 45:24
46:4 54:14
68:2 133:10
135:9,11
137:11,14
139:6 141:1
143:1,4 146:3
147:18 148:15
148:19,22

___

**D**

**D** 1:4 3:6 93:16
**dangerous** 45:3
45:4,8 124:15
176:6

**Darrell** 42:17
**Dartmouth**
133:21 162:18
**data** 10:25 11:3
11:9 69:8
73:16 107:25
109:10 110:2
116:4,6,7,13
117:14 121:13
123:16 127:7
127:20 141:18
152:3,10
162:10,21
163:3 175:17
**datasets** 162:14
**dates** 115:10
136:6
**David** 36:24
38:1
**day** 79:15
137:18 158:21
159:18
**Dayja** 2:3
**days** 67:4 80:25
137:1
**deal** 34:13 43:13
84:1 99:11,17
100:5 119:19
160:19
**dealing** 122:10
158:20
**debunked**
128:17 149:9,9
**decade** 133:16
**decades** 60:17
60:18,22,24
**deception**
138:22 140:6
**deceptive**
171:19
**decide** 102:24
102:25 103:10
103:11
**decided** 30:9

Salter, Anna C.
5/30/2023

decision 49:18
50:1 74:20
171:8 173:10
decisions 53:10
53:12 95:23
96:3,4
declined 173:1
deeply 60:6
defend 170:3
defendant 64:10
65:2
defendant's
15:18
defendants 1:12
2:10 79:19,22
79:23 80:12,13
80:18
defendants'
13:21 18:20
80:16
defense 18:17
23:9 46:10,15
71:12 76:11
154:14
define 19:9
24:20,25 25:2
26:19 27:5
106:16 115:5
defined 25:19
defines 20:23
definite 168:8
definitely 28:4
115:1 118:7
165:18
definition 24:6
25:14 29:17
48:17 87:21
112:19
definitions 19:6
20:2,7 22:2
27:25 29:10
45:8
degrade 97:20
98:2,3

delayed 70:7,24
72:10 74:2
DeLisi 30:16
DeLisi's 31:6
DeMoss 52:21
department 2:7
38:11,14 53:6
54:4 55:9 56:2
56:24 59:20
79:4 94:23
95:2,4,12
96:20 118:4
134:1,2 136:9
depend 21:14,15
98:21 99:4
101:16
depends 20:3
21:4,23 31:23
45:4 99:8
112:8
deposed 63:19
deposition 1:16
4:6 7:12 8:5
18:24 65:4
67:17 111:13
118:8 176:14
177:15 178:8
178:14
depositions 4:22
62:18
depression
135:23 177:3
Des 140:14,18
140:24
describe 36:19
39:13 128:10
159:1,12,13
described 28:6
56:9 115:17
143:24
describes 30:1
151:20
describing 45:15
50:18 161:1

169:16
description 3:8
37:1 71:2
144:5,24
145:18
designed 56:11
143:25
desk 160:18
desktop 10:2
detail 139:25
details 47:24
detained 102:23
102:24 103:5
103:16
detected 19:11
23:22 25:15,16
25:21 26:6,22
27:13,16,23
30:15 87:22
88:16 107:2
108:13 110:23
111:4,5,20
112:2,5,20
113:3,7 131:10
detecting 138:22
140:6
detection 111:16
111:21
Detention 52:12
85:20 171:8
determination
63:24
determine 15:25
16:4,13 41:4
43:24 44:4,17
45:19,25 53:18
55:19 85:7
101:1 103:15
103:18 104:12
176:21
determined 45:3
45:10
determines 75:6
determining

95:21 102:22
103:4 168:4
detracted 168:9
development
70:11,12 139:2
144:2
diagnosed
103:21
diagnosis 156:6
168:7,15,18
177:9,10
differ 106:12
differed 57:8
difference 21:4
21:6,15 22:3,6
24:25 102:5,8
114:11
differences
117:8
different 15:2,7
29:20,20 41:2
46:20,21 49:10
55:23 73:17
81:1 85:13
102:13 109:19
110:17 117:23
117:24 118:10
125:19 139:21
144:20,22
161:2
differentiates
111:9
differently
23:16 60:24
102:14
differs 110:11
difficult 53:16
168:4
difficulties 29:4
directly 81:12
director 1:10
134:7,12
disabled 21:17
disaster 69:7

disavowed
124:11,18
125:12,16
discerned 168:8
discharge
156:18,19,20
156:22
disclose 132:11
132:12 175:24
disclosed 6:14
discloser 69:21
disclosure 70:7
70:24 72:10,10
74:2 76:1
113:16,20
138:15 175:25
disclosures
114:5 140:19
disconnected
16:15 25:25
28:23
discretion 97:18
98:2
discuss 7:23
89:19 97:13
161:19
discussed 6:17
6:18 7:18
172:9
discusses 88:19
97:12 112:21
131:7 144:3,18
172:25
discussing 112:4
discussion
112:14 124:1
125:8 131:22
discussions 80:3
86:1
disorder 177:2
Dispels 145:15
disregard 118:6
disruption
122:4

Salter, Anna C.
5/30/2023

distinguish
 31:10
distinguished
 107:24
distinguishes
 24:19
distort 128:5
 132:18,20
distorted 175:17
distortions
 139:3
distress 133:18
 133:19 134:19
distributed
 125:2
District 1:1,1
 66:20,21 167:8
 167:9 171:9
diverse 95:17
divided 47:4
DIVISION 1:2
DOC 155:12,12
 156:2
doctor 16:17
 54:23
document 14:13
documents 8:2
 9:8 17:8 18:13
DOE 1:4
dog 67:4 160:23
doing 6:20 41:3
 41:6,9,10,13
 41:16,20 44:15
 44:16 54:25
 55:25 82:12
 133:16 152:9
 154:2,8 155:1
 155:22 157:12
Dominique
 147:21
double 111:13
downloading
 125:3
Dr 4:18 8:16

10:1,14 13:17
 13:18,19,25
 14:2,7,8,25,25
 15:10,10,13,13
 16:22 18:19,19
 29:9 31:8
 82:15,23 83:9
 83:12,21 88:1
 88:9,10,13,25
 89:8,9 90:25
 93:11,25 120:7
 121:5 133:12
 157:10 167:21
 167:24 168:6
 171:17 172:13
 174:19,20
dramatic 106:11
draw 66:10
Drive 6:22 39:8
drop 26:1
 159:14
dropped 16:17
 26:18
dropping
 159:13,17
DSM-V 176:21
dtillman@acl...
 2:6
duly 4:13 178:9
DVD 142:7
dynamic 34:14
 36:22 84:18,21
 94:8,11 139:1

————— E —————
E 1:4 3:1,1,6,6
 93:18
e.g 118:15,16
earlier 91:25
 135:8,15
 136:15 137:17
 156:14 158:8
 163:20
earliest 12:15

earthquake
 139:19
easier 175:23
east 165:9,18
EASTERN 1:1
eat 67:5
edition 146:3,4,5
 146:7
educated 70:4
education 134:7
 161:22
educational
 127:18
effective 144:1
efficacy 15:23
 16:2,7
egregious
 155:19
eight 52:8 68:13
 68:14
either 53:13
 54:13 113:22
 126:1 176:9
 178:18
elaborate 5:18
elder 63:2
eligible 157:8
Elizabeth 14:14
 82:23 87:25
emails 12:16
empirical
 161:12,17
 162:13,16
 163:14
employee
 178:18
encourage 160:4
ended 47:17
 154:13
ends 41:21,24
 48:13
engage 44:12
engaged 54:6
England 58:2,11

59:12,16,20
enter 157:14
entire 117:18
 157:22
entirely 40:7
entitled 171:20
entry 139:9
epidemiology
 147:20 148:7
 152:6,15
equipment 4:7
Eric 2:8 174:14
especially 83:25
 160:16
essentially 15:7
 128:21
estimate 53:23
 69:15 72:24
 112:22
estimates 108:17
et 30:16 43:11
 74:24 77:9
 81:4 88:3
 124:5
ethical 149:4
ethics 149:2,15
 149:18,20
eval 46:25 47:19
 48:13 49:15
evals 46:22 47:8
 49:9 56:19
evaluate 32:11
 40:20 54:22
 55:10,16 57:14
 155:22
evaluated 53:3
evaluating 43:20
 54:6 153:12
evaluation 39:16
 44:16 45:17
 46:23,23 47:7
 47:11 51:10,21
 51:22 58:23
 60:3 64:12

65:20 85:14
 102:20 155:6
 155:10,20
 156:8,12 174:1
evaluations
 36:17,20 37:2
 37:18 41:3,7,9
 41:11,14,17
 43:18 44:16
 45:19,25 46:5
 46:8,13,14
 47:2 48:6,17
 48:24 49:3
 50:14 51:4,4
 51:13 53:8,8
 53:18,21 54:16
 54:17 55:19,22
 56:2 57:10
 58:24 59:7,17
 60:8,14,15,18
 60:23,25 65:21
 75:14 84:16
 85:1,17 86:7,8
 103:3,3 154:2
 154:9,10 155:1
 156:13 157:13
 174:7
evaluator 40:25
 46:9,16
evaluators 64:11
event 175:11
events 159:22
eventually 57:7
 149:17 167:12
everybody 29:6
evidence 49:18
 110:15 122:15
 124:17 127:8
 127:21 128:6
 132:19,20
 168:16,18
exact 47:15 70:9
 70:10
exactly 95:16

Salter, Anna C.
5/30/2023

125:1 157:4
**Examination**
3:4,4 4:16
174:17
**examinations**
172:8
**examine** 119:22
**examined** 4:15
**examining** 97:18
**example** 19:16
20:14 22:19
28:16 30:4,22
35:23 45:6
54:22 60:5
62:3 67:2
70:13 73:13,16
74:6 77:17
81:3 90:15
93:11 98:1
107:23 112:9
128:25 129:22
131:15 154:3
177:3,6
**examples** 23:14
90:12 143:3
**exception** 111:8
114:8 117:8
147:10
**exceptions** 20:21
22:12,16
**excluded** 163:25
164:3
**excluding** 60:12
68:5 125:4
**exclusively**
41:10
**excuse** 12:15
18:16 49:6
50:24 79:16
95:21 109:21
110:25 154:20
**exhibit** 3:9,10,11
3:12,13,14,15
3:16,17,18,19

3:20,21,23
8:11 9:18,20
9:21,23 10:9
24:21 38:19,20
39:2,13 40:5
52:2,4 86:16
86:19,19,20,22
97:3,5 116:18
126:21 130:20
130:22,24
133:10 169:2,2
169:3 170:7,8
170:18 171:5,6
171:12
**exhibitionist**
45:7
**exhibitionists**
45:9
**EXHIBITS** 3:8
**exist** 43:6 90:4
92:2 176:3
**experience** 5:15
39:10 43:17
72:2 122:4,18
149:4,16
175:23
**experiences**
151:20 152:12
**expert** 9:15 10:6
10:7 15:19
17:6,14 18:8
18:20 43:19
61:17,18,25
63:21,24 65:11
65:13,14,16,17
65:19,24 66:9
66:14 67:10,24
68:3,6,20
69:10 71:22
73:4,17,22
74:6 76:15,18
76:20,22 77:17
78:4,9 79:1,7
89:4 100:6

163:11,21,22
164:6 165:14
174:9
**experts** 13:3,13
13:21 18:16
73:20 83:24
88:5
**experts'** 9:10
13:12
**expired** 120:22
**expires** 178:24
**explain** 101:23
**explained**
161:13
**explaining**
157:21
**express** 10:12
94:5
**extended** 135:10
**extent** 89:1
172:12
**extra-familial**
118:15

————————
**F**
**F** 1:4 3:1
**faces** 142:4
**facility** 44:21
**fact** 63:5 94:10
105:9 117:17
121:1 175:9
**factors** 84:13
89:17 94:8,8
94:11 114:5,22
118:24 121:23
139:1
**facts** 9:4,8 10:25
11:2,8,24
127:24 168:6
**factual** 9:7
167:25
**failed** 132:11,12
155:15
**failing** 131:24

**fair** 4:24 6:14
11:23 31:22
52:19 60:22
62:4 82:18,20
83:3,6 84:2
85:14 96:19
102:15 104:8
109:12 114:1
114:14 117:20
117:23 118:1
127:9,22
128:12,16
129:5,8,21
135:1 162:4
166:25
**fairly** 69:18
106:11 128:9
**fall** 146:4
**falls** 24:6
**false** 73:16
**familial** 118:16
118:24 119:18
119:23 120:10
121:9,15
122:23,24
**familiar** 4:25
9:14 18:10
34:17 80:21
82:15,23 83:1
83:9,11,14,22
115:21 116:22
117:1 118:17
126:16 131:3
**families** 142:5
145:17
**family** 66:17,24
113:18 119:5
121:4,18,23,24
122:5
**far** 15:15,16
50:10,12 73:10
111:25 163:24
164:7,25
170:23

**faster** 14:14
**father** 169:19
**FBI** 140:3,24
**FBI's** 138:6
**fear** 118:25
**federal** 3:10
9:14,21 10:5,8
10:10 31:6
68:17,23,25
125:18 126:9
**fee** 47:15
**feedback** 145:2
150:16
**feel** 100:20
**feels** 105:8
**fell** 139:20
**female** 131:18
**females** 132:1
**fewer** 82:4
**field** 11:20 21:9
22:1 43:16
64:2 65:3,6
66:14 68:8
80:22 82:6,9
82:21 83:7,17
84:1 174:24
175:3
**fields** 84:3
**Fifty** 72:24
**figure** 129:20
164:25
**figures** 120:20
175:9 176:1
**File** 1:7
**filed** 93:7
**filings** 78:1
**film** 149:8
**final** 47:10,11
47:19,23
140:18,18
168:6
**finally** 6:11
173:25
**financial** 122:5

financially
178:19
find 12:6 30:23
62:17 84:22
88:18 89:4
93:4 115:15
118:8,12 125:9
125:10 154:22
171:3 174:2
175:22
finding 132:7,7
132:8 154:12
155:3,4
findings 88:7
112:10 129:2
129:14,14
130:8 131:25
132:21 167:18
168:16
finds 167:20
168:14 171:17
171:23 172:10
fine 12:10 38:5
61:8 99:7,19
101:15 102:1
141:10 160:24
finish 6:3 91:7,8
128:13 139:21
finished 5:19
first 4:13 12:5
24:24 25:23
27:1 40:23
44:4,8 59:18
62:7,11,18
90:16,16 91:15
92:15 94:20
101:13 107:23
109:23 111:23
111:24 112:23
113:3 119:13
119:14,16,19
124:20 125:25
130:5 139:9
143:17 145:25

146:19 151:18
155:10,12
156:1 159:18
159:18 167:23
174:19
five 53:23 58:18
67:4 72:24
109:9 136:16
137:1 139:18
148:16
five-minute
132:23 133:4,5
flaw 124:24
focus 143:8
focused 84:4
133:17
follow 156:5
follow-up 43:2
followed 63:10
83:24 122:6
following 36:18
84:2
follows 4:15
food 67:4
fooled 142:4
footprints
144:22
forensic 126:17
127:6,19 128:4
formal 161:21
161:22
forming 11:1,3
forms 77:24
forth 7:23 74:3
95:7
forward 154:5
155:23 156:10
found 28:7 44:7
44:8,11 47:10
48:19 74:23
81:10 97:19
113:5 119:10
126:3 148:16
154:13 156:15

164:18 165:14
170:1,23
171:15,21
173:25
Foundation
66:17,24
four 21:7,7,8
23:3,4,5 50:10
52:8 61:18
62:1 68:10
75:17 95:13
150:7,9 151:11
fourth 87:18
Frank 146:21
frankly 81:25
129:7 139:6
free 82:1 90:18
91:21 125:20
frequency 163:3
frequently 38:17
69:17 119:23
121:15
front 6:23 67:4
67:16 101:11
full 101:13
130:5 178:14
fully 21:20
FUND 2:2
funds 77:9 79:3
79:4
furnished
110:24
further 97:21
107:10 127:14
168:14 174:13
178:16
future 25:8
44:12

**G**

G 1:4
gap 12:22 22:8
43:6 175:21
gaps 176:3

GASPER 1:10
general 2:7 21:4
22:11 71:3
74:18 75:1
113:21 115:18
135:23 145:20
146:16
generalized
123:13
generally 21:8
21:10,25 46:12
49:25 55:23
58:8 65:18,24
66:3,4 69:19
72:7 73:23
74:5 81:12
98:3 102:21
114:20 123:14
123:17,25
164:17 176:21
getting 25:1,10
25:11,12 48:14
91:22 110:1
133:2 160:23
175:11,17
girl 22:20 63:2
girlfriend
123:23 166:13
give 58:25 90:8
90:13,14
172:18,20
173:6 174:6
given 9:10 13:5
17:14,17 86:18
175:14 178:15
gives 98:4
145:16 172:11
giving 163:25
164:3
go 20:2,6,13
28:24 31:12
33:19 39:12
40:4,4 41:22
49:12,14,15,16

49:21,22 50:22
50:22,25 52:11
52:17 53:25
54:9 55:1,20
57:10 61:4,4
61:13 67:20,25
68:1 78:8
81:20 86:15
87:17 90:10,14
91:14 101:7
103:25 105:25
106:19 110:6
111:13 114:8
118:8 120:24
130:19 133:10
138:9 139:20
139:24 147:7
152:6 154:4
155:15,23
159:25 160:10
164:13 174:6
176:21 177:14
God 84:11
goes 6:4 14:6
50:1,25 119:9
131:11,17,22
137:15 167:23
168:3
going 4:21 6:11
6:13 15:17
20:18,22 31:20
39:12 43:4
47:14,21,24
52:1 79:10
85:19 86:22
89:14 97:1
101:4,6,7
102:11 105:23
105:24 115:10
117:3 158:10
159:16,19
166:11 172:25
Goldsmith 1:8
gonna 26:13

Salter, Anna C.
5/30/2023

99:9 101:23
105:12 130:19
157:24 160:3
167:3
**good** 4:18 63:11
155:25 176:8
**Goodman-Wil...**
13:20
**Goodwin** 52:20
**gosh** 142:24
**gotten** 166:5
**Government**
168:11
**Governor** 1:9
**gradual** 51:24
68:16
**Graham** 3:17
167:8
**Grand** 2:4
**grants** 135:3
**great** 5:9,24
32:5 84:1 93:5
**greater** 102:15
**GRETCHEN**
1:9
**gross** 19:17
**grounds** 129:3
**group** 57:20
117:18 118:1
122:6 124:2
136:20,21,22
136:24 141:14
155:13
**groups** 40:20
59:21 96:9
123:9,12
135:22 143:4
**guards** 53:13
**guess** 38:25 49:8
84:5 103:13
113:13 119:13
135:7
**guidance** 159:5
**guide** 143:20,24

144:10 145:1
151:5
**guideline** 127:5
127:5
**guidelines**
126:17 127:2
128:3 132:18
**gun** 149:14
**guy** 75:9 162:3
166:13

---
**H**

**H** 1:4 3:6
**half** 57:6,8 80:1
**hallucinations**
177:6
**Hampshire**
57:24 135:20
**hand** 70:5
**handed** 13:22
**hands-on** 36:2
126:4
**Hang** 13:16
139:15
**Hanson** 14:25
15:10,13 36:24
37:4 38:1
82:15 88:1,9
89:9 93:11
129:18 161:18
162:2 174:19
**Hanson's** 13:15
13:23 14:6,6,7
14:10,14 88:13
90:14 93:25
**happen** 58:5
122:2
**happened** 122:8
164:11
**happening**
119:14
**hard** 50:4 139:6
**harms** 122:21
**Harris** 162:3

**Harvard** 161:10
161:13
**Hawaii** 62:8
63:4
**Hawaiian** 62:2
**heads** 5:1
144:22
**health** 57:21,22
59:19 134:4
138:4 139:12
144:1
**hear** 12:10
110:25 148:3
**hearing** 49:19
49:23
**hearings** 52:9
172:3
**heavily** 128:17
**held** 4:6
**Helmus** 36:25
38:2 97:2,12
98:17,18,25
162:2
**Helmus's** 115:12
**help** 8:22 38:24
60:7 149:12
**helped** 56:10
137:1
**helpful** 81:11
84:22 166:16
**Hernandez**
124:8,11,18,20
124:21,23
125:8,12,15
126:11,12,13
128:19,20
129:6
**hesitant** 121:17
**high** 85:10 88:5
126:4 140:24
155:14
**high-risk** 53:4
59:8,15,23
160:12

**higher** 32:17
81:7 89:18
111:16,21
115:13
**highlight** 143:21
**highlighted**
143:16 148:14
150:3,5
**highly** 67:1
**hire** 158:16
**hired** 46:15 51:5
149:13
**hit** 22:21
**hold** 28:24 43:19
76:14 90:10
143:18
**home** 139:20
149:12
**Hon** 1:8
**honest** 13:4
**honesty** 131:4
**hope** 42:11
43:22 80:23
**hospital** 57:16
140:22
**hospitals** 54:23
**hourly** 79:17
**hours** 56:23
57:4,5 79:21
80:2 102:20
**huge** 139:25
**hundred** 53:23
53:23
**hundreds**
131:10

---
**I**

**idea** 53:22 68:19
69:25 77:5
108:20 142:12
142:14
**identify** 30:14
**ignored** 168:6
**illegal** 22:10

**illustrate** 152:4
**immature** 139:2
**immediately**
93:16 119:11
**impact** 70:23
71:5 72:9 74:1
75:25 101:17
102:3,16
112:11 138:16
**impacted** 114:22
**impacts** 75:21
**impairment**
45:14
**impartial** 129:4
129:9
**impartially**
127:25
**impermissibly**
170:20
**implicit** 98:4
**implied** 170:24
171:2
**implying** 89:2
**important** 5:16
132:8 175:19
**improve** 106:2,4
**in-house** 156:8
**inaccuracies**
167:25
**incest** 118:22
119:7,9 120:6
120:16,17
121:2 139:3
**incidents** 148:5
**include** 11:5,19
13:11 19:16
20:16,25 23:21
24:15 28:1
29:11 49:1
78:24 79:1
80:7,10 85:14
94:14 96:1
117:14 126:6
129:19,21

Salter, Anna C.
5/30/2023

130:12,14
135:12 152:14
152:22 161:5
**included** 9:4
11:10,16,17,21
11:23,23 45:9
67:2 84:25
116:8,10
120:20 124:25
125:1 128:14
**includes** 15:12
79:2,3,4 80:3
152:13,17
**including** 18:20
60:11 77:8
94:20 116:5
127:7,20 129:6
130:10 164:23
172:8
**income** 76:20
77:3,7,17,18
78:3,10,13,16
78:23 174:8
**incorrect** 135:9
135:11
**increasingly**
70:7
**indecency** 19:17
**indefinitely**
102:23,25
**indicates** 45:24
**individual** 17:22
44:17,17 56:17
56:18 60:8,14
60:15 80:12,13
90:18 91:21
100:9 101:1,4
101:6,17 102:4
105:20,23
**individuals**
30:17 32:10
43:20 44:22
59:9 67:5
89:17 93:14

102:14 156:15
**influence** 7:7
**informal** 152:22
163:1
**information**
5:16 6:2 7:21
7:22 62:19
67:18 78:21
97:17 98:20
99:3,9 106:23
107:4,7,9,12
107:16,18,21
108:12 114:10
120:1,13
123:16 145:21
174:1,5
**initial** 30:4 41:6
41:9,14 43:24
44:15 45:25
46:7,21,24,25
47:8,19,21,23
49:23 53:11
55:18 80:5
85:16 86:7,8
96:4,7 119:8
119:12 147:11
147:14 154:2,8
154:10 155:1
155:19 173:10
**initially** 41:9
57:23 136:25
**inmates** 53:14
56:1 138:24
**inpatient** 134:13
**insensitive** 173:6
**insignificant**
167:25
**instantly** 93:4
**Institute** 131:1
**institution** 74:14
74:19,19,24
75:2,9
**institutional**
74:14

**institutionalized**
156:23
**institutions**
62:25 63:1,12
**instructs** 5:12
**instrument**
35:11,11,17
37:12 92:23
104:15
**instruments**
33:12,21 34:5
34:15 84:15,17
84:19 90:22,23
92:11,13,18
**integrate** 103:9
**intend** 10:16
15:14
**intended** 143:21
146:14
**intensive** 56:14
96:10 102:12
**intensive-pro...**
102:7
**intentionally**
3:24
**interested** 81:20
82:7,12 178:19
**interference**
125:20
**internet** 16:23
160:14
**Interpersonal**
81:10
**interpretation**
124:12,19
125:12,16
**interrupt** 91:8
**interrupted**
77:14 139:16
139:18 165:25
166:5 167:11
**interrupting**
91:6
**interventions**

102:13 103:23
103:25
**interview** 47:12
64:13,18
165:11
**interviewed**
152:23 169:23
**interviewing**
70:17 164:12
169:22 170:3
**interviews** 142:3
142:7 151:22
152:8,12,18
**investments**
77:9
**invited** 139:14
**involve** 31:9
48:17 59:8
**involved** 8:20
42:17 58:21
96:16 124:21
124:22,23
134:21 137:5
138:2,13
159:24 160:4,9
165:2
**involving**
162:14
**Iowa** 39:22
40:21,23,25
44:4 45:2,5,6
45:10 46:9,17
51:8 54:17
57:11 60:9,10
60:13 76:19
77:13,18 78:10
78:20,25 79:10
140:14,18
154:8 155:12
157:5 170:10
171:9 174:11
176:14,23
177:2
**Iowa's** 41:5,17

43:18,20 44:18
44:21
**ironically**
175:14
**irrelevant** 70:4
**Island** 165:17
**issue** 15:2,7
31:11 43:5
50:25 64:16
70:4 74:4 75:5
75:8 105:16
106:10 107:22
160:6,6 175:19
**issues** 61:2
69:23 70:16
71:6 72:13
75:22 99:15
104:11 105:2,4
105:8,10
**it'd** 87:10
**It'll** 43:10,11
**Ivy** 1:8

---
**J**
---
**J** 2:3 83:14
**James** 14:16
83:14
**Jamison** 2:8 3:4
11:12 16:14,17
16:19,23 17:10
17:13 25:24
26:1,13,18
28:22 33:15
88:25 91:6
100:11,18
132:25 174:15
174:18 177:12
**Jamison's** 26:11
**jamisone@mi...**
2:10
**Jefferson** 6:22
39:8
**Jeffrey** 52:20
**Jehovah's** 63:3

63:5,15
**Jersey** 168:25
169:7
**job** 85:6 103:6
125:19 153:22
154:1,2
**John** 1:4 14:19
**JOSEPH** 1:10
**journal** 81:9,10
81:17,23,23,25
82:1,10,11
149:2,20
150:11,15
151:2,14
**journals** 81:5,8
81:14,21,22
82:4,9 148:17
148:21 150:17
**Jr** 1:8
**judge** 49:17,22
49:24,25 51:1
71:25 73:6
164:10,11
165:13,22
166:4,7,23
**judges** 58:3
138:5 164:21
164:24 165:3
166:25
**judgment**
173:18
**July** 41:21,24,25
**jumbled** 111:2
**June** 44:23
**justice** 12:22
43:6 81:15,24
115:21 116:7
116:16 118:3,4
120:20 158:11
175:21 176:3
**justification**
88:4
**juvenile** 56:16
136:17,21,22

137:4,6
**juveniles** 56:19

### K

**K.M** 3:18 169:7
**Karl** 13:15
36:24 37:4
38:1 82:15
87:25 105:7
128:22 129:18
162:2
**Karl's** 83:25,25
**keep** 69:1 80:24
82:6 157:11,16
158:9
**keeping** 160:20
**keeps** 78:1
**Kelly** 14:16
28:16,17 30:4
30:10,19 31:15
83:9 98:8
107:14 111:8
111:16 112:14
124:3 130:25
**Kelly's** 112:10
**kept** 68:22 72:23
154:25 155:2
**key** 131:24
**kid** 67:3
**kid's** 160:9
**kids** 113:16,17
120:21 122:7
134:10 135:23
145:22 159:8
159:13,14
161:4
**kind** 19:13
35:10 47:2
55:19,25 58:21
59:16 76:24
106:1 125:2
130:17 147:7
**kinds** 72:13
114:4

**knew** 75:6
**know** 4:23 6:5
11:17 12:11
15:15,16 16:7
17:22,25 19:2
21:20 23:7,8
24:4,11 28:5
32:23 33:7
38:9 42:7
47:10 50:6,11
50:19 51:15
54:12 55:12,15
57:6,7 58:16
60:10 62:12
63:4,16,18,18
63:20 65:2,10
67:21 68:1,1,7
68:16 69:9,12
70:3 73:10
74:22 77:6
78:5,11,14,19
79:6,8,12,25
80:17 81:13
83:13 84:11
89:18 90:24,24
93:3 95:3,13
95:16 96:1,4
96:15 98:6
99:12 101:25
102:6 104:16
104:21,24
106:5,13,25
107:1,9 108:20
109:6,14,25
115:18,23
119:3 120:2,5
120:8,14
122:24 123:22
125:10 126:2
129:22 132:25
135:11 137:2
139:23 141:8
144:20 147:1
147:10 148:7

148:11,12,23
149:22 150:13
150:25 151:9
154:24 156:25
157:4,19 158:4
158:5,9 161:18
163:4,24 164:7
164:25 166:10
166:12,17,18
169:13 171:1
176:9,10 177:8
**knowledge**
10:20 11:18
17:15 63:22
65:12 71:25
75:18 88:6
167:2
**Kristen** 83:21
83:21

### L

**L** 3:1
**L-a-g-e-s-o-n**
14:19
**labeled** 146:9
**Lageson** 14:19
14:19
**Langevin** 30:16
129:22,24,25
**language** 36:18
65:22 66:15
**Lansing** 2:9
**large** 11:4 32:9
99:7,13,19
101:14,20,24
106:21 113:14
116:2 123:9,11
175:15
**larger** 8:13
**late** 75:25
**Lately** 84:23
**law** 24:3 41:5
45:5 81:15
156:5 157:5

**laws** 24:10,12
176:24
**lawsuits** 149:5
**lawyers** 93:9
158:11,15
**layers** 56:13
**lead** 97:22 98:14
114:5
**league** 159:14
159:18
**learn** 15:19
16:25 153:10
**learned** 103:23
149:1
**leave** 144:22
**leaving** 67:3
**Lebanon** 135:20
**lectured** 134:23
**left** 10:19 29:9
37:16 38:13
57:22 69:17
71:17
**legal** 3:12 11:13
19:19 25:16,17
26:7 27:14,18
27:23 42:7
43:8 52:2
58:21 107:6
108:14 112:20
113:8 149:12
149:17 171:24
**legally** 21:1,19
**Leslie** 36:24
38:2
**Lessons** 149:1
**let's** 7:11 8:13
10:3 12:2
16:16 17:6
19:6 22:19
28:24 30:22
32:7 38:3,18
38:22 39:12
40:4,4,23
42:23 51:25

Salter, Anna C.
5/30/2023

52:2,11 55:1
57:10 61:4,7
61:13 76:17
84:7 86:15
87:17 90:7,9
90:10 92:20
94:5 106:13,14
106:19 110:6
123:1 128:3
130:2,20 131:5
133:6,10 139:5
139:9 143:1,12
143:13 148:24
150:2 163:10
166:19 167:5
167:14 168:24
171:4
**Letourneau**
13:17,18 14:25
15:10 82:24
87:25 88:3,10
174:20
**Letourneau's**
13:24 14:8,15
14:15,16 15:13
83:25
**level** 55:20
158:3
**levels** 93:15
102:9
**Levine** 14:20
**liable** 63:5,9
**LIBERTIES** 2:2
**library** 81:7
**Lies** 142:2
**light** 13:8
**likability** 158:20
158:24
**likelihood** 86:25
87:12 88:15
**limitations**
120:22
**limited** 73:12,13
73:15

**line** 14:11 89:4
173:21
**list** 3:12 14:5
17:7,8 52:1,2,6
52:20 61:17,21
61:24 64:1
68:22 69:1,1
72:23 95:24
137:16,22
139:7 154:25
155:2 157:11
157:16 158:9
159:12
**listed** 6:12 18:11
62:5 64:7 72:9
72:15 148:18
148:22
**listing** 52:15,15
**lists** 69:5 147:18
**literature** 7:15
7:15,25 11:4
80:24 82:7
108:18 123:24
130:15 131:13
131:16,23
148:7 152:6
**little** 19:6 24:15
30:13 54:24
66:10 76:17
97:4 106:25
109:19 130:21
139:5 159:13
159:18 163:10
171:18
**live** 167:4
**lives** 99:24,25
100:5
**living** 119:3
**locations** 137:16
137:22
**log** 26:14
**long** 12:25 51:18
51:20 68:8,12
76:11 90:17

93:3 102:9
119:9 150:1
153:6
**longer** 39:8
90:17 91:20
120:25 135:10
**look** 24:14 30:22
38:18 43:15
51:25 61:13
81:2,19,25
82:11 90:7,10
100:1 106:9
111:14 130:19
139:5,9 143:1
143:1,13
147:15 150:2
166:18 167:5
167:14 168:24
171:4
**looked** 107:14
124:2 142:15
147:19 148:15
**looking** 10:9
14:9 32:20
33:1,13,22
78:15 101:9
108:17 114:11
127:5,10 141:7
173:20
**looks** 12:15
31:15 40:5
79:25 121:9
133:16,21
135:12 136:12
**lose** 141:17
**loss** 122:5
**lost** 16:23 43:8
69:7 100:17
**lot** 17:11 69:8
77:14 82:4
108:9 137:21
137:22 138:3,3
152:7,7 172:3
172:8

**low** 88:4 102:12
**low-risk** 102:7
**lower** 32:18 54:9
90:19 91:22
118:21 120:24
121:4 158:3
**lowered** 85:8
**lump** 47:4

**———— M ————**

**M** 2:8
**ma'am** 10:2
**Mag** 1:8
**main** 173:5
**major** 124:2
**majority** 54:25
111:14 124:13
**Makaha** 62:7
**making** 9:9 53:9
53:11 89:5
95:15 173:13
**male** 86:25
87:11 131:19
132:1
**malfeasance**
74:14
**man** 22:23
**manage** 103:24
**management**
55:24 61:2
**manipulate**
138:25
**manner** 127:9
127:23
**manual** 143:25
**March** 139:10
140:17
**mark** 1:8 9:19
9:20 52:2
**marked** 9:24
38:20 52:4
86:18,20 97:5
116:18 126:21
130:22 169:4

170:8 171:6
**marriage** 178:17
**Marshall** 122:6
**Martin** 64:2
65:3
**MARY** 1:4,5
**Massachusetts**
167:9
**master** 68:22
72:23
**master's** 70:12
**material** 13:5
35:25
**materials** 9:5
17:3,4 19:3
80:4 124:10
**maternal** 134:4
**matter** 85:10
132:21 178:9
**maukerman@...**
2:5
**mean** 18:16,18
19:12 21:18
22:11,15 23:12
23:25 26:5,21
29:15,20 35:22
39:17 45:4
55:12 57:2
60:1,2,10,11
64:16 73:6,10
73:20 76:22
78:21 79:23
84:8 88:9 95:5
99:17 102:4
104:20 106:18
108:20 113:3,4
133:3 146:8
147:1,3 152:11
162:4,8 164:15
169:9 172:3
**meaning** 27:13
27:21 28:21
29:22 87:21
109:8 138:11

Salter, Anna C.
5/30/2023

145:21
**means** 25:11
  101:23 157:8
**measure** 12:19
  33:3 113:24
  176:2
**measured** 12:20
**measures** 25:8
  42:15 86:24
  87:11,20 88:11
  88:14 89:9,11
  89:13,23 90:3
  94:7,11 173:3
**measuring** 26:9
  26:20,25 27:7
  27:8 35:17
  88:19 91:2
**mechanical**
  94:16
**median** 131:25
  132:15,17
**medical** 134:22
**medications** 7:7
**medium** 132:11
**meet** 154:4,6,13
  154:22
**member** 81:9
  82:2 119:4
  121:18,24
**members** 152:24
**memory** 96:18
  110:3 117:2
**men** 131:17,19
**mental** 44:8
  45:13 48:20
  57:21 59:19
  103:19,22,24
  104:2 138:3
  139:12 144:1
  173:17,24
  176:16,18,19
  176:22
**mention** 34:25
  36:15 132:9

**mentioned** 7:4
  7:24 13:12
  42:25 57:16
  140:10 165:3
**met** 22:20 137:2
  146:21 155:3
  166:9
**method** 104:11
  104:16 105:2,4
  105:6,11,14,15
  106:8
**methodology**
  161:24
**methods** 105:8
  144:3
**Michael** 42:18
  42:20
**Michigan** 1:1,9
  1:10,20 2:2,4,7
  2:9 4:5,19 24:3
  24:6,10 80:11
  80:14 94:23
  104:13,17
  178:1,6,23
**Michigan's**
  24:12
**mind** 31:17
**mine** 105:10
**Minnesota**
  164:4
**minority** 107:3
  111:25 175:10
**minute** 13:20
  14:4,5,5 42:23
  89:14 92:1,14
  130:4 139:15
  141:14 173:20
  174:6
**Miriam** 2:3 4:18
  133:1
**miscommunic...**
  32:6
**misinterpretat...**
  125:24

**misinterpreted**
  171:15
**misleading**
  105:13
**misperception**
  131:12,12,16
**misperceptions**
  130:25 131:7,9
**misread** 43:9
**missing** 148:18
**misstates** 100:11
  100:19
**mistake** 168:5
  172:4
**misunderstan...**
  31:7 166:14
**misuse** 42:13
**mobile** 26:2
**Moines** 140:14
  140:18,24
**molest** 131:18
  131:19
**molestation**
  158:21
**molested** 113:16
  113:17 117:19
**molesting** 75:10
**mom** 159:14
**moment** 23:15
  30:13 42:18
**money** 158:15
**monitoring**
  160:14
**monograph**
  149:9
**month** 21:7 48:9
  48:10,11,12,14
  79:10,11 137:2
**months** 41:23
  47:4
**Montreal**
  141:12
**morning** 4:18
  62:15,16,22

106:14
**mother** 165:13
  169:18
**motivation** 43:3
**motivations**
  166:3
**move** 92:20
**moved** 40:8,9
  45:20 77:10
  96:6 135:13
  136:2
**movement**
  175:15
**Moving** 172:7
**multiple** 26:6
  31:21 152:24
  155:17
**mystery** 143:9
**myth** 145:15

_____

**N**

**N** 3:1,1,6
**N.D** 62:7 64:24
**name** 4:4,18
  13:16 141:15
  146:20 162:3
  166:20,22
**named** 71:6
**names** 138:17
  166:17
**narrowing** 74:4
**national** 115:22
  116:2,5 118:5
  118:5 140:8,8
**nature** 44:12
  69:20 93:17
  104:18,19
**NCVS** 117:14
**necessarily** 45:9
  59:14,23 62:2
  113:19 141:8
**need** 5:3,13 6:9
  16:17 106:2,4
  132:23 133:5

141:8 144:20
  155:5 175:22
**needed** 13:9
  57:1
**needs** 98:20 99:3
  101:2 102:17
**negative** 164:21
  165:4
**neglected** 132:9
**Net** 82:1,5
**never** 27:4 51:9
  57:8 63:13,23
  63:23,25 67:24
  68:22 71:12
  72:21,23 81:16
  92:9 100:21
  101:7 108:13
  108:15 109:20
  119:10 120:19
  128:13 138:11
  177:3
**new** 32:11 57:24
  58:1,11 59:12
  59:16,20 66:21
  85:11 91:23
  109:17 135:20
  138:7 146:3
  168:25 169:7
**nice** 60:20 133:4
**niceness** 158:20
**night** 160:21
**nine-year-old**
  159:17
**nods** 5:1
**non-adversarial**
  52:18
**non-sadistic**
  144:21
**nondisabled**
  21:20
**nonresponsive**
  5:25
**normal** 43:9
  50:8

Salter, Anna C.
5/30/2023

normed 35:20
35:23
northern 66:21
136:20
Nos 3:23 9:23
169:3
notary 1:19 4:5
178:5,23
note 125:15
128:18
noted 89:6 173:8
notes 98:18
notification 75:8
notified 75:9
noting 167:24
novels 143:9
November 12:16
number 29:4
32:9 36:17,18
37:6,13 62:14
62:16 101:14
101:20,24
106:21 116:8
123:8,10
125:10 131:25
132:11 154:20
154:21 157:12
157:16,24
159:3,11
165:23 167:25
numbers 99:8
99:13,19
123:12
nurses 140:11

———————

O

O 3:1,1
O'Donohue
147:21 148:11
Oakland 1:19
178:2,6,23
object 5:12
objected 63:20
65:10 100:18

objection 11:12
33:15 89:1,6
100:11,14
objections 15:16
71:22,24 73:3
73:5,8,11
observed 27:13
27:18,19 29:18
observer 166:1
obvious 100:22
obviously 84:8
160:3 169:10
occasional 79:11
occasionally
134:21
occasions
171:19
occur 111:10,11
occurred 108:7
112:6
occurrence
69:22
odd 141:15
oddly 95:16
113:13
offend 27:22
177:7
offended 63:6
109:15 123:2
offender 19:8,9
19:18,21,24
20:7,17 21:3
21:11,14 22:4
22:9,14,24
23:10,12,18,25
23:25 24:4,5,6
27:4 40:20
56:13 57:20
72:8 74:21
75:1 107:7
108:1 110:22
111:4 113:11
116:9 119:5
121:10,18,25

131:9 135:22
136:17,19,21
161:6 163:10
163:12,14,18
163:19 165:23
166:8 167:13
offenders 22:11
30:14 31:6
34:20 36:9
39:16,21 40:1
40:18,20 43:2
43:14 53:4,19
53:20 54:22
55:16,19 56:6
56:7,12 57:19
59:22,23 66:3
70:1 72:12
73:25 86:25
87:11 89:24
108:1 110:12
110:13 113:1
113:23 114:19
118:14,15
120:6,16,18
123:17 124:14
124:15 130:25
131:14 135:21
136:22 137:6
138:2,2,13,19
138:24 140:5
142:3,3 143:19
143:23 144:2,4
144:17,20,21
145:12 146:24
152:4,8,18,23
154:3,6,16
156:10,23
157:25 175:4
175:16 176:5,5
offending 26:9
43:5 54:24
81:3 89:11,13
91:2 98:9
108:1,5,7

112:4,15,15,18
112:22 113:12
121:2 123:19
126:4 131:8
143:14 175:12
176:20 177:8
177:11
offense 20:4,5
20:15,19 25:21
25:23 26:22
27:8 29:23
32:20 33:1,8
35:8 36:1,2,4,4
45:12 87:1,2,4
87:6,14,22
88:15 91:23
93:17 103:20
104:6,18,19
106:19 107:6
107:20 108:4
108:14 109:4
109:23,24
110:23 111:5
121:11 122:23
122:24 123:22
125:3 153:25
155:19 158:18
170:14
offenses 11:6,19
11:20 16:12
20:17 26:6
27:3,16 31:21
32:10,12,15
45:1 54:18
98:7 104:21
106:22 107:11
107:15,22
108:20,22,24
109:2,7,13,17
109:25 110:9
110:11,17
111:4,9,10,15
111:19,20,25
112:1 113:1

118:22 119:19
119:23 120:10
121:3,9 123:14
123:25 131:8
151:25 153:19
155:17 162:14
175:10,25
177:1,10
offer 6:13,16
10:16 15:14
offered 163:23
offhand 12:7
office 69:18
officers 94:20
95:10
official 1:11
41:24
oh 21:25 28:24
37:10 58:16
84:11 105:9
130:4 140:15
142:24 146:19
154:15 158:4
160:16 164:20
167:2
okay 5:6,7,9,24
6:2,5,16,18,20
6:23 7:4,11,17
7:24 8:9,10,22
8:24 9:11,13
10:3,21 11:7
12:2,8,14,17
12:23 13:2,21
14:14,15,18,23
15:4,12,18
16:1,9 17:10
17:20,25 18:10
18:13 19:6,16
20:1,22,25
22:14,19 23:10
23:12,24 24:11
24:24 25:5,10
25:14 26:3,9
27:3,7,25 28:8

Salter, Anna C.
5/30/2023

28:17,19 29:20
31:5,14,18,25
32:5,7,14 33:8
33:11,24 34:5
35:5,9,16,20
36:5,10 37:4
37:23 38:18
39:12 40:10,17
40:23 41:13,20
42:10 43:17
45:24 46:7,13
46:15,18 47:5
48:1 49:3 51:3
51:7,25 53:3
53:21 54:11,16
60:17 61:9
62:4,7,14,21
63:13 64:14
65:2,6 66:4,10
66:16 67:12,19
68:2,10,17
71:21 72:18
73:3 74:8
76:13 82:14
83:3 84:7
85:16 86:15
87:17 88:24
90:7,16 91:5
91:12 93:20,23
94:2 97:12
98:16 100:8
101:21 102:19
103:18 104:8
105:18 106:8
106:13 107:1,9
108:10,12
109:1 110:4
112:18 114:7,9
114:21 115:4
115:15,21
116:1,22
117:20 118:3
119:17,22
121:14,23

122:18,25
125:15 126:9
127:5,14 131:5
132:22 133:6
134:24 135:6
135:14,19
136:6 137:10
137:21 140:14
141:12,19
142:23 143:22
144:7 145:4,7
146:3,10,13
147:14,18
148:8,14,21,24
150:2,6,18,20
151:4,8,11,14
151:24 152:16
152:19 155:25
158:25 161:8
161:12 163:6
163:25 169:12
170:6 171:4,23
172:7,21 173:8
173:16,25
174:6,12 175:6
**old** 21:1 22:25
23:2 60:19,21
**older** 21:22 23:3
23:4,5 67:6
**omitted** 3:24
**once** 5:10 25:5
26:22 45:15
51:9 71:13
76:11 121:23
137:2
**ones** 11:21,21
14:9 15:5,6
34:14 45:2,5
49:1 76:3 84:2
84:21 85:2
87:24 129:17
154:10 157:8
164:25
**ongoing** 37:11

161:21 162:1
**online** 44:21
74:23
**oOo--** 4:3
**Operate** 145:12
**opine** 15:3
**opinion** 6:16
10:22 11:1,22
11:25 12:18,24
13:2,3 103:11
128:6
**opinions** 6:13
9:9 10:11,16
11:3,16 127:24
152:2
**order** 32:11
36:20 97:4
**organization**
138:1,1
**organizations**
137:22,24
138:10 139:7
**organized**
139:13
**oriented** 144:15
**orients** 175:20
**Ottawa** 2:8
**out-of-home**
131:18,19
**outcome** 88:21
102:1
**outed** 121:25
**outing** 119:4
**outlier** 117:16
117:22 118:7
**outliers** 115:20
**outpatient** 96:9
139:14
**outside** 18:10
40:21 59:22
113:18 161:21
166:11 174:10
**over-18** 22:20
**overall** 168:8

**overestimation**
97:22 98:14
**overnight**
160:11
**overreacting**
176:4
**override** 158:21
158:24
**overrides** 97:20
97:21 98:13

---
**P**
**p.m** 61:10,10
133:7,7 177:15
**P63165** 2:3
**P75721** 2:8
**P86526** 2:3
**page** 3:2,8 10:9
31:2 39:13
65:4 67:16
85:25 86:22
87:18 89:3,3
89:15 90:4,16
91:16 92:5,8
92:14,15,20
93:11 94:5
98:16,17,23,24
101:13 104:9
106:19,20
110:5 118:11
118:12,20
125:10,11
129:23 130:3,5
131:5,6 137:14
141:6 153:10
158:10,17
159:12 167:18
170:17,19
171:16,23
172:7,25 173:8
173:16,25
**pages** 62:18
178:8
**paid** 46:18,23

47:5,7,9,13,14
47:16,18 48:4
76:17
**Palomino** 6:22
39:8
**panic** 140:21
**paper** 42:8,12
**paragraph** 31:3
39:15 90:16,17
91:14,15 92:9
92:12,15,16
101:13 130:5
**parent** 140:21
160:1
**parenting** 134:9
**parents** 133:18
133:19 134:19
142:5 145:21
150:23 160:4,8
**parole** 95:10
138:5
**part** 15:18 16:10
16:11 57:25
99:6 104:1
115:25 172:1
173:9
**particular** 14:24
16:10 63:4
64:15,16 73:21
113:25 123:12
137:4 139:22
165:13 168:15
168:22
**particularly**
43:13 53:12
70:23 175:5
**parties** 4:10
178:17
**partly** 122:20
**partner** 21:13
**party** 21:16
**passage** 88:13
88:18
**path** 165:25

pathology
  138:19 158:19
patient 49:11,21
patients 49:13
  85:12 135:14
  135:15,17,21
  135:25 136:1,4
pay 77:25 79:2
paying 70:14
payment 46:25
  47:3
payments 47:23
  48:1
Pearson 52:20
pediatric 134:6
pediatrician
  135:2
pediatricians
  134:10
pediatrics 134:3
  134:8
Pedophiles
  145:11
peer 146:18,20
  146:22 147:7
  147:12 148:9
  148:10,11
  149:19,23
  150:13,15,17
  151:1,3,8
peer-review
  147:8
peer-reviewed
  147:5
pending 6:10
people 5:10 16:4
  22:11,15 23:18
  23:21 27:12
  29:20 31:9
  32:14,17,18
  35:23 37:4
  38:4 41:4,17
  42:8 43:8,13
  45:1,10 48:17

51:7 53:13
54:6,18 55:10
56:12 57:13
59:25 60:4
64:1,11 66:14
87:5 98:1
102:9,10 107:5
107:10,19
108:13,23
109:3,13,14,18
109:20,22
110:7,8,22
111:3 113:24
114:17 115:4
116:14 117:18
117:19 122:11
123:1,8,13,19
124:3,4,25
125:1 128:23
130:7 138:24
139:12 146:23
151:24 153:19
154:12,15
155:13,15
156:2,8 157:1
157:2,19,23
158:18 159:1,5
160:7 162:14
176:4,21,25
people's 99:24
  99:25 100:4
  153:2
percent 56:25
  57:3 108:20,21
  109:2,6,12,17
  110:5,11
  115:16,16
  117:5 118:2
  122:8 154:3,6
  154:12 155:24
  156:9,11,12
  165:2 167:3
  175:13,25
percentage

78:19 110:16
117:9,24 155:3
perfectly 43:9
period 38:17
  56:17 85:2
  119:9 120:25
permeated
  131:13,16
perpetrator
  119:4
person 19:20
  20:19 21:1,2,2
  21:13,21 25:2
  25:5,6,15
  26:21 27:1,3
  43:25 44:3
  45:15,16,19
  46:10 47:10,12
  50:20 64:15,17
  74:21 85:7
  95:25 102:23
  103:5,18
  111:15 120:3
  120:10 121:10
  122:22 147:16
  149:6,7 151:18
  154:22 155:22
  156:5 157:13
  157:17 169:23
  177:6
person's 32:21
  33:2,13,22
  46:10 102:16
  104:2
personal 122:18
  151:20 178:13
personality
  177:2
personally 77:20
  77:21
persons 153:24
perspectives
  127:7,20
petitioner

171:16
Ph.D 1:17 3:3
  4:11 133:14
  178:7
phase 103:12
  157:8,23
Phenix 38:3,3
phone 26:2,13
  49:25 149:11
  149:15 160:20
phonetic 14:20
  34:25 135:2
phony 149:11,15
phrased 87:8
pick 74:25
pictures 160:17
piece 128:16
pieces 153:8
place 88:25
  89:21 155:11
  156:1 178:10
plaintiff 64:24
  66:17
plaintiffs 1:7 2:6
  4:20 17:23,25
  19:1,2 22:20
  67:9 74:10
  93:7
plaintiffs' 3:7
  9:23 13:3,13
  38:20 52:4
  86:20 97:5
  116:18 126:21
  130:22 169:3
  170:8 171:6
plan 157:7,23
pleadings 93:8
plethysmogra...
  172:23 174:4
plus 140:10
point 10:7 26:10
  26:25 27:16
  30:19 31:14
  39:20 47:12

48:8 49:9 62:4
71:25 74:20
84:6 88:13
89:12,22 90:1
103:13 112:1
128:10 137:3
155:23 166:24
174:19
pointing 22:13
points 171:18
police 1:10
  108:21 110:11
  114:13 116:16
  117:10 119:20
policy 175:20
political 175:18
polygraph 56:10
  126:5 172:8,12
  172:17,19
  174:4
polygraphs
  108:2 172:10
  172:22
poodle 160:24
  160:25
poof 103:25
pool 157:21
poor 70:3
popular 43:15
population 75:1
  108:17
populations
  35:20
porn 36:9
pornography
  20:14,16 34:20
  124:14 125:2,4
  138:23 139:2
  140:11
pose 175:16
position 168:15
possessing 35:24
possible 141:24
possibly 36:7

Salter, Anna C.
5/30/2023

47:11 117:17
**potential** 103:15
103:17
**prac-** 20:8
**practical** 7:22
143:19,24,25
159:5
**practicality** 20:8
**practice** 39:18
40:6,8,12,18
40:22 54:21
55:4,8,13
57:12,22 58:12
59:6,8,14
60:11 135:8,9
135:12,18,24
136:3
**practices** 63:11
159:22
**practitioners**
127:6,19 128:5
**precisely** 49:8
**predator** 44:5,7
46:2 65:20
124:16 176:12
**predators** 41:5
43:3 123:20
131:15 138:23
140:12 145:11
145:16 151:17
152:20,21,23
158:10 162:23
162:24
**predict** 32:21
33:5,9 34:15
35:12,14 90:4
90:6 92:2
**predicted** 93:12
**predicting** 33:12
33:21 34:2,3
92:7
**prediction** 98:3
**predictive** 97:20
**predicts** 33:2,6

35:6 86:5
91:18,19 92:4
92:6
**predispose**
177:9
**predisposed**
156:6
**predisposes**
45:13 176:20
176:25
**prefer** 12:9 17:7
**pregnant** 165:24
**prejudicial**
73:18 164:16
**preliminary**
47:9,21
**preparation** 8:4
80:9
**prepare** 7:13 8:7
**prepared** 7:11
171:12
**Preschoolers**
151:5
**Prescott** 14:16
83:14
**presence** 178:12
**present** 23:15
68:2 73:16
127:10,24
154:1 159:21
160:1
**presentations**
141:22,23,25
142:1
**presented** 38:8
**pressure** 125:18
**presumably**
105:7
**pretend** 161:11
**pretending** 43:5
**pretty** 49:8
69:22 116:11
126:24 138:15
**prevalence**

148:6
**prevented** 74:16
**preventing**
63:11
**Prevention**
157:6
**previous** 110:18
168:14
**previously** 87:1
87:4,13 109:3
110:12 114:18
**primarily** 85:8
134:24 135:18
144:14
**prior** 61:18 69:5
80:11,16 108:7
**prison** 46:1 53:9
**prisons** 55:23
125:18
**private** 39:18
40:5,8,12,22
54:21 55:4,8
55:13 57:12,22
58:12 59:5,7
59:14 60:11
79:5 135:8,9
135:12,18
136:2
**probably** 35:15
39:19 50:8
54:13 68:9
84:5,11 87:8
133:3 139:17
142:24 143:12
147:10 151:16
152:15 160:25
165:7 176:23
**probation** 94:20
95:9 102:8
138:5
**probative** 73:19
**problem** 32:23
38:23 129:13
175:19

**problems**
105:18 172:9
**procedure** 9:22
10:5 43:24
**Procedures**
10:10
**proceeding**
85:23
**proceedings**
49:4,11 50:15
50:17 51:8
58:21 64:19
66:5,7,8 75:13
76:5,8
**process** 34:6
122:14 147:6,8
148:13
**professional**
89:16 97:18
98:2 127:9,23
**professionals**
94:20 138:12
144:1 145:1
**professor**
133:22
**profile** 59:25
60:1 69:25
70:1
**program** 41:18
43:18,21 45:22
51:23 56:10,14
96:5,10 102:12
102:13 133:19
133:20 134:8
134:16,17,18
134:19 156:21
156:25 157:1
158:1 172:18
172:18
**programs**
133:17 134:21
135:3
**progress** 85:15
**Project** 56:20

136:18
**projects** 56:6,21
**prominent**
36:22
**pronounced**
174:21
**pronouncing**
129:23
**proof** 172:4
**proponents**
87:18,23 88:9
**prosecuted**
113:6
**prosecution**
64:22 73:15
154:14
**prosecutors**
71:10,11 76:7
**prostitution**
20:1,3
**protect** 145:13
145:16,22,23
159:1,8 161:3
**protection** 35:7
**protective**
140:21
**protocols** 74:16
**provide** 5:21 9:4
12:18,23 13:2
17:7 114:9
137:24 138:14
159:5
**provided** 9:7
17:16 18:14,14
18:22,24 19:4
137:23
**providers**
146:15,17
**provides** 145:21
**providing**
127:18
**proxy** 173:9
**psychiatric**
134:5,14,15

Salter, Anna C.
5/30/2023

psychiatry
59:20 134:2,12
psychological
3:9 19:1 44:16
75:14 126:16
psychologist
81:16 133:11
psychologists
95:8,15 140:8
Psychology
126:17
psychopath
140:4
psychopaths
138:21 142:8
151:22
psychopathy
35:5,6 36:14
43:10 162:3
Psychosis 177:5
psychosocial
134:7
psychotic 177:8
public 1:19 4:6
145:22 160:19
178:5,23
publications
143:1,2,5
publish 83:17
146:23
published
116:17 143:8
144:7 145:7,25
146:11 148:16
148:18,21
150:20 151:11
151:14 162:21
163:8
publisher 146:8
Publishing
146:23
pull 79:22
138:17 139:22
pulling 68:16

punished 111:6
punishment
67:2
purchase 141:25
pure 36:8,8
purely 53:20
purpose 58:23
98:21 99:4
101:16 102:11
purposes 55:23
55:24 64:12
90:9 96:21,22
pursuant 4:9
push 133:3
put 24:20 40:11
52:6 53:14
54:7 59:3
60:24 61:21
87:9 99:10,16
99:23 104:21
131:1 142:9,13
147:2,3,11,11
putting 12:1
160:17 171:24
176:9

_____

Q

qualifications
164:6
qualified 63:20
65:10,13,14,17
65:18,24 66:4
66:6,6,9,11,13
67:24 71:22,24
72:3,5 73:4,22
74:5 156:15
163:21,22
qualifies 46:1
qualify 73:20
quantitative
153:5 162:10
quarrel 89:25
question 5:3,6
5:13 6:10 8:23

9:6 14:4 16:1
31:7,23 32:25
33:15 42:13
49:7 53:16
61:5 89:2
91:12 103:13
103:22 109:19
109:20 110:7
110:10 112:9
119:17 120:7,7
121:5,6,6,8
125:11 127:8
127:22 157:4
157:10
questioning
29:7 101:22
140:20
questions 5:14
5:19,20,22 6:1
6:6 7:9 15:17
70:10 95:25
98:10 114:25
115:1 174:13
174:14 175:2
175:14
quick 174:16
quickly 52:11
139:5 174:7
quit 54:12 60:15
quite 4:24 32:9
81:1 125:17
139:6
quote 36:19,25
37:19,20 86:4
98:24 104:10
104:15 106:20
106:23 110:14
110:19 124:12
131:12,17,23
144:14,15,16
144:17 145:15
153:10,13
158:11,12,22
159:15,20

160:23 170:1,1
170:2 172:10
quoted 91:25
quoting 132:6

_____

R

Rachael 13:20
Ralph 149:16
ran 57:20 58:13
58:16 59:21
136:2 137:5
random 116:2
range 115:19
132:4 160:16
ranges 115:9
ranking 86:6
rape 117:4
166:15
raped 166:11,12
rapes 165:23
Rapids 2:4
Rapists 145:11
rarely 176:6
177:5
rate 79:16,17
111:16,21
115:2 117:4
154:12 175:25
rates 88:3
106:23 107:4
108:13,16
113:16 115:16
115:24 116:17
118:21 119:7
119:18 120:2,8
120:9,14,24
121:9 123:18
123:21 126:4
re-evals 41:8
46:22 85:3
103:21 171:14
re-evaluations
85:1
reach 117:23

reactions 43:9
read 7:14,14
13:6 14:22,23
17:20 18:7
31:12 36:17
37:18 44:21
80:25 81:8,17
81:19 83:13
88:2 93:20
115:25 126:18
131:23 153:8
reading 82:9,10
129:7 151:17
153:7
ready 49:13
50:20 103:1,12
140:6
real 117:16,21
reality 106:21
really 31:13
50:4,19 60:10
77:12 78:5
83:16 85:13
89:15 135:4
151:9 155:25
159:16 164:22
174:16 176:5
reason 110:10
117:21 155:1
173:5,6 175:19
reasons 10:12
10:22 49:14
121:15 173:2
rebid 41:22
rebuttal 18:14
93:21
recall 52:25
65:17 66:13
67:14 73:12,13
76:10 141:10
141:11,12
149:22 156:14
167:7 169:8
174:8,8

receive 62:22
received 162:16
receiving 82:14
recess 61:10
133:7
recidivating
27:18
recidivism 12:20
13:10 24:8,19
24:25 25:3,8
25:10,14 27:13
27:19,21 29:15
29:17,17,19
33:4,5,9,10,13
33:21,23 34:3
34:4,15 35:8
35:12,14,18,19
42:14 86:5,6
86:14,24 87:11
89:21 91:19,23
92:6 93:12
98:1,3,5,14,15
100:2,3 106:10
106:12,17
107:17 124:2
173:3,9 175:4
175:4,6,8
recidivist 25:6
recognize 97:7
recollection
14:24 17:13
recommend
51:10,21 52:13
52:16,22
160:10,14,17
160:20,23
recommendati...
103:1 160:8
recommendati...
159:11,21
161:2
recommended
51:12,14,16,20
52:14 53:1

92:22,25 93:5
93:24 94:1
157:2,5,13,17
157:19 158:2,6
recommending
105:7
reconstruct 69:4
reconstructed
69:6
record 7:5 19:1
19:22 26:16
28:25 29:2,3,5
61:17 62:21
89:1 158:21
168:17 172:15
177:14
recorded 178:11
records 165:9
172:24 174:11
recovered
141:18
recruits 138:7
redid 125:4
reduced 173:24
reducing 175:20
reference
115:12
referenced 7:3
7:16,25 9:12
15:6,9
referrals 55:11
136:23
referred 55:10
57:15,16,18,19
58:6,20 59:1
59:25 64:12
95:22 155:6
referring 66:5
87:23 88:21
112:15 125:6
refers 91:17
92:5
refinement
55:17

reflect 39:9,9
reflected 40:10
refute 115:15
regarding
169:18
regardless 19:13
31:21 88:15
112:5
register 24:5
registered 23:25
24:4
registration
100:8 104:17
163:15,18,19
registries 108:24
109:14 110:22
111:4 114:18
registry 15:23
15:23 16:3,4,8
16:11 18:4,5
24:7,12,17
99:10,16,21,23
99:24 100:1,4
100:7,12 101:2
104:13,22,24
105:1,19
109:17,24
161:6 163:11
163:12 176:11
Registry's 24:10
regular 69:22
regularly 38:12
69:18
rejected 126:10
155:24 172:21
173:12
rejoins 16:19
relapse 157:23
related 39:21
56:6 117:17
143:14
relates 30:9
112:4 119:8
relative 113:17

relatively
111:18 157:24
Relax 157:6
release 45:22
50:21,21 51:1
51:10,12,14,16
51:20,21,23
52:13,14,16,22
53:1,4 103:2,7
103:9,11
153:23 156:15
156:18,21,24
157:3
released 45:20
45:23 46:1
146:4,5 153:16
154:4,17
157:17
relevant 17:3,4
82:12 113:21
123:17 124:1
128:5,25
130:15 132:19
132:20 143:13
reliable 106:22
107:4,9,18
108:12,16
174:2
reliably 93:12
reliance 126:10
172:9,21
relied 11:10
172:7
relief 17:25
158:7
religious 138:10
rely 116:4,6,11
116:13 124:1
172:14
remain 103:5
remains 90:18
91:21
remember 12:6
12:7 13:4,6,10

14:1,3 15:5,6
18:3 22:7 28:3
28:18 37:10,11
37:13,16 38:4
47:15,17,24
51:17,20 58:4
58:6,14,24
65:15,21 66:15
70:9,13 71:17
71:23 72:17
73:5,10 74:4
75:19 84:6
94:1 95:17
109:10,11
124:25 126:15
131:4 132:13
141:5,16
149:25 150:16
150:19 153:15
156:9,17 159:3
164:9,14 165:7
165:15,16,16
165:17,21
166:20,22
169:10 171:1,2
remembered
51:19
remote 1:16
remotely 4:9
140:12
reoffend 27:12
32:17,18 85:8
89:18 155:14
156:7 176:6
reoffended 27:9
reoffending
12:20,21 13:9
24:9,20 25:19
26:5,19,21,25
27:17 28:1,4,9
28:14,21 29:11
29:15,22,23
30:2,4,10,20
31:10,16,19

Salter, Anna C.
5/30/2023

32:1,3,15,22
32:24 33:2,4,6
33:6 42:15
87:20,21 88:2
88:3,11,18,20
88:22 89:21
90:1,3,5,6,19
91:20,24 92:2
92:5,7 98:2,5
100:3 106:10
106:12,17,18
106:23,25
107:16 120:3,9
120:11 123:21
154:9 173:4,9
175:7 176:2
**repeat** 26:9 27:4
111:9,10
**repeatedly** 88:1
88:22 91:17
**replacement**
105:22
**replicated**
128:21 129:1
**replication**
125:22
**report** 3:9 6:12
6:14,17,18,25
7:1,1,2,14,16
7:23,24 8:1,15
8:18 9:2,12,20
10:17,21,24
11:2,7,8 13:20
13:22,25 14:3
15:6,10,12,17
19:7,7,12
22:15 23:13
24:16,16,19,20
24:22 27:25
28:20 29:11,21
39:12 48:23
53:3 56:5
61:17 63:8,16
67:10,21 70:22

80:1,3,8 86:15
86:22 87:17
88:13,23 89:3
89:4,12 90:7
90:11,14 92:16
92:20 93:2,3
93:21,25 94:5
97:2,10 98:16
98:18 100:2
101:9,11
102:19 104:9
105:9 106:19
109:1 110:6
112:3,13,21
114:12 115:9
115:15 116:15
116:22 117:1
117:14 118:11
118:13,14,25
122:8,11,13,16
125:7,16 126:7
128:13,18
129:5,8 130:13
130:14 131:22
131:24 163:6
167:20,24
171:12 172:7
**reported** 74:22
107:2 108:21
110:11,16
112:19 114:13
117:10,25
119:11,13,14
119:16,19,21
119:23 120:21
121:16 122:7
122:12 126:2
155:20 172:19
175:10
**reporter** 1:18
4:4,5,8 5:1,9
178:5
**reporting** 113:1
113:25 115:15

115:19 116:16
116:17 117:4,4
118:21 119:7,8
119:18 120:2,3
120:8,9,10,23
120:24 121:9
122:2,22
132:21
**reports** 9:10,15
10:6,7 13:7,8
13:11,12,13
14:22 15:13
17:6,14 18:8
18:14,18,20
73:16 76:25
107:8 128:6
130:17
**represent** 4:20
127:6,19
**represented**
65:2 67:14
74:9
**representing**
74:10
**represents** 51:7
**reputable** 151:2
151:3
**requested** 61:21
**require** 11:8
68:25 103:25
**required** 10:7
24:5
**requirements**
24:3 128:9
176:15
**requires** 10:10
20:23 127:6
128:4 157:5
**rereview** 89:3
**research** 7:2,23
11:16 21:25
28:4,6,13,15
28:16,17 30:1
30:3,8,10,12

30:14,15,18,23
31:12 70:18
80:25 81:1,2,6
81:13 90:17,22
91:18,20,22
92:6,17,17
108:5 109:1
111:8 113:10
113:21 114:5,9
115:25 118:20
119:7 121:8,12
122:21,22
123:6 128:10
128:11,15,16
128:21,22,24
129:6,15 132:6
135:4 139:1
152:6,14,15,19
152:25 153:2,3
161:12,24
162:10,17,21
162:24
**researcher**
152:21 153:4
162:6 163:9
**researchers**
108:19 129:20
176:8
**ResearchGate**
81:11
**resembled** 96:9
**residency** 134:8
134:16
**residential**
66:25
**residents** 134:6
134:6,10,14,17
134:20,25
**resigned** 125:19
**resolving** 144:22
**respond** 13:3
**responded** 18:19
**response** 115:2
150:10

**responsibilities**
134:20
**responsibility**
23:8
**responsible**
74:15
**responsive** 5:22
**restate** 33:18
121:6
**restricting** 23:17
**result** 49:4
108:22
**resulted** 50:15
50:17
**results** 97:19
100:22,25
114:21 115:7
123:3 125:5,21
125:21 126:5
128:20 172:12
172:14,19
**resume** 29:7
**retained** 12:4,11
12:13 46:10
64:21,22,24
67:8 68:6
71:10,11,12
74:9 76:4,7,10
102:25 103:7
156:1
**retired** 42:1
**retirement** 77:9
79:3,5
**retiring** 41:25
**return** 78:3
**reversing**
170:13
**review** 8:2 13:7
13:8,14,25
89:2 146:20
147:7,12
150:16,17
152:25 153:2
167:17

Salter, Anna C.
5/30/2023

reviewed 7:15
7:24 9:5 13:12
13:18,19 14:7
146:18,22
147:2,4,9
148:9,10,11
149:19,23
150:14 151:1,3
151:8
reviewing 32:7
80:4
Rhode 165:17
rich 70:3
Richard 14:20
Richards 131:1
rid 176:11
ridiculous
142:13
right 7:11 21:18
27:17 30:24
38:25 41:3
44:5,24 45:21
46:11 48:24
49:5 50:8 53:6
54:14,15 55:5
62:1 66:21
71:4 81:22
103:13 107:15
107:20 109:19
109:23 112:19
112:23 113:2,7
113:11 115:11
115:19 116:2
121:16 132:9
133:23 136:6
137:18 141:6
141:20 142:16
142:21 143:21
145:20,23
147:5 149:5
150:9 151:15
151:18 152:2
156:1,3 159:9
161:15 162:11

163:2 167:17
172:1 174:3
177:12
rights 102:16
rigors 42:1
risk 32:11,15,17
32:18,22,23
33:2,3,5,6,11
33:20,24 34:6
34:8,10,21
35:17 36:10
84:12,15 85:8
89:17 90:4,5
92:1,2,3,4,11
92:12,22,25
93:11,13,15,24
94:6,7,11
96:20 97:15,23
98:6,19 99:1
101:19 102:17
103:14 120:6
133:18,20
134:16 155:14
175:16
risk-relevant
97:17
risked 89:18
robbery 117:8
ROE 1:5
roles 41:2 160:7
room 4:8 160:20
rotated 134:9,10
134:10
roughly 38:10
48:10 51:3
72:18 79:9
137:18
routine 99:7,12
99:19
routinely 96:24
116:11 158:19
RPP 157:6
rule 3:10 9:21
74:11,18

ruled 73:18
rules 4:21 9:15
9:21 10:5,10
11:8 68:25
94:16
ruling 169:20
run 83:19
135:22
running 40:19
142:19

―――――――――
S
―――――――――
S 2:3 3:1
S-Corporation
78:12
S.M.M 3:18
169:7
SACJ 34:13
sadism 43:11
177:1
sadist 153:15,16
153:18
sadistic 144:21
sadists 138:21
140:5 142:7
151:21 153:11
safe 159:6
safely 59:3
Sage 82:3
142:12,17
146:19,23
sale 158:12
Salter 1:17 3:3
4:11,18 8:16
10:1,14 16:22
29:9 31:8
88:25 89:8
90:25 120:7
121:5 133:12
157:10 167:21
178:7
Salter's 167:24
168:6 171:17
172:13

sample 114:23
116:2 118:5
123:5,7,9,12
samples 120:15
San 64:4
sanction 111:23
111:24 112:12
sanctions 112:11
Sandler 109:5
109:10,16
110:2,4,5
Sandra 1:17 4:4
178:4,22
satisfies 44:18
saw 135:16,17
135:20,22
saying 20:6
21:12 25:7
33:8 50:7
73:17 88:3,5
88:11 89:9,9
91:4,5 92:14
101:25 105:5
105:14,18,22
123:24,24
131:17 148:8
156:18
Saylor 107:24
124:5
says 10:24 40:7
48:23 49:11
54:14 56:5
68:2 70:22
86:3 88:14
89:12,23 91:1
91:1,3,19,25
92:3,7,11,17
93:11,17
101:13 102:19
117:7 118:13
121:3 122:21
127:17 131:8
137:11,14
140:17 141:4

142:20 143:2
144:14 145:15
146:3 167:14
167:15,19
170:19 171:16
scale 34:21
113:14
scales 97:15
Schenk 30:24
31:4
schizophrenia
177:9
scholarly 82:15
scholars 80:21
116:4,11
125:23 129:16
163:7
school 66:18,24
66:24 67:6,7
67:11 134:22
140:25 161:23
161:25
Schuman 52:20
85:20 86:19
171:9,25 173:2
173:10,12,16
173:24
scientific 89:16
124:17
score 84:12
85:10,13 95:8
95:8,10 96:7
121:4 173:1
scored 84:9
94:19
scores 84:25
96:1
scoring 37:20
scratch 57:24
screen 6:24 8:9
38:22 39:1
52:1 61:14
116:20 141:2
167:6 174:4

Salter, Anna C.
5/30/2023

**screening** 155:6
**scroll** 128:3
  131:5
**Scurich** 128:25
  129:10,12,16
**Scurich's** 129:14
**SE** 2:4
**sealed** 165:9
**searches** 82:7
**second** 9:13
  12:15 13:16
  16:10,16 39:14
  49:6 90:10
  97:25 100:17
  111:2 112:25
  118:12 122:16
  126:1 139:16
  142:6 144:9
  146:4,5,7
  147:3,6
**secondly** 49:17
  75:8
**section** 143:2
**secure** 45:20
**security** 54:9
  77:8 79:2
  140:9 158:3
**seduce** 138:24
**seduced** 152:24
**see** 6:3 8:10,11
  8:13,15 9:18
  10:1,2,3,14
  13:23 14:1,12
  14:16 17:6
  24:22 26:14
  38:2,3,22,24
  65:8 75:11
  82:11 86:1,9
  94:5 98:23
  116:20 117:3,5
  117:7,12 118:8
  118:11 125:9
  126:23,25
  127:12,13,15

**128**:3 130:2,3
  130:4 132:2
  135:21 139:21
  140:24,25
  142:4 168:24
**seeing** 8:11
**seek** 127:6,19
**seeking** 18:1
**seen** 51:9 120:17
  131:4 177:3
**segregation**
  53:15
**self** 59:25
**self-harming**
  55:25
**self-referred**
  57:17 59:24
  60:4
**self-report**
  123:1
**self-reports**
  123:4
**sell** 141:22
**Semi** 42:1
**send** 12:9 49:19
**sending** 156:2
**senior** 42:18
**sense** 15:8
  114:13 139:24
  139:25 155:25
  156:4
**sent** 14:3,4,9,11
  14:22 17:2,4,9
  54:22 57:13
  58:3 59:18
  61:14 62:14,16
  62:19 65:5
  67:16 93:22
  146:19 147:14
  147:16 155:10
  155:20 156:10
**sentence** 48:19
**separate** 28:5,8
  28:12,20 29:22

**29**:25 31:11,15
  78:13 108:3,6
**separated** 77:16
  78:9
**separately** 14:11
  29:11 47:9,14
**separates** 30:20
**September** 65:7
**series** 82:3 126:2
  152:23
**sermon** 70:15
**serve** 15:18
**served** 75:20
**service** 175:17
  176:4,10
**services** 76:21
  76:22 78:4,10
  79:1,7 127:18
**set** 115:9 143:12
  149:11
**sets** 24:3
**setting** 36:8
  45:20 54:9
  66:25 72:19
  135:1
**settled** 62:3
  63:15 67:20
**seven** 31:3 48:10
  68:13,14
**seven-month**
  165:24
**severe** 100:9,21
**sex** 19:8,9,18,21
  19:24 20:7,17
  21:3,10,14
  22:3,9,11,14
  22:21,23 23:10
  23:12,19,21,24
  23:25 24:1,4,5
  24:6 27:3
  29:23 30:14
  32:10,15 39:16
  43:2,13 45:1
  53:19 54:18

**55**:19 56:6,12
  56:13 57:19,20
  59:22 74:21,25
  86:25 93:17
  107:7 109:2,3
  109:12 110:9
  110:22 111:3
  115:6 119:24
  121:11 123:13
  123:17,22
  130:25 131:8
  131:14 135:21
  135:22 136:17
  136:19,21,22
  137:6 138:2,13
  138:19 140:5
  142:2 143:19
  143:23 144:16
  144:20 145:11
  146:24 151:25
  153:19,25
  156:10 158:18
  161:5 162:14
  163:10,12,14
  163:17,19
  175:4,16 176:5
  176:5
**sexual** 19:10,13
  19:15,23,23
  20:10,25 21:12
  21:21 22:12,16
  23:18 25:20,21
  25:23 26:6,22
  27:16 31:6
  34:15 35:7,12
  35:14,18 63:12
  65:19,19,20,25
  67:12 70:24,25
  71:5 72:7,9
  73:24,24 74:1
  74:6,7 75:7,21
  75:25 76:1
  81:7,18 87:1,4
  87:13,21 90:5

**92**:2,4 93:12
  104:6 106:18
  107:1 108:21
  108:23 109:24
  112:5 113:22
  115:5 117:5,9
  117:24 124:15
  131:7 133:20
  137:12,15
  138:16,16
  143:14 144:11
  145:16 147:20
  147:21 148:6
  150:10,12
  154:9 156:6
  159:2 165:10
  169:19 170:14
  175:11,25
  176:20,25
  177:1,10,11
**sexually** 35:24
  41:4 44:5,7,12
  45:11 46:1
  48:21 54:23
  103:20 123:20
  176:11
**Shaffer** 52:21
**shaking** 5:2
**share** 8:9 9:17
  52:1 61:14
  141:1 152:2
  167:6
**sharing** 9:17
**ships** 142:21
**short** 130:21
**shorthand** 1:18
  4:5 178:4
**show** 78:3 85:19
  92:21 97:1
  101:9 116:15
  117:4 126:20
**showing** 38:18
  109:1 123:11
  130:24

shown 90:17
91:20
shows 40:24
52:8 91:22
111:16 118:21
sic 110:16
168:25
side 67:14 75:5
sides 127:8,21
sign 51:1 77:23
signed 49:11
178:24
significance
168:5
significant
117:11 168:1
silly 51:12
similar 43:14
47:18,20 75:21
125:21 129:14
169:15
similarly 1:6
simply 20:18,22
25:10 32:20
33:13 90:23
105:18 124:16
125:3
sit 31:14
situated 1:6
situation 84:23
160:12 163:22
six 41:23
six-week-olds
70:14
size 108:17
111:22 114:22
123:4,6
skills 144:3
sleeping 123:23
slides 138:17
141:7
small 107:3
126:24 157:24
175:10

smaller 39:1
Socia 14:16
18:19 83:9,12
Socia's 13:25
Social 77:8 79:2
sociological
113:20
sodomy 19:19
19:24
sold 142:11,14
sole 35:11
solely 35:7
solved 104:13
somebody
101:23 123:22
128:24 142:19
somebody's
119:4
someway 74:16
75:9
somewhat 46:4
soon 61:7
sorry 7:1 9:6,20
25:20 26:1
31:2,4 34:24
36:3 40:1 47:6
50:16 57:23
58:9 61:4
64:23 86:17
88:25 91:14
98:24 100:13
111:1,3 127:14
131:6 138:9
148:3 169:1
sort 9:7 29:5
76:17 146:16
sound 14:23
44:24 54:14,15
111:2 115:11
173:18
sounds 14:7
20:18 147:6
169:15
sources 77:8

78:23
SOUTHERN
1:2
speak 8:4
speaking 111:18
131:23
speaks 130:17
special 56:6
specialized
144:3
specific 24:3
28:14 32:2
59:1 66:15
73:10 74:2
81:3 88:8
150:16 152:1
specifically 13:5
13:6,10 30:9
30:20 31:16
32:1 58:5
65:21 72:8
104:21 107:14
112:17 118:21
125:11 158:5
177:7
specify 22:3
speculated 68:7
spend 17:11
103:15
spent 102:19
133:16 136:16
spoke 51:7
sport's 159:22
sports 159:25
spread 81:14
SPV 65:20
ss 178:1
stable 34:16
36:13 94:14,17
94:19,24 96:17
Stable-2007
84:23
staff 138:23,25
140:12 152:22

152:24 156:2
162:24
stage 50:18
stand 15:24
132:20 170:4
stand-alone
92:22,25 93:24
104:14
standard 171:24
standards 62:25
63:11 75:7
Stapleton 14:21
start 4:21 6:16
136:19,22
started 7:22
56:11 77:10
134:8 135:3
136:8,23
137:19
starting 135:6
136:8,16
143:17 148:25
state 1:9,10,20
3:19 4:5 40:25
45:2 46:9,14
51:5,6 60:12
60:13 61:1
62:10,12 64:1
68:18 74:17
76:4,19 80:11
165:16,17
170:10 176:23
178:1,6
stated 173:17
statement 10:11
10:21 70:16
86:13 88:8
89:5,8 90:2
93:6 98:22
106:24 110:20
153:14 158:14
158:23
statements 88:2
88:7 170:23

171:16
states 1:1 54:25
167:8,8
static 36:22 84:9
84:13,17,19
92:18 94:7
Static-2002
36:12
Static-2002R
34:9 36:23
84:20
Static-99 12:13
12:19,21 15:24
16:3,12 19:25
20:2,7,11,15
20:23 22:2
24:9 34:9
36:12 42:13,14
81:4 84:7,24
84:25 85:9
86:1,3,23,24
87:5,11 88:7
88:14,19,21
89:9,13,19,19
89:23 90:3,20
90:23 91:1,18
92:1,10,18
93:19 94:6
95:18 96:1,11
97:8,13 98:18
99:14,15 105:7
105:12,21,22
105:25 106:3
120:5 121:1
129:18 130:10
138:25 173:1,3
173:14,14
176:2
Static-99R
35:16 36:16,23
37:7,15,19,20
37:23,25 38:7
38:8 84:7,20
85:13,14,16

87:19,19 88:10
92:3,21,25
93:13,23 94:17
94:24 95:4,6
95:11 96:7
97:16,22 101:5
101:7,8 102:2
104:14 161:20
175:5
**statistical** 129:3
129:12 161:16
161:20 162:9
**statistically**
117:10 163:5
**statistician**
161:10
**statistics** 116:7
116:16 117:2
118:4 161:9
**Statistics'**
115:22
**status** 104:2
**statute** 120:22
**stenographica...**
178:11
**step** 157:13
**steps** 159:6,8
161:3
**Steve** 135:2
162:19
**Stewart** 85:20
171:9
**stipulate** 50:20
153:16,22
**stood** 125:21
**stop** 5:25 9:17
16:16,18
135:25
**stopped** 54:25
135:14,25
136:4
**Story** 171:9
**stranger** 118:15
166:15

**strangers** 160:5
**Street** 2:4,8
**strictly** 131:23
**strike** 84:24
**strive** 127:9,23
**struck** 153:7
**structure** 47:3
47:15
**studied** 31:6
**studies** 31:8
107:13 111:14
112:22,25
115:9,17
117:23 118:10
119:18,22
123:8,9,11,17
123:20 124:4,7
124:20 126:3
127:7,21
128:20 129:1
129:17 130:10
130:16 152:19
162:22
**study** 11:5,20
24:10 30:19,24
31:5,15 97:17
107:14,24
109:5,10,17
110:5 111:8,16
115:13 118:9
122:10 124:2,4
124:8,11,12,19
124:19 125:4
125:13,20,24
125:25 126:1
126:10,11,13
128:19,20
129:1,7,22,25
132:6 152:22
152:25 163:1
**stuff** 161:22
**subcontractors**
48:9 49:1
**subdivides**

78:14
**subject** 15:16
104:17 149:4,6
**submitted** 39:6
63:16 67:21
148:12
**subscribe** 82:3
**subscribing**
81:22
**substituting**
104:14
**sue** 149:7
**sued** 149:14
**sufficient** 11:24
49:18 99:14
**suggest** 106:8
110:16 123:8
**suggested** 106:5
**suggestibility**
70:17,18
164:14
**suggesting** 132:4
**suggestion** 15:24
**suggestive**
140:20 165:12
**suggests** 90:3
**suing** 67:7
**suit** 149:17
**Suite** 2:4
**sum** 47:4
**summary**
152:14
**Superior** 64:5
169:6
**supervised**
134:5,6,14
**supervisees**
102:7,8
**supervising**
134:20,25,25
137:5,7
**supervision**
50:21 178:13
**support** 11:16

11:24 122:5
156:24
**supported** 11:21
11:22 124:16
172:15
**supports** 90:2
**suppose** 164:2
**supposed** 74:24
95:25
**supposedly**
66:24,25
**Supreme** 168:25
**sure** 4:24 9:6
12:10 15:8
32:5 40:14,16
42:6,24 49:6
50:24 53:24
56:10 65:15,23
73:20 80:15
84:5 99:6,22
101:22 119:11
121:6 123:15
130:6 136:6
139:14 149:23
166:23 167:2
170:12
**survey** 114:15
114:21,23
115:22 116:1,5
118:6,6 123:3
**surveying**
113:22,23
115:4
**surveys** 112:23
113:11,11,14
113:15,15,20
113:24 114:4
114:16 116:9,9
116:14 117:17
119:25 122:25
123:1
**survivors**
144:11,15,19
144:23

**SVP** 47:8,11
52:9 59:3,4
64:11,12,19
85:16 86:7,8
124:3 154:9
155:1,7 164:24
165:22
**SVPs** 46:24,25
124:6
**switched** 41:10
87:19
**sworn** 4:9,13
178:10
**syndrome**
150:11
**system** 25:16,17
26:7 27:14,19
27:23 30:17
39:22 57:23
107:6 108:14
112:20 113:8
158:11

_____
          T
_____
**T** 3:1,1,1,6
**table** 6:11 117:3
**take** 5:1,9 6:8
20:12 22:19
30:22 37:8,9
38:18 42:7
56:18 61:5,13
74:12 77:11
79:12 128:19
130:21 132:22
132:23 149:14
159:4,6,8
161:3 175:9
**taken** 1:17 36:12
36:21,23 37:5
37:11 61:11
99:12 100:9
133:8 178:8
**takes** 12:25
**talk** 5:11 7:11

Salter, Anna C.
5/30/2023

12:2,13 13:9
19:6 32:7
40:23 72:1,3
76:17 84:7
86:23 106:13
106:14 110:4,4
112:14 118:20
123:1 130:20
137:10 142:8
148:24 163:10
**talked** 18:13
43:17 61:16
72:15 76:13,18
82:14 88:1
94:10 106:16
111:7 121:14
122:25 135:7,8
135:15,17
136:15 161:1
165:23 166:11
169:13 174:23
176:14
**talking** 5:10
16:22,24 21:18
21:19 26:18
28:19 29:10
31:4,18,20
32:1,5 43:23
56:4 57:10,11
58:11,25 59:10
70:19 88:17
90:9 98:9
99:13,18,21,22
112:9,11 113:7
113:22 120:23
121:1,7 127:12
132:16 146:25
147:5 156:19
166:2 167:10
169:21 174:19
**talks** 53:3
144:18 151:21
151:24
**tasks** 39:21

**taught** 133:21
**tax** 77:24 78:1,3
**taxes** 77:19,21
77:23,25 78:12
79:3
**teach** 133:25
134:1,22
**teaching** 133:17
**team** 37:19,23
37:25 38:2,4
157:7
**technical** 29:4
**technique** 170:3
**techniques** 67:2
169:23
**teenage** 20:25
**teenagers** 160:3
**Teepee** 52:21
**tell** 4:13 8:24 9:1
11:17 51:19
54:20 68:22
69:21 72:7,21
72:21 73:2
74:11 79:9
83:10 96:16
114:16 115:24
120:15 138:18
139:6 141:3
160:12 165:5
177:6
**telling** 7:17
121:12 170:24
**ten** 48:8,10
53:23 68:21
69:10,13,16
72:20,24 73:1
**tend** 81:2 98:14
118:1 138:12
160:5,6
**tended** 59:14
**tends** 97:22
**term** 19:8,9,12
22:14 23:12,18
28:1,6,8,12

29:11,14,15,25
31:19 32:2
45:4 88:18
92:10 106:18
**terminology**
29:21
**terms** 12:17
63:11 72:14
155:3 161:20
**testified** 4:15,23
52:3,9,15 55:5
61:25 63:13,23
63:25 65:6,15
68:3,20,23
69:9,12,15,18
69:23,25 70:3
70:6,8,11,16
70:17,23 71:4
71:8,14,18
72:19 75:13,16
75:19,24 85:25
86:3 93:20
95:5 100:4
137:17 153:24
156:14 163:20
170:14 171:13
**testify** 51:2 62:2
64:18 65:9
70:1,7 72:5
73:9,14 74:19
75:2,3 85:21
104:23 153:16
153:23 154:16
154:17 164:5,7
164:12,17
**testifying** 24:16
24:17 52:14
70:13 76:24,25
77:17 100:1,2
104:25 123:18
153:12,15,17
153:18,20,20
154:20 163:19
165:10 167:7

169:8,22
**testimony** 18:24
61:18 69:1
71:3 77:15
79:6 86:11
100:19 128:7
164:1,3,22
165:4,20 167:1
167:19,24
169:18 170:5
174:9,10 178:7
178:11,15
**tests** 36:22
**Texas** 140:23
141:4
**text** 117:7
**thank** 13:18
121:14 122:25
161:8 177:13
**theory** 176:24
**they'd** 122:16
**thing** 12:21
23:13 25:8
28:20 31:19
32:6 49:21
50:4 72:3 75:4
76:24 92:6
98:5 121:7
154:25 164:2
175:6
**things** 5:2 6:12
11:10 13:1
18:11 59:2
69:19 71:7
72:9 76:13,23
106:2 113:15
115:12 149:8
153:7 158:24
176:9,11
**think** 4:23 5:16
7:20 8:23
11:24 13:19
17:13 19:20
22:7 23:3,8,14

23:15 30:13
31:7 35:2 38:5
39:18 42:23
46:18 47:16,18
47:25 48:3
49:13 50:10
54:13 55:7
56:18,20 57:6
58:5,9 63:2
70:22 71:5,13
72:2 76:16
78:17 85:13
90:9 93:10
96:16 99:6,23
100:6,8,25
101:6,19 102:1
102:5,13 105:9
105:11,12
110:2,10
111:12,13
112:17 115:19
117:16 118:7
122:2 123:18
124:24 125:1
127:12,14
128:22 129:8
129:20 130:15
132:16 133:4
135:4 136:25
137:20 138:6
139:13 140:5
141:14 142:6
142:10,17,17
144:21 147:9
147:12 148:20
149:20 152:4
152:14,21
154:11 155:16
158:8 160:2,5
164:5 166:22
170:17 172:1
173:5 174:12
174:16 176:14
177:12

Salter, Anna C.
5/30/2023

thinking 43:4
138:19,23
140:10
thinks 99:14
third 111:18
145:10 147:4,6
Thornton 34:12
36:24 38:1
161:19 162:2
thought 16:24
47:13 128:25
141:24 142:9
147:8 155:13
159:17 171:2
173:23
three 22:7 27:3
38:13 47:23
48:1,8 50:10
50:12 58:17,18
61:24 62:4
68:10,11 71:6
71:7 72:15
75:16 77:10,16
79:16 89:14
98:8 111:19
126:3 136:19
143:13 164:21
165:3
threw 172:24
throwing 156:22
thrown 149:17
149:18,18
Thursday 50:11
50:13
tied 177:7,11
till 40:15 136:14
Tillman 2:3
time 5:11,11
17:11 23:13
29:5 38:17
40:19 51:16
55:2,7,9,12
56:17 57:7,9
58:10 68:12,14

71:14 72:14
75:7 77:7 85:2
95:14 106:6
119:10 120:21
120:25 122:16
131:9 132:24
134:3 135:4
139:21 150:1
153:6 158:2,6
161:16 178:10
times 23:15
51:14 54:22
58:7 68:6,20
69:9,12,15,21
70:6 71:9,23
74:8 84:14
109:14 111:19
134:23
tip 78:22
Tjernagel 3:19
170:10
today 6:8,11 7:9
7:12 19:20
31:14,20
156:25 175:15
175:15
told 51:8 62:17
71:25 72:3
79:8 158:8
tongue 78:22
tool 92:3 93:13
94:7
tools 34:8,10
35:13 36:10
90:4 92:1
94:11 96:13,21
145:16
top 82:20 83:7
87:17 130:5
141:6 148:25
156:12 174:23
175:3
topic 63:8 64:10
73:21 81:19,21

138:14 164:6
164:10 173:18
topics 70:10
74:2 81:3 82:7
139:7 140:9
144:19 152:5
164:15,17
torture 70:9
total 48:12 80:2
111:19 151:11
totality 168:7
track 17:11 78:1
154:19,21
158:21
train 36:15
37:12,14,19
38:6 95:18
138:8,12
trained 36:11
38:11,13,16,17
95:6 133:11
138:10,11
140:1,3,7,11
training 36:21
37:5 42:6
56:15 82:14
136:25 137:1,4
137:8,15,23
138:3,6 139:4
139:8,10,22
142:1 143:23
150:4 161:9,12
161:16,24,25
162:8,16
164:13
trainings 36:23
37:6,7,11,13
38:7 79:12,14
79:15 137:10
137:12,16,18
137:21,25
138:4,4,4,5,14
138:21,22
139:17 140:13

161:18
transcribed
178:12
transcript 3:13
3:20 85:19,25
86:19 178:15
transcripts
151:23 152:3
152:17
Transforming
144:10
transition 51:24
103:2 157:14
157:20
transitional
45:22 50:21
51:23 103:7,9
156:18,20,24
157:3
transitioning
158:3
Trauma 144:10
traumatized
122:14
traveling 60:15
treat 144:19
treated 39:24
40:1,19
treating 40:17
56:12 135:14
135:25 136:1,4
143:19 144:11
144:15,16
146:24 150:22
treatment 55:20
55:20,23 56:13
60:3,4 72:8
73:25,25 85:5
85:6,9,11,15
96:3,4,5,9,10
102:12,12
103:12 144:1,4
145:1 146:15
146:17 155:15

155:16 157:7
172:18 173:7
Tri-Counties
56:20 136:17
triage 99:7,13
99:19,20
101:14,16,17
101:20,24
triaging 101:25
102:3
trial 49:19,20
50:2,17 154:5
154:18 169:20
170:15
trials 50:3 68:4
tried 69:3 84:22
149:14 166:10
trivial 100:23,25
troubled 60:6
troubling 168:9
TRP 51:1
TRPR 153:23
true 22:18 75:4
90:23 122:20
153:19 171:22
173:15 176:9
176:10 178:14
trust 160:7
truth 4:14,14,14
142:2 170:24
truthfully 7:9
try 5:10 10:3
26:2,13 38:25
89:3 91:8
112:22 113:11
139:21 152:4
trying 17:11
29:5 50:7
73:21 139:24
139:25 156:4
166:6 176:10
Tuesday 1:20
4:1
turned 43:15

Turner 42:17
turns 22:21
145:5
twice 71:13
76:11
twisted 154:15
two 5:10 13:1,23
15:9 21:8 22:8
41:2 42:8 46:8
49:10,24 60:22
60:24 80:14
96:9 107:25
112:21 113:10
124:20 139:17
142:1,18
146:14 155:18
164:21 165:3
171:17
two-minute 61:6
twofold 75:5
type 19:14 36:3
36:4 46:21
53:15 114:1,9
114:15 135:15
135:17 138:1
165:11
typed 152:9
types 42:3 49:10
69:23 77:3
112:21 113:10
118:14,16
137:24
typical 82:6
147:12
typically 20:2
46:8 51:21
54:7 58:22
59:1,8 73:20
79:15 81:5,18
108:6 119:9,25
120:19 147:8,9
148:9 155:14
typologies 140:5

**U**
U.S 3:17 66:20
ultimate 168:5
ultimately
175:18
Um-hmm 55:14
unacceptable
55:25
underage 21:13
21:21 22:22
23:7 123:23
underestimate
175:16
underestimates
120:6
underreporting
120:23
understand 6:19
9:6 73:21
75:11 89:25
112:18 141:7
143:9 167:17
understanding
16:1,5 18:6
26:19 43:23
49:3 93:2
125:17 144:10
146:13 149:3
understate
158:19
understood 5:7
5:8
Underwager
149:16
undetected 11:5
11:19,20 25:21
26:22 30:23
43:5 81:3
87:22 89:11,13
89:24 91:2
98:7,9 106:22
107:14,25
108:5,6 111:15
111:20 112:1,4

112:14,15,18
112:22 113:12
114:11,14,17
114:19 123:10
123:19,25
UNION 2:2
unit 134:13
138:7
United 1:1 167:8
167:8
unlawful 19:10
19:13,15,23,23
20:10,19 22:12
22:16
unobserved
27:21 29:15,17
unpublished
169:6
unquote 131:24
unstructured
33:25 97:21
unwilling
168:17
up-to-date 81:6
use 19:7,8,12
22:14 23:13
24:9 27:25
28:8 29:20,25
31:19 32:2
35:3 36:2,3,5
36:11 84:17,17
84:19,20,21
85:16 86:7
89:25 93:17
95:17,18,23
96:3,11 97:13
97:18 101:8
102:2 105:22
106:17 116:14
160:15
useful 81:17
86:7,14 144:16
145:6
uses 92:9

USPS 39:7
usual 50:9
usually 60:4
80:5 103:25
116:8,10
121:13 122:1
126:4 142:8

**V**
v 3:17,18,19
64:2 66:14
167:8 169:7
170:10
vague 33:16
valid 125:25
130:18 173:11
valuable 142:9
variable 50:19
121:2,2
varies 32:15
variety 34:5,12
34:14 39:21
56:2,5 70:16
77:8 81:4,14
87:24 96:21
98:6 129:15
130:16 135:20
139:12 149:8
various 49:14
84:8 93:14
134:20 163:7
verbally 4:25
Vernon 52:20
version 141:1
versions 84:8
versus 13:9 24:8
68:18 100:2,3
106:10,17
113:17
victim 70:8,25
72:11,12 74:3
75:21 76:2
108:18 112:23
113:11,14,15

113:20,24,25
114:4,15,16
115:5 119:25
120:15 122:25
132:4 140:4
170:21
victim's 74:1
138:11
victimization
115:22 116:1,5
118:5
victimized
131:10
victims 39:23,24
40:1,17,19
43:7,10,16
69:20 70:24
71:5 72:10
75:25 113:23
114:12 118:14
118:24 119:25
120:12,17,17
121:12,17
123:10,12
131:19,20,20
131:25 132:1
132:10,16
138:12 142:5
143:19,24
144:2,4 145:3
145:6 146:24
175:23,23
victims' 43:9
video 141:22,23
141:25 142:9
videoconference
1:16 2:6,10
16:15,20 25:25
28:23
videoconferen...
4:7
videos 142:1,2
142:11
view 21:15 22:9

**Viewed** 168:7
**views** 127:24
151:24
**violence** 34:21
35:6 81:10
**violent** 41:4 44:5
44:7,12 45:11
46:2 48:21
53:4,20 54:7
55:16 56:1,6
66:3 103:20
104:6 117:9
123:20 138:2
176:12
**Vitae** 3:11
**volition** 45:14
**volume** 147:20
**vouch** 147:15
**vouched** 170:20
**VRS-SO** 34:16
34:21 84:22
96:18
**vs** 1:8

**W**

**wait** 13:19 14:4
14:5,5 42:23
89:14 92:1,14
127:10 130:4
139:15 141:14
173:20
**want** 4:20 5:16
6:8 10:6 20:6
42:9 49:14
55:1 60:6,6
65:23 89:2
90:8,12 98:10
105:25 136:6
139:22 143:8
153:10
**wanted** 6:7 32:5
66:10 153:8
164:7
**wanting** 106:14

167:17
**wants** 5:18 6:1
49:12
**warned** 158:18
**warning** 74:21
74:25 75:2
**wasn't** 6:18
40:19 53:24
64:9,15 72:3
74:24 85:3
96:15 104:22
105:6 113:5
129:1 132:7
154:17 165:1
**watching** 159:14
**way** 12:1 21:17
26:14 29:21
43:8 82:6
105:16 106:4
112:25 113:8
113:24 131:15
135:5 156:3
**ways** 72:11
78:14 95:17
106:11 144:20
175:22
**we'll** 5:25 6:3
9:13 29:7 39:2
98:9
**we're** 6:20 21:18
21:19 28:19
31:18,18,25
32:5 56:4
58:25 70:19
87:20 90:9
97:3 113:7
121:7
**we've** 29:4 76:13
106:16
**Wealthy** 2:4
**Web** 81:1
**website** 141:19
141:23,24
142:14,15,19

142:22
**week** 56:23 57:5
57:8,8 62:20
96:10 158:22
**weigh** 127:10,23
**weighing** 167:19
168:18
**weight** 168:16
171:20 172:11
172:18,20
**Weinroff** 124:5
**Weinrott** 107:24
**Welfare** 150:23
151:6
**went** 7:5,14
47:11 50:17
57:22 63:18
73:6 95:7 96:8
120:18 141:24
148:14 170:23
**weren't** 14:11
109:23
**West** 2:8
**Westlaw** 3:17,18
3:19
**when's** 54:11
71:14 72:14
158:6
**whistleblower**
149:1
**WHITMER** 1:9
**who've** 108:13
**wide** 129:14
130:16 135:20
**widely** 82:18
83:3,10 129:11
130:1,9
**widely-used**
93:13
**willing** 21:12,20
**winding** 68:12
**Wisconsin** 37:16
38:12,13 39:20
40:9,12,21

53:5 54:17,21
55:3,13 56:4
56:15,24 57:11
57:12,24 58:3
58:8,11 59:10
59:11,13 60:9
60:13 61:1
69:17 71:16
95:2,3,11
96:20 135:18
136:9,20
140:12 152:22
164:3,11
166:23
**wish** 108:18
**withdrawing**
77:11
**withhold** 128:5
132:18
**witness** 3:2 4:7,8
4:12 10:12,25
11:9 17:17
91:10 100:13
100:17,21
133:5 167:21
168:10 178:12
178:15
**witnesses** 5:15
63:3,5,15
**woman** 63:1
142:21 149:12
165:25 166:6,9
**wonderful** 81:4
**wondering**
141:8
**word** 90:1 159:4
**words** 11:7
12:22 74:22
152:5
**work** 12:3 38:25
39:23 40:23
41:20 42:3
54:24 56:25
57:5,19 58:2

76:18 77:4
80:7,11,16,21
82:16,18,23
83:3,9,11,15
83:19,22,24
84:3 127:3
132:4 134:24
136:15 137:7,8
140:8 149:9,10
155:9 160:3,18
161:17 162:13
163:6,7,14
**worked** 39:20
56:16 57:4,6
58:1 59:19,19
69:17 79:21
95:24
**working** 42:7
54:12 55:8
56:19,23 80:18
133:17 136:9
143:16 151:4
154:8
**works** 103:9
160:24
**workshops**
143:3,5
**worried** 119:3
**worse** 122:1
**worth** 167:23
**wouldn't** 22:9
52:14 60:21
72:25 105:22
116:13 155:15
164:10,12,15
174:3 177:9
**wrapping** 67:3
**write** 8:18,22,24
42:9,11 67:10
86:23 97:14
137:1 143:9
158:11,17
**writes** 97:21
98:19

**writing** 8:20 9:1
42:25 76:25
80:1,3 124:12
149:7,9 152:19
**written** 18:18
36:17 37:2
80:8 93:8
128:6 143:14
145:10 146:14
148:16 151:17
163:6,17
164:21 165:3
**wrong** 127:11
142:18 171:24
**wrote** 37:18
77:1 134:18
135:3 159:15

___

**X**

**X** 3:6,6

___

**Y**

**yada** 176:6,6,7
**Yanthis** 14:20
**yeah** 15:8 17:8
17:13 35:23
54:14 59:13
70:21 79:23
100:18 130:4
136:14 143:22
146:19 149:20
150:5 162:18
172:1 173:23
174:15
**year** 38:16 49:12
49:16 50:3,12
68:13,15 71:17
75:6 77:15
78:2,17 102:24
103:5,16 138:8
140:3 159:18
**years** 21:7,7,8,8
22:7,8 23:3,4,5
32:8 37:6,17

37:17 38:13
39:15,17 40:9
41:3,13,16
51:9 52:8
58:13,17 60:16
61:18 62:1
68:10,11,21
69:4,10,13,16
71:13 72:20
75:12,17 77:10
77:16 80:15
95:7,9,13
119:15 120:18
136:3,13,14,16
139:18 140:2,7
142:24 144:9
145:25 158:5
164:9
**yellow** 148:15
**York** 66:21
**young** 21:21
160:2
**youth-serving**
63:12
**Yup** 137:10

___

**Z**

**Z-g-o-b-a** 14:2
14:17
**Zgoba** 14:2
83:21,21
**Zoom** 6:20 7:21

___

**0**

**06/08/2029**
178:24
**06/12/2023**
178:24

___

**1**

**1** 3:9 8:11 9:20
9:23 24:21
39:13 86:16,22
87:18 106:19
106:20 108:21

117:3 165:1
175:13
**1.02** 127:5
**1.3** 131:25
132:11,17
**10** 3:15 89:16
110:5 126:21
167:18
**10:02** 1:21 4:2
**10:24** 16:14
**10:27** 16:19 29:1
**10:39** 25:24
**10:40** 25:24
26:11,15
**10:44** 26:15
**10:47** 28:22
**100** 46:5 122:8
167:4
**103** 46:6
**1099s** 78:10
**11** 3:16 48:11
130:20,22,24
158:25 160:16
161:2
**11.01** 128:3
**11:23** 29:1
**116** 3:14
**119** 31:6
**12** 3:23 47:4
117:18 125:11
136:14
**12-month** 42:1
**12:17** 61:10
**12:20** 61:7,10
**123** 85:25
**126** 3:15
**13** 3:17 118:20
136:13,14
169:2,3
**130** 3:16
**138** 44:22
157:22
**14** 3:18 98:24
157:1 169:2,3

**14-year-old**
160:16
**144** 44:22
**149** 142:15,20
**15** 3:19 23:1
98:16,17,23
101:13 102:20
108:20 170:7,8
170:18 172:7
175:25
**15-year-old**
21:10
**150** 131:20
132:5
**1514** 2:4
**16** 3:20 104:10
158:10 171:5,6
171:12
**169** 3:17,18
**173** 3:21 97:3,5
**17-year-old** 21:9
**170** 3:19
**171** 3:20
**174** 3:4
**177** 178:8
**18** 172:25
**180-** 78:23
**180,000** 78:18
**19** 173:8
**1970's** 161:15
**1977** 133:14
**1980** 68:2
**1981** 133:22
**1984** 115:10
**1985** 150:23
151:4,12
**1988** 133:22,23
135:6 144:7
**1992** 147:24
148:1
**1995** 145:7
**1996** 40:6,8
133:23 135:6
136:1,2,8

**1997** 38:14
**1998** 39:19
151:12,15
**1999** 39:19
40:16 55:7
57:13 58:25
136:4

___

**2**

**2** 3:10 9:18,21
9:23 10:9,24
39:13 47:20,21
93:11 94:5
108:21 118:11
118:12 165:2
167:2 175:13
**2-** 47:16
**2,000** 137:20
**2:12** 133:7
**2:18** 133:7
**2:22-cv-10209**
1:7
**20** 32:8 41:3,13
41:16 51:9
60:17,18 75:12
90:4 92:5
131:18 132:5
132:10,10,16
139:10 145:25
173:16
**200** 68:9 164:20
**2000** 38:15
39:25 40:2,13
40:14,16 55:5
**2000-** 54:13
**2003** 40:25
45:24 116:17
145:25 146:11
**2007** 34:16
**2009** 136:16
**2014** 41:8
**2015** 41:6,10
45:24 115:10
**2017** 170:11

Salter, Anna C.
5/30/2023

**2018** 38:15
54:13
**2019** 38:15
54:13,14 71:17
71:19 136:14
146:4
**2020** 50:5 52:3
69:7 141:4,17
**2020-2022**
140:17
**2021** 44:23
115:12
**2022** 12:16 65:7
139:10 141:4
171:12
**2023** 1:20 4:1
50:11 52:3
**21** 140:24
**22** 80:1 173:25
**224** 159:13
**25** 158:17
**26** 9:21 10:10
158:17
**260** 2:4
**29** 90:16 91:16
92:15

**3**

**3** 3:23 10:9
86:23 137:14
**3,000** 47:16,25
48:2,2,13
**3:21** 177:15
**30** 1:20 4:1
**300** 6:22 39:8
**301-0930** 2:5
**32** 115:16,20
118:2
**335-7573** 2:9
**35** 144:9
**350** 79:17
**3500** 79:15
137:17
**38** 3:11

**3K** 47:20,21

**4**

**4** 3:4,11 38:19
38:20 39:2
40:5 92:20
131:6 133:10
141:6 156:12
157:9,23
170:17,19
**4.4** 132:1
**40-** 92:9
**41,000** 48:12
**425** 48:23
**430** 49:8,9 50:14
51:3
**47** 92:9,12,14,16
**48** 117:5
**48933** 2:9
**49506** 2:4

**5**

**5** 3:12 52:2,4
131:5
**50** 53:24 56:25
57:3 72:25
154:3,6 155:24
**500** 84:11
**51** 154:12
**517** 2:9
**52** 3:12
**525** 2:8

**6**

**6** 3:13 85:9
86:19,20
115:16,19
118:2
**60** 89:3
**616** 2:5

**7**

**7** 3:23 153:10
171:16
**7,875** 80:2

**70** 89:3,3

**8**

**8** 3:23 129:23
130:3 156:11
171:23
**86** 3:13

**9**

**9** 3:9,10,14
116:18
**90s** 142:25
**92** 150:20
**95** 109:2,6,12,17
110:5
**97** 3:21
**99** 84:13
**9K** 48:14