# Exhibit 69D:

# Dr. Anna Salter Deposition Exhibit 13



683 F.Supp.2d 129
United States District Court, D. Massachusetts.

UNITED STATES of America, Petitioner,
v.
Wesley GRAHAM, Respondent.

Civil Action No. 07–12065–JLT.
|
Feb. 8, 2010.

**Synopsis**
**Background:** Federal government brought civil action seeking to commit federal prison inmate as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act. At the conclusion of bench trial, parties proposed findings of fact and conclusions of law.

**Holding:** The District Court, Tauro, J., held that government failed to establish by clear and convincing evidence that inmate suffered from a nonconsensual sex paraphilia as would make him sexually dangerous to others.

Ordered accordingly.

West Headnotes (1)

[1]   Mental Health ⟶ Evidence
      Mental Health ⟶ Experts

Federal government failed to establish by clear and convincing evidence that federal prison inmate suffered from a nonconsensual sex paraphilia as would make him sexually dangerous to others as required for inmate's involuntary civil commitment under Adam Walsh Child Protection and Safety Act; despite a criminal history involving three sex offenses, there was no evidence that inmate was aroused by, fantasized about, or fixated on nonconsenting partners, inmate's criminal history included a number of non-sexual offenses, including assault, battery, and petit larceny, which further indicated paraphilia diagnosis was inappropriate, and testimony and report of government's licensed psychologist supporting a paraphilia diagnosis not only conflicted with conclusions of court-appointed psychiatrist and psychologist, but contained a number of factual inconsistencies and evinced a reluctance to credit contradictory evidence which pointed to a bias in finding that inmate suffered from paraphilia that detracted from government psychologist's credibility. 18 U.S.C.A. §§ 4247, 4248(d).

**Attorneys and Law Firms**

*130 Jennifer C. Boal, Mark J. Grady, Eve A. Piemonte–Stacey, Mark T. Quinlivan, Donald J. Savery, Jennifer A. Serafyn, United States Attorney's Office, Boston, MA, Helen H. Hong, U.S. Department of Justice, Trial Attorney, Washington, DC, for Petitioner.

Ian Gold, Judith H. Mizner, Stylianus Sinnis, Federal Public Defender Office, District of Massachusetts, Boston, MA, for Respondent.

*MEMORANDUM*

TAURO, District Judge.

I. *Introduction*
Petitioner the United States of America ("the Government") instituted this civil action on March 19, 2007, seeking to commit Wesley Graham ("Respondent") as a "sexually dangerous person," pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the Adam Walsh Act"). The Government's petition states that mental health personnel for the Federal Bureau of Prisons ("BOP") have examined Respondent and issued a preliminary determination that he is sexually dangerous. Upon receipt of the petition, the Adam Walsh Act required this court to stay Respondent's release from federal custody, pending a hearing to determine whether Respondent qualifies for commitment as a sexually dangerous person.

To commit Respondent, the Government must prove by clear and convincing evidence that Respondent is a sexually dangerous person, which the Adam Walsh Act defines as "a person who has engaged or attempted to engage in sexually

violent conduct or child molestation and who is sexually dangerous to others."[1] An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."[2]

This court held a four-day bench trial on this matter beginning on September 9, 2009. The only Government witness at trial was Dr. Anna Salter, Ph.D. Dr. Salter opined that Respondent met the criteria for commitment under the Adam Walsh Act.

Respondent called two experts. Respondent's first expert, Dr. Joseph J. Plaud, Ph.D, testified that Respondent was not sexually dangerous under the Adam Walsh Act. Respondent's second expert, Dr. Barry Joseph Mills, appointed by the court pursuant to 18 U.S.C. § 4247, also testified that Respondent was not sexually dangerous under the Adam Walsh Act. In addition, Respondent's nephews, Ivan Young and Floyd Young, testified regarding their intention to provide assistance to Respondent upon his release.

At the conclusion of trial, Parties proposed findings of fact and conclusions of law. After considering the testimony at trial, the evidentiary record, and Parties' submissions, this court concludes that the Government has failed to establish by *131 clear and convincing evidence that Respondent suffers from a serious mental illness, abnormality, or disorder as required by the Adam Walsh Act. In support of this decision, this court issues the following findings of fact and conclusions of law.

II. *Findings of Fact*

   A. *Personal History*

Respondent was born in March 1950 in South Carolina.[3] At age seven, Respondent moved with his family to the District of Columbia.[4] Respondent's father was a roofer and his mother worked at a dry cleaning store.[5] Respondent described his father to Dr. Mills as a fair disciplinarian and his mother as "loving and 'church going.' "[6] He denies any form of sexual, physical, or emotional abuse, but indicated that he received "whippings" and spankings as discipline.[7]

Respondent left school after the seventh grade.[8] He participated in classes towards his General Equivalency Diploma ("GED") while incarcerated, his only formal education since leaving school.[9] Respondent has not succeeded in passing the GED exam, despite several attempts, due to very poor scores in math.[10]

Respondent reported using marijuana on a monthly basis from age fourteen until the mid-1980s.[11] He has given inconsistent accounts of his heroin use, admitting only to snorting the drug in one account, but admitting to daily injections from the ages of fifteen to twenty-one in another account.[12] He was on a Methadone maintenance program for a short time in the 1970s.[13] Respondent has also tested positive for THC and PCP.[14]

Though Respondent never married, he had one long-term girlfriend, Mary Phargood, that he cohabitated with for approximately 7 years.[15] Ms. Phargood is still in contact with Respondent and presently lives in Maryland.[16] Respondent also had one son out of a prior relationship, who died by violence in 1996.[17]

   B. *Criminal and Sexual Offense History*

Respondent was first convicted of petit larceny at age thirteen for shoplifting.[18] He was placed on probation for a short period of time for that offense.[19] Two years later, at age fifteen, Respondent was sentenced to one year in a juvenile detention facility on a conviction for simple assault.[20] Respondent was also arrested twice for disorderly conduct, in October 1971 and December 1972, receiving a $10 fine for each offense.[21]

*132 Respondent's first sexual offense occurred in January 1974 (the "1974 Rape"), when he was arrested for rape.[22] A police report on the subject of that incident states the following:

> Black female reports that at about 0215 hours, 1/24/74, she accepted a ride home from the Chun–King restaurant at 709 H. Street, N.E. A man known to her as 'Wesley' drove her to the 5100 block of C Street, S.E. and parked in a parking lot. He told her that he wasn't a teenager and he was going to show her that he wasn't. He told her to remove her clothes, and she told him no. He grabbed her pants and the seam tore in the crotch. He removed her pants and her panties and had sexual intercourse with her, reaching

a climax and ejaculating on her and in her. He let her out of the car and told her that he would give her a ride to her boyfriend's. She told him to 'Go to Hell.' She went to her boyfriend's home and called her cousin—and then called the police. The complainant was later examined at D.C. General Hospital and released. The defendant denies having intercourse with the complainant.[23]

In July 1974, Respondent was convicted after jury trial and was sentenced to 6–18 months in prison.[24] He was released on parole in January 1975, after serving approximately five and a half months of his sentence.[25]

For his part, Respondent denied committing this offense to evaluators, reporting that he was falsely accused by an ex-girlfriend after he refused to rekindle a romantic relationship with her.[26]

On July 2, 1975, only six months after being released from prison on his first sexual offense and while still on parole, Respondent was arrested for a sexual assault on a pregnant woman in a public park (the "1975 Assault").[27] Few details of this incident are available. Respondent pleaded guilty to assault with attempt to rape in March 1976 and was sentenced to 4–12 years incarceration later that year.[28] Respondent also now denies the commission of that offense, despite pleading guilty.[29]

Respondent attended psychotherapy while incarcerated, but agreed to terminate this treatment after he failed to make progress.[30] Respondent had approximately nine disciplinary findings during this incarceration.[31] He was released on parole on October 15, 1982.[32] On May 9, 1985, Respondent was convicted of driving while intoxicated and sentenced to thirty days commitment and one year probation.[33]

On December 5, 1985, Respondent was convicted of one count of battery arising out of a June 1985 incident involving Ms. Phargood and her two daughters. He received a sentence of probation.[34]

Respondent tested positive on several drug tests in 1986, resulting in the issue of *133 a parole violation warrant on May 5, 1986.[35] He ceased reporting to his parole officer in June 1986.[36]

On May 24, 1987, at age 37, Respondent committed a third sexual offense, rape, while still on parole for his 1976 assault with attempt to rape conviction (the "1987 Rape").[37] Though the parties could not locate the trial transcript, the Maryland Court of Appeals offered the following description of the incident:

> The victim testified that on May 24, 1987 at eight a.m. she had been working in her garden adjacent to her residence for over an hour when appellant approached her from the sidewalk. Appellant stepped onto the victim's patio and engaged her in a brief neighborly type conversation. The victim brought the conversation to a close and went inside her residence and closed the screen door. It could not be locked. The victim saw that appellant had left the patio and had returned to the picnic area nearby. While the victim was listening to the audio of a videotape, appellant again appeared at the screen door and presented her with a plant. She thanked him and again said that she had to go inside. At approximately 11 a.m. the victim saw the appellant again standing at her screen door with his right hand gloved and his left hand pressed against the glass. It was then that she became apprehensive. Despite the victim's protest, appellant pushed his way into her condominium, asserting that he wanted to see the plant he had given her. When the victim screamed, appellant placed his gloved hand over her throat and grabbed her into the living room. Although the victim initially struggled to free herself, she stopped when appellant threatened to kill her. Appellant then choked the victim until she passed out telling her, 'I have just got to put you out for a while.' When the victim regained consciousness and attempted to stand, appellant choked her again. The victim twisted her body so that she could kick the door. She stopped when appellant again threatened to kill her. For the second time the appellant choked the victim into unconsciousness. Before the appellant initiated sexual intercourse with her, the victim requested that he be gentle because she had not had intercourse for about four months. After the act was completed, the appellant warned the victim that no one would believe her if she reported because there was no sign of forced entry. Then victim requested a glass of tea and appellant helped her up because she was too weak to stand. At approximately 11:30 a.m. appellant outstretched his hand to guide the victim to a bedroom, stated that he wanted to make love to her in her bed. The second act of intercourse occurred in the bedroom. Afterwards there was some conversation wherein the appellant requested the victim's telephone

number which she gave to him. The victim thanked him for not killing her.

On January 6, 1988, Graham was convicted after jury trial of both first and second degree rape charges.[38] After his conviction, the court sentenced Respondent to twenty-five years of incarceration.[39] Respondent now admits to committing this crime.[40]

*134 C. *Mental Condition*

1. *Experts' Qualifications*

The court appointed Dr. Barry Mills, M.D., a licensed physician specializing in psychiatry,[41] to conduct a psychiatric examination of Respondent, pursuant to 18 U.S.C. § 4247(b).[42] To assist in the preparation of his report, Dr. Mills was authorized to review Respondent's records and to conduct an interview of Respondent.[43] Dr. Mills has been licensed to practice medicine in Massachusetts since June 2004 and is currently employed as Medical Director at the Cambridge Health Alliance at Harvard University and as the chief forensic psychiatrist at Massachusetts General Hospital.[44] He has served as an expert in one other sexually dangerous person proceeding, the matter of *United States v. Wilkinson*, 07–cv–12061–MLW.[45]

The court also designated Dr. Joseph Plaud, Ph.D., a licensed psychologist, to examine Respondent pursuant to 18 U.S.C. § 4247(b).[46] Dr. Plaud reviewed Respondent's record and conducted a clinical interview.[47] He has published several articles on sexual offenses and behavior,[48] and frequently testifies as an expert witness in civil commitment proceedings, often for respondents.[49]

Lastly, the court authorized an expert retained by the government, Dr. Anna Salter, a licensed psychologist, to review Respondent's records and reports.[50] The court did not permit Dr. Salter to interview Respondent in the course of her evaluation.[51] Dr. Salter has been working professionally with sex offenders for thirty years, and has treated both sex offenders and sex offender victims for over twenty years.[52] She is presently employed as a consultant to the Wisconsin Department of Corrections and performs sex offender evaluations for the State of Iowa.[53]

Parties have not challenged the qualifications of these experts and, after reviewing their curricula vitae and hearing their testimony, this court finds that Drs. Barry Mills, Joseph Plaud and Anna Salter are qualified to offer expert testimony as to the proper diagnosis of Respondent.

2. *Expert Diagnoses*

All three experts relied on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM–IV–TR"), an official publication of the American Psychiatric Association, in developing their opinions about whether Respondent suffered from a serious mental illness, abnormality, or disorder. The text contains a standard set of definitions and criteria for mental disorders, and it is used for diagnostic purposes by virtually all psychiatrists and psychologists in the United States.[54] Dr. Salter testified that the DSM–IV–TR is "the bible of what is accepted and what is not in terms of mental health"[55] and "the only classification *135 system that is used to assess diagnoses in this country."[56]

Dr. Mills, the court-appointed expert, diagnosed Respondent with Antisocial Personality Disorder ("ASPD"), though he explained that, in his opinion, ASPD is not a serious mental illness, abnormality or disorder.[57] Dr. Mills also testified that he did not believe Respondent met the criteria for any paraphilia diagnosis.[58]

Dr. Plaud also concluded that Respondent did not meet the criteria for a paraphilia diagnosis.[59] And, while he acknowledged that "by his record" the Respondent "could" meet the criteria for an ASPD diagnosis, Dr. Plaud explained that Respondent did not presently meet the criteria for an ASPD diagnosis.[60] Dr. Plaud therefore also concluded that Respondent did not suffer from a serious mental illness, abnormality, or disorder.[61]

Dr. Salter, testifying on behalf of the Government, diagnosed Respondent as suffering from Paraphilia Not Otherwise Specified Nonconsent ("Paraphilia NOS: Nonconsent"), a disorder Dr. Salter also referred to as "Paraphilic Rapism."[62] She also concluded that Respondent suffers from ASPD.[63] It is the opinion of Dr. Salter that both of these conditions

constitute serious mental illnesses, abnormalities, or disorders in this case.[64]

### 3. Paraphilia NOS: Nonconsent

The term "paraphilia" describes mental disorders characterized by deviant sexual arousal.[65] According to Dr. Plaud, "[a] paraphilia essentially refers to intense arousing, exciting, sexually gratifying thoughts, fantasies, or behaviors that focus on sexual interactions/behaviors that go beyond the bounds of normal human experiences that are not within the realm of what are considered and defined as normal or appropriate sexual behavior."[66]

The DSM–IV–TR is organized in diagnostic classes and contains a general category of diagnoses for paraphilias.[67] According to the DSM–IV–TR, "[t]he essential features of a Paraphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months."[68]

The DSM–IV–TR lists eight separate paraphilia diagnoses: exhibitionism (deviant arousal to public exposure of one's genitals), fetishism (deviant arousal to objects), frotteurism (deviant arousal involving touching and rubbing against a non-consenting person), pedophilia (deviant arousal to prepubescent children), masochism (deviant arousal to being humiliated, beaten, bound, or otherwise made to suffer), sadism (sexual excitement from the psychological or physical suffering and humiliation of others), transvestic fetishism (deviant arousal to cross-dressing), and *136 voyeurism (deviant arousal to observing individuals unaware of the observation naked or engaged in sexual activity).[69]

Though the DSM–IV–TR does not contain a specific diagnosis for sexual arousal to nonconsensual sex,[70] the Government maintains that it is appropriate to consider such behavior as a Paraphilia Not Otherwise Specified ("NOS").[71] Every category of diagnosis in the DSM–IV–TR contains an "NOS" diagnosis.[72] The DSM–IV–TR, in explaining the purpose of "NOS" diagnoses, states "[n]o classification of mental disorders can have a sufficient number of specific categories to encompass every conceivable clinical presentation. The Not Otherwise Specified categories are provided to cover the not infrequent presentations that are at the boundary of specific categorical definitions."[73]

With respect to the Paraphilia NOS diagnosis, the DSM–IV–TR provides:

> This category is included for coding Paraphilias that do not meet the criteria for any of the specific categories. Examples include, but are not limited to, telephone scatologia (obscene phone calls), necrophilia (corpses), partialism (exclusive focus on part of body), zoophilia (animals), coprophilia (feces), klismaphilia (enemas), and urophilia (urine).[74]

This court heard testimony that there was an effort to add a separate category for Paraphilic Coercive Disorder in the DSM–III–TR in the mid–1980s, though this diagnosis was ultimately excluded from the final version of the text.[75]

During her testimony, Dr. Salter introduced an example contained in the DSM–IV–TR Casebook (the "DSM Casebook"). The purpose of the DSM Casebook, according to Dr. Salter, was "to help people with differential diagnoses" by applying the criteria in the DSM–IV–TR to "real world cases."[76]

The "real world" example introduced by Dr. Salter involved an individual named Jim Healy who experiences a sexual arousal to rape:

> Jim Healy, a 35–year–old social science researcher, has just received multiple sentences of life imprisonment after his third conviction for a series of rapes. Jim was reared in a chaotic family. His father was physically abusive towards his mother and toward women in general. Both parents were sexually promiscuous, sometimes in his presence. On at least one occasion as a child he was sodomized by his father. Growing up, feeling alone and unloved, he began fantasizing about the perfect relationship with an ideal woman who he could sweep off her feet. As time passed such fantasies and urges began to assume an eroticized, obsessional quality. Initially, he would imagine himself coercing unwilling women into sexual activities that she would then come to enjoy. He would then fantasize a continuing caring relationship. Often, he would masturbate *137 while having these fantasies. Though Jim understood that the scenario in his fantasies was unlikely, he nevertheless began to be preoccupied with sexually exciting urges to act upon those fantasies.

When Jim was 16, he committed his first rape. After each rape he would promise himself never again; but in time, as his preoccupations and urges were rekindled, he would repeat the cycle. Although he would often threaten women with a knife to obtain their compliance, he never physically hurt them, and he used the minimal amount of force necessary. Any obvious signs of suffering or anguish would diminish rather than enhance his sexual arousal ... allotted arousal; and during the course of each rape, he would invariably throw away his weapon and assure the woman that he did not intend to injure her or cause her harm. While reading magazines or watching movies depicting females in positions of subjugation or bonding, he would become erotically aroused, fantasizing that they were enjoying the experience, but he would not become thus aroused if the women seemed to be suffering or in genuine distress. When tested in prison with a penile plethysmograph, Jim developed an erection when presented with stimuli depicting females in positions of subjugation, but his arousal was diminished if they seemed to be suffering. Laboratory testing of his blood revealed an elevated level of serum testosterone.

Apart from his convictions for rape, Jim has never been convicted or even accused of any other type of criminal activity. He has no history of out-patient/inpatient psychiatric treatment. He has a stable work history. He has never abused alcohol or other drugs.[77]

After providing the relevant factual information, the DSM Casebook provides the proper diagnosis for "Jim":

> Some rapists, particularly serial rapists, have an aberrant sexual drive, a Paraphilia, a disorder in which there are intense sexual urges and sexually arousing fantasies involving either non human objects or the suffering or humiliation of oneself, one's partner, children, or other non-consenting persons ... However, [Jim's] rape behavior can be best understood as a manifestation of specific Paraphilia because his erotic arousal depended on having a nonconsenting partner. During the development of the DSM–III–R, the term Paraphilic Coercive Disorder was suggested for this particular kind of Paraphilia, but the category has never been officially recognized. Therefore, Jim's disorder would be coded as Paraphilia Not Otherwise Specified (DSM–IV–TR, p. 576).[78]

It is clear, therefore, that at least in some circumstances a Paraphilia NOS: Nonconsent diagnosis may be appropriate.

Dr. Salter testified that a Paraphilia NOS: Nonconsent diagnosis for Respondent was appropriate because, in her words, "the object was a nonconsenting person and I infer the existence of the arousing urges from the behavior and the analysis that I did, not simply from the fact that he raped a number of people," but because Respondent's "behavior, sexual urges or fantasies, cause clinically significant distress or impairment in social, occupational or other important areas of functioning."[79]

In reaching this diagnosis, Dr. Salter first ruled out "other reasons for rape."[80] *138 For example, Dr. Salter determined that Respondent did not meet the description of an "opportunistic rapist," an offender who rapes because an opportunity arises to do so, or an "angry rapist," who hates women.[81]

Dr. Salter then conducted an evaluation based on nine factors to apply in diagnosing Paraphilia NOS: Nonconsent identified in "Evaluating Sex Offenders: A Manual for Civil Commitments and Beyond" by Dr. Dennis Doren.[82] Dr. Salter described the nine factors in the following manner: (1) there is evidence that an offender was sexually aroused by conduct he knew to be non-consensual; (2) there is evidence of repetitive behaviors, also described as a "sexual script"; (3) the offender committed only sex crimes; (4) the offender committed rape in situations where the victim might otherwise consent; (5) the offender committed rapes with high frequency; (6) the offender committed rapes in situations where there was a high likelihood of being caught; (7) the offender had access to consenting sex partners; (8) the offender has multiple types of victims, a factor which suggests the offender "want[s] to rape somebody and they don't actually care who"; and (9) there is evidence of a rape kit.[83]

Using Dr. Doren's criteria, Dr. Salter first concluded that, while it was possible to question whether the 1974 Rape was consensual, Respondent must have known that the 1975 Assault was non-consensual "because he attacked a stranger on a path and attacking a stranger, an eight-month pregnant woman in a public place in the middle of the afternoon on a path is not consistent with thinking the rape was consensual."[84] Dr. Salter also testified that, with respect to the 1987 Rape, "it [was] absolutely clear to Mr. Graham that this woman was not consenting [because] he threatened to kill her in order to subdue her and then he strangled her on three different occasions ... Going in—pushing his way in

a woman's house who is screaming and trying to fight him off, there is clear evidence that he understood the rape was not consensual."[85] Dr. Salter also thought it was relevant that Respondent understood the victim of the 1987 Rape "was not consenting and had to be threatened with her life in order to consent and that she was screaming and frightened, this did not stop the attack and it did not diminish his arousal."[86]

In assessing whether Respondent's offenses exhibited repetitive patterns, Dr. Doren's second criterion for a diagnosis of Paraphilia NOS: Nonconsent, Dr. Salter noted that, while there was no repetitive pattern "across the rapes," there was "a repetitive pattern within the last rape ... there is no explanation for the strangulation on the three occasions except the sexual script ... what other reason is there for strangling someone who has already agreed to have sex except that you find the strangulation sexually exciting."[87]

Dr. Salter also opined that Respondent's behavior satisfied Dr. Doren's third factor because "virtually all of his criminal offending is sexual."[88] In Dr. Salter's assessment, Respondent "has what I consider a fairly minor nonsexual criminal history, at least in cases of the offenders that I see. We have an assault at fifteen and another assault in part of the domestic violence incident but he does not have a *139 big track record of other criminal offenses."[89]

Dr. Salter found that Dr. Doren's fourth criterion was not present in this case "because the strangers were not willing to have consensual sex."[90] Dr. Doren's fifth criterion, relating to the frequency of sexual offenses, applies because Respondent "did rape very quickly when he was released and he was on supervision, he was raping while he was still on supervision in two instances."[91]

Dr. Salter also found that the circumstances of the 1975 Assault and the 1987 Rape satisfied Dr. Doren's sixth criterion, whether the offender committed rapes in situations where there was a high likelihood of being captured.[92] In assessing the 1975 Assault, Dr. Salter noted that there is "a high likelihood of getting caught at three o'clock in the afternoon on a public path."[93] Similarly, with respect to the 1987 Rape, Dr. Salter noted that "[t]here is a high likelihood of getting caught going to your neighbor's house who knows that you live across the way because you've identified yourself as a neighbor. It is a virtual certainty of getting caught."[94]

Dr. Salter also testified that the seventh factor, access to consenting sex partners, was also present in this case because Respondent "lived with [a partner] for several years".[95]

Finally, Dr. Salter found that the eighth criterion, multiple types of victims, was not present here, because "[h]is victims are pretty much adult females within a narrow range".[96] She also testified that Dr. Doren's ninth criterion, evidence of a "rape kit," was not present in this case.[97] Dr. Salter did note, however, that though Respondent "did not have a rape kit per se. this was his first home invasion so he didn't have a set modus operandi."[98]

### 4. Sexual Sadism

Dr. Salter testified that, though she believed Respondent's behavior during the 1987 Rape was "sadistic," he did not qualify for a diagnosis of Sexual Sadism because "he was arrested right afterwards so there was no ability to establish the six-month timeline which is part of the criteria" in the DSM–IV–TR.[99] Dr. Salter further explained, however, that she "didn't give him a separate diagnosis of Sexual Sadism because we only had one incident and [she] couldn't see a pattern from one incident."[100]

Despite the fact that Respondent does not, in Dr. Salter's opinion, qualify for a diagnosis of Sexual Sadism, she opined that the strangulations that occurred in the 1987 Rape "speak[ ] to a disordered arousal pattern."[101] She also stated that "the strangulations are clearly in escalation from previous behaviors. It is the most violent, the last one was the most violent assault yet so he is getting older but the rapes aren't getting less violent. The rapes are getting more violent."[102]

*140 ### 5. Antisocial Personality Disorder

Dr. Salter also diagnosed Respondent with ASPD. The Government, however, represented to the court that, standing alone, an ASPD diagnosis was not sufficient to justify indefinite commitment in this case.[103]

### III. Conclusions of Law

The Government bears the burden of proving that Respondent is a "sexually dangerous person" under the Adam Walsh Act.

To meet this burden under the statute, the Government must establish: (1) that Respondent has "engaged or attempted to engage in sexually violent conduct or child molestation" in the past; and (2) that Respondent "is sexually dangerous to others."[104] In turn, to demonstrate that an individual is "sexually dangerous to others," the Government must prove: (a) that Respondent "suffers from a serious mental illness, abnormality, or disorder"; and (b) that Respondent "would have serious difficulty in refraining from sexually violent conduct or child molestation if released."[105]

### A. Past Violent Sexual Conduct

The court finds as a fact that the first criterion for commitment under the Adam Walsh Act, that Respondent has "engaged or attempted to engage in sexually violent conduct or child molestation" in the past, is satisfied. All three experts in this case agreed that Respondent committed several acts of sexually violent conduct[106] and Respondent does not contest this element.[107]

### B. Serious Mental Illness, Abnormality, or Disorder

To meet its burden of establishing that Respondent is "sexually dangerous to others," the Government must prove that Respondent "suffers from a serious mental illness, abnormality, or disorder."[108]

By statute, the Government must prove this element by clear and convincing evidence.[109] The clear and convincing evidence standard is an "intermediate standard" that lies somewhere "between preponderance of the evidence and proof beyond a reasonable doubt."[110] The Government must produce "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain."[111]

In civil or criminal cases "involv[ing] individual rights, the selected standard of proof 'reflects the value society places on individual liberty.'"[112] Because the Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," it has advised that courts "must be mindful that the function of legal process is to minimize the risk of erroneous decisions." *141 [113] In addition, courts have been cautioned to "assess both the extent of the individual's interest in not being involuntarily confined indefinitely and the state's interest in committing the emotionally disturbed under a particular standard of proof."[114]

Dr. Salter, the only witness for the Government, diagnosed Respondent with two mental illnesses, abnormalities, or disorders: (1) Paraphilia NOS: Nonconsent; and (2) Antisocial Personality Disorder.[115] Dr. Salter testified that it was her opinion that both conditions were serious in this case.[116] The Government represented to the court that, in this case, it does not wish to commit Respondent solely on the basis of an ASPD diagnosis, but argued that an ASPD diagnosis may be considered "in combination" with a Paraphilia NOS diagnosis.[117]

### 1. Paraphilia Not Otherwise Specified: Nonconsent

This court finds that the Government failed to set forth clear and convincing evidence that Respondent suffers from a paraphilia. This finding is not based on a ruling as to the legitimacy of a Paraphilia NOS: Nonconsent diagnosis, though the court heard significant testimony at trial on the vigorous debate in the medical community over the soundness of a such a diagnosis. Rather, in so finding, the court is swayed by the dearth of persuasive evidence set forth to support a paraphilia diagnosis in this case.

### A. Essential Features of Paraphilia

The DSM–IV–TR describes the "essential features" of a paraphilia as "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons that occur over a period of at least 6 months."[118] In addition, for a paraphilia diagnosis to be appropriate, "the behavior, sexual urges, or fantasies" must "cause clinically significant distress or impairment in social, occupational, or other important areas of functioning."[119]

According to a report submitted by Dr. Mills, the court-appointed expert, "the respondent does not have a diagnosis of Sexual Sadism, Paraphilic Rapism, Paraphilia NOS or other Paraphilia."[120] Dr. Mills explained that although "due to its violence, his third offense is suggestive of Sexual Sadism, Paraphilic Rapism or Paraphilia NOS ... besides this incident,

we have no history of a persistent pattern of sexual arousal involving violence or forced sex upon a non-consenting partner."[121] Dr. Mills states in his report that "[i]t would be scientifically suspect to diagnosis [sic] a Paraphilia merely based upon one *142 incident without more supporting information."[122]

At trial, Dr. Mills testified that "[t]here's actually only a small group of people that commit sexual offenses that actually have paraphilias."[123] In Dr. Mills' assessment, it's his "task" as a licensed psychiatrist "to help identify those people."[124] And, consistent with his report, Dr. Mills advised the court at trial that there was no evidence in the record that Respondent "suffers from such paraphilia or any evidence that he's acting based upon a script or anything else that shows a deviant sexual arousal pattern."[125]

Importantly, Dr. Mills testified that, in some circumstances, a Paraphilia NOS: Nonconsent diagnosis may be appropriate. He stated that he "would agree that [Paraphilia NOS: Nonconsent] probably can exist."[126] It was Dr. Mills' opinion, however, that the diagnosis is "theoretical," and that Drs. Doren and Salter have taken "a position that's not even—it's not even in left field; it's outside the ballpark"[127] because they have "deemphasized the internal mental state" central to a paraphilia diagnosis.[128]

Like Dr. Mills, Dr. Plaud, who also testified on behalf of Respondent, agreed that "a paraphilia NOS diagnosis ... can be properly made based upon a deviant sexual arousal to nonconsenting sex."[129] Dr. Plaud emphasized, however, that such a diagnosis must be "[b]ased on evidence of the underlying arousal that is focused on nonconsenting aspects to sexual arousal," not simply overt behaviors.[130] Accordingly, he advised the court that "[b]ased upon the information reviewed for this evaluation of Mr. Graham, it is clear that he does not meet the diagnostic criteria for any of the paraphilias."[131]

In contrast to Drs. Mills and Plaud, Dr. Salter found that Respondent did satisfy the essential criteria for a paraphilia diagnosis, testifying that "the object was a nonconsenting person and I infer the existence of the arousing urges from the behavior and the analysis that I did, not simply from the fact that he raped a number of people."[132] Dr. Salter's evaluation, however, relied principally on an analysis of criteria set forth by Dr. Doren for assessing a Paraphilia NOS: Nonconsent diagnosis, rather than an explicit examination of the "essential features" of a paraphilia, though there is undoubtedly a significant amount of overlap between the two analyses.

In evaluating the evidence adduced at trial, the court was guided by *United States v. Carta*, a recent First Circuit opinion.[133] In that case, the district court weighed whether a condition termed "Paraphilia NOS: Hebephilia"—a deviant sexual attraction to adolescents—was, in fact, a valid diagnosis under the Adam Walsh Act given that it was not specifically listed in the DSM–IV–TR. In Carta, the First Circuit held that "a mental disorder or defect need not necessarily be one so identified in the DSM in order to meet the statutory requirement" of the Adam Walsh Act.[134] Instead of attempting to discern whether *143 Carta qualified for a specific Paraphilia NOS diagnosis, the First Circuit analyzed whether Carta exhibited the three "essential features" of a paraphilia, ultimately determining that "[b]ased on [the government expert's] report, Carta's past history of sexually abusing minors, his in-prison behavior and his expressed attitudes seemingly justify classifying him as suffering from a paraphilia: he has a decades-long sexual fixation on minors that plainly has 'caused significant distress or impairment' in his life."[135]

Thus, in view of *Carta,* this court has the task of attempting to determine, from the totality of expert testimony and the other record evidence, whether Respondent satisfies the "essential features" of a Paraphilia NOS diagnosis. The court finds that he does not.

This court's analysis hinges on the first "essential feature" of a paraphilia, namely the presence or absence of recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving nonhuman objects, the suffering or humiliation of oneself or one's partner, or children or other nonconsenting persons.

Read broadly, the court acknowledges that all repeat rapists would seemingly satisfy this feature of a paraphilia, as they exhibit "behaviors involving ... nonconsenting persons." The court declines to adopt this expansive interpretation, however, because it would render meaningless the first element of an Adam Walsh Act claim, which requires that the respondent "engaged or attempted to engage in sexually violent conduct or child molestation." Notably, even Dr. Salter, the only witness put forward by the Government at trial, also declined

to adopt this broad reading of the first criterion of a paraphilia, stating that she did not agree that if an individual "has multiple rapes he must be paraphiliac,"[136] because there are "typologies of sex offenders going back 30 years" demonstrating that "some rapists are motivated by anger" and "[s]ome rapists are antisocial only and simply want sex."[137]

This court finds as a fact that the Government failed to demonstrate that Respondent is part of the subgroup of rapists that rape as a result of "a serious mental illness, abnormality, or disorder" that causes them to do so. The example involving a Paraphilia NOS: Nonconsent diagnosis from the DSM Casebook proffered to the court by the Government was not persuasive.

The DSM Casebook example introduces many facts about Jim Healy, the fictional subject of the diagnosis, that suggest a paraphilia diagnosis is appropriate: (1) a childhood history of sexual abuse; (2) regular, obsessional fantasies about unwilling sexual partners; (3) an "urge" to act upon those fantasies; (4) at least three completed acts of rape; (5) the use of weapons to force compliance with his sexual will, but never to hurt the victim; (6) penile plethysmograph and blood test results indicating that Healy developed an erection when presented with stimuli depicting females in positions of subjugation but experienced diminished arousal when presented with images of suffering; (7) information that Healy became aroused by reading magazines or watching movies depicting females in positions of subjugation or bonding; and (8) a complete lack of criminal convictions outside of sexual offenses.

Even acknowledging that it is problematic for a court to independently draw conclusions from a medical text, it is evident that Respondent's history stands in stark contrast to the example included in the DSM Casebook. Despite Dr. Salter's *144 contention, there is simply not enough information in this record to infer that Respondent is in fact *aroused by* nonconsenting partners. Here, unlike in the DSM Casebook example, there is a conspicuous lack of evidence demonstrating that Respondent fantasizes or fixates on nonconsenting partners. Similarly, in this case, unlike in the DSM Casebook example, there are no penile plethysmograph or blood test results supporting a paraphilia diagnosis.

Moreover, unlike the DSM Casebook example, Respondent's criminal record includes a number of non-sexual offenses, including assault, battery, and petit larceny. In addition, Respondent's violent behavior in the 1987 Rape shows that, unlike Jim Healy, he did not refrain from the infliction of pain or suffering during rape.

B. *Dr. Salter's Application of Dr. Doren's Criteria for a Paraphilia NOS: Nonconsent Diagnosis*

After weighing both her testimony and the content of her report, this court finds that Dr. Salter was not a credible witness.

First, it is worth noting that Dr. Salter's report and testimony contained a number of factual inaccuracies, many insignificant and some significant. For example, Dr. Salter repeatedly refers to the 1975 Sexual Assault as a "rape" in her report,[138] rather than assault with intent to commit rape, a distinction this court believes is important.

In analyzing Respondent's use of strangulation in the 1987 Rape, Dr. Salter concluded in her report that "[w]hile choking a victim can be used as a way of subduing resistance, in this instance that was not the case."[139] She continues that "[t]here is simply no other explanation for the strangling except sadism."[140] In making this assertion, Dr. Salter expressly contradicts a report by a Bureau of Prisons psychologist who wrote "it appears as though the aggression associated with Mr. Graham's offense conduct was to subdue his victim so he could rape her."[141] And, in describing the 1974 Rape in her analysis, Dr. Salter states that Respondent "knew" his victim "slightly," ignoring substantial information in the record suggesting Respondent had a past romantic relationship with the victim.

It is difficult for the court to determine the ultimate significance, if any, of each mistake or ignored fact on Dr. Salter's final diagnosis. Viewed in total, however, the court discerned a definite bias in her overall analysis towards a finding that Respondent suffers from Paraphilia NOS: Nonconsent, and that his condition is serious. This troubling bias detracted from her credibility as a witness for the Government.

As discussed above, Dr. Salter relied on an assessment of nine factors identified by Dr. Doren in "Evaluating Sex Offenders: A Manual for Civil Commitments and Beyond" in concluding that a diagnosis of Paraphilia NOS: Nonconsent was appropriate with respect to Respondent. Even assuming

that Dr. Doren's nine-factor approach is an appropriate means of establishing a Paraphilia NOS diagnosis, and it is far from clear that it is, the court was not persuaded by Dr. Salter's evaluation of the facts of this case.

Dr. Mills testified,[142] and this court agrees, that there are internal inconsistencies *145 in Dr. Salter's report. When asked whether he thought Dr. Salter's position was "more in line with Dennis Doren's position," Dr. Mills testified that "it depends. At different points she kind of argues different things that almost contradict themselves, so at times she seems to be taking Doren's position; at other times, she seems to take a more mediated position and emphasizes how we need to infer behavior or infer internal mental states from behavior. She seems to be kind of having it both ways."[143]

Dr. Salter's application of Dr. Doren's factors to the facts of this case also demonstrates a predisposition toward a paraphilia diagnosis, which concerns this court.

For example, in assessing Dr. Doren's second factor, whether Respondent's offenses exhibited repetitive patterns, because Respondent strangled his victim several times during the 1987 Rape, even though she could discern no pattern "across the rapes." Absent evidence that Respondent employed this tactic over time, however, the court is hesitant to accept a finding that actions in the course of a single offense, however abhorrent, establish a "sexual script." In so finding, the court is mindful of an assertion made by Dr. Mills in his report that "[i]t would be scientifically suspect to diagnosis [sic] a Paraphilia merely based upon one incident without more supporting information."[144] For his part, Dr. Mills testified that "[t]here's nothing ... that indicates scripting or allows us to diagnose paraphilia."[145]

Dr. Salter also found, against the weight of the evidence in the record, that Dr. Doren's third criterion for establishing a Paraphilia NOS: Nonconsent diagnosis was satisfied, i.e., whether the offender committed only sex crimes. In testimony, Dr. Salter opined that "virtually all of [Respondent's] criminal offending is sexual"[146] and that Respondent "does not have a big track record of other criminal offenses."[147] In doing so, Dr. Salter effectively glossed over Respondent's non-sexual offenses, essentially ignoring a list of convictions for petit larceny, assault, battery, and operating under the influence.[148]

In addition, Dr. Salter found that Respondent committed rapes with "high frequency," satisfying Dr. Doren's fifth factor favoring a Paraphilia NOS: Nonconsent diagnosis, explaining that her conclusion "ha[d] to do with the fact that he did rape very quickly when he was released and he was on supervision, he was raping while he was still on supervision in two instances."[149] Taking into account that the fact that Dr. Salter again misrepresents the 1975 Assault with a completed rape, this finding rests on thin evidence. And, as Dr. Salter interprets this factor, it seems to encompass every recidivist rapist, yet the Adam Walsh Act does not contemplate the commitment of every recidivist rapist. Accordingly, this information fails to aid the court in distinguishing that particular subgroup of rapists that suffers from a paraphilia.

In testimony, Dr. Salter appeared unwilling to credit evidence weighing against a paraphilia diagnosis. For example, Dr. Salter was noncommittal even in conceding the absence of evidence supporting Dr. Doren's ninth criterion for the diagnosis, the existence of a "rape kit," advising the court that though Respondent "did not *146 have a rape kit per se ... this was his first home invasion so he didn't have a set modus operandi."[150]

Dr. Mills, the court appointed expert, also discerned a bias on the part of Dr. Salter in favor of a paraphilia diagnosis, taking issue with what he perceived to be her method of assuming as a "default" that a paraphilia diagnosis is appropriate "merely on the basis of a conviction" unless there is "other evidence to disprove it."[151] Dr. Mills continued, "even in forensic situations which are always a little bit more suspicious because you can't entirely take the defendant's or respondent's word as the truth, the default is still that there's no diagnosis until you have evidence to support [it]."[152] Dr. Mills stated that "one of the things in Dr. Salter's report that concerned"[153] him was that her diagnosis was not based on sufficient evidence, stating that "[o]n one hand, she makes a conclusion; on the other hand, when she gives the evidence, she says this set of facts suggests a diagnosis ... and it kind of struck me because there are things all the time that suggest diagnoses that we may then pursue further, but you do not then make a final diagnosis without more information."[154]

For the foregoing reasons, the court finds that the Government failed to establish by clear and convincing evidence that Respondent suffers from a Paraphilia Not Otherwise Specified.

## 2. Anti–Social Personality Disorder

The Government represented to the court that, standing alone, an ASPD diagnosis was not sufficient to justify indefinite commitment of the Respondent. It argues, however, that diagnoses of ASPD and Paraphilia NOS, working in combination, effectively render Respondent incapable of refraining from further sexually violent acts.[155]

This court has already found that the Government failed to establish that Respondent suffers from a Paraphilia Not Otherwise Specified. It is unnecessary, therefore, to evaluate Dr. Salter's diagnosis of ASPD, a condition the Government concedes is not "serious" for the purposes of the Adam Walsh Act.

### C. Serious Difficulty Refraining

Having decided that the Government has failed to prove that Respondent suffers from a serious mental illness, abnormality, or disorder, this court need not address the third criterion for commitment under the Adam Walsh Act, that is, whether Respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released.

## IV. Conclusion

For the foregoing reasons, the Government has failed to show by clear and convincing evidence that Respondent currently suffers from a serious mental illness, abnormality, or disorder within the meaning of the Adam Walsh Act. Accordingly, this court concludes that Respondent is not a sexually dangerous person and orders his RELEASE from BOP custody.

AN ORDER HAS ISSUED.

*ORDER OF JUDGMENT*

For the reasons set forth in the accompanying Memorandum, this court concludes that the Government has failed to establish by clear and convincing evidence **\*147** that Respondent is a sexually dangerous person and, therefore, orders his RELEASE from the custody of the federal Bureau of Prisons.

IT IS SO ORDERED.

**All Citations**

683 F.Supp.2d 129

## Footnotes

| | |
|---|---|
| 1 | 18 U.S.C. § 4247(a)(5). |
| 2 | 18 U.S.C. § 4247(a)(6). |
| 3 | Exh. 25 at pp. 1, 3. |
| 4 | Exh. 25 at p. 3. |
| 5 | Exh. 1 at p. 7. |
| 6 | Exh. 25 at p. 3. |
| 7 | Exh. 1 at p. 7; Exh. 25 at 3. |
| 8 | Exh. 25 at p. 3; Exh. 27 at 3. |
| 9 | Exh. 25 at pp. 3–4; Exh. 27 at 3. |
| 10 | Exh. 25 at p. 4. |
| 11 | Exh. 25 at p. 8. |

12 Exh. 25 at p. 8.

13 Exh. 25 at p. 8.

14 Exh. 25 at p. 8.

15 Exh. 25 at p. 4; Tr. 9/11/09, 11:8–11.

16 Exh. 27 at p. 4.

17 Exh. 27 at p. 4.

18 Exh. 22; Ex. 17 at GR00810.

19 Ex. 17 at GR00810.

20 Ex. 17 at GR00810.

21 Ex. 17 at GR00810.

22 Exh. 13 at GR00409.

23 Exh. 13 at GR00409.

24 Exh. 22.

25 Exh. 22.

26 Exh. 25 at p. 5.

27 Ex. 13 at GR00410–411.

28 Ex. 17 at 811.

29 Ex. 17 at 809.

30 Tr. 9/9/09, 63:1–4.

31 Exh. 22.

32 Ex. 17 at GR00796.

33 Exh. 22.

34 Ex. 17 at GR00796.

35 Exh. 22.

36 Ex. 17 at GR00819.

37 Exh. 22.

38 Exh. 22.

39 Exh. 22; Ex. 16 at GR00516, 566, 576, 580, 613.

40 Exh. 25 at p. 5; Exh. 27 at p. 5.

41 Tr. 9/14/09, 16:2–7.

42  Docket No. 36.

43  Id.

44  Exh. 26; Tr. 9/14/09 16:12–20.

45  Tr. 9/14/09, 17:21–18–4; 88:10–14.

46  Exh. 27 at p. 3.

47  Exh. 27 at 1.

48  Tr. 9/11/09, 29:10–17; Ex. 28.

49  Tr. 9/11/09, 38:10–16.

50  Docket No. 36.

51  Docket No. 41.

52  Tr. 9/9/09, 44:17–45:10.

53  Tr. 9/9/09, 45:13–24; Ex. 3, p. 2.

54  Tr. 9/10/09, 6:6–11; 9/11/09, 55:18–56:4.

55  Tr. 9/09/09, 103:23–24.

56  Tr. 9/09/09, 90:18–91:1.

57  Exh. 25 at p. 11; 14; 9/14/09, 68, 73–74.

58  Exh. 25 at pp. 14–15.

59  Exh. 27 at 7–8.

60  Tr. 9/11/09, 187:7–16.

61  Tr. 9/11/09, 40:3–9.

62  Tr. 9/9/09, 90:4–12, 103:25–104:1.

63  Tr. 9/9/09, 90:4–12.

64  Tr. 9/9/09, 149:13–22, 97:6–98:2.

65  Tr. 9/11/09, 115:24–116:15.

66  Tr. 9/11/09, 56:10–16.

67  Exh. 21 at p. 566.

68  Id.

69  Exh. 21 at pp. 566–575.

70  Tr. 9/09/09, 105:8–11.

| | |
|---|---|
| 71 | Gov't Proposed Findings of Fact at ¶ 63 ("While the testifying experts disagree as to whether a diagnosis of Paraphilia NOS may be made as to Graham individually, every expert to have testified in this matter recognized that Paraphilia NOS can be an appropriate diagnosis for individuals who meet the general paraphilia criteria and who experience deviant sexual arousal to nonconsenting sex (or rape).") (citations omitted). |
| 72 | Tr. 9/14/09, 172:25–173:2. |
| 73 | Tr. 9/10/09, 162:1–9. |
| 74 | Exh. 21 at p. 576. |
| 75 | Tr. 9/10/09, 36:1–24. |
| 76 | Tr. 9/09/09, 108:5–12. |
| 77 | Tr. 9/11/09, 104:16–107:17. |
| 78 | Tr. 9/9/09, 110:5–111:2. |
| 79 | Tr. 9/10/09, 164:24–165:16. |
| 80 | Tr. 9/9/09, 129:22–131:19. |
| 81 | Tr. 9/9/09, 131:23–132:13. |
| 82 | Tr. 9/9/09, 127:4–129:21. |
| 83 | Tr. 9/9/09, 129:22–131:19. |
| 84 | Tr. 9/9/09, 133:22–134:5. |
| 85 | Tr. 9/9/09, 133:3–7, 134:5–7. |
| 86 | Tr. 9/9/09, 134:10–14. |
| 87 | Tr. 9/9/09, 134:15–22. |
| 88 | Tr. 9/9/09, 135:5–7. |
| 89 | Tr. 9/9/09, 135:7–11. |
| 90 | Tr. 9/9/09, 137:3–8. |
| 91 | Tr. 9/9/09, 137:5–8. |
| 92 | Tr. 9/9/09, 137:9–14. |
| 93 | Tr. 9/9/09, 137:9–14. |
| 94 | Tr. 9/9/09, 137:10–14. |
| 95 | Tr. 9/9/09, 137:15–18. |
| 96 | Tr. 9/9/09, 138:2–3. |
| 97 | Tr. 9/9/09, 138:2–5. |
| 98 | Tr. 9/9/09, 138:8–13. |

| | |
|---|---|
| 99 | Tr. 9/9/09, 153:9–11. |
| 100 | Tr. 9/9/09, 153:13–17. |
| 101 | Tr. 9/9/09, 153:25. |
| 102 | Tr. 9/09/09, 154:3–7. |
| 103 | Tr. 9/11/09, 123:2–5. |
| 104 | 18 U.S.C. § 4247(a)(5). |
| 105 | 18 U.S.C. § 4247(a)(6). |
| 106 | Tr. 9/9/09, 89:18–90:3; Ex. 1, p. 37; Ex. 25, p. 11; Ex. 27, p. 7. |
| 107 | Resp.'s Proposed Findings of Fact and Conclusions of Law [# 103] at ¶ 30. |
| 108 | 18 U.S.C. § 4247(a)(6). |
| 109 | 18 U.S.C.A. § 4248(d)("If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court shall commit the person to the custody of the Attorney General."); see *United States v. Hunt*, 643 F.Supp.2d 161, 162 (D.Mass.2009); *United States v. Shields*, 522 F.Supp.2d 317, 328 (D.Mass.2007). |
| 110 | *Id.* at 425. |
| 111 | Black's Law Dictionary 596 (9th ed.2004). |
| 112 | *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (internal citation omitted). |
| 113 | *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Speiser v. Randall*, 357 U.S. 513, 525–526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)) |
| 114 | *Id.* |
| 115 | Tr. 9/09/09, 09:4–12. |
| 116 | *Id.* |
| 117 | Tr. 9/11/09, 23:2–5; Gov't Proposed Findings of Fact and Conclusions of Law at ¶ 120. |
| 118 | DSM–IV–TR at p. 566; *see also Carta*, 592 F.3d at 40 (The First Circuit defined "essential features" of a paraphilia as " 'recurrent, intense sexually arousing fantasies, sexual urges, or behaviors' fixated on a specific 'stimuli,' which 'occur over a period of at least 6 months' and 'cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.' ") (citing the DSM–IV–TR at 522–23). |
| 119 | DSM–IV–TR at p. 566. |
| 120 | Exh. 25 at p. 14. |
| 121 | *Id.* at pp. 14–15. |
| 122 | *Id.* at p. 15. |
| 123 | Tr. 9/14/09, 12:19–20. |
| 124 | *See id.* at 12:20–21. |

125  *Id.* at 15:8–12.

126  *Id.* at 53:19–54:1.

127  *Id.*

128  *Id.* at 51:3–52:3.

129  Tr. 9/11/09, 142:6–14.

130  *Id.*

131  Exh. 27 at pp. 7–8.

132  Tr. 9/10/09, 164:14–165:2.

133  592 F.3d 34 (1st Cir.Mass.2010).

134  *Id.* at 39–40 (citations omitted).

135  See *id.* at 40–41.

136  Tr. 9/09/09, 116:14–19.

137  *Id.* at 116:20–24.

138  Exh. 1 at p. 13 ("For his second rape ... he attacked a stranger victim. This second rape involved more callousness as the victim was not only a stranger but vulnerable by virtue of being eight months pregnant.").

139  *Id.*

140  *Id.*

141  Exh. 5 at GR00007.

142  Tr. 9/14/09, 55:5–16.

143  *Id.* at 55:5–13.

144  *Id.* at p. 15.

145  Tr. 9/14/09, 41:5–7.

146  Tr. 9/09/09, 135:5–7.

147  Tr. 9/09/09, 135:7–11.

148  Exh. 22 at pp. 1–2.

149  Tr. 9/09/09, 137:3–8.

150  Tr. 9/09/09, 138:8–13.

151  Tr. 9/14/09, 42:14–19.

152  *Id.* at 42:19–24.

153  *Id.* at 41:7–9.

154  *Id.* at 42:8–13.

155  Tr. 9/09/09, 157:9–21.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.