# Exhibit 69E:

# Dr. Anna Salter Deposition Exhibit 14



2011 WL 3176534
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

**K.M.**, Plaintiff–Respondent,

v.

**S.M.M.**, Defendant–Appellant.

Argued: April 6, **2011**.
|
Decided: **July 28, 2011**.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FM–07–1254–06.

**Attorneys and Law Firms**

Candida M. Harty (Arnold & Porter, LLP) of the District of Columbia and California bars, admitted pro hac vice, and Michael D. Hynes argued the cause for appellant (DLA Piper LLP, Ms. Harty, and Reed Smith, LLP, attorneys; Mr. Hynes and Ms. Harty, of counsel and on the briefs).

Mark H. Sobel argued the cause for respondent (Greenbaum, Rowe, Smith & Davis, LLP, attorneys; Mr. Sobel and Jacqueline M. Printz, of counsel and on the brief; Ellen C. Marshall, Lisa B. DiPasqua, and Amanda B. Sherman, on the brief).

Before Judges AXELRAD, R.B. COLEMAN, and J.N. HARRIS.

**Opinion**

PER CURIAM.

**\*1** In this divorce action, defendant mother alleged that plaintiff father sexually abused the parties' young daughters. The court found otherwise, concluding mother had endangered her children's health and safety by intentionally manipulating them and turning them against their father. The court awarded father sole custody. Mother appeals from portions of the final judgment of divorce, alleging a variety of trial errors, including the court's failure to hold an independent

hearing on the abuse allegations pursuant to Title 9 prior to the custody trial, its exclusion of purportedly critical evidence of that abuse, and its failure to appoint the children a law guardian, which she contends irreparably influenced the outcome of the custody litigation to her detriment. Mother also challenges the significant counsel fee award in father's favor.

Based on our review of the voluminous record and applicable law, we are satisfied the findings of the trial judge, who presided over this tumultuous, bitter litigation spanning over four years and who conducted about seventy days of judicial proceedings from June 16, 2006 through August 18, 2009, are amply supported and legally based. Moreover, Judge James Convery made credibility assessments and provided painstakingly detailed factual and legal explanations for his rulings. Accordingly, we affirm substantially for the reasons articulated in his oral rulings and his comprehensive written opinions of February 20, 2008, January 27, 2009, and August 18, 2009.

I.

We include only the procedural history relevant to this appeal. Father filed a complaint for divorce on December 1, 2005, and mother filed an answer and counterclaim on January 30, 2006, alleging, in part, that father had sexually abused the parties' daughters, then aged six and three and one-half. A prior domestic violence complaint filed by mother, dismissed by the court following trial on November 7, 2005, spawned investigations of father by the Essex County Prosecutor and the Division of Youth and Family Services ("DYFS"), which resulted, respectively, in a decision not to present the matter to a grand jury and an initial finding that the abuse allegations were unsubstantiated. Pursuant to an inquiry from mother, on June 20, 2006, the New Jersey Attorney General advised it found no abuse of discretion by the prosecutor's office in declining to proceed and thus would not intervene.

Father then filed an emergent application to be reunited with the children. Mother filed opposition and a cross-motion seeking, in part, permission to amend her counterclaim to include a claim under _N.J.S.A._ 9:6–8.21 ("Title 9") and for the appointment of a law guardian for the children. By order of **July** 27, 2006, the court directed, in part, that mother remain the parent of primary residence; reinstated the parenting plan previously agreed to by the parties with supervision of

father during his parenting time by his family members; and generally denied the relief sought in mother's cross-motion.

**\*2**  In response to father's emergent application to transfer custody of the children to his parents and the court's receipt of additional information from DYFS, by orders of December 8, 2006, the court directed mother's parenting time to be supervised pending the return date, and appointed Barry Katz, Ph.D. as a therapist for the children. Mother filed a cross-motion seeking suspension of father's parenting time. By oral decision and order of December 21, 2006, Margaret Dee Hellring, Esquire was appointed as Guardian Ad Litem ("GAL"), the maternal grandmother was directed to move into mother's house to supervise mother's future parenting time with the assistance of other family members, and trial was scheduled to commence on February 15, 2007.[1]

On January 29, 2007, mother filed an order to show cause seeking reconsideration of the ==July== 27, 2006 order, a suspension of father's parenting time with the children pending completion of a Title 9 fact-finding hearing, and recusal of the judge. By orders of the same date, the court denied all relief sought by mother in the proposed order, which included, in part, appointing Hellring as the law guardian; forwarding the complaint to the prosecutor's office; suspending contact between father and the children pending a Title 9 hearing; and holding an immediate fact-finding hearing under Title 9.

Mother filed an emergent interlocutory appeal. By order of February 2, 2007, we denied mother's emergent application for a Title 9 hearing and disqualification of the trial court, noting, in part, that father had supervised parenting time since ==July== 2006, and we were "satisfied that the issues raised by [mother] in her Title 9 complaint will be thoroughly addressed at the hearing scheduled to commence on February 15, 2007."

At the request of the GAL, the court entered an order on February 6, 2007, appointing Susan Cohen Esquilin, Ph.D. as an independent expert retained on behalf of the children. A trial on the issues of custody and sexual abuse commenced on February 15, 2007, over approximately fifty non-continuous days, and concluded on April 16, 2009.

On March 30, 2007, on father's motion, and with opposition by mother and the GAL, Judge Convery issued an order barring the GAL from "attend[ing] the trial sessions except as a witness until further order of the Court." The court issued a written opinion on that date, primarily concluding there was

no best interest need for the GAL's attendance at the plenary sessions and the significant expert fees should be minimized.[2] By order of April 17, 2007, the court denied mother's motion for reconsideration.

On or about October 15, 2007, father moved *in limine* to bar mother from utilizing the testimony, reports or tapes of interviews of psychologist Joyanna Silberg, Ph.D. The court conducted an *N.J.R.E.* 104 ("104") hearing over seven days from October 24, 2007 through January 9, 2008. Dr. Silberg testified, along with psychologists Anna Salter, Ph.D. and Sharon Ryan Montgomery, Psy.D. By order of February 20, 2008, the court barred mother from calling Dr. Silberg as a witness and from using her expert reports, letter, tapes, and interviews. The court's ruling was explained in a lengthy written opinion appended to the order. The trial court denied a stay, and by order of April 22, 2008, we denied mother's motion for leave to appeal and request for a stay.

**\*3**  In accordance with *N.J.R.E.* 803(c)(27), on February 27, 2008, mother provided notice of her intent to offer alleged disclosures by M.M., the parties' older daughter, of sexual abuse by father. The court conducted a 104 hearing over fourteen days from March 10 through August 20, 2008. In a ninety-two page written opinion of January 27, 2009, memorialized in an order of the same date, Judge Convery barred as untrustworthy the admission of M.M.'s testimony and any sexual abuse statements attributed to M.M.

The parties' remaining witnesses as to custody testified. On April 7, 2009, the court orally ruled that Hellring's testimony was limited to those portions of her investigation and report pertaining to her observations and resulting perceptions relating to custody and parenting time issues, and barred expert testimony sought to be presented by mother that relied on M.M.'s inadmissible statements. The ruling was memorialized in an order of April 13, 2009.

On August 18, 2009, Judge Convery issued a final dual judgment of divorce and 109–page accompanying opinion, awarding father sole custody and attorney and expert fees of nearly $2,000,000. Mother was granted supervised parenting time upon her completion of eight weeks of psychotherapy with supervised overnight parenting time to begin after six months. The judge denied mother's motion for a stay pending appeal. By order of August ==28==, 2009, we denied mother's emergent application to the same effect. This appeal ensued.

## II.

We abridge the factual statement contained in this voluminous record as many of the facts are recited at length in the judge's opinions, which we are satisfied accurately reflect the testimony and evidence before the court. We highlight those facts pertinent to the issues on appeal. The omission of a specific recitation of facts does not in any way indicate they were overlooked in our review of the record.

Both parties are well educated and earn considerable livings as ophthalmologists with private practices, father in New Jersey and mother in New York City. They were married on August 29, 1998, and have two daughters of the marriage, M.M. born on January 15, 2000, and J.M. born on August 28, 2002. The parties sought marital counseling from three successive therapists as early as 2001, to address, from father's perspective, the parties' lack of emotional intimacy, and from mother's perspective, father's sexual aggression. Mother sought legal advice about ending the marriage from at least a dozen attorneys beginning as early as December of that year. She would come to record many of her conversations with father, the children, and mental health professionals on the advice of one of those attorneys, and began keeping a journal, as well, early in 2005.

Father left the marital home on March 12, 2005. Father admitted on cross-examination that M.M. became hysterical when he left and wanted her father to stay. He moved back home for a few weeks but finally left in mid-April. The parties executed a shared parenting agreement affording father three overnight visits with the children each week.

**\*4** According to mother, the final separation was precipitated by an argument about the parties' tax returns, during which father threw papers down at her from the balcony above their living room and then ran down the stairs toward her, chasing her into the bedroom and frightening her. After father left, she contacted an organization offering support for women in abusive relationships and attended individual and group counseling there over the next few months. The parties continued psychotherapy together after their separation, as well, until their respective psychiatrists advised on June 15, 2005, contrary to mother's suggestion and to her considerable and obvious disappointment, that they would not diagnose father with a borderline or narcissistic personality disorder.

On September 25, 2005, father brought the children home after a visit. Shortly thereafter, a dispute arose over whether he should put the children to bed alone because M.M. was upset and reluctant to let mother leave the room. The parties agree that, after some argument between them, father touched mother's face and kissed her just before leaving, telling her the marriage was "done," though mother recalled the action as more aggressive than did father. According to mother, M.M., who had been standing near her when father left the house, assured her later that night that she would "protect" mother from father.

Mother promptly obtained a temporary restraining order ("TRO") prohibiting father from contacting her or the children[3] on the basis of that incident. Mother's complaint made no mention of any alleged sexual or other abuse of her or the children. Nor did she mention such abuse when she presented each child's school a copy of the TRO the following day and instructed Jeffrey Truppo, M.M.'s school principal, that father was not allowed on the premises. Truppo suggested the school's guidance counselor, Jean Pasvankias, meet with M.M.

That evening, mother brought the children to Cathy Ludwig, a crisis mental health evaluator recommended by her attorney. Mother acknowledged at trial that she discussed the prior day's events with the children before their visit with Ludwig "to document what they had witnessed as far as the incident" with father and she had "started to correct [M.M.'s] recollection" of the prior night. She claimed, though, that she stopped upon realizing that M.M. should report the incident from her own memory.

Ludwig was the first person to formally interview M.M.[4] She testified at trial on behalf of mother. According to Ludwig, she explained to M.M. that she was a therapist whose job it was to help M.M.'s family and, to that end, would take extensive contemporaneous notes of what M.M. said so that she could write a report "that the judge and the attorneys and her parents would eventually see." Ludwig asked open-ended questions to make M.M. comfortable about discussing the subject, and, throughout, M.M. remained focused, articulate, and eager to talk, though understandably somewhat anxious given the circumstances of the interview.

**\*5** M.M. told Ludwig that, on the night of the incident, she saw her father grab her mother's face and shout in her ear, "[I]t's done," before storming out of the house. M.M. related that her father had never been that mean or done anything like

that to her mother before, and that was the first time M.M. had ever been scared of him. Asked specifically if there was ever any "hitting" in the household, M.M. recalled that her father had once yelled at her while she was trying to walk down the stairs because she was not going fast enough, picked her up and carried her to her bedroom, and then hit her on the back as he put her to bed. She commented that her father never hit her sister, though, because "she's too little to get hurt."

M.M. generally described her father as "shouty and cranky" and shared more specifically that "[m]ommy says that daddy is mean to everybody including her cousins" and that she "agree[s] with mommy ." Ludwig related that M.M. spontaneously offered, as well, that her father had removed her mother's name from a family credit card, which "[w]asn't very nice." Ludwig found that particular disclosure unusual and the matter inappropriate for a parent to discuss with such a young child.

Ludwig further testified that M.M. additionally volunteered that her mother "never hits or yells" at her or J.M. and "only yells at daddy sometimes." M.M. related that her parents had been arguing for a long time and she felt as though she were caught in the middle. Moreover, M.M. expressed that if she had to choose, she would prefer to live with her mother, but would be "sad" if she could not also see her father.

Ludwig prepared a report and recommended the children continue to have regularly scheduled parenting time with their father, M.M. have individual therapy, and mother, the children, and, if appropriate, father, have family therapy. She was surprised to find that M.M. later made disclosures of sexual abuse and reviewed her records to ensure that she had not failed to recognize any indication of abuse during the interview. Although child abuse was not her specific area of expertise, she was confident, given her extensive education and the fact she had treated a child who had been sexually abused, that M.M. had given no indication of abuse. In his January 27, 2009 opinion, the court noted that mother testified she believed Ludwig had testified truthfully, and he found "Ludwig clearly had sufficient expertise to offer the intended testimony and her testimony was sufficiently reliable."

Mother testified that the following day, September 27, 2005, she provided background information to Pasvankias in anticipation of a counseling session with M.M. Mother related that she described her relationship with father as abusive and revealed several "red flag" incidents that concerned her about possible sexual abuse of the children. She also testified she

reminded M.M. that day that no one was allowed to touch her "private parts" and M.M. should feel comfortable telling her mother anything. On cross-examination, mother admitted that she had never voiced a concern to any of her attorneys that her children had been sexually abused.

**\*6** Based on their conversation, Pasvankias told mother to expect a call from another counselor to schedule an interview with M.M. Shana Goldman, a school crisis counselor and social worker, called mother early the next morning, September **28,** 2005, before she brought M.M. to school, to schedule an appointment later that day. Mother admitted she told Goldman about "red flags" she had claimed to perceive, about a sex schedule she claimed father had imposed on her, about her sexual history with father, and about mother being a victim of domestic violence.

Mother presented Goldman as her witness at the *N.J.R.E.* 803(c)(27) ( "803(c)(27)") hearing. Goldman testified she met with M.M. later in the day on September **28**, 2005 in the music room at school for the first of two interviews. Goldman related that she sat on the rug in the music room with M.M. and asked some general preliminary questions about school. Goldman escorted M.M. to the bathroom at the child's request and waited outside the stalls. There was considerable discussion during Goldman's testimony regarding M.M .'s purported statement to her at that time regarding a "secret." Goldman testified that M.M. said she had a secret and it was not with anyone specific. However, according to Goldman's sworn statement to Detective Susan Johnson of the Morris County Prosecutor's Office on September 29, 2005, M.M. had said she had "a really big secret that only mom and I know about" and she could not share with Goldman, and according to Goldman's 2006 deposition, M.M. had said she "had a secret and mom does not know it."

Goldman further testified that after being encouraged to share the secret, M.M. reported that her father had put "poopy" in her face. When M.M. left the stall and washed her hands, she demonstrated what her father had done, using a crumpled up piece of paper towel in her hand. According to Goldman's sworn statement to Detective Johnson, when she asked M.M. for specific details, the child elaborated that it happened every time she visited her father's house and he did it while "fully dressed" in his "suit for work."

Goldman brought M.M. back to the music room and asked her whether anything else had happened that made her feel uncomfortable. According to Goldman, M.M. responded that

her father sometimes did "gross" things that she preferred not to discuss, because she was scared. Goldman related that M.M. then reported that her father forced her to watch him shower, where he touched his "pee pee" for a long time and then "pee[d]" on his hand. He then asked her to give him a towel and to touch his penis with it, but she was "grossed out" after touching his pubic hair and ran off. Asked whether she touched her father's penis with anything else, she replied she had done so with a broom handle, so that she could remain far away. When Goldman then inquired whether M.M. had ever seen her father's penis on another occasion, M.M. claimed she saw her father kiss it and that he asked her to do so, but she refused. According to Goldman, M.M. confided that these things made her feel "bad," and Goldman assured her that her father should not have asked her to do any of those things, that she was right to feel as she did, and that Goldman herself was sorry he had done them.

**\*7** Goldman admitted that, when first asked, M.M. denied that her father had touched her "pee pee" and said she would never let him do so. Goldman then specifically asked M.M. whether her father had touched J.M.'s "pee pee" and M.M. demonstrated by moving her finger up and down in the air. Goldman again assured M.M. that her father had no right to do so and that it was "like breaking the law ."

After the interview, Goldman brought M.M. to her classroom, where she resumed her normal activities. Goldman apprised Truppo of the situation, and he called the police while she contacted mother and DYFS.

Goldman met with M.M. a second time that day in the nurse's office. The nurse, Susan Gould, reviewed the concepts of good and bad touching with M.M. using a stuffed animal, and M.M. demonstrated on the stuffed animal how her father had touched her sister, placing her finger between its legs. When asked to demonstrate how her father was mean to her, she punched the stuffed animal in the head and chest with a closed fist. In response to direct questioning, M.M. informed Gould, contrary to her earlier denial, that her father had also touched her "pee‑pee." Gould reassured M.M. that she was sorry about what he had done. Gould observed no signs of abuse during the child's physical examination. As more fully discussed *infra,* in his January 27, 2009 opinion, Judge Convery found Goldman "not [to] be a neutral interviewer and became [mother's] advocate demonstrating a clear bias in obtaining statements from [M.M.] to inculpate [father] that he sexually abused his daughter."

Heather Frommer, a DYFS caseworker, conducted M.M.'s third interview that day. According to the records admitted into evidence, M.M. disclosed to Frommer that her father yelled and was mean to her and to her sister and mother, that he had hit her and her sister, and grabbed her mother's face. M.M. denied, when asked, that he had done any other bad things.

Detective Johnson conducted M.M.'s fourth interview that day. She conducted a videotaped interview with M.M. in Frommer's presence for just under an hour. The detective related that M.M. vacillated in her answers, for example, when asked directly whether her father ever touched her private parts, she answered "no" and later admitted talking to Goldman about her father touching her "pee‑pee." Judge Convery viewed the videotape of the interview.

When they arrived home that night, mother told M.M. that she was proud of her for discussing "things that were hard to talk about," and reminded M.M. that she should feel free to talk with her about anything.

The following day, an examination by Dr. Nina Agrawal, a pediatrician specializing in child abuse, revealed no evidence of physical abuse to either girl.

Karen Smarz, Ph.D., a DYFS psychologist, testified about her interview of M.M. about six weeks later, on November 14, 2005, as part of the agency's investigation. According to Dr. Smarz, M.M. repeated that her father had put "poopy" in her face, had digitally penetrated her, everything also happened to her sister, and all the abuse occurred at both her father's and mother's houses. Yet, earlier in the interview when Dr. Smarz had asked M.M. whether anything had happened to her body that she did not like, M.M. recalled only getting a cast on her arm, rather than any instance of sexual abuse.

**\*8** By letter of March 12, 2007, Dr. Katz, the court‑ordered therapist for the children, related to the court the following incident, among other items pertaining to the parties and children:

> [Mother] has been adamant and detailed in her reporting of how [M.M.] has been sexually abused and tormented by her father causing significant and enduring psychological trauma. [Mother] has repeatedly reported that [M.M.] is currently terrified of her father as a result of his acts of sexual abuse and repeated threats to [M.M .] that he is going to murder the child. [Mother] has reported that signs of traumatic stress symptoms occur at home and at school.

[Mother] has emphasized that therapy must focus on sexual abuse treatment for [M.M.], and that the therapist must get [M.M.] to discuss her abuse by her father. *[Mother] would not accept the possibility that any of the information reported by [M.M.] could be distorted or confounded in any way. In fact, when this issue was presented to [mother] by the therapist, she proceeded to "faint" in the therapist's office. She lay down on the floor and did not get up or respond until the therapist announced to her that she was going to call 911.* At that point, [mother] did get up and sit on the couch. [Mother] complained of the office being hot and not having eaten earlier as the cause of her fainting. It is noted that the office was warm that day, but that *[mother's] announcement that she was going to faint took place right after the issue regarding potential contamination or distortion of the data was presented to her.*

[Emphasis added.]

Dr. Katz was replaced with Amie Wolf–Mehlman, Ph.D. on June 15, 2007, after the children frequently missed sessions and reported they preferred not to have a male therapist.

Turning to the custody issue, at trial both parties testified they were involved with their children's upbringing and they could flexibly schedule their ophthalmology practices to accommodate parenting time with their children. After reunification, the children spent supervised time with father at his parents' home. They engaged in outdoor activities together, and father prepared their meals and helped them with their homework. He explained that he wanted the children to have positive relationships with both parents and their extended families, but related that mother frequently disregarded the parenting agreement, removed all pictures of him from the marital home, limited the children's telephone conversations with him, and discouraged them from showing him affection in her presence. His mother and sister testified and confirmed the affection the girls showed to him and his family.

Mother explained that she had taken on greater child-rearing responsibilities after the children's former live-in nanny left her employ and emphasized that she lived close to their new school. In addition to M.M.'s teacher and a camp counselor, who testified to both parents' involvement in M.M.'s education and activities, and mother's office manager, who attested to mother's efforts to modify her work schedule to accommodate her parenting responsibilities, mother offered Hellring, who reported warm interactions

between each party and the children. However, mother declined to offer her parents or brother to testify either as to their court-ordered supervision of mother's parenting time with the children or to any of M.M.'s traumatic episodes at her mother's house. Accordingly, pursuant to *Michaels v. Brookchester,* 26 *N.J.* 379 (1958), the court drew an inference that their testimony would have been unfavorable to mother.

**\*9** Father presented two psychologists as custody experts, Edwin A. Rosenberg, Ph.D., and Dr. Montgomery,[5] who were accepted as such by the court. Dr. Rosenberg conducted a best-interests evaluation in accordance with the guidelines promulgated by the State Board of Psychological Examiners. He reviewed documents, met with the parties and children, and spoke with the children's former live-in nanny and mother's psychiatrist. Notably, he testified that mother told him father had been diagnosed with an Axis II disorder[6] by a psychiatrist and he later found out this was untrue and she had been upset by the psychiatrist's failure to make that diagnosis. According to Dr. Rosenberg, this showed that mother had "inflexibility" in her thinking, such that once she believes something she will not let it go, as in her belief she and the children were abused and father has an Axis II disorder.

Dr. Rosenberg testified about the psychological tests he performed and evaluated. The results suggested the parties were both capable of logical and coherent thinking and of perceiving people and events realistically, but exhibit diminished tolerance for frustration and a tendency toward impulsive actions and emotional outbursts, characteristics which would negatively impact their functioning as parents. Father's ability to form intimate relationships without giving his own needs priority over those of others lent to a more positive outlook on his parenting ability, while mother appeared inflexible in her beliefs and behavior and likely to place her own needs above those of others. Moreover, she was prone to anxiety, depression, and self-pity.

Dr. Rosenberg interviewed M.M. as part of the evaluation. She told him her father "stuck his finger in her bagina [sic]" and hit her and did "other mean things" but when asked what else, "she shut down" and said she did not remember. M.M. was "matter of fact" when recounting this and expressed no discomfort. The psychologist expressed doubts about how "spontaneous and real her disclosure [of abuse] was" because of her lack of sadness or anxiety when reporting the incidents. M.M. also said her mother promised they were moving, possibly to Manhattan.

Dr. Rosenberg found M.M. to be emotionally immature, as confirmed by her nanny's disclosure to him that M.M. frequently told untruths to seek attention. He explained that it was important that, at her age, M.M. develop a degree of "self-sufficiency and self[-]care and [be] self[-]soothing" and, to that end, she be encouraged by her parents to become more independent. Her relationship with mother, however, was deficient in that regard. While Dr. Rosenberg observed father promptly correcting M.M.'s behavior when she attempted to cheat in a game with her sister, mother was more lenient. Moreover, the children slept through the night in their own beds at their paternal grandparents' house but in bed with their mother at her house.

In observing the children with father, Dr. Rosenberg found neither child avoided physical contact with him and were comfortable being close to him physically. Father was also responsive to the children's needs, was "supportive and nurturing," and was able to be firm with M.M. without showing anger. Moreover, neither child appeared afraid of him.

 **\*10** In observing the children with mother, the expert observed she did not persist in trying to modify M.M.'s behavior that needed to be corrected, unlike father who persisted until the behavior subsided. The children were very competitive about mother's attention, and when she paid attention to J.M., M.M. pouted. M.M. also "regressed in her behavior" when mother showed physical affection to J.M., and sought to redirect her mother's attention back to her.

Dr. Rosenberg found father had "a positive nurturing relationship" with both children. He opined that father "would facilitate and encourage a relationship between his children and" mother, while she would be incapable of returning the favor, given her unsupported belief that he abused the children and her hostility to the idea of him even being granted supervised visitation. According to Dr. Rosenberg, M.M. would be better able to develop into a more independent and self-sufficient person in father's care and this development would be hindered by her current relationship with mother because of M.M.'s regressive behavior when with her. Dr. Rosenberg recommended the parties be granted joint legal custody and concluded, in light of the *N.J.S.A.* 9:2–4 factors, that father be given primary residential custody. He recognized that the separation from mother would impact M.M. in the "short term," but in the long term he opined she would benefit by getting out of the symbiotic relationship with her mother. Moreover, because the children had had

only limited, supervised visitation with father, and in view of mother's expressed feelings about father to the children, he recommended the children be permitted the opportunity for uninterrupted contact and bonding with father. Accordingly, Dr. Rosenberg recommended mother have limited contact for a period of time, with a graduated process for supervised parenting time.

Dr. Montgomery also met with the parties and children, as well as father's family members, and analyzed the statutory custody factors. When she interviewed M.M., she felt the child "was very prepped" to come to the meeting, and immediately started volunteering information that her father did "bad things," and looking for the psychologist's reaction. She found "most significant" M.M.'s "playful, at ease, comfortable demeanor" in discussing "very disturbing topics"; M.M. was almost gleeful in telling her about the sexual abuse. Furthermore, Dr. Montgomery related that M.M. sounded "very rehearsed" and there was a big disconnect between what she was saying and her affect. When discussing the sexual abuse, M.M. told Dr. Montgomery that it seemed as if she had talked about the abuse "a hundred" times and volunteered that she had frequently spoken about it with her mother. M.M. asked Dr. Montgomery if she were going to give M.M.'s drawings to the lawyers or judge, and when asked how she knew about the judge she said her mother told her. M.M. spoke negatively about her father throughout the evaluation, and Dr. Montgomery felt she "was going almost overboard to impress [the doctor] with the fact" that her mother was all good and her father was mean and not even a part of the family.

 **\*11** J.M. "rotely repeated" that her mother was angry at her father "because he did bad things," without "any emotional connection to the words," but could not elaborate or recall ever having seen her father do those bad things. She also related that her mother was sad when she visited with her father and she could not speak with him in front of her mother.

In observing the children with father, Dr. Montgomery felt "it was a very relaxed, natural interaction" and there was no detectable anxiety or apprehension. M.M. and J.M. both demonstrated physical affection towards father, and M.M's demeanor was relaxed and she put her arm around him.

Both parents appeared to attend to the children's needs and they were affectionate with mother as well. Dr. Montgomery did note that M.M. asked her mother what the word "licked" meant, which she found odd because in other interviews

M.M. had reported she "licked her father's penis." At one point, mother referred to J.M. by her first and last name in a kidding manner, and M.M. looked straight at Dr. Montgomery to gauge her reaction and said J.M.'s last name was really her mother's maiden name. When mother corrected M.M., the child repeated the same thing, again looking directly at Dr. Montgomery with a smile on her face, trying to get her attention.

Dr. Montgomery also listened to tapes mother made of conversations with the children, finding the substance and process of taping to be "disturbing," opining that the content of some of the conversations negatively reinforced the children's feelings about father. For example, on either a tape recording or journal entry, mother asked whether father's "penis was soft or hard," and whether it was "pointing up"; according to Dr. Montgomery, this was "educational" and "very influencing of the child."

With regard to custody, Dr. Montgomery largely concurred with Dr. Rosenberg. She recommended a shared parenting relationship because abuse was not substantiated and had a concern if custody were slanted in mother's favor, that would continue to give the message to the children that something was wrong with father. She recommended the children spend an initial period of time completely with father to acclimate them to the fact they have "two parents that were on equal footing" and "equalize the playing field[.]" The psychologist opined that the period of separation from mother would also likely stop the conversations she continued to have with the children about the sexual abuse allegations and her "anxiety" about it would no longer be conveyed to the children.

Judge Convery credited the factual bases and opinions of the custody experts in his August 18, 2009 opinion. He noted that the "welfare of children will always be the overreaching consideration of the court[,]" and, in part, that both experts testified that father's interaction with the children was a "healthier one" than mother's and he would be "better able to nurture the children's growth and emotional independence."

**\*12** Based on his assessment of all the testimony and evidence presented during the lengthy trial, some of which was contained in prior written opinions, the judge was satisfied "the children's emotional health and safety has been placed in jeopardy by [mother's] pattern of behavior during an extended period of the children's 'nurturing years' without any contact by [father] or his right to exercise his parental role in raising his children." He was concerned that the

children, particularly M.M., would "continue to be at risk of her mother's manipulative behaviors to gain custody of the children at all costs and to attempt to eliminate [father] from his children's lives." He was of the opinion the children would be better able to separate and grow to be self-determined by being with their father as their primary parent.

The judge continued his analysis as follows:

> The court accepts [father's] experts', Drs. Rosenberg and Montgomery, factual findings and conclusions that there must be a period of no contact between [mother] and the children to "sever or extricate" [mother's] feelings from the children's imposed beliefs about their father. [Father] has and will provide a more stable home environment than [mother]. From [mother's] actions in fostering the children's ill gotten beliefs about their father, her ceasing any contact with the children and their father, their paternal grandparents and extended family, the reported behaviors of the children only during [mother's] parenting time and with [mother] disobeying the prohibition of being with the children unsupervised, the court finds there was substantial adverse effect on the children in the environment offered by [mother].

Judge Convery concluded, in pertinent part:

> Based on the body of evidence of [mother's] behavior and its adverse effect upon the children and [father], [he] shall be awarded sole legal custody of the parties' children and shall be designated the parent of primary residence [citations omitted]. [Father's] parenting of his children shall be unsupervised. However, as Dr. Montgomery cautioned, [father] must be vigilant and watchful at all times to protect himself from any accusations as the children's primary parent while the children are under his care and until the children undergo therapy and become re-educated. The children must continue to participate in family therapy [and] ... continue their sessions with Dr. Wolf–Mehlman....

The court further designated mother as the children's parent of alternate residence with her parenting time supervised by a court-approved supervisor and required mother to begin psychotherapy, appointed a Parent Coordinator, and set a detailed parenting schedule.

Pertinent to this appeal, the court awarded father $1,565,955.29 in attorneys' fees and costs and $255,406 in expert fees, totaling $1,821,361.29. According to the court, it particularly considered "the factor of fundamental 'fairness' " and, in part, exercised "its equitable power to redress an evil practice or wrongful conduct" on mother's part. This

obligation was expressly designated "to be in the nature of support to serve as a nexus in conjunction with the child support award," citing *Winegarden v. Winegarden,* 316 *N.J.Super.* 52 (App.Div.1998) and *DiGiacomo v. DiGiacomo,* 256 *N.J.Super.* 404 (App.Div.1992). Moreover, the court determined such award, under the circumstances of the case, to be as much "necessaries" as maintenance and support to the children, citing *Pelusio v. Pelusio,* 130 *N.J.Super.* 538 (App.Div.1974); 11 *U.S.C.A.* § 523(a)(5). These rulings were reflected in a dual judgment of divorce, from which mother appeals.

## III.

**\*13** On appeal, mother argues the court's failure to hold a Title 9 hearing or adjudicate the abuse allegations independently of and prior to the custody trial is reversible error. More specifically, mother argues the law guardian should have been appointed to protect the children's interests and help them express their wishes to the court as required by *N.J.S.A.* 9:6–8.23, and the court's failure to hold a Title 9 hearing caused the burden of proof to be impermissibly shifted. Mother further asserts as reversible error the court's exclusion of: (1) GAL Hellring from attending trial and the limitation of her testimony to exclude reference to sexual abuse; (2) Dr. Silberg's reports, interviews and testimony; (3) other experts' reports and testimony regarding M.M.'s purported disclosures of sexual abuse; and (4) M.M.'s testimony regarding sexual abuse. Mother also argues in general terms that the court failed to faithfully follow the best interest of the children standard in resolving custody issues and abused its discretion in awarding father counsel and expert fees. We disagree with all of mother's contentions and affirm.

It is well-settled that a "trial court has broad discretion in the conduct of the trial[.]" *Litton Indus. Inc. v. IMO Indus., Inc.,* 200 *N.J.* 372, 392 (2009). Moreover, our scope of review of a trial judge's factfinding and discretionary rulings is limited. Generally, we accord due deference to the credibility findings and the "feel of the case" by the trial judge who has heard and observed the witnesses, *Pascale v. Pascale,* 113 *N.J.* 20, 33 (1988); *Gallo v. Gallo,* 66 *N.J.Super.* 1, 5 (App.Div.1961), and findings by the trial court are binding on appeal when supported by adequate, substantial and credible evidence in the record. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 484 (1974). This is particularly so with Family Part judges who possess special expertise in these types of matters. *Cesare v. Cesare,* 154 *N.J.* 394, 413 (1998).

We reject mother's argument that an independent Title 9 proceeding was statutorily mandated and, as additionally suggested at oral argument, required by us in our interlocutory order of February 2, 2007. It is important to place into context the procedural posture of mother's Title 9 request. Following investigations, the police, DYFS, and the county prosecutor's office declined to institute criminal proceedings against father or to "originate proceedings" for abuse, cruelty and neglect pursuant to *N.J.S.A.* 9:6–8.33 and *N.J.S.A.* 9:6–8.34(a), (c), and (f).

Mother had the authority to initiate a Title 9 proceeding. *N.J.S.A.* 9:6–8.34(a). However, she chose not to formally do so. Instead, mother incorporated the sexual abuse allegations as part of her counterclaim for divorce filed in January 2006, alleging the court was required under Title 9 "to immediately protect the children and to focus primarily on the protection of the children at all times[,]" and among the standard divorce and custody relief, sought appointment of a law guardian for the children, a Title 9 hearing, and adjudication of the children as sexually abused. By cross-motion seven months later, among other relief, mother sought to amend her counterclaim "to include a count under *N.J.S.A.* 9:6–8.21 *et seq.*" and appoint a law guardian.[7] Noting that the issues of the best interests of the children and custody were already before the court, Judge Convery denied mother's request and directed reinstatement of father's parenting time, which the judge required to be supervised by family members.

**\*14** Mother moved for reconsideration of the order six months later, on the eve of trial, seeking a stay of the "FM" proceedings, recusal of Judge Convery, and permission to file and proceed on a separate Title 9 complaint. Hellring, upon whom mother sought to rely, did not support her request, commenting at oral argument on January 29, 2007 that it did not appear there were "new allegations of sexual abuse," and mother's desire to have an immediate hearing to protect the children would be accomplished by the hearing scheduled in the following few weeks. Hellring further stated:

> It does seem to me that what we're looking at, at the trial, is what has occurred with the children, and what will be in their best interest. Whether it is in the Family Part, FM Docket number, or under Title 9, we're all moving towards the same goal. What should happen with these children, what's in their best interest? Should they be—should they

see their father, or not see their father? With whom should they live? What should be the parenting plan, et cetera? It's all in the same Family Court.

So I would say we should move forward, as fast as we can towards the February 15th hearing. Not complicate it or delay it with other proceedings.

By January 2007, the litigation had been proceeding for over a year, and the record shows a myriad of motions and orders relating to parenting time and financial issues. There can be no doubt that by the time mother filed her Title 9 complaint, Judge Convery had an excellent feel of the case and was justified in his conclusion that the complaint was "an attempt to delay" the court's adjudication of the children's best interests. He denied mother's request, and trial on the issue of custody and sexual abuse commenced as scheduled on February 15, 2007.

Contrary to mother's assertion, our February 2, 2007 order did not mandate an independent Title 9 hearing but required the sexual abuse issues be thoroughly addressed at the hearings before Judge Convery. Based on our review of the extensive record, we are satisfied these issues were fully litigated.

Mother further argues the court's failure to prioritize and thoroughly consider the abuse evidence at trial, as required by Title 9, marginalized and ultimately excluded the evidence, and permitted the allegations to be re-framed as simply part of a mother's vendetta against a father. In support, she cites to the statement in *State v. P.Z.*, 152 *N.J.* 86, 112 (1997), where the Court cautioned against "shift[ing] the primary focus of Title Nine from the right of children to be protected from abuse and neglect to the right of parents to the custody of their children." This analogy is unavailing. *P.Z.* dealt with a parent's right to counsel during a DYFS child abuse investigation, in which the father unsuccessfully argued the investigation was akin to a custodial interview implicating the Sixth Amendment right to counsel. This statement was made in the context of comparing the statutory right of a parent to counsel at the first hearing after DYFS files an abuse and neglect complaint, *N.J.S.A.* 9:6–8.43(a), with the preliminary investigation performed by DYFS at which it determined whether the family could be rehabilitated and the children safely returned. *P.Z., supra,* 152 *N.J.* at 111–12. It had nothing to do with the conduct of a Title 9 hearing. *Id.* at 112.

**\*15** Mother also argues that because a Title 9 hearing required the appointment of a law guardian, *N.J.S.A.* 9:6–8.23(a), the judge committed reversible error in declining to

do so in the matrimonial proceeding. She contends this error was compounded by the order barring the GAL from trial and the subsequent exclusion of her report and testimony on sexual abuse. We are not so persuaded.

As this is a matrimonial action, as opposed to a Title 9 proceeding, the appointment of a law guardian is controlled by court rule and is subject to judicial discretion. The pertinent provision of *Rule* 5:8A, Appointment of Counsel for Child, states, in part:

In all cases where custody or parenting time/visitation is an issue, the court may, on the application of either party or the child or children in a custody or parenting time/ visitation dispute, or on its own motion, appoint counsel on behalf of the child or children.... The appointment of counsel should occur when the trial court concludes that a child's best interest is not being sufficiently protected by the attorneys for the parties.

The official comment to *Rules* 5:8A and 5:8B explains the distinction between a GAL and law guardian as follows:

A court-appointed counsel's services are to the child. Counsel acts as an independent legal advocate for the best interests of the child and takes an active part in the hearing, ranging from subpoenaing and cross-examining witnesses to appealing the decision, if warranted. If the purpose of the appointment is for legal advocacy, then counsel would be appointed.

A court-appointed guardian ad litem's services are to the court on behalf of the child. The GAL acts as an independent fact finder, investigator and evaluator as to what furthers the best interests of the child. The GAL submits a written report to the court and is available to testify. If the purpose of the appointment is for independent investigation and fact finding, then a GAL would be appointed. The GAL can be an attorney, a social worker, a mental health professional or other appropriate person. If the primary function of the GAL is to act in the capacity of an expert, then the court should ordinarily appoint a GAL from the appropriate area of expertise. Attorneys acting on behalf of children in abuse or neglect cases and in termination of parental rights cases should act as counsel for the child pursuant to *Rule* 5:8A rather than in the capacity of a GAL pursuant to *Rule* 5:8B.

There is scant case law on appointing law guardians in custody disputes. It is clear that in certain family actions

affecting a child, "the court has the power, if necessary, to appoint counsel" or a GAL for the child. *Luedtke v. Shobert,* 342 *N.J.Super.* 202, 214 (App.Div.2001). The decision to appoint a GAL or law guardian under the *Rule* is left to the "broad discretion" of the Family Part judge. *Gyimoty v. Gyimoty,* 319 *N.J.Super.* 544, 550 n. 1 (Ch. **Div**.1998). Such appointment, "which entails considerable expense, should be utilized only where the interests of the child are truly adverse to those of the parent(s). One example of such adverse interest would be the situation where neither parent is a fit custodian." *Mayer v. Mayer,* 150 *N.J.Super.* 556, 563 (Ch. **Div**.1977) (discussing appointment of law guardian prior to adoption of *Rule* 5:8A). In custody and relocation cases, we have suggested that where the party seeking relief, which will impact upon the child, is not represented and the opposing party is, appointing a law guardian may be appropriate to ensure the child's interests are "adequately protected." *Luedtke, supra,* 342 *N.J.Super.* at 214.

**\*16** When the court appointed Hellring as the GAL, mother requested a law guardian also be appointed. The court stated that the GAL would be permitted to hire an attorney for the children if she deemed it necessary under *Rule* 5:8B(a)(7). As this was not done, it is implicit that Hellring, in her assessment of the children's best interests, found it was not necessary to have a third party advocate the children's wishes.

Furthermore, under the factual circumstances of this case, there is nothing in the record suggesting the children's interests were not adequately safeguarded by the appointment of the GAL. Both parents were represented by skilled counsel who conducted extensive cross-examination of all witnesses presented, in contrast to *Luedtke.* Indeed, this is not a situation contemplated by *Mayer* where both parents are unfit and the children's interests are adverse to those of their parents. With the exception of mother's obsession with pursuing her perceived claim of sexual abuse, both mother and father were found capable of parenting their children.

Based on our review of the record, it also appears that appointing a law guardian for the children would have been futile because the children had been so programmed by mother to view father negatively. Furthermore, information given to the law guardian presumably would have been the same as that given to the GAL, i.e. untrustworthy statements by M.M. and evaluations based on those statements, and likely would have rendered the law guardian's opinion regarding the abuse equally unreliable, as without factual basis. Accordingly, we are not persuaded the court's

discretionary decision not to appoint a law guardian in addition to the GAL was legal error.

As a related issue, mother claims the court abrogated its obligation to further the best interests of the children by barring the GAL from trial. We disagree.

*Rule* 5:8B, Appointment of Guardian Ad Litem, provides in relevant part:

> In all cases in which custody or parenting time/visitation is an issue, a guardian ad litem may be appointed by court order to represent the best interests of the child or children if the circumstances warrant such an appointment. The services rendered by a guardian ad litem shall be to the court on behalf of the child.... The guardian ad litem shall file a written report with the court setting forth findings and recommendations and the basis thereof, and shall be available to testify and shall be subject to cross-examination thereon. In addition to the preparation of a written report and the obligation to testify and be cross-examined thereon, the duties of a guardian may include, but need not be limited to, the following:
>
> 1. Interviewing the children and parties.
>
> 2. Interviewing other persons possessing relevant information.
>
> 3. Obtaining relevant documentary evidence.
>
> 4. Conferring with counsel for the parties.
>
> 5. Conferring with the court, on notice to counsel.
>
> **\*17** 6. Obtaining the assistance of independent experts, on leave of court.
>
> 7. Obtaining the assistance of a lawyer for the child (*Rule* 5:8A) on leave of court.
>
> 8. Such other matters as the guardian ad litem may request, on leave of court.

A "guardian ad litem acts on behalf of the court for the benefit of the child and serves as an independent factfinder, investigator, and evaluator of what furthers the best interests of the child." *Isaacson v. Isaacson,* 348 *N.J.Super.* 560, 574 (App.Div.), *certif. denied,* 174 **N.J.** 364 (2002). It is well understood that "[a] court-appointed guardian ad litem's services are to the court," not the parties. *In re M.R.,* 135 **N.J.**

155, 173 (1994) (citing official comment to *Rules* 5:8A and B).

By order of March 30, 2007, Judge Convery directed the GAL not to attend trial except as a witness until further order.[8] In his written opinion, Judge Convery noted father's objection to the GAL's continuing presence at trial, arguing she had already performed her duties and issued her report, thus she had no continuing function to perform; father also contended the GAL's presence had serious financial implications for the parties. Mother argued the GAL should be permitted to attend trial in order to make the court aware of certain facts, and also to confer with the court outside the presence of the parties. Judge Convery found there was no legal authority for this proposition, and permitting the GAL to confer with the court without the parties would be a due process violation.

The GAL also requested she be permitted to attend trial because of the potential for issues to arise over vacation time and summer scheduling. Judge Convery was of the opinion these issues would not be addressed at trial. He further found the GAL "has no role in the court's fact finding responsibilities" and should a best interests issue arise during trial, necessitating the GAL's assistance, the court could require the GAL to investigate and make findings to the court. The court also noted that "the parties are well represented by counsel who if a best interest issue arose during trial concerning the children[,] would make the issue known to the court."

Balancing all the factors, the court therefore concluded there was "no best interest need for the" GAL to attend trial, and considering the "enormous fees incurred by the parties" in connection with the GAL and other court appointed experts, the GAL was not to attend trial. According to the court, it was "clearly in the children's best interest" that both parents be financially secure at the end of the litigation.

The court's analysis, insofar as recognizing that nothing in the *Rules* or case law discusses the GAL's presence at trial, is correct. Furthermore, the court correctly stated the GAL's duty is to issue a report and be available to testify, at the discretion of the court. Given the enormity of the fees incurred in this action, the court's consideration of the financial aspect was also proper once it found the children's best interest did not require the GAL's presence for all aspects of the trial. Accordingly, the decision to bar the GAL from trial was an appropriate discretionary decision, justified within the Family Part judge's broad equitable powers, and will not be disturbed.

See *Cesare, supra,* 154 *N.J.* at 413; *Crespo v. Crespo,* 395 *N.J.Super.* 190, 193–94 (App.Div.2007).

**\*18** Mother next argues the court erred in excluding the bulk of the GAL's report because "once a court seeks assistance from a GAL, it cannot refuse to consider her report." We disagree.

In excluding portions of the GAL's report dealing with the issues of sexual abuse, the court reiterated its finding that M.M.'s memory was tainted and any statements made by her regarding sexual abuse were untrustworthy and inadmissible. The court found the GAL relied upon M.M.'s disclosures in issuing her report, in addition to conclusions by experts such as Drs. Silberg and Salter, which were barred by the court following the 104 hearing, discussed *infra.* Consequently, the court ruled the GAL could testify regarding issues of custody and parenting time based on her observations and perceptions, but could not testify to findings relying on M.M.'s inadmissible statements.[9]

Hellring testified about her observations of the children and mother, noting they interacted "in a warm and close fashion," mother "was extremely attentive to" the girls, she set appropriate limits for them, and, overall, the girls "seemed to be happy." She also testified that over the past two years, "they have become much more relaxed" and "seem to be thriving."

Hellring observed that the girls were also "happy and comfortable" and "very much at ease" in their paternal grandparents' home, and were "very comfortable" with father, climbing all over him and vying for his attention. She admitted that the recordings she listened to, made by mother, reinforced negative views the children had of their father. The GAL also was aware mother caused the children to suffer "a sudden and prolonged loss" of their paternal grandparents in their lives by prohibiting contact with them. Hellring did not testify to a custody recommendation.

Mother cites to a Florida case for the proposition that once a court requests a report, it must consider that report. *See Allen v. Childress,* 448 *So.*2d 1220, 1222 (Fla.Dist.Ct.App.1984). *Allen* is not controlling, but it warrants a brief discussion. As done throughout her brief, mother misrepresents the law in *Allen.* In *Allen,* involving a custody dispute, the Florida Department of Health and Rehabilitative Services conducted an investigation of the mother pursuant to court order. *Supra,* 448 *So.*2d at 1221. The father lived out of state, so Florida requested its counterpart in that state to conduct

the evaluation. *Ibid.* The trial court admitted the report on the mother, but refused to admit or even consider the report on the father, finding it to be hearsay. *Ibid.* The appellate court was troubled that one report was admitted and not the other, and held that "once a court decides to request a report, the court must at least read that report in order to determine whether or not it wishes to use the information contained therein in ruling on the custody issue." *Id.*, at 1222.

The situation here is clearly distinguishable. It is obvious from Judge Convery's oral decision that he did, in fact, consider the GAL's report as he concluded that many sources of information used in the report were inadmissible. Based on prior rulings, however, he chose not to accept all the findings contained in the GAL's report and to limit the GAL's testimony accordingly.

**\*19** It is clear the trial court's decision to admit or exclude evidence is discretionary. *Benevenga v. Digregorio,* 325 *N.J.Super.* 27, 32 (App.Div.1999), *certif. denied,* 163 *N.J.* 79 (2000). A trial judge "plainly has power" to "accept some of an expert's opinion but not all." *Todd v. Sheridan,* 268 *N.J.Super.* 387, 401 (App.Div.1993). "The weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated." *Johnson v. Salem Corp.,* 97 *N.J.* 78, 91 (1984) (citation and internal quotation marks omitted). Thus, if "an essential factual basis of [the expert]'s opinion was false, it [is] error for [the court] to rely on it." *Todd, supra,* 268 *N.J.Super.* at 401.

Simply because the report was issued by a court-appointed expert does not elevate it to a higher level than any other expert report. The plain language of *Rule* 5:8B does not require the court to accept carte blanche the GAL's recommendations; rather, the *Rule* requires that the GAL is to submit a report, and be available to testify should it be necessary. That was done in this case.

Mother's final "Title 9" argument is that the court's failure to hold an independent abuse and neglect hearing caused the burden of proof to be impermissibly shifted. Specifically, mother argues the court incorrectly assigned her the burden of proof of the sexual abuse allegations, while under Title 9, the burden would have shifted to father to prove his innocence once she established a prima facie case. We reject this argument as without legal merit.

In a Title 9 action, "[a] fact-finding hearing shall be held to determine whether the [complainant] has shown by a preponderance of the evidence that the child was abused or neglected." *N.J. Div. of Youth & Family Servs. v. G.M.,* 198 *N.J.* 382, 398 (2009). Pursuant to the statute, "in a fact-finding hearing (1) any determination that the child is an abused or neglected child must be based on a preponderance of the evidence and (2) only competent, material and relevant evidence may be admitted." *N.J.S.A.* 9:6–8 .46(b). Accordingly, "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." *N.J.S.A.* 9:6–8.46(a)(4).

Because a finding of abuse or neglect has a profound impact on a family, it is paramount that any finding must be based on competent reliable evidence. *N.J. Div. of Youth & Family Servs. v. J.Y.,* 352 *N.J.Super.* 245, 264–65 (App.Div.2002). Procedural dictates require that the trial court's conclusions be based on material and relevant evidence and the witnesses be under oath and subject to cross-examination. *G.M., supra,* 198 *N.J.* at 401. The court here did conduct numerous fact-finding hearings in order to determine if there was any competent evidence of abuse. As there was no medical or other physical evidence of sexual abuse, the Family Part judge conducted twenty-one days of hearings to determine the trustworthiness of M.M.'s purported statements and whether there was competent corroborative evidence of sexual abuse. The procedural mandates for a Title 9 hearing were followed as the witnesses were under oath, and the court found no competent, material evidence of sexual abuse.

**\*20** That the court conducted the hearings pursuant to 104 and 803(c)(27), rather than Title 9, is of no moment. The conduct of the hearing would have been the same, as would have been the outcome.

Where direct evidence of abuse through a child's competent testimony identifying his or her abuser is unavailable, Title 9 permits the complainant, ordinarily DYFS, to establish its case pursuant to the doctrine of res ipsa loquitur. *N.J. Div. of Youth & Family Servs. v. J.L.,* 400 *N.J.Super.* 454, 470 (App.Div.2008). Once the complainant has met its burden of establishing a prima facie case, the burden of production shifts to the accused, but the burden of persuasion ordinarily does not. *Ibid.*

The statute provides:

In any hearing under this act ... proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie evidence that a child of, or who is the responsibility of such person is an abused or neglected child[.]

[*N.J.S.A.* 9:6–8.46(a)(2).]

This provision applies where "a limited number of persons[ ] each ha[d] access or custody of a baby during the time frame when a sexual abuse *concededly* occurred, no one else ha[d] such contact[,] and the baby [was and remains] helpless to identify her abuser[.]" *In re D.T.*, 229 N.J.Super. 509, 517 (App.Div.1988) (emphasis added). The cases dealing with this burden shifting approach also deal with an apparent physical injury indicative of abuse.

However, the doctrine of res ipsa loquitur does not apply here. Mother's case relies nearly exclusively on M.M.'s disclosures purportedly identifying the abuse and the abuser, as well as expert testimony reliant solely on those specific disclosures. Her case thus stands or falls on the competency, or trustworthiness, of that evidence, and the court found, following a lengthy examination, that the underlying evidence had no indicia of reliability.

The court found mother had the burden of proof on the trustworthiness of the statements, which is appropriate given the facts of this case, and also comports with the existing law, which provides that once a prima facie case is made, the burden shifts. Here, mother did not make a prima facie case, so the burden stayed with her. Therefore, the court's assignment to mother of the burden of proof as to the abuse allegations does not constitute grounds for reversal.

The Family Part judge did not cut corners in the proceedings or marginalize the sexual abuse evidence presented by mother. There is no doubt in our mind that, regardless of whether the case proceeded as an abuse and neglect matter under an FN docket or a matrimonial matter under an FM docket, his foremost concern at all times of the proceedings was the best interests of the children. Judge Convery made difficult *in limine* and trial rulings respecting the exclusion of such testimony and evidence, with comprehensive explanations citing to legal precedent and the record, and appropriately conducted 104 and 803(c)(27) hearings in his judicial gate-keeping function. As we have

noted, expert opinions "should, of course, be examined during an *N.J.R.E.* 104 hearing before being admitted into evidence." *Vassallo v. Am. Coding & Marking Ink Co.*, 345 N.J.Super. 207, 217 (App.Div.2001). After conducting the hearing, "the trial court should apply its gate-keeping function to determine whether the experts' opinions are sufficiently reliable to be considered...." *Id.* at 218. The court did not exclude "evidence essential to a sound and complete fact-finding hearing." *N.J. Div. of Youth & Family Servs. v. H.B.*, 375 N.J.Super. 148, 175 (App.Div.2005). Rather, it heard all the evidence during the 104 and 803(c)(27) hearings and determined the underlying statements were not trustworthy and the reports and testimony based thereon were inadmissible based on the same fatal defect.

*21 We also discern no error by Judge Convery in the manner in which he conducted the 104 hearing and his ultimate ruling to bar Dr. Silberg's reports[10] and testimony. In order to understand fully the court's ruling, we summarize the seven-day 104 hearing in detail. The hearing was precipitated by father's *in limine* motion to bar mother from utilizing Dr. Silberg's reports and letters of **July** 19 and December 11, 2006 and January 23, 2007, and the tapes of interviews she conducted on **July** 19, 2006 and January 11, 2007, and to bar Dr. Silberg from testifying or alternatively require mother, in advance of Dr. Silberg's testimony, to proffer the scientific basis for her interview protocol in conducting a child sexual abuse validation assessment on **July** 19, 2006 and January 11, 2007. In support, father provided various lay and expert deposition testimony and reports. In his comprehensive February 20, 2008 written opinion, Judge Convery stated the court's duty at a *Frye*[11] hearing and the proper standard under *N.J.R.E.* 702 governing admission of expert testimony. He described the focus of the hearing as follows:

The issue to be determined by the court at the hearing, commonly known as a *Frye* Hearing [citation omitted], is whether expert testimony based on scientific technique would be admitted into evidence only if the expert's procedures were "sufficiently established to have gained general acceptance in the particular field in which it belongs." In this case it is whether there is scientific acceptance for the interview protocol used by Dr. Silberg as demonstrated by expert testimony, scientific and legal writings and judicial opinions acknowledging general scientific acceptance. Having the plaintiff meet the prima facie showing with filings of the motion papers, the burden of going forward shifts to the defendant as the proponent

of Dr. Silberg's testimony to show by a preponderance of the ... credible evidence that Dr. Silberg possesses (1) the requisite expertise, both generally and specifically; and (2) that the factual foundation for her opinion and professional acceptance of the science that forms the basis of her offered opinion is adequate. *N.J.R.E.* 702; *N.J.R.E.* 703.

Drs. Silberg, Salter, and Montgomery testified as experts in child sexual abuse on the issue of the admissibility of Dr. Silberg's expert testimony. The court concluded that "[e]ach of the witnesses qualified as experts by their education, knowledge, experience and training to form an opinion and to provide an analysis of the science used by Dr. Silberg in conducting" the July 19, 2006 interview of M.M. and arriving at a conclusion. Judge Convery provided painstaking detail of each expert's testimony, evaluated by the generally accepted standards and protocols for conducting a scientifically reliable interview of a potential child sexual abuse victim articulated by our Supreme Court in *State v. Michaels,* 136 *N.J.* 299 (1994), and the various professional guidelines. He then made detailed credibility assessments, ultimately crediting Dr. Montgomery's opinion as to the "principles, methodology and judgments" regarding the interview protocols and rejecting the opinions of Drs. Silberg and Salter related to Dr. Silberg's interview with M.M. Because of the thoroughness of Judge Convery's opinion, which accurately reflects the testimony adduced at the l04 hearing, we need only recite, as illustrative, some of the testimony.

**\*22** Dr. Silberg testified she went into the interview "completely cold" because she did not want to have any possible biases that could come with knowing the allegations. However, she admitted having spoken with mother's attorney before conducting the interview, who informed her of the "urgency" in interviewing the children and issuing a report because father was seeking parenting time and her report was being used in support of mother's opposition to that request. The psychologist also admitted that prior to the interview, mother had spoken to her for about twenty minutes about her sexual problems with father and that mother had told her it was consistent with what he did to the children. Dr. Silberg also reviewed a "symptom checklist" to corroborate sexual abuse. She admitted, however, that mother, not M.M., responded to the checklist, but explained that factor was built into the instrument. Dr. Silberg related that she evaluated whether M.M.'s memory was tainted based on her conversations with M.M. and her mother and the behavioral checklist.

Dr. Silberg did not videotape the evaluation of M.M. but used an audio recorder that shut off multiple times. She claimed she took "accurate verbatim notes" in order to fill in the gaps in the tape recording, but conceded she did not write down everything that was said. She also testified the only information she needed "to make conclusive results and opinions" was the interview with the child.

Dr. Silberg acknowledged when she first interviewed M.M. in July 2006, she was "aware that there was a question about the validity of [M.M.'s] previous reports" and they "may have been suspect." Nonetheless, she opined that M.M. was not coerced because of the consistency of her answers. In addition to M.M.'s verbal answers, Dr. Silberg assessed M.M.'s body language to determine if it was consistent with what she was saying. According to the psychologist, M.M. "held her crotch" and gagged when reporting the incidents of abuse, which Dr. Silberg claimed demonstrated the reports were the product of real memories. Furthermore, the psychologist opined that M.M.'s facial expressions and demeanor when discussing the abuse indicated her statements were reliable.

Dr. Silberg also said she was told by mother how many times M.M. had been interviewed. She was confident, based on M.M.'s behavior and the time that had elapsed since earlier interviews, that those interviews had not tainted M.M.'s disclosures. Dr. Silberg testified she followed interview guidelines established by the American Professional Society on the Abuse of Children (APSAC). She stated the guidelines note that "multiple interviews may carry risks for creating memory errors" and advise an interviewer to be aware of taint and to balance the possibility of harming the child through suggestion and helping the child by uncovering things that could be helpful, and acknowledged the content of the conversations would be important. She also acknowledged under the guidelines that multiple interviews should not be conducted because professionals have not shared information with each other, and that she neither gave nor received information from other professionals who had interviewed M.M.

**\*23** Judge Convery found Dr. Silberg's methods and claims about the reliability of the interview flawed because she stated the proper procedure would be to explore the prior interviews for analysis of suggestibility and tainting, but failed to do so. He further found her use of the behavioral checklist to bolster reliability not to be scientifically supported.

He also found completely unreliable Dr. Silberg's claim that she assessed M.M.'s credibility from her verbal and non-verbal disclosures during the interview in view of the psychologist's choice not to videotape the interview in order to evidence the non-verbal communication. He assessed Dr. Silberg's testimony, in part, as follows:

> The court finds Dr. Silberg's conduct in doing an "urgency" interview was a deliberate attempt in haste to present her "opinion" to the court which had no scientific basis and clearly was not founded on "totality of the circumstances" known to or should have been known to Dr. Silberg as mandated by the professional guidelines and requisite findings made by the New Jersey courts in *Michaels*. [See *Michaels, supra,* 136 *N.J.* at 306 ("The question of whether the interviews of the child victims of alleged sexual abuse were unduly suggestive and coercive requires a highly nuanced inquiry into the totality of the circumstances surrounding those interviews.").] Dr. Silberg by her interview tested no plausible "rival" hypothesis under the "totality of circumstances" in this case.

Dr. Salter testified about Dr. Silberg's interview technique of M .M.[12] She listed nineteen factors that were important for a proper interview and discussed why she felt Dr. Silberg "met each and every one of them." However, her conclusion appears inconsistent with her testimony. For example, Dr. Salter did say that some of Dr. Silberg's questions had leading information, contrary to the factor that "the disclosures [should] not be [ ] leading or reinforcing." Dr. Salter also testified that Dr. Silberg asked questions with new information, such as asking M.M. what clothes she was wearing when her father abused her, however, "the child rejected" the suggestions so it was "minor."

Dr. Salter also noted Dr. Silberg did a "very short warm up" but a good rapport seemed to have been established so it was acceptable. She opined that Dr. Silberg sufficiently explored alternate plausible hypothesis by asking M.M. certain questions because "you get information from the child." Dr. Salter also accepted Dr. Silberg's statement that she was unaware of the specific allegations but did not question how she knew to ask M.M. about "poop" because it was not important to the issue of whether Dr. Silberg conveyed bias or not.

As noted by the court, Dr. Salter opined that Dr. Silberg's interview technique was within the "best practices" guidelines suggested by the Association for the Treatment of Sexual

Abusers (ASTA), APSAC, and the American Academy of Child and Adolescent Psychiatry, and was generally accepted in the profession. The judge noted she was candid that she would have looked at previous interviews of M.M., which Dr. Silberg did not, while still claiming Dr. Silberg satisfied the best practices.

**\*24** Judge Convery found problematic Dr. Salter's conclusion that, at most, Dr. Silberg, as a psychologist, only needed to follow "best practices" to interview M.M. as Dr. Silberg "in her judgment" determined them to be. He found Dr. Salter to be "evasive in answering the questions of whether all information should be reviewed before" Dr. Silberg rendered an opinion in this case. Accordingly, he concluded:

> Dr. Salter was clearly not credible in her attempt to walk a professional tightrope as to interview techniques and reliability from such interview techniques. The guidelines, the scientific and legal writings and the judicial opinions clearly refute Dr. Salter's attempt to justify her colleague, Dr. Silberg's "judgment," in interviewing [M.M.] on July 19, 2006.

The court therefore "reject[ed] Dr. Salter's opinion that the guidelines and mandated procedures adopted by the profession and as espoused by law may be ignored by Dr. Silberg and she may use her judgment to ignore obtaining and reviewing 'the most reliable accurate detailed information on sexual abuse allegation ' " in issuing a professional opinion.

Dr. Montgomery testified as father's witness that Dr. Silberg ignored the generally accepted science in conducting M.M.'s interview and issuing her report and violated the mandated procedures adopted by their profession and as espoused in *Michaels* . She opined "that it would be impossible to reliably ascertain that any type of sexual abuse had occurred given the absence of the context in which" Dr. Silberg's interview took place. She testified that the American Psychological Association (APA) had re-drafted the guidelines for forensic interviews to "clearly state[ ]" that a psychologist conducting a forensic interview, i.e. one that is going to be used in court, is "mandated to seek all the documentation, prior information; the entire complete context environment in which" the practitioner is being employed. Furthermore, the claimed emergency "has nothing to do with reliability."

She also stated that the standards set forth in *Michaels* are consistent with research in the area of proper interviewing methods of children in sexual abuse contexts. Furthermore,

the APSAC guidelines incorporate the same concepts underpinning the *Michaels* decision. She explained that required exploration of outside influences on the child stated in *Michaels* are based on research in the field and require the interviewer to consider "prior interview experiences," in particular, any that were "suggestive in anyway or improperly done," the number of interviews, whether information was carried across interviews, and whether there was a misattribution of the source of information.

Dr. Montgomery felt there was an obligation for Dr. Silberg to explore alternate plausible hypotheses, particularly because of the facts here, such as M.M. not having seen her father for ten months prior to the interview. She felt an interviewer is "compelled ... to look at every single hypothesis," especially in a divorce case, because the false accusation rate is six times higher, approximately thirty-three percent, in the context of divorce than in non-divorce cases. Dr. Montgomery emphasized that Dr. Silberg failed to explore alternative hypotheses prior to issuing her July 19, 2006 report.

**\*25** Furthermore, according to Dr. Montgomery, there were many indicators of memory distortion in this case, such as the long period of no contact with father and mother's ninety conversations with M.M. about bad acts. There were also indicators of vilification or "negative stereotyping" and molding, such as mother: (1) praising M.M. for making statements about the bad acts; (2) making negative comments to M.M. about father; (3) removing photos of father from the marital home; and (4) cutting the children off from their paternal grandparents for ten months.

In sum, Dr. Montgomery found the sources Dr. Silberg utilized, the short interview with mother, the fifty-minute interview with M.M ., and the behavioral checklist mother prepared, were insufficient sources for a forensic interview leading to a scientifically reliable conclusion.

The judge noted Dr. Montgomery's testimony that the Court's findings in *Michaels* have been "mainstreamed in her profession and acknowledged in the various protocols and guidelines" used by forensic psychologists currently. Judge Convery explicitly found Dr. Montgomery's opinion as to the accepted principles "more credible and acceptable as reasonably grounded by facts and authoritative science" and rejected both Dr. Silberg's and Dr. Salter's opinions as "ignor[ing] the scientific principles and methodology concerning 'totality of the circumstances' surrounding" M.M.'s statements and their reliability. He continued that "Dr.

Silberg's conclusion is not even remotely supported as general acceptance by credible expert testimony, by scientific and legal writings and by judicial opinions ."

Accordingly, after having observed the witnesses over seven days of hearings and reviewing the evidence, Judge Convery concluded that mother "clearly failed in her burden" to establish the scientific reliability of Dr. Silberg's interview and assessment required in a 104 hearing. He elaborated:

> The National Center for the Prosecution of Child Abuse in co-operation with The American Prosecutor's Research Institute adopted protocols to serve as standards for the proper interrogation of suspected child-abuse victims. Those guidelines require an interviewer [to] remain "open, neutral and objective." Dr. Joyanna Silberg's determination to conduct an "urgency" interview was not just a case of a reasonable expert disagreeing on issues of judgment but was a deliberate attempt to circumvent the scientific requirements related to the claims of sexual abuse in this case. By Dr. Silberg's conduct on July 19, 2006, the court finds she clearly demonstrated she was not an "open, neutral and objective" forensic psychologist. Without doubt the scholarly authority, guidelines and protocols and case law recognized by the New Jersey Supreme Court in *Michaels* indicate children are susceptible to improper interviews "tainting" and thereby undermining the reliability of their statements of sexual abuse.

**\*26** Mother's first argument is that the court erred in evaluating the admissibility of Dr. Silberg's testimony strictly pursuant to *Michaels,* a criminal case, rather than discerning whether Dr. Silberg's methods were sufficiently reliable to justify admission of her psychological expert testimony pursuant to *N.J.R.E.* 702 and *State v. Kelly,* 97 *N.J.* 178 (1984). We reject that argument as it draws a distinction without a difference.

*Michaels* is the seminal case dealing with the trustworthiness of a child's sexual abuse disclosure. There, the Supreme Court found the trial court must "ensure that evidence admitted at trial is sufficiently reliable so that it may be of use to the finder of fact," *Michaels, supra,* 136 *N.J.* at 316, therefore, on a preliminary showing that interview techniques may have been so suggestive as to irreparably taint the child's memory, it must hold a hearing to determine whether,

> despite the presence of some suggestive or coercive interview techniques, when considering the totality of the circumstances surrounding the interviews, the statements

or testimony retain a degree of reliability sufficient to outweigh the effects of the improper interview techniques.

[*Id.* at 321.]

The Court specified that investigatory methods may be inappropriately suggestive to the extent that they involve

the absence of spontaneous recall, interviewer bias, repeated leading questions, multiple interviews, incessant questioning, vilification of [the accused], ongoing contact with peers and references to their statements, and the use of threats, bribes and cajoling, as well as the failure to videotape or otherwise document the initial interview sessions[.]

[*Ibid.*]

Pursuant to the rules of evidence, "a witness qualified as an expert by knowledge, skill, experience, training, or education" may testify and provide an expert opinion, *N.J.R.E.* 702, provided only that the expert's methods have " 'a sufficient scientific basis to produce uniform and reasonably reliable results so as to contribute materially to the ascertainment of the truth.' " *Ryan v. KDI Sylvan Pools, Inc.,* 121 *N.J.* 276, 286 (1990) (quoting *Kelly, supra,* 97 *N.J.* at 210).

Judge Convery did not apply *Michaels* as an inflexible evidential construct, but rather properly utilized its principles to analyze the reliability of a child sexual abuse victim interview as illustrative of the accepted practices in forensic psychology, as stated by Dr. Montgomery, whose opinion as to the "principles, methodology and judgments" the court did accept. *See Michaels, supra,* 136 *N.J.* at 316 (noting that reliability is the linchpin in determining the admissibility of evidence mandated by due process). The court clearly analyzed Dr. Silberg's opinion under the proper *N.J.R.E.* 702 standard, finding that based on Dr. Montgomery's credible testimony, Dr. Silberg's opinion did not conform "even remotely" to the generally accepted practices of the relevant scientific community. The court also relied on professional guidelines from professional societies including APSAC and the National Center for Prosecution of Child Abuse in finding Dr. Silberg's opinion not credible or scientifically reliable. Based on our review of the entirety of the record that formed the basis for the ruling, we are satisfied the judge applied and performed a thoughtful and comprehensive analysis of the relevant law, and his conclusion that mother failed in her burden to establish the scientific reliability of Dr. Silberg's

interview and sex abuse assessment of M.M. was based on an insightful assessment of the totality of the circumstances from sufficient credible evidence in the record.

**\*27** Moreover, contrary to mother's assertion, the court's decision that Dr. Silberg's methodology was not based on generally accepted science was not based solely on the psychologist's lack of knowledge of the circumstances of the decision not to prosecute father. We have recognized that an expert opinion is "not inadmissible simply because it fails to account for some particular condition or fact which the adversary considers relevant." *Creanga v. Jardal,* 185 *N.J.* 345, 360 (2004) (citation and internal quotation marks omitted). Among other deficiencies, Dr. Silberg also failed to test alternative hypotheses, record the interview, and generally failed to consider the totality of the circumstances leading to M.M.'s interview.

Finally, mother's bald assertions that Dr. Silberg's opinion was "state of the art" is also without any support in the record. To the contrary, the court clearly found, based on sufficient evidence, that her methods were not state of the art, and not sufficiently reliable to meet the standard for admissibility under *N.J.R.E.* 702.

Mother next argues the court committed reversible error in excluding the testimony and reports of other experts she proffered on the issue of sexual abuse. This argument is not supported by the record.

At the GAL's request, the court appointed Dr. Esquilin as an independent expert to assist the GAL. Dr. Esquilin issued a report on March 6, 2007, opining that it was likely sexual abuse of M.M. occurred based solely on her review of the documents provided in the case, including statements made by mother and M.M. to Goldman, Gould (the school nurse), and Drs. Agarwal, Smarz, and Silberg. She did not interview M.M. In his ruling on April 7, 2009, Judge Convery found Dr. Esquilin's opinion inadmissible because she "reviewed unfounded, unreliable, inadmissible, and barred information in arriving at her conclusions." Furthermore, because the court had found there was no reliable evidence of sexual abuse, he deemed her testimony irrelevant.

Moreover, it appears Dr. Esquilin's testimony would not have been favorable to mother. In her deposition taken on May 8, 2007, after the 104 hearing, she appeared to distance herself from Dr. Silberg. The following colloquy took place:

[Father's attorney]: ... If a child had been multiply interviewed and had been excluded from the alleged perpetrator's presence for ten months and had been having discussions, as we know [M.M.] has had discussions with her mother according to her mother's sworn testimony 90 times, would there be a great risk of contamination when [M.M.] is interviewed by Joy[anna] Silberg on **July** 19, 2006?

....

A. I think there certainly is a risk of that. I would say yes, a great risk.

....

[Father's attorney]: And you, if you had been offered the opportunity to interview [M.M.] on **July** 19, 2006, you would have declined. Is that your testimony?

A. I think I would have.... If I had been asked to get involved at that point, I would have set certain parameters. One of them would have been probably not to see her, or at least not to interview her around this.

   **\*28** [Father's attorney]: So when Sharon Montgomery opined that nobody on **July** 19, 2006 could likely get a valid report of sexual abuse because of the multiple interviews and the discussions that had regularly been had between [M.M.] and her mother, would you agree with that conclusion ... of Sharon Montgomery.

A. I think I would.

At the same time and for similar reasons, the court barred the testimony of Dr. Walker, a school psychologist, who issued a report on January 26, 2007, based on a review of documents provided by mother's attorneys. Judge Convery found Dr. Walker relied on expert reports, statements, and documents the judge found unreliable.[13] Moreover, Dr. Walker's report was based on an "assumption that there [were] factual issues of domestic violence and child sexual abuse," both issues which the court determined were unfounded. Accordingly, her testimony would not be helpful to the court as trier of fact. Thus, under *N.J.R.E.* 702, Dr. Walker was properly barred from testifying.

In the oral ruling, the court also excluded the testimony of David Shapiro, Ph.D., a psychologist from Florida who issued a report for mother critiquing the reports of Drs. Rosenberg

and Montgomery, as well as that of Maggie Bruck, Ph.D. The court noted the report was undated but appeared to be faxed on February 26, 2007, about a week after the deadline for the exchange of expert reports under a case management order. A party must comply with discovery deadlines. *See Rules* 4:24-1, 4:23-2.

The court also found Dr. Shapiro's report "cumulative" under *N.J.R.E.* 403 and 611, because of the prior testimony on the applicable guidelines concerning expert qualification under domestic violence and child sexual abuse. Judge Convery further noted that mother's proffered expert considered the issues of domestic violence and child sexual abuse in making his findings, thus his testimony would be irrelevant.

"The trial judge's discretion in excluding evidence is broad and should stand unless so wide of the mark that it results in a manifest denial of justice." *Bitsko v. Main Pharmacy, Inc.,* 289 *N.J.Super.* 267, 284 (App.Div.1996). More specifically, the decision of whether to admit expert testimony is "remitted to the sound discretion of the trial court. Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion." *Carey v. Lovett,* 132 *N.J.* 44, 64 (1993). *See also Kuehn v. Pub Zone,* 364 *N.J.Super.* 301, 321 (App.Div.2003), *certif. denied,* 178 *N.J.* 454 (2004).

We discern no abuse of discretion in the Family Part judge's exclusion of additional expert witnesses proffered by mother on the issue of sexual abuse. Each one relied heavily on inadmissible evidence, such as Dr. Silberg's report, mother's journal entries, and M.M.'s statements, and would have provided no assistance to the trier of fact as required by *N.J.R.E.* 702. Moreover, Dr. Shapiro's report was untimely and cumulative because the guidelines he discussed had already been testified to at length by Drs. Montgomery, Rosenberg, and Bruck, and all three were subject to extensive cross-examination. Determinations pursuant to *N.J.R.E.* 403,[14] which permits exclusion of cumulative evidence, "should not be overturned on appeal 'unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted.' " *Green v. N.J. Mfrs. Ins. Co.,* 160 *N.J.* 480, 492 (1999) (quoting *State v. Carter,* 91 *N.J.* 86, 106 (1982)). Here, there is no evidence Judge Convery abused his discretion in barring Dr. Shapiro's testimony because it was properly excluded on multiple bases.

   **\*29** Mother next argues the court erred in using *Michaels* to determine whether M.M.'s statements were admissible,

and failed to consider the totality of the circumstances. To understand the procedural and factual backdrop of this aspect of the trial, we again summarize the salient testimony and the rulings of the court.

A fourteen (non-consecutive) day 104 hearing was held pursuant to *N.J.R.E.* 803(c)(27) between March and August 2008 to determine the admissibility of M.M.'s statements. Mother testified that in the summer of 2005, she had a "general" discussion with the children about how "private parts shouldn't be touched" and if someone did touch them to tell her, in light of what she considered "sexual red flags." She also related that she told Goldman on September **28**, 2005 about these "red flags."

Mother testified that, in February 2005, she walked into the living room of the marital home and observed father sitting on the couch with a visible erection, a strange look on his face, and M.M. between his legs. On another occasion that month, she and the children arrived home to find father in the parties' bedroom in his underwear and a robe and, again, with a clearly visible erection that he did not attempt to cover upon seeing them walk in. Moreover, she had recently noticed M.M. straddling and rubbing herself while sitting on mother's leg. Mother recalled at trial a number of other "red flag" incidents as well, though she was unsure whether she had shared all of them with Pasvankias during their phone call. She recounted that, following the children's overnight visit with their father, she noticed blood on some toilet paper after wiping J.M., and broached the subject with father, who told her that the same thing had happened a week earlier. On another occasion, she found what resembled a pubic hair across J.M.'s anus after J.M. complained that her "tushy" hurt. She claimed to have saved the toilet paper in a plastic bag and the hair in an envelope but eventually threw them both away.

Mother relied on the journal she purportedly kept to document what the children told her about the sexual abuse to refresh her memory in testifying about the reports of sexual abuse. She said she began the journal in March 2005 on the advice of one of the numerous attorneys she consulted in order to document "the abuse." She also used the journal to refresh her memory about numerous, graphic conversations she allegedly had with both children about the sexual abuse either in bed first thing in the morning, at bedtime, or bath time.

Dr. Agrawal testified that M.M. told her "daddy put his finger in my pee-pee." Her physical examination disclosed no

indications of sexual abuse and there was no evidence M.M. suffered from symptoms such as vaginal pain or discharge.

Detective Johnson, who was assigned to the sex crimes/child endangerment unit of the prosecutor's office, testified that she was familiar with appropriate interview techniques. She knew M.M. had been interviewed three times earlier that day, by Goldman, Gould the school nurse, and Frommer from DYFS, but was unaware of the circumstances of those interviews or that the child had also been interviewed by Ludwig a few days earlier.

**\*30** Detective Johnson conducted a videotaped interview with M.M. in Frommer's presence for just under an hour. As previously stated, the court viewed the videotape. Detective Johnson confirmed that she had difficulty keeping M.M. focused as she was distracted and bouncing around the room. She acknowledged that she did not explore M.M.'s ability to tell the truth, although she knew, based on her familiarity with the circumstances and substance of her prior interviews, that many of the child's responses were untrue. Moreover, when M.M. gave what the detective knew to be false information, the detective did not confront her with the lie or impress upon her the importance of telling the truth.

During the interview Detective Johnson was the first person "to inject a sexual element into the conversation" by asking if Goldman asked M.M. "if daddy ever touched your private parts." M.M. denied she was touched by her father. Detective Johnson then exited the room, and upon returning, lied to M.M. and said she had spoken to Goldman and Goldman said it was okay for M.M. to talk to the detective about anything. M.M. still did not give any clear disclosures of sexual abuse.

Detective Johnson acknowledged her familiarity with *Michaels* and that her interview of M.M. did not comport with the *Michaels* protocol. Moreover, Detective Johnson testified that, after interviewing Goldman, she concluded Goldman's interview with M.M. was suggestive and did not comport with the *Michaels* standards and such interview could taint M.M.

Dr. Salter also testified at the 803(c)(27) hearing and opined that M.M.'s statements to Goldman were trustworthy because there were "no coercive and leading questions" in the interview, and while acknowledging "a couple of specific questions" were asked, felt the statements were spontaneous. However, Dr. Salter felt M.M.'s claim that she and her mother had a secret was not reliable because it lacked consistency. She echoed the same for the statement that M.M. touched her

father's penis with a broom and towel. She also found M.M.'s statement that her father kissed his penis and licked it and then asked her to do the same not credible because it was not repeated consistently.

Dr. Salter admitted she felt Goldman's deposition testimony mischaracterized her interview of M.M. to make it appear more flattering, but felt that had no bearing on whether what Goldman reported to the prosecutor's detective was accurate. Dr. Salter said she agreed that an interviewer's bias can impact the accuracy of the child's statements, but said she did not think mother's statements to Goldman that she thought abuse might have occurred created a bias. She also saw nothing problematic with the multiple interviews, or multiple interviewers at one time.

Goldman testified that mother told her that M.M. cried when her father put her to bed, about the alleged incident when M.M. was on her father's lap and he had an erection, and father watching pornography in front of M.M. As previously discussed, there was considerable discussion regarding M.M.'s purported disclosure to Goldman of her "secret" and the discrepancies in Goldman's sworn statement to Detective Johnson, her deposition testimony, and her trial testimony. M.M. outright denied that father had ever touched her "pee pee" and said that she would never let him do so.

**\*31** During the interview, Goldman asked pointed and leading questions, and praised M.M. "multiple times" for telling her the truth, including a high-five. Goldman admitted she had no previous experience in sexual abuse investigations and no knowledge of *Michaels*. She did not question M.M.'s veracity at any point. Goldman testified at trial that she thought she had discussed with M .M. the need for her to tell the truth, which was contrary to her deposition testimony that she did not ask M.M. if she was telling the truth during the interview.

She did not tape record the interview and a broken thumb prevented her from taking her own contemporaneous notes, but she testified she retained a good recollection of the discussions. Goldman did dictate some notes to the school principal shortly after the first interview, but she doubted the accuracy of some of those notes at trial.

Dr. Smarz related that during the DYFS investigation M.M. said her father had digitally penetrated her, and that all of the abuse occurred in the bathroom at both her father's and mother's houses. M .M. also "spontaneously" "exclaimed"

that everything had also happened to J.M. and she saw it, but was unable to give any specifics of the incidents or locations. Her understanding was that M.M.'s first disclosure of sexual abuse to Goldman was that both she and J.M. were digitally penetrated, as reported to her by Frommer. Dr. Smarz also acknowledged her concern about "tainting" at the time she wrote her report because of the numerous interviews, but without knowledge of the content of those interviews could not determine if M.M. was tainted.

Dr. Bruck, an expert presented by father who specializes in the reliability of child sexual abuse disclosures, testified that M.M.'s statements were not trustworthy. She opined that the use of the teddy bear during the Goldman/Gould interview tainted the interview because of the science showing that props elicit actions that may or may not be true, and also because young children do not have the capability of understanding that the teddy bear represents them. She said that leading questions can contain information the child did not already give, can constitute repeated questions, and repeated questions can cause the child to change the answer.

In Dr. Bruck's opinion, Goldman's reporting of the interview with M.M. was unreliable, and she failed to use appropriate protocols for a proper interview because of her failure to make systematic notes, failure to conduct a warm-up, failure to remind M.M. to tell the truth, failure to test her memory, and failure to test alternative plausible hypotheses. Dr. Bruck also felt the Gould/Goldman interview was unreliable because of the presence of the two adults and uncertainty of who said what, the teddy bear, and additional repeated questioning. The failure to adhere to protocol doomed the reliability of the Goldman, Goldman/Gould, and Johnson interviews. According to Dr. Bruck, M.M.'s memory was irremediably tainted due to the bad interviews as well as mother's twenty to forty conversations with M.M. about her disclosures in a six week period; therefore, her disclosures to Dr. Smarz were also unreliable. Dr. Bruck also opined that mother was not a good reporter of M.M.'s statements; therefore, what was contained in the diary was of doubtful accuracy.

**\*32** Judge Convery issued a comprehensive ninety-two page opinion on January 27, 2009. He appropriately cited *N.J.R.E. 803(c)(27)* as requiring a judge to consider the totality of the circumstances surrounding the making of the statement to determine if there is an indicia of reliability, and *Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L. Ed.2d 638 (1990)* and *Michaels, supra,* as the "standard applicable" to the trustworthiness determination. He placed the burden of

proof on the issue of trustworthiness on mother because "the prima facie showing from the statements of sexual abuse was overcome by the initial credible findings by" DYFS that sexual abuse was unfounded, a decision with which the Essex County Prosecutor's office and Attorney General's office concurred.

The court painstakingly went through many portions of mother's journal, finding first that, despite a court order to produce the originals, mother only produced copies.[15] The court also found mother's claim that she began keeping the journal in March 2005 on the advice of counsel not credible as there were entries dated January 2005. The court found the journal entries to be "replete with self-serving statements clearly rewritten and edited" and thus inadmissible hearsay under *N.J.R.E.* 802. Accordingly, the court decided to use the entries to demonstrate mother's state of mind. The court's review of mother's journal entries is extremely detail oriented, noting things such as a gap in writing which the court found showed editing. In sum, the court found the entries were "manufactured ... for the purpose of trial to bolster her testimonial evidence as memory refreshed when in fact it was a self-serving script."

The court also found mother was "simply not credible" based on her "testimonial demeanor," "prior bad faith" and "deceptive conduct." For example, mother testified that she received the call from Goldman after bringing M.M. to school, but the court concluded, based on her journal and Goldman's testimony, that the call had been placed earlier, while M.M. was still home. The court noted that mother's testimony was "evasive," and often "sarcastic." The court concluded from the discrepancy that she attempted to conceal that M.M. overheard the phone call, where mother repeated the claims about "red flags" she had earlier made to Pasvankias.

The court also found significant mother's failure to mention to Pasvankias that she had long before spoken with a pediatrician, who explained to her that some bleeding from anal fissures was normal for a child, and that she had noticed M.M.'s straddling behavior months earlier, not recently, and was told by a friend that the behavior was not unusual or troublesome. Moreover, mother had conspicuously omitted the pubic hair incident from her otherwise comprehensive journal and apparently spoke with no one about it until months later.

Furthermore, Judge Convery found mother engaged in "continuing coercive and suggestive manipulation of her children resulting in the children's recollection of actual events" being "irremediably distorted." Accordingly, any related statements were unreliable. The court's findings with respect to mother's journal entries are amply supported by the record as the court went into painstaking detail about the substance of the entries. Furthermore, these findings are clearly based on the court's ability to judge the demeanor of the witness and make credibility findings, and thus should not be disturbed. *See N.J. Div. of Youth & Family Servs. v. E.P.,* 196 *N.J.* 88, 104 (2008) (holding the family judge's "feel of the case" is given deference on appeal); *Cesare, supra,* 154 *N.J.* at 413; *Crespo, supra,* 395 *N.J.Super.* at 193–94.

**\*33** The court also carefully detailed Goldman's testimony, noting the inconsistencies and "evasive" nature of the testimony. The court found Goldman "was not and could not be a neutral observer" and was clearly biased in obtaining the statements. Furthermore, Goldman's interview was suggestive, leading, and "incompetent" and her testimony was "deliberately ... false [ ]." Therefore, the statements by M.M. in both the first and second interviews were the result of the "suggestive and coercive interview technique[ ]" and retained insufficient reliability to be admissible. Accordingly, the court found mother "failed to meet her burden of proof as to the reliability of [M.M.]'s statements" and those statements were thus inadmissible.

Judge Convery also analyzed Dr. Salter's testimony, carefully detailing the ways in which she failed to adhere to the "directives" of *Michaels* and the APSAC guidelines, such as failing to evaluate the totality of the circumstances, her disagreement that multiple interviews should not be conducted, and her disagreement that once memory is tainted the taint is irremediable. The court found her testimony "evasive, argumentative, combative and verbally parrying," concluding "her testimony, her demeanor, [and] the way she answered questions, was not credible." In total, the court rejected Dr. Salter's opinion on the trustworthiness of M.M.'s statements, finding her testimony was an attempt "to camouflage" her testimony from the Dr. Silberg hearing "that coercive and suggestive interviews" do not shape a child's recollection of events that undermine the reliability of a child's responses. Judge Convery also found Dr. Salter "ignored the body of evidence which supported the findings [mother] coached, suggested and manipulated" both children, thus tainting M.M.'s disclosures of sexual abuse irremediably. He therefore rejected Dr. Salter's opinion, finding "her

principles, her methodology, assumptions and judgments were not reasonably grounded in the facts and science."

Judge Convery analyzed Dr. Bruck's testimony, highlighting her statements about memory distortion, spontaneity, prop use, and interviewer bias and how each of these elements affected each interview and disclosure. He also noted her agreement with the principles espoused in *Michaels.* The court thus found Dr. Bruck's "opinion, principles, methodology, assumptions and judgments more credible and acceptable as reasonably grounded in the facts and science in finding that [M.M.]'s sexual abuse statements were not trustworthy."

We discern no legal error in the court's reliance, in part, on the *Michaels* standards in assessing the trustworthiness of M.M.'s purported disclosures. These standards clearly represent the "best practices" of experts, researchers, and practitioners in the field of child sexual abuse victim interviews and reliability, as Judge Convery articulated at length in his opinion. *See generally Michaels, supra,* 136 *N.J.* at 309–12. The court also accepted Dr. Bruck's testimony that in her professional opinion, certain elements need to be assessed in determining taint, such as suggestive questions, interviewer bias, vilification, and lack of spontaneity. These elements are among those named by the Supreme Court in *Michaels. See id.* at 321.

**\*34** Furthermore, it is clear from the record the court did consider the totality of the circumstances surrounding M.M.'s disclosures as required by *Michaels.* The court took into consideration the circumstances surrounding each disclosure, as well as mother's manufactured journal entries and her conversations with the children in which she applauded M.M. for telling Goldman what happened and continued to discuss the allegations with the children, thus ingraining the allegations. Mother's attempts to have father diagnosed with a personality disorder was also considered as evidence of her diabolical efforts to remove him from the children's lives. The court further considered that M.M. made no disclosures of sexual abuse to Ludwig a few days prior to her conversation with Goldman. Nor did she make any disclosures to Detective Johnson. The court clearly considered the "totality" of Goldman's conversation with mother, which the court found was in the presence of the children. The absence of evidence of any physical abuse was also considered.

The court also made a credibility assessment in favor of Dr. Bruck, supporting reliance on the *Michael* factors as

acceptable ones within the profession. There was ample credible evidence in the record to support Dr. Bruck's opinion. Mother has not provided any factual or legal basis upon which to question the court's credibility assessment and findings on this issue.

As to mother's general challenge to the judge's custody determination, there is no doubt the issue of the children's best interests was first and foremost in his mind throughout the litigation. We note that mother failed to produce a single expert at trial to opine about the children's best interests. Father, however, produced two custody experts, whose testimony was detailed and credited by the court. *See Kinsella v. Kinsella,* 150 *N.J.* 276, 318 (1997) ( "In implementing the 'best-interest-of-the-child' standard, courts rely heavily on the expertise of psychologists and other mental health professionals.").

Contrary to mother's assertion, the judge's decision to award sole custody to father was not a knee-jerk punitive reaction. As is patent from Judge Convery's l09–page opinion of August 18, 2009, he appropriately and thoroughly analyzed the *N.J.S.A.* 9:2–4 factors. The record is replete with substantial credible evidence to support his determination of sole custody to father with mother having phased-in supervised parenting time and attending psychotherapy. We note only a few of the most blatant examples of mother's contemptuous and vindictive behavior, which apparently subsumes her ability to rationally parent her children.

The judge noted, for example, mother's attempt to eradicate any hint of the existence of father and his family members from the home, and mother's posting of a note about father's supervised parenting time on the synagogue bulletin board where J.M. attended pre-school. In contrast, father helped the children make gifts and cards for mother after he was reunited with the children and he invited her to attend events with the children during his parenting time, which was never reciprocated.

**\*35** The judge incorporated his findings contained in the prior opinions from the previous hearings, noting, in part, "from the total body of credible evidence, none of the alleged disclosure[s] by [M.M.] [were] credible and none [were] admissible in evidence" and "there was no credible evidence of domestic abuse." He elaborated:

> [Mother had a] pattern of conduct demonstrating her motive to deprive [father] of his parental right to participate in raising his daughters.... Clearly, [mother's] unyielding

preoccupation to sever [father's] relationship with his children continued throughout the marriage and this litigation to breach her duty to [father] as well as the corresponding emotional and psychological harm to the children in using them to achieve her goal.

The judge also found mother disregarded the December 21, 2006 order requiring supervised parenting time, noting that both children acknowledged they slept with their mother in the upstairs bedroom while her parents slept in the downstairs bedroom; mother's testimony she went and got her mother to come upstairs was "simply not credible," and she failed to produce either her parents or brother to testify as to her compliance with the court-ordered supervision.

Judge Convery also found

[mother's] pattern of conduct demonstrated a substantial adverse effect upon her children and, with [mother's] overt and covert attempts to disgrace and to tarnish [father's] reputation and character "to the world" and to enlist her children through "behavioral modification" to co-join with her to achieve her unending goal to obtain sole legal and residential custody, [mother] clearly jeopardized her children's health, safety and welfare.

He further noted:

[Mother] testified that she encouraged the children to be honest, good, and kind children. However, the body of evidence presented in this case demonstrated [mother's] pattern of behavior taught the children the opposite with [mother] being dishonest, mean and destructive towards their father from which she manipulated, distorted and tainted the children's feelings and memory against their father....

Perhaps most troubling is the following recitation of mother's testimony by the court:

Ironically, [mother] testified that although she continued to believe the children were abused by [father] if the court awarded joint custody without supervision she would abide by the decision because she knew the children were "old[ ] enough and they understood that any kind of touching of their private parts is not allowed. It's forbidden and [they're] old enough to report should anything happen." [Mother] was asked by her attorney if she could reassure the court that she will never mention to the children the fact there's been a custody trial, that the court made any decisions and that she may be other than completely satisfied

with whatever the court decides, testified "if it were to come up, answer their questions the best I can, without placing emphasis on the past, but going forward and living each day, so that's what I intend to do." [Mother], however, acknowledged at trial on April 15, 2009 when questioned by [father's] attorney that on about March 31, 2009, approximately two weeks before, she spoke at a luncheon in front of two hundred people, full of local residents with children and grandchildren who know the parties' daughters, a mile from [father's] practice and a mile from the children's school that her children were abused by their father and that she needed help to protest if she lost custody. [Mother] also acknowledged she once again contacted media sources and numerous friends to promote a rally to protest the court's decision rendered on January 27, 2009. [Mother] stated she reached out to the Post, the New York Times, 20/20, and Fox News. [Mother's] continuing pattern of conduct is what both Drs. Rosenberg and Montgomery found they feared would not change and was one of the basic reasons for their custody and parenting time recommendations.

IV.

**\*36** Mother does not challenge any of the financial determinations contained in the divorce judgment other than the award of $1,821,361 .29 in counsel and expert fees to father. We do not find her arguments seeking to undo that award to be persuasive.

An award of counsel fees and costs in a matrimonial action rests in the sound discretion of the trial court. *Williams v. Williams,* 59 *N.J.* 229, 233 (1971); *Guglielmo v. Guglielmo,* 253 *N.J.Super.* 531, 544–45 (App.Div.1992). We will not interfere in the absence of an abuse of that discretion. *Von Pein v. Von Pein,* 268 *N.J.Super.* 7, 20 (App.Div.1993).

In making a determination on counsel fees in a family court matter, the trial court shall consider the following factors:

(1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred

to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

[*R.* 5:3–5(c).]

In awarding counsel fees, the trial court is required to make findings of fact supporting the award, and evaluate the application in light of the factors enumerated by the *Rule*. *Loro v. Colliano,* 354 *N.J.Super.* 212, 227–**28** (App.Div.), *certif. denied,* 174 *N.J.* 544 (2002).

Judge Convery found both parties had the income, ability, and financial resources to pay counsel and expert fees, but that mother, who had a higher net worth and had entered into an agreement to cap her counsel fees, was in a better position to afford them. That was so despite her refusal to work full time to earn an income commensurate with her ability. As the judge stated in his preliminary discussion of the parties' finances and statistical information, "[f]rom the court's findings as to [mother's] undisclosed agenda early in the marriage, it is reasonably inferred [mother] was and continued in bad faith to be intentionally underemploye[d] throughout the divorce litigation" and she should be able to generate significant income as a full-time eye surgeon in New York City.

Judge Convery found overwhelming evidence of bad faith on mother's part from the outset of the litigation that significantly contributed to the skyrocketing fees incurred by father. The judge was convinced that mother's bad faith conduct unnecessarily forced father and herself to drain their resources to shoulder litigation expenses rather than preserve them to ensure a proper equitable distribution of marital assets and sustain the marital lifestyle for themselves and their children.

The court found that mother engaged in such conduct to secure sole custody of the children and deprive father of his parental rights. The judge recounted evidence that mother had turned the children against their father and attempted to have him diagnosed with a mental disorder and found to have abused her and the children. He found she invented the precipitating domestic violence incident, suggested sexual abuse allegations to mental health professionals who subsequently interviewed the children, and attempted to manipulate the outcome of the investigations by DYFS and the prosecutor's and Attorney General's offices. She then manufactured journal entries for use at trial and testified untruthfully. Moreover, as noted by the court, mother failed to comply with pretrial discovery deadlines and orders, forcing father to seek compliance that should not have required

judicial intervention, and she herself generated substantial and unnecessary pretrial motion practice.

 **\*37**  At the time of father's application, he had paid $365,169.81 to Greenbaum Rowe Smith & Davis (Greenbaum) and owed the firm an additional $1,200,885.48 in counsel fees. He also incurred $255,406 in expert fees. Greenbaum's certification indicated that this litigation demanded more than 4,400 hours of legal services at hourly rates ranging from $475 for partners to $135 for paralegals. The court was satisfied the hours spent performing those services were reasonable, as were the rates charged based on the attorneys' skill, reputation, and experience.

The court concluded that, because mother's conduct dramatically increased the parties' litigation expenses and drained the parties' ability to maintain the marital estate for their own and their children's benefit, an award of father's full fees would permit him "to be financially free to share his post divorce income and assets to adequately support his children in his role as his children's sole legal and residential parental custodian." The court specified that it intended mother's obligation to pay this award to be a "necessary" in the nature of "support and maintenance," and, as such, not dischargeable in bankruptcy. *See* 11 *U.S.C.A.* § 523(a)(5); *DiGiacomo, supra,* 256 *N.J.Super.* at 409–10.

Mother continues to assert that this award improperly punished her for acting in good faith and seeking to act in her children's best interests throughout this litigation, a notion she reiterates bolstered by expert testimony about her ostensibly sincere belief that father had abused the parties' daughters. That contention is belied by the record.

Judge Convery's discussion of mother's behavior during the entirety of the litigation is comprehensive, and painstakingly details mother's course of destructive behavior, without regard to long term adverse consequences it would have on the parties' young children. The judge found mother was not credible and had more than sufficient basis to conclude she pursued the abuse claims in bad faith. Furthermore, the judge incorporated his previous opinions barring Dr. Silberg's testimony and barring M.M.'s statements of sexual abuse, in which he found M.M. was coached by her mother. The judge clearly and thoughtfully found that mother's course of conduct was in bad faith and was done to "intentionally deprive" father of his parental rights.

Finding mother's journal entries to be "manufactured," the judge was satisfied she worked to manipulate school counselors and the children to instill false sexual abuse memories and taint their memory of their father. These credibility assessments and factual findings are supported by abundant evidence in the record, as well as Judge Convery's particularized "feel of the case" after having presided over approximately seventy days of lay and expert testimony, which is afforded great deference. *See E.P., supra,* 196 *N.J.* at 104.

In fact, mother's conduct throughout the litigation is the epitome of bad faith for purposes of a counsel fee award. In *Kelly v. Kelly,* 262 *N.J.Super.* 303, 308 (Ch. **Div**.1992), the Family Part defined bad faith as "requir[ing] a party to have malicious motives, to be unfair, to desire to destroy the opposing party, to use the court system improperly to force a concession not otherwise available."

 **\*38** In *Borzillo v. Borzillo,* 259 *N.J.Super.* 286 (Ch. **Div**.1992), the Family Part provided the following examples of bad faith:

- To seek relief which one knows or should know that no reasonable argument could be advanced in fact or law in support thereof;

- Acts of a losing party that have been vexatious, wanton or carried out for oppressive reasons;

- The intentional noncompliance with court-ordered obligations;

- The intentional noncompliance with a voluntary agreement; and

- An unwillingness to provide *pendente lite* support or contribute to the preservation of marital assets or reduction of marital debt commensurate with one's ability to pay.

[*Id.* at 293–94.]

Here, in lieu of continuing the shared custodial arrangement the parties had followed for more than five months after their separation, mother chose to seek sole custody of the children by falsely claiming their father had sexually abused them, the most heinous allegation that can be hurled against an innocent parent. Mother also subjected the children to a multitude of unnecessary and invasive physical examinations, psychiatric examinations,[16] and psychological trauma that

may have longstanding consequences. As the Family Part judge found on numerous occasions, mother, who was an educated professional, acted with knowledge of the falsity of her allegations and with the sole intent to thwart father's parental reunification.

Although the award may be steep, we discern no abuse of discretion by the trial judge, who provided ample factual and legal reasoning for his ruling. The record is clear that mother's bad faith conduct from the outset of the litigation resulted in an unnecessary and unduly prolonged resolution of potentially uncomplicated legal issues, resulting in a substantial obligation on father's part for the payment of counsel and expert fees. The purpose of a counsel fee award in a matrimonial action is to protect the innocent party from unnecessary costs and to punish the guilty party. *Yueh v. Yueh,* 329 *N.J.Super.* 447, 461 (App.Div.2000).

While it is true mother is not responsible for all the fees father incurred as he did file the divorce action, this is irrelevant to what was actually awarded because the fees father incurred in filing the divorce action were not calculated into the court's ultimate award as no certification pursuant to *Rule* 4:42–9(b) was filed in connection with those fees. The only fees father was awarded were those incurred in connection with his representation by Greenbaum, which began in May 2006, after mother filed her counterclaim and the sexual abuse allegations took over the litigation.

Judge Convery similarly acted within his discretion in his award of expert fees. He incorporated his findings on custody and counsel fees into his discussion of expert fees; implicit in this is the notion that but for mother's destructive and bad faith course of conduct, the retention of those experts would not have been necessary. Prior to mother's false allegations of child sexual abuse, the parties shared custody of the children. Had mother not proceeded on a vindictive rampage, it is reasonable to assume the parties would have continued this shared custody arrangement and the retention of the GAL, Drs. Rosenberg, Montgomery, Bruck, Esquilin, and Milchman,[17] would have been unnecessary.

 **\*39** We are also satisfied Judge Convery's decision to classify the counsel fees and costs as necessaries in the nature of "support and maintenance" is supported by legal precedent and well within his broad discretion. Based on Judge Convery's intimate understanding of this case and his ability to observe the parties throughout the lengthy, tortured

litigation, his findings on the counsel and expert fee issue are amply supported by the record and entitled to our deference.

In *DiGiacomo,* the wife filed for divorce, and the husband refused to comply with court orders, including discovery. *Supra,* 256 *N.J.Super.* at 410–11. In upholding the award of attorney's fees, the court found the husband's "recalcitrance ... evidenced by his disobeying court orders regarding discovery and otherwise impeding the case's progress, forced [the wife] to incur additional attorney services and the resultant fees." *Id.* at 411. In finding the attorney's fees were properly classified as necessaries and thus non-dischargeable in bankruptcy, the court reasoned the fee award "was a 'necessary,' vital to her support through this arduous litigation." *Ibid.*

The facts here are similar to *DiGiacomo* in that mother continued to defy court orders, act uncooperatively, and engage in excessive motion practice throughout the four years of this litigation. Moreover, mother's actions were far more egregious than those in *DiGiacomo* as she engaged in efforts to sever father's relationship with his children by fabricating domestic violence and sexual abuse allegations, as well as seeking to alienate the children from their paternal relatives. Even after the judge's ruling to the contrary, mother continued to seek to ruin father's reputation by contacting media outlets and speaking at a synagogue luncheon attended by parents and grandparents of their children's peers in which she reported that father was sexually abusing the children.

According to the court, the award was integral to ensuring the children continue to enjoy the same standard of living as during the marriage, notwithstanding the severe depletion of the marital estate occasioned by mother's bad faith conduct. The court found that mother, "by ill motive, schemed and designed a mindset which dissipated the family's net worth," consequently depriving the children of the ability to live a lifestyle enjoyed by an intact family. The court specifically intended the fee award to "serve as a nexus in conjunction with the child support award."

We deem mother's argument challenging the court's imputation of income to her without merit; accordingly, it does not warrant any discussion other than that contained in the court's final opinion. *See R.* 2:11–3(e)(1)(A) and (E).

Affirmed.

**All Citations**

Not Reported in A.3d, 2011 WL 3176534

### Footnotes

1    The transcript of the December 21, 2006 hearing reflects the appointment of Hellring. However, the amended order of that date does not mention the appointment. The order appointing Hellring is not contained in either party's appendix.

2    Although mother included the order in her appellate appendix, she did not include the judge's opinion, which was expressly referenced in the order, contrary to *Rule* 2:6–1(a)(1)(I). This order involves an issue raised by mother on appeal. At our request, the opinion was obtained from counsel by our calendaring staff.

3    Mother claimed at trial she was unaware the order also restricted father's contact with the children, but the court found that claim incredulous.

4    Mother and J.M. were not present during the interview.

5    Dr. Montgomery was also qualified as an expert in sexual abuse and, as previously stated, testified at the hearing regarding Dr. Silberg's ability to testify as an expert witness.

6    Pursuant to the Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition), an Axis II Disorder of the multi-axial system is a "dimension used with DSM–IV, which includes personality disorders: paranoid, schizoid, schizotypal, antisocial, borderline, histrionic, narcissistic, dependent, obsessive-compulsive, personality "NOS" and mental retardation."

7    The motion is contained in father's appendix; the proposed amended counterclaim is not in the appellate record.

8    We note Hellring attended and participated in the case management conference of May 30, 2007, in which parenting issues were discussed. She also participated on M.M.'s behalf in a motion on September 7, 2007, challenging father's request to pierce the patient-psychologist privilege regarding M.M. and J.M.'s records with Drs. Katz and Wolf–Mehlman. Hellring was also in court on January 27, 2009 and August 18, 2009, when the court issued its written opinions for the 803(c)(27) hearing and its final opinion, respectively, and she testified on April 16, 2009.

9    The GAL reported it was "probable" that sexual abuse occurred based on the reports of Drs. Esquilin, Silberg, and Salter. She also relied on the report of Lenore Walker, Ed.D., an expert from Florida retained by mother. Accordingly, the GAL recommended mother be the custodial parent. All the underlying experts' testimony was deemed untrustworthy and inadmissible as based on M.M.'s untrustworthy statements.

10    Mother's appendix contains Dr. Silberg's first report in its entirety; however, the submission of her second report based on additional interviews with both parents and M.M. is incomplete. Dr. Silberg testified solely about her **July** 19, 2006 assessment.

11    *Frye v. U.S.*, 293 *F.* 1013 (D.C.Cir.1923).

12    As Dr. Salter's report contained in mother's appendix is incomplete, the complete report was obtained from counsel by our calendaring staff.

13    Missing from Dr. Walker's report contained in mother's appendix is a catalogue of the documents she relied on in reaching her opinion. We had our calendaring staff obtain a complete copy from counsel.

14    Under *N.J.R.E.* 403, otherwise "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence."

15    Only certain portions of the journal were supplied on appeal, rather than the entirety of the entries reviewed by Judge Convery.

16    As an example, mother brought M.M. to a psychiatrist in May 2007, despite a court order prohibiting any further evaluations, claiming M.M. had threatened to kill herself. Mother claimed M.M. had another episode on August 13, 2007, and brought her to St. Barnabas Hospital in Livingston. M.M. was admitted to the Newark Beth Israel psychiatric ward after mother reported M.M. had been sexually abused by her father and suffered from post traumatic stress disorder. Mother authorized treating her with Zoloft. Father learned of her admission, and Dr. Wolf–Mehlman intervened, informing physicians that M.M. had not been diagnosed with post traumatic stress disorder and should not be treated with Zoloft. M.M. was released to father and the paternal grandfather that evening. Hospital records indicated that M.M. had shown no symptoms of any mental health disorder and was happy to see her father upon release.

17    Madelyn Simring Milchman, Ph.D. was appointed by the court on **July** 6, 2006, to conduct a full psychological evaluation of both the parties on an expedited basis.

---

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.