# Exhibit 69F:

# Dr. Anna Salter Deposition Exhibit 15



895 N.W.2d 922 (Table)
Decision without published opinion. This disposition is referenced in the North Western Reporter.
Court of Appeals of Iowa.

STATE of Iowa, Plaintiff-Appellee,
v.
Jill TJERNAGEL, Defendant-Appellant.

No. 15-1519
|
Filed January 11, 2017

Appeal from the Iowa District Court for Hamilton County, James A. McGlynn, Judge.

Jill Tjernagel appeals her conviction and sentence for sexual abuse in the second degree following a jury trial. **REVERSED AND REMANDED.**

**Attorneys and Law Firms**

Brandon J. Brown, Robert P. Montgomery, and Adam C. Witosky of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Sheryl A. Soich, Assistant Attorney General, for appellee.

Considered by Potterfield, P.J., Mullins, J., and Scott, S.J.[*]

**Opinion**

MULLINS, Judge.

*1 Jill Tjernagel appeals her conviction and sentence for sexual abuse in the second degree following a jury trial. She argues (1) trial counsel rendered ineffective assistance resulting in prejudice by failing to object to (a) impermissible expert testimony consisting of vouching for the credibility of the victim, using statistics to imply guilt, profiling the defendant, and giving information that was within the common knowledge of the jurors, and (b) misconduct by the prosecutor in soliciting expert vouching testimony; (2) the district court erred in denying her motion for new trial based on her claims of impermissible vouching testimony by expert witnesses; (3) the jury wrongfully considered extraneous and inaccurate information regarding punishment; (4) her rights to compulsory process and due process were violated when the district court quashed subpoenas for prosecutor testimony in relation to her claims of prosecutorial misconduct; and (5) cumulative evidentiary and constitutional errors violated her rights to a fair trial and due process. Upon our review, we reverse Tjernagel's conviction and remand for new trial based on her claim trial counsel was ineffective in failing to object to expert witness testimony vouching for the credibility of the child victim. Because we expect testimony regarding statistics, profiling, and common knowledge to be issues that will be presented again on retrial, we will address them. We do not reach Tjernagel's other claims.

**I. Background Facts and Proceedings**

In June 2014, the State charged Tjernagel with the crime of sexual abuse in the second degree, in violation of Iowa Code sections 709.1(3) and .3(2) (2013), stemming from allegations Tjernagel sexually abused her step-grandson, L.K., when she babysat him at her home sometime before February 20, 2013. The testimony at trial alleged the conduct occurred when L.K. was between four and six years old.

In April 2015, a jury found Tjernagel guilty of second-degree sexual abuse. Tjernagel filed numerous posttrial motions raising several grounds for new trial and requesting reconsideration of her claims. After a hearing on the motions, the district court denied Tjernagel's motions and preserved her claims of ineffective assistance of counsel for postconviction relief.

The district court entered judgment of conviction and sentenced Tjernagel to a term of imprisonment for no more than twenty-five years, carrying a mandatory minimum of seventy percent, and a lifetime special sentence pursuant to Iowa Code section 903B.1. Tjernagel appeals.

**II. Scope and Standard of Review**

We review claims of ineffective assistance of counsel de novo because the claims implicate the defendant's Sixth Amendment right to counsel. *State v. Thorndike*, 860 N.W.2d 316, 319 (Iowa 2015). "Ineffective-assistance-of-counsel claims are an exception to the traditional error-preservation rules." *State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010). An ineffective-assistance-of-counsel claim may be raised and decided on direct appeal when the record is adequate to address the claim. Iowa Code § 814.7(2), (3); *see also Fountain*, 786 N.W.2d at 263.

### III. Analysis

**\*2** Tjernagel maintains her trial counsel rendered ineffective assistance by failing to object to testimony by expert witnesses (1) indirectly vouching for the credibility of the complaining child witness, (2) providing statistics regarding child sexual abuse, (3) profiling Tjernagel as a sexual offender, and (4) explaining topics of child sexual abuse that are within the common knowledge of the jury. The State urges us to preserve Tjernagel's claims for postconviction proceedings. Because we find the record adequate in this case, we consider the merits of Tjernagel's claims. See *Fountain, 786 N.W.2d at 263*.

To succeed on a claim of ineffective assistance of counsel, Tjernagel must show by a preponderance of the evidence: "(1) [her] trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *Thorndike, 860 N.W.2d at 320* (quoting *State v. Adams, 810 N.W.2d 365, 372 (Iowa 2012)*); accord *Strickland v. Washington, 466 U.S. 668, 687 (1984)*. "Under the first prong, 'we measure counsel's performance against the standard of a reasonably competent practitioner.'" *Thorndike, 860 N.W.2d at 320* (quoting *State v. Clay, 824 N.W.2d 488, 495 (Iowa 2012)*). "Under the second prong, the [defendant] must establish that prejudice resulted from counsel's failure to perform an essential duty." *Id.* Failure to prove either prong is fatal to the claim. See *State v. Shanahan, 712 N.W.2d 121, 142 (Iowa 2006)*. In examining Tjernagel's claims, we presume trial counsel performed his duties competently. See *Thorndike, 860 N.W.2d at 320*.

#### A. Vouching

Our supreme court has recently elaborated on what constitutes vouching for the credibility of a witness, both directly and indirectly. See *State v. Dudley, 856 N.W.2d 668, 676–77 (Iowa 2014)*; *State v. Brown, 856 N.W.2d 685, 689 (Iowa 2014)*; *State v. Jaquez, 856 N.W.2d 663, 665–66 (Iowa 2014)*. The court has explained:

> Although we are committed to the liberal view on the admission of psychological evidence, we continue to hold expert testimony is not admissible merely to bolster credibility. Our system of justice vests the jury with the function of evaluating a witness's credibility. The reason for not allowing this testimony is that a witness's credibility "is not a 'fact in issue' subject to expert opinion." Such opinions not only replace the jury's function in determining credibility, but the jury can employ this type of testimony as a direct comment on defendant's guilt or innocence. Moreover, when an expert comments, directly or indirectly, on a witness's credibility, the expert is giving his or her scientific certainty stamp of approval on the testimony even though an expert cannot accurately opine when a witness is telling the truth. In our system of justice, it is the jury's function to determine the credibility of a witness.

*Dudley, 856 N.W.2d at 676–77*; *Brown, 856 N.W.2d at 689*; *Jaquez, 856 N.W.2d at 665*.

Tjernagel challenges several statements made by the State's expert witness, Dr. Anna Salter, a child sexual abuse expert, and statements made by her own witness, Tammera Bibbins, who conducted two forensic interviews of L.K. On our review, we address each statement Tjernagel "claims as objectionable to determine whether the State crossed the line." *Dudley, 856 N.W.2d at 678*.

At the time of trial, L.K. was eight years old. He testified that on one occasion Tjernagel took off her clothes and took off his clothes, made him lie down on her bed, and put her mouth on his penis. He testified that while this was going on, he could smell popcorn and SpongeBob was on the television in Tjernagel's bedroom. L.K. also testified that on another occasion Tjernagel took off their clothes and began "playing with" his penis. He testified during this second incident, Tjernagel also put a green "bullet" in his butt that hurt when he later defecated at home and the object came out.

**\*3** The State called Dr. Salter as the final witness for its case-in-chief. Prior to trial, the parties had agreed to avoid inadmissible testimony regarding the credibility of witnesses. During her testimony, Dr. Salter made it clear she was not allowed to comment on the credibility of any other witness or opine whether L.K. was sexually abused. Instead, she explained the purpose of her testimony was to explain to the jury the general dynamics of child abuse, including child development, delayed and partial disclosure, suggestibility and coaching, and grooming techniques employed by sex offenders.

On direct examination by the State, Dr. Salter was asked:

> Q. What about the details that come from a child. What they smelled or what was playing on the TV, things like that. If these are false memories, where are those details coming from? A. Well, that's a good question. Nobody coaches SpongeBob, nobody coaches here's where you were, here's what—what you smelled or here's what you saw. I mean,

I've never had a coaching case where the parent coached sensory details like that to the child.

Tjernagel contends Dr. Salter's statements, "Nobody coaches SpongeBob, nobody coaches here's where you were, here's what—what you smelled or here's what you saw" and "I've never had a coaching case where the parent coached sensory details like that to the child," implied any time a child provides sensory details—what the child sees, hears, or smells—the child must be telling the truth because that level of detail cannot be coached. Thus, Tjernagel asserts, Dr. Salter's testimony improperly vouched for L.K.'s credibility regarding the alleged abuse.

Dr. Salter was also asked on direct examination:

Q. We're going to talk about suggestibility, okay? A. Yes.

Q. What does that mean in this area? A. The notion is that a child may claim something happened that didn't happen because it was suggested to them by someone else and they implanted the idea in the child's mind.

Q. All right. And so under this idea of suggestibility it means then that there is a false memory because the child now believes it? A. The child now believes it, yes.

Q. Okay. And that is separate from a child coming in and just making up a story? A. Well, most people don't claim that anymore as a defense because there's not much—why would a child just come in and make up a story? So that isn't something that's gotten a lot of ground. So it's typically either that the story is accurate or that some of the story is inaccurate, but that the child believes it. Now sometimes they accuse kids of lying, but that's fairly rare these days.

Q. And has there been a lot of research done in that area? A. There is. I've got about four volumes with me of research in that area. It's coming out all the time.

Tjernagel contends Dr. Salter's question, "[W]hy would a child just come in and make up a story?" and her further reference to "volumes" of research on suggestibility improperly vouched for L.K.'s credibility and truthfulness. She asserts Dr. Salter's statements indirectly told the jury young children do not lie about sexual abuse and, therefore, L.K. was credible.

The State then asked Dr. Salter whether "we need to be worried about" the details in a child's story changing over time. Dr. Salter replied:

Any kid that can come into court and face this group of people is under so much pressure to—it was hard for adults to come in and talk about their genitals and being raped. We put eight year olds in that situation because we have to, but I'm never surprised when we can't get the whole story out of them because—because it's a very intimidating place and they're trying their best to remember.

**\*4** Tjernagel argues Dr. Salter's response again vouches for L.K.'s credibility. She contends Dr. Salter's statements indicated L.K.'s testimony about the alleged abuse was credible regardless of any inconsistencies in his story because he was willing to testify in court despite his young age.

The State also questioned Dr. Salter about the forensic interviews performed in this case:

Q. And specifically on the tapes here did you see anything that was—you said—I think you testified earlier that you did not see anything inappropriate done in the interview? A. That's correct.

Q. And would that go for on the child's side as well as the interviewer's side? A. Yes.

Tjernagel claims Dr. Salter communicated her belief to the jury that L.K. was telling the truth by stating both L.K. and the interviewer were appropriate during the interviews.

Our courts have generally "permitted an expert witness to testify regarding the 'typical symptoms exhibited by a [victim of sexual abuse],' " why a "child's recollection of the events may seem inconsistent," and "why child[ ] victims may delay reporting their sexual abuse" because it can "assist the jury in understanding some of the seemingly unusual behavior child victims tend to display." Dudley, 856 N.W.2d at 676–77 (citations omitted); see also Iowa R. Evid. 5.702 (permitting expert opinion testimony "if ... specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"). But courts should "reject expert testimony that either directly or indirectly renders an opinion on the credibility or truthfulness of a witness." State v. Myers, 382 N.W.2d 91, 97 (Iowa 1986).

In *Dudley*, our supreme court found the testimony of an expert witness, the child victim's treating therapist, crossed the "very thin line" when the expert testified the child's "physical manifestations or symptoms" were consistent with sexual abuse, and "indirectly vouch[ed] that the victim was

telling the truth." 856 N.W.2d at 677. The court also found the forensic interviewer's testimony crossed the line when she recommended the child victim receive therapy and stay away from the defendant. *Id.* at 678. The court noted the interviewer "based these recommendations on her opinion that she believed [the defendant] sexually abused [the child] ...; thus, indirectly vouching for [the child's] credibility." *Id.*

In *Jaquez*, the supreme court held the expert witness's testimony indirectly vouched for the child victim's credibility "[b]y opining [the child]'s demeanor was 'completely consistent with a child who has been traumatized, particularly multiple times.' " 856 N.W.2d at 665. The court reasoned, "We allow an expert witness to testify generally that victims of child abuse display certain demeanors." *Id.* at 666. "However, when an expert witness testifies a child's demeanor or symptoms are consistent with child abuse, the expert crosses that very thin line and indirectly vouches for the victim's credibility, thereby commenting on the defendant's guilt or innocence." *Id.*

The State acknowledges Dr. Salter's "testimony was *almost entirely* couched in general terms" and otherwise "did not exceed permissible bounds by specifically connecting those behaviors to L.K." (Emphasis added.) We agree it was proper for Dr. Salter to discuss suggestibility and coaching in child sexual abuse cases in general and opine she did not believe the interviewer had done anything "inappropriate" during L.K.'s interviews. However, Dr. Salter's testimony crossed the line when she stated L.K. was not "inappropriate" in the forensic interviews and commented on the specific facts of this particular case. Her statement that L.K. was not "inappropriate" during his interviews was akin to saying the child did not appear to be coached during the interviews, indicating to the jury Dr. Salter's expert opinion L.K. was telling the truth about the alleged abuse. Additionally, her statements "[n]obody coaches SpongeBob" and "I've never had a coaching case where the parent coached sensory details like that to the child," after L.K. testified SpongeBob was on television and he could smell popcorn during the alleged abuse, clearly crossed the line. Regardless of whether the question posed by the State was general and the witness answered specifically, the expert's testimony before the jury indicated Dr. Salter believed L.K. was being truthful and Tjernagel committed the accused acts. Further, Dr. Salter's statements "why would a child just come in and make up a story?"; "[a]ny kid that can come into court and face this group of people"; and "[w]e put eight year olds in that situation because we have to, but I'm never surprised when we can't get the whole story out of them because—because it's a very intimidating place and they're trying their best to remember," implied L.K. was telling the truth about the alleged abuse simply because he testified in front of the jury at trial, and thus, the statements improperly vouched for L.K.'s credibility.

**\*5** The State asserts "the subject of coaching was fair game given the defense presented." We note that while the "subject of coaching" may have been "fair game" and testimony by the expert witnesses on coaching and suggestibility may have been admissible, *see Dudley,* 856 N.W.2d at 678, not all testimony relating to the subject of coaching is admissible. An expert witness is not entitled to opine that the child in this case was not coached simply because the defendant argued coaching as a theory of defense.

Tjernagel also challenges statements made by her expert witness, forensic interviewer Bibbins, on cross-examination by the State as vouching for L.K.'s credibility.

On cross-examination, the State questioned Bibbins about idiosyncratic details. Bibbins responded:

> The research shows that when children are able to give just kind of unique details about a narrative, that it's less likely that it's coached. Most often if someone is coaching someone, they're just going to give them the basic facts. When children come up with just out of the ordinary details about the event, it indicates that there's less likely—less likely coaching has happened.
>
> Q. And did some of those facts occur in this case? A. Yes.
>
> Q. Was he able to give you some of those types of facts? A. Yes.

Tjernagel does not object to the initial portion of Bibbins's answer, but she claims the follow-up questions, asking whether L.K. was able to provide unique details in this particular case, crossed the line into vouching territory.

The State then asked Bibbins:

> Q. And so would it surprise you or be unusual in any way that he would not give you all the information about his sexual abuse that first time? A. The way that children disclose, the literature—the literature talks about children disclosing in—I'll say in bits and pieces. Sometimes they'll disclose a little bit and then later on they maybe disclose

more. That may be because of memory or maybe they're just kind of testing the waters to see what the reaction to their disclosure is going to be.

Tjernagel contends Bibbins's response explains away any inconsistencies between Bibbins's first and second interviews with L.K. and vouches for his credibility.

Next, the State questioned Bibbins:

Q. So would it be something of concern if he told you that it happened when he was about four years old and his dates might be off? A. For a child [L.K.]'s age, for both interviews it's not unusual that he wouldn't have a good understanding of time and would not necessarily be able to pinpoint dates and time when things happened.

Q. Would it surprise you at all if he thought that he met and spoke with you like two weeks apart? Like he met and spoke with you and two weeks later he came back and spoke with you again, when in fact it was months later? A. It wouldn't be unusual that he would mislabel whatever that time frame was.

Tjernagel claims Bibbins answered questions regarding specific facts concerning L.K., conveying to the jury that L.K.'s inconsistencies were not evidence of lying.

Bibbins was then asked by the State:

Q. Now, you also were told by [L.K.] that he thought his mom went to a meeting? A. Correct.

Q. If it turned out that she was at a doctor's appointment, would that bother you at all or be a red flag in this case? A. It wouldn't be unusual that a child would just call some kind of appointment a meeting.

Tjernagel asserts Bibbins's statements lend credence to L.K.'s testimony and provide her opinion regarding whether L.K. was credible because she stated there were no "red flags" during his interviews.

**\*6** In *Dudley*, the supreme court held the forensic interviewer's testimony that the child's "statement was consistent throughout the entire interview process" did not "cross[ ] the line" because the expert "was merely stating the fact that throughout the interview [the child victim] never changed her story as to the events with [the defendant]." 856 N.W.2d at 678. The court reasoned, "The jury is entitled to use this information to determine the victim's credibility. This information gives the jury an insight into the victim's memory and knowledge of the facts." *Id.*

In *State v. Huffman*, No. 14-1143, 2015 WL 5278980, at *6 (Iowa Ct. App. Sept. 10, 2015), our court held an expert witness may testify regarding whether the particular children in that case "used developmentally appropriate language" because it "provided the jury some perception about their knowledge of the facts" and did "not vouch for the truthfulness of the statements" but left "the question of credibility to the jury."

Here, we do not find Bibbins's statements that young children who are victims of sexual abuse do not disclose everything about an incident at the first opportunity, that young children are not accurate as to dates and time, or that it would not be unusual for young children to refer to a parent's "appointment" as a "meeting," cross the line. However, we do find Bibbins's statement that L.K. was able to give "unique" or "out of the ordinary details" crosses the line into vouching for L.K.'s credibility because she previously testified such "details about the event ... indicate[ ] that there's less likely—less likely coaching has happened." While at first blush this testimony may seem similar to that which was admissible in *Huffman*, we note that expert testimony may be necessary to explain to the jury what constitutes "developmentally appropriate language" and whether a child used such language, while an expert is not necessary to explain to a jury what "unique" or "out of the ordinary details" are. *See Huffman, 2015 WL 5278980, at \*6*.

Additionally, Tjernagel contends the State engaged in "mirroring"—point-by-point reinforcing—of L.K.'s testimony with Dr. Salter in violation of our holding in *State v. Pansegrau, 524 N.W.2d 207, 211 (Iowa Ct. App. 1994)*. In *Pansegrau*, our court reversed the defendant's conviction and remanded for a new trial holding, "The hypothetical question [posed to the expert witness by the State on rebuttal] outlined all the events the alleged victim had testified preceded the rape. This personalized the opinion and conclusion. The court here admitted testimony beyond the careful exception carved in [*State v. Gettier, 438 N.W.2d 1, 6 (Iowa 1989)*]." 524 N.W.2d at 211 (noting, "In [*Gettier*], the Iowa court found no abuse of discretion when the trial court allowed testimony of a psychologist ... as to what she considered typical symptoms exhibited by a person after being traumatized and no more. A careful review of *Gettier* instructs that the Iowa Court has carefully limited the admission of similar testimony and set

guide rules for the credentials of the expert as well as limiting the testimony only to the reaction to trauma").

In *State v. Pitsenbarger*, our court noted:

> [T]he supreme court's ruling in *Dudley* clearly reflects expert testimony that indirectly or implicitly attempts to match up behaviors that are observed in known sex abuse victims with the complainant's behaviors constitutes vouching for the complainant's credibility. 856 N.W.2d at 677–78. We conclude the State crossed the line in its direct examination of [the expert witness] and defense counsel failed to object to the form of questioning.

 *7  No. 14-0060, 2015 WL 1815989, at *8 (Iowa Ct. App. Apr. 22, 2015).

Although not binding, we find our court's ruling in *Pitsenbarger* instructive. As in *Pitsenbarger*, the State in this case methodically bolstered L.K.'s credibility by soliciting responses from Dr. Salter conveying opinions regarding L.K.'s behaviors, actions, and statements as being consistent with the behaviors, actions, and statements of child victims of sexual abuse in the "volumes of research" Dr. Salter had reviewed and brought to trial with her. Based upon our review of the record, we conclude the State crossed the line in its direct examination of Dr. Salter.

Because we find statements made by Dr. Salter on direct examination by the State and those made by Bibbins on cross-examination by the State constituted improper vouching testimony, we examine whether Tjernagel's trial counsel failed in an essential duty. See *Thorndike*, 860 N.W.2d at 320.

"In determining whether an attorney failed in performance of an essential duty, we avoid second-guessing reasonable trial strategy." *Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010).

Our court noted in *Pitsenbarger*:

> We ... find no solace in the State filing its own motion in limine contending no witness should speak upon the credibility of another witness and then proceeding to present testimony vouching for the credibility of [the child]. Equally unconvincing is the State's effort in direct examination of [the expert witness] to establish that the purpose of her testimony was to not "make conclusions about what the child said or whether or not the abuse occurred." An expert's own testimony that she is "neutral" does not make it so. The same is true concerning the question poised to the expert that the purpose of the expert's testimony is not to invade the jury's role—with a corresponding answer by the expert, "correct." None of these efforts cleanse or whitewash the improper vouching. We recognize the State's desire to present expert testimony to support their prosecution. However, our system of justice does not rely upon the statistical probabilities of certain conduct absent scientifically proven principles but rather relies upon the jury to determine the credibility of witnesses to reach its verdict.

2015 WL 1815989, at *8.

Similar to our court in *Pitsenbarger*, 2015 WL 1815989, at *2, we cannot excuse trial counsel's failure to object to the experts' testimony because the State filed a pretrial motion in limine barring "[a]ny witnesses testifying about the credibility of other witnesses" or the following exchange between the State and Dr. Salter on direct examination:

> Q. I want to be clear about what the purpose of your testimony is here today. Are you here today to tell the jury whether or not this case—whether or not the sexual abuse happened? A. No.
>
> Q. Why not? A. Well, that's not my job. First of all, no witness can comment on the credibility of any other witness. That's just the law. So I'm not being asked to comment on the credibility of any witness today. And the ultimate issue of whether the child was sexually abused or not isn't up to me. That's the province of the jury to decide.

 *8  As stated in *Pitsenbarger*, "An expert's own testimony that she is 'neutral' does not make it so." 2015 WL 1815989, at *8. We also find no solace in the following exchange between the State and Bibbins on cross-examination:

> Q. So making them promise to tell the truth. Giving them the ability to correct you when they're wrong—or when you're wrong when you state something....
>
> ....
>
> Q. And now, you're not here to say whether or not this happened? A. Correct.
>
> Q. Okay. But did [L.K.] correct you—A. Yes.
>
> Q. —in the interview? Did he promise to tell the truth? A. Yes, he did.

Indeed, "[n]one of these efforts cleanse or whitewash the improper vouching" or counsel's failure to object. *Pitsenbarger*, 2015 WL 1815989, at *8, *9. Furthermore, on the record in this case we find there can be no reasonable

trial strategy for failing to object to the improper vouching testimony presented by the State in this case. See _id._ at *9.

Thus, we conclude Tjernagel's trial counsel failed to perform an essential duty when he failed to object to testimony given by Dr. Salter and Bibbins indirectly vouching for L.K.'s credibility and truthfulness.

We now turn to whether prejudice resulted from trial counsel's failure to perform an essential duty. Prejudice is the "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." _Strickland,_ 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." _Id._

Similar to _Brown_ and _Pitsenbarger_, the State's case in this action rested entirely on the credibility of the witnesses. See _Brown,_ 856 N.W.2d at 689; _Pitsenbarger,_ 2015 WL 1815989, at *7. There was no physical evidence of the alleged abuse and no witnesses other than the complaining witness, L.K. See _Pitsenbarger,_ 2015 WL 1815989, at *7. Furthermore, the expert witnesses' vouching testimony here "was pervasive —not just a single statement." _Id._ at *10. As our supreme court noted in _Brown_, "[t]he expert witness's statement put a stamp of scientific certainty on [the child victim]'s testimony. A jury uses this type of expert testimony to bolster the victim's testimony and tip the scales against the defendant." 856 N.W.2d at 689.

Moreover, in _Jaquez_, the court found the defendant was prejudiced by the admission of the improper vouching testimony in part because the State had "emphasized this wrongly admitted testimony in [its] presentation to the jury." 856 N.W.2d at 666; _see also_ _Pitsenbarger,_ 2015 WL 1815989, at *10. Tjernagel's brief argues each example of vouching as having been referenced during the State's closing or rebuttal arguments to the jury. On our review of those arguments, the references complained of were largely subtle and could have been mostly references to admissible testimony. Nonetheless, we conclude the numerous examples of vouching identified above were pervasive and laid the groundwork for the State's emphasis on the credibility and believability of L.K. during closing arguments.

We conclude Tjernagel has shown that but for counsel's unprofessional errors in failing to object to the vouching testimony, "the probability of a different result is 'sufficient to undermine [our] confidence in the outcome' " of the proceedings. _State v. Graves,_ 668 N.W.2d 860, 882 (Iowa 2003) (quoting _Strickland,_ 466 U.S. at 694). We reverse the conviction and remand for new trial based on statements made by the expert witnesses vouching for L.K.'s credibility and truthfulness.

_B. Statistics_

**\*9** Tjernagel contends trial counsel rendered ineffective assistance by failing to object to Dr. Salter's use of statistics at trial.

It is well-established in Iowa that expert witnesses are prohibited from providing statistics suggesting children do not lie about sexual abuse. _Myers,_ 382 N.W.2d at 97; _see also_ _State v. Tracy,_ 482 N.W.2d 675, 678 (Iowa 1992). In _Pitsenbarger_, our court held the expert witness's statement "that only five percent of children lie about sexual abuse and then usually only after coaching by an adult constitutes indirect vouching for [the child]'s credibility." 2015 WL 1815989, at *7.

Here, Dr. Salter cited statistics about how likely and at what age children who are victims of sexual abuse disclose the abuse. Her use of statistics at trial and comments that "most disclosures" or "most children do not tell right away" were not comments on whether children lie about sexual abuse, but rather, comments about when children typically disclose sexual abuse. Dr. Salter's testimony in this regard did not cross the line and bolster L.K.'s credibility. We find Tjernagel's trial counsel did not render ineffective assistance in failing to object to Dr. Salter's use of statistics regarding disclosure at trial.

_C. Profiling_

Tjernagel claims her trial counsel provided ineffective assistance by failing to object to Dr. Salter's testimony "profiling" her as a sex offender.

In _State v. Hulbert,_ 481 N.W.2d 329, 333 (Iowa 1992), the supreme court held the district court did not abuse its discretion in excluding an expert witness's proposed testimony that the defendant did not fit the profile of a sex offender because it resembled an "expert opinion on the ultimate question of guilt or innocence" and would not have aided the jury.

Here, although Dr. Salter testified women can certainly be sex offenders, she specifically testified "there's no profile of either female or male sex offenders." Dr. Salter also provided examples of cases she had worked on over the years in which offenders used various methods, including grooming, to continue to sexually abuse children. She did so not to show Tjernagel fit any kind of mold as a sex offender but rather to show there is no mold. We conclude Tjernagel's trial counsel did not provide ineffective assistance in failing to object to Dr. Salter's testimony about grooming and other behaviors or actions by known sex offenders.

*D. Common Knowledge*

Tjernagel asserts her trial counsel rendered ineffective assistance by failing to object to testimony by Dr. Salter and Bibbins that was in the common knowledge of the jurors. Tjernagel contends Dr. Salter improperly testified about several topics that were within the common knowledge of the jury, including a child's capacity for details, a child's concept of time, parental responses to allegations of child sexual abuse, and parental discussions of allegations of abuse with the child. She also claims Bibbins improperly testified about topics within the common knowledge of the jury, including parents escorting their children to forensic interviews and children using age-appropriate language. She argues the expert witnesses' testimony on these topics invaded the province of the jury as the trier of fact.

 *10 Iowa Rule of Evidence 5.702 provides experts are permitted to testify "in the form of an opinion or otherwise" when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is admissible in cases involving child sexual abuse if it will "assist the jury in understanding some of the seemingly unusual behavior child victims tend to display." *Dudley*, 856 N.W.2d at 675.

Based on our review of the record, we find the expert witnesses' testimony in this case may have assisted the jury in "understand[ing] the evidence or determin[ing] a fact in issue." *See* Iowa R. Evid. 5.702. Thus, we cannot find trial counsel was ineffective in failing to object to the challenged testimony.

**IV. Conclusion**

We reverse Tjernagel's conviction and remand for new trial based on her claim trial counsel was ineffective in failing to object to expert witness testimony vouching for L.K.'s credibility. We do not find trial counsel rendered ineffective assistance in failing to object to the expert witnesses' testimony based on claims the experts used statistics at trial, profiled Tjernagel as a sex offender, or testified about topics within the common knowledge of the jurors. We do not reach Tjernagel's other claims.

**REVERSED AND REMANDED.**

**All Citations**

895 N.W.2d 922 (Table), 2017 WL 108291

Footnotes

\*   Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.