# Exhibit 69G:

# Dr. Anna Salter Deposition Exhibit 16

E-FILED                    EQCV047108 - 2022 AUG 17 10:38 AM           STORY
                            CLERK OF DISTRICT COURT                    Page 1 of 25

EXHIBIT
16
A. Salter, PhD | 05-30-2023
S. Apley, CSR #8838

# IN THE IOWA DISTRICT COURT FOR STORY COUNTY

| | | |
|---|---|---|
| IN RE THE DETENTION OF | ) | No. EQCV047108 |
| STEWART SCHUMAN | ) | ORDER ON |
| | ) | ANNUAL REVIEW |

This case came before the court on July 6, 2022 for final hearing on an annual review as provided by Iowa Code § 229A.8(6). The trial was conducted by Zoom with the consent of the respondent and both attorneys. The respondent appeared by video, and was represented by his attorney, Michael H. Adams. The State was represented by Assistant Attorney General Keisha F. Cretsinger.

Schuman was civilly committed as a sexually violent predator pursuant to Iowa Code Chapter 229A in 2012. At that time, a jury determined that he had been convicted of a sexually violent offense, that he suffered from a mental abnormality that caused him serious difficulty controlling his sexually violent behavior, and that he was likely to engage in predatory acts constituting sexually violent offenses if not confined in a secure facility. Schuman has been held at the Civil Commitment Unit for Sex Offenders, located in Cherokee, Iowa, since December 12, 2012.

Trial of an annual review is a two-step process. First, the court must decide that there is evidence to justify a trial. If there is, then a final hearing is conducted, which may be before a jury or before the court alone. On March 21, 2022, Judge Kurt Stoebe determined that Schuman had met his burden under Iowa Code § 229A.8(5)(e)(1) to prove that there is relevant and reliable evidence to rebut the presumption of continued commitment,

which would lead a reasonable person to believe a final hearing should be held. The July 6, 2022 proceeding heard by this court was the final hearing, governed by Iowa Code § 229A.8(6).

The issue in this final hearing on this annual review is whether Schuman's mental abnormality has so changed that he is no longer likely to engage in predatory acts constituting sexually violent offenses if he is discharged or whether Schuman is not suitable for placement in a transitional release program pursuant to § 229A.8A. The burden initially was on Schuman to prove that he was entitled to a final hearing, Iowa Code § 229A.8(5)(e)(1), but at this final hearing the burden is on the State by proof beyond a reasonable doubt. § 229A.8(6)(d). Schuman specifically testified that he is not seeking a discharge, so the issue is now narrowed to whether the State has shown beyond a reasonable doubt that he is not suitable for placement in a transitional release program (TRP).

A previous annual review was submitted to a jury in April 2016. That jury determined that Schuman continued to have a mental abnormality and that because of that mental abnormality, Schuman was likely to engage in predatory acts constituting sexually violent offenses if discharged. The annual review now before this court was tried to the court without a jury. Schuman now seeks a transfer to treatment phase 5, the Transitional Release Program, pursuant to Iowa Code § 229A.8A.

Schuman was born on December 1, 1954, which makes him 67 years old. He is diabetic and has high blood pressure, as well as arthritis and various aches and pains that are probably the result of advancing age.

Schuman was raised in Louisiana, mostly in a series of foster homes and a state school. He completed the 11th grade and later obtained a GED at the Mount Pleasant, Iowa, Correctional Facility. He has a criminal history

that includes a variety of nonsexual offenses in addition to his sexual offenses. He has been married twice and he has one daughter, one stepdaughter, and one son.

Schuman was convicted of sexual abuse in the third degree in Polk County in 1995. The victim was his seven-year-old son. On November 9, 2005, Schuman was convicted of sexual abuse in the third degree in Story County. This victim was his six-year-old nephew. In addition to the two convictions, he also admits to abusing other children. The dates and details vary among the two expert reports and his testimony.

The victim information in his Relapse Prevention Plan (RPP) attached to the report of Luis Rosell, Psy. D., as Appendix 1 (report pages 21-22), also varies. Violations 3 through 7 list Schuman's age at the time of those offenses as 54 and 55, which is unlikely because Schuman was incarcerated after his conviction in 2005, a month before he turned 51, and had not yet been released when the petition commencing this SVP case was filed on September 27, 2011, two months before he turned 57. These ages are not examples of deceitfulness, and the State does not claim that they are. Schuman had nothing to gain by misstating these ages. If anything, more recent offenses would hurt his case. These are examples of imperfect memory and an inability to accurately place events in time.

In 1977 he was accused of molesting an eight-year-old girl in Southern California. He may or may not have been arrested, but if he was, the case was dismissed. In any event, he was never convicted, but he admitted the offense in his testimony. He admitted an offense against an eleven-year-old girl (in his testimony he said she was 9 or 10) at an indefinite time in the early 1980's. His RPP (Rosell report, p. 21) describes this as fondling and attempted rape. He admitted an offense against a thirteen-year-old boy who

he testified was the son of a friend of his. His RPP (Rosell report, p. 22) described that offense as anal rape. He admitted fondling a four-year-old girl while giving her a bath.

The State points out that he also listed a nine-year-old girl in the victim information section of his RPP (Rosell report, p. 21, item # 3) and that Schuman and his counsel consistently referred to seven victims during his testimony. The seventh victim was apparently the July 17, 1981 charge listed in the report by Schuman's expert, Dr. Rosell, on page 3, as having been dismissed. In his trial testimony on July 6, and in his interviews with Dr. Salter and with Dr. Rosell, he denied that offense, but explained at trial that he felt obligated to list it on his relapse plan because he understood he was required to list every accusation.

Dr. Salter reports that in a 2013 polygraph, Schuman admitted to more than 100 victims and that in a 2016 Abel Screen he admitted to 30. She also testified that more recently he has indicated fewer victims. In her report and in her testimony, she says he is still not admitting all of his victims. (Annual Report by Anna C. Salter, Ph.D., p. 25.) (hereafter Salter report.)

Dr. Rosell also notes that Dr. Smith, who Dr. Salter identified as a licensed clinical psychologist at CCUSO, reported that Schuman admitted additional victims as well as the use of child pornography and other troubling behaviors. (Rosell report, p. 3). In speaking with Dr. Rosell, Schuman denied all those admissions. Dr. Salter identified Dr. Smith and testified that to the best of her knowledge, Dr. Smith has never met Schuman. (Rough transcript p. 126).[1] It appears that Dr. Salter relies on Dr. Smith's reports and that Dr. Smith's reports are based on information provided to him by

---

[1] The rough transcript available to the court does not have a cover sheet or index pages. If a final transcript is prepared, page references will need to be adjusted accordingly.

polygraph and plethysmograph operators, thus creating two more degrees of separation between what Schuman said and much of what has been included in the Salter and Rosell reports.

Dr. Salter's report regarding victims and offenses beyond the six directly admitted by Schuman is based on Schuman's RPP, which he has explained, and on the reports of other examiners. This court has no means to assess the accuracy of the other examiners' statements or even whether Dr. Salter has accurately understood their reports. Schuman's statements directly to Dr. Salter and Dr. Rosell would not be hearsay if offered by the State. Iowa R. Evid. 5.803(d)(2)(A). But these third-hand reports of what he is alleged to have said to polygraph and plethysmograph operators are double or triple hearsay. Even if the rule 5.803(4) hearsay exception for statements made for medical diagnosis or treatment applies, there is no assurance in this record that the operators' methods and procedures are reliable.

It is proper in this context for both Dr. Salter and Dr. Rosell to refer to and rely on the reports of Schuman's treatment providers in forming their opinions. Iowa R. Evid. 5.703. Their reliance on such information does not make Dr. Salter's or Dr. Rosell's testimony inadmissible. "However, this rule does not automatically render hearsay admissible. *See C.S.I. Chem. Sales, Inc. v. Mapco Gas Prods.,* 557 N.W.2d 528, 531 (Iowa App.1996)." *City of Dubuque v. Fancher*, 590 N.W.2d 493, 496 (Iowa 1999). *See also Matter of Est. of Kelly*, 558 N.W.2d 719, 721 (Iowa App. 1996) ("[T]he rule permits hearsay evidence to be admitted, not as substantial evidence, but to explain the basis for an expert's opinion.") In its capacity as the finder of fact, this court does not consider the hearsay from the polygraph and plethysmograph operators to be sufficiently reliable to serve as proof of the facts that hearsay

contains, such as that Schuman had 100 victims or 30 victims. The court will consider the hearsay in weighing the experts' opinions.

The rules of evidence support the proposition that the finder of fact may consider the quality of the information an expert has relied upon to decide how much weight to give that expert's opinion. Iowa R. Evid. 5.705. The rule says the cross-examiner may require disclosure of underlying facts or data, but in this judge-tried case the court received the experts' reports, subject to certain objections, and those reports disclose the sources of the underlying facts.

This court, acting as the finder of fact, may also consider Schuman's self-interest in weighing what he has said, both in his testimony and in his statements to others. *See* Iowa Civil Jury Instruction 100.9. The court may also consider Schuman's admission that he lied to the polygraph operator in September of 2021, to remain in Phase 4. He told that lie in connection with his argument with the operator about whether he had masturbated or not, in an attempt to remain at Phase 4. As the court will explain, the court was not and is not able to make any sense of the argument in the first place or of how Schuman thought lying in response to the polygraph operator's questionable finding of deceitfulness might help him.[2]

Dr. Salter questions Schuman's veracity in two of his denials based on his manner of expressing himself. On page 23 of her report, she argues that his statement that "I will deny that" (Salter report, p. 9) and "I am going to deny that." (*Id.* at p. 10) suggest he is being deceptive. This is not a hearsay issue. The State is entitled to offer Schuman's statements as those of a party opponent, but when the court considers Schuman's intellectual limitations

---

[2] The court explains why the argument makes no sense and the polygraph operator's finding is questionable at page 11 and 12.

and that in both instances, as described on pages 9 and 10 of her report, Schuman followed the language that Dr. Salter found problematic with unconditional denials, the court finds that Dr. Salter's analysis of the two points makes too much of too little. Her conclusion that he was deceptive on these occasions is not entitled to any weight.

In summary, the court finds that the State has shown that Schuman has six victims. That is more than enough to qualify him as a sexually violent predator, if he meets the other criteria.

In seeking release to TRP, Schuman relies on the testimony of Luis Rosell, Psy.D., to raise reasonable doubts about the State's case. He also points to his age, and claims to be unable to attain an erection. Considering his age, his health issues, and his medications, the court finds this assertion of erectile dysfunction to be credible. This may be consistent with a July 6, 2017 penile plethysmograph that was uninterpretable because he did not meet the minimum threshold of arousal on any segment. (Salter report, p. 7.)

An erection is not required to commit sexual abuse. In Schuman's history specifically, only three of the six acts of abuse against children that he admits are shown by the record to have required an erection. The record does not disclose whether the attempted abuse was not carried out because of an erectile failure, or because the act was interrupted or the victim successfully escaped, or for some other reason. His erectile incapacity is a consideration, but it does not exclude Schuman as a possible sexual predator.

When he was committed in 2012, Schuman was diagnosed with pedophilic disorder and with antisocial personality disorder.[3]  Schuman admitted in his trial testimony that he is "still attracted to children.  It depends what I do with it."  Dr. Salter testified that Schuman has made remarkable progress with his antisocial personality disorder.  Her much-less-favorable assessment of his pedophilia is affected by her belief that he is deceitful.  Dr. Salter concludes that Schuman is not suitable for placement in the TRP because, according to her analysis, he fails to meet six of the ten statutory criteria established by Iowa Code § 229A.8A(2),(3), and (4).[4]

She also opines that he is not ready for discharge.  In discussing discharge, she cites Iowa Code § 229.8(5)(e)(1) and says the burden is on Schuman.  This is a mistake.  The section she cites refers to the initial question of whether he was entitled to a final hearing.  The proceeding now

---

[3] Dr. Salter has added a diagnosis of sexual sadism.  Dr. Rosell rejects that diagnosis for not meeting the DSM criteria.  The original diagnostician, Barry Leavitt, Psy.D., found two other "mental conditions of relevance," alcohol abuse and borderline intellectual functioning.  Statement of Probable Cause filed September 27, 2011.

[4] Iowa Code § 229A.8A provides in part:

2. A committed person is suitable for placement in the transitional release program if the court finds that all of the following apply:

a. The committed person's mental abnormality is no longer such that the person is a high risk to reoffend.

b. The committed person has achieved and demonstrated significant insights into the person's sex offending cycle.

c. The committed person has accepted responsibility for past behavior and understands the impact sexually violent crimes have upon a victim.

d. A detailed relapse prevention plan has been developed and accepted by the treatment provider which is appropriate for the committed person's mental abnormality and sex offending history.

e. No major discipline reports have been issued for the committed person for a period of six months.

f. The committed person is not likely to escape or attempt to escape custody pursuant to section 229A.5B.

g. The committed person is not likely to engage in predatory acts constituting sexually violent offenses while in the program.

h. The placement is in the best interest of the committed person.

i. The committed person has demonstrated a willingness to agree to and abide by all rules of the program.

3. If the committed person does not agree to the conditions of release, the person is not eligible for the transitional release program.

4. A committed person who refuses to register as a sex offender is not eligible for placement in a transitional release program.

before this court is governed by § 229A.8(6)(d).  This error does not affect the remainder of Dr. Salter's report or opinions.  Again, Schuman has specifically disclaimed any request for discharge.

Dr. Rosell, in contrast, has found that Schuman meets the statutory criteria and is suitable for transitional release as defined by Iowa Code § 229A.8A.  He also finds that Schuman is appropriate for discharge but, again, Schuman asks only for transitional release, so the court will limit itself to considering that possibility.

Schuman acknowledges that if he is released from confinement, he will need to build a support team.  He says he has no friends outside of CCUSO, but he hopes to establish a relationship with his daughter and he proposes to go to NA or AA.  He also hopes to improve his financial situation while on TRP.

There are five treatment phases at CCUSO.  Those phases are:

1. Treatment Engagement/Interfering Factors
2. Identification of Dynamic Risk Factors/Long Term Vulnerabilities
3. Specific Interventions for Dynamic Risk Factors/Long Term Vulnerabilities
4. Maintenance of Change
5. Transitional Release

(Salter report, p. 13.)

Phase 1 is designed to engage patients in treatment and to identify factors interfering in treatment.  All patients begin in Phase 1 upon arrival at CCUSO.  (*Id.*)

Phase 2 involves developing insight into the factors that are related to an individual's offense cycle.  (*Id.*)

In Phase 3, patients learn to develop specific interventions to control their dynamic risk factors (DRFs).  (*Id.*)

In Phase 4, patients practice utilizing their interventions in their daily lives. They also are expected to learn to monitor themselves for thinking errors, dysregulation, deviant arousal and other factors that might lead to a re-offense. It is considered reasonable to conclude that by the end of Phase 4, that risk has been reduced and that a patient is ready for a less restrictive environment. (*Id.*)

Schuman was at Phase 4, Level 5 for four years, but was reduced to Phase 3, Level 4 sometime in 2021 as a result of failing two polygraphs.

Dr. Salter's report develops each of these steps, their purposes and their goals more fully at pages 13 and 14 of her annual report. Particularly relevant to this annual review is her explanation that phase 4 involves a patient practicing his interventions. She warns, "Patients who are removed from the program in Phase 3 have not practiced their interventions in a secure setting with support, much less practiced them in a less restrictive setting where they have limited access to the community, such as the TRP**.**" (*Id.* at 13.) The court does not doubt the accuracy or importance of Dr. Salter's warning, but Schuman had more than three years of practice at Phase 4 before his return to Phase 3 in 2021. Of course, three years at Phase 4 can cut both ways. Has he received the full benefit of Phase 4 so that he is just wasting time now, or was his development and rehabilitation delayed so that he could not proceed any more quickly than he did? Dr. Salter's criticisms of his work during Phase 4 point toward the latter conclusion.

Phase 5 is the Transitional Release Program (TRP). *See* Iowa Code § 229A.8A. This involves controlled and monitored introduction of the patient into the community outside of confinement at CCUSO. Each venture that a patient makes into the community must be approved by the CCUSO staff. Trips into the community are monitored more closely at first, but that

supervision becomes less rigid as a patient shows himself to be reliable.[5] Throughout a patient's time in TRP, it is within the discretion of the staff to delay or deny trips into the community.

Schuman is presently at Phase 3, Level 4. As noted, Phases relate to treatment progress, while Levels relate to the respondent's behavior and privileges. Also as previously noted, Schuman was at Phase 4 for over three years, but was returned to Phase 3, Level 4 sometime in 2021 as a result of failing two maintenance polygraphs, one in March of 2021 and the other in September of 2021.

The first failed polygraph was administered on March 26, 2021. As Dr. Salter reports at page 6 of her annual report:

> He was not polygraphed on the interview but on three specific questions: 1) Since your last test, did you penetrate your anus with your fingers for sexual pleasure, 2) Since your last test, did you stick any kind of food into your anus, and 3) Since your last test, did you enter your anus with any inanimate object? He said no to each of these questions, but test results indicated that he had a significant response to question one, and the examiner labelled this response "untruthful." Because of the dampening effect of a significant response, the evaluator expressed no opinion of his responses to the second and third questions. He then admitted to scratching his anal orifice but denied it was for sexual pleasure.

(Salter report, p. 6.)

Although the practice is disgusting, the State never explains how penetrating one's own anus with one's own fingers for sexual pleasure relates to the likelihood that an individual is a sexually violent predator. Dr. Salter explains that the problem is the deception, and not the act itself, but there is no

---

[5] The male pronoun is proper. There are no female sexually violent predators at CCUSO.

explanation for why the question was asked in the first place. As for the deception, the conclusion that there was a deception is based on a polygraph and, as the court will explain shortly, the court finds that to be problematic at best.

The second failed polygraph was a maintenance polygraph conducted on September 22, 2021. (Salter report, p. 6.) Schuman was asked about masturbation. Masturbation in private is not prohibited at CCUSO, but there is concern about what a patient is masturbating to, or about. He denied masturbating because he was unable to obtain an erection. The polygrapher maintained that an individual does not need to be aroused to masturbate but that touching or groping oneself would be sufficient. Schuman contends that an erection is necessary to masturbation and that he can no longer obtain an erection.

Schuman and the polygrapher are arguing over the definition of masturbation, and not over whether Schuman committed any specific act or not. He admitted trying, but told the polygrapher "I didn't get nothing." Consultation with a standard dictionary reveals that Schuman's definition of the term masturbation is at least defensible. The American Heritage Dictionary of the English Language, Fifth Edition, defines masturbation as "excitation of one's own or another's genital organs *usually to orgasm*, by manual contact or means other than sexual intercourse." (Emphasis added.) Merriam-Webster and WebMD.com are consistent. More importantly, in telling the polygrapher he tried but "didn't get nothing," Schuman did acknowledge conduct that the polygrapher describes as masturbation. This is an argument about the meaning of a word and is not an adequate basis for deciding that Schuman was being deceptive.

Dr. Salter lists three specific questions that the polygrapher reported that Schuman was asked. The first was, "Since your last test, other than that

one time that you said, did you masturbate your bare penis?" Schuman answered no to that question as well as the other two, but "had a significant response to the first question. Mr. Schuman did not offer relevant information after he was informed that he had a significant response to the first question. The polygrapher labeled his response to the first question as 'untruthful.'"

The same polygrapher conducted both the March 2021 examination and the September 2012 examination. The court knows nothing about the polygrapher except that the polygrapher is relatively new. The record gives some context in that Schuman had passed fourteen polygraphs and failed one before failing the two by the new operator. The record reveals nothing about the either polygrapher's methods or qualifications. While polygraphs (and penile plethysmographs, which will be discussed shortly) are apparently commonly accepted for use in treatment regimes, "[t]he general rule is that polygraph evidence is inadmissible [at trial], at least in the absence of a stipulation by the parties." *Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98, 101 (Iowa 1985), *abrogated on a different issue by Barreca v. Nickolas*, 683 N.W.2d 111 (Iowa 2004).

Apparently, this court has some discretion in admitting polygraph results. "Past challenges to the admission of polygraph evidence have generally been focused on the general rule that the issue of admissibility is tested for an abuse of discretion. *See In Interest of S.J.M.,* 539 N.W.2d 496, 500 (Iowa App.1995)." *State v. Countryman*, 573 N.W.2d 265, 266 (Iowa 1998). Although the polygraph results are in evidence in this case through Dr. Salter's report, and over Schuman's objections, the considerations that support the general rule of inadmissibility also affect this court's consideration of the weight to be given those results in this court's role as the finder of fact. *See State v. Purk*, 2019 WL 5790875, **4 (Iowa App. 2019)

(evidence of a polygraph exam introduced during bench trial; no reversible error because the trial judge expressly acknowledged the polygraph evidence was inadmissible and disclaimed any reliance on it).

The Iowa Supreme Court has explained the reasoning behind this general rule of inadmissibility. In general, the concern is about reliability, or the lack of it. More particularly, "the validity of the polygraph result depends on the qualifications, skill and integrity of the polygraph operator. The instrument by its nature is subject to abuse." *State v. Conner*, 241 N.W.2d 447, 459 (Iowa 1976).

> In a field where so much depends on subjective analysis by the machine operator and the outcome of trial may well turn on the polygrapher's opinion, we believe a strong showing of scientific acceptance and evidentiary reliability must be made. Despite the exceptional qualifications of the defense polygraphers in the present case, and the thoroughness of their examinations, we do not find the requisite showing to establish polygraphy as a field of proper opinion evidence subject matter was made here.

*Id.*

The Iowa Court of Appeals considered the use of polygraph evidence in a sentencing, where the rules of evidence generally are applied more loosely. *See* Iowa R. Evid. 5.1101(4) (the Iowa Rules of Evidence do not apply to, among other proceedings, sentencings). The Court of Appeals found it

> particularly problematic that the district court relied on a failed polygraph examination as a factor to assess Shaneyfelt's credibility and justify the sentence. The record contains scant information about the polygraph administered in this case. The only record reference to the examination appears in the PSI report which does not indicate (1) the qualifications of the examiner, (2) the technique employed by the examiner, or (3)

> evidence tending to establish the reliability of the technique
> employed by the examiner. The PSI report merely asserts that
> Shaneyfelt voluntarily took and failed a polygraph examination.

*State v. Shaneyfelt*, 2005 WL 427569, *4 (Iowa App. 2005). The record in
this case suffers from all the same shortcomings.

Again, this court recognizes that a distinction has been drawn between
the use of polygraphs at trial and their use in a therapeutic setting. *See*, e.g.,
*United States v. Weber*, 451 F.3d 552, 564–66 (9th Cir. 2006); *Mitchell v.
State*, 420 S.W.3d 448, 452–54 (Tex. App. 2014). Whether that distinction
makes sense or not might be debatable. Why should a therapist be
encouraged to use methods of doubtful reliability? But this is a trial, and the
polygraph is being used to support the State's contention that Schuman
remains a sexually violent predator.

In its role as finder of fact, this court gives no weight to the polygraph
results. To the extent that Dr. Salter's conclusions and CCUSO's actions
rely on those results, those conclusions and actions are not supported in this
record.

Dr. Salter also discusses a penile plethysmograph (PPG) administered
to Schuman on August 26, 2021. Dr. Salter's full description of that event is
included on page 7 of her annual report:

> On 8.26.21, he took a second PPG. His response reached
> clinical significance on one segment, female prepubescent
> coercive. However, there were signs of possible response
> interference on the male prepubescent coercive segment.
> The report stated, "Mr. Schuman was angry during the
> majority of the test and talked during some of the segments,
> which required prompting him to stop." The test results were
> inconsistent with Mr. Schuman's self-report, which was that
> he was sexually aroused by females, ages 10-14. The

report stated that Mr. Schuman's age preference score indicated he was more aroused by images of children than adults and said, "These findings suggest that in terms of the sexual arousal variable (age), he falls within the high range of risk, indicating he has a high degree of sexual motivation in committing offense behaviors."

In *United States v. Rhodes*, 552 F.3d 624, 626–27 (7th Cir. 2009), the Seventh Circuit provides a description of the PPG that is useful as background.

Penile plethysmograph testing is a procedure that "involves placing a pressure-sensitive device around a man's penis, presenting him with an array of sexually stimulating images, and determining his level of sexual attraction by measuring minute changes in his erectile responses." Jason R. Odeshoo, *Of Penology and Perversity: The Use of Penile Plethysmography on Convicted Child Sex Offenders,* 14 Temp. Pol. & Civ. Rts. L.Rev. 1, 2 (2004). The use of PPG testing "has become rather routine in adult sexual offender treatment programs," *United States v. Weber,* 451 F.3d 552, 562 (9th Cir.2006), and courts have upheld conditions requiring offenders to undergo PPG testing under various legal challenges. *See* Odeshoo, *supra,* at 20 n. 151-52 (collecting cases).

Though the use of PPG is not uncommon, experts disagree as to its effectiveness. "The reliability and validity of this procedure in clinical assessment have not been well established, and clinical experience suggests that subjects can simulate response by manipulating mental images." Am. Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 567 (4th ed., text revision 2000); *see also* Dean Tong, *The Penile Plethysmograph, Abel Assessment for Sexual Interest, and MSI-II: Are They Speaking the Same Language?,* 35 Am. J. of Fam. Therapy, 187, 190 (2007) ("The PPG, when administered properly, represents a direct and objective measurement of a

man's level of sexual arousal to normal versus sexualized stimuli. Since there is a strong relationship between an individual's pattern of sexual arousal and the probability that he may or will act upon that arousal, an important first step in gauging one's propensity to sexual deviancy is to obtain an accurate assessment of that person's sexual arousal patterns, which is precisely what the PPG does."); James M. Peters, *Assessment and Treatment of Sex Offenders: What Attorneys Need to Know,* Advocate, Dec. 1999, at 23 (1999) (PPG "is invaluable in the evaluation, treatment and management of known sexual offenders."); John Matthew Fabian, *The Risky Business of Conducting Risk Assessments for Those Already Civilly Committed as Sexually Violent Predators,* 32 Wm. Mitchell L.Rev. 81, 101 (2005).

552 F.3d 624, 626–27.

The *Rhodes* decision then continues to explain the controversy in the area.

"[S]ome evaluators believe that polygraph and [PPG] testing are unreliable and invalid, and thus should be prohibited because such data may lead to false positives, suggesting that an offender will reoffend when he ultimately does not."); Odeshoo, *supra,* at 43 ("Why, given the fact that PPG is more expensive, more time-consuming, more intrusive and degrading, and not demonstrably more reliable than the polygraph, would authorities nonetheless insist that sex offenders submit to PPG examinations?").

Again, as with the polygraph, the State has not sought to establish the qualifications of the plethysmograph operator or the reliability of the operator's methods. There is no evidence of the condition or reliability of the equipment used. The evidence of the PPG is in the record, but this court, acting as the finder of fact, considers that on this specific record the PPG is

of little to no value. If the Iowa Supreme Court ever concludes that plethysmograph results should be admissible, it is very unlikely that the court would do so on a record like this one.  Again, however, on the basis of this record and acting as the finder of fact, this court gives the plethysmograph no weight.

The experts take different approaches to the application of actuarial instruments that purport to predict additional offenses.  ==Dr. Rosell scores Schuman on the Static-99R, while Dr. Salter declines to consider that score.==

Dr. Salter brings impressive credentials to this disagreement.  She has been qualified as a trainer on the Static-99R after extensive training and what she described as "the exam from hell."[6]  She is in the process of writing an article on the instrument, presumably for publication is a professional journal. She gave three reasons.

==Her first reason was that the Static-99R is insensitive to treatment.==  It considers variables that are not affected or changed by treatment, such as the number of victims.  This would disfavor Schuman in this context, but in this court's judgment, Dr. Rosell offers a persuasive explanation of the effect of Schuman's treatment history apart from his inclusion of the Static-99R score, and explains why that treatment history supports his, Dr. Rosell's, conclusion that Schuman is not likely to reoffend.

Her second reason is that the Static-99R takes off three points when the offender reaches 60.  She concludes that the Static-99R cannot identify older high-risk offenders.  Dr. Rosell pointed out that Schuman is seven years beyond the age 60 mark, and that although the Static-99R score will never be changed for age again, Schuman's risk to reoffend continues to

---

[6] Dr. Salter seemed to recoil from her own description. The court is not offended by her time-honored description of difficult tests, and understands that she meant the exam was extremely challenging.

decline.  Dr. Rosell relied on extensive research that tends to show that age does reduce the degree of an offender's threat.  The court finds as an issue of fact that Dr. Rosell's explanation and position is the more persuasive.  The instrument's 3-point reduction at age 60 is appropriate for consideration here.

Dr. Salter's third reason, which she believes is the most important, is that the Static-99R measures recidivism and not reoffending.  She refers to studies to contend that only a small percentage of sexual offense victims, both children and adults, report the crimes against them, so that "you could have a 70, 80, 90, 100 percent reoffense rate with an extremely low recidivism rate." (Rough transcript pp. 75.)  She asserts that, "we know that one conviction may be a proxy for 50 offenses or 150 or whatever.  We're not sure how many, but we know it's a proxy rate.  We know everybody is not caught for everything they do."  *(Id.* at 75-76).  She then moved to a discussion of rank ordering.

The Static-99R or similar instruments are an important part of most SVP cases at the initial stage, used to estimate whether an offender is more likely than not to reoffend.   The version in use in 2011 was used in Schuman's initial trial.  According to Dr. Rosell's testimony and report, the normative data used to score the Static-99R has been updated three times since then by expanding the size of the offender population studied.  It is this court's observation that the recidivism vs. reoffense, or proxy, issue was and is present to some degree in both calculations.  The comparison of his initial score to his present score is at least as valid as its initial use in 2011, and probably more so.  It is a temporal rank ordering, instead of a rank ordering across a population.  Dr. Rosell observes that while the Static-99R is not as important in this review context as it was in the initial determination, it

remains important in addressing the issue of whether risk of reoffense has decreased.

Treating the issue as one of fact, the court finds Dr. Rosell's position to be more persuasive. He engaged in an extensive discussion of relevant professional literature that supports his conclusions. The experts agree that the Static-99 and Static-99R are better at ranking offenders according to relative risk. But Dr. Rosell has the stronger argument when he explains that the scoring of the actuarial instruments has been updated and that treatment, age, and more recent studies of sexual recidivism point to a significantly reduced estimate or prediction of the likelihood of Schuman reoffending.

Both experts consider the statutory criteria of section 229A.8A. The court must also consider those criteria.

a. The committed person's mental abnormality is no longer such that the person is a high risk to reoffend. Dr. Salter's conclusion that this is not met is heavily (but not exclusively) based on her assessments of Schuman's credibility. The court is not convinced that her judgments on that topic are sound, mainly because she is too dependent on the polygraph and plethysmograph results. In any event, as the court has already said, the court finds that Dr. Rosell's consideration of the decreased Static-99R score, and his opinion that Schuman's participation in treatment means he is no longer likely to engage in predatory acts constituting sexually violent offenses is the more persuasive of the two opinions presented to the court.

b. The committed person has achieved and demonstrated significant insights into the person's sex offending cycle. Dr. Salter's opinion that this has not been accomplished is based on her belief that he has not made full disclosure. Again, her judgment is too dependent on the polygraph and plethysmograph results that the court does not find to be reliable. Dr.

Rosell's conclusion that Schuman's "treatment work reveals an understanding of his offense cycle" is supported by this record and is sound.

In contrast to Dr. Salter's assessment of Schuman's lack of transparency, Dr. Rosell points out that Schuman is very transparent regarding the most important issue, his attraction for children. Dr. Rosell disagrees with Dr. Salter's assessment of Schuman's honesty in general and believes he is transparent.

c. The committed person has accepted responsibility for past behavior and understands the impact sexually violent crimes have upon a victim. Here again, Dr. Salter posits that Schuman "is still denying a number of offenses that children have disclosed." This, again, is too heavily dependent on two instruments that this record does not show are adequately reliable as used in this case. She does acknowledge that Schuman "does seem to have some understanding of what sexual abuse does to victims."

Dr. Rosell finds that Schuman has accepted responsibility and "has been able to voice the consequences of his actions and expressed remorse and regret about his conduct." Dr. Rosell's conclusion is better supported in this record.

d. A detailed relapse prevention plan has been developed and accepted by the treatment provider which is appropriate for the committed person's mental abnormality and sex offending history. Dr. Salter relies simply on the fact that Schuman was reduced to Phase 3 and RPPs are not accepted until Phase 4. If that was a sufficient reason, the concept of judicial review would be defeated and this trial would have been a waste of time. The court is convinced that there was no reliable reason for the reduction to Phase 3.

Dr. Rosell finds that his treatment work is comprehensive and detailed and that his recent relapse prevention plan covers the necessary areas. Dr. Rosell has attached the most recent RPP to his report. The court's own review of the RPP attached as Appendix 1 to the Rosell report leads the court to determine that Dr. Rosell's conclusion on this point is sound.

e. No major discipline reports have been issued for the committed person for a period of six months. The experts agree this criterion has been met.

f. The committed person is not likely to escape or attempt to escape custody pursuant to section 229A.5B. The experts and the treatment team agree that Schuman is not an escape risk.

g. The committed person is not likely to engage in predatory acts constituting sexually violent offenses while in the program. Dr. Salter expresses concern about transparency which, again, is based on information that the court does not find is reliable. The court thus finds that this conclusion has an unreliable basis. She reiterates that "he needs to obtain Phase 4 and get his RPP approved. At present he does not have an approved plan." The court has considered this point in connection with criterion d and rejects it here for the same reasons.

As Dr. Rosell points out, Schuman has not had difficulty controlling his sexual behavior with other residents. That fact is not debated and is closely related to this criterion.

Of considerably less importance is the other fact that Dr. Rosell also points out, that Schuman passed previous polygraphs regarding lying and sexual behavior. The court finds that there is absolutely no basis in this record for concluding that the polygraph operator of 2021 or the polygraphs of 2021 were in any way more reliable or more worthy of belief than the

fourteen preceding polygraphs. This court does not find that any of the polygraphs or plethysmographs given to Schuman at any time were reliable. The most that can be said on this record is that if the polygraph has the same accuracy as a coin toss (and nothing in this record shows anything different), the coin came up heads 14 times, tails once in the past, and tails twice most recently.

h. The placement is in the best interest of the committed person. Dr. Salter predicts that he will fail and revert to the "anger and frustration that partially fueled previous offenses." Dr. Rosell, on the other hand, contends that it is time for him to begin to put what he has learned into practice. The court finds that refusing to allow Schuman the chance at TRP is likely to generate anger and frustration that will sabotage his progress to this point, and that the likelihood of that happening is greater than the remote possibility that he will fail if he goes to TRP. Placement in TRP is in Schuman's bet interest.

i. The committed person has demonstrated a willingness to agree to and abide by all rules of the program. This record shows that Schuman is willing to abide by all rules of the program.

j. A committed person who refuses to register as a sex offender is not eligible for placement in a transitional release program. Schuman has agreed to register.

CONCLUSION

Iowa Code § 229A.8(6)(d) provides:

The burden of proof at the final hearing shall be upon the state to prove beyond a reasonable doubt either of the following:

(1) The committed person's mental abnormality remains such
that the person is likely to engage in predatory acts that
constitute sexually violent offenses if discharged.

(2) The committed person is not suitable for placement in a
transitional release program pursuant to section 229A.8A.

The State has not met this burden of proof.

IT IS THEREFORE ORDERED that Stewart Schuman shall be placed

in the Transitional Release Program forthwith.



State of Iowa Courts

**Case Number**       **Case Title**
EQCV047108            IN RE: THE DETENTION OF STEWART SCHUMAN
**Type:**             OTHER ORDER

So Ordered

James C. Ellefson, District Court Judge
Second Judicial District of Iowa

Electronically signed on 2022-08-17 10:38:29