# Exhibit 70:

## Dr. Darrel Turner Deposition Transcript



# TRI-COUNTY COURT REPORTERS INC.

(248)608-9250 Fax (844)270-7115
www.tri-countycourtreporters.com
depos@tricountyreporters.com

Transcript of the Testimony of
**Darrel Turner**

**Date:** June 7, 2023
**Volume:**

**Case:** John Does A, B, et al v. Gretchen Whitmer, et al

Printed On: June 26, 2023

Darrel Turner
6/7/2023                                                        FIRM #8093

---

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE,
on behalf of themselves and
all others similarly situated,
            Plaintiffs,
vs.                        No. 2:22-cv-10209
GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of Michigan State
Police, in their official capacities,

            Defendants.

_____

DEPOSITION VIA ZOOM OF
DARREL B. TURNER, Ph.D.
Lake Charles, Louisiana
June 7, 2023
10:07 a.m.

---

**Page 2**

1
2   APPEARANCES:
3       FOR PLAINTIFFS:
4       UNIVERSITY OF MICHIGAN LAW SCHOOL
        By:  Paul D. Reingold (P27594)
5            802 Legal Research Building
             801 Monroe Street
6            Ann Arbor, Michigan  48109-1215
             (734) 355-0319
7            E-mail: pdr@umich.edu
8
        FOR DEFENDANTS:
9
        ATTORNEY GENERAL'S OFFICE
10      By:  Eric M. Jamison (P75721)
             525 West Ottawa Street
11           Lansing, Michigan  48933
             (517) 335-7573
12           E-mail: jamisone@michigan.gov
13
        Also Present: Dayja Tillman, ACLU
14                     Jesse Lin, ACLU
                       Lt. Aimee Brimacombe - Client
15                     Representative for Michigan State
                       Police
16
17
18
        REPORTER:  Robin Darnbrook, CSR-2508, RPR
19
20
21
22
23
24
25

---

**Page 3**

1
2
3       T A B L E   O F   C O N T E N T S
4
5   WITNESS:    DARREL B. TURNER, Ph.D.
6   BY MR. REINGOLD:                         Page
7       Cross Examination . . . . . . . .    6
8
    BY MR. JAMISON:
9
        Direct Examination . . . . . . . .   169
10
11            - - -
12
    Exhibits                   Identified
13
    1 - Curriculum Vitae               9
14
    2 - Case List                      53
15
    3 - Static-99R Tally Sheets        94
16
    4 - Dr. Turner's Report            72
17
    5 - Bureau of Justice Statistics Special
18      Report                         152
19  6 - Analysis of Patterns of Denial on
        Males Accused of Sexual Offending  124
20
    7 - Alper and Durose Recidivism of Sex
21      Offenders Released from State Prison:
        A 9-Year Follow-Up             135
22
23
24
25

---

**Page 4**

1           June 7, 2023
2           Lakes Charles, Louisiana
3               - - -
4           COURT REPORTER:  I am not in the same
5   location as the witness and this deposition is being
6   conducted remotely.  Is there any objection to my
7   administering the oath remotely?
8           MR. REINGOLD:  No.
9           MR. JAMISON:  No objection.
10              - - -
11          DARREL B. TURNER, Ph.D.,
12  Witness herein, having been first duly sworn to
13  testify the truth, the whole truth and nothing
14  but the truth, was examined and testified as
15  follows:
16              - - -
17          MR. REINGOLD:  I think we are
18  underway.  My name is Paul Reingold.  I'm a
19  Cooperating ACLU Attorney and I'm representing the
20  Plaintiffs in this case.  We're here pursuant to
21  Notice under the Federal Rules of Civil Procedure in
22  the case of Does versus Whitmer for all purposes
23  permitted under the rules.
24          Dr. Turner, I just want to first
25  welcome and then I just want to go through some

---

Darrel Turner
6/7/2023                                                                    FIRM #8093

| 1  | basic rules of the road for today and cover some |
| 2  | other material in a prefatory way to make a record. |
| 3  | A couple of reminders for you.  The |
| 4  | court reporter can't take down non-verbal answers or |
| 5  | uh-huhs and so it's important that you give a yes or |
| 6  | a no or more answer to every question.  If you don't |
| 7  | understand a question or if you need clarification |
| 8  | on a question, you should ask.  And also, the court |
| 9  | reporter can't take down two people at once, so we |
| 10 | should try to avoid talking over each other, okay? |
| 11 | THE WITNESS:  Yes, sir. |
| 12 | MR. REINGOLD:  If you answer a |
| 13 | question, we're going to assume that you understand |
| 14 | it, okay? |
| 15 | THE WITNESS:  Yes, sir. |
| 16 | MR. REINGOLD:  From time to time, |
| 17 | your Counsel may object to a question, which is |
| 18 | fine, but unless he instructs you not to answer, you |
| 19 | should answer the question. |
| 20 | THE WITNESS:  Understood. |
| 21 | MR. REINGOLD:  Okay.  In my |
| 22 | experience, sometimes witnesses want to add |
| 23 | information that they think is important but isn't |
| 24 | what I asked about, and so I want to ask you -- I |
| 25 | want to advise you that you should only answer the |

Page 5

| 1  | question that I've asked and if you want to add |
| 2  | something more later, your lawyer will have a chance |
| 3  | to ask questions when I'm done and you can flesh out |
| 4  | any missing details at that point. |
| 5  | If your attorney wants to elaborate, |
| 6  | the time to do that, as I said, is at the back end, |
| 7  | not in the middle or when I'm doing the questioning. |
| 8  | Can you agree that you'll try to provide answers |
| 9  | that are responsive to the questions that I'm |
| 10 | asking? |
| 11 | THE WITNESS:  Yes. |
| 12 | MR. REINGOLD:  And if you're not |
| 13 | responsive, I may cut you off.  If I do, you should |
| 14 | stop and as I said, your attorney can ask for more |
| 15 | information later.  If you need to take a break at |
| 16 | any point, let me know.  The only thing I ask is |
| 17 | that you answer the pending question, okay? |
| 18 | THE WITNESS:  Yes, sir. |
| 19 | --- |
| 20 | CROSS EXAMINATION |
| 21 | BY MR. REINGOLD: |
| 22 | Q   Since we're doing this by Zoom, I want to clarify |
| 23 | where you are.  I'm assuming that you're in Lake |
| 24 | Charles, Louisiana; is that right? |
| 25 | A   That's correct. |

Page 6

| 1  | Q   Is there anything in front of you other than your |
| 2  | computer screen? |
| 3  | A   Yes. |
| 4  | Q   And what is that? |
| 5  | A   I'm actually operating off of two laptops, so this |
| 6  | laptop is doing all of the Zoom and then my records, |
| 7  | access to my C.V., things like that are going to be |
| 8  | on this laptop.  So I have another laptop and then |
| 9  | I've also printed out my report.  I have a hard copy |
| 10 | of my report and that's it pertaining to this |
| 11 | case. |
| 12 | Q   Thank you.  Is there anyone else with you? |
| 13 | A   No, sir. |
| 14 | Q   And are you under the influence of any medications |
| 15 | or any other condition that would impair your |
| 16 | ability to be deposed today? |
| 17 | A   No, sir. |
| 18 | Q   Okay.  Anything that would prevent you from |
| 19 | answering the questions truthfully? |
| 20 | A   No, sir. |
| 21 | Q   Let's start by covering a little bit about what you |
| 22 | did to prepare for the deposition.  What did you do |
| 23 | to prepare for the deposition today? |
| 24 | A   I reviewed my report, I reviewed some of the |
| 25 | evidence or reports that were provided to me by |

Page 7

| 1  | Mr. Jamison, I reviewed the Notice of Deposition, |
| 2  | and then I spoke with Mr. Jamison this morning for |
| 3  | about three minutes, not about the content of the |
| 4  | deposition but I just had some sort of procedural |
| 5  | and administrative questions.  That would be how I |
| 6  | prepared. |
| 7  | Q   Did you have any longer substantive conversations |
| 8  | with any of your attorneys? |
| 9  | A   No, sir.  Not about the deposition.  We talked about |
| 10 | the case and my opinion and my report but we haven't |
| 11 | spoken specifically about the deposition. |
| 12 | Q   So those were further back in time? |
| 13 | A   Yes, sir. |
| 14 | Q   Okay.  And other than the documents that you've just |
| 15 | described, did you review anything else? |
| 16 | A   No, sir. |
| 17 | Q   And did you speak with anyone else about your |
| 18 | deposition? |
| 19 | A   I e-mailed Dr. Anna Salter and asked her if she |
| 20 | thought I would need a certain article for the |
| 21 | deposition, or I think I called her and asked her if |
| 22 | I would need a certain article for the deposition, |
| 23 | but again, that was just kind of procedural and |
| 24 | administrative and not substantive. |
| 25 | Q   All right.  And did she tell you you did need it or |

Page 8

2 (Pages 5 to 8)

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023                                                                    FIRM #8093

| | |
|---|---|
| 1   you didn't need it? | 1   starting graduate school? |
| 2   **A**  I don't remember.  I think she said that it was | 2   **A**  Yes. |
| 3        probably excessive preparation on my part, something | 3   **Q**  And what was that? |
| 4        to that nature. | 4   **A**  I worked with the Lake Charles Police Department |
| 5   **Q**  Okay.  I want to now turn to your C.V. and you can | 5        Cold Case Homicide Unit for a year. |
| 6        bring it up on your own screen if you wish but for | 6   **Q**  And was that a job that grew out of what you had |
| 7        the record and so that everyone can see it, I will | 7        been doing as an undergraduate in psychology or was |
| 8        bring it up here.  This is going to be marked for | 8        it unrelated? |
| 9        the deposition as Plaintiff's Exhibit 1, which I | 9   **A**  It was unrelated. |
| 10       will try to successfully share.  And you now see | 10  **Q**  And then was there anything about that experience |
| 11       that document? | 11       that led you to -- was there other work first before |
| 12  **A**  Yes, sir. | 12       you went to grad school? |
| 13  **Q**  All right.  And is that a copy of your C.V.? | 13  **A**  No, sir.  I did that the year between graduating |
| 14  **A**  Yes, sir. | 14       with my Bachelor's and starting graduate school, I |
| 15  **Q**  I want to go through it with you.  This will take a | 15       took a year and did that work. |
| 16       bit of time but I think it will be useful.  You | 16  **Q**  Right.  And when you applied for graduate school in |
| 17       graduated from college in 2002; is that right? | 17       counseling psychology, was that in any way related |
| 18  **A**  Yes, sir. | 18       to the work that you had done for the Lakes Charles |
| 19  **Q**  And you're a psych major at McNeese? | 19       Police? |
| 20  **A**  Yes, sir. | 20  **A**  No, sir. |
| 21  **Q**  What was your focus as a psych major as an | 21  **Q**  All right.  You then came back and you chose a |
| 22       undergrad? | 22       Master's program that I take it was called |
| 23  **A**  It was strictly psychology.  It wasn't broken down | 23       Counseling Psychology and I just want to know how |
| 24       beyond that. | 24       does that differ from just plain psychology? |
| 25  **Q**  And after college, did you do any work before | 25  **A**  Counseling psychology is more specific to |

Page 9 Page 10

| | |
|---|---|
| 1        psychotherapy. | 1        terms of research and training that I was interested |
| 2   **Q**  And why did you choose that? | 2        in, so it would have been an extra bonus to have |
| 3   **A**  Because it was the only Master's program available. | 3        been accepted there and I was. |
| 4        I was a single father most of my adult life and so | 4   **Q**  And what were the things that they had that you were |
| 5        it was a matter of where I could continue my | 5        interested in? |
| 6        education but still be able to get my son to see | 6   **A**  It was traditionally a forensic psychology program, |
| 7        other members of his family and things like that. | 7        so everything from electives to practicum placements |
| 8        So at that point, it was a matter of picking a job. | 8        to research opportunities, and then it was |
| 9        I didn't especially want to be a therapist or | 9        APA-accredited as a clinical psychology program, so |
| 10       anything like that. | 10       it was great because I got the degree that I wanted |
| 11  **Q**  And I take it you live close to McNeese and they | 11       with the curriculum that I was most interested in. |
| 12       only offered a Master's in Counseling Psychology; is | 12       It was sort of a clinical program with a focus in |
| 13       that right? | 13       forensics. |
| 14  **A**  They offered other Master's programs but in a | 14  **Q**  And what was it that attracted you about |
| 15       field -- I mean I had just finished in psychology, | 15       forensics? |
| 16       so it was kind of a natural progression, so... but | 16  **A**  You know, I really wanted to be a musician but as a |
| 17       yes, sir. | 17       single father, you can't -- the whole starving |
| 18  **Q**  And then once you finished the Master's, did you go | 18       artist thing doesn't pay very well and I needed to |
| 19       directly to Sam Houston for the Ph.D. or was there | 19       pick a career and there wasn't much that I was |
| 20       an inter period where you did some work? | 20       really interested in.  I enjoyed my time with cold |
| 21  **A**  It was direct.  I went directly there. | 21       case and so I just thought that any work in the area |
| 22  **Q**  And what led you to that school? | 22       of forensics would be interesting and it was. |
| 23  **A**  Again, the proximity was the primary reason.  I had | 23  **Q**  And then once you started at Sam Houston, I take it |
| 24       a certain travel radius that I was willing to do and | 24       that you pretty quickly had some practicums that |
| 25       they also were looking at some forensic things in | 25       were available to you in grad school; is that |

Page 11 Page 12

3 (Pages 9 to 12)

Darrel Turner
6/7/2023                                                          FIRM #8093

| | |
|---|---|
| 1    right? | 1    A  Yes, sir. |
| 2    A  Yes, sir. | 2    Q  And can you just very briefly describe the work that |
| 3    Q  Can you tell us -- one of them listed was MCDCSC in | 3       you did during that period of time in Texas? |
| 4       Willis, Texas.  The acronym wasn't written out and | 4    A  Sure.  That was my practicum placement for about two |
| 5       so I just wondered what that was. | 5       years and I did forensic psychological evaluations |
| 6    A  I don't think I ever knew what it was, which is why | 6       under her in her private practice and through the |
| 7       I didn't write it out.  It's a deferred -- well, I | 7       university because she was clinical director. |
| 8       don't really know legally what it is but from a | 8    Q  And were you paid for that or was that viewed as |
| 9       mental health point of view, it was people who | 9       part of your education? |
| 10      were -- it was adults who were first-time felons, | 10   A  Boy, I can't remember.  All I remember is that I was |
| 11      adult males, I should say, who were first-time | 11      on student loans.  I know that everyone had to have |
| 12      felons that had either a substance abuse problem or | 12      a practicum and I think if you had an eight-hour |
| 13      their offense was related to substance abuse.  So it | 13      practicum it was not paid but if you had a 20-hour |
| 14      was an inpatient facility that helped them sort of | 14      practicum it was, but it might have just been a |
| 15      get a job, get on their feet and stay out of prison. | 15      tuition waiver.  I really can't remember, sir.  I'm |
| 16      And then I'm not sure if they were ultimately able | 16      sorry. |
| 17      to have things expunged or what.  I'm not sure. | 17   Q  That's all right. |
| 18   Q  And what was your role when you were doing that? | 18   A  If I was paid, it wasn't much. |
| 19   A  I was just an in-house therapist.  I was -- I did | 19   Q  And I take it you would do the forensic evaluation |
| 20      individual and group treatment largely related to | 20      or whatever and were you also the one who would |
| 21      substance abuse but just general counseling there. | 21      testify in court if that was required? |
| 22   Q  And then your C.V. says -- shows that from 2007 to | 22   A  No, sir, not while I was in Huntsville, but once I |
| 23      2009, you also started doing forensic exams in Texas | 23      went to my internship at the federal prison in Fort |
| 24      with I think it was one of the faculty members but I | 24      Worth, which is still technically part of my |
| 25      might be wrong, Dr. Conroy? | 25      doctoral program, I did testify in federal court for |
| Page 13 | Page 14 |

| | |
|---|---|
| 1    a forensic evaluation that I did there under | 1    that I can remember aside from -- I know I did many |
| 2    supervision but not -- I never testified while at | 2    semesters under a forensic psychologist doing what |
| 3    Sam Houston.  I would go with her if she had to | 3    we just talked about.  That ended up being kind of |
| 4    testify but, you know, she would approve the report | 4    where I got assigned mostly. |
| 5    and we'd sign it together and it was basically her | 5    Q  And was that the Federal Correction Institute at |
| 6    work product. | 6       Fort Worth or was that -- did that come later? |
| 7    Q  All right, that's what I was asking.  So you were | 7    A  That was later.  That was my internship. |
| 8       doing some of the hands-on work with the people | 8    Q  Yeah, okay.  All right.  And what was the subject of |
| 9       being evaluated or reviewed or whatever and you | 9       your dissertation? |
| 10      would help draft the report but in the end, it would | 10   A  The role of expert witnesses and juror perceptions |
| 11      go in under both signatures and she would be the one | 11      of evidence and expert witness evidence in sexually |
| 12      to testify if there was testimony? | 12      violent predator civil commitment hearings in the |
| 13   A  Right, but to be clear, I did the entire evaluation | 13      State of Texas. |
| 14      and wrote the entire report.  She just added some | 14   Q  I had noticed that you listed that, I believe, as a |
| 15      commas and things like that but I mean that's -- | 15      post doc in 2010-2011 but it says you didn't get |
| 16      it's her license, so yes. | 16      your Ph.D. until September of 2011.  Was there a |
| 17   Q  Okay.  All right.  You then did the -- so were there | 17      delay in getting your Ph.D. or was the internship |
| 18      other practicums in graduate school? | 18      considered part of it?  How did the dates work? |
| 19   A  Yes, sir. | 19   A  Yes, sir.  The internship is considered your fifth |
| 20   Q  And again, briefly what were those? | 20      year and after that fifth year, if you're |
| 21   A  I worked at an inpatient hospital that also had an | 21      satisfactory in your performance and everything |
| 22      outpatient unit.  I worked at a juvenile detention | 22      else, then you can get your diploma at that point. |
| 23      center in Houston doing forensic evaluations.  I | 23      So there was no break. |
| 24      did, I think, a little bit of counseling at a | 24   Q  So it's kind of viewed as the equivalent of a post |
| 25      psychological services center.  Those are the ones | 25      doc even though you don't have the Ph.D. yet |
| Page 15 | Page 16 |

4 (Pages 13 to 16)

**Page 17**

1　officially?
2　A　Correct.
3　Q　And then now let's go look at your employment.
4　　Let's see where we're picking up here. So fair to
5　　say your first job post doc actual employment was at
6　　the Federal Correctional Complex of Pollock?
7　A　Yes, sir.
8　Q　And there you were a staff psychologist. What did
9　　you do as a staff psychologist?
10　A　I treated inmates and then there were certain things
11　　that my policy psychologist had to have a role in,
12　　like solitary confinement situations, sexual
13　　assaults and things of that nature. So that was --
14　　and I was at the penitentiary, which is the highest
15　　level of security, and so a lot of times that would
16　　be disrupted and we would be assigned to other
17　　details that were more just kind of general prison
18　　maintenance.
19　　　　So it was -- but the ideal goal is
20　　to -- you know, there was times where I did a talk
21　　in their introductory orientation and just those
22　　types of things.
23　Q　So a little bit of jack-of-all-trades --
24　A　Yes, sir.
25　Q　-- as a prison psychologist?

**Page 18**

1　A　Yes, sir.
2　Q　And again, were you drawn to work at the prison
3　　because of the forensic work you had done and it was
4　　a logical next step, or again was it more that you
5　　needed to be near Lake Charles for family reasons
6　　and this was a decent post and so you took it?
7　A　It was a little bit of both because I was willing --
8　　at that point, my son was living with me, so I was
9　　willing to travel if we needed to for that year, but
10　　I was offered a position close to home and it was
11　　just nice, so I guess a little bit of both.
12　Q　And I gather that you also were involved in or
13　　became involved in media consulting at that time.
14　　Can you tell us how you got into that and what it
15　　entailed?
16　A　I don't remember how I got into it. I think I was
17　　speaking at a conference maybe and was asked to
18　　participate in an interview and then I got a couple
19　　of calls from them, and at first it was something I
20　　enjoyed doing, it was a little bit different, but
21　　I've really been sort of convicted about not really
22　　wanting to do media stuff anymore unless it's a case
23　　that I happen to end up working on or something like
24　　that.
25　　　　So I did that for a while and then

**Page 19**

1　every now and then someone will call with just a
2　general question about not guilty by reason of
3　insanity and I'll help out and do a little interview
4　but that's not something that I really pursue.
5　That's not something that I terribly enjoy.
6　Q　That more or less comes with the territory, right?
7　A　Yes, sir. People ask you to do a favor for them. I
8　　know this guy that works at so and so, would you
9　　just talk to them, that sort of thing.
10　Q　And when you finished the two years at Pollock, at
11　　that point did you wind up employed elsewhere or is
12　　that the point at which you moved into a private
13　　practice?
14　A　That was private practice.
15　Q　How did you make that transition?
16　A　I had set up a few contracts to do some very basic
17　　community psychology work that I thought along with
18　　my fiancee's teacher income would be enough to
19　　support us and so I made that leap.
20　Q　I take it at that point, again from your C.V., that
21　　you also were able to pick up some consulting work
22　　with the FBI, NCIS, Department of Homeland Security
23　　and so forth. Would you describe what you were
24　　doing for them?
25　A　Sure. I had been building those relationships while

**Page 20**

1　I was in the federal prison system but the federal
2　prison system doesn't allow -- I guess they don't
3　want any dual role complication, so they don't allow
4　you as a federal employee to work outside cases and
5　things like that. But I had been cultivating those
6　relationships and so as soon as I went into private
7　practice, I started testifying and doing work
8　largely federally, which generally means that they
9　were investigated at least to some degree by one of
10　those agencies and then that has developed into
11　providing trainings and things like that.
12　Q　Let's see. At some point, you also began providing
13　　services or you became a member of the Louisiana
14　　Registry of Sex Offender Providers, that's further
15　　up on our list here up near the top, and that was
16　　2013 to the present. Is that just simply signing up
17　　on something and then waiting for a call or is it
18　　more interactive than that?
19　A　It's more interactive than that.
20　Q　And how does it work?
21　A　It is essentially -- the quickest answer I can give
22　　is that it's essentially our State's version of
23　　being a licensed sex offender treatment provider.
24　　It's not a license, it's a registry but it's the
25　　exact same thing, you got to prove your work, you

Darrel Turner
6/7/2023                                                    FIRM #8093

**Page 21**

```
 1    got to prove your training, you got to have people,
 2    you know, write letter.
 3         It's the same thing except the
 4    difference is -- no.  Well, I mean that's how -- so
 5    if you want to work with probation and parole or do
 6    any kind of sex offender treatment that's going to
 7    count for these guys towards completing their
 8    State-mandated goals, then you would need to be on
 9    that list.
10  Q    And the work you would actually do, I take it, is
11    contract work for probation or parole or possibly
12    for the registry itself; is that right?
13  A    Yes, sir, largely.  Yes, sir.
14  Q    And when I say contract work, what I'm imagining,
15    you can correct me if I'm wrong, is say people who
16    are coming out of prison and going into the
17    community, they've been evaluated, parole might be
18    contingent on the fact that they get treatment.  Is
19    that kind of an accurate picture of the sort of
20    thing you were doing?
21  A    Yes, sir.
22  Q    Okay.  And you have done that from then until now?
23  A    I did it for a while initially in private practice
24    and then stopped but I've recently contracted with
25    the federal system to do -- well, to supervise the
```

**Page 22**

```
 1    treatment of their sex offenders in this district in
 2    Louisiana but I'm not actually providing treatment
 3    anymore, I quit doing that in about 2015, but I am a
 4    part of treatment and supervision and the contract
 5    is mine.
 6  Q    And when you were doing that back in the mid teens
 7    or early to mid teens, did you also score people on
 8    the Static-99?
 9  A    Yes.
10  Q    And did you score them on other similar kinds of
11    instruments like the STABL or -- for the record,
12    S-t-a-b-l, or the VASOR, V-A-S-O-R?
13  A    I think I've used the STABL once and I don't -- I
14    may have used the VASOR once but largely it's been
15    the Static in terms of that -- those types of
16    actuarial instruments.
17  Q    And when you were doing that, was that on a per job
18    basis or was it an hourly rate for your time?
19  A    Well, I just -- maybe if I can clarify, I didn't
20    really use -- the Static was more -- had already
21    been done by the prison system, so I'm not getting
22    these guys in and scoring them on Statics but I
23    began doing risk assessments fairly early in private
24    practice because of my training and I used the
25    Static for most of my career doing that.  So I'm
```

**Page 23**

```
 1    referring to that and I'm only saying that for
 2    clarity.
 3  Q    No, no, I appreciate it.  So as people were leaving
 4    prison, the Department of Corrections, whatever it's
 5    called in Louisiana, they would do the Statics and
 6    figure out what they wanted to do with the parole or
 7    figure out what they wanted to do with each
 8    departing inmate, so I take it your job was more on
 9    the treatment side?
10  A    Yes, sir, and I'm not sure which instruments the
11    Department of Corrections uses.  I work at the Texas
12    Department of Corrections.  I know they use the
13    Static, so I'm not really sure about the Louisiana
14    Department of Corrections, and it is the Louisiana
15    Department of Corrections.  But yes, I was a
16    treatment provider and a supervisor, so I didn't
17    score the Static for purposes of treatment.
18  Q    And when you were doing the treatment, same
19    question, and that is if that was on a contract
20    basis, were you paid hourly or in some other way?
21    If paid hourly, how much an hour?
22  A    I'm paid per session and per group and I don't
23    know -- I don't know how much that is because I
24    supervised that work.  I have that coming out of my
25    office but as I said, I supervise the providers, so
```

**Page 24**

```
 1    I don't know -- and they get that pay.  So I don't
 2    know what that pay is.
 3         But when I did treatment under the
 4    registry, I think I saw -- I think I saw people for
 5    maybe $75 for a session and there was not much of
 6    that work back then.
 7  Q    And was the session typically an hour or less?
 8  A    Yes, sir, 50 minutes.
 9  Q    Yeah, okay.  And when you were supervising other
10    people's work like that, how did you get paid?  Was
11    that on a salary or was that also on a sort of by
12    supervision rate?
13  A    I'm supervising that now and I don't -- I don't take
14    a percentage of the treatment hours.  I supervise
15    it.  Sometimes I sit in on group.  I interview the
16    guys who agree to be interviewed for training
17    purposes.  I have some -- I have research that is
18    ongoing that I use them for, so I actually don't get
19    paid as a result of that contract, my office mate
20    does.
21  Q    So that's effectively sort of a pro bono side of
22    your practice that you get benefits from but that
23    you're not paid for directly?
24  A    Well, I was initially paid directly because I had a
25    couple of them on my caseload but I've ended up
```

6 (Pages 21 to 24)

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023                                                              FIRM #8093

| | |
|---|---|
| 1   traveling so much that I can't.  I don't feel that | 1   Q   I lost the last thing that you said. |
| 2   it's fair to them to constantly have to reschedule | 2   A   I said I'm sorry -- |
| 3   and talk to somebody different and things like that, | 3   Q   No, no, just before that.  You said you're not being |
| 4   so I've ultimately just given up my patient load in | 4      paid under the contract? |
| 5   the last, I'd say, six months. | 5   A   I'm not being paid.  Someone in my office is being |
| 6   Q   That confused me because I thought you had said that | 6      paid because they're doing all the work and I'm |
| 7      you were doing direct service with community | 7      supervising the work and involved in a research |
| 8      patients for the Department of Corrections only back | 8      aspect. |
| 9      in the mid or early teens and then stopped doing it | 9   Q   All right.  So your sidekick or somebody in your |
| 10      and had been doing some supervision but I -- | 10      office is doing the individual super -- not |
| 11   A   That's right, but at the outset -- at the outset of | 11      supervision but the individual treatment, whatever |
| 12      the contract, which I started about two years ago, I | 12      it is, that person's getting paid an hourly rate and |
| 13      had one or two patients that I took on my caseload | 13      you're kind of hovering above and around them on a |
| 14      briefly for two or three months before I realized | 14      volunteer basis? |
| 15      that it wasn't going to work and I gave them all up. | 15   A   Yes, sir. |
| 16   Q   All right.  But again, just so that I make sure I'm | 16   Q   Okay, that cleared it up.  Thank you. |
| 17      understanding, you just said about two years ago | 17         I take it you've also done some |
| 18      there was a contract and you started with some | 18      substance abuse work as an evaluator and you're |
| 19      direct patient care and then stopped that, but did | 19      program certified for that as well? |
| 20      that mean the contract stopped but you continued as | 20   A   Yes, sir. |
| 21      a volunteer doing the supervision? | 21   Q   You said that you've also -- were recently |
| 22   A   No, sir, I still have the contract.  I'm just not -- | 22      contracted with the feds for sex offender risk |
| 23      I'm just supervising the work being done now, so I'm | 23      assessment and treatment for the Federal District |
| 24      not getting paid off of the contract.  I'm sorry if | 24      that's in Louisiana.  What is it that you do for |
| 25      I'm being confusing. | 25      them? |
| Page 25 | Page 26 |

| | |
|---|---|
| 1   A   Where are we looking now, sir? | 1      and -- but again, I did that for about maybe two |
| 2   Q   That's the one at the top of the page on the shared | 2      months before I realized that I wasn't going to be |
| 3      screen.  My cursor is on it.  I can never read the | 3      around enough to do it consistently, so... yeah. |
| 4      cursor on Zoom but you might be able to see it. | 4   Q   You also report from 2021 a consultant to the Oceans |
| 5   A   Sure.  That's the contract that we're talking about | 5      Boulevard Behavioral Inpatient Center.  What were |
| 6      now.  That's with the federal sex offenders and | 6      you doing for them? |
| 7      community supervision.  That's what that's referring | 7   A   It's just kind of being on call.  It's an inpatient |
| 8      to.  I haven't updated this since 2022, so it | 8      psychiatric center in town here, so it's being on |
| 9      doesn't reflect that I'm supervising that now as | 9      call if they need to have some testing done or |
| 10      opposed to treatment provider but I mean the | 10      something like that. |
| 11      contract is the same. | 11   Q   And would that be related to sexual offenses or is |
| 12   Q   All right.  This is part of my misunderstanding. | 12      this just individual patient care? |
| 13      What you're saying is -- what we're talking about | 13   A   No, sir, it's pure clinical work, it's not forensic |
| 14      now is what we were just talking about a few minutes | 14      at all. |
| 15      ago. | 15   Q   How many hours would that entail? |
| 16   A   Yes. | 16   A   None so far.  I think they needed a name on a blank |
| 17   Q   And I thought we were still talking about the State | 17      as someone that fills that role, but I'm sure at |
| 18      work and the State Department of Corrections. | 18      some point I'll get a referral and if I do, then |
| 19   A   Oh, I apologize.  That's probably my fault. | 19      I'll do testing with them and that would be great, |
| 20   Q   That's okay.  It's clarified now.  All right.  When | 20      but so far I haven't gotten any referrals. |
| 21      you do the same work for the feds, was the rate that | 21   Q   And then the last item, meaning the most recent one, |
| 22      the feds paid the $75? | 22      is this the one that's really most descriptive of |
| 23   A   No, sir, that was the one that I'm saying I'm not | 23      what you do day to day, private clinical practice |
| 24      sure what it was.  I think it was about $75 for an | 24      and forensic practice, competency exams, sanity |
| 25      individual session and maybe like 150 for a group | 25      exams, risk assessment for sex offenders, child |
| Page 27 | Page 28 |

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023

FIRM #8093

---

**Page 29**

1    custody evaluations, fitness for duty, I assume
2    that's military?  Is that a good description of your
3    stock in trade for the most part?
4    A   Yes, sir.
5    Q   Let me ask what percentage of your work is related
6    to evaluations like competency, sanity, risk
7    assessment, fitness for duty and diagnostic
8    evaluations as opposed to counseling or other
9    activities?  Give me just a rough percentage.
10   A   The majority would be forensic evaluations or
11   especially evaluations in general.  I would estimate
12   maybe 60 percent of my work is that kind of work.
13   Q   And what's the other 40 percent?  Can you describe
14   that again briefly?
15   A   Yes, sir.  I do some purely clinical stuff like
16   we've talked about that's not forensic related and
17   I'm involved with research and that takes up a lot
18   of time, and then providing trainings and speaking
19   at conferences and things is starting to take up
20   more and more time.
21   Q   All right.  And when you say clinical, is that
22   typically private patients or again is that in other
23   settings where you're going in, doing the treatment
24   and, you know, coming back out?
25   A   I'll tell you I don't provide treatment, I don't see

---

**Page 30**

1    patients, I don't do therapy at all.  I do
2    consulting and testing and evaluating and assessment
3    and treatment recommendations and whatnot but I
4    don't -- you've just referred to like my caseload or
5    patients a couple of times and I just want to make
6    sure that I'm clearly representing myself.
7         When I do clinical work, it's any
8    kind of testing or assessment or consulting that's
9    not forensic related, so with hospitals or with
10   helping someone get referred to a medical doctor for
11   psychiatric medication or something like that.  So
12   that's really what the clinical portion looks like.
13        I'm not -- I do some pro bono
14   counseling through my church or family friends and
15   things like that but that's usually just a one shot
16   and then kind of get them to someplace where they
17   need to be to get continued help because I travel so
18   much.
19   Q   So what you're really saying is 60 percent is the
20   forensic evaluations and so forth and then the rest
21   is similar kinds of work on the non-forensic side
22   and then also the sort of smattering of, you know,
23   favors to friends or other kinds of obligations.
24   And what percent would you say is research oriented?
25   A   Maybe about 15.  Again, I'm estimating.

---

**Page 31**

1    Q   That's fine.  I understand.  I believe I understood
2    from your C.V. that you've testified a fair amount,
3    and we'll get to that later, in federal court as an
4    expert; is that right?
5    A   Yes, sir.
6    Q   And when you do that, do you normally file an expert
7    report?
8    A   No, sir.  Not normally, no, sir.
9    Q   Were you aware that under the Federal Rules of Civil
10   Procedure, when you write an expert report, you're
11   supposed to include a case list of any expert
12   depositions or testimony that you've given in the
13   last four years and that you're also supposed to
14   include a statement of how much you're being paid?
15   Did you know that?
16   A   I did know that, but that's a fairly recent ruling.
17   I mean recently in terms of it's not ten years old,
18   correct?
19   Q   And when you did your report for this case, is it
20   true that you didn't include a statement of recent
21   testimony and didn't list your rates, or did you?  I
22   mean when you submitted the report.
23   A   I don't know.  I know I have a list -- I have a list
24   of cases that I've provided testimony in and things
25   like that.  I can't remember if I provided it in

---

**Page 32**

1    this case or not.
2    Q   Okay.  And did you include the rate that you charge
3    for your work?
4    A   Yes, sir, that would have all been included with the
5    contract and whatnot.
6    Q   I'm asking if it was included in the report.
7    A   I did a section where I did talk about how much I
8    charge an hour, yes, sir.
9    Q   And how much are you charging for your work on this
10   case?
11   A   450 an hour.
12   Q   And is your rate any different for depositions or
13   trial work than it is for writing the report or
14   doing the research for the report?
15   A   No, sir.
16   Q   About how many hours have you worked on this case?
17   A   I would estimate probably about around 20 at this
18   point, 20 hours, maybe more.
19   Q   Have you done any prior work for the State of
20   Michigan or any of the individual defendants or
21   their attorneys?
22   A   I've testified in Ann Arbor before.  I don't
23   remember the circumstances.  I don't remember if it
24   was defense or prosecution but I have testified
25   there and -- but I have not worked with these

---

8 (Pages 29 to 32)

Darrel Turner
6/7/2023                                                           FIRM #8093

---

**Page 33**

1    individuals or anyone affiliated with the case.
2  Q  During the time that you worked as an expert on this
3    case, in how many other court cases are you also
4    serving as an expert evaluator or report writer or
5    deponent or potential witness in court?
6  A  I don't know.  I don't have an answer to that
7    question.
8  Q  Well, you must have a rough sense of how many other
9    cases are on your docket.
10  A  I would say probably -- can I just ask a clarifying
11    question?
12  Q  You may.
13  A  Are you referring to cases that I'm working on but
14    have sort of gone stagnant for whatever legal reason
15    and I'm not actively working on them right now, or
16    are you referring to cases where say last week and
17    this week I'm preparing and actively working on?
18  Q  I'm asking for the total.  So since you began
19    working on this case, I'm trying to get a feel for
20    how many other cases while you were doing this that
21    you served as an expert evaluator or report writer
22    or deponent or expert witness in court, consultant,
23    you know, whatever?
24  A  Twenty to 30, I would say.
25  Q  Okay, thank you.  Now, I want to turn to your

---

**Page 34**

1    research and that is, I think, a little further down
2    here.  Hold on just a second.
3  A  May I ask if I can close my door for a second?
4  Q  Sure.
5  A  Excuse me.  Thank you.
6  Q  Sure.  So I've brought up -- what I'm looking at now
7    is the items on your C.V. just before the
8    Presentations at Professional Meetings.  So I'm
9    going in reverse order of research activities that
10    you've been involved in.  The first one on the list
11    is research at the Calcasieu, I don't know how it's
12    pronounced, Correctional Center way back in 2004 and
13    5, which was on the effect of cell assignment on
14    recidivism among violent and non-violent inmates.
15    What was your role in that?
16  A  I was the lead researcher.
17  Q  And did it result in a study or a publication or was
18    it just presented to the correctional center?
19  A  Are we in the -- I keep trying to go to move my
20    screen but I forget that you're controlling it.  Are
21    we under publications?
22  Q  No, no, I'm in the research section.  And it's --
23    here, it's right in the center of the screen now.
24  A  Okay.  I believe I did publish that.  Well, it would
25    be under publications if I did.  I'm sorry.

---

**Page 35**

1  Q  All right, we'll see.  It may show up.  Moving up,
2    let's see, there was also -- you did some research
3    on -- let's see, number two is this one.  Summer of
4    2005, the Relationship Between Inmate Performance on
5    a Multi-Axial Inventory Instrument and Severity of
6    Criminal Behavior, right?
7  A  Yes, sir.
8  Q  For the first one and for this one, basically you're
9    looking at -- like in the first one, you look at
10    inmates' cell assignments and what the effect is on
11    recidivism.  What is it that you're looking about
12    cell assignments?  Is it whom they're housed with or
13    the, you know, the security level?  What are the
14    variables that you're trying to figure out?
15  A  We had a violent scale of offense and it was the
16    violence of a non-violent offender who was housed
17    with primarily more violent or less violent inmates,
18    if there was any difference in the violence of their
19    recidivism that could be shown to have any effect on
20    the fact that they were paired with -- so for
21    example, if they go in for shoplifting and they're
22    paired with a murderer or something like that, just
23    the kind of the learning effect that is the theory
24    behind what we were looking at.
25  Q  And is the measurement recidivism?

---

**Page 36**

1  A  Yes.  Well, the type, yes, but yes basically.
2  Q  Yeah, okay.  And then the 2005, 2006 one on the
3    inventory, is that similar, the relationship in
4    inmate performance as predicted by the inmate -- by
5    the inventory, is that what we're looking at?
6  A  It was looking at the -- it's the MCMI, it's a
7    measure of -- it's sort of a brief measure of
8    personality traits and we were comparing which
9    personality traits correspond to more serious
10    criminal behavior.
11  Q  And again, is that measured after the fact or is
12    that backward looking?
13  A  It's looking at what they had already done.
14  Q  Yeah.  Okay.  All right.  And then the next one up
15    was looking at incarceration of mentally ill and
16    also arresting officer judgment correlated to inmate
17    performance on mental health tests.
18    Again, this is -- correct me if I'm
19    wrong but it's basically reviewing something in the
20    file about what the arresting officer did or the
21    effect of incarceration generally and then looking
22    at later mental health status; is that right?
23  A  Yes.
24  Q  Okay.  And then your thesis at McNeese was actually
25    completely unrelated to forensics, right, that was

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023                                              FIRM #8093

| | Page 37 | | Page 38 |
|---|---|---|---|

**Page 37**

1     on Big Wins for Pathological Gambling?

2  A  Correct.

3  Q  And how did you get into that?

4  A  I needed a thesis, man, and Cameron Melville was a

5     really cool cat and he and I hung out anyway, and he

6     was really looking at gambling because the casinos

7     had just recently come to Lake Charles, we have

8     casinos here and there was whatever.  And so I

9     thought yeah, you know, I can get behind that,

10     especially if I can get a thesis out of it.  It was

11     at least interesting to me.  That's it, though.

12  Q  The next ones at the top, there were two, the top

13     two ones here, which is at the top of the page, this is

14     looking at witness preparation and one looks at

15     witness preparation and the other looks at sexually

16     violent predators, so commitment court expert

17     witness testimony and its effects on jurors,

18     right?

19  A  Yes, sir.

20  Q  So this is the point where the stuff that you've

21     been doing in Texas, the forensic work with sexually

22     violent predators, becomes the focus of your

23     research and these are the first two research

24     projects and then those are going to proliferate as

25     we go forward, right?

**Page 38**

1  A  Yes, sir.  Very well said.  Like you're saving us a

2     lot of time here.

3  Q  Well, I'm just trying to get a feel for what it is

4     and when you did it.  The second to last one under

5     research experience is a bit of an oddity because

6     this is looking at recidivism rates for capital

7     murderers in Texas going back 15 years or so.  How

8     did you come about to do that project?

9  A  That was a study that Dr. Conroy was consulting as

10     an expert on that case and she thought it would make

11     a good study because it was so nuanced being murder

12     for hire or solicitation of murder for hire crime.

13     So we studied that for about two years while I was

14     there at least and helped her gather and collect

15     data and figure out how to do that and whatnot.

16  Q  And as a graduate student at that time, what was

17     your hands-on participation or what were you

18     actually doing?

19  A  More than likely, I was crunching numbers and

20     entering numbers into data sets from TDCJ's data.

21  Q  And the numbers would have been related to what?

22  A  Related to their recidivism rates, what those

23     reoffenses were, demographic characteristics and

24     probably just ensuring that everything that we were

25     given in the data set actually was a solicitation

**Page 39**

1     for murder for hire.  So just, you know, grunt work.

2  Q  And then the last one is Collaborating with

3     Government Behavior Analysis Units on Risk Factors

4     for Child Pornography and that's been ongoing.  What

5     again exactly is it that you do for them?

6  A  This was an ongoing research study that I was

7     collaborating with.  They contacted me based on a

8     presentation that they saw me do and that's -- but

9     that's very slow going and I don't even know if that

10     will end up being anything, quite frankly.

11  Q  Let's take a quick look at your publications.

12  A  You know, I feel like I have an interesting job

13     until I look at the C.V. like this and then it seems

14     like the most boring thing in the world.

15  Q  So looking -- again, we'll just go through these

16     pretty quickly to get a sense of your focus, okay?

17     The first one here, the State of Louisiana one at

18     the bottom, that just had to do with District Court

19     and visitation, so we're going to pass that one by.

20     The first one that's sort of

21     substantively in your field has to do with

22     evaluators reporting consistently higher or lower

23     scores on the psychopathic checklist revised, the

24     PCLR.  I take it this grew out of your work during

25     the civil commitment hearings, right?

**Page 40**

1  A  Correct.  If I can just point out, on my screen

2     halfway through that is the start of what should be

3     the -- what should be below that in terms of

4     publication and that's the one that we were talking

5     about earlier, so it was published.

6  Q  That's the one the assignment of violent and

7     non-violent offenders?

8  A  Yes, sir.

9  Q  Okay, thanks for correcting that.  And I take it

10     that -- let's see.  The concern about consistently

11     higher or lower scores, is that part of what you

12     were seeing doing the civil commitment hearings was

13     differences in the evaluators' reports probably

14     typically tied to which side they were on; is that

15     right?

16  A  Yes, sir.

17  Q  And I take it that it bothered you because you felt

18     like one side or the other were being in some ways

19     biased or unfair; is that fair to say?

20  A  Yes.

21  Q  And so you followed up that study with the next one,

22     which is the Murrie paper, and that one was on Rater

23     (Dis)agreement in Risk Assessment Measures again in

24     the same kinds of civil commitment proceedings,

25     right?

10 (Pages 37 to 40)

Darrel Turner
6/7/2023                                                        FIRM #8093

| | |
|---|---|
| 1   A   Right. | 1   Q   No, no, this was just an exercise in class. |
| 2   Q   And I like the term adversarial allegiance.  That's | 2   A   Yeah.  Was it very clear? |
| 3       what was annoying you, right? | 3   Q   It was very clear, yes. |
| 4   A   Yes, sir, and that's what we were looking at in the | 4   A   It was very clear in these studies.  I mean it's -- |
| 5       study before that as well. | 5   Q   Yeah, invariably the -- |
| 6   Q   Yeah.  And did you find it on both sides or did | 6   A   Yeah. |
| 7       you -- | 7   Q   Once you're assigned to a side, your sense of what's |
| 8   A   Absolutely. | 8       fair is completely colored by your side, and I take |
| 9   Q   Yeah, okay.  So this was a form of -- | 9       it that's what you were finding as well? |
| 10  A   Well, I guess -- never mind.  You're hitting my | 10  A   Yes, sir.  And then as you'll see up a couple more, |
| 11      nerdy research button. | 11      we ended up publishing an article in a textbook |
| 12  Q   What I'm saying is what you identified was -- what's | 12      about how to combat that, you know, what it looks |
| 13      often known, at least among lawyers, as advocacy | 13      like, that poll and that allegiance and things to be |
| 14      bias, right? | 14      aware of.  There it is, The Ethical Challenges. |
| 15  A   Yes, sir. | 15  Q   Yes. |
| 16  Q   I used to give my students identical facts in a | 16  A   So that was an interesting little time.  It's |
| 17      landlord-tenant case -- landlord-tenant problem, it | 17      interesting that you did that with your students. |
| 18      wasn't a case and the assignment was for them to | 18      That's exactly what we were showing. |
| 19      come up with a solution that would be fairest to | 19  Q   And let's see, number 4.  This is the one we were |
| 20      both sides and that I was emphatic that that is what | 20      just talking about, my number 4.  Let's go up to |
| 21      we wanted.  We were targeting perfect fairness to | 21      Boccaccini on Ethical Challenges in the same |
| 22      both sides.  Then I'd assign half of them to | 22      context.  Again, is your conclusion that the ethical |
| 23      represent the landlord and half of them to represent | 23      challenges face both sides or do your articles |
| 24      the tenant and what do you suppose happened? | 24      reflect more discontent with the defense side? |
| 25  A   Wow.  Did you publish that? | 25  A   No, sir, all -- all of the above. |

Page 41

Page 42

| | |
|---|---|
| 1   Q   Okay.  Well, you mean yes, some more unhappiness | 1       were looking at, too. |
| 2       with the defense side or -- | 2   Q   Is that in part, do you think, because the two |
| 3   A   No, sir, just look, here's studies we've done, | 3       experts cancel each other out or is it just they |
| 4       here's the evidence, here are some things to | 4       just don't care about the science or that part of |
| 5       remember, you know, and here are some things to just | 5       the science from anybody? |
| 6       be self-aware of that can hopefully help you not | 6   A   I think maybe a little bit of both. |
| 7       fall victim to this was the idea. | 7   Q   Moving up so we can get through this and get to the |
| 8   Q   All right, let's look at next one up.  This had to | 8       guts of our deposition.  The one at the bottom of |
| 9       do with risk scoring, the one on the top, which is | 9       the page, that one had to do with the legal standard |
| 10      another Boccaccini one.  Again, is part of this | 10      that's applied in sex offender civil commitment |
| 11      coming out of the fact that the risk scores done by | 11      trials; is that right? |
| 12      each side differ and then you have to argue to the | 12  A   Yes. |
| 13      jury about who's right, that sort of thing? | 13  Q   And it's actually a pretty -- it's not all that high |
| 14  A   Yes, sir, essentially.  Yes, sir. | 14      a standard, right, it's likely to reoffend? |
| 15  Q   Okay.  And we'll go on up to the next page. | 15  A   There's a bit more with it than that but what we |
| 16  A   Well, it's going to bother me.  Can I just add it | 16      were looking at was some states' civil commitment |
| 17      was not only that but it was also, you know, we | 17      laws have percentages assigned to the likelihood and |
| 18      think that they -- we think that they care as | 18      in Texas there's not and so it just says likely and |
| 19      experts about the PCLR and the Static and we think | 19      that's left up to the jury.  So we asked the jury |
| 20      that the juries listen to us and that we're very | 20      what does likely mean to them and then we got a |
| 21      important as experts, so we wanted to look at how | 21      whole range of answers. |
| 22      much does the jury care and we had them rank what | 22  Q   Okay.  Next one again, very similar, jurors' views |
| 23      they care about and we were bottom of the barrel. | 23      on the value and objectivity of expert witnesses. |
| 24      They really don't consider the scores a lot when | 24      We'll go on up to the next one.  Jurors' report on |
| 25      they deliberate, so that's one of the main things we | 25      risk scores, again more of the same.  Let's see. |

Page 43

Page 44

11 (Pages 41 to 44)

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023                                                            FIRM #8093

```
 1        The next one is the piece you did for
 2   the U.S. Attorneys bulletin on -- this one's
 3   refuting defense psychology and risk assessment
 4   reports at sentencing.  I take it this one is more
 5   of an advocacy piece in the sense that it's from the
 6   perspective of the government side of the case and
 7   it's counseling attorneys on how to deal with
 8   refuting what the defense is presenting; is that
 9   right?
10   A   Right.  But as part of it and if it was going to be
11   a publication, I wanted to analyze some data, so I
12   asked them to provide me with a sample of expert
13   risk assessments from defense experts.  So my
14   section of the article was analyzing that data.
15   Q   Okay.  But the publication itself is designed to --
16   A   Sure.
17   Q   It's designed to improve government lawyers' ability
18   to refute defense psychological reports and risk
19   assessment reports at sentencing?
20   A   Right, when they're misrepresentative, not just a
21   general how to attack a psychologist but just when
22   they're irresponsible, I guess.
23   Q   All right, we're getting near the end.  The Trupp
24   paper was generalizability of certain findings to
25   scores assigned to individuals of a sex offense.
```

Page 45

```
 1   Can you just again tell us exactly what this was
 2   about?
 3   A   It's just looking at various types of psychopathy
 4   and how psychopathy can manifest itself differently
 5   in people.  Some might be smooth talking, some might
 6   be more concrete.  These next two are looking at
 7   those different presentations of psychopathy.
 8   Q   What is your definition of psychopathy?
 9   A   It's the structure, it's the personality and
10   behavioral structure that's most commonly measured
11   by the PCL-R by Dr. Robert Hare, it's similar to
12   antisocial personality disorder and its framework,
13   I'd say.
14   Q   And that's the one that's used most commonly with
15   sexually violent predators in civil commitment
16   hearings?
17   A   Yes, sir, it's actually mandated by the statute that
18   you have to assess for psychopathy and that's the
19   one most frequently used, yes, sir.
20   Q   All right.  And then it looks like between 2015 and
21   2021, you didn't do any publication work.  Was there
22   a reason for that?
23   A   Yeah, I was trying to put a practice together and,
24   you know.  And this research work is all -- I mean
25   no one gets paid for any of this, so this is all
```

Page 46

```
 1   just doing it for a love of wanting to contribute to
 2   the field.
 3   Q   And are most of your collaborators in a similar
 4   position to you, that is, private practitioners, or
 5   are many of these co-authors, university or
 6   people -- or academics?
 7   A   Most of them are academicians and this is what they
 8   get to do for money.  One I can think of is also in
 9   private practice.
10   Q   And the ones where you're the last author, if this
11   is like other fields, typically the authors are
12   listed in relation to the contribution that they
13   made to the paper.  So is it fair to say that if
14   you're last, you had less to do with what's in the
15   paper and if you're first, you're lead author and
16   had the most to do with it?
17   A   Sure, I think that's very fair.
18   Q   Okay.  All right.  Sir, is it fair to say that the
19   great bulk of your publications address issues that
20   arise or that arose out of what you saw in the
21   sexually violent predator civil commitment
22   hearings?
23   A   Yes, sir.
24   Q   And it's true, isn't it, that those kinds of
25   hearings are used to keep offenders in a custodial
```

Page 47

```
 1   setting even after their criminal sentence has been
 2   served?
 3   A   Yes.
 4   Q   And in fact, these are people who otherwise would go
 5   free, they've actually discharged off their sentence
 6   but the State is seeking to keep them in custody or
 7   a form of custody because they're viewed as so
 8   dangerous?
 9   A   Yes.
10   Q   Is it fair to say that the number of people so
11   confined is a tiny percentage of all convicted sex
12   offenders?
13   A   Yes.
14   Q   The web this morning told me that Texas has about a
15   hundred thousand people on its registry.  Does that
16   sound right?
17   A   I don't know.  I'll take your word for it.
18   Q   Okay, a little over a hundred, and the biannual
19   report of the Texas Civil Commitment Office that
20   runs the civil commitment process tells me that as
21   of on November 30th, 2022, there were 572 civilly
22   committed sexually violent predators.  Does that
23   also strike you as about right?
24   A   Yes, sir.
25   Q   So it's about one-half of one percent of all people
```

Page 48

12 (Pages 45 to 48)

Darrel Turner
6/7/2023                                                    FIRM #8093

| | |
|---|---|
| 1   with sexual offenses? | 1   you were looking at the effects of having a certain |
| 2   A   Yes, sir, it's very small. | 2   kind of roommate or how you scored on an inventory, |
| 3   Q   And as the name implies, they are among the most | 3   those two weren't limited to sex offenders, that was |
| 4   dangerous of sexual offenders; is that fair to say, | 4   general recidivism, right? |
| 5   too? | 5   A   Right. If you just want to say that few of my |
| 6   A   Yes, sir. | 6   publications have dealt with recidivism, I'll agree |
| 7   Q   And many have psychopathic or sociopathic | 7   with that. If that's what you said, I apologize, |
| 8   personality disorders? | 8   I'll agree. |
| 9   A   Yes, sir. | 9   Q   Okay. |
| 10   Q   And it's true that once civilly committed, a great | 10   A   I only hesitated because I think it's |
| 11   many of them remain committed for years even if | 11   misrepresentative to say that with an implication |
| 12   there's a form of annual or other periodic review? | 12   that I'm not familiar with that kind of work because |
| 13   A   Biannual, yes, sir. | 13   one study is a lot of work, so to have a few that |
| 14   Q   Is it also fair to say that few of your studies of | 14   dealt with it, I've dealt with it a lot. That's |
| 15   the published studies involve statistical analysis | 15   all. |
| 16   of recidivism or the likelihood of reoffending, | 16   Q   But not in the context of sexual recidivism? |
| 17   whether detected or undetected? | 17   A   Well, all of the sexually violent predators civil |
| 18   A   No, sir, I wouldn't agree with that. There were | 18   commitment hearings are inherently related to sexual |
| 19   several that we talked about that looked at | 19   recidivism. They all have Static-99 scores, they |
| 20   recidivism, you know, so I guess -- | 20   all have PCLR scores, they all have a history of |
| 21   Q   Well, the big one that we looked at, the Texas one | 21   repeating. So just because it doesn't say that in |
| 22   on murderers didn't look at analysis of sexual | 22   the title, that's a huge part of what we're |
| 23   recidivism, right? | 23   factoring into that data analysis. So in that |
| 24   A   Correct. | 24   sense, I would say that most of my studies have |
| 25   Q   And some of the other ones that were in prison where | 25   actually involved recidivism in some capacity. |
| Page 49 | Page 50 |

| | |
|---|---|
| 1   Q   I think you're making a different point than what my | 1   So none of your research or writing |
| 2   question was. | 2   has been on the subject of recidivism by all people |
| 3   A   Okay. | 3   with sexual offense convictions as opposed to those |
| 4   Q   What I'm asking is -- and we just established that | 4   who are sexually violent predators? |
| 5   that extremely dangerous population is half of one | 5   A   That sounds right. I know I've done -- |
| 6   percent of the most dangerous people on the registry | 6   Q   That's all I need. All right. And you've done no |
| 7   or with sexual offenses, right? | 7   research or writing on undetected offending by all |
| 8   A   Right. | 8   people with a sexual offense conviction, right? |
| 9   Q   And they're not representative of the entire range | 9   A   Right. |
| 10   of all people with sexual offenses? | 10   Q   Okay. Are there any articles that you're working on |
| 11   A   Correct. | 11   now? |
| 12   Q   And to the extent that you're looking at recidivism | 12   A   Yes. There's another publication, I think it's on |
| 13   of that group, it bears little to no relationship | 13   Manuscripts in Progress, the APOD instrument that I |
| 14   with the recidivism of the full range of all people | 14   created, that's been published as well. |
| 15   who have committed sexual offenses? | 15   Q   And we'll talk about that a little bit more later. |
| 16   A   Okay, that's fine. That's fair. Yes, sir. | 16   Have you ever thought about planning an article on |
| 17   Q   And the recidivism studies that you actually did | 17   how some of the defense experts in this case are |
| 18   that looked not at individuals in individual cases | 18   either intentionally or carelessly using improper |
| 19   but that involved pulling up data as to one | 19   terminology in a way that distorts or minimizes |
| 20   variable, like whom they were lodged with or how | 20   undetected defending? |
| 21   they scored on a test and then correlating that or | 21   A   No. |
| 22   seeing that they correlated with recidivism, the | 22   Q   Let's turn to your case list, which requires a |
| 23   kinds that amount to recidivism thereafter, right? | 23   different exhibit, so let me stop sharing. I |
| 24   A   Yes. | 24   stopped sharing. Can you no longer see the screen |
| 25   Q   And -- all right, I'll leave it at that. Okay. | 25   that I had on before? |
| Page 51 | Page 52 |

13 (Pages 49 to 52)

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023                                                      FIRM #8093

| | |
|---|---|
| 1    **A**   Yes, sir. | 1    Prosecution Unit? |
| 2    **Q**   Okay, thanks. I just want to make sure that my | 2    **A**   Actually, all of these are sexually violent |
| 3    computer has pulled up the screen. I've got two | 3    predators civil commitment cases out of the State of |
| 4    screens and one used to be two and two is now one | 4    Texas where I've been retained to testify -- where |
| 5    and so I want to make sure I'm in the right place. | 5    I've testified, not where I've been retained, where |
| 6         Let's look at the case list. This | 6    I've testified. |
| 7    will be marked or can be marked as Exhibit 2. Let | 7    **Q**   So these are much more recent than the ones you did |
| 8    me share it. That is this one and I am sharing. | 8    way back when? |
| 9    Can you see that? | 9    **A**   Correct. |
| 10    **A**   Yes, sir. | 10    **Q**   And what's the time period over which these cases |
| 11    **Q**   And that's the list of cases that you've provided. | 11    went on? |
| 12    It may not have been provided with the report but | 12    **A**   I believe from the time I was -- from about 2014 |
| 13    that we eventually got, right? | 13    until when this list was made, which is being |
| 14    **A**   Yes. | 14    updated by my secretary now, but until this list was |
| 15    **Q**   Turning to page 2 of that, I want to start with the | 15    made, so from 2014 to -- I mean earlier this year |
| 16    other. This is Special Prosecution Unit, Civil | 16    but -- or last year. So recently. |
| 17    Division, State of Texas and it says 75. I assume | 17    **Q**   When you finish the updated one, if you can add to |
| 18    that means 75 cases that you worked on for the State | 18    it the date of each case and if you haven't, the |
| 19    of Texas; is that right? | 19    file number of each case, I would appreciate having |
| 20    **A**   Yes. | 20    a list that has those things on it. Is that |
| 21    **Q**   And every one of those, is it safe to assume that | 21    something that you're able to do? |
| 22    you were doing some kind of forensic evaluation on | 22    **A**   I will do whatever Mr. Jamison advises me to do. |
| 23    the defendant we kind of talked about before with | 23    **Q**   All right. Because without a date and without a |
| 24    Dr. Conroy on her reports and ultimately her | 24    file number, it can be awfully hard to find cases |
| 25    testimony and those were on behalf of the Special | 25    and if that's something you know and have available |
| Page 53 | Page 54 |

| | |
|---|---|
| 1    that is going to take us forever to find, I'd like | 1    going on, as you can imagine. So the civil division |
| 2    to have that, okay? | 2    of this SPU, which is the Special Prosecution Unit, |
| 3    **A**   Understood. | 3    and the State Council for Offenders Civil Division |
| 4    **Q**   All right. So these are 75 cases where you did the | 4    handle all of the civil commitment cases in the |
| 5    workup and testified. In civil commitment hearings, | 5    State of Texas as, you know, prosecution or defense |
| 6    I assume there's like never a settlement, is that | 6    or petitioner, whatever. |
| 7    right, or almost never? I don't want to overstate | 7         I have a contract separately with the |
| 8    it. | 8    State of Texas to do the initial evaluations on the |
| 9    **A**   Okay, like -- I think what we're talking about would | 9    people that they want screened and so I conduct |
| 10    be like an agreed judgment where they just say okay, | 10    several of those a month and report that back to |
| 11    fine, I'll be civilly committed? | 11    TDCJ and it's me and about five other |
| 12    **Q**   Yes. | 12    psychologists that we do those and we give an |
| 13    **A**   That does happen but it's certainly more rare, yes, | 13    opinion as to whether we think the person has a |
| 14    sir. | 14    behavioral abnormality that makes them likely to |
| 15    **Q**   And in the 75 cases in which you have testified, I | 15    reoffend. And then the State of Texas forwards the |
| 16    take it that that didn't happen? | 16    case on to the Special Prosecution Unit. |
| 17    **A**   Correct. That's correct. | 17         So I don't mean to meander, I'm |
| 18    **Q**   Of the 75 cases that you testified in -- let me ask | 18    trying to give you swift answers to your questions, |
| 19    it a different way. In every case -- let me back up | 19    but the 75 cases that I've been retained on, the |
| 20    a minute. | 20    vast majority of those I did an initial evaluation |
| 21         How is it that you get retained? | 21    where I said yes, I think this person has a |
| 22    **A**   I have a contract with the State of Texas, neither | 22    behavioral abnormality, so I was just retained by |
| 23    of these two divisions. These two divisions | 23    them to testify as to that opinion. |
| 24    prosecute or defend inmates either civilly or | 24         The other cases with the -- one's a |
| 25    criminally. So there's not a lot of civil stuff | 25    private defense attorney, 20 times State counsel for |
| Page 55 | Page 56 |

14 (Pages 53 to 56)

Darrel Turner
6/7/2023

FIRM #8093

1   offenders I was retained.  But at that time when I'm
2   retained to do an evaluation, I'm doing an
3   evaluation of another colleague that has already
4   opined.  Most of the time when I do the initial
5   evaluation, I find that there is not a behavioral
6   abnormality in some of the times that I do that.
7         So that's how I'm retained is because
8   I'm involved in the process from the beginning and
9   then now at this point, both offices just know me
10  from testifying and I go and present research to
11  them and things like that.
12  Q   In what percent of the cases, of the 75 cases listed
13      here did you testify for the prosecution?
14  A   Those are all prosecution cases where I testified.
15      Those are Special Prosecution cases.
16  Q   Are there also defense cases in Texas in which
17      you've testified?
18  A   This is -- so for the State Counsel for Offenders
19      Civil Division in a sexually violent predator civil
20      commitment case, I testified for them on one
21      occasion.  I was retained by them on 20 occasions.
22      I was retained by a private defense attorney on
23      another occasion but I testified --
24  Q   Okay, when you were retained in the other
25      approximately 20 cases, were you -- did you not

Page 57

1   testify because you thought that the person should
2   be civilly committed?
3   A   Well, I wouldn't say I thought the person should be
4       civilly committed.  I didn't testify because I agreed
5       with the initial evaluator that the person did have
6       a behavioral abnormality.
7   Q   All right.  So in all but one of 20 cases on the
8       defense side where you were asked to evaluate with a
9       potential of going to trial, in only one did you
10      find that the case in your view was defensible under
11      the standard, under the legal standard that was
12      required and then testified in that case; is that
13      fair to say?
14  A   Yes, sir.
15  Q   Okay.  And conversely, when doing evaluations for
16      the State of Texas, we know that in 75 of the cases,
17      you did the evaluation and then testified.  What
18      percentage of the cases -- in what percentage of the
19      cases would you say you find that the person meets
20      the standard so that the case should go forward?
21  A   Well, it's probably been about 45 of those cases or
22      40 of those cases where I did that initial
23      evaluation I was talking to you about, so I was
24      essentially just giving my own opinion.  But then I
25      was retained the rest of the time by them to give a

Page 58

1   second opinion.
2         The majority of that time I have
3   agreed with the initial evaluator like I did with
4   the defense that there was a behavioral abnormality
5   but there's been about, I'd say, 17, 18, 20 times
6   that the Special Prosecution Unit has retained me to
7   evaluate someone that has already been found to have
8   a behavioral abnormality that makes them likely to
9   reoffend sexually and I've told them that that's not
10  my opinion and that I disagree.
11  Q   And out of how many cases total is the 17 or 18?
12  A   It's probably close to -- it's probably close to
13      between 90 and a hundred, somewhere in there at this
14      point.
15  Q   Let's take a look at the federal cases.  Why don't
16      you just as a starting point tell us when you're
17      doing the prosecution side cases, are these straight
18      up criminal cases or are these also some kind of
19      specialty case done by the federal government?
20  A   These would be all criminal cases, if I'm not
21      mistaken.
22  Q   And over what period of time does the federal side
23      of this case list cover?
24  A   2013 up until now.
25  Q   Okay.  All right, let's start with the one civil

Page 59

1   case because that's an exception to the rule here.
2   Srok versus Coppola Wine Company, a case in
3   California.  You gave testimony, you did a record
4   review and then gave testimony on behalf of the
5   plaintiff.  What was that case about?
6   A   I gave -- I was deposed, I did not testify in court,
7       so I need to fix that.  That was -- I mean it's
8       technically testimony, I guess, but I'd rather
9       differentiate.  She was suing the Coppola Wine
10      Company for sexual harassment -- sexual assault and
11      sexual harassment, I believe.
12  Q   And what was -- how did you come to be involved in
13      that case?
14  A   I was retained by that attorney.
15  Q   And were you qualified by the court as an expert?
16      Or apparently not because you only got as far as
17      deposition, right?
18  A   Correct.
19  Q   And in what field or specialty were you holding
20      yourself out as an expert to opine about?
21  A   Sexual assault and impact on victims, grooming
22      behaviors, risk.
23  Q   Okay.  And what was the outcome of the case, if you
24      remember?
25  A   I don't remember.

Page 60

15 (Pages 57 to 60)

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023                                                        FIRM #8093

| | |
|---|---|
| 1   Q   All the rest of the cases are criminal cases; is | 1   Q   It was long enough ago that you don't remember? |
| 2       that right? | 2   A   Obviously, yes, sir. |
| 3   A   Yes, sir. | 3   Q   Okay.  Again, what's the time period that these |
| 4   Q   Let's start with the -- I believe there are only | 4       cover then?  I thought you said 2013 to the present |
| 5       five defense cases, so let's start with those.  At | 5       but I may have been wrong.  Are you going to correct |
| 6       the top of the chart here -- let's just pick the | 6       that if it's not right? |
| 7       first one so I get a feel for what you're doing. | 7   A   No, sir, it's up to whenever this list was made and |
| 8           U.S. versus Fitzhugh, it happens it | 8       I talked about it being updated but, you know, I |
| 9       was in my district, the Eastern District of | 9       don't remember those.  I don't know what you want me |
| 10      Michigan.  It says evaluation/consult.  Tell us what | 10      to tell you.  I can talk to you about the ones I do |
| 11      that meant in Fitzhugh. | 11      remember. |
| 12  A   I'll tell you, Mr. Reingold, I'm going to have a | 12  Q   Well, I'm trying to get a feel for the most recent |
| 13      hard time remembering most of these.  This is a lot | 13      one.  Was it like one within the last year, within |
| 14      of work, I do a lot of evaluations and I just don't | 14      the last two years, three years? |
| 15      remember all of them. | 15  A   Can we go down towards the bottom? |
| 16  Q   Are there any of the five defense ones that you do | 16  Q   Sure. |
| 17      remember, Anderson, Eaves, Talamonti, Hussain and | 17  A   Those are all of the -- okay, Robert Kelly, that was |
| 18      Fitzhugh? | 18      the R. Kelly trial.  That was last fall, I believe. |
| 19  A   No, sir.  I mean -- | 19  Q   Let's look at the ones that are labeled as blind |
| 20  Q   Is there any significance of the order in which the | 20      testimony.  I think there's only four and they're |
| 21      cases are listed?  Are these oldest to newest? | 21      all on this page.  What does blind testimony mean? |
| 22  A   I don't know.  My secretary did this.  I'm sorry. | 22  A   That's where I'm brought in to testify about |
| 23  Q   When was the last time you were doing an evaluation | 23      something that I'm an expert in without any |
| 24      or consult in federal court? | 24      knowledge of the case or other evidence in the case. |
| 25  A   I don't remember. | 25  Q   So does that mean you have to sit through the entire |
| Page 61 | Page 62 |
| 1       trial and hear what's presented? | 1   A   Yes, sir. |
| 2   A   No, sir, usually I'm the first one on and then | 2   Q   All right.  Are you cross-examined in those |
| 3       out. | 3       settings? |
| 4   Q   So what is it that you're talking about? | 4   A   Yes, sir. |
| 5   A   Aspects of sexual offending, grooming, impact on | 5   Q   And is your testimony prepared with the lawyer for |
| 6       victims, risk. | 6       whose side you're going to testify? |
| 7   Q   And would you know anything about the case when you | 7   A   No, sir.  Sometimes minimally they'll ask me a |
| 8       come in? | 8       general question over a phone or at a meeting, you |
| 9   A   No, sir.  That's why -- | 9       know, some kind of pretrial interview and I'll |
| 10  Q   Yeah, okay.  And are you hired by the court to do | 10      answer, but I don't -- you know, my answers might |
| 11      that, are you officially an expert for the court as | 11      refer to a male victim or a child victim and that's |
| 12      opposed to for one of the parties? | 12      not necessarily the case, so we don't go over -- |
| 13  A   No, sir, usually it's for one of the parties. | 13      we'll talk about qualifications and things like |
| 14  Q   But it's testimony that's intended to be completely | 14      that. |
| 15      unconnected to the facts of the case and is just | 15  Q   I guess what I'm trying to get a feel for is how you |
| 16      general background information for the benefit of | 16      know what to testify on if you know nothing about |
| 17      the jury? | 17      the case, I mean, and don't even know the charge. |
| 18  A   Yes, sir. | 18  A   Well, there are aspects of sexual offending that I |
| 19  Q   And all you know is what the charge is or do you not | 19      feel qualified as an expert to testify that these |
| 20      even know that? | 20      attorneys, I guess, think are helpful to the triers |
| 21  A   Sometimes I don't even know that. | 21      of fact in one way or another.  I've never been not |
| 22  Q   And you've done that, it looks like, four times and | 22      qualified as an expert. |
| 23      in all four cases, is it basically on grooming and | 23  Q   Okay.  All right, on the cases that say |
| 24      some sort of perpetrator behavior and victim | 24      evaluation/consultation, I take it those are ones |
| 25      behavior? | 25      where you were never deposed or testified; is that |
| Page 63 | Page 64 |

16 (Pages 61 to 64)

Darrel Turner
6/7/2023                                                              FIRM #8093

```
 1    right?
 2  A  Yes, sir.
 3  Q  And when you do the evaluation or consultation, if
 4     it doesn't move forward to deposition or to
 5     testimony, is that signaling that you told the
 6     lawyers by whom you were hired that you didn't like
 7     their case, or is it more open than that?  How does
 8     that work?
 9  A  Sometimes that's been the case but other times it's
10     just been maybe the person, you know, ultimately
11     pled, you know, or changed their plea or something
12     like that and it just didn't end up happening.
13  Q  On any of these, can you tell us which was which or
14     do you have no recollection as to that as well?
15  A  I just don't -- I don't remember.  I'm sorry.
16  Q  All right.  If it says evaluation, consultation and
17     testimony, does that mean a deposition and
18     testimony?
19  A  Not necessarily, no, sir.
20  Q  And of all the cases listed here, have you ever not
21     been qualified by the court when you got to court?
22  A  No, sir.
23  Q  And has your testimony or any portion of your
24     testimony ever been rejected by the court?
25  A  No, sir.
```

Page 65

```
 1  Q  And is that true in both defense cases -- couldn't
 2     be true in defense cases because none of the defense
 3     cases made it into testimony; is that right?
 4  A  Right.  That's true in my career.
 5  Q  That most cases don't make it to testimony?
 6  A  No, sir, that I've never been not qualified once
 7     I've gotten to court and I never had a part of my
 8     testimony rejected.
 9  Q  Okay, but I was asking you -- we've gone beyond
10     that.  I was asking you a different question.  With
11     the defense cases, there are only five of them but
12     none of them made it to testimony, right?
13  A  Right.
14  Q  Do you remember if in those cases you were on board
15     with the defense position?
16  A  I think it's the same as the others, some of the
17     times I was, some of the times I wasn't.
18  Q  In what percentage of the prosecution cases would
19     you say you disagree with the prosecution's case and
20     told them that?
21  A  It would be a smaller amount.  I think most of the
22     time -- I think most of the time that I'm reached
23     out to, it's because a case is, you know, especially
24     significant in one way or the other and so I've not
25     had as many -- I would say it would be a smaller
```

Page 66

```
 1     percentage of time but it has happened.
 2  Q  And on the defense side, is it more likely to happen
 3     that you say I'm not on board with the case?
 4  A  I don't know.  I wouldn't think so.  That doesn't
 5     seem to be the case, no, sir.
 6  Q  Well, with only five defense cases, it would only
 7     take one for you to be at 20 percent, right?
 8  A  Right.
 9  Q  But you're not in a position to recall whether in
10     any of those five you were not on board with the
11     defense position?
12  A  No, sir, I've already testified to the fact that I
13     was on board some of the time and not on board some
14     of the time.
15  Q  But you couldn't give us a percentage?
16  A  No, sir.
17        MR. REINGOLD:  All right, it's 11:52.
18     Is it okay if we take a ten-minute break and then
19     we'll move on from there?
20        THE WITNESS:  Yes, sir.
21        MR. REINGOLD:  All right.  Anybody
22     have objections to that?
23        MR. JAMISON:  No, sounds good.
24        MR. REINGOLD:  See you at noon.
25     (A break was taken at 11:52 a.m.)
```

Page 67

```
 1        - - -
 2        (Record resumed at 12:01 p.m.)
 3  BY MR. REINGOLD:
 4  Q  We're back on the record at noon and we will shift
 5     gears.  In your own words, would you describe what
 6     your assignment was as an expert in this case?
 7  A  I was asked at first about my feelings on the Static
 8     and how -- just basically that and then I was -- I
 9     wasn't told a lot about the case.  I was told that
10     there was some kind of question involving a registry
11     and that part of that related to the Static and so I
12     was asked to write a report addressing certain
13     aspects of the Static that I have found to be
14     problematic in recent years in the process of
15     consulting with people about writing up something.
16  Q  Do you know anything about the individual plaintiffs
17     in the case?
18  A  No, sir.
19  Q  Do you know what relief the Plaintiffs are
20     seeking?
21  A  No, sir.
22  Q  And did all of the information that you got come
23     from Counsel?
24  A  Yes, sir.
25  Q  Did you read any documents in the case before or
```

Page 68

17 (Pages 65 to 68)

Darrel Turner
6/7/2023

FIRM #8093

---

**Page 69**

1    after agreeing to become an expert, not counting any
2    expert reports?
3  A  No, sir.
4  Q  So you didn't read the Complaint or any of the other
5    filings in the case?
6  A  Not that I recall, no, sir.  I don't remember
7    reading anything about the case prior to agreeing to
8    be an expert.
9  Q  You don't know anything about the Plaintiffs in the
10    case.  Are you aware, I take it you're not, but I'll
11    ask you, are you aware that one of the Plaintiffs
12    never committed a sexual offense, was never found to
13    have any sexual motivation for his crime and yet
14    he's on the registry for life?
15  A  No, sir, I didn't know that.
16  Q  Are you aware that another Plaintiff was found by a
17    court in her home state not to be a dangerous
18    predator, her sentence was reduced and she was
19    required to register just once a year for ten years
20    but when she moved to Michigan to be closer to her
21    family, she became a lifetime registrant?
22  A  No, sir.
23  Q  Are you aware that another Plaintiff in the case
24    went to an over 18 club, wound up having sex with a
25    girl to used to fake ID to get into the club who

---

**Page 70**

1    is nevertheless on the registry for life even though
2    the couple are married and have three children
3    together?
4        MR. JAMISON:  I'm going to object to
5    this line of questioning, assumes facts not in
6    evidence.
7        MR. REINGOLD:  You may answer.
8  A  No, sir.
9  BY MR. REINGOLD:
10  Q  Are you aware that according to our preliminary
11    data, more than half of the people on Michigan's
12    registry who are out in the community committed
13    crimes other than CSC 1 or 2, that's Criminal Sexual
14    Conduct 1 or 2, the most serious sexual offenses?
15  A  No, sir.
16  Q  Are you aware that in that same group, our
17    preliminary data shows that more than half of them
18    are over age 50?
19  A  No, sir.
20  Q  Are you aware that despite those figures, about 93
21    percent of Michigan registrants are on the registry
22    for 25 years or for life?
23  A  No, sir.
24  Q  And you know, I assume, that but for time on the
25    registry and the frequency of reporting, everyone on

---

**Page 71**

1    the registry is subject to the same duties and
2    restrictions because it's a one size fits all law?
3  A  I do now.  I didn't before.
4  Q  Okay.  What that means is that the duties and
5    restrictions that were designed to control and
6    monitor the most dangerous offenders like the sexual
7    violent predators that you've worked with so much
8    and people who committed the horrific stranger,
9    kidnap, rape, murders of children for whom the laws
10    are named, those duties and restrictions also are
11    applied to the lowest level offenders?
12        MR. JAMISON:  Objection, misstates
13    the law.
14        MR. REINGOLD:  You can answer.
15  A  Are you asking me if I knew that?
16  BY MR. REINGOLD:
17  Q  I'm asking -- yeah, did you know that?
18  A  No, sir.
19  Q  You know it now?
20  A  Yes, sir.
21  Q  Okay.  Were you provided any materials to consider
22    in writing your report?
23  A  Yes, sir.
24  Q  What was that?
25  A  The experts -- the other experts' reports,

---

**Page 72**

1    Dr. Hanson -- sorry.
2  Q  H-a-n-s-o-n.  All right, I've called up -- let me
3    share my screen again.  This should be marked as
4    Exhibit 4.  Is this a copy of the report that you
5    submitted in the case?
6  A  Yes.
7  Q  And I take it you wrote it?
8  A  Yes.
9  Q  Was anyone else involved in writing it?
10  A  No.
11  Q  Anyone help you to write it?
12  A  Yes.
13  Q  And who is that?
14  A  Well, helped by finding research articles for me
15    about specific things but not in the writing.
16  Q  So you had a research assistant who did some work
17    for you?
18  A  Yes, sir.
19  Q  But no one told you what to write?
20  A  No, sir.
21  Q  Are all of the opinions that you intend to offer in
22    the case included in your report?
23  A  Unless I'm asked something on the stand that isn't
24    in the report, then I would say yes, sir.
25  Q  Haven't left anything out?

---

18 (Pages 69 to 72)

Darrel Turner
6/7/2023                                                    FIRM #8093

| | |
|---|---|
| 1  A   No, sir. | 1  Q   You've done no work on whether registries are |
| 2  Q   Does your report also include a complete statement | 2      effective in reducing offending? |
| 3      of the basis and reasons for your opinion? | 3  A   No, sir. |
| 4  A   Yes, sir. | 4  Q   Before coming into this case, were you familiar with |
| 5  Q   Haven't left anything out as to that? | 5      the work of Elizabeth Letourneau? |
| 6  A   No, sir. | 6  A   Yes, sir. |
| 7  Q   And you've identified all the documents that support | 7  Q   Is it fair to say her work is widely cited? |
| 8      your opinions? | 8  A   Yes, sir. |
| 9  A   Yes, sir. | 9  Q   Fair to say she's considered one of the top |
| 10 Q   Are you familiar with the works of scholars in the | 10     authorities in her field? |
| 11     field? | 11 A   Yes, sir. |
| 12 A   Yes, sir. | 12 Q   Are you familiar with the literature and scholarship |
| 13 Q   Let me ask you about the Plaintiffs' experts. | 13     in her area, meaning child sexual offenses and |
| 14     Before this case, were you familiar with | 14     recidivism? |
| 15     Dr. Hanson's work? | 15 A   Yes, sir. |
| 16 A   Yes. | 16 Q   Did you know the work of Kelly Socia? |
| 17 Q   All right.  Is it true that his work is widely | 17 A   I've read some of her articles.  I'm less familiar |
| 18     cited? | 18     with her body of work in general. |
| 19 A   Yes. | 19 Q   It's actually a he, but that's fine. |
| 20 Q   Fair to say he's considered one of the top | 20 A   Sorry. |
| 21     authorities in his field? | 21 Q   Fair to say that his work is also widely cited? |
| 22 A   Yes. | 22 A   I believe it is, yes, sir. |
| 23 Q   Fair to say his area overlaps only a little bit with | 23 Q   And fair to say he, too, is highly regarded in his |
| 24     yours? | 24     field? |
| 25 A   Yes. | 25 A   Yes, sir.  I'm sure he is. |
| Page 73 | Page 74 |

| | |
|---|---|
| 1  Q   Are you familiar with the work of Dr. James | 1  A   To a lesser degree. |
| 2      Prescott? | 2  Q   Do you know if her work is widely cited? |
| 3  A   To about the same degree, yes, sir. | 3  A   I'm not sure.  I'm less familiar with -- I'm less |
| 4  Q   Same degree as Socia? | 4      familiar with her. |
| 5  A   Yes, sir. | 5  Q   So you wouldn't know that she's one of the top |
| 6  Q   Fair to say his work is widely cited? | 6      authorities in her field? |
| 7  A   Yes, sir. | 7  A   Right. |
| 8  Q   Fair to say he's considered one of the top | 8  Q   Okay.  A couple of questions about the two leading |
| 9      authorities in his field? | 9      experts, Hanson and Letourneau.  Both testified in |
| 10 A   Yes, sir. | 10     their depositions that they got interested in their |
| 11 Q   All right.  And this is a field that's quite | 11     research fields from their clinical work with |
| 12     different from yours; isn't that true? | 12     victims of sexual assault.  Both wanted to reduce |
| 13         Let me put it a different way.  At | 13     sexual offending.  That was and is their primary |
| 14     least in this case, what he's writing about is the | 14     motivation for doing the work that they do, |
| 15     effect of registry laws, whether they work or not? | 15     according to them.  Do you have any reason to doubt |
| 16 A   Yes, sir. | 16     them in that regard? |
| 17 Q   And that's not something that you either know about | 17 A   No, sir. |
| 18     or have written about? | 18 Q   Over time both became critical of certain public |
| 19 A   Correct. | 19     policies like registries that based on their |
| 20 Q   Okay.  You don't know whether registries are | 20     research and the research of others did little or |
| 21     effective in reducing sexual offending? | 21     nothing to reduce sexual offending or to increase |
| 22 A   I know that the research has been pretty consistent | 22     public safety while preventing low risk offenders |
| 23     that they're not effective. | 23     from reintegrating into society and all at great |
| 24 Q   Okay.  How about Kristen Zgoba, are you familiar | 24     governmental expense.  Do you have any reason to |
| 25     with her work at all? | 25     doubt them in that regard? |
| Page 75 | Page 76 |

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023

FIRM #8093

---

**Page 77**

```
 1    A   No, sir.
 2    Q   All right, let's switch gears again and let me ask
 3        you some questions about your report.  In your
 4        report, it's true that you were critical of
 5        Dr. Hanson's carelessness, let's say, in the use of
 6        certain terms; is that right?
 7    A   Yes.
 8    Q   You felt like he would occasionally use the term
 9        reoffending, which can mean different things to
10        different people, with recidivism which can also
11        mean different things to different people?
12    A   Yes.
13    Q   Okay.  He has since written a rebuttal to your
14        report in which he made an effort to clarify his use
15        of the term; is that right?
16    A   I have no idea.  I've not heard of that or seen
17        it.
18    Q   You haven't seen the rebuttal report?
19    A   No.  I would like to.
20    Q   Well, he made clear that when he's talking about
21        observed recidivism rates, he's talking about people
22        being caught.  Is that the definition that you would
23        subscribe to?
24    A   I just think it's a lot more nuanced than that.  I
25        mean caught doesn't mean convicted.
```

**Page 78**

```
 1    Q   Let me ask a different question.  When people have a
 2        sexual conviction and they are then later arrested,
 3        charged or convicted of a new offense, would you
 4        agree that the new offense is recidivism or observed
 5        recidivism?
 6    A   Yes, sir.
 7    Q   And so that's an appropriate term to use when
 8        somebody has already had a sexual offense conviction
 9        and then gets caught in the sense of meaning a new
10        arrest, a new charge or a new conviction?
11    A   Yes, sir.
12    Q   And the problem arises if someone refers to that as
13        reoffending because reoffending can also mean
14        undetected reoffending, right?
15    A   Yes, sir.
16    Q   So he says that when he's talking about undetected
17        offending or reoffending, he's talking about events
18        that don't result in any kind of criminal justice
19        processing or records, that is, there would be no
20        arrest, no charge and no conviction.  Is that a fair
21        use of the term offending or reoffending or
22        undetected offending or undetected reoffending?
23    A   Yes, sir.
24    Q   And if he's made that clear, does that satisfy the
25        objection that you had before?
```

**Page 79**

```
 1    A   No.  Because I think the problem is that he has not
 2        done that for a long time and I think it's been a
 3        slow encroachment and I think that now we have an
 4        entire field of people who are using these terms
 5        interchangeably and they're using an instrument that
 6        just was a long time the gold standard and --
 7    Q   But he's now saying if there was confusion in my
 8        report about the terms that I used, which I thought
 9        for my normal audience of other social scientists
10        and judges and lawyers were clear by their context,
11        if he's saying if there was a lack of clarity, I'm
12        making it clear now, and so far you said -- so far
13        you have agreed that the terms that he has clarified
14        accurately describe what he wants them to describe.
15    A   Right, and I think that's a great start but I
16        think --
17    Q   Okay.  All right.  Thank you.  So what that means is
18        if the only knowledge of an alleged new offense is,
19        say, by neighbors and their knowledge of the offense
20        wouldn't make it into any official criminal justice
21        database, that would be an example of undetected
22        offending, right?
23    A   Yes.
24    Q   Okay.  He also clarified that the observed rates,
25        that means again rates based on official criminal
```

**Page 80**

```
 1        justice system records, are valid indicators of
 2        proven reoffending, he said that even if some of the
 3        people might never be convicted or might even later
 4        be exonerated.  Do you agree with that?
 5    A   Yes.
 6    Q   You do agree with that.  That was yes?  Sorry.
 7    A   That was a yes.
 8    Q   Okay, I didn't mean to talk over you.  So recidivism
 9        equals observed reoffending, arrest, charge or
10        conviction?
11    A   Yes.
12    Q   Okay.  And it's true that the Static-99 only deals
13        with official law enforcement records, right?
14    A   Yes.
15    Q   So anything coming out of the Static-99 can only
16        have to do with original convictions followed by
17        arrest, charge or conviction because it doesn't ask
18        about or measure anything else, true?
19    A   True.
20    Q   All right.  By the same token, when someone like you
21        talks about reoffending, you're typically talking
22        about something that is undetected and unknown and
23        that can only be guessed at, right?
24    A   That's part of it but I think the detected ones are
25        also reoffending.  I think reoffending is all
```

20 (Pages 77 to 80)

Darrel Turner
6/7/2023                                                    FIRM #8093

---

1  inclusive whereas recidivism is what we agreed to
2  earlier.
3  Q  So you're willing to use reoffending as to both
4     terms even though it causes confusion?
5  A  Yes, but I would make it --
6  Q  You can see -- I mean it confuses me just when you
7     say that because now when you talk about
8     reoffending, I don't know whether you mean and no
9     one can know whether you mean all reoffending, that
10    is, the official reoffending and the undetected
11    reoffending or only one or the other; isn't that
12    right?
13 A  No, I disagree with you.
14        MR. JAMISON:  Hold on, Doctor.  I'm
15    going to object.  Paul, you're mischaracterizing his
16    testimony.  You're not allowing him to finish his
17    answer.
18        MR. REINGOLD:  You can answer.
19 A  My answer to your question is no, I don't think it
20    was confusing.  I think that it was pretty clear.
21    Reoffending means someone has offended sexually and
22    they offend sexually again, whether we know about it
23    or not.  Reconviction, recidivism, recidivism is
24    something different.  Those are only the ones that
25    happen that we know about.  I don't know what's

Page 81

---

1  unclear about that.  I'm sorry.
2  BY MR. REINGOLD:
3  Q  Well, it just strikes me that you criticized
4     Dr. Hanson because he used both terms, he thought,
5     in context that made the meaning perfectly clear and
6     now you're saying you get to use a term in context
7     where the meaning is just as unclear as his was.
8         If he said recidivism and was somehow
9     alluding to undetected reoffending, that would be
10    wrong, and if you've used the word reoffending and
11    it includes recidivism, some of the people just
12    think you're going to be confused, right?
13 A  But how?  Because you said it yourself.  If he did
14    that, then he would be wrong.  If I did that, my
15    groups are exclusive of one another.  His groups are
16    the wrong way.  I'm saying reoffending is
17    everything, whether we know about it or not.  He's
18    sayings recidivism and reoffending are the -- he's
19    using them interchangeably and you cannot do that.
20    There's a huge difference.
21 Q  No, he has corrected that.
22 A  Well, come on.
23 Q  Well, I'm saying to his audience of other people in
24    the field and to his audience of lawyers and judges,
25    in his view, the context was clear and yet you're

Page 82

---

1  saying it's okay for you to use a similar term that
2  will lead people uncertain as to your meaning and
3  that doesn't strike me as fair.
4        MR. JAMISON:  Objection.  Paul, how
5     do you know what other people are going to believe
6     based on Dr. Turner's definition?  I don't even know
7     that there's a question in there.  Do you have a
8     question for Dr. Turner?
9  BY MR. REINGOLD:
10 Q  Dr. Turner, has someone who has been arrested
11    reoffended?
12        MR. JAMISON:  Objection, the question
13    is vague.  Arrested for what?
14 BY MR. REINGOLD:
15 Q  Arrested for -- if someone who has a sexual offense
16    and has been arrested for a new sexual offense, has
17    that person offended?
18 A  If we're talking about -- according to stats, if
19    we're running a study, which is what we're talking
20    about, then that person, if it's a rearrest study,
21    that person would have been rearrested and that
22    would count, whether he did it or not, as
23    recidivism.
24 Q  What you're saying is if there's context and it's
25    set in the context of the study, then it's clear,

Page 83

---

1  right?
2  A  If it's made clear in the study, sure.
3  Q  And when we're talking about Static-99 studies,
4     which only study official data, if someone says
5     someone has reoffended, why shouldn't that mean
6     reoffended within the context of the study?
7  A  Well, he uses the words to indicate what I'm using
8     them to mean in his own writings, in his own manual
9     he differentiates between that.  I mean that's not
10    really an argument or anything.  I mean you're a
11    very smart man but that's not a point that you can
12    prove.  He's made the difference, like he -- so what
13    we have to do at this point is my concern is talk
14    about the damage that has been done because of his
15    use of that.
16 Q  And why isn't the damage --
17 A  By and large, that reoffending -- I mean no one will
18    make the argument -- no one will make that argument.
19    I don't even think he would make that argument.
20 Q  Why isn't the damage equally done when people on
21    your side of the table refer to reoffending as if it
22    includes every allegation of an offense?  Isn't it
23    true that if someone is arrested, you count that as
24    a reoffense?
25        MR. JAMISON:  Objection, it's a

Page 84

---

                                     21 (Pages 81 to 84)

Darrel Turner
6/7/2023                                                        FIRM #8093

---

1    compound question.
2    A   That's also misrepresentative of what I said.
3        Reoffending is anything, whether we know about it or
4        not. I mean it's that simple. That's what
5        reoffending is. That's the definition if you look
6        it up.
7    BY MR. REINGOLD:
8    Q   All right. So someone who -- in your view, someone
9        who is alleged to have committed a crime, has not
10       been convicted, has not been proven beyond a
11       reasonable doubt that he did it, has reoffended?
12   A   No, you're making my point for me, that's the
13       problem. We're talking about reoffending as to
14       what's actually happening as opposed to other things
15       which are just a snapshot of someone that was
16       accused or did do it or got caught or got convicted.
17       That's a big difference. So you're making my point
18       for me. He's being confusing by his intermixing of
19       those where we need to call one thing what's red red
20       and what's blue blue.
21   Q   But Dr. Turner, when people who are advocating on
22       behalf of survivors talk about high recidivism --
23       not high recidivism rates, high rates of undetected
24       offending, part of what they're counting is offenses
25       that we have no idea who did it, if it actually

                          Page 85

---

1        occurred, if someone alleges an offense and it never
2        happened, it's still going to be counted as
3        reoffending, right?
4    A   Yes.
5    Q   And so there's an exaggeration going on in both
6        directions.
7    A   You know, I guess you and I are just going to have
8        to agree to disagree. I think my definitions are
9        very, very clear. I'm not talking about something
10       you can't prove or can't be proved or maybe it did
11       or didn't. I'm talking about something that
12       objectively, omnisciently did happen, those are
13       reoffenses. That is a person that committed
14       offenses, that got out and did something else. We
15       will never know about all of those but to say that
16       something that only studies things that ended in
17       arrest, charge or conviction is representative of
18       everything that happens is horribly misleading.
19   Q   Is it far be it for me to say that only the recorded
20       arrests, charges and convictions encompass the full
21       range of sexual offending? That's patent and
22       Dr. Hanson knows it and Dr. Letourneau knows it and
23       the Plaintiffs' lawyers know it.
24           But it's a fact that when people
25       count unknown offenses and unproven offenses,

                          Page 86

---

1        there's an escalation as to the actual number; isn't
2        that true? We don't know what the number is and
3        then people say here's a number because someone
4        alleged that something happened and we have no idea
5        if it did or not in many cases or in some cases.
6    A   Yeah, I agree with what you're saying. I think
7        we're saying the same thing.
8    Q   All right. Let's move on. And it's true that when
9        we don't have hard data like we have in use of the
10       Static-99, we wind up with quite wide variances in
11       the estimation of what's happening; isn't that
12       right?
13           MR. JAMISON: Objection, the question
14       is vague.
15   BY MR. REINGOLD:
16   Q   I'll make it clearer. In defense expert
17       Goodman-Williams' report, she cited articles, each
18       of which had a different figure for how many women
19       will report having been the victim of a serious
20       sexual assault and the range was from one in seven
21       to one in five to four out of five.
22   A   Okay.
23   Q   Isn't that what happens when we don't have data?
24           MR. JAMISON: Objection, lack of
25       foundation and the question is vague.

                          Page 87

---

1    A   I don't understand if she -- she is providing
2        data -- I'm thinking of data in terms of doing a
3        study. If she's interviewing and polling people,
4        then that is data, so I don't understand your
5        question, I'm sorry.
6    Q   Well, if the range of the data reported is from one
7        in seven to four out of five, that's like from, you
8        know, 13 percent or something to 80 percent. It
9        might be data but it doesn't do anybody any good,
10       right, we don't have a clue what the real answer is?
11           MR. JAMISON: Objection, misstates
12       the record.
13   A   I guess I would say I think some studies that are
14       done well do a better job of that than others.
15   BY MR. REINGOLD:
16   Q   And it also depends on the population that you're
17       interviewing or that you're surveying, right?
18   A   Of course, yes, sir, lots of variables.
19   Q   Yeah. And it also depends on how you define the
20       terms, what does sexual assault mean, something like
21       that, you need to know that?
22   A   Yes, sir.
23   Q   And you need to know the length of time that we're
24       looking at because that makes a huge difference?
25   A   Yes, sir.

                          Page 88

---

                                    22 (Pages 85 to 88)

Darrel Turner
6/7/2023

FIRM #8093

```
 1    Q   And unless you have all that information, the simple
 2        result from a survey doesn't get you very far,
 3        right?
 4    A   You know, sometimes it does and sometimes it
 5        doesn't.  It depends on all the variables that you
 6        just brought up.
 7    Q   Yeah.  And if the information is included in the
 8        study, we know a lot more, I would agree with that.
 9        Okay.
10            So let's take a look at the Static-99
11        itself.  It's true, isn't it, that it's an
12        actuarial-based instrument?
13    A   Yes.
14    Q   And what that means is it looks backward, right?
15    A   I didn't hear the end of what you said.
16    Q   I said it looks backward but if that's confusing,
17        I'll give an example, okay?
18    A   No, sir, I understand.  I literally didn't hear you
19        but I heard it fine.  Yes, sir, you're fine.
20    Q   So you agree it looks backward?
21    A   Yes, sir.
22    Q   And I always like to use the example of life
23        insurance because that's one that everybody knows
24        and it's easy to talk about and it's not as charged
25        as sexually offending.  So a good example of an
```

Page 89

```
 1        actuarial-type process is life insurance, right?
 2    A   Yes, sir.
 3    Q   And what it starts with is who died, yes?
 4    A   Yes, sir.
 5    Q   So what the insurance companies do is they start
 6        with large samples of dead people, yes?
 7    A   You know, I'm just going to agree with you.  I know
 8        what an actuarial is and I know that they use them
 9        at car insurance places but I don't know how they
10        work.  But I'll just say yes because you've been
11        pretty straight with me so far, so I'll take your
12        word for it.
13    Q   Well, what they're looking at is people who have
14        died and then they go backwards and try to find
15        statistically salient factors that correlate to
16        early, middle or late death because I mean that's
17        what life insurance is about, right?
18    A   Yes, sir.
19            MR. JAMISON:  I'm going to place a
20        standing objection on the record so I don't have to
21        object to every question, but Dr. Turner is not
22        qualified as an expert in life insurance or
23        actuarial tools related to life insurance and in
24        that area.
25            MR. REINGOLD:  I understand that.
```

Page 90

```
 1        I'm just trying to get some basic agreement on what
 2        it is that the Static-99 does and sometimes having
 3        an example makes that easier.
 4    BY MR. REINGOLD:
 5    Q   So if you're interested in life insurance and you
 6        want to figure out who's going to die early, who's
 7        going to die in the middle and who's going to die
 8        late so that you can set your rates accordingly,
 9        what you're looking for is the factors or features
10        that are associated with longevity or the lack of,
11        right?
12    A   Yes, sir.
13    Q   And then once you find those factors, you assign
14        weight to them in relation to how statistically
15        salient they are?
16    A   Yes, sir.
17    Q   And occasionally you might renorm the weighting of
18        those factors if there are discernible changes over
19        time?
20    A   Yes.  Yes, sir.
21    Q   And to do that, you need reliable data, you have to
22        actually know who died and you need reliable data on
23        the salient features, that is, a person's health
24        history, maybe their employment, criminal record,
25        stuff like that, so that you can find the salient
```

Page 91

```
 1        factors that influence or that correlate with early,
 2        middle or late death?
 3    A   Yes.
 4    Q   In the end what we're talking about is if someone's
 5        a smoker as opposed to a non-smoker and smoking is a
 6        salient feature, that's going to be one of the
 7        factors on the instrument that measures who's
 8        probably going to die early or not, right?
 9    A   Yes, sir, it's a factor analysis, yes, sir.
10    Q   All right.  But in the virtue of this kind of
11        method, what makes the method powerful is that it's
12        tied to scientific reality; is that fair to say?
13    A   Yes.
14    Q   That is, you're working backward and it's the data
15        that's telling you what are the salient factors,
16        it's not anybody's hunch or anybody's judgment?
17    A   Yes.
18    Q   And the only caveat when you get to the end of this
19        is that what you've got is this kind of data doesn't
20        tell you which individual person is going to die
21        early, middle or late, all it does is put them into
22        a risk pool of people who have the same factors or
23        the same score and it tells you what the pool --
24        what the risk is for that group of people, right?
25    A   Yes.
```

Page 92

23 (Pages 89 to 92)

Darrel Turner
6/7/2023                                                                    FIRM #8093

| | |
|---|---|
| 1  Q  All right.  And that's exactly how the Static-99<br>2     works, isn't it?<br>3  A  Yes.<br>4  Q  You start -- yes.  Okay.  So what you start with is<br>5     somebody, a population that have committed a sexual<br>6     offense and what you want to know is what are the<br>7     factors that correlate with sexual recidivism?<br>8  A  Yes.<br>9  Q  Okay.  So you do exactly the same thing, this is<br>10    what Hanson did, what Hanson and his colleagues did<br>11    in setting up the Static-99, fair to say, they look<br>12    at a whole range of factors statistically to see<br>13    what it is that most correlates to people who have a<br>14    new arrest or charge or conviction down the road,<br>15    right?<br>16  A  Yes.<br>17  Q  And then if you have that data, you can do<br>18    refinements of your statistical models and figure<br>19    out how much weight each of those gets, right?<br>20  A  Yes.<br>21  Q  And that's where we get the scale that is used to<br>22    tally the score when you're running a Static-99<br>23    test?<br>24  A  Yes.<br>25  Q  Okay.  And when we're done, what it tells us is the | 1     risk pool or the risk group that a person with a<br>2     certain score is associated with, right?<br>3  A  Right.<br>4  Q  It doesn't tell us which people in that pool are<br>5     actually going to reoffend because we can't know<br>6     that, right?<br>7  A  Right.<br>8  Q  And there's always going to be some variation no<br>9     matter how accurate the pools are; is that fair to<br>10    say?<br>11  A  Yes.<br>12  Q  Okay.  When you're scoring a Static-99, by<br>13    definition the factors or at least most of the<br>14    factors are static, that is, they're already --<br>15    they've already occurred in the person's life and<br>16    they aren't going to change; isn't that true?<br>17  A  Yes, sir.<br>18  Q  All right, let's take a look at them.  I might have<br>19    said earlier that your report was Exhibit 3 but I<br>20    think it was actually Exhibit 4 because this tally<br>21    sheet is Exhibit 3.  So if we can correct the record<br>22    in that regard.  So is this -- does this look like a<br>23    Static-99R tally sheet?<br>24  A  Yes, sir.<br>25  Q  And the kind of factors that we're looking at are |
| Page 93 | Page 94 |
| 1     over on the left and there's ten of them, right?<br>2  A  Yes, sir.<br>3  Q  And when you're doing a Static-99 scoring, what<br>4    you're basically doing is looking at each of the<br>5    factors and then you've got either a binary or a<br>6    slightly more than binary set of choices on the<br>7    right side and you select as to each of the choices,<br>8    right?<br>9  A  Yes, sir.<br>10  Q  And most of these are static because they happened<br>11    in the past and they can't change?<br>12  A  Yes, sir.<br>13  Q  And when we're done, the only one that changes,<br>14    actually, is the age at release from the index<br>15    offense and that's going to change because it<br>16    depends on when you get out, right?<br>17  A  Yes, sir.<br>18  Q  And when we're done, under the current scoring for<br>19    the Static-99R, we get five categories or risk pools<br>20    that people can fall into, low risk, below average<br>21    risk, average risk, above average risk and well<br>22    above average risk, right?<br>23  A  Yes, sir.<br>24  Q  And we can see statistically what the likelihood is<br>25    that people will reoffend in the first five years | 1     based on their Static score.  Have you seen this<br>2     sheet before?<br>3  A  I wouldn't say reoffend but I would say<br>4     recidivism.<br>5  Q  You're right, sorry, will recidivate.  Good catch.<br>6     But this is what it shows.<br>7  A  You used it perfectly earlier and so I thought all<br>8     right.<br>9  Q  No, no, I admire the effort.  All right.  But what<br>10    this shows is the risk range for people with<br>11    individual scores in the first -- in the first five<br>12    years after release, right?<br>13  A  Yes.<br>14  Q  Okay.  And it's a huge range, it means that people<br>15    who have the best score, the lowest risk score, the<br>16    day they get out, their range is .7 percent to two<br>17    percent, right?<br>18  A  Yes.<br>19  Q  And if we go to the other end, score of nine or<br>20    more, those people in the first five years are<br>21    likely to recidivate or have a risk of recidivating<br>22    at almost 23 percent to 37 percent?<br>23  A  Yes, sir.<br>24  Q  So what the instrument does and only thing that the<br>25    instrument does is tell us when someone who has a |
| Page 95 | Page 96 |

24 (Pages 93 to 96)

Darrel Turner
6/7/2023                                                                    FIRM #8093

| | |
|---|---|
| 1    sexual offense gets out, we can predict based on the | 1    to know whether or not it's normed for those |
| 2    risk pool that the score puts them into what their | 2    populations; is that true? |
| 3    risk of recidivating is for certain periods of | 3    A   Yes, sir. |

**Page 97**

1   sexual offense gets out, we can predict based on the
2   risk pool that the score puts them into what their
3   risk of recidivating is for certain periods of
4   time?
5   A   Yes.
6   Q   Can't do anything more?
7   A   Correct.
8   Q   Never could, never will?
9   A   Amen.
10  Q   If Hanson misspoke and used the word reoffending as
11      I did just now, it makes no sense because it can't
12      possibly produce or tell us anything about the risk
13      of undetected reoffending, right?
14  A   Right.
15  Q   And anybody who's an intelligent consumer of the
16      Static-99 knows that?
17  A   I don't agree with that statement.
18  Q   You think there are people that misunderstand?
19  A   Yes.
20  Q   But it's unlikely, don't you think, that researchers
21      in the field misunderstand?
22  A   No. Maybe researchers but less likely than
23      practitioners, I'll give you that, sure.
24  Q   It's also true, isn't it, that if the Static-99 is
25      going to be used for different populations, you have

**Page 97**

1   to know whether or not it's normed for those
2   populations; is that true?
3   A   Yes, sir.
4   Q   So for example, if law enforcement authorities or
5       Corrections people in Norway want to use the
6       Static-99, they can't be confident that the results
7       they get will be the same results that were normed
8       for Canadian and North American populations?
9   A   Agreed.
10  Q   So it would behoove them to then actually do a study
11      and figure out if the norming is similar enough that
12      A, it's reliable, B, it looks almost exactly like
13      North America or if it's more or less effective,
14      right?
15  A   Yes, sir.
16  Q   And then they can use it with confidence if it turns
17      out that it is; is that true?
18  A   Yes, sir.
19  Q   Okay. So another one of your objections -- let me
20      strike that. Hold on a second.
21          So one of the populations that it's
22      not normed for is women, right?
23  A   Right.
24  Q   And that's because, I gather, that there aren't
25      enough women sexual offenders to norm it for; is

**Page 98**

1       that your understanding?
2   A   Yes, sir.
3   Q   So it can't be used for women?
4   A   Right.
5   Q   And that means to the extent that there are women on
6       the -- within the population of everybody who's
7       committed a sex offense in Michigan, we don't
8       have -- we can't use the Static-99 to predict what
9       the recidivism rate is going to be?
10  A   Right.
11  Q   But we do know what recidivism rates for women are
12      generally, right, sexual recidivism rates for women
13      are generally?
14  A   I'm sure, yes.
15  Q   And you may not know but isn't it true that they are
16      the equivalent to the very lowest rates for men?
17  A   That's my understanding, yes, sir.
18  Q   And that means it's easily possible that all women
19      would be in the risk pool that would be the lowest
20      risk pool for men?
21  A   No, I wouldn't say all. I would never say that. I
22      would say most and prone to, yes, sir.
23  Q   All right, I'll agree with you on that. You might
24      find some rare exception and all overstates the
25      case. Again, I stand corrected. All right.

**Page 99**

1       You would -- there's another
2       population that within the United States it doesn't
3       match up with as well as it does for most other
4       people and that's Native Americans, right?
5   A   Right.
6   Q   And so when reporting Static-99 results of
7       recidivism to the extent that there are Native
8       Americans in the population being studied, it's
9       probably better practice to drop a footnote that
10      says as to Native Americans this may not be quite as
11      accurate as it is for the rest of the population?
12  A   Yes, sir.
13  Q   That would be what you -- what perfect science would
14      tell you?
15  A   Yes, sir.
16  Q   They would include it. Okay. You say that the
17      Static-99 -- another of your objections is that the
18      Static-99 isn't, to use your word, "normed" for
19      unofficial, unreported or undetected reoffending and
20      therefore "it cannot be generalized to sexual
21      reoffenses that are not reported or prosecuted."
22      That's on page 1 of your report. Is that
23      accurate?
24  A   Yes.
25  Q   Let's bring it back up just so we have it if we want

**Page 100**

25 (Pages 97 to 100)

Darrel Turner
6/7/2023

FIRM #8093

Page 101

```
 1    to look at it.
 2            THE WITNESS:  May I ask a question,
 3    Mr. Reingold?
 4            MR. REINGOLD:  Yes.
 5            THE WITNESS:  Just in trying to think
 6    about things, do you think that we'll take a lunch
 7    break and come back?  I don't know how much longer
 8    you think or -- just to get an idea of my schedule
 9    for the day.  I have to pick up my son.
10            MR. REINGOLD:  It took us a lot
11    longer to get through the C.V. than I expected and
12    so I still have a ways to go.  Maybe we'll do a
13    lunch break, like half-hour at 1:30 if we need to,
14    okay?
15            THE WITNESS:  Okay, thank you.
16    Q    So what I just said was that you -- I want to make
17    sure I understood what you said because I'm not sure
18    that I did.  So hold on just a sec.
19            THE WITNESS:  You know what, while
20    there's a bit of a pause, if we're going to take a
21    lunch break in a half-hour, can we take like a
22    five-minute restroom break right now?
23            MR. REINGOLD:  Sure.
24            THE WITNESS:  Thank you very much.
25            MR. REINGOLD:  See you in a few.
```

Page 102

```
 1            (A break was taken at 12:50 p.m.)
 2                    - - -
 3            (Record resumed at 12:54 p.m.)
 4    BY MR. REINGOLD:
 5    Q    Let's pick up where we just left off.  I had just
 6    asked about something you said on page 1 of your
 7    report.  You said "The Static-99 isn't normed for
 8    unofficial, unreported or undetected reoffending and
 9    therefore, it cannot be generalized to sexual
10    reoffenses that are not reported or prosecuted."  Is
11    that a fair summary of your position?
12    A    Yes.
13    Q    Okay.  When you say that, it isn't clear to me if
14    you're talking about the actual factors chosen, that
15    is the ten listed categories on the Static-99 and
16    the weight given to them, or if you're talking only
17    about the recidivism rates that the Static-99
18    generates.
19    A    I'm talking about both of those factors.
20    Q    So as to the second, you're saying the factors that
21    are on average five year, whatever, seven or nine or
22    whatever, you know, percent recidivism rate, that
23    that can't be -- that doesn't work for reoffending,
24    we don't know, right?
25    A    Right.
```

Page 103

```
 1    Q    Okay.  So there's no disagreement about that.  But I
 2    had questions about the first part.  It seems to me
 3    if we're not looking at the recidivism rates but
 4    only at the chosen most salient factors themselves,
 5    isn't it true that those factors and the weight
 6    given to them should be the same both for officially
 7    detected future crime, that is, recidivism and for
 8    unofficial, undetected future crime?  Shouldn't the
 9    risk factors that are salient be the same for
10    both?
11    A    No, sir, and I'm glad you brought that up because
12    that's really the crux of what my issues with the
13    Static are.
14    Q    Well, I'm having trouble understanding it but let me
15    ask another question.  It's fair to say that we
16    can't know anything about the unofficial,
17    unreported, undetected crime because for the most
18    part, we don't know who committed it, what the crime
19    was or what salient factors the perpetrator might
20    have had, right?
21    A    Right.
22    Q    So we're never going to be able to get a Static-99
23    type instrument for undetected crime, I mean that's
24    not possible?
25    A    Right.
```

Page 104

```
 1    Q    But if someone committed a sex crime and was given
 2    the Static-99 and scored in a high risk pool for
 3    officially detected recidivism, isn't it fair to say
 4    he should likewise be viewed as high risk for future
 5    undetected reoffending or offending?
 6            MR. JAMISON:  Object, the question is
 7    vague.
 8            MR. REINGOLD:  You can answer.
 9    A    I feel like I understand the question you're asking
10    but may I try to just give a brief answer that will
11    clear it up?
12    Q    Let me ask one other question first and see if we --
13    if we really have a disagreement or not.
14            It just seems to me that if someone
15    scores in a high risk pool based on the Static-99
16    factors, that's going to predict his future risk
17    whether the ultimate crime is detected or not.  Do
18    you disagree with that?
19    A    I think I disagree with that, yes, sir, because I
20    think that there's an issue of confounding variables
21    and I think that what the Static-99 is measuring is
22    what type of sex offenses are most likely to be
23    brought to the attention of law enforcement and
24    result in some kind of arrest, charge or conviction,
25    not what types of reoffending is going on.
```

26 (Pages 101 to 104)

Darrel Turner
6/7/2023

FIRM #8093

```
 1          So I think we're looking at things --
 2    I think we're looking at certain variables that
 3    speak to which sex offenses, subsequent sex offenses
 4    are most likely to be detected legally and
 5    sanctioned and which are just going to happen, and I
 6    think that that's looking at two different things
 7    and I think the questions on the Static are
 8    brilliant for getting at hey, which guys are more
 9    likely to end up back in prison for sex offending.
10    There is nothing better out there for it and
11    probably will never be.
12          But to generalize and say that these
13    specific things are risk factors for all offending,
14    I think that's a stretch and a leap that has been
15    made that shouldn't have been made and it's causing
16    confusion in the field.
17 Q  But isn't it true that all offending starts out as
18    officially unreported and undetected?
19 A  Yes, of course, by definition.
20 Q  And only after a period of time, whether it's
21    minutes, hours, you know, months or years does it
22    become officially reported and detected?
23 A  Yes.
24 Q  And I think it's true that nothing about the
25    perpetrator or the crime changes in its movement
```

Page 105

```
 1    from undetection to detection?
 2 A  Right. Yes. The offense as it goes.
 3 Q  I mean the only difference between undetected and
 4    detected crime is that it's come to the attention of
 5    law enforcement, right?
 6 A  And that has led to an arrest, if we're talking
 7    about the difference in reoffending.
 8 Q  No, no, I meant that -- you're right. I mean again,
 9    you're correct and maybe inappropriately so and yes,
10    that has led to an arrest.
11 A  And Mr. Reingold, the only reason I called that to
12    attention is because, you know, this sort of funnel
13    effect of offenses that happened, offenses that we
14    know about, offenses that are just told to family,
15    offenses that are told to law enforcement and then
16    offenses that are told to law enforcement that lead
17    to an arrest, and that's where we're starting to say
18    this is how much sexual reoffending is going on and
19    we're ignoring all of that, so that's the only
20    reason I bring that up.
21 Q  Yes. But someone on my side of the table would say
22    when you focus down that way, you're understating
23    the actual -- the true risk because you're not
24    taking into account all of the people who look like
25    the full pool of people on the registry, right?
```

Page 106

```
 1          I mean we know, for example, that
 2    only 12 percent of offenders are stranger danger
 3    cases, right?
 4 A  Right. I'm not seeing -- I didn't make the leap
 5    with you there. I'm sorry.
 6 Q  Well, those are the ones who are most likely to be
 7    reported, right?
 8 A  Yes. Yes.
 9 Q  And yet they're a small percentage, ten, 12 percent
10    of all people on the registry?
11 A  Right.
12 Q  So the effect works in both directions is what I'm
13    trying to say.
14 A  But you know, another argument to that is that
15    you're not only looking at -- and this is a point I
16    hope I made in my report well, but you're not only
17    looking at the confounding variable of what's going
18    to get reported to law enforcement but you're
19    looking at the confounding variable of what is going
20    to be followed up with by law enforcement, what is
21    going to be -- you know, what is going to lead them
22    to do that, and I think some of the variables on the
23    Static may be getting at that more so and I think
24    one of those -- and I'm in the process of searching
25    and reviewing it because as I said, some colleagues
```

Page 107

```
 1    of mine are working on something but what types of
 2    crimes are most likely to be followed up and taken
 3    seriously by law enforcement, is it stranger crimes
 4    versus incest crimes, is it male victims versus non.
 5          So it just opens up a whole barrel of
 6    questions that I don't even think Dr. Hanson, all
 7    due respect, has answered but we're allowing this
 8    instrument to just represent all kind of things that
 9    could potentially be very misleading and inaccurate.
10 Q  But the instrument itself doesn't claim any of that,
11    right? I mean all it does is it's just based on the
12    actuarial data, right? It's based on here's the
13    recidivism and looking backward, these are the
14    features and beyond that, we can't know anything,
15    right?
16 A  Right.
17 Q  And as to the undetected offending, it may be
18    steered this way, it may be steered that way but
19    there's nothing even remotely similar to the ability
20    of the Static-99 to tell us here's one thing we know
21    for sure as opposed to here's a thousand other
22    variables that we know nothing about?
23 A  Right. I agree and I think that's what the Static
24    is great at is --
25 Q  All right.
```

Page 108

27 (Pages 105 to 108)

Darrel Turner
6/7/2023

FIRM #8093

| | |
|---|---|

1    A    That's what it does.
2    Q    I mean the only difference between undetected and
3    detected crime is that it's come to the attention of
4    law enforcement in the form of an arrest, I mean
5    that's what we say?
6    A    Yes, sir.  If we're comparing recidivism to
7    reoffending, then yes, sir, that would be -- arrest
8    would be the first way into that.
9    Q    And if every crime that becomes a recidivism was
10   once an undetected crime, then by definition doesn't
11   the likelihood that a person with a sex offense --
12   doesn't the risk of a person with a sex offense of
13   committing an undetected crime or a detected crime,
14   shouldn't the risk be the same?
15   A    No, not at all.
16   Q    All right.
17   A    Because again, it's one of those things that they
18   don't necessarily overlap both ways.  All subsequent
19   detected crimes started out as undetected crimes but
20   not all undetected crimes share any space in space
21   time with those that were detected.  So you can't
22   relate the two.
23   Q    So you're saying it would only predict the risk of
24   undetected offenses that become detected offenses?
25   A    Of course.

Page 109

1    Q    And undetected offenses become detected offenses in
2    a million different ways?
3    A    I agree with that.
4    Q    All right.  I take it from what you've said that to
5    the extent you'd quarrel with this at all, you
6    wouldn't be saying the Static-99 risk pools, the one
7    through five bear no correlation to the risk that
8    someone will reoffend or recidivate, all you're
9    saying is that there might be some imperfections?
10   A    Yes.
11   Q    There's no magical influence out there that would
12   suggest that crimes that turn from undetected to
13   detected have unique characteristics different from
14   the ones that stay undetected for a long period of
15   time or forever?
16   A    I don't know.  That's part of the -- that's part of
17   what I'm looking at, what makes a sex offense
18   especially go undetected.  I think there may be some
19   information there and that's what I'm looking for in
20   the literature.  So I don't necessarily agree with
21   that, no.
22   Q    Since the most serious crimes, the ones by
23   strangers, you know, forceful rapes, rapes with
24   physical injury, you agree that those are the ones
25   that are more likely to be reported than sexual

Page 110

1    assaults by known assailants without force, without
2    physical injury and so on?
3    A    Yes.
4    Q    Isn't it fair to say then that if anything, the
5    official detection rate is likely to be higher for
6    people with past sexual offense arrests, charges or
7    convictions?
8    A    I don't understand that connection.
9    Q    What I mean is that if somebody has a past sexual
10   offense conviction and the cops are looking for a
11   perpetrator and there's three suspects and one of
12   them has an arrest, charge or conviction, isn't that
13   person likely to get more police attention than the
14   other two?
15   A    That makes sense.
16   Q    And that means there would be a higher chance of a
17   new arrest, charge or conviction even if it turns
18   out to be wrong?
19   A    I don't necessarily know that.  I don't know if
20   you're citing research or just asking for common
21   sense, but I don't know what research says about
22   that.
23   Q    Well, defense expert Goodman-Williams said we should
24   expect anyone with a prior arrest or charge to get
25   extra law enforcement attention and even more so for

Page 111

1    someone with a prior sex offense conviction.  Are
2    you disagreeing with her?
3    A    No, but I'm asking if she's -- she said attention
4    and then you extrapolated that to mean arrest and
5    whatnot and that's where I stopped and said well, I
6    need to see some data for that.  But her saying that
7    they get attention, that's why I said that sounds
8    very reasonable.
9    Q    It's also true, isn't it, that -- and I alluded to
10   this before, that whenever you use officially
11   detected reoffending to include arrests and charges,
12   it means there's some overcounting that's going on
13   in the sense that -- if we're looking at actual
14   culpability?
15   A    Are you referring to the fact that some people are
16   falsely arrested and falsely charged?
17   Q    Yes.
18   A    Yes, I would agree with that, that that happens but
19   on a far, far, far statistically less significant
20   scale than going undetected or unconvicted for an
21   offense, but yes, it does happen.
22   Q    And lots of those don't go -- you know, there might
23   be an arrest and it doesn't go further simply
24   because there's not enough evidence to go forward
25   with the case, right?

Page 112

28 (Pages 109 to 112)

Darrel Turner
6/7/2023

FIRM #8093

---

**Page 113**

1    A   Sometimes, yes, sir.
2    Q   In fact, a lot of them do that; isn't that true?
3    A   It happens sometimes. There's lots of reasons that
4        that happens, sure.
5    Q   But you're the one who's saying it's a tough road to
6        get from accusation to conviction, right?
7    A   I don't think I ever said it was a tough road. I
8        said there's just places where statistically things
9        plateau because you're not progressing from one tier
10       to the next.
11   Q   But your report said something like only three
12       percent of cases that --
13   A   Right.
14   Q   -- come to the attention wind up with a conviction,
15       right?
16   A   No, no, no. No, sir, not -- no, sir.
17   Q   Clarify for me. Sorry.
18              MR. JAMISON: Paul, can you point him
19       to that section of his report that you're referring
20       to?
21              MR. REINGOLD: I might be able to.
22   A   We're talking about all offenses, undetected
23       offenses and detected offenses, and then we're
24       talking about what percentage of those result in a
25       conviction and it's actually around 1.3, 1.4

---

**Page 114**

1        percent. So that's what I'm talking about there.
2        But what I mean is that --
3    BY MR. REINGOLD:
4    Q   No, I just want to clarify that. I thought you were
5        talking about three percent of the reported cases.
6    A   No, sir.
7    Q   All right, that was not clear to me.
8    A   Yeah.
9    Q   All right. Of the reported cases, do you know what
10       percent gets to conviction?
11   A   I do. But not -- I don't have it in front of me.
12       But there's a tier, it's reported to law
13       enforcement, it's arrested and charged, it's gone
14       through the D.A., it's resulted in -- you know, it
15       hasn't been argued down to a non-sexual offense or
16       something and it results in a very small percentage
17       but I don't remember that exact percentage. I'm
18       sorry.
19   Q   And unless or until we get to beyond a reasonable
20       doubt, at least in our system of justice, people who
21       don't get there are considered not to have committed
22       the crime, right?
23   A   Right.
24   Q   All right, let's -- I just want to take a short look
25       at your APOD article. Is that okay?

---

**Page 115**

1    A   Of course.
2    Q   Let me first -- let's see. All right, this is
3        Exhibit 6, which is Analysis of Patterns of Denial
4        on Males Accused of Sexual Offending. So correct me
5        if I'm wrong but essentially here you created an
6        instrument that in some respects is similar to the
7        99, to the Static-99; is that right?
8    A   In a statistical sense to some degree, yes, sir. In
9        the analysis of it. Sorry.
10   Q   Yeah. And what you've done is you've got a
11       12-factor scale to identify if a suspect's pattern
12       of denial as to committing a crime matches patterns
13       of other known or accused offenders, right?
14   A   Yes, sir.
15   Q   And as I understand it, because of your law
16       enforcement connections, you had access to data that
17       almost no one else was likely to get?
18   A   Right.
19   Q   And that included recorded interviews of three kinds
20       of people, there were those who denied some or all
21       culpability but were later convicted and believed in
22       fact to be guilty?
23   A   Yes, sir.
24   Q   And there were those who admitted most or all
25       culpability and were later convicted and are

---

**Page 116**

1        believed to have been actually guilty?
2    A   Yes, sir.
3    Q   And the third was those who denied all culpability
4        and were later exonerated, whether pre or post
5        conviction, and they were exonerated because there
6        was very strong proof, either DNA or somebody else's
7        confession or videotape, and they are believed to be
8        actually innocent, right?
9    A   Yes, sir.
10   Q   So your shorthand terms were guilt deniers, guilt
11       admitters and falsely accused folks?
12   A   Yes, sir.
13   Q   And what you were doing was especially useful
14       because when the recorded interviews were taken, we
15       didn't know what the people's status was, right?
16   A   Correct.
17   Q   We only find that out later. And the interviews
18       were real, this was cops interviewing real
19       perpetrators in various stages of denial or
20       admission?
21   A   Yes, sir.
22   Q   And you looked at that and kind of did not
23       statistically but sort of statistically what are the
24       factors in the speech patterns of these people that
25       appeared to be most significant once we know which

---

29 (Pages 113 to 116)

Darrel Turner
6/7/2023                                                        FIRM #8093

| | |
|---|---|
| 1   group they're actually in, right? | 1   A   Yes, sir, it's based on a statistical analysis of |
| 2   A   Sure.  Right. | 2       three but it's comparing to -- it's fine, yeah. |
| 3   Q   And the scale was an interesting one.  You've got a | 3       Everything you said has been fine.  I'm sorry. |
| 4       bunch of different things and most of it has to do | 4   Q   And when you use the scale like this, again kind of |
| 5       with faits that the person may use to turn the | 5       like the Static-99, you can't be sure that this |
| 6       conversation or, you know, blaming another person, | 6       particular suspect is in fact lying or telling the |
| 7       degrading the victim, claiming to be uninterested in | 7       truth, right, it's more putting them into a risk |
| 8       sex, all of those kinds of things, and what you're | 8       pool that their likelihood is increased if they -- |
| 9       able to do with that is then create a tool that says | 9       of guilt if they show these features and their |
| 10      here are some factors and if you're seeing these, it | 10      likelihood of guilt is decreased if they don't? |
| 11      can help you to determine whether somebody is in | 11  A   Yes, sir, in terms of comparative analysis to the |
| 12      group one, group two or group three or really groups | 12      two groups, yes, sir. |
| 13      one or two or group three; is that right? | 13  Q   Yeah.  Okay.  And the reason you can't tell if it's |
| 14  A   Yes, sir.  And group two was primarily for the | 14      this suspect individually is because for example, it |
| 15      statistical analysis, which were robust.  You said | 15      might be a nervous nelly, it be might be somebody |
| 16      that it wasn't really statistically shown but it was | 16      who's guilty of something else and so feels the need |
| 17      in fact, but that is just shown for an additional | 17      to deny everything, those kinds of problems, right? |
| 18      measuring point, but what the scale actually | 18  A   And no instrument is perfect and I'm just having -- |
| 19      differentiates between is people who are responding | 19      recommending that people use it as a tool just to |
| 20      in a manner that would indicate, you know, denial | 20      kind of check their own reaction to things, but by |
| 21      about something that actually happened versus people | 21      no means intend it be anything that a decision to |
| 22      that are denying something that truly didn't | 22      prosecute or anything is based on. |
| 23      happen. | 23  Q   Right.  And even if it's something that wasn't out |
| 24  Q   Yeah, okay.  So it's really one and three that | 24      there and that's a new tool in law enforcement's |
| 25      you're measuring? | 25      toolbox to help them assess suspects who are willing |
| Page 117 | Page 118 |
| 1       to be interviewed about their connection to a | 1       against, as you said, different kinds of |
| 2       crime? | 2       populations, you know, does it work as well for |
| 3   A   Yes, sir. | 3       blacks as for whites, Norwegians as for Americans, |
| 4   Q   It's different from the Static-99 in that it doesn't | 4       that sort of thing, you can figure that out? |
| 5       rely on any officially recorded hard data, the | 5   A   Right. |
| 6       equivalent of arrests, charges or convictions, | 6   Q   And for yours, it's much harder to do that because |
| 7       right? | 7       you're actually not going to get the real answer as |
| 8   A   Correct.  Correct. | 8       to who is what, you know, you may never know or if |
| 9   Q   All right.  There's nothing comparable to the | 9       you get the answer, it might not be in 25 years out |
| 10      observed rates that we have with the Static-99? | 10      when they're exonerated, right? |
| 11  A   Right. | 11  A   Right.  The only thing you could do to expedite that |
| 12  Q   So it's based on watching the interviews and having | 12      would be a validation study where someone would have |
| 13      grad students or other trained observers record the | 13      access to their own interviews and they would have |
| 14      patterns and they get reduced to the 12 features and | 14      people code them blind like I had my researchers do |
| 15      again, you can have people scoring each interview in | 15      and put out a study saying hey, here's our sample |
| 16      comparison to those 12 features, right? | 16      and here's how well it works with this sample and |
| 17  A   Yes, sir. | 17      that's actually in the process of being done by |
| 18  Q   The hardest thing about your study is that it's hard | 18      another organization right now. |
| 19      to validate, right?  I mean the great thing about | 19  Q   Yeah.  That would be a great way to do it.  But what |
| 20      things like the Static-99 is non-developers can go | 20      I'm saying is what sets the Static-99 apart and |
| 21      out and run the same kind of study in a different | 21      makes it so useful is that it can be validated to |
| 22      location, different pool, everything else and get | 22      different populations, it could be replicated, even |
| 23      validation, yes? | 23      the same study can be done again and again and it |
| 24  A   Right. | 24      has been, right? |
| 25  Q   And in a different -- in addition, you can norm it | 25  A   Right, but you could do that with the APOD as well, |
| Page 119 | Page 120 |

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023                                                          FIRM #8093

---

1    you can find normative data on females or juveniles
2    or you can norm it on non-sexual offenses.  That
3    could be done as well though granted you'd have to
4    have access to that data and it's much more easy to
5    get access to the type of data that Dr. Hanson and
6    his colleagues have used and the people that
7    revalidate that instrument have used.
8  Q  All right.  It's also true that in the APOD article,
9    you at least paid a little bit of attention to
10   polygraphs, right?
11  A  Right.
12  Q  And you noted that, and I've highlighted here,
13   "While polygraphs certainly are very useful as an
14   interview tool, it's not a crystal ball and cannot
15   reveal to the examiner precisely what the nature of
16   a lie might be, thus calling a polygraph machine a
17   lie detector is somewhat of a misnomer and one that
18   can be somewhat of a disservice to the field."  Did
19   I read that accurately?
20  A  Yes, sir.
21  Q  And you also say -- or you cite the National Academy
22   of Sciences 2002 which reports a validity finding of
23   a polygraph of 61 percent, right?
24  A  Yes, sir.
25  Q  And that's just a little bit over the level of

Page 121

---

1    chance, right?
2  A  Correct.
3  Q  And you note that only 18 of the United States allow
4    the admission of polygraph evidence?
5  A  Yes.
6  Q  Which means that the studies that use a polygraph to
7    try to get a feel for or to estimate the number of
8    undetected past sexual offenses of very high risk
9    offenders, like serially convicted offenders in
10   maximum security prisons or people in mental
11   hospitals, we shouldn't take the lie detector
12   results certainly as gospel, right?
13  A  Correct.
14  Q  In fact, it's fair to say they're just a little bit
15   over chance?
16  A  Well, that was -- you know, that was one study.
17   There have been other studies that put it up around
18   .7 and 80 percentage but, you know, I was just
19   pointing out the fact that we don't -- that we're
20   still in the process of a field of putting things
21   together to help us in this area.
22  Q  Right.  And of the 22 states -- or 32 states that
23   don't allow the admission of a polygraph, that's
24   because they think it doesn't meet the standards of
25   what the law sets for what can be used in court?

Page 122

---

1  A  Yes, sir.
2         MR. JAMISON:  Objection, lack of
3    foundation.
4  BY MR. REINGOLD:
5  Q  Lastly in this article, again I think back on the
6    first page, you said that --
7         MR. JAMISON:  Can you share what
8    you're looking at because if you're --
9         MR. REINGOLD:  I thought I was.  Oh,
10   gosh.
11        MR. JAMISON:  If you're asking
12   questions, he needs to --
13        MR. REINGOLD:  No, no, I apologize.
14   I've done that many times and I'm sorry.  Hold on a
15   second.  Now I'm -- now I lost my full screen, so
16   I -- total apologies.  I was rolling it up.  Is
17   everybody here or not?
18        MR. JAMISON:  Yeah, Dr. Turner
19   stepped away for a minute.  Looks like you're on
20   Exhibit 6 now, right?
21        MR. REINGOLD:  Yeah.  We'll wait.
22   Yes, sorry.  The problem for me is that I have a
23   left screen where I'm putting the document up and
24   the share screen is in my lower right on the other
25   screen, and so I say here it is, take a look at it

Page 123

---

1    and then I don't hit the share screen.  So yes, all
2    the quotes, I had them highlighted and I thought you
3    were all seeing them.
4  A  I just know the vertical like it's my child, so as
5    soon as you said it, I recognized it.
6  BY MR. REINGOLD:
7  Q  Yes, you were there.  So one of the things you say
8    is "Despite the somewhat instinctive belief that
9    denial of sexual offending must speak to an
10   increased risk of reoffending, meta-analytic studies
11   by Hanson and Morton-Borgoun (2005) indicate no
12   significant rate relationship between the two."  Did
13   I read that accurately?
14  A  Yes, sir.
15  Q  So in effect, what you're saying there is that even
16   though we all might expect that people who deny
17   having committed a crime that we later figure out,
18   you know, they in fact committed, we would expect
19   them to have higher rates of reoffending, right?  It
20   would feel like part of their personality trait,
21   right?
22  A  Yes, sir.
23  Q  But when people who know what they're doing, people
24   like Hanson actually go out and measure it, it turns
25   out not to be true, right, that's what happened

Page 124

---

31 (Pages 121 to 124)

Darrel Turner
6/7/2023                                                    FIRM #8093

1   here?
2   A   Right.
3   Q   And again, what I'm trying to make the point of,
4       isn't this precisely the virtue of research that's
5       based on reliable hard data, that is, some of the
6       things that we assume to be true and that seem
7       perfectly self-evident turn out not to be supported
8       by research science?
9   A   That in general is true here. The rest of the
10      paragraph, I talk about why I think there's a
11      problem with that research finding. But in general,
12      yes, there are things that we might assume to be
13      true as humans that, you know, we're shocked to find
14      out across research studies are not true. That's
15      the core of social psychology, yes, sir.
16  Q   And that's like the earth is flat and the sun
17      circles the earth?
18  A   Yes, sir.
19  Q   And I have the sense that -- and this might be my
20      own bias, but I have the sense that because you've
21      spent most of your time around the most serious and
22      violent sexual offenders that you have this kind of
23      intuitive feel that detected recidivism is
24      especially low compared to undetected reoffending
25      rates of the worst offenders whom you know. That

Page 125

1   might not be a fair criticism but it can feel that
2   way from someone like me listening to you.
3       Instead, if you look at all people
4   convicted of sexual offenses, isn't it true that the
5   majority -- I told you, I don't know if you know it,
6   but I said from our data, it shows the majority of
7   whom every year are convicted of lower level crimes,
8   it's true, isn't it, that it turns out that most of
9   the full population of sex offenders are never
10  arrested, charge or convicted of another sexual
11  offense?
12  A   Yes. That was a really loaded question, though.
13      You said something that you think I believed and
14      then you asked me a couple of questions, so...
15          MR. JAMISON: I was going to say
16      Paul, you -- I mean for purposes of clarity, that
17      was a compound -- or objection, that's a compound
18      question, it was sort of a leading question. To
19      have a clear transcript, I'd just ask you to ask
20      concise questions.
21          MR. REINGOLD: You're right. I was
22      trying to set the context so that my question would
23      make sense to you, that's all.
24  A   I'm aware of that. I don't think you were being
25      slippery. I think that I just lost my ability to

Page 126

1   follow the connection and I'm sorry.
2   BY MR. REINGOLD:
3   Q   And even though most sexual offenders are never
4       going to be arrested, charged or convicted of
5       another offense, that doesn't mean that some and
6       especially the most violent, predatory, stranger
7       danger type felons may be serially offending at high
8       rates and getting away with it?
9   A   Yes, sir.
10          MR. JAMISON: Paul, we talked about
11      taking a break sometime around 1:30. Is this a
12      logical point to --
13          MR. REINGOLD: Yeah, let's take half
14      an hour here and the second part will go faster,
15      okay?
16          MR. JAMISON: Do you have an idea of
17      how much longer you have to go?
18          MR. REINGOLD: Let's see. If we come
19      back at 2, I think we have a hope for 2 -- for 3.
20          MR. JAMISON: So it will be done by 3
21      potentially?
22          MR. REINGOLD: Potentially. I'll do
23      what I can, okay?
24          MR. JAMISON: Okay.
25          MR. REINGOLD: All right. Did you

Page 127

1   want to make lunch break shorter? We can do 20
2   minutes.
3       THE WITNESS: Yeah, I can do that. I
4   don't need a lot of time.
5       MR. REINGOLD: Let's do that.
6   (A break was taken at 1:33 p.m.)
7       - - -
8   (Record resumed at 2:02 p.m.)
9   BY MR. REINGOLD:
10  Q   Let's pick up back on the record. I had made a
11      point about the utility of research and there's
12      another one that relates to that. It's true,
13      Dr. Turner, that one of the things that Hanson's
14      become known for in the last seven or eight years is
15      the idea that if sex offenders are released into the
16      community and don't recidivate, that their risk
17      level drops, I think, way more even than he
18      expected. Are you aware of that research?
19  A   Yes.
20  Q   It's what he calls the time free in the community
21      calculation; is that right?
22  A   Yes, sir.
23  Q   All right. And since you understand it, I'm looking
24      for places to cut here. I won't go into great
25      detail but basically if you have somebody who scores

Page 128

32 (Pages 125 to 128)

Darrel Turner
6/7/2023                                                      FIRM #8093

| | |
|---|---|
| 1    at a ten percent risk of recidivating within five | 1    conviction.  Is that your understanding? |
| 2    years, for each five years that that person is out | 2  A   Yes. |
| 3    and does not recidivate, I'm using your words, the | 3  Q   And you've criticized his report when he gave -- |
| 4    risk that they find drops at 50 percent for every | 4    when he was talking about this and used the examples |
| 5    five years.  So is that your understanding? | 5    for not taking into account the age of the people |
| 6  A   Yes, sir.  I need to reclose my office door.  I'm so | 6    being released, that is, you said at page 8 -- and |
| 7    sorry. | 7    I'll pull it back up.  Let me screen share.  Let's |
| 8  Q   That's okay. | 8    see. |
| 9  A   I'm not even going to mute.  Just one second. | 9         You criticized him that the estimate |
| 10 Q   Okay. | 10    of lifetime rates was misleading because there are |
| 11 A   Okay, sorry.  Excuse me. | 11    material differences between someone released 20 |
| 12 Q   Sure.  So what it means is if a person started at | 12    years out who was 20 and someone released 20 years |
| 13    ten percent, then at the end of five years, their | 13    out who was 55.  Is that accurate? |
| 14    risk rate would be down to five percent and at the | 14 A   Right. |
| 15    end of ten years, they'd be down to two and a half | 15 Q   Okay.  And I think he thought and I as a reader |
| 16    percent.  Is that your understanding of what he's | 16    thought you were suggesting that the person released |
| 17    saying? | 17    at age 20 would be more likely to be alive and in |
| 18 A   Yes, sir. | 18    good health 20 years later than the individual |
| 19 Q   And the result is that at some point, all offenders | 19    released at age 55 who at that point is now going to |
| 20    will eventually reach a risk level that's | 20    be 75, right? |
| 21    indistinguishable from two other groups who are not | 21 A   Right. |
| 22    on the registry and those are A, males in the | 22 Q   And that's based on the well-known statistical |
| 23    general population and B, people who committed | 23    studies across all crimes that people age out over |
| 24    non-sex offenses but not -- they had a non-sex | 24    time, that is, the older you get, at some point the |
| 25    offense conviction but not a sexual offense | 25    less likely you are to reoffend? |
| Page 129 | Page 130 |

| | |
|---|---|
| 1  A   Yes. | 1    that although younger individuals are higher risk |
| 2  Q   And I think you were saying that there would be a | 2    than older individuals at the time of release, what |
| 3    material difference between the 40-year-old and the | 3    their study found was that the pattern of release |
| 4    75-year-old which Hanson was not taking into | 4    was the same, that is, after 20 years of detected, |
| 5    account.  Is that what your criticism was intended | 5    you know, offense-free living, the likelihood of a |
| 6    to do? | 6    new sexual offense was as small for the individuals |
| 7  A   No, sir. | 7    who were released when they were 20 as it was for |
| 8  Q   All right.  I think that's how he read it and that's | 8    the individuals who were released when they were |
| 9    how I read it.  If that's not right, tell me what | 9    55? |
| 10    your intention was.  What were you criticizing? | 10 A   No, sir, I did not misunderstand that and that's |
| 11 A   It's close to what you said but it's taking what you | 11    wherein the issue was. |
| 12    said and identifying that as a confounding variable | 12 Q   So the point you're making then is that there's no |
| 13    and then explaining why.  So I won't repeat | 13    such thing as lifetime -- zero lifetime recidivism; |
| 14    everything that you just said because everything you | 14    is that right? |
| 15    just said is of course true, you're just doing math, | 15 A   No, sir, that's not right. |
| 16    but the idea is that the use of the term lifelong -- | 16 Q   All right, you need to tell me then. |
| 17 Q   No, no, we're going to get to there in a minute. | 17 A   I'm sorry? |
| 18    Let me get to there in a minute.  All I want to know | 18 Q   I said can you explain what your objection was? |
| 19    is is it fair to say that your view was that the | 19 A   Yes.  First of all, lifelong is arbitrary and I |
| 20    55-year-old could still be dangerous where the | 20    think it denotes in the layperson lifelong meaning |
| 21    75-year-old would not or would have a higher risk? | 21    lifelong, so I think that it's -- I think Dr. Hanson |
| 22 A   No, sir, that's not what I'm referring to. | 22    has a lot of stroke and people listen to what he |
| 23 Q   Okay.  The reason that I ask is because he thought | 23    says and I think he needs to be careful when he |
| 24    that you might have misunderstood what he was saying | 24    assigns terms like low, average, high, moderate, |
| 25    because it turns out that younger individuals -- | 25    lifelong to graphs and charts and that why don't we |
| Page 131 | Page 132 |

33 (Pages 129 to 132)

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023                                                          FIRM #8093

| | |
|---|---|
| 1    just call it 20 years because someone who gets out | 1    don't quibble then with his point that the |
| 2    of prison at 38 years old is very different from | 2    recidivism rate at the end of 20 years will be |
| 3    someone that gets out of prison at 78 years old just | 3    comparable to or even lower than the detected rate |
| 4    in terms of how much time they have in which they | 4    of sexual offending in the male population or in the |
| 5    could potentially reoffend, and for them all to get | 5    population of people who committed a previous |
| 6    lumped into a group of 20 years and call that | 6    offense but not a sex offense? |
| 7    lifelong, so you might be considering 38-year-olds | 7  A  Right. |
| 8    as already having shown, you know, so to speak, or | 8  Q  And so then the question is and the question, I |
| 9    representing a level of risk and you could be | 9    think, that's the core of this case, at least for |
| 10   comparing that to someone that, you know, doesn't | 10   the Plaintiffs, is the idea that we put and keep |
| 11   have that long or has more health problems. | 11   people on registries when their risk of |
| 12              There's just a lot of confounding | 12   reoffending -- sorry, recidivating is the same as or |
| 13   variables again, just a lot of other things that I | 13   lower than vast numbers of people in the community |
| 14   think could be explaining some of these things that | 14   who have exactly the same statistical risk.  Do you |
| 15   we're seeing in research and it all boils back to me | 15   understand that's why we would view that as a |
| 16   to the fact that we're dealing with a crime that is | 16   problem? |
| 17   notoriously underreported, and I know you haven't | 17  A  Yes. |
| 18   asked me that and I don't mean to -- I think I've | 18              MR. JAMISON:  Object.  Well, it's a |
| 19   shown I'm not trying to give speeches, I'm trying to | 19   late objection but I object for lack of foundation. |
| 20   be succinct but we're not talking about bank robbery | 20  A  I'm strictly saying that I understand how you are |
| 21   or murder where we're in the 90 percent of -- you | 21   explaining how you see that as a problem.  Yes, I |
| 22   know, there's very little difference between what's | 22   understand your view. |
| 23   undetected and what's detected. | 23  BY MR. REINGOLD: |
| 24  Q  Right.  I'm going to stop you there because I don't | 24  Q  Okay.  And none of this means that no one will ever |
| 25   want to talk about that.  We'll get there.  But you | 25   commit a detected offense after the 20 years, only |
| Page 133 | Page 134 |
| 1    that the rate of those new offenses after 20 years | 1    without -- it's been a long time and I -- yes, sir. |
| 2    is virtually identical or lower than known lifetime | 2  Q  That's why I have it open in front of us and this, I |
| 3    rates? | 3    believe, was marked as Exhibit 7.  So this was a |
| 4              MR. JAMISON:  Objection, that's | 4    study where they looked at 20,000 people who were |
| 5    vague. | 5    released from prison in 2005 of 30 different states |
| 6  A  Yes, sir, I understand that Dr. Hanson thinks I | 6    and the purpose of the study was to compare actual |
| 7    might have misunderstood his findings but I did | 7    recidivism rates, meaning they actually used just |
| 8    not. | 8    arrests, so it was the lowest of the possible |
| 9  BY MR. REINGOLD: | 9    standards compared to other kinds of offenders. |
| 10  Q  But that didn't answer my last question.  It doesn't | 10             In Table 2, which I've lit up for you |
| 11   mean that no one will ever commit a detected offense | 11   and highlighted, gives us some of that information. |
| 12   thereafter, what it means is that the rate of those | 12   On the vertical axis is all prisoners and then the |
| 13   new offenses after 20 years is the same from 20 | 13   offense for which they were convicted, and then |
| 14   years on and lower than those other two | 14   going across you see the recidivism rates based on |
| 15   populations? | 15   arrests for the categories of offenses that were |
| 16  A  Yes. | 16   included in the study. |
| 17  Q  Let's take a look at -- this will be a quick look at | 17             I should tell you the definition of |
| 18   Exhibit 7, which my guess is you're going to be -- | 18   assault focused on violent or forcible crimes or |
| 19   oh, no, I think I got the wrong one.  Hold on a | 19   crimes where consent was not possible due to age or |
| 20   minute.  I'm supposed to be stop sharing first. | 20   disability, so it would include many offenses with |
| 21             Are you aware of the Special Report | 21   minors. |
| 22   from the U.S. Justice Department of 2019 by Alper | 22             The rape or assault included forcible |
| 23   and Durose about the Recidivism of Sex Offenders | 23   intercourse, forcible sodomy or penetration with an |
| 24   Released from State Prison: A 9-year Follow-Up? | 24   object, forcible or violent sexual acts, |
| 25  A  Yes, sir, but not enough to speak about it | 25   non-forcible sexual acts with a minor and |
| Page 135 | Page 136 |

                                          34 (Pages 133 to 136)

Darrel Turner
6/7/2023

FIRM #8093

**Page 137**

1    non-forcible sexual acts with someone who couldn't
2    give consent.
3         So what it shows, and I'll just so
4    you can see what we're talking about, all prisoners
5    had a 83 percent recidivism rate over the nine-year
6    period after their release. If we go to each
7    category, we see that sexual offenders had 7.7
8    recidivism rate; robbery offenders had a 16.8
9    recidivism rate; assailants, non-sexual assailants
10   had a 44 percent rate; property offenders had a 63.5
11   percent rate; and drug offenders a 60.4 percent
12   rate.
13        It's fair to say from this, isn't it,
14   that people with sexual convictions have a
15   significantly lower recidivism rate for a subsequent
16   crime that's similar to the one for which they were
17   incarcerated than every other discrete group of
18   offenders except for murderers. Homicide, it was
19   2.7, is that fair to say?
20   A  Yes.
21   Q  And people with sexual convictions have the lowest
22   recidivism rate for any post release violent crime
23   of all discrete -- of all discrete groups of
24   offenders, including murderers; is that fair to
25   say?

**Page 138**

1    A  Say that last one again?
2    Q  Let me read it a separate way.
3    A  I mean I don't disagree with this. This chart makes
4    sense.
5    Q  Okay.
6    A  Yeah. We're talking about recidivism. Their
7    recidivism rate is much lower. I mean they're
8    reported at an insanely lower rate than any of these
9    other offenses, so this just kind of proves my
10   point.
11   Q  Well, it may or may not.
12   A  That's actually my point. I'm just saying this
13   still doesn't -- I don't look at this and think oh.
14   I mean this is what I would expect to see.
15   Q  Well, put another way, it finds that non-sexual
16   assaultive offenders are rearrested for a new
17   non-sexual assault at six times the rate that sexual
18   offenders are, right?
19   A  Yes.
20   Q  And drug offenders rearrested at eight times the
21   rate that sexual offenders are arrested for a new
22   sexual offense.
23   A  Right.
24   Q  I mean you talked about public distortion, right?
25   If you said to a member of the public who has a

**Page 139**

1    higher recidivism rate, meaning new arrest, new
2    charge and new conviction, this would come as big
3    news to people, don't you think?
4         MR. JAMISON: Objection, lack of
5    foundation.
6    A  I think what you would need to do is have a
7    statistic by that that showed how frequently those
8    crimes are reported because I think what you would
9    see is that rape and sexual assault are among the
10   least reported, and so that confounds the whole
11   table, but it's a recidivism study and that's
12   interesting data and important.
13   BY MR. REINGOLD:
14   Q  Well, let's talk about the sexual -- I mean
15   recidivism for some of the other categories. Let's
16   talk about drug crimes for a minute. I'm moving
17   ahead with my notes, so let me see if I can find
18   here.
19        We know, don't we, that drug crimes
20   in the United States are rampant?
21   A  Yes.
22   Q  I checked and I believe in the most recent year, a
23   hundred thousand people had died from drug
24   overdoses. That sound fair?
25   A  I would have no reason to refute that, no, sir.

**Page 140**

1    Q  And that doesn't count the hundreds of thousands or
2    maybe millions of people who are addicted to
3    drugs?
4    A  Right.
5    Q  And all of those people or the great majority of
6    those people get their drugs not legally but
7    illegally, right?
8    A  I would say that's fair.
9    Q  And it's also true that if you look at street drugs,
10   sales on the street or any drug sales, isn't it true
11   that every time a drug is sold, there's actually two
12   crimes that are committed, not one, because both the
13   seller and the buyer are guilty of a crime?
14   A  Yes.
15   Q  The seller of the crime is distribution or sale and
16   for the buyer, it's possession because all these
17   drugs are illegal to have, right?
18   A  Yes, sir.
19   Q  So whatever the total number of crimes are, unlike
20   sexual offenses, whatever the total number of crimes
21   are when we're talking about drug crimes, if it's at
22   the bottom end where they're distributed, which is
23   where the biggest number of crimes would be, it's
24   actually doubled, right?
25   A  Well, I think you could make that point, yes, sir.

35 (Pages 137 to 140)

Darrel Turner
6/7/2023

FIRM #8093

1    I just shy away from saying statistically yes,
2    double it because that's where my brain goes.  But
3    yeah, that could include both parties in that
4    number, yes, sir.
5  Q   And we know that in this type of crime, unlike your
6    examples, which are good ones, murderers and bank
7    robbery where we almost always know that the crime
8    has been committed, it's easy to detect, right, with
9    murder there's a dead body?
10 A   Yes, sir.
11 Q   And where there's a dead body, it triggers the
12    attention of law enforcement, somebody's got to
13    write a death certificate and it gets referred to
14    the police if a dead body has bullet holes in it?
15 A   Yes, sir.
16 Q   But drugs are the exact opposite, right?  Drugs are
17    a willing buyer and a willing seller both of whom
18    have committed crimes who are never going to report
19    the offense, right?
20 A   Yes.
21 Q   So when you say on page 1 of your report that sexual
22    offending is unique in how underreported it is,
23    isn't it at least pretty likely that drug offending
24    probably dwarfs the underreporting of sexual
25    offending?

Page 141

1  A   I don't know that I'm not familiar with that
2    research.
3  Q   Well, put another way, I mean most sexual offenders,
4    I mean at some point, they're only able to offend
5    when the opportunity presents or, you know, if
6    they're sexually active, it's not as if they can --
7    unlike drug sales, they're probably not going to
8    have sex 20 times in a day, right?
9  A   But sexual offenses also occur in private, they're
10    not occurring on street corners.  There's a lot of
11    other things that play here.
12 Q   There may be.  I'm still saying one person can't
13    commit 20 crimes in a day.
14 A   I've known a couple of people -- no, I'm picking.
15    I'd agree with that.
16 Q   And so to hold out simply the underreporting as the
17    be all and end all of sexual offending doesn't
18    really work.  Isn't it true that property crimes
19    also, many, many property crimes are underreported
20    or unreported?
21 A   I don't know the statistics on that.
22 Q   Well, I mean I think you could do an informal survey
23    or ask yourself.  I mean I've had my house broken
24    into two times and my car broken into two times and
25    I think I made one police report and decided it

Page 142

1    wasn't worth it.  Ever experienced anything like
2    that?
3  A   No, sir, I've never had my home or my car broken
4    into.
5  Q   Okay.  But we know that there's huge underreporting
6    in those kinds of crimes, you wouldn't deny that?
7  A   There may be but I doubt that it approaches the
8    level that's been found across studies of rape and
9    sexual assault.
10 Q   Well, that may in large part be only because that's
11    the one that's been studied, right, the others
12    haven't been studied, we have to infer?
13 A   Right.  Maybe -- I'm not familiar with whether or
14    not there's research about disclosure and reporting
15    of property crimes much in the same way.
16 Q   Yes, there's not an advocacy group out there for
17    survivors of property crimes, right?
18 A   Right.  So I don't know.
19 Q   Yeah.  And I think that matters because we make
20    assumptions about sexual offenses that may or may
21    not be true and I just gave you an example of drugs
22    that makes clear sexual offending and overcount or
23    undercounting is not unique, the word that you use,
24    unique means there's nothing else like it.  Let's
25    also --

Page 143

1       MR. JAMISON:  Yeah, I'm going to
2    object to your characterization of how he -- his use
3    of the term unique and how, Paul, you may understand
4    it to the extent you're implying that you have the
5    same definition.
6       MR. REINGOLD:  All right, objection
7    noted.
8  BY MR. REINGOLD:
9  Q   Let's also look at the rearrest rate of the sexual
10    assault folks for any offense.  They got rearrested
11    at the rate of 67 percent, right?
12 A   Yes, sir.
13 Q   So does that mean they're especially skilled at
14    avoiding detection for rape and sexual assault but
15    they're not skilled at detection when it comes to
16    any other offense?  I mean it's not as if they were
17    eluding detection in all these other categories and
18    offenses, right?
19 A   I think it may very well be the case that sex
20    offenders are more skilled at eluding sexual
21    offenses than other types of crimes.  I can
22    absolutely see how that could be the case.
23 Q   But we also established earlier today that if
24    somebody has a previous sexual offense, they're more
25    likely to be detected because if they come within

Page 144

36 (Pages 141 to 144)

Tri-County Court Reporters
248-608-9250

Darrel Turner
6/7/2023

FIRM #8093

---

**Page 145**

```
1    the range of being a suspect, they're going to be
2    the first suspect, right?
3           MR. JAMISON:  Objection,
4    mischaracterize and misstate the previous testimony.
5           THE WITNESS:  Am I supposed to
6    answer?
7           MR. JAMISON:  You can if you
8    understand it.
9    A   I don't believe, sir, with all due respect that that
10   was a correct characterization of what I said
11   earlier.
12          May we take a restroom break?
13          MR. REINGOLD:  Yes.
14          THE WITNESS:  Thank you.  It was the
15   lunch.  I'm sorry.
16          MR. REINGOLD:  That's all right.
17          (A break was taken at 2:29 p.m.)
18              - - -
19          (Record resumed at 2:33 p.m.)
20   Q   We're back on the record.  The only other thing I
21   wanted to pointed out about drugs, this is not a
22   victimless crime, right, the last sale is the one
23   that -- or the last step in the distribution stage
24   or in the distribution process is the one that puts
25   the drugs into the hands or into the arms of the
```

---

**Page 146**

```
1    addict victims, right?
2    A   Yes, sir.
3    Q   Yet nine years out of custody, drug offenders are
4    still being caught 60.4 percent of the time and
5    sexual offenders are only being caught in the way
6    that we have earlier identified 7.7 percent of the
7    time.  Given the undercounting of drugs makes it
8    hard to blame the difference on underreporting,
9    doesn't it?
10   A   I guess when I look at what I see from what you're
11   saying is when I look at the rape/sexual assault and
12   you look at how many of them came back for that, it
13   dwarfs the percentages of the other crimes and so
14   that -- you know, I'm trying to look for an effect
15   that large in any of the other columns.
16   Q   I didn't understand you.  Came back from what?
17   A   So that came back for -- so maybe I'm reading it
18   wrong, I don't know, but the rape/sexual assault
19   offenders came back for rape and sexual assault 7.7
20   percent of the time.
21   Q   Yes.
22   A   So that -- look how much higher a percentage that is
23   than any other crimes and then look in the other
24   columns and look at -- look for a difference that
25   large and that's pretty uncommon.  So that's
```

---

**Page 147**

```
1    actually really interesting to me that they come
2    back so much more often relative to what is known
3    about their recidivism rates, so much of that
4    return.
5    Q   No, but the figures in that column are other people
6    returning for that offense and -- right?
7    A   Yes.
8    Q   Yeah.  And so the same is true, is going to be true
9    for every category, right, the drug offenders came
10   back at 60 percent compared to all of their
11   colleagues who weren't drug offenders to begin with,
12   and the property crimes people are way above their
13   cohort.
14   A   Yeah.
15   Q   And the assault crimes are way above their cohort.
16   A   Yeah.
17   Q   And the robberies are way above their cohort.  So
18   there's nothing particularly distinctive about the
19   sexual offenders in terms of --
20   A   No, no, it becomes very distinctive when we start
21   talking about how low the reconviction rates are for
22   sexual offending, and I mean it shows what
23   Dr. Hanson has proven in his brilliant meta studies,
24   which are that, you know, sexual deviants and
25   antisociology are related to reoffending of sex
```

---

**Page 148**

```
1    offenders and that's just interesting to me.
2           Maybe I just got excited about
3    something statistically but it's very telling to me
4    that this is such an underreported crime but the
5    ones that do come back, you know, almost twice as
6    much, if not more, than for any other offense is
7    going to be another sexual rape or assault.  That's
8    just very interesting.
9    Q   But again, with any of these statistics, you have no
10   idea whether that's because there's a certain number
11   of people with very, very high recidivism rates or
12   whether it's spread across the entire population,
13   right?
14   A   I guess I don't understand that question.
15   Q   You have no way of knowing on the 7.7 percent what
16   the distribution is across the entire population on
17   any of these?
18   A   Of what?  I'm sorry, sir, I'm trying to follow.  The
19   distribution?  That means something statistically,
20   so my head goes to another place maybe.
21   Q   Well, I think I've made the point that I want to
22   make, and that is that it's hard to claim that
23   underreporting is the cause of low offense rates --
24   or of low recidivism rates when with drugs, which we
25   agree has colossal underreporting, the drug
```

---

37 (Pages 145 to 148)

Darrel Turner
6/7/2023                                                    FIRM #8093

1   offenders are caught at a 60.4 percent rate and so
2   if that's another area of crime that has huge
3   underreporting as large as or larger than sex
4   offenses, you can't blame underreporting when you
5   see return rates of 60.4 percent; is that fair to
6   say?
7        MR. JAMISON: Objection, that's a
8   compound question. It mischaracterizes his prior
9   testimony. It assumes facts not in evidence.
10        MR. REINGOLD: You can answer.
11   A   I don't think we have any way to state that that
12   amount of underreporting for that offense is the
13   same, if not greater, than for rape/sexual assault.
14   I don't know where that came from, sir. I have not
15   said that once and I've not heard you say that and
16   agreed to it once.
17   BY MR. REINGOLD:
18   Q   All right. I will stop sharing and we will move on.
19   One of the things that you have talked about a lot
20   in addition to the uniqueness of sexual offending in
21   terms of underreporting is the difficulty it takes
22   to get through the system; isn't that right?
23   A   Yes, sir, and that's all kind of part and parcel to
24   the same thing is disclosing and then who's being
25   disclosed to, yes, sir.

Page 149

1   Q   But isn't it true in our system that we
2   intentionally have designed our criminal justice
3   system to make it hard to convict wrongdoers?
4   A   That's a really big statement. I don't know -- I'd
5   rather not -- I don't feel qualified to testify as
6   to that as an expert.
7   Q   Isn't it true that in our criminal justice system,
8   the excused have a right to counsel?
9   A   Yes.
10   Q   They can't be made to testify against themselves?
11   A   Yes.
12   Q   They have to be told their rights before being
13   interrogated?
14   A   Yes.
15   Q   They can demand a trial by jury?
16   A   Yes.
17   Q   The jury verdict might have to be unanimous?
18   A   Yes.
19   Q   And they can only be convicted by proof beyond a
20   reasonable doubt?
21   A   Yes.
22   Q   And for every category of crime, the kinds of
23   barriers to conviction that you talked about are
24   present to some degree; isn't that right?
25   A   Yes.

Page 150

1   Q   If you're a suspect, you may or may not be
2   thoroughly investigated?
3   A   Yes, sir.
4   Q   If you're investigated and arrested, the arrest may
5   not go anywhere?
6   A   Yes, sir.
7   Q   Because the burden of proof is so high, even if
8   you're referred to the prosecution, the prosecution
9   might say we don't think we can win this case and so
10   it doesn't go forward?
11   A   Yes, sir.
12   Q   And if it does go forward, the jury may not convict,
13   you might get acquitted?
14   A   Right.
15   Q   So in every category of crime, the number of people
16   or the percentage of people who are convicted
17   compared to the number of crimes committed and
18   especially undetected crimes committed, but for a
19   few crimes like murder and bank robbery, there's
20   going to be a significant spread between all
21   offending and convictions?
22   A   Yes, sir.
23   Q   When you talk about underreporting, there aren't
24   studies that have changed over time or that show --
25        This is Exhibit 5, can be marked as

Page 151

1   Exhibit 5. This is the Bureau of Justice Statistics
2   Special Report Reporting Crime to the Police back in
3   2000, now 20 years ago. Am I -- is it correct that
4   this study finds robbery was reported to --
5        MR. JAMISON: Paul, sorry to
6   interrupt. You're not sharing your screen if you
7   intended to.
8        MR. REINGOLD: Thank you. Thank you.
9   Thank you.
10        MR. JAMISON: That shows your Zoom
11   video.
12        MR. REINGOLD: Visible now?
13        MR. JAMISON: Yeah.
14   BY MR. REINGOLD:
15   Q   Robbery was reported to the police at percentages
16   somewhat higher than rape/sexual assault. 48
17   percent for rape/sexual assault. This is from the
18   Bureau of Justice Statistics. Do you know anything
19   about their operation?
20   A   Is this the study that Dr. Hanson cited that was not
21   subject to peer review?
22   Q   This is the study -- I don't know the answer to that
23   question. I can tell you this is the study that's
24   done according to the National Crime Victimization
25   Survey, which is probably the most comprehensive

Page 152

38 (Pages 149 to 152)

Darrel Turner
6/7/2023

FIRM #8093

| | |
|---|---|
| 1 survey of crime annually in the country. | 1 here. It says -- the other question I had is to |
| 2 Every year they don't just do random | 2 your knowledge, has the level of sexual reporting |
| 3 surveys and ask a single question, you know, have | 3 increased over the years? |
| 4 you had a sexual assault or did you report your | 4 MR. JAMISON: I'm going to object to |
| 5 sexual assault. This is the survey that goes out | 5 the question as vague. |
| 6 and visits people annually, trained interviewers | 6 MR. REINGOLD: You can answer. |
| 7 asking them carefully scripted, discrete questions | 7 A I think there are a few caveats but for the most |
| 8 and then consolidating the information. | 8 part, my understanding is yes, in the last couple of |
| 9 A I understand all of that but for me to testify about | 9 decades as opposed to previously. |
| 10 something as an expert, whether it is fully | 10 BY MR. REINGOLD: |
| 11 respectable and appears in the New York Times or | 11 Q All right. Let me ask you a few questions about the |
| 12 not, it's got to be -- for it to be part of our -- | 12 registry itself. The features to the system that |
| 13 you know, what we depend on in our opinions, it | 13 we're describing that make discouraging reporting |
| 14 needs to be peer reviewed. I will be happy to -- | 14 hard to get cases processed or convictions won, do |
| 15 with that caveat, if we can just sort of have that | 15 those have anything to do with the registry? |
| 16 as a running caveat, I'm happy to look at the | 16 MR. JAMISON: Objection, the |
| 17 results with you and answer your question. | 17 question's vague. |
| 18 Q I don't know the answer to that. My guess is it | 18 MR. REINGOLD: You can answer. |
| 19 can't be peer reviewed because of the kind of study | 19 A I don't know. I'm not familiar with the registry |
| 20 that it is, right? | 20 there. I'm not familiar with registries in general. |
| 21 A I mean USDO -- no, sir, the USDOJ has peer review | 21 I certainly don't feel comfortable speaking to them |
| 22 boards for their own research and things like that, | 22 as an expert. That's not what I was asked to do |
| 23 so it could. Yes, sir, it could. But we can -- I'm | 23 here. That's not what I'm putting myself out there |
| 24 happy to look at it with you. | 24 as an expert in. So I don't know. |
| 25 Q All right, let's also look at the one at the top | 25 BY MR. REINGOLD: |
| Page 153 | Page 154 |

| | |
|---|---|
| 1 Q Okay. So it's fair to say you're not an expert on | 1 A If we're talking about recidivating, I would agree |
| 2 registries, your expertise is limited to recidivism | 2 with that, not reoffending. |
| 3 and underreporting and non-reporting for purposes of | 3 Q Right. We've already established that there's no |
| 4 this case? | 4 reason to believe that people who have committed a |
| 5 A That's what I was saying. There are other areas in | 5 prior offense and people who have not should be |
| 6 which I have been and will testify, but I will just | 6 viewed differently as far as recidivating, right? |
| 7 say because I don't know exactly -- I can't think | 7 A Right, recidivating yes, sir. |
| 8 what I've been designated as but I will say that | 8 Q Right, okay. And when we try to assess reoffending |
| 9 it's not -- I mean my report, I don't think I | 9 as opposed to recidivating, we go backwards in time |
| 10 indicate registry even one time. | 10 to look at when people allegedly committed the |
| 11 Q Okay. | 11 offense, right? |
| 12 A I'm not trying to side-step you, sir. | 12 A Yes, sir. |
| 13 Q No, no, that's fine. And none of what we've talked | 13 Q And whether or not people then committed a sexual |
| 14 about today addresses the question of whether or not | 14 offense, I think you're saying we don't know whether |
| 15 having committed a sexual offense and being | 15 that has an effect or not, whether that has an |
| 16 convicted has an effect on recidivism rates or | 16 effect or not on their likelihood of reoffending? |
| 17 reoffending rates? | 17 A You're going to shoot me but I need you to start |
| 18 A I think that's exactly what we're saying, if I'm not | 18 that one over for me. I'm sorry. |
| 19 mistaken. I think that's exactly what I've been | 19 Q I may be turning myself into a pretzel here. I |
| 20 saying but I might have misunderstood you. | 20 think we've covered it and so I think we can move |
| 21 Q What I'm saying is we haven't made any distinction | 21 on. |
| 22 between people who were not convicted or have never | 22 A Okay. |
| 23 been convicted of a sexual offense in their rates of | 23 Q Here's what it is that I'm trying to say. |
| 24 reoffending or offending and people who have been | 24 Dr. Lovell wrote in her report "There's no |
| 25 convicted of a sexual offense? | 25 compelling evidence to suggest the percentage of |
| Page 155 | Page 156 |

39 (Pages 153 to 156)

Darrel Turner
6/7/2023

FIRM #8093

---

**Page 157**

1    reported offenses is different between those with no
2    previous convictions and those who do have previous
3    convictions." Would you agree with that?
4  A  Did she -- is that from a study? Because if that's
5    a finding from a study I'm not familiar with and
6    it's intriguing and if it is, then I wouldn't argue
7    that that study found that.
8  Q  It's from her report. That was actually a quote.
9  A  Can you say it one more time?
10  Q  Yes. "There's no compelling evidence to suggest the
11    percentage of reported offenses is different between
12    those with no previous convictions and those who
13    do." She has period but she means who do have
14    previous convictions. Do you agree with that?
15  A  I don't know. I'm not familiar with the research
16    findings on that specifically. I would look at them
17    but I don't know off the top of my head. And I
18    don't know -- you know, there's some terminology in
19    there. I don't know what she's pulling that from.
20    I don't just want to agree to a statement without
21    seeing the context. I can pull up her report if you
22    want me to or whatever.
23  Q  All right. All right, I'm going to stop sharing and
24    I just have a few more questions. One of the
25    criticisms you made of Dr. Hanson's report was that

---

**Page 158**

1    the Static-99R ignores antisocial behavior; is that
2    right?
3  A  I believe I was referring to the fact that it
4    ignored antisocial personality traits persuasion as
5    a risk factor, which I'm reading directly from
6    Dr. Hanson's own research, that it's one of the big
7    two predictive risk factors.
8  Q  But isn't it true that two of the ten items directly
9    address antisocial behavior, one being prior
10    non-sexual violence and the other prior sentencing
11    dates for anything?
12  A  Yes, sir, it does. I was referring to the fact that
13    I don't think that it's inclusive enough although
14    I'm aware that it's a factor analysis and that will
15    be their rebuttal. But yes, I agree with what
16    you're saying.
17  Q  And there are three other items that are also
18    strongly related to the general propensity for rule
19    violation, young age, never lived with a lover for
20    two years and victimized a stranger.
21  A  I think you can make an argument that every item
22    could get at antisociology in some way just because
23    it's related to them having committed a sexual
24    offense, but I think that -- I think there was a
25    point I'm making in the paper is that these two big

---

**Page 159**

1    risk factors that we know from Dr. Hanson's
2    research, and we're all thankful for it, that we
3    know to be predictive, especially in conjunction,
4    and that that is missing, and my whole argument is
5    that I think people are just taking the Static and
6    misrepresenting it and misusing it and that as much
7    as I respect Dr. Hanson, I feel that his own
8    language is contributing to that and it might be --
9  Q  You said that a number of times. I don't think you
10    need to say it again, not in response to a question.
11    But again, what we've got is an actuarial
12    instrument, right?
13  A  Yes.
14  Q  And presumably the factors that were chosen were the
15    ten that had the most traction when it comes to
16    predicting future sexual recidivism?
17  A  Right.
18  Q  Doesn't mean you couldn't have had a 12-factor test,
19    right?
20  A  No, sir, that was what I said about the factor
21    analysis. Yes, sir, I agree completely.
22  Q  In paragraph 65, you also were critical of the
23    report because you said it hadn't -- that there
24    hadn't been sufficient cross-validation and
25    independent studies or any peer review -- or any

---

**Page 160**

1    peer-reviewed publications and for that you cited
2    Cauley, right?
3  A  I need to see what you're talking about. Can you
4    share your screen or would you like me to pull mine
5    up?
6  Q  Yeah, pull yours up if you can. That was on the
7    last page, page 9.
8  A  Do I get credit for having the coat on today? It's
9    getting a little hot. I'm in Louisiana.
10    Ms. Darnbrook, are you all right with that?
11          COURT REPORTER: I'm fine with that.
12  Q  It's paragraph sixty -- let's see, it was page 9,
13    which is the last page, and the cite is in
14    footnote -- or the second to the last page. Sorry,
15    it is on page 9, sorry.
16  A  Okay. Okay, and where on page 9?
17  Q  The footnote is footnote 18, which is actually from
18    the previous page, you're right.
19  A  Okay. Okay, yes, sir, I see it.
20  Q  And the criticism, as I said, was that the Static-99
21    should not be used because, among other things, it
22    does not have the supportive cross-validation,
23    independent studies or any peer-reviewed
24    publications. That's not your statement, that's
25    what Cauley argued.

---

40 (Pages 157 to 160)

Darrel Turner
6/7/2023                                              FIRM #8093

| | |
|---|---|
| 1  A  Oh. Okay. | 1  context, I don't think anyone would agree that the |
| 2  Q  Right? | 2  Static-99 is not one of the most researched, if not |
| 3  A  Sorry. | 3  the most researched, actuarial in sexual offending |
| 4  Q  Sorry, didn't mean to be -- | 4  that there is. |
| 5  A  That saves us a lot of time. | 5  Q  The last thing I want to ask about is cost. When |
| 6  Q  Didn't mean to be confusing. Isn't it true that | 6  you're doing evaluations and Static-99s, if you're |
| 7  Cauley titled his article The Death of Static-99 | 7  using them, a lot of those that you've done were for |
| 8  because he thought it was going to disappear? | 8  people in civil commitment cases, right? |
| 9  A  I don't know. | 9  A  Yes. |
| 10  Q  Isn't it true that recent articles that identified | 10  Q  And there what's at stake is probably a lifetime of |
| 11  56 Static-99 validation studies, this is from a '22 | 11  custody or at least a very long time of custody? |
| 12  study by Helmus, they basically went back and looked | 12  A  Yes. |
| 13  at all the studies that had done validation studies | 13  Q  And in the criminal cases when you're doing |
| 14  of the Static-99 and found that the average | 14  individual evaluations, the same thing is true, if |
| 15  predictive accuracy was similar to what it had been | 15  someone's found guilty, they might be going away for |
| 16  in the developmental samples and that there were no | 16  ten, 20, 30 years, right? |
| 17  statistically difference -- significant differences | 17  A  Right. |
| 18  for the Static-99s between the developers' figures | 18  Q  When we're doing evaluations to try to determine |
| 19  and the independent authors' 46 studies? | 19  whether or not a person who's on the registry |
| 20  A  I can pull up the Cauley study but I will say that I | 20  remains dangerous or how far it might take someone |
| 21  disagree with the statement that the Static-99 has | 21  who's been out and on the registry to reach what |
| 22  not been, you know, revalidated, it has. I've said | 22  Hanson calls desistance, we don't need the same |
| 23  that numerous times. So I agree with everything | 23  level of evaluation, do we? |
| 24  that you just said without pulling up the Cauley | 24       MR. JAMISON: Objection, lack of |
| 25  article. Yeah, unless that was taken out of | 25  foundation. |
| Page 161 | Page 162 |
| 1  A  Can you repeat that, please? | 1       MR. JAMISON: Same objection. |
| 2  BY MR. REINGOLD: | 2  A  You know, I'm just being real careful. I think |
| 3  Q  Yeah. I said when you were doing those studies, | 3  we're getting at the crux of this case. |
| 4  those evaluations, which might have included a | 4  BY MR. REINGOLD: |
| 5  Static-99, the stakes were incredibly high for the | 5  Q  Let me withdraw that. |
| 6  people whom you were evaluating, right? | 6  A  It's not even the case but my own -- |
| 7  A  Yes. | 7  Q  I'm going to withdraw the question. Let me ask it a |
| 8  Q  And in one case at least, the State had to approve | 8  separate way. When you were doing the treatment or |
| 9  its case beyond a reasonable doubt and so you needed | 9  supervising treatment of people who had been |
| 10  everything in your arsenal to meet the proofs if you | 10  released from prison into the community, you said |
| 11  were the prosecution? | 11  you didn't do the -- you or your sidekick didn't do |
| 12  A  Okay, yes. | 12  the Static 99s because they were done by the |
| 13  Q  And conversely, if you were representing the | 13  Department of Corrections before release, right? |
| 14  defense, you needed everything in your arsenal to | 14  A  Yes, sir. |
| 15  try to sow reasonable doubt in the jury's mind? | 15  Q  And those were being done either in-house by DOC |
| 16  A  Yes. | 16  folks -- |
| 17  Q  But when we're talking about trying to figure out | 17  A  Right. |
| 18  who should stay on a registry or who deserves to be | 18  Q  -- or they might be done on a contract basis via an |
| 19  placed on a registry, especially who should stay, | 19  outsider, right? |
| 20  it's a different kind of story, isn't it? | 20  A  Sure. Who knows? |
| 21       MR. JAMISON: Objection, that's | 21  Q  In fact, we learned the same thing about Michigan |
| 22  vague. | 22  Department of Corrections. We deposed some of their |
| 23  BY MR. REINGOLD: | 23  people and it turns out almost all sex offenders at |
| 24  Q  Let's put it a different way. The stakes are not as | 24  least who are eligible get a Static-99 on the way |
| 25  high? | 25  in. Does that surprise you? |
| Page 163 | Page 164 |

41 (Pages 161 to 164)

Tri-County Court Reporters
248-608-9250

```
 1   A   No, sir, it's used everywhere.
 2   Q   It's used everywhere, it's routine.  And then again,
 3       they get a Static-99 on their way out because that's
 4       when you can begin calculating the time free in the
 5       community and you change the age factor, right?
 6   A   Yes, sir.
 7   Q   And those were done internally by a small group of
 8       people who could do them at very high speed because
 9       most of it's based on static information and in fact
10       they estimated that some of them would be done in as
11       short a time as 15 minutes?
12   A   Yes, sir.
13   Q   And that was true in your experience as well in
14       Louisiana?
15   A   That's what I was about to say.  I'm not confirming
16       what you're referring to but that is my experience,
17       yes, sir.
18   Q   Okay.  And so to get a report and even a Static-99
19       and a STABL, it not as if it takes hours and hours
20       and hours and ten or $20,000 to do it if what you
21       want to know is what treatment does this person need
22       on probation -- or not on probation, on parole, or
23       what treatment does this person need given that
24       they're going to be on the registry, that sort of
25       thing, you don't need the mega evaluation?
```
Page 165

```
 1   A   Okay.
 2   Q   In that situation, it's true that at the front end,
 3       people get a Static-99 that's done in very short
 4       order at very low cost; is that true?
 5   A   Very frequently, yes, sir.
 6   Q   And the same on the back end, when they're coming
 7       out, it's either done by DOC people or contract
 8       people who at relatively low pay are doing the
 9       Static-99 and scoring it?
10   A   I would agree.
11   Q   And you're then treating them in part based on the
12       information that the Static-99 or the Static-99 and
13       the STABL provides?
14   A   Well, no.  But to be fair, most people would say
15       yes, because most people rely on that, but I am not
16       one of those because I don't think that the
17       Static-99 has much of a purpose there.  So I don't
18       really care what the Static-99 says in those
19       situations.  I'm treating them based on their sexual
20       deviance, substance abuse issues, antisociality,
21       which are all things identified by Hanson but I
22       don't care -- I mean the Static-99 score has so
23       little to do with my treatment.  I decide based on
24       supervision how long these guys stay on.  I mean I
25       don't want to run away with your question but...
```
Page 167

```
 1           MR. JAMISON:  Objection, it's a
 2       compound question.  I think there was three
 3       questions in one there.
 4   BY MR. REINGOLD:
 5   Q   All right, we'll take them one at a time.  You don't
 6       need a mega evaluation to get the answer that you
 7       need?
 8   A   I have to fundamentally disagree with that.  How can
 9       you compromise the totality of an evaluation for
10       speed and money and resources?
11   Q   But you did it every day when you were supervising
12       people and treating people for the MDOC, you relied
13       on the -- isn't that true?
14   A   I don't know what you're -- what are you talking
15       about?
16   Q   When you were working on contract --
17   A   The MDOC, I don't know what --
18   Q   Or for defense.
19   A   Okay.
20   Q   People were coming out on parole.
21   A   Are you talking about the contract that I have for
22       treatment now?
23   Q   I'm talking about any time in which you've been
24       treating people coming out of prison into the
25       community on parole.
```
Page 166

```
 1   Q   So your conclusion is that the Static-99 provides no
 2       useful information or almost no useful information
 3       to you and you effectively are willing to ignore the
 4       score?
 5           MR. JAMISON:  Objection,
 6       mischaracterized his testimony.
 7   A   Yeah, that's not what I said.
 8   BY MR. REINGOLD:
 9   Q   Well, you said you don't pay any attention to it.
10   A   I don't know if I said I don't pay any attention.  I
11       don't even think I said that.  I just said that I'm
12       going to provide a service based on a different
13       assessment than a Static score and that a lot of my
14       assessment is going to be based on empirically
15       supported Static instruments but I'm trying to
16       prevent reoffending, not reconviction and I think
17       that Static looks at reconviction but says it looks
18       at reoffending when really it only looks at
19       reconviction.
20   Q   But what I'm saying is to do your treatment and to
21       have this person safely out in society, you don't
22       need and you don't get a five or ten or $15,000
23       evaluation of that person?
24   A   No, but wouldn't it be great if I did?  It would
25       solve --
```
Page 168

42 (Pages 165 to 168)

Darrel Turner
6/7/2023                                                               FIRM #8093

| | |
|---|---|
| 1   Q   Of course it would be. | 1   Q   Okay. In your experience, do sex offenders only |
| 2   A   Save money for the people that are paying me to have | 2     commit one offense? |
| 3     to figure that out myself. | 3   A   No, sir, not statistically most of the time, no. |
| 4   Q   Of course it would be but you're able to provide the | 4   Q   In your experience, do sex offenders stop committing |
| 5     treatment without a five or ten or $15,000 | 5     sex offenses after being convicted? |
| 6     evaluation? | 6   A   No, sir. |
| 7   A   Sure, I do the best I can with what I have, yes, | 7   Q   Do sex offenders -- do all sex offenders commit |
| 8     sir. | 8     other offenses after being convicted? |
| 9   Q   Exactly. | 9   A   No, sir. |
| 10        MR. REINGOLD: All right, I think | 10   Q   So in your experience, what causes sex offenders to |
| 11     we'll call it a day there for me. | 11     commit another offense? |
| 12        --- | 12        MR. REINGOLD: Objection as to form |
| 13        DIRECT EXAMINATION | 13     and foundation. |
| 14   BY MR. JAMISON: | 14   A   I think it's a combination of antisociality and |
| 15   Q   Okay, I just have a couple questions. So I'll ask | 15     psychopathy that allows them to feel entitled and |
| 16     you a few questions. I'm going to use the term sex | 16     okay with acting on sexually deviant urges and |
| 17     offender and my definition of a sex offender is | 17     sexual deviance, which is the other main risk |
| 18     someone who has been convicted of criminal sexual | 18     factor. |
| 19     conduct. Is that okay? | 19        I think we also know, thanks to |
| 20   A   Yes, sir. | 20     Dr. Hanson, that things like intoxication at the |
| 21   Q   All right. How many sex offenders would you say | 21     time of an offense, early behavioral sexual |
| 22     that you've worked with in a clinical setting? | 22     problems, emotional identification with children and |
| 23   A   This includes my forensic work? | 23     other things really contribute and really factor in |
| 24   Q   Yeah. | 24     but I think that those are the main ones. |
| 25   A   Thousands. | 25   Q   So those main ones you identified, do those go away |
| Page 169 | Page 170 |
| 1     with time? | 1   Q   So their rates of insurance could be off based on |
| 2   A   No, sir, because primarily they're represented by | 2     whether someone is being truthful with the life |
| 3     antisociality and sexual deviance, both of which are | 3     insurance company? |
| 4     chronic conditions, speaking clinically. So | 4   A   Yes, sir. |
| 5     something like a paraphilic diagnosis, pedophilia, | 5   Q   And then have you seen or have you heard of car |
| 6     sadism, for example, is going to be a chronic | 6     insurance companies that they'll offer you a lower |
| 7     lifelong condition as is antisociality or | 7     rate if they can put an app. on your phone that |
| 8     psychopathy even though there's some evidence that | 8     tracks your driving habits? |
| 9     they age out across that. | 9   A   I've not. I'm not surprised but I've not heard of |
| 10   Q   So earlier you were asked a series of questions | 10     that. |
| 11     about life insurance. Do you remember that line of | 11   Q   Is there any app. that you're aware that can track |
| 12     questioning? | 12     criminal sexual conduct? |
| 13   A   Yes, sir. | 13   A   No, sir. |
| 14   Q   And I think we -- or it was covered that smokers pay | 14   Q   And there was also a line of questioning relating to |
| 15     a higher rate for life insurance. Do you remember | 15     drug crimes. In drug crimes, who's the victim? |
| 16     that? | 16   A   I think there are collateral victims. Certainly |
| 17   A   Yes, sir. | 17     children, society in general. I guess -- |
| 18   Q   In that circumstance, a life insurance company | 18   Q   I guess in terms of the conviction, if we're looking |
| 19     relies on self-reporting. Does that sound accurate | 19     at convictions for drug crimes, is there a victim in |
| 20     to you? | 20     a drug crime? |
| 21   A   Yes, sir. | 21   A   That's a tough one. That's one that in 12 years |
| 22   Q   So life insurance companies when they're rating | 22     people are going to tell me what I said when you |
| 23     potential insureds, they don't actually know if | 23     asked me that. |
| 24     someone smokes, correct? | 24   Q   Let me rephrase a little bit. So in a murder, is |
| 25   A   Right. Correct. | 25     there a victim in the traditional sense? |
| Page 171 | Page 172 |

43 (Pages 169 to 172)

Darrel Turner
6/7/2023                                                    FIRM #8093

| | | | | |
|---|---|---|---|---|
| 1 | **A** Yes. | 1 | MR. REINGOLD: Yes. Go ahead, Eric. |
| 2 | **Q** In a robbery, is there a victim in the traditional | 2 | MR. JAMISON: Yeah, I just need a |
| 3 | sense? | 3 | searchable PDF. |
| 4 | **A** Yes. | 4 | MR. REINGOLD: For us, we like to get |
| 5 | **Q** In a property crime theft, something like that, is | 5 | more than Eric does. We like to get a mini and a |
| 6 | there a victim in the traditional sense? | 6 | full size. I like having the PTX because sometimes |
| 7 | **A** Yes, sir. | 7 | it's useful in ways that the others aren't, and my |
| 8 | **Q** In a drug crime, is there a victim in the | 8 | colleagues and I like to get a Word version if we |
| 9 | traditional sense like the previous three crimes I | 9 | can because that way it's easier to cut and paste |
| 10 | mentioned? | 10 | directly into briefs without any transfer errors. |
| 11 | **A** No, sir. I think some people may consider the | 11 | |
| 12 | person with the addiction to be the victim. | 12 | (Deposition was concluded at 3:20 p.m.). |
| 13 | **Q** Absolutely. | 13 | --- |
| 14 | **A** But they're still making a choice to engage in that | 14 | |
| 15 | behavior. I see that point, yes, sir. | 15 | |
| 16 | **Q** And with criminal sexual conduct, is there a | 16 | |
| 17 | victim? | 17 | |
| 18 | **A** Yes. | 18 | |
| 19 | MR. JAMISON: That's all I have. | 19 | |
| 20 | MR. REINGOLD: I have no further | 20 | |
| 21 | questions. | 21 | |
| 22 | MR. JAMISON: All right. I think | 22 | |
| 23 | you're all set. Thanks, Dr. Turner. | 23 | |
| 24 | COURT REPORTER: I just need the | 24 | |
| 25 | transcript orders, please. | 25 | |

Page 173                                   Page 174

| | |
|---|---|
| 1 | STATE OF MICHIGAN) |
| | ) SS. |
| 2 | COUNTY OF OAKLAND) |
| 3 | CERTIFICATE OF NOTARY PUBLIC |
| 4 | I, Robin V. Darnbrook, |
| 5 | Certified Shorthand Reporter, Notary Public, |
| 6 | Oakland County, Michigan, certify the witness |
| 7 | whose deposition was taken before me on |
| 8 | June 7, 2023 was by me cautioned and |
| 9 | sworn to testify the truth, that the testimony |
| 10 | contained in the deposition was recorded by means |
| 11 | of stenography, was reduced to a typewritten form |
| 12 | and is a true and correct transcript. |
| 13 | I further certify I am not |
| 14 | connected by blood or marriage to any of the |
| 15 | parties, their agents or attorneys; that I am |
| 16 | not an employee of any of them, nor interested |
| 17 | directly or indirectly in the matter in |
| 18 | controversy. |
| 19 | IN WITNESS WHEREOF, I have |
| 20 | hereunto set my hand and affixed my notarial |
| 21 | seal in the County of Oakland, State of |
| 22 | Michigan, this 21st day of June, 2023. |
| 23 | |
| 24 | *Robin V. Darnbrook* |
| | Robin V. Darnbrook - CSR2508 |
| | Notary Public, Oakland County, MI |
| 25 | My Commission Expires 11/19/2024 |

Page 175

44 (Pages 173 to 175)