# Exhibit 72:

## Timothy Fitzgerald Deposition Transcript



(248)608-9250 Fax (844)270-7115
www.tri-countycourtreporters.com
depos@tricountyreporters.com

Transcript of the Testimony of
**Fitzgerald, Timothy**

**Date:** June 28, 2023
**Volume:**

**Case:** JOHN DOES A, et al. v. GRETCHEN WHITMER, et al.

Printed On: July 13, 2023

Fitzgerald, Timothy
6/28/2023 FIRM #8093

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G,
H, MARY DOE and MARY ROE, on
behalf of themselves and all
others similarly situated,
    Plaintiffs,
  vs.      Case No. 2:22-cv-10209
            Hon. Mark A. Goldsmith
            Mag. Curtis Ivy, Jr.
GRETCHEN WHITMER, Governor of
the State of Michigan, and COL.
JOSEPH GASPER, Director of the
Michigan State Police, in their
official capacities,
    Defendants.
_____

The Deposition of TIMOTHY FITZGERALD,
Taken via videoconference,
Marshall, Michigan,
Commencing at 9:58 a.m.,

## Page 2

1   The Deposition of TIMOTHY FITZGERALD,
2   Taken via videoconference,
3   Marshall, Michigan,
4   Commencing at 9:58 a.m.,
5   Wednesday, June 28, 2023,
6   Before Heather DeMar, RPR, CSR-8951,
7   Tri-County Court Reporters - 8093.

## Page 3

APPEARANCES

PAUL REINGOLD - P27594
University of Michigan Law School
801 Monroe Street
Ann Arbor, Michigan 48109
734.355.0319
  Appearing on behalf of the Plaintiffs.

ERIC JAMISON - P75721
Michigan Department of Attorney General
525 West Ottawa Street
Lansing, Michigan 48933
517.335.7573
  Appearing on behalf of the Defendants.

## Page 4

TABLE OF CONTENTS

Witness                 Page
TIMOTHY FITZGERALD

EXAMINATION
BY MR. REINGOLD:         7
EXAMINATION
BY MR. JAMISON:          64
RE-EXAMINATION
BY MR. REINGOLD:        71

INDEX TO EXHIBITS

Exhibit                 Page
(Exhibits attached to transcript.)

DEPOSITION EXHIBIT 8     19
DEPOSITION EXHIBIT 5     24
DEPOSITION EXHIBIT 3     40
DEPOSITION EXHIBIT 1     48
DEPOSITION EXHIBIT 2     54

## Page 5

 1  Marshall, Michigan
 2  Wednesday, June 28, 2023
 3  9:58 a.m.
 4
 5         TIMOTHY FITZGERALD,
 6  was thereupon called as a witness herein via
 7  videoconference, where all parties stipulate to the
 8  witness having first been duly sworn in remotely to
 9  testify to the truth, the whole truth and nothing but
10  the truth, was examined and testified as follows:
11         MR. REINGOLD:  I think we're ready to
12  proceed.  My name is Paul Reingold.  I'm a cooperating
13  attorney for the ACLU representing the plaintiffs in
14  Does III, also known as Does v. Whitmer.  This is a
15  Zoom deposition, on June 28th, 2023, pursuant to the
16  Federal Rules of Civil Procedure, for all purposes
17  permitted by those rules.
18         Let me start by just going through a few
19  rules of the road that will make things easier for us
20  and for the court reporter.  First, let me ask, have
21  you ever been deposed before.
22         THE WITNESS:  One time.
23         MR. REINGOLD:  How long ago was that?
24         THE WITNESS:  More than ten years.
25         MR. REINGOLD:  All right.  Well, this will

## Page 6

 1  probably sound familiar then if you have -- if it
 2  wasn't such a bad experience that you blocked it out
 3  of your mind.  At the bottom, depositions help the
 4  parties to resolve factual disputes.  Basically they
 5  facilitate the transfer of knowledge that one side
 6  knows and the other side doesn't.
 7         The way it works, I'll simply be asking
 8  questions and you provide answers.  If you don't
 9  understand a question, you should tell me and I'll be
10  happy to rephrase it.  If you answer a question, we'll
11  assume that you understood it.  And I need to make
12  sure that you understand that.  Is that okay with you?
13         THE WITNESS:  Yes.
14         MR. REINGOLD:  You need to say yes.  Great.
15  Okay.  The -- my next line is you must answer in
16  words.  The court reporter can't take down head shakes
17  and uh-huhs.  And so, make sure that we do that.
18         In addition, the court reporter can't get a
19  clean transcript if two people are talking at once.
20  And so, we want to try to avoid talking over each
21  other.
22         I'd also ask that you try to answer the
23  question that I ask.  If there's more that you want to
24  say, at the end of the deposition there's a
25  possibility that the state's lawyer will want to ask

## Page 7

 1  you some questions as well.
 2         If you need to take a break at any time,
 3  feel free just to ask.  The only thing I ask is that
 4  you answer any pending questions before we take a
 5  break.
 6         And then the last thing is I also need to
 7  ask if you're on any medications or using any alcohol
 8  or drugs that would impair your ability to tell us
 9  what you know today?
10         THE WITNESS:  No, I'm not.
11         MR. REINGOLD:  Okay.  Thank you.  I'm not
12  sure how long this will take us.  The last dep was
13  about two hours.  I'm guessing this will be roughly
14  the same.  Might be a little longer, but it might be a
15  little shorter, too.
16            EXAMINATION
17  BY MR. REINGOLD:
18  Q.  Let me start by asking what you did to prepare?  What
19     you did, if anything, to prepare for the deposition
20     today?
21  A.  I -- well, I -- I had a phone conversation with you,
22     Paul.
23  Q.  Yeah.
24  A.  That was the impetus for the whole thing.  And then I
25     contacted Steve Beatty, who was the counsel for the

## Page 8

 1     state police at the time.
 2  Q.  And you --
 3  A.  Just to kind of test my memory from, you know, many
 4     years ago.
 5  Q.  Was that to get information as opposed to getting
 6     legal advice?
 7  A.  Honestly, it was a little bit of both.  Because
 8     it's -- it'd been so long since I'd been deposed.  But
 9     the -- the primary reason was to try to get a little
10     bit of background to jar my memory.  Because I don't
11     -- I didn't save any of my, you know, any of the notes
12     I had or any of my old stuff.
13         When I retired, I -- I kind of didn't -- I
14     was hoping I would never hear about the Sex Offender
15     Registry again, honestly.
16  Q.  Your plan was not to look back, I take it?
17  A.  Right.
18  Q.  Okay.  That's a good plan when one moves into
19     retirement.
20         Any conversation with anyone else to
21     discuss or prepare?
22  A.  No.
23  Q.  And Mr. Beatty is not representing you at this time,
24     is that right?
25  A.  No.

**Page 9**

1  Q. Okay. So your conversation with him was mostly to
2     sort of jog your memory and try to make sure that what
3     you remembered was accurate?
4  A. Right.
5  Q. Okay. I want to start by asking you just a little bit
6     about your background. Usually when we do a
7     deposition with more notice, we'll have a copy of the
8     person's CV or we'll, you know, we'll have checked
9     them out on LinkedIn or something like that. And I've
10    not done that.
11        Can you just give us a quick overview of
12    your educational background, just hit the highlights;
13    high school, college, any postcollege work, and police
14    training.
15 A. So I went to De La Salle Collegiate High School in
16    Detroit, graduated in '87. Then went to University of
17    Detroit, which became the University of Detroit Mercy.
18    But I'm kind of proud to say my diploma has U of D,
19    old school. I majored in accounting.
20        I worked briefly for Arthur Andersen
21    downtown in an internship and I realized quickly that
22    wasn't for me. So I wanted to pursue my initial
23    passion of being a police officer. So I applied to
24    the Michigan State Police, completed recruit training
25    in the 111th recruit school in 1995, January of '95.

**Page 10**

1        And so, I was on road patrol for roughly
2     sixteen and a half years. Then I took a spot in
3     special operations with the governor's security
4     section. I was with Governor Snyder for four years as
5     part of his detail.
6        Then I promoted to government affairs from
7     that spot, so I became a policy liaison, one of the
8     sergeants in that small unit and --
9  Q. What year was that?
10 A. That would have been '15, 2015. So then I became this
11    -- I was the, you know, the -- in that unit there's a
12    commander and then there's a couple of sergeants that
13    are basically attending legislative committees and
14    legislative work groups and this sort of thing.
15        That's when I first became familiar with
16    this issue on this level as opposed to the field
17    enforcement level. And then in 2018, I was promoted
18    to commander of that unit as a first lieutenant. And
19    that's where I retired in July of 2020.
20 Q. All right. The -- thank you. That's exactly what I
21    wanted.
22        In the -- the one question I had on your
23    background was you said when you went to the
24    governor's office it was doing special ops. And can
25    you just briefly describe the kinds of work you were

**Page 11**

1     doing in the governor's office. And I take it that
2     would have been roughly 2011 to 2015?
3  A. Correct. That was in -- I was on his protective
4     detail for the first term. So we did executive
5     protection. The types of things that go along with
6     that, basically twenty-four-hour security coverage of
7     the governor and his family. Site advances, you know,
8     in advance of wherever he attended or wherever he
9     went, travelling with them, that sort of thing.
10 Q. All right. And then what led you to government
11    relations? You said it was a promotion, but was it
12    because you got to know the governor? Or was there
13    something else going on?
14 A. No. No. It was a promotional opportunity. And
15    frankly, I'm not going to lie, it kind of sparked --
16    being around Lansing and the process all the time kind
17    of sparked an interest in what was going on in the
18    government affairs office.
19        It was a promotional opportunity to
20    sergeant. And after travelling for four years on
21    executive protection, you are -- you're constantly
22    basically away. And I have four kids, four sons. And
23    after the first term, when Snyder got reelected, my
24    wife was basically like we should do something
25    different. So that's why I pursued it.

**Page 12**

1  Q. That's the we meaning you?
2  A. Right.
3  Q. Okay. And so, when you arrived in 2015 as one of, I
4     take it, two sergeants, I -- I assume early on you're
5     kind of learning the ropes in the new position, is
6     that right?
7  A. Yes, exactly. Yeah, you're learning how to --
8     learning, you know, basically the committee schedule,
9     how the legislature works. And you quickly get put
10    into, you know, issue groups.
11        And so, usually you start with the, you
12    know, more traffic offenses, you know, some of the,
13    you know, some of the more minor legislative issues.
14    And then as you get more time, you get different
15    assignments.
16 Q. And do you remember when you first got involved with
17    anything having to do with SORA?
18 A. Yes. Well, I mean, generally in, I would say, 2017.
19    And, Paul, I would have -- either you or Miriam would
20    really know the date better than I would. It was
21    really Shelli Weisberg that reached out with the idea
22    that, you know, we needed to modify SORA.
23        I know that there was -- I don't exactly
24    know the timing of that other -- the other lawsuit,
25    you know, that one that found some of the items to be

**Page 13**

1  unconstitutional.  I think we were waiting for that
2  decision, I think, when that work group kind of
3  evolved to kind of begin talking about revisions to
4  the registry.
5  Q. Okay.  Yeah.  I think that's -- that's right or close
6  to right.  I believe the -- the Sixth Circuit decision
7  was 2016.  And then the state appealed that to the
8  U.S. Supreme Court and that took another, I don't
9  remember, but it was probably six months or seven
10 months, something like that.
11        Then it got remanded to the district court.
12 And I believe a final judgment wasn't entered until
13 mid-to-late 2017 in Does I.  And it probably would
14 have been late 2017 when we knew that the judgment was
15 going to be entered.
16        And at that point Shelli was trying to get
17 folks in Lansing interested in talking about what a
18 new statute might look like.
19 A. Okay.  Paul --
20 Q. Go ahead.
21 A. Real quick on my background piece.  I'm not an
22 attorney.  I was a policy, you know, liaison.  You
23 know, I was more involved in the politics of the thing
24 than the nuts and bolts of the cases and the legalese
25 that, you know, you guys are --

**Page 14**

1  Q. Yeah.  Yeah.
2  A. -- entrenched in.
3  Q. All right.  So when that work group started, that was
4  kind of informal, I think, right?  It was -- I was not
5  part of that initially.  I know that Shelli was
6  meeting and other people from PAAM who were meeting on
7  that.
8        And do you have recollections about what
9  was being talked about in that early stage of the work
10 group?
11 A. In the early stages of the work group, it was very
12 small.  It was Shelli, myself, KC Steckelberg from
13 PAAM, and representatives of the -- of the
14 legislature, like the Senate majority policy office.
15 And I can't remember who the House was sending to
16 those meetings.
17        It was a little small group and we
18 initially started with Shelli bringing in some people
19 to basically lay a background for the impact that SORA
20 was -- or being on SORA was having on people's lives.
21 That's -- that's my recollection of the beginning of
22 it.
23 Q. Based on your experience in governmental affairs for
24 the MSP, was it typical that you would be contacted in
25 the early stages of legislation?  Let's take an

**Page 15**

1  example and say outside of SORA, you know, if -- if a
2  legislator is thinking about legislation or -- or
3  they've got some proposals in mind, before the bill
4  actually gets drafted and introduced, are they
5  reaching out to agencies that are going to be affected
6  by it or trying to either collect information or get
7  more -- in the early stage, is that typical?
8  A. Yes.  That's -- that's exactly what would happen.  Not
9  always with legislators, but the ones, I think, who
10 are trying to have the most meaningful impact would
11 contact the agency that they thought would be the lead
12 on the bill if they were going to change something.
13        So, for example, speed limits almost always
14 would come to the state police and MDOT, things like
15 that.  And then they would reach out and talking about
16 whatever the change, the policy change would be.
17 Q. So one of the things that I was having trouble with --
18 with Lieutenant McGhee understanding when I was asking
19 her questions in her dep, was sort of how that process
20 works.
21        So the speed limits is a good example and
22 let's just stick with that for a minute.  If there's a
23 proposal to increase or reduce speed limits, you know,
24 whatever it's going to be and they're coming to you,
25 the question that I had is how does MSP as an agency

**Page 16**

1  decide what it's going to -- first, what information
2  it's going to provide to legislators in that situation
3  and, second, what its own position is actually going
4  to be?
5  A. Okay.  So first involved within the department, you
6  know, we are -- we're sort of chuck -- well, they were
7  sort of chuck full of subject matter experts in
8  things.  So first, speed limits, we had the traffic
9  engineering section, accident reconstruction section.
10       So we would have people that their whole
11 careers were, you know, on speed limits, were in those
12 two units, you know, would have guys that were filled
13 with training and experience and they would know if it
14 was plausible, whatever the idea was.
15       So like the speed limit, you know,
16 theoretically, say they were coming and saying the
17 speed limit should be eighty because I was out in
18 South Dakota and that worked out great and everything.
19 We would -- I would go to the experts and go what do
20 you think about eighty.  And they would say well, you
21 know, the road design comes into play.  And they would
22 come up with all these other things.
23       But even then -- to go to the second part
24 of your question to who makes the decision on what our
25 position is going to be -- that's the executive

**Page 17**

1  office. Because we're a state agency and we are sort
2  of -- we run -- we have to run everything through EOG
3  to get a direction of what they, you know, what
4  they're going to let us say. Because it could be our
5  position, yeah, you could -- we could do eighty. But
6  for whatever reason the EOG might say no, we're not
7  going to do that.
8  Q. When you're dealing with the EOG, is that also a
9  different people for different areas of expertise? Or
10 is it sort of the same group of people for almost any
11 legislation?
12 A. Well, in my time it was always somebody assigned.
13 Like during the Snyder administration, there was a
14 person assigned always to the -- the Senate and to the
15 House. So depending on where the bill originated,
16 you'd get that person and then the director of
17 legislative affairs.
18         And then, you know, that's -- when Whitmer
19 came in, I think they siloed it into one person. I
20 can't remember -- Greg Bird, I think, was the one when
21 I started. And honestly, I can't recall who the
22 Senate and the House people were.
23 Q. Yeah. And is the EOJ -- is it EOG or EOJ?
24 A. G, Executive Office of the Governor.
25 Q. Yeah. Okay. And then that's fully within the

**Page 18**

1  governor's office and it's basically the governor
2  saying to executive branch agencies, you know, yes,
3  you can have your opinions, but in the end here's what
4  we are going to do?
5  A. Exactly.
6  Q. All right. All right. So when we get to the issue of
7  SORA, we've got SORA 2011 being struck down by the
8  Sixth Circuit and part of it being struck down by the
9  district court.
10         So towards the end of 2017, the work group
11 begins. And then at that point what was the
12 expectation within the MSP about what was going to
13 happen with SORA?
14 A. From my recollection, it was that -- well, some of
15 those pieces of the registry were now unconstitutional
16 and we needed to make changes to accommodate that or
17 changes were needed to accommodate the court ruling.
18 Q. In your time at -- at governmental affairs before this
19 started had you ever encountered the situation where
20 the courts held a law to be unconstitutional and then
21 the legislature doesn't do anything, just nothing
22 happened?
23 A. I -- no. This was the only issue where I ever had a
24 court -- that there was a court case as the impetus
25 for making a policy change.

**Page 19**

1  Q. Okay. Let me pull up an exhibit that I'll share with
2  you, just a minute. I'm sharing a document from Does
3  II. Actually, because that's the only -- that's the
4  one I could find it, but it actually goes back to Does
5  I.
6          And I want to know if this was something
7  you knew about or had seen at any time. This was
8  after -- after the Sixth Circuit had ruled that the
9  Michigan SORA was unconstitutional. And this was a
10 memo that went out from the state police Sex Offender
11 Registry unit. And it's titled -- first, can you see?
12 A. I can, yeah.
13 Q. Okay. It's titled important information regarding
14 enforcement of specific provision of the Sex Offender
15 Registration Act, SORA, and the citation. Is this a
16 document that you've seen before?
17 A. I do recall seeing this before.
18         MARKED BY THE REPORTER:
19         DEPOSITION EXHIBIT 8
20         10:19 a.m.
21 BY MR. REINGOLD:
22 Q. All right. And this is something, I believe, that
23 went out from the state police, not just to the -- to
24 other state police units, but I believe to -- to --
25 broadly to law enforcement statewide.

**Page 20**

1          And it's basically -- I mean, correct me if
2  I'm wrong -- but I believe it's basically advising all
3  law enforcement that -- again, the bold letters are
4  what I'm looking at in the middle of the page -- that
5  enforcement of any of the 2006 or 2011 requirements
6  retroactively against any offender could subject
7  individual officers and law enforcement agencies to
8  possible civil liability.
9          Is it fair to say this was a document
10 alerting all law enforcement in the state that this
11 case has come down; that if people keep on doing what
12 they've been doing in the past, they could face civil
13 liability? Is that what this was intended to do?
14 A. You mean by people keep on --
15 Q. I mean law enforcement.
16 A. Yes. Yeah. This was an instructional document,
17 basically --
18 Q. Okay.
19 A. -- legal update.
20 Q. And is this the kind of thing the -- the state police
21 do on a -- not necessarily a regular basis -- but do
22 when there's a change in law and they want to make
23 sure that not just their own officers, but the law
24 enforcement statewide are keyed into and know about?
25 A. Yes.

```
 1            MR. JAMISON:  Objection for lack of
 2       foundation and vague.
 3   BY MR. REINGOLD:
 4   Q.  That's if you know.  You can answer.
 5   A.  Am I good to answer there?
 6   Q.  Yeah, you can answer.  Whenever there's an objection,
 7       you can --
 8            MR. JAMISON:  Yeah.  So I may make some
 9       objections and then sometimes Paul will just reframe
10       the question for you.  You'll still need to answer.
11            THE WITNESS:  Got it.  Okay.  So yes, this
12       is what -- this is what -- this was typical of what
13       would happen.  The same thing with our legal updates,
14       when there's law changes that are significant to
15       enforcement operations and we send out a legal update
16       that is a subscription services for locals.
17   BY MR. REINGOLD:
18   Q.  All right.  And that's because -- or is that because
19       the state police are viewed as, you know, sort of --
20       I'm not sure the polite way to say it -- but the --
21       the -- the highest level of law enforcement in the
22       state and the people who have their ears closest to
23       the ground?
24            MR. JAMISON:  Objection, lack of
25       foundation.
                        Page 21
```

```
 1   BY MR. REINGOLD:
 2   Q.  You can answer.
 3   A.  So I would -- I mean, I think that's a -- that's a --
 4       that way I would love to think about it.  But I think
 5       that we're just closest to the changes and I think a
 6       lot of local agencies don't have the resources to keep
 7       up.  So they -- that's why we put the legal bulletins
 8       out.
 9   Q.  Yeah.  All right.
10   A.  The thought that we're the best.
11   Q.  All right.  Let me see if there's anything else in
12       this exhibit.  No, all right.  I'm going to stop
13       sharing that.  I'm going to pick up -- all right.  All
14       right.  And can you no longer see that document?
15   A.  Yeah, it's gone.
16   Q.  Okay.  All right.
17            MR. REINGOLD:  And that was -- just for the
18       record, that was listed as Exhibit 8 because I found
19       it late and I had already renumbered the other ones.
20       So we're going a little bit out of order.
21   BY MR. REINGOLD:
22   Q.  You might recall that after the Does I judgment was
23       entered and the case became final, basically nothing
24       happened, right?  I mean, your work group got started,
25       but there was no progress from the legislature, right?
                        Page 22
```

```
 1   A.  Right.
 2   Q.  All right.  And I -- I remember and you may recall,
 3       too, that the state's lawyers and the ACLU also
 4       assumed that the legislature would act to amend SORA
 5       and were surprised when it did not.  You may have
 6       heard that from Shelli, I don't know, but there was a
 7       sense that once a court has ruled, you would expect
 8       the legislature to rule and it didn't.
 9            And so, was it your sense that there was
10       surprise all the way around at the passivity?
11   A.  Could you -- would you restate that.
12   Q.  Yeah.  I -- I mean, was it your sense from dealing
13       with the people in the informal work group that it
14       came as bit of a surprise to everybody that there was
15       no -- no response whatever from the legislature?
16   A.  Yes.
17   Q.  All right.  In fact, if my dates are right, I believe
18       the ACLU waited a year -- maybe less than a year, but
19       many months -- until June of 2018 before moving
20       forward with Does II, which was the second lawsuit.
21       And that was brought only to enforce the Does I
22       decisions as to all eligible registrants as opposed to
23       just the six Does I plaintiffs.
24            I went back and checked the amended
25       complaint and the -- the appearances of Miriam and me
                        Page 23
```

```
 1       in the case were all filed in the June of 2018.
 2            Do you remember the -- I think you said
 3       that it was -- maybe you didn't say.  Do you remember
 4       what month it was that you and Shelli and the others
 5       started meeting in 2018?
 6   A.  I don't remember the specific month.
 7   Q.  Okay.  Let me show you another exhibit.  And can you
 8       see that exhibit?
 9   A.  Yeah, I can.  Yes.
10   Q.  Okay.  This was an -- a -- a document that I think
11       after the work group began -- the informal work group
12       began in the fall of 2018, that I believe we were
13       asked to send to the Attorney General's Office, kind
14       of laying out where we thought the -- the negotiations
15       about a new SORA should go.
16            And I'm wondering if this is a document
17       that was shared with you either by Shelli or by the
18       AG's Office?  Is this something you've seen before, do
19       you recall?
20   A.  No.  This is not something I've seen before.
21            MARKED BY THE REPORTER:
22            DEPOSITION EXHIBIT 5
23            10:27 a.m.
24   BY MR. REINGOLD:
25   Q.  Okay.  This was a long document that laid out the
                        Page 24
```

6 (Pages 21 to 24)

## Page 25

1  ACLU's perspective on what would be most useful going
2  forward. And that highlighted some of the science and
3  so on and some of the law.
4       Because at this point Does II had been
5  filed and was moving forward and it also addressed
6  some of the legal arguments. But if you haven't seen
7  it, then I will take it down. Let me stop sharing.
8       I think that that confirms the timing,
9  because this would have been -- this was dated October
10 10th and would have been soon after those meetings had
11 begun.
12      All right. And how would you characterize
13 or describe the discussions that you had in that
14 original work group as -- as to what your goal was for
15 that group?
16 A. Collectively as a -- as the work group?
17 Q. Yes. Yes.
18 A. I think we were trying to come up with some reasonable
19 solutions to address the items that were
20 unconstitutional, and some areas where we agreed that
21 there was better policy than what was enforced at the
22 time.
23 Q. All right. And -- and was the thinking at that time
24 that if you could get some agreements or the -- the --
25 a sense or an -- at least maybe non-objection of some

## Page 26

1  of the major interested parties, that legislation
2  would have a better chance of being passed?
3  A. Yes.
4  Q. Okay. All right. Okay. And at that point that
5  legislative work group evolved into the more -- more
6  formal one that met intermittently maybe at the end of
7  2018 and then more steadily well into 2019, is that
8  right?
9  A. Yes. That -- that's the bigger group that was in the
10 conference room at PAAM?
11 Q. Yes.
12 A. It -- we ballooned from like six, eight people to over
13 twenty probably.
14 Q. Yes. That's my recollection as well. And you and I
15 were both part of that most meetings, right?
16 A. Uh-huh. Yes.
17 Q. Okay. Okay. And when -- and when you were a delegate
18 in -- or a delegate in that group again -- again, was
19 that something that somebody appointed you to do? Or
20 was that sort of basically part of your job and
21 something that you self-selected to do?
22 A. That was -- I was the senior person in government
23 affairs and I had been in the issue a little bit
24 before. So I, as was part of my job, took that issue
25 as one of my own, personally assigned it to myself. I

## Page 27

1  mean, I was the commander of the unit, but I chose not
2  to delegate it.
3  Q. Okay. And was part of the purpose of that group to
4  try to not just hammer out a new law, but work on one
5  that was more evidence based and that would also cure
6  the constitutional defects identified by the district
7  court and the Sixth Circuit in Does I?
8  A. Principally, I would say it was to address the --
9  unconstitutional pieces. That was -- that was -- that
10 was my recollection of it.
11 Q. Okay.
12       MR. JAMISON: Paul, I'm going to place a
13 standing objection on the record. I don't -- I don't
14 see the relevance of much of this with respect to the
15 claims or defenses in the lawsuit. Rather than
16 objecting to every question, there's going to be a
17 standing objection on the record.
18       MR. REINGOLD: All right.
19 BY MR. REINGOLD:
20 Q. All right. And then were there other people from MSP
21 who also attended some of those meetings? When I say
22 MSP, I mean Michigan State Police.
23 A. Yes.
24 Q. And who were those folks?
25 A. Steve Beatty was our -- was general counsel. Julie

## Page 28

1  Agueros was a staff attorney that worked for Steve,
2  you know, in our legal office, so she attended on
3  occasion, myself. And -- it seems like there, you
4  know, somebody from the Sex Offender Registry unit,
5  people that are responsible for the day-to-day
6  operation of the registry, they weren't regular
7  attenders. But I know there were times when some of
8  those folks attended.
9  Q. Do you recall who it was who attended that?
10 A. I can't remember who was running it at the time. It
11 was kind of a -- that position is a little bit of a
12 rotator.
13 Q. Yeah. Yeah, I don't remember either.
14 A. I'd have to check, Paul.
15 Q. Yeah, that's all right.
16       And when you would go to these -- to those
17 meetings, did you have a regular report back to
18 anybody? Either -- either in the MSP were you
19 conveying information about what was happening or to
20 EOJ -- EOG?
21 A. So -- so I should say that, you know, at this point in
22 the process, the bill was no longer assigned by the --
23 it wasn't assigned to MSP as the lead agency. It was
24 assigned to the EOG. And we were basically like
25 second chair in terms of the, you know, policy

### Page 29

1  development. You know, when bills come through, every
2  bill is assigned to a state agency. EOG had assigned
3  this one to themselves, in my recollection.
4  Q. All right. All right. And --
5  A. It --
6  Q. Go ahead, sorry, I didn't mean to interrupt.
7  A. That's all right. Our contact at EOG was Suzy
8  Shkreli, she was a deputy attorney there or -- she
9  worked under Mark Totten.
10 Q. Right. And at this point there wasn't an actual bill
11 that had been introduced yet, is that right?
12 A. That's correct.
13 Q. All right. So when -- when you say the bill, it means
14 there -- there were -- there must have been
15 conversations between EOG and someone in the
16 legislature where they're beginning to think about
17 what they want to do? Is that how it works?
18 A. Yeah. I believe Shelli was in regular contact with
19 the administration as well about the need, you know,
20 the pressing need and giving updates about the case.
21 So I think we were trying to draft a bill to be
22 introduced in that work group.
23    That's why some of the other state pollers
24 were members of the Senate majority policy office.
25 John Shiflett is who comes to mind that was a regular

### Page 30

1  attender. I can't remember who the House person was.
2  Q. Yeah.
3  A. Lindsay Vogelsberg and Suzy, ourselves, and then your
4  -- your team.
5  Q. Okay. Yeah. All right. So -- so what is -- what --
6  let me just ask again.
7     When -- when we would have a meeting at
8  that -- at that point even if you were secondary and
9  EOG was primary, did you not need to report to them
10 because they were in the room because -- and so they
11 were aware of what was happening? Is that how it
12 worked?
13 A. Yeah. If Suzy would attend the meeting, then we kind
14 of -- there's really no need to report out. If she --
15 I think there were a couple where she didn't make it
16 so we did do a report out, I'm air quoting that. But
17 it was -- it was nothing formal.
18 Q. Would you just give her a phone call to update her,
19 that sort of thing?
20 A. Yeah, how'd it go, whatever happened, whoever we --
21 Q. Okay. Was there anybody higher up in the MSP that was
22 also -- that you were also consulting with? A
23 director, deputy director, regional directors, did
24 they get brought in on any of this?
25 A. As part of my job as the commander of government

### Page 31

1  affairs, I would have to update my boss, was the --
2  God, you'd think I'd remember that. That office has
3  changed titles, too. It was the chief of staff at the
4  time. I don't know what they're calling it now.
5     But it was a major that was part of the
6  executive council, the executive leadership of the
7  department. So I would give them regular legislative
8  updates. And any update that would come from this
9  would just be part of that, like where are we at with
10 SORA.
11 Q. Did you ever meet with them personally? Or was it
12 just through the chief of staff person?
13 A. Most of the time I would just give them -- I was like
14 an agenda item on their regular meeting.
15 Q. And were you -- were you at the meetings to update
16 them?
17 A. Yes.
18 Q. Okay. And who would be attending at those upper level
19 staff meetings?
20 A. The colonel, the lieutenant colonels. At the time we
21 used to call the -- was it coordinating council, I
22 think they called it. The top leadership of the
23 department, all of your --
24 Q. Okay. How often were those meetings held where you
25 would attend and update them?

### Page 32

1  A. Those meetings were held weekly, but I would only be
2  on the agenda once a month.
3  Q. So -- all right. So it's fair to say that the
4  director -- the -- the colonel knew what was going on
5  in the work group and was kept up to date on the
6  progress of the work group?
7  A. Yeah. I would say they were briefed on it. Whether
8  they retained it, I don't know.
9  Q. Yeah. Okay. And then were there -- were there other
10 meetings with the governor's office other than with
11 Suzy, the one who was participating?
12 A. No. I mean, we had -- I can only think of one time
13 maybe when Mark Totten was in a meeting. But the rest
14 of the time it was just with Suzy.
15 Q. Yeah. Okay. And is your recollection the same as
16 mine, that Suzy almost never said a word at the
17 meeting?
18 A. Yes.
19 Q. All right. During the course of the legislature work
20 group discussion in 2018 and '19, did you have the
21 feeling that there was progress being made? To put it
22 a different way, did the work group identify some
23 areas of potential agreement?
24 A. Yes.
25 Q. And -- and was some of that progress on the -- the

8 (Pages 29 to 32)

**Page 33**

1  evidence based side in addition to on the
2  constitutional side? That is, was there a -- a sense
3  that the -- the science showed, for example, that --
4  that a -- that putting -- that assigning people to the
5  registry based on their offense of conviction wasn't
6  -- didn't square with the research that -- that people
7  who had been more serious offenses posed a higher
8  risk?
9          Do you remember talking about that and if
10  there was some agreement on that?
11         MR. JAMISON: I'm going to object to the
12  question as vague, lack of foundation, and compound
13  question.
14  BY MR. REINGOLD:
15  Q. Let me try to simplify it. I asked if some of the
16  progress that we made was evidence based. Why don't
17  you try to answer that first and I'll give you
18  examples.
19         MR. JAMISON: Object as vague.
20  BY MR. REINGOLD:
21  Q. You can answer.
22  A. I remember that was your presentation. I don't
23  remember that we -- I don't remember the MSP or the
24  EOG, you know, signing off that that was our position.
25  Q. Was there a suggestion or any agreement that it would

**Page 34**

1  be helpful to have clearer definitions about what to
2  report?
3  A. Yes.
4  Q. That easier reporting could reduce law enforcement
5  time?
6  A. Yes.
7  Q. That school exclusion zones had proven to be not
8  helpful?
9  A. I want to say yes on that one.
10  Q. Okay. That maybe certain crimes that were registrable
11  should be removed?
12  A. Yes.
13  Q. That it might be helpful to reduce the amount of youth
14  on the public registry?
15  A. I don't remember that one.
16  Q. Okay. And do you recall if there was some agreement
17  that doing tiers based on actual risk assessments
18  rather than offense of conviction would be more in
19  line at least with what the science told us?
20  A. I would say -- we did see -- we did agree that
21  timelines -- there was a -- timelines to establish a
22  pathway off was in agreement. I would say that.
23         We never really -- as you recall, we didn't
24  have the faith in the risk assessment process that you
25  guys did, you know, based on our experience in the

**Page 35**

1  Department of Corrections. It's -- it -- it hasn't
2  been a great thing in DOC. So we were -- my
3  recollection is we were skeptical of that as a -- a
4  reason. But a pathway off we did agree on.
5  Q. Yeah. Okay. That's fair. Do you think that if the
6  process had been allowed to go forward with the --
7  with the work group, do you think there was enough
8  progress that it might have formed a basis for an
9  amended law if the work group had been allowed to
10  continue its work?
11  A. Yes.
12  Q. Is it also true that in the course of those meetings,
13  the ACLU provided the group with a wealth of social
14  science research about registries to the participants
15  in the group?
16         MR. JAMISON: I'm going to object to the
17  question as vague.
18         THE WITNESS: Yes. It was -- you guys
19  provided a lot of.
20  BY MR. REINGOLD:
21  Q. All right. And some of the studies that we provided,
22  you can just say yes or no to each of these if you
23  remember. That sexual recidivism -- let me start that
24  again.
25         Sexual recidivism rates did not change when

**Page 36**

1  registries were introduced in the 1990s and early
2  2000s?
3  A. I recall that, yes.
4  Q. And that registries themselves had no discernable
5  effect on sexual recidivism and, if anything, might
6  increase it?
7  A. I recall that presentation, yeah.
8  Q. All right. That studies said that?
9  A. Yes. I recall you saying -- I'm not saying we agreed
10  to any of this. I remember you guys presenting it
11  extensively.
12  Q. Yes. And I believe we actually gave you many of the
13  studies or summaries of the research. Also that
14  registries tended to increase non-sexual recidivism
15  because registrants couldn't reintegrate into the
16  community due to restrictions that impaired their
17  ability to find stable housing and jobs?
18  A. Yes.
19  Q. And do you know if that was consistent with the
20  experience of the DOC?
21  A. I don't know, Paul.
22  Q. That's all right. I don't want you to speculate if
23  you don't know.
24         Do you also remember a -- a study about
25  recidivism rates of sexual offenders were not, quote,

**Page 37**

1  frightening and high as the U.S. Supreme Court had
2  once noted, but were in fact lower than all other
3  categories of felonies except murderers?
4         And when I say lower than all other
5  categories, I mean people re-offending or getting
6  reconvicted of the same crime for which they went to
7  prison. So murderers committing a new murder or
8  robber committing a new robbery.
9  A. I recall the presentation, yeah.
10 Q. Okay. Do you recall the -- the studies that showed
11    that most people on the registry will never be
12    convicted of a second sexual offense?
13 A. Yes.
14 Q. And the risk of sexual recidivism drops with age?
15 A. Yes.
16 Q. And that it also drops with people being time free in
17    the community without recidivating? That is, they're
18    released, they live free in the community, and don't
19    commit a new crime; that their risk of ever committing
20    a crime drops the longer they are time free in the
21    community.
22 A. That one -- I don't remember that specifically, no.
23 Q. Okay. Yeah. And then do you recall us presenting the
24    compiled research and the findings of the American Law
25    Institute which proposed a model SORA with no public

**Page 38**

1  registry based on its review and assessment of the
2  best research in the field?
3  A. Yes.
4  Q. And is it true that much of that material was made
5    available to you and to the other members of the work
6    group and could be taken back to their agencies and
7    shared with their agencies if they wished?
8  A. Yes, that's true.
9  Q. Okay. So it's fair to say that the ACLU spent a lot
10    its time during and between meetings sending things to
11    you, trying to educate the work group participants on
12    what the current social science research revealed
13    about people on the registry?
14 A. Yes.
15 Q. And doesn't that research also show that the vast
16    majority of people on the registry are not like the
17    highest risk offenders for which these laws are named,
18    namely people who had stalked, kidnapped, raped, and
19    murdered young children?
20 A. Yes.
21 Q. All right. Is it true that there came a time -- I
22    believe it was around September 2019 -- where the
23    talks came to a halt?
24 A. I remember them coming to a halt. I don't remember
25    the timeline specifically, but yes.

**Page 39**

1  Q. I looked in my calender. The last entry I could see
2    was 2019, but I don't know that that was the actual
3    last date. It might have been August, you know,
4    something like that. I might have had it scheduled
5    out.
6  A. Right.
7  Q. Were there any discussions that you were part of about
8    ending the talks?
9  A. No.
10 Q. And -- and do you know why the talks were stopped?
11 A. I don't know why they stopped. I was just, you know,
12    I would get the notice and we were attending based on
13    the invite. You know, it wasn't like we got a
14    direction or anything to -- that they were shutting
15    down. I can't even recall why they -- why we stopped
16    meeting, honestly.
17 Q. And did you make any inquiry as to why the work group
18    had stopped?
19 A. I didn't.
20 Q. Okay. And do you know if the impetus to stop the work
21    group discussions came from the legislative branch or
22    the executive branch or both?
23 A. I don't.
24 Q. Okay. Was it around the time -- did -- did -- did the
25    end of the work sessions come about at around the

**Page 40**

1  time, if you remember, that the governor was being
2  mentioned in the press as a possible VP candidate if
3  Biden were to be elected in 2020?
4  A. I remember the open source reports, but the timing I
5    don't specifically remember.
6  Q. Let me bring up an exhibit on that. Let me share the
7    screen. Can you see that?
8  A. Not yet.
9  Q. Sorry, I forget the last step. How about now?
10 A. Yes. I got that one, Michigan Advance.
11        MARKED BY THE REPORTER:
12        DEPOSITION EXHIBIT 3
13        10:50 a.m.
14 BY MR. REINGOLD:
15 Q. Yes. This was a -- an outfit called Michigan Advance
16    that is dated September 6th, 2019, and talks about
17    Whitmer being -- would make a fine running mate for
18    Vice President Joe Biden. This was based on something
19    that a New Jersey -- the New Jersey politicians had
20    been talking about and it made the national news and
21    got picked up in Michigan through Michigan Advance.
22        It mentions that the best match for Biden
23    as a vice presidential running mate might be Michigan
24    governor Gretchen Whitmer. She had just earned
25    acclaim for banning flavored e-cigarettes in Michigan.

**Page 41**

1  She was a representative for reproductive rights. She
2  was someone who had been sexually assaulted herself in
3  college. And the conclusion was she might be a match
4  made in heaven, I think it might happen.
5       Is that the kind of press that you remember
6  seeing at around that time?
7  A. Yes. Not this -- not this particular article. But I
8     -- more bland sources, like, you know, MRS and --
9  Q. Yeah.
10 A. -- the News and Free Press, yeah.
11 Q. From your vantage point in government affairs in the
12    Michigan State Police, were you seeing signs in any
13    way that the governor's office or the legislature were
14    concerned about the political repercussions of making
15    SORA more lenient -- or as we would say, evidence
16    based -- in order to cure its constitutional defects?
17 A. No. I would say no to that question.
18 Q. What was your sense about why it was taking so long
19    for a bill to get drafted and be introduced?
20 A. You know, I felt like we were -- I think that was just
21    fatigue. I assume there was just a fatigue about the
22    whole issue and the lack of any progress with the
23    legislative, you know, the bill drafters, and the
24    people from the policy offices and EOG.
25       I thought -- honestly, I was taking it as a

**Page 42**

1  break just due to fatigue because there was -- I guess
2  it would be speculative for me to say what the
3  legislative -- what the legislators -- I mean, the
4  feeling was that, you know, the Republicans in the
5  control were only open to a certain -- bandwidth for a
6  certain change, basically just the bare minimums to
7  accommodate the unconstitutional pieces.
8       We had wanted to go a little further. And
9  I thought that we were -- I thought we ended or were
10 taking a break due to fatigue and just there was no
11 progress. That was my feeling.
12 Q. Okay.
13 A. And I wasn't raising my hand, let's start the Sex
14    Offender Registry work group again. I freely admit
15    that.
16 Q. Why was that?
17 A. Similar feelings. It was sort of a -- a, you know, it
18    began to feel like we were spinning our wheels. And
19    this wasn't the only issue on our plate at the time.
20    So it was just one thing that I had to deal with, so.
21 Q. So was the sense that SORA as an issue was more
22    charged or more toxic maybe politically than the other
23    kinds of bills that come that relate to the state
24    police?
25       I mean, to give you an example, you know,

**Page 43**

1  there's been, you know, there's been over the past
2  several years a bunch of bills that made it through,
3  often with bipartisan support, you know, clean slate,
4  which made expungement easier, getting rid of the
5  judicial veto on lifers, making parole a little bit
6  easier for people with medical problems.
7       All of those had gone through without, you
8  know, huge delays or changes and yet this one, there
9  was nothing. Can you -- can you tell us what you
10 think about that.
11    MR. JAMISON: I'm going to object to that
12 question as vague.
13 BY MR. REINGOLD:
14 Q. What I'm asking is what made SORA different, if you
15    know? Or what do you think made SORA different?
16 A. In my experience in the policy office, it was -- it
17    had more of a charge to it because, you know, the
18    public information and the public outcry and the
19    connection to the registry is strong. And it gives --
20    it gives people a -- a sense of security, if that's --
21    whether that's true or false or whatever.
22       And I think there's political, you know,
23    there was perceived political backlash for making
24    sweeping changes or getting rid of it.
25 Q. All right. I -- are you aware that after the

**Page 44**

1  legislative work group shut down -- and it certainly
2  wasn't the plaintiffs who shut it down -- that the
3  plaintiffs felt like they had no choice but to go back
4  to court? Were you aware that we geared up again in
5  the courts once that happened?
6  A. I remember that start, yes.
7  Q. Okay. And then in February of 2020, the court ruled
8     that the parts of the 2011 SORA that were held to be
9     unconstitutional in Does I, as to the named plaintiffs
10    in Does I, were now unconstitutional as to all
11    eligible registrants across the entire registry.
12       I assume that you were aware of, and
13    probably even read the court's opinion and order that
14    came out on February 14th, 2020?
15 A. I didn't read the opinion.
16 Q. All right. Would you have been getting summaries of
17    it or something like that so you were --
18 A. Yeah.
19 Q. -- in the loop?
20 A. Uh-huh.
21 Q. Okay. I'll read you a quote from that opinion,
22    because it will be the foundation for my next
23    question. The court said for several years
24    registrants have been forced to comply with
25    unconstitutional provisions of SORA. The parties in

### Page 45

1  this court expected that the Sixth Circuit ruling
2  would spur legislative action. And for some time it
3  appeared that the legislature was poised to pass the
4  new and comprehensive statute, obviating the need for
5  this opinion.
6      Unfortunately, the legislature was not able
7  to finalize the new registration statute. Faced with
8  a continued violation of their rights, plaintiffs
9  returned to this court to remedy defendants' ongoing
10 violation. The court's duty is to invalidate those
11 portions of SORA that violate the constitution.
12     For the record, this was ECF eighty-four.
13 It was filed by the court on 2/14/2020. It's page ID
14 eighteen oh four, paragraphs -- of the opinion page
15 twenty-eight of thirty-two.
16     At that point to your knowledge, did that
17 opinion -- or let me ask it this way.
18     When the court did that, it also said that
19 it was going to grant a broad injunction. It was
20 basically going to say that anybody who was a pre-2011
21 registrant would come off the registry entirely. But
22 the court said we're not going to activate the
23 injunction for another sixty days to give the
24 legislature time to pass a new law.
25     Were you aware of those two things? That

### Page 46

1  the injunction would be issued, but that it would be
2  delayed for sixty days?
3  A. I remember parts of what you said about the coming
4  off, but I don't remember specifically -- this would
5  have been in the legal shop like the -- with Steve and
6  Julie, the lawyers and -- and the unit itself.
7  Q. All right. After February of 2020, was there a pickup
8  in the pace of -- of activity of moving on a proposed
9  bill? Or were you out of the loop by then?
10 A. This is the down -- this is where I'm in the downslide
11 of, you know, I -- at some point a bill was
12 reintroduced. And I can't remember exactly what time,
13 you know, when the -- whatever bill did eventually
14 pass. I think it passed after I retired.
15 Q. Yes, that's true.
16 A. And honestly, I couldn't even tell you who the
17 sponsors were for that bill. So I don't remember any
18 movement on this, Paul, from February until I retired
19 in July of 2020.
20     MR. JAMISON: Paul, can we take a quick
21 break.
22     MR. REINGOLD: Sure.
23     (Off the record 11:00 a.m.)
24     (Back on the record at 11:04 a.m.)
25 BY MR. REINGOLD:

### Page 47

1  Q. Just before we broke, I was asking about the -- the
2  timing of the legislation and the effect of the
3  injunction being delayed from February for two months.
4  And you had said that you weren't aware of any effort
5  to speed up the legislation at that point.
6      Did you -- do you also remember that by
7  April of that year, COVID was raging and the
8  legislature stopped being in session for a while. And
9  the court also entered an order that suspended the
10 enforcement of SORA for the duration of the pandemic.
11 Do you remember that happening?
12 A. Yes, I remember that.
13 Q. And was that the subject of discussion within the
14 department?
15 A. Not -- not in my office.
16 Q. Okay. Who -- were you aware of it generally? I mean,
17 were people anxious about what was going to happen?
18 A. I think people were anxious about a lot of things.
19 But specific to the SOR, I think the SOR unit itself,
20 they were reconfiguring or how everything was going to
21 happen or not happen or what the -- how everything was
22 going to go forward. I remember that.
23 Q. Yeah. Okay. And then you said you left in July of
24 2020?
25 A. Yes.

### Page 48

1  Q. By that time had the bill been reported out? Or was
2  it in the House judiciary committee or on its way to
3  the House judiciary committee? Do you recall?
4  A. I don't even recall.
5  Q. Let me -- there were hearings that summer in the House
6  judiciary committee. Let me pull up a document just
7  to see if you were part of this or not. Can you see
8  that document?
9  A. Yes.
10     MARKED BY THE REPORTER:
11     DEPOSITION EXHIBIT 1
12     11:06 a.m.
13 BY MR. REINGOLD:
14 Q. So this was dated May 6th. And this comes from the
15 department of state police and it's to the chair and
16 the House judiciary committee. And I believe this was
17 a time when the hearings were virtual and people could
18 attend by Zoom or, as always the case, they could also
19 submit written testimony. Is this a document that
20 you've seen before?
21 A. Can you scroll up.
22 Q. Yes.
23 A. I'm sorry, down.
24 Q. I'm sorry.
25 A. Yes. I remember this document.

| | |
|---|---|
| 1  Q. And is this one that was written by Steve Beatty?<br>2  A. Yes.<br>3  Q. Okay. And did you have input into it? Or were you on<br>4     the sidelines by this time?<br>5  A. My input would have been at the top, when -- the piece<br>6     that we were -- how it was phrased at the top, where<br>7     we were in -- yes, supportive of the intent of HB.<br>8     That's my way in there. The technical stuff is all<br>9     the attorney.<br>10 Q. All right. Is yours also -- also looking forward to<br>11    addressing several issues with SORA in an effort to<br>12    improve efficiency and functionality for both<br>13    offenders and law enforcement?<br>14 A. Yes.<br>15 Q. And would that go to the -- the better definitions and<br>16    the time restrictions and so on?<br>17 A. Yes. The product of the work group, you would say.<br>18 Q. Yeah. Okay. Were there other things that you would<br>19    include in that? Like maybe a path off, that sort of<br>20    thing?<br>21 A. We didn't include that in here, but I know that we<br>22    talked about that in the meeting.<br>23 Q. Okay. And --<br>24 A. It --<br>25 Q. -- was that something that you think that the<br><br>Page 49 | 1     department would have supported?<br>2  A. Again, we -- our support is, you know, our support is<br>3     kind of handed to us by the executive office. So if<br>4     Suzy was okay with it, then yes.<br>5  Q. Is this typical of a -- of -- what gets produced in --<br>6     in House or Senate conference hearings?<br>7  A. This was typical of the time. I mean, when I was<br>8     commander I much preferred, obviously, in-person<br>9     testimony at the table. But this was -- this is our<br>10    written testimony from -- or our submission to the<br>11    committee, right?<br>12 Q. Yes. And but this is -- this was one where you could<br>13    have testified by Zoom, right?<br>14 A. Uh-huh.<br>15 Q. And were you asked not to? Do you remember?<br>16 A. No. I don't remember being -- no, I don't remember<br>17    that.<br>18 Q. But basically it sounds like this was Beatty's<br>19    bailiwick, as it were?<br>20 A. The bullet points in the middle, I would say, yeah.<br>21 Q. Okay. All right. Okay. I will stop sharing that.<br>22    And what -- why did you choose not to do a Zoom<br>23    meeting with the House judiciary committee?<br>24 A. You know, I don't recall what -- I don't recall the<br>25    decision going even into the committee, to be honest<br><br>Page 50 |
| 1     with you.<br>2  Q. You mean even to file the written testimony?<br>3  A. Yeah. I don't remember what -- just reading that, it<br>4     just refreshed my memory about that. I don't remember<br>5     a specific conversation about why we didn't -- written<br>6     testimony as opposed to the Zoom.<br>7  Q. All right. Was it your sense at this point that both<br>8     EOG and the legislature were going to be delighted if<br>9     they could slow this down until after the election?<br>10       MR. JAMISON: Objection, lack of<br>11    foundation.<br>12 BY MR. REINGOLD:<br>13 Q. You can answer.<br>14 A. No.<br>15 Q. And why not?<br>16 A. Because they were -- they were -- I mean, the hearings<br>17    were happening. I think the legislature was moving --<br>18    my recollection is the legislature was trying to move<br>19    in reaction to the -- the -- I can't -- opinion or<br>20    whatever it was in 2020 from the court.<br>21       I thought there was an understanding that<br>22    they were trying to do something to satisfy or be in<br>23    compliance with the court ruling.<br>24 Q. But you also said that you weren't aware of any<br>25    movement that was spurred by that.<br><br>Page 51 | 1  A. Yeah, I -- help me out a little bit or what is that<br>2     exactly --<br>3        MR. JAMISON: Yeah, that's not really a<br>4     question there, Paul.<br>5  BY MR. REINGOLD:<br>6  Q. I thought that you had said earlier that after the<br>7     opinion came down that there was not a lot of movement<br>8     and -- and that -- until the time you retired, that<br>9     there wasn't much going on?<br>10 A. Yes. And I'm -- so what I'm -- in terms of that, I'm<br>11    talking about like our work group stopped meeting.<br>12    You know, we stopped having these regular contacts<br>13    that we had had up to that point.<br>14 Q. Okay. I misunderstood. I thought you were saying<br>15    that the legislature wasn't acting.<br>16 A. Yeah. I don't -- the bill -- and honestly, that --<br>17    just seeing that document reminded me that it was<br>18    Lower that was even the sponsor. So that, yeah, that<br>19    was -- I remember then that was assigned to -- that<br>20    bill when it came out was assigned to EOG.<br>21       And yeah, I don't remember why -- I don't<br>22    remember why we did the written testimony or what --<br>23    anything around that decision.<br>24 Q. All right. Isn't it fair to say if they were worried<br>25    that an injunction was going to be issued in sixty<br><br>Page 52 |

### Page 53

1  days and that they wanted it to go quickly, they
2  certainly were in a position to make it go quickly?
3       MR. JAMISON: Objection, lack of
4  foundation.
5       THE WITNESS: They meaning the legislature?
6  BY MR. REINGOLD:
7  Q. Yeah, the legislature and the governor.
8  A. Yeah. I mean, I can't -- I think that -- that would
9     be speculative on my part.
10 Q. All right. All right. And when House bill 5679 was
11    introduced, how similar was it to the outgoing bill,
12    the SORA 2011, if you recall?
13 A. I don't recall.
14 Q. Did it -- it still include the school exclusion zones?
15    Do you remember that?
16 A. I don't recall.
17 Q. Okay. And it still used the same tiering system?
18 A. I don't recall the bill at introduction --
19 Q. Okay.
20 A. -- or passage, frankly.
21 Q. Okay. It was passed long after you were gone, so.
22    Okay.
23       Did you monitor in any way the House
24    judiciary committee hearing? Were you observing some
25    of that online?

### Page 54

1  A. I did watch at least one of them that I recall.
2  Q. And do you recall that at those hearings, I believe
3     there were -- between the written testimony and the
4     in-person hearings, there was something like a hundred
5     seventy submissions and that --
6  A. Yeah.
7  Q. -- only one fully supported the bill. Is that your
8     recollection?
9  A. Yes.
10 Q. Okay. And it's also true that the Attorney General's
11    Office also put in a submission that was critical of
12    some of the bill in some respects. Do you remember
13    that?
14 A. That I don't remember.
15 Q. I want to ask you about that. I'll pull that one up,
16    too. This is Exhibit 2. Can you see that one?
17 A. Yes.
18       MARKED BY THE REPORTER:
19       DEPOSITION EXHIBIT 2
20       11:17 a.m.
21 BY MR. REINGOLD:
22 Q. This is from the Attorney General and it's to the
23    committee. This one is coming in a little later, May
24    11th -- or I guess around the same time, May 11th.
25    This is one you never saw?

### Page 55

1  A. I don't recall this document.
2  Q. Okay. The paragraph that's now in the center says
3     it's my opinion that the bill does not sufficiently
4     address either my concerns or those of the federal
5     court in the key areas identified in the previous
6     paragraph.
7        The bill needs considerably more work if
8     the state is going to avoid future litigation over the
9     constitutionality of the registry. And because courts
10    tend to analyze the registry as a whole, any major
11    area that remains insufficiently addressed could cause
12    the entire act to fall.
13       And then the Attorney General goes over the
14    specific parts that she thinks are still
15    unconstitutional, including the lack of individualized
16    risk assessment, the geographic exclusion zones which
17    were still in the bill, and the tiering based on
18    convictions, and the in-person reporting requirements.
19       Did Dana Nessel have any direct contact
20    with the MSP, to your knowledge, about this
21    submission?
22 A. No. The only contact we had with the AG's Office was
23    with Eric Restuccia.
24 Q. And was his contact through the EOG? Or was his
25    contact separate?

### Page 56

1  A. It was part of the -- it was part of the group.
2  Q. The EOG group?
3  A. Yes.
4  Q. And was he attending those meetings as the
5     governor's -- when you would go to the governor's
6     shop?
7  A. He -- he -- yes. He attended -- so I don't know all
8     of them, but he attended some of them. He was at some
9     of our state meetings, too.
10 Q. Yeah, he was. That's right.
11       Are you aware that the Attorney General was
12    taking a position opposite to what the EOG was
13    promoting?
14 A. I -- I probably was at the time. Honestly, I don't
15    clearly remember that. But --
16 Q. Okay.
17 A. -- just reading that, I can see -- that's why Eric
18    came to mind.
19 Q. And what the Attorney General said turned out to be
20    prescient. She predicted the future accurately, would
21    you agree?
22 A. Yes. It appears, yes.
23 Q. Let me see what else I want to cover. Why is it that
24    you prefer to testify in person rather than submit
25    written testimony if you can or if you're allowed to?

**Page 57**

1  A. You know, I generally think it's the right thing to
2     do. It allows, you know, address the legislators
3     directly and then answer questions for or against
4     directly right there. To me it's more meaningful and,
5     you know, we don't lose anything in context or
6     communication.
7  Q. The submission from the MSP that I showed you didn't
8     have a signature at the bottom. Is that typical?
9  A. Yes. On the -- in the MSP memo format, there's --
10    that's typical.
11 Q. Okay. Did anyone think that there was a problem,
12    given that Colonel Gasper was a defendant in Does II
13    while this was happening and was being represented by
14    Eric Restuccia and other members of the Attorney
15    General's Office, and yet the policy that was being
16    suggested by the Attorney General herself conflicted
17    with the legal advice that Colonel Gasper was getting?
18    Did that get discussed in any way, shape, or form?
19 A. Not --
20       MR. JAMISON: Objection, lack of foundation
21    and to the extent that it asks for processes protected
22    by privilege and potentially attorney/client
23    communication.
24 BY MR. REINGOLD:
25 Q. You can answer.

**Page 58**

1  A. That wasn't at my level.
2  Q. Do you think policy should be made based on what's
3     happening in a lawsuit as opposed to what's actually
4     best for the public down the road?
5        MR. JAMISON: Objection, lack of
6     foundation.
7  BY MR. REINGOLD:
8  Q. You can answer.
9  A. Generally -- no. Generally, I think good public
10    policy shouldn't be driven by legal action.
11 Q. Should be driven by?
12 A. It should not be driven by legal action, that's my
13    opinion.
14 Q. Okay. Do you know if there were any studies done by
15    the department during the period or after the period
16    that the SORA enforcement was suspended?
17 A. No. I'm not aware of any studies.
18 Q. What I'm asking is that presented an opportunity to
19    see if not having reported increased or decreased or
20    had any effect on the number of sexual offenses being
21    committed, right, or recidivated?
22 A. Yeah. I could see the window, but I -- to my
23    knowledge, that -- there were no studies.
24 Q. Okay. And the amended bill that we're talking about
25    was passed by the House, I believe the only change was

**Page 59**

1     taking out the school zones, is that right? Do you
2     know?
3  A. I don't know. It passed after I left the office.
4  Q. Okay. And it's true, isn't it, that it passed at the
5     very end of the lame duck session in late December and
6     was signed by the governor on one of the very last
7     days of the month?
8  A. I wasn't tracking it.
9  Q. Okay. If that were the case, would you agree that
10    that's perfect timing to pass a bill that you know
11    might have political backlash, to use your words?
12       MR. JAMISON: Objection, lack of
13    foundation.
14       THE WITNESS: Yes, I agree with you. Bills
15    passed in lame duck are -- they are what they are.
16 BY MR. REINGOLD,
17 Q. All right. It's passed in a way -- it's designed to
18    make it as invisible as possible for the public?
19       MR. JAMISON: Objection, lack of
20    foundation.
21 BY MR. REINGOLD:
22 Q. You can answer.
23 A. Yes.
24 Q. Are you aware of any major backlash or political
25    repercussions as a result of passing the law, even

**Page 60**

1     though it eliminated the school zones?
2  A. No.
3  Q. Did you ever hear if anybody else was surprised about
4     that? I mean, that's one of the things they were
5     hugely worried about and, at least as far as I know,
6     nobody said boo about it. And I wondered if you ever
7     talked to anybody about that or heard --
8  A. No.
9  Q. -- comment about it? No? Okay.
10 A. I didn't. You know, honestly, Paul, I didn't track it
11    after I left. So I didn't have any of that
12    conversation.
13 Q. Okay. You said earlier that you worked for sixteen
14    years in the field as a trooper, right?
15 A. Correct.
16 Q. And most of that -- maybe all of that -- was after the
17    original SORA was passed, is that right?
18 A. That's right.
19 Q. And during that time SORA was amended repeatedly,
20    right?
21 A. That's right.
22 Q. And in 2011, that's when it was amended in a
23    significant way, when Michigan decided to comply with
24    the federal SORNA?
25 A. Yes.

**Page 61**

1  Q. That's the one that was challenged in Does I?
2  A. Yes.
3  Q. Okay. Do you know if the MSP was consulted about that
4     decision back in 2011? Whether it was a -- whether it
5     would be a good thing for the Michigan State Police to
6     have a SORNA -- compliant SORA?
7  A. I don't. At that point I was just a -- a field
8     trooper.
9  Q. Okay. Let me ask you a few last questions about being
10    a field trooper. Once SORA came in and it got bigger
11    and bigger, to the point where, I think when you were
12    still in the field, it probably had close to forty
13    thousand people on the registry, did you personally
14    use the SORA database to any extent in your own field
15    work?
16 A. No.
17 Q. And why not?
18 A. For me, it wasn't a value add to anything that I would
19    have been working on. You know, I was fortunate at
20    some of the work sites that I worked at there was a
21    single individual person, usually a sergeant, was
22    assigned the Sex Offender Registry. So he would
23    handle on the reporting, those reporting days. He
24    kind of handled the whole thing. So we didn't -- it
25    wasn't something that I had to consult for any --

**Page 62**

1  Q. And --
2  A. -- any purpose.
3  Q. Was that true at most of the places you were posted?
4  A. Say that again.
5  Q. Was that true at most of your posts?
6  A. It was true at two of them, the two that I worked at.
7  Q. And what you're saying -- I want to make sure I got it
8     right -- is that there would be one person who would
9     be designated or volunteer to be the SORA contact
10    person and that person is the one who would get
11    trained in all things SORA?
12 A. That's correct.
13 Q. Okay. So it wasn't as if all troopers in the field
14    were using or were conversant with the program that
15    they were trained on?
16 A. That's correct.
17 Q. And that was a program that took a lot of work to
18    become proficient in, wasn't it?
19 A. It was. I think that's why they went to the single
20    point of contact. And, you know, then the field
21    troopers would get involved, say, for example, if
22    there were -- after the reporting periods would come
23    and there were people that hadn't reported or there
24    were other -- whatever technical violations were out
25    there, then we would be asked to go follow up, try to

**Page 63**

1     find, you know, track these people down, see where
2     they were now, getting them to update the address.
3  Q. Sweeps they were called?
4  A. Yeah.
5  Q. Yeah. And when you did that, were you using your own
6     databases to go find them and that sort of thing? Or
7     did someone provide the information to you?
8  A. We would use, you know, any investigative, you know,
9     the databases we had available were LEIN, court
10    records, and the Sex Offender Registry itself.
11    Usually, that was -- if their address in there would
12    be wrong, that's why we would be looking for them.
13 Q. So did you -- in all the time that you were a trooper
14    on any cases, did you have occasion to use the
15    registry through the program provided to the Michigan
16    State Police?
17 A. You mean use the -- use our MSP Sex Offender Registry?
18 Q. Yes.
19 A. No.
20 Q. Do you know if -- if that was true for most other
21    troopers as well? I mean, were people -- did they
22    have enough resources that they didn't need the
23    registry to do their investigations and so forth?
24 A. You know, in -- in the -- on my shift, I can tell you
25    that, you know, nobody regularly consulted the

**Page 64**

1     registry for, you know, investigative -- an
2     investigative purpose.
3        MR. REINGOLD: All right. All right. I
4  don't have any other questions. This was shorter than
5  I expected and I'm done. Thank you.
6        MR. JAMISON: I have what I hope will be a
7  few questions.
8        THE WITNESS: Okay.
9        MR. JAMISON: Those famous last words from
10 an attorney. We'll see if that holds true.
11                    EXAMINATION
12 BY MR. JAMISON:
13 Q. First, I want to ask you a little bit about the work
14    group. And that's the work group that you testified
15    to previously that related to sort of working through
16    a new SORA legislation.
17       I think you've already said this, but ACLU
18    participated in that work group, correct?
19 A. Correct.
20 Q. And do you remember who from the ACLU participated?
21 A. In the beginning, Shelli Weisberg, Kim, I can't
22    remember, Kim -- Shelli's number two there in Lansing.
23    I'm drawing a blank on her last name. And Paul was
24    eventually part of it. Those were the --
25    those were -- oh, Miriam was the other one.

**Page 65**

1  Q. And do you know Shelli and Kim, were they lobbyists?
2  A. Yes.
3  Q. And do you know are Paul and Miriam lobbyists?
4  A. I don't think so.
5  Q. Okay. Do you recall whether the work group considered
6     shorter registration terms?
7  A. As part of the -- as part of the pathway off, I -- I
8     do recall that.
9  Q. Can you explain what you recall about that.
10 A. You know, I remember that we were looking at, you
11    know, tiering the offenses and then offering, you
12    know, quicker pathways off for what would be the
13    lower -- less -- less violent or less, you know, the
14    lower tiers of the lower end crimes on the thing,
15    where they could be off.
16        And my recollection is we were starting at
17    like a ten, fifteen, and twenty-five year and I know
18    Shelli's were much different than that. Shelli's was
19    like, you know, two, five, and ten or something like
20    that.
21 Q. But there --
22 A. At the beginning of it.
23 Q. Okay. Was there -- in those discussions about the
24    shorter terms, was there -- was lifetime registration
25    part of the discussion?

**Page 66**

1  A. Yes. For the top, for the most like egregious, I
2     don't know, like the CSC 1's, person under thirteen,
3     those types of the more egregious sexual offenses.
4  Q. Okay. And is it accurate to say that the MSP was in
5     support of having shorter registration terms?
6  A. Yes.
7  Q. And to your knowledge, was the EOG in support of
8     having shorter registration terms?
9  A. I don't think so.
10 Q. Okay. And do you know why the -- or, I guess, what --
11    was there -- was there any agreement amongst the group
12    regarding the registration terms?
13 A. Just that -- just that there were -- just in the
14    basic -- the basic pieces of setting up tiers and then
15    -- that there should be a pathway off. I remember
16    that basic agreement.
17 Q. All right. And do you recall the position of the -- I
18    believe you testified that there were members of the
19    legislature that were part of the work group, is that
20    right?
21 A. Part of the policy administration.
22 Q. Uh-huh.
23 A. Senate majority policy office, I mentioned John
24    Shiflett, that's the one who I remember the most. So
25    they were part of it. The legislators themselves

**Page 67**

1     didn't come to these.
2  Q. Do you remember the folks in the legislature that did
3     come, were they in support of shorter registration
4     periods?
5  A. You know, I don't remember actual legislators coming.
6  Q. Okay. And you were asked a few questions about
7     recidivism. What's the -- your understanding of what
8     recidivism means?
9  A. Where a -- a -- somebody that's previously convicted
10    of an -- in this case, somebody previously convicted
11    of a sex offense re-offends in a similar way.
12 Q. Does re-offend mean that they commit another instance
13    of criminal sexual conduct? Or does it mean that
14    they've been caught again for committing another act
15    of criminal sexual conduct?
16 A. To me it means committing another act.
17 Q. Okay. So there is a difference between getting caught
18    for another sexual -- criminal sexual conduct versus
19    committing another act?
20 A. Yes.
21 Q. Do you have experience either professionally or
22    personally with sex offenses?
23 A. Other than my time here with the registry, no, or time
24    on the road, I mean, in the times that I had contact
25    with people that were registrants.

**Page 68**

1  Q. And your experience on the road with registrants, do
2     you recall whether the individuals, they only ever
3     committed one offense?
4  A. I don't recall numbers of offenses. What I do recall
5     is most of my contacts in the violation of the
6     registry were for what we call technical violations,
7     meaning, they didn't adhere to one of the
8     requirements. Or, you know, they didn't -- they moved
9     without changing their address, things like that.
10 Q. And those circumstances, where it was sort of a
11    technical violation, what happened after you showed up
12    and you identified -- or you said hey, John, or, Bill,
13    or, Suzy, you need to update your address? What would
14    happen from there?
15 A. Well, by the time it was -- it would come out to the
16    field for like in -- in Paul's term, a sweep, usually
17    those people were being arrested and lodged for their
18    offense, for failing to register.
19 Q. Okay. And that would have occurred about at least a
20    decade ago?
21 A. Yes. I left the road in early 2011.
22 Q. Okay. I think this is self-evident, but does MSP
23    control the legislature?
24 A. No.
25 Q. So even if MSP has some great ideas for changes in the

**Page 69**

```
 1    law, the legislature passes the laws, right?
 2  A. Correct.
 3  Q. We talked a little bit about the hearing related to
 4    the new SORA. Do you remember that?
 5  A. I do.
 6  Q. We talked about there being approximately one hundred
 7    seventy submissions about the bill. Do you remember
 8    that?
 9  A. Yes.
10  Q. Do you recall whether most of the submissions were
11    from registrants or family members of registrants?
12  A. That's my recollection.
13  Q. Is it surprising to you that registrants wouldn't be
14    in favor of SORA?
15  A. No.
16  Q. Why's that not surprising?
17  A. Is it surprising to me that wouldn't be in favor of
18    the change? I -- maybe I need you to clarify the
19    question.
20  Q. Yeah. I mean, is it -- is it shocking to you that a
21    bunch of registrants would show up wanting to oppose
22    SORA?
23  A. Oh no, no. Typically, they would love the registry to
24    be repealed.
25  Q. Okay. Do you recall whether any victims testified?
```

**Page 70**

```
 1  A. You know, I don't recall honestly.
 2  Q. Okay. Would it be surprising that no victims would
 3    show up to testify in support or lack of support of
 4    the bill?
 5  A. Yes, I think so. I mean, I can see why people
 6    wouldn't.
 7  Q. Why wouldn't victims of sexual assault want to show up
 8    and testify publicly?
 9  A. Well, because it's -- for one, it's being -- they're
10    being -- it's like being part of the crime --
11    experiencing part of the crime or elements of the
12    crime all over again. So it's traumatic, you know, it
13    creates stress, it creates, you know, opens wounds
14    maybe that have been closed.
15  Q. And then there was a couple questions about the
16    written comments submitted by MSP. Do you remember
17    that?
18  A. Yes.
19  Q. And those were submitted, I think, in the spring of
20    2020, is that right?
21  A. I'm going by the date on the memo, yes.
22  Q. And that -- that was in the midst of a global
23    pandemic, right?
24  A. Correct.
25       MR. JAMISON: Okay. I don't have any other
```

**Page 71**

```
 1    questions.
 2       MR. REINGOLD: I've got just one last
 3    question.
 4            RE-EXAMINATION
 5  BY MR. REINGOLD:
 6  Q. You were asked about what recidivism means. If
 7    someone's on the registry because they committed an
 8    offense and then they re-offend but are not caught,
 9    we'd never know, isn't that true?
10  A. Yes.
11  Q. The only way we know -- two questions now, not one --
12    the only way we know is if they're caught and
13    reconvicted, right?
14  A. Correct. Yes.
15       MR. REINGOLD: Okay. Thank you. Thanks so
16    much for your testimony. And I hope you have a good
17    rest of your day.
18       (The deposition was concluded at 11:40 a.m.
19    Signature of the witness was not requested by counsel
20    for the respective parties hereto.)
```

**Page 72**

```
 1                CERTIFICATE
 2
 3  STATE OF MICHIGAN
 4  COUNTY OF MACOMB
 5       I, Heather DeMar, RPR, CSR, and Notary
 6  Public in and for the above county and state, do
 7  hereby certify that this deposition was taken before
 8  me at the time and place hereinbefore set forth via
 9  videoconference; that the witness was by me first duly
10  sworn to testify to the truth; that this is a true,
11  full and correct transcript of my stenographic notes
12  so taken, completed on 7/6/2023; and that I am not
13  related, nor of counsel to either party, nor
14  interested in the event of this cause. I agree that I
15  nor any person, attorney, paralegal, or expert witness
16  may make, copy, and/or distribute to others for future
17  sales, monetary gain, or any other purpose, a
18  transcript and/or video without paying Tri-County
19  Court Reporters the ordinary and customary charge for
20  any and all additional transcripts.
21       _____
22       Heather DeMar, RPR, CSR - 8951
23       Notary Public.
24       Macomb County, Michigan
25       My Commission Expires: 12/18/2027
```

18 (Pages 69 to 72)