# Exhibit 73:

## Brenda Hoffman Deposition Transcript and Exhibits F and G



**TRI-COUNTY**

**COURT REPORTERS**

**INC.**

(248)608-9250 Fax (844)270-7115

www.tri-countycourtreporters.com

depos@tricountyreporters.com

Transcript of the Testimony of
**BRENDA HOFFMAN**

**Date:** April 24, 2023
**Volume:**

**Case:** Does v. Whitmer

Printed On: May 10, 2023

BRENDA HOFFMAN
4/24/2023

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE,
on behalf of themselves and
all other similarly situated,

    Plaintiffs,

vs.          Case No. 2:22-cv-10209
          Hon. Mark A. Goldsmith
          Mag. Curtis Ivy, Jr.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

    Defendants.

_____/

The Remote Deposition of
BRENDA HOFFMAN
Hartland, Michigan
Commencing at 9:04 a.m.
Monday, April 24, 2023
Before Gina Deskiewicz, CSR-9689, RPR.

**Page 2**

```
1    APPEARANCES
2
3    AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
     MIRIAM J. AUKERMAN (P63165)
4    1514 Wealthy SE, Suite 260
     Grand Rapids, Michigan 49506
5    (616) 301-0930
     maukerman@aclumich.org
6    Appearing via Zoom.
7
8    AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
     UNIV. OF MICHIGAN LAW SCHOOL
9    PAUL D. REINGOLD (P27594)
     802 Legal Research Building
10   801 Monroe Street
     Ann Arbor, Michigan 48109
11   (734) 355-0319
     pdr@umich.edu
12   Appearing via Zoom.
13
14   MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
     SCOTT L. DAMICH (P74126)
15   PO Box 30754
     Lansing, Michigan 48909
16   (517) 335-7573
     damichs@michigan.gov
17   Appearing via Zoom.
18
19   ACLU OF MICHIGAN
     DAYJA S. TILLMAN (P86526)
20   1514 Wealthy Street SE, Suite 260
     Grand Rapids, Michigan 49506
21   (616) 301-0930
     dstillman@ucdavis.edu
22   Appearing via Zoom.
23
24
25
```

**Page 3**

```
1    MICHIGAN STATE POLICE
     AIMEE L. BRIMACOMBE (P70926)
2    Po box 30634
     Lansing, Michigan 48909
3    (517) 290-8559
     brimacombea@michigan.gov
4    Appearing via Zoom.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1         T A B L E  O F  C O N T E N T S
2
3    WITNESS:
4    BRENDA HOFFMAN
5    EXAMINATIONS                        PAGE
6    EXAMINATION BY MR. REINGOLD              8
7
8
9         E X H I B I T S
10        (Attached to transcript.)
11   EXHIBIT NO.                    PAGE
12   EXHIBIT A                      23
13   -MSP Procedure Manual 07-14
14   EXHIBIT F                      38
15   -Director's Memorandum 3/24/2021
16   EXHIBIT C                      47
17   -Operational Procedure SOR-OP-304
18   EXHIBIT D                      56
19   -Operational Procedure SOR-OP-328
20   EXHIBIT E                      79
21   -Sex Offender Sweep Findings
22   EXHIBIT H                      95
23   -MDOC Policy Record 4/01/2014
24   EXHIBIT G                      109
25   -Director's Memorandum 2/1/2022
```

Tri-County Court Reporters
248-608-9250

BRENDA HOFFMAN
4/24/2023

```
 1  EXHIBIT J                    121
 2  -RI-004
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1  Hartland, Michigan
 2  April 24, 2023
 3        * * * * * *
 4        THE REPORTER:  We are going on the
 5  record.  It is 9:04 a.m.  My name is
 6  Gina Deskiewicz.  I am a Notary Public for the
 7  county of Macomb.  I am a certified shorthand
 8  reporter for the state of Michigan.
 9        This deposition is being held via
10  videoconferencing equipment.  The witness and the
11  reporter are not in the same room.  The witness
12  will be sworn in remotely, pursuant to agreement of
13  all parties.  The parties stipulate that the
14  testimony is being given as if the witness was
15  sworn in person.
16        * * * * * *
17        BRENDA HOFFMAN,
18  was thereupon called as a witness herein, and after
19  having first been duly sworn to testify to the truth,
20  the whole truth and nothing but the truth, was examined
21  and testified as follows:
22        MR. REINGOLD:  Good morning, everyone.
23  My name is Paul Reingold, I'm a cooperating
24  attorney with the ACLU on this case, Doe's versus
25  Whitemore, and I'm one of the plaintiff's lawyers.
```

Page 6

```
 1        Today is April 24th, it's a little
 2  after 9:00 a.m., and this is the deposition of
 3  Brenda Hoffman, pursuant to notice and for all
 4  purposes that it can be used for under the
 5  Federal Rules of Self Procedure.  Before we begin I
 6  wanted to remind everybody that in this case there
 7  are protective orders that govern two things.  One
 8  is the anonymity of the plaintiffs, and the other
 9  is certain information that has been provided by
10  the Michigan State Police, and the Michigan
11  Department of Corrections.
12        Everyone, not a lawyer in the case
13  should have signed a protective order, and you need
14  to understand that you're bound by that protective
15  order not to reveal anything covered by it.  Has
16  the protective order been given to the court
17  reporter and to the witness?
18        THE REPORTER:  I do not have it, but my
19  firm may have it.
20        MR. REINGOLD:  And Ms. Hoffman, have
21  you seen the protective order?
22        THE WITNESS:  I have not.
23        MR. REINGOLD:  All right.  We'll make
24  sure you get that, and we'll need for you to sign
25  it.  Okay?
```

Page 7

```
 1        THE WITNESS:  Yes.
 2        MR. REINGOLD:  Thank you.
 3        EXAMINATION
 4  BY MR. REINGOLD:
 5  Q.  Let me start by giving you a few rules for the
 6      deposition.  Let me ask, have you ever been deposed
 7      before?
 8  A.  Yes.
 9  Q.  Okay.  Good.  I think you'll find this interesting.
10      It might be a long session, but I don't think it
11      will be too painful.  The purpose of a deposition
12      basically is for one side to learn information from
13      the other side.  Often it's information that the
14      only way we can learn it is by talking to people
15      with the knowledge.
16        It helps the parties resolve factual
17      disputes, sometimes it makes it easier to move the
18      case forward, and it also transfers basic knowledge
19      from what's in your head, basically, to mine.  And
20      that's what we'll be doing today.
21        There are a few basic rules for the
22      deposition.  One is it's a series of questions and
23      answers.  If you don't understand a question that I
24      ask you, tell me and I'll try to rephrase it if I
25      can.  You should understand that if you answer the
```

Page 8

2 (Pages 5 to 8)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1  question, people reading the transcript later will<br>2  assume that you understood the question and<br>3  answered it with understanding. Is that okay with<br>4  you?<br>5  **A.** Yes, sir.<br>6  **Q.** Okay. You also have to answer in words, you can't<br>7  shake your head or say "ah-huh" because the court<br>8  reporter can't take down head shakes, and "ah-huh"<br>9  is sometimes negative, and sometimes it's positive.<br>10  So you have to try to speak, and I'll try to remind<br>11  you if you don't.<br>12  We also shouldn't talk over each other<br>13  because it's very hard for the court reporter to<br>14  get a clean record if two of us are talking at the<br>15  same time. Next, if you want to take a break at<br>16  any time, feel free to ask for one. The only thing<br>17  I ask is that if it is mid-question, that you<br>18  answer the question first before taking a break.<br>19  And then the last thing I need to ask<br>20  you is are you on any medications or using any<br>21  alcohol or drugs that would impair your ability to<br>22  tell us what you know today?<br>23  **A.** No, sir.<br>24  **Q.** Okay. All right. Let me start by asking you how<br>25  you prepared for this deposition; did you review<br><br>Page 9 | 1  any documents, and if so, what were they?<br>2  **A.** I did work with the Attorney General Scott Damich,<br>3  as well as Eric Jameson to just prepare for this<br>4  deposition.<br>5  **Q.** And that was basic preparation. But I'm asking<br>6  were there any documents that you reviewed<br>7  specifically?<br>8  **A.** I did review -- I had asked to prepare a list of<br>9  sweep details that we had done in the past.<br>10  **Q.** Was that in response to discovery?<br>11  **A.** Yes.<br>12  **Q.** And I take it you provided some of the documents,<br>13  or went out and looked for them, and then<br>14  identified them in the discovery process?<br>15  **A.** Correct.<br>16  **Q.** All right. And so in preparing for the dep, you<br>17  reviewed some of those discovery materials?<br>18  **A.** Correct.<br>19  **Q.** All right. Anything else that you looked at by way<br>20  of documents?<br>21  **A.** No, sir.<br>22  **Q.** Did you review any of the legal documents in the<br>23  case, the complaint or anything like that?<br>24  **A.** I'm sorry, can you ask that question again?<br>25  **Q.** Sure.<br><br>Page 10 |
| 1  Did you review any of the legal<br>2  documents in the case, like the complaint or maybe<br>3  briefs that the party has filed, things like that?<br>4  **A.** No, sir.<br>5  **Q.** Okay. All right. And can you just very briefly<br>6  give me an overview of what the documents were<br>7  that -- that you were responsible for finding<br>8  of -- you called them the sweet{sic} of documents.<br>9  **A.** I was asked to list any of the sweeps that were<br>10  organized by the Sex Offender Registry Unit.<br>11  **Q.** All right. So it's about the sweeps. I thought<br>12  you side the "sweet" of documents but you said<br>13  "sweep"?<br>14  **A.** Sweep, s-w-e-e-p.<br>15  **Q.** Okay.<br>16  **A.** You're sweet too, I guess.<br>17  **Q.** Okay. All right. All right. Let's move on.<br>18  We're going to start by getting a feel<br>19  for your educational and professional background.<br>20  I don't have a CV from you, I believe, so I'll ask<br>21  you to start with your educational background.<br>22  Can you tell us where you went to high<br>23  school, college, grad school if any, college if<br>24  any, and any police training or other kinds of<br>25  professional training; it can be years or the<br><br>Page 11 | 1  approximate times, that would be helpful.<br>2  **A.** I graduated from Laker High School, which is<br>3  Pigeon, Michigan, in 1990. After that I spent a<br>4  year overseas as an exchange student in<br>5  South Africa through the Rotary, so I attended<br>6  Fish Hoek -- and that's, h-o-e-k -- High School, in<br>7  Fish Hoek, South Africa.<br>8  When I returned from South Africa, I<br>9  then attended Central Michigan University; I<br>10  believe I graduated there in 1996 or '97. And then<br>11  from there I entered the state police -- well, I<br>12  mean, my next form of education then was I was<br>13  admitted into the 116th Trooper Recruit School for<br>14  the Michigan State Police in August of 1998.<br>15  **Q.** And when did you complete the trooper school?<br>16  **A.** January of 1999.<br>17  **Q.** Okay. And from there did you go directly into<br>18  work?<br>19  **A.** Correct.<br>20  **Q.** All right. Did you hold any jobs between high<br>21  school or college, or after college but before<br>22  doing law enforcement training?<br>23  **A.** Yes.<br>24  **Q.** And what kinds of jobs did you hold and when?<br>25  **A.** How far back did you want me to go?<br><br>Page 12 |

3 (Pages 9 to 12)

BRENDA HOFFMAN
4/24/2023

```
 1    Q.  High school to college, and then post college.
 2    A.  Well, in high school my dad was a farmer, so I
 3        worked beats in the summer or beams.  I also worked
 4        as a sporting goods store.  I was also -- had a
 5        little news article or thing that I did for the
 6        local newspaper.
 7              When I went overseas I did not work,
 8        but I did continue to write for the local newspaper
 9        of my experiences.  Once I returned from
10        South Africa, then I started college.  And in
11        college I worked in the cafeteria for
12        Central Michigan University.  I also worked in the
13        office in the chemistry unit.
14    Q.  All right.  That's good.  Were there any full time
15        jobs after college?
16    A.  Yeah.  When I was -- While I was in college I did
17        have a full time job at the Circuit Court in
18        Mount Pleasant.
19    Q.  What were your duties there?
20    A.  I was a court clerk.
21    Q.  And anything else between college and starting
22        trooper school?
23    A.  I used to ref volleyball during volleyball season.
24    Q.  All right.  Now, can you gives your work history
25        once you left school and started employment; I
```
Page 13

```
 1        assume from what you're saying you went directly to
 2        the Michigan State Police?
 3    A.  I'm sorry, repeat that.
 4    Q.  I'm assuming you went directly to the
 5        Michigan state police after graduating from the
 6        training?
 7    A.  Well, when you start with the academy is technically
 8        Michigan State Police, the academy is technically
 9        your start date with the state police.
10    Q.  All right.  And when you finished, what was your
11        first posting?
12    A.  I was assigned to the Metro North Post in Oak Park,
13        Michigan.
14    Q.  What were your duties there?
15    A.  I was a trooper where I worked patrol and
16        investigated complaints.
17    Q.  And for how long did you do that?
18    A.  Approximately 3 to 4 years.
19    Q.  And what years would those have been roughly?
20    A.  I believe 1999 through I believe 2003.
21    Q.  Okay.  And then where did you move to next?
22    A.  I was then assigned to work on an undercover team
23        called COMET, which stands for County Of Macomb
24        Enforcement Team.
25    Q.  And what kind of work were you doing there?
```
Page 14

```
 1    A.  We were investigating narcotics complaints.
 2    Q.  And for how long did that last?
 3    A.  Approximately four years.
 4    Q.  And that would take us to what date?
 5    A.  Either 2006 or -- it was about 2006, I believe.
 6    Q.  All right.  And from there?
 7    A.  From there I went to the Richmond Post.
 8    Q.  Where is Richmond?
 9    A.  In Richmond, Michigan, on the east side south of
10        Port Huron.
11    Q.  Is that also Macomb County?
12    A.  Yes, sir.
13    Q.  All right.  And what was your assignment there?
14    A.  Again, I worked patrol, investigated complaints.
15    Q.  And for how long?
16    A.  Until the post was shut down.
17    Q.  And was that a budget decision?
18    A.  Yes.
19    Q.  And what year was that?
20    A.  2011.
21    Q.  All right.  And can you take us from 2011 to the
22        present day?
23    A.  Once the post was shut down I was then assigned to
24        the Lapeer Post located in Lapeer, Michigan.  And
25        then from there I transferred to the Flint Post.
```
Page 15

```
 1        From the Flint Post, I then transferred to the
 2        Metro North Post.
 3    Q.  Can you give me the years of each just so I've got
 4        a chronology here?  Just rough.
 5    A.  Backwards.  I got to the Metro North Post in 2014.
 6        I went to the Flint Post in 2013 for about eight
 7        months, so between 2011 and 2013 I was
 8        at -- assigned to Lapeer.  I think it was like
 9        maybe July or August of 2013 until February of '14
10        I was at Flint Post.  And then from February 2014
11        through April of 2014 I was at the Metro North
12        Post.
13    Q.  All right.  And just finish it up for us, if you
14        can.
15    A.  And then April 2014, then I was assigned to the
16        Sex Offender Registry Enforcement Unit.
17    Q.  And when you made that move, is that because you
18        had experience doing that in some of your earlier
19        postings, or was it all new for you?
20    A.  It was all new.
21    Q.  And was it one that you had requested, or one that
22        you were assigned to?
23    A.  I was asked if I was interested in it.
24    Q.  And were you?
25    A.  Yes.
```
Page 16

4 (Pages 13 to 16)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1   Q. Why? | 1   Unit since that time. The unit itself has been |
| 2   **A.** I'm sorry, why? | 2   with different divisions within the state police. |
| 3   Q. Why. Sure. | 3   Q. All right. Would you describe the different |
| 4   **A.** It was something new. | 4   divisions that the enforcement was moved to, and |
| 5   Q. And what was it that you did at -- when you joined | 5   when and why? |
| 6   that unit? | 6   **A.** I don't know the exact date, but -- and I don't |
| 7   **A.** I was assigned to be the second district regional | 7   know the reason why it was changed. But it went |
| 8   coordinator. | 8   from Sejuk Unit to -- I believe it was the |
| 9   Q. And how many other people had positions like yours | 9   Special Investigation Division, SID. I believe we |
| 10   in the state at that time? | 10   were in that unit maybe approximately a year or so, |
| 11   **A.** At that time there were a total of four regional | 11   but then I know in 2017 our unit was moved to the |
| 12   coordinators in the unit. | 12   Special Operations Division in 2017. |
| 13   Q. And was that unit considered part of the Sex | 13   Q. And what does the Special Operations Division do |
| 14   Offender Registry Unit, or was it outside of that | 14   other than the Sex Offender Enforcement Unit? |
| 15   unit? | 15        MR. DAMICH: Objection. Form and |
| 16   **A.** In 2014 the Sex Offender Enforcement Unit was under | 16   foundation. |
| 17   the Sejuk{sp}, the criminal justice center side of | 17        MR. REINGOLD: If you know. |
| 18   things for the state police. | 18        THE WITNESS: The Special Operations |
| 19   Q. And was the SOR Unit also in the same overarching | 19   Division has a variety of units; it has our |
| 20   division? | 20   emergency support team, it has our bomb squad, it |
| 21   **A.** The Sex Offender Registry and the Sex Offender | 21   has our aviation team, it has our K9 team, it has |
| 22   Registry Enforcement Unit were both under Sejuk. | 22   our marine services team, the dive team. |
| 23   Q. Okay. And you can continue with your progress | 23   BY MR. REINGOLD: |
| 24   until today on the jobs. | 24   Q. And is the emergency response team -- what -- what |
| 25   **A.** I've been in the Sex Offender Registry Enforcement | 25   is that; I don't know what it covers. |
| <div align="center">Page 17</div> | <div align="center">Page 18</div> |

| | |
|---|---|
| 1        MR. DAMICH: Same objection to form and | 1   did there come a time where you changed -- your job |
| 2   foundation. | 2   changed? |
| 3        THE WITNESS: Are you asking what the | 3   **A.** I -- In August of 2019 I promoted as the sergeant |
| 4   emergency support team is? | 4   of the Sex Offender Registry Enforcement Unit. |
| 5        MR. REINGOLD: Yes. | 5   Q. And that was in 2017? |
| 6        THE WITNESS: Our emergency support | 6   **A.** No, August of 2019. |
| 7   team is a team of troopers and sergeants | 7   Q. Of 2019. Okay. |
| 8   that -- it's like our SWAT team. They are called | 8        And is that the position that you held |
| 9   for high-risk situations. | 9   ever since? |
| 10   BY MR. REINGOLD: | 10   **A.** Yes. |
| 11   Q. And that's a big unit, right, that's tens of | 11   Q. Okay. Is your current position listed as the |
| 12   people, 45 people or something like that? | 12   state-wide sex offender enforcement coordinator; is |
| 13   **A.** I believe so, yes. | 13   that fair? |
| 14   Q. But you don't know why the Sex Offence Enforcement | 14   **A.** Yes, sir. |
| 15   Unit was put into special operations? | 15   Q. Okay. And as to chain of command, to whom do you |
| 16        MR. DAMICH: Objection to form and | 16   report? |
| 17   foundation. | 17   **A.** My first lieutenant is Jason Bird, b-i-r-d. |
| 18        THE WITNESS: That is a question for | 18   Q. I wasn't so interested in the name as much as the |
| 19   someone higher up than me. | 19   position. What position does that person hold? |
| 20   BY MR. REINGOLD: | 20   **A.** He is the first lieutenant of -- in the Special |
| 21   Q. All right. Were you consulted in any way, or was | 21   Operations Division. |
| 22   your opinion asked in that transition or not? | 22   Q. And do you have people under you in the |
| 23   **A.** I don't recall. | 23   Sex Offender Enforcement Unit who report to you? |
| 24   Q. Okay. All right. And through those moves did you | 24   **A.** No. |
| 25   remain in the same position that you had held, or | 25   Q. And why is that? |
| <div align="center">Page 19</div> | <div align="center">Page 20</div> |

<div align="right">5 (Pages 17 to 20)</div>

BRENDA HOFFMAN
4/24/2023

```
 1   A. Because they never filled the vacancies.
 2   Q. Were those the vacancies where you said there were
 3      regional coordinators, and when you started there
 4      were four slots, and you're saying today there are
 5      no slots; is that right?
 6   A. There are slots, but they are vacant.
 7   Q. Right. And for how long have they been vacant?
 8   A. Several years.
 9   Q. All right. And is the -- Who makes the decision
10      whether to fill or not fill vacant slots, if you
11      know?
12            MR. DAMICH: Objection. Form and
13      foundation.
14            THE WITNESS: Someone higher than me.
15   BY MR. REINGOLD:
16   Q. For your unit do you know who it would be or not?
17   A. I know the positions have been asked to be filled,
18      but they have not been filled.
19   Q. And you -- When you say they've been asked, is that
20      by you, or you and others; and if so, whom?
21   A. I've asked them to be filled, and I've expressed
22      that to my lieutenant who I believe has told me he
23      expressed it to people higher than him.
24   Q. All right. And so far no luck; is that right?
25   A. Correct, they're still vacant.
```

Page 21

```
 1   Q. And do you know if this is a policy decision, or
 2      again, is it more a funding decision?
 3            MR. DAMICH: Objection. Form and
 4      foundation.
 5            THE WITNESS: I don't know.
 6   BY MR. REINGOLD:
 7   Q. Okay. Would you describe the relationship between
 8      the SORA Unit itself and the SORA Enforcement Unit;
 9      are you physically in the same place or not?
10   A. No, sir.
11   Q. And where are you and where are they?
12   A. What do you mean?
13   Q. To the extent that you have an office and they have
14      an office. I'm just trying to figure out --
15   A. Okay. The SOR Unit -- the SOR registry -- the Sex
16      Offender Registry Unit is still housed under Sejuk,
17      and their houses when they do work in person are at
18      the state police headquarters. I am technically
19      assigned out of SOD. Our offices are in Lansing as
20      well, but at the SOD office.
21   Q. All right. And how do you interact with people in
22      the SOR unit; what are your jobs or parts of your
23      jobs that bring you in contact with them?
24   A. They will generally reach out to me if they give
25      any enforcement questions and pass them along to
```

Page 22

```
 1      me. We work together with the database called
 2      M-SOR which is the Michigan Sex Offender Registry
 3      Database.
 4   Q. Anything else?
 5   A. We communicate when they have -- when there's
 6      questions about offenders, there's all sorts of
 7      different communications, I guess. I don't know
 8      really what you want me --
 9   Q. Maybe some examples would help.
10   A. If -- If someone from an agency calls and they have
11      a question about enforcement side of things, they
12      will either pass my name on to them or send me an
13      e-mail to say hey, a certain person may have some
14      questions, can you help them.
15   Q. All right. And when that happens, it's then your
16      responsibility to reach out to that person and
17      finish the correspondence; is that right?
18   A. Yes.
19            MR. REINGOLD: All right. Let's pull
20      up Exhibit A, which I will share to the best of my
21      ability.
22            MARKED FOR IDENTIFICATION
23            EXHIBIT A
24            9:30 a.m.
25            MR. REINGOLD: Is that now visible on
```

Page 23

```
 1      your screen?
 2            THE WITNESS: No.
 3            MR. REINGOLD: Is it now?
 4            THE WITNESS: I see a Zoom. Is that
 5      your screen?
 6            MR. REINGOLD: No, it shouldn't be.
 7      Let's see. Try again. It says I am share
 8      screening, but apparently I am not. Let's try that
 9      again.
10            MS. AUKERMAN: You were sharing your
11      screen before, Paul, I think you just had the wrong
12      window up.
13            MR. REINGOLD: Yeah, think that's
14      right. How about that one?
15            THE WITNESS: Yep.
16            MR. REINGOLD: Okay. This has been
17      marked -- or can be marked as
18      Plaintiff's Exhibit A, and it's probably easiest IF
19      I identify it.
20            It's labeled procedure manual 07-14,
21      Michigan State Police, Sex Offender Registry and
22      Enforcement, and it's purpose reads "this manual
23      procedures guidance and procedures on the
24      responsibilities of members responsible for sex
25      offender registration and enforcement."
```

Page 24

6 (Pages 21 to 24)

BRENDA HOFFMAN
4/24/2023

---

1
2  BY MR. REINGOLD:
3  Q.  Is everything that I read accurate?
4  A.  Yes, sir.
5  Q.  And is this the document that you're familiar with?
6  A.  Yes, sir.
7  Q.  All right.  And its effective date is April 19,
8      2022?
9  A.  Yes, sir.
10 Q.  All right.  I'm going to slide down to section 2.
11     Can you see that clearly, is it big enough?
12 A.  Yes, sir.
13 Q.  Okay.  Section 2 says in A, "the statewide sex
14     offender coordinator functions as the supervisor
15     for the Regional Sex Offender Coordinators, in
16     addition the SSOEC is responsible for the
17     following."
18         One is supervise the Sex Offender
19     Registry Enforcement regional coordinators.  I take
20     it from your testimony so far that no longer
21     occurs; is that right?
22 A.  Correct.  As I said, they're vacant.
23 Q.  I mean, when you started as the sergeant, were
24     there regional coordinators?
25 A.  There was one left.

Page 25

---

1  Q.  Right.  And as people left, were the
2      responsibilities that they were handling pushed off
3      on to those who remained?
4  A.  Correct.
5  Q.  And so now one person is doing the work of what
6      used to be five people; is that what you're saying?
7  A.  Correct.
8  Q.  So obviously -- I mean, you can't do the work that
9      five people did, so how did you tailor the job or
10     reconfigure the job to do what you think is the
11     most important work?
12 A.  I try to look at the biggest priority and work at
13     one thing at a time.
14 Q.  And at the moment can you list, say, your top 3 or
15     4 priorities?
16 A.  The biggest priority I would say is to try to
17     locate the offenders who have not resurfaced since
18     the new law started on March 24th of 2021.  Another
19     priority is we had a new database that was rolled
20     out in August 2021, that's still a work in progress
21     with getting that to work.  Other priorities is
22     dealing with the various e-mails and calls I get
23     from the field.
24 Q.  And is there a fourth that you would say is --
25 A.  Those three keep me pretty busy.

Page 26

---

1  Q.  Yeah, I know with being on the receiving end of
2      questions, that can be a full time job in itself.
3          You said that -- The first priority
4      that you listed at least had to do with getting
5      people back on the registry who might have dropped
6      off during covid; is that right?
7  A.  Yeah, when I say "back on the registry,"
8      they -- they're still on the registry, they just
9      have not reported for long periods of time, and
10     they definitely have not reported since the new law
11     started.
12 Q.  And is some of that caused you think by confusion
13     about the new law as to who had the register and
14     who didn't, or was it people who had come off the
15     registry, or at least had not been told that, you
16     know, the law no longer applied or didn't get
17     notice or didn't know what they were suppose to do?
18     MR. DAMICH:  Objection to form and
19     foundation.
20         MR. REINGOLD:  You can answer if you're
21     able.
22         THE WITNESS:  I think it's a
23     combination of things.  I mean, everyone was
24     dealing with covid, the injunction.  I think some
25     people were -- some people meaning

Page 27

---

1      offenders -- were told information about whether or
2      not they were or were not on the registry.  I think
3      offenders received the letters that we sent and
4      didn't understand them.
5          So I think it's a combination of
6      things, and I think there's some offenders who
7      weren't doing what they should have been doing for
8      even longer periods of time and they have just
9      continued to do so.  So I think it's a combination
10     of reasons why some people have not -- when I say
11     "resurfaced," I mean they have not verified since
12     the new law.
13         I found going through lists of people
14     who haven't showed up -- I mean, some people have
15     died.  I mean, that's probably a good reason why
16     they didn't have it shown up, you know?  Or they
17     maybe moved out of state or they're incapacitated,
18     they may have some medical issues that is -- is
19     giving them problems to come in.  So there's a
20     variety of reasons why some people have not come
21     in.
22 BY MR. REINGOLD:
23 Q.  And you're making it a priority to try to get those
24     people back into compliance --
25 A.  Correct.

Page 28

---

7 (Pages 25 to 28)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1   Q. -- and officially you said they're on the registry, | 1   those as well as any possible federal sex offender |
| 2    but up to date on the registry? | 2   investigations. |
| 3   A. Correct. | 3   Q. So the U.S. Marshal's office would either bring you |
| 4   Q. The notice that went out to registrants I think was | 4    in or would consult with you on federal cases, and |
| 5    similar to the notice that went out to the police, | 5    then what other kinds of cases that were nonfederal |
| 6    that wasn't an easy document to understand. Right? | 6    did they consult with you about? |
| 7   A. Are you asking me if I thought it was an easy | 7   A. We would work together on various -- I would say |
| 8    document? | 8    state cases of possible state violations for the |
| 9   Q. Yes. I said it was not an easy document to | 9    Sex Offender Registry. |
| 10    understand. I was asking if you agree? | 10   Q. And why would the U.S. Marshals be involved in |
| 11   A. I had to read it slowly. | 11    that? |
| 12   Q. Okay. And at the end did you think you understood | 12   A. The U.S. -- One of the U.S. Marshal's duties are to |
| 13    it or not? | 13    investigate federal Sex Offender Registry |
| 14   A. Yes, I understood it. | 14    violations. |
| 15   Q. Okay. All right. Let's look at some of the things | 15   Q. So does that mean the state violation might also be |
| 16    that at least according to the -- to Exhibit A, are | 16    a federal violation; is that the connection? |
| 17    within your bailiwick as it were. | 17   A. It could be. |
| 18      The second thing that's listed here is | 18   Q. Can you give an example of something that wasn't |
| 19    that you're suppose to be liaison with | 19    that and wasn't a federal crime but where |
| 20    U.S. Marshal's Sex Offender Investigation Branch. | 20    U.S. Marshals were involved? |
| 21    Can you describe what that entails? | 21   A. I'm sorry, can you repeat that? |
| 22   A. At one time when I first became -- got in the unit, | 22   Q. Yes. Can you give me an example of something that |
| 23    I worked a lot with U.S. Marshals. I was actually | 23    wasn't an underlying federal crime, and wasn't one |
| 24    even deputized with them. We would work on various | 24    where the state violation might be a federal |
| 25    sex offender investigations, and we would focus on | 25    violation, but the -- the Marshal's Office was |
| <div align="center">Page 29</div> | <div align="center">Page 30</div> |
| 1   still involved? | 1   effort between the Federal U.S. Marshals and State, |
| 2      MR. DAMICH: Objection to form and | 2    and that happens a lot with -- with law enforcement |
| 3   foundation. | 3    agencies. We sometimes work together on various |
| 4      THE WITNESS: I guess I don't know what | 4    cases. |
| 5   you're asking. We would focus on Sex Offender | 5   BY MR. REINGOLD: |
| 6   Registry violations either federally, or they would | 6   Q. Okay. That's an answer. All right. |
| 7   assist for, you know, state violations. | 7      What about number 3, monitor the |
| 8   BY MR. REINGOLD: | 8    SOR Most Wanted website. Is that a website that's |
| 9   Q. All right. What I'm really asking is the | 9    a private website or a public website? |
| 10    U.S. Marshal's Office has the authority to assist | 10   A. That no longer exists, that was taken down. |
| 11    whether or not there's a federal issue in the | 11   Q. And did it come down from the transfer of the old |
| 12    crime? | 12    program to M-SOR, or was it for a different reason? |
| 13      MR. DAMICH: Objection to foundation. | 13   A. I don't recall -- That was definitely taken down |
| 14      THE WITNESS: They would assist us on | 14    before the transfer of the new databases. Is that |
| 15   some of our state investigations. | 15    what you said? |
| 16   BY MR. REINGOLD: | 16   Q. Yes. |
| 17   Q. All right. And was that usually initiated by them | 17   A. Yeah, it was taken down before that. |
| 18    or by you? | 18   Q. And do you know who made the decision to take it |
| 19   A. We would work together. | 19    down, if you know? |
| 20   Q. I guess I'm still not understanding why federal | 20   A. I don't know who made that decision. |
| 21    authorities could be brought in or call you in on a | 21   Q. And again, is that a decision that you were |
| 22    state case; can you explain that? | 22    consulted or had input on or not? |
| 23      MR. DAMICH: Objection to foundation. | 23   A. No. |
| 24      THE WITNESS: I believe it was just | 24   Q. All right. When it was in operation, do you know |
| 25   like working hand in hand. It was a collaborative | 25    if it was a private or a public website? |
| <div align="center">Page 31</div> | <div align="center">Page 32</div> |

<div align="right">8 (Pages 29 to 32)</div>

BRENDA HOFFMAN
4/24/2023

```
 1    A.  It was public.
 2    Q.  And do you know if it came down because it wasn't
 3        being used, or it was -- or was it -- was this also
 4        a funding issue?
 5    A.  I don't know the reasons why it was taken down for
 6        sure. You'd have to ask whoever made that decision
 7        in the state police.
 8    Q.  Okay. When it was operational was it mostly used
 9        by MSP members, that is police, or was it -- if you
10        know, was it mostly used by the public?
11            MR. DAMICH: Objection to form and
12        foundation.
13            THE WITNESS: I can't determine who was
14        using it. I know we would use it to try to work on
15        those targets to try to find.
16    BY MR. REINGOLD:
17    Q.  And what was it about that website that could help
18        you find people?
19    A.  I think it just got, you know, there was a list of
20        offenders who we decided that, you know, we haven't
21        been able to find them for some time, and maybe by
22        putting them on this list would maybe alert someone
23        in the public to see them and possibly give us
24        information to try to track them down.
25    Q.  All right. And -- But that's -- It's no longer
```

Page 33

```
 1        available as a tool for you. Right?
 2    A.  Correct.
 3    Q.  What about 4, oversight of statewide enforcement
 4        issues -- initiatives. What I'm asking here is
 5        other than sweeps and residents checks, because I
 6        want to get to those later, can you give us
 7        examples of some statewide enforcement initiatives?
 8    A.  You're wanting me to include sweeps and residents
 9        checks, which are the same things in my mind?
10    Q.  Yes. Apart from those, are there other things that
11        you had categorized as statewide enforcement
12        initiatives?
13    A.  I oversee the various tips that are submitted on
14        the public website. Those may turn into
15        enforcement issues upon investigation.
16    Q.  And those have been submitted by the public?
17    A.  Correct.
18    Q.  All right. Anything else that would fit under
19        statewide enforcement initiatives?
20    A.  No, sir.
21    Q.  Okay. And the tips, that's just using the -- the
22        M-SOR programming, you can pull up whatever people
23        have entered by way of tips, it doesn't involve
24        collaboration with local law enforcement or
25        anything, it's just whatever the public puts into
```

Page 34

```
 1        the tip line?
 2    A.  Correct.
 3    Q.  All right. Did you -- For number 5, were you
 4        active in providing SOR Enforcement -- or are you
 5        active in providing SOR Enforcement trainings in
 6        the field?
 7    A.  I have not for several years.
 8    Q.  And why is that?
 9    A.  Well, obviously covid happened; that totally
10        changed a lot of things. But prior to that due to
11        just our lack of resources as well by not having
12        enough people in the unit we -- we took a step back
13        from doing enforcement trainings.
14    Q.  When the new law passed, were there trainings done
15        by you or you -- or your unit in addition to any
16        trainings put on by the SOR unit itself?
17    A.  There were online trainings for the new database
18        done by the Sex Offender Registry unit.
19    Q.  And did you have a role in that, or not?
20    A.  I -- They were all online. I -- I attended most of
21        them, but it was mainly for -- It was not to answer
22        enforcement questions, it was just to basically
23        stand by. It was more for -- Those trainings were
24        for how to utilize the new database.
25    Q.  That was the -- about a two-hour training; is that
```

Page 35

```
 1        right?
 2    A.  Correct.
 3    Q.  And do you know how many people were trained in
 4        those trainings?
 5    A.  I don't have a number for that; no, sir.
 6    Q.  Okay. And do you know how many people were trained
 7        in addition on the intricacies of SOR 21, the new
 8        law?
 9            MR. DAMICH: Objection to form and
10        foundation.
11            THE WITNESS: I did no trainings
12        regarding the new law. I don't know if anyone else
13        did throughout the state, but I have not done any
14        trainings.
15    BY MR. REINGOLD:
16    Q.  Okay. And are you aware of other trainings by
17        other units?
18    A.  I heard recently over on the west side of the state
19        there was some -- some trainings by -- I don't even
20        know who did it, but they were doing some
21        trainings. I mean, I don't have control of who
22        does trainings throughout the state on this.
23    Q.  All right. And as far as the SOR unit and
24        the -- SOR enforcement unit was concerned, was
25        part of the reason that there was no training on
```

Page 36

9 (Pages 33 to 36)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1  the 21 law that the new law remained so similar to<br>2  the old law?<br>3       MR. DAMICH: Objection, foundation.<br>4       THE WITNESS: Sorry, repeat that<br>5  question?<br>6       MR. REINGOLD: Yeah.<br>7  BY MR. REINGOLD:<br>8  Q.  Was part of the reasoning that there wasn't<br>9  concentrated training, or it sounds like any<br>10  training on the new law, was that because the new<br>11  law remained so much the same as the old law?<br>12       MR. DAMICH: Same objection.<br>13       THE WITNESS: Do I need to answer that?<br>14       MR. REINGOLD: Yes.<br>15       THE WITNESS: There just was not<br>16  training done for it because of the new law.<br>17  BY MR. REINGOLD:<br>18  Q.  I'm asking for most of the provisions, isn't it<br>19  true that no training would have been necessary<br>20  because it didn't change?<br>21       MR. DAMICH: Objection, foundation.<br>22       THE WITNESS: There were things that<br>23  were changed in the new law that were different<br>24  from the previous. There was some things that were<br>25  similar, some things this were different.<br><br>Page 37 | 1       MR. REINGOLD: All right. Let's take a<br>2  look at Exhibit F, which will take just a second to<br>3  pull up. This can be marked as Exhibit F.<br>4       MARKED FOR IDENTIFICATION<br>5       EXHIBIT F<br>6       1:26 p.m.<br>7       MR. REINGOLD: This is director's<br>8  memorandum dated March 24, 2021, from the director<br>9  of Michigan State Police.<br>10  BY MR. REINGOLD:<br>11  Q.  March 24th, 2021, is that the day that the new SOR<br>12  went into effect?<br>13  A.  I'm sorry, am I suppose to be looking at something?<br>14  Q.  Oh, I'm sorry. I forgot to share it. Thank you.<br>15  A.  I see it now, sir.<br>16  Q.  Okay. Great. You see it's dated March 24, 2021.<br>17  Is that the day that the new law took effect?<br>18  A.  Yes, sir.<br>19  Q.  And the subject is "enforcement of Michigan Sex<br>20  Offender Registration Act," and in the first<br>21  paragraph in the highlighted first three points,<br>22  doesn't Director Gasper lay out the major changes<br>23  to SORA, namely the elimination of the student<br>24  safety zones, the prohibition of tearing, and the<br>25  elimination of certain in-person requirements?<br><br>Page 38 |
| 1  A.  Yes, that's what's listed there.<br>2  Q.  Okay. And those are the only major changes that<br>3  Colonel Gasper included in the memo. Right?<br>4  A.  You're looking at the same memo I'm looking at,<br>5  that's what he wrote.<br>6  Q.  Okay. And each -- I'll stop sharing and we will<br>7  pull up Exhibit A again.<br>8       At each Michigan State Police post, is<br>9  everyone expected to learn the new M-SOR program,<br>10  or is that assigned just to a few people?<br>11       MR. DAMICH: Objection to form and<br>12  foundation.<br>13       MR. REINGOLD: You can answer.<br>14       THE WITNESS: The program is out there<br>15  for everyone to utilize and learn.<br>16  BY MR. REINGOLD:<br>17  Q.  And do you know about how many people at each post<br>18  learn it?<br>19  A.  I do not.<br>20  Q.  How many people are at a typical MSP post, troopers<br>21  I mean?<br>22  A.  I have no idea what counts are at each post on<br>23  average.<br>24  Q.  At the post that you've been at, how many other<br>25  troopers?<br><br>Page 39 | 1  A.  At the posts I've worked at in the past?<br>2  Q.  Yes.<br>3  A.  It varies from post to post. The Metro North Post<br>4  was, at the time, a large post. There was at least<br>5  50 or 60 troopers if not more that worked out of<br>6  there.<br>7  Q.  Okay. And at that time how many people did<br>8  Sex Offender Registry work directly?<br>9       MR. DAMICH: Objection to foundation.<br>10       THE WITNESS: I have no idea.<br>11  BY MR. REINGOLD:<br>12  Q.  All right. So your testimony is you don't really<br>13  have a clue how many people learned the program or<br>14  how many people actually do registration at any<br>15  given post?<br>16  A.  No, I don't have an exact number for you.<br>17  Q.  I'm not asking for an exact number. I'm asking if<br>18  you have an approximate percentage of how many<br>19  people would become adept to the program and would<br>20  be used as registration takers or verification<br>21  takers at the post, a percentage of people at the<br>22  post?<br>23  A.  Well, I would say there needs to be at least one<br>24  person who knows how to do it since offenders can<br>25  register at a state police post. I don't have a<br><br>Page 40 |

10 (Pages 37 to 40)

BRENDA HOFFMAN
4/24/2023

1    percentage. I would say there needs to be at least
2    one or two that know how to do it, if not more.
3    Every post is different, and I -- I -- I don't
4    know.
5    Q.  All right. Do you know if it's a popular thing for
6    people to want to do?
7              MR. DAMICH: Objection to foundation.
8              THE WITNESS: What's your definition of
9    "popular"?
10             MR. REINGOLD: Where people say "oh, I
11   can't wait to sign up," or is it viewed as a boring
12   job that nobody wants to do?
13             THE WITNESS: I can't speak --
14             MR. REINGOLD: Let's say that fewer
15   people want to do. Sorry. I didn't mean to speak
16   over you.
17             MR. DAMICH: Same objection.
18             THE WITNESS: I can't answer that. I
19   don't know what people's -- what they think is
20   popular or what they want to do.
21   BY MR. REINGOLD:
22   Q.  All right. Is it your understanding that the
23   percentage of people who do it in any post is
24   likely to be on the low end rather than on the high
25   end; we're talking 0 to 10 percent rather than 90

Page 41

1    to 100 percent?
2              MR. DAMICH: Objection, lacks
3    foundation.
4              THE WITNESS: I mean, is your question
5    about like how many people register people at the
6    post or --
7              MR. REINGOLD: Yes.
8    BY MR. REINGOLD:
9    Q.  In order to register them, I'm assuming they have
10   to know the program. Right?
11   A.  Correct.
12   Q.  So they have to be trained on the program. So I'm
13   asking at a typical post what's the percentage of
14   people who are involved in that training and done
15   that work to be able to do that work?
16   A.  Again, I don't have the percentage. Generally the
17   people who do the registering are usually the
18   people who are sitting at the desk, the desk
19   sergeant, because everyone else is working the road
20   and doing complaints.
21             So unless you're sitting the desk,
22   you're most likely not going to be the one who is
23   registering an offender when he or she comes into
24   the post.
25   Q.  All right. All right. You've already said a

Page 42

1    little bit about number 6, resolving
2    enforcement-related questions. Do you do this both
3    for MSP members and for local law enforcement?
4    A.  Yes, I do both.
5    Q.  And about how many per week do you get, calls and
6    e-mails, let's say contacts per week, from branchs
7    of law enforcement?
8    A.  It can vary depending on the week or depending
9    on -- it can vary.
10   Q.  On average?
11   A.  Anywhere from on the low end of 50 to 4- to 500.
12   Q.  Okay. Is there a website that's set up that also
13   is designed to answer questions for members and
14   local law enforcement?
15   A.  There's our state police public website. I haven't
16   been on it recently to see if there's -- if it has
17   frequently asked questions or not. I think it may
18   have that.
19   Q.  When people call or text or e-mail you with
20   questions, is your impression that they've been to
21   a website or that they're going to the horse's
22   mouth first thing?
23             MR. DAMICH: Foundation.
24             THE WITNESS: It can vary. I don't ask
25   them "did you check the website first?" I just try

Page 43

1    to help them.
2    BY MR. REINGOLD:
3    Q.  Yeah. It's safe to say that if they did check the
4    website first, they wouldn't be calling you if they
5    got an answer. Right?
6    A.  I would think if the answer was there, they
7    wouldn't need to call me. Correct.
8    Q.  Okay. Do you also get questions from registrants?
9    A.  Yes.
10   Q.  And how do they get to you?
11   A.  They somehow get my number. Which is fine, I have
12   no problems speaking with anyone.
13   Q.  And does the SOR unit also refer questions from
14   registrants to you, or are these people -- they
15   just find you on their own?
16   A.  I don't know how people get my number.
17   Q.  All right. And do you answer their questions as
18   well?
19   A.  I do try my best, yes, whenever anyone contacts me.
20   Q.  Do you know if registrants call the SOR unit
21   itself, is there someone there who is assigned to
22   answer questions?
23   A.  Offenders do call the SOR unit.
24   Q.  But is there someone assigned to answer questions
25   there, or are they going to be told to go talk to a

Page 44

11 (Pages 41 to 44)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1 | lawyer? |
| 2 | MR. DAMICH: Objection, foundation. |
| 3 | THE WITNESS: I don't know. There are |
| 4 | people that do answer the phones at the SOR |
| 5 | registration, and sometimes those phone calls are |
| 6 | from offenders, and I would think that they would |
| 7 | do their best to assist them with their questions. |
| 8 | If it's something that's outside their |
| 9 | scope, then I would assume they don't answer |
| 10 | anything that's outside their scope of knowledge. |
| 11 | BY MR. REINGOLD: |
| 12 | Q. All right. Let's turn to long-term absconders. |
| 13 | Initially does this issue fall within |
| 14 | the jurisdiction where the absconder lives; what |
| 15 | I'm asking is will both the Michigan State Police |
| 16 | and local law enforcement be involved, or does it |
| 17 | start with one or the other? |
| 18 | MR. DAMICH: Objection, form and |
| 19 | foundation. |
| 20 | THE WITNESS: So the SOR law is a |
| 21 | statewide law that can be enforced by anyone |
| 22 | throughout the state, not just the state police. |
| 23 | So those type of investigations could start from |
| 24 | local county or state police. |
| 25 | BY MR. REINGOLD: |

Page 45

| | |
|---|---|
| 1 | Q. All right. And if someone has been charged or |
| 2 | convicted or placed on probation or parole for a |
| 3 | non-sex offense and they abscond, how do MSP |
| 4 | officers go about trying to find -- when we don't |
| 5 | have -- when it's not a sex offender? |
| 6 | MR. DAMICH: Objection to form and |
| 7 | foundation. |
| 8 | THE WITNESS: I don't know the answer |
| 9 | to that. |
| 10 | BY MR. REINGOLD: |
| 11 | Q. Are there tools that are available for them to do |
| 12 | that? |
| 13 | A. For people who have absconded for parole and |
| 14 | probation? |
| 15 | Q. Yes, people who have been charged with an offense |
| 16 | or awaiting trial or whatever it is. |
| 17 | A. So I know there may be times that say our fugitive |
| 18 | teams may work with MDOC to do -- if there's an |
| 19 | arrest warrant for someone who has a warrant that |
| 20 | is not a sex crime, I know MSP has worked, you |
| 21 | know, with MDOC on that. |
| 22 | I know sometimes just as a trooper I |
| 23 | could -- you could run warrants in your area. If |
| 24 | you had maybe a slow day and you wanted to try to |
| 25 | track someone down, you could use your resources |

Page 46

| | |
|---|---|
| 1 | and run warrants from your area. And if those |
| 2 | warrants were from MDOC for probation or parole |
| 3 | violation, I could investigate them that way. |
| 4 | Q. And is there access to public and nonpublic |
| 5 | databases that might help you find somebody who is |
| 6 | missing in action like that? |
| 7 | A. For people who are not on the registry? |
| 8 | Q. Yes. |
| 9 | A. I'm not aware of another type of registry database |
| 10 | for any other type of crimes. |
| 11 | Q. Okay. I'm going to share my screen again. Are you |
| 12 | able to see this document which is marked as |
| 13 | Exhibit C? |
| 14 | A. Yes, sir. |
| 15 | Q. Okay. |
| 16 | MARKED FOR IDENTIFICATION |
| 17 | EXHIBIT C |
| 18 | 10:07 p.m. |
| 19 | BY MR. REINGOLD: |
| 20 | Q. And this is an operational procedure, it's number |
| 21 | SOR-OP-304 on tracking of absconders. And then it |
| 22 | says "this procedure establishes the method to use |
| 23 | when tracking absconders from the Sex Offender |
| 24 | Registry." |
| 25 | Let's go down to number 5. So this is |

Page 47

| | |
|---|---|
| 1 | for people who are registry absconders as opposed |
| 2 | to any other non-sex-offense absconders. But are |
| 3 | the tools available to the Michigan State Police |
| 4 | for any kind of search? |
| 5 | You can take a moment to read through |
| 6 | 5A and B. |
| 7 | A. So all state police do have access to LEIN which is |
| 8 | the Law Enforcement Information Network -- |
| 9 | Q. And that includes queries that can go to the |
| 10 | Department of Health and Human Services, to the |
| 11 | Secretary of State, to NLETS -- the National Law |
| 12 | Enforcement Telecommunications System -- |
| 13 | A. Correct. |
| 14 | Q. -- an to NCIC, right, the National Crime |
| 15 | Information Center? |
| 16 | A. Yes, sir. |
| 17 | Q. And all of those don't have information only on |
| 18 | people who committed sex offenses, they have |
| 19 | information on all -- all criminals, isn't that |
| 20 | right, or all people -- some of them all people? |
| 21 | A. The Law Enforcement Information Network has a |
| 22 | variety of information that you could get from it. |
| 23 | Q. What I was asking earlier, I didn't mean to trick |
| 24 | you, I was just trying to get information. |
| 25 | My understanding is if you're looking |

Page 48

12 (Pages 45 to 48)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1  for an armed burglar -- or an armed robber who has | 1  **A.** TLO stands for the last one.  It's a resource. |
| 2  absconded, and you're just a line officer in | 2   I -- I don't know for sure if all troopers have |
| 3  Michigan State Police, you have access to all of | 3   access to that or not.  I mean, I do have access to |
| 4  these databases, and in most of your days when | 4   it.  I think it has become more mainstream for |
| 5  you're doing your investigation this is where | 5   troopers to have it, but it's another resource that |
| 6  you're going to be going; isn't that right? | 6   we can use to try to find information on people |
| 7  **A.** Correct.  So let me just maybe then correct myself. | 7   that -- that we're trying to locate. |
| 8   When you were asking me if there were other | 8  Q. And is TLO one that's available to law enforcement |
| 9   databases or -- I thought you were asking if there | 9   only, or is that a public website? |
| 10  was other types of registries like the sex | 10  **A.** I'm not for sure. |
| 11  offender -- | 11  Q. And the main network allows queries.  So I take it |
| 12  Q. I understand.  No, I didn't think you were avoiding | 12   you can do a query that would cover DHS, the |
| 13  me.  I was trying to clarify. | 13   Secretary of State, SOS, and number 3, NLETS, and |
| 14  **A.** So yes.  Everyone -- | 14   number 4, NCIC in a single query; is that right? |
| 15  Q. Go ahead. | 15  **A.** In the Law Enforcement Information Network you can |
| 16  **A.** No, you go. | 16   do a variety of queries.  You wouldn't be able to |
| 17  Q. Just to summarize, again, all of these databases | 17   run all these of those in one query, they would |
| 18   are available to troopers, and these are the kinds | 18   have to be run separate. |
| 19   of databases they use all the time in | 19  Q. Okay.  I'm asking about this because during those |
| 20   investigating? | 20   two, I spoke to one of the MSP reps who was |
| 21  **A.** Correct. | 21   attending the legislative workgroup meetings that |
| 22  Q. Okay.  And will you say a little bit about the last | 22   we had when we were working on trying to come up |
| 23   one, number 5B, the last one, TLO it's called, and | 23   with a consensus about a new law, and I asked if he |
| 24   it has both an intelligence report and a media | 24   was familiar with the registry program that was |
| 25   search.  What is TLO, you tell me? | 25   being used at the time, and if he used it.  I'm |
| Page 49 | Page 50 |
| 1  blocking on the name of the previous program before | 1   think it's best to educate yourself on what |
| 2  M-SOR. | 2   resources are out there.  If he didn't use that |
| 3  **A.** Offender Watch. | 3   register try then he's missing out on more |
| 4  Q. What was it called? | 4   information, because there's nor information on the |
| 5  **A.** Offender Watch. | 5   registry than just running someone through lien. |
| 6  Q. Offender Watch.  That was it. | 6  BY MR. REINGOLD: |
| 7   I was a little surprised by his answer | 7  Q. In addition to the ones that were above, there's |
| 8   because he told me that nearly all the MSP members | 8   another -- number 3 to number 15, other places that |
| 9   he knew used the regular databases to conduct their | 9   people can go besides the registry to find people. |
| 10   investigation searches because those were the ones | 10   Right? |
| 11   they used the most, and knew how to use, and they | 11   I'm looking at numbers 3 through 15. |
| 12   were familiar using them from their other cases. | 12  **A.** There are a variety of other -- |
| 13   And so what he was telling me was if he | 13  Q. Sorry, I didn't mean to talk over you.  I said are |
| 14   needed to find a registrant, it's not like he would | 14   those all other ways to get information not through |
| 15   go to the registry because he didn't know how to | 15   the Sex Offender Registry? |
| 16   use it, so he would go here. | 16  **A.** Correct. |
| 17   So what I want to know is, is that your | 17  Q. All right.  And if someone has absconded, by |
| 18   experience as well, what he was telling me; does | 18   definition a registrant has absconded, by |
| 19   that jive with your experience? | 19   definition it means the information about that |
| 20   MR. DAMICH:  Objection to form and | 20   person on the registry as to address, quality of |
| 21  foundation. | 21   job, things like that, is out of date because |
| 22   THE WITNESS:  I can't answer to what | 22   otherwise you'd be able to find them quickly. |
| 23   everyone's education is or what their knowledge is | 23   Right? |
| 24   with the different resources out there.  There's | 24  **A.** Correct. |
| 25   resources out there just like with any job.  I | 25  Q. All right.  Is it your experience that the M-SOR is |
| Page 51 | Page 52 |

13 (Pages 49 to 52)

BRENDA HOFFMAN
4/24/2023

---

1  mostly used by field officers to create and update
2  the registry and to flag noncompliant registrants?
3          MR. DAMICH: Objection to form and
4  foundation.
5          THE WITNESS: Can you ask that question
6  again?
7          MR. REINGOLD: Yes.
8  BY MR. REINGOLD:
9  Q. Isn't it true that most of the time what the M-SOR
10     program is primarily used for -- I'm rephrasing
11     slightly -- is to create and update the registry
12     and to flag noncompliant registrants?
13          MR. DAMICH: Again, same objection.
14     Form and foundation.
15          THE WITNESS: The database can be used
16     for a variety of reasons, registering someone is
17     one of them. You can also use it for
18     investigations as well.
19  BY MR. REINGOLD:
20  Q. That didn't answer my question. I asked if its
21     primary use is for creating and updating the
22     registry and flagging noncompliant ones?
23          MR. DAMICH: Same objection.
24          THE WITNESS: I guess what's your
25     definition of "primary"? I mean, offenders have to

Page 53

---

1  come in and verify depending on their months that
2  they have to come in, so when they come in, the
3  database is used to do that.
4          So if you want -- I guess it's the
5  primary thing, I mean, they do that probably more
6  often than investigations. You're going to verify
7  and register more people than you're probably going
8  to do investigations on them.
9  BY MR. REINGOLD:
10  Q. Right. Because if there's 45,000 people on the
11     registry, there's only going to be 5,000 or 6,000
12     who are noncompliant. Right?
13  A. I don't know what the numbers are, but I mean, to
14     answer your question it is used to verify people
15     when they come in and verify.
16  Q. All right. And all of the other sources that we've
17     been looking at here allow you, if you know how to
18     use them, to find things like whether or not a
19     person has a car, whether or not someone has a
20     bridge card, and if so you can get an address.
21     Right?
22  A. Those are all investigative tools.
23  Q. Right. But what I'm saying at what that means at
24     the bottom is that the state has other ways to get
25     information about people other than by having them

Page 54

---

1  reported on a registry. Right?
2  A. Correct.
3  Q. All right. Let's ask a little bit about
4     international travel restrictions. Can you -- Have
5     I -- CAN you see the manual again?
6  A. Yes, sir.
7  Q. Okay. Great.
8          Describe what you do as to this
9     subsection, if anything. This is number 8.
10  A. Mm-hmm. If I happen to get any tips or information
11     on someone possibly traveling overseas, then I
12     would reach out to my contacts to see, to confirm
13     if they have in fact traveled overseas and didn't
14     report that.
15  Q. As to overseas travel, is this one more likely to
16     be something that's proactive where you're reaching
17     out, or is it -- does it more often come to you and
18     you're learning that somebody's traveled abroad and
19     returned and didn't do the things that they were
20     suppose to do?
21  A. It could be both. It could be both.
22  Q. And what kinds of steps do you take to investigate
23     one of these cases?
24  A. I would generally first reach out to my contacts
25     with ICE or border patrol.

Page 55

---

1          MR. REINGOLD: Okay. Let's take a look
2  at Exhibit D. This is what will be marked as
3  Exhibit D. It's an operational procedure
4  SOR-OP-328, it's dated November 18, 2019, and it's
5  titled "International Travel." The purpose is to
6  establish the steps to be taken when an offender
7  reports a move or temporary visit to another
8  country.
9          MARKED FOR IDENTIFICATION
10          EXHIBIT D
11          10:20 a.m.
12  BY MR. REINGOLD:
13  Q. Is that all accurate?
14  A. So can I just clarify? This is a procedure for the
15     registry unit, not the enforcement unit.
16  Q. That may well be. But does that -- Is it what I
17     said it is with that clarification?
18  A. It looks like it's a procedure through the -- the
19     Sex Offender Registry unit regarding international
20     travel.
21  Q. Okay. Yeah. And part of what it does is show at
22     paragraph three what has to be done if a person is
23     going to be leaving the country for more than seven
24     days. Right?
25          This is sort of a SOR unit instruction

Page 56

---

14 (Pages 53 to 56)

BRENDA HOFFMAN
4/24/2023

```
 1    for how you process such a case; is that what it
 2    appears to be to you?
 3  A.  Correct.
 4  Q.  Okay.  And it's a lot.  Right?  I mean, if you look
 5    at number three, the person has to get into M-SOR,
 6    select reports, select the travel notification,
 7    add -- go into Word, add as much information as
 8    possible based on the notes, and this was under the
 9    old offender launch program, but now it's the new
10    program.
11          They have to do all of that, and then
12    they have to wait because they can't enter it until
13    the date has occurred when the person is going to
14    leave.  In addition, number four, we can't change
15    their status to inactive until the date the person
16    leaves, and then we have to import that record into
17    the Michigan State Police account, we have to
18    change the offender's status, we have to uncheck
19    the published website box if it's checked, we have
20    to enter notes in the international travel form,
21    upload the international travel form, check the box
22    labeled clear offender NCIC record, and then save
23    and close the record.  Right?
24          All of that has to be done for somebody
25    going overseas for more than seven days; is that
```

Page 57

```
 1    right?
 2          MR. DAMICH:  Objection to form and
 3    foundation.
 4          THE WITNESS:  So this is an old
 5    procedure.  I don't know what the date of this is
 6    because it's saying Offender Watch, and how things
 7    are done in Offender Watch and how things are done
 8    in M-SOR are different.
 9  BY MR. REINGOLD:
10  Q.  But isn't it true that almost all things in
11    number 3 and number 4 aren't required by the
12    program, but are required by other notifications
13    that have to be made to other people; like when
14    you're clearing the offender NCIC record, that has
15    to be done no matter what program you're in, or if
16    you're uploading the international travel form, you
17    have to upload it no matter what program you're in,
18    the same for many of these.  Isn't that right?
19          MR. DAMICH:  Objection to form and
20    foundation.
21          THE WITNESS:  This is not anything that
22    I would do in my form of the job as far as document
23    stuff.  This is more of a registry thing to keep
24    the record up to date to determine that someone
25    actually has left and is not coming back, from how
```

Page 58

```
 1    I'm reading it.  Like they left the country.  So
 2    that's more of a question for the registry than me.
 3  BY MR. REINGOLD:
 4  Q.  Well, number 3 says if the offender is going to be
 5    gone from his residence for more than seven days
 6    this is what you do -- or rather -- 4 rather.
 7    Strike that.
 8          Number 4, this is for people who are
 9    required to report international travel 21 days in
10    advance.  Not that they're moving, just that
11    they're traveling.  All those things would have to
12    be done.
13  A.  You're showing me a stale procedure.
14  Q.  So you don't know if it still has to be done pretty
15    much the same way under M-SOR?
16  A.  Correct.  I would -- I would refer that question to
17    the registry as what their new procedures are with
18    the new database.
19  Q.  Okay.  But to the extent that anything in this
20    requires reporting to other agencies or steps to
21    input data, those things would remain unchanged.
22    Right?
23  A.  I'm not sure.
24  Q.  Okay.  And whatever the steps are, whether it's
25    Offender Watch or M-SOR, all of these procedures
```

Page 59

```
 1    apply to all registrants if they're going to be
 2    gone from the country for 21 days; is that right?
 3  A.  All offenders who are on Michigan's registry have
 4    the same duties and responsibilities.
 5  Q.  Okay.  And in fact it doesn't matter regardless of
 6    their age or health or how long they were
 7    incarcerated or their Static-99 scores as to their
 8    risk of re-offending; is that true?
 9  A.  Again, all offenders who are on Michigan's Sex
10    Offender Registry have the same duties and
11    responsibilities.
12  Q.  Okay.  And that means in a case like this where
13    someone is going abroad for more than seven days if
14    you had a registrant who was 80 years old,
15    permanently ill, and going to Mexico for eight days
16    for experimental surgery, which no one would do in
17    the United States, this form would have to be done?
18          MR. DAMICH:  Objection to form and
19    foundation.
20          THE WITNESS:  The offender would have
21    to comply with what his duties and responsibilities
22    are.
23  BY MR. REINGOLD:
24  Q.  And when you wind up having to do the same thing
25    for everyone with a one-size-fits-all registry,
```

Page 60

15 (Pages 57 to 60)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1   then it means you have to input all this data on | 1   given year? |
| 2   the outgoing route and redo it on the incoming | 2   A.  No. |
| 3   route even for people who, like my example would be | 3   Q.  And that too, is that something that could be |
| 4   an 80-year old terminal old man, going away for | 4   retrieved assuming the person registered the travel |
| 5   eight days; you still have to do it all because you | 5   and reported his return? |
| 6   have a one-size-fits-all registry? | 6   A.  It could be.  I -- I don't know for sure. |
| 7          MR. DAMICH:  Objection to form of the | 7   Q.  Okay. |
| 8   question. | 8   A.  I don't know how easy it would be to get it. |
| 9          THE WITNESS:  Correct.  No matter what | 9   Q.  All right.  And then the last -- In the list of |
| 10   someone's age, their health issues, whether their | 10   duties that are assigned to the sergeant in charge |
| 11   birthday is in February or whatever, they have the | 11   of the sex offender enforcement unit is to provide |
| 12   same duties and responsibilities. | 12   guidance to the emergency support team on |
| 13  BY MR. REINGOLD: | 13   SOR Enforcement.  Has that ever come up for you? |
| 14   Q.  Of the approximately 35,000 un-incarcerated people | 14   A.  Yes. |
| 15   on Michigan's registry, about how many report | 15   Q.  Can you give an example of that? |
| 16   travel abroad for more than seven days in a given | 16   A.  When I was moved -- or not I.  When the SOR unit |
| 17   calendar year, do you know? | 17   was moved under SOD, part of the reasons we were |
| 18   A.  I don't know. | 18   told we were moved is to have the emergency support |
| 19   Q.  Is that a figure you could get from the registry | 19   team to help with SOR Enforcement measures. |
| 20   assuming people notify the registry and the | 20   Q.  Have there been occasions since then where |
| 21   registry saved the information? | 21   emergency support team was needed or was called in |
| 22   A.  I don't know.  That would be a question to ask more | 22   for SOR enforcement? |
| 23   of the registry side to see if that could be ran. | 23   A.  Yes. |
| 24   Q.  And same for interstate travel that lasts longer | 24   Q.  How many that you can recall? |
| 25   than seven days, any idea how many report that in a | 25   A.  I can't recall.  I mean, I don't have a number for |
| Page 61 | Page 62 |

| | |
|---|---|
| 1   you. | 1          (On the record at 10:37 a.m.) |
| 2   Q.  And what was it that they were called in to do? | 2  BY MR. REINGOLD: |
| 3   A.  They were to assist with helping with the tips. | 3   Q.  We were just about to move to sweeps, but I have |
| 4   And in the past we did do residents checks, or | 4   one other question.  2.2 in the procedural manual |
| 5   sweeps as I would call them, to assist with those. | 5   shows the responsibilities of the regional sex |
| 6   Q.  I thought you had told me that the emergency | 6   offender enforcement coordinators, and it looks |
| 7   support team was more like a SWAT unit, but now | 7   like, I mean, their assignments in the past were |
| 8   you're saying they also enlisted on residence | 8   very similar to yours.  14 different |
| 9   checks; is that right? | 9   things -- yeah, 14 different things that they're |
| 10   A.  The emergency support team's main job is to do the | 10   suppose to do. |
| 11   main duties of the emergency support team, which is | 11          And just to be clear, everything on |
| 12   SWAT.  When they first became full time in 2017 it | 12   this page is now done by you alone; is that right? |
| 13   was determined that they may have some extra time | 13   A.  I can't say I do everything on this page, no, |
| 14   on their hands to assist with SOR Enforcement. | 14   because I'm only one person. |
| 15   Q.  All right.  And is that still true today or not? | 15   Q.  Yeah.  Okay. |
| 16   A.  They are a very busy team, and their first focus is | 16   A.  I wish I could. |
| 17   their emergency support team duties, and they | 17   Q.  But -- And to the extent that they're not being |
| 18   assist with limited SOR Enforcement. | 18   done by you, they're not being done at all.  Right? |
| 19   Q.  All right.  Let's address sweeps now.  Let me just | 19   A.  I don't know.  I mean, other -- other posts or |
| 20   hold on a minute and see if I have anything -- | 20   other agencies could be doing enforcement on their |
| 21          MS. AUKERMAN:  Do you mind if we take a | 21   own.  As I said, it's a statewide law. |
| 22   quick break? | 22   Q.  Right.  But it's not being done by the sex offender |
| 23          MR. REINGOLD:  That's fine.  Let's go | 23   unit that you run? |
| 24   off the record for a few minutes. | 24   A.  Correct. |
| 25          (Off the record at 10:32 a.m.) | 25   Q.  All right.  All right.  So I want to turn to |
| Page 63 | Page 64 |

16 (Pages 61 to 64)

1  sweeps.  Just to bring us up to speed, can you
2  describe what sweeps are?
3  A.  So I would define a sweep as basically it's a
4  residence check for compliance or noncompliance for
5  offenders who are on Michigan's registry.
6  Q.  And how is a sweep initiated?
7  A.  We usually have funding through grants or through
8  U.S. Marshals which would be a way where we could
9  pay for enforcement members to assist with that.
10  An area would be determined to do this sweep in,
11  and then we would gather targets, meaning
12  offenders, who are in that designated area to focus
13  doing a residence check on.
14  Q.  All right.  And in initiating a sweep like this,
15  does the motivation or the actual initiation come
16  out of your office, or does it come from local law
17  enforcement reaching out to you and saying, you
18  know, we haven't done a sweep in a year, we want to
19  do one, will you help us?
20  A.  It could be both, yes.
21  Q.  And do you have like a schedule of, you know, where
22  you want to sweep and when you want to sweep so
23  that you too can be saying to local law
24  enforcement, you know, it's been two years, are you
25  ready, are you willing, that sort of thing?

Page 65

1  A.  Are you saying now do I have a schedule?
2  Q.  Yes.
3  A.  I don't have any set schedule for -- I don't have
4  any set schedule.
5  Q.  And did you in the past?
6  A.  We had more of one, I'd say yes.
7  Q.  All right.  Back when we were doing discovery in
8  Doe's 1, it was clear that the enforcement unit was
9  partnering with local law enforcement on an annual
10  basis for sweeps around the state often at the same
11  time, like over a two-week period.  Were you around
12  when any of that was happening?
13       MR. DAMICH:  Objection to form and
14  foundation.
15       THE WITNESS:  We did sweeps in the
16  past.  It wasn't limited to just a two-week period
17  during the year.
18  BY MR. REINGOLD:
19  Q.  And when was it that it wasn't limited to two weeks
20  during the year; what years are you talking about?
21  A.  Well, I've been in the unit since 2014, so I can
22  only speak from then on.  There wasn't just like
23  a -- it wasn't like March Madness with basketball
24  where it was just a certain time of the year.  We
25  would just set them up as we had the time and

Page 66

1  resources.
2  Q.  All right.  And if we go from let's say 2014 to the
3  beginning of -- the end of 2019 because covid hit
4  in early 2020.
5       So if we go to 2014 to 2019, what's
6  changed in the way the sweeps were done over
7  those five to six years?
8  A.  Can you clarify what you're asking?  I guess I'm
9  confused on what you're asking me.
10  Q.  Yeah.  You said that you used to do more sweeps and
11  that they -- they weren't done all at the same time
12  as I suggested they had been back in 2013 when we
13  were taking deposition of Doe's 1, and so I want to
14  know what has changed about the number of sweeps,
15  who is involved, who plans them, who carries them
16  out, from 2014 when you first started being
17  involved in these until the end of 2019 when0 covid
18  put a kibosh on it?
19       MR. DAMICH:  Object to the form and
20  also the foundation of the question as well.
21       THE WITNESS:  I'm sorry.  Maybe I'm
22  just having a Monday on a Monday.  You're asking
23  what's changed between 2014 --
24       MR. REINGOLD:  Maybe I should break it
25  down for you.

Page 67

1       THE WITNESS:  Okay.  All right.
2  BY MR. REINGOLD:
3  Q.  In each of the years from 2013 to 2019
4  approximately, was it rising, was it declining,
5  what were the numbers?
6  A.  I don't have the numbers off the top of my head,
7  and I do not know any of the specifics from 2013 as
8  I was not in the unit.
9  Q.  No, I said from 2014 on.
10  A.  Okay.  I thought you said 2013.
11  Q.  Sorry.  If I did, I misspoke.
12  A.  Okay.  I don't have the specific numbers at the top
13  of my head.
14  Q.  Was the effort throughout those years from 2014 to
15  2019 pretty consistent; if there was funding, isn't
16  it true that you did as many sweeps as you could,
17  and viewed this as an effective way to enforce
18  SORA?
19       MR. DAMICH:  Objection to form.
20       THE WITNESS:  We have found that sweeps
21  were extremely effective with the enforcement
22  measures, and we would do as many as we could with
23  the resources and funding that we had.
24  BY MR. REINGOLD:
25  Q.  And -- But for SORA, would you have continued doing

Page 68

17 (Pages 65 to 68)

BRENDA HOFFMAN
4/24/2023

1  them in 2019, 2020, 2021, and 2022?
2  **A.** I'm sorry, did you say "but for SORA"?
3  Q.  But for covid.  I'm sorry.
4  **A.** Yeah, obviously covid changed a lot of things.
5  Q.  All right.  And is there now a plan -- again,
6     funding permitting -- to re-engage as these were,
7     and bring them back online?
8           MR. DAMICH:  Objection, lack of
9     foundation.
10          THE WITNESS:  Did you say "bring back
11    online"?
12          MR. REINGOLD:  I didn't mean literally
13    online.  I mean to bring them back into the fold as
14    a tool for SORA enforcement?
15          THE WITNESS:  Yes, we do special
16    funding, and I'm currently working on -- I'm
17    working on the property of the offenders who have
18    not resurfaced since the new law to try to see what
19    happened with them.  So those are what I'm focusing
20    on.
21  BY MR. REINGOLD:
22  Q.  And sweeps would be a major tool then to promote
23    one of your top priorities?
24  **A.** Correct.  That would be a resource that I would use
25    to try to help work on that property.

Page 69

1  Q.  All right.  And when it comes to funding for this,
2     how is the funding divided; like if you're doing a
3     joint sweep with local law enforcement, maybe
4     federal officers you said might be involved.
5           Did they have -- First, do you need
6     specific dollars for this, or can you -- like you
7     eluded to earlier -- if you're lucky, like borrow
8     people from special operation's emergency response
9     team without having to pay for them?
10          MR. DAMICH:  Objection to form and
11    foundation.
12          THE WITNESS:  In the past we have
13    received grand funding through the smart grant.
14    Some of that funding was put on hold because of
15    covid.  You know, that money is used to pay for the
16    participating members that work on these sweeps,
17    and that funding is to be utilized for MSP
18    personnel.
19  BY MR. REINGOLD:
20  Q.  All right.  So the funding you're getting is going
21    to cover MSP involvement in the sweep.  Do you know
22    if the local law enforcement or the feds also need
23    specific funding or sweeps, or can they do it just
24    out of their normal daily time and abilities?
25          MR. DAMICH:  Object to lack of

Page 70

1     foundation.
2           MR. REINGOLD:  If you know.
3           THE WITNESS:  I have done sweeps before
4     with U.S. Marshals where they provided funding to
5     do the sweeps.
6  BY MR. REINGOLD:
7  Q.  And were they paying MSP people, or was that for
8     their own money?
9  **A.** I know that they have paid for MSP personnel as
10    well as local departments in the past with previous
11    sweeps.
12  Q.  And with your grants, are you able to follow money
13    across to local law enforcement or under the feds,
14    or is it as you suggested earlier, only MSP?
15          MR. DAMICH:  Objection to foundation.
16          THE WITNESS:  The funding that I have
17    for the smart grant is only to be used for MSP
18    personnel.
19  BY MR. REINGOLD:
20  Q.  And about how much -- Have the smart grants been
21    for sweeps over the last, again, from 2016 to 2019?
22  **A.** I'm sorry, ask that question again, please.
23  Q.  Yeah.  How much of the smart grant was for sweeps
24    from 2016 to 2019 roughly?
25  **A.** I don't have an exact number on that.

Page 71

1  Q.  Okay.  If those grants were $400,000 a piece, do
2     you know what your piece of the pile was?
3  **A.** My understanding of the smart grants is that there
4     was an enforcement side of the grant and a registry
5     side of the grant.  So what I would be -- well,
6     what our unit would be given was broken down by a
7     certain amount of money which would equal an
8     approximate number of hours to be used.
9           I will say some of the grants, you
10    know, when they were calculated and applied for,
11    the amount of what a trooper would cost per hour,
12    what a sergeant would cost per hour, you know, has
13    increased because we have received some pay raises.
14          So it's not an exact -- just for
15    example, like 200 trooper hours equal $100,000.
16    I'm just throwing a number out there.  You know,
17    it's not an exact number now per se because of the
18    change in pay rates.
19  Q.  Right.  And does that figure also include in the
20    hourly rate benefits as opposed to just salary?
21          MR. DAMICH:  Objection, foundation.
22          THE WITNESS:  My understanding is that
23    the pay rate that's calculated does include like
24    the benefit side of things and such.  That's my
25    understanding.  That's more of a question I guess

Page 72

18 (Pages 69 to 72)

BRENDA HOFFMAN
4/24/2023

```
 1        for the accounting side of things.
 2   BY MR. REINGOLD:
 3   Q.   Right.  And is there a figure -- Is there like a
 4        minimum figure that you need -- actually, strike
 5        that.
 6             You said that you're trying to get
 7        trooper hours basically to -- from the MSP side of
 8        any sweep, when you do that because you don't have
 9        staff directly of your own, do you also have to be
10        shopping this out; I mean, you're saying to
11        troopers we want to do a sweep, this is "X" amount
12        of money we got, are they going to get extra money
13        to do this, is that how they're going to be
14        participating?
15             Long question, but give it a try.
16   A.   So when organizing a sweep after the location is
17        determined, that would obviously depend on what
18        area in the state we would be in, and what post
19        area that would cover.  For MSP when there's
20        overtime that's going to be offered to a worksite
21        that has to be sent through the channels of the
22        post, and then it has to be -- I mean, say for
23        example we were going to do a two-day sweep
24        in -- in Lansing.
25             A day would constitute an eight-hour
```

Page 73

```
 1        day, so there would be -- and say we were going to
 2        do two days where we needed four troopers each day.
 3        So whoever was organizing the sweep would contact
 4        the post, and say we're looking at doing a sweep in
 5        Lansing with our MSP troopers, we have eight hours
 6        to give to four troopers a day.
 7             So 8 times 4 is 32 hours for two days.
 8        32 times 2 is 64.  We have 64 hours to offer to
 9        work this detail.  How MSP does it, is if there's
10        overtime given to a post they have to post that for
11        troopers to say "yes" or "no," they want to work
12        that sweep.
13             And then there's like an
14        overtime-equalization thing that the post-admin
15        person would have to figure out who would be
16        assigned to that sweep.  And then they would say
17        Trooper Smith, Trooper Jones, Trooper Brown,
18        Trooper White, you're working on Monday this sweep
19        and, you know, four other troopers are working it
20        the next day.
21   Q.   So it sounds like it's an easy recruitment tool and
22        a good one, and there's fairness on their end
23        because you said of the sort of equalization of how
24        the overtime falls.  That's how it works?
25   A.   Correct.
```

Page 74

```
 1   Q.   All right.  Do you participate directly in some of
 2        the sweeps?
 3   A.   Yes.
 4   Q.   For you, is it an overtime job or not?
 5   A.   Some of it is, yes.
 6   Q.   Okay.  How do you decide whom to target for the
 7        sweeps?
 8   A.   Well, again, that can vary.  But usually what we
 9        would try to do is focus on offenders who haven't
10        come in to verify.  Again, they -- for whatever
11        reason they're not coming in when they should.  So
12        the goal, again, you know, the -- one of the
13        reasons for the registry is to know where offenders
14        are living, and if they're still there or not.
15             So if they're not command, why are they
16        not coming in?  So we would, generally once the
17        area was determined where we were going to work,
18        then we would focus more on those offenders who
19        were not -- who had failed to verify and were not
20        coming in.
21   Q.   All right.  So again, looking at the Exhibit A, C,
22        can you see that?
23   A.   Mm-hmm.  Yes, sir.
24   Q.   Is this an accurate -- This is 2.2C in the manual.
25        Is this still a current and accurate set of
```

Page 75

```
 1        priorities for targets of people who are
 2        noncompliant for sweeps?
 3   A.   Correct.
 4   Q.   Okay.  The last item under C is random residence
 5        checks.  When you're doing the sweeps, is there a
 6        time for that; I mean, do you include residence
 7        checks, or is there at this point enough to do that
 8        you're almost always going after known targets with
 9        known addresses?
10   A.   I would say there's times where we would do what
11        you call a random residence check.  There would be
12        times where we would also do random residences
13        check when we're out there.
14   Q.   Is that the situation like you're near a house or
15        next door to one and you say, you know, what the
16        heck, we're going across the street or next door?
17   A.   Correct.
18   Q.   Yeah.  Okay.  And I saw in one document, I can't
19        remember where, that sometimes when sweeps are
20        completed or nearly done, another category of
21        people that you might include would be homeless
22        folks who are on the registry.  Is that something
23        that you're continuing to do?
24   A.   To do a homeless sweep?
25   Q.   Yes.
```

Page 76

19 (Pages 73 to 76)

BRENDA HOFFMAN
4/24/2023

1    A.  I don't recall ever setting up an actual homeless
2        sweep.  It's -- It's kind of actually hard to
3        coordinate that because --
4    Q.  This wasn't referring to a dedicated homeless
5        sweep, but it sounded like it was an add-on, you
6        know, if there was time at the end of the day.  But
7        it sounds like you're not familiar with that having
8        been done; is that right?
9    A.  It could have been.  I mean, if there was someone
10       homeless in Lansing, I mean, really the only way to
11       find them is if they maybe said "hey, I'm homeless
12       and I'm living down by the river in van."  I mean,
13       we could go check that river.  But homeless
14       offenders are very hard to do a residence sweep
15       because they don't have a residence per se.
16   Q.  Yeah.  Okay.  All right.  And the actual work of
17       the sweep, is it basically going house to house
18       either to the last known address or whatever has
19       come up on the tip line or any other source, or
20       you're basically checking homes to see if people
21       who are noncompliant by virtue of not having
22       reported when they're suppose to as to address,
23       that's the way it goes; it's house checking?
24   A.  A normal sweep would be going to the last
25       registered address of the offender to see if he or

Page 77

1        she is living there.
2    Q.  All right.  And most of these sweeps, are you
3        teamed with local law enforcement so it's -- in
4        your example -- the four troopers who were doing
5        this?
6    A.  It can vary.  I mean, usually you have two people
7        working together just for safety measures.
8    Q.  What I'm asking is if you're going to put the
9        resources together to do a sweep, do you want to do
10       as big of one as you can; is there a benefit to
11       that?
12           MR. DAMICH:  Objection, foundation.
13           THE WITNESS:  I mean, there's
14       differences with sweeps.  We had smaller ones, we
15       had larger ones.  It just -- I mean, obviously with
16       the larger one you're going to have more targets,
17       obviously with the larger one it's going to take
18       more time to coordinate it and get all the
19       resources there, and it will take more money.
20           So it can vary -- Sweeps would vary as
21       far as the size and the resources and the length of
22       time that it took to do them.
23   BY MR. REINGOLD:
24   Q.  But either way, whether it's big or small, would
25       you describe as your best tool to find

Page 78

1        absconders?
2    A.  Doing residence checks was a -- is a great tool to
3        see whether or not the information we have on our
4        registry is accurate.
5           MR. REINGOLD:  At the end of the
6        sweep -- Let's take a look at Exhibit E.  I'm using
7        what's been marked as Exhibit E which is a document
8        titled "Sex Offender Sweep Findings."
9           MARKED FOR IDENTIFICATION
10          EXHIBIT E
11          11:01 a.m.
12   BY MR. REINGOLD:
13   Q.  I don't know if this is a current form or not.  Do
14       you know if this is still the current form that's
15       being used?
16   A.  I haven't used any forms lately so I don't have
17       anything current, but this appears to be something
18       that was used in the past.
19   Q.  Okay.  And when that sweep is completed, there's a
20       box near the bottom of the first page called
21       "data entry."  And it shows two lead checkboxes
22       which is "make an offender compliant" and the other
23       is "make an offender noncompliant."
24           Would you describe what those actually
25       mean; I mean, I have a sense of it, but I don't

Page 79

1        really know how this gets reported or what it is
2        that the person is doing.
3    A.  Can you tell me when you got this form?
4    Q.  This came from the Michigan State Police through
5        discovery.  It looks like it was given to us
6        January 10th, 2023, and I believe this was the only
7        form that was given to us, and we probably asked
8        for all forms going back a certain number of
9        years -- which is why I believe it's current -- but
10       it doesn't have a date on it, I don't think.  No,
11       there's no date on it.
12   A.  Can I see the whole form?
13   Q.  Sure.
14   A.  Is there more?
15   Q.  That's it.
16   A.  Well, this is obviously an old form because one of
17       the violations it's showing is a school SSZ, which
18       stands for school safety zone.  So this is
19       definitely a form that was used prior to
20       March 24th of 2021.
21   Q.  I'm sure that's correct.
22   A.  I'm just telling you, this is not a form that's
23       been used or utilized since the new law started.
24   Q.  All right.  Since there haven't been sweeps in the
25       last few years, we're asking about how this was

Page 80

20 (Pages 77 to 80)

BRENDA  HOFFMAN
4/24/2023

---

1    done in the past.  What did it mean for an officer
2    to make the offender compliant; I think they know
3    what that means, but what does it mean to make them
4    noncompliant when they're already listed as
5    noncompliant?
6  **A.**  Well, two things.  They -- In a sweep going in, the
7    offender may have been made -- been marked
8    noncompliant for a reason.  And maybe when we met
9    with them we were able to -- So say for example
10    they were marked noncompliant for not having their
11    palm prints on file, which would be a violation.
12        We actually had or have mobile palm
13    print machines, so sometimes what we would do is we
14    would go do the residence check, "hey, you've never
15    got your palm prints done.  We've got this here
16    right now, let's make it easy and get them done."
17        And then at the end they would then be
18    compliant because we had their palm prints on file.
19    So we could then make them compliant at the end
20    because we have completed getting their palm
21    prints.
22  **Q.**  If someone is noncompliant across several
23    measurements here, like they failed to verify, they
24    don't have a palm print, and you know they have a
25    vehicle that hasn't been reported, would all of

Page 81

---

1    those show up on the registry, or is there like a
2    lead one that is put on the registry?
3  **A.**  If -- If an offender is marked as noncompliant for
4    a violation, then those violations would be marked
5    on -- are you saying the public registry?
6  **Q.**  Yes, on the public registry.
7  **A.**  They would be marked on the public registry if they
8    are a published offender.
9  **Q.**  Okay.  All right.  And then one of the other boxes
10    above is "active warrants, felonies, misdemeanors,"
11    and so on.
12        When you're doing a sweep and someone
13    is, you know, noncompliant for whatever reason, do
14    you give them a chance to fix it as you said with
15    the palm print, or can you also chose to simply
16    say, you know, too bad, too late, you know, we're
17    issuing a warrant or arresting you or whatever it
18    is you might do; how do you make that decision?
19  **A.**  So I feel like you've asked a couple questions in
20    there.  You were first asking about object warrants
21    up above, and then you were asking about -- so
22    which one do you want me to answer first?
23  **Q.**  Yes.  Let me ask you, how do you decide when to let
24    an offense slide and when to go forward
25    with -- towards prosecution?

Page 82

---

1        MR. DAMICH:  Objection, form and
2    foundation.
3        THE WITNESS:  So I can only speak for
4    me.  If I was doing investigation and doing a
5    residence check, and if they were already marked as
6    noncompliant, you know, they may or may not be
7    marked as noncompliant, but then when I go to the
8    house I may discover through the investigation that
9    they are not compliant for a variety of reasons.
10        But my experience with doing these
11    sweeps if someone was noncompliant and I could get
12    them back on their feet, so to say, whether it be
13    the palm prints or they have to verify -- so maybe
14    they missed verifying last month.
15        Well, when I go to the house I'm told,
16    you know, "hey, last month he was hit by the truck,
17    and he has been bedridden while trying to
18    recuperate;" that's the reason why he didn't come
19    in.  I may at that time not taken enforcement
20    action based on that information.
21  BY MR. REINGOLD:
22  **Q.**  So that's at least what I would call a
23    discretionary decision.  Correct?
24  **A.**  Correct.
25  **Q.**  All right.  And I take it every officer who's doing

Page 83

---

1    sweeps -- state or local or MSP or federal -- they
2    also have discretion to decide whether they're
3    going to, in effect, bring the person into
4    compliance and charge them for the violation?
5        MR. DAMICH:  Object to form and
6    foundation.
7        THE WITNESS:  Correct.  There's
8    discretion.
9  BY MR. REINGOLD:
10  **Q.**  All right.  If somebody's on probation or parole,
11    is your discretion limited in any way?
12  **A.**  If someone's on probation or parole, how I describe
13    it is you have two sets of parents; you have one
14    parent with one set of rules, and the SOR is your
15    other parent with a different set of rules.  You
16    may have similar rule, but probation or parole may
17    have more strict rules than say the SORA registry
18    or vice versa.
19        So if I was going to violate someone
20    that's on probation or parole, I could do a
21    violation through the state.  And if probation or
22    parole wishes to violate them for their probation
23    or parole violation, then they could do that as
24    well.
25  **Q.**  Do you have any obligation -- If it's someone who

Page 84

---

21 (Pages 81 to 84)

BRENDA HOFFMAN
4/24/2023

1   is on parole or probation for a sex offense, do you
2   have an obligation to notify of probation or
3   parole, or is that the registrant's obligation?
4           MR. DAMICH: Objection, foundation.
5           THE WITNESS: I would say I would work
6   with probation or parole any time I could. A lot
7   of times probation or parole may have just done a
8   residence check at their probation or parolee's
9   house. So we try not to reinvent the wheel, and we
10  wouldn't use our resources for other people who
11  haven't been recently checked.
12  BY MR. REINGOLD:
13  Q. I'm asking a completely different question. I'm
14     asking if you've got someone who is noncompliant
15     for failure to register, and as in your example you
16     can kind of let it go by and let them register
17     right now, or, you know, insist that they go with
18     you or go in tomorrow, however you want to cure it,
19     or you can go forward towards prosecution.
20         What I'm asking is if they're on parole
21     or probation for a sex offense, would you then
22     necessarily get in contact with their probation or
23     parole officer to let them know of the violation?
24         MR. DAMICH: Objection, form and
25  foundation.

Page 85

1           THE WITNESS: So I just first want to
2   clarify. You said "fail to register." Did you
3   mean failure to verify?
4           MR. REINGOLD: Yeah, failure to verify.
5           THE WITNESS: If I knew that someone
6   was on probation or parole, then I would try to
7   reach out to the probation or parole and let them
8   know what I had going on with their probationer or
9   parolee.
10  BY MR. REINGOLD:
11  Q. All right. And they would make their own decision
12     as to what they wanted to do?
13  A. Right. You would share information. I can't say I
14     did it every single time, but if I knew they were
15     on probation or parole -- I don't automatically
16     know that someone's on probation or parole, that
17     would be a common question I would ask to someone.
18     And they may be on probation or parole for
19     something else besides a sex offense.
20  Q. All right. I'm just consulting my notes to get
21     back to my place.
22         When you're doing residence checks on a
23     sweep like this, you said it's a very effective way
24     to get people back where they should be. Of the
25     people whom you see if -- let's say you saw 100

Page 86

1   people or you did 100 checks, what's the rough
2   noncompliant rate?
3           MR. DAMICH: Objection to form and
4   foundation.
5           THE WITNESS: I don't have an answer
6   for that. That would vary from area to area as
7   well.
8           MS. AUKERMAN: I think you're still
9   screen sharing. You may just want to end that.
10          MR. REINGOLD: Oh, I will. Thanks.
11  BY MR. REINGOLD:
12  Q. There are statistics done from the sweeps; isn't
13     that right?
14  A. Correct.
15  Q. In fact, at the end of the sweep you're required to
16     turn in a form that shows the number of people who
17     were checked, the number of people who were
18     noncompliant, the number of warrants issued, the
19     number of people who were arrested; the data is all
20     there. Right?
21  A. That would be something that would be compiled at
22     the end, yes.
23  Q. Not only would it be compiled, but it would also go
24     down to a unit that would share it with the public.
25     Right?

Page 87

1           MR. DAMICH: Objection to foundation.
2           THE WITNESS: What unit are you saying
3   it was sent to?
4   BY MR. REINGOLD:
5   Q. Isn't there a press release issued at the end of
6     every sweep?
7   A. There was press releases released.
8   Q. And that's to be able to, in effect, say to the
9     public "we're monitoring all these scary people"?
10          MR. DAMICH: Objection, form.
11          THE WITNESS: I think it's a way to
12  give information to the public of what the state
13  police were doing at that time for SOR enforcement.
14  BY MR. REINGOLD:
15  Q. And do you know if the number of people who are
16     found noncompliant or the number of warrants issued
17     or the number of arrests made, do you know if those
18     figures are trending upward or downward; would you
19     pay any attention to those at all?
20          MR. DAMICH: Objection to form and
21  foundation.
22          THE WITNESS: I haven't had any sweeps
23  to get any trends lately.
24  BY MR. REINGOLD:
25  Q. Back when you were doing sweeps from 2014 to 2019,

Page 88

22 (Pages 85 to 88)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1    did you look for trends? | 1    target on the west side, and then having to go back |
| 2  **A.**  I did not look for trends, no. | 2    to the east side, and then going to the north side, |
| 3  Q.  Okay. What is the sweep enforcement wizard that's | 3    and the south side. So it would be a -- a way |
| 4    mentioned in the M-SOR program contract? | 4    to -- to assist to use our resources to be more |
| 5  **A.**  That does not work. | 5    functional. |
| 6  Q.  What is it suppose to do? | 6  Q.  Sounds like the way I used to do my paper route. |
| 7  **A.**  My understanding is the sweep wizard is suppose to | 7    Trying to be as efficient as you can be. All |
| 8    assist with helping to coordinate our sweeps for | 8    right. |
| 9    like mapping purposes. | 9  **A.**  Probably. Work smarter, not harder. |
| 10  Q.  When you say "mapping purposes," is that like to | 10  Q.  I want to ask you a few more questions about |
| 11    define areas that would have a denser population of | 11    cooperative efforts with probation and parole. |
| 12    known absconders, that sort of thing? | 12        Do you actually coordinate the sweeps |
| 13  **A.**  No, it -- So say I'm, again, I'm going to do a | 13    with probation and parole? |
| 14    sweep in Lansing -- I'm just throwing numbers out, | 14  **A.**  I do not. |
| 15    these are not accurate. Say Lansing has 200 | 15  Q.  And why not? |
| 16    offenders in their -- in their city jurisdiction, | 16  **A.**  Because I was busy with other things. |
| 17    and say I have, you know, four teams of -- of | 17  Q.  That's a fair answer. And after a sweep, might you |
| 18    troopers, two troopers with each team, and we're | 18    share information from the sweep with probation and |
| 19    going to divide Lansing into quadrants; a northwest | 19    parole so they can take whatever action they want |
| 20    quadrant, a northeast quadrant, a southeast and a | 20    to; it sounds like you said yes to that one? |
| 21    southwest quadrant. | 21        MR. DAMICH: Asked and answered, yeah. |
| 22        It would be beneficial, and it would | 22        THE WITNESS: Do I have to answer? |
| 23    always be to give teams general targets in an area | 23        MR. REINGOLD: Yeah, you should answer. |
| 24    so they could streamline it and do their targets in | 24        THE WITNESS: Okay. If I knew that |
| 25    a cohesive manner rather than bouncing like doing a | 25    someone was on probation and parole and we were |
| Page 89 | Page 90 |
| 1    going to take enforcement action, or if I found out | 1    Sex Offender Registry, they are suppose to comply |
| 2    any information that I feel might be helpful for | 2    with their duties and obligations. |
| 3    them, I'd pass that on and share that information | 3  BY MR. REINGOLD: |
| 4    with them. | 4  Q.  I'm asking if they're on probation and parole for a |
| 5  BY MR. REINGOLD: | 5    registrable offense, isn't that also a requirement |
| 6  Q.  All right. And it's true isn't it, that compliance | 6    for probation and parole? |
| 7    with SORA is a mandatory requirement for people | 7  **A.**  I would assume that's the case. I -- I don't know |
| 8    convicted of registrable offenses? | 8    the ins and outs of probation and parole, I don't |
| 9        MR. DAMICH: Objection, lack of | 9    work for MDOC. |
| 10    foundation. | 10  Q.  Okay. Do you know if -- if someone is found to |
| 11        THE WITNESS: Can you repeat that? | 11    have violated SORA, if there's a mandatory return |
| 12        MR. REINGOLD: Yes. | 12    to jail or prison provision? |
| 13  BY MR. REINGOLD: | 13        MR. DAMICH: Objection, calls for legal |
| 14  Q.  Compliance with SORA is a mandatory -- I guess | 14    conclusion, lack of foundation. |
| 15    "mandatory requirement" is redundant. | 15        MR. REINGOLD: If you know. |
| 16        Compliance with SORA is a requirement | 16        THE WITNESS: Again, I don't work for |
| 17    for people convicted of registry offenses or | 17    MDOC, so I don't know what their procedures are for |
| 18    registrable offense? | 18    that. |
| 19  **A.**  Yeah, can you one more time -- I'm sorry. Can you | 19        MR. REINGOLD: Okay. Let me frame it a |
| 20    repeat that one more time? | 20    slightly different way. |
| 21  Q.  Sure. Compliance with SORA is a requirement for | 21  BY MR. REINGOLD: |
| 22    people convicted of registrable offenses? | 22  Q.  If someone has failed to register on the registry |
| 23        MR. DAMICH: Same objection, lack of | 23    and they're on probation or parole for a |
| 24    foundation. | 24    registrable offense, is it almost certain that |
| 25        THE WITNESS: If one is on Michigan's | 25    they're also violating their probation and parole? |
| Page 91 | Page 92 |

23 (Pages 89 to 92)

BRENDA HOFFMAN
4/24/2023

---

**Page 93**

1        MR. DAMICH:  Objection, calls for legal
2  conclusion, foundation.
3        THE WITNESS:  So do you mean failing to
4  verify or failing to register?  That's two
5  different things.
6        MR. REINGOLD:  Failing to verify.
7  Right?  When you say "failing to register" in your
8  world, that means the original registration.
9  Right?
10        THE WITNESS:  Correct.  Usually that
11  happens when someone moves from another state into
12  Michigan and they fail to register with us.  So
13  failing to register is quite different than failing
14  to verify.
15        MR. REINGOLD:  Right.  We lay people
16  use "failing to register" when we shouldn't.  So
17  you're right.
18        THE WITNESS:  Yeah.
19        MR. REINGOLD:  I stand corrected.  Yes,
20  I mean failing to verify or failing to report.
21        THE WITNESS:  I forgot what you even
22  asked me.  Sorry.
23        MR. REINGOLD:  Yeah.
24  BY MR. REINGOLD:
25  Q.  So the question was if they failed to verify or

---

**Page 94**

1  report, that if they're on probation for parole for
2  a sexual offense or registrable offense, is it
3  almost certain that they are also violating their
4  probation and parole?
5        MR. DAMICH:  Objection, calls for legal
6  conclusion.
7        THE WITNESS:  Again, I do not know what
8  the MDOC procedures are if an offender who is on
9  probation and parole fails to verify what they
10  are -- if they would be in violation.  I would
11  assume so, but I do not -- I do not know that for
12  sure.  That's a question to ask someone with MDOC.
13  BY MR. REINGOLD:
14  Q.  If probation and parole staff have questions about
15  SORA enforcement, do they ever call you?
16  A.  Sometimes, yes.
17  Q.  Okay.  And they also have resources I would expect
18  from the MDOC.  Is that right; does the MDOC have
19  the same kind of procedures and policies that can
20  get them answers to questions?
21        MR. DAMICH:  Objection to foundation.
22        THE WITNESS:  Again, I do not work for
23  MDOC, I do not know what they have or don't have.
24        MR. REINGOLD:  All right.  I'm sharing
25  what's been marked as Exhibit H.

---

**Page 95**

1        MARKED FOR IDENTIFICATION
2        EXHIBIT H
3        11:24 a.m.
4        MR. REINGOLD:  It's an MDOC policy
5  record dated 4/01/2014.  This too was -- This one
6  actually came from the MDOC website as a still in
7  publication policy directive that I wanted you to
8  take a look at.
9  BY MR. REINGOLD:
10  Q.  In your work I take it you rely on the MSP
11    operating procedures and so on to get good
12    information; is that right?
13  A.  Yes, because I work in the state police.
14  Q.  Got it.  And a moment ago you noted that the -- a
15    form that we were looking at couldn't be current
16    because it mentioned school safety zones.  Right?
17  A.  Correct.
18  Q.  All right.  So I'm now showing you a current, still
19    active, MDOC policy directive that dates back to
20    2014 but is still current.
21      And I want to show you paragraph DD
22    which says "A registered sex offender who is not
23    incarcerated must report in person and notify local
24    law enforcement agency having jurisdiction over the
25    area to which the offender is moving, or nearest

---

**Page 96**

1  MSP post designated to receive or answer
2  registration within three business days after the
3  offender does any of the following."  And it
4  includes 5, 6, or 7.
5      Are 5, 6, and 7 still things to your
6  knowledge that have to be reported within three
7  business days?
8        MR. DAMICH:  Object to this line of
9  questioning.  You're asking her to testify
10  about -- towards MDOC policy.  She's not an MDOC
11  employee.
12        MR. REINGOLD:  I'm not asking her about
13  the MDOC policy.  I'm asking her if the three
14  things that are listed on the policy are consistent
15  with current law.
16        MR. DAMICH:  Then I'll object to you
17  asking her for a legal conclusion, but you can ask
18  the question.
19        THE WITNESS:  5 appears to be correct.
20  Number 6, that appears to be incorrect.  My
21  understanding of the new law is that anyone who has
22  an incident date prior to July 1st, 2011, no longer
23  has to report any Internet identifies which would
24  include electronic mail or instant messaging.
25

---

BRENDA HOFFMAN
4/24/2023

BY MR. REINGOLD:

1    Q.  And number 7, isn't it true that vehicles no longer
2        have to be reported within three days -- in person,
3        rather.  Sorry.  In person.
4    A.  Well, they have the option to report that now
5        through a mail-in form or a person.
6    Q.  Right.  And if we look at EE, it's also true that
7        that's out of date as well?
8    A.  My understanding of the new law is there's no more
9        school safety zone provisions over the law.
10   Q.  Okay.  So if a parole or probation officer went to
11       MDOC policy directive O4-01-2014 we just go on the
12       books for just information, part of what they would
13       get is information that's no longer current; is
14       that right?
15            MR. DAMICH:  Objection.  Form, calls
16       for a legal conclusion, and foundation.
17            THE WITNESS:  I'm not an MDOC employee.
18       I don't know if that's their most updated policy
19       they really have, or maybe there's an updated one
20       they have not posted.  But that would be a question
21       for MDOC.
22   BY MR. REINGOLD:
23   Q.  If it were one that were still posted and still in
24       use, do you agree that it contains information

Page 97

1        that's no longer correct?
2    A.  I believe there's some information that you showed
3        me that does not appear to be correct with the new
4        law.
5    Q.  How do you people get flagged on the registry as
6        being noncompliant?
7    A.  With our new database there are three ways that
8        someone will automatically or can be flagged as
9        noncompliant is if their ID -- if the information
10       on their ID is not updated in the system to reflect
11       a valid ID.
12            If they do not have palm prints on
13       file, that would be another reason to automatically
14       be flagged noncompliant, and if someone
15       marks -- does a residence check where they mark
16       someone being an absconder, then that would be flag
17       them as having an address violation.
18   Q.  All right.  When you say that those are
19       automatically flagged, does that mean the computer
20       changes them from compliant to noncompliant as soon
21       as that entry is either made by somebody --
22   A.  It syncs.
23   Q.  -- or can it do it by itself?
24   A.  So I'm not a computer programmer by any means, but
25       if -- so say for example a palm print, there is a

Page 98

1        place in the database that will say "yes" or "no"
2        for a palm print.  And if it says "no," then that
3        would sync it to make that person noncompliant for
4        a palm print violation.
5    Q.  All right.  And the same is true for failing to
6        verify if they miss a monthly --
7    A.  No.
8    Q.  -- report?
9            So what were the other two that could
10       happen automatically?
11   A.  ID violation.  All registrants are suppose to have
12       a valid Michigan ID or drivers license.  And so
13       if -- if the -- again, there's a place in the
14       database where the ID information is -- is listed,
15       and if says yesterday on April 23rd that person's
16       ID expired, then the system would -- would see that
17       it expired yesterday, and it would make them
18       noncompliant for an ID violation.
19   Q.  All right.  And then what about the residence
20       check, is that done automatically as well, or does
21       that require input by a person?
22   A.  That would require input by someone doing a
23       residence check and marking someone as an
24       absconder.  If your choice was making them an
25       absconder, then that would activate an address

Page 99

1        violation.
2    Q.  So right now there are only three things that
3        automatically result in -- in a noncompliant flag?
4    A.  Yes, that's my understanding.
5    Q.  All right.  And all the rest, anything else that
6        you're late on or not doing in order for there to
7        be a noncompliant flag as to those, someone either
8        during registration or some other time -- not
9        registration -- during verification or some other
10       time would actually is to make a decision to change
11       the compliance status to noncompliant?
12   A.  Correct.
13   Q.  Have there been other automatic switches like this
14       that the program has the ability to do but have not
15       been turned on, do you know?
16   A.  I'm not aware of any other ones that I know.  One
17       time the goal was if someone didn't come in during
18       the verification month, say they were come to come
19       in March and they didn't, they come in April 1st,
20       technically they're noncompliant for failing for
21       verify.
22            That is not an -- is not automatically
23       synced for making someone noncompliant for failing
24       for verify.  What does happen in the M-SOR database
25       is what's called a no-entry entry, that is put in

Page 100

25 (Pages 97 to 100)

BRENDA HOFFMAN
4/24/2023

```
 1    on -- as that exam on April 1st, and it will say no
 2    entry.
 3  Q.  And is that effectively a flag for a registry
 4    officer for the next time they see the person, or
 5    does it trigger some other kind of more immediate
 6    response?
 7  A.  It's there.  I mean, you have to go down and look
 8    in the verification to see, you know, with the new
 9    law.  You know, if you go on that no-entry-segment
10    portion, whatever you want to call it, there is
11    like a little box that -- I don't have the exact
12    verbatim, but it basically says "further
13    investigation needs to be done at this time to
14    prove a willful violation," because that is one of
15    the changes with the new law.
16  Q.  When someone is flagged as noncompliant other than
17    sweeps, will there be individual investigation, or
18    again, is it more passive; do you wait until they
19    come in the next time and then say, you know, we
20    got a problem with this or a problem with that?
21        MR. DAMICH:  Objection, form and
22    foundation.
23        THE WITNESS:  If someone is marked
24    noncompliant and someone who has the jurisdiction
25    to investigate -- who is in that jurisdiction that
```
                    Page 101

```
 1    can investigate that offender, then they can by all
 2    means go ahead and investigate that offender to see
 3    if they can prove the elements that they violate
 4    the Sex Offender Registry.
 5  BY MR. REINGOLD:
 6  Q.  Okay.  Let me ask you a few questions about how you
 7    decide whether to charge or not to charge a
 8    violation.  You eluded to this earlier, but let me
 9    give you a couple of possibilities.
10        If a registrant had a whole month to
11    report and waited until the last day, and then came
12    to the office and it was closed, or had an accident
13    on the way to the office and didn't get there on
14    time, would you charge the person for not
15    registering, or is that one you'd say, you know,
16    "we'll let it go by"?
17        MR. DAMICH:  Objection to form and
18    foundation.
19        THE WITNESS:  I think it would depend
20    on a case-by-case basis.  I don't -- Because of my
21    lack of resources, I just don't have the time to be
22    writing a bunch of warrants in that.  If I do chose
23    to do a warrant for someone, I probably would use
24    my resources to do it on someone who is totally
25    gone and I can't find him.
```
                    Page 102

```
 1        So I would probably use some discretion
 2    on that one that he or she is at least trying to
 3    get in.  But like I always tell everyone who is on
 4    the registry, you have the whole month to come in.
 5    Try to get in the practice of doing it in the
 6    beginning of the month because life can happen, and
 7    then you're not rushing around at the end of the
 8    month trying to do your thing.
 9        MR. REINGOLD:  Good advice.  Yep.
10  BY MR. REINGOLD:
11  Q.  As I said earlier, it's true isn't it, that the
12    more discretion that there is in the system, in
13    some respects, the less consistency there's going
14    to be who gets charged from jurisdiction to
15    jurisdiction?
16        MR. DAMICH:  Objection to form and
17    foundation.
18        THE WITNESS:  If people who are doing
19    the investigating want to use discretion or if they
20    wish to send everything through the prosecutor for
21    the prosecutor to decide, then that's up to them
22    how they do their investigation.
23  BY MR. REINGOLD:
24  Q.  And are you aware that in some counties or some
25    jurisdictions there are way more covid -- not
```
                    Page 103

```
 1    covid -- SORA prosecutions than in others?
 2  A.  I think every county is their own entity per se, so
 3    yes, there are some counties that do more SORA
 4    charges than others.
 5  Q.  Let me ask you some questions about reporting and
 6    registration issues, and some of this comes from
 7    our clients -- our clients including all
 8    50-plus-thousand registrants, and the same as you
 9    when there's that many people out there we get lots
10    of contact and complaints.
11        Here's the problem that we're seeing
12    more of.  When you go in to verify, if a paper form
13    is used -- First of all, is it preprinted or is it
14    a blank form; do you know?
15        I mean, is some of it filled in?
16    That's my question.
17  A.  I guess I don't know the question you're asking.
18    How it should happen is when the offender comes in,
19    information is either added or they get verified,
20    and then they print out the completed RI4 form, and
21    then the person who is doing the verifying will
22    sign it, the offender will sign it, and they then
23    should be provided a copy of that -- of that form.
24        Now, there are times like maybe the
25    system is having some technical difficulties, and
```
                    Page 104

26 (Pages 101 to 104)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1    they're not able to enter that information in the<br>2    database like I just described, so because the<br>3    offender is there they should still try to get them<br>4    verified and have them sign that form and fill it<br>5    out, and I would say kind of doing it the<br>6    old-fashioned way, and having to improvise if<br>7    there's some technical difficulties with the M-SOR<br>8    database at the date and time the offender is<br>9    there. Is that what you're asking?<br>10  Q. Yes, that's exactly what I was asking.<br>11        But the result is either way before the<br>12    registrant leaves, if the printers are working,<br>13    they should have a signed form that they can take<br>14    away with them?<br>15  **A.** Correct.<br>16  Q. And that's in part that if there's a glitch<br>17    inputting the data or if later on the system is<br>18    down and they're stopped, they have proof that they<br>19    did their verification on a certain date?<br>20  **A.** Correct. And also on that form it should provide<br>21    them with their next verification month.<br>22  Q. If it's done on a screen, do you know at most<br>23    offices can the registrants see the screen, or is<br>24    the screen facing the officer so they don't see<br>25    what the officer is typing on to the screen?<br><br>Page 105 | 1        MR. DAMICH: Objection to form and<br>2  foundation.<br>3        THE WITNESS: The screen is not facing<br>4    the offender, number one because the M-SOR database<br>5    is technically linked with the Law Enforcement<br>6    Information Network, and only law enforcement<br>7    officers should have access to that.<br>8  BY MR. REINGOLD:<br>9  Q. If -- Have you heard from registrants that some of<br>10    them are asking for written forms that they can't<br>11    be given -- won't be given the written<br>12    form -- can't or won't be given the written form?<br>13  **A.** I have heard that, yes.<br>14  Q. And has there been any investigation as to why<br>15    that's happening?<br>16  **A.** I have not investigated that, no.<br>17  Q. We're also hearing stories from registrants that<br>18    it's getting harder to report.<br>19        To your knowledge, is it true that some<br>20    local law enforcement agencies have either closed<br>21    offices or reduced their hours, that sort of thing?<br>22  **A.** I have heard that that has happened, yes.<br>23  Q. And does the MSP have any authority fix that<br>24    problem if it's local law enforcement that's doing<br>25    it?<br><br>Page 106 |
| 1  **A.** We do not. MSP is required to maintain the<br>2    registry.<br>3  Q. The way the statute is constructed, is there any<br>4    direct link that you know of from the legislature,<br>5    you know, in effect, ordering local law enforcement<br>6    to make sure that this gets implemented?<br>7        MR. DAMICH: Objection to form and<br>8  foundation.<br>9        THE WITNESS: I'm not aware of anything<br>10    like that.<br>11  BY MR. REINGOLD:<br>12  Q. Is there anything that you think the SOR unit or<br>13    your enforcement unit can do to reverse this trend?<br>14  **A.** There had been times when I, you know, have been<br>15    told that the agency may not be providing that, and<br>16    there have been times where I try to reach out to<br>17    see what's possibly going on with that.<br>18        So I've tried to see, you know, why<br>19    they're not doing that. But I, as<br>20    Sergeant Brenda Hoffman of the State Police, cannot<br>21    tell another department what they can and can't do.<br>22  Q. And what are you hearing back from them when you<br>23    have these contacts; what are the reasons they're<br>24    giving for why they're cutting back?<br>25  **A.** Sometimes it may be they don't have enough money to<br><br>Page 107 | 1    buy the paper, or they may not have the printing<br>2    capabilities, or maybe it's something on that day,<br>3    something happened to be wrong with connections, or<br>4    maybe the person didn't realize they should be, you<br>5    know, it's a good practice to give them a copy of<br>6    their paperwork.<br>7  Q. What about for the bigger problems like reduced<br>8    office hours or closing a reporting office?<br>9  **A.** Again, I work for the state police. I can't tell<br>10    Detroit PD or Southfield PD how to run<br>11    their -- their departments.<br>12  Q. No, I wasn't asking that. I was asking what<br>13    they're saying about why they're doing that?<br>14        MR. DAMICH: Objection to foundation.<br>15        THE WITNESS: I think probably -- I<br>16    don't know their reasoning. I can speak for MSP.<br>17    We have just our lobby hours open to do the<br>18    verification ourselves. Save resources, that's<br>19    probably a main thing I would -- I would say that<br>20    like I can just speak for MSP. I know we limit our<br>21    hours as well for a normal business days, Monday<br>22    through Friday, and closed holidays.<br>23  BY MR. REINGOLD:<br>24  Q. And do you know if this is a problem with<br>25    State Police posts as well?<br><br>Page 108 |

27 (Pages 105 to 108)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1      MR. DAMICH: Objection, foundation.<br>2      THE WITNESS: What do you mean by<br>3   "problem"?<br>4   BY MR. REINGOLD:<br>5   Q.  That offices are either reducing their hours or,<br>6      you know, more breaks, whatever, making it harder<br>7      for people to register; have you heard that's a<br>8      problem within the department?<br>9   A.  I don't know the exact hours for every post, but I<br>10      know we -- we make the effort to have, you know, a<br>11      business day open for the offenders to come in and<br>12      verify.  It is generally, you know, as I said,<br>13      Monday through Friday.  If we're closed for the<br>14      holidays or if the lobby is not open, then they<br>15      wouldn't be able to verify.<br>16      MR. REINGOLD: Let me again share the<br>17      screen with you.  I believe this is where I<br>18      couldn't rename the file, and so I couldn't tell<br>19      you.  This is Exhibit G.  This again is a<br>20      director's memo from Colonel Gasper to the field<br>21      regarding enforcement of the Sex Offender<br>22      Registration Act.<br>23      MARKED FOR IDENTIFICATION<br>24      EXHIBIT G<br>25      11:49 a.m.<br><br>Page 109 | 1      MR. REINGOLD: There's a paragraph at<br>2   the bottom of it which says that "members at every<br>3   worksite designated to receive or enter<br>4   registration information shall continue to<br>5   register, verify, and update information required<br>6   to be reported by individuals under SORA.<br>7      Because they are so required, any<br>8   department post, members that post shall not<br>9   discourage or refuse to accept a report required<br>10   under SORA, and shall not direct an individual to<br>11   report the information to another agency, worksite,<br>12   or post."  And then it says questions about<br>13   enforcement should be directed to you.<br>14      Does that suggest to you that the<br>15   director has heard compliance that even within the<br>16   MASP, registrants aren't getting reports or are<br>17   being sent to other agencies, worksites, or posts?<br>18      MR. DAMICH: Objection to form and<br>19   foundation.<br>20      THE WITNESS: I did not write that<br>21   memo, so I think you need to asked Colonel Gasper<br>22   why he put that in there.<br>23   BY MR. REINGOLD:<br>24   Q.  Do you think he would have put that in there if it<br>25      wasn't happening?<br><br>Page 110 |
| 1      MR. DAMICH: Objection. Foundation.<br>2      THE WITNESS: I can't think for the<br>3   colonel.<br>4      MR. REINGOLD: We'll let him think for<br>5   himself.<br>6   BY MR. REINGOLD:<br>7   Q.  I want to ask about a couple of other reporting<br>8      issues.  We -- We touched on this briefly earlier,<br>9      but you understand that reporting isn't always easy<br>10      for people who have illness or disabilities or old<br>11      people, that sort of thing.  Right?<br>12   A.  Yes.<br>13   Q.  The -- The current law, SORA 2021, doesn't make any<br>14      exception for the elderly, or the infirm, or even<br>15      people who are incompetent.<br>16      Isn't it true that everybody has to<br>17      register and report the same information on the<br>18      same schedule?<br>19   A.  Yes, that's how the law is written.<br>20   Q.  All right.  As the registry gets older and older<br>21      and more people have been on it into old age,<br>22      what -- what do you think is going to happen when,<br>23      you know, 20, 30, 40 percent of the population is<br>24      in nursing homes or whatever and can't get to the<br>25      registry?<br><br>Page 111 | 1      MR. DAMICH: Objection, form and<br>2   foundation.<br>3      THE WITNESS: They're probably not<br>4   going to report.<br>5   BY MR. REINGOLD:<br>6   Q.  Yeah.  And are they then going to get prosecuted?<br>7      MR. DAMICH: Objection, foundation.<br>8      THE WITNESS: They could if they're in<br>9   violation of the Sex Offender Registry law.<br>10   BY MR. REINGOLD:<br>11   Q.  Every single one of them could be prosecuted?<br>12      MR. DAMICH: Objection, asked and<br>13   answered.<br>14      MR. REINGOLD: Was that a "yes"?<br>15      THE WITNESS: Yes.  They are violating<br>16   the Sex Offender Registry law, they could be<br>17   prosecuted.<br>18   BY MR. REINGOLD:<br>19   Q.  Does the current M-SOR program have the capacity to<br>20      allow online verification?<br>21      MR. DAMICH: Objection, lack of<br>22   foundation.<br>23      THE WITNESS: No.<br>24   BY MR. REINGOLD:<br>25   Q.  Do you know if it's built in so that it could be<br><br>Page 112 |

28 (Pages 109 to 112)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1    done and simply hasn't been hooked up, or are you | 1        Do you know who decides what the manner |
| 2    saying that it can't be done? | 2    would be other than in-person; who makes that |
| 3  A. I'm not a computer programmer, and the database is | 3    decision? |
| 4    set up now for people to come in and verify in | 4  A. I'm sorry, can you repeat that question? |
| 5    person per the law. | 5  Q. Yes. The statute allows that some |
| 6  Q. And are you aware that the contract for M-SOR says | 6    changes -- verification changes can be done in |
| 7    that the program must allow offenders to update by | 7    person or in another manner prescribed by the |
| 8    phone or electronic devices; did you know that? | 8    department. |
| 9        MR. DAMICH: Objection, foundation. | 9        What I'm asking is who decides or who |
| 10        THE WITNESS: I'm sorry, can you repeat | 10    decided the manner in which the report would be |
| 11    that question? | 11    made other than in person? |
| 12        MR REINGOLD: Yes. | 12        MR. DAMICH: Objection, foundation. |
| 13  BY MR. REINGOLD: | 13        THE WITNESS: I don't know. |
| 14  Q. Do you know that the contract the developer with | 14  BY MR. REINGOLD: |
| 15    M-SOR with the MSP says that the contract must | 15  Q. And this is one of the puzzles that we're unable to |
| 16    allow offenders to update through phones or | 16    figure out, and everything we're dealing with SORA |
| 17    electronic devices? | 17    is who actually makes decisions that effect |
| 18        MR. DAMICH: Objection, foundation. | 18    registrants. You don't have any idea? |
| 19        THE WITNESS: I'm unaware of that part | 19  A. Correct. |
| 20    of the contract. | 20  Q. Okay. All right. When people go in to |
| 21  BY MR. REINGOLD: | 21    register -- excuse me -- to verify. You've |
| 22  Q. Okay. You know, I assume that the statute of law | 22    instructed me well. |
| 23    has some changes to be done in person or in another | 23        When they go in to verify, each time do |
| 24    manner has prescribed by the department as opposed | 24    they have to sign the verification form? |
| 25    to in-person only. | 25  A. When they're going to verify, yes. |
| Page 113 | Page 114 |

| | |
|---|---|
| 1  Q. And that's true whether it's a quarterly | 1    out the form and the signing was refused? |
| 2    verification or they're popping in because | 2  A. It would depend on how that post or agency handles |
| 3    something has changed? | 3    SORA violations. |
| 4  A. When they come in to verify, they need to sign the | 4  Q. All right. So it could be the same person, but it |
| 5    form. | 5    wouldn't be necessarily? |
| 6  Q. Okay. And at some locations now can they sign by | 6  A. It could be the same or it could be someone else. |
| 7    electronic signature pad? | 7  Q. Okay. The last sentence above the signature line |
| 8  A. Yes, sir. | 8    on the form requires that the person -- well, it |
| 9  Q. In fact, there was grant money for that; isn't that | 9    reads as follows. |
| 10    right? | 10        "I have read the above requirements |
| 11  A. We are looking to -- to put some grant money for | 11    and/or had them read to me, and I understand my |
| 12    some more electronic signature pads. I don't -- I | 12    registration duties." |
| 13    don't recall how we got those pads to begin with. | 13        Are you aware of that line in the form? |
| 14  Q. Right. And the registrant is legally required to | 14  A. Are you referring to the RI4 form? |
| 15    sign the form. Right? | 15  Q. Yes, I am. |
| 16  A. When they come to verify, yes. | 16  A. If you're reading off that form -- I don't see it |
| 17  Q. And what happens to them if they don't sign? | 17    in front of me -- but if you're reading verbatim |
| 18  A. Then the person who is verifying should write on | 18    off that, then yes, I would see that on the form. |
| 19    there "refused to sign." | 19  Q. I'm reading it verbatim, but if you want me to pull |
| 20  Q. And will that trigger a noncompliance alert? | 20    it up, I will. Can you see that form? |
| 21  A. It could. | 21  A. Not yet. Something is coming up. Yes, sir, I see |
| 22  Q. Who would make that decision? | 22    it. |
| 23  A. The person who would be doing the investigating for | 23  Q. RI-004, that's the one? |
| 24    that possible violation. | 24  A. Correct. |
| 25  Q. Is that different than the person who is filling | 25  Q. And it's dated 03/2021, which was the start of |
| Page 115 | Page 116 |

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1   SORA 2021. Right? | 1   A.  I can't speak for what an offender understands. |
| 2   A.  Yes, sir. | 2   Q.  Would you sign a form under oath, based on reading |
| 3   Q.  Okay.  And if we go to the very end, the line | 3       this form, that you have read and understand your |
| 4       reading verbatim "I knowledge that I have been | 4       registration duties so that it means all of them |
| 5       provided a written notice explaining my | 5       and not just the one summarized above? |
| 6       registration duties, I have read the above | 6   A.  If I were a registered sex offender I would make |
| 7       requirements and/or had them read to me, and I | 7       sure I educated myself so I knew what my duties |
| 8       understand my registration duties." | 8       were. |
| 9           That's new in this version of the form, | 9   Q.  Well, let's talk about that.  Here, let me stop |
| 10      isn't it? | 10      sharing and we'll see how well even an expert might |
| 11  A.  I would have to look at a previous form to see if | 11      know her duties. |
| 12      it's new or not. | 12          Isn't it true that under the old law |
| 13  Q.  I don't think I have a previous one, but you can | 13      phone numbers only had to be reported if they were |
| 14      take my word for it when I say "I have read the | 14      routinely used? |
| 15      above requirements and/or had them read to me, and | 15          MR. DAMICH:  Objection, calls for a |
| 16      I understand my registration duties," that's that a | 16      legal conclusion. |
| 17      new line? | 17          THE WITNESS:  Under the old law you're |
| 18  A.  Without comparing the two I will not be able to | 18      saying? |
| 19      answer yes or no to that. | 19          MR. REINGOLD:  Yeah. |
| 20  Q.  Okay.  In this version of the form, the person | 20          THE WITNESS:  Yes, under the old law if |
| 21      actually has to say that they understand their | 21      they were routinely used, they also had to be |
| 22      registration duties. | 22      registered. |
| 23          Have you ever met a registrant that you | 23  BY MR. REINGOLD: |
| 24      think totally understands their registration | 24  Q.  And under the old law vehicles only had to be |
| 25      duties? | 25      reported if they were regularly operated? |
| Page 117 | Page 118 |
| 1           MR. DAMICH:  Same objection.  Calls for | 1       every phone number registered to or used by them? |
| 2       legal conclusion. | 2           MR. DAMICH:  Objection.  Calls for |
| 3           THE WITNESS:  If that's what the old | 3       legal conclusion, form. |
| 4       law say, then that would be correct.  I don't have | 4           THE WITNESS:  My understanding is that |
| 5       the old law in front of me. | 5       they have to register phone numbers that are |
| 6   BY MR. REINGOLD: | 6       registered to them. |
| 7   Q.  But the point regardless of the language is that | 7   BY MR. REINGOLD: |
| 8       both for cars or for phones, registrants had to | 8   Q.  Is it also your understanding that the law says |
| 9       report them if they were used on a regular basis, | 9       "registered to or used by them"? |
| 10      routinely or regularly? | 10  A.  Can you pull that up for me so that I can review |
| 11          MR. DAMICH:  Objection, calls for legal | 11      the law? |
| 12      conclusion. | 12  Q.  I can. |
| 13  BY MR. REINGOLD: | 13          MR. REINGOLD:  Why don't we take a |
| 14  Q.  You don't dispute that, do you? | 14      short break because it will take me a minute to get |
| 15  A.  I believe the old law had that terminology in | 15      it. |
| 16      there, about regularly used. | 16          (Off the record at 12:03 p.m.) |
| 17  Q.  And the courts in Doe's 1 held those qualifiers | 17          (On the record at 12:09 p.m.) |
| 18      routinely regularly were too vague to be | 18  BY MR. REINGOLD: |
| 19      enforceable because neither registrants nor law | 19  Q.  Picking up where we left off, you wanted to see the |
| 20      enforcement could know when someone had crossed the | 20      actual language of the new statute.  This is a |
| 21      line -- right -- was it five, was it six, was it | 21      version of the statute that has -- |
| 22      ten?  Nobody knew. | 22          MR. REINGOLD:  Let's make this -- I'm |
| 23          In SORA 2021, instead of coming up with | 23      not sure what the exhibit would be, but the exhibit |
| 24      a number like saying more than five times, isn't it | 24      letter following the last exhibit. |
| 25      true that SORA 2021 requires registrants to report | 25 |
| Page 119 | Page 120 |

30 (Pages 117 to 120)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1     MARKED FOR IDENTIFICATION | 1     the last part of it, line 21, says "or telephone |

---

1           MARKED FOR IDENTIFICATION
2           EXHIBIT J
3           12:09 a.m.
4           MR. REINGOLD: I've got two different
5   places where I can show you the language, the text
6   of the new statute. One is the -- the text reads
7   "for vehicles the license plate number and
8   description of any" --
9           THE WITNESS: Can you show it? Can you
10  share your screen? I'm sorry.
11         MR. REINGOLD: No, my fault. See it?
12         THE WITNESS: Yeah, it's all marked up.
13         MR. REINGOLD: Yes.
14  BY MR. REINGOLD:
15  Q. It -- This is the version that shows both the old
16     statute and the new, and that way you can see the
17     changes. But the new version is lines 12 to 14 on
18     page 30, and as to cars, it's the license place
19     number and description of any vehicle owned or
20     operated by the individual.
21        Am I reading it correctly?
22  A. Correct. You just read what was highlighted in
23     light orange.
24  Q. Okay. This is information that must be provided,
25     and it includes any vehicle information, and then

Page 121

---

1   numbers registered to or used by the individual."
2   Do you see that?
3  A. Yes. You again read what was in light orange.
4  Q. Okay. And in the statute it does not say anywhere
5     that you can see as to when it is that you must
6     have used the telephone number?
7  A. In what you're showing me I do not see that.
8  Q. And the same for the other one; it didn't -- there
9     was no date or time limit as to when you operated
10    the vehicle. Right?
11  A. I did not see that either.
12  Q. Okay. All right. So what I was getting at was
13    instead of coming up with a reasonable number like
14    more than five times, SORA 2021 took a different
15    approach and simply said registrants have to report
16    every phone number, quote, "registered or used by,"
17    end quote, them, and to report the license plate
18    and description of every vehicle, quote,
19    "registered to or operated by," close quote, them.
20       If a phone number or a license plate
21    and description of a vehicle are reported to the
22    registry, for how long will it stay on the
23    registry?
24       MR. DAMICH: Object to form and

Page 122

---

1  foundation.
2       THE WITNESS: Until the registrant
3     comes in to say they no longer have it or no longer
4     use it.
5  BY MR. REINGOLD:
6  Q. Or until they come off the registry?
7  A. If they're -- If an offender's record is canceled
8     or they get off the registry then yes, the record
9     will be canceled.
10  Q. Okay. How is a registrant to know how far back to
11    go as to something that they -- that was used by
12    them or operated by them?
13       MR. DAMICH: Objection. Form and
14    foundation.
15       THE WITNESS: When they get
16    their -- the -- the form that they sign when they
17    come in had to verify, that will list all their
18    current information that is reported to the
19    registry.
20  BY MR. REINGOLD:
21  Q. But if there's no time limit that says that you
22    have to register every phone number -- not
23    register -- you have to report every phone number
24    registered to or used by them, how are they suppose
25    to know what "used by them" means in terms of time?

Page 123

---

1       Let me give you an example. If you're
2   coming in to report and you say "I'm 18 years old
3   and I left home four months ago and I used the
4   landline at my family home. Do I have to report
5   it? Now I'm living independently."
6       MR. DAMICH: Objection. Calls for
7   legal conclusion.
8       THE WITNESS: Does he or she have to
9   report the phone number or the new address?
10      MR. REINGOLD: No, the phone number.
11      THE WITNESS: Well, according to the
12   language of the law, if they're using a phone then
13   they should be reporting that.
14  BY MR. REINGOLD:
15  Q. It's not just if they're using a phone, it's if
16    they used a phone. Right?
17  A. That is how the law is -- how we both read it
18    according to what the legislators wrote it as.
19  Q. So that means if the registrant is now 22 and still
20    admits that he used that phone when he was 17 and a
21    half, it should still be on the registry. Right?
22      MR. DAMICH: Objection. Calls for
23   legal conclusion.
24      THE WITNESS: That is how the law is
25   written about the phones if it's registered to them

Page 124

31 (Pages 121 to 124)

BRENDA HOFFMAN
4/24/2023

```
 1    or if they use it.
 2    BY MR. REINGOLD:
 3    Q.  Or used it.  Right?
 4    A.  Used it, yeah.
 5    Q.  And the same for cars.  So if they used a car -- or
 6        I should say a vehicle because that's the word the
 7        statute used.
 8             If they used a vehicle sometime in the
 9        past and they know the license plate and can
10        describe it, that too should be registered.  Right?
11             MR. DAMICH:  Objection.  Calls for
12        legal conclusion.
13             THE WITNESS:  If you read the law as it
14        was written, then I would say yes, they would need
15        to register that.
16    BY MR. REINGOLD:
17    Q.  Under SORA '21 now every such use requires
18        reporting.  Right?
19    A.  I'm sorry, every what?
20    Q.  Every such use of a car or phone requires
21        reporting?
22    A.  That is what I'm reading.
23             MR. DAMICH:  Calls for legal
24        conclusion.  Objection.
25
```

Page 125

```
 1    BY MR. REINGOLD:
 2    Q.  And they can be charged with a crime if they fail
 3        to report the use of a phone or the operation of a
 4        vehicle?
 5             MR. DAMICH:  Objection to form and
 6        foundation.
 7             THE WITNESS:  According to how it was
 8        written, then yes, they could.
 9    BY MR. REINGOLD:
10    Q.  All right.  Let me give you some examples.  This
11        comes from one of our clients.
12             If a registrant spends a night at a
13        hotel and uses the in-room phone once to call the
14        front desk to ask for the Wi-Fi password in the
15        room, does he have to report the room phone number?
16             MR. DAMICH:  Objection, calls for legal
17        conclusion.
18             THE WITNESS:  Sir, the way the law is
19        written, that's just how the law is written.  And
20        that's for the offender to -- if they wish to
21        follow the law and they wish to report every phone
22        that they use, then that is what he or she can do.
23        We can probably go through a punch of examples like
24        this and I'm probably going to answer the same way.
25
```

Page 126

```
 1    BY MR. REINGOLD:
 2    Q.  All right.  Let me ask you a technical question.
 3        Must the person in your view actually use the
 4        number on the phone in order to have to report the
 5        phone number, or is it okay for example, if he
 6        borrows a phone and listens to Spotify?
 7             MR. DAMICH:  Objection, calls for a
 8        legal conclusion.
 9             THE WITNESS:  I don't know.
10    BY MR. REINGOLD:
11    Q.  If you think if he is in a car with somebody else,
12        and the person is driving, they're lost, the person
13        doesn't have a phone, the driver hands him a phone
14        and says "check Google, check where we are, check
15        Google Maps," does he have to report the phone?
16             MR. DAMICH:  Objection, calls for legal
17        conclusion.
18             THE WITNESS:  I'm going to go back to
19        the offender needs to follow the law and how it's
20        written.  If you feel there's some vagueness to it,
21        then you need to go to the legislators who wrote
22        the law because I did not write the law.
23    BY MR. REINGOLD:
24    Q.  All right.  And do you know anybody in the SOR unit
25        who can answer these questions?
```

Page 127

```
 1    A.  I don't know.  They did not write the law either.
 2    Q.  I'll ask you one more of these just to see if it
 3        makes a difference.
 4             "When I was away this past winter I
 5        asked my neighbor to start my car once to let it
 6        run for a few minutes in January in the garage to
 7        charge the battery."
 8             If he got in the car and started the
 9        car but never moved it, was he operating the
10        vehicle and therefore did he have to report it?
11             MR. DAMICH:  Objection, calls for legal
12        conclusion.
13             THE WITNESS:  Can you ask that question
14        again?
15    BY MR. REINGOLD:
16    Q.  Yeah.  "I asked him to start the car in the garage,
17        door closed, to charge the battery."  If he started
18        the car but never moved it, was he operating the
19        vehicle?
20    A.  Well, first of all, I'd be weary to start a car in
21        the garage without opening the door; that would be
22        dangerous.
23    Q.  Okay.  Let's say he did open the door.
24    A.  If he's not moving a vehicle on the roadway, then I
25        guess you'd have to look at what the definition of
```

Page 128

32 (Pages 125 to 128)

BRENDA HOFFMAN
4/24/2023

1   what "operate" is in the law, which I don't have
2   the definition of what "operate" truly means in
3   front of me.
4   Q.   All right.  And if it turns out that he -- someone
5        determines that he was operating the -- the vehicle
6        and he reported it, my license plate number and the
7        description of my car are now on the registry.
8        Right?
9   A.   If an offender reports a vehicle that they operated
10       to be on the registry, then yes, it would be on the
11       registry.
12  Q.   And if it's on the registry, then isn't he also
13       obligated to report changes in the vehicle?
14           MR. DAMICH:  Objection, calls for legal
15  conclusion.
16           THE WITNESS:  Changes such as what?
17           MR. REINGOLD:  If he gets -- If I get a
18  new license plate or I have the car painted a new
19  color?  This is a vehicle he's used, and under the
20  statute he's obligated to update changes to
21  vehicles he's operated or used.
22           THE WITNESS:  If he's using a vehicle
23  and there's some --
24           MR. REINGOLD:  Not using it.  He used
25  it.

Page 129

1           THE WITNESS:  He's used a vehicle, and
2   that's how the law is written that they have to
3   report that he used the vehicle and there's changes
4   with that vehicle, then I would suggest that they
5   follow the law and report whatever changes there
6   are to the used vehicle.
7   BY MR. REINGOLD:
8   Q.   Last one.  If a registrant's elderly neighbor tells
9        him that she'll pay him $5 to shovel her walk, does
10       he have to report his neighbor under SORA 2021 as
11       his employer?
12           MR. DAMICH:  Objection, calls for legal
13  conclusion.
14           THE WITNESS:  Can you say that question
15  again?
16           MR. REINGOLD:  Yes.
17  BY MR. REINGOLD:
18  Q.   The registrant's elderly neighbor tells him she'll
19       pay him $5 to shovel her walk.  Does he have to
20       report his neighbor under SORA 2021 as an employer?
21           MR. DAMICH:  Same objection.
22           THE WITNESS:  Can you pull up what it
23  says with regards to employers in the law, sir?
24  BY MR. REINGOLD:
25  Q.   I thought you told me you knew what all the

Page 130

1        registrant's requirements were?
2   A.   I don't have them verbatim in my head.  So if you'd
3        like to pull that up so I can refresh them, that'd
4        be great.
5   Q.   Let's see if we can find it.
6   A.   And I believe I said if I was a sex offender I
7        would educate myself on what the rules and
8        obligations were.
9   Q.   Let's take a quick look and see what we can do
10       here.
11           MS. AUKERMAN:  Paul, you can pull up
12  the Statute MCO 28.727, that might be the easier to
13  do.
14           MR. REINGOLD:  I've got it right here.
15           MS. AUKERMAN:  Oh, you've got it in the
16  other document.  Okay.
17           MR. REINGOLD:  Yeah.  Let me just
18  highlight it and share it.
19  BY MR. REINGOLD:
20  Q.   Can you read that?
21  A.   Yes, sir.
22  Q.   All right.  And for the record I will read it
23       aloud.  "The address" -- These are things that must
24       be included in registration, I believe, and
25       verification.

Page 131

1        "The address that each of the
2   individual's employers, for purpose of this
3   subdivision, employer includes a contractor and any
4   individual who has agreed to hire or contract with
5   the individual for his or her services.
6   Information under this subsection must include the
7   address or location of employment if different from
8   the address of the employer."
9   A.   So reading the law as you pulled it up here, if he
10       is employed by that person, he said the neighbor
11       was going to pay him $5 to shovel his or her
12       driveway, and it appears that they are contracting
13       them for their services, and once they're done with
14       the services then they should report that they're
15       no longer employed by that person.
16           MR. DAMICH:  I want to renew my
17  objection on the previous question, calls for legal
18  conclusion.  Sorry.
19           MR. REINGOLD:  That's fine.
20  BY MR. REINGOLD:
21  Q.   And do you think it's incumbent upon him to tell
22       the elderly lady next door that if he shovels her
23       walk that her name and her address will go not just
24       on the law enforcement registry, but also on the
25       public registry?

Page 132

33 (Pages 129 to 132)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1         MR. DAMICH: Objection. Calls for | 1    made a contract with you, will you shovel my |
| 2   legal conclusion. | 2   driveway?" |
| 3         THE WITNESS: Well, there's a couple | 3   A. I shovel my own driveway because my husband refuses |
| 4   questions for that. Your first question was is it | 4    to get a snowblower. |
| 5   incumbent on him to let that person know it is up | 5   Q. Let's assume you're disabled and your husband's out |
| 6   to the offender to let his neighbor know. And | 6    of town and it snowed two feet. |
| 7   secondly, it would depend on whether or not that | 7   A. I don't know what I would decide. |
| 8   offender is actually on the public website, whether | 8   Q. You'd be willing to have your name as the employer |
| 9   or not that would show on the public website or if | 9    on the Sex Offender Registry? |
| 10   he or she is unpublished then it would not show on | 10   A. I don't know what I would decide, sir. |
| 11   the public website. | 11   Q. Do you agree that the odds of him keeping that job |
| 12   BY MR. REINGOLD: | 12    and being able to make that $5 just tanked? |
| 13   Q. Right. Let's assume he was on the public website. | 13         MR. DAMICH: Objection. |
| 14   What do you think would happen when he tells his | 14         THE WITNESS: I guess he could do his |
| 15   neighbor "If I shovel your walk or driveway, your | 15   good deed for the day and just do it for his |
| 16   name and your address is going to go on the public | 16   elderly neighbor. |
| 17   Sex Offender Registry"? | 17   BY MR. REINGOLD: |
| 18         MR. DAMICH: Objection. Lack of | 18   Q. He could still have a problem because volunteer |
| 19   foundation. | 19    service has to be reported as well, and that may be |
| 20         THE WITNESS: I have no idea. It's a | 20    volunteer service. |
| 21   fictitious scenario. I don't know what he or she | 21   A. I would try to get a different neighbor then, |
| 22   would say. | 22    because it seems like this is problematic. |
| 23   BY MR. REINGOLD: | 23   Q. Yeah, and if he doesn't tell her and then she finds |
| 24   Q. If it were your driveway and you're the one who was | 24    out that she's on the registry, her name and her |
| 25   dealing with the registrant would you say "Great, I | 25    address are on the public registry, how do you |
| Page 133 | Page 134 |

| | |
|---|---|
| 1   think she's going to feel now? | 1   can provide to prove that indigency. |
| 2         MR. DAMICH: Objection, lack of | 2   Q. Right. But I was asking a slightly different |
| 3   foundation. | 3    question. |
| 4         THE WITNESS: I don't know how she's | 4         Do you know if when someone goes in |
| 5   going to feel, sir. | 5   whether they're asked if they can afford to pay the |
| 6   BY MR. REINGOLD: | 6   fee or must they be asked if they can afford to pay |
| 7   Q. She's not going to be happy about it. Right? | 7   the fee? |
| 8   A. I don't know, sir. | 8   A. I can only speak to how I would, you know, if I was |
| 9   Q. Really? | 9    registering somebody how I would handle it. |
| 10         MR. DAMICH: Objection. Argumentative. | 10   Q. And how would you handle it? |
| 11   BY MR. REINGOLD: | 11   A. If this was the first month of the year that they |
| 12   Q. Okay. A few questions about indigency. Everyone | 12    were verifying, which would be the month that they |
| 13   has to pay a $50 annual fee up to a statutory limit | 13    would need to pay the fee, I would ask them if they |
| 14   typically at their first reporting date for the | 14    have their $50 to pay their annual fee. |
| 15   year; is that right? | 15   Q. All right. So I take it you wouldn't ask them |
| 16   A. Yes, that's my understanding. | 16    initially "can you afford to pay it"? |
| 17   Q. Is there any requirement that you know of to inform | 17   A. I would not. |
| 18   registrants that the fee can be waived for | 18   Q. Okay. And then the fee waiver even if they get it |
| 19   indigency? | 19    is only good for 90 days. Right? |
| 20   A. Can you repeat that? | 20   A. That's my understanding, yes. |
| 21   Q. Yes. Is there any requirement to inform | 21   Q. Okay. After 90 days if registrants haven't paid |
| 22   registrants that the fee can be waived for | 22    the fee or returned with new proof of indigency, |
| 23   indigency? | 23    does their status change to noncompliant? |
| 24   A. I believe in the law it addresses whether or not | 24   A. It does not automatically change to noncompliant. |
| 25   someone is indigent what they have to -- what they | 25   Q. That would have to be manually entered? Sorry to |
| Page 135 | Page 136 |

34 (Pages 133 to 136)

BRENDA HOFFMAN
4/24/2023

---

**Page 137**

1  interrupt.
2  A.  Yes, sir.
3  Q.  All right.  What I want to do now is take
4  a --
5          MR. REINGOLD:  Actually, Scott, do you
6  have questions you want to ask?
7          MR. DAMICH:  Not at the moment.
8          MR. REINGOLD:  I just want to take a
9  two-minute break to see if my co-counsel has
10  follow-up questions she wants asked, and then I'll
11  return.
12          MR. DAMICH:  All right.
13          (Off the record at 12:31 p.m.)
14          (On the record at 12:34 p.m.)
15          MR. REINGOLD:  I'm back.  This won't
16  take long.  It will be a little disjointed because
17  these are questions going back from the beginning.
18  BY MR. REINGOLD:
19  Q.  One question was, when you worked at the police
20  post before you were in the SOR unit, did you have
21  people who worked under you at that time and whom
22  you supervised?
23  A.  I'm sorry, repeat the question?
24  Q.  Yes.  Before you were in the SORA enforcement unit
25  but at your previous post, did you have people whom

---

**Page 138**

1  you supervised, who worked under you?
2  A.  No, I was just a trooper.
3  Q.  Okay.  As to the new database that started in
4  August '21 -- 2021, you said that was a work in
5  progress getting it to work.  Would you just
6  explain a little bit more about what you mean about
7  that?
8  A.  Well, it's a new database, so there's been
9  different -- I'm not a computer programmer by any
10  means, but it's a new database, so there have been
11  things that have been added on to it or changed
12  because it wasn't working correctly.
13          So that's what I mean by it's a work in
14  progress.  There's been different layers, I guess,
15  you know, where some things were rolled out at a
16  certain timeframe, and sometimes when things were
17  added or changed, then sometimes like with
18  technology it may make something else not work.  So
19  that's what I mean by a work in progress.
20  Q.  Yes, that data -- the program training whose
21  training I listen to made it sound like an ongoing
22  data test even post implementation, you know, there
23  was a lot that had to be reworked.
24          You said with covid and the injunction
25  that offenders got different kinds of information

---

**Page 139**

1  from different sources, and some were told -- or it
2  was unclear whether they were told that they were
3  on the registry or off the registry.
4          What was your sense of how much that
5  contributed to the problem that you highlighted now
6  of people who are not verifying because they think
7  they're not on the registry?
8  A.  Did you say how much of a problem or --
9  Q.  Yeah.  Yeah.  How much do you think that
10  contributed to the problem?
11          MR. DAMICH:  Object to foundation.
12          THE WITNESS:  I don't know how to say
13  how much.  I know it was a contributing issue to
14  that -- to this problem.  So if --
15  BY MR. REINGOLD:
16  Q.  What were the kinds of things that you heard that
17  people were told?
18  A.  I was told by some offenders that they just were
19  told that they no longer had to register at all.  I
20  was told by some offenders that they no longer had
21  to register at this time and they would get a
22  letter in the mail.
23          I was told that people, you know, I
24  mean, those are like the main ones.  I was told
25  that they didn't have to register and they were

---

**Page 140**

1  going to get a letter, and they got the letter, and
2  when they ran the letter, that letter told them
3  they were no longer on the registry and that was
4  not the case.
5          So I can't speak to what was told to
6  every sex offender.  I can tell you when I was
7  asked what was going on I would -- I would say, you
8  know, at this time if they were how MSP did it, if
9  they were an offender and prior to covid if -- if
10  they had an incident date prior to April 11th of
11  2011, they didn't have to verify at that time until
12  the court proceeding finished.
13  Q.  A follow up question.
14          As to covid and the injunction, has the
15  department -- the Michigan State
16  Police -- instituted at all whether sex offenders
17  rose or fell during a period of the injunction when
18  SORA was not being enforced?
19          MR. DAMICH:  Objection, lack of
20  foundation.
21          THE WITNESS:  Can you explain what you
22  mean by rose or fell?
23  BY MR. REINGOLD:
24  Q.  Yes.  Were there more or fewer sexual convictions?
25          MR. DAMICH:  Objection to form and

---

35 (Pages 137 to 140)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1 foundation. | 1   A.  I don't think I said that. |
| 2      THE WITNESS:  I don't have any numbers. | 2   Q.  Oh, I'm sorry if you didn't.  That's what I |
| 3   You know, I don't think anyone ever dealt with the | 3      inferred. |
| 4   covid issue and the injunction issue.  I would, you | 4           Is -- Is my inference correct, that |
| 5   know, there were just proceedings that probably | 5      noncompliance rates are higher and you attribute |
| 6   weren't done because of covid.  Court wasn't being | 6      that to covid? |
| 7   held. | 7   A.  I don't have the numbers to compare of who was not |
| 8      But I don't have an exact number and I | 8      compliant before covid to who is not compliant now, |
| 9   can't say for sure whether sex crimes | 9      so I can't answer that either. |
| 10   increased -- or I should say sex crime convictions | 10   Q.  Okay.  When you get questions from registrants, |
| 11   increased or pleas increased or they decreased.  I | 11      what kinds of questions do you get; can you give a |
| 12   can't answer that for you. | 12      couple of examples of registrants' questions? |
| 13  BY MR. REINGOLD: | 13   A.  Some still question whether or not they can live |
| 14   Q.  And to your knowledge, have the Michigan State | 14      near a school; that's an easy answer now.  Some |
| 15      Police or the sex offense -- the Sex Offender | 15      still don't understand or don't know what months |
| 16      Enforcement Unit ever studied the -- whether or not | 16      they're suppose to verify. |
| 17      SORA reduces sexual offending? | 17   Q.  And when you get questions from law enforcement, a |
| 18        MR. DAMICH:  Object to the form and | 18      couple of examples of common questions from law |
| 19      foundation. | 19      enforcement? |
| 20        THE WITNESS:  I'm unaware of any | 20   A.  I would say one of the questions that's a little |
| 21      research in that area. | 21      different now is if an offender comes in late to |
| 22  BY MR. REINGOLD: | 22      verify with our new database, you no longer can |
| 23   Q.  You said that the noncompliance rates were higher | 23      actually verify them outside of their verification |
| 24      now than they were before, and you attributed that | 24      period. |
| 25      to covid -- | 25          So in that case that's where I would |
| Page 141 | Page 142 |

| | |
|---|---|
| 1   say well, technically if they didn't come in and | 1   made someone noncompliant for failing to verify the |
| 2   they didn't verify, they could be in violation of | 2   day after the month they were suppose to verify. |
| 3   failing to verify, and if you wish to investigate | 3   Does that make sense? |
| 4   it and if you can, you know, prove the -- the | 4   Q.  Yes, that makes sense.  You can get a report, but |
| 5   willingness part of it, and for MSP matters if the | 5      it's not an automatic noncompliance. |
| 6   violation -- the violation has to occur after the | 6        My question was under the old process, |
| 7   new law started, then that would be up to them | 7   under the old program, after the 30th day or 31st |
| 8   to -- to do their investigation and decide if they | 8   day of the month when they show up, you |
| 9   wish to proceed. | 9   could -- could you undo or cure the -- the fact |
| 10   Q.  And that's different from under the previous | 10   that they were late? |
| 11      program where after the period you could still | 11   A.  You can't verify that.  I mean, they're suppose to |
| 12      register them, and it wouldn't stay on their record | 12      verify during their verification month.  The old |
| 13      as an offense? | 13      database if they were suppose to verify in say |
| 14   A.  I think you're inferring that previously an offense | 14      March and they came in on April 1st, you could |
| 15      would be put on this and they could verify it | 15      still put an entry to verify them.  Sorry, I have |
| 16      after. | 16      to do air quotes.  In this system, like it won't |
| 17   Q.  Let me correct it.  I didn't mean that.  I should | 17      let you put that entry in if its not their month to |
| 18      have said the noncompliance could be fixed, not the | 18      verify. |
| 19      offense. | 19   Q.  But I'm saying the effect of that was to cure the |
| 20   A.  So the previous database also did not automatically | 20      defect and would show that they had verified for |
| 21      make someone noncompliant if they didn't come in | 21      that month, where as in the new program you can't |
| 22      during their month.  That -- That too had to be | 22      cure the defect and it won't show that they |
| 23      manually marked. | 23      verified in that month? |
| 24   Q.  Afterwards -- Go ahead.  Sorry. | 24   A.  Okay.  We're -- |
| 25   A.  With either database neither of them automatically | 25        MR. DAMICH:  Objection to form. |
| Page 143 | Page 144 |

36 (Pages 141 to 144)

BRENDA HOFFMAN
4/24/2023

| | |
|---|---|
| 1   THE WITNESS: People could be verified | 1   verify. |

1     THE WITNESS: People could be verified
2   outside their months in the old system, which is
3   technically wrong. That wasn't their month that
4   they were suppose to come in and verify. But at
5   least it would be a way to show, hey, they showed
6   up a day late, I entered them in. For the new
7   system you can't do that.
8        What I recommend to people if this
9   happens is they're either, one, going to start
10   their investigation for a possibly fail to verify
11   and then go through with their investigation.
12        If they chose to not violate them for
13   failing to verify, I suggest to them that they put
14   in some notes saying "hey, you know, Mr. Smith came
15   in a day late, he didn't keep track of his monthly
16   verification correctly. At this time I'm choosing
17   not to take enforcement action."
18   Q.  Right. And at the same time I assume, and correct
19   me if I'm wrong, that if the person supplies all
20   the information that they would have supplied
21   during the month they were suppose to verify and
22   that's recorded and entered into the system?
23   A.  I would hope that that would be the case. If
24   there's any changes to be made, then they would
25   give them as they would when they were coming to

Page 145

1   verify.
2   Q.  Yep. Okay. For sweeps in the past you said that
3   you had a schedule. Did you mean that there was
4   always something on the docket that you knew was
5   approaching, or do you mean that year to year you
6   did the same things at the same time?
7   A.  No, it was not always at the same time, and we
8   just -- if we had grant money to spend then we
9   would try to figure out what areas that we wanted
10   to concentrate on and space it out.
11        I mean, they're, you know, it would
12   take some time to coordinate it as I described. So
13   it wasn't like every third week we were going to do
14   a sweep. It would vary.
15   Q.  Okay. As to the sweep form that you thought might
16   be out of date, is there a new one that you're
17   creating, and if so, other than taking out what no
18   longer implies, how would it be different if you
19   were rewriting?
20        MR. DAMICH: Objection, form and
21   foundation.
22        THE WITNESS: I have not created a new
23   form yet, but if I were to create it I would, you
24   know, that form was used kind of just to make
25   things easier for documentation after the sweep or

Page 146

1   during the sweep.
2        We found it's sometimes easier to have
3   a box to check rather than having to write things
4   out in that. So I always try to make things as
5   easy for everyone for documentation.
6   BY MR. REINGOLD:
7   Q.  It's easier for data delivery, too?
8   A.  Yes.
9   Q.  Okay. When the new program or the new law talked
10   about the manner in which people report, were you
11   consulted on what manner should be used? This is
12   the switch from in-person to some other method.
13   A.  I was not consulted, no.
14   Q.  Last question. Are there sweeps that are done
15   locally without any assistance or input from MSP?
16        MR. DAMICH: Objection, foundation.
17        MR. REINGOLD: If you know.
18        THE WITNESS: In the past I only guess
19   there had been sweeps from other agencies that
20   they're free to investigate, that's state law.
21        MR. REINGOLD: All right. That's all
22   the questions that I have. I want to thank you
23   very much for your time. You've been helpful, and
24   it's a pleasure to get to know you. I have no
25   further questions. Scott, any cross?

Page 147

1        MR. DAMICH: No, nothing to follow up
2   on.
3        MR. REINGOLD: Okay. Thank you very
4   much.
5
6        (The Examination was concluded at
7   12:50 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

37 (Pages 145 to 148)

BRENDA  HOFFMAN
4/24/2023

```
  1                   CERTIFICATE
  2    STATE OF MICHIGAN   )
                          )
  3    COUNTY OF MACOMB    )
  4
  5         I, Gina Deskiewicz, a Notary Public
  6    in and for the above county and state, do hereby certify
  7    that this deposition was taken before me at the time and
  8    place hereinbefore set forth; that the witness was by me
  9    first duly sworn to testify to the truth; that this is a
 10    true, full and correct transcript of my stenographic
 11    notes so taken; and that I am not related, nor of
 12    counsel to either party, nor interested in the event of
 13    this cause.
 14
 15
 16
 17
 18
 19
 20    _____
       Gina Deskiewicz, CSR-9689, RPR.
 21    Notary Public
       Macomb County, Michigan
 22    My commission expires June 14, 2027
 23
 24
 25
```

Page 149

Tri-County Court Reporters
248-608-9250

Brenda Hoffman Deposition Exhibit F

EXHIBIT

Hoffman - F.  2023-04-24 GD

UD-040 (10/02)
MEMORANDUM

# STATE OF MICHIGAN
# DEPARTMENT OF STATE POLICE

**DATE:**     March 24, 2021

**TO:**       Department Members

**FROM:**     Col. Joseph M. Gasper, Director

**SUBJECT:**  Enforcement of Michigan's Sex Offenders Registration Act

2020 PA 295, effective March 24, 2021, amended the Sex Offenders Registration Act (SORA) to substantially conform its requirements to the federal Sex Offender Registration and Notification Act (SORNA), as amended.  Letters are being sent to registrants to provide notice of the major changes to the SORA, which include the following:

- Elimination of student safety zone prohibitions.
- Prohibition on publishing the tiering of registrants on the public Sex Offender Registry (SOR)
- Elimination of required "in person" reporting of changes to the registrant's vehicle information, electronic mail addresses, internet identifiers, telephone numbers, or temporary residence.  Such information may now be updated by first class mail sent not more than three (3) business days after the change to the local police agency, county sheriff, or local MSP post.
- Continued requirement for registrants to appear "in person" to update changes in residence or domicile, employment, enrollment as a student, or name not more than three (3) business days after the change.

Additionally, the department remains subject to the Interim Order and Injunction entered by the the United States District Court for the Eastern District of Michigan as described in Official Correspondence dated April 7, 2020.  As previously noted, this Interim Order and Injunction only prohibits enforcement of the SORA.  It does not prevent the department from maintaining the Sex Offender Registration (SOR), such as inputting information about new registrants or continuing the public SOR.  Furthermore, individuals required to be registered under the SORA may continue to voluntarily comply with the reporting, verification, and updating requirements under the SORA subject to those changes going into effect beginning March 24, 2021, as referenced above.

Accordingly, until the Interim Order and Injunction is dissolved or clarified by the Court, and until further notice, department members shall not take enforcement action for violations of the SORA.  However, there is no longer a general restriction on department members registering, verifying, and updating information reported by individual based on the date of the offense(s) requiring registration under the SORA.  As required beginning March 24, 2021, department members shall register and verify individuals who report in person to a worksite to update changes in residence or domicile, employment, enrollment as a student, or name.  Further, department members shall update changes to registrants' vehicle information, electronic mail addresses, internet identifiers telephone numbers, or temporary residence when updated through first-class mail or when voluntarily reported in person, except those individuals who were required to be registered under the SORA prior to July 1, 2011, and who have committed no registrable offense since, have no obligation to register or report electronic mail addresses or internet identifiers under the revised law.  In all other respects, the reporting obligations are the same for similarly situated registrants regardless of the date of the offense(s) requiring registration.

Questions may be directed to Sgt. Brenda Hoffmann in the Special Operations Division at 313-720-5249.

Brenda Hoffman Deposition Exhibit G



EXHIBIT

Hoffman - G.  2023-04-24 GD

UD-040 (03/17)
MEMORANDUM

# STATE OF MICHIGAN
# DEPARTMENT OF STATE POLICE

**DATE:**        February 1, 2022

**TO:**          Department Members

**FROM:**        Col. Joseph M. Gasper, Director

**SUBJECT:**     UPDATE - Enforcement of Michigan's Sex Offenders Registration Act

As described in Official Correspondence dated March 24, 2021, the Sex Offenders Registration Act (SORA) was amended to substantially conform its requirements to the federal Sex Offender Registration and Notification Act (SORNA).  This *new* version of SORA ("new SORA") went into effect **March 24, 2021,** and authorizes enforcement of *willful* violations of the new SORA committed by *any* individual occurring on or after March 24, 2021.  "Any individual" means any person required to register under SORA regardless of the date the person was initially required to register, with limited exceptions.

**No enforcement for violations occurring *before March 24, 2021***

As detailed in the Notice to Law Enforcement distributed to law enforcement agencies and the *Does II Agency Notice for Posting* required to be publicly displayed in all MSP posts for a period of one (1) year, successful constitutional challenges to the old SORA in both state and federal court have significantly limited enforcement of violations that occurred before March 24, 2021.  Accordingly, *members shall not initiate or take enforcement action for any SORA violations that occurred before March 24, 2021.*  Other than directing people to the SORA, publicly posted information, or resources and forms on the department's website, members shall not advise non-department members about enforcement of SORA violations that occurred before March 24, 2021, or about the impact of any court decision.

**Enforcement for willful violations occurring on or after *March 24, 2021***

Members are authorized to take enforcement action for *willful* violations of the new SORA occurring on or after March 24, 2021, but only if they can articulate sufficient facts and circumstances to demonstrate the individual knew of the requirements of the new SORA and willfully violated those requirements. *Enforcement members shall not make warrantless arrests where the only basis for the arrest is a violation of the SORA.*  Instead, enforcement members shall obtain arrest warrants before making any arrests for willful violations of the SORA.  Although letters were sent to registrants to provide notice of the major changes to SORA beginning March 24, 2021, members shall exercise discretion and good judgment when deciding to take enforcement action or allowing an opportunity to comply.  Unless an individual has demonstrated knowledge of the new SORA requirements by previously reporting on or after March 24, 2021, members shall provide a printed or digital copy of the letter, promptly upload a copy of the letter provided to the "Documents and Photos" section of the registry, and document acknowledgement or service in the "General Note History" section to support future enforcement efforts, if necessary.

Members at every worksite designated to receive or enter sex offender registration information shall continue to register, verify, and update information required to be reported by individuals under the SORA.  Because individuals are authorized to register, verify, and update information at any department post, members at posts shall not discourage or refuse to accept a report required under the SORA and shall not direct an individual to report the information to another agency, worksite, or post.

Questions regarding enforcement may be directed to Sgt. Brenda Hoffmann in the Special Operations Division at 313-720-5249.