# Exhibit 74:

Sharon Jegla Deposition
Transcript, and Deposition
Exhibits S and T



**TRI-COUNTY COURT REPORTERS INC.**

(248)608-9250 Fax (844)270-7115
www.tri-countycourtreporters.com
depos@tricountyreporters.com

Transcript of the Testimony of
**Sharon Jegla**

**Date:** April 27, 2023
**Volume:** I

**Case:** John Does, et al v. Gretchen Whitmer, et al

Printed On: June 9, 2023

Sharon Jegla
4/27/2023

---

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E,
F, G, H, MARY DOE, and
MARY ROE, on behalf of
themselves and all others
similarly situated,
    Plaintiffs,

vs.    Case No. 2:22-cv-10209
    Hon. Mark A. Goldsmith
    Mag. Curtis Ivy, Jr.

GRETCHEN WHITMER, Governor
of the State of Michigan,
and COL. JOSEPH GASPER,
Director of the Michigan
State Police, in their
official capacities,
    Defendants.

_____/

The Remote Deposition of SHARON JEGLA,
Taken at via Zoom, Commencing at 10:05 a.m.,
Thursday, April 27, 2023,
Before Medina J. Balderas-Horetski, CSR-6213.

---

**Page 2**

1  APPEARANCES:
2
3  SYEDA FARHANA DAVIDSON
4  Dayja Sade Tillman
5  Miriam Jane Aukerman
6  American Civil Liberties Union of Michigan
7  2966 Woodward Avenue
8  Detroit, Michigan 48201
9  (313) 578-6814
10  sdavidson@aclumich.org
11    Appearing on behalf of the Plaintiffs.
12
13  ERIC MICHAEL JAMISON
14  Michigan Attorney General
15  525 West Ottawa Street
16  Lansing, Michigan 48933
17  (517) 335-7573
18  jamisone@michigan.gov
19    Appearing on behalf of the Defendants.
20
21  ALSO PRESENT:
22  Aimee Brimacombe
23
24
25

---

**Page 3**

TABLE OF CONTENTS

WITNESS    PAGE
SHARON JEGLA

EXAMINATION
BY MS. DAVIDSON:    7
EXAMINATION
BY MR. JAMISON:    149

EXHIBITS
EXHIBIT    PAGE
(Exhibits attached to transcript.)

DEPOSITION EXHIBIT A    31
DEPOSITION EXHIBIT B    31
DEPOSITION EXHIBIT C    31
DEPOSITION EXHIBIT D    53
DEPOSITION EXHIBIT F    61
DEPOSITION EXHIBIT G    64
DEPOSITION EXHIBIT H    65
DEPOSITION EXHIBIT I    66
DEPOSITION EXHIBIT J    68
DEPOSITION EXHIBIT K    72
DEPOSITION EXHIBIT L    75
DEPOSITION EXHIBIT M    77
DEPOSITION EXHIBIT N    82
DEPOSITION EXHIBIT O    92
DEPOSITION EXHIBIT P    100
DEPOSITION EXHIBIT Q    110
DEPOSITION EXHIBIT E    111
DEPOSITION EXHIBIT R    114
DEPOSITION EXHIBIT S    121
DEPOSITION EXHIBIT T    121
DEPOSITION EXHIBIT U    128
DEPOSITION EXHIBIT V    131

---

**Page 4**

1  Thursday, April 27, 2023
2  10:05 a.m.
3
4    SHARON JEGLA,
5  was thereupon called as a witness herein, and after
6  having first been duly sworn remotely to testify to the
7  truth, the whole truth and nothing but the truth, was
8  examined and testified as follows:
9    MS. DAVIDSON:  Good morning, Ms. Jegla.
10    THE WITNESS:  Hi.
11    MS. DAVIDSON:  Can you here us okay?
12    THE WITNESS:  Yes.
13    MS. DAVIDSON:  Great.  My name is Syeda
14  Davidson; I'm an attorney for the plaintiffs in this
15  matter.  And today I'm going to be asking you some
16  questions.
17    Have you ever had your deposition taken
18  before?
19    THE WITNESS:  No.
20    MS. DAVIDSON:  No, okay.  So let me just go
21  over some of these ground rules with you.  I'm sure that
22  your attorney has covered some of them, but just kind to
23  refresh your memory, make sure that we're all on the
24  same page.
25    The first rule is that I'll need you to

---

Sharon Jegla
4/27/2023

---

**Page 5**

1  answer my questions verbally, so even if it's a yes or
2  no, you'll have to say yes or no.  No nodding or shaking
3  your head.  No uh-uh or uh-huh kind of thing.  It
4  translates better for the court reporter; it makes a
5  cleaner record.
6          It's also important that we don't talk over
7  each other because the court reporter is taking down
8  every word that we say to each other.  I sometimes slip
9  up at this myself, but I will try my best not to talk
10  over you and you should try your best to not talk over
11  me.
12          THE WITNESS:  Okay.
13          MS. DAVIDSON:  If you answer a question, I'm
14  going to assume that you understood it.  So if you don't
15  understand it, you can ask me to rephrase, and I'll do
16  my best to make it a question that you can understand.
17          THE WITNESS:  Okay.
18          MS. DAVIDSON:  If at any point you need a
19  break, that is no problem, but I will ask that you
20  answer the question that is pending before we take one.
21          THE WITNESS:  Sure.
22          MS. DAVIDSON:  And if you take a break, you
23  won't be allowed to discuss your testimony with your
24  attorney.
25          THE WITNESS:  Okay.

---

**Page 6**

1          MS. DAVIDSON:  Okay.  Sometimes Eric will
2  make an objection.  If that happens, he's just making an
3  objection for the record.  I would still expect you to
4  answer unless he instructs you otherwise.  Okay?
5          THE WITNESS:  Yes.
6          MS. DAVIDSON:  Great.  Any questions about
7  any of that?
8          THE WITNESS:  No.
9          MS. DAVIDSON:  Great.  Ordinarily, if we
10  were in person, I would ask you if you brought anything
11  into the room with you.  That's kind of odd, because
12  we're on Zoom, so I guess I'll just ask whether you have
13  anything in front of you that you'll be referring to
14  during our deposition?
15          THE WITNESS:  No.
16          MS. DAVIDSON:  Okay.  Is anyone else the
17  room with you?
18          THE WITNESS:  No.
19          MS. DAVIDSON:  And you're prepared to answer
20  questions, you're not under the influence of any
21  medication or anything that would impact your ability to
22  answer truthfully?
23          THE WITNESS:  Correct.
24          MS. DAVIDSON:  Great.  What did you do to
25  prepare for today's deposition?

---

**Page 7**

1          THE WITNESS:  I met with the -- with Eric
2  Jamison and Aimee Brimacombe a couple days ago, had a
3  meeting with them to learn what to expect today, and
4  then I also talked to Sergeant Hoffman after her
5  deposition on Monday.
6          MS. DAVIDSON:  Anything else?
7          THE WITNESS:  Nope.
8          MS. DAVIDSON:  Did you review any documents?
9          THE WITNESS:  Uh-uh, nope.
10          MS. DAVIDSON:  Thank you.
11              EXAMINATION
12  BY MS. DAVIDSON:
13      Q.  So let's talk a little bit about your educational
14  background first.
15          Did you finish high school?
16      A.  Yes.
17      Q.  What year?
18      A.  1981.
19      Q.  Any further education after that?
20      A.  Yes.
21      Q.  What did you do after high school?
22      A.  I took one -- a computer class at LCC, and then I
23  also took a six-month course at Ross Medical School.
24      Q.  What did you study at Ross?
25      A.  Administrative medical assistant.

---

**Page 8**

1      Q.  Any other education aside from that?
2      A.  Not after high school.
3      Q.  Okay.  Is LCC Lansing Community College?
4      A.  Yes.
5      Q.  Okay.  Fair to say you never did any legal
6  coursework?
7      A.  That's correct.
8      Q.  Do you have any education or training in
9  statistics or statistical methods?
10      A.  No.
11      Q.  Are you familiar with regression analysis?
12      A.  No.
13      Q.  Did you ever work as an administrative medical
14  assistant?
15      A.  Yes.  I worked as a medical transcriptionist,
16  which was part of the training.
17      Q.  Did you only do that as part of the training or,
18  when you were done with the program, did you also work?
19      A.  When I was done.
20      Q.  When you were done?
21      A.  Uh-huh.
22      Q.  For how long?
23      A.  Seven years at one hospital and three years at
24  another hospital.
25      Q.  So ten years in the hospitals doing medical

---

2  (Pages 5 to 8)

Sharon Jegla
4/27/2023

---

1　transcription, and approximately what year did you stop
2　doing that?
3　　**A.** 2000.
4　　**Q.** Where did you go next?
5　　**A.** Michigan Department of Corrections.
6　　**Q.** What did you do there?
7　　**A.** Typed PSIs, pre-sentence investigations.
8　　**Q.** What department were you in?
9　　**A.** Probation, Ingham County Probation.
10　　**Q.** Did you do anything other than typing
11　pre-sentence investigations there?
12　　**A.** Yes, there are several other forms that just
13　needed to be filled in, bench warrant forms.  It was all
14　forms that we had to type, so just clerical.
15　　**Q.** Okay, clerical, thank you.
16　　**A.** Uh-huh.
17　　**Q.** And how long were you in that position?
18　　**A.** Three years.
19　　**Q.** So that takes us to 2003; where did you go next?
20　　**A.** The State Place, the LEIN Field Services.
21　　**Q.** What did you do in LEIN Field Services?
22　　**A.** Secretary.
23　　**Q.** Is LEIN Field Services the department?
24　　**A.** Yes.
25　　**Q.** Okay.

Page 9

1　　**A.** The section.
2　　**Q.** How long did you do that?
3　　**A.** Two years.
4　　**Q.** What was your next position with the Michigan
5　State Police?
6　　**A.** I transferred to the Project Office as secretary.
7　　**Q.** How long were you there?
8　　**A.** One year.
9　　**Q.** Where did you go next?
10　　**A.** Where I'm at now.
11　　**Q.** Okay.
12　　**A.** Sex Offender Registry.
13　　**Q.** So that would have been -- help me out here with
14　the math; what year is that?
15　　**A.** I think 2003.
16　　**Q.** Okay.  So that's when you first started working
17　at the Sex Offender Registry.  What was your position at
18　first?
19　　**A.** Technician.
20　　**Q.** Okay.  What does a technician do?
21　　**A.** At that time, I was pretty much handling
22　offenders moving in and out of Michigan.  So if they
23　moved to Michigan, I -- we did it differently then, and
24　that was a long time ago, so I can't remember what the
25　procedures were then.

Page 10

---

1　　**Q.** Okay.  When you say you handled offenders moving
2　in and out, what does that mean?
3　　**A.** I think the law was different then.  It said that
4　they had to -- or else our system was different.
5　　　　Anyway, we had to be notified for some
6　reason. -- I don't remember, I'm just going to say.  I
7　don't recall.
8　　**Q.** Okay.  I guess my question is more when you say
9　you were handling offenders, does that mean you were
10　responsible for inputting data or did you work directly
11　with them?  Just kind of wondering what you mean by
12　handling them.
13　　**A.** Did not work directly with them.  It was with
14　maintaining the records.
15　　**Q.** Okay.  How long did you work as a technician?
16　　**A.** Ten years.
17　　**Q.** Okay.  And is that when you started the position
18　that you have now?
19　　**A.** Yeah, analyst.
20　　**Q.** Okay, you're an analyst now.
21　　　　Okay, just give me one second here, I'm
22　going to attempt to share my screen.  I did let Eric
23　know I was having some problems with this.
24　　　　Okay.  Can you see that?
25　　**A.** Yes.

Page 11

1　　**Q.** Okay.  Have you ever seen this before?
2　　　　**MR. JAMISON:** It's just a list of the
3　exhibits.  The exhibit is not actually on the screen
4　yet.
5　　　　**MS. DAVIDSON:** Oh, it's not?
6　　　　**MR. JAMISON:** Uh-uh.
7　　　　**MS. DAVIDSON:** Let me try this.  How about
8　now?
9　　　　**THE WITNESS:** Yes, flow chart.
10　BY MS. DAVIDSON:
11　　**Q.** Do you know what this flow chart is?
12　　**A.** Can you repeat that?
13　　**Q.** Do you know what this flow chart is?
14　　**A.** Yes.
15　　**Q.** Okay.  Can you tell me what it is?
16　　**A.** The Criminal Justice Information Center is a
17　division, and it shows what sections and units are below
18　that.
19　　**Q.** Sure.  And you are down here in the Sex Offender
20　Registry Unit, right?
21　　**A.** Right.
22　　**Q.** It says you're a department analyst 12; is that
23　accurate today?
24　　**A.** It's an 11, because the 12 is CCRS.
25　　**Q.** Okay.  So you're in 11?

Page 12

---

3 (Pages 9 to 12)

Tri-County Court Reporters
248-608-9250

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1 | **A.** Yes. |
| 2 | **Q.** Thank you for that clarification. |
| 3 | Is that accurate today, though? |
| 4 | **A.** Yes. |
| 5 | **Q.** Okay.  What does the 11 mean? |
| 6 | **A.** That is just levels with the State. |
| 7 | **Q.** Okay.  It's like a ranking level -- |
| 8 | **A.** Yes. |
| 9 | **Q.** -- of employment? |
| 10 | **A.** Uh-huh. |
| 11 | **Q.** Okay, thank you. |
| 12 | And Narcisa Morris is not your supervisor |
| 13 | anymore; is that right? |
| 14 | **A.** That's right. |
| 15 | **Q.** Who is your supervisor now? |
| 16 | **A.** Jami Selden Manor. |
| 17 | **Q.** And this shows you're under the umbrella of the |
| 18 | Incident Section? |
| 19 | **A.** Yes. |
| 20 | **Q.** What is the Incident Section? |
| 21 | **A.** Let's see.  That is just the manager that covers |
| 22 | the units that are shown below it. |
| 23 | **Q.** Right.  But can you describe what the Incident |
| 24 | Section does? |
| 25 | **A.** Do you mean the Incident Section itself?  Because |

Page 13

| | |
|---|---|
| 1 | that is just a manager that heads the departments that |
| 2 | are below it. |
| 3 | **Q.** Okay.  So it's not a whole unit? |
| 4 | **A.** I don't know. |
| 5 | **Q.** Okay.  As we just talked about, this chart shows |
| 6 | that there are both analysts and technicians, and I know |
| 7 | that you said that the technicians' world has changed a |
| 8 | little bit, but are there still technicians that work |
| 9 | with you? |
| 10 | **A.** Yes. |
| 11 | **Q.** Okay.  And do you know what they do? |
| 12 | **A.** Yes. |
| 13 | **Q.** Can you describe their work for me? |
| 14 | **A.** Yes.  They review records of new entries, because |
| 15 | MDOC and law enforcement enter them, and then they |
| 16 | review them and then activate the record.  They stay in |
| 17 | a pending queue until then.  They review for accuracy. |
| 18 | They handle offenders coming into Michigan.  They work |
| 19 | with the other states to get information that we need to |
| 20 | get them registered properly.  And then they also handle |
| 21 | offenders moving out of Michigan, and we submit |
| 22 | information to the other state to let them know that a |
| 23 | sex offender is moving there. |
| 24 | **Q.** Okay.  And you are an analyst, so what are your |
| 25 | responsibilities? |

Page 14

| | |
|---|---|
| 1 | **A.** I do a lot of different things.  Some of the |
| 2 | things I do is the invoicing for the sex offender fees. |
| 3 | I also handle FOIA requests.  Hard to think.  I manage |
| 4 | our Communities page, which is all of law enforcement |
| 5 | can see information to help them with the SORA system, |
| 6 | and I add stuff to that and update it.  And I also |
| 7 | manage the -- it's called the Admin Tool, where if |
| 8 | someone from an agency calls and says they can't -- |
| 9 | don't have access, they can't get into the system, I |
| 10 | check that admin tool to see if their permissions are |
| 11 | correct.  I also review analysts' work for quality |
| 12 | control.  I work -- I submit requests to the vendor to |
| 13 | do updates to our Crime Codes.  If there's a Crime Code |
| 14 | not in our system already, then we have to request that |
| 15 | to be added. |
| 16 | **Q.** Anything else? |
| 17 | **A.** I guess the main thing is answering e-mails |
| 18 | and -- because we get requests for information, like we |
| 19 | get requests for certified records, we get court |
| 20 | documents sent to remove somebody.  Different staff |
| 21 | members may send me e-mails, questions. |
| 22 | **Q.** Anything else? |
| 23 | **A.** Not that I can think of right now. |
| 24 | **Q.** Okay.  So I have that you handle the invoicing |
| 25 | for fees, respond to FOIAs, you manage the Communities |

Page 15

| | |
|---|---|
| 1 | page, you add stuff to the SORA database, you update it, |
| 2 | you manage the Administrative Tools, you review the work |
| 3 | of other analysts for quality control, you submit vendor |
| 4 | requests to add Crime Codes and you answer requests for |
| 5 | certified records. |
| 6 | Does that sound right? |
| 7 | **A.** Yet.  And I thought of another one, I update the |
| 8 | policies and procedures for the manager to approve. |
| 9 | **Q.** How does your role interact with the technicians? |
| 10 | **A.** They e-mail me for assistance on records. |
| 11 | |
| 12 | **Q.** When you say on records, what kind of assistance |
| 13 | do they e-mail you for? |
| 14 | **A.** If they're not sure about how to do something. |
| 15 | **Q.** What types of things do they e-mail you about? |
| 16 | **A.** Sometimes about the crime itself, if they can't |
| 17 | get documents, they're asking what can -- what are their |
| 18 | next steps, what can they do to get more information. |
| 19 | **Q.** To get more information about the crime? |
| 20 | **A.** Yes. |
| 21 | **Q.** And how do you assist with that? |
| 22 | **A.** It just depends on the Crime Code.  They might |
| 23 | need the police report.  They might need different |
| 24 | information from the other state, like how long their |
| 25 | duration is. |

Page 16

4  (Pages 13 to 16)

Sharon Jegla
4/27/2023

1    Q.  Okay.  And we'll come back to that one a little
2   bit later because I have some followup for that.
3        Okay.  What is the Communities page that you
4   manage?
5    A.  That is found in the MICJIN portal, which that's
6   a portal that houses our database, and it houses a lot
7   of other tools that law enforcement uses.  And there's a
8   page called Communities page where you can go for all
9   the different applications and you can get information
10   on that application.
11    Q.  You said MICJIN, can you spell that, please?
12    A.  M-I-C-J-I-N.
13    Q.  Is that an acronym for something?
14    A.  Yes.
15    Q.  What does that stand for?
16    A.  I don't know exactly.  I can guess, but --
17    Q.  That's okay, I don't want you to guess.
18    A.  Yeah.
19    Q.  Did you do anything else in the portal aside from
20   managing the Communities page?
21    A.  That's where the Admin Tool is, and in the
22   portal, there are other applications that we use besides
23   the Sex Offender database.
24    Q.  What other applications do you use?
25    A.  SNAP, which is the photos; you can get photos

Page 17

1   from there.  Alias, which is where we run criminal
2   histories.  I get my invoicing app from there; that is
3   called MICARS.  And then the FOIA application is in
4   there.
5    Q.  Anything else you do on the portal?
6    A.  That's all I can think of right now.
7    Q.  Thank you.
8        Okay.  When you say you add stuff to SORA,
9   can you tell me what you add?
10    A.  When?  When do I add stuff to SORA?
11    Q.  I'm sorry, I think you said the database, you add
12   things to the database as the part of an analyst, you
13   update it sometimes?
14    A.  Yes, update it.
15    Q.  Right.  So what kinds of information are you
16   putting in?
17    A.  If we're doing an audit of like the record, we
18   compare it to information found in LEIN, and then we --
19   if there's missing information, we can add it.  We can
20   also add documents, like if we receive a court order,
21   then we can upload it into our system.
22    Q.  What does an audit of the record consist of?
23    A.  Sometimes it can be a review of all the fields
24   and sometimes it can just be some of the fields, like
25   maybe just the crime.

Page 18

1    Q.  Okay.  Do audits occur on a set schedule or does
2   something usually prompt them?
3    A.  Usually prompts them.
4    Q.  What types of things might prompt an audit?
5    A.  If someone is requesting certified documents,
6   then we review the record before we prepare those.  If
7   someone calls and has a discrepancy, we'll do a review.
8    Q.  Okay.  And the last thing I want to ask about in
9   your responsibilities, you mention you update policies
10   and procedures for the manager?
11    A.  Yes.
12    Q.  How frequently are you asked to update policies
13   and procedures?
14    A.  Well, we haven't had a manager for a while, so
15   what I've done right now is when something comes up
16   that -- sometimes the techs ask me to add stuff to the
17   procedure, so I keep track of those, and then I meet
18   with the manager, and then we discuss adding things to
19   the procedure.
20    Q.  So a technician can ask for something to be added
21   to a procedure?
22    A.  Yes.
23    Q.  What kinds of things do they ask you to add?
24    A.  So, really, pretty simple things like when you
25   add a SID number from another state, you have to add the

Page 19

1   two-digit abbreviation, and some people were not doing
2   that, so they wanted it to be in the procedure so that
3   we -- some people don't miss that.
4    Q.  Okay.  So just basically steps added to
5   procedures?
6    A.  Yes.
7    Q.  You're working with your manager to see if
8   they're appropriate steps to add; do I have that right?
9    A.  Yes.
10    Q.  Thank you.
11        And did you say SID number?
12    A.  State identification number.
13    Q.  Thank you.
14        Are there different types of department
15   analysts in the Sex Offender Registry Unit?
16    A.  Yes.
17    Q.  What are the other types of analysts?
18    A.  There's one that just handles the system use.
19    Q.  Anything else?
20    A.  There's three analysts that do a lot of the
21   regular analyst's duties, but I do a little bit
22   different, because they're fairly new, so I've been
23   reviewing their work that they do right now.  So I'm
24   doing some different stuff than they are right now.
25    Q.  Okay.  You said they do the regular analyst

Page 20

5 (Pages 17 to 20)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1   duties -- | 1   **Q.** Anything else? |
| 2   **A.** Yes. | 2   **A.** No. |
| 3   **Q.** -- and you're reviewing that a little bit; is | 3   **Q.** So you have absconder training? |
| 4   that different from any of the items that you've already | 4   **A.** Tracking. |
| 5   described to me? | 5   **Q.** Tracking, sorry. I can't read my own writing. |
| 6   **A.** Yes. | 6   Usually I'd be typing this. I'm making due with |
| 7   **Q.** Okay. What is different about the regular | 7   technology today. |
| 8   duties? | 8   So absconder tracking, removal based on a |
| 9   **A.** Okay. I don't think I mentioned for me absconder | 9   court order, review pending entries, quality control |
| 10   tracking, so you can add that to my -- but they -- | 10   reports, and anything else? |
| 11   they're split up by alphabet between the four analysts | 11   **A.** They -- we have a main e-mail address, and they |
| 12   to track absconders. They remove offenders based on | 12   take turns answering that for a day; they alternate with |
| 13   court orders. They review the technicians' pending | 13   the technicians. They also answer phones. |
| 14   registrations. They do a percentage of them, they | 14   **Q.** Okay. And so you oversee these three -- is it |
| 15   review a percentage. | 15   three or four? I thought you said three and then you |
| 16   **Q.** Based on the alphabet? | 16   said four. |
| 17   **A.** Yes. | 17   **A.** Three, but I'm the fourth -- |
| 18   **Q.** Okay. So absconder -- I'm so sorry, were you | 18   **Q.** You're four. |
| 19   going to say something? | 19   **A.** -- because I do like the absconder tracking and |
| 20   **A.** No, I'm thinking. | 20   some of the court orders. Oh, another thing they do is |
| 21   **Q.** Okay. Are you ready? | 21   the certified record review, and they prepare the |
| 22   **A.** I'm trying to think of what else they do. They | 22   certified records. |
| 23   work on quality control reports, like if there's | 23   **Q.** You got a little bit ahead of me on my next |
| 24   something that needs to be updated in the system, then | 24   question. I was going to ask you which of these |
| 25   they split up the report and work on that. | 25   responsibilities you share. |
| Page 21 | Page 22 |
| 1   So it sounds like absconder tracking, | 1   **A.** I don't recall really. |
| 2   certified record review, removal -- | 2   **Q.** Okay. But you do have experience doing all the |
| 3   **A.** Certified record review I have not been -- | 3   things that they do? |
| 4   **Q.** No, okay. | 4   **A.** Yes. |
| 5   **A.** -- doing. | 5   **Q.** Okay. |
| 6   **Q.** Anything else other than absconder tracking for | 6   **A.** And I thought of one more thing they do. |
| 7   you? | 7   **Q.** Okay. |
| 8   **A.** As far as shared duties with them, no, I don't | 8   **A.** For duration ending, when it gets close to the |
| 9   think so. | 9   offender's time to come off the Registry, we do an audit |
| 10   **Q.** Okay. So you're overseeing their work right now; | 10   at that time, they do. |
| 11   is that right? | 11   **Q.** And you do not? |
| 12   **A.** Yes. | 12   **A.** No. I was doing it, but now they're doing it, |
| 13   **Q.** Okay. So do you have experience doing the things | 13   and so far I have reviewed all the ones that they're |
| 14   that they are responsible for doing right now? | 14   doing. |
| 15   **A.** Yes. | 15   **Q.** Okay, thank you. |
| 16   **Q.** Okay. How long were you -- any responsibilities | 16   **A.** Yes. |
| 17   that you're not doing right now, how long had you done | 17   **Q.** It sounds like a long list. Feel free to keep |
| 18   them? | 18   adding to it as they come to you. |
| 19   **A.** What do you mean any responsibilities I'm not | 19   **A.** All right. |
| 20   doing right now? | 20   **Q.** With regard to the other analysts, is this a |
| 21   **Q.** Right. So the responsibilities that they do that | 21   supervisor position for you? |
| 22   you don't do anymore. | 22   **A.** No. |
| 23   **A.** Uh-huh. | 23   **Q.** Okay. I'm going to try to share my screen again |
| 24   **Q.** If you have experience doing them, what is your | 24   can you see that? |
| 25   experience doing them, how long? | 25   **A.** Yes. |
| Page 23 | Page 24 |

6 (Pages 21 to 24)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1  Q. And what is this? | 1  Q. -- for me, it's difficult to tell whether that |
| 2  A. I ran some reports with totaled numbers and then | 2  reflects the number of registrants or if it reflects the |
| 3  signed this affidavit to show that I did that. | 3  number of occurrences of this particular crime or if it |
| 4  Q. So this is your signature? | 4  reflects the number of victims. |
| 5  A. Yes. | 5  Is it -- |
| 6  Q. Great. | 6  A. If you go down, slide down to the total -- |
| 7  I don't want you to tell me what you talked | 7  Okay. It would not be the number of |
| 8  about with your attorney, but can you broadly tell me | 8  offenders. It would be offenses. |
| 9  why you prepared this affidavit, but can you broadly | 9  Q. Offenses, okay. |
| 10  tell me why you prepared this affidavit? | 10  A. Yeah. |
| 11  A. Because I was asked to. | 11  Q. So it's occurrences, how many times this |
| 12  Q. Okay. This appears to be a list of offenses with | 12  particular crime has appeared? |
| 13  the number of registrants who are on the Registry for | 13  A. Yes. |
| 14  committing these offenses; does that sound like an | 14  Q. Thank you. |
| 15  accurate description to you? | 15  Okay. And this also says the data is recent |
| 16  A. Yes. | 16  as of January 25th, 2023, right? |
| 17  Q. Okay. Are you actually counting the number of | 17  A. Yes. |
| 18  registrants in this number or are you counting the | 18  Q. Okay. And you are aware that we have been |
| 19  number of offenses or the number of victims? | 19  provided with data during the discovery process in this |
| 20  MR. JAMISON: Objection, that's a compound | 20  case, right? |
| 21  question. | 21  A. I don't remember. |
| 22  MS. DAVIDSON: Okay, let me rephrase. | 22  Q. Okay. All right. So we also have data in this |
| 23  BY MS. DAVIDSON: | 23  case, just for your knowledge. |
| 24  Q. You have this results field off to the side -- | 24  But have you run any other analysis after |
| 25  A. Uh-huh. | 25  January 25th on these facts? |
| Page 25 | Page 26 |
| 1  A. No. | 1  A. I'm not sure what you mean. |
| 2  Q. Okay. So when you described your duties, I don't | 2  Q. Did you run anything as part of this project that |
| 3  think that you mentioned data analysis; would that be | 3  you didn't put in this affidavit? |
| 4  accurate? | 4  A. Not that I know of. |
| 5  A. Right. | 5  Q. Okay. Was there any analysis you were asked to |
| 6  Q. Okay. So is this something that would ordinarily | 6  run that you were not able to run because the data |
| 7  fall outside of the scope of your duties -- | 7  wasn't available? |
| 8  A. Yes. | 8  A. Not in this report. |
| 9  Q. -- running an analysis like this? | 9  Q. Okay. Did that happen for another report? |
| 10  A. Yes. | 10  MR. JAMISON: I'm going to object to this |
| 11  Q. Did you run it yourself? | 11  line of questioning as it impinges on the |
| 12  A. Yes. | 12  attorney/client privilege. |
| 13  Q. Have you ever had to run an analysis like this | 13  MS. DAVIDSON: Okay. All right. |
| 14  before? | 14  BY MS. DAVIDSON: |
| 15  A. Nope. | 15  Q. Don't answer anything that's privileged. |
| 16  Q. So this is your first time? | 16  Okay. Why don't you walk me through your |
| 17  A. I mean, I've ran reports, but nothing this | 17  process for obtaining these numbers that you provided |
| 18  extensive. | 18  here, we'll start there, and then maybe I'll ask you |
| 19  Q. Nothing that -- okay, so this is an extensive | 19  some specific questions. |
| 20  project for you? | 20  A. Okay. In our database, we have an advanced |
| 21  A. Yes. | 21  search feature, and for the first one, Public and |
| 22  Q. Okay. I do want to talk about your process for | 22  Private Registrants, we can just run a search of the |
| 23  the numbers that you provided here, but, first, can you | 23  whole database and we can pick certain statuses. And so |
| 24  tell me whether you ran any kind of an analysis that | 24  I picked everything except for canceled, people, |
| 25  didn't make this chart? | 25  deceased, and then out-of-state people and got the |
| Page 27 | Page 28 |

7 (Pages 25 to 28)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1   43,985.<br>2   Q. So when you say you can pick statuses, what are<br>3 other options?<br>4   A. The other statuses?<br>5   Q. Yes.<br>6   A. There's quite a few, there's active absconder,<br>7 homeless, federal prison, out of country, out of state,<br>8 pending out of state, pending review.<br>9   Q. Okay. So can you tell me what you mean by public<br>10 registrants?<br>11   A. They're on the public website.<br>12   Q. Okay. And what do you mean by private<br>13 registrants?<br>14   A. They're not on the public website.<br>15   Q. Does your number include incarcerated people?<br>16   A. Yes.<br>17   Q. So your number, you said it includes everybody<br>18 except for canceled status, deceased and everybody out<br>19 of state --<br>20   A. Yes.<br>21   Q. -- is that right?<br>22   A. Yes.<br>23   Q. Okay. Does the database include people who are<br>24 not currently living in Michigan?<br>25   A. Yes.<br><br>Page 29 | 1   Q. Are they on the public registry?<br>2   A. No.<br>3   Q. Are they on the private registry?<br>4   A. Yes.<br>5   Q. Okay. You specifically excluded that group,<br>6 they're not included in either total?<br>7   A. Correct.<br>8   Q. Okay. So not in the public registry number and<br>9 not in the private registry number, right?<br>10   A. Right.<br>11   Q. Can you point to anything in your affidavit that<br>12 explains which groups of registrants you've included in<br>13 your numbers for the total people on the Registry? And<br>14 I can scroll up and down as you need.<br>15   A. Can you repeat that again?<br>16   Q. Sure.<br>17      Is there anything in your affidavit where<br>18 you explain what groups are being excluded in your<br>19 calculations?<br>20   A. I don't see anything there.<br>21   Q. Would you like me to scroll down?<br>22   A. Yes. Nope, I don't see anything.<br>23   Q. Okay. So you would agree that's not included in<br>24 your affidavit?<br>25   A. Yes.<br><br>Page 30 |
| 1   Q. All right. I'm going to try to switch exhibits.<br>2 So can you see that?<br>3   A. Yes.<br>4   Q. This is what we'll call Exhibit C -- and I'm<br>5 sorry, Medina, the affidavit I'm going to be calling<br>6 Exhibit B and the flow chart Exhibit A.<br>7      MR. JAMISON: Syeda, does this have a Bates<br>8 number on it?<br>9      MS. DAVIDSON: It does, let me scroll down<br>10 and get it for you. It's Bates 1515.<br>11      MR. JAMISON: Perfect, thank you.<br>12      MS. DAVIDSON: Yes.<br>13      MARKED FOR IDENTIFICATION:<br>14      DEPOSITION EXHIBIT A<br>15      10:45 a.m.<br>16      MARKED FOR IDENTIFICATION:<br>17      DEPOSITION EXHIBIT B<br>18      10:45 a.m.<br>19      MARKED FOR IDENTIFICATION:<br>20      DEPOSITION EXHIBIT C<br>21      10:45 a.m.<br>22 BY MS. DAVIDSON:<br>23   Q. Okay. Ms. Jegla, have you seen this before?<br>24   A. It doesn't look familiar.<br>25   Q. If I told you that this information was provided<br><br>Page 31 | 1 to us by your attorneys during discovery, would you have<br>2 any reason to dispute that?<br>3   A. You mean the totals?<br>4   Q. This document was given to us in discovery, and<br>5 I'm just asking, since you've not seen it before, if I<br>6 were to tell you that this was provided to us during<br>7 discovery by your attorneys, would you dispute that for<br>8 any reason?<br>9   A. No.<br>10   Q. Okay. And I'm only asking that because you said<br>11 it doesn't look familiar to you.<br>12      Do you think that this document shows 40,135<br>13 public registrants and 4,044 non public registrants?<br>14   A. Yes.<br>15   Q. So a total of 44,179 registrants, right?<br>16   A. Yes.<br>17   Q. And you would agree that's more than the number<br>18 you provided, right?<br>19   A. What number did I provide?<br>20   Q. Let's go back to Exhibit B.<br>21      Forty-three thousand nine hundred<br>22 ninety-five.<br>23   A. Yes.<br>24   Q. Do you know why that number is different?<br>25   A. No.<br><br>Page 32 |

8 (Pages 29 to 32)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1    Q. All right. And do you see the date on this | 1    Q. Which one, all of it or -- |
| 2  document is January 4th, 2023? | 2    A. The subsequent registrable offense. |
| 3    A. Yes. | 3    Q. So that's run by the vendor? |
| 4    Q. Do you agree that's 21 days before the data in | 4    A. Yes. |
| 5  your affidavit? | 5    Q. Is that LexisNexis? |
| 6    A. I'd have to see that again. | 6    A. Yes. |
| 7    Q. Sure. | 7    Q. That's Craig at LexisNexis? |
| 8    A. Yes. | 8    A. Yes. |
| 9    Q. Okay. So would that mean that maybe 184 people | 9    Q. Okay. Is there anybody else at LexisNexis you |
| 10  were added to the registry over three weeks? | 10  talked to with regard to running these numbers? |
| 11    A. I don't know what that means. | 11    A. John Mobley, M-O-B-L-E-Y. He's the actual |
| 12    Q. Do you have any idea how many new registrants are | 12  programmer. |
| 13  added in a week? | 13    Q. Okay. So you're saying that with regard to the |
| 14    A. No, I don't. | 14  second row, you didn't run this number? |
| 15    Q. All right. And so let's stay on Exhibit B for a | 15    A. Correct. |
| 16  little bit. | 16    Q. Okay. Did you give -- you asked Craig to run it? |
| 17      This second line, you've written that it's | 17    A. I don't recall. |
| 18  for registrants with a subsequent registrable offense, | 18    Q. You asked somebody to run it for you? |
| 19  right? | 19    A. I don't recall. |
| 20    A. Right. | 20    Q. Okay. But you didn't run it? |
| 21    Q. When you were analyzing the second registrable | 21    A. Correct. |
| 22  offense, what were you using as an index -- | 22    Q. Okay. |
| 23    A. Actually, if I said that I did all this report, | 23    A. Also, I might have to change an answer, because |
| 24  I'm sorry, that one had to come from the vendor, that | 24  you had asked if I had any other totals that are not in |
| 25  number, because I can't run that report. | 25  here, and the -- and I said no, but the answer is I |
| Page 33 | Page 34 |

| | |
|---|---|
| 1  don't know. | 1    A. No. |
| 2    Q. Is that because you -- I'm sorry, were you going | 2    Q. And is it fair to say that you do not know |
| 3  to say something else? | 3  whether that was done with regard to this second row? |
| 4    A. Because I did do a spreadsheet and sent it to | 4    A. Can you repeat that again? |
| 5  Eric, and then he put this together, so -- | 5    Q. Sure. Is it fair to say that you do not know |
| 6    Q. Okay. Okay. Did you have anything to do with | 6  what other was done to get the number in the second row? |
| 7  running the numbers in the second row at all? | 7      MR. JAMISON: Objection, it's vague. |
| 8    A. No -- I don't know actually. I don't know. | 8      THE WITNESS: I don't remember what -- where |
| 9    Q. Okay. | 9  that number came from, but I know we can't do it in the |
| 10    A. I don't recall. | 10  system. |
| 11    Q. Are you able to define subsequent registrable | 11  BY MS. DAVIDSON: |
| 12  offense? | 12    Q. Okay. And you said you don't know who ran it? |
| 13    A. That is when they've got more than one conviction | 13    A. The vendor would have had to run it. |
| 14  on different dates. | 14    Q. Okay. So when you say you don't know, you just |
| 15    Q. Do you know what an index offense is? | 15  mean you don't know which specific contact, but you know |
| 16    A. No. | 16  it was a vendor; is that right? |
| 17    Q. Are you familiar with Scientific Research | 17    A. I don't know if I got it from the vendor or the |
| 18  Practices to Measure Repeat Offenses? | 18  vendor gave it to somebody else and they gave it to me. |
| 19    A. No. | 19  I don't know. |
| 20    Q. Do you know that there is a method of measuring | 20    Q. Okay. Okay. We can move on to the next portions |
| 21  recidivism that involves counting a cluster of | 21  of your chart here. |
| 22  convictions that are close in time as one offense? | 22      Okay. These appear to address offenses |
| 23    A. No. | 23  where the victims are a certain age; do I have that |
| 24    Q. Do you know why someone measuring recidivism | 24  right? |
| 25  might do that? | 25    A. Yes. |
| Page 35 | Page 36 |

9 (Pages 33 to 36)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1   Q. Okay. Did you run these numbers yourself? | 1   Q. Okay. Would that be for -- that's not just for |

1    Q. Okay. Did you run these numbers yourself?
2    A. Yes.
3    Q. So the column on the left is titled field and the
4  right-hand column is titled results, right?
5    A. Yes.
6    Q. And you were measuring occurrences, right, we
7  already talked about that?
8    A. Yes.
9    Q. Okay. Okay. So the data that we received had a
10  victim type field. Is there such a field in the -- is
11  there a victim type field in the database that you work
12  with?
13    A. I'm not sure if that's what it's called, but we
14  have one that is -- the choices are juvenile/adult.
15    Q. And that's for the type of victim?
16    A. I think so.
17    Q. What does it mean if the victim type says
18  nothing?
19    A. Okay. Victim type could be male/female. I'm not
20  sure which one it is. Sorry. And if -- and if it is
21  null, then that means we don't have that information.
22    Q. Okay. So do you put null anytime you don't have
23  the information?
24    A. No. We just don't -- we leave it blank, and then
25  it fills in as null.

Page 37

1    Q. Okay. Would that be for -- that's not just for
2  the victim type field, right, that would be for any
3  field that you don't have the information, if it says
4  null, that means you left it blank?
5    A. I can't say for sure for every field.
6    Q. Okay. And you're not sure whether victim type
7  means juvenile or adult or whether it means male or
8  female?
9    A. Correct.
10    Q. Okay. If I were to tell you that there's also a
11  field for victim gender, would that help you out a
12  little bit?
13    A. Yes.
14    Q. Okay. So if I were to tell you there's a field
15  for victim gender, in our data at least, would that lead
16  you to believe that victim type means probably juvenile
17  or adult?
18    A. Yes.
19    Q. Okay. We noticed that in some of the cases, it
20  says that the gender is unknown; does that mean that the
21  person who put it in couldn't find it in the records?
22    A. I don't know.
23    Q. When you're putting -- you or somebody on your
24  team is putting information into the database, is there
25  a victim age field?

Page 38

1    A. Yes.
2    Q. Okay. Is there a way to connect the victim's
3  demographic feature, such as age and gender, to the
4  specific conviction?
5    A. Yes.
6    Q. Can you walk me through how that works?
7    A. In the system, there's a module (phonetic) for
8  all the conviction information, and then, in the grid,
9  there's a button for victim notes, and it's attached to
10  that conviction.
11    Q. Thank you.
12        Do you know the process of entering ages
13  into the database?
14    A. That would be added by whoever is adding the
15  record, they usually add the victim age. If it's blank
16  and we need it, then we might request a police report or
17  a PSI or something to get that information.
18    Q. Why might you need a PSI or a police report?
19    A. Some of the offenses require a victim age in
20  order to determine the tier.
21    Q. Would you use any documents other than a PSI or
22  ap police report if you input ages?
23    A. Yes.
24    Q. What other documents might you use?
25    A. We can use Information Felony Sheet, anything

Page 39

1  from the court that would have it.
2    Q. Anything else?
3    A. Not that I can think of.
4    Q. If the age is unknown, what would you put in the
5  age field?
6    A. It's just left blank.
7    Q. Are certain numbers ever entered into the age
8  field as place holders?
9    A. Sometimes a zero.
10    Q. When would you use zero?
11    A. I think the system automatically did that,
12  entered the zero.
13    Q. In what instances would the system enter a zero?
14    A. I don't know.
15    Q. So if you leave it blank, does the system put a
16  zero or does it show up as null?
17    A. I don't know what it does right now.
18    Q. Okay.
19    A. We've had different systems, so I don't know what
20  it does.
21    Q. When you're putting the information in, do you
22  ever use zero as a placeholder? I know you just said
23  the system does it sometimes, but do you or your team
24  ever use a zero just as a placeholder to mean something
25  else?

Page 40

10 (Pages 37 to 40)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1       MR. JAMISON: Objection, lack of foundation. | 1       BY MS. DAVIDSON: |
| 2    BY MS. DAVIDSON: | 2       Q. Do you ever use 25 as a placeholder? |

1          MR. JAMISON: Objection, lack of foundation.
2     BY MS. DAVIDSON:
3          Q. You can still answer.
4          A. No, we don't.
5          Q. If I were to tell you that our data shows 33,745
6     entries where the age is zero, would you have any reason
7     to dispute that?
8          MR. JAMISON: Objection, lack of foundation.
9     BY MS. DAVIDSON:
10         Q. You can still answer.
11         A. I don't know, unless it's in this report.
12         Q. Assuming that were true, would you know why there
13    would be so many entries where there's a zero in the age
14    field?
15         MR. JAMISON: Same objection.
16         THE WITNESS: Can you clarify?
17    BY MS. DAVIDSON:
18         Q. Sure. If there were 33,745 entries where the age
19    is zero, would you agree that sounds like a lot of
20    entries?
21         A. Yes.
22         Q. Okay. Would you have any reason to know why
23    there would be so many entries where the age is zero?
24         MR. JAMISON: Objection, lack of foundation.
25         THE WITNESS: I'm not sure.

Page 41

1     BY MS. DAVIDSON:
2          Q. Do you ever use 25 as a placeholder?
3          A. No.
4          Q. If I were to tell you the data shows 6,132
5     entries where it shows the age is 25, would you know why
6     that is?
7          MR. JAMISON: Objection, lack of foundation.
8          THE WITNESS: No.
9     BY MS. DAVIDSON:
10         Q. How about the Number 99, is that ever used as a
11    placeholder?
12         MR. JAMISON: Lack of foundation.
13         THE WITNESS: Yes.
14    BY MS. DAVIDSON:
15         Q. You use 99 as a placeholder?
16         A. Yes.
17         Q. Tell me when you use 99, please.
18         A. So if someone is registered for a Tier 3 offense
19    and then they also have another offense that requires a
20    victim age, the system we had before would not tier that
21    automatically. So we put the 99 in there because we
22    didn't have the victim age and couldn't locate it, but
23    they're a Tier 3 anyway.
24         Q. Okay. So just to make sure that I understand
25    what you just said. If somebody is a Tier 3 offender

Page 42

1     and there is another offense, you put 99 in because
2     they're already a Tier 3?
3          A. Yes, because it has automated tiering, and
4     instead of automatically making them a Tier 3 because
5     they have a Tier 3 offense, it will say we cannot tier
6     this. So by putting the 99 in it, that just shows that
7     there's a victim in age in there and then it will tier.
8          Q. Okay, thank you.
9          A. Uh-huh, yes.
10         Q. Okay. So the data that we were provided has
11    64,458 gross for victims; does that sound right for you?
12         MR. JAMISON: Objection, lack of foundation.
13         THE WITNESS: I don't know.
14    BY MS. DAVIDSON:
15         Q. When we reviewed the data, we noticed that there
16    were a large number of ages that were absent from the
17    age field entirely, and so what I'd like to do is go
18    through some of these ages with you and you tell me if
19    it seems right to you, that these ages are missing from
20    the age field at all.
21         Is that all right?
22         A. Yes.
23         Q. Thank you.
24         So we did not see a single victim with the
25    age of one; does that seem right to you?

Page 43

1          MR. JAMISON: Objection, lack of foundation.
2     BY MS. DAVIDSON:
3          Q. You can answer.
4          A. I don't know.
5          Q. So you don't know whether you ever see a victim
6     with the age of one?
7          A. Correct.
8          Q. You don't know whether you've ever input the
9     number one for someone's age?
10         A. I don't know.
11         Q. Okay. How about 26 or 27?
12         A. Can you clarify the full question?
13         Q. Sure. Does it seem odd to you that there's no
14    victims who are aged 26 or 27?
15         MR. JAMISON: Objection, lack of foundation.
16         THE WITNESS: Yeah, I don't know.
17    BY MS. DAVIDSON:
18         Q. You input some of these ages yourself
19    occasionally, right?
20         A. Yes.
21         Q. Okay. How frequently are you responsible for
22    putting ages in?
23         A. Hardly ever.
24         Q. Okay. You review other people's entries also,
25    though?

Page 44

11 (Pages 41 to 44)

Tri-County Court Reporters
248-608-9250

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1    **A.**  Yes. | 1    Q.  Does this seem statistically likely to you? |
| 2    Q.  Pretty frequently; yes? | 2         MR. JAMISON:  Objection, lack of foundation. |
| 3    **A.**  Yes. | 3    BY MS. DAVIDSON: |
| 4    Q.  Okay.  And so you see the numbers in the age | 4    Q.  You can answer. |
| 5    fields pretty frequently; yes? | 5    **A.**  I think it can happen, yes. |
| 6    **A.**  Yes. | 6    Q.  Okay.  When we reviewed the victim age data, we |
| 7    Q.  Okay.  Would it surprise you if I told you there | 7    found a total of 12,854 adult victims between the ages |
| 8    were no 46-year-old victims? | 8    of 18 and 99; would you have any reason to dispute that? |
| 9         MR. JAMISON:  Objection, lack of foundation. | 9         MR. JAMISON:  Objection, lack of foundation. |
| 10   BY MS. DAVIDSON: | 10   BY MS. DAVIDSON: |
| 11   Q.  You can answer. | 11   Q.  You can answer. |
| 12   **A.**  Yeah, I don't know. | 12   **A.**  No. |
| 13   Q.  What if I told you that there were no victims at | 13   Q.  Your affidavit shows a total of 4,657 adult |
| 14   all between the ages of 48 and 61, would that surprise | 14   victims, correct? |
| 15   you? | 15   **A.**  Yes. |
| 16        MR. JAMISON:  Objection, lack of foundation. | 16   Q.  Would you agree that your number is about a third |
| 17   BY MS. DAVIDSON: | 17   of what I just told you that we found in the data? |
| 18   Q.  You can answer. | 18   **A.**  Where was your data? |
| 19   **A.**  I don't know. | 19   Q.  Our data was produced by your attorneys in the |
| 20   Q.  What if I told you there were no victims between | 20   discovery process.  My understanding is that it's a |
| 21   the ages of 63 and 98, would that seem right to you? | 21   spreadsheet that comes from the database.  It's not the |
| 22        MR. JAMISON:  Objection, lack of foundation. | 22   actual database, but it's a spreadsheet that's based on |
| 23   BY MS. DAVIDSON: | 23   the numbers in the database. |
| 24   Q.  You can answer. | 24   **A.**  Okay.  So what is your question again? |
| 25   **A.**  I don't know. | 25   Q.  What were you going to say -- |
| Page 45 | Page 46 |

| | |
|---|---|
| 1    **A.**  I said could you repeat. | 1         MS. DAVIDSON:  Okay.  And you are not |
| 2         MR. JAMISON:  Well, I mean, I'll just place | 2    talking about this, right, you're talking about the big |
| 3    a standing objection on the record so I don't have to | 3    spreadsheet of the public and private information, |
| 4    object to every one.  But to the extent you're asking | 4    right? |
| 5    questions about what you found in the data that Ms. | 5         MR. JAMISON:  Correct, the data, yeah, like |
| 6    Jegla -- she did not pull the data, she doesn't review | 6    the data dump, yeah. |
| 7    that data.  And to the extent you're comparing it | 7         MS. DAVIDSON:  Okay, all right.  Your |
| 8    against the data that she pulled, I'll just place a | 8    objection is noted. |
| 9    standing objection on the record.  She doesn't have | 9    BY MS. DAVIDSON: |
| 10   foundation to know what you pulled or what data has been | 10   Q.  And you had asked me to repeat the question, |
| 11   provided to you and opine on why there might be | 11   hadn't you, Ms. Jegla? |
| 12   differences between the two sets. | 12   **A.**  Yes. |
| 13        MS. DAVIDSON:  Okay.  And can I just clarify | 13   Q.  Okay.  So when we were looking at the data, we |
| 14   what you just said in your objection, because I think | 14   found the total of 12,854 adult victims between the ages |
| 15   that in your objection she didn't pull the data, and | 15   of 18 and 99.  Your affidavit shows a total of 4,657 |
| 16   then you're saying that she did pull the data. | 16   adult victims. |
| 17        MR. JAMISON:  She didn't pull the -- at | 17        Would you agree that's about a third of what |
| 18   least it's my understanding that she didn't pull the | 18   I just told you we found in the data? |
| 19   data that was provided to you. | 19   **A.**  Yes. |
| 20        MS. DAVIDSON:  Are you talking about in this | 20   Q.  Do you know why that might be? |
| 21   affidavit or in the data that -- | 21   **A.**  No. |
| 22        MR. JAMISON:  No, in the discovery | 22   Q.  And then here at Paragraph 5, you've written the |
| 23   responses.  So I believe the data that was provided -- | 23   majority of crimes listed above where the age of victim |
| 24   the database information was pulled by Narcisa and by | 24   is known; do you see that? |
| 25   the vendor. | 25   **A.**  Where is it? |
| Page 47 | Page 48 |

12 (Pages 45 to 48)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1   Q. Paragraph 5 -- | 1   Q. You don't know whether it's blank or whether it's |
| 2   A. Oh. | 2   a zero? |
| 3       Yes. | 3   A. No, but the -- if it was zero, then I treated it |
| 4   Q. -- you're referring to where the age of the | 4   as unknown. |
| 5   victim is known. | 5   Q. Okay.  Would you agree that the victim age field |
| 6       So given that, would you agree that there | 6   that you have here on this chart may not accurately |
| 7   are instances where the age of the victim is unknown? | 7   state the ages of the victims in all cases? |
| 8   A. Okay.  Where -- oh, above Number 5? | 8   A. They're not exact probably. |
| 9   Q. I'm actually just asking you if there are ever | 9   Q. Did you run the numbers for this affidavit in the |
| 10   instances where you don't know the age of the victim? | 10   rows where you have victim ages? |
| 11   A. Yes. | 11   A. Yes. |
| 12   Q. Okay.  And we just talked about some of the | 12   Q. Did you use the age field when you ran this data? |
| 13   placeholder numbers, how you use 99, and you're not sure | 13   A. Yes. |
| 14   whether you use zero or not, but when you made this | 14   Q. How did you use it? |
| 15   statement about the majority of crimes in Paragraph 5, | 15   A. If it was victim under 13, I did 1 through 12, |
| 16   did you exclude any of the placeholder numbers that we | 16   Victims 1 through 12.  And then for 13 to 17, I did the |
| 17   talked about? | 17   13 to 17.  And then for adult, I did 18 to -- I'm not |
| 18   A. Yes. | 18   sure how I did that -- 18 to 98. |
| 19   Q. Which numbers did you exclude? | 19   Q. You're saying you ran a search on these numbers? |
| 20   A. The 99. | 20   A. Yes. |
| 21   Q. Would you have excluded any of the zeroes? | 21   Q. Okay.  Does the database also have a field for |
| 22   A. No. | 22   the offense or Crime Code? |
| 23   Q. When you run this data, does the age field ever | 23   A. Yes. |
| 24   appear blank or does it appear as a zero? | 24   Q. Did you run any of the data based on an offense |
| 25   A. I'm not sure. | 25   or Crime Code? |
| Page 49 | Page 50 |
| 1   A. Yes. | 1   A. 750.520(d) and then all of the variables. |
| 2   Q. All of it? | 2   Q. And we already talked about how your numbers do |
| 3   A. Yes. | 3   not include out-of-state registrants; is that right? |
| 4   Q. So did you do two searches, one based on age and | 4   A. Yes. |
| 5   one based on Crime Code, or how did you do it? | 5   Q. Do they include out-of-state offenses? |
| 6   A. I did them together. | 6   A. No. |
| 7   Q. Okay.  So when you ran the search, you ran it | 7   Q. Do you know what the offense codes are based on? |
| 8   based on -- you put -- you ran it based on the age and | 8   A. I don't know what you mean. |
| 9   the Crime Code together? | 9   Q. Are they based on the statutory definitions? |
| 10   A. Yes. | 10   A. I think so. |
| 11   Q. Did you use any other parameters when you were | 11   Q. Do you know? |
| 12   running these numbers? | 12   A. I'm not sure what you mean.  I don't understand. |
| 13   A. I removed the statuses of deceased and canceled | 13   Q. When you're searching by offense code -- and I |
| 14   and then the out of state. | 14   realize you just gave me a statute, right, for your |
| 15   Q. So your search, age, Crime Code and all statuses | 15   offense code -- do you know if the offense codes are |
| 16   except removed, deceased, canceled and out of state; is | 16   based on what's actually in the statute? |
| 17   that accurate? | 17   A. Yes. |
| 18   A. Yes. | 18   Q. They are? |
| 19   Q. Any other parameters? | 19   A. Yes. |
| 20   A. No. | 20   Q. Thank you. |
| 21   Q. Okay.  So to move to the rows where you | 21       So we talked about how you ran this -- these |
| 22   calculated data on CSM3, do you see that? | 22   two rows using all variables of 750.520 Subsection D. |
| 23       Do you see where I'm looking? | 23   A. Uh-huh. |
| 24   A. Yes. | 24   Q. Okay.  When we look specifically at this victim |
| 25   Q. What offense code did you use for that data? | 25   under 13 row -- |
| Page 51 | Page 52 |

13 (Pages 49 to 52)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1 A. Uh-huh. | 1 let me know when you're ready to answer questions about |
| 2 Q. -- is that answer the same? | 2 it, and let me know if you need me to scroll down. |
| 3 A. Yes. | 3 A. Okay. |
| 4 Q. So you got to this number by using age, removing | 4 Q. You're ready? |
| 5 certain statuses and running all variables of | 5 A. Yes. |
| 6 750.520(d); is that right? | 6 Q. Okay. Can you tell me where in this statute you |
| 7 A. Yes, under 13, though, I did not (d)(1)(a) | 7 find a category for victims who are under 13? |
| 8 subsection because that one was just 13 to 16 or 13 to | 8 A. No. |
| 9 15, but (d)(1)(a) I did not for the under 13. | 9 Q. No, you can't tell me, or, no, you don't see -- |
| 10 Q. I'm going to show you another exhibit. | 10 A. No, I don't see a category for that. |
| 11 We're going to mark this as D. | 11 Q. Thank you. |
| 12 MARKED FOR IDENTIFICATION: | 12 Then we're going to go back to B in your |
| 13 DEPOSITION EXHIBIT D | 13 other CSC 3rd has a range of victim 13 and 15; do you |
| 14 11:21 a.m. | 14 see that? |
| 15 BY MS. DAVIDSON: | 15 A. Yes. |
| 16 Q. Have you seen this before, Ms. Jegla? | 16 Q. We're going to go back to this Exhibit D, if my |
| 17 A. Yes. | 17 computer will cooperate. Can you show me where you can |
| 18 Q. You have. Can you tell me what it is? | 18 find a category for victims that are between the ages of |
| 19 A. That's the description of the Crime Code | 19 13 and 17? |
| 20 750.520(d). | 20 A. No. |
| 21 Q. It's also the statute that tells -- | 21 Q. Does that appear to exist in this statute? |
| 22 A. Yes. | 22 A. I don't see it. |
| 23 Q. -- right? | 23 Q. Do you know what the age of consent is in |
| 24 A. Yes. | 24 Michigan? |
| 25 Q. I want you to take your time to look at this and | 25 A. No. |
| Page 53 | Page 54 |

| | |
|---|---|
| 1 Q. Would you agree that CSC 3 makes it a crime to | 1 Q. Okay. Let's go back to Exhibit B. Now I'm |
| 2 engage in sexual penetration with a person between 13 | 2 looking at the fourth degree rows; do you see that? |
| 3 and 17, based on this statute? | 3 A. Yes. |
| 4 A. Can you repeat that? | 4 Q. Can you see that? |
| 5 Q. Sure. As we're looking at this statute, would | 5 A. Yes. |
| 6 you agree that CSC 3 makes it a crime to engage in | 6 Q. Great. |
| 7 sexual penetration with a person between 13 and 16? | 7 Have you seen this before? |
| 8 A. Yes. | 8 A. Yes. |
| 9 Q. Do you know if it's a crime to engage in sexual | 9 Q. What is that? |
| 10 penetration with a person 16 or older? | 10 A. The description in the statute for the Crime Code |
| 11 A. No. | 11 750.520(e). |
| 12 Q. So looking at this subsection, do you see there's | 12 Q. Also known as CSC 4, right? |
| 13 a category for victims who are at least 13, but not yet | 13 A. Yes. |
| 14 16? | 14 Q. And, again, I'd like you to take your time with |
| 15 A. Yes. | 15 this and let me know when you're ready to talk about it. |
| 16 Q. Did you run any data specific to that? | 16 A. Okay. |
| 17 A. Yes, I ran that when I was looking for the victim | 17 MR. JAMISON: Syeda, I'm going to object. |
| 18 age between 13 and 17. | 18 It looks like there's two pages, and she hasn't had the |
| 19 Q. And you used 16 and 17 in that search, right? | 19 opportunity to review the entire statute. |
| 20 A. I ran that statute, and then I ran all the | 20 BY MS. DAVIDSON: |
| 21 others -- the other subsections and used 13 to 17. | 21 Q. Do you want me to scroll down, Ms. Jegla? |
| 22 Q. Thank you. | 22 A. Yes. |
| 23 So when you run data, you are able to run it | 23 Q. Just let me know when you're ready. |
| 24 based on each subsection if you want to? | 24 A. Thank you. |
| 25 A. Yes. | 25 Q. Are you ready to answer questions? |
| Page 55 | Page 56 |

14 (Pages 53 to 56)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1   **A.** Yes. | 1   **A.** Yeah. |
| 2   **Q.** Good. Thank you. | 2   **Q.** If that same person was also convicted of |
| 3   MR. JAMISON: Same objection. There's a | 3   CSC 2nd, that would appear in a search using a Crime |
| 4   second page I don't think she's seen yet. | 4   Code for CSC 2nd as well; is that right? |
| 5   THE WITNESS: Okay. | 5   **A.** Yes. |
| 6   BY MS. DAVIDSON: | 6   **Q.** You would agree that some people are convicted of |
| 7   **Q.** Okay. And I'll ask you can you show me the | 7   more than one offense? |
| 8   category for victims under 13? | 8   **A.** Yes. |
| 9   **A.** I don't see it in here. | 9   **Q.** They could be convicted of two counts, say, one |
| 10   **Q.** If I scroll down, do you want to look again? | 10   count of CSC 3rd and one count of CSC 2nd, right? |
| 11   **A.** Yeah, I don't see it. | 11   **A.** Yes. |
| 12   **Q.** Okay. And how about on the second page? | 12   **Q.** That might just involve one victim? |
| 13   **A.** Nope. | 13   **A.** Yes. |
| 14   **Q.** How about for victims between 13 and 17? | 14   **Q.** If a person was convicted of both CSC 3rd and |
| 15   **A.** Nope, I don't see it. | 15   CSC 2nd on the same day, would they be counted in both |
| 16   **Q.** You need me to scroll down? | 16   totals in your chart? |
| 17   **A.** Sure. | 17   **A.** Yes. |
| 18   **Q.** Sorry, that was too far. | 18   **Q.** They might appear twice? |
| 19   **A.** I don't see it. | 19   **A.** Yes. |
| 20   **Q.** And how about on this last page? | 20   **Q.** So when you ran these specific Crime Codes, what |
| 21   **A.** No. | 21   did you do to ensure that the people who had subsequent |
| 22   **Q.** Thank you. | 22   offenses, they weren't counted twice? |
| 23   If you are running a Crime Code for CSC 3rd, | 23   **A.** I didn't ensure that they weren't counted twice, |
| 24   a person who was convicted of CSC 3rd would appear in | 24   I did count them twice because these are offenses. They |
| 25   that search, correct? | 25   were counted twice. |
| Page 57 | Page 58 |
| 1   **Q.** Is it possible that an individual may have more | 1   included the same victim more than once at any point? |
| 2   than one distinct registration number in your database? | 2   **A.** I don't know. |
| 3   **A.** More than one? No. | 3   **Q.** Okay. So is it fair to say that you may not |
| 4   **Q.** It's not possible? | 4   actually know the total number of victims under 18? |
| 5   **A.** No. | 5   **A.** That's what -- so you're saying it could have |
| 6   **Q.** Okay. So the second chart in this declaration | 6   been offenders or it could have been offenses? |
| 7   has columns for the age range of victims and results, | 7   **Q.** Well, I'm asking you what it is and you said you |
| 8   correct? | 8   don't know. |
| 9   **A.** Correct. | 9   **A.** Yeah, I mean, if you could total it on the top, |
| 10   **Q.** How did you get the numbers for this chart? | 10   then you could see if -- I think if you total them on |
| 11   **A.** I don't recall. | 11   the top, you can see if it's the same. I think it's |
| 12   **Q.** Do you think you added the numbers from the first | 12   probably the same, all offenses. It has to be, because |
| 13   chart? | 13   you can't do them separate offenses. So that has to be |
| 14   **A.** That could be. Otherwise, I ran it in the | 14   by offenses, not offenders. |
| 15   database. I don't know. | 15   **Q.** Okay. So this chart that says age range of |
| 16   **Q.** If you ran it, how would you have run it? | 16   victims also counts occurrences is what you're saying? |
| 17   **A.** Select all of the Crime Codes and then the status | 17   **A.** Yes, yes. |
| 18   not deceased, canceled or out of state, and then for the | 18   **Q.** Okay. And so you may not actually know the total |
| 19   first one, Victim 1 through 12. | 19   number of victims under 18 because you're counting |
| 20   **Q.** Does this chart also count occurrences? | 20   occurrences; is that right? |
| 21   **A.** I don't know. | 21   **A.** It doesn't say total offenders with a victim |
| 22   **Q.** Okay. Okay. You have a row that says total | 22   under 18, so it is total victims under 18. |
| 23   victims under 18; do you see that? | 23   **Q.** Would you agree that some occurrences involve the |
| 24   **A.** Yes. | 24   same victim? |
| 25   **Q.** And do you know if the number is -- in this chart | 25   **A.** Yes. |
| Page 59 | Page 60 |

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1  Q. So this, again, may not be the total number of | 1  Q. So she works for MSP, and she is a liaison to the |
| 2  victims under 18, right? | 2  AG -- |
| 3  A. That's possible. | 3  A. Yes. |
| 4  MS. DAVIDSON: Okay.  We'll take five | 4  Q. Okay. |
| 5  minutes. | 5  MS. DAVIDSON: Okay.  And, Eric, there are |
| 6  (Off the record at 11:35 a.m.) | 6  three of these that are similar, so, for you, it's 1710. |
| 7  (Back on the record at 11:46 a.m.) | 7  BY MS. JEGLA: |
| 8  BY MS. DAVIDSON: | 8  Q. Okay.  So you prepared this chart, you think, Ms. |
| 9  Q. All right.  Let me share my screen again.  Can | 9  Jegla? |
| 10  you see that okay?  Let me try to pull this down a | 10  A. Yes. |
| 11  little bit so that it stops.  Okay, so -- all right. | 11  Q. Do you recall when? |
| 12  We'll call this Exhibit F. | 12  A. Not exactly, no. |
| 13  MARKED FOR IDENTIFICATION: | 13  Q. Okay.  Do you know that some of these numbers are |
| 14  DEPOSITION EXHIBIT F | 14  not the same as the numbers in your declaration? |
| 15  11:46 a.m. | 15  MR. JAMISON:  Objection, it's vague. |
| 16  BY MS. DAVIDSON: | 16  THE WITNESS:  I'd have to look. |
| 17  Q. Have you seen this before? | 17  BY MS. DAVIDSON: |
| 18  A. Yes. | 18  Q. Okay.  So let's look at -- do see at the row that |
| 19  Q. Can you tell me what this is? | 19  says gross indecency with a victim under 13? |
| 20  A. I believe it's the report I ran, and then sent | 20  A. Yes. |
| 21  that to Chris Bond to send to Eric, and then he created | 21  Q. And what does this number say? |
| 22  the affidavit with these totals. | 22  A. Eighty-two. |
| 23  Q. Okay.  I'm sorry, who is Chris Bond? | 23  Q. Right.  And if we go to your declaration, Exhibit |
| 24  A. She's the liaison.  She works for MSP between us | 24  B, what do you report for gross indecency with a victim |
| 25  and the AG's office. | 25  under 13? |
| Page 61 | Page 62 |
| 1  A. Seventy-six. | 1  Q. Okay.  At the bottom of this Exhibit F, do you |
| 2  Q. So staying on your declaration, gross indecency | 2  see in this last blue cell, it says these total 44,268, |
| 3  with a victim between 13 and 17, what do you report? | 3  there are 281 offenders that have both and then -- and |
| 4  A. One hundred thirty-one. | 4  then stops, what does the rest of it say? |
| 5  Q. And let's go back to F, ages 13 to 17, what does | 5  A. I don't know.  You'd have to -- you have to open |
| 6  this chart show? | 6  it farther, but I don't know what -- |
| 7  A. One hundred forty-five. | 7  MR. JAMISON:  Yeah, I'll -- I have that |
| 8  Q. If we're looking at the row here that says | 8  document.  I'll see if I can open it up for you and tell |
| 9  CSC 1st with a victim under 13, so this one right | 9  you what it is. |
| 10  here -- | 10  MS. DAVIDSON:  Thank you. |
| 11  A. Uh-huh. | 11  MR. JAMISON:  You can keep asking questions, |
| 12  Q. -- what does this document show? | 12  and I'll see if I can find an answer for you. |
| 13  A. Eight thousand one hundred thirty. | 13  MS. DAVIDSON:  Thank you.  Appreciate that. |
| 14  Q. And going back to your declaration, what do you | 14  BY MS. DAVIDSON: |
| 15  report? | 15  Q. Okay, so then let's pull this one down.  Have you |
| 16  A. Four thousand nine hundred three. | 16  seen this one before, Ms. Jegla? |
| 17  Q. Do you know why these numbers are different? | 17  A. Yep. |
| 18  A. That may not have been the final report.  There | 18  MS. DAVIDSON:  We're going to call this G, |
| 19  must have been a different one. | 19  and that is Bates number 1711. |
| 20  Q. Did something cause you to run a different one? | 20  MARKED FOR IDENTIFICATION: |
| 21  A. Yes, when I realized there were zeroes.  Because | 21  DEPOSITION EXHIBIT G |
| 22  I was running it for victim under 13, I was running less | 22  11:50 a.m. |
| 23  than 13, then I realized that there were zeroes in | 23  BY MS. DAVIDSON: |
| 24  there, and they were counting the zeroes as victims | 24  Q. Okay.  And what's this? |
| 25  under 13, so then I redid it. | 25  A. That was one I revised.  Everything in red was |
| Page 63 | Page 64 |

16 (Pages 61 to 64)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1 revised. | 1 just updated based on the -- any new offenders added |
| 2   Q. Okay. What is a non listed offender? | 2 with those offenses, so it could be one of those two |
| 3   A. That means they were convicted of an offense | 3 from January 23rd. Because you've shown me three so |
| 4 like, for example, child abuse and the victim was a | 4 far, and I know the one with the red on it was from |
| 5 minor and it was sexual in nature. It doesn't require | 5 January 25th. But this could be one of the ones from |
| 6 registration, but the judge ordered them to register. | 6 January 23rd. |
| 7     MS. DAVIDSON: Okay. And then let's call | 7   Q. So you're not sure? |
| 8 this one H, and that's 1712. | 8   A. Not positive, no. |
| 9     MARKED FOR IDENTIFICATION: | 9   Q. Okay. Do you know if you created this? |
| 10     DEPOSITION EXHIBIT H | 10   A. It looks like the other one, so -- but I can't |
| 11     11:51 a.m. | 11 say for sure. |
| 12 BY MS. DAVIDSON: | 12   Q. Okay. I think we can be done with Exhibit B. |
| 13   Q. Do you know what the date is on this one, Ms. | 13     So let's call this one I. |
| 14 Jegla? | 14     MARKED FOR IDENTIFICATION: |
| 15   A. Actually, January 25th, '23. | 15     DEPOSITION EXHIBIT I |
| 16   Q. I'm sorry? | 16     11:54 a.m. |
| 17   A. Of '23. | 17 BY MS. DAVIDSON: |
| 18   Q. Have you seen this before? | 18   Q. Have you seen this before? |
| 19   A. Wait a minute. I was talking about the revised | 19   A. Yes. |
| 20 one with the red in it. | 20   Q. What is this? |
| 21     What's this one? Sorry. | 21   A. It's a second report that I ran and also the |
| 22   Q. That's what I'm asking you, have you seen this? | 22 vendor had to run some of it. |
| 23     Do you know what it is? | 23   Q. Is this your signature? |
| 24   A. I don't know. Let me see. There was two from | 24   A. Yes. |
| 25 January 23rd, and they just had -- the second one was | 25   Q. Okay. And you just talked about the vendor ran |
| Page 65 | Page 66 |
| 1 some of it, and in paragraph five, you say that the | 1   A. So this one is based on the offender, not the |
| 2 vendor has more robust search tools than the on store | 2 amount of times they made these updates. So like, for |
| 3 database; is that right? | 3 example, the fourth one says 11,588 registrants, updated |
| 4   A. Yes. | 4 address, employer, volunteer or higher learning. So I |
| 5   Q. Okay. And we just talked about the vendor is | 5 don't -- I just don't have a way to look that up in an |
| 6 LexisNexis, right, same vendor? | 6 advanced search. There's no way to do that, to look up |
| 7   A. Yes. | 7 all those things. |
| 8   Q. And we talked about how you were communicating | 8   Q. Okay. I'll show you another -- okay. This is J. |
| 9 with Craig Roth on this, so is Craig Roth the vendor who | 9     MARKED FOR IDENTIFICATION: |
| 10 helped you with this affidavit? | 10     DEPOSITION EXHIBIT J |
| 11   A. Yes, and John Mobley. | 11     11:57 a.m. |
| 12   Q. What search tools does LexisNexis have that you | 12 BY MS. DAVIDSON: |
| 13 don't? | 13   Q. Have you seen this before? |
| 14   A. I don't know. | 14   A. Yes. |
| 15   Q. You knew that you needed their assistance to run | 15   Q. Okay. What's this? |
| 16 this report, though, right? | 16   A. Can you go down? |
| 17   A. I knew I couldn't do it, so I requested to see if | 17   Q. Yeah, I'm sorry. Probably have to look at it |
| 18 they could. | 18 backwards, right? |
| 19   Q. Okay. When you say that you knew that you | 19   A. Yeah. |
| 20 couldn't do it, what were you basing that on? | 20     Okay. I need to see that a little longer, |
| 21     What were you missing? | 21 right here what Craig said. |
| 22   A. It depends on the -- which one you're talking | 22   Q. Right now I'm asking what it is. |
| 23 about. | 23   A. I sent him what we needed, asked him if they |
| 24   Q. Well, you said that this came from the vendor, | 24 could do it, and then he asked me a question, and then I |
| 25 and this is the -- these are the numbers in Paragraph 5. | 25 didn't understand what he meant by comparisons. |
| Page 67 | Page 68 |

17 (Pages 65 to 68)

Sharon Jegla
4/27/2023

1   Q. Okay. So this is an e-mail between you and Craig
2   talking about the numbers that you need for Exhibit I,
3   right?
4   A. Yes, yes.
5   Q. All right. And you said that there was something
6   you wanted to look at closer?
7   A. Yeah, I mean, if you want more of what it was
8   talking about.
9       That, I know what that is.
10  Q. Go ahead.
11  A. I guess I'll wait for your next question to see
12  what I need to look at.
13  Q. It's okay. Actually, let me find it.
14      Okay. So this e-mail you've written to
15  Craig on -- I'll say the Bates number is 1690.
16      So you've written Craig and you said that
17  you've conducted some searches yourself, but that you
18  want to see if the numbers that he comes up with are
19  close; do you see that?
20  A. Yes.
21  Q. Great.
22      Tell me why you thought it was important to
23  compare your numbers with Craig's.
24  A. I didn't think -- I just wanted to see.
25  Q. Did you think they might not match?

Page 69

1   A. No.
2   Q. Have you ever had a situation where you and the
3   vendor run the same searches, but you have different
4   numbers?
5   A. No.
6   Q. Okay. And I'm noticing that, when you write
7   Craig, you're not saying that you want to see if you
8   have the same numbers, you want to see if your numbers
9   are close.
10      So when you're writing this, what, in your
11  mind, is close?
12  A. Like within -- I don't know.
13  Q. Could it be --
14  A. Ten.
15  Q. Ten.
16      And in this particular instance, did you get
17  a chance to talk with Craig and compare numbers?
18  A. Yes.
19  Q. And were they close?
20  A. Yes.
21  Q. How close were they?
22  A. I don't recall.
23  Q. Okay. And I think you talked about this a little
24  bit already, but he wrote you back and asks what numbers
25  you're using for the comparison, right here; do you see

Page 70

1   that?
2   A. Yes.
3   Q. Okay. And you -- as you know, you write him back
4   and you say you don't know what comparison date means
5   and you ask him to call you; do you see that?
6   A. Yes.
7   Q. And did he call you?
8   A. Yes.
9   Q. Did you learn what he meant by comparison date?
10  A. Yes, but I don't remember what the outcome of was
11  of that. John Mobley was also on the call.
12  Q. Okay. But based on what you learned during the
13  call, were you able to answer his question?
14  A. Yes.
15  Q. Do you recall what the answer was?
16  A. No.
17  Q. Do you remember if you talked about anything
18  else?
19  A. We just talked about the whole report.
20  Q. What did you discuss about the report?
21  A. All the numbers and how he was running it.
22  Q. What did you learn about how he was running it?
23  A. I don't recall.
24  Q. Okay. So you mentioned that you ran some of
25  these numbers yourself; can you tell me what parts you

Page 71

1   ran yourself?
2       I'll scroll up for you here.
3   A. Probably Number 4.
4   Q. And then Craig or John ran Number 5?
5   A. Let me see.
6   Q. Did Number 5 say that --
7   A. Yes. Yeah, so I think the vendor ran 5 and
8   after.
9   Q. Five and after?
10  A. Yes.
11      MS. DAVIDSON: Okay. Call this K.
12      MARKED FOR IDENTIFICATION:
13      DEPOSITION EXHIBIT K
14      12:03 p.m.
15  BY MS. DAVIDSON:
16  Q. Have you seen this before?
17  A. Yes.
18  Q. What is that?
19  A. That's what the vendor provided, was its totals.
20  Q. So this is from the vendor to you?
21  A. Yes.
22  Q. So this was prepared by either Craig or John?
23  A. Yes.
24  Q. Okay. And I want to draw your attention to
25  Paragraph 7. It looks like the vendor has written:

Page 72

18 (Pages 69 to 72)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1      Some offenders had multiple address changes | 1      A. Yes, that's how I took it. |
| 2   as broken out above. | 2      Q. Again, I'll ask you, understanding that you were |
| 3      Do you see that? | 3   not the one who ran this, but do you know whether these |
| 4      A. Yes. | 4   number reflect people or occurrences? |
| 5      Q. And the breakouts appear to include these | 5      A. No. |
| 6   categories in this box above it, home, homeless, | 6      Q. And then do you know, using in -- no, not |
| 7   incarcerated; do you see that? | 7   incarcerated -- using homeless, for example, if someone |
| 8      A. Uh-huh. | 8   had multiple address changes and they were homeless each |
| 9      Q. Is that your understanding of what he meant by | 9   time they changed their address, do you know if that |
| 10   breakouts? | 10   would be counted once or for each time they changed |
| 11      A. So between that year time frame, they had more | 11   their address? |
| 12   than one address change, and those were the breakdown of | 12      A. I don't know. |
| 13   the address changes. | 13      Q. Okay. Let's go back to I. Would you agree -- |
| 14      Q. Do you know whether this breakdown is just for | 14   and I'll give you time to review it if you need -- would |
| 15   people who had multiple address changes or is it a | 15   you agree that, in your affidavit, you don't state that |
| 16   breakdown of all address changes? | 16   some offenders had multiple address changes? |
| 17      A. I don't know. | 17      A. Are you talking about just the part I ran or -- |
| 18      Q. Can you tell by this breakout chart how many | 18      Q. I'm saying, in general, do you believe that this |
| 19   people had multiple address changes? | 19   affidavit advises us that anybody might have multiple |
| 20      A. No. Total, you mean? | 20   address changes? |
| 21      Q. I'm sorry. | 21      A. I don't see anything. |
| 22      A. Total? No. | 22      Q. Okay. All right. Have you seen this before? |
| 23      Q. Okay. Did you understand his statement to mean | 23      A. Yes. |
| 24   that some people might be reflected in more than one | 24      MS. DAVIDSON: We'll call this L. |
| 25   breakout category? | 25      MARKED FOR IDENTIFICATION: |
| Page 73 | Page 74 |
| 1      DEPOSITION EXHIBIT L | 1      Q. Does that include only Tier 1 people who reported |
| 2      12:08 p.m. | 2   only once? |
| 3   BY MS. DAVIDSON: | 3      A. Say that again, please. |
| 4      Q. This looks like it's another e-mail to Craig that | 4      Q. Sure. |
| 5   appears on the same search; is that right? | 5      Does that request only include a Tier 1 |
| 6      A. Yes. | 6   person who only reported once? |
| 7      Q. Okay. And you have written that you need to | 7      A. Yes. |
| 8   change something with the report, right? | 8      Q. Yes? |
| 9      A. Let me look. | 9      A. Uh-huh. |
| 10      Q. It might not be here. Let me see if it's lower | 10      Q. Do you know if a Tier 1 person who reported |
| 11   down. | 11   twice, being once for verification and once to update |
| 12      A. Okay. | 12   information, is included in this number? |
| 13      Q. Right here. Okay. Do you see it? | 13      A. No, they're not. |
| 14      A. Yes, because I was doing it like the other | 14      Q. Could it be, then, that the numbers you got back |
| 15   report, without out of state, but then I realized we | 15   only included, then, the Tier 1 registrants who reported |
| 16   have to have that out of state because we're talking | 16   no more than once? |
| 17   about address changes, and they come back and they move | 17      A. Yes, they verified. The reported means verified. |
| 18   out. | 18      Q. The term report does not include update then? |
| 19      Q. Okay. So -- okay. So that's the reason for the | 19      A. Uh-huh. |
| 20   change in report there? | 20      Q. Okay. So do you ask for something different -- |
| 21      A. Yeah. | 21      MR. JAMISON: Just so the record is clear, |
| 22      Q. Okay. It appears that you asked for the total | 22   Sharon, you said uh-huh or uh-uh. You need to answer |
| 23   number of Tier 1 registrants that reported one time | 23   affirmatively or negatively there. |
| 24   during the year; do you see that? | 24      THE WITNESS: Sorry. No, reported does not |
| 25      A. Yes. | 25   include updates. |
| Page 75 | Page 76 |

19 (Pages 73 to 76)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1  BY MS. DAVIDSON: | 1  **A.** Yes. |
| 2  **Q.** Okay. | 2  **Q.** And then there isn't a category for mailing on |
| 3  **A.** It's just verified. | 3  this other report; do you see that? |
| 4  **Q.** Okay. When you ask for updates, do you say, for | 4  **A.** Yes. |
| 5  example, report and update, if you wanted to get the | 5  **Q.** Do you know why? |
| 6  updates? | 6  **A.** No. |
| 7  **A.** So that wasn't part of this report. I don't know | 7  **Q.** Let's go back to Exhibit C. Have a look at this |
| 8  how you would even run something like that to get every | 8  and let me know when you're ready to talk. |
| 9  time a person updated. | 9  **A.** Okay. |
| 10  MS. DAVIDSON: Okay. Call this M. | 10  **Q.** How many people are 15-year residents? |
| 11  MARKED FOR IDENTIFICATION: | 11  **A.** Three thousand forty-five. |
| 12  DEPOSITION EXHIBIT M | 12  **Q.** How about 25 years? |
| 13  12:12 p.m. | 13  **A.** Eight thousand six hundred forty-five. |
| 14  BY MS. DAVIDSON: | 14  **Q.** And life? |
| 15  **Q.** Have you seen this? | 15  **A.** Thirty-two thousand three hundred sixty-eight. |
| 16  **A.** That looks like the same thing from before, the | 16  **Q.** Do you know if the Tier 1 registrants are the |
| 17  report that Craig gave us. | 17  15-year registrants who report once a year? |
| 18  **Q.** Yep. | 18  **A.** Yes. |
| 19  And, Eric, for you, this starts at 1708, and | 19  **Q.** And Tier 2 is 25 years, reporting twice a year? |
| 20  the other one starts at 1700. | 20  **A.** Yes. |
| 21  So, Medina, for you, we'll call this one | 21  **Q.** And then Tier 3 is life, reporting four times a |
| 22  Exhibit M. | 22  year? |
| 23  If you look, Ms. Jegla, Exhibit K, do you | 23  **A.** Yes. |
| 24  see, when we look at this breakout box that we talked | 24  **Q.** Going back to Exhibit I, your Paragraph 5 appears |
| 25  about, there's a category for mailing? | 25  to reflect going how many people are reporting and how often; |
| Page 77 | Page 78 |
| 1  is that an accurate description? | 1  March 24th, 2022 and March 10th, 2023; do you see it? |
| 2  **A.** It includes what? | 2  **A.** Yep. |
| 3  **Q.** Is it how many people are reporting and how | 3  **Q.** Okay. So how many people do you say -- how many |
| 4  often? | 4  Tier 1 registrants do you say register once a year? |
| 5  **A.** Yes. | 5  **A.** So this isn't how many registered -- I mean, are |
| 6  **Q.** How many Tier 1 registrants did you say | 6  required to. This is how many did. |
| 7  registered once a year? | 7  **Q.** Okay. |
| 8  **A.** In the other report? | 8  **A.** So it's different than that other number. |
| 9  **Q.** No, in your -- | 9  **Q.** Okay. |
| 10  **A.** One thousand eight hundred ninety-two. | 10  **A.** But it's 1,907. |
| 11  **Q.** And Tier 2? | 11  **Q.** And how about Tier 2, twice a year? |
| 12  **A.** Four thousand eight hundred thirty-seven. | 12  **A.** Four thousand nine hundred sixty-four. |
| 13  **Q.** And -- | 13  **Q.** Tier 3, four times a year? |
| 14  MR. JAMISON: I'm going to object here just | 14  **A.** Twelve thousand six hundred thirty-six. |
| 15  because I think there are two date ranges. So I just | 15  **Q.** Thank you? |
| 16  want to be clear for the record which date range you're | 16  And your declaration states that there are |
| 17  referring to, so if you wouldn't mind scrolling up so we | 17  44,110 registrants on the public and non public |
| 18  have that in the record. | 18  registry, right? |
| 19  BY MS. DAVIDSON: | 19  **A.** Yes. |
| 20  **Q.** March 24th, 2021 to March 23rd, 2022. And then | 20  **Q.** What identifier did you use to get this count? |
| 21  let's make sure this is -- so this is as of January 4, | 21  **A.** I can't say for sure. |
| 22  2023. | 22  **Q.** What parameters did you use? |
| 23  So thank you for catching that, Eric. | 23  **A.** I can't say for sure. |
| 24  Here we go. | 24  **Q.** Okay. You don't know how you got this 44,000 |
| 25  So if we look at Paragraph 6, the date range | 25  number? |
| Page 79 | Page 80 |

20  (Pages 77 to 80)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1  **A.** No, I have to see if I can -- I might have saved | 1  MS. DAVIDSON:  And this is N. |
| 2  search. | 2  MARKED FOR IDENTIFICATION: |
| 3  **Q.** Do you know whether this count includes | 3  DEPOSITION EXHIBIT N |
| 4  out-of-state registrants? | 4  12:20 p.m. |
| 5  **A.** It does not. | 5  BY MS. DAVIDSON: |
| 6  **Q.** Do you know whether it includes juveniles? | 6  **Q.** Okay.  And what are the statistics showing? |
| 7  **A.** Yes, it does. | 7  **A.** What the header says, the total active offenders, |
| 8  **Q.** Going back to 6.  It looks like you're telling me | 8  total incarcerated, required to verify, total on a |
| 9  that only half of that 44,000 number met their reporting | 9  public site, compliant and non compliant. |
| 10  requirements during the year; is that right? | 10  MR. JAMISON:  Does this have a Bates number |
| 11  **A.** That's what it looks like, yes.  But if it | 11  on it? |
| 12  included incarcerated, then they don't have to verify. | 12  MS. DAVIDSON:  Yes.  I'll get it for you, |
| 13  **Q.** Do you know if it included incarcerated? | 13  1564. |
| 14  **A.** Yes, it did. | 14  BY MS. DAVIDSON: |
| 15  **Q.** Even including incarcerated, does less than half | 15  **Q.** Okay.  So going back to your Exhibit I, your |
| 16  seem accurate to you? | 16  Paragraph 5 is for the time period March 2021 to March |
| 17  MR. JAMISON:  Objection, vague. | 17  2022, right? |
| 18  BY MS. DAVIDSON: | 18  **A.** Yes. |
| 19  **Q.** You can answer. | 19  **Q.** And if you look at Exhibit N and we go to that |
| 20  **A.** I don't know. | 20  time frame -- you see it? |
| 21  **Q.** Have you seen this before? | 21  **A.** What was the time frame again? |
| 22  **A.** Yes. | 22  **Q.** March of 2021. |
| 23  **Q.** What is that? | 23  **A.** Okay. |
| 24  **A.** It's statistics, just those totals there every | 24  **Q.** So you agree we're on the correct time frame |
| 25  month. | 25  here? |
| Page 81 | Page 82 |

| | |
|---|---|
| 1  **A.** Yes. | 1  mathematician. |
| 2  **Q.** According to Exhibit N, the total number of | 2  BY MS. DAVIDSON: |
| 3  people required to verify was 35,101, correct? | 3  **Q.** Approximately half? |
| 4  In March?  Yes. | 4  **A.** I don't know. |
| 5  **Q.** So given that, would you agree that your | 5  **Q.** Okay.  Can you tell me what the compliance rate |
| 6  declaration shows that less than half of those people | 6  is for March 2021 on Exhibit N? |
| 7  verified on the schedule they were supposed to? | 7  **A.** Eighty-five percent. |
| 8  **A.** Not really, because they could have -- like | 8  **Q.** If you look at all the listings for the year |
| 9  Tier 3 has to verify four times a year, but one of those | 9  2021, does the compliance rate ever fall below half? |
| 10  times he might have been in jail, so he's still | 10  **A.** No. |
| 11  compliant and did what he is supposed to.  He did the | 11  **Q.** Do you know why the numbers might look different? |
| 12  three.  Or he might have been out of state some of the | 12  **A.** Well, the one is just verifications, and this one |
| 13  time.  So it's -- if they didn't verify all four times, | 13  is all violations. |
| 14  that doesn't necessarily mean they were -- failed to | 14  **Q.** Do you know who created this? |
| 15  verify. | 15  **A.** No. |
| 16  **Q.** Okay.  What are other ways that somebody could be | 16  **Q.** Do you know how it's created? |
| 17  non compliant? | 17  **A.** Yes. |
| 18  **A.** If they don't have a valid I.D.; if they owe a | 18  **Q.** Can you tell me how it's created? |
| 19  fee and refuse to pay the fee; they have not updated | 19  **A.** I mean, I'm the one that updates it, but I don't |
| 20  their address; they fail to verify.  There are other | 20  know who created it in the first place. |
| 21  ones.  Those are the main ones that I know. | 21  **Q.** So what is the process for updating it? |
| 22  **Q.** Would you agree that your numbers in Paragraph 5 | 22  **A.** Run the totals in the reports in our database and |
| 23  reflect a compliance rate of about 52 percent? | 23  then enter it into here. |
| 24  **A.** I don't know. | 24  **Q.** Go back to I.  Okay. |
| 25  MR. JAMISON:  Objection.  She's not a | 25  Here in Paragraph 4, do you see where you |
| Page 83 | Page 84 |

21 (Pages 81 to 84)

Tri-County Court Reporters
248-608-9250

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1  report that 8,237 registrants are required to report | 1  do they not need to register their identifiers? |

1  report that 8,237 registrants are required to report
2  e-mail/Internet identifiers?
3      A. Yes.
4      Q. How did you determine that?
5      A. They have an offense committed -- let's see --
6  offense committed date -- just a minute.
7      Q. Take your time.
8      A. Okay. So they have an offense committed date
9  after July 1st, 2011.
10     Q. Is that the only search parameter that you ran?
11     A. I ran the committed date -- I can't say for sure.
12  And the status is, you know --
13     Q. Same ones we talked about before?
14     A. Yeah.
15     Q. Anything additional?
16     A. No.
17     Q. Okay. When you were setting the 7/1/2011
18  parameter to search, did you look at the conviction date
19  or the offense date?
20     A. Offense date.
21     Q. Do you know if a person with an offense date
22  before 7/1/2011, but a conviction date after 7/1/2011,
23  has to report Internet identifiers?
24     A. No.
25     Q. If a person has two convictions after 7/1/2011,

Page 85

1  do they not need to register their identifiers?
2      A. Our system bases it on committed date, so it
3  would depend on when they -- the conviction was
4  committed -- or when the offense was committed. Because
5  you said two convictions after 7/1 of '11, but it would
6  depend on when they were committed.
7      Q. Right. So what I'm trying to get at is is, in
8  these parentheses, you've written no subsequent
9  registrable offense, so I'm just trying to figure out
10  why you wrote that.
11     A. No subsequent offense after that, that's the
12  latest -- latest offense committed date on the record,
13  so there's nothing after that. Because someone could
14  have something from 2000 and then have a 2013, so that
15  would not be included.
16     Q. If I were to tell you that our analysis was that
17  there were less than 7,000 registrants who have reported
18  e-mail or Internet identifiers, would that surprise you?
19     A. No.
20     Q. Why wouldn't it surprise you?
21     A. I don't know how you got your numbers.
22     Q. Okay. Going to Paragraph 6. Okay. So you state
23  there were 11,303 registrants who updated temporary
24  residences and dates of travel, e-mail, Internet
25  identifiers, vehicle information and telephone numbers,

Page 86

1  that can all be done by mail, right?
2      A. Yes.
3      Q. Do you search to see how many of the updates were
4  actually done by mail?
5      A. There's no way to search that.
6      Q. So there's no way to break it down either?
7      A. No.
8      Q. Okay. Go back to M. Okay. So your vendor has
9  this description, Consolidated List of Unique Offenders;
10  do you see that?
11     A. Yes.
12     Q. Is that different from the total number of times
13  registrants reported this information?
14     A. Yes.
15     Q. Okay. What's the difference?
16     A. This is just based on offenders that -- so if an
17  offender changed his vehicle twice that year, it would
18  just count as one.
19     Q. Okay, thank you.
20          And in Paragraph 2 on Exhibit I, you say
21  this is based on your personal knowledge, right?
22     A. Right.
23     Q. And Paragraphs 5 and 6 involve reports on data
24  provided by your vendor?
25     A. Yes.

Page 87

1      Q. These are not numbers you ran yourself, right?
2      A. Five is, I think, right --
3      Q. I think --
4      A. -- or was it four?
5      Q. Do you want me -- let me scroll down.
6      A. It's four, yeah, four, but the vendor ran five
7  and six.
8      Q. Okay. Did you observe the vendor running a
9  search?
10     A. No.
11     Q. Did you just put in your affidavit what the
12  vendor reported to you?
13     A. Yes.
14     Q. Okay. Okay. I want to move on to out-of-state
15  offenses. Do you know if there are people who are
16  required to register if they have a conviction from
17  another state and they come here?
18     A. Can you repeat that?
19     Q. Sure. Do you know if there are people who are
20  required to register if they have a conviction from
21  another state and then they move to Michigan?
22     A. Yes.
23     Q. Okay. Do you have any responsibilities when it
24  comes to someone coming to Michigan who has an
25  out-of-state conviction?

Page 88

22 (Pages 85 to 88)

Sharon Jegla
4/27/2023

```
 1     A. Do I have any responsibilities?
 2     Q. Yes.
 3     A. Yes.
 4     Q. What are your responsibilities?
 5     A. If their Crime Code is not in our system, then I
 6  contact the vendor to have it added.
 7     Q. Anything else?
 8     A. So if it's -- also I -- if it's not tiered, then
 9  I would see if anything else is needed, like I said,
10  police report or conviction documents, and then I would
11  send to legal to do a review to figure out what tier
12  that they will be in.
13     Q. Anything else?
14     A. Not that I can think of.
15     Q. Okay. Let's start by walking through the steps
16  you take when someone comes to Michigan with an
17  out-of-state conviction.
18     A. Uh-huh.
19     Q. First, how do you learn that the person moved to
20  Michigan?
21     A. There's a SORNA exchange portal and all the
22  states use -- I don't know if all the states, but like
23  for our system, when someone moves to another state, it
24  sends a notice to the SORNA exchange portal, and that's
25  what the other states do. So the technicians are the
```

Page 89

```
 1  ones that handle those, and they go into the SORNA
 2  exchange portal and find offenders that are moving here.
 3     Q. All right. You said the technicians do that?
 4     A. Yes.
 5     Q. And do they report that to you?
 6     A. No, I don't -- only if they need -- the Crime
 7  Code is not tiered.
 8     Q. Okay. So if they have questions, it gets
 9  escalated to you; is that right?
10     A. Actually, it goes to one of the other analysts
11  first.
12     Q. Who does it go to first?
13     A. It is based on alphabet. The techs are paired up
14  with an analyst.
15     Q. Okay. So your techs and analysts, sounds like
16  they work in teams of two based on the alphabet?
17     A. Yes.
18     Q. All right. Okay. And then when would it get to
19  you?
20     A. If it was not tiered in the -- our database.
21     Q. Have you ever had to do what the techs and the
22  analysts do before it gets to you?
23     A. Do you mean has that ever been my job?
24     Q. Yeah, are you familiar with the process?
25     A. Not that SORNA exchange portal. I mean, I did
```

Page 90

```
 1  that before, but I'm not sure how -- how they do that
 2  now. I just know that they get notices, and then they
 3  have to -- if -- when the person actually checks in,
 4  they have to let the other state know through that
 5  portal.
 6     Q. Okay. You mentioned that sometimes you need some
 7  additional documents to determine whether someone should
 8  register and what tier they should be; is that right?
 9     A. Yes.
10     Q. And I believe you mentioned you need the -- did
11  you say the pre sentence report?
12     A. No, not for that.
13     Q. Okay. What do you need to help determine tiers?
14     A. When we send it to legal, we just want to have
15  all the information to give them, so usually conviction
16  documents and police report.
17     Q. Do you use judgment of sentence ever?
18     A. Yes.
19     Q. You said police report?
20     A. Yep.
21     Q. And you said you don't use the PSIs for this?
22     A. I have seen that before, if the other state
23  happens to send it over.
24     Q. How do those documents help with the
25  determination?
```

Page 91

```
 1     A. I don't know. That's what we send to legal.
 2     Q. So you don't do anything with the documents?
 3     A. No.
 4     Q. You just forward them?
 5     A. I mean, I right write up a summary.
 6     Q. Anything else?
 7     A. I can't think of anything.
 8     Q. Okay. So it sounds like you get these documents,
 9  you summarize them and then you forward them to legal; is
10  that right?
11     A. Yes.
12       MS. DAVIDSON: Okay. Let's call this O.
13       MARKED FOR IDENTIFICATION:
14       DEPOSITION EXHIBIT O
15       12:40 p.m.
16  BY MS. DAVIDSON:
17     Q. Have you ever seen this?
18     A. Yes.
19     Q. What's this?
20     A. A flow chart that we use for offenders moving
21  into Michigan, how to tier them.
22     Q. Do you know who created this?
23     A. TJ --
24     Q. I'm sorry?
25     A. TJ created the flow chart, him and I worked
```

Page 92

23 (Pages 89 to 92)

Sharon Jegla
4/27/2023

1    together on it.
2        Q. So you helped create it?
3        A. Yes.
4        Q. What did you say TJ's last name is?
5        A. Wrinkle, W-R-I-N-K-L-E.
6        Q. Who is that?
7        A. He was an analyst, and he's gone to work for
8    another section.
9        Q. When did you create this?
10       A. I don't remember.
11       Q. Would you say within the last five years?
12       A. Last year, I believe, yeah.
13       Q. Why did you create this?
14       A. For the techs to -- so they know what to look for
15   before sending it on.
16       Q. Did anything prompt that?
17       A. I don't recall.
18       Q. Do you ever use these flow charts?
19       A. I have not.
20       Q. Okay.  At the bottom, it says:
21           If the Crime Code is not listed or tiered in
22   the PACC Code Table, consult with an analyst before
23   moving to the next step.
24           Do you see that?
25       A. Oh, down at the bottom, yes.

Page 93

1        Q. When it refers to analyst, is that you or is that
2    the analyst that the technician is partnered with?
3        A. The one they're partnered with.
4        Q. Does anything make its way to you as a result of
5    this flow chart?
6        A. Yes.
7        Q. What kinds of things make their way to you?
8        A. If the Crime Code is not listed in our database
9    or it needs to get sent to legal for review.
10       Q. Can you see this whole flow chart?
11           You can?
12       A. Yeah.
13       Q. Can you walk me through it?
14       A. Yes.  So first, when it says comparable to a
15   Michigan adult conviction, that means it's already
16   tiered in our database.  So then if you go to yes, then
17   we do check if they discharged on or after 10/1/95.
18   Because if they discharged before, well -- so say on or
19   after, yes, it did, after the law took effect, and then
20   is it a Tier 3, yes, then they just registered as a
21   Tier 3 in Michigan.
22           So then the other thing is if it's
23   comparable to a Michigan conviction and then they
24   discharged before 10/1/95, or say no, then we check with
25   the other state to see if they require registration.  If

Page 94

1    they don't, then neither of us require registration, so
2    this person doesn't have to register.  If they do
3    require registration, then we're going to register them
4    based on all that state's requirements.
5            So then if we -- it is comparable, yes, and
6    then they did discharge on or after 10/1/95 and it is
7    not a Tier 3, then we check with the other state to find
8    out how long they require registration, do they require
9    registration at all.  If they do, then we're going to
10   register them based on our requirements, but we're going
11   to use the other state's duration if it's longer.  And
12   if the other state does not require registration, we'll
13   just register them based on the Michigan corresponding
14   tier of requirements.  So like if they're a Tier 1 and
15   the other state doesn't require registration, that's
16   what they're going to be, Tier 1, 15 years.
17       Q. Thank you.
18       A. So then if it's not comparable to a Michigan
19   conviction, say, another state registers for child abuse
20   and we don't, then it would say no, and then we check if
21   the other state requires registration.  And if they
22   don't, then they don't have to register.  If they do
23   registration, then we base it on their requirements.
24       Q. What's special conditions?
25       A. So when you pick a tier in the database, if the

Page 95

1    other state doesn't use tiering, we're just going to
2    pick special conditions.  That's just an extra thing in
3    there.  That's what that is used for.
4        Q. What is the practical effect of choosing special
5    conditions, what does that mean for the person who is
6    listed?
7        A. They don't have a tier.
8        Q. Okay.  So just to make sure that I understand
9    what you just walked me through correctly, if an
10   out-of-state conviction is not comparable to a Michigan
11   registrable offense, then the person still has to
12   register if the convicting state requires registration;
13   is that right?
14       A. Yes.
15       Q. And if the convicting state doesn't require
16   registration, the person might still have to register in
17   Michigan if the offense is considered comparable to a
18   Michigan registrable offense?
19       A. Yes.
20       Q. All right.  Would you agree that if a person was
21   discharged before 10/1/1995 for a conviction in the
22   state of Michigan, that person wouldn't have to
23   register?
24       A. Yes.
25       Q. If the person came to Michigan with an

Page 96

24  (Pages 93 to 96)

Sharon Jegla
4/27/2023

| | | |
|---|---|---|
| 1 | out-of-state conviction and was discharged before | |

1  out-of-state conviction and was discharged before
2  10/1/1995, that person would still have to register here
3  if their convicting state requires registration; is that
4  right?
5      A. Yes.
6      Q. If the offense is comparable to a Michigan Tier 1
7  or Tier 2 offense, is it correct that the registration
8  duration will be whichever is longer between the
9  Michigan requirements and the convicting state's
10  requirements?
11      A. Yes.
12      Q. Thank you.
13          So the second page of this has another flow
14  chart.  Have you ever seen this?
15      A. Yes.
16      Q. What's this?
17      A. It's the same type of thing, but it's for
18  juvenile offenders.  The other one was for adult.
19      Q. Okay.  Did you make this one too?
20      A. TJ and I.
21      Q. Okay.  You and TJ together?
22      A. Yes.
23      Q. Did anything prompt the creation of this
24  document?
25      A. Just to help the techs, walk them through.

Page 97

1      Q. Can you walk me through this one too, please?
2      A. Yes.  Okay.  The first one, if it's comparable to
3  juvenile adjudication just like the other one, yes, it
4  is, then all of the following, do they apply, if they're
5  14 or older at the time of the offense, the offense is a
6  Tier 3 and it discharged on or after 10/1/95.  If the
7  answer is yes, then they will register here as a Tier 3.
8  If the answer is no, then we need to check if the
9  adjudicating state requires registration.  And if they
10  do not, then they have to register here.  But if they
11  do, then we're going to register them based on the
12  convicting state's requirements.  That one is a simple
13  one because they only have to register for Tier 3s.
14      Q. Thank you.
15          And, again, I just want to make sure I
16  understand what you told me correctly.
17          So if an out-of-state offense is not
18  comparable to a Michigan registrable offense, does the
19  person still have to register if the adjudicating state
20  requires registration?
21      A. Yes.
22      Q. Okay.  Looks like there are a couple of options,
23  if it's comparable.  If a person was under 14, that
24  person still has to register if the adjudicating state
25  requires registration, right?

Page 98

1      A. Right.
2      Q. Would you agree that a juvenile who was under the
3  age of 14 would not have to register if the offense was
4  adjudicated in Michigan?
5      A. Yes.
6      Q. Okay.  If the offense was not a Tier 3 offense,
7  the person still has to register if the adjudicating
8  state requires registration; is that right?
9      A. Yeah.
10      Q. Would you agree that a juvenile who was
11  adjudicated as a Tier 1 or a Tier 2 offense in Michigan
12  would not have to register?
13      A. Yes.
14      Q. Okay.  If the person was discharged before
15  10/1/1995, they still have to register if the
16  adjudicating state requires registration, right?
17      A. Right.
18      Q. And would you agree that if a person was
19  discharged before 10/1/1995 for an adjudication that
20  occurred in Michigan, they wouldn't have to register?
21      A. Yes.
22      Q. Thank you.
23          MR. JAMISON:  Syeda, is there a good point
24  to take a break here?
25          MS. DAVIDSON:  We can take one right now if

Page 99

1  you'd like.  How long?
2          MR. JAMISON:  Do you know how much longer
3  you're going to go?  Well, we can go off the record.
4          MS. DAVIDSON:  Yeah, we can go off the
5  record.
6          (Off the record at 12:51 p.m.)
7          (Back on the record at 1:16 p.m.)
8  BY MS. DAVIDSON:
9      Q. Ms. Jegla, have you ever seen this before?
10      A. Yes.
11          MS. DAVIDSON:  Okay.  We're going to call
12  this Exhibit P.
13          MARKED FOR IDENTIFICATION:
14          DEPOSITION EXHIBIT P
15          1:16 p.m.
16  BY MS. DAVIDSON:
17      Q. Tell me what this is.
18      A. This is the list of all the Crime Codes that are
19  in our database, and then it lists their -- what state
20  and then the statute and the description and sometimes
21  the tier.
22      Q. Do you know when it was created?
23      A. No.
24      Q. Do you know who created it?
25      A. I don't know who created it.

Page 100

25 (Pages 97 to 100)

Sharon Jegla
4/27/2023

---

1    Q. Do you know why it was created?
2    A. Actually, it was around 2011.
3         It was created because we started -- we went
4    to tiering, and then we -- someone created that for --
5    list all the tiers, because we didn't have it before
6    we did tiering.
7    Q. Okay. Do you know how it was decided which
8    offenses were substantially similar?
9    A. No, I don't.
10   Q. Do you know who might know?
11   A. The manager was Karen Johnson at that time.
12   Q. Does Karen Johnson still work for the MSP?
13   A. Yes.
14   Q. Okay. Do you see there are tabs at the bottom
15   that show additional sheets?
16   A. Yes.
17   Q. And if you were to look at these sheets, would
18   you agree that they show additional or different
19   out-of-state offenses?
20   A. Looks like Sheet 3 was empty.
21   Q. Yeah, but the other ones, do they show additional
22   out-of-state offenses?
23   A. I don't know what Sheet 2 is. But those Crime
24   Codes, I don't know what that is for.
25   Q. Okay.

Page 101

---

1    A. But the second tab added after 7/16/21, that's
2    around the time we got our new system, so I don't know
3    if that's -- I think -- yeah, that has to do with that.
4    Because we sent them this, and then I added that tab
5    there to keep track of ones added after that date.
6    Q. When you say you sent them this, who is them?
7    A. The vendor.
8    Q. So you added these in July of 2021 because you
9    went to a new system?
10   A. I think that's the reason, yes.
11   Q. How often do you otherwise see this table change?
12   A. Not real often.
13   Q. Have you ever seen it change aside from your
14   addition in 2021?
15   A. No. That tells after July 2021, that's what
16   changes there are.
17   Q. Okay. Do you ever use this table?
18   A. Yes.
19   Q. What do you use it for?
20   A. To confirm the tier, to look up the statute and
21   then to see what the tier is. This also helps if it's
22   not tiering in our system and we don't know why, we can
23   look at this because then it might say we need a victim
24   age, so then we know that's what we need.
25   Q. Does anyone else on your team use this?

Page 102

---

1    A. Yes.
2    Q. Who else uses it?
3    A. The techs and the analysts.
4    Q. Do you know if this table was used to program the
5    MSOR database?
6    A. I know we sent this to them, to the programmers.
7    Q. But you don't know what they did with it?
8    A. No.
9    Q. If a technician enters an out-of-state offense
10   that's on this chart, does the MSOR database
11   automatically assign a tier and duration?
12   A. If there is one assigned in this spreadsheet,
13   yes.
14   Q. Okay. So it should populate according to what's
15   on the spreadsheet?
16   A. Yes.
17   Q. Are there circumstances where that wouldn't
18   happen?
19   A. Only if there's no tier.
20   Q. Okay. So what happens when a technician enters
21   an offense and the tier level is blank on this chart?
22   A. That's when they would send to an analyst, find
23   out what they need.
24   Q. What happens when a technician enters an offense
25   where the published field is blank on this chart?

Page 103

---

1    A. Then whatever it is determined what tier they
2    are, then -- so if it's a Tier 2 or Tier 3, those are
3    all published, unless it's a juvenile. And then Tier 1,
4    it depends what Tier 1 offense it's comparable to.
5    Q. I would like to walk through an example. So
6    right here, do you see where my cursor is?
7    A. Yes.
8    Q. AK 11.66.130 promoting prostitution in the third
9    degree; do you see that?
10   A. Yes.
11   Q. Can you walk me through what would happen if a
12   technician entered this event?
13   A. Yeah, it wouldn't tier, so they would just e-mail
14   the analyst and say that the tier's unknown. Yeah.
15   They -- that means -- well, what the analyst would do is
16   probably look up that statute and then send it to me.
17   They figure what they think the tier is, and then
18   they -- when they read the statute, if it's -- sometimes
19   it can be more than one thing in the statute. Like it
20   could be multiple different offenses within one statute,
21   sometimes it's just one thing and it's comparable to one
22   of our Michigan offenses. So if that's the case, if
23   it's -- looks like it's comparable to one of ours, then
24   we don't need, really, to get a police report or any
25   other stuff, and we can just send it to legal to give us

Page 104

---

26 (Pages 101 to 104)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1 | the tier.  But if it's -- like it says, it could be |
| 2 | penetration or contact, then we can't determine what the |
| 3 | tier would be without additional information. |
| 4 | Q.  Okay.  So you said that the publication status is |
| 5 | determined by what you determine for the tier? |
| 6 | A.  Yeah. |
| 7 | Q.  Are there instances where you need additional |
| 8 | information to assign tier? |
| 9 | A.  Yes. |
| 10 | Q.  What information would be helpful for that? |
| 11 | A.  The police report and conviction documents. |
| 12 | Q.  How do you get that information? |
| 13 | A.  Well, I don't do it, but sometimes the other |
| 14 | state has the information, sometimes they have to go |
| 15 | straight to the court or arresting agency. |
| 16 | Q.  Okay.  So, again, I just want to make sure we're |
| 17 | on the same page and that I'm understanding what you |
| 18 | told me. |
| 19 | A.  Uh-huh. |
| 20 | Q.  So where the tier level is listed on this chart, |
| 21 | the database automatically codes the person as that |
| 22 | tier; is that right? |
| 23 | A.  Yes. |
| 24 | Q.  Where the tier level is not listed, further |
| 25 | information might be needed to make a determination |

Page 105

| | |
|---|---|
| 1 | about tier, right? |
| 2 | A.  Yes. |
| 3 | Q.  Do you know if that requires an individualized |
| 4 | decision? |
| 5 | A.  What do you mean? |
| 6 | Q.  Like is it case by case? |
| 7 | A.  Yes. |
| 8 | Q.  Where the publication column has an entry, the |
| 9 | system would automatically code whether that person has |
| 10 | a publishable conviction, right? |
| 11 | A.  Yes, if there's a tier there, yep. |
| 12 | Q.  Okay.  And if the publication column is a blank, |
| 13 | then further information is needed to make a |
| 14 | determination about publication, but it's tied to tier? |
| 15 | A.  Yes. |
| 16 | Q.  Okay. |
| 17 | MR. JAMISON:  Lisa, I can't see the |
| 18 | publication column.  I don't know if you -- |
| 19 | MS. DAVIDSON:  Yeah, let me scoot this over. |
| 20 | It's way over here. |
| 21 | MR. JAMISON:  Thank you. |
| 22 | MS. DAVIDSON:  You see it? |
| 23 | MR. JAMISON:  Yep. |
| 24 | BY MS. DAVIDSON: |
| 25 | Q.  All right.  Is it accurate to say that your team |

Page 106

| | |
|---|---|
| 1 | might use the flow charts that we talked about before |
| 2 | when the system doesn't automatically code the person? |
| 3 | A.  Yes. |
| 4 | Q.  So your technician or analyst would go to this |
| 5 | code first, and then, if they couldn't find their |
| 6 | answer, they'd go to your flow chart? |
| 7 | A.  No.  They would do the flow chart first.  I don't |
| 8 | know if they do, but -- because if the -- if they were |
| 9 | under 14 when they committed their offense, we already |
| 10 | know they don't have to register here.  So they may just |
| 11 | contact the court and see what the requirements are |
| 12 | there, then we don't need to figure out the tier. |
| 13 | Q.  How much do you know about the individual |
| 14 | plaintiffs in this case? |
| 15 | A.  In the Does 3? |
| 16 | Q.  Yes. |
| 17 | A.  Isn't it all sex offenders? |
| 18 | Q.  Well, I'm just wondering about the named |
| 19 | plaintiffs, if you know any of the circumstances that |
| 20 | are in the Complaint or anything like that? |
| 21 | A.  What do you mean by circumstances in the |
| 22 | Complaint? |
| 23 | Q.  Okay.  So the background of each named plaintiff, |
| 24 | are you familiar? |
| 25 | A.  The background?  You mean like what they -- what |

Page 107

| | |
|---|---|
| 1 | their crime is? |
| 2 | Q.  The facts leading up to their conviction and |
| 3 | registration and that kind of thing. |
| 4 | A.  Not -- -- if I look them up, I would, but -- |
| 5 | Q.  Okay.  All right.  So I do want to go through |
| 6 | some examples with you using both the flow chart and |
| 7 | this code table.  And so just kind of -- the reason I |
| 8 | was asking what you knew about the individual plaintiffs |
| 9 | is because we wanted to talk about some of their |
| 10 | circumstances.  So, for example, Mary Doe in this case |
| 11 | was convicted of Ohio RC 2907.04 (a) and (b)3 and, in |
| 12 | Ohio, she's not subject to registration.  So if I were |
| 13 | to go to the flow chart, am I correct that the first |
| 14 | question would be whether her offense is substantially |
| 15 | similar to a Michigan offense? |
| 16 | MR. JAMISON:  Flow chart is not up on the |
| 17 | screen. |
| 18 | BY MS. DAVIDSON: |
| 19 | Q.  Let me see if I can -- how about now? |
| 20 | A.  Yes. |
| 21 | Q.  All right.  So am I correct that under the flow |
| 22 | chart, the first question is whether her offense is |
| 23 | substantially similar to a Michigan offense? |
| 24 | A.  Yes. |
| 25 | Q.  Okay.  Would you agree that based on the flow |

Page 108

27 (Pages 105 to 108)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1 chart, she isn't required to register because she's not | 1 Q. Let me scroll over here. |
| 2 required to register in Ohio? | 2 A. Tier 3. |
| 3 A. No. | 3 Q. Great. |
| 4 Q. No. Okay. What is incorrect about that? | 4 And publishable, right? |
| 5 A. Because what we mean by comparable to a Michigan | 5 A. Yes. |
| 6 adult conviction, that pretty much means that it's | 6 Q. Is there anything in the comparable Michigan code |
| 7 tiered in our PACC Code Table or, it might not be | 7 section? |
| 8 tiered, but we send it to legal and confirm that it is | 8 A. No. |
| 9 registrable. | 9 Q. Do you know what the Michigan comparable offense |
| 10 Q. All right. And then let's go back to this table | 10 is? |
| 11 and let me know if it doesn't show up. Can you see it? | 11 A. No. |
| 12 A. I see the flow chart. | 12 MS. DAVIDSON: Let's call this Q. Is this |
| 13 Q. How about now? | 13 up here or do I have to stop it and start it again? |
| 14 A. Yes. | 14 MR. JAMISON: Yeah, it's not up there. |
| 15 Q. I'm having further technical difficulties now. | 15 MARKED FOR IDENTIFICATION: |
| 16 It's frozen. | 16 DEPOSITION EXHIBIT Q |
| 17 What I'm going to do is go to the statute | 17 1:34 p.m. |
| 18 first and then I'm going to screen share again. | 18 BY MS. DAVIDSON: |
| 19 Can you see that? | 19 Q. How about now, can you see that? |
| 20 A. Yes. | 20 A. Yes. |
| 21 Q. Great. | 21 Q. Great. |
| 22 Okay. So what does it say about Ohio | 22 Take your time reviewing it and let me know |
| 23 2907.04? And let me scroll over for you. Did you find | 23 when you're ready to answer questions about it. |
| 24 the row? | 24 A. Okay. |
| 25 A. Yeah. | 25 Q. Let me scroll all the way down. |
| Page 109 | Page 110 |

| | |
|---|---|
| 1 A. Okay. | 1 conclusion. |
| 2 Q. And then I want you to have a look at Exhibit E | 2 BY MS. DAVIDSON: |
| 3 again, which is CSC 4. | 3 Q. You can still answer. |
| 4 MR. JAMISON: I'm going to place an | 4 A. I don't know. |
| 5 objection on the record with respect to the last exhibit | 5 Q. Is there an offense that you think might be more |
| 6 you showed. I don't know when that section of the code | 6 similar? |
| 7 is from and whether it was the applicable code at -- you | 7 A. I don't know. |
| 8 know, in effect at the time that Mary Roes was | 8 Q. Okay. And is it correct that CSC 4 is a Tier 2 |
| 9 convicted. To an extent you're trying to draw | 9 offense? |
| 10 conclusions between what you introduced as an exhibit, I | 10 A. No. |
| 11 think it's improper. | 11 Q. No. What tier is CSC 4? |
| 12 MS. DAVIDSON: Okay. Your objection is | 12 A. It could be a Tier 1, 2 or 3, depends on victim's |
| 13 noted. | 13 age. If the victim was under 13, it's a Tier 3; if the |
| 14 MARKED FOR IDENTIFICATION: | 14 victim was 13 to 17, it's a Tier 2; and if the victim |
| 15 DEPOSITION EXHIBIT E | 15 was 18 or older, it's a Tier 1. |
| 16 1:35 p.m. | 16 Q. Okay. And we already talked about how, under |
| 17 BY MS. DAVIDSON: | 17 your table, the MSOR database codes the Ohio statute to |
| 18 Q. Okay. So looking at Subsection A, this is the | 18 result in registration as a Tier 3, right? |
| 19 only part we're going to focus on for this question. Do | 19 A. Yes. |
| 20 you need to look at it further or are you -- | 20 Q. But that's not Tier 1, 2 or 3, it's just Tier 3, |
| 21 A. Nope. | 21 right, according to the Table? |
| 22 Q. Okay. So my question is do you think that the | 22 A. Yes. |
| 23 Ohio statute is substantially similar to our definition | 23 Q. Okay. And then to go to another exhibit -- we'll |
| 24 of CSC 4? | 24 take Ohio down -- we have another plaintiff who was |
| 25 MR. JAMISON: Objection, calls for a legal | 25 convicted in Nebraska. What are you seeing on your |
| Page 111 | Page 112 |

28 (Pages 109 to 112)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1 screen right now? | 1 Q. Are we looking at the same sexual assault of a |
| 2 A. The flow chart. | 2 child or a vulnerable adult, right? |
| 3 Q. Okay. I'm going to do this the same way I did it | 3 A. Yes. |
| 4 before. I'm going to stop sharing, find the statute and | 4 Q. Would you agree that's what we were looking at |
| 5 then share. | 5 before? |
| 6 Do you see that? | 6 A. Yes. |
| 7 A. Yes. | 7 Q. All right. And it looks like it's coded as a |
| 8 Q. Okay. So John Doe G was convicted in Nebraska of | 8 Tier 3 punishable offense on this chart, right? |
| 9 28.320.01; do you see that? | 9 A. Right. |
| 10 A. Yes. | 10 Q. Is there anything in the comparable Michigan |
| 11 Q. Do you know for how long a person would be | 11 offense column? |
| 12 required today register for that offense in Nebraska? | 12 Can you see it? |
| 13 A. No. | 13 A. No, I can't see it. |
| 14 Q. Do you have any knowledge of the Nebraska | 14 Q. How about now? |
| 15 registration requirements? | 15 A. No. |
| 16 A. No. | 16 Q. Okay, thank you. |
| 17 Q. What would you do to try to figure out what the | 17 Okay. So we're going to call this R, and I |
| 18 registration requirements are in Nebraska? | 18 assume your attorney will want to place an objection on |
| 19 A. We would contact their Sex Offender Unit. | 19 the record. |
| 20 Q. Okay. So let me just make sure that we are | 20 MR. JAMISON: Yeah, same objection as before |
| 21 tracking. | 21 related to the statute and the other exhibit that showed |
| 22 This is the worst day to only have one | 22 the Ohio statute. |
| 23 monitor. I'm so sorry. One second. | 23 MS. DAVIDSON: Okay. |
| 24 What's on your screen? | 24 MARKED FOR IDENTIFICATION: |
| 25 A. The Crime Code Table. | 25 DEPOSITION EXHIBIT R |
| Page 113 | Page 114 |

| | |
|---|---|
| 1 1:41 p.m. | 1 Michigan conviction, right? |
| 2 BY MS. DAVIDSON: | 2 A. Yes. |
| 3 Q. So, Ms. Jegla, please just take a minute with | 3 Q. Do you know whether comparable to Michigan |
| 4 this and let me know when you're ready to talk about it. | 4 conviction means the same thing as substantially similar |
| 5 Let me know when you need to scroll down. | 5 to a Michigan conviction? |
| 6 A. Okay. | 6 A. We mend it to be -- if it's tiered in our Crime |
| 7 Q. Need me to scroll down? | 7 Code Table. |
| 8 A. Yes. | 8 Q. I'm sorry? |
| 9 Okay. | 9 A. It says comparable to a Michigan offense, that |
| 10 Q. My question is do you think this statute is | 10 just means it is tiered, it is one that is tiered. |
| 11 substantially similar to CSC 4? | 11 Q. Right, but does it mean the same thing as |
| 12 MR. JAMISON: Objection, calls for legal | 12 substantially similar? |
| 13 conclusion. | 13 A. I don't know. |
| 14 BY MS. DAVIDSON: | 14 MR. JAMISON: Objection, calls for a legal |
| 15 Q. You can still answer. | 15 conclusion. |
| 16 A. I don't know. | 16 BY MS. DAVIDSON: |
| 17 Q. We already talked about how the database codes | 17 Q. When you or your team use the flow chart, are |
| 18 this to result in registration as a Tier 3, right? | 18 they the ones determining whether the conviction is |
| 19 A. Can you repeat that? | 19 comparable to a Michigan conviction? |
| 20 Q. Sure. We already talked about how the database | 20 A. Yes. |
| 21 codes this to result in registration as a Tier 3, right? | 21 Q. Okay. When would you escalate something to |
| 22 A. Yes. | 22 legal? |
| 23 Q. Okay. So let's say there's a case that is not | 23 A. When it's not tiered in that Crime Code Table and |
| 24 programmed into the database and, on the flow chart, the | 24 it says unknown tier, and then there's no tier in that |
| 25 first step is whether the conviction is comparable to a | 25 spreadsheet. It doesn't need victim age or anything, |
| Page 115 | Page 116 |

29 (Pages 113 to 116)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1    it's just not tiered.  Then that's when the analyst will | 1    Q.  Sure.  When your team starts working through |
| 2    run the statute and then see if we need police report or | 2    these flow charts and they're trying to work out what a |
| 3    conviction documents or anything. | 3    tier is going to be, have you ever seen people reach |
| 4    Q.  Okay.  And then all the analyst does is summarize | 4    different conclusions about whether or not an |
| 5    this and forward it to legal? | 5    out-of-state person needs to register at all? |
| 6    A.  To me and then I forward it to legal. | 6    A.  I don't know.  I don't recall any. |
| 7    Q.  Okay.  Do you ever try to determine what the tier | 7    Q.  How about different conclusions about what a |
| 8    is on your own? | 8    comparable offense should be? |
| 9    A.  Yes. | 9    A.  Do you mean between me and the analysts? |
| 10    Q.  When do you feel confident that you can assign a | 10    Q.  Sure.  Anyone on your team.  Anyone who is trying |
| 11    tier on your own if it's not tiered? | 11    to work it out. |
| 12    A.  Actually, right now, we've been sending | 12    A.  I don't recall a specific time, no. |
| 13    everything to legal, but we have in the past like if it | 13    Q.  Do you ever see different conclusions on what the |
| 14    was just possession of child pornography or something | 14    tier level should be? |
| 15    very simple, that only one crime. | 15    A.  I don't recall. |
| 16    Q.  When did you start forwarding everything to | 16    Q.  How about different conclusions on whether some |
| 17    legal? | 17    out-of-state processes count as a deferral program that |
| 18    A.  I'm not sure. | 18    would not be registrable? |
| 19    Q.  Would you say within the last year? | 19    A.  I'm not sure what you mean. |
| 20    A.  Yes. | 20    Q.  So some deferral programs are not registrable, |
| 21    Q.  So as your team works through the items in the | 21    right, like HYTA or something like that, right? |
| 22    flow charts, have you ever seen people reach different | 22    A.  Uh-huh. |
| 23    conclusions over whether an out-of-state person needs to | 23    Q.  And other states also have deferral programs, |
| 24    register? | 24    right? |
| 25    A.  Could you repeat that? | 25    A.  Uh-huh. |
| Page 117 | Page 118 |

| | |
|---|---|
| 1    Q.  Do you ever see anybody on your team have a | 1    Q.  All right.  If I were to refer to the elements of |
| 2    different conclusion about whether an out-of-state | 2    an offense, would you know what that means? |
| 3    process would count as a deferral program and not be | 3    A.  No. |
| 4    registrable because of that? | 4    Q.  Okay.  So when I talk about the elements of an |
| 5    A.  That would be something that we just send to | 5    offense, that's kind of each thing that you need to |
| 6    legal. | 6    prove within an offense; does that make sense? |
| 7    Q.  If there were conflicting conclusions, who would | 7    A.  Kind of. |
| 8    resolve them? | 8    Q.  It is each fact that needs to be proven in order |
| 9    A.  Legal. | 9    to have a conviction for an offense; does that make |
| 10    Q.  Okay.  Have you ever reached a different | 10    sense? |
| 11    conclusion from legal? | 11    A.  Not really. |
| 12    A.  I don't recall a specific time.  I may have, but | 12    Q.  No?  Okay.  When you compare a Michigan offense |
| 13    I don't recall one. | 13    to an out-of-state offense, what do you look at? |
| 14    Q.  So without recalling a specific time, can you | 14    A.  The statute. |
| 15    recall if it ever happened? | 15    Q.  Just the language of the statutes? |
| 16    A.  I feel like it might have once, but -- I'm not | 16    A.  Yes, the description -- not description, but the |
| 17    sure.  I don't know any of the details of it.  I just -- | 17    language, yeah, I guess. |
| 18    Q.  Okay.  We've talked about how sometimes you've | 18    Q.  Okay.  Do you also consider any information in |
| 19    had additional documents to determine what the tier is | 19    the documents that you just mentioned, police reports, |
| 20    going to be. | 20    things like that? |
| 21    A.  Uh-huh. | 21    A.  That's what we send to legal. |
| 22    Q.  Why do you need those documents, I mean, I know | 22    Q.  Okay.  So when you're doing it, you're just |
| 23    that you talked about age already, but is there anything | 23    looking at the two statutes side by side -- |
| 24    additional that you might need those documents for? | 24    A.  Yes. |
| 25    A.  I don't know.  Legal requests them. | 25    Q.  -- is that fair? |
| Page 119 | Page 120 |

30 (Pages 117 to 120)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1 | A. Yeah. |
| 2 | MS. DAVIDSON: Okay. All right. So let's |
| 3 | call this S and T. Let me see if I can get them to pull |
| 4 | up with minimal issue. |
| 5 | MARKED FOR IDENTIFICATION: |
| 6 | DEPOSITION EXHIBIT S |
| 7 | 1:50 p.m. |
| 8 | MARKED FOR IDENTIFICATION: |
| 9 | DEPOSITION EXHIBIT T |
| 10 | 1:50 p.m. |
| 11 | BY MS. DAVIDSON: |
| 12 | Q. Okay. Do you recognize these? |
| 13 | A. I don't see it. |
| 14 | Q. How about now? |
| 15 | A. Yes. |
| 16 | Q. Okay. So this one is S and the next one is T? |
| 17 | A. Yes -- well, I see my name on it, so -- |
| 18 | Q. You know what, let me start at the bottom for |
| 19 | both of them -- |
| 20 | A. Okay. |
| 21 | Q. -- and you just tell me when to scroll up. |
| 22 | A. Okay. |
| 23 | Okay. |
| 24 | Q. Tell me if you need me to stop. |
| 25 | A. Nope. |

Page 121

| | |
|---|---|
| 1 | MS. DAVIDSON: Eric, do you need a break? |
| 2 | MR. JAMISON: No. |
| 3 | BY MS. DAVIDSON: |
| 4 | Q. Are you good on this one? |
| 5 | A. Yes. |
| 6 | Q. Okay, let's go to this one, this one is T, and I |
| 7 | will go down to the bottom. |
| 8 | Are you still reading? |
| 9 | A. Yeah, I'm good. |
| 10 | Q. Can you tell me what these documents are? |
| 11 | A. They're ones we sent to legal to have them |
| 12 | interpret what tier. |
| 13 | Q. All right. Can you explain what is happening in |
| 14 | these conversations? |
| 15 | A. Well, there's two. I think -- I don't know if |
| 16 | one of them MDOC asked and I don't know if they're both |
| 17 | MDOC. |
| 18 | Q. Is that helpful? |
| 19 | A. I know MDOC asked what tiers someone would be, |
| 20 | and then I looked up the statute and sent it to the |
| 21 | manager, and the manager sent it to legal on the first |
| 22 | one, I think. |
| 23 | Q. Okay. And then on the second one? |
| 24 | A. Pretty much the same thing, someone -- I don't |
| 25 | know if it was MDOC was looking for the tier, I don't |

Page 122

| | |
|---|---|
| 1 | know if I sent it to Narcisa at that time or I sent it |
| 2 | right to John, maybe. |
| 3 | Q. Okay. Based on the documents you just reviewed, |
| 4 | if a person is convicted of unlawful use of a two-way |
| 5 | communications device, would you agree that they are not |
| 6 | required to register in Florida? |
| 7 | MR. JAMISON: Objection, calls for a legal |
| 8 | conclusion. |
| 9 | THE WITNESS: I don't know. |
| 10 | BY MS. DAVIDSON: |
| 11 | Q. Let's go back to the Florida statute; do you see |
| 12 | that? |
| 13 | A. Yes. |
| 14 | Q. Okay. And this statute does not appear to have a |
| 15 | sexual component to it, correct? |
| 16 | MR. JAMISON: Objection, calls for legal |
| 17 | conclusion. |
| 18 | THE WITNESS: I don't know. I can't tell. |
| 19 | BY MS. DAVIDSON: |
| 20 | Q. You can't tell whether this language has a sexual |
| 21 | component? |
| 22 | A. Well, I would have to send it to legal. I guess |
| 23 | I don't know. I'd have to read the whole thing, I |
| 24 | think, what else is in here. |
| 25 | Q. Well, this is just the part of the statute |

Page 123

| | |
|---|---|
| 1 | that's -- |
| 2 | A. Okay. |
| 3 | Q. Do you want to see it? |
| 4 | A. Sure. |
| 5 | Okay, I'm good. |
| 6 | Q. You're good? |
| 7 | A. Yeah. |
| 8 | Q. Do you agree it doesn't have a sexual component? |
| 9 | MR. JAMISON: Same objection. |
| 10 | BY MS. DAVIDSON: |
| 11 | Q. You can still answer. |
| 12 | A. I would have to check with legal on it. |
| 13 | Q. Okay. All right. It looks like somebody from |
| 14 | the MSOR Management Unit is uncertain whether this |
| 15 | person has to register; would you agree that is the |
| 16 | request? |
| 17 | A. Someone from where? |
| 18 | Q. The MSOR Management Unit -- let me go back. |
| 19 | A. Oh, it's the Michigan Department of Corrections. |
| 20 | Q. Okay, thank you. |
| 21 | Is that correct, though, this person is |
| 22 | unsure whether this individual has to register, right? |
| 23 | A. Yes. |
| 24 | Q. Do you have any idea why this person is |
| 25 | uncertain? |

Page 124

31 (Pages 121 to 124)

Tri-County Court Reporters
248-608-9250

Sharon Jegla
4/27/2023

```
 1       A.  No.
 2       Q.  Okay.  And it looks like you wrote her back and
 3  gave information from the police report -- let me find
 4  it to make sure.
 5           Okay.  Did you get this information from the
 6  police report, in this e-mail?
 7       A.  Yes, that last sentence, yep.
 8       Q.  Okay.  And then so when you forward it for a
 9  determination, it looks like John is telling you that
10  he's looking at both the factual basis and the original
11  charge; is that right?
12       A.  Yes.
13       Q.  Okay.  Would you agree that, under this statute
14  that we just looked at, the person could be convicted of
15  the Florida offense without there being any sexual
16  component to the crime?
17           MR. JAMISON:  Objection, calls for legal
18  conclusion.
19  BY MS. DAVIDSON:
20       Q.  You can answer.
21       A.  I don't know.
22       Q.  Do you think that, in comparing the statute side
23  by side, this is comparable to a Michigan sex offense?
24       A.  I don't know.
25           MR. JAMISON:  Objection, calls for a legal
```

                        Page 125

```
 1  conclusion.
 2           THE WITNESS:  I don't know.
 3  BY MS. DAVIDSON:
 4       Q.  And then there's also a question about whether
 5  Florida's a adjudication -- Florida's withholding of
 6  adjudication is similar to HYTA; do you see that?
 7       A.  Yes.
 8       Q.  Do you know what HYTA is?
 9       A.  Yes.
10       Q.  Okay.  So to determine if someone has to
11  register, do you also have to compare deferral programs?
12           MR. JAMISON:  Objection, calls for legal
13  conclusion.
14  BY MS. DAVIDSON:
15       Q.  You can answer.
16       A.  That is something we send to legal.
17           MS. DAVIDSON:  Can we go off the record for
18  a minute?
19           (Off the record at 2:02 p.m.)
20           (Back on the record at 2:04 p.m.)
21  BY MS. DAVIDSON:
22       Q.  Okay.  Ms. Jegla, were you in the Sex Offender
23  Registry Unit during Does 1?
24       A.  Yes.
25       Q.  During Does 1, there was testimony that
```

                        Page 126

```
 1  classification of out-of-state offenses was being done
 2  by an intern; were you aware of that?
 3       A.  I think some, yes.
 4       Q.  Do you know if the Michigan State Police has
 5  stopped using an intern?
 6       A.  That was just --
 7           MR. JAMISON:  Objection, it's vague.
 8           THE WITNESS:  Say the question again.
 9  BY MS. DAVIDSON:
10       Q.  Do you know if the Michigan State Police has
11  stopped using an intern for that purpose?
12       A.  It was just in 2011, but I don't know if that
13  was -- I know they had a student, but I don't know if
14  they were the final answer.  I don't know if legal, you
15  know, reviewed them all too and they just were helping.
16  I don't know.  I just heard that.
17       Q.  Okay.  That's actually my next question, so do
18  you know if anyone reviewed the classifications done by
19  the intern?
20       A.  No.
21       Q.  Okay.  Is there any way to tell which
22  classifications were done by an intern?
23       A.  Not that I'm aware.
24       Q.  In your experience, has SORA ever changed in a
25  way that results in the removal of registrants?
```

                        Page 127

```
 1       A.  Not that I'm aware.
 2       Q.  Are you aware that, in 2011, certain offenses
 3  were no longer required to be registered?
 4       A.  Yes.
 5       Q.  Are you aware that one of the changes was that
 6  only certain sodomy convictions resulted in
 7  registration?
 8       A.  In 2011.
 9       Q.  One of the changes, as a result of 2011, is that
10  only certain sodomy convictions result in registration?
11       A.  No.
12       Q.  Are you aware that sodomy with a consenting 16 or
13  17 year old is no longer registrable?
14       A.  No.
15       Q.  You are not aware of that?
16       A.  No.
17       Q.  Okay.  Can you see that?
18       A.  Yes.
19           MS. DAVIDSON:  Let's call this Exhibit U.
20           MARKED FOR IDENTIFICATION:
21           DEPOSITION EXHIBIT U
22           2:08 p.m.
23  BY MS. DAVIDSON:
24       Q.  Okay.  So I won't make you review this whole
25  thing.  Part of it is highlighted, I believe.  Yes.
```

                        Page 128

                                      32 (Pages 125 to 128)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1        Okay.  Can you review this highlighted | 1   MSP review database records to identify people who have |
| 2   portion and tell me when you're ready to talk about it. | 2   a substantially similar out-of-state offense? |
| 3     **A.** I'm ready. | 3     **A.** In all cases, I couldn't say for sure.  I don't |
| 4     **Q.** Okay.  Would you agree that this statute states | 4   know. |
| 5   that gay sex with a 16 year old does not require | 5     **Q.** Okay.  When you say in all cases, do you believe |
| 6   registration? | 6   it happens sometimes? |
| 7       MR. JAMISON:  Objection, misstates the | 7     **A.** It might.  I don't know. |
| 8   statute. | 8     **Q.** To your knowledge, has the Michigan State Police |
| 9       THE WITNESS:  I don't see anything about | 9   ever thought to identify people who are registered based |
| 10   gay. | 10   on the sodomy conviction where the offense involved |
| 11   BY MS. DAVIDSON: | 11   consentual activity with a 16 or 17 year old? |
| 12     **Q.** Okay.  Would you agree that sex with a 16 year | 12     **A.** Are you talking about a new person coming on |
| 13   old does not require registration under the statute? | 13   or -- |
| 14       MR. JAMISON:  Objection, calls for a legal | 14     **Q.** No.  I'm asking if the Michigan State Police has |
| 15   conclusion. | 15   ever looked to see if somebody who is registered was |
| 16   BY MS. DAVIDSON: | 16   registered based on a sodomy conviction involving sexual |
| 17     **Q.** You can still answer. | 17   activity with a 16 or 17 year old, so somebody who is |
| 18     **A.** I don't know. | 18   already registered. |
| 19     **Q.** When the law changes so that a certain Michigan | 19     **A.** No. |
| 20   offense is no longer registrable, does the Michigan | 20     **Q.** You're saying no, you do not believe that -- |
| 21   State Police review records to identify individuals with | 21     **A.** Say that last part, I didn't hear. |
| 22   a substantially similar out-of-state offense? | 22     **Q.** You're saying, no, you don't believe that such a |
| 23     **A.** Can you repeat that? | 23   review has ever happened? |
| 24     **Q.** Yes.  When the law changes so that a certain | 24     **A.** Yes. |
| 25   Michigan offense is not registrable anymore, does the | 25     **Q.** Is there a way that could be done? |
| Page 129 | Page 130 |
| 1     **A.** I don't know. | 1       A person commits the offense of sodomy when |
| 2     **Q.** I think this is the last question I have based on | 2   he or she performs or submits to any sexual activity |
| 3   this chart. | 3   involving the sex organs of one person in the mouth or |
| 4       MARKED FOR IDENTIFICATION: | 4   anus of another. |
| 5       DEPOSITION EXHIBIT V | 5       Right? |
| 6       2:12 p.m. | 6     **A.** Yes. |
| 7   BY MS. DAVIDSON: | 7     **Q.** Is that definition substantially similar to the |
| 8     **Q.** Do you see it? | 8   Michigan definition of who has to register for sodomy in |
| 9     **A.** Yes. | 9   Michigan? |
| 10     **Q.** Okay.  And so this chart shows -- they made this | 10       MR. JAMISON:  Objection, calls for a legal |
| 11   so that it's the top, but do you see Georgia 1662 -- | 11   conclusion. |
| 12     **A.** Uh-huh. | 12   BY MS. DAVIDSON: |
| 13     **Q.** -- is a charge for sodomy? | 13     **Q.** You can still answer. |
| 14     **A.** Yes. | 14     **A.** I don't know. |
| 15     **Q.** It's Tier 3 and it's publishable, right? | 15     **Q.** Okay.  Some people are registered not because |
| 16     **A.** Uh-huh. | 16   their offense is a substantially similar Michigan |
| 17     **Q.** Automatically? | 17   offense, but because they are required to register in |
| 18     **A.** Yes. | 18   the state of conviction, right? |
| 19     **Q.** Can you see this? | 19     **A.** Yes. |
| 20     **A.** I still see the PACC Code Table. | 20     **Q.** And other states may amend their registry's |
| 21     **Q.** Okay.  Sorry, I turned Teams off and I'm still | 21   statutes from time to time, right? |
| 22   getting notifications. | 22     **A.** Yes. |
| 23       Okay.  Can you see this? | 23     **Q.** And that might also remove or change registration |
| 24     **A.** Yes. | 24   requirements? |
| 25     **Q.** Okay.  So this statute says: | 25     **A.** Yes. |
| Page 131 | Page 132 |

Tri-County Court Reporters
248-608-9250

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1    Q. If another state changes its law so that an<br>2 offense is no longer registrable, do you get<br>3 notification of that?<br>4    **A.** I don't know.<br>5    Q. You don't know if you are notified if another<br>6 state changes its laws?<br>7    **A.** No.<br>8    Q. Are you saying no or are you saying --<br>9    **A.** I don't know. No, I don't know.<br>10    Q. Okay. Okay. Does the Sex Offender Registry Unit<br>11 monitor the registry legislation of all 50 states for<br>12 any new law changes?<br>13    **A.** No.<br>14    Q. So you actually wouldn't know if the law in<br>15 another state changed to someone who had to register in<br>16 the past no longer has to register, right?<br>17    **A.** Right.<br>18    Q. Let's say you register someone in 2020 based on<br>19 the fact that at the time the person is subject to<br>20 registration in Ohio, but then, in 2021, Ohio changes<br>21 its law and that person no longer has to register in<br>22 Ohio.<br>23      Would you know about the law change in Ohio?<br>24    **A.** If we are notified by Ohio.<br>25    Q. So you'd only learn about it if the state that<br><br>Page 133 | 1 changed the law notified you?<br>2    **A.** Or the offender.<br>3    Q. Is there any process to ensure that a person<br>4 comes off the Registry since the person is no longer<br>5 registered -- required to register in Ohio and the<br>6 Michigan registration requirement is only based on the<br>7 fact that they had to register in Ohio?<br>8    **A.** Not that I'm aware.<br>9    Q. Does the Sex Offender Register Unit monitor court<br>10 decisions in all 50 states about the constitutionality<br>11 and registration requirements of all of those states'<br>12 registry laws?<br>13    **A.** No.<br>14    Q. So the Michigan State Police requires people with<br>15 out-of-state convictions to register either because<br>16 their offense is substantially similar to a Michigan<br>17 offense or because they were required to register in the<br>18 jurisdiction where they were convicted; is that<br>19 accurate?<br>20    **A.** Yes.<br>21    Q. But to the Michigan State Police has no process<br>22 to identify or remove people with out-of-state<br>23 convictions who are no longer subject to registration if<br>24 either state's law changes; is that right?<br>25    **A.** Yes.<br><br>Page 134 |
| 1    Q. Okay. So those people would remain on the<br>2 registry; is that right?<br>3    **A.** Yes.<br>4    Q. Okay. So Ms. Morris testified that there was a<br>5 change on how out-of-state offenses were handled<br>6 sometime around 2022; does that sound right to you?<br>7    **A.** I'm not sure.<br>8    Q. How were out-of-state offenses determined when<br>9 you first started working --<br>10    **A.** Yeah.<br>11    Q. It sounds like -- it looks like something just<br>12 came to you --<br>13    **A.** Yeah, that flow chart.<br>14    Q. Okay. What about --<br>15    **A.** It's a little bit different, because, before, I<br>16 think if someone was a Tier 3 lifetime, we would just<br>17 use all of the other -- the -- our state's requirements,<br>18 but then, in 2022, we changed and we use the -- our<br>19 state's -- we use our state's requirements in their<br>20 duration if it's longer.<br>21    Q. So that's what changed in 2022?<br>22    **A.** Yeah, I think. Yeah, that's -- I know that<br>23 changed. Trying to think of anything else, but --<br>24 that's all I can think of that changed.<br>25    Q. Okay. Do you know who made the decision to<br><br>Page 135 | 1 change the process?<br>2    **A.** Yes.<br>3    Q. Who?<br>4    **A.** Our legal department.<br>5    Q. Do you know why?<br>6    **A.** No.<br>7    Q. Were you consulted?<br>8    **A.** About the change?<br>9    Q. Yes.<br>10    **A.** I was told about the change, yes.<br>11    Q. Were you notified or were you consulted? Were<br>12 you told after the decision was made?<br>13    **A.** I don't recall.<br>14    Q. Okay. How was it communicated to you?<br>15    **A.** I don't recall.<br>16    Q. Did the Michigan State Police go back and review<br>17 past modifications based on this change in policy?<br>18    **A.** I think if -- I shouldn't say I think.<br>19      If we do an audit of a record, then we look<br>20 at that new way.<br>21    Q. Do you know whether the Michigan State Police's<br>22 legal department has attorneys with law degrees from all<br>23 50 states?<br>24    **A.** No, I don't know.<br>25    Q. When someone moves from out of state and they<br><br>Page 136 |

34 (Pages 133 to 136)

Sharon Jegla
4/27/2023

1  have a conviction that might require them to report,
2  there's a process that has to be followed to register
3  them, right?
4      **A.** Yes.
5      Q. We just talked about that a little bit, right?
6      **A.** Yes.
7      Q. Are you involved in the process, aside from what
8  we've already talked about?
9      **A.** No.
10     Q. How long does it typically take to determine
11 registration requirements for a person living with an
12 out-of-state conviction, on average?
13     **A.** So if it's already tiered, then not long, but if
14 it's not tiered, it really varies.
15     Q. Okay. What do you mean by not long?
16     **A.** They can process it right away, because they
17 already know the tier.
18     Q. Okay. And you said it varies if it's not tiered;
19 can you give me a range?
20     **A.** It could be a couple of days to a month maybe.
21     Q. Would you say a month is a high-end or does it
22 ever take longer than that?
23     **A.** I've seen it take longer.
24     Q. What's the longest you've ever seen it take?
25     **A.** I don't know.

                    Page 137

1      Q. Six months?
2      **A.** I don't think so.
3      Q. Not that long, but maybe a little bit longer than
4  a month?
5      **A.** Yes.
6      Q. While a person's case is pending, does that
7  person have to register?
8          MR. JAMISON:  Objection, it calls for a
9  legal conclusion.
10 BY MS. DAVIDSON:
11     Q. You can answer.
12     **A.** I don't know.
13     Q. All right. Certain changes have to be reported
14 within three business days, right?
15     **A.** Yes.
16     Q. And some changes can be reported by mail now,
17 right?
18     **A.** Yes.
19     Q. How does that work?
20     **A.** I'm not sure where they get the form, if it's on
21 our website. We did send them all a letter with a copy
22 of the form. And then they fill out their changes and
23 they mail it to their local law enforcement, and then
24 the local law enforcement updates the information and
25 then uploads the form.

                    Page 138

1      Q. Okay. And so you just said they send it to their
2  local law enforcement?
3      **A.** Yes.
4      Q. So that's all the form instructs them to do,
5  right, there's no address on it to mail back, right?
6      **A.** Right.
7      Q. Okay. A registrant who mails in information
8  doesn't get a receipt, right?
9          MR. JAMISON:  Objection, lack of foundation.
10         THE WITNESS:  I don't know that he would get
11 a receipt.
12 BY MS. DAVIDSON:
13     Q. Do you know who is responsible for putting
14 mail-in updates in the system?
15     **A.** Whoever gets that mailed to them, whatever
16 agency.
17     Q. In your experience, how quickly do the law
18 enforcement agencies input these mail-in updates?
19     **A.** I have no idea.
20     Q. Does the Michigan State Police Sex Offender
21 Registry Unit ever get sent mail-in updates?
22     **A.** Yes.
23     Q. What do you do with the ones that you receive?
24     **A.** I don't deal with that, so I don't know.
25     Q. Who does deal with that?

                    Page 139

1      **A.** I don't know. It's whoever gets the mail, and I
2  don't even know who gets the mail.
3      Q. Can you tell the extent to which registrants are
4  actually using mail-in updates?
5      **A.** No, I can't.
6      Q. Are they coded differently in the database?
7      **A.** Coded?
8      Q. Yeah, like if you put them in, is there a way to
9  differentiate?
10     **A.** No.
11     Q. How do you count the three business days, like
12 what date do you start with?
13     **A.** I don't know.
14     Q. Is it from when the person signs the form?
15         MR. JAMISON:  Objection, asked and answered.
16         THE WITNESS:  I don't know.
17 BY MS. DAVIDSON:
18     Q. If a person gets a new e-mail address on Thursday
19 and they put a form in the mailbox on Sunday and the
20 Post Office doesn't pick it up until Monday, are they in
21 violation of the statute?
22         MR. JAMISON:  Objection, calls for a legal
23 conclusion.
24 BY MS. DAVIDSON:
25     Q. You can answer.

                    Page 140

                              35 (Pages 137 to 140)

Sharon Jegla
4/27/2023

| | |
|---|---|
| Page 141 | Page 142 |

**Page 141**

1    **A.** I don't know.

2        MS. DAVIDSON:  Okay.  I think I might be

3    done, but can we just take ten minutes so that I can

4    make sure?

5        THE WITNESS:  Uh-huh.

6        (Off the record at 2:27 p.m.)

7        (Back on the record at 2:38 p.m.)

8    BY MS. DAVIDSON:

9    **Q.** Okay.  So in the data that we have, there is --

10   there are verifications, residence checks, officer

11   alerts and Tips.

12       Do you have similar fields in the database?

13   **A.** Yes.

14   **Q.** Are any of those entries duplicated?

15   **A.** So officer alerts are, if you make an officer

16   alert, it also goes into a notes field.  Tips, I don't

17   know.  And residence checks, I don't really deal with,

18   so I don't want to say.  I don't know.  What was the

19   other ones, verifications?

20   **Q.** Tips, officer alerts, residence checks and

21   verifications.

22   **A.** Okay.  So the officer alerts, yes, they are

23   duplicated, but the others, I'm not aware of them being

24   duplicated.

25   **Q.** Okay.  And can you tell me the difference between

**Page 142**

1    those four categories?

2    **A.** Tips are -- yes, I can.

3        Tips are where -- the website, you can enter

4    a Tip and that goes right to the record, or we might

5    enter a Tip, someone might call with a Tip and then we

6    enter it in there, and so then law enforcement runs

7    their Tips.  So we don't do anything with the Tips,

8    other than enter them into there.

9        The officer alert is something that pops up

10   when someone opens the record, like if there's something

11   that they need to be aware of, like he still owes a fee

12   or he needs a Michigan I.D. or something like that,

13   there's -- you know, law enforcement can enter and we

14   can enter them.  It's just something to alert you.

15       Then residence checks, I just know that that

16   is entered when they do a residence check to make sure

17   someone is living where they say they are, then they

18   enter the results of the residence check in there.

19       And then the verification is when the

20   offender goes in person to verify, an entry gets put in

21   that they verified.

22   **Q.** Okay.  If you're searching using the verification

23   field, do updates also appear?

24   **A.** No.

25   **Q.** No.  How do you search for updates?

**Page 143**

1    **A.** We wouldn't be able to unless we do it, like open

2    each record and see -- look at all the different tabs to

3    see if they updated anything.  So if you needed a big

4    report, it'd have to be the vendor who would have to do

5    it, and then I don't even know if it's something they

6    can do.

7    **Q.** Okay.  In our data, we saw MDOC historical being

8    used as an incarceration address; can you tell me what

9    that is?

10   **A.** So they go to different prisons and if we don't

11   know what prison they were in, then we list it as

12   historical, because they were just in MDOC, in one of

13   them, and we don't know which one.

14   **Q.** Okay.  So you just know somebody is incarcerated

15   within MDOC and that's what that field means?

16   **A.** Yes.

17   **Q.** Okay.  Do you have a field that tracks compliance

18   that you can search through?

19   **A.** Can you be more specific?

20   **Q.** Sure.  If you're in the database, are you able to

21   search compliance status in the out-of-state data?

22   **A.** In the out-of-state data?

23   **Q.** Yes.

24   **A.** So you mean all out-of-state offenders that are

25   non compliant or --

**Page 144**

1    **Q.** So let me kind of explain.  When we looked at the

2    data, there is a part that says B2 current compliance

3    status, and we noticed that for the out-of-state data,

4    there were many numerical codes instead of a word

5    description.

6        And is there a way to define what numeric

7    codes are being used in the out-of-state data.

8    **A.** Hmm.  The vendor would -- yeah, I don't know.

9    **Q.** But you think the vendor might know?

10   **A.** Uh-huh.

11   **Q.** Okay.  You mentioned that the process changed

12   with legal about a year ago?

13   **A.** Uh-huh.

14   **Q.** What was happening before you started forwarding

15   everything to legal?

16   **A.** Then we would -- if they were simpler ones, then

17   that's when we would determine, like if it was just

18   possession, then we would -- we would always get the

19   manager and the manager would confirm that it would be a

20   Tier 1 or whatever.

21   **Q.** You said that's for the simpler ones; what did

22   you do with the harder ones before you started

23   forwarding them all to legal?

24   **A.** We sent them to legal.

25   **Q.** Oh, you still used legal, you just didn't send

Tri-County Court Reporters
248-608-9250

Sharon Jegla
4/27/2023

```
 1   everything --
 2       A. Yeah, yeah.
 3       Q. Okay. And then you said legal changed the
 4   process regarding the out-of-state registration
 5   duration; do you remember --
 6       A. Uh-huh.
 7       Q. -- talking about that?
 8       A. Yes.
 9       Q. What were you doing before that?
10       A. So if someone was comparable to, say, a Tier 1 in
11   Michigan, but the other state required Tier 3, we would
12   just make them Tier 3 lifetime and use all the other
13   state's requirements.
14       Q. And then you mentioned that techs are often
15   instructed to ask an analyst if they can't get the
16   information that they need to make a determination --
17       A. Yes.
18       Q. -- right?
19       A. Yes.
20       Q. Do they usually do that via e-mail?
21       A. Yes.
22       Q. Are there e-mails between analysts and techs?
23       A. Yes.
24       Q. And between you and analysts?
25       A. Yes.
```

Page 145

```
 1       Q. Okay. I have a question about special
 2   conditions. You mentioned that they're not in a tier?
 3       A. Uh-huh.
 4       Q. How, then, is it determined how long or how often
 5   they'll register?
 6       A. By that flow chart. If it's comparable to a
 7   Michigan offense, then they go by our requirements. If
 8   not, then we go by -- let me see.
 9           If it's not comparable, then we go by the
10   other state's requirements.
11       Q. Right. But doesn't one of your flow charts end
12   at special conditions, like isn't that a box at the end
13   of one of your flow charts?
14       A. Yes.
15       Q. So if the conclusion is special conditions,
16   right, and you're saying the person is not tiered, and
17   there's just a note that says there are special
18   conditions, are you saying that is not the end, you
19   still try to determine a tier from there?
20       A. I think right before it says special conditions,
21   right before that, it tells how they're tiered in that
22   flow chart. It shows what the requirements are.
23       Q. So is there anybody on the Registry who is not in
24   a tier?
25       A. Yes.
```

Page 146

```
 1       Q. Okay. So if somebody is in the Registry and
 2   they're required to report, but they're not in a tier,
 3   how do they know how long or how often they need to
 4   report?
 5       A. We -- if we put someone in that special
 6   conditions, then we send them a letter with their
 7   requirements.
 8       Q. Okay. So there are still requirements?
 9       A. Yes.
10       Q. And they are still notified of them?
11       A. Yes.
12       Q. And who decides what those requirements are going
13   to be?
14       A. If -- it just depends on that flow chart,
15   because -- let me see.
16           If they don't have to register in Michigan,
17   by that flow chart, but they do in the other state, but
18   the other state doesn't have tiers, then we register
19   them based on the other state's requirements.
20       Q. Okay. You mentioned you do absconder tracking?
21       A. Yes.
22       Q. Who counts as an absconder?
23       A. When law enforcement goes to the -- usually, when
24   they go to the address and they're not living there
25   anymore, then they mark them as an absconder in our
```

Page 147

```
 1   database.
 2       Q. Anybody else qualify as an absconder?
 3       A. No.
 4       Q. You mentioned that you update the procedures?
 5       A. Yes.
 6       Q. Does anyone else review them aside from the
 7   manager you bring them to?
 8       A. In some cases, legal has.
 9       Q. In what instances would you need to escalate to
10   legal?
11       A. Usually if it involves the tiering.
12       Q. And then is the procedure reissued with like a
13   new date on it?
14       A. Yes.
15       Q. Are these like your internal operating procedures
16   that you're talking about?
17       A. Yes.
18       Q. Any other kind of procedures that you work on?
19       A. No.
20       Q. I have one last question for you. You said you
21   have a new supervisor; can you spell that person's name
22   for the record, please.
23       A. It's Jami, J-A-M-I, and then last name is S as in
24   Sam, E-L-D-E-N, dash, M-A-N-O-R.
25           MS. DAVIDSON: I don't have anything else.
```

Page 148

37 (Pages 145 to 148)

Sharon Jegla
4/27/2023

| | |
|---|---|
| 1 | Thank you for your patience today with the technology |
| 2 | and for talking with me. |
| 3 | THE WITNESS:  You're welcome. |
| 4 | EXAMINATION |
| 5 | BY MR. JAMISON: |
| 6 | Q.  Sharon, I just have a -- I think what will be one |
| 7 | clarifying question.  Okay. |
| 8 | So throughout the course of your deposition, |
| 9 | you were asked several questions about what MSP requires |
| 10 | of registrants. |
| 11 | Is it MSP that sets the requirements for |
| 12 | registrants or is it the law? |
| 13 | A.  The law. |
| 14 | MR. JAMISON:  Okay, that's all I have. |
| 15 | MS. DAVIDSON:  I'm all set. |
| 16 | COURT REPORTER:  Does anybody need this |
| 17 | typed up? |
| 18 | MR. JAMISON:  Yes, please, searchable PDF |
| 19 | copy. |
| 20 | MS. DAVIDSON:  Mini and a PDF.  And I will |
| 21 | forward you the exhibits. |
| 22 | (The remote deposition concluded at 2:53 |
| 23 | p.m.  Signature of the witness was not requested by |
| 24 | counsel for the respective parties hereto.) |
| 25 | |

Page 149

| | |
|---|---|
| 1 | CERTIFICATE OF NOTARY |
| 2 | |
| 3 | STATE OF MICHIGAN   ) |
| 4 | ) SS |
| 5 | COUNTY OF WAYNE   ) |
| 6 | |
| 7 | I, MEDINA J. BALDERAS-HORETSKI, certify that |
| 8 | this remote deposition was taken before me on the date |
| 9 | hereinbefore set forth; that the foregoing questions and |
| 10 | answers were recorded by me remotely and |
| 11 | stenographically and reduced to computer transcription; |
| 12 | that this is a true, full and correct transcript of my |
| 13 | stenographic notes so taken; and that I am not related |
| 14 | to, nor of counsel to, either party nor interested in |
| 15 | the event of this cause. |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | Medina J. Balderas-Horetski, CSR-6213 |
| 22 | Notary Public |
| 23 | Wayne County, Michigan |
| 24 | My Commission expires June 11, 2027 |
| 25 | |

Page 150

38  (Pages 149 to 150)

Deposition Exhibit S

**Jegla, Sharon (MSP)**

| | |
|---|---|
| **From:** | Arritt, Elizabeth (MSP) |
| **Sent:** | Wednesday, March 31, 2021 8:10 AM |
| **To:** | Jegla, Sharon (MSP) |
| **Subject:** | FW: Ref: ███████████████████████ |

Can you let MDOC know, but do not leave Steve's email in or his contact details.

Thank you,
Liz

**From:** Beatty, Steven (MSP) <BeattyS@michigan.gov>
**Sent:** Tuesday, March 30, 2021 8:48 PM
**To:** Arritt, Elizabeth (MSP) <ArrittE@michigan.gov>
**Subject:** Re: Ref: ████████████████████

Hi Liz,

I believe he is a Tier II because as Sharon identified, it is substantially similar to a violation under MCL 750.145d(1)(a) (using a computer to commit possession of CSAM under MCL 750.145c).

Although the Michigan violation references a communication with "another person" to commit a listed crime which by its nature constitutes a sexual offense against a child (I.e. possession CSAM), the Florida violation's reliance on the use of a two way communication, (which implicitly includes a communication with another person) to commit a felony which can similarly include a Florida violation which by its nature constitutes a sexual offense against a minor. Based on the terms of probation which include no contact with minors and sex offender treatment, we can infer that the factual basis which supported his Florida plea/conviction was sufficient to support a finding that the "felony" being relied upon to support his plea to the unlawful 2-way communication was a felony that constituted a sexual offense against a minor.

Please let me know if you have any questions. Thanks!

Steve

On Mar 30, 2021, at 4:28 PM, Arritt, Elizabeth (MSP) <ArrittE@michigan.gov> wrote:

Steve,

Can you look at this? I am really uncertain. He is not registered in FL.

Best Regards,

Elizabeth Arritt, Manager
Sex Offender Registry Unit
Criminal Justice Information Center

Michigan State Police
7150 Harris Drive
Dimondale, Michigan 48821
Phone: 517-284-3115

"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, and COURTESY"
<image003.png>

---

**From:** Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Sent:** Tuesday, March 30, 2021 1:14 PM
**To:** Arritt, Elizabeth (MSP) <ArrittE@michigan.gov>
**Subject:** FW: Ref: ██████████████████████████

Have you had time to check this out?  MDOC is trying to determine if he is required to register in Michigan.

Thanks,

Sharon Jegla
Sex Offender Registry Unit
Criminal Justice Information Center
Michigan State Police
P.O. Box 30634
Lansing, MI 48909
Phone: 517-241-1806
Fax: 517-241-1868

"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, AND COURTESY"

<image002.png>

---

**From:** Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Sent:** Friday, March 26, 2021 4:52 PM
**To:** Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Subject:** FW: Ref: ██████████████████████████

Liz,

MDOC would like to know if this offender is required to register so I would like to run by you. He is not required to register in Florida for the offense. He was originally charged with 20 counts of Possession of Child Pornography. He was convicted of 934.215:

> 934.215   *Unlawful use of a two-way communications device.—Any person who uses a two-way communications device, including, but not limited to, a portable two-way wireless communications device, to facilitate or further the commission of any felony offense commits a felony of the third degree, punishable as provided in s.* **775.082**, *s.* **775.083**, *or s.* **775.084**.

The only one that I would consider to be comparable would be 750.145D.

Does v Whitmer                                  2                          MSP-0000695
Case No. 22-cv-10209                                                      Dec 16, 2022

**750.145d Use of internet or computer system; prohibited conduct; violation; penalty; jurisdiction; order to reimburse state or local governmental unit; definitions.**

Sec. 145d.

(1) A person shall not use the internet or a computer, computer program, computer network, or computer system to communicate with any person for the purpose of doing any of the following:

(a) Committing, attempting to commit, conspiring to commit, or soliciting another person to commit conduct proscribed under section 145a, 145c, 157c, 349, 350, 520b, 520c, 520d, 520e, or 520g, or section 5 of 1978 PA 33, MCL 722.675, in which the victim or intended victim is a minor or is believed by that person to be a minor.

(b) Committing, attempting to commit, conspiring to commit, or soliciting another person to commit conduct proscribed under section 411h or 411i.

(c) Committing, attempting to commit, conspiring to commit, or soliciting another person to commit conduct proscribed under chapter XXXIII or section 327, 327a, 328, or 411a(2).

(2) A person who violates this section is guilty of a crime as follows:

(a) If the underlying crime is a misdemeanor or a felony with a maximum term of imprisonment of less than 1 year, the person is guilty of a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $5,000.00, or both.

(b) If the underlying crime is a misdemeanor or a felony with a maximum term of imprisonment of 1 year or more but less than 2 years, the person is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $5,000.00, or both.

(c) If the underlying crime is a misdemeanor or a felony with a maximum term of imprisonment of 2 years or more but less than 4 years, the person is guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $5,000.00, or both.

(d) If the underlying crime is a felony with a maximum term of imprisonment of 4 years or more but less than 10 years, the person is guilty of a felony punishable by imprisonment for not more than 10 years or a fine of not more than $5,000.00, or both.

(e) If the underlying crime is a felony punishable by a maximum term of imprisonment of 10 years or more but less than 15 years, the person is guilty of a felony punishable by imprisonment for not more than 15 years or a fine of not more than $10,000.00, or both.

(f) If the underlying crime is a felony punishable by a maximum term of imprisonment of 15 years or more or for life, the person is guilty of a felony punishable by imprisonment for not more than 20 years or a fine of not more than $20,000.00, or both.

(3) The court may order that a term of imprisonment imposed under this section be served consecutively to any term of imprisonment imposed for conviction of the underlying offense.

(4) This section does not prohibit a person from being charged with, convicted of, or punished for any other violation of law committed by that person while violating or attempting to violate this section, including the underlying offense.

(5) This section applies regardless of whether the person is convicted of committing, attempting to commit, conspiring to commit, or soliciting another person to commit the underlying offense.

(6) A violation or attempted violation of this section occurs if the communication originates in this state, is intended to terminate in this state, or is intended to terminate with a person who is in this state.

(7) A violation or attempted violation of this section may be prosecuted in any jurisdiction in which the communication originated or terminated.

(8) The court may order a person convicted of violating this section to reimburse this state or a local unit of government of this state for expenses incurred in relation to the violation in the same manner that expenses may be ordered to be reimbursed under section 1f of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.1f.

(9) As used in this section:

(a) "Computer" means any connected, directly interoperable or interactive device, equipment, or facility that uses a computer program or other instructions to perform specific operations including logical, arithmetic, or memory functions with or on computer data or a computer program and that can store, retrieve, alter, or

*communicate the results of the operations to a person, computer program, computer, computer system, or computer network. Computer includes a computer game device or a cellular telephone, personal digital assistant (PDA), or other handheld device.*

*(b) "Computer network" means the interconnection of hardwire or wireless communication lines with a computer through remote terminals, or a complex consisting of 2 or more interconnected computers.*

*(c) "Computer program" means a series of internal or external instructions communicated in a form acceptable to a computer that directs the functioning of a computer, computer system, or computer network in a manner designed to provide or produce products or results from the computer, computer system, or computer network.*

*(d) "Computer system" means a set of related, connected or unconnected, computer equipment, devices, software, or hardware.*

*(e) "Device" includes, but is not limited to, an electronic, magnetic, electrochemical, biochemical, hydraulic, optical, or organic object that performs input, output, or storage functions by the manipulation of electronic, magnetic, or other impulses.*

*(f) "Internet" means that term as defined in section 230 of the communications act of 1934, 47 USC 230.*

*(g) "Minor" means an individual who is less than 18 years of age.*


Thanks,

Sharon Jegla
Sex Offender Registry Unit
Criminal Justice Information Center
Michigan State Police
P.O. Box 30634
Lansing, MI 48909
Phone: 517-241-1806
Fax: 517-241-1868


"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, AND COURTESY"

<image002.png>

---

**From:** MDOC-Sex Offender Management Unit <MDOC-SexOffenderManagementUnit@michigan.gov>
**Sent:** Wednesday, March 24, 2021 2:21 PM
**To:** Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Cc:** Province, Michael (MDOC) <ProvinceM@michigan.gov>
**Subject:** FW: Ref: ██████████████████████

Good Afternoon Sharon,

Would this ICOTS offender have to register here in Michigan?

Thank you,


Melanie Cascaddan, Lead Agent
Sex Offender Management Unit
Office of Parole and Probation Services-GVP
Office Phone (517) 582-8328

**From:** Province, Michael (MDOC) <ProvinceM@michigan.gov>
**Sent:** Wednesday, March 24, 2021 2:16 PM
**To:** MDOC-Sex Offender Management Unit <MDOC-SexOffenderManagementUnit@michigan.gov>
**Subject:** Ref: ███████████████████████████

Good afternoon,

The above offender is a FL probationer, sentenced this month, and requesting to transfer to MI.
The transfer has already been denied once due to the proposed placement not allowing sex offenders to reside there.
<u>Florida does NOT require him to register</u>, and is arguing that he would not be required to register in MI either.

Can you please reach out to MSP to determine if the offender would be required to register in MI or not?
Please see the attached arrest report and probation order with the final convicted offense

**Underlying offense: 20 counts of Possession of child pornography – Florida Statutes 827.071-5**
**Convicted offense: 2 counts of Unlawful use of two way communications device to facilitate a felony (appears to be Florida statute 934.215)**
**Age of the victim: Based on the file name, at least one of the victims in the images is 5 years old**


Based on the report, the most comparable offenses to the **convicted** offense that both the field office and I can come up with are Computer use to commit a crime (750.145d), or unauthorized surveillance of a minor (750.539j), both of which would require registration, based on the underlying offense, so we need clarification on the matter.

Thank you for your assistance with this.


*Michael Province*
Department Technician
Interstate Compact Unit
Offenders P-Z

Michigan Department of Corrections
Interstate Compact Unit
206 E Michigan Ave
Lansing, MI 48933
Phone: 517-335-6903
Fax: 517-241-5789

<image001.jpg>


████████████████████

Deposition Exhibit T

## Jegla, Sharon (MSP)

| | |
|---|---|
| **From:** | Gemellaro, John (MSP) |
| **Sent:** | Wednesday, July 27, 2022 12:18 PM |
| **To:** | Jegla, Sharon (MSP); Morris, Narcisa (MSP) |
| **Subject:** | RE: ███████████████████████ - FL probation Request for Reporting Instructions |

Update:

He should register as a tier II.  The information available regarding Flordia's withhold of adjudication does not appear to fit the profile for a youthful trainee.  As such, this should be treated as a conviction until the offender successfully completes his supervision period.

John Gemellaro
Legal Resources and Education
Transparency and Accountability Division
Michigan State Police
7150 Harris Drive
Dimondale, Michigan 48821
517-242-4548

"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, and COURTESY"



**From:** Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Sent:** Wednesday, July 27, 2022 11:46 AM
**To:** Gemellaro, John (MSP) <GemellaroJ@michigan.gov>; Morris, Narcisa (MSP) <MorrisN@michigan.gov>
**Subject:** RE: ███████████████████████ - FL probation Request for Reporting Instructions

So if this is similar to HYTA, we would not register him at this point. Just to confirm, is that what I should tell MDOC or do you still want to do some checking?

Thanks,

Sharon Jegla
Sex Offender Registry Unit
Criminal Justice Information Center
Michigan State Police
P.O. Box 30634
Lansing, MI 48909
Phone: 517-241-1806
Fax: 517-241-1868

"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, AND COURTESY"



**From:** Gemellaro, John (MSP) <GemellaroJ@michigan.gov>
**Sent:** Wednesday, July 27, 2022 11:42 AM
**To:** Jegla, Sharon (MSP) <jeglas@michigan.gov>; Morris, Narcisa (MSP) <MorrisN@michigan.gov>
**Subject:** RE: ███████████████████████ - FL probation Request for Reporting Instructions

It looks like he is transferring his probation here, so as of now, he has not completed his term of probation.

His supervision start date is 7/22/22, so he will be under supervision for awhile.


John Gemellaro
Legal Resources and Education
Transparency and Accountability Division
Michigan State Police
7150 Harris Drive
Dimondale, Michigan 48821
517-242-4548


"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, and COURTESY"



**From:** Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Sent:** Wednesday, July 27, 2022 11:36 AM
**To:** Morris, Narcisa (MSP) <MorrisN@michigan.gov>; Gemellaro, John (MSP) <GemellaroJ@michigan.gov>
**Subject:** RE: ███████████████████████ - FL probation Request for Reporting Instructions

If we have run into this situation in the past, we referred to legal and I don't have any documentation that we have seen this before for Florida. I agree that if it is similar to HYTA, I would need to know if they successfully completed their term of probation. Should I ask Melanie to find out if they successfully completed the 3 year probation term?

Thanks,

Sharon Jegla
Sex Offender Registry Unit
Criminal Justice Information Center
Michigan State Police
P.O. Box 30634
Lansing, MI 48909
Phone: 517-241-1806
Fax: 517-241-1868


"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, AND COURTESY"



**From:** Morris, Narcisa (MSP) <MorrisN@michigan.gov>
**Sent:** Wednesday, July 27, 2022 11:33 AM
**To:** Gemellaro, John (MSP) <GemellaroJ@michigan.gov>; Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Subject:** RE: ██████████████████████ - FL probation Request for Reporting Instructions

Hi John,

Sharon will have to  chime in.  But we had changes recently regarding HYTA, so I may be wrong, but if an agent entered the offender  it was up to them to tell us if they received HYTA, but we would register until it was identified they completed successfully.

Sharon do you agree?

Best Regards,

Narcisa Morris
Unit Manager Sex Offender Registry
Criminal Justice Information Center
Michigan State Police
P.O. Box 30634
Lansing, MI 48909
Cell: 517-420-2329

"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, and COURTESY"



---

**From:** Gemellaro, John (MSP) <GemellaroJ@michigan.gov>
**Sent:** Wednesday, July 27, 2022 9:55 AM
**To:** Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Cc:** Morris, Narcisa (MSP) <MorrisN@michigan.gov>
**Subject:** RE: ██████████████████████ - FL probation Request for Reporting Instructions

Good morning,

I truly appreciate your patience in the review of this record and the comparison of the statutes.

The factual basis and original charge are most closely aligned with a CSC 2 (MCL 750.520c) or perhaps accosting a child for an immoral purpose (MCL 750.145A).  The conviction is substantially similar to MCL 750.145d(1)(a).  As steve pointed out in his prior analysis, the criminal activity in both statutes involves communicating with another individual to commit a specified felony offense – in this case, CSC 2 or accosting a child.   As a result, and based on the tiering definitions in MCL 28.722, this individual should be appropriately registered as a tier II.

There is a catch, however.

## SECTION 2: ORDER WITHHOLDING ADJUDICATION

☒   Now, therefore, it is ordered and adjudged that the adjudication of guilt is hereby withheld and t
Probation for a period of <u>thirty-six (36) months</u> under the supervision of the Department of Co
Florida law.

This section is withholding adjudication of guilt.  My interpretation of this is similar to that of HYTA status or some other non-public record.  Have you encountered something like this before?  If so, how is it treated?  If not, we should discuss a bit further.

John Gemellaro
Legal Resources and Education
Transparency and Accountability Division
Michigan State Police
7150 Harris Drive
Dimondale, Michigan 48821
517-242-4548

"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, and COURTESY"



**From:** Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Sent:** Monday, July 25, 2022 3:02 PM
**To:** Gemellaro, John (MSP) <GemellaroJ@michigan.gov>
**Cc:** Morris, Narcisa (MSP) <MorrisN@michigan.gov>
**Subject:** FW: ██████████████████████- FL probation Request for Reporting Instructions

Hi John,

We have an offender moving to Michigan from Florida and MDOC is trying to determine if he would be required to register. He was convicted of 934.215 Unlawful Use of a 2-Way Communications Device. Florida does not require registration. We previously had an offender who moved to MI with that offense and Steve said to make him a Tier 2. This one has a bit of a different circumstance, so I wanted to run it by you to confirm. Steve's determination is attached ("Florida 934.215 Unlawful Use of Device").

934.215 Any person who uses a two-way communications device, including, but not limited to, a portable two-way wireless communications device, to facilitate or further the commission of any felony offense commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s.

The offender's probation order does not prohibit him from being around minors and it does not require him to attend sex offender treatment which were the circumstances with the previous case in Steve's email. However, this offense was committed against a minor and was sexual in nature.

In this case, the police report doesn't say anything about communication devices:

**Narrative**

Between the dates of March 2019 and October 2019, the defendant, ███████████ di
the offense of Offenses against students by authority figures in violation of Florida State St
800.101. The defendant did so by being thirty five years old while employed as a Teacher with
County School District at Arnold High School and engaging in a romantic and lewd relationship
seventeen year old student. The relationship is affectionate and intimate in nature. The defe
engage with the student by hugging, kissing on the head, forehead, and collarbone and rubbing
victim's leg in the upper thigh area. One at least one occasion the defendant while engaging
with the victim began to rub and grind his groin against the groin of the victim. He also sh
information with the student personal and intimate in nature such as his mental health, his er
dysfunction, and his favorite sexual positions. The defendant and the victim would meet at the
around 6:30 a.m. to engage in the cuddling, kissing, and personal talk. The defendant even d
their relationship as "School Husbands". The relationship was reciprocal in nature.

This Offense did occur in the city of Panama City Beach, Bay County, Florida

Please let me know if he should register in Michigan and what tier so that I can let MDOC know and they can get him registered if needed.

Thanks,

Sharon Jegla
Sex Offender Registry Unit
Criminal Justice Information Center
Michigan State Police
P.O. Box 30634
Lansing, MI 48909
Phone: 517-241-1806
Fax: 517-241-1868

"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, AND COURTESY"



---

**From:** MDOC-Sex Offender Management Unit <MDOC-SexOffenderManagementUnit@michigan.gov>
**Sent:** Monday, July 25, 2022 12:16 PM
**To:** Jegla, Sharon (MSP) <jeglas@michigan.gov>
**Subject:** FW: ████████████████████- FL probation Request for Reporting Instructions

Hi Sharon,

I checked in MSOR and it has this as a listed offense for Fl offenses. The victim was 17 at the time of the offense. The offender is not required to register in Florida, just checking to see if they will be required to register in MI. We received the below response back from Florida with the statute code:

The best fit for the NCIC code looks like 3707 which is Obscene Communication.  The FL Statute is below.

The

2021

Florida

Statutes

| Title XLVII | Chapter 934 | View Entire |
| CRIMINAL PROCEDURE AND CORRECTIONS | SECURITY OF COMMUNICATIONS; SURVEILLANCE | Chapter |

**934.215  Unlawful use of a two-way communications device.**—Any person who uses a two-way communications device, including, but not limited to, a portable two-way wireless communications device, to facilitate or further the commission of any felony offense commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

History.—s. 1, ch. 2001-114.

Copyright © 1995-2022 The Florida Legislature • _____

_____ • _____

---

**From:** Socia, Julie (MDOC) <SociaJ2@michigan.gov>
**Sent:** Friday, July 22, 2022 2:17 PM
**To:** MDOC-Sex Offender Management Unit <MDOC-SexOffenderManagementUnit@michigan.gov>
**Cc:** Cobb, Daryn (MDOC) <CobbD@michigan.gov>; Hines, Lydia (MDOC) <HinesL3@michigan.gov>; Castelein, Nayatt (MDOC) <CasteleinN@michigan.gov>
**Subject:** ███████████ - FL probation Request for Reporting Instructions

Good Afternoon,

Florida DOC has submitted a Request for Reporting Instructions for probationer ███████████ ICOTS offender ███████. FL DOC did not provide any sex offender registration requirement for this offender. Per the offense report the

subject was arrested for Offense Against Student by Authority Figures. The attached sentencing information states a conviction of Unlawful Use of Two-Way Communications Device.

Please advise if this offender would be required to register as a sex offender in the State of Michigan?

Thank you.

Julie Socia, Lead Agent
Michigan Department of Corrections
Interstate Compact Unit
517-335-6901 (desk)
517-331-4753 (MDOC iPhone)