# Exhibit 75:

James Kissinger Deposition Transcript



**TRI-COUNTY COURT REPORTERS INC.**

(248)608-9250 Fax (844)270-7115
www.tri-countycourtreporters.com
depos@tricountyreporters.com

Transcript of the Testimony of
# JAMES KISSINGER

**Date:** January 26, 2023
**Volume:**

**Case:** John Does, Mary Doe, & Mary Roe v. Whitmer & Gasper

Printed On: February 10, 2023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHER DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE,
on behalf of themselves and
all other similarly situated,

Plaintiffs,

vs.                    File No. 2:22-cv-10209
                       Hon. Mark A. Goldsmith
                       Mag. Curtis Ivy, Jr.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

Defendants.

_____/

The Remote Deposition of
JAMES KISSINGER
Lowell, Michigan
Commencing at 11:04 a.m.
Thursday, January 26, 2023
Before Gina Deskiewicz, CSR-9689, RPR.

**Page 1**

1   APPEARANCES
2
3   AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
    MIRIAM J. AUKERMAN (P63165)
4   1514 Wealthy SE, Suite 260
    Grand Rapids, Michigan 49506
5   (616) 301-0930
    maukerman@aclumich.org
6   Appearing via Zoom.
7
8   AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
    UNIV. OF MICHIGAN LAW SCHOOL
9   PAUL D. REINGOLD (P27594)
    802 Legal Research Building
10  801 Monroe Street
    Ann Arbor, Michigan 48109
11  (734) 355-0319
    pdr@umich.edu
12  Appearing via Zoom.
13
14  MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
    KRISTIN M. HEYSE (P64353)
15  SARAH E. TRUDGEON (P82155)
    525 W. Ottawa Street, PO box 30217
16  Lansing, Michigan 48933
    (517) 335-3055
17  heysek@michigan.gov
    Appearing via Zoom.
18
19
20  MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
    SCOTT L. DAMICH (P74126)
21  PO Box 30754
    Lansing, Michigan 48909
22  (517) 335-7573
    damichs@michigan.gov
    Appearing via Zoom.
23
24
25

**Page 2**

1   MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
    KEITH G. CLARK (P56050)
2   PO Box 30217
    Lansing, Michigan 48909
3   (517) 335-3055
    ClarkK33@michigan.gov
4   Appearing via Zoom.
5
6   ACLU OF MICHIGAN
    DAYJA S. TILLMAN (P86526)
7   1514 Wealthy Street SE, Suite 260
    Grand Rapids, Michigan 49506
8   (616) 301-0930
    dstillman@ucdavis.edu
9   Appearing via Zoom.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1                    I N D E X
2
3   WITNESS:
4   JAMES KISSINGER
5   EXAMINATIONS                    PAGE
6   EXAMINATION BY MR. REINGOLD                5
7   EXAMINATION BY MR. CLARK              79
8   RE-EXAMINATION BY MR. REINGOLD           82
9
10
11              E X H I B I T S
12       (Attached to transcript.)
13   EXHIBIT NO.                    PAGE
14   EXHIBIT #1                28
15   -OP operating procedure 05.01.100
16
17
18
19
20
21
22
23
24
25

**Page 4**

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1  Lowell, Michigan | 1  counsel in this case.  The case is called Doe's |
| 2  January 26, 2023 | 2  versus Whitmer, and the underlying litigation is a |
| 3          * * * * * * | 3  challenge to Michigan Sex Offender Registration |
| 4          THE REPORTER:  We are going on the | 4  Act. |
| 5  record.  It is 11:04 a.m. My name is | 5          This is a rule 30(b)(6) deposition |
| 6  Gina Deskiewicz.  I am a Notary Public for the | 6  pursuant to subpoena and a deposition notice.  It's |
| 7  county of Macomb.  I am a certified shorthand | 7  been adjourned from a week ago, and today is |
| 8  reporter for the state of Michigan. | 8  Thursday, January 26th, 2023, and it's a little |
| 9          This deposition is being held via | 9  after 11:00.  The witness has been sworn. |
| 10  videoconferencing equipment.  The witness and the | 10          Let me ask, do you prefer to go by |
| 11  reporter are not in the same room.  The witness | 11  James, Jim, or Mr. Kissinger? |
| 12  will be sworn in remotely, pursuant to agreement of | 12  A.  James is preferable. |
| 13  all parties.  The parties stipulate that the | 13  Q.  Okay.  That's great.  And I go by Paul, and that's |
| 14  testimony is being given as if the witness was | 14  fine, too.  All right. |
| 15  sworn in person. | 15          You've been designated by the MDOC |
| 16          * * * * * * | 16  Counsel as one of the two authoritative people on |
| 17          JAMES KISSINGER, | 17  the issues that we're going to be deposing today. |
| 18  was thereupon called as a witness herein, and after | 18  What that means is that you know a lot, and I know |
| 19  having first been duly sworn to testify to the truth, | 19  almost nothing.  And so the -- at least my rule |
| 20  the whole truth and nothing but the truth, was examined | 20  today is that we transfer the knowledge that's in |
| 21  and testified as follows: | 21  your head into mine, so that I get brought up to |
| 22          EXAMINATION | 22  speed on how these processes work. |
| 23  BY MR. REINGOLD: | 23          Let me start by asking you, have you |
| 24  Q.  All right.  This is a -- My name is Paul Reingold, | 24  ever been deposed before? |
| 25  I should say to start.  I'm one of the plaintiff's | 25  A.  I have not. |
| Page 5 | Page 6 |

| | |
|---|---|
| 1  Q.  That's good.  I always tell me clients it can be an | 1  Q.  Okay.  And if you need a break at any time, let me |
| 2  interesting and fun experience. | 2  know.  The only thing I ask is if there's a |
| 3          Have you ever been a witness in a court | 3  question that's pending, that you answer it |
| 4  case before? | 4  beforehand.  Okay? |
| 5  A.  I have not. | 5  A.  Okay. |
| 6  Q.  Okay.  I'll explain just a little bit about the | 6  Q.  Let me start by asking, did you do anything to |
| 7  process today.  Basically I'm asking you, you know, | 7  prepare for this deposition? |
| 8  a series of questions, and you're providing | 8  A.  We did meet with the AG's representatives to |
| 9  answers, as I said, to transfer information.  If | 9  discuss Kristin being the -- the lead on that, I |
| 10  you don't understand a question, please feel free | 10  believe. |
| 11  to stop me, and ask me to rephrase it.  If you | 11  Q.  Okay.  And did you review any documents? |
| 12  answer a question, we'll assume that you understood | 12  A.  I did review documents. |
| 13  it.  Okay? | 13  Q.  And what sort of documents did you review? |
| 14  A.  Okay. | 14  A.  OP 05.01.100, PD 05.01.100, MSAPP protocol, |
| 15  Q.  Perfect.  And then for any question, you have to | 15  Static-99R scoring manual, Stable-2007 scoring |
| 16  answer out loud; it's something we're not used to | 16  manual.  That is the exhaustive list that I can |
| 17  doing in other settings.  But if you don't answer | 17  think of at this time. |
| 18  out loud, the record won't be clear, and the court | 18  Q.  All right.  It sounds like you're up to speed. |
| 19  reporter can't take down a shake of the head, so | 19          Did you review any legal materials, |
| 20  try to remember to do that. | 20  anything about the case or anything? |
| 21          The other issue is the court reporter | 21  A.  I did not -- well, pardon me.  I did review the |
| 22  can't make a clean record if two people are talking | 22  30(b)(6) deposition to us, the questions. |
| 23  at once, and so we should try to not talk over each | 23  Q.  Okay.  Great.  Great.  And then were you involved |
| 24  other if we can avoid it. | 24  at all in responding to the subpoena that we had |
| 25  A.  Understood. | 25  served and the materials that we requested? |
| Page 7 | Page 8 |

2 (Pages 5 to 8)

JAMES KISSINGER
1/26/2023

| | Page 9 |
|---|---|
| 1 | **A.** I am not aware. I don't know that answer. |
| 2 | Q. Okay. No one came to you and said will you help us |
| 3 | out with this document request? It would have been |
| 4 | a couple weeks ago. |
| 5 | **A.** We did receive a question about what documents were |
| 6 | needed for this litigation, and I did respond to |
| 7 | that request. I do believe that was with Kristin. |
| 8 | Q. Okay. So you were the source for supplying some of |
| 9 | the documents? |
| 10 | **A.** Correct. |
| 11 | Q. Or at least you suggested some? |
| 12 | **A.** Correct. |
| 13 | Q. Okay. Great. All right. |
| 14 | What I want to do is start sort of by |
| 15 | getting to know you, and that is your biography. |
| 16 | And so you just walk us through your educational |
| 17 | history from high school through whatever you |
| 18 | finished, and what that means is schools, places if |
| 19 | it's not obvious, dates, your major maybe, and any |
| 20 | degrees that you have. |
| 21 | **A.** Very good. In 1996 I graduated from |
| 22 | Hope Christian School in Albuquerque, New Mexico, |
| 23 | that was high school. 2000 I graduated from |
| 24 | Calvin College in Grand Rapids, Michigan, with a |
| 25 | Bachelor's degree in Criminal Justice. In 2006 I |

| | Page 10 |
|---|---|
| 1 | graduated from Western Michigan University with a |
| 2 | Master's Degree in Counseling Psychology. And did |
| 3 | you also want my vocational history? I apologize |
| 4 | if you already asked that. |
| 5 | Q. Let's get to work history next. Were there any |
| 6 | brakes along the way; did you do military service |
| 7 | or anything like that? |
| 8 | **A.** No military service. |
| 9 | Q. Okay. And then when you finished school, can you |
| 10 | walk us through your work history up to the point |
| 11 | where you joined the Department of Corrections? |
| 12 | Stop me at that point. |
| 13 | **A.** Sorry, when you mean "finished school" are you |
| 14 | referencing graduate school? |
| 15 | Q. If there was a significant job between college and |
| 16 | graduate school or something like that, you can |
| 17 | include that. If, you know, you were a lifeguard |
| 18 | somewhere and it doesn't have any bearing on what |
| 19 | you're doing, I don't need to know. |
| 20 | **A.** Well, my undergraduate -- graduation From Calvin I |
| 21 | began work in substance use disorder assessment and |
| 22 | treatment at Pathfinder Resources In Grand Rapids, |
| 23 | Michigan; I served as a resident assistant and then |
| 24 | case manager. That period was from 2000 to |
| 25 | approximately 2003. |

| | Page 11 |
|---|---|
| 1 | I then worked for Goodwill Industries |
| 2 | of Greater Grand Rapids as a vocational services |
| 3 | coordinator before becoming Northern Vocational |
| 4 | Services Manager; I worked there until |
| 5 | approximately 2006. |
| 6 | In 2006 I was hired by Community Mental |
| 7 | Health of Ionia County. I worked in the ACT, |
| 8 | assertive community treatment team, from 2006 until |
| 9 | 2008 as a -- I don't know what my actual job title |
| 10 | was. I believe it was case manager. |
| 11 | And then 2008 -- April of 2008 I hired |
| 12 | with Michigan Department of Corrections as a |
| 13 | psychologist at the Michigan Reformatory. |
| 14 | Q. All right. So some of that work was while you were |
| 15 | in graduate school; is that right? |
| 16 | **A.** Correct. I worked full time and went to graduate |
| 17 | school at night. |
| 18 | Q. That's what it sounded like. Good for you. All |
| 19 | right. |
| 20 | So when you arrived at the MDOC it was |
| 21 | as a psychologist. And now can you walk us through |
| 22 | the posts that you've had at the MDOC describing |
| 23 | your work history again, positions, titles, places, |
| 24 | rough dates, and core responsibilities or duties, |
| 25 | and again, you don't need to be in graphic detail, |

| | Page 12 |
|---|---|
| 1 | but enough to bring us up to speed. |
| 2 | **A.** In 2008 I began as a psychologist at the |
| 3 | Michigan Reformatory in Ionia, Michigan. I was |
| 4 | part of the Psychology Services Unit, PSU. My |
| 5 | responsibilities included running sex offender |
| 6 | programming, SOP, and responding to mental-health |
| 7 | related emergent issues, suicide evaluations, |
| 8 | referrals for higher levels of mental health care. |
| 9 | I was involved in that at the Reformatory as a |
| 10 | psychologist under PSU until 2011, I then |
| 11 | moved -- sorry, I need to back up. |
| 12 | In 2011 I became Active Unit Chief of |
| 13 | the Reformatory, I did that for one year, and then |
| 14 | 2012 I transferred to Bellevue Creek Correctional |
| 15 | Facility as -- |
| 16 | Q. Let me just interrupt you on the last one. |
| 17 | What does it mean to be Acting Unit |
| 18 | Chief? |
| 19 | **A.** It means that I was put in the -- It's hard for me |
| 20 | to describe exactly what the "acting" means per |
| 21 | civil service standards. I was placed into that |
| 22 | role without having interviewed for the role and |
| 23 | not -- it says maximum timeframe 12 months to be in |
| 24 | a role for civil service guidelines. So -- |
| 25 | Q. And when you say "unit chief," is that for the |

3 (Pages 9 to 12)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1 | psychological services? |
| 2 | **A.** Correct, for psychological services at the |
| 3 | Michigan Reformatory.  I was a supervisor of |
| 4 | approximately six other mental health staff. |
| 5 | Q.  Okay.  You can pick up from there. |
| 6 | **A.** 2012 I transferred to Battle Creek Correctional |
| 7 | Facility to become part of the newly developed |
| 8 | Michigan Sex Offender Program; MSOP is what it was |
| 9 | formerly titled during that time.  I worked at |
| 10 | Bellevue Creek Correctional Facility in the MSOP |
| 11 | program as a therapist, evaluator, and trainer, |
| 12 | until I -- I was hired as State Administrative |
| 13 | Manager for Sexual Abuse Prevention Services in |
| 14 | June of 2017, and that is the role I currently |
| 15 | serve in. |
| 16 | Q.  All right.  So you've been doing that for six years |
| 17 | or so now? |
| 18 | **A.** Correct. |
| 19 | Q.  And in that role do you still do hands-on work |
| 20 | either with prisoners or doing assessments, or are |
| 21 | you now mostly an administrator and a policy |
| 22 | person? |
| 23 | **A.** Primarily administrator, policy, protocol, |
| 24 | operating procedure-level work, however, I'm |
| 25 | heavily involved in reviewing cases to ensure valid |

Page 13

| | |
|---|---|
| 1 | and reliable assessments, as well as going to |
| 2 | facilities and gauging group therapy with staff to |
| 3 | ensure the quality of our program. |
| 4 | Q.  All right.  Let's -- That's exactly what I wanted |
| 5 | to know.  So that's very, very helpful to me. |
| 6 | What approximate percentage of your |
| 7 | time do you spend working with people or with |
| 8 | employees who are focusing on people who committed |
| 9 | sexual offenses; is it almost all your time? |
| 10 | **A.** Approximately 70 percent of my time is focused on |
| 11 | working with individuals providing direct care. |
| 12 | Q.  All right.  All right.  In this deposition I'm |
| 13 | going to use the word "registrants" to refer to the |
| 14 | part of the population that we're focusing on |
| 15 | today, people with sex convictions.  And that's |
| 16 | because in this litigation, all 50,000 Michigan |
| 17 | registrants are our clients; they're all part of |
| 18 | this last action. |
| 19 | For purposes of this dep, when I use |
| 20 | the word "registrants" I'm really referring |
| 21 | primarily to incarcerated registrants because |
| 22 | that's whom we're going to be discussing, as |
| 23 | opposed to other people who are registrants but are |
| 24 | living on the outside, not in prison. |
| 25 | I can also tell you over the years that |

Page 14

| | |
|---|---|
| 1 | I've sued the MDOC many times, which we have not |
| 2 | done here, so I've learned a little bit about how |
| 3 | the department operates, and over the years I've |
| 4 | made some pretty good friends with MDOC folks along |
| 5 | the way, I've had some directors and parole board |
| 6 | shares who wound up, after retirement, serving as |
| 7 | either expert witnesses or doing declarations on |
| 8 | behalf of the plaintiffs in some of the cases. |
| 9 | All right.  Let's move along to sort of |
| 10 | organization and staffing.  Can you describe |
| 11 | the -- the structure as it were of -- of the work |
| 12 | that you're doing; is it viewed as part of health |
| 13 | care services, is it viewed as -- What is it viewed |
| 14 | as; how does it fit into the structure of the |
| 15 | department? |
| 16 | **A.** Sexual Abuse Prevention Services, that is the unit |
| 17 | that I manage, it's under behavioral health care |
| 18 | services in the department, and then under |
| 19 | behavioral health care services, under mental |
| 20 | health services. |
| 21 | Q.  All right.  So it's -- it's viewed as fitting in |
| 22 | the -- on the medical side, basically? |
| 23 | **A.** Correct. |
| 24 | Q.  Yeah.  Okay.  And how big is the unit, total number |
| 25 | of employees? |

Page 15

| | |
|---|---|
| 1 | **A.** We have 27 dedicated FTE's, full time |
| 2 | equivalences, for prison-based staff.  Within |
| 3 | SAP's administration I currently have 4 dedicated |
| 4 | FTE's. |
| 5 | Q.  All right.  And are those the people who are doing |
| 6 | the assessments and -- are running the programming, |
| 7 | or is that delegated further down? |
| 8 | **A.** Those -- The 27 FTE's dedicated for correctional |
| 9 | facilities and administration are the ones running |
| 10 | the therapy programs.  Administrative staff that I |
| 11 | have, including Corey Spickler, are responsible for |
| 12 | both community operations as well as management of |
| 13 | data related to our MSAPP groups for CFA staff. |
| 14 | Q.  What is CFA? |
| 15 | **A.** Correctional Facilities Administration. |
| 16 | Q.  Okay.  One of the hardest things going through the |
| 17 | augmenting procedures is the number of acronyms. |
| 18 | Right? |
| 19 | **A.** Absolutely. |
| 20 | Q.  And it sounds like as far as the chain of command |
| 21 | is concerned, you're at the top of this unit. |
| 22 | So who are you supervised by, and what |
| 23 | is the chain of command going up? |
| 24 | **A.** I'm supervised by Mental Health Director |
| 25 | David Dawdy, and Mental Health Director Dawdy |

Page 16

4 (Pages 13 to 16)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1   reports to Health Services Administrator | 1   people out there doing assessments? |
| 2   Marti K. Sherry. | 2  **A.** Correct. Well -- |
| 3  Q. Okay. | 3  Q. Okay. I'm sure it's not -- It's never enough. |
| 4  **A.** I would like to clarify part of my response related | 4   Right? |
| 5   to the assessments. | 5  **A.** Right. |
| 6  Q. Yes. | 6  Q. Okay. All right. What I'm trying to do is get |
| 7  **A.** The 27 FTE's are responsible for the operations of | 7   a -- get a sense of how registrants, people who |
| 8   group therapy programs. The evaluations, the | 8   have committed sexual offenses, are processed and |
| 9   sexual offense risk evaluations, are completed by | 9   treated the same as other prisoners, and how much |
| 10   mental health staff across the state. | 10   they're treated differently as to they're tracked |
| 11  Q. And when you say "mental health staff across the | 11   into assessment and programming. |
| 12   state," is that MDOC employees, or is that largely | 12     So I want to start at the beginning |
| 13   contracted out? | 13   with intake, the process when they arrive at an |
| 14  **A.** It's largely MDOC employees. We do have contracted | 14   MDOC facility after having been convicted of a |
| 15   staff that work for the MDOC inside our | 15   sexual crime. I've got some preliminary questions |
| 16   correctional facilities that complete some of those | 16   about that first, just because I haven't been |
| 17   evaluations. | 17   involved in prison litigation for a while, and so |
| 18  Q. All right. And what are the numbers for those | 18   I'm not current on how intake is being done. |
| 19   people, both groups, both the ones that are | 19     So at present, in 2023, are all |
| 20   employees and the contract people that might be? | 20   prisoners coming into the -- into MDOC facilities |
| 21  **A.** We currently have approximately 150 mental health | 21   steered to certain intake centers, or can intake |
| 22   staff across the state who have been trained in the | 22   occur anywhere? |
| 23   Static-99R, which would make them eligible to make | 23     MS. HEYSE: So I'm going to actually |
| 24   them engage in the assessment process. | 24   object. I'll give you a little bit of leeway, but |
| 25  Q. All right. So that means you've got a lot of | 25   I'm going to keep you in your topics, and don't go |
| Page 17 | Page 18 |

| | |
|---|---|
| 1   into any discussion about general intake processes | 1  Q. Okay. And when people are admitted and screened, |
| 2   or any of those types of procedures. | 2   are -- the registrants are admitted and screened, |
| 3     So I'll let James answer this question, | 3   are there certain facilities that are deemed as |
| 4   but I don't want to dive too far into topics | 4   more appropriate for them so that they wind up |
| 5   outside of what you designated here, because that's | 5   being steered to those facilities as opposed to, |
| 6   the purpose of the notice related to us. Okay? | 6   you know, any random prison? |
| 7     MR. REINGOLD: All right. Yeah. Part | 7  **A.** What do you mean -- |
| 8   of what I'm trying to do is get context so we all | 8     MS. HEYSE: I'm going to object to |
| 9   know, you know, where things occur. And I'm not | 9   form, but go ahead and ask your question |
| 10   going to ask substantive questions about, you know, | 10   clarifying, James. |
| 11   how it's done or that sort of thing. Okay? | 11  **A.** What do you mean by screen? |
| 12     MS. HEYSE: Okay. | 12  Q. Once they're through the initiation process and |
| 13  **A.** I can not speak authoritatively to where all the | 13   they're going to be sent out to a facility. |
| 14   intakes occur at. | 14   What -- What I'm asking is, are there target |
| 15  BY MR. REINGOLD: | 15   facilities for them as opposed to, you know, any |
| 16  Q. All right. I guess what I want to know is, where | 16   old general population unit that's appropriate for |
| 17   are registrants -- where is their intake done, is | 17   their classification level? |
| 18   that centralized or is that -- also can it be any | 18     MS. HEYSE: Again, I'm going to object |
| 19   of the places where intakes are done? | 19   to form, but you can answer if -- if you know how, |
| 20  **A.** Again, I can't speak authoritatively to where all | 20   James. |
| 21   intakes are done in Department of Corrections. I'm | 21  **A.** I cannot speak to how central classification or |
| 22   not aware if intakes are done locally or | 22   transfer coordination works to move individuals on |
| 23   100 percent. I can say the majority are completed | 23   any type of timeline, whether they're registrants |
| 24   at RG&C in Jackson, Michigan, registered or not, | 24   or not. |
| 25   but they may be completed at other facilities. | 25  Q. Yeah, I didn't mean timeline. I just meant are |
| Page 19 | Page 20 |

5 (Pages 17 to 20)

JAMES KISSINGER
1/26/2023

---

**Page 21**

1    there locations that are viewed as more appropriate
2    for registrants, for people that have committed sex
3    offenses, so that they wind up being in some ways
4    either segregated or concentrated?
5  **A.** Not for registrants. I don't know if I need to
6    push on that a little bit, but we don't distinguish
7    registrant versus non-registrant.
8  Q. Okay. I'll just say for people who committed sex
9    offenses?
10  **A.** We have five different prison facilities across the
11    State of Michigan, they're designated sites for
12    individuals who have a history of engaging in
13    sexually-motivated criminal behavior.
14  Q. Go okay. That's a -- That's exactly what I wanted
15    to know. And then within those facilities are
16    registrants who have committed sex offenses, are
17    they segregated from the rest of the population in
18    their own units?
19        MS. HEYSE: So I'm going to object.
20    Again, Paul, I'm struggling to see where this falls
21    within the topics that you've identified here. You
22    haven't even gotten into assessments. You're
23    talking about housing, placement, issues that were
24    not identified as something you wanted to talk
25    about with these folks.

---

**Page 22**

1        So I guess I'm struggling to see how
2    that falls within these categories of topics about
3    whether or not they're segregated or not, it has
4    nothing to do with risk assessments, which is what
5    I thought we were going to talk about today.
6        MR. REINGOLD: Well, what I'm trying to
7    figure out is where they go, because that's related
8    to both the risk assessment and the programming
9    that they're assigned. Okay?
10        MS. HEYSE: I guess I would disagree
11    with that -- with that summary and your assumption,
12    but, again, I'm not going to allow these guys to
13    answer questions that are outside of what you asked
14    about here, because I don't see anything that talks
15    about how these people are housed, where these
16    people are placed. It talks about conducting risk
17    assessments.
18        So if you want to talk to somebody
19    about housing decisions or placement decisions,
20    these may not be the folks that you would have to
21    talk to, and I would have to discuss that with them
22    first to identify the people you should be speaking
23    with on those topics.
24        MR. REINGOLD: Well, if they're working
25    with people in this classification of, you know,

---

**Page 23**

1    people that have committed sex offenses, I mean, I
2    could ask it a different way and say where do you
3    go when you do this, but all I'm trying to do is
4    figure out are they segregated.
5        MS. HEYSE: I understand they may know
6    the answer, but this is not a personal deposition.
7    This is a 30(b)(6) deposition, which we get the
8    opportunity to designate who we want to speak to
9    those topics. So when we're talking about placing
10    decisions and housing decisions, just because these
11    two individuals might know the answer to that
12    question doesn't mean it's an appropriate topic for
13    discussion.
14        So I mean, he's identified that there
15    are five facilities that they're placed at. I just
16    don't understand why you need to get into, you
17    know, what the housing process is or how
18    logistically they're housed. And if you can show
19    me on the topics where that's located then we
20    can -- we can, you know, get into that, but I think
21    that, you know, I don't think that's relevant for
22    purposes of determining how risk assessments are
23    conducted.
24        MR. REINGOLD: Are you instructing him
25    not to answer?

---

**Page 24**

1        MS. HEYSE: Yeah.
2        MR. REINGOLD: Okay. All right. I
3    will move on. That was my last question on the
4    section anyway.
5  BY MR. REINGOLD:
6  Q. I've got some other preliminary questions, although
7    these go directly to what happens when people are
8    arriving. Excuse me.
9        My understanding is that when people
10    arrive at the facility, they've already been added
11    to the -- to the registry by -- I think by the
12    probation department at the point of sentencing or
13    soon thereafter; is that right?
14  **A.** I do not know that answer.
15  Q. Okay. Is that something that your colleague would
16    know?
17  **A.** I do not know if he would know that answer.
18  Q. Okay. That's fine. Let me ask it a different way.
19        When people who have committed sex
20    offenses arrive at the prison, is there a unit that
21    does registration for them?
22  **A.** I do not know that answer. We are far removed from
23    the registration process as mental health
24    assessment and treatment providers.
25  Q. Okay. Okay. All right. So when people arrive and

---

Tri-County Court Reporters
248-608-9250

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1 they've committed a registrable sex offense, how is | 1 **A.** Correct. |
| 2 it that they get steered on to the sex offender | 2 **Q.** All right. And if someone like that gets put on |
| 3 track; who -- how do they get identified as needing | 3 the track, are they then, you know, sort of subject |
| 4 the kind of assessments that we're going to be | 4 to all of the same procedures or whatever as |
| 5 talking about in a little while? | 5 someone who has a registrable sex offense, or are |
| 6 **A.** The question is when people arrive, how are they | 6 they treated differently? |
| 7 steered towards receiving a sex offense risk | 7 **A.** We do not take whether the behavior is something |
| 8 assessment; is that what you're driving at me? | 8 that per MCO code can place them on the registry or |
| 9 **Q.** Yes. | 9 not into consideration. |
| 10 **A.** So when an individual arrives at RG&C for intake, | 10 **Q.** Okay. And is it also possible that people can get |
| 11 our Static shop staffed under the office of | 11 on this track later in their incarceration; for |
| 12 planning and research engages in a file review and | 12 example, if they have a sexual misconduct in prison |
| 13 determines if a Static-99R can or cannot be scored | 13 that would reveal their needs for these kinds of |
| 14 according to manual guidelines. | 14 assessments and services? |
| 15 If a Static can be scored, they will | 15 **A.** If an individual engages in sexually abusive |
| 16 score that Static and then update our computer | 16 behavior while incarcerated, and that behavior |
| 17 systems based on that Static score. | 17 rises to the level to meet Static-99R manual |
| 18 **Q.** Okay. If someone arrives who doesn't have a | 18 guidelines for scoring, we can score them and we |
| 19 registrable sexual offense conviction, but they | 19 can provide treatment recommendations based on that |
| 20 have a, you know, another conviction, a non-sex | 20 score. |
| 21 conviction, but one that had sexual motivation in | 21 **Q.** Okay. What about people who committed a |
| 22 it, can they also be put on the same track? | 22 registrable offense, but one that has no sexual |
| 23 **A.** Correct, they can be. | 23 motivation? I'll give you an example. |
| 24 **Q.** All right. And so the screener would be looking | 24 We have as one of our main plaintiffs a |
| 25 for those kinds of folks as well? | 25 John Doe who committed child kidnapping, but it was |
| Page 25 | Page 26 |

| | |
|---|---|
| 1 during an armed robbery. He moved a store manager, | 1 behaviors the individual engaged in to make a |
| 2 and the store manager happened to have a child with | 2 determination about potential risk and needs that |
| 3 her, and he pushed them into a room, you know, | 3 are amenable to treatment and supervision. |
| 4 where the money was. | 4 **Q.** All right. I think what I want to do now is turn |
| 5 Is someone like that eligible for a | 5 to the operating procedure that you were talking |
| 6 Static-99 or not? | 6 about, so let me share my screen. It should work. |
| 7 **A.** I can't speak to the individual case because I'm | 7 And I've done some highlighting, which is mostly |
| 8 not aware of the actual behaviors involved. I can | 8 for my purposes, but it may help all of us. Can |
| 9 speak to the -- The Static does not take | 9 you see that? |
| 10 registration into consideration to determine | 10 **A.** No, I cannot. |
| 11 whether or not we can score it. It's | 11 MS. HEYSE: I'm not seeing anything, |
| 12 behavioral -- the criminal behaviors, the | 12 Paul. Yeah. |
| 13 motivations for it is what we take into | 13 **Q.** Oh, sorry. I forgot to hit the share button. Just |
| 14 consideration. | 14 a second. Now? |
| 15 **Q.** All right. So the reason then the non-sex offense | 15 **A.** Yes, I can see the screen. |
| 16 that's considered registrable isn't going to wind | 16 **Q.** So this is -- We'll have this marked as Exhibit 1, |
| 17 up being screened is because the Static-99 isn't | 17 which is OP operating procedure 05.01.100. It's |
| 18 norm for those people and, so as you said, you | 18 dated 8/29/22, and if anyone needs to know, it's a |
| 19 can't do the assessment, doesn't make any sense? | 19 19-page document which are MDOC Bates numbers 6 |
| 20 MS. HEYSE: I'm going to object to | 20 through 24. |
| 21 form, but you can answer, James. | 21 MARKED FOR IDENTIFICATION |
| 22 **A.** So the -- You said the reason it is not screened. | 22 EXHIBIT #1 |
| 23 We would review based on the identified MCO code to | 23 11:38 a.m. |
| 24 make a determination about whether or not that | 24 **Q.** Let's just take it from the top. |
| 25 Static can be scored. Again, we're looking at the | 25 It says at the very first line of it is |
| Page 27 | Page 28 |

7 (Pages 25 to 28)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1    that the -- "To accurately assess, recommend, and | 1    quite a while? |
| 2    provide evidence-based programming to eligible | 2         MS. HEYSE: I'm going to object to |
| 3    prisoners prior to their release to the -- into the | 3    form, but you can answer if you can. |
| 4    community." | 4  **A.**  I can speak to within the -- the sexual abuse |
| 5         That's the -- the purpose of this | 5    prevention services realm for the past, but I |
| 6    operating procedure. What is "evidence-based | 6    cannot speak outside of that. |
| 7    programming," or at least what does it mean to you? | 7  **Q.**  That's fine. |
| 8  **A.**  That would require a relatively long explanation; I | 8  **A.**  Historically, the Michigan Department of |
| 9    will do my best to keep it short. Evidence-based | 9    Corrections followed a one-size-fits-all model |
| 10    programming incorporates actuarially-tied, | 10    which was driven by MCO code to provide sex |
| 11    research-driven risk assessment, criminogenic needs | 11    offender treatment. Historically, we employ |
| 12    assessment, and responsivity addressed for the | 12    subjective risk assessment to determine individuals |
| 13    individual. | 13    likelihood of engaging further in sexually |
| 14         So it's referred to as the risk, need, | 14    motivated offenses. That -- We do not do either |
| 15    responsivity framework, that is what we employ | 15    one of those things within the MSAPP program |
| 16    within the Michigan Sexual Abuse Prevention Program | 16    anymore, inside our facilities, or in our |
| 17    within our facilities, as well as within our | 17    community. |
| 18    community. | 18  **Q.**  When did the switchover occur; I assume it was |
| 19  **Q.**  And my understanding is that this is something that | 19    gradual, but when did it occur? |
| 20    the MDOC emphasizes, almost any operating procedure | 20  **A.**  The change to incorporating actuarially-tied |
| 21    or policy director that you open that has to do | 21    relative risk assessment tools began with use of |
| 22    with assessment and programming will start with a | 22    the VASOR, the Vermont Assessment of Sex Offender |
| 23    line similar -- similar to this. | 23    Risk, in 2009. Then we moved to use of the |
| 24         Is this a break from the past, or is | 24    Static-99R in approximately 2010-2011 timeframe. |
| 25    this something the department has been doing for | 25  **Q.**  All right. So it's fair to say that it's been |
| Page 29 | Page 30 |
| 1    roughly 14 years that you've been using | 1    able to spoke to this more eloquently than myself. |
| 2    evidence-based instruments? | 2    I don't know if you want to pass that question to |
| 3  **A.**  Correct. | 3    him, or I can answer it as well. |
| 4  **Q.**  All right. | 4  **Q.**  Give us the -- your best shot at a, you know, a |
| 5  **A.**  As far as the one-size-fits-all model programming, | 5    reasonable-degree answer. |
| 6    MSAPP was introduced in 2012, it ran along side the | 6  **A.**  Very good. So by "actuarial risk assessment" we |
| 7    old SOP program, and was gradually phased out with | 7    are looking at a tool that has been normed with a |
| 8    full MSAPP implementation occurring in 2017. | 8    similar population that is able to classify an |
| 9  **Q.**  All right. Thank you for you that. That was very | 9    individual's relative risk from engaging in that |
| 10    helpful. Let's slide down a little bit on the | 10    same behavior when compared to other individuals |
| 11    document. | 11    who engaged in that behavior. |
| 12         All right. So on the operating | 12         So it is not a measure of absolute |
| 13    procedure number one, when we get to the menu of | 13    risk, it a measure of relative risk. We know that |
| 14    assessments it says "actuarial and research-based | 14    individuals in certain risk categories engage at |
| 15    risk assessment tools are utilized by the | 15    higher rates of sexually motivated recidivism than |
| 16    department to identify the risks and needs of every | 16    other individuals. |
| 17    prisoner. Results of the assessment are utilized | 17         So for example, we use Counsel State |
| 18    to assist in making program recommendations, to | 18    Government's risk classification system that |
| 19    assist in making parole supervision and case | 19    provides level 1, 2, 3, 4A and 4B, risk |
| 20    management determinations." | 20    categorizations or bins, and we know that out of |
| 21         Say a little more about the actuarial | 21    100, the amount that will sector sort of a -- from |
| 22    parts of these tools; what does that mean; who is | 22    bin 1 is much less than the amount that will |
| 23    doing what that makes it actuarial? | 23    recidivate that are in bin 4B. We don't know which |
| 24  **A.**  I will speak to that, however, I do know that | 24    ones out of that 100 will offend, we just know |
| 25    Corey Spickler is a Static-99 trainer, and will be | 25    relative risk is greater. |
| Page 31 | Page 32 |

8 (Pages 29 to 32)

JAMES KISSINGER
1/26/2023

---

**Page 33**

1   Q. What I take from that and what I want you to do is
2   tell me if I'm right or wrong. This works a lot
3   like the way life insurance companies price life
4   insurance; that is they're able to look at a whole
5   bunch of factors as to whether someone will die
6   early or late, and they can norm those factors
7   looking backwards, you know, like if it turns out
8   that bald people -- bald men, you know, die
9   younger, and it's specifically significant, I'm
10  going to pay a higher premium because I might be in
11  a higher risk category.
12          And what they're doing is identifying
13  the fact that they have the most influence on early
14  or late death. Is that pretty much how it works?
15  A. It appears that you've done your research. That is
16  a good analogy to utilize when you're talking
17  actual risk assessments related to predicting
18  further sexually-motivated behavior.
19  Q. All right. And my understanding is that these
20  kinds of instruments, kind of like life insurance
21  or actuarial work, get better over time because the
22  more population you look at and the longer term you
23  had to look at them, the more you can adjust the
24  norm.
25          So, you know, in the first few years

---

**Page 34**

1   baldness doesn't show up a lot, but by 30-years old
2   baldness is clearly significant, you're going to
3   adjust the norming to give baldness to the higher
4   rate. Is that what they're doing as they readjust
5   the scoring?
6   A. By "better," what are you referencing?
7   Q. I mean more accurate.
8   A. So better validity?
9   Q. Yes, better validity, higher predictability of
10  value.
11  A. I would say that is -- that is accurate over time
12  with more research, larger norming groups. At
13  least I can speak to the Static from its original
14  development to its current form has evidence and
15  proved areas under the curved values over time.
16  Q. Okay. All right. And this explains why these
17  kinds of assessment tools are used a high priority
18  for the department, right, compared to what was
19  being used in the past, we know that these are
20  statistically validated and create
21  risk -- identifiable risk?
22          MS. HEYSE: Object to form and
23  foundation, but you can answer.
24  A. I can't speak to the department's motivations at
25  large outside of the MSAPP program or SAPP's

---

**Page 35**

1   programming in general. Within SAPP's programming
2   we are very interested in ensuring valid and
3   reliable assessment information and provide it to
4   all of our stakeholders, if that answers your
5   question.
6   Q. It does. So I mean, I take it that if you have a
7   choice of evidence-based tools to use or
8   nonevidence-based tools, the -- the overwhelming
9   preference would be to make the evidence-based
10  tools the -- the primary thing that you're using?
11  A. For SAPP's purposes, absolutely, yes, we want to go
12  with what the science says works.
13  Q. All right. Now I want to move on to the -- the
14  list of tools that are available. My first
15  question is, are all of the ones that are listed
16  below -- let's see, except for COMPAS -- are
17  these -- are all of these used at least some of the
18  time at the front end like close to intake or as
19  part of intake or initial screening, or are some of
20  them used more often or more regularly later on?
21  A. I -- Sorry. Go ahead, Kristin.
22          MS. HEYSE: It's okay. Can you
23  clarify -- Are you asking in the context of the
24  Program, Paul, because I think we talked about
25  there are only certain assessments that these

---

**Page 36**

1   individuals would be able to speak to, and
2   I'm -- I'm looking at some of them, and they
3   weren't ones that we had previously identified. So
4   are you asking him which ones they used or -- I
5   guess that's the point of my question.
6           MR. REINGOLD: Mine is simply a timing
7   question. When do these get used?
8           MS. HEYSE: Well, they'll only be able
9   to speak to the ones that they use. I mean, we had
10  that discussion prior to this deposition that they
11  weren't going to be able to speak to all
12  assessments and when they were used. They were
13  able to speak to the assessment tools they actually
14  utilized. We can provide somebody to talk about
15  the tool -- the timing of the tools that they don't
16  use if you need somebody to do that then these guys
17  aren't the ones to speak to those. So for
18  example --
19          MR. REINGOLD: I'm not asking about
20  expertise with -- with the different tools. I'm
21  asking about when they get used. That's all.
22          MS. HEYSE: Okay. And I -- If you're
23  asking specifically, like I can tell you we've had
24  this discussion, and that is why I told you you need
25  to bring somebody else in to talk about when some

---

9 (Pages 33 to 36)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1    of these tools were used, because these individuals<br>2    don't utilize them.  I think we're speaking past<br>3    each other here, or the example I can give you is<br>4    the COMPAS.  I've had conversations with these<br>5    individuals, they don't know about the ins and outs<br>6    and uses of COMPAS, they don't know when it's done<br>7    and how it's done.  We would have to provide<br>8    somebody else to do that.<br>9          MR. REINGOLD:  That's why I took COMPAS<br>10    out of this question.<br>11          MS. HEYSE:  Okay.<br>12          MR. REINGOLD:  I'm not asking about<br>13    COMPAS.  I'm asking about the ones that apply to<br>14    people who have committed sex offenses.<br>15          MS. HEYSE:  Okay.  I think that's a<br>16    more narrow question.  James, are you clear on<br>17    that, then?<br>18          THE WITNESS:  I'm not.  If you would<br>19    not mind repeating the question, please.<br>20    BY MR. REINGOLD:<br>21    Q.  Yeah.  All I want to know is of 2, 3, 4, and 5, are<br>22    all of those used at the front end as part of the<br>23    screening, or are some of them more likely to be<br>24    used later on?<br>25    A.  I should note that none of these are screening<br><br>Page 37 | 1    tools.<br>2    Q.  You're right.  I should have said assessment.<br>3    A.  No, the Static-99 is completed at the front end.<br>4    Q.  Okay.  And are there some people who might get a<br>5    Stable-2007 at the front end?<br>6    A.  Yes, there are some that might get the Stable-2007<br>7    at the front end.<br>8    Q.  And what would the reasons for something like that?<br>9    A.  The -- When an individual becomes within seven<br>10    years of their earliest release date, we request a<br>11    Stable evaluation to be completed in order to<br>12    determine their overall priority risk<br>13    categorization.<br>14    Q.  All right.  So what you're saying is -- and correct<br>15    me if I'm wrong -- is that at some point everyone<br>16    is going to get -- everyone in the group we're<br>17    talking about, people who committed sex offenses,<br>18    everyone is going to get a Stable-2007 assessment<br>19    in addition to their Static-99 within some point<br>20    within seven years of their release or parole<br>21    eligibility?<br>22    A.  Not necessarily.  There are different rules for<br>23    scoring the Static in the state.  So an individual<br>24    must have a conviction on that Stable, where as the<br>25    Static can be scored on a charge only.  So there<br><br>Page 38 |
| 1    are some cases where we can score Static, but we<br>2    cannot score Stable.<br>3    Q.  Okay.  All right.  That makes good sense to me.<br>4    But what you're saying is everybody who has a<br>5    conviction will line up with both?<br>6    A.  Every adult male who engaged in sexually abusive<br>7    behaviors that meets manual guidelines for scoring<br>8    will have a Static and Stable prior to parole<br>9    consideration.<br>10    Q.  No, I -- I love that you're so careful with the<br>11    answer because that's -- it's helpful to me.<br>12    You're making clear distinctions.  All right.<br>13          The COMPAS I want to bypass out of<br>14    difference to what your counsel has said.  I can<br>15    say it appears that it's sort of the overarching<br>16    assessment for everybody, and it becomes the<br>17    document that's teed to lots of programming down<br>18    the road, but you're not the people to address that<br>19    with, so I'll bypass that.<br>20          So what we know is that if COMPAS is<br>21    what everybody's going to get, 2 through 6 are what<br>22    subpopulations either will or might get.  And I'm<br>23    not interested in number 6 which has to do with<br>24    substance abuse, and I want to focus on number 2 a<br>25    little further down the road.  And so I just want<br><br>Page 39 | 1    to ask a few questions about 3, 4, and 5, to<br>2    distinguish them from what we will learn in a<br>3    little while about number 2.<br>4          Stable-2007 is described as a dynamic<br>5    risk instrument, and it's only for adult male sex<br>6    offenders.  And what I want to know is can you<br>7    describe the difference between a Static assessment<br>8    instrument and a dynamic risk one?<br>9    A.  I can.  A Static risk assessment is looking at<br>10    primarily historical indicators that have been<br>11    linked through research that relate to risk for<br>12    further engagement and the behavior it's trying to<br>13    assess.  So for the Static it would be for further<br>14    engagement sexually-motivated crime looking at<br>15    historical features.<br>16          The term "Static" itself implies stuck,<br>17    stuck in time.  They are not treatment targets for<br>18    us.  It's primarily -- even though some<br>19    professional judgment is required -- an objective<br>20    assessment of risk based on official criminal<br>21    justice records historical factors.<br>22          The Stable-2007 is looking at<br>23    personality characteristics, learned behaviors,<br>24    skill deficits, things that are linked to further<br>25    criminal behavior as well, but it involves a higher<br><br>Page 40 |

10 (Pages 37 to 40)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1 | level of structured professional judgement, but |
| 2 | also has very clear manual guidelines on how to |
| 3 | score. |
| 4 | So it's -- The intention there also is |
| 5 | to be dispassionate, objective in how we assess |
| 6 | criminogenic need.  So it's -- Those -- The Stable |
| 7 | will -- will help us identify things to target in |
| 8 | treatment that are amenable to change, as well as |
| 9 | things that we should pay attention to while an |
| 10 | individual is on supervision that could potentially |
| 11 | be linked to further sexually-motivated criminal |
| 12 | behavior. |
| 13 | Q.  And is the Stable something that might get done |
| 14 | more than once as a person's behavior changes, so |
| 15 | that in some way you can measure those changes in a |
| 16 | way that you have confidence? |
| 17 | A.  Yes, the Stable is expected to change, but not |
| 18 | drastically over the course of time. |
| 19 | Q.  He -- Go ahead.  Sorry. |
| 20 | A.  No, go ahead.  That's . . . |
| 21 | Q.  Is the Stable also helpful -- and I'm thinking of |
| 22 | an example, you know, I'm thinking on the margins. |
| 23 | There must be people who have, let's say, a very |
| 24 | high risk -- or let's say moderately high risk, you |
| 25 | know, Static-99 score, but very quickly people |

Page 41

| | |
|---|---|
| 1 | around them and their treaters, whatever, come to |
| 2 | have great confident in them, that even though they |
| 3 | have a high Static score, they -- they seem, you |
| 4 | know, incredibly responsible and safe. |
| 5 | Is someone like that -- Is the Stable |
| 6 | something that can then be used to get a fuller |
| 7 | picture of that person, and I assume the reverse |
| 8 | can be true as well; you might have somebody who |
| 9 | has got a really low score but it scares the hell |
| 10 | out of everybody, and you want to do a Stable to, |
| 11 | again, have more confidence in the assessment. |
| 12 | Does it get used that way? |
| 13 | MS. HEYSE:  Object to form, but you can |
| 14 | answer. |
| 15 | Q.  Yes, there was a lecture in the question at the |
| 16 | end. |
| 17 | A.  Right.  So is the question essentially if somebody |
| 18 | scares the hell out of you and their Static score |
| 19 | was low, would we do the Stable? |
| 20 | Q.  Yes. |
| 21 | A.  We do the Stable on anybody who meets scoring |
| 22 | criteria regardless of any emotional response to |
| 23 | the case. |
| 24 | Q.  Okay.  That's -- That's a good answer, too.  It |
| 25 | shows me you're -- you're well trained.  This is |

Page 42

| | |
|---|---|
| 1 | what the manual requires, and you're doing it, so |
| 2 | that's good.  Okay. |
| 3 | In the training for doing the Stable, |
| 4 | how long does it take to be trained? |
| 5 | A.  So the training is quite a process to become -- I'm |
| 6 | trying to think how to not oversimplify this. |
| 7 | Training must be received from a SORA-certified |
| 8 | trainer.  That trainer then can engage in the |
| 9 | dynamic supervision protocol, which is how the |
| 10 | Static and Stable were normed; it's referred to as |
| 11 | the trainer model. |
| 12 | So that individual who is trained by |
| 13 | what's referred as a master trainer, that requires |
| 14 | a review of all the literature for taking in an |
| 15 | exam and presenting in front of the master trainers |
| 16 | to get that certification, then that trainer |
| 17 | engages in training of staff. |
| 18 | That typically takes 8 to 10 hours to |
| 19 | complete the training, and involves case study at |
| 20 | the end to ensure that the individual who is |
| 21 | trained understood the concepts, as well as |
| 22 | continued consultation following that training. |
| 23 | Q.  Is part of the training having them do, you know, |
| 24 | scoring somebody, and then having the trainer or a |
| 25 | trainer equivalent scoring, and making sure they're |

Page 43

| | |
|---|---|
| 1 | coming out at the same place? |
| 2 | A.  Correct.  That is done at the end of all the |
| 3 | Stable-2007 trainings. |
| 4 | Q.  And of the 150 people that you said are in a |
| 5 | position to do Static-99 assessments, how many of |
| 6 | them are trained to do the Stable-2007? |
| 7 | A.  I cannot give you an exact answer on that.  I can |
| 8 | approximate if that's -- |
| 9 | Q.  That's fine.  Yeah, just rough. |
| 10 | A.  Within the Department of Corrections I would say |
| 11 | approximately 150 individuals have been trained to |
| 12 | utilize the Stable-2007 that are currently |
| 13 | employed. |
| 14 | Q.  Okay.  All right.  Let's move down to the -- the |
| 15 | next instrument.  I'll drop this down here.  This |
| 16 | one is tough because it has the same acronym, SORA, |
| 17 | as the Sex Offender Registration Act, and I'll |
| 18 | refer to it as the SO risk assessment. |
| 19 | This is a written psychological |
| 20 | evaluation report following an interview, and it |
| 21 | can be used to support or override risk levels |
| 22 | identified in the actuarial risk instruments. |
| 23 | Does every prisoner who has committed a |
| 24 | sex offense get this evaluation? |
| 25 | A.  Every prisoner who is engaged in sexually-motivated |

Page 44

11 (Pages 41 to 44)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1   criminal behavior, per administrative rule, must | 1   an evaluation of those engaged in sexually-abusive |
| 2   receive a SORA. | 2   behaviors. |
| 3   Q.  Okay.  And is the SORA -- Let me ask it a different | 3   Q.  Okay.  So I take it that the -- I'll call it again |
| 4   way. | 4   the SO risk assessment -- this one is not an |
| 5        Do people who haven't committed sex | 5   evidence-based instrument, but instead is a more |
| 6   offenses also have a psychological evaluation at | 6   traditional method where someone does an interview, |
| 7   intake that's different from this? | 7   and then based on that skill or experience or maybe |
| 8   A.  People who have not committed sexually-motivated | 8   whatever, maybe a gut feeling says either I agree |
| 9   crimes? | 9   with the actuarial research-based instruments, or |
| 10  Q.  Yeah, do they have a more general psychological | 10  they might say I disagree and I'd recommend raising |
| 11  eval? | 11  or lowering the score; is that part of what's |
| 12  A.  I can't speak to what goes on outside of the | 12  happened? |
| 13  Sexual Abuse Prevention Services, whether it | 13  A.  No, this is the -- The Sex Offense Risk Assessment |
| 14  qualifies as a psych eval or not. | 14  is -- is not a tool.  It's a combination of the |
| 15  Q.  Okay.  And do the people who committed sex | 15  Static and the Stable and Biopsychosocial |
| 16  offenses, do you know if they get a psychological | 16  Evaluation put into one format.  So it incorporates |
| 17  evaluation that's more general than this one, or | 17  the Static and the Stable into one format. |
| 18  are they getting two, or just the one? | 18       As far as support override risk levels, |
| 19  A.  They could potentially also receive psychological | 19  that is something that is not done.  The risk is |
| 20  evaluation depending on what the potential concerns | 20  the risk.  We can support or override treatment |
| 21  or needs are -- or concerns about response to | 21  recommendations based on that risk level. |
| 22  treatment or supervision maybe.  I'm not aware of | 22  Q.  All right.  So what you're saying is that the last |
| 23  any type of rule that we require that. | 23  sentence of number 4 is not really accurate |
| 24  Q.  Okay. | 24  anymore? |
| 25  A.  The SORA meets administrative rule requirements for | 25  A.  To the best of my knowledge, no, it is not accurate |
| Page 45 | Page 46 |

| | |
|---|---|
| 1   anymore. | 1   A.  And see, I don't know that for sure.  I do know |
| 2   Q.  Okay.  That's great and that takes out some of my | 2   it's ERD, earliest release date. |
| 3   questions.  Okay. | 3   Q.  Yeah.  Okay.  And then let's take a quick look |
| 4        Does that evaluation go into the | 4   at -- on number 5, the professor.  That's a |
| 5   person's medical or psychological record? | 5   checklist designed to identify and summarize |
| 6   A.  It does. | 6   protective and risk factors for adolescents and |
| 7   Q.  And does it also go to the parole board at the | 7   emerging adults. |
| 8   appropriate time? | 8        Is this one an evidence-based |
| 9   A.  It does. | 9   instrument, or is it more -- or not?  You tell me. |
| 10  Q.  Okay.  And so just to make sure I -- I understand, | 10  A.  I do not believe it meets criteria to |
| 11  virtually everybody coming in with a | 11  be -- it's -- again, it's not a risk assessment. |
| 12  sexually-oriented crime is going to get the SO risk | 12  It was never -- Dr. Warlien{sp}, the developer, did |
| 13  assessment in addition to a Static-99 as part of | 13  not intend it to be a risk assessment.  It is a |
| 14  intake or the initial process coming in? | 14  treatment guide based on evidence-based principals |
| 15  A.  They do not receive a SORA at the -- at the intake, | 15  for what is effective with juvenile-only offenders. |
| 16  no. | 16  Q.  And so it's mostly looking at identifying factors |
| 17  Q.  Oh, when is that done?  I misunderstood. | 17  that will steer the treater in one direction or |
| 18  A.  A SORA is typically done within two years of the | 18  another? |
| 19  parole board jurisdiction date -- sorry, earliest | 19  A.  Correct. |
| 20  release date, not the parole board jurisdiction | 20  Q.  When somebody comes in as an adolescent or emerging |
| 21  date.  Within two years of their earliest release | 21  adult and is in prison into adulthood, did they |
| 22  date is when a SORA is requested and administered. | 22  then get the Static-99, or are adolescents and |
| 23  Q.  I thought I read somewhere that parole board | 23  emerging adults getting the Static-99 as well; is |
| 24  jurisdiction and earliest release date and are the | 24  that norm for young people, too? |
| 25  same? | 25  A.  There's -- Sorry, there's a couple questions there. |
| Page 47 | Page 48 |

12 (Pages 45 to 48)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1   Q.  Yeah, let me back off that. | 1   A.  No, the age at time of engaging in sexually abusive |

Q. Yeah, let me back off that.
    Do adolescents and emerging adults get
the Static-99 at the front end?
A. How are you defining adolescents?
Q. I can only read what's here, so I -- I'm
reading -- You will have to tell me how -- how you
define it.
A. So if an individual meets criteria for scoring on
the Static-99R, then we will score them and utilize
that tool to drive treatment recommendations. If
an individual does not meet scoring criteria on the
Static-99R is what we would consider a youthful
offender. The professor can be used with the
individual during the course of treatment.
Q. All right. And is there an age cutoff for the
Static-99R?
A. There is an age cutoff for the Static-99R.
Q. And what is it?
A. I will need to refer to the Static manual because
unfortunately this is a relatively nuanced --
Q. Yeah, that's all right. I just wanted to know if
this was a a -- All right.
    So now my question is, once the person
passes the cutoff, will they be scheduled for a
Static-99R?

Page 49

A. No, the age at time of engaging in sexually abusive
behaviors is primarily what matters for scoring the
Static. So if somebody is 65-years old and they
engaged in sexually abusive behaviors at 15 and had
no other history of sexually abusive behaviors, we
could not score the Static-99R on them.
Q. Yeah, I'm looking at a different way. I'm saying
if an adolescent comes in, can't be scored on the
Static-99, gets the professor, and then, you know,
three years later or four years later has gone from
adolescent or emerging adult to adult, will that
trigger to them getting a Static-99R?
A. I guess I'm still struggling to understand what
you're asking here.
Q. Well, when you told me you can't get it at the
front end because they're too young and it's not
norm for them -- or they don't meet the criteria,
however you want to phrase it. And now they've
been in prison 3 or 4 years, and have now passed
whatever the age limitation is. And I'm just
asking, does that mean now they'll get a Static-99?
A. No, they will not get a Static-99 at that point
because --
Q. And why not?
A. Because the age for consideration is based upon how

Page 50

old they were at the time of engaging in the
sexually abusive behaviors.
Q. All right. And that's why the Static-99 is done as
soon as it can be after the commission of the
crime?
A. That's relatively irrelevant.
Q. Oh. I didn't understand your last answer then.
A. So again, if -- excuse me. If somebody engages in
a sexually motivated crime, age 14, and they come
to prison at age 42 --
Q. No, no, that's not my hypothetical anymore. My
hypothetical is if someone -- let's say someone
commits a crime at just below the Static-99 age and
comes into prison and gets the professor, and
within a couple years they're over the Static-99R
age.
    Is what prevents them from then getting
the Static-99 is that the behavior is two years
back and you can't do it, or is there some other
reason?
A. What prevents the use of Static-99R is how old they
were at the time of engaging in the behaviors. My
knowledge I do think applies to your question.
Q. Okay. So you're saying if they meet the cutoff at
the time of the crime then you can't -- you can't

Page 51

get that time back. Right; that's fixed?
A. It's based on how the Static was normed.
Q. Yeah. Yeah. I understand it now. That makes
sense.
    Let's turn to the Static-99R itself.
You've answered a lot of the questions that I had
for this section about training, and I just want to
check to see if there's anything else that we
didn't cover about training.
    I think we covered what I wanted. Oh,
are there any educational requirements to be
trained for the Static-99?
A. SORA defines the training requirements or the
requirements for the Static scoring, and there are
no educational obtainment requirements, it requires
to be trained by a certified trainer.
Q. Are a lot of people who are doing the training
within the department psychologists or clinical
social workers?
A. The -- We have at current time five trainers in the
Static-99R; four of them have masters degrees, one
has a bachelors degree.
Q. And the people that they're training, are a
significant number of them psychologists or social
workers, or not?

Page 52

13 (Pages 49 to 52)

JAMES KISSINGER
1/26/2023

```
 1   A.  I think you need to define "significant."  The --
 2   Q.  Well, again, we said we've got 150 people who are
 3       using this instrument.  I'm just trying to get a
 4       feel for, you know, whether half of them, you know,
 5       have a -- a masters degree or something like that,
 6       or none of them.
 7   A.  The majority of individuals who are trained in
 8       Static have a masters degree or higher; not all of
 9       them.
10   Q.  Okay.  That's what I thought, but I'm trying to
11       make sure I got it right.  All right.
12           If we drop further down this document
13       to "D," in the middle of "D" it says the "case
14       plan" -- which I think is the COMPAS case
15       plan -- "provides the prisoner with an outline of
16       programing based on his or her needs" and so on.
17           But then it says "as identified by an
18       actuarial risk assessment, for example COMPAS or
19       Static-99R, etcetera, it will be completed during
20       the presentence investigation prior to his or her
21       incarceration, and then also prior to release on
22       parole."
23           That suggests to me that the great
24       majority of COMPAS and Static-99R assessments are
25       being done before people arrive at the prison.  And
```

                           Page 53

```
 1       that came as a surprise to me if it's true, because
 2       in other places, including above, I thought the
 3       menu of things we were looking at were things that
 4       were likely to occur in the prison.
 5           So my question is what percentage of
 6       the Static-99R's are done in field around the time
 7       of sentencing and the completion of the PSI, and
 8       what percentage are done when people arrive at the
 9       prison?
10   A.  To my knowledge those that are sentenced to prison
11       do not get them done during the presentence
12       evaluation, they are done upon their arrival at
13       RG&C.
14   Q.  Okay.  So again, the green highlighting in "D" is
15       probably either out of date or just plain wrong?
16   A.  I did not write that, so I can't -- To the best of
17       my knowledge they are completed at RG&C.
18   Q.  Okay.  That's certainly what I'm -- I mean, people
19       doing PSI's have more than enough to do, but it
20       seemed bizarre to me that they would also be doing
21       COMPAS or Static-99R's at that time.
22           To make sure I've got this right, is it
23       fair to say that the -- vast majority of people
24       coming into prison with a sexual offense or
25       equivalent, that would make them eligible to be
```

                           Page 54

```
 1       assessed with a Static-99R, arrived without that
 2       having been done?
 3   A.  That would be fair to say.
 4   Q.  All right.  And that means in some respects you
 5       have more control over the process, and virtually
 6       all of the assessing that's being done is being
 7       done by highly-trained professionals whom you had
 8       trained and who have been trained by the agency
 9       that administers the Static-99R itself?
10           MS. HEYSE:  Object to form, but you can
11       answer, James.
12   A.  Trained -- The Static-99R's are primarily completed
13       Static shop staff out of the central office, which
14       is a smaller group of individuals than the 150 that
15       are trained.  They are trained according to SORA
16       criteria.
17   Q.  All right.  Okay.  So there's a second group of
18       people who also do Static-99R's at intake who have
19       been fully trained, but they're not under your
20       hospice, they're in a separate unit?
21   A.  Correct.
22   Q.  All right.  And are those periodically reviewed by
23       your office, anything like that?
24   A.  There's no formal review process in place
25       for -- between behavioral health care services and
```

                           Page 55

```
 1       offices of planning and research for reviewing
 2       validity or liability if the Static course is
 3       completed by the Static shop.
 4   Q.  Okay.  And how many people are doing that?
 5   A.  How many employees in the Static shop?
 6   Q.  Yes.
 7   A.  Two that I'm aware of.
 8   Q.  Okay.  All right.  In part of our requests to the
 9       department, we were asking about numbers of
10       Static-99's that were completed for the entire
11       prison population, and we were told that we could
12       get that information, at least accurately I think,
13       only for one year, 2022, and we said that's fine.
14       And the answer was it was a total of 1,634
15       Static-99Rs were completed in 2022 for 1,574 unique
16       individuals.
17           I understand that Static-99R's can be
18       done at the front end as part of the intake, or
19       will be done at the front end as part of the
20       intake, and will also be done at the back end for
21       purposes of parole.
22           And so what I'm asking here is out of
23       this number can you estimate for me the approximate
24       percentage of the front end intake assessments
25       versus the back end parole exit assessments?
```

                           Page 56

                                        14 (Pages 53 to 56)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1    MS. HEYSE:  So Paul, again, I don't | 1    personal knowledge.  You're asking the department |
| 2  think this falls -- This is one of the topics that | 2  to put up a representative that's speaking on |
| 3  we pulled out, because if we're talking numbers and | 3  behalf of the department about these numbers. |
| 4  statistics, that's something that's going to be | 4    So if you want accurate numbers, then I |
| 5  handled by research. | 5  think we need the appropriate person designated, |
| 6    MR. REINGOLD:  I just gave you the | 6  and we specifically asked for that to be pulled out |
| 7  numbers that we got, and I have the question about | 7  of the topics because any numbers would have to be |
| 8  the numbers -- | 8  talked about with research.  So that's our concern, |
| 9    MS. HEYSE:  Can I finish speaking | 9  is that we're blurring the lines with a 30(b)(6) |
| 10  before you jump in? | 10  dep where there's a representative speaking, and |
| 11    MR. REINGOLD:  Yep.  Sorry.  Didn't | 11  then a personal individual. |
| 12  mean to interrupt. | 12    I mean, he can certainly say he doesn't |
| 13    MS. HEYSE:  That's okay.  It's hard | 13  know in his personal capacity, but that's not |
| 14  with Zoom going back and forth.  These -- You're | 14  really relevant for purposes of a 30(b)(6) |
| 15  asking for them to identify a percentage of these | 15  deposition.  Right? |
| 16  numbers, and I'm suggesting you if we're talking | 16    MR. REINGOLD:  What I thought I had |
| 17  about statistics or numbers or percentages, that's | 17  said is that we weren't going to talk about |
| 18  probably a question that needs to be reserved for | 18  aggregate numbers -- or we would only talk about |
| 19  research. | 19  aggregate numbers and percentages, and that what we |
| 20    MR. REINGOLD:  I'll be happy to take an | 20  weren't going to do was say how about, you know, |
| 21  "I don't know" answer if that's what it is, but if | 21  not 2021 or 2020, or something like that. |
| 22  he knows, I think it's a perfectly fine question. | 22    All I'm trying to do is figure out |
| 23    MS. HEYSE:  But here's the principal I | 23  where the resources are going, how much goes to |
| 24  have with this, Paul.  This is a 30(b)(6) | 24  front end, and how much goes to back -- I can do it |
| 25  deposition, so we're not talking James Kissinger's | 25  without numbers.  I can simply say of the number of |
| Page 57 | Page 58 |

| | |
|---|---|
| 1  Static-99's that were done, what percentages of | 1  Static scoring.  So it's essentially to ensure that |
| 2  front end, and what percentages of back end.  I | 2  we are providing valid scores to our stakeholder. |
| 3  don't see how that exceeds what we we're talking | 3    So it's looked at again to make sure |
| 4  about. | 4  there was nothing missed.  The Static has question |
| 5    MS. HEYSE:  I thank that's a different | 5  number 2 on the Static sometimes does require an |
| 6  question. | 6  interview, and that's reference to whether they've |
| 7    MR. REINGOLD:  Let me frame it that | 7  ever lived with a lover for two years or more.  So |
| 8  way. | 8  some score changes can occur as a result of those |
| 9  BY MR. REINGOLD: | 9  interviews. |
| 10  Q.  Of the total numbers of Static-99R's that are done, | 10    And the Static manual speaks to the |
| 11  what percentage are done for front end assessment, | 11  allowance of that one-point deviation as a result. |
| 12  and what percentage are done for back end?  That's | 12  So it's essentially looked at twice to ensure that |
| 13  a better way. | 13  we're providing valid and reliable information. |
| 14  A.  So it will be hard for me to give any percentages | 14  Q.  Are there any other -- Strike that.  I'll return to |
| 15  because I have not researched that.  I think I can | 15  this later.  All right. |
| 16  answer this question, though, and be helpful. | 16    So what you're telling me is that the |
| 17    The RG&C statics are completed on the | 17  ones that are done originally get reviewed at the |
| 18  individual when they come in by the Static shop. | 18  back end and might get corrected up to one point, |
| 19  All cases are screened to see if they can meet | 19  but that didn't address even a very rough |
| 20  criteria for scoring.  If they're scored -- If they | 20  percentage as to -- as to how much is going -- I'm |
| 21  can be scored, they are scored. | 21  trying to figure out where the resources are going. |
| 22    When the individual becomes within | 22    Are they mostly occurring when people |
| 23  eligibility timeframes for further evaluation, | 23  come in, or -- or out of however many you do in a |
| 24  whether that's a sex offender risk assessment or a | 24  year, what percentage of the back end ones are |
| 25  Stable-2007 only, the evaluator must verify the | 25  being done? |
| Page 59 | Page 60 |

15 (Pages 57 to 60)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1 | **A.** I think that question was more about how many are |
| 2 | going out on parole versus how many are coming from |
| 3 | the front door. |
| 4 | **Q.** That's what I'm asking, if you know, just roughly. |
| 5 | **A.** I do not know. |
| 6 | **Q.** Okay. That's probably how we figure it out because |
| 7 | the bottom line is everybody is getting one at both |
| 8 | ends -- or almost everyone is getting one at both |
| 9 | ends -- and so intakes or outflow would tell us the |
| 10 | answer to that; is that right? |
| 11 | **A.** Correct. Sorry, I was shaking my head like you |
| 12 | told me not to. |
| 13 | **Q.** All right. And then one other thing that was |
| 14 | unusual about the numbers was there were 60 |
| 15 | repeats. It said so many were done for -- more |
| 16 | were done than the number of unique individuals. |
| 17 | And my question is, why would there |
| 18 | be -- What accounts for that; why would there be 60 |
| 19 | repeats? |
| 20 | **A.** Potentially, an individual's age moved him to a |
| 21 | different bracket which would cause a change in the |
| 22 | score. |
| 23 | **Q.** All right. That's exactly what I -- what I |
| 24 | thought. So what you're saying is although the |
| 25 | Static-99R deals almost entirely with Static |

Page 61

| | |
|---|---|
| 1 | features, age is not a Static feature and it can |
| 2 | change the score if enough time has passed? |
| 3 | **A.** That's correct. |
| 4 | **Q.** Okay. |
| 5 | **A.** In most cases. |
| 6 | **Q.** How much time does it take to do a Static-99 score, |
| 7 | let's say, assuming all the information you need is |
| 8 | in the file? |
| 9 | **A.** I don't know if I'm able to adequately address that |
| 10 | question outside of my own personal anecdotal |
| 11 | level. |
| 12 | **Q.** I'm looking sort of for an average time, you know, |
| 13 | if you're in training and somebody raising their |
| 14 | hand and says, you know, what's the average it |
| 15 | should take me to get one of these done assuming |
| 16 | I've got all the information? |
| 17 | **A.** The time to score Static is going to depend largely |
| 18 | upon the history of the person in front of you. |
| 19 | Somebody is on their "F" prefix and has a rather |
| 20 | extensive history, versus someone that has an |
| 21 | "A" prefix and doesn't. So the times do vary, so |
| 22 | it would be hard to kind of pigeonhole or give you |
| 23 | an exact timeframe. |
| 24 | **Q.** Can you give me an average for an easy one and an |
| 25 | average for a hard one? |

Page 62

| | |
|---|---|
| 1 | **A.** From my own personal experience for an easy one, |
| 2 | 15 minutes; for a hard one that involves |
| 3 | consultation, which the hard ones often do, up to |
| 4 | an hour. |
| 5 | **Q.** Okay. Great. All right. |
| 6 | And can you just say a short word or |
| 7 | two about how the assessor calculates the score? |
| 8 | **A.** The Static-99R? |
| 9 | **Q.** Yes. |
| 10 | **A.** According to manual guidelines. |
| 11 | **Q.** Okay. So basically you're putting checkmarks in |
| 12 | for the different factors, and then there's some |
| 13 | kind of sheet that's built into it that gives you |
| 14 | the score? |
| 15 | **A.** That is correct. It's entered into COMPAS that |
| 16 | does the tabulations automatically based on what is |
| 17 | identified as present or not. |
| 18 | **Q.** Okay. All right. And then you said that with the |
| 19 | Static-99 there are five risk levels; 1, 2, 3, 4A |
| 20 | and 4B. Do the risk levels have names in addition |
| 21 | to numbers? |
| 22 | **A.** They -- They do. |
| 23 | **Q.** And what are the five risk levels? |
| 24 | **A.** Level 1 is referred to as very low risk. Level 2, |
| 25 | below average risk. Level 3, above |

Page 63

| | |
|---|---|
| 1 | average -- sorry -- level 3, average risk. Level |
| 2 | 4A, above average risk. And level 4B, well above |
| 3 | average risk. |
| 4 | **Q.** All right. And if you -- If you're looking at the |
| 5 | scores cumulatively, do the -- do the scores wind |
| 6 | up being divided across the true risk |
| 7 | categories, will they be equally populated, or will |
| 8 | there be a concentration on one side or the other? |
| 9 | **A.** Are you asking for accurate information? |
| 10 | **Q.** No, no. I'm asking how -- how the -- the levels |
| 11 | work. You know, like if you're in college and |
| 12 | someone will say, oh, your grades are in the second |
| 13 | quintile or in the forth quintile, and all four |
| 14 | quintiles will have the same number of people in |
| 15 | them, what I'm asking is when the scores are done, |
| 16 | do they shade one way or the other, and if so, |
| 17 | which way and how much? |
| 18 | **A.** The majority of the individuals will fall within |
| 19 | the level 3 risk area. I don't know if it's a bell |
| 20 | curve precisely or not, the Static 99R's manual |
| 21 | providers risk distribution information. So that |
| 22 | information can be pulled. |
| 23 | **Q.** My understanding is that the Static-99 was -- the |
| 24 | score system in the levels were changed at some |
| 25 | point to match -- I used the phrase before, I can't |

Page 64

16 (Pages 61 to 64)

JAMES KISSINGER
1/26/2023

| | |
|---|---|
| 1 | remember what it was.  But it was the same scores |
| 2 | that's used for other categories of crime to make |
| 3 | it fit a national standard. |
| 4 | Were you using a Static-99 before that |
| 5 | change? |
| 6 | **A.**  We were. |
| 7 | Q.  And at that time was the distribution within the |
| 8 | categories different than it is today after the |
| 9 | change? |
| 10 | **A.**  That would also require referring to the Static-99R |
| 11 | 2003 evaluator's workbook.  I don't -- |
| 12 | Q.  Do you remember if -- if it did have a -- a |
| 13 | different effect or a different distribution? |
| 14 | **A.**  I do not. |
| 15 | Q.  Okay. |
| 16 | MS. HEYSE:  Paul? |
| 17 | MR. REINGOLD:  Yes. |
| 18 | MS. HEYSE:  Can I ask for a brief |
| 19 | break? |
| 20 | MR. REINGOLD:  Sure. |
| 21 | MS. HEYSE:  I just need probably less |
| 22 | than five minutes. |
| 23 | MR. REINGOLD:  Okay.  That's great. |
| 24 | (Off the record at 12:34 p.m.) |
| 25 | (On the record at 12:39 p.m.) |

Page 65

| | |
|---|---|
| 1 | BY MR. REINGOLD: |
| 2 | Q.  What's the reason that the Static-99 is done, |
| 3 | again, pre-parole?  I think you said it but I'm not |
| 4 | sure I understood it. |
| 5 | **A.**  The -- The Static is utilized to place individuals |
| 6 | into relative risk categories or bins, so we can |
| 7 | understand what their relative likelihood of |
| 8 | engaging in further sexually motivated behaviors |
| 9 | are to drive both supervision and treatment |
| 10 | responses for them. |
| 11 | Q.  All right.  And you said because the age is a |
| 12 | factor, it's at least looking at them all because |
| 13 | age may have changed the score? |
| 14 | **A.**  Correct.  And we need to be sure that we are |
| 15 | providing valid and reliable risk and needs |
| 16 | assessments so that review is necessary to make |
| 17 | sure. |
| 18 | Q.  Yeah.  You said it's the second check as well. |
| 19 | Yeah.  Okay. |
| 20 | **A.**  Correct. |
| 21 | Q.  I take it it's not used in the parole decision |
| 22 | itself.  Right? |
| 23 | MS. HEYSE:  I'm going to object |
| 24 | because, again, that's outside of this -- the |
| 25 | parole stuff we had set a side and we -- |

Page 66

| | |
|---|---|
| 1 | MR. REINGOLD:  Yeah, that's fine.  I'll |
| 2 | withdraw the question. |
| 3 | BY MR. REINGOLD: |
| 4 | Q.  All right.  And you said that the -- that age is |
| 5 | something that can change over time. |
| 6 | What about after release; are there |
| 7 | factors post-release that the Static-99R's |
| 8 | developers have found to be sufficiently strong |
| 9 | indicators of change that they can change a |
| 10 | person's score in addition to changes due to age? |
| 11 | **A.**  Yes, there are, and there's a -- a matrix that's |
| 12 | been developed by Dr. Carl Hanson, |
| 13 | Dr. Andrew Brakley{sp}, Dr. Helmus, and others that |
| 14 | looks at the amount of time the individual spends |
| 15 | in the community offense free, and the impact it |
| 16 | has on their risk level. |
| 17 | Q.  And I assume that with the five risks categories, |
| 18 | people in the different risk categories will reach |
| 19 | what Hanson and Helmus and so on, called assistance |
| 20 | at different times; is that right? |
| 21 | MS. HEYSE:  Can I just ask one question |
| 22 | for clarification; are you talking about people |
| 23 | that are still incarcerated or talking about people |
| 24 | in the community now? |
| 25 | MR. REINGOLD:  We're talking about |

Page 67

| | |
|---|---|
| 1 | post-release. |
| 2 | MS. HEYSE:  Okay.  I think those |
| 3 | questions are referring to Corey.  I mean, I'd |
| 4 | refer to you, James, but this is where the lines |
| 5 | get blurred because we have the individual that |
| 6 | specializes in incarcerated folks, and the folks |
| 7 | that are in the community is Corey.  So if you can |
| 8 | answer, James. |
| 9 | **A.**  Corey can speak to that more precisely. |
| 10 | Q.  It's less about who has less experience out in the |
| 11 | community and who has more knowledge of how the |
| 12 | Static-99 works later.  And so that should be a |
| 13 | good determiner.  Corey is the one who has the |
| 14 | better knowledge of the Static-99, I'll wait. |
| 15 | **A.**  Corey is a SORA-certified Static-99R trainer, I am |
| 16 | not, so I will defer that question to him if you're |
| 17 | okay with that. |
| 18 | Q.  Okay.  All right.  The next question goes to -- The |
| 19 | next couple of questions go to for how long the |
| 20 | current regime has existed. |
| 21 | What I'm trying to figure out is of all |
| 22 | the people who have come through the Department of |
| 23 | Corrections, how far back would we have to go |
| 24 | before we start finding people who haven't gotten a |
| 25 | VASOR or a Static-99 and would have graduated, |

Page 68

17 (Pages 65 to 68)

JAMES KISSINGER
1/26/2023

Page 69

```
 1    would have been released without the kind of robust
 2    assessment and review and programming that has been
 3    in place since around 2009, and part of -- that's
 4    the preface to the question. And part of the way
 5    I'm thinking about it is this.
 6          In 2009 and the early 2000-teens if you
 7    were implementing this more robust and
 8    science-driven regime, would people -- was it
 9    applied to everybody who was then in prison, or was
10    it only applied to people as they came in; so for
11    example, if you have someone who is near the end of
12    a 25-year sentence in 2014 or 2015, were they, too,
13    getting a COMPAS -- not a COMPAS -- a Static-99 and
14    a -- an SO risk assessment if they needed it, and
15    programming if they needed it before parole, so
16    that looking backwards you can say with some
17    confidence that, you know, most people in prison
18    have been getting this since when?
19 A.  Most people in prison have received a Static-99R
20    and Stable-2007 that meet criteria for scoring on
21    those tools since 2016 -- sorry, pardon me -- 2015.
22 Q.  And before that they would have gotten a VASOR, and
23    would they also have gotten an SO risk assessment?
24 A.  They would have received a VASOR and -- as well as
25    a Static from 2011 as a part of the sex offense
```

Page 70

```
 1    risk assessment process.
 2 Q.  All right. So when this came -- came in, what
 3    you're telling me is it ramped up pretty quickly
 4    and was applied broadly to the whole population?
 5 A.  I guess that depends on the definition of -- of
 6    "quickly." It was a very long process
 7    involving -- yeah. I wouldn't say quickly, but
 8    yes.
 9 Q.  Let me put it a slightly different way.
10          Did it focus on people who were
11    approaching parole so that the idea was you get
12    them assessed and you get them the programming you
13    need if they're on the way out, so the people who
14    were closest to parole in those years would be
15    getting it, which gives you more time to get to
16    everybody else?
17 A.  The -- The determination about timeframe for use of
18    that Stable is primarily driven by how long the
19    Stable is considered to be valid, which is up to
20    24 months because they didn't change over time, so
21    we wanted to make sure it was still considered
22    valid. So that really drove when we were doing
23    those SORA -- program SORA evaluations. I don't
24    know if that answers your question.
25 Q.  I think it does. Let me ask it this way.
```

Page 71

```
 1          Are you reasonably confident that
 2    everybody who has left prison -- I shouldn't say
 3    everybody -- the great majority of people serving
 4    sex offenses who left prison, you know, after or
 5    around 2011, something like that, got the benefit
 6    of the kind of work that's being -- that was being
 7    implemented then and is sort of routine today?
 8 A.  No, I'm not confident in that.
 9 Q.  What year would it take for you to get to --
10 A.  2015 or 2016.
11 Q.  But everyone before that got it -- got some VASOR
12    with this?
13 A.  Correct.
14 Q.  Okay.
15 A.  Between 2011 and 2015, some the Static and the
16    VASOR.
17 Q.  Yeah. Okay. In the current system that you have,
18    what we'll call the most robust, that has been
19    applied to thousands of people now on long-term and
20    life sentences as well as people serving short
21    sentences?
22 A.  Thousands of people now, yes, I would say that
23    is -- that's accurate.
24 Q.  And at least from working at the assessment
25    instruments and the way COMPAS brings all of these
```

Page 72

```
 1    things together, you -- you're able to amass
 2    like -- I mean, a ton of information in this
 3    evaluation process, right, this assessment process?
 4          MS. HEYSE: I'm going to object to
 5    form, but you can answer if you can.
 6 A.  We are able to assess risk-relevant information and
 7    put it into our various database systems.
 8 Q.  All right. The other questions that I had, had to
 9    do with programming. It looked like from the
10    document we've been reviewing that people can only
11    get into a certain number of programs, and my
12    question as to programming is if someone's been
13    identified as a sexual offender, are they almost
14    for sure going to wind up with MSAPP as their
15    primary default recommendation?
16 A.  I would not categorize it that way.
17 Q.  Okay. So how does it work?
18 A.  Based on an individual's assessment risk and needs,
19    appropriate programing is put in place for them.
20 Q.  And what I'm trying to figure out is how that
21    process works, you know. If I'm a violent offender
22    I can take violence training, if I'm a drug
23    offender I can take drug training, if I'm a sex
24    offender I can take MSAPP, but it looks like I
25    can't take more than one.
```

18 (Pages 69 to 72)

1    So one question is, is the not taking
2  more than one because these things overlap, and if
3  you're taking one you're getting benefits of all,
4  or is it a limitation on slots?
5    MS. HEYSE:  So hang on just one second
6  before you answer, James.  Paul, can you stop
7  sharing screen because I -- I'm on one screen right
8  now and I can't get to my own documents.
9    MR. REINGOLD:  Oh, I'm sorry.
10    MS. HEYSE:  That's okay.  I don't think
11  you're utilizing this at the moment.  I just want
12  to double check because, again, I don't recall
13  specific programming being on your list of topics,
14  but I want to double check to make sure I'm not
15  misspeaking.
16    MR. REINGOLD:  I believe that it did
17  include programming, but I don't have it in front
18  of me.  But I've only got a few questions this is
19  not going to be --
20    MS. HEYSE:  Okay.
21    MR. REINGOLD:  I'm just trying to
22  figure out how people get into MSAPP and if most
23  people wind up there.  That's really the question.
24    MS. HEYSE:  Okay.
25    MR. REINGOLD:  Most people in this

Page 73

1  category.
2    MS. HEYSE:  Okay.  That's what I was
3  going to ask you.  We're not speaking solely of
4  registrants at the moment, we're speaking
5  generally?
6    MR. REINGOLD:  No, we're speaking of
7  people who are sex offenders, which is what I said
8  who I would describe at registrants.
9  A.  Again, it's -- we're very far removed from the
10  court process and behavioral health care services
11  focused on problematic behavior, so I just want to
12  challenge that label of sex offenders or sex
13  offense as determinates for treatment
14  recommendations; we don't use those.
15  Q.  We try not to use those as well.  That's why I was
16  using "registrants."
17    Do you have a sense of -- again, as we
18  did before -- the approximate percentage of people
19  who are on the register industry or committed sex
20  offenses who wind up having MSAPP or some other
21  form of sexually-related therapy or programming
22  before the -- is it, you know, nearly everybody, or
23  over 80 percent, something like that?
24  A.  I can not speak to the aggregate data related to
25  how many are scored as a level 1, 2, 3, 4A, or 4B,

Page 74

1  or speak on how the treatment recommendations
2  follow along the risk assessment.
3  Q.  Okay.
4  A.  Maybe if an individual who is currently
5  incarcerated is assessed as level 1, 2, or 3, that
6  sex offense risk assessment is the end of their
7  interactions with MSAPP.  If they're assessed as
8  level 4A, they receive between 6 and 12 months of
9  MSAPP treatment -- or 6 to 12 months, and depending
10  on the response treatment is when I make the
11  determination on when we can complete them
12  successfully or not.  If they are level 4B they
13  receive between 12 and 18 months of MSAPP therapy
14  while they're incarcerated.
15  Q.  All right.  So that's exactly what I wanted to
16  know.  So what you're saying is all levels, 1, 2,
17  and 3, are not being -- are not going to be steered
18  into sexually related -- almost all aren't going to
19  be steered into a sexually-related program, they
20  might opt for it or try to get it later on their
21  own, but they're not going to be pushed into it?
22  A.  Not while they're incarcerated.  We do not
23  recommended prison-based treatment interventions
24  for those risk levels while they're incarcerated.
25  They will receive a new assessment and treatment

Page 75

1  when they are in the community.
2  Q.  Or while on parole?
3  A.  Correct.
4  Q.  Yeah.  Okay.
5  A.  That follows along -- That follows along with the
6  counsel state government's recommendation for
7  treatment intensity and duration.
8  Q.  Yeah, that's what I was trying to remember, when
9  they re-normed the Static-99?
10  A.  They did not re-norm it, no.
11  Q.  They changed the risk-level categories?
12  A.  No, that was a separate group.
13  Q.  Oh, what was that group?
14  A.  So the current body is referred to as SORNA that is
15  responsible for the Static-99R, Stable-2007.  The
16  Counsel State Governments was a group of experts
17  from around the country including Hanson and
18  Robert McGrath, who -- their goal is to be able to
19  recommend a common language to describe risk, as
20  well as what does the research state is effective
21  to reduce likelihood of that behavior.  So it's two
22  separate entities.
23  Q.  Okay.  Let's see.  Do you know if the MDOC does any
24  research on the Static-99 or these -- or others of
25  these instruments that we've been talking about to

Page 76

JAMES KISSINGER
1/26/2023

1    measure their effective -- their efficacy just
2    within the department?
3    **A.** Can you explain to me what you main by "efficacy?"
4    **Q.** Whether they're doing what you think they're doing.
5    **A.** So based on actual outcomes are we aware of
6    our -- what the validity is of the tools?
7    **Q.** I know they're evaluated from the outside, Hanson's
8    people are validated on the Static-99 all the time.
9    But I'm just wondering if your folks do it either
10   for MSAPP or for, you know, any of these tools
11   or programs?
12   **A.** What -- That's commonly referred to as creation of
13   localized norms.  We do not do that in Michigan.
14   **Q.** Okay.  All right.  I just have a couple of
15   questions left and then we'll wrap up.
16          It strikes me as though everything
17   you've been talking about hinges on the importance
18   of using evidence-based assessment, and whenever
19   possible evidence-based programming, and then it's
20   enhanced by carefully controlled things like the
21   Stable, or the way you're exercising judgement is
22   cabined so that it's as objective as it can be, and
23   then you also add onto that some direct clinical
24   evaluation that maybe, you know, shapes things a
25   little bit on the edges.  And that's part of what I

Page 77

1    described this as, an incredibly robust analysis.
2          Do you think that doing all this
3    prepares offenders -- sexual offenders -- or I
4    should say registrants -- for success on reentry?
5          MS. HEYSE:  I'm going to object on a
6    lot of grounds.  Form and foundation, but I also
7    think, you know, are you asking him in a
8    representative capacity, Paul, because if so,
9    again, I don't know that that's a question that
10   James Kissinger can answer on behalf of MDOC.
11   **Q.** I'll just -- Can you answer that or not?
12   **A.** Can I answer on behalf of MDOC, do we believe the
13   robust assessment treatment program works?
14   **Q.** Yes.
15   **A.** I do not believe I am in a position to answer that
16   question.
17   **Q.** Okay.  I -- Part of what I'm trying to get at here
18   is, it seems like the whole focus of what the MDOC
19   is doing is based on science, and then when
20   registrants get out, one of the things that they're
21   facing is the SORA.
22          To your knowledge, is the SORA itself
23   evidence based?
24          MS. HEYSE:  I'm going to instruct him
25   not to answer.  That is not one of the topics or

Page 78

1    questions that you asked, and again, I don't know
2    that MDOC is prepared -- I'm not prepared for him
3    to represent MDOC in response to that question,
4    Paul.
5          MR. REINGOLD:  All right.  Then James,
6    I want to thank you for your time and the wealth of
7    information that you conveyed.  We're done, and the
8    next dep will be a lot shorter.
9          THE WITNESS:  My pleasure, thank you
10   both.
11          MR. CLARK:  I'm sorry, Paul.
12   Keith Clark, assistant to the attorney general on
13   behalf of the Michigan State Police and the
14   governor's office in the Doe's Lawsuit.  I would
15   like to ask two very brief follow-up questions, or
16   a short series of follow-up questions, based upon
17   your questions for Mr. Kissinger on behalf of the
18   Michigan State Police and the governor's office in
19   the lawsuit.
20          MR. REINGOLD:  The floor is yours.
21          MR. CLARK:  Thank you.
22          EXAMINATION
23   BY MR. CLARK:
24   **Q.** So how are you today?
25   **A.** I'm well, thank you.

Page 79

1    **Q.** So I have some very limited questions.  I want to
2    clarify something that I think that you said
3    earlier.  I think there was another answer, I want
4    to clarify this.
5          If a juvenile offender only commits a
6    sexually deviant offense as a juvenile, then come
7    to the Department of Corrections and stays there, I
8    don't know, for 30 years, is it ever appropriate to
9    use a Static-99 if there's no further sexual
10   deviant behavior?
11   **A.** Do you mind defining what you mean by "deviant?"
12   **Q.** Oh, I'm sorry.  I'll ask you the question in a
13   better way.
14          Can you use the Static-99 if the only
15   thing a juvenile offender does is the original
16   offense that gets him into trouble?
17   **A.** So if a juvenile engages in sexually motivated
18   criminal behavior as a juvenile, can we use the
19   Static when they are now an adult?
20   **Q.** Yes.
21   **A.** No, we cannot.
22   **Q.** Okay.  Unless they commit some new sexually
23   motivated behavior?
24   **A.** As an adult, correct.
25   **Q.** As an adult.  Okay.  Thank you.

Page 80

20  (Pages 77 to 80)

JAMES KISSINGER
1/26/2023

---

Page 81

1       And the tool that you use for
2 juveniles, is that a risk assessment tool, or is
3 that a treatment assessment tool, or a need for
4 treatment assessment, the SORNA?
5 **A.** The professor is not a risk assessment tool.
6 **Q.** Thank you.
7 **A.** It is a treatment guide tool.
8 **Q.** Okay. Thank you. So it doesn't assess a risk, it
9 just determines whether or not someone would
10 benefit from treatment?
11 **A.** Correct. No, it is used in treatment with -- For
12 individuals engaging in sexually motivated
13 behaviors as a juvenile, the recidivism risk would
14 not suggest that treatment interventions would
15 reduce their likelihood in engaging in further
16 sexually motivated behaviors in general.
17       The professor it meant to build upon
18 already protective factors for those that are
19 placed into treatment. It's a treatment guide.
20 **Q.** Thank you. That was very informative. And my last
21 question involves risk assessment tools for female
22 offenders.
23       Does the department use any risk
24 assessment tools for female offenders?
25 **A.** We do not.

---

Page 82

1 **Q.** Does the Counsel of Governments, if you're aware,
2 recommend any assessment tools for female
3 offenders -- risk assessment tools?
4 **A.** They do not. They do not.
5 **Q.** Okay. Does a person's identification -- gender
6 identification play a part in which risk assessment
7 tool is used or whether or not you use a risk
8 assessment tool?
9 **A.** That's a relatively complicated question, I'll
10 state to the best of my abilities. The Static-99R
11 has clear scoring requirements based on
12 individual's biological parts at time of offending.
13 **Q.** Okay. That answers my question and ends my series
14 of questions. Thank you very much for your
15 answers.
16 **A.** My pleasure.
17       MR. REINGOLD: I have one follow up
18 question about -- I meant to ask you about women
19 and forgot.
20       RE-EXAMINATION
21 BY MR. REINGOLD:
22 **Q.** Is the reason that women don't get assessed because
23 this are no instruments that are normed for women,
24 or is it also because their risk level is so low
25 that there's no point in doing it?

---

Page 83

1 **A.** I attended a training by Dr. Kritana{sp} of
2 Montreal who is known as the expert on women who
3 engage in sexually abusive behaviors. At present
4 time, there is not enough of recidivistic behaviors
5 that women have engaged in that were sexually
6 motivated to be able to norm a tool for women who
7 engaged in sexually abusive behaviors.
8       So it's something that potentially can
9 happen down the road, but at present time there is
10 no validated risk assessment tools for women who
11 engage in sexually abusive behaviors.
12 **Q.** It sounds like what you're saying is you need
13 enough crime to be able to get statistically valid
14 norms, there aren't enough women criminals; you
15 need more women criminals to do that?
16       MS. HEYSE: I'm going to object to
17 form. You can answer if you can, James.
18 **A.** I kind of like the way -- the way he said that and
19 also hated the way he said that. I think that's a
20 fair characterization that there's not a large
21 enough pool to treat a norm sample out of.
22       MR. REINGOLD: All right. I'll leave
23 it there and again, thank you for your time and
24 effort. I appreciate it.
25       THE WITNESS: My pleasure.

---

Page 84

1
2     (The Examination was concluded at
3 1:07 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

21 (Pages 81 to 84)

JAMES KISSINGER
1/26/2023

```
 1              CERTIFICATE
 2    STATE OF MICHIGAN   )
                          )
 3    COUNTY OF MACOMB    )
 4
 5        I, Gina Deskiewicz, a Notary Public
 6    in and for the above county and state, do hereby certify
 7    that this deposition was taken before me at the time and
 8    place hereinbefore set forth; that the witness was by me
 9    first duly sworn to testify to the truth; that this is a
10    true, full and correct transcript of my stenographic
11    notes so taken; and that I am not related, nor of
12    counsel to either party, nor interested in the event of
13    this cause.
14
15
16
17
18
19
20    _____
      Gina Deskiewicz, CSR-9689, RPR.
21    Notary Public
      Macomb County, Michigan
22    My commission expires June 14, 2027
23
24
25
```

                    Page 85

Tri-County Court Reporters
248-608-9250