# Exhibit 77:

# Nicole McGhee Deposition Transcript



Transcript of the Testimony of
**Nicole McGhee**

**Date:** June 13, 2023
**Volume:**

**Case:** Does v Whitmer

Printed On: June 27, 2023

Nicole McGhee
6/13/2023
FIRM #8093

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE,
on behalf of themselves and
all other similarly situated,

    Plaintiffs,

vs.    Case No. 2:22-cv-10209
    Hon. Mark A. Goldsmith
    Mag. Curtis Ivy, Jr.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,
    Defendants.
_____/

ORAL DEPOSITION OF NICHOLE MCGHEE
Via Zoom No. 880 9128 2834

Tuesday, June 13, 2023 at 9:03 a.m.

Reporter: Amanda Grosshans, CSR 3853

TAKEN AT:
Tri-County Court Reporters, Inc.
929 W. University Dr., Suite 302
Rochester, Michigan 48307
_____

APPEARANCES:
On Behalf of the Plaintiffs:
AMERICAN CIVIL LIBERTIES UNION
FUND OF MICHIGAN
Attorneys at Law
1514 Wealthy SE, Suite 260
Grand Rapids, Michigan 49506
BY: DAYJA TILLMAN (P86526)

## Page 2

1
2  On Behalf of the Plaintiffs:
3  COOPERATING COUNSEL, AMERICAN CIVIL
   LIBERTIES UNION FUND OF MICHIGAN
4  Attorneys at Law
   802 Legal Research Building
5  801 Monroe Street
   Ann Arbor, Michigan 48109-1215
6  BY: PAUL D. REINGOLD (P27594)
7
8  On Behalf of the Defendants:
9  MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
   Attorneys at Law
10  825 W. Ottawa Street
    Lansing, Michigan 48933-1067
11  BY: ERIC M. JAMISON (P75721)
12
13
14
15
16
17
18
19
20
21
22
23
24  Present: Spl/F/Lt. Aimee Brimacomb & Marian Elbakr
25

## Page 3

              I N D E X

            NICOLE MCGHEE

10  EXAMINATION BY MR. REINGOLD:    5

             E X H I B I T S

17  EXHIBIT NO. 1 (MSP letter)    41

## Page 4

Rochester, Michigan
Tuesday, June 13, 2023
9:03 a.m.

         \* \* \* \* \* \* \*

    REPORTER: We are going on the record. My name is Amanda Grosshans. I am a notary public for the county of Macomb. I'm a certified shorthand reporter for the state of Michigan.

    This examination under oath is being held via videoconferencing equipment. The witness and reporter are not in the same room. The witness will be sworn in remotely, pursuant to agreement of all parties. The parties stipulate that the testimony is being given as if the witness were sworn in person.

    So could the witness please raise her right hand?

         NICOLE MCGHEE

the witness hereinbefore named, being first duly cautioned and sworn or affirmed to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

**Page 5**

1
2      MR. REINGOLD: Good morning everyone. My name is
3  Paul Reingold, I'm an ACLU Cooperating Attorney
4  representing the plaintiffs in the case of Does v Whitmer.
5      We're conducting a deposition on June 13, 2023 by Zoom
6  pursuant to Rule 30(b)(6) notice of the Federal Rules of
7  Civil Procedure, for all purposes permitted under the
8  Rules.
9
10                    EXAMINATION
11
12  BY MR. REINGOLD:
13  Q.  Is it okay if I call you Ms. McGhee?
14  A.  Yeah, absolutely.
15  Q.  Okay. I just want to start with a few preparatory sort of
16      rules of the road. The purpose of depositions is to help
17      the parties resolve factual disputes and basically transfer
18      knowledge that's in your head and not in mine by the move
19      of information from one side to the other.
20          Have you ever been deposed before?
21  A.  No, I have not.
22  Q.  Have you testified in court when you were a line officer?
23  A.  Yes.
24  Q.  Okay. So you probably know these rules of the road, but
25      I'll review them with you anyway. I'll be asking questions

**Page 6**

1   and you will be answering. If you don't understand a
2   question, you should let me know and I'll rephrase it. If
3   you answer a question, we'll assume that you understood it.
4   Do you understand that?
5   A.  Yes.
6   Q.  Okay. Also we have to answer questions in words. The
7       court reporter can't take down head shakes and uh-huhs, so
8       keep that in mind. And also the court reporter can't take
9       down two people at once, so we should try not to talk over
10      each other if we can avoid it. I'm going to ask you to
11      kind of limit your answers to the questions that I ask. If
12      you have more to say, your lawyer may have some questions
13      for you when I'm done. You can also take a break whenever
14      you want. I just ask that you answer any pending question
15      before doing so.
16          I also need to ask you if you are on any medications,
17      or using any alcohol, or drugs that would impair your
18      ability to tell us what you know today?
19  A.  No.
20  Q.  Okay. That's a good start. All right. This deposition I
21      don't expect will take a lot of time. It's a pretty narrow
22      area that I will be inquiring about. But let me start by
23      just by asking what you did to prepare for today's
24      deposition, if anything?
25  A.  Yeah. I reviewed some old, old emails and some of the

**Page 7**

1       public documents related to the bill that led to I believe
2       the 2021 law.
3   Q.  Okay. Did you have any conversations with anyone, other
4       than your attorneys, to discuss or to prepare for the
5       deposition?
6   A.  No.
7   Q.  All right. And you, when you say you reviewed some, some
8       documents and emails, what was is that you reviewed?
9   A.  Anything I was received related to the bill.
10  Q.  Okay. And then have you reviewed anything about the case
11      that is ongoing, Does versus Whitmer?
12  A.  No.
13  Q.  I'll be brief about your educational background. I think I
14      was able to get that off of LinkedIn, so I don't think
15      there's more than I need to know. I guess the one thing I
16      would ask you is, how did you wind up heading to the
17      Michigan State Police after graduation?
18  A.  A career preference I guess.
19  Q.  Okay. And as I gathered from your, again, from your
20      LinkedIn, a short CV that you started working for a couple
21      of years as a line officer, or whatever the correct
22      expression is that you use in the Michigan State Police; is
23      that right?
24  A.  As a trooper, yes. I started out as a trooper.
25  Q.  All right. And how did it come about that you moved from

**Page 8**

1       being a deputy in Missaukee County to going to governmental
2       relations in Lansing?
3   A.  Are you asking about my career progression?
4   Q.  Yes.
5   A.  Okay. I was a deputy in Missaukee County, and then I was
6       hired by the state police. Following my graduation from
7       school, I was assigned to the tri-city post in the Saginaw
8       area. I held a number of assignments at the rank of
9       trooper and specialist trooper and then was promoted to the
10      government relations section within the state police. Was
11      then promoted to internal affairs within the state police,
12      and then once again, promoted to my current position.
13  Q.  Okay. When you first went into governmental affairs, was
14      that something that you had to apply for?
15  A.  Yes. The promotion I had to apply for.
16  Q.  And what was it that drew you to that sort of work?
17  A.  I was assigned there temporarily for a couple of months and
18      made the decision that I wanted to apply for that position
19      full-time.
20  Q.  Okay. And when you started, how many people worked in
21      government relations for the MSP?
22  A.  Myself and two other people.
23  Q.  And I take it one of them would have been above you, is
24      that right, you had a supervisor or someone who was
25      occupying the position that you have now?

**Page 9**

1  A. Yes.
2  Q. And who was that?
3  A. That was First Lieutenant Timothy Fitzgerald.
4  Q. Who was the other person that worked with you?
5  A. That was Sergeant -- when I first got there we're talking
6     about though?
7  Q. Yes.
8  A. To be clear. Okay. That was Sergeant Chris Gerard.
9  Q. And is Chris Gerard a man or woman?
10 A. A man.
11 Q. A man. Okay. And had he been there for a while before you
12    got there or did he come in around the same time?
13 A. He had been there for a couple of months.
14 Q. And among the three of you, when you got there, let's see,
15    was that in June of 2019?
16 A. That was when I promoted, yes.
17 Q. Okay. So you had been there for a couple of months before
18    that?
19 A. Yes.
20 Q. As a temporary employee?
21 A. Yes.
22 Q. Okay. And when you got there, did the three of you have
23    distinct roles?
24 A. Yes.
25 Q. And can you describe what your role was and then compare it

**Page 10**

1     to what the others were doing?
2  A. So my role was to focus on small policy things, being that
3     I was so new, and reviewed those with First Lieutenant
4     Fitzgerald, and then he handled the larger policy issues
5     and the appropriations.
6  Q. All right. And what about Chris Gerard?
7  A. Chris was kind of in the middle, he didn't handle the
8     appropriations, that was on strictly on First Lieutenant
9     Fitzgerald. Chris helped with me, I kind of shadowed Chris
10    the learned from Chris, learned the policy role. Chris
11    also dealt with some policy stuff.
12 Q. All right. Can you describe your, how your primary
13    responsibilities changed over the time that you were there
14    from, would have been probably April or May of 2019 until
15    you left in February of '22?
16 A. Yes. So starting out as the, what we would call the junior
17    sergeant, I was newer than Chris was. It kind of followed
18    the natural progression of taking on some smaller bills,
19    you know, learning the ropes, learning how the legislative
20    process worked, and then working on things more, in a more
21    complex level as I became the senior sergeant in the
22    position.
23 Q. And did you become the senior sergeant because he left?
24 A. Yes. Eventually, eventually Chris did.
25 Q. And was he replaced or did the office go down to two

**Page 11**

1     people?
2  A. He was replaced.
3  Q. All right. And is his replacement still working in
4     government relations?
5  A. Yes.
6  Q. And who is that?
7  A. That is Sergeant Travis Fletcher.
8  Q. And what about Lieutenant Fitzgerald, did he, for how long
9     did he stay?
10 A. I believe he retired in, I believe it was 2020.
11 Q. And was he replaced with a new first lieutenant or did --
12    you tell me?
13 A. He was replaced.
14 Q. And who took over his job?
15 A. First Lieutenant Mackie Williams.
16 Q. And was he there until you left in February of 2022?
17 A. Yes.
18 Q. All right. And how did it come about that someone who had
19    not been in the office, as it were, leaped over you and
20    Sergeant Fletcher to run it?
21 A. I replaced First Lieutenant Williams when he left the
22    section in 2019.
23 Q. Okay. I'm not sure I understand. So you were promoted
24    again?
25 A. No. I was a sergeant at that time.

**Page 12**

1  Q. Okay. All right. All right. And when Lieutenant
2     Fitzgerald left, explain to me who replaced him? I'm not
3     sure I understood.
4  A. So when I joined the section in 2019, I replaced First
5     Lieutenant Matt Williams who had just promoted out of the
6     section at the time. And then when First Lieutenant
7     Fitzgerald retired, First Lieutenant Williams came back.
8     He promoted to that position in the section.
9  Q. I understand. Okay. So he had been there, he left, and
10    then he returned?
11 A. Yes.
12 Q. That makes sense. And was he still the first lieutenant
13    when you left in February of 2022?
14 A. Yes.
15 Q. And then I take it he left and that's when you came back?
16 A. Yes.
17 Q. Okay. All right. And why was it that you chose to leave
18    to go to the Internal Affairs Unit?
19 A. Was a career progression.
20 Q. So that was basically a promotion?
21 A. Yes. It was a promotion.
22 Q. And again, was that one that you applied for, or is that
23    one that they wanted you to do?
24 A. I applied for it.
25 Q. Okay. And why did you return?

**Page 13**

1  A. It was another promotion, a career progression, a natural
2     career progression for me.
3  Q. Yeah. Okay. All right. And what's different about
4     running the office, what you have been doing since August
5     of 2022?
6  A. As the section commander, I worked on the department budget
7     in our appropriations, which is vastly different than I did
8     before. And I oversee the two sergeants and kind of keep
9     an eye on all of the policy going on. I handle some of the
10    larger scale issues, if you will, as they come.
11 Q. When you're dealing with appropriations, earlier in the
12    case, we had deposed the person, I believe it is Sergeant
13    Hoffman who runs enforcement unit out of SORA, or relating
14    to SORA. And it was somewhat striking, because that was
15    the unit that use to have five or six slots, and is now
16    reduced to one. Is that the kind of issue that you deal
17    with in doing appropriations?
18 A. If the, if the executive recommendation asked for more
19    employees, yes.
20 Q. All right. And when you say the executive recommendation,
21    that's from the Michigan State Police to the legislature?
22 A. To the state budget office.
23 Q. To the budget office. Okay. And who is the executive
24    committee who makes the executive recommendation?
25 A. The governor does.

**Page 14**

1  Q. How does the governor know which slots the Michigan State
2     Police wants to get funding for?
3  A. The governor works that out with the state budget office.
4  Q. I'm asking how the Michigan State Police prioritizes what
5     it wants, what positions it wants filled or left vacant?
6  A. I am not part of those decisions.
7  Q. Okay. Do you know who makes those decisions?
8  A. No, I don't.
9  Q. Okay. All right. So during the period that you were there
10    from roughly the, maybe early spring of 2019, to February
11    of 2022, that was a period during which there was a fair
12    amount of activity around the Sex Offender Registration
13    Act, right?
14 A. Not that I was involved in.
15 Q. Oh. You were not involved in it then?
16 A. In the spring of '19?
17 Q. In the spring and summer of 2019.
18 A. No.
19 Q. Okay. When did your involvement start?
20 A. It really never did.
21 Q. Okay. Just to be clear, so even though you were in the
22    governmental relations unit from the spring of 2019 to
23    February of '22, you didn't have any connection to the, or
24    do any government relations work relating to either the
25    decline of the old SORA or the passage of the new SORA?

**Page 15**

1  A. Correct.
2  Q. I'm not sure why you are here then.
3        MR. JAMISON: I'm going to object to the question.
4     It's a 30(b)(6) deposition, and from what I understand
5     under 30(b)(6) the department offers someone that can get
6     reasonably prepared to discuss the topics that were
7     identify on the 30(b)(6).
8        MR. REINGOLD: All right. Objection is noted.
9  Q. (Continuing by Mr. Reingold:) Let me ask, who was taking
10    the lead on either the shutting down of the old SORA or the
11    negotiations over a new SORA?
12       MR. JAMISON: Object to the question, it is as
13    vague.
14       MR. REINGOLD: You can answer.
15       MR. JAMISON: If you understand the question, you
16    can answer.
17 A. I don't.
18 Q. (Continuing by Mr Reingold:) All right. What's your first
19    knowledge about there being a change in the SORA?
20 A. That there was a lawsuit filed and there were provisions
21    that were found to be unconstitutional.
22 Q. And when did you understand that?
23 A. When I got to the section in 2019.
24 Q. Okay. And what was your understanding of about what either
25    the Michigan State Police or the legislature was going to

**Page 16**

1     do about that issue?
2  A. There was a bill introduced to attempt to resolve the
3     constitutional issues.
4  Q. Do you remember when the bill was introduced?
5  A. I believe it was introduced in '19.
6  Q. I think that's right, I think late in '19. And before
7     that, were you aware that Lieutenant Fitzgerald was
8     participating in a legislative work group that was trying
9     to hash out a possible new statute?
10 A. Yes.
11 Q. And did he talk at all about the progress of about that
12    work group?
13 A. If he did, I don't remember the specifics of, of what was
14    happening.
15 Q. Okay. During the same period of time, were there other
16    statutes that you were working on that were your primary
17    responsibility?
18 A. Yes.
19 Q. And what were some of those?
20 A. I believe speed limits was one of them. I can't recall
21    them all off of the top of the head. But there were a of
22    number things that I was trying to learn at the time.
23 Q. All right. When you're doing that, does it involve meeting
24    with legislators, or legislator liaisons who worked in the
25    House or the Senate?

```
 1    A.  When working on legislation?
 2    Q.  Yes.
 3    A.  Yes.
 4    Q.  And can you explain how that process works?  Let's take
 5        speed limits as an example, just because it's one that you
 6        know about.  How does it get started and what happens over
 7        time?
 8    A.  It is completely on a case by case basis.
 9    Q.  Let's use speed limits as an example.
10    A.  Working on the speed limit bill?
11    Q.  Yes.
12    A.  I spoke with the sponsor of the bill, and state holders on
13        the bill, and worked on language.
14    Q.  All right.  And how do you know, in your position in
15        government relations, what the MSP's wishes for the bill
16        are going to be?
17    A.  It's done on completely case by case basis.
18    Q.  And how do you figure that out on a case by case basis,
19        whom do you talk to?
20    A.  It depends on the area that the bill is covering.
21    Q.  All right.  In the case of SORA, if SORA were coming up
22        right now for amendments, whom would you talk to?
23    A.  I would have to talk to our legal section.
24    Q.  Yeah.
25    A.  The SOR unit, the Sex Offender Registry unit, and the
```
Page 17

```
 1        governor's office.
 2    Q.  And when you are doing that, who is it that is actually
 3        setting the policy, you know, basically giving the thumbs
 4        up or the thumbs down, to provision in the bill, or the
 5        provisions in the proposed bill?
 6    A.  That's on a case by case basis as well.
 7    Q.  I'm asking, who has the authority to make the decision?
 8    A.  That depends.
 9    Q.  And what does it depend on?
10    A.  A number of things related to the bill.
11    Q.  All right.  In the case of SORA, you may recall that when
12        the new SORA bill was introduced, it included a provision
13        that the courts had already held to be unconstitutional,
14        and that was the school geographic exclusion zones.  So if
15        you were working on the SORA bill, and you got a draft of
16        the new bill, and you saw the school geographic exclusion
17        zones, how would you know whether that's something that the
18        Michigan State Police wants to keep in the bill or excise
19        from the bill?
20    A.  Are you referencing a future hypothetical bill or the last
21        actual bill.
22    Q.  If you know, the last actual bill, if you don't, a future
23        hypothetical bill.
24    A.  Okay.  I was not involved in the previous bill.  I don't
25        know how those conversations occurred.
```
Page 18

```
 1    Q.  So then hypothetically, if you had been, or you were in the
 2        future, the bill comes in, you read, I assume you read it,
 3        that's one of the first things you do?
 4    A.  Yes.
 5    Q.  Okay.  And then you have got to figure out what's good for
 6        us, what's bad for us, what do we want.  And can you
 7        describe how you go through that process, before we go
 8        through that process with a hypothetical new SORA or
 9        amended SORA?
10    A.  I would put that bill in front of our legal team, and in
11        front of the Sex Offender Registry Unit and get their
12        feedback.  And then I would take that feedback to the
13        governor's office in order to determine an official
14        position.
15    Q.  All right.  And when you're doing that with the governor's
16        office, is that a negotiation, or are you told what the
17        governor wants to do and then have to do it?
18    A.  When I give them that information?
19    Q.  In the conversations.
20    A.  They will, we will consult with them and give them our
21        feedback.  And from there, we will determine an official
22        position.
23    Q.  Who in the governor's office would you you be working with
24        on something like that?
25    A.  That's on a case by case basis.
```
Page 19

```
 1    Q.  I'm saying for a hypothetical SORA.
 2    A.  Probably involved the legal and the policy team.
 3    Q.  In the governor's office?
 4    A.  Yes.
 5    Q.  Okay.  And when you're referring to your legal department,
 6        is that the MSP's in-house legal department?
 7    A.  Yes.
 8    Q.  Okay.  In those negotiations, whether gathering information
 9        to figure out what your own people want while working with
10        the governor's office, who has to, again, with a
11        hypothetical SORA, who has to sign off on the MSP position
12        before it goes to the governor?
13    A.  It's a case by case basis.
14    Q.  With a law like SORA?
15    A.  Whoever is working on it.
16    Q.  So that means people from the SORA unit is what you're
17        saying?
18    A.  No.
19    Q.  They would not have to sign off on it?
20    A.  No.
21    Q.  Okay.  And why is that?
22    A.  Because they are providing input.
23    Q.  All right.  So what I'm asking is, to whom is that input
24        going?
25    A.  To the government relations section.
```
Page 20

5 (Pages 17 to 20)

## Page 21

1   Q.  And when you say the government relations section, there's
2       only three of you, and it sounds like only one of you would
3       be shepherding a single bill; is that right?
4   A.  Yes. Well, most of time, yes.
5   Q.  Okay. So when you say government relations, if you're in
6       charge and you're the ones who is shepherding SORA, it
7       would go to you?
8   A.  If the case was the one I was working on it?
9   Q.  Yes. That's what we are assuming for the purposes of the
10      hypothetical and just keep assuming that.
11          All right. So if you went to the SORA unit, and they
12      expressed their preferences and concerns, and they
13      expressed them to you as governmental relations, and you're
14      basically the grease that's going to make this work, to
15      whom do you take those unit preferences?
16  A.  I don't understand the first part of that.
17  Q.  What I'm saying is, you said to me that what you do is you
18      would go to the unit, in effect to get their, you know,
19      basically to get a pulse on how they feel about the bill,
20      and I assume there's going to be things that they like and
21      don't like; is that right?
22  A.  Yes.
23  Q.  OKay. And then they meet amongst themselves, they may have
24      their own internal preferences, they will hash that out and
25      basically it sounds like they will then say to you, here's

## Page 22

1       what we would like to see in it, and here is what we would
2       like to see taken out of it; is that right?
3   A.  I don't know what internal preferences the sex registry
4       unit has, but eventually feedback will be received.
5   Q.  Okay. I actually, from what we can tell, I don't actually
6       know if any anybody consulted with them. My understanding
7       is from previous deps that nobody did. Would that surprise
8       you?
9   A.  I wasn't involved, so I don't know.
10  Q.  Okay. But normally you're saying the unit that's most
11      affected would be consulted and their opinions asked?
12  A.  You're talking about the normal, and we were talking about
13      a hypothetical. It's truly on a case by case. If I wasn't
14      involved in that conversation, I don't know what would have
15      happened or should have happened before.
16  Q.  Okay. When you were working on the speed limit bills, was
17      there a unit that you went to that was going to be most
18      affected by speed limits so that you got input from?
19  A.  I went to the traffic crash reconstruction unit.
20  Q.  And that makes perfect sense. And any other bills that you
21      handled were there always, or almost always, units that you
22      could go to to get opinions and views of those who might be
23      closest to the issue that was going to be addressed in
24      independent legislation?
25  A.  It's on a case by case basis.

## Page 23

1   Q.  Well, I'm just asking, most of the time is there someone
2       you can actually talk to?
3   A.  If it's necessary.
4   Q.  What I'm trying to understand, why would it not be always a
5       good idea to get the input of the people who are closest to
6       the issue that the bill addresses?
7   A.  Because sometimes on issues like penalties, we wouldn't
8       have anybody to get involved in that.
9   Q.  Okay. So that's an example where it wouldn't occur. But a
10      bill like SORA, there's a special SORA unit, right?
11  A.  There is a SORA unit, yes.
12  Q.  Yeah. And its only job is to implement the statute?
13          MR. JAMISON: Objection, lack of foundation.
14  Q.  (Continuing by Mr. Reingold:) You may answer. I'll
15      rephrase. Its primary job is to implement the statute?
16  A.  I don't work in the sex registry unit.
17  Q.  But you said that if you were, hypothetically, the person
18      in the government relations who were shepherding a new SORA
19      through the legislative process, the first thing you would
20      do is go to the SORA unit and try to source out their
21      views?
22  A.  That would be a logical step for me to take with the
23      exception of the legal team.
24  Q.  Yeah. Okay. What I'm trying to understand now is, once
25      the information comes back to you, I assume, just because

## Page 24

1       they want something, doesn't mean that's what you're going
2       to report to the governor; is that true?
3           MR. JAMISON: Objection, it's vague as to who
4       "they" refers to.
5           MR. REINGOLD: I'll rephrase.
6   Q.  (Continuing by Mr. Reingold:) Just because the SORA unit
7       gives you its views, I assume you're not simply just going
8       to run out to the governor's office and say, this is what
9       the Michigan State Police want; is that right?
10  A.  Completely depends on the issue.
11  Q.  Well, something as major as a renovation, or not a
12      renovation, an amendment to, to a law like SORA, there's
13      somebody else that you would need to talk to before you
14      could make a recommendation to the governor; isn't that
15      correct?
16  A.  Are you referring to the SOR unit.
17  Q.  I'm asking you. I'm trying to understand how it is that
18      policy gets made in the Michigan Department of State
19      Police, and has remained okay, and at the moment, it's not
20      getting any clearer, and that's what I'm trying to
21      determine.
22          Who is it that makes the decision as to what it is
23      that they are going to ask the governor, or report to the
24      governor, what the official MSP position is on the
25      provisions of the bill, what says and what goes, or what

**Page 25**

1  they would like to stay or like to go, who makes that
2  decision?
3  A. That is done on a case by case basis.
4  Q. On this case by case basis, with a hypothetical SORA, who
5  would you go to before going to the governor?
6  A. On the hypothetical bill that I am working on?
7  Q. Yes. Related to SORA.
8  A. I would consult with the legal team and the SOR unit.
9  Q. All right. So nobody else?
10 A. It would depend on the feedback given from them.
11 Q. Can you elaborate on that, how so, how and why would it
12 depend on that?
13 A. Because in every single case is different, and every single
14 word in a bill is different, and if a word triggers the
15 need to contact somebody else, then we will do that.
16 Q. All right. Does anyone else in the department review what
17 you're taking to the governor, other than the unit
18 involved, if there is a unit involved, and the internal
19 legal team?
20 A. That's done on a case by case basis.
21 Q. And using SORA as an example, do you know if anybody else
22 was consulted, or if you were doing it now, would you
23 consult anybody else before bringing it to the governor?
24 A. I have no idea who was consulted on the previous bill. I
25 was not involved in those discussions. And the

**Page 26**

1  hypothetical bill we're talking about, that would
2  completely depend on what the bill actually said.
3  Q. Let's assume it says, everything that was in the proposed
4  SORA that you read for first time in late 2019, and let's
5  assume that's our hypothetical. That you were in charge of
6  bringing recommendations from the department to the
7  governor on that precise bill. And let's assume that, as I
8  believe occurred, for whatever reason, you didn't check
9  with the SORA unit, or the SORA unit was not invited to
10 comment on it, how would you know what the Michigan
11 Department of State Police wanted from, wanted to recommend
12 to the governor, who would you talk to?
13 A. Our legal team would be helpful in that situation.
14 Q. All right. So the legal team would in effect set the
15 policy for the Michigan Department of State Police?
16 A. No.
17 Q. I thought what you were going to recommend to the governor
18 would be the legal policy that the -- not the legal policy,
19 but the policy that the Department of State Police is
20 asking the governor to implement, is that wrong?
21 A. I'm kind of confused on the term policy. Are we talking
22 like a true like written policy?
23 Q. No, no. I'm talking about what would be in the bill. What
24 I'm trying to understand, I said this once before, and I
25 don't mean to be sharp with you at all. But it's

**Page 27**

1  completely I opaque. It seems to me that somebody is
2  making decisions at the Michigan State Police, and you're
3  telling me that the Government Relations Department, who
4  shepherds these things through, gathers information,
5  consults with legal, might consult with a section or a unit
6  if there is a relevant section or unit to consult with, and
7  it's not clear to me how that group of people reaches a
8  decision without any input from someone higher in the
9  department than the positions that the legal department
10 holds and you hold.
11    Is there any sign-off by anybody above the legal
12 department, or above government relations, as to what you
13 want in a bill?
14 A. That is done on a case by case basis.
15 Q. Sorry. I didn't mean to interrupt. Go ahead.
16 A. No, go ahead.
17 Q. You said the conversations. So you can finish the
18 sentence.
19 A. Yeah. We have those conversations with the executive
20 office of the governor.
21 Q. Are there any conversations held with executive officers of
22 the Michigan Department of State Police?
23 A. What's your -- what do you mean by executive officers?
24 Q. I mean anybody involved, the director of, or the first
25 lieutenant for government relations and in-house legal

**Page 28**

1  counsel?
2  A. On specific legislation?
3  Q. Yes. Like on SORA.
4  A. I don't know. I wasn't involved in those conversations.
5  Q. So let me give you a hypothetical. Let's assume you go to
6  the SORA unit, and the SORA unit says, we hate SORA, we
7  think it's a complete waste of time, and we want you to
8  tell the governor that she should kill SORA completely.
9  And you go to legal, and legal says, the statutes, in our
10 view, are constitutional. How do you know what to ask the
11 governor to do with the bill at that point? You had input
12 from the unit that's most concerned, you have had input
13 from legal that tells you it is legal, how do you know what
14 the position is, or the position of the Michigan State
15 Police is, when you go into the governor, to tell the
16 governor what it is that the Michigan State Police want?
17 A. I think that would completely depend on what the actual
18 language in the bill is.
19 Q. Well, I'm saying the SORA unit says, we hate all of it, we
20 don't want it to be passed, but we want SORA to go away, we
21 are unhappy with every word of the statute. Do you go to
22 the governor and say, that's the policy, that that's the
23 premise of the Michigan State Police, or do you talk to
24 somebody else?
25 A. Is the somebody else the legal team?

**Page 29**

1  Q. No. I mean in addition to the legal team. We know that
2     the legal team has said it is legal.
3  A. Okay.
4  Q. So I'm just asking, how do you, you arrive at the
5     governor's office, how do you know what to say?
6  A. I would just tell them that information, communicate that
7     to them.
8  Q. Okay. So there's no higher up who determines policy,
9     within the department, there's no higher up who determines
10    policy or preferences as to a bill, you are just a
11    messenger that conveys the information from whoever you
12    talk to?
13 A. It's on a case by case basis depending on the bill.
14 Q. And in the hypothetical that I've just given you, you
15    wouldn't talk to anybody else in the department, you would
16    simply go to the governor and say, I talked to the SORA
17    unit, they hate it, they want you to kill it, and there's
18    no language that will improve it, and that's what I'm
19    telling you, and legal says it's legal?
20 A. I would say that some further discussion needed to be done.
21 Q. And with whom would the further discussions be had?
22 A. The SOR unit and the legal team.
23 Q. In the end, is it the legal team in your view that sets MSP
24    policy?
25       MR. JAMISON: Objection, it's vague.

**Page 30**

1  Q. (Continuing by Mr. Reingold:) You can answer.
2       MR. JAMISON: If you understand the question, you
3     can answer.
4  A. I don't.
5  Q. (Continuing by Mr. Reingold:) Let's assume you didn't go
6     to the SORA unit at all, as we think happened here in
7     reality in this case, if you just went to the legal team,
8     and the legal team decided, this is what we want, is that
9     what you report to the governor?
10 A. Barring any other information, yes, I would communicate
11    what I knew to the governor's office.
12 Q. And in this hypothetical, you know that what legal wants is
13    the opposite of what the officers on the ground, and the
14    enforcement unit, and implementation unit, the SORA unit
15    wants. How do you know which to choose between?
16 A. That's on a case by case basis.
17 Q. And in this hypothetical, in this case, on this case by
18    case basis, how would you know which position to favor when
19    you go to the governor?
20 A. There's no favoring. It's determining parts of the bill
21    and then reviewing those on a case by case basis.
22 Q. All right. Let's assume that there's a change in the
23    language on the bill, for whatever reason, a single change
24    in language. Who would in the department, who at the
25    Michigan State Police determines whether or not to accept

**Page 31**

1     the change of the language?
2       MR. JAMISON: Objection, it's vague. Sorry. The
3     question is vague in terms of what accepts means. You can
4     answer, if you understand the question.
5  A. It's done on a case by case basis.
6  Q. (Continuing by Mr. Reingold:) I'll rephrase the question
7     for you. Let's assume again it's the SORA bill. Okay.
8     And let's hypothetically assume that it's, any bit of
9     language in the bill, that is substantive, that actually
10    matters. And at some point, you learn that the next
11    version of the bill is going to change, one word that will
12    change the meaning of an important provision. What do you
13    do with that proposed amendment?
14 A. Is this the hypothetical SORA bill or the actual SORA bill?
15 Q. The hypothetical.
16 A. The hypothetical SORA bill?
17 Q. Yes. There is a proposed amendment coming either from the
18    legislature, or from the governor's office, or from God,
19    and you have to bring it back to the department. Do you
20    need someone to approve the change?
21 A. The change in what?
22 Q. In the bill.
23 A. I don't have any control over what changes are made in a
24    bill.
25 Q. I'm saying, it hasn't been made yet. There's a proposed

**Page 32**

1     change, the governor's office, or the legislature, or
2     someone else has said, in light of -- we're going to make a
3     compromise, in light of the different parties who have
4     referred to us, and weighed in on this bill, we are going
5     to change, you know, a couple of words that will change the
6     meaning of a provision in a significant way. What is the
7     MSP's position on the change, how do you find out what the
8     MSP's position is on the change?
9  A. We consult with whoever that change impacts.
10 Q. All right. In this hypothetical, it would impact the SORA
11    bill.
12 A. Okay.
13 Q. Right, is that right?
14 A. In your hypothetical?
15 Q. Yes. Assuming it does, it would impact the SORA unit, so
16    it's their approval that you need?
17 A. Not necessarily need. I would ask them how it impacts
18    them.
19 Q. All right. And then you were communicating that to the
20    governor's office, whether they like it or they don't?
21 A. On a case by case basis discussions are had.
22 Q. And who has those discussions?
23 A. Whoever is working on the bill in that case.
24 Q. And who, so tell me the personalities, who are the people
25    who would, on any case by case basis, have that discussion?

8 (Pages 29 to 32)

**Page 33**

1    A.  The members of the government relations section.
2    Q.  But you said only one person has anything to do with that,
3        are you talking to yourself?
4    A.  No.
5    Q.  Well, then who are you talking to?
6    A.  I guess I'm confused.
7    Q.  You said discussions are had, and I said, who would be the
8        discussions, who is actually having the conversation, and
9        you said, government relation.  And you said, only one
10       person has anything to do with the bill, and I don't
11       understand how you can talk to others if they have nothing
12       to do with the bill.  So who is having the discussions?
13   A.  That member from government relations who is working on the
14       bill will have discussions with internal members in the
15       governor's office.
16   Q.  But you already had the discussion.  The discussion was,
17       we're going to change the provision in the bill that will
18       affect the SORA unit, and has made a substantive change as
19       part of a compromise.  So that discussion has already been
20       had.  Now you're bringing that proposed change back to the
21       MSP to figure out whether or not you're going to agree to
22       it, or oppose it.  And you're telling me you talk to
23       yourself, and if that's wrong, to whom do you speak?
24   A.  I guess I'm kind of --
25           MR. JAMISON:  Objection, it mischaracterizes her

**Page 34**

1        testimony.
2    Q.  (Continuing by Mr. Reingold:)  You may answer.
3    A.  I'm confused.
4    Q.  What are you confused about?
5    A.  Which hypothetical discussions are happening when.
6    Q.  I'll repeat the hypothetical.  The governor's office says
7        to you, we're going to change a provision of the bill.
8        It's a substantive change, it will have an affect on the
9        SORA unit.  You said to me you would bring that back and
10       have discussions.  I said, with whom, and you said
11       government relations.  I want to know how you know whether
12       to tell the governor's office the next time you go back,
13       yes, we're on board with the change, or no, we are not on
14       board with the change.  How does that decision get made?
15       That's policy in my view, and I want to know, who is making
16       that policy.  Because if you go with option A, the policy
17       will be one thing, and if you go with option B, the policy
18       will be a different thing, and I want to know who makes
19       that decision as to which way you are going to go.
20   A.  I guess what I'm not clear on is why that information is
21       coming from, in your hypothetical, from the governor's
22       office.  Because bills are made by the legislative sponsor.
23   Q.  We can have it anyway you want.  But you have told me that
24       there are conversations that happen while a bill is
25       pending, and changes get made.  And I said, whether it gets

**Page 35**

1        made by the legislature, or because of the wishes of other
2        interested people, it might be the Prosecutor's
3        Association, or it might be coming from the governor's
4        office.  A change is proposed by those who are interested.
5        And the MSP is unaware of this, because the only person who
6        knows about the proposed change is you, having talked to
7        the governor's office, and now you know it, and you have to
8        bring it back to the department to get a thumbs up or
9        thumbs down as to the change.  And I'm trying to understand
10       who makes that decision as to what the policy of the MSP
11       will be in relation to that change of the proposed statute.
12       Is that clear?
13   A.  A little more clear.  The word policy is kind of jamming me
14       up, but the recommendation is what I would call it.
15   Q.  Yes.  The recommendation, exactly.
16   A.  So those discussions, whatever amendment to a bill would be
17       taken back to whoever those amendments impact.  And we
18       would get feedback from them and provide, I would then
19       provide, in your hypothetical, I would then provide that
20       information to the governor's office and say, here is the
21       feedback, here are the impacts of what that language does.
22   Q.  And can you explain, if it's true, why everyone we have
23       talked to so far in the SORA unit has said, no one asked us
24       anything about our views of the proposed SORA 2021?
25   A.  I was not involved in those discussions.

**Page 36**

1    Q.  All right.  If that's true, would that strike you as a
2        break with normal practice within the government relations
3        office?
4    A.  Those discussions are had on a case by case basis.  And we
5        are talking about hypotheticals and I can't speak as to why
6        that happened.
7    Q.  Okay.  Did you ever talk to Lieutenant Fitzgerald about his
8        views about the bill?
9    A.  I'm sure we had discussions.  I regrettably don't recall
10       the specifics of those.
11   Q.  Okay.  Did anyone, other than the internal legal team, to
12       your knowledge, offer advise about what should or shouldn't
13       be in the SORA 2021 that was passed?
14   A.  I'm sorry.  I was not part of those discussions.
15   Q.  Did you ever have conversations with Lieutenant Fitzgerald
16       about the legislative work group that was meeting during
17       that period, or prior to that period of time?
18   A.  I knew he was involved in something.  I was not part of it.
19   Q.  Okay.  Were you aware that in the late winter of 2020, that
20       the legislative work group negotiations had broken down, I
21       think actually would have been in the late fall of 2019,
22       were you aware that those had stopped?
23   A.  I know that at some point I believe the work group stopped
24       happening.  I was not involved.
25   Q.  And did you hear anything as to why it stopped happening?

### Page 37

1    A. No.
2    Q. Okay. You don't know whether that came from the Michigan
3       Department of State Police?
4    A. That it dissolved?
5    Q. Yes.
6    A. No.
7    Q. Were you aware that after it dissolved, that the plaintiffs
8       had to go back to court, and in February of 2020, that the
9       court held much of the old SORA to be unconstitutional?
10   A. I know there were some court rulings. I don't recall them
11      specifically.
12   Q. Okay. And then did you play any role, in 2020, did you
13      have anything to do with either the implementation of SORA
14      or with anything to do with the pending bill?
15   A. No.
16   Q. Okay. Are you aware that the court finally entered an
17      opinion and order that was going to enjoin SORA, and I
18      believe that was entered, let's see, in February of 2020.
19      Was there awareness within governmental relations that SORA
20      was going to be enjoined?
21   A. I was aware of some sort of court ruling. I'm not familiar
22      with the specifics.
23   Q. Okay. Why do you think it was that the legislature was
24      unable to pass an amendment to SORA from 2016 to 2021?
25            MR. JAMISON: Objection, lack of foundation.

### Page 38

1    Q. (Continuing by Mr. Reingold:) If you know.
2    A. I don't.
3    Q. Okay. Did you ever hear any talk about the political
4       consequences of changes to SORA?
5    A. I'm confused with the question.
6    Q. Did you ever hear legislators, or legislative aides, or
7       people in the governor's office talk about the political
8       risks of changing SORA?
9    A. No. I was not involved in those discussions.
10   Q. Do you agree that the person I should be talking today is
11      Lieutenant Fitzgerald, is he the one who would be able to
12      answer all of these questions directly?
13            MR. JAMISON: Objection, lack of foundation.
14   Q. (Continuing by Mr. Reingold:) To your knowledge.
15   A. I'm sorry, sir. I couldn't hear you.
16   Q. Yes. Sorry. My microphone sometimes cuts out. I was
17      asking if the person who could answer all of my questions
18      today would be Lieutenant Fitzgerald?
19   A. I don't know. I know that he knows more, he was involved
20      more than I.
21   Q. All right. And is he, he's no longer with the department;
22      is that right?
23   A. Correct.
24   Q. Were you aware that the court also enjoined an enforcement
25      of SORA due to COVID?

### Page 39

1    A. Can you be more specific?
2    Q. Yes. After COVID hit, there were both federal and state
3       orders eluding people's ability to travel, either ordering
4       or suggesting that people stay in their houses, and as a
5       result, the federal court suspended the reporting
6       requirements under SORA. Were you aware of that?
7    A. It sounds familiar, but not something that I would have
8       been involved in.
9    Q. Okay. So you had absolutely nothing to do with the bill
10      that wound up becoming SORA 2021?
11   A. Correct.
12   Q. Did you, do you know whether or not the Michigan Department
13      of State Police filed any position statement with the
14      senate judiciary committee?
15   A. I do not know about that committee.
16   Q. Okay. So you wouldn't know who worked on it, or who wrote
17      it, or anything like that?
18            MR. JAMISON: Objection. It's vague in terms of
19      what "it" is.
20   Q. (Continuing by Mr. Reingold:) If there was a written
21      statement given to the senate judiciary committee, you
22      wouldn't know who wrote it, or who okayed it, or anything
23      like that?
24   A. To the senate judiciary committee?
25   Q. Yes.

### Page 40

1    A. No.
2    Q. Okay. What about any other position statements to any
3       other legislative body?
4    A. We --
5            MR. JAMISON: Paul, if I can interject to say. Is
6       there a statement that's been made to the senate judiciary
7       committee, is it something that you could bring up to show
8       her?
9            MR. REINGOLD: Yes. I wanted to ask about it
10      first. I'll get to it in a minute.
11           MR. JAMISON: Got it.
12   Q. (Continuing by Mr. Reingold:) You can go ahead. You were
13      answering. You were just saying you knew something.
14   A. You said from any other committee.
15   Q. Yes. To any other committee or any other legislative body
16      or unit.
17   A. We submitted written testimony to the House committee I
18      believe.
19   Q. Okay. And was this, and does the House committee precede
20      the Senate committee, do you remember?
21   A. It would have, because it was a House bill.
22   Q. It was a House bill. Yeah, I think I misspoke when I said
23      Senate, I meant House. Yes. Let's, I'll bring that up.
24      This may take a minute, because I have a new laptop and I
25      never get things right.

### Page 41

1  (EXHIBIT NO. 1)
2  Q. (Continuing by Mr. Reingold:) And can you now see what has
3     been marked for the deposition as Plaintiff Exhibit No. 1,
4     which is a letter on MSP stationary dated May 6, 2020.
5  A. Yes.
6  Q. And does that appear to be the submission that the MSP made
7     to the House Judiciary Committee?
8  A. Yes.
9  Q. The only version of it that I have, and I believe the
10    version that was actually filed, is unsigned. Is that
11    customary? I don't know how it is usually done.
12 A. I believe so.
13 Q. Okay. I thought it might be. And it's addressed to the
14    chair of the House Judiciary Committee, right?
15 A. Yes.
16 Q. Okay. It says, the Department of State Police, the first
17    line, is supportive of the intent of HB5679 in amending
18    SORA. When it says, the Department of State Police is
19    supportive, what people does that mean are supportive of
20    HB5679?
21 A. So what is key here is supportive of the intent.
22 Q. Yes, I understand. It's not a bill. It's just the attempt
23    of being a bill, it's going to make some criticisms of the
24    bill. But I'm saying, who it is that is supportive of the
25    intent?

### Page 42

1  A. Whoever First Lieutenant Fitzgerald was working with at the
2     time.
3  Q. Say that again. I didn't hear.
4  A. Whoever First Lieutenant Fitzgerald was working on this
5     with, that would be the position that was filled.
6  Q. And you have no clue who that was?
7  A. Who he was working with?
8  Q. Yes.
9  A. No.
10 Q. All right. And the two possibilities would have been the
11    SORA unit, which we think were not consulted, and the
12    internal legal department; is that right?
13 A. I don't know who he consulted with.
14 Q. Those are the only two people, the only two units you would
15    have consulted with in his situation?
16 A. I don't know what information he was working with at the
17    time.
18 Q. Do you know if he was also getting information or
19    consulting with the Attorney General's office?
20 A. I don't know.
21 Q. All right. In this submission, had you seen this at the
22    time that it was submitted?
23 A. Yes.
24 Q. And did you read it?
25 A. Yes.

### Page 43

1  Q. And did you agree with it?
2  A. I didn't have a position.
3  Q. Okay. And can you tell us why the department supported
4     removing the student safety zones?
5  A. I was not involved in those discussions.
6  Q. Okay. But this is a typical letter, right, it's from the
7     department to a legislative body, and you are saying this
8     is the kind of thing, a way that the department weighs in
9     on either providing support, or opposition to a bill, or
10    provisions in a bill; is that right?
11 A. It is a method of communicating.
12 Q. Right. And they also could have appeared in person, or by
13    Zoom, I think in those days at that time by Zoom, right?
14 A. Yes.
15 Q. And did anybody appear, to you knowledge, either in person
16    or by Zoom to testify about the bill?
17 A. Not to my knowledge, no.
18 Q. Who makes the decision whether someone will go in person
19    and testify as opposed to only submitting written
20    testimony?
21 A. That is done on a case by case basis.
22 Q. And who makes a decision on a case by case basis?
23 A. That depends on the case.
24 Q. Who are the possibilities? In this case, it's a bill about
25    SORA. If Lieutenant Hoffman wants to go and talk to the

### Page 44

1     legislature and give them her opinion of the bill, can she
2     do that?
3  A. Acting as a representative of the department or acting as a
4     citizen?
5  Q. Either.
6  A. Any citizen is, if it is a body, they can make a statement.
7     Acting as member of the department, she would have had to
8     run that passed the government relations section.
9  Q. And do you, do you have the authority to tell her, yes, you
10    can go and testify, or no, you cannot?
11 A. That's made on a case by case basis.
12 Q. All right. Change the hypothetical. Sergeant Hoffman
13    comes to you and says, I want to talk to the committee, and
14    I'm going to appear in support of the school zones. Do you
15    let her testify?
16 A. I would need to consult other people on that decision.
17 Q. And who would you consult?
18 A. I would talk to the governor's office.
19 Q. And would you be bound by what the governor's office tells
20    you or would that be a recommendation from the governor's
21    office?
22 A. Can you explain that a little bit more, please.
23 Q. Yeah. If the governor's office says, yeah, she can
24    testify, are you, can you still say no?
25 A. I don't know. Would there be a reason for me to?

---

**Page 45**

1  Q. Well, if the governor's office says, we want to take it
2     out, we agree with the department, we want to take it out,
3     but we want it to be a transparent process, and if she
4     wants to come in and testify, speak in front of the
5     department, that's okay with us. Would you let her go and
6     speak?
7  A. Sure.
8  Q. If the governor's office says, no, she's contradicting with
9     what we and the department want, you want it out, you want
10    it out, tell her not to testify. Do you have to tell her
11    not to testify or do you let her testify?
12 A. No. I would tell her not to testify.
13 Q. And that's because the governor's office has told you to?
14 A. Yes.
15 Q. So it sounds like in the end, the Department of State
16    Police doesn't really support or weigh against anything,
17    it's what the governor's office tells them to do; is that
18    fair to say?
19 A. No.
20 Q. But if the Governor's office opposes the position of the
21    Department of State Police, how do you deal with that?
22 A. It's done on a case by case basis.
23 Q. So sometimes the governor says, we don't want you to
24    testify as follows, but somebody in the department says, we
25    want to testify as follows, and then you do?

---

**Page 46**

1  A. No.
2  Q. So you are bound by what the governor tells you?
3  A. That's on a case by case basis.
4  Q. Yeah. But in this hypothetical, the governor has said, no,
5     the department has says, yes, and you said you would not
6     have anyone go and testify?
7  A. In this hypothetical, if they told us they would like us to
8     not testify, no, we would not testify.
9  Q. So what that means is, everything in -- correct me if I'm
10    wrong. But I assume what this means is, before this letter
11    went to the House Judiciary Committee, it was also screened
12    by the governor's office; is that right?
13 A. To the best of my knowledge, yes.
14 Q. And it would have been approved or edited by the governor's
15    office if they were unhappy with parts of it?
16 A. I don't know if it was edited. I know it got sent, so it
17    must have been approved.
18 Q. Okay. And is that true with almost all communications
19    affecting substantive policy that states the department's
20    position, that is that it is cleared through the governor's
21    office before it becomes part of an official legislative
22    record?
23 A. I can't say. I don't like the word always. It's on a case
24    by case basis.
25 Q. Is that typically the way it works?

---

**Page 47**

1  A. Sure.
2  Q. What's the chain of command at the top of the Michigan
3     State Police. We know that there is a director. What are
4     the other positions below that?
5  A. Deputy director.
6  Q. And below that?
7  A. Assistant deputy directors.
8  Q. And how many assistant deputy directors are there?
9  A. There are four.
10 Q. And are those divided up by geographic area or by
11    substantive areas?
12 A. By bureau.
13 Q. Say again.
14 A. By bureau.
15 Q. By bureau. Okay. So there are four major bureaus in the
16    department; is that right?
17 A. No. Hang on. There are three.
18 Q. But there are four deputy directors?
19 A. No. There are three deputy directors.
20 Q. Three. Okay. Is it just one assistant director?
21 A. I think the language is probably a little bit different.
22 Q. You said deputy director?
23 A. There are three deputy directors.
24 Q. Okay. And how are they divided up in terms of walls?
25 A. By bureau.

---

**Page 48**

1  Q. Okay. All right. So in making decisions about whether to
2     support a bill, or opposes a bill, or provisions of the
3     bill, does any of that get run by the director, either any
4     of the three deputy directors, or any of the three
5     assistant deputy directors?
6  A. On the merits of a specific bill?
7  Q. Yes.
8  A. A case by case basis.
9  Q. Is there ever a case where somebody at that level has not
10    given approval for the passage of a new bill that affects
11    the department?
12 A. Can you explain that a little bit more, please.
13 Q. Yeah. I'm asking if there is a new bill introduced in the
14    House or Senate, and it's going to passed, and it has an
15    affect on the Michigan Department of State Police, is it
16    typical that one of those seven people will have been on
17    it, have read it, and have approved it?
18 A. So they wouldn't necessarily give an approval, but if they
19    are one of the impacted areas that we talked about earlier,
20    they might be contacted for their feedback.
21 Q. Okay. And if a bill is in progress, as SORA was, and there
22    are provisions that are going to come out, something major,
23    like the school exclusion zones, is that something that
24    typically, something vague like that, is that something
25    that would make it to the, one of the seven people at the

**Page 49**

1    top?
2    A. I don't know if they were involved in those discussions.
3    Q. I didn't ask if they were involved. I asked, if that's the
4    kind of problem that typically kind of change in a bill
5    that typically would draw their attention and be brought to
6    them?
7    A. I actually don't know.
8    Q. So in this case, if you were shepherding the new SORA
9    through, and the governor's office said, we want to strike
10   out the school exclusion zones, is that something that you
11   would want approval on by one of those seven people before
12   saying to the governor, we can live with that?
13   A. No, not necessarily.
14   Q. And how would you make that decision?
15   A. I would consult with the people that it actually impacts.
16   Q. And if the people it impacts say, we want to keep it, would
17   you go over their heads to one of the seven above to say,
18   governor wants a change, our people don't, where do you
19   come down on this?
20   A. That would be on a case by case basis.
21   Q. And in this case, would you feel the need to do it?
22   A. I would feel the need to loop them in on the discussion.
23   But as far as decisions, it would depend on their
24   involvement.
25   Q. Okay. Why doesn't someone usually sign a submission letter

**Page 50**

1    like this one?
2    A. I don't know. We don't typically -- I don't want to say
3    typically. It's not often that we submit written
4    testimony.
5    Q. Is that because you're more likely to do --
6       (INTERNET INTERFERENCE)
7    Q. (Continuing by Mr. Reingold:) And what percentage of the
8    bills that affect the Michigan State Police do you present
9    live testimony?
10   A. I don't know the nature of that off the top of my head.
11   Q. Can you think of bills where you do have live testimony?
12   A. Yes.
13   Q. And can you give some examples?
14   A. We provided live testimony on some lien stuff, some vehicle
15   registrations, some drug recognition experts, maybe some
16   penalty bills.
17   Q. How about speed limits?
18   A. Yes.
19   Q. But not on SORA?
20   A. I was not involved in that. To the best of my knowledge,
21   no.
22   Q. Are you aware that the State Attorney General also
23   submitted written testimony and recommendations on SORA
24   2021?
25   A. No.

**Page 51**

1    Q. Have any of the bills that affected the Michigan Department
2    of State Police, in the time that you have been there, been
3    passed in lame-duck section other than SORA?
4    A. I'm sorry. Did you said passed in lame-duck?
5    Q. Yes.
6    A. I would have to look. I'm sorry.
7    Q. Do you recall any that were ever passed in lame-duck?
8    A. Not off the top of my head. But I know there have been
9    some lame-duck.
10   Q. But none that you can remember?
11   A. No. Not off the top of my head. I don't know bill numbers
12   off the top of my head.
13   Q. Okay. In your own unit, do you view yourself as a policy
14   maker?
15   A. No.
16   Q. You simply make recommendations to the governor?
17   A. Yes.
18   Q. Whom do you consider to be policy makers in the sense of
19   making the actual decision as to what it is that the
20   department wants?
21   A. It's my understanding it's on a case by case basis.
22   Q. And on a case by case basis, how do you determine who that
23   person is, who's going to set policy for the department?
24   A. I don't make policy for the department.
25   Q. But I'm asking, you have to make the recommendations to the

**Page 52**

1    governor, and how do you decide whose opinion to give?
2    A. You keep saying policy. Are you talking about like
3    legislative positions?
4    Q. Yes. Exactly, that's exactly what I mean. Legislative
5    positions, yes.
6    A. I'm sorry. Can you ask the question again?
7    Q. Yes. How do you decide who it is who's making the
8    decisions about legislative positions?
9    A. That is done on a case by case basis.
10   Q. So you go to the SORA unit, the SORA unit, and talk to the
11   two most knowledgeable people, and they are polls apart,
12   one is a yes and one is a no. Is that what you report to
13   the governor?
14   A. On a case by case basis.
15   Q. In this case.
16   A. In your hypothetical case?
17   Q. Yeah. Let's assume you are shepherding SORA through, and
18   you go to SORA, you go to the SORA unit, and they say,
19   we're all for it, but one says, and one says, we are
20   totally against it. And you go to legal, and somebody
21   says, I'm all for it, and we are split down the middle
22   here, and the other half is all against it.
23      How do you decide whose legislative position is the
24   one to report to the governor?
25   A. I would say that continued discussions need to be had.

13 (Pages 49 to 52)

## Page 53

1  Q. And then you hope that eventually there would be consensus
2     or a compromise?
3  A. Yes.
4  Q. And that would be the legislative position?
5  A. Yes.
6  Q. And if no one in the SORA unit gets consulted, then the
7     decision is going to get made by legal; is that right?
8  A. That would be on a case by case basis and who was looped
9     in.
10 Q. If someone is looped in, let's say one of the seven people
11    at the top, and their opinion is different from those at
12    the bottom who are most affected, does the, does the
13    opinion of the one of the seven become the legislative
14    position of the department?
15 A. No. Like I said earlier, it's on a case by case basis, and
16    some consensus is going to have to be figured out.
17 Q. And does the figuring out of the consensus mean meetings
18    among those who don't yet have consensus?
19 A. It could.
20 Q. So if you got one of the seven people saying, we think the
21    policy, or all of the seven people thinking, we think the
22    policy should be X, and the field people are saying, we
23    disagree, we think policy should be Y, and you would expect
24    that the two would get-together to hammer it out?
25        MR. JAMISON: I'm going to object to the question

## Page 54

1     as vague in terms of the phrase policy.
2  Q. (Continuing by Mr. Reingold:) You can answer.
3  A. I wouldn't use the word policy.
4  Q. I'll say, every time I use policy, I mean legislative
5     position.
6        MR. JAMISON: For purposes of clarity, can you just
7     use that phrase rather than policy.
8        MR. REINGOLD: I keep trying to and I apologies,
9     the three syllables instead of the seven syllables.
10 Q. (Continuing by Mr. Reingold:) So I'll ask the question
11    again. If you have, if the fundamental disagree is between
12    the people at the top, and the people at the bottom, or
13    well, you know, the high level folks and low level folks on
14    legislative position, and you need to reach a consensus,
15    would you expect those people to meet to hash it out
16    together?
17 A. In a hypothetical situation on a bill that I was dealing
18    with?
19 Q. Yes.
20 A. Sure.
21       MR. REINGOLD: I have no further questions.
22       MR. JAMISON: I have no questions.
23       MR. REINGOLD: All right. Any other business
24    before we part? I would like to order the transcripts and
25    get the contact information for the court reporter.

## Page 55

1        MR. JAMISON: Court reporter, any question for Ms.
2     McGhee or are we all set?
3        REPORTER: She is all set.
4        MR. JAMISON: We just want a searchable copy PDF of
5     the transcript.
6        MR. REINGOLD: We would like to get, for the
7     plaintiffs, is a mini, a full size, a PTX, and a Word.
8        REPORTER: Thank you very much.
9
10       (WHEREUPON THE DEPOSITION CONCLUDED AT 10:27 A.M.)

## Page 56

CERTIFICATE
STATE OF MICHIGAN}
         } ss:
COUNTY OF MACOMB }

   I, Amanda L. Grosshans, Certified Court Reporter, Registered Professional Reporter, a notary public in and for the aforesaid county and state, do hereby certify that the witness, Nicole McGhee on June 13, 2023 was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein, that the testimony of said witness was taken by me in machine shorthand and was thereafter reduced to typewritten form by me or under my direction and supervision, that the foregoing transcript is a true and accurate record of the testimony given to the best of my understanding and ability.
   I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcription or copies of the transcript attorney, or that requires me to provide any service not made available to all parties to the action.
   I agree that I nor any person, attorney, paralegal, or expert witness may make, copy, and/or distribute to others for future sales, monetary gain, or any other purpose, a transcript and/or video without paying Tri-County Court Reporters the ordinary and customary charges for any and all additional transcripts.

_Amanda L. Grosshans_
_____
Amanda L. Grosshans, CSR 3853
Notary Public

My commission expires: 9/20/2023

56 pages transcribe on 6/27/2023

14 (Pages 53 to 56)