# Exhibit 78:

## Narcissa Morris Deposition Transcript and Deposition Exhibit 7



TRI-COUNTY COURT REPORTERS INC.

(248)608-9250 Fax (844)270-7115
www.tri-countycourtreporters.com
depos@tricountyreporters.com

Transcript of the Testimony of
**Morris, Narcisa**

**Date:** January 25, 2023
**Volume:**

**Case:** JOHN DOES A, et al. v. GRETCHEN WHITMER, et al.

Printed On: February 10, 2023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES A, B, C, D, E, F, G,
H, MARY DOE and MARY ROE, on
behalf of themselves and all
others similarly situated,
        Plaintiffs,
   vs.      Case No. 2:22-cv-10209
           Hon. Mark A. Goldsmith
           Mag. Curtis Ivy, Jr.
GRETCHEN WHITMER, Governor of
the State of Michigan, and COL.
JOSEPH GASPER, Director of the
Michigan State Police, in their
official capacities,
        Defendants.
_____

The Deposition of NARCISA MORRIS,
Taken via videoconference,
Dimondale, Michigan,
Commencing at 9:03 a.m.,

Page 1

1  The Deposition of NARCISA MORRIS,
2  Taken via videoconference,
3  Dimondale, Michigan,
4  Commencing at 9:03 a.m.,
5  Wednesday, January 25, 2023,
6  Before Heather DeMar, RPR, CSR-8951.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1  APPEARANCES
2
3  MIRIAM AUKERMAN
4  American Civil Liberties Union of Michigan
5  1514 Wealthy Street SE, Suite 260
6  Grand Rapids, Michigan 49506
7  616.301.0930
8    Appearing on behalf of the Plaintiffs.
9
10
11
12
13
14  PAUL REINGOLD
15  University of Michigan Law School
16  801 Monroe Street
17  Ann Arbor, Michigan 48109
18  734.355.0319
19    Appearing on behalf of the Plaintiffs.
20
21
22
23
24
25

Page 3

1  ERIC JAMISON
2  Michigan Department of Attorney General
3  525 West Ottawa Street
4  Lansing, Michigan 48933
5  517.335.7573
6    Appearing on behalf of the Defendants.
7
8
9
10
11
12  ALSO PRESENT:
13  AIMEE BRIMACOMBE - MICHIGAN STATE POLICE REPRESENTATIVE
14  DAYJA TILLMAN - WITH PLAINTIFFS
15
16
17
18
19
20
21
22
23
24
25

Page 4

1 (Pages 1 to 4)

Morris, Narcisa
1/25/2023

INDEX TO EXAMINATIONS

1
2
3    Witness                    Page
4    NARCISA MORRIS
5
6    EXAMINATION
7    BY MS. AUKERMAN:            13
8    EXAMINATION
9    BY MR. JAMISON:            252
10   RE-EXAMINATION
11   BY MS. AUKERMAN:           254
12
13              INDEX TO EXHIBITS
14
15   Exhibit                    Page
16   (Exhibits retained.)
17
18   DEPOSITION EXHIBIT 1        32
19   DEPOSITION EXHIBIT 2        35
20   DEPOSITION EXHIBIT 3        61
21   DEPOSITION EXHIBIT 4        64
22   DEPOSITION EXHIBIT 5        93
23   DEPOSITION EXHIBIT 6       101
24   DEPOSITION EXHIBIT 7       124
25   DEPOSITION EXHIBIT 8       126

1    DEPOSITION EXHIBIT 9       140
2    DEPOSITION EXHIBIT 10      149
3    DEPOSITION EXHIBIT 11      156
4    DEPOSITION EXHIBIT 12      166
5    DEPOSITION EXHIBIT 13      176
6    DEPOSITION EXHIBIT 14      179
7    DEPOSITION EXHIBIT 15      185
8    DEPOSITION EXHIBIT 16      221
9    DEPOSITION EXHIBIT 17      236
10   DEPOSITION EXHIBIT 18      243
11   DEPOSITION EXHIBIT 19      247
12   DEPOSITION EXHIBIT 20      250

Page 5

Page 6

1    Dimondale, Michigan
2    Wednesday, January 25, 2023
3    9:03 a.m.
4
5              NARCISA MORRIS,
6    was thereupon called as a witness herein via
7    videoconference, where all parties stipulate to the
8    witness having first been duly sworn in remotely to
9    testify to the truth, the whole truth and nothing but
10   the truth, was examined and testified as follows:
11        MS. AUKERMAN:  Good morning, how are you?
12        THE WITNESS:  I'm good.  I'm going to turn
13   it up a little bit.  You guys are really quiet.
14        MS. AUKERMAN:  Sure.
15        THE WITNESS:  Okay.  Sorry about that.
16        MS. AUKERMAN:  No problem.  So before we
17   get started, I want to put a couple of things on the
18   record.  We received the class data yesterday.  Thank
19   you for sending that over.  We haven't been able to
20   download it yet to a secure location.
21        And so, we may have questions about the
22   data, about what different fields mean or things like
23   that.  I hope we can resolve that informally.
24   Probably the easiest thing is to have our expert talk
25   with you directly, if that's okay with you, just to

Page 7

1    like understand, you know, what the different fields
2    mean and things like that.  So hopefully we can
3    resolve that informally.
4        If not, we may have to reopen the
5    deposition or do another deposition about that.  So
6    hopefully we don't need that.  But I do want to put
7    that on the record.  Also, some discovery documents
8    that we haven't gotten, a privilege log and some
9    things like that we requested from your attorneys and
10   they haven't been produced yet.
11        And so, hopefully once we get those we
12   won't have further questions.  If we do, again, we
13   might have to reopen this.  I want to put that on the
14   record so you know that.
15        MR. JAMISON:  And we'll object to reopening
16   the deposition or -- I mean, if you didn't feel like
17   you were prepared to proceed with the deposition
18   today, it should have been rescheduled.
19        MS. AUKERMAN:  We asked for those things by
20   the close of business yesterday and they weren't
21   produced.
22        So moving forward with you, you said your
23   name for the record.  I'm going to talk a little bit
24   about what depositions are.  Have you ever been in a
25   deposition before?

Page 8

2  (Pages 5 to 8)

Morris, Narcisa
1/25/2023

---

**Page 9**

1          THE WITNESS:  No.

2          MS. AUKERMAN:  Okay.  So depositions are

3   really -- they're a conversation between the two of

4   us.  We're not in person.  We're doing this on Zoom.

5   But we've all had a lot of experience with Zoom over

6   the last couple of years.  So this is really a chance

7   for you to share what you know about SORA, about the

8   database.

9          When we were in court the other day,

10   Mr. Jamison said about you that you were the person

11   who knows everything about SORA and about the

12   database, right.  And so, it's a high compliment, I

13   think that's absolutely true from the interactions

14   we've had so far.

15          And this is really a chance for you to tell

16   us what you know.  And hopefully, that'll make a lot

17   of the other discovery not necessary.  I'm excited to

18   talk to you today because I feel like you have a lot

19   of information I'm excited to learn about.

20          And at the same time, I think the downside

21   of the fact that you know so much and you are so

22   incredibly knowledgeable is we're going to be here for

23   a while.  I want to put that out here.  It's going to

24   be a long day for me, for the court reporter, for

25   everybody who's sitting in.

---

**Page 10**

1          And it's, you know, if you need a break,

2   anything like that, you know, please let me know.

3   Because, you know, we'll take breaks, we'll stop for

4   lunch.  But you know a lot and there's a lot of

5   information that I hope that we can share and talk

6   about today.

7          So -- okay.  Just a couple rules since you

8   haven't been deposed before.  Have you testified in

9   court before?

10          THE WITNESS:  No, I have not.

11          MS. AUKERMAN:  Okay.  So just a couple of

12   things.  So if I ask a question and you answer it, if

13   you answer it, I'll assume that you understood the

14   question.  If you don't understand the question, just

15   tell me and I'll rephrase it.  Sometimes, especially

16   as we get tired or maybe make assumptions about what

17   you know or what you think or what an acronym means,

18   if there's something that you don't understand, just

19   ask me to rephrase the question and I'll try to make

20   it clearer.

21          I don't always ask the clearest questions.

22   And so, you know, just tell me if you don't understand

23   something.  If you answer the question, I'll assume

24   you understood what I meant.  You have to answer

25   verbally.  You can't nod or, you know, the court

---

**Page 11**

1   reporter can't take that down.  She needs and we all

2   need and the transcript needs you to answer the

3   question orally.

4          The court reporter can't take down two

5   people talking at once and especially over Zoom,

6   that's really, really difficult.  So we can't talk

7   over each other.  I know I sometimes interrupt and

8   I'll try not to do that.

9          And if I do correct me, but, you know, we

10   should not talk over each other.  And the court

11   reporter will hopefully tell us and ask us to repeat

12   ourselves so she can get an accurate and clear

13   transcript.

14          Again, we can take a break if we need to,

15   if you get tired, just to stop for whatever reason.  I

16   just ask that you answer whatever the question was

17   pending at that time.

18          So you said where you were and it appears

19   that you are not in the same room with Mr. Jamison,

20   correct?  You're in a separate place?

21          THE WITNESS:  Correct.

22          MS. AUKERMAN:  Okay.  Is there anybody with

23   you?

24          THE WITNESS:  No.

25          MS. AUKERMAN:  And you agree and understand

---

**Page 12**

1   that you can't -- during the deposition you can't

2   communicate with Mr. Jamison, do you understand that?

3   Or with any of the other attorneys, correct?

4          THE WITNESS:  Uh-huh.  Understood.

5          MS. AUKERMAN:  Okay.  And you can't, you

6   know, you can't text with the attorneys or other

7   people, right?

8          THE WITNESS:  Understood.

9          MS. AUKERMAN:  Okay.  Or, you know, private

10   Zoom or, you know, email, anything like that, do you

11   understand that, correct?

12          MR. JAMISON:  I'm going to object to those

13   questions.

14          MS. AUKERMAN:  Okay.  Mr. Jamison, do you

15   agree that you won't be communicating during the

16   questioning.

17          MR. JAMISON:  No.

18          MS. AUKERMAN:  You don't agree?

19          MR. JAMISON:  No.

20          MS. AUKERMAN:  You intend to communicate

21   with Ms. Morris during the questioning?

22          MR. JAMISON:  I don't know.

23          MS. AUKERMAN:  Okay.  All right.  Well, I

24   would ask you to let us know if you're communicating.

25   You're not allowed to instruct the witness during the

---

Tri-County Court Reporters
248-608-9250

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   deposition. | 1   Q. Do you know what you signed? |
| 2       MR. JAMISON: I'll agree that I won't | 2   A. Yes. |

1   deposition.
2       MR. JAMISON: I'll agree that I won't
3   instruct her how to answer the question. Whether or
4   not her and I have conversations, that doesn't have
5   any -- that's permissible under the rules. There's no
6   prohibition about an -- prohibiting an attorney from
7   talking with a client during a deposition.
8       MS. AUKERMAN: You agree not to instruct
9   the witness how to answer questions?
10      MR. JAMISON: Correct.
11          EXAMINATION
12   BY MS. AUKERMAN:
13   Q. Okay. Ms. Morris, do you want me to call you
14      Ms. Morris or Narcisa? What's -- what would you
15      prefer?
16   A. I have no preference.
17   Q. Okay. Did you -- are you aware there's a protective
18      order in this case?
19   A. I don't know that term.
20   Q. Okay. It's an order that restricts what information
21      can be talked about or shared or used.
22   A. Oh yes.
23   Q. Okay. Did you sign that protective order?
24   A. I signed a document, but I don't know that it said
25      protective order.

Page 13

**Page 14 (right column):**

1   Q. Do you know what you signed?
2   A. Yes.
3   Q. What was it?
4   A. A document disclosing or talking about the case and
5      saying that what I needed to provide and how I needed
6      to participate.
7   Q. Did it say anything about the individual plaintiffs in
8      this case?
9   A. Does and Roes.
10   Q. Yeah. The -- the individual people who are the named
11      plaintiffs, did it say anything about them?
12   A. It said Does and Roes.
13   Q. Did you -- did it say anything about whether or not --
14      let me ask you this.
15       Do you know the names of the individual
16      plaintiffs in this case?
17   A. Not by memory.
18   Q. But you have been provided those names?
19   A. Correct.
20   Q. Okay.
21       MR. JAMISON: I'm going to object to the
22      question as vague.
23   BY MS. AUKERMAN:
24   Q. Have you been provided the names of the plaintiffs --
25      the named plaintiffs in this case?

Page 14

1       MR. JAMISON: Same objection. Question was
2      vague.
3   BY MS. AUKERMAN:
4   Q. Have you been provided -- do you know who Doe number A
5      -- Doe A is?
6   A. No.
7   Q. You have not been given the name of Doe A?
8   A. I know who -- I know where to get it. I don't know it
9      by memory.
10   Q. So you have been made aware -- even if you don't
11      remember right now -- you've been made aware of the
12      names of the individual plaintiffs?
13       MR. JAMISON: Same objection, the question
14      is vague.
15   BY MS. AUKERMAN:
16   Q. You can answer.
17       MR. JAMISON: If you understand the
18      question, you can answer.
19   A. I know them -- I don't know them by memory, no.
20   BY MS. AUKERMAN:
21   Q. I mean, I wouldn't expect you to know them by memory.
22      Have you been asked to retrieve information about
23      those individuals?
24       MR. JAMISON: Objection, form of the
25      question.

Page 15

**Page 16 (right column):**

1   BY MS. AUKERMAN:
2   Q. Have you -- has your attorneys -- have the attorneys
3      for the defendants asked you to retrieve information
4      about those specific plaintiffs?
5   A. No.
6   Q. Okay. Tell me how you prepared for this deposition.
7   A. I'm unclear.
8   Q. You were told that a deposition was coming up. What
9      steps did you take to prepare yourself to talk to me
10      today?
11   A. I was advised to get all the documents, be prepared to
12      discuss the documents that have been provided.
13   Q. When you say all the documents, what documents are
14      those?
15   A. What I have provided.
16   Q. When you say what you have provided, what do you mean
17      by that?
18   A. I'm unclear.
19   Q. Okay. Sure. So there are -- are you talking about
20      the responses to the discovery requests?
21   A. Yes.
22   Q. Okay. So were you the person who provided all of
23      those? Or did some of those get provided by somebody
24      else?
25       MR. JAMISON: Objection, lack of

Page 16

4 (Pages 13 to 16)

Morris, Narcisa
1/25/2023

| Page 17 | Page 18 |
|---|---|
| 1    foundation. | 1    A.  My team. |
| 2  A.  Sorry? | 2  Q.  Okay.  So who on your team? |
| 3  BY MS. AUKERMAN: | 3  A.  Sharon Jegla, Karris Mayer. |
| 4  Q.  Okay.  So you were involved in preparing for the | 4  Q.  Anyone else? |
| 5    discovery -- the -- were you involved in preparing | 5  A.  Not that I can recall right now. |
| 6    discovery responses? | 6  Q.  Okay.  Did you consult with the SOR enforcement unit? |
| 7  A.  Yes. | 7  A.  I did not, that I recall. |
| 8  Q.  Okay.  And was anyone else involved in preparing the | 8  Q.  Okay.  So going back to how you prepared for today, |
| 9    discovery responses? | 9    you said, I believe, that you reviewed the documents |
| 10        MR. JAMISON:  Objection, lack of | 10    that you provided, correct? |
| 11    foundation.  If you know the answer, you can answer. | 11  A.  I'm sorry? |
| 12  A.  Yes. | 12  Q.  So let's go back.  What documents did you review to |
| 13  BY MS. AUKERMAN: | 13    prepare for today? |
| 14  Q.  Who else was involved in preparing the discovery | 14  A.  I didn't review documents for today. |
| 15    responses? | 15  Q.  What did you do to prepare for today? |
| 16  A.  I'm sorry, I'm really unclear about that question. | 16  A.  I was asked to be prepared to review or discuss the |
| 17  Q.  Sure.  So we've asked for a bunch of documents and | 17    documents that I had provided you.  So I did not |
| 18    information about the registry, correct? | 18    review. |
| 19  A.  Correct. | 19  Q.  So you didn't look at any documents in preparation for |
| 20  Q.  And you've been involved, as I understand it, in | 20    today? |
| 21    getting the materials that the attorneys have provided | 21  A.  No.  I just had them available. |
| 22    to us, correct? | 22  Q.  Okay.  Okay.  And did you have conversations with |
| 23  A.  Correct. | 23    anyone? |
| 24  Q.  Okay.  So I'm asking who was involved other than you | 24  A.  During what time? |
| 25    in getting those materials together, if anyone? | 25  Q.  To prepare for today. |

| Page 19 | Page 20 |
|---|---|
| 1  A.  Not today, no. | 1  A.  '95. |
| 2  Q.  Well, not today, did you in the -- in the weeks | 2  Q.  And after that? |
| 3    leading up -- weeks or months leading up to this | 3  A.  None. |
| 4    deposition, not about SORA -- I should rephrase that | 4  Q.  No further education after that? |
| 5    to be clear. | 5  A.  Not that resulted in a degree or anything. |
| 6    So to prepare for today, did you have | 6  Q.  Okay.  What high school did you graduate from? |
| 7    conversations about this deposition with anyone? | 7  A.  Eastern -- actually, I apologize, it was Waverly -- it |
| 8  A.  Yes. | 8    was technically Waverly. |
| 9  Q.  And who was that who -- | 9  Q.  Okay.  That's here in Michigan? |
| 10  A.  Eric Jamison. | 10  A.  Correct. |
| 11  Q.  Anyone else? | 11  Q.  Okay.  And then did you take any other like classes |
| 12  A.  Aimee Brimacombe. | 12    post high school, anything like that? |
| 13  Q.  How do you spell the last name? | 13  A.  I did. |
| 14  A.  It's in the web link. | 14  Q.  What kind of classes? |
| 15        MR. JAMISON:  It's up on the screen. | 15  A.  CNA. |
| 16        MS. AUKERMAN:  Yeah, I can't see it.  We'll | 16  Q.  Anything else? |
| 17    get it. | 17  A.  The basic writing, math. |
| 18  BY MS. AUKERMAN: | 18  Q.  Okay.  And then tell me about your work history. |
| 19  Q.  Anyone else? | 19    Where did you start after high school? |
| 20  A.  Not that I recall. | 20  A.  As a waitress. |
| 21  Q.  So tell me a little bit about your background and who | 21  Q.  As a waitress.  Okay.  And how long did you do that? |
| 22    you -- how you got to where you're at today.  Tell me | 22  A.  Ten years approximately. |
| 23    about your educational background. | 23  Q.  Okay.  And then what did you do? |
| 24  A.  High school. | 24  A.  Worked for the Marine Corps Depot. |
| 25  Q.  Okay.  When did you graduate high school? | 25  Q.  How long were you there? |

5 (Pages 17 to 20)

Tri-County Court Reporters
248-608-9250

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   **A.** I believe it was two years. | 1   **Q.** Okay. And after that? |
| 2   **Q.** Okay. And after that? | 2   **A.** Sex Offender Registry. |
| 3   **A.** I worked for Michigan State Police. | 3   **Q.** When did you start at the Sex Offender Registry? |
| 4   **Q.** Okay. So when did you start working at the Michigan | 4   **A.** I believe it was '18. |
| 5    State Police? | 5   **Q.** So 2018? In 2018? |
| 6   **A.** Approximately 2001. | 6   **A.** I don't recall exactly. |
| 7   **Q.** So you've been there about eleven years? | 7   **Q.** Okay. What was your first position in the -- that was |
| 8   **A.** Twenty, isn't it. | 8    in a SOR unit? |
| 9   **Q.** You're right, my math is terrible. So you've been | 9   **A.** That is correct. |
| 10    there about twenty years, a little over twenty years? | 10   **Q.** What was your first position there? |
| 11   **A.** Correct. | 11   **A.** A SOR coordinator. |
| 12   **Q.** Okay. So where did you start at the MSP? | 12   **Q.** What are the responsibilities of a SOR coordinator? |
| 13   **A.** Firearms temp. | 13   **A.** System management, enhancement programming; not |
| 14   **Q.** Okay. And how long were you there? | 14    creating programming, coordinating programming. |
| 15   **A.** I'm sorry? | 15   **Q.** Can you explain to me what that means. |
| 16   **Q.** How long were you in that position? | 16   **A.** Coordinating the programming, enhancements of the |
| 17   **A.** I don't recall. | 17    system. |
| 18   **Q.** Okay. What did you do next? | 18   **Q.** When you say program, do you mean programs for |
| 19   **A.** Firearm technician. | 19    training? Do you mean the actual database? I need |
| 20   **Q.** And then what position? | 20    you to explain it to me a little bit more. I don't |
| 21   **A.** Then it -- firearm analyst. | 21    understand what you're saying. |
| 22   **Q.** Okay. | 22   **A.** The database, coordinating with different moving parts |
| 23   **A.** Firearm destruction. | 23    for the database to put in enhancements or |
| 24   **Q.** And after that what position? | 24    improvements. If there are system outages, it was my |
| 25   **A.** And then security and access as -- | 25    responsibility to report them. |
| <div align="center">Page 21</div> | <div align="center">Page 22</div> |
| 1   **Q.** Did you do data entry in that job? | 1   **Q.** So what year did you move into that position? |
| 2   **A.** That was not my responsibility. | 2   **A.** December of 2022. |
| 3   **Q.** How long were you the SOR coordinator? | 3   **Q.** Is that your current position? |
| 4   **A.** Approximately maybe four years. | 4   **A.** That is. Sorry, the light shuts off automatically |
| 5   **Q.** And what position did you move to after that? | 5    without movement. |
| 6   **A.** Management. | 6   **Q.** So your current position -- can you give me the exact |
| 7   **Q.** Okay. What management position? | 7    job title. |
| 8   **A.** The SOR management position. | 8   **A.** It is system design support and quality control |
| 9   **Q.** So is that your current position? | 9    manager. |
| 10   **A.** No. | 10   **Q.** Okay. And you were in that position starting in |
| 11   **Q.** Okay. So what is -- so you said four years. So what | 11    December of 2022, correct? |
| 12    year did you move to the SOR management position? | 12   **A.** Correct. |
| 13   **A.** '21. | 13   **Q.** Until when? |
| 14   **Q.** Okay. What does the SOR management position involve? | 14   **A.** I'm sorry? |
| 15   **A.** The -- the technicians and the analysts and the | 15   **Q.** Until what time? |
| 16    coordinator of the unit for the maintenance of the | 16   **A.** I'm still the manager currently. |
| 17    system. | 17   **Q.** Okay. So this is a -- let me make sure I'm |
| 18   **Q.** How long were you in that position? | 18    understanding this. That's not in the SOR unit, |
| 19   **A.** Approximately a year. | 19    correct? |
| 20   **Q.** Okay. And then -- what position did you move into | 20   **A.** That is correct. |
| 21    after that? | 21   **Q.** What -- where is that located within the MSP |
| 22   **A.** A criminal history management position, management | 22    structure? |
| 23    position. | 23   **A.** It is on -- it is within the Criminal Justice |
| 24   **Q.** And what does that position involve? | 24    Information Center, with MSP. |
| 25   **A.** System support, design, quality control. | 25   **Q.** So you were the manager of the SOR unit. What was the |
| <div align="center">Page 23</div> | <div align="center">Page 24</div> |

<div align="right">6 (Pages 21 to 24)</div>

Morris, Narcisa
1/25/2023

| | Page 25 |
|---|---|
| 1 | -- your title in that position? |
| 2 | A. Sex Offender Registry manager. |
| 3 | Q. So can you describe to me -- back to when you were the |
| 4 | SOR unit manager, can you describe to me in detail |
| 5 | what your job responsibilities were. |
| 6 | A. So basically overseeing the technicians, assisting |
| 7 | them with any questions or concerns they might have, |
| 8 | carrying out policies and procedures, supporting the |
| 9 | analysts in whatever questions or concerns they have |
| 10 | in policies and procedures, monitoring legislation |
| 11 | changes to ensure that our system was compliant, |
| 12 | working with the system coordinator, that analyst |
| 13 | position, or enhancements or improvements. |
| 14 | Q. Anything else? |
| 15 | A. Assisting with grants, SMART grant. |
| 16 | Q. What else? |
| 17 | A. Any special projects assigned by legal or my command. |
| 18 | Q. What else? |
| 19 | A. Providing overall support. |
| 20 | Q. Anything else? |
| 21 | A. No. |
| 22 | Q. Okay. |
| 23 | A. Not that I recall. |
| 24 | Q. Okay. So you mentioned legislative changes. Tell me |
| 25 | about your role in that. |

Page 25

| | Page 26 |
|---|---|
| 1 | A. That would consist of if there was something -- like |
| 2 | we had a law change in March 24th, 2021. I just make |
| 3 | sure -- it was my responsibility to make sure that we |
| 4 | were carrying out any necessary policy and procedure |
| 5 | changes for processes to align with what was required |
| 6 | in statute. |
| 7 | Q. Okay. You mentioned that you started in 2021. Were |
| 8 | you -- when in 2021 did you start in that position? |
| 9 | A. I don't recall exactly. |
| 10 | Q. Okay. Were you the manager when -- in March of 2021? |
| 11 | A. Yes. |
| 12 | Q. Did your role involve coordinating with the legal -- |
| 13 | the Michigan State Police legal department? |
| 14 | A. Yes. |
| 15 | Q. And the AG's Office, Attorney General's Office? |
| 16 | A. Yes, if needed. |
| 17 | Q. How often did that come up? |
| 18 | MR. JAMISON: Objection, the question is |
| 19 | vague. |
| 20 | BY MS. AUKERMAN: |
| 21 | Q. How often did you -- how often did you typically |
| 22 | communicate with the legal -- Michigan State Police |
| 23 | legal department? |
| 24 | A. I'm sorry, I'm unclear. |
| 25 | Q. How often -- when you were in the SOR unit -- let's |

Page 26

| | Page 27 |
|---|---|
| 1 | just bracket this to say we're talking about the |
| 2 | period of time when you were the SOR unit |
| 3 | coordinator -- manager, I should say. How often would |
| 4 | you coordinate with the Michigan State Police legal |
| 5 | department? |
| 6 | A. Regularly. |
| 7 | Q. Daily? |
| 8 | A. A few times a week, I would say. |
| 9 | Q. And how often would you coordinate with the Attorney |
| 10 | General's Office? |
| 11 | A. Only when asked specifically, not often. |
| 12 | Q. So a couple times a month? |
| 13 | A. I can't say for sure. |
| 14 | Q. Okay. What kind of issues would you talk to the |
| 15 | lawyers about? I'm not asking for privileged |
| 16 | information, just the types of -- the types of issues |
| 17 | where you needed to involve the legal department. |
| 18 | MR. JAMISON: I'm going to object as |
| 19 | privileged. |
| 20 | MS. AUKERMAN: Let me restate the question. |
| 21 | BY MS. AUKERMAN: |
| 22 | Q. Are there issues where the SOR unit did not have the |
| 23 | ability to make the decisions itself without |
| 24 | consulting the legal department? |
| 25 | A. Can you repeat the question. |

Page 27

| | Page 28 |
|---|---|
| 1 | Q. Are there -- where the SOR unit needed -- needs -- let |
| 2 | me put this -- retry to say this so that it doesn't |
| 3 | get at privileged information. |
| 4 | Are there issues where the SOR unit needs |
| 5 | input from the -- from lawyers? |
| 6 | MR. JAMISON: Objection as vague. |
| 7 | BY MS. AUKERMAN: |
| 8 | Q. Are -- okay. Let's move on. |
| 9 | Are you responsible for audits of the |
| 10 | registry? Or were you responsible for audits of the |
| 11 | registry? |
| 12 | MR. JAMISON: Objection as vague. |
| 13 | BY MS. AUKERMAN: |
| 14 | Q. Is -- is the registry ever audited in any way? |
| 15 | MR. JAMISON: Lack of foundation. |
| 16 | BY MS. AUKERMAN: |
| 17 | Q. If you know. |
| 18 | A. I don't know what you mean by audits. |
| 19 | Q. So you mentioned, I believe earlier, quality control, |
| 20 | correct? |
| 21 | A. That's my new position. |
| 22 | Q. Okay. Was there any quality control work that was |
| 23 | done within the SOR unit? |
| 24 | A. Yes. |
| 25 | Q. And who was responsible for that? |

Page 28

7 (Pages 25 to 28)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   **A.** The quality assurance analyst. | 1   **Q.** Are you -- were you responsible for training of any |
| 2   **Q.** Did you oversee that person? | 2     kind? |
| 3   **A.** Yes. | 3         MR. JAMISON:  Objection as vague. |
| 4   **Q.** What kind of work did that person do to ensure quality | 4   BY MS. AUKERMAN: |
| 5     control? | 5   **Q.** Were you -- talking about -- I'm going to say this. |
| 6   **A.** Run reports, find discrepancies, work on updating | 6     We're talking about the period when you were the |
| 7     record information to correct any discrepancies. | 7     SOR -- managing the SOR unit. |
| 8   **Q.** Okay.  Were other -- were there other reports other | 8         While you were managing the SOR unit, were |
| 9     than -- other than the quality assurance reports, were | 9     you responsible for training of any kind? |
| 10     other reports run on the registry? | 10   **A.** Can you clarify that. |
| 11         MR. JAMISON:  Objection as vague. | 11   **Q.** Were you responsible for training people in your unit? |
| 12   BY MS. AUKERMAN: | 12   **A.** No. |
| 13   **Q.** Did the -- did you have to -- do you have to run | 13   **Q.** Were you responsible for training law enforcement? |
| 14     reports for the SMART office, the -- let me back up. | 14   **A.** No. |
| 15         Are you familiar with the SMART office? | 15   **Q.** Were you responsible for communications with people |
| 16   **A.** Yes. | 16     who used the -- the public registry? |
| 17   **Q.** Okay.  What do they do? | 17   **A.** No, not personally, no. |
| 18   **A.** The office is responsible for coordinating and working | 18   **Q.** Did you oversee people who did that? |
| 19     with different jurisdictions as it pertains to sex | 19   **A.** Yes. |
| 20     offenders tracking and monitoring. | 20   **Q.** Were you responsible for communications with law |
| 21   **Q.** Do you have to do reports for them? | 21     enforcement users of the registry? |
| 22   **A.** Yes. | 22   **A.** I'm sorry, can you ask that question again. |
| 23   **Q.** What kind of reports? | 23   **Q.** Were you responsible for communicating with law |
| 24   **A.** They have requests for monthly stats over a period of | 24     enforcement users of the registry?  So like police |
| 25     time. | 25     officers or doing a verification or something? |
| Page 29 | Page 30 |

| | |
|---|---|
| 1   **A.** If needed. | 1         MARKED FOR IDENTIFICATION: |
| 2   **Q.** Okay.  Did you work with prosecutors? | 2         DEPOSITION EXHIBIT 1 |
| 3   **A.** I'm sorry, in what capacity?  Like what? | 3         9:40 a.m. |
| 4   **Q.** We're talking the entire time -- we're talking about | 4   BY MS. AUKERMAN: |
| 5     your time at the SOR unit as a manager.  Did you work | 5   **Q.** So this shows the Sex Offender Registry unit.  And it |
| 6     with prosecutors at all? | 6     shows that was from November 4th, 2022, is that |
| 7   **A.** Not personally. | 7     correct? |
| 8   **Q.** Did you oversee people who did? | 8   **A.** That shows that on the paper, yes. |
| 9   **A.** Yes. | 9   **Q.** So what has changed about -- what, if anything, has |
| 10   **Q.** And what -- what did those individuals do in relation | 10     changed about the Sex Offender Registry unit that's |
| 11     to prosecutors? | 11     shown here? |
| 12   **A.** Record requests, certified record requests. | 12   **A.** I'm not the manager. |
| 13   **Q.** Okay.  Let's move on.  I'm going to open a document | 13   **Q.** Any other changes? |
| 14     here.  Can you see this document? | 14   **A.** No. |
| 15   **A.** Yes. | 15   **Q.** Do you know who the current manager is? |
| 16   **Q.** Okay.  Can you tell me what this is? | 16   **A.** There's not one. |
| 17   **A.** The organizational chart for the Criminal Justice | 17   **Q.** Are there any additional -- are there any other |
| 18     Information Center. | 18     changes to this chart or box, I should say? |
| 19   **Q.** Okay. | 19   **A.** Not that I notice. |
| 20         MS. AUKERMAN:  Let's mark this as Exhibit | 20   **Q.** What do the numbers like fourteen, twelve, eleven, |
| 21     1. | 21     what do those mean? |
| 22         MR. JAMISON:  Mariam, will you mind reading | 22   **A.** I don't know. |
| 23     the Bates numbers in for any of the exhibits so it's | 23   **Q.** What does a department analyst do? |
| 24     easier to track what they are. | 24   **A.** Review, analyze, provide recommendations. |
| 25         MS. AUKERMAN:  So this is Bates 85. | 25   **Q.** Which of the analysts there knows about the most about |
| Page 31 | Page 32 |

8 (Pages 29 to 32)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1      that job? | 1    **A.** The department techs are responsible for the incoming |
| 2    **A.** I'm sorry? | 2      and outgoing of registrants on the system and packing |
| 3           MR. JAMISON: Objection as vague. | 3      the record. |
| 4    BY MS. AUKERMAN: | 4    **Q.** So is the department tech person the person who'd be |
| 5    **Q.** Of the analysts listed on this chart, which one would | 5      entering individual registrant data, that kind of |
| 6      you say is the most knowledgeable about the registry? | 6      thing? |
| 7    **A.** They're all knowledgeable in their areas. They don't | 7    **A.** Can you clarify that. |
| 8      do the same things. | 8    **Q.** Is the -- the department tech is working more with |
| 9    **Q.** So what are the differences between what they do? | 9      individual records for individual registrants? |
| 10    **A.** The twelve, Karris Mayer, she is the SOR coordinator. | 10    **A.** I'm still unclear. |
| 11      So she's doing more system program management, | 11    **Q.** Can you maybe just explain to me what the department |
| 12      enhancements, tracking issues, reporting outages. | 12      techs' responsibilities are. |
| 13      Sharon Jegla is responsible for more of our procedures | 13    **A.** For monitoring incoming and outgoing registrants and |
| 14      and managing or updating as necessary. She's more of | 14      packing the record. |
| 15      an individual who assists and supports management for | 15    **Q.** Packing the record? |
| 16      working with unique or new registrants with unique | 16    **A.** Correct. |
| 17      crime codes or crime codes we haven't seen. | 17    **Q.** What does that mean? |
| 18           The other analysts are more for assisting | 18    **A.** If they're incoming registrants, new registrants, we |
| 19      law enforcement in tracking and monitoring individuals | 19      don't create or -- we don't create records. We just |
| 20      on the registry. | 20      ensure that everything that was collected by the |
| 21    **Q.** What do the department techs do? | 21      jurisdiction is in the system. If there are |
| 22    **A.** There's a quality assurance analyst that strictly | 22      discrepancies or missing information, they coordinate |
| 23      works on quality assurance stuff, finding errors in | 23      with that jurisdiction to make sure to get the |
| 24      reports and correcting them. | 24      information if available. |
| 25    **Q.** What do the department techs do? | 25    **Q.** Okay. |
| <div align="center">Page 33</div> | <div align="center">Page 34</div> |
| 1    **A.** If they're outgoing, then they're individual -- we | 1           MS. AUKERMAN: This is Bates 1516. |
| 2      have noticed that the individual is outgoing and | 2    BY MS. AUKERMAN: |
| 3      coordinating, we're checking with other states to see | 3    **Q.** This shows -- appears to be an SOR enforcement unit. |
| 4      if the individual did what they said they were going | 4      Can you tell me what the work of that unit is. |
| 5      to do. And they respond to daily inquiries or record | 5    **A.** For SOR enforcement, they are responsible for any |
| 6      requests, certified record requests, they prep them. | 6      enforcement of SOR. |
| 7    **Q.** Record requests, what do you mean by that? | 7    **Q.** How does their work differ from what the SOR unit |
| 8    **A.** Certified record requests, record requests are | 8      does? |
| 9      requests from other -- other states regarding | 9    **A.** They're enlisted law enforcement. |
| 10      registration, law enforcement regarding their | 10    **Q.** Okay. |
| 11      registration -- | 11    **A.** They have -- |
| 12    **Q.** Prosecutors? | 12    **Q.** Go ahead. |
| 13    **A.** Prosecutor, uh-huh, regarding registration. | 13    **A.** -- powers. |
| 14    **Q.** Let's look at -- I'm going to share a different | 14    **Q.** Anything else? |
| 15      document here. Can you see that? | 15    **A.** Not that I can think of right now. |
| 16    **A.** No. | 16    **Q.** What are their job responsibilities? What do they do |
| 17    **Q.** Can you see that now? | 17      day-to-day? |
| 18    **A.** Yes. | 18    **A.** I do not know. |
| 19    **Q.** Can you tell me what this is? | 19           MR. JAMISON: Object, lack of foundation. |
| 20    **A.** It appears to be an organizational chart. | 20    BY MS. AUKERMAN: |
| 21           MS. AUKERMAN: Let's mark this as Exhibit | 21    **Q.** If you don't know, fine. Do you know whether the SOR |
| 22    2. | 22      enforcement operations were previously located in the |
| 23          MARKED FOR IDENTIFICATION: | 23      SOR unit? |
| 24          DEPOSITION EXHIBIT 2 | 24    **A.** Say that again. |
| 25          9:47 a.m. | 25    **Q.** Do you know whether the SOR enforcement function, the |
| <div align="center">Page 35</div> | <div align="center">Page 36</div> |

<div align="right">9 (Pages 33 to 36)</div>

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   SOR enforcement responsibilities were previously | 1   SOR unit, who was your manager who would ask you |
| 2   located in the SOR unit, the one that you were | 2   questions? |
| 3   managing? | 3   A.  I've had a few. |
| 4   A.  I was not here during that, no, not since I've been | 4   Q.  Who are they? |
| 5   here. | 5   A.  So First Lieutenant Renz. |
| 6   Q.  So I want to ask you about some policy decisions | 6   Q.  And then? |
| 7   around SORA.  Who makes those decisions? | 7   A.  And then assistant division director Shawn Sible. |
| 8   A.  Can you clarify. | 8   Q.  Who else? |
| 9   Q.  So if there are decisions to be made about how a | 9   A.  That's it. |
| 10   statute gets implemented, who makes the decisions | 10   Q.  And they would ask you questions about SOR in order to |
| 11   about how that statute is going to get implemented? | 11   make policy decisions? |
| 12   A.  It's above me. | 12        MR. JAMISON:  Objection, lack of |
| 13   Q.  Okay.  And when you say above you, who is that? | 13   foundation. |
| 14   A.  I honestly don't know where that starts. | 14   BY MS. AUKERMAN: |
| 15   Q.  Are you ever consulted on policy issues related to | 15   Q.  Did they ask you questions about SOR? |
| 16   SORA? | 16   A.  They would ask me questions about SOR, yes. |
| 17   A.  We are asked questions that if they pertain to a | 17   Q.  Did they ask you questions in order to make policy |
| 18   certain policy and procedure we may not know right | 18   decisions? |
| 19   away, that they were pertaining to that. | 19        MR. JAMISON:  Objection, lack of |
| 20   Q.  So who asks you those questions? | 20   foundation. |
| 21   A.  It could be my command, it could be legal, MSP legal, | 21   BY MS. AUKERMAN: |
| 22   excuse me. | 22   Q.  Were they involved in making policy decisions around |
| 23   Q.  So who in command would ask you questions? | 23   SOR? |
| 24   A.  My supervisor, manager. | 24        MR. JAMISON:  Objection, lack of |
| 25   Q.  Who is that -- was that?  I mean, when you were in the | 25   foundation. |
| Page 37 | Page 38 |
| 1   BY MS. AUKERMAN: | 1   A.  From what I understand, correct. |
| 2   Q.  For Lieutenant Renz and assistant director Sible, | 2   Q.  And there are lawyers in the MSP legal unit that are |
| 3   Mr. Sible, were they involved in, if you know, policy | 3   involved in SOR related issues, correct? |
| 4   decisions around SOR? | 4   A.  From what I understand, correct. |
| 5   A.  I don't know. | 5   Q.  Okay.  To your knowledge, are there other people |
| 6   Q.  You mentioned legal would ask you questions about SOR, | 6   within the Michigan State Police who are involved in |
| 7   who in legal? | 7   dealing with the registry? |
| 8   A.  Steve Beatty. | 8   A.  I don't know. |
| 9   Q.  Okay. | 9   Q.  Okay.  Do Michigan State Police posts have a role in |
| 10   A.  Or John Gemellaro. | 10   dealing with the registry? |
| 11   Q.  What are the parts of the Michigan State Police are | 11   A.  Yes. |
| 12   involved in SOR related work other than the SOR | 12   Q.  Okay.  What is that? |
| 13   enforcement unit and the SOR unit and the legal | 13   A.  They are a jurisdiction for the purpose of registering |
| 14   department? | 14   and verifying. |
| 15        MR. JAMISON:  Objection as vague. | 15   Q.  Are there any other units within the Michigan State |
| 16   BY MS. AUKERMAN: | 16   Police or departments that deal with the registry? |
| 17   Q.  So you mentioned that the legal department, the SOR | 17        MR. JAMISON:  Objection, lack of |
| 18   unit, and the SOR enforcement unit are all involved in | 18   foundation. |
| 19   some way in dealing with the SOR statute, correct? | 19   BY MS. AUKERMAN: |
| 20   A.  I don't recall saying that. | 20   Q.  If you know. |
| 21   Q.  Okay.  The SOR unit is involved with the registry | 21   A.  I don't know. |
| 22   statute, correct? | 22   Q.  Okay.  If you know, where do policy decisions about |
| 23   A.  Correct. | 23   the registry get made within the Michigan State |
| 24   Q.  And the SOR enforcement unit is involved in enforcing | 24   Police? |
| 25   the registry statute, correct? | 25   A.  I don't know. |
| Page 39 | Page 40 |

10 (Pages 37 to 40)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1  Q. Okay.  What other entities does the SOR unit work with | 1  agents to make sure we're getting all the information |
| 2  outside of the Michigan State Police?  So let me give | 2  in the system. |
| 3  you some examples, like maybe local law enforcement, | 3  Q. Is that for people who are incarcerated? |
| 4  other states.  So let's just talk about all the | 4  A. Correct. |
| 5  different entities that you work -- that you work with | 5  Q. What about people who are like on probation?  Are they |
| 6  to do your job. | 6  also the primary unit who enters registration |
| 7  A. Other state registries. | 7  information for them? |
| 8  Q. Okay.  What else? | 8  A. MDOC, correct. |
| 9  A. Local law enforcement, Michigan courts, out-of-state | 9  Q. Who's the person you work with there? |
| 10  courts, MDOC. | 10  A. It's a group email. |
| 11  Q. Who in the MDOC? | 11  Q. Is there a specific person that is most knowledgeable |
| 12  A. I'm sorry, I don't know their unit name. | 12  there? |
| 13  Q. I saw a reference in some of the documents to an MDOC | 13  A. I'm sure there is.  They've had some changeover as |
| 14  sex offender management unit.  Does that sound | 14  well. |
| 15  familiar? | 15  Q. Okay.  So we talked about other states, local law |
| 16  A. It does. | 16  enforcement, Michigan courts, out-of-state courts. |
| 17  Q. Is that the MDOC unit that you mostly work with there? | 17  What about tribal entities like tribal police, tribal |
| 18  A. Yes. | 18  courts?  Do you work with them? |
| 19  Q. Are there other units? | 19  A. Not so much. |
| 20  A. I don't know. | 20  Q. Okay. |
| 21  Q. What other -- and actually on -- for the MDOC sex | 21  A. They are their own sovereign nation. |
| 22  offender management unit, what do you do in | 22  Q. What about with the federal government?  Are there |
| 23  coordination with them? | 23  federal agencies that you work with? |
| 24  A. They're primarily the unit that enters records for | 24  A. Yeah.  I guess upon occasion. |
| 25  registration.  And so, we work with them and their | 25  Q. Who are those? |
| Page 41 | Page 42 |
| 1  A. Federal bureau -- shoot, I'm only thinking of acronyms | 1  believe they are out of Michigan. |
| 2  right now, I apologize.  It's called FBOP, it's their | 2  Q. Are there other federal entities that you work with? |
| 3  federal probation offices and parole offices. | 3  A. Not that I recall at the moment. |
| 4  Q. What's your relationship with them?  What do you | 4  Q. We talked about the SMART office.  But any other like |
| 5  coordinate about? | 5  entities like the SMART office? |
| 6  A. Individuals that are convicted of federal offenses on | 6  A. Not like the SMART office.  But we do work with |
| 7  probation or parole or incarcerated. | 7  military courts occasionally, looking for registration |
| 8  Q. So you work to determine if -- what do you -- what do | 8  information to pack the record. |
| 9  you communicate about with respect to those | 9  Q. So is it fair to say that there's lots of different |
| 10  individuals? | 10  entities that are involved in administering the |
| 11  A. Just packing the record if someone is no longer | 11  statute? |
| 12  incarcerated, if they've moved incarceration.  If | 12  MR. JAMISON:  Objection, vague. |
| 13  they're on probation or parole, they might tell us | 13  BY MS. AUKERMAN: |
| 14  that, can't find them. | 14  Q. Is it fair to say that there are lots of different |
| 15  Q. What about the U.S. Marshals? | 15  entities that are involved with the registry? |
| 16  A. Yes. | 16  MR. JAMISON:  Same objection. |
| 17  Q. What's their involvement? | 17  BY MS. AUKERMAN: |
| 18  A. Primarily absconder work. | 18  Q. Do you understand the question? |
| 19  Q. What kind of absconder work? | 19  A. I do not.  I do not understand. |
| 20  A. Monitoring and tracking, tips, notes. | 20  Q. Okay.  You've described -- okay.  Let's move on. |
| 21  Q. Is that for interstate absconders? | 21  So you've described a variety of different |
| 22  A. Correct, in or out. | 22  entities that are involved with SOR in some way, |
| 23  Q. If it's an absconder in Michigan, like someone who's | 23  right? |
| 24  in Michigan, does that also go to the U.S. Marshals? | 24  A. Provide information. |
| 25  A. No.  Only if we know that we -- we have reason to | 25  Q. Okay.  So I'm interested now in talking about sort of |
| Page 43 | Page 44 |

11 (Pages 41 to 44)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    who's responsible for what.  So who is responsible for<br>2    answering questions from registrants about what their<br>3    responsibilities are?<br>4         MR. JAMISON:  Objection, lack of foundation<br>5    and vague.<br>6    BY MS. AUKERMAN:<br>7    Q.  So registrants sometimes have questions about what<br>8    their responsibilities are, right?<br>9    A.  Yes.<br>10    Q.  Okay.  So who, if anyone, is responsible among the<br>11    organizations that you've described for answering<br>12    their questions about the registry?<br>13         MR. JAMISON:  Objection, lack of<br>14    foundation.<br>15    BY MS. AUKERMAN:<br>16    Q.  Is anyone responsible -- let me back up.<br>17         So does the Michigan State Police have<br>18    responsibility for answering questions from<br>19    registrants about what they can and cannot do?<br>20         MR. JAMISON:  Objection, lack of<br>21    foundation.<br>22    BY MS. AUKERMAN:<br>23    Q.  Do you understand the question?<br>24    A.  I do not.<br>25    BY MS. AUKERMAN:<br><br>Page 45 | 1    Q.  So I'm trying to understand if a person -- a<br>2    registrant, where would -- where would they go to get<br>3    answers to questions about the registry?<br>4         MR. JAMISON:  Objection, lack of<br>5    foundation.<br>6    BY MS. AUKERMAN:<br>7    Q.  If you know.<br>8    A.  I need clarification.<br>9    Q.  Okay.  So do registrants sometimes have questions<br>10    about the registry?<br>11         MR. JAMISON:  Objection, lack of<br>12    foundation.<br>13    BY MS. AUKERMAN:<br>14    Q.  If you know.<br>15    A.  They do.<br>16    Q.  And who, if you know, can answer those questions?<br>17         MR. JAMISON:  Objection, it's vague.<br>18    BY MS. AUKERMAN:<br>19    Q.  If registrants have questions about the registry, who,<br>20    if you know, can answer those questions?<br>21         MR. JAMISON:  Same objection.<br>22    BY MS. AUKERMAN:<br>23    Q.  Do you understand the question?<br>24    A.  I need it -- I need clarification.<br>25    Q.  Okay.  If registrants call the SOR unit with a<br><br>Page 46 |
| 1    question about the registry, what is the SOR unit<br>2    supposed to do?<br>3    A.  Respond to specific questions about their registration<br>4    information.<br>5    Q.  Like -- uh-huh.<br>6    A.  We are not attorneys.  We don't provide guidance.  We<br>7    can only answer questions if they have about their<br>8    registration information in the system.<br>9    Q.  So if someone said am I tier I, you would be able to<br>10    answer that question, right?<br>11    A.  Upon proof they are who they say they are.<br>12    Q.  Okay.  But if someone said I got a volunteer job, I'm<br>13    volunteering at my church once a week, do I have to<br>14    report that, would you answer that question?<br>15    A.  No.<br>16    Q.  Okay.  So if a registrant had that question how would<br>17    the registrant get that question answered?<br>18         MR. JAMISON:  Objection, lack of<br>19    foundation.<br>20    BY MS. AUKERMAN:<br>21    Q.  If you know.  So a registrant has a question about<br>22    whether they have to report their volunteer job and<br>23    the SOR unit isn't going to give an answer, how does<br>24    the registrant get an answer to that question?<br>25         MR. JAMISON:  Same objection.<br><br>Page 47 | 1    BY MS. AUKERMAN:<br>2    Q.  If you know.  You can answer.<br>3    A.  I refer them to their own legal.<br>4    Q.  What about if local law enforcement has a question<br>5    about the registry?  To whom would they direct that<br>6    question, if you know?<br>7         MR. JAMISON:  Same objection.<br>8    BY MS. AUKERMAN:<br>9    Q.  You can answer.<br>10    A.  Chain of command.<br>11    Q.  Through the chain of command?<br>12    A.  Through their own chain of command.<br>13    Q.  So they would ask -- so -- let me give you an example.<br>14    If a police officer says hey, this registrant has --<br>15    is volunteering once a week at their church, do I have<br>16    to mark that down.  They would take that question up<br>17    their own chain of command, is that what you're<br>18    saying?<br>19    A.  Correct.<br>20         MR. JAMISON:  Objection, lack of<br>21    foundation.  And it's a hypothetical.<br>22         MS. AUKERMAN:  I can ask hypotheticals.<br>23    BY MS. AUKERMAN:<br>24    Q.  So they would take that up the chain of command to get<br>25    an answer?<br><br>Page 48 |

12 (Pages 45 to 48)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    MR. JAMISON:  Same objection. | 1   Q.  Was there any training provided by anyone? |
| 2   BY MS. AUKERMAN: | 2   A.  To? |
| 3   Q.  You can answer. | 3   Q.  To the SOR unit staff that you supervised? |
| 4   A.  Their own chain of command. | 4   A.  Yes. |
| 5   Q.  There's not a centralized place to get an answer to | 5   Q.  Who provided that? |
| 6        that question for law enforcement? | 6   A.  Their peers. |
| 7          MR. JAMISON:  Objection, lack of | 7   Q.  What do you mean by that? |
| 8        foundation. | 8   A.  The persons doing the job would train their peers. |
| 9   BY MS. AUKERMAN: | 9   Q.  So it was like on-the-job learning is what -- kind of |
| 10  Q.  If you know. | 10       what you're saying? |
| 11  A.  I don't know. | 11  A.  Correct. |
| 12  Q.  So the SOR unit would not provide an answer to that | 12  Q.  Were there any manuals or guides or cheat sheets that |
| 13       question? | 13       were provided to staff? |
| 14  A.  No. | 14  A.  We provide them our policies, our procedures.  Those |
| 15  Q.  Okay.  Are you aware of any other central entity that | 15       are their guides, any section Q and A questions or |
| 16       would provide an answer to that question? | 16       answer documents that we have. |
| 17  A.  I don't know. | 17  Q.  What Q and A documents do you have? |
| 18  Q.  Okay.  Let's talk about training for the SOR unit | 18  A.  We have a phone document, someone -- |
| 19       staff.  When you were running the unit, what kind of | 19  Q.  What -- |
| 20       training, if any, did you provide to your staff? | 20  A.  -- there are some answers, we tell them where to go. |
| 21          MR. JAMISON:  Objection, asked and | 21  Q.  Has that been provided to us, if you know? |
| 22       answered. | 22  A.  I don't know. |
| 23  BY MS. AUKERMAN: | 23  Q.  Okay.  So that's -- it's called a phone document? |
| 24  Q.  You can answer. | 24  A.  Yes.  It's a phone Q and A. |
| 25  A.  I personally did not provide training. | 25  Q.  Okay.  What other Q and A documents do you have? |
| Page 49 | Page 50 |

| | |
|---|---|
| 1   A.  We have an outdated one that used to be used for the | 1        by that? |
| 2        website, the -- the public website, I should say. | 2   A.  The policies and procedures, how to carry out the |
| 3   Q.  When you say an outdated one, what do you mean? | 3        specific task. |
| 4   A.  We aren't currently in use of it in our public | 4   Q.  So are those what are called the SOPs? |
| 5        website. | 5   A.  Correct. |
| 6   Q.  It was something that was -- was this something that | 6   Q.  And have we been provided all of the SOPs, to your |
| 7        was posted on the website? | 7        knowledge? |
| 8   A.  It used to be with our old vendor. | 8   A.  I don't know. |
| 9   Q.  But it's not posted anymore? | 9   Q.  Is there a list of all the SOPs? |
| 10  A.  Correct. | 10  A.  Yes. |
| 11  Q.  Any other types of Q and A documents? | 11  Q.  What are the most common areas of confusion for staff |
| 12  A.  Not that I recall. | 12       in the SOR unit? |
| 13  Q.  Any -- what kind of orientation materials are provided | 13  A.  There might be confusion as new processes are |
| 14       to new staff? | 14       implemented. |
| 15  A.  They get their normal packet that talks about | 15  Q.  Can you give an example of that? |
| 16       insurance, how to enter time through Sigma, health | 16  A.  As we transition through Lymon. |
| 17       benefits. | 17  Q.  Are there -- well, are there day-to-day questions that |
| 18  Q.  I mean more related to actually the job | 18       come up? |
| 19       responsibilities. | 19  A.  At first. |
| 20  A.  They get a list of policies and procedures.  There's a | 20  Q.  Like what? |
| 21       checklist that we just go through to make sure that | 21  A.  Anything we haven't addressed in the past.  I'm sorry, |
| 22       they've reviewed those policies and procedures and | 22       I can't think of anything at the moment.  But there's |
| 23       that somebody sat with them and then ensured that they | 23       always something we haven't encountered that they may |
| 24       understand. | 24       ask a question on. |
| 25  Q.  When you say policies and procedures, what do you mean | 25  Q.  All right.  I want to talk a little bit about the |
| Page 51 | Page 52 |

13 (Pages 49 to 52)

Morris, Narcisa
1/25/2023

**Page 53**

1  purpose of the registry.  In your opinion, what do you
2  think the purpose of the registry is?
3  **A.**  I don't have an opinion.
4  **Q.**  Okay.  What do you think the legislature intended the
5  registry to accomplish?
6      MR. JAMISON:  Objection, lack of
7  foundation.
8  **A.**  I wouldn't know.
9  BY MS. AUKERMAN:
10  **Q.**  Okay.  What is -- what is -- what is the registry
11  there for?  What is it supposed to do?
12      MR. JAMISON:  Objection, that's vague.
13  BY MS. AUKERMAN:
14  **Q.**  You can answer if you understand the question.
15  **A.**  I follow statute.  I simply follow statute.
16  **Q.**  I understand that.  But you've made a choice
17  professionally to spend a lot of amount of -- quite a
18  number of years working in the registry unit, right?
19  **A.**  A year as manager.
20  **Q.**  Right.  And then some years before that, right, as --
21  it sounds like?
22  **A.**  System --
23  **Q.**  Yeah.
24  **A.**  -- system coordinator.
25  **Q.**  So you've spent many, many hours of your life working

**Page 54**

1  at this registry.  So I'm trying to understand what
2  you -- what you think the registry does?  What does
3  it -- what does it accomplish?
4      MR. JAMISON:  Objection, that's vague.
5  BY MS. AUKERMAN:
6  **Q.**  What is the registry intended to do, in your opinion?
7  **A.**  I don't have an opinion.
8  **Q.**  Okay.  Is the registry a way to supervise people with
9  past sex offenses?
10  **A.**  We are required for the monitoring and tracking, make
11  sure information is current and reported as required
12  by statute.
13  **Q.**  What is the purpose of the non-public registry?
14      MR. JAMISON:  Objection, lack of
15  foundation.
16  BY MS. AUKERMAN:
17  **Q.**  What is the non-public registry there to do?
18      MR. JAMISON:  Same objection.
19  BY MS. AUKERMAN:
20  **Q.**  You can answer.
21  **A.**  Statute requires that it exists.  And we're required
22  to make sure it exists according to statute.
23  **Q.**  You don't have a view of this -- what the registry
24  does or doesn't accomplish?
25  **A.**  I don't have a personal view.

**Page 55**

1  **Q.**  You're just implementing a law that the legislature
2  passed?
3  **A.**  Correct.
4  **Q.**  Okay.  Okay.  Now, people who are on the registry, are
5  you aware of -- if people -- for people who are on the
6  registry, are you aware whether their convictions are
7  generally a matter of public record?
8  **A.**  I don't know.
9  **Q.**  Okay.  So if someone has a conviction for a sex
10  offense, would that show up on a background check?
11  **A.**  I guess that's dependent on the conviction and the
12  individual.
13  **Q.**  Okay.  So what does the registry do that a background
14  check doesn't do?
15      MR. JAMISON:  Objection, lack of
16  foundation, that's vague.
17  BY MS. AUKERMAN:
18  **Q.**  If you do a background check on someone and you can
19  pull up their criminal record, correct?
20      MR. JAMISON:  Objection, lack of foundation
21  and vague.
22  BY MS. AUKERMAN:
23  **Q.**  Are you familiar with the concept of background
24  checks?
25  **A.**  Somewhat.

**Page 56**

1  **Q.**  Okay.  And how are they used?
2      MR. JAMISON:  Lack of foundation.
3  BY MS. AUKERMAN:
4  **Q.**  If you know.
5  **A.**  I'm sorry, can you expand on that question.
6  **Q.**  What is a background check?
7      MR. JAMISON:  Same objection.  The question
8  is vague and she lacks foundation to answer the
9  question.
10  I don't like speaking objections, Mariam,
11  but I think it would be helpful, are you talking about
12  in MSP doing a background check, law enforcement, a
13  private company, you know, along those lines.
14      MS. AUKERMAN:  Yeah.  Okay.  That's fair.
15  Thank you.
16  BY MS. AUKERMAN:
17  **Q.**  So if an employer is looking to hire somebody, might
18  they do a background check?
19      MR. JAMISON:  Objection, lack of
20  foundation.
21  BY MS. AUKERMAN:
22  **Q.**  If you know?
23  **A.**  I'm sorry, did you say might?
24  **Q.**  Yeah.  Might they do a background check, if you know?
25  **A.**  They might.

14  (Pages 53 to 56)

Morris, Narcisa
1/25/2023

**Page 57**

```
 1    Q.  Okay.
 2    A.  I don't -- it's not my area of expertise.  I don't
 3        know.
 4    Q.  Is there information -- all right.  Let's move to
 5        talking about the number and --
 6    A.  I apologize, I don't mean to be rude.  It is 10:20,
 7        may we take a quick break for a snack.
 8            MS. AUKERMAN:  Sure.
 9            (Off the record 10:21 a.m.)
10            (Back on the record at 10:33 a.m.)
11    BY MS. AUKERMAN:
12    Q.  So let's talk about the numbers and categories of
13        registrants.  Can you tell me about the different
14        categories of registrants that there are?
15    A.  Categories?  Can you expand on that.
16    Q.  Sure.  So there's inactive, active, active, you know,
17        incarcerated, pending review, like all those.  I want
18        to understand what all the different categories are.
19    A.  Okay.
20    Q.  So can you tell me about that.
21    A.  I don't know them all by heart.
22    Q.  Sure.
23    A.  But they represent a -- the current status situation
24        of an individual or they help try to represent that
25        status.
```

**Page 58**

```
 1    Q.  What -- what are the different categories?
 2    A.  So again, I don't recall them all offhand.  But say,
 3        for instance, you mentioned pending review, so that is
 4        a status used for an individual whose record has been
 5        created in our system and a thorough check is being
 6        completed to ensure that everything meant to be in
 7        that record is in there from the jurisdiction that
 8        entered it.  And until it's complete, it doesn't get
 9        made to active.  Or it could go to incarcerated, could
10        go to homeless.  So it stays in pending review until
11        it's complete.
12    Q.  Okay.  And then there's -- go ahead.
13    A.  Active means they're active, there's no issues.
14        There's no -- there's nothing going on with the
15        individual specifically that needs attention.  They're
16        an active registrant.
17    Q.  Who falls in the active category?
18    A.  Individuals that don't -- aren't pending review or
19        incarcerated or homeless, absconded.
20    Q.  Okay.  So an incarcerated registrant is not an active
21        registrant?
22    A.  It's a type of active registrant, but they're
23        incarcerated.  So we try, again, to best represent --
24        use the status to best represent their current
25        situation.
```

**Page 59**

```
 1    Q.  So active registrants would include incarcerated
 2        individuals?
 3    A.  Not necessarily.  If I did a report for active and I
 4        used active as a status, incarcerated is not going to
 5        show because those individuals are incarcerated.
 6    Q.  So if you used active, who would show up?
 7    A.  Registrants that aren't incarcerated, homeless,
 8        absconded, heading out of state, that isn't one of the
 9        other statuses.
10    Q.  So it would include Michigan registrants who are out
11        in the community; so people who are living in Michigan
12        or working in Michigan, reporting in Michigan?
13    A.  I'm sorry, clarify that one more time.
14    Q.  So I'm trying to understand who falls in the active
15        bucket.  So you're saying it does not include
16        incarcerated individuals?
17    A.  Correct.
18    Q.  And it does not include people who are out of state?
19    A.  Correct.
20    Q.  And you're saying it doesn't include homeless
21        individuals?
22    A.  Correct.  Because they have their own status.  They
23        all have their own status.
24    Q.  And not -- it would not include absconders?
25    A.  Correct.
```

**Page 60**

```
 1    Q.  Okay.
 2    A.  It wouldn't include school only, employment only.
 3    Q.  Okay.  And then what about inactive registrants?  Who
 4        falls into those categories -- in that category?
 5    A.  Inactive would be anyone cancelled.  It would be
 6        anyone deported out of country, out of state.  That's
 7        all I can recall at this time.
 8    Q.  How are the incarcerated classified?  Is that a
 9        separate classification?
10    A.  I'm sorry, I'm not understanding the question.
11    Q.  So are incarcerated -- you said incarcerated are not
12        active, correct?
13    A.  No.  They're considered active, it -- they're just not
14        labelled -- their status is not active.  The status is
15        there to best represent the current situation of the
16        individual.
17    Q.  All right.  I'm still -- okay.  So let's -- let's use
18        an example here.  Maybe that'll help clarify my
19        confusion.
20            So I'm going to show you a document.  Can
21        you see that?
22    A.  Yes.
23    Q.  Okay.  Do you recognize this document?
24    A.  I do not.
25    Q.  Okay.  I can tell you that this was a document that
```

15 (Pages 57 to 60)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1  was provided to us in discovery as the number of<br>2  registrants -- in response to discovery requests about<br>3  the number of registrants.  Does that make things<br>4  clearer for you?<br>5  **A.**  Yes.<br>6  **Q.**  Do you recall -- were you involved in putting together<br>7  this document?<br>8  **A.**  I may have.<br>9        MS. AUKERMAN:  Let's mark this as, I think,<br>10  Exhibit 3.  That is Bates 1515.<br>11        MARKED FOR IDENTIFICATION:<br>12        DEPOSITION EXHIBIT 3<br>13        10:40 a.m.<br>14  BY MS. AUKERMAN:<br>15  **Q.**  Okay.  This document shows that there are forty<br>16  thousand, one hundred thirty-five -- as of January<br>17  4th, 2023, there were forty thousand, one hundred<br>18  thirty-five individuals on the public Sex Offender<br>19  Registry, correct?<br>20  **A.**  Correct.  I see that.<br>21  **Q.**  Can you tell me like how -- like what categories of<br>22  registrants were included to run that number?<br>23  **A.**  What statuses?<br>24  **Q.**  Yeah, what statuses.  Like does that include the<br>25  inactive, out of state, does it include the | 1  incarcerated?  Like who's included in that forty<br>2  thousand number?<br>3  **A.**  That would be active, that would be incarcerated, that<br>4  would be homeless, that would be absconded.  I'm sorry<br>5  if I repeat these, I'm not tracking what I'm -- that<br>6  could be pending out of state and that would include<br>7  pending review.<br>8  **Q.**  And what -- who is not included in that number?<br>9  **A.**  You have to forgive me, I don't recall them all, the<br>10  statuses, but that would be something like the<br>11  deported out of country, out of state, cancelled.<br>12  **Q.**  Do you know roughly how many out-of-state registrants<br>13  there are?<br>14  **A.**  I do not.<br>15  **Q.**  Do you know roughly how many total records there are?<br>16  **A.**  I do not.<br>17        MR. JAMISON:  Objection as vague.<br>18  BY MS. AUKERMAN:<br>19  **Q.**  You can answer.<br>20  **A.**  I do not.<br>21  **Q.**  Let's talk about the SOR database.  The SOR unit got a<br>22  new database while you were there, is that correct?<br>23  **A.**  That is correct.<br>24  **Q.**  Tell me again the implementation date for that.<br>25  **A.**  8/26/21. |
| <div align="center">Page 61</div> | <div align="center">Page 62</div> |
| 1  **Q.**  Can you tell me what that database can do that the old<br>2  system can't -- couldn't do?<br>3  **A.**  It has a more robust audit log.  I'm able to tell<br>4  specifically when someone modified something.  I have<br>5  --<br>6  **Q.**  What else?<br>7  **A.**  With -- I have a more robust search capability.  It<br>8  includes pretty much all the fields that we have in<br>9  the system.  I have the flexibility to create and use<br>10  different statuses.  I have the ability to -- in the<br>11  system we have the ability for agency jurisdictions to<br>12  upload their documents directly.<br>13        We have the ability to get notification --<br>14  or not so much notification, but the ability to have<br>15  things brought to our attention that we didn't have<br>16  before, such as if someone's noted as potentially<br>17  being deceased.  It's a way for the agency<br>18  jurisdiction to communicate with us within the system.<br>19  **Q.**  What else?<br>20  **A.**  That's all I can recall at the moment.  Those were<br>21  some big items for us.<br>22  **Q.**  Okay.  So I want to look at the contract for the<br>23  system, which I'll share with you in a minute.  Okay.<br>24  Can you see that?<br>25  **A.**  Yes, I can. | 1  **Q.**  So I'm -- are you familiar with the contract for the<br>2  database?<br>3  **A.**  I am familiar.<br>4  **Q.**  Okay.<br>5        MS. AUKERMAN:  So let's mark this as, I<br>6  believe, Exhibit 4.  It starts at Bates 355.<br>7        MARKED FOR IDENTIFICATION:<br>8        DEPOSITION EXHIBIT 4<br>9        10:46 a.m.<br>10  BY MS. AUKERMAN:<br>11  **Q.**  So I want to look through the business specification<br>12  worksheet for that contract.  And as I understand it,<br>13  these are the things that the system is supposed to be<br>14  able to do, is that right?<br>15  **A.**  That's how I understand it, correct.<br>16  **Q.**  Okay.  So when -- sometimes systems don't do what<br>17  they're supposed to do.  So I wanted to see which of<br>18  these things the system actually can do.  Okay.  Let's<br>19  just work through these.  So we won't go through all<br>20  of them, but -- I'm sorry, have we marked this Exhibit<br>21  4.<br>22        So can the system -- does the system have<br>23  the ability to meet changes initiated by Michigan<br>24  legislation or a judicial body within the time frame<br>25  established by those entities?  Can the system do |
| <div align="center">Page 63</div> | <div align="center">Page 64</div> |

<div align="right">16 (Pages 61 to 64)</div>

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   that? | 1   then? |
| 2   **A.** Yes. | 2      MR. JAMISON: Objection, lack of |
| 3   **Q.** Does it have the ability to meet changes initiated by | 3   foundation. |
| 4     the Michigan State Police -- policy changes within six | 4   BY MS. AUKERMAN: |
| 5     months or less? | 5   **Q.** You can answer. |
| 6   **A.** So far, yes. | 6   **A.** I guess the term responsible is the issue here. |
| 7   **Q.** Does the system have the ability to assign offenders | 7     Because we don't -- we just set it up so the system |
| 8     to responsible county jurisdiction based on home | 8     will put them in the corresponding county. We don't |
| 9     address for providing notifications, running reports, | 9     deem who's responsible for that individual. It could |
| 10     conducting searches of offenders that they are | 10     be at a local level or it could be at a county level. |
| 11     responsible for? | 11     That's not to our discretion. That is to the |
| 12   **A.** Yes. | 12     jurisdictions to determine. |
| 13   **Q.** So the system assigns people to particular | 13   **Q.** So the jurisdiction decides if it's the local police |
| 14     jurisdictions, is that right? | 14     or the county sheriff? |
| 15   **A.** It uses the county to put them in the jurisdictions, | 15   **A.** Correct. |
| 16     so it shows up for their jurisdiction. So if I'm | 16   **Q.** So the system here -- I'm scrolling. Does the system |
| 17     Ingham County, anybody that lives in that county, they | 17     automate violations? I'm looking under thirty-four |
| 18     can see them based on the address, city, and state. | 18     here on page eighty-eight. |
| 19   **Q.** And they're the ones who are then responsible for that | 19   **A.** Limited violations. |
| 20     registrant? | 20   **Q.** I'm sorry, I don't understand what you're saying. |
| 21   **A.** That's not necessarily true. | 21   **A.** Yes, limited violations. |
| 22   **Q.** What do you mean by that? | 22   **Q.** So it automates violations? |
| 23   **A.** We don't dictate who's responsible. | 23   **A.** Limited. |
| 24   **Q.** Okay. So it says system must assign offenders to a | 24      MR. JAMISON: Objection, asked and |
| 25     potential county jurisdiction. What does that mean | 25     answered. |
| <div align="center">Page 65</div> | <div align="center">Page 66</div> |
| 1   BY MS. AUKERMAN: | 1   BY MS. AUKERMAN: |
| 2   **Q.** I'm not understanding the answer. | 2   **Q.** You can answer. |
| 3   **A.** Yes. | 3   **A.** I need clarification. |
| 4   **Q.** So the answer is that the system automates violations? | 4   **Q.** So the fee violation, the specifications for the |
| 5   **A.** Yes. It has the capability. | 5     contract require an automated fee violation, correct? |
| 6   **Q.** Does it automate fee violations? | 6   **A.** Uh-huh. Correct. |
| 7   **A.** No. | 7   **Q.** So is that yet to be implemented? |
| 8   **Q.** So if someone misses a fee payment, would that show as | 8   **A.** Correct. |
| 9     a violation? | 9   **Q.** And will that be implemented? |
| 10   **A.** No. | 10   **A.** I don't know. |
| 11   **Q.** How is -- how is it -- when someone shows as having a | 11   **Q.** Who would know? |
| 12     fee violation on the SOR database, how does that | 12   **A.** Command, MSP legal. |
| 13     happen? | 13   **Q.** What about the ID violation? Is that automated? |
| 14   **A.** Entering jurisdiction. | 14   **A.** Yes. |
| 15   **Q.** So the entering jurisdiction has to manually enter a | 15   **Q.** The failed to verify, is that automated? |
| 16     fee violation? | 16   **A.** We didn't end up using fail to verify. |
| 17   **A.** Correct. | 17   **Q.** What is failed to verify? |
| 18   **Q.** That is one that's not automated? | 18   **A.** Failed to verify is when an individual is supposed to |
| 19   **A.** Correct. | 19     come in within their month period and they don't come |
| 20   **Q.** What about the palm prints? | 20     in. The system was going to notify or make an entry |
| 21   **A.** Automated. | 21     in the system that the individual did not come in. |
| 22   **Q.** Let me -- does -- on the fee violation, is that | 22   **Q.** And you're saying that's not used in the system? |
| 23     something that is going to get added to the system? | 23   **A.** I'm saying failed to verify is not used in the system. |
| 24      MR. JAMISON: Objection, lack of | 24   **Q.** So how does -- how does law enforcement know if |
| 25   foundation. | 25     someone didn't come in to verify? |
| <div align="center">Page 67</div> | <div align="center">Page 68</div> |

<div align="right">17 (Pages 65 to 68)</div>

Morris, Narcisa
1/25/2023

---

**Page 69**

1          MR. JAMISON:  Objection, lack of
2     foundation.
3     BY MS. AUKERMAN:
4     Q.  You can answer.
5     A.  They have to note it.
6     Q.  Can they run a report?
7     A.  Not for failed to verify, no.
8     Q.  How would they -- if an officer wanted to determine
9         everyone in their jurisdiction who was supposed to
10        report in January and didn't, what would they do?
11         MR. JAMISON:  Objection, lack of
12     foundation.
13     BY MS. AUKERMAN:
14     Q.  You can answer.
15     A.  They have to run a report to find out everyone who
16         verified.
17     Q.  This says an address automated violation, what is
18         that?
19     A.  That did not get implemented.
20     Q.  Okay.  So the next feature is -- there's required
21         features for investigation and monitoring of
22         registrants, is that right?
23     A.  That's what I see on the screen, yes.
24     Q.  Okay.  And the system has to accommodate tip results,
25         is that correct?

---

**Page 70**

1     A.  Correct.
2     Q.  And does it in fact do that?
3     A.  As I recall, yes.
4     Q.  And does the system automatically assign tips to the
5         responsible jurisdiction?
6     A.  I don't believe so.
7     Q.  When a tip comes in, where does -- does that get sent
8         someplace?
9     A.  No.
10     Q.  Does it show up an as alert?
11     A.  No.
12     Q.  For tips marked as new, the system must provide a
13         popup warning upon opening of an offender's record
14         that a new tip has been entered.  Does that -- does
15         the system do that?
16     A.  There's no popup warning.
17     Q.  So then I see here the next thing, the system must
18         have data fields for absconders.  Does the system have
19         those fields for absconders?
20     A.  Yes.
21     Q.  Okay.  The system is supposed to have mapping for
22         enforcement sweeps.  Does the system have that?
23     A.  No.
24     Q.  Do you know if the system -- if you know, will that be
25         added to the system?

---

**Page 71**

1     A.  I believe so.
2     Q.  And the system is supposed to show the last successful
3         residence check, correct?
4     A.  Correct.
5     Q.  And does it in fact do that?
6     A.  It shows all checks.
7     Q.  Okay.  Moving along, the system is supposed to add
8         Michigan residence check and investigative report
9         forms, correct?
10     A.  Repeat the question.
11     Q.  I'm looking at number fifty-nine, system must have the
12         ability to add registrant -- registration verification
13         forms, including the Michigan residence check, invest
14         report -- for investigative -- what are those reports?
15     A.  That is the name of the report.
16     Q.  Okay.  Is that a form?
17     A.  I would say yes.
18         MS. AUKERMAN:  I don't believe we've been
19     provided with that form.  So we'll need to see that.
20     BY MS. AUKERMAN:
21     Q.  What -- so the system has the ability to add those
22         residence checks or investigative reports, correct?
23     A.  I'm not clear as to the question.
24     Q.  Okay.  So --
25     A.  It's generated.  It's generated.  It's not -- it's a

---

**Page 72**

1     -- it's generated into a printable form, I guess is
2         how I would describe it.
3     Q.  So but you're saying that number fifty-nine -- that
4         the system has the ability described in number
5         fifty-nine?
6     A.  Uh-huh.  Correct.
7     Q.  Okay.  Looking at number sixty-four here, it says the
8         system is supposed to accept investigative tips that
9         feed into the registry system in a corresponding
10         jurisdiction for where the offender lives to be
11         addressed by law enforcement.  Can the system do that?
12     A.  In part.
13     Q.  What -- you say in part, what do you mean?
14     A.  It goes into the registrant's record, and that's as
15         far as it goes.
16     Q.  You're saying it doesn't go to the corresponding
17         jurisdiction?
18     A.  That is correct.
19     Q.  But if the jurisdiction opened the record, they would
20         see that?
21     A.  Correct.
22     Q.  Okay.  Okay.  The -- moving on to sixty-eight here,
23         website will map offender addresses for the public and
24         return results for offenders in user's vicinity, up to
25         fifteen miles.  Can the system do that?

---

18 (Pages 69 to 72)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 | **A.** Yes. |
| 2 | **Q.** The system shall allow the -- sixty-nine -- system |
| 3 | shall allow public users to sign up and receive emails |
| 4 | or text messages regarding when an offender moves to, |
| 5 | attends school near, or works in a user's vicinity. |
| 6 | Does the system do that? |
| 7 | **A.** Not fully. |
| 8 | **Q.** Can you explain that? |
| 9 | **A.** No text messages. |
| 10 | **Q.** So just emails? |
| 11 | **A.** Correct. |
| 12 | **Q.** So a public user can sign up for emails about when an |
| 13 | offender moves, attends school near, or works in the |
| 14 | person's vicinity, correct? |
| 15 | **A.** Correct. |
| 16 | **Q.** Number seventy, system shall allow offenders to sign |
| 17 | up and receives email notifications regarding |
| 18 | verification reminders or other pertinent information |
| 19 | through the public-facing website. Is that something |
| 20 | the system does? |
| 21 | **A.** No. |
| 22 | **Q.** Do you know if there's an intention to add that to the |
| 23 | system? |
| 24 | **A.** I believe so. |
| 25 | **Q.** Number seventy-seven, the system must allow offenders |

<div align="center">Page 73</div>

| | |
|---|---|
| 1 | to complete updates through their phones or other |
| 2 | electronic devices. Does the system do that? |
| 3 | **A.** No. |
| 4 | **Q.** If you know, is there an intention to add that |
| 5 | functionality to the system? |
| 6 | **A.** I believe so. |
| 7 | **Q.** If that were added to the system, registrants could |
| 8 | record information electronically? |
| 9 | **A.** I don't know. |
| 10 | **Q.** What do you mean you don't know? |
| 11 | **A.** I don't know what that looks like. |
| 12 | **Q.** But you're saying that there is an intention to add |
| 13 | the capability to the system to allow that -- let me |
| 14 | try to say this clearly. |
| 15 | The contract specified that the system must |
| 16 | allow offenders to complete updates through their |
| 17 | phone or other electronic devices, correct? |
| 18 | **A.** Correct. |
| 19 | **Q.** And your understanding is that the intention is to add |
| 20 | that functionality to the system, correct? |
| 21 | **A.** Correct. |
| 22 | **Q.** Okay. Looking at one one oh, this is with respect to |
| 23 | fees. It says the system -- the -- should have the |
| 24 | capability if fee status is indigent for ninety days, |
| 25 | on the ninety-first day, 12:00 a.m., EST, system must |

<div align="center">Page 74</div>

| | |
|---|---|
| 1 | automatically make the offender non-compliant for |
| 2 | fees. Does the system do that? |
| 3 | **A.** No. |
| 4 | **Q.** Is there an intention to have the system do that in |
| 5 | the future? |
| 6 | **A.** I don't know. |
| 7 | **Q.** Okay. I wanted to talk next about interfaces that the |
| 8 | system has with other -- the database has with other |
| 9 | databases and just go through and verify that these |
| 10 | are -- again, as I understand it -- specifications for |
| 11 | the system, correct? |
| 12 | **A.** Okay. |
| 13 | **Q.** And I wanted to see if what was in the contract is |
| 14 | actually happening or available in practice. |
| 15 | **A.** Okay. Do you mind making that bigger, please. |
| 16 | **Q.** Let me see if I can do that. |
| 17 | **A.** It's the plus or minus in the bottom right corner. |
| 18 | There you go. Thank you. |
| 19 | **Q.** Sure. Okay. So first of all, there's an interface |
| 20 | with the criminal history record. Is that interface |
| 21 | active? |
| 22 | **A.** Yes. |
| 23 | **Q.** Does that provide -- it looks like a nightly batch |
| 24 | process, is that what happens? |
| 25 | **A.** I believe so. |

<div align="center">Page 75</div>

| | |
|---|---|
| 1 | **Q.** Then moving on to the Michigan cashiering and |
| 2 | receiving system. There's supposed to be an interface |
| 3 | with that. Is that interface active? |
| 4 | **A.** Yes. |
| 5 | **Q.** And it indicates that the data's sent on a monthly |
| 6 | basis, is that the case? |
| 7 | **A.** I believe so. |
| 8 | **Q.** Okay. And then there's an interface with LEIN, is |
| 9 | that correct? So LEIN -- there's no interface with |
| 10 | LEIN? |
| 11 | **A.** Correct. |
| 12 | **Q.** Is there an, if you know, an intention to build that |
| 13 | capability into the system? |
| 14 | **A.** I do not know. |
| 15 | **Q.** And then there's -- the first LEIN entry here regards |
| 16 | warrants. And then there's LEIN entry for vehicles. |
| 17 | Is there an interface with LEIN regarding vehicles? |
| 18 | **A.** No. |
| 19 | **Q.** And then we have an interface with the Michigan |
| 20 | Department of Corrections. Is there an interface with |
| 21 | the Michigan Department of Corrections? |
| 22 | **A.** No. |
| 23 | **Q.** Do you know if there's an intention to create that |
| 24 | interface as indicated in the contract? |
| 25 | **A.** I believe so. |

<div align="center">Page 76</div>

<div align="right">19 (Pages 73 to 76)</div>

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 Q. Next we have the National Sex Offender Registry public | 1 interface, but you're saying that there's no intention |
| 2 website. Is there an interface there? | 2 to actually do what's in the contract? |
| 3 A. Yes. | 3 MR. JAMISON: Objection, lack of |
| 4 Q. Is that an -- it indicates realtime updates. Is that | 4 foundation. |
| 5 what's happening? | 5 BY MS. AUKERMAN: |
| 6 A. I believe so. | 6 Q. You can answer. |
| 7 Q. Okay. Moving on to SNAP, the Statewide Network Agency | 7 A. We are not interfacing with the SOS for death notice. |
| 8 Photos, is there an interface with SNAP? | 8 Q. Do you know why that interface was not created? |
| 9 A. Yes. | 9 A. Yes. |
| 10 Q. And it indicates that that's a realtime transfer, is | 10 Q. Why? |
| 11 that correct? | 11 A. Because we get it from somewhere else. |
| 12 A. I believe so. | 12 Q. Where do you get it from? |
| 13 Q. Okay. Then we've got the Secretary of State. Is | 13 A. We get it from LEIN. |
| 14 there an interface with the Secretary of State? | 14 Q. Okay. I thought you said that there's no interface |
| 15 A. No. | 15 with LEIN? |
| 16 Q. I went too fast. So Secretary of State, first of all, | 16 A. That was for warrants. |
| 17 there's an entry here regarding death records. Is | 17 Q. Okay. So what interface is there with LEIN? |
| 18 there an interface with Secretary of State for death | 18 A. For death notices. |
| 19 records? | 19 Q. Anything else? |
| 20 A. No. | 20 A. Not to my knowledge. |
| 21 Q. Is there an intention to create such an interface, to | 21 Q. Okay. Is there any interface with the Secretary of |
| 22 your knowledge? | 22 State? |
| 23 A. No. | 23 A. No. |
| 24 Q. Let me try to understand this. So the -- the contract | 24 Q. Okay. So moving on to vehicles -- or excuse me, |
| 25 specified that there should be a Secretary of State | 25 driver's licenses is next, seven point one, is that |
| Page 77 | Page 78 |

| | |
|---|---|
| 1 interface active? | 1 interface on vehicles? |
| 2 A. No. | 2 A. No. |
| 3 Q. Do you know why that interface was not created? | 3 Q. Do you get that information someplace else? |
| 4 A. We get it from somewhere else. | 4 A. No. |
| 5 Q. Where's that? | 5 Q. Registrants have to report that information, correct? |
| 6 A. If I recall correctly, it's SNAP. | 6 A. Per statute, yes. |
| 7 Q. So you get the driver's license information from SNAP? | 7 Q. Do you know why the interface was not created to |
| 8 A. I can't recall right now, but I believe so. | 8 provide the vehicle information? |
| 9 Q. Is there other information that you get from -- let's | 9 A. No. |
| 10 go back to SNAP? | 10 Q. Do you know whether there's an intention to complete |
| 11 A. No. | 11 this portion of the contract and create the vehicle |
| 12 Q. So from SNAP, you get it -- you get photographs in | 12 interface? |
| 13 realtime, correct? | 13 A. I do not know. |
| 14 A. I believe so. | 14 Q. Okay. Let's keep going here. We've got the Michigan |
| 15 Q. And then you said you get license information? | 15 State Police dashboard, is this -- is this an |
| 16 A. If I recall correctly, yes. | 16 interface that's active? |
| 17 Q. Is there anything else that you get from SNAP? | 17 A. No. |
| 18 A. No. | 18 Q. Do you know whether is it intended to become active -- |
| 19 Q. Going back to the Secretary of State, number seven | 19 that was a badly phrased question. |
| 20 point two, the photos, is that something that you get | 20 Do you know whether there's an intention to |
| 21 from the Secretary of State? | 21 make that interface active? |
| 22 A. No. | 22 A. I do not know. |
| 23 Q. Do you get that from SNAP, correct? | 23 Q. Okay. Okay. Next we've got the Federal Bureau of |
| 24 A. Correct. | 24 Prisons. Can the database interface with the Federal |
| 25 Q. Okay. Now seven point three, vehicles, is there an | 25 Bureau of Prisons? |
| Page 79 | Page 80 |

20  (Pages 77 to 80)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    **A.** No. | 1        MR. JAMISON: Objection, lack of |
| 2    **Q.** Do you get that information someplace else? | 2    foundation. |
| 3    **A.** No. | 3    **A.** I'm not understanding what you're talking about. |
| 4    **Q.** Do you know there's an intention to make that | 4    BY MS. AUKERMAN: |
| 5      interface active? | 5    **Q.** Okay. Let me clarify. So SOR requires registrants to |
| 6    **A.** I don't believe so. | 6      pay a fee, is that correct? |
| 7    **Q.** Okay. What about the interface with ICE? Is that | 7    **A.** The statute requires someone to pay a fee. |
| 8      active? | 8    **Q.** Okay. Are you aware that under the statute if a |
| 9    **A.** No. | 9      person is indigent, they can seek a waiver of the fee? |
| 10   **Q.** Do you get that information someplace else? | 10   **A.** Yes. |
| 11   **A.** No. | 11   **Q.** And are you aware that under the statute, if a |
| 12   **Q.** Do you know if there's an intention to make that | 12      person -- a person has to demonstrate that they're |
| 13      active? | 13      indigent to the satisfaction of law enforcement in |
| 14   **A.** I don't believe so. | 14      order to get a waiver, correct? |
| 15   **Q.** Okay. Moving on to the Bridge Card, is that -- is | 15   **A.** To their jurisdiction, correct. |
| 16      that active? | 16   **Q.** Okay. And are you aware that one of the ways to |
| 17   **A.** No. | 17      demonstrate indigency would be with a Bridge Card, |
| 18   **Q.** Do you get that information from someplace else? | 18      public benefits card? |
| 19   **A.** No. | 19   **A.** I was not aware. |
| 20   **Q.** If an offender is indigent, would they report that to | 20   **Q.** So if you're demonstrating indigency to the |
| 21      law enforcement to get a waiver of the fee? | 21      satisfaction of your local jurisdiction, one way you |
| 22   **A.** Can you clarify. | 22      could do that is to show you're receiving food |
| 23   **Q.** So if an indigent offender is a seeking a waiver of | 23      assistance, correct? |
| 24      the fee, is that something that they would tell law | 24   **A.** As you just said, yes. |
| 25      enforcement about? | 25   **Q.** Okay. This interface with the -- to determine who has |
| Page 81 | Page 82 |
| 1    a Bridge Card is not active, correct? | 1    **Q.** You can answer. |
| 2    **A.** Correct. | 2    **A.** The system collects data provided by jurisdictions. |
| 3    **Q.** Do you know -- does the Michigan State Police get that | 3    **Q.** Okay. In your -- you point out something there in |
| 4      information about who has a Bridge Card in another | 4      your answer, which is that the jurisdictions have to |
| 5      way? | 5      collect it for it to be entered, correct? |
| 6    **A.** No. | 6    **A.** They have to collect it and they have to enter it. |
| 7    **Q.** It would only be if the offender reports having a | 7    **Q.** Fair enough. Very good correction of my question. |
| 8      Bridge Card, correct? | 8      So if the jurisdiction doesn't collect the |
| 9    **A.** They don't typically report that to us. | 9      information, it won't be entered, correct? |
| 10   **Q.** If they -- if the registrant came in to say I have a | 10   **A.** I would agree with that statement. |
| 11      Bridge Card, I'm indigent, that's how the system would | 11   **Q.** Other than if there's an interface that like |
| 12      find out about it, correct? | 12      pre-populates that information? |
| 13        MR. JAMISON: Objection, lack of | 13   **A.** I would agree with that statement. |
| 14    foundation. | 14   **Q.** So if you have interfaces that are providing, say, |
| 15   **A.** If they reported that to the jurisdiction and the | 15      criminal history information, the jurisdiction doesn't |
| 16      jurisdiction entered that into the system. | 16      have to collect that information? |
| 17    BY MS. AUKERMAN: | 17        MR. JAMISON: Objection, lack of |
| 18   **Q.** Okay. Are you aware of whether there is an intention | 18    foundation. |
| 19      to make this interface with the Department of Health | 19    BY MS. AUKERMAN: |
| 20      and Human Services active? | 20   **Q.** You can answer. |
| 21   **A.** I don't believe so. | 21   **A.** I would disagree with that statement. |
| 22   **Q.** The SOR database is a database that captures a lot of | 22   **Q.** Can you explain it to me, what you disagree with. |
| 23      information, correct? | 23   **A.** Because you're talking about an interface with |
| 24        MR. JAMISON: Objection, that's vague. | 24      criminal history. But criminal history is only |
| 25    BY MS. AUKERMAN: | 25      Michigan offenses, it's not out-of-state offenses. We |
| Page 83 | Page 84 |

21 (Pages 81 to 84)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| **Page 85** | **Page 86** |

Page 85

1    don't always -- so we have to rely on the individual
2    to report to see if there was anything else.
3  Q.  But if there's information that comes in through an
4    interface, you don't -- it doesn't need to be -- it'll
5    still be in the system, even if the local jurisdiction
6    doesn't collect it, correct?
7  A.  Can you clarify that question.
8  Q.  So if there's information -- let me -- I'm trying to
9    say this clearly.
10        So if information comes in from the
11    interface, say, a photograph from SNAP, that will be
12    in the system, even if the local jurisdiction doesn't
13    collect a photograph from the registrant, correct?
14  A.  I agree with that statement.
15  Q.  Okay.  And if there's other types of information that
16    come in through an interface, that'll be in the system
17    even if the registrant doesn't report that
18    information, correct?
19  A.  No.
20  Q.  Can you explain why not?
21  A.  As I mentioned already, that if there is an instance
22    of something that's collected or happened in another
23    state, we don't automatically get that information,
24    even with an interface.
25  Q.  Right.  But I guess what I'm trying to understand and

Page 86

1    make sure I understand is that if you have information
2    in the -- that comes in from the interface -- I
3    realize some information doesn't come in through an
4    interface and the interface might be incomplete.
5        But the information that comes in through
6    the interface is in the system, correct?
7        MR. JAMISON:  Objection, vague.
8  BY MS. AUKERMAN:
9  Q.  You can answer.
10  A.  That would be the logic.
11  Q.  Okay.  So -- okay.  Let's move on to information that
12    is collected at the local -- by law enforcement when a
13    registrant comes in.  You mentioned earlier that the
14    information has to be both collected and entered,
15    correct?
16  A.  Correct.
17  Q.  And if the information is not entered by law
18    enforcement, it won't be in the system, correct?
19  A.  Correct.
20  Q.  Okay.  What -- in your opinion, experience, to what
21    extent are users inputting information that they
22    collect?
23  A.  I don't understand the question.
24  Q.  Well, sometimes people are really good about filling
25    out every single field and going through all the

| | |
|---|---|
| **Page 87** | **Page 88** |

Page 87

1    drop-downs.  And sometimes people just put in, you
2    know, sort of initial information, that maybe they
3    don't go to all the subparts of an entry, for example.
4        What I'm trying to get at is in your
5    experience, how good is the -- how complete is the
6    information that's being entered by law enforcement?
7        MR. JAMISON:  Objection, lack of foundation
8    and vague.
9  BY MS. AUKERMAN:
10  Q.  You can answer.
11  A.  I couldn't say.
12  Q.  You couldn't say because?
13  A.  I don't know.
14  Q.  Do you -- you mentioned earlier that there are quality
15    assurance checks to see how complete information, how
16    complete records are, correct?
17  A.  Correct.
18  Q.  So based on your experience looking at those quality
19    assurance reports, do you have a sense of how complete
20    the data is?
21  A.  No.
22  Q.  Are there things that you wish users of the
23    registry -- law enforcement users of the registry
24    would do that they're not doing?
25  A.  Can you repeat the question.

Page 88

1  Q.  Are there -- are there things that you, know, as
2    someone who supervised this unit, I had to deal with
3    whatever inaccuracies there are, incompleteness there
4    is?  Are there things you wish law enforcement users
5    of the registry would do that they are not doing?
6        MR. JAMISON:  Objection as vague.
7  BY MS. AUKERMAN:
8  Q.  You can answer.
9  A.  I'm sure, not that I can think of off the top of my
10    head right now.
11  Q.  Are there fields that often didn't get filled in?
12  A.  That's not my responsibility, so I can't really say.
13  Q.  Okay.  To give you an example, is it your experience
14    that every residence check gets entered into the
15    system?
16        MR. JAMISON:  Objection, lack of
17    foundation.
18  BY MS. AUKERMAN:
19  Q.  You can answer.
20  A.  Residence checks are not a requirement and, therefore,
21    it is not expected to see a residence check on the
22    file or many.
23  Q.  I'm not sure I understand that answer.
24  A.  Residence checks are not a requirement.
25  Q.  Okay.  But if someone conducts an -- are you saying

22 (Pages 85 to 88)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1  that someone might because they're -- are you saying | 1  **A.**  Your question isn't making sense to me, I'm sorry. |
| 2  that a person might conduct -- or law enforcement | 2  **Q.**  Let's move on actually.  Now, there's some information |
| 3  might conduct a residence check and not enter it into | 3  that the SOR unit, as I understand it, doesn't keep |
| 4  the system? | 4  within the SOR database, is that correct? |
| 5  **A.**  No, I'm not saying that. | 5      MR. JAMISON:  Objection, vague. |
| 6  **Q.**  Okay.  I'm -- maybe you can explain what you're | 6  **A.**  I don't know. |
| 7  saying, because I'm not understanding your answer. | 7  BY MS. AUKERMAN: |
| 8  **A.**  The residence check is not a requirement by statute. | 8  **Q.**  Okay.  Let me -- let me try to explain where I'm going |
| 9  **Q.**  Okay.  But there's a place in the system to mark when | 9  with this.  So do you have spreadsheets that you keep |
| 10  one's been done, correct? | 10  separate from the SOR database? |
| 11  **A.**  Correct. | 11  **A.**  Not that I'm aware of. |
| 12  **Q.**  Okay.  And is it your experience that every residence | 12  **Q.**  I think we received -- in discovery received a |
| 13  check that is ever done is marked in the system? | 13  spreadsheet involving recaptured individuals.  Is that |
| 14      MR. JAMISON:  Objection, lack of | 14  a spreadsheet that is kept separate from the SOR |
| 15  foundation. | 15  database? |
| 16  **A.**  I don't know. | 16  **A.**  That's in the SOR database, those names, those people. |
| 17  BY MS. AUKERMAN: | 17  **Q.**  That's not a separate spreadsheet that you track |
| 18  **Q.**  So for public -- for a user of the registry, if you | 18  recaptured people in? |
| 19  click on a registrant entry, what is the information | 19  **A.**  That was a report. |
| 20  you can find out about that registrant for a -- for a | 20  **Q.**  Okay.  Okay.  And then -- |
| 21  public user of the registry? | 21  **A.**  That wasn't ongoing use. |
| 22  **A.**  I need you to repeat that, I'm sorry. | 22  **Q.**  Okay.  With respect to Lymon, I believe we discussed |
| 23  **Q.**  So for a public user of the registry, if you look up a | 23  -- we heard that there was a spreadsheet to track the |
| 24  particular registrant, John Doe, what information can | 24  Lymon individuals.  Is that -- is there such a |
| 25  you find out about that registrant? | 25  spreadsheet? |
| Page 89 | Page 90 |

| | |
|---|---|
| 1  **A.**  We have created the communication to the prosecuting | 1  **Q.**  When you say Doe letters, what do you mean by that? |
| 2  attorneys, and we had to run a report to -- in order | 2  **A.**  As part of the mass mailings, I'm sorry.  I guess it |
| 3  to give them a list of who those individuals were for | 3  was part of that Doe's case, we had to send out mass |
| 4  those specific areas. | 4  mailing letters to all registrants. |
| 5  **Q.**  Is there a spreadsheet where you track responses from | 5  **Q.**  Okay.  This is Does 2 you're talking about? |
| 6  prosecutors? | 6  **A.**  Oh my gosh, maybe, I'm sorry. |
| 7  **A.**  We track in the system, but yes, we do have that -- we | 7  **Q.**  Okay.  Fair enough.  What you're saying is there's a |
| 8  have that report. | 8  spreadsheet that shows everybody who got a letter |
| 9  **Q.**  You're saying there's no tracking on a separate | 9  about the Doe's case?  Or I should say not got. |
| 10  spreadsheet? | 10      Everybody was sent a letter about the Doe's |
| 11  **A.**  We're putting it on the spreadsheet, but we're also | 11  case? |
| 12  putting it in the system. | 12  **A.**  Correct. |
| 13  **Q.**  That's what I'm trying to get at, is whether there are | 13  **Q.**  And that's a separate spreadsheet from the database? |
| 14  spreadsheets where you track particular projects or | 14  **A.**  And if I made a notation on that about it was |
| 15  particular information that is separate from what is | 15  returned, then I also entered it into MSOR. |
| 16  input into the SOR database itself.  So we've talked | 16  **Q.**  So that database would -- that spreadsheet would show |
| 17  about one of those, the Lymon spreadsheet. | 17  whether the letter was returned? |
| 18      Are there other spreadsheets where you | 18  **A.**  Correct. |
| 19  track particular projects? | 19  **Q.**  Are there -- we talked about the two spreadsheets, the |
| 20  **A.**  There are other reports that have been run where | 20  Lymon spreadsheet and the Doe letter spreadsheets. |
| 21  information is put in them and also in the database. | 21  Are there other spreadsheets or reports? |
| 22  **Q.**  And what are those? | 22  **A.**  Not that I can recall at the moment.  I mean, it is |
| 23  **A.**  When we sent out Doe letters.  We would make a | 23  possible, we run reports for projects, for cleanup |
| 24  notation first there that we sent it out, and then we | 24  work. |
| 25  would put it in the individual's record. | 25  **Q.**  Okay.  Let's talk about -- let's talk about the forms |
| Page 91 | Page 92 |

23 (Pages 89 to 92)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 that are used with the registry. I'm going to share | 1 A. It's in the system. It's generated in the system upon |
| 2 my screen here. Can you see that? | 2 completion of all the reported information. |
| 3 A. I can. | 3 Q. So walk me through that. A person is -- does an |
| 4 Q. Okay. Do you recognize this? | 4 initial registration -- a registrant is -- does an |
| 5 A. Yes. | 5 initial registration. They're not filling out this |
| 6 Q. What is it? | 6 form, correct? |
| 7 A. The Michigan sex offender registration, verification, | 7 A. In most cases, no. |
| 8 and update form. | 8 Q. And law enforcement isn't filling out the form, |
| 9 MS. AUKERMAN: We'll mark that Exhibit 5. | 9 correct? |
| 10 MARKED FOR IDENTIFICATION: | 10 A. Sometimes, yes. |
| 11 DEPOSITION EXHIBIT 5 | 11 Q. When would those times be? |
| 12 11:33 a.m. | 12 A. Well, if they're not coming through from |
| 13 BY MS. AUKERMAN: | 13 incarceration, parole, or probation, then chances are |
| 14 Q. Can you tell me is this the most current version? It | 14 they're showing up at their local law enforcement |
| 15 shows 3/20/2022. | 15 agency where they have jurisdiction of their |
| 16 A. I believe so. | 16 residents. |
| 17 Q. And is this -- tell me how this form is used. | 17 Q. Right. I guess my question is -- is -- is the -- are |
| 18 A. This is used for an individual when they -- it's when | 18 the initial entries made into the database? Or are |
| 19 they report their initial registration, verification, | 19 they made on the form? |
| 20 or an in-person update. | 20 A. Most of the time it's in the database, but sometimes |
| 21 Q. So three -- all three purposes? | 21 it's on the form. |
| 22 A. Correct. | 22 Q. Okay. If they're made in the database then how does |
| 23 Q. Is this a physical form that they're given? | 23 the form come into play? |
| 24 A. No. | 24 A. They would be the -- the user generates the form and |
| 25 Q. How is the form used then? | 25 it pre-populates with all the submitted information |

<div align="center">Page 93</div>

<div align="center">Page 94</div>

| | |
|---|---|
| 1 for review with the individual. | 1 copy of the form or manually hit print for the form to |
| 2 Q. Okay. So the user generates the form and is the form | 2 print out? |
| 3 printed out? | 3 A. They would have to generate it, print it. |
| 4 A. Correct. | 4 Q. Okay. So when does the -- I noticed in some of the |
| 5 Q. Is it always printed out? | 5 documents that in some places there are now digital |
| 6 MR. JAMISON: Objection, lack of | 6 pads to sign, is that correct? |
| 7 foundation. | 7 A. For the signature? |
| 8 A. I can't say. | 8 Q. Yeah. For the signature on this form. |
| 9 BY MS. AUKERMAN: | 9 A. In some places, yes. |
| 10 Q. Okay. So you're not sure. And it would be prefilled | 10 Q. So what does a registrant actually see when they're |
| 11 out with what -- whatever information is -- has been | 11 signing that signature pad? |
| 12 entered into the database? | 12 MR. JAMISON: Objection, lack of |
| 13 A. Correct. | 13 foundation. |
| 14 Q. And then the registrant is supposed to sign the form, | 14 BY MS. AUKERMAN: |
| 15 correct? | 15 Q. You can answer. |
| 16 A. Correct. | 16 A. They see just the signature, requirement of the |
| 17 Q. Does the system automatically require the form to be | 17 signature. |
| 18 printed? | 18 Q. So they just see the signature pad where it says sign |
| 19 A. Can you repeat that question. | 19 here? |
| 20 Q. So after a person verifies, they go in and they report | 20 A. Correct. |
| 21 they've -- this is the quarterly verification, nothing | 21 MR. JAMISON: Objection, lack of |
| 22 has changed, they sign on a digital pad. Does the | 22 foundation. |
| 23 system automatically print out a copy of the form? | 23 BY MS. AUKERMAN: |
| 24 A. Not automatically. | 24 Q. Okay. And then if the form is printed out, their |
| 25 Q. So the law enforcement officer would have to provide a | 25 signature would appear at the bottom of the form? |

<div align="center">Page 95</div>

<div align="center">Page 96</div>

<div align="right">24 (Pages 93 to 96)</div>

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 | **A.** Correct. |
| 2 | **Q.** When does a registrant sign this form? |
| 3 | **A.** After reviewing with the user. |
| 4 | **Q.** So they would sign it on initial registration, |
| 5 | correct? |
| 6 | **A.** Correct. |
| 7 | **Q.** And they would sign it on verification, correct? |
| 8 | **A.** Correct. |
| 9 | **Q.** And they would sign it for an in-person update? |
| 10 | **A.** Correct. |
| 11 | **Q.** Okay. Are registrants, if you know, legally required |
| 12 | to sign this form? |
| 13 | **A.** As prescribed by statute, they're supposed to. |
| 14 | **Q.** Does anything happen in the system if a registrant |
| 15 | refuses to sign? |
| 16 | **A.** Does anything happen in the system, no, I don't |
| 17 | believe so. |
| 18 | **Q.** Does the system generate a form violation? |
| 19 | **A.** It doesn't automatically generate. |
| 20 | **Q.** Is there a form violation flag in the system? Or is |
| 21 | it -- is that -- is that -- does the system have the |
| 22 | capability to show form violations? |
| 23 | **A.** Yes. |
| 24 | **Q.** And how are those violations generated? |
| 25 | **A.** Users. |

Page 97

| | |
|---|---|
| 1 | **Q.** So a user would say Mr. Doe came in and didn't sign |
| 2 | this form, I'm going to flag him as a form violator? |
| 3 | **A.** Yes. |
| 4 | **Q.** Okay. So has this form, to your knowledge, changed |
| 5 | over time? |
| 6 | **A.** I don't know. |
| 7 | **Q.** Was the same version of the form used the entire time |
| 8 | that you were in the registry unit? |
| 9 | **A.** We switched over to one form shortly after I came |
| 10 | over. |
| 11 | **Q.** So there have been different versions while you were |
| 12 | there? |
| 13 | **A.** I believe so. |
| 14 | **Q.** Okay. Do you know who wrote this form? |
| 15 | **A.** No, I don't. |
| 16 | **Q.** Were you consulted at all about the content of this |
| 17 | form? |
| 18 | **A.** I provided input, yes. |
| 19 | **Q.** What input did you provide? |
| 20 | **A.** My part was making sure if out of the form, two forms |
| 21 | coming together, if they -- if we captured all the |
| 22 | fields. |
| 23 | **Q.** So your input was about making sure that you had the |
| 24 | information you need to -- I think you used the term |
| 25 | pack the record? |

Page 98

| | |
|---|---|
| 1 | **A.** Required by statute, to make sure that the fields |
| 2 | existed that were required by statute. |
| 3 | **Q.** Whom did you provide that input to? |
| 4 | **A.** My manager at the time. |
| 5 | **Q.** Who was that? |
| 6 | **A.** Liz Arritt, Elizabeth Arritt, excuse me. |
| 7 | **Q.** Was she the -- what was her position at that time? |
| 8 | **A.** SOR unit manager. |
| 9 | **Q.** So she was the manager that preceded you, correct? |
| 10 | **A.** Correct. |
| 11 | **Q.** Can you -- let's look at the last sentence of the -- |
| 12 | right before the signature block. It says I have read |
| 13 | the above requirements and/or have read them to me and |
| 14 | I understand my registration duties, correct? |
| 15 | **A.** I see that. |
| 16 | **Q.** Okay. Do you know when that language first appeared |
| 17 | on the form? |
| 18 | **A.** I do not. |
| 19 | **Q.** Do you know who was involved in adding that language? |
| 20 | **A.** I do not. |
| 21 | **Q.** Has that language been on the form for the entire time |
| 22 | that you were working at the SOR unit? |
| 23 | **A.** I do not know. |
| 24 | **Q.** Okay. Let's look at this explanation of duties. How |
| 25 | would you describe what this explanation of duties is? |

Page 99

| | |
|---|---|
| 1 | **A.** These are the individual's requirements per statute. |
| 2 | **Q.** Is this everything that the statute requires? |
| 3 | **A.** For the purpose of reporting, I believe so. |
| 4 | **Q.** So there's nothing in the statute that isn't captured |
| 5 | here in this explanation of duties? |
| 6 | MR. JAMISON: Objection, mischaracterizes |
| 7 | her answer. |
| 8 | BY MS. AUKERMAN: |
| 9 | **Q.** You can answer. |
| 10 | **A.** I don't know. |
| 11 | **Q.** Is there any information or -- are there any |
| 12 | requirements in the statute that are not listed in the |
| 13 | explanation of duties? |
| 14 | **A.** I don't believe so. |
| 15 | **Q.** Does -- let's look at the description for internet |
| 16 | identifiers here. This tells registrants they have to |
| 17 | report all electronic addresses and internet |
| 18 | identifiers registered to me or used by me, correct? |
| 19 | **A.** I see that, yes. |
| 20 | **Q.** Does it tell you what an internet identifier is? |
| 21 | **A.** It says internet identifiers means all designations |
| 22 | used for self-identification or routing in internet |
| 23 | communication or postings, and provides citing of the |
| 24 | statute. |
| 25 | **Q.** Does it tell you whether that includes an IP address? |

Page 100

25 (Pages 97 to 100)

Morris, Narcisa
1/25/2023

|  | |  | |
|---|---|---|---|
| 1 | **A.** I don't read that there. | 1 | 11:48 a.m. |
| 2 | **Q.** Okay. So a person wouldn't know if they had to report | 2 | BY MS. AUKERMAN: |
| 3 | an IP address by reading this explanation of duties? | 3 | **Q.** Do you recognize that? |
| 4 | MR. JAMISON: Objection, lack of | 4 | **A.** I do. |
| 5 | foundation. | 5 | **Q.** What is this? |
| 6 | BY MS. AUKERMAN: | 6 | **A.** Michigan Sex Offender Registry mail-in update. |
| 7 | **Q.** You can answer. | 7 | **Q.** Let's mark this Exhibit 6. To your knowledge, is this |
| 8 | **A.** I don't know. | 8 | the current version? |
| 9 | **Q.** You don't know whether they would know? | 9 | **A.** I believe so. |
| 10 | **A.** Correct. | 10 | **Q.** And what -- how is this form used? |
| 11 | **Q.** It describes that you're supposed to provide the | 11 | **A.** This is used for the specific reporting areas for an |
| 12 | license plate number and description of any vehicle | 12 | individual to complete and mail in to their local |
| 13 | that I own or operate, correct? | 13 | jurisdiction having residence -- over their residence. |
| 14 | **A.** That's what it says, yes. | 14 | **Q.** So they would mail it to the local jurisdiction that's |
| 15 | **Q.** Would a -- does it tell a registrant whether they have | 15 | -- that -- that's responsible for them basically? |
| 16 | to report a car that they rent? | 16 | **A.** Correct. |
| 17 | **A.** I'm sorry, say that again. | 17 | **Q.** Okay. Do they need to sign this form each time that |
| 18 | **Q.** If a registrant rents a car for a day, does it tell | 18 | they mail it in? |
| 19 | them whether they have to report that? | 19 | **A.** Yes. |
| 20 | **A.** I don't see that it speaks to rental vehicles there. | 20 | **Q.** And let's just look at -- I should have said, this is |
| 21 | **Q.** Okay. Let's look at the mail-in update form. | 21 | Bates 325. Let's look at the language here. This |
| 22 | MS. AUKERMAN: I believe we are on Exhibit | 22 | again says I have read the explanation of duties to |
| 23 | 6. | 23 | register as a sex offender listed on pages two and |
| 24 | MARKED FOR IDENTIFICATION: | 24 | three of this form and/or had them read to me and I |
| 25 | DEPOSITION EXHIBIT 6 | 25 | understand my registration duties, correct? |

Page 101      Page 102

|  | |  | |
|---|---|---|---|
| 1 | **A.** That is what it reads, yes. | 1 | department, where can one find that? |
| 2 | **Q.** So each time they update information on this form they | 2 | **A.** I would refer to statute, if it specifically states to |
| 3 | have to sign beneath that statement, correct? | 3 | report in person, then it's anything -- any other way |
| 4 | **A.** Correct. | 4 | of reporting. |
| 5 | **Q.** Are you aware that under the statute there's some | 5 | **Q.** Right, for the in-person. But if it's a manner |
| 6 | types of information that is reported and has to be | 6 | prescribed by the department, where -- where is -- is |
| 7 | reported in person, correct? | 7 | there a rule that the MSP has about what that manner |
| 8 | **A.** Correct. | 8 | is? |
| 9 | **Q.** And there's some type of information that is reported | 9 | **A.** To my knowledge, that's the mail-in update. |
| 10 | in another manner as prescribed by the department, | 10 | **Q.** Okay. Is there any other -- other than the mail-in |
| 11 | correct? | 11 | update, is there anyplace where there's information |
| 12 | **A.** Correct. | 12 | about non-in-person reporting requirements? |
| 13 | **Q.** Where would one go to find information about what the | 13 | MR. JAMISON: Objection, lack of |
| 14 | manner prescribed by the department is? | 14 | foundation. |
| 15 | **A.** I'm not understanding the question. | 15 | BY MS. AUKERMAN: |
| 16 | **Q.** Okay. We know there's certain things you have to | 16 | **Q.** You can answer. |
| 17 | report in person, correct, because the statute says | 17 | **A.** Not that I recall. |
| 18 | you have to report them in person, right? | 18 | **Q.** Okay. Do you know who decided what the manner of |
| 19 | **A.** Correct. | 19 | reporting would be? |
| 20 | **Q.** Okay. And then the statute says there's other things | 20 | **A.** I do not. |
| 21 | that can be reported in a manner prescribed by the | 21 | **Q.** Okay. Do you know if there was any consideration of |
| 22 | department, correct? | 22 | using, say, online reporting? |
| 23 | **A.** The statute says that, yes. | 23 | **A.** Repeat the question. |
| 24 | **Q.** If I wanted to know -- if an -- if a registrant wants | 24 | **Q.** So for things that you don't have to report in person, |
| 25 | to know what's the manner prescribed by the | 25 | do you know if there was any consideration given to |

Page 103      Page 104

26 (Pages 101 to 104)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   allowing registrants to report online? | 1   Q.  Who did you give that input to? |

1   allowing registrants to report online?
2   A.  Yes.
3   Q.  Okay.  Tell me about that.
4   A.  It was in the business requirements.
5   Q.  And you said that there's -- that may get added
6       in the future as a possibility?
7   A.  Correct.
8   Q.  Okay.  Do you know why the MSP went with a mail-in
9       update other than online updating?
10  A.  I do not.
11  Q.  Who would know that?
12  A.  I don't know.
13  Q.  Do you know why the MSP went with a mail-in update
14      rather than phone reporting?
15  A.  I do not.
16  Q.  Do you know who would know that?
17  A.  I do not.
18  Q.  Okay.  Were you involved in conversations about the
19      mail-in update?
20  A.  No.
21  Q.  Okay.  Did you give any input?
22  A.  Not until later.
23  Q.  Okay.  Tell me about that.
24  A.  Again, it was looking at the fields and making sure it
25      was meeting the requirements of statute.

Page 105

1   Q.  Who did you give that input to?
2   A.  To my manager.
3   Q.  That would be Ms. Arritt?
4   A.  Correct.
5   Q.  Do you know if there were any formal rule that was --
6       let me back up.
7           Do you know if there was any public input
8       on the type of -- or request for -- let me restate the
9       question.
10          Do you know if there was any request for
11      public input on what the manner of reporting should
12      be?
13  A.  I do not know.
14  Q.  Okay.  Let's talk about computer-generated letters
15      that get generated by the system.  What kind of
16      letters can the system generate?
17  A.  Tier letters, there's different versions of those
18      letters; removal letters, I believe.
19  Q.  What else?
20  A.  I think that's it.
21  Q.  Okay.  You said tier letters -- I'm sorry, go ahead.
22  A.  I'm sorry.  That's all I can recall at the moment.
23  Q.  Okay.  So tier letters, tell me about those.
24  A.  Those are just letters, where dependent on the
25      individual's initial tier and if they're being changed

Page 106

1   because something else was found in terms of wronged
2   victim age or something to that effect, that would
3   change their tier as prescribed by statute.  Then we
4   would send them a letter letting them know, the
5   registrant, that is.
6   Q.  This would be like a Michigan registrant who is a tier
7       I and you discover something that makes the person a
8       tier III, you would send them a letter saying you're
9       now a tier III?
10  A.  A tier II or tier III, correct.
11  Q.  Okay.
12          MS. AUKERMAN:  I don't believe we have
13      copies of those, so we'll need to get those as well.
14  BY MS. AUKERMAN:
15  Q.  The -- what about an out of state -- actually, let me
16      back up.
17          If someone is a new registrant, do they get
18      an initial letter of some kind?
19  A.  No.
20  Q.  There's nothing sent to them saying you're a tier III
21      or you're a tier I, anything like that?
22  A.  That's what their verification -- their registration
23      verification update form identifies them with.
24  Q.  Okay.  So the way they're informed what tier they are
25      is on the form?

Page 107

1   A.  Their initial registration.
2   Q.  Okay.  What about an out-of-state registrant who moves
3       to Michigan?  Do they get a letter?
4   A.  They get the same form, which identifies their --
5       their tier.
6   Q.  So they don't get a letter telling them you're tier
7       III or tier I or whatever?
8   A.  The form tells them what tier they are.
9   Q.  I thought in the -- I saw something in the records
10      something about -- it was called a tier letter OOS
11      conviction, what is that?
12  A.  Out-of-state conviction.
13  Q.  Yeah.  What's the tier letter OOS conviction?
14  A.  I'd have to look at the form.  I don't recall at the
15      moment.
16  Q.  We want to --
17  A.  I'm sorry, I'd have to look at the letter to see what
18      that is.  I don't recall off the top of my head.
19  Q.  All right.  How we doing for time?  I'm happy to keep
20      going.
21  A.  I'd like to take a break now.
22          (Off the record 11:59 a.m.)
23          (Back on the record at 12:31 p.m.)
24  BY MS. AUKERMAN:
25  Q.  I wanted to just start by circling back a little bit

Page 108

27 (Pages 105 to 108)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   to what we were talking about earlier with -- we<br>2   talked about the contract and the various things that<br>3   were in the contract specifications but that the<br>4   system isn't doing right now. And I wanted to just<br>5   understand a little bit better about that.<br>6       Are those things that are -- were built<br>7   into the system and just like not turned on?<br>8       MR. JAMISON: Objection, lack of<br>9   foundation.<br>10  **A.** What?<br>11  BY MS. AUKERMAN:<br>12  **Q.** So let's take, for example, the automated fee<br>13  violation, right?<br>14  **A.** Okay.<br>15  **Q.** I believe you testified that that automated fee<br>16  violation is not currently active?<br>17  **A.** Correct.<br>18  **Q.** Okay.<br>19  **A.** It is not automated, correct.<br>20  **Q.** So my question is, is that something that you -- like<br>21  can just turn on in the system and someone made the<br>22  decision not to make it -- not to turn it on?<br>23  **A.** Yes.<br>24  **Q.** Who made that decision?<br>25  **A.** That was from our manager, Liz Arritt, I'm sorry,<br><br>Page 109 | 1   Elizabeth Arritt.<br>2  **Q.** Do you know if she made that decision on her own?<br>3  **A.** I do not.<br>4  **Q.** Do you know why she decided not to turn the fee<br>5  violation -- automated fee violations on?<br>6  **A.** Not for certain, no.<br>7  **Q.** Okay. Do you know -- of the things that -- we talked<br>8  about a variety of different things that are not in --<br>9  currently active in the system but are specified in<br>10  the contract, right?<br>11  **A.** Uh-huh.<br>12  **Q.** Do you know of those things, are there any that just<br>13  weren't built into the system?<br>14       MR. JAMISON: Objection, vague.<br>15  BY MS. AUKERMAN:<br>16  **Q.** You can answer if you know.<br>17  **A.** I would need you to be more specific.<br>18  **Q.** Okay. So I don't have the transcript here in front of<br>19  me obviously, but going back to like -- I believe you<br>20  said, for example, that there are not popup warnings<br>21  for new tips, correct?<br>22  **A.** Correct.<br>23  **Q.** Is that something the system is capable of doing?<br>24  **A.** That's not built in.<br>25  **Q.** It's not even possible? It's not like you could turn<br><br>Page 110 |
| 1   a switch and make it do that?<br>2  **A.** No, correct.<br>3  **Q.** And even though the contract said we want to have a<br>4  system with popup warnings for new tips, the system<br>5  wasn't built that way?<br>6  **A.** Correct.<br>7       MR. JAMISON: Objection, lack of<br>8  foundation.<br>9  BY MS. AUKERMAN:<br>10  **Q.** But for the automated fee violations, the system was<br>11  built that way, but you -- it just wasn't turned on?<br>12  **A.** For fees, correct.<br>13  **Q.** Okay. Who made the decision that certain things that<br>14  were required in the contract wouldn't be built into<br>15  the system?<br>16  **A.** I guess I need you to be more specific.<br>17  **Q.** So if the contract said we want to have popup warnings<br>18  from the new tips and you're telling me that the<br>19  system can't, it's just not built to do that, who<br>20  decided not to build in that functionality?<br>21  **A.** Specific to fees, I believe that was communication<br>22  with the manager at the time, the vendor, and command.<br>23  **Q.** We were talking actually about the popup warnings, but<br>24  would that also be a decision between the command,<br>25  manager, and the vendor?<br><br>Page 111 | 1  **A.** I'm sorry, I meant -- did I say fees or something?<br>2  **Q.** Yeah.<br>3  **A.** I meant tips.<br>4  **Q.** Okay.<br>5  **A.** I apologize. That doesn't apply to fees. I'm talking<br>6  about tips.<br>7  **Q.** You're saying that a decision to do -- not to build in<br>8  functionality that was required in the contract, that<br>9  would have been a decision that was made by command,<br>10  the SOR unit manager, and the vendor together?<br>11  **A.** Specific to tips.<br>12  **Q.** Specific to tips. What about other changes to what<br>13  the contract requires?<br>14  **A.** You'd have to be more specific.<br>15  **Q.** Okay. For example, the contract requires an interface<br>16  with the Secretary of State for vehicle information,<br>17  is that something that the system has the<br>18  functionality to do?<br>19  **A.** So that one -- that area we discussed, that -- that<br>20  might be something coming in later on, I don't.<br>21  **Q.** So I guess what I'm asking, right, is when you say<br>22  it's something that might come later on, is that<br>23  because they still have to build it? Or is it built<br>24  in the system and not turned on?<br>25       MR. JAMISON: Objection, that's vague.<br><br>Page 112 |

28 (Pages 109 to 112)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1  BY MS. AUKERMAN: | 1  Q.  Were there changes made to the terms of the contract? |
| 2  Q.  Was this system built with the capacity to do an | 2  A.  We did have a change order. |
| 3      interface for vehicle records with the Secretary of | 3          MS. AUKERMAN:  Again, I don't believe we've |
| 4      State? | 4      seen that.  So we need to see that.  It would be |
| 5          MR. JAMISON:  Objection, vague and lack of | 5      responsive to our requests. |
| 6      foundation. | 6  BY MS. AUKERMAN: |
| 7  BY MS. AUKERMAN: | 7  Q.  So what was in the change order? |
| 8  Q.  You can answer. | 8  A.  We needed functionality that wasn't present.  We |
| 9  A.  Can you say that one more time. | 9      needed essential functionality that wasn't present in |
| 10 Q.  Was the MSOR -- the MSOR contract requires the system | 10     the contract, it was overlooked. |
| 11     to have an interface with the Secretary of State for | 11 Q.  What was that? |
| 12     vehicle records, correct? | 12 A.  The communication and response -- being responsive to |
| 13 A.  It was in the contract. | 13     NCIC for queries. |
| 14 Q.  So was the system built to be able to do that? | 14 Q.  So there was an interface with NCIC? |
| 15 A.  Not currently. | 15 A.  I don't know that it's called an interface. |
| 16 Q.  So you couldn't just turn on that feature? | 16 Q.  Well, can you describe what -- what was the |
| 17 A.  No. | 17     functionality that was added as a result of this |
| 18 Q.  Okay.  Who made the decision to build the system | 18     change order? |
| 19     without that capacity? | 19 A.  We needed it to respond to NCIC when the queries came |
| 20 A.  I don't know that that's -- I don't know. | 20     through from searches that were conducted in NCIC.  We |
| 21 Q.  Do you know if the contract was amended? | 21     weren't sending anything back.  We were getting them, |
| 22 A.  No. | 22     we just weren't responding. |
| 23 Q.  You don't know?  Or it wasn't amended? | 23 Q.  So if there was a search by users in NCIC -- and can |
| 24 A.  It wasn't amended for that, no.  I don't know what -- | 24     you tell us for the record what NCIC is. |
| 25     I don't know what you mean by amended. | 25 A.  That's an acronym that I use all the time, and I'm -- |

<div align="center">Page 113        Page 114</div>

| | |
|---|---|
| 1      it is the national information for criminal -- | 1      contract wouldn't need to be fulfilled? |
| 2      national criminal information -- I'm sorry, I don't | 2          MR. JAMISON:  Objection, vague. |
| 3      recall right now. | 3  BY MS. AUKERMAN: |
| 4  Q.  That's fine.  That's fine.  But what you were saying, | 4  Q.  You can answer. |
| 5      if one searched NCIC to get information from MSOR, | 5  A.  I don't know. |
| 6      MSOR wasn't responding? | 6  Q.  Okay.  Were there -- earlier you testified with |
| 7  A.  Correct. | 7      respect to tips, that it was -- the command, the unit |
| 8  Q.  And so, you had a change order so that MSOR would | 8      manager, and the vendor that decided that there |
| 9      respond to NCIC queries? | 9      wouldn't be tip popups, correct? |
| 10 A.  Correct. | 10 A.  Correct. |
| 11 Q.  Was there anything else in that change order? | 11 Q.  Who in command? |
| 12 A.  SORNA messages, responding to SORNA messages. | 12 A.  I believe at the time that was First Lieutenant Renz. |
| 13 Q.  Can you explain that. | 13 Q.  What are his job responsibilities, do you know? |
| 14 A.  It's similar, just a different system.  It's the | 14 A.  He's the section manager.  He oversees a few units. |
| 15     federal system.  The queries were coming in, we just | 15 Q.  Are there communications -- are the communications |
| 16     weren't being responsive in the manner they needed. | 16     with the vendor about the contract in writing? |
| 17 Q.  So the change order also required functionality | 17         MR. JAMISON:  Objection, lack of |
| 18     around SORNA messages? | 18     foundation. |
| 19 A.  Correct. | 19 BY MS. AUKERMAN: |
| 20 Q.  What else was in the change order? | 20 Q.  If you know. |
| 21 A.  That's all that I recall. | 21 A.  Can you clarify. |
| 22 Q.  The change order didn't say we don't need vehicle | 22 Q.  So when you -- when there are communications with the |
| 23     information from SOS? | 23     vendor about compliance with the contract, who -- who |
| 24 A.  No. | 24     communicates with the vendor? |
| 25 Q.  Okay.  Who made the decision that certain parts of the | 25 A.  The manager does. |

<div align="center">Page 115        Page 116</div>

<div align="right">29  (Pages 113 to 116)</div>

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    Q. So that would have been you while you were in the | 1    A. Correct. |

**Page 117**

1    Q. So that would have been you while you were in the
2       unit?
3    A. If that change was during the time that I was there.
4       But many of what you're referring to was before me
5       being the manager.
6    Q. When was that change order?
7    A. 2022, maybe 2021, I don't know, 2022.
8    Q. While you were there?
9    A. Yes.
10    Q. Do you know if there were change orders that happened
11       before you arrived?
12    A. No.
13    Q. Who would know that?
14    A. I mean there were no change orders before that.
15    Q. You know that there were no change orders?
16    A. I know that there were no change orders before that.
17    Q. Do you know if there have been change orders since you
18       left?
19    A. I was working on another one, yes.
20    Q. What was that one?
21    A. To hire another programmer.
22    Q. What would that programmer do?
23    A. Help complete implementation.
24    Q. So this would be the vendor would hire another
25       programmer?

**Page 117**

1    A. Correct.
2    Q. Do you know if that has -- that change order has gone
3       through?
4    A. I'm not sure. I do not know.
5    Q. Do you know what the budget for that was?
6    A. I believe -- I don't recall at the moment.
7    Q. Okay. On the organizational chart -- let's go back to
8       that. So I believe -- I think this was exhibit --
9       might have been two. I can't remember.
10       This is the Criminal Justice Information
11       Center chart. Where is Lieutenant Renz on this? I'm
12       sorry, this is Exhibit 1.
13    A. He would be under the incident section.
14    Q. Okay. Who else is in the incident section?
15    A. I do not have that memorized.
16    Q. So you reported to Lieutenant Renz?
17    A. I did not.
18    Q. Who did you report to?
19    A. I reported to the assistant division director Shawn
20       Sible. I did for a short time, but I report now.
21    Q. So in fact you were a direct report to Shawn Sible?
22    A. I was a report to First Lieutenant Renz for a short
23       time. Then I reported to assistant director Shawn
24       Sible.
25    Q. Was assistant director Sible involved in policy

**Page 118**

1       divisions around SOR, if you know?
2    A. I do not know.
3    Q. Were any of the other individuals listed in that top
4       box -- Criminal Justice Information Center box -- were
5       any of those individuals involved in SOR?
6       MR. JAMISON: Objection, vague, lack of
7       foundation.
8    BY MS. AUKERMAN:
9    Q. You can answer.
10    A. Can you clarify. Involved in --
11    Q. So -- so you said that you reported to Mr. Sible. Did
12       you have interactions -- professional interactions
13       regarding the registry with any of the other
14       individuals listed in that box?
15    A. Well, as Michelle Kleckler is my director, I did -- we
16       do all have reporting to her and giving her updates.
17       Ashley Alvarado is the admin and so, regarding --
18       regular mailings and stuff would go through her to be
19       mailed out.
20    Q. Let's talk about the SMART office and your
21       relationship with sort of the federal -- the SOR unit
22       with the federal SMART office.
23       Can you tell me what -- what kind of
24       communications -- describe -- describe kind of that
25       interaction between the SOR unit and the SMART office.

**Page 119**

1    A. So the SMART office is where our grants go through, so
2       we work with them for grants. In a different area,
3       there is audit. So we would go through our audits
4       with them.
5       And in a different area there was our point
6       of contact for if we -- if there was a change at the
7       federal level, they might make us -- they might -- I'm
8       sorry -- they would make us aware of those changes and
9       what they needed from us. And we had assurance
10       letters that we had to complete with them.
11    Q. Okay. So let's go through each of those topics. Is
12       there anything else -- any -- what else -- in what
13       other ways do you interact with the SMART office?
14    A. That's all that I can think of at this time.
15    Q. What about interstate registration issues? Does that
16       go through the SMART office?
17    A. Not typically, no.
18    Q. Or enforcement issues?
19    A. No.
20    Q. Okay. So going to grants, who -- who is involved in
21       grants with the SMART office?
22    A. Through my different roles, I've kind of kept that
23       main responsibility.
24    Q. And on the SMART office side, who is --
25    A. Kashan Arnold.

**Page 120**

30 (Pages 117 to 120)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 Q. And tell me what is involved.  What are these grants | 1 for two years.  Now they run for three years, for a |
| 2 for? | 2 coverage of three years. |
| 3 A. To enhance and improve the monitoring and tracking of | 3 Q. So if you got a grant for three years, you would then |
| 4 sex offenders. | 4 apply three years later, not the next year? |
| 5 Q. What are the grant amounts typically? | 5 A. You applied over the course of three years.  You were |
| 6 A. They can have up to four hundred thousand. | 6 responsible for saying how and when the money will be |
| 7 Q. Do you know what size grants the unit has -- the | 7 spent. |
| 8 Michigan SOR unit has received in the last two years? | 8 Q. Right.  But I would get that money for three years and |
| 9 A. All have been varied. | 9 towards the end of that three-year period would be the |
| 10 Q. Okay.  So how much for the first one? | 10 next time you would apply? |
| 11 A. I can't say for sure. | 11 A. Not necessarily. |
| 12 Q. Okay.  Can you give me an estimate? | 12 Q. Can you explain that. |
| 13 A. About three hundred and ninety thousand. | 13 A. Because if I spent the money -- if I'm allotted to |
| 14 Q. And when was that received? | 14 spend a certain amount of money in the first year that |
| 15 A. That's an estimate.  And I don't know which -- for | 15 I got that grant, I got another grant, I'm asking for |
| 16 which year that was. | 16 the same thing.  I already spent it in the first year, |
| 17 Q. Have there been other grants in that time that you've | 17 now I can apply the second year -- the next year's |
| 18 been there? | 18 grant towards it.  Because I already spent what I |
| 19 A. Yes.  They're every year or -- | 19 needed out of the first one.  So they're running |
| 20 Q. Just -- | 20 consecutively.  Sometimes they're running |
| 21 A. Excuse me, they're every year, but they run for two | 21 consecutively. |
| 22 years, three years now. | 22 Q. Do you mean consecutively or concurrently? |
| 23 Q. I'm not sure I'm understanding that.  You're saying | 23 A. You're right, concurrently. |
| 24 every year one gets a grant? | 24 Q. So the grants are running concurrently.  Okay. |
| 25 A. Every year we can apply for a grant.  They used to run | 25 You said the money was for monitoring -- |

<div style="text-align:center">Page 121</div>     <div style="text-align:center">Page 122</div>

| | |
|---|---|
| 1 monitoring and tracking, I think, of sex offenders. | 1 been educational tools or -- for supplies. |
| 2 What specifically is the money for? | 2 Q. What do you mean by educational tools? |
| 3 A. Improving, enhancing the monitoring and tracking, | 3 A. If we were putting on training and we wanted to create |
| 4 apprehension of sex offenders.  That's what the SMART | 4 manuals or anything that we needed to print as tools |
| 5 office stands for. | 5 to give to them, we would -- |
| 6 Q. You -- go ahead. | 6 Q. Like trainings for law enforcement you mean? |
| 7 A. I was trying to think of the acronym. | 7 A. Yes. |
| 8 Q. So when you put together a budget, though, you have to | 8 Q. I want to go back to the sweeps.  You said they're |
| 9 say what you're going to do with the money, what are | 9 done by MSP enforcement? |
| 10 you asking for money for? | 10 A. Correct. |
| 11 A. Correct.  In the past it's been for enforcement | 11 Q. Do these grants ever involve sub-granting to local law |
| 12 sweeps. | 12 enforcement? |
| 13 Q. Tell me about that. | 13 A. Not ours. |
| 14 A. Enforcement sweeps are -- I would have to have some | 14 Q. Let's take a look at -- I'm going to show you another |
| 15 notes to speak to that.  That's not my -- I just know | 15 exhibit.  Do you recognize this email? |
| 16 they're enforcement sweeps.  I don't know what | 16 A. Yes. |
| 17 power -- specifically I'm not a part of doing that | 17 Q. Okay. |
| 18 sweep or what they do or how they come up with their | 18 MS. AUKERMAN:  Let's mark this Exhibit 7. |
| 19 plans. | 19 MARKED FOR IDENTIFICATION: |
| 20 Q. Okay.  Do you know who does those sweeps? | 20 DEPOSITION EXHIBIT 7 |
| 21 A. SOR enforcement. | 21 12:56 p.m. |
| 22 Q. At the Michigan State Police? | 22 BY MS. AUKERMAN: |
| 23 A. Correct. | 23 Q. Can you tell me what this -- it's indicated here that |
| 24 Q. Okay. | 24 you are seeking funding -- this relates to -- appears |
| 25 A. And it would be also signature pads.  In the past it's | 25 to relate to a grant question, is that correct? |

<div style="text-align:center">Page 123</div>     <div style="text-align:center">Page 124</div>

<div style="text-align:right">31 (Pages 121 to 124)</div>

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 | **A.** Correct. |
| 2 | **Q.** And you indicate that you have a question, correct? |
| 3 | **A.** Correct. |
| 4 | **Q.** What was your question? |
| 5 | **A.** It was actually enforcement's question, but they have |
| 6 | to go through me since I'm the point of contact. |
| 7 | **Q.** What was that question? |
| 8 | **A.** Having to do with the sweep initiatives. |
| 9 | **Q.** Can you be more specific? |
| 10 | **A.** I don't recall the rest of the content. |
| 11 | **Q.** Do you know why this information was redacted? |
| 12 | **A.** I do not. |
| 13 | MS. AUKERMAN: We'll ask for an unredacted |
| 14 | copy of that. |
| 15 | BY MS. AUKERMAN: |
| 16 | **Q.** So you were seeking funding here for sweeps? |
| 17 | **A.** I was not seeking funding, no. |
| 18 | **Q.** No? |
| 19 | **A.** No. |
| 20 | **Q.** What was the purpose of this email? |
| 21 | **A.** It was about something having to do -- I can see it's |
| 22 | something that has to be with the sweep initiative |
| 23 | schedule. So it most likely had to do with something |
| 24 | we already had awarded to us. |
| 25 | **Q.** So you had some kind of funding for sweeps and you had |

Page 125

| | |
|---|---|
| 1 | a question about what you could -- something related |
| 2 | to that funding. |
| 3 | **A.** To the scheduling and how it was executed. |
| 4 | **Q.** Okay. Okay. And you indicated here they've always |
| 5 | been in large groups, what does that mean? |
| 6 | **A.** Typically a sweep is comprised of sixteen troopers and |
| 7 | so many analysts. |
| 8 | **Q.** What are their roles -- what are the roles of the |
| 9 | troopers? |
| 10 | **A.** I don't participate, I don't know. |
| 11 | **Q.** Do you know what the roles of the analysts are? |
| 12 | **A.** To support it, to support for information, updating of |
| 13 | records. |
| 14 | **Q.** Those would be analysts in the SOR unit? |
| 15 | **A.** Correct. |
| 16 | **Q.** Okay. |
| 17 | MS. AUKERMAN: Let's look at another |
| 18 | document here. Let's mark it Exhibit 8. |
| 19 | MARKED FOR IDENTIFICATION: |
| 20 | DEPOSITION EXHIBIT 8 |
| 21 | 1:00 p.m. |
| 22 | MR. JAMISON: What was the Bates number for |
| 23 | Exhibit 7? |
| 24 | MS. AUKERMAN: I have -- I'll have to go |
| 25 | back and give it to you later. I don't have it pulled |

Page 126

| | |
|---|---|
| 1 | up anymore. |
| 2 | BY MS. AUKERMAN: |
| 3 | **Q.** So you can see this -- this is an -- appears to be an |
| 4 | email from April 22nd between you and the SMART |
| 5 | office, correct? |
| 6 | **A.** Correct. |
| 7 | **Q.** Okay. Let's mark this Exhibit 8. I'm going to scroll |
| 8 | down here. So this is now on Bates 1363. Okay. This |
| 9 | looks like a grant application that you attached, |
| 10 | correct? |
| 11 | **A.** Budget detail. |
| 12 | **Q.** Yeah. Okay. So it appears here that the funding that |
| 13 | you were requesting was for a three-year initiative, |
| 14 | sixteen troopers and a SOR enforcement coordinator, |
| 15 | correct? |
| 16 | **A.** Correct. |
| 17 | **Q.** And four phases that include planning, record audits, |
| 18 | residence checks, report writing, meaning, getting |
| 19 | warrants and arrest sweeps, correct? |
| 20 | **A.** That's what it says, correct. |
| 21 | **Q.** Was this grant -- did you get this grant? |
| 22 | **A.** What year is this? |
| 23 | **Q.** It was attached to an email in 2022. |
| 24 | **A.** So that's from '21. |
| 25 | **Q.** I was confused because it said -- on the budget detail |

Page 127

| | |
|---|---|
| 1 | it says expires 11/30/2020. |
| 2 | **A.** That's -- those are -- that's the first page of the |
| 3 | Excel spreadsheet, I'm guessing, and it gives you |
| 4 | examples. It says budget detail worksheet. |
| 5 | MR. JAMISON: Is there a question there? |
| 6 | BY MS. AUKERMAN: |
| 7 | **Q.** I'm trying to understand the -- what the data -- the |
| 8 | date of this grant application is? |
| 9 | **A.** It's at the top, it says '21. If you go to the top of |
| 10 | the email, subject 2021 budget detail. |
| 11 | **Q.** This is a 2021 grant? |
| 12 | **A.** Budget detail from the grant. |
| 13 | **Q.** Okay. And was that -- is that a grant that the unit |
| 14 | got? |
| 15 | **A.** We were approved. |
| 16 | **Q.** To do those sweeps? |
| 17 | **A.** We weren't approved until 2022. |
| 18 | **Q.** So it's approved in 2022 and the money that was |
| 19 | provided included the request -- the enforcement |
| 20 | money, correct? |
| 21 | **A.** Correct. |
| 22 | **Q.** Okay. Has the -- has the SMART office ever cut off |
| 23 | funding to Michigan that you're aware of? |
| 24 | **A.** We had our grant ability to spend suspended. |
| 25 | **Q.** Why was that? |

Page 128

32 (Pages 125 to 128)

Morris, Narcisa
1/25/2023

---

**Page 129**

1  A. Progress report wasn't submitted for a review period
2     for the grant.
3  Q. Okay. To your knowledge, has the SMART office ever
4     declined to provide funding based on the ways in which
5     Michigan's statute is not in substantial compliance
6     with SMART?
7  A. I'm sorry, I'm not sure I understand the question.
8  Q. Okay. So after the Doe's 1 and Doe's 2 decision,
9     there were certain changes that were made, correct?
10 A. Changes?
11 Q. To the way the registry was implemented.
12 A. Yes.
13 Q. Okay. Has the SMART office cut off funding in
14    response to any of those changes?
15 A. No.
16 Q. I've seen some references in the documents to the
17    SORNA exchange portal. Can you explain to me what
18    that is.
19 A. The SORNA exchange portal is the method for which
20    federal statute requires the communication between
21    jurisdictions on the movement of registrants. And
22    that is the portal that those communications are
23    shared for those who participate.
24 Q. How does that work in practice? What does that look
25    like?

---

**Page 130**

1  A. We get that information by notification, by email,
2     that we have a SORNA message. We log into SORNA and
3     we review our message from other states. And those
4     are typically for those registrants that are moving to
5     our state.
6  Q. Would you put a message in the portal if a Michigan
7     registrant were moving out of state?
8  A. We wouldn't put it through the portal, per se,
9     manually. It happens automatically. That was that
10    interface we were referring to earlier.
11 Q. I see.
12 A. We make a change in the system that says out of state,
13    it automatically sends it for us.
14 Q. So if a user in Grand Rapids, if a registrant comes in
15    and says hey, I'm moving to Ohio, and the law
16    enforcement user enters that, it would automatically
17    notify -- the system would automatically notify Ohio
18    that someone is moving to Ohio?
19 A. Not at that time, no.
20 Q. How does that work then?
21 A. It has to be reviewed by someone here in our unit.
22    And then once confirmed, then the notification would
23    go.
24 Q. So just making sure I understand this. A registrant
25    comes in, says I'm moving to Ohio, I'm moving to

---

**Page 131**

1     Cleveland, the user puts that in, you somehow get
2     notified about that? You're going to get notified of
3     that?
4  A. Yes, somehow.
5  Q. How is the somehow?
6  A. We get -- remember the statuses we were referring to
7     earlier.
8  Q. Yeah.
9  A. The system flips it to out of state and puts it in an
10    out-of-state inbox, for which we manage and go through
11    regularly.
12 Q. So then you have an analyst or somebody in your unit
13    looks at the out-of-state inbox, confirms that this
14    person is moving to Ohio and that?
15 A. Triggers.
16 Q. When you say triggers, what does it do?
17 A. Triggers the communication to SORNA automatically.
18 Q. So the Ohio registry would get notified this person is
19    moving to Ohio?
20 A. The Ohio registry, yes, if they're a participant.
21 Q. Do you know how many states participate in the portal?
22 A. I do not.
23 Q. Okay. If someone is moving into Michigan, how does
24    that communication work in practice?
25 A. It comes through the SORNA portal.

---

**Page 132**

1  Q. Does that go to like an inbox? How does that -- can
2     you explain it to me.
3  A. It comes in through -- as a notification. And then we
4     have someone here that verifies that the person showed
5     up.
6  Q. So does it come as a notification in the exchange
7     portal? Or in the MSOR database?
8  A. In the SORNA portal.
9  Q. So there's someone who's responsible for checking the
10    portal?
11 A. They're all responsible for checking the portal.
12 Q. Okay.
13 A. We all have access to it.
14 Q. How many notifications do you get a month in the
15    portal?
16 A. I cannot say, I don't know.
17 Q. Five? A hundred? A thousand?
18 A. I don't know.
19 Q. Any -- is it closer to five than a hundred?
20 A. I don't know.
21       MR. JAMISON: Objection, she's asked and
22    answered the question.
23 BY MS. AUKERMAN:
24 Q. Okay. So you don't -- you don't have any sense of how
25    many out-of-state registrants move into Michigan in a

---

33 (Pages 129 to 132)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   month? | 1   **A.** This is outlined in procedure. After ten business |
| 2   **A.** I do not. | 2   days, if the individual hasn't shown up, that we |
| 3   **Q.** Okay. What happens if someone moves to Michigan? You | 3   notify the other entity that they haven't shown up. A |
| 4   get a notification that a person has moved from Ohio | 4   communication is then shared with U.S. Marshals. |
| 5   to Michigan through the SORNA exchange portal and | 5   **Q.** Is there any communication with the local jurisdiction |
| 6   somebody in your unit checks the notifications, what | 6   where the person has said they were going to go? |
| 7   happens next? | 7   **A.** They don't usually say for the jurisdiction where they |
| 8   **A.** They verify the person has come to Michigan. If they | 8   are going to go. |
| 9   -- | 9   **Q.** Okay. You mentioned -- you mentioned audits that are |
| 10   **Q.** What do you mean? | 10   done by the SMART office. Can you tell me about |
| 11   **A.** Checked in, so to speak. | 11   those. |
| 12   **Q.** What do you mean they verify? | 12   **A.** The audits are if we were meeting the appropriate |
| 13   **A.** In MSOR. | 13   reporting requirements in terms of what we're sharing |
| 14   **Q.** So they would look at MSOR to see has this person | 14   with them and through NCIC. Those are established |
| 15   shown in Grand Rapids, say? | 15   through the SMART office, those requirements, NSOR is |
| 16   **A.** Correct. | 16   what we refer to it as. |
| 17   **Q.** What if the person hasn't checked in, then what? | 17   **Q.** How often are those done? |
| 18   **A.** Nothing. | 18   **A.** Once every three years, I believe it is. |
| 19   **Q.** Nothing happens? | 19   **Q.** When was the most recent one? |
| 20   **A.** No. | 20   **A.** I can't remember off the top of my head, but I know we |
| 21   **Q.** There's no further communication through the portal? | 21   provided that. |
| 22   **A.** Not at that time. | 22   **Q.** I don't -- yeah, maybe. When is the next substantial |
| 23   **Q.** Is there at a later time? | 23   -- is this the same thing as the substantial |
| 24   **A.** Yes. | 24   compliance report? |
| 25   **Q.** When is that? | 25   **A.** I'm sorry, say -- I'm -- I totally missed that. |
| Page 133 | Page 134 |

| | |
|---|---|
| 1   **Q.** Is the audit the same thing as the substantial | 1   **Q.** What happens if a registrant doesn't report twenty-one |
| 2   compliance report? | 2   days in advance of travels internationally? |
| 3   **A.** Yes. They're together, yes. I also refer to that as | 3   **A.** We wouldn't really know if they didn't, honestly. |
| 4   the assurance letter. | 4   **Q.** What do you mean? |
| 5   **Q.** The assurance letter. Okay. Do you know when the | 5   **A.** How do we know that they didn't, I wouldn't -- we |
| 6   next one of those is due? | 6   don't know that they don't. |
| 7   **A.** I do not, not off the top of my head, no. | 7   **Q.** So let's say they report ten days in advance, like |
| 8   **Q.** Okay. And then you mentioned that there's a point of | 8   they just didn't know, family member gets sick in |
| 9   contact regarding changes at the federal level. Can | 9   England. They got to go. They -- they're leaving in |
| 10   you explain what you mean by that? | 10   ten days and it's not twenty-one days. What happens? |
| 11   **A.** The only example I have is when SMART office | 11   MR. JAMISON: Objection, vague. |
| 12   determined that they wanted to improve and enforce the | 12   BY MS. AUKERMAN: |
| 13   twenty-one-day notice, the travel notice out of | 13   **Q.** You can answer. |
| 14   country. And they wanted our communication, our -- | 14   **A.** I don't know. To my knowledge, nothing that we do. |
| 15   either communications or statutes or requirements to | 15   **Q.** Let's talk a little bit about SORNA. Are you familiar |
| 16   change and support their objective. | 16   with SORNA? |
| 17   **Q.** Can you explain that more. | 17   **A.** To some capacity, yes. |
| 18   **A.** They wanted to push -- they wanted to make sure that | 18   **Q.** That's the federal Sex Offender Registration |
| 19   the applicants were aware they had an obligation to | 19   Notification Act? |
| 20   report out of country twenty-one days in advance. And | 20   **A.** Correct. |
| 21   they wanted each state to have something, whether in | 21   **Q.** Is it your understanding that if someone who's |
| 22   statute or requirement, to ensure that the individual | 22   required to register moves interstate, that SORNA |
| 23   knew that you had to do that. | 23   would apply to them? |
| 24   **Q.** So what changes did that result in in Michigan? | 24   **A.** SORNA does apply to them, yes. |
| 25   **A.** We put it on our form. | 25   **Q.** How do they -- so SORNA requires them to register if |
| Page 135 | Page 136 |

34 (Pages 133 to 136)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    they move interstate, correct? | 1    federal government? |
| 2    **A.**  Yes. | 2    **A.**  No, not to my knowledge. |
| 3    **Q.**  How do they fulfill that registration obligation? | 3    **Q.**  Would they be removed from the national registry? |
| 4    **A.**  In our state, we have state statute to support that | 4    **A.**  Yes. |
| 5        registration requirement. | 5    **Q.**  How does that happen? |
| 6    **Q.**  So they have to register under the state registration | 6    **A.**  It's automatic, behind the scenes. |
| 7        system, correct? | 7    **Q.**  So let's take after the 2020 law changes, there were |
| 8    **A.**  Correct. | 8        individuals who were under the Holmes Youthful Trainee |
| 9    **Q.**  There's not like a federal registry that they can | 9        Act.  Are you familiar with the Holmes Youthful |
| 10        register in? | 10        Trainee Act? |
| 11    **A.**  Not to my knowledge, no. | 11    **A.**  Yes. |
| 12    **Q.**  Okay.  I saw some references to the NSOR database, | 12    **Q.**  And some of those individuals came off the registry |
| 13        what is that? | 13        after the 2021 law changes, correct? |
| 14    **A.**  I'm sorry, I need more content. | 14    **A.**  I wasn't a participant, so. |
| 15    **Q.**  I've seen some references in the documents to a | 15    **Q.**  You weren't personally involved in removing |
| 16        National Sex Offender Registry database.  Are you | 16        individuals? |
| 17        familiar with what that is? | 17    **A.**  Correct.  I know something happened, I just don't know |
| 18    **A.**  Can you expand more?  Was there more with that?  It's | 18        the reason or the details around it. |
| 19        not bringing anything to my recall. | 19    **Q.**  Okay.  Sure.  Are you -- did you -- but you're aware |
| 20    **Q.**  Okay.  I'll maybe on a break see if I can find a | 20        that there were people that were removed as a result |
| 21        document. | 21        of the 2021 law changes around HYTA? |
| 22    **A.**  Okay. | 22    **A.**  I know that there were people removed regarding HYTA. |
| 23    **Q.**  So if somebody is removed from the registry in | 23    **Q.**  Okay.  Would those individuals then also come off the |
| 24        Michigan, maybe there's a court order that they get | 24        federal registry? |
| 25        removed, do you communicate that in any way to the | 25    **A.**  They would come -- they -- if they come off our |
| Page 137 | Page 138 |
| 1    registry, they come off the public's -- National | 1    **Q.**  Let's talk about out-of-state offenses, which is kind |
| 2        Public Sex Offender Registry. | 2        of confusing, at least to me.  I'm hoping you can help |
| 3    **Q.**  Okay.  Let's say that that person still has -- a | 3        me understand it.  Can you explain how you determine |
| 4        person who's under the Holmes Youthful Trainee Act | 4        the registration requirements for people with |
| 5        still has an obligation to register under federal law, | 5        out-of-state offenses? |
| 6        how would the person do that? | 6    **A.**  If it's an out-of-state offense that we've encountered |
| 7    **A.**  I don't know. | 7        before, legal has already provided guidance on what |
| 8              MR. JAMISON:  Objection, lack of | 8        the tier should be, they're already in our system.  If |
| 9        foundation. | 9        it's something we haven't encountered before, we pass |
| 10    BY MS. AUKERMAN: | 10        that through legal for a case by case review. |
| 11    **Q.**  So you don't know how a person could register if | 11    **Q.**  Okay. |
| 12        they're not on the federal registry -- excuse me. | 12              MS. AUKERMAN:  So let's take a look at an |
| 13              If someone is removed from Michigan's | 13        exhibit here.  This is Bates 723, Exhibit 9. |
| 14        registry, you're not aware of a way for them to | 14              MARKED FOR IDENTIFICATION: |
| 15        register, correct? | 15              DEPOSITION EXHIBIT 9 |
| 16    **A.**  Correct. | 16              1:23 p.m. |
| 17    **Q.**  What about -- let's talk about the pre-2011 | 17    BY MS. AUKERMAN: |
| 18        registrants for a second.  So one of the changes that | 18    **Q.**  Can you tell me what this is? |
| 19        was made in March of 2021 was that the pre-2011 | 19    **A.**  Out-of-state adult conviction flowchart. |
| 20        registrants don't have to report internet identifiers, | 20    **Q.**  So can you walk me through how this works. |
| 21        is that correct? | 21    **A.**  It's like following the prompts.  You answer the |
| 22    **A.**  Correct. | 22        questions to know where you go next for an |
| 23    **Q.**  So if a person were required to report that under | 23        out-of-state conviction -- an out-of-state offense. |
| 24        federal law, how could they report that? | 24              Now these are our offenses that have |
| 25    **A.**  I don't know. | 25        already been identified.  However, there was a change |
| Page 139 | Page 140 |

35 (Pages 137 to 140)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1  in policy applicability of when we use our duration<br>2  versus the state's duration because the language in<br>3  statute. And so, this helped us determine that.<br>4  Q. Can you explain that. I'm sorry, go ahead.<br>5  A. So there are --<br>6  Q. Go ahead.<br>7  A. So there is -- it -- this essentially helps us<br>8  determine whether we're using our state duration based<br>9  on that conviction or if -- that similar conviction or<br>10  if it would have been their state duration. And<br>11  again, these are for convictions that have already<br>12  been identified in the system.<br>13  Q. Okay. So let me make sure, because it's a -- to me<br>14  it's a confusing flowchart -- make sure I'm<br>15  understanding you correctly.<br>16       So if someone has an offense that's not<br>17  comparable to Michigan registration statute, so we're<br>18  here on this first box, go no, okay. They still have<br>19  to register if the state requires -- if their state of<br>20  conviction requires registration, correct?<br>21  A. If their state of conviction requires registration,<br>22  yes.<br>23  Q. So you could have -- if the -- if the state of<br>24  registration -- it doesn't matter if comparable to a<br>25  Michigan offense if the state of registration -- if | 1  the -- if -- it doesn't matter if it's comparable to a<br>2  Michigan offense; if the convicting jurisdiction<br>3  requires registration, you have to register, correct?<br>4  A. Say that again.<br>5  Q. If the convicting jurisdiction requires registration,<br>6  the person has to register in Michigan even if it's<br>7  not comparable to a Michigan conviction?<br>8  A. So one way or the other, yeah, if their jurisdiction<br>9  requires them to register, they would have to<br>10  register.<br>11  Q. So, for example, if you had indecent exposure, that's<br>12  not a registrable offense in Michigan. If it's a<br>13  registrable offense in, I don't know, Georgia, the<br>14  person would still have to register in Michigan?<br>15  A. Correct.<br>16  Q. Okay. Okay. So let's say the convicting -- the<br>17  offense -- excuse me.<br>18       Let's say -- well, let's say the convicting<br>19  state doesn't require registration -- a comparable --<br>20  I found this chart very confusing.<br>21       If it's comparable to a Michigan adult<br>22  conviction, but the state -- convicting state doesn't<br>23  require registration, would the person have to<br>24  register?<br>25  A. Say that again, I'm sorry. |
| <div align="center">Page 141</div> | <div align="center">Page 142</div> |
| 1  Q. So let's take an offense that the convicting state<br>2  doesn't require registration. But if comparable to a<br>3  Michigan offense, as I read this looking at this top<br>4  line along the flowchart, it looks like they would --<br>5  they could still have to register in Michigan?<br>6  A. They could, yes.<br>7  Q. Okay. And so, let's take someone who is -- who has --<br>8  that's an offense that's comparable to a Michigan<br>9  conviction, but it's not a tier III offense. It's<br>10  tier I or tier II offense. As I read this chart, the<br>11  registration duration would be whichever is longer,<br>12  the convicting state or Michigan, is that correct?<br>13  A. Yes.<br>14  Q. Let's go on to the next page for out-of-state juvenile<br>15  adjudications. Can you sort of summarize how juvenile<br>16  adjudications are handled for out of state?<br>17  A. Let me think about this for a minute. So again, this<br>18  is trying to figure out -- because we had that change<br>19  where we could go on either duration. This was<br>20  helping us identify the duration, when to use our<br>21  duration requirements or the other state's.<br>22  Q. When you mentioned we had that change about duration,<br>23  when was that?<br>24  A. I don't know off the top of my head.<br>25  Q. Was it while you were in the unit? | 1  A. Correct.<br>2  Q. While you were manager?<br>3  A. Correct.<br>4  Q. Was there a memo or directive or written guidance of<br>5  any kind about that durational change?<br>6  A. Received communication, I believe, I don't know if it<br>7  was formal or it was just a change in process of what<br>8  we've been doing. And so, then we were told we were<br>9  supposed to do it this way. But it was new to us so<br>10  we needed to somehow write it down to keep track of<br>11  it.<br>12  Q. Who made that decision to change the durational<br>13  requirements?<br>14  A. MSP legal.<br>15  Q. Okay.<br>16       MS. AUKERMAN: We're going to want whatever<br>17  communications or directive was provided to the staff.<br>18  BY MS. AUKERMAN:<br>19  Q. If I'm understanding this chart -- this flowchart<br>20  correctly, if it's not comparable to a Michigan<br>21  juvenile adjudication, the person still has to<br>22  register if the adjudicating state requires<br>23  registration, correct?<br>24  A. Correct.<br>25  Q. If the adjudicating state requires registration of, I |
| <div align="center">Page 143</div> | <div align="center">Page 144</div> |

<div align="right">36 (Pages 141 to 144)</div>

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   don't know, some offense that we don't consider an | 1   correct. |
| 2   offense here, a juvenile would still -- if the | 2   Q.  So at the bottom of these charts it says consult with |
| 3   juvenile has to register in the other state, they'd | 3   an -- if the code is not listed, consult with an |
| 4   still have to register in Michigan? | 4   analyst.  Who gets consulted? |
| 5   A.  Correct. | 5   A.  I'm sorry? |
| 6   Q.  Okay.  If it is comparable to a Michigan juvenile | 6   Q.  It says consult with an analyst.  Who's the analyst |
| 7   adjudication and in Michigan -- a Michigan juvenile | 7   that's being consulted here? |
| 8   only registers if they're over fourteen, correct? | 8   A.  Our analysts, one of our four analysts. |
| 9   A.  Correct. | 9   Q.  Okay.  We received a bunch of documents that were |
| 10   Q.  But if the adjudicating state requires registration | 10   communications with MSP legal about trying to figure |
| 11   and the person is under thirteen, the person would | 11   out whether certain offenses were comparable to |
| 12   still be required to register in Michigan, correct? | 12   Michigan offenses.  When is legal brought in to those |
| 13   A.  Correct. | 13   decisions? |
| 14   Q.  So if you had an eight-year-old that was required to | 14   A.  If it's an offense we've never encountered before, so |
| 15   register in Georgia for juvenile adjudication, they | 15   it's not already captured, then we would move that on |
| 16   would have to register in Michigan? | 16   up the chain of -- to MSP legal.  Or if for some |
| 17   A.  Correct.  That's how I understand it. | 17   reason it just isn't making sense to us or we just |
| 18   Q.  And in Michigan only tier III offenses require | 18   don't feel comfortable or we feel there's something |
| 19   registration for juveniles, correct? | 19   questionable about the situation, then we would pass |
| 20   A.  Correct. | 20   that to legal. |
| 21   Q.  Okay.  But if the -- if the offense is not a tier III, | 21   Q.  For offenses you haven't encountered before, do |
| 22   if it's a tier I or tier II, but the adjudicating | 22   different analysts have -- sometimes have different |
| 23   state requires registration, the person would still | 23   perspectives on what the comparable Michigan offense |
| 24   have to register in Michigan? | 24   is? |
| 25   A.  Correct.  They may still have to register in Michigan, | 25         MR. JAMISON:  Objection, lack of |
| Page 145 | Page 146 |
| 1   foundation. | 1   A.  Correct. |
| 2   BY MS. AUKERMAN: | 2   Q.  Who makes the decision about whether an out-of-state |
| 3   Q.  You can answer. | 3   process is equivalent to a juvenile adjudication? |
| 4   A.  Are you -- will you ask the question again. | 4   A.  I'm sorry, can you ask the question again. |
| 5   Q.  So -- yeah.  So when you encounter an offense that you | 5   Q.  So different states have different ways of treating |
| 6   haven't come across before and you're trying to figure | 6   juveniles of -- different deferral programs, things |
| 7   out what -- whether it's comparable to a Michigan | 7   like that. |
| 8   offense, do different analysts sometimes come to | 8         Who makes the decision that say, you know, |
| 9   different conclusions about whether it's comparable to | 9   a Georgia program is comparable to the Holmes Youthful |
| 10   a Michigan offense? | 10   Trainee Act? |
| 11   A.  No.  Because they don't do that.  They're just looking | 11   A.  If it -- it's not clearly communicated from that other |
| 12   to see if there isn't something that already -- if | 12   state, we don't -- we would send it to legal to |
| 13   it's a new one, they go through legal.  We don't make | 13   review.  We don't determine that. |
| 14   those decisions at this level.  These are ones that we | 14   Q.  So what kind of documents do you get in order for |
| 15   already had in the system that now we had to apply the | 15   legal to make those decisions? |
| 16   new process to. | 16   A.  We try to ascertain any conviction documentation, |
| 17   Q.  Let me make sure I understand this.  This chart is -- | 17   police reports. |
| 18   this isn't for -- this only relates to ones that are | 18   Q.  Why do you get the police reports? |
| 19   already in the flowchart? | 19   A.  Just sometimes there's age -- age is captured for |
| 20   A.  Correct. | 20   victim; that is -- doesn't always come across in some |
| 21   Q.  Okay.  So then you would say look, it's -- | 21   of the convicting documentation. |
| 22   A.  It's already been identified. | 22   Q.  Is the comparison based on -- the comparison for the |
| 23   Q.  Uh-huh.  And then you would go through the flowchart. | 23   out-of-state offense, is that based on the -- what the |
| 24   Okay.  Correct?  That's when you'd go through the | 24   person was convicted of?  Or what the -- what the |
| 25   flowchart, correct? | 25   allegations in the documents are? |
| Page 147 | Page 148 |

37 (Pages 145 to 148)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 | **A.** I don't -- I can't answer that. I don't know. |
| 2 | MS. AUKERMAN: Let's look at another |
| 3 | document here. This is going to be the PACC code |
| 4 | table. This is Exhibit 10. |
| 5 | MARKED FOR IDENTIFICATION: |
| 6 | DEPOSITION EXHIBIT 10 |
| 7 | 1:38 p.m. |
| 8 | BY MS. AUKERMAN: |
| 9 | **Q.** Do you recognize this document? |
| 10 | **A.** I don't see anything yet. |
| 11 | **Q.** I apologize. Can you see that now. Do you recognize |
| 12 | this document? |
| 13 | **A.** Yes. |
| 14 | **Q.** Okay. And can you explain how -- what this is -- is |
| 15 | -- let me stop. |
| 16 | Can you tell us what this is? |
| 17 | **A.** This is what populates our tier table in MSOR. |
| 18 | **Q.** When you say populates our tier table, what do you |
| 19 | mean by that? |
| 20 | **A.** The crime codes that are in MSOR, this is how we -- we |
| 21 | communicate them. We get information. Like if there |
| 22 | was a similar -- similar offense, then if we got |
| 23 | information from legal saying that it was, we would |
| 24 | fill this out. We would send it to our vendor. And |
| 25 | then the vendor would use this to add it to the tier |

Page 149

| | |
|---|---|
| 1 | table in MSOR. |
| 2 | **Q.** So if someone comes in with Arkansas eleven forty-one |
| 3 | four twenty offense, if that's in MSOR, that would |
| 4 | automatically populate? |
| 5 | **A.** If it's in here, it's in MSOR. These are ones we've |
| 6 | already encountered. We've already determined whether |
| 7 | it's published, their tier, you know, based on |
| 8 | whatever the criteria might be. |
| 9 | **Q.** What does CRR mean? |
| 10 | **A.** That is a national -- the NCIC, that is a designation |
| 11 | within NCIC regarding the -- it being the type of sex |
| 12 | offense. |
| 13 | **Q.** Okay. And then the next column here is tier level, |
| 14 | correct? |
| 15 | **A.** Correct. |
| 16 | **Q.** How -- I see a bunch of these are blank. What does |
| 17 | that mean that they are blank? |
| 18 | **A.** Is there anything to the right of it? |
| 19 | **Q.** No. |
| 20 | **A.** I'm not sure. |
| 21 | **Q.** Okay. |
| 22 | **A.** I'm guessing because it needs to be evaluated |
| 23 | dependent -- I'm guessing it would be something -- if |
| 24 | we got one of those, we would have to give it to legal |
| 25 | to review. Because each time it could be |

Page 150

| | |
|---|---|
| 1 | circumstantial -- not circumstantial -- but it could |
| 2 | be circumstances that need to be reviewed by them. |
| 3 | **Q.** So like for all these we have here starting on line |
| 4 | fifty-seven a whole bunch of Alabama offenses that |
| 5 | there's no tier level for. So those would not yet |
| 6 | have been reviewed by legal? |
| 7 | **A.** I'm saying they probably have been reviewed by legal, |
| 8 | but because of the way the statute is written, it may |
| 9 | need to be something reviewed each time. It's not |
| 10 | something we can just say it's always going to be this |
| 11 | or that. |
| 12 | **Q.** So what you're saying is there's some offenses where |
| 13 | you can't tell from the language of the statute |
| 14 | whether or not a person is tier I, tier II, tier III, |
| 15 | and so they're going to have to be individually |
| 16 | reviewed? |
| 17 | **A.** That is my best guess. |
| 18 | **Q.** Okay. So then there's column O, it says publish |
| 19 | single offense. What does that mean? |
| 20 | **A.** That they only have to have one offense and they're |
| 21 | published. |
| 22 | **Q.** And if that's blank, what does that mean? |
| 23 | **A.** Again, it hasn't been determined. |
| 24 | **Q.** Okay. And then there's a column here for approved by |
| 25 | MSP legal. What does that mean? |

Page 151

| | |
|---|---|
| 1 | **A.** Can you click the arrow, please, the filter. |
| 2 | **Q.** I don't know that I can because I don't have the |
| 3 | passwords to go in. But you can kind of see that it's |
| 4 | blank. |
| 5 | **A.** They're not all blank. |
| 6 | **Q.** They're almost all blank. |
| 7 | **A.** So right there, they should say yes. And then if it |
| 8 | was comparable to the code, I guess, I don't know. |
| 9 | **Q.** Okay. |
| 10 | **A.** It looks like it's been over the years used for |
| 11 | different reasons. |
| 12 | **Q.** Okay. And then I see that -- so but -- but most of |
| 13 | these are blank whether or not they've been approved. |
| 14 | If we scroll down here, we can see on column R that |
| 15 | almost all of them are blank, correct? |
| 16 | **A.** I see that. |
| 17 | **Q.** Okay. And the comparable Michigan code, what is that |
| 18 | column supposed to be for? |
| 19 | **A.** I don't know that we've updated it from before to now. |
| 20 | So I don't know what it means. |
| 21 | **Q.** Okay. But you agree that most of these -- there's not |
| 22 | a comparable Michigan code listed for most of these |
| 23 | offenses? |
| 24 | **A.** Correct. |
| 25 | **Q.** Do you know if that's because there isn't a -- when we |

Page 152

38 (Pages 149 to 152)

Morris, Narcisa
1/25/2023

---

1  go back to the flowchart, right, whether or not
2  something is a comparable Michigan offense is the
3  first thing you have to figure out.
4          So the fact that these are blank, does that
5  mean that there's not a comparable Michigan offense?
6  **A.** I don't know that.
7  **Q.** How would the analyst know whether there's a
8  comparable Michigan offense if it's not marked in this
9  chart?
10 **A.** They don't use this chart to do that. They use what's
11 in MSOR.
12 **Q.** Does MSOR have a field for comparable offense?
13 **A.** No. But whatever the tier is, is how we kind of
14 figure it out. Obviously, if it's another state and
15 they're not using tiers or something, we don't look at
16 that.
17 **Q.** So how do I -- how would I figure out what -- let's
18 take -- I don't know. Here, let's just take -- D.C.,
19 second degree child abuse, tier III; how do I know
20 what the comparable Michigan offense is? Where is
21 that -- where's that kept?
22 **A.** We don't keep that. I don't know. We don't keep
23 that.
24 **Q.** Does anybody keep that?
25 **A.** Not that I'm aware of.

Page 153

---

1  **Q.** Okay. So but at some point there was a determination
2  made that this D.C. twenty-two three oh nine
3  offense is comparable to some Michigan offense that
4  requires tier III registration, correct?
5  **A.** I know that it was designated as a tier III if the
6  victim was one through twelve.
7  **Q.** I guess what I'm trying to get at is it seems like
8  whether or not something is comparable to a Michigan
9  offense is pretty foundational to how that person is
10 classified, correct?
11         MR. JAMISON: Objection, vague.
12 BY MS. AUKERMAN:
13 **Q.** You can answer.
14 **A.** I'm not sure of your question.
15 **Q.** Okay. Let's go back to the prior document.
16         MR. JAMISON: Can we take five minutes.
17 She's saying she needs a break. Is that okay?
18         MS. AUKERMAN: Yeah, that's fine. I'm
19 trying to confirm that we're not communicating with
20 the witness.
21         MR. JAMISON: Mariam, I'm not telling my
22 witness how to answer questions.
23         MS. AUKERMAN: Okay.
24         MR. JAMISON: I said that at the beginning
25 of the deposition. If her and I want to communicate

Page 154

---

1  about whether or not she needs a break, that's totally
2  permissible. We'd like to take ten minute and we'll
3  reconvene at 2:00.
4          MS. AUKERMAN: That's fine.
5          MR. JAMISON: Do you have any idea how much
6  longer you're going to need?
7          MS. AUKERMAN: I think we're going to need
8  the rest of the day.
9          MR. JAMISON: You're going to take the full
10 seven hours?
11         MS. AUKERMAN: Yes, I am, likely. We'll
12 see how it's -- let's off the record.
13         (Off the record 1:48 p.m.)
14         (Back on the record at 2:02 p.m.)
15 BY MS. AUKERMAN:
16 **Q.** Just a couple more questions on the sort of
17 out-of-state offenses, really just one more. I read
18 in the documents that you don't do predeterminations,
19 is that correct?
20 **A.** Correct.
21 **Q.** The unit does predeterminations for law enforcement,
22 correct? Like for an out-of-state registry?
23 **A.** That was a new process change. So the only ones we do
24 that for are like ICOTS and MDOC, which is the
25 transfer.

Page 155

---

1  **Q.** So you would -- the MDOC, if they want to know whether
2  someone is a past registrant, you would make -- based
3  on out-of-state conviction, you would make that
4  predetermination, correct?
5  **A.** Yeah. ICOTS is part of the MDOC. So that's what I'm
6  referring to, yes.
7  **Q.** Okay.
8  **A.** Because when they're having people transferring from
9  other states.
10         MS. AUKERMAN: Let me share one more
11 document here. This is one of the policy manuals. I
12 believe we're on Exhibit 11. This is Bates 775.
13         MARKED FOR IDENTIFICATION:
14         DEPOSITION EXHIBIT 11
15         2:03 p.m.
16 BY MS. AUKERMAN:
17 **Q.** Do you recognize this document?
18 **A.** Can you go to the top, please.
19 **Q.** Sure.
20 **A.** Okay.
21 **Q.** Do you recognize this document?
22 **A.** Yes.
23 **Q.** Okay. And I just note here it says that in the --
24 this we're now on page Bates 776. It says that
25 there's no predeterminations made, correct, for

Page 156

---

39 (Pages 153 to 156)

Tri-County Court Reporters
248-608-9250

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 registrants? | 1 that, is there a role for the registrant's attorney in |
| 2 **A.** Uh-huh. | 2 determining what is substantially similar? |
| 3 **Q.** And that there are predeterminations made for the MDOC | 3 Like is there an appeals process or |
| 4 or for a court, correct? | 4 anything that -- the registrant or attorney can do to |
| 5 **A.** Correct. | 5 say, you know, I don't think it's substantially |
| 6 **Q.** Okay. And then the highlighted language here says the | 6 similar to this. I think it's substantially not |
| 7 offender shall be provided with the resources needed | 7 similar. Is there -- what's the process, if any? |
| 8 to make the determination. What resources are | 8 **A.** So I have actually had that happen, and I've referred |
| 9 provided to registrants moving in out of state to make | 9 to legal, MSP legal. |
| 10 that determination? | 10 **Q.** So the registrant or their attorney would need to |
| 11 **A.** Referencing the state statute, the registrable | 11 contact MSP legal? |
| 12 offenses. | 12 **A.** No. They don't contact them, they contact us. The |
| 13 **Q.** So the registrant will be told you can look at your | 13 attorney, if they have issue with it, they contact us. |
| 14 out-of-state conviction and you can look at the | 14 And we can tell them that we can refer to our legal |
| 15 Michigan conviction and -- | 15 for a review. But typically that's after they have |
| 16 **A.** And consult an attorney. | 16 already been determined a certain tier. |
| 17 **Q.** And consult an attorney. But they're not provided | 17 **Q.** But if the registrant's attorney says I disagree, I |
| 18 with the chart -- | 18 think this is tier II and not tier III, what happens? |
| 19 **A.** No. | 19 **A.** For someone who's already registered? |
| 20 **Q.** -- or anything like that? | 20 **Q.** Yeah. The person has been registered and told you're |
| 21 So they would have to try to figure out | 21 tier III and the attorney says no, I think this is |
| 22 themselves whether something is substantially similar | 22 more comparable to a tier II offense, what happens? |
| 23 to a Michigan offense, correct? | 23 **A.** They usually send something to our group email and we |
| 24 **A.** I guess correct, yes. | 24 advise them that we are forwarding to legal for |
| 25 **Q.** All right. Let's talk about -- one last question on | 25 review. |
| Page 157 | Page 158 |
| 1 **Q.** Right. And then if legal says nope, we think this | 1 that be considered substantially similar to kidnapping |
| 2 person is a tier III, what happens? | 2 in Michigan? |
| 3 **A.** I don't know. That -- usually we respond. I haven't | 3 **A.** If it -- I would follow the typical rule. If for some |
| 4 had anything come back. I've only had that experience | 4 reason that's something that we are directed to start |
| 5 once. | 5 addressing, we would address it. |
| 6 **Q.** Okay. Let's talk about the non-sex offense cases. | 6 **Q.** Okay. So you're familiar with the Michigan Court of |
| 7 Are you familiar with registration requirements for | 7 Appeals called People v. Lymon, correct? |
| 8 people who are not convicted of a sex offense? | 8 **A.** Correct. |
| 9 **A.** Somewhat. | 9 **Q.** What's happening in response to Lymon within the SOR |
| 10 **Q.** Can you describe what you know. | 10 unit? |
| 11 MR. JAMISON: Objection, vague. | 11 **A.** As we've been directed, we are providing communication |
| 12 BY MS. AUKERMAN: | 12 to prosecutors, law enforcement, and courts advising |
| 13 **Q.** Can you describe who has to register for a non-sex | 13 of specific individuals with those offenses -- those |
| 14 offense? | 14 offenses only -- and asking them to review and |
| 15 **A.** What I've learned thus far is the Lymon, in three | 15 determine if a sexual component existed -- existed. |
| 16 instances of Lymon; child enticement, kidnapping, and | 16 And that if we don't get any response or determined |
| 17 unlawful imprisonment. | 17 that there was none, they are being removed from the |
| 18 **Q.** What about out-of-state offenses? | 18 registry. That we need to hear from them. |
| 19 **A.** What about? | 19 **Q.** So when you say you've been providing communication, |
| 20 **Q.** Are there out of state -- are there people with | 20 when -- when did that occur? |
| 21 out-of-state non-sex offenses that are required to | 21 **A.** So the first one, I believe, went out in November, I |
| 22 register in Michigan? | 22 think. And then we just sent another here in January, |
| 23 **A.** I don't know. I don't -- I've not been instructed or | 23 a reminder. |
| 24 had to look at that thus far. | 24 **Q.** When you say the first one, what do you mean? |
| 25 **Q.** So if someone had a kidnapping offense in Ohio, would | 25 **A.** The notice to PAAM, the courts, law enforcement, |
| Page 159 | Page 160 |

40 (Pages 157 to 160)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1  prosecutors.  We sent them that letter telling them | 1  Q.  Do you know who wrote the letters to the prosecutors? |
| 2  what we were doing, as I just described.  And then we | 2  A.  I do not. |
| 3  just sent them that same letter stating reminder; the | 3  Q.  Who provided you with those letters? |
| 4  only difference being reminder.  And sent it to them | 4  A.  John Gemellaro. |
| 5  again. | 5  Q.  Okay.  So -- so when you identified people who could |
| 6      MS. AUKERMAN:  We haven't gotten the final | 6  be impacted by Lymon, how did you do that? |
| 7  versions of those letters as they went out.  We're | 7  A.  Because we were requested to look for individuals with |
| 8  going to need to get those as well as the reminder | 8  those specific offenses and only those specific |
| 9  letter. | 9  offense, it was -- we just ran a query in the system. |
| 10  BY MS. AUKERMAN: | 10  Because we did find out that they wanted more details |
| 11  Q.  Was there a letter sent to registrants? | 11  around that query, we ended up going through the |
| 12  A.  Not yet, no. | 12  vendor. |
| 13  Q.  Will there be a letter to registrants? | 13  Q.  When you say wanted more details, what do you mean? |
| 14  A.  As far as I knew, that was the plan. | 14  A.  To the offenses, to the offense.  Like I was |
| 15  Q.  So in terms of the decision to remove people based on | 15  describing name and registration number.  They wanted |
| 16  the Lymon decision, who was involved in making -- | 16  the actual -- they wanted everything on the |
| 17  who's involved in deciding that these individuals | 17  spreadsheet, their name and conviction information. |
| 18  should be removed? | 18  Q.  Okay.  So when you pulled the initial -- when you |
| 19  A.  I don't know. | 19  pulled the group of people who would be the subject of |
| 20  Q.  Were you involved in any way? | 20  these letters, you looked for those three specific |
| 21  A.  No.  I was only provided direction. | 21  offenses, is that correct, kidnapping, unlawful |
| 22  Q.  Who provided you that direction? | 22  imprisonment, and child enticement? |
| 23  A.  MSP legal. | 23  A.  Correct. |
| 24  Q.  Who at MSP legal? | 24  Q.  You did not look for out-of-state non-sex offenses? |
| 25  A.  John Gemellaro and Steve Beatty. | 25  A.  No. |
| Page 161 | Page 162 |

| | |
|---|---|
| 1  Q.  How were you tracking the responses in Lymon?  You | 1  I'm not there anymore. |
| 2  mentioned earlier that you have a spreadsheet for | 2  Q.  Let me back up just a second.  So currently -- how |
| 3  this. | 3  many -- do you know how many people are impacted -- |
| 4  A.  Right.  We're writing on the report and then we're | 4  how many -- about how many people these letters went |
| 5  putting notification -- notice in the record itself. | 5  out -- that wasn't a very clear question.  Let me say |
| 6  Q.  Do you know -- do you know how many prosecutors have | 6  that again. |
| 7  responded? | 7      How many people are part of this group that |
| 8  A.  I do not. | 8  is being considered for removal? |
| 9  Q.  Who would know that information? | 9  A.  Can you -- are you speaking about registrants?  What |
| 10  A.  The staff in the unit. | 10  are you speaking to? |
| 11  Q.  Are there any steps being taken to remove people with | 11  Q.  Yeah.  So how many -- letters were sent out about -- |
| 12  out-of-state non-sex offense convictions? | 12  to prosecutors and courts and so forth -- about people |
| 13  A.  I'm sorry, repeat the question. | 13  who might come off under Lymon, correct? |
| 14  Q.  Are there any steps being taken to remove people with | 14  A.  Uh-huh. |
| 15  out-of-state non-sex offense convictions? | 15  Q.  How many people were on -- were part of that -- I'm |
| 16  A.  I don't know. | 16  trying to say this in a clear way. |
| 17  Q.  Were you involved in any such efforts? | 17      There were attachments to these letters, |
| 18  A.  No, I was not. | 18  correct, that went out? |
| 19  Q.  So if a prosecutor responds to this letter and says I | 19  A.  To the -- yes. |
| 20  believe there was a sexual component to the offense, | 20  Q.  Right.  And so, on those attachments it would say in |
| 21  what happens then? | 21  Grand Rapids, here's the ten people who are impacted? |
| 22  A.  I mean, we put that communication in the individual's | 22  A.  Gotcha.  Yes.  Yes. |
| 23  record and that individual stays on.  And we -- I | 23  Q.  Okay.  What I'm trying to understand is what's the |
| 24  think they're notifying legal as they find out.  I'm | 24  total number of people who were -- who were being |
| 25  not sure.  I shouldn't speak to that.  I don't know. | 25  considered -- about who prosecutors are being asked |
| Page 163 | Page 164 |

41 (Pages 161 to 164)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1     questions? | 1     correct? |

1    questions?
2    A.  I don't have an exact number, but it's only a few
3        hundred, a little bit more than a few hundred.  But I
4        don't have an exact number off the top of my head.
5    Q.  For those people, are they currently on the public
6        registry?
7    A.  They may or may not be.  I can't say for sure.
8    Q.  If they were a public registrant, has anything -- has
9        anything changed about their record while the letter
10       -- while we are waiting to hear back from the
11       prosecutors?
12            MR. JAMISON:  Objection, vague.
13   BY MS. AUKERMAN:
14   Q.  So -- so the record hasn't changed pending a response
15       from the prosecutor, correct?
16            MR. JAMISON:  Same objection.
17   BY MS. AUKERMAN:
18   Q.  You can answer.
19   A.  Correct.
20   Q.  If the prosecutor says that there was a sexual
21       component, the SOR unit will keep the person on the
22       registry, correct?
23   A.  Correct.
24   Q.  Is -- the SOR unit is not going to require a judicial
25       determination of whether there was a sexual component,

Page 165

1    correct?
2    A.  I don't know.
3            MS. AUKERMAN:  Let's take a look at -- I
4        believe this is Exhibit 12.
5            MARKED FOR IDENTIFICATION:
6            DEPOSITION EXHIBIT 12
7            2:20 p.m.
8    BY MS. AUKERMAN:
9    Q.  Do you recognize this document?
10   A.  It looks familiar, yes.
11   Q.  What is it?
12   A.  This is that draft RSO letter that you were referring
13       to earlier.
14   Q.  Do you know if this is the current version?
15   A.  It appears to be.
16   Q.  Do you know when this will go out?
17   A.  After ninety days from the date we sent the first
18       letter to the prosecutors, courts, and law
19       enforcement.
20   Q.  Okay.  Will all of those letters go out at the same
21       time?
22   A.  I don't know.
23   Q.  If a prosecutor says this person needs to continue to
24       register, will the registrant get a letter?
25   A.  I don't know.

Page 166

1    Q.  The language in bold here says this is not a
2        determination that you no longer need to register,
3        verify, or update your information as required by
4        Michigan law, federal law, or another state's law,
5        correct?
6    A.  I see that there, yes.
7    Q.  How is the registrant supposed to know whether they
8        have to register if they get a letter saying that it's
9        not a determination about whether they have to
10       register?
11            MR. JAMISON:  Objection, lack of
12       foundation.
13   BY MS. AUKERMAN:
14   Q.  You can answer.
15   A.  I don't know.
16   Q.  Okay.  So what if a prosecutor thinks an offense had a
17       sexual component, but a registrant disagrees, is there
18       a process for that?
19   A.  I don't know.
20   Q.  Are you aware that the Lymon case has gone to the
21       Michigan Supreme Court?
22   A.  I do not -- I did not know.
23   Q.  Have you had conversations about what would happen if
24       the courts say that registration of people with
25       non-sex offenses is okay, is constitutional?

Page 167

1    A.  I'm sorry, say that again.
2    Q.  Have you had conversations about what will happen with
3        these Lymon records, these individuals, if the courts
4        say that registration is constitutional for people
5        with non-sex offenses?
6    A.  I have not had that conversation.
7    Q.  Are the records for people who do get removed?  Are
8        those marked as inactive?
9    A.  They are marked as cancelled.
10   Q.  If you were told -- the unit were told to reactivate
11       those records, what would be involved in that?
12   A.  I don't know.  I'm not -- I'm not there anymore.  I
13       don't know what their plan would be.
14   Q.  Okay.  But the -- a cancelled record could be
15       reactivated, correct?
16   A.  Correct.  With the assistance of the offender.
17   Q.  So if MSP legal said to you -- or said to the unit we
18       need to reactivate all the Lymon people who were
19       cancelled because the law has changed, that would be
20       something that would just -- could be done?
21   A.  I would think so.
22   Q.  Okay.  Let's talk about recapture cases.  Do you know
23       what a recapture case is?
24   A.  Basically from my understanding, it's individuals who
25       had an offense prior to '95 who were not incarcerated,

Page 168

42 (Pages 165 to 168)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   on probation, or parole at that time who were not | 1   MS. AUKERMAN: This -- |
| 2   required to register for the sex offense, but then | 2   MR. JAMISON: This was the second email, |
| 3   later commits a felony and then are required to | 3   the additional exhibit you sent? |
| 4   register because of that subsequent felony. | 4   MS. AUKERMAN: Yeah. That has confidential |
| 5   Q. To your knowledge, were recapture cases removed after | 5   client data in it. |
| 6   the Doe's 1 decision? | 6   MR. JAMISON: Let me pull it up. |
| 7   A. To my knowledge, I believe so, yes. | 7   MS. AUKERMAN: I don't want to screen share |
| 8   Q. Do you know how many people were removed? | 8   that. |
| 9   A. Not off the top of my head. | 9   MR. JAMISON: Narcisa, this is the Excel |
| 10   Q. Do you know roughly? | 10   spreadsheet that you provided to me that is -- that |
| 11   A. A little over a few hundred maybe, a small amount. | 11   has the -- whatever there are, three hundred or so, |
| 12   Q. Are their records in the system as cancelled records? | 12   retroactive removals on there. You provided it a |
| 13   A. Anything removed from our registry is a cancelled | 13   couple days ago, I think. And this was subsequently |
| 14   record. | 14   produced to the plaintiff's counsel. Do you remember |
| 15   Q. So those could get reactivated in theory? | 15   that? |
| 16   A. Correct. | 16   A. Yes. I opened it, the one I sent you, yeah. |
| 17   Q. Okay. I'm going to pull up a document, but because | 17   MR. JAMISON: All right. So it's got three |
| 18   this is subject to the protective order, I'm not going | 18   tabs on the bottom, retroactive, retroactive, the new |
| 19   to screen share it. And I believe it was provided to | 19   CSC, and the sheet one. |
| 20   you this morning, this is the retroactive registration | 20   A. Yes. |
| 21   AG report. | 21   MR. JAMISON: Yeah, that's it. |
| 22   MS. AUKERMAN: Unless, Eric, you have a | 22   MS. AUKERMAN: Yeah, that's it. |
| 23   better way -- suggestion about how to deal with this. | 23   BY MS. AUKERMAN: |
| 24   MR. JAMISON: Give me one minute to look at | 24   Q. Can you explain to me what I'm looking at here. |
| 25   it. Was it -- | 25   A. This was before me. So I can only garner what I see |
| |     here, just as you do. |
| Page 169 | Page 170 |
| 1   Q. Is this supposed to -- is this -- do you know when | 1   that mean that they're recaptured? Or -- because lots |
| 2   this was prepared? | 2   of people have had retroactive registration issues. |
| 3   A. I think in 2018. And I only know that because I went | 3   I'm trying to make sure we're talking about the same |
| 4   under info and looked at when it was last modified and | 4   unit of people. |
| 5   printed. | 5   A. I can't answer that. I don't know. |
| 6   Q. And do you know why it was prepared? | 6   Q. You don't know if these are recapture cases or not? |
| 7   A. I did find a -- a communication about removing | 7   A. No. This is all I found on retroactivity when I was |
| 8   retroactivity. | 8   asked. |
| 9   Q. Is -- this was in response to the Doe's 1 litigation, | 9   Q. How would one find that out? |
| 10   is that right? | 10   A. I was -- Eric, was there something else that I sent |
| 11   A. I don't know. I was just getting here. I don't know. | 11   with this? Or was it just this? |
| 12   Q. Okay. | 12   MR. JAMISON: I think it was just this. |
| 13   A. Into the unit. | 13   Let me look. |
| 14   Q. But this is -- this is a list -- these are people | 14   BY MS. AUKERMAN: |
| 15   who -- who have been removed from the registry, is | 15   Q. If -- while he's looking, what is the event date |
| 16   that right? | 16   column? |
| 17   A. Correct. | 17   A. The event date was the language from the prior system. |
| 18   Q. And they have been removed because of retroactivity, | 18   And it was -- it is an equivalent to a reported date. |
| 19   correct? | 19   Q. What do you mean by reported day? |
| 20   A. That first tab, yes. | 20   A. The date that this was reported to the registry. |
| 21   Q. And then are these all recapture cases? Or is there | 21   Q. I see. And the committed -- |
| 22   something else? | 22   A. The registration was reported to the registry. |
| 23   A. It says under notes confirmed retroactive | 23   Q. Like the first date of registration? |
| 24   registration. | 24   A. Usually, it's associated with an entry to -- entry to |
| 25   Q. Okay. I guess what I'm trying to understand is does | 25   a vehicle, address, phone number, like this is when |
| Page 171 | Page 172 |

43 (Pages 169 to 172)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   they reported it. But this is within -- it's got a | 1   here. But I was looking and there are -- there are |
| 2   start and end date. So I don't know, because it's | 2   additional crime codes and descriptions as you move to |
| 3   just here in the middle of something. | 3   the right. And I was wondering if that was when the |
| 4   Q. Okay. And the committed date would be the offense | 4   initial one was, because there are 1983. And but |
| 5   date, when the offense was committed, correct? | 5   there's one in 2005, the rest are in 1994 and before. |
| 6   A. Correct. | 6   So -- |
| 7   Q. Okay. So one of the things that I was confused by | 7   Q. Right. But a person with a more recent offense would |
| 8   looking at this is that there are some people with | 8   not be removed for recapture. How can we figure out |
| 9   offense dates in the 2000s, correct? Or excuse me, | 9   whether these are recapture cases or not? |
| 10   yeah, committed dates in the 2000s. | 10   A. I don't know. There was no indication of recapture in |
| 11   A. Okay. | 11   the previous system. |
| 12   Q. So I'm trying to understand, recapture really deals | 12   Q. Okay. |
| 13   with people who have had offenses before the registry | 13   A. This was just titled retroactive registrants. And I |
| 14   went into effect, so before 1995. So I'm trying to | 14   was advised to look for anything having to do with |
| 15   understand whether we're even talking about -- whether | 15   that term. And that's -- since this is before me, |
| 16   this is even the right set of information. Do you | 16   this is what I found. |
| 17   understand my question? | 17   Q. Okay. Are recapture cases currently being added to |
| 18         Because the recapture people would be | 18   the registry? |
| 19   people who had offenses before 1995. And lots of | 19   A. To my knowledge, I believe so. |
| 20   people on this spreadsheet have more recent offenses | 20   Q. Do you know when that started up again? |
| 21   than that. | 21   A. Not off the top of my head, no. |
| 22   A. So that -- | 22   Q. Do you know roughly? Like was it ten years ago with |
| 23   Q. Go ahead. | 23   the new law? Do you have any sense like that? |
| 24   A. Again, I was not a part of this project or this -- or | 24   A. So that's MDOC. You might -- MDOC is the one that |
| 25   knowing about this spreadsheet other than what I see | 25   enters those. I don't know. |
| Page 173 | Page 174 |
| 1   Q. You're saying MDOC enters new recapture cases? | 1   Q. Under the statutory petitioning provisions, correct? |
| 2   A. Correct. | 2   A. Correct. |
| 3   Q. Either for incarceration or for -- through probation | 3   Q. Sometimes people are removed because a court finds |
| 4   officers? | 4   some kind of constitutional violation, correct? |
| 5   A. Correct. | 5   A. Correct. |
| 6   Q. Okay. All right. Let's talk about removals from the | 6   Q. Are there other kinds of removals that you can think |
| 7   registry. We had asked for data on the number of | 7   of? |
| 8   removals that were based on petitioning and that | 8   A. That they just don't want to register anymore and they |
| 9   wasn't provided. And so, I wanted to understand sort | 9   feel they've stayed out of trouble, so they request to |
| 10   of more about what information is available. | 10   be removed. |
| 11         You track court-ordered removals, correct? | 11   Q. And the court orders that? |
| 12   A. Correct. | 12   A. Correct. |
| 13   Q. And that shows up as a field, like cancellation, | 13   Q. Are you referring to the petitioning? |
| 14   court-ordered removal or something like that? Is that | 14   A. Maybe. I -- I don't know the reasons. I'd have to |
| 15   the field? | 15   look at what being -- |
| 16   A. That is correct. It's an action. It's not a field. | 16   Q. Okay. |
| 17   Q. Okay. The action would be cancel -- | 17   A. I don't know. |
| 18   A. Court order. | 18   Q. Do you know roughly how many court-ordered removals |
| 19   Q. And you can search on that? | 19   there are per year? |
| 20   A. Correct. | 20   A. I do not. |
| 21   Q. What kind of court-ordered removals are there? | 21   Q. Okay. All right. |
| 22   A. I don't know. I'd have to look at them. I don't | 22         MS. AUKERMAN: Let's take a look at this |
| 23   know. | 23   next exhibit. I believe we're on 13. |
| 24   Q. Okay. So some people petition for removal, correct? | 24         MARKED FOR IDENTIFICATION: |
| 25   A. Correct. | 25         DEPOSITION EXHIBIT 13 |
| Page 175 | Page 176 |

44 (Pages 173 to 176)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    2:38 p.m. | 1    BY MS. AUKERMAN: |
| 2    BY MS. AUKERMAN: | 2    Q.  Okay.  At the bottom it says sweep record prepped for |
| 3    Q.  Do you recognize this exhibit? | 3       name of city, county, sweep month, year.  Do you know |
| 4    A.  I do not. | 4       what that is a reference to? |
| 5    Q.  Okay.  This was something that was provided to us in | 5    A.  Again, this looks like somebody's personal verbiage |
| 6       discovery, it's MSP 923.  Can you tell me what -- do | 6       that they were using for canned language.  And that -- |
| 7       you have a sense of what you're looking at here?  This | 7       that has been used since I've been here.  That was |
| 8       seems to be something about different types of reviews | 8       previously.  I've seen it in records for previous |
| 9       and officer alerts, is that accurate? | 9       systems. |
| 10   A.  This document isn't named. | 10   Q.  Is there something that's done to prep a record for a |
| 11   Q.  This is all there is. | 11      sweep? |
| 12   A.  Hold on a second.  It looks like someone's personal | 12   A.  So to help the troopers, we print out the registrant |
| 13      canned language for entering -- like some of the | 13      information.  Because they can't take their laptops |
| 14      common alerts they might enter. | 14      in -- or devices to the door when they visit an |
| 15   Q.  Do you know where it says duration ending what cancel | 15      individual and they're trying to update their |
| 16      letter sent means? | 16      information or confirm things with them.  So they have |
| 17   A.  It's a standard letter that -- it's a template letter. | 17      a printout.  We just get it ready for them. |
| 18      And we just add the applicable registrant information | 18   Q.  There's not -- are there changes or information that's |
| 19      and send it to them. | 19      put in the MSOR database to prep for a sweep? |
| 20   Q.  Okay.  And the court-ordered removal, cancel letter | 20   A.  I've never participated, so I don't know. |
| 21      would also be such a template letter? | 21   Q.  Going back to sort of removals.  Do you know if -- to |
| 22   A.  Yes. | 22      your knowledge, has the SOR unit ever tracked what |
| 23   Q.  Okay. | 23      happens to people who are removed from the registry? |
| 24         MS. AUKERMAN:  So these are also letters | 24   A.  Can you expand on that. |
| 25      that we haven't received and need to get. | 25   Q.  Has the SOR unit ever looked to see whether people who |
| Page 177 | Page 178 |
| 1    are removed from the registry re-offend? | 1    A.  I believe so. |
| 2    A.  No.  That's not something we do. | 2    Q.  Okay.  Go down to question six there, we asked for |
| 3    Q.  Let's talk about evaluations of the registry.  What | 3       policy level documents, respond a variety of different |
| 4       kind of evaluations are done, if any? | 4       things.  The only document that was provided in |
| 5    A.  Can you expand on evaluations. | 5       response to that is Bates 1098 to 1198, that's the |
| 6    Q.  What kind of -- so -- when you have a program or a | 6       contract. |
| 7       government -- like a government program, sometimes the | 7          So I wanted to see if there's any other |
| 8       government will try to see whether that program is | 8       documents that might exist.  Are there any other |
| 9       effective, whether there's a way to improve it, | 9       documents that weren't provided that show operations |
| 10      whether it's meeting its intended goals.  So there | 10      of the registry? |
| 11      will be evaluations of the program. | 11         MR. JAMISON:  I'm going to object.  There's |
| 12         Are you aware of any such evaluations of | 12      an objection to discovery requests and I think it's |
| 13      the registry? | 13      improper to ask her questions about this over the |
| 14   A.  That does not sound familiar to me, at least in my | 14      objections. |
| 15      time. | 15         MS. AUKERMAN:  Your objection is noted. |
| 16         MS. AUKERMAN:  I think we're on 14.  I'm | 16   BY MS. AUKERMAN: |
| 17      losing track here.  We're on Exhibit 14.  So let's | 17   Q.  You can answer.  Are there any other documents related |
| 18      share screen.  These are our -- these are the | 18      to effectiveness of the registry that weren't |
| 19      responses to the Interrogatories, to the Requests for | 19      provided? |
| 20      Production. | 20         MR. JAMISON:  Objection, the question was |
| 21         MARKED FOR IDENTIFICATION: | 21      vague and she lacks personal knowledge about what was |
| 22         DEPOSITION EXHIBIT 14 | 22      produced. |
| 23         2:43 p.m. | 23   BY MS. AUKERMAN: |
| 24   BY MS. AUKERMAN: | 24   Q.  Did you provide the attorneys with any documents |
| 25   Q.  Do you recognize this document? | 25      related to the effectiveness of the registry? |
| Page 179 | Page 180 |

45 (Pages 177 to 180)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   **A.** Not that I recall, no. | 1   **A.** No. |
| 2   **Q.** With respect to the cost of the registry, we did | 2   **Q.** Or how often law enforcement uses the registry? |
| 3      receive a budget for the SOR unit. Are there any | 3   **A.** No. |
| 4      other documents you're aware of related to the cost of | 4   **Q.** Okay. Are you aware of any documents on the |
| 5      the registry? | 5      demographics of registrants? |
| 6           MR. JAMISON: Objection, vague. | 6   **A.** No. |
| 7   BY MS. AUKERMAN: | 7   **Q.** Are you aware of documents about violations or |
| 8   **Q.** You can answer. | 8      non-compliance by registrants? By that, I mean like |
| 9   **A.** Not that I'm aware of, no. | 9      not individual incidents, but like evaluations of how |
| 10  **Q.** Are you aware of whether there's ever been an | 10     often people are non-compliant? |
| 11     evaluation of the total cost of the registry? So | 11  **A.** No. |
| 12     looking at things like the amount of time that police | 12  **Q.** Are you aware of any documents of vigilantism or |
| 13     spend, courts, prosecutors, are you aware of any such | 13     harassment of registrants? |
| 14     cost evaluation? | 14  **A.** No. |
| 15  **A.** Not that I'm aware of, no. | 15  **Q.** Are you aware of any evaluations related to the impact |
| 16  **Q.** Okay. Are you aware of any information about the | 16     of registration on recidivism? |
| 17     usage by the public of the registry? Like how many | 17  **A.** No. |
| 18     people use the registry, who uses the registry? Are | 18  **Q.** Has the registry ever been audited? |
| 19     you aware of any documents about that? | 19          MR. JAMISON: Objection, it's vague. |
| 20  **A.** No. | 20  BY MS. AUKERMAN: |
| 21  **Q.** Or any evaluations of that? | 21  **Q.** Are you aware of any audits of the registry internally |
| 22  **A.** No. | 22     within the -- within the MSP? |
| 23  **Q.** What about usage by law enforcement? Are you aware of | 23  **A.** Not that I'm aware of. |
| 24     any documents that look at how law enforcement uses | 24  **Q.** I believe you mentioned earlier that the SMART office |
| 25     the registry? | 25     sometimes audits the registry, correct? |
| Page 181 | Page 182 |
| 1   **A.** Correct. | 1   **A.** Anybody accessing any of our state police systems has |
| 2   **Q.** Does -- has the Office of the Inspector General ever | 2      to be vetted to determine whether the use is |
| 3      audited the registry? | 3      appropriate or not. |
| 4   **A.** Yes. | 4   **Q.** Who does that vetting? |
| 5   **Q.** When was that done? | 5   **A.** Our security and access section. |
| 6   **A.** I don't have an exact date. | 6   **Q.** So the security and access section within the Michigan |
| 7   **Q.** Roughly? | 7      State Police? |
| 8   **A.** I can't even give you a rough. I think we did look | 8   **A.** Correct. |
| 9      into that, somebody looked into it. I think it's at | 9   **Q.** So let's say there's a new -- Trooper Brown is |
| 10     their public website, you can see when they last | 10     hired -- Officer Brown is hired at Grand Rapids Police |
| 11     audited us. | 11     Department. Is Officer Brown vetted by the security |
| 12  **Q.** Okay. Is the report itself on their website? | 12     and access section before being given access? Is that |
| 13  **A.** I do not know. I didn't even know it existed until | 13     how it works? |
| 14     recently. | 14  **A.** No. The agency would be vetted as a whole. And then |
| 15  **Q.** Okay. | 15     there would be a point of contact that we refer to as |
| 16          MS. AUKERMAN: So if it's not on the public | 16     local admins that would be designated in order to |
| 17     website, we'll need that as well. | 17     extend that vetting of their own staff and personnel |
| 18  BY MS. AUKERMAN: | 18     to determine if they should have access or not. And |
| 19  **Q.** Okay. Do you need a break? Are you doing okay? | 19     if they are, they would assign them that role. |
| 20  **A.** I'm okay. | 20  **Q.** So the agencies are vetted, not the individuals? |
| 21  **Q.** Okay. So let's talk about usage of the registry. Can | 21  **A.** The agencies are vetted. And then they are -- one |
| 22     you tell me who has access to the non-public database? | 22     person who's trained and designated -- well, I |
| 23  **A.** Those users that have been vetted, such as law | 23     shouldn't say one person. But there are -- could be |
| 24     enforcement, prosecutors, tribal. I think that's it. | 24     persons who are appointed to have that authority to do |
| 25  **Q.** When you say vetted, what do you mean? | 25     that within their own agency. |
| Page 183 | Page 184 |

46 (Pages 181 to 184)

Morris, Narcisa
1/25/2023

---

**Page 185**

1  Q.  Okay.  So let me show you the answer to interrogatory
2    four, which was asking about basically who has access
3    to the registry, the types of agencies, categories of
4    staff.  And the answer to that was that there are
5    three thousand, two hundred fifty-one non-MSP users
6    from four hundred and sixty-one non-MSP agencies.  Can
7    you see that?
8  A.  Yes.
9          MR. JAMISON:  Did you mean to put it up on
10    your screen?
11          MS. AUKERMAN:  I thought I had done so.
12    Let me do that again.  I think we're on Exhibit 15.
13          MARKED FOR IDENTIFICATION:
14          DEPOSITION EXHIBIT 15
15          2:52 p.m.
16  BY MS. AUKERMAN:
17  Q.  This is the -- I'll have that marked as Exhibit 15.
18    These are the amended Interrogatories.  Do you
19    recognize this document?  I'll go up to the top here.
20  A.  Right.  Yes.
21  Q.  Okay.  So looking at the response to number four, it
22    says three thousand, two hundred fifty-one non-MSP
23    users, correct?
24  A.  I see that, yes.
25  Q.  Are those agencies or individuals?

---

**Page 186**

1  A.  It says non-MSP users from four hundred sixty-one
2    non-MSP agencies.  So that first number are users out
3    of those four hundred and sixty-one agencies.
4  Q.  Okay.  So each of those three thousand, two hundred
5    fifty-one people would have an -- maybe an individual
6    user with an individual account, correct?
7  A.  They're associated with an agency, so they have access
8    through the agency.  So it's an account that may have
9    multiple users.
10  Q.  Okay.  And then what -- what types of agencies are in
11    these four hundred sixty-one non-MSP agencies?
12  A.  I don't know off the top of my head.
13  Q.  Would that involve local police?
14  A.  Correct.
15  Q.  And Michigan Department of Corrections?
16  A.  Correct.
17  Q.  Probation?
18  A.  Probation -- like what kind of probation?
19  Q.  Like county probation.
20  A.  Yes.
21  Q.  Federal -- federal law enforcement?
22  A.  I don't know.
23  Q.  Okay.  Federal immigration?
24  A.  I don't know.
25  Q.  Courts?

---

**Page 187**

1  A.  Yes.
2          MS. AUKERMAN:  We can go -- we lost
3    Mr. Jamison here.  I don't want to proceed without
4    him.  We can go off the record.
5          (Off the record 2:55 p.m.)
6          (Back on the record at 3:01 p.m.)
7          MS. AUKERMAN:  Back on the record.
8  BY MS. AUKERMAN:
9  Q.  We were talking about who uses the database and the
10    different agencies that have access to it.  Is there a
11    difference between agencies with read-only access and
12    agencies that have write assess?
13  A.  Yes.
14  Q.  Can you tell me about that.
15  A.  So read-only access wouldn't have access to the
16    certain tabs, like fee tab.  They wouldn't have access
17    to -- I'm drawing a blank.  They wouldn't have access
18    to enter a verification.  There's no ability to add
19    anything into the record.  They're just being able to
20    look at the information that's there.
21  Q.  What agencies have read access?
22  A.  Those would be -- I believe it's hospital police,
23    the -- most of our tribal agencies, those prosecutors.
24    And there might be more, but I can't think of them
25    right now.

---

**Page 188**

1  Q.  I'm going to share my screen.  I think we're on 15
2    here.  Actually, this is -- I'm sorry, this is the
3    contract again, which is I'll -- here we go.  The
4    contract is Exhibit 4, go back to Exhibit 4.
5          This shows the -- this is what the contract
6    intends or is contemplated under the contract.  These
7    are the -- the numbers and types of users.  So I
8    wanted to go over whether this is actually what the
9    system can do.
10          It shows that it has the capacity for nine
11    point nine nine nine million public citizens to read -- to
12    -- to read what's on the registry.  Does that sound
13    right?
14  A.  For the public Sex Offender Registry, yes.
15  Q.  Okay.  And the number of concurrent daily users is
16    five thousand.  Does that sound right?
17  A.  That's what's stated there, yes.
18  Q.  And then with respect to MSP employees, setting aside
19    the super admin, the write access for seven thousand
20    people.  Does that sound right?
21  A.  At that time, yeah.
22  Q.  What about now?
23  A.  I think it was a little bit under that.
24  Q.  That currently have it?
25  A.  Right.

---

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   Q. So somewhat less than seven thousand people have write | 1     system -- excuse me. |

**Page 189**

1  Q. So somewhat less than seven thousand people have write
2    access?
3  A. Right.
4  Q. And read access, it shows a thousand people. Does
5    that sound right?
6  A. Based on that document, yes.
7  Q. Okay. And before when we were looking at the answer,
8    it said three thousand, two hundred fifty-one non-MSP
9    users. Do you know how many MSP users have access?
10  A. Not off the top of my head, no.
11  Q. Do you have a rough idea?
12  A. No.
13  Q. What about usage of the public Sex Offender Registry?
14    The public Sex Offender Registry is available to
15    anybody with access to the internet, is that right?
16  A. Correct.
17  Q. Can you tell me how many people use the public Sex
18    Offender Registry in a given day?
19  A. I cannot.
20  Q. Or in a year?
21  A. I cannot.
22  Q. Okay. Do you know if the old system had a tracker for
23    the number of users?
24  A. I don't know.
25  Q. Do you have to report the number -- the usage of -- of

**Page 189**

1    system -- excuse me.
2      Do you have to report how many public --
3    how often the public uses the system to anyone?
4  A. No.
5  Q. Like the SMART office doesn't care, doesn't ask for
6    how many people use the registry?
7  A. No.
8  Q. I noticed that the home page says due to the volume of
9    users, the public Sex Offender Registry may be
10    unavailable from time to time. Do you recall it
11    saying that?
12  A. Yes.
13  Q. What's the volume of users that would make the
14    registry unavailable?
15  A. I don't know.
16  Q. Is it hundreds? Thousands?
17  A. I don't know.
18  Q. The contract we just looked at had showed five
19    thousand people can use it a day. Do you know if
20    that's the actual limit? Or five thousand concurrent
21    daily users, is that a limit?
22  A. I don't know.
23  Q. Tell me about the types of searches that can be done
24    on the public registry.
25      MR. JAMISON: Objection, vague.

**Page 190**

1  BY MS. AUKERMAN:
2  Q. What kind of searches can a user of the public
3    registry do on the registry?
4  A. I believe -- I believe they can search by name. They
5    can do by MDOC number or registration number. They
6    can do by address. I believe they can do by county --
7    do registrants by county, excuse me. I believe they
8    can do, if I remember correctly, I believe there's the
9    option to run by incarcerated. That's all I can
10    recall at this time.
11  Q. Anything else?
12  A. No. That's all I can recall.
13  Q. Do you need the name of a registrant to do a search?
14  A. No. I believe you can do it by address, you can do an
15    address.
16  Q. So one could search one's workplace and see everybody
17    within a certain radius of that workplace --
18  A. No.
19  Q. -- who's on the registry? No?
20  A. No.
21  Q. I thought you said you could put in an address?
22  A. Yes.
23  Q. Okay. And search for everybody within a radius of
24    that address?
25  A. No. You can put in an address and find out if there

**Page 191**

1    was a registered sex offender at that address.
2  Q. If you put in your home address and you want to see if
3    there are people in your neighborhood who are on the
4    registry, can you do that?
5  A. Yes, I believe so.
6  Q. So you could put in a work address and also find out
7    the people in that neighborhood who are on the
8    registry?
9  A. It may be possible.
10  Q. Tell me about how the email alert accounts work.
11      MR. JAMISON: Objection, vague.
12  BY MS. AUKERMAN:
13  Q. Let me back up for a second. Do you know how many
14    searches are conducted on the -- on how many
15    geographic searches are conducted?
16  A. No.
17  Q. Or how many named searches are conducted?
18  A. No.
19  Q. Are you aware that the system allows the members of
20    the public to sign up for email alerts?
21  A. Yes.
22  Q. Can you tell me how those work.
23  A. If they have someone move into a specific radius, they
24    are notified of a new registrant in their area.
25  Q. They would be notified when the person comes in?

**Page 192**

48 (Pages 189 to 192)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   **A.** When it's -- something's been notified as registered | 1   **A.** I do not. |

**Page 193**

1   **A.** When it's -- something's been notified as registered
2      in that area.
3   **Q.** If the registrant in that area does an update of some
4      kind, does the person receive a new notification?
5   **A.** If they've moved out of the area.
6   **Q.** But not for other types of changes?
7   **A.** No.
8   **Q.** Are there alerts about specific individuals?
9   **A.** I'm sorry, can you --
10   **Q.** Can you sign up to track a particular individual?
11   **A.** Yes, I believe so.
12   **Q.** There was an interrogatory response that said there
13      was six thousand, five hundred and six public email
14      alert accounts. Do you recall that?
15   **A.** I do not.
16   **Q.** Let me show you that. These are the amended
17      Interrogatories, give me a second, we can find the
18      exhibit number for those. I believe that's 4. Can
19      you see that it shows six thousand, five hundred six
20      public email alert accounts?
21   **A.** I see that.
22   **Q.** Okay. Do you know how many of those are for tracking
23      an individual?
24   **A.** I do not.
25   **Q.** Or how many are for geographic radius?

**Page 193**

1   **A.** I do not.
2   **Q.** Is there a way to tell that?
3   **A.** I don't know.
4   **Q.** Okay. Let's talk about what information is provided
5      to registrants. So what -- what kind of information
6      do registrants get to know what their obligations are?
7         MR. JAMISON: Objection, lack of
8      foundation.
9   BY MS. AUKERMAN:
10   **Q.** You can answer.
11   **A.** I'm not sure I understand the question.
12   **Q.** So registrants are required to do a bunch of different
13      things under the law, correct?
14         MR. JAMISON: Objection, vague.
15   BY MS. AUKERMAN:
16   **Q.** SORA has certain requirements for registrants,
17      correct?
18   **A.** Correct.
19   **Q.** How do registrants know what those requirements are?
20         MR. JAMISON: Objection, lack of
21      foundation.
22   BY MS. AUKERMAN:
23   **Q.** You can answer.
24   **A.** I guess I'm not understanding.
25   **Q.** So how does a registrant find out what they are

**Page 194**

1   supposed to do under SORA?
2         MR. JAMISON: Objection, lack of
3      foundation.
4   BY MS. AUKERMAN:
5   **Q.** You can answer.
6   **A.** Do you mean at the time that they're incarcerated and
7      then they are supposed to receive their requirements
8      before they leave?
9   **Q.** I'm trying to figure out is what information is being
10      provided to registrants to inform them what their
11      responsibilities are?
12         MR. JAMISON: Objection, lack of
13      foundation.
14   BY MS. AUKERMAN:
15   **Q.** You can answer.
16   **A.** So according to statute, if they are incarcerated and
17      they are getting ready to be released, they receive
18      that registration verification update form that
19      provides the requirements and cites the statute
20      references.
21   **Q.** So the information provided to registrants about what
22      the law requires is that verification form?
23   **A.** They go over it with their agents and they are
24      provided that form.
25   **Q.** Is there any other information provided to them?

**Page 195**

1         MR. JAMISON: Objection, lack of
2      foundation.
3   BY MS. AUKERMAN:
4   **Q.** That you're aware of.
5   **A.** I'm not aware.
6   **Q.** Okay. And when you said they go over it with their
7      agent, how do you know that?
8   **A.** It says it needs to be reviewed.
9   **Q.** You don't know -- personally know whether they go over
10      it with their agents?
11   **A.** No.
12   **Q.** So you're not aware of any other information other
13      than the registration form that is provided to
14      registrant -- the verification form that is provided
15      to registrants to explain their duties under the
16      statute?
17   **A.** I'm not aware, correct.
18   **Q.** Does the SOR unit create any educational materials for
19      registrants?
20   **A.** No. Not that I'm aware of.
21   **Q.** Do you have a help line for registrants to answer
22      questions they have?
23   **A.** We have a SOR line that's open to anybody and
24      everybody.
25   **Q.** And I believe you testified earlier that you don't

**Page 196**

Morris, Narcisa
1/25/2023

| | Page 197 | | Page 198 |
|---|---|---|---|
| 1 | provide advice over that line, correct? | 1 | **A.** I don't know that I can say.  I didn't answer the |
| 2 | **A.** That is correct. | 2 | phones. |
| 3 | **Q.** And if a registrant calls with a question about what | 3 | **Q.** Did law enforcement call the SOR unit sometimes with |
| 4 | their requirements are, what do you tell them? | 4 | questions? |
| 5 | **A.** If they think they're required to register, to | 5 | **A.** I imagine they did. |
| 6 | register.  Otherwise, they should contact legal | 6 | **Q.** What kind of information was provided to law |
| 7 | representative to determine whether they should or | 7 | enforcement when they called? |
| 8 | shouldn't be registering. | 8 | **A.** I'm sorry, I'm not understanding. |
| 9 | **Q.** Okay.  So they have to go talk to a lawyer? | 9 | **Q.** So if law enforcement calls the SOR unit with |
| 10 | **A.** Essentially, yes. | 10 | questions, are those questions answered? |
| 11 | **Q.** Do you refer them at all to local law enforcement? | 11 | **A.** Can you expand on that. |
| 12 | **A.** Generally, no. | 12 | **Q.** I guess what I'm trying to get at is -- it sounds like |
| 13 | **Q.** What about the prosecutor's office? | 13 | we lost Eric again.  Let's go off the record. |
| 14 | **A.** No. | 14 | (Off the record 3:20 p.m.) |
| 15 | **Q.** Okay.  What if they have a question about like do they | 15 | (Back on the record at 3:21 p.m.) |
| 16 | have to register, you know, that volunteer job.  Do | 16 | MS. AUKERMAN:  Back on the record. |
| 17 | you -- what do you tell them to do if they have a | 17 | BY MS. AUKERMAN: |
| 18 | question about what they have to do? | 18 | **Q.** You were talking about what information is provided to |
| 19 | **A.** We just refer them to the spot in statute and tell | 19 | law enforcement.  So let's say an officer is unsure |
| 20 | them they need to seek legal advice if they have | 20 | about what internet information to collect from |
| 21 | additional questions regarding it. | 21 | somebody.  Where would that officer go to get |
| 22 | **Q.** What about -- tell me about what information is | 22 | information about what to do? |
| 23 | provided to law enforcement about what the law | 23 | MR. JAMISON:  Objection, lack of |
| 24 | requires.  What are the most common questions that the | 24 | foundation. |
| 25 | SOR unit gets from law enforcement about the law? | 25 | BY MS. AUKERMAN: |

| | Page 199 | | Page 200 |
|---|---|---|---|
| 1 | **Q.** You can answer. | 1 | Grand Rapids who is unsure what internet information |
| 2 | **A.** We would direct them to their own chain of command. | 2 | to collect would go up their chain of command, |
| 3 | We don't -- we're not privy to telling them what to | 3 | correct? |
| 4 | do.  We direct them to the statute.  We direct them to | 4 | **A.** A local. |
| 5 | go through their own chain of command. | 5 | **Q.** A local police officer, yeah. |
| 6 | Worst case scenario, if they're persistent | 6 | **A.** Correct. |
| 7 | and won't get off the phone, we may tell them what we | 7 | **Q.** And a local police officer in Kalamazoo would go up |
| 8 | advise our troopers to do.  But otherwise, we try to | 8 | their chain of command to find that out, correct? |
| 9 | avoid that if at all possible, since we have no | 9 | **A.** Yeah. |
| 10 | authority over their -- over the locals. | 10 | **Q.** And the chain of command might have different answers, |
| 11 | **Q.** So the trooper in Grand Rapids would go up the chain | 11 | correct? |
| 12 | of command and ask there what internet information to | 12 | MR. JAMISON:  Objection, lack of |
| 13 | report.  And the trooper in Kalamazoo would go up the | 13 | foundation. |
| 14 | chain of command there to ask what internet | 14 | BY MS. AUKERMAN: |
| 15 | information to report, is that right? | 15 | **Q.** You can answer. |
| 16 | **A.** Usually -- | 16 | **A.** I don't know. |
| 17 | MR. JAMISON:  Objection. | 17 | **Q.** But there's no centralized guidance provided to local |
| 18 | BY MS. AUKERMAN: | 18 | law enforcement about, say, what internet information |
| 19 | **Q.** You can answer. | 19 | to collect, correct? |
| 20 | MR. JAMISON:  Mischaracterizes her | 20 | MR. JAMISON:  Objection, lack of |
| 21 | testimony. | 21 | foundation. |
| 22 | BY MS. AUKERMAN: | 22 | BY MS. AUKERMAN: |
| 23 | **Q.** I'm just asking a question.  So you can answer. | 23 | **Q.** You can answer. |
| 24 | **A.** A trooper we can respond to. | 24 | **A.** Not that I'm aware of. |
| 25 | **Q.** Okay.  So a police officer -- a police officer in | 25 | **Q.** And you mentioned there's something that you tell |

50 (Pages 197 to 200)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1   troopers to do, what is that? | 1   certain time.  And we refer to statute, that it's in |
| 2   **A.**  Can you expand on that. | 2   that first registration cycle or verification cycle. |
| 3   **Q.**  You said something about what you advise troopers to | 3        And so, they continue to ask questions, if |
| 4   do.  If you have someone on the call, you said worst | 4   they can collect it at other times or something.  And |
| 5   case we would give them -- they stay on the phone, | 5   we just say, as we tell our troopers, it's in the |
| 6   something about a -- how you would tell them about | 6   first verification cycle only, unless they want to pay |
| 7   what you advised troopers to do.  So I want to | 7   forward.  But that's not -- we don't require that |
| 8   understand what that is. | 8   collection any other time, only that first period. |
| 9   **A.**  I don't know what you're speaking of specifically, | 9   **Q.**  Okay.  That's helpful.  If an MSP trooper has |
| 10   like. | 10   questions about what internet information to collect, |
| 11        MS. AUKERMAN:  Can we have that read back. | 11   how does that trooper get information? |
| 12        (The requested portion of the record was | 12   **A.**  We may refer them to the SOR enforcement unit. |
| 13        read by the reporter at 3:25 p.m.) | 13   **Q.**  So the SOR enforcement unit would provide guidance to |
| 14   BY MS. AUKERMAN: | 14   -- let me correct that. |
| 15   **Q.**  When you said advise our troopers to do -- that's what | 15        Do you know if the SOR enforcement unit |
| 16   I meant.  What do you advise the MSP troopers to do? | 16   provides guidance to troopers about what the |
| 17   **A.**  I guess that's subjective to the question | 17   requirements are? |
| 18   specifically.  But that is why I use the word may | 18   **A.**  I do not know. |
| 19   advise.  Because there's some things we don't -- we | 19   **Q.**  Do you know if there are anymore detailed instructions |
| 20   don't provide direction on, period.  We're not -- | 20   for law enforcement about what information should be |
| 21   we're not the law enforcement.  We're not legal in the | 21   collected from registrants? |
| 22   SOR unit. | 22        MR. JAMISON:  Objection, lack of |
| 23        So the only -- the example that comes to | 23   foundation. |
| 24   mind that I may provide would be if they're | 24   BY MS. AUKERMAN: |
| 25   determining whether they should collect a fee at a | 25   **Q.**  You can answer. |
| Page 201 | Page 202 |
| 1   **A.**  Outside of our -- | 1   **Q.**  And it sounds like from what we've been talking about |
| 2   **Q.**  Outside of what's on the verification form. | 2   today, it requires involvement from the SOR unit, the |
| 3   **A.**  Okay.  Only during the time that we have the | 3   enforcement unit, the Department of Corrections, local |
| 4   injunction order did we send out -- the department | 4   law enforcement, Michigan State Police posts, tribal |
| 5   send out official correspondence about not taking | 5   government, federal government.  There's a lot of |
| 6   action against an individual registrant.  And that's | 6   different agencies involved in the registry process, |
| 7   it. | 7   is that fair to say? |
| 8   **Q.**  So is there -- but there's not -- is there a manual | 8   **A.**  Yes. |
| 9   where, for example, law enforcement could look up and | 9   **Q.**  So I want to get a sense of kind of all of the work |
| 10   say this type of internet identifier has to be | 10   that goes into maintaining this registry.  So starting |
| 11   reported and this one doesn't? | 11   with the initial registration for a new registrant, |
| 12   **A.**  No. | 12   what's involved in that? |
| 13   **Q.**  Or could look up this type of employment is not | 13   **A.**  So there are many different ways someone gets |
| 14   frequent enough, so it doesn't have to be reported? | 14   registered.  Is there a specific action you're -- |
| 15   **A.**  No. | 15   you're talking about?  Are you -- |
| 16   **Q.**  There's no manual or guide like that? | 16   **Q.**  How's that done.  Sorry, I interrupted you.  How's |
| 17   **A.**  No. | 17   that done, the initial registration? |
| 18   **Q.**  All right.  I want to talk about your workload, which | 18   **A.**  The person presents, information is collected on |
| 19   I'm sure -- or what it was while you were -- | 19   that -- that would be applicable to that form.  It's |
| 20   **A.**  I was going to say. | 20   transferred to the system as they are collecting it. |
| 21   **Q.**  Kind of what it takes to run the registry.  I mean, | 21   It's reviewed and given a copy to the individual after |
| 22   it's a big job running the registry. | 22   they sign -- or excuse me -- they review it and then |
| 23   **A.**  Okay. | 23   they sign it. |
| 24   **Q.**  Yes? | 24        And once that's all in the system and |
| 25   **A.**  Yes. | 25   captured, it's sent to us.  We review it.  We make |
| Page 203 | Page 204 |

51 (Pages 201 to 204)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 | sure it's packed, it has all the details necessary to |
| 2 | properly tier the individual.  And then it's |
| 3 | activated. |
| 4 | Q.  From the side of the -- the MDOC person or police |
| 5 | officers who is doing that initial collection of |
| 6 | information, how long would you estimate that that |
| 7 | takes, that initial registration? |
| 8 | MR. JAMISON:  Objection, lack of |
| 9 | foundation. |
| 10 | BY MS. AUKERMAN: |
| 11 | Q.  You can answer. |
| 12 | A.  Honestly, it varies. |
| 13 | Q.  Varies between what, do you think? |
| 14 | A.  It varies on what information is provided.  If they're |
| 15 | having trouble -- if -- especially if they're |
| 16 | out-of-state convictions, trying get those details of |
| 17 | victim age, the actual true conviction, if there's |
| 18 | missed -- it's -- if there's conflicting information, |
| 19 | trying to substantiate that, it could take forever for |
| 20 | somebody to call us back on something. |
| 21 | Even from getting signatures from the |
| 22 | individuals at incarceration.  As the individual moves |
| 23 | around, once they're moved, it takes time to get back |
| 24 | to that individual to get appropriate signatures or |
| 25 | get confirmation of details or waiting for the court |

Page 205

| | |
|---|---|
| 1 | processes. |
| 2 | There's all different kinds of reasons |
| 3 | something could prolong the process.  So there is no |
| 4 | set times specifically on when this has to or -- to |
| 5 | tell you how long something should take. |
| 6 | Q.  So if everything goes smoothly, it's a Michigan |
| 7 | conviction, the person, you know, the -- the person |
| 8 | collects the information, sends it to you, how long |
| 9 | would you -- how much total time do you think is |
| 10 | somebody working on that initial registration? |
| 11 | A.  Are you asking me to guess? |
| 12 | Q.  No, I'm not asking you to guess.  I'm asking you to |
| 13 | estimate.  So the officer who's collecting the -- or |
| 14 | the MDOC person who's doing the initial entry, how |
| 15 | much would you estimate -- how much time would you |
| 16 | estimate it takes to do that initial entry in a simple |
| 17 | case? |
| 18 | A.  If everything was -- was already there, we didn't have |
| 19 | to do any followup or ask any additional questions, it |
| 20 | could be completed in -- from the time the person |
| 21 | starts the review -- within twenty-four hours. |
| 22 | Q.  How much time is the person actively working on it? |
| 23 | Like the MDOC person who's working on it. |
| 24 | A.  I can't -- |
| 25 | MR. JAMISON:  Objection, lack of |

Page 206

| | |
|---|---|
| 1 | foundation. |
| 2 | A.  I can't speak to MDOC. |
| 3 | BY MS. AUKERMAN: |
| 4 | Q.  What about for you?  How much time does your unit |
| 5 | spend on an initial registration, a simple one? |
| 6 | A.  That's what I was referring to when I spoke to the |
| 7 | twenty-four hours. |
| 8 | Q.  So it takes twenty-four hours of staff time is what |
| 9 | you're saying? |
| 10 | A.  A single member. |
| 11 | Q.  Okay.  What about a complex one? |
| 12 | A.  It could take months. |
| 13 | Q.  How much actual staff time is spent on that?  So like |
| 14 | you're waiting for somebody to respond, so it's taking |
| 15 | months.  How much actual staff time is being used? |
| 16 | A.  That's never been evaluated, I don't know.  This is |
| 17 | what they do all day long, every day. |
| 18 | Q.  They being the analysts? |
| 19 | A.  The techs. |
| 20 | Q.  Okay.  How long does a verification take? |
| 21 | A.  We don't do verifications. |
| 22 | Q.  Can you estimate how long a police officer -- it would |
| 23 | take a police officer to do a verification? |
| 24 | MR. JAMISON:  Objection, lack of |
| 25 | foundation. |

Page 207

| | |
|---|---|
| 1 | BY MS. AUKERMAN: |
| 2 | Q.  You can answer. |
| 3 | A.  I don't know.  I haven't -- I don't know. |
| 4 | Q.  Let's talk about the requirements.  Can you describe |
| 5 | your understanding of what registrants' reporting |
| 6 | requirements are? |
| 7 | A.  Reporting requirements -- what the reporting |
| 8 | requirements are, I'm sorry? |
| 9 | Q.  Yeah.  What the reporting requirements are? |
| 10 | A.  You want me to repeat everything from the form, or? |
| 11 | Q.  Well, let's -- I guess, let's just go through this. |
| 12 | Address information, does that need to be reported? |
| 13 | A.  During verification, to be clear? |
| 14 | Q.  That's a fair response.  So does a registrant have to |
| 15 | report their address information to law enforcement? |
| 16 | It's not a trick question. |
| 17 | A.  I was just thinking.  So statute requires at time of |
| 18 | verification that they report their address or within |
| 19 | three business days -- I believe it's three business |
| 20 | days of moving. |
| 21 | Q.  And what addresses have to get reported? |
| 22 | A.  Residential addresses, employment addresses, school |
| 23 | addresses -- higher education, excuse me, addresses, |
| 24 | volunteer addresses. |
| 25 | Q.  What if someone spent a couple nights at his partner's |

Page 208

52 (Pages 205 to 208)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1      house? Does he have to report that? | 1    A. I would say no. |
| 2    A. No. Not just for two nights. | 2    Q. What -- who qualifies to registers as homeless? |
| 3    Q. How long could he spend there before he'd have to | 3    A. Who qualifies, so if the individual reports they're |
| 4      report it? | 4      homeless. |
| 5    A. If I recall what statute says, it's if they -- if that | 5    Q. What if that homeless person is couch surfing and |
| 6      is where they're spending, I believe -- how does it | 6      spends four nights here -- doesn't have a home, but |
| 7      say it -- lay their head there. Well, if they're | 7      spend four nights here, four nights there, one night |
| 8      going to be anywhere in their place over seven days, | 8      on the street, four nights with another friend? What |
| 9      they report. It also says something to the effect | 9      is that person supposed to report? |
| 10      about other addresses if they're spending a majority | 10    A. Homeless. |
| 11      or -- or laying their head there most of the time or | 11    Q. If they spent seven nights at a friend's house, what |
| 12      something to that effect. I'm sorry, I can't | 12      would they have to report? |
| 13      recall -- | 13    A. Seven nights? |
| 14    Q. You're not -- | 14    Q. Uh-huh. |
| 15    A. -- what it says. | 15    A. I wouldn't expect them to report anything other than |
| 16    Q. You're not sure how many nights they would need to | 16      homeless at that point, unless they go over. |
| 17      spend before they would have to report it? | 17    Q. So say they spend eight nights? |
| 18          MR. JAMISON: Objection, mischaracterizes | 18    A. Well, then I would think they would be reporting that |
| 19      her testimony. | 19      if they're staying there. |
| 20    BY MS. AUKERMAN: | 20    Q. Is that a temporary address or a residential address? |
| 21    Q. Do you know how many nights they would need to spend | 21    A. I cannot speak to temporary address. |
| 22      before they would have to report it? | 22    Q. You don't know if it's a temporary address? |
| 23    A. Over seven. | 23    A. No, I don't know. |
| 24    Q. What if they spent two nights a week for a month? | 24    Q. Okay. What about employment? That also has to be |
| 25      Would they have to report that? | 25      reported, correct? |
| Page 209 | Page 210 |

| | |
|---|---|
| 1    A. Correct. | 1    Q. What if somebody works at like a Walmart on Main |
| 2    Q. Okay. And what employment information has to be | 2      Street and they get assigned for a day to go work on |
| 3      reported? | 3      the Walmart at the 28th Street? Do they have to |
| 4    A. The address, the start date. | 4      report that? |
| 5    Q. Anything else? | 5    A. No. I don't know of a requirement to report that. |
| 6    A. They can give the name if they have that available. | 6    Q. If they got assigned to the Walmart for -- on 28th |
| 7    Q. What does a person report if their worksite changes | 7      Street for a month, would they have to report that? |
| 8      from day-to-day? | 8    A. I don't believe so. |
| 9    A. They report the main company, the main -- the main -- | 9    Q. If they got -- how long would they have to be assigned |
| 10      I don't know what you would refer to it, the main | 10      to a Walmart at 28th Street before they would have to |
| 11      site. As in -- | 11      report that? |
| 12    Q. So -- | 12    A. They're still working at Walmart, I don't -- I don't |
| 13    A. -- they report the trucking company address and they | 13      know. |
| 14      are in and out all the time. | 14    Q. Do you have to report if you leave employment? |
| 15    Q. So they don't have to report their travel route, their | 15    A. Yes. |
| 16      -- from trucking? | 16    Q. What if you're temporarily laid off? |
| 17    A. During trucking? | 17    A. You still report if you're laid off. |
| 18    Q. I thought you were saying if someone does like a | 18    Q. So you're laid off for two weeks, you have to report |
| 19      trucking company. | 19      that you're laid off and then you have to report that |
| 20    A. If somebody works for a trucking company, they're on | 20      you started again? |
| 21      the road, so they're not at a site. So they just say | 21    A. If you're not working, you report when you're not |
| 22      I work for a trucking company, here's my site. | 22      working. If you're working, you report you are |
| 23    Q. Do they have to report their routes of travel? | 23      working. |
| 24    A. No. They're not required to report their routes of | 24    Q. What about odd jobs? Like walking a dog or selling |
| 25      travel. | 25      snow that you get paid for, do you have to report |
| Page 211 | Page 212 |

53 (Pages 209 to 212)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1  that? | 1  A.  As defined under definitions. |

**Page 213**

```
 1   that?
 2   A.  A lot of people report those under personal
 3       employment -- yeah, self-employment, I'm sorry, excuse
 4       me.
 5   Q.  Say that again.
 6   A.  If they are self-employed, they report it.
 7   Q.  Okay.  But if you're not doing this as a regular gig,
 8       right, you're not a dog walker, you just -- your
 9       neighbor says hey, I'm gone on vacation this week,
10       will you walk the dogs this week, I'll give you fifty
11       bucks, do you have to report that?
12   A.  If they're self-employed, they have to report that.
13       They're required to report that if they're
14       self-employed.  It's not for me to determine what type
15       of -- what type of -- what qualifies as employment.
16   Q.  So you're not able to say what qualifies as
17       employment?
18   A.  I'm not to -- I'm only the keeper of the records.  I'm
19       not to tell them how or what is to be reported other
20       than if you are employed, then you are employed and
21       you report it.
22   Q.  What about volunteer work?  You mentioned that, is
23       that reportable?
24   A.  Yes.
25   Q.  What counts as reportable volunteer work?
```

**Page 213**

```
 1   A.  As defined under definitions.
 2   Q.  Okay.  So can you explain that.
 3   A.  It's defined in -- as a volunteerism.
 4   Q.  So let's talk about some examples there.  Like if you
 5       volunteer at a soup kitchen once a week, do you have
 6       to report that?
 7   A.  The statute says they have to report if it's a
 8       volunteerism.  If they're volunteering, then I would
 9       expect them to report.
10   Q.  So any kind of volunteer work has to be reported?
11   A.  If they're volunteering.
12   Q.  Even if it's a onetime thing?
13   A.  I don't recall of any time frames or conditions or
14       criteria of volunteerism to determine whether someone
15       reports or not.  Only that if they're volunteering,
16       that they are volunteering, they report it.
17   Q.  So is your answer that even one day of volunteering
18       has to be reported?
19   A.  I'm saying the statute says volunteerism, to report
20       volunteerism.  I don't know the criteria that says how
21       many days, how many hours.
22   Q.  Are you saying you're not sure whether one day would
23       have to be reported?
24   A.  I'm saying the statute doesn't say or have criteria on
25       how many days or how many hours.  It says if they're
```

**Page 214**

```
 1       volunteering to report volunteerism.
 2   Q.  Let's talk about phones.  What phone information has
 3       to be reported?
 4   A.  The phone number.
 5   Q.  Which phone numbers?
 6   A.  Phone numbers they're using.
 7   Q.  What about historical numbers?  Like I used to have
 8       this phone number, do I have to report that?
 9   A.  It's the phone numbers they're using.
10   Q.  So it's only currently used?
11   A.  To my knowledge of statute, it says they're using;
12       your current phone number you're using.
13   Q.  What about if somebody's phone is dead and they use a
14       friend's cell phone to make some calls?  Is that a
15       reportable number?
16   A.  Again, I -- if the statute says they're supposed to
17       report the phone numbers they're using, they're
18       reporting it, then I'm guessing they're saying that
19       they're using this phone.
20   Q.  But do they have to report it?
21           MR. JAMISON:  Objection, asked and
22       answered.
23   BY MS. AUKERMAN:
24   Q.  You can answer.
25   A.  I'm sorry, what's the question?
```

**Page 215**

```
 1   Q.  Does a person have to report a phone number if they
 2       borrow another person's phone because their own phone
 3       is dead?
 4   A.  I refer to the statute again.  If it says -- if
 5       they're saying -- if they're reporting a phone number
 6       because they say they're using it, then they're
 7       reporting it.  It says they're supposed to report the
 8       phone number they're using.  It's not for me to say
 9       they have to meet a certain minute usage.
10   Q.  What if somebody starts using a texting app like
11       Google Voice that gives you a new number?  Do you have
12       to report that?  You know, some of these phone apps,
13       they'll give you a temporary number so that people
14       can't see your real number.  Is that a reportable
15       number?
16   A.  If it's a phone number they're using and they're
17       reporting it, we're accepting it.
18   Q.  I'm not asking about whether you're accepting it.  I'm
19       asking whether they're required to report it?
20   A.  I do not enforce what they're reporting.  I'm the
21       record -- the keeper of the records.  So I'm not
22       enforcing.  We wouldn't answer that question if
23       somebody called us and asked us.
24   Q.  Okay.  What about vehicle information?  The law says a
25       vehicle owned or operated by a person, is that what
```

**Page 216**

54 (Pages 213 to 216)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    has to be reported? | 1    used after it's reported? |
| 2  **A.**  Correct. | 2  **A.**  I do not know. |
| 3  **Q.**  What about a rental car?  Does that need to be | 3  **Q.**  Do you know if it's used in some way? |
| 4    reported? | 4  **A.**  I do not know. |
| 5  **A.**  If it's owned or operated and they are reporting it, I | 5  **Q.**  Now, for the pre-2011 registrants, they don't have to |
| 6    accept it. | 6    report electronic identifiers and internet |
| 7  **Q.**  But you don't know whether they have to -- they're | 7    identifiers, correct? |
| 8    required to report it? | 8  **A.**  Correct. |
| 9  **A.**  Again, it's not for me to determine what to tell them | 9  **Q.**  Okay.  But some of them had previously reported that |
| 10    what they have to report.  I'm just the record-keeper | 10    kind of information, right? |
| 11    on this end. | 11  **A.**  Correct. |
| 12  **Q.**  For internet information, if a person sets up an | 12  **Q.**  What was done with the information that's in the |
| 13    online bank account, is that something they have to | 13    system that they previously reported? |
| 14    report? | 14  **A.**  As they are coming back in, the agencies are directed |
| 15  **A.**  I'm sorry, say that again. | 15    to remove them.  If we run across them for whatever |
| 16  **Q.**  If someone sets up an online bank account and they | 16    reason, we remove them. |
| 17    have a user name for a bank account, is that something | 17  **Q.**  It sounds like that's in process? |
| 18    they have to report? | 18  **A.**  At some point. |
| 19  **A.**  I -- if they're reporting it as a user name, I'm | 19  **Q.**  Okay.  Do you have a sense of how close you are to |
| 20    accepting it.  I don't -- I wouldn't give them -- | 20    completing that removal process? |
| 21    anyone direction on if they had to report that or not. | 21  **A.**  I do not know. |
| 22  **Q.**  So you wouldn't give people direction about what kind | 22  **Q.**  Do you know if there's been any impact from not having |
| 23    of internet information they have to report, correct? | 23    that information available for pre-2011 registrants? |
| 24  **A.**  No.  Correct. | 24      MR. JAMISON:  Objection, vague and lack of |
| 25  **Q.**  Do you know how -- how is the internet information | 25    foundation. |
| Page 217 | Page 218 |
| 1    BY MS. AUKERMAN: | 1    taekwondo class, do you have to report that? |
| 2  **Q.**  You can answer. | 2  **A.**  Again, if they report it, I accept it.  I do not |
| 3  **A.**  I do not know. | 3    provide guidance on what is to be reported to anyone. |
| 4  **Q.**  You're not aware of any impacts of not having that | 4  **Q.**  What about travel?  What travel information needs to |
| 5    information available? | 5    be reported? |
| 6  **A.**  I'm not aware. | 6  **A.**  If they're travelling out of country. |
| 7  **Q.**  Have you received any complaints from law enforcement | 7  **Q.**  What about other -- what else? |
| 8    that that information is no longer available? | 8  **A.**  I'm drawing a blank. |
| 9  **A.**  Say that again. | 9  **Q.**  Like domestic travel. |
| 10  **Q.**  Have you received any complaints from law enforcement | 10  **A.**  If they're going to be gone for more than seven days, |
| 11    that for pre-2011 registrants internet information is | 11    then they're to report that they're leaving. |
| 12    not available? | 12  **Q.**  What if a person is travelling out of state for a |
| 13  **A.**  I may have had some comments, but not complaints, no. | 13    week, but they don't have very firm plans on what |
| 14  **Q.**  When you say comments, what do you mean? | 14    they're going to do, what do they have to report? |
| 15  **A.**  Just agency oh -- law enforcement asking where it is, | 15  **A.**  Just that they're leaving if it's going to be over |
| 16    why isn't it there.  And we explain to them again why. | 16    those seven days. |
| 17    And that's it. | 17  **Q.**  Do they have to report where they're going? |
| 18  **Q.**  So they just want to know why it's not -- | 18  **A.**  Not for just domestic vacation time.  If they were |
| 19  **A.**  Correct. | 19    going over twenty-one days and out of the country, |
| 20  **Q.**  -- in the system? | 20    they have to report any flight information, any -- |
| 21      What about education?  What does a person | 21    where they're going to be at, address information, any |
| 22    have to report with respect to education? | 22    rental information, any things having to do with |
| 23  **A.**  Attendance to higher education. | 23    out-of-country travel. |
| 24  **Q.**  What about if someone takes like a class at a | 24  **Q.**  So for out-of-country travel, what if someone doesn't |
| 25    community college or community center?  Like taking a | 25    have a firm itinerary? |
| Page 219 | Page 220 |

55 (Pages 217 to 220)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 | **A.** Then they don't have a firm itinerary; I take what |
| 2 | they report to me. |
| 3 | Q.  What if somebody reports that they're going out of |
| 4 | state and they're planning to stay at XYZ motel, but |
| 5 | they get there and it's full and they end up staying |
| 6 | somewhere else, are they supposed to -- what are they |
| 7 | supposed to do then? |
| 8 | **A.** They've already reported that they're leaving.  And |
| 9 | so, there's -- there's nothing that I do.  I take what |
| 10 | they report.  I don't do followup or -- only to ensure |
| 11 | that if they're returning on the day they said they |
| 12 | were going to return.  And even then, that's reported |
| 13 | to the local agency, not us directly. |
| 14 | MS. AUKERMAN:  Let's look at -- I think |
| 15 | this is 17.  This is 16. |
| 16 | MARKED FOR IDENTIFICATION: |
| 17 | DEPOSITION EXHIBIT 16 |
| 18 | 3:57 p.m. |
| 19 | BY MS. AUKERMAN: |
| 20 | Q.  Can you tell me what this is? |
| 21 | **A.** Notification of international travel of sex offender. |
| 22 | Q.  How is this used? |
| 23 | **A.** This one -- yeah, this one is about if they're leaving |
| 24 | out of the country.  And this is what I was referring |
| 25 | to about reporting their departure date, how they are |

Page 221

| | |
|---|---|
| 1 | going to get there, any flight information. |
| 2 | Q.  Who fills this out? |
| 3 | **A.** They report it to the local jurisdiction and they |
| 4 | generate this form. |
| 5 | Q.  Is it generated in the MSOR database? |
| 6 | **A.** Correct.  So some of this is prepopulated from the |
| 7 | MSOR and the rest they fill in with the individual. |
| 8 | Q.  So -- so I'm understanding, the person comes in, says |
| 9 | I'm going to Canada and -- next month.  Is there a |
| 10 | screen in MSOR that the officer goes to to fill this |
| 11 | out? |
| 12 | **A.** No.  It's just the general -- it already has the |
| 13 | information unless -- excuse me.  It already has the |
| 14 | general information so that they can generate it.  And |
| 15 | then it'll populate with like the offense information, |
| 16 | dates of conviction, that -- those details.  And then |
| 17 | the name and information on top, but the -- then the |
| 18 | travel information and any other information they are |
| 19 | filling out together. |
| 20 | Q.  And that information that's the -- they're filling out |
| 21 | together, is that filled out in MSOR or on this form? |
| 22 | **A.** On this form. |
| 23 | Q.  And then what happens with this form once it's filled |
| 24 | out? |
| 25 | **A.** I believe if you look down further, it says it gets |

Page 222

| | |
|---|---|
| 1 | faxed to or emailed to NSOTC on the bottom. |
| 2 | Q.  This is, by the way, Bates 309. |
| 3 | **A.** I don't see it.  But I thought it said to fax or -- |
| 4 | there it is, right there. |
| 5 | Q.  I'm sorry, where? |
| 6 | **A.** On the bottom of the first page. |
| 7 | Q.  So it's emailed or sent to the DOJ, to the sex |
| 8 | offender travel? |
| 9 | **A.** Uh-huh. |
| 10 | Q.  What's IOD? |
| 11 | **A.** I don't know. |
| 12 | Q.  Does your unit -- is your unit involved in this in |
| 13 | some way? |
| 14 | **A.** No. |
| 15 | Q.  So this happens directly between the local law |
| 16 | enforcement and the U.S. Marshals Service? |
| 17 | **A.** Local law enforcement and the registrant, and the user |
| 18 | is required to send it. |
| 19 | Q.  The user being the local law enforcement? |
| 20 | **A.** Correct. |
| 21 | Q.  And then it's sent to the Marshals? |
| 22 | **A.** It's sent to the email, and I don't know where it goes |
| 23 | from there. |
| 24 | Q.  Okay.  Do you know what happens with it after it |
| 25 | arrives? |

Page 223

| | |
|---|---|
| 1 | **A.** I do not. |
| 2 | Q.  Let's talk about the 2021 SORA changes.  You're aware |
| 3 | that the statute changed effective March 2021, |
| 4 | correct? |
| 5 | **A.** Correct. |
| 6 | Q.  Were you aware that it was -- there was a legislative |
| 7 | work group that worked on developing a new statute? |
| 8 | **A.** I do know that my manager was attending meetings.  I |
| 9 | don't know if that was part of the work group or not. |
| 10 | Q.  That was Elizabeth Arritt? |
| 11 | **A.** That is correct. |
| 12 | Q.  Do you know what her role was? |
| 13 | **A.** She was my manager of the SOR unit. |
| 14 | Q.  Sorry, I wasn't clear.  Do you know what involvement |
| 15 | she had with that work group? |
| 16 | **A.** No.  I don't even know if she was going to the work |
| 17 | group.  I was just saying I know she was going to |
| 18 | meetings for the purpose of the legislative changes. |
| 19 | But I don't know if she was part of the work group or |
| 20 | not.  I cannot confirm. |
| 21 | Q.  Do you know was the SOR unit involved in development |
| 22 | of the new statute? |
| 23 | **A.** I do not. |
| 24 | Q.  You don't know if it was involved? |
| 25 | **A.** I don't know. |

Page 224

56 (Pages 221 to 224)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 | Q. Do you know if the SOR unit was requested to provide |
| 2 | any data to people working on the statute? |
| 3 | A. I do not. |
| 4 | Q. To your knowledge, there was no data provided? |
| 5 | A. I don't know. |
| 6 | Q. You're not aware of any legislators asking for data |
| 7 | from the SOR unit? |
| 8 | A. I don't know. |
| 9 | Q. Once the new statute was passed, what did the SOR unit |
| 10 | do to implement changes in the law? |
| 11 | A. We had to update our forms. We had work group |
| 12 | meetings amongst ourselves so management could advise |
| 13 | what those changes were and how they were going to |
| 14 | reflect. I can't recall exactly, but we may have made |
| 15 | some adjustments to the system itself. |
| 16 | Q. Do you recall what any of those adjustments might have |
| 17 | been? |
| 18 | A. No, I do not. I know we had to update policies and |
| 19 | procedures as well. |
| 20 | Q. When you say you updated the forms, what forms got |
| 21 | updated? |
| 22 | A. The verification, the registration verification update |
| 23 | form, the mail-in -- I believe the mail-in update form |
| 24 | was created as a result. |
| 25 | Q. Was there any other things that the unit did to |

Page 225

| | |
|---|---|
| 1 | implement the statute? |
| 2 | A. Not that I recall at this time. |
| 3 | Q. Were there any kind of internal instructions that got |
| 4 | generated? |
| 5 | A. For our team, the unit? |
| 6 | Q. Yeah. |
| 7 | A. Yeah. We had many discussions as a team and the |
| 8 | manager told us what we were doing and why -- what |
| 9 | direction we were going and what we needed to address. |
| 10 | And that's when we determined to update the forms, |
| 11 | create the new form, see if -- I just remember meeting |
| 12 | about it. |
| 13 | Q. Do you recall any sort of written guidance about |
| 14 | changes? |
| 15 | A. I'm sure there must have been. I don't recall at the |
| 16 | moment. |
| 17 | Q. There were as a result of the -- of the 2021 -- March |
| 18 | 2021 statute that became effective -- let me say this |
| 19 | again. As a result of the -- I'm trying to figure out |
| 20 | how to ask this in a way that's clear. |
| 21 | Are you aware that there were people who |
| 22 | were extended to lifetime registration in 2011? |
| 23 | A. I believe I do recall something being shared with me |
| 24 | when I first came on about that. |
| 25 | Q. And there were not -- those individuals remained on |

Page 226

| | |
|---|---|
| 1 | lifetime registration after the March 2021 changes to |
| 2 | the statute, is that correct? |
| 3 | A. They were what? |
| 4 | Q. They -- they remained on lifetime registration after |
| 5 | the March 2021 changes to the statute, correct? |
| 6 | A. I believe so. I'm not sure. |
| 7 | Q. You indicated that you couldn't recall what |
| 8 | adjustments were made to the system, correct? |
| 9 | A. Right. |
| 10 | Q. Did the system basically stay the same? |
| 11 | A. I don't recall. |
| 12 | Q. Were there letters that were sent out to registrants |
| 13 | about the new statute? |
| 14 | A. Yeah. That would be the mass mailings, I believe. |
| 15 | Q. Okay. Who wrote those letters? |
| 16 | A. I don't know. |
| 17 | Q. Who would know? |
| 18 | A. Maybe legal, I'm going to say legal. |
| 19 | Q. Were you consulted at all about what information |
| 20 | should be -- was the SOR unit consulted at all about |
| 21 | what information should go into those letters? |
| 22 | A. I know we got to see drafts. But as to us |
| 23 | specifically making suggestions to changes or anything |
| 24 | like that, I don't recall. |
| 25 | Q. You don't recall whether you gave input? |

Page 227

| | |
|---|---|
| 1 | A. No. I know we seen the drafts, though. They sent -- |
| 2 | they made changes and they sent them a couple times. |
| 3 | But I don't know that we had any specific changes. We |
| 4 | had more questions than changes, but yeah. |
| 5 | Q. Who received -- to whom were those letters mailed? |
| 6 | A. To the registrants on the record. |
| 7 | Q. To all registrants? |
| 8 | A. Yes. |
| 9 | Q. Including out of state? |
| 10 | A. Yes. |
| 11 | Q. How many letters were returned? |
| 12 | A. Thousands. And I still have those in -- yeah. |
| 13 | Q. What happened with the letters that were returned? |
| 14 | A. I can't remember those -- for a certain time frame we |
| 15 | checked to see if we had an address or something for |
| 16 | them. And we tried to resend them out if we could |
| 17 | find another address for them. |
| 18 | Q. You tried to send to another address? |
| 19 | A. Correct. |
| 20 | Q. Did you document whether or not a letter was returned? |
| 21 | A. I'm sorry, can you clarify that a little bit. |
| 22 | Q. Did you -- did you track whose letters were returned? |
| 23 | A. Are you talking about the ones that we re-sent after |
| 24 | they were returned and then we re-sent them again, did |
| 25 | we track them? |

Page 228

57 (Pages 225 to 228)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    Q.   I'm trying to understand what tracking you -- can you | 1    calls. |
| 2         just explain what information was tracked about | 2    Q.   Okay.  And the phone call -- the caller didn't |
| 3         letters that were returned or letters that were | 3         understand from the letter what they needed to do, |
| 4         re-sent? | 4         correct? |
| 5    A.   So we only -- we only track, so to speak, the ones | 5    A.   They just wanted to know -- the majority of them |
| 6         that were returned.  And there was a certain time | 6         wanted to know if they needed to go in now and verify |
| 7         frame that we had to keep track of them in order to | 7         or if they just did it in their normal time.  They |
| 8         find a new address or at least investigate if there | 8         were -- I'm guessing they were just worried and wanted |
| 9         was another address to send to, like if they had come | 9         to be staying compliant. |
| 10        in and updated or something. | 10             MS. AUKERMAN:  How about we take a break. |
| 11             So we only tracked those up to that date. | 11        I think -- off the record. |
| 12        And, I'm sorry, I cannot recall the date at this time | 12             (Off the record 4:12 p.m.) |
| 13        that was.  But then after that time period, any | 13             (Back on the record at 4:33 p.m.) |
| 14        returned letters we were not required or ordered to | 14    BY MS. AUKERMAN: |
| 15        continue trying to resend to them. | 15    Q.   So I'm going to share this, I believe Exhibit 15, |
| 16   Q.   Did you get questions after the letters went out? | 16        these are the Interrogatories.  And this shows -- |
| 17   A.   Sure.  Yeah. | 17        looking at interrogatory three here, which requested |
| 18   Q.   What kind of questions did you get? | 18        information about what -- circumstances on which |
| 19   A.   What do they need to do, do they need to come in -- | 19        non-public information can be released to -- under |
| 20        the registrants would ask us do I need to come in and | 20        what circumstances non-public registry information can |
| 21        verify again. | 21        be released. |
| 22   Q.   Did you -- how many -- how many questions did you get? | 22             The answer here, as you can see, was that |
| 23   A.   I don't know. | 23        the MSP will release information on the private |
| 24   Q.   Was it phone calls?  Letters? | 24        database to other state registries or law enforcement |
| 25   A.   I don't believe we got letters.  But we did get phone | 25        agencies for registry or investigative purposes, |
| Page 229 | Page 230 |
| 1         attorneys through a signed RIO 46 release form, | 1    Q.   And then the second thing here is to law enforcement |
| 2         certified record request, or any other authorized | 2         for registry or investigative purposes.  Can you |
| 3         users of MSOR. | 3         explain what that means? |
| 4              I want to go through each of those.  Under | 4    A.   So that would be similar to out of state, if for some |
| 5         what circumstances does the MSP release information to | 5         reason the law enforcement agencies are asking for |
| 6         other state registries? | 6         certain registry information or asking to explain |
| 7    A.   For the purpose of registration. | 7         something, if it doesn't make sense to them.  If they |
| 8    Q.   Can you explain that. | 8         see an alert in the record and they want to know more |
| 9    A.   So if for some reason they -- not for some reason.  If | 9         about what this means.  Or if they are doing an |
| 10        the individual has moved to their state and is | 10        investigation of some kind and it pertains to records |
| 11        registering in their state and they want conviction | 11        or a potential individual who's on the registry. |
| 12        information, then we will provide that to them because | 12   Q.   So like if they're investigating like non-compliance |
| 13        they are registering in their state. | 13        with registration requirements or something like that |
| 14   Q.   Do you provide information other than conviction | 14        you would provide that information? |
| 15        information? | 15   A.   That could be, yeah. |
| 16   A.   I don't know.  Usually it's pertaining to conviction | 16   Q.   Those users have access to the registry themselves, |
| 17        information. | 17        correct? |
| 18   Q.   So like historical address information or whether the | 18   A.   The law enforcement agencies, yes. |
| 19        person is -- | 19   Q.   So under what circumstances do they contact the SOR |
| 20   A.   Not historical.  But I could see us give -- I know | 20        unit? |
| 21        that we have given them the last verification form to | 21   A.   If they don't know what something means. |
| 22        show when they last verified with us.  But we don't | 22   Q.   When does that come up? |
| 23        typically -- I don't know -- to give historic | 23   A.   So as I said, if it's -- there's an alert message in |
| 24        information like that.  It's usually about the | 24        there and they don't understand what it means or if |
| 25        offenses. | 25        there's a note next to something and they don't know |
| Page 231 | Page 232 |

58 (Pages 229 to 232)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1 | what it means, they may ask us for that. |
| 2 | If they're -- for the investigative |
| 3 | purposes, if they're looking for specific information |
| 4 | to narrow down to a specific individual, they may not |
| 5 | know how to run the reports because they don't do |
| 6 | those frequently.  So we may get questions about how |
| 7 | to run the reports. |
| 8 | Q.  Okay.  The next one here is the an attorney with a |
| 9 | signed release form.  When does that come up? |
| 10 | A.  If the attorney wants to talk about the client -- |
| 11 | their client, excuse me. |
| 12 | Q.  So what kind of information do attorneys seek? |
| 13 | A.  About the registration. |
| 14 | Q.  Uh-huh. |
| 15 | A.  Anything about the registration.  It could be about |
| 16 | the -- what convictions we have on file.  Anything |
| 17 | that may pertain to their case or be helpful in their |
| 18 | case. |
| 19 | Q.  So is this about registration violations or whether |
| 20 | people should register?  Like when -- when are |
| 21 | attorneys contacting you for information from the |
| 22 | registry? |
| 23 | A.  Anytime they want to talk about the registrant.  It |
| 24 | doesn't even have to be a specific violation issue. |
| 25 | It could be -- they contact us about all kinds of |

Page 233

| | |
|---|---|
| 1 | stuff. |
| 2 | Q.  Like what? |
| 3 | A.  As I said, they contact us about what kind of |
| 4 | convictions are on their record.  They can't see that |
| 5 | information if the person is non-public.  So anything |
| 6 | about what's on the registry for that individual. |
| 7 | Q.  What else? |
| 8 | A.  I don't know. |
| 9 | Q.  Do they contact you about whether an individual is |
| 10 | correctly registered? |
| 11 | A.  We've had questions like that. |
| 12 | Q.  And what do you do with those? |
| 13 | A.  As mentioned earlier, we would pass those along to |
| 14 | legal to review. |
| 15 | Q.  What about certified records request? |
| 16 | A.  Those are just certifying that what is in the record |
| 17 | is correct. |
| 18 | Q.  When are those used? |
| 19 | A.  Anytime law enforcement is seeking -- well, law |
| 20 | enforcement action against an individual. |
| 21 | Q.  So this would be for violations of the registry -- of |
| 22 | SORA? |
| 23 | A.  Yes. |
| 24 | Q.  How many of those does the SOR unit do in a year? |
| 25 | A.  I don't know.  I've never checked. |

Page 234

| | |
|---|---|
| 1 | Q.  What about -- those are used then to prosecute people |
| 2 | for violations? |
| 3 | A.  I believe so, yes. |
| 4 | Q.  And then any authorized users of MSOR, when does that |
| 5 | come up? |
| 6 | A.  So again, those would be law enforcement agencies.  It |
| 7 | could be tribal agencies.  It could be any -- any of |
| 8 | the identified users discussed earlier would be |
| 9 | calling us to ask us to explain something or expand on |
| 10 | something -- |
| 11 | Q.  You -- |
| 12 | A.  -- and find somebody. |
| 13 | Q.  If it's an authorized user, you would provide the |
| 14 | confidential information? |
| 15 | A.  Correct. |
| 16 | Q.  How do you verify that it's an authorized user? |
| 17 | A.  By their user name.  I can check their credentials. |
| 18 | Q.  When you say by their user name, this would be an |
| 19 | electronic user name?  Like an email? |
| 20 | A.  Yeah.  It's typically their email, but yes, their user |
| 21 | name.  There's three of us that have the ability to do |
| 22 | that.  So we check it. |
| 23 | Q.  What if it's a phone call? |
| 24 | A.  We still check it. |
| 25 | Q.  You would ask the person to identify who they are and |

Page 235

| | |
|---|---|
| 1 | they then -- |
| 2 | A.  If you're talking about one of these authorized users, |
| 3 | yes.  They're going to have information that nobody |
| 4 | else would have because it's in our law enforcement |
| 5 | system. |
| 6 | Q.  Okay. |
| 7 | MS. AUKERMAN:  Let's go to -- this is, I |
| 8 | believe, Exhibit 17, if we could mark it as that. |
| 9 | MARKED FOR IDENTIFICATION: |
| 10 | DEPOSITION EXHIBIT 17 |
| 11 | 4:43 p.m. |
| 12 | BY MS. AUKERMAN: |
| 13 | Q.  This is a series of emails with the SMART office from |
| 14 | you.  I want to scroll down to the end where |
| 15 | there's -- there seems to be documents that are |
| 16 | performance measure surveys.  Do you recognize those? |
| 17 | A.  Uh-huh. |
| 18 | Q.  Let me make it bigger. |
| 19 | A.  Thank you. |
| 20 | Q.  Can you tell me -- so we marked this as 17.  Do you |
| 21 | recognize these surveys? |
| 22 | A.  Yes. |
| 23 | Q.  Can you tell me how these are used? |
| 24 | A.  I don't know how they use them. |
| 25 | Q.  Can you tell me what your involvement with these |

Page 236

59 (Pages 233 to 236)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| **Page 237** | **Page 238** |

**Page 237**

1    documents is?

2    A.  I obtain -- I ask the vendor to run reports to obtain

3    those details, and I provide them back to the SMART

4    office.

5    Q.  So this is a form that you have to fill out for the

6    SMART office?

7    A.  Yes.  This is actually in their DOJ system.

8    Q.  So this is in like a portal from the -- the SMART

9    office?

10    A.  From the Department of Justice, yes.

11    Q.  Okay.  So just looking through the information that

12    the -- the Department of Justice wants, it looks like

13    first they want to know about twenty-one advanced day

14    notification of international travel, correct?

15    A.  Uh-huh.  Correct.

16    Q.  And the response here indicates there's no way to

17    capture that information?

18    A.  For 2019, correct.

19    Q.  Is that information currently captured?

20    A.  It can be captured currently.

21    Q.  Do you know how many such notifications there

22    currently are?

23    A.  No.

24    Q.  Same thing with violations of the twenty-one-day

25    advanced notice.  What does that mean?  A violation of

**Page 238**

1    the twenty-one-day advanced notification?

2    A.  That'll always be zero.  We don't capture that

3    information.

4    Q.  What are they asking you to capture?

5    A.  If anybody was violated for the purpose of not

6    completing a twenty-one-day advanced notification.

7    Q.  So the federal government was trying to figure out

8    whether Michigan is violating people for not reporting

9    travel twenty-one days in advance?

10    A.  Correct.

11    Q.  And then the number of jurisdiction personnel trained

12    on SORNA during the compliance period, what is that

13    asking for?

14    A.  That's for training about the system.

15    Q.  Is that always zero?

16    A.  No.

17    Q.  When are -- when have people been trained on SORNA

18    compliance?

19    A.  When have they been trained?

20    Q.  Uh-huh.

21    A.  We weren't doing any training in 2019.

22    Q.  That's the --

23    A.  Or '21 or -- we started in -- no, we didn't even do --

24    we had all the litigation going on through all those

25    years.  So there was nothing being done during that

**Page 239**

1    time.  Everything was on hold.  So as we trained on

2    the new system, we did do some new training when we

3    launched our new system after August of '21.

4    Q.  So we've received a video about the new system.  Are

5    you familiar with the video that was sent over?

6    A.  It was a live capture of a session, correct.

7    Q.  Who did that training?

8    A.  Previous employee of the SOR unit.

9    Q.  Who was that?

10    A.  I believe the one that you have is Talmadge Wrinkle.

11    Q.  Talmadge?

12    A.  Talmadge.

13    Q.  How do you spell that?

14    A.  T-A-L-M-A-D-G-E.

15    Q.  Last name?

16    A.  W-R-I-N-K-L-E.

17    Q.  And where is Mr. Wrinkle now?

18    A.  He was promoted to biometrics identification division

19    -- biometrics and identification division.

20    Q.  How long was he in the SOR unit?

21    A.  I can't say for sure.

22    Q.  Approximately?

23    A.  More than five years.

24    Q.  What was his position when he did that training?

25    A.  He was an analyst.

**Page 240**

1    Q.  All right.  So moving through the -- what is the

2    number of records data electronically accessible, what

3    does that  refer to?

4    A.  It refers to data that -- any documents that were

5    electronically accessible in a record.

6    Q.  I'm not understanding what you're saying.

7    A.  Anything that was uploaded in a record, they can --

8    and a user can electronically access it, that's what

9    those numbers represent.

10    Q.  So does this mean forty-four thousand, two hundred

11    twenty registrant files?

12    A.  It looked at all registrant files that were other than

13    cancelled or inactive status.  It's looking at our

14    active records and it's looking for how many documents

15    are in those records that were available to users to

16    electronically access.

17    Q.  So is this sort of showing -- are these numbers here,

18    forty-four thousand, two hundred twenty, forty-four

19    thousand, two hundred fifteen, is that showing the

20    number of active registrants over the course --

21    A.  No.

22    Q.  -- of first month, second month?

23    A.  No.  It's documents that are electronically accessible

24    during that first month.

25    Q.  When you say documents, what do you mean by that?

**60 (Pages 237 to 240)**

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    **A.** Anything that was uploaded into the record. | 1    **Q.** So there's -- there's not twenty-two thousand new |
| 2    **Q.** So these are like individual verification forms or | 2    registrants, correct? |
| 3    those types of documents? | 3    **A.** Captured and/or automated during the reporting period, |
| 4    **A.** Yes.  It could be. | 4    so I would say yes, those are ones that were |
| 5    **Q.** When it says the -- number ten -- number of updated | 5    activated. |
| 6    sex offender registration records electronically | 6    **Q.** So there's twenty-two thousand new registrants |
| 7    transmitted through the SORNA exchange portal, what is | 7    activated in the reporting period? |
| 8    that referring to? | 8    **A.** That were -- they may not be new, but they've been |
| 9    **A.** That's referring to those tracking of registrants | 9    activated for whatever reason.  So they could be new. |
| 10    going in and out of state. | 10    They could be reactivated.  They could have left and |
| 11    **Q.** So during the first month, there were twenty-nine -- | 11    came back.  There could have been something that |
| 12    of this reporting period -- there were twenty-nine | 12    happened that they're now activated. |
| 13    individuals who either moved in or moved out? | 13    **Q.** Then there's the number of information exchanges |
| 14    **A.** That's what it appears to say, yes. | 14    between state and tribal territories sex offender |
| 15    **Q.** It looks like in a half year period you're looking at | 15    registration agencies and other SORNA jurisdictions |
| 16    a hundred -- roughly a hundred fifty, correct, people | 16    through the SORNA exchange portal.  What is that |
| 17    moving in or out?  And that includes both those going | 17    referring to? |
| 18    out and going in, correct? | 18    **A.** It's referring to all those different agencies and us |
| 19    **A.** Correct. | 19    giving them information. |
| 20    **Q.** Number sixteen, number of records captured and/or | 20    **Q.** So there's eleven thousand, seven hundred and |
| 21    automated during the reporting period, what does that | 21    eighty-five -- |
| 22    refer to? | 22    **A.** Exchanges. |
| 23    **A.** Those are activated records. | 23    **Q.** -- exchanges of some kind? |
| 24    **Q.** What does that mean? | 24    **A.** Uh-huh.  Correct. |
| 25    **A.** A new registrant. | 25    **Q.** It looks like there's roughly a hundred and fifty |
| Page 241 | Page 242 |
| 1    people moving in and out, but almost twelve thousand | 1    you're no longer required to register for the offense |
| 2    communications, is that -- am I understanding that | 2    for which you're registered, correct? |
| 3    correctly? | 3    **A.** Correct. |
| 4    **A.** Correct. | 4    **Q.** And this letter is dated December 12th, 2022, correct? |
| 5    **Q.** Are those communications about those a hundred and | 5    **A.** Correct.  I see that. |
| 6    fifty people? | 6    **Q.** Okay.  So it looks like it took -- was -- this person |
| 7    **A.** I can't say for sure. | 7    was on the registry for more than a decade, even |
| 8    **Q.** What else would they be about? | 8    though their offense was no longer -- the person was |
| 9    **A.** I can't say for sure. | 9    no longer required to register for that offense, is |
| 10    **Q.** Okay. | 10    that correct? |
| 11        MS. AUKERMAN:  I'm going to share this.  I | 11    **A.** That is a template.  So it just prints with the most |
| 12    believe this is 19.  It's 18. | 12    current date.  So it's possible.  I can't confirm that |
| 13        MARKED FOR IDENTIFICATION: | 13    that was sent to anybody. |
| 14        DEPOSITION EXHIBIT 18 | 14    **Q.** Okay.  Do you know -- |
| 15        4:54 p.m. | 15    **A.** When we generate that, it puts a date on it. |
| 16    BY MS. AUKERMAN: | 16    **Q.** Okay.  It mentions the department has performed an |
| 17    **Q.** Do you recognize this letter? | 17    audit of your sex offender registration, is the first |
| 18    **A.** Yes. | 18    sentence of the letter, correct? |
| 19    **Q.** Can you tell me what this is? | 19    **A.** Correct. |
| 20    **A.** It means that they are -- we were advising an | 20    **Q.** So we talked about audits earlier.  Are -- are the |
| 21    individual they are no longer required to register. | 21    audits used to determine if people are on the registry |
| 22    **Q.** When are these letters sent out? | 22    who shouldn't be? |
| 23    **A.** When we learn that someone is no longer required to | 23    **A.** In the term that you use audit, this is not an audit. |
| 24    register. | 24    It makes me feel like we shouldn't use the word audit |
| 25    **Q.** So it -- this letter says effective July 1, 2011, | 25    as you have referenced and discussed today.  This is |
| Page 243 | Page 244 |

61 (Pages 241 to 244)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    just us finding out that -- maybe it was brought to | 1    A.  They may have, yes. |

---

1    just us finding out that -- maybe it was brought to
2    our attention by someone else or by the registrant or
3    by -- for what -- we were making corrections in the
4    record and all of a sudden we seen it -- brought
5    attention to something else.
6            And so, then we look at these records and
7    we find there's something we need to rectify. And
8    then they were saying oh yeah, we did an audit of the
9    record. We reviewed it. We looked at it. And we
10    determined this is not correct, so we're fixing it for
11    you now.
12    Q.   So these letters were being sent out while you were
13    the unit manager, correct?
14    A.   This may have, yes.
15    Q.   So that would have been between '21 -- 2021 and 2022,
16    correct?
17    A.   It may have, yes.
18            MR. JAMISON: I'm going to object. I mean,
19    the document speaks for itself. It has Rick Snyder
20    and Colonel Etue at the top of the letter.
21            MS. AUKERMAN: It has Narcisa at the
22    bottom. You can object -- your objection is noted.
23    BY MS. AUKERMAN:
24    Q.   So the -- these letters were being sent out under your
25    signature as unit manager, correct?

Page 245

1    A.   They may have, yes.
2    Q.   And they indicate that a person -- a person receiving
3    this letter would have been on the registry from July
4    1, 2011, until receiving this letter for an offense
5    that doesn't require registration?
6            MR. JAMISON: Objection, misstates her
7    testimony.
8    BY MS. AUKERMAN:
9    Q.   You can answer. It's a question.
10    A.   It may have, yes.
11    Q.   Do you know how many of these letters were sent?
12    A.   I do not.
13    Q.   Is there a way to find that out?
14    A.   No. I -- not that I'm aware of, no.
15    Q.   Why would someone be on the registry for a decade for
16    an offense that doesn't require registration?
17    A.   Again, I don't know if this was even used. This is a
18    template.
19    Q.   Okay. Why would a person -- why would -- after July
20    1, 2011, do you know whether there were quality
21    assurance measures taken to ensure that individuals
22    who were no longer required to register were removed
23    from the registry?
24    A.   I don't know. I wasn't here during that time.
25    Q.   Do you know after the March 2021 changes whether

Page 246

1    quality assurance measures were taken to ensure that
2    anyone who is no longer required to register was
3    removed from the registry?
4    A.   I don't know.
5    Q.   To your knowledge, there were no quality assurance
6    measures taken?
7    A.   We ran our reports. We removed people. It's possible
8    -- it's always possible we could have missed somebody.
9    Q.   There was not an effort to audit to ensure that
10    everybody who should be removed was removed?
11    A.   We ran the report, again, to make sure nobody came up.
12    Q.   Okay. I want to talk -- we don't have much time left.
13    But I want to talk just briefly about the out-of-state
14    offenses because I'm still confused by the
15    information. Let's look at an example here. Maybe
16    that'll help me understand this better. Okay.
17            MS. AUKERMAN: This is 19. We'll mark this
18    Exhibit 19.
19            MARKED FOR IDENTIFICATION:
20            DEPOSITION EXHIBIT 19
21            5:01 p.m.
22    BY MS. AUKERMAN:
23    Q.   This appears to be communications about whether or not
24    an individual from Florida should register, is that
25    correct?

Page 247

1    A.   It appears to be so, yes.
2    Q.   It looks like initially as a request from the
3    Department of Corrections about whether the person has
4    to register, correct?
5    A.   It looks like the possible transfer.
6    Q.   Right. And then there's the Florida statute is
7    provided, correct?
8    A.   I see that there, yes.
9    Q.   And this statute doesn't say anything in particular
10    about a sexual offense, correct?
11    A.   Not just in that description right there, no.
12    Q.   And it says here the individual's not required to
13    register in Florida, correct?
14    A.   That's what it says there, correct.
15    Q.   So back on that chart that we looked at a while ago,
16    if the person has to register it would be because the
17    offense is considered similar to a Michigan offense,
18    right?
19    A.   So that chart is looking at if we've had those
20    offenses designated. So I would have to look to see
21    this offense, if it's on that crime code table. And
22    then determine if it's -- that would be if it was
23    similar. But this I can't speak to. I wasn't even
24    the lead on this communication. I'm just cc'd on it.
25    Q.   Okay. So but the person isn't required to register in

Page 248

62 (Pages 245 to 248)

Page 249

1    Florida, so that isn't the basis for registration in
2    Michigan, correct?
3  **A.**  Based on this communication, it says he does not have
4    to register in Florida, correct.
5  Q.  So then it looks like Ms. Jegla here is providing
6    sections of a police report, correct?
7  **A.**  I don't know.
8  Q.  Okay. I'll give you a moment to look at it.
9  **A.**  I see narrative, I don't know that that came from a
10    police report.
11  Q.  It says here, in this case the police report doesn't
12    say anything about communication devices. And then it
13    has a colon.
14  **A.**  I see that now.
15  Q.  Okay. So then there's a description of the
16    relationship here -- or of the conduct I should say,
17    correct?
18  **A.**  What was your question, I'm sorry?
19  Q.  We have a police report that describes the conduct
20    involved, correct?
21  **A.**  I see that, yes.
22  Q.  And then we have -- and then we have someone from MSP
23    legal saying that this offense is comparable to a
24    conviction for MCL 750.145b 1(a)?
25  **A.**  That's what it reads there, yes.

Page 250

1    MS. AUKERMAN:  I'm going to switch screens.
2  We can mark this as 20.
3    MARKED FOR IDENTIFICATION:
4    DEPOSITION EXHIBIT 20
5    5:06 p.m.
6  BY MS. AUKERMAN:
7  Q.  I'm showing you the statute for that offense. Do you
8    see that?
9  **A.**  Okay. I see that.
10  Q.  Do you see that that refers to various sexual
11    offenses?
12  **A.**  I see that.
13  Q.  Okay. So this is -- the Michigan offense requires a
14    sexual component, correct?
15  **A.**  Are you asking me to speak to his interpretation of
16    it?
17  Q.  I'm asking you whether this -- this statute requires a
18    sexual -- has a sexual component to it, correct?
19  **A.**  It says commit conduct proscribed under, and it gives
20    various citings. I don't know what all those are.
21  Q.  You may not be familiar with those. Those are like
22    CSC 1, CSC 2, CSC 3, those kinds of things.
23  **A.**  Okay.
24  Q.  Okay. So we see here that the MSP legal unit compares
25    these two offenses and finds them comparable, correct?

Page 251

1  **A.**  They refer to another analysis.
2  Q.  We have -- basically the Michigan State -- the
3    Michigan legal unit is comparing a Florida offense
4    that doesn't have a sexual component to a Michigan
5    offense that does have a sexual component, correct?
6  **A.**  If that's what that says.
7  Q.  Okay. And then it looks like that there's also a
8    discussion here about whether or not this offense is
9    similar to the Holmes Youthful Trainee Act, correct?
10  **A.**  I think Sharon is bringing in another scenario on top
11    of the two.
12  Q.  Okay. And then Mr. -- the MSP legal unit says that
13    the Florida withholding of adjudication isn't similar
14    to the youthful trainee. So it -- this should be
15    treated as a conviction, correct?
16  **A.**  That's what it states there, yes.
17  Q.  Is it fair to say that it's a pretty complicated
18    process to figure out whether this is a similar
19    offense?
20    MR. JAMISON:  Objection, vague.
21  BY MS. AUKERMAN:
22  Q.  You can answer.
23  **A.**  I don't know. I'm not an attorney. I don't -- he may
24    be better read than I am on the subject matter in
25    doing those comparisons. I can't speak for him.

Page 252

1  Q.  There's a lot of back -- there's -- there are a number
2    of emails back and forth here to determine whether or
3    not this is a comparable Michigan offense, correct?
4  **A.**  Well, there's a lot of -- she brings up more than one
5    scenario. It starts with one. It incorporates
6    another and then incorporates a third. So if there's
7    a lot of back and forth, it's because she's bringing
8    on other situations instead of sticking with one item.
9    That's how I read this.
10    MS. AUKERMAN:  Okay. I think -- I don't
11    know if Mr. Jamison has questions. If you do, I'll
12    reserve the rest of my time to respond to any
13    questions that you have.
14    MR. JAMISON:  Sure.
15    EXAMINATION
16  BY MR. JAMISON:
17  Q.  Are you -- do you have any personal knowledge -- I
18    guess to back up a minute.
19    There was a lot of discussion about sweeps
20    and there was some several documents that were shown
21    to you about sweeps and grant funding for sweeps. Are
22    you aware of any sweeps that MSP has conducted? And I
23    guess to clarify, a sweep is where a group of MSP
24    members go out and they conduct some sort of residence
25    check on a registrant to see if they live there or to

63 (Pages 249 to 252)

Morris, Narcisa
1/25/2023

| | |
|---|---|
| 1    see if they work at a certain location. | 1        MS. AUKERMAN:  I just had one followup |
| 2       So are you aware of any sweeps that MSP has | 2    question. |
| 3    conducted in 2020? | 3        RE-EXAMINATION |
| 4    **A.**  No. | 4    BY MS. AUKERMAN: |
| 5    **Q.**  Are you aware of any sweeps that they conducted in | 5    **Q.**  You testified earlier about grant funding for sweeps, |
| 6    2021? | 6    is that correct? |
| 7    **A.**  No. | 7    **A.**  Uh-huh. |
| 8    **Q.**  Are you aware of any sweeps they conducted in 2022? | 8    **Q.**  What was that -- has that money been used for? |
| 9    **A.**  No. | 9    **A.**  What had the money been used for? |
| 10    **Q.**  What about in 2023? | 10    **Q.**  Well, there was -- we talked about grant applications |
| 11    **A.**  No. | 11    for troopers for sweeps, correct? |
| 12    **Q.**  Do you know if they currently have any staff allocated | 12    **A.**  Correct. |
| 13    to conducting those sorts of sweeps? | 13    **Q.**  And you indicated that that grant was received, |
| 14    **A.**  I don't believe so.  I don't know. | 14    correct? |
| 15    **Q.**  Okay.  Can you tell me approximately how many hours | 15    **A.**  Correct. |
| 16    you've spent searching for records to respond to | 16    **Q.**  What was done with the money that was allocated for |
| 17    discovery requests in this case? | 17    troopers and sweeps? |
| 18    **A.**  Since the beginning? | 18    **A.**  I'd have to go back and look.  Typically we do a grant |
| 19    **Q.**  Yeah.  Or if you have, you know, for any -- I know | 19    modification. |
| 20    there's been several rounds of requests.  I think the | 20    **Q.**  Do you know if there was a grant modification? |
| 21    more recent time period was from the end of December | 21    **A.**  For what time period? |
| 22    to current.  Do you have any idea how many hours | 22    **Q.**  For the grant that allocated money for troopers and |
| 23    you've spent? | 23    sweeps. |
| 24    **A.**  Approximately seventy-some hours. | 24    **A.**  We probably do a grant modification for every year.  I |
| 25        MR. JAMISON:  Okay.  That's all I have. | 25    don't know specifically.  I'd -- I don't know which |
| Page  253 | Page  254 |

| | |
|---|---|
| 1    one specifically you're referring to and I'd have to | 1        CERTIFICATE |
| 2    look. | 2 |
| 3    **Q.**  So your -- we previously discussed a grant that had | 3    STATE OF MICHIGAN |
| 4    money for troopers and sweeps, correct? | 4    COUNTY OF MACOMB |
| 5    **A.**  Correct.  2019. | 5       I, Heather DeMar, RPR, CSR, and Notary |
| 6    **Q.**  2019.  Do you know if there was a grant modification | 6    Public in and for the above county and state, do |
| 7    for the money that was allocated to troopers and | 7    hereby certify that this deposition was taken before |
| 8    sweeps? | 8    me at the time and place hereinbefore set forth via |
| 9    **A.**  I don't know. | 9    videoconference; that the witness was by me first duly |
| 10    **Q.**  And you're not involved with enforcement, correct? | 10    sworn to testify to the truth; that this is a true, |
| 11    **A.**  That is correct. | 11    full and correct transcript of my stenographic notes |
| 12        MS. AUKERMAN:  Okay.  Thank you for your | 12    so taken; and that I am not related, nor of counsel to |
| 13    time.  I know it's been a long day for all of us.  And | 13    either party, nor interested in the event of this |
| 14    I know that while you were at the unit, we took a lot | 14    cause.  I agree that I nor any person, attorney, |
| 15    of your time, took a lot of your time today.  And we | 15    paralegal, or expert witness may make, copy, and/or |
| 16    appreciate that you were here with us today.  I hope | 16    distribute to others for future sales, monetary gain, |
| 17    you get some rest. | 17    or any other purpose, a transcript and/or video |
| 18        (The deposition was concluded at 5:14 p.m. | 18    without paying Tri-County Court Reporters the ordinary |
| 19    Signature of the witness was not requested by counsel | 19    and customary charges for any and all additional |
| 20    for the respective parties hereto.) | 20    transcripts. |
| 21 | 21 |
| 22 | 22    Heather DeMar, RPR, CSR - 8951 |
| 23 | 23    Notary Public. |
| 24 | 24    Macomb County, Michigan |
| 25 | 25    My Commission Expires:  8/31/2023 |
| Page  255 | Page  256 |

64  (Pages  253  to  256)

**From:** Morris, Narcisa (MSP)
**Sent:** Friday, July 15, 2022 1:13 PM
**To:** Arnold, Kashan (OJP)
**Subject:** Question: Michigan

<div style="border:1px solid black">

**EXHIBIT**

**MORRIS - 7**

</div>

Hi Kashan,

Hope all is well. I have a question that I think I know the answer too, but I do need to confirm.  In our grants we have sweep initiatives scheduled and they have always been large groups.

Let me know your thoughts.  Thank you.

Best Regards,

Narcisa Morris
Unit Manager Sex Offender Registry
Criminal Justice Information Center
Michigan State Police
P.O. Box 30634
Lansing, MI 48909
Cell: 517-420-2329

"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, and COURTESY"

