# Exhibit 79:

# Corey Spickler Deposition Transcript



**TRI-COUNTY COURT REPORTERS INC.**

(248)608-9250  Fax (844)270-7115
www.tri-countycourtreporters.com
depos@tricountyreporters.com

## Transcript of the Testimony of
## COREY SPICKLER

**Date:** January 26, 2023
**Volume:**

**Case:** John Does, Mary Doe, & Mary Roe v. Whitmer & Gasper

Printed On: February 10, 2023

COREY SPICKLER
1/26/2023

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHER DIVISION

JOHN DOES A, B, C, D, E, F, G, H,
MARY DOE and MARY ROE,
on behalf of themselves and
all other similarly situated,

    Plaintiffs,
vs.    File No. 2:22-cv-10209
    Hon. Mark A. Goldsmith
    Mag. Curtis Ivy, Jr.

GRETCHEN WHITMER, Governor of the
State of Michigan, and COL. JOSEPH
GASPER, Director of the Michigan State
Police, in their official capacities,

    Defendants.
_____/

The Remote Deposition of
JAMES KISSINGER
Fruitport, Michigan
Commencing at 1:12 p.m.
Thursday, January 26, 2023
Before Gina Deskiewicz, CSR-9689, RPR.

Page 2

APPEARANCES

AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
MIRIAM J. AUKERMAN (P63165)
1514 Wealthy SE, Suite 260
Grand Rapids, Michigan 49506
(616) 301-0930
maukerman@aclumich.org
Appearing via Zoom.

AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN
UNIV. OF MICHIGAN LAW SCHOOL
PAUL D. REINGOLD (P27594)
802 Legal Research Building
801 Monroe Street
Ann Arbor, Michigan 48109
(734) 355-0319
pdr@umich.edu
Appearing via Zoom.

MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
KRISTIN M. HEYSE (P64353)
SARAH E. TRUDGEON (P82155)
525 W. Ottawa Street, PO box 30217
Lansing, Michigan 48933
(517) 335-3055
heysek@michigan.gov
Appearing via Zoom.

MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
SCOTT L. DAMICH (P74126)
PO Box 30754
Lansing, Michigan 48909
(517) 335-7573
damichs@michigan.gov
Appearing via Zoom.

Page 3

MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
KEITH G. CLARK (P56050)
PO Box 30217
Lansing, Michigan 48909
(517) 335-3055
ClarkK33@michigan.gov
Appearing via Zoom.

ACLU OF MICHIGAN
DAYJA S. TILLMAN (P86526)
1514 Wealthy Street SE, Suite 260
Grand Rapids, Michigan 49506
(616) 301-0930
dstillman@ucdavis.edu
Appearing via Zoom.

Page 4

INDEX

WITNESS:
COREY SPICKLER
EXAMINATIONS    PAGE
EXAMINATION BY MR. REINGOLD    5
EXAMINATION BY MR. DAMICH    43

E X H I B I T S
EXHIBIT NO.    PAGE
(None offered.)

1 (Pages 1 to 4)

COREY SPICKLER
1/26/2023

```
 1   Fruitport, Michigan
 2   January 26, 2023
 3           * * * * * *
 4         THE REPORTER: We are going on the
 5   record. It is 1:12 p.m. My name is
 6   Gina Deskiewicz. I am a Notary Public for the
 7   county of Macomb. I am a certified shorthand
 8   reporter for the state of Michigan.
 9         This deposition is being held via
10   videoconferencing equipment. The witness and the
11   reporter are not in the same room. The witness
12   will be sworn in remotely, pursuant to agreement of
13   all parties. The parties stipulate that the
14   testimony is being given as if the witness was
15   sworn in person.
16           * * * * * *
17              COREY SPICKLER,
18   was thereupon called as a witness herein, and after
19   having first been duly sworn to testify to the truth,
20   the whole truth and nothing but the truth, was examined
21   and testified as follows:
22              EXAMINATION
23   BY MR. REINGOLD:
24   Q.  This will be repetitive because you all have sat
25       through one dep, but because each dep is separate I
```
Page 5

```
 1       need to go through the same steps. My name is
 2       Paul Reingold, I'm one of the Plaintiff's lawyers,
 3       and we're here under Federal Rule 30(b)(6) pursuant
 4       to subpoena and a deposition notice adjourned from
 5       one week ago.
 6            You can -- I didn't hear if you already
 7       stated your name for the record or not. If you
 8       did, you don't need to do it again. If you didn't,
 9       go ahead.
10   A.  Corey Spickler.
11   Q.  Okay. And for purposes of the deposition, would
12       you prefer to be called Corey or Mr. Spickler? I'm
13       happy either way.
14   A.  Corey is fine.
15   Q.  Okay. As I said before, you've been designated
16       as -- by MDOC Counsel as a person of authoritative
17       of the matters we're going to cover, and what we'll
18       be doing today -- much more briefly than in the
19       previous dep -- is to try to learn a little bit
20       about what you know, and bring it -- to help us get
21       up to speed.
22            I will be asking a series of questions
23       that you can answer. If you don't understand, you
24       should tell me to rephrase them. If you answer a
25       question, we'll assume that you understood it. Is
```
Page 6

```
 1       that okay?
 2   A.  Yes.
 3   Q.  You need to say "yes."
 4   A.  Yes.
 5   Q.  Okay. And again, you must answer verbally,
 6       otherwise we won't have a record, and the same with
 7       trying to not to talk over each other. And again,
 8       can you take a break when you need it, although I'm
 9       hoping this will be short enough that we won't need
10       breaks.
11            Let me ask you to start by asking, did
12       you review anything to prepare for this deposition,
13       and if so, what?
14   A.  So yes, I met with Kristin on two different
15       occasions in preparation for the deposition, as
16       well as reviewed the Static-99R coding manual and
17       evaluator's workbook, and the Stable-2007 coding
18       manual and workbook, as well as the community-based
19       contract for one of my vendors which includes
20       outpatient treatment as well as residential
21       treatment.
22   Q.  All right. Did you meet with any other lawyers
23       like from the Michigan State Police, or just
24       Kristin?
25   A.  No one else.
```
Page 7

```
 1   Q.  Okay. And did you review any legal materials?
 2   A.  No.
 3   Q.  Okay. Did you have any involvement in responding
 4       to the discovery requests or the subpoena requests
 5       that we made?
 6   A.  No.
 7   Q.  That gets us to your biography.
 8            Can you please give us your education
 9       with dates, places if it matters, major, and any
10       advanced degrees, basically high school through
11       now?
12   A.  Sure. So I graduated from Grand Blanc High School
13       in Grand Blanc, Michigan in 2006. I graduated with
14       a Bachelor's degree in Psychology from
15       Taylor University in 2011, and I graduated from
16       Eastern Michigan University with a Master's degree
17       in Clinical Behavioral Psychology in 2013.
18   Q.  All right. And again, any major breaks where you
19       did something that we should know about, or served
20       in the armed forces?
21   A.  No, I kind of went from one schooling to the next.
22   Q.  You were a straight-througher. Okay.
23            Would you tell us your work history
24       before your arrival at the MDOC; again, rough
25       dates, position -- that sort of thing -- and
```
Page 8

COREY SPICKLER
1/26/2023

```
 1      employers.
 2   A. Sure.  I guess my first relevant job to kind of
 3      this field would be in graduate school I worked for
 4      a neuropsychologist doing assessment while in
 5      graduate school.  Following graduation, I took a
 6      job with Pine Rest Christian Mental Health Services
 7      in Grand Rapids, Michigan, working with their CPRS
 8      program, so essentially working with business
 9      franchise youths.  I began that job in the spring
10      of 2013 and worked there until the fall of 2013 at
11      which time I was employed with the
12      Michigan Department of Corrections, Michigan Sex
13      Offender program.
14             I worked as a psychologist at
15      Muskegon Temporary Correctional Facility from fall
16      of 2013 until November of 2017 as a psychologist,
17      at which time I took my current position which is
18      the program manager for community-based treatment
19      for sexual abuse prevention services, and I've been
20      in that role since.
21   Q. And where are you based?
22   A. Lansing, Michigan, is my office location.
23   Q. And can you describe for us sort of the specifics
24      of your current job responsibilities that you've
25      been doing for the past several years?
                        Page 9
```

```
 1   A. Yep, you're speaking to my current role.  Correct?
 2   Q. Yes.
 3   A. Okay.  So as part of my current role, my job is to
 4      oversee variety, presently six different contracts,
 5      across the State of Michigan with contracted
 6      vendors to provide sex offender treatment for those
 7      individuals that are on parolee and probation with
 8      a history of engaging in sexual abusive behaviors.
 9      So I do a lot of quality assurance and training of
10      those staff, as well as training of probation
11      agents.
12   Q. Okay.  And let me ask again the same questions I
13      asked before about the chain of command of your
14      unit and in the structure of your unit.  So let's
15      start with the second.
16             Where in the department does your unit
17      fit?
18   A. I'm a direct report to James Kissinger, who is the
19      state administrative manager for sexual abuse
20      prevention services.  He reports to mental health
21      director, David Dawdy, who is the direct report to
22      our health care services administrator,
23      Marti K. Sherry.
24   Q. And does your unit oversee probation and parolee in
25      any way after people leave prison?
                        Page 10
```

```
 1   A. So my unit is specifically targeted towards sexual
 2      abuse prevention treatment, and so I work alongside
 3      field office administration staff, so parolee and
 4      probation agents.
 5             But my role is specifically related to
 6      the treatment and consultation regarding risk for
 7      individuals treatment, and risks for individuals
 8      who are currently on parolee and probation in the
 9      State of Michigan.
10   Q. All right.  You said that you have a number of
11      contracts, or you oversee a number of contracts.
12             Is this with vendors or providers that
13      might have lots of people working for them, or are
14      these individual contracts with, you know,
15      psychologists or social workers who are doing work?
16   A. So presently we have six contracts with six
17      different agencies across the State of Michigan.
18      There are presently 54 clinical staff, so 54
19      therapists that provide sex offender assessment and
20      treatment services across the state that directly
21      work for those contracts that I supervise.
22   Q. And is this in addition to the contract positions
23      that James Kissinger was describing, or are these
24      included -- Is this what he was prescribing?
25   A. This is separate from the services that are
                        Page 11
```

```
 1      provided within the facilities.  Some of those
 2      vendors may provide some staff, but those will be
 3      different staff than those that I supervise as part
 4      of this contract work.
 5   Q. All right.  So yours is totally looking at the
 6      outside, and what he was talking about would have
 7      been people coming in?
 8   A. Correct.  Correct.  The realm of my work is
 9      specifically tailored to individuals on parole and
10      probation.
11   Q. All right.  I should tell you that I -- I was
12      somewhat misled by the policy directors or
13      operating procedures to believe that a fair number
14      of Static-99's were done at probation and parole,
15      and so I had prepared a lot of questions for you
16      about how that process worked.
17             And I'm now learning is it doesn't,
18      right, because that's not where most of the
19      Static-99's are done; they're done at arrival, and
20      we got a pretty detailed view of what that looks
21      like.  But that shortened your deposition a lot.
22      What I wanted to do, therefore, is go straight --
23   A. Can I give a clarification on that?
24   Q. Sure.
25   A. The individuals who do not come into prison and are
                        Page 12
```

3 (Pages 9 to 12)

COREY SPICKLER
1/26/2023

### Page 13

```
 1       on probation, Static-99's are completed in the
 2       community.
 3   Q.  Oh, okay.
 4   A.  It would not be at the time of the PSI, but it
 5       would be at the time of treatment essentially.  So
 6       there are Statics completed in the community.
 7   Q.  All right.  And what you're saying is if somebody
 8       gets probation, the Static-99 will be done
 9       how -- how quickly after the sentence typically?
10   A.  I don't know if I can speak to how quickly after
11       the sentence.  I can only speak to the point in
12       time at which they're referred to treatment.
13   Q.  All right.  And what would be the triggering event
14       from referal to treatment?
15   A.  Typically that is a special condition placed on
16       their order requiring treatment under community
17       supervision.
18   Q.  And I want to make sure we're talking about the
19       same thing.  I'm talking now about people who never
20       get to prison, but are released on probation.  And
21       it sounds like if there's going to be a referral
22       for some kind of treatment, that has to come out of
23       a process, I assume, post-conviction -- or
24       post-conviction but possibly presentence; is that
25       right?
```

### Page 14

```
 1   A.  I'm not exactly sure on the timeline of when those
 2       decisions are made as far as differentiating
 3       between pre-sentence and post-conviction.
 4   Q.  All right.  And who makes the decision that
 5       treatment is going to be required?
 6   A.  Are you speaking specifically for parolees,
 7       probationers --
 8   Q.  Yeah, I'm still talking just about probation,
 9       people who never got to prison.
10   A.  I believe that would be a question that need to be
11       answered by our sex offender management unit.
12   Q.  Okay.  All right.  So what you're saying is if
13       somebody comes in that's charged with a felony, but
14       it's mild enough or it's a first offense, whatever,
15       and they're not going to go to prison, at some
16       point in the evaluative process that results in the
17       production of the PSI and then sentencing.
18           Somebody will look at that and say,
19       this is someone that while on probation we want to
20       have programming of some kind, and when that
21       occurs, if it's sexual offense programming, those
22       people are going to get a Static-99 assessment; is
23       that right?
24   A.  As part of the intake process for sex offender
25       treatment in the community, those individuals
```

### Page 15

```
 1       meeting scoring criteria do receive a Static-99R as
 2       part of that intake assessment.
 3   Q.  And as for the people inside, do they's get
 4       something that's the equivalent of a risk
 5       assessment?
 6   A.  We completed what we call evaluation for treatment
 7       and supervision, which is similar in nature to a
 8       sex offender risk assessment completed for
 9       individuals who are incarcerated.  It does include
10       additional factors that may be relative toward
11       protective factors and risk-relevant information
12       that would be present for somebody on supervision.
13   Q.  And that's because they're in the community as
14       opposed to being --
15   A.  Correct.  Correct.
16   Q.  Okay.  But what you're telling us is anybody who is
17       going to get treatment while on probation,
18       treatment of a sexual nature, they too are going to
19       get fully screened -- not screened -- fully
20       assessed both with a risk -- an evidence-based
21       research tool, and with a clinical add-on
22       assessment?
23   A.  For those that meet the scoring criteria for the
24       assessment --
25   Q.  You're well taught.  You're as careful as James was
```

### Page 16

```
 1       to make sure that we're adhering to the
 2       requirements of the -- Okay.
 3           And what about people coming out on the
 4       back end of prison terms; we know that they get a
 5       new Static-99 both because they may have aged into
 6       a new category, and as a way of guaranteeing that
 7       the original one which would be years or decades
 8       old has been properly scored.
 9           And so when they get out on parole,
10       are -- who decides whether or not they need
11       programming while they're on parole?
12   A.  Typically that is reserved for individuals who are
13       given special condition 1.5 as a part of their
14       parole conditions.
15   Q.  And what does 1.5 say?
16   A.  Requirement for sex offender treatment as approved
17       by -- I don't know the exact wording for it, but as
18       a recommendation for sex offender treatment.
19   Q.  Yeah, I wouldn't hold you to the exact wording.
20       And I take it that would probably come out of
21       psychologists who did the -- any updated
22       psychologists or psychiatrists who did any updated
23       parole review -- re-evaluation for parole review;
24       is that right?
25   A.  I think that would be a question that would need to
```

4 (Pages 13 to 16)

**Page 17**

```
 1    be addressed through the -- the parole board.  It's
 2    not something I would be able to specifically speak
 3    to, why those special conditions are placed on
 4    somebody and why they're not on other individuals.
 5  Q. Yeah, okay.  All right.  But it's not as if the
 6    parole board is making it up on their own; they're
 7    going to have to review the whole file and
 8    someone's going to assist, and they're going to say
 9    here's what this person needs, someone who has been
10    treating or someone who has been assessed; is that
11    right?
12  A. Again, I'm not knowledgeable on this specific
13    criteria and/or why the parole board would make a
14    determination to place someone in sex offender
15    treatment versus not as a part of their community
16    supervision.
17  Q. Again, sex offenders -- again, we don't want to use
18    that term -- people who have committed sex
19    offenses, registrants, who arrive in the community,
20    do you have a sense of the approximate percentage
21    of the number of people on parole with a sex
22    offense who are doing treatment, or for whom
23    treatment has been mandated?
24  A. I don't have any aggregate numbers as far as how
25    many people are of the, you know, comparing the
```

**Page 18**

```
 1    total population of individuals currently on
 2    community supervision and those that are actively
 3    in treatment, so I don't have anything to speak to.
 4  Q. Let me ask then, say for the current year, for
 5    2022, how many were actively in treatment, because
 6    then we can go look at how many were on parole, and
 7    that way we would be able to get those numbers?
 8  A. So --
 9         MS. HEYSE:  Are you asking for raw
10    numbers, Paul?
11         MR. REINGOLD:  I'm going for the
12    approximate percentage -- yes, I'm asking for the
13    number of people that are being served annually.
14         MS. HEYSE:  Okay.  So those
15    are -- again, we're talking about the numbers, and
16    that would be something that the folks in
17    research -- so those are the numbers you're having
18    pulled, then you need to speak with the other MDOC
19    representative about data and research.  They deal
20    in the numbers game.  So I don't think that Corey
21    is going to be qualified to speak to actual
22    numbers.  So I'm going to, you know, I think he
23    just --
24         MR. REINGOLD:  All right.  So if we do
25    a supplemental request to you, is that something
```

**Page 19**

```
 1    that we can get?
 2         MS. HEYSE:  Well, you're -- I'm not so
 3    sure that you're not going to get that in the data
 4    you guys are requesting anyway, but if it's
 5    something you're not going to get, Paul, we can
 6    talk about that.  I'm just telling you, these folks
 7    are not the people that would be able to provide
 8    that information to you.
 9         MR. REINGOLD:  Okay.
10  BY MR. REINGOLD:
11  Q. Let's go back to people in either one, whether it's
12    probationers who are out or parolees who are out,
13    and for whom treatment has been mandated, can you
14    give us just a quick overview of what that looks
15    like and what the newly done Static-99 -- what work
16    the newly done Static-99 is doing in that process?
17  A. Can you clarify what you mean by "newly done
18    Static-99?"
19  Q. Well, the people who are coming out on probation
20    are having -- just had a first Static-99 done
21    presumably, and people coming out of parole just
22    had a second Static-99 done.
23         And what I'm asking is what function
24    does it serve for the people who are leaving prison
25    and going into the kind of treatment that your unit
```

**Page 20**

```
 1    is providing?
 2  A. So for both of those populations, the Static-99 for
 3    treatment purposes, which is what I can speak to,
 4    determines what treatment track.  So the intensity
 5    and duration of treatment in the community is
 6    determined by that Static-99R and Stable-2007 over
 7    all priority risk.
 8  Q. All right.  I neglected to ask about the Stable, so
 9    I should include that.
10         Are both the probationers and parolees
11    also getting a Stable -- what is it,
12    Stable 70 -- what's the number with the Stable?
13    I'll call it the Stable.  Are they getting both of
14    those?
15  A. For those individuals who meet scoring criteria for
16    the Static-99R and the Stable-2007, they are
17    receiving those evaluations upon intake into
18    community-based treatment.
19  Q. Okay.  That's -- That's very helpful.  Okay.  All
20    right.  I think the treatment itself is -- I just
21    want to know a little bit about it.
22         You said what people get is based
23    on -- or can be based on their score on the
24    Static-99.  What does the treatment itself look
25    like; is it this a kind of psychotherapy, is it a
```

5 (Pages 17 to 20)

COREY SPICKLER
1/26/2023

Page 21

```
 1    group therapy; you know, again, a quick overview of
 2    the kinds of programs that are being provided.
 3 A. Sure. So it is an extension of our prison-based
 4    sexual abuse prevention program, and it follows a
 5    similar line of treatment in that it is cognitive
 6    behavioral based. It is based on the risk need
 7    responsivity model for providing criminogenic
 8    interventions to reduce recidivism.
 9         We follow the good likes model, and we
10    place individuals into treatment for -- as group
11    therapy, also includes individualized therapy for
12    those that fall into the treatment tracks that have
13    individualized treatment.
14         Then we place individuals according to
15    that assessed risk, to effectively reduce
16    criminogenic risk over the course of treatment
17    according to the Counsel of State Government's
18    recommendations.
19 Q. All right. If somebody coming out on probation is
20    in Static-99 category 1, 2, or 3, which would not
21    get them treatment inside, but for whatever reason
22    the parole board says, you know, we want the person
23    to have treatment, I assume that person gets
24    treatment despite the -- the relatively long score
25    on the Static-99; is that right?
```

Page 22

```
 1 A. Are you referring to individuals in the community,
 2    or are you referring to --
 3 Q. Yes. Yes. Yeah.
 4 A. So we have treatment tracks established for
 5    individuals who score levels risk 1, 2, and 3, for
 6    community-based programming for both parolees and
 7    probationers.
 8 Q. Okay. So the scoring doesn't have as -- it's not a
 9    disqualifier, it simply leading to a different
10    level of treatment?
11 A. The treatment tracks are established per the
12    services we provided based on that risk level.
13 Q. Yeah. And is it true -- I assume -- that the lower
14    the risk level, probably the shorter the duration
15    of the treatment and the lower intensity of the
16    treatment?
17 A. In most cases, yes, but we also take into
18    consideration responsivity factors to treatment.
19 Q. All right. So you can override those if -- if
20    somebody needs longer term treatments?
21 A. There's a clinical -- There's a clinical review
22    process to determine appropriate reduction of risk
23    over the course of treatment.
24 Q. Okay. And about how long do the treatments last?
25 A. For our level 1 and 2 risk individuals, we provide
```

Page 23

```
 1    didactic treatment which is roughly 9 sessions of
 2    psychoeducational treatment primarily focused on
 3    community reintegration with some focus on risk.
 4         For level 3 we have 26 to 39 sessions
 5    which typically span 6 to 9 months of treatment.
 6    And for level 4A and 4B we provide one year or
 7    52 sessions of intervention in the community.
 8 Q. And I take it this is the kind of programming that
 9    if they're not cooperative, that can be a parole
10    violation; is that right, a parole or probation
11    violation?
12         MS. HEYSE: If you know.
13 A. Unsuccessful discharge from treatment can but does
14    not always lead to a parole violation.
15 Q. Okay. All right. So for example, there are some
16    people who just can't do it, don't have the
17    capacity, and then there are people who, say,
18    refuse or are uncooperative or disruptive in a way
19    that they can control; are those the kinds of
20    measures that we're talking about?
21 A. There are a myriad of differences between
22    individuals that would lead to further discussion
23    amongst a treatment team to determine what the best
24    course of action would be to successfully reduce
25    reduction and promote success while under the
```

Page 24

```
 1    community supervision.
 2         So I don't know if I can -- Each person
 3    is different. We don't typically look at cases in
 4    broad strokes, and we look at specifically what's
 5    going on with that individual to determine what is
 6    best for their long-term success.
 7 Q. Okay. All right. I want to pick up where we left
 8    off with James Kissinger about the use of the
 9    Static-99 once people arrive in the community.
10         He was referencing the time free -- the
11    post-release time free in the community factor.
12    And I believe what he said was that the Static-99R
13    developers have found time free in the
14    community -- I'm not sure this is what was said
15    exactly -- but what I understood was the time free
16    in the community could be a sufficiently strong
17    indicator that they could change a person's score
18    in addition to, or along the same lines as the way
19    age can change a person's score; is that right?
20         MS. HEYSE: Just so we preserve the
21    record, I'm going to object to form and foundation.
22    But you can go ahead and answer, Corey.
23 A. Sure. So the authors of the Static-99R and
24    Stable-2007 have developed a chart, table -- I
25    don't know how you want to identify that -- looking
```

6 (Pages 21 to 24)

COREY SPICKLER
1/26/2023

### Page 25

1  at years time free, both sexual and violence free
2  in the community, to look at desistance when
3  looking at what relative risk categorization
4  someone has been placed in.
5        So over time the varying risk levels
6  based on time free in the community, we're finding
7  that they recidivate at lower and lower rates the
8  longer they've been free in the community. That's
9  what that chart speaks to is what risk can we
10 perceive them to be given the amount of time
11 they've spent in the community without engaging in
12 urgent sexual and/or violent behavior.
13 Q. All right. And the point of desistance, how is
14 that defined, if you know?
15 A. Are you asking me to define the term desistance or
16 how it's being used in this context?
17 Q. I mean, how do the developers use it? Let me ask
18 it a different way. Maybe you can tell me if I'm
19 right or wrong.
20       My understanding of desistance is that
21 when someone reaches the point that other
22 males -- reaches the point when their risk factor
23 drops equal to or below other males whom we don't
24 require to be monitored.
25 A. I would say in this context when we're looking at,

### Page 26

1  as noted, bins -- right -- this is all based on
2  relative risk. So the likelihood someone who looks
3  like you and has the same or similar criminal
4  background history of convictions, and types of
5  offending or characteristics of offending, is
6  likely to commit another sex offense over a
7  predetermined period of time. With a Static-99
8  typically those are typically five-year recidivism
9  rates.
10       So with the Static we place people in
11 these -- for lack of a better term -- bins. So
12 many individuals who are placed in said bin are
13 likely to recidivate in a sexual fashion over a
14 five-year period of time before using the five-year
15 recidivism rates.
16      So this desistance table, or this
17 time-free calculation table, says you no longer
18 look like and will recidivate at a rate as is
19 assessed by your overall priority risk level. Now,
20 your rate of recidivism has dropped to -- depending
21 on how long they've been free in the community -- a
22 different bin. Does that make sense?
23 Q. Yeah, that -- that makes sense.
24      So what you're saying is at different
25 points post-release, they can be reassessed and

### Page 27

1  rescored on the Static-99, and at some point they
2  will fall into the category where their risk level
3  is the equivalent to other people in the
4  community -- either males in the general population
5  or released prisoners who never had a sex
6  offense -- their risk level will be comparable to
7  those people and, therefore, they will be deemed to
8  have attained desistance because the risk is
9  indistinguishable from other people in the
10 community who aren't supervised in any way,
11 something like that?
12       MS. HEYSE: Objection, form and
13 foundation, but you can answer.
14 A. So no, I wouldn't say that for all
15 individuals -- so first, we never rescore the
16 Static. The Static risk is what it is until
17 further -- until -- So age is the one item on the
18 Static that can change. At point of release, that
19 is the age we look at; age at release to risk on
20 the Static-99.
21      At this point in time, whatever age
22 they are, so they -- you noted before they might be
23 scored, it's been 30 years in prison, we're scoring
24 that, ensuring that that risk is accurate at the
25 time of release.

### Page 28

1       The Static, unless they engage in
2  further sexual misbehavior, sexual criminal
3  behavior, we are not rescoring that Static at any
4  point in time to determine that -- we wouldn't say
5  we're rescoring the Static because they've been out
6  ten years. Your Static risk is what it is.
7       We know based on research that an
8  individual who, let's say, scores a level 3 at time
9  of release, will recidivate at level 2 levels over
10 a 5-year period of time at said time post-release.
11 And after longer in the community, that person will
12 recidivate, commiserate with individuals who
13 recidivate at a level 1 for a predetermined period
14 of time.
15       So that desistance table marks people
16 across time, and even though they were a level 4A,
17 now their recidivism rate over this period of time
18 looks a lot more like a level 3, and after a longer
19 period of time that they've, again, the recidivism
20 rating looks like a level-2 individual.
21 Q. All right. Yes, that makes sense to me. I'm not
22 sure if I agree or not, but we'll press it and see.
23      You also said that the norming -- or
24 the research on which this is based is based on
25 there being a Static-99 at this point of release,

7 (Pages 25 to 28)

COREY SPICKLER
1/26/2023

**Page 29**

1  and so that's -- I take it that's another reason or
2  another really important reason why the Static-99
3  is given to everybody, or almost everybody, at the
4  point of release, because it allows you to use
5  these tables and understand their risk, or their
6  category risk, going forward; is that right?
7  A. Sexual Abuse Prevention Services uses that
8  primarily for placement into treatment, and to
9  determine how much intervention they need to
10 effectively reduce risks for community-based
11 programming for those individuals on parole and
12 probation, how much treatment they need based on if
13 they've never had treatment before,
14 prior -- post-committing this offense, how much
15 treatment do they need to reduce risk for those
16 individuals who have had treatment previously, we
17 take that into consideration, and that's why we're
18 using risk assessment, is to place people in
19 treatment.
20 Q. But it has the salutary collateral effect of being
21 able to then score people using the desistance
22 tables, right, because everybody has got a point of
23 release Static-99?
24 A. The desistance table would be able to be used
25 depends on how much time someone has been free in

**Page 30**

1  the community.
2  Q. Yeah, okay. Isn't it true that some people in
3  level 1 will be low enough that they will be viewed
4  as having reached desistance the day they walk out
5  the door from prison?
6  A. Are you -- How are you defining "desistance" in
7  this instance?
8  Q. As I just described it. The point where, according
9  to Hanson, their category risk level or their
10 score -- I think it's actually tied to the
11 score -- their score puts them at a risk level
12 that's equal to or lower than other
13 people, everybody else in the community who are not
14 subject to any kind of supervision.
15 A. So I -- I -- I want to clarify to make sure I'm
16 understanding what you're asking. You're saying
17 are there individuals who are scored on the
18 Static-99R whose risk of recidivism would be that
19 of the general population?
20 Q. Yes, upon the day they leave.
21 A. Level -- Without need for treatment or intervention
22 is -- I just want to clarify -- that their rate of
23 their recidivism is that of the general population.
24 Is that how you're defining desistance?
25 Q. I said the general population or prisoners who have

**Page 31**

1  been released and did not have a sex offense and
2  also did not have any supervision?
3  A. So those two populations engage in sexual offending
4  at different rates.
5  Q. Yes, that's right. But not by much. Yeah.
6  A. So --
7  Q. I believe the tables are based on the rate -- the
8  slightly higher rate of people who committed a
9  non-sex offense and have been released, because
10 Hanson is as careful as you are being to make sure
11 that his research matches, and he's looking at
12 recidivism rates, and technically only someone who
13 has been in prison can have a recidivism rate.
14 A. Correct.
15 Q. But he's also said that the same thing applies to
16 the general population, although that percentage
17 number is slightly lower.
18 A. There are individuals who score out on the
19 Static-99 who are no more likely to commit a sex
20 offense than the general criminal population as a
21 whole without a history of sexual offending. I
22 guess that's the best way I can answer that
23 question.
24 Q. No, I understand.
25    And isn't it also true that 10 to

**Page 32**

1  13 years out, the majority of registrants will have
2  also attained a desistance level of risk?
3  A. I would have to refer to that desistance table to
4  be able to speak to, and particularly what you mean
5  by "majority."
6  Q. Well, I mean more than 50 percent.
7  A. I would have to refer to the research, the
8  desistance table, and the Static-99, our coding
9  manual, to be able to speak to that.
10 Q. All right. And the final question on rates like
11 this is, isn't it true that in recent years they've
12 discovered that even the highest risk people whom
13 the experts I think were surprised to learn that
14 even they researched desistance after 20 years and
15 are not actually high risk forever; is that correct
16 do you know?
17    MS. HEYSE: Paul, I'm going to object.
18 I think I let this go quite a bit, but we're
19 getting into official positions about, you know,
20 research that you guys clearly all know about, but
21 I don't think was kind of noted on the topics.
22    I mean, I get that it's you know,
23 topically related but, again, it's a difference if
24 you're asking Corey in personal capacity, or
25 whether you're asking from an official position

8 (Pages 29 to 32)

COREY SPICKLER
1/26/2023

### Page 33

           from MDOC. And I don't think the MDOC has taken a
           position on the research of the recidivism rate
           today.
                  MR. REINGOLD: I'm only asking in his
           capacity if someone well-trained and knowledgeable
           about the Static-99, which includes the timeframe
           and community.
                  MS. HEYSE: Yeah, but that's not how
           30(b)(6) depositions work. When you're asking for
           this individual to come and represent the MDOC,
           again, it's on the topics, and in your topics it
           doesn't say we're going to talk about the validity
           of the research, the current research that's out
           there.
                  And, you know, prior to that topic we
           could have had a discussion as to whether or not
           the official MDOC position was clear, and then we
           can communicate that. Right. The difference
           between -- and again, we're blurred the lines quite
           a bit today.
                  There's a difference between
           Corey Spickler's position or the MDOC's position
           officially, and we're not prepared to respond to
           the validity of the research or MDOC's position
           with regard to the validity of that research today.

### Page 34

           We were talking about risk assessments,
           how they were conducted, what, you know, results
           were of those, those types of questions. So I'm
           going to ask that we not delve into this, and if
           you, you know, want to proceed with this line of
           questioning, then I think we have to determine who
           is going to be designated to address those
           questions.
                  That's the whole point of 30(b)(6)
           topic, is so that the MDOC can say this is the
           person we want to speak to that. Right?
                  MR. REINGOLD: On this one I disagree,
           because I feel like you said earlier that we should
           focus on the Static-99, and that you brought before
           me the two people who knew the most about
           Static-99. Now I'm asking a question about the
           Static-99 and not about MDOC policy. Let me
           reframe the question and see if it will satisfy
           you.
                  MS. HEYSE: No. If you can point me to
           one of these topics here that actually talks about
           speaking to current research or MDOC's position
           with regard to research or rates of recidivism or
           this, you know, desistance table, you know, then
           I'm happy to continue the discussion.

### Page 35

           MR. REINGOLD: I don't see how this
           could be more central to having before me an expert
           on the Static-99. Let me try reframing it and see
           if it works.
                  MS. HEYSE: Okay.
                  MR. REINGOLD: This will be the last
           question about it.
        BY MR. REINGOLD:
        Q. All I'm asking about it is, is it your
           understanding from your training with the Static-99
           that using the desistance tables after 20 years,
           everyone reaches desistance?
        A. "Everyone" is a very umbrella term to describe
           that.
        Q. Let me put it a different way.
                  Isn't it true that Hanson, et al., view
           everyone who has attained 20 years as having
           desistance risk; they stopped following him because
           there were no crimes left look at?
        A. I would need -- There's a -- There's a new study
           published in 2023 looking at 20-year rates. I'm at
           this time not prepared to speak to the entirety of
           that 20-year outlook outcome study to speak to
           whether all individuals had reached desistance.
        Q. All right. One final question on this topic. If

### Page 36

           it isn't all, is it damn close?
                  MS. HEYSE: I'm going to object. I
           think you're asking the same question in a
           different format, Paul, so I think asked and
           answered. And again, I think he's made it clear
           that he's not in a position to make that
           determination in order to respond to that question.
        Q. Can you respond to the question?
        A. I would respond the same as the previous question.
           There is a new meta-analytic study that was
           published this year looking at a study for
           20 years, and I would need to spend some time in
           that report to speak to it in a professional
           manner.
        Q. Okay. So for the people who come out of prison and
           go on parole and are required to have any kind of
           programming -- Well, first of all, everybody
           getting out not only has been evaluated at the
           front end, and then in the available program during
           their time in prison, but they get another
           Static-99, and if they qualify for it, a Stable on
           their way out.
                  And some of those people then get
           treatment, which to me means that by the time they
           come off parole, the amount of assessment and

9 (Pages 33 to 36)

COREY SPICKLER
1/26/2023

**Page 37**

```
 1    treatment they've got is even more robust than it
 2    was when they left prison; is that fair to say?
 3              MS. HEYSE:  Object to form and
 4    foundation, but you can answer.
 5  A.  So I want to clarify that you're asking following
 6    release to the community for those individuals who
 7    had assessment and treatment in the -- in the
 8    prison system?
 9  Q.  Yeah.
10  A.  Would we say they've had more treatment -- more
11    robust treatment?  I'm just wondering if you can
12    kind of clarify that question a little bit, what
13    you're specifically asking there.
14  Q.  Yeah.  The point I'm trying to make sure
15    I -- I -- I understand is that this is -- this is
16    an add on.
17              So whatever everybody got in prison,
18    these are folks who are getting more.  If you're
19    just leaving you're going to get a Static-99, but
20    it sounds like if you're leaving and you're going
21    to get treatment, you're going to get a Static-99
22    and a Stable, and you're then going to have the
23    treatment.
24              And so there's significant both
25    reassessment and additional treatment for this
```

**Page 38**

```
 1    group of people; is that a fair characterization?
 2  A.  The entire process under Sexual Abuse Prevention
 3    Services is to follow evidence-based practices
 4    regarding assessment, treatment, and over the
 5    course of receiving treatment, reassess changes in
 6    dynamic risk and dynamic need, so that by the end
 7    of the program -- whether that be receiving
 8    treatment in prison, treatment in the community, or
 9    those individuals who do need criteria for
10    treatment while they're incarcerated and then get
11    treatment in the community on parole -- to have
12    addressed the dynamic risk and dynamic needs
13    present identified in the Stable-2007 to have
14    provided an adequate time, as far as number of
15    hours and group and individual treatment, to meet
16    the Counsel of State Government's recommendations
17    for how much treatment someone should receive based
18    on their overall priority risk categorization.
19  Q.  And are you aware of any studies that the
20    Department of Corrections has done that would
21    validate the effectiveness of the
22    post-incarceration or probation treatment that's
23    being provided?
24  A.  I am not aware of any studies the research
25    department has completed looking at recidivism
```

**Page 39**

```
 1    rates based on programming.
 2              MR. REINGOLD:  All right.  I want to
 3    take a two-minute break just to see if my
 4    co-counsel has any extra questions she wants me to
 5    ask, and if not we'll wrap it this up.  Okay?
 6              (Off the record at 2:02 p.m.)
 7              (On the record at 2:04 p.m.)
 8              MR. REINGOLD:  I do have just a couple
 9    of questions if everybody is back.
10  BY MR. REINGOLD:
11  Q.  You corrected me a bunch of times about who isn't
12    qualified for the Static-99, and I would like to
13    get a clearer picture of what groups are included
14    in that.  I know that women can't use the
15    Static-99, and I know that there's an age of
16    offense that -- or age at the time of offense.
17              Can you outline the groups or the
18    cutoffs so we know who is not getting the Static,
19    please?
20  A.  So specifically those individuals that are not able
21    to be coded on the Static-99 per manual guidelines;
22    that's what you're referring to?
23  Q.  Yeah, and I want to know what are those manual
24    guidelines, who --
25  A.  Sure.  So this is quite an extensive description.
```

**Page 40**

```
 1    I'll refer at times to -- to the manual to do this.
 2  Q.  That's fine.
 3  A.  Individuals who are juveniles and committed their
 4    offense prior to the age of 17 are not able to be
 5    coded.  There's a small subset of individuals who
 6    are age 17 at the time they committed their
 7    offense, but were sentenced and released to risk or
 8    released to the community, whether that be parole
 9    or probation at the age of 18 or later that are
10    able to be coded, but there has to be some very
11    specific features -- which I can walk through as
12    many of those as possible, but there might be a few
13    that I miss -- but really they're offending has to,
14    in a nutshell, look like an adult-like offense.  It
15    has to have characteristics of an adult-like
16    offense.  Not something we see very often, but
17    there is a caveat there.
18              Most individuals who are coded on the
19    Static-99 have committed their offense at the age
20    of 18 or later.  There's a distinction between
21    category A and category B offenses on the
22    Static-99R.
23              Typically, it's not a great word to
24    use, but we use -- we'll use the term "identifiable
25    victim."  That is very clearly defined in the
```

10 (Pages 37 to 40)

COREY SPICKLER
1/26/2023

**Page 41**

1  manual what is considered an identifiable victim
2  for the purposes of the Static-99R.
3    But we have a difference between
4  category A and category B offenses. Category B
5  offenses I can give you an example of a couple of
6  them, but I'm probably not going to off the top of
7  my head be able[ to give an exhaustive list.
8    Urinating in public, possession of
9  child sexually abusive materials, public sex with a
10 consenting partner, and there are others. Some
11 soliciting-type offenses can fall into both
12 categories.
13   So cases where there is an identifiable
14 victim that meet the criteria for category A
15 offenses are codable, so there are subsets. We
16 can't score it on female offenders, can't score it
17 on juveniles.
18   It was normed on a variety of
19 populations and has continued to be renormed. So
20 we got into some of those discussions on gender
21 identity, and there is specific information that we
22 know that speaks to at what point in time would
23 someone no longer be considered male, because we
24 can only score this on males.
25   But there's a long list of criteria,

**Page 42**

1  fairly exhaustive, and they've continued to update
2  this as they update the manual, but those would be
3  some of the examples. I don't know if you want me
4  to further elaborate.
5  Q. No, that that's fine. It sounds like there's some
6  very clear lines, and then for a small number of
7  people cases on the margin so that it might be a
8  closer call, and you're not sure or they're not
9  sure, and they're realizing as they go. Okay.
10   I think -- I think I'm going to wrap it
11 there. I think -- Let me just take one more look.
12   Do you have any connection with parole
13 reporting?
14 A. What do you mean by that, with parole reporting?
15 Q. Do you have any knowledge of parole reporting
16 relating to registrants?
17 A. You mean like the -- their supervision requirements
18 and reporting to a parole officer?
19 Q. I was thinking the methods for parole reporting?
20 A. My interaction with parole primarily relates to
21 treatment and risk.
22   MR. REINGOLD: Yeah, okay. All right.
23 I think -- think we're done.
24   MS. HEYSE: I don't know if
25 defense -- I don't have anything. I don't know if

**Page 43**

1  Defense Counsel has anything.
2    MR. DAMICH: Actually, I do have a
3  couple followups, and it will be very quick.
4         EXAMINATION
5  BY MR. DAMICH:
6  Q. I'm Scott Damich. You were here for the previous
7  deposition, and much like Mr. Clark, I'm an
8  assistant attorney general with the State of
9  Michigan, and I represent the Defendants in this
10 matter.
11   I want to go back to the topic of the
12 use of Static-99 for those offenders who re-entered
13 the community. And just to be clear, that's
14 required by court order for sex offender treatment;
15 is that correct?
16 A. Are you indicating that per court order they have
17 to have a Static-99R completed?
18 Q. Yes.
19 A. I am not sure about that. I do know within our
20 contracts in the community we require -- so it is
21 required that if a parolee or probation agent is
22 going to send someone to sex offender treatment,
23 they come to a contracted vendor in the state. We
24 require under our contracts that if they are
25 scorable on a Static or Stable, that is completed.

**Page 44**

1  Q. Okay. Does it have anything to do with whether or
2  not they have to register on the Michigan Sex
3  Offender Registration Act?
4  A. We don't take that into consideration at all. We
5  have individuals that don't have to register that
6  we complete those evaluations on because we follow
7  the guidelines based on behavior. We don't take
8  registration into consideration at all.
9  Q. Okay. I'm happy to bring that up because it leads
10 me to my second question, or series of questions.
11   Whether an individual can be scored on
12 a Static-99, is it true that it requires the
13 conviction contained an element of a sexual crime
14 or --
15 A. It requires a -- For the Static-99 it requires
16 being charged --
17 Q. Yes?
18 A. -- with a crime where there were scorable elements
19 within that. So they might have pled out, or might
20 have had something else, or even they might have
21 been initially charged with assault. But if we
22 really read what's going on in that case, that a
23 sex offense occurred, if they were charged and that
24 information was included in a police report or a
25 PSI, we can score the Static.

11 (Pages 41 to 44)

COREY SPICKLER
1/26/2023

```
 1        MR. DAMICH:  Perfect.  That's all the
 2   questions I had.  Thank you.
 3        MR. REINGOLD:  Thanks for clarifying,
 4   and I think we are all dismissed.
 5
 6
 7        (The Examination was concluded at
 8        2:12 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 45

```
 1              CERTIFICATE
 2   STATE OF MICHIGAN  )
                        )
 3   COUNTY OF MACOMB   )
 4
 5        I, Gina Deskiewicz, a Notary Public
 6   in and for the above county and state, do hereby certify
 7   that this deposition was taken before me at the time and
 8   place hereinbefore set forth; that the witness was by me
 9   first duly sworn to testify to the truth; that this is a
10   true, full and correct transcript of my stenographic
11   notes so taken; and that I am not related, nor of
12   counsel to either party, nor interested in the event of
13   this cause.
14
15
16
17
18
19
20   _____
     Gina Deskiewicz, CSR-9689, RPR.
21   Notary Public
     Macomb County, Michigan
22   My commission expires June 14, 2027
23
24
25
```

Page 46

12 (Pages 45 to 46)

Tri-County Court Reporters
248-608-9250