# Exhibit 136:

*Does I* Joint Statement of Facts,
No. 2:12-cv-11194, R. 90

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN DOES #1-5 and MARY DOE,

                      Plaintiffs,

v.

RICHARD SNYDER, Governor of the
State of Michigan, and COL. KRISTE
ETUE, Director of the Michigan State
Police, in their official capacities,

          Defendants.

File No. 2:12-cv-11194

HON. ROBERT H. CLELAND

Mag. Judge DAVID R. GRAND

_____

**JOINT STATEMENT OF FACTS**

i

# TABLE OF CONTENTS

I.     INTRODUCTION AND TERMINOLOGY ....................................................1

II.    STATEMENTS OF LAW..........................................................................2

    A.  The Historical Evolution of SORA ............................................2

    B.  SORA Requires Offense-Based Registration ............................7

    C.  Summaries of the SORA Statute................................................8

III.   THE PLAINTIFFS ...................................................................................9

    A.  John Doe #1.............................................................................9

    B.  John Doe #2...........................................................................13

    C.  John Doe #3...........................................................................19

    D.  John Doe #4...........................................................................24

    E.  John Doe #5...........................................................................27

    F.  Mary Doe ..............................................................................33

IV.    THE DEFENDANTS ..............................................................................38

    A.  Governor Richard Snyder ......................................................38

    B.  Colonel Kriste Etue ...............................................................39

V.     THE PURPOSE OF SORA.....................................................................39

VI.    THE MICHIGAN REGISTRY AND THE SOR DATABASE .....................41

    A.  The Size of Michigan's Registry ............................................41

    B.  The SOR Data Management System ........................................41

    C.  OffenderWatch.......................................................................43

VII.   THE FEDERAL SEX OFFENDER REGISTRATION AND
    NOTIFICATION ACT.............................................................................46

    A.  SORNA and Federal Funding.................................................46

    B.  SORNA and Substantial Compliance ......................................51

    C.  The Legislative Process of Drafting the SORA 2011 Amendments...........52

VIII.  RETROACTIVITY.................................................................................56

    A.  Retroactivity and Tier Structure.............................................56

    B.  Retroactivity and Substantial Compliance with SORNA ..........58

i

IX. RESEARCH ON LIFETIME REGISTRATION AND RECIDIVISM RISK ...........................................................................................59

    A. Variations in Recidivism Risk ..................................................60

    B. Risk Prediction Based on Clinical Risk Assessments Versus the Offense of Conviction ...........................................................64

    C. Research on the Comparative Risk of Non-Sex Offenders and Sex Offenders ..............................................................................71

    D. Research on Whether Tier Classifications Correspond to Risk ................76

    E. Use of Risk Assessments to Design Supervision Strategies at the Michigan Department of Corrections ........................................77

X. GEOGRAPHIC ZONES ...........................................................80

    A. The Size of Geographic Zones ...................................................82

    B. The Impact of Different Measurement Methods on the Shape and Size of Geographic Zones .........................................................87

    C. Defendants' Understanding of the Geographic Zones ...............96

    D. Local Law Enforcement Agencies Make Decisions About How to Measure Geographic Zones .........................................................98

    E. Property Line to Property Line as the Most Common Method of Measurement ...........................................................................102

    F. OffenderWatch's Use of Point-to-Point Measurement ...........102

    G. Identifying the Boundaries of Geographic Zones ....................105

    H. Access to Parcel Data ...............................................................106

    I. "School Properties" under SORA ...........................................107

    J. Information Available to Plaintiffs About Geographic Zones ................108

    K. Plaintiffs' Experiences Measuring Geographic Zones ............112

XI. RESEARCH ON WHETHER PUBLIC REGISTRATION, GEOGRAPHIC ZONES AND REPORTING REQUIREMENTS ARE EFFECTIVE ...........................................................................114

    A. Research on Recidivism and Public Registration ....................115

    B. Research on Recidivism and Geographic Zones .....................118

    C. Research on Recidivism and Failure to Comply with Reporting Requirements ...........................................................................121

XII. SORA'S "LOITERING" PROVISION .......................................122

A. The SOR Unit's Understanding of What Constitutes "Loitering" ...........122

B. Plaintiffs' Understanding of What Constitutes "Loitering" ....................123

XIII. SORA AND PLAINTIFFS' ABILITY TO PARENT.................................126

A. SORA and Plaintiffs' Parenting and Involvement in Their Children's Education and Upbringing ........................................................................126

B. Defendants' Understanding of Whether Registrant-Parents Can Observe or Contact Their Own Children Inside Geographic Zones.........141

C. Law Enforcement's Understanding of What Parenting Activities Are Permitted under SORA ...........................................................................143

D. The Impact on Children of Having Parents on the Registry....................145

XIV. SORA AND PLAINTIFFS' USE OF THE INTERNET ...........................146

A. SORA 2013's Requirements Involving the Internet................................146

B. Law Enforcement Use or Non-Use of Registrants' Internet Information....................................................................................................148

C. Law Enforcement's Understanding of Internet Reporting Requirements................................................................................................149

D. The Impact of SORA on Registrants' Internet Use ................................154

XV. LAW ENFORCEMENT'S UNDERSTANDING OF SORA ......................166

A. Local Law Enforcement's and Prosecutors' Interpretations of SORA ....166

B. Parole and Probation Agents' Understanding of SORA...........................168

C. SOR Unit Training ....................................................................................173

D. Trainings by the Prosecuting Attorneys Association of Michigan...........178

XVI. REGISTRANTS' UNDERSTANDING OF SORA....................................181

A. The Explanation of Duties Form...............................................................181

B. Michigan State Police Letters to Registrants ...........................................184

C. Allocation of Responsibility Between Local Law Enforcement and the Michigan State Police for Answering Questions about SORA ..........185

D. How the MSP SOR Unit and Local Law Enforcement Respond to Registrants' Questions ...............................................................................187

E. Plaintiffs' Understanding of SORA ........................................................191

F. The Impact of Amendments to SORA on Registrants' Understanding....197

G. Misinterpretation of SORA and Criminal Liability .................................199

XVII.   SORA'S REPORTING REQUIREMENTS .............................................201

    A.  Statutory Reporting Obligations ...................................................201

    B.  Law Enforcement's Understanding of What Registrants Must Report ....202

    C.  Plaintiffs' Understanding of What They Are Required to Report ...........205

XVIII.  STRICT LIABILITY AND IMPOSSIBILITY .........................................209

    A.  The Strict Liability Provisions of SORA ...................................209

    B.  Strict Liability Where Compliance Is Practically or Actually
        Impossible .........................................................................209

    C.  Enforcement Requirements and Prosecutorial Discretion ........................212

    D.  Data on Specified Types of Non-Compliance ...........................................214

XIX.  THE EFFECTS OF LIFETIME REGISTRATION ................................215

    A.  Plaintiffs' Access to Housing........................................................215

    B.  Plaintiffs' Ability to Find Employment ...................................221

    C.  Reporting and Verification............................................................224

    D.  Enforcement of SORA ..................................................................227

    E.  Supervision Requirements Compared to Probation and Parole................230

    F.  Plaintiffs' Access to Education ....................................................232

    G.  Plaintiffs' Ability to Travel..........................................................233

    H.  The Effects of Public Registration .............................................235

    I.   Additional Restrictions Triggered By Plaintiffs' Status as Registrants ...237

    J.   Plaintiff's Allegations that their Alleged Harms are Attributable to
        SORA .................................................................................238

XX. THE ANNUAL FEE REQUIREMENT ........................................................239

XXI. SYSTEM COSTS AND THE MECHANICS OF REGISTRATION..........242

    A.  The Cost of Michigan's Sex Offender Registry .........................242

    B.  Registration Occurs Prior to or as Part of Sentencing and Involves
        Multiple Law Enforcement Agencies .......................................243

    C.  Sex Offender Registration and Plea Negotiations ....................245

XXII.   BACKGROUND OF LAW ENFORCEMENT WITNESSES ................249

    A.  Karen Johnson..............................................................................249

    B.  Sergeant Bruce Payne ..................................................................250

iv

C.  Trooper Timothy Burchell .......................................................251

D.  Leslie Wagner ......................................................................251

E.  Herbert Tanner, J.D..............................................................252

F.  Lt. Chris Hawkins .................................................................253

XXIII.  BACKGROUND OF OTHER WITNESSES ............................253

A.  I.G...........................................................................................253

B.  S.F. .........................................................................................254

C.  Timothy Poxson ....................................................................254

D.  Joseph Granzotto ...................................................................255

XXIV.  QUALIFICATIONS OF EXPERT WITNESSES ....................255

A.  Dr. James J. Prescott .............................................................255

B.  Dr. Janet Fay-Dumaine .........................................................257

C.  Dr. Jill S. Levenson ...............................................................258

D.  Peter Wagner, J.D. ................................................................258

E.  Richard Stapleton, J.D. ..........................................................260

F.  Anne Yantus, J.D. ..................................................................261

## I.   INTRODUCTION AND TERMINOLOGY

1.  Plaintiffs John Does #1-5 and Mary Doe are Michigan residents and registered sex offenders whose Sex Offender Registration Act (SORA) requirements have been retroactively extended for life. *See* M.C.L. § 28.721 *et. seq.*; Verified Complaint[1] ¶ 1.

2.  As used here, the term "SORA" refers to Michigan's Sex Offender Registration Act in general. The term "SORA 2011" refers to the cumulative amendments in effect in 2011, including the 2006 amendments imposing geographic zones and the 2011 amendments creating a tier structure, requiring lifetime registration for Tier III registrants, and adding new verification and immediate reporting requirements. The term "SORA 2013" refers to the 2013 iteration of the statute, which was amended to impose an annual fee. Mich. Pub. Acts 121, 127 (2005); Mich. Pub. Act. 17-18 (2011); Mich. Pub. Act 149 (2013).

3.  The parties vary on the terminology used to describe various aspects of SORA. Defendants describe the 1000-foot zones around school as "student safety zones," since that is the term used in the statute. Plaintiffs describe those areas as "geographic exclusion zones," since they have the effect of excluding registrants from living or working in those zones. For the purposes of this joint statement, the parties stipulate to describe the 1000-foot area with the term "geographic zones."

---

[1] All references to the Verified Complaint refer to the First Amended Complaint, Dkt 46.

## II.   STATEMENTS OF LAW

### A. The Historical Evolution of SORA

**Defendants make a continuing objection to the relevance of this section of the facts because the history of prior amendments to SORA has no bearing on the constitutionality of the current form of the statute.**

4.  Michigan first passed a sex offender registration law in 1994. Mich. Pub. Act 295 (1994).

5.  Under the 1994 statute, registration information was available only to law enforcement, and was exempt from public disclosure. A person who divulged registry information to the public was guilty of a misdemeanor, and a registrant whose information was revealed had a civil cause of action for treble damages. Mich. Pub. Act 295, Sec. 10 (1994).

6.  Plaintiffs contend the statute did not require regular verification or reporting. After the initial registration was completed, the only additional obligation was to notify local law enforcement within 10 days of a change of address. The registrant did not need to notify law enforcement in person. Mich. Pub. Act 295, Sec. 5(1) (1994).

7.  The non-public law enforcement registry information was maintained for 25 years for people convicted of one offense, and for life for people convicted of multiple offenses. Mich. Pub. Act 295, Sec. 5(3)-(4) (1994).

8.  Plaintiffs contend the statute applied retroactively to people whose convic-

tions occurred before October 1, 1995, but only if they were still incarcerated, on probation or parole, or under the jurisdiction of the juvenile division of the probate court or Department of Social Services on that date. Mich. Pub. Act 295, Sec. 3(b)-(c) (1994).

9. The legislature has amended SORA over the last two decades. Mich. Pub. Act 494 (1996); Mich. Pub. Act 85 (1999); Mich. Pub. Act 542 (2002); Mich. Pub. Acts 238, 239, 240 (2004); Mich. Pub. Acts 121, 127, 132 (2005); Mich. Pub. Act 46 (2006); Mich. Pub. Acts 17, 18 (2011); Mich. Pub. Act 149 (2013).

10. Effective April 1, 1997, law enforcement agencies were required to make registry information available to the public (for zip codes within the agency's jurisdiction) during business hours. The public could view a paper copy of the registry by visiting their local law enforcement agency. Mich. Pub. Act 494, Sec. 10(2) (1996).

11. In 1999, registry information became available to the public on the Internet. Mich. Pub. Act 85, Sec. 8(2), 10(2)(3) (1999).

12. The 1999 amendments to SORA added in-person reporting requirements that required registrants to report quarterly or yearly, depending on their offense. Mich. Pub. Act 85, Sec. 5a(4) (1999).

13. Plaintiffs contend the 1999 amendments also expanded the list of offenses for which registration was required and the categories of individuals required to

3

register for life; lengthened the penalties for some SORA offenses; required registrants to maintain a driver's license or personal identification card; made registry information on certain juveniles public; required fingerprinting and digitized photographs for registrants; and required registration for out-of-state students attending Michigan schools, out-of-state employees working in Michigan, and anyone who was convicted of a listed offense or required to register in another state or country. Mich. Pub. Act 85 (1999).

14. In 2002, amendments to SORA required both resident and non-resident registrants to report in person when they enrolled, dis-enrolled, worked, or volunteered at institutions of higher learning. Mich. Pub. Act 542, Sec. 4a (2002).

15. Amendments in 2004 required registrants' photographs to be posted on the Internet-based public registry, created a one-time registration fee for registrants, and made failure to pay the fee a misdemeanor. Mich. Pub. Acts 237, 238 (2004).

16. The 2004 amendments removed the registration requirement for youthful (HYTA) offenders after October 1, 2004, unless they had lost their HYTA status. Youth assigned to HYTA before that date were still required to register, but could petition to reduce or eliminate their registration requirements depending on the circumstances of their offense—such as the age difference with the victim and the charge. This was commonly referred to as the "Romeo and Juliet" exception. Mich. Pub. Acts 239, 240 (2004).

17. Further amendments, effective January 1, 2006, prohibited registrants (with some exceptions, *see* MCL 28.734-736) from working, residing, or "loitering" within 1000 feet of school property, and imposed criminal penalties for non-compliance. Mich. Pub. Acts 121, 127 (2005). In addition, the penalties for some SORA offenses were increased. Mich. Pub. Act 132 (2005).

18. In 2006, SORA was amended to allow subscribing members of the public to be notified by email when a person registers or moves into a specified zip code. Mich. Pub. Act 46 (2006).

19. In 2011, SORA was amended to comply with the federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 *et seq.,* (Title I of the Adam Walsh Child Protection and Safety Act of 2006 (Public Law 109-248)). Mich. Pub. Act. 17-18 (2011).

20. In comformity with SORNA, the 2011 amendments placed registrants into three tiers based on the offense of conviction. Mich. Pub. Act 17-18 (2011).  A registrant's tier-classification determines the length of time that a person must register and the frequency of reporting. M.C.L. §§ 28.722(r)-(w); 28.725(10)-(13). Tier I registrants must register and comply with all obligations imposed by SORA for 15 years; Tier II registrants must register and comply for 25 years; and Tier III registrants must register and comply for life. M.C.L. §§ 28.722 (r)-(w); 28.725(10)-(13).

21. Under SORA 2011, plaintiffs were classified as Tier III offenders who must register and comply with SORA for life. Mich. Pub. Act. 17-18 (2011).

22. In conformity with SORNA, the 2011 amendments also provided that persons whose offenses predated creation of the registry would be required to register if convicted of any new felony. Mich. Pub. Act 17-18 (2011).

23. In conformity with SORNA, the 2011 amendments require registrants to provide additional information (*e.g.*, internet identifiers, telephone numbers, vehicle information, *etc.*) during verification periods, and to immediately report in person when certain information changes. Mich. Pub. Act 17-18 (2011).

24. SORA 2011 also made several changes that reduced or eliminated registration requirements for certain offenders, including the following:

- Required 15-year registration for Tier I offenders. Previously the shortest registration period was 25 years.
- Eliminated registration for juvenile offenders adjudicated of Tier I and Tier II offenses. Juveniles convicted of Tier III offenses must still register.
- Eliminated registration for all juvenile offenders (regardless of tier) who were under 14 at the time of their offense.
- Eliminated certain offenses, including indecent exposure, from the list of offenses requiring registration.
- Removed juvenile and most Tier I offenders from the public website.
- Provided that offenders are not required to register if the age difference between the offender and the victim is not greater than four years and the victim consented to the sexual conduct ("Romeo and Juliet exception"), regardless of whether they were adjudicated under HYTA.

Mich. Pub. Act 17-18 (2011). Plaintiffs contend that none of these changes apply to them.

6

25. In 2013, while this case was pending, Michigan enacted new legislation requiring registrants to pay a $50 annual fee, and linking registrants' reporting dates to registrants' birthdays, with the result that all registrants are no longer going to police agencies to register in the same time period. Mich. Pub. Act 149 (2013).

26. The 2006 geographic zone amendments and the 2011 amendments were applied retroactively. Mich. Pub. Act 46 (2006); Mich. Pub. Act 17-18 (2011).

**B. SORA Requires Offense-Based Registration**

27. All individuals convicted of a listed offense under SORA are required to register. The tier assignment and length of registration are determined by the particular criminal offense charged and—in some cases—the age difference between the offender and the victim. Registration requirements are not based on clinical or actuarial risk assessments. M.C.L. §§ 28.722(r)-(w); 28.722-28.723.

28. SORA does include a process that allows certain juvenile sex offenders whose adjudications occurred at least 25 years ago, and some Tier I offenders who have been on the registry at least 10 years, to file a petition with the circuit court to have their registration requirements discontinued. Youthful offenders whose offenses no longer qualify as listed offenses may also petition for removal. None of these procedures apply to the plaintiffs. Plaintiffs contend that SORA contains no mechanism that would allow the plaintiffs to have their registration obligations

7

eliminated or reduced, or their tier level changed, based on a showing that they are not dangerous. M.C.L. § 28.721 *et seq.*; M.C.L. § 28.728c.

29. SORA 2013 requires in-person reporting irrespective of how long the person has served offense-free in the community. M.C.L. §§ 28.725(1); 28.727(1).

### C. Summaries of the SORA Statute

30. SORA 2013 contains 23 sections, many of which contain multiple subsections, and cross-references. M.C.L. § 28.721 *et seq.*

31. Plaintiffs prepared a summary of SORA 2013's requirements, organized by type of restriction (e.g. employment restrictions, housing restrictions, reporting obligations, etc.). That summary is contained in Exhibit 34.

> **Defendants do not stipulate to the accuracy, completeness, or relevance of Plaintiffs' Exhibit 34. Defendants contend that the summary represents plaintiffs' own interpretation of the statute and is thus legal argument, not fact.**

32. Plaintiffs also prepared a summary of language in SORA 2013 that they contend is unconstitutionally vague. That summary is contained in Plaintiffs' Responses to Defendants' Interrogatories, No. 11, attached as Exhibit 35.

> **Defendants do not stipulate to the accuracy, completeness, or relevance of Plaintiffs' Exhibit 35. Defendants contend that the summary represents only plaintiffs' own self-serving arguments about the language of statute and are thus legal argument, not fact.**

## III.  THE PLAINTIFFS

### A.   John Doe #1

34. John Doe #1 resides in the Eastern District of Michigan. Verified Compl, ¶ 15.

35. Mr. Doe #1 graduated high school. As a teenager he sold drugs. Doe #1 Dep 5 ln 21-25, Exh 1.

36. In 1990, when Mr. Doe #1 was 20 years old, he was fired from his job at McDonalds. He believed he was fired unjustly. He states that, out of anger and revenge, he attempted to rob his former employer. Verified Compl, ¶ 16.

37. As the manager of the McDonalds and her son were leaving, Mr. Doe #1 approached them with the intent of robbing the restaurant. He forced them back inside the McDonalds from the parking lot and compelled them to open the safe at gunpoint. When the manager did not comply, he struck her and kicked her 14-year-old son. Mr. Doe #1 also threatened to lock the son in the walk-in freezer if the manager did not open the restaurant's safe. Doe #1 Dep 11-12, Exh 1.

38. The manager and her son escaped, and Mr. Doe #1 was apprehended by police. *Id.* at 21-23.

39. Mr. Doe #1 was charged with 11 felony counts, including kidnapping. He pled no contest to kidnapping (for forcing the manager's son into the McDonald's and holding him against his will). He also pled guilty to the other charges, including armed robbery and weapons charges. Verified Compl, ¶ 18; Doe #1 Dep 12-23,

9

Exh 1.

40. Mr. Doe #1 never engaged in any sexual conduct during the attempted robbery, nor has he ever otherwise been accused of sexual misconduct. Verified Compl, ¶ 19; Doe #1 Dep 84, Exh 1.

41. Mr. Doe #1 was sentenced in 1991 to 22 to 40 years in prison for armed robbery. Verified Compl, ¶ 20; Doe #1 Dep 7 ln 2—8 ln 9, 26, Exh 1.

42. Mr. Doe #1 testified that after a conversation with his mother, where he realized that by being incarcerated he had hurt his family, he decided to turn his life around. Doe #1 Dep 28-29, Exh 1.

43. Mr. Doe #1 helped run Chance for Life, a program that trains prisoners how to handle conflict peacefully. He was an elected officer for a prisoner organization that helps inmates litigate cases *pro per* and collects funds from inmates to support churches and shelters. He was involved in the Warden's Forum, a program where older prisoners mentored younger ones. He earned the support of his warden for parole. Doe #1 Dep 28, 30-32, 87, 106, Exh 1; Verified Compl, ¶ 21.

44. While in prison, John Doe #1 tutored other prisoners, helping them with reading and writing. He spent a great deal of time in the law library. Doe #1 Dep, 28 ln 3-5, Exh 1.

45. Mr. Doe #1 served 20 years in prison. He has taken full responsibility for his crime, including writing the victims to apologize. Doe #1 Dep 23, 35-36, Exh 1.

10

46. In November 2009, Mr. Doe #1 was paroled. He successfully completed his parole in November 2011. Verified Compl, ¶ 22.

47. Mr. Doe #1 first learned that he would be required to register as a sex offender when he was paroled. He testified that he did not understand why he was required to register as a sex offender when he had not committed a sex offense. Doe #1 Dep 40, 43, Exh 1.

48. Mr. Doe #1 has been employed for nearly five years as a vocational services coach, where he assists adults with mental and physical disabilities in the workplace. He has been promoted to a management/supervisor position. Doe #1 Dep 10 ln 4-18; 94 ln 18-19, Exh 1; Verified Compl, ¶ 23.

49. Mr. Doe #1 has two adult children and one toddler, and also co-parents his fiancé's teenaged daughter. He currently lives with his fiancée and his two youngest children. Doe #1 Dep 64-65, 68, Exh 1.

50. Mr. Doe #1 has not been charged with or convicted of any crime since his convictions following the 1990 McDonalds robbery. Verified Compl, ¶ 24.

51. Under SORA 2013, people convicted of kidnapping a minor are required to register as sex offenders for life, even if the circumstances of the offense lack any sexual component. M.C.L. § 28.722(w)(ii). Although Mr. Doe #1's offense did not include a sexual component, he was required to register because he was convicted of kidnapping a minor. Doe #1 Dep 40 ln 11— 41 ln 9, Exh 1.

11

52. At the time Mr. Doe #1 was convicted, Michigan did not have a sex offender registry. He therefore did not receive any notice that his conviction for a non-sex offense would subject him to registration as a sex offender. Verified Compl, ¶ 26; Doe #1 Dep 84-85, Exh 1.

53. Mr. Doe #1 testified that had he had reason to believe that a kidnapping conviction would result in lifetime sex offender registration, he would have gone to trial or tried to bargain for an alternate disposition that would not have resulted in registration. Verified Compl, ¶ 27; Doe #1 Dep 84-85, Exh 1.

**Defendants object to this statement as speculation, conclusory, and based upon a hypothetical that cannot be proved or disproved. What Mr. Doe #1 would or would not have done is unknowable.**

54. When Mr. Doe #1 was released from prison in 2009 he was required to register for 10 years. Mich. Pub. Act 132 Sec. 5(6) (2005) (requiring registration for 25 years, or 10 years after release from imprisonment, whichever is longer).

55. As a result of the 2011 amendments, Mr. Doe #1 was classified as a Tier III offender who must register and comply with SORA for life. Verified Compl, ¶ 28; Mich. Pub. Act 17, §5(12) (2011).

56. Mr. Doe #1 has previously contacted his U.S. congressman regarding the registry. He has not contacted any state legislators. Doe #1 Dep 82 ln 2-14, Exh 1.

57. Mr. Doe #1 has drafted, but not yet sent, letters to state legislators regarding the sex offender law. He has put his efforts on hold pending the outcome of this

case. Doe #1 Dep 81 ln 12—82 ln 1, Exh 1.

58. Mr. Doe #1 reads and understands English, and does not have any learning disabilities. Doe #1 Dep 11 ln 12-14, Exh 1.

**B. John Doe #2**

59. John Doe #2 resides in the Eastern District of Michigan. Verified Compl, ¶ 29.

60. In the summer of 1996, when Mr. Doe #2 was 18 years old, he had a sexual and romantic relationship with a 14-year-old girl. Doe #2 Dep 52-53, Exh 2.

61. Eventually, the mother of Mr. Doe #2's under-age girlfriend became aware of their relationship. One day, the girl's mother called him and informed him that the girl was a minor. Doe #2 Dep 56-57, Exh 2.

62. Mr. Doe #2 was prosecuted after three boys, including him, engaged in sexual acts with the girl. Mr. Doe #2 knew the girl's age when this occurred. Doe #2 Dep, 51-601, Exh 2.

63. After she became an adult, the girl signed an affidavit stating that she willingly engaged in that sexual contact. Aff of Victim in Case of Doe #2, Exh 66; Doe #2 Dep 59-60, Exh 2.

64. Mr. Doe #2 pled guilty under the Holmes Youthful Trainee Act (HYTA) to criminal sexual conduct III, which prohibits sex with person under the age of 16. Verified Compl, ¶ 31; Doe #2 Dep 60, Exh 2; M.C.L. § 750.520d(1)(a).

65. HYTA provides that if a youth aged 17 to 21 pleads guilty, the court "with-

out entering a judgment of conviction" may "assign that individual to the status of youthful trainee." M.C.L. § 762.11(1). If the youth completes the trainee period, then "the court shall discharge the individual and dismiss the proceedings." M.C.L. § 762.14(1).

66. Under HYTA, an assignment to youthful trainee status "is not a conviction for a crime." M.C.L. § 762.14(2). Under SORA, assignment to youthful trainee status is included in the definition of "convicted." M.C.L. § 28.722(b).

67. Court records in HYTA cases are sealed from the public and do not appear on the person's criminal history, as "all proceedings regarding the disposition of the criminal charge and the individual's assignment as youthful trainee shall be closed to public inspection." M.C.L. § 762.14(4).

68. At the time of Mr. Doe #2's offense, Michigan had just created its sex offender registry. Although the statutory scheme required registration of HYTA trainees, the registry was private and was available only to law enforcement. Registry information was exempt from Freedom of Information Act requests. Verified Compl, ¶ 37; Mich. Pub. Act 295 (1994) (eff. Oct. 1, 1995).

69. HYTA was amended in 2004 to specify that certain HYTA trainees are subject to sex offender registration. Those amendments were not in effect at the time Mr. Doe #2 pled. Mich. Pub. Act 239 (2004), codified as M.C.L. §§ 762.13(6); 762.14(3).

14

70. Mr. Doe #2 knew at the time he pled that he would have to register as a sex offender under the then-existing registry, which was accessible only to law enforcement. Doe # 2 Dep 58 ln 24—60 ln 19, Exh 2.

71. Mr. Doe #2's plea was based on prosecutor's promise that his case would be dismissed under HYTA and his records sealed. At no time before his plea was Mr. Doe #2 ever told that information about his case could be posted on a public Internet-based sex offender registry, which at that time did not exist. Doe #2 Dep 60, 66, 136-138, Exh 2.

72. Pursuant to his plea, Mr. Doe #2 received no jail time. He was sentenced to two years of probation. His name was placed on the non-public law enforcement sex offender registry for 25 years, making him eligible for removal at age 44. Verified Compl, ¶ 35; Doe #2 Dep 61, 66, 76, Exh 2.

73. Mr. Doe #2 successfully completed his HYTA probation, and was discharged early (after 18 months) for good behavior. He also completed sex offender therapy. His case was dismissed without a conviction being entered and his records were sealed. Verified Compl, ¶ 35; Doe #2 Dep 61, 66, 76, Exh 2.

74. Mr. Doe #2 registered for the first time when he completed probation. Doe #2 Dep 61 ln 6-12, Exh 2.

75. After Mr. Doe #2 initially registered and his name was placed on the non-public registry, it was his understanding that nothing further was required of him.

15

Plaintiffs assert that the statute did not require reporting at regular intervals at that time. Doe #2 Dep 61-62, 67, Exh 2; Mich Pub. Act 295, Sec. 10 (1994).

76. Mr. Doe #2 did not register again during the next 15 years. Doe #2 Dep 62 ln 19-24, Exh 2.

77. Had Mr. Doe #2 known that changes in Michigan law would result in him being subjected to life-time public registration as a sex offender, he would have taken his case to trial. Doe #2 Dep 137, Exh 2.

> **Defendants object to this statement as speculation, conclusory, and based upon a hypothetical that cannot be proved or disproved. What Mr. Doe #2 would or would not have done is unknowable.**

78. Mr. Doe #2 left high school but completed his GED. He briefly studied business at the University of Detroit-Mercy. Doe #2 Dep 5 ln 1-4, ln 13-25, Exh 2.

79. Mr. Doe #2 left college to join the army. He served in active-duty military service twice, earning an honorable discharge both times. He stated that he received training as a combat engineer and in military intelligence. Verified Compl, ¶ 39; Doe #2 Dep 6, 8, 11-14, 63, 89, Exh 2; Certificate of Release from Active Duty (Doe #2 DD-214), Exh 65.

80. While on inactive status with the army, Mr. Doe #2 went back to college and obtained a certification to be a medical assistant, and also obtained training on subjects like OSHA and hazardous materials. Doe #2 Dep 9 ln 13-22, Exh 2.

81. While in the service, Mr. Doe #2 was injured in an accidental grenade

explosion, suffering a traumatic brain injury. He now receives disability benefits through the Veterans Administration. Verified Compl, ¶ 39; Doe #2 Dep 11-14, 63, Exh 2; Certificate of Release from Active Duty (Doe #2 DD-214), Exh 65.

82. Around 2010, after Mr. Doe #2 was discharged from the military, he got a call from a Michigan state trooper. The officer told him that he was now subject to supervision as a sex offender and that he needed to comply with his registration requirements. Mr. Doe #2 had not previously known that as a result of amendments to SORA, he had retroactively become subject to Michigan's requirements for ongoing reporting. Doe #2 Dep 20, 63, 67-68, Exh 2.

83. Although he had not registered for 15 years, Mr. Doe #2 was not arrested. The trooper explained to Mr. Doe #2 that he needed to register, and Mr. Doe #2 explained "how regular life has been," that he had not been in trouble since his HYTA case, and that he had no idea he was supposed to register. He felt that the trooper understood his situation. Doe #2 Dep 63 ln 3–64 ln 22, Exh 2.

84. For nearly 15 years before being notified that he was subject to supervision and reporting as a sex offender, Mr. Doe #2 had lived without the restrictions associated with sex offender registration. Doe #2 Dep, 62, Exh 2.

85. In 2011, Mr. Doe #2 was retroactively re-classified as a Tier III offender, and he must now register for life. *Id.*at 68.

86. Mr. Doe #2 was four years and one month older than the girl with whom he

17

had a sexual relationship. Doe #2 Dep 82, Exh 2. Plaintiffs contend that under

SORA, had the age difference between them been less than four years, Mr. Doe #2

would not be subject to sex offender registration under the "Romeo and Juliet"

exceptions. M.C.L. § 28. 722(w)(iv), 28.728c(14); Doe #2 Dep 82, Exh 2.

87. Mr. Doe #2's adjudication is not a conviction under HYTA and does not

appear on a criminal background check. He has no other criminal history. He does

have a military disciplinary action for marijuana use. Doe #2 Dep 137-138, Exh 2.

88. The Michigan State Police criminal history print-out for Mr. Doe #2 indi-

cates that he does not have any conviction history. However, he is listed as a con-

victed sex offender on Michigan's sex offender registry. *Compare* Doe #2 MSP

Criminal History Print-out, Exh 63, *with* Doe #2 Michigan Sex Offender Registry

Print-out, Exh 64.

89. But for the fact that Mr. Doe #2 is publicly listed on the sex offender regis-

try, schools, employers, landlords, and the public would be unaware of his sealed

HYTA case or the facts underlying it. Verified Compl, ¶ 44; Doe # 2 Dep 76, 138,

Exh 2.

> **Defendants object to this statement on the grounds of speculation.
> There is no way to determine what the public would or would not know
> or what the victim or her mother might choose to reveal.**

90. Mr. Doe #2 testified that the requirement of public, life-time registration

"grossly contradict[s]" the terms of the plea agreement he had made, whereby his

record would be sealed under HYTA. Doe #2 Dep 68 ln 14—69 ln 1, Exh 2.

91. Mr. Doe #2 has not had any encounter with law enforcement in which he was threatened with arrest or imprisonment for anything to do with his sex offender registration. Doe #2 Dep 72 ln 1-21, Exh 2.

92. Mr. Doe #2 has not contacted any state legislators to seek a change to SORA, but he testified that he plans to do so in the future. Doe #2 Dep 78 ln 20—79 ln 1, Exh 2.

93. Mr. Doe #2 has one teenage daughter who also resides in the Eastern District of Michigan, living with her mother. The girl's mother has full custody and Mr. Doe #2 has visitation on weekends. Doe #2 Dep 22-24, Dep 33 ln 7-17, Exh 2.

94. Mr. Doe #2 currently has a girlfriend, and she knows about his past. He explained his history to her and she chose to continue dating him. Doe #2 Dep146 ln 21—147 ln 16, Exh 2.

**C.  John Doe #3**

95. John Doe #3 resides in the Eastern District of Michigan. Verified Compl, ¶ 46.

96. Mr. Doe #3 left high school in his senior year, but obtained his GED. Doe #3 Dep 6 ln 12-15, Exh 3.

97. After getting his GED, Mr. Doe #3 worked at the local fruit market and a few other odd jobs. He then worked at his family's auto service station. Doe #3 Dep 10 ln 12—11 ln 2, Exh 3.

98. Mr. Doe #3 stated that in January 1998, when he was 19 years old, he had a romantic and sexual relationship with a 14-year-old girl. Verified Compl, ¶ 47.

99. Mr. Doe #3 met the girl at a hair salon in his neighborhood, where she was working. As he was paying for his haircut she slipped him her phone number. Doe #3 Dep 24, Exh 3.

100. Mr. Doe #3 called the number she had given him, and they met for coffee and began dating. On the third or fourth date—but within the first week—they had sex. Doe # 3 Dep 25, Exh 3.

101. At the time, Mr. Doe #3 did not know how old she was. John Doe #3 stopped having intercourse with the girl after her father informed him of her age. Doe #3 Dep 26-29, Exh 3.

102. Both Mr. Doe #3 and his girlfriend were from immigrant Muslim families. Doe #3 Dep 35-36, 40, Exh 3.

103. It is Mr. Doe #3's understanding that when the girl's father learned of their relationship he flew into a rage and threatened to kill his daughter for disgracing the family. To protect herself from her father, the girl told her father she had been raped. Her father then took her to the police, where she gave a written statement. Doe #3 Dep 30-31, 43-45, Exh 3.

<span style="color:red">**Defendants object to the description of the father's reaction and the victim's motives are hearsay, speculation, and also irrelevant.**</span>

104.  After the police were contacted, the girl's family and Mr. Doe's family
met to discuss the matter. The girl's father demanded that Mr. Doe #3 marry his
daughter. Doe #3 Dep 31, 37-38, Exh 3.

105.  Mr. Doe #3 agreed to the family's demands that he marry his girlfriend in
an Islamic ceremony, though no date was set. (They could not marry in a civil
ceremony because she was underage.) After this agreement, Mr. Doe #3 and his
girlfriend had her father's permission to continue seeing each other. Doe #3 Dep
37-41, Exh 3.

106.  As a result of the agreement between the families, Mr. Doe #3's girlfriend
and her father went back to the police and changed her statement – admitting that
the sexual relationship had, in fact, been consensual. Doe #3 Dep 46-47, Exh 3.

> **Defendants object to this statement on the grounds that the victim's
> motives and the statement concerning consent are hearsay and also
> irrelevant.**

107.  Mr. Doe #3 testified that, about a month later, his girlfriend's father sud-
denly decided the marriage must happen immediately. Mr. Doe #3 testified that the
father demanded a $50,000 dowry and $50,000 more if they ever divorced. Doe #3
Dep 41-42, 47-48, Exh 3.

> **Defendants object to this statement on the grounds that the father's
> alleged demands are hearsay and irrelevant.**

108.  Mr. Doe #3 and the girl had sex again between the time that the girl's

father gave his permission to date his daughter and the time that the father

demanded money. At that time, Mr. John Doe #3 knew her age. Doe #3 Dep 49 ln

9-21, Exh 3.

109.  Mr. Doe #3 testified that he and his family refused the father's demand for

money. Doe #3 Dep 41-42, 47-48, Exh 3.

110.  The next day Mr. Doe #3 was arrested for having sex with a minor. Doe

#3 Dep 40-42, 50-52, Exh 3.

111.  Mr. Doe #3 eventually entered into a plea agreement, pleading guilty to

attempted criminal sexual conduct III, which prohibits sex with a person under the

age of 16. He was sentenced in 1998 under the Holmes Youthful Trainee Act to

four years of probation. Doe #3 Dep 56, Exh 3; M.C.L. § 750.520d(1)(a).

112.  At the time of Mr. Doe #3's offense, Michigan did not yet have a public,

Internet-based registry. Mr. Doe #3 was required to register for 25 years on the

non-public law enforcement registry, making him eligible for removal at age 45.

Mich. Pub. Act 494, Sec. 10(2) (1996).

113.  The requirements for quarterly in-person reporting were introduced after

Mr. Doe #3's plea was accepted, and they were applied retroactively to him. Veri-

fied Compl ¶ 51; Doe #3 Dep 61-62, Exh 3.

114.  During his last year of HYTA probation in 2001, Mr. Doe #3 came back

from a vacation near the end of the 15-day registration period. The police station

was closed from Friday, Saturday, and Sunday for a long weekend, and he was unable to report until it reopened on Monday. As a result, he reported one day late. Defendants contend that it is not clear why Mr. Doe #3 chose to return from vacation at that time, or if he made any effort to check the police station's availability before going on vacation, or if he attempted to go to any other police agency to report once he learned that his local police station was closed.  Doe #3 Dep 22, 56-60, Exh 3.

115.  John Doe #3 testified that after he noticed his registration paperwork was date-stamped for the day after his registration period ended, he went straight to the probation office to tell his agent that he had reported late. Based on his failure to report timely, he was found to have violated his probation. The court gave him the choice of either serving one year in prison and keeping his HYTA status, or giving up HYTA. Mr. Doe #3 chose to give up his HTYA status. His HYTA status was revoked, and a conviction was entered. Doe #3 Dep 22, 56-60, Exh 3.

116.  When Mr. Doe #3 met his wife, he was a registered sex offender. He explained why he was on the registry to her and her father right away. Doe #3 Dep 17-18, Exh 3; S.F. Dep16 ln 7—17 ln 21, Exh 8.

117.  Mr. Doe #3 and his wife S.F. [2] have three sons, aged nine, six, and six months. S.F. Dep 9, Exh 8.

_____

[2] S.F.'s initials have been changed to protect the privacy of their family.

118.  Mr. Doe #3 works at the family business, an auto repair shop and gas station. Doe #3 Dep 11, Exh 3.

119.  Mr. Doe #3's wife is a public school teacher and has a master's degree in education. Doe #3 Dep 119, Exh 3; S.F. Dep 9-10, Exh 8.

120.  In 2011, Mr. Doe #3 was retroactively classified as a Tier III offender. His registration period was extended from 25 years to life. Doe #3 Dep 65, Exh 3.

121.  Mr. Doe #3 was four years and ten months older than the girl with whom he had sex. Verified Compl ¶ 54. Plaintiffs contend that had the age difference been less than four years, Mr. Doe #3 would not be subject to registration under the "Romeo and Juliet" provisions of SORA. M.C.L. §§ 28.728c(14); 28.722(w)(iv).

122.  Mr. Doe #3 attested that he has no other criminal convictions. Verified Compl ¶ 55.

**D.   John Doe #4**

123.  John Doe #4 resides in the Western District of Michigan. He is homeless. Verified Compl ¶ 56; Doe #4 Dep 35, Exh 4.

124.  In the summer of 2005, when Mr. Doe #4 was 23 years old, he had a sexual and romantic relationship with I.G., a girl he met at a nightclub. Doe #4 Dep 10, Exh 4; Decl of I.G., Exh 31.

125.  The club where they met was restricted to those aged 18 and older. Doe #4 Dep 10, Exh 4; I.G. Dep 18, Exh 7.

126.  Mr. Doe #4 testified that he did not know that I.G. had managed to slip into the nightclub without having her ID checked because she was with a group of older friends. He testified that he assumed she was of age because she had entered the club. At the time I.G. was actually 15. Doe #4 Dep 20, Exh 4; I.G. Dep 18, Exh 7.

127.  I.G. became pregnant as a result of their relationship. After her parents learned she was pregnant they went to the police and Mr. Doe #4 was later arrested. Verified Compl ¶ 58; I.G. Dep 32-34, Exh 7; Doe #4 Dep 23, Exh 4.

128.  After Mr. Doe #4 was questioned by the police, he learned I.G.'s actual age. Doe #4 Dep 20-21, Exh 4.

129.  In 2006, Mr. Doe #4 pled guilty to attempted criminal sexual conduct III, which prohibits sex with person under the age of sixteen. Doe #4 Dep 25, Exh 4; M.C.L. § 750.520d(1)(a).

130.  Under the terms of the plea agreement, the case was to be dismissed if I.G.'s baby's DNA did not match that of Mr. Doe #4. I.G. had had other sexual partners, and it was unclear with whom she had become pregnant. It turned out that Mr. Doe #4 was the father of the child, and thus the case was not dismissed. Verified Compl ¶ 60; I.G. Dep 32, 40-41, Exh 7.

131.  Mr. Doe #4 was sentenced to five years probation, which he successfully completed. He also completed sex offender counseling. Doe #4 Dep 25, Exh 4.

132.  At the time of his conviction, Mr. Doe #4 was required to register for 25

years, making him eligible for removal at age 49. Verified Compl ¶ 62; Doe #4
Dep 48, Exh 4.

133.  In 2011, Mr. Doe #4 was retroactively classified as a Tier III offender, and
his registration period was extended from 25 years to life. Verified Compl ¶ 63;
Doe #4 Dep 48, Exh 4.

134.  Some years after his conviction, I.G. (who is now over 18) and Mr. Doe
#4 renewed their romantic relationship. They remain involved and now have two
children together: a daughter whose conception resulted in the criminal case (now
7) and a new baby. Doe #4 Dep 59-64, Exh 4; I.G. Dep 46-47, Exh 7.

135.  I.G. testified that while sex offender registration laws are intended to pro-
tect victims like her, "I feel like the overall effect of it was completely opposite
and I don't feel like there was an actual crime." I.G. testified that she "couldn't
have a relationship with [John Doe #4] for years." Rather than feeling like a victim
of a crime, she feels like a "victim of the criminal justice system" because of the
impact the registry has had on her ability to have a normal family life with Mr. Doe
#4 and their children. I.G. Dep 88-90, Exh 7.

> **Defendants object to these statements as the product of leading questions
> from Plaintiffs' counsel and questions that called for legal conclusions.
> Further, Defendants object to the relevance and foundation of I.G.'s
> opinion on the purpose of SORA.**

136.  Mr. Doe #4 also has two children with his ex-wife. Doe #4 Dep 63, Exh 4.

137. Mr. Doe #4 testified that he has repeatedly lost jobs when employers learned he is on the registry. He currently works for a cell phone company. Doe #4 Dep 29-31, Exh 4.

138. Mr. Doe #4's only other criminal convictions are for driving on a suspended license. Verified Compl ¶ 64.

139. Mr. Doe #4 completed his GED. He does not have any learning disabilities, and can read and understand English. Doe #4 Dep 5 ln 11-13; 9 ln 12-15, Exh 4.

**E. John Doe #5**

140. Mr. Doe #5 resides in the Eastern District of Michigan. Verified Compl ¶ 335.

141. Mr. Doe #5 is a high school graduate. After high school, he enlisted in the navy and served as a fire control technician for missiles and radar. Doe #5 Dep 5 ln 8-21, Exh 5.

142. Mr. Doe #5 was given an administrative discharge from the navy after ten and a half months. Doe #5 Dep 5 ln 22—6 ln 5, Exh 5.

143. Mr. Doe #5 completed his apprenticeship for cement masonry. Doe #5 Dep 6 ln 9-18, Exh 5.

144. After leaving his masonry job, Mr. Doe #5 obtained a service-related disability pension. Doe #5 Dep 8 ln 7-14, Exh 5.

145.  In 1979, when Mr. Doe #5 was 21 years old, he ran into his sister and a young woman from the neighborhood at a local party store. Doe #5 Dep 15, Exh 5.

146.  Mr. Doe #5 and the young woman had known each other since they were children, and she was also a friend of his sister. At that time the young woman was 17 years old. Doe #5 Dep 15, Exh 5.

147.  The three of them decided to go back to Mr. Doe #5's apartment. At some point the girl and Mr. Doe #5 went into Mr. Doe #5's bedroom and had sex. Doe #5 Dep 16, Exh 5.

148.  Mr. Doe #5 testified that when the young woman's family learned she had had sex, her father, who was a preacher, insisted that charges be filed. Doe #5 Dep 18-19, 22, Exh 5.

**Defendants object to this statement on the grounds of lack of foundation and hearsay.**

149.  Mr. Doe #5 was charged with criminal sexual conduct III. Verified Compl, ¶ 341; Doe #5 Dep 19, Exh 5.

150.  Mr. Doe #5 testified that he was offered a plea to criminal sexual conduct IV with six months jail time, but he rejected the plea because the sex was consensual. He did not want to plead guilty to a crime he felt he did not commit, so he chose to take the case to trial. Verified Compl, ¶¶ 342-43; Doe #5 Dep 30, Exh 5.

28

151. At the trial Mr. Doe #5's sister, who had been present in the apartment when Mr. Doe #5 and the young woman had sex, testified in support of his account that the sex was consensual. The alleged victim testified against Mr. Doe #5, saying that she did not consent. Mr. Doe #5 believes she testified that way to stay in the good graces of her father. Doe #5 Dep 19-22, 33-34, Exh 5.

**Defendants object to the statement concerning the victim's motives for her testimony on the grounds of hearsay and lack of foundation.**

152. Mr. Doe #5 chose to testify. He believes he came across as arrogant, which in retrospect is how he would describe himself at 21 years old. Verified Compl ¶ 346; Doe #5 Dep 30-31, Exh 5.

153. A jury convicted Mr. Doe #5 of CSC III in 1980. The court sentenced him to 2-15 years in prison. That was his first criminal conviction. Verified Compl ¶ 347; Doe #5 Dep 23, 37-38, Exh 5.

154. In 1980, at the time of Mr. Doe #5's conviction, there was no sex offender registry in Michigan, and therefore, no one mentioned the possibility of registration to Mr. Doe #5. Verified Compl, ¶ 347; Doe #5 Dep 41, 44, Exh 5.

155. Mr. Doe #5 served about 21 months of his sentence. Doe #5 Dep 38, Exh 5.

156. In subsequent years, Mr. Doe #5 was convicted of several property crimes. He was incarcerated in 1988, 1990, and 1995 for breaking and entering convictions. Verified Compl, ¶¶ 349-50; Doe #5 Dep 10-12, 43-45, Exh 5.

29

157. Up until 2011, Mr. Doe #5 was not required to register as a sex offender. Verified Compl, ¶¶ 349-50; Doe #5 Dep 43-45, Exh 5.

158. In November 2011, Mr. Doe #5 was arrested for illegally removing aluminum sheeting from an abandoned building, and pled guilty to larceny (M.C.L. § 750.3563A). Verified Compl, ¶ 351; Doe #5 Dep 43, 45, Exh 5.

159. Mr. Doe #5 testified that he was not informed during the plea bargaining process that a felony conviction for larceny would result in lifetime sex offender registration. He acknowledges that at sentencing he was informed by the judge that it was possible that he would have to register. Doe #5 Dep 41-42, 45, Exh 5.

160. Had Mr. Doe #5 known during plea negotiations that his plea would lead to registration, he would have attempted to negotiate a different plea. Doe #5 Dep 42-43, Exh 5.

**Defendants object to this statement as speculation, conclusory, and based upon a hypothetical that cannot be proved or disproved. What Mr. Doe #5 would or would not have done is unknowable.**

161. Mr. Doe #5 was sentenced to probation. Doe #5 Dep 45, Exh 5.

162. Although he was convicted and released before SORA took effect, pursuant to the "recapture" provisions that were added to SORA in 2011, John Doe #5 is now required to register as a sex offender for the 1980 offense because he was convicted of a new offense (larceny) after the 2011 amendments took effect. Doe #5 Dep 41 ln 6— 43 ln 2, Exh 5.

30

163.  While serving probation, Mr. Doe #5 was informed by the probation department that he was now required to register for life. During sentencing, the judge gave him until November 2012 to register. Verified Compl, ¶ 356; Doe #5 Dep 46, Exh 5.

164.  Mr. Doe #5 testified that did not register after being informed that he had to register because he did not believe he should have to register for something that happened over 30 years ago. Verified Compl, ¶ 358; Doe #5 Dep 43, 46-47, 52-54, Exh 5.

165.  After being cited for a probation violation for not reporting to his probation officer, Mr. Doe #5 was jailed for 90 days for not registering. Verified Compl, ¶ 358; Doe #5 Dep 52-54, Exh 5.

166.  Mr. Doe #5 testified that since being jailed for failing to register, he has tried to comply with SORA. Verified Compl, ¶ 359; Doe #5 Dep 52, Exh 5.

167.  Mr. Doe #5's sole source of income is disability benefits from the Veterans Administration and Social Security Administration, totaling about $710 a month. Verified Compl, ¶ 362; Doe #5 Dep 8, Exh 5.

168.  Prior to being ordered to register in 2012, Mr. Doe #5 had lived from 1980 to 2012 without being required to register or comply with SORA. Doe #5 Dep 77, Exh 5.

169.  Mr. Doe #5 testified:

Q:   So for approximately 33 years you did not have to report your address to
     the police?
A.   No.
Q.   You didn't have to report any employment to the police?
A.   No.
Q.   Your email?
A.   No.
Q.   For 32 to 33 years you could live wherever you wanted?
A.   Yes.
Q.   You could live within 1000 feet of a school?
A.   Yes.
Q.   You could work within 1000 feet of a school?
A.   Yes.
Q.   And for 32 to 33 years no one could look you up on a registry with your
     picture and your address?
A.   Yes.
…
Q.   And in that [32-33 year] period of time were you ever accused of, charged,
     with, or convicted of a sex offense…?
A.   No.

Mr. Doe #5 is now 56 years old and will remain on the registry for the rest of his

life for a crime he committed in 1979. Doe #5 Dep 77-78, Exh 5; Verified Compl,

¶¶ 336-47.

**Defendants object to the last sentence as an inadmissible conclusory
and argumentative statement from the Verified Complaint.**

170.  Since his 1980 conviction, Mr. Doe #5 was never charged with nor con-

victed of a new sex offense. Doe #5 Dep 77-78, Exh 5.

171.  Since he began registering, Mr. Doe #5 has not been threatened with arrest

by any police officer for non-compliance with SORA. Doe #5 Dep, 64 ln 11-15,

Exh 5.

172.  After Mr. Doe #5 was required to register, his probation officer ordered him to move because his apartment was within 1000 feet of a school, and Mr. Doe #5 was forced to relocate. He would have been arrested for a residency violation had he failed to comply. Verified Compl, ¶360; Doe #5 Dep 67, Exh 5.

173.  John Doe #5 currently lives in a house that is not within 1000 feet of a school. Doe #5 Dep 68 ln 4-16, Exh 5.

174.  Mr. Doe #5 has a girlfriend, children, and grandchildren, whom he visits regularly. Verified Compl, ¶ 365, Doe #5 Dep 78, Exh 5.

**F.   Mary Doe**

175.  Mary Doe resides in the Eastern District of Michigan. Verified Compl, ¶ 65.

176.  Ms. Doe completed high school, attended college to study psychology and education, and recently completed a certification in medical billing. Mary Doe Dep 7 ln 15—10 ln 10, Exh 6.

177.  In 2003, while living in Ohio, she was convicted of one count of unlawful sexual conduct with a minor for having a sexual relationship with a 15-year-old male. Mary Doe Dep 11-12, Exh 6.

178.  A teenage boy was spending weekends with Ms. Doe and her husband because the boy was trying to convert to their religion. Since his family did not share that religion, it was convenient for him to stay with Ms. Doe and her then-

husband. Ms. Doe had previously had other children who were converting to her religion stay at her home. Mary Doe Dep 12 ln 3—13 ln 10, Exh 6.

179.  Ms. Doe cannot remember the "specific details," but she admits that "intercourse did happen" between her and the teenage boy. Ms. Doe had intercourse with the boy multiple times, but she is uncertain of exactly how many times. Mary Doe Dep 12 ln 11-12; 14 ln 20-24, Exh 6.

180.  Ms. Doe cannot point to any particular factor that led her to engage in a sexual relationship with a 15-year-old. She denies that alcohol or drugs were a factor. She testified that she cannot remember the details of how the affair began because it has been ten years and she has moved on. Mary Doe Dep 14 ln 3-14; 16 ln 3-6, Exh 6.

181.  The boy's mother learned of the intercourse through her son's instant messages. She reported what she learned to their religious leader. Mary Doe Dep 12 ln 13-17, Exh 6.

182.  Mary Doe confessed to her then-husband, who made an appointment for them with his therapist. The therapist reported to Child Protective Services. Mary Doe Dep 12 ln 18-25, Exh 6.

183.  At the time they had intercourse, Mary Doe was 29 and the boy was 15. Mary Doe Dep 13 ln 23—14 ln 2, Exh 6.

184.  Ms. Doe testified that the judge presiding over her case decided that

34

because of Ms. Doe's "position in the community," he was going to make an example out of her. The judge sentenced her to three years in prison. Mary Doe Dep 13 ln 8-14, Exh 6.

185.  Mary Doe considered herself a friend of the boy's mother. Mary Doe Dep 15 ln 5-12, Exh 6.

186.  Ms. Doe attested that this was her only arrest or conviction for sexual misconduct, and that she has no other criminal history. Verified Compl, ¶ 77.

187.  Plaintiffs contend that at the time of Ms. Doe's conviction, Ohio's sex offender registration statute was risk-based rather than offense-based. A person's registration requirements, including the length and frequency of reporting, were determined through an individualized adjudication of risk. Verified Compl, ¶ 68; Former Ohio R.C. 2950.07; 2950.09(B); 2950.09(D) (providing for classification hearings, listing factors court should weigh to determine classifications, and specifying duties based on classification level); *State v. Bodyke*, 933 N.E.2d 753 (Ohio 2010).

> **Defendants object to this statement on the grounds of relevance and, to the extent it depends upon interpretation of case law, it is legal argument, not fact.**

188.  Ms. Doe attests that, based on a psychological evaluation, the Ohio court concluded that Ms. Doe was neither a "sexual predator" nor a "habitual offender." She was assigned to the lowest risk level of the registry, which required address

verification once a year for ten years. Verified Compl, ¶ 69; Former Ohio R.C. 2950.07.

189. Although Ohio has since moved to an offense-based registration scheme similar to Michigan's SORA 2013 (in order to comply with the same federal requirements that led to Michigan's SORA amendments in 2011), the Ohio Supreme Court has held that people like Ms. Doe (who received individualized risk-based hearings) cannot be retroactively reclassified under an offense-based scheme. The court held that such legislative reclassification of individuals who have been adjudicated by the judiciary violates the separation of powers. *See* Ohio Rev. Code § 2950.01, *et. seq.*, enacted June 30, 2007; *State v. Bodyke*, 933 N.E.2d 753 (Ohio 2010).

> **Defendants object to this statement on the grounds of relevance and, because it depends upon interpretation of case law, it is legal argument, not fact.**

190. Based on court decisions in Ohio, Ms. Doe could not be required to register there for more than ten years, nor could she be subjected to restrictions beyond those imposed under the terms of her initial Ohio registration order. Verified Compl, ¶ 72; *State v. Bodyke*, 933 N.E.2d 753 (Ohio 2010).

> **Defendants object to this statement on the grounds of relevance and, because it depends upon interpretation of case law, it is legal argument, not fact.**

191.  In May 2004, after serving less than eight months in prison, Ms. Doe was granted judicial release. Her sentence was modified to four years of probation and 200 hours of community service. She successfully completed probation, community service, and sex offender therapy, and was discharged from probation in April 2008. Mary Doe Dep 13, 16, Exh 6; Verified Compl, ¶ 73.

192.  Ms. Doe testified that she acknowledges that what she did was wrong, and has worked to change her life. She testified that she now does everything to put her family first. Mary Doe Dep 16-17, Exh 6.

193.  When Ms. Doe received judicial release in 2004, she moved to Michigan to live with her parents. Under Michigan law at the time, she was required to register quarterly for 25 years, becoming eligible for removal at age 54. Verified Compl, ¶ 74.

194.  Ms. Doe married her current husband in 2010. Her husband is aware that she is a registered sex offender. Mary Doe Dep 18, Exh 6.

195.  Ms. Doe has one child from her first marriage, a teenage daughter who is now approximately 15 years old. Ms. Doe has been awarded sole custody of that child. Ms. Doe lives with her husband and daughter. Mary Doe Decl, Exh 30.

196.  Ms. Doe also has step-children and step-grandchildren through her new marriage. Her step-grandchildren are ages seven, five, and three, with another grandchild expected soon. Mary Doe Dep 18-19, Exh 6.

197.  Ms. Doe's family, including her elderly parents, her extended family and

step-children and step-grandchildren all live in Michigan. For these reasons, Ms. Doe wishes to live in Michigan. Verified Compl, ¶ 75; Mary Doe Dep 23, Exh 6.

198.  Ms. Doe is gainfully employed. Mary Doe Dep 113, Exh 6.

199.  In 2011, Ms. Doe was retroactively re-classified as a Tier III offender, and her registration period was extended from 25 years to life. Mary Doe Dep 28-29, Exh 6.

200.  Ms. Doe has no learning disabilities and can read and understand English very well. Mary Doe Dep 11 ln 10-15, Exh 6.

201.  Ms. Doe believes that there should be a sex offender registry, but that it should be a risk-based: individuals who rehabilitate themselves, own up to their pasts, and rebuild their lives should not remain on the registry forever. The registry should be limited to "the ones that are the molesters, the ones that are actively pursuing the children." Mary Doe Dep 99 ln 24–102 ln 23, Exh 6.

202.  Ms. Doe has complied with her quarterly registration requirements for the past ten years. She has not been arrested or investigated for violating any registration requirements. Mary Doe Dep 95 ln 21–96 ln 9, 98 ln 23–99 ln 18, Exh 6.

203.  Ms. Doe has never asked any legislators to address her concerns with the sex offender registration statute. Mary Doe Dep 45 ln 23–46 ln 3, Exh 6.

## IV.  THE DEFENDANTS

### A.  Governor Richard Snyder

204.  Defendant Richard Snyder is the Governor of Michigan. He is sued in his official capacity. Verified Compl, ¶ 78; Answer ¶ 78.

## B.   Colonel Kriste Etue

205.  Defendant Colonel Kriste Etue is the director of the Michigan State Police (MSP). She is sued in her official capacity. Verified Compl, ¶ 81; Answer ¶ 82.

## V.  THE PURPOSE OF SORA

206.  Michigan has a compelling interest in protecting children from violence and sexual abuse. Doe #1 Dep 83 ln 10-14, Exh 1; Doe #1-5 Requests to Admit #10, Exhs 101-106.

207.  SORA 2013 reflects the belief that people convicted of sex offenses pose such a high risk to public safety that monitoring, reporting, supervision, geographic zones and other restrictions should be imposed. For Tier III offenders, that risk is deemed to be so great that these restrictions are imposed for life. M.C.L. §§ 28.721a; 28.725(12); SMART National Guidelines, 3-4, Exh 111.

208.  Specifically, the statute's statement of intent is:

The legislature declares that the sex offenders registration act was enacted pursuant to the legislature's exercise of the police power of the state with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means

39

to monitor those persons who pose such a potential danger.

M.C.L. § 28.721a.

209.  This statement of intent was added to the statute in 2002. Plaintiffs contend that the legislative history does not show that the Michigan legislature, before enacting this statement of intent in 2002, held hearings or engaged in fact-finding regarding the recidivism rates of people convicted of sex offenses. Mich. Pub. Act 542 (2002).

210.  The MSP does not track the recidivism rate of registrants, the impact of registration on recidivism, nor data on the effectiveness of the registry. Payne Dep 68, 110, Exh 17; L. Wagner Dep 41, Exh 18; Defs' Resp to First Interrog, No. 10, Exh 42.

211.  Leslie Wagner, the MSP sex offender registry coordinator, testified that the technical capacity exists to run reports showing recidivism rates, but the state has never run a report to determine whether or not individuals on the registry are committing additional sex crimes because "it's not our purpose." Rather, the purpose is "registering sex offenders." L. Wagner Dep 46, Exh 18.

212.  Karen Johnson, manager of the MSP Sex Offender Registration Unit, testified:

Q. If you don't track recidivism rates how do you know whether you're impacting recidivism?
A. We don't.

40

Q. You don't know if you're impacting recidivism?
A. No.

Johnson Dep 257, Exh 15.

## VI. THE MICHIGAN REGISTRY AND THE SOR DATABASE

### A. The Size of Michigan's Registry

213. Over the last several years, Michigan's registry has had between 40,000-49,000 registrants. The registry includes individuals who are incarcerated, although those registrants do not need to report until released. There are between 27,000 and 28,000 active registrants who have not left the state and who are not incarcerated. Total Number on SOR By Year, Exh 53; Johnson Dep 298-299, Exh 15.

214. Approximately 2,000 new registrants are added to Michigan's registry each year. Total Number on SOR By Year, Exh 53.

215. Based on her research, plantiffs' expert Dr. Jill Levenson, a psychology professor who studies sex offender registries, concluded that Michigan's registry was the fourth largest state registry in the United States with 47,329 registrants, as of June 2011. Levenson Expert Report, 1, Exh 23.

### B. The SOR Data Management System

216. Over the years the Michigan State Police's Sex Offender Registration (SOR) Unit has developed a computer system to record, maintain, and publicize information on registrants. The data management system can be accessed by MSP staff and other Michigan law enforcement agencies, including prosecuting

41

attorneys, Native American tribes, and correctional staff. Johnson Dep 92-93, Exh 15; L. Wagner Dep 67 ln 22–68 ln 1; 68 ln 23–69 ln 2, Exh 18.

217.  A subset of the information maintained on registrants is made available to the public via the Public Sex Offender Registry (PSOR). M.C.L. § 28.728(2).

218.  The SOR database creates the PSOR by coding some information as for law enforcement purposes only. Queries to the PSOR will produce results showing any information that is not restricted. Johnson Dep 82-88, Exh 15.

219.  The SOR software can issue alerts if registrants fail to meet SORA's address verification requirements. Johnson Dep 31-34, 82-88, Exh 15.

220.  The database has an interface to share information with the Law Enforcement Information Network (LEIN), the National Criminal Information Center (NCIC), the National Public Sex Offender Registry, and the Michigan Secretary of State. Johnson Dep 31-34, 82-88, Exh 15.

221.  Information is also shared with the Michigan Department of Human Services due to a requirement that registrants cannot be foster parents or daycare providers. In addition, the SOR Unit provides a data file annually to the federal Department of Housing and Urban Development to "assist them in ensuring that they don't have those offenders in public housing." Federal law prohibits certain registrants from living in subsidized housing. Johnson Dep 85 ln 9—89 ln 1, Exh 15.

222.  The SOR database is audited for completeness and accuracy of the data. L.

Wagner Dep 20 ln 2-6, Exh 18.

### C.   OffenderWatch

223.  In February 2014, after the close of discovery, the MSP implemented a new software system called "OffenderWatch" to replace the prior SOR data management system. Letter Announcing OffenderWatch, Exh 99; Johnson Dep 197-98, 200-03, Exh 15.

224.  There were several reasons that the MSP switched to OffenderWatch. First, SORA 2011 required a great deal more registrant information to be maintained in the SOR data management system. The first day the new law took effect the SOR Unit's servers crashed, and they continued to crash periodically for months. Due in part to these technological issues, the MSP SOR unit determined that its current database had limitations that could not be easily overcome with the computer resources available to the state. After visiting other states and researching the matter, the SOR unit decided to lease OffenderWatch, which is a dedicated software program designed for sex offender registration. Johnson Dep 197-98, 200-03, Exh 15.

225.  Second, the OffenderWatch data management system provides both law enforcement and the general public with new features that the previous data management system lacked. At the same time, OffenderWatch allows the SOR unit to do everything it did previously, but with a more user-friendly interface and with a

private vendor providing technical assistance. Johnson Dep 202-03, Exh 15;

OffenderWatch Contract 34-35, Exh 52; OffenderWatch PSOR Home Screen, Exh

118.

226. OffenderWatch is different from the old system in that every data field for

a registrant is searchable. OffenderWatch will allow law enforcement to search for

alias names, internet identifiers, or vehicles. Burchell Dep 30 ln 8—31 ln 11; 84 ln

4-14, Exh 16; L. Wagner Dep 24 ln 2-16, Exh 18.

227. The OffenderWatch system, as distributed by its developer, has the capa-

bility to track other information about registrants, including sexual orientation,

religion, nationality, marital status, and medical history. Michigan does not track

this information. Johnson Dep 248-50, Exh 15; OffenderWatch Manual 67-68, 98-

99, Exh 50

228. The public will continue to be able to access the same information on the

OffenderWatch website as on the prior website. L. Wagner Dep 75 ln 21—76 ln 5,

Exh 18.

229. In addition, the public can now search for registrants by name, by address

(home, work, or school), or by city. OffenderWatch Search Screen, Exh 119.

230. Both the OffenderWatch home screen and each registrant's individual

page contain a feature, labeled "Tell a Friend," that allows the public to share

information about registrants. The public can enter an email address and have that

registrant's SOR profile sent to others. Doe #2 OffenderWatch Page, Exh 120;

Michigan Public Sex Offender Registry Home Screen, Exh 118.

231. The public can now sign up to track any individual registrant, and receive

email alerts regarding that registrant. OffenderWatch Registration for Email Alerts

on Individuals, Exh 124; Doe #2 OffenderWatch Page, Exh 120; OffenderWatch

Search Screen, Exh 119.

232. The public can also sign up to receive email alerts regarding all registrants

who live, work or attend school within a specified distance (e.g. 2 miles) from a

given address (e.g. the searcher's home). OffenderWatch Registration for Email

Alerts on Locations, Exh 125.

233. The public can now click on a map icon on each registrant's page, and pull

up a map showing the location of the registrant's address. Doe #2 Offender Watch

Page, Exh 120; OffenderWatch Individual Registrant Map, Exh 123.

234. The public can also enter a specific location and get a map of all regis-

trants who work, live, or study within specified distances from that location. This

OffenderWatch feature shows all registrants within .25 mile, .5 mile, 1 mile, or 2

miles of the specified location. One can then click on the name of a registrant

within the selected radius and pull up information on that registrant. Offender-

Watch Search Results from Specified Point, Exh 122.

235. The public can now access a list of all non-compliant registrants. Offen-

derWatch Non-Compliant Offender Search Results, Exh 121.

236.  The cost of implementing OffenderWatch is $2 million, payable over the 5-year life of the initial contract. The annual maintenance and support costs are $360,000. (The first five years of maintenance and support are included in the initial $2 million.) Johnson Dep 202-03, Exh 15; OffenderWatch Contract 34-35, Exh 52.

## VII.  THE FEDERAL SEX OFFENDER REGISTRATION AND NOTIFICATION ACT

### A.   SORNA and Federal Funding

237.  The federal SORNA statute provides that states that do not adopt laws that substantially comply with SORNA will lose 10 percent of their Byrne Judicial Access Grant funds. States could either implement SORNA or forego the federal funds. 42 U.S.C. § 16901 *et seq.*; Hawkins Dep 17-18, Exh 19.

238.  Michigan previously received federal Byrne grant funding for the State Police, all local police departments, prosecuting attorneys' offices, corrections, county sheriffs, and the judiciary. Hawkins Dep 17 ln 3-20, Exh 19.

239.  If Michigan had elected not to become SORNA-compliant, it would have lost 10 percent of its Byrne funds. Byrne grant funding varies from year to year, ranging between $10 and $20 million a year. Byrne Fund Reports 2011, Exh 96; Hawkins Dep 18 ln 1-12, Exh 19

240.  Accordingly, if Michigan had not substantially complied with SORNA, it

would have lost about $1 to $2 million a year in Byrne grant funding. Hawkins Dep 18 ln 1-12, Exh 19.

241. The Prosecuting Attorneys Association of Michigan (PAAM) wanted Michigan's law to meet SORNA requirements so that Byrne grant funding would continue. Tanner Dep 19 ln 1-8, Exh 21.

242. Lt. Chris Hawkins, who at the time was responsible for the Michigan State Police's legislative work, testified that in his opinion Byrne grant funding was absolutely essential to Michigan. There had been an eight-year downturn in which there had been repeated decreases in the state budget, with similar decreases at the local government level. As a result, he found the prospect of losing more funding very concerning. Hawkins Dep 68 ln 21—69 ln 5, Exh 19.

243. Lt. Hawkins testified that Michigan never attempted to determine whether the 10 percent reduction in Byrne funds would be more or less costly to the state than the cost of becoming SORNA compliant and administering a SORNA-compliant registry in perpetuity at both the state and local levels. Hawkins Dep 18-19, Exh 19.

244. Lt Hawkins testified that the MSP's Sex Offender Registration Unit believed there would be very little cost to implementing SORNA because Michigan had already received federal grants to build a SORNA-compliant system, and that they just needed to "push the button and turn it on." Hawkins Dep 19 ln 16—

20 ln 3, Exh 19.

245.  After Michigan sought and obtained two one-year extensions to comply with SORNA, it was notified by the Department of Justice's Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) office that if Michigan did not comply by the final statutory deadline, it would lose 10% of its Byrne funding for each year thereafter that the state did not comply. Feb. 1, 2011 SMART Letter, Exh 107.

246.  States were required to comply with SORNA by July 27, 2011. To date 17 states, three territories, and 61 tribes have substantially complied with SORNA. SMART SORNA Substantial Compliance Jurisdictions, Exh 91.

247.  A January 2010 report from the National Conference of State Legislatures noted that some states were concerned with the implementation costs of SORNA, and that "[i]n 2006, it was determined to be more costly – in every state – to implement SORNA than to lose 10 percent of [Byrne grant] funding." Nat'l Conference of State Legislatures, *Cost-Benefit Analyses of SORNA Implementation*, Exh 72.

<span style="color:red">**Defendants do not agree with the conclusions of that report.**</span>

248.  Texas studied the projected cost of SORNA compliance, focusing on the cost to local law enforcement. Texas estimated that the costs of implementing SORNA there would range from $14 million to $25.9 million a year. Texas determined that the loss of 10 percent of its Byrne funds (about $2 million in 2011)

48

would be far less than the cost of complying with SORNA. Texas Association of Counties Study 10, Exh 75; Byrne Fund Reports 2011, Exh 96.

249. A report by the California Sex Offender Management Board described SORNA as an "unfunded mandate," and advised that: "[i]nstead of incurring the substantial and un-reimbursed costs associated with [SORNA], California should absorb the comparatively small loss of federal funds that would result from not accepting the very costly and ill-advised changes to state law and policy required by the Act." California AWA Position Statement 3-4, Exh 73.

250. A white paper by the Colorado Sex Offender Management Board concluded that the cost of implementing SORNA in Colorado "far exceeds" the 10% non-compliance penalty for Byrne grant funding, and estimated that "the cost of implementation to one individual mid-size law enforcement agency may be comparable to the [] annual penalty." Colorado AWA White Paper 4, 17, Exh 74.

251. Defendants do not agree with the conclusions of Texas, California, or Colorado studies. Defendants contend that Michigan was not similarly situated with these other states.

252. Although the federal SMART Office provided grants to help Michigan transition to a SORNA-compliant law, those grants will cease now that Michigan has attained substantial compliance. Johnson Dep 338-39, 349, Exh 15; SMART Confirmation of Michigan's Substantial Compliance, Exh 95.

253. Michigan no longer receives federal grant money to implement SORNA. At present the costs of SORA are being borne within Michigan. Hawkins Dep 21 ln 22—23 ln 10, Exh 19; Johnson Dep 285 ln 3-12, Exh 15.

254. The federal SMART office developed National Guidelines for Sex Offender Registration and Notification that provide narrative descriptions of what is required for substantial compliance. Hawkins Dep 26 ln 19-24, Exh 19; SMART National Guidelines, Exh 111.

255. The SMART national guidelines state that the notification requirements are intended to be non-punitive regulatory measures adopted for public safety purposes. SMART National Guidelines 7, Exh 111.

256. The SMART National Guidelines state that in a federal union such as the United States with a mobile population, the effectiveness of sex offender registration depends upon "having effective arrangements for tracking registrants as they move among jurisdictions." SMART National Guidelines, 4, Exh 111.

257. According to the SMART National Guidelines, SORNA's goal is an effective and comprehensive national system of registration and notification programs, with the ultimate objective of protecting the public against sex offenders. SMART National Guidelines 7, Exh 111.

258. The SMART National Guidelines state that Congress determined that "patchwork" standards that had resulted from piecemeal amendments should be

replaced with comprehensive new standards that would close potential gaps and loopholes under prior law and strengthen the nationwide network of sex offender registration programs. SMART National Guidelines, 4, Exh 111.

## B.   SORNA and Substantial Compliance

259.  To attain substantial compliance under SORNA, states must substantially meet the requirements set out by the SMART office. *See* SMART National Guidelines, Exh 111; SMART Checklist, Exh 110.

260.  Karen Johnson's understanding is that SORNA requires "substantial compliance," not "exact compliance." Johnson Dep 339-340, Exh 15.

261.  Lt. Hawkins testified there was a "certain amount of leeway" and that Michigan did not need to comply with all SORNA guidelines in order to be "substantially compliant." Hawkins Dep 29, 34-35, 37,102, Exh 19.

262.  In response to a question from Plaintiffs' counsel, Lt. Hawkins agreed that for things like reporting there may be less restrictive alternatives that would not be out of compliance with SORNA. Hawkins Dep 37, Exh 19.

> **Defendants object to this question on the grounds that it called for a legal conclusion and further object to the relevance of Lt. Hawkins' personal opinion on one of the ultimate legal issues that is in dispute in this lawsuit.**

263.  Michigan was determined to be substantially compliant with SORNA on May 9, 2011. Hawkins Dep 26 ln 25—27 ln 9, Exh 19; SMART Annual Implementation Review Letter, Exh 100.

264.  Each year, the SMART office performs an annual implementation assurance review to verify that those jurisdictions that have substantially complied with SORNA remain substantially compliant. SMART Annual Implementation Review Letter, Exh 100.

265.  SORA 2013 includes requirements – such as the geographic zones, some immediate reporting requirements, and annual fees – that are not part of the SORNA standards. 42 U.S.C. § 16901 *et seq.*; Johnson Dep 340, Exh 15; Tanner Dep 21, Exh 21; Hawkins Dep 34-35, Exh 19.

### C. The Legislative Process of Drafting the SORA 2011 Amendments

266.  Prior to the passage of SORNA, the MSP created a Sex Offender Advisory Committee. Johnson Dep 346 ln 13—348 ln 19, Exh 15.

267.  Beginning in the fall of 2010, Lt. Chris Hawkins led the Michigan State Police's efforts to implement SORNA by advocating changes to Michigan's SORA. At that time, Lt. Hawkins was a sergeant serving as the MSP's legislative liaison. Hawkins Dep 12 ln 10-19; 63 ln 14-20, Exh 19.

268.  Lt. Hawkins' job was to find a legislative sponsor, work with committees to get the draft legislation, and shepherd the bill through the legislative process. Hawkins Dep 24 ln 20-25; 63 ln 23—64 ln 10, Exh 19.

269.  In the fall of 2010, Lt. Hawkins and others in the MSP approached Michigan State Senator Wayne Kuipers and asked him to sponsor legislation that would

bring the state into substantial compliance with SORNA. There was limited time in that legislative session and Sen. Kuipers was not successful in moving the bill. In the next legislative session, Senator Rick Jones sponsored new legislation to amend SORA to be SORNA complaint. Hawkins Dep 24 ln 18—25 ln 10, Exh 19.

270.  Lt. Hawkins worked with Senator Rick Jones, who was the chair of the senate judiciary committee and a former sheriff, and provided Sen. Jones with proposed legislation. Hawkins Dep 65 ln 16-22, Exh 19.

271.  Once there was draft bill, meetings were arranged with stakeholders in the legislation. There were dozens if not hundreds of stakeholder meetings over a four-month process. Hawkins 66 ln 2-5, Exh 19.

272.  The stakeholder meetings on the proposed changes to SORA included representatives of the American Civil Liberties Union of Michigan (ACLU). Hawkins Dep 66 ln 2-16, Exh 19.

**Plaintiffs object (continuing) to all discussion of the ACLU. The ACLU is not a party and its position on the legislation is irrelevant.**

273.  Lt. Hawkins was personally involved in those stakeholder meetings, although he was not at every meeting. Hawkins Dep 66 ln 21—67 ln 4, Exh 19.

274.  Lt. Hawkins worked closely with Sen. Jones' office as well as with other stakeholders and lobbyists to draft the bill and shepherd it through the legislative process. Hawkins Dep 25 ln 3-10, Exh 19.

275.  Lt. Hawkins testified that his overarching strategy during the process of drafting the amendments to SORA was to bring Michigan into compliance with SORNA and do no more, no less. Hawkins Dep 89 ln 12-16, Exh 19.

276.  The House Fiscal Agency analysis for the SORA bills states that critics of Michigan's registry had long maintained that it included people who pose no risk of reoffending. The analysis noted that one argument supporters of the 2011 amendments made was that some offenses would no longer require registration, some juveniles would be removed from the registry, and some registrants would be on the non-public registry. House Fiscal Agency Analysis, 9, Exh 112; Hawkins Dep 72 ln 25—73 ln 17, Exh 19.

277.  The ACLU indicated a position of neutrality on the 2011 SORA amendments (SB 188, 189, and 206). House Fiscal Agency Analysis, 10-11, Exh 112.

> **Plaintiffs object (same); also misleading: legislation involves compromises, none of which are binding or limit legal claims.**

278.  Lt. Hawkins testified that he worked closely with the ACLU throughout the drafting process to address the ACLU's concerns, and he was proud that the ACLU took a neutral position. Hawkins Dep 75 ln 6-15, Exh 19. During the legislative drafting process, Karen Johnson prepared a written statement outlining the SOR Unit's responses to concerns raised by the ACLU. Hawkins Dep 75 ln 21—76 ln 3, Exh 19; SOR Unit Responses to ACLU, Exh 115.

279. The framework for stakeholder meetings was amending SORA to become substantially compliant with SORNA. The ACLU articulated its concerns about the draft legislation within the negotiating framework of substantial SORNA compliance. ACLU Dissection of Draft, Exh 116; Hawkins Dep 66-68, Exh 19.

280. In commenting on the draft legislation, the ACLU advocated for a wide range of changes, which included (1) automatic removal of juveniles under the age of 14, and a reduction in the number of juvenile offense resulting in registration (both changes permissible under SORNA); (2) limiting the public registry so that it did not include all registrants (a change permissible under SORNA); and (3) not retroactively extending the registration terms of current registrants to life (a provision that the ACLU noted was subject to constitutional challenge). ACLU Dissection of Draft, 1, 3, 8, Exh 116; SMART National Guidelines for Sex Offender Registration and Notification, Exh 111.

281. Ultimately, juveniles under the age of fourteen were removed from the registry, Tier I registrants were not included on the public registry, and some other changes promoted by the ACLU were included in the legislation. *Compare* ACLU Dissection of Draft, Exh 116, *with* Mich. Pub. Acts 17, 18 (2011).

282. Other changes advocated by the ACLU were not adopted. For example, the law was retroactively applied. *Compare* ACLU Dissection of Draft, Exh 116, *with* Mich. Pub. Acts 17, 18 (2011).

283. Earlier drafts of the 2011 SORA amendments required that every time a registrant operated a different vehicle (e.g. borrowed or rented a car), the registrant would need to report in person within three days. ACLU Dissection of Draft, 5, 7, Exh 116.

284. The ACLU proposed a change that would require registration only for vehicles "regularly operated" by the registrant, language that was consistent with the SORNA Guidelines. The SOR Unit did not oppose that change. The language in SORA 2011 concerning "regularly used" vehicles was introduced at the request of the ACLU. Hawkins Dep 76 ln 20—80 ln 5, Exh 19; SOR Unit Responses to ACLU, 5 (Bates #30), Exh 115; ACLU Dissection of Draft, 7, Exh 116.

> **Plaintiffs object (same); also misleading, since the alternative of requiring registrants to report every single vehicle ever used would have been enormously burdensome.**

## VIII.   RETROACTIVITY

### A.   Retroactivity and Tier Structure

285. Before the 2011 SORA amendments, almost three-quarters of those on the registry were 25-year registrants. Registration Length June/August 2011, Exh 61; M.C.L. § 28.725(6) (2009).

286. Under the 2011 amendments, the registration periods for 25-year registrants who were retroactively assigned to Tier III were retroactively extended to life. M.C.L. § 28.725(12).

287.  The tier classifications took effect July 1, 2011. Mich. Pub. Act 18, Enacting Sec. 2 (2011).

288.  MSP data show that on June 1, 2011, there were 11,313 registrants subject to lifetime registration. On August 1, 2011 (after implementation of the tier classifications), there were 28,680 registrants – 17,367 more – subject to lifetime registration. Registration Length June/August 2011, Exh 61.

289.  About 27 percent of active registrants were subject to lifetime registration before the 2011 amendments. At that time there were 41,815 active registrants, of whom 11,313 were lifetime registrants. Registration Length June/August 2011, Exh 61.

290.  About 72 percent of active registrants were subject to lifetime registration after the 2011 amendments. At that time, there were 39,611 active registrants, of whom 28,680 were lifetime registrants. Registration Length June/August 2011, Exh 61; Total Number of Offenders by Tier, Exh 54; L.Wagner Dep 57 ln 12-20, Exh 18.

291.  The percentage of lifetime registrants increased from 72 percent in August 2011 to about 73 percent in May 2013. Total Number of Offenders by Tier, Exh 54 (showing 2,362 Tier I registrants; 8,754 Tier II registrants; and Tier III 29,420 as of 5/24/13).

292.  No formal process exists for registrants to challenge their tier assignment.

After the statute changed in 2011, the MSP SOR Unit received over 100 letters from individuals objecting to their tier classification. The MSP agreed that some people were incorrectly classified, and their tier levels were changed. Johnson Dep 121-24, Exh 15.

293.  SORA 2013 does not contain specific tier classifications for out-of-state offenses. Karen Johnson, manager of the MSP's SOR Unit, testified that a student or legal intern (under the supervision of a lawyer) identified comparable Michigan offenses in order to assigns tier classifications to individuals with out-of-state convictions. Johnson Dep 114-17, Exh 15.

**B. Retroactivity and Substantial Compliance with SORNA**

294.  The DOJ's SMART office provided a Sex Offender Registration and Notification checklist for substantial compliance. Hawkins Dep 25 ln 20—26 ln 3, Exh 19; SMART Checklist, Exh 110.

295.  The SMART checklist includes retroactive application to previously registered sex offenders. SMART Checklist 14, Exh 110.

296.  The SMART national guidelines state that SORNA requirements for substantial compliance are not limited to offenders convicted after implementation of SORNA, and include those who were convicted before SORNA. SMART National Guidelines 7, 45-47, Exh 111.

297.  The Department of Justice noted in its Summary of Comments on the then-proposed guidelines for sex offender registration that retroactivity was required for substantial compliance. Federal Register, Vol. 73, No. 128 (July 2, 2008) 38035-38036; 38046-38047, Exh 108.

298.  The MSP's Sex Offender Advisory Committee determined that retroactive extension of registration periods was a requirement for substantial compliance, and produced legislative recommendations in 2008 stating that SORNA requires retroactive application. Michigan Sex Offender Registration Legislative Recommendations (Bates 322), Exh 109; Johnson Dep 346 ln 13—348 ln 19, Exh 15.

299.  Chris Hawkins testified that Michigan's SORA, as amended, includes retroactive application because it was a requirement under SORNA to avoid a reduction in Byrne grant funding. Hawkins Dep 58 ln 2-25, Exh 19.

300.  The Substantial Implementation Review conducted by SMART indicated that Michigan's retroactivity provisions substantially complied with SORNA. SMART Annual Implementation Review Letter, 3, Exh 100.

## IX.  RESEARCH ON LIFETIME REGISTRATION AND RECIDIVISM RISK

301.  Plaintiffs submitted expert reports addressing risk and recidivism issues from Dr. Janet Fay-Dumaine, a psychologist at the State of Michigan's Center for Forensic Psychiatry, and Dr. Jill Levenson, an associate professor at Lynn Univer-

sity who studies sex offender registries. Fay-Dumaine Expert Rep, Exh 24; Levenson Expert Rep, Exh 23.

302.  The treatment of sex offenders generally involves an assessment of an offender's strengths and weaknesses. A psychologist will take in account all available information to determine whether treatment is effective, including behavioral factors like inappropriate masturbation or aggression towards women, and whether or not the individual is complying with their mental health treatment including medication. Treatment also relies on what the offender is reporting in therapy. A psychologist treating sex offenders interprets behavioral factors and the individual's self-reporting according to the available research. Fay-Dumaine Dep 14 ln 2—16 ln 9, Exh 12.

303.  In the field of psychology there are manualized treatments for certain types of interventions and certain types of disorders, but there will always be some individual variability and some standard error of measure. "So nothing is a hundred percent, not working with people. It just, you know, it's just not possible."  Fay-Dumaine Dep 36 ln 9-19, Exh 12.

304.  To the knowledge of Dr. Fay-Dumaine, there is no current research establishing risk of recidivism based only on the convicted offense. Fay-Dumaine Dep 120 ln 22—121 ln 2, Exh 12.

## A.   Variations in Recidivism Risk

305.  Dr. Levenson concludes that among people with prior sex offenses, recidivism rates vary based on certain actuarial risk factors. Levenson Expert Rep 8, Exh 23.

306.  According to Dr. Fay-Dumaine, while some individuals convicted of sex offenses pose a significant risk to public safety, most do not. Fay-Dumaine Dep 82, 129-130, Exh 12.

307.  In the opinion of Dr. Levenson and Dr. Fay-Dumaine, most sex offenders do not re-offend sexually. They testified that first-time sex offenders are significantly less likely to re-offend than those with multiple sexual convictions, and older offenders are much less likely to re-offend than younger offenders. They also conclude that recidivism rates differ significantly depending on the nature of the offense (*e.g.*, rape, incest, child victim, *etc*.). Levenson Expert Rep 7-10, Exh 23; Fay-Dumaine Dep 82, 114, Exh 12.

308.  Dr. Fay-Dumaine testified: "It's extremely contrary to our cultural assumptions about sex offenders. It's hard for people to get their head around. Yes, there is a group of sex offenders that are at high risk of recidivating, but that's a very small number of sex offenders. Most sex offenders do not recidivate. And this is a pretty robust finding in the literature." Fay-Dumaine Dep 129-130, Exh 12.

309.  Dr. Levenson stated that it was her opinion that because Michigan's registration is based on the offense of conviction, rather than on risk assessments,

the public's ability to identify sexually dangerous persons is significantly reduced. Levenson Expert Rep 2, Exh 23; Levenson Dep 11-15, Exh 9. "When registries have so many people on them and there's such a wide range of risk, it becomes hard for the public to know who's most likely to pose a threat to them or their children, who's most likely to commit a new sex crime in the future." Levenson Dep 11-15, 68, Exh 9.

310. Dr. Levenson also testified that she thinks law enforcement cannot focus its resources on those who pose the greatest risk: "[T]he more work involved for law enforcement to track them and monitor [all registrants].…they have less resources to really devote to those people who are higher risk … or severely high risk." Levenson Dep 70, Exh 9.

311. Dr. Levenson stated that her pilot study for the National Institute of Justice confirmed what other research had found: that law enforcement agents feel "unable to really target high-risk individuals because they have so many [other registrants] to track and monitor." Levenson Dep 71, Exh 9.

312. Dr. Levenson stated her opinion that SORA, by focusing on the danger posed by strangers, misidentifies the source of risk. She noted that in 93% of cases of child sexual abuse, the offender was a family member or acquaintance. About 7% of child sex abuse cases involve strangers. Levenson Dep 108 ln 6-13, Exh 9;Levenson Expert Rep 9, Exh 23.

313.  According to Dr. Fay-Dumaine, "[m]ost sex offending happens within the family. Most sex offending happens in stressful difficult situations, or it's young adult males not making a good judgment about having sex with somebody who's a few years younger than they are. But that's the lump sum of most sex offenses. The number of pedophiles in the world is extremely small, but the perception in the public is … everybody is going to re-offend, but there's no data to support that." Fay-Dumaine Dep 83, Exh 12.

314.  Dr. Fay-Dumaine testified, "[as to] serial rapists, I can tell you in my [20-year] career how many I have seen on one hand." Fay-Dumaine Dep 130, Exh 12.

315.  Dr. Levenson testified that, in her opinion, public sex offender registration and residency restrictions, which focus on "stranger danger," give parents a false sense of security by implying that knowing where registrants live or banishing them from the community reduces the risk of sex offenses being committed, when, according to the research she cited, such measures do not have this effect. Levenson Dep 71, Exh 9.

316.  According to Dr. Levenson, sex offenders who abuse children are most likely to meet those children through some prior social relationship with the victim that they have built through their families. Levenson Dep 89 ln 7-25, Exh 9.

317.  In Herbert Tanner's experience as a prosecutor, the age of the offender or their level of maturity is not significant to their risk of re-offense and he believes

that there are very few sex offenders who make a "youthful mistake" and commit a sexual offense. But he thinks that the age of the victim or the victim's level of maturity is significant because it indicates the perpetrator's exploitation of that vulnerability. Tanner Dep 50 ln 2—51 ln 8, Exh 21.

> **Plaintiffs Object: Inadmissible opinion testimony from a witness who is not listed as an expert and admits he is not an expert. Foundation; Competence. His opinions about sex offender risk are contradicted by the psychological literature and demographic studies. Tanner Dep 72 ln 12—73 ln 5, Exh 21.**

> **Defendants respond that this is Mr. Tanner's lay opinion that is rationally based on his perceptions through his years of experience prosecuting sex offenses.**

318.  Based on Herbert Tanner's experience prosecuting, his personal opinion on the nature of sex offenders is that, "not only are they serial sex offenders, they tend to be polymorphous serial offenders, that is that they do other acts of violence, interpersonal, inter-partner violence, child abuse, child sexual abuse. That research is out there as well, so yeah, I'm very comfortable in saying that sex offenders, the majority are serial offenders and that if we can catch one we've stopped a one-person crime spree."  Tanner Dep 73 ln 2—74 ln 13, Exh 21.

> **Plaintiffs Object: same.**

> **Defendants offer the same response.**

**B.   Risk Prediction Based on Clinical Risk Assessments Versus the Offense of Conviction**

319.  Plaintiffs' experts testified that actuarial risk assessment instruments –

which are used to determine the statistical likelihood that offenders will re-offend based on known indicators – are far better at predicting recidivism risk than the offense of conviction. Levenson Expert Rep 8, Exh 23; Levenson Dep 41-44, Exh 9; Fay-Dumaine Dep 112-113, Exh 12.

320.  Dr. Janet Fay-Dumaine testified that she is unaware of any actuarial risk assessment tools specific to sex offenders existing prior to the 1990's.  Fay-Dumaine Dep 29 ln 15-18, Exh 12.

321.  According to Plaintiffs' experts, the most commonly used and best-researched risk instrument is called the Static-99. The Static-99 is an actuarial-based tool designed to assist in the prediction of sexual recidivism for male sex offenders. According to Dr. Levenson and Dr. Fay-Dumaine, the Static-99 has demonstrated good predictive accuracy in multiple validation studies and offers a firm scientific basis for assessing the likelihood that offenders convicted of a sex offense will re-offend. Levenson Expert Rep 8, Exh 23; Fay-Dumaine Dep 44-46, Exh 12.

322.  Dr. Faye- Dumaine testified that there have been multiple studies in Canada, the United States, and Europe validating the Static-99. Studies of the Static-99 have been done with general correctional populations, as well with high risk populations and other populations. Fay-Dumaine Dep 72 ln 23—74 ln 11, Exh 12.

323.  When asked about sample size, Dr. Fay-Dumaine stated that there have

been "so many studies." She stated that one of the studies cited in her report was

based was 4,040 convicted sex offenders from Canada, the United States, England,

Austria, and Sweden. It is possible, although unlikely as the data sample was

collected before most states had registration schemes, that a portion of the sample

set of sex offenders from the United States were registered sex offenders. For that

study, it is possible that  registered sex offenders were included in that portion of

the sample set that was taken from the United States. There is no data set available

for undiscovered sex offenders. Fay-Dumaine Dep 72 ln 23—74 ln 11; 95 ln 19-

22, Exh 12.

324.  Acturial tools like the Static-99 are not designed to predict whether any

particular individual will or will not reoffend, but are designed to screen people

into relative risk categories, "in a similar way as our car insurance companies do."

Levenson Dep 63 ln 12-24, Exh 9.

325.  Plaintiffs' experts describe the Static-99 as being easily administered by

anyone trained to do so. Levenson Expert Rep 8, Exh 23; Fay-Dumaine Dep 68-69,

Exh 12.

326.  Administration of a Static-99 often relies on information in the offender's

record including pre-sentencing investigation reports, case managers' reports,

medical records, *etc.* Administration of the Static-99 does not require an interview of the offender. Fay-Dumaine Dep. 53 ln 1-24, Exh 12.

327.  For some factors (such as whether the victim is known to the offender), the scoring of the Static-99 test relies heavily on the original criminal investigation and the details of the investigative report. Fay-Dumaine Dep. 67 ln 16—68 ln 2, Exh 12.

328.  A Static-99 test can only be performed on people who have been convicted of certain listed sex offenses. For example, the Static-99 cannot be performed on offenses such as the possession of child pornography. Fay-Dumaine Dep. 56 ln 19—57 ln 14, Exh 12.

329.  The Static-99 test cannot be performed on female offenders because they are relatively rare and their "recidivism rate is incredibly low." There is also no comparable tool to the Static-99 for female sex offenders. Fay-Dumaine Dep 89 ln 21—90 ln 1, Exh 12.

330.  The Static-99 cannot be applied to juveniles and may be inaccurate for offenders not native to North American culture. Levenson Dep 64 ln 4—65 ln 13, Exh 9.

331.  A person must be trained in order to score the Static-99. Dr. Fay-Dumaine testified that most correctional departments and other agencies that use the Static-99 are "pretty stringent" about training. Static-99 scores are not required to be

verified by another person besides the original scorer unless the agency where the scorer works has an internal policy requiring it, which many do. Scores are not submitted to any central body for confirmation. Ultimately, the accuracy of a Static-99 depends on the reputation of the individual or agency scoring it. Fay-Dumaine Dep 68 ln 17--69 ln 25; 70 ln 23—71 ln 7, Exh 12.

332.  Dr. Fay-Dumaine conducted actuarial risk assessments of plaintiffs John Does #2-4 using the most recent version of the Static-99. Fay-Dumaine Expert Rep 1, Exh 24; Fay-Dumaine Dep 44, Exh 12.

333.  Dr. Fay-Dumaine could not score John Doe #1 because his offense did not have a sexual component, and the Static-99 is specific to sex offenses. She also could not score Mary Doe because the Static-99 has not been validated for female offenders. (John Doe #5 was not scored because he intervened in the litigation after Dr. Fay-Dumaine's report was completed.) Fay-Dumaine Expert Rep 1, 4, Exh 24.

334.  John Does #2-4 all received a Static-99 score of "2". Offenders from routine correctional samples with a score of "2" have been found to sexually reoffend at a rate of five percent (or one in 20) over five years. Fay-Dumaine Expert Rep 1, Exh 24.

335.  The Static-99 is based on statistical probability, not a clinical judgment of a particular offender. Individuals can sometimes defy probability. The overall predicative accuracy of the Static-99 on any given offender's likelihood of reoffend-

ing is about 70 percent. Fay-Dumaine Dep 79 ln 15—81 ln 17, Exh 12.

336.  Plaintiffs' experts testified that sexual offending decreases with age, and age is one of the factors that the Static-99 considers. John Does #2-4 are all currently under age 35. At the age of 35, their Static-99 scores will drop to a "1". Offenders with a score of 1 have a recidivism risk of about 3.8%. As plaintiffs grow older, their actuarial risk of recidivism will continue to decrease. Fay-Dumaine Expert Rep 1, 3, Exh 24; Fay-Dumaine Dep 52, 114, Exh 12.

337.  The age of the offender does not cause offending, but age is correlated with risk of offending. As age increases, risk of offending decreases. Nothing specific occurs on an offender's 35th birthday that reduces their risk of offending, but they will then belong to an actuarial group with a lower risk level. Fay-Dumaine Dep 52 ln 9-25, Exh 12.

338.  Although the Static-99 could not be scored for Mary Doe, Plaintiffs' experts testified that research on female sexual offenders has found female offenders to have "an 'extremely low' rate of sexual recidivism" (between 1-3%)". Fay-Dumaine Expert Rep 4, Exh 24; Fay-Dumaine Dep 89-90, Exh 12; Levenson Dep 65, Exh 9.

339.  According to Dr. Fay-Dumaine, although the plaintiffs are classified as Tier III offenders and are required to register for life, actuarial risk assessments indicate that they score in the range that is extremely low risk. Moreover, in Dr.

Fay-Dumaine's opinion, the nature of their offenses and the length of time that they have lived offense-free in the community also indicate that they are extremely unlikely to re-offend. Fay-Dumaine Expert Rep 1, 4, Exh 24; Fay-Dumaine Dep 96-97, 82, 104, 110-114, Exh 12.

340. In Herbert Tanner's opinion, there is a difficulty in anyone determining the risk of an offender committing a future offense:

> I think it has to do with a number of factors, not the least of which, something that [counsel] already mentioned about correlation and causation. Generally the problem is that we don't really know. We're not good at judging this stuff. We can take clinical judgment, say have a psychiatrist or psychologist give some kind of test to someone and in their clinical judgment they're going to say it is -- this person isn't a risk or is this level of risk. And that kind of clinical judgment stuff is a coin flip at best I think. There are instruments out there that various states have used or various organizations have suggested, but the reality is that without knowing who that sex offender is and without knowing who the cohort of people that that risk assessment was normed against, it's very difficult to say that this person is going to offend -- to put a risk.

>         \*     \*     \*

> And, you know, we study, and these risk assessments are studying the people that got caught. What do we know that the vast majority of rapes are not reported, that those reported are not necessarily investigated, that when investigated they're not necessarily charged, and when they're charged they don't always result in a conviction or even frequently result in a conviction. We're studying the wrong group -- we studied the wrong group to develop these risk assessments.

>         \*     \*     \*

[A]lso -- it is and it's also not only that, it's the what does it mean to reoffend, what does recidivism mean.  And there has to be an acknowledgment of the underestimation.  If you say recidivism is measured by the number of people that are rearrested that's going to -- that's an underestimation of the actual re-offense rate. If you say recidivism is the number of people who were convicted of a subsequent offense that's going to even more grossly underestimate the number – the recidivism.  And, you know, taking say like the Department of Corrections likes to do and they put their little Compass thing out there and they say only 5 percent have been returned to prison, okay, now I know what their definition of recidivism is. Tell me how many of those people rape their kids. They can't do that unless they were returned to prison for that, so what are we measuring with all of these instruments, what are we asking the court to measure?

Tanner Dep 93 ln 6—96 ln 1, Exh 21.

Pls Object: Inadmissible opinion testimony from a witness who is not listed as an expert and admits he is not an expert. Foundation, Competence. His opinions are contradicted by the psychological literature and demographic studies. Tanner Dep 72 ln 12—73 ln 5, Exh 21.

Defendants respond that this is Mr. Tanner's lay opinion that is rationally based on his perceptions through his years of experience prosecuting sex offenses.

C.   Research on the Comparative Risk of Non-Sex Offenders and Sex Offenders

341.  According to plaintifs' experts, requiring registration for 25 years to life is both inefficient and unnecessary because after the passage of time reoffending is "very unlikely to occur." Fay-Dumaine Dep 92-94, 115-116, Exh 12; Levenson Expert Report 10, Exh 23.

342.  Risk for sexual recidivism declines with age. Recidivism risk also

declines the more time a person spends offense-free in the community. Levenson

Expert Rep 10, Exh 23; Fay-Dumaine Dep 104, Exh 12; Levenson Dep 129-138,

Exh 9.

343.  Dr. Fay-Dumaine testified that it is possible that a small subset of high

risk sex offenders get better at concealing their crimes over time. However, studies

show that the majority of sex offenders offend only once. Fay-Dumaine Dep 119 ln

19—120 ln 15, Exh 12.

344.  Dr. Fay-Dumaine testified that the research shows that most sex offenders,

including high risk offenders, do not reoffend after their first conviction. Fay-

Dumaine Dep 82, Exh 12.

345.  The part of the Static-99 test that evaluates whether the offender has prior

offenses does not factor in arrests, investigations, accusations, or complaints—only

criminal charges or institutional misconducts. Charges and misconducts, in turn,

depend upon a victim coming forward or the authorities becoming aware of the

incident through other avenues. Fay-Dumaine Dep 59 ln 1—61 ln 12, Exh 12.

346.  Sex crimes are under-reported. Levenson Dep 62 ln 21—63 ln 7, Exh 9.

347.  According to Dr. Fay-Dumaine, sex offenders who do reoffend usually do

so within three to five years. For individuals who do not reoffend during that

period "there's a precipitous drop" in recidivism risk. Fay-Dumaine Dep 82, Exh

12.

348.  According to Dr. Fay-Dumaine, when individuals remain offense free in the community, their risk drops 50% after five years, and another 50% for every five-year interval after that. She reports that this is true even for high-risk offenders. Fay-Dumaine Dep 82, 104, 129-139, Exh 12.

349.  Dr. Levenson stated that persons who have never been convicted of a sex offense also present a risk of committing sex offenses. Dr. Levenson reported that while some individuals convicted of sex offenses will re-offend, she testified that the vast majority of new sex offenses are committed not by registered offenders, but by individuals without prior sex offenses. Dr. Levenson cited a study in New York found that 95% of all arrests for sexual offenses were for individuals who did not have a prior sexual offense conviction and who were not on a sex offender registry. Levenson Expert Rep 8, Exh 23

350.  Dr. Fay-Dumaine testified that the risk of sexual offending is about 3% in the general male population. Fay-Dumaine Dep 93, Exh 12.

351.  In the opinion of Drs. Levenson and Fay-Dumaine, research that distinguishes between low, medium, and high-risk offenders shows that low-risk offenders actually have a lower risk for sexual offending than the general male population by about one percentage point. Fay-Dumaine Dep 82, 93, Exh 12; Levenson Dep 130-137, Exh 9.

352.  Specifically, Drs. Levenson and Fay-Dumaine reported on research that

shows that the baseline population of individuals who have never been arrested for a sex-related offense, but have been arrested for some other crime, had a 3% chance of committing an "out-of-the blue" sex offense. From the outset, low-risk sex offenders have a lower risk of committing a sex offense (2.2%) than that baseline. Levenson Dep 130-137, Exh 9; Fay-Dumaine Dep 93, Exh 12; Hanson Study 9-11, Exh 78; Hanson Decl 1, 9, Exh 79.

**Defendants make a continuing objection to the introduction of the Hanson Study as an exhibit on the grounds that Dr. Hanson was not listed as a witness, was not subject to examination, and the paper was not identified as an exhibit or produced by Plaintiffs during discovery as a document upon which they sought to rely.**

**Plaintiffs state that the Hanson Study was in fact provided to opposing counsel in advance of Dr. Levenson's deposition as a document she relied on in forming her opinion. It was also discussed at her deposition. *See* Levenson Dep 127—137, Exh 9, and deposition exhibit F. The article is also available in the *Journal of Interpersonal Violence*.**

353. Drs. Levenson and Fay-Dumaine conclude that for medium-risk sex offenders, the risk of committing a sex offense drops off over time so that after 10-14 years offense-free in the community, it is below the baseline for non-sex offenders. They conclude that high-risk sex offenders pose no more risk than the base-line group after 17 years offense-free in the community. Fay-Dumaine Dep 93, Exh 12; Levenson Dep 130-137, Exh 9; Hanson Study 11, Exh 78; Hanson Decl 2, Exh 79.

354. The graph below, which reflects the research of Karl Hanson and was

74

explained by Dr. Levenson at her deposition, shows how recidivism rates of
different risk categories drop off over time, and how they compare to the baseline
population. Levenson Dep 130-137, Exh 9.



Sex Offender Sexual Recidivism Risk Levels Over Time Graph, Exh 80.

355. According to Drs. Levenson and Fay-Dumaine, the current research in the
field shows that low-risk offenders pose less risk of committing a sex offense than
the baseline for "out of the blue" offenses, and that the recidivism risk of medium
and high-risk offenders drops off dramatically over time, so that after 17 years

even high-risk offenders present a statistical risk equivalent to the baseline. Fay-Dumaine Dep 92-93, 111-112, Exh 12; Levenson Dep 130-138, Exh 9; Hanson Decl 1, Exh 79; Hanson Study 9-11, Exh 78.

356. Dr. Fay-Dumaine reported that low and medium-risk offenders comprise upwards of 90 percent of all sex offenders. Fay-Dumaine Dep 113, Exh 12.

357. Dr. Levenson testified that even high risk sex offenders are "no more likely" than the baseline population to commit a sex offense after 17 years offense-free in the community. She stated that from a

> cost-effectiveness point of view any benefit that a registry might serve, and, again, there's really no consensus in the research to support benefits of the registry in terms of recidivism, but any benefits that might exist after 17 years are sort of washed out by the – you know, the low likelihood of committing a new sex crime.

Levenson Dep 137-138, Exh 9.

**Defendants object to Dr. Levenson's opinion regarding the cost-effectiveness of registries for lack of foundation and because it is outside the scope of her proffered expertise as a psychologist.**

## D. Research on Whether Tier Classifications Correspond to Risk

357. According to Dr. Levenson, research shows that many individuals classified as Tier III have a lower risk of re-offending than individuals in lower tier levels. Dr. Levenson's report discusses research showing that tier structures based on the offense of conviction, "fail to distinguish between registered offenders who present significant threat to public safety and those who present lower risk." For

example, research in Florida showed that Tier III offenders have lower recidivism rates and lower actuarial risk scores than Tier II offenders. Levenson Expert Rep 2, Exh 23; Levenson Dep 127, 140-41, Exh 9.

358. Dr. Levenson's report states that some jurisdictions "classify risk" based strictly on the conviction. At her deposition she clarified that it is more accurate to say that some states structure their registry on the conviction rather than the actuarial risk any given individual poses. Levenson Dep 38 ln 16—41 ln 9, Exh 9.

359. Dr. Fay-Dumaine testified that "[t]he offense alone doesn't really denote any particular risk," and that other factors, like those captured on the Static-99, are more relevant to risk determinations. Fay-Dumaine Dep 112, Exh 12.

360. Dr. Fay-Dumaine testified that having a list of over forty-thousand convicted offenders that could be tracked over time for recidivism may "possibly" be valuable resource for further scientific research. Fay-Dumaine Dep 133 ln 9—134 ln 11, Exh 12. Dr. Levenson stated that a pool of data on sex offenders registering for a period of 25 years to life would be useful for further research on sex offenders and recidivism. Levenson Dep 113 ln 6-12, Exh 9.

     **Plaintiffs object: irrelevant to any issue in this case.**

### E. Use of Risk Assessments to Design Supervision Strategies at the Michigan Department of Corrections

361. Plaintiffs' expert Richard Stapleton, the former chief legal counsel for the Michigan Department of Corrections, testified that because evidence-based

correctional research has shown that supervision strategies must be tailored to an individual's risk level, and because individuals with serious offenses may have lower risk levels than individuals with lesser offenses especially over time, the MDOC uses empirically-based risk assessment instruments to determine each offender's actuarial risk. Supervision for parolees and probationers can then be tailored to each offender's actual risks and needs. Stapleton Expert Rep 3-4, Exh 28; Stapleton Dep 36-37, Exh 13.

362. The Michigan Parole Board and MDOC probation agents strive to narrowly tailor conditions of supervision to the individual circumstances of each individual. The Parole Board uses risk assessment tools to tailor conditions, and "the more accurate the risk assessment is the more narrowly tailored the conditions can be." Stapleton Expert Rep 1, 5, Exh 28; Stapleton Dep 92, Exh 13.

363. Current MDOC case management standards no longer require in-person monthly reports for all offenders, regardless of risk. Rather, the frequency and nature of reporting (*e.g.*, in person, by phone, by mail) are determined by the offender's assigned level of supervision. Depending on the supervision level, some parolees and probationers can use the phone, mail, or email to contact their agents or report changes. Stapleton Expert Rep 4, Exh 28; Stapleton Dep 73-75, Exh 13.

364. According to Mr. Stapleton, the MDOC not only targets interventions to high-risk offenders, but also minimizes interventions with low-risk offenders,

because evidence-based research shows that intensive supervision of low-risk offenders is counter-productive. Targeting MDOC resources to high-risk offenders is the best way to protect the public. Stapleton Expert Rep 1, 3-4, 5-7, Exh 28.

365.   During his deposition, Mr. Stapleton was unable to recall offhand the research upon which he based his conclusion that the greater burden you place on offenders, the more likely they are to engage in negative behavior. He stated that this was a general line of thought over the years in his field and that there have been articles in *Corrections Today Magazine* discussing this, as well as other studies and articles. Stapleton Dep 48 ln 7—50 ln 3, Exh 13.

366.   Mr. Stapleton reported that SORA 2013's requirements are applied to all registrants, regardless of risk level. Stapleton Expert Rep 1, Exh 28.

367.   According to Mr. Stapleton, the fact that parolees and probationers with sex offenses are subject to SORA undermines the MDOC's use of evidence-based correctional practices because the statute imposes virtually identical requirements on all registrants regardless of risk level. Stapleton Expert Rep 1, 5-7, Exh 28.

368.   In preparing his expert report, Mr. Stapleton did not perform any case studies of particular parolees or probationers, nor analyze any of the Does. Rather, he based his conclusions on his experience at the MDOC and research performed over the last 20 years establishing that evidence-based practices work in reducing criminal behavior. Stapleton Dep 50 ln 51 ln 4-12, Exh 13.

369.  Mr. Stapleton's conclusions are based in part upon a 2004 article entitled "Implementing Evidence-Based Practice in Community Corrections." That article did not include specific analysis of sex-offender registration requirements, but did include discussion of sex offenders. Stapleton Dep 52 ln 14—53 ln 15, Exh 13.

370.  Mr. Stapleton testified that while the purposes of sex offender registration and probation or parole are not identical, both registration and parole/probation have the purpose of protecting the public. But the purpose of supervision under the MDOC is also to rehabilitate and reintegrate, while the sex offender registry has the purpose of notifying the public. Stapleton Dep 41 ln 21—42 ln 13; 45 ln 11-15; 94 ln 14—95 ln 10, Exh 13.

371.  Mr. Stapleton admits that each convicted sex offender poses some risk of reoffending in the future since they are human beings and "we all pose some level of risk." Stapleton Dep p 42 ln 14-17, Exh 13.

## X.   GEOGRAPHIC ZONES

372.  Under SORA 2013, the plaintiffs are barred from residing, working, or "loitering" within a "student safety zone," defined as "the area that lies 1000 feet or less from school property." M.C.L. §§ 28.733(e)-(f), 28.734, 28.735.

373.  School property is defined as, "a building, facility, structure, or real property owned, leased, or otherwise controlled by a school, other than a building, facility, structure, or real property that is no longer in use on a permanent or contin-

80

uous basis" and is either "used to impart educational instruction" or "is for use by students not more than 19 years of age for sports or other recreational activities." M.C.L. §§ 28.733(e).

374. SORA 2013's geographic zones are not limited to only those registrants convicted of offenses against children. M.C.L. §§28.733-736; Johnson Dep 303, Exh 15.

375. Plaintiffs submitted two expert reports regarding the geographic zones from Peter Wagner, the director of the Prison Policy Initiative who has for the last decade regularly created maps that analyze demographic data in relation to statutory restrictions that impose geographic limits for criminal justice purposes. Wagner 1st Expert Rep, Exh 25; Wagner 2nd Expert Rep, Exh 26; Wagner Supp Decl 1, Exh 128.

376. Mr. Wagner stated that his methodology has never been challenged, including by opposing experts in other litigation where Mr. Wagner has served as an expert witness. P. Wagner Dep 58 ln 19—59 ln 8, Exh 11; Supplemental Wagner Decl ¶4, Exh 128.

377. Mr. Wagner has never been retained as an expert by a government seeking to defend a sex offender geographic zone. P. Wagner Dep 36 ln 5-8, Exh 11.

378. No one has ever verified one of Mr. Wagner's maps on a parcel-by-parcel basis to confirm that the map is accurate and actually represents what it purports to

show. P. Wagner Dep 58 ln 19—59 ln 8, Exh 11.

379.  Mr. Wagner stated that in Michigan, the size, shape, and boundaries of "student safety zones" are effectively unknowable, even for experts with specialized software and relevant training. Accordingly, the plaintiffs often cannot know if they are working, residing, or "loitering" within 1000 feet of school property. Wagner 2nd Expert Rep i, Exh 26. Mr. Wagner stated that it is possible, provided one has parcel data, to work backwards from a given address and determine if it is in compliance with the sex offender geographic zones.  P. Wagner Dep 95 ln  18-20, Exh 11.

**A. The Size of Geographic Zones**

380.  According to Mr. Wagner, the geographic zones can cover vast areas, especially in urban and suburban regions. They thereby severely restrict access to employment and housing, and limit registrants' ability to engage in normal human activity. Wagner 1st Expert Rep 6-10, Exh 25.

381.  Mr. Wagner produced an under-inclusive map (erring on the conservative side) for the City of Grand Rapids, showing that at least 46% of the city's property parcels lie within geographic zones. Wagner 2nd Report ii, 27-28, Figure 10, Exh 26.

# "School safety zones" in the city of Grand Rapids



**Figure 10.**

382. Mr. Wagner stated that towns smaller than Grand Rapids may have

substantially fewer schools. P. Wagner Dep 63 ln 4-6, Exh 11.

383.  In making his map of Grand Rapids, Mr. Wagner included adjoining

parcels owned by a school without knowing whether that adjoining parcel was

being used to impart education or by students younger than 19 for purposes of

sports. He did not include adjoining parcels under separate ownership that may

have been rented or used by the school to impart education or for the purposes of

sports. P. Wagner Dep 55 ln 1-16, Exh 11.

384.  Some of the shaded areas in figure 10 of Mr. Wagner's report may not be

residential. P. Wagner Dep 103 ln 18—105 ln 19, Exh 11.

385.  According to Mr. Wagner, many of the "permissible" areas on that map

are likely not appropriate for living, working, or spending time because they are in

industrial areas. *Id.*

386.  Expanding the number of "protected places" can dramatically increase the

total area covered by exclusion zones. For example, during the 2011-12 legislative

session, the Michigan Senate (but not the House) passed S.B.76 and 77, which

would have criminalized "loitering" within 1000 feet of daycare centers. Based on

a list of the approximately 10,729 daycare providers in Michigan, Mr. Wagner

created a map showing what 1000 foot circles around just two dozen daycare

providers in Lansing would look like. This map significantly understates the size of

the potential geographic zones, because it is not based on parcel data. Wagner 2nd

Expert Rep 28-32, Figure 11, Exh 26; S.B. 76 and 77 (2012), Exh 97.

387.  Mr. Wagner acknowledges that Michigan has not passed any legislation adding day cares to the areas restricted by geographic zones. P. Wagner Dep 110 ln 5-11, Exh 11.



**Figure 11.**

388. Mr. Wagner also found that if daycares are added to the list of protected places, 75% of Grand Rapids would be off-limits. Wagner 2nd Expert Rep, Figure 12, Exh 26.

## Most of Grand Rapids is within 1,000 feet of a school or day care property



Figure 12.

86

## B.   The Impact of Different Measurement Methods on the Shape and Size of Geographic Zones

389.  According to Mr. Wagner, there are four significant variables that affect the measurement of geographic zones.

   a.  The activity (reside, work, or loiter, as defined in M.C.L. § 28.733(b));
   b.  The measurement of the distance (as the crow flies or along the road);
   c.  What point the distance is measured from (building, property line, etc.);
   d.  What point the distance is measured to (person, building, property line).

Variations in those factors lead to different results in the size, shape, and boundaries of exclusion zones, and therefore determine whether or not a registrant is engaging in lawful behavior. Wagner 2nd Expert Rep 3, Exh 26.

390.  Mr. Wagner stated that if the statute was changed or interpreted in such a way so that there was a consistent method of measuring zones that was both know-able and possible for an offender to do, that would eliminate ambiguity regarding exclusion zones, though it would not eliminate the burden of complying with the zones. P. Wagner Dep 112 ln 22—114 ln 8, Exh 11.

391.  Mr. Wagner stated that the nature of the prohibited activity can affect how one measures distance. Loitering and working are not necessarily stationary activi-ties, meaning that determining whether a registrant is within a protected zone can involve real-time mapping of the distance between a fixed protected area and an ambulatory person moving about. *Id.*

392. Ms. Johnson, the SOR Unit manager, testified that proximity mapping "doesn't work for loitering," when a person is moving around.

> Q. So your testimony is you don't know how it's measured, loitering is measured, whether it's measured from the person or from the parcel or from some other thing?
> A. Correct.

Johnson Dep 228-29, Exh 15.

393. Mr. Wagner's expert report includes figures showing that if one measures in a straight line between two points, regardless of obstructions or normal travel routes, then a geographic zone may include areas that are not at all close to schools in terms of actual/practical travel distance. Wagner 2nd Expert Report 5-6, 13-14, Figures 1, 2, Exh 26.



Figure 1 (person in marked house, which is less than 1000 feet from school, would need to travel 4,200 feet to get to the closest part of school property)



Figure 2 (home within 1000 feet of school has driving distance of 4.4 miles)

394.  While 1000 feet is an objective distance, the size, shape, and boundaries of a geographic zone are affected by the two points between which one measures. In Wagner's opinion, taking the example of the prohibition on residing within 1000 feet of a school, geographic zones could be measured: (a) from the school building to the home building; (b) from the school property line to the home property line; (c) from the school property line to the home building; or (d) from the school building to the home property line. Wagner 2nd Expert Rep 4, 7, Exh 26.

395.  Variations in the methodology used to measure the protected distance impact the size, shape, and boundaries of geographice zones, and hence control whether or not registrants are in fact residing, working, or visiting a place unlawfully. Wagner 2nd Expert Report 7-15, Figures 3-5, Exh 26.



Figure 3 (view of school)



Figure 4 (showing, in successively darker colors, a school symbol for the front entrance, the school's outline in orange, and the school's property line in brown)



Figure 5 (showing 1000-foot geographic zones drawn around each of three nested protected areas: the school's entrance, the school building and the school property)

396. Mr. Wagner's reports use these images to demonstrate that the area covered by a 1000-foot distance around a school property perimeter is more extensive than the area covered by a 1000-foot distance from a single point at the school. The differential was 3.5 times larger for the example used in Mr. Wagner's report. Wagner 2nd Expert Rep 9-10, Figures 4, 5, Exh 26.

397. Mr. Wagner explained in his deposition:

A. …The general problem here … is that as the distance gets bigger the area that's affected grows much faster, so as you double the distance, as you double the radius, the area that's affected goes up four times. So 500 feet sounds like it's half the size of 1,000 feet but the affected area is actually a quarter of the size.

Q. And why is that?

A. Geometry. . . . It's because the area of a circle is pi r2, so when you double r you're actually making the area four times larger.

P. Wagner Dep 65-66, Exh 11.

398.  According to Mr. Wagner, geographic zones are not necessarily shaped like simple circles around a fixed point. He stated that while measuring 1000 feet from a single point will produce a circle, measuring 1000 feet from a parcel boundary will produce an irregular shape. Moreover, as shown in figures 6a, 6b, and 6c, measuring to the home property line will create oddly shaped exclusion zones, since the entire parcel of a home becomes off limits if any part of the parcel is within 1000 feet of a school. The size of the intersecting parcels affects the total size of the geographic zones. Wagner 1st Expert Rep 4, Exh 25; Wagner 2nd Expert Rep 11-13, Figures 6a-6c, Exh 26.



Figure 6a (geographic zone measured from school entrance to home property line)



Figure 6b (geographic zone measured from school building perimeter to home property line)



Figure 6c (geographic zone measured from school property line to home property line)

399. The size, shape and boundaries of exclusion zones are also affected by

93

whether distances are measured "as the crow flies" or as a person could actually travel. Wagner 2nd Expert Rep 4-5, figure 7a, 7b, Exh 26.



Figure 7a (1000 foot distance measured along streets that connect to school property)



Figure 7b (showing properties that are adjacent to the 1000 foot distances as

94

measured along roads)

400.  Finally, Mr. Wagner reported that exclusion zones in densely populated areas frequently intersect and overlap, creating oddly shaped zones that blanket communities. Wagner 1st Expert Rep 4-5, Exh 25; Wagner 2nd Expert Rep 34, Figure 13, Exh 26.



Figure 13 (map showing how different 1000–foot geographic zones overlap)

401.  In Mr. Wagner's opinion, if parcel-to-parcel measurement is used for all prohibited conduct, registrants must be able to identify these oddly-shaped exclusion zones and structure their lives accordingly. Wagner 2nd Expert Rep 13, Exh 26.

402.  According to Mr. Wagner, whether or not a person is violating SORA by residing, working, or loitering in a particular place will depend on what measure-

ment method is used. Wagner 2nd Expert Rep 15, Exh 26.

### C.   Defendants' Understanding of the Geographic Zones

403.  The MSP's SOR Manual does not define how geographic zones should be measured. MSP SOR Manual § 4.1, Exh 83.

404.  When asked about her understanding of how geographic zones should be measured, Karen Johnson, the manager of the MSP Sex Offender Registration Unit, testified: "We get the telephone calls asking us the questions, so I know what the questions are but I don't know what the answers are."  Johnson Dep 58 ln 16-18, Exh 15.

405.  Ms. Johnson testified that she did not know how to determine whether a residential or employment address is within a geographic zone, and that she did not know whether the 1000-foot distance is measured property-line to property-line or point to point. Johnson Dep 58, 61, 225-26, Exh 15.

406.  Leslie Wagner, the MSP Registry Coordinator who is a civilian employee responsible for overseeing the SOR database system, testified:

A. We don't know and I don't know if the registry is supposed to be from one parcel to a point or a parcel to a parcel or point to point . . .
Q. You yourself are not sure whether it should be measured parcel to parcel or point to point?
A. Correct.

L. Wagner Dep 27-29; 15 ln 11-15; 16 ln 12-25; 58 ln 12-18, Exh 18.

407.  It is not the practice of the SOR Unit to make a determination over the phone whether an area is in a geographic zone. The SOR Unit usually refers questions about geographic zones or measurement to local law enforcement, the local state police post, or the local prosecutor. Payne Dep 34, 118 ln 25—119 ln 5, Exh 17; Johnson Dep 97 ln 17—98 ln 8; 99 ln 21—101 ln 9; 242 ln 21—243 ln 5; 315-16, Exh 15; Burchell Dep 45, Exh 16.

408.  When geographic zones were created in 2006, the MSP SOR Unit created a "cheat-sheet" for internal use of frequently asked questions about the zones to help SOR unit staff understand the law. The SOR Unit uses the FAQ internally, and questions about the zones are usually referred to prosecutors. Johnson Dep 97 ln 17—98 ln 8; 314-315 ln 23, Exh 15; Student Safety Zone Cheat-sheet, Exh 49.

409.  The cheat-sheet contains answers to approximately 15 questions. One entry is crossed out as incorrect. One other entry states that homeless registrants cannot use shelters. Student Safety Zone Cheat-sheet, Exh 49. Subsequent to the creation of the "cheat sheet", a federal court held that SORA does not prohibit registrants from using emergency shelters within 1000 feet of a school. *Poe v. Snyder*, 834 F. Supp. 2d 721, 733 (W.D. Mich. 2011).

410.  The cheat-sheet does not state how the 1000 feet is measured. Student Safety Zone Cheat-sheet, Exh 49.

411.  Ms. Johnson testified that the MSP does not share the cheat-sheet with

other agencies "because other agencies are not bound by our attorneys' interpretation" and "other agencies might come to different conclusions" about how to interpret the law. Johnson Dep 314-315, Exh 15.

412.  Trooper Burchell, SOR Unit State Coordinator, was asked whether a farmer is in violation if he drives his tractor across two fields, each of which is a separate parcel but only one parcel of which is within a geographic zone. Trooper Burchell did not know. He did not know whether a particular Grand Rapids area school, which is located within a zoo, would qualify as a school, and he did not know "how a registrant could figure out if it's a school." Burchell Dep 56, 58-60, Exh 16.

> **Defendants objected to these questions and answers on the grounds that they call for a legal conclusion and lack of foundation.**

### D.   Local Law Enforcement Agencies Make Decisions About How to Measure Geographic Zones

413.  Ms. Johnson testified that each "[law enforcement] agency should know their jurisdictional areas, but each agency may have their own policies and procedure on how they determine whether or not a sex offender can live at a residence or not. I don't know what those are and we don't provide any guidance how they should do that." Johnson Dep 56 ln 6-19, Exh 15.

414.  Ms. Johnson testified that, to her knowledge, the prosecuting attorneys association has not trained prosecutors on how to handle geographic zone issues. Johnson Dep 59-60, Exh 15.

415.  If registrants call with questions about geographic zones, the MSP refers them to local law enforcement. If local law enforcement calls the MSP, they are referred to the local prosecutor. Johnson further testified that it is possible that one prosecutor could measure 1000 feet from the door of a school while another prosecutor could measure 1000 feet from the edge of the school's football field. She did not know how prosecutors advise local law police to measure, saying that "[w]e really don't deal with student safety zones." Johnson Dep 56-60, Exh 15.

416.  Johnson testified that the plaintiffs, who are from different parts of the state, would need to contact their respective local police departments, local prosecutors and local sheriffs to determine how measurement is handled in their jurisdiction. Johnson Dep 100-01, Exh 15.

417.  Johnson testified that she was "aware of a couple instances" where law enforcement agencies measured distances by going to the offender's home and measuring the distance, or by using internet mapping software. Johnson Dep 225 ln 4-24, Exh 15.

418.  SOR Unit Enforcement Coordinator Bruce Payne testified that the MSP does not provide any guidance to local law enforcement agencies on how to meas-

ure geographic zones. The local law enforcement agency itself decides whether to measure 1000 feet from property line to property line or from building to building, as well as whether to measure as the crow flies or as a person would actually travel. Payne Dep 31-35, 42-43, Exh 17.

> Q: But it would be the local law enforcement decision whether to measure from the building to the property line or whether to measure from the property line to property line?
>
> A. Absolutely, yes.

Payne Dep 35, Exh 17.

419. Sergeant Payne testified that he did not know what measurement techniques local agencies use, and that "there's so many law enforcement agencies in the state of Michigan you would have to individually contact every one to see what they are specifically doing." Payne Dep 36, Exh 17.

420. Sgt. Payne has suggested offenders use Google maps. He has also suggested that they should contact their local law enforcement agency or prosecutor. Payne Dep 33 ln 5-18, Exh 17.

421. SOR Unit Coordinator Burchell testified that whether to measure property line to property line or point to point would be up to the local prosecutor:

> Q: So you get a question regarding how to measure loitering, and the person says the registrant is standing 2,000 feet away from the school, but the parcel, the property on which the registrant is standing, is 900 feet away from the school. Is that a violation?
>
> A. I would ask them to check with their local prosecutor whether or not it's a violation.

Burchell Dep 45-47, 54, Exh 16.

422.  Trooper Burchell encourages officers to check whether an offender's address is in a geographic zone when an offender registers an address and suggests they use Google Maps. He is not aware of any legal requirement to check whether an offender is residing in a zone. Burchell Dep 49 ln 11-24, Exh 16.

423.  Trooper Burchell testified that he knew of two county websites that include a map with a measuring tool to check distances. Those websites are available to the public, but are "not easy to find." Burchell Dep 49 ln 25—51 ln 4, Exh 16.

424.  According to Mr. Wagner, plaintiffs' expert, because local law enforcement in one place may use point to point measurement and local law enforcement in another place may use property line to property line measurement,

> there's no uniformity state-wide . . . [P]eople can't know without knowing how law enforcement at that moment is enforcing the law where they can live or work. And then once they know how law enforcement is currently enforcing the law there's no guarantee if there's no uniformity that the law will continue to be enforced in that area, so before I buy a home or get a job there's no notice that the next police officer in the same town will agree with that interpretation . . . . [T]here's this massive discrepancy on how the law is enforced and understood which greatly affects what areas are subject to special treatment, so the amount of uncertainty that it gives to people on the registry is quite large.

P. Wagner Dep 123-125, Exh 11.

### E.  Property Line to Property Line as the Most Common Method of Measurement

425.  Herb Tanner, an attorney with the Prosecuting Attorneys' Association of Michigan, testified that among prosecutors there is "a pretty strong consensus that [the 1000 foot distance] is measured property line to property line." Tanner Dep 17, 79 ln 1-5, Exh 21.

### F.  OffenderWatch's Use of Point-to-Point Measurement

426.  Unlike the prior SOR data management system, the new OffenderWatch system has tools allowing law enforcement to determine whether a residence, work, or volunteer address is within 1000 feet of a school building and/or school property line, depending on how the system is programmed. The software is still being developed for use in Michigan, and it is therefore is not yet clear what features can or will be programmed into the Michigan system. Johnson Dep 219 ln 19—223 ln 17, Exh 15; OffenderWatch Manual 28-29, 44, 138, Exh 50; OffenderWatch Contract 26, Exh 52.

427.  The system will have the capability of providing a pop-up alerts when a registrant reports an address within a geographic zone. Johnson Dep 219 ln 19-223 ln 17, Exh 15; OffenderWatch Manual 28-29, 44, 138, Exh 50; OffenderWatch Contract 26, Exh 52.

428.  OffenderWatch will input a list of schools that the MSP obtained from the Michigan Department of Education. That list does not include all school properties

as defined in SORA, but does include all active schools according to the Michigan Department of Education. Johnson Dep 233-36, Exh 15.

429.  Ms. Wagner testified that whether OffenderWatch's mapping tool will use point to point or parcel to parcel measurement depends on whether the SOR unit can obtain parcel data. L. Wagner Dep 27-29, Exh 18.

430.  Ms. Johnson testified that although uncertainties remain because OffenderWatch is still being developed, she believed OffenderWatch will be programmed to measure proximity violations from point to point. Ms. Johnson was uncertain, but thought that the point will be the center of the parcel, rather than the center of any building located on that parcel. Johnson Dep 226-28, Exh 15.

431.  The MSP SOR Unit has tried but been unable to obtain parcel data, despite working with the State of Michigan's Geographic Information Systems Office. Wagner 2nd Expert Report 23, Exh. 26; L. Wagner Dep 59, Exh 18.

432.  If the SOR Unit could obtain parcel data, OffenderWatch could be used to map parcel to parcel. L. Wagner Dep 29 ln 11-22, Exh 18.

433.  Because of the unavailability of parcel data, the OffenderWatch mapping tool can only measure point to point, and will only be able to give approximate distances. The proximity measurements in OffenderWatch are "not a definitive interpretation of where schools are or how to measure or what's within 1000 feet of a school." Johnson Dep 226 ln 6-19, 354, Exh 15.

434.  The new mapping feature is a "tool" to help law enforcement to determine if a registrant is within a prohibited zone. The new mapping feature is "not going to tell [law enforcement] exactly if [a specific location] [i]s within a school safety zone." It will still be "up to each agency" to determine how to measure. L. Wagner Dep 26 ln 13—29, Exh 18.

435.  The final decision on whether a residence or work location is within a geographic zone will be made by the prosecutor. According to Ms. Johnson, a prosecutor could prosecute for a proximity violation even if no violation shows in OffenderWatch. Johnson Dep 239 ln 17-3; 354, Exh 15.

**Defendants objected on the grounds of speculation to the hypothetical question concerning what a prosecutor could choose prosecute.**

436.  Ms. Johnson testified that she expects that law enforcement agencies will make use of the mapping tool in OffenderWatch to determine whether or not an offender is in a prohibited zone. Johnson Dep 344 ln 18–345 ln 2, Exh 15

437.  Ms. Johnson believes use of the new mapping tool will lead to "some uniformity" in the application of the statute. Johnson Dep 344 ln 18—345 ln 5, Exh 15.

438.  Every law enforcement agency in Michigan will have access to the mapping tool in OffenderWatch. Johnson Dep 230 ln 18-19, Exh 15.

439.  Registrants will not have access to the OffenderWatch mapping tool.

Johnson Dep 230-31, Exh 15.

### G.   Identifying the Boundaries of Geographic Zones

440.  The boundaries of SORA's geographic zones are not marked in the

physical environment. Wagner 1st Expert Rep 4, Exh 25.

441.  Similarly, the property lines of schools or other property parcels are un-

marked in the physical environment. Sgt. Payne noted:

> Q. So how would a registrant know where the property line is?
> A. I don't know. I don't have that answer.
> Q. But it's not like – I mean, you can see a corner of a building, right? You can
>   see where that is, right?
> A. Right.
> Q. But you can't necessarily see where a property line is; is that accurate?
> A. That could be accurate, yes.
> Q. Do you know if there's any publicly available maps showing parcel data that
>   are available to registrants?
> A. Personally I do not, no.

Payne Dep 57, Exh 17.

442.  Sgt. Payne testified that if he saw a registrant who was close to a school,

he would tell the registrant to move along, even without measuring whether the

registrant was actually within 1000 feet. Payne Dep 62, Exh 17.

443.  Trooper Burchell testified:

> Q. Assuming that student safety zones are measured from the parcel boundaries
>   rather than the building, how would a registrant know what parcel a school's
>   located on?
> A. I don't know …. I don't know how they'd know.

Burchell Dep 60, Exh 16.

**Defendants objected to this question on the grounds of speculation and lack of foundation.**

## H.   Access to Parcel Data

444.  According to plaintiffs' expert, Peter Wager, in jurisdictions where geographic zones are measured property line to property line, it is necessary to obtain parcel data in order to accurately map the zones. Mr. Wagner explained that obtaining parcel data is the first step for determining the boundaries of the geographic zone:

> Because assuming, and in Michigan this is a big assumption, assuming that … the statute is to be measured on a property line to property line basis, you have to know where the property lines actually are.

P. Wagner Dep 48, Exh 11; Wagner 2nd Expert Rep, 15, 19, 21-22, Exh 26.

445.  Part of Mr. Wagner's expert report quotes Leslie Wagner of the Michigan State Police for her understanding of how to measure the geographic zones, but he does not know details regarding her specific job responsibilities beyond that she is "responsible for the sex offender system." P. Wagner Dep 98 ln 1-25, Exh 11.

446.  As detailed in Mr. Wagner's report, he made repeated, unsuccessful attempts to to obtain parcel data. Some jurisdictions indicated that they did not have such data. Others indicated they did have the data, but the cost of acquiring it ran as high as six figures for just one county. After "several years and many pages [of correspondence]," Mr. Wagner was "eventually able to find parcel data for parts of just one county in Michigan," which he used to make some of the maps

included in his second expert report. Wagner 1st Expert Rep, 11, Exh 25; Wagner 2nd Expert Rep, 23, Exh 26; P. Wagner Dep 48, Exh 11.

**I.  "School Properties" under SORA**

447.  SORA's geographic zones prohibit employment, housing, and "loitering" around "school property," defined as "a building, facility, structure, or real property owned, leased, or otherwise controlled by a school, other than a building, facility, structure, or real property that is no longer in use on a permanent or continuous basis, to which either of the following applies:

    (i)   It is used to impart educational instruction.
    (ii)  It is for use by students not more than 19 years of age for sports or other recreational activities."

M.C.L. § 28.733(e).

448.  Peter Wagner stated in his expert report that it is not always obvious whether a particular property qualifies as school property, triggering a geographic zone. Wagner 2nd Expert Rep, 19, Exh 26.

449.  MSP SOR Unit staff members were unable to answer hypothetical deposition questions about whether certain types of properties or educational activities would be considered "school properties" that trigger a geographic zone. Payne Dep 46-55, Exh 17; Johnson Dep 241-42, Exh 15.

       **Defendants objected to these questions on the grounds of lack of foundation and that they called for legal conclusions.**

450.  SOR Unit staff have "tried but [] could not find" a list of properties that

qualified as "school properties," as defined by SORA. L. Wagner Dep 36, Exh 18.

451.  The SOR Unit is attempting to obtain such a list from the Michigan Department of Education or the state Geographical Information Service. Johnson Dep 233 ln 21—234 ln 6, Exh 15.

452.  SOR Unit staff contacted the Geographical Information Service, and that Service did not know of parcel data for schools. L. Wagner Dep 27 ln 13 – 28 ln 7, Exh 18.

453.  The SOR Unit does have a list from the Michigan Department of Education of 4,253 schools. This list includes the addresses of school buildings. It does not include other school properties or parcel data. Defs' Resp to Pls' First Interrog, No. 6, Exh 42; Johnson Dep 234 ln 10—15, Exh 15.

454.  Ms. Johnson testified that she relies on the Michigan Department of Education to determine whether a particular property qualifies as a "school property" within the meaning of SORA. Johnson Dep 244, Exh 15.

**J.   Information Available to Plaintiffs About Geographic Zones**

455.  The State of Michigan does not make maps available to the public showing where the geographic zones are located. "No information is created, maintained, updated, and/or publicized [by the defendants] regarding which geographic areas are located within student safety zones." Defs' Resp to First Interrog, No. 4, Exh 42.

456.  The Explanation of Duties Form which is provided to registrants when

they first register (*see* Section XVI.A) does not identify the geographic zones,

explain how to determine the boundaries of such zones, or explain how the 1000

feet are measured. Explanation of Duties Form, Exh 62.

457.  Leslie Wagner testified:

Q. So looking at [the Explanation of Duties Form] the registrant wouldn't know
   whether it's measured parcel to parcel or point to point?
   [Objection omitted.]
A. I would assume they would not know.
Q. Is there anywhere else – any other written material that's provided to
   registrants to tell them where the student safety zones are or how they are
   measured?
A. I don't know, nothing has been produced since I've been there.
Q. Do you – you don't provide any maps to registrants?
A. No.
Q. Do you know if local law enforcement provides maps?
A. I don't know.
Q. But you don't instruct local law enforcement to develop maps for their
   jurisdiction?
A. No.

L. Wagner Dep 80-81, Exh 18; Explanation of Duties Form, Exh 62.

**Defendants objected to these questions on the grounds that it called for
speculation, called for a legal conclusion.**

458.  Ms. Johnson testified that "I try to encourage my staff not to answer ques-

tions about geographic zones." Johnson Dep 315, Exh 15.

459.  To determine if different law enforcement agencies apply the requirements

of SORA differently – with respect to exclusion zones and other issues – plaintiffs

asked two volunteers, Timothy Poxson and Joseph Granzotto, to make calls to

local law enforcement agencies and to prosecutor's offices and ask a series of questions about SORA requirements. Poxson Decl 2, 6, Exh 32; Granzotto Decl 1-2, 8, Exh 33.

460.  Mr. Poxson called 23 police departments and 19 prosecutor's offices. Mr. Granzotto called 29 police departments and 10 prosecutor's offices. *Id*.

461.  None of the police departments Mr. Granzotto contacted as part of his survey were able to provide him with maps of the geographic zones. Mr. Granzotto also reviewed the results of Freedom of Information Act requests sent by plaintiffs' counsel to police departments seeking such maps. Of the eight departments that responded to such requests, only one provided a map. Granzotto Decl 6-7, 12, Exh 33.

**Defendants object to Mr. Poxson and Mr. Granzotto's testimony about the survey on the grounds of hearsay, as stated more fully in Defendants' motion in limine.**

462.  Mr. Wagner and his staff have specialized software and experience making maps. After obtaining the relevant parcel data, they spent 16 hours creating a geographic zone map for one city. Wagner 2nd Expert Rep 24-26, Exh 26.

463.  According to Mr. Wagner,"[i]t is reasonable to assume that generating a map such as this one…would be impossible for a lay person on the registry who has no mapmaking experience or tools whatsoever." Specialized mapping software is expensive and requires considerable training. Wagner 2nd Expert Rep 15-16, 26,

Exh 26.

464.  Accurate measurement and mapping requires parcel data. Such data is not readily available, and is not available for Michigan in Google Earth. Wagner 2nd Expert Report 15-16, 23, Exh 26.

465.  Mr. Wagner also reported that it is impossible to measure 1000 feet with ordinary consumer tools, such as a tape measure. In his opinion, using a car odometer results in "a lot of error" since one must follow the road to measure "because you really can't drive through people's houses or across rivers with your car." P. Wagner Dep 101, Exh 11; Wagner 2nd Expert Rep 15-16, Exh 26.

466.  Mr. Wagner testified that Google Maps has certain features, such a scale of distance and the ability to put a visual "pin" at the approximate location of an address, which could tell someone, with the possibility of error, whether a location was close enough to 1,000 feet to warrant further investigation. Google Maps can also provide the approximate walking or driving distance between two street addresses. P. Wagner Dep 77 ln 4—79 ln 13; 91 ln 18-20, Exh 11.

467.  Mr. Wagner testified that programs like Google Maps can provide a "rough estimate" of what areas are in geographic zones, but "[w]hat that rough estimate does is gives you a huge list – a very small list of yeses, a very small list of noes, and a huge list of maybes." P. Wagner Dep 101, Exh 11.

468.  Mr. Wagner testified that, using the Yellow Pages, a person can identify

the names of schools, phone numbers for the school, and to some degree the

address associated with that school.  Mr. Wagner notes, however, that such a

source will include false positives and miss "a lot of stuff." Furthermore, parcel

data is unavailable in the Yellow Pages or on the Internet. Wagner Dep 90 ln 9-20;

94 ln 16-20, Exh 11.

469.  Mr. Wagner concluded:

> Exclusion zones in Michigan are not only unknowable for the average person
> on the street. They are also unknowable to trained geographers with special
> software, access to specialized data and expertise in criminal justice
> mapping…. In sum, there is simply no good way in Michigan for experts,
> much less registrants, to determine exactly what areas are subject to SORA's
> "student safety zone" provisions.

Wagner 2nd Expert Rep 34, Exh 26.

**K.   Plaintiffs' Experiences Measuring Geographic Zones**

470.  Peter Wagner testified that plaintiffs' experience is quite different from

that of law enforcement officials, who need only prove a violation at one moment

in time:

> [L]aw enforcement can just work backwards from a given address to
> determine if it's in compliance. It's a very different process that someone has
> to go through in order to determine where they can reside, work, or loiter.

P. Wagner Dep 95, Exh 11.

471.  According to Mr. Wagner, methods a registrant might use to determine

whether a fixed location is within 1000 feet of a school are not available to them as

they move about during the course of their daily lives, which can include working

in multiple locations or traveling across town with their children in tow:

> Realistically the only way to do that [move about town without violating an exclusion zone] would be to map the entire city or county before you left the house and consult it constantly, or make your own smart phone app, but you really have to map everything in advance. This is not something you can do one at a time. For enforcement purposes the police can measure back from that one point and it's very easy for them. For a person who's going about their daily life without having a map in advance it's impossible.

P. Wagner Dep 130, Exh 11.

472.  Mr. Doe #1 stated that when he was looking for an apartment, he could not determine whether or not residences were within a geographic zone. He stated he did not know from where the 1000 feet was measured or where school property lines were located. Verified Compl, ¶ 223.

473.  When Mr. Doe #3 and his wife were searching for a new home, they saw homes they wanted to buy that were clearly too close to a school, but also homes where they did not know if the house was too close to a school. Mr. Doe #3 used his odometer to estimate distances based on the driving distance:

> Honestly, I drove my car and I reset my tach [*sic*] and I drove the neighborhood to see how far it was. You know, I figured, you know, a quarter mile was more than a thousand feet, so if I was anything over a quarter mile I was pretty much safe.

Doe #3 Dep 125, 130-31, Exh 3.

474.  Mr. Doe #3's wife looked up addresses on internet sites like Mapquest or Google Maps to try to determine if they were 1000 feet from a school. S.F. Dep 13

ln 16—14 ln 11, Exh 8.

475.  Mr. Doe #4 testified that he does not know how to find out if a place is 1000 feet from a school. Doe #4 Dep 95, Exh 4.

476.  When Mary Doe and her husband were looking for a home, the police did not give her a map or tell her how to figure out what housing was permissible. She testified that she knows that in order to measure the distance that a particular address is from a school one can go on Google Maps and search for schools near an address: "[T]hen it gives you point two miles, point one miles, and then you've got to figure out how many feet are in point one of a mile and then figure out from there if you're in violation or not." Mary Doe Dep 109 ln 9-18, Exh 6.

477.  Because Mary Doe was unsure what areas were restricted, she looked at properties that were further from the 1000 foot mark "so that I know that I'm okay." Mary Doe Dep 109-110, Exh 6.

478.  The difficulty of determining where exclusion zones are has affected Ms. Doe's job searches: "If you're out of work and you're just applying wherever and you get that job and then you have to say, oh, I can't take it, you know, because you didn't know at the time it was within a thousand feet." Mary Doe Dep 77, Exh 6.

## XI.   RESEARCH ON WHETHER PUBLIC REGISTRATION, GEOGRAPHIC ZONES AND REPORTING REQUIREMENTS ARE EFFECTIVE

479.  Plaintiffs submitted two expert reports that address whether sex offender

114

registries and geographic zones are effective in reducing recidivism, one from Dr. James J. Prescott, an economist and law professor at the University of Michigan law School, and one from Dr. Jill Levenson, an associate professor at Lynn University. Prescott Expert Rep, Exh 22; Levenson Expert Rep, Exh 23.

### A.   Research on Recidivism and Public Registration

480.  According to plaintiffs' experts, research shows that public registries are likely to increase, rather than decrease, recidivism, and are therefore are counterproductive to their avowed public safety goal. According to Dr. Prescott, research shows that the more people a state subjects to public sex offender registration, the higher the relative frequency of sex offenses in that state. He concludes that public registries (based on the offense of conviction) correlate with an increase in frequency of sex offenses against all types of victims (family members, neighbors, acquaintances, and strangers). Prescott Expert Rep 3-4, Exh 22.

481.  Dr. Prescott testified that the public notification laws have some deterrent effect on potential sex offenders who are not registered. At the same time, such laws have a recidivism enhancing effect, meaning "the inclusion of somebody's name on a public registry … rather than actually making them less likely to return to crime makes them more likely to return to crime." Prescott Dep 7, Exh 10.

482.  Dr. Prescott's study found that with respect to sex offenses committed against strangers, there is no evidence that "registration is going to be effective

against stranger sex offenses" in terms of reducing recidivism. The study did find that public notification had some deterrent effect on stranger offenses committed by first time sex offenders. Prescott Dep 102, Exh 10.

483.  The data used in Dr. Prescott's study terminates at 2005, and has not been updated with published crime reports for the intervening years. Prescott Dep 82; 104, Exh 10.

484.  Active notification did not begin in Michigan until 2006, which is outside of Dr. Prescott's study period. Public access to Michigan's registry began in 1997. Prescott Dep 101, Exh 10; Mich. Pub. Act 494, Sec. 10(2) (1996).

485.  Dr. Prescott's study did not differentiate between first-time and repeat offenders. Prescott Dep 73-74, Exh 10.

486.  Dr. Prescott reported that, applied to Michigan, this research suggests that SORA contributes to sex offense rates in Michigan that are 10% higher than they would be without SORA. Prescott Expert Rep 3, Exh 22.

487.  Dr. Prescott's study observed an "uptick" in sexual offenses after notification systems came on line.  He does not know if that trend has reversed itself in the years following his study. Prescott Dep 83, Exh 10.

488.  Drs. Prescott and Levenson stated that although it may seem counter-intuitive that public registration increases rather than decreases recidivism, these results reflect the fact that sex offender registration and the attendant consequences

exacerbate risk factors for recidivism, such as lack of employment and housing, and prevent healthy reintegration into the community. Prescott Expert Rep 7-8, Exh 22; Levenson Dep 77-78, Exh 9.

489. A study by Amanda Agan regarding public registration—conducted using data for the same time period as Dr. Prescott's study and looking at the overall effects on crime rates—did not reach precisely the same conclusions as Dr. Prescott's study, namely that notification increases recidivism. Prescott Dep 42, Exh 10.

490. Comparing Agan's study to his own work Dr. Prescott stated, "it's really tough to compare….But by and large…I would say they are largely consistent with each other….She does not make that conclusion [that public notification increases recidivism] but she also doesn't ask that question." Prescott Dep 42, Exh 10.

491. Other studies are consistent with Dr. Prescott's work, but no other study has reached all the same conclusions as Dr. Prescott. He stated, "our study is the only one that looks at registration [and] notification separately and also has a strategy for separating out the deterrent and recidivism effects of the law." Prescott Dep 40, Exh 10.

492. Dr. Prescott's study was based on data from fifteen states. Prescott Dep 25, Exh 10.

117

493.  Dr. Prescott's study does not separate out the "vagueness" of the laws as an independent factor. Rather, his study measures the consequences of sex offender registration and notification laws as a whole. The study did not include procedural differences in SORA requirements between the states. Prescott Dep 30; 111-112, Exh 10.

494.  Dr. Prescott stated that the effect of "less burdensome" registration laws than those that have been studied is unknown. Prescott Dep 222, Exh 10.

495.  Drs. Prescott and Levenson stated that most studies reveal no significant reduction in sex crime rates that can be attributed to sex offender laws. Rather, the empirical research shows that, at best, public registration makes no difference to recidivism rates, and at worst is counter-productive. Levenson Expert Rep 3, Exh 23; Prescott Expert Rep 12, Exh 22; Levenson Dep 75, 88, 123-24, 168-69, Exh 9.

496.  According to Dr. Levenson, the two studies that detected reductions in sex crime recidivism after the passage of registration laws were both in states that have risk-based, rather than offense-based, classification, and that limit public notification to those offenders who have been individually determined to pose the greatest threat to community safety. Levenson Expert Rep 3, Exh 23; Levenson Dep 42, Exh 9.

## B.   Research on Recidivism and Geographic Zones

497.  According to Dr. Levenson, there is no research showing that registrants

who live closer to child-oriented settings are more likely to reoffend. She stated that the research shows that where registrants live is not a significant contributing factor to recidivism. Levenson Expert Rep 4, Exh 9; Levenson Dep 81-83, Exh 23.

498.  Dr. Levenson's report stated that, "The best current research finds no support for the hypothesis that sex offenders who live closer to child-oriented settings are more likely to reoffend." Levenson Expert Report, 4, Exh 23.

499.  But at her deposition Dr. Levenson explained that statement as summarizing the research, stating "there's really no consensus to support the idea that living closer to a school is a risk factor." Levenson Dep 81 ln 1-13, Exh 9.

500.  Dr. Levenson testified that on a case-by-case basis, there "certainly are some case-management decisions that could be made that would pertain uniquely to specific individuals so there may be some people who shouldn't live near schools or go to schools or be able to interact with children." However, in her opinion a broad restriction on a group of people that keeps them from living within a certain proximity of a school is not associated with the risk of re-offense. Levenson Dep 86 ln 11—87 ln 4, Exh 9.

501.  A 2013 Department of Justice study evaluating sex offender residency restrictions in Michigan and Missouri found that these restrictions did not decrease recidivism. In Michigan, the geographic restrictions may have slightly increased recidivism. The study further found that many registrants had to relocate or could

not live with family due to the restrictions, and that these laws also made it more difficult for registrants to find employment. DOJ Evaluation of Sex Offender Residency Restrictions 9-10, Exh 82; Levenson Dep 154-157, Exh 23.

502.  According to Dr. Levenson, the research shows that sex offenders do not appear to abuse children because these offenders live near schools. She cites to a Florida study that showed that proximity measures were not significant predictors of recidivism. She also cites to an Iowa study finding that residency restrictions did "not seem to have led to fewer charges or convictions" for sex offenses. She also cites to a Minnesota study that concluded that residency restrictions would not have prevented even one re-offense. Levenson Expert Rep 4-5, Exh 23.

503.  The study of Orlando, Florida included in Dr. Levenson's report dealt with a residential restriction of 2500 feet from school, parks, daycares, and school bus stops. Levenson Dep 94 ln 24—95 ln 5, Exh 9.

504.  In the opinion of Drs. Prescott and Levenson, residency restrictions reduce housing options, leading to housing instability. Housing instability is consistently correlated with higher criminal recidivism in general. Some research also links unstable housing to higher rates of sexual recidivism. In the opinions of Drs. Prescott and Levenson, residency restrictions are likely to increase rather than decrease sexual offending. Prescott Expert Rep 7-8, Exh 22; Levenson Expert Rep 5-6, Exh 23; Levenson Dep 95-100, Exh 9.

505.  In her expert report, where Dr. Levenson talks about housing instability being associated with recidivism, she is referring to the likelihood of committing crime generally, not necessarily committing new sex crimes. Levenson Dep 96 ln 18—97 ln 1, Exh 9.

506.  Dr. Prescott's study concluded that sex offender registration and public notification is associated with increases in sexual offending. His study did not find evidence of an increase in other types of crimes. Prescott Dep 78-80, Exh 10.

507.  Dr. Levenson reported that SORA requirements that interfere with employment, social support, and engagement in pro-social activities undermine the avowed public safety goals of sex offender registration laws. In her opinion, policies that ostracize and disrupt the stability of registrants are counterproductive to increasing public safety. Levenson Expert Rep 7, 10, Exh 23; Levenson Dep 97-99, Exh 9.

## C.   Research on Recidivism and Failure to Comply with Reporting Requirements

507.  Dr. Levenson cited research showing that failure to comply with registration requirements does not predict sexual recidivism. Levenson Expert Rep 11-12, Exh 23.

508.  In Dr. Levenson's opinion, there is no empirical evidence to support the notion that more frequent registration check-ins lower recidivism, nor is there evidence that reporting additional information (*e.g.*, email addresses, employment

information) reduces recidivism. Levenson Expert Rep 10, Exh 9.

## XII.   SORA'S "LOITERING" PROVISION

509.  SORA 2013 prohibits registrants, with some exceptions not applicable here, from "loitering" within 1000 feet of school property. M.C.L. § 28.734.

510.  The statute defines "to loiter" as meaning "to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors." M.C.L. § 28.733(b).

### A.   The SOR Unit's Understanding of What Constitutes "Loitering"

511.  The MSP SOR Unit's internal cheatsheet regarding the geographic zones does not define loitering other than to cite the statutory definition. SOR Unit Student Safety Zone Cheatsheet, Exh 49.

512.  MSP Enforcement Coordinator Payne testified that if a registrant did not understand the term "loitering," he would put it in simple terms. He would tell the registrant that "loitering" means "you can't hang around a school or student safety zone." Payne Dep 24 ln 21—25 ln 1; 26 ln 9-14, Exh 17.

513.  According to Sgt. Payne, the loitering provision would (a) prohibit a registrant from being present on school property even when there are no children there; (b) prohibit a registrant from taking her/his own children to a school playground, even if there are no other children present; and (c) prohibit a registrant from taking his/her child to a park within 1000 feet of a school because they are

"hanging around" a place that is too close to a school. Payne Dep 26, 60-61, 81-82, Exh 17.

**Defendants objected to these questions on the grounds that they were vague and confusing and called for legal conclusions.**

514.  Trooper Burchell testified that callers with questions on "loitering" are referred to the specific statute provision that defines "loitering". Burchell Dep 48 ln 13—21, Exh 16.

515.  Ms. Johnson testified that she was unsure whether going to a school playground on a weekend would be prohibited as "loitering." Johnson Dep 326, Exh 15.

### B.   Plaintiffs' Understanding of What Constitutes "Loitering"

516.  Mr. Doe #1 testified that he does not know what "loitering" means. Doe #1 Dep 88, Exh 1.

517.  Mr. Doe #1 believes that because he is on the registry he cannot speak to his niece's class at the University of Michigan. Doe #1 Dep 15-22, Exh 1.

518.  Mr. Doe #3 testified that he not know what "loitering" means. Doe #3 Dep 100-01, 123-24, Exh 3.

519.  John Doe #3 has not looked up the definition of the word "loitering" either in the SORA statute or the dictionary. Doe #3 Dep 100 ln 19-25, Exh 3.

**Pls object: dictionary definition is not relevant as differs from statutory definition.**

520.  Mr. Doe #3's wife, who is a schoolteacher with a master's degree in education, has not read the SORA statute, and does not remember if she had seen the specific definition of "loitering" contained within it. When asked by defendants' counsel what the term "observing minors" in that definition means, she testified:

> I – honestly I don't know. Could it mean – it could mean many different things. That's one of those words that could have many – several different definitions. He could be watching my own children, his own children, walk down the street.

S.F. Dep 37; 40 ln 10—41 ln 2; 71; 91, Exh 8.

521.  Mr. Doe #3's wife explained that if "loitering" means "he can't hang around the school for purposes of observing minors" then "that would mean my own children I guess also." Based on their understanding of what is meant by "loitering," her husband does not attend parent-teacher conferences, where children may be present. S.F. Dep 844, 1-83, Exh 8.

522.  Mr. Doe #3's wife believes that her husband cannot be near children because she assumes that is the purpose of the law. S.F. Dep 41 ln 7—42 ln 6, Exh 8.

523.  S.F. explained that her family cannot risk misinterpreting the statute:

Q: What is your understanding of what [the term "loitering"] means?
A. For a period of time…. But how long would a period of time be? ... There's a gray area….
    …
Q. For a period of time that a reasonable person would determine is for the primary purpose of observing minors.

A. Observing minors but to what extent? Like, I have cousins that go to that school and my husband has nieces and nephews that attend that school and my children attend that school, he can't be standing there waiting for my children? I mean, I don't know what a period of time is. I don't know. Like, I don't know what that means. Can he be standing there waiting for my children to come out of school and talk to his niece or nephew or observe his own children walking down from school? I don't know what that means. I don't know what he could get into trouble for…. So do we avoid things? Yes, just so he doesn't get in trouble.

S.F. Dep 87-88, Exh 8.

524.  Mr. Doe #4's girlfriend I.G. testified, with respect to a family movie night at her child's school, some families might be there for the purpose of observing the movie, while others would be there for the purpose of seeing other families and children, and so she does not know whether Mr. Doe # 4 would be "loitering" if he went to such an event. I.G. Dep 72, Exh 7.

525.  John Doe #5 understands the word "loiter" to mean "[h]ang around somewhere." Doe #5 Dep 64 ln 7-10, Exh 5.

526.  Mary Doe understands the meaning of the words "primary purpose" and "observing or contacting minors." Mary Doe Dep 81 ln 2-15, Exh 6.

527.  Mary Doe testified the she did not understand the meaning of the word "loitering": "I mean, are you loitering if you're – if you walk to the school to pick her up and you're waiting outside, is that considered loitering?" Mary Doe Dep 78 ln 16-18, Exh 6.

## XIII.   SORA AND PLAINTIFFS' ABILITY TO PARENT

### A.   SORA and Plaintiffs' Parenting and Involvement in Their Children's Education and Upbringing

528.  Mr. Doe #1 would like to take his two-year old son to parks or play-grounds, but he does not because he fears it would make him non-compliant: "I don't understand my responsibility, and more importantly I'm just in fear of the consequences of … not doing what's right… so I just don't." Doe #1 Dep 65-67, Exh 1.

529.  Mr. Doe #1 has not asked his parole agent, any law enforcement officer, or the prosecutor about visiting parks with his children. Doe #1 Dep 65 ln 23—66 ln 5, Exh 1.

530.  Although Mr. Doe #1 hopes to go to his son's sporting events and parent teacher conferences as the child grows up, Mr. Doe #1 must weigh this desire to be an involved parent against the risk of being a totally absent parent if he violates SORA: "[B]ut that fear of going back to prison, which one weighs more heavy, me not being involved in their life while I'm out here or me going back to prison." Doe #1 Dep 104-05, Exh 1.

531.  Mr. Doe #1 testified that so long as he is on the registry, he would follow his child's education by going through his child's mother, rather than by emailing or contacting the teacher directly. When asked whether he "[w]ould have any interest in discussing his [child's] education with his teachers," he said he would

just "go through [the child's] mom." Doe #1 Dep 70 ln 23–71 ln 21, Exh 1.

532.  Mr. Doe #1 cannot attend his future step-daughter's school and extra-curricular events. He does not contact her teachers due to fear of violating his registry requirements and thereby "subjecting my family [to] losing me again." Doe #1 Dep 91, 105-06, Exh 1; Verified Compl, ¶ 128.

533.  According to Mr. Doe #2, his ability to participate in the upbringing of his daughter is limited because he cannot participate in her school and extra-curricular events. Verified Compl, ¶ 129.

534.  According to Mr. Doe #2, his daughter wants him to go to her basketball games and field trips, but he cannot. Doe #2 Dep 41, 131, Exh 2.

535.  Mr. Doe #2 has explained the reason he cannot attend to his daughter, including why he was on the registry. He told her that it was not something to be ashamed to talk about. Doe #2 Dep 41 ln 12-24, Exh 2.

536.  Mr. Doe #2 has limited his involvement in his daughter's education:

> After I found out that schools were – I mean, it's so cloudy to what I can and can't do that once I read schools were off limits in some sort of way or another I left it alone altogether because I did not want to risk my freedom…

Doe #2 Dep 50, Exh 2.

537.  Mr. Doe #2 has not attempted to contact his daughter's school since he started registering as a sex offender, and has not attempted to telephone or e-mail his daughter's principal or teachers. He has not attempted to meet with his

daughter's teachers outside of school. Doe #2 Dep 47 ln 24—48 ln 20; 48 ln 8-20; 50 ln 9-23, Exh 2.

538.  The mother of Mr. Doe #2's daughter had a legal service write a letter to the school regarding his sex offender status, telling them that he is not allowed contact with his daughter. The school then refused to give him information about his daughter's education, such as report cards or progress reports. Doe #2 Dep 24 ln 17—25 ln 11, Exh 2.

539.  Mr. Doe #2 has never seen and does not know the exact content of his daughter's mother letter to the school. Doe #2 Dep 42 ln 14—43 ln 10, Exh 2.

540.  Prior to the time of the letter, John Doe #2 used to go to the school to discuss his daughter's education. Doe #2 Dep 43 ln 11-22, Exh 2.

541.  After his daughter's mother was ordered by a court to withdraw the letter she wrote to the school, the school cooperated with John Doe #2 and provided copies of his daughter's report card. Doe #2 Dep 44 ln 19—45 ln 22, Exh 2.

542.  Mr. Doe #2 has a difficult relationship with the mother of his daughter. She once threatened to call the police after they got into an argument over how to discipline their daughter. Doe #2 Dep 37 ln 16—38 ln 17, Exh 2.

543.  Mr. Doe #3's testified that it was important for him to get off the registry so he could give his children (a fourth grader, a first grader, and an infant) a normal life: "Most important thing is my children. I feel like my children are

getting tried with me. I feel like they're the victims." Doe #3 Dep 128, Exh 3; S.F.

Dep 9, Exh 8; Doe #3 Interrog No. 8, Exh 38.

544. Mr. Doe #3's wife testified regarding how she understands the SORA

requirements:

> We have a lot of family oriented nights [at the school] and … I'd love for my
> husband and children to come, but he can't…. If my son forgets his backpack
> at home he can't take it to him. He can't drop off my children nor pick them
> up, and I have to be at work 15 minutes before and stay 15 minutes after. I can
> never drop off my kids nor be there for their first day of kindergarten. Neither
> can my husband…. I can't attend parent-teacher conferences because my
> parent-teacher conferences for my students are the same days as my
> children…. And neither can he…. [H]e can never attend functions at my kids'
> schools, and especially when they're during the day I can't either, first days,
> last days of school, school parties, classroom parties. I'd love to be a
> homeroom mom but I'd love even more for my husband to be there with his
> children…. I feel like this is depriving him of his right of being a father.

S.F. Dep 20-21, Exh 8.

545. Mr. Doe #3 admits that he can contact his children's teachers through

telephone or e-mail, or meet with the teachers off of school property. Doe #3

Requests to Admit #2-4, Exh 103.

546. Mr. Doe #3 is unaware of the Attorney General's letter opinion concern-

ing an offender picking up his/her own children from school. Doe #3 Dep 129 ln

14-18, Exh 3.

547. As a teacher, Mr. Doe #3's wife admits that parents can e-mail her with

questions and that she has spoken with parents on the phone, although she prefers

not to. She testified that discussing student progress over the phone is "not impossible; it's just very hard." S.F. Dep, 63 ln 19—64 ln 20, Exh 8.

548.  Mr. Doe #3's wife explained that teachers do not necessarily have time to talk with parents over the phone given the teachers' work load. "[I]f I actually would sit there and talk to [the parents] on the phone I couldn't eat my lunch. There's no time. We really don't have any time." It is difficult to do parent teacher conferences over the phone:

> [D]uring the conference we're usually handing out report cards, and parents want to know why their child received this grade. And that's where I pull out my grade book and I pull out all my assessments and I say, okay, this is where it happened here and this is what they need to work on and this is why they received this grade, and it has to be like – honestly it has to be in person.

S.F. Dep 61-64, Exh 8.

549.  S.F. admits that she does not think the primary purpose of a parent-teacher conference is to observe children, but rather to "observe your own child's educational behavior." S.F. Dep103 ln 9—104 ln 11, Exh 8.

550.  As a teacher, Mr. Doe #3's wife conducts parent-teacher conferences after school hours. Children are sometimes present and sometimes not present during these conferences. S.F. Dep 43 ln 18—44 ln 1; 82 ln 10-21, Exh 8.

551.  At S.F.'s deposition, defendants' counsel suggested that Mr. Doe #3 could attend parent-teacher conferences because he would not be there for the purpose of observing minors, provided he did not take his own children along. S.F. testified

that in her opinion the family cannot take that risk:

> Q.  If we're going to go for the idea that –let's just, you know, assume they were, you know, reasonable people and they're not, you know, trying to play games with the language.  If the idea is he's going to go to a parent-teacher conference, sit in the classroom with the teacher and talk about your child's education, do you think that that type of activity, its primary purpose is observing children?
>
> A. Not other children besides my own obviously.
>
> Q. And by observing you mean – are you using observing as –
>
> A. Oh, okay, watching, are we talking about the word watching?
>
> Q. Watching children.
>
> A. Okay.  Do I think parent-teacher conferences are to go to watch other children? No, that's not what the purpose is for.
>
> Q. The purpose is to talk about your child's education?
>
> A. Yes.
>
> Q. So unless you mean observing – unless you – unless, you know, talking about your child's education, you know, it falls in the category of observing, you don't think that's observing?
>
> A.  No.
>
> Q.  Okay.
>
> A. But can he be arrested for that? I don't know. Can I tell an officer, hey, officer he was there to speak to the teacher solely, only to speak to the teacher for my kid's education, I don't know what he can and can't be arrested for.… I don't, but can you promise me that he won't be arrested if he goes to parent-teacher conferences?
>
> Q. I can't answer questions for you.
>
> …
>
> A. Can anyone answer that question for me? Is it part of the law that states if you're going for your own child's educational purpose it's okay to go? No, there's the gray area that I'm talking about… so, yeah, do we avoid it? Absolutely. If it's not stated specifically that he can go he can't go.

S.F. Dep 104-05, Exh 8.

552.  Mr. Doe #3's understanding is that he cannot pick up his children at

school. Doe # 3 Dep 119-20, Exh 3; S.F. Dep 26, Exh 8.

553. Mr. Doe #3's children play sports through non-profit community (non-school) programs. The play occurs both at community parks and at schools. Doe #3 Dep 112 ln 24—114 ln 7, Exh 3; S.F. Dep 79 ln 20-23, Exh 8.

554. Mr. Doe #3 fears prosecution if he attends his sons' events, and is uncertain "as a parent what can I do with my kids, where can I go with my kids? … My kids' sporting event, can I be there, can I not be there? Where am I – where am I prohibited? You know, as a parent why do I have to have limits with my kids? My kids didn't commit this crime." Doe #3 Dep 107, Exh 3; Verified Compl, ¶ 133

555. Mr. Doe #3's wife testified:

> If the games are held at school he can't come. I mean, part of fatherhood is wanting to watch your children play their sports. He can't attend and I do it all. I mean, sometimes I'm exhausted. I have a newborn baby, you know, it's hard, but I mean, we manage to do it because I'm not going to deprive my kids of joining sports because their dad can't be at the games that are held at schools… But he can't be there for his children's sports and I have to do it all, so at times I feel like I'm a single parent because he can't help me even if he wanted to, which he does. He'd love more than anything to coach his son's team. Can't.
>
>     *       *       *       *       *       *
>
> Like you can't go back in time and make up this time because he's missed my first son in all of his soccer games, and now he's in football and I know how much my husband loves football. And my son, he sees like, you know, the glow in his dad's eyes when he wears his uniform or whatever, and he can't go so, you know. And my second child plays soccer and he's really good at it, and my oldest son that plays football, he starts in all the games, and he sees dads there and he always asks me, and he gets emotional and he cries and he thinks his dad doesn't care. Then I have to see my husband crying. I do. This is what I have to do. I have to see them cry and I have to see them go through this and it hurts me, so that's what I mean by normal… And I have three boys. They're all boys. I know nothing about football, but I'm learning because I

132

have to live with this for the rest of my life…

S.F. Dep 24-25, 76-77, Exh 8. *See* Doe # 3 Dep 112-14, 120, Exh 3.

556.  Mr. Doe #3 has not attempted to determine whether the parks where his children play are within 1000 feet of a school because from what he "understood parks were included, that sex offenders were not allowed in parks." Mr. Doe #3 has not asked an attorney about whether he is allowed in parks, and he has not read the statute. Doe #3 Dep 113 ln 21—115 ln 13, Exh 3.

557.  It is not clear from the record whether or not the parks where Mr. Doe #3's children play are or are not within 1000 feet of a school or school property line, and whether or not Mr. Doe #3 would be in violation of SORA if he watches those games. Doe #3 Dep 112 ln 24—114 ln 17, Exh 3.

558.  Mr. Doe #3 buys DVDs of his sons' games from another parent who tapes them. S.F. Dep 80-81, Exh 8.

559.  Because he does not know exactly what is and is not permitted, Mr. Doe #3 misses out on activities with his children such as field trips. When they ask why he cannot go he tells them he has to work and "[i]t's always a lie." He cannot attend school activities like movie nights, math nights, bingo nights, open house/meet the teacher, talent shows, musicals, concerts or plays. Doe #3 Dep 118-19, Exh 3; S.F. Dep 85-86, Exh 8.

560.  Mr. Doe #3 has also missed his son's birthdays because he believes he

cannot go to child-centered locations. (Whether he is allowed to go under SORA

depends on whether the location is within 1000 feet of a school.)

Q.  Have you ever missed a birthday?
A.  Yes.
Q.  What happened?
A.  That was one of the things that we talked about, Jungle Java [an indoor playground]… I had to tell them I had to work, and it was a Sunday and I don't work on Sundays.
Q.  How did your son react?
A.  He knew I was lying, but I left the house the whole day in my work clothes. He was upset.

Doe #3 Dep 118-19, Exh 3.

561.  Mr. Doe #3's wife is concerned about what will happen when their son

goes to middle school, where the sex ed curriculum includes teaching about the sex

offender registry:

> I mean, my husband's nephew came home one day because they allowed them to [search the registry in sex ed class] and told his parents, you know, my uncle's on the registry and my friends were asking isn't that your uncle? And he said no because he was embarrassed…[I]f I don't want my son in this class – I mean, in this sex ed and I can sign him out of it it doesn't stop his friends from being in that class and learning about it, getting on there and telling him, hey, isn't that your dad.

S.F. Dep 28-30, Exh 8.

562.  Mr. Doe #4, his girlfriend I.G., and their two children have been unable to

live together because he is on the registry. Although I.G. has worked as a leasing

agent for four years and manages approximate 1,800 apartments, although she has

looked into dozens of properties in different neighborhoods, and although she has

access to leasing-agent property lists, the only places she can find where the family could live together are in dangerous neighborhoods or high-rent areas. Quite a few properties are in prohibited zones, while others will not accept registrants. I.G. could get a 15% rent discount at her employer's complex, but as a registrant Mr. Doe #4 is unable to live there. I.G. Dep 8-13, 77-84, Exh 7; Doe #4 Dep 96, Exh 4.

563.  I.G. and the couple's children are currently living with her parents in order to save money so the family can buy a home together. Because the family has been unable to determine how far I.G.'s parents' house is from a school, Mr. Doe #4 cannot live there:

> Q. Is [Mr. Doe #4] able to live with you at your parents' home?
> A: I don't think he would be able to. I mean I don't know the exact distance. The school is right down the street so I'm not sure if it's like 1,001, I don't know. It's like really close when I try to look it up but…
> Q. So you're not able to figure out whether it's within 1000 feet?
> A. Right.
> Q. Would your parents let [Mr. Doe #4] live there if it were not within 1000 feet?
> A. Until we found a place, yes.
> Q. But because you're not sure whether it's within 1000 feet he's not living there now?
> A. Yes.
> …
> Q. Is it fair to say that he could be living with you today if he were not on the registry?
> A. Yup.

I.G. Dep 86-87, Exh 7.

564.  I.G. testified that she feels like "[w]e can't really be a family," "we cannot

live together," and "I still feel like a single parent." She testified that the fact that

Mr. Doe #4 is on the registry affects "everyday activities," and the family lives

with "constant uncertainty about how his registry status can affect [them]." She

also testified that because the family cannot live together, it means "we're not

together in the sense where we can, you know, always have dinner together or help

with my daughter's homework, things like that." I.G. Dep 55-60, 75-76, Exh 7.

565.  Mr. Doe #4's testified that he believes his status as a registrant limits his

parenting: "I want to be involved in my kids' stuff but it's impossible." Doe #4

Dep 59-60, Exh 4. Mr. Doe #4 does not take his daughter to the park or other

places where children might be, because he is not sure whether this is allowed. I.G.

Dep 58-59, Exh 7.

566.  I.G. testified that Mr. Doe #4 "cannot participate in everyday activities as

far as school goes," such as evening programs, and holiday parties. Because I.G.'s

work schedule can prevent her from taking their daughter to school activities, the

fact that Mr. Doe #4 cannot attend means that their daughter does not participate in

these opportunities. I.G. Dep 55-68, 74, Exh 7.

567.  Because the I.G. is unsure what parenting activities are allowed, she is

afraid for Mr. Doe #4 to step foot on school property. Once when I.G. went to get

her daughter at school, the police were there checking everyone's identification

due to an incident at the school unrelated to Mr. Doe #4. Thereafter she became

even more concerned about Mr. Doe #4 ever going to the school. She believes that if he had been there that day, he might have been arrested for being a sex offender on school property. She decided that "safest course of action" for Mr. Doe #4 is not to go near the school. I.G. Dep 69-72, Exh 7.

568.  Mr. Doe #4 admits that he is not legally prevented from contacting his children's teachers by telephone or e-mail. Doe #4 Requests to Admit #2-3, Exh 102. Mr. Doe #4 has not attempted to contact his children's teachers by telephone or e-mail, or attempted to meet with them off of school grounds. Doe #4 Dep 78 ln 15—80 ln 4, Exh 4.

569.  Mr. Doe #4 and his girlfriend testified that he does not contact his children's teachers or attempt to meet with them off of school grounds because he does not understand if that is allowed. The school does not provide phone numbers or email addresses for teachers, and parent/teacher communication occurs at conferences or at pick-up/drop-off. Mr. Doe #4 is homeless and does not have a phone. Doe #4 Dep 63-65, 71 ln 13, Exh 4; I.G. Dep 73-74, Exh 7.

570.  I.G. testified that Mr. Doe #4's registry status has also affected the family with respect to the birth of their second child: "Now with the baby…I have to do it all on my own, whether – well, when he could be there but he can't at the moment." She testified that a newborn takes a lot of care, and that because the family does not live together, Mr. Doe #4 would be unable to help with nighttime

feedings, diaper changing, and other day-to-day baby care. I.G. Dep 75-76, Exh 7.

571.  Mr. Doe #4 believes that the registry has affected his ability to be involved in the upbringing of his two children with his ex-wife. Prior to being placed on the sex offender registry, Mr. Doe #4 described himself as an involved parent. "Anything – any activities she had in school I went. Any activities in general I was there." Verified Compl, ¶ 135; Doe #4 Dep 59-64, Exh 4.

572.  Due to his status as a registered sex offender, Mr. Doe #4 now cannot attend his 11-year-old daughter's volleyball games, basketball games, and other school or extra-curricular functions. Mr. Doe #4's daughter asks him why he never comes to her events. Verified Compl, ¶ 138.

573.  Mr. Doe #5 has no children of school age. Doe #5 Dep 63 ln 11-13, Exh 5; Doe #5 Requests to Admit #2-4, Exh 105.

574.  Mr. Doe #5 wants to be able to participate in the lives of his grandchildren, who are currently toddlers. He would like to be able to attend their sporting events, school plays, and similar events as they grow up, but he cannot do so because he is on the registry. Doe #5 Dep 78-79, Exh 5.

575.  Ms. Doe discusses homework with her daughter and offers advice on how to succeed with her studies. She discusses schoolwork with her daughter approximately four times a week. Mary Doe Dep 72 ln 11—73 ln 1, Exh 6.

576.  Ms. Doe testified that when her daughter was attending school in Ohio,

she:

> went to every parent-teacher conference. I went to every school program, everything, and it was all on campus because Ohio laws I want to say weren't the same as Michigan that I was able to do it all. Her teachers all knew me. I was in constant communication with them at all times. I was even at her fifth grade graduation.

Mary Doe Dep 107-08, Exh 6; Verified Compl, ¶ 140-41.

577. Now that Ms. Doe's daughter attends school in Michigan, Ms. Doe is barred from extra-curricular events. She missed her daughter's eighth grade graduation because it was on school grounds, and she cannot attend her daughter's school plays. Mary Doe Dep 66-70, 108, Exh 6; Verified Compl, ¶ 140-41.

578. Ms. Doe admits that she is able to speak with her child's teachers by telephone. Mary Doe Requests to Admit #2, Exh 106.

579. Ms. Doe has tried to communicate with her daughter's teachers by phone, and her experience is that the teachers either do not return her calls or take days to do so. She did receive return phone calls after several days from her daughter's English studies teacher. No teacher had ever met with her off school grounds. Mary Doe Dep 66-71 ln 7, 108, Exh 6.

580. Ms. Doe admits that she is "theoretically able to" communicate with her child's teachers by e-mail. In practice the teachers have not done so. Mary Doe Requests to Admit #3, Exh 106.

581. Ms. Doe's ex-husband contacts their daughter's teachers at parent-teacher

conference, by telephone and by e-mail. Ms. Doe does not know whether teachers respond to his emails. Mary Doe Dep 71 ln 21—72 ln 10, Exh 6.

582. Mary Doe asked local police whether she would be able to attend a school play that was being performed off school grounds. The first time she asked, she was told that she could attend if it was off school property. She asked again after she moved, and was told by the sergeant that he wanted to say she could, but he would have to get back to her. Mary Doe Dep 31 ln 9-23, Exh 6.

583. On the question of whether Ms. Doe can drop off and pick up her child at school, Ms. Doe testified that there "has never been a clear answer." Mary Doe Dep 31 ln 25-32 ln 2, Exh 6.

584. Ms. Doe contacted multiple police and government agencies in an effort to get an answer to that question. When Ms. Doe first asked local police, she was directed to contact a government agency in Lansing, but she cannot remember which one. In response to her question, the Lansing agency sent a letter with legal information to her ex-husband, but not to her. The information included a copy of an Attorney General letter opinion. The letter states that it is the opinion of the Attorney General's office that picking up and dropping off one's own child at school is not a violation of the student safety zone law. Mary Doe Dep 32, 36-42, Exh 6; Michigan Attorney General Letter Re Student Safety Zones, 2, Exh 94.

585. Mary Doe has only glanced at the definition of loitering as it was

contained in the Attorney General letter. Mary Doe Dep 79 ln 17—80 ln 11, Exh 6.

586.  When Ms. Doe contacted her Ohio attorney for an explanation of the

Attorney General letter "because the letter made no sense," the attorney said he did

not know Michigan law. When she contacted her local police agency, she was told

she could drop off her child if she stayed in the car pool lane. After Mary Doe

moved to a new town, she asked the police there whether she could pick up or drop

her off her child at school, and was told she was not in violation. Mary Doe Dep

32, 36-42, Exh 6.

### B.  Defendants' Understanding of Whether Registrant-Parents Can Observe or Contact Their Own Children Inside Geographic Zones

587.  When asked to admit that SORA's  ban on loitering (observing or

contacting children) within geographic zones contains no exception for registrant-

parents who are observing or contacting their *own* children, defendants stated:

> Admit that SORA does not contain [the] express language described in the
> request. Denied in part because Defendants neither admit nor deny that
> plaintiffs' contacting or observing their own children constitutes "loitering"
> within the meaning of the statute.

Defs' Answers to First Req for Admis, No. 93, Exh 44; M.C.L. §§ 28.733(b),

28.734(1)(b).

588.  Defendants admit that SORA is interpreted in the same manner regardless

of whether a registrant does or does not have children. A person's status as a parent

does not change the way the statute is enforced. Defs' Answers to First Req for

Admis, No. 136, Exh 44; Payne Dep 80, Exh 17; Burchell Dep 65, Exh 16.

589. The MSP does not keep track of whether a registrant is a parent. Payne Dep 80, Exh 17; Burchell Dep 65, Exh 16.

590. Under the new OffenderWatch data management system, it would be possible to track whether or not a particular registrant has children. Johnson Dep 251-53, 256-57, Exh 15; OffenderWatch User Manual 45, 73, 79-80, Exh 50.

591. Several SOR Unit staff, including manager Karen Johnson, Trooper Burchell and Leslie Wagner, testified that they did not know whether observing one's own child in a school zone – for example, taking a walk with one's child that crosses a school zone, or taking one's child to a playground on the weekend or when no other children are present – would be loitering. Burchell Dep 54, 64-66, Exh 16; L. Wagner Dep 39, Exh 18; Johnson Dep 326, Exh 15.

592. Sgt. Payne testified that the definition of loitering does apply to observing one's own children. Thus, local law enforcement would need to decide the question of whether, for example, a grandparent/registrant could attend Thanksgiving dinner at a home within 1000 feet of a school for the purpose of observing his grandchildren. If a parent wants to take his or her child to a park located within 1000 feet of a school, the parent should first confirm with local law enforcement whether this is permitted. Payne Dep 20, 94-96, Exh 17.

## C. Law Enforcement's Understanding of What Parenting Activities Are Permitted under SORA

**Defendants have a continuing hearsay objection to the testimony of Mr. Granzotto and Mr. Poxson, particularly as it relates to the surveys they conducted under the direction and supervision of Plaintiffs' counsel.**

593.  In his survey of law enforcement agencies, Mr. Granzotto asked whether registrants may pick up or drop off their children at school. Four police department respondents said it would not violate SORA, two were unsure, and two said it was a violation. Of the three responding prosecutor's offices, two said it was not a violation, and one said it was technically a violation. Granzotto Decl 5-6, 10, Exh 33.

594.  With respect to parent-teacher conferences, three police department respondents indicated that whether a registrant would be allowed to attend would vary from school to school, which did not address whether such attendance is a violation. One police department respondent said registrants cannot attend; two were unsure. Granzotto Decl 2, 6, Exh 33.

595.  With respect to parents attending their children's sports events, school plays, or similar events, most law enforcement respondents stated that this was not permitted, although several were unsure, and one said that the local prosecutor allowed this while the state did not. For prosecutor's offices, one respondent said this was a violation, and their office has successfully prosecuted registrant parents for attending their children's sports events. Another prosecutor's office stated that

there was no comprehensive law on the issue. Granzotto Decl 8, 11, Exh 33.

596.  With respect to whether parent-registrants can take their own children to a school playground on the weekend, five police department respondents said this would not be allowed, one said it would be allowed, and two were unsure. Among prosecutor's offices, one respondent said it would be allowed, one said it would not, and one said it would be close to a violation. Granzotto Decl 8, 11-12, Exh 33.

597.  During their depositions, SOR Unit staff answered similar questions as follows. Sgt. Payne testified that a parent could not attend his/her child's football game at a school. Payne Dep 80, Exh 17. Leslie Wagner, who had received that very question from a caller on the day of her deposition, said she told the caller this would be loitering, but that the caller should follow up with local law enforcement or the local prosecutor to see how it would be handled in his jurisdiction. L. Wagner Dep 40-41, Exh 18. Trooper Burchell testified that he did not know whether a registrant could attend his/her child's football game, that he would need to check with the local prosecutor, and that "some prosecutors might say that's fine and others might say it's a violation." Burchell Dep 65-66, Exh 16.

**Defendants objected to these questions on the grounds that they call for speculation and legal conclusions, and lack of foundation.**

598.  In Herb Tanner's experience, there is fairly universal agreement among prosecutors that attending a parent-teacher conference is *not* loitering, and that

watching a school football game *is* loitering under SORA. Tanner Dep 29 ln 23—
30 ln 15, Exh 21.

599.  Karen Johnson is aware of prosecutors who have determined that attend-
ing a parent-teacher conference is not a violation of SORA. Johnson Dep 325 ln
17-23, Exh 15.

600.  Neither the statute itself nor the Explanation of Duties Form provided to
registrants specifies whether attending parent-teacher conferences or school events
is permitted. M.C.L. §28.734; Explanation of Duties Form, Exh 62.

### D.   The Impact on Children of Having Parents on the Registry

601.  Dr. Levenson's report summarizes research, including a study co-authored
by Dr. Levenson assessing the impact of registration on registrants' children. This
research shows that children of registrants are affected by the housing and employ-
ment consequences that stem from registration and geographic zones. That study
found that 33% of registrants surveyed could not live with family members due to
residency restrictions. Levenson Expert Rep 7, 17, Exh 23; Levenson Dep 149 ln
1-7, Exh 9.

602.  Dr. Levenson stated at her deposition that her study also found that 74%
of registrants could not attend school events, sports events, or children's birthday
parties. Levenson Dep 151 ln 5-15, Exh 9; Collateral Damage: Family Members of
Registered Sex Offenders 11, Exh 81.

**Defendants object to the admission of this article by Dr. Levenson because it was not identified as a possible exhibit or document Plaintiffs intended to rely upon, or alternatively is cumulative and already incorporated into Levenson's report as a reference for her opinion.**

**Plaintiffs state that this article was in fact provided to opposing counsel in advance of Dr. Levenson's deposition as a document she relied on in forming her opinion. It was also discussed at her deposition. *See* Levenson Dep 145 ln 16—151 ln10, Exh 9, and deposition exhibit G. The article is also available in the *American Journal of Criminal Justice*.**

603.  Dr. Levenson's research on children of registrants has demonstrated that they are treated differently by other children at school, that their friendships are affected by public notification, and that they experience ridicule, teasing, and depression. Collateral Damage: Family Members of Registered Sex Offenders 11, Exh 81; Levenson Expert Report 7, Exh 23.

## XIV.   SORA AND PLAINTIFFS' USE OF THE INTERNET

### A.   SORA 2013's Requirements Involving the Internet

604.  Approximately 2,770 registrants (out of a total of between 40,000-49,000) were convicted of Internet or computer-related offenses. Johnson Dep 296-298, Exh 15; Total Number on SOR by Year, Exh 53; Defs' 2nd Supp Resp to First Interrog, No. 14, Exh 98.

605.  All registrants must report "all electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and all log-in names or other identifiers used by the individual when using any electronic mail address or instant messaging system." M.C.L. § 28.727(1)(i).

146

606.  SORA 2013 also requires that registrants report in person within three days whenever they establish "any electronic mail or instant message address, or any other designations used in internet communications or postings." M.C.L. § 28.725(1)(f).

607.  SORA 2013 does not contain definitions of the terms "electronic mail address," "instant message address," "log-in names or identifiers," or "other designations used in internet communications and postings." M.C.L. §§ 28.725 (1)(f), 28.727(1)(i).

608.  SORA 2013 does not limit what e-mail address or internet identifier a registrant can use, nor prohibit registrants from using social media or web services, so long as it does not conflict with a probation or parole condition. Johnson Dep 297 ln 25— 298 ln 3, Exh 15; Payne Dep, 119 ln 13-22, Exh 17.

609.  Some websites and web-based services prohibit individuals who are required to register as sex offenders from using their websites or their services. SORA 2013 itself does not limit what websites or services a registered offender can use. Payne Dep 120 ln 2-4, Exh 17; Mary Doe Dep 48, Exh 6.

610.  Under SORA 2013, registrants' internet identifiers are not made available to the general public. Johnson Dep 84 ln 5-7, Exh 15; PSOR Public Website Example, Exh 64.

611.  As passed by Congress, the federal SORNA statute does not contain a

provision requiring registration of Internet or electronic information, or any definitions of those terms. 42 U.S.C. § 16914.

612. SORNA does contain a provision providing for the collection of "any other information required by the Attorney General." 42 U.S.C. § 16914(a)(7). The SMART office used that authority of SORNA to require reporting of Internet identifiers for states seeking substantial compliance. Federal Register, Vol. 73, No. 128, July 2, 2008, at 38055, Exh 108.

613. The SMART National Guidelines state that sex offenders are required to provide all designations used, "for purposes of routing or self-identification in Internet communications or postings." The Guidelines further state that there "may be no clear line" between identifiers used on the Internet and "aliases" that are required to be registered as names. SMART National Guidelines, 27, Exh 111; Tanner Dep 81 ln 14—82 ln 3, Exh 21.

**Plaintiffs object: misleading, irrelevant. Michigan's SORA did not incorporate any definitions that may exist in the National Guidelines regarding reportable internet information.**

## B. Law Enforcement Use or Non-Use of Registrants' Internet Information

614. Ms. Johnson testified that, to her knowledge, no police department has ever asked the MSP to look up an internet identifier to identify a registered sex offender contacting a minor online. Johnson Dep 177 ln 20–178 ln 19, Exh 15.

615. In theory, internet information collected from sex offenders could be used

for investigative law enforcement purposes, such as determining if an Internet identifier used to contact a minor was registered by a sex offender. Johnson 176 ln 22—177 ln 12, Exh 15; SMART National Guidelines, 27, Exh 111.

616. Under the prior SOR data management system, it was not possible to search the database to determine whether a particular Internet identifier was linked to a registrant. Such a search would have required the MSP to request that the Michigan Department of Technology, Management and Budget write a computer program to generate such a report. Johnson Dep 177 ln 20–178 ln 19, Exh 15.

617. The new OffenderWatch system will allow law enforcement to search the database for a particular e-mail address. L. Wagner Dep 71 ln 20-25, Exh 18.

618. The SMART National Guidelines suggest that knowledge that their Internet identifiers are known to the authorities may deter registered sex offenders from engaging in criminal behavior on the Internet. SMART National Guidelines 27, Exh 111.

619. Plaintiffs contend that the Guidelines do not cite any research that supports this statement.

## C. Law Enforcement's Understanding of Internet Reporting Requirements

620. Defendants admit that they do "not provide training specific to determining what information is specifically reportable under 'other identifier' or other designations used in internet communications and posting, nor as to how it is

specifically determined whether an address/name/identifier is reportable as 'established,' 'used,' or 'routinely used' by the registrant. [The MSP SOR unit] would refer the [inquiring] law enforcement agency to their local prosecuting attorney's office for guidance." Defs' Resp to Pls' First Interrog, No. 11, Exh 42.

621. The SOR Unit manual repeats the language of the statute with respect to reporting of electronic information, stating that registrants are required to register e-mail and instant message addresses and, "any other designations used in Internet communications or postings." Plaintiffs contend that the manual does not provide additional information about what types of designations are reportable. SOR Unit Manual §2.5.6, Exh 83.

622. The SOR training powerpoint used to train law enforcement agencies states that an individual must report in person if they establish any e-mail address, instant message address, or other designations used in Internet communications or postings. The powerpoint refers to the language of the statute about what types of internet identifiers are reportable. No other information is included. MSP Training PowerPoint 5, Exh 58.

623. Plaintiffs contend that the Explanation of Duties Form provided to registrants does not specify what kinds of accounts must be reported. Explanation of Duties Form, Exh 62.

624. Karen Johnson testified that Explanation of Duties Form does not state

150

that the reporting requirement is limited to identifiers involving "social communication." Johnson Dep 336, Exh 15; Explanation of Duties Form, Exh 62.

625. When Mr. Poxson surveyed local law enforcement agencies regarding whether an on-line bank account, newspaper account, Amazon account, or X-Box account needs to be reported, he received varying responses. Different respondents stated that all accounts, or all accounts with usernames, or all accounts with email addresses would need to be reported. One respondent said only email addresses need to be registered, while another respondent stated that Internet bank account information would not need to be registered, but newspaper, Amazon, or X-box accounts would. Repondents from prosecutor's offices stated either that they did not know the answer, or that none of these types of accounts were reportable. Poxson Decl 3-4, 8-9, Exh 32.

**Defendants object to these statements as hearsay.**

626. Ms. Johnson testified that the MSP's position is that the electronic reporting requirement applies only to e-mail addresses and screen names "in which social communication exists." Johnson Dep 332 ln 3, Exh 15.

627. According to Ms. Johnson, the MSP interprets this "Internet communications or posting" provision, M.C.L. § 28.275(1)(f), as excluding bank or bill paying transactions. Johnson Dep 332 ln 11—333 ln 10, Exh 15.

628. Ms. Johnson admitted that Internet banking involves communicating with

the bank, but said that it would not need to be registered. Johnson Dep 333 ln 8-10, Exh 15

629. According to Ms. Johnson, whether or not a gaming account would need to be registered would depend on whether there are other players in the game. Johnson Dep 333 ln 17-334 ln 18, Exh 15.

630. Ms. Johnson testified that the SOR Unit trains law enforcement agencies to register e-mail addresses and screen names in which social communication exists. That includes things like Facebook, Myspace, Yahoo! e-mail—but not their bank account login. Johnson Dep p 331 ln 24—332 ln 10, Exh 15.

631. It is Ms. Johnson's opinion that local law enforcement agencies know what types of Internet identifiers have to be reported and which do not. Johnson Dep 335 ln 19-25, Exh 15.

632. Ms. Johnson testified that the SOR Unit trains agencies that when they notify registrants of their responsibilities, they should "give [registrants] an understanding of what their requirements are" for reporting Internet identifiers. Johnson 334 ln 19—335 ln 8, Exh 15.

633. Prosecutor Herb Tanner testified that on-line bank identifiers would not need to be registered because the law is directed at social media. He was asked:

Q. Can you show me where in the law it says it's directed at social media?
A. It's not in the law.

Tanner Dep 81, Exh 21.

634. Sgt. Payne testified that he did not know what "other designations used in Internet communications or postings means." He did not know whether a registrant would need to report creation of an account in order to comment on a news website or use a gaming website. Payne Dep 100-101, Exh 17.

**Defendants objected to these questions on the grounds that they call for legal conclusions, and on grounds of vagueness.**

635. Trooper Burchell's understands the "internet identifier" registration requirement to mean that if the offender communicates with another person on the internet using an identifier, that identifier must be registered. Burchell Dep 75 ln 15—76 ln 5, Exh 16.

636. Trooper Burchell testified that identifiers used to play at gaming sites or comment on news articles would need to be reported. His belief was that all identifiers used to communicate with other people are reportable. While he admitted that an on-line bank account identifier is used to communicate with a bank, he believed such identifiers need not be reported because "you can't stalk your bank." He was uncertain whether accounts for on-line purchases, such as Amazon, are reportable. Burchell Dep 75-79, Exh 16.

637. Ms. Wagner testified that she has difficulty understanding what is meant by a "designation used in Internet communications or postings." She did not know

whether registrants must report email addresses used at work or accounts created to comment on news articles. She first thought online banking would not be reportable because "it's not communicating with others." But when asked whether registrants are communicating with their bank, she was unsure and said that "it would be up to the prosecutor to decide what that means." L. Wagner Dep 63-66, Exh 18.

**Defendants objected to these questions on the grounds that they called for speculation, called for legal conclusions, and lack of foundation.**

### D. The Impact of SORA on Registrants' Internet Use

638. National research shows that 92% of adult Americans use email. Pew Research Center, *Search and email still top the list of most popular on-line activities* (May 2011), Exh 77.

639. MSP data show that less than half of all non-incarcerated Michigan registrants report having an email address or other Internet identifier. Of the approximately 28,000 active registrants on the SOR database, 13,232 reported some kind of Internet identifier. Defs' 2nd Supp. Resp to First Interrog, No. 15c, Exh 98; Johnson Dep 298-300, Exh 15.

640. Plaintiffs are concerned about using the Internet because they are unclear about when they must report immediately and in person. They do not know, for example, if they must report immediately in person if they set up an on-line account to pay their taxes, register with Netflix, purchase or review products on Amazon, or comment on on-line bulletin board. Verified Compl, ¶ 203.

641.  Mr. Doe #1 limits his Internet use both because he has "a hard time know-ing what exactly I have to report" and because if he creates a new account, he has to go report it in person, which is time-consuming. Doe #1 Dep 52-59, Exh 1; Doe # 1 Interrog Resp No. 2, 5, Exh 36.

642.  Mr. Doe #1 would like to establish a business and has tried to do so. How-ever, he gave up because the SORA restrictions made it difficult to market his bus-iness on the Internet (*e.g.,* advertise on Craig's List or Angie's List, or do other sorts of on-line marketing). He specifically did not create a Facebook or Kick-starter account for his business because he feared becoming non-compliant. Even ordering business cards or registering his business on-line would likely involve creating new electronic accounts, and he is unsure what he then needs to do to be in compliance with his registration requirements. Doe #1 Dep 52-59, 85, Exh 1; Doe #1 Interrog Resp No. 4, Exh 36.

643.  Mr. Doe #1 also testified that because he had been incarcerated for a long time, "the internet and iPhones and this technology doesn't interest me—I don't have no desire to do those things." Mr. Doe #1 also noted the time necessary to register Internet information: "And in so being its time consuming for me to have say, well, I want to go and get on the internet for this, however, before I do let me call you or go to the police station and say, hey, you guys, I need to register this information." Doe #1 Dep 50 ln 9-17, Exh 1.

644.  Doe #1 never asked his former parole agent specifically about what he can or cannot do on the internet. Mr. Doe #1 did ask his parole agent about attending a computer class at a library and the agent told him "what I can and cannot do." Mr. Doe #1 was not allowed by his agent to attend the computer class. Doe #1 Dep 59 ln 17—61 ln 15, Exh 1.

645.  Doe #2 stated:

Before I had to register I used the Internet a lot. Once I was told I had to register, I closed down a quite a number of accounts because I did not want to have to report them. I try not to do anything that would cause me to create a new account on the Internet, since I would then have to register that account. I am also very confused about what I have to report, such as whether I have to report accounts that are not social media accounts.

      *      *      *      *      *

I used to have accounts with MySpace and other social sites. When I was told I had to report those, I closed my accounts.

I would like to have a Facebook account, Twitter account, or other accounts that people with free lives can open up. I can't even open an account on a recipe site without having to register that. I would like to do on-line shopping at sites like East-Bay [sic] where you can save money, but I don't open accounts because of the registration requirements.

Doe #2 Interrog Resp No. 2, 4, Exh 37.

646.  Mr. Doe #2 testified that he is also reluctant to use the Internet because he is concerned that his internet screen names might one day be placed on the public registry website. Doe #2 Dep 107 ln 3—108 ln 11, Exh 2.

647.  When Mr. Doe #2 originally registered in 1996, SORA was a private law enforcement database, and the information he provided was not available to the

public. That previously confidential information has since become public.

*Compare* Mich Pub. Act 295 (1994) (eff. Oct. 1, 1995), and M.C.L. § 28.721 *et. seq.*.

<span style="color:red">**Defendants object to this statement as argument, not fact.**</span>

648.  Mr. Doe #2 further testified that he is reluctant to use the internet out of concern that individuals may try to learn his identity and track him down because of prejudice against sex offenders. Doe #2 Dep 100 ln 18—101 ln 8, Exh 2.

649.  Although Mr. Doe #2's actual residential address is listed on his registry page, no one has approached him about his registration. Doe #2 Dep 101 ln 9-15, Exh 2.

650.  Mr. Doe #2 stated that he understands email to be "basically electronically getting in touch with someone." He thinks that "e-mail" is a vague term:

> E-mail, just the phrase e-mail is – makes it so cloudy because you can have an e-mail account on Amazon, you can have an e-mail account on Craig's List, you can have an e-mail account on things that aren't necessarily social media, and you wonder why would I have to register any of that. I mean, it's vague. It's very vague.

Doe #2 Dep 88 ln 9-16, 90 ln 1-2, Exh 2.

651.  Mr. Doe #2 stated that hisconfusion about what is reportable causes him to restrict his Internet use: "I don't know what brings me into conflict with the registration requirements, so to feel safe I cut out as much Internet activity as I can." Doe #2 Interrog Resp No. 5, Exh 37; Doe #2 Dep 97-98, Exh 2.

652.  Mr. Doe #2 does use the internet to shop on Amazon, to play chess, and to read news. He testified that when looks at news sites, he does not comment on such sites because he would have to report doing so. Doe #2 Dep 93 ln 7—23, 94, Exh 2.

653.  The officer with whom Mr. Doe #2 registered told him that he does not need to register his Amazon.com account, but that he does need to report social media, instant messaging IDs and things of that nature. Doe #2 Dep 89 ln 14-23, 97 ln 2-7, Exh 2.

654.  Mr. Doe #2 understands instant messaging as being social media in which a person chats back and forth with another person. He understands that a social media account like MySpace or Facebook is something that he would have to register. Doe #2 Dep 90 ln 14—91 ln 7, Exh 2.

655.  Mr. Doe #2 does not register his on-line banking ID. Doe #2 Dep 98 ln 9-14, Exh 2.

656.  Mr. Doe #2 does not maintain a Netflix account, but that is because he is too busy to have time for television, and it is not because of his sex offender registration. Doe #2 Dep 102 ln 19—103 ln 2, Exh 2.

657.  Mr. Doe #2 understands that SORA does not prohibit him from having e-mail or Facebook accounts, but requires him to register his account information. He described this as "definitely a deterrent." Doe #2 Dep 91 ln 8-22, Exh 2.

658.  Mr. Doe #2 admits that it could be useful for police to be able to search for suspects by an on-line screen name that they used. Doe #2 Dep 96 ln 1-10, Exh 2.

659.  Mr. Doe #3 testified that he was unsure what Internet activity he has to report, such as a fantasy football league where he has a unique user name. More-over, "there's things I want to do with my son, like Study Island, but I have to – he's nine and my other son is six, so if I want to put in my name and my e-mail am I allowed to do that? I don't know." Doe #3 Dep 71-72, Exh 3.

660.  Mr. Doe #3 testified:

Q. Is it your understanding that you are prohibited from doing anything on the Internet?
A. I feel as if I'm prohibited.
Q. Has any law enforcement officer or an attorney or anybody ever told you that you are actually legally prohibited?
A. No.
Q. Do you understand the – you know, you can have any account that you want, you just have to register if you're going to use an e-mail, Internet chat, or message board or anything like that?
A. I understand that I can have accounts, but what I don't understand is what accounts need to be registered. What do I need to tell them and what don't I tell them…. Where am I safe and where I'm not safe…. Say I've got 16 different accounts to where – like I listed here in my answer, as far as like [My City] Soccer, Facebook, Twitter, other social networks, Study Island, math websites, ESPN fantasy football, these are the things that I don't – I'm not on because I'm unclear if I can have them…. Especially the ones with Study Island, math websites, those two are crucial in my life because I want to be a father and I want to teach my kids, you know, this is education.

Doe #3 Dep 79 ln 20—81 ln 4, Exh 3.

661.  Mr. Doe #3 then explained how a website called Study Island would allow

him to get his son's scores if Mr. Doe #3 could sign up for the website, and how the [My City] Soccer site would allow him to keep track of his children's games, cancelled practices, and who is supposed to bring a snack for the team. But he does not participate "because I don't know if I can be involved … because it's a children thing." "If I'm not allowed near schools how am I allowed to do anything online with kids' websites?" Doe #3 Dep 80-84, 99-102, Exh 3; Doe #3 Interrog Resp No. 4, 5, Exh 38.

662.  When asked whether he'd inquired of law enforcement about his Internet reporting obligations Mr. Doe #3 testified:

A. With all due respect, nobody inside the [city] police station has a clue about the law or the statute of a sex offender.
Q. And why do you say that?
A. Because I've asked questions before and they can never answer them.

Doe # 3 Dep 87-88, Exh 3.

663.  When Mr. Doe #3 asked local law enforcement what internet accounts he needed to register, they told him just his e-mail account. He was told he did *not* need to register his Instagram account. Doe #3 Dep 88 ln 23—89 ln 24, Exh 3.

664.  Mr. Doe #3 has asked questions about whether he needed to register his fantasy football account or his child's Study Island account, and whether he needed to provide his passwords. He was told he only needed to provide e-mail addresses. Mr. Doe #3 could not remember asking any additional internet questions on the

occasion when he asked those questions.  Doe #3 Dep 71 ln 10—p 72 ln 24, Exh 3.

665.  Mr. Doe #3 avoids doing anything on the Internet that would require him to open additional accounts, because he would then have to go and report in person. Doe #3 Interrog Resp No. 2, Exh 38. Mr. Doe #3 has a Craigslist account, an Instagram account, and a PayPal account, and visits the Detroit News website. He also has an on-line banking account. He does not read comments on news stories. Doe #3 Dep 88 ln 9-22, 90 ln 2-8, Exh 3.

666.  Mr. Doe #3 does not use Facebook or Twitter because he does not want someone to recognize him from the registry. Doe #3 Dep 85 ln 17—86 ln 3, Exh 3.

667.  Mr. Doe #3's wife knows what an e-mail address is, what a chat ID is, and that regularly means "often." S.F. 65 ln 3-22, Exh 8.

668.  Mr. Doe #4 would like to use the Internet, email friends or family, use Facebook, comment on websites, and purchase items on-line. Doe #4 Dep 53-58, 93, Exh 4; Doe #4 Interrog Resp No. 2, 4, Exh 39.

669.  Mr. Doe #4 testified that he does not understand his Internet obligations. Doe #4 Dep 57 ln 25, Exh 4. When defense counsel read Mr. Doe #4 sections of the Explanation of Duties Form stating that he must register if he establishes an e-mail or instant message address, or any other designation used in internet communications postings, and asked if Mr. Doe #4 understood this, he replied, "From what you are telling me yes." Doe #4 Dep 55 ln 19—56 ln 3, Exh 4.

670.  Mr. Doe #4 has never used e-mail, instant messaging, or internet forums because "I don't understand what I can or cannot do with this." Doe #4 Dep 58 ln 1-11, Exh 4.

671.  Mr. Doe #4 stated that he will be getting a work-related email account. Doe #4 Interrog Resp No 3, Exh 39.

672.  Mr. Doe #4 testified that "it is just easier and safer not to use the Internet at all. I do know that I have to report in person when I get a new account…. it is too complicated to report in person." Doe #4 Dep 53-58, 93, Exh 4; Doe #4 Interrog Resp No. 2, 4, Exh 39.

673.  Mr. Doe #4 testified that, given his lack of experience with the Internet, if SORA disappeared, he would have no idea what to do with e-mail, instant messaging, or forum posting. Doe #4 Dep 58 ln 12-15, Exh 4.

674.  Mr. Doe #5 is unclear about what his responsibilities are in terms of the Internet. Doe #5 Interrog Resp No. 2, Exh 40.

675.  Mr. Doe #5 uses the Internet for entertainment and to keep up with the news. Doe #5 Interrog Resp No 2-4, Exh 40; Doe #5 Dep 63, Exh 5.

676.  Mr. Doe #5 has had one e-mail address which he used primarily to contact a vocational counselor. He used that account for less than one month. By the time he began registering as a sex offender, he had already stopped using that e-mail and was not using e-mail at the time of his deposition. Doe #5 Interrog Resp No 2,

162

Exh 40; Doe #5 Dep 62 ln 4-21, Exh 5.

677.  Mr. Doe #5 does not use social media and is not interested in using it because he is a private person. Doe #5 Dep 62 ln 22—63 ln 10, Exh 5.

678.  Mr. Doe #5 admits that the main reason he rarely uses the internet is that he is not computer savvy, rather than because he is on the sex offender registry. Doe #5 Requests to Admit #5, Exh 105.

679.  Because Mr. Doe # 5 is not computer-savvy, he does not know what accounts he might open if SORA did not exist. Doe #5 Interrog Resp No 4, Exh 40; Doe #5 Dep 63, Exh 5.

680.  Mr. Doe #5 has not asked any local law enforcement officers or the prosecuting attorney about what he is required to do in regards to the internet. Doe #5 Dep 61 ln 18-25, Exh 5.

681.  Mary Doe testified that she limits her Internet use because she is "very confused about what I do and do not need to report," and because she has to report new accounts in person. Mary Doe Interrog Resp No. 2, 4, 5, Exh 41; Mary Doe Dep 31, Exh 6.

682.  Ms. Doe has sought legal advice on what Internet information she must register "but because the laws are so confusing even they [the attorneys] don't know the answer." Mary Doe Dep 50-51, Exh 6.

**Defendants object to this statement as hearsay.**

163

683.  Ms. Doe asked the police what identifiers she must register, and was told she did not have to register identifiers associated with bank accounts or utility bill payment accounts. Mary Doe Interrog Resp No. 2, 4, 5, Exh 41; Mary Doe Dep 30 ln 19-31 ln 8; 32 ln 12-20, Exh 6.

684.  The police asked Ms. Doe if she uses social networking websites, which she does not. They told her that if she uses them, she would have to register them. The police did not tell her that she cannot have social media accounts. Mary Doe Dep 32 ln 21—33 ln 16, Exh 6.

685.  Mary Doe stated that—but for registration requirements—she would open Facebook, Twitter, and Instagram accounts. Mary Doe Dep 47 ln 5—48 ln 1, Exh 6.

686.  Ms. Doe would like to respond to on-line news articles (on websites like the Detroit News, Click on Detroit, or Fox) and use Facebook, Instagram and Twitter to communicate with family and friends. Mary Doe Dep 47-48, Exh 6; Mary Doe Interrog Resp No. 4, Exh 41.

687.  Mary Doe testified that she does not do these things because then she would have to go register within three days, and because she is confused about what she has to report. An additional reason for not commenting on news articles is that she believes readers would find her account name on the registry. Verified Compl 207; Mary Doe Dep 31, 47-48, 50-52, 60, 104-04, Exh 6; Mary Doe Interrog Resp No 4, Exh 41.

688.  Ms. Doe testified that the registry also affects her ability to shop on-line:

> [I]f I were to create … an account one day for one store and then I saw
> something on sale a couple days later and something on sale a couple days
> more later, it's very confusing that if I don't report it if I'm going to be
> charged with a felony, a misdemeanor, and just be sent right back to prison or
> be on probation again.

Mary Doe Dep 104-05, Exh 6; Mary Doe Interrog Resp No. 4, Exh 41.

689.  Mary Doe has not specifically asked police or the prosecutor whether she needs to register online identifiers she uses to purchase clothes over the Internet. Mary Doe Dep 49 ln 19—50 ln 21, Exh 6.

690.  Mary Doe maintains and registers a Paypal account, but she has never looked at online store websites closely enough to know whether she can buy from those stores using her Paypal account. Mary Doe Dep 114 ln 25—115 ln 17, Exh 6.

691.  Mary Doe "is not positive" whether internet identifiers are part of the public registry website. Mary Doe Dep 52 ln 4-8, Exh 6.

692.  Mary Doe objects to police having access to her internet identifiers because she considers herself a "private person," because she wants "to keep everything I do private," and because "to me it's big brother watching." Mary Doe Dep 59 ln 5—60 ln 18, Exh 6.

693.  Mary Doe testified that the Explanation of Duties Form does not state that she is prohibited from having internet accounts. Rather, this is information that she is required to report. Mary Doe Dep 54 ln 24—55 ln 22; 58 ln 10—59 ln 4, Exh 6.

694.  If a registrant post comments using a registered internet identifier, any law enforcement user with access to the SOR system could search in OffenderWatch and determine which registrant made the posting. L. Wagner Dep 71-72, Exh 18.

**Defendants objected to this question on the grounds that it called for speculation and assumed facts not in evidence.**

695.  There are approximately 8,000 users of the SOR database who have access to registrants' internet identifiers. Johnson Dep 92-93, Exh 15.

## XV.  LAW ENFORCEMENT'S UNDERSTANDING OF SORA

### A.  Local Law Enforcement's and Prosecutors' Interpretations of SORA

696.  SORA registration and enforcement is handled by law enforcement agencies, including county sheriffs' departments, municipal police departments, probation agents and parole agents. M.C.L. §§ 28.722(n); 28.724.

697.  There are 83 county prosecutors' offices that prosecute SORA violations. Tanner Dep 31, Exh 21.

698.  There are approximately 600 law enforcement agencies that can access Michigan's SOR database. OffenderWatch Training, Disc 3, Part 1, Exh 68.

699.  There are approximately 8,000 individual users who can access Michigan's SOR database. Law enforcement employees do not need to be trained before they access the system. Johnson Dep 92-93, Exh 15.

700.  Mr. Poxson reported that he did not receive consistent answers to any of the questions on his survey of law enforcement agencies and prosecutors. The

people he called were often unsure about their answers, or provided conflicting answers, including to questions like when registrants must report an address change, or whether registrants must report self-employment or on-line education. Poxson Decl 2-9, Exh 32.

**Defendants continue their objection to Mr. Granzotto's and Mr. Poxson's surveys as hearsay.**

701.  Respondents to Mr. Granzotto's survey were unsure about, or provided varying answers to, questions about whether registrants may pick up or drop off their children at school, or whether school sports fields are included in the geographic zones, or under what circumstance registrants can pass through a geographic zone. Granzotto Decl 2-3, 5-7, 9-11, Exh 33.

702.  When asking about how long registrants have to report an address change, Mr. Poxson got answers ranging from three days (including weekends) to ten days. Poxson Decl 2, Exh 32. Of the two prosecutor's offices that responded to the same question, one respondent said a week, and the other 10-15 days. *Id.* at 8-9, Exh 32.

703.  Similarly, when Mr. Poxson asked prosecutors' offices about the requirements to report travel, one reported that travel need not be reported, and the other did not know. Poxson Decl 8-10, Exh 32. Under SORA 2013, registrants must report travel. M.C.L. §§ 28.725(1)(e), (7).

704.  Sergeant Bruce Payne, the MSP's SORA Enforcement Coordinator,

testified that after he took that job it took "a good six, seven months" before he felt like he really understood SORA's requirements. Payne Dep 15-16, Exh 17.

705.  In response to a deposition question, Sgt Payne testified that registrants cannot live within 1000 feet of a university. Payne Dep 47, Exh 17.

**Defendants objected to this question on the grounds that it called for legal conclusions.**

706.  SORA creates geographic zones around schools, defined as grades 1-12. M.C.L. § 28.733(d).

707.  Sgt. Payne also testified that a homeless person could not stay at a shelter that is within 1000 feet of a school. Payne Dep 64, Exh 17. A federal court has held that SORA does not bar emergency shelter use within 1000 feet of a school. *Poe v. Snyder*, 834 F. Supp. 2d at 733.

**Defendants objected to this question on the grounds that it called for legal conclusions.  Defendants further object to the remainder of this statement as legal argument challenging the witness' legal conclusions.**

708.  Sgt. Payne could not remember what education information registrants must report. Payne Dep 96, Exh 17.

**Defendants objected to these questions on the grounds that they called for legal conclusions.**

### B.   Parole and Probation Agents' Understanding of SORA

709.  Richard Stapleton, former Legal Affairs Administrator for the Michigan Department of Corrections (MDOC), stated in his expert report that parole and

probation agents charged with supervising parolees and probationers who are also subject to sex offender registration have great difficulty interpreting and applying SORA. Stapleton Expert Rep 1, Exh 28.

710.  The portion of Mr. Stapleton's report that concludes that parole/probation agents have difficulty interpreting SORA is based upon his own experience. Mr. Stapleton retired from MDOC in 2011. Stapleton Dep ln 6-9, 51 ln 13—52 ln 2, Exh 13.

711.  Mr. Stapleton testified that some parole/probation agents contact local prosecutors with questions about SORA, and that agents must have a supervisor's approval before violating an offender for non-compliance with SORA. Stapleton Dep 75 ln 17—76 ln 9, Exh 13.

712.  At the MDOC, Mr. Stapleton was responsible for assisting department managers and field staff in answering legal questions about SORA. Stapleton Expert Rep 8, Exh 28; Stapleton Dep 30-31, 83, Exh 13.

713.  Mr. Stapleton testified that although he is an attorney and has been professionally responsible for providing guidance to the MDOC on the meaning of SORA, he could not remember the details without looking at the statute. In his opinion, registrants who lack legal training, professional experience, or access to legal resources would "find it quite confusing." Stapleton Dep 101-02, Exh 13.

714.  Mr. Stapleton stated that he could not recite all the requirements of SORA

off the top of his head without looking at the statue because "[t]here's so many requirements within SORA it's hard to remember them all." Specifically he could not precisely recite all the information that must be registered about a registrant's vehicle, their schools, and internet identifiers.  Mr. Stapleton is aware of the Attorney General's opinion regarding geographic zones, but could not recall whether it allows a registrant to pick up or dropping off their own children at school. He stated it "would be something that I would look up very fast, I know exactly where to find the opinion." Stapleton Dep 69 ln 10—79 ln 7, Exh 13.

715.  Mr. Stapleton received many questions, mostly related to employment, "loitering", family reunification, and how to measure geographic zones. He found that many such questions "could not be appropriately answered because of the lack of adequate definition or guidance within SORA itself." Stapleton Expert Rep 8, Exh 28; Stapleton Dep 30-31, 83, Exh 13.

> **Defendants make a continuing objection to Mr. Stapleton's report and testimony to the extent it reveals legal advice he provided to MDOC or its employees, as such matters are protected by attorney-client privilege and MDOC has not wavied that privilege.**

716.  In trying to answer questions about SORA, Mr. Stapleton looked at the statute and tried to determine legislative intent. He testified that his focus was not so much "legal research . . . because most of the questions arise because of the lack of an answer in the act itself." Stapleton Dep 34, Exh 13.

**Defendants object to this statement as being a legal conclusion.**

717.  Instead Mr. Stapleton "sounded out" the question with the attorneys in the Corrections Division of the Office of Attorney General, called the Michigan State Police, or phoned the MDOC's Field Operations Administration to "find out what we've been doing" in practice. When Mr. Stapleton found that different MDOC agents were applying SORA differently, he would draft internal memorandum in an effort to promote uniform application among MDOC employees across the state. Stapleton Dep 33-35, Exh 13.

**Defendants object to the extent that Mr. Stapleton's report or testimony reveals or discusses legal advice or opinions provided to him by the Corrections Division of the Department of Attorney General, on the grounds that Mr. Stapleton would have such discussions only in his official capacity on behalf of MDOC, and MDOC has not waived its attorney-client privilege.**

718.  Mr. Stapleton reported that even though the MDOC has a central legal office to address questions and promote consistent application of the law, there was "very much inconsistency" and a "great deal of disparity" in how MDOC agents were applying SORA. For example, on the west side of the state parole agents were not allowing registrants to attend their children's sporting events or plays, whereas on the east side of the state they were. Stapleton Dep 86-88, Exh 13.

719.  Mr. Stapleton also explained that measuring geographic zones was complicated for MDOC agents because:

there isn't a standard process by which to measure, you know, is it as the crow flies again or do you measure from property corner to property corner. You know, sometimes there's private property that you cannot cross in between but if you go down the sidewalk and over then . . . it's more than 1000 feet, but if you cut across between the houses right across it might be 800 feet.

Stapleton Dep 85, Exh 13.

720.  Mr. Stapleton testified that at least within the MDOC there "was some means of trying to communicate with the field operations administration folks to get [interpretations] out to their agents, but independent police departments, sheriffs, troopers at the front desk, they don't know this stuff and there's a lot of bad information that gets put out." Stapleton Dep 87-88, Exh 13.

> **Defendants object to this statement as hearsay, speculation, and beyond Mr. Stapleton's supposed expertise.**

721.  Mr. Stapleton also reported that the MDOC has established "sex offender specific" caseloads, allowing agents to specialize in the technical requirements of SORA. "But even with intensive supervision, SORA's complexity and vagueness all but guarantee that parolees and probationers will still be unsure about what they can and cannot do." No similar orientation is provided to registrants who are not under MDOC supervision. Stapleton Expert Rep 9, Exh 28.

722.  In Mr. Stapleton's experience, the interpretation of SORA varies significantly from jurisdiction to jurisdiction, meaning that to avoid prosecution registrants must rely on the varying interpretations of prosecutors and courts across the

state. Stapleton Expert Rep 9, Exh 28.

> **Defendants object to this statement as speculation and beyond Mr. Stapleton's supposed expertise.**

723.  Law enforcement officials told Mr. Stapleton more than once that "loitering" is something you know when you see it. Mr. Stapleton testified that there were circumstances where MDOC agents approved registrants to work in particular areas, but law enforcement would say they were loitering even though they have the agent's approval to work in that area. Stapleton Expert Rep 9, Exh 28; Stapleton Dep 77, Exh 13.

> **Defendants object to these statements as hearsay.**

724.  Mr. Stapleton also testified that in his opinion, the disparities in SORA enforcement do not reflect disparities in prosecutorial decisions about whether to prosecute an offense, but rather in how different prosecutors interpret what conduct even constitutes an offense. Stapleton Dep 109-11, Exh 13.

### C.   SOR Unit Training

725.  The SOR Unit is responsible for conducting training on the registry for the general law enforcement community and for MSP enforcement coordinators. Burchell Dep 24 ln 3-15, Exh 16.

726.  Karen Johnson testified that when the law or the SOR registration database changes in significant ways, the SOR unit provides training to every law enforcement agency, probation or parole officers, the Department of Corrections

and MSP personnel. Johnson Dep 94 ln 3-7, 95-98, 110, Exh 15.

727.  If an agency cannot attend a SOR unit training and requests training, the SOR Unit sends troopers to the agency and provides the training there free of charge. Johnson Dep 94 ln 18-23, Exh 15.

728.  Training on SORA is not required for MSP or other law enforcement officers, with the exception of MSP post coordinators. Burchell Dep 24 ln 16-22, 94 ln 9-17, Exh 16.

729.  The SOR Unit advises each law enforcement jurisdiction to establish a Sex Offender Enforcement Coordinator as a resource "to other agencies and the general public." Where such local coordinators are appointed, the SOR Unit's four regional coordinators work with the local officers to coordinate SORA enforcement. MSP Training PowerPoint, 12, Exh 58; MSP Sex Offender Registry and Enforcement Coordinators, Exh 56; Johnson Dep 148-50, Exh 15.

730.  The MSP does not have supervisory authority over local law enforcement, and cannot compel them to comply with SORA. Hawkins Dep 61 ln 4-10, Exh 19.

731.  Ms. Johnson testified that the SOR unit trains a minimum of 3,000 people each year. Johnson Dep 94 ln 8-17, Exh 15.

732.  Sgt. Payne testified that he had been in his job approximately one and a half years, and that no training had occurred during that time. Payne Dep 12, 119 ln 6-9, Exh 17.

733.  The SOR training PowerPoint was created in approximately April or May of 2011. The PowerPoint was used by Trooper Burchell and others when providing training. Burchell Dep 10 ln 6-16; 27 ln 4—29 ln 4, Exh 16; MSP Training Powerpoint 2011, Exh 58.

734.  The SOR training PowerPoint includes information on use of the SOR database, the system of enforcement coordinators, how to conduct investigations, who is required to register, what agencies are responsible for registration, what information must be reported, and the public website. MSP Training Powerpoint 2011, Exh 58.

735.  Trooper Burchell testified that a "large portion" of the SOR Unit's training focus on how to use the SOR data management system, as opposed to how to interpret the law. Burchell Dep 25 ln 10-13, Exh 16.

736.  The SOR Training PowerPoint does not contain any slides on "loitering" or the geographic zones. MSP Training PowerPoint, Exh 58.

737.  Trooper Burchell testified that the training discusses the statute's prohibitions regarding geographic zones, and "what's allowed," but does not provide information on "loitering," other than advising that one should refer to the statute and to check with the prosecutor. Burchell Dep 48, 49 ln 8-10, Exh 16.

738.  The SOR Unit's training PowerPoint contains several slides on registrant's reporting duties. The PowerPoint states that "immediately" is defined as

three business days, and that registrants must immediately report in person if they establish any e-mail address, instant message address, or other designations "used in Internet communications or postings," if they intend to temporarily reside at another address for more than seven days, or if they purchase or regularly use a vehicle or discontinue its use. MSP Training PowerPoint, 12-13, Exh 58.

739.  Trooper Burchell testified that he has conducted training with several state coordinators at once that lasted for seven hours that included a review of statutory changes and how to use the SOR system. Burchell Dep 25 ln 5-9; 27 ln 21—28 ln 6, Exh 16.

740.  During trainings, Trooper Burchell has received questions from law enforcement about what a geographic zone is, and he answered by referring to the statute and pointing out that the statute refers to "real property" and "school property." Burchell Dep 29 ln 10-22, Exh 16.

741.  Trooper Burchell has received questions about registering offenders' employment, telephone numbers, vehicles, and aliases—including internet identifiers. Burchell Dep 29 ln 23-30 ln 7, Exh 16.

742.  Trooper Burchell—as a state coordinator—is available to assist if someone from an MSP post, from his district or from local law enforcement has questions regarding the registry. Burchell Dep 42 ln 14-43 ln 4, Exh 16.

743.  Trooper Burchell cannot give legal advice. Burchell Dep 47 ln 1-4, Exh 16.

744. The SOR Unit training emphasizes that any officer investigating a SOR violation check with their prosecutor. MSP Training PowerPoint, 14-15, Exh 58.

745. The SOR Unit has developed a training manual which it provides to every law enforcement agency. The manual is not provided to registrants. Johnson Dep 95 ln 17-24, Exh 15; SOR Unit Manual, Exh 83.

746. The training manual focuses on how to use the SOR database. The training manual reiterates the registration requirements contained in the statute, such as that registrants must provide address, work, campus, e-mail and instant message addresses, and vehicle information. The manual does not define what constitutes "regular use" of a telephone or vehicle. SOR Unit Manual §2.5.1-2.5.7, Exh 83.

747. The training manual lists the statutory requirements of geographic zones. The manual does not address how or from what point zones should be measured. SOR Unit Training Manual, §4-4.5, Exh 83.

748. The manual includes a "Frequently Asked Questions" section. The FAQ states that an offender picking up and dropping off their own children is not a violation. The FAQ also states that it is a violation for a registrant to attend his/her own child's play or sporting event. SOR Unit Training Manual, §4-4.5, Exh 83.

749. There is a help guide within the SOR database software itself. Johnson Dep 95 ln 17-24, Exh 15.

### D.   Trainings by the Prosecuting Attorneys Association of Michigan

750.  Herb Tanner, a former prosecutor who works for the Prosecuting Attorney's Association of Michigan (PAAM), has provided trainings on SORA to prosecutors at least five times. The 2013 PowerPoint is the latest version of the training he provides. Tanner Dep 37 ln 15-18; 36 ln 24—37 ln 14, Exh 21; Tanner 2013 PowerPoint, Exh 58.

751.  Mr. Tanner first gave a public presentation on the sex offender registry in 2008, and the purpose was to discuss the changes that were coming. Tanner Dep 42 ln 15—43 ln 2, Exh 21.

752.  Prosecutors and police will call PAAM because PAAM has demonstrated expertise in issues prosecutors face with SORA. Mr. Tanner receives calls and provides answers to questions about SORA between one and five times per month. Tanner Dep 26 ln 5—29 ln 1, Exh 21.

753.  The most common question Mr. Tanner receives from prosecutors concerns loitering—usually prompted by a phone call to the prosecutor from a school principal asking what to do because somebody, such as a parent seeking to attend a school function or parent-teacher conference, is a registrant. In those cases, the answer is to point the principal to the law and direct him/her to talk to the school's legal counsel so they can decide what their policy is going to be. Tanner Dep 27 ln 11—29 ln 22, Exh 21.

754.  Wayne County, Oakland County, and Kent County have units of prose-cuting attorneys dedicated to sex crimes, and there may be more counties that have similar units. Tanner Dep 32 ln 5-13, Exh 21.

755.  Mr. Tanner testified that different prosecutors have different levels of familiarity with SORA and SORA violations, just as prosecutors have different levels of expertise and experience with every other criminal law. Tanner Dep 33 ln 3—34 ln 4, Exh 21.

756.  Mr. Tanner's training does not focus on violations of SORA because that is not something that prosecutors or anyone else has asked for training on. Tanner Dep 54 ln 9-21, Exh 21.

757.  In Mr. Tanner's experience, geographic zones are not the most common violation of SORA, and he does not believe prosecutors charge them often. Rather, the most common violations are the failure to change a registered address after moving, and the failure to comply with other registration requirements. Tanner Dep 54 ln 22—55 ln 5; 96 ln 6-23, Exh 21.

758.  Approximately 632 registrants have been charged with geographic zone violations between 2006 and 2013. MSP SORA Charging Data 2, Exh 45.

759.  Mr. Tanner infers from the fact that prosecutors have not asked for train-ing on geographic zones, there is either a consensus on the definitions, or there are not that many cases involving such violations because otherwise "they would be at

[his] doorstep." Tanner Dep 96 ln 6-23, Exh 21.

760. I n 2009, before Michigan amended SORA to comply with SORNA, Mr. Tanner delivered a training presentation at the MSP conference, which was geared toward troopers involving failure-to-register crimes and what prosecutors were looking for in prosecuting those cases. Tanner Dep 57 ln 7-18, Exh 21; Tanner PowerPoint 2009, Exh 117.

761. During the 2009 MSP conference, troopers asked Mr. Tanner about prosecutors who would decline to bring charges for violations of SORA. Tanner Dep 59 ln 15— 60 ln 4, Exh 21.

762. In the 2009 MSP conference, Mr. Tanner received questions from troopers about what "loitering" is and how it was interpreted by prosecutors. Tanner Dep 60 ln 5-10, Exh 21.

763. Mr. Tanner repeated his SORA-specific training for police, prosecutors, and educators in 2010, and again in 2011 in conjunction with MSP, the latter focusing on changes to the law and included discussions on pleading and charging. Tanner Dep 62 ln 22—64 ln 4; 64 ln 19—65 ln 6, Exh 21; Tanner PowerPoint 2011, Exh 60.

764. PAAM prepared an outline of changes made in the SORA in 2011, and Lt. Hawkins from the MSP has used that outline in training. Hawkins Dep 92 ln 3-12, Exh 21; PAAM Outline of 2011 SORA Changes, Exh 114.

## XVI.   REGISTRANTS' UNDERSTANDING OF SORA

765.  Karen Johnson, the SOR Unit Manager, testified about problems that arise if the MSP does not have Explanation of Duties Form on file for an offender: "[it] is difficult [for registrants] to maintain compliance if they don't know what they're supposed to do." Johnson Dep 28 ln 18-20, Exh 15.

766.  Leslie Wagner, the statewide SOR coordinator, admitted that it is "difficult for people to comply if they don't know what the law is." L. Wagner Dep 78 ln 6-11, Exh 18.

### A.   The Explanation of Duties Form

767.  The "only document provided to registrants that describes or explains what information registrants must report" is the "Explanation of Duties" Form. Defs' Supp Resps to 1st Interrogs, RFP No 10, Exh 43; Explanation of Duties Form, Exh 62.

768. R egistrants are required to sign the Explanation of Duties Form at their initial registration. Johnson Dep 144-145, Exh 15.

769.  Failure to sign the registration or notice form is a misdemeanor. M.C.L. §§ 28.725a(1)-(2), 28.727(3)-(4); 28.729(3).

770.  The Explanation of Duties Form is "the way in which registrants are informed about what their obligations are." L. Wagner Dep 80 ln 1-3, Exh 18.

771.  Leslie Wagner testified that she believes registrants must comply with SORA regardless of whether they ever received and signed that form. L. Wagner

Dep 80 ln 4-8, Exh 18.

772.  Ms. Johnson testified that after a person is convicted of a sex offense, the registering official will prepare the registration form and "advise the offender of their responsibilities" by having the registrant sign the registration form and Explanation of Duties Form. The SOR Unit trains local law enforcement agencies to provide registrants with  copies of those documents. Johnson Dep 26 ln 19—27 ln 25, 145 ln 1-19, Exh 15.

773.  The Explanation of Duties Form is only provided to registrants at the time of signing. "They're notified once and that satisfies what our unit asks for. They have been notified of their duties." Burchell Dep 92, Exh 16.

774.  The Explanation of Duties Form was revised in 2011. Individuals on the registry at that time, who had previously signed an earlier version of the form, were required to sign the new form. Johnson Dep 141, Exh 15.

775.  According to Ms. Johnson, the Explanation of Duties Form is "supposed to encapsulate what registrants are supposed to do." But "[t]he statute has things in it that are not in this explanation of duties." Johnson Dep 141, 147, Exh 15; Explanation of Duties Form, Exh 62.

776.  For example, the Explanation of Duties Form states that registrants are "prohibited by law from loitering within 1000 feet" of school properties. The form does not define what "loitering" is. Johnson Dep 141, 145-47, Exh 15; Explanation

of Duties Form, No 13, Exh 62.

777. The Explanation of Duties Form also states that registrants must provide all phone numbers they "routinely use" and information regarding any vehicle they "regularly operate." Explanation of Duties Form, No 4, Exh 62.

778. Plaintiffs contend that the form does not quantify how frequently a phone number or vehicle must used to be reported, by for example listing a specified number of uses before reporting is required. Explanation of Duties Form, No 4, Exh 62. Defendants contend that the "regularly operate" and "routinely use" language was inserted into the statute at the request of the ACLU legislative liason.

779. The Explanation of Duties Form states that registrants must report within three business days upon establishing any email address, instant messaging address or "any other designation used in Internet communications." Explanation of Duties Form, No 6, Exh 62.

780. Sgt. Payne testified that if a registrant cannot read, the Explanation of Duties Form is read to him/her so there is a clear understanding of what the registrant's duties are.  Payne Dep 24 ln 13-20, Exh 17. In his experience, for offenders who can read, law enforcement agencies only read the form if the person indicates, "that, you know, there's something in here I don't understand or I'm having trouble with." *Id.* at 24 ln 21—25 ln 1.

781. Sgt. Payne testified that there is no definition of "loitering" listed on the

Explanation of Duties Form. In his experience, if the offender was reading the document on their own, law enforcement would not volunteer explanations of what "loitering" means. If someone asked what loitering meant, Sgt. Payne would put it "simple terms," like "you can't hang around schools." Payne Dep 24 ln 6—26 ln 7, Exh 17.

782.  The Explanation of Duties Form is available on the MSP website, although it is not on the Public Sex Offender Registry website. Ms. Johnson testified that "if you were a registrant looking on the SOR website [the Explanation of Duties form] would not be there." Johnson Dep 142 ln 11-21, Exh 15.

**B.   Michigan State Police Letters to Registrants**

783.  The SOR unit has sent mass mailing to notify registrants of major changes to SORA. Ms. Johnson testified that there had been "very, very, very few" mailings and estimated that this occurred fewer than five times. One mailing was done after the 2011 amendments, and another after registrants' photographs were added to the public registry. Johnson Dep 108-10, 142-44, Exh 15.

784.  The letters sent out after the 2011 statutory changes notified registrants of their tier level, some of the changes to the statute, and some of the registrants' new obligations. For example, a form letter was sent to all newly reclassified Tier III registrants notifying them that they would have to register for life and would have to provide additional information. Letters were also sent to offenders who were

removed from the registry or whose registration periods were reduced as a result of the 2011 amendments, informing them of their changed registration status. Johnson Dep 78 ln 19—79 ln 11; 139-41, Exh 15; L. Wagner Dep 54 ln 8—56 ln 1, Exh 18; Tier Notification Letters, Exh 48.

785.  Ms. Johnson testified that the letters "weren't intended to be comprehensive about what the requirements were." Johnson Dep 139-41, Exh 15.

786. The tier notification letters do not contain information about the geographic zones. Tier Notification Letters, Exh 48.

### C.  Allocation of Responsibility Between Local Law Enforcement and the Michigan State Police for Answering Questions about SORA

**Defendants continue their hearsay objection on the survey testimony of Mr. Granzotto and Mr. Poxson.**

787.  When Mr. Granzotto surveyed local police departments, of the 17 police departments that provided some kind of response, nine referred him to the Michigan State Police for answers to his questions. Granzotto Decl 2, Exh 33.

788.  Of the 23 police departments surveyed by Mr. Poxson, three told him to contact the Michigan State Police. Poxson Decl 2, Exh 32.

789.  Leslie Wagner, MSP Registry Coordinator, testified that the MSP SOR Unit refers registrants' questions on the meaning of SORA to local law enforcement, or if the registrant has already contacted local law enforcement, to the prosecutor. "[I]f the local law enforcement agency is asking that question I'm not going

to refer them back to themselves, I would refer them to the county prosecutor." L. Wagner Dep 39-40, Exh 18.

790.  Sgt. Payne, SORA Enforcement Coordinator, testified that when the MSP is unsure about what SORA means, the MSP refers the registrant asking the question to local law enforcement. If local law enforcement does not know, then it would "be up to the local prosecutor to decide what the law means." Payne Dep 32-33, 90-91, Exh 17.

791.  The MSP refers to local law enforcement any questions about whether a residence is within a geographic zone, or whether a particular educational establishment qualifies as a "school" for the purpose of creating a geographic zone, or whether a registrant must report cross-country travel for a week, or report a vehicle that is used three times during a three month period. Payne Dep 32-33, 49, 68-69, 90, 93, 98-99, Exh 17.

792.  Karen Johnson testified that one reason the MSP refers questions to local prosecutors is that different prosecutors can have different answers to the same questions. Johnson Dep 315-16, Exh 15.

793.  Sgt. Payne testified that when registrants "can't get anywhere with the local law enforcement agency we will refer them to the prosecutor's office" to seek clarity. Payne Dep 34, Exh 17.

794.  Sgt. Payne testified that because local law enforcement would have to

prosecute violations, they are the ones who make the determination of whether an

offender is registering an address or employer that is inside a geographic zone.

Payne Dep 31 ln 10-19; 32 ln 9-14; 114 ln 16-19, Exh 17.

795.  Trooper Burchell, SOR Unit Coordinator, testified that he refers questions

from local law enforcement agencies to their local prosecutors:

> Q. And why do you tell them to check with their local prosecutor?
> A. Because every county's different.
> Q. When you say 'every county's different,' what do you mean by that?
> A. That the prosecutors make different decisions from county to county on what
>    they will prosecutor [sic] and what they won't.
> Q. What things do they decide differently?
> A. I'm not sure, but I know that in our experience that we can't give a broad
>    statement that covers how the law's going to be enforced.

Burchell Dep 45, Exh 16.

796.  Prosecutors rarely call the SOR Unit, and when they do call they are

usually asking for documents. Johnson Dep 287 ln 24— 288 ln 16, Exh 15.

797.  Ms. Johnson cannot recall a time when a prosecutor called and asked how

to interpret a provision of SORA. Johnson Dep 288 ln 2-16, Exh 15.

### D.   How the MSP SOR Unit and Local Law Enforcement Respond to Registrants' Questions

798.  When Ms. Johnson was asked how registrants could determine whether

activities like attending a child's football game, volunteering at a church picnic, or

taking a job would violate SORA, she testified that because different law enforce-

ment agencies interpret SORA differently, registrants should contact their local law

enforcement agency before engaging in those activities:

> Q. [F]rom the perspective of the registrant, if they want to determine whether they can go to [their child's] football game, whether they can volunteer at the church fundraiser and whether they could apply for work at the 50 different places they're applying for work, you would say to them you need to contact your local law enforcement to get the answers to all those questions?
>
> A. Yes.
>
> Q. So for many common life activities a person would first have to contact their local law enforcement before doing that in order to avoid the risk of prosecution?
> [Objections and discussion between counsel omitted.]
>
> A. For all the – leaving common life activities out, the answer would be yes, they need to contact their law-enforcement agencies if they want to ensure they are not working within a student safety zone or doing other activities that would violate the statute.

Johnson Dep 331-32, Exh 15.

**Defendants objected to the questions as argumentative.**

799.  Ms. Johnson also testified that if a registrant was applying for 50 jobs and wanted to determine if those jobs were within a geographic zone, the registrant would need to contact local law enforcement about each of the 50 jobs. Johnson Dep 323, Exh 15.

800.  Mr. Doe #3's wife explained that "anything we want to do we have to think of [the registry] first" to see what is permitted and whether the registry will interfere. S.F. Dep 34, Exh 8.

801.  Mr. Granzotto, who surveyed 29 local police departments, found that nine departments answered his questions, with three more providing answers to some of

his questions. Respondents at the remaining departments did not return messages after repeat calls, or could not connect Mr. Granzotto to anyone who could answer his questions. Of the ten prosecutor's offices he contacted, three provided answers. The remaining prosecutor's offices either did not answer his questions, or Mr. Granzotto was unable to reach anyone. Granzotto Decl 2, 4-5, 8-9, Exh 33.

**Defendants continue their hearsay objection on the survey testimony of Mr. Granzotto and Mr. Poxson.**

802.  Mr. Poxson, who surveyed 23 local police departments, found that 11 departments answered most or all of his questions about SORA. Respondents at the remaining 12 either did not answer his questions, or did not know the answer. Of the 19 prosecutors' offices he contacted, two answered all of his questions. Respondents at five offices told him to contact a private attorney, and six told him to contact another agency for answers. Poxson Decl 2, 7, Exh 32.

803.  Mr. Poxson, who was previously a registrant but whose registration period has expired, testified that as a registrant he would call law enforcement with questions but "couldn't get direct answers." When he called to find out whether he could reside within 1000 feet of a school bus garage, he was "never was able to get an answer" about whether that was permitted. Poxson Dep 63-64, Exh 14.

**Defendants object to this statement on the grounds of relevance, because Mr. Poxson is not a plaintiff and he was no longer registered when SORA 2011 was enacted.**

189

804.  Ms. Johnson testified both that she receives questions from registrants, and that the SOR Unit does not receive many questions from registrants about their responsibilities. She rarely receives question about geographic zones. Instead, the questions from registrants are about how to get off the registry. Johnson Dep 58, 98 ln 6-8; 144 ln 3-10, Exh 15.

805.  Trooper Burchell testified that SOR unit personnel will "answer [registrants'] questions to the best of our ability." Burchell Dep 44 ln 5-12, Exh 16.

806.  In answering questions, Trooper Burchell refers to the statute. In his experience the SOR Unit "can't give a broad statement that covers how the law's going to be enforced." Rather, he directs the caller to check with the local prosecutor.  Burchell Dep 45 ln 3-18, Exh 16.

807.  The Michigan Public Sex Offender Registry webpage has a "Frequently Asked Questions" page. Public Sex Offender Registry FAQ, Exh 113.

808.  Ms. Johnson testified that the FAQ site is geared to the members of the public using the registry, and is "more about how the registry works and how to access information on registrants." The MSP does not have an "FAQ for registrants" on its website. Johnson Dep 143 ln 24–144 ln 2, Exh 15.

809.  Sgt. Payne testified that he had no prior experience with the registry before joining the SOR Unit. He stated that after he started with the SOR Unit, he learned the SOR is "quite different  and I know they are very specific and there's

certain duties that the offenders have to comply to, so the responsibility is really on the offender to make sure that he or she complies with the requirements of the registry." Payne Dep 14, Exh 17.

### E.   Plaintiffs' Understanding of SORA

810.  Mr. Doe #1 stated that he does not know how to read or understand the statute, and that "[n]o one has given me a guide to what I can and cannot do." Doe #1 Interrog Resp No 11, Exh 36.

811.  When Mr. Doe #1 was paroled, his parole agent explained his registration requirements, going through the 2009 version of the Explanation of Duties Form line-by-line. Doe #1 Dep 41 ln 10-21, Exh 1.

812.  Mr. Doe #1 was provided with an updated Explanation of Duties Form in 2011. At the time he received the updated form, he did not have any questions for the parole officer. He had questions later. Doe #1 Dep, 44 ln 1-7, Exh 1.

813.  Mr. Doe #1 stated, with respect to the Explanation of Duties Form, that he "[doesn't] understand any of it." He does understand the individual words on the form. Doe #1 Dep 77 ln 22-78 ln 8-10, Exh 1.

814.  Mr. Doe #1 has "some familiarity with where you can find laws and look up cases" as a result of the legal research he did while in prison. Since his release he has done legal research related to SORA. He testified that he could not understand SORA despite this research: "So as far as the research of the stipulations or

the rules in and of itself, I did read them but I did not understand them. I still don't

understand them." Doe #1 Dep 72, Exh 1.

815.  While he was still on parole, John Doe #1 would ask his parole officer

when he had any questions about his registration responsibilities. He no longer has

a parole officer. Doe #1 Dep 44 ln 8-15, Exh 1; Verified Compl ¶ 22.

816.  Mr. Doe #2 testified that it is difficult to ask questions about SORA when

registering because the lines are so long:

> I wanted to ask . . . exactly what the guidelines were with different stuff like
> schools and where to move, where to live, what to register, what not to
> register. I didn't get a chance to say much at all. They just told me to sign a
> paper, get in line.

Doe #2 Dep 74, Exh 2.

817.  Mr. Doe #2 stated that when he asked questions of local law enforcement

about what he "can and cannot do . . . they could not answer my questions." He

was never given any kind of rulebook:

> I am clueless about the rules… It seems like the state is more concerned with
> getting us on the list than telling us what the rules are. There is not [sic]
> manual or rulebook that we can look at to figure out what we can and cannot
> do. There aren't any public maps about where the school safety zones are
> either. It seems like if they want us to follow the rules, they should tell us
> what the rules are.

Doe #2 Interrog Resp Nos 6, 11, Exh 37.

818.  When Mr. Doe #3 first received the Explanation of Duties Form, he did

not have any questions at the time for the officer about his registration duties.

When he received the updated form, he asked questions about why he was a Tier III offender who had to register for life, why he had to pay a fee, and what the paper was for. Doe #3 Dep 64 ln 18—67 ln 16, Exh 3.

819. When Mr. Doe #3 has questions about his registration requirements, one of the places he contacts is the Police Records Bureau. Doe #3 Dep 70 ln 16—71 ln 9, Exh 3.

820. Mr. Doe #3 testified that when he has tried to ask local law enforcement officials questions, "they're like, we're not the court. You've got to go and talk to other people. We can't – we need you to initial this paper, give us I think it was $35, and have a nice day." Doe #3 Dep 66, Exh 3.

821. Mr. Doe #3 has asked questions at the police department about his registration obligations, "but no one can give me clear answer about what information I have to give them.... Now I don't ask questions because the police officers don't know the answer to my questions anyway." Doe #3 Interrog Resp No 6, Exh 38.

822. Mr. Doe #3, who works in auto repair, testified that he does not know what work is permissible. "[F]or work . . . I do a lot of tows . . . . If I get a call, hey, you've got a lockout, a lady locked her keys out in the parking lot of this school, can I go do that call? I'm unclear about what I can do and what I can't do." Doe #3 Dep 10-11, 109, Exh 3.

823. Mr. Doe # 3's wife testified that the lack of clarity affects day-to-day life:

Q. And when you don't know if he can or can't do something or if he has to do something or not do something, what do you guys do as a couple?

A. We don't do it, honestly, because of our past experiences.

Q. And why don't you do it? Why do you err on the side of caution?

A. I don't want him getting arrested, so, I mean, if we have to stay away from doing something, again not living normal, you know, we won't do it.

Q. Okay. So if there's an area, a gray area, something you don't understand, your response is?

A. Don't do it... It's just not worth it.

S.F. Dep 99-100, Exh 8.

824. S.F. further testified that the SORA requirements were not clear to her "[s]o we avoid anything that could potentially get him in trouble or arrested." S.F. Dep 36-37, 78-79, Exh 8.

825. In Mr. Doe #3's experiences, when he does get answers from police, those answers may be wrong. For example, when Mr. Doe #3 told police that he was planning a four-day trip to Mexico with his wife, the registering official told him registrants cannot leave the country. He conducted his own research and determined that was incorrect, and he went to Mexico anyway. Doe #3 Dep 93, 131 ln 10—132 ln 7, Exh 3. SORA would not bar the trip, although registrants must provide 21 days advance notice for foreign travel lasting more than seven days. M.C.L. § 28.725(7).

826. Mr. Doe #3 did not contact the prosecutor's office with questions about his registration requirements. He did contact an attorney, but is not willing to discuss what his attorney told him. Doe #3 Dep 67 ln 22—68 ln 5, Exh 3.

827. Mr. Doe #4 has asked local police and his own lawyer about his registration requirements. Doe #4 Dep 70 ln 18-22, Exh 4.

828. Mr. Doe #4 testified that when he asks questions of the police about his SORA obligations, "[s]ometimes they don't even know," and "[s]ometimes my lawyer doesn't even know." For example, when his employer was going to have him move from store to store, he sought legal advice from his attorney, who was unable to answer his question. He then asked the police, who told him that if he worked anywhere for between two and five hours, he would have to register that location. Doe #4 Dep 49-50, 68-69, 89, Exh 4.

829. Mr. Doe #4 stated in his answers to interrogatories:

> There are no maps about where I can live, work or be. … I am not [a] lawyer, and I don't know how to read laws. But even when I ask my lawyers[Plaintiffs' counsel] what something means, they often don't know, but have to guess what it probably means.

Doe #4 Interrog Resp No 11, Exh 39.

830. In Mr. Doe #4's experience, different law enforcement officers within the same agency can provide different answers to the same question. For example, he testified that he has received different answers from different registering officials about whether or not he needed to register his GED classes. Doe #4 Dep 88, Exh 4.

**Defendants object to Doe #4 testifying about what unidentified officers told him on the grounds that such statements are hearsay.**

831. Mr. Doe #4 testified that he does not know whether he can take his own

children to a playground on school property, attend a minor cousin's birthday party in a public park, or go to a mall where children may be present. Verified Compl, ¶ 224; Doe #4 Dep 76, Exh 4.

832.  Because of his confusion about what the law requires, Mr. Doe #4 avoids activities, some of which are in fact prohibited by the statute and others of which are actually permitted. Doe #4 Dep 71-72, 76, Exh 4.

833.  Mr. Doe #4 has never asked the prosecutor about his registration requirements. Doe #4 Dep, 70 ln 23—71 ln 3, Exh 4.

834.  Mr. Doe #5 was given an Explanation of Duties Form, but he chose not to read it because he decided he did not want to. Mr. Doe #5 objected to signing the form because "it's like acknowledging something that I never had to do over 30 years." The registering officer did not go through the form with him. Doe #5 Dep 88 ln 24—89 ln 18, Exh 5.

835.  Mr. Doe #5 has never asked any questions of the police about his registration. Doe #5 Dep 59 ln 10-12, Exh 5. Mr. Doe #5 has not conducted any research on his own about the legal requirements of his registration. Doe #5 Dep 62 ln 1-3, Exh 5.

836.  Mary Doe was given a copy of the Explanation of Duties Form. Other than the requirements listed on 4(i), 4(k), 6(f), 7, 12, and 13, Mary Doe admits understanding the remaining requirements on the Explanation of Duties Form "to

the best of [her] knowledge." Mary Doe Dep 76 ln 17—78 ln 9; 92 ln 19—93 ln 7,

Exh 6; Explanation of Duties Form, Exh 62.

837.  Mary Doe has asked local police officers questions about her registration

requirements, and they have given her answers although for some questions there

"has never been a clear answer." Mary Doe Dep 30 ln 19—32 ln 6, Exh 6.

838.  Mary Doe has never looked up the sex offender registration statute. Mary

Doe 43 ln 8-10, Exh 6.

839.  As a non-lawyer, Mary Doe explained that she does not know how to

"decipher" the SORA statute. She can read what it says "but I don't understand

exactly what it's requiring." Ms. Doe testified that "because everything in [the law]

is very vague, that if you make a mistake you're always worried about, you know,

did I make a mistake? … You're constantly worrying about that. It's always in the

back of your mind." Mary Doe Dep 53-56; 105, Exh 6.

### F.   The Impact of Amendments to SORA on Registrants' Understanding

840.  Mr. Doe #1 stated that "the state keeps changing the requirements. But I

don't know how I am supposed to know when the laws change." Doe #1 Interrog

Resp No 11, Exh 36.

841.  Mr. Doe #2 stated that because the registry requirements have changed so

often in the past, and have been applied retroactively, he has no faith that SORA will

not change again in the future, and be applied retroactively. He is therefore concerned

about turning over personal information to the government that, though not publicly posted now, could be made public in the future. Doe #2 Dep 138-39, Exh 2.

842. Mr. Doe #3 stated that as a non-lawyer he does not know how to understand the law but he does "know that the state keeps changing the requirements." Doe #3 Interrog Resp No 11, Exh 38.

843. Mr. Doe #4 testified that it seems to him as if the "registry changes every day," making it is difficult to understand what he can and cannot do. Doe #4 Dep 65, Exh 4.

844. Ms. Johnson testified that the MSP was "assuming there are going to be sex offenders that are confused" by recent legislative changes, which set different verification periods for registrants depending on their birth month, rather than requiring all registrants to verify at the same time (formerly January, April, July and October for Tier III registrants). Ms. Johnson testified that it would be up to the prosecutor to decide whether individuals who verify in the wrong month are prosecuted. Johnson Dep 272-76, Exh 15; Mich. Pub. Act 149 (2013).

**Defendants objected to questions directed to Ms. Johnson about what prosecutors would prosecute on the grounds that they called for legal conclusions and lack of foundation.**

845. Plaintiffs' expert, Richard Stapleton, testified that in his experience, registrants are unlikely to know about judicial decisions that affect the interpretation of SORA, since they do not typically have access to Westlaw/Nexis alerts to inform

them of new cases. The SOR Unit does not provide registrants with copies of cases

or Attorney General opinions interpreting SORA. Stapleton Dep 102-03, Exh 13.

> **Defendants object to Stapleton testifying to what registrants do or do not know about a statute that has been amended since he retired, or what the SOR Unit does or does not provide. These matters are beyond his stated expertise and lack foundation.**

## G.   Misinterpretation of SORA and Criminal Liability

846.  SORA 2013 imposes penalties of up to 10 years imprisonment for viola-

tions of the Act. M.C.L. §§ 28.729(1); 28.734(2); 28.735(2).

> **Defendants object to this statement as being both legal argument and vague. Further, it misrepresents the statute. The only 10 year penalty is for 2 or more <u>willful</u> violations for failing to register. The student safety zone violations are one year misdemeanors, and become a felony only if there are prior violations—and even then are punishable by only two years.**

847.  A registrant who does not comply with SORA requirements faces jail or

prison. As Mr. Doe #4 testified, "the consequences of making a mistake" about

what the registry requires are "[p]rison, and I don't want to go to prison." Doe #4

Dep 87, Exh 4.

848.  In Mr. Poxson's experience, where he was able to get information from

law enforcement about his obligations, reliance on that information does not pro-

tect him from prosecution if the information was erroneous. Mr. Poxson testified

that the local police told him that his misdemeanor offense required only annual

verification. But the MSP disagreed, and told him that unless he began registering

quarterly, he would be arrested. Mr. Poxson was prosecuted for failure to report even though he was "doing exactly what [he] had been told to do by local law enforcement." Poxson stated that the prosecutor eventually dropped the charges after seeing that Mr. Poxson had it in writing that he was only required to report once a year. Poxson Dep 66-68, Exh 14.

**Defendants object to this statement on the grounds of relevance, because Mr. Poxson is not a plaintiff and he was no longer registered when SORA 2013 was enacted.**

849.  Former MDOC Legal Affairs Director Stapleton reported that confusion about the meaning of SORA leads to situations where MDOC agents inform parolees/probationers that some conduct is permissible, only to find that prose-cutors or law enforcement agencies disagree. Stapleton was involved in several cases where parole agents had authorized parolees to attend their children's sport-ing events, only to have the registrants charged with SORA violations by local prosecutors. In another case, a parolee was approved to re-shingle roofs near a school, and the local prosecutor wanted to prosecute him for loitering. Stapleton Expert Report 9, Exh 28; Stapleton Dep 83-85, 105-06, Exh 13.

850.  Mr. Stapleton testified that because SORA requires that any violation of the act results in parole rescission, the MDOC is required to return registrants to prison if they are not in compliance, even where prosecutors do not prosecute these violations. Registrants are returned to prison for SORA violations under a prepon-

200

derance of the evidence standard, which is all that is required for a parole violation.

Parolees have no right to appeal such a parole violation internally within the de-

partment. Stapleton Dep 88-89, 108-09, Exh 13; M.C.L. §§ 28.729(5), (7).

## XVII.   SORA'S REPORTING REQUIREMENTS

### A.   Statutory Reporting Obligations

851.  As Tier III registrants, plaintiffs must report in person every three months

within a specified 15-day period[3], M.C.L. 28.725a(3)(c), and must provide or up-

date (if changed):

- all names and nicknames, Social Security number, and date of birth;
- residential address, including any address where the individual expects to spend more than seven days, as well as the dates of any such temporary stays;
- employer names and addresses, as well as the general areas worked and routes of travel if the individual does not have a fixed employment location;
- schools attending or schools to which accepted;
- telephone numbers registered to the individual or routinely used;
- e-mail and instant message addresses assigned to the individual or routinely used, and log-in names or other identifiers used by the individual when using any e-mail address or instant messaging system;
- all other designations used in Internet communications or postings;
- license plate and registration information for any vehicle owned or regularly operated by the individual, and the location where that vehicle is kept;
- driver's license number or personal ID card number;

---

[3] Registrants previously had to report during the first 15 days of January, April, July and October. After passage of Public Act 149 of 2013, Tier III registrants continue to report quarterly, but must do so according to a schedule set by their birth month. M.C.L. § 28.725a(3), *as amended*.

- passport and immigration documents;
- occupational license information; and
- a complete physical description.

M.C.L. § 28.727(1).

852. Plaintiffs must provide a photograph, fingerprints, and palm prints. If a plaintiff's appearance changes, he or she must update the photograph. M.C.L. §§ 28.725a(5), 28.727(1)(q).

853. In addition to reporting in person at regular intervals, the plaintiffs must report "immediately" (within three days) whenever certain information changes. The immediate, in-person reporting requirement is triggered whenever the plaintiffs:

- change their residence;
- change or discontinue employment;
- enroll or dis-enroll as a student;
- change their name;
- intend to temporarily reside at any place other than their residence for more than seven days;
- establish an e-mail address, instant message address, or any other Internet designation used in internet communications or postings; and
- buy or begin using a vehicle, or cease owning or using a vehicle.

M.C.L. § 28.725(1).

**B. Law Enforcement's Understanding of What Registrants Must Report**

**Defendants continue their hearsay objection to testimony about Mr. Poxson's and Mr. Granzotto's surveys.**

854. When Mr. Poxson asked local law enforcement agencies about the em-

202

ployment reporting requirements, some respondents did not answer and some provided different answers to the same questions regarding reporting requirements. Some respondents said that shoveling snow (or ceasing to shovel snow) must be reported, others said it need not be, and others did not know. Of the two responding prosecutor's offices, one respondent did not know, and the other said snow shoveling is not reportable. Poxson Decl 5, 8-9, Exh 32.

855. When Mr. Poxson surveyed local law enforcement agencies about how often a registrant could use a vehicle before having to report it, some respondents did not know the answer, and others provided answers ranging from once or twice, to six or seven times, to "whatever is reasonable." Respondents from the prosecutor's offices stated that they either did not know the answer to the question, or that there was no requirement to report borrowed vehicles. Poxson Decl 3, 8-9, Exh 32.

856. In response to questions from Plaintiffs' counsel at their depositions, Sgt. Payne, Trooper Burchell, and Ms. Wagner were unable to answer questions about whether volunteering at a church fundraiser needs to be reported, whether snow-shoveling is reportable employment, whether a registrant whose manager sent him to work at a different job site for a week would need to report that change, or how a registrant who is traveling but does not have a specified address destination could report. Payne Dep 85-89, Exh 17; Burchell Dep 67-68, Exh 16; L. Wagner Dep 37,

60-63, Exh 18.

> **Defendants objected to these questions on the grounds that they call for legal conclusions, call for speculation, and lack of foundation.**

857.  During his deposition Trooper Burchell reviewed both the Explanation of Duties Form and the SORA statute in responding to those questions.  He was asked:

> Q: [I]f you don't know the answer to those questions, is there any information that is given to registrants that would allow them to know the answer to those questions?
> A. Not that I know of.

Burchell Dep 70-71, Exh 16.

> **Defendants objected to this question on grounds of calling for speculation and lack of foundation.**

858.  Ms. Johnson responded to questions about what constitutes reportable employment by saying that she "would give [registrants] a definition [of employment in the statute] and rely on them to get with their prosecutor and make that determination." Johnson Dep 327, Exh 15.

> **Defendants objected to this question on grounds of calling for speculation and lack of foundation.**

859.  When asked about SORA 2013's requirements for reporting certain property items that are "regularly used" or "routinely operated," Sgt. Payne, Trooper Burchell, and Ms. Wagner did not know how often a registrant could borrow a car before needing to report it. Trooper Burchell testified that this is "up to interpreta-

tion by the prosecutor." Sgt. Payne testified, "Some may say, yes, it's regular use, some may say no. That would be probably a judgment call by the prosecutor or the law enforcement agency." Payne further agreed that "each law enforcement agency might come to a different conclusion about what regular use means." Payne Dep 93, Exh 17; Burchell Dep 73-74, Exh 16; L. Wagner Dep 38, Exh 18.

**Defendants objected to this question on grounds of calling for speculation and lack of foundation.**

860. Plaintiffs contend that the SOR Unit's Manual does not explain what qualifies as reportable "employment," what "designations used in internet communications" are reportable, or how often a vehicle can be used before it must be reported. MSP SOR Manual § 2.5, Exh 83.

### C. Plaintiffs' Understanding of What They Are Required to Report

861. Mr. Doe #1's employer has a fleet of vehicles. Mr. Doe #1 testified that he does not know which vehicles he must report: "I don't know whether or not I have to go tell them I got to register 36 vehicles that they have because there may come a time I may get van 27." Doe #1 Dep 89, 94-95, Exh 1.

862. Mr. Doe #1, when asked about reporting his own vehicle, testified that he has no questions about the process of registering vehicles. Doe #1 Dep 72 ln 8-12, Exh 1.

863. Mr. Doe #1 has never asked his parole officer any questions about vehicle registration, using the internet, or where he can be in relation to a school because

"all those things were explained to me, so I didn't have no further questions." Doe #1 Dep 46 ln 2-12, Exh 1.

864.  Mr. Doe #1 has never attempted to contact anyone in the prosecutor's office with any questions he may have about his registration duties or use of the internet. Doe #1 Dep 59 ln 11-14, Exh 1.

865.  Mr. Doe #1 stated that "One of the biggest problems with being on the registry is the constant fear that I will not be in compliance with the registry requirements. I have a hard time knowing what exactly I have to report and what I don't." Doe #1 Interrog Resp No 5, Exh 36. Mr. Doe # 1 repeatedly testified to finding the statute confusing. Doe #1 Dep 52-59, 65-67, 89, 94-95, Exh 1.

866.  Mr. Doe #2 understands that he has to register vehicles that he uses regularly. Doe #2 Dep 122 ln 15-22, Exh 2.

867.  Mr. Doe #2 uses his girlfriend's car once a quarter to go register and maybe two or three other times in that time period. He himself does not consider that to be "regular use." Doe #2 Dep 123 ln 25—124 ln 21, Exh 2.

868.  Mr. Doe #2 does not know if he must register his girlfriend's car. Doe #2 Interrog Resp No. 15, Exh 37. Mr. Doe #2 has read the Explanation of Duties Form. He has not read the SORA statute. Doe #2 Dep 85 ln 25—86 ln 25, Exh 2.

869.  Mr. Doe #2 has attempted to seek legal advice regarding his registration requirements, but was discouraged by the cost. He has counsel in the present case.

Other than that, Mr. Doe has not sought or obtained legal counsel with respect to his registration. Doe #2 Dep 75 ln 15-21, Exh 2.

870. Mr. Doe #2 has not attempted to contact the prosecutor's office with any questions about the terms of his registration. Doe #2 Dep 75 ln 10-14, Exh 2.

871. Mr. Doe #3 understands the word "routinely" to mean the same thing as "frequently or regularly." Doe #3 130 ln 6-8, Exh 3.

872. Mr. Doe #3 is unsure whether the term "routinely use" means daily use, weekly use, or monthly use. Doe #3 Dep 121-22, Exh 3.

873. Mr. Doe #3 understands that if he stays somewhere for longer than 7 days, he must update his registration. Doe #3 Dep 92 ln 14-20, Exh 3.

874. Mr. Doe #3's wife admitted that she understands the wording of John Doe #3's registration requirements, but testified that "still there's just a gray area." She identified various requirements she did not understand, such as what parenting activities are permissible. S.F. Dep 71 ln 24 –72 ln 12-24, 87-88, 104-05, Exh 8.

875. Mr. Doe #4 understands the word "regularly" to mean something that you do often. Doe #4 Dep 84 ln 7-9, Exh 4.

876. Mr. Doe #4 does not have a vehicle of his own, but has been told by the police that if he borrows a car more than three times he must immediately report in person. Mr. Doe #4's colloquial understanding is that the term "regular use" of a vehicle should mean a vehicle he drives every day. Verified Compl, ¶ 218; Doe #4

Dep 84, Exh 4.

877. Mr. Doe #4, who does not have a phone of his own, states that he is unsure whether he must register his mother's telephone number if he uses her phone on occasion, such as to get messages from counsel. Verified Compl, ¶ 219.

878. Mr. Doe #5 understands "routinely" to mean "ordinary or regular." Doe #5 Dep 82 ln 8-11, Exh 5.

879. Mr. Doe #5 uses public transportation and does not drive. He does not want a car. Doe #5 Dep 63 ln 18—64 ln 2, Exh 5.

880. Mary Doe was uncertain whether she needed to register a vehicle she drives that belongs to her parents. When she asked her local police department, she was told she had to register a vehicle if she was driving it or if it was parked in her driveway. Mary Doe now understands that she needs to register her parent's vehicle if she uses it every day even if it is not titled in her name. Mary Doe Dep 41 ln 22–44 ln 11-25, Exh 6.

881. Mary Doe's everyday vehicle is titled in her parents' name, and the vehicle her husband drives is titled in her name. She understands that she must register both those vehicles. Mary Doe Dep 73 ln 13–74 ln 7-24, Exh 6.

882. Mary Doe does not think she can get a passport because she is a sex offender, but is not aware of any particular law that prohibits registered sex offenders from having passports. Mary Doe Dep 87 ln 5-18, Exh 6.

883. Mary Doe understands that she would have to register her passport if she obtained one. Mary Doe Dep 88 ln 14-22, Exh 6.

## XVIII. STRICT LIABILITY AND IMPOSSIBILITY

### A. The Strict Liability Provisions of SORA

884. Defendants admit that SORA makes plaintiffs strictly liable for failure to comply with certain requirements and prohibitions. Defs' Answers to First Req for Admis, No. 142-45, Exh 44.

885. SORA's penalty provisions include both strict liability provisions and "willful" violation provisions. M.C.L. §§ 28.729; 28.734, 28.735.

886. Defendants admit that under M.C.L. § 28.729(2), plaintiffs are strictly liable for violating the requirements of M.C.L. § 28.725a (other than payment of the fee). M.C.L. § 28.725a includes the requirement that plaintiffs report in person every three months, and the requirement that a registrant must get a new photograph taken within three days if the registrant's current photograph does not match the registrant's appearance sufficiently to properly identify him or her. M.C.L. § 28.725a(5); Defs' Answers to First Req for Admis, No. 142, Exh 44.

887. Defendants admit that M.C.L. §§ 28.734-28.735 makes registrants strictly liable for working, residing, or loitering in a geographic zone. Defs' Answers to First Req for Admis, No. 143-45, Exh 44.

### B. Strict Liability Where Compliance Is Practically or Actually Impossible

888.  Sgt. Payne testified that if a registrant were run over by a bus and hospitalized, the registrant would still be a violation of SORA for failing to register in person during the 15-day verification window. He believed such a person probably would not be charged. Payne Dep 105 ln 15—106 ln 5, 120 ln 5-13, Exh 17.

> **Plaintiffs object (continuing) to all testimony regarding what prosecutors would or would not prosecute. Speculation. Relevance: state law and state policy policy requires all non-compliant registrants to have a warrant. M.C.L. §28.728a(1)(d); MSP SOR Manual §6.2, Exh 83; MSP Sex Offender Registry and Enforcement Training Powerpoint 2011, 82, Exh 58.**

889.  As a prosecutor, Herbert Tanner would not charge a sex offender with failing to register if they had a good reason, such as being in the hospital.  Even if they "just forgot" and were only 10 days late but not trying to evade the requirements, he would look at that and—even if it were a violation of the law—he would consider that in his prosecutorial discretion before "taking someone's liberty away from them again." Tanner Dep 59 ln 6—61 ln 14, Exh 21.

890.  MSP does not provide guidance to local law enforcement on how to handle situations where registrants cannot verify in person due to age, disability, or similar factors. Rather, training materials state: "It is up to your agency to determine verification procedures when an offender is physically unable to verify his/her address. Hospital. Nursing Home. Mental Health Facility." MSP Training Powerpoint 2011, 50, Exh 58; L. Wagner Dep 76-77, Exh 18; Payne Dep 104-06,

Exh 17; Johnson Dep 337-38, Exh 15.

891.  Defendants admit that registrants are strictly liable if they do not have a driver's license or personal identification card that matches their registry address, regardless of whether they can meet the Secretary of State's criteria for issuance of such identification. Defs' Answers to First Req for Admis, No. 141, Exh 44; MSP Official Order No. 79, 4, Exh 47; M.C.L. § 28.725a(7).

892.  Since becoming homeless Mr. Doe #4 has been unable to comply with the SORA requirement that he maintain a driver's license or personal identification that matches the address he uses to register for SORA. The Secretary of State will not issue identification with "homeless" as an address. Mr. Doe #4, who is registered under SORA as homeless, cannot get a driver's license that matches his registration information. Doe #4 Dep 90 ln 5—91 ln 8, Exh 4; Verified Compl, ¶ 227; M.C.L. § 28.725a(7).

893.  Mr. Doe #4 also has difficulty complying with the reporting requirements because he does not have a vehicle and cannot always arrange for transportation to update information within three days. Doe #4 Dep 99-100, Exh 4.

894.  Mr. Poxson surveyed law enforcement agencies about registrants' reporting obligations with respect to travel. Respondents stated that registrants must have a destination address, must have an itinerary, and must report to local law enforcement each time they change locations. Poxson Decl 6, Exh 32. M.C.L. § 28.725

(1)(e) (requiring in-person reporting whenever registrants "intend[] to temporarily reside at any place other than his or her residence for more than 7 days").

**Defendants object to this statement as hearsay.**

895. Sgt. Payne testified that a registrant traveling across the country should stop in every state to check with local law enforcement to see what the requirements are, since they differ from state to state. A homeless registrant who was moving from place to place might need to register in person as often as every eight days. Payne Dep 90-92, Exh 17.

**Defendants objected to these questions on grounds of lack of foundation and calling for a legal conclusion.**

896. According to Ms. Wagner, a homeless registrant who is staying with different friends for short periods could have to report every eight days. L. Wagner Dep 62, Exh 18.

**Defendants objected to these questions on grounds of lack of foundation and calling for a legal conclusion.**

**C. Enforcement Requirements and Prosecutorial Discretion**

897. SORA provides that law enforcement "[s]eek a warrant for the individual's arrest if the legal requirements for obtaining a warrant are satisfied." M.C.L. §28.728a(1)(d).

898. I n response to letters from registrants regarding the difficulties of registration, the MSP SOR Unit explains that MSP is "obligated to obey and enforce the

Michigan Sex Offenders Registration Act. The Department does not have the legal authority to deviate from the requirements under the Act." Sample SOR Letter to Registrant, Exh 57.

899.  MSP training materials state that "[e]very non-compliant offender should have a warrant." MSP SOR Manual §6.2, Exh 83; MSP Sex Offender Registry and Enforcement Training Powerpoint 2011, 82, Exh 58.

900.  Ms. Johnson explained that slide from the training materials and testified that not every instance of non-compliance will result in a warrant being sought against the offender. The investigating officer is still responsible for establishing probable cause. The SOR Unit provides training that discusses bringing an offender into compliance as the priority instead of just assuming non-compliance. Johnson Dep 308 ln22—312 ln 1, Exh 15.

901.  Trooper Burchell testified that a police officer finding an offender who is non-compliant would have discretion whether to arrest and could decide that the non-compliance does not warrant arrest. Burchell Dep 39 ln 15—40 ln 1, Exh 16.

902.  When a registrant fails to verify for the first time, Trooper Burchell will call and determine if a legitimate reason exists, and will try to convince the registrant to comply. Burchell Dep 19 ln 17—20 ln 3, Exh 16.

903.  In Mr. Tanner's experience, if an individual is not trying to evade registration requirements and just forgot to update their information or if they were in the

hospital, that—although not a valid legal defense—would be something that Mr. Tanner as a prosecutor would consider in the exercise of his prosecutorial discretion before bringing charges. Tanner Dep 60 ln 14—62 ln 11, Exh 21.

904.  According to Mr. Tanner, if a registrant tries to comply with the registration requirements by, for example, trying to measure the 1000 foot distance, those attempts to comply could be considered by a prosecutor and, depending on all the facts and circumstances, "discretion could be exercised to say I'm not going to prosecute" even where a person is in violation of the law. Tanner Dep 98 ln 8—100 ln 2, Exh 21.

905.  Mr. Tanner and Lt. Hawkins testified that there is always an element of discretion, not only at the local law-enforcement level, but the prosecutorial level as to which violations will be investigated and/or charged. Tanner Dep 96 ln 24—98 ln 7, Exh 21; Hawkins Dep 52 ln 17-22, Exh 19.

906. Sgt. Payne testified that in his experience, it is not unusual for law enforcement officers or prosecutors to make judgments about whether an act constitutes a crime. Payne Dep114 ln 20—115 ln 5, Exh 17; Burchell Dep 39 ln 15—40 ln 1, Exh 16.

### D.   Data on Specified Types of Non-Compliance

907.  The prior SOR Data Management System flagged certain types of non-compliance by registrants, including failure to verify, non-payment of fees, and

missing forms. That system did not track other types of non-compliance, such as non-compliance with geographic zones. Johnson Dep 29 ln 6 – 34 ln 20, Exh 15.

908. Trooper Burchell testified that approximately 95% of offenders were compliant with the SORA requirements tracked by the prior SORA data management system. Burchell Dep Exh 33 ln 2-23, Exh 16.

909. MSP data from October 2012 showed that there were then approximately 2,894 registrants flagged as non-complaint within the SOR data management system. That represents approximately 10% non-compliance among the 27,000-28,000 "active" registrants who are not incarcerated or out of state. MSP News Releases on Sweeps, Exh 93; Johnson Dep 298-299, Exh 15.

## XIX.    THE EFFECTS OF LIFETIME REGISTRATION

### A.    Plaintiffs' Access to Housing

910. SORA 2013 bars plaintiffs from "residing" within 1000 feet of school property, making housing within those geographic zones unavailable as a matter of law. Plaintiffs are also prohibited from living with family members if those family members live within 1000 feet of school property. M.C.L. § 28.735.

911. According to plaintiffs' expert Dr. Levenson, national research shows that residential restrictions profoundly reduce housing options for registrants, increasing transience and homelessness, as well as preventing registrants from living with their families. Levenson Expert Rep 4, Exh 23.

215

912. Mr. Doe #1 stated that when he was released from prison, he had to live in a half-way house, although he had hoped to live with his family. He could not live with either his mother or his sister, because they both lived within 1000 feet of a school. He also could not live with another sister or his aunt because the MDOC does not allow registrants to live in homes with children. Verified Compl, ¶ 145; Doe #1 Dep 86, Exh 1.

913. Mr. Doe #1 stated that he was rejected by landlords because of his status as a registered sex offender. He stated that he was finally able to get an apartment when he had a friend lease a unit for him. Verified Compl, ¶ 146.

914. Mr. Doe #2 stated that when he was looking for apartments, he was rejected by landlords because he is a registrant. Verified Compl, ¶ 147; Doe #2 Dep 127-28, 145-46, Exh 2.

915. Mr. Doe #2 does not have criminal record and his dismissed HYTA case does not appear on a criminal background check. He attributes his difficulties finding housing to his status as a registrant.

> Even when I tried to get into an apartment, they gave me a readout of why they wouldn't let me live there, and it said national sex offender registry and up under it said, conviction information, none.

Doe #2 Dep 76, Exh 2.

916. Mr. Doe #2 stated that he asked his cousin for a place to stay. His cousin refused, stating that the neighbors would find Mr. Doe #2 on the registry, and

would then seek to have both Mr. Doe #2 and his cousin evicted. Verified Compl, ¶ 149.

917.  Mr. Doe #2 stated that he could qualify for subsidized housing as a disabled military veteran. He identified a program that would have provided him with a Section 8 voucher for his own apartment, but individuals subject to lifetime sex offender registration are barred under federal law from subsidized housing. Verified Compl, ¶ 150; 42 U.S.C.A. § 13663.

918.  Mr. Doe #3 and his wife testified that in antcipation of their third child, they wanted to move their family to a larger home. They restricted their search to houses that were more than 1000 feet of a school. The home they purchased cost $25,000 more than bigger homes they wanted to purchase that were in the prohibited geographic zones. Verified Compl, ¶ 159; S.F. Dep 11-14, 85, Exh 8; Doe # 3 Dep 125-31, Exh 3.

919.  Mr. Doe #4 stated that he lost his home to foreclosure after he lost his job when his employer found out he was on the registry. Verified Compl, ¶ 152.

920.  Mr. Doe #4 testified that when he has tried to rent an apartment, he has been denied due to his status as a registrant. He also states that he tried to rent a room from friends, but they refuse because he is on the registry. Verified Compl, ¶ 153; Doe #4 Dep 33-35, 39, Exh 4.

921.  For a time after his conviction Mr. Doe #4 was registered at his mother's

address. He testified that after an anonymous caller reported that he was on the registry, his mother was threatened with eviction unless he moved out, so he left. Verified Compl, ¶ 154; Doe #4 Dep 39, 97-98, Exh 4.

922.  Mr. Doe #4 then lived with his sister, but had to leave after "the marshals went over there, I guess, for a sweep." It is Mr. Doe #4's understanding that his sister would have been evicted if he had not left. Doe #4 Dep 98 ln 6—99 ln 9, Exh 4.

923.  Mr. Doe #4 testified that he had been able to live with both his mother and his sister despite having a felony conviction, but was forced to leave immediately in both cases once the landlord learned he was a registrant. Doe #4 Dep 39, 97-99, Exh 4. Verified Compl, ¶ 154.

924.  I.G., who is a leasing agent, testified that apartment complexes are unwilling to rent to registrants. In her job, she not only screens potential tenants on the sex offender registry, but also gets automated updates if someone registers using an address at her complex. In addition, other residents sometimes inform her that they have found out through registry phone or email alerts that another tenant is on the registry. She then starts the eviction process. Her complex rejects all applicants who are on the sex offender registry, even if they only have misdemeanors. I.G. Dep 77-81, Exh 7.

925.  Mr. Doe #4 testified that he does not stay with his mother or sister for

more than several days at a time because then he would have to register their addresses, and he is concerned that his family members could get evicted. Verified Compl, ¶ 157; Doe #4 Dep 39, Exh 4.

926.  Mr. Doe #4 testified that in the previous eight to nine months before his deposition, Mr. Doe #4 had unsuccessfully tried to rent a room. Since getting a job, he has not looked for an apartment of his own, due to his prior experiences looking for housing while on the registry. Doe #4 Dep 38 ln 21-23; 39 ln 12—40 ln 4, Exh 4.

927.  Mr. Doe #4 was homeless when the Complaint was filed, and remains homeless. Verified Compl, ¶ 156; Doe # 4 Dep 35, Exh 4.

928.  Mr. Doe #5 was able to live wherever he wanted for 33 years after he was convicted. When he was retroactively added to the registry, he became subject to the geographic zones. Doe #5 Dep 77, Exh 5.

929.  Mr. Doe #5 testified that he does not understand why he could no longer live near a school and was forced to move out of his apartment, given that "[m]y case was dealing with an adult or someone of age." Doe # 5 Dep 67, Exh 5; Verified Compl, ¶ 360.

930.  In 2010, before Mr. Doe #5 was on the registry, he began receiving Section 8 federal housing assistance. Mr. Doe #5 states that his 1980 conviction for a

sex offense did not disqualify him for such assistance when he applied in 2010.

Doe #5 2nd Decl, Exh 29.

**Defendants object to this paragraph because is a conclusory statement from his own declaration.**

931.  In November 2013, Mr. Doe #5 received a notice that his federal housing assistance was being terminated because he is now subject to lifetime sex offender registration. Mr. Doe #5 stated that the termination notice he received was based on his lifetime registration status, not his conviction. Doe #5 2nd Decl, Exh 29.

**Defendants object to this paragraph because is a conclusory statement from his own declaration.**

932.  Federal law prohibits individuals who are subject to lifetime sex offender registration from admission into the Section 8 housing assistance program. 42 U.S.C.A. § 13663.

933.  Mr. Doe #5 stated in his declaration that he fears that without voucher assistance he will not be able to afford an apartment and will become homeless. Doe #5 2nd Decl, Exh 29.

934.  According to Mary Doe, she and her husband rented a home from a distant cousin, but when the cousin lost the home to foreclosure, the bank notified the family that they might be forced to vacate on short notice. Mary Doe stated that despite an exhaustive search, Ms. Doe and her husband were unable to find alternate affordable housing that was not within a restricted zone. Eventually, Ms. Doe

and her husband negotiated with the bank to let them remain in the home. Verified Compl, ¶¶ 158-59.

## B.   Plaintiffs' Ability to Find Employment

935.  SORA 2013 bars the plaintiffs from working within 1000 feet of school property. M.C.L. § 28.735.

936.  Under SORA 2013 employer address information is posted on the public sex offender registry. M.C.L. § 28.728(2)(d); Verified Compl, ¶ 178.

937.  As of October 30, 2013, MSP data showed that 13,494 registrants – or less than half of non-incarcerated registrants living in Michigan – reported having any employment. Johnson Dep 298-300, Exh 15. Defs' 2nd Supp. Resp to Pls' First Interrog, No. 15b, Exh 98.

938.  Mr. Doe #1 has repeatedly lost employment opportunities because he is a registered sex offender. When he was first released from prison, he participated in a reentry program designed to help him find employment. Verified Compl, ¶ 162; Doe #1 Dep 86-87, Exh 1.

939.  Mr. Doe #1 actively sought work and flagged potential jobs off employment lists, but his case manager told him repeatedly that those employers would not hire registrants. The occupations where he was denied employment included garbage collection and fast food restaurants. Verified Compl, ¶ 163.

940.  Mr. Doe #1 tried to open his own business as a subcontractor on a home

preservation project to restore foreclosed homes. Mr. Doe #1's parole agent required him to close the business because many contracting jobs are within restricted geographic zones. Verified Compl, ¶ 164.

941. Mr. Doe #1 was hired by the organization that ran his reentry program for its programs for special needs adults, and he has been employed there since. Verified Compl, ¶ 165.

942. Mr. Doe #2 need not list his sealed HYTA case on job applications asking whether he has a criminal record. However, employers refuse to hire him when they find out that he is on the registry. Due to his registry status he was unable to work as a firefighter, at Home Depot, and in various Department of Defense positions. Verified Compl, ¶ 166; Doe #2 Dep 139, Exh 2.

943. Mr. Doe #2 stated that he hoped to start a program mentoring at-risk youth by engaging them in construction projects. He was unable to do so because his status as a registered sex offender would have made it impossible for him to work with youth. Verified Compl, ¶ 167.

944. Mr. Doe #3 is a co-owner of a family business, and has worked there for many years. Although he is employed now, he is concerned that if he were unable to continue working in the family business, his status as a registrant would prevent him from finding another job. Verified Compl, ¶ 168.

945. Mr. Doe #4 worked at an auto parts factory at the time of his offense and

for much of the time he was on probation. Mr. Doe #4 stated that he did well, repeatedly earning raises over a three-year period. Verified Compl, ¶ 170.

946.  Mr. Doe #4 stated that in 2008, an anonymous caller informed the factory's management that Mr. Doe #4 was listed on the sex offender registry. Mr. Doe #4's boss showed him a print-out from the registry and fired him. He was escorted off the premises by security. Verified Compl, ¶ 171; Doe #4 Dep 27-29, Exh 4.

947.  Mr. Doe #4 stated that he could not pay his bills after he was fired. As a result, he lost his home to foreclosure, and his car was repossessed. Verified Compl, ¶ 173.

948.  Mr. Doe #4 had great difficulty finding work thereafter because, in his experience, few employers are willing to hire registrants. Verified Compl, ¶ 174.

**Defendants object to this statement from the verified complaint on the grounds that it is conclusory.**

949.  Mr. Doe #4 stated that he found a job with a finishing company and worked there for about six months. Then the newspaper *Busted*, which republishes photos and information from the sex offender registry in a newsprint format, published the registry listing for Mr. Doe #4. He was fired from his job the day after *Busted* appeared in the break room at work. He tried to explain the circumstances of his offense, but "they didn't want to listen." Doe #4 Dep 30-31, Exh 4; Verified

Compl, ¶ 175; Doe #4 *Busted* Newspaper, Exh 69.

**Defendants object to these statements from the verfied complaint on the grounds that they are conclusory.**

950.  Mr. Doe #4 stated that he was offered a factory job by a staffing agency, but the factory was within 1000 feet of a school, so he could not accept. Verified Compl, ¶ 176.

951.  Mary Doe earned a degree in medical billing and was placed in an externship through her career services office. She stated that although the host organization was pleased with her work, the employer was concerned about hiring her because the employer's information would be posted on the registry. Verified Compl, ¶ 178.

**Defendants object to the statement from the verfied complaint about concerns over hiring Mary Doe on the grounds that they are conclusory and hearsay.**

952.  When Ms. Doe worked in a previous medical billing job, someone told her employer she was on the registry, and she was terminated the next day. Ms. Doe's current employer does not know she is on the registry, and Ms. Doe believes she would be fired if the employer found out. Mary Doe Dep 114, Exh 6.

## C.   Reporting and Verification

953.  Not every law enforcement agency in Michigan handles sex offender registration, and some registrants must travel to report. Lines to register can be "upwards of a 100 people." Johnson Dep 101-02, 212, Exh 15.

954. Mr. Doe #2 testified that registration took two hours at the location where he used to register. Mr. Doe #2 overheard someone say that it was quicker to register at another location. At the new location, it currently takes Mr. Doe #2 about 20 minutes to register. Doe #2 Dep 75, 140-141, Exh 2.

955. Mr. Doe #3 has had to report several vehicle purchases in-person within three days. He must take off work and the registration process at the police station can take an hour: "It's a long process just for something so simple." Because his police station is only open three to four hours a day, with a different schedule depending on the day of the week, Mr. Doe #3 sometimes goes to register only to find that the office is closed and he will have to come back. Doe #3 Dep 77-79, 120-21, Exh 3.

956. The first time John Doe #5 registered at the local police station, it took approximately 30 minutes. Doe #5 Dep 59 ln 13-15, Exh 5.

957. Ms. Doe, who has completed 40 quarterly registrations, used to report at a police station that was open on the weekends. After moving, she now reports to a station that is only open on weekdays, and must take off work to register: "I might be gone two hours, it's not an easy thing to do every three months with an employer." The actual registration process, not counting travel time, can take 45 minutes, and is embarrassing because she must speak loudly through bulletproof glass or through a speaker, allowing other people to hear that she is a registered sex offen-

225

der. Mary Doe Dep 51, 106-07, Exh 6.

958.  Michigan has purchased, but not yet started using, OffenderWatch Express, a product that would allow registrants who have computer access to log into any internet-connected computer and enter information, which "save[s] time on data entry of the actual law-enforcement agency." Johnson Dep 204-10, Exh 15.

959. OffenderWatch Express' marketing materials claim that it has the potential to reduce the amount of data-entry time at the station-house to less than three minutes. Registrants would need to pre-enter the data, and would need to travel to the law enforcement agency and possibly wait in line to register in person. Offender-Watch Express Description, Exh 51; OffenderWatch Contract 17, Exh 52; Johnson Dep 204-10, Exh 15.

960.  Ms. Johnson testified that law enforcement "simply take[s] the registrant's word for it" when they report registration information, with the exception of residence information, where the police may require documentary proof. She further testified that there is no reason "other than that the law requires it" that registrants must appear quarterly in person to update information that they could provide online. Johnson Dep 205 ln 19—206 ln 15; 208 ln 4—210 ln 22, Exh 15; Offender-Watch Express Description, Exh 51; OffenderWatch Contract 17, Exh 52.

961.  At present SORA requires in–person reporting. M.C.L. §§ 28.724a, 28.725. Lt. Hawkins "speculate[d]" that in the future there might be changes to the

in-person reporting requirement when the MSP has the capability to do that. Hawkins Dep 47 ln 17—48 ln 18, Exh 19.

962. Lt. Hawkins testified that being able to register by e-mail would be more convenient, but would require a statutory change and would not necessarily alter any other SORA restrictions or change the information registrants are required to provide. Hawkins Dep 70 ln 13-21, Exh 19.

### D. Enforcement of SORA

963. MSP data from 1994 through part of 2013 shows that over 10,000 felony-level charges have been brought against registrants for various registration violations, along with almost 7,000 misdemeanor charges. There have been over 6,000 felony convictions and over 9,000 misdemeanor convictions. MSP SORA Charging Data, Exh 45; MSP SORA Conviction Data, Exh 46.

964. Between 2006, when the geographic zones were enacted, and 2013, over 600 people were charged with and over 450 people were convicted of geographic zone violations. MSP SORA Charging Data, Exh 45; MSP SORA Conviction Data, Exh 46.

965. The MSP, county sheriff's offices, the U.S. Marshalls, and local law enforcement agencies regularly engage in a variety of sweeps to determine SORA compliance. These operations include: (a) random residence checks to "just randomly knock on the door of offenders to make sure they are in fact staying where

227

they are reporting they are staying;" Payne Dep 71-78, Exh 17; (b) operations

targeted at registrants who are "noncompliant;" Burchell Dep 36-42, Exh 16; (c)

"absconder sweeps;" Johnson Dep 155-57, Exh 15; and (d) other types of sweeps.

For at least ten years, the MSP has annually run "Operation Verify" to locate

registrants deemed non-compliant. MSP SOR Manual §3.3.12, Exh 83; MSP

Memo re Operation Verify, Exh 87.

966.  Registrants can be non-compliant for various reasons, including missing a

verification period or failing to pay a fee or turn in a form. Sweeps are not limited

to individuals who fail to verify. Payne Dep 76, Exh 17; Burchell Dep 39, Exh 16.

967.  The Public Sex Offender Registry includes a "submit a tip" button on each

registrant's page. Information provided by the public through that system is sent to

the registrant's local law enforcement agency for follow-up. Johnson Dep 131-33,

Exh 15; Doe #2 PSOR Print-Out, Exh 64.

968.  Both the former SOR database and the new OffenderWatch database

include investigative screens for each registrant, which are used to document

citizen tips, track follow-up law enforcement actions, and track the progress of

investigation into registrants. SOR Unit Manual § 3.3.13, Exh 83; OffenderWatch

User Manual 44, Exh 50; Johnson Dep 255, Exh 15.

969.  Mr. Doe #1 reported that when officers come to his home to do random

residence checks, they sometimes talk to his neighbors to ask if Mr. Doe #1 lived

there. It is not clear from Mr. Doe #1 deposition testimony whether or not the

officers revealed his registration status.  Doe #1 Dep 85-86, Exh 1.

970.  When the police come to Mr. Doe #3's home for residence checks, he and

his wife have to try to explain to his children, as well as the neighbors, why the

police are there asking for him.

> Mom, there's a police officer at the door. So unprofessional[]. Knocking –
> banging on the door… and he'll come to the door, and them driving by down
> the street and saying, just making sure. Really? My neighbors questioning,
> why was there an officer at your door? Scaring my children. I mean, there are
> other ways of handling this.

The officers do these sweeps multiple times a year, and have come in the early

morning when the family is sleeping, and shouted out Mr. Doe #3's name, being

"very aggressive." S.F. Dep 23-24, 45-51, Exh 8; Doe # 3 Dep 126-27, Exh 3.

971.  Mr. Poxson reported that when he was on the registry, the police would

come to his home to verify that he lived there, sometimes showing up as late at

11:30 p.m. They would ask to come in and look around, and required him to pro-

vide two forms of identification. Poxson Dep 68-69, Exh 14.

**Defendants object to the relevance of this statement on the grounds that
Mr. Poxson is not a plaintiff and he was no longer required to register
when SORA 2013 was enacted.**

972.  In Mr. Doe #3's experience, the SOR system can show a registrant as non-

compliant when they are in fact compliant. He and his children were pulled over by

a police officer who claimed that he was noncompliant. Mr. Doe #3 was "begging

this [officer] in front of my children," explaining that he had in fact registered. Doe #3 Dep 110-12, Exh 3.

973.  S.F. testified: "I never want my husband being arrested in front of his children for something that had happened when he was a teenager." Eventually the officer determined that while the state police records indicated Mr. Doe #3 had failed to register, a local police verification receipt, that Mr. Doe #3 had with him in the car, showed he was in fact compliant. S.F. Dep 23, Exh 8.

**Defendants object to the first sentence of this paragraph on the grounds that it is irrelevant and conclusory.**

974.  Plaintiffs contend that the fact that they are now required to register for life increases the likelihood that they will be arrested for, prosecuted, or convicted of a SORA-related offense.

975.  An MSP trainer said at an OffenderWatch training for law enforcement agencies: "Maybe we don't get them for the violation that day, but [we] got the rest of their lives to, you know, basically finally get them." OffenderWatch Training Video, Disk 4, Part 1, Minute 20:25, Exh 68.

### E.    Supervision Requirements Compared to Probation and Parole

976.  Parolees do not have to report some of the information required of registrants, such as phone numbers or vehicles they regularly use. SORA also automatically imposes restrictions on employment and residency within geographic zones. MDOC conditions that restrict residency or employment are generally

tailored to the individual's circumstances. SORA requirements apply for 15 years

to life. Parole restrictions typically last two years. SORA requirements do not

decrease over time and cannot be contested. Probation/parole conditions are

frequently relaxed during the course of supervision and can be challenged through

the MDOC grievance procedures. Stapleton Expert Rep, 1, 7-8, Exh 28; Stapleton

Dep 73-75, 104-05, Exh 13.

977.  Plaintiffs reported that SORA 2013's reporting and supervision require-

ments are more onerous than what they experienced while serving their sentences

on probation or parole, both because they must report more information and be-

cause they must report certain changes in person within three business days – a

level of reporting that exceeds what plaintiffs experienced on probation or parole.

Verified Compl, ¶¶ 122-125.

**Defendants object to this statement from the verified complaint on the grounds that it is conclusory.**

978.  Mr. Doe #1 testified: "I feel like I'm still on parole… each day it's like

I'm still on parole… So I still feel as though I'm not free..." Doe #1 Dep 87, Exh 1.

979.  Mr. Poxson testified that "when you had police showing up at your house

and you had to go in and report to the police, to me it was just another form of

probation," except that it was "worse than probation." Having experienced both

probation and sex offender registration, Mr. Poxson testified that "without

question" registration was more punitive. Moreover, after he proved himself on probation, his reporting requirements decreased very substantially to almost nothing. By contrast, his reporting requirements on the registry increased over time. Poxson Dep 65-72, Exh 14.

**Defendants object to the relevance of this statement on the grounds that Mr. Poxson is not a plaintiff and he was no longer required to register when SORA 2013 was enacted.**

980.  As a former police officer, Mr. Poxson testified that law enforcement officers view sex offender registration as a form of probation. When he made a complaint to the Ingham County Sheriff regarding residence checks, he was told by the sheriff that "we check on probation and parole people all the time and you're just the same, a registrant is just the same." Poxson Dep 69-72, Exh 14.

**Defendants object to this statement on the grounds that it is speculation and hearsay, and Mr. Poxson lacks the foundation to describe how law enforcement officers view registration as compared to parole under SORA 2013.**

## F.   Plaintiffs' Access to Education

981.  Mr. Doe #2 stated that he wanted to pursue a degree as a medical assistant. When he applied to such a program at the Everest Institute, he was denied because he was on the registry. Because Mr. Doe #2's HYTA case is sealed, the Everest Institute would not have known of his history but for the fact that Mr. Doe #2 is on the registry. Verified Compl, ¶ 181; Doe #2 Dep 139-40, 142-45, Exh 2.

**Defendants objected to questions about what Everest Institute would**

232

**have known on the grounds of calling for speculation and lack of foundation.**

982.  Mr. Doe #2 was eventually able to earn a degree as a medical assistant through another institution. He then wanted to become a cardio-vascular steno-grapher. That degree requires clinical courses. Because of Mr. Doe #2's status as a registered sex offender, he is not allowed to take clinical courses, and could not pursue his chosen degree. Verified Compl, ¶ 182; Doe #2 Dep, 15-17, Exh 2.

**Defendants object to the statement about clinical courses on the grounds that this statement from the verified complaint is conclusory, and is not a requirement of SORA.**

983.  Mr. Doe #3 enrolled in college in 2005. When he learned that he had to report attending college, he feared that his classmates would find out that he was a registrant, and dropped out of school rather than risk facing hostility. Verified Compl, ¶ 183.

984.  Mr. Doe #4 was rejected by several GED programs because he is a regis-tered sex offender. With the assistance of his probation officer, Mr. Doe #4 was eventually able to identify a GED program that accepts registrants, and completed his GED. Verified Compl, ¶¶ 184 185; Doe #4 Dep 5, Exh 4.

### G.   Plaintiffs' Ability to Travel

985.  Plaintiffs must provide advance notice when they intend to travel any-where for seven days or more, and must inform the police where they are going, where they will stay, how long they will be there, and when they will return.

M.C.L. § 28.725(1). Twenty-one days advance notice is required for travel outside the U.S. for more than seven days. M.C.L. § 28.725(7).

986.  If the plaintiffs travel, they must comply with any applicable sex offender laws in other jurisdictions. According to plaintiffs' expert, Dr. Prescott, because sex offender laws are complex and vary from state to state, it is difficult to obtain information about either affirmative reporting obligations (such as registering one's presence in a state) or restrictions (such as prohibitions on visiting a library or park) in other jurisdictions. He surveyed sex offender laws across the country, and concluded that "there is incredible variety in the procedures and substantive obligations across the states." An attachment to his report provides examples from different jurisdictions. *See* Prescott Expert Report, 11, and Attach A, Exh 22.

987.  Mr. Doe #1, Mr. Doe #2, and Mary Doe all reported limiting travel to no more than six days at a time, because otherwise they would be required to notify law enforcement in person about their travel plans. Verified Compl, ¶ 191-198.

988.  Mr. Doe #3 took his wife on a four-day getaway to a resort in Mexico in 2011 to celebrate her university graduation. On their return, border agents separated him from his wife, interrogated him for hours, and asked questions about his sex offender status. Mr. Doe #3 is now reluctant to travel outside the U.S. Verified Compl, ¶ 196; Doe #3 Dep 94-97, Exh 3; S.F. Dep 33-34, Exh 8.

989.  Ms. Doe once took a wrong turn while driving in Detroit, and accidentally

got into a traffic lane leading to the tunnel to Canada. She had to go back through the U.S. border checkpoint. Because of Ms. Doe's status as a registrant, border agents demanded that Ms. Doe and her family get out of the vehicle. The agents searched the car, interrogated Ms. Doe, her husband, and her daughter separately, and suggested that Ms. Doe was abducting her daughter. The family was eventually released. Verified Compl, ¶¶199-200.

**Defendants object to the statement about the border agents' motivations or statements, as those allegations from the verified complaint are conclusory or hearsay.**

### H.   The Effects of Public Registration

990.  As of May 22, 2013, there had been over 12,568,000 visitors to Michigan's Michigan Public Sex Offender Registry (PSOR) website. Defs' Responses to Pls' 1st Interrog, No. 10, Exh 42.

991.  The old data management system showed the current number of visitors on its website. (http://www.mipsor.state.mi.us, last visited 12/19/2014, at which time the counter showed 14,373,268 visitors.) The record does not indicate whether this number represents unique vistors, or if it includes page views from non-unique visitors. The OffenderWatch website does not publicly show the number of visitors. OffenderWatch Home Screen, Exh 118.

992.  Michigan's sex offender registry website posts personal information about each plaintiff, including residential address, employer address, date of birth, school

information, vehicle information, physical description (weight, height, etc.), and a photograph. M.C.L. § 28.728(2); Doe #2 PSOR Print-out, Exh 64; Doe #2 OffenderWatch Page, Exh 120.

993. The public registry website lists each registrants' tier classification. All of the plaintiffs are classified as Tier III offenders. *See, e.g.,* Doe #2 PSOR Print-Out, Exh 64; Doe #2 OffenderWatch Page, Exh 120.

994. The home page for OffenderWatch states that the registry is intended to prevent crimes by "convicted sex offenders." OffenderWatch Home Screen, Exh 118.

995. The OffenderWatch page for Mr. Doe #1 lists the date convicted and the state of conviction. Doe #1 OffenderWatch Page, Exh 127. Mr. Doe #1 was never convicted of a sex offense. Verified Compl, ¶ 208

> **Defendants object to the last sentence of this paragraph as conclusory. Also, this statement is not accurate or complete because Mr. Doe #1 was convicted of a "listed offense" under SORA.**

996. The OffenderWatch page for Mr. Doe #2 lists the date convicted and the state of conviction. Doe #2 OffenderWatch Page, Exh 120. Mr. Doe #2's case was dismissed without conviction under HYTA. Verified Compl, ¶ 209, Doe #2 Dep 138, Exh 2; Doe #2 Criminal History Print-Out, Exh 63.

997. Mr. Doe #4 states that he received an anonymous death threat by mail in 2010. He received an envelope containing a print-out of his sex offender registry page. His eyes were blacked out on the photo. Handwritten on the paper were the

words "You will die." Mr. Doe #4 also states that he has been called a child

molester on the street. Doe #4 Death Threat, Exh 70; Verified Compl, ¶ 213.

> **Defendants object to this statement from the verified complaint and the alleged threat the grounds that allegation is conclusory, and the supposed threat is hearsay. Further, there is nothing beyond Mr. Doe #4's own testimony establishing that this threat was actually sent to him instead of having been created by him.**

998.  Mary Doe testified that a vigilante came to her home when she was not

home, but her husband was, and inquired about her status on the registry. Ms. Doe,

who believed the man was "threatening my family," reported the incident to the

police to "find out what rights I had, and I found out I had none" and that the

police "couldn't do anything about it." Mary Doe Dep 97-98, Exh 6.

> **Defendants object to this paragraph on the grounds it is entirely based on statements Mary Doe's husband made to her. Mary Doe lacks personal knowledge of this event.**

## I.  Additional Restrictions Triggered By Plaintiffs' Status as Registrants

999.  Because the plaintiffs are required to register as sex offenders under

SORA 2013, they will be subject for life to an array of laws, other than SORA,

imposed on registrants by the federal government, other state or tribal govern-

ments, and local municipalities. Prescott Expert Report, 11-12, Attach A, Exh 22.

1000.  A compendium of some state laws (which does not include federal, tribal,

or local laws, and which disregards many of the more minor requirements) con-

tains over 1000 pages of obligations and restraints. *Id.* at Attach A, 9.

1001.  According to Dr. Prescott, because registration in one state generally triggers registration in other states, the fact that plaintiffs are subject to Michigan's SORA makes them subject to sex offender laws in other jurisdictions if they travel or move. *Id.* at Attach A, 1.

### J.   Plaintiff's Allegations that Their Alleged Harms Are Attributable to SORA

<span style="color:red">Defendants object to these paragraphs as repetitive and cumulative.</span>

1002.  Doe #2's case was dismissed under HYTA and he does not have a criminal record that would appear on a background check. Mr. Doe #2 alleges that he has suffered consequences stemming from the fact that the state publicly labels him as a registered sex offender. Verified Compl, ¶ 35; Doe #2 Dep 61, 66, 76, 127-28, 137-39, 145-46, Exh 2; Doe #2 MSP Criminal History Print-out, Exh 63; Doe #2 Public Sex Offender Registry Print-out, Exh 64.

1003. Plaintiffs testified to situations where they were able to access housing or employment despite having criminal records, but then lost that housing or employment when the landlord/employer learned they were on the sex offender registry. *See, e.g.*, Doe #4 Dep 27-29, 30-31, 39, 97-98, Exh 4; Doe #5 Dep 77, Exh 5; Doe #5 2nd Decl, Exh 29; Mary Doe Dep 114, Exh 6.

1004.  As Mr. Poxson testified, his life changed significantly after he came off the sex offender registry, even though he continues to have criminal record. Mr. Poxson explained that much more information is available on the registry, and that,

unlike with the sex offender registry, criminal history information is available only

if one knows a person's name and date of birth. For him, being a registered sex

offender was the worst experience of his life, other than the death of his ten-year-

old daughter. Poxson Dep 18, 70-74, Exh 14.

> **Defendants object to this paragraph as irrelevant because Mr. Poxson is not a plaintiff, and his opinions do not constitute harms alleged by the Plaintiffs.  The statement about Mr. Poxson's daughter is also irrelevant and has no bearing on any fact at issue in this case.**

## XX.  THE ANNUAL FEE REQUIREMENT

1005. In 2013, while this case was pending, Michigan enacted new legislation

requiring non-incarcerated registrants to pay a $50 annual fee (capped at $550).

The requirement applies retroactively to all registrants. Mich. Pub. Act 149 (2013);

M.C.L. § 28.725a (eff. 4/1/14).

1006. An indigent registrant may seek a temporary waiver of the fee by proving

indigency to the satisfaction of the local law enforcement agency. A registrant who

is unable to pay must prove indigency every 90 days. The statute defines

"indigent." M.C.L. §§ 28.722(h); 28.725b(3); Johnson Dep 275-77, Exh 15.

1007. In March 2014, the MSP sent a mass mailing notifying registrants of the

due date for the new annual fee. The letter does not inform registrants that they can

seek a temporary waiver based on indigency. MSP Annual Fee Letter, Exh 126.

1008. The MSP trains law enforcement that they "may charge an offender with a 90-day misdemeanor for refusing to pay the registration fee … after claiming one instance of indigence." MSP Official Order 79, 6, Exh 47.

1009. Willful refusal or failure to pay the fees is a misdemeanor, punishable by imprisonment for not more than 90 days. M.C.L. § 28.729(4).

1010. The annual fee was adopted after Ms. Johnson recommended to the budget office that SORA include an annual fee similar to that in some other states. The record does not show how many states do or do not impose charges on registrants, how much those charges are on average, or how Michigan's charges compare. All the states surrounding Michigan have an annual fee, and Ms. Johnson testified that there are states that charge $100 or $250 a year. Johnson Dep 215 ln 18—216 ln 21, 350 ln 18-22, Exh 15; Hawkins Dep 62 ln 11-14, Exh 19.

1011. The annual fee was a legislative priority for the MSP because of budget concerns. Hawkins Dep 13 ln 22—14 ln 9, Exh 19. Federal funding was diminishing, there was a concern about financially supporting the SOR system, and there was a need to cover budget shortfalls resulting from the purchase of the $2-millon-dollar OffenderWatch system. The additional fee revenue will be used to offset the loss of grant funding and other budget shortfalls. Johnson Dep 201-201, 214-219, Exh 15; Hawkins Dep 62 ln 11-14, Exh 19.

1012. The annual fee was not created solely to pay for OffenderWatch, and the fee change would have been sought whether or not OffenderWatch was purchased. The purchase process for OffenderWatch was started well prior to any discussion of changing the fee structure. However, the annual charge was needed to cover budget shortfalls when the decision was made to purchase OffenderWatch and in light of declining federal funding.  Johnson Dep 199 ln 2-8; 216 ln 15-21; 218 ln 7-22; 350 ln 23—351 ln 4, Exh 15.

1013. Ms. Johnson estimated that 50-60% of registrants would pay the fee. Johnson Dep 280-83, Exh 15; Senate Fiscal Agency Analysis for S.B. 221, Exh 76.

1014. As of September 6, 2013, 16,980 registrants had not paid what was at that time a one-time registration fee of $50. Johnson Dep 42 ln 21-24, Exh 15.

1015. The fee structure which had been in place since 2004 (when fees were first imposed) provided approximately $90,000 per year to the MDP for operation of the SOR database and $60,000 to local law enforcement agencies for enforcement. With the new annual fee, estimates are that the MSP will receive up to $420,000 and local agencies will receive $280,000. These figures do not account for fees not collected from indigent offenders. Senate Fiscal Agency Analysis for Senate Bill 221, at 1, Exh 76.

1016. For each $50 fee, $30 goes to the sex offenders registration fund held at the Department of Treasury and $20 of the fee is retained by the local law enforcement agency that collects the fee. Johnson Dep 282 ln 1-6, Exh 15.

1017. Michigan's SORA amendments provide a "sunset" provision for the annual fee requirement. The annual fee does not cover the entire cost of the registry. Hawkins Dep14 ln 17—15 ln 11; 99 ln 3-9, Exh 19.

## XXI.  SYSTEM COSTS AND THE MECHANICS OF REGISTRATION

### A.   The Cost of Michigan's Sex Offender Registry

1018. The total cost of Michigan's sex offender registry is unknown. Neither the legislature nor the State Police have conducted any study of the cost of setting up and operating the registry. Hawkins Dep 18-19, Exh 19.

1019. The budget of the SOR unit is between $1.2 and $1.5 million. Johnson testified that the unit's annual budget is about $1.2 million, of which $600,000 is for database support and $600,000 is for staff, supplies, training, and other expenses. Fiscal year 2014 documents show the budget as almost $1.5 million. Johnson Dep, 215 ln 19-21, 283 ln 12-15, 284, Exh 15; Fiscal Year 2014 SOR Unit Budget, Exh 67; Senate Fiscal Agency Analysis for Senate Bill 221, at 2, Exh 76.

1020. The SOR Unit has a 14-person staff. Roster of SOR Unit Staff, Exh 55.

1021. The SOR Unit budget does not include any of the costs imposed on local law enforcement agencies, on the Department of Corrections (which handles

registration and supervision of registrants on parole/probation), or on the court system. Johnson Dep 284, Exh 15; Fiscal Year 2014 SOR Unit Budget, Exh 67.

>**Defendants object to the relevance of this paragraph on the grounds that the Headlee claim has already been dismissed by Order of this Court.**
>
>**Plaintiffs state: this paragraph is relevant to determining the true cost of SORA, which is much greater than simply the SOR Unit budget.**

1022. Plaintiffs contend that the SOR Unit budget does not include the cost of incarcerating registrants who are convicted for failure to comply with SORA. The estimated daily cost for a prisoner in the MDOC is approximately $94 per day. State of Michigan Prison Costs, Exh 90. The average cost of housing an inmate in a Michigan county jail varies from county to county, but is approximately $70 per day. *Regional Jail Feasibility Study* 223, Exh 89.

1023. Since 1997, approximately 2,000 new registrants have been added to Michigan's registry each year, with the exception of 2011-12, when some registrants (such as youth under age 14) were removed. There were approximately 17,000 registrants in March 1997, and approximately 40,000 registrants in January 2013. Legislative Services Bureau Report on SORA, Exh 92; Total Number On SOR By Year, Exh 53; Mich. Pub. Act. 17-18 (2011).

### B.   Registration Occurs Prior to or as Part of Sentencing and Involves Multiple Law Enforcement Agencies

1024. Sex offender registration is supposed to occur prior to sentencing. A

judge cannot sentence unless the defendant has been registered. M.C.L. § 28.724 (5); Yantus Dep 58-59, Exh 20.

1025. The current Judgment of Sentence form approved by the State Court Administrative Office contains a checkbox to show that sex offender registration has been completed. Judgment of Sentence Form CC 219b, box 3, Exh 84.

1026. Depending on when a defendant was sentenced, the requirement for sex offender registration may have been written on an earlier version of the Judgment of Sentence form or on a probation order. *See, e.g.*, Doe #2 Order Amending Probation, Exh 85; Doe #3 Order of Probation, Exh 86.

1027. For offenses not specifically listed in SORA as requiring registration, the judge must determine whether the offense is by its nature a sexual offense against a person under the age of 18, and then include a finding that registration is required on the judgment. M.C.L. § 769.1(13); Yantus Dep 58-59, Exh 20.

1028. Depending on the defendant's sentence, responsibility for initial registration can lie with a probation agent, parole agent, the MDOC, the sheriffs' department, the probate court, or other entities. M.C.L. § 28.724; Johnson Dep 26-27, Exh 15.

1029. The MSP SOR unit has established procedures for initial registration, periodic verification, and updating of registration information. A new registrant must (a) fill out a registration form, and (b) sign an Explanation of Duties Form.

Johnson Dep 22-24, 53, Exh 15.

1030. The Michigan Department of State provides digitized state identification photos (e.g. driver's license photographs) for use on the public website. Johnson Dep 85 ln 9—89 ln 1, Exh 15.

1031.  For their ongoing verification and immediate reporting requirements, registrants must report to their "registering authority," defined as the "local law enforcement agency or sheriff's office having jurisdiction over the individual's residence, place of employment, or institution of higher learning, or the nearest [MSP] post designated to receive and enter sex offender registration information." M.C.L. § 28.722(n).

1032. Information that changes as result of registrants' ongoing verification and reporting requirements (*e.g.*, updating address, employment, phone number, email address, etc.) is generally entered directly by local law enforcement via their own office computers. A local law enforcement agency can also mail or fax updated information to the SOR unit in Lansing. Johnson Dep 19, 24-27, 72-73, Exh 15; SOR Manual § 8.3, Exh 83.

1033. Hard copies of registration receipts are supposed to be provided to registrants, so that if a question arises or a computer error occurs, the registrant can prove that he or she reported. Johnson Dep 19, 75, Exh 15.

### C.   Sex Offender Registration and Plea Negotiations

1034. Plaintiffs contend that the evidence shows that prosecutors are trained to leverage sex offender registration as part of plea negotiations, as well as to use charging decisions to ensure certain defendants are required to register or are subject to public registration. Tanner Training 2013, 11, Exh 59; Tanner 2011 Training 2011, 4-7, Exh 60.

1035. According to Herbert Tanner, prosecutors consider the registry when engaging in plea bargaining considerably less now than in the past:

> Many of the prosecutors who did that lost their election bids or re-election bids or retired, and I think the sex offender registry changes—the SORNA registry really made those opportunities—foreclosed a lot of those opportunities to do that. And we have I think done our best in the process of education of why they should not use that as a bargaining chip, but to the extent that we still get defense lawyers who come and say can you cut a deal that will keep him off the registry, they're still--there are still considerations like that made. Like the changes in the law, I would frown upon that and tell my prosecutors that is not the best practice.

Tanner Dep 67 ln 7—68 ln 2, Exh 21.

1036. The PAAM 2013 powerpoint used to train prosecutors contains the question: "How can/should this [sex offender registration] be used in plea bargaining? For example, an agreement not to contest the hearing [on whether the sex act was consensual] in exchange for a plea." Tanner 2013 Training, 11, Exh 59.

1037. The PAAM 2011 powerpoint used to train prosecutors contains a series of hypothetical case studies regarding charging decisions and sex offender registration. Case Study # 1 involves a defendant who cannot join the Marines if he

pleads to a registrable offense. The example shows that by pleading to disorderly conduct, registration can be avoided. Case Study #2 involves a situation where "you [the prosecutor] believe the defendant should be punished but you don't believe he should be on the registry." The example discusses which possible convictions will result in Tier I (non-public) versus Tier II (public) registration. Case Study #4 involves an offense that would not result in public registration, and states that by charging separate counts in consecutive complaints, the defendant can be made a Tier II (public) registrant. Tanner 2011 Training 2011, 4-7, Exh 60.

1038. Mr. Tanner stated that he created Case Study #2 in the training powerpoint to talk about the pitfalls of trying to plea bargain out of registration requirements. Tanner Dep 70 ln 25—72 ln 1, Exh 21.

1039. Mr. Tanner stated that he invented Case Study #4 in the training powerpoint in part to convey certain ideas and concepts. He wanted to challenge prosecutors' ethics and talk about why prosecutors should not do business that way. Tanner Dep 68 ln 23—70 ln 3, Exh 21.

1040. Mr. Tanner testified that he has tried to educate prosecutors that it is not the best practice to use the registry as a bargaining chip in plea negotiations, but that there are defense attorneys who try to cut deals to keep a defendant off the registry. Tanner Dep 67 ln 7—68 ln 2, Exh 21.

247

1041. Mr. Tanner testified that "there are prosecutors who – just like everybody else, who think that there are certain circumstances that would justify not putting someone on the registry, like when the prosecutor thinks the defendant is "a good kid from a good family and [the prosecutor doesn't] want to ruin his life." Tanner Dep 66 ln 15-22, Exh 21.

1042. Both Mr. Tanner of PAAM and Ms. Yantus, plaintiffs' expert who is a managing attorney with the State Appellate Defender Office, testified that defense attorneys will try to negotiate for a conviction that does not entail registration, or for non-public registration, if possible. Yantus Expert Rep ¶¶ 5-7, Exh 27; Tanner Dep 67 ln 7—68 ln 2, Exh 21.

1043. Ms. Yantus stated that because of the burdens associated with sex offender registration, the issue of whether a conviction will result in registration is critical for criminal defendants. The choice whether or not to plead guilty often turns on whether a defendant must register, for how long a defendant must register, and whether registration is public or private. Yantus Expert Rep ¶¶ 5-7, Exh 27.

1044. Ms. Yantus testified that defense attorneys are unable to give accurate advice to defendants about any registration-related consequences of their convictions because SORA has been repeatedly amended. In her opinion, the possibility of future amendments means that legal advice given today about whether regis-

tration will be public, the length of registration, or even whether a conviction will result in registration, may not be accurate in the future. Yantus Dep 80-81, Exh 20.

1045. Ms. Yantus testified that some of problems that may arise with requiring offenders to register as sex offenders for crimes that were not sexual in nature can sometimes be resolved by a post-conviction appeal. Yantus Dep 71-74, Exh 20.

1046. Ms. Yantus stated that some probation conditions track the language of the SORA, such as the loitering provisions.  Yantus Dep 75, Exh 20.

1047. Ms. Yantus testified that if an individual decides to plead to a listed offense it is not possible to negotiate away the registration requirement. In order to negotiate a plea where there is no registration, the prosecutor can "change the offense and that may eliminate registration." Yantus Dep 60, Exh 20.

## XXII.  BACKGROUND OF LAW ENFORCEMENT WITNESSES

### A.  Karen Johnson

1048.  Karen Johnson is the manager of the MSP SOR Unit, a position she has held for over two years. Johnson Dep 8 ln 8-13; 12 ln 10-12, Exh 15.

1049.  Ms. Johnson started working for the MSP in 2000 as a Department Technician in the SOR Unit. Prior to that she worked with the MDOC for three years, including time in the Ingham County probation office. Johnson Dep 12 ln 6-9; 12 ln 24—13 ln 11, Exh 15.

1050. Ms. Johnson testified that she believes that within the SOR Unit she has the most knowledge concerning what SORA does or does not require. Johnson Dep 287 ln 5-8, Exh 15.

### B. Sergeant Bruce Payne

1051. Sgt. Payne is the Enforcement Coordinator for the MSP SOR Unit and is responsible for supervising the four troopers who provide sex offender registry training to local law enforcement agencies. He has not yet provided any training himself. Payne Dep 16 ln 8—17 ln 13, Exh 17.

1052. Sgt. Payne has been with the MSP since 1989, working as a road trooper for over three years and as a sergeant on the fugitive team for three years. He has also worked on the violent crime task force for cold case homicide, and worked another year and half as a post detective before spending over four years on the Governor's security detail. He then spent another year and a half in the Emergency Management Homeland Security Division assigned to critical infrastructure protection. He transferred into the SOR Unit in April, 2012. Payne Dep 11 ln 8—12 ln 24, Exh 17.

### C.   Trooper Timothy Burchell

1053.  Trooper Burchell is a state coordinator for the SOR Unit working under Sgt. Payne. He has worked with MSP for fourteen years. Burchell Dep 14 ln 24—15 ln 2; 21 ln 19—22 ln 21, Exh 16.

1054.  Prior to working as a state coordinator, Trooper Burchell worked as a trooper investigator, performing residence checks and seeking warrants for non-compliant offenders. Burchell described "non-compliant" offenders as those that failed to verify, did not pay the fee, those who did not sign the form, and those found not to be living at the address they listed on their registration.  Burchell Dep 16 ln 1—17 ln 22; 17 ln 24—18 ln 6, Exh 16.

1055.  Trooper Burchell believes that he has more direct contact with local law enforcement than Sgt. Payne. Burchell Dep 21 ln 19 22 ln 3, Exh 16.

### D.   Leslie Wagner

1056.  Leslie Wagner has worked for MSP as a civilian employee since 2004, and has worked in the SOR Unit since August of 2011—after the implementation of SORNA. L. Wagner Dep 11 ln 11-13; 15 ln 2-10, Exh 18.

1057.  Ms. Wagner is the statewide SOR coordinator and oversees the SOR database system. She is involved in some legislative activities. There are other legislative activities, including SORNA compliance, in which she is not involved. L. Wagner Dep 15 ln 11-15; 16 ln 12-25; 58 ln 12-18, Exh 18.

1058. Ms. Wagner answers questions from across the state concerning the SOR database. L. Wagner Dep 19 ln 10-17; 16 ln 15-25, Exh 18.

### E.   Herbert Tanner, J.D.

1059. Herbert Tanner is the Director of the Violence Against Women project with the Prosecuting Attorneys Association of Michigan (PAAM) and has provided training on SORA for prosecutors and others. Tanner Dep 8 ln 12-19; 17 ln 18—18 ln 25; 22 ln 21—24 ln 19, Exh 21.

1060. Before working at PAAM, Mr. Tanner had a private practice that included criminal defense. He defended some sexual offenders. He left private practice after ten years and became a prosecutor in Montcalm County. Tanner Dep 11 ln 17—13 ln 23, Exh 21.

1061. As the Chief Assistant in the Montcalm Prosecutor's office, Mr. Tanner handled almost all of the felony sexual assault cases and domestic violence cases from 1993 to 2003. Tanner Dep 13 ln 20—14 ln 18; 15 ln 15, Exh 21.

1062. Herbert Tanner has personal experience with sex offenders in Montcalm County, where he helped start a dedicated sex offender oversight probation/parole unit that included polygraphy, therapy, and "really intensive oversight."  In that experience, he learned, "quite a bit from the discussions you have with the offenders." Tanner Dep 91 ln 25—92 ln 10, Exh 21.

1063. Mr. Tanner is the only attorney in PAAM that conducts trainings on the sex offender registry, and is aware of no other organization providing training to prosecutors. Tanner Dep 36 ln 2-9, Exh 21.

### F.   Lt. Chris Hawkins

1064. Lt. Hawkins holds a bachelor's degree in Criminal Justice and a law degree from Wayne State University. Hawkins Dep 6 ln 12-20, Exh 19.

1065. Lt. Hawkins worked in the field as a Michigan State Trooper for three and a half years. Hawkins Dep 7 ln 25—8 ln 3, Exh 19.

1066. Lt. Hawkins is the commander of the legislative and legal resources section of the Michigan State Police. In that capacity, he supervises the government affairs unit, which is the MSP's legislative liaison. Hawkins Dep 63 ln 1-13, Exh 19.

1067. Lt. Hawkins is personally familiar with the process by which the 2011 amendments to Michigan's SORA were drafted, revised, and ultimately passed. Hawkins Dep 67 ln 5-9, Exh 19.

## XXIII. BACKGROUND OF OTHER WITNESSES

### A.   I.G.

1068. I.G. is a high school graduate. She completed one year of community college. I.G. Dep 7, Exh 7.

1069. I.G. is currently employed as a leasing agent. She has been a leasing

agent for four years. *Id.* at 8-9. As part of her job I.G. checks to see if potential

tenants are on the Michigan sex offender registry. *Id.* at 78.

1070. I.G. was the victim in Mr. Doe #4's criminal case. They are romantically

involved and have two children together. Doe #4 Dep 59-64, Exh 4; I.G. Dep 46-

47, Exh 7.

**B.   S.F.**

1071. S.F. is married to Mr. Doe #3. They have been married 11 years and have

three sons together. S.F. Dep 9, 15, Exh 8.

1072. S.F. earned her B.A. in education in 2005 and M.A. in education in 2010.

She has been a public school teacher for eight years. She teaches in the same dis-

trict in which her children attend school. S.F. Dep 10, 31, Exh 8.

**C.   Timothy Poxson**

1073.   Timothy Poxson worked for the Lansing Police Department for twenty-

two years. He now works in real estate. Poxson Dec 1, Exh 32. Mr. Poxson holds a

bachelor's degree graduate of Michigan State University. Poxson Dep 6, Exh 14.

1074. Mr. Poxson was on Michigan's sex offender registry for seventeen years,

from 1994 until 2011. Mr. Poxson was required to register because he was

convicted of two counts of Criminal Sexual Conduct in the 4th Degree following an

investigation into complaints that he touched female drivers' breasts during traffic

stops outside of a strip club. His conviction ended his career in law enforcement. Poxson Dep 14 ln 25—16 ln 14, 17, Exh 14.

1075. He is an unpaid volunteer in the ACLU of Michigan's Lansing office. He has volunteered weekly since 2009. Poxson Dec 1, Exh 32.

1076. In his capacity as volunteer, Mr. Poxson conducted a survey of 23 Michigan police departments and 19 Michigan prosecutor's offices to ask questions about SORA. Poxson Dec, Exh 32.

### D.   Joseph Granzotto

1077. Joseph Granzotto is a graduate of Kalamazoo College. From September 2013 to May 2014 he worked as a Civil Liberties Fellow for the ACLU of Michigan in Grand Rapids. Granzotto Dec 1, Exh 33.

1078. In his capacity as a Civil Liberties Fellow, Mr. Granzotto conducted a survey of 29 Michigan police departments and 10 Michigan prosecutor's offices to ask questions about SORA. Granzotto Dec, Exh 33.

## XXIV.   QUALIFICATIONS OF EXPERT WITNESSES

### A.   Dr. James J. Prescott

1079. Dr. Prescott holds a bachelor's degree in Public Policy and Economics from Stanford University, a law degree from Harvard Law School, and a Ph.D. in Economics from the Massachusetts Institute of Technology. Prescott Expert Rep 1, Exh 22; Prescott Dep 14, Exh 10.

1080. Dr. Prescott works as a professor of law at the University of Michigan Law School in Ann Arbor, Michigan. He began as an assistant professor in 2006 and was promoted to a full-time professor of law in 2011. He teaches and writes in the areas of criminal law and criminal sentencing. Prescott Expert Rep 1, Exh 22; Prescott Dep 16, Exh 10.

1081. Between college and graduate school Dr. Prescott worked as a research assistant at the Brookings Institution in Washington D.C. doing economic and data analysis. After completing law school he clerked for a federal judge on the District of Colombia Court of Appeals. Prescott Dep 15-16, Exh 10.

1082. Dr. Prescott's recent work focuses on the consequences of sex-offender post-release laws, specifically on the effects that sex offender registration and community notification have on sex offense rates. Prescott Expert Rep 1, Exh 22.

1083. Dr. Prescott's export report particularly concentrates on a 15-state study he conducted in 2008, 2009, and 2011. This study uses registry size information and distinguishes between registration laws and notification laws in order to separate out the effects of registration laws versus notification laws. This methodology allowed Dr. Prescott not only to assess whether these laws have any deterrent effect on first-time offenders and any recidivism reduction effect on prior offenders, but also to distinguish between these two effects. Prescott Dep 6-7, Exh 10.

## B.   Dr. Janet Fay-Dumaine

1084.  Dr. Fay-Dumaine holds a bachelor's degree from the University of Massachusetts Boston and a doctorate in clinical psychology from the Virginia Consortium Program in Clinical Psychology. She is also a certified forensic examiner. Fay-Dumaine Dep 6, Exh 12; Fay-Dumaine Expert Rep, Attach B 1, Exh 24.

1085.  Dr. Fay-Dumaine currently works as a psychologist at the State of Michigan's Center for Forensic Psychiatry, where she runs the sex offender treatment program. She has worked at that facility for approximately three and a half years and has been the coordinator for the sex offender program for about two years. Immediately prior to working at the Center, Dr. Fay-Dumaine worked as supervisor of mental health at the Diagnostic and Evaluation Center for the Nebraska Department of Correctional Services. She has worked with both sex offenders and victims of sex offenses. Fay-Dumaine Dep 6; 9; 129-30, Exh 12; Fay-Dumaine Expert Rep, Attach B 1-2, Exh 24.

1086.  At the Center for Forensic Psychiatry, Dr. Fay-Dumaine coordinates treatment for and conducts risk assessments on patients in the sex offender program. Fay-Dumaine Dep 6, Exh 12; Fay-Dumaine Expert Rep, Attach B 1, Exh 24.

### C.   Dr. Jill S. Levenson

1087.  Dr. Jill S. Levenson has been an associate professor at Lynn University, Department of Psychology, in Boca Raton, Florida since 2004. She has a Doctorate Degree in Social Welfare from Florida International University in Miami (2003), a Masters in Social Work from the University of Maryland, School of Social Work in Baltimore (1987), and a Bachelor of Arts Degree in Sociology at the University of Pittsburgh (1985). Levenson Expert Rep 1, Exh 23.

1088.  She has authored over eighty publications and presentations in the area of sex offender recidivism, treatment, and policies regulating sex offenders. *Id.* at 1.

1089.  Dr. Levenson also has extensive experience working with both victims of sexual violence, including child sex abuse survivors, and sex offenders. She maintains a clinical practice as a licensed clinical social worker evaluating and treating sex offenders. *Id.* at 1.

1090.  Dr. Levenson is currently engaged in research projects funded by the National Institute of Justice regarding sex offender registration. She also serves on the editorial board of the journal "Sexual Abuse: Journal of Research and Treatment." *Id.* at 1.

### D.   Peter Wagner, J.D.

1091.  Peter Wagner earned his Juris Doctor in 2003 from the Western New England College School of Law and is barred in the state of Massachusetts. He

received his Bachelors of Arts from the University of Massachusetts at Amherst in 1994. Wagner 2nd Expert Rep 41, 47, Exh 26.

1092. Since 2001 Mr. Wagner has been employed by the Prison Policy Initiative, where he currently serves as Executive Director. In this capacity he regularly creates maps that analyze demographic data in relation to statutory restrictions that impose geographic limits for criminal justice purposes. Mr. Wagner attested that for the last decade, exclusion zone mapping has been a significant part of his work. Wagner 2nd Expert Rep 1, Exh 26; Wagner Supp Decl 1, Exh 128.

1093. Mr. Wagner has submitted expert reports, including maps, and testified regarding geographic zones created by sex offender laws in both state and federal court cases. He has been involved in cases in the U.S. District Courts for the Northern District of Georgia, the District of Colorado, and the Middle District of Alabama, as well as in Massachusetts state courts. Wagner 2nd Expert Rep 6-7, Exh 26; Wagner Supp Decl 1, Exh 128.

1094. Mr. Wagner was retained in 2006 by the Massachusetts Committee for Public Counsel Services to conduct a detailed study of sex offender residency restrictions. Wagner 2nd Expert Rep 7, Exh 26.

1095. Mr. Wagner's mapping work has also been used by the *New York Times* and similarly prominent newspapers. Wagner Supp Decl 3, Exh 128

**Defendants object to this statement on the grounds that it is irrelevant and that it is vague because there is no context for what kind of maps or for what purpose they were used.**

1096. Mr. Wagner has published numerous articles regarding geographic zones, sentencing enhancement zones, and gerrymandering. Wagner 2nd Expert Rep 43-45, Exh 26.

### E.   Richard Stapleton, J.D.

1097. Mr. Richard Stapleton received his J.D. in 1986 from the Michigan State University College of Law. Stapleton Expert Rep 14, Exh 28.

1098. From 1999 to 2011, Mr. Stapleton was Administrator of the Michigan Department of Corrections' Office of Legal Affairs. As chief legal counsel for the MDOC he was responsible for development of policy directives and promulgation of administrative rules. *Id.* at 1-2.

1099. During his tenure at the MDOC Office of Legal Affairs, the department and the parole board began using empirically-based actuarial instruments to assess each prisoner, parolee, or probationers' individual risk level. The MDOC also began using these risk assessment tools to tailor supervision levels to the needs of the individual probationer or parolee. *Id.* at 3-4.

1100. As MDOC's Legal Affairs Administrator Mr. Stapleton often had to attempt to interpret SORA as part of his duties. He was responsible for assisting

department managers in interpreting the statute in order to provide the appropriate guidance to probation and parole officers. *Id.* at 8-9.

### F.   Anne Yantus, J.D.

1101. Anne Yantus is managing attorney with the State Appellate Defender Office (SADO) Plea Unit. Yantus Expert Rep 1, Exh 27. She has held this position since 2006. Yantus Dep 10, Exh 20.

1102. Ms. Yantus frequently conducts trainings on plea matters in Michigan. Yantus Expert Rep 1, Exh 27.

1103. Ms. Yantus teaches criminal sentencing at the University of Detroit-Mercy School of Law. *Id.*

1104. Ms Yantus co-authored a chapter on sentencing for *Michigan Criminal Procedure* (ICLE), and is published in the areas of sentencing and plea matters. *Id.*

1105. Ms. Yantus estimates in her own practice she has reviewed approximately two thousand criminal cases. Yantus Expert Rep 2, Exh 27.

Respectfully submitted,

s/ Miriam Aukerman
American Civil Liberties Union
 Fund of Michigan
Attorney for Plaintiffs
1514 Wealthy SE
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org (P63165)

s/ Sofia Nelson
s/ Michael Steinberg
s/ Kary Moss
American Civil Liberties Union
 Fund of Michigan
Attorneys for Plaintiffs
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
snelson@aclumich.org (P77960)
msteinberg@aclumich.org (P43085)
kmoss@aclumich.org (P49759)

/s Erik Grill
Michigan Attorney General's Office
Attorney for Defendants
525 Ottawa St., Fl 5
Lansing, Mi 48909
(517) 373-6434
grille@michigan.gov

s/ Paul D. Reingold
Michigan Clinical Law Program
Attorneys for Plaintiffs
363 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 763-4319
pdr@umich.edu (P27594)

s/ William Swor
Attorney for Plaintiffs
645 Griswold Street, Ste. 3060
Detroit, MI 48226
(313) 967-0200
wwswor@wwnet.net (P21215)

262

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOES #1-5 AND MARY
DOE,

     Plaintiffs,

v

RICK SNYDER, Governor of the
State of Michigan, and COL.
KRISTE ETUE, Director of the
Michigan State Police, in their
official capacities,

     Defendants.

No. 2:12-cv-11194

HON. ROBERT H. CLELAND

MAG. DAVID R. GRAND

_____

**CERTIFICATE OF SERVICE (E-FILE)**

     I hereby certify that on June 27, 2014, I electronically filed the

above document(s) with the Clerk of the Court using the ECF System,

which will provide electronic copies to counsel of record.

*s/ Erik A. Grill*
Erik A. Grill (P64713)
Assistant Attorney General
Attorney for Defendants
P.O. Box 30736
Lansing Michigan 48909
(517) 373-6434
GrillE@michigan.gov
P64713