# Exhibit 141:

Dr. Rachael Goodman-Williams
Declaration

### EXPERT DECLARATION OF DR. RACHAEL GOODMAN-WILLIAMS

### BACKGROUND, EDUCATION, AND QUALIFICATIONS

1.      I am an Assistant Professor of Psychology at Wichita State University in Kansas. I have worked at Wichita State University since August 2020.

2.      I received my BA in Gender & Women's Studies and Political Science from Knox College (2009), and both my MA (2017) and Ph.D. (2020) in Ecological-Community Psychology from Michigan State University.

3.      Between completing my BA in 2009 and beginning my doctoral program in 2014, I worked at sexual assault/domestic violence agencies where I delivered prevention programming and support services for adolescents (2009 – 2011) and managed the 24-hour support hotline and in-person response services at a rape crisis center (2011 – 2014). My role at the rape crisis center involved responding to sexual assault victims in-person and by telephone, training volunteer advocates how to respond to sexual assault victims in those situations, training community agencies about sexual assault response, providing shift briefings to law enforcement patrol officers throughout Washington County, Oregon, and serving as a member of the Washington County Sexual Assault Response Team (SART).

4.      During my doctoral program, I worked on multiple federally funded research projects, one focused on serial sexual perpetration (National Institute of Justice, U.S. Department of Justice Grant Number 2014-NE-BSX-0006; PI R. Campbell) and another on victim/survivor experiences related to the untested sexual assault kit (SAK) backlog in Detroit, MI (Office of Violence Against Women Grant Number 2018-SE-AX-0001; PI R. Campbell). I also worked as a program evaluator for the for the Michigan Coalition to End Domestic and Sexual Violence (MCEDSV), contributing to the evaluation of the Centers for Disease Control and Prevention

funded Domestic Violence Prevention Enhancement and Leadership Through Alliances (DELTA) FOCUS (2015 – 2018) and IMPACT (2018 – 2020) projects.

5.      In my position at Wichita State University, I teach undergraduate courses on research methods (PSY 311), and graduate courses on program evaluation (PSY 941), cultural diversity (PSY 912), and community practicum (PSY 944). While pursuing my doctorate at Michigan State University, I taught undergraduate courses on prevention of and interventions related to sexual assault (PSY 317), gender-based violence across the lifespan (PSY 318), and human services fieldwork in the community (PSY 381).

6.      I conduct quantitative and qualitative research on topics including serial sexual perpetration, victim/survivor experiences after sexual assault, victim/survivor reasons for non-reporting, and advocacy, criminal-legal, and medical responses to sexual assault.

7.      I have served as a peer reviewer for scientific research journals, including but not limited to *Journal of Investigative Psychology and Offender Profiling*, *Journal of Interpersonal Violence*, *Trauma, Violence, & Abuse*, *Violence and Victims*, and *Violence Against Women.*

8.      My research has been published in peer-reviewed journals, including but not limited to *Psychological Trauma: Theory, Research, Practice, and Policy*, *Psychology of Violence*, *Journal of Criminal Justice, Psychology of Women Quarterly*, and *Victims & Offenders.* I have presented my research at various academic conferences and scientific meetings, including those held by the American Association of Forensic Sciences and the American Psychological Association.

9.      My curriculum vitae is attached. This document includes a true record of my academic and community work.

10.     I was approached by counsel for the defendants in this case and asked to summarize the available research literature and provide my professional opinion related to the underreporting of sexual assault, attrition of sexual assault cases through the criminal legal system, how underreporting and attrition affects what can be known about serial sexual perpetration based on criminal history data, and what recent DNA testing of previously untested SAKs has contributed to understandings of serial sexual perpetration.

11.     The purpose of this report is the provide an overview of the scientific literature and my professional opinion on the topics listed above.

## EXECUTIVE SUMMARY

12.     As I review in the sections below, my research and the research of others who focus on sexual assault victimization and perpetration finds that:

> Sexual assault is pervasive; national studies indicate that approximately one in five women and one in thirty-three men experience attempted or completed rape at some point in their lives.

> Sexual assault victims have a history of being treated poorly by the criminal legal system (and society as a whole) when they report their assaults to police, with some victims describing experiences so painful that they consider them to be a "second rape."

> Largely due to fears about how they will be treated if they report the assault and skepticism about the likelihood of positive outcomes, the vast majority of victims (between 75% – 85%) do not report their sexual assaults to police.

➢ These concerns are well-founded; research has consistently found that for decades, sexual assault cases were routinely closed with minimal investigative work and most cases are not referred by police to prosecutors.

➢ Attrition throughout the criminal legal system means that few reported sexual assaults (approximately 6.5% - 14.0%) end in a conviction.

➢ Many of the cases that do end in a conviction reach that verdict through a plea bargain, meaning that the offender's criminal history record may not reflect the sex crime for which they were originally reported.

➢ Collectively, these patterns of underreporting and case attrition limit the conclusions that can be drawn about serial sexual offending from criminal history records alone.

➢ More specifically, estimates of serial sexual perpetration that rely solely on criminal history records are likely to substantially underestimate serial sexual offending.

➢ Incorporating DNA linkages as indicators of serial sexual perpetration can mitigate the limitations of criminal history records and provide a fuller picture of serial sexual offending.

➢ Research that incorporates DNA linkages as an indicator of serial sexual perpetration has found substantially higher rates of serial sexual perpetration than research that relies solely on criminal history records. More specifically, research that includes DNA linkages has found serial offending rates of 35% - 39%.

➢ Based on this research, I conclude that rates of serial sexual offending based solely on criminal history records substantially underestimate the frequency of

serial sexual offending. Research that includes DNA evidence indicates that serial sexual offending is much more common than research based solely on criminal history records would suggest.

## PREVALENCE OF SEXUAL ASSAULT AND SOCIETAL TREATMENT OF SEXUAL ASSAULT VICTIMS

13.     Sexual assault is pervasive. National studies estimate that approximately one in five women and one in thirty-three men experience rape or attempted rape at some point in their lives.[1] When considering contact sexual violence more broadly (rather than solely penetration-based offenses), rates of lifetime victimization exceed one in three among women[2,3] and reach approximately one in four among men.[4]

14.     Despite its frequency, victims of sexual assault have historically been treated with disbelief and disdain. Since the 1980's, social scientists have criticized the criminal legal response to sexual assault as one based on rape myths and stereotypes, creating a system in which the vast majority of perpetrators are never held accountable.[5,6]

15.     These critiques led to a rape reform movement that tried to improve the likelihood of victims finding justice through the criminal legal system, but many of the changes have since been recognized as ineffective and having created little meaningful change.[7,8] In the past four

---

[1] Smith, S.G., Zhang, X., Basile, K.C., Merrick, M.T., Wang, J., Kresnow, M.J., Chen, J. (2018). *The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief—Updated Release.* Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

[2] Breiding, M.J., Chen, J., & Black, M.C. (2014). *Intimate Partner Violence in the United States—2010.* Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

[3] See note 1 above

[4] See note 1 above

[5] Estrich, S. (1987). *Real rape.* Harvard University Press.

[6] Horvath, M.A.H, & Brown, J.M. (Eds.) (2023). *Rape: Challenging contemporary thinking – 10 years on.* Routledge.

[7] Spohn, C., (2020). Sexual assault case processing: The more things change, the more they stay the same. *International Journal for Crime, Justice, and Social Democracy, 9*(1), 86 – 94.

[8] Jordan, J. (2011). Here we go round the review-go-round: Rape investigation and prosecution—are things getting worse not better? *Journal of Sexual Aggression, 17*(3), 234 – 249.

decades, a plethora of research has demonstrated that sexual assault victims are frequently blamed and not believed when they report their assaults to police.[9,10] The treatment many sexual assault victims experience when reporting their assaults is recognized as so harmful that it has come to be known as "secondary victimization" or "the second rape".[11,12] In light of the treatment described above, it should not be surprising that the vast majority of sexual assault victims do not report their rapes to police. This issue will be discussed in depth below.

## UNDERREPORTING OF SEXUAL ASSAULT AND CASE ATTRITION THROUGH THE CRIMINAL LEGAL SYSTEM

16.     Sexual assault is reported less often than any other violent crime. The National Crime Victimization Survey (NCVS), for example, found that approximately 50% of violent victimizations were reported to police in 2011. Sexual assaults were the least frequently reported of all these violent crimes, with NCVS data showing that only approximately 25% of sexual assault victimizations were reported to the police.[13,14] Research surveys that situate their questions in the context of health, rather than crime, have found even lower rates of police reporting, ranging from 5% – 15%.[15,16,17] Collectively, these findings indicate that **the criminal**

[9] Spohn, C., & Tellis, K. (2014). *Policing and Prosecuting Sexual Assault: Inside the Criminal Justice System.* Boulder: Lynne Rienner Publishers.

[10] Shaw, J., Campbell, R., Cain, D., & Feeney, H. (2017). Beyond surveys and scales: How rape myths manifest in sexual assault police records. *Psychology of Violence, 7*(4), 602 – 614.

[11] Williams, J.E., (1984). Secondary victimization: Confronting public attitudes about rape. *Victimology, 9*(1), 66 – 81.

[12] Madigan, L., & Gamble, N. (1991). *The second rape: Society's continued betrayal of the victim.* New York: Macmillan.

[13] Truman, J.L., & Planty, M. (2012). *Criminal Victimization, 2011.* U.S. Department of Justice.

[14] Morgan, R.E., & Oudekerk, B.A. (2019). *Criminal victimization, 2018* (NCJ 253043). Bureau of Justice Statistics. https://www.bjs.gov/content/pub/pdf/cv18.pdf

[15] Wolitzky-Taylor, K.B., Resnick, J.L., Amstander, A.B., Kilpatrick, D.G., & Ruggiero, K.J. (2011). Is reporting of rape on the rise? A comparison of women with reported versus unreported experiences in the National Women's Study-Replication. *Journal of Interpersonal Violence, 26*(4). 807 – 832.

[16] Kilpatrick, D.G., Resnick, H.S., Ruggiero, K.J., Conoscenti, L.M., & McCauley, J. (2007). *Drug-facilitated, incapacitated, and forcible rape: A national study.* Charleston, SCS: National Criminal Justice Reference Service.

[17] Fisher, B.S., Daigle, L.E., Cullen, F.T., & Turner, M.G., (2003). Reporting sexual

**legal system is only made aware of a fraction of the total number of sexual assaults perpetrated.** Not only do these low levels of reporting mean that victims have no chance of finding justice through the criminal legal system, but it also means that many perpetrators can offend, potentially repeatedly, without being brought to the attention of law enforcement.

17.     There is a large body of literature that has examined the reasons why victims choose not to report their assaults to police. Common reasons include the fear that people will blame them for the assault,[18,19] fear of harm or retaliation,[20,21] and the belief that their report will not be meaningfully addressed by the criminal legal system.[22,23] My recent research has explored reasons for non-reporting specifically among victims who have medical forensic exams completed shortly after the assault but choose not to report their assaults to law enforcement at that time. Two of the themes that were identified through that research were "Reporting Won't Help" and "Reporting Will Harm," illustrating that even among victims who seek help from formal systems, many believe that participating in the criminal legal system will not benefit them, at best, and will actively harm them, at worst.[24,25] Unfortunately, victims' instincts that their cases will not progress through the criminal legal system are often correct, as most sexual assault cases that are reported to the criminal legal system receive minimal attention.[26]

---

[18] See note 12 above

[19] Jones, J.S., Alexander, C., Wynn, B.N., Rossman, L., & Dunnuck, C. (2009). Why women don't report sexual assault to the police: The influence of psychosocial variables and traumatic injury. *The Journal of Emergency Medicine, 36*(4), 417-424.

[20] See note 12 above

[21] Zweig, J.M., Newmark, L., Raja, D., & Denver, M. (2014). *Sexual assault medical forensic exams and VAWA 2005: Payment practices, successes, and directions for the future.* U.S. Department of Justice.

[22] See 12 above

[23] See note 17 above

[24] Goodman-Williams, R., & Volz, J. (2022). *Saving evidence: Understanding non-reporting when sexual assault evidence is collected.* [Conference Presentation]. Society for the Psychological Study of Social Issues Annual Conference, San Juan, Puerto Rico, United States.

[25] Volz, J., & Goodman-Williams, R. (2023). *Who doesn't report? Understanding how victim, offender, and assault characteristics relate to stated reasons for not reporting sexual assault to the police.* [Conference Presentation]. American Academy of Forensic Sciences Annual Meeting, Orlando, Florida, United States.

[26] See note 6 above

18.     Case attrition occurs at every step of the criminal legal process, starting with insufficient investigation of reported sexual assaults. While law enforcement officers are expected to investigate all reports, the thoroughness of those investigations varies widely, and research has consistently found that many cases are closed with little to no meaningful investigative work.[27] Research analyzing police officer documentation of reported sexual assaults has found extensive evidence of rape myths, indicating that victims' reports were routinely compared to stereotypes of what "real rape" or "real victims" should look like and dismissed when they or their experiences did not measure up.[28]

19.     Even when law enforcement officers are committed to carrying out a thorough investigation, there are unique barriers to achieving justice for sexual assault victims through the criminal legal system. Other crimes, such as murder, robbery, and aggravated assault, do not routinely face a "consent defense," in which the alleged perpetrator argues that the potentially criminal act occurred but was in fact not criminal because the complainant agreed to the act at that time.[29] Unless a victim is incapable of giving consent via an indisputable characteristic, such as age, the consent defense is routinely used by alleged offenders if they are questioned by police or taken to trial.[30] The appeal of this defense is understandable when one considers how difficult it is to disprove. Sexual acts typically take place in private, meaning the only two witnesses to the event are the complainant and the alleged perpetrator. In the context of an "innocent until proven guilty" legal system, how do you prove beyond a reasonable doubt that you did not agree

---

[27] See note 6 above

[28] Shaw, J., Campbell, R., Cain, D., & Feeney, H. (2016). Beyond surveys and scales: How rape myths manifest in sexual assault police records. *Psychology of Violence, 7*(4), 602 – 614.

[29] This double standard is parodied in the 1975 short story *The Rape of Mr. Smith*, in which a mugging victim, Mr. Smith, is grilled by the defense attorney, who asks him questions such as "Did you struggle with the robber?" and "Have you ever GIVEN money away?" See "The Legal Bias Against Rape Victims (The Rape of Mr. Smith)" written by Connie K. Borkenhagen and published in the American Bar Association Journal.

[30] Archambault, J., & Faugno, D. (2001). Overcoming a consent defense to sexual assault. *Journal of Emergency Nursing, 27*(2), 204 – 208.

to do something? Whereas many jurisdictions presume lack of consent when it comes to property crimes, such a standard is not extended to sexual crimes, which makes them a great deal harder to prove in a court of law.[31]

20.    Arrest rates, too, indicate how few sexual assaults move forward through the criminal legal process. FBI data indicates that in 2006, less than 40% of forcible rapes were cleared by arrest or exceptional means.[32] While clearance due to "exceptional means" is supposed to indicate that law enforcement were unable to clear a case by arrest due to factors outside of their control, research has routinely shown that clearance through exceptional means is overused, particularly in sexual assault cases, to close out cases that law enforcement officers do not think will succeed in court.[33] Accordingly, data that disaggregate clearance by arrest from clearance by exceptional means paint an even more dismal picture of sexual assault case attrition. Three such data sources have found sexual assault arrest rates of 12.2%[34], 18.8%[35], and 33.9%.[36] This means that of the already few sexual assaults that are reported compared to the number experienced, suspects are only arrested in 12.2% – 33.9% of cases, with the remaining 66% – 88% of reported sexual assaults not even passing through this first step in the criminal legal system.

21.    The investigative phase is recognized as the most extreme point of attrition, but it remains an obstacle farther downstream in the criminal legal process, as well. Most cases are not

---

[31] Hilgert, N. (2016). The burden of consent: Due process and the emerging adoption of the affirmative consent standard in sexual assault laws. Arizona Law Review, *58*(3), 867 – 899.

[32] Federal Bureau of Investigation. (2006). *Crime in the United States.* Washington, D.C.: U.S. Department of Justice.

[33] Spohn, C., & Tellis, K. (2012). *Policing and prosecuting sexual assault in Los Angeles city and county: A collaborative study in partnership with the Los Angeles Police Department, the Los Angeles Sheriff's Department, and the Los Angeles County District Attorney's Office.* Department of Justice.

[34] Ibid

[35] Morabito, M.S., Williams, L.M., & Pattavina, A. (2019). *Decision Making in Sexual Assault Cases: Replication Research on Sexual Violence Case Attrition in the U.S.* National Criminal Justice Reference Service.

[36] See note 34 above

referred by police to prosecutors, but even of those that are so referred, filing of charges is far from guaranteed. Research conducted in Los Angeles, California, found that the likelihood of charges being filed in cases where an arrest had been made ranged from 66% to 82%[37],[38]. Interestingly, the lowest charge rate (66.0%) was from the Los Angeles Sheriff's Department, which had the highest arrest rate (33.9%); conversely, the highest charge rate (82.2%) was from the Los Angeles Police Department, which also had the lowest arrest rate (12.2%). Taken together, these statistics indicate that all the jurisdictions studied have paths through which they weed out "weak" cases. For some, more cases are screened out at investigation and fewer referred to prosecutors and for others it is the reverse, but all jurisdictions studied have a process through which the vast majority of sexual assault reports are never brought to trial. In these same jurisdictions, between 53.4% and 78.1% of cases for which prosecutors brought charges ended in a conviction.

22.     When considering the process as a whole, these statistics make clear how few reported rapes end in a conviction. In Spohn and Tellis' (2012) analysis, 7.7% of sexual assaults reported to the Los Angeles Police Department ended in conviction. For the Los Angeles Sheriff's Department the rate was slightly better, but still a dispiriting 14.0%. Morabito et al.'s (2019) study that sought to replicate and extend Spohn and Tellis' (2012) findings by purposively sampling six diverse jurisdictions across the country found that only 6.5% of reported sexual assaults ended in a conviction. In individual cases, Morabito's findings mean that **across six United States jurisdictions in which 2,887 reports of sexual assault were made, 189 of them resulted in a conviction and 2,698 did not.**

---

[37] See note 33 above
[38] See note 35 above

## IMPLICATIONS OF UNDERREPORTING AND CASE ATTRITION FOR
## UNDERSTANDING SERIAL SEXUAL PERPETRATION

23.     The extremely high rate of case attrition has implications for societal

understandings of sexual assault, broadly, and understandings of serial sexual perpetration,

specifically. **Broadly, these findings mean that criminal history data are an incredibly**

**inaccurate way to gauge the frequency of sexual offending** that occurs in a given community

or society at large. This is particularly true of data in which the threshold is conviction (as

opposed to arrest or charge). In the data referenced above, collected from six jurisdictions across

the United States, relying on conviction data would indicate that only 189 sexual assaults

occurred across those communities instead of the 2,698 that were reported to police. Utilizing an

arrest threshold provides a fuller picture, but because so many cases are screened out at an

investigative level, even an arrest threshold is woefully insufficient if the goal is to gauge the

occurrence or risk of sexual victimization or perpetration in a community.

24.     These reporting and case attrition data also mean that **serial sexual perpetration**

**studies that rely on criminal legal data are drawing conclusions based on only a small**

**portion of all sexual assaults.** Again, this is particularly true of studies that rely on a conviction

threshold. Such studies would define someone as a serial sexual perpetrator only if they had been

convicted for two unique sex offenses, requiring that victims in both cases make a police report,

both cases be thoroughly investigated, both cases result in the suspect being arrested, charges

brought, and conviction attained. Even at the arrest or charge threshold, two cases would have to

get farther in the criminal legal process than is true for the majority of reported sexual assaults in

order for an offender's serial sexual perpetration to be recognized.

25.     Some could argue that undetected sexual offending does not inherently mean

higher rates of undetected *serial* sexual offending, as each undetected sexual offense could be

committed by a unique, first-time perpetrator. This is certainly possible, but it would be unlikely for underreporting and case attrition not to distort our view of serial sexual perpetration. **Because most reported sexual assaults do not progress through the criminal legal system, a definition of serial sexual perpetration that requires multiple such progressions makes it less likely that we will identify serial sexual perpetration when it occurs.**

26.     As an example, let's consider a sexual offender who committed two sexual assaults, both of which were reported to police. The lowest threshold of serial sexual offending used in research based on criminal history data is arrest, so for this thought experiment we will define serial sexual offending as having been arrested for two sexual assaults. Based on the data discussed in the previous section, we can estimate the probability of a reported sexual assault resulting in an arrest at approximately 20% (slightly higher than the 18.8% found in the six jurisdictions studied by Morabito).[39] This probability can be thought of through the lens of a five-sided dice, with a roll of "one" representing the outcome in which a reported sexual assault results in arrest and rolls of two, three, four, or five representing outcomes in which the reported assault that does not result in arrest. While the probability of rolling one "one" is 1/5, the probability of rolling two "ones" is 1/25. All possible combinations are represented below, with the single combination indicated by rolling a "one" twice shaded grey.

**Die #2**

|  |  | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| | **1** | (1 , 1) | (1 , 2) | (1 , 3) | (1 , 4) | (1 , 5) |
| **Die #1** | **2** | (2 , 1) | (2 , 2) | (2 , 3) | (2 , 4) | (1 , 5) |
| | **3** | (3 , 1) | (3 , 2) | (3 , 3) | (3 , 4) | (1 , 5) |
| | **4** | (4 , 1) | (4 , 2) | (4 , 3) | (4 , 4) | (1 , 5) |
| | **5** | (5 , 1) | (5 , 2) | (5 , 3) | (4 , 4) | (1 , 5) |

---

[39] See note 35 above

27.     Applying these probabilities to serial sexual assault would lead to the table below, in which dice roll values are replaced by "Yes" to symbolize instances in which a reported sexual assault results in arrest and "No" to symbolize instances in which the reported sexual assault does not result in arrest. The interior cells of the table show the combination of arrest outcomes, with only the uppermost left cell indicating an instance in which two reported sexual assaults both results in arrest.

**Arrest for Assault 2**

|  | **Yes** | **No** | **No** | **No** | **No** |
|---|---|---|---|---|---|
| **Yes** | Yes/Yes | Yes/No | Yes/No | Yes/No | Yes/No |
| **No** | No/Yes | No/No | No/No | No/No | No/No |
| **No** | No/Yes | No/No | No/No | No/No | No/No |
| **No** | No/Yes | No/No | No/No | No/No | No/No |
| **No** | No/Yes | No/No | No/No | No/No | No/No |

(Arrest for Assault 1)

28.     In the case of a reported sexual assault resulting in arrest, however, it is likely inaccurate to treat these outcomes as independent (i.e., presuming that the second outcome is unaffected by the first outcome). If an offender is arrested for a first sexual assault, a second sexual assault report against that same person would likely be taken more seriously and investigated more thoroughly by the criminal legal system. There is no data, to my knowledge, on conditional arrest rates (i.e., the probability of a second report for sexual assault resulting in an arrest if the individual has been arrested for a previous sexual assault), so for the sake of argument let's suppose that it is 100%--that is to say, if someone commits two assaults, and they were arrested for the first one, we will suppose that they will always be arrested for the second. This is a standard unlikely to be met, but it should demonstrate criminal history records' best

ability to identify serial sexual offending. Three new outcomes are depicted in the table below: "Yes," to indicate the 20% probability that a reported sexual assault results in an arrest, "No," to indicate the 80% probability that a reported sexual assault does not result in arrest, and "Yes if" to indicate the agreed upon condition in which all reports of sexual assault result in an arrest if the alleged perpetrator has been arrested for a sexual assault previously. Again, the interior cells of the table show the combination of arrest outcomes.

**Arrest for Assault 2 (with hypothetical conditional probabilities)**

| | | Yes | Yes only if previously arrested | Yes only if previously arrested | Yes only if previously arrested | Yes only if previously arrested |
|---|---|---|---|---|---|---|
| **Arrest for Assault 1** | Yes | Yes/Yes | Yes/Yes if | Yes/Yes if | Yes/Yes if | Yes/Yes if |
| | No | No/Yes | No/No | No/No | No/No | No/No |
| | No | No/Yes | No/No | No/No | No/No | No/No |
| | No | No/Yes | No/No | No/No | No/No | No/No |
| | No | No/Yes | No/No | No/No | No/No | No/No |

29. Because an analysis relying on this hypothetical data would not identify the offender as a serial sexual offender unless there were two or more arrests for sexual assault, 80% of outcome combinations would lead to the incorrect conclusion that this offender was not a serial sexual offender. In terms of the ability of criminal history data to identify serial sexual offending, the outcome combinations that do not indicate serial sexual offending even though two assaults did occur can be thought of as the data source's "false negative" rate (i.e., the probability that the data source will not show serial sexual perpetration when, in reality, the offender did perpetrate multiple sexual assaults). The following table illustrates the ability of the data to correctly identify serial offending when it occurs based on the usual 20% arrest rate and

agreed upon 100% arrest rate for a second sexual assault after a first sexual assault arrest, as

discussed. False negatives are denoted with a grey background.

**Arrest for Assault 2 (with hypothetical conditional probabilities)**

| | | Yes | Yes only if previously arrested | Yes only if previously arrested | Yes only if previously arrested | Yes only if previously arrested |
|---|---|---|---|---|---|---|
| | **Yes** | Serial (Correct) | Serial (Correct) | Serial (Correct) | Serial (Correct) | Serial (Correct) |
| | **No** | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) |
| | **No** | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) |
| | **No** | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) |
| | **No** | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) | Non-Serial (Incorrect) |

*Arrest for Assault 1* (label on left side of table)

30.     Although an estimated 80% false negative rate is disheartening enough, the true

rate is likely much worse. All of these estimates are based only on *reported* sexual assaults and

as was discussed previously, at least 75% of sexual assaults are not reported to police.

Additionally, serial sexual perpetration estimates that rely on conviction, rather than arrest,

would miss even more instances of serial sexual perpetration than is true of the estimates above.

This is due not only to the attrition in later stages of the criminal legal process, but also due to

the effect that plea bargains can have on identification of serial sexual offending. Many offenders

convicted in response to a reported sexual assault may be convicted of something substantially

different than the crime they were accused of committing. While this occurs across the criminal

legal system, it is especially true for sexual assault and domestic violence cases.[40,41] Of the 189

convictions that came out of the 2,887 sexual assaults reported across six United States

jurisdictions discussed previously, 152 (81%) of those convictions were the result of a plea

bargain.[42] Plea bargains are often particularly appealing to alleged sexual offenders when they

are offered the opportunity to plead guilty to a lesser charge that is not sexual in nature, thereby

avoiding registering as a sex offender. If offenders plead guilty to a non-sexual crime, serial

perpetration data that relies on conviction as the offense threshold would not incorporate those

crimes into rates of serial sexual perpetration.

  31. A final consideration in this discussion is the possibility of a false positive for

serial sexual offending, which would mean instances in which criminal history data lead to the

conclusion that someone is a serial sexual offender when, in fact, they are not. The simplest

reason that this has not been discussed in-depth is that research has consistently shown that rates

of falsely reporting sexual assault to police are quite low—approximately 5%.[43,44] Furthermore,

the practical purpose of the steps that have been discussed thus far—from the police officer's

decision of whether to thoroughly investigate, to their decision of whether or not to arrest, to the

prosecutor's decision of whether or not to charge, to a judge or jury's decision regarding whether

or not to convict—is to ensure that alleged perpetrators are only brought to court and potentially

held accountable for sexual assaults in which there is exceedingly strong evidence against them.

It is certainly possible that individuals who have not, in fact, perpetrated the sexual assault they

---

[40] See note 32 above

[41] Lovell, R., Flannery, D.J., & Luminais, M. Lessons learned: Serial sex offenders identified from backlogged sexual assault kits (SAKs). In A.T. Vazsonyi, D.J. Flannery, & M. DeLisi (Eds.), *The Cambridge handbook of violent behavior and aggression (2nd ed.)* (pp. 399 – 417). Cambridge University Press.

[42] See note 35 above

[43] Spohn, C., White, C., & Tellis, K. (2014). Unfounding sexual assault: Examining the decision to unfound and identifying false reports. *Law & Society Review, 48*(1), 161 - 192.

[44] De Zutter, A., Horselenberg, R., & van Koppen, P.J. (2017). The prevalence of false allegations of rape in the United States from 2006 – 2010. *Journal of Forensic Psychology, 2*(2), 119 – 123.

are accused of are wrongly investigated, arrested, charged, and brought to trial, but the criminal legal system is designed to minimize that possibility and there is no evidence that it is systematically failing in that regard. There is, however, a plethora of evidence that the criminal legal system is systematically failing to adequately investigate, arrest, prosecute, and convict sexual assaults.

32.     The orientation of the United States criminal legal system to minimize false positives at the expense of false negatives is by design—informed by British Common Law ("better that ten guilty persons escape, than that one innocent suffer")[45] and later codified by the U.S. Supreme Court ("better to let the crime of a guilty person go unpunished than to condemn the innocent").[46] Most Americans agree that this orientation is preferable to the alternative, in which a greater number of innocent people would be held responsible for crimes they did not commit.[47] **However, while the criminal legal system's acceptance of a high rate of false positives may be preferable to the alternative, it seriously undermines its validity as a data source from which to draw conclusions about the frequency of serial sexual offending.**

### SELF-REPORTED PERPETRATION BEHAVIOR AS AN ALTERNATIVE TO CRIMINAL HISTORY RECORDS AS THE SOLE INDICATOR OF SEXUAL OFFENDING

33.     There is no perfect alternative to using criminal history records as an indicator of serial sexual offending, but it is nevertheless worthwhile to consider the alternatives that exist and how these indicators can collectively inform our understanding.

---

[45] Blackstone, W. (1765). *Commentaries on the laws of England*. Clarendon Press.
[46] *Coffin v. United States,* 156 U.S. 432 (1985).
[47] Ekins, E. (2016). *Policing in America: Understanding public attitudes toward police. Results from a national survey.* Cato Institute. Retrieved from  https://www.cato.org/sites/cato.org/files/survey-reports/pdf/policing-in-america-august-1-2017.pdf.

34.     There has been some research in the past four decades focused on measuring *undetected* serial sexual offending, that is to say, serial sexual offending for which the offender was never arrested, charged, or convicted. These studies have typically used anonymous self-report surveys, in which male samples are asked whether they have engaged in behaviors that meet legal definitions of sexual assault over the course of their lifetimes or across specific time periods.

35.     Two such studies were carried out with samples of sex offenders who were incarcerated or in sex offender treatment. In the first, 83 convicted rapists and 54 convicted child molesters filled out an anonymous questionnaire about their history of sex offenses.[48] Approximately 81% of the incarcerated respondents whose detected offense was rape and 49% of the respondents in the rehabilitation program whose detected offense was rape disclosed undetected rapes, disclosing an average of 5.2 rapes and 4.2 rapes, respectively. Respondents who were incarcerated for child molestation disclosed, on average, having victimized an additional 6.0 children, and respondents who were in the treatment program for child molestation disclosed having molested an additional 3.4 undetected child victims. It should be noted that these means were calculated *after* the study authors had excluded 7% of the offenders (6 child molesters and 3 rapists) who had an unusually high number of undetected offenses (50 or more), so as not to artificially inflate the means. A similar study conducted approximately ten years later found that their sample of 37 men convicted of rape had been arrested a total of 52 times and charged with 66 sex offenses, with a mean number of 1.8 detected victims per offender. When undetected offenses were included (i.e., rapes self-reported by men in the sample that they had never been caught for), this total increased to 433 total rapes across the 37 men, with a mean of

---

[48] Growth, A.N., Longo, R.E., & McFadin, J.B. (1982). Undetected recidivism among rapists and child molesters. *Crime & Delinquency, 28*(3)*, 450 – 458.

11.7 victims and a median of 6 victims each.[49] Based on some of the characteristics shared in the studies (specifically, that the majority of offenders in the first study had been convicted more than once and the offenders in the second study were recruited from a sex offender treatment program at a medical hospital), these were likely particularly high risk offenders, and their rates of undetected offending should not be assumed to be generalizable to sex offenders more broadly. **What *can* be fairly taken away from these studies, however, is confirmation that the criminal legal system detects only a fraction of the offenses committed by sexual offenders.**

36.     Two additional studies worth noting were carried out with general population samples, that is to say samples in which participants were identified not based on having perpetrated detected or undetected sexual offenses. The first of these, which surveyed 1,882 male students at an urban commuter university, found that 6.4% of respondents disclosed having carried out behavior that met approximate legal definitions of attempted or completed rape. Nearly two-thirds of those perpetrators ($n = 76$, 63.3%) reported perpetrating multiple rapes. A total of 439 rapes were disclosed by these 76 repeat rapists, for a mean of 5.8 rapes each ($SD = 7.7$; median = 3).[50] The second study, which sampled 1,146 newly enlisted Navy personnel, found that 13% of those sampled reported carrying out behavior that met approximate legal definitions of completed or attempted rape. Among those who admitted to perpetrating completed or attempted rape, 71% ($n = 96$) reported perpetrating multiple incidents of rape, with a mean of 6.36 rapes per repeat perpetrator ($SD = 9.55$).[51] **Considering these two general**

---

[49] Weinrott, M.R., & Saylor, M. (1991). Self-report of crimes committed by sex offenders. *Journal of Interpersonal Violence, 6*(3), 286 – 300.

[50] Lisak, D., & Miller, P.M. (2002). Repeat rape and multiple offending among undetected rapists. *Violence and Victims, 17*(1), 73 – 84.

[51] McWhorter, S.K., Sander, V.A., Merrill, L.L., Thomsen, C.J., & Milner, J.S. (2009). Reports of rape reperpetration by newly enlisted male navy personnel. *Violence and Victims, 24*(2), 204 – 218.

**population studies in tandem, it appears that among men who commit sexual assault, men who commit a single assault are in the minority.** What's more, when considering the self-report sexual perpetration literature as a whole, it appears that when people who perpetrate sexual assault (whether incarcerated, in sex offender treatment, or in the community at large) are given the opportunity to disclose the full range of their sexual perpetration behaviors with no legal repercussions, most disclose a great many more sexual assault perpetrations than they have ever had to criminally take responsibility for.

### DNA LINKAGES AS AN ALTERNATIVE TO CRIMINAL HISTORY RECORDS AS THE SOLE INDICATOR OF SEXUAL OFFENDING

37.     An additional option for identifying and measuring serial sexual perpetration is establishing DNA matches across sexual offenses. This process requires an understanding of how DNA is collected in the aftermath of a sexual assault, and so I will briefly explain that process before reviewing how such DNA informs knowledge of serial sexual offending.

38.     After a sexual assault, victims are routinely encouraged to seek out a medical forensic exam (MFE). The MFE as a whole includes examination of physical trauma, documentation of signs of penetration or force, interviewing the patient, and collecting evidence. Having an MFE conducted post-assault is routinely described as an emotionally difficult, even retraumatizing, experience for sexual assault victims,[52] which helps explains why only 21% - 38% of victims seek such care in the aftermath of an assault.[53,54,55] Physical and/or biological

---

[52] Campbell, R., Wasco, S.M., Ahrens, C.E., Sefl, T., & Barnes, H.E. (2001). Preventing the "second rape": Rape survivors' experiences with community service providers. *Journal of Interpersonal Violence, 16,* 1239 – 1259.
[53] Amstadter, A.B., McCauley, J.L., Ruggiero, K.J., Resnick, H.S., & Kilpatrick, D.G> (2008). Service utilization and helpseeking in a national sample of female rape victims. *Psychiatric Services, 59,* 1450 – 1457.
[54] Ullman, S.E., & Lorenz, K. (2020). Correlates of African American sexual assault survivors' medical care seeking. *Women and Health, 60,* 502 – 516.
[55] Zinzow, H.M., Resnick, H.S., Barr, S.C., Danielson, C.K., & Kilpatrick, D.G> (2012). Receipt of post-rape medical care in a national sample of female victims. *American Journal of Preventative Medicine, 43,* 183 – 187.

evidence left behind by the perpetrator (e.g., saliva, semen) is collected is stored in a sexual

assault kit (SAK), which can be sent to a forensic lab for DNA testing and analysis, and used to

support a law enforcement investigation.

39.     In the late 2000's and early 2010's, however, it became apparent that many

jurisdictions across the United States had not been submitting SAKs for testing and had instead

been storing them in warehouses or other large storage facilities, untested and largely forgotten.[56]

It is estimated that the national total of previously unsubmitted SAKs is somewhere between

300,000 and 400,000.[57] What's more, as of 2010, approximately 18% of unsolved sexual assault

cases were believed to contain forensic evidence that was never submitted to a crime lab for

DNA testing.[58] As jurisdictions have started submitting and testing their previously untested

SAKs, the DNA linkages they've produced have been another source of information about serial

sexual perpetration.

40.     The first step in SAK testing is that it be screened for biological evidence that can

then be analyzed for DNA. If a DNA profile is found that is of sufficient quality (i.e., that has the

requisite number of core loci for that specimen type) and there is reasonable belief that the

sample is from the person who committed the crime, the DNA profile can be uploaded into the

federal criminal DNA database, CODIS (Combined DNA Index System), where it can be

searched against other DNA profiles. CODIS has two indexing systems that are used in this

search: the offender index, which contains known DNA profiles from arrested or convicted

offenders who committed a CODIS-eligible offense, and the forensic index, which contains

---

[56] Reilly, S. (2015, July 16). Tens of thousands of rape kits go untested across. USA. *USA Today.* Retrieved from http://www.usatoday.com/story/news/2015/07/16/untested-rape-kits-evidence-across-usa/29902199/

[57] Strom, K., Scott, T., Feeney, H., Young, A., Couzens, L., & Berzofsky, M. (2021). How much justice is denied? An estimate of unsubmitted sexual assault kits in the Untied States. *Journal of Criminal Justice, 73,* 1 – 9.

[58] Strom, K.J., & Hickman, M.J. (2010). Unanalyzed evidence in law-enforcement agencies: A national examination of forensic processing in police departments. *Criminology & Public Policy, 9*(2), 381 – 404.

unknown DNA profiles obtained at crime scenes or obtained from crime scene evidence, including SAKs. CODIS linkages, known as "hits," to these indexing systems, are called "offender hits" and "forensic hits," respectively. When a large number of SAKs are tested at once, as was the case for many jurisdictions that tested thousands of previously untested SAKs in short succession, DNA profiles from those SAKs can also hit to each other; these linkages are called "case-to-case associations."

41.    These different types of CODIS hits have the potential to communicate different information. When a new DNA profile is entered into CODIS and an "offender hit" occurs, that new DNA profile has hit to a known offender profile already in CODIS. If the SAK was associated with an assault in which the victim did not know the identity of the assailant, an offender hit may provide crucial insight into the identity of the offender. Additionally, because an offender's qualifying offense is entered into the offender index along with their DNA profile, SAK DNA hitting to the offender index can also indicate suspected serial sexual offending if the qualifying index offense was another sexual assault.[59] When a DNA profile is entered into CODIS and a "forensic hit" occurs, the new DNA profile has hit to an unknown DNA profile, and while the hit can therefore not directly resolve the identity of the offender if it is unknown, it can indicate suspected serial sexual offending if the forensic profile it hit to was from another sexual assault or potentially resolve the identity of the offender through connecting law enforcement agencies who may have unique information on the case to each other.

42.    Like criminal history data, data from SAKs will still underestimate serial sexual offending, as the majority of sexual assault victims do not receive post-assault medical care or

---

[59] Because DNA profiles from SAKs are typically not from cases that have been adjudicated when they are entered into CODIS, it is important to recognize that an SAK is not proof in and of itself that a crime occurred. Therefore, these linkages are referred to as instances of *suspected* serial sexual offending.

forensic evidence collection (discussed above), and those are cases in which SAK data cannot be used to produce a DNA profile that could link to other assaults. Additionally, even when the victim does have a SAK collected, the perpetrator may not have left DNA behind or may have left DNA of insufficient quality to qualify for CODIS upload. Research studying an early batch of previously untested SAKs sent for testing in Detroit, Michigan, revealed that approximately half of the SAKs yielded a CODIS-eligible DNA profile.[60] If we estimate that approximately one-in-three sexual assault victims seeks post-assault medical care (an estimate in the upper-middle range of the research discussed above) and that one-in-two SAKs produces a CODIS-eligible DNA profile, then only one-in-six sexual assaults has the potential to be linked to other assaults through CODIS. Still, this data can offer a unique and valuable vantage point from which to explore serial sexual perpetration data, as SAK DNA (at least once it is tested) is not vulnerable to case attrition in the same way as data stemming from arrest, charge, or conviction.

43.     Through a National Institute of Justice research grant (PI: Campbell, NIJ 2014-NE-BX-0006), my colleagues and I analyzed data resulting from the DNA testing of 7,287 previously untested SAKs in Detroit, Michigan.[61] These previously untested SAKs spanned nearly 30 years (1980 – 2009) and were therefore able to offer an extensive period of observation for many offenders. Of the 7,287 SAKs that were submitted for testing and screened for biological evidence, 5,048 were identified as having biological evidence that could be tested for DNA. Approximately 58% of those SAKs (n = 2,938) produced CODIS-eligible DNA profiles

[60] Campbell, R., Fehler-Cabral, G., Pierce, S.J., Sharma, D.B., Bybee, D., Shaw, J., & Feeney, H. (2015). *The Detroit Sexual Assault Kit (SAK) Action Research Project (ARP), final report.* Washington, DC: National Institute of Justice. Retrieved from https://www.ncjrs.gov/pdffiles1/nij/grants248680.pdf

[61] Campbell, R., Pierce, S.J., Sharma, D., Feeney, H., Goodman-Williams, R., & Ma, W. (2019). *Serial sexual assaults: A longitudinal examination of offending patterns using DNA evidence.* Washington, DC: National Institute of Justice. Retrieved from https://www.ojp.gov/pdffiles1/nij/grants/252707.pdf

that could be uploaded into the CODIS database. 1,675 of those SAKs yielded a CODIS hit, and analysis of those CODIS hits produced record of 1,424 unique (i.e., unduplicated) offenders.

44.     From this sample of unique offenders, we sought to determine the percentage who could be identified as suspected serial sexual offenders through CODIS hits. When the CODIS hit was to the offender database and the identity of the offender was therefore known, we were able to (through partnership with our law enforcement colleagues who de-identified the data before sending it to us) obtain their criminal history records to explore what other crimes they had committed. When incorporating criminal history records into our definition of suspected serial sexual offending, we included previous arrests, charges, or convictions in their adult (age 16+) Michigan criminal histories. This process provided two distinct yet overlapping samples: (1) unique perpetrators, $n = 1,424$ and (2) unique and identifiable perpetrators, $n = 1,270$. We used these samples to answer two research questions. The first question was: what proportion of unique perpetrators were associated with two or more sexual assaults through CODIS hits? The second question was: what proportion of unique and identifiable perpetrators (i.e., perpetrators whose criminal history records we could access) were associated with two or more sexual assaults through CODIS and/or their adult criminal history records from the state of Michigan? A depiction of this progression is presented in Figure 1.[62]

---

[62] Figure was created from data and depictions in Campbell, R., Feeney, H., Goodman-Williams, R., Sharma, D.B., & Pierce, S.J. (2019). Connecting the dots: Identifying suspected serial sexual offenders through forensic DNA evidence. *Psychology of Violence, 10*(3), 255 – 267.



*Figure 1.* Forensic testing outcomes and serial sexual perpetration identification from *N* = 7,287 sexual assault kits (SAKs).

45.      **We determined that 35.7% of all unique perpetrators were associated with serial sexual offending based on DNA linkages through CODIS.** Of the 508 serial sexual perpetrators identified, approximately 70% had two sexual assaults documented through CODIS DNA linkages, with the remaining 30% associated with three or more sexual assaults (15.5% three assaults, 6.1% four assaults, 7.9% five or more sexual assaults). The mean number of assaults associated with individuals in the unique perpetrator subsample was 2.64 ($SD$ = 1.37) with a range of 2 to 12 sexual assaults identified per offender through CODIS data alone.  Figure 2, on the next page, illustrates the undetected pattern of offending in one of these cases.

**November, 1993**
Offender sexually assaults a 19 year old woman.
She has a SAK collected but it is not tested.

**December, 1993**
Offender sexually assaults another woman who has
a SAK collected. SAK is not tested.

**December, 1994**
Sexually assaults a 13 year old girl. She has a SAK
collected but it is not tested.

**December, 2001**
Offender sexually assaults another woman who has a SAK
collected. The SAK is tested and uploaded into the CODIS
forensic index, but receives no hits.

**April, 2015**
Previously untested SAKs from Nov. 1993, Dec. 1993, &
Dec. 1994 are tested and uploaded into the CODIS
forensic index. All three SAKs hit to one another and to
the SAK from Dec. 2001, revealing that a single offender
committed all four assaults.

**KEY**
Grey circle = SAK collected but not submitted for testing at time of collection
Black circle = SAK collected and submitted for testing at the time of collection
Black diamond = Previously unsubmitted SAK are tested, matches revealed

*Figure 2.* A case study depicting a unique serial sexual perpetrator identified
through CODIS forensic index hits.

46.     To explore what proportion of offenders are identified as serial sexual perpetrators based on both CODIS DNA linkages and criminal history data, we refocused our attention to the sample of $n = 1{,}270$ unique and identifiable perpetrators (i.e., perpetrators whose adult, Michigan criminal history records we could access).[63]  We received data that delineated each Michigan-based criminal offense according to 449 crime codes. To address our research question, we identified the unique and identifiable perpetrators whose criminal history records had any criminal incident record (arrest, charge, or conviction) for Michigan's Criminal Sexual Conduct codes. For each incident of sexual assault identified in the criminal history records, we compared the offense date to the forensic testing data to ensure that we were not double counting offenses; when the two dates were within 45 days of each other, we considered them to be the same incident. This may have resulted in an underestimate of sexual offending when offenses occurred close together, but it ensured that we did not overestimate sexual offending across the two data sources.

47.     Of the $n = 1{,}424$ unique perpetrators we had identified, $n = 1{,}270$ of them were unique and identifiable perpetrators, meaning that they could be identified from hits the offender index of CODIS and their criminal history records could be obtained. Many of the $n = 508$ unique serial sexual perpetrators were identifiable as well, with $n = 365$ determined to be unique and identifiable serial sexual assault perpetrators based solely on CODIS data.

48.     When criminal history data was incorporated into the analysis, we discovered that many of the offenders had *additional* sexual assault arrests, charges, or convictions. Incorporating these criminal history records into our designations of serial sexual offending

---

[63] Those data were compiled by community partners at Michigan State Police, who assigned a unique, anonymized research ID number to each individual, such that we never had access to perpetrators' names, state-issued ID numbers, or DNA profiles.

increased the number of unique and identifiable serial sexual offenders from $n = 365$ to $n = 504$. In other words, **when considering both CODIS data and criminal history records, $n = 504$ (39.7%) of the 1,270 unique and identifiable perpetrators were identified as suspected serial sexual offenders.** When both CODIS data and criminal history records were considered, these 504 perpetrators committed an average of over three assaults ($M = 3.27$, $SD = 2.02$) with a range of 2 to 15 sexual assaults. When both data sources were considered, less than half of this sample (49.4%) was associated with only two assaults, nearly a quarter more were (24.8%) associated with three, and the remaining quarter were associated with four or more assaults (10.1% four assaults, 4.4% five assaults, 3.6% six assaults, 7.7% seven assaults or more).

49.     There is relatively little research published on serial sexual offending with CODIS data, but it is worth noting that another such study found similar results. Rachel Lovell's research team analyzed data associated with $n = 1,132$ previously untested SAKs out of Cuyahoga County, Ohio, and (similar to our sample of unique and identifiable perpetrators) were able to locate criminal history for a $n = 801$ of them. When considering both CODIS hit data and criminal history records, they found that 39.2% were associated with two or more sexual offenses and could be considered suspected serial sexual perpetrators.[64]

50.     Findings from these studies underscore the weakness of criminal history data as a sole indicator of serial sexual offending. **Whereas findings from recidivism studies typically estimate that 8% – 15% of sexual offenders recidivate, findings that incorporate CODIS data indicate that approximately 40% of sexual offenders sexually assault multiple victims.**

---

[64] Lovell, R., Dover, T., Williamson, A., Keel, T., & Overman, L. (2022, March 15 – 19). *Rethinking estimates of sexual recidivism: How the national sexual assault kit initiative (SAKI) is changing our understanding of repeat sexual offending.* [Conference presentation]. Academy of Criminal Justice Sciences 59th Annual Meeting, Las Vegas, Nevada, United States.

Based on the limited vantage point held by recidivism studies that rely solely on criminal history records, they are likely to substantially overestimate desistance among sexual offenders.

## CONCLUSION

51.    In sum, the literature on underreporting of sexual assault and case attrition highlights numerous problems with relying on criminal history records as the sole indicators of serial sexual perpetration. The vast majority of sexual assaults are not reported, and of those that are reported the majority do not result in arrest, charge, or conviction. These realities mean that any sexual assaults that are not reported will not factor into estimates of serial sexual perpetration, nor will reports of sexual assault that do not lead to an arrest. Depending on the threshold used to define serial sexual perpetration in a particular recidivism study, reported rapes that lead to an arrest but not a conviction may not contribute to estimates of serial sexual perpetration, either. At least some of the under-identification of offenders at these later levels of case progression is due to the intentionally high threshold for conviction in which guilt must be proved beyond a reasonable doubt. It is incredibly difficult to prove a crime of consent beyond a reasonable doubt, however. Estimates of serial sexual perpetration gleaned from criminal history records are likely to be affected by this difficulty to the degree that they are not accurate indicators of serial sexual perpetration, only of the small portion of serial sexual perpetration identified by the criminal legal system. **Recidivism studies based solely on criminal history data are therefore not measuring sexual offenders' behaviors so much as they are measuring the behavior of the criminal legal system; they are not effectively measuring multiple instances of sexual offending so much as they are measuring multiple instances of being caught and held accountable by a system with a uniquely poor track record of doing so. Measures of serial sexual offending that include data less vulnerable to case attrition**

**suggest that approximately 40% of sexual offenders are serial sexual offenders.** This, too, is likely an underestimate, but it provides a clear enough picture to illustrate that people who sexually offend once often do so multiple times and against multiple different victims.

## STATEMENT OF COMPENSATION

I am charging $250.00 an hour for researching and writing this report.

I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

_Rachael Goodman-Williams_
Rachael Goodman-Williams, Ph.D.

Dated: March 10, 2023

# Rachael Goodman-Williams

Wichita State University
Jabara Hall, Room 433
1845 Fairmount St.
Wichita, Kansas 67260
rachael.goodman-williams@wichita.edu

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| August 2020 - Present | Assistant Professor, Community Psychology, Wichita State University |
| August 2020 – Present | Core Faculty, Clinical-Community Psychology, Wichita State University |

## EDUCATION

| | |
|---|---|
| August 2020 | Doctor of Philosophy in Ecological-Community Psychology<br>Specialization in Quantitative Methods and Evaluation Sciences<br>Michigan State University, East Lansing, MI |
| May 2017 | Master of Arts in Ecological-Community Psychology<br>Michigan State University, East Lansing, MI |
| May 2009 | Bachelor of Arts in Gender & Women's Studies, *Summa Cum Laude*<br>Knox College, Galesburg, IL |

## GRANT FUNDING

| | |
|---|---|
| 2021 – 2023 | Center for Institutional Courage<br>*Title IX Practitioners' Experiences of and Perspectives on Mandatory Reporting for Sexual Violence: An Examination of Institutional Practices that Foster Betrayal and Courage*<br>Award Number:<br>Total Costs: $4,000<br>Role: Co-Investigator<br>Primary Investigator: Kathryn Holland, Ph.D. |

## AWARDS, FELLOWSHIPS, & HONORS

| | |
|---|---|
| 2020 | Graduate Student Teaching Award, College of Social Sciences, Michigan State University ($500) |
| 2020 | Research Enhancement Award, Michigan State University Graduate School ($500) |
| 2019 | Future Academic Scholars in Teaching Fellowship, Michigan State University ($2,000) |
| 2019 | Bob and Bets Caldwell Land Grant Values Award, Michigan State University ($4,000) |

1

Goodman-Williams, R.

2014            University Distinguished Fellowship, Michigan State University ($64,000 awarded 2014-2020)

2008            Ford Fellowship Research Award, Ford Fellowship Foundation ($3,000)

## PEER-REVIEWED PUBLICATIONS

*Published or In Press*

17. **Goodman-Williams, R.,** Clark, S.L., Campbell, R.M., & Ullman, S.E. (2022). Longitudinal patterns of PTSD symptoms among sexual assault survivors: A latent transition analysis. *Psychological Trauma: Theory, Research, Practice, and Policy*. Advance online publication. DOI: 10.1037/tra0001376

16. Campbell, R, **Goodman-Williams, R.,** Javorka, M., Engleton, J., & Gregory, K. (2022). Understanding sexual assault survivors' perspectives on archiving qualitative data: Implications for a feminist approach to open science. *Psychology of Women Quarterly.* Advance online publication. DOI: 10.1177/03616843221131546

15. Engleton, J., **Goodman-Williams, R.,** Javorka, M., Gregory, K., & Campbell, R.M. (2022). Sexual assault survivors' engagement with advocacy services during the COVID-19 Pandemic. *Journal of Community Psychology.* Advance online publication. DOI: 10.1002/jcop.22819

14. Campbell, R, **Goodman-Williams, R.,** Engleton, J., Javorka, M., & Gregory, K. (2022). Open science and data sharing in truama research: Developing a trauma-informed protocol for archiving sensitive qualtitative data. *Psychology Trauma: Theory, Research, Practice, & Policy.* Advance online publication. DOI: 10.1037/tra0001358

13. Javorka, M., Engleton, J., **Goodman-Williams, R.,** Gregory, K., & Campbell, R.M. (2022). The impacts of COVID-19 on criminal legal proceedings and legal advocacy for sexual assault survivors. *Victims & Offenders.* Advance online publication. DOI: 10.1080/15564886.2022.2038319

12. Campbell, R., Pierce, S.J., **Goodman-Williams, R.,** Feeney, H. (2022). A window of opportunity: Examining the potential impact of mandatory sexual assault kit (SAK) testing legislation on crime prevention. *Psychology, Public Policy, and Law.* Advance online publication. DOI: 10.1037/law0000349

11. Campbell, R., Javorka, M., Engleton, J., **Goodman-Williams, R.,** & Gregory, K. (2022). Post-assault healthcare for sexual assault survivors during COVID-19: A mixed methods analysis of service rates in a predominately African American community. *Journal of Interpersonal Violence.* Advance online publication. DOI: 10.1177/08862605221098963

10. Holland, K., Cipriano, A., **Goodman-Williams, R.,** & Diede, A.S. (2021). Examining support for university-to-police reporting policies for sexual assault: The role of survivors' consent. *American Journal of Community Psychology.* Advance online publication. DOI: 10.1002/ajcp.12533

9. **Goodman-Williams, R.,** & Ullman, S.E. (2020). Post-traumatic stress disorder and measurement invariance in a sample of sexual assault survivors: Are symptom clusters stable over time? *Psychological Trauma: Theory, Research, Practice, and Policy, 12*(4), 389-396. DOI: 10.1037/tra0000509

8. Campbell, R., **Goodman-Williams, R.,** Feeney, H., & Fehler-Cabral, G. (2020). Assessing triangulation across methodologies, methods, and stakeholder groups: The joys, woes, and politics of interpreting convergent and divergent data. *American Journal of Evaluation, 41*(1), 125-144. DOI: 10.1177/1098214018804195

Goodman-Williams, R.

7. Campbell, R., Feeney, H., **Goodman-Williams, R.,** Sharma, D.B., & Pierce, S.J. (2020). Connecting the dots: Identifying suspected serial sexual offenders through forensic DNA evidence. *Psychology of Violence, 10*(3), 255-267. DOI: 10.1037/vio0000243

6. **Goodman-Williams, R**., Campbell, R.M., Sharma, D., Pierces, S.J., Feeney, H., & Fehler-Cabral, G. (2019). How to Right a Wrong: Developing Empirically Tested Approaches for Resolving Untested Rape Kits. *Journal of Trauma and Dissociation, 20*(3), 288-303. Doi: 10.1080/15299732.2019.1592645 **(Runner-up for the Richard P. Klutt Award for *Journal of Trauma & Dissociation* 2019 Best Article).**

5. Campbell, R., **Goodman-Williams, R.,** & Javorka, M. (2019). A trauma informed approach to sexual violence ethics and open science. *Journal of Interpersonal Violence, 34*(23-24), 4765-4793. Doi: 10.1177/0886260519871530

4. Campbell, R., Pierce, S.J., Ma, W., Feeney, H., **Goodman-Williams, R**., & Sharma, D.B. (2019). Will history repeat itself? Growth mixture modeling of suspected serial sexual offending using forensic DNA evidence. *Journal of Criminal Justice, 61*, 1-12. Doi: 10.1016/j.jcrimjus.2019.01.004

3. Chiaramonte, D., Quarles, J., Strzyzykowski, T., **Goodman-Williams, R.,** Weber, R., Broessel, K., & Thompson, T. (*2019*). Lessons that cannot be lectured: Highlighting the experiences and benefits of undergraduates engaged in community psychology research. *Global Journal of Community Psychology Practice, 10*(2), 1-21.

2. Kubiak, S.P., Brenner, H.J., Bybee, D., Campbell, R., Cummings, Darcy, K.M., Fedock, G., & **Goodman-Williams, R.** (2017). Do sexually victimized female prisoners perceive justice in litigation processes and outcomes? *Psychology, Public Policy, and Law, 23*(1), 39-52. http://dx.doi.org/10.1037/law0000100

1. Kubiak, S.P., Brenner, H.J., Bybee, D., Campbell, R., Cummings, C.E., Darcy, K.M., Fedock, G., & **Goodman-Williams, R.** (2017). Sexual misconduct in prison: What factors affect whether incarcerated women will report abuses committed by prison staff? *Law and Human Behavior, 41*(4), 361-374. http://dx.doi.org/10.1037/lhb0000239

*Under Review*

4. **Goodman-Williams, R.,** Dworkin, E., & Hetfield, M (Invited resubmission). Why do sexual assault rates vary across studies? A meta-anslysis examining study-level factors.

3. **Goodman-Williams, R.,** Simmons, C., Chiaramonte, D., Ayeni, O.O., Guerrero, M., Sprecher, M., & Sullivan, C.M. (Invited resubmission). Domestic violence survivors' housing stability, safety, and well-being over time: Examining the role of Domestic Violence Housing First, social support, and material hardship.

**2.** Campbell, R., Gregory, K., **Goodman-Williams, R.,** Engleton, J., & Javorka, M. (Invited resubmission). Organizational readiness and response during COVID-19: Reflections from a sexual assault agency serving a predominantly African American Community.

1. Campbell, R., Gregory, K., Javorka, M., Engleton, J. & **Goodman-Williams, R.** Victim notification protocols for untested sexual assault kits (SAKs): Survivors' and advocates' perspective on law enforcement-led outreach methods.

## CONFERENCE PRESENTATIONS

**Goodman-Williams, R.**, & Volz, J. (2022, June). Saving evidence: Understanding non-reporting when sexual assault evidence is collected. Presented at the Society for the Psychological Study of Social Issues (SPSSI) Annual Conference, San Juan, Puerto Rico.

**Goodman-Williams, R.**, Campbell, R., Engleton, J., Javorka, M., & Gregory, K. (2022, June). Whose story is it? A trauma-informed approach to open science and qualitative data. In R. Goodman-Williams' *Qualitative Research with Marginalized Communities: The Importance of Narrative Control.* Presented at the Society for the Psychological Study of Social Issues (SPSSI) Annual Conference, San Juan, Puerto Rico.

Javorka, M., Engleton, J., **Goodman-Williams, R.,** Gregory, K., & Campbell, R. (2021, November). "They let me down:" Sexual assault survivors' reactions to untested sexual assault kit (SAK) notifications. Presented at the American Society of Criminology Conference, Chicago, IL.

Engleton, J., Javorka, M., **Goodman-Williams, R.,** Gregory, K., & Campbell, R. (2021, November). What do sexual assault survivors want from the victim notification process? Presented at the American Society of Criminology Conference, Chicago, IL.

**Goodman-Williams, R.** (2021, June). Value consistent student assessments in social justice and diversity courses. In R. Goodman-Williams *Strategies for Teaching Anti-Racism and Diversity-Focused Courses.* Presented at the Society for Community Research and Action Biennial Conference, Virtual Conference.

**Goodman-Williams, R.,** & Chiaramonte, D. (2019, October). Facilitating undergraduate involvement in community-engaged work through research and teaching. Presented at the Annual Conference of the Engaged Scholarship Consortium, Denver, CO.

**Goodman-Williams, R.** (2019, August). Working with what we've got: Analyzing sexual assault data through meta-analysis and meta-regression. In R. Goodman-Williams & S. Cook *Methodological and Ethical Considerations in Sexual Assault Research in the Age of Open Science.* Presented at the American Psychological Association Annual Convention, Chicago, IL.

**Goodman-Williams, R.** (2019, June). "Your question about t-tests reminds me of your goal…": Motivating student learning by connecting course content to personal goals. In R. Goodman-Williams *"I could tell she really wanted us to learn": Strategies to engage undergraduate students and enhance learning.* Presented at the Society for Community Research and Action Biennial Conference, Chicago, IL.

**Goodman-Williams, R.,** Chiaramonte, D., Quarles, J., & Strzyzykowski, T. (2019, June). Labs over lectures: Undergraduate students' engagement with community psychology through research assistant experiences. In J. Wallington-Rushman, *College as a Site of Community Inquiry: Undergraduates Researching Undergraduate Experiences.* Presented at the Society for Community Research and Action Biennial Conference, Chicago, IL.

Cattaneo, L., **Goodman-Williams, R.,** Graham, B., Kraft, A. (2019, June). Channeling community psychology knowledge into our teaching. Roundtable presented at Society for Community Research and Action Biennial Conference, Chicago, IL.

Feeney, H., **Goodman-Williams, R.,** & Vollinger, L. (2019, June). Teaching difficult topics online: Ethical challenges and possible solutions. Roundtable presented at Society for Community Research and Action Biennial Conference, Chicago, IL.

4

Goodman-Williams, R.

Alia-Ray, K., Shaw, J., & **Goodman-Williams, R.** (2019, June). Propelling a movement for equitable justice: Opportunities and challenges for community psychology in criminal justice. Roundtable presented at Society for Community Research and Action Biennial Conference, Chicago, IL.

Feeney, H., Campbell, R., Pierce, S.J., Sharma, D., & **Goodman-Williams, R.** (2018, November). *Serial sexual assaults: A longitudinal examination of offending patterns.* Panel presentation at the American Society for Criminology Annual Meeting, Atlanta, GA.

**Goodman-Williams, R.,** & Chiaramonte, C., Strzyzykowski, T., & Quarles, J. (2018, October). Lessons that cannot be lectured: Highlighting the experiences and benefits of undergraduates engaged in community psychology research. Presented at the International Conference for Community Psychology, Santiago, Chile.

Helms, T., & **Goodman-Williams, R.,** (2017, November). The impact of organizational context on measurement design. In. T. Armstead *Intentional use of data-to-action processes to shape programs and shift evaluations: Examples from CDC DELTA FOCUS grantees.* Presented at the American Association for Evaluation Conference, Washington, D.C..

**Goodman-Williams, R.,** Strzyzykowski, T., Spring, H., & Bombsta, H. (2017, October). Undergraduate research assistant needed: How to train and support undergraduate students doing sensitive research. Chaired Panel Presentation, Midwest Eco Conference, Lansing, MI.

**Goodman-Williams, R.** (2016, March). "Did you ever scream out at all—'this officer is going to rape me'?": Rape myths about sexual abuse in prison. In S. Kubiak *Sexual Abuse of Women in Prison: A Multi-Disciplinary Feminist Examination.* Presented at the Association for Women in Psychology Annual Conference, Pittsburgh, PA.

**Goodman-Williams, R.,** Hussein, A., James, R., Long, B. (2015, October). That's so meta(analysis): Practical tips and lessons learned. Presented at the Midwest Eco Conference, Madison, WI.

Pendergast, T., Brown, A., Ullman, S., Chiaramonte, D., Sunnquist, M., Feeney, H., **Goodman-Williams, R.,** & Jason, L. (2015, October). Making a difference through advocacy: Challenges to our field. Roundtable presented at the Midwest Eco Conference, Chicago, IL.


## SELECTED COMMUNITY PRESENTATIONS AND WEBINARS

**Goodman-Williams, R.** (2021, December). Non-report medical forensic exams and opportunities for research-community partnerships. Presentation given for the Montgomery County Sexual Assault Response Team.

Campbell, R., & **Goodman-Williams, R.** (2019, July). Trajectories of suspected serial sexual offending using criminal history and DNA data. Webinar given for the Sexual Assault Kit Initiative (SAKI) Project.

Campbell, R., & **Goodman-Williams, R.** (2018, November). Understanding case connectivity: How testing SAKs can link criminal cases. Webinar given for the Sexual Assault Kit Initiative (SAKI) Training Team.

**Goodman-Williams, R.,** & ┼Helms, T. (2017, May). Evaluation conclusions that can be drawn with client satisfaction surveys. Presentation given for Abused Women's Assistance and Resources.

5

Goodman-Williams, R.

Helms, T., & **Goodman-Williams, R.** (2016, August).  Program evaluation in sexual assault and domestic violence advocacy organizations. Webinar given for Michigan Coalition to End Domestic and Sexual Violence.


## SELECTED TECHNICAL REPORTS AND WHITE PAPERS

Campbell, R. Gregory, K., Javorka, M., Engleton, J., **Goodman-Williams, R.,** & Fishwick, K. (2022). *Evaluating a Victim Notification Protocol for Untested Sexual Assault Kits (SAKs): How Do Survivors Define Justice Years After an Assault?* (OVW 2018-SI-AX-0001). East Lansing, MI: Michigan State University.

Campbell, R., Pierce, S.J., Sharma, D., Feeney, H., **Goodman-Williams, R.,** Ma, W. (2018). Serial *Sexual Assaults: A Longitudinal Examination of Offending Patterns Using DNA Evidence.* (NIJ 2014-NE-BX-0006, NCJRS Document No. 252707). East Lansing, MI: Michigan State University. Available from National Criminal Justice Reference Service website: https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=274932.

Campbell, R., & **Goodman-Williams, R.** (2018). *Understanding Case Connectivity: How Testing SAKs Can Link Criminal Cases.* Prepared for the Sexual Assault Kit Initiative Training and Technical Assistance Project. Research Triangle Park, NC: RTI International.


## EVALUATION EXPERIENCE & CONSULTING EXPERIENCE

| | |
|---|---|
| 2021 – 2022 | **Research Consultant** <br> Domestic Violence Housing First Longitudinal Data Demonstration Research Grant <br> Funded by the Washington State Coalition Against Domestic Violence ($872,000) <br> PI: Cris Sullivan, Ph.D. |
| 2015 – 2020 | **Program Evaluator** <br> *Michigan Coalition to End Domestic and Sexual Violence,* Okemos, MI <br> Centers for Disease Control funded *Domestic Violence Prevention Enhancement and Leadership Through Alliances (DELTA) Impact (2018-2020)* <br><br> Centers for Disease Control funded *Domestic Violence Prevention Enhancement and Leadership Through Alliances, Focusing in Outcomes for Communities United with States (DELTA FOCUS) (2013-2018)* |
| 2017 – 2018 | **Evaluation Consultant** <br> Prevention and Education Program <br> *Sexual Assault Resource Center Beaverton, OR* |


## TEACHING EXPERIENCE

### Graduate Courses Taught

*Wichita State University*
PSY 944: Community Practicum (Fall 2021, Spring 2022)
PSY 912: Seminar in Cultural Diversity (Spring 2021)
PSY 941: Applied Research Methods in Community Settings (Fall 2020, Fall 2022)

### Undergraduate Courses Taught

*Wichita State University*
PSY 311: Research Methods in Psychology (Fall, 2022)

*Michigan State University*
PSY 318: Gender-Based Violence Across the Lifespan (Summer 2019)
PSY 381: Human Services Internships (Spring 2019)
PSY 317: Sexual Assault Context, Interventions, and Prevention (Summer 2018)

# UNIVERSITY AND PROFESSIONAL SERVICE

### *University and Departmental Service*

| | |
|---|---|
| 2021 – 2022 | Program Coordinator, Community Psychology Doctoral Program, Wichita State University |
| 2021 – 2022 | Curriculum Committee, Psychology Department, Wichita State University |
| 2021 – 2022 | Research Roundup Committee, Psychology Department, Wichita State University |
| 2021 – 2022 | Hiring Committee, Community Psychology Program, Wichita State University |
| 2021 – 2022 | Hiring Committee, Clinical-Community Psychology Program, Wichita State University |
| 2021 - 2022 | Workload Committee, Psychology Department, Wichita State University |
| 2020 – 2021 | Colloquium Committee, Psychology Department, Wichita State University |

### *Professional Service*

| | |
|---|---|
| 2020 – 2022 | Academic Alliance for Survivor Choice in Title IX Reporting Policies |
| 2019 – 2020 | Undergraduate Teaching Interest Group, Society for Community Research and Action |
| 2018 – 2020 | LGBT Interest Group, Society for Community Research and Action |

### *Ad-hoc Reviewer*

Canadian Society of Forensic Science Journal
Journal of American College Health
Journal of Interpersonal Violence
Trauma, Violence & Abuse
Violence Against Women
Violence and Victims

# PROFESSIONAL AFFILIATIONS

American Psychological Association
Division 27 of the American Psychological Association, Society for Community Research and Action
Division 35 of the American Psychological Association, Psychology of Women
Division 44 of the American Psychological Association, Society for Sexual Orientation and Gender Diversity
Society for the Psychology Study of Social Issues
American Evaluation Association