# Exhibit 142:

## Dr. Anna Salter Declaration

*Anna C. Salter, Ph.D.*

*PO Box 169*
*Jefferson, CO 80456*
*608-358-7373*
*acsalter@annasalter.com*

Does V Whitmer, et al.
Psychological Report
Actuarial Measures and Recidivism v Reoffending

Referral Request

I was contacted by Eric Jamison of the Office of the Attorney General in Michigan regarding consulting with them on Does v Whitmer, et al. After subsequent discussion, I was asked to write a report giving my opinion on the relationship of Static-99R to recidivism and reoffending.

Executive Summary

The conclusions from this report are as follows:

√ There is a difference in recidivism (getting caught and charged) and reoffending (committing a sexual offense whether detected or undetected).

√ Static-99R is an actuarial instrument which measures recidivism, not reoffending.

√ In the initial research paper describing Static-99R, the authors acknowledged that Static-99R measured recidivism. They did not use the term reoffending to describe their outcome measure.

√ Recently, proponents of Static-99R have switched to claiming Static-99R measures reoffending, which it does not. The switch is evident in some of the expert reports for this case.

√ Somewhere between 14% and 32% of sex offenses are reported to authorities. Far fewer are sent to prosecutors and even fewer result in convictions. Static-99R figures are all based on cases which have at least been charged. This ignores the majority of sex offenses because they are undetected by the criminal justice system.

√ Claiming that an instrument which is based on recidivism is actually measuring reoffending misleads the reader into thinking that sexual reoffending relapse rates are low. In reality, because of the large number of undetected offenses, there is no reliable information on reoffending rates.

1

    √   Claiming that reoffending rates are known and are low prevents the public and policymakers from grappling with "the justice gap," the gap between the number of offenses that are committed and the number that result in charges and/or convictions.

    √   Recidivism rates cannot be used as a proxy for reoffending rates because of differential reporting. Victims report some types of offenders, e.g., extra-familial and stranger offenders, more than they do other types, e.g., familial and familiar. This leads to some types of offenders having higher recidivism rates than others, although they may reoffend the same amount or more.

    √   Static-99R is not a comprehensive risk assessment. It only measures the impact of *static* risk factors. Recidivism rates are also strongly affected by dynamic factors and by other factors not included in Static-99R, e.g., health.

    √   A comprehensive assessment, even of recidivism likelihood, is time-consuming and in my case and other evaluators I know, takes approximately 15 hours.

<u>Background, Education, and Qualifications</u>

I have an M.A. in Child Study from Tufts University and a Ph.D. in Clinical Psychology and Public Practice from Harvard University. I was a Teaching Fellow at both universities. I have worked in the field of sexual abuse and violence since 1980. I assessed and treated both sexual abuse victims and offenders for 20 years in a community mental health center, then at Dartmouth, and finally in private practice.  While at Dartmouth in the mid-80s I had a joint appointment in Psychiatry and Pediatrics/Maternal and Child Health. I was Co-Director of the Children-at-Risk Program, Director of the Parents-in-Distress Program, Co-Director of the Parenting Program, Director of Psychosocial Education for the Pediatric Residents, and Director of the Inpatient Consultation Program.

Between 1996 and 2019, I was a consultant to the Wisconsin Department of Corrections. In that capacity I helped develop their sex offender polygraph program, trained psychologists and other staff, wrote a treatment curriculum for juvenile sex offenders and one for adults, evaluated high-risk violent offenders for release from Administrative Confinement, and took on a variety of special projects related to sex offenders and violent offenders.

In recent years, I have concentrated on the evaluation of sex offenders.  From approximately 2003-2015, I did initial Sexually Violent Predator (SVP) evaluations for the State of Iowa and have completed over 100 evaluations. From 2014 to the present time, I have been in charge of annual evaluations for those individuals who have been committed as Sexually Violent Predators in Iowa and have done 425 annual evaluations.

I have also testified in multiple criminal legal cases regarding sex offenders and victims, particularly on the impact of child sexual abuse on victims, delayed disclosure of sexual abuse, and counterintuitive victim behaviors. I have testified also in civil cases such as SVP and Annual Review SVP cases on risk levels in sex offenders.

I have written three books on sex offenders and victims: *Treating Child Sex Offenders and Victims: A Practical Guide; Transforming Trauma: A Guide to Understanding and Treating Adult Survivor of Sexual Abuse; and Predators: Pedophiles, Rapists, and Other Sex Offenders: Who They Are, How They Operate, and How We Can Protect Ourselves and Our Children.* I have trained in all 50 states, most of them multiple times, and 10 countries besides the United States (England, Canada, Scotland, France, Sweden, Holland, Australia (including Tasmania), New Zealand, Germany, and Costa Rico). See my vita for more details.

Description of Static-99R

Static-99R is a 10-item static actuarial instrument that measures recidivism of adult male sex offenders, or the likelihood that someone who has previously committed a sexual offense will be charged or convicted of another one. The exception is that it cannot be used with men who only have child pornography charges or convictions. Static-99R has been shown to have moderate predictability for sexual offense recidivism. Scores range currently from -3 to 12 points. The authors have re-normed the Static-99R repeatedly and stated this was due primarily to changes in the base rates of sexual offending and to research that indicated older offenders, reoffended less.  In 2015 norms were released and divided into "routine" norms, which included all samples, and "high-risk/high need" samples which included offenders who were preselected for high-risk based on variables independent of Static-99R. The two sets of norms showed that absolute recidivism rates were different for individual scores between offenders in the two settings. The lower routine norms were generally recommended, and the high-risk norms were specified to be used on an individual basis based on the number and density of dynamic risk variables. In 2021, the routine norms were updated again with 5-year, 10-year, and projections to 20-year rates.

Static-99R was developed from a need to standardize and increase the accuracy of sex offender risk assessment. Prior and subsequent to its inception a series of research articles documented that clinical assessment inadequately assessed sex offender risk to recidivate (see, e.g., Grove, Zald, Boyd, Snitz, & Nelson, 2000; Hanson, 2004; Hanson & Bussiere, 1998; Hanson & Morton-Bourgon, 2009; Hilton, Harris, & Rice, 2006). This should not have been a surprise to anyone because, until the large-scale meta-analyses that Hanson and colleagues did, there was no body of research to determine whether the variables thought to predict sex offender recidivism actually did so. In addition, psychologists did not agree on which variables had the most impact on reoffending.  Given two offenders, one of whom was sexually attracted to children but functional in the community and the other of whom was antisocial but did not have a deviant arousal pattern, there was no agreement as to which variable was more important or if the two offenders were equally likely to reoffend or not reoffend.

When the early meta-analytic studies came out (Hanson & Bussiere, 1998; Hanson & Morton-Bourgon, 2005), it was discovered that some variables commonly used to assess risk were unrelated to sex offense recidivism, and others were actually inversely correlated. Items previously routinely included in clinical assessment such as sexually abused as a child, general psychological problems, alcohol abuse problems, low motivation for treatment, and length of treatment were not found to predict sex offense recidivism.

3

Of great importance is the fact that the outcome variable for these studies was *recidivism*, i.e., the involvement of the criminal justice system with the sexual crime, primarily in the form of charges and convictions against the alleged offender. This was by default, as although few people would have contended, even at the time, that all sex offenses resulted in arrests, charges, or convictions, there was no methodology then for adequately determining the scope of undetected offending. Many of the large-scale victim studies as well as the studies on offenders who have admitted undetected offenses, had not been done. These studies eventually demonstrated that the majority of sexual offenses are never reported to authorities.

Initially, Static-99R made no claims to measure reoffending, which is the commission of a sex offense whether detected or undetected, and whether it results in charges/convictions or is never reported to police. The original authors were conservative in their claims. The term recidivism was used over 90 times in the article, and I found only one place where the appropriate term "recidivism" was replaced by an incorrect use of the term "reoffending" (Hanson & Thornton, 2000). "Survival analysis calculates the probability of recidivating for each time period given that the offender has not yet reoffended." (p. 125). Of course, survival analysis was based on involvement with the criminal justice system through charges or convictions, and there was no way to know if the offenders who had not been charged or arrested had reoffended. In all other cases the term recidivism was used to describe the outcome variable of Static-99R.

However, Static-99R has become the most widely used risk assessment instrument in the world for assessing risk in sex offenders (Helmus, 2022; Jackson & Hess, 2007; Neil & Grisso, 2014). And with that fame has come an aggrandizement of what the instrument can do. Increasingly, the terms reoffending and recidivism are substituted as though both mean the same thing, and in this case Static-99R is now being recommended as a stand-alone risk assessment instrument. In the original article, the authors were clear that Static-99R was not a comprehensive assessment:

> Static-99 does not claim to provide a comprehensive assessment, for it neglects whole categories of potentially relevant variables (e.g., dynamic factors) (Hanson & Thornton, 2000, p. 132).

At present, however, unsubstantiated claims are being made that Static-99R actually measures the likelihood of reoffending. Regarding the misuse of the term "reoffend(ing)," I counted at least 9 times in Dr. Hanson's affidavit for this case that he used the term "reoffending" instead of "recidivism" to describe individuals who have not been caught by the criminal justice system (but could have undetected offenses). They may not have reoffended, but they may also have reoffended and just not been caught. These statements included the following:

> Research has long shown that the longer an individual remains free of arrests or convictions, the lower the chance of *reoffending* (Blumstein & Nakamura, 2009).

.
But the Blumstein and Nakamura data was not based on sex offenses and did not address reoffending. Their analysis was based on new arrests:

4

> Our analysis uses hazard (or hazard rate) . . . Hazard is the conditional probability of a new arrest given surviving without an arrest up to time t. pp. 335-336

In short, the study showed that the longer an individual remains free of arrests or convictions, the less likely it is that they will be arrested in the future. This may be because they did not reoffend, or it may be, for example, because they became savvy and experienced offenders who chose victims who did not report, because they were successful in hiding their identity from victims, or for some other reason.

Other statements that confounded sexual recidivism and sexual reoffending by Dr. Hanson were as follows:

> Contrary to the popular notion that all individuals who have ever committed a sexual offence remain at risk of re-offending through their lifespan, the longer individuals remain *offence-free* in the community, the less likely they are to *re-offend sexually*. (p. 2)

> After 10 years in the community *without committing a sex offence*, most individuals with a history of sexual offending pose no more risk of *sexual offending* than do males in the general population. (p. 2)

> After 20 years without a new arrest for a sex-related offence, all individuals with a history of sexual crime no longer pose any more risk of *committing a sex offence* than do males in the general population. (p. 2)

> Given that the risk of new *sexual offending* drops below baseline levels for most individuals after 10 years, and for all individuals after 20 years, lengthy and lifetime registration terms serve no public protection function. (pp. 2-3) (Italics added in all cases.)

In each of these cases, he is actually talking about the chance an offender will be arrested charged, and/or convicted, otherwise known as recidivism.

Likewise, in her affidavit, Dr. Letourneau consistently conflated recidivism and reoffending:

> Moreover, these investigators found in another study of 265 people adjudicated of sex crimes as minors that the federal tier designations failed to accurately distinguish between those few people who *re-offended* versus the majority who did not. (p. 7)

> In fact, a comparison group of people whose initial offense was for a nonsexual violent crime were just as likely to *commit a future sexual offense* as those whose initial offense was sexual in nature. (p. 7)

The *sexual re-offense rate* was less than 2% across a 2-year follow-up with no differences between registered and nonregistered ex offenders. (p. 8)

Results indicated that the law had no effect on *sexual re-offense rates.* (p. 8) (Italics added in all cases.)

In reality very little is known about reoffending given the fact that so few sex offenses are actually reported to authorities, much less successfully prosecuted. In each case above the word recidivism, which includes the likelihood of getting caught, arrested, charged, and/or convicted, should have been used instead of reoffending.

<u>Does It Matter that the Terms Sexual Recidivism and Sexual Reoffending are Conflated?</u>

By combining sexual recidivism and sexual reoffending, researchers imply, perhaps unintentionally, that instruments that only measure a small fraction of sexual reoffending actually measure all of it or enough of it that the number of undetected offenses is small and insignificant. This substantially underestimates the problem of sexual offending and reduces the likelihood that resources will be directed into this area. Take, for example, the literature (discussed under Differential Reporting) that suggests incest offenders have less recidivism, not necessarily because they offend less, but because victims report them less compared to out-of-home offenders. If incest victims report less, then the solution is to find ways to support victims of incest so they can report. If incest offenders reoffend less, then there is no problem and Static-99R scoring incest offenders lower because of the lower recidivism rates, is justified. Implications of the latter could be, for example, that they can be put back in families with their victims, since they have a low likelihood of reoffending. But we have no evidence they reoffend less, only evidence that they get caught less because of the victims' reluctance to disclose.

There is a growing literature on the "justice gap," which is the difference in the number of sex offenses occurring in this society and the number of offenses which result in charges and convictions (Krahn, 2008; Lonsway & Archambault, 2012; Temkin & Krahé, 2008). Confusing recidivism with reoffending undermines the argument that a "justice gap" of considerable proportions exists whereby sexual offending is a major societal problem, but sex offenders are rarely brought to justice, and it suggests reforms are unnecessary. Denying this gap exists, even by implication, deflects attention away from the reasons why victims don't report and what can be done to insure a greater level of reporting by sexual abuse victims and greater accountability for sex offenders. It underestimates the risk that sex offenders pose and disenfranchises victims. It implies that the number of victims who are not able to report, for whatever reasons, or those who report but whose cases are not taken forward, do not matter and are irrelevant to the discussion of the problem of sexual offending in this country. And most of all, it is inaccurate and lulls the public into thinking that because sex offenders have low recidivism rates, they have low reoffending rates.

The truth is we know precious little about reoffending rates. We only know that few offenders get caught for new offenses, and we know the majority of sexual offenses are never disclosed to the legal system. Static-99R only measures the likelihood of getting caught and at least arrested or charged with a sexual offense. It does not measure the likelihood of reoffending.

6

Undetected Offending

This section will review the reasons to think that recidivism, as defined by charges and convictions, does not capture the majority of sexual offenses as only a minority of sexual offenses are reported to police.  Daly and Bouhours reviewed studies from five countries (Australia, Canada, England, Wales, Scotland, and the United States) and found that only *14% of sex offenses were reported to authorities* (Daly & Bouhours, 2010). The range in studies was from 6% in a Canadian study to 32% in a US study.  The 32% study was removed from the analysis as an outlier as other US studies found rates of reporting from 15% to 19%. Of the 14% of sexual offenses reported, 30% were forwarded to prosecutors for adjudication (20% in the United States), 20% were adjudicated, 12.5% were convicted of any sexual offense, and 6.5 % of the original 14%were convicted of the original, charged offense. Surveyed victims were typically age 16 and older. The authors noted that where studies included lower age groups, the highest rate of sexual victimization was found in the 10 to 14-year-old age group. They state, "Although the number of studies is small (and all are from the United States), they suggest a somewhat lower likelihood that child and youth victims report sexual victimization to the police than adult victims." The recidivism rates that instruments like Static-99R address are less than 14% of actual sexual offenses, as even with this low reporting rate, most of these cases are not forwarded to prosecutors and offenders are not charged.  Some of this may be because the children or adults may not be believed or the children may not be old enough or competent enough to testify. In the case of stranger victims, they may not be identified.

Other research has likewise found that the vast majority of child sex offenses are not reported to police. A summary of 10 studies by London and colleagues of victims found that between 10% and 18% of sexual assaults on minors are reported to authorities (London, Bruck, Ceci, & Shuman, 2005; London, Bruck, Ceci, & Shuman, 2007). Other studies have continued to replicate these findings (Jonzon & Lindblad, 2016).

Several studies have found that between 6 to 12% of all sexual abuse is reported to police and rarely more than 20% (Elliott, 1993; Russell, 1984; Saunders, Villeponteaux, Lipovsky, Kilpatrick, & Veronen, 1992; Smith et al., 2000). The National Violence Resource Center reports that 12% of child sexual abuse is reported to authorities (http://www.nsvrc.org/sites/default/files/publications_nsvrc_factsheet_media-packet_statistics-about-sexual-violence_0.pdf). Significant rates of undetected offenses are even found when juvenile sex offenders, who presumably have only recently begun offending, are queried. A comparison of disclosures of bestiality on the Multiphasic Sexual Inventory-II (MSI-II) to self-reports based on the polygraph found that 37.5% of juveniles made such admissions on the MSI-II compared to 81.3% on the polygraph (Schenk, Cooper-Lehki, Keelan, & Fremouw, 2014). This suggests that juveniles also have significant numbers of undetected offenses.

A 2015 report from the National Sexual Violence Resource Center found that sexual assault was the most under-reported crime; 63% of sexual assaults overall were not reported to police. As noted, this figure has turned out to be an outlier, and studies in the US generally find that only 14% to 19% of rapes are reported to police. Lisak and Miller (2002) researched 120 male students who admitted they had committed rape but were not arrested for it. Of this group, 63.3%

7

disclosed either multiple rapes of different victims or multiple rapes of the same victim. Over half (58.3%) admitted other violent acts including battery, child abuse, child molestation or other types of sexual assaults.  In total they admitted 483 rapes, 53 sexual assaults, and 319 sexual assaults of children. Langevin et al. (2004) followed a sample of 320 Canadian sexual offenders for 25 years. The recidivism rate was 61.1% using official conviction as the definition, yet it was 88.3% when official crime statistics were combined with self-report data (Langevin, 2004).  The study found that between 73% and 77% of child molesters and 43%% of sexual aggressives admitted to undetected offenses.

In 2016, DeLisi studied 119 federal sexual offenders and found their self-reports of offending was greatly in excess of those offenses they were caught for. Official arrest charges for rape or sexual abuse found a mean of 1.11 victims. Polygraphs resulted in self-reports of 3.69 contact victims with a median of 1. The subjects admitted three times the number of offenses that official records indicated they had (DeLisi et al., 2016).

Weinrott and Saylor studied 37 rapists committed to a Western State Hospital for an indefinite period as "sex psychopaths." They had between them 66 official charges. Under conditions of confidentiality the 37 men self-reported 433 rapes. Thus they had an average of 1.8 official charges but self-reported an average of 11.7 victims, or 6.5 times more victims than their number of charges and/or convictions indicated (Weinrott & Saylor, 1991). Bouchard and Lussier (2015) examined all individuals admitted to a Canadian federal prison between 1994 and 2000. Based on their data, they estimated that the actual incidence of sexual offending was 20.5 times greater than estimates taken from official charges and convictions. Research by Koss on university students found the incidence of sexual assault was 10 to 15 times larger than the provided official figures (Koss, Gidycz, & Wisniewski, 1987).

However, even when sexual abuse is reported, the offender is rarely arrested. A study by Lonsway and Archambault (2012) described an "ever widening gap" between reports of abuse and arrests using data found in the FBI Uniform Crime Reports (UCR) from 1971 – 2008. For example, in 1971, there were roughly 21 reports of forcible rape per 100,000 population and approximately 11 per 100,000 arrests. In 2008, the per capita reports of rape were 29.3 per 100,000 population but the per capita arrests were 7.5. This translates into a ratio of roughly 1 in 4 or exactly 25.6 percent as compared to a ratio of reports to arrests around 50% in the 70s.  They estimated that out of every 100 forcible rapes that are committed, between five and 20 will be reported, and 0.4 to 5.4 will be prosecuted and .2 to 2.8 result in a conviction.

Scurich and John (2019) used a probabilistic simulation approach using both offender self-report, victim disclosures, and different assumptions about the likelihood of being convicted of a new sexual offense if reported.  They concluded:

> Under any configuration of assumptions, the dark figure is substantial, and as a consequence the disparity between recidivism defined as a new legal charge or conviction for a sex crime and recidivism defined as actually committing a new sexual crime is large. These findings call into question the utility of recidivism studies that rely exclusively on official crime statistics to define sexual recidivism (p. 158)

First, we believe it is untenable for researchers to rely exclusively on sexual recidivism that is based on official crime statistics; the majority of sexual recidivism is not detected by such a definition. Moreover, legal and policy decision makers are understandably concerned with actual recidivism, not observed recidivism . . . The reality, as demonstrated in this paper, is that such studies may be capturing only a tiny sliver of actual sexual recidivism and that not much is known empirically about actual sexual recidivism—which may constitute the bulk of sexual recidivism.

Second, given that observed recidivism may be such a small sliver of actual recidivism, serious questions arise about the appropriateness of using actuarial risk assessment instruments trained to predict observed recidivism to address legal issues that are concerned with actual recidivism . . . No existing actuarial risk assessment instruments predict actual sexual recidivism or account for the difference between observed and actual recidivism rates (p. 172).

As demonstrated in this paper, under any realistic assumptions, the rate of actual sexual recidivism is substantially larger than the rate of observed sexual recidivism (p. 173)

Scurich and John have been criticized for some of the statistical analysis used in this study (see, e.g., Abbott, 2020). Nonetheless, whether or not the probabilistic analysis is accurate, the literature review reveals that virtually every study that has looked at undetected offending has concluded that only a small percentage of sexual offenses are ever reported to police and a miniscule number of offenses result in charges and convictions. Scurich and John are correct when they say, "Under any configuration of assumptions, the dark figure is substantial."

For some reason, a study by Finkelhor and colleagues of children 17 and under has been cited by some to refute studies that have found much higher rates of adult victimization of children.  Children were asked directly in this study if they had been sexually abused (Finkelhor, Shattuck, Turner, & Hamby, 2014). The lifetime prevalence of child sexual abuse was found to be 26.6% for girls and 5.1% for boys. Sexual abuse prevalence by adults was 11.2% for girls and 1.9% for boys. While interesting, this study likely has lower rates of sexual victimization by adults than some other studies because the majority of children who eventually disclose abuse do so as adults.  As has been pointed out, most child sexual abuse is not revealed in childhood, but only in adulthood. In childhood, victims are often living with perpetrators and the pressure not to tell is considerable. The "pressure cooker" that McElvaney and colleagues describe, does not seem to boil over for most until adulthood (McElvaney, Greene, & Hogan, 2012)

The counter often cited to this to this is that sexual offenses by not previously convicted offenders outnumber the offenses committed by repeat offenders. A 2008 study found that approximately 95% of all arrests for a sex offense in New York State which were eligible for the sex offender registry (RSOs) were offenders without a previous conviction for an eligible

9

sexual offense (Sandler, Freeman, & Social, 2008). It is not surprising that the group who were not previously convicted was dramatically larger than the group who had been previously convicted as the US population contains 100,994,367 adult males (https://www.infoplease.com/us/census/demographic-statistics) and even a small percentage of the population committing sex offenses would be larger than the group who have multiple convictions for sex offenses, given it is likely that not all sex offenders reoffend.

However, the entire argument is a red herring. The question is not which group has the most offenses but whether there is any reason to think that the 14% of offenses which are reported to police differs between offenders not previously convicted and offenders who have been. While the argument can be made that repeat offenders have more scrutiny when they are released and thus a higher percentage might be detected, it can also be argued they are less likely to be caught because of their experience. They may have developed techniques to ensure victims do not tell or targeted victim groups such as young children which make poor witnesses. I have certainly had offenders say they were attracted to elementary school children and older but targeted preschoolers because they were seldom put on the stand. Children may be under more pressure because the offender is a family member and family members do not want him to go back to jail. All in all, there is no compelling evidence to suggest the 14% of reported offenses is different between those with no previous convictions and those who do. The point remains that research that uses recidivism as the outcome variable, while valuable in its own right, is research on recidivism and needs to be clear about what percentage of sex offenses are actually discovered, taken to authorities, victims are believed, and the crimes sent to prosecutors for charges. The entire literature of sex offender actuarial instruments is actually based on a small minority of caught and charged offenses.

The second counter is that sanctions make a difference and offenders commit fewer offenses once they have been sanctioned. The issue of sanctions was addressed by a recent study by Kelly (in press). This study looked at 200 men who were ultimately civilly committed as Sexually Violent Predators. Polygraphs, done after their commitment, focused on detected and undetected offending in their past and correlated the number of undetected offenses with the dates of the sanctions. Detected offending was subtracted from the over-all count to yield a count of undetected offending following each time they were sanctioned. The premise was that sanctions would impact offending and also that individuals with sanctions were under more supervision so that their offenses were more likely to be detected, thus reducing the number of undetected offenses. This study was, of course, dependent on men remembering all their undetected victims, sometimes from decades in the past.[1] Only those men who had passed at least one part of a polygraph questionnaire were included. Seven of the men were convicted after the first offense, typically because of its nature, e.g., sexual homicide or contact offending in prison.

Results indicated that for the 89 men who were released following a first sanction, detected offenses were 22.57% of the total of detected and undetected offenses combined at their first arrest. After this first sanction, 548 victims were detected across all subsequent arrests and sanctions out of 1583 total detected and undetected victims. This meant that 34.62% of all

---

[1] One offender actually said in a court hearing where I was present, "But who can remember all of them?"

victims were detected. These differences were significant but reflected a small effect size. The authors concluded:

> Overall, we found that the individuals in this study continued to commit detected and undetected sexual offenses despite prior sanctions for such behavior. However, the proportion of victims detected significantly increased after an initial sanction, resulting in a lower proportion of undetected victims and fewer total victims overall. Of note, this effect only appears present following the first sanction. Second and third sanctions for sexual offenses did not appear to further suppress sexual offending or significantly increase the detection rate.

It should be noted this is not a typical sample as these men were civilly committed for sex offenses and this typically only occurs after multiple sexual convictions. I offer it, not as an indicator of how many undetected offenses the average offender commits, but because this study is used to say that undetected offending goes down after sanctions and that sex offenders are not likely to have many undetected offenses after a sanction. In this study, at all arrests and sanctions, there were more undetected offenses than detected.

> Of the cases who had one or more releases following their first sanction (*n* = 193), the total number of victims was 1,780. Of these, 557 victims (31.2%) were detected. This indicates that the true sexual offense rate was about 3.2 times higher than the reported rate of criminal offenses and within the range found in similar samples who had been incarcerated for a sexual offense (i.e., previous studies report rates from 1.25 to 7.0 times higher; Falshaw et al., 2003; Groth et al., 1982; Weinrott & Saylor, 1991).

The authors point out that the data were positively skewed with some individuals claiming to have no undetected offenses and others admitting large numbers. They also claim that offenders who continue to offend are likely, by their calculation, to eventually get caught. One analysis indicates that if there is a detection rate of 15% per victim, and by the 10th victim, only 20 of 100 offenders would still be undetected. However, it is of little comfort to know that it would take up to 10 victims per offender to get to that point. The analysis by Kelly et al. also assumes that all offenders have an equal likelihood of getting caught, but research indicates that some types of offenders, e.g., incest offenders, are less often reported than out-of-home offenders, and some offenders are more charming, powerful, and better at selecting victims who won't talk than others. There is no basis to assume that all offenders have an equal detection rate.

In addition to other issues regarding Static-99R, it should be noted that individuals who have only been caught for child pornography offenses cannot be assessed using the instrument. This is a major issue. While it is often claimed that child pornography possessors are a different type of sex offender and have very low rates of hands-on offenses (see, e.g. Seto, Hanson, & Babchishin, 2011), research which includes polygraph examinations have not found this to be true. A study by Drury examined the entire population of federal supervised release clients with at least one sexual offense in a federal jurisdiction in the Midwest between 2016 and 2020. There were 216 offenders. Of these 109 (50.5%) had an official arrest for a contact sexual offense and 107 (49.5) did not. Of these

offenders, 168 had self-report data. Of those 71 offenders with child pornography possession and no known contact offense history, 59% reported at least one contact sexual abuse victim.  More than 42% reported at least two victims. They concluded, "An offender's official criminal record is at best a sampling of his or her actual criminal activity" (Drury, 2020).

Likewise, Bourke and Hernandez found in their study of child pornography offenders that 26% of their sample of child pornography offenders were known to have at least one hands-on victims at sentencing, whereas by the end of treatment and polygraph testing 85% had acknowledged hands-on victims (Bourke & Hernandez, 2009). A 2015 study by Bourke and colleagues of 127 individuals under investigation for child pornography offenses (possession, receipt, or distribution) agreed to take a polygraph.  Prior to the polygraph only 4.7% admitted to a hands-on offense.  By the end of the procedure, 57.5% had admitted to at least one hands-on offense. This is lower than the previous Bourke study, but individuals in this sample were being investigated. They were not convicted and in a treatment program where admissions would have no practical consequences as they were in the 2009 study. In the 2015 study those who felt they might fail the polygraph could simply refuse to take it. By contrast, the polygraph was a part of the treatment program in 2009.

DeLisi's 2016 study of 119 federal sexual offenders used self-report backed by polygraph. The ratio of self-report to official victims was 3.32.  The seven most prolific sex offenders included four with no official criminal history except for possession or receipt of child pornography.  Child pornography offenders pose a risk not just of future of child pornography possession but often have a history of contact sexual offending and a future risk, particularly in the early years of release, of future contact sexual offending.

Differential Reporting

Static-99R authors have indicated that the ranking of offenders by risk is more reliable than the absolute numbers as the absolute numbers are not consistent across settings and samples and the rankings are (Helmus, 2022). It has been claimed that the rankings can be used to identify high-risk sex offenders even if the absolute numbers dramatically under-estimate offending (although the problem with that is it makes a difference in most settings if recidivism ranges from .4% to .8% or 40% to 80%). Nonetheless, the claim has been made that it does not matter if each charge is a proxy for, on average, 5 victims or a proxy for 150 or 250, the rankings will define the high-risk group.  This claim makes certain fundamental assumptions and before we conclude that measuring the risk of getting caught will rank order men who offend, these should be examined.  First, it assumes that the risk of getting caught is equal across offenders. The nature of sexual abuse disclosure, however, particularly by children, is such that *not* all types of offenses and all types of sex offenders are equally likely to be reported to police.

There are at least four reasons why some offenders get caught less than others: First some offenders are protected by their positions, whether they be priests, ministers, doctors, or others whose job role in the past was seen as incompatible with sexual offending.  In the case of priests, for instance, they were routinely transferred from one jurisdiction to another without legal intervention.  The hundreds of victims that some of them amassed testify to the fact that they were high risk to reoffend. However, even after hundreds of victims, they typically score very low on Static-99R because they often have no previous

12

charges or convictions.  Likewise, the military has been accused repeatedly of burying sexual abuse reports.

It would be strange, at the least, to say that one man who had hundreds of victims was *not* high risk to reoffend because he was protected by the church, whereas another man who also had hundreds of victims but was not protected by the church and who had several convictions behind him as a result, was at high risk.  Yet this is what Static-99R results would indicate.  These results make sense only if you realize that Static-99R measures the risk of getting caught in the future and therefore the man who did not have the protection of the church really was more likely to get caught in the future.

A second reason that offenders are differentially caught is that incest victims report less often and delay their reports more than out of home victims (Goodman-Brown, Edelstein, Goodman, Jones, & Gordon, 2003; Lyon, 2009; Malloy, Lyon, & Quas, 2007; Pipe et al., 2007; Sjoberg & Lindblad, 2002).  For instance, Smith et al., found long delays in 5% of those sexually abused by strangers but long delays in 48% of those abused by family members (Smith et al, 2000).

Because incest offenders are less often reported, they are less often likely to end up in the criminal justice system. Therefore, the fact that Static-99R gives a point to extrafamilial offenders but a 0 to those who "only" commit incest means that Static-99R results are in line with recidivism statistics, but in this case, not in line with the likelihood of reoffending. For example, let us consider the possible that victims might be twice as likely to report an out-of-home offense rather than an in-home offense.  (No one knows precisely what the figure would be so these numbers are chosen for illustrative purposes only.)  In that case, one would have to double the recidivism rates of incest offenders to be able to make valid comparisons when using charges and convictions as a proxy for reoffending.  Yet recidivism figures today make no such adjustments, thus making it look as though incest offenders are lower risk than out-of-home offenders.  They may be, but the literature consistently reports that incest victims delay reporting more or do not report at all, especially in childhood where they are often still living with the offender. Disclosures that occur during adulthood (which is when most victims report) are unlikely to result in criminal prosecution in any case, because of the likelihood the statute of limitations have expired.

 A third reason that offenders may go undetected some offenders have unusually good social skills and present a persona to the community that suggests they are not the kind of men who would do that kind of thing.  This influences both victims and those to whom the child might report. Victims often do not report when they do not expect to be believed (McElvaney, Greene, & Hogan, 2014).  Often when they do attempt to report such a man, their parents do not believe them, and the case never reaches the authorities.  In the case of a man that I interviewed who believed he had approximately 1250 victims over a 20-year period, he was reported to parents several times by children that he molested, but each time the parents rejected the accusations as incredible.  His first incarceration did not occur until after the 1250 victims. Thereafter, he continued to insinuate himself in churches and reoffend, despite his criminal convictions.   His charm over-rode the sensible step of checking his criminal background. Likeability is a factor in who gets caught and who doesn't. His new offenses were only discovered accidentally.

13

The final case in which charges and convictions may not be a good proxy for offending occurs because some offenders choose victims who are disabled or disadvantaged and whose lives are filled with loss, neglect, physical and emotional abuse.  Particularly when the offender provides some warmth and/or material goods the children may not report. Offenders who choose this type of victim often have long runs at molesting even after charges or convictions.  While Static-99R would have us believe they will have few offenses in the future because their lack of charges in the past will result in a low Static-99R score, in fact it is also possible that Static-99R is only correct in that the criminal justice system will not see them for a long time.  But does this mean they will not be offending?  Or just not getting caught?

In all of these cases the offender may have low scores on Static-99R but still be at high risk to offend.   On the other hand, offenders with little protection, with few social skills, and who do not choose their victims wisely will have a number of charges in the past and Static-99R no doubt is correct that they will have more in the figure.  However, it is not getting caught that makes someone high risk to reoffend.  Getting caught is simply a way to measure the extent to which the offender has offended in ways that made the criminal justice system take notice.

Static-99R does what it was designed to do:  it measures the chance someone will get caught in the future.  It was designed to predict recidivism, and it does so. However, there are situations where the likelihood of recidivism and the likelihood of reoffending differ. This makes it extremely problematic when individuals claim that Static-99R measures reoffending and that individuals who have not been arrested have not reoffended.

Static-99R is more problematic for those offenders who score low than those who score high. Do they score low because they are truly not high risk to reoffend?  This is certainly the case with many offenders.  Still, it may also be true that they score low because they have chosen their victims carefully in the past and have had few charges and convictions as a result.  Their victims may be related to them or may be severely disadvantaged. Conversely, they may have chosen a career which puts them in contact with children and in a position where they are likely to be believed over the children.  Not everyone who scores low on Static-99R is low risk to reoffend.  If certain dynamic factors are present, then Static-99R may not be an accurate indicator of their risk of reoffending, although it will be an accurate indicator of their likelihood of getting caught.

Is Static-99R by itself a Comprehensive Assessment

In 2022, Helmus wrote,

> Ultimately, a risk assessment score (e.g., Static-99R) is not the same thing as a comprehensive risk assessment . . . What additional information needs to be considered may depend on the purpose of the assessment. For example, it would be irresponsible to conduct a civil commitment evaluation based solely on Static-99R, without also using a structured risk scale to assess dynamic risk factors. However, static-only assessments may be fine for routine triage of large numbers of cases. Other issues external to Static-99R may be necessary to consider, including severe individual specific limitations, such as serious physical

disabilities or severely failing health. Obviously, stated intentions to reoffend or clear evidence of offense planning (compiling items for a rape kit) would also warrant special consideration. Static-99R can be misused either through myopic tunnel vision that fails to contextualize Static-99R as part of a broader assessment, or by minimizing Static-99R results in the presence of potentially redundant or irrelevant external information. (Helmus, 2022)

But is it fine to triage large numbers of cases with Static-99R alone? That may depend on the purpose of the triage and how much the triaging will impact the individual.

Thornton, Hanson and Helmus argued in a Summer 2010 ATSA Forum article that it is time to move beyond "the standard model" of actuarial assessment. The standard model involved 1) determining the offender's Static-99 score, 2) using the recidivism figures associated with that score as a starting point, 3) considering how similar the offender is to the offenders in the sample, 4) determining whether the offender has other risk characteristics which are not captured by Static-99R and 5) adjusting the risk level up or down in a relatively minor way as it has been thought that dynamic adjustments weakened the accuracy.

In the brief article they demonstrated that offenders with a specified Static-99R score whether it be 2, 5, or 7 (low, intermediate, or high) who had either high or low scores on Stable-2007 had very different recidivism rates. For example, offenders with a 7 on the routine norms who had a Stable 5 had a 14% recidivism rate over 3 years, whereas offenders with a 7 who had a Stable 14 had a 32% recidivism rate. Dynamic factors were shown to double the recidivism rate within the same Static score. While Thornton et al. emphasized their belief that this means that even with a high Static score the evaluator must still find evidence of negative dynamic factors outside Static-99R to say the person is truly high, obviously the converse is also true. Offenders with a low Static-99R score may, in fact, be high risk if they have dynamic factors which are outside Static-99R.

Despite its popularity, not everyone is a fan of Static-99R, particularly as a stand-alone assessment (see, e.g., Sreenivasan, Weinberger, Frances, & Cusworth-Walker, 2010). Sreenivasan et al., (2010) after a review of a number of issues with Static-99R including the failure of different samples in different places to produce the same or even similar absolute numbers wrote:

> The Static-99/Static-99R can be seen as one more tool that may be used by the clinician in rendering opinions on risk, as long as the clinician understands and conveys its limitations. Ignoring salient clinical factors (e.g., sexual sadism) because clinical judgment is out of vogue or not empirical and choosing instead the solitary application of actuarial risk norms can have serious consequences for the public. Clinical judgment is the process that incorporates all elements of a case, not just one, such as a numeric risk score. Forensic experts can provide an understanding of deviant drives that underlie sexual offenses and can identify "red flags" for risk (e.g., strangulation of a child victim during the sexual act that speaks to a pedophilic/sadistic focus) that are critical to the goal of a comprehensive risk assessment.

In my own practice, I spend at least 15 hours on each sex offender evaluation in my attempt to do a comprehensive assessment. There are usually a large number of records to be read, a 2 to 4-hour interview with the examinee, the Static-99R, Stable-2007, and the Hare Psychopathy Checklist-R to be scored, and a report to be written which includes the offender's history, the interview, the scores on the instruments, and other clinical information, (e.g., some offenders have become too disabled to offend) and other relevant factors. I would not find Static-99R alone sufficient, and it is potentially misleading as it does not measure progress through treatment. Regardless of the amount of treatment an offender has had and how he has responded to it, his Static-99R score will not change.

<u>Conclusions</u>

The most concerning use of Static-99R has been the tendency over time to confuse recidivism with sexual offending, ignoring the large and robust literature on victims that suggests only a minority of sexual offenses are ever reported to police, much less result in arrests, charges, and/or convictions.  Concerning also is the attempt to use Static-99R as a proxy for reoffending, as it does not take into account differential offending, which is definitely a factor in the incest variable but may well be one in the stranger variable as well, since strangers are reported more quickly and more reliably than acquaintance offenders. Static-99R is valuable for what it does. Research on recidivism is important, but Static-99R can only be used wisely if both its strengths and limitations are understood. If there are issues with the method that is being used to determine who belongs on the Michigan Registry, they will not be solved by substituting Static-99R as a stand-alone instrument.

References

Abbott, B. (2020). Illuminating the dark figure of sexual recidivism. *Behavioral Sciences and the Law, 38*(6), 543-558.

Blumstein, A., & Nakamura, K. (2009). Redemption in the presence of widespread criminal background checks. . *Criminology, 47*, 327-359.

Bouchard, M., & Lussier, P. (2015). Estimating the size of the sexual aggresor popuolation. In A. Blokland & P. Lussier (Eds.), *Sex offenders: A criminal career approach*. Malden, MA: John Wiley & Sons.

Bourke, M. L., & Hernandez, A. E. (2009). The "Butner Study" redux: A report of the incidence of hands-on child victimization by child pornography offenders. *Journal of Family Violence, 24*(3), pp. 183- 191.

Daly, M., & Bouhours, B. (2010). Rape and attrition in the legal process:  A comparative analysis of five countries. *Crime and Justice, 39*, 565-650.

DeLisi, M., Caropreso, D. E., Drury, A. J., Elbert, M. J., Evans, J. L., Heinrichs, T., & Tahja, K. M. (2016). The dark figure of sexual offending: New evidence from federal sex offenders. *Journal of Criminal Psychology, 6*(1), 3-15.

Drury, A. J. E., Michael J; DeLisi, Matt. (2020). The dark figure of sexual offending: A replication and extension. *Behavioral Sciences & the Law, 38*(6), 559-570.

Elliott, M. (Ed.) (1993). *Female Sexual Abuse of Children*. New York: Guilford Press.

Finkelhor, D., Shattuck, A., Turner, H. A., & Hamby, S. (2014). The lifetime prevalence of child sexual abuse and sexual assault assessed in late adolescence. *Journal of Adolescent Health, 55*(3), 329-333.

Goodman-Brown, T. B., Edelstein, R. S., Goodman, G. S., Jones, D. P. H., & Gordon, D. S. (2003). Why chldren tell: a model of children's disclosure of sexual abuse. *Child Abuse and Neglect, 27*, 525-540.

Grove, W. M., Zald, D. H., Boyd, S. L., Snitz, B. E., & Nelson, C. (2000). Clinical versus mechanical prediction: A meta-analysis. *Psychological Assessment, 12*(1), 19-30.

Hanson, K. (2004). *Predictors of sexual recidivism:  An updated meta-analysis*. Retrieved from Ottawa:

Hanson, K., & Bussiere, M. T. (1998). Predicting relapse:  a meta-analysis of sexual offender recidivism studies. *Journal of Consulting and Clinical Psychology, 66*, 348-362.

Hanson, K., & Morton-Bourgon, K. (2005). The Characteristics of Persistent Sexual Offenders: A Meta-Analysis of Recidivism Studies. *Journal of Consulting & Clinical Psychology, 73*(6), 1154-1163.

Hanson, K., & Morton-Bourgon, K. (2009). The accuracy of recidivism risk assessments for sexual offenders: A meta-analysis of 118 prediction studies. *Psychological Assessment, 21*(1), 1-21.

Hanson, K., & Thornton, D. (2000). Improving Risk Assessments for Sex Offenders: A Comparison of Three Actuarial Scales. *Law and Human Behavior, 24*(1), 119-136.

Helmus, L. (2022). Static-99R: Strengths, Limitations, Predictive Accuracy Meta-Analysis, and Legal Admissibility Review. *Psychology, Public Policy, and Law,, 29*(3), 307-331.

Hilton, N. Z., Harris, G. T., & Rice, M. E. (2006). Sixty-six years of research on the clinical versus actuarial assessment of violence. *The Counseling Psychologist, 34*(3), 400-409.

Jackson, R. L., & Hess, D. T. (2007). Evaluation for Civil Commitment of Sex Offenders:  A Survey of Experts. *Sexual Abuse:  A Journal of Research and Treatment, 19*(4), 425-448.

Jonzon, E., & Lindblad, F. (2016). Disclosure, reactions, and social support: Findings from a sample of adult victims of child sexual abuse. *Child Maltreatment, 9*(2), 190-200.

Kelly, S. M., Kahn, R. E., Mundt, J. C., & Barahal, R. M. (in press). Do sanctions affect undetected sexual offending. *in press*. Retrieved from https://doi.org/10.1177/10790632221139178

Koss, M. P., Gidycz, C. A., & Wisniewski, N. (1987). The scope of rape:  Incidence and prevalence of sexual aggression and victimization in a national sample of higher education students. *Journal of Consulting and Clinical Psychology, 55*(2), 162-170.

Krahn, B. (2008). *Sexual Assault and the Justice Gap:  A Question of Attitude*. Oxford, England: Hart Publishing.

Langevin, R. C., Suzanne; Federoff, Paul; Bennett, Renee. (2004). Lifetime Sex Offender Recidivism: A 25-Year Followup Study. *Canadian Journal of Criminology and Criminal Justice, 46*(531-552).

Lisak, D., & Miller, P. M. (2002). Repeat rape and multiple offending among undetected rapists. *Violence and Victims, 17*(1), 73-84.

London, K., Bruck, M., Ceci, S. J., & Shuman, D. W. (2005). Disclosure of child sexual abuse: What does the research tell us about the ways that children tell? *Psychology, Public Policy, and Law, 11*(1), 194-226.

London, K., Bruck, M., Ceci, S. J., & Shuman, D. W. (2007). Disclosure of child sexual abuse: A review of the contemporary empirical literature. In M. E. Pipe, M. Lamb, Y. Orbach, & A.-C. Cederborg (Eds.), *Child Sexual Abuse:  DIsclosure, Delay and Denial* (pp. 11-39). New York: Routeledge.

Lonsway, K. A., & Archambault, J. (2012). The "justice gap" for sexual assault cases: Future directions for research and reform. *Violence against women, 18*(2), 145-168.

Lyon, T. D. (2009). Abuse disclosure:  What adults can tell. In B. L. Bottoms, C. J. Najdowski, & G. S. Goodman (Eds.), *Children as victims, witnesses, and offenders:  Psychological science and the law*. New York: Guilford Press.

Malloy, L. C., Lyon, T. D., & Quas, J. A. (2007). Filial dependency and recantation of child sexual abuse allegations. *Journal of the Academy of Child and Adolescent Psychiatry, 46*, 162-170.

McElvaney, R., Greene, S., & Hogan, D. (2012). Containing the secret of child sexual abuse. *Journal of Interpersonal Violence, 27*(6), 1155-1175.

McElvaney, R., Greene, S., & Hogan, D. (2014). To tell or not to tell: Factors influencing young people's informal disclosures of child sexual abuse. *Journal of Interpersonal Violence, 29*(5), 928-947.

Neil, T. M. S., & Grisso, T. (2014). Assessment practices and expert judgment methods in forensic psychology and psychiatry. *Criminal Justice and Behavioar, 41*(12), 1406-1421.

Pipe, M.-E., Lamb, M. E., Orbach, Y., Sternberg, K. J., Steward, H. L., & Esplin, P. (2007). Factors associated with nondisclosure of suspected abuse during forensic interviews. In M.-E. Pipe, M. E. Lamb, Y. Orbach, & A.-C. Cederberg (Eds.), *Child Sexual Abuse: Disclosure, Delay, and Denial* (pp. 77-96). Mahjah, NJ: Lawrence Erlbaum.

Russell, D. E. H. (1984). *Sexual Exploitation:  Rape, Child Sexual Abuse, and Workplace Harassment*. Beverly Hills, CA: Sage.

Sandler, J. C., Freeman, N. J., & Social, K. M. (2008). Does a watched pot boil? A time-series analysis of New York State's Sex Offender Registration and Notification Law. *Psychology, Public Policy, and Law, 14*(4), 284-302.

Saunders, B. E., Villeponteaux, L. A., Lipovsky, J. A., Kilpatrick, D. G., & Veronen, L. J. (1992). Child sexual assault as a risk factor for mental disorders among women:  A community study. *Journal of Interpersonal Violence, 7*(2), 189-204.

Schenk, A. M., Cooper-Lehki, C., Keelan, C. M., & Fremouw, W. (2014). Underreporting of bestiality among juvenile sex offenders: Polygraph versus self-report. *Journal of Forensic Sciences, 59*(2), 540-542.

Scurich, N., & John, R. S. (2019). The dark figure of sexual recidivisim. *Behavioral Sciences & the Law, 37*(2), 158-175.

Seto, M. C., Hanson, K., & Babchishin, K. M. (2011). Contact sexual offending by men with online sexual offenses. *Sexual Abuse:  A Journal of Research and Treatment, In press*.

Sjoberg, R., & Lindblad, F. (2002). Limited disclosure of sexual abuse in children whose experiences were documented by videotape. *American Journal of Psychiatry, 159*(2), 312-314.

Smith, D. W., Letourneau, E. J., Saunders, B., Kilpatrick, D. G., Resnick, H. S., & Best, C. L. (2000). Delay in disclosure from childhood rape:  Results from a  national survey. *Child Abuse and Neglect: The International Journal, 24*(2), 273-287.

Sreenivasan, S., Weinberger, L. E., Frances, A., & Cusworth-Walker, S. (2010). Alice in Actuarial-Land: Through the Looking Glass of Changing Static-99 Norms. *The Journal of the American Academy of Psychiatry and the Law, 38*(3), 400-406.

Temkin, J., & Krahé, B. (2008). *Sexual Assault and the Justice Gap:  A Question of Attitude*. Oxford and Portland, Oregon: Hart Publishing.

Weinrott, M. R., & Saylor, M. (1991). Self-report of crimes committed by sex offenders. *Journal of Interpersonal Violence, 6*(3), 286 - 300.

# CURRICULUM VITAE

## ANNA CAROL SALTER, Ph.D.

PO Box 849
Como, CO 80432
(608-358-7373)
Acsalter@annasalter.com
(Email preferred)

### CERTIFICATIONS:

Licensed psychologist by State of Wisconsin, No. 1982
Licensed psychologist, State of Iowa, No. 077860
Licensed psychologist, State of Colorado, Psy00050066

### ORGANIZATONS:

American Psychological Association – lifetime status
Association for the Treatment of Sexual Abusers
Society for the Scientific Study of Psychopathy
Academy for Violence and Abuse
National Register of Health Care Providers in Psychology

### EDUCATIONAL RECORD:

1977          Ph.D. in Clinical Psychology and Public Practice
              Harvard University
              Cambridge, Massachusetts

1973          MA in Child Study Tufts University,
              Eliot-Pearson Department of Child Study
              Medford, Massachusetts

1968          BA in Philosophy and English
              University of North Carolina
              Chapel Hill, North Carolina,

1964-66       Wake Forest University
              Winston-Salem, North Carolina

### FELLOWSHIPS:

| | |
|---|---|
| 1973-1976 | Teaching Fellow<br>Department of Psychology and Social Relations<br>Harvard University, Cambridge, Massachusetts |
| 1971-1972 | Teaching Fellow<br>Department of Child Study<br>Tufts University, Medford, Massachusetts |

**EXPERIENCE:**

| | |
|---|---|
| 2014 – present | Annual Evaluator for the Civil Commitment Program for the State of Iowa.  Have done 399 annual evaluations of civilly committed sex offenders in Iowa for Transition or Release. |
| 2003 – 2015 | Civil Commitment Evaluator for the State of Iowa<br>Responsible for 100 + initial Sexually Violent Predator Evaluations. |
| 1980 – present | Have testified as an expert in both civil and criminal trials |
| 1996 - 2019 | Consultant<br>Department of Corrections, State of Wisconsin |
| 2009 – 2013 | Consultant<br>Tri-Counties Juvenile Sex Offender Project |
| 1988-96 | Private Practice, Lebanon, New Hampshire<br>Adjunct Professor of Clinical Psychiatry and<br>Clinical Maternal and Child Health<br>Dartmouth Medical School, Hanover, New Hampshire |
| 1985-1988 | Assistant Professor of Clinical Psychiatry and<br>Maternal and Child Health<br>Dartmouth Medical School, Hanover, New Hampshire |
| 1981-1988 | Assistant Professor of Clinical Psychiatry,<br>Department of Psychiatry<br>Dartmouth Medical School Hanover, New Hampshire |
| 1984-1988 | Director of Child Psychiatry Consultation Service<br>Mary Hitchcock Memorial Hospital and Clinic<br>Hanover, New Hampshire |

| 1983-1988 | Director of Psychosocial Education<br>Pediatric Residency Training Program,<br>Department of Maternal and Child Health<br>Dartmouth Medical School, Hanover, New Hampshire |
|---|---|
| 1985-1988 | Assistant Director, Children-At-Risk Program,<br>Department of Maternal and Child Health<br>Dartmouth-Hitchcock Medical Center<br>Hanover, New Hampshire |
| 1985-1988 | Co-Director, Parenting Clinic<br>Department of Maternal and Child Health<br>Dartmouth-Hitchcock Medical Center<br>Hanover, New Hampshire |
| 1984–1990 | Director, Parents in Distress Program<br>Department of Maternal and Child Health<br>Dartmouth-Hitchcock Medical Center<br>Hanover, New Hampshire |
| 1981-1985 | Psychologist, Children-At-Risk Program<br>Department of Maternal and Child Health<br>Dartmouth-Hitchcock Medical Center<br>Hanover, New Hampshire |
| 1979-1984 | Psychotherapist,<br>West Central Community Mental Health Services<br>Hanover, New Hampshire |
| 1978-1979 | Assistant Professor, Department of Social and<br>Behavioral Sciences<br>Colby-Sawyer College, New London, New Hampshire |

## TRAININGS & WORKSHOPS:

| 1978 - present | Dr. Salter has conducted trainings on sexual abuse in 50 states and 10 countries (England, Canada, Scotland, France, Sweden, Holland, Australia (including Tasmania), New Zealand, Germany, Costa Rico) |
|---|---|

### Recent Trainings:

| March<br>2020-2022 | Quit traveling in March 2020 because of Covid. Have done only remote trainings since then: Anchorage, Alaska, Des Moines, |
|---|---|

3

Iowa, Austin, Texas, Montreal, Canada. Pending training for FBI and National Security Agency psychologists.

2020     Anchorage, Alaska; FBI Behavior Analysis Unit, Virginia; Phoenix, AZ, Chicago, IL; Des Moines, IA

2019     Atlanta, Georgia; FBI Behavioral Analysis Unit, Virginia; Madison, Wisconsin; Ontario, Canada; Phoenix, Arizona; Winnipeg, Canada

2018     Anchorage, Alaska; FBI Behavioral Analysis Unit, Virginia; Des Moines, Iowa; La Crosse, Wisconsin; Madison and the Dells, Wisconsin; Winnipeg, Canada;

2017     Mooseheart and Moline, Illinois, San Diego, California; Madison, Wisconsin; Pittsburg, Pennsylvania; Newton, Massachusetts

2016     Penn State, PA; Sioux Falls, SD; Moline, IL; Los Angeles, CA; WI

2015     Canada; FBI in Charlottesville, VA; Des Moines, IA: Dubuque, IA; Biloxi, MS; Spartanburg, SC, Wisconsin Dells, WI; WY

2014     Mt. Aloynsius, PA; Atlanta, GA; Mt. Eau Claire, Lake Geneva, Manitowoc, and Rhinelander, WI; Mooseheart, IL; Utah; San Diego, CA; Winnipeg, Canada

2013     Baltimore, MD; Denver, CO; Idaho; JAG Training School, W Va.; Illinois; Louisville, KY; Marietta, GA; Ohio; Michigan; Salt Lake, Utah; Savannah, GA; Wisconsin;

2012     Atlanta, Arizona, California, Georgia, Idaho, Illinois, Iowa, Louisiana, Maryland, Nebraska, Oregon, Pennsylvania, Tasmania, Texas, Utah, Virginia, Wisconsin,

2011     Colorado, Delaware, Georgia, Indiana, Illinois Iowa, North Dakota, Ohio, Oklahoma, Texas, West Virginia, Wisconsin

2010     Alaska, Florida, Kansas, Illinois, London Canada, Montana, New York, Paris France, Pennsylvania, Rhode Island, Texas, Winnipeg Canada, West Virginia, Wisconsin

4

| | |
|---|---|
| 2009 | California, Colorado, Florida, Hawaii, Illinois, Indiana, Nevada, New York, Regina (Canada),  Regina Canada, Texas, Victoria (Canada), Toronto (Canada), Victoria (Canada), Wisconsin, |
| 2008 | Alaska, Connecticut, Florida, New York, Oregon, Pennsylvania, Texas, Virginia, Washington DC, Wisconsin |
| 2007 | California, Florida,  Maryland, Massachusetts, Minnesota, North Dakota, Texas, Virginia, Wisconsin |
| 2006 | Delaware, Illinois, Indiana, Minnesota, New York, Oregon, Pennsylvania, Tennessee, Virginia, Washington, Wisconsin |
| 2005 | Arizona, Germany, Indiana, Louisiana, Ohio, Virginia, Wisconsin |
| 2004 | Alabama,  California, Canada, Colorado, Idaho, Indiana, Illinois, Massachusetts, Missouri, New Mexico, New York, Ohio, Oregon, Pennsylvania, Texas, Vermont |

## PUBLICATIONS, AWARDS & EXAMPLES OF WORKSHOPS:

Salter, A. *Predators:  Pedophiles, Rapists, and Other Sex Offenders:  Who They Are, How They Operate, and How We Can Protect Our Children.* New York:  Basic Books, 2003. Second edition to be released in the fall of 2019.

Working with Victims and Offenders of Sexual Abuse.  Three Day Workshop, Launceston, Tasmania.

 "Truth, Lies, and Sex Offenders," and "Sadistic and Nonsadistic Sex Offenders," (Educational Films). Newbury Park, CA, Sage Publications.

"Sex Offender Assessment and Treatment."  Paper presented at Sexual Abuse, Research and Treatments Conference sponsored by the L'Institut de la famille de Toulouse, Lillie, France, November 26th – 28th, 1998.

"Evaluation and Treatment of Sex Offenders," Workshop presented in Stockholm, Sweden, November 20th, 1998.

Salter, A. Confessions of a whistle blower:  Lessons learned. *Ethics and Behavior.* 8(2), 1998, pp. 115-124.

Significant Achievement Award, Association for the Treatment of Sexual Abusers, October, 1997.  Presented at the ATSA National Conference, Arlington, VA, October 16, 1997.

Salter, A. "Risk Assessment of Sex Offenders," Keynote Address presented at the National Offender Treatment Association, Southampton, England, September 11, 1997.

Salter, A. "Special Issues in Sex Offender Assessment and Treatment."  Workshop presented at A Gathering of Experts., San Diego, August 22, 1997.

Salter, A. "Confessions of a Whistle Blower:  Lessons Learned."  Presented at the American Psychological Association, August 18, 1997.

Salter, A. "Adjudication of Sex Offenders,"  presented at the 1996, 1997, 1998 and 1999 Florida College of Advanced Judicial Studies,.

"Understanding Sexual Violence:  The Judicial Response to Stranger and Nonstranger Rape and Sexual Assault," presented at the Northern New England Judicial Education Conference, October 20, 1996, Bretton Woods, NH.

Salter, A. *Transforming Trauma:  A Guide to Understanding and Treating Survivors of Child Sexual Abuse.*  Newbury Park, CA:  Sage Publications, 1995

Keynote Speaker. "How to Get Sex Offenders out of the Heads of Victims" presented at the National Conference on Child Sexual Abuse. February, 1995, Auckland, New Zealand.

Featured Speaker.  2 Day Workshops in each of 6 Australian cities on Assessment and Treatment of Sex Offenders and Victims, February and March, 1995.

Keynote Speaker.  "Treating Victims and Offenders of Child Sexual Abuse" and "Transforming Trauma" presented at the First National Conference on Child Sexual Abuse for the Children's Protection Society, March 16-18, 1994, Melbourne Australia.

Salter, A. Epidemiology of child sexual abuse.  In O'Donohue, W. and Geer, J. H.  *The Sexual Abuse of Children:  Theory and Research Volume 1.* Hillsdale, NJ:  Lawrence Erlbaum Associates, 1992

Salter, A. Response to the "Abuse of the child sexual abuse accommodation syndrome." *Journal of Child Sexual Abuse.*  V. 1(4), pp. 173-177, 1992.

6

"Parents in Distress Program." Keynote Speaker at the New England Association of Child Welfare Commissioners and Directors Annual Meeting; Warwick, Rhode Island.  February, 1989.

"A Systems Approach to Managing Sexual Offenders." National Institute of Corrections Conference;  Boulder, Colorado.  September 12-16, 1988.

Grant Recipient.  Principal Investigator. National Institute of Corrections, Washington, D.C. "Training Child Sex Offenders: A Curriculum for Mental Health Professionals within Corrections." July, 1988.

Grant Recipient.  Principal Investigator. National Institute of Corrections, Washington, D.C. "Audiovisual Presentation on the Treatment and Assessment of Child Sex Offenders Designed as Companion Materials to be Used with *Training Child Sex Offenders: A Curriculum for Mental Health Professionals within Corrections.* " July, 1988.
Grant Recipient.  Principal Investigator. New England Child Welfare Commissioners, "The Reliability of Children's Testimony in Child Sexual Abuse Cases," April,1988.

Salter, A.  *Treating Child Sex Offenders and Victims*.  Newbury  Park, CA: Sage Publications, 1988.

Grant Recipient.  Hitchcock Foundation, Hanover, New Hampshire. "Psychopathology, Empathy and Life Stress Factors Correlated with Maltreatment of Children."  September 1987.

Grant Recipient.  Co-investigator with S. Kairys, M.D.  National Institute of Corrections, Washington, D.C.  "Treating Child Sex Offenders: A Curriculum for Mental Health Professionals," September 15, 1987.

Grant Recipient.  Charles Ulrich and Josephine Bay Foundation, New York, New York.  Grant to implement Child Abuse Treatment Project.  December 1986.

Grant Recipient.  Charles Ulrich and Josephine Bay Foundation, New York, New York. Planning Grant to develop Child Abuse Treatment Project.  December 1985

Salter, A., Kairys, S., and Richardson, C.  "Treating Abusive Parents," *Child Welfare*, 64(4): 327-241, July-August 1985.

Salter, A., Richardson, C., and Martin, P "Working with Abused Preschoolers:  A Guide for Caretakers,"  .  *Child Welfare*, 64(4): 343-356, July-August 1985.

7

Grant Recipient.  B.R.S.G. Dartmouth Medical School Research Grant Committee, Dartmouth College, Hanover, New Hampshire.  Pilot study on "Psychopathology, Empathy and Life Stress: Factors Correlated to Child Maltreatment.  1984.

Saul Blatman Award for Excellence in Teaching, Pediatric Residency Training Program, Department of Maternal and Child Health, Dartmouth Medical School, Hanover, New Hampshire.  1984