# Exhibit 146:

American Law Institute, Model Penal Code, Sexual Assault and Related Offenses, Section 213.11

Submitted by the Council to the membership of
The American Law Institute
for consideration at the 2021 Annual Meeting on May 17-18 and June 7-8, 2021.



# Model Penal Code:
# Sexual Assault and Related Offenses

---

*Tentative Draft No. 5*

(May 4, 2021)

---

**SUBJECTS COVERED**

| | |
|---|---|
| **ARTICLE 213** | Part I – Grading |
| | Part II – Sections 213.0 to 213.11J |
| **APPENDIX A** | Pertinent 1962 Code Provisions |
| **APPENDIX B** | Black Letter of Tentative Draft No. 5 |

The Executive Office
The American Law Institute
4025 Chestnut Street
Philadelphia, PA 19104-3099
Telephone: (215) 243-1626 • Fax: (215) 243-1636
E-mail: ali@ali.org • Website: http://www.ali.org

©2021 by The American Law Institute
All Rights Reserved

As of the date on its cover, this draft had not been considered by the membership of The American Law Institute and therefore may not represent the position of the Institute on any of the issues with which it deals. Any action taken by the membership with respect to this draft may be ascertained by consulting the ALI website or the Proceedings of the Annual Meeting.

# The American Law Institute

DAVID F. LEVI, President
LEE H. ROSENTHAL, 1st Vice President
TERESA WILTON HARMON, 2nd Vice President
WALLACE B. JEFFERSON, Treasurer
PAUL L. FRIEDMAN, Secretary
RICHARD L. REVESZ, Director
STEPHANIE A. MIDDLETON, Deputy Director

### COUNCIL

KIM J. ASKEW, DLA Piper US LLP, Dallas, TX
DONALD B. AYER, McLean, VA
SCOTT BALES, Arizona Supreme Court (retired), Phoenix, AZ
JOHN H. BEISNER, Skadden, Arps, Slate, Meagher & Flom, Washington, DC
JOHN B. BELLINGER III, Arnold & Porter, Washington, DC
EVAN R. CHESLER, Cravath, Swaine & Moore, New York, NY
MARIANO-FLORENTINO CUÉLLAR, California Supreme Court, San Francisco, CA
ALLISON H. EID, U.S. Court of Appeals, Tenth Circuit, Denver, CO
IVAN K. FONG, 3M Company, St. Paul, MN
KENNETH C. FRAZIER, Merck & Co., Inc., Kenilworth, NJ
PAUL L. FRIEDMAN, U.S. District Court, District of Columbia, Washington, DC
STEVEN S. GENSLER, University of Oklahoma College of Law, Norman, OK
DANIEL C. GIRARD, Girard Sharp LLP, San Francisco, CA
ABBE R. GLUCK, Yale Law School, New Haven, CT (on leave from Council until fall 2021)
YVONNE GONZALEZ ROGERS, U.S. District Court, Northern District of California, Oakland, CA
ANTON G. HAJJAR, Chevy Chase, MD
THOMAS M. HARDIMAN, U.S. Court of Appeals, Third Circuit, Pittsburgh, PA
TERESA WILTON HARMON, Sidley Austin, Chicago, IL
NATHAN L. HECHT, Texas Supreme Court, Austin, TX
WILLIAM C. HUBBARD, University of South Carolina School of Law, Columbia, SC
SAMUEL ISSACHAROFF, New York University School of Law, New York, NY
KETANJI BROWN JACKSON, U.S. District Court, District of Columbia, Washington, DC
WALLACE B. JEFFERSON, Alexander Dubose & Jefferson LLP, Austin, TX
GREGORY P. JOSEPH, Joseph Hage Aaronson LLC, New York, NY
MICHELE C. KANE, The Walt Disney Company, Burbank, CA
PAMELA S. KARLAN, Stanford Law School, Stanford, CA
HAROLD HONGJU KOH, Yale Law School, New Haven, CT
CAROLYN B. KUHL, Superior Court of California, County of Los Angeles, Los Angeles, CA
DEREK P. LANGHAUSER, Maine Maritime Academy and Community Colleges, Cumberland Foreside, ME
CAROL F. LEE, Taconic Capital Advisors, New York, NY
DAVID F. LEVI, Duke University School of Law, Durham, NC
LANCE LIEBMAN*, Columbia Law School, New York, NY
GOODWIN LIU, California Supreme Court, San Francisco, CA
RAYMOND J. LOHIER, JR., U.S. Court of Appeals, Second Circuit, New York, NY
GERARD E. LYNCH, U.S. Court of Appeals, Second Circuit, New York, NY
LORI A. MARTIN, WilmerHale, New York, NY
TROY A. MCKENZIE, New York University School of Law, New York, NY
M. MARGARET MCKEOWN, U.S. Court of Appeals, Ninth Circuit, San Diego, CA
JUDITH A. MILLER, Chevy Chase, MD
PATRICIA ANN MILLETT, U.S. Court of Appeals, District of Columbia Circuit, Washington, DC
JANET NAPOLITANO, University of California Berkeley, Goldman School of Public Policy, Berkeley, CA
KATHRYN A. OBERLY, District of Columbia Court of Appeals (retired), Palm Beach, FL
KATHLEEN M. O'SULLIVAN, Perkins Coie, Seattle, WA

*Director Emeritus

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

STEPHANIE E. PARKER, Jones Day, Atlanta, GA
STUART RABNER, New Jersey Supreme Court, Trenton, NJ
DAVID W. RIVKIN, Debevoise & Plimpton, New York, NY
DANIEL B. RODRIGUEZ, Northwestern University Pritzker School of Law, Chicago, IL
LEE H. ROSENTHAL, U.S. District Court, Southern District of Texas, Houston, TX
GARY L. SASSO, Carlton Fields, Tampa, FL
ANTHONY J. SCIRICA, U.S. Court of Appeals, Third Circuit, Philadelphia, PA
MARSHA E. SIMMS, Weil, Gotshal & Manges (retired), New York, NY
ROBERT H. SITKOFF, Harvard Law School, Cambridge, MA
JANE STAPLETON, Christ's College, University of Cambridge, Cambridge, England
LAURA STEIN, Mondelēz International, Chicago, IL
LARRY S. STEWART, Stewart Tilghman Fox Bianchi & Cain (retired), Jupiter, FL
ELIZABETH S. STONG, U.S. Bankruptcy Court, Eastern District of New York, Brooklyn, NY
CATHERINE T. STRUVE, University of Pennsylvania Carey Law School, Philadelphia, PA
JEFFREY S. SUTTON, U.S. Court of Appeals, Sixth Circuit, Columbus, OH
SARAH S. VANCE, U.S. District Court, Eastern District of Louisiana, New Orleans, LA
SETH P. WAXMAN, WilmerHale, Washington, DC
STEVEN O. WEISE, Proskauer Rose LLP, Los Angeles, CA
DIANE P. WOOD, U.S. Court of Appeals, Seventh Circuit, Chicago, IL

## COUNCIL EMERITI

KENNETH S. ABRAHAM, University of Virginia School of Law, Charlottesville, VA
PHILIP S. ANDERSON, Little Rock, AR
SUSAN FRELICH APPLETON, Washington University School of Law, St. Louis, MO
JOSÉ I. ASTIGARRAGA, Reed Smith, Miami, FL
SHEILA L. BIRNBAUM, Dechert LLP, New York, NY
ALLEN D. BLACK, Fine, Kaplan and Black, Philadelphia, PA
AMELIA H. BOSS, Drexel University Thomas R. Kline School of Law, Philadelphia, PA
MICHAEL BOUDIN, U.S. Court of Appeals, First Circuit, Boston, MA
WILLIAM M. BURKE, Costa Mesa, CA
ELIZABETH J. CABRASER, Lieff Cabraser Heimann & Bernstein, San Francisco, CA
GERHARD CASPER, Stanford University, Stanford, CA
EDWARD H. COOPER, University of Michigan Law School, Ann Arbor, MI
N. LEE COOPER, Maynard, Cooper & Gale, Birmingham, AL
GEORGE H. T. DUDLEY, Dudley Newman Feuerzeig, St. Thomas, U.S. VI
CHRISTINE M. DURHAM, Utah Supreme Court (retired), Salt Lake City, UT
CONRAD K. HARPER, New York, NY
D. BROCK HORNBY, U.S. District Court, District of Maine, Portland, ME
MARY KAY KANE, University of California, Hastings College of the Law, San Francisco, CA
CAROLYN DINEEN KING, U.S. Court of Appeals, Fifth Circuit, Houston, TX
CAROLYN B. LAMM, White & Case, Washington, DC
DOUGLAS LAYCOCK, University of Virginia School of Law, Charlottesville, VA
PIERRE N. LEVAL, U.S. Court of Appeals, Second Circuit, New York, NY
BETSY LEVIN, Washington, DC
MARTIN LIPTON, Wachtell, Lipton, Rosen & Katz, New York, NY
MYLES V. LYNK, District of Columbia Office of Disciplinary Counsel, Washington, DC
MARGARET H. MARSHALL, Choate Hall & Stewart, Cambridge, MA
JOHN J. "MIKE" MCKETTA III, Graves, Dougherty, Hearon & Moody, Austin, TX
ROBERT H. MUNDHEIM, Shearman & Sterling, New York, NY
HARVEY S. PERLMAN, University of Nebraska College of Law, Lincoln, NE
ELLEN ASH PETERS, Connecticut Supreme Court (retired), Hartford, CT
ROBERTA COOPER RAMO*, Modrall Sperling, Albuquerque, NM
MARY M. SCHROEDER, U.S. Court of Appeals, Ninth Circuit, Phoenix, AZ
ROBERT A. STEIN, University of Minnesota Law School, Minneapolis, MN
MICHAEL TRAYNOR*, Cobalt LLP, Berkeley, CA
FREDERICK WILLIAM (BILL) WAGNER, Wagner McLaughlin, Tampa, FL
WILLIAM H. WEBSTER, Milbank LLP (retired), Washington, DC
HERBERT P. WILKINS, Concord, MA

*President Emeritus and Chair of the Council Emeritus

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

**Model Penal Code:**
**Sexual Assault and Related Offenses**

Comments and Suggestions Invited

We welcome written comments on this draft. They may be submitted via the website project page or sent via email to MPCSAcomments@ali.org. Comments will be forwarded directly to the Reporters, the Director, and the Deputy Director. You may also send comments via standard mail; contact information appears below.

Unless expressed otherwise in the submission, individuals who submit comments authorize The American Law Institute to retain the submitted material in its files and archives, and to copy, distribute, publish, and otherwise make it available to others, with appropriate credit to the author. Comments will be accessible on the website's project page as soon as they are posted by ALI staff. You must be signed in to submit or view comments.

Reporter
Professor Stephen J. Schulhofer
New York University School of Law
40 Washington Square South # 322B
New York, NY 10012-1005
Email: stephen.schulhofer@nyu.edu

Associate Reporter
Professor Erin E. Murphy
New York University School of Law
40 Washington Square South # 419
New York, NY 10012-1005
Email: erin.murphy@nyu.edu

Director
Professor Richard L. Revesz
The Executive Office
THE AMERICAN LAW INSTITUTE
4025 Chestnut Street
Philadelphia, PA 19104-3099
Email: director@ALI.org

Deputy Director
Ms. Stephanie A. Middleton
The Executive Office
THE AMERICAN LAW INSTITUTE
4025 Chestnut Street
Philadelphia, PA 19104-3099
Email: smiddleton@ALI.org

Reporters' Conflicts of Interest

The project's Reporters may have been involved in other engagements on issues within the scope of the project; all Reporters are asked to disclose any conflicts of interest, or their appearance, in accord with the Policy Statement and Procedures on Conflicts of Interest with Respect to Institute Projects.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

# Model Penal Code:
# Sexual Assault and Related Offenses

REPORTER
STEPHEN J. SCHULHOFER, New York University School of Law, New York, NY

ASSOCIATE REPORTER
ERIN E. MURPHY, New York University School of Law, New York, NY

ADVISERS

MICHELLE J. ANDERSON, Brooklyn College, Brooklyn, NY
SUSAN FRELICH APPLETON, Washington University School of Law, St. Louis, MO
JANIS M. BERRY, Attorney at Law (retired), Marblehead, MA
SAMUEL W. BUELL, Duke University School of Law, Durham, NC
I. BENNETT CAPERS, Fordham University School of Law, New York, NY
W. TUCKER CARRINGTON, University of Mississippi School of Law, University, MS
ROBERT M. CARY, Williams & Connolly, Washington, DC
SARAH DEER, University of Kansas School of Law, Lawrence, KS
DEBORAH W. DENNO, Fordham University School of Law, New York, NY
PAUL STEVEN DIAMOND, U.S. District Court, Eastern District of Pennsylvania,
    Philadelphia, PA
ARTHUR T. DONATO, Media, PA
RONALD EISENBERG, Pennsylvania Attorney General's Office, Philadelphia, PA
DONNA LEE ELM, Law Practice of Donna Elm, Cottonwood, AZ
MARY D. FAN, University of Washington School of Law, Seattle, WA
KIMBERLY KESSLER FERZAN, University of Pennsylvania Carey School of Law, Philadelphia,
    PA
TERRY L. FROMSON, Women's Law Project, Philadelphia, PA
FATIMA GOSS GRAVES, National Women's Law Center, Washington, DC
AYA GRUBER, University of Colorado Law School, Boulder, CO
ROSEMARY HART, Office of Legal Counsel, U.S. Department of Justice, Washington, DC
BARBARA PARKER HERVEY, Texas Court of Criminal Appeals, Austin, TX
WILLIAM M. JACKSON, District of Columbia Superior Court, Washington, DC
VIRGINIA M. KENDALL, U.S. District Court, Northern District of Illinois, Chicago, IL
NELLY N. KHOUZAM, Florida Second District Court of Appeal, Tampa, FL
DEREK P. LANGHAUSER, Maine Maritime Academy and Community Colleges, Cumberland
    Foreside, ME
JENNIFER G. LONG, AEquitas, Washington, DC
GERARD E. LYNCH, U.S. Court of Appeals, Second Circuit, New York, NY
CATHARINE A. MACKINNON, University of Michigan Law School, Ann Arbor, MI
DANIEL J. MELTZER, Harvard Law School, Cambridge, MA [Deceased 2015]
NANCY E. O'MALLEY, Alameda County District Attorney's Office, Oakland, CA
WENDY L. PATRICK, County of San Diego District Attorney's Office, San Diego, CA
LEE H. ROSENTHAL, U.S. District Court, Southern District of Texas, Houston, TX
DAVID RUDOVSKY, Kairys, Rudovsky, Messing, Feinberg & Lin, Philadelphia, PA
JON M. SANDS, Federal Public Defender, District of Arizona, Phoenix, AZ
SUELLYN SCARNECCHIA, University of Michigan Law School (retired), Ann Arbor, MI
ABBE SMITH, Georgetown University Law Center, Washington, DC
DARRYL ANTONIO STALLWORTH, The Law Office of Darryl A. Stallworth, Oakland, CA
CAROL S. STEIKER, Harvard Law School, Cambridge, MA
JEANNIE SUK GERSEN, Harvard Law School, Cambridge, MA
RONALD S. SULLIVAN, JR., Harvard Law School, Criminal Justice Institute, Cambridge, MA
ANDREW E. TASLITZ, American University, Washington College of the Law, Washington, DC
    [Deceased 2014]
REGGIE B. WALTON, U.S. District Court, District of Columbia, Washington, DC

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

JOAN PATRICIA WEBER, San Diego Superior Court, San Diego, CA
COREY RAYBURN YUNG, University of Kansas School of Law, Lawrence, KS

LIAISONS

MARY KATHERINE BURKE, Rape, Abuse & Incest National Network, Washington, DC
LAURA DUNN, L.L. Dunn Law Firm, Washington, DC
CYNTHIA GARRETT, Families Advocating for Campus Equality, San Diego, CA
REBECCA HENRY, ABA Commission on Domestic & Sexual Violence, Washington, DC
MICHAEL J. IACOPINO, National Association of Criminal Defense Lawyers, Manchester, NH
NORMAN L. REIMER, National Association of Criminal Defense Lawyers, Washington, DC
RICHARD SCOTT SCHMECHEL, D.C. Criminal Code Reform Commission, Washington, DC
EBONY TUCKER, National Alliance to End Sexual Violence, Washington, DC

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

MEMBERS CONSULTATIVE GROUP

**Model Penal Code: Sexual Assault and Related Offenses**
(as of May 03, 2021)

RAHEEMAH F.  ABDULALEEM, Washington, DC
ELIZABETH K.  AINSLIE, Philadelphia, PA
JAMES J.  ALFINI, Houston, TX
RONALD J.  ALLEN, Chicago, IL
JOSÉ F.  ANDERSON, Baltimore, MD
RICHARD T.  ANDRIAS, New York, NY
DAVID J.  ARONOFSKY, Missoula, MT
JOSEPH R.  BANKOFF, Atlanta, GA
JENNIFER S.  BARD, Gainesville, FL
FLORA L.  BECKER, Philadelphia, PA
JOHN S.  BECKERMAN, New Harbor, ME
WARREN  BELMAR, Palm Beach, FL
DIANNE  BENNETT, Buffalo, NY
BRIAN  BIX, Minneapolis, MN
CHRISTOPHER L.  BLAKESLEY, Las Vegas, NV
STEVEN M.  BRADFORD, Muscatine, IA
RUSSELL J.  BRUEMMER, Washington, DC
ELLEN M.  BUBLICK, Phoenix, AZ
JOSÉ A.  CABRANES, New Haven, CT
TERRY  CALVANI, Nashville, TN
CATHERINE L.  CARPENTER, Los Angeles, CA
ERIC R.  CARPENTER, Miami, FL
JENNY E.  CARROLL, Tuscaloosa, AL
JOHN HILL  CAYCE, Fort Worth, TX
MARTHA E.  CHAMALLAS, Columbus, OH
HENRY L.  CHAMBERS JR., Richmond, VA
STEVEN L.  CHANENSON, Villanova, PA
GABRIEL J.  CHIN, Davis, CA
PENELOPE L.  CHRISTOPHOROU, New York, NY
DANE S.  CIOLINO, Metairie, LA
ROGER S.  CLARK, Camden, NJ
CHRISTINE NERO  COUGHLIN, Winston Salem, NC
THOMAS L.  CUBBAGE III, Plano, TX
RICHARD OLAF  CUNNINGHAM, Washington, DC
BEVERLY WINSLOW  CUTLER, Palmer, AK
GEORGE A.  DAVIDSON, New York, NY
ROSS E.  DAVIES, Arlington, VA
MICHELLE MADDEN  DEMPSEY, Villanova, PA
JOHN L.  DIAMOND, San Francisco, CA
DONALD L.  DOERNBERG, Penn Valley, CA
JOSHUA  DRESSLER, Columbus, OH
JENNIFER ANN  DROBAC, Indianapolis, IN
MEREDITH J.  DUNCAN, Houston, TX
CHRISTINE M.  DURHAM, Salt Lake City, UT
CINDY  DYER, Washington, DC

ILANA H.  EISENSTEIN, Philadelphia, PA
IRA MARK  ELLMAN, Berkeley, CA
SHELDON H.  ELSEN, New York, NY
ROGER A.  FAIRFAX JR., Washington, DC
IRA M.  FEINBERG, New York, NY
JAMES E.  FELMAN, Tampa, FL
HERBERT L.  FENSTER, Longmont, CO
EUGENE R.  FIDELL, New Haven, CT
ARTHUR NORMAN  FIELD, New York, NY
EDWARD B.  FOLEY, Columbus, OH
C. ALLEN  FOSTER, Washington, DC
MARY ANNE  FRANKS, Miami, FL
CAROLINE ROSE  FREDRICKSON, Washington, DC
ERIC M.  FREEDMAN, Hempstead, NY
ROBERT SHENTON  FRENCH, Perth, Australia
ANDREW L.  FREY, New York, NY
CHARLES  FRIED, Cambridge, MA
PAUL L.  FRIEDMAN, Washington, DC
HALEY J.  FROMHOLZ, Pasadena, CA
KENNETH S.  GALLANT, Sequim, WA
ANNE  GARDNER, Fort Worth, TX
BRYAN A.  GARNER, Dallas, TX
STEPHEN P.  GARVEY, Ithaca, NY
HENRY L.  GARZA, Belton, TX
JACOB E.  GERSEN, Cambridge, MA
NANCY  GERTNER, Cambridge, MA
CHRISTOPHER S.  GONTARZ, Newport, RI
HERVÉ  GOURAIGE, Newark, NJ
LINDA SHERYL  GREENE, Madison, WI
MICHAEL  GREENWALD, Philadelphia, PA
BETSY J.  GREY, Phoenix, AZ
CHARLES E.  GRIFFIN, Ridgeland, MS
JUST. WILLIAM M. C.  GUMMOW, Canberra,
    Australia
JAMES B.  HALPERN, Bethesda, MD
LESLIE JOAN  HARRIS, Eugene, OR
MICALYN SHAFER  HARRIS, Ridgewood, NJ
ROBERT M.  HART, Bronxville, NY
VIRGINIA ELLEN  HENCH, Honolulu, HI
RONALD K.  HENRY, Washington, DC
ERNEST R.  HIGGINBOTHAM, Dallas, TX
W. WILLIAM  HODES, Lady Lake, FL
BRIAN M.  HOFFSTADT, Los Angeles, CA
STEVEN F.  HUEFNER, Columbus, OH
JOHN A.  HUMBACH, White Plains, NY

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

RICHARD H.  HUNTER, St. Croix, Virgin Islands
CRAIG  ISCOE, Washington, DC
RALPH A.  JACOBS, Philadelphia, PA
RICHARD GIBBS  JOHNSON, Cleveland, OH
LIZA ILONA  KARSAI, Chicago, IL
HENRY R.  KAUFMAN, New York, NY
MICHAEL EDWARD  KEASLER, Austin, TX
ORIN S.  KERR, Berkeley, CA
EVELYN V.  KEYES, Houston, TX
MARK R.  KILLENBECK, Fayetteville, AR
NANCY S.  KIM, San Diego, CA
NANCY J.  KING, Nashville, TN
LAIRD C.  KIRKPATRICK, Washington, DC
DANIEL S.  KLEINBERGER, Mendota Heights, MN
CECELIA M.  KLINGELE, Madison, WI
NINA A.  KOHN, Syracuse, NY
GLENN S.  KOPPEL, Irvine, CA
MICHAEL J.  KRAMER, Albion, IN
BRUCE N.  KUHLIK, Washington, DC
SYBIL H.  LANDAU, New York, NY
HOWARD  LANGER, Philadelphia, PA
MÁXIMO  LANGER, Los Angeles, CA
WILLIAM J.  LEAHY, Albany, NY
BILL LANN  LEE, Berkeley, CA
CYNTHIA K.  LEE, Washington, DC
EVAN TSEN  LEE, San Francisco, CA
JUDITH  LEONARD, Washington, DC
GEORGE W.  LIEBMANN, Baltimore, MD
WAYNE A.  LOGAN, Tallahassee, FL
HENRY R.  LORD, Baltimore, MD
MARGARET COLGATE  LOVE, Washington, DC
LINDA A.  MALONE, Williamsburg, VA
C. SCOTT  MARAVILLA, Washington, DC
RICHARD D.  MARKS, Charlottesville, VA
AMIE C.  MARTINEZ, LINCOLN, NE
MARGARET PENNY  MASON, New Haven, CT
MARY  MASSARON, Bloomfield Hills, MI
ALFRED D.  MATHEWSON, Albuquerque, NM
DAVID  MCCORD, Des Moines, IA
ROY W.  MCLEESE III, Washington, DC
BENJAMIN C.  MCMURRAY, Salt Lake City, UT
M. ISABEL  MEDINA, New Orleans, LA
A. DOUGLAS  MELAMED, Stanford, CA
MARJORIE A.  MEYERS, Houston, TX
KATHERINE G.  MINARIK, Chicago, IL
NATASHA  MINSKER, Sacramento, CA
S. DAVID  MITCHELL, Columbia, MO
SAIRA  MOHAMED, Berkeley, CA
THOMAS D.  MORGAN, Naples, FL
THOMAS R.  NEWMAN, New York, NY
VIRGINIA E.  NOLAN, del Mar, CA

MICHAEL M.  O'HEAR, Milwaukee, WI
JOHN EDWARD  OSBORN, Chadds Ford, PA
NANCY LEEDS  PERKINS, Washington, DC
ELLEN S.  PODGOR, Gulfport, FL
SUSAN  POSER, Chicago, IL
JOSEPHINE R.  POTUTO, Lincoln, NE
MARGARET JANE  RADIN, Ann Arbor, MI
GERALD S.  REAMEY, San Antonio, TX
HENRY R.  REEVE, Denver, CO
CHRISTINA C.  REISS, Burlington, VT
SARAH E.  RICKS, Camden, NJ
ALICE  RISTROPH, Brooklyn, NY
IRA P.  ROBBINS, Bethesda, MD
JAMES L.  ROBERTSON, Jackson, MS
PAUL H.  ROBINSON, Philadelphia, PA
MARGARET CASEY  RODGERS, Pensacola, FL
THEODORE O.  ROGERS JR., New York, NY
RONALD S.  ROLFE, New York, NY
HOWARD  RUDA, New York, NY
SABRINA R.  SAFRIN, Newark, NJ
STEPHEN A.  SALTZBURG, Washington, DC
LYNN HECHT  SCHAFRAN, New York, NY
PAUL  SCHLAUD, Austin, TX
ELIZABETH M.  SCHNEIDER, Brooklyn, NY
MILTON R.  SCHROEDER, Paradise Valley, AZ
VICTOR E.  SCHWARTZ, Washington, DC
ELIZABETH J.  SHAPIRO, Washington, DC
ANNA WILLIAMS  SHAVERS, Lincoln, NE
RICHARD W.  SHEPRO, Chicago, IL
KAMI CHAVIS  SIMMONS, Winston Salem, NC
KENNETH W.  SIMONS, Irvine, CA
VIRGINIA E.  SLOAN, Washington, DC
ROBERT D.  SLOANE, Boston, MA
KATHLEEN  SMALLEY, Los Angeles, CA
BRADLEY Y.  SMITH, New York, NY
MARGARET POLES  SPENCER, Richmond, VA
ARTHUR B.  SPITZER, Washington, DC
JANE  STAPLETON, Cambridge, England
EDWIN H.  STERN, Florham Park, NJ
H. MARK  STICHEL, Baltimore, MD
KATE  STITH, New Haven, CT
MARK P.  STRASSER, Columbus, OH
GUY MILLER  STRUVE, New York, NY
DWIGHT H.  SULLIVAN, Washington, DC
MARY-CHRISTINE  SUNGAILA, Irvine, CA
STEPHEN LYLE  TATUM, Fort Worth, TX
CAROLYN ENGEL  TEMIN, Philadelphia, PA
BOWEN H.  TUCKER, Chicago, IL
DEBORAH  TUERKHEIMER, Chicago, IL
MICHAEL  VITIELLO, Sacramento, CA
EUGENE  VOLOKH, Los Angeles, CA

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

SECTION 213.11. SENTENCING AND COLLATERAL CONSEQUENCES OF CONVICTION

**Comment:**

### Executive Summary[*]

Sentencing and the collateral consequences of conviction raise unusually complex issues; extensive black letter is required to treat them with precision. But black letter is not the ideal way to convey the provisions' overall aims and effects. This Executive Summary serves that purpose. It first explains why there is a need for Sections 213.11 to 213.11J in the scheme of Article 213. It then summarizes the most prominent features of current law on this subject and explains why it is important for Sections 213.11 to 213.11J to establish a different framework.

1. *Why is this subject addressed in Article 213?* Underlying this common question are concerns about preemption and the appropriate scope of the project. Sentencing is treated comprehensively in the Institute's recent revision of the sentencing provisions of the MPC. To reconsider that subject in Article 213 might seem unnecessary or inconsistent with prior judgments of the Institute. Moreover, *collateral* consequences are not intrinsically matters of criminal law and therefore might seem beyond the proper scope of a *penal* code.

These concerns are understandable but misplaced. With respect to "preemption," *MPC:Sentencing* treats sentencing issues only in general terms applicable to any offense. The Comments to *MPC:Sentencing* state that it is not intended to preclude special rules tailored to the specifics of particular offenses.[1] In any event, Sections 213.11-213.11J are not <u>inconsistent</u> with *MPC:Sentencing;* they <u>supplement</u> its provisions without contradicting them.

The concern about relevance to criminal law is especially important. In determining whether to criminalize various forms of sexual misconduct, the Article 213 revision must consider all important consequences of doing so, regardless of whether they be labeled "penal" or

---

[*] Footnote cross-references in this Executive Summary indicate footnotes in Sections 213.11-213.11J of this Draft.

[1] See MODEL PENAL CODE: SENTENCING, Section 7.06(4) (Official Statutory Text, AM. L. INST., May 24, 2017) (stating that "[a] certificate of restoration of rights removes all mandatory collateral consequences …, except as provided by Article 213.) See also MODEL PENAL CODE: SENTENCING Section 7.06 Comment *d* (Proposed Final Draft*,* AM. L. INST., April 10, 2017) (stating that the Section 7.06 provisions concerning relief from collateral consequences are subject to an exception: "for individuals convicted of sexual offenses, the restrictions on relief set forth in Article 213 apply.")

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## Section 213.11. Executive Summary

1    "regulatory." When revising the sentencing provisions of the MPC, the Institute approved a

2    lengthy Article on collateral consequences, defined as "disadvantages, however denominated, that

3    are authorized or required by federal or state law as a direct result of an individual's conviction

4    [that] are *not part of the sentence* ordered by the court ...."[2] In that Article, moreover,

5    *MPC:Sentencing* addresses—and forbids—certain demonstrably noncriminal consequences of

6    conviction—disenfranchisement and disqualification from jury service.[3] In short, the Institute has

7    rejected the position that collateral consequences lie outside the domain of the MPC.

8    Collateral consequences are *especially* important for Article 213. Over the past half-

9    century, the principle that frames the sexual offenses has shifted from force and coercion to the

10    absence of consent. Updating the MPC to reflect this shift was a primary motivation for the

11    Institute's decision to revise Article 213. And because absence of consent, rather than only force,

12    coercion, or incapacity, can now support conviction, the reach of sexual-offense law has justifiably

13    expanded in most American jurisdictions[4] and around the world.[5]

14    The crucial question is to determine *how far* this expansion should go. That judgment must

15    be shaped by balancing the need for penal safeguards against the potentially disproportionate

16    consequences of a criminal conviction. A decision to consider the first half of this equation in

17    isolation, without attention to the second half, would be difficult to defend.[6]

18    This is not an abstract question. In prevalent state law, the consequences of a sexual-offense

19    conviction often include highly restrictive "collateral" measures, such as onerous registration

---

[2] Model Penal Code: Sentencing, Section 7.01 (Official Statutory Text, Am. L. Inst., May 24, 2017) (emphasis added).

[3] Id., Section 7.03.

[4] See "Current State of the Law -- Consent-Only Offenses" (Oct. 20, 2016).

[5] For example, the Istanbul Convention, adopted by the Council of Europe in 2011, requires member states to criminalize all "non-consensual acts of sexual nature." *See* Council of Europe Treaty Series - No. 210, *Convention on Preventing and Combating Violence Against Women and Domestic Violence,* May 11, 2011. The Convention was signed by 45 of the Council's 47 member nations; only Russia and Azerbaijan failed to sign.

[6] Referring to current Minnesota efforts to revise that state's definitions of sexual assault, the mother of Jacob Wetterling (the victim of a nationally notorious sexual crime) recently wrote that "[a]ny statutory analysis of the criminal statutes is woefully incomplete without considering the effectiveness, cost, and collateral and material consequences the [sex-offense] Registry poses." Patty Wetterling, Letter to Minnesota Senators and Representatives, Feb. 8, 2021.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1  duties, limits on employment and residency, and expanded public awareness of a local resident's
2  record of convictions. Courts have held that sex-offense collateral-consequence regimes in Alaska,
3  Kentucky, Michigan, Pennsylvania, and many other states constitute *criminal punishment* and
4  therefore are subject to all the strictures of the criminal law.[7] Statutory provisions like those are
5  obviously appropriate for a penal code to address. But whether these consequences are penal or
6  regulatory, they have powerful impacts on a convicted individual and therefore must be considered
7  in any judgment about whether to criminalize an area of behavior.

8      An example makes this principle concrete. A decision to punish sexual penetration without
9  force but without consent could be readily supported if the potential prison sentence is low and if
10  the Code stipulates that conviction cannot lead to any "collateral" burdens. But that decision would
11  be difficult to sustain if conviction could lead to life imprisonment even in the absence of
12  aggravating circumstances. That decision likewise would be difficult to sustain if conviction could
13  require lifetime registration with law enforcement and lifetime limits on employment and
14  residency. Yet in many states, current law does exactly that; a penal code that did not address the
15  issue would leave these burdens of conviction in effect. A sound approach to the criminalization
16  decision cannot avoid attention to these consequences.

---

[7] In Smith v. Doe, 538 U.S. 84, 92 (2003), the Supreme Court held that sex-offense registration regimes are not necessarily punitive and that Alaska SORA was not punitive as a matter of federal constitutional law. Compare Doe v. State, 189 P.3d 999 (Alaska 2008) (holding Alaska SORA to be punitive under state constitution); Doe v. Snyder, 834 F.3d 696, 705-706 (6th Cir. 2016) (holding that "*Smith* [should not] be understood as writing a blank check to states to do whatever they please in this arena…. Michigan's SORA imposes punishment"). Accord, State v. Myers, 923 P.2d 1024 (Kan. 1996) (holding Kansas SORA to be punitive as applied); Commonwealth v. Baker, 295 S.W.3d 437 (Ky. 2009) (holding residency restrictions of Kentucky SORNA to be punitive); State v. Letalien, 985 A.2d 4 (Me. 2009) (holding Maine SORNA to be punitive on its face); State v. State, 111 A.3d 1077, 1100 (N.H. 2015) (holding that "[a]s applied to petitioner, … the punitive effect of [New Hampshire registry law] was enough to overcome any nonpunitive legislative intent"); Riley v. N.J. State Parole Bd., 98 A.3d 544 (N.J. 2014) (holding New Jersey Sex Offender Monitoring Act to be punitive); Starkey v. Oklahoma Dep't of Corr., 305 P.3d 1004 (Okla. 2013) (holding Oklahoma SORA to be punitive as applied); Commonwealth v. Muniz, 164 A.3d 1189 (Pa. 2018) (holding Pennsylvania SORNA to be punitive); In re C.P., 967 N.E.2d 729, 738 (Ohio 2012) (holding that Ohio SORNA imposes cruel and unusual punishment as applied to juveniles).

Cf. State v. Bani, 36 P.3d 1255, 1268 (Haw. 2001) (holding Hawaii SORNA to violate procedural due process in the absence of individualized risk assessment); Doe v. Attorney General, 686 N.E.2d 1007 (Mass. 1997) (Massachusetts, same); in re J.B., 107 A.3d 1 (Pa. 2014) (holding that Pennsylvania SORNA violates procedural due process as applied to juveniles); Doe v. Wasden, 9th Cir. Dec. 9, 2020 (holding that *Smith* does not foreclose plaintiffs' claim that Idaho SORNA regime is punitive).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1        2. *Current law.* All American jurisdictions currently require persons convicted of certain
2    sexual offenses to register with local law-enforcement where they reside, work, or study, and to
3    continually update the personal information provided. In most states the list of sexual offenses that
4    trigger these obligations is extensive, the obligations are long-lasting, and the steps required to
5    keep the information updated are onerous. Many states or their municipalities also prohibit
6    registrants from residing in certain areas; most prohibit registrants from working in certain
7    occupations.[8] And in nearly all states, the registry information is widely available. Although a few
8    states keep that information confidential except with respect to registrants at high risk of
9    reoffending,[9] most permit public access to information pertaining to every registered ex-
10   offender.[10] Moreover, most states require law enforcement to proactively notify the community as
11   soon as a new registrant comes to the area. Although a few states notify only groups or individuals
12   with a particular need to know, the great majority distribute notification widely, including to
13   anyone who asks to be notified, regardless of need to know.[11]

14       Federal law complicates this picture. The Sex Offender Registration and Notification Act
15   of 2006 (federal SORNA)[12] requires every state, as a condition of receiving certain federal funds,
16   to maintain a registry of persons convicted of almost any offense that has a sexual element.
17   Although federal SORNA does not require states to limit registrants' employment or residency, its
18   other requirements are more restrictive than much preexisting state law. The offenses that must
19   trigger a state duty to register include adjudications of delinquency involving use of force by
20   juveniles aged 14 or older and adult convictions even for misdemeanor contact offenses[13];
21   registrants must appear in person, within three business days, to report any change in required

---

[8] See generally, text at notes 149, 296-301, 319-322.

[9] See text at notes 94-99, 276-278.

[10] See text at note 243.

[11] See text at notes 243, 274-278.

[12] 34 U.S.C. §§ 20901-20929 (2020).

[13] Id., § 20911(5) & (8).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1   registry information[14]; the duties to register and to update personal information normally continue

2   for at least 15 years even for the lowest-level offenses; and those duties normally continue for life

3   in the case of any penetration offense committed by force or threat.[15] Federal SORNA also requires

4   each state to make available on the Internet most information about every registrant and to

5   immediately notify the entire local community whenever an ex-offender updates registry

6   information or newly registers in the area.[16]

7       Given the onerous requirements federal SORNA imposes on registrants and on state

8   officials themselves, a large majority of the states have chosen not to comply with its entire

9   mandate. As of November 2020, only 18 states were fully SORNA-compliant; the rest have opted

10  to disregard one or more of its major provisions, even at the cost of losing millions of dollars in

11  federal funding.[17] Even so, registration requirements, public access to registry information, and

12  proactive community notification about registrants in the area are the norm throughout the United

13  States. And in many jurisdictions the burdens imposed on persons convicted of a sexual offense

14  are even more restrictive than federal SORNA requires. Most states require registrants to submit

15  to GPS monitoring in various circumstances; many restrict Internet usage; and at least 27 states

16  and many municipalities prohibit registrants from living near schools, parks, playgrounds, and

17  day-care centers.[18]

18      3. *Assessment*. The aim of these laws is to ease public fear, reduce recidivism, and enable

19  concerned citizens to take steps for self-protection. Yet extensive research demonstrates that these

20  gains have not materialized. To the contrary, there is clear evidence, widely acknowledged by

21  professionals in the field, that these laws are seriously counterproductive.[19] They are expensive

---

[14] Id., § 20913(c).

[15] Id., § 20915(a).

[16] Id., §§ 20920(a); 20923(b).

[17] See text at note 167. The most frequent reasons for substantial noncompliance were narrower lists of triggering offenses and less frequent obligations to verify and update registry information. See Andrew J. Harris & Christopher Lobanov-Rostovsky, National Sex Offender Registration and Notification Act (SORNA) Implementation Inventory Preliminary Results (July 2016), pp. 4, 13-30 (detailing reasons for noncompliance as of March 2016.)

[18] See text at note 297.

[19] See text at notes 150, 255-256, 316-327.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1    for local police to administer, unduly hinder the rehabilitation of ex-offenders, and ultimately

2    defeat their own central purposes by *impeding* law enforcement and *increasing* the incidence of

3    sexual offenses.[20]

4        a. *Recidivism*. Although a common view holds that that "[t]he risk of recidivism posed by

5    sex offenders is 'frightening and high,'"[21] the available empirical evidence lends little or no

6    support to this claim.[22] Even taking into account that reporting rates for sexual offenses are

7    exceptionally low, "[s]ex offenders have some of the lowest recidivism rates of any class of

8    criminal."[23] This is also true of sexual offenses against children. Again, low reporting rates for

9    offenses against minors make research about recidivism in these cases only suggestive rather than

10    definitive, but to the extent that reliable data are available, they indicate that recidivism rates for

11    these offenses are as low as or lower than for other sexual crimes.[24]

12        Comparative recidivism rates, however, are largely beside the point. Sexual offenses are

13    distinctively unsettling and injurious, even more so in the case of sexual offenses against children.

14    Exceptional prevention efforts are unquestionably justified. The crucial point is simply that

15    registration, public access, community notification, residency restrictions, and other special

16    burdens do not have the anticipated preventive effect. Research on this point has been extensive,

17    and its conclusions are unequivocal: all the available evidence indicates that these special burdens

18    *do not* reduce the incidence of these offenses.[25]

---

[20] See generally id.

[21] Smith v. Doe, 538 U.S. 84, 103 (2003) (quoting McKune v. Lile, 536 U.S. 24, 34 (2002)).

[22] See text at notes 111-128.

[23] Stuart A. Scheingold et al., *Sexual Violence, Victim Advocacy, and Republican Criminology: Washington State's Community Protection Act*, 28 LAW & SOC'Y REV. 729, 743 (1994) (noting that "as few as 5.3% [of sex offenders] re-offend within three years, according to the Bureau of Justice Statistics, as opposed to rates in the 65 to 80% range for drug offenders and thieves.")

[24] See text at notes 111-128.

[25] See text at notes 131-135. With respect to the recidivism impact of particular measures, "research provides little if any support for the effectiveness of residential restriction laws in deterring or preventing sexual offenses." Tewksbury, *Residency Restrictions*, note 299, at 539. See also text at notes 319-323.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1    b. *Self-protection.* Citizen self-protection is a separate goal. Yet public access and
2    community notification seldom prompt individuals to take effective precautions to safeguard
3    themselves or their loved ones. And the very existence of these regimes diverts attention from
4    much more significant sexual dangers, thus in effect fostering a false sense of security and
5    increasing the dangers to children and others.[26]

6    Schools, day-care centers, and other organizations that serve vulnerable populations
7    present a different issue. They must not employ staff or volunteers who put their clientele at risk
8    of sexual abuse, and their due-diligence obligations in that regard are strong. But background-
9    check mechanisms are available nationally and in all states to meet this need within well-regulated
10   privacy-protective frameworks. Where incomplete or too narrow in their coverage, these
11   background-check mechanisms can be strengthened without resort to county- and municipal-level
12   sex-offense registries, which in any event cannot meet the need—they are overbroad, poorly
13   insulated from *unnecessary* public access, and dangerously *under*inclusive because they omit
14   criminal history pertaining to relevant nonsexual offenses.[27]

15   c. *Costs.* Substantial costs must be weighed against these scant public-safety benefits.
16   Registration laws are expensive to implement, especially when (as is typical) they target a large,
17   heterogeneous group of ex-offenders. For local police departments, registry management, GPS
18   monitoring, and related duties take personnel away from responding to emergencies, investigating
19   crime, and providing other public services. Out-of-pocket expenses for website technology and for
20   recording and updating registry information can run to several millions of dollars per year.[28] Many
21   states find that more selective approaches can achieve nearly all the benefits at much lower cost.[29]

22   d. *Unintended Effects.* Even more concerning are the counterproductive side effects.
23   Restricted residency pushes registrants into socially disorganized, economically stressed
24   neighborhoods or into homelessness. Public access to registry information, community
25   notification, overbroad limits on employment and residency, and indirect impacts on registrants'

---

[26] See text at note 136 and Reporters' Note to Section 213.11H.

[27] See text at notes 258-271.

[28] See text at notes 145-146, 309-312.

[29] See note 167.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1    ability to find jobs and housing lead to a high incidence of registrant joblessness, social isolation,

2    homelessness, suicide, and even physical violence at the hands of misguided members of the

3    public.[30] These effects in turn mean negative impacts *for public safety* because successful

4    reintegration into society requires stable living arrangements, supportive family, and steady

5    employment, while poor social support and psychological stress are important risk factors for

6    sexual recidivism. So the burdens typically imposed on registrants almost inevitably aggravate the

7    very dangers they seek to allay; the adverse impacts on registrants impede their rehabilitation and

8    aggravate their risks of reoffending.[31] Registration of juveniles has had distinctively harsh

9    consequences, and assessments of its value have been especially negative.[32] Because these

10    criminogenic effects can *increase* registrant recidivism, they tend to outweigh any public-safety

11    benefits of self-protection and the enhanced possibilities for surveillance and deterrence of

12    registrants. The result, convincingly documented, is that these laws actually undermine public

13    safety, the exact opposite of what lawmakers and the public so confidently assume they

14    accomplish.

15        4. *Recommendations*.

16        a. *Overall approach*. The strong case against these schemes prompts many experts to

17    unconditionally oppose *any* regime for sex-offense registration or other collateral consequences.

18    The Draft does not endorse that view. First, simply as a pragmatic matter, it is clear that an Institute

19    recommendation to eliminate registries entirely will have no constructive law-reform impact,

20    either now or in any foreseeable political future. Registries and their associated features currently

21    command overwhelming public support, based on emotions and intuitions not easily dislodged.

22    Those actively engaged in the reform effort on the ground are emphatic that there is no legislative

23    audience for an approach that categorically opposes registries altogether.[33]

---

[30] See text at notes 149, 253-256, 319-322.

[31] See text at notes 150, 255-256, 316-327.

[32] See note 81 and text at notes 190-204.

[33] See, e.g., William Buhl, J.J. Prescott & Miriam Aukerman, *Michigan Poised to Double Down on Failed Sex Offender Registry*, DETROIT FREE PRESS, Dec. 10, 2020 (statement of "a judge whose hands were tied by SORA's one-size-fits-all approach, a researcher who has documented the counterproductive impact of registries, and an attorney who has represented [registrants]" arguing that in Michigan "[l]egislators should bring together stakeholders and experts to draft an evidence-based statute, looking to examples like the draft model law written by the American Law Institute." ); Patty Wetterling, Letter to

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1      On the merits, moreover, unqualified opposition to registries in any form reaches farther

2  than a discriminating analysis can justify. Sex-offense collateral consequences in the United States

3  are certainly too harsh, a fact that no doubt contributes to the strongly negative reaction that the

4  registry concept so often prompts. But the overly severe, counterproductive effects are not inherent

5  in registries as such. Instead, they result from features common in the United States but readily

6  severable and virtually unheard of elsewhere in the world.

7      Nearly every Western nation maintains registries of persons who have been convicted of a

8  sexual offense. But unlike American registries, those of other countries are almost exclusively for

9  law-enforcement use, with either very limited need-to-know access for others or (in the great

10  majority of countries) no public access at all. Registry regimes outside the United States typically

11  include none of the elements that make American sex-offense regimes so destructive—most

12  obviously, the sweeping and illogical restrictions on residency, but also, for registries themselves,

13  the overbroad list of offenses that require registration, burdensome and overly long-lasting update

14  duties, unrestricted public access, and sweeping community notification disconnected from any

15  plausible need to know.[34]

---

Minnesota Senators and Representatives, Feb. 8, 2021 (urging appointment of a Working Group to consider "many needed reforms" because Minnesota SORNA is "overbroad" and "must be scaled back."); Eric Janus, Letter to Minnesota Senators and Representatives, Feb. 8, 2021 (same); Ira Ellman, email to Stephen Schulhofer, Nov. 10, 2020 (describing difficult, nearly unsuccessful California effort to enact modest SORNA amendments, merely to differentiate triggering offenses by tiers, and concluding "The idea of proposing [California] simply abolish its registry never occurred to anyone. [Even in] this heavily blue state in which Democrats enjoy legislative super majorities, that would have been a complete non-starter."); Eric S. Janus, email to Stephen Schulhofer, Jan. 21, 2021 ("Although I doubt that there are good grounds for uniquely targeting sex crimes for even highly confined registration laws, I believe that the current ALI draft moves substantially in the right direction. I am aware of efforts in some states … [to] rein in registration laws. A model law that focuses on the one arguably valid foundation for such laws—assisting law enforcement—would be of enormous benefit as a guide to state legislative efforts."); Eric Tennen (Boston attorney who has represented several hundred registrants), Letter to Stephen Schulhofer, Feb. 16, 2021:

> "I [do not] support registration. … But as a practical matter, I recognize there is no real legal or political route to abolition.… I believe [the ALI's] efforts can more realistically achieve reform than simply taking the position registration should not exist.… I do not believe that even our progressive [Massachusetts] Legislature would entertain calls to abolish our registry. However, I do believe our Legislature might be responsive to evidence-based arguments to scale back registration…Therefore, [I support] ALI's efforts on this front. I believe Council Draft 11 is an extremely well argued, well researched proposal. It is both modest and groundbreaking. Modest because it recognizes the reality of registration; groundbreaking because it insists registration be objective and scientific."

[34] See text at notes 30-80.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1    In light of these concerns, the Draft does not condemn sex-offense collateral consequences
2    wholesale. Instead, it recommends a selective approach. Because a sex-offense registry provides
3    locally relevant information that police cannot obtain from ordinary criminal-history databases
4    when they have not identified a particular suspect,[35] registries facilitate high-priority investigations
5    of serious sexual offenses. That gives them the important practical advantages that prompt virtually
6    all Western nations to maintain sex-offense registries for law-enforcement use.[36] As long as the
7    confidentiality of these records is preserved, registration for law-enforcement purposes poses
8    relatively few dangers to public safety and to the welfare of registrants themselves.

9    The Draft therefore accepts the value of registries available exclusively to law enforcement,
10    but requires that they be structured to avoid undue burdens on registrants. At the same time, the
11    Draft limits and carefully targets other special burdens, permitting them only on a substantially
12    more restricted basis than that found in much of current American law, in order to make their
13    imposition more coherent and less prone to abusive application.

14    b. *Principal details*. The Draft's core recommendation is to permit sex-offense registries
15    for the exclusive use of law enforcement, while deploying a range of devices, some conspicuous
16    and others more granular, to minimize or eliminate unnecessarily harsh and counterproductive
17    features of currently prevalent law. Seven of these limiting devices are especially important:

18    1) *Triggering offenses*. Section 213.11A sharply restricts the class of individuals to whom
19    the duty to register and other sex-offense collateral consequences apply. It precludes registration
20    of nearly all juveniles, and for adults, it imposes the threshold duty to register only upon conviction
21    of offenses that most strongly arouse public concern, specifically:

22    (i) Sexual Assault by Aggravated Physical Force or Restraint.

23    (ii) Sexual Assault by Physical Force, but only when committed after the offender
24    had previously been convicted of a felony sex offense.

25    (iii) Sexual Assault of an Incapacitated Person, but only when committed after the
26    offender had previously been convicted of a felony sex offense.

27    (iv) Sexual Assault of a Minor, but only when the minor is younger than 12 and the
28    actor is 21 years old or older.

---

[35] See text at notes 85.

[36] See text at notes 30-80.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1    (v) Incestuous Sexual Assault of a Minor, but only when the minor is younger than

2    16.

3    2) *Updating information*. Section 213.11E permits registrants to update required

4    information by email or other readily accessible means of communication, without needing to

5    make overly frequent personal appearances or navigate other burdensome bureaucratic obstacles.

6    3) *Duration of duties*. The registration framework shortens in three ways the duration of

7    required registration. Section 213.11F(2) limits to 15 years the registrant's duty to keep registry

8    information current. Section 213.11F(3) provides for automatic termination of that duty at an

9    earlier date if the registrant meets specified rehabilitative goals during the initial registration

10   period. Finally, Section 213.11J permits the registrant to apply for early removal from the registry

11   upon an appropriate showing of rehabilitation.

12   4) *Public access to registry information*. Section 213.11H marks a major departure from

13   the American practice of investing considerable resources in an effort to maximize public

14   awareness of registry information. It permits only government law-enforcement agencies and

15   personnel to access registry information. Non-law-enforcement access is precluded, and Section

16   213.11H imposes on authorities who have access to registry information a strong obligation to

17   preserve its confidentiality.

18   A legitimate need for non-law-enforcement access arises when an individual is being

19   considered for a position of trust involving contact with a vulnerable population. But the FBI has

20   authority to share criminal-history information with state agencies responsible for licensing and

21   employment background checks in regulated areas, including for individuals who work with

22   vulnerable populations.[37] Although some state regimes do not apply to all arguably relevant

23   occupations and may have other gaps, the solution to that problem is simply to fill those gaps

24   directly, after expressly confronting the conflicting public-safety benefits and privacy costs.

25   Whether that step is taken or not, local sex-offense registries cannot fill such gaps because they

26   omit criminal history information pertaining to large numbers of crucially relevant nonsexual

27   offenses and therefore are vastly underinclusive.[38] To open local registries for these purposes

28   would create unnecessary risks, given the availability of pertinent records (including for relevant

---

[37] See text at note 262.

[38] See text at notes 262-271.

491

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

## SECTION 213.11. EXECUTIVE SUMMARY

1   *nonsexual* offenses) from national and state databases subject to stronger oversight and controls.

2   Since the legitimate need can be met adequately, and indeed more adequately, in other ways,

3   Section 213.11H does not permit non-law-enforcement access to registry information.

4       5) *Community notification.* Because persons and organizations with a justifiable need to

5   know have access to criminal-record information on a well-regulated basis through the criminal-

6   history background-check systems just mentioned, Section 213.11I(3) bars proactive government

7   measures broadly notifying community organizations and individuals that a registrant resides,

8   works, or studies in the area.

9       6) *Other burdens*. Section 213.11I tightly constrains, and in most cases eliminates, other

10  burdens and restrictions applicable specifically to persons convicted of a sexual offense. It creates

11  a strong presumption against GPS monitoring, residency restrictions, limits on Internet access, and

12  the like, permitting them only when an individual, case-by-case risk assessment strongly supports

13  the need for such a measure, to an extent that outweighs its potential for costly, counterproductive,

14  and criminogenic effects. The official making the determination must carefully consider the

15  public-safety need for the particular measure; weigh that need against its impact on the registrant,

16  the registrant's family, and the registrant's prospects for rehabilitation; and ensure that any

17  measure approved is drawn as narrowly as possible to achieve its public-safety objectives.

18      7) *Relief from registration and other burdens*. Section 213.11J establishes standards and

19  procedures by which registrants can petition for early relief from registration and other special

20  burdens of a sex-offense conviction.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1　**SECTION 213.11. SENTENCING AND COLLATERAL CONSEQUENCES OF CONVICTION**

2　**(1)** *Definitions*. **For purposes of this Article:**

3　　　**(a) "sentencing consequences" are penalties, disabilities, or disadvantages that**
4　**are part of the sentence imposed by the court or by an agency authorized to set the**
5　**terms of parole or post-release supervision in connection with conviction of an Article**
6　**213 offense; and**

7　　　**(b) "collateral consequences" are penalties, disabilities, or disadvantages,**
8　**however denominated, that are authorized or required by federal, state, or local law**
9　**as a direct result of an individual's conviction of an Article 213 offense but are not**
10　**part of the sentence imposed by the court or by an agency authorized to set the terms**
11　**of parole or post-release supervision in connection with that conviction.**

12　**(2)** *General Rule*. **Sentencing procedure, the authorized disposition of a person**
13　**convicted of an Article 213 offense, sentencing consequences, and collateral consequences are**
14　**specified in Articles 6 and 7 of this Code,\* and are subject to the additional requirements of**
15　**this Section.**

16　**(3)** *Additional Requirements for Sentencing Consequences*. **Notwithstanding any**
17　**contrary provisions of law, the conditions of any suspended sentence under Section 6.02(2),**
18　**any sentence to probation under Section 6.05, and any terms of parole or post-release**
19　**supervision under Section 6.13 must be eligible for early relief under Section 213.11J and**
20　**must not include:**

21　　　**(a) a condition that:**

22　　　　**(i) imposes an obligation to register with law enforcement that carries**
23　　　**requirements other than those authorized under Sections 213.11A-213.11G**
24　　　**and Section 213.11J;**

25　　　　**(ii) permits access to the person's registry information, except as**
26　　　**authorized under Section 213.11H; or**

27　　　　**(iii) authorizes or permits any government official to notify a public or**
28　　　**private entity or individual, other than a government law-enforcement agency**

---

\* MODEL PENAL CODE: SENTENCING, *Official Statutory Text* (May 24, 2017).

493

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1    or individual, that the person is registered with law enforcement or resides,
2    works, or studies in the locality;

3    **(b)** a condition that restricts the person's occupation or employment, except as
4    required by state law or authorized under paragraph (d) of this subsection; or

5    **(c)** except as authorized under paragraph (d) of this subsection, a condition
6    that:

7    **(i)** requires the person to submit to GPS monitoring; or

8    **(ii)** restricts the person's education, Internet access, or place of
9    residence.

10   **(d)** The court, and any agency authorized to set the terms of parole or post-
11   release supervision, may impose a condition, not required by state law, that restricts
12   the person's occupation or employment, or a condition specified in paragraph (c) of
13   this subsection, only if the court or agency determines that the condition is manifestly
14   required in the interest of public safety. That determination must be:

15   **(i)** made after due consideration of the nature of the offense; all other
16   circumstances of the case; the person's prior record; and the potential
17   negative impacts of the burden, restriction, requirement, or government
18   action on the person, on the person's family, and on the person's prospects for
19   rehabilitation and reintegration into society; and

20   **(ii)** accompanied by a written statement of the official setting the
21   condition, explaining the need for it, the evidentiary basis for the finding of
22   need, and the reasons why a more narrowly drawn condition would not
23   adequately meet that need.

24   **(e)** Any condition imposed under paragraph (d) must be:

25   **(i)** drawn as narrowly as possible to achieve the goal of public safety;
26   and

27   **(ii)** imposed only for a period not to exceed that permitted under
28   Section 213.11F for the duties to register and keep the registration current.

29   **(4)** *Additional Requirements for Collateral Consequences that are Applicable Primarily*
30   *to Persons Convicted of a Sexual Offense.* Notwithstanding any contrary provisions of law,
31   collateral consequences applicable primarily to persons convicted of a sexual offense,

494

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

including the obligation to register with law enforcement; associated duties; restrictions on occupation and employment, education, and place of residence applicable primarily to persons convicted of a sexual offense; and other collateral consequences applicable primarily to persons convicted of a sexual offense, are authorized and their scope and implementation are delineated as follows:

(a) The person's obligation to register for law-enforcement purposes is governed by Section 213.11A.

(b) Notification of the person's obligation to register and associated duties is governed by Section 213.11B.

(c) The time of initial registration is governed by Section 213.11C.

(d) The information required upon registration is specified in Section 213.11D.

(e) The duty to keep registration current is specified in Section 213.11E.

(f) The duration of the registration requirements is specified in Section 213.11F.

(g) Penalties for failure to register are governed by Section 213.11G.

(h) Access to registry information is governed by Section 213.11H.

(i) Collateral consequences applicable primarily to persons convicted of a sexual offense, other than the obligation to register for law-enforcement purposes and restrictions on occupation and employment required by state law, are governed by Section 213.11I.

(j) Standards and procedures for relief from the obligation to register, associated duties, and other collateral consequences applicable specifically to persons convicted of a sexual offense are governed by Section 213.11J.

**Comment.**

*1. Scope.* In current American law, persons convicted of a sexual offense face a variety of legal burdens not typically imposed on persons convicted of other serious crimes—burdens such as obligations to register with local law enforcement, GPS monitoring of their location, and restrictions on permissible places of residence. No single body of law generates all these burdens or even any particular type of restriction. For instance, a residency restriction may be imposed by

495

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    the sentencing court as condition of probation, imposed by a parole board as a condition of

2    postrelease supervision, mandated by state law, or even applicable in some municipalites of the

3    state but not in others. Articles 6 and 7 of *Model Penal Code: Sentencing* apply to sentencing

4    procedures, sentencing consequences, and collateral consequences for criminal offenses generally,

5    including those defined in Article 213. Section 213.11 and Sections 213.11A-213.11J of Article

6    213 supplement those provisions with additional requirements tailored to the particular

7    circumstances of the sexual offenses. These additional requirements apply not only when the

8    relevant consequences are imposed by the sentencing court or parole board ("sentencing

9    consequences"), but also when they do not arise in the sentencing process but instead are ordered

10   by other state agencies or mandated by other federal, state, or local laws ("collateral

11   consequences").[1]

12       For sentencing consequences, subsection (3) specifies the additional requirements that

13   govern and supersede any contrary provisions of law, with respect to the conditions listed in

14   subsection (3)(a), (b), and (c).

15       For collateral consequences, subsection (4) specifies that the additional requirements of

16   Sections 213.11A-213.11J govern and supersede any contrary provisions of law, with respect to

17   collateral consequences that are "applicable primarily to persons convicted of a sexual offense."

18   The additional requirements of Sections 213.11A-213.11J are not limited to consequences that

19   apply *only* to persons convicted of a sexual offense. Some statutes provide for burdens that are

20   applicable not only to persons convicted of a sexual offense but  also to persons convicted (for

---

[1] The Article 7 provisions applicable to collateral consequences reach "penalties, disabilities, or disadvantages … authorized or required by state or federal law [that] are not part of the sentence ordered by the court." MODEL PENAL CODE: SENTENCING, Section 7.01 (AM. L. INST., Official Statutory Text, May 24, 2017) (hereafter *MPCS Statutory Text*). The Comment to this Section indicates that its requirements do not govern "locally imposed" consequences of conviction. MODEL PENAL CODE: SENTENCING, Section 6x.01, Comment *b*, p. 278 (AM. L. INST., Proposed Final Draft, April 10, 2017) (hereafter *MPCS Proposed Final Draft*) (stating that this Section "excludes from the definition of collateral consequences all informal, locally imposed, private, and extralegal consequences of conviction"). The Comment could be read as intended to exclude "locally imposed" consequences of conviction only when they are *informal* or *private*, or also when they are formally mandated by the laws of a city or county. Either way, for sexual offenses, the difference between state-level and local-level law is not relevant to the concerns that animate Article 213, and important burdens of conviction, such as residency restrictions, often are grounded in municipal ordinances rather than statewide legislation. See text at note 297, *infra*. The standards and procedures of Section 213.11 and Sections 213.11A-213.11J therefore apply to restrictions under local as well federal and state law.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    example) of kidnapping or child abduction. When those burdens are triggered by conviction of an
2    Article 213 offense, the provisions of Sections 213.11A-213.11J apply and supersede contrary
3    provisions of the laws in question, because those laws apply only to persons convicted of sexual
4    offenses and a small number of other serious crimes. But these additional requirements do not
5    affect collateral consequences—such as limits on the right to vote, serve on a jury, or receive public
6    benefits[2]—that may result from conviction for any serious crime or for a wide range of diverse
7    felonies.

8         Section 213.11 and Sections 213.11A-213.11J do not apply in connection with conviction
9    for an offense other than one defined by Article 213. Sentencing procedure, sentencing
10   consequences, and collateral consequences for offenses outside Article 213 are governed by
11   Articles 6 and 7 of *Model Penal Code: Sentencing*.

12        ***2. General Principles.***

13        All American jurisdictions require persons convicted of a sexual offense to register with
14   local law-enforcement authorities where they reside, work, or are enrolled as a student,[3] and to
15   continually update the personal information provided. Typically, these registries permit the general
16   public to access more limited, but still extensive personal information about the registrant through
17   a separate public website that does not post especially sensitive personal-identity information, such
18   as the registrant's social security number.

19        Beyond these core features, there is considerable variation in the registry regimes and other
20   restrictions applicable specifically to persons convicted a sexual offense. The majority of
21   jurisdictions require law-enforcement agencies to notify concerned community organizations or
22   the public generally when a person who has been convicted of a sexual offense moves into the
23   area. And most jurisdictions require these persons to submit to GPS monitoring of their location
24   at all times. Additional restrictions targeting persons convicted of a sexual offense are also

---

[2] See, e.g., *MPCS Statutory Text*, supra note 1, Section 7.03.

[3] Federal SORNA (the Sex Offender Registration and Notification Act of 2006), for example, defines "student" as "an individual who enrolls in or attends an educational institution, including (whether public or private) a secondary school, trade or professional school, and institution of higher education." SORNA § 20911(11).

497

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   common, though by no means universal. For example, many states or their municipalities prohibit
2   these persons from residing in certain areas or working in certain occupations.[4]

3   The objective of these laws is to reduce recidivism and enable the public to take measures
4   for self-protection, or at least ease public fear of crimes that are particularly unsettling and
5   injurious. Yet despite the intuitive plausibility of these benefits, extensive research demonstrates
6   convincingly that the expected gains have not materialized.[5] At the same time, the laws have a
7   broad range of well-documented, undesirable consequences. Most obvious are the onerous burdens
8   on registrants themselves,[6] but the less evident effects are important and too often overlooked. In
9   part because the burdens imposed on registrants can be powerfully criminogenic, these laws appear
10  to result in more rather than less crime, including sexual crime, and ultimately impair rather than
11  enhance public safety,[7] undermining the very purposes that lawmakers and the public pursue in
12  supporting these policies.

13  Because the registries provide locally relevant information that police cannot obtain from
14  ordinary criminal-history databases when they have not identified a particular suspect,[8] sex-
15  offense registries facilitate high-priority investigations of serious sexual offenses. That gives them
16  important practical advantages for the police,[9] and virtually all Western nations maintain sex-
17  offense registries for law-enforcement use.[10] But unrestricted public access to the registries,
18  community notification, limits on residency and employment, and similar burdens are a different
19  matter. These wider measures, which with few exceptions are unique to the United States,[11] can
20  be dangerously counterproductive.[12]

---

[4] See generally, text at notes 149, 296-301, 319-322, infra.

[5] See text at notes 131-136, infra.

[6] See, e.g., text at notes 149, 253-256, 319-322, infra.

[7] See generally text at notes 150, 255-256, 316-327, infra.

[8] See text at notes 84-85, infra.

[9] Id.

[10] See text at notes 30-80, infra.

[11] Id.

[12] See text at notes 150, 255-256, 316-327,  infra.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    In light of these concerns, the Institute calls for a cautious, discriminating approach to

2  measures that impose on persons convicted of a sexual offense special burdens not applicable to

3  persons convicted of most other serious crimes. It recognizes that registries available *exclusively*

4  to law enforcement serve valuable, cost-effective functions and, if reasonably implemented, need

5  not be punitive or unduly burdensome for the registrant. A registry can fulfill its purposes while

6  insuring, for example, that the person concerned can satisfy the associated duties, such as the

7  obligation to keep registry information current, without being obliged (as is often the case in

8  current registry regimes) to navigate an obstacle course of daunting bureaucratic requirements.

9    At the same time, in the interests of both fairness and public safety, the Institute finds it

10  important to limit and carefully target other special burdens potentially applicable to these persons.

11  Subsections (3) and (4) therefore authorize other special burdens only on a substantially more

12  restricted basis than that found in much of current American law, in order to make their imposition

13  more consistent, coherent, and less prone to abuse or oppression in application or effect.

14    Specifically, under the grading provisions of Article 213, only the most serious sexual

15  offenses trigger an obligation to register with law enforcement and other burdens applicable

16  specifically to persons convicted of a sexual offense. And conviction of one of these especially

17  serious offenses authorizes only a few, narrowly tailored burdens in the interests of public safety

18  and public peace of mind. Moreover, the same limitations apply to all legal penalties, disabilities,

19  or disadvantages that result from conviction of an Article 213 offense, regardless of whether those

20  burdens are imposed in connection with sentencing or under other legal authority.

21    When the obligation to register applies, Sections 213.11A-213.11G and Section 213.11J

22  define and constrain the requirements associated with registration, Section 213.11H permits only

23  law-enforcement agencies and personnel to access registry information, and Section 213.11I

24  permits specified additional burdens (GPS monitoring and restrictions on the person's occupation,

25  employment, education, Internet access, or place of residence) only in compliance with detailed

26  safeguards. Other burdens applicable specifically to persons convicted of a sexual offense (in

27  particular, non-law enforcement access to registry information and community notification) are

28  not authorized within the safeguards of Section 213.11I and therefore are precluded entirely.

29    To make those limitations effective in connection with sentencing, subsection (3)(a)(i)

30  provides that a suspended sentence, a sentence to probation, and any terms of parole or postrelease

31  supervision must be eligible for early relief under Section 213.11J and must not impose an

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   obligation to register with law enforcement except as authorized under Sections 213.11A-213.11G

2   and Section 213.11J. Those limits on the obligation to register and their justification are discussed

3   in the Comments and Reporters' Notes to those Sections.

4     Subsection (3)(a)(ii) provides that sentencing consequences must not permit access to

5   registry information, except as authorized under Section 213.11H, which imposes on law

6   enforcement a strong obligation to preserve the confidentiality of that information. That limitation

7   and its basis are discussed in the Comments and Reporters' Notes to Section 213.11H.

8     Under subsection (3)(a)(iii), sentencing consequences must not authorize or permit

9   notification to any public or private individual or agency, other than law enforcement, that the

10  person concerned is registered with law enforcement or resides, works, or studies in the locality.

11    Under subsection (3)(b), sentencing consequences must not authorize or permit a condition

12  that restricts the person's occupation or employment, except as required by state law or authorized

13  under the procedural safeguards and substantive standards of paragraph (d) of subsection (3).

14  Many state-law restrictions on occupation and employment apply to a broad range of felony

15  offenses and therefore are not affected by the rules and limitations imposed by Sections 213.11-

16  213.11J. But those Sections do apply to state laws that primarily target sexual offenses, and many

17  state laws relating to occupation and employment do just that.[13]  These laws raise issues that are

18  in part distinct from those presented by other sex-offense collateral consequences. Often they are

19  embedded in detailed occupational licensing schemes that Article 213 should not categorically

20  override, and their justifications are stronger than those that can plausibly apply to registration,

21  residency restrictions, GPS monitoring, and the like. Restrictions on employment in nursing homes

22  and day-care centers, for example, can reasonably be based on a broader list of triggering sexual

23  offenses than those which arguably warrant duties to register with law enforcement. Paragraph (b)

24  therefore does not require case-by-case justification under paragraph (d) for restrictions on

25  occupation and employment that are required by state law. But restrictions on occupation and

26  employment not required by state law can be imposed only in compliance with paragraphs (d) and

27  (e).

---

[13] See, e.g., Miss. Code Ann. § 43-15-303 (prohibiting organizations involved in child care from employing sex offenders or permitting them to volunteer). See also text at note 102, infra.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1      Under paragraph (c) of subsection (3), sentencing consequences also may extend to GPS
2   monitoring or restrictions on the person's education, Internet access, or place of residence (as well
3   as restrictions on the person's occupation and employment that are not required by state law), but
4   again, only as authorized under paragraphs (d) and (e). Paragraph (d) imposes procedural
5   safeguards and substantive standards that require a showing of specific need, assessed after due
6   consideration of the potential negative impacts on the registrant, the registrant's family and the
7   registrant's prospects for rehabilitation and reintegration into society. Under paragraph (e), any
8   such restrictions must be drawn as narrowly as possible to achieve the goal of public safety and
9   must not be imposed for longer than the period permitted under Section 213.11F for the duties to
10  register and keep the registration current. The reasons for precluding community notification as a
11  sentencing consequence and for allowing the other listed burdens only in compliance with specific
12  procedural and substantive safeguards are explained in the Comments and Reporters' Notes to
13  Section 213.11I.

14      To make the same limitations effective for collateral consequences, Subsection (4) and
15  Sections 213.11A-213.11J impose essentially identical procedures and standards in connection
16  with penalties, disabilities, and disadvantages that result directly from conviction of an Article 213
17  offense but are not part of the sentence or the terms of parole or postrelease supervision. The
18  justification for those procedures and standards, explained in the Comments and Reporters' Notes
19  to Sections 213.11A-213.11J, is the same for collateral consequences as it is for sentencing
20  consequences.

## REPORTERS' NOTES

21  **1. Introduction: Sex-Offense Sentencing Consequences and Collateral Consequences**
22  **Generally.**
23      Every state currently has legislation requiring persons convicted of a sexual offense, on
24  release from custody, to register with local authorities in their place of residence, to keep
25  authorities informed of changes in their address, and to observe a variety of other restrictions. This
26  legislation makes their personal information available to law enforcement and typically permits
27  the general public to retrieve much but not all of this information through a public website. Many
28  of these laws also establish a regime of community notification—a requirement that local
29  authorities take affirmative steps to inform the public about the names and addresses of persons
30  convicted of a sexual offense who reside, work, or study in the area.

501

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

Federal law requires every state, as a condition of receiving certain federal funds, to establish an Internet-accessible registry of persons convicted of a sexual offense, with certain minimum information about these persons.[14] To facilitate public access to the state-run websites, the Department of Justice maintains a central resource, the National Sex Offender Public Website (NSOPW), that links to the state websites and thus directs a concerned citizen to information that may be publicly available at the state's registry. Federal law, in addition, requires the FBI to maintain a national database, the National Sex Offender Registry (NSOR), that includes more detailed information about each person required to register in a jurisdiction's sex offense registry. NSOR, however, is available only to law enforcement and other authorized criminal-justice agencies.[15]

Although originally inspired by concern over violent recidivists, these laws now apply even to persons with no prior criminal record who are convicted of a broad range of sexual offenses, often including possession of child pornography and statutory rape (sometimes including statutory rape in which victim and perpetrator are close in age). And states and localities have used these regimes as the basis for what has been aptly described as "a cluster of ancillary social control strategies,"[16] including (in many states) GPS monitoring and limits on places where registrants can reside or work.

Collateral consequences of conviction are not confined to the sex offenses, and in recent years they have proliferated across broad swaths of the criminal law, prompting several prominent law-reform bodies to address collateral sanctions applicable to offenders in general.[17] These initiatives have considered under one umbrella virtually the entire gamut of collateral sanctions triggered by conviction not only of sexual offenses but also offenses ranging from homicide to drug crimes, securities fraud, and drunk driving; likewise these assessments seek to cover the entire gamut of collateral consequences, including disenfranchisement, ineligibility for public housing, loss of other public benefits, barriers to occupational licensing, and the like.

These efforts mainly aim to identify general principles and corresponding statutory language suitable for application to any collateral consequence associated with conviction for any offense. Because they cover so much terrain, they cannot delve into the substantive question of when a given sanction should be available for a given offense. Rather, of necessity they focus on general principles of procedural fairness that can be cast in broadly applicable terms—for example,

---

[14] 34 U.S.C. § 20922.

[15] See generally https://smart.ojp.gov/nsopw-nsor-fact-sheet.

[16] Wayne A. Logan, *Origins and Evolution*, in WAYNE A. LOGAN & J. J. PRESCOTT, EDS., SEX OFFENDER REGISTRATION AND COMMUNITY NOTIFICATION LAWS 1, 14 (forthcoming 2021).

[17] See American Bar Association, Standards for Collateral Sanctions and Discretionary Disqualification of Convicted Persons (2004); National Conference of Commissioners on Uniform State Laws, Uniform Collateral Consequences of Conviction Act (2009); *MPCS Statutory Text*, supra note 1, Art. 7.

502

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

requiring that the sentencing judge explain applicable collateral consequences to defendants prior to entry of a guilty plea and at sentencing; that appropriate authorities compile in one place a list of the jurisdiction's collateral sanctions; that jurisdictions allow offenders to seek relief from inappropriate collateral sanctions; and that sentencing commissions develop guidelines for courts to use in making substantive decisions about whether to impose a given collateral sanction or grant relief from it.[18] These treatments inevitably stop short of the sustained attention to the range of issues that arise in the context of collateral consequences applicable specifically to the sexual offenses.

The effects of these measures in the context of the sexual offenses are not only important in their own right, but they also have important implications for the substantive definition of the sexual offenses. In deciding the proper scope of penal prohibitions, legislative bodies must consider the severe collateral consequences typically triggered by state offenses denominated as "rape" or "sexual assault." Concerns of this nature presumably shaped the Institute's original decision, in 1962 MPC Section 213.5, to address matters of procedure and evidence distinctive to rape that go beyond mere substantive crime definition. Sections 213.11A-213.11J likewise reflect the judgment that sound treatment of the sexual offenses in Article 213 cannot confine itself to offense definitions alone but must also address sanctions and collateral consequences authorized or required upon conviction.

Note 2 examines the historical development of collateral consequences and other special burdens applicable specifically to persons convicted of a sexual offense. Note 3 surveys practices abroad with respect to special burdens applicable to persons convicted of a sexual offense. Note 4 provides a brief overview of the policy concerns surrounding these laws and explains the judgments underlying Sections 213.11-213.11J. Note 5 describes in detail the restrictions and disabilities in question and variation in the relevant state and federal legislation, with respect to both registration regimes and other consequences applicable specifically to persons convicted of a sexual offense. Note 6 examines the policy goals of this kind of legislation and assesses the evidence bearing on its effects, both intended and unintended. Note 7 explains the approach of Article 213 with regard to these collateral consequences and other burdens applicable specifically to persons convicted of a sexual offense.

### 2. Historical Background.

Since the 1930s and before, persons convicted of a sexual offense have faced a variety of special sanctions, including mandatory sterilization and indefinite commitment for psychiatric treatment.[19] But these measures had relatively little visibility or importance when the Model Penal

---

[18] See, e.g., *MPCS Statutory Text*, supra note 1, Art. 7.

[19] See WAYNE A. LOGAN, KNOWLEDGE AS POWER: CRIMINAL REGISTRATION AND COMMUNITY NOTIFICATION LAWS IN AMERICA 1-48 (2009); PHILIP JENKINS, MORAL PANIC: CHANGING CONCEPTS OF THE CHILD MOLESTER IN MODERN AMERICA (1998); Karen J. Terry & Alissa R. Ackerman, *A Brief History of Major Sex Offender Laws*, in RICHARD G. WRIGHT, ed., SEX OFFENDER LAWS: FAILED POLICIES, NEW DIRECTIONS 50, 51-53 (2d ed. 2015).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

Code was originally drafted. That picture changed dramatically in the early 1990s, when public interest in identifying persons previously convicted of a sexual offense emerged with new intensity following several highly publicized murders of young children.[20] In 1993, 12-year-old Polly Klaas was kidnapped, raped, and murdered by a man with a prior record for the commission of serious violent crimes. The next year, seven-year-old Megan Kanka was sexually assaulted and killed by a person who lived across the street and had previously been convicted of multiple sexual offenses. Several similar incidents were widely publicized during the 1990s and shortly thereafter.[21] The legislative reaction to the Klaas killing focused on the "three-strikes-and-you're-out" solution, which mandates extended terms of imprisonment for offenders previously convicted of two serious or violent felonies.[22] In New Jersey, Megan Kanka's murder prompted a different response, imposing registration requirements applicable only to persons convicted of a sexual offense. Within weeks of the killing, the state assembly declared a legislative emergency, and a sex-offender registration law passed, without committee hearings, about two months later.[23]

In 1990, Patricia Wetterling responded to the murder of her 11-year-old son Jacob by establishing a foundation to press for the enactment of registration laws applicable to persons convicted of a sexual offense.[24] A year after New Jersey's enactment of Megan's Law, her efforts bore fruit when Congress, as part of the Violent Crime Control and Law Enforcement Act of 1994, enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, which required all states, on pain of loss of federal funding, to establish a system of registration for all persons convicted of a sexually violent offense or any criminal offense against a minor.[25]

---

[20] See generally Logan, *Origins and Evolution*, supra note 16, at 1-16; Terry & Ackerman, supra note 19, at 74-94.

[21] In the Sex Offender Registration and Notification Act of 2006 ("SORNA"), Congress's "declaration of purpose," 34 U.S.C. § 20901 (2019), lists more than a dozen specific victims.

[22] See Michael Vitello, *Three Strikes: Can We Return to Rationality?*, 87 J. Crim. L. & Criminology 395 (1997).

[23] See Michelle Ruess, *Second Thoughts About Megan's Law: Concern Growing over Ripple Effects*, Record (Hackensack, N.J.), Feb. 19, 1996, at A1 (describing rapid passage of Megan's Law); Robert E. Freeman-Longo, *Reducing Sexual Abuse in America: Legislating Tougher Laws or Public Education and Prevention*, 23 New Eng. J. on Crim. & Civ. Confinement 303, 316 (1997) (same). The statute is now codified at N.J. Stat. Ann. § 2C:7-6 (West 1995 & Supp. 2011).

[24] Jacob's body was missing for almost 30 years, having been found only in 2016, and his murderer was unknown until he confessed at that time. But from the outset the crime was assumed to be the work of a sexual predator.

[25] See 42 U.S.C. § 14071(f)(1) (Supp. III 1997).

504

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    Congress subsequently repealed that statute and replaced it with a broader law—the Sex
2  Offender Registration and Notification Act of 2006 (SORNA).[26] SORNA directs each state to
3  maintain a registry of persons convicted of any sexual offense and requires states to create a crime,
4  punishable under state law by more than a year's imprisonment, for a person convicted of a sexual
5  offense who fails to register or meet a deadline for updating required registry information.[27]
6  SORNA also establishes the National Sex Offender Public Website (NSOPW), which serves as a
7  central clearing house linking to the public websites established by individual states.[28]  After the
8  passage of SORNA, many states expanded their own registration requirements and enacted other
9  special restrictions. In addition, it is a federal crime, punishable by up to 10 years in prison, for a
10  person convicted of a state-law sex offense to travel interstate without maintaining an up-to-date
11  registration with state authorities.[29]

12    *3. Practices Abroad.*
13    Many places outside the United States, including the United Kingdom (UK), Canada, and
14  the European Union (EU), require persons who have been convicted of a sexual offense to register
15  with law enforcement or other official authority. Like the United States, these jurisdictions have
16  faced pressure to make sex-offense registry information readily available to the general public, but
17  unlike the United States, they have generally declined to do so.[30] Typically, their registry
18  information can be retrieved only by law enforcement, or they permit somewhat wider access in
19  limited circumstances. One fundamental reason is that other nations generally treat criminal-

---

[26] PUB. L. NO. 109-248, tit. I, 120 Stat. 590 (2006) (codified as amended at 34 U.S.C. §§ 20901-20929 (2019)).

[27] 34 U.S.C. § 20913(e).

[28] See text at note 15, supra.

[29] 18 U.S.C. § 2250.

[30] For detailed discussion, see James B. Jacobs & Dimitra Blitsa, *US, EU & UK Employment Vetting as Strategy for Preventing Convicted Sex Offenders from Gaining Access to Children*, New York University School of Law, Public Law & Legal Theory Research Paper Series, Working Paper No. 12-64 (Nov. 2012), available at http://ssrn.com/abstract=2176897. For limited exceptions to this no-public-access principle, see text infra at note 62 (discussing community notification that some Canadian provinces authorize with respect to certain high-risk registrants), notes 65-66 (noting that one Australian state (Western Australia) permits public searches of the local registry, but only for missing and high-risk registrants or to determine whether a particular person in contact with their child is registered), and 78 (describing Poland's dual registries: one accessible only to public officials and  employers whose staff works with children, and the second accessible to the public generally, but listing only the most dangerous perpetrators of sexual crimes, such as those who have raped children or committed rapes with "extraordinary cruelty").

505

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   history information as confidential, in order to protect the privacy of those who have been
2   convicted of crime and aid their rehabilitation.[31]

3        A global survey conducted by the U.S. Department of Justice in 2016 found that although
4   most nations surveyed maintain sex-offense registries in some form, usually the registries either
5   are not available to the public at all, or individuals and organizations with special need can query
6   the database about high-risk registrants under certain circumstances.[32] Virtually none of the
7   foreign countries listed in the 2016 survey permits the prevalent U.S. practice of proactive
8   notification of sex-offense registry information to unlimited community organizations and the
9   general public.[33] More recently, at least two Latin American nations have enacted sex-offense
10   registry laws, but they too reject the U.S. practice of proactive community notification; access to
11   sex-offense registry information is largely restricted to law enforcement, with limited exceptions.[34]

12        The following sections of this Note provide additional detail for the common-law countries
13   and Europe.

---

[31] See, e.g., James B. Jacobs & Elena Larruri, *Are Criminal Convictions a Public Matter?: The USA and Spain*, 14 PUNISHMENT & SOC'Y 3, 12-14 (2012). On respect for this principle in countries outside the United States, see text accompanying notes 30-80, infra.

[32] U.S. Dept. of Justice, Office of Justice Programs, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, *Global Survey of Sex Offender Registration and Notification Systems* 17-22 (2016), https://smart.gov/pdfs/global-survey-2016-final.pdf. One nation (Chile) is listed as permitting data-base queries by the general public. Id., at 18.

[33] South Korea is the only jurisdiction other than the United States that the DoJ survey lists as authorizing proactive notification to the public generally. Id., at 21. The survey noted (id., at 17-21) that a few jurisdictions authorize public notification limited to cases involving particular high-risk registrants: Bahamas, Bermuda, Canada (discussed in text at note 62, infra), Guernsey, and New Zealand (see also text at note 63, infra); the survey lists two jurisdictions as providing notice in high-risk cases but only to limited categories of recipients: "individuals and organizations who need the information" (Nigeria) or "parents, in certain circumstances" (Portugal, see also text at note 73, infra).

[34] See Misterio Público, *El Reglamento del Registro Nacional de Agresores Sexuales del Misterio Público* (May 14, 2018), available at https://consultasmp.mp.gob.gt/docs_download/Reglamento%20del%20RENAS.pdf) (Guatemala); *Artículo 3, D-1954432, Ley que Establece las Medidas de Protición a la Sociedad contra Agresores Sexuales*, promulgated July 28, 2020, http://silpy.congreso.gov.py/expediente/118670 (Paraguay). As of December 2019, no other Latin American country appeared to have a national-level sex-offense registry at all; registry systems were proposed but not yet enacted in Argentina and Mexico. See *Creacion del Registro Nacional de Delincuenes Sexuales (RENADESE), 1617-D-2015* (Argentina); Rolando Ramos, *Buscan fichar a agresores sexuales*, EL ECONOMISTA, Dec. 30, 2019, https://www.eleconomista.com.mx/politica/Buscan-fichar-a-agresores-sexuales-20191230-0067.html (Mexico); *Ley de Registro de Agresores Sexuales en la CDMX incluirá nombre, la foto, alias y ADN*, INFOBAE, Dec. 3, 2019, https://www.infobae.com/america/mexico/2019/12/03/ley-de-registro-de-agresores-sexuales-en-la-cdmx-incluira-nombre-la-foto-alias-y-adn-de-los-agresores-sexuales (visited Sep. 6, 2020) (discussing proposed registry for ex-offenders residing in Mexico City and noting that access will be limited to public officials or persons authorized by judicial authorities).

506

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1       *a. United Kingdom.* The disabilities imposed on persons who have been convicted of a
2  sexual offense are far more limited in the UK than in the United States, largely because of concern
3  that widespread dissemination of criminal history and burdensome disabilities can undermine the
4  rehabilitation of ex-offenders.[35]

5       The UK first implemented a sex-offense registry through the Sex Offenders Act of 1997,
6  later superseded by the Sex Offences Act of 2003.[36] England/Wales, Scotland, and Northern
7  Ireland each have separate registry systems,[37] but because those of Scotland and Northern Ireland
8  largely build on and mirror the regime for England/Wales, this summary of the provisions
9  applicable in England is approximately accurate for the rest of the UK as well.

10      Upon release from custody, persons convicted of a sexual offense must report to local
11  police, provide certain personal details (for example, birthday, national insurance number, names
12  used, and where they are living or planning to travel), and keep these details current for as long as
13  they remain on the registry. Registrants must also provide notice when they travel abroad or stay
14  in a house with children, and must provide a DNA sample, fingerprints, and a current photograph.[38]

---

[35] See Jacobs & Blitsa, supra note 30.

[36] Kate Blacker & Lissa Griffin, *Megan's Law and Sarah's Law: A Comparative Study of Sex Offender Community Notification Schemes in the United States and the United Kingdom*, 46 CRIM. L. BULL. 987, 994 (2010); Kristen M. Zgoba & Devin Cowan, *Sexual Offense Legislation Across the Pond: A Review of Community Sentiment Toward the United Kingdom's Implementation of Sarah's Law*, 32 SEXUAL ABUSE 476, 477 (2020).

[37] See Kieran McCartan, Hazel Kemshall, & James Hoggett, *Reframing the Sex Offender Register and Disclosure: From Monitoring and Control to Desistance and Prevention*, in 2 CONTEMPORARY SEX OFFENDER MANAGEMENT 208, 215 (Hazel Kemshall & Kieran McCartan, eds., 2017). Policing policy in both Scotland and Northern Ireland is under separate, local, control. See ROB MAWBRY & ALAN WRIGHT, POLICE ACCOUNTABILITY IN THE UNITED KINGDOM) 2,4 (Commonwealth Human Rights Initiative, 2005), available at https://www.humanrightsinitiative.org/programs/aj/police/res_mat /police_accountability_in_uk.pdf (describing UK's "tripartite system of police accountability"). Scotland has its own registry system, much like that of the regime in England/Wales, though apparently less formalized. See Scottish Government, *Multi-Agency Public Protection Arrangements (MAPPA): National Guidance 2016* (Mar. 3, 2016) (describing Scottish participation in ViSOR and disclosure policies). For Northern Ireland, see Public Protection Arrangements in Northern Ireland, *PPANI Annual Report: 1st April 2016 – 31st March 2017* (2017) (describing Northern Ireland's "framework for managing the risks to the public posed by sexual and certain violent offenders").

[38] See R(F) and Another v. Sec'y of State for the Home Dept., [2010] UKSC 17 (describing provisions of the Sexual Offenses Act of 2003, §§ 80, 83(5)); Home Office, Guidance on Part 2 of the Sexual Offences Act of 2003, at 3, 12-13 (Sep. 2018), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/755142 /11.18guidanceonpart2ofthesexualoffencesact2003.pdf; Blacker & Griffin, supra note 36, at 999; David Edwards, *ViSOR—Violent and Sex Offender Register*, 51 CRIM. JUSTICE MATTERS 28 (2003).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1  The Violent and Sex Offenders Register (ViSOR) allows law enforcement to access information
2  in the registry and to track offenders within their jurisdiction.[39]

3  Parliament originally mandated "an indefinite period" of registration for persons
4  "sentenced to imprisonment or detention for 30 months or more."[40] However, in R(F) v. Sec'y of
5  State for the Home Dep't,[41] the UK Supreme Court held that provision invalid. The court ruled it
6  a "disproportionate interference" with the individual's right to privacy under the European
7  Convention on Human Rights, because it made "no provision for individual review of its
8  requirements."[42] Parliament, responding in 2012, amended the applicable statute to provide a
9  mechanism by which registrants subject to lifetime registration could have that requirement
10 reviewed and, in some cases, lifted.[43] Early relief from the registration requirement apparently has
11 become more the norm than the exception. Between 2016 and 2018, 72 percent of the registrants
12 who asked to be taken off the registry had their requests granted.[44]

13 Unlike the United States, England does not permit unlimited public access to registry
14 information.[45] Instead, England provides for "controlled disclosure" of information about certain
15 registrants, but only if they have been convicted of a sex offense against a child.[46] Under that

---

[39] See Jack O'Sullivan et al., *Understandings, Implications and Alternative Approaches to the Use of the Sex Offenders Register in the UK*, 13 IRISH PROBATION J. 84, 86 (2016); McCartan et al., supra note 37, at 212.

[40] See R(F) v. Sec'y of State, supra note 38, at ¶ 10 (reviewing Sexual Offences Act 2003, § 82).

[41] Id. at ¶ 58.

[42] Id.

[43] See UK Home Office and Nat'l Police Chief's Council, *Sex Offender Notification Requirements: Review Mechanism* (July 2017) (outlining review procedures), available at https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/626930 /Sex_Offender_Notification_Requirements_-_Review_Mechanism__leaflet_.pdf.

[44] Jim Norton, *Sex Offenders Allowed to Sign Off Danger List*, THE DAILY MAIL, Jan. 3, 2020, https://www.dailymail.co.uk/news/article-7846583/Sex-offenders-allowed-sign-danger-list.html (reporting that over the three-year period, 1,288 applications had been filed seeking removal from the registry, and only 363 had been refused).

[45] See HAZEL KEMSHALL, UNDERSTANDING THE MANAGEMENT OF HIGH RISK OFFENDERS 118-119 (2008) (explaining that "the UK has not adopted public disclosure or community notification as per the USA models").

[46] See U.K. Home Office, *Protecting Children* (Mar. 3, 2010), https://webarchive.nationalarchives.gov.uk/20100412124519/http://www.homeoffice.gov.uk/about-us/news/child-sex-offenders-disclosure.html; U.K. Home Office, *The Child Sex Offender (CSO) Disclosure Scheme Guidance Document* [hereinafter *CSOD Guidance*] (Nov. 5, 2010). A separate regime, known as Clare's Law, provides for somewhat more expansive disclosure to interested persons of information about persons with a history of domestic violence or abuse. See U.K. Home Office, *Domestic Violence Disclosure Scheme (DVDS) Guidance* [hereinafter *DVDS Guidance*] 4 (Dec. 2016), available at

508

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1  regime, known as Sarah's Law,[47] members of the public may inquire whether a specific individual
2  poses an ongoing risk to their child.[48] Before disclosure is made, the application by the parent or
3  guardian is subject to an apparently rigorous series of reviews. The official assessing the disclosure
4  application must consider whether a registered ex-offender "wishes to make representations in
5  order to ensure that the [official] has all the information necessary to conduct the balancing
6  exercise he is required to perform justly and fairly."[49] Disclosure "must be … limited to very
7  pressing cases"; otherwise, "the presumption is against disclosure."[50] The low reported rates of
8  disclosure[51] seem to bear out the apparently restrictive character of this standard. And when
9  disclosure is permitted, Home Office Guidance requires all persons receiving a disclosure to "sign
10 an undertaking that they agree that the information is confidential and they will not disclose this
11 information further" and warns them that "legal proceedings could result if this confidentiality is
12 breached."[52]

---

https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/575361/DVDS_guidance_FINAL_v3.pdf; Jamie Grace, *Clare's Law, or the National Domestic Violence Disclosure Scheme: The Contested Legalities of Criminality Information Sharing*, 79 J. CRIM. L. 36, 38 (2015).

[47] Sarah Payne disappeared in 2000, while playing near her grandparents' home. Her naked body was found 16 days later in a shallow grave. The crime had been perpetrated by Roy Whiting, a registered sex offender living only five miles from where she had gone missing; he had been convicted of kidnapping and sexually assaulting a nine-year-old girl five years earlier but had served only half of his four-year sentence for those prior offenses. For Sarah's killing, Whiting was convicted of murder and sentenced to life in prison. See Sally Lipscombe, Library of the House of Commons, *Sarah's Law: the Child Sex Offender Disclosure Scheme, at 3* (Mar. 6, 2012), https://researchbriefings.files.parliament.uk/documents/SN01692/SN01692.pdf; Mark Townsend, *Sarah Payne's Killer in Plea for Early Release*, THE OBSERVER ONLINE, Mar. 11, 2006, https://www.theguardian.com/uk/2006/mar/12/ukcrime.theobserver (relating details about the case).

[48] See McCartan et al., supra note 37, at 213-215.

[49] See X (South Yorkshire) v. Secretary of State for the Home Dep't, [2013] 1 WLR 2638. See also *CSOD Guidance*, supra note 30, § 5.5.4 (stating that "[i]f the application raises 'concerns', the police must consider if representations should be sought from the subject to ensure that the police have all necessary information to make a decision in relation to disclosure.").

[50] *X (South Yorkshire)*, supra note 49, at ¶ 70.

[51] As of 2015, English, Welsh, and Scottish authorities had received 5,357 disclosure applications and had made disclosure in only 877 cases (roughly 16%). See Martin Evans, *Sarah's Law is 'not working'*, *NSPCC warn,* THE TELEGRAPH (Jul. 30, 2015). See also *Details of 700 paedophiles disclosed since Sarah's Law launched*, THE GUARDIAN (Dec. 23, 2013) (reporting 15% disclosure rate as of end of 2013); More recent data apparently are not available.

[52] *CSOD Guidance*, supra note 46, § 5.2.12. Stressing the gravity of this commitment to confidentiality, the CSOD Guidance adds "that it is an offence under Section 55 of the Data Protection Act 1998 for a person to knowingly or recklessly obtain or disclose personal data without the consent of the

509

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1      Other mechanisms for disclosure outside the domain of law enforcement are likewise
2  limited in scope. Multi-Agency Public Protection Arrangements (MAPPA) require police, prison,
3  and probation authorities to work with other agencies to manage the risk posed by persons who
4  have been convicted of a sexual offense.[53] MAPPA allows authorities to disclose registrant
5  information when necessary to protect a child from serious harm.[54] English employers and
6  volunteer organizations can use the government's Disclosure and Barring Service to check the
7  criminal history of job applicants, especially for those who apply for positions that afford close
8  contact with children and other especially vulnerable groups[55]; indeed, they have a legal obligation
9  to do so.[56] A public agency determines which forms of private employment should be closed to
10  persons who have been convicted of a sexual offense.[57]

11      *b. Canada.* The sex-offense registration system in Canada is similar to that in the UK.
12  Registry information is available to law enforcement for the purpose of investigating and
13  preventing sexual offenses but generally is not available to the public.[58]

14      Following a high-profile abduction and murder, the province of Ontario created a sex-
15  offense registry (OSOR) in 2001. When other provinces prepared to follow suit, Canada in 2004
16  adopted a National Sex Offender Registry (NSOR), administered by the Royal Canadian Mounted
17  Police.[59] Whereas registration in Ontario (under the OSOR) is required automatically upon
18  conviction, the original 2004 legislation placed offenders on the national registry (NSOR) only by
19  court order at the prosecutor's request, which the judge could reject if it was found not to be in the

---

data controller (i.e. the agency holding the information that will be disclosed, which in most cases will be the police)." Id.

[53] See *CSOD Guidance*, supra note 46, at 65; Blacker & Griffin, supra note 36,  at 995-996.

[54] Criminal Justice Act, 2003, c. 44, Pt. 13 § 327A (Eng.).

[55] See https://www.gov.uk/government/organisations/disclosure-and-barring-service.

[56] See Terry Thomas & Kevin Bennett, Employment Screening and Non-Conviction Information: A Human Rights Perspective 1-27 (2019); CSOD Guidance, supra note 46, at 66-68.

[57] Id.

[58] See Janine Benedet, *A Victim-Centered Evaluation of the Federal Sex Offender Registry*, 37 Queen's L.J. 437, 464 (describing effect of 2011 amendment to Canada's Sex Offender Information Registration Act); Barb Sweet, *Sex Offender Lists Are Private in Canada, But Should They Be?*, The Telegram (St. Johns, Newfoundland), Feb. 19, 2019, available at https://www.thetelegram.com/news/local/sex-offender-lists-are-private-in-canada-but-should-they-be-285847/.

[59] See Lisa Murphy, J. Paul Fedoroff & Melissa Martineau, *Canada's Sex Offender Registries: Background, Implementation, and Social Policy Considerations*, 18 Canadian J. of Human Sexuality 61, 62-63 (2009).

510

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   public interest.[60] Subsequently, registration was made mandatory for all those convicted of any of
2   the particularly serious sex offenses designated by the Act.[61]

3          National sex-offense registry information in Canada is available only to the police, but
4   individual provinces have established separate community-notification schemes to notify the
5   public about high-risk registrants.[62] In 2015, the Tougher Penalties for Child Predators Act enacted
6   the High Risk Child Sex Offender Database Act, to create a national database centralizing
7   information about high-risk registrants, but it includes only information that the police or other
8   authority has previously disclosed publicly (though often just locally).[63]

9          *c. Australia and New Zealand.* Beginning with New South Wales in 2001, each Australian
10  state and territory has created a sex-offense registry linked to an Australian National Child
11  Offender Register (ANCOR).[64]  In 2012, Western Australia became the only Australian state to
12  allow public access.[65] Its three-tier system (1) publicizes missing registrants who have not
13  complied with reporting obligations, (2) allows members of the public to search for high-risk
14  registrants in their local area, and (3) allows members of the public to inquire whether a particular
15  person in contact with their child is a sex-offense registrant, a system similar to the CSODS in the
16  UK.[66] In 2016, New Zealand created a sex-offense registry that is not publicly available.[67]

17         *d. European Union.* EU regulations require specific safeguards to protect the
18  confidentiality of criminal-history information and stipulate that registries of criminal convictions
19  "may be kept only under the control of official authority."[68] Sex-offense registries therefore are

---

[60] Id., at 63, 65.

[61] See Benedet, supra note 58, at 464  (2012) (detailing 2011 amendments to 2004 Act). The 2011
amendments also made registration mandatory for persons charged with those offenses but found not
criminally responsible by reason of mental disorder. The Canada Supreme Court recently held that
provision unconstitutional. See Ontario (Attorney General) v. G., 220 SCC 38 (Canada S. Ct., Nov. 20,
2020), available at https://www.scc-csc.ca/case-dossier/cb/2020/38585-eng.aspx.

[62] See Michael Petrunik, Lisa Murphy & J. Paul Fedoroff, *American and Canadian Approaches to
Sex Offenders: A Study of the Politics of Dangerousness*, 21 FED. SENT. REP. 111, 118-119 (2008); Lisa
Murphy & J. P. Federoff, *Sexual Offenders' Views of Canadian Sex Offender Registries: A Survey of a
Clinical Sample*, 45 CANADIAN J. OF BEHAVIOURAL SCIENCE 238, 239 (2013).

[63] See Tougher Penalties for Child Predators Act § 29(5).

[64] See S. Caroline Taylor, *Community Perceptions of a Public Sex Offender Registry Introduced in
Western Australia*, 18 POLICE PRACTICE AND RESEARCH 275, 279-280 (2017).

[65] Id.

[66] See *About Community Protection*, https://www.communityprotection.wa.gov.au/About.

[67] See New Zealand Police, *CSO Register: Information for People on the Register* (Oct. 2016),
https://www.police.govt.nz/sites/default/files/documents/cso_register_information_booklet.pdf.

[68] European Parliament & Council, *European Union Directive 95/46/EC*, 24 Oct. 1995, art. 8(5).
The EU's General Data Protection Regulation (2016) protects the confidentiality of criminal conviction

511

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   not precluded, and the EU's directive on child sexual abuse[69] states that Member States "may
2   consider" adopting measures "such as the registration in sex offender registers of persons
3   convicted of [sex] offences." But with its overriding commitment to privacy and the rehabilitation
4   of ex-offenders, the EU generally forbids public disclosure of registry information. The directive
5   on child sexual abuse adds that "[a]ccess to those registers should be subject to limitation in
6   accordance with national constitutional principles and applicable data protection standards, for
7   instance by limiting access to the judiciary and/or law enforcement authorities."[70]

8          The EU has modified that background presumption only to the extent of seeking to bar
9   persons from working with children if they have previously been convicted of a sexual offense
10  against a child and seeking to make convictions for sexual offenses against children available to
11  employers whose staff serve that clientele.[71] The EU relies on each of its Member States to
12  implement this obligation, and most have established such screening systems.[72] National laws
13  generally limit employer access to conviction records to protect the rights of those who have been
14  convicted. Some EU members, including France and Portugal, have established sex-offense
15  registries that are available to law enforcement but closed to the public.[73] Some EU states require
16  screening for a broad range of professional or voluntary activities, but most require screening only
17  for specific activities (e.g., child-care or public-sector employees).[74] While it is sometimes
18  possible for employers to access criminal records directly (usually for employers directly involved

---

records and likewise permits processing of such records "only under the control of official authority or when the processing is authorised by Union or Member State law providing for appropriate safeguards for the rights and freedoms of data subjects." European Parliament & Council, *Protection of Natural Persons with Regard to the Processing of Personal Data and on the Free Movement of Such Data*, Regulation 2016/679, 27 April 2016, 2016 O.J. (L 119) 1, art. 10.

[69] European Parliament & Council, *Combating the Sexual Abuse and Sexual Exploitation of Children and Child Pornography*, Directive 2011/93 of 13 December 2011, art. 10.

[70] Id.

[71] Id.

[72] See Amandine Scherrer & Wouter van Ballegooij, *Combating Sexual Abuse of Children: Directive 2011/93/EU*, European Implementation Assessment, at 41-43 (April 2017), https://www.europarl.europa.eu/RegData/etudes/STUD/2017/598614/EPRS_STU(2017)598614_EN.pdf.

[73] See Scherrer & van Ballegooij, supra note 72, at 44 (France); *Child Sex Offender Register Approved*, THE PORTUGAL NEWS (Aug. 20, 2015), http://theportugalnews.com/news/child-sex-offender-register-approved/35648 (Portugal); see U.S. Dept. of Justice, supra note 32, at 9, 18, 21.

[74] See generally Missing Children Europe, ECPAT, ENASCO, *A Survey on the Transposition of Directive 2011/93/EU on Combating Sexual Abuse and Sexual Exploitation of Children and Child Pornography* 33-38 (2015), https://missingchildreneurope.eu/Portals/0/Docs/A%20survey%20on%20transposition%20of%20Directive%20against%20child%20sexual%20exploitation%20and%20abuse.pdf.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

in education or child care), generally, job applicants themselves present their criminal record to employers.[75] A few EU Member States require employers to check with a dedicated screening agency, like those of most American states and the Disclosure and Barring Service in England.[76]

The number of Member States with such registries has increased in recent years, but many states within the EU do not have any sex-offense registration requirements.[77] Poland is in the minority that discloses information on certain high-risk ex-offenders on a publicly available website. It maintains both a "Restricted Access Register" and a "Public Register." The former contains information on the perpetrators of all sexual crimes. Access to it is limited in three ways: First, all individuals have the right to know if data about themselves is included in the Register. Second, courts, prosecutors, police, and other authorized official authorities have access to information from the Register when their mission requires. Finally, employers and those responsible for activities related to upbringing, education, recreation, treatment or childcare are required (on pain of criminal sanctions) to check whether data pertaining to a future employee or person admitted to that activity is included in the Register. The Public Register is available to everyone on the Internet, but it contains information only about the most dangerous perpetrators of sexual crimes, such as individuals who have raped children or committed rapes with "extraordinary cruelty." The courts determine which offenders qualify for inclusion on the Public Register.[78]

Public interest in greater access to information about persons who have been convicted of a sexual offense has prompted efforts to establish a sex-offense registry for the EU as a whole. But given that rehabilitating ex-offenders and protecting personal data remain European priorities, these efforts to date have not succeeded.[79] Instead of an EU-wide sex-offense registry, the EU has emphasized the need to improve information sharing between authorities across national borders.[80]

---

[75] Id.

[76] See notes 269-270 infra (discussing Pennsylvania regime); Missing Children Europe, note 74 supra (discussing England); https://www.gov.uk/government/organisations/disclosure-and-barring-service providing details concerning background checks by the UK's Disclosure and Barring Service).

[77] Scherrer & van Ballegooij, supra note 72, at 44.

[78] On all the above points, see Polish Ministry of Justice, *Sex Offenders Register*, https://rps.ms.gov.pl/en-US/Public#/.

[79] See Commission Reply to Petition No 2147/2014 by Jos Aalders (Dutch), On Registration of Paedophiles in Europe, (Jan. 27, 2016), https://www.europarl.europa.eu/doceo/document/PETI-CM-576744_EN.pdf?redirect; see also Sarah Hilder, *Managing Sexual and Violent Offenders Across EU Borders*, in 2 CONTEMPORARY SEX OFFENDER MANAGEMENT 95-96 (Hazel Kemshall & Kieran McCartan, eds., 2017).

[80] See Scherrer & van Ballegooij, supra note 72, at 44-47.

513

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

*4. Overview of Policy Concerns and the Judgments Underlying Sections 213.11A-213.11J.*

Laws of this kind pose several distinct policy issues: What, precisely, is their underlying justification? Does their adverse impact on the convicted person's prospects for gainful employment and reintegration into the community outweigh their potential contribution to social protection and public peace of mind? Do registries in fact provide such peace of mind, and how might they be structured for optimal effect?

Despite their prevalence in the United States, registration and other collateral-consequence laws targeting persons convicted of a sexual offense rest on highly contested premises. The best available studies discredit many of their central justifications. At the same time, the research provides strong evidence of unintended negative impacts, including tendencies (especially for the broadest of these laws) to *aggravate* recidivism and *jeopardize* public safety, the very opposite of the results that lawmakers and the general public expect registration and community notification to accomplish.

This realization is now widespread among criminal-justice professionals, even those who otherwise disagree about almost all other policies relating to sexual offenses. Among victim-advocacy organizations, many continue to support public access to the registries, community notification, residency and employment restrictions, and the like.[81] But many other victim advocates oppose key aspects of these policies, because they see harsh collateral consequences as major contributors to recidivism, to the frequent reluctance of police and prosecutors to properly charge serious sex offenders, and to the frequent reluctance of judges and juries to support justified convictions.[82] In candid moments, many state lawmakers, even while supporting this legislation

---

[81] For example, Victor Vieth is the Director of Education and Research for the Zero Abuse Project. See https://www.zeroabuseproject.org/about/. Vieth strongly supports registration, public access and community notification with respect to adults convicted of a sexual offense. He argues that people who lead busy lives often do not pay sufficient attention to the dangers that a sexual predator might pose to their children. Once they learn there is a registrant in their neighborhood, their attention can be engaged. Organizations like his can then intervene to offer a wider perspective on those dangers, not only from a particular registrant but from as-yet-undetected offenders; educators can also discuss effective protective measures while also cautioning against overreaction. "Education is crucial," he says. Vieth warns, however, that juveniles should "almost never" be on a public sex-offense registry, and that the need for public access and community notification must always rest on an individualized appraisal of risk, one not based entirely on the offense of conviction, but rather based on rigorous assessment of as many as a dozen factors that affect the risk posed by a particular individual. Vieth cautions that this is not a "one size fits all" problem; the focus must be on "what we need to do to help this particular offender." Victor Vieth, Zoom interview with Stephen Schulhofer, April 8, 2021.

[82] See text at notes 151-161, 190-193, 324-329, infra. But see note 81, supra (victim advocate Victor Vieth expressing support for community notification).

514

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1 themselves, describe it as overbroad and largely counterproductive, but politically impossible to
2 oppose.[83]

3     Mindful of these assessments, Sections 213.11A-21311J authorize special sex-offense
4 sentencing burdens and collateral consequences only on terms substantially narrower than those
5 found in currently prevalent state and federal legislation. Positions supported by strong currents of
6 public opinion and widely endorsed in the political process cannot be ignored, and Article 213
7 does not lightly depart from them. At the end of the day, however, the Model Code must be guided
8 by the best available evidence and judgments not deformed by known imperfections in the relevant
9 political deliberations.

10     Section 213.11 and Sections 213.11A-213.11J therefore limit special sex-offense
11 sentencing consequences and collateral consequences to the domains most likely to offer public-
12 safety benefits, without strong counterproductive side effects. It does so through four distinct
13 mechanisms.

14     First, the relevant provisions sharply distinguish registration for law-enforcement purposes
15 from other burdens and restrictions, including community notification, residency and employment
16 limitations, and other measures applicable specifically to those who have been convicted of a
17 sexual offense. Up-to-date local registration serves legitimate law-enforcement purposes. Of
18 course, when police investigating a sexual crime identify a particular "person of interest," they can
19 access national databases for information about that individual's criminal record.[84] But queries to
20 a national database are beside the point when police are unable to pinpoint a suspect. In that
21 situation, a local registry becomes a valuable aid to the investigation[85]—bearing in mind, to be
22 sure, the dangers of a premature focus on someone who happens to have a prior record for a sexual
23 offense. Registration solely for law-enforcement use is therefore far more cost-effective than other

---

[83] See Mary Katherine Huffman, *Moral Panic and the Politics of Fear: The Dubious Logic Underlying Sex Offender Registration Statutes and Proposals for Restoring Measures of Judicial Discretion to Sex Offender Management*, 4 VA. J. CRIM. L. 241, 248-249 (2016) (arguing that "sex offender registration and notification laws proceed from emotion and political posturing to ensure re-election …, rather than from empirical data. The intersection of public fear, a ratings-driven media, and lawmakers motivated by personal aggrandizement has led to the present, popular yet ill-conceived, political and legislative responses to sex offending.").

[84] The National Sex Offender Registry (NSOR), maintained by the Federal Bureau of Investigation, provides a centralized database of registered sex offenders, but it is available only to law enforcement and authorized criminal-justice agencies. See https://smart.ojp.gov/nsopw-nsor-fact-sheet. For criminal records generally, the National Crime Information Center (NCIC) maintains an electronic clearinghouse of crime data available to criminal-justice agencies nationwide. See https://www.fbi.gov/services/cjis/ncic. Neither of these databases is open to the general public. See 28 C.F.R. §§ 20.33, 50.12.

[85] The available empirical research on this point is thin, but its conclusions are in accord. See David M. Bierie & Kristen M. Budd, *Registration and the Closure of Stranger-Perpetrated Sex Crimes Reported to Police*, SEXUAL ABUSE (SAGE) 1, 1 (2020) (reporting study finding that "incidents of stranger-perpetrated sexual assault were cleared 23% to 28% faster post-registration implementation").

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1  burdens and restrictions widely imposed on those who have been convicted of a sexual offense.
2  Moreover, so long as the confidentiality of these records is .preserved, registration exclusively for
3  law-enforcement purposes poses relatively few dangers to public safety and to the welfare of
4  registrants themselves. Other social-control measures applicable to persons convicted of a sexual
5  offense, in contrast, impose steep implementation costs for law enforcement and entail other
6  significant, well-documented difficulties[86]; accordingly they must be targeted and managed with
7  particular care.

8       Sections 213.11A, 213.11D, and 213.11E, reflecting these judgments, require all adults
9  convicted of a registrable offense to provide up-to-date registry information to local law-
10 enforcement authorities. But Section 213.11H imposes on those authorities a strong obligation to
11 preserve the confidentiality of that information, and Section 213.11I strictly limits community
12 notification and other burdens applicable specifically to persons convicted of a sexual offense.

13      Second, Section 213.11A sharply restricts the class of individuals to whom the threshold
14 duty to register applies. It precludes registration of nearly all juveniles, and for adults, it imposes
15 the threshold duty to register only upon conviction of offenses that most strongly arouse public
16 concern.

17      Third, the registration framework shortens in two ways the duration of required
18 registration. The serious offenses that require registration under Section 213.11A would, under
19 federal and most state law, trigger an obligation to register for life. In contrast, Section 213.11F
20 limits to 15 years the registrant's duty to keep registry information current and provides for
21 automatic termination of that duty at an earlier date if the registrant meets specified rehabilitative
22 goals during the initial registration period; in either case the registrant is removed from the registry
23 at the end of the applicable period. In addition, Section 213.11J permits the registrant to apply for
24 early removal from the registry or relief from some or all of the duties associated with registration
25 upon an appropriate showing of rehabilitation.

26      Fourth, Section 213.11I tightly constrains, and in most cases eliminates, other burdens and
27 restrictions applicable specifically to persons convicted of a sexual offense, such as community
28 notification, limits on occupation and employment not required by state law, and limits on
29 residency, internet access, and the like. In current law, community notification is widely required
30 for a long list of sex-related offenses, and a wide range of other burdens, though not mandated by
31 federal law, is also commonly imposed. In contrast, Section 213.11I permits community
32 notification and other measures targeting persons convicted of a sexual offense only when an
33 individual, case-by-case risk assessment strongly supports the need for such measures, to an extent
34 that outweighs their potential for costly, counterproductive, and criminogenic effects.

35      ***5. Current Law: What Burdens Are Imposed and on Whom?***
36      As discussed above, federal SORNA requires each state, on pain of losing federal funds,
37 to maintain a registry applicable to persons convicted of a sexual offense and specifies many

---

[86] See text accompanying notes 145-246, 190-204, 255-256, 283-295, infra.

516

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1     parameters that state registration regimes must satisfy to comply with the federal mandate,
2 including the offenses that must trigger the obligation to register, the information states must
3 include in their registries, the duration of a registrant's duties, and the frequency with which
4 registrants must provide updates. Separately, SORNA requires states to make it a criminal offense,
5 punishable by at least a year in prison, for a designated offender to miss a deadline for updating
6 registry information or fail to register at all.[87] Beyond federal mandates pertaining to the registry
7 system itself, federal SORNA directs states to afford public access to their registry and establish a
8 program for promptly notifying concerned entities and individuals in the community about any
9 change in information pertaining to registrants in the area. Federal SORNA does not seek to dictate
10 state approaches to other measures that target persons convicted of a sexual offense, such as GPS
11 monitoring and limits on residency, employment, and Internet usage.

12     All states have a registration regime applicable to persons convicted of a broad list of sexual
13 offenses.[88] But states vary considerably in the extent to which they conform to federal SORNA
14 expectations with respect to many of the ostensibly mandated details, particularly with regard to
15 triggering offenses, public access, and community notification. States also vary in the extent to
16 which they impose other burdens applicable specifically to persons convicted of a sexual offense.

17     *a. Which Offenses?* Federal SORNA requires states to impose the obligation to register as
18 a "sex offender" and meet an array of other requirements on anyone convicted of a broad list of
19 sexual offenses, both felonies and misdemeanors. Juvenile-delinquency adjudications are included
20 if the minor was at least 14 years old at the time of an offense involving sexual penetration by the
21 use of force.[89] The designated offenses range from the most violent sex crimes to any offense of
22 coerced sexual contact, solicitation of a minor to engage in any sexual conduct, possession of child
23 pornography, "video voyeurism" (defined as photographing or filming the private area of an
24 individual without the individual's consent),[90] and any other sexual conduct not involving
25 consenting adults, even low-level misdemeanors such as public indecency. For example, for an
26 offense comparable to MPC Section 251.1, the petty misdemeanor of committing "any lewd act
27 which [the actor] knows is likely to be observed by others who would be affronted," SORNA
28 requires mandatory registration, public access, and community notification under the "sex
29 offender" label.

30     Federal SORNA establishes a three-tier offender-classification system based solely on the
31 seriousness of the sex offense and whether it was the defendant's first. All persons convicted of a
32 qualifying sex offense, regardless of classification, must (to comply with SORNA) face at

---

[87] Federal SORNA § 20913(e).

[88] See Catherine Carpenter & Amy E. Beverlin, *The Evolution of Unconstitutionality in Sex Offender Registration Law*, 63 HASTINGS L.J. 1071, 1078 (2012) (describing sex-offender registry laws enacted in the wake of federal SORNA).

[89] SORNA § 20911(5), (8); 18 U.S.C. § 2241(a)(1).

[90] See 18 U.S.C. § 1801 (2019).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    minimum all of the measures detailed in Note 4(d) below with respect to registration, public access
2    to registry information, and community notification—that is, proactive law-enforcement measures
3    to alert schools, other local agencies, and the general public to the identity of registered sex
4    offenders present in the area. The three tiers differ only in the length of time the individual is
5    subject to the restriction and the accompanying duty to keep registration information current (15
6    years for the least serious offenses, life for the most serious), and the frequency with which the
7    registrant must appear personally to confirm the required information (once a year for the least
8    serious offenses, quarterly for the most serious).

9         Many states likewise automatically impose the burdens of registration and related collateral
10   consequences on all persons convicted of any of almost any sex-related crimes. The triggering
11   offenses typically include all felonies and misdemeanors, however classified, that fall within the
12   purview of Article 213, as well as many offenses that do not—for example, possession of child
13   pornography, solicitation to practice prostitution, sexual performance involving a minor, and
14   exhibitionism. In some states, the list of covered misconduct includes as many as 40 distinct
15   offenses.[91] In some of these jurisdictions, the burdens of a sex-offense conviction automatically
16   extend not only to registration, often for life, but also to stringent residency restrictions.[92] Some
17   states grade offenses according to tiers of seriousness, but as under federal SORNA, their tiers are
18   determined solely by prior record and the nature of the offense of conviction.

19        Other state regimes are more nuanced. Many exclude minors from registration and other
20   obligations.[93] Some states further narrow the universe of potential registrants by using a ranking
21   system to vary the scope of the collateral burdens as a function of the intensity of perceived need.[94]
22   One common approach eschews categorization based solely on the conviction offense and prior
23   record. Instead, many states classify persons convicted of a sexual offense on the basis of an
24   individualized risk assessment that considers a variety of factors pertinent to the nature and
25   seriousness of the risk posed, such as whether the victim of the offense was a minor, and the age

---

[91] See, e.g., UTAH CODE ANN. § 77-27-21.5(g), (n) (2011) (listing 29 registerable offenses); LA. REV. STAT. ANN. § 15:541(24)(a) (2011) (listing 26 registerable offenses); N.Y. CORRECT. LAW § 168-a (2011) (listing over 40 registerable offenses).

[92] See Chiraag Bains, *Next-Generation Sex Offender Residency Statutes: Constitutional Challenges to Residency, Work, and Loitering Restrictions*, 42 HARV. C.R.-C.L.L. REV. 483 (2007); Brian J. Love, *Regulating for Safety or Punishing Depravity? A Pathfinder for Sex Offender Residency Restriction Statutes*, 43 CRIM. L. BULL. 834 (2007). For discussion of states where residency restrictions are automatic or discretionary, see Mary A. Lentz, § 13:3. Missing children—Megan's Law: Missing, Abused, and Neglected Children: Residency Laws for Sex Offenders in Various States, in LENTZ SCHOOL SECURITY (2011-2012 ed.); D. Scott Bennett, Sex Offender Registry Laws and School Boards, INQUIRY AND ANALYSIS, NAT'L SCHOOL BOARDS ASS'N (Feb. 2008).

[93] See, e.g., Lisa Ann Minutola & Riya Saha Shah, *A Lifetime Label: Juvenile Sex Offender Registration*, 33 DEL. LAW. 8, 12 (2015).

[94] See text at notes 94-99, 276-278, infra.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   difference and relationship between victim and perpetrator.[95] In New York, the level of assessed
2   risk affects the duration of the obligation to remain registered and the type of information that can
3   be publicly released.[96] Minnesota and New Jersey, among other states, rely on actuarial assessment
4   to distinguish persons convicted of a sexual offense on the basis of risk and assign more serious
5   collateral consequences to those who pose the greatest danger to the public.[97] In Georgia, a "Sex
6   Offender Registration Review Board"[98] uses research-based assessments to assign "points" that
7   are used to compute a score indicating a high, moderate, or low risk of reoffending; sexual attacks
8   against strangers and a history of multiple offenses are among the factors considered indicative of
9   high risk.[99]

10          *b. Which Burdens?*

11          All states require registrants to update their registry information periodically and authorize
12   criminal punishment for failing to register or keep registry information up to date.[100] And the great
13   majority permit everyone in the general public to access a website containing a wealth of personal
14   information about each registrant, though not including the registrant's Social Security number,
15   the names of victims and information about arrests not resulting in conviction.[101] Similarly, most
16   states or localities, at their own initiative, regularly distribute registry information to the entire

---

[95] E.g., N.Y. CORRECT. LAW, §§ 168-169-W (2019). See generally Russell Hinton, "Georgia's Sexual Offender Registry" GEORGIA DEPARTMENT OF AUDITS AND ACCOUNTS PERFORMANCE AUDIT OPERATIONS (2010), available at http://www.atlantaunfiltered.com/wp-content/uploads/2010/08/sex-offender-registry-audit.pdf (noting that many law-enforcement officials follow classification systems that are more nuanced, and therefore more restrictive than the ostensibly mandatory federal regime).

[96] See [N.Y.] Div. of Crim. Just. Services, "Risk Level & Designation Determination," https://www.criminaljustice.ny.gov/nsor/risk_levels.htm (visited Jul. 29, 2019) (stating that "risk level governs the amount and type of information which can be released as community notification and also impacts duration of registration").

[97] See text at notes 276-278, infra.

[98] See GA. CODE ANN. § 42-1-12 et seq. (2019). For discussion of Georgia protocols for actuarial risk assessment, see Sexual Offender Registration Rev. Board [Ga.], *Sexual Offender Registration Review Board Standing Procedure* (last visited July 29, 2019) https://www.sorrb.org/board-information/standing-procedures.

[99] For example, sexual attacks against strangers and a history of multiple offenses are high-risk indicators of recidivism. See Russell Hinton, "Georgia's Sexual Offender Registry" GEORGIA DEPARTMENT OF AUDITS AND ACCOUNTS PERFORMANCE AUDIT OPERATIONS (2010), available at http://www.atlantaunfiltered.com/wp-content/uploads/2010/08/sex-offender-registry-audit.pdf.

[100] See Carpenter & Beverlin, supra note 88, at 1078 (2012) (describing sex-offender registry laws enacted in the wake of federal SORNA).

[101] For details, see Reporters' Note to Section 213.11H, infra. See also "Collateral Consequences," ABA CRIMINAL JUSTICE SECTION, http://www.abacollateralconsequences.org/search/?jurisdiction=37.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    community or to pertinent government agencies and to private organizations where contact with
2    children or other vulnerable individuals might occur.

3    　　　Nearly all states bar persons convicted of a sexual offense from working as teachers, as
4    security guards, and in other sensitive occupations, but many exclude these persons from
5    numerous additional occupations.[102] Persons convicted of a sexual offense are commonly
6    prohibited from living near schools, parks, and other places where children congregate.[103] And
7    even when these registrants are not formally excluded from living or working at a certain place,
8    community notification can create almost insuperable barriers to finding a landlord or employer
9    willing to deal with them. More than 45 states now require GPS monitoring under some
10   circumstances.[104] Limits on using the Internet, once common,[105] are now restricted by the First

---

[102] See id.; Sara Geraghty, *Challenging the Banishment of Registered Sex Offenders from the State of Georgia: A Practitioner's Perspective*, 42 HARV. C.R.-C.L. L. REV. 513, 515 (2007).

[103] Id., at 514-515 (summarizing states' residency-restriction laws). For further detail, see notes 297-301, infra.

[104] See A. McJunkin & J.J. Prescott, *Fourth Amendment Constraints on the Technological Monitoring of Convicted Sex Offenders*, 21 NEW CRIM. L. REV. 379 (2018) (noting that "[m]ore than forty U.S. states currently track at least some of their convicted sex offenders using GPS devices."); Kamika Dunlap, *Sex Offenders After Prison: Lifetime GPS Monitoring?*, FINDLAW BLOTTER, Feb. 1, 2011; Michelle L. Meloy & Shareda Coleman, *GPS Monitoring of Sex Offenders*, in WRIGHT, supra note 3, at 243 (reporting that as many as 46 states use GPS monitoring to track persons convicted of a sexual offense under some circumstances).

The Supreme Court has held that GPS monitoring of a sex-offense parolee constitutes a search that must meet Fourth Amendment requirements of reasonableness, but the Court did not reach the question whether such monitoring passes muster under that standard. Grady v. North Carolina, 575 U.S. 306 (2015). The lower courts are split on the question whether lifetime GPS monitoring satisfies Fourth Amendment requirements of "reasonableness." Compare Belleau v. Wall, 811 F.3d 929 (7th Cir. 2016) (upholding Wisconsin regime); Doe v. Bredesen, 507 F.3d 998 (6th Cir. 2007) (same, Tennessee regime); State v. Bowditch, 364 N.C. 335, 700 S.E.2d 1 (N.C. 2010) (same, North Carolina regime), with State v. Grady, 826 S.E.2d 451 (N.C. 2019) (holding North Carolina GPS monitoring requirement unreasonable as applied to Grady); Riley v. New Jersey State Parole Bd., 219 N.J. 270, 98 A.3d 544 (N.J. 2014) (striking down New Jersey GPS monitoring law); Commonwealth v. Cory, 454 Mass. 559, 911 N.E.2d 187 (Mass. 2009) (same, Massachusetts regime).

[105] See Charles Wilson, *Court Upholds Ind. Facebook Ban for Sex Offenders*, ASSOCIATED PRESS, June 25, 2012, available at http://abcnews.go.com/Technology/wireStory/judge-upholds-ind-facebook-ban-sex-offenders-16642465#.T-ikN_LNnio (discussing cases in which courts have held bans on Internet use compatible with the First Amendment).

520

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    Amendment.[106] Other restrictions, less common for the time being, sometimes include chemical
2    castration.[107]

3    **6. Results.**

4         Because most states have implemented simultaneously a package of diverse duties and
5    restrictions applicable to persons convicted of a sexual offense, much of the data-driven research
6    does not tease out the separate effects of registration alone or of other common elements of sex-
7    offense policy. The overall picture therefore is best understood by beginning with what is known
8    about the impact of special sex-offense consequences generally, noting where available the
9    findings pertinent to particular components of those policies. This Note then focuses on the likely
10   benefits and costs of these individual components, and the Notes to Sections 213.11H and 213.11I
11   return to that question, with more sustained attention to the impact of collateral consequences other
12   than law-enforcement registration alone.

13        *a. Intended Effects and Inherent Limitations.* The various collateral-consequence measures
14   (registration, public access, notification, residential restrictions, employment restrictions, and the
15   like) differ substantially in the burdens they impose on registrants, but broadly speaking they share
16   the same two goals—not to inflict punishment, a goal incompatible with the basis on which the
17   courts have upheld these regimes[108]—but rather to reduce recidivism and to facilitate self-
18   protective measures on the part of the public. A collateral aim, no doubt, is to alleviate public fear,
19   even if the measures have no concrete effect on the behavior of offenders or law-abiding citizens.
20   Some state legislators have occasionally articulated a third objective that is specific to residency
21   restrictions—the goal of making life so difficult for persons convicted of a sexual offense that they
22   will simply choose to leave the state.[109]

---

[106] Packingham v. North Carolina, 137 S. Ct. 1730 (2017).

[107] See Alan Blinder, *What to Know about the Alabama Chemical Castration Law*, N.Y. TIMES, June 11, 2019. Other states imposing chemical castration on some paroled sex offenders include California, Florida, Louisiana, and Wisconsin. Id.

[108] E.g., Smith v. Doe, 538 U.S. 84 (2003). A number of courts, however, have held that a particular state's regime *is* punitive and therefore is unconstitutional. E.g., Doe v. Snyder, 834 F.3d 696, 705-706 (6th Cir. 2016) (holding that Michigan SORA is punitive); cf. Doe v. Wasden, 9th Cir. Dec. 9, 2020 (holding that *Smith* does not foreclose plaintiffs' claim that Idaho SORNA regime is punitive). See also Doe v. State, 189 P.3d 999 (Alaska 2008) (holding that Alaska statute upheld against federal challenge in *Smith* is punitive under state constitution); State v. Letalien, 985 A.2d 4 (Me. 2009) (holding state SORNA to be punitive); Riley v. N.J. State Parole Bd., 98 A.3d 544 (N.J. 2014) (same); Commonwealth v. Muniz, 164 A.3d 1189 (Pa. 2018) (same); Starkey v. Oklahoma Dep't of Corr., 305 P.3d 1004 (Okla. 2013) (holding state SORA to be punitive as applied);  State v. Myers, 923 P.2d 1024 (Kan. 1996) (same); Doe v. State, 111 A.3d 1077, 1100 (N.H. 2015) (same);  Commonwealth v. Baker, 295 S.W.3d 437 (Ky. 2009) (holding residency restrictions of Kentucky SORNA to be punitive);  In re C.P., 967 N.E.2d 729, 738 (Ohio 2012) (holding that Ohio SORNA, as applied to juveniles, imposes cruel and unusual punishment.).

[109] See Nancy Badertscher, *Law to Track Sex Offenders Studied*, ATLANTA J.-CONST., Aug. 16, 2005, at B1 (quoting Representative Keen, the sponsor of proposed residency restrictions, as saying: "If it

521

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    Four dimensions of the question warrant discussion. First, the primary objective of these
2    special burdens—reducing recidivism—has been extensively studied, and the research findings
3    are unequivocal:  With the possible exception of regimes that make registry information available
4    only to law enforcement, these policies have had no measurable deterrent effect. Second, there is
5    also significant research examining how members of the public alter their behavior in response to
6    these laws. On this point the studies find no significant benefits and powerfully counterproductive
7    side effects: community notification, unrestricted citizen access to registry information, and
8    restrictions on residency and employment have little impact on citizens' self protective measures
9    but are associated with strongly negative impacts on registrants, including great difficulty
10   reintegrating into society and significantly enhanced rates of recidivism.[110] Third, there is an
11   inherent mismatch between the risks that different sorts of offenders pose and the restrictions to
12   which they are subject. Finally, the laws are expensive to implement. These four points are
13   discussed in turn.

14       (i) *Reducing Recidivism*. Endorsing a widely held view, the Supreme Court has declared
15   that "[t]he risk of recidivism posed by sex offenders is 'frightening and high.'"[111] More concretely,
16   the Court has suggested that recidivism rates for persons convicted of a sexual offense are much
17   higher than recidivism rates for persons convicted of other crimes.[112]

18       There is little or no reliable data to support these common perceptions. Indeed, the available
19   evidence points strongly in the opposite direction. Although methodological limitations call for
20   some caution in interpreting this research, the studies tend to suggest that sex-offense recidivism
21   is *not* exceptionally high,[113] a fact that should surprise anyone who confidently accepts the
22   conventional wisdom on this subject.

23       For reasons developed below, the necessary policy judgments with respect to sex-offense
24   registration and related restrictions ultimately do not turn on whether sex-offense recidivism is

---

becomes too onerous and too inconvenient, [sex offenders] just may want to live somewhere else… And I don't care where, as long as it's not Georgia"); Editorial, *Sex Offenders Won't Vanish for Good*, ATLANTA J.-CONST., Mar. 23, 2006, at 14A (quoting Jerry Keen, House Majority Leader, as stating: "Candidly … they will in many cases have to move to another state").

[110] See Reporters' Notes, infra.

[111] *Smith*, supra note 108, 538 U.S. at 103 (quoting McKune v. Lile, 536 U.S. 24, 34 (2002)).

[112] Id.

[113] See, e.g., Ira Mark Ellman & Tara Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake About Crime Statistics*, 30 CONSTIT. COMM. 495 (2015). See also Heather Ellis Cucolo & Michael L. Perlin, *"The Strings in the Books Ain't Pulled and Persuaded": How the Use of Improper Statistics and Unverified Data Corrupts the Judicial Process in Sex Offender Cases*, 69 CASE W. RES. L. REV. 637 (2019). One writer notes that there is "vanishingly little evidence for the Supreme Court's assertion," and that the origin of its mistake was simply "a throwaway line in a glossy magazine." Adam Liptak, *Did the Supreme Court Base a Ruling on a Myth?*, N.Y. TIMES, Mar. 6, 2017.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

"high" or "low." But misunderstanding about the data is sufficiently widespread to warrant further discussion.

On several occasions, the Supreme Court has stated that "convicted sex offenders are much more likely than any other type of offender to be rearrested for a new rape or sexual assault."[114] The claim is literally true but misleading. It relies on a Bureau of Justice Statistics finding that a convicted rapist is more likely than someone convicted of some other crime (e.g., bank robbery) to be arrested subsequently for rape;[115] the study does not find that rapists, as compared to other offenders, have a higher rate of recidivism *for their own offense of conviction.* Nor does it find that rapists, as compared to other offenders, have a higher rate of recidivism for subsequent crime generally. To the contrary, the data strongly suggest that "[s]ex offenders have some of the lowest recidivism rates of any class of criminal."[116] In a 2002 Department of Justice study, sex crimes were one of the offense categories for which convicted offenders had the lowest rates of rearrest for any new offense, and only 2.5 percent of released rapists were rearrested for a new rape.[117] A more recent DoJ study followed offenders over a longer period and found a 7.7% rate of rearrests for rape or sexual assault;[118] by comparison, 13.4 percent of released robbers were rearrested for a new robbery and 22 percent of offenders convicted of a nonsexual assault were rearrested for a new assault.[119] Again, the likelihood of rearrest for any crime was lower for those initially

---

[114] *Smith*, supra note 108, 538 U.S. at 103 (quoting *McKune*, supra note 111, 536 U.S. at 33).

[115] U.S. Dept. of Justice, Bureau of Justice Statistics, *Sex Offenses and Offenders* 27 (1997). The most recent DoJ study is to similar effect: persons released after imprisonment for a sex offense were more than three times as likely as other released prisoners to be arrested for rape or sexual assault (7.7% versus 2.3%). See U.S. Dept. of Justice, Bureau of Justice Statistics, *Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14)*, at 1 (2019).

[116] Stuart A. Scheingold et al., *Sexual Violence, Victim Advocacy, and Republican Criminology: Washington State's Community Protection Act*, 28 LAW & SOC'Y REV. 729, 743 (1994) (noting that "as few as 5.3% [of sex offenders] re-offend within three years, according to the Bureau of Justice Statistics, as opposed to rates in the 65 to 80% range for drug offenders and thieves." See also Katherine K. Baker, *Once a Rapist? Motivational Evidence and Relevancy in Rape Law*, 110 HARV. L. REV. 563, 578 (1997) (noting evidence that convicted rapists are less likely to reoffend than convicted burglars and thieves); WESLEY G. JENNINGS, RICHARD TEWKSBURY & KRISTEN ZGOBA, SEX OFFENDERS: RECIDIVISM AND COLLATERAL CONSEQUENCES, available at https://www.ncjrs.gov/pdffiles1/nij/grants/238060.pdf (2011).

[117] U.S. Dept. of Justice, *Prisoners Released in 1994*, supra note 116, at 1, 9.

[118] U.S. Dept. of Justice, *9-Year Follow-Up*, supra note 115, at 1.

[119] U.S. Dept. of Justice, *Prisoners Released in 1994*, supra note 116, at 1, 9. See also U.S. Dept. of Justice, *Sex Offenses and Offenders*, supra note 115, at 25-26 (among felony offenders placed on probation, "rapists had a lower rate of re-arrest for [any] new felony and a lower rate of re-arrest for a violent felony than most categories of probationers with convictions for violence"). All such studies are of

523

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1  convicted of a sexual offense, and same-offense rearrest rates after conviction for a sexual offense
2  were lower—much lower—than same-offense rearrest rates after conviction for many other
3  crimes. Similar findings apply to sexual offenses against children; across the range of sexual
4  offenses against minors, observed recidivism rates are as low or even lower than for sexual crimes
5  against adults.[120]

6      The qualifications to this picture run in two opposing directions. First, because so many
7  sexual offenses are never reported, the *observed* recidivism rates substantially understate *actual*
8  recidivism rates for these offenses. And this distortion arguably bolsters the case for registration
9  and related policies to strengthen the prevention of crimes that are more frequent than might
10 appear. But from the opposite direction, estimates that take account of unreported crimes may
11 actually *overstate* the recidivism risk *for the relevant group of offenders*.

12     Note first the reasons why overall recidivism rates for sex offenses are *higher* than the
13 typical recidivism studies suggest. Sex offenses are massively underreported,[121] and this may be
14 especially true for offenses against children.[122] The most recent Department of Justice
15 victimization survey estimated that only about 25 percent of rapes and sexual assaults were
16 reported to law enforcement while the reporting rate for all violent crime was 43 percent, almost

---

course sensitive to the definition of reoffending (which offenses and whether established by arrest or conviction), and the time period over which recidivism is measured.

[120] An Ohio study is especially helpful because it followed ex-offenders for 10 years after release from custody, and the period largely preceded the enactment of SORNA-like provisions, so those laws cannot be credited with  contributing to the relatively low recidivism rates found. See OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, TEN-YEAR RECIDIVISM FOLLOW-UP OF 1989 SEX OFFENDER RELEASES (2001) (finding 10-year recidivism rate of 8.5% when initial sex offense was against minor; 17.5% when initial sex offense was against adult). With a smaller sample and only a six-year follow-up period, British researchers found that reoffense rates were roughly similar for those whose initial offense was against an adult and those whose initial offense was against a child. See Roger Hood, et al., *Sex Offenders Emerging from Long-Term Imprisonment,* 42 BRITISH J. CRIMINOLOGY 371 (2002) (reoffense rate of 8.5% following adult-victim offense; reoffense rate of 10% following child-victim offense).

[121] See, e.g., Belleau v. Wall, supra note 104, at 933-934 (lengthy discussion of recidivism statistics for sex offenders, stressing that rampant underreporting of sex crimes has substantial distorting effect on those statistics).

[122] See, e.g., R. Pryzbylski, *Adult Sex Offender Recidivism*, in U.S. Department of Justice, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, *Sex Offender Management Assessment and Planning Initiative*, available at https://www.smart.gov/SOMAPI/pdfs/SOMAPI_Full%20Report.pdf   (noting that under-reporting is especially great when a child victim knows the perpetrator, which is true in most child sexual-abuse cases).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    twice as high.[123] And victimization surveys are themselves subject to significant underreporting
2    problems, much more so for sexual offenses than for other crimes and probably more so for sexual
3    offenses against children than for sexual offenses against adults. In other words, the true gap
4    between reporting rates for sexual offenses and for other offenses is almost certainly even larger
5    than the gap found in studies that attempt to estimate that gap empirically.
6            Other sources likewise provide evidence of massive underreporting. News reports all too
7    frequently reveal instances of perpetrators who exploit a position of trust, for example as a coach
8    or as clergy, to abuse as many as a dozen or more victims over a period of years without ever being
9    detected.[124]   More systematic studies, for example examining previously untested rape kits, also
10   show high rates of serial offending by previously undetected perpetrators.[125]

---

[123] Rachel E Morgan & Barbara Oudekerk, *Criminal Victimization, 2018*, U.S. Dept of Justice, Bureau of Justice Statistics, NCJ 253043, at p. 8, Table 5 (2019). A recent article, using a complex statistical model, concludes that the reporting rate for sexual offenses is a great deal lower. See N. Scurich & R. S. John, *The Dark Figure of Sexual Recidivism*, 37 BEHAV. SCI. & LAW 158 (2019). For pointed criticism of the methodology underlying this paper's analysis, see Ira Mark Ellman, *When Animus Matters and Sex Offense Underreporting Does Not: The Sex Offender Registry Regime*, U. PA. J. L. & PUB. AFFAIRS (forthcoming Nov. 2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3817201; Tamara Rice Lave, J. J. Prescott & Grady Bridges, *The Problem with Assumptions: Revisiting The Dark Figure of Sexual Recidivism*, forthcoming in BEHAV. SCI. LAW (2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3672031; Brian R. Abbott, *Illuminating the Dark Figure of Sexual Recidivism*, 38 BEHAV. SCI. LAW 543–558 (2020).

[124] In Pennsylvania, a retired football coach working with a charity to aid underprivileged youth was convicted of sexually abusing numerous underage boys over a 15-year period before being formally investigated and charged. See Malcolm Gladwell, *In Plain View: How Child Molesters Get Away with It*, THE NEW YORKER, Sept. 24, 2012. See also *When the Athlete is a Child: An Assessment of USA Swimming's Safe Sport Program* (Gundersen National Child Protection Training Center, Jan. 27, 2014) at 10, available at https://www.usaswimming.org/docs/default-source/safe-sportdocuments/safe-sport-basics/2014-vieth-report.pdf (reporting instances of serial child abuse by swimming coaches who escaped detection for many years); T.J. Quinn & Greg Amante, *Sex Abuse Pervasive in USA Swimming,* April 27, 2010, available at http://sports.espn.go.com/espn/otl/news/story?id=5071820 (same); Laura Russell, *Pursuing Criminal Liability for the Church and Its Decision Makers for Their Role in Priest Sexual Abuse*, 81 WASH. U. L. Q. 885, 888-95 (2003) (describing widespread allegations of unreported sexual abuse by Catholic priests).

[125] E.g., Rachel Lovell, et al., *Offending Histories and Typologies of Suspected Sexual Offenders Identified via Untested Sexual Assault Kits*, 47 CRIM. JUST. & BEHAV. 407 (2020) (reporting that approximately 30% of suspected sexual offenders identified through previously untested rape kits had at least one arrest for rape, and that more than 20% of the suspected sex offenders had their DNA in two or more of the untested rape kits in the sample); Rebecca Campbell, et al., *Connecting the Dots: Identifying Suspected Serial Sexual Offenders Through Forensic DNA Evidence*, 10 PSYCHOL. OF VIOLENCE 255 (2020) (reporting that in analysis of more than 7,000 untested rape kits, 35.7% of the suspected perpetrators in the sample had two or more sexual assaults linked via DNA); Rachel Lovell et al., *Describing the Process*

525

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    Pointing in the opposite direction, however, is the need for precision in identifying the
2    population whose recidivism risk is relevant. Low rates of reporting and arrest, together with the
3    case attrition that occurs at every stage of the criminal process (with especially large impact in sex-
4    offense prosecutions), mean that the great majority of those who commit sexual offenses are not
5    convicted in the first place, so they are not on a registry when they commit their subsequent
6    offenses. Registry regimes cannot help prevent this predominant segment of recidivist sex
7    offenses.[126] In fact, many professionals believe that registries, public access, and community
8    notification actually *impede* effective enforcement by focusing police and public attention on a
9    relatively small population of unlikely recidivists, at the expense of attention to the much larger
10   population of potential offenders not yet caught and therefore not yet on any registry.[127]

11   Moreover, serial offending by perpetrators before they are first caught and by individuals
12   who escape detection entirely tells us little about the risk of reoffending by an individual after
13   being identified, prosecuted, convicted, incarcerated (if the charges are serious), and then released.

14   Properly understood, in other words, the data invoked to support burdens that especially
15   target persons convicted of a sexual offense paradoxically show how *mis*directed these laws can
16   be. A Justice Department analysis of prisoners released in 1994 found that among 1,717 ex-
17   prisoners subsequently arrested for rape, *less than five percent* had previously been convicted of
18   that offense.[128]  Thus by focusing attention on offenders previously convicted of sexual offenses,

---

*and Quantifying the Outcomes of the Cuyahoga County Sexual Assault Kit Initiative*, 57 J. CRIM. JUST. 106 (2018) (reporting that out of the 1,429 defendants identified by testing  previously untested rape kits, 27% were associated with more than one victim).

Several studies report high rates of serial offending, without distinguishing stranger assaults from assaults involving family members or acquaintances, and without distinguishing perpetrators who assaulted different victims from the arguably distinct behavioral problem of repeatedly assaulting the same victim. E.g., Heidi M. ZinZow & Martie Thompson, *A Longitudinal Study of Risk Factors for Repeated Sexual Coercion and Assault in U.S. College Men*, 44 ARCHIVES OF SEXUAL BEHAV. 213 (2015) (in self-reports by 238 college men who acknowledged committing at least one sexual assault, 68% had done so repeatedly, including 14% who offended four times and 23% who offended five or more times); David Lisak & Paul M. Miller, *Repeat Rape and Multiple Offending Among Undetected Rapists*, 17 VIOLENCE & VICTIMS 73 (2002) (in sample of 1,882 college-aged men who acknowledged acts of interpersonal violence, 6% acknowledged committing rape or attempted rape, and 63% of those men reported committing repeat rapes, averaging at 5.8 rapes each).

[126] This point would require qualification if registry regimes have a general deterrent effect, but the research to date finds that they do not. See notes 131-135, infra.

[127] See Ellman, supra note 123.

[128] U.S. Dept. of Justice, Bureau of Justice Statistics, *Recidivism of Prisoners Released in 1994*, at 9-10 (2002).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

registration requirements risk diverting attention from the vastly larger pool of individuals who will eventually commit such crimes against children, adults, or both—individuals who were previously convicted of other offenses or not previously convicted of any crime at all.

Although persons convicted of a sexual offense and therefore potentially subject to a registry regime are not necessarily more likely than other offenders to reoffend, special burdens can be defended on the basis that sex crimes, being distinctively harmful and unsettling, warrant exceptional effort to prevent them.[129] And of course this is especially true for sexual offenses against children. As one group of authors who are sympathetic to registration policies concludes:[130]

> The risk of recidivism is far below our worst fears and substantially less than the overwhelmingly large percentages that have sometimes been cited by legislators in advocating for legislation related to sexual offending…. While the risk of recidivism is clearly less than it sometimes has been portrayed, it is large enough that it justifies investing in effective management and treatment methods and maintaining a healthy degree of vigilance.

The crucial question, then, is whether registration and other special burdens have succeeded in reducing the incidence of these crimes. The research suggests that in nearly all respects they have not.

Before-after studies have found no significant correlation between recidivism rates and the passage of registration laws, public registries, and community notification.[131] A regression

---

[129] See, e.g., Belleau v. Wall, supra note 104, at 933-934 (court, in holding that GPS monitoring of registrant was "reasonable" under Fourth Amendment, commented, "Readers of this opinion who are parents of young children [should] ask themselves whether they should worry that there are people in their community who have 'only' a 16 percent or an 8 percent probability of molesting young children—bearing in mind the lifelong psychological scars that such molestation frequently inflicts.").

[130] Theodore P. Cross, et al., *Adult Sex Offenders Against Children: Etiology, Typologies, Investigation,Treatment, Monitoring, and Recidivism*, in R. GEFFNER et al. (eds.), HANDBOOK OF INTERPERSONAL VIOLENCE ACROSS THE LIFESPAN 1, 19, 21 (2020).

[131] For New Jersey, a statewide study found a long-term downward trend in sex-offense rates, with an acceleration of the trend when Megan's Law passed in 1994. But when disaggregated to the county level, that effect became negligible; in six counties (of 21 studied) there was no statistically significant change in the long-term downtrend, and in six others, the acceleration of that trend preceded passage of Megan's Law. Kristen Zgoba & Philip Witt, *Megan's Law: Assessing the Practical and Monetary Efficacy*, N.J. Dep't of Corrs. (Dec., 2008), available at https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf. The New Jersey study based sex-offending rates on arrest data, a potential source of bias, either because registered offenders were more easily targeted and arrested (an effect that would generate arrest statistics higher than the actual rate of reoffending post-1994), or because law-enforcement arrest efforts slackened in a false-sense-of-security effect (which would generate arrest statistics lower than the actual rate of reoffending post-1994).

527

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   analysis found that *registration alone*, by keeping police informed about persons in the area who
2   had been convicted of a sexual offense, tended to reduce the frequency of reported sex offenses
3   against neighbors of the registrant (but not against family members or more distant strangers).[132]
4   *Notification laws* had some apparent crime-reduction effect by deterring *nonregistered* individuals
5   from committing offenses that would render them eligible for this sanction,[133] but community

---

Whatever the bias, it would seem that any positive effect on recidivism was too slight to be detected in any but very subtle analysis. In a different research sample, the New Jersey researchers tracked persons convicted of a sexual offense following their release from prison between 1990 and 2000; the researchers found a significant drop in reoffending post-1994 (from 50 percent to 41 percent), but the drop cut across all offenses, with no statistically significant drop for *sexual* offenses, with respect either to likelihood of rearrest or time from prison release to rearrest. Id. at 21-32.

A before-after study of community notification in the state of Washington produced similar findings: no significant drop in the rate of rearrest for sex crimes, and a slightly larger but still statistically insignificant drop in the rate of rearrest for crimes generally. Donna D. Schram & Cheryl Darling Milloy, *Community Notification: A Study of Offender Characteristics and Recidivism* 17, 19, Washington State Institute for Public Policy (Oct., 1995), available at http://www.wsipp.wa.gov/rptfiles/chrrec.pdf. In the case of crimes generally, there was a substantial difference in the time to the first rearrest (a median of only 25 months for the notification group but much better—62 months—for the control group); nonetheless, this difference could have been due to the use of arrest statistics as a proxy for reoffending rates, and in any case the difference was observed only in rearrests for crimes generally, not in rearrests for sex crimes.

A study relying on three distinct data sets and three outcome measures (crime rates for sex offenses, recidivism rates for sex offenders, and location-specific incidence of offenses) found "[no] support [for] the hypothesis that sex-offender registries are effective tools for increasing public safety." Amanda Y. Agan, *Sex Offender Registries: Fear without Function?*, 54 J. L. & ECON. 207, 207 (2011). See also J.J. Prescott, *Portmanteau Ascendant: Post-Release Regulations and Sex Offender Recidivism*, 48 CONN. L. REV. 1035 (2016) (noting that "empirical researchers to date have found essentially no reliable evidence that these laws work to reduce sex offender recidivism (despite years and years of effort), and some evidence (and plenty of expert sentiment) suggests that these laws may increase sex offender recidivism.")

[132] J.J. Prescott & Jonah E. Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J. L. & ECON. 161 (2011). On the complexity of disentangling the effects of registration as such from accompanying measures involving community notification, see James Vess et al., *International Sex Offender Registration Laws: Research and Evaluation Issues Based on a Review of Current Scientific Literature*, 14 POLICE PRACTICE AND RESEARCH: AN INTERNATIONAL JOURNAL 322 (2014).

[133] Deterrence has not been officially advanced as a policy rationale for registration laws, and to do so would undermine of the argument that these collateral consequences are nonpunitive. That rationale is the foundation for Supreme Court decisions holding that many of these state regimes are "regulatory" measures, and therefore are not subject to the federal constitution's ex post facto prohibition. E.g., *Smith*, supra note 103, at 92-96; Connecticut Dept. of Public Safety v. Doe, 538 U.S. 1 (2003).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1    notification also tended to increase recidivism among persons who *were* registered. As a result,
2    "any beneficial effect of registration on recidivism is dampened by the use of notification, and
3    [thus] . . . the punitive aspects of notification laws may have perverse consequences."[134]

4         Overall, the available research does not conclusively exclude the possibility that
5    registration, notification, restricted residency, and similar collateral consequences could
6    potentially contribute to public safety. But after two decades of experience with such laws, and
7    with the considerable body of evidence that experience has generated, their beneficial effects (if
8    any) have yet to be demonstrated. Moreover, this is not a case where skeptics can be faulted for
9    claiming that absence of evidence is evidence of absence. In this instance, there is evidence,
10    considerable evidence, and it shows that these laws have not reduced recidivism. A careful recent
11    assessment, summing up the results of a comprehensive literature review, offers this appraisal:[135]

12         The story that emerges across dozens of papers, data sources, and empirical
13         methods is coherent and convincing: there is scant evidence that SORN reduces
14         recidivism or otherwise increases public safety, with the possible exception of some
15         tentative evidence that registration alone (i.e., without notification …) might reduce
16         sexual offense recidivism.

17         One reason for this inability to detect public-safety benefits may be that some benefits were
18    realized but were offset by the negative consequences for public safety that these laws also entail.
19    That possibility is examined in Note 6(b) below.

20         (ii) *Transparency and Self-Protection.* Public access and community notification give the
21    public and organizations responsible for the welfare of vulnerable populations an ability to take
22    precautions. Indeed, the perception of transparency and empowerment seems to follow almost
23    axiomatically from public access and community notification. But their effects have been
24    decidedly mixed. The evidence is discussed in the Reporters' Note to Section 213.11H, which
25    addresses the specifics of public access to registry information. Overall, the research suggests that
26    public awareness typically prompts few self-protective measures, and that the very existence of
27    these regimes tends to divert attention away from much more significant sexual dangers.[136]

28         (iii) *Mismatch.* The collateral-consequence laws under consideration here were initially
29    prompted by cases like Megan Kanka's: a young child sexually assaulted by a stranger with a prior
30    history of sexual offenses who was, unbeknownst to her parents, living nearby. Nonetheless, from
31    the start these laws extended their reach to offenses against adults and to perpetrators who were
32    well known to their victims. Such expansive conceptions of the persons to be targeted are

---

[134] Prescott & Rockoff, supra note 132, at 181.

[135] Amanda Agan & J. J. Prescott, *Offenders and SORN Laws*, in LOGAN & PRESCOTT, supra note 16, at 102, 102-103 (assessing all the empirical research prior to 2021).

[136] See Reporters' Note to Section 213.11H, infra.

529

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1  understandable and potentially justified, but they sweep within the single rubric of the "sex
2  offender" individuals who may present no current danger or who present a range of different risks
3  that call for different measures of social protection. Persons convicted of a sexual offense can be
4  distinguished on several important dimensions. But those differences are not necessarily stable.
5  Another problem is that not all perpetrators "specialize" in a particular type of victim or a sexual
6  offense. Instead, research finds significant rates of "crossover" sexual offending ("polymorphism"
7  in the language of behavioral science). Four "mismatch" concerns are crucial for sound registration
8  policy.

9  First is the "stranger danger" myth. Though contemporary sex-offense registration regimes
10  grew out of highly publicized stranger crimes, most sexual assaults—by a wide margin—involve
11  family members or acquaintances. In a Wisconsin sample of 200 recidivists previously convicted
12  of a sexual offense, *none* had perpetrated crimes against strangers; a more comprehensive Justice
13  Department study found that among child victims of sexual abuse, 34 percent had been molested
14  by family members and an additional 25 percent by close acquaintances.[137] Moreover, despite
15  important qualifications in the "crossover" literature discussed below, perpetrators who molest a
16  family member seldom go on to target strangers. It should be superfluous to point out that the
17  needs for notification and residency restrictions are quite different (if they apply at all) when a
18  parent is convicted of molesting the parent's own child; yet stranger assaults and acquaintance
19  assaults are legally identical offenses. That means that in the prevalent state and federal approach,
20  classifying offenders automatically based on the legal offense of conviction, stranger and
21  acquaintance offenses entail precisely the same collateral consequences.

22  Second, the "child victim" concern is not a myth, but it often involves a distinctive set of
23  behavioral and rehabilitative issues. Some persons who target young, preadolescent children
24  present different risks from those of the perpetrator who has assaulted an adult. Many classification
25  regimes automatically place offenses against minors in a more serious category, but some do not.
26  And even where that distinction is drawn, it is often insufficiently discriminating. Classifications
27  often fail to take into account the age of the minor victim or to differentiate between *adults* who
28  target young, preadolescent children and offenders who are themselves teenagers who had
29  consensual sex with other teens who were identical in age or nearly so.

30  Third is the mismatch between risks and remedies. Often offenses involving adult victims,
31  even those in the least serious category, nonetheless remain subject to almost all the collateral
32  consequences applicable to offenses against children. In the federal regime, for example, the only
33  respect in which those consequences differ from those applicable to offenses against children is in
34  the length of the registration period (15 years rather than 25 years or life). Yet many of the required
35  collateral consequences—such as the federal mandate to notify day-care centers and common state
36  mandates barring residence close to school zones (not to mention prohibitions on living near a

---

[137] See Jill Levenson, *Sex Offender Residence Restrictions*, in WRIGHT, supra note 19, at 267, 275;
PATRICIA TJADEN & NANCY THOENNES, FINDINGS FROM THE NATIONAL VIOLENCE AGAINST WOMEN
SURVEY, available at https://www.ncjrs.gov/pdffiles1/nij/210346.pdf (2006).

530

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

school-bus stop)—apply even though the necessity for these measures is different or nonexistent when the offender is an employer who groped an adult employee in the store room or a person who raped an adult stranger but shows no indication of being attracted to preadolescent children.[138]

Fourth, "cross-over" offending complicates this picture. Although in conventional wisdom, the person who sexually molests a young child and the person who forcibly rapes an adult are often assumed to harbor different sexual proclivities, this is not uniformly true. Those who sexually abuse children do not necessarily "specialize" in offenses against young victims.[139] One recent study of the issue found that among recidivist offenders, 37 percent of those who initially raped or sexually assaulted an adult subsequently committed a sexual offense against a prepubescent child.[140] Research finds similar, though less pronounced, polymorphism across the stranger-acquaintance divide. In one study of sexual recidivists, over 25 percent had sexually assaulted both strangers and nonstrangers,[141] but other studies find recidivist targeting patterns to be "highly stable" in terms of victim-perpetrator relationship (i.e., stranger vs. acquaintance vs. intrafamilial)

---

[138] In many states, residency restrictions apply to all persons convicted of a sexual offense regardless of their classification. Catherine Elton, *Behind the Picket Fence*, THE BOSTON GLOBE, May 6, 2007, at 36; Geraghty, supra note 102, at 516.

[139] See T.D. Miethe, J. Olson & O. Mitchell, *Specialization and Persistence in the Arrest Histories of Sex Offenders: A Comparative Analysis of Alternative Measures and Offence Types*, 43 J. Res. Crime & Delinq. 204 (2006).

[140] Jenna Rice & Raymond A. Knight, *Differentiating Adults with Mixed Age Victims from Those Who Exclusively Sexually Assault Children or Adults*, 31(4) SEXUAL ABUSE: A J. OF RES. AND TREATMENT 410, 411 (2019). Accord, Skye Stephens, et al., *Examining the Role of Opportunity in the Offense Behavior of Victim Age Polymorphic Sex Offenders*, 52 J. CRIM. JUST. 41, 41 (2017) (reporting "high levels of polymorphism" in regard to the targeting of adult vs. child victims); Skye Stephens, et al., *The Relationships Between Victim Age, Gender, and Relationship Polymorphism and Sexual Recidivism*, 30(2) SEXUAL ABUSE: A J. OF RES. AND TREATMENT 132, 141 (2018) (finding age-based polymorphism to be most common type). An earlier study found a much higher rate of adult-victim/child-victim crossover offending (70%) among prison inmates, but a much lower rate (18%) among parolees; researches speculated that parolees may have been less truthful for fear of triggering greater parole restrictions. See Peggy Heil, et al., *Crossover Sexual Offenses*, 15 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 221, 229 (2003). See also Mariana A. Saramago, Jorge Cardoso & Isabel Leal, *Victim Crossover Index Offending Patterns and Predictors in a Portuguese Sample*, 24 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 1, 1 (2018) (finding that among sexual recidivists in a Portuguese prison, 48% had victims in different age categories).

Related, but indicative of the widely divergent estimates of age-based polymorphism, see Jessica N. Owens, et al., *Investigative Aspects of Crossover Offending from a Sample of FBI Online Child Sexual Exploitation Cases*, 30 AGGRESSION AND VIOLENT BEHAVIOR 3, 3 (2016) (reporting that "[r]eliable estimates vary about the percentage of child pornography offenders who also engage in other sexual crimes against children, ranging from 3 to 5% to 85%.").

[141] Rachel Lovella, et al., *Offending Patterns for Serial Sex Offenders Identified via the DNA Testing of Previously Unsubmitted Sexual Assault Kits*, 52 J. CRIM. JUST. 68, 72 (2017). The authors also find that among recidivists who targeted strangers, there was significant crossover offending by age. Id.

531

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

as well as the victim's gender.[142] Crossover offending cautions against narrowly matching collateral sanctions to the character of the triggering offense. But because baseline rates of recidivism for sexual offenses are quite low,[143] crossover offenses by previously convicted recidivists represent a small sliver of the total problem, arguably not enough to justify the law-enforcement effort and expense devoted to the issue. And some aspects of crossover offending actually reinforce these reasons to restrict rather than extend the scope of registration and notification. One study of sexual recidivists released on parole found that only 4.5 percent had been arrested only for sex offenses. The others had heterogeneous prior records—they had either committed a nonsexual offense first (and hence would not have been on a registry prior to committing their sexual offense) or they had committed a sex offense first (and hence would have been on a registry subject to law-enforcement attention in that regard, but then went on to commit a nonsexual offense).[144]

(iv) *Cost.* Legislators sometimes assume that registration, residency restrictions, and other collateral burdens imposed on persons convicted of a sexual offense are virtually cost-free so far as the state itself is concerned. But these measures are expensive to implement, especially when (as is typical) the requirements target a large, heterogeneous group of offenders. Recording and updating the required information and installing the requisite website technology can cost each jurisdiction millions of dollars per year,[145] without even counting the resulting need for law-enforcement personnel to reduce the time they can devote to responding to emergencies and other duties.[146]

This experience raises great doubt about whether these measures are fiscally viable and worth their direct costs to state and local government. Many state criminal-justice agencies, after careful assessment, have concluded that they are not, especially when more selective approaches can achieve most or all of the benefits at considerably lower cost.[147]

*b. Unintended Effects.* In contrast to the intended benefits of collateral sanctions, for which empirical measures of success are disappointing or nonexistent, unintended negative side effects are well-documented. This is particularly true with respect to burdens that extend beyond the

---

[142] Stephens, et al., supra note 140, at 41 (finding rates of polymorphism below 10% for victim gender and below 20% in terms of victim-offender relationship).

[143] See text at notes 117-119, supra. On the inferences to be drawn from the fact that a high percentage of sex offenses are not reported and therefore are not included in deflate these recidivism figures, see text at notes 122-126, supra.

[144] See Jeffrey Lin & Walter Simon, *Examining Specialization Among Sex Offenders Released from Prison*, 28(3) SEXUAL ABUSE: A J. OF RES. AND TREATMENT 253, 263 (2016).

[145] See text accompanying notes 309-321, infra. See also Hinton, supra note 99, at 2.

[146] See Geraghty, supra note 102, at 518.

[147] See notes 163-166, infra.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   disclosure of registry information solely to law-enforcement agencies—burdens such as public
2   access, community notification, and restrictions on residency and employment. The issue is
3   discussed in more detail in the Reporters' Note to Section 213.11I, which addresses the specifics
4   of collateral consequences additional to the duty to register with law enforcement.[148]

5   The negative impacts *on registrants* include difficulty in obtaining housing and
6   employment, psychological stigma, and physical abuse by misguided members of the public.[149]
7   These consequences in turn mean negative impacts *for public safety* because the adverse personal
8   impacts for registrants impede their reintegration into society and aggravate their risks of
9   reoffending.[150]

10   It could be that the intuitively plausible law-enforcement benefits of these laws partially or
11   fully offset these negative consequences for public safety, a result that would explain the inability
12   of researchers to detect any *net* reduction in reoffending rates. If so, the resulting symmetry is a
13   poor one, taking no account of the human consequences for registrants and their families, and

---

[148] See Reporters' Note to Section 213.11I, infra.

[149] See, e.g., Doe v. Snyder, 834 F.3d 696, 705-706 (6th Cir. 2016). In holding that Michigan statute cannot pass muster as a legitimate public-safety, regulatory measure and therefore constitutes "punishment," the court described the legislation as:

> [a] regime that severely restricts where people can live, work, and "loiter," that categorizes them into tiers ostensibly corresponding to present dangerousness without any individualized assessment thereof, and that requires time-consuming and cumbersome in-person reporting, all supported by—at best—scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe…. It consigns them to years, if not a lifetime, of existence on the margins, not only of society, but often, as the record in this case makes painfully evident, from their own families, with whom, due to school zone restrictions, they may not even live.

Accord, E.B. v. Verniero, 119 F.3d 1077, 1102 (3d Cir. 1997) ("The record documents that registrants and their families have experienced profound humiliation and isolation as a result of the reaction of those notified. Employment and employment opportunities have been jeopardized or lost. Housing and housing opportunities have suffered a similar fate. Family and other personal relationships have been destroyed or severely strained. Retribution has been visited by private, unlawful violence and threats. . . ."). See also Jill S. Levenson et al., *Grand Challenges: Social Justice and the Need for Evidence-based Sex Offender Registry Reform*, 43 J. Soc. & Soc. Welfare 3, 11-12 (noting that the challenges of reintegration after conviction of a criminal offense are especially pronounced for persons placed on a sex-offense registry).

A recent review of the academic literature (thus not taking into account findings of record in cases like Doe v. Snyder and *Verniero*) notes methodological shortcomings in much of that literature calls for further research with more rigorous research design. See U.S. Library of Congress, Federal Research Division, Sex Offender Registration and Notification Policies: Summary and Assessment of Research on Claimed Impacts on Registered Offenders (June 2020).

[150] Prescott & Rockoff, supra note 132, at 181.

533

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1 achieving a public-safety equilibrium only by driving up law-enforcement effort and expense to a
2 sufficient extent to counterbalance the *increased* danger of future sexual offenses.

3   Perhaps unexpectedly, victim advocates and organizations actively engaged in providing
4 support services for rape survivors often share these concerns and forcefully criticize burdens that
5 especially target persons convicted of a sexual offense. A recurring grievance is the way that public
6 access and community notification have "done a disservice by . . . the construction of sexual assault
7 risk—who poses it, who faces it, and how to mitigate it—and [by] the reinforcement of a victim
8 hierarchy that demeans most victims."[151] Victim services organizations like state-based
9 Coalition[s] Against Sexual Assault (CASA's) repeatedly elaborate on this theme. A victim
10 advocate affiliated with a CASA in the Northeast explained that these laws "have confused the
11 public by emphasizing the least common offender."[152] At another CASA, an advocate noted that
12 "Vulnerability [for sexual abuse] is actually reinforced by these laws because it turns the attention
13 [of the public and law enforcement towards] one-percent of the crime."[153]

14   Similarly, advocates often object that special burdens tied to conviction of a sexual offense
15 "reinforce a narrow [view] that only forced sexual contact with a stranger that results in grave
16 bodily harm is a 'real' assault, and that only child victims are 'real victims'"[154]; that view in turn
17 "makes it harder [for victims] to come forward [because the laws] reinforce the notion that [the
18 justice system, the public, and service providers] are only interested in a specific offender type."[155]

19   Another prominent concern for many victim advocates has been that expensive initiatives
20 to impose collateral-consequence restrictions on registrants have been coupled with "absolutely
21 no corresponding increase in material support for victim services."[156] Further, "[a]ccording to
22 several CASAs, these expensive laws have demonstrated little to no discernable impact on
23 reducing recidivism. Instead, they eat up scarce resources, scare victims into not reporting [an
24 abusive] loved one, and reinforce to the public stereotypes about what violence is and who

---

[151] Rachel Kate Bandy, *The Impact of Sex Offender Policies on Victims*, in RICHARD G. WRIGHT, ed., SEX OFFENDER LAWS: FAILED POLICIES, NEW DIRECTIONS 491 (2009).

[152] Id. (quoting CASA interviewee).

[153] Id (quoting CASA interviewee located on West coast).

[154] Id., at 493.

[155] Id., (quoting CASA interviewee based in Southeast). But see note 81 supra (reporting views of victim advocate Victor Vieth).

[156] Id., at 502 (reporting views of a West Coast CASA).

534

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   perpetrates it."[157] One advocate summarizes that "[t]hese policies are about a *sense* of safety, not
2   *real* safety."[158]

3         Patricia Wetterling, the mother of a murder victim, is widely credited with playing a pivotal
4   role in enactment of SORNA's predecessor, the first federal legislation mandating the creation of
5   state regimes for registering persons convicted of a sexual offense.[159] Wetterling continues to
6   support registration as a useful law-enforcement tool, along with notification when it is carefully
7   done ("the way we do it in Minnesota"[160]), but she has come to regret much of the overextended
8   legislation that her initiative spawned. She describes residency restrictions as "ludicrous," noting
9   that "most sex offenses are committed by somebody that gains your trust, or is a friend or
10  relative…. [N]one of these laws address the real [problem] that nobody wants to talk about."[161]

11        Registration of juveniles convicted of a sexual offense has had distinctively harsh
12  consequences, and assessments of its value have been especially negative. The relevant research
13  is discussed in the Reporters' Note to Section 213.11A(3), which imposes special limits on juvenile
14  registration.

15        *7. The Model Code: Sections 213.11A-213.11J.* A regime to govern sex-offense
16  sentencing and collateral consequences must address a dense thicket of substantive and procedural
17  issues. Distinctive features of local law necessarily affect the appropriate statutory structure and
18  language dealing with operational detail. Thus, many facets of scope and implementation do not
19  lend themselves to treatment in a Model Code intended for a multi-jurisdictional audience. Crucial
20  issues of drafting and policy, however, are common to all jurisdictions and can be addressed in
21  universal terms: Which offenses and which perpetrators should ever be subject to restrictions
22  specific to persons convicted of a sexual offense? How much information should be publicly
23  accessible? Should particular burdens (for example, limits on where a registrant can reside) ever
24  be imposed upon conviction of a sexual offense? If so, which sexual offenses should trigger
25  exposure to that burden, and should it be imposed automatically or only after an individualized
26  assessment of benefits and costs? What should be the duration of the measure in question? What
27  procedural safeguards should attend the determination of whether a particular person should be

---

[157] Id., at 505.

[158] Id. (quoting a West Coast CASA advocate and noting that as a result, the unintended byproduct of these laws "may well be the creation of more victims.").

[159] See text at notes 24-25, supra.

[160] In Minnesota, the extent of community notification depends on an assessment of the registrant's dangerousness and the degree of community members' need to know. See text at note 276, infra.

[161] Patricia Wetterling & Richard G. Wright, *The Politics of Sex Offender Policies: An Interview with Patricia Wetterling*, in WRIGHT, supra note 19, at 69, 71. For further discussion of Wetterling's further criticism of residency restrictions, see Reporters' Note to Section 213.11H, infra.

535

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   subject to a particular measure or whether a previously imposed burden should be lifted? Sections
2   213.11A-213.11J address broadly relevant issues of this kind.

3       Sections 213.11A-213.11J do not accept the federal framework as a given and instead
4   reconsider the federal baseline on its merits, for two reasons. First, the federal "mandate" is quite
5   weak, because noncompliance causes states to lose only 10 percent of their federal law-
6   enforcement grants.[162] By comparison, the costs of compliance typically are many times greater.
7   For example, in California, the state's Sex Offender Management Board estimated that complying
8   with federal SORNA would cost the state at least $38 million, as against a loss of only $2.1 million
9   in federal funds.[163] For Texas, comparable figures were assessed at a cost of $39 million for
10  SORNA compliance, as against a loss of only $1.4 million in federal funding.[164] In Colorado, the
11  state estimated that the federal funds lost ($240,000) would suffice to implement SORNA only in
12  a single mid-size law-enforcement agency.[165] As a result, in most states, SORNA is seen as an
13  unfunded mandate of considerable proportions.[166]

14      Second, and partly as a consequence of the first point, as of 2020, only 18 states had
15  complied with the federal mandate.[167] All states have some system for registering persons

[162] 34 U.S.C. § 20925(a) (2019).

[163] California Sex Offender Management Board, Adam Walsh Act Statement of Position 3-4 (n.d.), available at http://www.opd.ohio.gov/AWA_Information/AWA_CA_SOMB_SORNA_Position_Paper.pdf. The implementation costs continue to dwarf even the more substantial loss of federal funds ($3.2 million) that California faced for fiscal 2011. See National Conference of State Legislatures, SORNA Noncompliance Penalties, available at http://www.ncsl.org/Portals/1/documents/cj/jagstatedollars.pdf.

[164] Senate Criminal Justice Committee [Texas], Interim Report 14 (Dec. 15, 2010), available at http://www.senate.state.tx.us/75r/Senate/commit/c590/c590.InterimReport81.pdf.

[165] Colorado Sex Offender Management Board, White Paper on the Adam Walsh Child Protection & Safety Act of 2006, at 17 (Sept. 2008), available at http://dcj.state.co.us/odvsom/Sex_Offender/SO_Pdfs/SOMB%20AWA%20White%20Paper%20Final%20-%2009-19-08.pdf. In 2013 Colorado nonetheless took steps sufficient to convince DoJ's SMART Office to certify that the state had "substantially implemented SORNA." See U.S. Dept. of Justice, Office of Justice Programs, SMART Office, *SORNA Substantial Implementation Review, State of Colorado – Revised* (Oct. 29, 2013). In addition to the California, Colorado, and Texas assessments just cited, see also Hinton, supra note 99, at 9-18.

[166] See Dylan Scott, *States Find SORNA Non-Compliance Cheaper*, Nov. 7, 2011, available at http://www.governing.com/blogs/fedwatch/States-Find-SORNA-Non-Compliance-Cheaper.html#; Levenson, supra note 136, at 15 (noting that "[m]ore than half of states have elected not to comply with the AWA due to the financial burden it placed on them, because the loss of federal dollars was estimated to be less than the costs of implementing new mandates.").

[167] See U.S. Dept. of Justice, Office of Justice Programs, SMART Office, "Jurisdictions That Have Substantially Implemented SORNA," https://smart.ojp.gov/sorna/substantially-implemented (accessed Nov. 10, 2020) (listing 18 states that have substantially implemented SORNA). Prior to 2016, the Department of Justice considered only 17 of the 50 states to be SORNA-compliant. DoJ guidance finalized in August 2016 provided states "greater flexibility" in implementing SORNA's requirements with respect

536

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

convicted of a sexual offense, but the majority have chosen to go their own way, adopting more flexible approaches, even at the cost of losing some federal funds. The collateral burdens imposed on persons convicted of a sexual offense vary widely, exceeding the federal minimum in some jurisdictions but falling below it in others. This pattern suggests widespread dissatisfaction with the federal regime, whether because of fiscal or policy concerns.

For these reasons, Sections 213.11A-213.11J, while targeting issues that the federal mandate currently leaves to the discretion of the states, also evaluate, and in part reject, approaches that current federal law seeks to mandate nationwide. The potential benefits of sex-offense collateral consequences become attenuated, and costs together with negative side effects dominate decisively when—as under currently prevalent law—the obligation to register applies indiscriminately to persons of widely divergent culpability and future risk; when public access to registry information is essentially unlimited; and when special measures go beyond registration to include affirmative community notification, occupational and residency restrictions, and the like. The broad, inflexible sweep of collateral-consequence sanctions under federal SORNA and under the legislation of most states is unjust and counterproductive. On this point, well-considered arguments for a more limited approach have won a positive reception in the legislatures and law-enforcement agencies of a significant minority of the states, even in the face of considerable political risk. By delineating a balanced, discriminating approach, Sections 213.11A-213.11J offer a template for legislatures willing to consider much-needed reform in this area.The Article 213 offense definitions limit eligibility for collateral sanctions of any sort, and for eligible offenses, Sections 213.11A-213.11J provide a structure for selectively assessing the need to burden the registrant with particular sorts of collateral consequences beyond the threshold requirement of registration itself. These provisions require restraint in imposing registration, community notification, residency restrictions, and related collateral consequences, in light of the public-policy costs of such sanctions that, although not readily apparent to the general public, are nonetheless substantial and well-documented in all the relevant research.

Section 213.11A establishes the scope of the threshold duty to register. Issues relevant to implementing that duty are discussed in the Reporters' Notes to Section 213.11B (for the notice that must be given to a person convicted of a sexual offense), Section 213.11C (for the time when the obligation to register ripens), Section 213.11D (for the information registrants and states themselves must provide), Sections 213.11E and 213.11F (for the registrant's duty to periodically update registry information and the duration of that duty), and Section 213.11G (for penalties applicable to failure to register or update registry information as required). Consequences other than registration are discussed in more detail in the Reporters' Notes to subsequent Sections, which restrict, substantively and procedurally, the registrant's exposure to other collateral consequences. Section 213.11H strictly limits public access to registry information. Section 213.11I establishes a

_____

to juvenile registration. See Office of the Attorney General, Supplemental Guidelines for Juvenile Registration Under the Sex Offender Registration and Notification Act, 81 Fed. Reg. 50,522, 50,552 (Aug. 1, 2016). The relaxation of these rules permitted a modest increase in the count of SORNA-compliant states.

537

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11. Sentencing and Collateral Consequences of Conviction

1   formal procedure for deciding on the need for additional obligations or disabilities; identifies
2   factors the authorized official must weigh in determining whether a particular registrant should
3   incur such consequences; and requires a written explanation of the reasons why any additional
4   collateral consequence is justified in the interest of public safety, after due consideration of its
5   impact on the registrant's prospects for successful reintegration into law-abiding society. Finally,
6   Section 213.11J addresses procedures by which registrants can obtain early relief from sex-offense
7   duties and disabilities, including the duty to keep registry information current.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1    **SECTION 213.11A. REGISTRATION FOR LAW-ENFORCEMENT PURPOSES**

2    **(1) *Offenses Committed in This Jurisdiction***

3    **(a) Except as provided in subsection (3), every person convicted of an offense**
4    **that is designated a registrable offense in this Article must, in addition to any other**
5    **sanction imposed upon conviction, appear personally and register, at the time**
6    **specified in Section 213.11C, with the law-enforcement authority designated by law**
7    **in the [county] where the person resides. If the person who is required to register**
8    **under this subsection does not reside in this jurisdiction, but works in this**
9    **jurisdiction, registration must be accomplished in the [county] where the person**
10   **works; if the person does not reside or work in this jurisdiction but is enrolled in a**
11   **program of study in this jurisdiction, registration must be accomplished in the**
12   **[county] where the person studies.**

13   **(b) Notwithstanding any other provision of law, no conviction for an offense**
14   **under this Article, or for any other criminal offense in this jurisdiction, will require**
15   **the person convicted to register with law enforcement or other governmental**
16   **authority in a registry regime applicable primarily to persons convicted of a sexual**
17   **offense, unless this Article designates that offense as a registrable offense.**

18   **(2) *Offenses Committed in Other Jurisdictions***

19   **(a) *Duty to register and related duties*. Every person currently obliged to**
20   **register with law enforcement or other pubic authority in another jurisdiction,**
21   **because of a sexual offense committed in that jurisdiction, who subsequently resides,**
22   **works, or enrolls in a program of study in this jurisdiction, must register with the**
23   **law-enforcement authority designated by law and comply with the requirements of**
24   **Sections 213.11A-213.11G, provided that the offense committed in the other**
25   **jurisdiction is comparable to an offense that would be registrable under this Article**
26   **if committed in this jurisdiction.**

27   **(b) *Place of registration*. If the person who is obliged to register under**
28   **paragraph (a) resides in this jurisdiction, registration must be accomplished in the**
29   **[county] where the person resides. If the person who is obliged to register under**
30   **paragraph (a) does not reside in this jurisdiction, but works in this jurisdiction,**
31   **registration must be accomplished in the [county] where the person works; if the**

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1     person does not reside or work in this jurisdiction but is enrolled in a program of
2     study this jurisdiction, registration must be accomplished in the [county] where the
3     person studies.

4         **(c)** *Determining the comparability of in-state and out-of-state offenses*

5            **(i)** *Standard*. An offense committed in another jurisdiction is
6     comparable to a registrable offense under this Article if and only if the
7     elements of the out-of-state offense are no broader than the elements of that
8     registrable offense. When, regardless of the conduct underlying the out-of-
9     state conviction, the out-of-state offense can be committed by conduct that is
10     not sufficient to establish a registrable offense under this Article, the two
11     offenses are not comparable.

12            **(ii)** *Procedure.* Before determining that an offense committed in another
13     jurisdiction is comparable to a registrable offense under this Article, the
14     authority designated to make that determination must give the person
15     concerned notice and an opportunity to be heard on that question, either orally
16     or in writing.

17         **(d)** Notwithstanding any other provision of law, no conviction for a sexual
18     offense in another jurisdiction will require the offender to register with law
19     enforcement or other governmental authority in this jurisdiction, unless that
20     conviction currently requires the offender to register with law enforcement or other
21     governmental authority in the jurisdiction where the offense was committed and the
22     conviction is for an offense comparable to an offense that would be registrable under
23     this Article if committed in this jurisdiction.

24     **(3)** *Persons under the age of 18*. No person may be subject to the obligation to register
25   under subsection **(1)** of this Section, to other obligations or restrictions under this Section, or
26   to additional collateral consequences under Section 213.11I, on the basis of a criminal
27   conviction for an offense committed when the person was under the age of 18, or on the basis
28   of an adjudication of delinquency based on conduct when the person was under the age of
29   18; provided, however, that this subsection **(3)** does not apply to a person convicted of a
30   criminal offense of Sexual Assault by Aggravated Physical Force or Restraint if the person
31   was at least 16 years old at the time of that offense.

540

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1 **Comment:**

2 *1. Offenses Committed in This Jurisdiction.* Section 213.11A(1) applies to collateral

3 consequences potentially applicable on the basis of an offense committed in this jurisdiction.

4 *a. Subsection (1)(a).* In order to serve law-enforcement purposes, subsection (1)(a) requires

5 a person convicted of a sexual offense to register with a locally designated law enforcement agency

6 and fulfill related duties when this Article designates it as a registrable offense.

7 The following offenses are the only offenses designated as registrable under this Article:

8 (i) Section 213.1. Sexual Assault by Aggravated Physical Force or Restraint.

9 (ii) Section 213.2. Sexual Assault by Physical Force, but only when committed after

10 the offender had previously been convicted of a felony sex offense.

11 (iii) Section 213.3(1). Sexual Assault of an Incapacitated Person, but only when

12 committed after the offender had previously been convicted of a felony sex offense.

13 (iv) Section 213.8(1). Sexual Assault of a Minor, but only when the minor is

14 younger than 12 and the actor is 21 years old or older.

15 (v) Section 213.8(2). Incestuous Sexual Assault of a Minor, but only when the

16 minor is younger than 16 years old.

17 Subsection (1)(a) requires persons convicted of any of these designated offenses to register

18 with law-enforcement authorities in the [county] where the person resides. Municipal organization

19 and local logistical capabilities will determine for each state the official agency and jurisdictional

20 level where the registration obligation is centered. But because registration in the scheme of Article

21 213 is designed to serve primarily law-enforcement objectives, the agency must in any event be

22 one with a law-enforcement mission. For example, in California, persons required to register must

23 do so "with the chief of police of the city in which he or she is residing, or the sheriff of the county

24 if he or she is residing in an unincorporated area or city that has no police department, and,

25 additionally, with the chief of police of a campus of the University of California, the California

26 State University, or community college if he or she is residing upon the campus or in any of its

27 facilities."[168] In Pennsylvania, persons required to register must do so with an appropriate official

---

[168] CAL. PENAL CODE § 290(b) (2019).

541

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1   of the correctional facility where incarcerated prior to release, with the Pennsylvania Board of

2   Probation and Parole, or with the Pennsylvania state police, depending on the circumstances.[169]

3      *b. Subsection (1)(b).* Existing sex-offense registration requirements and related provisions

4   are codified in diverse places within the corpus of state law. In addition, many jurisdictions impose

5   registration and related obligations on the basis of sexual offenses other than rape and sexual

6   assault—including sex-related offenses that fall outside the scope of Article 213, such as

7   exhibitionism, stalking, and possession of child pornography. Section 213.11A(1)(b) provides that

8   an obligation to register with law enforcement, related duties, and other collateral consequences

9   applicable primarily to persons convicted of a sexual offense may not be imposed on an offender

10   on the basis of any offense committed in this jurisdiction that is not defined by Article 213 and

11   designated by this Article as a registrable offense.

12      Subsection (1)(b) therefore makes clear that the registration provisions of Section 213.11A

13   supersede prior law governing sex-offense registration and other sentencing and collateral

14   consequences provisions applicable primarily to sex offenses in the jurisdiction. Once enacted, the

15   Article 213 designation of offenses that are registrable, and the provisions of Sections 213.11A-

16   213.11J specifying the scope and limits of sentencing consequences and collateral consequences

17   applicable primarily to persons convicted of a sexual offense constitute the exclusive source of

18   law applicable to these collateral consequences in the jurisdiction. Collateral consequences not

19   applicable primarily to persons convicted of a sexual offense—that is, obligations or restrictions

20   applicable both to persons convicted of sexual offenses and to persons convicted of a broad range

21   of other offenses, such as disqualifications from voting, jury service, or eligibility for public

22   benefits—are governed by Model Penal Code: Sentencing and are not affected by the provisions

23   of Sections 213.11A-213.11J.

24      ***2. Offenses Committed in Other Jurisdictions.*** Section 213.11A(2) applies to sex-offense

25   collateral consequences potentially applicable when a person enters this jurisdiction to reside,

26   work, or enroll in a program of study after having been convicted of a sexual offense in another

27   jurisdiction.

---

[169] 42 PA. CONS. STAT. ANN. § 9799.19 (2019)

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1  *a. Duty to Register.* Under subsection (2)(a), an out-of-state conviction triggers the
2 registration obligations of Section 213.11A if and only if the person in question is currently obliged
3 to register as a sex offender in the jurisdiction where the offense was committed *and* the offense
4 is comparable to one that would be registrable if committed in this jurisdiction. Altogether,
5 therefore, there are four situations in which an out-of-state conviction does not require a person to
6 register or face other sex-offense collateral consequences in this jurisdiction when subsequently
7 residing, working, or enrolling in a program of study in this jurisdiction: (1) the out-of-state
8 conviction is for an offense that is not registrable in either jurisdiction; (2) the out-of-state
9 conviction is for an offense that is registrable where committed but would not be registrable if
10 committed in this jurisdiction;  (3) the out-of-state conviction is for an offense that would be
11 registrable if committed in this jurisdiction but is not registrable where committed; and (4) the out-
12 of-state conviction is for an offense that is registrable in both jurisdictions, but the person
13 concerned is not *currently* obliged to register in the out-of-state jurisdiction because the person has
14 received a full pardon, the conviction has been expunged, or the person's obligation to register in
15 the out-of-state jurisdiction has terminated in any other way.

16  *b. Place of Registration.* When a person required to register under subsection (2)(a) resides
17 in this jurisdiction, registration must be accomplished in the [county] where the person resides.
18 When that person works in this jurisdiction but does not resides in this jurisdiction, registration
19 must be accomplished in the [county] where the person works; if the person does not resides or
20 work in this jurisdiction but is enrolled in a program of study in this jurisdiction, registration must
21 be accomplished in the [county] where the person studies.

22  *c. Comparability.* The facts underlying the particular conviction for the out-of-state offense
23 in question are not relevant in determining comparability. Instead, subsection (2)(c)(i) provides
24 that an offense committed in another jurisdiction is "comparable" when and only when the
25 elements of the out-of-state offense are no broader than the elements of an offense that is
26 registrable under this Article. And because substantial liberty interests are implicated in a decision
27 that triggers the duty to register, subsection (2)(c)(ii) provides that the authority designated to
28 determine comparability must give the affected person notice and an opportunity to be heard on

543

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1  that question, either orally or in writing.[170] Subsection (2)(c)(ii) does not resolve the question
2  whether the affected person, if indigent, must be afforded counsel at state expense. When
3  necessary, courts must resolve that question in light of the seriousness of the registration
4  consequences and the complexity of the legal question specific to the particular case.

5      This elements-only standard is intended to ensure that comparability decisions will not turn
6  on elusive inquiries into the particular facts underlying an out-of-state conviction; rather, those
7  decisions can be made by comparing the definitional elements of the relevant Article 213 offense
8  to those of the out-of-state offense, as clarified by applicable case law. This standard also is
9  intended to ensure that once the comparability or noncomparability of two offenses is established,
10  the issue will be settled for all other cases involving those two offenses; the decisionmaking
11  authority will not have to revisit the issue *de novo* and delve into underlying facts case by case in
12  future situations involving the same two offenses.

13      As a result, when the definition of the out-of-state offense permits conviction in
14  circumstances that are insufficient to establish a registrable offense under this Article, the two
15  offenses are not comparable. For example, if negligence suffices to establish the mens rea element
16  of the out-of-state offense while the relevant Article 213 offense requires proof of recklessness,
17  the two offenses are not comparable, even though the facts proved at trial or admitted on a guilty
18  plea might establish that the defendant in the actual case acted recklessly or even purposely.
19  Conversely, if a knowing mens rea or specific intent is required to establish the mens rea element
20  of the out-of-state conviction while the relevant Article 213 offense requires only recklessness,
21  and if there is no other difference between the elements of the two offenses, then the two offenses
22  are comparable, because any conviction for the out-of-state offense necessarily establishes that the
23  person concerned could have been convicted of the relevant Article 213 offense if the conduct in
24  question had occurred in this jurisdiction.

25      ***3. Persons under the Age of 18.*** Subsection (3) protects persons who were under 18 at the
26  time of the offense from the obligation to register and from other collateral consequences
27  applicable primarily to persons convicted of sexual offenses, regardless of whether the potential

---

[170]  See, e.g., Meredith v. Stein, 355 F. Supp. 3d 355 (E.D.N.C. 2018) (determination that an out-of-state conviction was "substantially similar" to a registrable state offense, without providing the affected person an opportunity to be heard, held to violate procedural due process); Creekmore v. Attorney General of Texas, 341 F. Supp. 2d 648, 666 (E.D. Tex. 2004) (same).

544

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1    trigger for those consequences is an adjudication of delinquency or a criminal conviction under
2    this Article, except that minors convicted of a criminal offense of Sexual Assault by Aggravated
3    Physical Force or Restraint remain subject to the requirements of Section 213.11A if they were at
4    least 16 years old at the time of that offense.

## REPORTERS' NOTES

5    The findings canvassed in the Reporters' Notes to Section 213.11 above cast considerable
6    doubt on the efficacy and wisdom of nearly all the common collateral-consequence requirements
7    enacted for sex offenses since the early 1990s. One response to that assessment would be to discard
8    registration-related practices entirely and treat persons convicted of sexual offenses who live in
9    the community no differently from anyone else who has a criminal record. That approach,
10   however, gives insufficient weight to legitimate social interests, especially the law-enforcement
11   interests that a local registry can serve.

12   To be sure, law-enforcement officials can readily retrieve criminal-history information,
13   regardless of the jurisdiction where the conviction occurred, when they need background on a
14   person of interest in a particular criminal investigation. But that option is more cumbersome than
15   the ability to quickly determine through a local registry whether that individual has a serious sex-
16   offense record. And a search of the national data base for the criminal history of an individual
17   suspect is beside the point when there is a need to identify the unknown perpetrator of a serious
18   sexual crime. At least to the extent that the information does not leave law-enforcement hands, its
19   public-safety value easily outweighs the potential costs. An obligation to register with local law-
20   enforcement authority therefore seems readily defensible for persons convicted of the most serious
21   sexual offenses. Section 213.11A delineates the appropriate reach of that obligation.

22   A significant difficulty is that once information exists anywhere in cyberspace, its
23   confidentiality is fragile, no matter what the law may say.[171] Whether the combined risks of data
24   breach and data misuse outweigh the law-enforcement value of location-specific information about
25   persons convicted of a sexual offense is not easy to determine; the answer inevitably depends in
26   large part on local cyber-security measures and the danger posed by those who commit particular
27   types of offenses. The difficulty of appraising these factors counsels in favor of limiting the
28   registration obligation, with its attendant costs, to individuals most likely to pose a significant
29   public-safety threat, and then relying on registrant-specific assessments of risk, as several states
30   already do, to determine the frequency and duration of information-update obligations, eligibility
31   for early termination of registration, and other collateral consequences.[172]

---

[171] Leakage of ostensibly confidential information was a problem for registry information even before the Internet. See Logan, supra note 19, at 229 n.218.

[172] Cf. R(F) v. Sec'y of State for the Home Dep't, supra note 38, at ¶ 58 (holding mandatory registration a "disproportionate interference" with offenders' rights to privacy, and therefore a violation of

545

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

A separate but especially salient interest is the value of heightened possibilities for citizen self-protection in settings such as schools, day-care centers, and nursing homes, where staff have frequent, unsupervised access to young children and other particularly vulnerable individuals. That interest is discussed in connection with the provisions of Section 213.11H, which govern public access to registry information.

*1. Section 213.11A(1): Adults Convicted of Sex Offenses in This Jurisdiction.* The Article 213 offense definitions classify as "registrable," and therefore capable of triggering sex-offense collateral consequences, only those sexual offenses most likely to signal a propensity for dangerous predatory sexual behavior. The following Article 213 offenses are classified as registrable:

(i) *Section 213.1. Sexual Assault by Aggravated Physical Force or Restraint.* This, the most serious sexual offense, involves exceptionally aggressive sexual abuse that clearly justifies special concern about the danger of violent recidivism.

(ii) *Section 213.2. Sexual Assault by Physical Force.* This offense covers a wide range of sexual misconduct, from that involving reckless uses of "aggravated physical force" to many lesser degrees of force and threat, including any amount of physical force that is more than negligible, provided of course that the offender has the necessary culpable awareness of causing the other person to submit to or perform penetration or oral sex by those forcible means. So defined, the offense includes within its reach misconduct that, while very serious, does not necessarily mark the offender as a threat to children or a potentially violent predator. To require registration for all such persons would therefore be overbroad. Section 213.2 therefore classifies the offense as registrable only when the offense conduct occurs after the perpetrator had previously been convicted of a felony sex offense.

(iii) *Section 213.3(1). Sexual Assault of an Incapacitated Person.* This offense similarly covers a wide range of sexual misconduct. The conduct within its reach, while very serious, does not necessarily mark the perpetrator as a threat to children or a potentially violent predator. To require registration for all such persons would therefore be overbroad. A sexual offense against an incapacitated person does, however, support a stronger concern about potential recidivism when the perpetrator has a history of one or more previous convictions for serious sexual assault. Section 213.3(1) therefore classifies the offense as registrable only when the assault occurs after the perpetrator had previously been convicted of a felony sex offense.

(iv) *Section 213.8(1).* This offense is registrable when it involves sexual penetration or oral sex with a victim younger than 12 by an offender who is 21 years old or older. This is predatory sexual abuse of exceptionally serious nature, justifying the special precautions that registration with law enforcement permits.

---

the European Convention on Human Rights, because it made "no provision for individual review of its requirements.").

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1    (v) *Section 213.8(2).* This offense is registrable when it involves sexual penetration or oral
2 sex with a victim under the age of 16 by a person who is a parent, guardian, or other adult in a
3 similarly direct position of trust and responsibility for the victim's welfare. This is exceptionally
4 serious sexual misconduct, involving exploitation and abuse of trust that calls for the special
5 precautions that the sex-offense registry permits.

6    The one comparably dangerous Article 213 offense not classified as registrable is the
7 offense of Sex Trafficking under Section 213.9. Like the registrable offenses, it is an especially
8 serious felony involving predatory behavior and exploitation of vulnerable victims. But as its
9 motivation is primarily economic, it calls for a different kind of law-enforcement attention. Unless
10 its perpetrators are themselves guilty of other Article 213 offenses, they do not warrant inclusion
11 in a registry that aims to identify a different sort of offender.

12    The other Article 213 offenses all involve serious crimes, and their perpetrators
13 undoubtedly may include a number of potential recidivists. But the empirical research and
14 experience detailed above make clear that the currently prevalent approach, which seeks to cast
15 the widest conceivably defensible net, is unjust, costly, and counterproductive. With respect to the
16 Article 213 offenses not designated as registrable, the social harms of registration demonstrably
17 outweigh its potential benefits. Making this judgment explicit, Section 213.11A(1)(b) stipulates
18 that no conviction for any other criminal offense under Article 213 can be the basis for requiring
19 registration with law enforcement or any other obligation applicable primarily to persons convicted
20 of a sexual offense.

21    Several jurisdictions extend their sex-offense registry systems to *nonsexual* offenses that
22 arguably pose similar risks (for example, kidnapping a child).[173] Given the limited value and

---

[173] Federal SORNA is an example. SORNA § 20911(5)(A)(ii) defines the term "sex offense" to
include "a criminal offense that is a specified offense against a minor," and subsections (7)(A) & (B) of
that section define the term "specified offense against a minor" to include "an offense against a minor …
(unless committed by a parent or guardian) involving kidnapping [or] false imprisonment." See also VA.
CODE ANN. 9.1-902 (Sex Offender and Crimes Against Minors Registry Act); Rainer v. State, 690 S.E.2d
827 (Ga. 2010) (nonparental false imprisonment is registrable); Commonwealth v. Thompson, 548 S.W.3d
881 (Ky. 2018) (attempted kidnapping of a minor is registrable); People v. Knox, 903 N.E.2d 1149 (N.Y.
2009) (nonparental kidnapping and unlawful imprisonment are registrable); State v. Smith, 780 N.W.2d 90
(Wis. 2010) (nonparental false imprisonment is registrable); Lozada v. South Carolina Law Enforcement
Division, 719 S.E.2d 258 (S.C. 2011) (Pennsylvania conviction for unlawful restraint registrable as
kidnapping in South Carolina. But see People v. Diaz, 32 N.Y.3d 538 (2018) (murder of 13-year-old girl
in Virginia, registrable under Virginia's Sex Offender and Crimes Against Minors Registry Act, held not
registrable under New York Sex Offender Registry Act, because Virginia law did not require defendant to
register "as a sex offender"); Doe v. Sex Offender Registry Board, 11 N.E.3d 153 (Mass. App. Ct. 2014)
(federal conviction for kidnapping of a minor not registerable in Massachusetts); State v. Coman, 273 P.3d
701 (Kan. 2012) (bestiality not a registrable offense); State v. Haynes, 760 N.W.2d 283 (Mich. Ct. App.
2008) (same); State v. Duran, 967 A.2d 184 (Md. 2009) (indecent exposure not registrable because

547

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1    substantial social costs of registration even in the case of explicitly sexual crimes,[174] and the
2    dangers of mission creep if registries begin to sweep nonsexual crimes within their purview, there
3    is strong reason to limit a registration regime to the serious sexual offenses that fall within the
4    scope of Article 213. Accordingly, Section 213.11A(1)(b), reflecting the majority view among the
5    states, stipulates that no conviction for a criminal offense in this jurisdiction can trigger an
6    obligation to register or any other obligation applicable primarily to persons convicted of a sexual
7    offense, unless the offense is a registrable offense under this Article.

8        ***2. Section 213.11A(2): Adults Convicted of Sex Offenses in Other Jurisdictions.*** In
9    virtually all jurisdictions, a person's conviction for a sexual offense can sometimes trigger an
10   obligation to register when the person moves elsewhere to live, work, or study. Many states require
11   sex-offense registration for a much broader array of offenses than those that trigger registration
12   obligations under Article 213, including, in some states, nonsexual offenses.[175] The policy
13   judgment underlying Section 213.11A—that sex-offense registration should be carefully
14   targeted—makes registration inappropriate in such cases.
15       The converse situation is less straightforward. A person may have committed an offense
16   that would be registrable if committed in this jurisdiction but is not registrable in the jurisdiction
17   where it was committed. That situation will seldom arise in practice, because few states if any
18   restrict the registration obligation more narrowly than does Article 213. In such an event, however,
19   the policy underlying Section 213.11A arguably might call for the public-safety measures that
20   Sections 213.11A-213.11J contemplate. Nonetheless, when such an offense was not registrable
21   where committed, the offender would not receive registration-related notice at the time of
22   conviction. It is therefore neither practical nor fair for that offender to face Section 213.11A
23   requirements when subsequently entering this state.
24       A related situation in which the registration obligations of this jurisdiction could be broader
25   than that of another jurisdiction can arise when the person concerned, after meeting all registration-
26   related obligations in that jurisdiction, has been removed from its registry. Or similarly, a person
27   ordinarily subject to registration in the other state for an offense that is registrable in this
28   jurisdiction may receive a pardon or succeed in having the out-of-state conviction expunged. The
29   Department of Justice reports that "[o]n occasion, offenders have had their convictions expunged,
30   but still might face registration requirements in other states."[176]  In these cases as well, the policy

---

lewdness element of the crime incorporated conduct that was not sexual in addition to conduct that could
be sexual).

[174] See Reporters' Notes to Section 213.11, supra.

[175] See note 173, supra.

[176] U.S. Dep't of Just., Sex Offender Registration and Notification In the United
States: Current Case Law and Issues (2019), at 2 (noting that "at least one state has [determined] that

548

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1  judgment underlying Section 213.11A—that sex-offense registration should be carefully
2  targeted—makes registration inappropriate.
3      For those reasons, Section 213.11A(2)(a) provides that the out-of-state offense triggers the
4  registration obligations of Sections 213.11A-213.11J if and only if two requirements are met: the
5  person must be currently obliged to register as a sex offender in the jurisdiction where the offense
6  was committed *and* the offense must be one that would be currently registrable if committed in
7  this jurisdiction. As a corollary, Section 213.11A(2)(d) makes explicit that no conviction for an
8  offense that would not be registrable if committed in this jurisdiction can be the basis for imposing
9  registration requirements or any other obligation that this jurisdiction applies primarily to persons
10  convicted of a sexual offense.
11      Section 213.11A(2)(b) explains *where* that person must register. If the person lives in this
12  jurisdiction, registration must be accomplished in the [county] where the person lives. If the person
13  does not live in this jurisdiction, but works in this jurisdiction, registration must be accomplished
14  in the [county] where the person works. If the person does not live or work in this jurisdiction but
15  studies in this jurisdiction, registration must be accomplished in the [county] where the person
16  studies.
17      Section 213.11A(2)(c) explains the standard and procedures for determining whether an
18  out-of-state offense triggers a duty to register. The required procedure is straightforward: Under
19  subsection (2)(c)(ii), the decisionmaking authority must give the affected person notice and an
20  opportunity to be heard on the comparability question, either orally or in writing.
21      The standard for determining comparability merits more extended discussion. States
22  typically provide that a person's out-of-state conviction triggers an obligation to register as a sex
23  offender only when that offense "is 'comparable,' 'similar' or 'substantially similar' to one or
24  more of the receiving jurisdiction's registerable [sic] offenses."[177] Most states designate a central
25  authority to make that determination, but some do not.[178]
26      Comparability issues arise with some frequency, because of a lack of congruence between
27  the out-of-state offense and the nearest equivalent registrable offense in the receiving state. Under
28  current law, that issue is easily resolved when the question is whether comparability should be
29  determined by the names of the two offenses or instead by their facts and definitional elements.
30  The label itself is not relevant; two offenses can be comparable, even when they have different

---

'out-of-state offenders whose convictions have been expunged must register … [so long as] they were
required to register' in another jurisdiction as a sex offender").

[177] Id.

[178] Id. In several states, a local sheriff's determination that an out-of-state conviction was
"substantially similar" to a registrable state offense, without providing the affected person an opportunity
to be heard, was held to violate procedural due process. See Meredith v. Stein, 355 F. Supp. 3d 355
(E.D.N.C. 2018); Creekmore v. Attorney General of Texas, 341 F. Supp. 2d 648, 666 (E.D. Tex. 2004).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

names or captions, if their elements are identical.[179] For example, assume that a person has been convicted of "child molestation," an offense that is registrable where committed but that does not exist under that name in the jurisdiction to which the person subsequently moves. If that offense, as defined, requires proof of sexual contact with a minor under the age of 14 and if that conduct suffices to establish a registrable offense (perhaps labeled "sexual abuse of a minor") in the receiving jurisdiction, the latter jurisdiction can justifiably conclude that the two offenses are comparable and that the person concerned must register in the place where that person moves.

Conversely, offenses sometimes are *not* comparable even though they carry the same label. Assume that (1) two states have a registrable offense of "sexual abuse of a minor," (2) the out-of-state registrable offense requires proof of sexual contact with a minor under the age of 16, (3) the receiving state's registrable offense requires proof of sexual contact with a minor under the age of 14, and (4) the victim of this particular offense was 15 years old. The two offenses are *not* comparable, even though they carry identical names, because neither the elements of the out-of-state offense nor the underlying facts in the particular case suffice to establish a registrable offense in the receiving jurisdiction.[180]

Greater difficulty arises when the formal elements of the offense and the conduct underlying the conviction point in different directions. Assume that (1) an out-of-state offense of "child molestation," registrable where committed, requires proof of sexual contact with a minor under the age of 16, (2) the receiving state's nearest equivalent registrable offense ("aggravated sexual abuse of a minor") requires proof that the victim was under 12, and (3) the victim of this particular offense was 10 years old. Judged by the underlying facts, the out-of-state offense is comparable to the receiving state's registrable offense of "aggravated sexual abuse of a minor." But judged only by its definitional elements, the out-of-state offense is not comparable because some conduct falling within its scope (e.g., sexual abuse of a 15-year-old) does not trigger registration duties in the receiving state.[181]

No uniform approach has emerged to resolve this issue. When the elements of the out-of-state offense cover some conduct that is registrable in the receiving state and some that is not, many jurisdictions limit the inquiry to the formal elements of the offenses in question.[182]

---

[179] E.g., WYO. STAT. ANN. § 7-19-301(a)(viii)(B) (2019) (out-of-state conviction is registrable when "containing the same or similar elements … as sufficient to prove a Wyoming registrable sex offense").

[180] E.g., State v. Duran, 967 A.2d 184 (Md. 2009) (out-of-state conviction for indecent exposure not registrable in Maryland because lewdness element of out-of-state offense could be satisfied by nonsexual as well as sexual conduct).

[181] Cf. State v. Hall, 294 P.3d 1235 (N.M. 2013) (holding that California conviction for annoying or molesting children not registrable in New Mexico without evidence of actual conduct comparable to the registrable New Mexico offense).

[182] E.g., State v. Doe, 425 P.3d 115, 119-121 (Alaska 2018) (Washington crime of communicating with a minor for immoral purposes and California crime of molesting a child younger than 18 held not

550

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1    Elsewhere, statutes or case law requires or permits the decisionmaking authority to determine
2    comparability by looking to the facts underlying the conviction in the particular case.[183] This
3    approach is not intrinsically unworkable when the relevant facts are stipulated (as they might be
4    when the conviction is by guilty plea) or otherwise clearly established by the record. But some
5    jurisdictions permit wide-ranging inquiry into the circumstances underlying the out-of-state
6    conviction,[184] a potentially complex factfinding process with significant possibilities for
7    unfairness. Some jurisdictions, acknowledging this difficulty, permit inquiry into the underlying

---

similar to Alaska offense of attempted sexual abuse of a minor because "it is the law that must be similar …. [This] does not mean that the elements of the offense must be identical or even substantially equivalent, but the elements do have to be categorically alike with no significant differences …. [We] employ a categorical approach by looking to the statute . . . of conviction, rather than to the specific facts underlying the crime."); State v. Duran, 967 A.2d 184 (Md. 2009) (out-of-state conviction for indecent exposure not registrable in Maryland because lewdness element of the offense could be satisfied by nonsexual as well as sexual conduct); Doe v. Sex Offender Registry Bd., 925 N.E.2d 533 (Mass. 2010) (Board may not consider facts underlying the conviction); Commonwealth v. Sampolski, 89 A.3d 1287 (Pa. Super. Ct. 2014) (determination must be based on elements of the offense).

[183] E.g., WYO. STAT. ANN. § 7-19-301(a)(viii)(B) (2019) (treating out-of-state convictions as registrable when "containing the same or similar elements, or arising out of the same or similar facts or circumstances" as sufficient to prove a Wyoming registrable sex offense); United States v. Byun, 539 F.3d 982 (9th Cir. 2008) (conviction for alien smuggling properly triggered registration where underlying facts involved sex trafficking); State v. Hall, 294 P.3d 1235 (N.M. 2013) (California conviction for annoying or molesting children not registrable in New Mexico if underlying conduct not comparable to New Mexico registrable offense; "courts must look beyond the elements of the conviction to the defendant's actual conduct."); North v. Bd. of Exam'rs of Sex Offenders, 871 N.E.2d 1133, 1139 (N.Y. 2007) ("[W]here the offenses overlap but the foreign offense also criminalizes conduct not covered under the New York offense, the Board must review the conduct underlying the foreign conviction to determine if that conduct is, in fact, within the scope of the New York offense."); State v. Lloyd, 132 Ohio St. 3d 135, 970 N.E.2d 870 ("If the out-of-state statute defines the offense in such a way that the court cannot discern from a comparison of the statutes whether the offenses are substantially equivalent, a court may … rely on a limited portion of the record in a narrow class of cases where the factfinder was required to find all the elements essential to a conviction under the listed Ohio statute."); State v. Howe, 212 P.3d 565, 567 (Wash. Ct. App. 2009) (quoting State v. Morley, 952 P.2d 167, 175-176 (Wash. 1998)) ("'[I]f the elements are not identical, or the foreign statute is broader than the Washington definition of the particular crime,' then, as a second step, the trial court may examine the facts of the out-of-state crime.").

    See also Sam Ashman, Note, *The Danger in New Mexico's Method of Deciding Whether an Out-of-State Conviction is a Registrable Sex Offense*, 49 N.M. L. REV. 354 (2019).

[184] E.g., State v. Orr, 304 P.3d 449, 451-452 (N.M. Ct. App. 2013) ("Although we do not have a sufficient record on appeal, the State has indicated that during the pendency of this appeal, it obtained several documents from the district attorney's office and court in North Carolina, including an investigation report, grand jury indictment, transcript of plea, prior convictions for sentencing, and judgment and commitment, to understand the underlying facts and procedural posture of Defendant's conviction in North Carolina. Accordingly, we remand this case to the district court for further proceedings ….").

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1   facts only when the statutory elements are "substantially similar"[185] (an elusive inquiry in itself),
2   or when a formal record readily establishes those facts.[186] Even this narrower approach means that
3   the comparability of an in-state offense to an out-of-state offense is never categorically resolved;
4   that issue always depends on the facts underlying the out-of-state conviction in each case.

5         Accordingly, subsection (2)(c) provides that comparability must be determined solely by
6   comparing the definitional elements of the two offenses. An offense is comparable to a registrable
7   offense under Article 213 if and only if the elements of the out-of-state offense are no broader than
8   the elements of an offense that is registrable under this Article. When, regardless of the conduct
9   underlying the out-of-state conviction, the out-of-state offense can be committed by conduct that
10   is not sufficient to establish a registrable offense under this Article, the two offenses are not
11   comparable. This definitional-elements standard avoids the inconvenience for the decisionmaker
12   and the risk for the person concerned when the judgment about comparability requires determining
13   the specific facts underlying each out-of-state conviction. It also serves the goal of judicial
14   economy in that it permits the comparability of two offenses to be definitively resolved for all
15   future situations implicating those offenses, even when cases potentially involve different
16   underlying facts. The Supreme Court uses essentially this standard, which it calls the "modified
17   categorical approach," when it assesses the nature of a prior conviction for federal sentence-
18   enhancement purposes.[187]

---

[185] Dep't Pub. Safety v. Anonymous, 382 S.W.3d 531, 535 (Tex. Ct. App. 2012) ("individual facts and circumstances underlying the foreign conviction [could be considered] only after determining that the elements of the two statutes were objectively substantially similar, although not identical …. For a foreign statute to be substantially similar to a [registrable] offense, 'the elements being compared . . . must display a high degree of likeness, but may be less than identical.' … [E]xcept in unusual cases, the elements of the relevant offenses [must] be compared for substantial similarity without regard to individual facts and circumstances.")

[186] E.g., CAL. PENAL CODE § 290.005(a) (West 2018) (treating out-of-state convictions as registrable "based on the elements of the convicted offense or facts admitted by the person or found true by the trier of fact"); State v. Lloyd, 132 Ohio St. 3d 135, 970 N.E.2d 870 ("court may … rely on a limited portion of the record in a narrow class of cases where the factfinder was required to find all the elements essential to a conviction under the listed Ohio statute."); State v. Werneth, 197 P.3d 1195, 1198 (Wash. Ct. App. 2008) (Georgia conviction for child molestation held not registerable in Washington: "[T]he out-of-state court did not necessarily find each fact essential to liability for the proposed Washington counterpart. [Therefore,] Mr. Werneth's Georgia crime cannot count as Washington's crime of attempted second degree child molestation *without more.'* 'More' means proof that the Georgia court *entered findings of fact that* support the additional elements of the Washington offense.") (emphasis added).

[187] See Deschamps v. United States, 470 U.S. 254 (2013). The Court's requirement that offenses be compared in "categorical" (definitional-elements) terms is modified only for "divisible" statutes—those that set out several offense elements in the alternative. In that situation, "[a court can] consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction. The court can then do what the categorical approach demands: compare the elements of the crime of conviction (including the alternative element used in the case) with the elements of the … crime [to which it must be compared]." Id., at 257. The problem of "divisible" statutes apparently has not arisen in determining the comparability of sexual offenses. If it does, the relevant

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1      **3. Section 213.11A(3): Persons under the Age of 18**.

2      Under current law, many states impose duties to register and other sex-offense collateral
3  consequences for a long list of sexual offenses even when the perpetrator was younger than 18 at
4  the time of the misconduct. Registration is widely required, often for life, not only when the youth
5  is convicted of a criminal offense as an adult but also in many circumstances where the offense
6  was the basis for an adjudication of delinquency.[188] Federal SORNA seeks to require states to
7  extend registration to juveniles adjudicated delinquent if they were at least 14 years of age at the
8  time of the offense and the offense was comparable to or more severe than the federal crime of
9  aggravated sexual abuse (defined as including sexual penetration by use of force) or an attempt or
10  conspiracy to commit that offense.[189]

11      The research is replete with heartbreaking stories of the unnecessarily cruel, life-destroying
12  impact of placing individuals on a sex-offender registry for offenses committed as minors.[190] The
13  impact has been not only harsh but exceptionally counterproductive. Patricia Wetterling is
14  especially outspoken in condemning juvenile registration. "I don't see any, not one redeeming
15  quality in doing that. . . . Registering juveniles is ludicrous and wrong always." Noting that she
16  objected to the language covering juveniles when the Jacob Wetterling bill was being drafted, she
17  recalls that she "kept raising questions about treating juveniles the same way we treat adults. It
18  makes no sense at all . . . . I was told not to worry about the juvenile provisions because that would
19  get thrown out. I was told there was no way that it would pass . . . and yet [it did]."[191]

20      Victim advocates report that "juvenile offender registration [has] inadvertently created a
21  disincentive for victims to disclose [their victimization]."[192] They say their clients "fear that there
22  are no intermediate interventions available," and that when abused at the hands of a juvenile, "they
23  fear that the youth will be required to register as a sex offender and will, therefore, be 'branded'
24  for life despite being potentially amenable to treatment."[193]

---

statutory detail would guide a judgment about whether a similar "modified" approach was appropriate, but beyond the definitional elements, the comparability judgment could be informed by consulting, at most, only "a limited class of documents," not the underlying facts.

[188] See Elizabeth J. Letourneau, *Juvenile Registration and Notification are Failed Policies That Must End*, in LOGAN & PRESCOTT, supra note 16, at 164, 166-168.

[189] SORNA § 20911(8) (2019); 18 U.S.C. § 2241.

[190] HUMAN RIGHTS WATCH, RAISED ON THE REGISTRY (2013).

[191] Wetterling & Wright, supra note 161, at 99, 101. See also note 81, supra.

[192] Bandy, supra note 151, at 471, 488.

[193] Id.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1    Apart from the vivid anecdotal evidence, systematic research consistently tells a similarly
2    negative story. Findings suggest that registration of juveniles has no preventive effect[194] and
3    substantial criminogenic consequences,[195] with overall effects that are unambiguously counter-
4    productive for the individual concerned and for society as a whole.[196] One quantitative study
5    estimates that juvenile registration alone saddles the public with social costs, net of benefits,
6    amounting to at least $40 million per year, and that community notification pertaining to offenders
7    placed on a registry as minors generates net social costs of at least $10 billion per year.[197]

8    Studies from other methodological perspectives regularly reach qualitatively similar
9    results.[198] In 2016, the Federal Advisory Committee on Juvenile Justice, in recommendations to
10   the Justice Department's Office of Juvenile Justice and Delinquency Prevention, reported that
11   juvenile sex-offender registration laws "are inconsistent with research and evidence-based practice
12   and undermine positive outcomes." The Committee urged rejection of the registration approach
13   for juveniles in preference to using "evidence-based, community based and family-focused
14   responses," and formally recommended that SORNA be amended "to exempt juveniles from sex

---

[194] See Letourneau, *Failed Policies*, supra note 188, at 170 (reporting that "studies examining the policies of several states and the federal government have all concluded that subjecting children to SORN has no impact on sexual recidivism"); Elizabeth J. Letourneau et al., *Juvenile Registration and Notification Policy Effects: A Multistate Evaluation Project*, National Criminal Justice Reference Service, http://www.ncjrs.gov/App/publications/abstract.aspx?ID=273674 (January 2018); Cynthia J. Najdowski et al., *Adolescent Sex Offender Registration Policy: Perspectives on General Deterrence Potential from Criminology and Developmental Psychology*, 22 PSYCHOL., PUB. POL'Y, & L. 114 (2016).

[195] Catherine L. Carpenter, *Throwaway Children: The Tragic Consequences of a False Narrative*, 45 SW. L. REV. 461 (2016).

[196] For a review of methodological issues in some of the reports referenced here and a call for more systematic research, see U.S. Library of Congress, supra note 149, at 4-5.

[197] See Richard B. Belzer, *The Costs and Benefits of Subjecting Juveniles to Sex-Offender Registration and Notification*, 41 R STREET POL'Y STUDY (2015), https://www.rstreet.org/wp-content/uploads/2015/09/RSTREET41.pdf. See also Levenson, supra note 149, at 15 (explaining that "[t]he expenditures of registry programs include local police surveillance and compliance verification of RSOs [registered sex offenders], costs associated with non-compliance, such as courts and incarceration, and expenses for continuous technological improvements to build and maintain online registries and to seamlessly update and connect registry systems with other databases … When quantifiable costs are summed, they are estimated to range from $10 billion to $40 billion nationally per year.").

[198] See, e.g., J.C. Sandler, et al., *Juvenile Sexual Crime Reporting Rapes Are Not Influenced by Juvenile Sex Offender Registration Policies*, PSYCH., PUB. POL'Y & L. (forthcoming 2020); E.J. Letourneau, et al., Juvenile Registration and Notification Policies Fail to Prevent First-Time Sexual Offenses: A Replication Study (manuscript under review, 2019); A.J. Harris, et al., *Collateral Consequences of Juvenile Sex Offender Registration and Notification: Results from a Survey of Treatment Providers*, 28 SEXUAL ABUSE: A J. OF RES. AND TREATMENT 770 ((2016); Najdowski et. al., supra note 158.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

offender registration, community notification, and residency restriction laws."[199] Largely concurring in this recommendation, the Justice Department's official guidance on the subject noted that "[j]uvenile cases have been pled to non-registration offenses at the expense of the juvenile not being eligible for treatment," even though "[c]ost-benefit analysis demonstrates that sex-offender treatment programs for youth can provide a positive return on taxpayer investment." The Department concluded that "[f]urther expansion of SORN [Sex Offender Registration and Notification] with juveniles is not recommended."[200]

Responding in part to these assessments, several state courts have held that mandatory registration of juveniles convicted of a sexual offense is unconstitutional because it lacks an individualized assessment of risk.[201] At a minimum, the research suggests, juvenile registration must be reserved for "situations where either unique risk or needs are clearly associated with the commission of a crime"[202] and individuals convicted (or adjudicated delinquent) for conduct as minors must have viable opportunities to terminate their registration duties at an early date. But even a limited period on a sex-offense registry leaves a youthful offender's sex-offense record widely available through public and private databases, in effect creating long-term punishment and

---

[199] GEORGE W. TIMBERLAKE & AMY M. DAVENPORT, FED. ADVISORY COMM. ON JUVENILE JUSTICE, RECOMMENDATIONS OF THE FEDERAL ADVISORY COMMITTEE ON JUVENILE JUSTICE 4 (2016), https://facjj.ojp.gov/ojpasset/Documents/FACJJ_Recommendation_OJJDP_November_2016.pdf.

[200] U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, SEX OFFENDER MANAGEMENT ASSESSMENT AND PLANNING INITIATIVE (2016).

[201] In re C.P., 967 N.E.2d 729 (Ohio 2012) (finding automatic, lifelong registration of juvenile to violate constitutional prohibition against cruel and unusual punishment); In re J.B., 107 A.3d 1 (Pa. 2014) (finding automatic, lifelong registration of juvenile to violate procedural due process). See also Marsha Levick & Riya Saha Shah, *The Momentum Builds: Challenging Lifetime Registration of Juveniles Convicted of Sexual Offenses in the Post-Roper Era*, 40 N.Y.U. REV. L. & SOC. CHANGE HARBINGER 115 (2016).

[202] Amanda M. Fanniff et al., *Juveniles Adjudicated for Sexual Offenses: Fallacies, Facts, and Faulty Policy*, 88 TEMP. L. REV. 789, 799 (2016). The authors argue that a "reasonable strategy would be to target the highest risk [juvenile sex offenders] for the … most invasive social control policies," but note the difficulty of developing the accurate risk assessment tools on which such a strategy depends. As a result other prevention strategies "may prove more fruitful than registration and notification policies, … without [their] potential harmful effects." Id., at 800-801.

See also Lydia D. Johnson, *Juvenile Sex Offenders: Should They Go to a School with Your Children or Should We Create a Pedophile Academy*, 50 U. TOL. L. REV. 39, 54-56 (2018) (arguing that registry obligations for juveniles should be limited to those who commit crimes such as forcible rape or sexual assault of minor children younger than 14, and those juvenile offenders who fail to complete an assigned rehabilitation treatment program).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11A. Registration for Law-Enforcement Purposes

1   leading many to argue that minors should be exempt from registration and notification
2   requirements entirely.[203] Eleven states specifically exclude minors from their state sex-offender
3   registries, despite the federal mandate to the contrary.[204]
4       Reflecting these persuasive assessments, Section 213.11A(3) rejects registration and all
5   associated disabilities for juveniles—that is, offenders under the age of 18 at the time of their
6   offense—regardless of the underlying offense, except in the case of offenders over 16 who are
7   criminally convicted of a sexual assault involving aggravated physical force or restraint, in
8   violation of Section 213.1.

9   **SECTION 213.11B. NOTIFICATION OF THE OBLIGATION TO REGISTER AND ASSOCIATED**
10  **DUTIES**

11      **(1) Before accepting a guilty plea, and at the time of sentencing after conviction on a**
12  **guilty plea or at trial, the sentencing judge must:**

13          **(a) inform the person who is subject to registration of the registration**
14      **requirement;**

15          **(b) explain the associated duties, including:**

16              **(i) the identity and location, or procedure for determining the identity**
17          **and location, of the law-enforcement agency where the person must appear to**
18          **register as required by Section 213.11A;**

19              **(ii) the duty to register with a law-enforcement agency in any locality**
20          **where the person subsequently resides, including the possible duty to register**
21          **with a law-enforcement agency or other government authority in another**
22          **jurisdiction to which the person subsequently moves;**

23              **(iii) the duty to report to that office or agency periodically in person, as**
24          **required by Section 213.11E(1); and**

25              **(iv) the duty to promptly notify at least one of the local jurisdictions**

---

[203] Ashley R. Brost & Annick-Marie S. Jordan, *Punishment That Does Not Fit the Crime: The Unconstitutional Practice of Placing Youth on Sex Offender Registries*, 62 S.D. L. REV. 806, 817, 829 (2017).

[204] Minutola & Shah, supra note 93, at 8.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11B. Notification of the Obligation to Register

1        where the person is registered of any change in the registry information

2        pertaining to that person, as required by Section 213.11E(2);

3        (c) notify the person of the right to petition for relief from those duties as

4    provided in Section 213.11J;

5        (d) confirm that defense counsel has explained to that person those duties and

6    the right to petition for relief from those duties;

7        (e) confirm that the person understands those duties and that right;

8        (f) require the person to read and sign a form stating that defense counsel and

9    the sentencing judge have explained the applicable duties and the right to petition for

10    relief from those duties, and that the person understands those duties and that right;

11        (g) ensure that if the person convicted of a sexual offense cannot read or

12    understand the language in which the form is written, the person will be informed of

13    the pertinent information by other suitable means that the jurisdiction uses to

14    communicate with such individuals; and

15        (h) satisfy all other notification requirements applicable under Model Penal

16    Code: Sentencing, Section 7.04(1).

17    (2) At the time of sentencing, the convicted person shall receive a copy of the form

18  signed pursuant to subsection (1)(f) of this Section.

19    (3) If the convicted person is sentenced to a custodial sanction, an appropriate official

20  must, shortly before the person's release from custody, again inform the person of the

21  registration requirement, explain the associated rights and duties, including the right to

22  petition for relief from those duties, and require the person to read and sign a form stating

23  that those rights and duties have been explained and that the person understands those rights

24  and duties. At the time of release from custody, the person concerned shall receive a copy of

25  that form.

26  **Comment:**

27    *Subsection (1)* specifies the procedures for notifying persons convicted of a sexual offense

28  of applicable registration rights and duties and also details the information that must be included

29  in that notification. *Subsection (2)* requires the sentencing judge to provide the person a copy of

30  the form signed pursuant to subsection (1). For a person who is incarcerated after conviction,

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11B. Notification of the Obligation to Register

1    *subsection (3)* specifies the procedures for again notifying an incarcerated person of applicable

2    registration rights and duties prior to that person's release from custody.

## REPORTERS' NOTES

3        The notification provisions of federal SORNA are stated in the briefest terms, requiring

4    only that an appropriate official "inform the sex offender of the duties of a sex offender …[,]

5    explain those duties; [and] require the sex offender to read and sign a form stating that the duty to

6    register has been explained and that the sex offender understands the registration requirement."[205]

7    Subsection (1) adds specificity by building on the notification protocols applicable to collateral

8    consequences generally under the sentencing provisions of the Model Penal Code.[206]

9        Going beyond those protocols:

10        (a) subsection (1)(b), consistent with federal SORNA, requires the sentencing judge to

11    explain the required information to the person concerned;[207]

12        (b) subsection (1)(d) requires the judge to ensure that defense counsel has also explained

13    that information,

14        (c) subsection (1)(e) requires the judge to make a record showing that the person

15    understands that information;

16        (d) under subsection (1)(f), the judge must, consistent with federal SORNA, require the

17    person concerned to read and sign a form stating that defense counsel and the judge have explained

18    the relevant information and that the person understands it; and

19        (e) subsection (1)(g) calls attention to the need to communicate effectively with convicted

20    persons who cannot read or understand the language in which notification is given.

21    **SECTION 213.11C. TIME OF INITIAL REGISTRATION**

22        **A person subject to registration must initially register:**

23           **(a) if incarcerated after sentence is imposed, then within three business days**

24    **after release; or**

25           **(b) if not incarcerated after sentence is imposed, then not later than five**

---

[205] SORNA § 20919(a).

[206] See *MPCS Statutory Text*, supra note 1, Section 7.04(1).

[207] MPCS requires the sentencing judge to provide that information to the person in writing but does not explicitly require the judge to explain it or assure that the person understands.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1      **business days after being sentenced for the offense giving rise to the duty of**

2      **registration.**

3  **Comment:**

4      Section 213.11C specifies the time when the obligation to register ripens.

## REPORTERS' NOTES

5      Federal SORNA requires persons who must register to do so within a strict time frame. If

6 they have been incarcerated, they must register "*before* completing a sentence of imprisonment

7 with respect to the offense giving rise to the registration requirement."[208] Those who were not

8 sentenced to a term of imprisonment must register "not later than 3 business days after being

9 sentenced for that offense."[209] These deadlines are unnecessarily tight and a considerable challenge

10 to meet. Not all incarcerated offenders will know prior to release exactly where they will be living,

11 and even when their new address is known in advance, incarcerated offenders can hardly be

12 expected to travel to their new residence *before release* and then appear *in person* at the designated

13 local agency, as federal SORNA and most state registry regimes require.[210] Taken literally, these

14 provisions guarantee that persons subject to registration who are incarcerated after conviction will

15 commit a crime the moment they step outside the prison gate. To avoid this absurd result, several

16 jurisdictions designate an authority to register affected individuals prior to release.[211] SORNA

17 authorizes the Attorney General to prescribe rules for registering those who are unable to comply

18 with these deadlines,[212] but to date no federal solution to this problem has taken effect.[213] And the

19 three-day time limit for persons required to register but not sentenced to incarceration, though not

20 inherently ridiculous, is also unnecessarily tough to meet.

---

[208] SORNA § 20913(b)(1) (emphasis added).

[209] SORNA § 20913(b)(2).

[210] SORNA § 20918 requires those subject to registration to appear periodically in person at the site designated for registration in order to allow the jurisdiction to take a current photograph.

[211] See discussion in *Registration Requirements under the Sex Offender Registration and Notification Act*, 15804 Fed. Reg. 49332 (proposed Aug. 13, 2020), https://beta.regulations.gov/document/DOJ-OAG-2020-0003-0001 (noting that several states and the District of Columbia have such provisions).

[212] SORNA § 20913(d) (authorizing Attorney General to prescribe rules for the registration of persons who are unable to comply with the deadlines prescribed in § 20913(b)).

[213] See *Registration Requirements,* supra note 211, at § 72.7(a)(2) (proposing rule that would allow individuals in this situation to comply with SORNA by registering within three business days of entering a jurisdiction following release from custody).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11C. Time of Initial Registration

1    Section 213.11C sets more realistic deadlines that adequately meet any realistic public-
2  safety concern—a deadline of three business days *after* release for persons required to register who
3  are incarcerated after sentencing and a deadline of five days after sentencing for those who are not
4  sentenced to incarceration.


5  **SECTION 213.11D. INFORMATION REQUIRED IN REGISTRATION**

6    **(1) A person subject to registration under Section 213.11A must provide the following**
7  **information to the appropriate official for inclusion in the law-enforcement registry:**

8        **(a) the name of the person (including any alias used by the person);**

9        **(b) the Social Security number, if any, of the person;**

10       **(c) the address of each place where the person resides or expects to reside;**

11       **(d) the name and address of any place where the person works or expects to**
12   **work;**

13       **(e) the name and address of any place where the person is a student or expects**
14   **to be a student;**

15       **(f) the license-plate number and a description of any vehicle owned or**
16   **regularly operated by the person.**

17    **(2) *Supplementary Information*. The local jurisdiction in which a person registers must**
18  **ensure that the following information is included in the registry for that person and kept up**
19  **to date:**

20       **(a) the text of the provision of law defining the sexual offense for which the**
21   **person is registered;**

22       **(b) the person's criminal history, including the date and offense designation of**
23   **all convictions; and the person's parole, probation, or supervised-release status;**

24       **(c) any other information required by law.**

25    **(3) *Registrants Who Lack a Stable Residential Address*. If a person required to register**
26  **lacks a stable residential address, the person must, at the time of registration, report with as**
27  **much specificity as possible the principal place where the person sleeps, instead of the**
28  **information required under subsection (1)(c).**

29    **(4) The local jurisdiction in which a person registers must promptly provide the**
30  **information specified in subsections (1), (2), and (3) of this Section to an appropriate law-**

560

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11D. Information Required in Registration

1    enforcement authority in every other jurisdiction in which the registrant works or expects
2    to work and is enrolled or expects to enroll in a program of study.

3    **(5)** *Correction of Errors*. Each locality where a person registers and each locality that
4    receives information about a registrant pursuant to subsection (4) of this Section must
5    provide efficacious, reasonably accessible procedures for correcting erroneous registry
6    information. Each locality where a person registers must, at the time of registration, provide
7    the registrant instructions on how to use those procedures to seek correction of registry
8    information that the registrant believes to be erroneous.

9    Comment:

10   Subsections (1) and (2) specify the information that the registrant and the registering
11   authority itself must provide. They require the disclosure of considerable detail, as do all existing
12   registration regimes, consistent with their perceived public-safety objectives.

13   Subsection (3) explains the information to be provided, instead of the location of the
14   person's residence, when the registrant lacks a stable residential address. Subsection (4) requires
15   each locality where a person registers to inform the registrant, at the time of registration, how to
16   seek correction of registry information that the registrant considers erroneous. It does not specify
17   any particular correction procedures but leaves those details to each local jurisdiction, subject to
18   the requirement that the procedures afforded be reasonably user-friendly and offer expeditious
19   means to determine the validity of a registrant's complaint and to correct information found to be
20   erroneous.

### REPORTERS' NOTES

21   **1.** *Subsections (1) and (2): The Required Information.* Federal SORNA directs states to
22   obtain from each person required to register a long list of personal information, including the
23   registrant's name, address, and Social Security number; the location of the registrant's current
24   employment or school; and the license-plate number and description of any vehicle owned or
25   operated by the registrant. In addition, states must themselves provide to the directory the
26   registrant's criminal history, physical description and a current photo, fingerprints, palm prints, a

561

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1  DNA sample, and a photocopy of the registrant's driver's license or identification card.[214] States
2  vary considerably in the information that registrants must provide.[215]

3      Subsections (1) and (2) follow federal SORNA requirements with respect to the
4  information required to be reported.

5      **2. *Subsection (3): Registrants Who Lack a Stable Residential Address.*** Nineteen states
6  and the District of Columbia provide no statutory guidance on how registrants who lack a stable
7  residential address can satisfy their obligation to report their place of residency. Federal SORNA
8  is silent on this issue as well, although some clarification is offered in guidance issued by the
9  Attorney General. Subsection (3) provides that a person required to register who lacks a stable
10  residential address can instead report with as much specificity as possible the principal place where
11  the person sleeps.

12      **3. *Subsection (4): Sharing Information with Other Law-Enforcement Authorities.***
13  Subsection (4) requires the jurisdiction in which a person first registers to provide the registry
14  information concerning that person to an appropriate law-enforcement authority in every other
15  jurisdiction in which the registrant works, studies, or expects to work or study.

16      **4. *Subsection (5): Correction of Errors.*** Like Federal SORNA,[216] Subsection (5) requires
17  states to have a process for correcting erroneous registry information and to make sure that
18  registrants are made aware of the available procedures. Under Subsection (5), each locality where
19  a person registers must inform the registrant, at the time of registration, how to seek correction of
20  erroneous registry information. Subsection (5) does not stipulate the details that an appropriate
21  system must include, since those matters depend in large measure on local logistics, customs, and
22  agency procedures. But the correction processes afforded must be reasonably easy to use; they
23  must ensure that complaints will be resolved promptly and that information found to be erroneous
24  will be corrected without unnecessary delay.

25  **SECTION 213.11E. DUTY TO KEEP REGISTRATION CURRENT**

26      **(1) *Periodic Updates.* A person who is required to register under Section 213.11A**
27  **must, not less frequently than once every year, appear in person in at least one jurisdiction**

---

[214] SORNA § 20914.

[215] See Carpenter & Beverlin, supra note 88, at 1078 (2012) (describing sex-offense registry laws
enacted in the wake of SORNA).

[216] See 34 U.S.C. § 20920(e).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1    where the person is required to register, verify the current accuracy of the information
2    provided in compliance with Section 213.11D(1), allow the jurisdiction to take a current
3    photograph, and report any change in the identity of other jurisdictions in which the person
4    is required to register or in which the person works or is enrolled in a program of study.

5        **(2)** *Change of Circumstances*

6            **(a)** Except as provided in paragraph (b) of this subsection, a person subject to
7        registration under Section 213.11A must, not later than five business days after each
8        change of name and each change in the location where the person resides, works, or
9        is enrolled in a program of study, notify at least one local jurisdiction specified in
10       Section 213.11A of:

11               **(i)** all changes in the information that the person is required to provide
12           under Section 213.11D, and

13               **(ii)** the identity of all other jurisdictions in which the person resides,
14           works, or is enrolled in a program of study.

15           **(b)** Registrants who lack a stable residential address, and therefore report
16       instead the principal place or places where they sleep, as provided in Section
17       213.11D(3), must confirm or update those locations once every 90 days but need not
18       do so more often.

19           **(c)** Each jurisdiction that maintains a registry of persons who have been
20       convicted of a sexual offense must permit registrants to notify the jurisdiction, by one
21       or more reliable, readily accessible methods of communication of the jurisdiction's
22       choosing, such as U.S. mail, submission of an appropriate form online, or otherwise,
23       of any change of name, residence, employment, student status, or vehicle regularly
24       used, and any change in the identity of all other jurisdictions in which the person
25       resides, works, or is enrolled in a program of study.

26           **(d)** Each jurisdiction where a person registers pursuant to Section 213.11A
27       must advise the registrant, at the time of registration, of the registrant's option to use
28       the means of communication established under subsection (2)(c), rather than
29       appearing personally for that purpose, if the registrant so chooses.

30       **(3)** The local jurisdiction notified of any changes pursuant to subsections (1) and (2)
31   must promptly provide the registrant a written receipt confirming that the updated

563

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1   **information has been provided, and must provide that information to all other jurisdictions**

2   **in which the person resides, works, or is enrolled in a program of study.**

3   **Comment:**

4   　　　Subsection (1) requires periodic updates of registry information in person once a year.

5   　　　In Subsection (2), paragraph (a) requires registrants to report more promptly—within five

6   business days—any changes to a registrant's name, residence, place of work, place of study, or

7   vehicle regularly used and to inform the jurisdiction notified about all other jurisdictions in which

8   the person is required to register. Paragraph (b) applies to registrants who lack a stable residential

9   address and therefore instead report on registration the principal place or places where they sleep.

10  It requires registrants in that position to update the relevant information once every 90 days, but

11  does not require them to report a change of residence more often, even when a registrant has

12  relocated more frequently during that period.

13  　　　Subsection (2)(c) requires jurisdictions to permit registrants to report changed

14  circumstances by one or more readily used means of communication of the jurisdiction's choosing,

15  and subsection (2)(d) requires jurisdictions to advise registrants of their ability to use that option,

16  if they prefer, rather than reporting the change of information in person.

17  　　　Subsection (3) requires the jurisdiction initially notified of any changes pursuant to

18  subsections (1) and (2) to provide the updated information promptly to all other jurisdictions in

19  which the person is required to register.

## REPORTERS' NOTES

20  　　　**1. *Periodic Updates***. Federal SORNA requires registrants to appear periodically in person

21  in at least one jurisdiction where they are required to register, allow that jurisdiction to take a

22  current photograph, and "verify the information in each registry in which that offender is required

23  to be registered."[217] The required frequency of these periodic updates under federal SORNA varies

24  from quarterly to yearly, depending on the seriousness of the offense that triggers the obligation

25  to register. But updates only on an annual or semiannual basis are permitted only for lower-level

---

[217] 34 U.S.C. § 20918.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1   offenses that Section 213.11A does not treat as registrable at all.[218] Federal SORNA requires
2   updates at least every three months for all of the offenses that are registrable under Article 213.

3       Such frequent updates in person are unnecessarily burdensome and in effect punitive,
4   because registrants are in any event required to notify the pertinent local agency within a matter of
5   days whenever there is a change in the registrant's name, residence, vehicle, or place of work or
6   study. Absent such a change of circumstances, reporting in person serves only to assure the current
7   accuracy of the offender's personal appearance as recorded in the photograph on file, and that need
8   is adequately met on an annual basis.[219] Therefore, absent a change in circumstances, Section
9   213.11E requires periodic personal appearance only once a year.

10      **2. *Change of Circumstances.*** Under federal SORNA, state registration regimes must
11  require registrants to appear in person before appropriate state authorities, not later than three
12  business days after any change of name, residence, or place of work or study, in order to update
13  the pertinent information. Requiring the registrant to provide these updates *in person* and to do so
14  within *three days* is unnecessarily burdensome and in effect punitive because, with respect to
15  information of this nature, in-person appearance provides no assurance of accuracy that cannot be
16  achieved by requiring submission of appropriate documentation in writing, whether by U.S. mail,
17  completion and internet transmission of suitable fill-in forms made available online, or other
18  means of efficient communication. Several jurisdictions disregard these SORNA requirements by
19  allowing more time for information updates and permitting updated information to be submitted
20  by mail or the internet rather than in person.[220]

21      In accord with these sensible, more flexible approaches, subsection (2)(a) requires
22  registrants to provide the necessary notice within five business days rather than just three,
23  subsection (2)(b) requires each jurisdiction to permit registrants to report these changes by one or
24  more reliable, readily accessible means of communication of the jurisdiction's choosing, and
25  subsection (2)(c) requires jurisdictions to advise registrants of that option.

---

[218] Federal SORNA permits annual updates for Tier I offenses and semiannual updates for Tier II offenses.

[219] Federal SORNA does not treat a registrant's deliberate alteration of personal appearance (for example, by changing hair style or hair color) as a change of circumstance requiring immediate notification, so even the most frequent periodic update required by federal SORNA (once every three months) does not effectively guard against a predator who alters personal appearance to evade SORNA surveillance.

[220] See ANDREW J. HARRIS & CHRISTOPHER LOBANOV-ROSTOVSKY, NATIONAL SEX OFFENDER REGISTRATION AND NOTIFICATION ACT (SORNA) IMPLEMENTATION INVENTORY: PRELIMINARY RESULTS 24-25 (2016), https://www.ncjrs.gov/pdffiles1/nij/grants/250132.pdf (citing as an example that Iowa gives offenders five days to update information and noting that SORNA's mandate for registrants to update their information *in person* is one of the most frequent reasons for state noncompliance with SORNA; giving Massachusetts, Alaska, and Arkansas as examples of states that do not require in-person updates of registrant information).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11E. Duty to Keep Registration Current

1    Nineteen states and the District of Columbia provide no statutory guidance on how
2    registrants who lack stable living arrangements can satisfy their obligation to report and
3    continuously update their information pertaining to their place of residency. Among states that
4    address the problem, periodic update requirements range from 90 days (Arizona, California) to a
5    month (Texas), a week, or even every three days (Georgia, North Dakota).[221] In Florida, registrants
6    who provide a "transient residence" when they register "must report in person every 30 days to the
7    sheriff's office in the county in which [they are] located" even when they remain at the same
8    transient address.[222] But every registrant in Florida must "within 48 hours after vacating the
9    permanent, temporary, or transient residence, report [that change] in person to the sheriff's office
10   of the county in which he or she is located."[223] In practice, therefore, Florida registrants who do
11   not have a stable residence can be required to update their registry information far more often that
12   once a month.[224]

13       Registry requirements, along with unrestricted public access, community notification, and
14   restrictions on housing and employment, are themselves a major cause of homelessness among
15   those who have been convicted of a sexual offense.[225] Adding insult to injury for those who lack
16   stable housing, the extra burdens of more frequent updating and the shortened periods for doing
17   so can make compliance virtually impossible. Even more stringent than Florida's requirement of
18   an update within 48 hours of every change of a transient location, Minnesota and Washington
19   require notification within 24 hours.[226]

20       The relatively simple approach of Arizona and California,[227] allowing registrants in this
21   position to update the relevant information once every 90 days, mitigates the considerable burden
22   that periodic update requirements impose on a class of registrants who already face a welter of

---

[221] See ARIZ. REV. STAT §13-3822(A) (person who registers as a transient must report and re-register every 90 days); CAL. PENAL CODE § 290.012(b) (West 2017) (same); N.Y. CORRECT. LAW § 168-f(3) (McKinney 2012) (same); TEX. CODE CRIM. PROC. ANN. art. 62.051(j)(1)--(2) (West 2017) (transient must report every 30 days); E. Esser-Stuart, Note, *"The Irons Are Always in the Background": The Unconstitutionality of Sex Offender Post-Release Laws as Applied to the Homeless*, 96 TEX. L. REV. 811 (2018).

[222] FL. STAT. ANN. 943.0435(4)(b)(2).

[223] FL. STAT. ANN. 943.0435(4)(b)(1).

[224] Compare State v. Burbey, 403 P.3d 145 (Ariz. 2017) (rejecting argument that state's 72-hour notice requirement is triggered whenever a transient changes his or her transient location; instead transient must re-register only once every 90 days).

[225] See generally Jill Levenson, et al., *Where for Art Thou: Transient Sex Offenders and Residence Restrictions*, https://journals.sagepub.com/doi/pdf/10.1177/0887403413512326.

[226] MINN. STAT. 243.166 (subdiv. 3a (a)) (2019); see Boyd v. State, 408 P.3d 362 (Wash. Ct. App. 2017) (upholding similar Washington provision).

[227] See note 221, supra.

566

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11F. Duration of Registration Requirement

1 difficulties, without presenting any apparent inconvenience for law enforcement. Subsection (3)
2 therefore adopts a 90-day update requirement for registrants who lack a stable residence to report
3 changed circumstances, and does not require more frequent updates when these registrants move
4 one or more times in the interim.

5 **SECTION 213.11F. DURATION OF REGISTRATION REQUIREMENT**

6 **(1) Subject to the provisions of subsection (3) of this Section and Section 213.11J, a**
7 **person required to register must keep the registration current for a period of 15 years,**
8 **beginning on the date when the registrant is released from custody after conviction for the**
9 **offense giving rise to the registration requirement; or if the registrant is not sentenced to a**
10 **term of incarceration, beginning on the date when the registrant was sentenced for that**
11 **offense.**

12 **(2) At the expiration of that 15-year period, the duty to keep that registration current**
13 **will terminate; the person who had been registered will not be subject to any further duties**
14 **associated with that registration requirement; and no public or private agency other than a**
15 **government law-enforcement agency shall thereafter be permitted access to the person's**
16 **registry information.**

17 **(3) *Early Termination*. If, during the first 10 years of the period during which a person**
18 **is required to keep registration information current, the person:**

19 **(a) successfully completes any period of supervised release, probation, or**
20 **parole, and satisfies any financial obligation such as a fine or restitution, other than**
21 **a financial obligation that the person, despite good-faith effort, has been unable to**
22 **pay; and**

23 **(b) successfully completes any required sex-offense treatment program; and**

24 **(c) is not convicted of, or facing pending charges for, any subsequent offense**
25 **under this Article, or any subsequent sexual offense in another jurisdiction that would**
26 **be an offense under this Article if committed in this jurisdiction; then:**

27 **the duty to keep that registry information current will terminate; the person who had**
28 **been registered will not be subject to any further duties associated with that registration**
29 **requirement; and subsequent access to registry information will be governed by subsection**

567

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11F. Duration of Registration Requirement

1  **(4).**

2  **(4) *Access to Registry Information After Termination*. When the person's obligation to**
3  **register and to keep registry information current terminates under subsection (2) or (3),**
4  **subsequent access to registry information is limited as follows:**

5  **(a) Registry information recorded as of the date when termination takes effect**
6  **may remain available to any government law-enforcement agency seeking disclosure**
7  **of that information in compliance with Section 213.11H(1)(a).**

8  **(b) Except as provided in paragraph (a), no public or private agency may**
9  **thereafter be permitted access to registry information concerning the person whose**
10  **obligation to register and keep registry information public has terminated.**

11  **(5) *Notice of Termination*. When a person's duty to register terminates under**
12  **subsection (2) or (3), the law-enforcement agency in the local jurisdiction where the person**
13  **resides must:**

14  **(a) include in its registry a notice that the person's duty to register and all**
15  **duties associated with that registration requirement have terminated; and**

16  **(b) upon the person's request, notify all other jurisdictions where the person**
17  **is registered and where information about the registrant has been provided pursuant**
18  **to Section 213.11D(4) that the person's duty to register and all duties associated with**
19  **that registration requirement have terminated and that no public or private agency**
20  **other than a government law-enforcement agency shall thereafter be permitted to**
21  **have access to that registry information.**

22  **(6) *Certification*. When a person's duty to register terminates under subsection (2) or**
23  **(3), the law-enforcement agency in the local jurisdiction where the person resides must, upon**
24  **request, provide that person a certificate attesting that person's duty to register and all duties**
25  **associated with that registration requirement have terminated.**

26  **Comment:**

27  Section 213.11F(1) specifies the duration of the registration requirement, including the
28  duration of the registrant's continuing obligation to keep registry information current.

29  Subsection (2) provides that the duty to keep registration information current and all other
30  duties associated with registration terminate after 15 years. It also specifies that no public or private

568

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1   agency other than a government law-enforcement agency may thereafter access the person's
2   registry information.

3        Subsection (3) provides for early termination of registration duties and associated
4   consequences, when the registrant is not convicted of a subsequent sexual offense and complies
5   with other obligations associated with the original conviction.

6        After termination, subsection (4) limits access to registry information under subsection (2)
7   or (3).

8        Subsection (5) provides that when a person's registration duties terminate, the agency in
9   the local jurisdiction where that person resides must, upon the person's request, report that
10  termination to all other jurisdictions where the person is registered and where information about
11  the person has been provided pursuant to Section 213.11D(4). That local agency must also caution
12  those jurisdictions that no public or private agency other than a government law-enforcement
13  agency may have access to that registry information.

14       Subsection (6) provides that when a person's registration duties terminate, the law-
15  enforcement agency in the local jurisdiction where the person resides must, upon request, provide
16  that person a certificate attesting that person's duty to register and all duties associated with that
17  registration requirement have terminated.

## REPORTERS' NOTES

18       Federal SORNA specifies the duration of registration and the accompanying duty to keep
19  information current—15 years for Tier I offenses (the least serious); 25 years for Tier II offenses;
20  and life for Tier III offenses, which include offenses comparable to the offenses registrable under
21  Article 213. The statute affords only limited opportunity for early relief from these obligations.
22  For persons convicted of Tier I offenses who maintain a clean record for 10 years, registry
23  obligations terminate at the end of that period, that is, five years early. For persons adjudicated
24  delinquent on the basis of Tier III offenses who maintain a clean record for 25 years, registry
25  obligations terminate at the end of that period, rather than remaining in effect for life. Under federal
26  SORNA, no other registrants are eligible for early relief from registry obligations. Thus, even a
27  juvenile registrant must remain on the registry for at least 25 years, and Tier III adult registrants
28  must be retained for life on the registry, with all its attendant obligations, even if they remain
29  entirely crime-free for decades.[228]

---

[228] SORNA § 20915. A "clean record" is defined as "(a) not being convicted of any offense for
which imprisonment for more than 1 year may be imposed; (B) not being convicted of any sex offense;

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11F. Duration of Registration Requirement

States vary considerably in the duration of the registrant's obligation to keep registry information current, but lifetime registration is widely required for the most serious offenses, such as those that are registrable under Article 213. Early relief also varies considerably but many states, including the 22 that are SORNA-compliant, impose inescapable lifetime registration on persons convicted of the most serious sexual offenses.[229]

There is no plausible justification for maintaining the registry obligation for such an extended period, without regard to the registrant's subsequent behavior. Among the minority of registrants who recidivate at all, nearly all do so within five or at most 10 years of release from custody.[230] Together with the natural decline of offending rates by age, a crime-free period of 10 years provides strong assurance that the likelihood of the registrant's committing a new sexual offense is remote, certainly no higher than the risk that a person of the same age with no previous sex-offense record will commit a new sexual offense. Although the possibility of a false negative cannot be excluded, that vanishingly small risk must be weighed against the substantial costs to law enforcement itself—in terms of required personnel, attention and, resources—of maintaining and constantly updating registry information on thousands of ex-offenders who will never pose any threat to public safety.

Accordingly, Section 213.11F sets the duration of the duty to register and its associated duties at 15 years. Subsection (3) provides for early termination of those duties after 10 years if, during that period, the registrant successfully completes any period of supervised release, probation, or parole; satisfies related conditions; successfully completes any required sex-offense treatment program; and is not convicted of any new sexual offense. In the event that the registrant does commit a new sexual offense during that period, of course, the registrant will face a new criminal sentence, along with whatever additional registry obligations are triggered by the new offense. In addition to the possibilities for early termination, Section 213.11J adds a procedure under which a registrant can petition for discretionary early relief at any time.

---

(C) successfully completing any periods of supervised release, probation, and parole; and (D) successfully completing an appropriate sex offender treatment program ….".

[229] See Carpenter & Beverlin, supra note 88, at 1078 (2012).

[230] See generally R. Karl Hanson et al., *Reductions in Risk Based on Time Offense-Free in the Community: Once a Sexual Offender, Not Always a Sexual Offender*, 24 PSYCHOL. PUB. POL'Y AND L. 48, 57 (2017); R. Karl Hanson et al., *High-Risk Sex Offenders May Not Be High Risk Forever*, 29 J. INTERPERS. VIOLENCE 2792 (2014)

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1    **SECTION 213.11G. FAILURE TO REGISTER**

2       **(1) *Offense of Failure to Register*. A person required to register under Section 213.11A**
3    **is guilty of Failure to Register, a misdemeanor, if that person knowingly fails to register as**
4    **required by Sections 213.11A, 213.11C, 213.11D, and 213.11E(1), or knowingly fails to**
5    **update a registration as required by Section 213.11E(2).**

6       **(2) *Affirmative Defense*. In a prosecution for Failure to Register under subsection (1)**
7    **of this Section, it is an affirmative defense that:**

8          **(a) circumstances beyond the control of the accused prevented the accused**
9          **from complying;**

10         **(b) the accused did not voluntarily contribute to the creation of those**
11         **circumstances in reckless disregard of the requirement to comply; and**

12         **(c) after those circumstances ceased to exist, the accused complied as soon as**
13         **reasonably feasible.**

14   **Comment:**

15      Section 213.11G defines the misdemeanor offense of Failure to Register, applicable to a
16   person required to register who knowingly fails to do so as required or knowingly fails to update
17   registry information as required. The relevant requirements are defined in Section 213.11A
18   (specifying who must register and where), Section 213.11C (specifying when registration must
19   occur), Section 213.11D (specifying the information that the registrant must provide), Section
20   213.11E(1) (defining the duty to appear periodically to verify the current accuracy of information
21   the registrant has provided), and Section 213.11E(2) (defining the duty to update required
22   information in the event of changed circumstances).

23      Section 213.11G(2) provides an affirmative defense for a person who cannot comply with
24   any of these required obligations because of circumstances beyond that person's control, provided
25   that the person (1) did not voluntarily contribute to creating those circumstances in reckless
26   disregard of the requirement to comply and (2) subsequently complied as soon as reasonably
27   feasible.

571

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1    The offense is graded as a misdemeanor. Under the sentencing provisions of the Model
2    Penal Code, a person convicted of a misdemeanor "may be sentenced … to a term of incarceration
3    … [that] shall not exceed [one year]."[231]

### REPORTERS' NOTES

4    Federal SORNA requires states to make it a criminal offense, punishable by "a maximum
5    term of imprisonment that is greater than 1 year," for a person required to register to fail to do so
6    or to miss a deadline for updating any change of the required information.[232] In addition, federal
7    law makes it a crime, punishable by up to 10 years in prison, to travel interstate after knowingly
8    failing to register or update a required registration.[233]

9    State statutory offenses for failure to register and for failure to fulfill related duties vary
10   widely. In some states, failure to register carries a sentence equivalent to the potential punishment
11   for the sexual offense that triggered the underlying registration requirement. In other states, the
12   sanction can be even greater. In Ohio and Washington State, a conviction for failing to register can
13   increase the risk classification level that determines the scope and duration of the registrant's
14   registration-related duties, including the registrant's eligibility to be placed on the public online
15   registry.[234] At least 35 states reportedly classify even a first conviction for failure to register as a
16   felony, with authorized penalties varying from just one year's incarceration to prison terms ranging
17   from five to 10 years and higher.[235] Regardless of the additional prison time a failure-to-register
18   conviction carries, it often extends the registrant's registration period and adds to the associated
19   duties.

20   The need to ensure an adequate incentive for compliance obviously requires that failure to
21   register and failure to comply with associated duties carry consequences. But the harsh penalties

---

[231] *MPCS Statutory Text*, supra note 1, Section 6.06. The maximum term is "stated in brackets [in part because] recommendations concerning the severity of sanctions that ought to attend particular crimes … are fundamental policy questions that must be confronted by responsible officials within each state. . . ." MODEL PENAL CODE: SENTENCING Section 6.06(7)(a) (AM. L. INST., Proposed Final Draft 2017) Section 6.06, Comment *k*, p. 157.

[232] SORNA § 20913(e).

[233] 18 U.S.C. § 2250(a) (2019).

[234] Massachusetts, for example, imposes mandatory minimum sentences rising from six months for the first offense to five years' incarceration after multiple convictions for failing to register. In Washington State, registrants convicted of failing to register (FTR) face imprisonment for up to 57 months, depending on the number of previous failure-to-register convictions. It is worth repeating though that offenders charged with their first FTR violation still risk being charged with a felony if the underlying conviction was for a felony sex offense. Until 2008, Georgia imposed a life sentence for sex-offense registrants convicted of a second FTR offense, a penalty that was ultimately held unconstitutional.

[235] E.g., Kansas, South Dakota, Tennessee, and New York; Arkansas, Hawaii, and North Dakota.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1   prescribed by currently prevalent state laws are almost entirely counterproductive. Studies find
2   that noncompliance with registration duties does not signal an increased risk of committing a new
3   sexual offense; instead noncompliance typically reflects the registrant's underlying social,
4   economic and psychological deficits, such as cognitive impairment and poor capacity for self-
5   control.[236] As a result, the added burdens triggered by a prosecution for noncompliance can make
6   failure to keep up with registration requirements even more likely in the future. Recognizing this
7   difficulty, the offense under Section 213.11G requires a mens rea of knowledge and makes the
8   offense punishable only as a misdemeanor.

9   **SECTION 213.11H. ACCESS TO REGISTRY INFORMATION**

10   **(1) *Confidentiality***

11   **(a) Each law-enforcement agency with which a person is registered and each
12   law-enforcement agency that receives information about a registrant pursuant to
13   Section 213.11D(4) must exercise due diligence to ensure that all information about
14   the registrant remains confidential, except that relevant information about a specific
15   registrant must be made available to any government law-enforcement agency that
16   requests information to aid in the investigation of a specific criminal offense.**

17   **(b) Any disclosure pursuant to paragraph (a) must include a warning that:**

18   **(i) the law-enforcement agency receiving the information must exercise
19   due diligence to ensure that the information remains confidential;**

20   **(ii) such information may be disclosed and used as provided in
21   paragraph (a), but otherwise must not be disclosed to any person or public or
22   private agency;**

23   **(iii) such information may be used only for the purpose requested;**

24   **(iv) such information may not be used to injure, harass, or commit a
25   crime against the registrant or anyone else; and**

26   **(v) any failure to comply with the confidentiality and use-limitation
27   requirements of paragraph (b) could result in civil or criminal penalties.**

---

[236] See Mary Katherine Huffman, *Moral Panic and the Politics of Fear: The Dubious Logic Underlying Sex Offender Registration Statutes and Proposals for Restoring Measures of Judicial Discretion to Sex Offender Management*, 4 VA. J. CRIM. L. 241, 260 (2016).

573

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

**(2)** *Unauthorized Disclosure of Registry Information.* **An actor is guilty of Unauthorized Disclosure of Registry Information if:**

    **(a) the actor, having received registry information as provided in subsection (1), knowingly or recklessly discloses that information, or permits that information to be disclosed, to any person not authorized to receive it; or**

    **(b) the actor obtains access to registry information by computer trespassing or otherwise in violation of law and subsequently knowingly or recklessly discloses that information, or permits that information to be disclosed, to any other person.**

**Unauthorized Disclosure of Registry Information is a felony of the fourth degree [*five-year maximum*].**

**Comment:**

Section 213.11H seeks to reserve registry information exclusively for law-enforcement use. Subsection (1) therefore requires that registry information be disseminated no more widely than necessary to serve direct law-enforcement objectives. Information concerning a specific registrant must be provided to a government law-enforcement agency that requests assistance in connection with the investigation of a specific criminal offense. Private police and private security guards do not have comparable responsibilities for investigating and prosecuting criminal offenses and therefore are not eligible to gain access to registry information under this provision.

Unauthorized Disclosure of Registry Information is a felony of the fourth degree. Under subsection (2)(a), it is committed when an actor who obtains registry information under subsection (1) subsequently knowingly or recklessly discloses it to someone not authorized to receive it. Under subsection (2)(b), the offense is committed when an actor obtains registry information illegally and subsequently knowingly or recklessly discloses it to another person. In both cases the offense requires that the actor disclose the information to another person. An actor who obtains registry information illegally (by computer trespassing, for example) but does not disclose it to others may face civil or criminal liability under other provisions of law but is not punishable under this Section. The sentencing provisions of the Model Penal Code provide that a felony of the fourth degree is punishable by imprisonment for a term that "shall not exceed [five] years."[237] The

---

[237] *MPCS Statutory Text*, supra note 1, Section 6.06.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11H. Access to Registry Information

1    maximum term is stated in brackets because the Code "does not offer exact guidance on the
2    maximum prison terms that should be attached to different grades of … offenses."[238]

## REPORTERS' NOTES

3         Federal SORNA and most state registration regimes contemplate largely unrestricted
4    public access to registry information. The federal statute requires states to post on the Internet and
5    make available to the general public, in conveniently searchable form, all information included in
6    the registry, subject to specified exceptions.[239] States are required to withhold from the public the
7    registant's Social Security number, the names of victims, and all information about arrests that did
8    not result in conviction. In addition, states are permitted to withhold information concerning
9    registants convicted of certain low-level offenses, when the victim of the offense was an adult. For
10   the more serious offenses, and for all covered offenses involving a victim who is a minor, states
11   are permitted to withhold (in addition to Social Security number and records of arrests not resulting
12   in conviction) only the name and location of a registrant's employer or (for a student) place of
13   study. In other words, for registants convicted of more serious offenses, and for *any* registrant
14   convicted of a covered offense involving a victim who is a minor, states *must* make available to
15   any member of the public the registrant's current address, physical description, current photo, a
16   photocopy of the registrant's driver's license, and identifying information for any vehicle the
17   registrant uses. In addition, the state information must be submitted to the Attorney General, who
18   maintains a national registry of the same information,[240] and a public website (the Dru Sjodin
19   National Sex Offender Public Website) with most of the same information accessible in searchable
20   form on the Internet, subject to the same restrictions.[241] Though many foreign countries maintain
21   sex-offense registries of some sort, this practice of largely unrestricted public access to registry
22   information is virtually unheard of outside the United States.[242]

---

[238] The maximum term is "stated in brackets [in part because] recommendations concerning the severity of sanctions that ought to attend particular crimes … are fundamental policy questions that must be confronted by responsible officials within each state. . . ." MODEL PENAL CODE: SENTENCING (AM. L. INST., Proposed Final Draft 2017) Section 6.06, Comment *k*, p. 157, Section 6.06, Comment *k*, p. 157.

[239] SORNA § 20920.

[240] SORNA § 20921.

[241] SORNA § 20922.

[242] See JAMES B. JACOBS, THE ETERNAL CRIMINAL RECORD, 159-160 (2015) (referring to this practice as "American criminal record exceptionalism"); WAYNE A. LOGAN, MARGARET COLGATE LOVE & JENNY ROBERTS, COLLATERAL CONSEQUENCES OF CRIMINAL CONVICTION: LAW, POLICY AND PRACTICE (2018) § 5.3 (2018)(noting that "[o]utside of the United States, unrestricted access to criminal record information is generally only possible for law enforcement agencies, prosecutors, courts, prison

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11H. Access to Registry Information

1    A large majority of the states comply with federal SORNA's public-access requirement by
2    maintaining registries readily accessible to any member of the general public.[243] But a few states,
3    resisting the broad mandate of federal SORNA, permit public access to their registries only with
4    respect to registrants determined to present a particularly high risk of reoffending.[244]  In
5    Massachusetts, a sex-offense registry board classifies registrants by assessing the risk of
6    reoffending in accordance with criteria outlined by statute.[245] Prior to 2013, only registrants placed
7    at the highest level (Level 3) were listed on the Massachusetts registry's public website; a 2013
8    enactment extended public access to registrants classified at Level 2 after that date.[246]   In
9    Minnesota, a committee assesses reoffense risk on a case-by-case basis,[247] and the state's
10   website lists only registrants placed at the highest level.[248]  New Jersey posts information on high-
11   risk and some moderate-risk registrants.[249] In New York a board of examiners classifies registrants
12   based on risk of reoffending,[250] and only those placed at the two highest levels are listed on the
13   state's public website.[251]

14   Public access, however, is only the beginning of a pervasive system for raising community
15   awareness and sensitivity with regard to the persons in the area who have been previously
16   convicted of a sexual offense. Federal SORNA requires each local jurisdiction to employ active
17   measures to alert interested individuals and public and private agencies when such a person
18   registers in the area. Most states take similar steps with regard to public access and community
19   notification.

20   Section 213.11H deals with access to registry information, while Section 213.11I
21   (Additional Collateral Consequences of Conviction) addresses (along with a variety of other

---

administration authorities, and listed public agencies dealing with particularly important and delicate matters."). See also text accompanying notes 30-80, supra.

[243]See "Collateral Consequences," ABA CRIMINAL JUSTICE SECTION, http://www.abacollateralconsequences.org/search/?jurisdiction=37.

[244] See Wayne A. Logan, *Sex Offender Registration and Notification*, in 4 REFORMING CRIMINAL JUSTICE: PUNISHMENT, INCARCERATION, AND RELEASE 397, 404 (Erik Luna ed., 2017) (citing Massachusetts, New York, and Minnesota as states that follow this approach).

[245] Mass. Gen. Laws Ann. ch. 6, § 178K.

[246] See id. § 178D; Moe v. Sex Offender Registry Bd., 467 Mass. 598 (2014) (holding that the 2013 statute extending public access from level 3 to level 2 offenders cannot have retroactive application).

[247] Minn. Stat. Ann. § 244.052 subd. 3.

[248] Id. subd. 4b.

[249] N.J. Stat. Ann. § 2C:7-13.

[250] N.Y. Correct. Law § 168-l.

[251] N.Y. Correct. Law § 168-q.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1    collateral consequences) proactive measures to alert individuals and organizations in the
2    community. Accordingly, details particular to community notification are discussed in the
3    Reporters' Note to Section 213.11I. Many issues, however, are common to public access and
4    community notification; these are discussed here.

5        Open records and government transparency are bedrock, if oversimplified, values in
6    American political culture.[252] In addition, both public access and community notification can
7    enable citizens to feel a sense of empowerment with regard to crimes that many consider especially
8    sinister, unpredictable, and frightening. Payoffs of this kind are arguably important even if such
9    laws have no effect on actual recidivism rates.

10       But the empirical research shows that actual effects are complicated, even with respect to
11   these seemingly inherent benefits. Public access to registry information and indiscriminate
12   community notification designed to alert the population to the presence in its midst of a person
13   who has been convicted of a sexual offense have been responsible for unwarranted public alarm at
14   the same time that they generate acutely counterproductive side effects.

15       Studies in Ohio and Minnesota found no statistically significant relationship between being
16   notified about a high-risk registrant in the neighborhood and taking steps to protect *oneself* (such
17   as installing better locks or lighting).[253] But among residents who were parents, those receiving
18   notification in both states were more likely to take steps to protect *their children*, such as warning
19   them not to talk to strangers and not to let unknown persons into the home.[254]

20       Of course, such warnings should be routine for all children; it would be worrisome if some
21   parents not receiving notification and finding nothing of note at their own initiative neglected to
22   warn their children out of a false sense of security (false because children are equally if not more
23   vulnerable to attack by individuals with no prior sex-offense record and recidivist sex offenders
24   *not* living in their own neighborhoods). It would be similarly worrisome if parents who receive
25   notification tend to emphasize the dangers of stranger abuse at the expense of warnings and
26   protective measures appropriate with respect to the even-higher risk of abuse at the hands of
27   relatives, teachers, and other acquaintances. In any case, without minimizing the importance of
28   such warnings, it is safe to say that state and local law enforcement could easily use other public-
29   education measures, where necessary, to encourage wise child-protection behavior on the part of
30   parents and teachers, without incurring the direct costs (and indirect consequences for registrants)

---

[252] See generally JACOBS, supra note 242.

[253] Rachel Bandy, *Measuring the Impact of Sex Offender Notification on Community Adoption of Protective Behaviors*, 10 CRIMINOLOGY & PUBLIC POLICY 237 (2011) (Minneapolis); Victoria S. Beck, James Clingermayer, Robert J. Ramsey & Lawrence F. Travis, *Community Response to Sex Offenders*, 32 J. PSYCHIATRY & L. 141 (2004) (Hamilton County, Ohio).

[254] Bandy, supra note 253, at 249, 255; Beck, et al., supra note 253, at 163. See also Levenson, supra note 149, at 6-7 (noting that "[f]ew people seem to utilize registries with any regularity or take preventive measures after searching a registry").

577

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11H. Access to Registry Information

1 entailed in public registries and community-notification laws that spotlight the small part of the
2 overall risk that stems from particular individuals.

3 Negative impacts on registrants are convincingly documented in an extensive literature.
4 They include a high incidence of joblessness, social isolation, homelessness, suicide, and on
5 occasion even physically violent victimization at the hands of self-appointed vigilantes or
6 psychologically unstable citizens who object to having a "sex offender" nearby.[255] Because these
7 powerfully criminogenic effects hinder the registant's rehabilitation and make recidivism more
8 likely, they offset to some extent and probably outweigh the potential public-safety benefits of
9 self-protection and the enhanced possibilities for surveillance and deterrence of registrants.[256]

10 In light of these considerations, Section 213.11H marks a major departure from the
11 prevalent American practice of investing considerable resources in an effort to maximize public
12 awareness of registry information. Both to promote just treatment of persons convicted of sexual
13 offenses and, importantly, to further public-safety goals rather than impeding them, Section
14 213.11H prohibits unrestricted public access and makes registry information available solely for
15 law-enforcement purposes, in order to ensure maximum feasible confidentiality for registry
16 information.[257]

17 A discrete and legitimate need for non-law-enforcement access arises when a school, day-
18 care center, or other organization or person needs to perform a background check on an individual
19 being considered for a position of trust involving contact with a vulnerable population.[258]
20 Commercial services cull criminal-history information from courthouse docket sheets and other
21 open records, but the information available from these sources is frequently incomplete or
22 inaccurate,[259] leaving a justifiable desire for access to more reliable, official sources.[260] Although

---

[255] See, e.g., *Verniero*, supra note 149, 119 F.3d at 1102 (noting that "[r]etribution has been visited by private, unlawful violence and threats . . . .").

[256] Prescott & Rockoff, supra note 132, at 181.

[257] Sorrell v. IMS Health Inc., 564 U.S. 552 (2011), appears to grant First Amendment protection for the disclosure and sale of ostensibly confidential records (in that case the prescribing practices of doctors), but only in a situation where the person concerned acquires the information in a lawful manner; *Sorrell* grants no right of access to the information itself. Because the offense of Unauthorized Disclosure defined by subsection (2) applies only to individuals who obtain or disclose registry information unlawfully, the offense presumably does not raise First Amendment problems.

[258] See LOGAN, ET AL., supra note 242 at § 5.34 (noting that "[c]riminal history background screening is a legitimate step that employers and volunteer organizations take to protect their customers, their employees, their assets, and the public.").

[259] Id., at §§ 5.6, 5.10. Commercial services of this kind are regulated under the Fair Credit Reporting Act (FCRA). 15 U.S.C.A. §§1681 et seq., but the quality of their reports is very uneven. Id.

[260] Employers and others with needs of this sort can turn to NSOPW, the national clearing house specifically maintained as a resource for locating information on persons convicted of a sexual offense. See text at note 15 & note 84, supra. But NSOPW merely directs such inquiries to state-run public websites; the

578

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11H. Access to Registry Information

1    most private-sector employers cannot directly access the FBI's national databases for criminal-
2    history information,[261] a cluster of discrete statutory authorities permits the FBI to share criminal-
3    history information with state and local government agencies responsible for licensing and other
4    background checks in regulated areas, including, for example, day-care and nursing-home workers
5    and others who work with vulnerable populations, such as persons who are disabled.[262]

6          As it currently stands, however, that system does not meet all legitimate background-check
7    needs in every jurisdiction. Some states do not have the kind of licensing regime needed to give
8    them access to FBI databases; their regimes may not apply to all arguably relevant occupations;
9    and volunteer positions may not be covered at all. Responding to concerns like these from
10   organizations that employ staff in a wide range of positions of trust (not only those involving
11   potential sexual abuse), the Attorney General in 2006 proposed widening the options for private-
12   sector direct access to FBI databases, subject to certain privacy safeguards.[263] But Congress did
13   not accept those recommendations, in part because of the risks to privacy when criminal-history
14   information is more widely disseminated.[264]

15         A sex-offense registry offers a possible way to meet the remaining need. But local registries
16   have serious weaknesses as background-check mechanisms. Unless a potential employer collects
17   an applicant's DNA or fingerprints, a local registry is readily subject to false negatives, due to
18   variation in the spelling of names or a job applicant's willful misrepresentation. In any case, local
19   registries, broad as they are, fall far short of reaching all relevant offenses of concern, most of
20   which do not include a sexual element. In the case of nursing homes, for example, federal
21   regulations prohibit the employment of anyone convicted of crimes involving abuse, neglect,
22   exploitation, mistreatment, or misappropriation of property.[265] States typically require criminal

---

information sought cannot be obtained in this way if access to the relevant state's registry is restricted exclusively to law enforcement agencies, as Section 213.11H generally requires.

[261] LOGAN, ET AL., supra note 242, at § 5.37.

[262] Id., at § 5.45. See also National Child Protection Act of 1993, Pub. L. No. 103-209, 107 Stat. 2490 (1993) (allowing businesses or organizations working with children to ask a state agency to check FBI records on employees and volunteers).

[263] See U.S. DEP'T OF JUSTICE, THE ATTORNEY GENERAL'S REPORT ON CRIMINAL HISTORY BACKGROUND CHECKS 7 (2006), available at https://www.bjs.gov/content/pub/pdf/ag_bgchecks_report.pdf.

[264] See U.S. GOV'T ACCOUNTABILITY OFF., GAO-15-162, CRIMINAL HISTORY RECORDS: ADDITIONAL ACTIONS COULD ENHANCE THE COMPLETENESS OF RECORDS USED FOR EMPLOYMENT-RELATED BACKGROUND CHECKS 17 (2015), available at https://www.gao.gov/assets/670/668505.pdf (noting among other concerns, that FBI officials worried that criminal history information made available to the private sector could not be securely protected, with a resulting threat to privacy rights).

[265] 42 C.F.R. § 483.12(a)(3).

579

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11H. Access to Registry Information

1　background checks for all nursing-home employees who have contact with residents, and specify
2　a broad list of offenses for which conviction is a presumptive or conclusive bar to employment—
3　not only sexual offenses, but also homicide, robbery, burglary, abuse of children or the elderly,
4　nonsexual assault, drug offenses, theft, forgery, financial crimes, and fraud.[266] In Pennsylvania,
5　child-safety advocates expressed alarm that the state's sex-offense registries omitted child-abuse
6　allegations known to children's protective services that were determined to be well founded but
7　did not result in criminal prosecution.[267] In sum, because local law-enforcement registries are
8　prone to false negatives and are vastly underinclusive, they cannot possibly serve the legitimate
9　need for a reliable source of needed background-check information.

10　　　At the same time, opening local registries to private-sector inquiries, even if only on a need-
11　to-know basis, endangers the successful reintegration and rehabilitation of ex-offenders, because
12　judgments about disclosure are highly decentralized—initially left to the discretion of county and
13　municipal-level law enforcement, with subsequent protection of confidentiality entrusted to
14　countless private employers and their human-resources personnel. These privacy issues recently
15　led the FBI and Congress to resist wider private-sector direct access to the FBI's criminal history
16　database,[268] and they apply even more strongly in the case of private-sector access to local
17　registries.

---

[266] E.g., CAL. HEALTH & SAFETY CODE § 1569.17 (disqualifying offenses include robbery, sexual battery, child abuse, elder or dependent-adult abuse, arson, and kidnapping); FLA. STAT. ANN. §§ 430.0402, 435.04 (disqualifying offenses include murder, burglary, sexual battery, kidnapping, sexual and nonsexual abuse of minors and other vulnerable populations, forgery, fraud, and identity theft); ILL. ADMIN. CODE tit. 77, § 955.160 & App. C & § 955.275 & App. B (disqualifying offenses, with option to apply for waiver, include assault, burglary, arson, hijacking, cruelty to children, theft, and credit-card fraud); id., § 955.160 & App. A. (disqualifying offenses, with only narrow possibility for waiver, include murder, armed robbery, sexual crimes, and financial exploitation of the elderly); N.Y. EXEC. LAW § 845–b(5) (disqualifying offenses, subject to a narrow exception, include all Class A felonies and any felony involving assault, a sexual offense, larceny, prescription-medication theft, drug offenses, or endangering the welfare of the elderly); 35 PA. STAT. ANN. § 10225.502-503 (disqualifying offenses include controlled-substance offenses, violent crimes, sex offenses, offenses endangering children, theft, and forgery); TEX. HEALTH & SAFETY CODE ANN. § 250.006 (disqualifying offenses include homicide; kidnapping; arson; robbery; sex offenses; injury to a child, elder, or disabled person; money laundering; health-care fraud; burglary; assault; theft; disorderly conduct; and misapplication of fiduciary property).

[267] See JOINT STATE GOVERNMENT COMMISSION, CHILD PROTECTION IN PENNSYLVANIA: PROPOSED RECOMMENDATIONS, REPORT OF THE TASK FORCE ON CHILD PROTECTION (November 2012), available at http://www.childprotection.state.pa.us/ Resources/press/2012-1127%20Child%20Protection%20Report%20FINAL.pdf; Center for Children's Justice, Children's Justice & Advocacy Report: Act 153 of 2014 (Nov. 3, 2014), http://www.c4cj.org/files/cjar1132104backgroundchecks.pdf.

[268] See U.S. GOV'T ACCOUNTABILITY OFF., supra note 264.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

1       Good solutions to the background-check concern are readily available, moreover, without
2  the risks of private-sector access to local registries. If a state's licensing system leaves gaps of the
3  kind just discussed, the obvious answer is simply to fill those gaps directly, by expanding the list
4  of licensed occupations and offenses of concern, after expressly confronting the conflicting public-
5  safety benefits and privacy costs. For example, Pennsylvania recently enacted a comprehensive
6  system that requires every person who seeks access to a position involving contact with children
7  to obtain a background clearance from a state agency and submit it to the employer or organization
8  concerned.[269] Pennsylvania lawmakers designed the system to ensure that background checks do
9  not miss relevant information that might not appear in a sex-offense registry.[270] At the same time
10  the system minimizes the threat to the ex-offender's privacy because the applicant for a position
11  initiates the clearance process and either obtains the necessary certification or simply declines to
12  pursue the job application. Britain's Disclosure and Barring Agency serves a similar purpose and
13  operates in a similar way.[271]
14       Since the relevant needs can be better met in ways that also offer the advantage of stronger
15  oversight, Section 213.11H does not permit non-law-enforcement access to registry information.

16  **SECTION 213.11I. ADDITIONAL COLLATERAL CONSEQUENCES OF CONVICTION**

17  **(1) *Definition*. For purposes of this Section, the term "additional collateral**
18  **consequence" means any collateral consequence, as defined in Section 213.11(1)(b), that is**
19  **applicable primarily to persons convicted of a sexual offense, other than the obligation to**
20  **register with law enforcement specified in Section 213.11A, the associated duties and**
21  **restrictions specified in Sections 213.11C-213.11G, and any restriction on occupation or**
22  **employment required by state law. These additional collateral consequences include any**
23  **government-imposed program or restriction applicable primarily to persons convicted of a**

---

[269] 23 Pa. Cons. Stat. Ann. §§ 6344 *et seq.* These clearances consist of (1) a criminal history report from the Pennsylvania State Police; (2) a child-abuse history certification from the Department of Human Services; and (3) a federal criminal history obtained after submitting fingerprints through the Pennsylvania State Police to the FBI. Id. §§ 6344(b), 6344.2(b). An employer or organization must obtain this documentation from applicants prior to their employment or volunteering and must maintain it on file. Id. § 6344(b.1) & (b.2). The certifications remain valid for five years, after which the employee or volunteer must obtain new clearances. Id. § 6344.4.

[270] See PA. HOUSE J., 2014 Reg. Sess., No. 64 (Oct. 14, 2014), at 1568-1569.

[271] See text at note 55, supra.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

1    sexual offense that restricts the convicted person's occupation or employment except as
2    required by state law; limits the convicted person's education, Internet access, or place of
3    residence; uses methods such as GPS monitoring to track the person's movements; notifies
4    a community organization or entity or a private party that the person resides, works, or
5    studies in the locality; or permits a public or private agency, organization, or person to access
6    registry information, except as authorized by Section 213.11H. An "additional collateral
7    consequence" under this Section does not include a collateral consequence that applies to
8    persons convicted of many different offenses, such as government-imposed limits on voting,
9    jury service, access to public benefits, and other government-imposed penalties, disabilities,
10   and disadvantages that result from conviction of a wide variety of offenses, including but not
11   limited to sexual offenses.

12          (2) *Additional Collateral Consequences Precluded for Persons Not Required to Register.*
13   Notwithstanding any other provision of law, no person shall be subject to an additional
14   collateral consequence, as defined in subsection (1), unless that person has been convicted of
15   a registrable offense and is required to register with law enforcement under Section 213.11A.

16          (3) *Additional Collateral Consequences Precluded for Persons Required to Register.*
17   Notwithstanding any other provision of law, a person required to register with law
18   enforcement under Section 213.11A must not be subject to any government action notifying
19   a community organization or entity or a private party that the person resides, works, or
20   studies in the locality; and must not be subject to any government action permitting a public
21   or private agency, organization, or person to access registry information, except as
22   authorized by Section 213.11H.

23          (4) *Additional Collateral Consequences Available for Persons Required to Register.*
24   Notwithstanding any other provision of law, a person required to register with law
25   enforcement under Section 213.11A may be subject to an additional collateral consequence
26   not specified in subsection (3), but only if an official designated by law, after affording the
27   person notice and an opportunity to respond concerning the proposed additional collateral
28   consequence, determines that the additional collateral consequence is manifestly required in
29   the interest of public safety, after due consideration of:

30          (a) the nature of the offense;
31          (b) all other circumstances of the case;

582

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

1    **(c) the person's prior record; and**

2    **(d) the potential negative impacts of the burden, restriction, requirement, or**
3    **government action on the person, on the person's family, and on the person's**
4    **prospects for rehabilitation and reintegration into society.**

5    **(5) *Limitations*. The designated official who approves any additional collateral**
6    **consequence pursuant to subsection (4) of this Section must determine that the additional**
7    **collateral consequence:**

8    **(a) satisfies all applicable notification requirements set forth in Section**
9    **213.11B;**

10   **(b) is authorized by law;**

11   **(c) is drawn as narrowly as possible to achieve the goal of public safety;**

12   **(d) is accompanied by a written statement of the official approving the**
13   **additional collateral consequence, explaining the need for it, the evidentiary basis for**
14   **the finding of need, and the reasons why a more narrowly drawn restriction,**
15   **disability, or government action would not adequately meet that need; and**

16   **(e) is imposed only for a period not to exceed that permitted under Section**
17   **213.11F for the duties to register and keep the registration current.**

18   **(6) *Confidentiality*. In any proceeding under subsection (4) to consider whether to**
19   **impose an additional collateral consequence, the official responsible for making the**
20   **determination must insure that the identity of the registrant concerned remains confidential.**

21   **Comment:**

22   Section 213.11I determines when conviction for a sexual offense can trigger collateral
23   consequences beyond the basic duties to register with law enforcement and to keep the registry
24   information up to date.

25   Subsection (1), together with Section 213.11(1)(b), defines the operative term "additional
26   collateral consequence" and makes clear that it includes any government action or government-
27   imposed burden or limitation applicable primarily to persons convicted of a sexual offense, other
28   than the basic duties associated with registration itself and any restriction on occupation or
29   employment required by state law. The additional collateral consequences referenced include such
30   common restrictions as limits on a registrant's employment that are not required by state law, and
31   limits on a registrant's education, Internet access, and residency. Also included are the widespread

583

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

### Section 213.11I. Additional Collateral Consequences of Conviction

1   practices of GPS monitoring, notifying community organizations and private citizens that a person

2   previously convicted of a sexual offense is present in the area; and allowing non-law-enforcement

3   agencies and officials to access registry information. These measures are permitted only when

4   authorized under the conditions specified in subsections (2), (3), (4), and (5).

5        Because the "additional collateral consequences" governed by Section 213.11I include

6   only burdens applicable primarily to sex offenses as such, Section 213.11I does not affect collateral

7   consequences triggered by wider categories of offenses, such as the restrictions that many

8   jurisdictions impose on ex-offenders' rights to vote, serve on juries, or receive public benefits.

9        Subsection (2) provides that "additional collateral consequences," as defined, are

10  categorically precluded in the case of persons not subject to registration under Section 213.11A.

11  Subsection (3) identifies two groups of "additional collateral consequences" that are categorically

12  precluded even for persons who *are* subject to registration—namely, any government action

13  notifying a community organization or entity or a private party that the person resides, works, or

14  studies in the area; and any other government action providing or permitting access to registry

15  information by any entity or individual other than a law-enforcement agency or official.

16       Under subsection (4), "additional collateral consequences" not identified in subsection (3)

17  are not categorically prohibited, but they may be imposed only in compliance with the procedures

18  and standards specified in subsections (4) and (5). The person concerned must have notice of the

19  additional collateral consequences proposed and an opportunity to respond. Thereafter, the official

20  designated to make the determination may authorize one or more of the permissible "additional

21  collateral consequences," but only upon finding that each additional consequence is manifestly

22  required in the interest of public safety, after considering all relevant circumstances, including the

23  nature of the offense, the person's prior record, the potential negative impacts of the additional

24  restriction, disability, or government action on the person, the person's family, and the person's

25  prospects for rehabilitation and reintegration into society.

26       Subsection (5) further limits the imposition of additional collateral consequences by

27  requiring that they be authorized by law, drawn as narrowly as possible, and accompanied by a

28  written statement explaining the need for the additional restriction, disability, or government

29  action; its evidentiary basis; and the reasons why a more narrowly drawn additional consequence

30  would be inadequate. In addition, no additional collateral consequence may be imposed for a

31  period that exceeds the duration of the person's registry obligations under Section 213.11F.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

1    Subsection (6) requires that the official responsible for making the determination under
2    subsection (4) must insure that the identity of the registrant concerned remains confidential.

## REPORTERS' NOTES

3    Section 213.11I establishes procedures and standards for imposing additional collateral
4    consequences, beyond those delineated in Sections 213.11A-213.11H. It precludes imposition of
5    any additional collateral consequence on the basis of a conviction for an offense that is not a
6    registrable offense under Article 213. It also precludes two groups of consequences even when the
7    triggering offense *is* registrable: community notification and non-law-enforcement access to
8    registry information. But it authorizes a variety of additional collateral consequences, including
9    restrictions on employment, residency, and Internet access, GPS monitoring, and a number of other
10   restrictions and disabilities, provided that the decision to impose one of these permissible
11   consequences must be made in compliance with the requirements of subsections (4) and (5).

12   *Regarding community notification*, federal SORNA not only requires states to make
13   specified information pertaining to registrants publicly available on the Internet but also, at their
14   own initiative, to take active steps to alert individuals or organizations about the presence of sex-
15   offense registrants in their communities. Direct notification of information pertaining to registrants
16   who reside, work, or are enrolled in a program of study in the locality (other than information
17   exempted from public access, such as registrants' Social Security numbers) must be given
18   regularly to schools, public-housing agencies, and:[272]

19           "Any agency responsible for conducting employment-related
20           background checks …[;]

21           "Social service entities responsible for protecting minors in the child
22           welfare system[;] and

23           "Volunteer organizations in which contact with minors or other
24           vulnerable individuals might occur."

25   Beyond those organizations with a potential need to know, federal SORNA also requires the
26   appropriate local agency to provide direct notification of registrant information to "[a]ny
27   organization, company, or individual who requests such notification …." Moreover, federal
28   SORNA allows any concerned organization or individual to opt to receive this notification as
29   frequently as once every five business days.[273] Many states similarly invest heavily in proactive
30   community notification. In New Mexico, the county sheriff must notify "every licensed daycare
31   center, elementary school, middle school and high school within a one-mile radius of the sex
32   offender's residence," and any member of the public can request registrant information or view it

---

[272] SORNA § 20923(b).

[273] SORNA § 20923(c).

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

1  on the Internet.[274] As in the case of the ability of private individuals and organizations to access
2  registry information at their own initiative, such widespread proactive community notification is
3  virtually unheard of outside the United States.[275]

4       A few states, in disregard of the federal mandate, proactively notify only a narrower list of
5  potentially interested groups. In Minnesota, for example, the extent of community notification
6  varies as a function of "the level of danger posed by the offender, … the offender's pattern of
7  offending behavior, and … the need of community members for information to enhance their
8  individual and collective safety."[276] Thus, for Level 1 registrants, Minnesota law enforcement has
9  discretion to notify other law-enforcement agencies, victims, and witnesses; for Level 2 registrants,
10 law enforcement may notify, in addition, any agencies that serve a population at risk of
11 victimization that are located near the registrants' home, such as educational institutions or day-
12 care centers, as well as individuals likely to be victimized by the registrant; for Level 3 registrants,
13 law enforcement may also notify other members of the community whom the registrant is likely
14 to encounter.[277] The New Jersey scheme is similar: County prosecutors classify registrants into
15 one of three tiers according to the risks they pose. For Tier 1 (low-risk) registrants, only law-
16 enforcement agencies are notified. For Tier 2 (moderate-risk) registrants, schools, licensed day-
17 care centers, summer camps, and registered community organizations are also notified. For Tier 3
18 (high-risk) registrants, the general public is notified as well.[278]

19      Most states, however, proactively notify any organization or individual that requests notice
20 about new registrants and updated new registry information, without requiring a showing of any
21 particular need to know.[279] For example, in Pennsylvania, the state maintains a website listing all
22 registered persons who have been convicted of a sexual offense, with their home and work
23 addresses, the license-plate number of their car, and their sex-offender classification. The website
24 advises those who visit it that the information it provides "could be a significant factor in protecting
25 yourself, your family members, or persons in your care" from the "recidivist acts" of the

---

[274] N.M. Stat. Ann. § 29-11A-5.1.

[275] See text at notes 30-80, supra.

[276] Minn. Stat. Ann. § 244.052 subd. 4(a).

[277] Id. subd. 4(b).

[278] N.J. Stat. Ann. § 2C:7-8.

[279] See "Collateral Consequences," supra note 101. States use different approaches to community notification. Louisiana, for example, requires offenders themselves to notify their neighbors through the mail. La. Stat. Ann. § 15:542.1. In New York, law-enforcement authorities have discretion to share the information more widely. N.Y. Correct. Law § 168-l.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

individuals listed.[280] In a recent year, three million people accessed the site.[281] To further enhance public awareness, the Pennsylvania State Police send out "red alerts" by email to all persons who ask to be informed whenever a registrant in their area adds or deletes a home, work, or school address; in a recent year the State Police sent out almost four million of these red alerts.[282]

The research establishes unambiguously that community notification has no measurable public-safety benefits but acute costs. In several widely reported incidents, persons who had been convicted of a sexual offense have been brutally attacked and even murdered by neighbors who learned of their presence through registration and notification programs.[283] More systematic research has largely depended on registrant self-reports, arguably a reason to discount some of the unfavorable consequences described. Subject to that caveat, however, the studies find extensive evidence of noxious impacts.

Among registrants subject to community notification in Connecticut and Indiana (an undifferentiated group of defendants convicted of any sex offense), 21 percent lost a job because a boss or co-worker learned of their status,[284] 21 percent were forced to move out of their residence because a landlord or neighbor found out, 10 percent had been physically assaulted after community notification had been given, and 16 percent of registrants reported that a member of their household had been threatened, harassed, or assaulted.[285] Roughly half reported fearing for their safety, and a similar proportion said they felt alone and isolated because of community

---

[280] See https://www.pameganslaw.state.pa.us/.

[281] Pennsylvania State Police, Megan's Law Section, 2017 Annual Report, at 5-6, available at https://www.pameganslaw.state.pa.us/Documents/ MegansLaw Annual Report.pdf.

[282] Id.

[283] See Doe v. Pataki, 120 F.3d 1263, 1279 (2d Cir. 1997) (noting "numerous instances in which sex offenders have suffered harm in the aftermath of notification—ranging from public shunning [to] physical attacks, and arson"); *Verniero*, supra, 119 F.3d at 1102 ("[While] incidents of 'vigilante justice' are not common, they happen with sufficient frequency and publicity that registrants justifiably live in fear of them"). See also *Washington State Man Accused of Slaying Two Sex Offenders*, REUTERS, June 5, 2012, available at http://www.nytimes.com/reuters/2012/06/05/us/05reuters-usa-sexoffenders. One of the *amicus* briefs filed in a companion case to Smith v. Doe, 538 U.S. 84, 103 (2003), describes numerous specific instances in which registration laws resulted in sex-offense registrants being subjected to grave physical assault, harassment, threats, loss of employment or loss of housing, including being driven into homelessness or moving out of state; the brief also describes many specific instances in which such laws drove a sex-offense registrant to suicide. Godfrey v. Doe, No. 01-729, October Term 2001, Brief Amicus Curiae of the Public Defender For The State of New Jersey, et al., at 7-21, 2002 WL 1798881 (July 31, 2002).

[284] Jill S. Levenson, David A. D'Amora, & Andrea Hern, *Megan's Law and its Impact on Community Re-Entry for Sex Offenders*, 25 BEHAV. SCI. & L. 587, 594 (2007).

[285] Id.

587

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

1    notification.[286] On a more positive note, 22 percent of the registrants said registration and
2    notification had helped them avoid reoffending, but a larger proportion expressed feelings of
3    hopelessness, with 44 percent of the registrants agreeing with the statement that "no one believes
4    I can change, so why even try."[287]

5         Adverse impacts may be even more widespread among registrants in the highest risk
6    categories.[288] In a sample of high-risk sex-offense registrants in Wisconsin, all but one said that
7    notification made it harder for them to reintegrate into the community.[289] The study found that 83
8    percent had been excluded from a residence, and 57 percent had lost a job because of community
9    notification.[290] More than three-quarters reported being ostracized by neighbors and
10    acquaintances, or either humiliated, harassed, or threatened by community residents or others.[291]
11    In two-thirds of the cases, adverse effects extended to the parents or children of registrants;
12    relatives commonly experienced emotional distress and sometimes had been humiliated or
13    ostracized by acquaintances.[292] Similar findings recur throughout the literature. In a Florida study,
14    35 percent of the sex-offense registrants were forced to move, 27 percent lost their jobs, and 19
15    percent had been harassed.[293] In light of this research and their own on-the-ground experience, a
16    number of states resist public demands for indiscriminate community notification and restrict that
17    measure to a narrow category of registrants determined to be at highest risk of reoffending.[294] In
18    Washington, the state's Sex Offender Policy Board unanimously recommended that "sex offender

---

[286] Id.

[287] Id.

[288] Richard G. Zevitz & Mary Ann Farkas, National Institute of Justice, Sex Offender Community Notification: Assessing the Impact in Wisconsin (Dec. 2000), available at https://www.ncjrs.gov/pdffiles1/nij/179992.pdf.

[289] Id. at 9.

[290] Id. at 10.

[291] Id. at 9.

[292] Id.

[293] Richard Tewksbury, *Collateral Consequences of Sex Offender Registration*, 21 J. CONTEMP. CRIM. JUST. 67, 67-79 (2005). To similar effect, see also Anne-Marie McAlinden, THE SHAMING OF SEXUAL OFFENDERS: RISK, RETRIBUTION AND REINTEGRATION 116 (2007) ("[t]he community's abhorrence and rejection of sex offenders" prevents reintegration); Richard Tewksbury, *Experiences and Attitudes of Registered Female Sex Offenders*, 68 FED. PROBATION 30, 31 (2004) (female sex-offense registrants experienced harassment, as well as loss of jobs, friendships, and residences); Richard Tewksbury & Matthew Lees, *Perceptions of Sex Offender Registration: Collateral Consequences and Community Experiences*, 26 SOC. SPECTRUM 309, 330-333 (2006) (78 percent of sex-offense registrants in Illinois said that restrictions had "impeded their ability to reintegrate into community life").

[294] See, e.g., text at notes 94-99, 276-278, supra.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

1   registration information should be exempt from public disclosure." The Board noted that "this
2   information has been held from public disclosure for decades, and has proven to be in the best
3   interests of the public, of victims of sexual assault, of community safety, and of registered sex
4   offenders—both in terms of facilitating their successful reintegration into the community and in
5   terms of their physical safety."[295]

6       In sum, community notification does much more harm than good. Section 213.11I(3)
7   categorically bars this practice.

8       *GPS monitoring, Internet access, and limits on employment and residency* are not
9   addressed in federal SORNA, and state approaches vary widely. Nearly all states bar persons who
10   have been convicted of a sexual offense from working in particularly sensitive areas of
11   employment (such as teachers and security guards), but the list of excluded occupations is far from
12   uniform.[296] At least 27 states and many municipalities prohibit some or all persons who have
13   committed a sexual offense from living within 500, 1,000, or 2,000 feet of schools, parks,
14   playgrounds and day-care centers.[297] In densely populated counties, such residency restrictions
15   can make it virtually impossible for persons who have been convicted of a sexual offense to live
16   anywhere in the jurisdiction.[298] Some states bar persons who have been convicted of a sexual
17   offense from living close to school-bus stops, a requirement that can preclude them, even in rural
18   areas, from residing almost anywhere in the county.[299] Compounding the burden of such
19   restrictions, parolees are often required as a condition of their parole (and on pain of parole
20   revocation), to obtain employment within 45 days of release, even though community notification

---

[295] WASHINGTON ST. SEX OFFENDER POL'Y BOARD, General Recommendations for Sex Offender Management, 6-7 (2016) https://sgc.wa.gov/sites/default/files/public/sopb/documents general_recommendations.pdf.

[296] See "Collateral Consequences," supra note 101; Geraghty, supra note 102, at 515 (2007).

[297] Id., at 514-515 (summarizing states' residency-restriction laws); accord, Jill Levenson, *Sex Offender Residency Restrictions*, in WRIGHT, supra note 19, at 267, 268 (stating that 30 states impose residency restrictions); "Collateral Consequences," supra note 101 (indicating 22 states that impose residency restrictions). In some states, residency restrictions imposed by municipalities have been held invalid on the ground that they are preempted by state legislation. See, e.g., People v. Diack, 26 N.E.3d 1151 (N.Y. 2015).

[298] See, e.g., Williams v. Dep't of Corr. & Cmty. Supervision, 979 N.Y.S.2d 489 (N.Y. Sup. Ct. 2014) (upholding constitutionality of condition that paroled sex offender not live within 1,000 feet of a school or other places where children congregate; the restriction ruled out virtually all of Manhattan and the Bronx, but court noted that large areas of Brooklyn and Queens remained available). Compare In re Taylor, 343 P.3d 867 (Cal. 2015) (holding that California voter initiative barring all persons who have been convicted of a sexual offense from living within 2,000 feet of schools and playgrounds was unconstitutional as applied to parolees living in San Diego County, because the restriction placed more than 97% of the county's affordable housing off limits).

[299] Richard Tewksbury, *Exile at Home: The Unintended Collateral Consequences of Sex Offender Residency Restrictions*, 42 HARV. C.R.-C.L. L. REV. 531, 533 (2007).

589

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

1   puts employers on alert not to hire them,[300] or to reside in a particular county, even though virtually
2   no housing may be available to them there.[301]

3       At least 17 states require persons who have been convicted of a sexual offense to wear a
4   GPS monitoring device that enables law enforcement to determine their location at all times, and
5   most others require GPS monitoring under some circumstances.[302] Less common for the time
6   being, but worthy of note, are statutes in at least three states (Indiana, Louisiana, and Nebraska)
7   that prohibit persons who have been convicted of a sexual offense from using the Internet to engage
8   in social networking.[303] Instead of imposing a categorical ban on Internet use, a California voter
9   initiative required sex-offense registrants to provide to law enforcement all their email addresses
10  and user names, and to notify authorities within 24 hours of any changes to that information.[304]
11  Alabama recently joined a small group of states taking the lead in another area, imposing chemical
12  castration as a condition of parole after conviction for certain sexual offenses.[305]

13      These burdens and limitations have prompted a host of constitutional challenges. The
14  Supreme Court has held that a complete ban on use of the Internet violates the First Amendment.[306]
15  Many of the other issues have produced conflicting holdings, with little prospect that litigation will
16  abate any time soon.[307] Even where courts have found such restrictions constitutionally

---

[300] See, e.g., State v. Dull, 351 P.3d 641 (Kan. 2015) (considering burden of requirement to secure employment within 45 days as a factor rendering mandatory lifetime supervision unconstitutional as applied to juvenile sex offender).

[301] See text at notes 297-299, 319-322, infra.

[302] See Kamika Dunlap, Sex Offenders After Prison: Lifetime GPS Monitoring? FINDLAW BLOTTER, February 1, 2011; Michelle L. Meloy & Shareda Coleman, GPS Monitoring of Sex Offenders, in WRIGHT, supra note 151, at 243 (reporting that as many as 46 states use GPS monitoring under some circumstances to track persons who have been convicted of a sexual offense). Courts are split on the question whether such monitoring violates the Fourth Amendment. See note 101, supra.

[303] See Charles Wilson, Court Upholds Ind. Facebook Ban for Sex Offenders, ASSOCIATED PRESS, June 25, 2012, available at http://abcnews.go.com/Technology/wireStory/judge-upholds-ind-facebook-ban-sex-offenders-16642465#.T-ikN_LNnio (discussing cases in which courts have held bans on internet use compatible with the First Amendment).

[304] Doe v. Harris, 772 F.3d 563 (9th Cir. 2014) (upholding preliminary injunction against enforcement of this restriction on ground of its likely unconstitutionality under the First Amendment).

[305] See Alan Blinder, What to Know about the Alabama Chemical Castration Law, N.Y. TIMES, June 11, 2019. Other states imposing chemical castration on some paroled sex offenders include California, Florida, Louisiana, and Wisconsin. Id.

[306] Packingham v. North Carolina, supra note 106.

[307] With respect to the constitutionality of mandatory lifetime GPS monitoring of sex offenders, compare Belleau v. Wall, supra note 104 (upholding Wisconsin provision to that effect), with State v. Dykes, 728 S.E.2d 455 (S.C. 2012) (holding South Carolina provision to that effect unconstitutional as a violation of due process). See also note 104, supra.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1  permissible, however, the cases have underscored the overbreadth and unfairness that the
2  restrictions can present both generally and as applied to particular registrants, juveniles and elderly
3  parolees in particular.

4       Overall, the evidence bearing on the impact of these measures establishes with little doubt
5  that they are responsible for wasted law-enforcement effort and misdirected civilian efforts at self-
6  protection, with little to no public-safety payoff, and harsh, criminogenic impact on the registrants
7  themselves.[308] The evidence with respect to particular measures is discussed in the paragraphs that
8  follow.

9       *GPS monitoring* of sex-offense registrants has cost the state of California $60 million
10 annually.[309] Monitoring costs for states and localities involve more than simply the additional
11 dollar outlays. In some jurisdictions, sheriff's deputies and other government employees have had
12 to reduce the time they can devote to other duties, including 9-1-1 dispatch, in order to monitor
13 registrant residences and post eviction notices for those living in impermissible zones.[310] GPS
14 locational monitoring of registrant movements requires law-enforcement agents to spend more
15 time at their computers and less time directly supervising parolees or carrying out other duties in
16 the field.[311] To make matters worse, 99 percent of the GPS alerts received in some jurisdictions
17 have come from low-battery signals or other false alarms; only one percent indicated that a
18 registrant had entered a restricted area.[312] Of course, the low incidence of true alarms would be
19 consistent with the hypothesis that GPS monitoring deters registrants from violating their
20 restrictions, but even if this is the case, the frequency of false alarms means that any such gains
21 come at a high price in terms of required law-enforcement attention.

22      Despite these concerns, GPS monitoring can be justified in discrete situations. Importantly,
23 it can be a preferable alternative to a sentence to incarceration, and it has not been associated with
24 acute criminogenic effects. Section 213.11I therefore does not preclude imposition of this measure,
25 but seeks to prevent its indiscriminate use by requiring compliance with substantive and procedural
26 limitations.

27      With respect to *residency restrictions*, the evidence of possible benefit is similarly
28 disappointing, and in this case the unintended, criminogenic effects have been acute. The
29 Minnesota Department of Corrections found that among persons rearrested after release from
30 prison after serving a sentence for a sexual offense (seven percent of all sex offenders released, a
31 figure far lower than the recidivism rate for other serious crimes), "[n]ot one . . . would likely have

---

[308] See also Reporters' Notes to Sections 213.11A & 213.11H, supra.

[309] See Don Thompson, *California to Change Sex-Offender Tracking*, Associated Press, May 26,
2011, available at http://www.msnbc.msn.com/id/43186851/ns/us_news-.

[310] See Geraghty, supra note 102, at 518.

[311] See Thompson, supra note 309.

[312] Id.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

1    been deterred by a residency restriction law," largely because "[those who] established direct
2    contact with victims . . . were unlikely to do so close to where they lived."[313] The Colorado
3    Department of Corrections found that persons convicted of child molestation who reoffended did
4    not live closer to child-care facilities and schools than individuals without a prior criminal record
5    who were arrested for similar crimes; the Department therefore concluded that "[p]lacing
6    restrictions on the location of … supervised sex offender residences may not deter the sex offender
7    from re-offending and should not be considered as a method to control sexual offending
8    recidivism."[314] Other available evidence on the efficacy of residency restrictions is uniformly to
9    the same effect.[315]

10        These consequences in turn mean negative impacts for public safety because the adverse
11   personal impacts for persons who have been convicted of a sexual offense impede their
12   reintegration into society and aggravate their risks of reoffending. Successful reintegration and
13   law-abiding behavior typically depend on stable living arrangements, supportive family
14   relationships, and steady employment,[316] while poor social support and psychological distress are
15   important risk factors for sexual recidivism.[317] Thus, any direct gains from greater law-
16   enforcement efficacy or from improved public awareness and self-protection may be outweighed
17   by an *increased* likelihood of recidivism.[318]

18        The negative consequences of restricted living arrangements (whether as a direct
19   consequence of residency prohibitions or an indirect effect of community notification) can be
20   dramatic, because these limitations tend to push registrants into socially disorganized,

---

[313] Minn. Dept. of Corr., Residential Proximity & Sex Offense Recidivism in Minnesota 1, 2 (2007), available at http://www.corr.state.mn.us/publications/documents/04-07SexOffenderReport-Proximity.pdf.

[314] Sex Offender Mgmt. Bd., Colo. Dep't of Pub. Safety, Report on Safety Issues Raised by Living Arrangements for and Location of Sex Offenders in the Community 4 (2004), available at http://dcj.state.co.us/ors/pdf/docs/FullSLAFinal.pdf.

[315] See also text at notes 319-323, infra. A recent review of the literature bearing on these issues finds no studies to support a contrary conclusion, but notes methodological weaknesses in the available research and calls for better study design in future research. See U.S. Library of Congress, Federal Research Division, Sex Offender Registration and Notification Policies: Summary and Assessment of Research on Claimed Housing Impacts on Registered Offenders (June 2020).

[316] CUMMING & BUELL, SUPERVISION OF THE SEX OFFENDER (1997); Levenson, *Sex Offender Residence Restrictions*, supra note 137, at 282-283; Elton, supra note 138, at 38 ("community reintegration, therapy, and stability help reduce recidivism among the majority of [sex] offenders").

[317] R.K. Hanson & A. J. R. Harris, *Dynamic Predictors of Sexual Recidivism* (1998), available at http://www.static99.org/pdfdocs/hansonandharris1998.pdf; Levenson, *Sex Offender Residence Restrictions*, supra note 137, at 267, 281.

[318] Prescott & Rockoff, supra note 132, at 181.

592

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

economically disadvantaged communities.[319] In Iowa, residency restrictions barred sex-offense registrants from 98 percent of one county's housing units,[320] and throughout the state many of them became homeless.[321] In one Florida county, restrictions on living near a school-bus stop left only one percent of the county open to residency by sex-offense registrants.[322] At the same time, "research provides little if any support for the effectiveness of residential restriction laws in deterring or preventing sexual offenses."[323]

In sum, residency restrictions have frequent, well-documented adverse impacts on registrants. And (other things being equal) these impacts tend to make recidivism *more likely*.

Many victim advocates share these reservations. They list a wide range of harmful impacts for victims, for example, that "residency restrictions … have inadvertently created a disincentive for victims to disclose [their victimization]."[324] Victims informed about residency restrictions "rolled their eyes, seemingly in exasperation" at the irrelevancy of these laws to their situation.[325]

A state Coalition Against Sexual Assault reported that residency restrictions "have actually impeded public safety because they have reinforced to the public grossly inaccurate depictions of the type of sexual assault risk one is most likely to face. . . . [b]y focusing on the 'stranger danger' myth, people are less aware of a more likely assailant: a person they know. These myths, in turn, have created a public demand for sexual assault risk mitigation (e. g. residency restrictions, offender registries and notification) aimed at particularly scary, but unlikely, threats."[326] Many of these coalitions have "publicly denounced residency restriction laws, describing them as 'irresponsible' and 'counterproductive.'"[327]

---

[319] Tewksbury, *Experiences and Attitudes*, supra note 293, at 533.

[320] See Brian J. Love, *Regulating for Safety or Punishing Depravity? A Pathfinder for Sex Offender Residency Restriction Statutes*, 43 CRIM. L. BULL. 834, 835 (2007).

[321] See Elton, supra note 138, at 38. See also Allison Frankel, *Pushed Out and Locked In: The Catch-22 for New York's Disabled, Homeless, Sex-Offender Registrants,* 129 YALE L.J. F. 279, 285-286 (2019) (noting that because of "the abundance of schools and population density in New York City, … most of the City, and practicably all of Manhattan, [are] off-limits to registrants.")

[322] See Tewksbury, *Experiences and Attitudes*, supra note 293, at 533.

[323] Tewksbury, *Residency Restrictions*, supra note 299, at 539. See also Am. Cor. Ass'n, Resolution on Neighborhood Exclusion of Predatory Sex Offenders (Jan. 24, 2007) (stating that "there is no evidence to support the efficacy of broadly-applied residential restrictions on sex offenders"); Levenson, et al., *Grand Challenges*, supra note 136, at 22 (arguing that restrictions on registrant residency are counterproductive).

[324] Bandy, supra note 151, at 471, 488.

[325] Id., at 490.

[326] Id., at 491-492 (paraphrasing CASA interviewee based in Southwest).

[327] Id., at 492 (explaining that these provisions "provide the public with a false sense of security and serve to reinforce stereotypes about the typical offender and the typical victim").

593

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11I. Additional Collateral Consequences of Conviction

1    Patricia Wetterling, one of the original leaders of the movement for registration and
2 community notification, is equally emphatic. Residency restrictions, she says, are "wrong and
3 ludicrous and make no sense at all. We're putting all our energy on the stranger, the bad guy, and
4 the reality is it's most sex offenses are committed by somebody that gains your trust, or is a friend
5 or relative, and so none of these laws address the real, sacred thing that nobody wants to talk
6 about."[328]    Wetterling adds, "When these guys are released from prison, we want them to succeed.
7 . . . All of these laws they've been passing make sure that they're not going to succeed. They don't
8 have a place to live; they can't get work. Everybody knows of their horrible crime and they've
9 been vilified. There is too much of a knee jerk reaction to these horrible crimes. . . . [T]here is no
10 safe place for these guys. We have not built into the system any means for success . . . ."[329]

11    Unless carefully targeted, therefore, burdens of these kinds almost inevitably aggravate the
12 very dangers that they are intended to allay.

13    In light of these findings, Section 213.11I creates a strong presumption against GPS
14 monitoring, limits on residency, limits on occupation and employment not required by state law,
15 and other restrictive measures applicable specifically to persons who have been convicted of a
16 sexual offense, because these measures can only impede the registrant's prospects for reintegration
17 into society.

18    Different issues are presented when a particular sex-offender restriction is deployed on a
19 carefully targeted basis. To accommodate potentially legitimate needs, subsections (4) and (5)
20 establish a framework for approving on a case-by-case basis specific collateral consequences,
21 additional to those authorized by Sections 213.11A-213.11H. The official making that individual
22 determination is required to give careful consideration to the public-safety need for the particular
23 measure; to weigh that need against its impact on the registrant, the registrant's family, and the
24 registrant's prospects for rehabilitation and reintegration into society; and to ensure that any
25 measure approved is drawn as narrowly as possible to achieve the goal of public safety.

26    This standard will not open the door to routine imposition of additional collateral
27 consequences just because a particular registrant has been found guilty of a very serious offense.
28 For example, an assisted-living facility seeking to avoid hiring an employee who has a prior
29 conviction for a sexual offense does not require affirmative notification or unrestricted access to
30 registry information; ordinary background-check procedures already in place at the national and
31 state levels suffice for that purpose.[330] In contrast, a registrant who has a record of prior convictions
32 for molesting young children might reasonably face a narrowly targeted restriction on living near
33 schools and play areas where young children congregate, provided that the restriction is imposed
34 only after carefully considering all the circumstances.

---

[328] Wetterling & Wright, supra note 161, at 71.

[329] Id., at 76-77, 79.

[330] See Reporters' Note to Section 213.11H, addressing the related issue of whether organizations
of this sort need access to registry information.

594

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11J. Relief from Registration and Other Sentencing Consequences
and Collateral Consequences

1    The important point is that the interests in public safety and successful rehabilitation of
2    registrants require both that the unintended harms of additional collateral consequences be fully
3    appreciated and that they be used sparingly, only in a narrow range of specially compelling
4    circumstances.[331] Subsections (4) and (5) identify the factors that the sentencing judge or other
5    authorized official must weigh in determining whether a particular person should incur such
6    consequences.[332]

7    **SECTION 213.11J. DISCRETIONARY RELIEF FROM REGISTRATION AND OTHER SENTENCING**
8    **CONSEQUENCES AND COLLATERAL CONSEQUENCES**

9    **(1)** *Petition for Discretionary Relief.* **At any time prior to the expiration of any**
10   **sentencing consequences imposed under Section 213.11(3) or any collateral consequences**
11   **applicable primarily to persons convicted of a sexual offense, including the obligation to**
12   **register, the obligation to comply with associated duties, restrictions on occupation or**
13   **employment required by state law, collateral consequences imposed under Section 213.11(4),**
14   **and additional collateral consequences imposed under Section 213.11I(4), the registrant may**
15   **petition the sentencing court, or other authority authorized by law, to order relief from all**
16   **or part of those consequences. If the obligation to register or other consequences arose from**
17   **an out-of-state conviction, the petition may be addressed to a court of general jurisdiction or**
18   **other authority of this state in the place where the person concerned is registered.**

---

[331] Cf. Doe v. Attorney General, 686 N.E.2d 1007 (Mass. 1997) (holding Massachusetts provision linking sex-offense conviction to mandatory registration accompanied by public access and community notification to violate procedural due process in the absence of an individualized risk assessment); State v. Bani, 36 P.3d 1255, 1268 (Haw. 2001) (same). But see Connecticut Department of Public Safety v. Doe, 538 U.S. 1 (2003) (Connecticut's mandatory registration with public access and community notification did not violate procedural due process).

[332] Statutory language is not the place to mandate specific risk-assessment parameters. The sentencing judge or other authorized official will draw on detailed protocols that are evolving and continually refined for this purpose. See, e.g., Grant Duwe, *Better Practices in the Development and Validation of Recidivism Risk Assessments: The Minnesota Sex Offender Screening Tool-4*, 30 CRIM. JUSTICE POLICY REV. 538 (2019); R. Karl Hanson, et al., *The Field Validity of Static-99/R Sex Offender Risk Assessment Tool in California*, 1 J. THREAT ASSESSMENT & MGMT. 102 (2014); R. Karl Hanson & Kelly E. Morton-Bourgon, *The Accuracy of Recidivism Risk Assessments for Sexual Offenders: A Meta-Analysis of 118 Prediction Studies*, 21 PSYCHOL. ASSESSMENT 1 (2009).

595

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11J. Relief from Registration and Other Sentencing Consequences
and Collateral Consequences

1       **(2)** *Proceedings on Petition for Discretionary Relief.* **The authority to which the petition**
2    **is addressed may either dismiss the petition summarily, in whole or in part, or institute**
3    **proceedings to rule on the merits of the petition. If that authority chooses to entertain**
4    **submissions, hear argument, or take evidence prior to ruling on the merits of the petition, it**
5    **must give notice of the proceeding and an opportunity to participate in it to the prosecuting**
6    **attorney for the offense out of which the obligation to register or other consequence arose. If**
7    **the obligation to register or other consequence arose from an out-of-state conviction, notice**
8    **of the proceeding and an opportunity to participate in it must be addressed to the principal**
9    **prosecuting attorney in the jurisdiction of this state where the authority to which the petition**
10   **is addressed is located.**

11      **(3)** *Judgment on Proceedings for Discretionary Relief.* **Following proceedings for**
12   **discretionary relief under subsection (2), the authority to which the petition is addressed may**
13   **grant or deny relief, in whole or in part, from the obligation to register, any associated duties,**
14   **and any of the sentencing consequences or collateral consequences in question. When that**
15   **order terminates the registrant's obligation to register and to keep registry information**
16   **current, subsequent disclosure of registry information is governed by subsection (5) of this**
17   **Section. An order granting or denying relief following those proceedings must explain in**
18   **writing the reasons for granting or denying relief.**

19      **(4)** *Standard for Discretionary Relief.* **The authority to which the petition is addressed**
20   **must grant relief if it finds, after proceedings to rule on the merits pursuant to subsection**
21   **(2), that the sentencing consequence or collateral consequence in question is likely to impose**
22   **a substantial burden on the registrant's ability to reintegrate into law-abiding society, and**
23   **that public-safety considerations do not require continued imposition of the obligation, duty,**
24   **or consequence after due consideration of:**

25          **(a) the nature of the offense;**

26          **(b) all other circumstances of the case;**

27          **(c) the registrant's prior and subsequent record of criminal convictions, if any;**
28      **and**

29          **(d) the potential negative impacts of the burden, restriction, or government**
30      **action on the registrant, on the registrant's family, and on the registrant's prospects**
31      **for rehabilitation and reintegration into society.**

596

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11J. Relief from Registration and Other Sentencing Consequences
and Collateral Consequences

1      **Relief must not be denied arbitrarily or for any punitive purpose.**

2      **(5) *Access to Registry Information after Discretionary Relief*. When an order of**

3      **discretionary relief terminates the person's obligation to register and to keep registry**

4      **information current, all limits on access to registry information under Section 213.11H shall**

5      **remain in effect. Registry information recorded as of the date when discretionary relief takes**

6      **effect must remain available to any government law-enforcement agency seeking disclosure**

7      **of that information in compliance with Section 213.11H(1)(a) but must not otherwise be**

8      **disclosed.**

9      **(6) *Notice to Other Jurisdictions Concerning Discretionary Relief*.**

10         **(a) When discretionary relief is granted to a person under this Section, the**

11         **authority granting the order of relief must, upon the person's request, give notice of**

12         **that order to any other jurisdiction where the person concerned is registered or where**

13         **information about the person has been provided pursuant to Section 213.11D(4).**

14         **(b) When the other jurisdiction notified is a jurisdiction of this state, the notice**

15         **must specify that the other jurisdiction must extend the same relief from registration-**

16         **related duties and any other sentencing consequences or collateral consequences.**

17         **When that order terminates the registrant's obligation to register and to keep registry**

18         **information current, that notice must also specify the limits on subsequent disclosure**

19         **of registry information applicable under subsection (5).**

20     **(7) *Proceedings Subsequent to Discretionary Relief*. An order of discretionary relief**

21     **granted under this Section does not preclude the authority to which the petition was**

22     **addressed from later revoking that order if, on the basis of the registrant's subsequent**

23     **conduct or any other substantial change in circumstances, the authority finds by a**

24     **preponderance of the evidence that public-safety considerations, weighed against the burden**

25     **on the registrant's ability to reintegrate into law-abiding society, no longer justify the order**

26     **of relief.**

27     **(8) *Confidentiality*. In any proceedings under this Section to consider whether to grant**

28     **or deny discretionary relief, the official responsible for making the determination must**

29     **insure that the identity of the registrant concerned remains confidential.**

597

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11J. Relief from Registration and Other Sentencing Consequences
and Collateral Consequences

1    **Comment:**

2        Section 213.11J identifies the standards and procedures for relieving a person from the

3    obligation to register, from the associated duties, or from any other sentencing consequences or

4    collateral consequences. It largely follows the framework applicable generally to petitions for

5    relief from collateral consequences, as specified in the sentencing provisions of the Model Penal

6    Code,[333] with additional detail pertinent to sex-offense consequences. It stipulates that when an

7    order of relief terminates the registrant's obligation to register and to keep registry information

8    current, access to registry information is subsequently limited, in terms specified by subsection

9    (5).

10       Subsection (6) aims to ensure that discretionary relief is communicated to all jurisdictions

11   where a person is registered or where information about the person has been provided pursuant to

12   Section 213.11D(4). When the other jurisdiction notified is a jurisdiction of this state, it must

13   extend similar relief, including the limits on access to registry information specified in subsection

14   (5) and Section 213.11H.

15       In deciding whether to grant discretionary relief, the sentencing judge or other official

16   authorized to make the determination is instructed to consider all the circumstances of the case,

17   including the nature of the offense; the registrant's prior and subsequent criminal record; and the

18   potential negative impacts of the consequence in question on the registrant, on the registrant's

19   family, and on the registrant's prospects for rehabilitation and reintegration into society.

20       Under subsection (8), the official responsible for determining whether to grant or deny

21   discretionary relief must insure that the identity of the registrant concerned remains confidential.

### REPORTERS' NOTES

22       Federal SORNA makes no provision for early relief from registration and its associated

23   duties and restrictions, apart from affording registrants convicted of the least serious sexual

24   offenses who maintain a "clean" record for at least 10 years a limited opportunity for early relief,

25   with longer minimum periods for offenses classified at higher tiers of seriousness.[334] More than

26   half the states provide some opportunity for early termination of registration requirements, though

27   in almost all cases the opportunity is limited to persons convicted of the least serious sexual

---

[333] See *MPCS Statutory Text*, supra note 1, Section 7.04(2) & (3).

[334] See text at note 228, supra.

598

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11J. Relief from Registration and Other Sentencing Consequences
and Collateral Consequences

1  offenses.[335] Many states endorse criteria for relief similar to those specified in Section 213.11J,
2  but some offer even  greater detail. Washington, for example, breaks down the general categories
3  of relevant circumstances into 12 factors and adds that the court may also take into account "[a]ny
4  other factors the court may consider relevant."[336]

5      For discretionary relief, Section 213.11J draws on the early relief provisions of Model
6  Penal Code: Sentencing, Article 7 ("MPCS"), with additional provisions relevant to sex-offense
7  consequences, and with several adjustments to align these relief provisions with implementation
8  details and policy considerations specific to this context:[337]

9      (a) MPCS directs that petitions for relief be addressed to the sentencing court, and this is a
10  common approach among jurisdictions that authorize early relief from sex-offense registry
11  obligations.[338] However, many jurisdictions take a different approach. In some, petitions for relief
12  must be addressed to a court in the jurisdiction where the registrant resides.[339] In some states, the
13  sentencing court acts on the advice on a board of experts;[340] elsewhere the final decision is
14  entrusted to an independent risk-assessment board.[341] In the context of the sexual offenses, it is
15  important to allow for local flexibility in this regard. Section 213.11J endorses that approach.

16      (b) MPCS imposes a daunting burden of proof: an offender subject to collateral
17  consequences can obtain relief only by demonstrating by clear and convincing evidence that the
18  criteria for relief are satisfied. The effect is to create a strong presumption in favor of sustaining a

---

[335] See "Relief from Sex Offender Registration Obligations," http://ccresourcecenter.org/state-restoration-profiles/50-state-comparison-relief-from-sex-offender-registration-obligations/.

[336] WASH. REV. CODE ANN. § 9A.44.142 (2019).

[337] The collateral-consequence provisions of MPCS were not intended to apply without exception to the unique circumstances of sex-offense collateral consequences. See MODEL PENAL CODE: SENTENCING, Section 7.06(4) (AM. L. INST., Official Statutory Text, May 24, 2017) (stating that "[a] certificate of restoration of rights removes all mandatory collateral consequences …, except as provided by Article 213.) See also MODEL PENAL CODE: SENTENCING Section 7.06 Comment *d* (AM. L. INST., Proposed Final Draft, April 10, 2017) (stating that the Section 7.06 provisions concerning relief from collateral consequences are subject to an exception: "for individuals convicted of sexual offenses, the restrictions on relief set forth in Article 213 apply.")

[338] E.g., See, e.g., FLA. STAT. ANN. § 943.0435(11)(a)(2); GA. CODE ANN. § 42-1-19; MICH. COMP. LAWS ANN. § 28.728c(4); N.Y. CORRECT. LAW § 168-o.

[339] E.g., CAL. PENAL CODE § 290.5 (*effective July 1, 2021* ) (petition to court in county in which offender resides); OHIO REV. CODE ANN. § 2950.15 (same).

[340] E.g., 42 PA. STAT. AND CONS. STAT. ANN. § 9799.15(a.2) (sentencing court acts on report of State Sexual Offenders Assessment Board); TEX. CODE CRIM. PROC. ANN. art. 62.404 (sentencing court acts on basis of individual risk assessment conducted by the state's Council on Sex Offender Treatment).

[341] E.g., MD. CODE REGS. 12.06.01.14 (decision by Sex Offender Registry Unit); 803 MASS. CODE REGS. 1.30 (petition to Sex Offender Registry Board).

599

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

Section 213.11J. Relief from Registration and Other Sentencing Consequences
and Collateral Consequences

1     mandatory collateral consequence that by definition was not initially attuned to the situation of the
2     individual offender. This high hurdle has drawn criticism as unduly difficult to meet with respect
3     to collateral consequences generally.[342] It is especially inappropriate in the context of sex-offense
4     sentencing consequences and collateral consequences, because these duties and restrictions carry
5     no strong presumption that they are likely to be sufficiently justified in the first place for the
6     individual registrant. To the contrary, the case for most of the sex-offense consequences in
7     question here is mixed at best, particularly with the passage of time since the registrant's initial
8     registration. Accordingly, for sex-offense consequences, the appropriate burden of proof is not a
9     matter that can be suitably constrained in advance. Subsections (3) and (4) of Section 213.11J do
10    not specify a particular burden of proof and instead leave this decision to the sound discretion of
11    the decisionmaking authority.

12        (c) MPCS sets stiff criteria for granting relief. The offender must show that the
13    consequence in question is (i) not substantially related to the elements and facts of the conviction
14    offense; (ii) likely to impose a substantial burden on the offender's ability to reintegrate into
15    society; *and* (iii) not required by public-safety considerations. In the context of sexual offenses, it
16    will too often be impossible to demonstrate that all three of these criteria are met. Except in rare
17    instances, the sex-offense consequences at issue here will be intrinsically related to the elements
18    and facts of the underlying sexual offense, making the first essential criterion beyond reach in most
19    cases, even when the balance of public-safety considerations and adverse impacts on the registrant
20    clearly warrant relief. Accordingly, Section 213.11J(4) requires that when the decisionmaking
21    authority chooses to rule on the merits of a petition for relief, that decisionmaker must grant relief
22    simply on the basis of a finding that (1) the consequence in question is likely to impose a substantial
23    burden on the registrant's ability to reintegrate into law-abiding society and that (2) public-safety
24    considerations do not require its continued imposition.

25        (d) MPCS permits the decisionmaking authority to deny relief without making any specific
26    finding that the evidence and the relevant criteria warrant that result. And when the decisionmaking
27    authority does grant relief, MPCS does not expressly require that the necessary findings be
28    explained in writing. Section 213.11J(2) specifies that when the decisionmaking authority
29    institutes proceedings to rule on the merits of a petition for relief, an order granting *or denying*
30    relief at the conclusion of those proceedings must explain in writing the reasons for granting or
31    denying relief.

---

[342] See Nora V. Demleitner, *Structuring Relief for Sex Offenders from Registration and Notification Requirements: Learning from Foreign Jurisdictions and from the Model Penal Code: Sentencing*, 30 FED. SENT. RPTR. 317, 321-323 (2018).

600

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

**PERTINENT MODEL PENAL CODE PROVISIONS\***

*\* Pertinent provisions of the 1962 Model Penal Code are reproduced below, numbered as they appear in that Code. These provisions of the 1962 Code are reproduced verbatim, except that the gendered language used in the 1962 Code has been replaced by gender-neutral terms used in the other parts 1962 Code, such as "the person" or "the actor."*

**1.12 Proof Beyond a Reasonable Doubt; Affirmative Defenses; Burden of Proving Fact When Not an Element of an Offense; Presumptions**

**(1) No person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt. In the absence of such proof, the innocence of the defendant is assumed.**

**(2) Subsection (1) of this Section does not:**

**(a) require the disproof of an affirmative defense unless and until there is evidence supporting such defense; or**

**(b) apply to any defense that the Code or another statute plainly requires the defendant to prove by a preponderance of evidence.**

**\*\*\***

**1.13 General Definitions**

**In this Code, unless a different meaning plainly is required:**

**\*\*\***

**(5) "conduct" means an action or omission and its accompanying state of mind, or, where relevant, a series of acts and omissions;**

**(6) "actor" includes, where relevant, a person guilty of an omission;**

**\*\*\***

**(9) "element of an offense" means (i) such conduct or (ii) such attendant circumstances or (iii) such a result of conduct as**

**(a) is included in the description of the forbidden conduct in the definition of the offense; or**

**(b) establishes the required kind of culpability; or**

**(c) negatives an excuse or justification for such conduct; or**

601

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

(d) negatives a defense under the statute of limitations; or

(e) establishes jurisdiction or venue;

(10) "material element of an offense" means an element that does not relate exclusively to the statute of limitations, jurisdiction, venue, or to any other matter similarly unconnected with (i) the harm or evil, incident to conduct, sought to be prevented by the law defining the offense, or (ii) the existence of a justification or excuse for such conduct;

(11) "purposely" has the meaning specified in Section 2.02 and equivalent terms such as "with purpose," "designed" or "with design" have the same meaning;

(12) "intentionally" or "with intent" means purposely;

(13) "knowingly" has the meaning specified in Section 2.02 and equivalent terms such as "knowing" or "with knowledge" have the same meaning;

(14) "recklessly" has the meaning specified in Section 2.02 and equivalent terms such as "recklessness" or "with recklessness" have the same meaning;

(15) "negligently" has the meaning specified in Section 2.02 and equivalent terms such as "negligence" or "with negligence" have the same meaning;

(16) "reasonably believes" or "reasonable belief" designates a belief that the actor is not reckless or negligent in holding.

***


2.02 *General Requirements of Culpability*

(1) *Minimum Requirements of Culpability.* Except as provided in Section 2.05, a person is not guilty of an offense unless the person acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense.

(2) *Kinds of Culpability Defined.*

(a) Purposely.

A person acts purposely with respect to a material element of an offense when:

(i) if the element involves the nature of the person's conduct or a result thereof, it is the person's conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, the person is aware of the existence of such circumstances or the person believes or hopes that

602

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

they exist.

**(b) Knowingly.**

**A person acts knowingly with respect to a material element of an offense when:**

**(i) if the element involves the nature of the person's conduct or the attendant circumstances, the person is aware that the person's conduct is of that nature or that such circumstances exist; and**

**(ii) if the element involves a result of the person's conduct, the person is aware that it is practically certain that the person's conduct will cause such a result.**

**(c) Recklessly.**

**A person acts recklessly with respect to a material element of an offense when the person consciously disregards a substantial and unjustifiable risk that the material element exists or will result from the person's conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.**

**(d) Negligently.**

**A person acts negligently with respect to a material element of an offense when the person should be aware of a substantial and unjustifiable risk that the material element exists or will result from the person's conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.**

**(3) *Culpability Required Unless Otherwise Provided.* When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts purposely, knowingly or recklessly with respect thereto.**

**(4) *Prescribed Culpability Requirement Applies to All Material Elements*. When the law defining an offense prescribes the kind of culpability that is sufficient for the commission of**

603

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears.

**(5)** *Substitutes for Negligence, Recklessness and Knowledge.* When the law provides that negligence suffices to establish an element of an offense, such element also is established if a person acts purposely, knowingly or recklessly. When recklessness suffices to establish an element, such element also is established if a person acts purposely or knowingly. When acting knowingly suffices to establish an element, such element also is established if a person acts purposely.

\*\*\*

**2.03** *Causal Relationship Between Conduct and Result; Divergence Between Result Designed or Contemplated and Actual Result or Between Probable and Actual Result*

**(1) Conduct is the cause of a result when:**

 **(a) it is an antecedent but for which the result in question would not have occurred; and**

 **(b) the relationship between the conduct and result satisfies any additional causal requirements imposed by the Code or by the law defining the offense.**

**(2) When purposely or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the purpose or the contemplation of the actor unless:**

 **(a) the actual result differs from that designed or contemplated, as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm designed or contemplated would have been more serious or more extensive than that caused; or**

 **(b) the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a [just]\* bearing on the actor's liability or on the gravity of the actor's offense.**

**(3) When recklessly or negligently causing a particular result is an element of an offense,**

---

\* The commentary at p.261 n.16 explains: "The word 'just' is in brackets because of disagreement within the Institute over whether it is wise to put undefined questions of justice to the jury…."

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of negligence, of which the actor should be aware unless:

> (a) the actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the probable injury or harm would have been more serious or more extensive than that caused; or

> (b) the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a [just] bearing on the actor's liability or on the gravity of the actor's offense.

(4) When causing a particular result is a material element of an offense for which absolute liability is imposed by law, the element is not established unless the actual result is a probable consequence of the actor's conduct.

## 2.12 *De Minimis Infractions*

The Court shall dismiss a prosecution if, with regard to the nature of the conduct charged to constitute an offense and the nature of the attendant circumstances, it finds that the defendant's conduct:

> (a) was within a customary license or tolerance, neither expressly negatived by the person whose interest was infringed nor inconsistent with the purpose of the law defining the offense; or

> (b) did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or

> (c) presents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense.

The Court shall not dismiss a prosecution under subsection (3) of this Section without filing a written statement of its reasons.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

**210.0 Definitions**

      **\*\*\***

      **(2) "bodily injury" means physical pain, illness or any impairment of physical condition;**

      **(3) "serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ;**

      **(4) "deadly weapon" means any firearm or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury.**

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

# ARTICLE 213

# BLACK LETTER

### SECTION 213.0. GENERAL PRINCIPLES OF LIABILITY; DEFINITIONS

(1) This Article is governed by Part I of the 1962 Model Penal Code, including the definitions given in Section 210.0, except that:

(a) Section 2.11 (the definition of "consent") does not apply to this article.

(b) Subsection (2) of Section 2.08 (Intoxication) does not apply to this article. Instead, the general provisions of the criminal law and rules of evidence of the jurisdiction govern the materiality of the actor's intoxication in determining the actor's culpability for an offense.

*(2) Definitions*

In this Article, unless a different definition is plainly required:

(a) "Sexual penetration" means an act involving penetration, however slight, of the anus or genitalia by an object or a body part, except when done for legitimate medical, hygienic, or law-enforcement purposes.[*]

(b) "Oral sex" means a touching of the anus or genitalia of one person by the mouth or tongue of another person.*

(c) "Sexual contact" means any of the following acts, when the actor's purpose is the sexual arousal, sexual gratification, sexual humiliation, or sexual degradation of any person:

(i) touching the clothed or unclothed genitalia, anus, groin, breast, buttocks, or inner thigh of any person with any body part or object; or

---

[*] Approved by the membership, May 2017.

607

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

(ii) touching any body part of any person with the clothed or unclothed genitalia, anus, groin, breast, buttocks, or inner thigh of any person; or

(iii) touching any clothed or unclothed body part of any person with the ejaculate of any person.

The touching described in paragraph (c) includes the actor touching another person, another person touching the actor or a third party, or another person touching that person's own body. It does not include the actor touching the actor's own body.

(d) "Fondling" means prolonged contact with or manipulation of the genitals, when the actor's purpose is the sexual arousal, sexual gratification, sexual humiliation, or sexual degradation of any person. Fondling requires more than a transient grope or grab. "To fondle" means to engage in fondling.

(e) "Consent"[**]

(i) "Consent" for purposes of Article 213 means a person's willingness to engage in a specific act of sexual penetration, oral sex, or sexual contact.

(ii) Consent may be express or it may be inferred from behavior—both action and inaction—in the context of all the circumstances.

(iii) Neither verbal nor physical resistance is required to establish that consent is lacking, but their absence may be considered, in the context of all the circumstances, in determining the issue of consent.

(iv) Notwithstanding subsection (2)(e)(ii) of this Section, consent is ineffective when given by a person incompetent to consent or under circumstances precluding the free exercise of consent, as provided in Sections 213.1, 213.2, 213.3, 213.4, 213.5, 213.7, 213.8, and 213.9.

(v) Consent may be revoked or withdrawn any time before or during the act of sexual penetration, oral sex, or sexual contact. A clear verbal refusal—such as "No," "Stop," or "Don't"—establishes the lack of

---

[**] Approved by the membership, May 2016.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

consent or the revocation or withdrawal of previous consent. Lack of consent or revocation or withdrawal of consent may be overridden by subsequent consent given prior to the act of sexual penetration, oral sex, or sexual contact.

(f) Force.

(i) "Physical force or restraint" means a physical act or physical restraint that inflicts more than negligible physical harm, pain, or discomfort or that significantly restricts a person's ability to move freely. More than negligible physical harm includes but is not limited to a burn, black eye, or bloody nose, and more than negligible pain or discomfort includes but is not limited to the pain or discomfort resulting from a kick, punch, or slap on the face.

(ii) "Aggravated physical force or restraint" means a physical act or physical restraint that inflicts or is capable of inflicting death, serious bodily injury, or extreme physical pain, or that confines another for a substantial period in a place of isolation other than under color of law.

(g) "Actor" means a person more than 12 years old, except that "actor" includes a person younger than 12 when the charge is Sexual Assault by Aggravated Physical Force or Restraint (Section 213.1). "Actor" includes, where relevant, a person guilty of an omission.

(h) "Registrable offense"

(i) "Registrable offense" means an offense that makes a convicted person eligible for or subject to any of the collateral consequences specified in Section 213.11.

(ii) No offense is a registrable offense under any provision of law unless it is specifically so designated in this Article or is committed in another jurisdiction, is a registrable offense in that jurisdiction, and would be a registrable offense in this jurisdiction if it had been committed in this jurisdiction.

609

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

SECTION 213.1 SEXUAL ASSAULT BY AGGRAVATED PHYSICAL FORCE OR RESTRAINT

(1) *Sexual Assault by Aggravated Physical Force or Restraint*. An actor is guilty of Sexual Assault by Aggravated Physical Force or Restraint when:

(a)   the actor causes another person to submit to or perform an act of sexual penetration or oral sex; and

(b)   the act is without effective consent because:

(i) the actor uses or explicitly or implicitly threatens to use aggravated physical force or restraint against anyone; and

(ii) the actor's use of or threat to use aggravated physical force or restraint causes the other person to submit to or perform the act of sexual penetration or oral sex; and

(c)   the actor knows that the circumstances described in paragraphs (a) and (b) are present.

(2) *Grading*. Sexual Assault by Aggravated Physical Force or Restraint is a registrable offense.  It is a felony of the third degree [*10-year maximum*], except that (1) the maximum term of imprisonment is five years greater than that otherwise applicable to a felony of the third degree; and (2) it is a felony of the second degree [*20-year maximum*] if the actor violates subsection (1) of this Section and in so doing:

(a) knowingly uses or explicitly or implicitly threatens to use a deadly weapon and knows that this act causes the other person to submit to or perform the act of sexual penetration or oral sex; or

(b) knowingly acts with one or more persons who:

(i) also engage in an act or acts of sexual penetration or oral sex with the same victim at the same place at a time contemporaneous with the actor's violation of this Section; or

(ii) assist in the use of or threat to use aggravated physical force or restraint when the actor's act of sexual penetration or oral sex occurs; or

(c) causes serious bodily injury to any person, and is aware of, yet recklessly disregards, the risk of causing such injury.

(3) *Effective consent*. Consent is ineffective under Section 213.0(2)(e)(iv) when the

610

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

other person submitted to or performed the act of sexual penetration or oral sex under the circumstances described in subsection(1)(b). Submission, acquiescence, or words or conduct that would otherwise indicate consent do not constitute effective consent when occurring in a circumstance described in that subsection.  If applicable, the actor may raise an affirmative defense of Explicit Prior Permission according to the terms of Section 213.10.

**SECTION 213.2 SEXUAL ASSAULT BY PHYSICAL FORCE OR RESTRAINT**

(1) *Sexual Assault by Physical Force or Restraint.* **An actor is guilty of Sexual Assault by Physical Force or Restraint when:**

(a) the actor causes another person to submit to or perform an act of sexual penetration or oral sex; and

(b) the act is without effective consent because:

(i) the actor uses or explicitly or implicitly threatens to use physical force or restraint against anyone; and

(ii) the actor's use of or threat to use physical force or restraint causes the other person to submit to or perform the act of sexual penetration or oral sex; and

(c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraphs (a) and (b) are present.

(2) *Grading.* Sexual Assault by Physical Force or Restraint is a felony of the third degree [*10-year maximum*]. It is a registrable offense when the actor has previously been convicted of a felony sex offense.

(3) *Effective consent.* Consent is ineffective under Section 213.0(2)(e)(iv) when the other person submitted to or performed the act of sexual penetration or oral sex under the circumstances described in subsection (1)(b). Submission, acquiescence, or words or conduct that would otherwise indicate consent do not constitute effective consent when occurring in a circumstance described in that subsection. If applicable, the actor may raise an affirmative defense of Explicit Prior Permission according to the terms of Section 213.10.

611

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

SECTION 213.3 SEXUAL ASSAULT OF AN INCAPACITATED, VULNERABLE, OR LEGALLY RESTRICTED PERSON

(1) *Sexual Assault of an Incapacitated Person*. An actor is guilty of Sexual Assault of an Incapacitated Person when:

(a) the actor causes another person to submit to or perform an act of sexual penetration or oral sex; and

(b) the act is without effective consent because at the time of the act, the other person:

(i) is sleeping, unconscious, or physically unable to communicate lack of consent; or

(ii) lacks substantial capacity to appraise, control, or remember the person's own sexual conduct or that of anyone else because of a substance administered to that person, without that person's knowledge or consent; and the actor administered the incapacitating substance for the purpose of causing that incapacity or knows that it was surreptitiously administered by another for that purpose; and

(c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraphs (a) and (b) are present.

Sexual Assault of an Incapacitated Person is a felony of the third degree [*10-year maximum*]. It is a registrable offense when the actor has previously been convicted of a felony sex offense.

(2) *Sexual Assault of a Vulnerable Person*. An actor is guilty of Sexual Assault of a Vulnerable Person when:

(a) the actor causes another person to submit to or perform an act of sexual penetration or oral sex; and

(b) the act is without effective consent because at the time of the act, the other person:

(i) has an intellectual, developmental, or mental disability, or a mental illness, that makes the person substantially incapable of appraising the nature of the sexual activity involved, or of understanding the right to give or withhold consent in sexual encounters, and the actor has no

612

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

similarly serious disability; or

 (ii) is passing in and out of consciousness; or

 (iii) lacks substantial capacity to communicate lack of consent; or

 (iv) is wholly or partly undressed, or in the process of undressing, for the purpose of receiving nonsexual professional or commercial services from the actor and has not given the actor explicit prior permission to engage in that act; and

(c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraphs (a) and (b) are present.

Sexual Assault of a Vulnerable Person is a felony of the fourth degree [*five-year maximum*].

(3) *Sexual Assault of a Legally Restricted Person.* An actor is guilty of Sexual Assault of Legally Restricted Person when:

(a) the actor, who did not have a consensual sexually intimate relationship with the other person at the time that a state-imposed restriction on that person's liberty began, causes the other person to submit to or perform an act of sexual penetration or oral sex; and

(b) the act is without effective consent because at the time of the act, the other person is:

 (i) in custody, incarcerated, on probation, on parole, under civil commitment, in a pretrial release or pretrial diversion or treatment program, or in any other status involving a state-imposed restriction on liberty; and

 (ii) the actor is in a position of actual or apparent authority or supervision over the restriction on the other person's liberty; and

(c) the actor knows that the circumstances described in paragraphs (a) and (b) are present.

Sexual Assault of a Legally Restricted Person is a felony of the fifth degree [*three-year maximum*].

(4) *Effective consent.* Consent is ineffective under Section 213.0(2)(e)(iv) when a condition or circumstance described in subsections (1)(b), (2)(b), or (3)(b) existed at the time

613

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

the other person submitted to or performed the act of sexual penetration or oral sex. Submission, acquiescence, or words or conduct that would otherwise indicate consent do not constitute effective consent when occurring in a condition or circumstance described in these subsections.

### SECTION 213.4. SEXUAL ASSAULT BY EXTORTION

(1) *Sexual Assault by Extortion*. An actor is guilty of Sexual Assault by Extortion when:

> (a) the actor causes another person to submit to or perform an act of sexual penetration or oral sex; and

> (b) the act is without effective consent because the actor explicitly or implicitly threatened:

>> (i) to accuse that person or anyone else of a criminal offense or of a failure to comply with immigration regulations; or

>> (ii) to take or withhold action as an official, or cause an official to take or withhold action, whether or not the purported official has actual authority to do so; or

>> (iii) to take any action or cause any consequence that would cause submission to or performance of the act of sexual penetration or oral sex by someone of ordinary resolution in that person's situation under all the circumstances; and

>> (iv) the actor's threat causes the other person to submit to or perform the act of sexual penetration or oral sex; and

> (c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraphs (a) and (b) are present.

(2) *Grading*. Sexual Assault by Extortion is a felony of the fourth degree [*five-year maximum*].

(3) *Effective consent*.  Consent is ineffective under Section 213.0(2)(e)(iv) when the other person submitted to or performed the act of sexual penetration or oral sex because of a threat described in subsection (1)(b). Submission, acquiescence, or words or conduct

614

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

that would otherwise indicate consent do not constitute effective consent when occurring in a circumstance described in that paragraph. If applicable, the actor may raise an affirmative defense of Explicit Prior Permission under Section 213.10.

SECTION 213.5 SEXUAL ASSAULT BY PROHIBITED DECEPTION

(1) An actor is guilty of Sexual Assault by Prohibited Deception when:

(a) the actor causes another person to submit to or perform an act of sexual penetration or oral sex; and

(b) the act is without effective consent because:

(i) the actor caused the other person to believe falsely that the act had diagnostic, curative, or preventive medical properties; or

(ii) the actor caused the other person to believe falsely that the actor was someone else who was personally known to that person; and

(iii) the actor's deception causes the other person to submit to or perform the act of sexual penetration or oral sex; and

(c) the actor knows that the circumstances described in paragraphs (a) and (b) are present.

(2) *Grading.* Sexual Assault by Prohibited Deception is a felony of the fifth degree [*three-year maximum].*

(3) *Effective consent.* Consent is ineffective under Section 213.0(2)(e)(iv) when the other person submitted to or performed the act of sexual penetration or oral sex because of a circumstance described in subsection (1)(b). Submission, acquiescence, or words or conduct that would otherwise indicate consent do not constitute effective consent when occurring under a circumstance described in that paragraph.

SECTION 213.6. SEXUAL ASSAULT IN THE ABSENCE OF CONSENT

(1) An actor is guilty of Sexual Assault in the Absence of Consent when:

(a) the actor causes another person to submit to or perform an act of sexual penetration or oral sex; and

(b) the other person does not consent to that act; and

615

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

(c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraphs (a) and (b) are present.

(2) *Grading*. Sexual Assault in the Absence of Consent is a felony of the fifth degree [*three-year maximum*], except that it is a felony of the fourth degree [*five-year maximum*] when:

(a) the other person has, by words or actions, expressly communicated unwillingness to submit to or perform the act, or the act is so sudden or unexpected that the other person has no adequate opportunity to express unwillingness before the act occurs; and

(b) the actor is aware of, yet recklessly disregards, the risk that a circumstance described in paragraph (a) existed at the time of the act of sexual penetration or oral sex.

(3) If applicable, the actor may raise an affirmative defense of Explicit Prior Permission under Section 213.10.

SECTION 213.7. OFFENSIVE SEXUAL CONTACT BY PHYSICAL FORCE OR RESTRAINT OR SURREPTITIOUS INCAPACITATION; OFFENSIVE SEXUAL CONTACT

(1) *Offensive Sexual Contact by Physical Force or Restraint or by Surreptitious Incapacitation*. An actor is guilty of Offensive Sexual Contact by Physical Force or Restraint or by Surreptitious Incapacitation when:

(a) the actor knowingly causes another person to submit to or perform an act of sexual contact with any person; and

(b) the act is without effective consent because:

(i) the actor uses or explicitly or implicitly threatens to use physical force or restraint against anyone, and that conduct causes the other person to submit to or perform the act of sexual contact; or

(ii) at the time of the act of sexual contact the other person lacks substantial capacity to appraise, control, or remember the person's own sexual conduct or that of anyone else because of a substance administered to that person, without that person's knowledge or consent; and the actor

616

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

administered the incapacitating substance for the purpose of causing that incapacity or knows that it was surreptitiously administered by another for that purpose; and

(c) the actor is aware of, yet recklessly disregards, the risk that a circumstance described in paragraph (b) is present, and that the other person submitted to or performed the act of sexual contact because of a circumstance described in paragraph (b).

Offensive Sexual Contact by Physical Force or Restraint or by Surreptitious Incapacitation is a felony of the fifth degree [*three-year maximum*].

(2) *Offensive Sexual Contact.* An actor is guilty of Offensive Sexual Contact when:

(a) the actor knowingly causes another person to submit to or perform an act of sexual contact with anyone; and

(b) the other person did not consent to that act, and the actor is aware of, yet recklessly disregards, the risk that the other person did not consent to that act; or

(c) that act is without effective consent because:

(i) the other person is unaware that such act is occurring,  or is physically unable to communicate lack of consent at the time of the act; and the actor is aware of, yet recklessly disregards, the risk that the other person is in that condition at the time of the act; or

 (ii) the act would be an offense as defined by Section 213.3(2) or (3), involving vulnerable or legally restricted persons, had the act been one of sexual penetration or oral sex; or

(iii) the act would be an offense as defined by Section 213.4, involving extortion, had the act been one of sexual penetration or oral sex; or

(iv) the act would be an offense as defined by Section 213.5, involving prohibited deception, had the act been one of sexual penetration or oral sex.

Offensive Sexual Contact is a petty misdemeanor [*six-month maximum*].

(3) *Effective consent.* Consent is ineffective under Section 213.0(2)(e)(iv) when the other person submitted to or performed the act of sexual contact under a circumstance described in subsections (1)(b) or (2)(c). Submission, acquiescence, or words or conduct that would otherwise indicate consent do not constitute effective consent when occurring

617

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

under a circumstance described in those subsections. If applicable, an actor charged with a violation of subsections (1)(b)(i), (2)(b), or (2)(c)(iii) may raise an affirmative defense of Explicit Prior Permission under Section 213.10.

SECTION 213.8. SEXUAL OFFENSES INVOLVING MINORS

(1) *Sexual Assault of a Minor*. An actor is guilty of Sexual Assault of a Minor when:

(a) the actor engages in an act of sexual penetration or oral sex with another person or causes another person to submit to or perform an act of sexual penetration or oral sex; and

(b) the act is without effective consent because at the time of the act:

(i) the other person is younger than 16; and

(ii) the actor is more than five years older than the other person; and

(c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraphs (a) and (b) exist.

Sexual Assault of a Minor is a felony of the fifth degree [*three-year maximum*] except that it is a felony of the fourth degree [*five-year maximum*] when at the time of the act the actor is 21 or older, and it is a felony of the third degree [*10-year maximum*] and a registrable offense when at the time of the act the actor is 21 or older, the other person is younger than 12, and the actor is aware of, yet recklessly disregards, the risk that the other person is younger than 12.

(2) *Incestuous Sexual Assault of a Minor*. An actor is guilty of Incestuous Sexual Assault of a Minor when:

(a) the actor engages in an act of sexual penetration or oral sex with another person or causes another person to submit to or perform an act of sexual penetration or oral sex; and

(b) at the time of the act, the actor is 18 or older and the other person is younger than 18; and

(c) the act is without effective consent because at the time of the act the actor is:

(i) a parent or grandparent of the other person, including a biological, step, adoptive, or foster parent or grandparent; or

618

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

(ii) the legal spouse, domestic partner, or sexual partner of a person described by subparagraph (i); or

(iii) a legal guardian or de facto parent of the other person, who resides intermittently or permanently in the same dwelling as the other person; and

(d) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraphs (a) through (c) exist.

Incestuous Sexual Assault of a Minor is a felony of the third degree [*10-year maximum*]. It is a registrable offense when at the time of the act the other person is younger than 16.

(3) *Exploitative Sexual Assault of a Minor*. An actor is guilty of Exploitative Sexual Assault of a Minor when:

(a) the actor engages in an act of sexual penetration or oral sex with another person or causes another person to submit to or perform an act of sexual penetration or oral sex; and

(b) the act is without effective consent because at the time of the act:

(i) the other person is younger than 18; and

(ii) the actor is more than five years older than the other person; and

(iii) the actor holds a formal position of authority over the other person, such as a teacher, employer, religious leader, treatment provider, administrator, or coach; and

(c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraphs (a) and (b) exist.

Exploitative Sexual Assault of a Minor is a felony of the fifth degree [*three-year maximum*]. It is a defense to a prosecution under Section 213.8(3) for the actor to prove by a preponderance of the evidence that the actor's position of authority over the other person did not impair the other person's ability to form an independent judgment about whether to consent to the act of sexual penetration or oral sex.

(4) *Fondling a Minor*. An actor is guilty of Fondling a Minor when:

(a) the actor knowingly fondles another person, or knowingly causes another person to submit to or perform an act of fondling with anyone; and

619

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

(b) the act is without effective consent because at the time of the act:

(i) the other person is younger than 12 and the actor is more than five years older than the other person; or

(ii) the other person is younger than 16 and the actor is more than seven years older than the other person; and

(c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraph (b)(i) or (ii) exist.

*Grading.* Fondling a Minor is a felony of the fifth degree [*three-year maximum*], except that it is a felony of the fourth degree [*five-year maximum*] when at the time of the act the actor is 21 or older, the other person is younger than 12, and the actor is aware of, yet recklessly disregards, the risk that the other person is younger than 12.

(5) *Aggravated Offensive Sexual Contact with a Minor.* An actor is guilty of Aggravated Offensive Sexual Contact with a Minor when:

(a) the actor knowingly engages in an act of sexual contact with another person or causes another person to submit to or perform an act of sexual contact; and

(b) the act is without effective consent because at the time of the act:

(i) the other person is younger than 18; and

(ii) the actor is more than five years older than the other person; and

(iii) the act, had it been an act of sexual penetration or oral sex, would be an offense as defined by Section 213.1, 213.2, 213.3, 213.4, 213.5, or 213.8(2) or (3); and

(c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraph (b)(i) and (ii) exist.

Aggravated Offensive Sexual Contact with a Minor is a felony of the fourth degree [*five-year maximum*].

(6) *Offensive Sexual Contact with a Minor.* An actor is guilty of Offensive Sexual Contact with a Minor when:

(a) the actor knowingly engages in, or causes another person to submit to or perform:

(i) an act of sexual contact; or

620

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

(ii) an act involving the touching of the tongue of anyone to any body part or object, when that act is for the purpose of anyone's sexual arousal, sexual gratification, sexual humiliation, or sexual degradation; and

(b) the act is without effective consent because at the time of the act:

(i) the other person is younger than 12, and the actor is more than five years older than the other person; or

(ii) the other person is younger than 16, and the actor is more than seven years older than the other person; and

(c) the actor is aware of, yet recklessly disregards, the risk that the circumstances described in paragraph (b)(i) or (ii) exist.

Offensive Sexual Contact with a Minor is a misdemeanor [*one-year maximum*], except that it is a felony of the fifth degree [*three-year maximum*] when at the time of the act the actor is 21 or older, the other person is younger than 12, and the actor is aware of, yet recklessly disregards, the risk that the other person is younger than 12.

(7) *Effective consent*. Consent is ineffective under Section 213.0(2)(e)(iv) when the circumstances described in any of the subsections (1) through (6) exist at the time of the act. Submission, acquiescence, or words or conduct that would otherwise indicate consent do not constitute effective consent when occurring under the circumstances described in any of those subsections.

(8) *Calculation of ages.* The age of any person described in this Section is calculated according to the "days-and-month" approach, which determines age by the day, month, and year of that person's birth, measured in whole numbers.

[(9) *Affirmative defense of marriage.* It is an affirmative defense to a charge under subsections (1), (3), (4), and (6) of this Section, and to a charge under subsection (5)(d) based on an act that would be a violation of subsection (8)(3) had it been an act of sexual penetration or oral sex, that the actor was the legal spouse of the other person at the time of the act of sexual penetration, oral sex, fondling, or sexual contact.]

SECTION 213.9. SEX TRAFFICKING

(1) *Sex Trafficking*. An actor is guilty of Sex Trafficking if the actor knowingly recruits, entices, transports, transfers, harbors, provides, isolates, or maintains a person by

621

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

any means, with the purpose of facilitating a commercial sex act involving that person when:

(a) coercion is being, or will be, used to cause the person to submit to or perform a commercial sex act, which therefore will be without effective consent; and the actor knows that coercion is being or will be used to cause the person to submit to or perform that commercial sex act; or

(b) the person is younger than 18 and is being, or will be, caused to submit to or perform a commercial sex act; and the actor is aware of, yet recklessly disregards, the risk that the person is younger than 18 and is being, or will be, caused to submit to or perform the commercial sex act.

(2) *Definitions*. For purposes of Section 213.9(1):

(a) "Coercion" means:

(i) using or threatening to use physical force or restraint against anyone;

(ii) taking, destroying, or threatening to take or destroy the person's money, credit or debit card, passport, driver's license, immigration document, or other government-issued identification document, including a document issued by a foreign government, or any travel document pertaining to the person;

(iii) restricting or threatening to restrict the person's access to a substance that is a controlled substance under the federal Controlled Substance Act, 21 U.S.C. § 801 et seq.;

(iv) administering or withholding a controlled substance in circumstances that impair the person's physical or mental ability to avoid, evade, or flee from the actor;

(v) using a scheme, plan, deception, misrepresentation, or pattern of behavior for the purpose of causing the person to believe that failing to submit to or perform a commercial sex act would result in physical, psychological, financial, or reputational harm to anyone that is sufficiently serious to cause someone of ordinary resolution who is of the same background, in the same circumstances, and in the same physical and mental

622

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

condition as that person, to submit to or perform a commercial sex act in order to avoid incurring that harm; or

(vi) any combination of these circumstances.

(b) "Commercial Sex Act" means any act of sexual penetration, oral sex, or sexual contact performed in exchange, or the expectation of exchange, for money, property, services, or any other thing of value given to or received by anyone.

(3) *Grading.* Sex Trafficking is a felony of the third degree [*10-year maximum].*

(4) *Effective consent.* Consent is ineffective under Section 213.0(2)(e)(iv) when the circumstances described in subsection (1) are present. Submission, acquiescence, or words or conduct that would otherwise indicate consent do not constitute effective consent when occurring under a circumstance described in that subsection. If applicable, the actor may raise an affirmative defense of Explicit Prior Permission under Section 213.10 when:

(a) a charge of Sex Trafficking is based on coercion under subsection (1)(a); and

(b) the person giving such permission does so before that person has been subjected to trafficking under subsection (1) and before that person has been subjected to coercion under subsection (1)(a).

## SECTION 213.10. AFFIRMATIVE DEFENSE OF EXPLICIT PRIOR PERMISSION

(1) Except as provided in subsection (3), it is an affirmative defense to a charge under this Article that the actor reasonably believed that, in connection with the charged act of sexual penetration, oral sex, or sexual contact, the other party personally gave the actor explicit prior permission to use or threaten to use physical force or restraint, or to inflict or threaten to inflict any harm otherwise proscribed by Sections 213.1, 213.2, 213.4, 213.7, or 213.9, or to ignore the absence of consent otherwise proscribed by Section 213.6.

(2) Permission is "explicit" under subsection (1) when it is given orally or by written agreement:

(a) specifying that the actor may ignore the other party's expressions of unwillingness or other absence of consent;

(b) identifying the specific forms and extent of force, restraint, or threats that

623

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

are permitted; and

> (c) stipulating the specific words or gestures that will withdraw the permission.

Permission given by gestures or other nonverbal conduct signaling assent is not "explicit" under subsection (1).

(3) The defense provided by this Section is unavailable when:

> (a) the act of sexual penetration, oral sex, or sexual contact occurs after the explicit permission was withdrawn, and the actor is aware of, yet recklessly disregards, the risk that the permission was withdrawn;

> (b) the actor relies on permission to use force or restraint or ignore the absence of consent at a time when the other party will be unconscious, asleep, or otherwise unable to withdraw that permission;

> (c) the actor engages in conduct that causes or risks serious bodily injury and in so doing is aware of, yet recklessly disregards, the risk of such injury; or

> (d) at the time explicit permission is given, the other party is, and the actor is aware of, yet recklessly disregards, the risk that the other party is:

> > (i) younger than 18;

> > (ii) giving that permission while subjected to physical force or restraint;

> > (iii) giving that permission because of the use of or threat to use physical force or restraint, or extortion as defined by Section 213.4, if that party does not give the permission;

> > (iv) lacking substantial capacity to appraise or control his or her conduct as a result of intoxication, whether voluntary or involuntary, and regardless of the identity of the person who administered the intoxicants;

> > (v) incapacitated, vulnerable, or legally restricted, as defined by Section 213.3;

> > (vi) subject to prohibited deception, as defined by Section 213.5; or

> > (vii) subject to trafficking, as defined by Section 213.9(1).

624

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

**SECTION 213.11. SENTENCING AND COLLATERAL CONSEQUENCES OF CONVICTION**

 **(1)** *Definitions*. **For purposes of this Article:**

**(a) "sentencing consequences" are penalties, disabilities, or disadvantages that are part of the sentence imposed by the court or by an agency authorized to set the terms of parole or post-release supervision in connection with conviction of an Article 213 offense; and**

**(b) "collateral consequences" are penalties, disabilities, or disadvantages, however denominated, that are authorized or required by federal, state, or local law as a direct result of an individual's conviction of an Article 213 offense but are not part of the sentence imposed by the court or by an agency authorized to set the terms of parole or post-release supervision in connection with that conviction.**

**(2)** *General Rule*. **Sentencing procedure, the authorized disposition of a person convicted of an Article 213 offense, sentencing consequences, and collateral consequences are specified in Articles 6 and 7 of this Code,[*] and are subject to the additional requirements of this Section.**

**(3)** *Additional Requirements for Sentencing Consequences*. **Notwithstanding any contrary provisions of law, the conditions of any suspended sentence under Section 6.02(2), any sentence to probation under Section 6.05, and any terms of parole or post-release supervision under Section 6.13 must be eligible for early relief under Section 213.11J and must not include:**

**(a) a condition that:**

**(i) imposes an obligation to register with law enforcement that carries requirements other than those authorized under Sections 213.11A-213.11G and Section 213.11J;**

**(ii) permits access to the person's registry information, except as authorized under Section 213.11H; or**

**(iii) authorizes or permits any government official to notify a public or private entity or individual, other than a government law-enforcement agency or individual, that the person is registered with law enforcement or resides, works, or studies in the locality;**

---

[*] **MODEL PENAL CODE: SENTENCING**, *Official Statutory Text* (May 24, 2017).

625

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

(b) a condition that restricts the person's occupation or employment, except as required by state law or authorized under paragraph (d) of this subsection; or

(c) except as authorized under paragraph (d) of this subsection, a condition that:

(i) requires the person to submit to GPS monitoring; or

(ii) restricts the person's education, Internet access, or place of residence.

(d) The court, and any agency authorized to set the terms of parole or post-release supervision, may impose a condition, not required by state law, that restricts the person's occupation or employment, or a condition specified in paragraph (c) of this subsection, only if the court or agency determines that the condition is manifestly required in the interest of public safety. That determination must be:

(i) made after due consideration of the nature of the offense; all other circumstances of the case; the person's prior record; and the potential negative impacts of the burden, restriction, requirement, or government action on the person, on the person's family, and on the person's prospects for rehabilitation and reintegration into society; and

(ii) accompanied by a written statement of the official setting the condition, explaining the need for it, the evidentiary basis for the finding of need, and the reasons why a more narrowly drawn condition would not adequately meet that need.

(e) Any condition imposed under paragraph (d) must be:

(i) drawn as narrowly as possible to achieve the goal of public safety; and

(ii) imposed only for a period not to exceed that permitted under Section 213.11F for the duties to register and keep the registration current.

(4) *Additional Requirements for Collateral Consequences that are Applicable Primarily to Persons Convicted of a Sexual Offense*. Notwithstanding any contrary provisions of law, collateral consequences applicable primarily to persons convicted of a sexual offense, including the obligation to register with law enforcement; associated duties; restrictions on occupation and employment, education, and place of residence applicable primarily to

626

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

persons convicted of a sexual offense; and other collateral consequences applicable primarily to persons convicted of a sexual offense, are authorized and their scope and implementation are delineated as follows:

(a) The person's obligation to register for law-enforcement purposes is governed by Section 213.11A.

(b) Notification of the person's obligation to register and associated duties is governed by Section 213.11B.

(c) The time of initial registration is governed by Section 213.11C.

(d) The information required upon registration is specified in Section 213.11D.

(e) The duty to keep registration current is specified in Section 213.11E.

(f) The duration of the registration requirements is specified in Section 213.11F.

(g) Penalties for failure to register are governed by Section 213.11G.

(h) Access to registry information is governed by Section 213.11H.

(i) Collateral consequences applicable primarily to persons convicted of a sexual offense, other than the obligation to register for law-enforcement purposes and restrictions on occupation and employment required by state law, are governed by Section 213.11I.

(j) Standards and procedures for relief from the obligation to register, associated duties, and other collateral consequences applicable specifically to persons convicted of a sexual offense are governed by Section 213.11J.


SECTION 213.11A. REGISTRATION FOR LAW-ENFORCEMENT PURPOSES

(1) *Offenses Committed in This Jurisdiction*

(a) Except as provided in subsection (3), every person convicted of an offense that is designated a registrable offense in this Article must, in addition to any other sanction imposed upon conviction, appear personally and register, at the time specified in Section 213.11C, with the law-enforcement authority designated by law in the [county] where the person resides. If the person who is required to register

627

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

under this subsection does not reside in this jurisdiction, but works in this jurisdiction, registration must be accomplished in the [county] where the person works; if the person does not reside or work in this jurisdiction but is enrolled in a program of study in this jurisdiction, registration must be accomplished in the [county] where the person studies.

(b) Notwithstanding any other provision of law, no conviction for an offense under this Article, or for any other criminal offense in this jurisdiction, will require the person convicted to register with law enforcement or other governmental authority in a registry regime applicable primarily to persons convicted of a sexual offense, unless this Article designates that offense as a registrable offense.

(2) *Offenses Committed in Other Jurisdictions*

(a) *Duty to register and related duties*. Every person currently obliged to register with law enforcement or other pubic authority in another jurisdiction, because of a sexual offense committed in that jurisdiction, who subsequently resides, works, or enrolls in a program of study in this jurisdiction, must register with the law-enforcement authority designated by law and comply with the requirements of Sections 213.11A-213.11G, provided that the offense committed in the other jurisdiction is comparable to an offense that would be registrable under this Article if committed in this jurisdiction.

(b) *Place of registration*. If the person who is obliged to register under paragraph (a) resides in this jurisdiction, registration must be accomplished in the [county] where the person resides. If the person who is obliged to register under paragraph (a) does not reside in this jurisdiction, but works in this jurisdiction, registration must be accomplished in the [county] where the person works; if the person does not reside or work in this jurisdiction but is enrolled in a program of study this jurisdiction, registration must be accomplished in the [county] where the person studies.

(c) *Determining the comparability of in-state and out-of-state offenses*

(i) *Standard*. An offense committed in another jurisdiction is comparable to a registrable offense under this Article if and only if the elements of the out-of-state offense are no broader than the elements of that

628

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

registrable offense. When, regardless of the conduct underlying the out-of-state conviction, the out-of-state offense can be committed by conduct that is not sufficient to establish a registrable offense under this Article, the two offenses are not comparable.

(ii) *Procedure.* Before determining that an offense committed in another jurisdiction is comparable to a registrable offense under this Article, the authority designated to make that determination must give the person concerned notice and an opportunity to be heard on that question, either orally or in writing.

(d) Notwithstanding any other provision of law, no conviction for a sexual offense in another jurisdiction will require the offender to register with law enforcement or other governmental authority in this jurisdiction, unless that conviction currently requires the offender to register with law enforcement or other governmental authority in the jurisdiction where the offense was committed and the conviction is for an offense comparable to an offense that would be registrable under this Article if committed in this jurisdiction.

(3) *Persons under the age of 18.* No person may be subject to the obligation to register under subsection (1) of this Section, to other obligations or restrictions under this Section, or to additional collateral consequences under Section 213.11I, on the basis of a criminal conviction for an offense committed when the person was under the age of 18, or on the basis of an adjudication of delinquency based on conduct when the person was under the age of 18; provided, however, that this subsection (3) does not apply to a person convicted of a criminal offense of Sexual Assault by Aggravated Physical Force or Restraint if the person was at least 16 years old at the time of that offense.

SECTION 213.11B. NOTIFICATION OF THE OBLIGATION TO REGISTER AND ASSOCIATED DUTIES

(1) Before accepting a guilty plea, and at the time of sentencing after conviction on a guilty plea or at trial, the sentencing judge must:

(a) inform the person who is subject to registration of the registration requirement;

629

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

(b) explain the associated duties, including:

(i) the identity and location, or procedure for determining the identity and location, of the law-enforcement agency where the person must appear to register as required by Section 213.11A;

(ii) the duty to register with a law-enforcement agency in any locality where the person subsequently resides, including the possible duty to register with a law-enforcement agency or other government authority in another jurisdiction to which the person subsequently moves;

(iii) the duty to report to that office or agency periodically in person, as required by Section 213.11E(1); and

(iv) the duty to promptly notify at least one of the local jurisdictions where the person is registered of any change in the registry information pertaining to that person, as required by Section 213.11E(2);

(c) notify the person of the right to petition for relief from those duties as provided in Section 213.11J;

(d) confirm that defense counsel has explained to that person those duties and the right to petition for relief from those duties;

(e) confirm that the person understands those duties and that right;

(f) require the person to read and sign a form stating that defense counsel and the sentencing judge have explained the applicable duties and the right to petition for relief from those duties, and that the person understands those duties and that right;

(g) ensure that if the person convicted of a sexual offense cannot read or understand the language in which the form is written, the person will be informed of the pertinent information by other suitable means that the jurisdiction uses to communicate with such individuals; and

(h) satisfy all other notification requirements applicable under Model Penal Code: Sentencing, Section 7.04(1).

(2) At the time of sentencing, the convicted person shall receive a copy of the form signed pursuant to subsection (1)(f) of this Section.

(3) If the convicted person is sentenced to a custodial sanction, an appropriate

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

official must, shortly before the person's release from custody, again inform the person of the registration requirement, explain the associated rights and duties, including the right to petition for relief from those duties, and require the person to read and sign a form stating that those rights and duties have been explained and that the person understands those rights and duties. At the time of release from custody, the person concerned shall receive a copy of that form.

## SECTION 213.11C. TIME OF INITIAL REGISTRATION

A person subject to registration must initially register:

(a) if incarcerated after sentence is imposed, then within three business days after release; or

(b) if not incarcerated after sentence is imposed, then not later than five business days after being sentenced for the offense giving rise to the duty of registration.

## SECTION 213.11D. INFORMATION REQUIRED IN REGISTRATION

(1) A person subject to registration under Section 213.11A must provide the following information to the appropriate official for inclusion in the law-enforcement registry:

(a) the name of the person (including any alias used by the person);

(b) the Social Security number, if any, of the person;

(c) the address of each place where the person resides or expects to reside;

(d) the name and address of any place where the person works or expects to work;

(e) the name and address of any place where the person is a student or expects to be a student;

(f) the license-plate number and a description of any vehicle owned or regularly operated by the person.

(2) *Supplementary Information.* The local jurisdiction in which a person registers must ensure that the following information is included in the registry for that person and

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

kept up to date:

   (a) the text of the provision of law defining the sexual offense for which the person is registered;

   (b) the person's criminal history, including the date and offense designation of all convictions; and the person's parole, probation, or supervised-release status;

   (c) any other information required by law.

  (3) *Registrants Who Lack a Stable Residential Address.* If a person required to register lacks a stable residential address, the person must, at the time of registration, report with as much specificity as possible the principal place where the person sleeps, instead of the information required under subsection (1)(c).

  (4) The local jurisdiction in which a person registers must promptly provide the information specified in subsections (1), (2), and (3) of this Section to an appropriate law-enforcement authority in every other jurisdiction in which the registrant works or expects to work and is enrolled or expects to enroll in a program of study.

  (5) *Correction of Errors.* Each locality where a person registers and each locality that receives information about a registrant pursuant to subsection (4) of this Section must provide efficacious, reasonably accessible procedures for correcting erroneous registry information.  Each locality where a person registers must, at the time of registration, provide the registrant instructions on how to use those procedures to seek correction of registry information that the registrant believes to be erroneous.


## SECTION 213.11E. DUTY TO KEEP REGISTRATION CURRENT

  (1) *Periodic Updates.* A person who is required to register under Section 213.11A must, not less frequently than once every year, appear in person in at least one jurisdiction where the person is required to register, verify the current accuracy of the information provided in compliance with Section 213.11D(1), allow the jurisdiction to take a current photograph, and report any change in the identity of other jurisdictions in which the person is required to register or in which the person works or is enrolled in a program of study.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

**(2)** *Change of Circumstances*

**(a)** Except as provided in paragraph (b) of this subsection, a person subject to registration under Section 213.11A must, not later than five business days after each change of name and each change in the location where the person resides, works, or is enrolled in a program of study, notify at least one local jurisdiction specified in Section 213.11A of:

    **(i)** all changes in the information that the person is required to provide under Section 213.11D, and

    **(ii)** the identity of all other jurisdictions in which the person resides, works, or is enrolled in a program of study.

**(b)** Registrants who lack a stable residential address, and therefore report instead the principal place or places where they sleep, as provided in Section 213.11D(3), must confirm or update those locations once every 90 days but need not do so more often.

**(c)** Each jurisdiction that maintains a registry of persons who have been convicted of a sexual offense must permit registrants to notify the jurisdiction, by one or more reliable, readily accessible methods of communication of the jurisdiction's choosing, such as U.S. mail, submission of an appropriate form online, or otherwise, of any change of name, residence, employment, student status, or vehicle regularly used, and any change in the identity of all other jurisdictions in which the person resides, works, or is enrolled in a program of study.

**(d)** Each jurisdiction where a person registers pursuant to Section 213.11A must advise the registrant, at the time of registration, of the registrant's option to use the means of communication established under subsection (2)(c), rather than appearing personally for that purpose, if the registrant so chooses.

**(3)** The local jurisdiction notified of any changes pursuant to subsections (1) and (2) must promptly provide the registrant a written receipt confirming that the updated information has been provided, and must provide that information to all other jurisdictions in which the person resides, works, or is enrolled in a program of study.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

SECTION 213.11F. DURATION OF REGISTRATION REQUIREMENT

(1) Subject to the provisions of subsection (3) of this Section and Section 213.11J, a person required to register must keep the registration current for a period of 15 years, beginning on the date when the registrant is released from custody after conviction for the offense giving rise to the registration requirement; or if the registrant is not sentenced to a term of incarceration, beginning on the date when the registrant was sentenced for that offense.

(2) At the expiration of that 15-year period, the duty to keep that registration current will terminate; the person who had been registered will not be subject to any further duties associated with that registration requirement; and no public or private agency other than a government law-enforcement agency shall thereafter be permitted access to the person's registry information.

(3) *Early termination.* If, during the first 10 years of the period during which a person is required to keep registration information current, the person:

(a) successfully completes any period of supervised release, probation, or parole, and satisfies any financial obligation such as a fine or restitution, other than a financial obligation that the person, despite good-faith effort, has been unable to pay; and

(b) successfully completes any required sex-offense treatment program; and

(c) is not convicted of, or facing pending charges for, any subsequent offense under this Article, or any subsequent sexual offense in another jurisdiction that would be an offense under this Article if committed in this jurisdiction; then:

the duty to keep that registry information current will terminate; the person who had been registered will not be subject to any further duties associated with that registration requirement; and subsequent access to registry information will be governed by subsection (4).

(4) *Access to Registry Information after Termination.* When the person's obligation to register and to keep registry information current terminates under subsection (2) or (3), subsequent access to registry information is limited as follows:

(a) Registry information recorded as of the date when termination takes effect may remain available to any government law-enforcement agency seeking

634

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

disclosure of that information in compliance with Section 213.11H(1)(a).

(b) Except as provided in paragraph (a), no public or private agency may thereafter be permitted access to registry information concerning the person whose obligation to register and keep registry information public has terminated.

(5) *Notice of Termination*. When a person's duty to register terminates under subsection (2) or (3), the law-enforcement agency in the local jurisdiction where the person resides must:

(a) include in its registry a notice that the person's duty to register and all duties associated with that registration requirement have terminated; and

(b) upon the person's request, notify all other jurisdictions where the person is registered and where information about the registrant has been provided pursuant to Section 213.11D(4) that the person's duty to register and all duties associated with that registration requirement have terminated and that no public or private agency other than a government law-enforcement agency shall thereafter be permitted to have access to that registry information.

(6) *Certification*. When a person's duty to register terminates under subsection (2) or (3), the law-enforcement agency in the local jurisdiction where the person resides must, upon request, provide that person a certificate attesting that person's duty to register and all duties associated with that registration requirement have terminated.

## SECTION 213.11G. FAILURE TO REGISTER

(1) *Offense of Failure to Register*. A person required to register under Section 213.11A is guilty of Failure to Register, a misdemeanor, if that person knowingly fails to register as required by Sections 213.11A, 213.11C, 213.11D, and 213.11E(1), or knowingly fails to update a registration as required by Section 213.11E(2).

(2) *Affirmative Defense*. In a prosecution for Failure to Register under subsection (1) of this Section, it is an affirmative defense that:

(a) circumstances beyond the control of the accused prevented the accused from complying;

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

(b) the accused did not voluntarily contribute to the creation of those circumstances in reckless disregard of the requirement to comply; and

(c) after those circumstances ceased to exist, the accused complied as soon as reasonably feasible.


SECTION 213.11H. ACCESS TO REGISTRY INFORMATION

(1) *Confidentiality*

(a) Each law-enforcement agency with which a person is registered and each law-enforcement agency that receives information about a registrant pursuant to Section 213.11D(4) must exercise due diligence to ensure that all information about the registrant remains confidential, except that relevant information about a specific registrant must be made available to any government law-enforcement agency that requests information to aid in the investigation of a specific criminal offense.

(b) Any disclosure pursuant to paragraph (a) must include a warning that:

(i) the law-enforcement agency receiving the information must exercise due diligence to ensure that the information remains confidential;

(ii) such information may be disclosed and used as provided in paragraph (a), but otherwise must not be disclosed to any person or public or private agency;

(iii) such information may be used only for the purpose requested;

(iv) such information may not be used to injure, harass, or commit a crime against the registrant or anyone else; and

(v) any failure to comply with the confidentiality and use-limitation requirements of paragraph (b) could result in civil or criminal penalties.

(2) *Unauthorized Disclosure of Registry Information*. An actor is guilty of Unauthorized Disclosure of Registry Information if:

(a) the actor, having received registry information as provided in subsection (1), knowingly or recklessly discloses that information, or permits that information to be disclosed, to any person not authorized to receive it; or

(b) the actor obtains access to registry information by computer trespassing or otherwise in violation of law and subsequently knowingly or recklessly discloses

636

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

that information, or permits that information to be disclosed, to any other person.

Unauthorized Disclosure of Registry Information is a felony of the fourth degree [*five-year maximum*].

### SECTION 213.11I. ADDITIONAL COLLATERAL CONSEQUENCES OF CONVICTION

(1) *Definition*. For purposes of this Section, the term "additional collateral consequence" means any collateral consequence, as defined in Section 213.11(1)(b), that is applicable primarily to persons convicted of a sexual offense, other than the obligation to register with law enforcement specified in Section 213.11A, the associated duties and restrictions specified in Sections 213.11C-213.11G, and any restriction on occupation or employment required by state law. These additional collateral consequences include any government-imposed program or restriction applicable primarily to persons convicted of a sexual offense that restricts the convicted person's occupation or employment except as required by state law; limits the convicted person's education, Internet access, or place of residence; uses methods such as GPS monitoring to track the person's movements; notifies a community organization or entity or a private party that the person resides, works, or studies in the locality; or permits a public or private agency, organization, or person to access registry information, except as authorized by Section 213.11H. An "additional collateral consequence" under this Section does not include a collateral consequence that applies to persons convicted of many different offenses, such as government-imposed limits on voting, jury service, access to public benefits, and other government-imposed penalties, disabilities, and disadvantages that result from conviction of a wide variety of offenses, including but not limited to sexual offenses.

(2) *Additional Collateral Consequences Precluded for Persons Not Required to Register.* Notwithstanding any other provision of law, no person shall be subject to an additional collateral consequence, as defined in subsection (1), unless that person has been convicted of a registrable offense and is required to register with law enforcement under Section 213.11A.

(3) *Additional Collateral Consequences Precluded for Persons Required to Register.* Notwithstanding any other provision of law, a person required to register with law enforcement under Section 213.11A must not be subject to any government action notifying

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

a community organization or entity or a private party that the person resides, works, or studies in the locality; and must not be subject to any government action permitting a public or private agency, organization, or person to access registry information, except as authorized by Section 213.11H.

(4) *Additional Collateral Consequences Available for Persons Required to Register*. Notwithstanding any other provision of law, a person required to register with law enforcement under Section 213.11A may be subject to an additional collateral consequence not specified in subsection (3), but only if an official designated by law, after affording the person notice and an opportunity to respond concerning the proposed additional collateral consequence, determines that the additional collateral consequence is manifestly required in the interest of public safety, after due consideration of:

(a) the nature of the offense;

(b) all other circumstances of the case;

(c) the person's prior record; and

(d) the potential negative impacts of the burden, restriction, requirement, or government action on the person, on the person's family, and on the person's prospects for rehabilitation and reintegration into society.

(5) *Limitations*. The designated official who approves any additional collateral consequence pursuant to subsection (4) of this Section must determine that the additional collateral consequence:

(a) satisfies all applicable notification requirements set forth in Section 213.11B;

(b) is authorized by law;

(c) is drawn as narrowly as possible to achieve the goal of public safety;

(d) is accompanied by a written statement of the official approving the additional collateral consequence, explaining the need for it, the evidentiary basis for the finding of need, and the reasons why a more narrowly drawn restriction, disability, or government action would not adequately meet that need; and

(e) is imposed only for a period not to exceed that permitted under Section 213.11F for the duties to register and keep the registration current.

(6) *Confidentiality*. In any proceeding under subsection (4) to consider whether to

638

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

impose an additional collateral consequence, the official responsible for making the determination must insure that the identity of the registrant concerned remains confidential.

## SECTION 213.11J. DISCRETIONARY RELIEF FROM REGISTRATION AND OTHER SENTENCING CONSEQUENCES AND COLLATERAL CONSEQUENCES

(1) *Petition for Discretionary Relief.* At any time prior to the expiration of any sentencing consequences imposed under Section 213.11(3) or any collateral consequences applicable primarily to persons convicted of a sexual offense, including the obligation to register, the obligation to comply with associated duties, restrictions on occupation or employment required by state law, collateral consequences imposed under Section 213.11(4), and additional collateral consequences imposed under Section 213.11I(4), the registrant may petition the sentencing court, or other authority authorized by law, to order relief from all or part of those consequences. If the obligation to register or other consequences arose from an out-of-state conviction, the petition may be addressed to a court of general jurisdiction or other authority of this state in the place where the person concerned is registered.

(2) *Proceedings on Petition for Discretionary Relief.* The authority to which the petition is addressed may either dismiss the petition summarily, in whole or in part, or institute proceedings to rule on the merits of the petition. If that authority chooses to entertain submissions, hear argument, or take evidence prior to ruling on the merits of the petition, it must give notice of the proceeding and an opportunity to participate in it to the prosecuting attorney for the offense out of which the obligation to register or other consequence arose. If the obligation to register or other consequence arose from an out-of-state conviction, notice of the proceeding and an opportunity to participate in it must be addressed to the principal prosecuting attorney in the jurisdiction of this state where the authority to which the petition is addressed is located.

(3) *Judgment on Proceedings for Discretionary Relief.* Following proceedings for discretionary relief under subsection (2), the authority to which the petition is addressed may grant or deny relief, in whole or in part, from the obligation to register, any associated

639

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

duties, and any of the sentencing consequences or collateral consequences in question. When that order terminates the registrant's obligation to register and to keep registry information current, subsequent disclosure of registry information is governed by subsection (5) of this Section. An order granting or denying relief following those proceedings must explain in writing the reasons for granting or denying relief.

(4) *Standard for Discretionary Relief.* The authority to which the petition is addressed must grant relief if it finds, after proceedings to rule on the merits pursuant to subsection (2), that the sentencing consequence or collateral consequence in question is likely to impose a substantial burden on the registrant's ability to reintegrate into law-abiding society, and that public-safety considerations do not require continued imposition of the obligation, duty, or consequence after due consideration of:

(a) the nature of the offense;

(b) all other circumstances of the case;

(c) the registrant's prior and subsequent record of criminal convictions, if any; and

(d) the potential negative impacts of the burden, restriction, or government action on the registrant, on the registrant's family, and on the registrant's prospects for rehabilitation and reintegration into society.

Relief must not be denied arbitrarily or for any punitive purpose.

(5) *Access to Registry Information after Discretionary Relief.* When an order of discretionary relief terminates the person's obligation to register and to keep registry information current, all limits on access to registry information under Section 213.11H shall remain in effect. Registry information recorded as of the date when discretionary relief takes effect must remain available to any government law-enforcement agency seeking disclosure of that information in compliance with Section 213.11H(1)(a) but must not otherwise be disclosed.

(6) *Notice to Other Jurisdictions Concerning Discretionary Relief.*

(a) When discretionary relief is granted to a person under this Section, the authority granting the order of relief must, upon the person's request, give notice of that order to any other jurisdiction where the person concerned is registered or where information about the person has been provided pursuant to Section

640

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

213.11D(4).

(b) **When the other jurisdiction notified is a jurisdiction of this state, the notice must specify that the other jurisdiction must extend the same relief from registration-related duties and any other sentencing consequences or collateral consequences. When that order terminates the registrant's obligation to register and to keep registry information current, that notice must also specify the limits on subsequent disclosure of registry information applicable under subsection (5).**

(7) *Proceedings Subsequent to Discretionary Relief.* **An order of discretionary relief granted under this Section does not preclude the authority to which the petition was addressed from later revoking that order if, on the basis of the registrant's subsequent conduct or any other substantial change in circumstances, the authority finds by a preponderance of the evidence that public-safety considerations, weighed against the burden on the registrant's ability to reintegrate into law-abiding society, no longer justify the order of relief.**

(8) *Confidentiality.* **In any proceedings under this Section to consider whether to grant or deny discretionary relief, the official responsible for making the determination must insure that the identity of the registrant concerned remains confidential.**

# SECTION 213.12. PROCEDURAL AND EVIDENTIARY PRINCIPLES APPLICABLE TO ARTICLE 213

[*reserved*]

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.

© 2021 by The American Law Institute
Material not approved
This draft is subject to discussion, change, and approval at the 2021 Annual Meeting.